law. This is a fraudulent misrepresentation of the law. You also haven't told your passengers of the dozens of health risks of covering their sources of oxygen or that the scientific consensus is that masks are totally worthless in reducing COVID-19 spread. *See* bit.ly/masksarebad. Failing to disclose this information pursuant to the Food, Drug, & Cosmetic Act and your other legal obligations is a fraudulent misrepresentation.

6.  Airlines by federal law are NOT permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement. "In providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment." 49 USC § 41705(a).

7.  An airline may not refuse transportation solely on the basis of a passenger's disability. "As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part." 14 CFR § 382.19(a).

8.  Recipients of federal funds including airlines are prohibited from discriminating against the disabled. "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

9.  Requiring Passengers Not Known to Have a Communicable Disease to Wear a Face Covering: Federal law bans airlines from requiring passengers who do not have a communicable disease to don a face mask. The ACAA, 49 USC § 41705, and its accompanying regulations, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who are known to have a communicable disease. Your mask policy violates these regulations by assuming that every passenger has a communicable disease such as COVID-19. Airlines are prohibited from requiring that a passenger wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR Part 382. Your rules illegally assume every single traveler is infected with COVID-19. This violates the regulation that "In determining whether an individual poses a direct threat, you must make an individualized assessment." 14 CFR § 382.19(c)(1). Your mask policy doesn't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. According to DOT, "If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)." This is the only scenario airlines are permitted to force any passenger to don a face covering.

10. "You must not take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected by this part or the Air Carrier Access Act." 14 CFR § 382.11(a)(4).

11. You are prohibited by federal regulations from forcing a disabled passenger to disclose his/her medical conditions. "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. Generally, you may not

make inquiries about an individual's disability or the nature or severity of the disability," according to DOT. Your mask policy constitutes invasion of privacy, which is illegal.

12. Refusing Transportation to Disabled Passengers Who Are Healthy & Don't Pose a Direct Threat to Anyone: Airlines may not refuse to transport a disabled person who can't wear a face mask when there's no evidence that person is positive for COVID-19 or any other communicable disease."[Y]ou must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2).

13. Breach of Contract: I did not agree to wear a face mask when I bought my ticket. Any mask provisions in your Contract of Carriage are invalid as they violate federal law and international treaties.

14. Reckless Endangerment – Forcing Passengers to Wear Masks in Violation of the Food, Drug, & Cosmetic Act that Are Experimental Medical Devices Proven to Harm Human Health: You are violating the Food, Drug, & Cosmetic Act by not giving passengers our legal option to refuse administration of an FDA unauthorized or emergency medical device (a face mask). 21 USC § 360bbb-3(e)(1)(A)(ii)(III). You may not provide illegal and/or EUA masks to your passengers without informing them use of the device is optional and they must give informed consent. This constitutes reckless endangerment.

15. Practicing Medicine without a License: You are prescribing all passengers to wear FDA unauthorized or EUA medical devices, but you do not have a license to practice medicine. Practicing medicine without a license is illegal in every state.

16. Deceptive & Misleading Trade Practices: You are deceiving your customers regarding mask rules, efficacy, and harms, and attempt to mislead us into believing face coverings are good for our health when the reality is they cause dozens of harms and create chaos in the sky due to oxygen deprivation. "Intent is not an element of either unfairness or deception," according to DOT. 85 Fed. Reg. 78,707 (Dec. 7, 2020). However, it's clear you have an intent to deceive passengers that face masks are effective in reducing COVID-19 spread, are authorized by FDA, etc. You clearly mislead customers that masks may be forced on passengers without their consent in violation of the Food, Drug, & Cosmetic Act. DOT defines an unfair trade practice by airlines as "demonstrating that the harm to consumers is (1) substantial; (2) not reasonably avoidable; and (3) not outweighed by offsetting benefits to consumers or competition." DOT defines a practice as ''deceptive'' by showing that: "(1) The practice actually misleads or is likely to mislead consumers; (2) who are acting reasonably under the circumstances; (3) with respect to a material matter." These requirements are codified at 14 CFR § 399.79. Airlines have a statutory duty not to deceive and mislead their customers. 49 USC § 41712.

17. Nuisance: You deprive disabled passengers who can't wear masks of our constitutional right to travel and our statutory right to use the public airspace. A public nuisance is when a person or corporation unreasonably interferes with a right that the general public shares in common.

18. Infringement on the Constitutional Right to Travel: You deprive disabled Americans and those who refuse to wear masks for health reasons of the ability to fly. In many cases, such as traveling from noncontinental states and territories to other states and territories, as well as going overseas, commercial airplanes are the only means of transportation. The Constitution protects against Americans' infringement on our freedom of movement by government actors and common carriers.

19. Violation of International Covenant on Civil & Political Rights: You require passengers to wear masks without giving our free consent, deprive us of our freedom to travel for not wanting to obstruct our breathing, curtail the liberty of movement, prevent us from entering or exiting our country of citizenship, and unlawfully interfere with our privacy. The United States has ratified the International Covenant on Civil & Political Rights, which makes it binding treaty law upon all persons and corporations in our country. "[N]o one shall be subjected without his free consent to medical or scientific experimentation." ICCPR Art. 7. "No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." ICCPR Art. 9. "1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement ... 2. Everyone shall be free to leave any country, including his own. 3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law… 4. No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art. 12. "1. No one shall be subjected to arbitrary or unlawful interference with his privacy … 2. Everyone has the right to the protection of the law against such interference or attacks." ICCPR Art. 17.

**RE: [EXTERNAL] Request for Mask Exemption**

1 message

---

**Mask Exception** <MaskException@united.com>     Plaintiffs' Exhibit 69     Thu, Oct 14, 2021 at 3:02 PM
To: CJRZ <cjrz123@gmail.com>

Hello Ms. Russo,

Thank you for contacting United Airlines, Inc. ("United") regarding your request for an exemption from our face mask policy for your upcoming trip. After review of the request, we have declined your request for a face mask exception because the documentation you submitted was either incomplete. This decision was made in accordance with the Center for Disease Control Order, dated January 29, 2021, Transportation Security Administration Security Directive 1544-21-02, dated January 31, 2021, and the Air Carrier Access Act and its implementing regulations at 14 CFR 382.

United's form complies with CDC, TSA and DOT directives/guidance. A passenger that is not wearing a mask poses a direct threat to the health and safety of others, so we are able to require that the form be filled out. This allows us to determine if the direct threat can be reasonably mitigated by employing alternative measures to accommodate other passengers.


I understand that you may not want to fill out the form, there are 2 options

1 – If you want to travel, you will then need to wear a mask

2 – if you are not able to wear a mask and unable to travel, we can cancel and return the miles to your account – fee waived

We understand this decision may impact your travel plans.

Regards,

Wendy Marzullo
United Airlines

---

**From:** CJRZ <cjrz123@gmail.com>
**Sent:** Thursday, October 14, 2021 1:50 PM
**To:** Mask Exception <MaskException@united.com>
**Subject:** [EXTERNAL] Request for Mask Exemption


This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.


Hello,


Attached please find the completed form requesting a mask exemption for my upcoming trip.


Sincerely,

Cindy Russo

(908) 797-8066

---

🌐 **CDC Order Wearing of face masks while on conveyances and at transportation hubs 321.html**

**RE: [EXTERNAL] Flight GZP7YS**

1 message

---

**Mask Exception** <MaskException@united.com>                                              Wed, Oct 27, 2021 at 1:06 PM
To: CJRZ <cjrz123@gmail.com>

Hello Ms. Russo,

I did add a note to your reservation that your mask exception was denied which would not interfere with you checking in for your flight.

Regards,

Wendy

---

**From:** CJRZ <cjrz123@gmail.com>
**Sent:** Wednesday, October 27, 2021 1:57 PM
**To:** Mask Exception <MaskException@united.com>
**Subject:** [EXTERNAL] Flight GZP7YS

This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.

Hello,

I received a notice to check in for my upcoming flight on Oct 28th and when I tried to do that I received the following message.



Would you know if this has anything to do with my application for a mask exception?  I'd like to understand what this is about before arriving at the airport.  I have been corresponding with Wendy Marzullo.


Thank you,

Cindy Russo

(908) 797-8066

Plaintiffs' Exhibit 70

10:35 a.m.

Burbank (BUR)

12:01 p.m.

San Francisco (SFO)

Fare class: United Economy (XN)

Duration: 1h 26m

*Flight UA5655 is operated by Skywest Airlines*

Aircraft: Canadair Regional Jet

0h 59m CONNECTION

Depart

October 28, 2021

1:00 p.m.

San Francisco (SFO)

Arrival

October 28, 2021

9:29 p.m.

New York/Newark (EWR)

Flight info

Flight: UA 2324

Fare class: United Economy (XN)

Duration: 5h 29m

Aircraft: Boeing 757-200

## Plaintiffs' Exhibit 71

Depart
November 1, 2021
12:00 p.m.
New York/Newark (EWR)

↑

Arrival
November 1, 2021
3:15 p.m.
San Francisco (SFO)

Flight info
Flight: UA 414
Fare class: United Economy (XN)
Duration: 6h 15m
Aircraft: Boeing 777-300ER

───── 0h 50m CONNECTION ─────

Depart
November 1, 2021
4:05 p.m.
San Francisco (SFO)

↑

Arrival
November 1, 2021
5:21 p.m.
Burbank (BUR)

Flight info
**Flight: UA 1822**
Fare class: United Economy (XN)
Duration: 1h 16m
**Aircraft: Airbus A319**

Your safety is our top priority. Learn more about how we're providing a safer, cleaner travel experience at **united.com/cleanplus**

**Airconsumer Acknowledgement**    Plaintiffs' Exhibit 72

1 message

---

**airconsumer@dot.gov** <airconsumer@dot.gov>                                    Fri, Oct 15, 2021 at 12:39 AM
To: cjrz123@gmail.com

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel.  As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

   PERSONAL INFO:
   Passenger - Cindy Russo cjrz123@gmail.com

   CONTACT INFO:
   Santa Clarita,CA

   Home Phone:
   Daytime Phone: 908-797-8066

   COMPLAINT INFO:
   Airline Code: UA

   Flight Date: 10/28/2021
   Flight Itinerary: BUR-SFO-EWR

   Description of Problem/Inquiry/Comment:
   United Airlines violated the Air Carrier Access Act and numerous other laws by refusing to grant me a mask exemption for my Oct. 28, 2021, flights BUR-SFO-EWR and returning Nov. 1. United fraudulently informed me "federal law" requires each person to wear a mask while flying. However, Congress has never passed such a law, nor has DOT or any other agency promulgated a regulation. United cites no provision of the U.S. Code or the Code of Federal Regulations to support its false claim that "federal law" requires face coverings.  I can't wear a mask due to my medical conditions. United required me to submit an exemption request in advance, which is illegal. "As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight." 14 CFR § 382.25.  I submitted the form despite it being unlawful to request advance notice. I included a doctor's note that I shall not wear a mask. I wrote that United's mask policy is illegal in at least 19 ways including that airlines by federal law are NOT permitted to impose certain requirements or conditions on a person requesting an exemption from the mask mandate. 49 USC § 41705(a).  United may not require a medical certificate from disabled passengers who ask for a mask exemption. "[Y]ou must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a).  United may not require disabled passengers needing a mask exemption to undergo a medical screening since they may not ask for a medical certificate. 14 CFR § 382.23(d).  United may not change a disabled passenger's travel dates and/or flights. "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17. United also may not change the seat assignment of a mask-exempt passenger. "As a carrier, you must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability...." 14 CFR § 382.87(a).  United may not require disabled passengers who seek a mask exemption to submit a negative COVID-19 test. No ACAA provision (nor any other law) permits airlines to require passengers submit a negative virus test. And mandating that only disabled flyers submit a COVID-19 test is illegal discrimination. 14 CFR § 382.11(a)(1) & 49 USC § 41705.  United denied my mask-exemption request, falsely claiming it is obeying the ACAA. United must be fined for violating the ACAA. DOT must also enjoin United from continuing to require numerous illegal steps to obtain a mask exemption.


   This is System generated message, and a response to this email will not be delivered. 10/15/2021 03:39:27

Plaintiffs' Exhibit 73

tsa.gov

## Civil Rights | Transportation Security Administration

2 minutes

TSA security screening policies, procedures and practices must comply with all applicable civil liberties and civil rights laws, regulations, executive orders and policies and must not discriminate against travelers on the basis of race, color, national origin, sex, religion, age, disability, genetic information, sexual orientation and parental status.

### The Disability and Multicultural Branches:

- Promote respect for civil rights and civil liberties in policy and training creation and implementation;

- Educate TSA personnel at headquarters and in the field on TSA's civil rights and liberties responsibilities to the public;

- Collaborate with organizations and advocacy groups through TSA's Disability and Multicultural Coalition to identify promising practices for TSA's nondiscriminatory delivery of security, custody, and customer-service programs and activities; and

- Investigate and resolve civil rights and civil liberties complaints filed by the public alleging discrimination in TSA's security screening activities at federalized airports.

The Disability Branch addresses disability-based complaints under Section 504 of the Rehabilitation Act. See the Disabilities and Medical Conditions page for more information.

The Multicultural Branch addresses complaints alleging discrimination on the bases of race, color, national origin, sex/gender (including gender identity, sexual orientation and parental status), religion, and age. See the Multicultural page for more information.

Plaintiffs' Exhibit 74

fbi.gov

# Terrorist Screening Center | Federal Bureau of Investigation

4-5 minutes

---

**Terrorist Screening Center**



**About the Terrorist Screening Center**

Following the terrorist attacks of September 11, 2001, the President and Congress mandated that federal executive departments and agencies share terrorism information with those in the counterterrorism community responsible for protecting the homeland. In 2003, the Terrorist Screening Center (TSC) was created to fulfill that mandate.

The Terrorist Screening Center, a multi-agency center administered by the FBI, is the U.S. Government's consolidated counterterrorism watchlisting component and is responsible for the management and operation of the Terrorist Screening Database, commonly known as "the watchlist."

The watchlist is a single database that contains sensitive national security and law enforcement information concerning the identities of those who are known or reasonably suspected of being involved in terrorist activities. The TSC uses the watchlist to support front-line screening agencies in positively identifying known or suspected terrorists who are attempting to obtain visas, enter the country, board an aircraft, or engage in other activities.

The TSC is a vital part of the U.S. Government's counterterrorism early warning and interdiction network.

You can learn more about the Terrorist Screening Center by reviewing answers to our frequently asked questions.



**Protecting Privacy and Safeguarding Civil Liberties**

The TSC is dedicated to ensuring watchlisting and screening activities are conducted in a manner consistent with protecting privacy and civil liberties. Individuals are included in the watchlist when there is reasonable suspicion to believe that a person is a known or suspected terrorist. Individuals are not watchlisted based solely on race, ethnicity, national origin, religious affiliation, or any First Amendment-protected activities such as free speech, the exercise of religion, freedom of press, freedom of peaceful assembly, and petitioning the government for redress of grievances.

And the TSC regularly conducts comprehensive and case-specific quality assurance reviews of data in the Terrorist Screening Database to ensure the U.S. Government's substantive criteria for watchlisting is met and to ensure the records maintained in the watchlist are current, accurate, and thorough.

### The Terrorist Screening Center and Redress

The Department of Homeland Security's Traveler Redress Inquiry Program (DHS TRIP) provides the public with a single point of contact for individuals who have inquiries or seek resolution regarding difficulties they experience during travel screening at transportation hubs, such as being incorrectly delayed, denied boarding, identified for additional screening, or any other difficulties while traveling or seeking entry into the country. Since there are many reasons why a traveler may seek redress, DHS TRIP works with the TSC, as appropriate, when an inquiry appears to be related to the watchlist.

The TSC does not accept redress inquiries directly from the public. Instead, members of the public should contact the relevant screening agency with their questions or concerns about screening. The screening agency is in the best position to identify and resolve issues related to that agency's screening process. Information on how to contact screening agencies is listed below:

- For more information, or to file a redress request related to travel, please see the DHS TRIP website.

- The State Department's Bureau of Consular Affairs website provides information on how to seek redress for the denial of a visa. Individuals who are overseas should contact the U.S. embassy or consular office abroad regarding visa issues.

Since the Terrorist Screening Database is derived from classified intelligence and/or sensitive law enforcement information, the Terrorist Screening Center cannot confirm or deny whether any individual may be included in the watchlist. Disclosure of such information would significantly impair the government's ability to investigate and mitigate terrorism, and expose sensitive national security information.

Plaintiffs' Exhibit 101

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.

---

NOTICE OF ENFORCEMENT POLICY:
ACCOMMODATION BY CARRIERS OF PERSONS WITH DISABILITIES
WHO ARE UNABLE TO WEAR OR SAFELY WEAR MASKS WHILE ON
COMMERCIAL AIRCRAFT

---

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation (DOT or the Department), is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019 (COVID-19).  OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act (ACAA)[1] and the Department's implementing regulation in 14 CFR Part 382 (Part 382) to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

To carry out the Executive Order on Promoting COVID-19 Safety in Domestic and International Travel (Executive Order),[2] the Centers for Disease Control and Prevention (CDC) issued an order on January 29, 2021 (CDC Order)[3] that, among other things, requires U.S. and foreign air carriers to use their best efforts to ensure that persons on flights to, within, or from[4] the United States wear a mask for the duration of travel, including when boarding and disembarking aircraft. The CDC Order exempts certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask

---

[1] The ACAA, signed into law in 1986, prohibits discrimination by airlines against individuals with disabilities in commercial air transportation.  The Americans with Disabilities Act, signed into law after the ACAA in 1990, prohibits discrimination against individuals with disabilities in employment, state or local government, public accommodations, commercial facilities, telecommunications, and transportation other than by commercial airlines.

[2] Exec. Order No. 13998, 86 FR 7205 (Jan. 26, 2021).

[3] Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b): Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (CDC Order), *available at* https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf.

[4] CDC Order specifies that "[c]onveyance operators must also require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons onboard (passengers or conveyance operators) will return to the United States while this Order remains in effect." CDC Order at 9.

because of the disability.[5] However, it allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability.  Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks.[6]  The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD.  At the same time, the ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability. This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

<u>Background</u>

SARS-CoV-2, the virus that causes COVID-19, spreads most often when an infected person coughs, sneezes, or talks, and droplets from the infected individual's mouth or nose are spread through the air and come in contact with people nearby.[7]  Persons with COVID-19 infection may have symptoms of fever, cough, or shortness of breath,[8] or they may be asymptomatic[9] or pre-symptomatic[10] but still able to spread the virus.[11]  CDC has made clear that appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.[12]

---

[5] CDC Order at 4 and 5 (noting that this is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to disability).

[6] TSA Security Directive 1544-21-02: Security Measures – Face Mask Requirements (January 31, 2021).

[7] *See* Ctrs. for Disease Control & Prevention, *How COVID Spreads*, CDC.gov (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Ctrs. for Disease Control & Prevention, *Considerations for Wearing Masks*, CDC.gov (last updated Dec. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[8] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus*, CDC.gov (last updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[9] An asymptomatic case is an individual infected with SARS-CoV-2, who does not exhibit symptoms during the course of infection.   Ctrs. for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, CDC.gov (last updated Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[10] A pre-symptomatic case of COVID-19 is an individual infected with SARS-CoV-2, who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection.  *COVID-19 Pandemic Planning Scenarios*, *supra* note 8.

[11] *See How COVID Spreads* and *Considerations for Wearing Masks*, *supra* note 6.

[12] CDC Order at 6.

As of January 27, 2021, there have been over 99 million confirmed cases of COVID-19 globally and over 25 million confirmed cases of COVID-19 in the United States, with over 2 million deaths globally and over 400,000 deaths in the United States due to the disease.[13]  To slow the spread of COVID-19, on January 21, 2021, President Biden issued Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-wearing in domestic and international transportation.  The Executive Order further provides that the heads of agencies may make categorical or case-by-case exceptions to policies developed under the order, consistent with applicable law, to the extent that doing so is necessary or required by law.

Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.[14]  To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator.  The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.[15]

In response to COVID-19, U.S. and foreign air carriers generally have implemented policies requiring passengers to wear masks onboard aircraft even before the issuance of the Executive Order and the CDC Order.  Some carriers have adopted policies that expressly allow "no exceptions" to the mask requirement other than for children under the age of two.[16]  OACP has

---

[13] *Id.* at 5.

[14] 42 U.S.C. 12102(4).  OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation.   See also CDC Order at 4 and 5.

[15] CDC Order at 4. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

[16] It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others.  *See* Ctrs. for Disease Control & Prevention, *Information for Pediatric Healthcare Providers*, CDC.gov (last updated Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-

received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a "no exceptions allowed" mask policy.

The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth.[17] The CDC Order provides that a mask is not required in circumstances where an individual is "unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to wear the mask without assistance."[18] The Order notes that individuals may remove masks "who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask"."[19] Also, individuals with acute illness may remove the mask if it "interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask."[20] CDC will issue additional guidance regarding persons who cannot wear a mask on the basis of disability.[21] Individuals who have a physical or mental impairment that substantially limits one or more major life activities are individuals with a disability for purposes of the ACAA and Part 382.[22]

<u>Legal Authority</u>

The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability.[23] When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities, provided that the modifications would not constitute an undue burden or fundamentally alter the airline's program.[24]

Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that

---

ncov/hcp/pediatric-hcp.html (stating that "[r]ecent evidence suggests that compared to adults, children likely have similar viral loads in their nasopharynx, similar secondary infections rates, and can spread the virus to others").

[17] Considerations for Wearing Masks, *supra* note 6.

[18] CDC Order at 4.

[19] CDC Order at 4 (footnote 7).

[20] CDC Order at 4 (footnote 7).

[21] CDC Order at 5 (footnote 9).

[22] 49 U.S.C. 41705(a); 14 CFR 382.3.

[23] 49 U.S.C. 41705(a); 14 CFR 382.11.

[24] 14 CFR 382.13.

4

the individual would pose a "direct threat" to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible.[25]  To support a determination that an individual poses such a direct threat, the airline must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," in order to ascertain "(i) [t]he nature, duration, and severity of the risk; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk."[26]  If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must, for example, "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation.[27]  Furthermore, the Department's regulations permit the airline to impose reasonable conditions, restrictions, or requirements on a passenger who has a "medical condition" that may cause the passenger to pose a risk to the health and safety of others.[28]

<u>Enforcement Policy</u>

The authority to pursue or not to pursue enforcement action against airlines with respect to air travel consumer protection and civil rights requirements, including compliance with the ACAA, lies with OACP.[29]

In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that treat passengers presumptively as potential carriers of the SARS-CoV-2 virus and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew.[30]  Notably, however, the CDC Order exempts from the mask mandate a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the

---

[25] 14 CFR 382.19(c)(1), (2).

[26] *Id.*

[27] 14 CFR 382.19(c)(2).

[28] 14 CFR 382.21(a)(3).  The rule recognizes that a passenger with a communicable disease or infection, such as infection with the SARS-CoV-2 virus or other "medical condition," may pose a direct threat to the health and safety of others onboard an aircraft, and the airline may be justified in refusing to transport the passenger or in requiring protective measures to mitigate the risk, consistent with the directives of public health authorities.  14 CFR 382.21(a)–(b).

[29] 49 U.S.C. 41705(c), 46301. The CDC Order requiring aircraft operators to mandate mask use will be enforced by the Transportation Security Administration under its statutory and regulatory authorities, including 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR 1542.303, 1544.305, and 1546.105.

[30] CDC Order at 5 ("The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."); *id.* at 7 ("Traveling on public conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces.").

disability.  The Department also requires reasonable accommodations for persons with disabilities who are unable to wear masks or are unable to wear them safely.[31]

Airlines have expressed concerns to OACP that a significant number of passengers may claim medical exemption from the mask requirements without an apparent credible basis.  The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.[32] Similarly, under the Department's disability regulation in 14 CFR Part 382, airlines may impose conditions, restrictions, or requirements on a passenger asserting that a medical condition prevents the passenger from wearing a face mask, because the passenger may pose a direct threat to the health or safety of others, as any passenger is a potential carrier of the SARS-CoV-2 virus.[33]  In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask.

Airlines have also represented to OACP that, given the number of passengers making such claims, it is not practicable for airlines to make the required individualized assessment of appropriate mitigation measures at the airport on the day of the flight.  Under the Department's disability regulation in Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask.[34]  However, Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance. Airlines may also require such passengers to check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel.

In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers.  For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test,[35] taken at the passenger's own expense, during the days immediately

---

[31] 14 CFR 382.13.

[32] *Id.*

[33] 14 CFR 382.21(a)(3).

[34] 14 CFR 382.19(c)(1).

[35] On January 12, 2021, CDC issued an order requiring any passenger flying into the United States from a foreign country to provide, before boarding the flight, proof of a negative pre-departure test result for SARS-CoV-2, the virus that causes COVID-19, or documentation of recovery from COVID-19 after a previous SARS-CoV-2 infection. This order became effective on January 26, 2021.  Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b): Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airlines or Other Aircraft Passengers Arriving into the United States from Any Foreign Country, *available at* https://www.cdc.gov/quarantine/pdf/global-airline-testing-order_2021-01-2_R3-signed-encrypted-p.pdf.

prior to the scheduled flight.[36]  Further, the airline may arrange for additional, appropriate mitigation measures, including arranging for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight.

To ensure travelers are aware of the face mask requirements, airlines should use their best efforts to make this information easily available.  The Department requires airlines provide information on request, to individuals with disabilities, about any service-related or other limitations on the airline's ability to accommodate passengers with a disability.[37]  Also, CDC and TSA require airlines to provide passengers with prominent and adequate notice to facilitate awareness and compliance with the requirement that masks must be worn, subject to certain limited exemptions, to mitigate the spread of COVID-19 during air travel.[38]  Airlines' obligation to provide information on the face mask requirements includes updating airlines' face mask policies on their websites to ensure accuracy and consistency with the ACAA, CDC Order and TSA SD.[39]

In recognition of the CDC Order, as well as airlines' efforts to minimize the potential for transmission of the virus onboard aircraft by implementing policies requiring passengers to wear masks onboard aircraft even before the issuance of the CDC Order, OACP  will exercise its prosecutorial discretion and provide airlines an opportunity to follow the steps described herein to become compliant before taking further action.[40]  Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382.  OACP will refrain from taking enforcement action against an airline for a period of up to 45 days from the date of this notice, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued.  This timeframe should provide airlines with adequate time to review and revise their mask procedures as needed to comply with the law.[41]

---

[36] A positive test result for SARS-CoV-2, the virus that causes COVID-19, is a valid reason for an airline to deny transport to any individual, including an individual with a disability.  CDC recommends isolation to separate people infected with SARS-CoV-2 from people who are not infected.  *See* Ctrs. for Disease Control & Prevention, *Isolate if You are Sick*, CDC.gov (last updated Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html.

[37] 14 CFR 382.41.

[38] CDC Order at 1; TSA SD at 2.

[39] *See* 14 CFR 399.79 (b)(2) (defining an airline's practice as "deceptive" to consumers within the meaning of section 41712 if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter).

[40] Every day, we are learning more about how COVID-19 spreads and affects people and communities.  OACP will continue to follow the data and information provided by public health authorities, such as CDC, on actions necessary to limit the spread or impact of SARS-CoV-2 and will make changes to this notice as necessary to be consistent with current medical knowledge and the best available objective evidence.

[41] This document is a temporary notice of enforcement discretion.  Regulated entities may rely on this notice as a safeguard from Departmental enforcement as described herein. To the extent that this notice includes guidance on how regulated entities may comply with existing regulations, it does not have the force and effect of law and is not meant to bind the regulated entities in any way.

Questions regarding this Notice may be addressed to the Office of Aviation Consumer Protection (C-70), 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

By:

Blane A. Workie
***Assistant General Counsel for***
***Office of Aviation Consumer Protection***

Dated:  February 5, 2021

*An electronic version of this document is available at http://www.dot.gov/airconsumer*

Plaintiffs' Exhibit 102

whitehouse.gov

# Executive Order on Promoting COVID-19 Safety in Domestic and International Travel | The White House

11-14 minutes

---

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.  Policy.**  Science-based public health measures are critical to preventing the spread of coronavirus disease 2019 (COVID-19) by travelers within the United States and those who enter the country from abroad.  The Centers for Disease Control and Prevention (CDC), the Surgeon General, and the National Institutes of Health have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19.  Accordingly, to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely, it is the policy of my Administration to implement these public health measures consistent with CDC guidelines on public modes of transportation and at ports of entry to the United States.

**Sec. 2.  Immediate Action to Require Mask-Wearing on Certain Domestic Modes of Transportation.**

(a)  Mask Requirement.  The Secretary of Labor, the Secretary of Health and Human Services (HHS), the Secretary of Transportation (including through the Administrator of the Federal Aviation Administration (FAA)), the Secretary of Homeland Security (including through the Administrator of the Transportation Security Administration (TSA) and the Commandant of the United States Coast Guard), and the heads of any other executive departments and agencies (agencies) that have relevant regulatory authority (heads of agencies) shall immediately take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in compliance with CDC guidelines in or on:

(i)   airports;

(ii)   commercial aircraft;

(iii)  trains;

(iv)   public maritime vessels, including ferries;

(v)    intercity bus services; and

(vi)   all forms of public transportation as defined in section 5302 of title 49, United States Code.

(b)  Consultation.  In implementing this section, the heads of agencies shall consult, as appropriate, with interested parties, including State, local, Tribal, and territorial officials; industry and union representatives from the transportation sector; and consumer representatives.

(c)  Exceptions.  The heads of agencies may make categorical or case-by-case exceptions to policies developed under this section, consistent with applicable law, to the extent that doing so is necessary or required by law.  If the heads of agencies do make exceptions, they shall require alternative and appropriate safeguards, and shall document all exceptions in writing.

(d)  Preemption.  To the extent permitted by applicable law, the heads of agencies shall ensure that any action taken to implement this section does not preempt State, local, Tribal, and territorial laws or rules imposing public health measures that are more protective of public health than those required by the heads of agencies.

(e)  Coordination.  The Coordinator of the COVID-19 Response and Counselor to the President (COVID-19 Response Coordinator) shall coordinate the implementation of this section.  The heads of agencies shall update the COVID-19 Response Coordinator on their progress in implementing this section, including any categorical exceptions established under subsection (c) of this section, within 7 days of the date of this order and regularly thereafter.  The heads of agencies are encouraged to bring to the attention of the COVID-19 Response Coordinator any questions regarding the scope or implementation of this section.

**Sec. 3.  Action to Implement Additional Public Health Measures for Domestic Travel.**

(a)  Recommendations.  The Secretary of Transportation (including through the Administrator of the FAA) and the Secretary of Homeland Security (including

through the Administrator of the TSA and the Commandant of the Coast Guard), in consultation with the Director of CDC, shall promptly provide to the COVID-19 Response Coordinator recommendations concerning how their respective agencies may impose additional public health measures for domestic travel.

(b)  Consultation.  In implementing this section, the Secretary of Transportation and the Secretary of Homeland Security shall engage with interested parties, including State, local, Tribal, and territorial officials; industry and union representatives from the transportation sector; and consumer representatives.

**Sec. 4.  Support for State, Local, Tribal, and Territorial Authorities.**  The COVID-19 Response Coordinator, in coordination with the Secretary of Transportation and the heads of any other relevant agencies, shall promptly identify and inform agencies of options to incentivize, support, and encourage widespread mask-wearing and physical distancing on public modes of transportation, consistent with CDC guidelines and applicable law.

**Sec. 5.  International Travel.**

(a)  Policy.  It is the policy of my Administration that, to the extent feasible, travelers seeking to enter the United States from a foreign country shall be:

(i)   required to produce proof of a recent negative COVID-19 test prior to entry; and

(ii)  required to comply with other applicable CDC guidelines concerning international travel, including recommended periods of self-quarantine or self-isolation after entry into the United States.

(b)  Air Travel.

(i)    The Secretary of HHS, including through the Director of CDC, and in coordination with the Secretary of Transportation (including through the Administrator of the FAA) and the Secretary of Homeland Security (including through the Administrator of the TSA), shall, within 14 days of the date of this order, assess the CDC order of January 12, 2021, regarding the requirement of a negative COVID-19 test result for airline passengers traveling into the United States, in light of subsection (a) of this section.  Based on such assessment, the Secretary of HHS and the Secretary of Homeland Security shall take any further appropriate regulatory action, to the extent feasible and consistent with CDC guidelines and applicable law.  Such assessment and regulatory action shall include consideration of:

(A)  the timing and types of COVID-19 tests that should satisfy the negative test requirement, including consideration of additional testing immediately prior to departure;

(B)  the proof of test results that travelers should be required to provide;

(C)  the feasibility of implementing alternative and sufficiently protective public health measures, such as testing, self-quarantine, and self-isolation on arrival, for travelers entering the United States from countries where COVID-19 tests are inaccessible, particularly where such inaccessibility of tests would affect the ability of United States citizens and lawful permanent residents to return to the United States; and

(D)  measures to prevent fraud.

(ii)   The Secretary of HHS, in coordination with the Secretary of Transportation (including through the Administrator of the FAA) and the Secretary of Homeland Security (including through the Administrator of the TSA), shall promptly provide to the President, through the COVID-19 Response Coordinator, a plan for how the Secretary and other Federal Government actors could implement the policy stated in subsection (a) of this section with respect to CDC-recommended periods of self-quarantine or self-isolation after a flight to the United States from a foreign country, as he deems appropriate and consistent with applicable law.  The plan shall identify agencies' tools and mechanisms to assist travelers in complying with such policy.

(iii)  The Secretary of State, in consultation with the Secretary of HHS (including through the Director of CDC), the Secretary of Transportation (including through the Administrator of the FAA), and the Secretary of Homeland Security, shall seek to consult with foreign governments, the World Health Organization, the International Civil Aviation Organization, the International Air Transport Association, and any other relevant stakeholders to establish guidelines for public health measures associated with safe international travel, including on aircraft and at ports of entry. Any such guidelines should address quarantine, testing, COVID-19 vaccination, follow-up testing and symptom-monitoring, air filtration requirements, environmental decontamination standards, and contact tracing.

(c)  Land Travel.  The Secretary of State, in consultation with the Secretary of HHS, the Secretary of Transportation, the Secretary of Homeland Security, and the Director of CDC, shall immediately commence diplomatic outreach to the governments of Canada and Mexico regarding public health protocols for land ports of entry.  Based on this diplomatic engagement, within 14 days of the date of this order, the Secretary of HHS (including through the Director of CDC), the Secretary

of Transportation, and the Secretary of Homeland Security shall submit to the President a plan to implement appropriate public health measures at land ports of entry.  The plan should implement CDC guidelines, consistent with applicable law, and take into account the operational considerations relevant to the different populations who enter the United States by land.

(d)  Sea Travel.  The Secretary of Homeland Security, through the Commandant of the Coast Guard and in consultation with the Secretary of HHS and the Director of CDC, shall, within 14 days of the date of this order, submit to the President a plan to implement appropriate public health measures at sea ports.  The plan should implement CDC guidelines, consistent with applicable law, and take into account operational considerations.

(e)  International Certificates of Vaccination or Prophylaxis.  Consistent with applicable law, the Secretary of State, the Secretary of HHS, and the Secretary of Homeland Security (including through the Administrator of the TSA), in coordination with any relevant international organizations, shall assess the feasibility of linking COVID-19 vaccination to International Certificates of Vaccination or Prophylaxis (ICVP) and producing electronic versions of ICVPs.

(f)  Coordination.  The COVID-19 Response Coordinator, in consultation with the Assistant to the President for National Security Affairs and the Assistant to the President for Domestic Policy, shall coordinate the implementation of this section. The Secretary of State, the Secretary of HHS, the Secretary of Transportation, and the Secretary of Homeland Security shall update the COVID-19 Response Coordinator on their progress in implementing this section within 7 days of the date of this order and regularly thereafter.  The heads of all agencies are encouraged to bring to the attention of the COVID-19 Response Coordinator any questions regarding the scope or implementation of this section.

**Sec. 6.  General Provisions.**  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,
January 21, 2021.

Plaintiffs' Exhibit 103

washingtonpost.com

# Sneezed on, cussed at, ignored: Airline workers battle mask resistance with scant government backup

*Michael Laris*

13-17 minutes

---

Other passengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements, treating the potentially lifesaving act as a pandemic game of cat-and-mouse. A loophole allowing the removal of masks while consuming food and beverages is a favorite dodge.

Asked to mask up, one passenger pulled out a large bag of popcorn and nibbled her way through it, kernel by kernel, stymieing the cabin crew for the length of the flight. Others blew off requests by chomping leisurely on apple slices, between occasional coughs, or lifting an empty plastic cup and declaring: "I am drinking!"

The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic and reviewed by The Washington Post. The reports provide an unguarded accounting of bad behavior by airline customers, something executives hit by a steep drop in travel and billions in pandemic-related losses are loath to share themselves.

Some reports raise safety concerns beyond the risk of coronavirus infection. A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing.

One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart. The error was caught, and "there was no conflicting traffic," the captain wrote.

The Boeing 737 Max was grounded for 20 months following two crashes that killed 346 people. Now, after design changes, the aircraft is returning to service. (The Washington Post)

Some passengers are portrayed as oblivious, obstinate, foul-mouthed and, at times, dangerous. One called a flight attendant a "Nazi." Another "started to rant how the virus is a political hoax and that she doesn't wear a mask," a flight attendant reported.

With millions of passengers ignoring warnings from the Centers for Disease Control and Prevention to refrain from holiday travel, the reports offer an X-ray into the country's deeper failures against the coronavirus — and insights into the pitfalls and possibilities facing a new presidential administration.

While the White House under President Trump has, at times, been dismissive or hostile toward masks, President-elect Joe Biden is making a patriotic appeal to "mask up for 100 days," whatever people's politics. Biden has said he will sign an order on his first day requiring masks for "interstate travel on planes, trains and buses." How well those efforts will work remains to be seen.

Experts in psychology and decision-making say hostility toward wearing masks, even within the shared confines of a passenger jet, has been fueled by politicization — but also by skewed incentives and inconsistent messaging.

"The reinforcement principles are backward," said Paul Slovic, who studies the psychology of risk at the University of Oregon.

The usual signs of danger, and rewards for following potentially bothersome rules, are thrown off by a virus that is spread easily by people who don't know they have it, Slovic said.

"You get an immediate benefit for not following the guidelines because you get to do what you want to do," Slovic said. "And you don't get punished for doing the wrong thing" because it's not immediately clear who is being harmed.

The "squishiness of the requirement" to wear masks on planes also undermines the message that they are critical for public health, Slovic said. In contrast, he cites the rigid clarity of the ban on flying with a firearm. "It's not, 'You can carry it as long as you don't use it,' " Slovic said.

But passengers are allowed to drop their masks to snack and sip beverages. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said.

Applying mask rules also worsens the already strained position of flight attendants, who are front-line enforcers even as they keep their usual safety responsibilities, experts said.

"Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority."

The Department of Transportation in October rejected a petition to require masks on airplanes, subways and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department "embraces the notion that there should be no more regulations than necessary."

The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June hearing "we do not plan to provide an enforcement specifically on that issue."

Such matters are more appropriately left to federal health authorities, Dickson argued. "As Secretary Chao has said, we believe that our space is in aviation safety, and their space is in public health," Dickson said, referring to the CDC and other health officials.

Airline representatives say they take mask usage seriously and the overwhelming majority of customers comply. Some airlines have banned passengers for the length of the pandemic for refusing to mask up. Many have eliminated medical exemptions in their mask requirements.

"Of the hundreds of thousands of passengers who have flown with us, we have only needed to ban

about 370 customers for not complying," United Airlines spokeswoman Leslie Scott said. Delta said its mask-related no-fly list includes about 600 people, despite carrying about 1 million people each week.

Resistance by some passengers prompted Alaska Airlines to begin issuing yellow cards, akin to the warnings in soccer, to problem passengers.

The initial yellow card said employees would file a report that could result in a passenger being suspended. A later version was more aggressive, saying continued defiance would lead to a flight ban "immediately upon landing," even if the customer had a connecting flight.

Alaska Airlines has barred 237 passengers since August, and "in more than half of these incidents we also canceled onward or returning travel," spokeswoman Cailee Olson said.

American Airlines declined to release numbers of banned customers, as did Southwest, which said in a statement it appreciates "the ongoing spirit of cooperation among customers and employees as we collectively take care of each other while striving to prevent the spread of COVID-19."

Yet a small, uncooperative minority can wreak outsize havoc, safety reports show.

The anonymous reports are collected in a National Aeronautics and Space Administration database, part of a program meant to increase aviation safety by encouraging employees to provide candid descriptions of emerging problems without fear of reprisal. Names of people filing the reports, and their airlines, are removed by NASA before they are made available to regulators at the FAA and the public.

NASA analysts screen the reports to weed out irrelevant filings and may call back filers to clarify safety points. But its analysts do not try to verify people's identities or the accuracy of the reports.

The database shows some fliers treat airline mask requirements as a seemingly asinine rule to evade, akin to sneaking a late look at text messages after phones are supposed to be in airplane mode. Passengers berate flight attendants about their noncompliant cabin mates. Some reports read like cries for help.

"It all has to stop," pleaded one flight attendant.

"In the future I would like to feel safe while doing my job," said another.

● A woman refused to wear her mask as the plane rolled away from the terminal, saying it made her ill, and the pilot pulled over temporarily to try to avoid returning to the gate. She continued to resist but finally agreed.

"As soon as we took off, she took it off again and kept it off the entire flight," the flight attendant reported.

● A man started down the aisle, pausing about 18 inches from a flight attendant.

"He sneezed directly in my face, making no attempt to cover his mouth, pull up his mask or turn towards the row 1 window," the employee wrote. The flight attendant, who was wearing a face covering, judged the act unintentional and tried to blot away the remnants.

● A woman propped her foot up and painted her toenails with her mask below her chin, despite

several requests to wear it properly. After another passenger appealed for more to be done, the woman acquiesced, then loudly instructed the flight attendant to "go away!"

After landing, she cut in line to rush off the plane. "Although we understand the importance of wanting to retain customer loyalty, this kind of behavior should not be tolerated for the sake of one over an entire cabin of guests and employees," the flight attendant wrote.

● An immunocompromised passenger was furious at the lack of enforcement as another customer snacked incessantly on chocolate. The concerned passenger then removed his mask to complain to the flight attendant.

● A passenger claimed discrimination, arguing he was singled out for enforcement because of his tattoos. "He said 'I am complying, #%$^!' His nostrils were clearly visible," the flight attendant wrote.

● A pilot flouted the mask requirement with what appeared to be a passive-aggressive display, donning a flimsy, see-through veil described as useless for containing airborne particles.

● Flight attendants made an exception and allowed a distraught mother, whose daughter may have had a disability and screamed about the mask requirement, to remain on the plane. They tried cookies, which didn't help, then moved the family to seats three rows from other passengers, who were supportive.

● A customer, after earlier warnings, stuck his mask-free head in the aisle during the safety demonstration, "making a total mockery out of me," a flight attendant wrote. He repeated his taunt when the plane was fourth in line for takeoff. The captain turned around, and the man was taken off the plane.

The obstinacy cuts against basic health precautions. Experts in cabin air say masks are critical tools for safety. Cabin air is run through powerful filters, mixed with outside air and recirculated. But it takes several minutes for all air to be vented out of the cabin, giving the coronavirus and other viruses the opportunity to spread.

A Harvard study funded by the aviation industry said flying can be done with a relatively low risk of coronavirus infection if precautions are followed. It said masks are "perhaps the most essential layer" among measures to reduce transmission.

The study said removing masks to eat should be kept to an "absolute minimum," and straws should be used when feasible. "When one passenger briefly removes a mask to eat or drink, other passengers in close proximity should keep their masks on," researchers said.

Trump and some of his advisers, meanwhile, have stoked divisions over masks.

The president mocked Biden's frequent mask use, presided over White House events that flouted mask guidelines and relied on a former pandemic adviser who wrongly argued masks were ineffective. The White House also blocked a nationwide order, drafted by the CDC, that would have required masks on all forms of public transportation.

"Masks have been made a political issue from the start of the pandemic, and people don't believe they need to wear them," said Garland, whose union represents about 50,000 flight attendants.

"We do not have a president who tells people to wear a mask, and the federal government, not just in aviation but across the board, has declined to mandate it in any way, shape or form," she added, saying her members are eager to see a Biden administration set a different tone.

An FAA spokesman declined to answer questions about the risks involved with passengers refusing to wear masks.

After inquiries from The Post about enforcement, the agency distributed a news release touting its role in pursuing civil penalties in two assault cases but reiterated that "the failure to wear a face covering is not itself a federal violation."

The cases show how mask disputes can escalate.

On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him and grabbed his phone as he described a mask-related dispute to the captain, according to the FAA. The agency said it is pursuing a $15,000 civil penalty for assault and interfering with a flight attendant.

Allegiant declined to say whether anyone was arrested or charged.

On a SkyWest Airlines flight to Chicago in August, a passenger took off a mask, "continually bothered" fellow customers and "at one point, grabbed a flight attendant's buttock as she walked by the passenger's row of seats," according to the FAA, which is seeking a $7,500 penalty.

Beyond addressing such extreme cases, some outside experts say federal and corporate leaders have fallen short.

"Both industry and government have failed the people on the front line who need to administer these rules," said Baruch Fischhoff, a psychologist and professor at Carnegie Mellon University who researches decision-making.

Politics often has driven responses to the pandemic, while critical public health communication on things like masks has not been tested to make sure it hits the right notes or is convincing, Fischhoff said. "Neither have fulfilled that responsibility for clear, consistent, tested communications," he said.

Fischhoff said that with 330 million people in the United States, it's not surprising the safety reports received by NASA reveal examples of poor behavior.

"Part of the reason they stand out is, I think, the vast majority of people are polite and civil to one another," Fischhoff said. Still, the reports probably represent a dramatic undercount because it takes time and initiative for busy employees to file them.

"If you see 100, there are probably 1,000 or 10,000. This is a widespread enough phenomenon that it needs to be taken seriously," he said. "You have to give credit to people who lodge just complaints and recognize they're just a fraction of the people who are observing things that threaten our health and our economy."

# Plaintiffs' Exhibit 104

**Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System**

As reflected in numerous determinations by the Executive Branch, including the President's March 13, 2020 determination that the outbreak of Coronavirus Disease 2019 (COVID-19) constitutes a "national emergency" under the National Emergencies Act and the nationwide public health emergency declared by the Secretary of Health and Human Services on January 31, 2020, the COVID-19 pandemic continues to pose a threat to our health and security. On January 15, 2021, the Centers for Disease Control and Prevention (CDC) updated their information to account for several new strains of COVID-19, including variant B.1.1.7 from the United Kingdom, variant B.1.351 from South Africa, and variant B.1.1.28.1 from Brazil. As of January 20, 2021, the United States has experienced more than 24 million confirmed COVID-19 cases and more than 400,000 COVID-19 deaths. The CDC, the Surgeon General, and the National Institutes of Health have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19. On January 21, 2021, the President issued the *Executive Order on Promoting COVID-19 Safety in Domestic and International Travel.* The purpose of this Executive Order is to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely. Further, on January 25, 2021 the President issued a *Proclamation on the Suspension of Entry as Immigrants and Non-Immigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease* whereby he reinstituted travel restriction for individuals traveling to the United States from the United Kingdom, Ireland, the Schengen Area, and instituted restrictions for South Africa.

In the light of these circumstances and direction from the President, and after consultation with public health officials, I, David P. Pekoske, Acting Secretary of Homeland Security, pursuant to the authority vested in me under section 101 of the Aviation and Transportation Security Act (ATSA), as codified at section 114(g) of title 49, United States Code (U.S.C.) do hereby determine that a national emergency exists and am directing the Transportation Security Administration to take actions consistent with the authorities in ATSA as codified at 49 U.S.C. sections 106(m) and 114(f), (g), (l), and (m) to implement the Executive Order to promote safety in and secure the transportation system. This includes supporting the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system, including

passengers and employees, from COVID-19 and to mitigate the spread of COVID-19 through the transportation system, to the extent appropriate and consistent with applicable law.  I specifically direct the Transportation Security Administration to use its authority to accept the services of, provide services to, or otherwise cooperate with other federal agencies, including through the implementation of countermeasures with appropriate departments, agencies, and instrumentalities of the United States in order to address a threat to transportation, recognizing that such threat may involve passenger and employee safety.

1/27/2021

David P. Pekoske

Acting Secretary

Department of Homeland Security

Plaintiffs' Exhibit 105

**Federal Register** / Vol. 86, No. 21 / Wednesday, February 3, 2021 / Notices    **8025**

The rapidly changing nature of the pandemic requires not only that CDC act swiftly, but also deftly to ensure that its actions are commensurate with the threat. This necessarily involves assessing evolving conditions that inform CDC's determinations.

The conditions that existed on September 4, 2020 have only worsened. As of January 21, 2021, there have been over 24,400,000 cases and over 400,000 deaths. Data collected by Princeton University show that eviction filings are occurring; it is therefore expected that large numbers of evictions would be processed if the Order were to expire. [*https://evictionlab.org/eviction-tracking*]. Without this Order, there is every reason to expect that evictions will increase significantly, resulting in further spread of COVID–19. It is imperative to act quickly to protect the public health, and it would be impracticable and contrary to the public interest to delay the issuance and effective date of the Order pending notice-and-comment rulemaking.

Similarly, if this Order qualifies as a rule under the APA, the Office of Information and Regulatory Affairs (OIRA) has determined that it would be a major rule under the Congressional Review Act (CRA). But there would not be a delay in its effective date. The agency has determined that for the same reasons, there would be good cause under the CRA to make the requirements herein effective immediately

If any provision of this Order, or the application of any provision to any persons, entities, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any persons, entities, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

This Order shall be enforced by federal authorities and cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18. However, this Order has no effect on the contractual obligations of renters to pay rent and shall not preclude charging or collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

*Criminal Penalties*

Under 18 U.S.C. 3559, 3571; 42 U.S.C. 271; and 42 CFR 70.18, a person violating this Order may be subject to a fine of no more than $100,000 if the violation does not result in a death, or a fine of no more than $250,000 if the

violation results in a death, or as otherwise provided by law. An organization violating this Order may be subject to a fine of no more than $200,000 per event if the violation does not result in a death or $500,000 per event if the violation results in a death or as otherwise provided by law. The U.S. Department of Justice may initiate criminal proceedings as appropriate seeking imposition of these criminal penalties.

*Notice to Cooperating State and Local Officials*

Under 42 U.S.C. 243, the U.S. Department of Health and Human Services is authorized to cooperate with and aid state and local authorities in the enforcement of their quarantine and other health regulations and to accept state and local assistance in the enforcement of Federal quarantine rules and regulations, including in the enforcement of this Order.

*Notice of Available Federal Resources*

While this Order to prevent eviction is effectuated to protect the public health, the states and units of local government are reminded that the Federal Government has deployed unprecedented resources to address the pandemic, including housing assistance.

The Department of Housing and Urban Development (HUD) has informed CDC that all HUD grantees—states, cities, communities, and nonprofits—who received Emergency Solutions Grants (ESG) or Community Development Block Grant (CDBG) funds under the CARES Act may use these funds to provide temporary rental assistance, homelessness prevention, or other aid to individuals who are experiencing financial hardship because of the pandemic and are at risk of being evicted, consistent with applicable laws, regulations, and guidance.

HUD has further informed CDC that: HUD's grantees and partners play a critical role in prioritizing efforts to support this goal. As grantees decide how to deploy CDBG–CV and ESG–CV funds provided by the CARES Act, all communities should assess what resources have already been allocated to prevent evictions and homelessness through temporary rental assistance and homelessness prevention, particularly to the most vulnerable households.

HUD stands at the ready to support American communities take these steps to reduce the spread of COVID–19 and maintain economic prosperity. Where gaps are identified, grantees should coordinate across available Federal, non-Federal, and philanthropic funds to ensure these critical needs are

sufficiently addressed and utilize HUD 's technical assistance to design and implement programs to support a coordinated response to eviction prevention needs. For program support, including technical assistance, please visit *www.hudexchange.info/program-support*. For further information on HUD resources, tools, and guidance available to respond to the COVID–19 pandemic, state and local officials are directed to visit *https://www.hud.gov/coronavirus*. These tools include toolkits for Public Housing Authorities and Housing Choice Voucher landlords related to housing stability and eviction prevention, as well as similar guidance for owners and renters in HUD-assisted multifamily properties.

Similarly, the Department of the Treasury has informed CDC that the funds allocated through the Coronavirus Relief Fund and the Emergency Rental Assistance Program may be used to fund rental assistance programs to prevent eviction. Visit *https://home.treasury.gov/policy-issues/cares/state-and-local-governments* for more information about the Coronavirus Relief Fund and *https://home.treasury.gov/policy-issues/cares/emergency-rental-assistance-program* for more information about the Emergency Rental Assistance Program..

*Effective Date*

This Order is effective on January 31, 2021 and will remain in effect, unless extended, modified, or rescinded, through March 31, 2021.

**Authority**

The authority for this Order is Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 CFR 70.2.

Dated: January 29, 2021.

**Sherri Berger**

*Acting Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–02243 Filed 1–29–21; 4:15 pm]

**BILLING CODE 4163–18–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice of Agency Order.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), announces an Agency Order requiring persons to wear masks over the mouth and nose when traveling on any conveyance (*e.g.*, airplanes, trains, subways, buses, taxis, ride-shares, ferries, ships, trolleys, and cable cars) into or within the United States. A person must also wear a mask on any conveyance departing from the United States until the conveyance reaches its foreign destination. Additionally, a person must wear a mask while at any transportation hub within the United States (*e.g.*, airport, bus terminal, marina, train station, seaport or other port, subway station, or any other area that provides transportation within the United States). Furthermore, operators of conveyances and transportation hubs must use best efforts to ensure that persons wear masks as required by this Order.

**DATES:** This Order takes effect at 11:59 p.m. Monday February 1, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Buigut, Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16–4, Atlanta, GA 30329. Email: *dgmqpolicyoffice@cdc.gov.*

**SUPPLEMENTARY INFORMATION:** The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. These droplets can land in the mouths, eyes, or noses of people who are nearby and possibly be inhaled into the lungs. Some people without symptoms also spread the virus. In general, the more closely a person interacts with others and the longer that interaction, the higher the risk of COVID–19 spread.

This Order is issued to preserve human life; maintain a safe and operating transportation system; mitigate the further introduction, transmission, and spread of COVID–19 into the United States and from one state or territory into any other state or territory; and support response efforts to COVID–19 at the Federal, state, local, territorial, and tribal level.

Appropriately worn masks reduce the spread of COVID–19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID–19. Masks are most likely to reduce the spread of COVID–19 when they are widely used by people in public

settings. Using masks along with other preventive measures, including social distancing, frequent handwashing, and cleaning and disinfecting frequently touched surfaces, is one of the most effective strategies available for reducing COVID–19 transmission.

This Order will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists.

A copy of the Order is provided below and a copy of the signed order can be found at *https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html*

## CENTERS FOR DISEASE CONTROL AND PREVENTION

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## ORDER UNDER SECTION 361

## OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)

## AND 42 CODE OF FEDERAL REGULATIONS 70.2, 71.31(b), 71.32(b)

## REQUIREMENT FOR PERSONS TO WEAR MASKS

## WHILE ON CONVEYANCES AND AT TRANSPORTATION HUBS

*SUMMARY:*

Notice and Order; and subject to the limitations under ''Applicability,'' pursuant to 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b):

(1) Persons [1] must wear [2] masks over the mouth and nose when traveling on conveyances into and within the United States. Persons must also wear masks at transportation hubs as defined in this Order.

(2) A conveyance operator transporting persons into and within the United States [3] must require all persons onboard to wear masks for the duration of travel.

(3) A conveyance operators operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for

the duration of travel as a condition of controlled free pratique.[4]

(4) Conveyance operators must use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel. Best efforts include:

• Boarding only those persons who wear masks;

• instructing persons that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law;

• monitoring persons onboard the conveyance for anyone who is not wearing a mask and seeking compliance from such persons;

• at the earliest opportunity, disembarking any person who refuses to comply; and

• providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.

(5) Operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask. Best efforts include:

• Allowing entry only to those persons who wear masks;

• instructing persons that Federal law requires wearing a mask in the transportation hub and failure to comply constitutes a violation of Federal law;

• monitoring persons on the premises of the transportation hub for anyone who is not wearing a mask and seeking compliance from such persons;

• at the earliest opportunity, removing any person who refuses to comply from the premises of the transportation hub; and

• providing persons with prominent and adequate notice to facilitate awareness and compliance with the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or

---

[1] As used in this Order, ''persons'' includes travelers (*i.e.*, passengers and crew), conveyance operators, and any workers or service providers in the transportation hub.

[2] To ''wear a mask'' means to wear a mask over the nose and mouth.

[3] This includes international, interstate, or intrastate waterways, subject to the jurisdiction of the United States.

[4] As a condition of this controlled free pratique to commence or continue operations in the United States, conveyance operators must additionally require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons on the conveyance (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. This precaution must be followed regardless of scheduled itinerary.

**8027**

email; posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.

*DEFINITIONS:*

*Controlled free pratique* shall have the same definition as under 42 CFR 71.1, meaning "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions."

*Conveyance* shall have the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle,[5] vessel . . . or other means of transport, including military." Included in the definition of "conveyance" is the term "carrier" which under 42 CFR 71.1 has the same definition as conveyance under 42 CFR 70.1.

*Conveyance operator* means an individual operating a conveyance and an individual or organization causing or authorizing the operation of a conveyance.

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[6]

*Interstate traffic* shall have the same definition as under 42 CFR 70.1, meaning

"(1):

(i) The movement of any conveyance or the transportation of persons or property, including any portion of such movement or transportation that is entirely within a state or possession—

(ii) From a point of origin in any state or possession to a point of destination in any other state or possession; or

(iii) Between a point of origin and a point of destination in the same state or possession but through any other state, possession, or contiguous foreign country.

(2) Interstate traffic does not include the following:

(i) The movement of any conveyance which is solely for the purpose of unloading persons or property transported from a foreign country or loading persons or property for transportation to a foreign country.

(ii) The movement of any conveyance which is solely for the purpose of effecting its repair, reconstruction, rehabilitation, or storage."

*Intrastate traffic* means the movement of any conveyance or the transportation or movement of persons occurring solely within the boundaries of a state or territory, or on tribal land.

*Possession* shall have the same definition as under 42 CFR 70.1 and 71.1, meaning a "U.S. territory."

*State* shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

*Territory* shall have the same definition as "U.S. territory" under 42 CFR 70.1 and 71.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the [Commonwealth of the] Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

*Transportation hub* means any airport, bus terminal, marina, seaport or other port, subway station, terminal (including any fixed facility at which passengers are picked-up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States.

*Transportation hub operator* means an individual operating a transportation hub and an individual or organization causing or authorizing the operation of a transportation hub.

*U.S. port* shall have the same definition as under 42 CFR 71.1, meaning any "seaport, airport, or border crossing point under the control of the United States."

*STATEMENT OF INTENT:*

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:
• Preservation of human life;
• Maintaining a safe and secure operating transportation system;
• Mitigating the further introduction, transmission, and spread of COVID–19 into the United States and from one state or territory into any other state or territory; and
• Supporting response efforts to COVID–19 at the Federal, state, local, territorial, and tribal levels.

*APPLICABILITY:*

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe that (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Such

requirements must provide the same level of public health protection as—or greater protection than—the requirements listed herein.

In addition, the requirement to wear a mask shall not apply under the following circumstances:
• While eating, drinking, or taking medication, for brief periods;
• While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication;
• If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;
• If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;[7] or
• When necessary to temporarily remove the mask to verify one's identity such as during Transportation Security Administration screening or when asked to do so by the ticket or gate agent or any law enforcement official.

This Order exempts the following categories of persons:[8]
• A child under the age of 2 years;
• A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*).[9]

---

[5] This includes rideshares meaning arrangements where passengers travel in a privately owned road vehicle driven by its owner in connection with a fee or service.

[6] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N–95 respirators fulfill the requirements of this Order. CDC guidance for attributes of acceptable masks in the context of this Order is available at: *https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.*

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID–19 such as a negative result from a SARS–CoV–2 viral test or documentation of recovery from COVID–19. CDC definitions for SARS–CoV–2 viral test and documentation of recovery are available in the Frequently Asked Questions at: *https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.* Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask

Continued

• A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

This Order exempts the following categories of conveyances, including persons on board such conveyances:

• Private conveyances operated solely for personal, non-commercial use;

• Commercial motor vehicles or trucks as these terms are defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle or truck;

• Conveyances operated or chartered by the U.S. military services provided that such conveyance operators observe Department of Defense precautions to prevent the transmission of COVID–19 that are equivalent to the precautions in this Order.

This Order applies to persons on conveyances and at transportation hubs directly operated by U.S. state, local, territorial, or tribal government authorities, as well as the operators themselves. U.S. state, local, territorial, or tribal government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities.

To the extent permitted by law, and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID–19 Safety in Domestic and International Travel),[10] Federal agencies are required to implement additional measures enforcing the provisions of this Order.

*BACKGROUND:*

There is currently a pandemic of respiratory disease (coronavirus disease 2019 or "COVID–19") caused by a novel coronavirus (SARS–CoV–2). As of January 27, 2021, there have been 99,638,507 confirmed cases of COVID–19 globally, resulting in more than 2,141,000 deaths. As of January 27, 2021, there have been over 25,000,000 cases identified in the United States and over 415,000 deaths due to the disease. New SARS–CoV–2 variants have emerged in recent weeks, including at

least one with evidence of increased transmissibility.[11]

The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. These droplets can land in the mouths, eyes, or noses of people who are nearby and possibly be inhaled into the lungs. Infected people without symptoms (asymptomatic) and those in whom symptoms have not yet developed (pre-symptomatic) can also spread the virus. In general, the more closely an infected person interacts with others and the longer those interactions, the higher the risk of COVID–19 spread. COVID–19 may be transmitted by touching surfaces or objects that have the virus on them and then touching one's own or another person's eyes, nose, or mouth.

Masks help prevent people who have COVID–19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others.[12] Masks are primarily intended to reduce the emission of virus-laden droplets, *i.e.,* they act as source control by blocking exhaled virus.[13] This is especially relevant for asymptomatic or pre-symptomatic infected wearers who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions.[14 15] Masks also provide personal protection to the wearer by reducing inhalation of these droplets, *i.e.,* they reduce wearers' exposure through filtration.[16] The community benefit of wearing masks for SARS–CoV–2 control is due to the combination of these effects; individual prevention benefit increases with increasing

numbers of people using masks consistently and correctly.

Appropriately worn masks reduce the spread of COVID–19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID–19. Seven studies have confirmed the benefit of universal masking in community level analyses: in a unified hospital system,[17] a German city,[18] a U.S. State,[19] a panel of 15 U.S. States and Washington, DC,[20 21] as well as both Canada [22] and the United States [23] nationally. Each analysis demonstrated that, following directives from organizational and political leadership for universal masking, new infections fell significantly. Two of these studies [24 25] and an additional analysis of data from 200 countries that included localities within the United States [26] also demonstrated reductions in

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html.

[12] https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html.

[13] Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nature Medicine.* 2020;26(5):676–680.https://dx.doi.org/10.1038/s41591-020-0843-2.

[14] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID–19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513–17515.10.1073/pnas.2008373117. https://www.ncbi.nlm.nih.gov/pubmed/32632012.

[15] Johansson MA, Quandelacy TM, Kada S, et al. SARS–CoV–2 Transmission From People Without COVID–19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 Jan 4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[16] Ueki H, Furusawa Y, Iwatsuki-Horimoto K, et al. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS–CoV–2. *mSphere.* 2020;5(5).10.1128/mSphere.00637–20. https://www.ncbi.nlm.nih.gov/pubmed/33087517.

[17] Wang X, Ferro EG, Zhou G, Hashimoto D, Bhatt DL. Association Between Universal Masking in a Health Care System and SARS–CoV–2 Positivity Among Health Care Workers. *JAMA.* 2020.10.1001/jama.2020.12897. https://www.ncbi.nlm.nih.gov/pubmed/32663246.

[18] Mitze T., Kosfeld R., Rode J., Wälde K. *Face Masks Considerably Reduce COVID–19 Cases in Germany: A Synthetic Control Method Approach.* IZA—Institute of Labor Economics (Germany);2020.ISSN: 2365–9793, DP No. 13319. http://ftp.iza.org/dp13319.pdf.

[19] Gallaway MS, Rigler J, Robinson S, et al. Trends in COVID–19 Incidence After Implementation of Mitigation Measures—Arizona, January 22-August 7, 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(40):1460–1463.10.15585/mmwr.mm6940e3. https://www.ncbi.nlm.nih.gov/pubmed/33031366.

[20] Lyu W, Wehby GL. Community Use Of Face Masks And COVID–19: Evidence From A Natural Experiment Of State Mandates In The US. *Health Aff (Millwood).* 2020;39(8):1419–1425.10.1377/hlthaff.2020.00818. https://www.ncbi.nlm.nih.gov/pubmed/32543923.

[21] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[22] Karaivanov A., Lu SE, Shigeoka H., Chen C., Pamplona S. *Face Masks, Public Policies and Slowing the Spread of Covid–19: Evidence from Canada* National Bureau of Economic Research 2020. Working Paper 27891. http://www.nber.org/papers/w27891.

[23] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid–19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23–62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[24] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[25] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid–19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23–62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[26] Leffler CT, Ing EB, Lykins JD, Hogan MC, McKeown CA, Grzybowski A. Association of country-wide coronavirus mortality with demographics, testing, lockdowns, and public wearing of masks. Am J Trop Med Hyg. 2020 Dec;103(6):2400–2411. doi: 10.4269/ajtmh.20–1015. Epub 2020 Oct 26.

---

for reasons related to the disability. CDC will issue additional guidance regarding persons who cannot wear a mask under this exemption. https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

[10] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-promoting-covid-19-safety-in-domestic-and-international-travel/.

mortality. An economic analysis using U.S. data found that, given these effects, increasing universal masking by 15% could prevent the need for lockdowns and reduce associated losses of up to $1 trillion or about 5% of gross domestic product.[27]

Wearing a mask especially helps protect those at increased risk of severe illness from COVID–19[28] and workers who frequently come into close contact with other people (*e.g.*, at transportation hubs). Masks are most likely to reduce the spread of COVID–19 when they are widely used by people in public settings. Using masks along with other preventive measures, including social distancing, frequent handwashing, and cleaning and disinfecting frequently touched surfaces, is one of the most effective strategies available for reducing COVID–19 transmission.

Traveling on multi-person conveyances increases a person's risk of getting and spreading COVID–19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and crowded airport terminals. Social distancing may be difficult if not impossible on flights. People may not be able to distance themselves from the recommended 6 feet from individuals seated nearby or those standing in or passing through the aircraft's aisles. Travel by bus, train, vessel, and other conveyances used for international, interstate, or intrastate transportation pose similar challenges.

Intrastate transmission of the virus has led to—and continues to lead to—interstate and international spread of the virus, particularly on public conveyances and in travel hubs, where passengers who may themselves be traveling only within their state or territory commonly interact with others traveling between states or territories or internationally. Some states, territories, Tribes, and local public health authorities have imposed mask-wearing requirements within their jurisdictional boundaries to protect public health.[29]

Any state or territory without sufficient mask-wearing requirements for transportation systems within its jurisdiction has not taken adequate measures to prevent the spread of COVID–19 from such state or territory to any other state or territory. That determination is based on, *inter alia,* the rapid and continuing transmission of the virus across all states and territories and across most of the world. Furthermore, given how interconnected most transportation systems are across the nation and the world, local transmission can grow even more quickly into interstate and international transmission when infected persons travel on non-personal conveyances without wearing a mask and with others who are not wearing masks.

Therefore, I have determined that the mask-wearing requirements in this Order are reasonably necessary to prevent the further introduction, transmission, or spread of COVID–19 into the United States and among the states and territories. Individuals traveling into or departing from the United States, traveling interstate, or traveling entirely intrastate, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transportation, must comply with the mask-wearing requirements set forth in this Order.

America's transportation systems are essential. Not only are they essential for public health, they are also essential for America's economy and other bedrocks of American life. Those transportation systems carry life-saving medical supplies and medical providers into and across the nation to our hospitals, nursing homes, and physicians' offices. Trains, planes, ships, and automobiles bring food and other essentials to our communities and to our homes. Buses bring America's children and teachers to school. Buses, trains, and subways, bring America's workforce to their jobs.

Requiring masks on our transportation systems will protect Americans and provide confidence that we can once again travel safely even during this pandemic. Therefore, requiring masks will help us control this pandemic and aid in re-opening America's economy.

The United States and countries around the world are currently embarking on efforts to vaccinate their populations, starting with healthcare personnel and other essential workers at increased risk of exposure to SARS–

CoV–2 and people at increased risk for severe illness from the virus. While vaccines are highly effective at preventing severe or symptomatic COVID–19, at this time there is limited information on how much the available COVID–19 vaccines may reduce transmission in the general population and how long protection lasts.[30] Therefore, this mask requirement, as well as CDC recommendations to prevent spread of COVID–19,[31] additionally apply to vaccinated persons. Similarly, CDC recommends that people who have recovered from COVID–19 continue to take precautions to protect themselves and others, including wearing masks;[32] therefore, this mask requirement also applies to people who have recovered from COVID–19.

*ACTION:*

Until further notice, under 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b), unless excluded or exempted as set forth in this Order, a person must wear a mask while boarding, disembarking, and traveling on any conveyance into or within the United States. A person must also wear a mask at any transportation hub that provides transportation within the United States.

Conveyance operators traveling into or within the United States may transport only persons wearing masks and must use best efforts to ensure that masks are worn when embarking, disembarking, and throughout the duration of travel. Operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask.

As a condition of receiving controlled free pratique under 42 CFR 71.31(b) to enter a U.S. port, disembark passengers, and begin operations at any U.S. port of entry, conveyances arriving into the United States must require persons to wear masks while boarding, disembarking, and for the duration of travel. Conveyance operators must also require all persons to wear masks while boarding and for the duration of their travel on board conveyances departing from the United States until the conveyance arrives at the foreign destination, if at any time any of the persons onboard (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. These travel conditions are

---

[27] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html.* Accessed January 20, 2021.

[28] *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.*

[29] Based on internet sources, 37 states plus DC and Puerto Rico mandate the wearing of masks in public. Among the jurisdictions that have imposed mask mandates, variations in requirements exist. For example, exemptions for children range in cutoff age from 2 to 12, but masks are generally required in indoor public spaces such as restaurants and stores, on public transit and ride-hailing services, and outdoors when unable to maintain 6

feet of distance from others. *See https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html* (accessed January 28, 2021).

[30] *https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html.*

[31] *https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.*

[32] *https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.*

necessary to mitigate the harm of further introduction of COVID–19 into the United States.

Requiring a properly worn mask is a reasonable and necessary measure to prevent the introduction, transmission and spread of COVID–19 into the United States and among the states and territories under 42 U.S.C. 264(a) and 42 CFR 71.32(b). Among other benefits, masks help prevent dispersal of an infected person's respiratory droplets that carry the virus. That precaution helps prevent droplets from landing in the eye, mouth, or nose or possibly being inhaled into the lungs of an uninfected person, or from landing on a surface or object that an uninfected person may then touch and then touch his or her own or another's eyes, nose, or mouth. Masks also provide some protection to the wearer by helping reduce inhalation of respiratory droplets.

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe, where the controlling governmental authority: (1) Requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Those requirements must provide the same level of public health protection as—or greater protection than—the requirements listed herein.

In accordance with 42 U.S.C. 264(e), state, local, territorial, and tribal authorities may impose additional requirements that provide greater public health protection and are more restrictive than the requirements in this Order. Consistent with other federal, state, or local legal requirements, this Order does not preclude operators of conveyances or transportation hubs from imposing additional requirements, or conditions for carriage, that provide greater public health protection and are more restrictive than the requirements in this Order (*e.g.,* requiring a negative result from a SARS–CoV–2 viral test or documentation of recovery from COVID–19 or imposing requirements for social distancing or other recommended protective measures).

This Order is not a rule within the meaning of the Administrative Procedure Act ("APA") but rather is an emergency action taken under the existing authority of 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), 71.32(b). In the event that a court determines this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and

the opportunity to comment on this Order and the delay in effective date. Considering the public health emergency caused by COVID–19, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Order. Similarly, the Office of Information and Regulatory Affairs has determined that if this Order were a rule, it would be a major rule under the Congressional Review Act, but there would not be a delay in its effective date as the agency has determined that there would be good cause to make the requirements herein effective immediately under the APA.

This order is also an economically significant regulatory action under Executive Order 12866 and has therefore been reviewed by the Office of Information and Regulatory Affairs of the Office of Management and Budget. The agency is proceeding without the complete analysis required by Executive Order 12866 under the emergency provisions of 6(a)(3)(D) of that Order.

If any provision of this Order, or the application of any provision to any carriers, conveyances, persons, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any carriers, conveyances, persons, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

To address the COVID–19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration under appropriate statutory and regulatory authorities including the provisions of 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR part 1503, 1540.105, 1542.303, 1544.305 and 1546.105.

This Order shall be further enforced by other federal authorities and may be enforced by cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18 and 71.2.[33]

*EFFECTIVE DATE:*

This Order shall enter into effect on February 1, 2021, at 11:59 p.m. and will

remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists.

Dated: February 1, 2021.

**Sherri Berger,**

*Acting Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2021–02340 Filed 2–1–21; 4:15 pm]

**BILLING CODE 4163–18–P**

---

# DEPARTMENT OF THE INTERIOR

## Geological Survey

**[GX20EG31DW50100; OMB Control Number 1028-New]**

## Agency Information Collection Activities; Hydrography Addressing tool

**AGENCY:** U.S. Geological Survey, Interior.

**ACTION:** Notice of Information Collection; request for comment.

---

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, we, the U.S. Geological Survey (USGS) are proposing a new information collection.

**DATES:** Interested persons are invited to submit comments on or before April 5, 2021.

**ADDRESSES:** Send your comments on this information collection request (ICR) by mail to U.S. Geological Survey, Information Collections Officer, 12201 Sunrise Valley Drive MS 159, Reston, VA 20192; or by email to *gs-info_collections@usgs.gov.* Please reference OMB Control Number 1028–xxxx in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** To request additional information about this ICR, contact Michael Tinker by email at *mdtinker@usgs.gov* or by telephone at 303–202–4476.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act of 1995, we provide the general public and other Federal agencies with an opportunity to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are soliciting comments on the proposed ICR that is described below.

---

[33] While this Order may be enforced and CDC reserves the right to enforce through criminal penalties, CDC does not intend to rely primarily on these criminal penalties but instead strongly encourages and anticipates widespread voluntary compliance as well as support from other federal agencies in implementing additional civil measures enforcing the provisions of this Order, to the extent permitted by law and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID–19 Safety in Domestic and International Travel).

 **World**

Plaintiffs' Exhibit 106

● LIVE TV 

# WHO stands by recommendation to not wear masks if you are not sick or not caring for someone who is sick



**By** Jacqueline Howard**, CNN**

Updated 2:24 AM ET, Tue March 31, 2020

**(CNN)** — World Health Organization officials Monday said they still recommend people not wear face masks unless they are sick with Covid-19 or caring for someone who is sick.



**Related Article:** Masks may actually increase your coronavirus risk if worn improperly, surgeon general warns

"There is no specific evidence to suggest that the wearing of masks by the mass population has any potential benefit. In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly," Dr. Mike Ryan, executive director of the WHO health emergencies program, said at a media briefing in Geneva, Switzerland, on Monday.

"There also is the issue that we have a massive global shortage," Ryan said about masks and other medical supplies. "Right now the people most at risk from this virus are frontline health workers who are exposed to the virus every second of every day. The thought of them not having masks is horrific."

Dr. Maria Van Kerkhove, an infectious disease epidemiologist with the WHO, also said at Monday's briefing that it is important "we prioritize the use of masks for those who need it most," which would be frontline health care workers.

"In the community, we do not recommend the use of wearing masks unless you yourself are sick and as a measure to prevent onward spread from you if you are ill," Van Kerkhove said.

"The masks that we recommend are for people who are at home and who are sick and for those individuals who are caring for those people who are home that are sick," she said.

World Health Organization officials warned at a media briefing last week that globally there is a "significant shortage" of medical supplies, including personal protective gear or PPE, for doctors.

**Related Article:** People around the country are sewing masks. And some hospitals, facing dire shortage, welcome them

"We need to be clear," Van Kerkhove said last week. "The world is facing a significant shortage of PPE for our frontline workers -- including masks and gloves and gowns and face shields -- and protecting our health care workers must be the top priority for use of this PPE."

## Get CNN Health's weekly newsletter

Sign up here to get **The Results Are In with Dr. Sanjay Gupta** every Tuesday from the CNN Health team.

# Advice on the use of masks in the community, during home care and in health care settings in the context of the novel coronavirus (2019-nCoV) outbreak

Interim guidance

29 January 2020



## Introduction

This document provides rapid advice on the use of medical masks in communities, at home and at health care facilities in areas that have reported outbreaks caused by the 2019 novel coronavirus (2019-nCoV). It is intended for public health and infection prevention and control (IPC) professionals, health care managers, health care workers and community health workers. It will be revised as more data become available.

With the current information available, it is suggested that the route of human-to-human transmission of 2019-nCoV is either via respiratory droplets or contact. Any person who is in close contact (within 1 meter) with someone who has respiratory symptoms (e.g., sneezing, coughing, etc.) is at risk of being exposed to potentially infective respiratory droplets.

Medical masks are surgical or procedure masks that are flat or pleated (some are like cups); they are affixed to the head with straps[a].

## General Advice

Wearing a medical mask is one of the prevention measures to limit spread of certain respiratory diseases, including 2019-nCoV, in affected areas. However, the use of a mask **alone is insufficient to provide the adequate level of protection** and other equally relevant measures should be adopted. If masks are to be used, this measure must be combined with hand hygiene and other IPC measures to prevent the human-to-human transmission of 2019-nCov. WHO has developed guidance for home care[b] and health care settings[c] on infection prevention and control (IPC) strategies for use when infection with 2019-nCoV is suspected.

Wearing medical masks when not indicated may cause unnecessary cost, procurement burden and create a false sense of security that can lead to neglecting other essential measures such as hand hygiene practices. Furthermore, using a mask incorrectly may hamper its effectiveness to reduce the risk of transmission.

## Community setting

*Individuals without respiratory symptoms should:*
- avoid agglomerations and frequency of closed crowded spaces;
- maintain distance of at least 1 meter from any individual with 2019-nCoV respiratory symptoms (e.g., coughing, sneezing);
- perform hand hygiene frequently, using alcohol-based hand rub if hands are not visibly soiled or soap and water when hands are visibly soiled;
- if coughing or sneezing cover nose and mouth with flexed elbow or paper tissue, dispose of tissue immediately after use and perform hand hygiene;
- refrain from touching mouth and nose;
- a medical mask is not required, as no evidence is available on its usefulness to protect non-sick persons. However, masks might be worn in some countries according to local cultural habits. If masks are used, best practices should be followed on how to wear, remove, and dispose of them and on hand hygiene action after removal (see below advice regarding appropriate mask management).

*Individuals with respiratory symptoms should:*
- wear a medical mask and seek medical care if experiencing fever, cough and difficulty breathing, as soon as possible or in accordance with to local protocols;
- follow the below advice regarding appropriate mask management.

## Home Care

In view of the currently available data on the disease and its transmission, WHO recommends that suspected cases of 2019-nCoV infection be cared for using isolation precautions and monitored in a hospital setting. This would ensure both safety and quality of health care (in case patients' symptoms worsen) and public health security.

---

[a] Infection prevention and control of epidemic- and pandemic-prone acute respiratory infections in health care. World Health Organization. (2014). Available at https://apps.who.int/iris/handle/10665/174652
[b] Home care for patients with suspected novel coronavirus (nCoV) infection presenting with mild symptoms and management of contacts. Available at https://www.who.int/publications-detail/home-care-for-patients-with-suspected-novel-coronavirus-

(ncov)-infection-presenting-with-mild-symptoms-and-management-of-contacts
[c] Infection prevention and control during health care when novel coronavirus (nCoV) infection is suspected. Available at https://www.who.int/publications-detail/infection-prevention-and-control-during-health-care-when-novel-coronavirus-(ncov)-infection-is-suspected-20200125

However, for several possible reasons, including situations when inpatient care is unavailable or unsafe (i.e. limited capacity and resources unable to meet demand for health care services), or in a case of informed refusal of hospitalization, home settings for health care provision may need to be considered. Specific IPC guidance for home care should be followed[b].

*Individuals with suspected 2019-nCoV infection with mild respiratory symptoms should:*
- perform hand hygiene frequently, using alcohol-based hand rub if hands are not visibly soiled or soap and water when hands are visibly soiled;
- keep distance from well individuals as much as possible (at least 1 meter);
- to contain respiratory secretions, a medical mask should be provided to the individual and worn as much as possible, if it can be tolerated. For individuals who cannot tolerate a medical mask, he/she should rigorously apply respiratory hygiene, i.e. cover mouth and nose when coughing or sneezing with disposable paper tissue. Dispose of the material after use. Clean hands immediately after contact with respiratory secretions;
- improve airflow in living space by opening windows and door as much as possible.

*Relatives or caregivers to individuals with suspected 2019-nCoV infection with mild respiratory symptoms should:*
- perform hand hygiene frequently, using alcohol-based hand rub if hands are not visibly soiled or soap and water when hands are visibly soiled;
- keep distance from affected individual as much as possible (at least 1 meter);
- wear a medical mask when in the same room with the affected individual;
- dispose of the material immediately after use. Clean hands immediately after contact with respiratory secretions;
- improve airflow in living space by opening windows as much as possible.

## Health Care Facilities

*Individuals with respiratory symptoms should:*
- wear a medical mask while waiting in triage or waiting areas or during transportation within the facility;
- wear a medical mask when staying in cohorting areas dedicated to suspected or confirmed cases;

- do not wear a medical mask when isolated in single rooms but cover mouth and nose when coughing or sneezing with disposable paper tissues. Dispose them appropriately and perform hand hygiene immediately afterwards.

*Health care workers should:*
- wear a medical mask when entering a room where patients suspected or confirmed of being infected with 2019-nCoV are admitted and in any situation of care provided to a suspected or confirmed case[c];
- use a particulate respirator at least as protective as a US National Institute for Occupational Safety and Health (NIOSH)-certified N95, European Union (EU) standard FFP2, or equivalent, when performing aerosol-generating procedures such as tracheal intubation, non-invasive ventilation, tracheotomy, cardiopulmonary resuscitation, manual ventilation before intubation, and bronchoscopy.

## Masks management

If medical masks are worn, appropriate use and disposal is essential to ensure they are effective and to avoid any increase in risk of transmission associated with the incorrect use and disposal of masks.

The following information on correct use of medical masks derives from the practices in health-care settings[d]:
- place mask carefully to cover mouth and nose and tie securely to minimise any gaps between the face and the mask;
- while in use, avoid touching the mask;
- remove the mask by using appropriate technique (i.e. do not touch the front but remove the lace from behind);
- after removal or whenever you inadvertently touch a used mask, clean hands by using an alcohol-based hand rub or soap and water if visibly soiled
- replace masks with a new clean, dry mask as soon as they become damp/humid;
- do not re-use single-use masks;
- discard single-use masks after each use and dispose of them immediately upon removal.

Cloth (e.g. cotton or gauze) masks are not recommended under any circumstance.

---

© World Health Organization 2020. Some rights reserved. This work is available under the CC BY-NC-SA 3.0 IGO licence.

WHO reference number: WHO/nCoV/IPC_Masks/2020.1

---

[d] Infection prevention and control of epidemic- and pandemic-prone acute respiratory infections in health care. World Health Organization. (2014). Organization. https://apps.who.int/iris/handle/10665/112656

npr.org

# Why There Are So Many Different Guidelines For Face Masks For The Public

*Huo Jingnan Twitter*

13-17 minutes



A do-it-yourself mask culture is springing up in the Czech Republic. This woman was photographed on the Charles Bridge in Prague on March 28. **Michal Cizek/AFP via Getty Images hide caption**

**toggle caption**

Michal Cizek/AFP via Getty Images



*A do-it-yourself mask culture is springing up in the Czech Republic. This woman was photographed on the Charles Bridge in Prague on March 28.*

Michal Cizek/AFP via Getty Images

On Feb. 29, the U.S. surgeon general Dr. Jerome Adams tweeted that masks do not offer any benefit to the average citizen.

Seriously people- STOP BUYING MASKS!

They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk! https://t.co/UxZRwxxKL9

— U.S. Surgeon General (@Surgeon_General) February 29, 2020

About a month later, on Friday, April 3, the Centers for Disease Control and Prevention recommended that Americans wear "cloth face coverings fashioned from household items or made at home from common materials ... as an additional, voluntary public health measure."

This isn't the only example of a change or updating of mask-wearing policies during the coronavirus crisis. It's happened in countries around the world — from Singapore to Austria to Kenya (which just announced one of the world's strictest policies — police are arresting anyone caught without a mask in their vehicle, on a bus or in a public place.)

Meanwhile, some health agencies have taken a stand that calls for mask-wearing in public from the early stages of the outbreak — Hong Kong on Jan. 24, mainland China on Jan. 31.



In Wuhan, China, and other parts of East Asia, wearing masks in public has been commonplace since the SARS outbreak in the early 2000s. This photo was taken on January 23, about a week before China called on citizens to wear masks as a way to stem the spread of the novel coronavirus.

**Stringer for NPR hide caption**

**toggle caption**

Stringer for NPR

To understand why mask guidelines have been so varied, NPR reached out to specialists in academia and in government. What we learned is that face mask guidelines are about science — but go beyond. The reasons for a policy may have to do with practical considerations like the national supply of masks but ==may also reflect cultural values and history.==

**Shifting Guidelines**

In order to understand the range of guidelines, ==the first issue to consider is the data on the potential benefits of masks. As with so many points surrounding the novel coronavirus, there's not a clear-cut finding.==

But there is emerging research and data that suggests transmission of COVID-19 by asymptomatic and pre-symptomatic individuals. Such research has been coming out at least since February; the latest report is from Singapore on April 1. These studies emphasize that people can spread the virus before realizing that they are sick — and that wearing a mask in public could help keep the infected person from spreading infectious droplets.

Among the reasons for reluctance on the part of some health agencies and places to urge mask wearing is the concern about the shortage of masks for medical workers. ==That's why the World Health Organization has stayed consistent in its recommendation==, Margaret Harris of its coronavirus response team told NPR. And that position is: yes to masks for health-care workers and people with symptoms, ==no for the general public.==

WHO and other agencies have also raised concerns about the potential problems that could arise due to the wearing of a mask — for example, a false sense of security that would undermine other preventive measures or self-contamination from touching a contaminated mask.

Epidemiologist Sergio Brusin who works on the European Center for Disease Control's coronavirus response, offered NPR a similar rationale in an interview. However, ECDC only mentioned that face masks aren't effective in protecting the wearer on its public-facing website. A number of other health agencies — like WHO and the CDC — offered little explanation on their website.

The result of these sometimes incomplete messages: "I think that if you talk to even the highly informed members of the general public and ask[ed] them a week, or two or three weeks ago, if the face masks work, they would say 'no' because they would have read CDC guidance, WHO guidance," says Lawrence Gostin, professor of global health law at Georgetown University and director of the World Health Organization Center on National & Global Health Law.

"But that wouldn't have been correct. Based upon the science [about potential benefits of masks for the public] we knew at the time."

Governments should not have downplayed the importance of face masks [as a protective measure for the public], says Leiyu Shi, who researches comparative health systems and health policy at Johns Hopkins University, "because it will make them [seem] very foolish when they change their stance. Again and again," Shi says.

In response to NPR's inquiry about its April 3 guideline change, the CDC said its change was driven by "increasing and widespread transmission of the new coronavirus across the country," citing studies published in February and March showing pre-symptomatic and a symptomatic spread. A CDC spokesperson also noted reports from Asian countries showing that a cloth face covering can reduce the chance of spreading respiratory droplets when people need to be in places with others.

Asked by NPR about the Surgeon General's earlier tweet about the ineffectiveness of masks, the office of the Surgeon General issued a statement Thursday noting that back in February Dr. Adams was following the CDC, WHO and other health organizations, which all recommended against wearing masks as a way to protect the person wearing them. The statement said that the understanding on spread from infected individuals who have not shown symptoms has since changed.

**The Impact Of SARS On Mask Guidance**

For Jeremy Lim, Adjunct Associate professor of public health from the National University of Singapore School of Public Health, East Asia's threshold for taking action on face masks and more potentially preventive measures was sparked by SARS, or Severe Acute Respiratory Syndrome, another coronavirus that swept through the region in 2003.

"Policymakers will always have to live with uncertainty and incomplete information,' Lim says. "For East Asian countries, the attitude was 'better to be safe than to be sorry.' "

Asked about the new CDC position in the U.S., public health academics like Gostin and Shi believe the guideline changes in the U.S. could have come sooner, given the emerging evidence of potential benefits.

This guidance was updated on 5 June. Click here to access the new version.

# Advice on the use of masks in the context of COVID-19

Interim guidance

6 April 2020



## Background

This document provides advice on the use of masks in communities, during home care, and in health care settings in areas that have reported cases of COVID-19. It is intended for individuals in the community, public health and infection prevention and control (IPC) professionals, health care managers, health care workers (HCWs), and community health workers. It will be revised as more data become available.

Current information suggests that the two main routes of transmission of the COVID-19 virus are respiratory droplets and contact. Respiratory droplets are generated when an infected person coughs or sneezes. Any person who is in close contact (within 1 m) with someone who has respiratory symptoms (coughing, sneezing) is at risk of being exposed to potentially infective respiratory droplets. Droplets may also land on surfaces where the virus could remain viable; thus, the immediate environment of an infected individual can serve as a source of transmission (contact transmission).[1]

WHO has recently summarized reports of transmission of the COVID-19 virus and provided a brief overview of current evidence on transmission from symptomatic, pre-symptomatic, and asymptomatic [a] people infected with COVID-19 (full details are provided in WHO COVID-19 Situation report 73).[2]

Current evidence suggests that most disease is transmitted by symptomatic laboratory confirmed cases. The incubation period for COVID-19, which is the time between exposure to the virus and symptom onset, is on average 5-6 days, but can be as long as 14 days. During this period, also known as the "pre-symptomatic" period, some infected persons can be contagious and therefore transmit the virus to others.[3-8] In a small number of reports, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases.[3-8] This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms.[9,10]

Thus, it is possible that people infected with COVID-19 could transmit the virus before symptoms develop. It is important to recognize that pre-symptomatic transmission still requires the virus to be spread via infectious droplets or through

touching contaminated surfaces. WHO regularly monitors all emerging evidence about this critical topic and will provide updates as more information becomes available.

In this document medical masks are defined as surgical or procedure masks that are flat or pleated (some are shaped like cups); they are affixed to the head with straps. They are tested according to a set of standardized test methods (ASTM F2100, EN 14683, or equivalent) that aim to balance high filtration, adequate breathability and optionally, fluid penetration resistance. This document does not focus on respirators; for guidance on use of respirators see IPC guidance during health care when COVID-19 infection is suspected.[11]

Wearing a medical mask is one of the prevention measures that can limit the spread of certain respiratory viral diseases, including COVID-19. **However, the use of a mask alone is insufficient to provide an adequate level of protection, and other measures should also be adopted.** Whether or not masks are used, maximum compliance with hand hygiene and other IPC measures is critical to prevent human-to-human transmission of COVID-19. WHO has developed guidance on IPC strategies for home care[12] and health care settings[11] for use when COVID-19 is suspected.

## Community settings

Studies of influenza, influenza-like illness, and human coronaviruses provide evidence that the use of a medical mask can prevent the spread of infectious droplets from an infected person to someone else and potential contamination of the environment by these droplets.[13] There is limited evidence that wearing a medical mask by healthy individuals in the households or among contacts of a sick patient, or among attendees of mass gatherings may be beneficial as a preventive measure.[14-23] However, there is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including COVID-19.

**Medical masks should be reserved for health care workers.** The use of medical masks in the community may create a false sense of security, with neglect of other essential measures, such as hand hygiene practices and physical distancing, and may lead to touching the face under the masks and under the eyes, result in unnecessary costs, and take

---

[a] An asymptomatic laboratory-confirmed case is a person infected with COVID-19 who does not develop symptoms. Asymptomatic transmission refers to transmission of the virus from a person, who does not develop

symptoms. The true extent of asymptomatic infections will be determined from serologic studies.

masks away from those in health care who need them most, especially when masks are in short supply.

**Persons with symptoms should:**

- wear a medical mask, self-isolate, and seek medical advice as soon as they start to feel unwell. Symptoms can include fever, fatigue, cough, sore throat, and difficulty breathing. It is important to note that early symptoms for some people infected with COVID-19 may be very mild;
- follow instructions on how to put on, take off, and dispose of medical masks;
- follow all additional preventive measures, in particular, hand hygiene and maintaining physical distance from other persons.

**All persons should:**

- avoid groups of people and enclosed, crowded spaces;
- maintain physical distance of at least 1 m from other persons, in particular from those with respiratory symptoms (e.g., coughing, sneezing);
- perform hand hygiene frequently, using an alcohol-based hand rub if hands are not visibly dirty or soap and water when hands are visibly dirty;
- cover their nose and mouth with a bent elbow or paper tissue when coughing or sneezing, dispose of the tissue immediately after use, and perform hand hygiene;
- refrain from touching their mouth, nose, and eyes.

In some countries masks are worn in accordance with local customs or in accordance with advice by national authorities in the context of COVID-19. In these situations, best practices should be followed about how to wear, remove, and dispose of them, and for hand hygiene after removal.

**Advice to decision makers on the use of masks for healthy people in community settings**

As described above, the wide use of masks by healthy people in the community setting is not supported by current evidence and carries uncertainties and critical risks. WHO offers the following advice to decision makers so they apply a risk-based approach.

Decisions makers should consider the following:

1. **Purpose** of mask use: the rationale and reason for mask use should be clear– whether it is to be used for source control (used by infected persons) or prevention of COVID-19 (used by healthy persons)
2. Risk of **exposure** to the COVID-19 virus in the local context:
   – The population: current epidemiology about how widely the virus is circulating (e.g., clusters of cases versus community transmission), as well as local surveillance and testing capacity (e.g., contact tracing and follow up, ability to carry out testing).
   – The individual: working in close contact with public (e.g., community health worker, cashier)
3. **Vulnerability** of the person/population to develop severe disease or be at higher risk of death, e.g. people with comorbidities, such as cardiovascular disease or diabetes mellitus, and older people

4. **Setting** in which the population lives in terms of population density, the ability to carry out physical distancing (e.g. on a crowded bus), and risk of rapid spread (e.g. closed settings, slums, camps/camp-like settings).
5. **Feasibility**: availability and costs of the mask, and tolerability by individuals
6. **Type** of mask: medical mask versus nonmedical mask (see below)

In addition to these factors, potential advantages of the use of mask by healthy people in the community setting include reducing potential exposure risk from infected person during the "pre-symptomatic" period and stigmatization of individuals wearing mask for source control.

However, the following potential risks should be carefully taken into account in any decision-making process:

- self-contamination that can occur by touching and reusing contaminated mask
- depending on type of mask used, potential breathing difficulties
- false sense of security, leading to potentially less adherence to other preventive measures such as physical distancing and hand hygiene
- diversion of mask supplies and consequent shortage of mask for health care workers
- diversion of resources from effective public health measures, such as hand hygiene

Whatever approach is taken, it is important to develop a strong communication strategy to explain to the population the circumstances, criteria, and reasons for decisions. The population should receive clear instructions on what masks to wear, when and how (see mask management section), and on the importance of continuing to strictly follow all other IPC measures (e.g., hand hygiene, physical distancing, and others).

**Type of Mask**

**WHO stresses that it is critical that medical masks and respirators be prioritized for health care workers.**

The use of masks made of other materials (e.g., cotton fabric), also known as nonmedical masks, in the community setting has not been well evaluated. There is no current evidence to make a recommendation for or against their use in this setting.

WHO is collaborating with research and development partners to better understand the effectiveness and efficiency of nonmedical masks. WHO is also strongly encouraging countries that issue recommendations for the use of masks in healthy people in the community to conduct research on this critical topic. WHO will update its guidance when new evidence becomes available.

In the interim, decision makers may be moving ahead with advising the use of nonmedical masks. Where this is the case, the following features related to nonmedical masks should be taken into consideration:

- Numbers of layers of fabric/tissue
- Breathability of material used
- Water repellence/hydrophobic qualities
- Shape of mask
- Fit of mask

## Home care

For COVID-19 patients with mild illness, hospitalization may not be required. All patients cared for outside hospital (i.e. at home or non-traditional settings) should be instructed to follow local/regional public health protocols for home isolation and return to designated COVID-19 hospital if they develop any worsening of illness.[7]

Home care may also be considered when inpatient care is unavailable or unsafe (e.g. capacity is limited, and resources are unable to meet the demand for health care services). Specific IPC guidance for home care should be followed.[3]

**Persons with suspected COVID-19 or mild symptoms should**:
- Self-isolate if isolation in a medical facility is not indicated or not possible
- Perform hand hygiene frequently, using an alcohol-based hand rub if hands are not visibly dirty or soap and water when hands are visibly dirty;
- Keep a distance of at least 1 m from other people;
- Wear a medical mask as much as possible; the mask should be changed at least once daily. Persons who cannot tolerate a medical mask should rigorously apply respiratory hygiene (i.e. cover mouth and nose with a disposable paper tissue when coughing or sneezing and dispose of it immediately after use or use a bent elbow procedure and then perform hand hygiene.)
- Avoid contaminating surfaces with saliva, phlegm, or respiratory secretions.
- Improve airflow and ventilation in their living space by opening windows and doors as much as possible.

**Caregivers or those sharing living space with persons suspected of COVID-19 or with mild symptoms should**:
- Perform hand hygiene frequently, using an alcohol-based hand rub if hands are not visibly dirty or soap and water when hands are visibly dirty;
- Keep a distance of at least 1 meter from the affected person when possible;
- Wear a medical mask when in the same room as the affected person;
- Dispose of any material contaminated with respiratory secretions (disposable tissues) immediately after use and then perform hand hygiene.
- Improve airflow and ventilation in the living space by opening windows as much as possible.

## Health care settings

WHO provides guidance for the use of PPE, including masks, by health care workers in the guidance document: Rational use of PPE in the context of COVID-19.[24] Here we provide advice for people visiting a health care setting.

**Symptomatic people visiting a health care setting should**:
- Wear a medical mask while waiting in triage or other areas and during transportation within the facility;
- Not wear a medical mask when isolated in a single room, but cover their mouth and nose when coughing or sneezing with disposable paper tissues. Tissues must be disposed of appropriately, and hand hygiene should be performed immediately afterwards.

**Health care workers should**:
- Wear a medical mask when entering a room where patients with suspected or confirmed COVID-19 are admitted.
- Use a particulate respirator at least as protective as a US National Institute for Occupational Safety and Health-certified N95, European Union standard FFP2, or equivalent, when performing or working in settings where aerosol-generating procedures, such as tracheal intubation, non-invasive ventilation, tracheotomy, cardiopulmonary resuscitation, manual ventilation before intubation, and bronchoscopy are performed.
- Full infection prevention and control guidance for health care workers is provided here.

One study that evaluated the use of cloth masks in a health care facility found that health care workers using cotton cloth masks were at increased risk of infection compared with those who wore medical masks.[25] Therefore, cotton cloth masks are not considered appropriate for health care workers. As for other PPE items, if production of cloth masks for use in health care settings is proposed locally in situations of shortage or stock out, a local authority should assess the proposed PPE according to specific minimum standards and technical specifications.

## Mask management

For any type of mask, appropriate use and disposal are essential to ensure that they are effective and to avoid any increase in transmission.

The following information on the correct use of masks is derived from practices in health care settings:
- Place the mask carefully, ensuring it covers the mouth and nose, and tie it securely to minimize any gaps between the face and the mask.
- Avoid touching the mask while wearing it.
- Remove the mask using the appropriate technique: do not touch the front of the mask but untie it from behind.
- After removal or whenever a used mask is inadvertently touched, clean hands using an alcohol-based hand rub or soap and water if hands are visibly dirty.
- Replace masks as soon as they become damp with a new clean, dry mask.
- Do not re-use single-use masks.
- Discard single-use masks after each use and dispose of them immediately upon removal.

WHO continues to monitor the situation closely for any changes that may affect this interim guidance. Should any factors change, WHO will issue a further update. Otherwise, this interim guidance document will expire 2 years after the date of publication.

## References

1. Water, sanitation, hygiene and waste management for COVID-19 https://www.who.int/publications-detail/water-sanitation-hygiene-and-waste-management-for-covid-19

2. Coronavirus disease 2019 (COVID-19) Situation Report – 73. https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_6

3. Yu P, Zhu J, Zhang Z, Han Y. A familial cluster of infection associated with the 2019 novel coronavirus indicating possible person-to-person transmission during the incubation period. J Infect 2020 doi:10.1093/jiaa077

4. Huang R, Xia J, Chen Y, Shan C, Wu C. A family cluster of SARS-CoV-2 infection involving 11 patients in Nanjing, China Lancet Infect Dis 2020 doi: 10.1016/ S1473-3099(20)30147-X

5. Pan X, Chen D, Xia Y et al. Asymptomatic cases in a family cluster with SARS-CoV-2 infection. Lancet Infect Dis 2020 doi: 10.1016/ S1473-3099(20)30114-6.

6. Tong Z-D, Tang A, Li K-F, Li P, Wang H-L, Yi J-P, et al. Potential presymptomatic transmission of SARS-CoV-2, Zhejiang Province, China, 2020. Emerg Infect Dis. 2020 doi: 10.3201/eid2605.200198

7. Wei WE, Li Z, Chiew CJ, Yong SE, et al. Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020. MMWR, 1 April 2020/69.

8. Kimball A, Hatfield KM, Arons M, James A, et al. Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility — King County, Washington, March 2020. MMWR, 3 April 2020, 69(13);377–381.

9. WorldHealthOrganization.ReportoftheWHO-ChinaJointMissiononCoronavirusDisease2019(COVID-19) 16-24 February 2020 [Internet]. Geneva: World Health Organization; 2020 Available from: https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final- report.pdf

10. Wei WE, Li Z, Chiew CJ, Yong SE, et al. Presymptomatic Transmission of SARS-CoV-2 — Singapore, January 23–March 16, 2020. MMWR, 1 April 2020/69.

11. World Health Organization. Infection prevention and control during health care when COVID-19 is suspected: interim guidance, (accessed 29 January 2020).

12. World Health Organization. Home care for patients with COVID-19 presenting with mild symptoms and management of contacts: interim guidance (accessed 29 January 2020)

13. Infection prevention and control of epidemic- and pandemic-prone acute respiratory diseases in health care. Geneva: World Health Organization; 2014 (https://apps.who.int/iris/bitstream/handle/10665/112656/9789241507134_eng.pdf, accessed 17 January 2020).

14. Aiello AE, Coulborn RM, Perez V, et al. A randomized intervention trial of mask use and hand hygiene to reduce seasonal influenza-like illness and influenza infections among young adults in a university setting. International Journal of Infectious Diseases 2010;14:E320-E20. doi: 10.1016/j.ijid.2010.02.2201

15. Cowling BJ, Fung ROP, Cheng CKY, et al. Preliminary Findings of a Randomized Trial of Non-Pharmaceutical Interventions to Prevent Influenza Transmission in Households. Plos One 2008;3(5) doi: 10.1371/journal.pone.0002101

16. Suess T, Remschmidt C, Schink SB, et al. The role of facemasks and hand hygiene in the prevention of influenza transmission in households: results from a cluster randomised trial; Berlin, Germany, 2009-2011. BMC Infect Dis 2012;12:26. doi: 10.1186/1471-2334-12-26.[published Online First: 2012/01/28]

17. Aiello AE, Perez V, Coulborn RM, et al. Facemasks, hand hygiene, and influenza among young adults: a randomized intervention trial. PLoS One 2012;7(1):e29744. doi:10.1371/journal.pone.0029744. Epub 2012 Jan 25. [published Online First: 2012/02/02]

18. Barasheed O, Almasri N, Badahdah AM, et al. Pilot Randomised Controlled Trial to Test Effectiveness of Facemasks in Preventing Influenza-like Illness Transmission among Australian Hajj Pilgrims in 2011. Infect Disord Drug Targets 2014;14(2):110-6. doi: 10.2174/1871526514666141021112855 [published Online First: 2014/10/23]

19. Canini L, Andreoletti L, Ferrari P, et al. Surgical mask to prevent influenza transmission in households: a cluster randomized trial. PLoS One 2010;5(11):e13998. doi:10.1371/journal.pone.0013998. [published Online First: 2010/11/26]

20. MacIntyre CR, Zhang Y, Chughtai AA, et al. Cluster randomised controlled trial to examine medical mask use as source control for people with respiratory illness. BMJ Open 2016;6(12):e012330. doi: 10.1136/bmjopen-2016-012330. [published Online First: 2017/01/01]

21. Lau JT, Tsui H, Lau M, Yang X. SARS transmission, risk factors, and prevention in Hong Kong. Emerg Infect Dis. 2004 Apr;10(4):587-92.

22. Wu J, Xu F, Zhou W et al. Risk factors for SARS among persons without known contact with SARS patients, Beijing, China. Emerg Infect Dis. 2004 Feb;10(2):210-6.

23. Barasheed O, Alfelali M, Mushta S et al. Uptake and effectiveness of facemask against respiratory infections at mass gatherings: a systematic review. Int J Infect Dis. 2016 Jun;47:105-11. doi: 10.1016/j.ijid.2016.03.023.

24. Rational use of personal protective equipment for coronavirus disease (COVID-19) https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/infection-prevention-and-control

25. MacIntyre CR, Seale H, Dung TC, Hien NT, Aga PH, Chugtai AA, Rahman B, Dwyer DE, Wang Q. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. BMJ Open 2015;5:e006577. doi:10.1136/bmjopen-2014-006577

© World Health Organization 2020. Some rights reserved. This work is available under the CC BY-NC-SA 3.0 IGO licence.

WHO reference number:  WHO/2019-nCoV/IPC_Masks/2020.3

businessinsider.com

# WHO says there is no need for healthy people to wear face masks, days after the CDC told all Americans to cover their faces

*Julia Naftulin*

8-9 minutes

---

- On April 6, the World Health Organization released new guidance saying that healthy people don't need to wear face masks to prevent coronavirus spread.

- Masks should be for the sick, their caretakers, and healthcare workers, the WHO guidance said.

- Scientists and public-health organizations can't agree on the best face-mask protocol, and the WHO guidelines go against the CDC's face-mask recommendations.

- *Editor's note: As of June 5, the WHO recommends the use of fabric face masks and/or face shields for the general public as a tool to reduce the spread of the novel coronavirus.*

- Visit Business Insider's homepage for more stories.

The use of face masks on healthy people during the coronavirus pandemic has been a major point of contention and confusion among scientists and the public.

On Friday, the US Centers for Disease Control and Prevention recommended that all Americans wear face masks when they are in public.

But new guidance from the World Health Organization released on Monday says healthy people don't need to wear face masks and that doing so won't provide added protection from the coronavirus.

There's some evidence that caretakers of infected people can protect their health by wearing masks, the WHO guidance said, but "there is currently no evidence that wearing a mask (whether medical or other types) by healthy persons in the wider community setting, including universal community masking, can prevent them from infection with respiratory viruses, including COVID-19."

WHO also said community masking could lead to a "false sense of security" and cause people to ignore other evidence-based measures like handwashing and self-isolation.

## WHO says masks should be saved for healthcare workers, caretakers, and sick people — everyone else should just stay home

Crystal Cox/Business Insider

WHO said masks should be reserved for people who have COVID-19 or are in regular close contact with people who have the disease, like caretakers and hospital workers.

People with COVID-19 symptoms like a cough or shortness of breath should wear masks even if they haven't tested positive, and they should self-isolate, seek medical advice from home, and practice good hygiene, including handwashing and changing their masks, WHO said.

The organization also said that healthcare workers should use medical-grade masks, not makeshift cloth masks, when they can after one study showed that medical workers who used cloth masks were at increased risk of infection compared with those who used medical-grade masks.

"If production of cloth masks for use in health care settings is proposed locally in situations of shortage or stock out, a local authority should assess the proposed PPE according to specific minimum standards and technical specifications," the WHO report said.

## Masks could slow transmission, but there's room for infection-causing human error

Some health experts believe community masking efforts can't hurt.

"The argument ... about everybody wearing a mask is not that it will prevent everyone from getting infected — it's that it will slow down transmission in the community a bit," Ben Cowling, a professor of epidemiology and a mask researcher at the University of Hong Kong's School of Public Health, previously told Business Insider. "That's already useful. Just to have even a small effect is useful."

At the same time, Cowling recognized that face masks aren't a perfect public-health tool because they allow room for user error, a point made in the WHO guidance.

==WHO officials said healthy people who wear masks might touch their own faces more often than necessary, which could increase their risk for COVID-19.==

==Cowling said user error was a potential reason studies have yet to show community masking is effective at preventing disease spread.==

"Randomized trials don't support a big effect of face masks, but there is the mechanistic plausibility for face masks to work, right? So why not consider it?" Cowling said. "If you don't wear the mask properly, and if there's a lot of chances for you to get infected, then the mask may not do a lot of good."

But with much of the world already dealing with severe outbreaks, Cowling said ==masking efforts for the healthy are unlikely to stop the spread== at this point in time.

"I think it's too late to do a lot for the current epidemic because it's already spread such a lot, and then the cases that you're getting now are people infected two or three weeks ago. And the lockdowns that are in place will hopefully really slow down infections," Cowling said. =="Adding masks now I don't think would make a lot of difference to that trajectory."==

## You can protect yourself without a mask

The coronavirus is typically spread through tiny droplets that are ejected when an infected person coughs, sneezes, or talks, and the droplets land on another person or surface.

Scientists are still studying to understand to what extent coronavirus-containing aerosols linger in the air, which would make face-mask wearing more important, Business Insider previously reported.

So far, evidence suggests that the virus does not linger in the air outside hospital settings, where certain procedures, such as intubating a patient, can aerosolize virus particles.

For people who isolate at home and practice social distancing when outdoors, aerosols are likely not an issue. Running outdoors alone without wearing a mask, for example, is safe if you feel healthy, Business Insider previously reported.

As such, WHO said, practicing self-isolation, good hygiene, and social distancing are the best ways for healthy people to stay safe. The organization said it would also update its face-mask guidance based on new information as it comes out.





More: Health  coronavirus  Face masks  hygiene

# Advice on the use of masks in the context of COVID-19

Interim guidance

5 June 2020



This document is an update of the guidance published on 6 April 2020 and includes updated scientific evidence relevant to the use of masks for preventing transmission of Coronavirus disease 2019 (COVID-19) as well as practical considerations. The main differences from the previous version include the following:

- Updated information on transmission from symptomatic, pre-symptomatic and asymptomatic people infected with COVID-19, as well as an update of the evidence of all sections of this document;
- New guidance on the targeted continuous use of medical masks by health workers working in clinical areas in health facilities in geographical areas with community transmission[1] of COVID-19;
- Updated guidance and practical advice for decision-makers on the use of medical and non-medical masks by the general public using a risk-based approach;
- New guidance on non-medical mask features and characteristics, including choice of fabric, number and combination of layers, shape, coating and maintenance.

Guidance and recommendations included in this document are based on previous WHO guidelines (in particular the WHO Guidelines on infection prevention and control of epidemic- and pandemic-prone acute respiratory infections in health care) (1) and the evaluation of current evidence by the WHO ad hoc COVID-19 IPC Guidance Development Group (COVID-19 IPC GDG) that meets at least once a week. The process of interim guidance development during emergencies consists of a transparent and robust process of evaluation of the available evidence on benefits and harms, synthetized through expedited systematic reviews and expert consensus-building facilitated by methodologists. This process also considers, as much as possible, potential resource implications, values and preferences, feasibility, equity, ethics and research gaps.

**Purpose of the guidance**

This document provides guidance to decision makers, public health and IPC professionals, health care managers, and health workers on the use of medical and non-medical masks in health care (including long-term care and residential)

settings, for the general public, and during home care. It will be revised as more data become available.

## Background

The use of masks is part of a comprehensive package of the prevention and control measures that can limit the spread of certain respiratory viral diseases, including COVID-19. Masks can be used either for protection of healthy persons (worn to protect oneself when in contact with an infected individual) or for source control (worn by an infected individual to prevent onward transmission).

However, the use of a mask alone is insufficient to provide an adequate level of protection or source control, and other personal and community level measures should also be adopted to suppress transmission of respiratory viruses. Whether or not masks are used, compliance with hand hygiene, physical distancing and other infection prevention and control (IPC) measures are critical to prevent human-to-human transmission of COVID-19.

This document provides information and guidance on the use of masks in health care settings, for the general public, and during home care. The World Health Organization (WHO) has developed specific guidance on IPC strategies for health care settings (2), long-term care facilities (LTCF) (3), and home care.(4)

**Transmission of COVID-19**

Knowledge about transmission of the COVID-19 virus is accumulating every day. COVID-19 is primarily a respiratory disease and the spectrum of infection with this virus can range from people with very mild, non-respiratory symptoms to severe acute respiratory illness, sepsis with organ dysfunction and death. Some people infected have reported no symptoms at all.

According to the current evidence, COVID-19 virus is primarily transmitted between people via respiratory droplets and contact routes. Droplet transmission occurs when a person is in close contact (within 1 metre) with an infected person and exposure to potentially infective respiratory droplets occurs, for example, through coughing, sneezing or very close personal contact resulting in the inoculation of entry portals such as the mouth, nose or conjunctivae

---

[1] Defined by WHO as "experiencing larger outbreaks of local transmission defined through an assessment of factors including, but not limited to: large numbers of cases not linkable to transmission chains; large numbers of cases from sentinel

surveillance; and/or multiple unrelated clusters in several areas of the country/territory/area" (https://www.who.int/publications-detail/global-surveillance-for-covid-19-caused-by-human-infection-with-covid-19-virus-interim-guidance)

community transmission, consider additional precautions, including the wearing of a medical mask, when community health workers provide essential routine services (Table 2).

When a patient is suspected or confirmed to have COVID-19 infection, community health workers should use contact and droplet precautions. Contact and droplet precautions include the use of a medical mask, gown, gloves and eye protection.(53)

## Guidance on the use of masks for the general public

**Available evidence**

Studies of influenza, influenza-like illness, and human coronaviruses (not including COVID-19) provide evidence that the use of a medical mask can prevent the spread of infectious droplets from a symptomatic infected person (source control) to someone else and potential contamination of the environment by these droplets.(54, 55) There is limited evidence that wearing a medical mask by healthy individuals in households, in particular those who share a house with a sick person, or among attendees of mass gatherings may be beneficial as a measure preventing transmission.(41, 56-61) A recent meta-analysis of these observational studies, with the intrinsic biases of observational data, showed that either disposable surgical masks or reusable 12–16-layer cotton masks were associated with protection of healthy individuals within households and among contacts of cases.(42)

This could be considered to be indirect evidence for the use of masks (medical or other) by healthy individuals in the wider community; however, these studies suggest that such individuals would need to be in close proximity to an infected person in a household or at a mass gathering where physical distancing cannot be achieved, to become infected with the virus.

Results from cluster randomized controlled trials on the use of masks among young adults living in university residences in the United States of America indicate that face masks may reduce the rate of influenza-like illness, but showed no impact on risk of laboratory-confirmed influenza.(62, 63) At present, there is no direct evidence (from studies on COVID-19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19.

WHO regularly monitors all emerging evidence about this important topic and will provide updates as more information becomes available.

**Guidance**
1) **WHO recommends that persons with any symptoms suggestive of COVID-19 should (1, 2):**
   - wear a medical mask, self-isolate, and seek medical advice as soon as they start to feel unwell with potential symptoms of COVID-19, even if symptoms are mild. Symptoms can include: fever, cough, fatigue, loss of appetite, shortness of breath and muscle pain. Other non-specific symptoms such as sore throat, nasal congestion, headache, diarrhoea, nausea and vomiting, have also been reported. Loss of smell and taste preceding the onset of respiratory symptoms have also been

reported.(64, 65) Older people and immunosuppressed patients may present with atypical symptoms such as fatigue, reduced alertness, reduced mobility, diarrhoea, loss of appetite, delirium, and absence of fever.(26, 66, 67) It is important to note that early symptoms for some people infected with COVID-19 may be very mild and unspecific;
   - follow instructions on how to put on, take off, and dispose of medical masks and perform hand hygiene;(68)
   - follow all additional measures, in particular respiratory hygiene, frequent hand hygiene and maintaining physical distance of at least 1 metre (3.3 feet) from other persons.(42)

In the context of the COVID-19 pandemic, it is recommended that all persons, regardless of whether they are using masks or not, should:
   - avoid groups of people and crowded spaces (follow local advice);
   - maintain physical distance of at least 1 metre (3.3 feet) from other persons, especially from those with respiratory symptoms (e.g. coughing, sneezing);
   - perform hand hygiene frequently, using an alcohol-based handrub if hands are not visibly dirty or soap and water;
   - use respiratory hygiene i.e. cover their nose and mouth with a bent elbow or paper tissue when coughing or sneezing, dispose of the tissue immediately after use, and perform hand hygiene;
   - refrain from touching their mouth, nose, and eyes.

2) **Advice to decision makers on the use of masks for the general public**

Many countries have recommended the use of fabric masks/face coverings for the general public. At the present time, the widespread use of masks by healthy people in the community setting is not yet supported by high quality or direct scientific evidence and there are potential benefits and harms to consider (see below).

However, taking into account the available studies evaluating pre- and asymptomatic transmission, a growing compendium of observational evidence on the use of masks by the general public in several countries, individual values and preferences, as well as the difficulty of physical distancing in many contexts, WHO has updated its guidance to advise that to prevent COVID-19 transmission effectively in areas of community transmission, governments should encourage the general public to wear masks in specific situations and settings as part of a comprehensive approach to suppress SARS-CoV-2 transmission (Table 2).

WHO advises decision makers to apply a risk-based approach focusing on the following criteria when considering or encouraging the use of masks for the general public:

1. **Purpose** of mask use: if the intention is preventing the infected wearer transmitting the virus to others (that is, source control) and/or to offer protection to the healthy wearer against infection (that is, prevention).

2. Risk of **exposure** to the COVID-19 virus
   – due to epidemiology and intensity of transmission in the population: if there is community transmission and there is limited or no capacity to implement other containment measures such as contact tracing, ability to carry out testing and isolate and care for suspected and confirmed cases.
   – depending on occupation: e.g., individuals working in close contact with the public (e.g., social workers, personal support workers, cashiers).
3. **Vulnerability** of the mask wearer/population: for example, medical masks could be used by older people, immunocompromised patients and people with comorbidities, such as cardiovascular disease or diabetes mellitus, chronic lung disease, cancer and cerebrovascular disease.(69)
4. **Setting** in which the population lives: settings with high population density (e.g. refugee camps, camp-like settings, those living in cramped conditions) and settings where individuals are unable to keep a physical distance of at least 1 metre (3.3 feet) (e.g. public transportation).
5. **Feasibility**: availability and costs of masks, access to clean water to wash non-medical masks, and ability of mask wearers to tolerate adverse effects of wearing a mask.
6. **Type** of mask: medical mask versus non-medical mask

Based on these criteria, Table 2 provides practical examples of situations where the general public should be encouraged to wear a mask and it indicates specific target populations and the type of mask to be used according to its purpose. The decision of governments and local jurisdictions whether to recommend or make mandatory the use of masks should be based on the above criteria, and on the local context, culture, availability of masks, resources required, and preferences of the population.

**Table 2. Examples of where the general public should be encouraged to use medical and non-medical masks in areas with known or suspected community transmission**

| Situations/settings | Population | Purpose of mask use | Type of mask to consider wearing if recommended locally |
|---|---|---|---|
| Areas with known or suspected widespread transmission and limited or no capacity to implement other containment measures such as physical distancing, contact tracing, appropriate testing, isolation and care for suspected and confirmed cases. | General population in public settings, such as grocery stores, at work, social gatherings, mass gatherings, closed settings, including schools, churches, mosques, etc. | Potential benefit for source control | Non-medical mask |
| Settings with high population density where physical distancing cannot be achieved; surveillance and testing capacity, and isolation and quarantine facilities are limited | People living in cramped conditions, and specific settings such as refugee camps, camp-like settings, slums | Potential benefit for source control | Non-medical mask |
| Settings where a physical distancing cannot be achieved (close contact) | General public on transportation (e.g., on a bus, plane, trains)<br><br>Specific working conditions which places the employee in close contact or potential close contact with others e.g., social workers, cashiers, servers | Potential benefit for source control | Non-medical mask |
| Settings where physical distancing cannot be achieved and increased risk of infection and/or negative outcomes | Vulnerable populations:<br>• People aged ≥60 years<br>• People with underlying comorbidities, such as cardiovascular disease or diabetes mellitus, chronic lung disease, cancer, cerebrovascular disease, immunosuppression | Protection | Medical mask |
| Any setting in the community* | Persons with any symptoms suggestive of COVID-19 | Source control | Medical mask |

*This applies to any transmission scenario

**Potential benefits/advantages**

The likely advantages of the use of masks by healthy people in the general public include:
• reduced potential exposure risk from infected persons before they develop symptoms;
• reduced potential stigmatization of individuals wearing masks to prevent infecting others (source control) or of people caring for COVID-19 patients in non-clinical settings;(70)
• making people feel they can play a role in contributing to stopping spread of the virus;

- reminding people to be compliant with other measures (e.g., hand hygiene, not touching nose and mouth). However, this can also have the reverse effect (see below);
- potential social and economic benefits. Amidst the global shortage of surgical masks and PPE, encouraging the public to create their own fabric masks may promote individual enterprise and community integration. Moreover, the production of non-medical masks may offer a source of income for those able to manufacture masks within their communities. Fabric masks can also be a form of cultural expression, encouraging public acceptance of protection measures in general. The safe re-use of fabric masks will also reduce costs and waste and contribute to sustainability.

**Potential harms/disadvantages**

The likely disadvantages of the use of mask by healthy people in the general public include:

- potential increased risk of self-contamination due to the manipulation of a face mask and subsequently touching eyes with contaminated hands;(48, 49)
- potential self-contamination that can occur if non-medical masks are not changed when wet or soiled. This can create favourable conditions for microorganism to amplify;
- potential headache and/or breathing difficulties, depending on type of mask used;
- potential development of facial skin lesions, irritant dermatitis or worsening acne, when used frequently for long hours;(50)
- difficulty with communicating clearly;
- potential discomfort;(41, 51)
- a false sense of security, leading to potentially lower adherence to other critical preventive measures such as physical distancing and hand hygiene;
- poor compliance with mask wearing, in particular by young children;
- waste management issues; improper mask disposal leading to increased litter in public places, risk of contamination to street cleaners and environment hazard;
- difficulty communicating for deaf persons who rely on lip reading;
- disadvantages for or difficulty wearing them, especially for children, developmentally challenged persons, those with mental illness, elderly persons with cognitive impairment, those with asthma or chronic respiratory or breathing problems, those who have had facial trauma or recent oral maxillofacial surgery, and those living in hot and humid environments.

If masks are recommended for the general public, the decision-maker should:

- clearly communicate the purpose of wearing a mask, where, when, how and what type of mask should be worn. Explain what wearing a mask may achieve and what it will not achieve, and communicate clearly that this is one part of a package of measures along with hand hygiene, physical distancing and other measures that are all necessary and all reinforce each other;
- inform/train people on when and how to use masks safely (see mask management and maintenance sections), i.e. put on, wear, remove, clean and dispose;

- consider the feasibility of use, supply/access issues, social and psychological acceptance (of both wearing and not wearing different types of masks in different contexts);
- continue gathering scientific data and evidence on the effectiveness of mask use (including different types and makes as well as other face covers such as scarves) in non-health care settings;
- evaluate the impact (positive, neutral or negative) of using masks in the general population (including behavioral and social sciences).

WHO encourages countries and community adopting policies on masks use in the general public to conduct good quality research to assess the effectiveness of this intervention to prevent and control transmission.

**3) Types of mask to consider**

**Medical mask**

Medical masks should be certified according to international or national standards to ensure they offer predictable product performance when used by health workers, according to the risk and type of procedure performed in a health care setting. Designed for single use, a medical mask's initial filtration (at least 95% droplet filtration), breathability and, if required, fluid resistance are attributed to the type (e.g. spunbond or meltblown) and layers of manufactured non-woven materials (e.g. polypropylene, polyethylene or cellulose). Medical masks are rectangular in shape and comprise three or four layers. Each layer consists of fine to very fine fibres. These masks are tested for their ability to block droplets (3 micrometres in size; EN 14683 and ASTM F2100 standards) and particles (0.1 micrometre in size; ASTM F2100 standard only). The masks must block droplets and particles while at the same time they must also be breathable by allowing air to pass. Medical masks are regulated medical devices and categorized as PPE.

The use of medical masks in the community may divert this critical resource from the health workers and others who need them the most. In settings where medical masks are in short supply, **medical masks should be reserved for health workers and at-risk individuals when indicated.**

**Non-medical mask**

Non-medical (also referred to as "fabric" in this document) masks are made from a variety of woven and non-woven fabrics, such as polypropylene. Non-medical masks may be made of different combinations of fabrics, layering sequences and available in diverse shapes. Few of these combinations have been systematically evaluated and there is no single design, choice of material, layering or shape among the non-medical masks that are available. The unlimited combination of fabrics and materials results in variable filtration and breathability.

A non-medical mask is neither a medical device nor personal protective equipment. However, a non-medical mask standard has been developed by the French Standardization Association (AFNOR Group) to define minimum performance in terms of filtration (minimum 70% solid particle filtration or droplet filtration) and breathability (maximum pressure difference of 0.6 mbar/cm$^2$ or maximum

inhalation resistance of 2.4 mbar and maximum exhalation resistance of 3 mbar).(71)

The lower filtration and breathability standardized requirements, and overall expected performance, indicate that the use of non-medical masks, made of woven fabrics such as cloth, and/or non-woven fabrics, should only be considered for source control (used by infected persons) in community settings and not for prevention. They can be used ad-hoc for specific activities (e.g., while on public transport when physical distancing cannot be maintained), and their use should always be accompanied by frequent hand hygiene and physical distancing.

Decision makers advising on type of non-medical mask should take into consideration the following features of non-medical masks: filtration efficiency (FE), or filtration, breathability, number and combination of material used, shape, coating and maintenance.

a) Type of materials: filtration efficiency (FE), breathability of single layers of materials, filter quality factor

The selection of material is an important first step as the filtration (barrier) and breathability varies depending on the fabric. Filtration efficiency is dependent on the tightness of the weave, fibre or thread diameter, and, in the case of non-woven materials, the manufacturing process (spunbond, meltblown, electrostatic charging).(49, 72) The filtration of

cloth fabrics and masks has been shown to vary between 0.7% and 60%.(73, 74) The higher the filtration efficiency the more of a barrier provided by the fabric.

Breathability is the ability to breathe through the material of the mask. Breathability is the difference in pressure across the mask and is reported in millibars (mbar) or Pascals (Pa) or, for an area of mask, over a square centimeter (mbar/cm$^2$ or Pa/cm$^2$). Acceptable breathability of a medical mask should be below 49 Pa/cm$^2$. For non-medical masks, an acceptable pressure difference, over the whole mask, should be below 100 Pa.(73)

Depending on fabric used, filtration efficiency and breathability can complement or work against one another. Recent data indicate that two non-woven spunbond layers, the same material used for the external layers of disposable medical masks, offer adequate filtration and breathability. Commercial cotton fabric masks are in general very breathable but offer lower filtration.(75) The filter quality factor known as "Q" is a commonly used filtration quality factor; it is a function of filtration efficiency (filtration) and breathability, with higher values indicating better overall efficiency.(76) Table 3 shows FE, breathability and the filter quality factor, Q, of several fabrics and non-medial masks.(73, 77) According to expert consensus three (3) is the minimum Q factor recommended. This ranking serves as an initial guide only.

**Table 3. Non-medical mask filtration efficiency, pressure drop and filter quality factor\***

| Material | Source | Structure | Initial Filtration Efficiency (%) | Initial Pressure drop (Pa) | Filter quality factor, Q ** (kPa$^{-1}$) |
|---|---|---|---|---|---|
| Polypropylene | Interfacing material, purchased as-is | Spunbond (Nonwoven) | 6 | 1.6 | 16.9 |
| Cotton 1 | Clothing (T-shirt) | Woven | 5 | 4.5 | 5.4 |
| Cotton 2 | Clothing (T-shirt) | Knit | 21 | 14.5 | 7.4 |
| Cotton 3 | Clothing (Sweater) | Knit | 26 | 17 | 7.6 |
| Polyester | Clothing (Toddler wrap) | Knit | 17 | 12.3 | 6.8 |
| Cellulose | Tissue paper | Bonded | 20 | 19 | 5.1 |
| Cellulose | Paper towel | Bonded | 10 | 11 | 4.3 |
| Silk | Napkin | Woven | 4 | 7.3 | 2.8 |
| Cotton, gauze | N/A | Woven | 0.7 | 6.5 | 0.47 |
| Cotton, handkerchief | N/A | Woven | 1.1 | 9.8 | 0.48 |
| Nylon | Clothing (Exercise pants) | Woven | 23 | 244 | 0.4 |

\* This table refers only to materials reported in experimental peer-reviewed studies. The filtration efficiency, pressure drop and Q factor are dependent on flow rate. \*\* According to expert consensus, three (3) is the minimum Q factor recommended.

It is preferable not to select elastic material for making masks; during wear, the mask material may be stretched over the face, resulting in increased pore size and lower filtration efficiency throughout use. Also, elastic materials may degrade over time and are sensitive to washing at high temperatures.

b) Number of layers

A minimum of three layers is required for non-medical masks, depending on the fabric used. The innermost layer of the mask is in contact with the wearer's face. The outermost layer is exposed to the environment.(78)

Fabric cloths (e.g., nylon blends and 100% polyester) when folded into two layers, provides 2-5 times increased filtration efficiency compared to a single layer of the same cloth,-and filtration efficiency increases 2-7 times if it is folded into 4 layers.(75) Masks made of cotton handkerchiefs alone should consist of at least 4 layers, but have achieved only 13% filtration efficiency.(73) Very porous materials, such as gauze, even with multiple layers will not provide sufficient filtration; only 3% filtration efficiency. (73)

It is important to note that with more tightly woven materials, as the number of layers increases, the breathability may be

reduced. A quick check for breathability may be performed by attempting to breathe, through the mouth, and through the multiple layers.

c) Combination of material used

The ideal combination of material for non-medical masks should include three layers as follows: 1) an innermost layer of a hydrophilic material (e.g. cotton or cotton blends); 2), an outermost layer made of hydrophobic material (e.g., polypropylene, polyester, or their blends) which may limit external contamination from penetration through to the wearer's nose and mouth; 3) a middle hydrophobic layer of synthetic non-woven material such as polyproplylene or a cotton layer which may enhance filtration or retain droplets.

d) Mask shape

Mask shapes include flat-fold or duckbill and are designed to fit closely over the nose, cheeks and chin of the wearer. When the edges of the mask are not close to the face and shift, for example, when speaking, internal/external air penetrates through the edges of the mask rather than being filtered through the fabric. Leaks where unfiltered air moves in and out of the mask may be attributed to the size and shape of the mask.(79)

It is important to ensure that the mask can be held in place comfortably with little adjustment using elastic bands or ties.

e) Coating of fabric

Coating the fabric with compounds like wax may increase the barrier and render the mask fluid resistant; however, such coatings may inadvertently completely block the pores and make the mask difficult to breathe through. In addition to decreased breathability unfiltered air may more likely escape the sides of the mask upon exhalation. Coating is therefore not recommended.

f) Mask maintenance

**Masks should only be used by one person and should not be shared.**

All masks should be changed if wet or visibly soiled; a wet mask should not be worn for an extended period of time. Remove the mask without touching the front of the mask, do not touch the eyes or mouth after mask removal. Either discard the mask or place it in a sealable bag where it is kept until it can be washed and cleaned. Perform hand hygiene immediately afterwards.

Non-medical masks should be washed frequently and handled carefully, so as not to contaminate other items.

If the layers of fabrics look noticeably worn out, discard the mask.

Clothing fabrics used to make masks should be checked for the highest permitted washing temperature. If instructions for washing are indicated on the clothing label, verify if washing in warm or hot water is tolerated. Select washable fabrics that can be washed. Wash in warm hot water, 60°C, with soap or laundry detergent. Non-woven polypropylene (PP) spunbond may be washed at high temperatures, up to 125°C.(72) Natural fibres may resist high temperature washes and ironing. Wash the mask delicately (without too much friction, stretching or wringing) if nonwoven materials (e.g. spunbond) are used. The combination of non-woven PP spunbond and cotton can tolerate high temperatures; masks made of these combinations may be steamed or boiled.

Where hot water is not available, wash mask with soap/detergent at room temperature water, followed by either i) boiling mask for one minute OR ii) soak mask in 0.1% chlorine for one minute then thoroughly rinse mask with room temperature water, to avoid any toxic residual of chlorine.

WHO is collaborating with research and development partners and the scientific community engaged in textile engineering and fabric design to facilitate a better understanding of the effectiveness and efficiency of non-medical masks. WHO urges countries that have issued recommendations on the use of both medical and non-medical masks by healthy people in community settings to conduct research on this important topic. Such research needs to look at whether SARS-CoV-2 particles can be expelled through non-medical masks of poor quality worn by a person with symptoms of COVID-19 while that person is coughing, sneezing or speaking. Research is also needed on non-medical mask use by children and other medically challenging persons and settings as mentioned above.

Table 4 provides a summary of guidance and practical considerations on the composition, construction and management of non-medical masks.

# Advice on the use of masks for children in the community in the context of COVID-19

## Annex to the Advice on the use of masks in the context of COVID-19

## 21 August 2020

 

## Purpose of the document

This document provides guidance to decision makers, public and child health professionals to inform policy on the use of masks for children in the context of the COVID-19 pandemic. It does not address the use of masks for adults working with children or parents/guardians or the use of masks for children in health-care settings. This interim guidance will be revised and updated as new evidence emerges.

## Background

The World Health Organization (WHO) and the United Nations Children's Fund (UNICEF) advise the use of masks according to a risk-based approach, as part of a comprehensive package of public health interventions that can prevent and control the transmission of certain viral respiratory diseases, including COVID-19. Compliance with other measures including physical distancing, hand hygiene, respiratory etiquette and adequate ventilation in indoor settings is essential for reducing the spread of SARS-CoV-2, the virus that causes COVID-19.

This guidance provides specific considerations for the use of non-medical masks, also known as fabric masks, by children as a means for source control in the context of the current COVID-19 pandemic. The document is an annex to the WHO's Advice on the use of masks in the context of COVID-19[1] in which further details on fabric masks can be found.  This annex also advises the use of medical masks for children under conditions. For the purposes of this guidance, children are defined as anyone below the age of 18 years[2].

### Methodology for developing the guidance

The World Health Organization (WHO) Infection Prevention and Control (IPC) Guidance Development Group (GDG) and experts from UNICEF and the International Paediatric Association (IPA) jointly reviewed the available evidence to develop guidance on the use of masks for children in the context of the current pandemic. Five international expert meetings were held between June and August 2020. In the absence of strong scientific evidence, consensus among these groups forms the main basis for this guidance. Furthermore, the draft guidance was reviewed by a multidisciplinary group of additional external experts prior to finalization.

### Available evidence

*Transmission of COVID-19 in children*

Currently, the extent to which children contribute to transmission of SARS-CoV-2 is not completely understood. According to the WHO global surveillance database of laboratory-confirmed cases developed from case report forms provided to WHO by Member States[3] and other studies, 1-7% of COVID-19 cases are reported to be among children, with relatively few deaths compared to other age groups[4-8]. The European Centre for Disease Prevention and Control (ECDC) has recently reported the age distribution of COVID-19 among children in the European Union (EU), European Economic Area (EEA) and the United Kingdom (UK); they reported that as of 26 July 2020, 4% of all cases in the EU/EEA and the UK were among children[6].

To date, the available evidence suggests that most reported cases among children have resulted from transmission within households, although this observation may have been influenced by school closures and other stay at home measures implemented by some countries[7,9]. Although culture-competent virus has been isolated from symptomatic children with viral load levels found to be similar to that in adults[10], evidence from available studies of contacts of COVID-19 cases and cluster investigations suggests that children are unlikely to be the main drivers of COVID-19 transmission[7,9 11-14]. To date, documented transmission among children and staff within educational settings is limited[15-20]. Evidence is also limited regarding the prevalence of SARS-CoV-2 infection among children, as measured by seroepidemiology studies. However, available evidence suggests that seroprevalence appears to be lower for younger children compared to older children and adults[17,21-25].

Studies of viral load and the duration of viral shedding of infectious virus in children compared to adults, are also limited. One published study suggests that viral load in infected patients may differ by age, and that symptomatic children have a longer duration of viral shedding than asymptomatic children[25]. Some studies have reported that children below five years are reported to have lower

amounts of viral RNA in respiratory secretions and faeces compared to school children, adolescents and adults[26,27]. However, one study from the United States of America found that children below five years with mild to moderate COVID-19 have higher amounts of viral RNA in their upper respiratory samples compared with older children and adults[28], while a pre-print (non-peer-reviewed) study from Germany reported no differences in the amount of viral RNA among adults and children[29].

In summary, the degree to which age alone, regardless of symptoms, affects viral load and transmission is not well understood.

**Available evidence on the use of masks in children for COVID-19 and other respiratory diseases**

Evidence on the benefits and harms of children wearing masks to mitigate transmission of COVID-19 and other coronaviruses is limited. However, some studies have evaluated the effectiveness of mask use in children for influenza and other respiratory viruses[30-34]. A study of mask wearing during seasonal influenza outbreaks in Japan noted that the use of masks was more effective in higher school grades (9-12 year old children in grades 4-6) than lower grades (6-9 year old children, in grades 1-3)[34]. One study, conducted under laboratory conditions and using non-betacoronaviruses, suggested that children between five and 11 years old were significantly less protected by mask wearing compared to adults, possibly related to inferior fit of the mask[35]. Other studies found evidence of some protective effect for influenza for both source control[30] and protection in children[34], although overall compliance with consistent mask wearing, especially among children under the age of 15, was poor.

Some studies, including studies conducted in the context of influenza and air pollution, found the use and acceptability of mask wearing to be highly variable among children, ranging from very low to acceptable levels and decreasing over time while wearing masks[30,31,33,36-38]. One study was carried out among primary school children during COVID-19 and reported 51.6% compliance.[31]

Several studies found that factors such as warmth, irritation, breathing difficulties, discomfort, distraction, low social acceptability and poor mask fit were reported by children when using masks[30,33,36,37]. So far, the effectiveness and impact of masks for children during play and physical activity have not been studied; however, a study in adults found that N95 respirator and surgical masks reduced cardiopulmonary capacity during heavy exertion[39].

*Main conclusions*

According to the limited available evidence, young children may have lower susceptibility to infection compared to adults[11,14], however available data suggests that this may vary by age among children[17, 21-25]. Data from seroepidemiology studies and transmission studies suggest that older children (e.g. teenagers) may play a more active role in transmission than younger children.[11,14,17, 21-25]

The benefits of wearing masks in children for COVID-19 control should be weighed against potential harm associated with wearing masks, including feasibility and discomfort, as well as social and communication concerns. Factors to consider also include age groups, sociocultural and contextual considerations and availability of adult supervision and other resources to prevent transmission.

There is a need for data from high quality prospective studies in different settings on the role of children and adolescents in transmission of SARS-CoV-2[40], on ways to improve acceptance and compliance of mask use and on the effectiveness of masks use in children. These studies must be prioritized and include prospective studies of transmission within educational settings and households stratified by age groups (ideally <2, 2-4, 5-11 and > 12 years) and with different prevalence and transmission patterns. Particular emphasis must be placed on studies in schools in low- and middle-income settings.

**Advice to decision makers on the use of masks for children in the community**

**Overarching guiding principles**

Given the limited evidence on the use of masks in children for COVID-19 or other respiratory diseases, including limited evidence about transmission of SARS-CoV-2 in children at specific ages, the formulation of policies by national authorities should be guided by the following overarching public health and social principles:

- Do no harm: the best interest, health and well-being of the child should be prioritized.
- The guidance should not negatively impact development and learning outcomes.
- The guidance should consider the feasibility of implementing recommendations in different social, cultural and geographic contexts, including settings with limited resources, humanitarian settings and among children with disabilities or specific health conditions.

**Advice on the use of masks in children**

WHO and UNICEF advise decision makers to apply the following criteria for use of masks in children when developing national policies, in countries or areas where there is known or suspected community transmission[a] of SARS-CoV-2 and in settings where physical distancing cannot be achieved.

1. Based on the expert opinion gathered through online meetings and consultative processes, children aged up to five years should not wear masks for source control. This advice is motivated by a "do no harm" approach and considers:
   - childhood developmental milestones[b] [41]
   - compliance challenges and
   - autonomy required to use a mask properly.

The experts (following the methods described above) recognized that the evidence supporting the choice of the age cut-off is limited (see above, section related to transmission of COVID-19 in children), and they reached this decision mainly by consensus. The rationale included consideration of the fact that by the age of five years, children usually achieve significant developmental milestones, including the manual dexterity and fine motor coordination movements needed to appropriately use a mask with minimal assistance.

In some countries, guidance and policies recommend a different and lower age cut-off for mask use[42-45]. It is recognized that children may reach developmental milestones at different ages and children five years of age and under may have the dexterity needed to manage a mask. Based on the do no harm approach, if the lower age cut-off of two or three years of age is to be used for recommending mask use for children, appropriate and consistent supervision, including direct line of sight supervision by a competent adult and compliance need to be ensured, especially if mask wearing is expected for an extended period of time. This is both to ensure correct use of the mask and to prevent any potential harm associated with mask wearing to the child.

Children with severe cognitive or respiratory impairments who have difficulties tolerating a mask should, under no circumstances, be required to wear masks.

Other IPC, public health and social measures should be prioritized to minimize the risk of SARS-CoV-2 transmission for children five years of age and under; specifically maintaining physical distance of at least 1 meter where feasible, educating children to perform frequent hand hygiene and limiting the size of school classes. It is also noted that there may be other specific considerations, such as the presence of vulnerable persons or other local medical and public health advice that should be considered when determining if children five years of age and under need to wear a mask.

2. For children between six and 11 years of age, a risk-based approach should be applied to the decision to use of a mask. This approach should take into consideration:
   - intensity of transmission in the area where the child is and updated data/available evidence on the risk of infection and transmission in this age group;
   - social and cultural environment such as beliefs, customs, behaviour or social norms that influence the community and population's social interactions, especially with and among children;
   - the child's capacity to comply with the appropriate use of masks and availability of appropriate adult supervision;
   - potential impact of mask wearing on learning and psychosocial development; and
   - additional specific considerations and adaptions for specific settings such as households with elderly relatives, schools, during sport activities or for children with disabilities or with underlying diseases.

3. Advice on mask use in children and adolescents 12 years or older should follow the WHO guidance for mask use in adults[1] and/or the national mask guidelines for adults.

   Even where national guidelines apply, additional specific considerations (see below) and adaptions for special settings such as schools, during sport, or for children with disabilities or with underlying diseases will need to be specified.

4. The use of a medical mask for immunocompromised children or for paediatric patients with cystic fibrosis or certain other diseases (e.g. cancer) is usually recommended but should be assessed in consultation with the child's medical provider[46,47].

---

[a] Defined by WHO as "experiencing larger outbreaks of local transmission defined through an assessment of factors including, but not limited to: large numbers of cases not linkable to transmission chains; large numbers of cases from sentinel surveillance; and/or multiple unrelated clusters in several areas of the country/territory/area" (https://www.who.int/publications-detail/global-surveillance-for-covid-19-caused-by-human-infection-with-covid-19-virus-interim-guidance)
[b] An example of considering childhood developmental milestones as defined by CDC are available here:
https://www.cdc.gov/ncbddd/actearly/pdf/checklists/Checklists-with-Tips_Reader_508.pdfhttps://www.cdc.gov/ncbddd/actearly/pdf/checklists/Checklists-with-Tips_Reader_508.pdf

For children of any age with developmental disorders, disabilities or other specific health conditions that might interfere with mask wearing, the use of masks should not be mandatory and should be assessed on a case by case basis by the child's educator and/or medical provider.

**Implementation considerations**

Local epidemiology and contextual issues, such as intensity of transmission, ability to physically distance or implement appropriate ventilation measures in indoor settings, age mixing and contact with other vulnerable individuals should be considered when adopting advice for wearing masks among different age groups, in addition to potential harms and adverse effects of mask wearing.

Age-appropriate communication aimed at improving understanding of the purpose of mask wearing, safe and appropriate mask wearing and maintenance of masks, should be provided by parents/guardians, teachers, educators, and trusted community members through role-modelling. Materials, messages and mechanisms for communication on masks for children should remain flexible and adaptive and be systematically reviewed and updated based on changes in evidence and community needs and questions[48,49]. Children should also be listened to regarding their perceptions and any concerns about wearing a mask. Adapted communication should be available for different social, cultural and linguistic settings, with feedback mechanisms in place for responding to children's questions and expectations.

Specific education and communication messages should be developed to ensure that the use of masks does not result in a false sense of security or disregard for other public health measures by children. It is important to emphasize that the use of masks is one tool and that children should also adhere to physical distancing, hand hygiene and respiratory etiquette. Parents, family members, teachers and educators have a critical role in ensuring that these messages are consistently conveyed to children.

Strategies for assisting children, especially in younger age groups, to manage the wearing of masks safely and effectively should be included in the implementation of this advice. This may include processes for safe storage of used masks for reuse by the same child after eating or exercising, storing soiled masks (e.g. in dedicated bags or containers) before they can be laundered and storage and supply of additional clean masks if a child's mask becomes soiled, wet, or is lost.

Masks should be made accessible free of charge to children living in households or geographic areas with social vulnerabilities and limited resources to ensure equitable access for all children. Consideration should also be made for provision of masks for the journey to and from school.

The design of face masks for children should take into consideration the overall quality of the fabric, suitable breathability and comfort[1] and child-friendliness (appropriate size, colours, design, etc.) to help improve their acceptance of and use by children. Specific attention needs to be given to the care of masks and the need for masks to be changed when they get wet or soiled. Specific measures will need to be in place for children under 12 years who are in a situation where they are asked to wear masks.

The age cut-off for wearing a mask should be adapted to social or school settings to avoid stigmatizing and alienating children in mixed-aged groups where individuals may be on opposite sides of a recommended age cut-off. For example, in situations where older children for whom masks are advised are in the same class as younger children who fall below the age cut-off for wearing masks, the older learners might be exempt from wearing masks.

**Specific additional considerations for children with disabilities**

Children with developmental disorders or disabilities may face additional barriers, limitations and risks and therefore should be given alternative options to mask wearing, such as face shields (see below). Policies on masks should be adapted for children with disabilities based on social, cultural and environmental considerations.

Some children with disabilities require close physical contact with therapists, educators or social workers. In this context, it is critical that all care providers adopt key IPC measures, including wearing masks, and that settings are adapted to strengthen IPC.

The wearing of masks by children with hearing loss or auditory problems may present learning barriers and further challenges, exacerbated by the need to adhere to the recommended physical distancing[50]. These children may miss learning opportunities because of the degraded speech signal stemming from mask wearing, the elimination of lipreading and speaker expressions and physical distancing. Adapted masks to allow lipreading (e.g. clear masks) or use of face shields (see below) may be explored as an alternative to fabric masks[51].

**Specific additional considerations for school settings**

To facilitate the operationalization of this guidance in school settings (as per national standards) it is advised that the age categories be adapted to the national/local education level structure.

The use of masks by children and adolescents in schools should only be considered as one part of a comprehensive strategy to limit the spread of COVID-19. The following guidance documents can be used to inform policy making and programming either for a comprehensive school safety strategy when re-opening or operations in the context of COVID-19:

- WHO considerations for school-related public health measures in the context of COVID-19

- WB/WFP/UNESCO/UNICEF framework for school reopening

- WHO/UNICEF/IFRC Interim Guidance for COVID-19 Prevention and Control in Schools

As part of the comprehensive school safety strategy for reopening, the views of teachers and educators on the perception of risks and the time burden required to ensure adherence to COVID-19 policies in schools and classrooms–including the use of masks by children–should be considered. Situations where wearing a mask can significantly interfere with the learning process and have a negative impact on critical school activities like physical education, meal programs, play time and sports – as well as learning – require special consideration.

If wearing of fabric masks is recommended in schools, specific instructions and supplies should be provided for the safe storage, handling and availability of fabric masks (see above). A sufficient supply of appropriate masks should be ensured for all school children. Basic water, sanitation and hygiene requirements should be met in the school building so that comprehensive IPC measures can be implemented, linked to specific age-appropriate educational activities.

If medical or disposable masks are used in specific situations, a system for waste management including disposal of used masks will need to be established to reduce the risk of contaminated masks being disposed of in classrooms and playgrounds.

No children should be denied access to education because of mask wearing or the lack of a mask because of low resources or unavailability.

## Alternative to fabric masks for children

**Face shields**

Face shields are designed to be used[52] to provide protection from splashes of biological fluid (particularly respiratory secretions), chemical agents and debris[53,54] into the eyes. In the context of protection from SARS-CoV-2 transmission through respiratory droplets, they are used by health workers as personal protective equipment (PPE) for eye protection in combination with a medical mask or a respirator[55,56]. In the context of COVID-19 in community settings, some children may not be able to wear a mask for a variety of reasons (e.g. health issues, fear of mask), and thus, face shields may be considered as an alternative to masks as respiratory droplet protection or as source control, based on availability, improved feasibility and better tolerability[57,58]. Some countries, such as Australia[59] recommend face shields as an alternative to a mask. Other countries, such as Singapore[60] advise that both a mask and a shield can be worn together, but acknowledge that children with special needs may need to be exempt from wearing either.

WHO and UNICEF have reviewed the current available evidence on the use of face shields for respiratory droplet protection and/or source control in the context of the COVID-19 pandemic. While a face shield may confer partial protection[52] of the facial area against respiratory droplets with the added benefit of ease of use, the effectiveness of face shields for source control has not yet been adequately studied. Droplets may be exhaled or inhaled from the open gaps between the visor and the face[52], which is a disadvantage inherent to its design[53]. Other design disadvantages include glaring, fogging, optical imperfection, and being bulkier than goggles and safety glasses[61]. There are many emerging face shield designs that attempt to overcome these limitations, but current laboratory testing standards only assess face shields for their ability to provide eye protection from chemical splashes[61,62]. Further research and laboratory challenge standards are urgently needed to investigate the effectiveness of face shields for respiratory droplet protection and/or source control[56]. At present, face shields are considered to provide a level of eye protection only and should not be considered as an equivalent to masks with respect to respiratory droplet protection and/or source control.

WHO and UNICEF will continue to monitor emerging information on the use of face shields for the prevention of respiratory virus transmission. WHO and UNICEF advise that when physical distance cannot be maintained, and in special situations where it is not practical to wear a mask (for example, among children with hearing loss or other disabilities or health conditions that limit compliance with wearing fabric or medical masks and consequently their utility), face shields may be used while taking the following considerations into account:

- The face shield is an incomplete physical barrier and does not provide the filtration layers of a mask.
- The face shield should cover the entire face, be wrapped around the sides of the face and extend to below the chin[58].
- Reusable face shields must be properly cleaned (with soap or a detergent and water), disinfected (with 70-90% alcohol) and stored after each use[44]. Face shields that will withstand the use of disinfectants without damaging their optical properties should be selected.
- Maintaining physical distance of at least 1 m (3.3 feet) should be maintained where feasible, with ongoing promotion of frequent hand hygiene and respiratory etiquette[56].
- Caution should be taken to avoid injury when children don, wear, and doff face shields.

## Monitoring and evaluation of the impact of the use of masks in children

If authorities decide to recommend mask-wearing for children, key information should be collected on a regular basis to accompany and monitor the intervention. Monitoring and evaluation should be established at the onset and should include indicators that measure the impact on the child's health, including mental health; reduction in transmission of SARS-CoV-2; motivators and barriers to mask wearing; and secondary impacts on a child's development learning, attendance in school, ability to express him/herself or access school; and impact on children with developmental delays, health conditions, disabilities or other vulnerabilities.

Data should be used to inform strategies on communication; training and support to teachers, educators, and parents; engagement activities for children; and distribution of materials that empower children to use masks appropriately.

Analysis should include sex, age, physical, social and economic stratification to ensure that the policy implementation contributes to reducing health and social inequities.


WHO and UNICEF will continue to closely monitor emerging evidence about this topic and the situation for any changes that may affect this interim guidance. Should any factors change, WHO and UNICEF will issue a further update. Otherwise, this interim guidance document will expire six months after the date of publication.


## Acknowledgements

This document was developed in consultation with the following members of:

1.  The WHO Health Emergencies Programme (WHE) Ad-hoc COVID-19 Guidance Development Group:
    Jameela Alsalman, Ministry of Health, Bahrain; Anucha Apisarnthanarak, Thammsat University Hospital, Thailand; Baba Aye, Public Services International, France; Roger Chou, Oregon Health Science University, USA; May Chu, Colorado School of Public Health, USA; John Conly, Alberta Health Services, Canada; Barry Cookson, University College London, United Kingdom (UK); Nizam Damani, Southern Health & Social Care Trust, UK; Dale Fisher, Goarn, Singapore; Tiouiri Benaissa Hanene, CHU La Rabta Tunisia; Joost Hopman, Radboud University Medical Center, The Netherlands; Mushtuq Husain, Institute of Epidemiology, Disease Control & Research, Bangladesh; Kushlani Jayatilleke, Sri Jayewardenapura General Hospital, Sri Lanka; Seto Wing Jong, School of Public Health, Hong Kong SAR, China; Souha Kanj, American University of Beirut Medical Center, Lebanon; Daniele Lantagne, Tufts University, USA; Fernanda Lessa, Centers for Disease Control and Prevention, USA; Anna Levin, University of São Paulo, Brazil; Yuguo Li, The University of Hong Kong, China; Ling Moi Lin, Sing Health, Singapore; Caline Mattar, World Health Professions Alliance, USA; MaryLouise McLaws, University of New South Wales, Australia; Geeta Mehta, Journal of Patient Safety and Infection Control, India; Shaheen Mehtar, Infection Control Africa Network, South Africa; Ziad Memish, Ministry of Health, Saudi Arabia; Babacar Ndoye, Infection Control Africa Network, Senegal; Fernando Otaiza, Ministry of Health, Chile; Diamantis Plachouras, European Centre for Disease Prevention and Control, Sweden; Maria Clara Padoveze, School of Nursing, University of São Paulo, Brazil; Mathias Pletz, Jena University, Germany; Marina Salvadori, Public Health Agency of Canada, Canada; Ingrid Schoeman, TB Proof, South Africa; Mitchell Schwaber, Ministry of Health, Israel; Nandini Shetty, Public Health England, United Kingdom; Mark Sobsey, University of North Carolina, USA; Paul Ananth Tambyah, National University Hospital, Singapore; Andreas Voss, Canisus-Wilhelmina Ziekenhuis, The Netherlands; Walter Zingg, University of Geneva Hospitals, Switzerland.


2.  Experts from UNICEF:
    Maya Arii, Gregory Built, Simone Carter, Carlos Navarro Colorado, Anne Detjen, Nada Elattar, Maria Agnese Giordano, Gagan Gupta, Nagwa Hasanin, Linda Jones, Raoul Kamadjeu, Sarah Karmin, Asma Maladwala, Ana Nieto, Luwei Pearson Sarah Karmin, Jerome Pfaffmann.


3.  External reviewers:
    Susanna Esposito, World Association for Infectious Diseases and Immunological Disorders and University of Parma, Italy; Angela Dramowski, Stellenbosch University, South Africa; Alfredo Tagarro, Universidad Europea de Madrid, Spain.

    Reviewers from IPA:
    Zulfiqar A. Bhutta, Centre for Global Child Health, The Hospital for Sick Children, Canada; Margaret Fisher, Department of Pediatrics, Monmouth Medical Center, USA; Jonathan Klein, University of Illinois at Chicago, IPA Executive Committee and Focal Point for WHO Collaboration, USA; Berthold Koletzko, Ludwig-Maximilians-Universität München, Germany; Jane E Lucas, International Health and Child Development IPA Strategic Advisory Group on Early Child Development, USA; Mohamad Mikati  Division of Pediatric Neurology and Developmental Medicine, Duke University Medical Center, USA; Aman Pulungan, University of Indonesia, and Indonesian Pediatric Society and Asia Pacific Pediatric Association; Susan M Sawyer, International Association for Adolescent Health and University of Melbourne,

Australia; Mortada El-Shabrawi, Cairo University, Egypt; Russell M Viner, Faculty of Population Health Sciences of University College London and Royal College of Pediatrics and Child Health, UK.

4.   WHO Secretariat:

Benedetta Allegranzi, Gertrude Avortri, Mekdim Ayana, Hanan Balkhy, April Baller, Elizabeth Barrera-Cancedda, Alessandro Cassini, Giorgio Cometto, Ana Paula Coutinho Rehse, Sophie Harriet Dennis, Sergey Eremin, Dennis Falzon, Dennis Nathan Ford, Jonas Gonseth-Garcia, Rebecca Grant, Tom Grein, Ivan Ivanov, Landry Kabego, Pierre Claver Kariyo, Ying Ling Lin, Olivier Le Poulin, Ornella Lincetto, Abdi Rahman Mahamud, Madison Moon, Takeshi Nishijima, Pillar Ramon-PardoAlice Simniceanu, Valeska Stempliuk, Maha Talaat Ismail, Joao Paulo Toledo, Anthony Twywan, Maria Van Kerkhove, Vicky Willet, Masahiro Zakoji, Bassim Zayed, Wilson Were.

## References

1.   World Health Organization. Advice on the use of masks in the context of COVID-19. Geneva: World Health Organization; 2020 (https://apps.who.int/iris/handle/10665/331693 accessed 20 August 2020).
2.   UNICEF. Convention on the Rights of the Child text. 1990 (https://www.unicef.org/child-rights-convention/convention-text accessed 20 August 2020).
3.   https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports.
4.   Guan WJ, Ni ZY, Hu Y, et al. Clinical Characteristics of Coronavirus Disease 2019 in China. N Engl J Med. 2020;382(18):1708-20. Epub 2020/02/29.
5.   Wortham JM, Lee JT, Althomsons S, et al. Characteristics of Persons Who Died with COVID-19 - United States, February 12-May 18, 2020. MMWR Morb Mortal Wkly Rep. 2020;69(28):923-9. Epub 2020/07/17.
6.   European Centre for Disease Prevention and Control. COVID-19 in children and the role of school settings in COVID-19 transmission. 6 August 2020 (https://www.ecdc.europa.eu/sites/default/files/documents/COVID-19-schools-transmission-August%202020.pdf accessed 20 August 2020).
7.   CDC COVID-19 Response Team. Coronavirus Disease 2019 in Children - United States, February 12-April 2, 2020. MMWR Morb Mortal Wkly Rep. 2020;69(14):422-6. Epub 2020/04/10.
8.   Ladhani SN, Amin-Chowdhury Z, Davies HG, et al. COVID-19 in children: analysis of the first pandemic peak in England. Arch Dis Child. 2020:archdischild-2020-320042.
9.   Joint IPA-UNICEF COVID-19 Information Brief. Epidemiology, Spectrum, and Impact of COVID-19 on Children, Adolescents, and Pregnant Women. (https://ipa-world.org/society-resources/code/images/HjNYEyfuM250.pdf accessed 20 August 2020).
10.  L'Huillier AG, Torriani G, Pigny F, Kaiser L, Eckerle I. Culture-Competent SARS-CoV-2 in Nasopharynx of Symptomatic Neonates, Children, and Adolescents. Emerg Infect Dis. 2020;26(10). Epub 2020/07/01.
11.  Goldstein E, Lipsitch M, Cevik M. On the effect of age on the transmission of SARS-CoV-2 in households, schools and the community. medRxiv. 2020. (https://www.medrxiv.org/content/10.1101/2020.07.19.20157362v2 accessed 20 August 2020).
12.  Li X, Xu W, Dozier M, et al. The role of children in transmission of SARS-CoV-2: A rapid review. J Glob Health. 2020;10(1):011101. Epub 2020/07/03.
13.  Ludvigsson JF. Children are unlikely to be the main drivers of the COVID-19 pandemic - A systematic review. Acta Paediatr. 2020;109(8):1525-30. Epub 2020/05/21.
14.  Viner M, Mytton O, Bonnell C, et al. Susceptibility to and transmission of COVID-19 amongst children and adolescents compared with adults: a systematic review and meta-analysis. medRxiv. 2020. (https://www.medrxiv.org/content/10.1101/2020.05.20.20108126v1 accessed 20 August 2020).
15.  Macartney K, Quinn HE, Pillsbury AJ, Koirala A, Deng L, Winkler N, et al. Transmission of SARS-CoV-2 in Australian educational settings: a prospective cohort study. Lancet Child Adolesc Health. 2020. Epub 2020/08/08.
16.  Fontanet A, Grant R, Tondeur L, et al. SARS-CoV-2 infection in primary schools in northern France: A retrospective cohort study in an area of high transmission. medRxiv. 2020. (https://www.medrxiv.org/content/10.1101/2020.06.25.20140178v2 accessed 20 August 2020).
17.  Fontanet A, Tondeur L, Madec Y et al. Cluster of COVID-19 in northern France: A retrospective closed cohort study. medRxiv. 2020. (https://www.medrxiv.org/content/10.1101/2020.04.18.20071134v1 accessed 20 August 2020)
18.  Stein-Zamir C, Abramson N, Shoob H, et al. A large COVID-19 outbreak in a high school 10 days after schools' reopening, Israel, May 2020. Euro Surveill. 2020;25(29). Epub 2020/07/29.
19.  Torres JP, Pinera C, De La Maza V, et al. SARS-CoV-2 antibody prevalence in blood in a large school community subject to a Covid-19 outbreak: a cross-sectional study. Clin Infect Dis. 2020. Epub 2020/07/11.
20.  Heavey L, Casey G, Kelly C, Kelly D, McDarby G. No evidence of secondary transmission of COVID-19 from children attending school in Ireland, 2020. Euro Surveill. 2020;25(21). Epub 2020/06/04.
21.  Stringhini S, Wisniak A, Piumatti G, et al. Seroprevalence of anti-SARS-CoV-2 IgG antibodies in Geneva, Switzerland (SEROCoV-POP): a population-based study. Lancet. 2020;396(10247):313-9. Epub 2020/06/15.

22. Public Health England. Weekly Coronavirus Disease 2019 (COVID-19) Surveillance Report. Summary of COVID-19 surveillance systems. 2020.

23. Streeck H, Schulte B, Kümmerer B, et al. Infection fatality rate of SARS-CoV-2 infection in a German community with a super-spreading event. medRxiv. 2020 (https://www.medrxiv.org/content/10.1101/2020.05.04.20090076v2 accessed 20 August 2020).

24. Shakiba M, Nazari S, Mehrabian F, et al. Seroprevalence of COVID-19 virus infection in Guilan province, Iran. medRxiv. 2020 (https://www.medrxiv.org/content/10.1101/2020.04.26.20079244v1 accessed 20 August 2020).

25. Lu Y, Li Y, Deng W, et al. Symptomatic Infection is Associated with Prolonged Duration of Viral Shedding in Mild Coronavirus Disease 2019: A Retrospective Study of 110 Children in Wuhan. Pediatr Infect Dis J. 2020;39(7):e95-e9. Epub 2020/05/08.

26. Danis K, Epaulard O, Benet T, et al. Cluster of Coronavirus Disease 2019 (COVID-19) in the French Alps, February 2020. Clin Infect Dis. 2020;71(15):825-32. Epub 2020/04/12.

27. Xu Y, Li X, Zhu B, , et al. Characteristics of pediatric SARS-CoV-2 infection and potential evidence for persistent fecal viral shedding. Nat Med. 2020;26(4):502-5. Epub 2020/04/15.

28. Heald-Sargent T, Muller WJ, Zheng X, Rippe J, Patel AB, Kociolek LK. Age-Related Differences in Nasopharyngeal Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Levels in Patients With Mild to Moderate Coronavirus Disease 2019 (COVID-19). JAMA Pediatr. 2020. Epub 2020/08/04.

29. Jones TC, Mühlemann B, Veith T, et al. An analysis of SARS-CoV-2 viral load by patient age. medRxiv. 2020 (http://medrxiv.org/lookup/doi/10.1101/2020.06.08.20125484 accessed 20 August 2020).

30. Canini L, Andreoletti L, Ferrari P, et al. Surgical mask to prevent influenza transmission in households: a cluster randomized trial. PLoS One. 2010;5(11):e13998. Epub 2010/11/26.

31. Chen X, Ran L, Liu Q, Hu Q, Du X, Tan X. Hand Hygiene, Mask-Wearing Behaviors and Its Associated Factors during the COVID-19 Epidemic: A Cross-Sectional Study among Primary School Students in Wuhan, China. Int J Environ Res Public Health. 2020;17(8). Epub 2020/04/26.

32. Simmerman JM, Suntarattiwong P, Levy J, et al. Findings from a household randomized controlled trial of hand washing and face masks to reduce influenza transmission in Bangkok, Thailand. Influenza Other Respir Viruses. 2011;5(4):256-67. Epub 2011/06/10.

33. Suess T, Remschmidt C, Schink SB, et al. The role of facemasks and hand hygiene in the prevention of influenza transmission in households: results from a cluster randomised trial; Berlin, Germany, 2009-2011. BMC Infect Dis. 2012;12:26. Epub 2012/01/28.

34. Uchida M, Kaneko M, Hidaka Y, et al. Effectiveness of vaccination and wearing masks on seasonal influenza in Matsumoto City, Japan, in the 2014/2015 season: An observational study among all elementary schoolchildren. Prev Med Rep. 2017;5:86-91. Epub 2016/12/17.

35. van der Sande M, Teunis P, Sabel R. Professional and home-made face masks reduce exposure to respiratory infections among the general population. PLoS One. 2008;3(7):e2618. Epub 2008/07/10.

36. Allison MA, Guest-Warnick G, Nelson D, et al. Feasibility of elementary school children's use of hand gel and facemasks during influenza season. Influenza Other Respir Viruses. 2010;4(4):223-9. Epub 2010/09/15.

37. Stebbins S, Downs JS, Vukotich CJ, Jr. Using nonpharmaceutical interventions to prevent influenza transmission in elementary school children: parent and teacher perspectives. J Public Health Manag Pract. 2009;15(2):112-7. Epub 2009/02/10.

38. Smart NR, Horwell CJ, Smart TS, Galea KS. Assessment of the Wearability of Facemasks against Air Pollution in Primary School-Aged Children in London. Int J Environ Res Public Health. 2020;17(11). Epub 2020/06/06.

39. Fikenzer S, Uhe T, Lavall D, et al. Effects of surgical and FFP2/N95 face masks on cardiopulmonary exercise capacity. Clin Res Cardiol. 2020. Epub 2020/07/08.

40. World Health Organization. Transmission of SARS-CoV-2: implications for infection prevention precautions. Geneva: World Health Organization; 2020 (https://www.who.int/publications/i/item/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations accessed 20 August 2020).

41. Shelov S AT. Caring for Your Baby and Young Child: Birth to Age 5, Fifth Edition. American Academy of Pediatrics. Elk Grove Village, IL. . 2009.

42. Centers for Disease Control and Prevention. Considerations for Wearing Masks.United States of America;2020 (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html accessed 14 August 2020).

43. Swiss Federal Office for Public Health. New coronavirus: Masks. Koniz;2020 (https://www.bag.admin.ch/bag/en/home/krankheiten/ausbrueche-epidemien-pandemien/aktuelle-ausbrueche-epidemien/novel-cov/masken.html accessed 20 August 2020).

44. Department of Health and Social Care. Face coverings: when to wear one and how to make your own. United Kingdom;2020 (https://www.gov.uk/government/publications/face-coverings-when-to-wear-one-and-how-to-make-your-own/face-coverings-when-to-wear-one-and-how-to-make-your-own accessed 20 August 2020).

45. American Academy of Pediatrics. Cloth Face Coverings for Children During COVID-19. 2020 (https://www.healthychildren.org/English/health-issues/conditions/COVID-19/Pages/Cloth-Face-Coverings-for-Children-During-COVID-19.aspx accessed 20 August 2020).

46. Centers for Disease Control and Prevention. If You Are Immunocompromised, Protect Yourself From COVID-19. United States of America;2020 (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html accessed 20 August 2020).

47. Cystic Fibrosis Foundation. COVID-19 Community Questions and Answers. 2020 (https://www.cff.org/Life-With-CF/Daily-Life/Germs-and-Staying-Healthy/CF-and-Coronavirus/COVID-19-Community-Questions-and-Answers/#:~:text=People%20with%20CF%20should%20continue,cross%2Dinfection%20from%20CF%20germs. accessed 20 August 2020).

48. Esposito S, Principi N. To mask or not to mask children to overcome COVID-19. Eur J Pediatr. 2020. Epub 2020/05/11.

49. Del Valle SY, Tellier R, Settles GS, Tang JW. Can we reduce the spread of influenza in schools with face masks? Am J Infect Control. 2010;38(9):676-7. Epub 2010/07/08.

50. American Cochlear Implant Alliance. Consideration of face shields as a return to school option. 2020 (https://www.acialliance.org/page/consideration-of-face-shields-as-return-to-school-option accessed 20 August 2020).

51. United Nations. Transparent masks aid communication for hard of hearing. 2020 (https://www.un.org/en/coronavirus/transparent-masks-aid-communication-hard-hearing accessed 20 August 2020).

52. Lindsley WG, Noti JD, Blachere FM, Szalajda JV, Beezhold DH. Efficacy of face shields against cough aerosol droplets from a cough simulator. J Occup Environ Hyg. 2014;11(8):509-18. Epub 2014/01/29.

53. Hirschmann MT, Hart A, Henckel J, Sadoghi P, Seil R, Mouton C. COVID-19 coronavirus: recommended personal protective equipment for the orthopaedic and trauma surgeon. Knee Surg Sports Traumatol Arthrosc. 2020;28(6):1690-8. Epub 2020/04/29.

54. Anon JB, Denne C, Rees D. Patient-Worn Enhanced Protection Face Shield for Flexible Endoscopy. Otolaryngol Head Neck Surg. 2020;163(2):280-3. Epub 2020/06/10.

55. Kähler CJ, Hain R. Fundamental protective mechanisms of face masks against droplet infections. Journal of Aerosol Science 148, 105617. (https://doi.org/10.1016/j.jaerosci.2020.105617 accessed 20 August 2020).

56. World Health Organization. Rational use of personal protective equipment for coronavirus disease 2019 (COVID-19). Geneva: World Health Organization; 2020 (https://apps.who.int/iris/rest/bitstreams/1274340/retrieve accessed 20 August 2020).

57. Tony Blair Institute for Global Change. The Role of Face Shields in Responding to Covid-19. 2020 (https://institute.global/sites/default/files/articles/The-Role-of-Face-Shields-in-Responding-to-Covid-19.pdf accessed 20 August, 2020).

58. Perencevich EN, Diekema DJ, Edmond MB. Moving Personal Protective Equipment Into the Community: Face Shields and Containment of COVID-19. JAMA. 2020. Epub 2020/04/30.

59. Victoria State Health and Human Services. Face coverings: whole of Victoria. 2020 (https://www.dhhs.vic.gov.au/face-coverings-covid-19#what-does-wearing-a-face-covering-mean accessed 20 August 2020).

60. Ministry of Health. Guidance for use of masks and face shields. Singapore;2020 (https://www.moh.gov.sg/news-highlights/details/guidance-for-use-of-masks-and-face-shields accessed 20 August 2020).

61. Roberge RJ. Face shields for infection control: A review. J Occup Environ Hyg. 2016;13(4):235-42. Epub 2015/11/13.

62. World Health Organization. Disease Commodity Package v5. Geneva: World Health Organization; 2020 (https://www.who.int/emergencies/what-we-do/prevention-readiness/disease-commodity-packages/dcp-ncov.pdf?ua=1 accessed August 20, 2020).

WHO and UNICEF continue to monitor the situation closely for any changes that may affect this interim guidance. Should any factors change, an update will be issued. Otherwise, this interim guidance document will expire 2 years after the date of publication.

© World Health Organization and the United Nations Children's Fund (UNICEF), 2020. Some rights reserved. This work is available under the CC BY-NC-SA 3.0 IGO licence.

WHO reference number: WHO/2019-nCoV/IPC_Masks/Children/2020.1

# Mask use in the context of COVID-19

Interim guidance
1 December 2020



This document, which is an update of the guidance published on 5 June 2020, includes new scientific evidence relevant to the use of masks for reducing the spread of SARS-CoV-2, the virus that causes COVID-19, and practical considerations. It contains updated evidence and guidance on the following:

- mask management;
- SARS-CoV-2 transmission;
- masking in health facilities in areas with community, cluster and sporadic transmission;
- mask use by the public in areas with community and cluster transmission;
- alternatives to non-medical masks for the public;
- exhalation valves on respirators and non-medical masks;
- mask use during vigorous intensity physical activity;
- essential parameters to be considered when manufacturing non-medical masks (Annex).

## Key points

- The World Health Organization (WHO) advises the use of masks as part of a comprehensive package of prevention and control measures to limit the spread of SARS-CoV-2, the virus that causes COVID-19. A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control. Other infection prevention and control (IPC) measures include hand hygiene, physical distancing of at least 1 metre, avoidance of touching one's face, respiratory etiquette, adequate ventilation in indoor settings, testing, contact tracing, quarantine and isolation. Together these measures are critical to prevent human-to-human transmission of SARS-CoV-2.
- Depending on the type, masks can be used either for protection of healthy persons or to prevent onward transmission (source control).
- WHO continues to advise that anyone suspected or confirmed of having COVID-19 or awaiting viral laboratory test results should wear a medical mask when in the presence of others (this does not apply to those awaiting a test prior to travel).
- For any mask type, appropriate use, storage and cleaning or disposal are essential to ensure that they are as effective as possible and to avoid an increased transmission risk.

Mask use in health care settings
- WHO continues to recommend that health workers (1) providing care to suspected or confirmed COVID-19

patients wear the following types of mask/respirator in addition to other personal protective equipment that are part of standard, droplet and contact precautions:
  - medical mask in the absence of aerosol generating procedures (AGPs)
  - respirator, N95 or FFP2 or FFP3 standards, or equivalent in care settings for COVID-19 patients where AGPs are performed; these may be used by health workers when providing care to COVID-19 patients in other settings if they are widely available and if costs is not an issue.
- In areas of known or suspected community or cluster SARS-CoV-2 transmission WHO advises the following:
  - universal masking for all persons (staff, patients, visitors, service providers and others) within the health facility (including primary, secondary and tertiary care levels; outpatient care; and long-term care facilities)
  - wearing of masks by inpatients when physical distancing of at least 1 metre cannot be maintained or when patients are outside of their care areas.
- In areas of known or suspected sporadic SARS-CoV-2 transmission, health workers working in clinical areas where patients are present should continuously wear a medical mask. This is known as targeted continuous medical masking for health workers in clinical areas;
- Exhalation valves on respirators are discouraged as they bypass the filtration function for exhaled air by the wearer.

Mask use in community settings
- Decision makers should apply a risk-based approach when considering the use of masks for the general public.
- In areas of known or suspected community or cluster SARS-CoV-2 transmission:
  - WHO advises that the general public should wear a non-medical mask in indoor (e.g. shops, shared workplaces, schools - see Table 2 for details) or outdoor settings where physical distancing of at least 1 metre cannot be maintained.
  - If indoors, unless ventilation has been be assessed to be adequate[1], WHO advises that the general public should wear a non-medical mask, regardless of whether physical distancing of at least 1 metre can be maintained.

---

[1] For adequate ventilation refer to regional or national institutions or heating, refrigerating and air-conditioning societies enacting ventilation requirements. If not available or applicable, a

recommended ventilation rate of 10 l/s/person should be met (except healthcare facilities which have specific requirements). For more information consult "Coronavirus (COVID-19) response

– Individuals/people with higher risk of severe complications from COVID-19 (individuals $\geq$ 60 years old and those with underlying conditions such as cardiovascular disease or diabetes mellitus, chronic lung disease, cancer, cerebrovascular disease or immunosuppression) should wear medical masks when physical distancing of at least 1 metre cannot be maintained.

- In any transmission scenarios:
  – Caregivers or those sharing living space with people with suspected or confirmed COVID-19, regardless of symptoms, should wear a medical mask when in the same room.

Mask use in children (2)

- Children aged up to five years should not wear masks for source control.
- For children between six and 11 years of age, a risk-based approach should be applied to the decision to use a mask; factors to be considered in the risk-based approach include intensity of SARS-CoV-2 transmission, child's capacity to comply with the appropriate use of masks and availability of appropriate adult supervision, local social and cultural environment, and specific settings such as households with elderly relatives, or schools.
- Mask use in children and adolescents 12 years or older should follow the same principles as for adults.
- Special considerations are required for immunocompromised children or for paediatric patients with cystic fibrosis or certain other diseases (e.g., cancer), as well as for children of any age with developmental disorders, disabilities or other specific health conditions that might interfere with mask wearing.

Manufacturing of non-medical (fabric) masks (Annex)

- Homemade fabric masks of three-layer structure (based on the fabric used) are advised, with each layer providing a function: 1) an innermost layer of a hydrophilic material 2) an outermost layer made of hydrophobic material 3) a middle hydrophobic layer which has been shown to enhance filtration or retain droplets.
- Factory-made fabric masks should meet the minimum thresholds related to three essential parameters: filtration, breathability and fit.
- Exhalation valves are discouraged because they bypass the filtration function of the fabric mask rendering it unserviceable for source control.

## Methodology for developing the guidance

Guidance and recommendations included in this document are based on published WHO guidelines (in particular the WHO Guidelines on infection prevention and control of epidemic- and pandemic-prone acute respiratory infections in health care) (2) and ongoing evaluations of all available scientific evidence by the WHO ad hoc COVID-19 Infection Prevention and Control Guidance Development Group (COVID-19 IPC GDG) (see acknowledgement section for list of GDG members). During emergencies WHO publishes interim guidance, the development of which follows a

transparent and robust process of evaluation of the available evidence on benefits and harms. This evidence is evaluated through expedited systematic reviews and expert consensus-building through weekly GDG consultations, facilitated by a methodologist and, when necessary, followed up by surveys. This process also considers, as much as possible, potential resource implications, values and preferences, feasibility, equity, and ethics. Draft guidance documents are reviewed by an external review panel of experts prior to publication.

## Purpose of the guidance

This document provides guidance for decision makers, public health and IPC professionals, health care managers and health workers in health care settings (including long-term care and residential), for the public and for manufactures of non-medical masks (Annex). It will be revised as new evidence emerges.

WHO has also developed comprehensive guidance on IPC strategies for health care settings (3), long-term care facilities (LTCF) (4), and home care (5).

## Background

The use of masks is part of a comprehensive package of prevention and control measures that can limit the spread of certain respiratory viral diseases, including COVID-19. Masks can be used for protection of healthy persons (worn to protect oneself when in contact with an infected individual) or for source control (worn by an infected individual to prevent onward transmission) or both.

However, the use of a mask alone, even when correctly used (see below), is insufficient to provide an adequate level of protection for an uninfected individual or prevent onward transmission from an infected individual (source control). Hand hygiene, physical distancing of at least 1 metre, respiratory etiquette, adequate ventilation in indoor settings, testing, contact tracing, quarantine, isolation and other infection prevention and control (IPC) measures are critical to prevent human-to-human transmission of SARS-CoV-2, whether or not masks are used (6).

## Mask management

For any type of mask, appropriate use, storage and cleaning, or disposal are essential to ensure that they are as effective as possible and to avoid any increased risk of transmission. Adherence to correct mask management practices varies, reinforcing the need for appropriate messaging (7).

WHO provides the following guidance on the correct use of masks:

- Perform hand hygiene before putting on the mask.
- Inspect the mask for tears or holes, and do not use a damaged mask.
- Place the mask carefully, ensuring it covers the mouth and nose, adjust to the nose bridge and tie it securely to minimize any gaps between the face and the mask. If using ear loops, ensure these do not cross over as this widens the gap between the face and the mask.

resources from ASHRAE and others''
https://www.ashrae.org/technical-resources/resources

## Guidance on mask use in community settings

**Evidence on the protective effect of mask use in community settings**

At present there is only limited and inconsistent scientific evidence to support the effectiveness of masking of healthy people in the community to prevent infection with respiratory viruses, including SARS-CoV-2 (75). A large randomized community-based trial in which 4862 healthy participants were divided into a group wearing medical/surgical masks and a control group found no difference in infection with SARS-CoV-2 (76). A recent systematic review found nine trials (of which eight were cluster-randomized controlled trials in which clusters of people, versus individuals, were randomized) comparing medical/surgical masks versus no masks to prevent the spread of viral respiratory illness. Two trials were with healthcare workers and seven in the community. The review concluded that wearing a mask may make little or no difference to the prevention of influenza-like illness (ILI) (RR 0.99, 95%CI 0.82 to 1.18) or laboratory confirmed illness (LCI) (RR 0.91, 95%CI 0.66-1.26) (44); the certainty of the evidence was low for ILI, moderate for LCI.

By contrast, a small retrospective cohort study from Beijing found that mask use by entire families before the first family member developed COVID-19 symptoms was 79% effective in reducing transmission (OR 0.21, 0.06-0.79) (77). A case-control study from Thailand found that wearing a medical or non-medical mask all the time during contact with a COVID-19 patient was associated with a 77% lower risk of infection (aOR 0.23; 95% CI 0.09–0.60) (78). Several small observational studies with epidemiological data have reported an association between mask use by an infected person and prevention of onward transmission of SARS-CoV-2 infection in public settings. (8, 79-81).

A number of studies, some peer reviewed (82-86) but most published as pre-prints (87-104), reported a decline in the COVID-19 cases associated with face mask usage by the public, using country- or region-level data. One study reported an association between community mask wearing policy adoption and increased movement (less time at home, increased visits to commercial locations) (105). These studies differed in setting, data sources and statistical methods and have important limitations to consider (106), notably the lack of information about actual exposure risk among individuals, adherence to mask wearing and the enforcement of other preventive measures (107, 108).

Studies of influenza, influenza-like illness and human coronaviruses (not including COVID-19) provide evidence that the use of a medical mask can prevent the spread of infectious droplets from a symptomatic infected person to someone else and potential contamination of the environment by these droplets (75). There is limited evidence that wearing a medical mask may be beneficial for preventing transmission between healthy individuals sharing households with a sick person or among attendees of mass gatherings (44, 109-114).

A meta-analysis of observational studies on infections due to betacoronaviruses, with the intrinsic biases of observational data, showed that the use of either disposable medical masks or reusable 12–16-layer cotton masks was associated with protection of healthy individuals within households and among contacts of cases (46). This could be considered to be indirect evidence for the use of masks (medical or other) by healthy individuals in the wider community; however, these studies suggest that such individuals would need to be in close proximity to an infected person in a household or at a mass gathering where physical distancing cannot be achieved to become infected with the virus. Results from cluster randomized controlled trials on the use of masks among young adults living in university residences in the United States of America indicate that face masks may reduce the rate of influenza-like illness but showed no impact on risk of laboratory-confirmed influenza (115, 116).

### Guidance

The WHO COVID-19 IPC GDG considered all available evidence on the use of masks by the general public including effectiveness, level of certainty and other potential benefits and harms, with respect to transmission scenarios, indoor versus outdoor settings, physical distancing and ventilation. Despite the limited evidence of protective efficacy of mask wearing in community settings, in addition to all other recommended preventive measures, the GDG advised mask wearing in the following settings:

1.  In areas with known or suspected community or cluster transmission of SARS-CoV-2, WHO advises mask use by the public in the following situations (see Table 2):

    Indoor settings:
    –   in public indoor settings where ventilation is known to be poor regardless of physical distancing: limited or no opening of windows and doors for natural ventilation; ventilation system is not properly functioning or maintained; or cannot be assessed;
    –   in public indoor settings that have adequate[3] ventilation if physical distancing of at least 1 metre cannot be maintained;
    –   in household indoor settings: when there is a visitor who is not a household member and ventilation is known to be poor, with limited opening of windows and doors for natural ventilation, or the ventilation system cannot be assessed or is not properly functioning, regardless of whether physical distancing of at least 1 metre can be maintained;
    –   in household indoor settings that have adequate ventilation if physical distancing of at least 1 metre cannot be maintained.

---

[3] For adequate ventilation refer to regional or national institutions or heating, refrigerating and air-conditioning societies enacting ventilation requirements. If not available or applicable, a recommended ventilation rate of 10 l/s/person should be met (except healthcare facilities which have specific requirements). For more information consult "Coronavirus (COVID-19) response

resources from ASHRAE and others''
https://www.ashrae.org/technical-resources/resources

In outdoor settings:

–   where physical distancing of at least 1 metre cannot be maintained;

–   individuals/people with higher risk of severe complications from COVID-19 (individuals ≥ 60 years old and those with underlying conditions such as cardiovascular disease or diabetes mellitus, chronic lung disease, cancer, cerebrovascular disease or immunosuppression) should wear medical masks in any setting where physical distance cannot be maintained.

2.   In areas with known or suspected sporadic transmission or no documented transmission, as in all transmission scenarios, WHO continues to advise that decision makers should apply a risk-based approach focusing on the following criteria when considering the use of masks for the public:

• **Purpose of mask use**. Is the intention source control (preventing an infected person from transmitting the virus to others) or protection (preventing a healthy wearer from the infection)?

• **Risk of exposure to SARS-CoV-2**. Based on the epidemiology and intensity of transmission in the population, is there transmission and limited or no capacity to implement other containment measures such as contact tracing, ability to carry out testing and isolate and care for suspected and confirmed cases? Is there risk to individuals working in close contact with the public (e.g., social workers, personal support workers, teachers, cashiers)?

• **Vulnerability of the mask wearer/population**. Is the mask wearer at risk of severe complications from COVID-19? Medical masks should be used by older people (≥ 60 years old), immunocompromised patients and people with comorbidities, such as cardiovascular disease or diabetes mellitus, chronic lung disease, cancer and cerebrovascular disease (117).

• **Setting in which the population lives**. Is there high population density (such as in refugee camps, camp-like settings, and among people living in cramped conditions) and settings where individuals are unable to keep a physical distance of at least 1 metre (for example, on public transportation)?

• **Feasibility**. Are masks available at an affordable cost? Do people have access to clean water to wash fabric masks, and can the targeted population tolerate possible adverse effects of wearing a mask?

• **Type of mask**. Does the use of medical masks in the community divert this critical resource from the health workers and others who need them the most? In settings where medical masks are in short supply, **stocks should be prioritized for health workers and at-risk individuals.**

The decision of governments and local jurisdictions whether to recommend or make mandatory the use of masks should be based on the above assessment as well as the local context, culture, availability of masks and resources required.

3. In any transmission scenario:

• Persons with any symptoms suggestive of COVID-19 should wear a medical mask and (5) additionally:
   –   self-isolate and seek medical advice as soon as they start to feel unwell with potential symptoms of COVID-19, even if symptoms are mild);

–   follow instructions on how to put on, take off, and dispose of medical masks and perform hand hygiene (118);

–   follow all additional measures, in particular respiratory hygiene, frequent hand hygiene and maintaining physical distance of at least 1 metre from other persons (46). If a medical mask is not available for individuals with suspected or confirmed COVID-19, a fabric mask meeting the specifications in the Annex of this document should be worn by patients as a source control measure, pending access to a medical mask. The use of a non-medical mask can minimize the projection of respiratory droplets from the user (119, 120).

–   Asymptomatic persons who test positive for SARS-CoV-2, should wear a medical mask when with others for a period of 10 days after testing positive.

**Potential benefits/harms**

The potential advantages of mask use by healthy people in the general public include:

• reduced spread of respiratory droplets containing infectious viral particles, including from infected persons before they develop symptoms (121);

• reduced potential for stigmatization and greater of acceptance of mask wearing, whether to prevent infecting others or by people caring for COVID-19 patients in non-clinical settings (122);

• making people feel they can play a role in contributing to stopping spread of the virus;

• encouraging concurrent transmission prevention behaviours such as hand hygiene and not touching the eyes, nose and mouth (123-125);

• preventing transmission of other respiratory illnesses like tuberculosis and influenza and reducing the burden of those diseases during the pandemic (126).

The potential disadvantages of mask use by healthy people in the general public include:

• headache and/or breathing difficulties, depending on type of mask used (55);

• development of facial skin lesions, irritant dermatitis or worsening acne, when used frequently for long hours (58, 59, 127);

• difficulty with communicating clearly, especially for persons who are deaf or have poor hearing or use lip reading (128, 129);

• discomfort (44, 55, 59)

• a false sense of security leading to potentially lower adherence to other critical preventive measures such as physical distancing and hand hygiene (105);

• poor compliance with mask wearing, in particular by young children (111, 130-132);

• waste management issues; improper mask disposal leading to increased litter in public places and environmental hazards (133);

• disadvantages for or difficulty wearing masks, especially for children, developmentally challenged persons, those with mental illness, persons with cognitive impairment, those with asthma or chronic respiratory or breathing problems, those who have had facial trauma or recent oral maxillofacial surgery and those living in hot and humid environments (55, 130).

**Background**

A non-medical mask, also called fabric mask, community mask or face covering, is neither a medical device nor personal protective equipment. Non-medical masks are aimed at the general population, primarily for protecting others from exhaled virus-containing droplets emitted by the mask wearer. They are not regulated by local health authorities or occupational health associations, nor is it required for manufacturers to comply with guidelines established by standards organizations. Non-medical masks may be homemade or manufactured. The essential performance parameters include good breathability, filtration of droplets originating from the wearer, and a snug fit covering the nose and mouth. Exhalation valves on masks are discouraged as they bypass the filtration function of the mask.

Non-medical masks are made from a variety of woven and non-woven fabrics, such as woven cotton, cotton/synthetic blends, polyesters and breathable spunbond polypropylene, for example. They may be made of different combinations of fabrics, layering sequences and available in diverse shapes. Currently, more is known about common household fabrics and combinations to make non-medical masks with target filtration efficiency and breathability (119, 146-150). Few of these fabrics and combinations have been systematically evaluated and there is no single design, choice of material, layering or shape among available non-medical masks that are considered optimal. While studies have focussed on single fabrics and combinations, few have looked at the shape and universal fit to the wearer. The unlimited combination of available fabrics and materials results in variable filtration and breathability.

In the context of the global shortage of medical masks and PPE, encouraging the public to create their own fabric masks may promote individual enterprise and community integration. Moreover, the production of non-medical masks may offer a source of income for those able to manufacture masks within their communities. Fabric masks can also be a form of cultural expression, encouraging public acceptance of protection measures in general. The safe re-use of fabric masks will also reduce costs and waste and contribute to sustainability (151-156).

This Annex is destined intended for two types of readers: homemade mask makers and factory-made masks manufacturers. Decision makers and managers (national/sub-national level) advising on a type of non-medical mask are also the focus of this guidance and should take into consideration the following features of non-medical masks: breathability, filtration efficiency (FE), or filtration, number and combination of fabric layers material used, shape, coating and maintenance.

**Evidence on the effectiveness of non-medical (fabric) masks**

A number of reviews have been identified on the effectiveness of non-medical masks (151-156). One systematic review (155) identified 12 studies and evaluated study quality. Ten were laboratory studies (157-166), and two reports were from a single randomized trial (72, 167). The majority of studies were conducted before COVID-19 emerged or used laboratory generated particles to assess filtration efficacy. Overall, the reviews concluded that cloth face masks have limited efficacy in combating viral infection transmission.

**Homemade non-medical masks**

Homemade non-medical masks made of household fabrics (e.g., cotton, cotton blends and polyesters) should ideally have a three-layer structure, with each layer providing a function (see Figure 1) (168). It should include:

1. an innermost layer (that will be in contact with the face) of a hydrophilic material (e.g., cotton or cotton blends of terry cloth towel, quilting cotton and flannel) that is non-irritating against the skin and can contain droplets (148)
2. a middle hydrophobic layer of synthetic breathable non-woven material (spunbond polypropylene, polyester and polyaramid), which may enhance filtration, prevent permeation of droplets or retain droplets (148, 150)
3. an outermost layer made of hydrophobic material (e.g. spunbond polypropylene, polyester or their blends), which may limit external contamination from penetrating through the layers to the wearer's nose and mouth and maintains and prevents water accumulation from blocking the pores of the fabric (148).

Although a minimum of three layers is recommended for non-medical masks for the most common fabric used, single, double or other layer combinations of advanced materials may be used if they meet performance requirements. It is important to note that with more tightly woven materials, breathability may be reduced as the number of layers increases. A quick check may be performed by attempting to breathe, through the mouth, through the multiple layers.



*Figure 1.* Non-medical mask construction using breathable fabrics such as cotton, cotton blends, polyesters, nylon and polypropylene spunbond that are breathable may impart adequate filtration performance when layered. Single- or double-layer combinations of advanced materials may be used if they meet performance requirements (72).

Assumptions regarding homemade masks are that individual makers only have access to common household fabrics and do not have access to test equipment to confirm target performance (filtration and breathability). Figure 1 illustrates a multi-layer mask construction with examples of fabric options. Very porous materials, such as gauze, even with multiple layers, may provide very low filtration efficiency (147). Higher thread count fabrics offer improved filtration performance (169). Coffee filters, vacuum bags and materials not meant for clothing should be avoided as they may contain injurious content when breathed in. Microporous films such as Gore-Tex are not recommended (170).

 **Centers for Disease Control and Prevention**

## Plaintiffs' Exhibit 107

# Order: Wearing of face masks while on conveyances and at transportation hubs

The Centers for Disease Control and Prevention (CDC) issued an Order ▪ [PDF – 11 pages] on January 29, 2021 requiring the wearing of masks by travelers to prevent spread of the virus that causes COVID-19. Conveyance operators must also require all persons onboard to wear masks when boarding, disembarking, and for the duration of travel. Operators of transportation hubs must require all persons to wear a mask when entering or on the premises of a transportation hub.

This Order must be followed by all passengers on public conveyances (e.g., airplanes, ships, ferries, trains, subways, buses, taxis, ride-shares) traveling into, within, or out of the United States as well as conveyance operators (e.g., crew, drivers, conductors, and other workers involved in the operation of conveyances) and operators of transportation hubs ( e.g., airports, bus or ferry terminals, train or subway stations, seaports, ports of entry) or any other area that provides transportation in the United States.

People must wear masks that cover both the mouth and nose when awaiting, boarding, traveling on, or disembarking public conveyances. People must also wear masks when entering or on the premises of a transportation hub in the United States.

This Order ▪ [PDF – 11 pages] is effective as of February 2, 2021 and was published in the Federal Register ↗ on February 3, 2021.

For frequently asked questions, visit the FAQs.

The following are attributes of masks needed to fulfill the requirements of the Order. CDC will update this guidance as needed.

- A properly worn mask completely covers the nose and mouth.
- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).
- Mask should be secured to the head with ties, ear loops, or elastic bands that go behind the head. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.
- Mask should fit snugly but comfortably against the side of the face.
- Mask should be a solid piece of material without slits, exhalation valves, or punctures.

The following attributes are additionally acceptable as long as masks meet the requirements above.

- Masks can be either manufactured or homemade.
- Masks can be reusable or disposable.
- Masks can have inner filter pockets.
- Clear masks or cloth masks with a clear plastic panel may be used to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators fulfill the requirements of the Order.

The following do not fulfill the requirements of the Order.

- Masks worn in a way that does not cover both the mouth and nose
- Face shields or goggles (face shields or goggles may be worn to supplement a mask that meets above required attributes)
- Scarves, ski masks, balaclavas, or bandannas
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose.
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through
- Masks made from materials that are hard to breathe through (such as vinyl, plastic or leather)
- Masks containing slits, exhalation valves, or punctures
- Masks that do not fit properly (large gaps, too loose or too tight)

Additional guidance on the use of masks to slow the spread of COVID-19 is available on CDC's website.

# Disability Exemptions of the Order

Who is covered by the exemption for "a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act ☐ (ADA, 42 U.S.C. 12101 *et seq.*)"?

Most people, including those with disabilities, can tolerate and safely wear a mask and are required to wear one as per CDC's Order. However, certain people with disabilities who, because of their disability, cannot wear a mask, or cannot safely wear a mask, are exempted from CDC's mask-wearing requirement.

The exemption is not meant to cover people with disabilities for whom wearing a mask might only be difficult or whose disability does not prevent them from wearing a mask or wearing a mask safely.

The following narrow subset of persons with disabilities are exempt from CDC's requirement to wear a mask:

- A person with a disability who, for reasons related to the disability, would be physically unable to remove a mask without assistance if breathing becomes obstructed. Examples might include a person with impaired motor skills, quadriplegia, or limb restrictions
- A person with an intellectual, developmental, cognitive, or psychiatric disability that affects the person's ability to understand the need to remove a mask if breathing becomes obstructed

The following persons with disabilities might be exempt from CDC's requirement to wear a mask based on factors specific to the person:

- A person with a disability who cannot wear a mask because it would cause the person to be unable to breathe or have respiratory distress if a mask were worn over the mouth and nose. A person with a condition that causes intermittent respiratory distress, such as asthma, likely does not qualify for this exemption because people with asthma, or other similar conditions, can generally wear a mask safely.
- A person with a disability requiring the use of an assistive device, such as for mobility or communication, that prevents the person from wearing a mask and wearing or using the assistive device at the same time. If use of the device is intermittent and the person can remove the mask independently to use the device, then a mask must be worn during periods when the person is not using the device.
- A person with a severe sensory disability or a severe mental health disability who would pose an imminent threat of harm to themselves or others if required to wear a mask. Persons who experience discomfort or anxiety while wearing a mask without imminent threat of harm would not qualify for this exemption.

**How can operators facilitate safer transportation where a passenger is a person with a disability who is exempt from the requirement to wear a mask?**

Operators of conveyances or transportation hubs should consider providing options for additional protective measures that improve the ability of the people who are subject to the exemption to maintain social distance (separation from others by at least 6 feet/2 meters [about 2 arm lengths]). Examples include—

- If travel is pre-scheduled, schedule travel for people who are exempt at less crowded times or on less crowded conveyances.
- Seat or otherwise situate the person in a less crowded section of the conveyance or transportation hub.
- Inform people with disabilities who cannot wear a mask safely that these additional measures might be taken to facilitate safer transportation.

All people should consider the necessity of using public transportation, especially those with disabilities or underlying conditions that may place them at increased risk for severe illness from COVID-19. Disability alone may not be related to higher risk for getting COVID-19 or having severe illness. Most people with disabilities are not inherently at higher risk for becoming infected with or having severe illness from COVID-19. However, some people with disabilities might be at a higher risk of infection or severe illness, at least in part because of their underlying medical conditions.

People with disabilities should talk with their healthcare providers if they have questions about their health or how their health conditions are being managed.

While this guidance uses the ADA's definition of disability, it does not address other ADA provisions that may be pertinent to issues involving the use of masks.

Page last reviewed: March 23, 2021

Plaintiffs' Exhibit 108

IIA

117TH CONGRESS
2D SESSION

# S. J. RES. 37

Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by Centers for Disease Control and Prevention relating to "Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs".

————————————

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 10, 2022

Mr. PAUL (for himself, Mr. MARSHALL, Mr. BRAUN, Mr. CRAMER, Mrs. BLACKBURN, Mr. LANKFORD, Mr. HAWLEY, Mr. CRUZ, Mr. SCOTT of Florida, Mr. WICKER, Mr. COTTON, Mr. TUBERVILLE, Mrs. HYDE-SMITH, Mr. HOEVEN, Mr. LEE, and Ms. LUMMIS) introduced the following joint resolution; which was read twice and referred to the Committee on Health, Education, Labor, and Pensions

————————————

# JOINT RESOLUTION

Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by Centers for Disease Control and Prevention relating to "Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs".

1     *Resolved by the Senate and House of Representatives*

2 *of the United States of America in Congress assembled,*

3 That Congress disapproves the rule submitted by the Cen-

4 ters for Disease Control and Prevention relating to "Re-

5 quirement for Persons To Wear Masks While on Convey-

2

1 ances and at Transportation Hubs'' (86 Fed. Reg. 8025

2 (February 3, 2021); determined through a letter of opin-

3 ion from the Government Accountability Office dated De-

4 cember 14, 2021, and printed in the Congressional Record

5 on December 15, 2021, on pages S9206–S9208, that the

6 order is a rule under the Congressional Review Act), and

7 such rule shall have no force or effect.

○

*www.fitness.gov* when it has been finalized.

The meeting that is scheduled to be held on May 5, 2015, is open to the public. Every effort will be made to provide reasonable accommodations for persons with disabilities and/or special needs who wish to attend the meeting. Persons with disabilities and/or special needs should call (240) 276–9567 no later than close of business on April 21, 2015, to request accommodations. Members of the public who wish to attend the meeting are asked to pre-register by sending an email to *rsvp.fitness@hhs.gov* or by calling (240) 276–9567. Registration for public attendance must be completed before close of business on April 28, 2015.

Dated: March 20, 2015.

**Shellie Y. Pfohl,**
*Executive Director, Office of the President's Council on Fitness, Sports, and Nutrition, U.S. Department of Health and Human Services.*

[FR Doc. 2015–06999 Filed 3–26–15; 8:45 am]

**BILLING CODE 4150–35–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC) in the Department of Health and Human Services (HHS) is publishing this Notice to inform the public of the criteria CDC considers for requesting federal travel restrictions for public health purposes, including for use of the Do Not Board (DNB) list and Public Health Border Lookout records. Individuals with communicable diseases that pose a public health threat to travelers can be placed on this list to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. This notice further describes the factors that HHS/CDC will consider in evaluating whether to request that an individual who may have been exposed to a hemorrhagic fever virus be placed on the DNB list, which is administered by the Department of Homeland Security (DHS). It also contains information for

individuals who have been placed on this list to respond to this decision in writing, if they believe the decision was made in error. This notice is effective immediately.

**DATES:** This notice is effective on March 27, 2015.

**FOR FURTHER INFORMATION CONTACT:** For information regarding this Notice: Ashley A. Marrone, J.D., Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE., MS–E03, Atlanta, GA 30329. For information regarding CDC operations related to this Notice: Travel Restrictions and Intervention Activity, ATTN.: Francisco Alvarado-Ramy, M.D., Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE., MS–C–01, Atlanta, GA 30329. Either may also be reached by telephone 404–498–1600 or email *travelrestrictions@cdc.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Individuals with communicable diseases who travel on commercial aircraft can pose a risk for infection to the traveling public. In June 2007, HHS/CDC and DHS developed a public health DNB list, enabling domestic and international public health officials to request that individuals with communicable diseases who meet specific criteria, including having a communicable disease that poses a public health threat to the traveling public, be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States.[1] The public health DNB list, administered by DHS and based on HHS/CDC's requests, is intended to supplement state and/or local public health measures to prevent individuals who are infectious, or reasonably believed to have been exposed to a communicable disease and may become infectious, from boarding commercial aircraft. Use of the list is limited to those communicable diseases that would pose a public health threat to travelers should the infected individual be permitted to board a flight. Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any commercial domestic flight or for any commercial international flight arriving in or departing from the United States.

An individual is typically removed from the DNB upon receipt by HHS/CDC of the treating physician's or public health authority's statement (or other medical documentation) that the individual is no longer considered infectious, or lapse of the period that the individual is at risk of becoming infectious without development of symptoms.

Individuals included on the DNB list are assigned a Public Health Border Lookout ("Lookout") record that assists in ensuring that an individual placed on the DNB is detected if he or she attempts to enter or depart the United States through a port of entry. When this happens, officials from U.S. Customs and Border Protection (CBP), a component agency of DHS, notify HHS/CDC so that a thorough public health inquiry and evaluation can be conducted and appropriate public health action taken, as needed.

Requests for an individual to be placed on the public health DNB list with an associated Lookout record happen through a number of means, including: State or local public health officials contact the CDC Quarantine Station of jurisdiction, health-care providers make requests by contacting their state or local public health departments, and foreign and U.S. government agencies contact the CDC's Emergency Operations Center (EOC) in Atlanta. HHS/CDC may also request that DHS place an individual on the public health DNB and Lookout lists if HHS/CDC becomes independently aware of an individual who meets the placement criteria.[2]

HHS/CDC has refined the criteria that it initially considered, as published in the Morbidity and Mortality Weekly Report (MMWR) in 2008, and this notice describes the criteria CDC currently considers when making requests to DHS to include an individual on the DNB list and associated Lookout record. If an individual satisfies the first criteria and any of the three other criteria, then he/she may qualify to be placed on the list. Currently, HHS/CDC considers whether:

(1) The individual is known or reasonably believed to be infectious or reasonably believed to have been exposed to a communicable disease and may become infectious with a communicable disease that would be a public health threat should the individual be permitted to board a commercial aircraft or travel in a manner that would expose the public; and

---

[1] CDC. *Federal air travel restrictions for public health purposes—United States, June 2007–May 2008.* MMWR 2008; 57:1009–12. Available at *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5737a1.htm*.

[2] CDC. *Federal air travel restrictions for public health purposes—United States, June 2007–May 2008.* MMWR 2008; 57:1009–12. Available at *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5737a1.htm*.

(2) the individual is not aware of his or her diagnosis, has been advised regarding the diagnosis and is non-compliant with public health requests or has shown potential for non-compliance, or is unable to be located; or

(3) the individual is at risk of traveling on a commercial flight or of traveling internationally by any means; or

(4) the individual's placement on the DNB is necessary to effectively respond to outbreaks of communicable disease or other conditions of public health concern. For example, an individual's placement on the DNB may be considered when necessary to aid in the application of controlled movement [3] or in the execution of a federal, state, or local quarantine, isolation, or conditional release order.

## II. Authority

The DNB list and Lookout record are based on requests made by HHS/CDC regarding public health decisions and actions, and are administered by DHS. Under the Public Health Service Act, the Secretary of HHS is authorized to make and enforce regulations and take other actions necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the United States or between states.[4] Under its delegated authority, the HHS/CDC Division of Global Migration and Quarantine fulfills this responsibility through a variety of activities that may include operating quarantine stations at ports of entry, conducting routine public health screening, and administering quarantine regulations that govern the international and interstate movement of persons, animals, and cargo.[5]

*Authority of DHS*

Federal law authorizes CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Coast Guard (USCG) officers to assist HHS by enforcing quarantine rules and regulations.[6] In addition, other DHS Components such as the Transportation Security Administration (TSA), relying on their existing authorities, may provide supportive roles to federal screening efforts designed to prevent the introduction and spread of communicable disease.

TSA has the authority to accept the services of, or otherwise cooperate with, other federal agencies including implementing the DNB list.[7] Further, TSA may "develop policies, strategies, and plans for dealing with the threats . . . including coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States."[8] Consistent with this authority, TSA may assist another Federal agency in carrying out its authority in order to address a threat to transportation. These threats may involve passenger safety.[9] In administering the DNB list, TSA relies on CDC to make public health findings as the basis for its request. As the medical authority for DHS,[10] the Office of Health Affairs reviews and approves the medical appropriateness of HHS/CDC's request prior to DHS implementing HHS/CDC's request by placing the person on the DNB list.

## III. Operations

Because of the urgency involved in restricting individuals with serious communicable diseases from boarding commercial aircraft, individuals might not be notified prior to their inclusion on the DNB list and associated Lookout record. When an individual is placed on the DNB list with an associated Lookout record, HHS/CDC advises in writing that the individual is temporarily restricted from traveling by commercial air carrier and provides the reasons why HHS/CDC has reached this decision. HHS/CDC interprets "temporarily restricted" to mean that the individual will remain on the lists until no longer considered to be infectious or at risk of becoming infectious. HHS/CDC's notification to the individual also explains that, while the individual is on these lists, travel by commercial aircraft is forbidden and any attempt to enter the United States through any port of entry will be stopped by CBP officials and that the individual will be referred for public health evaluation. If an individual cannot be located, HHS/CDC works with state and local public health officials to contact the individual through family or other contacts. HHS/CDC and DHS take great care to ensure personal medical information is safeguarded.

As part of its notification process HHS/CDC also asks the appropriate state or local health department to notify the individual directly, state the reasons for the placement on the DNB list and associated Lookout record, and provide the medical or public health requirements that must be satisfied to be removed from the lists. The primary consideration for requesting removal from the DNB list and associated Lookout record is CDC's determination that the individual is no longer considered to be infectious or at risk of becoming infectious; however, other factors may be taken into consideration including the individual's return to treatment, if applicable, and following public health recommendations. Once HHS/CDC receives documentation that these medical and other stated requirements have been met, it sends a request to DHS to lift the travel restrictions (both the DNB list and the Lookout record).[11] Once an individual is removed from the DNB list and the associated Lookout record is removed, a second notification letter is sent by HHS/CDC to the individual informing him or her that the public health travel restrictions have been removed and providing further recommendations on an as-needed basis (*e.g.,* advising that the individual continue treatment, if applicable).

HHS/CDC's letter informing individuals that they have been placed on the DNB list and associated Lookout records invites individuals who believe that HHS/CDC's public health decision was made in error to submit a written response to the Director of HHS/CDC's Division of Global Migration and Quarantine and provide any supporting facts or other evidence supporting their belief. These operations and procedures will not change as a result of this Notice.

## IV. Requesting Travel Restrictions for Viral Hemorrhagic Fevers

To date, the DNB list and associated Lookout records have been used primarily with respect to individuals with suspected or confirmed pulmonary tuberculosis (TB), including multidrug-resistant tuberculosis (MDR–TB), and a very small number with measles. However, travel restrictions are also applicable to other suspected or confirmed communicable diseases that could pose a public health threat during travel, including viral hemorrhagic fevers such as Ebola virus disease

---

[3] See *http://www.cdc.gov/vhf/ebola/exposure/monitoring-and-movement-of-persons-with-exposure.html.*

[4] 42 U.S.C. 264–265. The Secretary has promulgated implementing regulations at 42 CFR parts 70 and 71, administered by the CDC.

[5] See generally U.S. Department of Health and Human Services Centers for Disease Control and Prevention, Public Health Screening at U.S. Ports of Entry: A Guide for Federal Inspectors (July 2007) (describing port of entry health screening procedures); 42 CFR part 70 (interstate quarantine regulations); 42 CFR part 71 (foreign quarantine regulations).

[6] See 42 U.S.C. 97, 268(b).

[7] 49 U.S.C. 106(l), (m), 114(m).

[8] 49 U.S.C. 114(f)(3), (4).

[9] See, *e.g.,* 49 U.S.C. 114(h)(3).

[10] 6 U.S.C. 321e(c)(1).

[11] In addition to contacting CDC, individuals seeking removal from the Public Health DNB may also seek assistance through the redress process established by DHS in 49 CFR 1560.205.

(Ebola). Ebola is a type of viral hemorrhagic fever that is often fatal in humans and nonhuman primates. Ebola can spread through human-to-human transmission, with infection resulting from direct contact (through broken skin or mucous membranes) with the blood, secretions, droplets, or other body fluids of infected people, and indirectly from contact with surfaces or items (such as needles) contaminated with such fluids.

With respect to viral hemorrhagic fevers, placement on the DNB list and associated Lookout record is requested for people known or suspected to have a viral hemorrhagic fever. Placement may also be requested for people without symptoms who have been exposed to a viral hemorrhagic fever, particularly if these individuals intend to travel against public health recommendations. Even though people without symptoms are not infectious, these restrictions are requested because of the possibility that symptoms could develop during travel, particularly long international flights. Exposure is determined through a CDC risk factor assessment using information available from a variety of public health, medical and other official sources. Examples of types of potential exposure to viral hemorrhagic fevers contained within the CDC risk factor assessment include the following. It should be noted that all of these exposures may result in travel restrictions.

- Having been in a country with widespread Ebola virus transmission within the past 21 days and, although having had no known exposures, is showing symptoms
- Percutaneous (*e.g.,* needle stick) or mucous membrane exposure to blood or body fluids of a person with Ebola while the person was showing symptoms
- Exposure to the blood or body fluids (including but not limited to feces, saliva, sweat, urine, vomit, and semen) of a person with Ebola while the person was showing symptoms without appropriate personal protective equipment (PPE) (see *http://www.cdc.gov/vhf/ebola/hcp/procedures-for-ppe.html*)
- Laboratory processing of blood or body fluids of a person with Ebola while the person was showing symptoms without appropriate PPE or standard biosafety protections
- Direct contact with a dead body without appropriate PPE in a country with widespread Ebola virus transmission (see *http://www.cdc.gov/vhf/ebola/outbreaks/2014-west-africa/distribution-map.html*)
- Having lived in the immediate household and provided direct care to

a person with Ebola while the person was showing symptoms
- In countries with widespread Ebola virus transmission: Direct contact while using appropriate PPE with a person with Ebola while the person was showing symptoms, or with the person's body fluids, or any direct patient care in other healthcare settings
- Close contact in households, healthcare facilities, or community settings with a person with Ebola while the person was showing symptoms
  ○ Close contact is defined as not wearing appropriate PPE within approximately 3 feet (1 meter) of a person with Ebola while the person was showing symptoms
- Having brief direct contact (*e.g.,* shaking hands), while not wearing appropriate PPE, with a person with Ebola while the person was in the early stage of disease
- In countries without widespread Ebola virus transmission: Direct contact while using appropriate PPE with a person with Ebola while the person was showing symptoms
- Traveled on an aircraft with a person with Ebola while the person was showing symptoms

Exposure risk factors, such as those just described, will be considered by HHS/CDC in their totality when determining whether an individual meets the first criteria for placement on the DNB List, as described in Section I of this notice. HHS/CDC would also consider other facts and information it may have to make a decision with respect to the other criteria, as described in Section I of this notice. It should be noted that all facts are considered when applying the criteria. Again, with the exception of the first criteria, not all of the other criteria need to be present for HHS/CDC to make a request to DHS to have an individual placed on DNB and Lookout.

HHS/CDC would also consider these risk factors when assessing an individual who has been in a country where outbreaks of viral hemorrhagic fevers were occurring and refuses to comply with a public health assessment, and otherwise meets the travel restriction criteria. Refusing to comply with a public health risk assessment in this situation could include refusing to provide relevant information that would allow public health officials to assess the exposure risk.

## V. Provisions of This Notice

HHS/CDC will make requests of DHS based on the criteria in this notice effective immediately. Individuals who have had their travel temporarily

restricted as a result of placement on the DNB list and associated Lookout records may submit a written response to the Director, Division of Global Migration and Quarantine, if they believe that HHS/CDC has erred in its public health request to DHS. The response should be addressed to: Director, Division of Global Migration and Quarantine, ATTN: Travel Restriction and Intervention Activity, Centers for Disease Control and Prevention, 1600 Clifton Road, MS E–03, Atlanta, GA 30329. Responses may also be faxed to CDC at (404) 718–2158 or emailed to *travelrestrictions@cdc.gov.*

As part of the response, individuals should include the reference number listed in the notification letter they received and any facts or other evidence indicating why they believe that HHS/CDC's public health request was made in error.

The policy and program operations described above will become effective on March 27, 2015.

Dated: March 24, 2015.

**Sylvia M. Burwell,**

*Secretary.*

[FR Doc. 2015–07118 Filed 3–26–15; 8:45 am]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. FDA–2011–N–0908]

**Agency Information Collection Activities; Proposed Collection; Comment Request; Guidance for Clinical Trial Sponsors: Establishment and Operation of Clinical Trial Data Monitoring Committees**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing an opportunity for public comment on the proposed collection of certain information by the Agency. Under the Paperwork Reduction Act of 1995 (the PRA), Federal Agencies are required to publish notice in the **Federal Register** concerning each proposed collection of information, including each proposed extension of an existing collection of information and to allow 60 days for public comment in response to the notice. This notice solicits comments on the collection of information concerning the establishment and operation of clinical trial data monitoring committees.

Plaintiffs' Exhibit 110

cdc.gov

# Travel Restrictions | CDC

3 minutes



*Credit: David Snyder*

Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a **Do Not Board list** to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a **Lookout** list so they will be detected if they attempt to enter the United States by land or sea. **These tools can be used for anyone who poses a threat to the public's health.**

Local and state public health officials can request CDC's assistance if a person who poses a public health threat intends to travel. CDC helps ensure these people do not travel while contagious.

**Placing people on the lists**

The criteria for adding people to the **Do Not Board** and **Lookout** lists are

1. Known or believed to be infectious with, or at risk for, a serious contagious disease that poses a public health threat to others during travel; **and** any of the following three:

1. **not** aware of diagnosis or **not** following public health recommendations, **or**

2. Likely to travel on a commercial flight involving the United States or travel internationally by any means; **or**

3. Need to issue travel restriction to respond to a public health outbreak or to help enforce a public

health order.

Criteria number one plus one of the three subsets must be met for a person to be placed on the **Do Not Board** and **Lookout** lists.



*Credit: David Heaberlin*

Once a person is placed on these lists, airlines will not issue a boarding pass to the person for any commercial flight within, arriving to, or departing from the United States.

To date, the Do Not Board and Lookout lists have been used for people with suspected or confirmed infectious tuberculosis (TB), including multidrug-resistant tuberculosis (MDR-TB), and measles. However, travel restrictions can also be used for other suspected or confirmed contagious diseases that could pose a public health threat during travel, including viral hemorrhagic fevers such as Ebola.

Preventing people with contagious diseases from traveling also helps to make sure they get or continue medical treatment, such as for infectious tuberculosis.

**Taking people off the lists**

Once public health authorities confirm a person is no longer contagious, the person is removed from the lists (typically within 24 hours). Also, CDC reviews the records of all persons on the lists every two weeks to determine whether they are eligible for removal.

# Plaintiffs' Exhibit 111

## References Pertaining to Pilots & Masks Violating Industry Regulations

Compiled by pilot Janviere Carlin. Highlighted to emphasize key points, followed by my commentary.

## 14 CFR § 61.53 – Prohibition on Operations During Medical Deficiency

(a) Operations that require a medical certificate. Except as provided for in paragraph (b) of this section, no person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person:

(1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation; or

(2) Is taking medication or receiving other treatment for a medical condition that results in the person being unable to meet the requirements for the medical certificate necessary for the pilot operation.

(b) Operations that do not require a medical certificate. For operations provided for in § 61.23(b) of this part, a person shall not act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person knows or has reason to know of any medical condition that would make the person unable to operate the aircraft in a safe manner.

**Commentary:** Pretty cut and dry. Masks are harmful to me and I know it because I have read the data and I have experienced the effects on me personally; therefore, I cannot in good faith operate as a pilot or even as a crewmember deadheading or jumpseating since I am always considered a required or additional crewmember, and my very ability to be certified as a pilot medically relies upon my true attestation of my fitness (see all below).

## 14 CFR § 117.5 – Fitness for Duty

(a) Each flight crew member must report for any flight duty period rested and prepared to perform his or her assigned duties.

(b) No certificate holder may assign and no flight crew member may accept assignment to a flight duty period if the flight crew member has reported for a flight duty period too fatigued to safely perform his or her assigned duties.

(c) No certificate holder may permit a flight crew member to continue a flight duty period if the flight crew member has reported him or herself too fatigued to continue the assigned flight duty period.

(d) As part of the dispatch or flight release, as applicable, each flight crew member must affirmatively state he or she is fit for duty prior to commencing flight.

**Commentary**: The CFRs clearly define fit for duty. If we are aware of the hazardous implications of masking with respect to fatigue, we are obligated to avoid wearing them or to self-report. The NIH National Library of Medicine contains the following article addressing Mask Fatigue: https://pubmed.ncbi.nlm.nih.gov/33475571 and the CDC also recognizes the effects of long-term mask use and workplace fatigue: https://www.cdc.gov/coronavirus/2019-ncov/hcp/managing-workplace-fatigue.html.

### FAA 2022 Guide for Aviation Medical Examiners (Page 8)

https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide

The consequences of a negligent or wrongful certification, which would permit an unqualified person to take the controls of an aircraft, can be serious for the public, for the Government, and for the AME. If the examination is cursory and the AME fails to find a disqualifying defect that should have been discovered in the course of a thorough and careful examination, a safety hazard may be created and the AME may bear the responsibility for the results of such action.

Of equal concern is the situation in which an AME deliberately fails to report a disqualifying condition either observed in the course of the examination or otherwise known to exist. In this situation, both the applicant and the AME in completing the application and medical report form may be found to have committed a violation of Federal criminal law which provides that:

"Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or who makes any false, fictitious or fraudulent statements or representations, or entry, may be fined up to $250,000 or imprisoned not more than 5 years, or both" (Title 18 U.S. Code. Secs. 1001; 3571).

### 49 USC § 46310 – Reporting & Recordkeeping

(a) General Criminal Penalty.—An air carrier or an officer, agent, or employee of an air carrier shall be fined under title 18 for intentionally—
   (1) failing to make a report or keep a record under this part;
   (2) falsifying, mutilating, or altering a report or record under this part; or
   (3) filing a false report or record under this part.
(b) Safety Regulation Criminal Penalty.— An air carrier or an officer, agent, or employee of an air carrier shall be fined under title 18, imprisoned for not more than 5 years, or both, for intentionally falsifying or concealing a material fact, or inducing reliance on a false statement of material fact, in a report or record under section 44701(a) or (b) or any of sections 44702-44716 of this title.

**Commentary**: We see an FAA certified medical doctor 1-2 times each year and we are both obligated BY LAW (cited above) to disclose any disqualification condition pertaining to obtaining OR maintaining our medical certificate. If we know that masks are unhealthy for us and their continued use can cause cumulative harm (as evidenced by years of unbiased scientific studies prior to COVID politicization), we are obligated by moral, legal, and punitive implications to abstain and/or report.

## 14 CFR § 117.3 – Definitions

Flight Duty Period ("FDP") means a period that begins when a flight crew member is required to report for duty with the intention of conducting a flight, a series of flights, or positioning or ferrying flights, and ends when the aircraft is parked after the last flight and there is no intention for further aircraft movement by the same flight crew member. A Flight Duty Period includes the duties performed by the flight crew member on behalf of the certificate holder that occur before a flight segment or between flight segments without a required intervening rest period. Examples of tasks that are part of the Flight Duty Period include deadhead transportation, training conducted in an aircraft or flight simulator, and airport/standby reserve, if the above tasks occur before a flight segment or between flight segments without an intervening required rest period.

**Commentary**: ONLY allowing us to remove the mask WHILE we control the plane violates the definition of the FDP. According to the FDP, we should not be wearing it before, during, or after our intention to conduct a flight, a series of flights, or positioning or ferrying flights. This also includes, as defined above, deadheading in the cabin or riding in the jumpseat.

## AIRLINE PILOTS ASSOCIATION JUMPSEAT GUIDE (July 2018)

While you are exercising the privileges afforded you by FAR 121.547 or 121.583 (i.e., jumpseating regulations), you are considered an additional crewmember and the alcohol limitations of FAR 91 apply. Having a seat in the back does not relieve you of this responsibility. Even when not in uniform, remember that you are still considered an additional crewmember and you may be required to assist on the flight deck or in the cabin in case of unusual or emergency circumstances. You must remain prepared to assists the flight crew should the need arise.

**Commentary**: While the above guidance pertains to alcohol, it makes a blanket statement about our overall responsibilities when riding in a jumpseat or non-reving in the back of the plane. Our union's own jumpseat guide references the CFRs requiring pilots to always maintain their health and fitness for duty. Since masking

impairs our ability when conducting a flight as evidenced by the fact that we are not required to wear a mask when flying, it also impairs our fitness for flight when acting in other required capacities.

## DEPARTMENT OF TRANSPORTATION FAQs

https://www.transportation.gov/flyhealthy/frequently-asked-questions

What happens if a passenger does not comply with an airline's mask policies and/or causes an inflight disruption or distraction for the crew?

While the failure to wear a face covering is not itself a federal violation, federal law prohibits physically assaulting or threatening to physically assault aircraft crew or anyone else on a civil aircraft. Passengers are subject to civil penalties for such misconduct, which can threaten the safety of the flight by disrupting or distracting cabin crew from their safety duties. Additionally, federal law provides for criminal fines and imprisonment of passengers who interfere with the performance of a crewmember's duties by assaulting or intimidating that crewmember. U.S. airlines have policies about wearing face coverings in the airplane cabin. Please be sure to check with your airline prior to flight for further guidance

**Commentary**: Masking is NOT, in fact, a federal law on a plane. So if you do not escalate the situation, you cannot be forced to wear a mask and you are violating no federal law. You might be violating the airline's policy, but not an actual law. The minute you pushback is when they would then use other actual laws to say that you are interfering with a flight so they charge you by proxy. This is deceptive and makes the airlines the mask police and the government is acting through businesses to enforce its will upon the patrons.

Plaintiffs' Exhibit 112



**U.S. Department
of Transportation**

**Federal Aviation
Administration**

# SAFO

Safety Alert for Operators

SAFO 20009
DATE: 05/25/21

Flight Standards Service
Washington, DC

**http://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/safo**

*A SAFO contains important safety information and may include recommended action. Besides the specific action recommended in a SAFO, an alternative action may be as effective in addressing the safety issue named in the SAFO. The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.*

**Subject:** COVID-19: Updated Interim Occupational Health and Safety Guidance for Air Carriers and Crews.

**Purpose:** This SAFO updates SAFO 20009 and provides updated interim occupational health and safety guidance by the Centers for Disease Control and Prevention (CDC) and the Federal Aviation Administration (FAA) for air carriers and crewmembers regarding Coronavirus Disease 2019 (COVID-19). The CDC and FAA are providing this additional occupational health and safety guidance for air carriers and their crews to reduce crewmembers' risk of exposure to COVID-19, decrease the risk of transmission of COVID-19 on board aircraft and to destination communities through air travel, and provide guidance for fully vaccinated[1] crewmembers.

**Background:** SARS-CoV-2, the virus that causes COVID-19, has spread throughout the world and to all States and territories of the United States (U.S.). Air carriers and crews conducting flight operations having a nexus to the United States, including both U.S. and foreign air carriers, should follow CDC's occupational health and safety guidance, as outlined in the Appendix below.

**Discussion:** On January 30, 2020, the World Health Organization (WHO) declared that the outbreak of COVID-19 constituted a Public Health Emergency of International Concern. On January 31, 2020, the Secretary of Health and Human Services declared COVID-19 to be a public health emergency in the United States under section 319 of the Public Health Service Act.[2] On March 11, 2020, WHO characterized the outbreak of COVID-19 as a pandemic. On March 13, 2020, the President declared a national emergency concerning the COVID-19 outbreak.

Because air travel remains essential, including transportation of personnel and supplies necessary to support COVID-19 response and recovery efforts, it is critical to protect the health and safety of crews

---

[1] People are considered fully vaccinated for COVID-19 two weeks after they have received the second dose in a 2-dose series, or two weeks after they have received a single-dose vaccine. CDC's guidance applies to COVID-19 vaccines currently authorized for emergency use by the FDA: Pfizer-BioNTech, Moderna, and Johnson and Johnson (J&J)/Janssen COVID-19 vaccines. CDC's guidance can also be applied to COVID-19 vaccines that have been authorized for emergency use by WHO (e.g. AstraZeneca/Oxford).

[2] This public health emergency has been renewed several times since January 31, 2020, most recently on April 15, 2021.

while ensuring that essential flight operations can continue. The FAA and CDC recommend that air carriers and crewmembers take precautions to avoid exposure of crewmembers to SARS-CoV-2. Crewmembers should not work while symptomatic with fever, cough, or shortness of breath, or other symptoms of COVID-19 or after having tested positive for SARS-CoV-2. They may return to work only after they are no longer considered infectious according to CDC's criteria for Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings.

The CDC continues to recommend a 14-day quarantine for individuals with known exposure to COVID-19; however, shorter quarantine periods may be considered. Crewmembers with known exposure should not work on aircraft until they meet CDC's criteria for release from quarantine. The CDC has issued guidance for exposed workers in critical infrastructure who might need to return to work before these criteria are met, available in COVID-19 Critical Infrastructure Sector Response Planning. While air travel is a vital economic activity, CDC does not recommend allowing crewmembers with known exposures to continue to work until they have met criteria for release from quarantine, even if asymptomatic, because of the inability of crewmembers to remove themselves from the workplace if they develop symptoms during a flight and the challenges involved in effectively isolating a symptomatic person on board an aircraft. Crewmembers who are fully vaccinated against COVID-19 or who recovered from COVID-19 in the past 3 months do not need to quarantine, be tested, or be excluded from work following an exposure unless they have symptoms of COVID-19. However, they should still self-monitor for symptoms of COVID-19 until 14 days after their last known exposure. Those who develop symptoms should self-isolate and be tested, regardless of vaccination status or previous recovery from COVID-19.

COVID-19 vaccines authorized for emergency use by the U.S. Food and Drug Administration (FDA) are available across the United States, and everyone 16 years of age and older is eligible to get a COVID-19 vaccination. These vaccines are effective against COVID-19, including severe disease, and a growing body of evidence suggests that fully vaccinated people are less likely to have asymptomatic infection or to transmit SARS-CoV-2 to others, although further investigation is ongoing. Wide-spread vaccination is a critical tool to help stop the pandemic, and air crewmembers are recommended to get vaccinated as soon as possible and in compliance with FAA direction on flight duties after vaccination.

**Recent CDC Actions:** In order to slow the worldwide spread of SARS-CoV-2 and its highly contagious variants, on January 12, 2021, CDC issued an Order requiring all air passengers, including those who are fully vaccinated, traveling to the United States from a foreign country to present a negative result of a SARS-CoV-2 test or documentation of recovery from COVID-19 before boarding their flight. While the Order includes a limited exemption for crewmembers under the conditions outlined in CDC's Frequently Asked Questions, CDC and FAA recommend that air carriers consider implementing routine testing of crewmembers to minimize the likelihood of crewmembers working on aircraft while asymptomatically or pre-symptomatically infected with SARS-CoV-2. It is also recommended that fully vaccinated people with no COVID-19-like symptoms and no known exposure should be exempt from routine screening

testing programs, if feasible.[3] Crewmembers who recovered from COVID-19 in the past 3 months should also be exempt.[4]

To further slow the spread of the virus, the CDC issued an Order effective February 2, 2021, requiring the use of masks on public conveyances (including aircraft) traveling into, within, or out of the United States, and in U.S. transportation hubs including airports. Wearing masks helps people who may have COVID-19 avoid transmitting the virus to others. Masks also provide some protection to the wearer. While the wearing of masks on aircraft is required, the Order includes an exemption if wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations. See CDC's Guidance and Frequently Asked Questions for the most up-to-date information about the mask requirement. Air carriers and crewmembers should be mindful of the regulations regarding the use of oxygen masks where the operation requires an oxygen mask to be rapidly placed on the face, properly secured, sealed, and supplying oxygen upon demand.[5] CDC's Order does not apply if wearing of oxygen masks is needed on an aircraft when a loss of cabin pressure or other event affecting aircraft ventilation occurs. Air carriers should complete a safety risk assessment and provide guidance to their crewmembers on procedures for the use of masks as they may affect the donning of oxygen masks or conducting other safety functions on the flight deck or in the cabin.

**Recommended Action:** The FAA and CDC recommend and expect that all U.S.-based air carriers and crewmembers, all non-U.S.-based air carriers operating flights with a U.S. nexus, and all non-U.S.-based crewmembers on flights with a U.S. nexus implement and use their company-developed COVID-19 preparedness plans and procedures in conjunction with the FAA and CDC occupational health and safety guidance in the attached appendix regarding practices for limiting the spread of COVID-19. The FAA and CDC will update or supplement this SAFO as more information becomes available. Air carriers and crewmembers should also review and incorporate into their COVID-19 preparedness plans and procedures, CDC's Updated Interim Guidance for Airlines and Airline Crew: Coronavirus Disease 2019 (COVID-19).

CDC has additionally provided fact sheets for the transportation industry and a communications toolkit for airlines.

**Contact:** Questions or comments regarding this SAFO should be directed to the Air Transportation Division, at 202-267-8166. Urgent questions pertaining to the Appendix below should be directed to the CDC Emergency Operations Center at 770-488-7100. Non-urgent questions or comments may be directed to 800-CDC-INFO (800-232-4636.

---

[3] See CDC guidance for fully vaccinated people with no COVID-19-like symptoms and no known exposure to someone with suspected or confirmed COVID-19

[4] People who have recovered from COVID-19 may continue to test positive for three months or more without being contagious to others. For this reason, crewmembers who tested positive for SARS-CoV-2 in the past 3 months should be tested only if they develop new symptoms of possible COVID-19. Getting tested again should be discussed with a healthcare provider, especially if the crewmember has been in close contact with another person who has tested positive for COVID-19 in the last 14 days. The healthcare provider may work with an infectious disease expert at the local health department to determine when the crewmember can be around others.

[5] See e.g., 14 C.F.R. § 121.333.

An official website of the United States government Here's how you know ⌄ Plaintiffs' Exhibit 113

The latest general information on the Coronavirus (COVID-19) is available on Coronavirus.gov. For FAA-specific COVID-19 resources, please visit faa.gov/coronavirus.

United States Department of Transportation



**Federal Aviation Administration**

# 2021 Unruly Passenger Data

The FAA investigates unruly-passenger incidents that airline crews report to the agency. The 2021 data below reflects all cases the FAA investigated that cited violations of one or more FAA regulations or federal laws.

## 2021 Year-End Totals



**5,981** Unruly Passenger Reports



**4,290** Mask-related Incidents Reported



**1,116** Investigations Initiated



**350** Enforcement Actions Initiated

In 2021, the FAA proposed $5 million in fines against unruly passengers.



*Unruly passenger rate is 6.9 incidents per 10k flights for the week of December 26, 2021.*

Page last modified: March 01, 2022 10:09:43 AM EST

🇺🇸 An official website of the United States government Here's how you know ⌄   Plaintiffs' Exhibit 114

ℹ The latest general information on the Coronavirus (COVID-19) is available on Coronavirus.gov. For FAA-specific COVID-19 resources, please visit faa.gov/coronavirus.

United States Department of Transportation



**Federal Aviation Administration**

# Unruly Passengers

The FAA investigates unruly-passenger incidents that airline crews report to the agency. The data below reflects all cases the FAA investigated that cited violations of one or more FAA regulations or federal laws.

<u>Zero Tolerance for Unruly and Dangerous Behavior Toolkit</u> — digital products to help promote safe and responsible passenger behavior and bring awareness to the zero tolerance policy. Products include press releases, videos, and graphics.

**Year-to-date numbers current as of March 7, 2022.**


**814** reports of unruly passengers


**535** related to facemasks


**224** investigations initiated


**100** enforcement action cases initiated



_6.2 incidents per 10k flights for week ending January 30, 2022._



Investigations initiated for calendar years 1995–2022

Hover for more details.

## 2021 Unruly Passenger Data

## General notes

- Interfering with the duties of a crewmember violates federal law.

- Federal Aviation Regulations 91.11, 121.580 and 135.120 state that "no person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated."

- The numbers in the table reflect all cases that FAA investigated that cited violations of one or more of the following regulations and/or federal laws: 14 CFR 91.11, 121.580, 135.120, 125.328, 49 U.S.C. 46318 & 46504. Historically, FAA has closed these cases with legal enforcement action (civil penalties), administrative action (warning notices), compliance action (counseling), or no action if there is insufficient evidence of a regulatory violation or violation of federal law. However, under our current *zero-tolerance policy* toward unruly passengers, we are not addressing cases with warning notices or counseling.

- The FAA's database contains only those incidents reported to FAA. Reporting is at the discretion of the crewmember.

- Security violations are excluded. Those cases are handled by the Transportation Security Administration (TSA).

- The repercussions for passengers who engage in unruly behavior can be substantial. They can be fined by the FAA or prosecuted on criminal charges.

- As part of the FAA's Reauthorization Bill (PDF) FAA can propose up to $37,000 per violation for unruly passenger cases. Previously, the maximum civil penalty per violation was $25,000. One incident can result in multiple violations.

Page last modified: March 08, 2022 9:12:46 AM EST

 **Federal Aviation Administration**   Plaintiffs' Exhibit 115

# Press Release – Federal Aviation Administration Adopts Stricter Unruly Passenger Policy

## For Immediate Release

January 13, 2021
Contact: pressoffice@faa.gov

---

**WASHINGTON** – FAA Administrator Steve Dickson today signed an order (PDF) directing a stricter legal enforcement policy against unruly airline passengers in the wake of recent, troubling incidents.

The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed both from passengers' refusals to wear masks and from recent violence at the U.S. Capitol.

"Flying is the safest mode of transportation and I signed this order to keep it that way," Administrator Dickson said.

Historically, the agency has addressed unruly-passenger incidents using a variety of methods ranging from warnings and counseling to civil penalties. Effective immediately, however, the FAA will not address these cases with warnings or counseling. The agency will pursue legal enforcement action against any passenger who assaults, threatens, intimidates, or interferes with airline crew members. This policy will be in effect through March 30, 2021.

Passengers who interfere with, physically assault, or threaten to physically assault aircraft crew or anyone else on an aircraft face stiff penalties, including fines of up to $35,000 and imprisonment. This dangerous behavior can distract, disrupt, and threaten crewmembers' safety functions.

The FAA has initiated more than 1,300 enforcement actions against unruly passengers during the past 10 years, including recent cases for allegedly interfering with and assaulting flight attendants who instructed them to wear masks.

While the FAA does not have regulatory authority over aviation security or no-fly lists, the agency works closely with federal law enforcement and national security partners on any reported security threats that may impact aviation safety.

Watch a video message from Administrator Dickson on Zero Tolerance for Disruptive Passengers.

###

Plaintiffs' Exhibit 116

reuters.com

# CDC defends U.S. transit mask mandate as some call for scrapping

*David Shepardson*

4 minutes

---

Travelers board the air train ahead of the July 4th holiday, at the Newark Liberty International Airport, in Newark, New Jersey, U.S., July 2, 2021. REUTERS/Eduardo Munoz

WASHINGTON, July 16 (Reuters) - A senior U.S. health official who signed a sweeping order for masks to be worn on nearly all forms of public transport said they were a key tool in preventing COVID-19 transmission even as some lawmakers call for ending the rules.

Marty Cetron, director for the Centers for Disease Control and Prevention's (CDC) Division of Global Migration and Quarantine, told Reuters Thursday the agency's "current position" is the mandate should not be lifted.

"Masks are really powerful and we should make sure they're part of our arsenal," Cetron said in an interview. "We mask not just to protect ourselves - we mask because it's the way we take care and express our concern for each other."

The rules in place since January require masks to be worn by all travelers on airplanes, ships, trains, subways, buses, taxis, and ride-shares and at transport hubs like airports, bus or ferry terminals, train and subway stations and ports.

"The truth is that the unvaccinated portion that's out there is extremely vulnerable," Cetron said, especially in an indoor transportation hub "where the ventilation may not be optimized."

A group of Republican lawmakers this week introduced legislation to prohibit

mask mandates for public transport, arguing they no longer make sense with a growing number of Americans getting vaccinated. Republican Representative Andy Biggs said transit mask rules "are only being kept in place by those who relish controlling our day-to-day lives."

In mid-May, CDC said fully vaccinated people could avoid wearing masks indoors in most places - with some exceptions like transit.

The mask mandate has been a huge source of friction on U.S. airplanes. The Federal Aviation Administration said Tuesday that since Jan. 1 it has received 3,420 unruly passenger reports, including 2,559 for refusing to wear masks.

The Transportation Security Administration (TSA) said Sunday was the single-busiest day since February 2020, with nearly 2.2 million passengers.

"I get we're all just over this emotionally but I do think we will succeed together if we realize the virus is the enemy and it's not your fellow citizen or the person sitting next to you on a plane or a piece of cloth that you have to wear over your face," Cetron said.

The CDC transit mask order has no expiration date. In April, the TSA extended its mask requirement until Sept. 13.

"As long as the CDC order is in place, the expectation is the implementing modes ... would continue with their own directives," Cetron said.

"We won't wait until September to reevaluate," Cetron said, adding CDC is regularly reviewing the mandate. "If the pandemic were to suddenly disappear before then we have the ability to take down the order."

Under Donald Trump, a CDC push to mandate masks in transit was blocked.

Asked if he still believes there is a scientific or public health basis for U.S. travel restrictions that bar entry from some countries in the United States, Cetron said: "I'm not going to get into the details" but said U.S. government discussions are going on.

Reporting by David Shepardson Editing by Robert Birsel

Our Standards: The Thomson Reuters Trust Principles.

Plaintiffs' Exhibit 117

tsa.gov

# Coronavirus (COVID-19) information | Transportation Security Administration

19-24 minutes

---

TSA has **237** employees with active COVID-19 infections. Those individuals are staying home to help keep the traveling public safe. Since the beginning of the pandemic, TSA has cumulatively had **22,297** federal employees test positive for COVID-19. **22,060** employees have recovered, and **36** have unfortunately died after contracting the virus. We have also been notified that two screening contractors have passed away due to the virus.

TSA is committed to notifying the public about airport locations where TSA employees or screening contractors have tested positive for COVID-19. The chart below lists airports with confirmed COVID-19 cases and the last date worked for the most recent screening employee who tested positive. It does not include non-airport TSA employees or contractors who have limited or no interaction with the public. Passengers who believe they may have come in contact with an infected individual within the past 14 days should follow the CDC's recommendations for travel-associated exposure.

*The chart includes TSA employees and screening contractors who may have had direct interaction with the public at an airport location.*

**Airport Total Confirmed Cases TSA Screening Officers Non-Screening Employees Last work date of most recent screening officer confirmed case** ABE - Lehigh Valley International 19 16 3 1/25/22 ABI - Abilene Regional 6 6 2/12/22 ABQ - Albuquerque International Sunport 79 65 14 2/16/22 ABR - Aberdeen Regional 3 3 11/9/21 ABY - Southwest Georgia Regional 7 7 1/12/22 ACK - Nantucket Memorial 2 2 3/15/21 ACT - Waco Regional 13 12 1 2/21/22 ACV - Arcata 1 1 1/18/22 ACY - Atlantic City International 18 14 4 1/9/22 ADQ - Kodiak Airport 4 4 1/7/22 AEX -

Plaintiff's Exhibit 118

# Understanding the Difference



## Surgical Mask



## N95 Respirator

| | Surgical Mask | N95 Respirator |
|---|---|---|
| **Testing and Approval** | Cleared by the U.S. Food and Drug Administration (**FDA**) | Evaluated, tested, and approved by **NIOSH** as per the requirements in 42 CFR Part 84 |
| **Intended Use and Purpose** | Fluid resistant and provides the wearer protection against large droplets, splashes, or sprays of bodily or other hazardous fluids. Protects the patient from the wearer's respiratory emissions. | Reduces wearer's exposure to particles including small particle aerosols and large droplets (**only non-oil aerosols**). |
| **Face Seal Fit** | Loose-fitting | Tight-fitting |
| **Fit Testing Requirement** | No | Yes |
| **User Seal Check Requirement** | No | Yes. Required each time the respirator is donned (put on) |
| **Filtration** | Does NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection | Filters out at least 95% of airborne particles including large and small particles |
| **Leakage** | Leakage occurs around the edge of the mask when user inhales | When properly fitted and donned, minimal leakage occurs around edges of the respirator when user inhales |
| **Use Limitations** | Disposable. Discard after each patient encounter. | Ideally should be discarded after each patient encounter and after aerosol-generating procedures. It should also be discarded when it becomes damaged or deformed; no longer forms an effective seal to the face; becomes wet or visibly dirty; breathing becomes difficult; or if it becomes contaminated with blood, respiratory or nasal secretions, or other bodily fluids from patients. |



Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

Plaintiff's Exhibit 119

# Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)

## Guidance for Industry and Food and Drug Administration Staff

**May 2020**

**This document supersedes "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)" issued April 2020.**

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Devices and Radiological Health (CDRH)**
**Office of Product Evaluation and Quality (OPEQ)**

*Contains Nonbinding Recommendations*

# Preface

## Public Comment

This guidance is being issued to address the Coronavirus Disease 2019 (COVID-19) public health emergency. This guidance is being implemented without prior public comment because the Food and Drug Administration (FDA or the Agency) has determined that prior public participation for this guidance is not feasible or appropriate (see section 701(h)(1)(C) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 371(h)(1)(C)) and 21 CFR 10.115(g)(2)). This guidance document is being implemented immediately, but it remains subject to comment in accordance with the Agency's good guidance practices.

Comments may be submitted at any time for Agency consideration. Submit written comments to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. Submit electronic comments to https://www.regulations.gov. All comments should be identified with the docket number FDA-2020-D-1138 and complete title of the guidance in the request.

## Additional Copies

Additional copies are available from the FDA webpage titled "Coronavirus Disease 2019 (COVID-19)," *available at* https://www.fda.gov/emergency-preparedness-and-response/mcm-issues/covid-19-related-guidance-documents-industry-fda-staff-and-other-stakeholders, and the FDA webpage titled "Search for FDA Guidance Documents," *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents. You may also send an e-mail request to CDRH-Guidance@fda.hhs.gov to receive an additional copy of the guidance. Please include the document number 20018 and complete title of the guidance in the request.

## Questions

For questions about this document, contact 1-888-INFO-FDA or CDRH-COVID19-SurgicalMasks@fda.hhs.gov

*Contains Nonbinding Recommendations*

# Table of Contents

I.      Introduction ........................................................................................................... 1

II.     Background ........................................................................................................... 2

III.    Scope .................................................................................................................... 3

IV.     Definitions............................................................................................................ 4

V.      Policy ................................................................................................................... 5

      A.      Overview............................................................................................... 5

      B.      Face Masks, Face Shields, and N95 Respirators Not Intended for a Medical Purpose ....... 5

      C.      Face Masks Intended for a Medical Purpose that are NOT Intended to Provide Liquid Barrier Protection ........................................................................... 6

      D.      Face Shields Intended for a Medical Purpose ..................................... 7

      E.      Surgical Masks Intended to Provide Liquid Barrier Protection......................................... 8

      F.      Alternatives When FDA-Cleared or NIOSH-Approved N95 Respirators are Not Available ................................................................................ 9

VI.     EUAs for Face Masks Intended for a Medical Purpose, Surgical Masks and N95 Respirators 10

# Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)

## Guidance for Industry and Food and Drug Administration Staff

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff or Office responsible for this guidance as listed on the title page.

## I.    Introduction

FDA plays a critical role in protecting the United States from threats such as emerging infectious diseases, including the Coronavirus Disease 2019 (COVID-19) pandemic. FDA is committed to providing timely guidance to support response efforts to this pandemic.

FDA is issuing this guidance to provide a policy to help expand the availability of general use face masks for the general public and particulate filtering facepiece respirators (including N95 respirators) for healthcare personnel (HCP)[1] for the duration of the COVID-19 public health emergency.

This policy is intended to remain in effect only for the duration of the public health emergency

---

[1] As used in the three EUAs for filtering facepiece respirators in effect at the time of this guidance, healthcare personnel (HCP) refers to all paid and unpaid persons serving in healthcare settings who have the potential for direct or indirect exposure to patients or infectious materials, including body substances (e.g., blood, tissue, and specific body fluids); contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air. These healthcare personnel include, but are not limited to, emergency medical service personnel, nurses, nursing assistants, physicians, technicians, therapists, phlebotomists, pharmacists, dentists and dental hygienists, students and trainees, contractual staff not employed by the healthcare facility, and persons not directly involved in patient care, but who could be exposed to infectious agents that can be transmitted in the healthcare setting (e.g., clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, and volunteer personnel).

*Contains Nonbinding Recommendations*

related to COVID-19 declared by the Secretary of Health and Human Services (HHS) on January 31, 2020, effective January 27, 2020, including any renewals made by the HHS Secretary in accordance with section 319(a)(2) of the Public Health Service Act (PHS Act) (42 U.S.C. 247d(a)(2)).

Given this public health emergency, and as discussed in the Notice in the *Federal Register* of March 25, 2020, titled "Process for Making Available Guidance Documents Related to Coronavirus Disease 2019," *available at* https://www.govinfo.gov/content/pkg/FR-2020-03-25/pdf/2020-06222.pdf, this guidance is being implemented without prior public comment because FDA has determined that prior public participation for this guidance is not feasible or appropriate (see section 701(h)(1)(C) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 371(h)(1)(C)) and 21 CFR 10.115(g)(2)). This guidance document is being implemented immediately, but it remains subject to comment in accordance with the Agency's good guidance practices.

In general, FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidance means that something is suggested or recommended, but not required.

## II.   Background

There is currently an outbreak of respiratory disease caused by a novel coronavirus. The virus has been named "SARS-CoV-2," and the disease it causes has been named "Coronavirus Disease 2019" (COVID-19). On January 31, 2020, the HHS issued a declaration of a public health emergency related to COVID-19 and mobilized the Operating Divisions of HHS.[2] In addition, on March 13, 2020, the President declared a national emergency in response to COVID-19.[3]

FDA believes the policy set forth in this guidance may help address these urgent public health concerns by clarifying the regulatory landscape of face masks and respirators, helping to expand the availability of general use face masks for use by the general public, and of filtering facepiece respirators (including N95 respirators) for use by HCP in healthcare settings.

This document supersedes the guidance, "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)," issued April 2020. The April 2020 version revised the original guidance, "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency," issued March 25, 2020, to include face shields and to provide FDA's recommendations regarding alternatives when FDA-cleared or NIOSH-approved N95 respirators are not available. This version includes additional updates regarding alternatives when FDA-cleared or NIOSH-approved N95 respirators are not available and removes FDA's prior recommendations regarding emergency use

---

[2] Secretary of Health and Human Services Alex M Azar, Determination that a Public Health Emergency Exists. (Jan. 31, 2020, renewed April 21, 2020), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.
[3] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

*Contains Nonbinding Recommendations*

authorizations  (EUAs) for decontamination  of face masks and filtering  facepiece respirators.[4]

# III.  Scope

There are many products marketed in the United States as "face masks" that offer a range of protection  against potential health hazards. Face masks[5] and respirators  are regulated by FDA when they meet the definition  of a device under section 201(h) of the Federal Food, Drug, and Cosmetic Act (FD&C Act). Generally,  face masks fall within  this definition  when they are intended  for a medical purpose, including  for use by HCP.[6] Face masks that are not intended  for a medical purpose are not medical devices, as described  in further detail below. FDA-regulated face masks and respirators  are listed in Table 1:

**Table 1**

| Classification Regulation | Device Type | Product Code[7] |
|---|---|---|
| 21 CFR 878.4040 | Mask, Surgical | FXX |
| | Pediatric/Child  Facemask | OXZ |
| | Accessory, Surgical  Apparel (Face Shield)[8] | LYU |
| | Surgical mask with antimicrobial/antiviral  agent | OUK |
| | Respirator, Surgical | MSH |
| | N95 Respirator with Antimicrobial/Antiviral  Agent | ONT |
| 21 CFR 880.6260 | N95 Respirator with Antimicrobial/Antiviral  Agent for Use by the General Public  in Public  Health Medical Emergencies | ORW |
| 21 CFR 880.6260 | Respirator, N95, for Use by the General Public  in Public Health Medical Emergencies | NZJ |

---

[4] Concurrently with issuance of this revised guidance, the FDA is issuing the guidance, "Recommendations for Sponsors Requesting EUAs for Decontamination and Bioburden Reduction Systems for Surgical Masks and Respirators During the Coronavirus Disease 2019 (COVID-19)  Public Health Emergency."

[5] FDA also considers face mask and surgical mask accessories that are intended to help hold the mask to the face (e.g., surgical mask strap holders, tension release bands) to fall within the scope of this guidance. Respirator accessories are not included in the scope of this guidance.

[6] As used in this guidance "intended for a medical purpose" means that the device is intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease and, therefore, meets the definition of "device" set forth in section 201(h) of the FD&C Act.

[7] For more information see the Product Classification Database at
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm.

[8] The scope of this guidance is limited to face shields and their accessories that are intended to help hold the face shield to the face under product code LYU, "Accessory, Surgical Apparel." Face shields and their accessories that are intended to help to hold the face shield to the face are class I devices and are exempt from premarket notification requirements under 510(k) of the FD&C Act.  *See* 21 CFR 878.4040.  Face shields combined with devices other than a face mask (e.g., a gown, hood or toga) are not within the scope of this guidance. *See* "Enforcement Policy for Gowns, Other Apparel, and Gloves During the Coronavirus Disease (COVID-19) Public Health Emergency" *available at*
https://www.fda.gov/regulatory-information/search-fda-guidance-documents/enforcement-policy-gowns-other-apparel-and-gloves-during-coronavirus-disease-covid-19-public-health.

*Contains Nonbinding Recommendations*

This policy does **NOT** apply to other types of masks including but not limited to those in Table 2.

**Table 2**

| Classification Regulation | Device Type | Product Code |
|---|---|---|
| 21 CFR 868.5450 | Humidifier, Respiratory Mask | OBN |
| | Humidifier, Respiratory Gas | BTT |
| 21 CFR 868.5550 | Mask, Anesthetic, Gas | BSJ |
| 21 CFR 868.5580 | Mask, Oxygen | BYG |
| 21 CFR 868.5600 | Mask, Oxygen, Low Concentration, Venturi | BYG |
| 21 CFR 868.5570 | Mask, Oxygen, Non-Rebreathing | KGB |
| 21 CFR 868.5905 | Resuscitator, Manual, Non Self-Inflating | NHK |
| | Mask, Ventilator, Non-Continuous, Reprocessed | NMC |
| 21 CFR 868.5560 | Strap, Head, Gas Mask | BTK |

FDA recognizes that, when personal protective equipment (PPE), such as FDA-cleared surgical masks or respirators, are unavailable, individuals, including HCP, might improvise. FDA does not intend to object to individuals' distribution and use of improvised PPE when FDA-cleared or authorized surgical masks or respirators are not available.

# IV.  Definitions

For the purposes of this guidance, the following definitions are used.

**Face Mask** – A mask, with or without a face shield, that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. Face masks are for use by the general public and HCP only as source control in accordance with CDC recommendations.[9,10]

**Face Shield -** A face shield is a device used to protect the user's eyes and face from bodily fluids, liquid splashes, or potentially infectious materials. Generally, a face shield is situated at the crown of the head and is constructed with plastic to cover the user's eyes and face.

**Surgical Mask** – A mask that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials. The mask meets certain fluid barrier protection standards and Class I or Class II flammability tests.[11]

**Filtering Facepiece Respirator** – A filtering facepiece respirator (FFR) is a device that is a disposable half-face-piece non-powered air-purifying particulate respirator intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates.

---

[9] Source control refers to the use of a facemask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19.
[10] https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html.
[11] CPSC CS-191-53 Flammability Test Method (16 CFR 1610) Standard for Flammability of Clothing Textiles.

4

*Contains Nonbinding Recommendations*

**N95 Respirator** – A disposable half-mask filtering facepiece respirator (FFR) that covers the user's airway (nose and mouth) and offers protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181. Such an N95 FFR used in a healthcare setting is regulated by FDA under 21 CFR 878.4040 (FDA product code MSH) and is either a class II device that is exempt from premarket notification requirements under section 510(k) of the FD&C Act or is a class II cleared device.

**NIOSH Approved N95 Respirator** – An N95 respirator, approved by NIOSH that meets filtration efficiency level per 42 CFR 84.181.

**Surgical N95 Respirator** – A disposable FFR used in a healthcare setting that is worn by HCP during procedures to protect both the patient and HCP from the transfer of microorganisms, body fluids, and particulate material at an N95 filtration efficiency level per 42 CFR 84.181. A surgical N95 respirator is regulated by FDA under 21 CFR 878.4040 (FDA product code MSH) and is either a class II device that is exempt from premarket notification requirements under section 510(k) of the FD&C Act or is a class II cleared device.

# V.   Policy

## A. Overview

FDA is taking steps to expand the availability of face masks and respirators and believes the policy set forth in this guidance may help address the urgent public health concerns caused by shortages of such products by taking a risk-based approach and clarifying the policies that FDA intends to apply to masks and respirators, including these products' associated indications and claims.

## B. Face Masks, Face Shields, and N95 Respirators Not Intended for a Medical Purpose

Face masks, face shields, and N95 respirators are devices when they meet the definition of a device set forth in section 201(h) of the FD&C Act. Under section 201(h) of the FD&C Act, these products are devices when they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease.

Other face masks, face shields, and FFRs are marketed to the general public for general, non-medical purposes, such as use in construction and other industrial applications. Because they are not intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, FDA device marketing authorization is **not** required, and all the other requirements of the FD&C Act do **not** apply to manufacturers, importers, and distributors of these products.

Face masks, face shields, and respirators are devices when they are intended for a medical purpose, such as prevention of infectious disease transmission (including uses related to COVID-19). Face masks, face shields, and respirators are not devices when they are intended for a non-medical

*Contains Nonbinding Recommendations*

purpose, such as for use in construction. When evaluating whether these products are intended for a medical purpose, among other considerations, FDA will consider whether:

1) they are labeled or otherwise intended for use by a HCP;
2) they are labeled or otherwise for use in a health care facility or environment; and
3) they include any drugs, biologics, or anti-microbial/anti-viral agents.

## C. Face Masks Intended for a Medical Purpose that are NOT Intended to Provide Liquid Barrier Protection

In general, FDA recommends that HCP follow current Centers for Disease Control and Prevention (CDC) guidance regarding personal protective equipment (PPE) that should be used during the COVID-19 outbreak.[12] Health care employers must also comply with standards of the Occupational Safety and Health Administration (OSHA) that require PPE to protect workers and that apply to infectious disease hazards.[13] Face masks are to be used for source control only, and are not personal protective equipment, meaning they are not a substitute for FFRs or for surgical face masks.[14]

In the April 2, 2020 publication of this guidance, FDA provided flexibility regarding distribution and use of face masks without compliance with certain regulatory requirements, including submission of a 510(k) under certain circumstances. FDA's policy was based on the evolving public health emergency and the increased need for devices for source control. In addition to this policy and in response to the shortage of face masks, on April 18, 2020 FDA issued an EUA for certain face masks[15] that FDA determined met the criteria for issuance under Section 564 of the Act. This EUA has succeeded in increasing the availability of face masks for HCP and the general public for use as source control when FDA-cleared face masks are not available.

Wherever possible, HCP and the general public should continue to use FDA-cleared face masks as source control or, when those are not available, face masks authorized under the EUA. However, to help foster the availability of equipment that might offer some benefit to HCP and the general public during the COVID-19 outbreak, FDA is continuing its April 2, 2020 policy regarding face masks, recognizing there is some overlap with the EUA. Thus, for the duration of the public health emergency FDA does not intend to object to the distribution and use of face masks, with or without a face shield (not including respirators), that are intended for a medical purpose (whether used by medical personnel or the general public), without compliance with the following regulatory requirements where the face mask does not create an undue risk in light of the public health emergency: prior submission of a premarket notification under section 510(k) of the FD&C Act and 21 CFR 807.81, Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR 820, Reports of Corrections and Removals in 21 CFR Part 806, and Unique

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhcp%2Finfection-control.html.

[13] *See* 29 CFR 1910 subpart I.

[14] See FDA's EUA for face masks (non-surgical) available at https://www.fda.gov/media/137121/download and FAQs on the Emergency Use Authorization for Face Masks (Non-Surgical) available at https://www.fda.gov/medical-devices/emergency-situations-medical-devices/faqs-emergency-use-authorization-face-masks-non-surgical.

[15] https://www.fda.gov/media/137121/download.

*Contains Nonbinding Recommendations*

Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20. FDA currently believes such devices would not create such an undue risk where:

- The product includes labeling that accurately describes the product as a face mask (as opposed to a surgical mask or FFR) and includes a list of the body contacting materials (which does not include any drugs or biologics);

- The product includes labeling that makes recommendations that would reduce sufficiently the risk of use, for example, recommendations against: use in any surgical setting or where significant exposure to liquid, bodily or other hazardous fluids, may be expected; use in a clinical setting where the infection risk level through inhalation exposure is high; and use in the presence of a high intensity heat source or flammable gas; and

- The product is not intended for any use that would create an undue risk in light of the public health emergency, for example the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses and does not include particulate filtration claims.

## D. Face Shields Intended for a Medical Purpose

In general, FDA recommends that HCP follow current Centers for Disease Control and Prevention (CDC) guidance regarding PPE that should be used during the COVID-19 outbreak.[16] Health care employers must also comply with standards of the Occupational Safety and Health Administration (OSHA) that require PPE to protect workers and that apply to infectious disease hazards.[17] To help foster the availability of equipment that might offer some benefit to HCP and the general public during the COVID-19 outbreak, for the duration of the public health emergency, FDA does not intend to object to the distribution and use of face shields that are intended for a medical purpose (whether used by medical personnel or the general public), without compliance with the following regulatory requirements where the face shield does not create an undue risk in light of the public health emergency: Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR Part 820, Reports of Corrections and Removals in 21 CFR Part 806, and Unique Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20. FDA currently believes such devices would not create such an undue risk where:

- The product includes labeling that accurately describes the product as a face shield and includes a list of the body contacting materials (which does not include any drugs, or biologics);

- The face shield does not contain any materials that will cause flammability, or the product meets Class I or Class II flammability requirement per 16 CFR 1610 (unless labeled with a recommendation against use in the presence of high intensity heat source or flammable gas);

---

[16] https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhcp%2Finfection-control.html.

[17] *See* 29 CFR 1910 subpart I.

7

*Contains Nonbinding Recommendations*

- The product is not intended for any use that would create an undue risk in light of the public health emergency, for example, the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses, or for radiation protection.

# E. Surgical Masks Intended to Provide Liquid Barrier Protection

Surgical masks are class II devices that cover the user's nose and mouth and provide a physical barrier to fluids and particulate materials and are tested for flammability and biocompatibility. For the duration of the declared public health emergency, FDA does not intend to object to the distribution and use of surgical masks without compliance with the following regulatory requirements where the surgical mask does not create an undue risk in light of the public health emergency: prior submission of a premarket notification under section 510(k) of the FD&C Act and 21 CFR 807.81, Registration and Listing requirements in 21 CFR 807, Quality System Regulation requirements in 21 CFR 820, Reports of Corrections and Removals in 21 CFR Part 806, and Unique Device Identification requirements in 21 CFR Part 830 and 21 CFR 801.20. FDA currently believes such devices would not create such an undue risk where:

- The product meets fluid resistance testing (liquid barrier performance) consistent with standard ASTM F1862[18] Standard Test Method for Resistance of Medical Face Masks to Penetration by Synthetic Blood (Horizontal Projection of Fixed Volume at a Known Velocity);

- The product meets Class I or Class II flammability requirement per 16 CFR 1610 (unless labeled with a recommendation against use in the presence of high intensity heat source or flammable gas);

- The product includes labeling that accurately describes the product as a surgical mask and includes a list of the body contacting materials (which does not include any drugs or biologics); and

- The product is not intended for any use that would create an undue risk in light of the public health emergency, for example, the labeling does not include uses for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses and does not include particulate filtration claims.

---

[18] For the current edition of the FDA-recognized standard(s) referenced in this document, see the FDA Recognized Consensus Standards Database available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfStandards/search.cfm. For more information regarding use of consensus standards in regulatory submissions, refer to FDA guidance titled "Appropriate Use of Voluntary Consensus Standards in Premarket Submissions for Medical Devices," available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/appropriate-use-voluntary-consensus-standards-premarket-submissions-medical-devices.

*Contains Nonbinding Recommendations*

## F. Alternatives When FDA-Cleared or NIOSH-Approved N95 Respirators are Not Available

CDC published on its website Strategies for Optimizing the Supply of N95 Respirators: Crisis/Alternate Strategies,[19] which, as part of a set of crisis management recommendations, identifies alternatives to FDA-cleared or NIOSH-approved N95 respirators approved under standards used in other countries, some of which were evaluated under methods that are similar to NIOSH-approved N95 respirators.

In the April 2, 2020 publication of this guidance, FDA provided flexibility regarding distribution and use of respirators identified in the CDC recommendations without compliance with certain regulatory requirements, including submission of a 510(k) under certain circumstances. FDA's policy was based on the evolving public health emergency and the increasing need for respiratory protection devices for HCP, which was rapidly outpacing the supply of FDA-cleared or NIOSH-approved respirators. The guidance also recommended that importers take appropriate steps to verify the authenticity of products they import.

In addition to this policy and in response to the shortage of respirators, FDA issued emergency use authorizations (EUAs) for certain respirators that FDA determined met the criteria for issuance under Section 564 of the Act.[20] These EUAs have succeeded in increasing the availability of respirators for HCP when FDA-cleared or NIOSH-approved respirators are not available.

Since the April 2, 2020 publication of this guidance, FDA has become aware of concerns regarding the performance of certain respirators based on testing conducted by the CDC.[21] This indicates that greater FDA oversight of respirators that are not FDA-cleared or authorized under an EUA is important to protect the public health. As a result of these changed circumstances, FDA is discontinuing its previous policy from April 2, 2020 under which FDA did not intend to object to the distribution and use of certain respirators that were not FDA-cleared or authorized under an EUA and did not meet other regulatory requirements.

FDA currently believes that FDA-cleared or NIOSH-approved N95 respirators should be used when they are available, but when they are not, FDA recommends using FDA-authorized respirators before any other alternatives. This is consistent with the CDC's approach for optimizing the supply of N95 respirators. FDA does not recommend using a product as a respirator unless it has been FDA-cleared, NIOSH-approved, or authorized by FDA for emergency use as a respirator. Such a product could instead be used as a face mask by the general public and HCP as source control when certain criteria are met under the EUA for face masks.[22] In that case, the product should be labeled accordingly and not used as a respirator.[23]

---

[19] https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/crisis-alternate-strategies.html.
[20] See FDA's webpage regarding emergency use authorizations, available at https://www.fda.gov/medical-devices/emergency-situations-medical-devices/emergency-use-authorizations#covid19ppe.
[21] https://www.cdc.gov/niosh/npptl/respirators/testing/NonNIOSHresults.html.
[22] https://www.fda.gov/media/137121/download.
[23] Source control refers to the use of a facemask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19. See also https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html.

*Contains Nonbinding Recommendations*

In addition, FDA notes that HCP should ensure that respirators adequately fit. Hospitals and end users should be aware that it may be difficult to achieve an adequate fit when wearing respirators with ear loops instead of head straps. When proper fit is not achieved for a respirator, it should not be used as a respiratory protective device.

# VI.  EUAs for Face Masks Intended for a Medical Purpose, Surgical Masks and N95 Respirators

Wherever possible, health care facilities should continue to use FDA-cleared surgical masks and NIOSH-approved and/or FDA-cleared N95 respirators, or better. In response to the COVID-19 pandemic, FDA has also issued EUAs that authorize certain FFRs, including NIOSH-approved FFRs,[24] imported non-NIOSH-approved disposable FFRs from certain jurisdictions excluding China,[25] and non-NIOSH-approved disposable FFRs manufactured in China,[26] for use in healthcare settings by HCP. These EUAs are intended to help increase availability of these devices to front-line personnel during the public health emergency. FDA has also issued an EUA for face masks[27] for use by the general public and HCP as source control.

For devices that do not fall within the scope of these EUAs, FDA is interested in interacting with manufacturers on additional device-specific EUAs. This may include manufacturers of masks and respirators that are not currently legally marketed in the US as well as manufacturers who have not previously manufactured masks or respirators with capabilities to increase supply of these devices.

FDA would find it helpful if such manufacturers (whether foreign or domestic) send FDA the following information to CDRH-COVID19-SurgicalMasks@fda.hhs.gov; FDA believes this information will be valuable in assessing whether the device would be able to meet the EUA requirements. FDA believes that companies may already have available information to help support an EUA request such as the information outlined below. FDA will expeditiously review this information, and other required information,[28] to determine whether the device can be authorized under an EUA.

1) For current face mask and respirator manufacturers whose product(s) are not currently marketed in the US, FDA recommends providing the following information:
   a. General information such as your contact information, name and place of business, email address, and contact information for a U.S. agent (if any) in addition to general information about the device such as the proprietary or brand name, model number, and marketing authorization in your country (or region).
   b. A copy of the product labeling.
   c. Whether the device currently has marketing authorization in another regulatory jurisdiction (including certification number, if available).

---

[24] https://www.fda.gov/media/135763/download.
[25] https://www.fda.gov/media/136403/download.
[26] https://www.fda.gov/media/136664/download.
[27] https://www.fda.gov/media/137121/download.
[28] See Section 564 of the FD&C Act.

*Contains Nonbinding Recommendations*

    d. Whether the device is manufactured in compliance with 21 CFR Part 820 or ISO 13485: *Medical Devices – Quality Management Systems – Requirements for Regulatory Purposes* or an equivalent quality system and the manufacturer or importer has documentation of such.

    e. Description of testing conducted on the device, including any standards met, such as liquid barrier protection, flammability, biocompatibility, and filtration performance, as appropriate. For surgical N95 respirators, FDA recommends including fluid resistance testing (liquid barrier performance).

2) For face mask manufacturers who have not previously been engaged in medical device manufacturing but with capabilities to increase supply of these devices:

FDA welcomes the opportunity to work with manufacturers not previously engaged in medical device manufacturing with the interest and capability to manufacture face masks and respirators. This may include US manufacturers in other manufacturing sectors. These manufacturers should send an email to the address above and describe their proposed approach. FDA intends to work collaboratively with these manufacturers through its EUA process.

==For any face mask or FFR (including N95 respirators) issued an EUA, FDA will include appropriate conditions of authorization in accordance with section 564 of the FD&C Act. Although this is a case-by-case determination, based on current information and experience, we will likely include the following conditions:==

- Appropriate conditions designed to ensure that HCP administering the device are informed—
  - that FDA has authorized the emergency use of the device;
  - of the significant known and potential benefits and risks of the emergency use of the device, and of the extent to which such benefit and risks are unknown; and
  - of the alternatives to the device that are available, and of their benefits and risks.

- Appropriate conditions designed to ensure that individuals to whom the device is administered are informed—
  - that FDA has authorized the emergency use of the device;
  - of the significant known and potential benefits and risks of the emergency use of the device, and of ==the extent to which such benefit and risks are unknown;== and
  - ==of the option to accept or refuse administration of the device,== of the consequence, if any, of refusing administration of the device, and of the alternatives to the device that are available and of their benefits and risks.

- Appropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the device. FDA intends to include conditions that are consistent with those promulgated under 21 CFR Part 803.

- For manufacturers of the device, appropriate conditions concerning recordkeeping and reporting, including records access by FDA, with respect to emergency use of the device.



# Plaintiff's Exhibit 120

April 24, 2020

To:     Manufacturers of Face Masks;
        Health Care Personnel;
        Hospital Purchasing Departments and Distributors; and
        Any Other Stakeholders.

On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks,[1,2] the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) authorizing the use of face masks for use by members of the general public, including health care personnel (HCP)[3] in healthcare settings as personal protective equipment (PPE), to cover their noses and mouths, in accordance with Centers for Disease Control and Prevention (CDC) recommendations, to prevent the spread of the virus called severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) during the Coronavirus Disease 2019 (COVID-19) pandemic, pursuant to section 564 of the Federal, Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3).

On February 4, 2020, pursuant to Section 564(b)(1)(C) the Act, the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States

---

[1] A face mask is a device, with or without a face shield, that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. It may be for single or multiple uses, and if for multiple uses it may be laundered or cleaned. There are many products marketed in the United States as "face masks" that offer a range of protection against potential health hazards. Face masks are regulated by FDA when they meet the definition of a "device" under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. Face masks are regulated under 21 CFR 878.4040 as Class I 510(k)-exempt devices (non-surgical masks).

[2] Surgical masks are not covered within the scope of this authorization. Surgical masks are masks that cover the user's nose and mouth and provide a physical barrier to fluids and particulate materials and are regulated under 21 CFR 878.4040 as class II devices requiring premarket notification. These masks meet certain fluid barrier protection standards and Class I or Class II flammability tests. More information on the distinction is provided in FDA guidance, titled "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency" available at https://www.fda.gov/media/136449/download.

[3] HCP refers to all paid and unpaid persons serving in healthcare settings who have the potential for direct or indirect exposure to patients or infectious materials, including body substances (e.g., blood, tissue, and specific body fluids); contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air. These HCP include, but are not limited to, emergency medical service personnel, nurses, nursing assistants, physicians, technicians, therapists, phlebotomists, pharmacists, dentists and dental hygienists, students and trainees, contractual staff not employed by the healthcare facility, and persons not directly involved in patient care, but who could be exposed to infectious agents that can be transmitted in the healthcare setting (e.g., clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, and volunteer personnel).

Page 2

citizens living abroad, and that involves the virus that causes COVID-19.[4]  Pursuant to Section 564 of the Act, and on the basis of such determination, the Secretary of HHS then declared on March 24, 2020, that circumstances exist justifying the authorization of emergency use of medical devices, including alternative products used as medical devices, due to shortages during the COVID-19 pandemic, subject to the terms of any authorization issued under that section.[5]

On April 24, 2020 in response to questions and concerns that have been received by FDA since issuance of the April 18, 2020 letter of authorization and having concluded that revising the April 18, 2020 EUA is appropriate to protect the public health or safety under section 564(g)(2)(c) of the Act (21 U.S.C. § 360bbb-3(g)(2)(c)), FDA is reissuing the April 18, 2020 letter in its entirety with amendments[6] incorporated. Specifically, FDA is clarifying through this re-issued letter that facemasks, including cloth face coverings, are authorized to be used by HCP only as source control[7,8] in accordance with CDC recommendations under this EUA.[9]  As stated in the April 18 letter, face masks are authorized for use by the general public to cover their noses and mouths, in accordance with CDC recommendations.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of face masks for use in accordance with CDC recommendations, as described in the Scope of Authorization (Section II) and pursuant to the Conditions of Authorization (Section IV) of this letter.

For the most current CDC recommendations on the use of face masks by the general public during COVID-19, please visit CDC's webpage:  Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission For the most recent recommendations on use of face masks by HCPs in a healthcare setting, see: Strategies to Optimize the Supply of PPE and Equipment.

## I.      Criteria for Issuance of Authorization

I have concluded that the emergency use of face masks in accordance with CDC recommendations as source control as described in the Scope of Authorization (Section II) to

---

[4] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. 85 FR 7316 (February 7, 2020)

[5] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 17335 (March 27, 2020).

[6] The amendments to the April 18, 2020 letter clarify that the eligible facemasks are to be used for source control only, and are not personal protective equipment, meaning they are not a substitute for filtering face piece respirators or for surgical face masks. This reissued EUA does not change any aspects of the April 18, 2020 letter with respect to the use of face masks by the general public.

[7] Source control refers to the use of a facemask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19.

[8] https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html

[9] In addition, health care employers should refer to standards of the Occupational Safety and Health Administration (OSHA) that apply to PPE to protect workers and infectious disease hazards. *See* 29 CFR 1910 subpart I.

Page 3

help prevent spread of the virus during the COVID-19 pandemic meets the criteria for issuance of an authorization under Section 564(c) of the Act, because I have concluded that:

1. SARS-CoV-2, the virus that causes COVID-19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized face masks may be effective as source control to help prevent the spread of SARS-CoV-2 by infected individuals who may or may not have symptoms of COVID-19 during the COVID-19 pandemic, and that the known and potential benefits of face masks, when used in accordance with the scope of this authorization (Section II), outweigh the known and potential risks of such product; and

3. There is no adequate, approved, and available alternative to the emergency use of face masks for source control by the general public and for HCPs to help prevent the spread of the virus due to face mask shortages during the COVID-19 pandemic.[10],[11]

## II. Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited to the use of face masks, including cloth face coverings, as source control for use by members of the general public, as well as HCP in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of the SARS-CoV-2 during the COVID-19 pandemic. The facemasks are not intended to be used by HCPs as PPE, meaning they are neither substitutable for respiratory protective devices such as filtering face piece respirators, nor for surgical face masks. This use is consistent with face masks regulated as Class I 510(k)-exempt face masks under 21 CFR 878.4040.

### Authorized Face Masks

Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public as well as HCPs in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic. Authorized face masks must meet the following requirements:

1. The product is labeled accurately to describe the product as a face mask and includes a list of the body contacting materials (which does not include any drugs or biologics);

---

[10] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[11] Providing authorization for the introduction into interstate commerce of face masks by manufacturers that do not customarily engage in the manufacture of medical devices helps meet the needs of the healthcare system. In addition, increased availability of face masks helps meet the needs for source control for the general population, reserving FDA-cleared surgical masks and FDA-cleared or -authorized N95 and N95 equivalent Face Filtering Respirators for use by HCP. Providing HCP who are on the forefront of the COVID-19 response with sufficient PPE is necessary in order to help prevent HCP exposure to pathogenic biologic airborne particulates during the COVID-19 pandemic.

Page 4

2. The product is labeled accurately so that it does not claim to be intended for use as a surgical mask or to provide liquid barrier protection;

3. The product labeling includes recommendations against use in a clinical setting where the infection risk level through inhalation exposure is high;

4. The product is not labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction;

5. The product is not labeled as a respiratory protective device, and therefore should not be used for particulate filtration; and

6. The product is not labeled for use in high risk aerosol generating procedures.[12]

Manufacturers of face masks that are used as described above and meet the above requirements (i.e., are within this section (the Scope of Authorization, Section II)) do not need to take any action, other than complying with the Conditions of Authorization (Section IV) to be authorized under this EUA. FDA's posting and public announcement of this EUA at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization, serves as face mask manufacturers' notification of authorization.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of face masks as described within this section (the Scope of Authorization, Section II), outweigh the known and potential risks of such products.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that face masks may be effective as described within this section (the Scope of Authorization, Section II) of this letter, pursuant to Section 564(c)(2)(A) of the Act.

FDA has reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I of this letter, and concludes that face masks (as described in this section, the Scope of Authorization, Section II), meet the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of face masks must be consistent with, and may not exceed, the terms of this letter, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section IV).  Subject to the terms and conditions of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), face masks, as source control, are authorized for use by members of the general public, as well as HCPs in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic.

---

[12] Examples of aerosol generating procedures in healthcare settings may be found at https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-faq.html

Page 5

## III. Waiver of Certain FDA Requirements

Pursuant to Section 564(e)(3) of the Act, with respect to the emergency use of a product for which an authorization under this section is issued, FDA may waive or limit, to the extent appropriate given the circumstances of the emergency, requirements regarding good manufacturing practice otherwise applicable to the manufacture, processing, packing, or holding of products subject to regulations under this Act, including such requirements established under sections 520(f)(1). FDA grants that waiver, including the quality system requirements under 21 CFR Part 820 and labeling requirements under the FD&C Act and FDA regulations, including unique device identification requirements in 21 CFR Part 830 and 21 CFR 801.20, except that face masks must include the labeling elements specified in the Conditions of Authorization (Section IV).

## IV. Conditions of Authorization

Pursuant to Section 564(e) of the Act, I am establishing the following conditions to this authorization:

## Manufacturers and Distributors of Authorized Products[13]

A. Manufacturers and Distributors will make face masks available with labeling that includes a description of the product as a face mask, including a list of the body contacting materials (which does not include any drugs or biologics).

B. Manufacturers and Distributors of authorized products shall not label the product: 1) as a surgical mask, to provide liquid barrier protection; 2) for use in a clinical setting where the infection risk level through inhalation exposure is high; 3) for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses; 4) as a respiratory protective device; or 5) for high risk aerosol-generating procedures.

C. Manufacturers must make the required labeling available to each end user or end user facility (each hospital) in hard copy or in an alternative format (e.g., electronic labeling on the manufacturer's website). Instructions on how to access the labeling if provided in an alternative format must be available to each end user or end user facility.

D. Manufacturers and Distributors will include instructions for recommended cleaning and/or disinfection materials and processes, if applicable, for their authorized product(s). Manufacturers must provide these instructions, if applicable, to each end user or end user facility (e.g., each hospital) in hard copy or in an alternative format (e.g., electronic instructions). Instructions on how to access the labeling if provided in an alternative format must be available to each end user or end user facility.

---

[13] The requirements under 21 CFR Part 806 (Reports of Corrections and Removals) and 21 CFR Part 807 (Registration and Listing) do not apply to products authorized under an EUA. As such, compliance with these regulations are not required under this EUA.

Page 6

E. Manufacturers will have a process in place for reporting adverse events of which they become aware to FDA under 21 CFR Part 803. Adverse events of which the manufacturer becomes aware will be reported to FDA. See FDA's webpage "Medical Device Reporting (MDR): How to Report Medical Device Problems"[14] for reporting requirements and procedures.[15]

F. Manufacturers and distributors will ensure that any records associated with this EUA are maintained until otherwise notified by FDA. Such records will be made available to FDA for inspection upon request.

G. Through a process of inventory control, manufacturers and distributors will maintain records of the entities to which they distribute the face masks and the numbers of each such product they distribute.

H. Manufacturers and distributors are authorized to make available additional information relating to the emergency use of the product that is consistent with, and does not exceed, the terms of this letter of authorization.

**Conditions Related to Advertising and Promotion**

I. All printed matter, including advertising and promotional materials, relating to the use of the authorized face mask shall be consistent with the labeling elements listed in Section II of this EUA, as well as the terms set forth in this EUA and the applicable requirements set forth in the Act and FDA regulations.

J. No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic.

K. All advertising and promotional descriptive printed matter relating to the use of the product shall clearly and conspicuously state that

- The product has not been FDA cleared or approved

- The product has been authorized by FDA under an EUA for use as source control by the general public as well as by HCP in healthcare settings as to help prevent the spread of infection or illness during the COVID-19 pandemic.

- This product is authorized only for the duration of the declaration that circumstances exist justifying the authorization of the emergency use of medical devices, including alternative products used as medical devices,

---

[14] FDA guidance, titled "Medical Device Reporting (MDR): How to Report Medical Device Problems" is available at https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems.

[15] Also refer to FDA guidance, titled "Postmarketing Adverse Event Reporting for Medical Products and Dietary Supplements During a Pandemic" available at https://www.fda.gov/media/72498/download.

Page 7

during the COVID-19 outbreak, under section 564(b)(1) of the Act, 21 U.S.C.
§ 360bbb-3(b)(1) unless the authorization is terminated or revoked sooner.

**V. Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying this
authorization is terminated under Section 564(b)(2) of the Act or the EUA is revoked under
Section 564(g) of the Act.

Sincerely,

/S/

_____

RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Plaintiff's Exhibit 121

fda.gov

# FAQs on the Emergency Use Authorization for Face Masks (Non-Surgical)

4-5 minutes          April 26, 2020

**Q: Why did the FDA re-issue the Emergency Use Authorization (EUA) for face masks?**

A: The FDA received questions about the original face mask EUA posted on April 18, 2020. On April 24, 2020, the FDA updated and re-issued the EUA to clarify that face masks, including cloth face coverings, that are authorized by the EUA are only authorized for use by the general public and health care personnel as source control.

These face masks are not authorized to be personal protective equipment, meaning they are not a substitute for filtering face piece respirators or for surgical face masks.

**Q: What does wearing a face mask for source control mean?**

A: Source control means preventing the transmission of infection through a person's respiratory secretions which are produced when speaking, coughing, or sneezing. Face masks, including cloth face coverings, help with source control by covering the wearer's mouth and nose. COVID-19 may be spread through respiratory secretions by individuals who may or may not have symptoms of COVID-19.

For more information on source control, see the CDC's Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.

Cloth face coverings made from common, easily accessible materials are an additional, voluntary public health approach to help slow the spread of COVID-19. The CDC has a list of FAQs about Cloth Face Coverings for use by the general public.

**Q: During the COVID-19 public health emergency, when should health care personnel wear face masks?**

A: Face masks are not personal protective equipment. Health care facilities should not purchase or offer these masks as substitutes for surgical masks or filtering facepiece respirators. Face masks, including cloth facial coverings, when used as source control, may help in preventing or slowing the spread of COVID-19. Face masks are authorized under this EUA to be worn for source control only, including in the healthcare setting.

Personal protective equipment (i.e., surgical masks and filtering facepiece respirators) are critical supplies that must continue to be reserved for health care personnel and other medical first responders, as recommended in the CDC's Strategies for Optimizing the Supply of Facemasks.

Face masks should NOT be used in place of surgical masks or filtering facepiece respirators to provide protections such as:

- Liquid barrier protection
- Antimicrobial or antiviral protection, prevention, or reduction
- Respiratory protection
- Particulate filtration
- Protection in high-risk aerosol generating procedures

**Q: What type of face mask should someone who is suspected or confirmed with COVID-19 wear?**

A: In What to Do if You Are Sick, the CDC recommends wearing a cloth face covering to control the spread of the virus to others. The CDC also provides recommendations to prevent transmission from infected individuals.

**Q: How should health care facilities prioritize the use of masks?**

A: The CDC provides strategies for optimizing the supply of face masks when there is limited supply. The FDA also provides information about conservation strategies for face masks.

delegated herein prior to the effective date of this delegation.

**Robert McGowan,**
*Chief of Staff, CDC.*
[FR Doc. 2020–06471 Filed 3–26–20; 8:45 am]
**BILLING CODE 4163–18–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Ryan White HIV/AIDS Treatment Extension Act of 2009: Update to the List of Potentially Life-Threatening Infectious Diseases to Which Emergency Response Employees May Be Exposed To Include Coronavirus Disease 2019 (COVID–19), the Disease Caused by Severe Acute Respiratory Syndrome Coronavirus 2 (SARS–CoV–2)

**AGENCY:** Centers for Disease Control and Prevention, HHS.

**ACTION:** Notice.

**SUMMARY:** The National Institute for Occupational Safety and Health (NIOSH), of the Centers for Disease Control and Prevention (CDC), within the Department of Health and Human Services (HHS), is adding coronavirus disease 2019 (COVID–19), the disease caused by severe acute respiratory syndrome coronavirus 2 (SARS–CoV–2), to the *List of Potentially Life-Threatening Infectious Diseases to Which Emergency Response Employees May be Exposed.* The list and companion guidelines are published by NIOSH pursuant to the Ryan White HIV/AIDS Treatment Extension Act of 2009. NIOSH encourages medical facilities to review the agency's guidelines describing the manner in which medical facilities should make determinations on whether an emergency response employee was exposed to COVID–19, the disease caused by SARS–CoV–2.

**FOR FURTHER INFORMATION CONTACT:** Rachel Weiss, Office of the Director, NIOSH; 1090 Tusculum Avenue, MS:C–48, Cincinnati, OH 45226; telephone (855) 818–1629 (this is a toll-free number); email *NIOSHregs@cdc.gov.*

**SUPPLEMENTARY INFORMATION:**

**Statutory Authority**

The Ryan White Comprehensive AIDS Resources Emergency (CARE) Act of 1990 (Pub. L. 101–381) was reauthorized in 1996, 2000, 2006, and 2009. The most recent reauthorization, the Ryan White HIV/AIDS Treatment Extension Act of 2009 (Pub. L. 111–87),

amended the Public Health Service Act (PHS Act, 42 U.S.C. 201–300ii) and, pursuant to Section 2695, requires the HHS Secretary to establish the following: A list of potentially life-threatening infectious diseases, including emerging infectious diseases, to which emergency response employees (ERE) may be exposed while responding to emergencies; guidelines describing circumstances in which EREs may be exposed to these diseases, taking into account the conditions under which emergency response is provided; and guidelines describing the manner in which medical facilities should make determinations about exposures to EREs.

In a **Federal Register** notice published on July 14, 2010, the HHS Secretary delegated this responsibility to the CDC Director.[1] The CDC Director further assigned the responsibility to the NIOSH Director and formally re-delegated the authority to develop the list and guidelines to NIOSH on August 27, 2018.[2]

**Addition of COVID–19, the Disease Caused by the Virus SARS–CoV–2, to the List of Potentially Life-Threatening Infectious Diseases to Which Emergency Response Employees May Be Exposed**

The list of potentially life-threatening infectious diseases maintained by NIOSH is available in a **Federal Register** notice published on November 2, 2011 (76 FR 67736), available on the NIOSH website at *https://www.cdc.gov/niosh/topics/ryanwhite/default.html.* With this notice the NIOSH *List of Potentially Life-Threatening Infectious Diseases to Which Emergency Response Employees May Be Exposed* is updated by the addition of the following:

*C. Potentially Life-Threatening Infectious Diseases: Routinely Transmitted Through Aerosolized Droplet Means*

■ COVID–19 (the disease caused by the virus SARS–CoV–2)

COVID–19, the disease caused by the virus SARS–CoV–2, is being added to the existing list. COVID–19, the disease caused by the virus SARS–CoV–2, is a potentially life-threatening emerging infectious disease that is thought to be spread primarily by respiratory droplets generated by an infectious person through events such as coughing or sneezing (*https://www.cdc.gov/coronavirus/2019-ncov/index.html*).

EREs may be exposed to COVID–19, the disease caused by the virus SARS–CoV–2, by a victim of an emergency who may be infected with SARS–CoV–2 while attending to, treating, assisting, or transporting the victim to a medical facility. Medical facilities should review the NIOSH guidelines describing the manner in which medical facilities should make determinations about exposures to life-threatening infectious diseases, including COVID–19, available on the NIOSH website at *https://www.cdc.gov/niosh/topics/ryanwhite/default.html.*

**John J. Howard,**
*Director, National Institute for Occupational Safety and Health, Centers for Disease Control and Prevention, Department of Health and Human Services.*
[FR Doc. 2020–06458 Filed 3–26–20; 8:45 am]
**BILLING CODE 4163–18–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of the Secretary

### Emergency Use Authorization Declaration

**ACTION:** Notice of Emergency Use Authorization Declaration.

**SUMMARY:** The Secretary of Health and Human Services (HHS) is issuing this notice pursuant to section 564 of the Federal Food, Drug, and Cosmetic (FD&C) Act. On February 4, 2020, the Secretary determined pursuant to his authority under section 564 of the FD&C Act that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City, Hubei Province, China in 2019 (2019–nCoV). The virus is now named SARS–CoV–2, which causes the illness COVID–19. On the basis of this determination, he also declared that circumstances exist justifying the authorization of emergency use of medical devices, including alternative products used as medical devices, pursuant to section 564 of the FD&C Act, subject to the terms of any authorization issued under that section.

**DATES:** The determination was effective February 4, 2020, and this declaration is effective March 24, 2020.

**FOR FURTHER INFORMATION CONTACT:** Robert P. Kadlec, M.D., MTM&H, MS, Assistant Secretary for Preparedness and Response, Office of the Secretary, Department of Health and Human

---

[1] 75 FR 40842.
[2] 83 FR 50379 (October 4, 2018).

Services, 200 Independence Avenue SW, Washington, DC 20201, Telephone (202) 205–2882 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Under section 564 of the FD&C Act, 21 U.S.C. 360bbb–3, the Commissioner of the Food and Drug Administration (FDA), acting under delegated authority from the Secretary of HHS, may issue an Emergency Use Authorization (EUA) authorizing (1) the emergency use of an unapproved drug, an unapproved or uncleared device, or an unlicensed biological product; or (2) an unapproved use of an approved drug, approved or cleared device, or licensed biological product. Before an EUA may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of four determinations: (1) A determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a, chemical, biological, radiological, or nuclear (''CBRN'') agent or agents; (2) the identification of a material threat by the Secretary of Homeland Security pursuant to section 319F–2 of the Public Health Service (PHS) Act sufficient to affect national security or the health and security of United States citizens living abroad; (3) a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of title 10 or title 50, of attack with (i) a biological, chemical, radiological, or nuclear agent or agents; or (ii) an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to United States military forces; or (4) a determination by the Secretary that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a CBRN agent or agents, or a disease or condition that may be attributable to such agent or agents.

Based on any of these four determinations, the Secretary of HHS may then declare that circumstances exist that justify the EUA, at which point the FDA Commissioner may issue an EUA if the criteria for issuance of an authorization under section 564 of the FD&C Act are met. The Office of the Assistant Secretary for Preparedness and Response, HHS, requested that the FDA, HHS, issue an EUA for certain medical devices to allow the Department to take response measures based on information currently available about the virus that causes COVID–19. The determination of a public health emergency, and the declaration that circumstances exist justifying emergency use of certain medical devices by the Secretary of HHS, as described below, enable the FDA Commissioner to issue an EUA for these devices for emergency use under section 564 of the FD&C Act.

**II. Determination by the Secretary of Health and Human Services**

On February 4, 2020, pursuant to section 564 of the FD&C Act, I determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City, Hubei Province, China in 2019 (2019–nCoV). The virus is now named SARS–CoV–2, which causes the illness COVID–19.

**III. Declaration of the Secretary of Health and Human Services**

On March 24, 2020, on the basis of my determination of a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves the novel (new) coronavirus, SARS–CoV–2, I declared that circumstances exist justifying the authorization of emergency use of medical devices, including alternative products used as medical devices, pursuant to section 564 of the FD&C Act, subject to the terms of any authorization issued under that section.

Notice of the EUAs issued by the FDA Commissioner pursuant to this determination and declaration will be provided promptly in the **Federal Register** as required under section 564 of the FD&C Act.

Dated: March 24, 2020.

**Alex M. Azar II,**

*Secretary of Health and Human Services.*

[FR Doc. 2020–06541 Filed 3–25–20; 4:15 pm]

**BILLING CODE 4150–28–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**National Institutes of Health**

**National Institute on Alcohol Abuse and Alcoholism; Notice of Closed Meetings**

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute on Alcohol Abuse and Alcoholism Special Emphasis Panel NIAAA Review Subcommittee Member Conflict Review Panel.

*Date:* April 7, 2020.

*Time:* 1:00 p.m. to 3:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, 6700B Rockledge Drive, Suite 2118, Bethesda, MD 20817 (Telephone Conference Call).

*Contact Person:* Philippe Marmillot, Ph.D., National Institute on Alcohol Abuse and Alcoholism, National Institutes of Health, 6700B Rockledge Drive, Bethesda, MD 20817 301–443–2861 *marmillotp@mail.nih.gov.*

*Name of Committee:* National Institute on Alcohol Abuse and Alcoholism Initial Review Group Epidemiology, Prevention and Behavior Research Review Subcommittee.

*Date:* June 8, 2020.

*Time:* 8:30 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, 6700B Rockledge Drive, Conference Room B, Bethesda, MD 20817.

*Contact Person:* Anna Ghambaryan, M.D., Ph.D., Scientific Review Officer, Extramural Project Review Branch Office of Extramural Activities National Institute on Alcohol Abuse and Alcoholism, 6700b Rockledge Drive, Room 2120, MSC 6902 Bethesda, MD 20892, 301–443–4032, *anna.ghambaryan@nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.271, Alcohol Research Career Development Awards for Scientists and Clinicians; 93.272, Alcohol National Research Service Awards for Research Training; 93.273, Alcohol Research Programs; 93.891, Alcohol Research Center Grants; 93.701, ARRA Related Biomedical Research

receive confirmation when they have been accepted.

If you need special accommodations due to a disability, please contact Stephanie Choi (see **FOR FURTHER INFORMATION CONTACT**) no later than April 3, 2020.

*Requests for Oral Presentations:* During online registration you may indicate if you wish to present during a public comment session for a specific breakout session, and which topic(s) you wish to address. We will do our best to accommodate requests to make public comments (and requests to participate in the focused sessions). Individuals and organizations with common interests are urged to consolidate or coordinate their presentations, and request time for a joint presentation, or submit requests for designated representatives to participate in the focused sessions. Following the close of registration, we will determine the amount of time allotted to each presenter and the approximate time each oral presentation is to begin, and will select and notify participants by April 10, 2020. All requests to make oral presentations must be received by the close of registration on April 3, 2020, midnight Eastern Time. If selected for presentation, any presentation materials must be emailed to *GDUFARegulatoryScience@fda.hhs.gov* no later than April 24, 2020, midnight Eastern Time. No commercial or promotional material will be permitted to be presented or distributed at the public workshop.

Persons attending FDA's workshops are advised that FDA is not responsible for providing access to electrical outlets.

*Streaming Webcast of the Public Workshop:* This public workshop will also be webcast. Please register online by April 3, 2020, midnight Eastern Time to attend the workshop remotely. Please note that remote attendees will not be able to speak or make presentations during the public comment session or during any other session of the workshop. To join the main sessions of the workshop via the webcast, please go to *https://collaboration.fda.gov/gdrsipw2020/*. Webcast information for the four breakout sessions will be provided separately via email upon successful registration.

If you have never attended a Connect Pro event before, test your connection at *https://collaboration.fda.gov/common/help/en/support/meeting_test.htm*. To get a quick overview of the Connect Pro program, visit *https://www.adobe.com/go/connectpro_overview*. FDA has verified the website addresses in this document, as of the date this document

publishes in the **Federal Register**, but websites are subject to change over time.

*Transcripts:* Please be advised that as soon as a transcript of the public workshop is available, it will be accessible at *https://www.regulations.gov* or at *https://www.fda.gov/gdufaregscience*. It may be viewed at the Dockets Management Staff (see **ADDRESSES**). A link to the transcript will also be available on the internet at *https://www.fda.gov/gdufaregscience*.

Dated: March 4, 2020.

**Lowell J. Schiller,**
*Principal Associate Commissioner for Policy.*
[FR Doc. 2020–04866 Filed 3–9–20; 8:45 am]
**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of the Secretary

### Emergency Use Declaration

**AGENCY:** Office of the Secretary, Department of Health and Human Services.

**ACTION:** Notice.

**SUMMARY:** The Secretary of Health and Human Services (HHS) is issuing this notice pursuant to section 564 of the Federal Food, Drug, and Cosmetic (FD&C) Act. On February 4, 2020, the Secretary determined, pursuant to his authority under section 564 of the FD&C Act, that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City, Hubei Province, China in 2019 (2019–nCoV). The virus is now named SARS–CoV–2, which causes the illness COVID–19.

On the basis of this determination, he also declared that circumstances exist justifying the authorization of emergency use of personal respiratory protective devices during the COVID–19 outbreak, pursuant to section 564 of the FD&C Act, subject to the terms of any authorization issued under that section.

**DATES:** The determination was effective February 4, 2020, and this declaration is effective March 2, 2020.

**FOR FURTHER INFORMATION CONTACT:** Robert P. Kadlec, M.D., MTM&H, MS, Assistant Secretary for Preparedness and Response, Office of the Secretary, Department of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201, Telephone (202) 205–2882 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Under Section 564 of the FD&C Act, the Commissioner of the Food and Drug Administration (FDA), acting under delegated authority from the Secretary of HHS, may issue an Emergency Use Authorization (EUA), authorizing (1) the emergency use of an unapproved drug, an unapproved or uncleared device, or an unlicensed biological product; or (2) an unapproved use of an approved drug, approved or cleared device, or licensed biological product. Before an EUA may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of four determinations: (1) A determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a, chemical, biological, radiological, or nuclear ("CBRN") agent or agents; (2) the identification of a material threat by the Secretary of Homeland Security, pursuant to section 319F–2 of the Public Health Service (PHS) Act,[1] sufficient to affect national security or the health and security of United States citizens living abroad; (3) a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of title 10 or title 50, of attack with (i) a biological, chemical, radiological, or nuclear agent or agents; or (ii) an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to United States military forces; or (4) a determination by the Secretary that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a CBRN agent or agents, or a disease or condition that may be attributable to such agent or agents.[2]

Based on any of these four determinations, the Secretary of HHS may then declare that circumstances

---

[1] 42 U.S.C. 247d–6b.

[2] As amended by the Pandemic and All-Hazards Preparedness Reauthorization Act, Public Law 113–5, the Secretary may make determination of a public health emergency, or a significant potential for a public health emergency, under section 564 of the FD&C Act. The Secretary is no longer required to make a determination of a public health emergency in accordance with section 319 of the PHS Act, 42 U.S.C. 247d to support a determination or declaration made under section 564 of the FD&C Act.

exist that justify the EUA, at which point the FDA Commissioner may issue an EUA if the criteria for issuance of such an authorization under section 564 of the FD&C Act are met.

The Centers for Disease Control and Prevention (CDC), HHS, requested that the FDA, HHS, issue an EUA for personal respiratory protective devices to allow the Department to take preparedness measures, based on information currently available about the virus that causes COVID–19. The determination of a public health emergency, and the declaration that circumstances exist justifying emergency use of personal respiratory protective devices by the Secretary of HHS, as described below, enable the FDA Commissioner to issue an EUA for respiratory protective devices for emergency use under section 564 of the FD&C Act.

## II. Determination by the Secretary of Health and Human Services

On February 4, 2020, pursuant to section 564 of the FD&C Act, I determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City, Hubei Province, China in 2019 (2019–nCoV). The virus is now named SARS–CoV–2, which causes the illness COVID–19.

## III. Declaration of the Secretary of Health and Human Services

On March 2, 2020, on the basis of my determination of a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves the novel (new) coronavirus, I declared that circumstances exist justifying the authorization of emergency use of personal respiratory protective devices during the COVID–19 outbreak, pursuant to section 564 of the FD&C Act, subject to the terms of any authorization issued under that section.

Notice of the EUAs issued by the FDA Commissioner pursuant to this determination and declaration will be provided promptly in the **Federal Register** as required under section 564 of the FD&C Act.

**Alex M. Azar II,**
*Secretary.*
[FR Doc. 2020–04823 Filed 3–9–20; 8:45 am]
**BILLING CODE P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

### National Institute of Allergy and Infectious Diseases; Notice of Closed Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute of Allergy and Infectious Diseases Special Emphasis Panel; Investigator Initiated Extended Clinical Trial (R01 Clinical Trial Required).
*Date:* March 24, 2020.
*Time:* 1:00 p.m. to 6:00 p.m.
*Agenda:* To review and evaluate grant applications.
*Place:* National Institute of Allergy and Infectious Diseases, National Institutes of Health, 5601 Fishers Lane, Room 3G53A, Rockville, MD 20892 (Telephone Conference Call).
*Contact Person:* Julio C. Aliberti, Ph.D., Scientific Review Officer, Immunology Review Branch, Scientific Review Program, Division of Extramural Activities, National Institute of Allergy and Infectious Diseases, National Institutes of Health, 5601 Fishers Lane, Room 3G53A, Rockville, MD 20892–9823, 301–761–7322, julio.aliberti@nih.gov.
(Catalogue of Federal Domestic Assistance Program Nos. 93.855, Allergy, Immunology, and Transplantation Research; 93.856, Microbiology and Infectious Diseases Research, National Institutes of Health, HHS)

Dated: March 4, 2020.
**Tyeshia M. Roberson,**
*Program Analyst, Office of Federal Advisory Committee Policy.*
[FR Doc. 2020–04780 Filed 3–9–20; 8:45 am]
**BILLING CODE 4140–01–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

### National Institute of Allergy and Infectious Diseases; Notice of Closed Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as

amended, notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute of Allergy and Infectious Diseases Special Emphasis Panel; NIH Support for Conferences and Scientific Meetings (Parent R13 Clinical Trial Not Allowed).
*Date:* April 6–8, 2020.
*Time:* 8:00 a.m. to 1:00 p.m.
*Agenda:* To review and evaluate grant applications.
*Place:* National Institute of Allergy and Infectious Diseases, National Institutes of Health, 5601 Fishers Lane, Room 3F21B, Rockville, MD 20892 (Virtual Meeting).
*Contact Person:* Maryam Feili-Hariri, Ph.D., Scientific Review Officer, Scientific Review Program, Division of Extramural Activities, National Institute of Allergy and Infectious Diseases, National Institutes of Health, 5601 Fishers Lane, Room 3F21B, Bethesda, MD 20892–9834, (240) 669–5026, haririmf@niaid.nih.gov.
(Catalogue of Federal Domestic Assistance Program Nos. 93.855, Allergy, Immunology, and Transplantation Research; 93.856, Microbiology and Infectious Diseases Research, National Institutes of Health, HHS)

Dated: March 4, 2020.
**Tyeshia M. Roberson,**
*Program Analyst, Office of Federal Advisory Committee Policy.*
[FR Doc. 2020–04782 Filed 3–9–20; 8:45 am]
**BILLING CODE 4140–01–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

### Center for Scientific Review; Notice of Closed Meetings

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant

Administration, 10903 New Hampshire Ave., Bldg. 66, Rm. 5431, Silver Spring, MD 20993–0002. Send one self-addressed adhesive label to assist that office in processing your request.

**FOR FURTHER INFORMATION CONTACT:** Charles Viviano, Center for Devices and Radiological Health, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 66, Rm. 2680, Silver Spring, MD 20993–0002, 240–402–2975.

**SUPPLEMENTARY INFORMATION:**

### I. Background

FDA has developed this draft guidance to propose select updates to the FDA guidance document "Guidance for the Non-Clinical and Clinical Investigation of Devices Used for the Treatment of Benign Prostatic Hyperplasia (BPH)." The existing guidance on devices used for the treatment of BPH remains in effect, in its current form, until this draft guidance is finalized. FDA intends to incorporate this draft guidance into one final guidance document after obtaining and considering public comment on these select updates. The sections of the existing BPH guidance that are not affected by this select update will not be substantively changed and will remain in effect.

### II. Significance of Guidance

This draft guidance is being issued consistent with FDA's good guidance practices regulation (21 CFR 10.115). The draft guidance, when finalized, will represent the current thinking of FDA on "Select Updates for Guidance for the Non-Clinical and Clinical Investigation of Devices Used for the Treatment of Benign Prostatic Hyperplasia (BPH)." It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.

### III. Electronic Access

Persons interested in obtaining a copy of the draft guidance may do so by downloading an electronic copy from the internet. A search capability for all Center for Devices and Radiological Health guidance documents is available at *https://www.fda.gov/MedicalDevices/ DeviceRegulationandGuidance/ GuidanceDocuments/default.htm.* This guidance document is also available at *https://www.regulations.gov.* Persons unable to download an electronic copy of "Select Updates for Guidance for the Non-Clinical and Clinical Investigation of Devices Used for the Treatment of Benign Prostatic Hyperplasia (BPH)" may send an email request to *CDRH-Guidance@fda.hhs.gov* to receive an electronic copy of the document. Please use the document number 1724 and the full title to identify the guidance you are requesting.

### IV. Paperwork Reduction Act of 1995

This draft guidance refers to previously approved collections of information. These collections of information are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521). The collections of information in the following FDA regulations and guidance have been approved by OMB as listed in the following table:

| 21 CFR part or guidance | Topic | OMB control No. |
|---|---|---|
| 58 | Good Laboratory Practice (GLP) Regulations for Nonclinical Laboratory Studies. | 0910–0119 |
| 800, 801, and 809 | Medical Device Labeling Regulations | 0910–0485 |
| 807, subpart E | Premarket Notification | 0910–0120 |
| 812 | Investigational Device Exemption | 0910–0078 |
| 814, subparts A through E | Premarket Approval Applications | 0910–0231 |
| "De Novo Classification Process (Evaluation of Automatic Class III Designation)". | De Novo Classification Process | 0910–0844 |
| "Requests for Feedback on Medical Device Submissions: The Pre-Submission Program and Meetings with Food and Drug Administration Staff". | Q-submissions | 0910–0756 |

Dated: July 8, 2020.

**Lowell J. Schiller,**

*Principal Associate Commissioner for Policy.*

[FR Doc. 2020–15089 Filed 7–13–20; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. FDA–2020–N–1584]

### Authorization of Emergency Use of Certain Medical Devices During COVID–19; Availability

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing the issuance and reissuance of Emergency Use Authorizations (EUAs) (the Authorizations) for certain medical devices related to the Coronavirus Disease 2019 (COVID–19) public health emergency. FDA has issued, and in some cases reissued, the Authorizations listed in this document under the Federal Food, Drug, and Cosmetic Act (FD&C Act). These Authorizations contain, among other things, conditions on the emergency use of the authorized products. The Authorizations follow the February 4, 2020, determination by Secretary of Health and Human Services (HHS) that there is a public health emergency that has a significant potential to affect national security or the health and security of U.S. citizens living abroad, and that involves the virus that causes COVID–19, and the subsequent declarations on February 4, 2020, March 2, 2020, and March 24, 2020, that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of the virus that causes COVID–19, personal respiratory protective devices, and medical devices, including alternative products used as medical devices, respectively, subject to the terms of any authorization issued under the FD&C Act. These Authorizations, which include an explanation of the reasons for issuance and reissuance, are listed in this document, and are available on FDA's website at the links indicated.

**DATES:** These Authorizations are applicable on their date of issuance.

**ADDRESSES:** Submit written requests for single copies of the EUA to the Office of Counterterrorism and Emerging Threats, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 1, Rm. 4338, Silver Spring, MD 20993–0002. Send one self-addressed adhesive label to assist that office in processing your request or include a fax number to which the Authorization may be sent.

See the **SUPPLEMENTARY INFORMATION** section for electronic access to the Authorization.

**FOR FURTHER INFORMATION CONTACT:** Jennifer J. Ross, Office of Counterterrorism and Emerging Threats, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 1, Rm. 4332, Silver Spring, MD 20993–0002, 301–796–8510 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Section 564 of the FD&C Act (21 U.S.C. 360bbb–3) allows FDA to strengthen the public health protections against biological, chemical, radiological, or nuclear agent or agents. Among other things, section 564 of the FD&C Act allows FDA to authorize the use of an unapproved medical product or an unapproved use of an approved medical product in certain situations. With this EUA authority, FDA can help ensure that medical countermeasures may be used in emergencies to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by a biological, chemical, radiological, or nuclear agent or agents when there are no adequate, approved, and available alternatives.

Section 564(b)(1) of the FD&C Act provides that, before an EUA may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of the following grounds: (1) A determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents; (2) a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to U.S. military forces, including personnel operating under the authority of title 10 or title 50 of the U.S. Code, of attack with (A) a biological, chemical, radiological, or nuclear agent or agents; or (B) an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to U.S. military forces;[1] (3) a determination by the Secretary of HHS that there is a public health emergency,

or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of U.S. citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents; or (4) the identification of a material threat by the Secretary of Homeland Security pursuant to section 319F–2 of the Public Health Service (PHS) Act (42 U.S.C. 247d–6b) sufficient to affect national security or the health and security of U.S. citizens living abroad.

Once the Secretary of HHS has declared that circumstances exist justifying an authorization under section 564 of the FD&C Act, FDA may authorize the emergency use of a drug, device, or biological product if the Agency concludes that the statutory criteria are satisfied. Under section 564(h)(1) of the FD&C Act, FDA is required to publish in the **Federal Register** a notice of each authorization, and each termination or revocation of an authorization, and an explanation of the reasons for the action. Section 564 of the FD&C Act permits FDA to authorize the introduction into interstate commerce of a drug, device, or biological product intended for use when the Secretary of HHS has declared that circumstances exist justifying the authorization of emergency use. Products appropriate for emergency use may include products and uses that are not approved, cleared, or licensed under sections 505, 510(k), 512, or 515 of the FD&C Act (21 U.S.C. 355, 360(k), 360b, or 360e) or section 351 of the PHS Act (42 U.S.C. 262), or conditionally approved under section 571 of the FD&C Act (21 U.S.C. 360ccc). FDA may issue an EUA only if, after consultation with the HHS Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention (to the extent feasible and appropriate given the applicable circumstances), FDA [2] concludes: (1) That an agent referred to in a declaration of emergency or threat can cause a serious or life-threatening disease or condition; (2) that, based on the totality of scientific evidence available to FDA, including data from adequate and well-controlled clinical trials, if available, it is reasonable to believe that (A) the product may be effective in diagnosing, treating, or preventing (i) such disease or condition;

or (ii) a serious or life-threatening disease or condition caused by a product authorized under section 564, approved or cleared under the FD&C Act, or licensed under section 351 of the PHS Act, for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and (B) the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product, taking into consideration the material threat posed by the agent or agents identified in a declaration under section 564(b)(1)(D) of the FD&C Act, if applicable; (3) that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition; (4) in the case of a determination described in section 564(b)(1)(B)(ii), that the request for emergency use is made by the Secretary of Defense; and (5) that such other criteria as may be prescribed by regulation are satisfied.

No other criteria for issuance have been prescribed by regulation under section 564(c)(4) of the FD&C Act.

**III. Electronic Access**

An electronic version of this document and the full text of the Authorizations are available on the internet at *https://www.fda.gov/ emergency-preparedness-and-response/ mcm-legal-regulatory-and-policy- framework/emergency-use- authorization.*

**IV. The Authorizations**

Having concluded that the criteria for the issuance and, in some cases reissuance, of the following Authorizations under section 564(c) of the FD&C Act are met, FDA has authorized the emergency use of the following products for diagnosing, treating, or preventing COVID–19 subject to the terms of each Authorization. The Authorizations in their entirety, including any authorized fact sheets and other written materials, are available on the internet from the FDA web page entitled ''Emergency Use Authorization,'' available at *https:// www.fda.gov/emergency-preparedness- and-response/mcm-legal-regulatory- and-policy-framework/emergency-use- authorization.* The lists that follow include Authorizations issued, in some cases reissued, from April 11, 2020, through May 15, 2020, and we have included explanations of the reasons for their issuance, as required by section 564(h)(1) of the FD&C Act. FDA is

---

[1] In the case of a determination by the Secretary of Defense, the Secretary of HHS shall determine within 45 calendar days of such determination, whether to make a declaration under section 564(b)(1) of the FD&C Act, and, if appropriate, shall promptly make such a declaration.

[2] The Secretary of HHS has delegated the authority to issue an EUA under section 564 of the FD&C Act to the Commissioner of Food and Drugs.

**Federal Register** / Vol. 85, No. 135 / Tuesday, July 14, 2020 / Notices

**42409**

hereby announcing the following Authorizations for in vitro diagnostics: [3]

• Ortho-Clinical Diagnostics, Inc.'s VITROS Immunodiagnostic Products Anti-SARS–CoV–2 Total Reagent Pack, issued April 14, 2020;

• Chembio Diagnostic System, Inc.'s DPP COVID–19 IgM/IgG System, issued April 14, 2020;

• Mount Sinai Laboratory's COVID–19 [enzyme-linked immunosorbent assay] ELISA IgG Antibody Test, issued April 15, 2020;

• Maccura Biotechnology (USA) LLC's SARS–CoV–2 Fluorescent PCR Kit, issued April 15, 2020;

• GenoSensor, LLC's GS COVID–19 RT–PCR KIT, issued April 16, 2020;

• KorvaLabs Inc.'s Curative-Korva SARS–CoV–2 Assay, issued April 16, 2020;

• Fosun Pharma USA Inc.'s Fosun COVID–19 RT–PCR Detection Kit, issued April 17, 2020;

• OSANG Healthcare's GeneFinder COVID–19 Plus RealAmp Kit, issued April 18, 2020;

• Trax Management Services Inc.'s PhoenixDx 2019–CoV, issued April 20, 2020;

• Laboratory Corporation of America's COVID–19 RT–PCR Test, reissued April 20, 2020 (original issuance March 16, 2020);

• Seegene, Inc.'s Allplex 2019–nCoV Assay, issued April 21, 2020;

• altona Diagnostics GmbH's RealStar SARS–CoV–2 RT–PCR Kits U.S., issued April 22, 2020;

• SD Biosensor, Inc.'s STANDARD M nCoV Real-Time Detection Kit, issued April 23, 2020;

• Autobio Diagnostics Co. Ltd.'s Anti-SARS–CoV–2 Rapid Test, issued April 24, 2020;

• Ortho-Clinical Diagnostics, Inc.'s VITROS Immunodiagnostic Products Anti-SARS–CoV–2 IgG Reagent Pack, issued April 24, 2020;

• DiaSorin Inc.'s LIAISON SARS–CoV–2 S1/S2 IgG, issued April 24, 2020;

• Abbott Laboratories Inc.'s SARS–CoV–2 IgG assay, issued April 26, 2020;

• SEASUN BIOMATERIALS's U–TOP COVID–19 Detection Kit, issued April 27, 2020;

• Bio-Rad Laboratories, Inc's Platelia SARS–CoV–2 Total Ab assay, issued April 29, 2020;

• Rheonix, Inc.'s Rheonix COVID–19 MDx Assay, issued April 29, 2020;

• LabGenomics Co., Ltd.'s LabGun COVID–19 RT–PCR Kit, issued April 29, 2020;

• Wadsworth Center, New York State Department of Health's New York SARS–CoV Microsphere Immunoassay for Antibody Detection, issued April 30, 2020;

• BioFire Diagnostics, LLC's BioFire Respiratory Panel 2.1 (RP2.1), issued May 1, 2020;

• Bio-Rad Laboratories, Inc.'s Bio-Rad SARS–CoV–2 ddPCR Test, issued May 1, 2020;

• Roche Diagnostics's Elecsys Anti-SARS–CoV–2, issued May 2, 2020;

• Sansure BioTech Inc.'s Novel Coronavirus (2019–nCoV) Nucleic Acid Diagnostic Kit (PCR-Fluorescence Probing), issued May 4, 2020;

• EUROIMUN US Inc.'s Anti-SARS–CoV–2 ELISA (IgG), issued May 4, 2020;

• Fast Track Diagnostics Luxembourg S.á.r.l's. (a Siemens Healthineers Company) FTD SARS–CoV–2, issued May 5, 2020;

• BioMérieux SA's SARS–COV–2 R–GENE, issued May 6, 2020;

• Sherlock BioSciences, Inc.'s Sherlock CRISPR SARS–CoV–2 Kit, issued May 6, 2020;

• OPTI Medical Systems, Inc.'s OPTI SARS–CoV–2 RT PCR Test, issued May 6, 2020;

• Zymo Research Corp.'s Quick SARS–Cov–2rRT–PCR Kit, issued May 7, 2020;

• Rutgers Clinical Genomics Laboratory at RUCDR Infinite Biologics-Rutgers University's Rutgers Clinical Genomics Laboratory TaqPath SARS–CoV–2 Assay, reissued May 7, 2020 (original issuance April 10, 2020);

• Gnomegen LLC's Gnomegen COVID–19–RT–qPCR Detection Kit, issued May 8, 2020;

• Quidel Corporation's Sofia 2 SARS Antigen FIA, issued May 8, 2020;

• Abbott Molecular Inc.'s Alinity m SARS–CoV–2 assay, issued May 11, 2020;

• 1drop Inc.'s 1copy COVID–19 qPR Multi Kit, issued May 11, 2020;

• Applied DNA Sciences, Inc.'s Linea COVID–19 Assay Kit, issued May 13, 2020;

• GeneMatrix, Inc.'s NeoPlex COVID–19 Detection Kit, issued May 14, 2020;

• Hologic, Inc., Aptima SARS–CoV–2 assay, issued May 14, 2020;

• Assurance Scientific Laboratories' Assurance SARS–CoV–2 Panel, issued May 15, 2020;

• Fulgent Therapeutics, LLC's Fulgent COVID–19 by RT–PCR Test, issued May 15, 2020; and

• Certain SARS–CoV–2 Antibody Tests (lateral flow or ELISA tests) that are for use in laboratories certified under the Clinical Laboratory Improvement Amendments of 1988, 42 U.S.C. 263a, to perform moderate or high complexity tests, issued on April 28, 2020 (a current list of tests included under this EUA is available at *https://www.fda.gov/media/137471/download*).

FDA is hereby announcing the following Authorizations for personal respiratory protective devices: [4]

• Certain Non-[National Institute of Industrial and Occupational Safety]NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China, reissued May 7, 2020, (original issuance April 3, 2020). A current list of respirators included under this EUA is available at *https://www.fda.gov/media/136663/download*.

FDA is hereby announcing the following Authorizations for other medical devices:

• B. Braun Medical, Inc.'s B. Braun Space and Outlook Pumps, issued April 11, 2020; [5]

• Advanced Sterilization Products, Inc.'s ASP STERRAD Sterilization Systems, issued April 11, 2020; [6]

---

[3] As set forth in the EUAs for these devices, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness or condition, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the devices may be effective in diagnosing COVID–19, and that the known and potential benefits of the devices, when used for diagnosing COVID–19, outweigh the known and potential risks of such devices; and (3) there is no adequate, approved, and available alternative to the emergency use of the devices.

[4] As set forth in the EUAs, FDA has concluded that: (1) SARS–CoV–2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is either reasonable to believe that the authorized respirators may be effective in preventing healthcare personnel (HCP) exposure to pathogenic biological airborne particulates during Filtering Facepiece Respirator (FFR) shortages, and that the known and potential benefits of the authorized respirators, when used to prevent HCP exposure to such particulates during FFR shortages during COVID–19, outweigh the known and potential risks of such products, and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[5] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the B. Braun Space and Outlook Pumps may be effective for use in the tracheal delivery of continuous nebulized medications into a nebulizer to treat COVID–19 patients of all ages and for the ground medical transport use of the Infusomat Space Volumetric Infusion Pump System, and that the known and potential benefits of the B. Braun Space and Outlook Pumps for these uses, outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[6] As set forth in this EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to

Continued

- Certain Face Shields, reissued April 13, 2020 (original issuance April 9, 2020);[7]
- Synapse Biomedical, Inc.'s TransAeris Diaphragm Pacing System, issued April 13, 2020;[8]
- Stryker Instruments' STERIZONE VP4 Sterilizer, issued April 14, 2020;[9]

- Lungpacer Medical USA, Inc.'s Lungpacer DPTS, issued April 14, 2020 (see footnote 8);
- ExThera Medical Corporation's Seraph 100 Microbind Affinity Blood Filter, issued April 17, 2020;[10]
- Certain Face Masks, issued April 18, 2020, and reissued April 24, 2020;[11]
- Sterilucent, Inc.'s Sterilucent Sterilizer System, issued April 20, 2020;[12]
- Philips Medizin Systeme Boeblingen GmbH's IntelliVue Patient Monitors, issued April 21, 2020;[13]

- ALung Technologies, Inc.'s Hemolung RAS, issued April 22, 2020;[14]
- Baxter Healthcare Corp.'s oXiris Set device, issued April 23, 2020;[15]
- VitalConnect, Inc.'s VitalPatch, issued April 26, 2020;[16]
- Fresenius Medical Care's multiFiltrate PRO System and multiBic/ multiPlus Solutions to provide continuous renal replacement therapy, issued May 1, 2020;[17]
- Liberate Medical, LLC's VentFree, issued May 1, 2020;[18]

FDA, it is reasonable to believe that the ASP STERRAD Sterilization Systems may be effective at preventing exposure to pathogenic airborne particulates when there are insufficient supplies of N95 respirators during the COVID–19 pandemic by decontaminating, for a maximum of two decontamination cycles per respirator, compatible N95 respirators that are contaminated or potentially contaminated with SARS–CoV–2 or other pathogenic microorganisms, and that the known and potential benefits of the Sterilization Systems, when used to decontaminate compatible N95 respirators for single-user reuse by HCP to prevent exposure to pathogenic airborne particulates during N95 respirator shortages during the COVID–19 pandemic, outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[7] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized face shields may be effective at preventing HCP exposure to fluid biological airborne particulates during face shield shortages by providing minimal or low barrier HCP protection to the wearer, and that the known and potential benefits of face shields, when used to prevent HCP exposure to such particulates during face shield shortages during COVID–19 outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[8] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the product may be effective for emergency use to treat patients by assisting in weaning patients off ventilators in healthcare settings during the COVID–19 pandemic, and that the known and potential benefits of the such product, for such use, outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative.

[9] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the STERIZONE VP4 N95 Respirator Decontamination Cycle may be effective at preventing exposure to pathogenic airborne particulates by decontaminating, for a maximum of two decontamination cycles per respirator, compatible N95 respirators that are contaminated or potentially contaminated with SARS–CoV–2 or other pathogenic microorganisms, and that the known and potential benefits of this device, when used as described, outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the STERIZONE VP4 N95 Respirator Decontamination Cycle for decontaminating compatible N95 respirators for single-user reuse by HCPs during FFR shortages during the COVID–19 pandemic.

[10] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Seraph 100 Microbind Affinity Blood Filter device may be effective in treating patients 18 years of age or older with confirmed COVID–19 admitted to the intensive care unit (ICU) with confirmed or imminent respiratory failure, and that the known and potential benefits of the Seraph 100 Microbind Affinity Blood Filter device, when used to treat such patients, outweigh the known and potential risks of the device; and (3) there is no adequate, approved, and available alternative to the emergency use of this device.

[11] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized face masks may be effective as source control to help prevent the spread of SARS–CoV–2 by infected individuals who may or may not have symptoms of COVID–19 during the COVID–19 pandemic, and that the known and potential benefits of face masks, when used in accordance with the scope of this authorization, outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[12] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Sterilucent Sterilization System may be effective at decontaminating compatible N95 respirators for single-user reuse by HCPs to prevent exposure to pathogenic biological airborne particulates, and that the known and potential benefits of this device, when used as described, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[13] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the IntelliVue Patient Monitors may be effective in preventing COVID–19 exposure in healthcare providers, through use of remote patient monitoring, and that the known and potential benefits of such products, for such use, outweigh the known and potential risks of the IntelliVue Patient Monitors; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[14] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Hemolung RAS may be effective in treating lung failure when used as described in the Scope of Authorization, and that the known and potential benefits of the Hemolung RAS for treating these patients, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[15] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the oXiris Set device may be effective in treating patients 18 years of age or older with confirmed COVID–19 admitted to the ICU with confirmed or imminent respiratory failure in need of blood purification, including use in continuous renal replacement therapy, and that the known and potential benefits of the oXiris Set device, when used to treat such patients, outweigh the known and potential risks of the oXiris Set device; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[16] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the product may be effective in remotely monitoring and detecting QT interval changes of an ECG in patients who are undergoing treatment in a hospital setting for COVID–19 with drugs that can prolong QT intervals and may cause life threatening arrhythmias (*e.g.,* hydroxychloroquine or chloroquine, especially when used in combination with azithromycin), the known and potential benefits of product for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[17] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness and multiple organ failure, including acute kidney injury, in humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that your multiFiltrate PRO System and multiBic/multiPlus Solutions may be effective in delivering CRRT in an acute care environment, and that the known and potential benefits of the multiFiltrate PRO System and multiBic/multiPlus Solutions, for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[18] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes

• Certain Protective Barrier Enclosures, issued May 1, 2020;[19]
• PhsiolGuard Corp. Ltd.'s PhysiolGuard ECG–QT Analysis System, issued May 5, 2020 (refer to footnote 15);
• Duke University Health System's Duke Decontamination System, issued May 7, 2020;[20]
• Comunale's Patient Isolation Transport Unit, issued May 8, 2020;[21]

[19] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized protective barrier enclosures may be effective at preventing HCP exposure to pathogenic biological airborne particulates by providing an extra layer of barrier protection in addition to PPE when caring for or performing medical procedures on patients who are known or suspected to have COVID–19 in healthcare settings and that the known and potential benefits of protective barrier enclosures, for such use, outweigh the known and potential risks of such product; and, (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[20] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Duke Decontamination System may be effective at decontaminating compatible N95 respirators for reuse by HCPs to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used as described, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[21] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the PITU may be effective in preventing HCP exposure to pathogenic biological airborne particulates by providing an extra layer of barrier protection in addition to PPE, and that the known and potential benefits of such products, when used by HCP for temporary isolation and transport of patients with suspected or confirmed diagnosis of COVID–19 requiring airborne or droplet isolation precautions in healthcare settings to prevent HCP exposure to pathogenic biological airborne particulates by providing an extra layer of barrier protection in

• Ascom (US) Inc.'s teleCARE IP Nurse Call System, issued May 11, 2020;[22]
• Eko Devices, Inc.'s Eko ELEFT, issued May 11, 2020;[23]
• Certain Infusion Pumps and Infusion Pump Accessories, issued May 13, 2020;[24]
• G Medical Innovations Ltd.'s VSMS Patch, issued May 14, 2020;[25] and

addition to PPE, outweigh the known and potential risks of the PITU; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[22] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the use of the teleCARE IP Nurse Call System in healthcare environments may be effective for preventing COVID–19 exposure in healthcare providers by enabling remote communication between patients and healthcare providers, and, for those patients utilizing a ventilator, remote monitoring of ventilator status updates to alert the healthcare provider. FDA concluded that the known and potential benefits of the teleCARE IP Nurse Call System, for such use, outweigh the known and potential risks of the product; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[23] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the ELEFT may be effective for use by HCP to provide an assessment of LVEF for use as a diagnostic aid to screen for potential cardiac complications associated with COVID–19 or underlying cardiac conditions that may affect clinical management of COVID–19, in adult patients having or suspected of having COVID–19 and that the known and potential benefits of ELEFT, for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[24] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that authorized infusion pumps and infusion pump accessories may be effective for use by HCPs to treat conditions caused by COVID–19 with the controlled infusion of medications, TPN, and/or other fluids, and that the known and potential benefits of such products, for such use outweigh the known and potential risks of such products; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[25] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the VSMS Patchmay be effective in remotely monitoring QT interval prolongation on an ECG in patients who are undergoing treatment in a hospital setting for COVID–19 with drugs that can prolong QT intervals and may cause life-threatening arrhythmias (e.g., hydroxychloroquine or chloroquine, especially when used in combination

• Everlywell Inc.'s Everlywell COVID–19 Test Home Collection Kit, issued May 15, 2020.[26]

Dated: July 8, 2020.

**Lowell J. Schiller,**
*Principal Associate Commissioner for Policy.*

[FR Doc. 2020–15137 Filed 7–13–20; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. FDA–2020–N–1313]

### Electronic Submissions; Data Standards; Support for Standard for the Exchange of Nonclinical Data

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA or Agency) Center for Biologics Evaluation and Research (CBER) is announcing support for the current version of Clinical Data Interchange Standards Consortium (CDISC) Standard for the Exchange of Nonclinical Data (SEND) and an update to the FDA Data Standards Catalog for the submission of nonclinical data in new drug applications (NDAs), abbreviated new drug applications (ANDAs), certain biologics license applications (BLAs), and certain investigational new drug applications (INDs). This update does not apply to noncommercial INDs for a product that is not intended for commercial distribution (research and investigator-sponsored INDs); INDs and BLAs for devices that are regulated by CBER as biological products under the Public Health Services (PHS) Act; and submissions for blood and blood components, including Source Plasma.

with azithromycin), the known and potential benefits of the VSMS Patch, for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[26] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the product may be effective in diagnosing COVID–19 by serving as an appropriate means to collect and transport human specimens so that an authorized laboratory can detect SARS–CoV–2 RNA from the home-collected human specimen, and that the known and potential benefits of the product when used for such use, outweigh the known and potential risks of the product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

Additional Draft Q&As on Biosimilar Development and the BPCI Act.'' The Q&A format is intended to inform prospective applicants and facilitate the development of proposed biosimilars and proposed interchangeable biosimilars, as well as to describe FDA's interpretation of certain statutory requirements added by the BPCI Act.

The BPCI Act created an abbreviated licensure pathway in section 351(k) of the PHS Act (42 U.S.C. 262(k)) for biological products shown to be biosimilar to, or interchangeable with, an FDA-licensed biological reference product (see sections 7001 through 7003 of the Patient Protection and Affordable Care Act (Pub. L. 111–148)). FDA believes that guidance for industry that provides answers to commonly asked questions regarding FDA's interpretation of the BPCI Act will enhance transparency and facilitate the development and approval of biosimilar and interchangeable products.

FDA has been using the format of Q&A guidance to describe the Agency's thinking on and update certain information and recommendations relevant to the development of biosimilar and interchangeable products. This draft guidance document contains only Q&As that are in draft form. After FDA has considered any comments on the Q&As contained in this draft guidance received during the relevant comment period and, as appropriate, incorporated suggested changes to the Q&A, individual Q&As will be finalized and moved to the final guidance document ''Questions and Answers on Biosimilar Development and the BPCI Act,'' which is updated as appropriate. The final guidance contains Q&As that have been through the public comment process and reflects FDA's current thinking on the topics described. A Q&A may be withdrawn and removed from the Q&A guidance documents if, for instance, the issue addressed in the Q&A has been addressed in another FDA guidance document. No such changes to currently issued draft or final guidance documents are being made in connection with the issuance of this draft guidance.

FDA has maintained the original numbering of the Q&As used in the December 2018 final guidance ''Questions and Answers on Biosimilar Development and the BPCI Act'' and the December 2018 draft guidance ''New and Revised Draft Q&As on Biosimilar Development and the BPCI Act (Revision 2).'' This draft guidance document provides new Q&As. It does not replace the draft guidance document entitled ''New and Revised Draft Q&As on Biosimilar Development and the BPCI Act (Revision 2),'' issued December 12, 2018.

This draft guidance is being issued consistent with FDA's good guidance practices regulation (21 CFR 10.115). The Q&As in this draft guidance, when finalized, will appear in the final guidance, and the final guidance will represent the current thinking of FDA on the Q&As posed in the ''Biosimilarity and Interchangeability: Additional Draft Q&As on Biosimilar Development and the BPCI Act.'' It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.

## II. Paperwork Reduction Act of 1995

This draft guidance refers to previously approved collections of information found in FDA regulations. These collections of information are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521). The collections of information in 21 CFR part 312 for submission of an investigational new drug application have been approved under OMB control number 0910–0014. The collections of information in 21 CFR 314.50 for submission of a new drug application have been approved under OMB control number 0910–0001. The collections of information in section 351(a) of the PHS Act and 21 CFR part 601 for submission of a biologics license application (BLA) have been approved under OMB control number 0910–0338. The collections of information in section 351(k) of the PHS Act and 21 CFR part 601 for submission of a BLA have been approved under OMB control number 0910–0719.

## III. Electronic Access

Persons with access to the internet may obtain the draft guidance at either *https://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/ Guidances/default.htm, https:// www.fda.gov/vaccines-blood-biologics/ guidance-compliance-regulatory- information-biologics/biologics- guidances,* or *https:// www.regulations.gov.*

Dated: November 16, 2020.

**Lauren K. Roth,**

*Acting Principal Associate Commissioner for Policy.*

[FR Doc. 2020–25606 Filed 11–19–20; 8:45 am]

**BILLING CODE 4164–01–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

[Docket No. FDA–2020–N–1584]

## Authorization of Emergency Use of Certain Medical Devices During COVID–19; Availability

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing the issuance and reissuance of Emergency Use Authorizations (EUAs) (the Authorizations) for certain medical devices related to the Coronavirus Disease 2019 (COVID–19) public health emergency. FDA has issued, and in some cases reissued, the Authorizations listed in this document under the Federal Food, Drug, and Cosmetic Act (FD&C Act). These Authorizations contain, among other things, conditions on the emergency use of the authorized products. The Authorizations follow the February 4, 2020, determination by Secretary of Health and Human Services (HHS) that there is a public health emergency that has a significant potential to affect national security or the health and security of U.S. citizens living abroad, and that involves the virus that causes COVID–19, and the subsequent declarations on February 4, 2020, March 2, 2020, and March 24, 2020, that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of the virus that causes COVID–19, personal respiratory protective devices, and medical devices, including alternative products used as medical devices, respectively, subject to the terms of any authorization issued under the FD&C Act. These Authorizations, which include an explanation of the reasons for issuance and reissuance, are listed in this document, and are available on FDA's website at the links indicated.

**DATES:** These Authorizations are applicable on their date of issuance/ reissuance.

**ADDRESSES:** Submit written requests for single copies of an EUA to the Office of Counterterrorism and Emerging Threats, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 1, Rm. 4338, Silver Spring, MD 20993–0002. Send one self-addressed adhesive label to assist that office in processing your request or include a fax number to which the Authorization may be sent. See the **SUPPLEMENTARY INFORMATION**

section for electronic access to the Authorization.

**FOR FURTHER INFORMATION CONTACT:**
Jennifer J. Ross, Office of Counterterrorism and Emerging Threats, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 1, Rm. 4332, Silver Spring, MD 20993–0002, 301–796–8510 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Section 564 of the FD&C Act (21 U.S.C. 360bbb–3) allows FDA to strengthen the public health protections against biological, chemical, radiological, or nuclear agent or agents. Among other things, section 564 of the FD&C Act allows FDA to authorize the use of an unapproved medical product or an unapproved use of an approved medical product in certain situations. With this EUA authority, FDA can help ensure that medical countermeasures may be used in emergencies to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by a biological, chemical, radiological, or nuclear agent or agents when there are no adequate, approved, and available alternatives.

Section 564(b)(1) of the FD&C Act provides that, before an EUA may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of the following grounds: (1) A determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents; (2) a determination by the Secretary of Defense that there is a military emergency, or a significant potential for a military emergency, involving a heightened risk to U.S. military forces, including personnel operating under the authority of title 10 or title 50 of the U.S. Code, of attack with (A) a biological, chemical, radiological, or nuclear agent or agents; or (B) an agent or agents that may cause, or are otherwise associated with, an imminently life-threatening and specific risk to U.S. military forces;[1] (3) a determination by the Secretary of HHS that there is a public health emergency, or a significant potential for a public

health emergency, that affects, or has a significant potential to affect, national security or the health and security of U.S. citizens living abroad, and that involves a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents; or (4) the identification of a material threat by the Secretary of Homeland Security pursuant to section 319F–2 of the Public Health Service (PHS) Act (42 U.S.C. 247d–6b) sufficient to affect national security or the health and security of U.S. citizens living abroad.

Once the Secretary of HHS has declared that circumstances exist justifying an authorization under section 564 of the FD&C Act, FDA may authorize the emergency use of a drug, device, or biological product if the Agency concludes that the statutory criteria are satisfied. Under section 564(h)(1) of the FD&C Act, FDA is required to publish in the **Federal Register** a notice of each authorization, and each termination or revocation of an authorization, and an explanation of the reasons for the action. Section 564 of the FD&C Act permits FDA to authorize the introduction into interstate commerce of a drug, device, or biological product intended for use when the Secretary of HHS has declared that circumstances exist justifying the authorization of emergency use. Products appropriate for emergency use may include products and uses that are not approved, cleared, or licensed under section 505, 510(k), 512, or 515 of the FD&C Act (21 U.S.C. 355, 360(k), 360b, or 360e) or section 351 of the PHS Act (42 U.S.C. 262), or conditionally approved under section 571 of the FD&C Act (21 U.S.C. 360ccc). FDA may issue an EUA only if, after consultation with the HHS Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention (to the extent feasible and appropriate given the applicable circumstances), FDA[2] concludes: (1) That an agent referred to in a declaration of emergency or threat can cause a serious or life-threatening disease or condition; (2) that, based on the totality of scientific evidence available to FDA, including data from adequate and well-controlled clinical trials, if available, it is reasonable to believe that (A) the product may be effective in diagnosing, treating, or preventing (i) such disease or condition; or (ii) a serious or life-threatening

disease or condition caused by a product authorized under section 564, approved or cleared under the FD&C Act, or licensed under section 351 of the PHS Act, for diagnosing, treating, or preventing such a disease or condition caused by such an agent; and (B) the known and potential benefits of the product, when used to diagnose, prevent, or treat such disease or condition, outweigh the known and potential risks of the product, taking into consideration the material threat posed by the agent or agents identified in a declaration under section 564(b)(1)(D) of the FD&C Act, if applicable; (3) that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition; (4) in the case of a determination described in section 564(b)(1)(B)(ii), that the request for emergency use is made by the Secretary of Defense; and (5) that such other criteria as may be prescribed by regulation are satisfied.

No other criteria for issuance have been prescribed by regulation under section 564(c)(4) of the FD&C Act.

**III. Electronic Access**

An electronic version of this document and the full text of the Authorizations are available on the internet at *https://www.fda.gov/ emergency-preparedness-and-response/ mcm-legal-regulatory-and-policy- framework/emergency-use- authorization.*

**IV. The Authorizations**

Having concluded that the criteria for the issuance and, in some cases reissuance, of the following Authorizations under section 564(c) of the FD&C Act are met, FDA has authorized the emergency use of the following products for diagnosing, treating, or preventing COVID–19 subject to the terms of each Authorization. The Authorizations in their entirety, including any authorized fact sheets and other written materials, are available on the internet from the FDA web page entitled ''Emergency Use Authorization,'' available at *https:// www.fda.gov/emergency-preparedness- and-response/mcm-legal-regulatory- and-policy-framework/emergency-use- authorization.* The lists that follow include Authorizations issued, in some cases reissued, from May 16, 2020, through September 14, 2020, and we have included explanations of the reasons for their issuance, as required by section 564(h)(1) of the FD&C Act. FDA is hereby announcing the following Authorizations for molecular diagnostic

---

[1] In the case of a determination by the Secretary of Defense, the Secretary of HHS shall determine within 45 calendar days of such determination, whether to make a declaration under section 564(b)(1) of the FD&C Act, and, if appropriate, shall promptly make such a declaration.

[2] The Secretary of HHS has delegated the authority to issue an EUA under section 564 of the FD&C Act to the Commissioner of Food and Drugs.

and antigen tests for COVID–19, excluding multianalyte tests:[3]

• Color Genomics, Inc.'s Color SARS–CoV–2 LAMP Diagnostic Assay, issued May 18, 2020, and reissued July 24, 2020;

• Quidel Corp.'s Lyra Direct SARS–CoV–2 Assay, issued May 18, 2020;

• P23 Labs, LLC's P23 Labs TaqPath SARSd–CoV–2 Assay, issued May 21, 2020, and reissued July 10, 2020;

• SEASUN BIOMATERIALS, Inc.'s AQ–TOP COVID–19 Rapid Detection Kit, issued May 21, 2020;

• SolGent Co., Ltd.'s DiaPlexQ Novel Coronavirus (2019–nCoV) Detection Kit, issued May 21, 2020;

• BioCore Co., Ltd.'s BioCore 2019–nCoV Real Time PCR Kit, issued May 21, 2020;

• Exact Sciences Laboratories' SARSd–CoV–2 (N gene detection) Test, issued May 22, 2020, and reissued August 3, 2020;

• dba SpectronRx's Hymon SARSd–CoV–2 Test Kit, issued May 22, 2020;

• PrivaPath Diagnostics, Inc.'s LetsGetChecked Coronavirus (COVID–19) Test, issued May 28, 2020, and reissued August 14, 2020;

• Gravity Diagnostics, LLC's Gravity Diagnostics COVID–19 Assay, issued June 1, 2020;

• Phosphorus Diagnostics LLC's Phosphorus COVID–19 RT–qPCR Test, issued June 4, 2020;

• Genetron Health (Beijing) Co., Ltd.'s Genetron SARSd–CoV–2 RNA Test, issued June 5, 2020;

• Euroimmun US Inc.'s EURORealTime SARSd–CoV–2, issued June 8, 2020;

• ChromaCode Inc.'s HDPCR SARSd–CoV–2 Assay, issued June 9, 2020;

• Illumina, Inc.'s Illumina COVIDSeq Test, issued June 9, 2020;

• Tide Laboratories, LLC's DTPM COVID–19 RT–PCR Test, issued June 10, 2020;

• TBG Biotechnology Corp.'s ExProbe SARSd–CoV–2 Testing Kit, issued June 10, 2020;

• Cue Health, Inc.'s Cue COVID–19 Test, issued June 10, 2020;

• RTA Laboratories Biological Products Pharmaceutical and Machinery

Industry's Diagnovital SARSd–CoV–2 Real-Time PCR Kit, issued June 12, 2020;

• Kaiser Permanente Mid-Atlantic States's KPMAS COVID–19 Test, issued June 13, 2020, and reissued September 9, 2020;

• Applied BioCode, Inc.'s BioCode SARSd–CoV–2 Assay, issued June 15, 2020;

• The Ohio State University Wexner Medical Center's OSUWMC COVID–19 RT–PCR test, issued June 17, 2020;

• Omnipathology Solutions Medical Corp.'s Omni COVID–19 Assay by RT–PCR, issued June 17, 2020;

• Jiangsu Bioperfectus Technologies Co., Ltd.'s COVID–19 Coronavirus Real Time PCR Kit, issued June 18, 2020;

• 3B Blackbio Biotech India Ltd., a subsidiary of Kilpest India Ltd.'s TRUPCR SARSd–CoV–2 Kit, issued June 18, 2020;

• HealthQuest Esoterics's HealthQuest Esoterics TaqPath SARSd–CoV–2 Assay, issued June 23, 2020;

• University of Alabama at Birmingham Fungal Reference Lab's FRL SARS CoV–2 Test, issued June 23, 2020;

• Gencurix, Inc.'s GenePro SARSd–CoV–2 Test, issued June 23, 2020;

• University of Texas MD Anderson Cancer Center, Molecular Diagnostics Laboratory's MD Anderson High-throughput SARSd–CoV–2 RT–PCR Assay, issued June 24, 2020;

• Diagnostic Solutions Laboratory, LLC's DSL COVID–19 Assay, issued June 25, 2020;

• PreciGenome LLC's FastPlex Triplex SARSd–CoV–2 detection kit (RT–Digital PCR), issued June 25, 2020;

• PlexBio Co., Ltd.'s IntelliPlex SARSd–CoV–2 Detection Kit, issued June 25, 2020;

• Inform Diagnostics, Inc.'s Inform Diagnostics SARSd–CoV–2 RT–PCR Assay, issued June 26, 2020;

• Acupath Laboratories, Inc.'s Acupath COVID–19 Real-Time (RT–PCR) Assay, issued June 29, 2020;

• LifeHope Labs' LifeHope 2019–nCoV Real-Time RT–PCR Diagnostic Panel, issued June 29, 2020;

• Psomagen, Inc.'s Psoma COVID–19 RT Test, issued June 30, 2020;

• TNS Co., Ltd.'s (Bio TNS) COVID–19 RT–PCR Peptide Nucleic Acid (PNA) kit, issued June 30, 2020;

• The Kroger Co.'s Kroger Health COVID–19 Test Home Collection Kit, issued June 30, 2020;

• CENTOGENE US, LLC's CentoFast–SARS–CoV–2 RT–PCR Assay, issued July 1, 2020;

• Becton, Dickinson and Co.'s BD Veritor System for Rapid Detection of SARSd–CoV–2, issued July 2, 2020;

• Laboratorio Clinico Toledo's Laboratorio Clinico Toledo SARSd–CoV–2 Assay, issued July 6, 2020;

• Gene By Gene's Gene By Gene SARSd–CoV–2 Detection Test, issued July 7, 2020;

• Access Bio, Inc.'s CareStart COVID–19 MDx RT–PCR, issued July 7, 2020;

• Enzo Life Sciences, Inc.'s AMPIPROBE SARSd–CoV–2 Test System, issued July 7, 2020;

• Clinical Research Sequencing Platform (CRSP), LLC at the Broad Institute of MIT and Harvard's CRSP SARSd–CoV–2 Real-time Reverse Transcriptase (RT)–PCR Diagnostic Assay, issued July 8, 2020;

• BioSewoom, Inc.'s Real-Q 2019–nCoV Detection Kit, issued July 9, 2020;

• UCSF Health Clinical Laboratories, UCSF Clinical Labs at China Basin's SARSd–CoV–2 RNA DETECTR Assay, issued July 9, 2020;

• Boston Medical Center's BMC–CReM COVID–19 Test, issued July 10, 2020;

• KogeneBiotech Co., Ltd.'s PowerChek 2019–nCoV Real-time PCR Kit, issued July 13, 2020;

• Trax Management Services Inc.'s PhoenixDx SARSd–CoV–2 Multiplex, issued July 13, 2020;

• Compass Laboratory Services, LLC's Compass Laboratory Services SARSd–CoV2 Assay, issued July 13, 2020;

• Quest Diagnostics Infectious Disease, Inc.'s Quest Diagnostics PF SARSd–CoV–2 Assay, issued July 15, 2020, and reissued August 21, 2020;

• Quest Diagnostics Infectious Disease, Inc.'s Quest Diagnostics RC SARSd–CoV–2 Assay, issued July 15, 2020, and reissued August 21, 2020;

• Quest Diagnostics Infectious Disease, Inc.'s Quest Diagnostics HA SARSd–CoV–2 Assay, issued July 15, 2020, and reissued August 21, 2020;

• Boston Heart Diagnostics' Boston Heart COVID–19 RT–PCR Test, issued July 16, 2020;

• Access Genetics, LLC's OraRisk COVID–19 RT–PCR, issued July 17, 2020;

• DiaCarta, Inc.'s QuantiVirus SARSd–CoV–2 Multiplex Test Kit, issued July 21, 2020;

• Helix OpCo LLC's (dba Helix's) Helix COVID–19 Test, issued July 23, 2020;

• Jiangsu CoWin Biotech Co., Ltd.'s Novel Coronavirus (SARSd–CoV–2) Fast Nucleic Acid Detection Kit (PCR-Fluorescence Probing), issued July 24, 2020;

• LabCorp's COVID–19 RT–PCR Test, reissued July 24, 2020 (original issuance March 16, 2020);

• Eli Lilly and Co.'s Lilly SARSd–CoV–2 Assay, issued July 27, 2020;

[3] As set forth in the EUAs for these products, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the products may be effective in diagnosing COVID–19, and that the known and potential benefits of the products, when used for diagnosing COVID–19, outweigh the known and potential risks of such products; and (3) there is no adequate, approved, and available alternative to the emergency use of the products.

• Sandia National Laboratories' SNL–NM 2019 nCoV Real-Time RT–PCR Diagnostic Assay, issued July 27, 2020;

• Clinical Reference Laboratory, Inc.'s CRL Rapid Response, issued July 30, 2020;

• University of California San Diego Health's UCSD RC SARSd–CoV–2 Assay, issued July 31, 2020;

• Xiamen Zeesan Biotech Co., Ltd.'s SARSd–CoV–2 Test Kit (Real-time PCR), issued July 31, 2020;

• ISPM Labs, LLC dba Capstone Healthcare's Genus SARSd–CoV–2 Assay, issued August 3, 2020;

• Poplar Healthcare's Poplar SARSd–CoV–2 TMA Pooling assay, issued August 3, 2020;

• Cleveland Clinic Robert J. Tomsich Pathology and Laboratory Medicine Institute's Cleveland Clinic SARSd–CoV–2 Assay, issued August 3, 2020;

• Ethos Laboratories' Ethos Laboratories SARSd–CoV–2 MALDI–TOF Assay, issued August 3, 2020;

• Wren Laboratories LLC's Wren Laboratories COVID–19 PCR Test, issued August 3, 2020;

• Vela Operations Singapore Pte Ltd.'s ViroKey SARSd–CoV–2 RT–PCR Test, issued August 5, 2020;

• Helix OpCo LLC's (dba Helix) Helix COVID–19 NGS Test, issued August 6, 2020;

• George Washington University Public Health Laboratory's GWU SARSd–CoV–2 RT–PCR Test, issued August 7, 2020;

• Quest Diagnostics Infectious Disease, Inc.'s SARSd–CoV–2 RNA, Qualitative Real-Time RT–PCR, reissued August 7, 2020 (original issuance March 17, 2020);

• Alpha Genomix Laboratories' Alpha Genomix TaqPath SARSd–CoV–2 Combo Assay, issued August 10, 2020;

• Solaris Diagnostics' Solaris Multiplex SARSd–CoV–2 Assay, issued August 10, 2020;

• Biomeme, Inc.'s Biomeme SARSd–CoV–2 Real-Time RT–PCR Test, issued August 11, 2020;

• LumiraDx UK Ltd.'s LumiraDx SARS–CoV–2 RNA STAR, issued August 11, 2020;

• Pro-Lab Diagnostics' Pro-AmpRT SARSd–CoV–2 Test, issued August 13, 2020;

• Yale School of Public Health, Department of Epidemiology of Microbial Diseases' SalivaDirect, issued August 15, 2020, and reissued August 28, 2020;

• ZhuHai Sinochips Bioscience Co., Ltd.'s COVID–19 Nucleic Acid RT–PCR Test Kit, issued August 17, 2020;

• LumiraDx UK Ltd.'s LumiraDx SARSd–CoV–2 Ag Test, issued August 18, 2020;

• Assurance Scientific Laboratories' Assurance SARSd–CoV–2 Panel, reissued August 19, 2020 (original issuance May 15, 2020);

• Guardant Health, Inc.'s Guardant-19, issued August 21, 2020;

• DxTerity Diagnostics, Inc.'s DxTerity SARSd–CoV–2 RT–PCR Test, issued August 21, 2020;

• Texas Department of State Health Services, Laboratory Services Section's Texas Department of State Health Services SARSd–CoV–2 Assay, issued August 21, 2020;

• Fluidigm Corp.'s Advanta Dx SARSd–CoV–2 RT–PCR Assay, issued August 25, 2020;

• QDx Pathology Services' QDX SARSd–CoV–2 Assay, issued August 25, 2020;

• Cuur Diagnostics' Cuur Diagnostics SARSd–CoV–2 Molecular Assay, issued August 26, 2020;

• Abbott Diagnostics Scarborough, Inc.'s BinaxNOW COVID–19 Ag Card, issued August 26, 2020;

• Patients Choice Laboratories, LLC's PCL SARSd–CoV–2 Real-Time RT–PCR Assay, issued August 28, 2020;

• DxTerity Diagnostics, Inc.'s DxTerity SARSd–CoV–2 RT PCR CE Test, issued August 28, 2020;

• T2 Biosystems, Inc.'s T2SARSd–CoV–2 Panel, issued August 31, 2020;

• MiraDx's MiraDx SARSd–CoV–2 RT–PCR assay, issued August 31, 2020;

• Mammoth Biosciences, Inc.'s SARSd–CoV–2 DETECTR Reagent Kit, issued August 31, 2020;

• BayCare Laboratories, LLC's BayCare SARSd–CoV–2 RT PCR Assay, issued August 31, 2020;

• Detectachem Inc.'s MobileDetect Bio BCC19 (MD-Bio BCC19) Test Kit, issued September 1, 2020;

• OPTOLANE Technologies, Inc.'s Kaira 2019–nCoV Detection Kit, issued September 1, 2020;

• Bioeksen R&D Technologies Ltd.'s Bio-Speedy Direct RT–qPCR SARSd–CoV–2, issued September 2, 2020;

• BillionToOne, Inc.'s qSanger-COVID–19 Assay, issued September 4, 2020;

• Verily Life Sciences' Verily COVID–19 RT–PCR Test, issued September 8, 2020; and

• Beijing Wantai Biological Pharmacy Enterprise Co., Ltd.'s Wantai SARSd–CoV–2 RT–PCR Kit, issued September 9, 2020.

FDA is hereby announcing the following Authorizations for serology tests:[4]

• Healgen Scientific LLC's COVID–19 IgG/IgM Rapid Test Cassette (Whole Blood/Serum/Plasma), issued May 29, 2020;

• Siemens Healthcare Diagnostics Inc.'s Atellica IM SARSd–CoV–2 Total (COV2T), issued May 29, 2020;

• Siemens Healthcare Diagnostics Inc.'s ADVIA Centaur SARSd–CoV–2 Total (COV2T), issued May 29, 2020;

• Hangzhou Biotest Biotech Co., Ltd.'s RightSign COVID–19 IgG/IgM Rapid Test Cassette, issued June 4, 2020;

• Vibrant America Clinical Labs' Vibrant COVID–19 Ab Assay, issued June 4, 2020;

• Siemens Healthcare Diagnostics Inc.'s Dimension Vista SARSd–CoV–2 Total antibody assay (COV2T), issued June 8, 2020;

• Siemens Healthcare Diagnostics Inc.'s Dimension EXL SARSd–CoV–2 Total antibody assay (CV2T), issued June 8, 2020;

• InBios International, Inc.'s SCoV–2 Detect IgG ELISA [enzyme-linked immunosorbent assay], issued June 10, 2020;

• Cellex Inc.'s qSARSd–CoV–2 IgG/IgM Rapid Test, reissued June 12, 2020 (original issuance April 1, 2020);

• Emory Medical Laboratories' SARSd–CoV–2 RBD IgG test, issued June 15, 2020;

• Biohit Healthcare (Hefei) Co. Ltd.'s Biohit SARSd–CoV–2 IgM/IgG Antibody Test Kit, issued June 18, 2020;

• Hangzhou Laihe Biotech Co., Ltd.'s LYHER Novel Coronavirus (2019–nCoV) IgM/IgG Antibody Combo Test Kit (Colloidal Gold), issued June 19, 2020;

• Babson Diagnostics, Inc.'s Babson Diagnostics aC19G1, issued June 23, 2020;

• Beckman Coulter, Inc.'s Access SARSd–CoV–2 IgG, issued June 26, 2020;

• InBios International, Inc.'s SCoV–2 Detect IgM ELISA, issued June 30, 2020;

• Assure Tech.'s (Hangzhou Co., Ltd.) Assure COVID–19 IgG/IgM Rapid Test Device, issued July 6, 2020;

• Diazyme Laboratories, Inc.'s Diazyme DZ-Lite SARSd–CoV–2 IgG CLIA Kit, issued July 8, 2020;

• Beijing Wantai Biological Pharmacy Enterprise Co., Ltd.'s WANTAI SARSd–CoV–2 Ab Rapid Test, July 10, 2020;

---

[4] As set forth in the EUAs for these products, FDA has concluded that: (1) SARSd–CoV–2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the products may be effective in diagnosing recent or prior infection with SARSd–CoV–2 by identifying individuals with an adaptive immune response to the virus that causes COVID–19, and that the known and potential benefits of the products when used for such use, outweigh the known and potential risks of the products; and (3) there is no adequate, approved, and available alternative to the emergency use of the products.

• Salofa Oy's Sienna-Clarity COVIBLOCK COVID–19 IgG/IgM Rapid Test Cassette, issued July 13, 2020;

• Luminex Corp.'s xMAP SARSd–CoV–2 Multi-Antigen Ig Assay, issued July 16, 2020;

• Megna Health, Inc.'s Rapid COVID–19 IgM/IgG Combo Test Kit, issued July 17, 2020;

• Access Bio, Inc.'s CareStart COVID–19 IgM/IgG, issued July 24, 2020;

• Xiamen Biotime Biotechnology Co., Ltd.'s BIOTIME SARSd–CoV–2 IgG/IgM Rapid Qualitative Test, issued July 24, 2020;

• Siemens Healthcare Diagnostics Inc.'s ADVIA Centaur SARSd–CoV–2 IgG (COV2G), issued July 31, 2020;

• Siemens Healthcare Diagnostics Inc.'s Atellica IM SARSd–CoV–2 IgG (COV2G), issued July 31, 2020;

• Beijing Wantai Biological Pharmacy Enterprise Co., Ltd.'s WANTAI SARSd–CoV–2 Ab ELISA, issued August 5, 2020;

• bioMérieux SA's VIDAS SARSd–CoV–2 IgM, issued August 6, 2020;

• bioMérieux SA's VIDAS SARSd–CoV–2 IgG, issued August 6, 2020;

• Diazyme Laboratories, Inc.'s Diazyme DZ-Lite SARSd–CoV–2 IgM CLIA Kit, issued August 17, 2020;

• BioCheck, Inc.'s BioCheck SARSd–CoV–2 IgG and IgM Combo Test, issued August 17, 2020;

• Biocan Diagnostics Inc.'s Tell Me Fast Novel Coronavirus (COVID–19) IgG/IgM Antibody Test, issued August 25, 2020;

• TBG Biotechnology Corp.'s TBG SARSd–CoV–2 IgG/IgM Rapid Test Kit, issued August 31, 2020;

• University of Arizona Genetics Core for Clinical Services' COVID–19 ELISA pan-Ig Antibody Test, issued August 31, 2020;

• Sugentech, Inc.'s SGTi-flex COVID–19 IgG, issued September 3, 2020;

• BioCheck, Inc.'s BioCheck SARS–CoV–2 IgG Antibody Test Kit, issued September 9, 2020;

• BioCheck, Inc.'s BioCheck SARS–CoV–2 IgM Antibody Test Kit, issued September 9, 2020; and

• Shenzhen New Industries Biomedical Engineering Co., Ltd.'s MAGLUMI 2019–nCoV IgM/IgG, issued September 14, 2020.

FDA is hereby announcing the following Authorizations for multianalyte in vitro diagnostics:[5]

• Centers for Disease Control and Prevention's Influenza SARS–CoV–2 (Flu SC2) Multiplex Assay, issued July 2, 2020;

• Roche Molecular Systems, Inc.'s cobas SARS–CoV–2 & Influenza A/B, issued September 3, 2020; and

• Roche Molecular Systems, Inc.'s cobas SARS–CoV–2 & Influenza A/B Nucleic Acid Test for use on the cobas Liat system, issued September 14, 2020.

FDA is hereby announcing the following Authorizations for personal respiratory protective devices:[6]

• Certain Non-National Institute of Industrial and Occupational Safety (NIOSH)-Approved Disposable Filtering Facepiece Respirators Manufactured in China, reissued June 6, 2020 (original issuance April 3, 2020). A current list of respirator models authorized by this EUA is available at *https://www.fda.gov/ medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/ personal-protective-equipment-euas#appendixa;* and

• Certain Imported, Non-NIOSH Approved Disposable Filtering Facepiece Respirators, reissued June 6, 2020 (original issuance March 24, 2020). A current list of respirator models authorized by this EUA is available at *https://www.fda.gov/medical-devices/ coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/personal-protective-equipment-euas#exhibit1.*

FDA is hereby announcing the following Authorizations for other medical devices:

• Baxter Healthcare Corp.'s Prismaflex ST Set, issued May 20, 2020;[7]

• STERIS Corp.'s AMSCO Medium Steam Sterilizers + the STERIS STEAM Decon Cycle, issued May 21, 2020;[8]

• Certain Gowns and Other Apparel, issued May 22, 2020;[9]

• CLEW Medical Ltd.'s CLEWICU System, issued May 26, 2020;[10]

• Abiomed, Inc.'s Impella RP System, issued May 29, 2020;[11]

---

[5] As set forth in the EUAs, FDA has concluded that: (1) SARS–CoV–2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the products may be effective in diagnosing COVID–19 through the simultaneous detection and differentiation of SARS–CoV–2, influenza A virus, and/or influenza B virus nucleic acids and that the known and potential benefits of the products when used for such a use, outweigh the known and potential risks of the products; and (3) there is no adequate, approved, and available alternative to the emergency use of the products.

[6] As set forth in the EUAs, FDA has concluded that: (1) SARS–CoV–2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized respirators may be effective in preventing healthcare personnel (HCP) exposure to pathogenic biological airborne particulates during Filtering Facepiece Respirator (FFR) shortages, and that the known and potential benefits of the authorized respirators, when used to prevent HCP exposure to such particulates during FFR shortages during COVID–19, outweigh the known and potential risks of such products; and (3) there is no adequate, approved, and available alternative to the emergency use of this product.

[7] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the products may be effective in diagnosing COVID–19 through the simultaneous detection and

[8] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the STERIS STEAM Decon Cycle in AMSCO Medium Steam Sterilizers may be effective at decontaminating compatible N95 respirators for single-user reuse by HCPs to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates for a maximum of 10 decontamination cycles per respirator, and that the known and potential benefits of this product, when used as described, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[9] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized gowns and other apparel worn by HCPs may be effective at preventing the transfer of microorganisms, bodily fluids, and particulate material in low or minimal risk situations by providing minimal-to-low barrier protection to HCP and patients to prevent the spread of COVID–19, and that the known and potential benefits of gowns and other apparel for such use, outweigh the known and potential risks of such products; and (3) there is no adequate, approved, and available alternative to the emergency use of these products.

[10] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the CLEWICU System may be effective in treating COVID–19, when used by HCP in the intensive care unit (ICU) as a diagnostic aid to assist with the early identification of adult patients who are likely to be diagnosed with respiratory failure or hemodynamic instability which are common complications associated with COVID–19, and that the known and potential benefits of the CLEWICU System, for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[11] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Impella RP may be effective in providing temporary right

• Roche Diagnostics' Elecsys IL–6, issued on June 2, 2020;[12]

• Battelle Memorial Institute's Battelle CCDS Critical Care Decontamination System ("Battelle Decontamination System"), reissued June 6, 2020[13] (original issuance March 29, 2020);

• STERIS Corp.'s STERIS Sterilization System, reissued June 6, 2020[14] (original issuance April 9, 2020);

• Stryker Instruments' STERIZONE VP4 N95 Respirator Decontamination Cycle, reissued June 6, 2020[15] (original issuance on April 14, 2020);

• Advanced Sterilization Products, Inc.'s (ASP) STERRAD 100S, NX, and 100NX Sterilization Systems ("ASP STERRAD Sterilization Systems"), reissued June 6, 2020[16] (original issuance April 11, 2020);

• Stryker Sustainability Solutions' (SSS) SSS VHP N95 Respirator Decontamination System, issued May 27, 2020, reissued June 6, 2020;[17]

• Sterilucent, Inc.'s Sterilucent HC 80TT Hydrogen Peroxide Sterilizer ("Sterilucent Sterilization System"), reissued June 6, 2020[18] (original issuance April 20, 2020);

• Duke University Health System's Duke Decontamination System for Decontamination and Reuse of N95 Respirators with Hydrogen Peroxide Vapor ("Duke Decontamination System"), reissued June 6, 2020[19] (original issuance May 7, 2020);

• Technical Safety Services LLC's 20–CS Decontamination System, issued June 13, 2020;[20]

• Oceanetics, Inc.'s Negative-pressure Respiratory System with Advanced Ventilation Return ("NRSAVR–100"), issued June 13, 2020;[21]

• US Army and MHS's COVID–19 Airway Management Isolation Chamber (CAMIC), issued May 19, 2020 and reissued to US Army Medical Research Development Command June 22, 2020;[22]

---

ventricular support for up to 14 days in critical care patients with a body surface area ≥1.5 m2, for the treatment of acute right heart failure or decompensation caused by complications related COVID–19, including pulmonary embolism, and that the known and potential benefits of the Impella RP, for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[12] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the product may be effective in treating COVID–19, by assisting in identifying severe inflammatory response in patients with confirmed COVID–19 illness to aid in determining the risk of intubation with mechanical ventilation, and that the known and potential benefits of this product when used for such use, outweigh the known and potential risks of this product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[13] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Battelle Decontamination System may be effective at decontaminating compatible N95 respirators for multiple-user reuse by HCPs to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used for such use, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[14] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the STERIS Sterilization Systems may be effective at decontaminating compatible N95 respirators for single-user reuse by HCPs to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used for such use, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[15] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory

illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the STERIZONE VP4 N95 Respirator Decontamination Cycle may be effective at preventing exposure to pathogenic biological airborne particulates by decontaminating, for a maximum of 2 decontamination cycles per respirator, comparable N95 respirators that are contaminated with SARS–CoV–2 or other pathogenic microorganisms, and that the known and potential benefits of this product, when used as described, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[16] As set forth in this EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the ASP STERRAD Sterilization Systems may be effective at decontaminating, for a maximum of 2 decontamination cycles per respirator, compatible N95 respirators for single-user reuse by HCP to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of the ASP STERRAD Sterilization Systems, when used for such use, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[17] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the SSS VHP N95 Respirator Decontamination may be effective at decontaminating compatible N95 respirators for multiple-user reuse by HCP to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used as described, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[18] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Sterilucent Sterilization System may be effective at decontaminating compatible N95 respirators for single-user reuse by HCP to prevent exposure to pathogenic biological airborne particulates, and that the known and potential benefits of this device, when used for such use, outweigh the known and potential risks of the use of such product; and (3)

there is no adequate, approved, and available alternative to the emergency use of the product.

[19] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Duke Decontamination System may be effective at decontaminating compatible N95 respirators for multiple-user reuse by HCP to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used for such use, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[20] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the 20–CS Decontamination System may be effective at decontaminating compatible N95 respirators for multiple-user reuse by HCPs to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used as described, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[21] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the NRSAVR–100 may be effective in preventing HCP exposure to pathogenic biological airborne particulates by providing an extra layer of barrier protection in addition to PPE, at the time of definitive airway management, or when performing medical procedures, or during transport of patients with suspected or confirmed diagnosis of COVID–19 and that the known and potential benefits of the NRSAVR–100 for such use outweigh its known and potential risks; and (3) there is no adequate, approved available alternative to the emergency use of this product.

[22] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

Continued

- electroCore, Inc.'s gammaCore Sapphire CV, issued July 10, 2020;[23]
- Michigan State University Animal Care Program's MSU Decontamination System, issued July 24, 2020;[24]
- IkonX, Inc.'s Airway Dome, issued July 24, 2020;[25]
- Abiomed, Inc.'s Impella Left Ventricular (LV) Support Systems, issued August 3, 2020[26]

(2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the CAMIC may be effective in preventing HCP exposure to pathogenic biological airborne particulates by providing an extra layer of barrier protection in addition to PPE when transporting or performing medical procedures on patients who are known or suspected to have COVID–19, and that the known and potential benefits of the CAMIC for such use outweigh its known and potential risks; and (3) there is no adequate, approved alternative to the emergency use of the product.

[23] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the gammaCore Sapphire CV may be effective for acute emergency use at home or in a healthcare setting to treat adult patients with known or suspected COVID–19 who are experiencing exacerbation of asthma-related dyspnea and reduced airflow, and for whom approved drug therapies are not tolerated or provide insufficient symptom relief as assessed by their HCP, by using non-invasive Vagus Nerve Stimulation (nVNS) on either side of the patients neck, and that the known and potential benefits of this product for such use outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[24] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the MSU Decontamination System may be effective at decontaminating compatible N95 respirators for single-user reuse by HCP to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used for such use, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[25] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Airway Dome may be effective in preventing HCP exposure to pathogenic biological airborne particulates by providing an extra layer of barrier protection in addition to PPE, at the time of definitive airway management, when performing airway-related medical procedures during certain transport of patients with suspected or confirmed diagnosis of COVID–19 and that the known and potential benefits of the Airway Dome for such use outweigh its known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[26] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes

- Disposable, single-use surgical masks, issued August 5, 2020.[27] A current list of surgical masks authorized by this EUA is available here: *https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/personal-protective-equipment-euas#appendixasurgicalmasks;*
- Baxter Healthcare Corp.'s Prismaflex HF20 Set, issued August 10, 2020;[28]
- NovaSterilis, Inc.'s Nova2200 using the NovaClean decontamination process for decontaminating compatible N95 respirators, issued August 20, 2020;[29] and

COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Impella LV Support Systems may be effective when used by HCP in the hospital setting for providing temporary LV unloading and support to treat critical care patients with confirmed COVID–19 infection who are undergoing ECMO treatment and who develop pulmonary edema while on V–A ECMO support or late cardiac decompensation from myocarditis while on V–V ECMO support, and that the known and potential benefits of the Impella LV Support System, for such use, outweigh the known and potential risks; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[27] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized surgical masks may be effective for use in healthcare settings by HCPs as PPE to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID–19 pandemic, and that the known and potential benefits of the authorized surgical masks, when used consistent with the scope of the authorization, outweigh the known and potential risks of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the products.

[28] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, the virus that causes COVID–19, can cause a serious or life-threatening disease or condition, including severe respiratory illness and multiple organ failure, including acute kidney injury, to humans infected by this virus; (2) Based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Prismaflex HF20 Set (cartridge, including hemodialyzer plus tubing set) may be effective at providing continuous renal replacement therapy (CRRT) to treat low weight patients who have low blood volume and who have acute renal failure, fluid overload, or both, and who cannot tolerate a larger extracorporeal circuit volume in an acute care environment during the COVID–19 emergency and that the known and potential benefits of the Prismaflex HF20 Set, when used for such use, outweigh the known and potential risks of the Prismaflex HF20 Set; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[29] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

- Color Genomics, Inc.'s Color COVID–19 Self-Swab Collection Kit, issued August 31, 2020.[30]

Dated: November 13, 2020.

**Lauren K. Roth,**
*Acting Principal Associate Commissioner for Policy.*

[FR Doc. 2020–25603 Filed 11–19–20; 8:45 am]

BILLING CODE 4164–01–P

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

[Docket No. FDA–2020–D–2107]

## Cross Labeling Oncology Drugs in Combination Drug Regimens; Draft Guidance for Industry; Availability

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice of availability.

**SUMMARY:** The Food and Drug Administration (FDA or Agency) is announcing the availability of a draft guidance for industry entitled "Cross Labeling Oncology Drugs in Combination Drug Regimens." This guidance describes FDA's current recommendations on including relevant information in labeling for oncology drugs approved for use in combination drug regimens.

**DATES:** Submit either electronic or written comments on the draft guidance by January 19, 2021 to ensure that the Agency considers your comment on this draft guidance before it begins work on the final version of the guidance.

**ADDRESSES:** You may submit comments on any guidance at any time as follows:

(2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that the Nova2200 may be effective at decontaminating compatible N95 respirators for single-user reuse by HCP to prevent exposure to SARS–CoV–2 and other pathogenic biological airborne particulates, and that the known and potential benefits of this product, when used for such use, outweigh the known and potential risks of the use of such product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

[30] As set forth in the EUA, FDA has concluded that: (1) SARS–CoV–2, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus; (2) based on the totality of scientific evidence available to FDA, it is reasonable to believe that this product may be effective in diagnosing COVID–19 by serving as an appropriate means to collect and transport human specimens so that an authorized laboratory can detect SARS–CoV–2 RNA from the self-collected human specimen, and that the known and potential benefits of this product when used for such use, outweigh the known and potential risks of this product; and (3) there is no adequate, approved, and available alternative to the emergency use of the product.

Plaintiffs' Exhibit 126

# Personal Protective Equipment EUAs

Personal Protective Equipment (PPE) (/medical-devices/general-hospital-devices-and-supplies /personal-protective-equipment-infection-control) refers to protective clothing, helmets, gloves, face shields, goggles, respirators or other equipment designed to protect the wearer from injury or the spread of infection or illness.

To help address concerns about availability during the COVID-19 pandemic, the FDA has issued Emergency Use Authorizations (EUAs) for certain PPE products including face shields, other barriers, and respiratory protective devices such as respirators. Additionally, the FDA has issued recommendations and policies about PPE which can be found here: Recent Final Medical Device Guidance Documents (/medical-devices/guidance-documents-medical-devices-and-radiation-emitting-products/recent-final-medical-device-guidance-documents).

Templates for these EUA submissions are available to help facilitate the preparation, submission, and authorization of an EUA, including an Interactive Review Template For Non-IVD Products (/media /137965/download). Additionally, the FDA has posted a Surgical Masks EUA Template for Addition to Appendix A (/media/140896/download) of the Surgical Mask Umbrella EUA.

## Table of Personal Protective Equipment (PPE) EUAs

- Umbrella EUA for Surgical Masks
- N95 and Other Respirators EUAs
- Face Shields and Other Barrier EUAs

**FDA Revokes Emergency Use Authorizations for Non-NIOSH-Approved Disposable Respirators and Decontamination Systems as Access to FDA-authorized and NIOSH-approved N95s Increases Nationwide**

On June 30, 2021, the FDA announced the revocation (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations) of the following EUAs:

- Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (/medical-devices /emergency-use-authorizations-medical-devices/revoked-euas-non-niosh-approved-disposable-filtering-facepiece-respirators#imported) (effective July 6, 2021)

- Non-NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China (/medical-devices/emergency-use-authorizations-medical-devices/revoked-euas-non-niosh-approved-disposable-filtering-facepiece-respirators#china) (effective July 6, 2021)

- Decontamination and Bioburden Reduction System EUAs for Personal Protective Equipment (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations#decontamination) (effective June 30, 2021)

As of the effective date of the revocations, these devices will no longer be authorized for use by health care personnel in health care settings. For additional information, please see Update: FDA No Longer Authorizes Use of Non-NIOSH-Approved or Decontaminated Disposable Respirators - Letter to Health Care Personnel and Facilities (/medical-devices/letters-health-care-providers/update-fda-no-longer-authorizes-use-non-niosh-approved-or-decontaminated-disposable-respirators).

Historical information regarding these EUAs can be found on Historical Information about Device Emergency Use Authorizations (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations).

## Umbrella EUA for Surgical Masks

On August 5, 2020, the FDA issued an umbrella EUA for certain disposable, single-use surgical masks in response to concerns relating to insufficient supply and availability of such masks. This EUA authorized the emergency use of surgical masks that met certain performance requirements for use in healthcare settings by health care personnel (HCP) as PPE, to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic. Surgical masks that have been confirmed by FDA to meet the criteria under the EUA are included below in Appendix A as authorized surgical masks.

- EUA Letter of Authorization - Umbrella EUA for Surgical Masks (/media/140894/download)
- Fact Sheet for Healthcare Personnel (/media/140895/download)
- Appendix A: Authorized Surgical Masks
- Surgical Masks Removed from Appendix A

The Surgical Masks EUA Template for Addition to Appendix A (/media/140896/download) can be used to provide the information requested in the EUA to the FDA.

### Appendix A: Authorized Surgical Masks

The table below includes a list of surgical masks authorized by this Umbrella EUA for emergency use during the COVID-19 public health emergency.

All authorized surgical masks in the table below (Appendix A) are assigned the QMF product code.

Search: [                    ]

Show [ 100 ˅ ] entries

| Date of Addition | Manufacturer | Authorized Product Name (including model numbers) |
|---|---|---|

| Date of Addition | Manufacturer | Authorized Product Name (including model numbers) |
|---|---|---|
| 07/16/2021 | INTAI Technology CORP | 9W001200 (50 pieces/box)<br>9W001201 (30 boxes/carton) |
| 07/12/2021 | SurgiMac Manufacturing Inc. | Surgical Mask (Model – MAC-6501) |
| 07/02/2021 | Sesa LLC | Sesa Health Surgical Mask (Model Number - SH.PPE.SM.2L3) |
| 07/02/2021 | LM Surgical Mask | 3-ply level 3 Earloop - LM0787<br>3-ply level 3 Head Straps - LM1019 |
| 07/01/2021 | Connecticut Mask Company, LLC | CMC Surgical Mask 10 (Model - CMC 10; ASTM Level 1)<br>CMC Surgical Mask 30 (Model - CMC30; ASTM Level 3) |
| 06/30/2021 | Thrace Polyfilms S.A. | Surgical Masks Model PLF.IIR |
| 05/26/2021 | Linghe International co. Ltd. | Linghe Disposable, Single-Use Surgical Mask (Model Number: Best02) |
| 05/21/2021 | Medtecs USA Corporation | Medtecs Medical Mask (Model FM-140G) |
| 05/21/2021 | Filtra-Systems Company, LLC | Filtra Systems Surgical Face Mask (Model number – 0605202) |
| 05/12/2021 | Lumensource, LLC | Lumensource Surgical Mask Model # PKM-S201B |
| 05/07/2021 | Altor Safety | 3 Ply Surgical Mask (Model # 62212)<br>4 Ply Surgical Mask (Model #62232) |
| 05/07/2021 | Health Pro Supplies Limited | Medical Surgical Mask HP2723 (Large)<br>Medical Surgical Mask HP9503 |
| 04/29/2021 | Phoenix Quality MFG, LLC | PQM LibertyAir Surgical MaskModel - S-9501-EUA |
| 04/29/2021 | Honeywell International Inc. | Procedure Mask with Earloops (PM345 C) |
| 04/29/2021 | Honeywell International Inc. | Procedure Mask with Earloops (PM345 D) |
| 04/29/2021 | Honeywell International Inc. | Procedure Mask with Earloops (PM345 E) |
| 04/28/2021 | Devshree International Pvt. Ltd. | Hoplon Brand Disposable Single Use Surgical Masks Level 1 per ASTM F2100 H3SS |
| 04/21/2021 | GRAFICA VENETA S.p.A. | MASK MEDICA GV 2 GV2-GVII-202007 |
| 04/19/2021 | BLUETRACK, Inc. | Healthcare Pro Surgical Masks S-3050-WH |

| Date of Addition | Manufacturer | Authorized Product Name (including model numbers) |
|---|---|---|
| 04/16/2021 | Manohar Filaments Private Limited | 3 Ply Surgical Mask<br>MF-SM3-EH |
| 04/06/2021 | Keeo Life Private Limited | 3PLY Surgical Mask KF-SM3-EL<br>4PLY Surgical Mask KF-SM4-EL |
| 03/30/2021 | PZero Innovations, Inc. | PZero Surgical Mask Model Number: FM20PZ00 |
| 03/29/2021 | Protektair, Inc | Protektair-3 Surgical Mask Model #: PSM-3000 |
| 03/19/2021 | Cleveland Veteran Business Solutions | CVBS Surgical Mask - Model Number: SM1 |
| 02/12/2021 | SIO International Wisconsin, Inc | Sharp MQ-3050 Surgical mask; Foxconn MQ-3050 Surgical mask |
| 01/29/2021 | 131co Inc. | ARX Surgical Mask (Model number ARX1001) |
| 01/22/2021 | Honeywell International Inc. | Procedure Mask with Earloops<br>Model #: 559250M D |
| 01/19/2021 | KNH Enterprise Co., Ltd. | KNH Surgical Face Mask<br>Model Numbers:<br>902E1 (Ear Loop Level 1 – inner loop)<br>902E1-1 (Ear Loop Level 1 – outer loop)<br>902E2 (Ear Loop Level 2 – inner loop)<br>902E2-1 (Ear Loop Level 2 – outer loop)<br>902D1-M (3D Level 1 – size M)<br>902D1-L (3D Level 1 – size L)<br>902D2-M (3D Level 2 – size M)<br>902D2-L (3D Level 2 – size L)<br>902Z1 (Z-Folded Level 1)<br>902Z1 (Z-Folded Level 2) |
| 12/19/2020 | Honeywell International Inc. | Procedure Mask with Earloops<br>Model #: 559250M B and 559250M C |
| 12/16/2020 | Honeywell International Inc. | Procedure Mask with Earloops<br>Model #: 559250M |
| 12/10/2020 | Danameco Medical Joint Stock Corporation | D-Care Surgical Face Mask 3 ply (white), TAMMY Surgical Face Mask 3 ply (white)<br>Model/AMIS Numbers: KTY60WK050, KTY75WK050, KTY74WK050 |
| 12/10/2020 | MOCACARE Corporation | MOCACARE Procedure Mask (Level 1)<br>Model #: BC1003 |
| 12/09/2020 | Nomad Goods | Nomad Surgical Mask N-MASK-3 |

| Date of Addition | Manufacturer | Authorized Product Name (including model numbers) |
|---|---|---|
| 11/20/2020 | Rymco Medical | Surgical Mask (Tie-On) Model #: IMABEU |
| | | Surgical Mask (Earloop) Model #: IMSBEU |
| 11/06/2020 | EcoGuard Inc. | Surgical Mask - Disposable Single-Use 4-Ply Earloop Model #: EcoGuard A ECO03 |
| | | Surgical Mask - Disposable Single-Use 4-Ply Tie-on Model #: EcoGuard A ECO04 |
| 11/03/2020 | Fischer Manufacturing, LLC | Heartland Health Surgical Mask |
| 10/15/2020 | Brandix Apparel Solutions Limited | Disposable Surgical Mask BRNDX-DSM-001-LARGE |
| 10/08/2020 | WPT Corporation | WPT ASTM F2100-19 Level 3 Earloop Surgical Face Mask (Model # SMS2020) |
| 10/05/2020 | Hanesbrands, Inc. | Hanes Surgical Mask 01, Small and Large |
| 08/18/2020 | Venus Group, Inc. | Venus Medical Grade Disposable Surgical Mask |
| 08/08/2020 | Outdoor Research | Outdoor Research Surgical Mask model #OR2159 |

Showing 1 to 41 of 41 entries

Previous | 1 | Next

## Surgical Masks Removed from Appendix A

These surgical mask models had been on the list of authorized surgical masks in Appendix A but no longer meet the EUA's (/media/140894/download) scope of authorization and thus are no longer authorized and have accordingly been removed from Appendix A.

Search:

Show 100 entries

| Date No Longer Authorized | Manufacturer | Surgical Mask Model(s) No Longer Authorized |
|---|---|---|
| 07/23/2021 | Altor Safety | 3 Ply Surgical Mask (Model #62222) |
| 06/15/2021 | Premium-PPE Amerishield | Premium PPE Amerishield Disposable Surgical Mask Model #: PPE-M-AS-SUR-lvl2-S |

| Date No Longer Authorized | Manufacturer | Surgical Mask Model(s) No Longer Authorized |
|---|---|---|
| 03/19/2021 | Homtex, Inc. | Sovereign America Surgical Mask<br>Model #: 2000SM1, Blue color |
| 02/02/2021 | EcoGuard Inc. | Surgical Mask - Disposable Single-Use 3-Ply Earloop<br>Model #: EcoGuard B ECO01<br><br>Surgical Mask - Disposable Single-Use 3-Ply Tie-on<br>Model #: EcoGuard B ECO02 |
| 01/21/2021 | Premier Guard USA LLC | Premier Guard USA Surgical Face Mask 20-1002-SFM3 |

Showing 1 to 5 of 5 entries

Previous | 1 | Next

## N95 and Other Respirators EUAs (including EUAs for NIOSH-Approved N95s and imported respirators)

The table below includes information about respirators authorized for emergency use by healthcare personnel during the COVID-19 public health emergency.

Search: [          ]

Show [ 100 ] entries

| Date EUA Issued | PPE (Letter of Authorization) | Other Documents |
|---|---|---|
| 03/28/2020 | NIOSH-Approved Air Purifying Respirators for Use in Health Care Settings During Response to the COVID-19 Public Health Emergency (/media/135763/download) | • EUA Clarification Letter on Respirators (/media/136023/download) |

Showing 1 to 1 of 1 entries

Previous | 1 | Next

## Face Shields and Other Barrier EUAs

On May 1, 2020, the FDA issued an umbrella EUA for emergency use of protective barrier enclosures by HCP when caring for or performing medical procedures on patients who are known

Plaintiffs' Exhibit 127

fda.gov

# Revoked EUAs for Non-NIOSH-Approved Disposable FFRs

7-9 minutes

---

### Revoked EUAs for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators

---

### On this page:

- Umbrella EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) Manufactured in China (Revoked effective July 6, 2021))

- Umbrella EUA for Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) (Revoked effective July 6, 2021)

---

### Umbrella EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) Manufactured in China (Revoked effective July 6, 2021)

On April 3, 2020, the FDA issued an umbrella EUA for certain filtering face-piece respirators (FFRs) that are manufactured in China and are not approved by the National Institute for Occupational Safety and Health (NIOSH). Respirator models that were authorized by this EUA were listed in Appendix A and were authorized for emergency use by healthcare personnel in healthcare settings in accordance with CDC recommendations. Summaries of FDA's reissuances of this EUA follow.

As part of the federal government's quality assessment of these respirators, the FDA, working with CDC's NIOSH, conducted additional assessments and found that NIOSH's data indicated that some of the respirators authorized under the April 3, 2020 EUA did not meet the expected performance standards. In response, the FDA revised and reissued the EUA on May 7, 2020, including revising the third eligibility criterion such that all respirators that were previously authorized only under that criterion were no longer within the scope of authorization and were accordingly removed from Appendix A unless the respirator model was authorized under one of the remaining eligibility criterion in the May 7th letter.

Additionally, the FDA, in collaboration with CDC's NIOSH, increased surveillance and sampling of all respirators imported from China. All respirator shipments from China that came into the U.S. were subject to random sampling and testing by CDC's NIOSH to determine whether the respirator meets the expected particulate filtration standards.

On June 6, 2020, the FDA further revised the Scope of Authorization of this EUA, including, among other changes, further revision to the eligibility criteria to provide additional specificity regarding the jurisdictions eligible for review and to remove decontaminated respirators from the scope of authorized products such that authorized respirator models listed in Appendix A are not authorized if they are decontaminated.

On October 15, 2020, the FDA reissued the EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators manufactured in China to authorize for emergency use only those respirators listed in the EUA's Appendix A as of the date of this reissuance. As of October 15, 2020, this EUA no longer included the three eligibility criteria that were included in the previous June 6, 2020 authorization letter, meaning the FDA no longer reviewed requests  to add new respirator models to Appendix A based on those criteria as of October 15, 2020.

On June 30, 2021, the FDA announced the revocation of EUA (effective July 6, 2021).

- Revoked EUA Letter of Authorization - Umbrella EUA: Non-NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China

- Non-NIOSH Approved Disposable Filtering Facepiece Respirators Manufactured in China EUA FAQs

- Appendix A (Last Updated February 18, 2021; All models revoked effective July 6, 2021)

- Respirator Models Previously Removed from Appendix A (Last Updated October 15, 2020; All models revoked effective July 6, 2021)

**Appendix A (Last Updated February 18, 2021; All models revoked effective July 6, 2021)**

The table below includes a list of non-NIOSH-approved respirator models manufactured in China that were authorized at the time this Umbrella EUA was revoked.

These respirators were authorized for use by healthcare personnel in healthcare settings in accordance with the CDC's recommendations. For the most current CDC recommendations on optimizing respirator use, please visit CDC's webpage: Strategies for Optimizing the Supply of N95 Respirators.

**Respirator Models Previously Removed from Appendix A  (Last Updated October 15, 2020; All models revoked effective July 6, 2021)**

These respirator models had been on the list of authorized respirators in Appendix A but no longer met the EUA eligibility criteria and thus were no longer authorized. Results from NIOSH's testing are provided at: https://www.cdc.gov/niosh/npptl/respirators/testing/NonNIOSHresults.html

---

## Umbrella EUA for Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) (Revoked effective July 6, 2021)

On March 24, 2020, the FDA issued an umbrella EUA for certain imported disposable filtering facepiece respirators (FFRs) that are not approved by the National Institute for Occupational Safety and Health (NIOSH) and that met eligibility criteria as described in the EUA. Under this EUA, respirators, listed in Exhibit 1, were authorized for use in healthcare settings by healthcare personnel (HCP) when used in accordance with CDC recommendations to prevent wearer exposure to pathogenic biological airborne particulates during FFR shortages resulting from the Coronavirus Disease 2019 (COVID-19) outbreak.

On March 28, 2020, FDA revised this EUA to authorize the use of certain authorized respirators that have been decontaminated pursuant to the terms and conditions of an authorized decontamination system.

On June 6, 2020, FDA again revised the EUA to exclude decontaminated respirators with exhalation valves from the scope of authorization, as well as to add additional specificity regarding which jurisdictions were included in the second criterion for eligibility.

On March 24, 2021, the FDA revised this EUA to authorize for emergency use only those respirators listed in the EUA's Exhibit 1 as of the date of this reissuance. The FDA no longer reviewed requests to add new respirator models to Exhibit 1 of this EUA after March 24, 2021.

On June 30, 2021, the FDA announced the revocation of EUA (effective July 6, 2021).

- Revoked EUA Letter of Authorization - Umbrella EUA Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators

- Exhibit 1 (Last Updated March 8, 2021; All models revoked effective July 6, 2021)

### Exhibit 1 (Last Updated March 8, 2021; All models revoked effective July 6, 2021)

The table below includes a list of non-NIOSH-approved disposable FFRs that were authorized under this Umbrella EUA for emergency use in healthcare settings by HCP when used in accordance with CDC recommendations. For the most current CDC recommendations on optimizing respirator use, please visit CDC's webpage: Strategies for Optimizing the Supply of N95 Respirators.

# Revoked EUAs for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators

**FDA Revokes Emergency Use Authorizations for Non-NIOSH-Approved Disposable Respirators and Decontamination Systems as Access to FDA-authorized and NIOSH-approved N95s Increases Nationwide**

On June 30, 2021, the FDA announced the revocation (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations) of the following EUAs:

- Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (/medical-devices/emergency-use-authorizations-medical-devices/revoked-euas-non-niosh-approved-disposable-filtering-facepiece-respirators#imported) (effective July 6, 2021)

- Non-NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China (/medical-devices/emergency-use-authorizations-medical-devices/revoked-euas-non-niosh-approved-disposable-filtering-facepiece-respirators#china) (effective July 6, 2021)

- Decontamination and Bioburden Reduction System EUAs for Personal Protective Equipment (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations#decontamination) (effective June 30, 2021)

As of the effective date of the revocations, these devices will no longer be authorized for use by health care personnel in health care settings. For additional information, please see Update: FDA No Longer Authorizes Use of Non-NIOSH-Approved or Decontaminated Disposable Respirators - Letter to Health Care Personnel and Facilities (/medical-devices/letters-health-care-providers/update-fda-no-longer-authorizes-use-non-niosh-approved-or-decontaminated-disposable-respirators).

Historical information regarding these EUAs can be found on Historical Information about Device Emergency Use Authorizations (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations).



Top ()

## On this page:

- Umbrella EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) Manufactured in China (Revoked effective July 6, 2021))

- Umbrella EUA for Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) (Revoked effective July 6, 2021)

## Umbrella EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) Manufactured in China (Revoked effective July 6, 2021)

On April 3, 2020, the FDA issued an umbrella EUA for certain filtering face-piece respirators (FFRs) that are manufactured in China and are not approved by the National Institute for Occupational Safety and Health (NIOSH). Respirator models that were authorized by this EUA were listed in Appendix A and were authorized for emergency use by healthcare personnel in healthcare settings in accordance with CDC recommendations. Summaries of FDA's reissuances of this EUA follow.

As part of the federal government's quality assessment of these respirators, the FDA, working with CDC's NIOSH, conducted additional assessments and found that NIOSH's data indicated that some of the respirators authorized under the April 3, 2020 EUA did not meet the expected performance standards. In response, the FDA revised and reissued the EUA on May 7, 2020, including revising the third eligibility criterion such that all respirators that were previously authorized only under that criterion were no longer within the scope of authorization and were accordingly removed from Appendix A unless the respirator model was authorized under one of the remaining eligibility criterion in the May 7th letter. Additionally, the FDA, in collaboration with CDC's NIOSH, increased surveillance and sampling of all respirators imported from China. All respirator shipments from China that came into the U.S. were subject to random sampling and testing by CDC's NIOSH to determine whether the respirator meets the expected particulate filtration standards.

On June 6, 2020, the FDA further revised the Scope of Authorization of this EUA, including, among other changes, further revision to the eligibility criteria to provide additional specificity regarding the jurisdictions eligible for review and to remove decontaminated respirators from the scope of authorized products such that authorized

Top ()

respirator models listed in Appendix A are not authorized if they are decontaminated.

On October 15, 2020, the FDA reissued the EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators manufactured in China to authorize for emergency use only those respirators listed in the EUA's Appendix A as of the date of this reissuance. As of October 15, 2020, this EUA no longer included the three eligibility criteria that were included in the previous June 6, 2020 authorization letter, meaning the FDA no longer reviewed requests  to add new respirator models to Appendix A based on those criteria as of October 15, 2020.

On June 30, 2021, the FDA announced the revocation (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations) of EUA (effective July 6, 2021).

- Revoked EUA Letter of Authorization - Umbrella EUA: Non-NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China (/media /136664/download)

- Non-NIOSH Approved Disposable Filtering Facepiece Respirators Manufactured in China EUA FAQs (/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/faqs-euas-non-niosh-approved-respirators-during-covid-19-pandemic)

- Appendix A (Last Updated February 18, 2021; All models revoked effective July 6, 2021)

- Respirator Models Previously Removed from Appendix A (Last Updated October 15, 2020; All models revoked effective July 6, 2021)

## Appendix A (Last Updated February 18, 2021; All models revoked effective July 6, 2021)

The table below includes a list of non-NIOSH-approved respirator models manufactured in China that were authorized at the time this Umbrella EUA (/media /136664/download) was revoked.

These respirators were authorized for use by healthcare personnel in healthcare settings in accordance with the CDC's recommendations. For the most current CDC recommendations on optimizing respirator use, please visit CDC's webpage: Strategies for Optimizing the Supply of N95 Respirators (https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/index.html).

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| 3M | 9001, 9002, 9501, 9501+, 9501V+, 9502, 9502+, 9502V+, 9505+, 9541, 9541V, 9542, 9542V, 9552, 9552V | • 9001: IFU (https://multimedia.3m.com/mws/media /1827635O/3m-particulate-respirator-9001-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9002: IFU (https://multimedia.3m.com/mws/media /1827636O/3m-particulate-respirator-9002-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9501: IFU (https://multimedia.3m.com/mws/media /1827633O/3m-particulate-respirator-9501-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9501+: IFU (https://multimedia.3m.com/mws/media /1827631O/3m-particulate-respirator-9501-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9501V+: IFU (https://multimedia.3m.com/mws/media /1827630O/3m-particulate-respirator-9501v-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9502: IFU (https://multimedia.3m.com/mws/media /1826785O/3m-particulate-respirator-9502-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9502+: IFU (https://multimedia.3m.com/mws/media /1828869O/3m-particulate-respirator-9502-user-instructions-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies /website-disclaimer)<br><br>• 9502V+: IFU (https://multimedia.3m.com/mws/media /1826783O/3m-particulate-respirator-n95-9502v-ui-for-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies /website-disclaimer)<br><br>• 9505+: IFU (https://multimedia.3m.com/mws/media /1827632O/3m-particulate-respirator-9505-ui-eua.pdf) ⬚ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| | | • 9541: IFU (https://multimedia.3m.com/mws/media/1827634O/3m-particulate-respirator-9541-ui-eua.pdf) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9541V: IFU (https://multimedia.3m.com/mws/media/1827629O/3m-particulate-respirator-9541v-ui-eua.pdf) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9542: IFU (https://multimedia.3m.com/mws/media/1826786O/3m-particulate-respirator-9542-ui-eua.pdf) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9542V: IFU (https://multimedia.3m.com/mws/media/1826789O/3m-particulate-respirator-9542v-ui-eua.pdf) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9552: IFU (https://multimedia.3m.com/mws/media/1825857O/3m-95-5-2-particulate-respirator-n95-user-instruction-eua-website.pdf) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9552V: IFU (https://multimedia.3m.com/mws/media/1826807O/3m-particulate-respirator-9552v-ui-eua.pdf) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Allmed Medical Products Co., Ltd | LP220002 | • IFU (http://www.allmed-china.com/index.php?m=content&c=index&a=show&catid=20&id=33) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| AnDum Protective Equipment Technology (Changzhou) Co.,Ltd. | AD-1001 | • IFU (http://www.an-dum.com/index.php?m=content&c=index&a=show&catid=184&id=158) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

⌃
Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Anhui Hanxiutang Biotechnology Co., Ltd. | HXT-01 | • IFU (http://www.ahhxt.cn/en/Products/Product_categories_1/16.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| ANHUI JIABAO PROTECTIVE EQUIPMENTS CO.,LTD | JB-RP001 | • IFU (http://en.jiabaofhyp.com/display/432588.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Anhui Jinrui Auto Parts Co., Ltd. | JR-01 | • IFU (http://www.jinruikeji.com/cn/jksy/index_138.aspx) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Anhui Zhongke Duling Commercial Appliance Co. Ltd | M-9501 | |
| Anshun Health and Medical Technology Co., Ltd. | AKF6002 | • IFU (http://www.runbomask.com/AKF6002-FFP2-NR/AKF6002FFP2NR-1.shtml) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |



Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| AOK Tooling Ltd. (aka Shenzhonghai Medical) | 20130040, 20130045A, 20180021, 20130038, 20190019, 910, 20190029 | <ul><li>20130040: IFU (http://www.toolingexpress.com/images/20130040-InstructionsforUse.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li><li>20130045A: IFU (http://www.toolingexpress.com/images/20130045-InstructionsforUse.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li><li>20180021: IFU (http://www.toolingexpress.com/images/20180021-InstructionsforUse.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li><li>20130038: IFU (http://www.toolingexpress.com/images/20130038-InstructionsforUse.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li><li>20190019: IFU (http://www.toolingexpress.com/images/20190019-InstructionsforUse.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li><li>910: IFU (http://www.toolingexpress.com/images/910-Instruction.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li><li>20190029: IFU (http://www.toolingexpress.com/images/20190029-Instruction.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li></ul> |
| Baoding Yinhong Yuhe Medical Device Manufacturing Co., Ltd. | YH/KN95-1 | |
| Bei Bei Safety Co Ltd. | B702, B702V, B704, B704V | <ul><li>IFU (https://www.beibeisafety.com/upload/download/2005152125490000002.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li></ul> |
| Beifa Anhui Manufacturing Co., Ltd. | BF-A-01 | <ul><li>IFU (http://www.beifa.com/en/productsd.php?tid=1227&pid=6417) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)</li></ul> |

⌃
Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Beijing Topnew Import & Export Co., Ltd. | ZY95 | • IFU (http://ie.topnew.cn/english/productf.aspx?from=groupmessage&isappinstalled=0) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| BG PRECISION CO. LTD | KN95-N | • IFU (http://www.bgprecision.cn/news-16-1.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| BYD Precision Manufacture Co. Ltd. | DG3101, DN1102 | • DG3101: IFU (https://www.byd.care/pages/kn95) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• DN1102: IFU (https://www.byd.care/pages/kn95-respirator) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Careable Biotechnology Co., Ltd. | CARE002, CARE003 | • IFU (https://www.careablemask.com/aboutus/37115.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Carte Medical Equipment (Suzhou) Co., Ltd | K8201 | • IFU (http://www.carteholding.com/page.asp?id=854) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Changsha Changjiu Medical Technology Co. Ltd. | KN95-05, KN95-08 | • IFU (http://www.hncjmed.com/articles/2286/2020-7/65216.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Changshu Dayi Health Protection Articles Co., Ltd | DY-3 | • IFU (http://en.dayimedical.cn/use.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Chengde Technology Co. | KN95 | • IFU (https://yizhantongimage.oss-accelerate.aliyuncs.com/UploadFiles/2021012221072772737.pdf) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Chongqing China Nano Technology Co., Ltd. | ZN6005 | • IFU (http://www.zhongnakeji.com/product/namixianweixincailiao/61.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Chongqing Zisun (Zaisheng) Technology Corp., Ltd. | ZS-ZD-FJ-1, ZS-ZD-WJ-1 | • IFU (https://en.cqzskj.com/news/news_show/?id=5579&cid=1306The) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Creative Concepts Manufacturing Ltd. aka Huizhou RD Plastic Co., Ltd | 02676 | • IFU (https://www.mediconceptsgroup.com/kn95/manual/) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Deli Group Co., LTD. | ET30000 | |
| DONGGUAN AOXING AUDIO VISUAL EQUIPMENT CO.,LTD | AX-KF95 | • IFU (https://www.aoxing.net/en/ProductDetail/3778814.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Dongguan Arun Industrial Co., LTD | KN95 N9 | • IFU (http://www.all-round.com.cn/ProductView.Asp?ID=27) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Dongguan City Outdoorsy Co., Ltd. | OD-001 | • IFU (http://www.outdoorsy360.com/product/pro1/) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |



Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Dongguan Pan American Electronics Co., Ltd. | KN95-01, KN95-02, N1001 | • KN95-01: IFU (http://panamericanelectronics.com/uploads/soft/200618/Instruction%20for%20Use%20for%20KN95-01.pdf) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• KN95-02: IFU (http://panamericanelectronics.com/uploads/soft/200618/Instruction%20for%20Use%20for%20KN95-02.pdf) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• N1001: IFU (http://panamericanelectronics.com/uploads/soft/200618/Instruction%20for%20Use%20for%20N1001.pdf) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Dongguan Rysam Medical Equipment Manufacturing Co. | Particle Filtering half mask RSN95B, Particle Filtering half mask RSN99V | • IFU (https://www.rysam.cn/eua) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Dongguan Sengtor Plastics Products Co., Ltd. | KN95 | • IFU (https://www.sengtor.com/instructions-for-use) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Donghua Siecom Communication Technology Co.,Ltd | ZGKNM-01 | • IFU (https://www.siecom.cn/?app=survival&act=details&id=89) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| ESound Medical Device Co., Ltd. | 20182140615 Folded | • IFU (http://www.e-soundmed.com/h-pd-130.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |



Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| FOSHAN FLOCON MEDICAL EQUIPMENTS CO., LTD | M1 | |
| Foshan Nanhai Chuanzhishang Clothing Co., LTD | CZ-S02 | |
| Fujian Dahong Industrial Development Co. Ltd. | PGT-0095 | |
| Fujian Leephick Pharmaceutical Industry Co. Ltd. | KPM-3 | • IFU (https://www.leephick.com/product/ffp2_filtering_half_mask_headband_/133.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Fujian Yifa Healthcare Products Co., Ltd. | Y195 | • IFU (https://en.newyifagroup.com/article/90.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Fujian Yongtai Sanlian Garment Co., Ltd. | N95 Particulate Respirator (Xier) | |
| Fuzhou Chunlan Medical Equipment Co., Ltd. | CL-P1 | • IFU (http://www.fjchunlan.com/en/pd.jsp?id=14) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangdong GangRong Medical Technology Co., Ltd | GR200 | • IFU (http://www.gdgrmt.com/blog-single4.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |



Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| GUANGDONG GOLDEN LEAVES TECHNOLOGY DEVELOPMENT CO., LTD. | 8862 KN95 | • IFU (http://www.cnjymedical.com/detail?id=8862) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| GUANGDONG JINGCOS CO., LTD | 95J1 | |
| Guangdong KINGFA SCI. & TECH. Co. Ltd. | KF-A F01, KF-A F10(SC) | • IFU (http://www.kingfa.com/en/respirator3/642.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangdong Languan Medical Biotechnology Co., Ltd. | LGKN95 | • IFU (http://www.blueguan.com.cn/cn/produ /Product_Instruction/index.html) ☐ (http://www.fda.gov /about-fda/website-policies/website-disclaimer) |
| Guangdong Nuokang Medical Technology Co., Ltd. | KN95 Non-Surgical Disposable Particulate FFR | • IFU (https://www.nuokang.net/respirator?product_id=9) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangdong Seyouse Technology and Culture CO,.LTD | SS-001 | |
| Guangdong Tengrui Pharmaceutical Technology Co., Ltd. | LSH-201 | • IFU (http://www.tengruipharm.com/views/167/cid/49.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangdong Willing Technology Corporation | WL-01 | • IFU (http://www.willingchina.com/e/proDetail.php?id=24135& cateid=37413) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |


Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Guangdong Winsun Personal Care Products Co., Ltd. | YS0003 | • IFU (https://gdwinsun.en.made-in-china.com/product/qOQEPhjWEUVw/China-Protective-Ys0003-Filter-in-Stock-Face-Mask-with-FFP2-Approved.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangdong Yidao Medical | YD-002 | • IFU (http://www.superyidao.com/en/product/product-44-633.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangdong Zhizhen Biological Medicine Co., Ltd. | KN95 Three-Dimensional Protective Face Mask | • IFU (http://www.zhizhenmedic.com/instruction.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangxi MC Medical equipment Co., Ltd | MC010501 | • IFU (http://www.mcmedical.net/en/h-pd-3.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| GUANGZHOU BIOFIL AIR PURIFICATION MATERIALS CO.,LTD | MY3D2 | • IFU (http://www.baifeier.com.cn/en/article-28481-41890.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangzhou Bofeite Safety Protective Supplies Co., Ltd. | HT9510V, HT9510 | |
| Guangzhou Carrot Mall Network Technologies Co., Ltd. | IRYS-01 | • IFU (http://www.ivrou.com/images/Intended_Use_and%20Other_Instructions_of_IVROU.pdf) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangzhou Harley Commodity Company Limited | L-103V KN95 | • IFU (http://www.kn95.net/english/cpzx/gykz/188.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |



Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Guangzhou Nan Qi Xing Non-Woven Co., Ltd. | KN-1 Respirator | • IFU (https://www.gznqx.com/china-kn95-china-masks-customized-nanqixing) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guangzhou Powecom Labor Insurance Supplies Co., LTD | KN95 | • IFU (http://www.powecom.com/eng_product.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Guanyang Yunhan Textile Co., Ltd. | YH-9500 | • IFU (http://www.yohansupplies.com/en/?p=page&sortid=263&typeid=302&pid=3698&showlist=2) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Haishi Hainuo Lexiang Medical Technology (Qingdao) Co., Ltd. | LX1001 | |
| HANGZHOU FILTECH INTELLIGENT CO., LTD. | Filtech Face Mask Model F860, F862, F890V, F891V, F890, F861 | • F860: IFU (http://www.filtech.cn/filtechmask/FFP2/F860.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br>• F862: IFU (http://www.filtech.cn/filtechmask/FFP2/F862.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br>• F890V: IFU (http://www.filtech.cn/filtechmask/FFP3/F890V.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br>• F891V: IFU (http://www.filtech.cn/filtechmask/FFP3/F891V.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hangzhou Gang Yu Health Products Co., Ltd. | GY2020001 | • IFU (http://www.gywsyp.com/index.php/product/detail/53.html) ⬀ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

∧
Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Hangzhou San Qiang Safety Protection Products Co., Ltd. | 9420 (FFP2), 9420V (FFP2), 9480 (FFP2), 9450B, 9480V (FFP2), 9980V (FFP3), 9920V (FFP3) | • 9420 (FFP2), 9420V (FFP2), 9480 (FFP2), 9480V (FFP2): IFU (http://www.qqq-ppe.com/public/upload/certification/20200708/914f310e94bb5508cc1e8396d83aeb55.jpg) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• 9980V (FFP3), 9920V (FFP3): IFU (http://www.qqq-ppe.com/public/upload/certification/20200708/9f0bcbe3a824a8b44d64978dd83d32ea.jpg) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hebei Pengyuan Optoelectronics Co. Ltd. | SUPERNOVA-P2 | • IFU (https://www.china-supernova.com/sale-13193847-face-mask-instructions-for-model-supernova-p2.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Henan Aklly Filter Engineering Co., Ltd. | KZ888E | • IFU (http://www.hnsaklly.com/eng/news/4_119) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Henan Bingzun Industrial Co.,Ltd. | 8410 | • IFU (http://m.zunyue188.com/kz222/vip_doc/17753275.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Henan Yadu Industrial Co., Ltd | Flat Fold | • IFU (http://www.yadu-medical.com/new/new-43-284.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Heyuan COE Communication Technology Co., Ltd. | CHMM-NB | • IFU (//www.hycoe.com/showpro.asp?ID=65) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hubei Huaqiang High-Tech Co., Ltd. | Flat Fold (Earloop) Non-Sterile | • IFU (http://www.huaqiang.world/23341.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

⌃
Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Hui Zhou Tian Chang Industrial Co., Ltd. | N002-AW | • IFU (https://carewe.store/pages/instruction-for-use-n002-aw-ffp2) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Huizhou Green Communication Equipment Manufacturing Co., Ltd | G95200 Particle Filtering Half Mask | • IFU (http://www.green-cem.com/en/productsDetail.php?id=13) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Huizhou Huinuo Technology Co., Ltd | 9501A | • IFU (http://www.hvn-china.com/en/pro/kn95/) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Huizhou Yibaidu Medical Device Technology Co., Ltd. | YBD-2 | |
| Hunan Boltpower Guokang Medical Equipment Co., Ltd. | GK-002A | • IFU (http://www.djjgkyl.com/product/11.html) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hunan Changyuan Technology Co., Ltd. | CY005 Filtering Half Mask | • IFU (https://dcmask.com/ffp2-face-mask/) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hunan EEXI Technology & Service Co., Ltd. | YX152, YX153 | • YX152: IFU (https://www.hunaneexi.com/productinfo/450184.html?templateId=1133605) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br>• YX153: IFU (https://www.hunaneexi.com/productinfo/5440.html?templateId=1133605) ☑ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |



Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Hunan Hengchang Pharmaceutical Co., LTD. | N9501-L (non-sterile type) | • IFU (http://www.hcyy.com /sustainableQualityShow.php?cid=36&id=36&wid=341) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hunan Jianyuan Medical Science and Technology Co. Ltd. | JY009A | • IFU (http://en.jyylkj.com/product/58.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Hunan Kangweining Medical Devices Co., Ltd. | YH-I (non-sterile) and YH-II (sterile) | • IFU (http://www.kwnmc.com/Mask/) ☐ (http://www.fda.gov /about-fda/website-policies/website-disclaimer) |
| Jiande Chaomei Daily Chemicals Co. | F-Y3-A | • IFU (http://www.cmmask.net/products/details/yyfhkz-135.html) ☐ (http://www.fda.gov/about-fda/website-policies /website-disclaimer) |
| Jiangmen Nostop Electric Co., Ltd | JW-017 | • IFU (http://www.nostop.cn /InformationofourEUAlistedrespirator.pdf) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| JIANGSU CHANGMEI MEDTECH CO.,LTD | DFM-01 | • IFU (http://www.czmed.com/index.php?option=com_k2& view=itemlist&layout=category&task=category&id=229& Itemid=744&lang=en) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| JiangSu EverSmart Nano Technology Co., Ltd. | HZ-KN95 | • IFU (http://www.eversmartnano.com/article-detail /bLARp49B) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| JIANGSU HOMCAN MEDICAL TECHNOLOGY CO. LTD | HC-NP95A | • IFU (https://www.homcan.cn/FFP2-instructions) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Jiangsu Jiaao Medical Technology Co., Ltd. | JA95-1 Filtering half mask | • IFU (http://www.jiaaomed.cn/pd.jsp?id=7) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jiangsu Kangershun Protective Equipment Co., Ltd. | KES-002 | • IFU (https://fdamaster.com/kes-002-user-instruction/) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jiangsu Sanfo Outdoor Products Co., Ltd | CX9501-P | • IFU (http://www.cx365mask.com/h-col-108.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jiangsu Yimao Filter Media Co., Ltd | 9570K, 9560K | • 9560K<br>• 9570K: IFU (https://www.eimoeco.com/pd42376175.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jiaxing Yinuo Busway Co., Ltd. | YJ-P2 | |
| Jingzhou Strong Sciences & Technology Development Co.,ltd | ST-A9502, A9507 | • ST-A9502: IFU (http://www.jzstrong.com/enshop/bencandy.php?fid=3&id=197) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br>• A9507: IFU (http://www.jzstrong.com/enshop/bencandy.php?fid=3&id=198) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jinhua Ai Kou Protective Equipment Co., | AK003 | • IFU (http://www.aaikou.com/aaikou/products/18974771.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jinhua Jiadaifu Medical Supplies Co., Ltd. | Disposable Non-Medical Face Mask (KN95) | • IFU (http://www.jiadf.com/a.html) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

^
Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Jinwells (Tianjin) Science and Technology Co., Ltd. | JWS-1, JWS-2 | • JWS-1: IFU (http://www.jinwells.com /default.aspx?pageid=14&pageType=detail&id=59) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• JWS-2: IFU (http://www.jinwells.com /default.aspx?pageid=14&pageType=detail&id=60) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Jinyi (Tianjin) Medical Technology Co., Ltd. | JY9501 | • IFU (http://www.jinyimedical.com/aspcms/news/2020-8-21 /185.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Lanshan Shendun Technology Co., Ltd. | SD-KN95 | • IFU (http://en.lamdownmask.com/article/1013/1005) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Liaoning Dalian Jieying Energy Saving Environmental Protection Technology Development Co., Ltd. | JY-FH-F, JY-FH | • JY-FH-F: IFU (https://www.jieyingtechnology.com/Content /show/catid/109/id/17/lang/en.html) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer)<br><br>• JY-FH: IFU (https://www.jieyingtechnology.com/Content /show/catid/88/id/14/lang/en.html) ⧉ (http://www.fda.gov /about-fda/website-policies/website-disclaimer) |
| Lu'an Bi Hai Protective Equipment Co., Ltd. | BH2020 | |
| Meizhuangchen Health Technology (Shenzhen) Co., Ltd. | ENKN95-001 | |


Top ()

| Manufacturer | Respirator Model(s) | Instructions for Use |
|---|---|---|
| Naton Medical Protective Mask (Zhuozhou) Co., Ltd | FS9501-L, FS9501-M, FS9501-S; FS9901-L, FS9901-M, FS9901-S | • IFU (http://www.natonmask.com/index.php?m=content&c=index&a=lists&catid=25) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| ORICH Medical Equipment (Tianjin) Co., Ltd. | N95 Folded Form (Non-sterile) | • IFU (https://www.orichmed.com/particulate-respirator-583.html) ↗ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |

Showing 1 to 100 of 167 entries

Previous | 1 | 2 | Next

## Respirator Models Previously Removed from Appendix A  (Last Updated October 15, 2020; All models revoked effective July 6, 2021)

These respirator models had been on the list of authorized respirators in Appendix A but no longer met the EUA (/media/136664/download) eligibility criteria and thus were no longer authorized. Results from NIOSH's testing are provided at: https://www.cdc.gov/niosh/npptl/respirators/testing/NonNIOSHresults.html (https://www.cdc.gov/niosh/npptl/respirators/testing/NonNIOSHresults.html)

Search: [                    ]

Show [ 100 ▾ ] entries

| Date No longer Authorized ▾ | Manufacturer ⇅ | Respirator Model(s) No Longer Authorized ⇅ |
|---|---|---|
| 10/15/2020 | HeiQ Materials AG | HVB-FFP2-01 |
| 06/06/2020 | Fujian Kang Chen Daily Necessities Co, Ltd. | K0450, 57793 |

∧
Top ()

| Date No longer Authorized | Manufacturer | Respirator Model(s) No Longer Authorized |
|---|---|---|
| 05/07/2020 | AAB (China) Co., Ltd | KN95 |
| 05/07/2020 | Anshun Health and Medical Technology Co., LTD | AKF2002 |
| 05/07/2020 | Bei (Dong Shan) Protective Supplies Co., LTD | B707 |
| 05/07/2020 | Changsha JNEYL Medical Equipment Co., Ltd | JN-9501 |
| 05/07/2020 | Changzhou Wedream Medical Device Co., Ltd | KN95 |
| 05/07/2020 | Chongqing China Nano Technology Co., Ltd | ZN8005 |
| 05/07/2020 | Chongqing Zaisheng Technology Co., Ltd. | ZS-A950 |
| 05/07/2020 | Chuzhou Qiao Dong Industrial Co., Ltd | Langie KN95 FFP2 |
| 05/07/2020 | Creative Concepts Manufacturing Ltd | 02669, KN95 |
| 05/07/2020 | CTT CO. Ltd. | KN95 |
| 05/07/2020 | Daddybaby Co. Ltd. | KN95 FFP2 |
| 05/07/2020 | DongGuan HuaGang Communication Technology Co., Ltd | KN95-A; KN95-B |
| 05/07/2020 | Dongguan Leihuo Medical Device Co., LTD | CPFM-100, CPFM-101, LH-KN95 |
| 05/07/2020 | Dongguan Xianda Medical Equipment Co., Ltd | KN95 |
| 05/07/2020 | Foshan Nanhai Weijian Sanbang Protective Equipment Technology Co., Ltd | KN95 Model 9051A |
| 05/07/2020 | Fujian Pageone Garment Co., Ltd | KN95 |

⌃
Top ()

| Date No longer Authorized | Manufacturer | Respirator Model(s) No Longer Authorized |
|---|---|---|
| 05/07/2020 | Guangdong Fei Fan MStar Technology Ltd | KN95 |
| 05/07/2020 | Guangdong Kaper Protection Technology Co., Ltd | KP-K02 (N95) |
| 05/07/2020 | Guangzhou Aiyinmei Co., LTD | A&F KN95 |
| 05/07/2020 | Guangzhou Sunjoy Auto Supplies Co., LTD | Earhook folding type K1-K100, Headband folding type K1-K100 |
| 05/07/2020 | Guangzhou Yihere Medical Technology Development Co., Ltd | YH-MFK-B95, YH-MFK-Z95 |
| 05/07/2020 | Guizhou Bocai Medical Device Co., Ltd. | Bocai KN95 |
| 05/07/2020 | Henan Fengzhihuang Industrial Co., Ltd | HF/KN95-3 |
| 05/07/2020 | Henan Youmaisi Health Technology Co. LTD | YMS-AN95 |
| 05/07/2020 | Huizhou Huinuo Technology Co., LTD | HV-N White 9501B |
| 05/07/2020 | Huizhou Jiahe Cubic Technology Co., LTD | KN95 |
| 05/07/2020 | Huizhou Lexuslance Technology Co. Ltd. | LK 003 |
| 05/07/2020 | Improve Medical (Hunan) Co., Ltd. | PPDS Disposable Protective Respirator Strap Headband, PPDS Disposable Protective Respirator Ear Hook |
| 05/07/2020 | Jiangsu Weichuangli New Materials Co., Ltd. | WCL-0075 |
| 05/07/2020 | Jiangxi Hornet Industrial Co. Ltd. | S-KN95 |
| 05/07/2020 | Jiangxi Yifengyuan Biological Engineering Co., Ltd. | N95, KN95 |

^
Top ()

| Date No longer Authorized | Manufacturer | Respirator Model(s) No Longer Authorized |
|---|---|---|
| 05/07/2020 | Jinan Vhold Co., LTD | VH-95 |
| 05/07/2020 | Juntech (Jiaxing) Healthcare Materials Co. Ltd | KN95 |
| 05/07/2020 | Panzhihua Gangcheng Group Yasheng Industrial Co., Ltd. | KN95 |
| 05/07/2020 | Qingdao Orphila Medical Technology Co. LTD. | OM-KN95-FFP2 |
| 05/07/2020 | Qingyuan Leite Technology Development Co. | GV-0095A, GVHKN95 |
| 05/07/2020 | Shandong Daddy's Choice Health Science and Technology Co., Ltd | Purism KN95 |
| 05/07/2020 | Shandong Huishoutang Pharmaceutical Co | KN95 |
| 05/07/2020 | Shandong Shengquan New Material Co., Ltd | SNN70370B (Willow leaf form valveless) |
| 05/07/2020 | Shauguan Taijie Protection Technology Co. Ltd. | KN95 |
| 05/07/2020 | Shenzhen Horb Technology Corp., Ltd | 1.7.02.02.0001 |
| 05/07/2020 | Shenzhen Missadola Technology Co., Ltd, dba 1AK Medical Supplies | 2626-1 KN95 |
| 05/07/2020 | Sunright Medical Technology (GuangDong) Co., LTD | KN95-C3 |
| 05/07/2020 | Tianjin Benmo Medical Equipment Co., Ltd. | KN95 |
| 05/07/2020 | Winner Medical Co. Ltd. | WN-N95FG |
| 05/07/2020 | Yiwu Henghao household products Co., Ltd | HH-KN95-001 |

⌃
Top ()

| Date No longer Authorized | Manufacturer | Respirator Model(s) No Longer Authorized |
|---|---|---|
| 05/07/2020 | Yiwu Yifan Knitting Co. Ltd | KN95 |
| 05/07/2020 | Zhangzhou Easepal Industrial Corp. | MASK-104 |
| 05/07/2020 | Zhejiang Baiyi Intelligent Garment Co LTD | KN95 |
| 05/07/2020 | Zhejiang Shengtai Baby Products Co Ltd | KN95 |
| 05/07/2020 | Zhengzhou QBS New Material Co., LTD | KN95 |
| 05/07/2020 | Zhengzhou Wanshenshan Healthcare PPE Co., Ltd. | KN95 |

Showing 1 to 54 of 54 entries

Previous | 1 | Next

# Umbrella EUA for Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (FFRs) (Revoked effective July 6, 2021)

On March 24, 2020, the FDA issued an umbrella EUA for certain imported disposable filtering facepiece respirators (FFRs) that are not approved by the National Institute for Occupational Safety and Health (NIOSH) and that met eligibility criteria as described in the EUA. Under this EUA, respirators, listed in Exhibit 1, were authorized for use in healthcare settings by healthcare personnel (HCP) when used in accordance with CDC recommendations to prevent wearer exposure to pathogenic biological airborne particulates during FFR shortages resulting from the Coronavirus Disease 2019 (COVID-19) outbreak.

On March 28, 2020, FDA revised this EUA to authorize the use of certain authorized respirators that have been decontaminated pursuant to the terms and conditions of an authorized decontamination system.



Top ()

On June 6, 2020, FDA again revised the EUA to exclude decontaminated respirators with exhalation valves from the scope of authorization, as well as to add additional specificity regarding which jurisdictions were included in the second criterion for eligibility.

On March 24, 2021, the FDA revised this EUA to authorize for emergency use only those respirators listed in the EUA's Exhibit 1 as of the date of this reissuance. The FDA no longer reviewed requests to add new respirator models to Exhibit 1 of this EUA after March 24, 2021.

On June 30, 2021, the FDA announced the revocation (/medical-devices/emergency-use-authorizations-medical-devices/historical-information-about-device-emergency-use-authorizations) of EUA (effective July 6, 2021).

- Revoked EUA Letter of Authorization - Umbrella EUA Imported, Non-NIOSH-Approved Disposable Filtering Facepiece Respirators (/media/136403/download)
- Exhibit 1 (Last Updated March 8, 2021; All models revoked effective July 6, 2021)

## Exhibit 1 (Last Updated March 8, 2021; All models revoked effective July 6, 2021)

The table below includes a list of non-NIOSH-approved disposable FFRs that were authorized under this Umbrella EUA (/media/136403/download) for emergency use in healthcare settings by HCP when used in accordance with CDC recommendations. For the most current CDC recommendations on optimizing respirator use, please visit CDC's webpage: Strategies for Optimizing the Supply of N95 Respirators (https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/index.html).



Search: [                    ]

Show [100] entries

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| 3M | 8205 | Japan | |
| 3M | 8822 | South Korea | |

Top ()

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| 3M | 9320+ | UK, Singapore, Turkey | |
| 3M | 9322+ | UK, Singapore, Turkey | |
| Advanced Medical Devices Pty Limited | Nano-Tech P2 Particulate Respirator - T4 | Australia | • IFU (https://amdmed.com.au/instruction-to-use/) ☐ (http://www.fda.gov/about-fda/website-policies/wel |
| Allix Co., Ltd. | AM 200 | South Korea | |
| Alumitek Ingenieria S de RL de CV | MXN95R1 | Mexico | • IFU (https://en.safetyproductsmfg.com/respirador-n (http://www.fda.gov/about-fda/website-policies/wel |
| Ap Mascarillas S.A. de C.V. | AP M10, AP Z6 | Mexico | |
| Best Pacific Vietnam Company Limited | MASK-VN-22 | Vietnam | • IFU (http://vn.doctorcross.com/labeling_VN22) ☐ ( /about-fda/website-policies/website-disclaimer) |
| BioSerenity | 1016-07003-US | France | |



Top ()

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| Brands Unlimited S.A. de C.V. | Medimask MM-001, MM-002, MM-003 A, MM-003 B, MM-003 C, MM-003 D, MM-003 E, MM-003 F, MM-003 G, MM-003 H, MM-003 I, MM-003 J, MM-003 K, MM-003 L, MM-004 A, MM-004 B, MM-004 C, MM-004 D, MM-004 E, MM-004 F, MM-004 G, MM-004 H, MM-004 I, MM-004 J, MM-004 K, and MM-004 L | Mexico | |
| BTL Industries | FLAT-FIT Healthcare Respirator | Bulgaria | • IFU (https://btl-misc.s3.eu-west-1.amazonaws.com/misc/BTL_Respirator_LF_User-Manual_ENESUS100 (http://www.fda.gov/about-fda/website-policies/wel |
| Care Essentials Pty Ltd | MSK-001, MSK-001S, MSK-002, MSK-002S | Australia | • IFU (https://www.careessentials.com.au/product-inf instructions/) ☐ (http://www.fda.gov/about-fda/we/website-disclaimer) |
| Dromex | Model 1020 | South Africa | |
| Evolve Group Pty Ltd | IPKIS P2 Respirator | Australia | |

Top ()

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| Galia Textil S.A. DE C.V | GTN95 | Mexico | |
| GCE Lighting / Savoy International | MRP-FFP2-AM-20 | France | • IFU (https://www.savoy-international.com/wp-conten /manual-FFP2-savoy-international.pdf) ☐ (http://wv fda/website-policies/website-disclaimer) |
| Grupo 10X SA DE CV d.b.a Sanitek Pro | Sanitek Pro N95 | Mexico | • IFU (https://sanitekpro.com/n95-respirator/) ☐ (htt /about-fda/website-policies/website-disclaimer) |
| Hwa Yui Co., Ltd | HY20 | South Korea | • IFU (https://www.hwayui.co.kr/2021/02/03/instructi masks/) ☐ (http://www.fda.gov/about-fda/website-disclaimer) |
| Hygiene Austria LP GmbH | HA PP02 | Austria | |
| Keeo Life Private Limited | KF-SG-N95-HL, KF-SG-N95-EL | India | |
| Lanaco Limited | WAIRE P2 | New Zealand | • IFU (https://lanaco.co.nz/wp-content/uploads/2020, Respirator-v2.1-Insert-Card-User-Instructions-1.pdf) (http://www.fda.gov/about-fda/website-policies/wel |
| Layfield Canada Ltd. | 1970EU | Canada | • IFU (https://layfieldmedical.com/wp-content/upload /layfield_1970eu_respirator_m00006013_user_instru ☐ (http://www.fda.gov/about-fda/website-policies/ |
| Macopharma | F2001N | France | • IFU (https://www.macopharma.com/wp-content/upl /NOTEURO60-01.2021.pdf) ☐ (http://www.fda.gov/ policies/website-disclaimer) |
| Manohar Filaments Private Limited | MF-SG-N95-HH, MF-SG-N95-EH | India | • MF-SG-N95-HH: IFU (http://www.mfpl.care/N95-IFU-I (http://www.fda.gov/about-fda/website-policies/wel • MF-SG-N95-EH: IFU (http://www.mfpl.care/N95-IFU-E (http://www.fda.gov/about-fda/website-policies/wel |

Top ()

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| Mkteks Mensucat Tekstil Sanayi VE Ticaret Limited Sirketi | WV NR 101 | Turkey | |
| MUSK Medikal Tekstil Plastik Sanayi Ve Ticaret Limited Sirketi | MUSK001 | Turkey | |
| MY ARLET | ARLET 5000 FFP2 NR, ARLET 6000 FFP3 NR | Turkey | • IFU (http://myarlet.com/pdf/ffp3.pdf) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Novita, 9 Koi Marketing Pte Ltd | R5, R7 | Singapore | • IFU (https://novita.com.sg/web/respirator/r5r7userg... (http://www.fda.gov/about-fda/website-policies/web... |
| NTI Vina Co. Ltd. | SG9010V | Vietnam | • IFU (http://enwglobal.com/en/bbs/content.php?co_id=instruction_to_use) ☐ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) |
| Plastcor Do Brasil LTDA | ECHO PFF2 CA 38.811 | Brazil | • IFU (http://plastcors.com/instructionsforuse.pdf) ☐ (http://www.fda.gov/about-fda/website-policies/web... |
| Productos Químicos y Farmacéuticos R&M S.A de C.V. | PLB 95 | Mexico | |
| Rang Company | MB100 | South Korea | |
| Rose Personal Protective Equipment Industry and Trade Anonym Company | IRYS-08 | Turkey | • IFU (http://ivrou.com/pdf/Intended%20Use%20and%20Other%20Instructio... revised.pdf) ☐ (http://www.fda.gov/about-fda/webs.../website-disclaimer) |

⌃
Top ()

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| Softmed Manufacturing Pty Ltd | SM-RC201, SM-RF202 | Australia | • SM-RC201: Labeling (https://softmedusa.com/instru /LA-009_USA_Medical_P2_CUP_SM-RC201-20_Head (http://www.fda.gov/about-fda/website-policies/wel (https://softmedusa.com/instructions /IFU_1_00_Insert_USA_Cup_Respirator_V1.pdf)  (l /about-fda/website-policies/website-disclaimer)  <br>• SM-RF202: IFU (https://softmedusa.com/instruction /IFU_2_00_Insert_USA_95_Folded_Respirator_V1.pdf (http://www.fda.gov/about-fda/website-policies/wel |
| Sonata Calcetin S.A. de C.V. | CB01 | Mexico | |

^
Top ()

| Manufacturer | Respirator Model(s) | Country of Manufacture | Instructions for Use |
|---|---|---|---|
| Tenamyd Pharmaceutical Corporation | Tenamyd FM-N95 Model YCKTC13, Tenafa® N-95 Model YCTFA04, Tenami® N-95 Model YCTM102, YCTFM02, YCTFA07, YCTMI08, YCTFM01, YCTFA06, YCTMI07 | Vietnam | • YCKTC13: IFU (https://tenamydpharma.com/san-pha n95-(model-ycktc13)) ⏷ (http://www.fda.gov/about policies/website-disclaimer)<br><br>• YCTFA04: IFU (https://tenamydpharma.com/san-pha n95-(model-yctfa04)) ⏷ (http://www.fda.gov/about policies/website-disclaimer)<br><br>• YCTFM02: IFU (https://tenamydpharma.com/san-pha n95-2011-(model-yctfm02)) ⏷ (http://www.fda.gov/ policies/website-disclaimer)<br><br>• YCTFA07: IFU (https://tenamydpharma.com/san-pha n95-2011-(model-yctfa07)) ⏷ (http://www.fda.gov/ policies/website-disclaimer)<br><br>• YCTMI08: IFU (https://tenamydpharma.com/san-pha n95-2011-(model-yctmi08)) ⏷ (http://www.fda.gov/ policies/website-disclaimer)<br><br>• YCTFM01: IFU (https://tenamydpharma.com/san-pha n95-duck-beak-(model-yctfm01)) ⏷ (http://www.fda fda/website-policies/website-disclaimer)<br><br>• YCTFA06: IFU (https://tenamydpharma.com/san-pha beak-(model-yctfa06)) ⏷ (http://www.fda.gov/abou policies/website-disclaimer)<br><br>• YCTMI07: IFU (https://tenamydpharma.com/san-pha beak-(model-yctmi07)) ⏷ (http://www.fda.gov/abou policies/website-disclaimer)<br><br>• YCTMI02: IFU (https://tenamydpharma.com/san-pha n95-(model-yctm102)) ⏷ (http://www.fda.gov/abou policies/website-disclaimer) |
| TRN MODA TEKSTIL SAN VE TIC LTD STI | O2BLS-NRFM002, O2BLS-NRFM003 | Turkey | |

Showing 1 to 38 of 38 entries

Previous | 1 | Next ()

⌃ Top ()

Plaintiff's Exhibit 128

# Emergency Use Authorization of Medical Products and Related Authorities

Guidance for Industry and Other Stakeholders

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
Office of the Commissioner
Office of the Chief Scientist
Office of Counterterrorism and Emerging Threats

**January 2017**

Procedural
OMB Control No. 0910-0595
Expiration Date 08/31/2022
See additional PRA statement in section IX of this guidance.

*Contains Nonbinding Recommendations*

# Emergency Use Authorization of Medical Products and Related Authorities[1]

## Guidance for Industry and Other Stakeholders

---

This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.

---

## I.   <u>INTRODUCTION</u>

This guidance explains FDA's general recommendations and procedures applicable to the authorization of the emergency use of certain medical products under sections 564, 564A, and 564B of the Federal Food, Drug, and Cosmetic Act (FD&C Act)[2] as amended or added by the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 (PAHPRA)[3]. The provisions in PAHPRA, described in section II of this guidance, include key legal authorities to sustain and strengthen national preparedness for public health, military, and domestic emergencies involving chemical, biological, radiological, and nuclear (CBRN) agents, including emerging infectious disease threats such as pandemic influenza. PAHPRA clarifies and enhances FDA's authority to support emergency preparedness and response and foster the

---

[1] This guidance was prepared by the Office of Counterterrorism and Emerging Threats (OCET) in cooperation with the Center for Biologics Evaluation and Research (CBER), Center for Devices and Radiological Health (CDRH), and Center for Drug Evaluation and Research (CDER).

[2] 21 U.S.C. 360bbb-3, 360bbb-3a, and 360bbb-3b. Section 564 was first added to the FD&C Act by the Project BioShield Act of 2004 (Public Law 108-276). Hereafter in this document, statutory references (e.g., "section __") are to the FD&C Act, except where otherwise indicated.

[3] Public Law 113-5. Section 3088 of the 21st Century Cures Act, signed into law by the President on December 13, 2016, amends sections 564, 564A, and 564B of the FD&C Act to add new authorities to: (1) authorize emergency use of unapproved animal drugs, (2) make applicable other emergency use authorities (e.g., to issue emergency dispensing orders, waive compliance with current good manufacturing practices (CGMPs), make available Centers for Disease Control and Prevention (CDC) emergency use instructions, and extend expiration dates) to approved animal drugs, and (3) allow unapproved animal drugs to be held for emergency use. While much of what is described in this guidance will apply to those new authorities, this guidance does not by its terms reference them; FDA asks anyone interested in utilizing these authorities to contact FDA directly to discuss how to proceed. FDA plans to review these new authorities and address any new procedural issues raised as we develop more experience with these new authorities.

*Contains Nonbinding Recommendations*

development and availability of medical products for use in these emergencies.  These medical products, also referred to as "medical countermeasures" or "MCMs," include drugs[4] (e.g., antivirals and antidotes), biological products (e.g., vaccines, blood products, and biological therapeutics), and devices (e.g., *in vitro* diagnostics and personal protective equipment).  This guidance finalizes the draft guidance, *Emergency Use Authorization of Medical Products and Related Authorities (April 2016)* and replaces the following two guidance documents, *Emergency Use Authorization of Medical Products* (July 2007) and *Emergency Use Authorization Questions and Answers* (April 2009).

In general, FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidance means that something is suggested or recommended, but not required.

## II.    SCOPE OF GUIDANCE

This document is intended to inform all stakeholders[5] involved in emergency response activities and FDA staff of FDA's general recommendations and procedures for:

> (1) Issuance of Emergency Use Authorizations (EUAs) under section 564;
>
> (2) Implementation of the emergency use authorities set forth in section 564A; and
>
> (3) Reliance on the governmental pre-positioning authority set forth in section 564B."

---

[4] Throughout this guidance references to "drugs" and "drug products" include both drugs approved under the FD&C Act and biological products licensed under the Public Health Service (PHS) Act, but not biological products that also meet the definition of a device in section 201(h) of the FD&C Act (21 U.S.C. 321(h)).

[5] For purposes of this guidance, "stakeholders" include industry and government sponsors and other government stakeholders/entities involved in emergency response activities (including Federal, State, local, tribal, or territorial government stakeholders/entities). The term "government stakeholders" refers to the public health and/or emergency response agencies or their agents/delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundaries (e.g., city, county, tribal, territorial, State, or Federal), or functional range or sphere of authority (e.g., law enforcement, public health, military health) to prescribe, administer, deliver, distribute, hold, or dispense a medical product during an emergency situation.

*Contains Nonbinding Recommendations*

Section 564, as amended by PAHPRA, permits the Commissioner[6] to authorize the emergency use of an unapproved medical product or an unapproved use of an approved[7] medical product for certain emergency circumstances (discussed in section III.A of this guidance) after the HHS Secretary has made a declaration of emergency or threat justifying authorization of emergency use.  The Commissioner may issue an EUA to allow an MCM to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by a CBRN agent when there are no adequate, approved, and available alternatives.  Section III of this guidance addresses EUAs.

Section 564A, as added by PAHPRA, establishes streamlined mechanisms to facilitate preparedness and response activities involving certain FDA-approved MCMs *without* FDA issuing an EUA, which can be a resource-intensive process.  These authorities, and the definition of eligible products to which they apply, are discussed in section IV of this guidance.  These authorities, which apply only to eligible FDA-approved medical products intended for use during a CBRN emergency, include provisions that:

- Empower FDA to extend the expiration date of an eligible FDA-approved MCM stockpiled for use in a CBRN emergency and to establish appropriate conditions relating to such extensions, such as appropriate storage, sampling, and labeling;

- Permit FDA to waive otherwise-applicable current good manufacturing practice (CGMP) requirements[8] (e.g., storage or handling) to accommodate emergency response needs;

- Allow emergency dispensing of MCMs during an actual CBRN emergency event without requiring an individual prescription for each recipient[9] of the MCM or all of the information otherwise required or by responders who may not otherwise be

---

[6] As provided in section 1003 and existing delegations of authority (found in the FDA Staff Manual Guide 1410.10), the Secretary of Health and Human Services (HHS Secretary or Secretary of HHS) has delegated most of the authorities under sections 564, 564A, and 564B to the Commissioner of FDA (Commissioner).  Thus, this guidance refers to either FDA or the Commissioner rather than the HHS Secretary, except where the HHS Secretary has traditionally exercised the authority or has delegated it to another official (e.g., the authority to issue emergency use instructions pursuant to section 564A(e) was delegated to the Director of the CDC).

[7] Unless otherwise specified, the terms "approved product" and "FDA-approved product" refer to a product that is approved, licensed, or cleared under section 505, 510(k), or 515 of the FD&C Act or section 351 of the PHS Act, as applicable. For purposes of this document, an "unapproved" product refers to a product that is not approved, licensed, or cleared for commercial distribution under section 505, 510(k), or 515 of the FD&C Act or section 351 of the PHS Act; an "unapproved use of an approved product" refers to a product that is approved, licensed, or cleared under such a provision but for which the specific use is not an approved, licensed, or cleared use of the product. See section 564(a)(2).

[8] As applied to medical devices, these are referred to as "Quality System Regulation" requirements.  See 21 CFR 820.

[9] For purposes of this guidance, the term "recipient(s)" refers to individual(s) to whom an MCM product is administered or on whom the product is used.

*Contains Nonbinding Recommendations*

> licensed to dispense, if permitted by state law in the state where such dispensing occurs or if in accordance with an order issued by FDA; and

- Permit the Centers for Disease Control and Prevention (CDC) to create and issue "emergency use instructions" (EUI) concerning the FDA-approved conditions of use for eligible products.[10]

In addition, PAHPRA amended section 505-1(k) to authorize FDA to waive Risk Evaluation and Mitigation Strategy (REMS) requirements for CBRN emergencies.

Finally, section 564B, also added by PAHPRA, permits government stakeholders to pre-position (e.g., stockpile, forward-deploy) MCMs in anticipation of FDA approval or clearance, authorization of an investigational use, or the issuance of an EUA, to enable these stakeholders to prepare for potential rapid deployment during an actual CBRN emergency. This authority is discussed in section V of this guidance.

## III.   ==EMERGENCY USE AUTHORIZATIONS==

The EUA authority under section 564 allows FDA to facilitate availability and unapproved uses of MCMs needed to prepare for and respond to CBRN emergencies.  The EUA authority is separate and distinct from use of a medical product under an investigational application (i.e., Investigational New Drug Application (IND) or Investigational Device Exemption (IDE)), section 561 expanded access authorities,[11] and section 564A emergency use authorities discussed in section IV of this guidance.

---

[10] U.S. Department of Health and Human Services, Delegation of Authority of section 564A(e) of the Federal Food, Drug, and Cosmetic Act, December 16, 2013, see http://www.fda.gov/downloads/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCMLegalRegulatoryandPolicyFramework/UCM510446.pdf.

[11] For general information on expanded access mechanisms, see http://www.fda.gov/NewsEvents/PublicHealthFocus/ExpandedAccessCompassionateUse/default.htm.

*Contains Nonbinding Recommendations*

Before an EUA declaration terminates, the Secretary of HHS must provide advance notice that is sufficient to allow for the disposition of an unapproved product, and of any labeling or other information provided related to an unapproved use of an approved product (section 564(b)(3)).[19]

## B.   EUA MEDICAL PRODUCTS

### 1.   Criteria for Issuance

During the effective period of the HHS Secretary's EUA declaration, FDA may authorize the introduction of a medical product into interstate commerce when the product is intended for use during an actual or potential emergency.  EUA candidate products include medical products and uses that are not approved, cleared, or licensed under sections 505, 510(k), and 515 of the FD&C Act or section 351 of the PHS Act.

After the requisite determination and declaration have been issued, and after feasible and appropriate consultations, FDA may issue an EUA only if FDA concludes that the following four statutory criteria for issuance have been met.  If the product does not meet the statutory criteria for issuance or is not otherwise an appropriate candidate, an alternative regulatory mechanism (i.e., access under an IND or IDE, which can include expanded access protocols[20]) may be an appropriate means to provide patients access to an unapproved use of a product in a CBRN emergency.

#### a.   Serious or Life-Threatening Disease or Condition

For FDA to issue an EUA, the CBRN agent(s) referred to in the HHS Secretary's EUA declaration must be capable of causing a serious or life-threatening disease or condition.

#### b.   Evidence of Effectiveness

Medical products that may be considered for an EUA are those that "may be effective" to prevent, diagnose, or treat serious or life-threatening diseases or conditions that can be caused by a CBRN agent(s) identified in the HHS Secretary's declaration of emergency or threat of emergency under section 564(b).  Potential EUA products also include those that may be effective to mitigate a disease or condition caused by an FDA-regulated product (including a product authorized for emergency use under section 564 or an approved product) used to diagnose, treat, or prevent a disease or condition caused by a CBRN agent.

---

[19] The Secretary of HHS publishes in the Federal Register notice of each EUA declaration justifying issuance of an EUA, with an explanation of the basis of the declaration under section 564(b)(1), as well as any advance notice of termination of such a declaration.

[20] For general information on expanded access mechanisms, see
http://www.fda.gov/NewsEvents/PublicHealthFocus/ExpandedAccessCompassionateUse/default.htm.

*Contains Nonbinding Recommendations*

==The "may be effective" standard for EUAs provides for a lower level of evidence than the "effectiveness" standard that FDA uses for product approvals.==[21]  FDA intends to assess the potential effectiveness of a possible EUA product on a case-by-case basis using a risk-benefit analysis, as explained below.  If, based on the totality of the scientific evidence available, it is reasonable to believe that the product may be effective for the specified use, FDA may authorize its emergency use, provided that other statutory criteria for issuing an EUA also are met.

c.   <u>Risk-Benefit Analysis</u>

A product may be considered for an EUA if the Commissioner determines that the known and potential benefits of the product, when used to diagnose, prevent, or treat the identified disease or condition, outweigh the known and potential risks of the product.  In making this assessment, FDA must take into consideration the material threat posed by the CBRN agent(s) identified in the HHS Secretary's declaration of emergency or threat of emergency if applicable (section 564(c)).

In determining whether the known and potential benefits of the product outweigh the known and potential risks, FDA intends to look at the totality of the scientific evidence to make an overall risk-benefit determination.  Such evidence, which could arise from a variety of sources, may include (but is not limited to): results of domestic and foreign clinical trials, *in vivo* efficacy data from animal models, and *in vitro* data, available for FDA consideration.  FDA will also assess the quality and quantity of the available evidence, given the current state of scientific knowledge.  The types of evidence that FDA may consider and that should be submitted to support a request for an EUA are discussed more fully in section III.D.2 of this guidance.

d.   <u>No Alternatives</u>

==For FDA to issue an EUA, there must be no adequate, approved, and available alternative to the candidate product for diagnosing, preventing, or treating the disease or condition.==  A potential alternative product may be considered "unavailable" if there are insufficient supplies of the approved alternative to fully meet the emergency need.  A potential alternative product may be considered "inadequate" if, for example, there are contraindicating data for special circumstances or populations (e.g., children, immunocompromised individuals, or individuals with a drug allergy), if a dosage form of an approved product is inappropriate for use in a special population (e.g., a tablet for individuals who cannot swallow pills), or if the agent is or may be resistant to approved and available alternative products.

---

[21] Regulations regarding treatment INDs and IDEs also use the terminology "may be effective."  A request for a treatment IND for a drug or biologic intended to treat an immediately life-threatening disease may be granted when, among other things, there is evidence that the drug may be effective for its intended use in its intended population (21 CFR 312.320(a)(3)(ii)). For devices, a treatment IDE may be withdrawn if FDA determines that the available scientific evidence fails to provide a reasonable basis for concluding that the device "may be effective for its intended population" (21 CFR 812. 36(d)(2)(iv)(A)).  It should be noted that FDA's decisions on requests for EUAs and treatment INDs and IDEs involve product-specific and circumstance-dependent determinations of risks and benefits. FDA also notes that the amount, type, and quality of evidence available to support an EUA may not always be the same as that required for expanded access, IDEs, or humanitarian device exemptions under the FD&C Act and FDA regulations.

*Contains Nonbinding Recommendations*

- Dosing information (if applicable), including any specific instructions for special populations; and

- Contact information for reporting adverse events and additional information about the product.

Health care professionals or authorized dispensers will likely have very limited time to review Fact Sheets during an emergency and, therefore, FDA anticipates that Fact Sheets typically will be brief (i.e., a few pages).  FDA makes available on its website Fact Sheets for products for which an EUA is issued.[41]

FDA further recommends that Fact Sheets target the health care professional or authorized dispenser who has the most basic level of training, recognizing that individuals responding to an emergency may have different levels of training, could come from a variety of backgrounds, and may have different types of experience or speak different languages.  FDA recommends that Fact Sheets accompany the EUA product in an accessible form (e.g., printable as a hard copy) when the product is distributed to the health care professional or authorized dispenser if practicable.  To the extent consistent with other conditions of authorization, information on the EUA product also may be disseminated to health care professionals or authorized dispensers through mass media (including print, broadcast, radio, satellite, Internet, or other electronic means of dissemination), videos/DVDs, or direct communication from public health agencies.

For unapproved drug products, which do not have FDA-approved labeling for any indication, FDA recommends that, in addition to the brief summary information found in a Fact Sheet, the sponsor also develop more detailed information similar to what health care professionals are accustomed to finding in FDA-approved package inserts.  For medical devices regulated, such as *in vitro* diagnostics, in addition to the brief summary information found in a Fact Sheet, FDA recommends the sponsor also develop separate Instructions for Use.[42]

With respect to an EUA that authorizes a change in labeling of an approved product, but for which the manufacturer chooses not to make such labeling change, the EUA may not authorize the product's distributor or any other person to alter or obscure the manufacturer's labeling (section 564(e)(2)(B)).[43]  In such a situation, however, FDA must, to the extent practicable given the applicable circumstances, authorize a person acting pursuant to such EUA to provide, in

---

[41]For examples of Health Care Professional Fact Sheets, see FDA's website at: http://www.fda.gov/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCMLegalRegulatoryandPolicyFramework/ucm182568.htm#current.

[42] For examples of Instructions for Use, see FDA's website at: http://www.fda.gov/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCMLegalRegulatoryandPolicyFramework/ucm182568.htm#current.

[43] We note that this prohibition does not apply to changes in expiration dating permitted pursuant to section 564A(b). See section IV.B of this guidance.

*Contains Nonbinding Recommendations*

addition to the manufacturer's labeling, appropriate information with respect to the product, such as that provided in the brief Fact Sheet described above.[44]

b.   Information for Recipients

Although informed consent as generally required under FDA regulations[45] is not required for administration or use of an EUA product, section 564 does provide EUA conditions to ensure that recipients are informed about the MCM they receive under an EUA. ==For an unapproved product (section 564(e)(1)(A)(ii)) and for an unapproved use of an approved product (section 564(e)(2)(A)), the statute requires that FDA ensure that recipients are informed to the extent practicable given the applicable circumstances:==

- That FDA has authorized emergency use of the product;

- ==Of the significant known and potential benefits and risks associated with the emergency use of the product, and of the extent to which such benefits and risks are unknown;==

- ==That they have the option to accept or refuse the EUA product and of any consequences of refusing administration of the product;[46]== and

- Of any available alternatives to the product and of the risks and benefits of available alternatives.

==Therefore, FDA recommends that a request for an EUA include a "Fact Sheet" for recipients that includes essential information about the product.== In addition to the above information, the Agency recommends that the content of the Fact Sheets for recipients include the following information:

- Product name and explanation of the intended use of the product;

- A description of the disease/condition;

---

[44] Additional information provided under section 564(e)(2)(B)(ii) as a condition of authorization is not considered "labeling" for purposes of section 502 of the FD&C Act while the EUA for the product is effective.

[45] See 21 CFR part 50.

[46] ==The President may under certain circumstances waive the option for members of the armed forces to accept or refuse administration of an EUA product (10 U.S.C. 1107a).== In addition, the option to accept or refuse may not be practicable with regard to certain diagnostics because, for example, when a sample is taken from an individual it may be unknown, even to the health care professional, which diagnostic test will be used to test the sample. For this reason, Fact Sheets for both health care professionals and recipients may not accompany an EUA diagnostic product, but instead be publicly posted for reference when receiving test results.

*Contains Nonbinding Recommendations*

- A description of items to discuss with a health care provider and adverse event information, including contact information for how to get more information and for reporting adverse reactions; and

- Dosing information (if applicable), including specific instructions for home use or preparation (if applicable).

==FDA recommends that recipients be given as much appropriate information as possible given the nature of the emergency and the conditions of the authorization.[47]  Ordinarily, FDA expects that some written form of information will be given to recipients with the MCM, similar to the Fact Sheet for health care professionals or authorized dispensers.==  FDA recognizes that these Fact Sheets, like those for health care professionals or authorized dispensers, will generally be brief. To ensure that individuals of varying educational levels comprehend the information provided, FDA recommends that all written information be stated in the simplest language possible using techniques to improve health literacy.[48] In addition, translations to other languages may be appropriate if practicable.[49]  FDA recognizes that some flexibility may be needed for health care providers or authorized dispensers to make minor, nonsubstantive changes to the fact sheets for recipients such as adding local contact information, using specific letterhead or minor format changes.

FDA acknowledges that exigent circumstances may dictate the use of other appropriate dissemination methods.  Therefore, FDA expects that information would be disseminated in the most effective and expeditious way possible to reach the recipient before administration or use of an EUA product.[50]  If, however, taking the time needed to provide such information would diminish or negate the effectiveness of the product for the recipient, FDA may include as a condition of authorization that the information be provided to the recipient as soon as practicable after dispensing.  Other methods of dissemination may include internet posting, mass media, videos/DVDs, or direct communication from health care professionals and public health agencies.

## 2.    Monitoring and Reporting of Adverse Events

==For an unapproved product (section 564(e)(1)(A)(iii)), EUA conditions for monitoring and reporting of adverse events are required to the extent practicable given the circumstances of the emergency; such conditions may be established for an EUA for an unapproved use of an approved product (section 564(e)(2)(A)), at the discretion of FDA.==

---

[47] For examples of Patient/Recipient Fact Sheets, see FDA's website at: http://www.fda.gov/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCMLegalRegulatoryandPolicyFramework/ucm182568.htm#current.

[48] See, e.g., http://www.health.gov/communication/literacy/quickguide/healthinfo.htm.

[49] When the translation of a fact sheet to a foreign language is determined to be appropriate and necessary, the party producing the translation is responsible for the accuracy and completeness of the translation; FDA does not intend to review translations to ensure their accuracy.

[50] As noted above, however, this may not be practicable or appropriate for certain diagnostic tests.

*Contains Nonbinding Recommendations*

Conditions may be placed to enable the collection and analysis of information on the safety and effectiveness of the EUA product during the period when the authorization is in effect and for a reasonable time following such period.  FDA expects that the primary focus of adverse event-related conditions will be capturing serious adverse events and applying appropriate mechanism(s) for the collection of follow-up clinical information.  Some reporting may be directed to predefined mechanisms to capture adverse event data (e.g., FDA's Safety Information and Adverse Event Reporting System (MedWatch) or Vaccine Adverse Event Reporting System (VAERS)).  FDA will work with product sponsors in some circumstances to develop proposals for more active data collection and follow-up mechanisms to capture adverse event information under the EUA.  FDA encourages EUA sponsors to provide proposals for data collection and follow-up during pre-EUA interactions.

### 3.    Records

To the extent practicable given the circumstances of the emergency, FDA must establish conditions for a manufacturer of an unapproved product to maintain records and to grant FDA access to records concerning the EUA product.[51]  FDA anticipates that such conditions may relate to, for example, the number of doses, devices, or other unit(s) (including lot identification) that have been shipped or sold under an EUA; or the name and addresses of the facilities to and from which the EUA product was shipped.  FDA may also impose comparable recordkeeping requirements on any person (e.g., an authorized distributor or dispenser) other than a manufacturer who carries out any activity for an unapproved EUA product (section 564(e)(1)(B)(iv)).

FDA may also impose recordkeeping and records access requirements on any person (including a manufacturer) engaged in an activity for which an EUA is issued for an unapproved use of an approved product (section 564(e)(2)(A)).  In addition to the examples noted above for unapproved EUA products, examples may include conditions relating to actual use of the product and disposition of any unused product, and monitoring of patients who have been administered the product under an EUA.

### 4.    Additional Conditions of Authorization

FDA, on a case-by-case basis and to the extent feasible given the circumstances of the emergency, may establish additional conditions that FDA finds to be necessary or appropriate to protect the public health (section 564(e)) [52], such as the following:

- *Distribution and administration*— conditions may be placed on which entities may distribute and who may administer the product, and how distribution and administration are to be performed.  In addition, conditions may be placed on the

---

[51] Section 564(e)(1)(A)(iv).

[52] Section 564(e)(1)(B) (for unapproved products) and 564(e)(2)(A) (for unapproved uses of approved products).

*Contains Nonbinding Recommendations*

### 1.   Revision and Revocation

FDA will periodically review the circumstances and appropriateness of an EUA, including circumstances that might warrant revocation of the EUA.  The review will include regular assessment based on additional information provided by the sponsor of the progress made with respect to the approval, licensure, or clearance of the unapproved product, or of the unapproved use of an approved product, for which an EUA was issued.

FDA may revise or revoke an EUA if the circumstances justifying its issuance (under section 564(b)(1)) no longer exist, the criteria for its issuance are no longer met, or other circumstances make a revision or revocation appropriate to protect the public health or safety.[58]  Such circumstances may include significant adverse inspectional findings (e.g., when an inspection of the manufacturing site and processes has raised significant questions regarding the purity, potency, or safety of the EUA product that materially affect the risk/benefit assessment upon which the EUA was based); reports of adverse events (number or severity) linked to, or suspected of being caused by, the EUA product; product failure; product ineffectiveness (such as newly emerging data that may contribute to revision of the FDA's initial conclusion that the product "may be effective" against a particular CBRN agent); a request from the sponsor to revoke the EUA; a material change in the risk/benefit assessment based on evolving understanding of the disease or condition and/or availability of authorized MCMs; or as provided in section 564(b)(2), a change in the approval status of the product may make an EUA unnecessary.

### 2.   Product Disposition and Continued Use

Upon revocation of an EUA or its termination as a result of the termination of the HHS EUA declaration supporting it, an unapproved product or its labeling, and product information for an unapproved use of an approved product, must be disposed of pursuant to section 564(b)(2)(B) and (b)(3).[59]  Notwithstanding any such revocation or termination, under section 564(f)(2) an authorization shall continue to be effective to provide for continued use in any patient who began treatment before revocation or termination (to the extent found necessary by the patient's attending physician).  Any study or future use of an EUA product beyond the term of a declaration is subject to investigational product regulations (e.g., IND regulations).

### H.   PUBLICATION

FDA will promptly publish in the Federal Register a notice of each EUA, including an explanation of the reasons for issuance, a description of the intended use, and any contraindications of the EUA product.  The Agency also will promptly publish in the Federal Register each termination or revocation of an EUA and an explanation of the reasons for the decision.  Although FDA is not required to publish notice of an EUA revision(s) in the Federal

---

[58] Section 564(g)(2).

[59] Section 564(b)(2)(B) provides that FDA shall consult with the manufacturer of the product with respect to the appropriate disposition.

*Contains Nonbinding Recommendations*

Register, FDA plans to post any revisions to EUAs on FDA's website at
http://www.fda.gov/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCML
egalRegulatoryandPolicyFramework/ucm182568.htm.[60]

## I.       OPTION TO CARRY OUT AUTHORIZED ACTIVITIES

If a manufacturer is the sole source of an unapproved product authorized for emergency use, that
manufacturer must inform FDA, within a reasonable time after the authorization, if the
manufacturer does not intend to make its product available for use under the EUA (section
564(l)).  The Commissioner does not have the authority under section 564 to require a person to
carry out any activity for which an EUA is issued.  Section 564(l), however, does not limit
FDA's authority to impose conditions on persons who carry out any activity for which an EUA is
issued.

## IV.      EMERGENCY USE OF ELIGIBLE FDA-APPROVED MCMs WITHOUT AN EUA

Section 564A allows FDA to facilitate certain emergency activities involving FDA-approved
MCMs without an EUA.  This authority is independent of the EUA authority under section 564.
In the past, to address concerns about potential FD&C Act violations related to the activities
discussed in this section involving MCMs, FDA has either: (1) exercised its enforcement
discretion with respect to the activity; or (2) issued an EUA to ensure that use of such MCMs
remains covered under any otherwise applicable protections under the PREP Act [61] (discussed in
section VII of this guidance).  MCMs used under this authority qualify for applicable PREP Act
protection.[62]

In some cases, FDA and CDC may coordinate activities under section 564A authorities including
the issuance of an emergency dispensing order, waiver of cGMPs, waiver of REMS, extension of
expiration dating, and/or issuance of EUI for specific MCMs.[63]

---

[60] In publicly releasing information on an EUA, FDA will take necessary steps to protect nonpublic
information and information otherwise protected by law, as appropriate.

[61] *See* 42 U.S.C. 247d-6d.

[62] *See* 42 U.S.C. 247d-6d(i)(1)(C), (i)(7)(B)(iii).

[63] See, e.g., Emergency Dispensing Information tables for doxycycline and ciprofloxacin at:
http://www.fda.gov/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCMLegalRegul
atoryandPolicyFramework/ucm495126.htm#doxy
http://www.fda.gov/EmergencyPreparedness/Counterterrorism/MedicalCountermeasures/MCMLegalRegul
atoryandPolicyFramework/ucm495126.htm#cipro.

*Contains Nonbinding Recommendations*

duties.[76]  Under the legal principles of implied conflict preemption, courts have found state law preempted where it is impossible to comply with both federal and state law, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[77]  Consistent with this case law, section 4(a) of Executive Order 13132 states that "[a]gencies shall construe... a Federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute."[78]

FDA believes that the terms and conditions of an EUA issued under section 564 preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564.  Similarly, an order or waiver issued under section 564A and pre-positioning under section 564B preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements related to the activity authorized under sections 564A or 564B.

To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and "conflicts with the exercise of Federal authority under [§ 564]." The same rationale applies to an order or waiver issued under section 564A and pre-positioning of an MCM under section 564B.

Affected state laws may include, but are not limited to, laws governing the administration of investigational medical products, such as informed consent laws and laws requiring Institutional Review Board approval, and laws governing the prescribing or dispensing of medical products, such as laws limiting who may prescribe or dispense medical products and under what circumstances.

Moreover, the PREP Act, which expressly provides immunity from tort liability associated with certain MCM activities, preempts state laws that are different from, or in conflict with, any requirement applicable to a covered countermeasure under the PREP

---

[76] Medtronic v. Lohr, 518 U.S. 470, 503 (1996) (Breyer, J., concurring in part and concurring in the judgment); id. at 510 (O'Connor, J., joined by Rehnquist, C.J., Scalia, J., and Thomas, J., concurring in part and dissenting in part); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521 (1992) (plurality opinion); id. at 548-49 (Scalia, J., joined by Thomas, J., concurring in judgment in part and dissenting in part).  Under the same reasoning, state regulations and local ordinances would also be preempted.

[77] See Arizona v. United States, 132 S. Ct. 2492, 2501, 2505, 2507 (2012); Crosby v.  National Foreign Trade Council, 530 U.S. 363, 373 (2000); Geier v.  American Honda Motor Company, Inc., 529 U.S. 861, 873 (2000);  Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

[78] Exec. Order No. 13132, 64 FR 43255 (August 4, 1999).

Plaintiffs' Exhibit 129

fda.gov

# Certain Respirators from China May Not Provide Adequate Protection

13-16 minutes

---

### Certain Filtering Facepiece Respirators from China May Not Provide Adequate Respiratory Protection - Letter to Health Care Providers

The U.S. Food and Drug Administration (FDA) is concerned that certain filtering facepiece respirators (respirators) from China may not provide consistent and adequate respiratory protection to health care personnel exposed to COVID-19 based on additional filtration performance testing conducted by the National Institute for Occupational Safety and Health (NIOSH) - National Personal Protective Technology Laboratory (NPPTL) of the Centers for Disease Control and Prevention (CDC) (referred to below as the NIOSH testing). Based on the FDA's increased understanding of the performance and design of these respirators, the FDA has decided that these respirators should not be decontaminated for reuse by health care personnel. As such, the FDA has revised and reissued the May 7, 2020, EUA.

On May 7, 2020, the FDA reissued the April 3, 2020 EUA for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China to revise the third eligibility criterion –  the criterion for authorization of respirators based on review of test reports from recognized independent test laboratories submitted to the FDA by the manufacturer or importer – and accordingly removed from Appendix A the respirators that had been authorized under that criterion but were no longer authorized based on this revision.[1] The FDA took this public health action primarily because a number of these respirators failed to demonstrate a minimum particulate filtration efficiency of 95 percent in testing conducted at NIOSH.

On June 6, 2020, the FDA further revised this criterion such that respirators that are authorized under this criterion and that do not meet performance expectations are no

==longer authorized. Respirators that have a failing grade as indicated by NIOSH testing may be re-labeled as face masks and authorized as face masks for use as source control if certain criteria are met under the Face Mask umbrella EUA.== For other information, please see the FDA's enforcement policy on face masks,  as described in the Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised) Guidance.

Non-NIOSH-approved disposable filtering facepiece respirators that meet the other eligibility criteria in the reissued Emergency Use Authorization remain authorized by the FDA for use during the COVID-19 pandemic and continue to be listed in Appendix A.

## Considerations

Health care facilities with these respirators in inventory should review the considerations listed below. The information is specific to respirators that are designed to achieve a very close facial fit and to filter airborne particles. These considerations are not applicable to surgical masks or face masks that are loose-fitting and create a physical barrier between the health care personnel's mouth and nose and potential contaminants in the immediate environment.

- Respirators that no longer appear in Appendix A of the EUA may not reliably provide a minimum percent particulate filtration efficiency of 95 percent. Refer to the NIOSH assessment webpage to determine whether non-NIOSH-approved disposable filtering facepiece respirators manufactured in China have been tested and to review the testing results.

- ==A complete list of Respirator Models No Longer Authorized is available on our website.==

- NIOSH regularly updates its list of testing results.
- Respirators that have been tested by NIOSH and failed to demonstrate a Minimum Particulate Filtration Efficiency of 95 percent may be considered for use as face masks for source control if they do not have exhalation valves, to help slow the spread of infection when a person speaks, coughs, or sneezes. Health care facilities should be aware that this use of face masks is different from personal protective equipment for health care personnel.

- Health care facilities with these respirators that failed the NIOSH testing may wish to consider a number of factors in deciding to use these products as face masks, including current need, inventory, facility practices, and acceptable uses.

- At this time and based on the available information, the FDA believes that any respirators listed in Appendix A may not be reliably decontaminated in any decontamination system authorized for use during the COVID-19 pandemic.

- If you have respirators that were removed from Appendix A based on the May 7, 2020, update to the third criterion and you want NIOSH to test their filtration efficiency, you can request NIOSH testing by submitting the International Respirator Assessment Request.

## Additional Information

Health care facilities may find the following information useful when considering the purchase or use of respirators:

- Products labeled as "respirators" must meet the applicable FDA requirements or receive an Emergency Use Authorization to be imported and distributed in the United States. However, products labeled as "face masks" are subject to different requirements from products labeled as "respirators." "Face masks" do not need to be on Appendix A to the reissued EUA, or on Exhibit 1 to the June 6, 2020, EUA for imported respirators, to be imported and distributed in the United States. But face masks are not considered PPE. For more information, please see the Face Mask umbrella EUA which authorizes face masks that meet certain criteria, as well as the Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised).

- Consistent with CDC's recommendations, HCP should use an FDA-cleared or NIOSH-approved respirator before another authorized, imported respirator, when available. The FDA authorized the emergency use of all NIOSH-approved air purifying respirators for use in healthcare settings during the COVID-19 public health emergency. The CDC provides a list of NIOSH-Approved Particulate Filtering Facepiece Respirators and powered air purifying respirators.

- If FDA-cleared or NIOSH-approved respirators are not available, consider using respirators covered under one of the other FDA Emergency Use Authorizations for respirators. Based on the totality of scientific evidence and other information available to FDA, it is reasonable to believe these authorized respirators may be effective at preventing exposure to certain particulates to prevent the spread of COVID-19. These respirators are listed in Exhibit 1 of the June 6, 2020, Imported, Non-NIOSH Approved Disposable Filtering Facepiece Respirators Emergency Use Authorization for respirators manufactured in other countries, or Appendix A of the Emergency Use

Authorization for Non-NIOSH Approved Disposable Filtering Facepiece Respirators manufactured in China. The lists in Appendix A and in Exhibit 1 are updated on a rolling basis as new information becomes available for FDA to review.

- Consider asking questions of the seller and conducting a physical assessment of the product and fit testing, to make the most informed benefit-risk decision about respirator use.

- Continue to ensure that "fit testing" of respirators is conducted with health care personnel so that a very close facial fit is achieved. Many respirators manufactured in China have an ear loop design. According to the CDC, limited assessment of ear loop designs indicate there may pose difficulty achieving a proper fit. Follow your health care facility's guidelines for conducting fit testing.

- If a used respirator that is FDA-cleared or NIOSH-approved is available and a new respirator covered under one of the FDA Emergency Use Authorizations for respirators is not available, you may consider decontaminating and reusing the used respirator with a decontamination system that has an FDA Emergency Use Authorization, if the used respirator is compatible with the decontamination system.

- If your facility is using respirators that have been removed from Appendix A, these respirators are no longer authorized by FDA for single use or for reuse by an FDA authorized decontamination system.

- Additionally, as of June 6, 2020, any KN95 respirator, or any respirators with exhalation valves, should not be decontaminated and are no longer authorized to be decontaminated by any authorized decontamination systems.

- If you have concerns about respirators or questions about the packaging, labeling, or quality of the respirators, consider replacing, discarding, or returning the respirators to the distributor.

See Frequently Asked Questions (FAQs) about Non-NIOSH-Approved Filtering Facepiece Respirators for more information.

## FDA Actions

The FDA continues to actively monitor and take action to mitigate any potential shortages in the supply chain, including the medical device supply chain. This includes taking action to help assure health care personnel on the front lines have the necessary supplies of personal protective equipment to meet the demand.

Additionally, on June 6, 2020, the FDA reissued the Emergency Use Authorization (EUA) for Non-NIOSH-Approved Disposable Filtering Facepiece Respirators Manufactured in China by revising the Scope of Authorization to revise that authorized respirators listed in Appendix A will no longer be authorized if decontaminated. The FDA also reauthorized the EUAs for multiple decontamination systems so that these decontamination systems are no longer authorized to decontaminate respirators manufactured in China nor are they authorized to decontaminate respirators with exhalation valves, where applicable. For more information on the FDA's revised EUAs on respirators and decontamination systems, please see the FDA's press release.

The FDA continues to collaborate with the CDC to increase the availability and ensure the integrity of respirators during the COVID-19 public health emergency.

The FDA will continue to keep health care providers and the public informed if new or additional information becomes available.

If additional information becomes available that indicates respirators are not eligible to be authorized, they will be removed from Appendix A and this removal will be publicly communicated on the Respirator Models No Longer Authorized-COVID19 document.

## Reporting Problems to the FDA

The FDA encourages health care providers to report any adverse events or suspected adverse events experienced with respirators.

- Voluntary reports can be submitted through MedWatch, the FDA Safety Information and Adverse Event Reporting program.

- Device manufacturers and user facilities must comply with the applicable Medical Device Reporting (MDR) regulations.

- Health care providers employed by facilities that are subject to the FDA's user facility reporting requirements should follow the reporting procedures established by their facilities.

- Fraudulent COVID-19 products pose a serious risk to public health. We encourage any concerns about potential counterfeit or fraudulent product be sent to FDA-COVID-19-Fraudulent-Products@fda.hhs.gov.   If possible, please include a description of the product along with a picture of the product's labeling.

Prompt reporting of adverse events can help the FDA identify and better understand the risks associated with medical devices.

## Contact Information

If you have questions about this letter, contact the Division of Industry and Consumer Education (DICE).

### Additional Resources:

- Personal Protective Equipment Emergency Use Authorizations

- The FDA's Video "What is an Emergency Use Authorization?"

- NIOSH's Healthcare Respiratory Protection Resources Fit Testing

- The Occupational Safety and Health Administration's (OSHA) video about Respiratory Protection Fit Testing

- The CDC's Counterfeit Respirators/Misrepresentation of NIOSH-Approval and Factors to Consider When Planning to Purchase Respirators from Another Country provides information about recognizing counterfeit respirators, recommended best practices for proper respirator use, and to assist buyers in making procurement decisions.

---

[1] However, respirators previously authorized by meeting the original third eligibility criterion (i.e., review of independent test lab reports) for which manufacturers have requested FDA sample collection and NIOSH testing and have demonstrated greater than or equal to 95 percent filtration efficiency per a modified version of NIOSH Standard Test Procedure (STP) TEB-APR-STP-0059), https://www.cdc.gov/niosh/nppt/stps/pdfs/TEB-APR-STP-0059-508.pdf, within 45 days of EUA reissuance on May 7, 2020, are eligible for authorization under the revised third criterion and are listed on Appendix A.

# Plaintiff's Exhibit 130

**FDA -- Surgical Masks EUA**
**Template for Addition to Appendix A**

This template includes the data/information requirements needed by FDA to support addition of a surgical mask to the list of authorized surgical masks in Appendix A under the Surgical Masks EUA (the "Surgical Masks EUA" or "EUA"), as set forth in the EUA. ***As explained in the EUA, once completed, please send this interactive review template with the subject line "Surgical Masks Eligible for EUA" to*** CDRH-nondiagnosticEUA-templates@fda.hhs.gov*.*

## GENERAL INFORMATION ABOUT THIS TEMPLATE

- In order to be added to Appendix A, consistent with the criteria and requirements in Section II of the EUA, text highlighted in yellow [text] must be provided to FDA as applicable to each model number.

- This is a template for addition to Appendix A of the Surgical Mask EUA and is not a guidance document. It contains no new information.

- Any trade secret or confidential commercial information provided within the template and during the interactive review process will remain confidential.

- Please remember that if your product is added to this specific EUA, the authorization would only be for the use specified in the EUA and subject to the conditions in the EUA. This device must not be introduced into interstate commerce for uses outside the authorized use without obtaining marketing clearance, approval, IDE, or another EUA by the FDA.

- The Surgical Mask EUA is only in effect until the declaration that circumstances exist justifying this authorization is terminated under Section 564(b)(2) of the Federal Food, Drug, and Cosmetic Act (the Act) or the EUA is revoked under Section 564(g) of the Act.

- ***The EUA is not a pathway to permanent marketing of your product.*** For information on premarket submissions, refer to FDA's website on "How to Study and Market Your Device" at https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/how-study-and-market-your-device. For information on FDA's enforcement policy for surgical masks, see FDA guidance *Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)*. For guidance on modifications that trigger the requirement that a manufacturer submit a new premarket notification (510(k)) to FDA, refer to FDA guidance *Deciding When to Submit a 510(k) for a Change to an Existing Device*.

Case 2:22-cv-02383-SSS-AS   Document 1-1   Filed 04/08/22   Page 201 of 586   Page ID
#:657
Template for Addition to Appendix A of the Surgical Masks EUA

## Template for Addition to Appendix A of the Surgical Mask EUA

**A. Required Information from Section II of the EUA:**

**1) Applicant**

Applicant information:
- Applicant Company Name:
- Applicant Address:
- Applicant Contact Person:
- Applicant Contact Phone#:
- Applicant Contact Email:

Correspondent information (if different from the Applicant):
- Correspondent Company Name:
- Correspondent Address:
- Correspondent Contact Person:
- Correspondent Contact Phone#:
- Correspondent Contact Email:

**2) Device proprietary or brand name, model number:**

Proprietary Name - [product trade name]
Established Name - [generic name]
Model number - [model number]

**3) Product Labeling**

[Provide a copy of the product labeling, including the instructions for use.]

As stated in the EUA, the product labeling must:

- Describe the product as a disposable, single-use surgical mask. The labeling must include a list of the body contacting materials (which does not include any drugs, biologics, nanoparticles, or antimicrobial/antiviral agents);
- State that the product is not intended to replace the need for FDA-cleared surgical masks or FDA-cleared or authorized respirators;
- State that surgical masks are not intended to provide protection against pathogenic biological airborne particulates and are not recommended for use in aerosol generating procedures and any clinical conditions where there is significant risk of infection through inhalation exposure;
- Not include statements that would misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: (1) reuse, (2) antimicrobial or

Case 2:22-cv-02383-SSS-AS   Document 1-1   Filed 04/08/22   Page 202 of 586   Page ID
#:658
Template for Addition to Appendix A of the Surgical Masks EUA

antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency.

**4) Device Marketing Estimate**

[Provide an estimate of the number of surgical masks you are planning to market and distribute during the public health emergency.]

**5) Evidence Demonstrating The Surgical Mask Meets The Criteria**

[Provide a summary of the evidence demonstrating that the surgical mask meets the criteria required in the EUA, including test reports.]

As set forth in the EUA, a surgical mask is authorized if it has been designed, evaluated, and validated consistent with the following performance criteria and is not excluded from the scope of authorization. The following surgical masks are excluded from the scope and are not authorized under this EUA: (1) surgical masks that are FDA-cleared; (2) surgical masks that are manufactured in China; and (3) surgical masks that include drugs, biologics, nanoparticles, or antimicrobial/antiviral agents.

**a. Fluid Resistance Requirements**

[Provide test reports to demonstrate that the model meets fluid resistance requirements (liquid barrier performance) consistent with ASTM F1862: *Standard Test Method for Resistance of Medical Face Masks to Penetration by Synthetic Blood (Horizontal Projection of Fixed Volume at a Known Velocity)*.]

**b. Flammability Testing**

[Provide test reports to demonstrate that the textiles used in the surgical mask meet flammability performance consistent with the definition of either a Class 1 or Class 2 textile in 16 CFR Part 1610]

**c. Particle Filtration Testing**

[Provide test reports to demonstrate that the model meets particulate filtration efficiency requirements consistent with ASTM F2100: *Standard Specification for Performance of Materials Used in Medical Face Masks.*]

**d. Air Flow Resistance (i.e., Breathability) Assessment**

[Provide evidence, including test reports, to demonstrate that the model meets air flow resistance (i.e., breathability) requirements with an acceptance criterion of <6 mm $H_2O/cm^2$ for differential pressure (delta P) testing consistent with ASTM F2100: *Standard Specification for Performance of Materials Used in Medical Face Masks* for those masks composed of 4 or more layers.]

Template for Addition to Appendix A of the Surgical Masks EUA

e.   **Biocompatibility Assessment**

[Provide evidence, including test reports, indicating how the model has materials of manufacture that are either (1) non-cytotoxic, non-irritating and non-sensitizing consistent with the recommendations in FDA's guidance, "*Use of International Standard ISO 10993-1, 'Biological evaluation of medical devices - Part 1: Evaluation and testing within a risk management process*'" or (2) conform to the following biocompatibility standards:
- ISO 10993-1: *Biological evaluation of medical devices - Part 1: Evaluation and testing within a risk management process*
- ISO 10993-5: *Biological evaluation of medical devices - Part 5: Tests for in vitro cytotoxicity*
- ISO 10993-10: *Biological evaluation of medical devices - Part 10: Tests for irritation and skin sensitization.*]

6)   **Authorized Distributors and/or Authorized Importers**

[Please provide a list of authorized distributors and/or authorized importers, including contact information (name, address, contact person, phone number, and email).]

**B.  FDA Summary of Documentation and Review [for FDA Internal Use Only]**

FDA reviewers will include a brief summary of the documentation provided and their conclusion of whether the product meets the criteria identified in Section II.

FDA reviewers should clearly distinguish their comments and edits in the document from the information provided by the sponsor.

**C.  Review Log  [for FDA Internal Use Only]**

Use the table below to document interactions between FDA or the sponsor.

| Date | Type of Interaction (phone/ email/ formal submission-DCC) | Brief Description (e.g., questions asked/ feedback from FDA received / any word documents included) |
|------|------|------|
| [X] | [X] | [X] |
| | | |
| | | |

**D.  Next Steps**

Once FDA review is completed, if the eligible product has been confirmed to meet the criteria of the EUA, then you will receive an email notification with that information and your product will be added to Appendix A of the Surgical Mask EUA. If the product is

4

Template for Addition to Appendix A of the Surgical Masks EUA

not eligible for addition to or fails to meet the criteria of the EUA, then you will receive
an email notification with that information.  Please note that, as set forth in FDA's
guidance Emergency Use Authorization of Medical Products and Related Authorities,
FDA intends to prioritize its review of EUA requests during a declared emergency based
on various factors, including the extent to which the product would serve a significant
unmet medical need.

**E.  Finalizing Review [for FDA Internal Use Only]**

Once FDA review is completed, FDA reviewers should finalize the documentation, sign
and date this template, and document concurrence from the OHT management.

Plaintiffs' Exhibit 131

law360.com

# Takeaways From FDA's Relaxed Rules For Making Face Masks - Law360

12-16 minutes

By **Denise Bense and Karl Neumann**

Law360 is providing free access to its coronavirus coverage to make sure all members of the legal community have accurate information in this time of uncertainty and change. Use the form below to sign up for any of our weekly newsletters. Signing up for any of our section newsletters will opt you in to the weekly Coronavirus briefing.

Law360 (April 13, 2020, 5:47 PM EDT) --

Persistent headlines keep reminding us that the U.S. has run out of masks. Health officials have implored retailers to practice corporate generosity and donate what is left on their shelves. The surgeon general is asking lay people not to buy or hoard them. And the shortage has led to investigations into what some are calling unethical price-gouging.

The U.S.' strategic national stockpile includes roughly 12 million medical-grade N95 masks and 30 million surgical masks.[1] That is only approximately 1% of the estimated 3.5 billion that the U.S. Department of Health and Human Services estimates would be necessary if the COVID-19 pandemic lasts over a year.[2] With now more than 550,000 confirmed cases in the U.S. alone,[3] the shortage presents yet another obstacle for health care workers in the fight against the virus.

Ascending from this shortage has been a grassroots-meets-industry mobilization to help wage war on the virus. Lay people and manufacturers of just about every type of business are lending assistance to create masks. Companies that once made mattresses, shoes, apparel and many other products are now turning efforts toward the manufacturing face masks.[4] Even a business that manufactures sports jerseys for professional athletes is now making masks using the same jersey material from its products.

A recurring question from manufacturers wanting to assist in these efforts is, "What regulations exist and to what extent are they being enforced?" In light of this and an effort to increase availability of masks, the U.S. Food and Drug Administration recently issued an updated guidance policy for face masks and respirators.[5] At its core, the policy's

purpose is to ease compliance requirements that manufacturers would typically have to meet before distributing masks.

The guidance remains in effect for the duration of the public health emergency as declared by HHS.[6] For those businesses wanting to start manufacturing face masks, understanding the FDA's regulation of face masks generally and in light of recent circumstances will prove helpful in manufacturing efforts.

**When is a face mask a medical device?**

There are many types of face masks out on the market used in different industries and for varying purposes. The FDA regulates face masks when they meet the definition of a device under Section 201(h) of the Federal Food, Drug and Cosmetic Act.

A face mask is a device subject to regulation when it is intended for a medical purpose, or otherwise "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease."[7] The masks that are subject to regulation cover a range of masks and include masks used by the general public in public health emergencies,[8] to more robust masks like surgical masks with antiviral agents.[9]

In determining whether the products are intended for a medical purpose, the FDA will consider whether the mask (1) is labeled or intended for use by a health care professional; (2) is labeled or intended to be used in a health care-associated environment; and (3) includes any drugs, biologics, anti-microbial or anti-viral agents.[10] This list is nonexhaustive.

When face masks are not intended for medical use, they are not classified as a medical device and, therefore, neither FDA device marketing authorization nor the requirements under the Federal Food, Drug and Cosmetic Act apply.

**The FDA is lifting typical production and distribution requirements.**

In light of the ongoing need for masks, the FDA is suspending[11] enforcement of premarket requirements for certain face masks: the "FDA does not intend to object to individuals' distribution and use of improvised PPE when no alternatives, such as FDA-cleared masks or respirators, are available."[12]

More specifically, the FDA is waiving regulatory requirements, including submission of premarket notification under the 510(k) process, registration and listing requirements, quality system regulation requirements, reports or corrections and removals, and unique device identification requirements.[13]

The major caveat is that any face mask manufactured cannot "create an undue risk in light of the public health emergency."[14] For face masks intended for medical purposes, but not intended to provide liquid barrier protection, no undue risk is seen where:

- The product includes accurate labeling describing the product as a face mask. For example, the face mask should not be labeled as a surgical mask.

- The labeling includes a list of the material that makes contact with the body. The contacting materials may not include any drugs or biologics.

- The labeling makes recommendations that would sufficiently reduce any risks of usage. For example, it could include a recommendation against use in a surgical setting or against use in environments with increased exposure to fluids or high intensity heat sources.

- The product is not intended for any use that would create an undue risk in light of the public health emergency. For example, the labeling should not include that the mask can be used for antimicrobial or antiviral protection or be used for infection prevention.

  The FDA takes a similar approach with surgical masks that are intended to provide liquid barrier protection. Surgical masks are Class II devices that cover the user's nose and mouth while also providing a barrier to fluids and particulate materials. They are also tested for flammability and biocompatibility. The FDA is lifting the same requirements as those noted above for masks not intended to provide liquid barrier protection.[15]

  Such devices are not believed to create an undue risk under similar circumstance to above with a few additional variables:

- The product meets fluid resistance testing consistent with ASTM F1962.

- The mask meets Class I or Class II flammability requirements pursuant to Title 16 of Code of Federal Regulations Part 1610. This does not apply if the mask is labeled with an explicit recommendation against use in the presence of high-intensity heat sources.

- The product includes accurate labeling describing the product as a surgical mask.

- The product includes a list of materials contacting the body, which do not include drugs or biologics within the materials.

- The product is not intended for any use that would create an undue risk in light of the public health emergency.

Similarly, the FDA states it does not intend to object to companies importing and distributing alternative respirators identified in CDC recommendations.[16] The Centers for Disease Control and Prevention recommends use of alternative face masks approved under standards used in other countries when FDA-cleared or National Institute for Occupational Safety and Health-approved N95 respirators are unavailable.[17]

However, the FDA notes that because it cannot confirm the authenticity of any alternative respirators from abroad, it recommends that people take appropriate steps to verify the authenticity of the products before importing them.

**The FDA is seeking collaboration, and companies should be familiar with compliance.**

In the recent guidance update, the FDA is now welcoming the opportunity to work with any manufacturer with interest in manufacturing masks and respirators — even if the manufacturer has no previous experience in medical device manufacturing. For example, the FDA would like to work collaboratively with manufacturers on device-specific emergency use authorizations.

Likewise, the FDA guidance also addresses the reprocessing of otherwise disposable N95 particulate filtering facepiece respirators (or other similar filtering facepiece respirators). Under normal circumstances, a reprocessor would need to obtain 510(k) clearance to reprocess single-use medical devices. The FDA is seeking input from companies to facilitate the safe reuse and conservation of such devices.

The FDA recognizes that because of the short supply of masks, companies need to act quickly despite not being well-versed in mask construction and regulation. The FDA's guidelines will help increase the supply of alternative face masks during the ongoing pandemic. Worth noting, the FDA's guidance does not establish any enforceable rights or responsibilities — i.e., it is merely the FDA's current thinking and any guidance are at most suggestions or recommendations.

That said, companies attempting to manufacture or distribute face masks should not only review the entirety of the FDA's guidance but also be familiar with other FDA compliance measures that may still be applicable. The FDA's guidance document is not necessarily an exhaustive list of what should be done when manufacturing masks, and a full understanding of FDA regulations is required.

So long as the masks are not created with undue risk, efforts by various companies will serve as another vehicle toward preserving the workforce that is on the front lines in the fight against the virus.

---

*Denise Bense is a member and Karl Neumann is an associate at Cozen O'Connor.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firms, their clients, or any of its or their respective affiliates. This article is for purposes of general information and is not intended to be and should not be taken as legal advice.*

[1] Abby Goodnough, Some Hospitals Are Close to Running Out of Crucial Masks for Coronavirus (March 9, 2020), https://www.nytimes.com/2020/03/09/health/coronavirus-n95-face-masks.html.

[2] Dep't of Health and Human Servs., HHS to Procure N95 Respirators to Support Healthcare Workers in COVID-19 Outbreaks (March 4, 2020), https://www.hhs.gov/about/news/2020/03/04/hhs-to-procure-n95-respirators-to-support-healthcare-workers-in-covid-19-outbreaks.html.

[3] Centers for Disease Control and Prevention, Cases in U.S. (Updated April 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[4] Ingrid Schmidt, Fashion Brands Are Making Face Masks, Medical Gowns for the Coronavirus Crisis, Los Angeles Times (March 24, 2020), https://www.latimes.com/lifestyle/story/2020-03-24/fashion-brands-face-masks-medical-surgical-gowns-coronavirus; Nicole Yang, New Balance is Working to Manufacture Facial Masks During Coronavirus Pandemic (March 28, 2020), https://www.bostonglobe.com/2020/03/28/sports/new-balance-is-working-manufacture-facial-masks/.

[5] See U.S. Food and Drug Admin., Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised), Guidance for Industry and Food and Drug Administration Staff (April 2020), https://www.fda.gov/media/136449/download.

[6] On January 31, 2020, the Secretary of Health and Human Services, Alex Azar II, determined that a nationwide public health emergency began on January 27, 2020. Dep't of Health and Human Services, Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (January 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

[7] Section 201(h) of the Food, Drug & Cosmetic Act.

[8] 21 CFR 880.6260 (General Hospital and Personal Use Devices).

[9] 21 CFR 878.4040 (Surgical Apparel).

[10] See U.S. Food and Drug Admin., Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised), Guidance for Industry and Food and Drug Administration Staff (April 2020),

https://www.fda.gov/media/136449/download.

[11] Id.

[12] Id.

[13] Id.

[14] Id.

[15] The FDA's updated guidance also addresses face shields for medical use. While outside the scope of this article, face shields are Class I devices and exempt from premarket notification requirements under the 510(k) process. See 21 CFR 878.4040.

[16] See Centers for Disease Control and Prevention, Strategies for optimizing the Supply of N95 Respirators During the COVID-19 Response, cdc.gov/coronavirus/2019-ncov/hcp/checklist-n95-strategy.html ("Use alternatives to N95 respirators where feasible (e.g.,other disposable filtering facepiece respirators, elastomeric respirators with appropriate filters or cartridges, powered air purifying respirators)").

[17] Notably, even state health departments are releasing interim guidance on alternative facemasks Minnesota Dep't of Health, Interim Guidance on Alternative Facemasks (March 27, 2020), https://www.health.state.mn.us/diseases/coronavirus/hcp/masksalt.pdf.

For a reprint of this article, please contact reprints@law360.com.

Plaintiffs' Exhibit 132

butzel.com

## The House Forwards Legislation Expanding the FDA's Authority to Manage Counterfeit Medical Devices

8-10 minutes

A bill expanding the authority of the Food and Drug Administration (FDA) may provide safer medical devices to the American public amid the Covid-19 pandemic, as well as support manufacturers of legitimate medical devices, by addressing a loophole in the Food, Drug, and Cosmetic Act.  Counterfeit medical devices have been a danger in the U.S. supply chain for years, but their presence has been especially of concern during the current pandemic, when there have been shortages of products considered to be medical devices by the FDA, such as medical masks, surgical gowns and gloves, respirators, and other products.  Counterfeit medical devices may include various products like those mentioned above, but often depend on the intended use and labeling.

Background

Many products used during the Covid-19 pandemic are considered to be medical devices by the FDA.  The FDA has issued special guidance concerning medical masks, distinguishing those that are regulated by the FDA where they are intended for medical uses versus industrial uses.  The FDA has also issued a number of guidance documents concerning various types of masks that may be considered medical devices.[i]

The FDA has already identified numerous hand sanitizers from China that were found to be packaged in a way that could be confused with drinks and cause serious injury.[ii]  The FDA has also recalled many hand sanitizers due to methanol contamination as well.

FDA and Counterfeit Products

The FDA has had the power to seize and destroy counterfeit medicines, ensuring that they will not end up in American homes and endangering public health.  The FDA does not, currently, however, have this same authority when regulating counterfeit medical devices.  Additionally, drugs attached to medical devices, like a syringe, are technically considered "medical devices," creating a large loophole.  In response, Republican Congressman Brett Guthrie and Democratic Congressman Eliot Engel introduced the bipartisan bill known as

the Safeguarding Therapeutics Act of 2020 ("the Act") in January of this year.

While counterfeit medical devices have been problematic for years, the Act is especially relevant this year in light of the ongoing pandemic that has increased demand for many of these products. Manufacturers of counterfeit devices have certainly taken advantage of the Covid-19 pandemic by seizing the opportunity to sell counterfeit devices amidst shortages and fearful consumers. Manufacturers of counterfeit devices have been producing and shipping fake Covid-19 tests, products that claim to cure Covid-19, and counterfeit medical supplies to the U.S. For example, in March, U.S. Customs and Border Protection at the Los Angeles International Airport and Chicago O'Hare International Airport confiscated counterfeit Covid-19 tests. In September, over 500,000 counterfeit N-95 masks were seized at the Chicago O'Hare International Airport. These counterfeit devices would only contribute to misleading and improperly protecting consumers, a significant threat during a pandemic. Although the FDA has the power to store items or send them back, it has been unable to *destroy* counterfeit devices to ensure that they do not reach medical providers and consumers. The Safeguarding Therapeutics Act aims to change that.

On September 21, 2020, the U.S. House of Representatives passed the bill, allowing it to move along in the legislative process to the Senate. It was received in the Senate, read twice, and was referred to the Committee on Health, Education, Labor, and Pensions on September 22, 2020. From there, little or no activity appears to have occurred in the Committee. There has not been a reference to a subcommittee nor has there been a markup session.

There is, however, a Senate companion bill (S4225), titled "Safeguarding Therapeutics Act of 2020." S4225 was introduced in July 2020 and was referred to the Committee on Health, Education, Labor, and Pensions. It has three sponsors: Maggie Hassan (D) from New Hampshire, Rick Scott (R) from Florida, and Mike Enzi (R) from Wyoming.

The legislation seeks to amend the Food, Drug, and Cosmetic Act and address the loophole that has limited the FDA's power to target and regulate the increasing number of counterfeit medical devices in the U.S. supply chain. The bill defines "counterfeit medical devices" as:

a device which, or the container, packaging, or labeling of which, without authorization, bears a trademark, trade name, or other identifying mark, imprint, or symbol, or any likeness thereof, or is manufactured using a design, of a device manufacturer, packer, or distributor other than the person or persons who in fact manufactured, packed, or distributed such device and which thereby falsely purports or is represented to be the product of, or to have been packed or distributed by, such other device manufacturer, packer, or distributor.

Although the proposed changes are few, they would have significant impacts on the FDA's authority and effectiveness in regulating counterfeit medical devices.  The Act would add the phrase "or counterfeit device" to 28 U.S.C. 381(a), which currently gives the FDA the authority to refuse admission of a counterfeit drug.  The Act also includes an amendment that would give the FDA the authority to destroy counterfeit devices valued at $2,500 or less, which the FDA has been able to do with counterfeit drugs.  Currently, the FDA may refuse admission of the devices, but cannot seize or destroy devices deemed as counterfeit because owners must first be provided the opportunity to export the product.  The FDA is thus left with the choice of storing or returning the counterfeit medical devices.  This results in the FDA often returning the counterfeit medical devices to their senders, who often repackage the devices and send them back to the U.S.  If they are not caught, the counterfeit devices enter the supply chain.  Thus, counterfeit devices are often not fully intercepted and prevented from entering the market and endangering the health of consumers.

Lastly, besides protecting the public from counterfeit devices, increased regulation may support manufacturers of legitimate medical devices by helping curb the counterfeit medical devices on the market.  Manufacturers of legitimate medical devices may benefit from a decreased need for spending and by being able to invest less in anti-counterfeiting measures, such as tracking devices and having systems in place that allow for reporting counterfeits.  These measures may still be needed to different extents depending on each manufacturer's situation, but the enactment of the Safeguarding Therapeutics Act would likely assist manufacturers in their anti-counterfeiting efforts.  Lastly, while the law would not provide a cause of action for manufacturers of genuine devices, it would offer support for their position against manufacturers of counterfeit devices in litigation.

Counterfeiting is a major problem that affects many U.S. businesses.  Fortunately, the U.S. Customs and Border Protection (CBP) also provide protection against counterfeiting by allowing U.S. companies that hold registered trademarks and copyrights to record them with CBP, and suspected counterfeits are detained at the border.[iii]  This would be in addition to the remedies set out in the proposed Safeguarding Therapeutics Act.  Butzel Long attorneys have extensive experience in assisting clients against counterfeit imports.

It is yet to be seen whether this Act will get signed into law and—if it does—whether it will be in its current version.  But Butzel Long will continue to monitor this Act and report back to our clients on how this may impact you and your businesses.

**Leslie Alan Glick**

202.454.2839

glick@butzel.com

**T.R. Eppel**

Plaintiffs' Exhibit 133

sgs.com

# FDA Issues New Emergency Use Authorization for Surgical Masks

8-10 minutes          Aug. 20, 2020

---

**SAFEGUARDS** | Personal Protective EquipmentNO. 123/20



On August 5, 2020, the US Food and Drug Administration (FDA) issued an umbrella emergency use authorization (EUA) for certain disposable, single-use surgical masks in response to concerns relating to insufficient supply and availability of such masks.

This EUA authorizes the emergency use of surgical masks that meet certain performance requirements for use in healthcare settings by health care personnel as personal protective equipment to provide a physical barrier to fluids and particulate materials to prevent healthcare personnel (HCP) exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic.

## FDA's Emergency Use Authorizations

During a public health emergency, the FDA can use EUA to allow the use of unapproved medical products, or unapproved uses of approved medical products, to diagnose, treat, or prevent serious or life-threatening diseases when certain criteria are met, including that there are no adequate, approved, and available alternatives.

Before the FDA can issue an EUA, the Secretary of Health and Human Services must make a declaration of emergency or threat justifying authorization of emergency use for a

product.

When the emergency is over, the EUA declaration is terminated, and all EUAs issued based on that declaration will no longer remain in effect.

Typically, EUAs will established certain requirements intended to mitigate undue risk of unapproved or unapproved use of medical devices. Meeting applicable requirements outlined in an EUA are essential.

To help address concerns about availability during the COVID-19 pandemic, the FDA has issued EUAs for certain PPE products including face shields, other barriers, and respiratory protective devices such as respirators.

To aid in the industry understanding, the FDA has released an FAQ on EUAs for medical devices during the COVID-19 pandemic.

## Requirements of FDA's Surgical Masks EUA

As with other EUAs, to limit undue risk of the authorized surgical masks the EUA includes labeling and performance requirements, among other requirements.

Key labeling requirements include:

- Describe the product as a disposable, single-use surgical mask. The labeling must include a list of the body contacting materials (which does not include any drugs, biologics, nanoparticles, or antimicrobial/antiviral agents)

- State that the product is not intended to replace the need for FDA-cleared surgical masks or FDA-cleared or authorized respirators

- State that surgical masks are not intended to provide protection against pathogenic biological airborne particulates and are not recommended for use in aerosol generating procedures and any clinical conditions where there is significant risk of infection through inhalation exposure; and

- Not include statements that would misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: (1) reuse, (2) antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency

In addition to above labeling, authorized products must be accompanied with a fact sheet when being made available to HCP:

- Fact Sheet for Healthcare Personnel: Emergency Use of Authorized Disposable, Single Use Surgical Masks During the COVID-19 Pandemic

Specific performance criteria for authorized surgical masks include:

- Fluid resistance requirements (liquid barrier performance) consistent with ASTM F1862: *Standard Test Method for Resistance of Medical Face Masks to Penetration by Synthetic Blood (Horizontal Projection of Fixed Volume at a Known Velocity)*

- Flammability performance consistent with the definition of either a Class 1 or Class 2 textile in 16 CFR Part 1610

- Particulate filtration efficiency requirements consistent with *ASTM F2100: Standard Specification for Performance of Materials Used in Medical Face Masks*

- Air flow resistance (i.e. breathability) requirements with an acceptance criterion of <6 mm H2O/cm2 for differential pressure (delta P) testing consistent with ASTM F2100: *Standard Specification for Performance of Materials Used in Medical Face Masks* for those masks composed of 4 or more layers

- The materials of manufacture are either:
- Non-cytotoxic, non-irritating and non-sensitizing consistent with the recommendations in the FDA's guidance, "Use of International Standard ISO 10993-1, 'Biological evaluation of medical devices – Part 1: Evaluation and testing within a risk management process'"10 or

- Conform to the following biocompatibility standards:
- ISO 10993-1: *Biological evaluation of medical devices – Part 1: Evaluation and testing within a risk management process*

- ISO 10993-5: *Biological evaluation of medical devices – Part 5: Tests for in vitro cytotoxicity*

- ISO 10993-10: *Biological evaluation of medical devices – Part 10: Tests for irritation and skin sensitization*

The FDA has provided a template that can be used for submittal to FDA. Referred as "Template A", it includes the data/information requirements needed by FDA to support addition of a surgical mask to the list of authorized surgical masks in Appendix A under the Surgical Masks EUA, as set forth in the EUA. Once completed, templates can be submitted along with test reports to the above criteria for review via e-mail with the subject line "Surgical Masks Eligible for EUA" to CDRH-nondiagnosticEUA-templates@fda.hhs.gov

Surgical masks that have been confirmed by the FDA to meet the criteria under the EUA are included in "Appendix A: Authorized Surgical Masks" which can be found on the FDA website.

Note, the following surgical masks are excluded from the scope and are not authorized under this EUA:

- Surgical masks that are FDA-cleared

- Surgical masks that are manufactured in China, and

- Surgical masks that include drugs, biologics, nanoparticles, or antimicrobial/antiviral agents

SGS is committed to providing information about development in regulations for consumer products as complimentary services. Through a global network of laboratories, SGS provides a wide range of services including physical/mechanical testing, analytical testing and consultancy work for technical and non-technical parameters applicable to a comprehensive range of consumer products. Please do not hesitate to contact us for further information.

## NEXT STEP:

Additionally, the FDA has issued recommendations and policies about PPE which can be found here: Recent Final Medical Device Guidance Documents.

SGS can assist with testing to the methods specified in this surgical mask EUA, as well as other FDA guidances and regulations.

For enquiries, please contact:

**Matthew McGarrity**
Hardlines Technical Manager
t: 9738978889

Stay on top of regulatory changes within your industry: subscribe to SafeGuardS!

Read more articles for the Consumer Goods and Retail industry

© SGS Group Management SA - 2020 - All rights reserved - SGS is a registered trademark of SGS Group Management SA. This is a publication of SGS, except for 3rd parties' contents submitted or licensed for use by SGS. SGS neither endorses nor disapproves said 3rd parties contents. This publication is intended to provide technical information and shall not be considered an exhaustive treatment of any subject treated. It is strictly educational and does not replace any legal requirements or applicable regulations. It is not intended to constitute consulting or professional advice. The information contained herein is provided "as is" and SGS does not warrant that it will be error-free or will meet any particular criteria of performance or quality. Do not quote or refer any information herein without SGS's prior written consent.

# FACT SHEET FOR HEALTHCARE PERSONNEL

**Emergency Use of Authorized Disposable, Single-Use Surgical Masks During the COVID-19 Pandemic**
August 5, 2020

## Plaintiff's Exhibit 134

**Coronavirus Disease 2019 (COVID-19)**

This Fact Sheet informs you of the significant known and potential risks and benefits of the emergency use of authorized disposable, single-use surgical masks (hereafter referred to as "authorized surgical masks") during the COVID-19 pandemic.

Certain surgical masks are authorized for emergency use by healthcare personnel (HCP) in healthcare settings as personal protective equipment (PPE) to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic. This Fact Sheet is specific to surgical masks that were authorized by the United States Food and Drug Administration (FDA) under an emergency use authorization (EUA).

**Healthcare personnel should adhere to Standard and Transmission-based Precautions when caring for patients with SARS-CoV-2 infection per CDC guidelines.**

**What are the symptoms of COVID-19?**

Many patients with confirmed COVID-19 have developed fever and/or symptoms of acute respiratory illness (e.g., cough, difficulty breathing). However, limited information is currently available to characterize the full spectrum of clinical illness associated with COVID-19. Based on what is known about the virus that causes COVID-19, signs and symptoms may appear any time from 2 to 14 days after exposure to the virus.

Public health officials have identified cases of COVID-19 infection throughout the world, including the United States, which may pose risks for public health. Please check the Centers for Disease Control and Prevention (CDC) webpage for the most up to date information.

**What do I need to know about the emergency use of authorized surgical masks?**

- Authorized surgical masks meet the fluid barrier, flammability, and particulate filtration efficiency performance requirements set forth in the EUA and do not pose significant risks concerning breathability and biocompatibility.
- Authorized surgical masks may be effective in blocking respiratory droplets and large particles.
- Authorized surgical masks do not include drugs, biologics, nanoparticles or antimicrobial/antiviral agents and are not FDA-cleared.
- HCP should review the authorized surgical mask labeling prior to use and follow the instructions for use.

Use appropriate PPE when caring for individuals suspected of having COVID-19 as outlined in the CDC *Interim Infection Prevention and Control Recommendations for Patients with Confirmed Coronavirus Disease 2019 (COVID-19) or Persons Under Investigation for COVID-19 in Healthcare Settings* or on the CDC webpage on *Infection Control*.

Current information on COVID-19 for healthcare providers is available at CDC's webpage, *Information for Healthcare Professionals* (see links provided in "Where can I go for updates and more information" section).

**When is it not appropriate to use an authorized surgical mask?**

- Authorized surgical masks are not intended to replace the need for FDA-cleared surgical masks.
- Surgical masks may not provide the user a reliable level of protection from inhaling smaller airborne particles and are not personal respiratory protective devices. They are not intended to replace the need for FDA-cleared or authorized respirators.
- Because of the loose fit between the surface of the surgical mask and the user's face, surgical masks used by HCP are not considered respiratory protection against pathogenic biological airborne particulates.
- Surgical masks are not recommended for use in aerosol generating procedures and any clinical

# FACT SHEET FOR HEALTHCARE PERSONNEL

**Emergency Use of Authorized Disposable, Single-Use Surgical Masks During the COVID-19 Pandemic**
**August 5, 2020**

**Coronavirus Disease 2019 (COVID-19)**

conditions where there is significant risk of infection through inhalation exposure. Under those conditions, a filtering facepiece respirator (such as an N95 respirator) with a tight fit should be used to provide a more reliable level of respiratory protection.

**What are the known and potential benefits and risks of authorized surgical masks?**

Potential benefits of authorized surgical masks:

- Decreases risk of transmitting the SARS-CoV-2 virus to the wearer, other HCP, or patients
- Helps prevent HCP exposure to the spread of infection or illness

Potential risks of authorized surgical masks:

- Inadequate barrier protection leading to spread of infection or illness
- Loose-fitting contributing to inadequate respiratory protection against pathogenic biological airborne particulates
- Adverse reaction to device materials
- Flammable in the presence of high intensity heat sources or flammable gas
- Difficulty breathing

**What is an EUA?**

The FDA has made surgical masks available under an emergency access mechanism called an Emergency Use Authorization (EUA). The EUA is supported by a Secretary of Health and Human Service's (HHS's) declaration that circumstances exist to justify the emergency use of medical devices, including alternative devices used as medical devices, due to shortages during the COVID-19 pandemic.

This product has been authorized by FDA under an EUA for use by HCP as PPE in healthcare settings to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic. An authorized surgical mask made available under an EUA has not undergone the same type of review as an FDA-approved or cleared

device. This product has not been FDA-cleared or approved. However, in the absence of an FDA-approved or cleared alternative and based on the totality of scientific evidence, it is reasonable to believe the authorized surgical mask may be effective for the authorized use. This product is authorized only for the duration of the declaration that circumstances exist justifying the authorization of the emergency use of medical devices, including alternative products used as medical devices, during the COVID-19 outbreak, unless the authorization is terminated or revoked sooner.

An FDA approved or cleared device should be used instead of the authorized surgical mask under EUA, when available.

## Where can I go for updates and more information?

### CDC webpages:
**General:** https://www.cdc.gov/COVID19
**Healthcare Professionals:** https://www.cdc.gov/coronavirus/2019-nCoV/guidance-hcp.html
**Infection Prevention and Control Recommendations in Healthcare Settings:** https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html
**Infection Control:** https://www.cdc.gov/coronavirus/2019-ncov/infection-control/index.html

### FDA webpages:
**General:** www.fda.gov/novelcoronavirus
**EUAs:** https://www.fda.gov/medical-devices/emergency-situations-medical-devices/emergency-use-authorizations



# Plaintiff's Exhibit 135

August 5, 2020

To:   Manufacturers of Surgical Masks;
      Health Care Personnel;
      Hospital Purchasing Departments;
      Authorized Distributors and Authorized Importers; and
      Any Other Stakeholders

The U.S. Food and Drug Administration (FDA) is issuing this Emergency Use Authorization (EUA) in response to concerns relating to the insufficient supply and availability of disposable, single-use surgical masks[1,2] (hereafter also referred to as "surgical masks") for use in healthcare settings by health care personnel (HCP)[3] as personal protective equipment (PPE)[4] to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the Coronavirus Disease 2019 (COVID-19) pandemic, pursuant to section 564 of the Federal, Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3).

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Act, the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes COVID-19.[5]

---

[1] A surgical mask is a mask that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials. Surgical masks are generally regulated by FDA as Class II devices under 21 CFR 878.4040 – Surgical apparel.

[2] FDA-cleared surgical face masks, non-surgical face masks, surgical masks with antimicrobial/antiviral agent, and all particulate filtering facepiece respirators are not within the scope of this authorization.

[3] For the purposes of this EUA, HCP refers to all paid and unpaid persons serving in healthcare settings who have the potential for direct or indirect exposure to patients or infectious materials, including body substances (e.g., blood, tissue, and specific body fluids); contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air. These HCP include, but are not limited to, emergency medical service personnel, nurses, nursing assistants, physicians, technicians, therapists, phlebotomists, pharmacists, dentists and dental hygienists, students and trainees, contractual staff not employed by the healthcare facility, and persons not directly involved in patient care, but who could be exposed to infectious agents that can be transmitted in the healthcare setting (e.g., clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, and volunteer personnel).

[4] Surgical masks may be effective in blocking splashes and large particle droplets. While surgical masks are not protective against smaller airborne particulates as described in Section II, they are considered PPE because they are intended to be used to protect HCP from infectious disease hazards.  Surgical masks are different from non-surgical face masks, which are only used as source control by the general public and are not considered PPE.

[5] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. 85 FR 7316 (February 7, 2020).

Page 2

Pursuant to Section 564 of the Act, and on the basis of such determination, the Secretary of HHS then declared on March 24, 2020, that circumstances exist justifying the authorization of emergency use of medical devices, including alternative products used as medical devices, due to shortages during the COVID-19 pandemic, subject to the terms of any authorization issued under that section.[6]

As discussed further below, I have concluded that a surgical mask meeting the criteria set forth in Section II meets the criteria for issuance of an EUA under Section 564(c) of the Act.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of surgical masks that meet the criteria set forth in Section II pursuant to the Conditions of Authorization (Section IV) of this letter (referred to in this letter as "authorized surgical masks"). Authorized surgical masks will be added to this letter of authorization in Appendix A, as described in the Scope of Authorization (Section II).

**I.      Criteria for Issuance of Authorization**

I have concluded that the emergency use of authorized surgical masks as described in the Scope of Authorization (Section II) of this letter for use in healthcare settings by HCP as PPE during the COVID-19 pandemic meets the criteria for issuance of an authorization under Section 564(c) of the Act, because I have concluded that:

1.  SARS-CoV-2, the virus that causes COVID-19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2.  Based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized surgical masks may be effective for use in healthcare settings by HCPs as PPE to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic, and that the known and potential benefits of the authorized surgical masks, when used consistent with the scope of this authorization (Section II), outweigh the known and potential risks of such product; and

3.  There is no adequate, approved, and available alternative to the emergency use of these authorized surgical masks for use in healthcare settings by HCP to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic.[7,8]

---

[6] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 17335 (March 27, 2020).

[7] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[8] There are not sufficient quantities of surgical masks to meet the needs of the U.S. healthcare system.  These articles of PPE are an integral part of patient care during the COVID-19 pandemic. Providing authorization for the introduction into interstate commerce of surgical masks by manufacturers, including those that do not customarily engage in the manufacture of medical devices, helps meet the needs of the healthcare system. Providing HCP who

Page 3

## II. Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited to the use of the authorized surgical masks, for use in healthcare settings by HCP as PPE to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic.

Surgical masks are not intended to replace the need for FDA-cleared surgical masks or FDA-cleared or authorized respirators. Surgical masks may be effective in blocking splashes and large-particle droplets; however, because of the loose fit between the surface of the surgical mask and the user's face, leakage can occur around the edge of the mask when the user inhales. Therefore, a surgical mask may not provide the user with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection. For this reason, surgical masks are not recommended for use in aerosol generating procedures and any clinical conditions where there is significant risk of infection through inhalation exposure. In such clinical conditions, a filtering facepiece respirator (such as an N95 respirator) with a tight fit is recommended to provide a more reliable level of respiratory protection against pathogenic biologic airborne particulates.

### Authorized Surgical Masks

Surgical masks that have been designed, evaluated, and validated consistent with the following performance criteria and that are not excluded, are authorized for the above-described intended use. The following surgical masks are excluded from the scope and are not authorized under this EUA: (1) surgical masks that are FDA-cleared; (2) surgical masks that are manufactured in China; and (3) surgical masks that include drugs, biologics, nanoparticles, or antimicrobial/antiviral agents. A surgical mask that is not excluded is authorized if it meets the following performance criteria:

- Fluid resistance requirements (liquid barrier performance) consistent with ASTM F1862: *Standard Test Method for Resistance of Medical Face Masks to Penetration by Synthetic Blood (Horizontal Projection of Fixed Volume at a Known Velocity);* [9]
- Flammability performance consistent with the definition of either a Class 1 or Class 2 textile in 16 CFR Part 1610;

---

are on the forefront of the COVID-19 response with sufficient PPE is necessary in order to reduce the risk of illness in HCP and increase their availability to provide care to affected patients or those suspected of having COVID-19.

[9] For the current edition of the FDA-recognized standard(s) referenced in this document, see the FDA Recognized Consensus Standards Database, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfStandards/search.cfm. For more information regarding use of consensus standards in regulatory submissions, refer to FDA guidance titled "Appropriate Use of Voluntary Consensus Standards in Premarket Submissions for Medical Devices," available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/appropriate-use-voluntary-consensus-standards-premarket-submissions-medical-devices.

Page 4

- Particulate filtration efficiency requirements consistent with ASTM F2100: *Standard Specification for Performance of Materials Used in Medical Face Masks*;
- Air flow resistance (i.e., breathability) requirements with an acceptance criterion of <6 mm $H_2O/cm^2$ for differential pressure (delta P) testing consistent with ASTM F2100: *Standard Specification for Performance of Materials Used in Medical Face Masks* for those masks composed of 4 or more layers; and
- The materials of manufacture are either (1) non-cytotoxic, non-irritating and non-sensitizing consistent with the recommendations in FDA's guidance, "Use of International Standard ISO 10993-1, 'Biological evaluation of medical devices - Part 1: Evaluation and testing within a risk management process'"[10] or (2) conform to the following biocompatibility standards:
  - ISO 10993-1: *Biological evaluation of medical devices - Part 1: Evaluation and testing within a risk management process*
  - ISO 10993-5: *Biological evaluation of medical devices - Part 5: Tests for in vitro cytotoxicity*
  - ISO 10993-10: *Biological evaluation of medical devices - Part 10: Tests for irritation and skin sensitization.*

To be added to Appendix A as an authorized surgical mask under this EUA, the surgical mask must not be excluded and manufacturers must provide test reports that demonstrate that the surgical mask meets the performance criteria above. Manufacturers may request the inclusion of any surgical mask model in Appendix A by submitting a request to FDA with the subject line "Surgical Masks EUA" to CDRH-nondiagnosticEUA-templates@fda.hhs.gov and include the following information, which will allow FDA to confirm that the surgical mask meets the criteria and provide other relevant information:

- Manufacturer contact information, name and address of business, email address, contact information for a U.S. agent (if any), in addition to general information about the device such as the proprietary or brand name, model number (if any);

- A copy of the product labeling;

- An estimate of the number of surgical masks you are planning to market and distribute during the public health emergency;

- A summary of the evidence demonstrating that the surgical mask meets the above criteria, including test reports; and

- A list of authorized distributor(s) and/or authorized importer(s),[11] including contact information (name, address, contact person, phone number, and email).

---

[10] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/use-international-standard-iso-10993-1-biological-evaluation-medical-devices-part-1-evaluation-and.

[11] "Authorized Distributor(s)" and "Authorized Importer(s)" are identified by the manufacturer in an EUA submission as an entity allowed to import and/or distribute the device. If the entity distributing the device is also the entity importing the device, the manufacturer should so indicate on the list provided to FDA.

Page 5

The labeling of the authorized surgical masks must:

- Describe the product as a disposable, single-use surgical mask. The labeling must include a list of the body contacting materials (which does not include any drugs, biologics, nanoparticles, or antimicrobial/antiviral agents);

- State that the product is not intended to replace the need for FDA-cleared surgical masks or FDA-cleared or authorized respirators;

- State that surgical masks are not intended to provide protection against pathogenic biological airborne particulates and are not recommended for use in aerosol generating procedures and any clinical conditions where there is significant risk of infection through inhalation exposure; and

- Not include statements that would misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: (1) reuse, (2) antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency.

Authorized products must be accompanied by the above required labeling, and in addition, the authorized products must be accompanied by the following information pertaining to the emergency use, which are authorized to be made available to HCPs:

- Fact Sheet for Healthcare Personnel: Emergency Use of Authorized Disposable, Single-Use Surgical Masks During the COVID-19 Pandemic

The manufacturer's labeling (which must meet the labeling requirements specified above ) and the fact sheet, are referred to as "authorized labeling."

FDA may remove an authorized surgical mask from Appendix A of this EUA if FDA has reason to believe that the product no longer meets the Scope of Authorization (Section II) or any of the Conditions of Authorization (Section IV). FDA will provide the manufacturer 24 hours advance notice of such removal and may work with the manufacturer to resolve the issue(s) that led to removal of the device(s) from Appendix A. Products that are removed from Appendix A will appear on a list maintained on FDA's website.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of authorized surgical masks as described within this section (the Scope of Authorization, Section II), outweigh the known and potential risks of such products.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that authorized surgical masks may be effective as described within this section (the Scope of Authorization, Section II), pursuant to Section 564(c)(2)(A) of the Act.

Page 6

FDA has reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, and concludes that authorized surgical masks (as described in the Scope of Authorization, Section II), meet the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of authorized surgical masks must be consistent with, and may not exceed, the terms of this letter, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section IV). Subject to the terms of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), surgical masks that are determined to meet the criteria set forth in this section (Section II) are authorized under the terms and conditions of this EUA.

### III. Waiver of Certain FDA Requirements

I am waiving applicable current good manufacturing practice requirements, including the quality system requirements under 21 CFR Part 820 with respect to the design, manufacture, packaging, labeling, storage, and distribution of the authorized surgical masks that are used in accordance with this EUA.

### IV. Conditions of Authorization

Pursuant to Section 564(e) of the Act, I am establishing the following conditions to this authorization:

**Manufacturers of Authorized Products**

A. Manufacturers will make authorized products available with the authorized labeling (including the labeling requirements described in Section II). Manufacturers must make available all labeling in English, to each end user facility (e.g., each hospital) that receives the authorized products, and may include the authorized labeling with each individual authorized product.

B. Manufacturers must comply with 21 CFR Part 803, and must have a process in place for reporting adverse events of which they become aware to FDA consistent with 21 CFR Part 803. See FDA's webpage "Medical Device Reporting (MDR): How to Report Medical Device Problems"[12] for additional information concerning reporting requirements under 21 CFR Part 803 and procedures.

C. Manufacturers will ensure that any records associated with this EUA are maintained until otherwise notified by FDA. Such records will be made available to FDA for inspection upon request.

---

[12] FDA guidance, titled "Medical Device Reporting (MDR): How to Report Medical Device Problems" is available at https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems.

D. Through a process of inventory control, manufacturers will maintain records of the entities to which they distribute the surgical masks and the numbers of each such product they distribute.

E. Manufacturers will notify FDA of any authorized distributor(s) and/or authorized importers of the authorized surgical masks, including the name, address, and phone number of any authorized distributor(s) and authorized importer(s), and provide authorized distributor(s) and authorized importer(s) with a copy of this EUA and any updates.

F. Manufacturers are authorized to make available additional information relating to the emergency use of the product that is consistent with, and does not exceed, the terms of this letter of authorization.

G. Manufacturers of authorized surgical masks will submit, upon FDA's request, new lots of the authorized surgical masks for testing by FDA or by another entity designated by FDA.  The manufacturers must not distribute any lot or shipment that fails testing, meaning the lot or shipment containing a lot that did not perform as expected based on the performance criteria in the Scope of Authorization (Section II). FDA will make the manufacturer aware of the testing results.

**Authorized Distributors and Authorized Importers**

H. Authorized Distributors and Authorized Importers must ensure that authorized surgical masks comply with condition A of this EUA.

I. Through a process of inventory control, Authorized Distributors and Authorized Importers will maintain records of the entities to which they distribute the surgical masks and how many of each authorized product model they distribute or import, as applicable.

J. Authorized Distributors and Authorized Importers will ensure that any records associated with this EUA are maintained until otherwise notified by FDA. Such records will be made available to FDA for inspection upon request.

K. Authorized Distributors and Authorized Importers of authorized surgical masks will submit, upon FDA's request, lots or shipments of the authorized surgical masks for testing by FDA or by another entity designated by FDA.  Authorized Distributors and Authorized Importers must not distribute any lot or shipment that fails testing, meaning the lot or shipment containing a lot that did not perform as expected based on the performance criteria in the Scope of Authorization (Section II). FDA will make the Authorized Distributor or Authorized Importer aware of the testing results.

Page 8

**Conditions Related to Advertising and Promotion**

L.  All descriptive printed matter, including advertising and promotional materials, relating to the use of the authorized surgical mask shall be consistent with the labeling requirements listed in Section II and this section (Conditions of Authorization) of this EUA, and the applicable requirements set forth in the Act and FDA regulations.

M.  No descriptive printed matter, including advertising or promotional materials, relating to the use of the authorized surgical mask may represent or suggest that such product is safe or effective for the prevention or treatment of COVID-19.

N.  All descriptive printed matter, including advertising and promotional materials, relating to the use of the product shall clearly and conspicuously state that:

- The product has not been FDA cleared or approved.

- The product has been authorized by FDA under an EUA for use in healthcare settings by HCP as PPE to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic.

- This product is authorized only for the duration of the declaration that circumstances exist justifying the authorization of the emergency use of medical devices, including alternative products used as medical devices, during the COVID-19 outbreak, under section 564(b)(1) of the Act, 21 U.S.C. § 360bbb-3(b)(1) unless the authorization is terminated or revoked sooner.

**V. Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying this authorization is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

_____

RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

# Plaintiffs' Exhibit 136

**State Mask Mandates During COVID-19 Pandemic**

*Data updated through April 1, 2022*

| STATE | MASK MANDATE | REPEALED | MASK BAN | NOTES |
|---|---|---|---|---|
| Alabama | Yes | 4/9/2021 | No | |
| Alaska | No | N/A | No | |
| Arizona | Yes | 3/25/2021 | Yes | Local mandates prohibited by EO |
| Arkansas | Yes | 3/31/2021 | Yes | Local mandates prohibited by law |
| California | Yes | 3/1/2022 | No | Reinstated 12/15/21; repealed again 3/1/22 |
| Colorado | Yes | 5/14/2021 | No | |
| Connecticut | Yes | 2/28/2022 | No | Applied only to unvaccinated |
| Delaware | Yes | 2/11/2022 | No | Reinstated 1/11/22; repealed again 2/11/22 |
| Florida | No | N/A | Yes | Local mandates prohibited by EO; school mandates prohibited by law |
| Georgia | No | N/A | No | |
| Hawaii | Yes | 3/25/2022 | No | |
| Idaho | No | N/A | No | |
| Illinois | Yes | 2/28/2022 | No | |
| Indiana | Yes | 4/6/2021 | No | |
| Iowa | Yes | 2/7/2021 | Yes | Local mandates prohibited by law |
| Kansas | Yes | 4/1/2021 | No | Repealed by legislature; counties could opt out when in effect |
| Kentucky | Yes | 6/11/2021 | Yes | Mandates prohibited by law |
| Louisiana | Yes | 10/27/2021 | No | |
| Maine | Yes | 5/24/2021 | No | |
| Maryland | Yes | 7/1/2021 | No | |
| Massachusetts | Yes | 5/29/2021 | No | |
| Michigan | Yes | 6/22/2021 | No | |
| Minnesota | Yes | 5/14/2021 | No | |
| Mississippi | Yes | 3/3/2021 | No | Only applied to counties with high COVID-19 case rates |
| Missouri | No | N/A | No | |
| Montana | Yes | 2/12/2021 | Yes | Local mandates prohibited by law |
| Nebraska | No | N/A | No | |
| Nevada | Yes | 2/10/2022 | No | Reinstated; repealed again 2/10/22 |
| New Hampshire | Yes | 4/16/2021 | No | |
| New Jersey | Yes | 5/28/2021 | No | |
| New Mexico | Yes | 2/17/2022 | No | |
| New York | Yes | 2/10/2021 | No | Reinstated for unvaccinated; repealed again 2/10/21 |
| North Carolina | Yes | 5/14/2021 | No | |
| North Dakota | Yes | 1/18/2021 | Yes | Mandates prohibited by law |
| Ohio | Yes | 6/2/2021 | Yes | Mandates prohibited by law |
| Oklahoma | No | N/A | Yes | School mandates restricted by law |
| Oregon | Yes | 3/1/2022 | No | Reinstated 8/15/21; repealed again 3/1/22 |
| Pennsylvania | Yes | 6/28/2021 | No | |
| Rhode Island | Yes | 2/11/2022 | No | Applied only to indoor venues with a capacity of 250+ |
| South Carolina | No | N/A | Yes | Local mandates prohibited by EO; school mandates prohibited by law |
| South Dakota | No | N/A | No | |
| Tennessee | No | N/A | Yes | Local mandates prohibited by law |
| Texas | Yes | 3/10/2021 | Yes | Local mandates prohibited by EO |
| Utah | Yes | 4/10/2021 | Yes | Repealed by legislature; local and school mandates prohibited by law |
| Vermont | Yes | 6/15/2021 | No | |
| Virginia | Yes | 5/28/2021 | Yes | School mandates prohibited by law |
| Washington | Yes | 3/12/2022 | No | |
| West Virginia | Yes | 6/20/2021 | No | |
| Wisconsin | Yes | 3/31/2021 | No | Struck down by Wisconsin Supreme Court |
| Wyoming | Yes | 3/16/2021 | No | |

*Primary Source: www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html*

*Chart By: Lucas Wall, www.lucas.travel*

Plaintiffs' Exhibit 137

nbcwashington.com

# CDC Is Leaving It Up to States to Set Guidelines for Mask-Wearing, Director Says

*Berkeley Lovelace Jr., CNBC*

4-5 minutes    Published June 30, 2021

- CDC Director Dr. Rochelle Walensky said Wednesday the U.S. agency is leaving it up to states and local health officials to set guidelines around mask-wearing.

- The CDC has "always said that local policymakers need to make policies for their local environment," she said.

CDC Director Dr. Rochelle Walensky said Wednesday the U.S. agency is leaving it up to states and local health officials to set guidelines around mask-wearing even after the World Health Organization urged fully vaccinated people to continue the practice.

The Centers for Disease Control and Prevention has "always said that local policymakers need to make policies for their local environment," Walensky said during an interview on the NBC program "TODAY." She added that the agency's guidelines broadly recommend that vaccinated people don't need to wear masks.

**Money Report**





"There are areas of this country where about a third of people are vaccinated, they have low vaccination rates," Walensky said. "There are areas where they have more disease in the context of people not being vaccinated. So, in those areas, we've always said please look, make suggestions."

She added, "If you are vaccinated, you are safe from the variants that are circulating here in the United States."

The CDC director's comments come days after WHO officials urged fully vaccinated people to continue to wear masks, social distance and practice other pandemic safety measures as the highly contagious delta variant spreads rapidly across the globe.

Delta, now in at least 92 countries, including the United States, is expected to become the dominant variant of the disease worldwide, according to the WHO. In the U.S., the prevalence of the strain is doubling about every two weeks.

WHO officials said Friday they are asking fully vaccinated people to continue to

"play it safe" because a large portion of the world remains unvaccinated and highly contagious variants, like delta, are spreading in many countries and spurring outbreaks.

"People cannot feel safe just because they had the two doses. They still need to protect themselves," Dr. Mariangela Simao, WHO assistant director-general for access to medicines and health products, said during a news briefing.

The WHO's comments were a departure from the CDC, which has said fully vaccinated Americans can go maskless in most settings, and sparked widespread confusion.

Walensky said Wednesday that the WHO makes recommendations for a global population, adding many regions of the world remain unvaccinated.

"When the WHO makes those recommendations, they do so in that context," she said.

Still, while many states have lifted most of their mask restrictions, places like Mississippi are recommending that residents continue to wear masks indoors even if they are fully vaccinated.

Delta is the dominant variant in Mississippi right now and only 31% of the state's eligible population is vaccinated, state health officials said on a call late Tuesday. About 96% of new Covid cases are unvaccinated people, they added.

*– CNBC's Rich Mendez contributed to this report.*

**Also on CNBC**

- Dr. Gottlieb: U.S. unlikely to have 'raging epidemic' from Covid delta variant

- 5 things to know before the stock market opens Wednesday

- Putin reveals he had the Sputnik V shot as Russia struggles to convince public

Plaintiffs' Exhibit 138

usatoday.com

## Biden saying there is no federal solution to COVID means our patchwork response continues

4-5 minutes          12-28-21

Well, President Joe Biden finally decided to say the quiet part out loud. After months of carrying on about a national plan and the need to follow guidelines and best practices, he finally threw his hands in the air and admitted it.

This pandemic will end when the states sort out how to end it.

"Look, there is no federal solution," Biden said Monday, according to a transcript of a conversation he had with a group of governors. "This gets solved at a state level."

Now, if you've paid attention to the national trends during the pandemic you already knew this. You already knew that the states and governors hold the actual power in fighting this God-forsaken pandemic. You already knew that our experience throughout all of this was dependent on where we live. You already knew this.

**Opinions in your inbox:** Get a digest of our takes on current events every day

Just look at how states reacted to the idea of mask mandates and vaccine mandates in schools. Some welcomed all precautions. Others weaponized and banned them. I mean the states can't even agree on how to return to "normal."

But for the president of the United States to casually say the solution to this problem is with the states is jarring because it makes crystal clear that where we live matters in a way that maybe it hadn't before.



Keep in mind that he said this as the nation deals with an omicron variant that is ransacking the country. He said it as the United States reported more than half a million new cases on Monday. He said it as Texas ran out of a vital tool for fighting the virus. He said it as California saw more than 4,000 COVID hospitalizations on Sunday.

And that's a drop in the bucket of what states are dealing with.

My family moved out of Arizona for work months before the pandemic hit. So we've ridden out the pandemic in Virginia but watched as the state we spent so much time in is run by a governor who joined the fight against mandates. It's not surprising that Arizona has one of the highest COVID death rates in 2021 and sits in the middle of the pack in the percentage of people vaccinated.

This isn't me criticizing a Republican governor or saying blue states have handled the pandemic better than red states. That's the type of blanket nonsense statement that has contributed to the poisonous discourse about the pandemic.

What I'm saying is that it's become frighteningly clear that Americans will walk away from this pandemic, eventually, having lived different versions of it, and that ==Biden outright saying there is no federal solution== means we will be on our own for the rest of this evil ride.

Because he can offer all the support and prayers and good vibes in the world. The Centers for Disease Control can change its guidelines at will, and Dr. Anthony Fauci can evangelize vaccine mandates until network television shows get tired of asking him.

**More:**Biden's omicron plan is better late than never. Meanwhile, doctors brace for another wave.

None of it will matter if you live in a state that will ignore it all.

If you live in a state where your elected leaders think mask mandates and vaccine mandates are "fascist," your situation will not change. If you live in a state where you wish the governor would issue mandates and do more to protect students, that will not change.

Mostly, it means that help isn't coming for those of us who want it, and that mandates aren't coming for those who hate them.

It also means that the lack of a federal solution clears the way for the continuance of state-specific Band-Aids, which will likely extend the pandemic while we sit around and argue over how to fix this.

*Louie Villalobos is a member of the Editorial Board and an editor at USA TODAY Opinion. Follow him on Twitter: @louievillalobos*

Plaintiffs' Exhibit 139

cdc.gov

# Coronavirus Disease 2019

34-43 minutes      CDC Media Briefing 2-25-22
_____

    ◯     0:00 / 39:17     ◯

**Operator:**

Welcome and thank you for standing by. At this time, all participants are on listen only mode during the Q&A session. If you'd like to ask a question, you may press star one on your phone. Today's call is being recorded. If you have any objections, you may disconnect at this time. Now I'd like, turn the call over to Mr. Benjamin Hayes. Sir, may begin.

**Benjamin Haynes:**

Thank you, Ted. And thank you all for joining us for today's COVID 19 update. We're joined by CDC Director, Dr. Rochelle Walensky and Dr. Greta Massetti from the COVID 19 Incident Management Team, both will provide opening remarks before taking your questions. I would now like to turn the call over to Dr. Walensky.

**Dr. Walensky:**

Thank you, Benjamin and thank you all for joining us today. Today, CDC is updating its framework to monitor the level of COVID 19 and communities. We're in a stronger place today as a nation with more tools to protect ourselves in our communities from COVID 19, like vaccination, boosters, broader access to testing, availability of high quality masks, accessibility to new treatments, and improved ventilation. Over 200 million people have received a primary vaccine series and nearly 100 million have been boosted and millions more have had prior disease. With widespread population immunity, the overall risk of severe disease is now generally lower. Now, as the virus continues to circulate in our communities, we must focus our metrics beyond just cases in the community and direct our efforts toward protecting people at high risk for severe illness and preventing COVID 19 from overwhelming our hospitals and our healthcare systems. This new framework moves beyond just looking at cases and test positivity to evaluate factors that reflect the severity of disease, including hospitalizations and hospital capacity, and helps to determine whether the level of COVID 19 and severe disease are low, medium, or high in a community.

**Dr. Walensky:**

The COVID 19 community level we are releasing today will inform CDC recommendations on prevention measures like masking and CDCs recommendations for layer prevention measures, and will depend on the COVID 19 level in the community. This updated approach focuses on directing our prevention efforts towards protecting people at high risk for severe illness and preventing hospitals and healthcare systems from being overwhelmed. To find your community level, we are

updating the CDC's website to reflect this framework. So people will be able to go to www.cdc.gov or call 1-800-CDC-INFO to find your community level and what prevention strategies are recommended, including where or when to mask. Please remember that there are people who remain at higher risk for COVID 19 and who may need additional protection. Those who are immunocompromised or have underlying health conditions, those who have disabilities, or those who live with people who are at risk. Those people might choose to take extra precautions regardless of what level their community is in. So with that, I'm going to turn things over now to Dr. Greta Massetti, who will walk us through this framework and the science behind it. Thank you.

**Dr. Massetti:**

Thank you, Dr. Walensky. The updated metrics in this framework provide a current picture of COVID 19 disease in a community. They also include strong predictors of the potential for strain on the healthcare system. A community's COVID 19 level is determined by a combination of three pieces of information: new hospitalizations for COVID 19, current hospital beds occupied by COVID 19 patients or hospital capacity, and new COVID 19 cases. These metrics will tell us if the level is low, medium, or high. Let me walk you through what we are recommending at each level. Regardless of level, we continue to recommend that people stay up to date on vaccines and get tested if they're sick.

**Dr. Massetti:**

At the low level, there is limited impact on the healthcare system and low amounts of severe disease in the community. People should stay up to date with their vaccines and get tested if they're sick. At the medium level, more people are experiencing severe disease in the community and they're starting to see more impact on the health healthcare system. At this level, CDC recommends that people who are high risk, such as someone who is immunocompromised, should talk to their healthcare provider about taking additional precautions and may choose to wear a mask. As communities enter into the high level, there is high amount of people experiencing severe disease and high potential for healthcare systems strains. At the high level, CDC recommends that everyone wear a mask indoors, in public, including in schools. Communities can use these metrics, along with their own local metrics, such as wastewater surveillance, emergency department visits, and workforce capacity, to update and further inform their local policies and ensure equity and prevention efforts. And these categories help individuals assess what impacts COVID 19 is having on their community so that they can decide if they need to take extra precautions, including masking based on their location, their health status, and their risk tolerance.

**Dr. Massetti:**

We should all keep in mind that some people may choose to wear a mask at any time based on personal preference. And importantly, people who wear high quality masks are well protected, even if others around you are not masking. And there are some situations where people should always wear a mask. For example, if they have symptoms, if they tested positive for COVID 19, or if they have been exposed to someone with COVID 19. Today, we're also updating our recommendations for schools. Since July, 2021, CDC recommended universal masking in schools, no matter what level of impact COVID 19 was having on the community. With this update, CDC will now only recommend universal school masking in communities at the high level. Importantly, COVID 19 community levels and public health prevention strategies can be dialed up when our communities

are experiencing more severe disease and dialed down when things are more stable. So what do these updated metrics mean for where we are as a country, as of today, more than half of counties representing about 70% of Americans are in areas with low or medium COVID 19 community levels. This is an increase from about one third of counties at low or medium community levels last week and we continue to see indicators improve in many communities. Thank you. And I will now hand it back to Dr. Walensky.

**Dr. Walensky:**

Thank you, Dr. Massetti, before we take your questions, I would like to leave you with a few final thoughts. None of us know what the future may hold for us and for this virus and we need to be prepared and we need to be ready for whatever comes next. We wanna give people a break from things like mask wearing when our levels are low and then have the ability to reach for them again, should things get worse in the future. We at CDC will continue to follow the science and epidemiology to make public health recommendations and guidance based on the data. Our new framework was rigorously evaluated both with current data and retrospectively during the Alpha, Delta and Omicron waves and these new metrics have demonstrated predictive capacity for weeks into the future. We will continue to evaluate how well they perform in our communities. This new framework will best way for us to judge what level of preventive measures may be needed in our communities. If or when new variants emerge or the virus surges, we have more ways to control the virus and protect ourselves and our communities than ever before. Thank you. I'll now turn it back over to you, Benjamin.

**Benjamin Haynes:**

Thank you, Dr. Walensky and thank you, Dr. Massetti. Ted, we are ready to take questions.

**Operator:**

The phone lines are now open for questions. If you would like to ask a question over the phone, please press star one and record your name. We also ask that you just limit yourself to one follow up question. If you would like to remove your question, please press star two. One moment please. And the first question accused from Dr. Jon LaPook with CBS news, your line is not open.

**Dr. Jon LaPook:**

Hi, thank you. Thanks for this update and we've heard that, you know, the best mask is the one people will wear, but let's assume somebody's incentivized to wear the best mask they can and they're gonna try to get it well fitted. Can you be more granular about which mask provide the best protection is an N 95, KN-95, KF-94. surgical cloth. What should people who want to protect themselves the most, which of the masks they should be using? Thanks.

**Dr. Walensky:**

Maybe I'll start with that. Thank you, Dr. LaPook. Of course we've said in our prior masking guide that infiltration are key in those, the N-90-

**Dr. Massetti:**

It sounds like we might have lost Dr. Walensky. I think what she was noting was that we often have emphasized that fit and filtration are really critical and there are a variety of ways to achieve that.

 Centers for Disease Control and Prevention

# Plaintiffs' Exhibit 140



## COVID-19

# Use and Care of Masks
Wear a mask with the best fit, protection, and comfort for you

Updated Feb. 25, 2022

Masks can help protect you and others from COVID-19. Learn more about different types of masks and respirators and how to get the best fit.

# When to Wear a Mask or Respirator

Layered prevention strategies — like staying up to date on vaccines and wearing masks — can help prevent severe illness and reduce the potential for strain on the healthcare system. **Wear a mask with the best fit, protection, and comfort for you.**

## Know the COVID–19 Community Level where you live

COVID-19 Community Levels are a tool to help communities decide what prevention steps to take based on the latest data.



### Low

Wear a mask based on your personal preference, informed by your personal level of risk



### Medium

* If you are immunocompromised or at high risk for severe illness
  - Talk to your healthcare provider about additional precautions, such as wearing masks or respirators indoors in public
* If you live with or have social contact with someone at high risk for severe illness, consider testing yourself for infection before you get together and wearing a mask when indoors with them.



### High

* Wear a well-fitting mask indoors in public, regardless of vaccination status or individual risk (including in K-12 schools and other community settings)
* If you are immunocompromised or at high risk for severe illness
  - Wear a mask or respirator that provides you with greater protection

Learn more about how COVID-19 Community Levels are measured.

You may choose to wear a mask or respirator that offers greater protection in certain situations, such as when you are with people at higher risk for severe illness, or if you are at higher risk for severe illness.

It is important to wear a mask or respirator when you are sick or caring for someone who is sick with COVID-19. When caring for someone who is sick with COVID-19, a respirator will provide you the best level of protection.



## COVID-19 Community Levels in US by County

| | Total | Percent | % Change |
|---|---|---|---|
| High | 17 | 0.53% | -1.12% |
| Medium | 146 | 4.53% | -2.7% |
| Low | 3057 | 94.94% | 3.82% |

How are COVID-19 Community Levels calculated?

March 31, 2022



Plaintiffs' Exhibit 141



# Runway to Recovery

The United States Framework for Airlines and Airports to Mitigate the Public Health Risks of Coronavirus

Guidance Jointly Issued by the U.S. Departments of Transportation, Homeland Security, and Health and Human Services

**July 2020**

## PUBLIC HEALTH RISK MITIGATION IN THE PASSENGER AIR TRANSPORTATION SYSTEM

used within the airport (e.g. trains, buses, etc.). It is imperative that airlines and airports inform passengers when it may not be possible to meet social distancing expectations and, as a result, emphasize the additional importance of observing all the other preventive measures, including strict hand hygiene, respiratory etiquette, and wearing a face mask or cloth face covering.

**Rationale:** SARS-CoV-2, the virus that causes COVID-19, spreads mainly among people who are in close contact for greater than 15 minutes. Social distancing of at least six feet is the best way to reduce the spread of infection. However, the air transportation system presents many areas where confined physical spaces make recommended social distancing difficult or impossible to achieve at times. Where space constraints limit the practice of social distancing, such as onboard aircraft or within the Federal Inspection Station (FIS) area during peak international arrival times, it is essential that passengers, crew members, and aviation workers adhere at all times to all other preventive measures, especially hand washing, respiratory etiquette[5], and wearing face masks or cloth face covering.

**Resources:** CDC developed guidance on social distancing, including for people with disabilities, on its website:

» cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

## Masks or Cloth Face Covering

**Recommendation:** Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (excluding children under age 2, or anyone who has a medical condition that causes trouble breathing, is unconscious and unable to be awakened, or otherwise unable to remove the mask without assistance). Airlines and airports are strongly encouraged to require that everyone correctly wear a mask or cloth face covering in shared spaces unless they meet the exceptions described above. Airports and airlines should have masks or cloth face coverings available for passengers and aviation workers who may arrive without one or require a replacement. Wearing a mask or cloth face covering is particularly necessary any time social distancing cannot be maintained. Reasonable accommodations

---

5 cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

should be made for persons with disabilities or ailments who cannot wear masks
or cloth face coverings.

> » **Note:** *Passengers and aviation workers may be asked to briefly remove
> their masks or cloth face coverings when interacting with government
> officials or systems that must verify identity, such as U.S. Customs and
> Border Protection (CBP) Officers, Transportation Security Administration
> staff, law enforcement, airline or airport staff, and biometric exit controls.
> Physical barriers or face shields should be used to protect employees and
> the public in these instances. Accommodations for persons with disabilities
> or ailments who cannot wear cloth face coverings should be considered
> on a case-by-case basis. This may include seating that allows social
> distancing from non-companion passengers. Brief removal of masks or
> cloth face coverings should be permitted for drinking or eating.*

**Rationale:** The greatest risk of spreading COVID-19 is when an infected person
coughs, sneezes, or talks and droplets from his or her mouth or nose are
launched into the air and land in or near the mouths or noses of people nearby.
Requiring all persons to wear masks or cloth face coverings prevents droplets
from spreading, including from potentially asymptomatic individuals. If everyone
in an environment participates in covering their mouths and noses, cloth face
coverings can be effective at reducing viral spread:

**Resources:** cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-
coverings.html

## Cleaning and Disinfection

**Recommendation:** Airlines and airports should require all areas with potential
for human contact and transmission be disinfected per defined schedules as
recommended by CDC and the Occupational Safety and Health Administration
(OSHA). Special attention should be given to increasing the frequency of
cleaning high-touch surfaces like door handles, armrests, elevator buttons,
escalator/stair handrails, and kiosks. Additionally, hand sanitizer stations and
disinfecting wipes should be provided at kiosks and other common areas
passengers are expected to touch frequently.

Plaintiffs' Exhibit 142





# CARES Act Payroll Support to Air Carriers and Contractors

*Updated October 22, 2020*

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act; P.L. 116-136), signed into law on March 27, 2020, provided assistance to consumers and businesses, including aid to air carriers and eligible contractors. Emergency funds also were provided to eligible airports. Assistance to air carriers in Division A, Title IV of the CARES Act included loans and loan guarantees, funds to support the pay and benefits of air carrier workers, and a suspension of aviation excise taxes on air transport of people, cargo, and aviation fuel through calendar year 2020. This Insight focuses on the payroll support program (PSP).

Section 4112 of the CARES Act provided $32 billion in payroll support to aviation workers. From this amount, the Secretary of the Treasury was authorized to provide up to

- $25 billion for passenger air carriers (any air carrier that, during the period from April 1, 2019, to September 30, 2020, derived more than 50% of its air transportation revenue from the transportation of passengers);
- $4 billion for cargo air carriers (any air carrier that, during the period from April 1, 2019, to September 30, 2020, derived more than 50% of its air transportation revenue from the transportation of property or mail, or both); and
- $3 billion for contractors who provide ground services directly to air carriers, such as catering services or on-airport functions.

The law specified that the amount received by each air carrier or contractor was to be based on its payroll expenses for the six-month period from April through September 2019, and that the payroll support funds must be used exclusively for continuing the payment of employee wages, salaries, and benefits. The law also required that air carriers or contractors receiving payroll support must refrain from conducting involuntary layoffs or furloughs or reducing pay rates and benefits from the day the payroll support agreement was executed until September 30, 2020.

According to the CARES Act, air carriers and contractors receiving payroll support also must comply with other program terms and conditions, including continuation of certain air service deemed necessary by the Secretary of Transportation, refraining from stock buybacks or dividend payments through September 30, 2021, and limiting the compensation of highly paid employees until March 24, 2022.

**Congressional Research Service**

https://crsreports.congress.gov

IN11482

Administered by the U.S. Treasury, PSP has generated considerable interest from airlines and contractors. Treasury data show that, by October 5, 2020, more than $28 billion in payroll support had been approved for disbursement to 610 recipients, including 352 passenger airlines (some operating unscheduled service), 38 cargo carriers, and 220 contractors.

Although Treasury set April 27, 2020, as the deadline for PSP applications, it agreed to accept and consider applications beyond the deadline, subject to the availability of funds. Program data indicate that Treasury accepted and approved applications in the months after the original deadline, as shown in **Table 1**.

### Table 1. CARES Act Payroll Support Program (PSP)
(As of October 5, 2020)

|                       | Passenger Airlines | Cargo Airlines | Contractors   | Total           |
| --------------------- | ------------------ | -------------- | ------------- | --------------- |
| 1st Agreement Date    | 04/20/2020         | 05/08/2020     | 05/15/2020    | N/A             |
| Number of Recipients  | 352                | 38             | 220           | 610             |
| PSP Amount            | $24,960,745,211    | $826,478,739   | $2,411,868,310| $28,199,092,260 |

**Source:** CRS analysis of U.S. Treasury CARES Act Payroll Support Program data (as viewed on October 21, 2020).

Treasury data indicate that the first group of agreements was reached with a number of passenger airlines on April 20, 2020, and about 72% of the passenger airlines payroll agreements occurred in April and May. The first batch of agreements with cargo airlines was reached on May 8, 2020, followed by contractors in mid-May (**Table 1**). Contractors' payroll support agreements were disbursed relatively evenly in May, June, and July. The timing of PSP agreements suggests that passenger airlines were the first group affected by the abrupt drop in air travel as a result of the COVID pandemic, followed by aviation contractors downstream. Air cargo carriers have been less affected.

The data also indicate that, as of October 5, 2020, over 99% of the $25 billion appropriated for payroll support to passenger airlines was committed, compared with approximately 80% of the $3 billion for contractors and over 20% of the $4 billion for cargo carriers. This also appears to agree with reports that cargo carriers have been faring better than passenger airlines.

As one of the PSP requirements prohibits involuntary furloughs or pay-rate reductions through September 2020, many airlines have asked employees to voluntarily take a leave of absence and/or begun to offer voluntary separation packages. Airlines also have warned employees about possible furloughs in October. Airlines and union groups have been advocating for continued federal aid.

However, the payroll support benefit did not expire on September 30, 2020. There is no deadline for a recipient to expend payroll support funds, as long as they are used exclusively for the continuation of employee wages, salaries, and benefits, as stated in a Treasury document. Since many payroll support agreements were approved and executed in May, June, July, or later, many employers are likely to have had funds available for payroll support beyond September 30, 2020. Meanwhile, airlines have been accessing additional capital in private markets and from Treasury's loan and loan guarantees program.

PSP has helped airlines and contractors to temporarily avert mass layoffs and furloughs due to the unprecedented drop in business. The number of passengers on U.S. airlines in April 2020 was 96% lower than in the same month in 2019. The number of U.S. airline passengers in mid-October 2020 remains about 65% lower than the 2019 level, and air travel is not expected to fully recover to pre-pandemic level for years. Congress could consider augmenting, extending, or reallocating undistributed PSP funds to passenger carriers that need more assistance. However, without immediate and significant improvement in passenger traffic, airlines may not have sufficient business to sustain current employment levels even

with short-term payroll assistance from the government. It is likely the airlines will need to restructure for survival and long-term growth.

## Author Information

Rachel Y. Tang
Analyst in Transportation and Industry

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# Plaintiffs' Exhibit 143

iclg.com

## International Comparative Legal Guides

*Global Legal Group*

65-83 minutes



## USA: Aviation Laws and Regulations 2021

**ICLG - Aviation Laws and Regulations** - USA covers common issues in aviation laws and regulations - including aircraft trading, finance and leasing, litigation and dispute resolution – in 27 jurisdictions

Published: 02/02/2021

### Hot off the press

**Chapter Content Free Access**

1. 1. **General**

2. 2. **Aircraft Trading, Finance and Leasing**

3. 3. **Litigation and Dispute Resolution**

4. 4. **Commercial and Regulatory**

5. 5. **In Future**

### 1. General

**1.1     Please list and briefly describe the principal legislation and regulatory bodies which apply to and/or regulate aviation in your jurisdiction.**

Aviation is principally regulated by the following:

on March 27, 2020, the bipartisan Coronavirus Aid Relief and Economic Security ("CARES") Act was signed into law which included $58 billion in aid to airlines ($29 billion in payroll grants for workers and $29 billion in loans for the airlines).

**4.7     Are state subsidies available in respect of particular routes?  What criteria apply to obtaining these subsidies?**

The Essential Air Service ("EAS") Program permits the US government to subsidise air carriers to serve small, rural communities to maintain a minimal level of scheduled air service to those communities.  Generally, the DOT will subsidise between two round trips per day with a 30- to 50-seat aircraft between an EAS community and a major hub airport.  In selecting a carrier, the DOT considers: (1) service reliability; (2) contractual and marketing arrangements with a larger carrier at the hub; (3) interline arrangements with a larger carrier at the hub; and (4) community views (49 USC §§ 41731–41732).

The Alternative Essential Air Service Program designates funds directly to the municipality or airport authority instead of to the carrier, and allows them to forego their EAS for a certain amount of time and allocate the grant money in ways that may better suit their individual needs, but that would not otherwise meet EAS guidelines.

The Small Community Air Service Development Program ("SCASDP") is a grant program to provide financial assistance to small communities that address air service and airfare issues (49 USC § 41743).  SCASDP's eligibility criteria are broader than EAS and provide a grant applicant the opportunity to self-identify its air service deficiencies and propose an appropriate solution.  To be eligible, the airport serving the community cannot be larger than a small hub airport and the community must demonstrate that it has insufficient air carrier service, or unreasonably high airfares.  The DOT may provide assistance to an air carrier to subsidise service to and from an underserved airport for a period of up to three years, or it may provide assistance to an underserved airport.  SCASDP can involve, for example, revenue guarantees, financial assistance for marketing programs, start-up costs and studies.  There is no limit on the amounts of the grants, which vary depending upon the features and merits of proposals.  To date, grant sizes have ranged from $20,000 to nearly $1.6 million.

**4.8     What are the main regulatory instruments governing the acquisition, retention and use of passenger data, and what rights do passengers have in respect of their data which is held by airlines and airports?**

For purposes of security screening, the Intelligence Reform and Terrorism Prevention Act of 2004 (49 USC § 114) and the TSA's Secure Flight Program (49 CFR Parts 1540 and 1560) require airlines that operate flights to and from the US to collect passenger name records ("PNR data"), which includes the passenger's full name, date of birth, and gender. Records of passengers who are not potential or confirmed matches on the No Fly List are

**4.14    To what extent does general consumer protection legislation apply to the relationship between the airport operator and the passenger?**

Airports must be accessible to passengers with disabilities through compliance with the applicable sections of the Americans with Disabilities Act of 1990 (49 USC §§ 12101–12213), Section 405 of the Rehabilitation Act of 1973 (29 USC § 794), and the Air Carrier Access Act of 1986 (40 USC § 41705, 14 CFR Part 382).  Airlines are also required to provide: assistance to passengers with disabilities, such as wheelchair or other guided assistance to board, deplane, or connect to another flight; seating accommodation assistance that meets passengers' disability-related needs; and assistance with the loading and stowing of assistive devices.

In addition, when airport owners and operators accept federal grants, such as through the AIP, the Federal Aid to Airports Program, or the Airport Development Air Program, they agree to operate their facilities in a safe and efficient manner and to comply with certain conditions and assurances.  These assurances include that the airport will be available for public use on fair and reasonable terms without unjust discrimination.

**4.15    What global distribution suppliers (GDSs) operate in your jurisdiction?**

The GDSs that operate in the US include Amadeus, Sabre, and Travelport (parent company of GDS systems Galileo, Apollo, and Worldspan).

**4.16    Are there any ownership requirements pertaining to GDSs operating in your jurisdiction?**

No.  However, the DOT can monitor the actions of GDSs under its unfair and deceptive practice statute, 49 USC § 41712.

**4.17    Is vertical integration permitted between air operators and airports (and, if so, under what conditions)?**

There are patterns of vertical integration in the US, especially with multiple major operators contracting with smaller operators at regional airports.  Generally, however, operators enter into lease agreements with airports and there is federal oversight because of competition concerns given that airports are natural monopolies.  "Local" competition in the New York area (with JFK, Newark, and LaGuardia airports being in competition with each other and JFK's multiple terminals being operated individually by multiple different carriers and non-carriers) may be viewed as an exception.

**4.18    Are there any nationality requirements for entities applying for an Air Operator's Certificate in your jurisdiction or operators of aircraft generally into and out of your jurisdiction?**

Yes.  Under the FAA's enabling statute, a US air carrier must be deemed a US citizen by

remains to be seen with many of the defendant airlines moving to dismiss the actions. However, a significant decision was recently issued in *Ward v. American Airlines, Inc.* wherein the US District Court of Northern Texas rejected America Airline's argument that the breach-of-contract claims were preempted by the ADA.

On a different note, there has been a call for the overhaul of the FAA's aircraft certification process that will affect aircraft manufacturers going forward.  In October 2018 and March 2019, Boeing's 737 Max jets were involved in two deadly crashes prompting lawmakers to push to enact legislation that would impose stricter requirements on the Federal Aviation Administration's aircraft certification process.  In October 2018, Lion Air Flight 610 crashed in the Kava Sea, resulting in 189 deaths, and was followed by the crash of Ethiopian Airlines Flight 302 in March 2019, resulting in 157 deaths.  Since the March 2019 crash, the fleet has been grounded.  On November 17, 2020, the House passed the bipartisan Aircraft Certification Reform and Accountability Act, which includes nearly 30 provisions aimed at strengthening the aircraft certification process, ensuring transparency and accountability, incorporating improvements in the analysis of human factors, and imposing stricter requirements for disclosing "safety-critical information" to the FAA.  The bill will also require the FAA to revise and improve its process for issuing amended type certificates to older airplanes and implement an added layer of oversight for the FAA's Organization Designation Authorization ("ODA") program, which currently delegates certain tasks of the aircraft certification process to the plane manufacturers themselves. The bill would require the FAA to approve any employees who are selected by manufacturers to perform delegated tasks under the program and assign FAA engineers or inspectors to be advisors to the employees participating in the ODA program.

### Acknowledgment

The authors thank Jean Cunningham, an associate in Fox's Aviation Practice Group in New York, for her assistance with the preparation of this USA chapter.  Ms. Cunningham helps clients resolve a broad range of aviation, product liability and commercial matters.

Plaintiffs' Exhibit 144



# Section 504 of the Rehabilitation Act of 1973: Prohibiting Discrimination Against Individuals with Disabilities in Programs or Activities Receiving Federal Assistance

**Cynthia Brougher, Coordinator**
Legislative Attorney

September 29, 2010

**Congressional Research Service**

7-....

www.crs.gov

RL34041

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against an otherwise qualified individual with a disability solely by reason of disability in any program or activity receiving federal financial assistance or under any program or activity conducted by an executive agency or the U.S. Postal Service. Section 504 was the first federal civil rights law generally prohibiting discrimination against individuals with disabilities. This report examines Section 504, recent amendments to the definition of disability, Section 504's regulations, and Supreme Court interpretations. Section 504's differences with the ADA, and its relationship to the Individuals with Disabilities Education Act (IDEA), are also discussed.

*Section 504 of the Rehabilitation Act of 1973*

# Contents

Introduction ........................................................................................................................... 1

Overview of Section 504 ....................................................................................................... 2

    Historical Background ...................................................................................................... 2

    Statutory and Regulatory Provisions ............................................................................... 2

        Section 504 Statutory Provisions ............................................................................... 2

        Definition of Disability .............................................................................................. 3

        Regulations ................................................................................................................. 4

    Selected Supreme Court Decisions ....................................................................................... 4

Section 504 and the ADA ...................................................................................................... 7

Section 504 and Education ..................................................................................................... 8

# Contacts

Author Contact Information ................................................................................................... 9

Acknowledgments .................................................................................................................. 9

# Introduction

Section 504 of the Rehabilitation Act of 1973[1] prohibits discrimination against an otherwise qualified individual with a disability solely by reason of disability in any program or activity receiving federal financial assistance or under any program or activity conducted by an executive agency or the U.S. Postal Service. Section 504 was the first federal civil rights law generally prohibiting discrimination against individuals with disabilities.[2] The concepts of Section 504 and its implementing regulations were used in crafting the Americans with Disabilities Act (ADA)[3] in 1990. The ADA and Section 504 are, therefore, very similar and have some overlapping coverage but also have several important distinctions. For example, Section 504 is limited to programs receiving federal funds or the executive agencies and the Postal Service while the ADA broadly covers the private sector regardless of whether federal funds are involved and does not cover the executive agencies or the Postal Service. The ADA Amendments Act of 2008, P.L. 110-325, amended the definition of disability in the ADA and the definition of disability applicable to Section 504.[4]

This report examines Section 504, the recent amendments to the definition of disability, Section 504's regulations, and Supreme Court interpretations. Section 504's differences with the ADA, and its relationship to the Individuals with Disabilities Education Act (IDEA), are also discussed.[5]

---

[1] 29 U.S.C. §794. Title V of the Rehabilitation Act contains other sections relating to disability discrimination law. Section 501, 29 U.S.C. §791, requires federal agencies to establish affirmative action program plans for the hiring, placement, and advancement of individuals with disabilities. Section 502, 29 U.S.C. §792, establishes the Architectural and Transportation Barriers Compliance Board (the Access Board), which in part provides technical guidance regarding architectural, transportation, and communication barriers. See http://www.access-board.gov/. Section 503, 29 U.S.C. §793, provides for affirmative action in employment of individuals with disabilities in certain federal contracts. The Rehabilitation also contains provisions authorizing the federal government to make grants to states and territories to provide vocational rehabilitation (VR) services to persons with disabilities who are interested in seeking and retaining employment.  For a discussion of VR services see CRS Report RL34017, *Vocational Rehabilitation Grants to States and Territories: Overview and Analysis of the Allotment Formula*, by Scott Szymendera and (name redacted). This report focuses on section 504; a discussion of these provisions is beyond its scope.

[2] The National Council on Disability, the independent federal agency tasked with making recommendations to the President and Congress to enhance the quality of life for all Americans with disabilities and their families, stated: "Section 504 of the 1973 Rehabilitation Act is acknowledged as the first national civil rights law to view the exclusion and segregation of people with disabilities as discrimination and to declare that the Federal Government would take a central role in reversing and eliminating this discrimination." National Council on Disability, "Rehabilitating Section 504" (February 12, 2003), at http://www.ncd.gov/newsroom/publications/2003/section504.htm.

[3] 42 U.S.C. §12101 *et seq.* For a detailed discussion of the ADA see CRS Report 98-921, *The Americans with Disabilities Act (ADA): Statutory Language and Recent Issues*, by (name redacted).

[4] For a more detailed discussion of the ADA Amendments Act see CRS Report RL34691, *The ADA Amendments Act: P.L. 110-325*, by (name redacted).

[5] 20 U.S.C. §1400 et seq. For a discussion of IDEA, see CRS Report RS22590, *The Individuals with Disabilities Education Act (IDEA): Overview and Selected Issues*, by (name redacted) and (name redacted).

# Overview of Section 504

## Historical Background

Although Section 504 was the first federal statute that provided broad civil rights protections for individuals with disabilities, there was very little discussion of its meaning or importance during its enactment in 1973. The most detailed discussion was during congressional debate when Senator Humphrey observed,

> I am deeply gratified at the inclusion of these provisions which carry through the intent of original bills which I introduced, jointly with the Senator from Illinois (Mr. Percy), earlier this year, S. 3044 and S. 3458, to amend, respectively, Titles VI and VII of the Civil Rights Act of 1964, to guarantee the right of persons with a mental or physical handicap to participate in programs receiving Federal assistance, and to make discrimination in employment because of these handicaps, and in the absence of a bona fide occupational qualification, an unlawful employment practice. The time has come to firmly establish the right of these Americans to dignity and self-respect as equal and contributing members of society, and to end the virtual isolation of millions of children and adults from society.[6]

The implementation of Section 504 was not performed expeditiously. The then Department of Health, Education, and Welfare (HEW)[7] published regulations in 1978 only after a federal court held that HEW was required to promulgate regulations[8] and after demonstrations at HEW offices.[9] The year 1978 also saw major amendments to Section 504.[10] These amendments expanded Section 504 nondiscrimination requirements to programs or activities conducted by executive agencies, and added a new section 505[11] which applied the remedies, procedures and rights of Title VI of the Civil Rights Act of 1964[12] to Section 504 actions.

## Statutory and Regulatory Provisions

### Section 504 Statutory Provisions

Section 504 has been amended numerous times since its original enactment in 1973. The core requirement of the section is found in subsection (a). This subsection was amended by P.L. 95-602 which added the provisions regarding the regulations. Section 504(a) currently states the following:

---

[6] 118 Cong. Rec. 32310 (September 26, 1972) (Remarks of Sen. Humphrey).

[7] HEW was divided into the current Department of Health and Human Services (HHS) and the current Department of Education (ED).

[8] *Cherry v. Mathews,* 419 F.Supp. 922 (D.D.C. 1976).

[9] National Council on Disability, "Rehabilitating Section 504" (February 12, 2003), at http://www.ncd.gov/newsroom/publications/2003/section504.htm.

[10] P.L. 95-602.

[11] 29 U.S.C. §794a.

[12] 42 U.S.C. §2000d *et seq.*

(a) No otherwise qualified individual with a disability in the United States, as defined in section 705(20), shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of Congress, and such regulations may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.[13]

Subsection (b) of Section 504 defines the term "program or activity." This subsection was added by P.L. 100-259 in 1988 in response to the Supreme Court's narrow interpretation of the phrase "program or activity" in Title IX of the Education Amendments of 1972.[14] The amendment clarified that discrimination is prohibited throughout the entire institution if any part of the institution receives federal financial assistance.[15]

Subsection (c) of Section 504 was also added by P.L. 100-259 in 1988. It contains an exception for small providers so they are not required to make significant structural alterations to their existing facilities to render them accessible if alternative means of providing the services are available. This subsection was added to clarify that P.L. 100-259 does not add new requirements for architectural modification.[16]

Subsection (d) of Section 504 requires that the standards used to determine whether there has been a violation of Section 504 regarding employment discrimination complaints are the same as those in the Americans with Disabilities Act. This subsection was added by P.L. 102-569 in 1992. P.L. 102-569 also substituted the term "disability" for the term "handicap."

## Definition of Disability

The definition of disability applicable to Section 504[17] was amended by the ADA Amendments Act of 2008 to conform with the new definition of disability for the ADA.[18] The Senate Statement of Managers noted the importance of maintaining uniform definitions in the two statutes so covered entities "will generally operate under one consistent standard, and the civil rights of individuals with disabilities will be protected in all settings."[19]

The ADA definition defines the term disability with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such

---

[13] 29 U.S.C. §794(a).

[14] *Grove City College v. Bell*, 465 U.S. 555 (1984). See also *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624 (1984).

[15] For a discussion of the purpose of the amendment see S.Rept. 100-64, 100th Cong., 2d Sess. (June 5, 1987), reprinted in 1988 U.S. CODE CONG. & AD. NEWS 3 (1988).

[16] *Id.*

[17] 29 U.S.C. §705.

[18] P.L. 110-325, §7. For a more detailed discussion of the ADA Amendments Act see CRS Report RL34691, *The ADA Amendments Act: P.L. 110-325*, by (name redacted).

[19] 153 CONG. REC. S. 8347 (Sept. 11, 2008)(Statement of Managers to Accompany S. 3406, the Americans with Disabilities Act Amendments Act of 2008).

individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."[20] Although this is essentially the same statutory language as was in the original ADA, P.L. 110-325 contains new rules of construction regarding the definition of disability, which provide that

the definition of disability shall be construed in favor of broad coverage to the maximum extent permitted by the terms of the act;

the term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act;

an impairment that substantially limits one major life activity need not limit other major life activities to be considered a disability;

an impairment that is episodic or in remission is a disability if it would have substantially limited a major life activity when active; and

the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, except that the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered.[21]

The ADA Amendments Act specifically lists examples of major life activities including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. The act also states that a major life activity includes the operation of a major bodily function.

## Regulations

The first Section 504 regulations were promulgated by the then department of Health, Education, and Welfare (HEW) in January of 1978. Soon after this, the 1978 amendments to Section 504 were passed which applied Section 504 nondiscrimination requirements to programs or activities conducted by executive agencies, and added language requiring the promulgation of regulations. Each executive agency and the Postal Service now has its own Section 504 regulations which are tailored to the particular recipients of that agency's programs. In addition, each executive agency and the Postal Service have regulations which delineate the coverage of Section 504 with regard to that agency's own programs. In 1980, President Carter issued Executive Order 12250 which provided that the Department of Justice shall coordinate the implementation and enforcement of certain nondiscrimination provisions, including those of Section 504.[22]

# Selected Supreme Court Decisions

The Supreme Court has examined Section 504 in numerous contexts and, since the enactment of the ADA in 1990, has often referenced Section 504 in its analysis of ADA cases. The first Section

---

[20] P.L. 110-325, §4(a), amending 42 U.S.C. §12102.

[21] Low vision devices are not included in the ordinary eyeglasses and contact lens exception.

[22] Executive Order 12250 (November 2, 1980), reprinted at http://www.usdoj.gov/crt/cor/byagency/eo12250.htm.

504 case to reach the Supreme Court was *Southeastern Community College v. Davis*.[23] In *Southeastern*, the plaintiff was a student with a serious hearing disability and who sought to be trained as a registered nurse. The college argued that she was not "otherwise qualified" as she could not understand speech except through lip reading and that this limitation made it unsafe for her to participate in the normal clinical program. The Supreme Court agreed with the college, noting that it was unlikely that she "could benefit from any affirmative action that the regulations reasonably could be interpreted as requiring."[24] The Court concluded that

> there was no violation of §504 when Southeastern concluded that respondent did not qualify for admission to its program. Nothing in the language or history of §504 reflects an intention to limit the freedom of an educational institution to require reasonable physical qualifications for admission to a clinical training program. Nor has there been any showing in this case that any action short of a substantial change in Southeastern's program would render unreasonable the qualifications it imposed.[25]

Similarly, in *Alexander v. Choate*[26] the Supreme Court found no violation of Section 504 where Medicaid recipients with disabilities claimed that a proposed 14-day limitation on in-patient coverage had a discriminatory effect on individuals with disabilities. The Court found that the limitation was neutral on its face as it would provide Medicaid users with or without disabilities with "identical and effective hospital services."[27] Section 504 did not require the state to alter its definition of the Medicaid benefit because individuals with disabilities have greater medical needs. Citing *Southeastern*, the Court observed that Section 504 requires even-handed treatment and an opportunity for individuals with disabilities to participate and benefit from programs receiving federal funds. "The Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed."[28]

*Consolidated Rail Corporation v. Darrone*[29] raised the issue of whether an employment discrimination action under Section 504 was limited to situations where the primary objective of the federal financial assistance was to provide employment. The Supreme Court held that such actions were not limited since the primary goal of the Rehabilitation Act is to increase employment of individuals with disabilities. The fact that Congress chose to ban such employment discrimination only by the federal government and recipients of federal funds did not require that Section 504 be further limited.

In *Bowen v. American Hospital Association*[30] the Supreme Court addressed the issue of whether Section 504 regulations requiring the provision of health care to infants with disabilities were authorized by Section 504. This case began when the parents of a child with Down Syndrome requested that life-saving surgery not be performed.[31] In response to the death of the child, HHS

---

[23] 442 U.S. 397 (1979).

[24] *Id.* at 409.

[25] *Id.* at 414.

[26] 469 U.S. 297 (1985).

[27] *Id.* at 302.

[28] *Id.* at 304.

[29] 465 U.S. 624 (1984).

[30] 476 U.S. 610 (1986).

[31] This situation is generally referred to as the "Baby Doe" case.

promulgated a regulation under Section 504 stating that Section 504 required that nourishment and medically beneficial treatment should not be withheld from infants with disabilities.[32] Striking down these regulations, the Court noted that the legislative history of the Rehabilitation Act did not support the argument that federal officials can intervene in treatment decisions traditionally left by state law to the parents and attending physicians.[33]

*School Board of Nassau County v. Arline*[34] examined the issue of when an individual with a disability is "otherwise qualified" for a job if the individual has a contagious disease. Gene Arline taught elementary school until her employment was terminated after she suffered a third relapse of tuberculosis within two years. The Supreme Court held that an individual with a contagious disease may be a person with a disability under Section 504 but that a person who poses a significant risk of communicating an infectious disease to others that cannot be alleviated by reasonable accommodation will not be otherwise qualified for a job. This should be determined by findings of fact based on reasonable medical judgments about the nature of the risk, the duration of the risk, the severity of the risk, and the probabilities the disease will be transmitted and will cause harm.[35]

In *Traynor v. Turnage*[36] the Supreme Court examined the application of Section 504 to an executive agency, more specifically to the Veterans' Administration (VA). The veterans who brought the suit had been denied an extension of the time limit for the use of educational benefits due to disability on the ground that their alleged disability was due to alcoholism unrelated to a psychiatric condition. VA regulations prohibited the granting of a time extension because alcoholism unrelated to a psychiatric condition was considered willful misconduct.[37] 38 U.S.C. §211(a) bars judicial review of the Veterans' Administrators' decision "on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans." The first question the Court addressed, then, was whether 38 U.S.C. §211(a) foreclosed the Court from considering whether the VA regulation violated Section 504. Holding that such suits were not precluded, the Supreme Court noted that

> Section 211(a) insulates from review decision of law and fact 'under any law administered by the Veterans' Administration,' that is, decisions made in interpreting or applying a particular provision of that statute to a particular set of facts... But the cases now before us involve the issue whether the law sought to be administered is valid in light of a subsequent statute whose enforcement is not the exclusive domain of the Veterans' Administration.[38]

The Court then examined the second issue in *Traynor*: whether the regulation was inconsistent with the requirements of Section 504. Finding that the regulation did not violate Section 504, the Court observed, "There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."[39] The Court also noted that "Congress is entitled to establish priorities for the allocation

---

[32] 45 C.F.R. §84.55(b) (1985).

[33] 476 U.S. 610, 645 (1986).

[34] 480 U.S. 273 (1987).

[35] *Id.* at 288.

[36] 485 U.S. 535 (1988).

[37] 28 C.F.R. §3.301(c)(2).

[38] 485 U.S. 535, 543-544 (1988).

[39] *Id.* at 549.

of the limited resources available for veterans' benefits, ... and thereby to conclude that veterans who bear some responsibility for their disabilities have no stronger claim to an extended eligibility period than do able-bodied veterans."

The Supreme Court in *Barnes v. Gorman*[40] held in a unanimous decision that punitive damages may not be awarded under Section 202[41] of the ADA and Section 504 of the Rehabilitation Act. Jeffrey Gorman uses a wheelchair and lacks voluntary control over his lower torso which necessitates the use of a catheter attached to a urine bag. He was arrested in 1992 after fighting with a bouncer at a nightclub and during his transport to the police station suffered significant injuries due to the manner in which he was transported. He sued the Kansas City police and was awarded over $1 million in compensatory damages and $1.2 million in punitive damages. The eighth circuit court of appeals upheld the award of punitive damages but the Supreme Court reversed. Although the Court was unanimous in the result, there were two concurring opinions, and the concurring opinion by Justice Stevens, joined by Justices Ginsburg and Breyer, disagreed with the reasoning used in Justice Scalia's opinion for the Court.

Justice Scalia observed that the remedies for violations of both Section 202 of the ADA and Section 504 of the Rehabilitation Act are "coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964."[42] Neither Section 504 nor Title II of the ADA specifically mention punitive damages, rather they reference the remedies of Title VI of the Civil Rights Act. Title VI is based on the congressional power under the Spending Clause[43] to place conditions on grants. Justice Scalia noted that Spending Clause legislation is "much in the nature of a contract" and, in order to be a legitimate use of this power, the recipient must voluntarily and knowingly accept the terms of the "contract." "If Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."[44] This contract law analogy was also found to be applicable to determining the scope of the damages remedies and, since punitive damages are generally not found to be available for a breach of contract, Justice Scalia found that they were not available under Title VI, Section 504, or the ADA.

# Section 504 and the ADA

The Americans with Disabilities Act was modeled on the statutory language, regulations, and case law of Section 504. The ADA and Section 504 are, therefore, very similar and have some overlapping coverage but also have several important distinctions. Most significantly, Section 504 is limited to programs receiving federal funds or the executive agencies and the Postal Service while the ADA broadly covers the private sector regardless of whether federal funds are involved and does not cover the executive agencies or the Postal Service.

There are several other distinctions between the ADA and Section 504. For example, the ADA contains specific exemptions for religious entities.[45] There are no corresponding provisions in

---

[40] 536 U.S. 181 (2002).

[41] 42 U.S.C. §12132. Section 203, 42 U.S.C. §12133, contains the enforcement provisions.

[42] 42 U.S.C. §2000d *et seq.*

[43] U.S. Const., Art. I §8, cl.1.

[44] *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

[45] 42 U.S.C. §§12113(c), 12187.

Section 504. Therefore, if a faith-based organization receives federal funds, it is prohibited from discriminating against an individual with a disability.[46]

Title I of the ADA prohibits employment discrimination which is also prohibited with regard to the entities covered by Section 504. However, the enforcement procedures for the two statutes are somewhat different. Enforcement of Title I of the ADA parallels that of Title VII of the Civil Rights Act of 1964 and includes the requirement that persons alleging discrimination file a charge with the EEOC.[47] However, under Section 504 an employment discrimination complaint may be filed with the Office of Civil Rights for the agency that provided the federal financial assistance or the Department of Justice. Administrative procedures do not have to be exhausted prior to filing suit in federal court.[48]

# Section 504 and Education

Several federal statutes, notably the Individuals with Disabilities Education Act (IDEA),[49] Section 504, and the ADA, address the rights of individuals with disabilities to education.[50] Although there is overlap, particularly with Section 504 and the ADA, each statute plays a significant part in the education of individuals with disabilities. Generally, although there are some differences regarding K-12 schools, the Department of Education (ED) has interpreted the Section 504 compliance standards for schools to be the same as the basic requirements of IDEA.[51]

As discussed previously, the Rehabilitation Act is amended by the ADA Amendments Act to reference the definition of disability in the ADA. Section 504's coverage of education was a subject of discussion during the passage of the ADA Amendments Act, and the Senate Statement of Managers observed:

> We expect that the Secretary of Education will promulgate new regulations related to the definition of disability to be consistent with those issued by the Attorney General under this Act. We believe that other current regulations issued by the Department of Education Office of Civil Rights under Section 504 of the Rehabilitation Act are currently harmonious with Congressional intent under both the ADA and the Rehabilitation Act.[52]

The implications of the changes in the definition of disability under Section 504 and the ADA for the coverage of children in K-12 schools is not entirely clear. Perry Zirkel, a Lehigh University education and law professor, argues that the ADAAA would result in more students in K-12 education being given Section 504 plans, especially students with diabetes, asthma, food

---

[46] For a more detailed discussion of Section 504 requirements for faith-based organizations see http://www.dol.gov/odep/pubs/fact/faith.htm.

[47] 42 U.S.C. §12117(a), 42 U.S.C. §2000e-5.

[48] 29 U.S.C. §794a, 42 U.S.C. §2000d *et seq.*

[49] 20 U.S.C. §1400 et seq.

[50] For a more detailed discussion and comparison of the educational coverage of these statutes see CRS Report R40123, *Education of Individuals with Disabilities: The Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act (ADA)*, by (name redacted) and (name redacted).

[51] These requirements include the provision of a free appropriate public education in the least restrictive setting. See 34 C.F.R. Part 104, Appx. A, Subpart D.

[52] *Id.*

---

allergies, dyslexia, and attention deficit disorder (ADD).[53] Another commentator noted that the addition of "reading" in the list of major life activities may be problematic since "there is no easy way to distinguish children who are unable to read because they have a disability from those who have simply received poor instruction."[54]

## Author Contact Information

Cynthia Brougher, Coordinator
Legislative Attorney
/redacted/@crs.loc.gov, 7-....

## Acknowledgments

Previous authors of this report include (name redacted) and (name redacted).

---

[53] "ADA Amendments Become Law, New Definitions Expand Protection," Section 504 Compliance Handbook (Nov. 2008).

[54] "List of 'Major Life Activities' in ADA Bill Raises Questions About Reading," 24 The Special Educator 3 (October 10, 2008).

Plaintiffs' Exhibit 145



# State and Federal Authority to Mandate COVID-19 Vaccination

April 2, 2021

**Congressional Research Service**

https://crsreports.congress.gov

R46745

**CRS REPORT**
Prepared for Members and
Committees of Congress



Congressional Research Service
Informing the legislative debate since 1914

**SUMMARY**

R46745

April 2, 2021

**Wen W. Shen**
Legislative Attorney

# State and Federal Authority to Mandate COVID-19 Vaccination

The Coronavirus Disease 2019 (COVID-19) vaccines recently authorized by the U.S. Food and Drug Administration (FDA) are a critical tool to address the pandemic. After determining that these vaccines meet the applicable statutory standards and the Agency's specific safety and efficacy standards, FDA issued Emergency Use Authorizations (EUAs) under Section 564 of the Federal Food, Drug, and Cosmetic Act (FD&C Act). In particular, data supporting the EUA requests show that the vaccines are effective at preventing symptomatic COVID-19 in vaccinated individuals. Given this data, many public health experts believe that promoting COVID-19 vaccination—along with continued engagement in community mitigation activities that prevent transmission, such as mask wearing and social distancing—should be a key component of the United States' pandemic response.

One available legal tool for increasing vaccination rates is for governments to require vaccination. Under the United States' federalist system, states and the federal government share regulatory authority over public health matters, with states traditionally exercising the bulk of the authority in this area pursuant to their general police power. This power authorizes states, within constitutional limits, to enact laws "to provide for the public health, safety, and morals" of the states' inhabitants. In contrast to this general power, the federal government's powers are confined to those enumerated in the Constitution.

This report provides an overview of state and federal authority to mandate vaccination. The first part of the report provides background on state and local authority to mandate vaccination under states' general police power. It discusses the Supreme Court's long-standing recognition of state and local authority to mandate vaccination as an exercise of their police power, as well as modern courts' analyses of more recent challenges to state vaccination mandates based on the First Amendment's Free Exercise Clause. The first part of the report closes with a look at how the COVID-19 vaccines' EUA status may affect a court's analysis of a potential mandate.

The second part of the report provides an overview of federal authority to mandate vaccination. It discusses one possible source of existing federal authority, Section 361 of the Public Health Service Act (PHSA), and reviews the extent of Congress's constitutional authority under the Constitution's Spending and Commerce Clauses to potentially mandate vaccination.

fines.[63] CDC has incorporated the higher fines into applicable regulations, which subject violating individuals to a fine up to $100,000 if the violation does not result in death, or a fine of up to $250,000 if the violation results in a death.[64] Violations by organizations are subject to a fine of up to $200,000 per event if the violation does not result in a death, or $500,000 per event if the violation results in a death.[65] Given the significant potential penalties, any mandate issued under the provision—assuming that it falls within the Agency's delegated authority—may be more appropriately structured as requirements on entities in interstate commerce, such as a requirement on entities to verify vaccination status.[66]

## Congress's Authority to Mandate Vaccination

Although states have traditionally exercised the bulk of authority over public health matters, including vaccination, Congress shares certain concurrent authority in this area emanating from its enumerated powers in the Constitution.[67] This authority derives from, among other sources, the Constitution's Spending and Commerce Clauses.[68]

The Spending Clause empowers Congress to tax and spend for the general welfare.[69] Under this authority, which is subject to several limitations, Congress may offer federal funds to nonfederal entities and prescribe the terms and conditions under which the funds are accepted and used by recipients.[70] Over the past century, Congress has frequently invoked this authority in the public health context, including for purposes of controlling specified diseases, establishing neighborhood or community health centers, and creating federal health insurance programs, including Medicare and Medicaid.[71]

Applying its authority in the context of a vaccination mandate, Congress could encourage states to enact a vaccination mandate meeting certain federal requirements by imposing it as a condition of receiving certain federal funds.[72] This use of the Spending Clause authority, assuming it falls within the broad parameters of being for the "general welfare," would be permissible so long as (1) Congress provides clear notice of the vaccination mandate that states must enact; (2) the mandate is related to the purpose of the federal funds; (3) this conditional grant of funds is not

---

[63] *See* 18 U.S.C. §§ 3559, 3571(b)(5), 3571(c)(5).

[64] *See* 42 C.F.R. § 70.18(a).

[65] *See id.* § 70.18(b).

[66] For instance, CDC's public transit mask mandate was issued under Section 361 and includes an obligation on conveyance operators to require passengers to wear masks while also contemplating "widespread voluntary compliance" and enforcement support from other federal agencies with access to civil enforcement schemes. *See* 86 Fed. Reg. 8025, 8026, 8030 n.33 (Feb. 3, 2021). *See also* Abramson, *supra* note 17, at 24–27 (noting that some state vaccination mandates for health care workers are structured as a requirement on hospitals and health care facilities to ensure that their employees are vaccinated against specified vaccine-preventable diseases).

[67] McCuskey, *supra* note 6, at 113–20.

[68] *See id.* at 116–19.

[69] U.S. Const. art. I, § 8, cl. 1.

[70] *See* Nolan & Lewis, *supra* note 8, at 29–31 (discussing South Dakota v. Dole, 483 U.S. 203, 207–08 (1987)).

[71] *See* James G. Hodge, Jr., *The Role of New Federalism and Public Health Law*, 12 J.L. & Health 309, 335–37 (1998); McCuskey, *supra* note 6, at 118–19.

[72] *See Dole*, 483 U.S. at 211–12 (holding that 23 U.S.C. § 158, which conditioned the provision of certain federal highway funds upon a state's enactment of a minimum drinking age of twenty-one, was a valid exercise of Congress's spending clause authority).

Plaintiffs' Exhibit 146

usatoday.com

## Only 'guidelines': FAA won't make wearing of face masks on airlines mandatory

3 minutes      6-17-20

The Federal Aviation Administration won't require the wearing of masks on commercial aircraft, continuing to leave that issue to individual airlines, the agency's chief said Wednesday.

Administrator Stephen Dickson told a Senate committee that the Centers for Disease Control and Prevention, not the FAA, is the lead agency charged with requiring safety precautions against the spread of the coronavirus.

"Our space is aviation safety, and their space is public health," he said.

Two senators expressed dismay that the FAA would suggest, rather than require, anti-COVID-19 safety measures on planes in the face of a public health crisis that has resulted in the deaths of more than 110,000 people in the U.S.

**More:** Traveling again? Leisure and business travelers share tips to stay safe from coronavirus

When it comes to having passengers wear face masks on planes, "reports have shown enforcement for noncompliance has been uneven and difficult," said Sen. Kyrsten Sinema, a Democrat from Arizona, "The FAA needs to do more to ensure the aviation system is mitigating the spread of the virus."

Sen. Brian Schatz reacted when Dickson referred to new "guidelines" being developed to aid airlines with practices to help ward off COVID-19.





"Is this, like, a philosophical thing with you folks?" the Democrat from Hawaii asked. "I just don't get why you wouldn't want this to be mandatory,"

Dickson replied by citing Transportation Secretary Elaine Chao's policy that "these will not be regulatory mandates."

**More:** [Travelers accused of breaking coronavirus quarantine set to leave Hawaii](#)

Dickson added, however, that the agency is monitoring airlines' voluntary safety programs "to make sure they are following through" and that airlines have been better about enforcement.

Most airlines require passengers to wear masks. Some say they are trying to take other precautions, like checking passengers' temperatures before they board planes and leaving middle seats empty when flights aren't full.

**More:** [Airlines got coronavirus aid, so why are they stingy on flight refunds and safety?](#)

But it isn't always easy. United Airlines, for instance, said it is [developing a list](#) of passengers who refuse to wear masks. Those who refuse could be barred from future flights.

# Plaintiffs' Exhibit 147

lucas.travel

## JetBlue & Southwest Broke Law by Refusing Virginia Man Mask Exemptions – Quest for 243

8-10 minutes

---

***Decisions a Victory for Disabled Americans***

***Fighting Airlines' Exclusionary Policies***

Nov. 28, 2021

By LUCAS WALL

HENRICO COUNTY, Virginia – The U.S. Department of Transportation determined JetBlue Airways and Southwest Airlines violated federal law when they refused to grant a disabled Virginia man mask exemptions, a win for Americans with medical conditions battling the airlines over their extremely restrictive policies on face coverings.

DOT found JetBlue violated the Air Carrier Access Act by failing to provide an accommodation to a passenger with a disability with respect to the carrier's mask policy for Kleanthis Andreadakis' October 2020 request to fly maskless from Richmond, Virginia, to Boston, Massachusetts, for the birth of his first granddaughter.

"JetBlue's mask policy that was in place at the time Mr. Andreadakis planned to travel failed to provide an exemption for passengers with disabilities who cannot wear or safely wear a mask due to their disabilities," according to the Investigation Summary Sheet issued by DOT's Office of General Counsel. "As a result, JetBlue did not conduct an individualized assessment to determine whether Mr. Andreadakis could not wear or safely wear a mask due to his disability and whether a reasonable accommodation could be made that would permit Mr. Andreadakis to fly safely without a mask. Therefore, we find that JetBlue violated the ACAA."

Andreadakis, who is part of a group of 13 disabled flyers suing JetBlue, Southwest, and five other airlines for illegal mask discrimination, filed a complaint with DOT in October 2020, which took more than a year to resolve. He complained that JetBlue's website at the time stipulated that all passengers over the age of two must wear a face covering over their nose and mouth throughout their journey, with no exemptions for medical conditions.

"In the carrier's October 22, 2020, letter to Mr. Andreadakis, JetBlue confirms Mr. Andreadakis' understanding of its mask policy by stating that it requires all customers over the age of 2 to wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, in flight and deplaning," according to DOT. However, "The Air Carrier Access Act and its implementing regulation … require airlines to make reasonable accommodations, based on

individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disabilities."

DOT did not fine JetBlue for discriminating against Andreadakis, which he said is disturbing. He is considering challenging the lack of a penalty in the U.S. Court of Appeals for the Fourth Circuit in Richmond. He is already suing the Transportation Security Administration in the Court of Appeals to strike down the Federal Transportation Mask Mandate.

"For DOT to simply give JetBlue a pass on anything punitive for violating my civil rights is mind-boggling," he said. "ACAA – the law that is supposed to protect the disabled in air travel – has been the law since 1986. DOT can't abrogate airlines' legal responsibilities under the law. It's appalling that the agency charged by Congress with the protection and enforcement of civil rights for the disabled in air travel is not fining airlines for depriving me of the ability to fly, furthering the prejudices that the disabled endure daily."

DOT also found Southwest violated the ACAA by failing to provide an accommodation for Andreadakis' September 2020 request to fly maskless from Richmond to Tampa, Florida.

"Mr. Andreadakis was informed that anyone not wearing mask will not be allowed to travel on Southwest. In the carrier's September 21, 2020, reply to Mr. Andreadakis, Southwest confirms Mr. Andreadakis' allegation that a passenger who can not or refuses to wear a mask will not be allowed to travel on Southwest," DOT wrote. "Southwest's mask policy that was in place at the time Mr. Andreadakis planned to travel failed to provide an exemption for passengers with disabilities who cannot wear or safely wear a mask due to their disabilities. … Therefore, we find that Southwest violated the ACAA."

But again, DOT did not fine Southwest for its illegal discrimination against the disabled. Both rulings allege that the air carriers have informed DOT that they have amended their mask policy to comply with the ACAA, but Andreadakis said that's not true.

"It's terrible that DOT found Southwest broke the law but imposed no penalty," Andreadakis said. "Only a month ago, Southwest denied yet another mask-exemption request from me, clearly showing it hasn't changed its policy to comply with the law. Something is very wrong at Southwest Airlines and even more so at the Department of Transportation."

Plaintiffs in the class-action lawsuit have charged the seven airlines (Southwest, Alaska, Allegiant, Delta, Frontier, JetBlue, and Spirit) with conspiracy to interfere with civil rights by barring anyone who can't wear a mask from flying. The complaint also charges the carriers with 29 other counts including infringing on the constitutional right to travel interstate and internationally; reckless endangerment; as well as breaking numerous provisions of the Air Carrier Access Act, Rehabilitation Act, and international treaties. The case is being litigated in the U.S. District Court in Orlando.

JetBlue has harshly treated those suing it for illegal discrimination, including placing the lead plaintiff in the class-action lawsuit Andreadakis is a participating in on its no-fly list last month. Lucas Wall has been stuck in Florida since early June, when Southwest Airlines and the Transportation Security Administration refused to grant him a mask exemption at Orlando International Airport. He sued the federal government June 7 to strike down the FTMM. A week

later, he filed the lawsuit against Southwest, JetBlue, and five other airlines for their illegal discriminatory mask policies that prohibit those who are medically unable to cover their faces from flying.

Wall booked a ticket Oct. 12 and requested a mask exemption from JetBlue. He was shocked to receive an e-mail the next day that his ticket was canceled – with no explanation. During a phone call, a JetBlue supervisor told Wall the security department voided his booking. The airline later confirmed it had banned Wall. He filed a complaint Oct. 14 with DOT, which hasn't been resolved.

"JetBlue continues discriminating against passengers with medical conditions who can't wear masks," he said. "DOT has shamefully failed to fine airlines for violating the Air Carrier Access Act regarding mask-exemption denials, which proliferate to this day. And it should not take 13 months to investigate a simple complaint such as the one Kleanthis filed."

Wall said these DOT determinations that JetBlue and Southwest broke the law will be excellent evidence to present in court.

"We've offered to work with all seven carriers on a consent decree to halt their illegal behavior, but they have refused," Wall said. "They must obey the Air Carrier Access Act and, at minimum, offer mask exemptions without mandating numerous illegal steps such as advance notice, coronavirus testing, and producing a doctor's letter. They shall not further conspire with each other to bar the disabled from flying."

The class-action lawsuit against seven airlines is Wall v. Southwest Airlines, No. 6:21-cv-1008, U.S. District Court for the Middle District of Florida Orlando Division. The lawsuit against TSA is Andreadakis v. Transportation Security Administration, No. 21-1237, U.S. Court of Appeals for the District of Columbia Circuit.

Donate to our legal fund on GoFundMe: Help End Federal Transportation Mask Mandate

Join our Facebook group: Americans Against Mask Mandates

View: 223 Studies, Articles, & Videos Describe How Masks Don't Reduce COVID-19 Spread But Harm Human Health



**U.S. Department of Transportation**

Office of the Secretary of Transportation

GENERAL COUNSEL

1200 New Jersey Ave., S.E.
Washington, DC 20590

November 12, 2021

Mr Kleanthis Andreadakis
5108 Hunters Meadow Pl
Henrico, VA 23231

Dear Mr Andreadakis:

This letter is in further reference to your disability complaint regarding JetBlue Airways. We were sorry to hear of the incident and appreciate the opportunity to advise you of the outcome of our investigation. Enclosed you will find an Investigation Summary Sheet that details the results of our investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. Section 41705, and our implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382, provides a brief summary of that section and explains this office's view on whether the carrier has violated the ACAA and 14 CFR Part 382. If your complaint raises more than one disability issue, an additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates the action that we plan to take. We will either pursue formal enforcement action or by copy of this letter notify the airline specified in your complaint of our determination and warn it that any similar incidents could lead to formal enforcement action. Generally, we will pursue enforcement action on the basis of a number of complaints from which we may infer a pattern or practice of discrimination. However, where one or a few complaints describe particularly egregious conduct on the part of a carrier and those complaints are supported by adequate evidence, we will pursue enforcement action as our resources permit. If we decide to seek enforcement action against the airline, your complaint will be among those considered in the context of this action, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties. In the event that this enforcement action leads to litigation, it is possible that we may need sworn statements or witnesses for a hearing. We will advise you if, in fact, we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing cease and desist orders and assessing civil penalties not to exceed $34,174 per violation. Such action can only be accomplished through settlements or formal hearings before administrative law judges. We cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated the ACAA, we will not pursue enforcement action. Notwithstanding our decision not to pursue enforcement action, however, private legal action may be pursued in the courts based on private contract rights or on civil rights statutes that provide for a private right of action and, in such a proceeding, monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our monthly *Air Travel Consumer Report* reflect your complaint. Our monthly report is made available to the

aviation industry, the news media and the general public so that both consumers and air travel companies can compare the overall complaint records of individual airlines, as well as the number of disability complaints filed against particular carriers. This system also serves as a basis for rulemaking, legislation, and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant further action. This ongoing process also enables us to ensure prompt corrective action whenever we determine that an airline's policies or procedures are not in compliance with our ACAA regulations. Your complaint will be among those considered in the context of this overall process.

I hope this further information is useful. Thank you again for taking the time to contact us.

Sincerely,

Livaughn Chapman, Jr.
Deputy Assistant General Counsel
 for Aviation Consumer Protection

/s/

By: Clereece Kroha
Senior Trial Attorney

Enclosures
cc: JetBlue Airways



**U.S. Department of Transportation**
Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

## INVESTIGATION SUMMARY SHEET

| | |
|---|---|
| **Case Number:** | AT2020100032 |
| **Complainant Title:** | MR |
| **Name:** | KLEANTHIS ANDREADAKIS |
| **Address:** | 5108 HUNTERS MEADOW PL HENRICO, VA 23231 |
| **Passenger(s):** | Mr. Kleanthis Andreadakis |
| **Airline:** | JetBlue Airways |
| **Travel Date(s):** | Not Applicable |
| **Flight Number(s):** | Not Applicable |
| **City Pair:** | Richmond to Boston |
| **Location of Incident:** | Not Applicable |
| **Complaint/Issue:** | Failure to provide an accommodation to a passenger with a disability with respect to the carrier's mask policy. |
| **Applicable Section of 14 CFR Part 382:** | 382.19 |

**Section Summary:**

(a) As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part.

(b) You must not refuse to provide transportation to a passenger with a disability because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

(c) You may refuse to provide transportation to any passenger on the basis of safety, as provided in 49 U.S.C. 44902 or 14 CFR 121.533, or to any passenger whose carriage would violate FAA or TSA requirements or applicable requirements of a foreign government.

(1) You can determine that there is a disability-related safety basis for refusing to provide transportation to a passenger with a disability if you are able to demonstrate that the passenger poses a direct threat (see definition in §382.3). In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:

(i) The nature, duration, and severity of the risk;

(ii) The probability that the potential harm to the health and safety of others will actually occur; and

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

(2) If you determine that the passenger does pose a direct threat, you

must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal.

(3) In exercising this authority, you must not act inconsistently with the provisions of this part.

(4) If your actions are inconsistent with any of the provisions of this part, you are subject to enforcement action under Subpart K of this part.

| | |
|---|---|
| **Rule Violated?** | Yes |
| **Remarks:** | |

Mr. Andreadakis states that he has a disability that prevents him from wearing a mask.  Mr. Andreadakis states that he was looking to travel to Boston for the birth of his first granddaughter and JetBlue Airways (JetBlue) offered non-stop flights.  Mr. Andreadakis further states that JetBlue's website stipulates that all passengers over the age of 2 must wear a face covering over their nose and mouth throughout their journey.

In the carrier's October 22, 2021, letter to Mr. Andreadakis, JetBlue confirms Mr. Andreadakis' understanding of its mask policy by stating that it requires all customers over the age of 2 to wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, in flight and deplaning.

On February 5, 2021, the Department of Transportation's Office of Aviation Consumer Protection (OACP) issued a notice titled "Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear Masks While on Commercial Aircraft." The notice reminds U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with COVID-19.  The notice makes clear that airline policies that expressly allow no exceptions to the mask requirement other than for children under the age of two violate the Air Carrier Access Act.

The Air Carrier Access Act and its implementing regulation, 14 CFR Part 382 (Part 382), require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disabilities. It would be a violation of the ACAA and Part 382 for an airline to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater heath risk to others.

JetBlue's mask policy that was in place at the time Mr. Andreadakis planned to travel failed to provide an exemption for passengers with disabilities who cannot wear or safely wear a mask due to their disabilities.  As a result, JetBlue did not conduct an individualized assessment to determine whether Mr. Andreadakis could not wear or safely wear a mask due to his disability and whether a reasonable accommodation could be made that would permit Mr. Andreadakis to fly safely without a mask.  Therefore, we find that JetBlue violated the ACAA and Part 382 in this instance.

Since the issuance of the notice, OACP has exercised its prosecutorial discretion and provided the airlines 45 days from the date of the Enforcement Notice to come into compliance with its obligation under the ACAA and Part 382 by amending their mask polices to provide reasonable accommodations to persons with disabilities who are unable to wear masks or to wear masks safely, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued.  A copy of OACP's Enforcement Notice is available on the Department's website at: https://www.transportation.gov/airconsumer/masks-notice-of-enforcement-policy.  We note that since the time of this incident, JetBlue has informed OACP that it has amended its mask policy to comply with

the ACAA and Part 382.



**U.S. Department of Transportation**
Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

November 22, 2021

Mr Kleanthis Andreadakis
5108 Hunters Meadow Pl
Henrico, VA 23231

Dear Mr Andreadakis:

This letter is in further reference to your disability complaint regarding Southwest Airlines. We were sorry to hear of the incident and appreciate the opportunity to advise you of the outcome of our investigation. Enclosed you will find an Investigation Summary Sheet that details the results of our investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. Section 41705, and our implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382, provides a brief summary of that section and explains this office's view on whether the carrier has violated the ACAA and 14 CFR Part 382. If your complaint raises more than one disability issue, an additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates the action that we plan to take. We will either pursue formal enforcement action or by copy of this letter notify the airline specified in your complaint of our determination and warn it that any similar incidents could lead to formal enforcement action. Generally, we will pursue enforcement action on the basis of a number of complaints from which we may infer a pattern or practice of discrimination. However, where one or a few complaints describe particularly egregious conduct on the part of a carrier and those complaints are supported by adequate evidence, we will pursue enforcement action as our resources permit. If we decide to seek enforcement action against the airline, your complaint will be among those considered in the context of this action, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties. In the event that this enforcement action leads to litigation, it is possible that we may need sworn statements or witnesses for a hearing. We will advise you if, in fact, we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing cease and desist orders and assessing civil penalties not to exceed $34,174 per violation. Such action can only be accomplished through settlements or formal hearings before administrative law judges. We cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated the ACAA, we will not pursue enforcement action. Notwithstanding our decision not to pursue enforcement action, however, private legal action may be pursued in the courts based on private contract rights or on civil rights statutes that provide for a private right of action and, in such a proceeding, monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our monthly *Air Travel Consumer Report* reflect your complaint. Our monthly report is made available to the

aviation industry, the news media and the general public so that both consumers and air travel companies can compare the overall complaint records of individual airlines, as well as the number of disability complaints filed against particular carriers. This system also serves as a basis for rulemaking, legislation, and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant further action. This ongoing process also enables us to ensure prompt corrective action whenever we determine that an airline's policies or procedures are not in compliance with our ACAA regulations. Your complaint will be among those considered in the context of this overall process.

I hope this further information is useful. Thank you again for taking the time to contact us.

Sincerely,

Livaughn Chapman, Jr.
Deputy Assistant General Counsel
  for Aviation Consumer Protection

/s/

By: Stuart Hindman
Senior Trial Attorney

Enclosures
cc: Southwest Airlines



**U.S. Department of Transportation**
Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

## INVESTIGATION SUMMARY SHEET

| | |
|---|---|
| **Case Number:** | AT2020100041 |
| **Complainant Title:** | MR |
| **Name:** | KLEANTHIS ANDREADAKIS |
| **Address:** | 5108 HUNTERS MEADOW PL HENRICO, VA 23231 |
| **Passenger(s):** | Mr. Kleanthis Andreadakis |
| **Airline:** | Southwest Airlines |
| **Travel Date(s):** | Not Applicable |
| **Flight Number(s):** | Not Applicable |
| **City Pair:** | Richmond to Tampa |
| **Location of Incident:** | On board flights |
| **Complaint/Issue:** | Failure to provide an accommodation to a passenger with a disability with respect to the carrier's mask policy. |
| **Applicable Section of 14 CFR Part 382:** | 382.19 |
| **Section Summary:** | (a) As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part. |

(b) You must not refuse to provide transportation to a passenger with a disability because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

(c) You may refuse to provide transportation to any passenger on the basis of safety, as provided in 49 U.S.C. 44902 or 14 CFR 121.533, or to any passenger whose carriage would violate FAA or TSA requirements or applicable requirements of a foreign government.

(1) You can determine that there is a disability-related safety basis for refusing to provide transportation to a passenger with a disability if you are able to demonstrate that the passenger poses a direct threat (see definition in §382.3). In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:

(i) The nature, duration, and severity of the risk;

(ii) The probability that the potential harm to the health and safety of others will actually occur; and

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

(2) If you determine that the passenger does pose a direct threat, you

must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal.

(3) In exercising this authority, you must not act inconsistently with the provisions of this part.

(4) If your actions are inconsistent with any of the provisions of this part, you are subject to enforcement action under Subpart K of this part.

**Rule Violated?**     Yes

**Remarks:**

Mr. Andreadakis states that he has a disability that prevents him from wearing a mask.  Mr. Andreadakis states that he was looking to travel to Tamoa and he reached out to Southwest Airlines (Southwest) for information regarding a mask exemption. Mr. Andreadakis was informed that anyone not wearing mask will not be allowed to travel on Southwest.

In the carrier's September 21, 2020, reply to Mr. Andreadakis, Southwest confirms Mr. Andreaadakis' allegation that it passenger who can not or refuse to wear a mask will not be allowed to travel on Southwest.

On February 5, 2021, the Department of Transportation's Office of Aviation Consumer Protection (OACP) issued a notice titled "Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear Masks While on Commercial Aircraft." The notice reminds U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with COVID-19.  The notice makes clear that airline policies that expressly allow no exceptions to the mask requirement other than for children under the age of two violate the Air Carrier Access Act.

The Air Carrier Access Act and its implementing regulation, 14 CFR Part 382 (Part 382), require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disabilities. It would be a violation of the ACAA and Part 382 for an airline to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater heath risk to others.

Southwest's mask policy that was in place at the time Mr. Andreadakis planned to travel failed to provide an exemption for passengers with disabilities who cannot wear or safely wear a mask due to their disabilities.  As a result, Southwest did not conduct an individualized assessment to determine whether Mr. Andreadakis could not wear or safely wear a mask due to his disability and whether a reasonable accommodation could be made that would permit Mr. Andreadakis to fly safely without a mask.  Therefore, we find that Southwest violated the ACAA and Part 382 in this instance.

Since the issuance of the notice, OACP has exercised its prosecutorial discretion and provided the airlines 45 days from the date of the Enforcement Notice to come into compliance with its obligation under the ACAA and Part 382 by amending their mask polices to provide reasonable accommodations to persons with disabilities who are unable to wear masks or to wear masks safely, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued.  A copy of OACP's Enforcement Notice is available on the Department's website at: https://www.transportation.gov/airconsumer/masks-notice-of-enforcement-policy.  We note that since the time of this incident, Southwest has informed OACP that it has amended its mask policy to comply with the ACAA and Part 382.

Plaintiffs' Exhibit 148

# *New Horizons*

 Information for the
Air Traveler with
a Disability





U.S. Department of Transportation

Rev. Feb. 2004

## *INTRODUCTION*

For years, access to the nation's air travel system for persons with disabilities was an area of substantial dissatisfaction, with both passengers and the airline industry recognizing the need for major improvement. In 1986 Congress passed the Air Carrier Access Act, requiring the Department of Transportation (DOT) to develop new regulations which ensure that persons with disabilities will be treated without discrimination in a way consistent with the safe carriage of all passengers. These regulations were published in March 1990 and have been amended several times since then.

The DOT regulations, referred to here as the Air Carrier Access rules, represent a major stride forward in improving air travel for persons with disabilities. The rules clearly explain the responsibilities of the traveler, the carriers, the airport operators, and contractors, who collectively make up the system which moves over one million passengers per day.

The Air Carrier Access Act was amended effective April 5, 2000, to cover foreign air carriers. The rules that implement the ACAA will be amended to reflect that change.

The Air Carrier Access rules are designed to minimize the special problems that travelers with disabilities face as they negotiate their way through the nation's complex air travel system from origin to destination. This is achieved:

- By recognizing that the physical barriers encountered by passengers with disabilities can frequently be overcome by employing simple changes in layout and technology.

- By adopting the principle that many difficulties confronting passengers with hearing or vision impairments will be relieved if they are provided access to the same information that is available to all other passengers.

- Through training of all air travel personnel who come in day-to-day contact with persons with disabilities, to understand their needs and how they can be accommodated quickly, safely, and with dignity.

This guide is designed to offer travelers with disabilities a brief but authoritative source of information about the Air Carrier Access rules: the accommodations, facilities, and services that are now required to be available. It also describes features required by other regulations designed to make air travel more accessible.

The guide is structured in much the same sequence as a passenger would plan for a trip: the circumstances he or she must consider prior to traveling, what will be encountered at the airport, and what to expect in the transitions from airport to airplane, on the plane, and then airplane to airport.

## ✢ *Planning Your Trip*

**The New Traveling Environment**

THE AIR CARRIER ACCESS RULES SWEEP aside many restrictions that formerly discriminated against passengers with disabilities:

- A carrier may not refuse transportation to a passenger solely on the basis of a disability.

- Air carriers may not limit the number of individuals with disabilities on a particular flight.

- All trip information that is made available to other passengers also must be made available to passengers with disabilities.

- Carriers must provide passage to an individual who has a disability that may affect his or her appearance or involuntary behavior, even if this disability may offend, annoy, or be an inconvenience to crew-members or other passengers.

There are a few exceptions:

- The carrier may refuse transportation if the individual with a disability would endanger the health or safety of other passengers, or transporting the person would be a violation of FAA safety rules.

- The carrier may refuse transportation if there are no lifts, boarding chairs or other devices available which can be adapted to enplane the passenger.  Airline personnel are not required to carry a mobility-impaired person on or off the aircraft by hand, i.e. to directly pick up the passenger's body in the arms of one or more airline staffers and carry the individual up or down stairs.  Lifts or similar devices are currently required for nearly all flights on aircraft with 19 or more seats at airports with 10,000 or more annual enplanements.

- There are special rules about persons with certain disabilities or communicable diseases.  These rules are covered in the chapter entitled "At the Airport."

- The carrier may refuse transportation if it is unable to seat the passenger without violating the FAA Exit Row Seating rules.  See the chapter "On the Plane."

There are new procedures for resolving disputes:

- All carriers are now required to have a Complaints Resolution Official (CRO) immediately available (even if by phone) to resolve disagreements which may arise between the carrier and passengers with disabilities.

- Travelers who disagree with a carrier's actions toward them can pursue the issue with the carrier's CRO on the spot.

- A carrier that refuses transportation to any person based on a disability must provide a written statement to that person within 10 calendar days, stating the basis for the refusal.  The statement must include, where applicable, the basis for the carrier's opinion that transporting the person could be harmful to the safety of the flight.

- If the passenger is still not satisfied, he or she may pursue DOT enforcement action.

**Getting Advance Information About the Aircraft**

Travelers with disabilities must be provided information upon request concerning facilities and services available to them.  When feasible this information will pertain to the specific aircraft scheduled for a specific flight.  Such information includes:

- Any limitations concerning the ability of the aircraft to accommodate an individual with a disability (the carrier shall provide this information to any passenger who states that he or she uses a wheelchair for boarding,

1

even if the passenger does not explicitly request the information);

- The location of seats (if any) with movable aisle armrests and any seats which the carrier does not make available to an individual with a disability (e.g., exit rows);

- Any limitations on the availability of storage facilities in the cabin or in the cargo bay for mobility aids or other equipment commonly used by an individual with a disability;

- Whether the aircraft has an accessible lavatory.

Normally, advance information about the aircraft will be requested by phone. Any carrier that provides telephone service for the purpose of making reservations or offering general information must provide comparable services for hearing-impaired individuals, utilizing telecommunications devices for the deaf (TDDs), or text telephones (TTs). The TTs shall be available during the same hours that the general public has access to regular phone service. The response time to answer calls on the TT line shall also be equivalent to the response time available to the general public. Charges for the call, if any, shall be the same as charges made to the general public.

## When Advance Notice Can Be Required

==Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability except as provided below.== Nonetheless, letting the airline know in advance how they can help you will generally result in a smoother trip.

==Carriers may require up to 48 hours advance notice and one hour advance check-in from a person with a disability who wishes to receive any of the following services:==

- Transportation for an electric wheelchair on an aircraft with fewer than 60 seats;

- Provision by the carrier of hazardous materials packaging for the battery of a wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group;

- Provision of an on-board wheelchair on an aircraft that does not have an accessible lavatory for persons who can use an inaccessible lavatory but need an on-board chair to do so.

An airline that uses a "block seating" approach to provide special seating for passengers with disabilities is free to require 24 hours advance notice for such accommodations. See the "Seating" section later in this booklet.

Carriers are not required to provide the following services or equipment, but should they choose to provide them, they may require 48 hours advance notice and a one hour advance check-in:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical supply;

- Accommodations for a passenger who must travel on a stretcher.

Carriers may impose reasonable, non-discriminatory charges for these optional services.

Where a service is required by the rule, the airline must ensure that it is provided if appropriate notice has been given and the service requested is available on that particular flight. If a passenger does not meet advance notice or check-in requirements, carriers must make a reasonable effort to accommodate the requested service, providing this does not delay the flight.

If a passenger with a disability provides the required notice but is required to fly on another carrier (for example, if the flight is cancelled), the original carrier must, to the maximum extent feasible, provide assistance to the second carrier in furnishing the accommodation requested by the individual.

It must be recognized that even when a passenger has requested information in advance on the accessibility features of the scheduled aircraft,

carriers sometimes have to substitute a different aircraft at the last minute for safety, mechanical or other reasons.  The substitute aircraft may not be as fully accessible—a condition that may prevail until the retirement of the last of the aircraft that were in service before the implementation of the Air Carrier Access rules.

## When Attendants Can Be Required

Carriers may require the following individuals to be accompanied by an attendant:

- A person traveling on a stretcher or in an incubator (for flights where such service is offered);

- A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from carrier personnel;

- A person with a mobility impairment so severe that the individual is unable to assist in his or her own evacuation from the aircraft;

- A person who has both severe hearing and severe vision impairments which prevent him or her from receiving and acting on necessary instructions from carrier personnel when evacuating the aircraft during an emergency.

The carrier and the passenger may disagree about the applicability of one of these criteria.  In such cases, the airline can require the passenger to travel with an attendant, contrary to the passenger's assurances that he or she can travel alone. However, the carrier cannot charge for the transportation of the attendant.

The airline can choose an attendant in a number of ways.  It could designate an off-duty employee who happened to be traveling on the same flight to act as the attendant.  The carrier or the passenger with a disability could seek a volunteer from among other passengers on the flight to act as the attendant.  The carrier could provide a free ticket to an attendant of the passenger's choice for that flight segment.  In the end, however, a carrier is not required to find or furnish an attendant.

The attendant would not be required to provide personal service to the passenger with a disability other than to provide assistance in the event of an emergency evacuation.  This is in contrast to the case of the passenger that usually travels accompanied by a personal attendant, who would provide the passenger whatever service he or she requests.

If there is not a seat available on the flight for an attendant, and as a result a person with a disability holding a confirmed reservation is denied travel on the flight, the passenger with a disability is eligible for denied boarding compensation.

For purposes of determining whether a seat is available for an attendant, the attendant shall be deemed to have checked in at the same time as the person with the disability.

## ✈ *At The Airport*

### Airport Accessibility

UNTIL A FEW YEARS AGO, ONLY THOSE AIRPORT facilities designed, constructed, or renovated by or for a recipient of federal funds had to comply with federal accessibility standards. Even at federally-assisted airports, not all facilities and activities were required to be accessible. Examples are privately-owned ground transportation and concessions selling goods or services to the public.  As a result of the Air Carrier Access rules, and the Americans with Disabilities Act of 1990 (ADA) and implementing regulations, these privately-owned facilities must also be made accessible.

In general, airports under construction or being refurbished must comply with the ADA Accessibility Guidelines (ADAAG) and other regulations governing accessibility in accordance with a timetable established in the ADA.  The ADAAGs can be found at http://www.access-board.gov/adaag/html/adaag.htm.  Note in particular section 10.4, "Airports."  Thus, while there are still many changes to be made, the accessibility of most airports is improving.  With few exceptions, the following services should be available in all air carrier terminals within the next few years:

- Accessible parking near the terminal;

- Signs indicating accessible parking and the easiest access from those spaces to the terminal;

- Accessible medical aid facilities and travelers aid stations;

- Accessible restrooms;

- Accessible drinking fountains;

- Accessible ticketing systems at primary fare collection areas;

- Amplified telephones and text telephones (TTs) for use by persons with hearing and speech impairments (there must be at least one TT in each terminal in a clearly marked accessible location);

- Accessible baggage check-in and retrieval areas;

- Jet bridges and mobile lounges that are accessible (at airports that have such facilities);

- Level entry boarding ramps, lifts or other means of assisting an individual with a disability on and off an aircraft;

- Information systems using visual words, letters or symbols with lighting and color coding, and systems for providing information orally;

- Signs indicating the location of specific facilities and services.

### Moving Through the Airport

To make travel easier for an individual with a disability, major airports will be required to make the following services accessible under new rules being put into effect in the next several years:

- Shuttle vehicles, owned or operated by airports, transporting people between parking lots and terminal buildings;

- People movers and moving walkways within and between terminals and gates.

All carrier facilities must currently include one accessible route from an airport entrance to ticket counters, boarding locations and baggage handling areas.  These routes must minimize any extra distance that wheelchair users must travel compared to other passengers to reach these facilities.  Outbound and inbound baggage facilities must provide efficient baggage handling for individuals with a disability, and these facilities must be designed and operated so as to be accessible.  There must be appropriate signs to indicate the location of accessible services.

Carriers cannot restrict the movements of persons with disabilities in terminals or require them to remain in a holding area or other location while awaiting transportation and other assistance.

Curbside baggage check-in (available only for domestic flights) may be helpful to passengers with a disability.

## Passenger Information

Carriers must ensure that individuals with disabilities, including those with vision and hearing impairments, have timely access to the same information provided to other passengers,including (but not limited to) information on:

- ticketing;

- scheduled departure times and gates;

- change of gate assignments;

- status of flight delays;

- schedule changes;

- flight check-in;

- checking and claiming of luggage.

This information must be made available upon request. A crew member is not required to interrupt his or her immediate safety duties to supply such information.

A copy of the Air Carrier Access rules must be made available by carriers for inspection upon request at each airport.

As previously noted, any carrier that provides telephone service for the purpose of making reservations or offering general information shall also provide TT service. This service for people with speech and hearing impairments must be available during the same hours that the general public has access to regular phone service, with equivalent response times and charges.

## Security Screening

An individual with a disability must undergo the same security screening as any other member of the traveling public.

If an individual with a disability is able to pass through the security system without activating it, the person shall not be subject to special screening procedures. Security personnel are free to examine an assistive device that they believe is capable of concealing a weapon or other prohibited item. If an individual with a disability is not able to pass through the system without activating it, the person will be subject to further screening in the same manner as any other passenger activating the system.

Security screening personnel at some airports may employ a hand-held device that will allow them to complete the screening without having to physically search the individual. If this method is still unable to clear the individual and a physical search becomes necessary, then at the passenger's request, the search must be done in private.

If the passenger requests a private screening in a timely manner, the carrier must provide it in time for the passenger to board the aircraft. Such private screenings will not be required, however, to a greater extent or for any different reason than for other passengers. However, they may take more time.

## Medical Certificates

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care.

A disability is not sufficient grounds for a carrier to request a medical certificate. Carriers shall not require passengers to present a medical certificate unless the person:

- Is on a stretcher or in an incubator (where such service is offered);

- Needs medical oxygen during flight (where such service is offered);

- Has a medical condition which causes the carrier to have reasonable doubt that the individual can complete the flight safely, without requiring extraordinary medical assistance during the flight; or

5

- Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight.

If the medical certificate is necessitated by a communicable disease (see next section), it must say that the disease or infection will not be communicable to other persons during the normal course of flight, or it shall state any conditions or precautions that would have to be observed to prevent transmission of the disease or infection to others.

Carriers cannot mandate separate treatment for an individual with a disability except for reasons of safety or to prevent the spread of a communicable disease or infection.

## Communicable Diseases

As part of their responsibility to their passengers, air carriers try to prevent the spread of infection or a communicable disease on board an aircraft. If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may:

- Refuse to provide transportation to the person;

- Require the person to provide a medical certificate stating that the disease at its current stage would not be transmittable during the normal course of flight, or describing measures which would prevent transmission during flight;

- Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask).

If the individual has a contagious disease but presents a medical certificate describing conditions or precautions that would prevent the transmission of the disease during the flight, the carrier shall provide transportation unless it is not feasible to act upon the conditions set forth in the certificate to prevent transmission of the disease.

Plaintiffs' Exhibit 149

## What Airline Employees, Airline Contractors, and Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities

*A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382 (Part 382)*

# Chapter 1:  Understanding How to Use this Manual

**A.  Introduction**
**B.  Background**
**C.  Keyword Definitions**

**A.  Introduction**

<u>*Purpose of the Manual*</u>

This manual is a guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR part 382 (part 382).  It is designed to serve as a brief but authoritative source of information about the services, facilities, and accommodations required by the ACAA and the provisions of part 382.  The manual does not expand air carriers' legal obligations or establish new requirements under the law.   It contains suggested practices and procedures for carriers to use on a voluntary basis to implement Part 382.


The primary purpose of the manual is to help you, employees/contractors of air carriers and employees/contractors of indirect air carriers that provide services or facilities to passengers with disabilities, to assist those passengers in accordance with the law. Knowing your legal responsibilities will help ensure consistent compliance with the law and protect the civil rights of air travelers with disabilities when providing services, facilities, and accommodations to them.


Throughout the manual, rather than talking about air carriers' or indirect air carriers' employees/contractors such as yourself in the third person, the word "you" is used.  In most instances, the word "you" refers to personnel who deal directly with the traveling

public.  Moreover, the obligations and responsibilities under the law as set forth in the

manual must be read within the context of each specific employee's duties on the job.

A second purpose of this manual is to offer air travelers with disabilities information about their rights under the ACAA and the provisions of part 382.  Accordingly, in addition to the other useful information in this manual, Appendix I contains a list of "Tips for Air Travelers with Disabilities" to help ensure a smooth and comfortable trip.  In addition, Appendix III provides a list of "Frequently Asked Questions" and answers and Appendix IV contains a list of "Recent DOT Enforcement Orders Related to the ACAA." These DOT enforcement orders are useful because they provide examples in which DOT has interpreted some of the provisions of the ACAA and part 382 under particular circumstances.

**B.  Background**

*U.S. Air Carriers*

In 1986, Congress passed the ACAA, which prohibits discrimination by U.S. air carriers against qualified individuals with disabilities.  49 U.S.C. 41705.  In 1990, the Department of Transportation (DOT) issued part 382, the regulations defining the rights of passengers with disabilities and the obligations of U.S. air carriers under the ACAA.  Since then, these regulations have been amended a number of times.  DOT has also issued guidance to air carriers on the ACAA and part 382 in a variety of ways:  preambles to regulatory amendments, industry letters, correspondence with individual carriers or complainants, enforcement actions, website postings, and informal conversations with the public and air carriers.

2

*Foreign Air Carriers*

On April 5, 2000, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"; Pub. L. 106-181) amended the ACAA to cover foreign air carriers. Although a final rule modifying part 382 to cover foreign air carriers has not yet been issued, in May 2000 DOT's Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Enforcement Office) issued a notice informing the public of its intent to use the provisions of part 382 as guidance in investigating any complaints of non-compliance with the ACAA by foreign carriers. In addition, in July 2003 DOT amended part 382 by adding a new section, 382.70, that requires both U.S. carriers and foreign carriers to record and report to DOT on written disability-related complaints that they receive. At the present time, section 382.70 is the only provision of part 382 that specifically states that it applies to foreign carriers. Finally, a notice of proposed rulemaking (NPRM) proposing to extend the other provisions of part 382 to foreign carriers was published on November 4, 2004. Therefore, while the majority of this manual does not expressly apply to foreign carriers, they should look to this document and part 382 in satisfying their general nondiscrimination obligations under AIR-21 and DOT's May 2000 guidance.

*Development of Technical Assistance Manual*

In 2000, Congress required DOT to create a technical assistance manual to provide guidance to individuals and entities with rights or responsibilities under the ACAA. This manual responds to that mandate. In creating this manual, DOT held meetings with representatives from the disability community, air carriers, and organizations that contract with air carriers to provide disability-related services. Those who attended the

meetings made suggestions for this manual.  All of these suggestions have been thoroughly considered by DOT and incorporated where appropriate.

_ACCESS_

A step-by-step process for resolving issues involving passengers with disabilities appears later in this manual.  Whether the issue is a matter of law, customer service, or both, the ACCESS checklist will be useful in identifying the needs of passengers with disabilities and determining what accommodations the air carriers are required to provide as a matter of law.  *See* Chapter 6, section B.

**How to use this Manual**

This manual is structured in the same sequence as the steps a passenger would encounter on a trip, *i.e.*, requirements concerning

- planning a flight,

- the airport experience,

- enplaning, deplaning, and making connections,

- services during a flight, and

- responding to disability-related complaints.

This manual contains the following tools to assist you in quickly and easily finding the answer to your questions:

- A Table of Contents at the beginning of the manual;

- An Alphabetical Index at the back of the manual; and

- A part 382 Index listing the citations to part 382 at the back of the manual.

4

Also, the following appendices appear at the end of the manual:

- Appendix I: "Tips for Air Travelers with Disabilities" as they relate to the most commonly-used accommodations, facilities, and services that carriers are required to make available to such passengers;

- Appendix II: a list of concerns applicable mainly to air carrier management, as opposed to frontline customer service personnel;

- Appendix III: a list of "Frequently Asked Questions" and answers;

- Appendix IV: a list of "Recent DOT Enforcement Orders Related to the ACAA";

- Appendix V: the full text of part 382; and

- Appendix VI: the DOT document "Guidance Concerning Service Animals in Air Transportation."

***Themes of this Manual***

<u>*Legal Requirements and Customer Service*</u>

This manual highlights the difference between actions you must take according to the law as stated in part 382 and actions that you may choose to take in an effort to provide superior customer service to passengers with disabilities. Legal requirements are generally designated by the words, "must" or "shall" in the manual. Words such as "should" or "may" indicate accommodations that part 382 does not require but that DOT recommends and that you may decide to provide as a matter of good customer service.

<u>*Safety*</u>

5

**Indirect Air Carrier:**

A company not directly involved in the operation of an aircraft that sells air transportation services to the general public, such as tour and charter operators.  [Sec. 382.5]

**Individual with a Disability:**

Any individual who:

- has a physical or mental impairment that, on a permanent or temporary basis,
- substantially limits one or more major life activities,
- has a record of such an impairment, or
- is regarded as having such an impairment. [Sec. 382.5]

**Qualified Individual with a Disability:**

An individual with a disability who:

- accompanies or meets a traveler using airport facilities;
- seeks information about schedules, fares, or policies;
- attempts to use facilities or services offered to the general public by an air carrier;
- has a ticket, or makes a good faith attempt to buy a valid ticket for a flight;
- arrives with a valid ticket for the flight; and
- meets reasonable, nondiscriminatory requirements applicable to all passengers.

   [Sec. 382.5]

# Chapter 2:  Learning the Basics about the Law

# Protecting Air Travelers with Disabilities

- **What does the Air Carrier Access Act (ACAA) say?**  The ACAA prohibits U.S. and foreign air carriers from discriminating against an air traveler with a disability on the basis of such disability (49 U.S.C. 41705).

- **What is 14 CFR Part 382 (part 382)?**  Part 382 is a detailed set of rules that define air carriers' responsibilities under the ACAA and ensures that individuals with disabilities will be treated without discrimination consistent with the safe carriage of all passengers.

- **Who has to follow part 382?**  The following organizations and individuals must comply with part 382: (1) air carriers and their employees (*e.g.*, ticket and gate agents, flight attendants, baggage handlers, pilots, etc.); (2) authorized agents of an air carrier (*e.g.*, travel agents); (3) organizations and their employees that have business arrangements with air carriers to provide disability-related services (*e.g.*, wheelchair service, baggage handling, etc.); and (4)  indirect air carriers and their employees (*e.g.*, tour operators) that provide facilities, services, or other accommodations to passengers with disabilities.

- **Who is protected by part 382?**  Part 382 protects three categories of individuals with disabilities: (1) individuals who have a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (2) individuals who

==have a record of such impairment; and== (3) individuals who are regarded as having such an impairment, whether they have the impairment or not.

- **What is a physical or mental impairment?**

  **Physical impairments** include (1) physiological disorders or conditions; (2) cosmetic disfigurements; or (3) anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

  Examples of physical impairments include orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, HIV disease, drug addition, and alcoholism.

  ==Mental impairments include mental or psychological disorders, such as== mental retardation, organic brain syndrome, ==emotional or mental illness,== and specific learning disabilities.

  Physical characteristics such as the color of one's eyes, hair, or skin, baldness, and left-handedness do not constitute physical impairments.  Similarly, neither age nor obesity alone constitutes a physical impairment.  Disadvantages due to cultural or economic factors are not covered by part 382.  Moreover, the definition of "physical or mental impairment" does not include personality traits such as poor judgment or a quick temper, where these are not symptoms of a mental or psychological disorder.

- **What is a substantial limitation on major life activities?** To qualify as a "disability" under part 382 a condition or disease must substantially limit a major life activity.  Major life activities include, but are not limited to, activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

- **When does an impairment "substantially limit" a major life activity?**  There is no absolute standard for determining when an impairment is a substantial limitation.  Some impairments obviously limit the ability of an individual to engage in a major life activity.

    *Example 1*:  *A person who is deaf is substantially limited in the major life activity of hearing.*

    *Example 2*:  *A person with traumatic brain injury may be substantially limited in the major life activities of:  (a) caring for himself or herself; and (b) working, because of memory deficiency, confusion, contextual difficulties, and the inability to reason appropriately.*

    *Example 3*:  *An individual who is paraplegic may be substantially limited in the major life activity of walking.*

- **Are temporary mental or physical impairments covered by part 382?**  Yes.

    *Example*:  *While on a skiing trip, Jane breaks her leg and is placed in a cast that keeps her from bending her leg and walking without the use of crutches.  Jane will eventually recover the full use of her leg, but in the meantime she is substantially limited in the major life*

*__Example 2__:  Karen, an individual born with a prominent facial disfigurement, has been refused transportation on the grounds that her presence has upset several passengers who have complained to gate agents about her appearance.  Karen's physical disfigurement becomes substantially limiting only as a result of the attitudes of others and she is protected by the provisions of part 382.  Refusing to provide transportation to Karen would violate section 382.31 because you must not refuse to provide transportation to a qualified individual with a disability, such as Karen, solely because her appearance may offend or annoy other passengers.  As in the example above, and regardless whether the decision to refuse transportation was correct, you must provide Karen with a written explanation of the specific basis for the refusal within 10 calendar days of the incident.*

- **How do I determine whether a person is an individual with a disability?**

  Provide an opportunity for the passenger to self-identify by asking how you can best assist him or her.

- **How do I assist a passenger with a disability?**  Ask the passenger how you can best assist him or her.  A passenger with a disability has the most information about his or her abilities, limitations, level of familiarity with the airport and airline, and needs in connection with traveling by air.

- **May I ask an individual what his or her disability is?**  Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38.  Generally, you may not make inquiries about an individual's disability or the nature or

severity of the disability.  However, you may ask questions about an individual's ability to perform specific air travel-related functions, such as enplaning, deplaning, walking through the airport, etc.

**_Example 1_**_:  You may not ask a person, "What is your disability?"_  You may not ask, "Do you have diabetes?"

**_Example 2_**_:  You may ask, "Can you walk from the gate area to your aircraft seat?"  You may ask, "Are you able to transfer from the aisle chair over a fixed aisle seat armrest?" You may ask, "Can you walk from this gate to your connecting gate?"  You may ask (by writing a note if necessary), "Do you need me to notify you if I make any announcements over the public address speaker?"_

**_Example 3_**_:  Susan asks for a bulkhead seat because the condition of her leg necessitates her need for greater legroom. You may ask, "Are you unable to bend your leg or is your leg fused or immobilized?"  [Sec. 382.38]_

- **What are some of the requirements of part 382 that you should be aware of?**  Following are some of the principal requirements of part 382.  It is important to note that the requirements of part 382 listed below are not meant to be exhaustive.  Rather, it is a list of requirements governing situations that you are likely to encounter on a regular basis.

- You must not discriminate against qualified individuals with a disability.  [Sec. 382.7(a)(1)]  You must not *require* a passenger with a disability to accept special services (including, but not limited to, pre-boarding) not requested by the passenger.  [Sec. 382.7(a)(2)]  Instead, you may *ask* a passenger with a disability if he or she would like a particular service, facility, or other accommodation.  In addition, you must not exclude a qualified individual with a disability from or deny the individual the benefit of any air transportation or related services that are available to other passengers.  [Sec. 382.7(a)(3)]  For example, if you choose to provide ground transportation and overnight accommodations to passengers because of a flight cancellation, you must ensure that the ground transportation to the hotel, and the hotel itself, are accessible to a passenger with a disability.

- You must not refuse transportation to a passenger solely on the basis of a disability.  [Sec. 382.31(a)]

- You must provide transportation to an individual with a disability who has an impairment that affects his or her appearance or results in involuntary behavior except under limited circumstances specified below.  You must provide transportation to such individuals with disabilities even if the disability may offend, annoy, or inconvenience crewmembers or other passengers.  [Sec. 382.31(b)]  However, if the person's disability results in involuntary behavior that would or might be inimical to the safety of the flight, then the person may properly be refused transportation.  [Sec. 382.31(d)]

- You shall not limit the number of individuals with disabilities on a particular flight.  [Sec. 382.31(c)]

- If transportation of a passenger with a disability would endanger the safety of the aircraft or the health or safety of its passengers or violate an FAA safety regulation, you may refuse transportation to the individual with a disability.  [Sec. 382.31(d)]

- You shall not require a passenger with a disability to travel with an attendant or to present a medical certificate, *except* in very limited circumstances.  [Secs. 382.35(a) and 382.53(a)]

- You shall not exclude a passenger with a disability from any seat in an exit or other row solely on the basis of his or her disability except to comply with FAA safety rules.  FAA safety rules establish criteria that must be met in order for a passenger to occupy a seat in the emergency exit rows.  [14 CFR 121.585]  If a passenger with a disability meets these FAA criteria, he or she must be allowed to sit in an emergency exit row.  As with any other passenger, you must look at the individual passenger with a disability and reasonably assess whether he or she meets FAA criteria for exit-row seating.  [Sec. 382.37(a)]

- You must provide timely enplaning, deplaning, and connecting assistance to passengers with disabilities requesting such assistance.  As part of this duty, you must provide equipment (*e.g.*, wheelchairs, electric carts, and aisle chairs) and personnel (*e.g.*, individuals to propel wheelchairs and aisle chairs and individuals to assist passengers with disabilities in carrying and stowing their baggage).  [Secs. 382.39(a)(1) and 382.39(b)(5)]

- You must allow a passenger with a disability to stow his or her cane or other assistive device inside the cabin of the aircraft close to his or her seat if it fits, consistent with FAA safety rules on carry-on items.  [Sec. 382.41(c)]

23

# Chapter 3:  Assisting Air Travelers with Disabilities

# Planning a Trip

A.  **Advance Notice**
B.  **Information about the Aircraft**
C.  **Mobility Aids and Assistive Devices**
D.  **Service Animals**
E.  **Accommodations for Air Travelers  who are Deaf, Hard of Hearing, or Deaf-Blind**
F.  **Communicable Diseases**
G.  **Medical Certificates:  When are They Allowed?**
H.  **Your Obligation to Provide Services and Equipment**
I.  **Attendants**

## A.    Advance Notice

You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability except as provided below.  [Sec. 382.33(a)]

*Advance Notice Only for Particular Services and Equipment*

You may require up to 48 hours' advance notice and one hour's advance check-in from a passenger with a disability who wishes to receive the following services:

- Transportation for a battery-powered wheelchair on an aircraft with fewer than 60 seats;

- Provision by the carrier of hazardous materials packaging for the battery of a wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group; and

27

- Provision of an on-board wheelchair on an aircraft that does not have an accessible
  lavatory for passengers with disabilities who can use an inaccessible lavatory but
  need an on-board chair to do so.  [Secs. 382.33(b)(5)-(8)]

**_Example_**:  *While making his reservation, a passenger with a disability gave the
reservation agent 48 hours' advance notice that he would need an aisle chair to access
the lavatory on his upcoming flight.  The flight is on an aircraft with more than 60 seats
and it does not have an accessible lavatory.  During the call, the passenger is made
aware of the fact that the lavatory is inaccessible, but explains that he can use an
inaccessible lavatory as long as he has access to a carrier-provided aisle chair.  Because
the passenger has complied with the advance notice requirement here, normally this
information would have been entered into the passenger's reservation record (otherwise
known as the passenger name record (PNR)) by the carrier and the request for an aisle
chair would have been handled through that notification process.  You are a new gate
agent for your carrier and when this passenger approaches you at the gate more than an
hour before the scheduled departure time of the flight and asks about the aisle chair, you
are not sure how to reply.  What should you do?*

*To begin, as a matter of good customer service, you should tell the passenger that you
are not sure but you will find out for him.  You should ask a colleague and, if necessary,
contact a CRO.  When you ask your colleague, you are told that all aircraft with more
than 60 seats in your carrier's fleet maintain an in-cabin aisle chair.  Once you receive
this information you should assure the passenger that an aisle chair is available so he
can use the inaccessible lavatory on the aircraft.*

*Advance Notice for Optional Services and Equipment*

Although carriers are not required to provide the following services or equipment, if they choose to provide them, you may require 48 hours' advance notice and one hour's advance check-in for:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical power supply; and

- Accommodation for a passenger who must travel on a stretcher.  [Secs. 382.33(b)(1)-(4)]

If appropriate advance notice has been given and the requested service is available on that particular flight, you must ensure that the service or equipment is provided.

*Make a Reasonable Effort to Accommodate, Even Without Advance Notice*

In addition, even if a passenger with a disability does *not* meet the advance notice or check-in requirement, you must make a reasonable effort to furnish the requested service or equipment, provided that making such accommodation would not delay the flight. [Secs. 382.33(c) and (e)]

**Example 1***:  Mr. Thomas uses a battery-powered wheelchair.  He travels frequently between Washington, DC, and New York for business.  One day, he finds out that he has an important business meeting in New York and must travel up to New York that afternoon.  He has no time to provide advance notice regarding the transportation of his battery-powered wheelchair and arrives at the gate 45 minutes before his flight is*

29

*scheduled to depart.  The aircraft for the flight has fewer than 60 passenger seats.  What
should you do?*

*Carriers may require 48 hours' advance notice and one-hour advance check-in for
transportation of a battery-powered wheelchair on a flight scheduled to be made on an
aircraft with fewer than 60 seats.  Carriers may require the same advance notice for
provision of hazardous materials packaging for a battery.  However, airline personnel
are required to make reasonable efforts to accommodate a passenger who fails to
provide the requisite notice to the extent it would not delay the flight.  Therefore, you
must make a reasonable effort to accommodate Mr. Thomas as long as it would not delay
the flight.*

*Mr. Thomas is a frequent traveler on this particular route and he knows that usually it is
feasible to load, store, secure, and unload his battery-powered wheelchair and spillable
battery in an upright position [Sec. 382.41(g)(2)] or detach, "box", and store the
spillable battery [Sec. 382.41(g)(3)] within about 20-25 minutes.  If this is the case, you
must accommodate Mr. Thomas, his battery-powered wheelchair, and the spillable
battery even though Mr. Thomas did not provide advance notice, since doing so would
not delay the flight.*

***Example 2****:  Ms. Webster must travel with medical oxygen and shows up at the airport
without providing advance notice of her need for medical oxygen.  As a policy, your
carrier does not provide medical oxygen on any flights.  What should you do?*

30

*To begin, you should confirm that your carrier does not provide the optional service of medical oxygen for use on board a flight.  If no medical oxygen service is available on your carrier, you should explain this to Ms. Webster and tell her that the carrier cannot accommodate her.*

*As a matter of customer service, you may direct Ms. Webster to another carrier that does provide medical oxygen service in that market.  The passenger should be aware, however, that the provision of medical oxygen involves coordination with the passenger's physician to determine the flow rate and the amount of oxygen needed and arranging for the delivery of the oxygen by the carrier to the point of origin of the passenger's trip. Therefore, normally, it is not possible to accommodate a passenger who needs medical oxygen on a flight unless the advance notice is provided because the accommodation cannot be made without delaying the flight.*

*If Aircraft is Substituted, Make an Effort to Accommodate*

Even if a passenger with a disability provides advance notice, sometimes weather or mechanical problems require cancellation of the flight altogether or the substitution of another aircraft.  Under these circumstances, you must, to the maximum extent feasible, assist in providing the accommodation originally requested by the passenger with a disability.  [Sec. 382.33(f)]

## B.   Information about the Aircraft

You should be familiar with and be able to provide information about aircraft accessibility for passengers with a disability when they request this information.  [Secs.

_Requests for Seat Assignments by a Passenger Accompanied by a Service Animal_

For a disabled passenger traveling with a service animal, you must provide, as the passenger with a disability requests, either a bulkhead seat or a seat other than a bulkhead seat.  [Sec. 382.38(a)(3)]

If carriers provide special information concerning the transportation of animals outside the continental United States to any passengers, you must provide such information to all passengers with a disability traveling with a service animal on the flights.  [Sec. 382.55(a)(3)]

**E.**     **Accommodations for Air Travelers who are Deaf, Hard of Hearing, or Deaf-Blind**

If your carrier makes available a telephone reservation and information service to the public, you must make available a text telephone (TTY) to permit individuals who are deaf or hard of hearing to make reservations and obtain information.  The TTY must be available during the same hours as the telephone service for the general public and the same wait time and surcharges must apply to the TTY as the telephone service for the general public.  [Secs. 382.47(a) and (b)]

**F.**     **Communicable Diseases**

_Passengers with a Communicable Disease Are Permitted on Flight_

Except as described below, you must not (i) refuse transportation to; (ii) require provision of a medical certificate from; or (iii) impose any condition, restriction, or requirement not

37

imposed on other passengers on, a passenger with a communicable disease or infection. [Sec. 382.51(a)]

*If Direct Threat to Health or Safety of Others, Limitations May be Imposed*

Only if a passenger with a communicable disease or infection poses a *direct threat* to the health or safety of others, can you take any of the actions listed above.  [Sec. 382.51(b)(1)]  A *direct threat* means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, you must make an individualized assessment based on a reasonable judgment, ***relying on current medical knowledge or the best available objective evidence.*** If the presentation of a medical certificate would alleviate concerns over the passenger's condition, or reasonable modification of policies, practices, or procedures would lessen the risk to other passengers, then you should consider this in making such an individualized assessment.  You should also confer with appropriate medical personnel and a CRO when making this assessment.

*If the Passenger Poses a Direct Threat to the Health and Safety of Others*

If, in your estimation, a passenger with a communicable disease or infection poses a direct threat to the health or safety of other passengers, you may (i) refuse to provide transportation to that person; (ii) require that person to provide a medical certificate

stating that the disease at its current stage would not be transmittable during the normal course of a flight or, if applicable, describing measures that would prevent transmission during the flight [Sec. 382.53(c)]; or (iii) impose on that passenger a special condition or restriction (*e.g.*, wearing a mask). You must **choose the least restrictive** of the three options set forth above that would accomplish the objective.  [Sec. 382.51(b)(4)]

At all times, as a matter of good customer service, you should treat the passenger with courtesy and respect.

## G.   Medical Certificates:  When are they Allowed?

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical assistance during the flight.  Except under the circumstances described below, you must not require medical certification of a passenger with a disability as a condition for providing transportation.

You may require a medical certificate only if the passenger with a disability is an individual who

- is traveling on a stretcher or in an incubator (where such service is offered);

- needs medical oxygen during the flight (where such service is offered); or

- has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight.  [Sec. 382.53 (a) and (b)]

*Medical Certificate and a Passenger with a Communicable Disease or Infection*

In addition, if you determine that a passenger with a communicable disease or infection poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger.  [Sec. 382.53(c)(1)]  The medical certificate must be dated within 10 days of the flight date.  [Sec. 382.53(c)(2)]

In the event that you determine the need for a medical certificate, you should indicate to the passenger with a disability the reason for the request.  You should base your request on the reasons set forth under the law and outlined above.

At all times, you should treat the passenger from whom you are requesting a medical certificate with courtesy and respect.

**_Example_**:  *A passenger arrives at the gate with her six year old daughter.  The girl's face and arms are covered with red lesions, resembling chicken pox.  What should you do?*

*Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection.  However, if a passenger appears to have a communicable disease or infection that poses a direct threat to the health or safety of other passengers, you may be required to make a determination about the best course of action based on the seriousness of the health risk and the ease of disease transmittal.  For a communicable disease or infection to pose a direct threat, the condition must both be readily transmitted under conditions of flight and have serious health consequences (e.g., SARS).  Medical conditions that are easily*

*transmitted in aircraft cabins but have limited health consequences (e.g., a common cold) as well as conditions that are difficult to transmit in aircraft cabins but have serious health consequences (e.g., AIDS) do not pose a direct threat to the health or safety of passengers.*

*The first thing you should do is interview the passenger and her mother to obtain basic information about the girl's condition. This exchange should be done discreetly and in a courteous and respectful manner. If you still have a question about the nature of the child's condition that will impact decisions about transportation, you should contact a CRO and explain the situation.*

*Here, the mother tells you and the CRO that the child has chicken pox but is no longer contagious. The CRO would likely consult with appropriate medical personnel to verify whether the child could be contagious based on the mother's statement.*

*If there is a reasonable basis for believing that the passenger poses a direct threat to the health or safety of others, you must choose the least restrictive alternative among the following options: (i) refusing transportation to the individual; (ii) requiring a medical certificate; or (iii) imposing a special condition or limitation on the individual. If the medical support people indicate that there is a chance that the child is no longer contagious but only if a certain number of days have passed since the outbreak of the lesions, you could request a medical certificate before you permit the child to travel.*

*Having discussed the situation with the passenger and her mother and consulted the CRO and the medical support personnel, the request for a medical certificate appears to be reasonable under the circumstances and the least restrictive of the three options.*

*Keep in mind that section 382.53(c)(2) specifies that the medical certificate be from the child's physician and state that the child's chicken pox would not be communicable to other passengers on the flight. The medical certificate must also include any conditions or precautions that would have to be observed to prevent the transmission of the chicken pox to other passengers and be dated within ten days of the date of the flight. If the medical certificate is incomplete or if the passenger is attempting to travel before the date specified in the medical certificate or without implementing the conditions outlined to prevent transmission, the child would not be permitted to fly.*

## H.   Your Obligation to Provide Services and Equipment

When assistance getting on or off a plane, making flight connections, or receiving transportation between gates is requested by a passenger with a disability, or offered by carrier personnel and accepted by the passenger, you must provide it. [Sec. 382.39(a)] More specifically, you must provide, as needed, the following:

- services personnel
- ground wheelchairs
- boarding wheelchairs
- ramps or mechanical lifts. [Sec. 382.39(a)(1)]

Aircraft with more than 60 passenger seats having an accessible lavatory must be equipped with an operable on-board wheelchair. [Sec. 382.21(a)(4)] On-board

It may not be apparent whether a person is an individual with a disability.  You should provide

an opportunity for a passenger to self-identify as an individual with a disability by asking if the

person needs assistance and, if so, how best you can assist with those needs.  Keep in mind that

you cannot require an individual with a disability to accept special services, including pre-

boarding.

***Some Examples of Physical Impairments [Sec. 382.5(a)(1)]:***

- Orthopedic impairment;

- Deafness (profound hearing loss);

- Hard of hearing (mild to profound hearing loss);

- Vision impairment and blindness;

- Speech disorder;

- Cerebral palsy;

- Epilepsy;

- Muscular dystrophy;

- Multiple sclerosis;

- Cancer;

- Heart disease; and

- Diabetes.

***Some Examples of Mental or Psychological Impairments [Sec. 382.5(a)(2)]:***

- Mental retardation;

- Depression;

- Anxiety disorders;

- Specific learning disabilities; and

- Brain injury.

Below is a list of general tips to consider when interacting with people with disabilities followed by tips relating to interacting with individuals with one or more of the five basic types of disabilities.  These tips are aimed at ensuring that services, facilities, and other accommodations are provided to passengers with disabilities in a respectful and helpful manner.

Some of the tips relate to specific legal requirements, but most of them set forth suggestions for interacting in a way that would constitute good customer service and demonstrate a sensitivity to the issues concerning passengers with disabilities.  The following tips should be read and employed with the above qualification in mind.

# APPENDIX II

# Airline Management-Related Issues

# Airline Management-Related Issues

Appendix II highlights provisions of the ACAA and the accompanying regulations outlining specific responsibilities of management of carriers, *i.e.*, requirements to be implemented by management employees as opposed to personnel who deal with the traveling public, including passengers with a disability.  In places, these are overlapping responsibilities and cross-references will be made to specific sections of this manual.

**Discrimination is Prohibited**

Management of carriers are required to ensure that the carrier (either directly or indirectly through its contractual, licensing, or other arrangements for provision of air transportation) does not discriminate against qualified individuals with a disability by reason of such disability.  [Sec. 382.7(a)(1)]  In addition, management of carriers should be aware that they are responsible for compliance with the ACAA and part 382 not only by their *own* employees, but also by employees of any company or entity performing functions on behalf of the carrier.

More specifically, carriers cannot require a passenger with a disability to accept special services, *e.g.*, pre-boarding, not requested by the passenger.  [Sec. 382.7(a)(2)]  Carriers cannot exclude a qualified individual with a disability from or deny that individual the benefit of air transportation or related services that are available to other individuals, even if there are separate or different services available for passengers with a disability, except as provided by the ACAA and part 382.  [Sec. 382.7(a)(3)]  Carriers cannot take actions adverse to passengers with a disability if they assert their rights under the ACAA and part 382.  [Sec. 382.7(a)(4)]

Carriers cannot limit the number of passengers with a disability on a given flight.  [Sec. 382.31(c)]   Carriers must modify policies, practices, and facilities as necessary to ensure nondiscrimination consistent with the standards of Section 504 of the Rehabilitation Act, as amended.  Carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their program.  [Sec. 382.7(c)]

### *Refusal of Transportation*

Carriers cannot refuse transportation to a qualified individual with a disability solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience others.  [Sec. 382.31(b)]  Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted by the ACAA and part 382.  [Sec. 382.31(a)]

### *Safety Considerations*

The ACAA does not require air carriers to disregard applicable FAA safety regulations.  [Sec. 382.3(d)]

Carriers may refuse to provide transportation to *any* passenger on the basis of safety and if carriage would violate FAA regulations.  However, when carriers exercise this authority, they must not discriminate against a passenger with a disability on the basis of disability.  [Sec. 382.31(d)]

**Written Explanation for Refusal of Transportation**

When a carrier refuses to provide transportation to a passenger on a basis relating to disability, the carrier must specify in writing to the passenger the basis for the determination within 10 days of the refusal of transportation.  [Sec. 382.31(e)]  In the situation where refusal of transportation is based on safety concerns, the written notice must include the carrier's reasonable and specific basis for its opinion that transporting the passenger would be inimical to the safety of the flight.

**No Charge for Accommodating Passengers with a Disability**

Carriers cannot impose charges for providing facilities, equipment, or services that are required by the ACAA and its accompanying regulations for passengers with a disability.  [Sec. 382.57]

**Indirect Air Carriers**

If an indirect air carrier provides facilities or services for passengers that are covered for other carriers by sections 382.21 through 382.55, the indirect air carrier must do so in a manner consistent with those regulations.  [Sec. 382.7(b)]

**Contractors and Travel Agents**

Carriers must receive assurances from their contractors who provide services, including travel agents (except non-U.S. citizens providing services outside the U.S.), that they will not discriminate on the basis of disability when providing such services and include a clause with that assurance in their contracts.  [Sec. 382.9(a)]  Similarly, their contracts must contain a

# APPENDIX III

# **Frequently Asked Questions**

# Frequently Asked Questions

**QUESTION**:  What's the difference between the Air Carrier Access Act (ACAA) and the Americans with Disabilities Act (ADA)?

**ANSWER**: The ACAA, signed into law by then-President Reagan in 1986, prohibits discrimination by *airlines* against individuals with disabilities in commercial air transportation. The ADA, signed into law after the ACAA in 1990 by then-President Bush, prohibits discrimination against individuals with disabilities in employment, public accommodations, commercial facilities, telecommunications, and *transportation other than by commercial airlines* (*e.g.*, subway and bus systems).  [Sec. 382.1]

**QUESTION**:  Do the ACAA and its implementing regulations (14 CFR part 382 or part 382) apply to both U.S. and foreign carriers?

**ANSWER**:  When initially passed in 1986, the ACAA and part 382 (subsequently issued in March 1990) applied only to U.S. carriers.  However, on April 5, 2000, Congress extended the applicability of the ACAA to cover foreign carriers.  At approximately the same time, DOT issued a notice to foreign carriers advising them that the Department intended to use the provisions of part 382, which by its terms does not impose requirements on foreign air carriers, as guidance in investigating any complaints it receives alleging noncompliance with the ACAA by foreign carriers.  The only provision of part 382 that currently applies to foreign air carriers is Section 382.70(b), which expressly requires foreign carriers to record, categorize, and report written disability-related complaints associated with any flight segment originating or

**Glossary**

***Direct Threat to the Health or Safety of Others***
<mark>A significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.</mark>

***Fundamental Alteration***
A modification that substantially alters the basic nature or purpose of a program, service, product or activity.

***Individual with a Disability***
"Any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment."  (Section 382.5).

***Qualified Individual with a Disability***
Any individual with a disability who:
(1) "takes those actions necessary to avail himself or herself of facilities or services offered by an air carrier to the general public with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares or policies";
(2) "offers, or makes a good faith attempt to offer, to purchase or otherwise validly to obtain . . . a ticket" "for air transportation on an air carrier"; or
(3) "purchases or possesses a valid ticket for air transportation on an air carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the ticket has been purchased or obtained; and meets reasonable, nondiscriminatory contract of carriage requirements applicable to all passengers."  (Section 382.5).

***Service Animal***
Any animal that is individually trained or able to provide assistance to a qualified person with a disability; or any animal shown by documentation to be necessary for the emotional well being of a passenger.

**Sources**
*See:* 14 CFR 382.5**,** 14 CFR 382.37(a) and (c), 14 CFR 382.38 (a)(3), (b), (d) & (h)-(j), 14 CFR 382.55(a)(1)-(3), 14 CFR 382.57, "Guidance Concerning Service Animals in Air Transportation," (61 FR 56420-56422, (November 1, 1996)), "Commonly Asked Questions About Service Animals in Places of Business" (Department of Justice, July, 1996), and "ADA Business Brief: Service Animals" (Department of Justice, April 2002).
Questions regarding this notice may be addressed to the Office of Aviation Enforcement and Proceedings, C-70, 400 7th Street, SW, Washington, D.C. 20590.  A copy of this notice will be published in the Federal Register.
An electronic version of this document is available on the World Wide Web at http://airconsumer.ost.dot.gov
Issued in Washington, DC on May 2, 2003.

Samuel Podberesky,

Assistant General Counsel for Aviation Enforcement and Proceedings

Plaintiffs' Exhibit 150

# Runway to Recovery

## The United States Framework for Airlines and Airports to Mitigate the Public Health Risks of Coronavirus

Guidance Jointly Issued by the U.S. Departments of Transportation, Homeland Security, and Health and Human Services

**Version 1.1 | December 2020**



# OVERVIEW

A safe, secure, efficient, and resilient air transportation system is essential to our Nation's physical, economic, and social health.  The Coronavirus Disease 2019 (COVID-19) public health emergency has demonstrated that protecting public health in the air transportation system is just as critical as aviation safety and security to the confidence of the flying public.  Government, aviation, and public health leaders have been working together—and must continue to do so—to meaningfully reduce the public health risk and restore passenger, aviation workforce (including aircrew), and public confidence in air travel. The U.S. Government continues to assess the evolving situation and the effectiveness of actions and recommendations implemented to date.  This updated guidance reflects this continual assessment and updated information. Although there are some updates and adjustments throughout, the key additions and changes in this document include new information on:

» Passenger and Aviation Workforce Education

» Contact Tracing

» Mask Use, specifically the need to accommodate those who cannot wear masks

» Passenger Testing

This document provides the U.S. Government's updated guidance to airports and airlines for implementing measures to mitigate the public health risks associated with COVID-19, support an increase in travel volume, and ensure that traditional aviation safety and security measures are not compromised. This guidance addresses public health concerns and supports U.S. air carriers and airports as they make decisions and implement changes to reduce the spread of SARS-CoV-2 (the virus that causes COVID-19).  The aviation industry has maintained a safe and secure system because stakeholders do not compete on safety and security; we expect the aviation industry to take the same system-level approach to implement guidance on public health risk mitigations.

PUBLIC HEALTH RISK MITIGATION IN THE PASSENGER AIR TRANSPORTATION SYSTEM

themselves, but should maintain at least six feet of distance from others outside of their group. Strategies to allow for social distancing should also be employed for passenger transports used within the airport (e.g., trains, buses, etc.). It is imperative that airlines and airports inform passengers when it may not be possible to meet social distancing expectations and, as a result, emphasize the additional importance of observing all the other preventive measures, including strict hand hygiene, respiratory etiquette[7], and wearing a mask.

**Rationale:** SARS-CoV-2 spreads mainly among people who are in close contact with an infected person or persons for greater than 15 minutes over a 24-hour period.  Social distancing of at least six feet is a way to reduce the spread of infection in an indoor setting.  However, the air transportation system presents many areas where confined physical spaces make recommended social distancing difficult or impossible to achieve at times. Where space constraints limit the practice of social distancing, such as onboard aircraft or within the Federal Inspection Station (FIS) area during peak international arrival times, it is essential that passengers, crew members, and aviation workers adhere at all times to all other preventive measures, especially handwashing, respiratory etiquette, and wearing a mask.

**Resources:** CDC developed guidance on social distancing, including for people with disabilities, on its website: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

Masks

**Recommendation:** Everyone should wear a mask per CDC guidance, over their nose and mouth, at all times in the passenger air transportation system (excluding children under age 2, or anyone who has a medical condition for which wearing a mask is contraindicated, is unconscious and unable to be awakened, or otherwise unable to remove the mask without assistance). Masks should have two or more layers of non-synthetic and tightly woven materials, fit snugly on the face without gaps, be large enough to comfortably cover the mouth and nose during speech and physical activity, and should not contain an exhalation valve or vent. Airlines and airports are strongly encouraged to

---

7 https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

require that everyone correctly wear a mask in shared spaces unless they meet the exceptions described above. People should also wear masks over the mouth and nose in other transportation settings that are connected to airports, such as shuttle vans, buses, trains, subways, or similar transportation systems or car rental locations. Airports and airlines should have masks available for passengers and aviation workers who may arrive without one or require a replacement. Wearing a mask is particularly necessary any time social distancing cannot be maintained. Brief removal of masks should be permitted for minimal drinking, eating, or taking medication. During the brief removal of the mask in these circumstances, individuals should refrain from conversation.

Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks. However, under the Americans with Disabilities Act, entities may impose legitimate safety requirements necessary for safe operation that do not require modification, so long as those safety requirements are based on actual risks, and not mere speculation, stereotypes, or generalizations about persons with disabilities. Other accommodations for persons with disabilities or ailments who cannot wear a mask should be considered on a case-by-case basis. This may include, for example, seating in waiting areas that allows social distancing from non-companion passengers.

Airport and airline personnel should consider reasonable alternatives to removing their own face masks in order to communicate with persons who are deaf or hearing impaired, such as using clear face masks, writing on a pad of paper that can be shown without contact, or protective barriers.

> » **_Note:_** _Passengers and aviation workers may be asked to remove their masks briefly when interacting with government officials or systems that must verify identity or confirm entry/exit, such as U.S. Customs and Border Protection (CBP) Officers, Transportation Security Administration staff, law enforcement, or airline or airport staff. Physical barriers or face shields should be used to protect employees and the public in these instances._

**Rationale:** The greatest risk of spreading COVID-19 is when an infected person coughs, sneezes, talks, or breathes and respiratory droplets or small particles, such as those in aerosols, are launched into the air from his or her mouth or nose. Requiring all persons to wear masks reduces the risk of droplets or airborne particles from spreading, including from potentially asymptomatic

infected individuals. If everyone in an environment participates in covering their mouths and noses, masks can be effective at reducing viral spread.

Airports must comply with the Americans with Disabilities Act and the Rehabilitation Act regulations in considering reasonable modifications for persons with disabilities who cannot wear a mask. However, as discussed above, reasonable modifications of legitimate safety requirements are not required. Under the Air Carrier Access Act, U.S. and foreign air carriers have legal obligations to accommodate the needs of passengers with disabilities when the airlines develop and implement policies requiring the use of masks to mitigate the public health risks associated with COVID-19.  The Air Carrier Access Act and its implementing regulations in 14 CFR Part 382 require airlines to ensure that their mask policies provide for reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear a face covering for medical reasons.  The Office of Aviation Consumer Protection within the Department of Transportation and the Office of Civil Rights in the Federal Aviation Administration enforce aspects of these requirements within their jurisdiction.

**Resources:** The following websites provide information related to appropriate mask use and special accommodations:

» https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

» https://www.cdc.gov/coronavirus/2019-ncov/travelers/face-masks-public-transportation.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-to-wear-cloth-face-coverings.html

» https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html

» https://www.transportation.gov/airconsumer

*B. Federal Reserve Bank of Dallas* (Karen Smith, Director, Applications) 2200 North Pearl Street, Dallas, Texas 75201–2272:

1. *The Morris Family Trust and Frank E. Morris, individually and as trustee of the Trust, both of Gainesville, Texas;* to retain voting shares of Red River Bancorp, Inc., and thereby indirectly retain voting shares of First State Bank, both of Gainesville, Texas.

Board of Governors of the Federal Reserve System, December 2, 2021.

**Michele Taylor Fennell,**

*Deputy Associate Secretary of the Board.*

[FR Doc. 2021–26519 Filed 12–6–21; 8:45 am]

**BILLING CODE P**

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The public portions of the applications listed below, as well as other related filings required by the Board, if any, are available for immediate inspection at the Federal Reserve Bank(s) indicated below and at the offices of the Board of Governors. This information may also be obtained on an expedited basis, upon request, by contacting the appropriate Federal Reserve Bank and from the Board's Freedom of Information Office at *https://www.federalreserve.gov/foia/request.htm.* Interested persons may express their views in writing on the standards enumerated in the BHC Act (12 U.S.C. 1842(c)).

Comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors, Ann E. Misback, Secretary of the Board, 20th Street and Constitution Avenue NW, Washington DC 20551–0001, not later than December 31, 2021.

*A. Federal Reserve Bank of Philadelphia* (William Spaniel, Senior Vice President) 100 North 6th Street, Philadelphia, Pennsylvania 19105–1521. Comments can also be sent electronically to *Comments.applications@phil.frb.org:*

1. *Workers United, Philadelphia, Pennsylvania; and Amalgamated Financial Corp., New York, New York;* to merge with Amalgamated Investments Company, and thereby indirectly acquire Amalgamated Bank of Chicago, both of Chicago, Illinois. This notice supplements FR Doc. 2021–26297.

Board of Governors of the Federal Reserve System, December 1, 2021.

**Michele Taylor Fennell,**

*Deputy Associate Secretary of the Board.*

[FR Doc. 2021–26422 Filed 12–6–21; 8:45 am]

**BILLING CODE P**

## FEDERAL RETIREMENT THRIFT INVESTMENT BOARD

### Notice of Board Meeting

**DATES:** December 17, 2021 at 10:00 a.m.

**ADDRESSES:** Telephonic. Dial-in (listen only) information: Number: 1–415–527–5035, Code: 2764 722 1247; or via web: *https://tspmeet.webex.com/tspmeet/onstage/g.php?MTID=e1220191d046633c698c24283fba3fb14.*

**FOR FURTHER INFORMATION CONTACT:** Kimberly Weaver, Director, Office of External Affairs, (202) 942–1640.

**SUPPLEMENTARY INFORMATION:**

#### Board Meeting Agenda

*Open Session*

1. Approval of the November 19, 2021 Board Meeting Minutes
2. Monthly Reports
   (a) Participant Activity Report
   (b) Investment Performance
   (c) Legislative Report
3. Quarterly Report
   (d) Vendor Risk Management Update
4. 2022/23 Internal Audit Plan Approval

*Closed Session*

Information covered under 5 U.S.C. 552b (c)(2) and (c)(9).

*Authority:* 5 U.S.C. 552b (e)(1).

Dated: December 1, 2021.

**Dharmesh Vashee,**

*General Counsel, Federal Retirement Thrift Investment Board.*

[FR Doc. 2021–26421 Filed 12–6–21; 8:45 am]

**BILLING CODE P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Requirements for Negative Pre-Departure Covid–19 Test Result or Documentation of Recovery From Covid–19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice of amended Agency Order.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS), announces an Amended Order requiring a negative pre-departure COVID–19 test result or documentation of recovery from COVID–19 for all airline or other aircraft passengers arriving into the United States from any foreign country. This Amended Order was signed by the CDC Director on December 2, 2021, and supersedes the previous Order signed by the CDC Director on October 25, 2021.

**DATES:** This Amended Order will become effective at 12:01 a.m. on December 6, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Buigut, Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16–4, Atlanta, GA 30329. Email: *dgmqpolicyoffice@cdc.gov.* Telephone: 1–800–232–4636.

**SUPPLEMENTARY INFORMATION:** This Amended Order updates COVID–19 testing requirements for air passengers 2 years or older boarding a flight to the United States.

This Amended Order prohibits the boarding of any passenger 2 years or older on any airline or aircraft destined to the United States from a foreign country unless the passenger presents paper or digital documentation of one of the following requirements:

(i) A negative pre-departure viral test result for SARS–CoV–2 conducted on a specimen collected no more than 1 calendar day before the flight's departure from a foreign country (*Qualifying Test*)

Or

(ii) Documentation of having recovered from COVID–19 in the past 90 days in the form of both of the following (*Documentation of Recovery*):

• A positive viral test result for SARS–CoV–2 conducted on a specimen

collected no more than 90 calendar days before the flight; and

• A letter from a licensed healthcare provider or public health official stating that the passenger has been cleared for travel.

This Amended Order also constitutes a controlled free pratique to any airline or other aircraft operator with an aircraft arriving into the United States. Pursuant to this controlled free pratique, the airline or other aircraft operator must comply with the requirements outlined in the Order.

A copy of the Amended Order and Passenger Attestation form is provided below. A copy of the signed Amended Order and Passenger Attestation form can be found at *https://www.cdc.gov/ quarantine/fr-proof-negative-test.html.*

## CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS)

## NOTICE AND AMENDED ORDER UNDER SECTION 361 OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264) AND 42 CODE OF FEDERAL REGULATIONS 71.20 & 71.31(b)

## REQUIREMENTS FOR NEGATIVE PRE-DEPARTURE COVID–19 TEST RESULT OR DOCUMENTATION OF RECOVERY FROM COVID–19 FOR ALL AIRLINE OR OTHER AIRCRAFT PASSENGERS ARRIVING INTO THE UNITED STATES FROM ANY FOREIGN COUNTRY

### Summary

Pursuant to 42 CFR 71.20 and 71.31(b) and as set forth in greater detail below, this Notice and Amended Order prohibits the boarding of any passenger—2 years of age or older—on any aircraft destined to the United States [1] from a foreign country unless the passenger: [2]

Presents paper or digital documentation of one of the following requirements:

(iii) A negative pre-departure viral test result for SARS–CoV–2 conducted on a specimen collected no more than 1 calendar day before the flight's departure from a foreign country (*Qualifying Test*)
*Or*

(iv) Documentation of having recovered from COVID–19 in the past 90 days in the form of both of the following (*Documentation of Recovery*):

• A positive viral test result for SARS–CoV–2 conducted on a specimen collected no more than 90 calendar days before the flight; and

• A letter from a licensed healthcare provider or public health official stating that the passenger has been cleared for travel.

Each passenger must retain paper or digital documentation presented to the airline or other aircraft operator reflecting one of the following:

• A negative result for the *Qualifying Test; or*

• *Documentation of Recovery* from COVID–19.

Upon request, a passenger, or the passenger's authorized representative, must also produce such documentation to any U.S. government official or a cooperating state or local public health authority.

Pursuant to 42 CFR 71.31(b), and as set forth in greater detail below, this Notice and Amended Order constitutes a controlled free pratique to any airline or other aircraft operator with an aircraft arriving into the United States.[3] Pursuant to this controlled free pratique, the airline or other aircraft operator must comply with the following conditions to receive permission for the aircraft to enter and disembark passengers within the United States:

• Airline or other aircraft operator must confirm that every passenger onboard the aircraft has presented a negative result for a *Qualifying Test* or *Documentation of Recovery.*

• Airline or other aircraft operator must verify that every passenger onboard the aircraft has attested to receiving a negative result for the *Qualifying Test* or having tested positive for SARS–CoV–2 on a specimen collected no more than 90 calendar days before the flight and been cleared to travel as *Documentation of Recovery.*

This Notice and Amended Order does not alter the obligation of persons to comply with the applicable requirements of other CDC Orders, including:

• Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (published at 86 FR 8025, February 3, 2021) (as may be further amended);

• Amended Order Implementing Presidential Proclamation on Advancing the Safe Resumption of Global Travel During the COVID–19 Pandemic (published at 86 FR 61224, November 5, 2021); and

• Other CDC Orders or CDC Directives that may be published relating to preventing the introduction, transmission, and spread of COVID–19 into and throughout the United States.

This Notice and Amended Order supersede the previous Order signed by the CDC Director on October 25, 2021. This Order shall enter into effect for flights departing at or after 12:01 a.m. EST (5:01 a.m. GMT) on December 06, 2021.

### Statement of Intent

This Amended Order shall be interpreted and implemented to achieve the following paramount objectives:

• Preservation of human life;

• Preventing the further introduction, transmission, and spread of the virus that causes COVID–19 into the United States, including the Omicron virus variant and other new virus variants;

• Preserving the health and safety of crew members, passengers, airport personnel, and communities; and

• Preserving hospital, healthcare, and emergency response resources within the United States.

### Definitions

*Aircraft* shall have the same definition as under 49 U.S.C. 40102(a)(6). "Aircraft" includes, but is not limited to, commercial, general aviation, and private aircraft destined for the United States from a foreign country.

*Aircraft Operator* means an individual or organization causing or authorizing the operation of an aircraft.

*Airline* shall have the same definition as under 42 CFR 71.1(b).

*Attest/Attestation* means having completed the attestation in Attachment A.[4] Such attestation may be completed in paper or digital form. The attestation

---

[1] This includes any flight regardless of whether the United States is the final destination or a connection to another country.

[2] A parent or other authorized individual may present the required documentation on behalf of a passenger 2–17 years of age. Children under the age of 2 years of age are not subject to the requirements of this Amended Order. An authorized individual may act on behalf of any passenger who is unable to act on their own behalf (*e.g.*, by reason of age, or physical or mental impairment).

[3] On October 25, 2021, the President issued a Proclamation, titled, "Advancing the Safe Resumption of Global Travel During the COVID–19 Pandemic." On November 26, 2021, the President issued a Proclamation, titled, "A Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease 2019." These Proclamations were issued pursuant to Sections1182(f) and 1185(a)(1) of Title 8, and Section 301 of Title 3, United States Code. This amended CDC Order complements and advances these Proclamations.

[4] CDC has provided a combined passenger disclosure and attestation that fulfills the requirements of CDC Orders: *Requirements for Negative Pre-departure COVID–19 Test Result or Documentation of Recovery from COVID–19 and Testing for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country* and *Order Implementing Presidential Proclamation on Advancing the Safe Resumption of Global Travel During the COVID–19 Pandemic.*

is a statement, writing, entry, or other representation under 18 U.S.C. 1001.[5]

*Documentation of Recovery* means paper or digital documentation of having recovered from COVID–19 in the form of a positive SARS–CoV–2 viral test result and a letter from a licensed healthcare provider or public health official stating that the person has been cleared for travel (*i.e.,* has recovered).[6][7] The viral test must have been conducted on a specimen collected no more than 90 calendar days before the departure of the flight, or at such other intervals as specified in CDC guidance.

*Foreign country* means anywhere that is not a state, territory, or possession of the United States.

*Qualifying Test* means a negative result on a SARS–CoV–2 viral test that was conducted no more than *1 calendar day* before the flight's departure from a foreign country to the United States.

*United States* has the same definition as "United States" in 42 CFR 71.1(b), meaning "the 50 States, District of Columbia, and the territories (also known as possessions) of the United States, including American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

*Viral Test* means a viral detection test for current infection (*i.e.,* a nucleic acid amplification test [NAAT] or a viral antigen test) cleared, approved, or issued an emergency use authorization (EUA) by the U.S. Food and Drug Administration, or granted marketing authorization by the relevant national authority, for the detection of SARS–CoV–2, performed in accordance with the approval/clearance/EUA/marketing authorization.

**Exemptions**

The following categories of individuals and organizations are exempt from the requirements of this Amended Order:

• Crew members of airlines or other aircraft operators if they follow industry standard protocols for the prevention of COVID–19 as set forth in relevant Safety Alerts for Operators (SAFOs) issued by the Federal Aviation Administration (FAA).[8]

• Airlines or other aircraft operators transporting passengers with COVID–19 pursuant to CDC authorization and in accordance with CDC guidance.[9]

• U.S. federal law enforcement personnel on official orders who are traveling for the purpose of carrying out a law enforcement function, provided they are covered under an occupational health and safety program that takes measures to ensure personnel are not symptomatic or otherwise at increased risk of spreading COVID–19 during travel. Those traveling for training or other business purposes remain subject to the requirements of this Order.

• U.S. military personnel, including civilian employees, dependents, contractors, and other U.S. government employees when traveling on U.S. military assets (including whole aircraft charter operators), if such individuals are under competent military or U.S. government travel orders and observing U.S. Department of Defense guidance to prevent the transmission of COVID–19 as set forth in *Force Protection Guidance Supplement 20—Department of Defense Guidance for Personnel Traveling During the Coronavirus Disease 2019 Pandemic* (April 12, 2021) including its testing guidance.[10]

• Individuals and organizations for which the issuance of a humanitarian exemption is necessary based on both: (1) Exigent circumstances where emergency travel is required to preserve health and safety (*e.g.,* emergency medical evacuations); and (2) where pre-departure testing cannot be accessed or completed before travel because of exigent circumstances.

**Background**

*A. COVID–19 Pandemic*

Since January 2020, the respiratory disease known as "COVID–19," caused by a novel coronavirus (SARS–CoV–2), has spread globally, including cases reported in all 50 states within the United States, plus the District of Columbia and all U.S. territories. As of December 02, 2021, there have been over 262,000,000 million cases of COVID–19 globally, resulting in over 5,200,000 deaths.[11] In the United States, more than 48,000,000 cases have been identified, and over 775,000 deaths attributed to the disease.

SARS–CoV–2 spreads mainly from person-to-person through respiratory fluids released during exhalation, such as when an infected person coughs, sneezes, or talks. Exposure to these respiratory fluids occurs in three principal ways: (1) Inhalation of very fine respiratory droplets and aerosol particles; (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays; and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.[12][13] Spread is more likely when people are in close contact with one another (within about 6 feet), especially in crowded or poorly ventilated indoor settings. Persons who are not fully vaccinated, including those with asymptomatic or pre-symptomatic infections, are significant contributors to community SARS–CoV–2 transmission and occurrence of COVID–19.[14][15]

---

[5] CDC encourages airlines and aircraft operators to incorporate the attestation into paperless check-in processes. An airline or aircraft operator may use a third party (including a third-party application) to collect attestations, including to provide translations. However, an airline or aircraft operator has sole legal responsibility to provide and collect attestations, to ensure the accuracy of any translation, and to comply with all other obligations under this Order. An airline or aircraft operator is responsible for any failure of a third party to comply with this Order. An airline or aircraft operator may not shift any legal responsibility to a third party.

[6] Healthcare providers and public health officials should follow CDC guidance in clearing patients for travel to the United States. Applicable guidance is available at *https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html.*

[7] A letter from a healthcare provider or a public health official that clears the person to end isolation (*e.g.,* to return to work or school), can also be used to show that the person has been cleared to travel, even if travel is not specifically mentioned in the letter.

[8] Airlines, aircraft operators, and their crew members may follow stricter protocols for crew and passenger health, including testing protocols. SAFO 20009, COVID–19: Updated Interim Occupational Health and Safety Guidance for Air Carriers and Crews, available at *https://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/safo/all_safos/media/2020/SAFO20009.pdf.*

[9] Interim Guidance for Transporting or Arranging Transportation by Air into, from, or within the United States of People with COVID–19 or COVID–19 Exposure, available at *https://www.cdc.gov/quarantine/interim-guidance-transporting.html.*

[10] Force Protection Guidance Supplement 20—Department of Defense Guidance for Personnel Traveling During the Coronavirus Disease 2019 Pandemic, available at *https://media.defense.gov/2021/Apr/16/2002622876/-1/-1/1/MEMORANDUM-FOR-FORCE-HEALTH-PROTECTION-GUIDANCE-SUPPLEMENT%2020-DEPARTMENT-OF-DEFENSE-GUIDANCE-FOR-PERSONNEL-TRAVELING-DURING-THE-CORONAVIRUS-DISEASE-2019-PANDEMIC.PDF.*

[11] *https://covid19.who.int/.*

[12] *Scientific Brief: SARS–CoV–2 Transmission,* Centers for Disease Control and Prevention (May 7, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html.*

[13] *Science Brief: SARS–CoV–2 and Surface (Fomite) Transmission for Indoor Community Environments,* Centers for Disease Control and Prevention (Apr. 5, 2021), *https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html.*

[14] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID–19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513–17515.10.1073/pnas.2008373117, available at *https://www.ncbi.nlm.nih.gov/pubmed/32632012.*

[15] Johansson MA, Quandelacy TM, Kada S, et al. SARS–CoV–2 Transmission from People Without COVID–19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 January;4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

Among adults, the risk for severe illness from COVID–19 increases with age, with older adults at highest risk.[16] Severe illness means that persons with COVID–19 may require hospitalization, intensive care, or a ventilator to help them breathe. People of any age with certain underlying medical conditions (*e.g.*, cancer, obesity, serious heart conditions, diabetes, conditions that weaken the immune system) are at increased risk for severe illness from COVID–19.[17]

*B. Emergence of Variants of Concern: Omicron*

New variants of SARS–CoV–2 have emerged globally, several of which have been broadly classified as ''variants of concern.'' Some variants are more transmissible, even among those who are vaccinated, and some may cause more severe disease, which can lead to more hospitalizations and deaths among infected individuals.[18] Furthermore, recent findings suggest that antibodies generated during previous infection or vaccination may have a reduced ability to neutralize some variants, resulting in reduced effectiveness of treatments or vaccines, or increased diagnostic detection failures.[19] The emergence of variants that substantially decrease the effectiveness of available vaccines against severe or deadly disease is a primary public health concern.

On November 24, 2021, the Republic of South Africa informed the World Health Organization (WHO) of a new variant of SARS–CoV–2, the virus that causes COVID–19, that was detected in that country. On November 26, 2021, WHO designated the variant B.1.1.529 as a variant of concern and named it Omicron.[20] This decision was based on the evidence presented to the Technical Advisory Group on SARS–CoV–2 Virus

Evolution (TAG–VE) which is a group of independent experts charged with assessing the evolution of SARS–CoV–2 and examining if specific mutations and combinations of mutations may alter how the virus spreads and whether it may cause more severe illness. The evidence presented to the TAG–VE noted that Omicron has several mutations that may have an impact on how easily it spreads or the severity of illness it causes.[21]

Currently, there are no data available to assess the ability of sera from vaccinated persons or those with previous SARS–CoV–2 infection to neutralize the Omicron variant. The spike protein is the primary target of vaccine-induced immunity. The Omicron variant contains more changes in the spike protein than have been observed in other variants. Based on the number of substitutions, the location of these substitutions, and data from other variants with similar spike protein substitutions, significant reductions in neutralizing activity of sera from vaccinated or previously infected individuals, which may indicate reduced protection from infection, are anticipated.[22]

At the present time, WHO and CDC are coordinating with many researchers around the world to better understand the Omicron variant. Studies include assessments of transmissibility, severity of infection (including symptoms), performance of vaccines and diagnostic tests, and effectiveness of treatments. CDC and other federal agencies are working closely with international public health agencies to monitor the situation closely and are taking steps to enhance surveillance for and response to the Omicron variant within the United States. Considering these ongoing studies into the potential danger to public health posed by this newly identified variant, CDC has determined that proactive measures must be implemented now to protect the U.S. public health from the importation, transmission and spread of the emergent Omicron variant into the United States.

*C. Requirement for Pre-Departure Testing Regardless of Vaccination Status*

On November 26, 2021, the President issued a Proclamation suspending the entry into the United States, of immigrants or nonimmigrants, of noncitizens who were physically

present within certain Southern African countries during the 14-day period preceding their entry or attempted entry into the United States.[23] This Proclamation was issued under the authority of sections 212(f) and 215(a) of the Immigration and Nationality Act, as codified at sections 1182(f) and 1185(a) of title 8, United States Code (U.S.C.), and 3 U.S.C. 301 based on a determination that entry of certain noncitizens covered by the Proclamation would be detrimental to the interests of the United States. The Proclamation directs the Secretary of State, the Secretary of Transportation, and the Secretary of Homeland Security to endeavor to ensure that any noncitizen subject to the Proclamation does not board an aircraft traveling to the United States, to the extent permitted by law. The Proclamation also states that any individuals exempt from the suspension may nevertheless be subject to an entry suspension, limitation, or restriction under Proclamation 10294 of October 25, 2021.

As the virus that causes COVID–19 spreads, it has new opportunities to change (mutate) and become more difficult to control. While it is known and expected that viruses change through mutation leading to the emergence of new variants, the emergent Omicron variant is particularly concerning and of critical significance for this Amended Order. CDC has determined that given the rapid spread of the Omicron variant, including to countries and regions outside of those originally identified in the November 26 Proclamation, requiring a SARS–CoV–2 test no more than 1 calendar day before the flight's departure from a foreign country as specified in this Notice and Amended Order, and applicable to all passengers regardless of vaccination status or country of origin (except passengers who present valid *Documentation of Recovery*), is necessary to protect the public health of the United States.

In response to this new variant, the United States Government, including CDC, reexamined its policies on international travel and concluded the proactive 1 calendar day testing measure is necessary to protect the public health and should remain in place until more information becomes available that may alter or improve the public health outlook. This Amended Order requires that all passengers,

[16] CDC. COVID–19 Risks and Vaccine Information for Older Adults *https://www.cdc.gov/aging/covid19/covid19-older-adults.html.*

[17] People with Certain Medical Conditions *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.*

[18] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS–CoV–2 B.1.617.2 (Delta) Variant COVID–19 Outbreak Associated with a Gymnastics Facility—Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: *http://dx.doi.org/10.15585/mmwr.mm7028e2* (describing a B.1.617.2 (Delta) Variant COVID–19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which might lead to increased incidence rates).

[19] SARS–CoV–2 Variant Classifications and Definitions, Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html#Concern.*

[20] *https://www.who.int/news/item/26-11-2021-classification-of-omicron-(b.1.1.529)-sars-cov-2-variant-of-concern.*

[21] *https://www.who.int/news/item/28-11-2021-update-on-omicron.*

[22] *Science Brief: Omicron (B.1.1.529) Variant,* Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/scientific-brief-omicron-variant.html.*

[23] *https://www.whitehouse.gov/briefing-room/presidential-actions/2021/11/26/a-proclamation-on-suspension-of-entry-as-immigrants-and-nonimmigrants-of-certain-additional-persons-who-pose-a-risk-of-transmitting-coronavirus-disease-2019/.*

regardless of vaccination status or country of origin, except passengers who present a valid *Documentation of Recovery,* provide documentation of a negative SARS–CoV–2 viral test result from a specimen collected no more than 1 calendar day preceding the departure of the passenger's originating flight to the United States. While CDC's previous Amended Order [24] indicated that "decreasing the time window for testing before departure from three days to one day provides minimal additional public health benefit for fully vaccinated travelers," this statement did not account for the Omicron variant, which had not yet been identified.

At this time, it is unknown what level of protection current vaccines will provide against this newly emergent mutated variant. To best protect the health of the United States, unless and until CDC can confirm that current approved and authorized vaccines provide adequate protection against the Omicron variant, all passengers— including those who are fully vaccinated, but excluding passengers who present a valid *Documentation of Recovery*—must obtain a viral test on a specimen collected no more than 1 calendar day before their flight's departure to meet the requirements of this Amended Order. The one-day time window, a reduction from the previous 3-day window for fully vaccinated passengers, will provide less opportunity to develop infection with the Omicron variant prior to arrival into the United States.

Testing for SARS–CoV–2 infection is a proactive, risk-based approach that is not dependent on the infecting variant, nor on vaccination status of the individual. This risk-based testing approach has been addressed in CDC guidance and the Runway to Recovery guidance jointly issued by the Departments of Transportation, Homeland Security, and Health and Human Services.[25] Most countries now use testing in some form to monitor risk and control introduction and spread of SARS–CoV–2.[26] With case counts and deaths due to COVID–19 continuing to increase around the globe and the emergence of the new and concerning Omicron variant, the United States is taking a multi-layered proactive approach to combating COVID–19,

concurrently preventing and slowing the continued introduction of cases and further spread of the virus within U.S. communities. CDC acknowledges that pre-departure testing does not eliminate all risk.

*D. Statement of Good Cause Under the Administrative Procedure Act ("APA")*

To reduce introduction and spread of current and future SARS–CoV–2 variants into the United States at a time when global air travel is increasing, CDC must take quick and targeted action to help curtail the introduction and spread of the Omicron variant into the United States. As of December 2, 2021, WHO has indicated that 23 countries have reported cases of the Omicron variant, many of which were associated with international travelers.

This Amended Order is not a rule within the meaning of the Administrative Procedure Act ("APA") but rather is an emergency action taken under the existing authority of 42 U.S.C. 264(a) and 42 CFR 71.20 and 71.31(b), which were promulgated in accordance with the APA after full notice-and-comment rulemaking and a delay in effective date. In the event that this Amended Order qualifies as a new rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and a delay in effective date. *See* 5 U.S.C. 553(b)(B), (d)(3).

Considering the rapid and unpredictable developments in the public health emergency caused by COVID–19, including the recently identified emergent Omicron variant, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Amended Order. Further delay could increase risk of transmission and importation of additional undetected cases of SARS–CoV–2 Omicron variant or other emerging variants through passengers.

Similarly, the Office of Information and Regulatory Affairs has determined that if this Amended Order were a rule, it would be a major rule under Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (the Congressional Review Act), 5 U.S.C. 804(2), but there would not be a delay in its effective date as the agency has determined that there would be good cause to make the requirements herein effective immediately under the APA, 5 U.S.C. 808(2).

This Amended Order is also an economically significant regulatory action under Executive Order 12866 and has therefore been reviewed by the

Office of Information and Regulatory Affairs of the Office of Management and Budget.

If any provision of this Amended Order, or the application of any provision to any carriers, persons, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any carriers, persons, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

Pursuant to 5 U.S.C. 553(b)(B), and for the reasons stated above, I hereby conclude that notice-and-comment rulemaking would defeat the purpose of the Amended Order and endanger the public health, and is, therefore, impracticable and contrary to the public interest. For the same reasons, I have determined, consistent with 5 U.S.C. 553(d)(3), that there is good cause to make this Amended Order effective immediately upon filing at the Office of the Federal Register.

**Action**

For the reasons outlined above, I hereby determine that passengers covered by this Amended Order are at risk of transmitting SARS–CoV–2 virus, including the emergent Omicron variant and other virus variants. Accordingly, requiring passengers to demonstrate pre-departure either a negative COVID–19 test result or recovery from COVID–19 after previous SARS–CoV–2 infection in the past 90 days is necessary to reduce the risk of transmission of the SARS–CoV–2 virus, including the Omicron variant and other virus variants, and to protect the health of fellow passengers, aircraft crew, and U.S. communities. This Amended Order shall remain effective until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or I determine that based on specific public health or other considerations that continuation of this Order is no longer necessary to prevent the further introduction, transmission, and spread of COVID–19 into the United States, whichever occurs first. Upon determining that continuation of this Order is no longer necessary to prevent the further introduction, transmission, and spread of COVID–19 into the United States, I will publish a notice in the **Federal Register** terminating this Order. I retain the authority to modify or terminate the Order, or its implementation, at any time as needed to protect public health.

---

[24] *https://www.federalregister.gov/documents/ 2021/11/05/2021-24388/requirement-for-negative- pre-departure-covid-19-test-result-or- documentation-of-recovery-from.*

[25] Runway to Recovery 1.1, December 21, 2020, available at *https://www.transportation.gov/ briefing-room/runway-recovery-11.*

[26] *https://ourworldindata.org/coronavirus- testing#testing-and-contact-tracing-policy.*

1. Requirements for Airlines & Other Aircraft Operators

Any airline or other aircraft operator with passengers arriving into the United States from a foreign country, shall:

A. Confirm that every passenger—2 years or older—onboard the aircraft has paper or digital documentation reflecting a *Qualifying Test* or *Documentation of Recovery.*

(1) Requirements for a *Qualifying Test* include:

a. Documentation of a negative SARS–CoV–2 viral test result from a specimen collected no more than 1 calendar day preceding the passenger's flight to the United States. The negative SARS–CoV–2 viral test result must include:

i. personal identifiers (*e.g.,* name and date of birth) on the negative test result that match the personal identifiers on the passenger's passport or other travel documents;

ii. a specimen collection date indicating that the specimen was collected no more than 1 calendar day before the flight's departure (or first flight in a series of connections booked on the same itinerary);

iii. the type of viral test indicating it is a NAAT or antigen test;

iv. a test result that states "NEGATIVE," "SARS–CoV–2 RNA NOT DETECTED," "SARS–CoV–2 ANTIGEN NOT DETECTED," or "COVID–19 NOT DETECTED," or other indication that SARS–CoV–2 was not detected in the individual's specimen. A test marked "invalid" is not acceptable; and

v. information about the entity issuing the result (*e.g.,* laboratory, healthcare entity, or telehealth service), such as the name and contact information.

(2) Requirements for *Documentation of Recovery* include:

a. Documentation of a positive SARS–CoV–2 viral test result from a specimen collected no more than 90 calendar days preceding the passenger's scheduled flight to the United States.[27] The positive SARS–CoV–2 viral test result must include:

i. Personal identifiers (*e.g.,* name and date of birth) on the positive test result match the personal identifiers on the passenger's passport or other travel documents;

ii. a specimen collection date indicating that the specimen was collected no more than 90 calendar days before the flight's departure;

iii. information that the test performed was a viral test indicating it is a NAAT or antigen test;

iv. a test result that states "POSITIVE," "SARS–CoV–2 RNA DETECTED," "SARS–CoV–2 ANTIGEN DETECTED," or "COVID–19 DETECTED," or other indication that SARS–CoV–2 was detected in the individual's specimen. A test marked "invalid" is not acceptable; and

v. information about the entity issuing the result (*e.g.,* laboratory, healthcare entity, or telehealth service), such as the name and contact information.

b. A signed letter from a licensed healthcare provider or a public health official stating that the passenger has been cleared for travel.[28][29] The letter must have personal identifiers (*e.g.,* name and date of birth) that match the personal identifiers on the passenger's passport or other travel documents. The letter must be signed and dated on official letterhead that contains the name, address, and phone number of the healthcare provider or public health official who signed the letter.

B. Confirm that each passenger has attested to having received a negative result for a *Qualifying Test* or having tested positive for SARS–CoV–2 on a specimen collected no more than 90 calendar days before the flight and been cleared to travel. Airlines or other aircraft operators must retain a copy of each passenger attestation for 2 years. The attestation is attached to this order as Attachment A.

C. Not board any passenger without confirming the documentation as set forth in section 1.A and 1.B.

Any airline or other aircraft operator that fails to comply with section 1, "Requirements for Airlines & Other Aircraft Operators," may be subject to criminal penalties under, *inter alia,* 42 U.S.C. 271 and 42 CFR 71.2, in conjunction with 18 U.S.C. 3559 and 3571.

2. Requirements for Aircraft Passengers

Any aircraft passenger[30] departing from any foreign country with a destination in the United States shall—

A. Present paper or digital documentation reflecting one of the following:

(1) A negative *Qualifying Test* that has a specimen collection date indicating that the specimen was collected no more than 1 calendar day before the flight's departure (or first flight in a series of connections booked on the same itinerary); or

(2) *Documentation of Recovery* from COVID–19 that includes a positive SARS–CoV–2 viral test result conducted on a specimen collected no more than 90 calendar days before the flight and a letter from a licensed healthcare provider or public health official stating that the passenger has been cleared for travel.[31][32]

B. Provide the attestation to the airline or other aircraft operator, of:

(1) Having received a negative result for the *Qualifying Test;* or

(2) having tested positive for SARS–CoV–2 on a specimen collected no more than 90 calendar days before the flight and been cleared to travel.

The attestation is attached to this order as Attachment A. Unless otherwise permitted by law, a parent or other authorized individual may present the required documentation on behalf of a passenger 2–17 years of age. An authorized individual may act on behalf of any passenger who is unable to act on their own behalf (*e.g.,* by reason of age, or physical or mental impairment).

C. Retain a copy of the applicable documentation listed in part A of this section and produce such documentation upon request to any U.S. government official or a cooperating state or local public health authority after arrival into the United States.

Any passenger who fails to comply with the requirements of section 2, "Requirements for Aircraft Passengers," may be subject to criminal penalties under, *inter alia,* 42 U.S.C. 271 and 42 CFR 71.2, in conjunction with 18 U.S.C. 3559 and 3571. Willfully giving false or misleading information to the government may result in criminal penalties under, *inter alia,* 18 U.S.C. 1001.

This Amended Order shall be enforceable through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 71.2.

---

[27] Interim Guidance on Ending Isolation and Precautions for Adults with COVID–19 *https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.*

[28] Healthcare providers and public health officials should follow CDC guidance in clearing patients for travel to the United States. Applicable guidance is available at *https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html.*

[29] A letter from a healthcare provider or a public health official that clears the person to end isolation, *e.g.,* to return to work or school, can also be used to show that the person has been cleared to travel, even if travel is not specifically mentioned in the letter.

[30] A parent or other authorized individual may present the required documentation on behalf of a passenger 2–17 years of age. An authorized individual may act on behalf of any passenger who is unable to act on their own behalf (*e.g.,* by reason of age, or physical or mental impairment).

[31] A letter from a healthcare provider or a public health official that clears the person to end isolation, *e.g.,* to return to work or school, can also be used to show that the person has been cleared to travel, even if travel is not specifically mentioned in the letter.

[32] Healthcare providers and public health officials should follow CDC guidance in clearing patients for travel to the United States. Applicable guidance is available at *https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html.*

As the pandemic continues to rapidly evolve and more scientific data becomes available regarding the emergent Omicron variant and/or the effectiveness of COVID–19 vaccines related to currently circulating variants, CDC may exercise its enforcement discretion to adjust the scope of accepted pre-departure testing requirements to allow passengers and airline and aircraft operators greater flexibility regarding the requirements of this Amended Order or to align with current CDC guidance. Such exercises of enforcement discretion will be announced on CDC's website and the Amended Order will be further amended as soon as practicable through an updated publication in the **Federal Register**.

**Effective Date**

This Amended Order shall enter into effect for flights departing at or after 12:01 a.m. EST (5:01 a.m. GMT) on December 6, 2021, and will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists with respect to COVID–19.

**BILLING CODE 4163–18–P**

# Plaintiffs' Exhibit 152

### ATTACHMENT A: COMBINED PASSENGER DISCLOSURE AND ATTESTATION
### TO THE UNITED STATES OF AMERICA

This combined passenger disclosure and attestation fulfills the requirements of U.S. Centers for Disease Control and Prevention (CDC) Orders: *Requirement for Proof of Negative COVID-19 Test Result or Recovery from COVID-19 for All Airline Passengers Arriving into the United States* and *Order Implementing Presidential Proclamation on Advancing the Safe Resumption of Global Travel During the COVID-19 Pandemic.*[1] As directed by the CDC and the Transportation Security Administration (TSA), through Security Directive 1544-21-03 and Emergency Amendment 1546-21-02, and consistent with CDC's Order implementing the Presidential Proclamation, all airline or other aircraft operators must provide the following disclosures to all passengers prior to their boarding a flight from a foreign country to the United States.

The information provided below must be accurate and complete to the best of the individual's knowledge. Under United States federal law, the applicable portion of the attestation must be completed for each passenger age two or older and the attestation must be provided to the airline or aircraft operator prior to boarding a flight to the United States from a foreign country. Failure to complete and present the applicable portion of the attestation, or submitting false or misleading information, could result in delay of travel, denial of boarding, or denial of boarding on future travel, or put the passenger or other individuals at risk of harm, including serious bodily injury or death. Any passenger who fails to comply with these requirements may be subject to criminal penalties. Willfully providing false or misleading information may lead to criminal fines and imprisonment under, among others, 18 U.S.C. § 1001. Providing this information can help protect you, your friends and family, your communities, and the United States. CDC appreciates your cooperation.

AIRLINE AND AIRCRAFT OPERATOR DISCLOSURE REQUIREMENTS:

As required by United States federal law, all airlines or other aircraft operators must collect the passenger attestation on behalf of the U.S. Government.[2]

**Required Proof of Negative COVID-19 Test Result or Recovery from COVID-19**
All airlines and other aircraft operators must additionally confirm one of the following for each passenger – 2 years or older—prior to their boarding a flight to the United States from a foreign country:
   1. A negative result for a *Qualifying Test* or
   2. *Documentation of Recovery* from COVID-19 in the form of a positive COVID-19 viral test on a sample taken no more than 90 days prior to departure **and** a letter from a licensed healthcare provider or public health official stating that the passenger has been cleared for travel.

**Required Proof of COVID-19 Vaccination for Non-U.S. citizen, Nonimmigrant Air Passengers**
As directed by the TSA, including through a security directive or emergency amendment, all airlines and other aircraft operators must additionally confirm one of the following for each noncitizen who is a nonimmigrant passenger prior to their boarding a flight to the United States from a foreign country:
   1. Proof of being *Fully Vaccinated Against COVID-19* or
   2. Proof of being excepted from the requirement to be *Fully Vaccinated Against COVID-19.*

---

[1] These requirements (e.g., proof of negative COVID-19 test result and proof of being fully vaccinated against COVID-19) do not apply to crew members of airlines or other aircraft operators if they are traveling for the purpose of operating the aircraft, or repositioning (i.e., on "deadhead" status), provided their assignment is under an air carrier's or operator's occupational health and safety program that follows applicable industry standard protocols for the prevention of COVID-19 as set forth in relevant Safety Alerts for Operators (SAFOs) issued by the Federal Aviation Administration (FAA).

[2] Children under 2 years of age do not need to complete Section 1 or Section 2 of this attestation.  The airline or other aircraft operator may permit them to board an aircraft without an attestation.

Public reporting burden of this collection of information is estimated to average 2 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB Control Number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to CDC/ATSDR Reports Clearance Officer, 1600 Clifton Road NE, MS D-74, Atlanta, Georgia 30333; ATTN: PRA 0920-1318

Form
OMB Control No.: 0920-1318
Expiration date: 05/31/2022

## SECTION 1:

**Passenger Attestation Requirement Relating to Proof of Negative COVID-19 Test Result or Recovery from COVID-19**

<span style="color:red">**TO BE COMPLETED BY OR ON BEHALF OF ALL PASSENGERS 2 YEARS OR OLDER, REGARDLESS OF CITIZENSHIP OR VACCINATION STATUS:**[3]</span>

### A.  NEGATIVE PRE-DEPARTURE TEST RESULT

[ ] I attest that I have received a **negative** pre-departure test result for COVID-19. The test was a viral test that was conducted on a specimen collected from me no more than **1 calendar day** before the flight's departure.

[ ] On behalf of [_____], I attest that this person received a **negative** pre-departure test result for COVID-19. The test was a viral test that was conducted on a specimen collected from the person no more than **1 calendar day** before the flight's departure.

### B.  DOCUMENTATION OF RECOVERY FROM COVID-19

[ ] I attest that I tested positive for COVID-19 and **have been cleared** for travel by a licensed healthcare provider or public health official. The test was a viral test that was conducted on a specimen collected from me no more than 90 days before the flight's departure.

[ ] On behalf of [_____], I attest that this person tested positive for COVID-19 and **has been cleared for travel** by a licensed healthcare provider or public health official. The test was a viral test that was conducted on a specimen collected from the person no more than 90 days before the flight's departure.

### C.  HUMANITARIAN EXEMPTION

[ ] I attest that I have received a humanitarian exemption to the testing requirement, as determined by CDC and documented by an official U.S. Government letter.

[ ] On behalf of [_____], I attest that this person has received a humanitarian exemption to the testing requirement, as determined by CDC and documented by an official U.S. Government letter.

---

[3] U.S. military personnel, including civilian employees, dependents, contractors, and other U.S. government employees when traveling on official military travel orders are exempt from the testing or documentation or recovery requirement and do not need to fill out Section 1. U.S. Federal Law Enforcement Officials traveling on official orders for purposes of carrying out a law enforcement function are also exempt from the testing or documentation of recovery requirement and do not have to fill out Section 1.

Form
OMB Control No.: 0920-1318
Expiration date: 05/31/2022

<u>**SECTION 2:**</u>

**<u>Passenger Attestation Requirement Relating to Presidential Proclamation on Advancing the Safe Resumption of Global Travel During the COVID-19 Pandemic</u>**

<span style="color:red">**TO BE COMPLETED BY OR ON BEHALF OF EVERY COVERED INDIVIDUAL 2 YEARS OR OLDER.[4]**</span>

**Covered individuals must complete Section 1 and Section 2, and comply with applicable after travel requirements in Section 2.**

**A.  FULLY VACCINATED COVERED INDIVIDUALS**
*(After you check a box in A, proceed to signature line and sign the form to complete the Attestation)*

[ ] I attest that I am **fully vaccinated** against COVID-19.

[ ] On behalf of [_____], I attest that this person is **fully vaccinated** against COVID-19.

**B.  NOT FULLY VACCINATED COVERED INDIVIDUALS**
[ ] I am a Covered Individual who is not fully vaccinated and attest that I am **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* based on one of the following (<u>*check only one box, as applicable*</u>):

Diplomatic and Official Foreign Government Travel (*proceed to and complete C only and then sign the form to complete the Attestation*).

Child 2 to 17 years of age (*proceed to and complete D only and then sign the form or have a legal representative sign on this person's behalf to complete the Attestation*).

Participant in certain COVID-19 vaccine trials as determined by CDC (*proceed to and complete D only and then sign the form to complete the Attestation*).

Medical contraindication to an accepted COVID-19 vaccine as determined by CDC (*proceed to and complete E only and then sign the form to complete the Attestation*).

Humanitarian or emergency exception as determined by CDC and documented by an official U.S. Government letter (*proceed to and complete F only and then sign the form to complete the Attestation*).

Valid nonimmigrant visa holder (excluding B-1 or B-2 visas) and citizen of a *Foreign Country with Limited COVID-19 Vaccine Availability* as determined by CDC (*proceed to and complete F only and then sign the form to complete the Attestation*).

Member of the U.S. Armed Forces or spouse or child (under 18 years of age) of a member of the U.S. Armed Forces (*proceed to signature line only and sign the form to complete the Attestation*).

Sea crew member traveling pursuant to a C-1 and D nonimmigrant visa (*proceed to and complete F only and then sign the form to complete the Attestation*).

Person whose entry is in the U.S. national interest as determined by the Secretary of State, the Secretary of Transportation, the Secretary of Homeland Security, or their designees (*proceed to and complete G only and then sign the form to complete the Attestation*).

---

[4] This means any passenger covered by the Presidential Proclamation and CDC's implementing Order: a noncitizen (other than a U.S. lawful permanent resident or U.S. national) who is a nonimmigrant seeking to enter the United States by air travel. This term does not apply to crew members of airlines or other aircraft operators if such crewmembers and operators adhere to all industry standard protocols for the prevention of COVID-19, as set forth in relevant guidance for crewmember health issued by the CDC or by the Federal Aviation Administration in coordination with the CDC.

Form
OMB Control No.: 0920-1318
Expiration date: 05/31/2022

[ ] On behalf of [_____], I attest that this person is **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* based on one of the following *(check only one box, as applicable)*:

    Diplomatic and Official Foreign Government Travel *(proceed to and complete C only and then sign the form to complete the Attestation)*.

    Child 2 to 17 years of age *(proceed to and complete D only and then sign the form or have a legal representative sign on this person's behalf to complete the Attestation)*.

    Participant in certain COVID-19 vaccine trials as determined by CDC *(proceed to and complete D only and then sign the form to complete the Attestation)*.

    Medical contraindication to an accepted COVID-19 vaccine as determined by CDC *(proceed to and complete E only and then sign the form to complete the Attestation)*.

    Humanitarian or emergency exception as determined by CDC and documented by an official U.S. Government letter *(proceed to and complete F only and then sign the form to complete the Attestation)*.

    Valid nonimmigrant visa holder (excluding B-1 or B-2 visas) and citizen of a *Foreign Country with Limited COVID-19 Vaccine Availability* as determined by CDC *(proceed to and complete F only and then sign the form to complete the Attestation)*.

    Member of the U.S. Armed Forces or spouse or child (under 18 years of age) of a member of the U.S. Armed Forces *(proceed to signature line only and sign the form to complete the Attestation)*.

    Sea crew member traveling pursuant to a C-1 and D nonimmigrant visa *(proceed to and complete F only and then sign the form to complete the Attestation)*.

    Person whose entry is in the U.S. national interest as determined by the Secretary of State, the Secretary of Transportation, the Secretary of Homeland Security, or their designees *(proceed to and complete G only and then sign the form to complete the Attestation)*.

**C.  EXCEPTION: <u>Diplomat and Official Foreign Government Travel</u>**

[ ] I am **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and have made the following arrangements (*must check all boxes in C and then proceed to sign Attestation*).

    To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless I have documentation of having recovered from COVID-19 in the past 90 days;

    To self-quarantine for a full 7 calendar days, even if the test result to my post-arrival viral test is negative, except during periods when my attendance is required to carry out the purposes of the diplomatic or official foreign government travel (e.g., to attend official meetings or events), unless I have documentation of having recovered from COVID-19 in the past 90 days.

    To self-isolate if the result of the post-arrival viral test is positive or if I develop COVID-19 symptoms.

[ ] On behalf of [_____], I attest that such person is **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and has made or has had the following arrangements made on their behalf (*must check all boxes in C and then proceed to sign Attestation*).

    To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless this person has documentation of having recovered from COVID-19 in the past 90 days;

    To self-quarantine for a full 7 calendar days, even if the test result to this person's post-arrival viral test is negative, except during periods when this person's attendance is required to carry out the purposes of the diplomatic or official foreign government travel (e.g., to attend official meetings or events), unless this person has documentation of having recovered from COVID-19 in the past 90 days.

    To self-isolate if the result of the post-arrival viral test is positive or if this person develops COVID-19 symptoms.

Form
OMB Control No.: 0920-1318
Expiration date: 05/31/2022

**D.  EXCEPTIONS:**
- **Child 2 to 17 years of age**
- **Participant in certain COVID-19 vaccine trials as determined by CDC**

[ ] I attest that I am **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and have made the following arrangements (*must check all boxes in D and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless I have documentation of having recovered from COVID-19 in the past 90 days;

To self-isolate if the result of the post-arrival viral test is positive or if I develop COVID-19 symptoms.

[ ] On behalf of [_____], I attest that such person is **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and has made or has had the following arrangements made on their behalf (*must check all boxes in D and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless this person has documentation of having recovered from COVID-19 in the past 90 days;

To self-isolate if the result of the post-arrival viral test is positive or if this person develops COVID-19 symptoms.

**E.  EXCEPTION: Medical contraindication to an accepted COVID-19 vaccine as determined by CDC**

[ ] I attest that I am **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and have made the following arrangements (*must check all boxes in E and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless I have documentation of having recovered from COVID-19 in the past 90 days;

To self-quarantine for a full 7 calendar days, even if the test result to my post-arrival viral test is negative, unless I have documentation of having recovered from COVID-19 in the past 90 days.

To self-isolate if the result of the post-arrival viral test is positive or if I develop COVID-19 symptoms.

[ ] On behalf of [_____], I attest that such person is **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and has made or has had the following arrangements made on their behalf (*must check all boxes in E and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless this person has documentation of having recovered from COVID-19 in the past 90 days;

To self-quarantine for a full 7 calendar days, even if the test result to this person's post-arrival viral test is negative, unless this person has documentation of having recovered from COVID-19 in the past 90 days.

To self-isolate if the result of the post-arrival viral test is positive or if this person develops COVID-19 symptoms.

**F.  EXCEPTIONS:**
- **Humanitarian or emergency exception as determined by CDC;** or
- **Valid nonimmigrant visa holder (excluding B-1 or B-2 visas) and citizen of a Foreign Country with Limited COVID-19 Vaccine Availability as determined by CDC;** or
- **Sea crew member traveling pursuant to a C-1 and D nonimmigrant visa**

[ ] I attest that I am **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and have made the following arrangements (*must check all boxes in F and then proceed to sign Attestation*).

Form
OMB Control No.: 0920-1318
Expiration date: 05/31/2022

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless I have documentation of having recovered from COVID-19 in the past 90 days;

To self-quarantine for a full 7 calendar days, even if the test result to my post-arrival viral test is negative, unless I have documentation of having recovered from COVID-19 in the past 90 days.

To self-isolate if the result of the post-arrival viral test is positive or if I develop COVID-19 symptoms.

To become fully vaccinated against COVID-19 within 60 days of arriving in the United States, or as soon thereafter as is medically appropriate, if intending to stay in the United States for more than 60 days.

[ ] On behalf of [_____], I attest that such person is **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and has made or has had the following arrangements made on their behalf (*must check all boxes in F and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless this person has documentation of having recovered from COVID-19 in the past 90 days;

To self-quarantine for a full 7 calendar days, even if the test result to this person's post-arrival viral test is negative, unless this person has documentation of having recovered from COVID-19 in the past 90.

To self-isolate if the result of the post-arrival viral test is positive or if this person develops COVID-19 symptoms.

To become fully vaccinated against COVID-19 within 60 days of arriving in the United States, or as soon thereafter as is medically appropriate, if intending to stay in the United States for more than 60 days.

## G. **EXCEPTION: <u>Person whose entry is in the U.S. National Interest</u>**

[ ] I am **excepted** from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and have made the following arrangements (*must check all boxes in G and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless I have documentation of having recovered from COVID-19 in the past 90 days;

To self-quarantine for a full 7 calendar days, even if the test result to my post-arrival viral test is negative, except during periods when my attendance is required to carry out the purposes of the travel for the U.S. national interest (e.g., to attend official meetings or events), unless I have documentation of having recovered from COVID-19 in the past 90 days.

To self-isolate if the result of the post-arrival viral test is positive or if I develop COVID-19 symptoms.

To become fully vaccinated against COVID-19 within 60 days of arriving in the United States, or as soon thereafter as is medically appropriate, if intending to stay in the United States for more than 60 days.

[ ] On behalf of [_____], I attest that such person is excepted from the requirement to present *Proof of Being Fully Vaccinated Against COVID-19* and has made or has had the following arrangements made on their behalf (*must check all boxes in G and then proceed to sign Attestation*).

To be tested with a COVID-19 viral test 3-5 days after arriving in the United States, unless this person has documentation of having recovered from COVID-19 in the past 90 days;

To self-quarantine for a full 7 calendar days, even if the test result to this person's post-arrival viral test is negative, except during periods when this person's attendance is required to carry out the purposes of the travel for the U.S. national interest (e.g., to attend official meetings or events), unless this person has documentation of having recovered from COVID-19 in the past 90 days.

Form
OMB Control No.: 0920-1318
Expiration date: 05/31/2022

To self-isolate if the result of the post-arrival viral test is positive or if this person develops COVID-19 symptoms.

To become fully vaccinated against COVID-19 within 60 days of arriving in the United States, or as soon thereafter as is medically appropriate, if intending to stay in the United States for more than 60 days.

_____ Print Name

_____ Signature

_____Date

**Privacy Act Statement for Travelers Relating to the Requirement to Provide Proof of a Negative COVID-19 Test Result**

The United States Centers for Disease Control and Prevention (CDC) requires airlines and other aircraft operators to collect this information pursuant to 42 C.F.R., 71.20 and 71.31(b), as authorized by 42 U.S.C. § 264. Providing this information is mandatory for all passengers arriving by aircraft into the United States. Failure to provide this information may prevent you from boarding the plane. Additionally, passengers will be required to attest to providing complete and accurate information, and failure to do so may lead to other consequences, including criminal penalties. CDC will use this information to help prevent the introduction, transmission, and spread of communicable diseases by performing contact tracing investigations and notifying exposed individuals and public health authorities; and for health education, treatment, prophylaxis, or other appropriate public health interventions, including the implementation of travel restrictions.

The Privacy Act of 1974, 5 U.S.C. § 552a, governs the collection and use of this information. The information maintained by CDC will be covered by CDC's System of Records No. 09-20-0171, Quarantine- and Traveler-Related Activities, Including Records for Contact Tracing Investigation and Notification under 42 C.F.R. Parts 70 and 71. See 72 Fed. Reg. 70867 (Dec. 13, 2007), as amended by 76 Fed. Reg. 4485 (Jan. 25, 2011) and 83 Fed. Reg. 6591 (Feb. 14, 2018). CDC will only disclose information from the system outside the CDC and the U.S. Department of Health and Human Services as the Privacy Act permits, including in accordance with the routine uses published for this system in the Federal Register, and as authorized by law. Such lawful purposes may include, but are not limited to, sharing identifiable information with state and local public health departments, and other cooperating authorities. CDC and cooperating authorities will retain, use, delete, or otherwise destroy the designated information in accordance with federal law and the Privacy Act Records Notice (SORN) set forth above. You may contact the system manager at dgmqpolicyoffice@cdc.gov or by mailing Policy Office, Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16-4, Atlanta, GA 30329, if you have questions about CDC's use of your data.

Plaintiffs' Exhibit 153

nytimes.com

## C.D.C. Says to Avoid Cruises, Regardless of Vaccination

*Todd Gregory, Ceylan Yeginsu, Oscar Lopez*

4-5 minutes                12-30-21

Travel|The C.D.C. tells travelers to avoid cruises, regardless of vaccination.

https://www.nytimes.com/2021/12/30/travel/cdc-cruises.html

**The C.D.C. tells travelers to avoid cruises, regardless of vaccination.**







Credit...Andrew Kelly/Reuters

- Dec. 30, 2021

The Centers for Disease Control and Prevention on Thursday raised its Covid-19 warning level for cruise ships to 4, the highest, and issued a blunt warning: "Avoid cruise travel regardless of vaccination status."

The move came as the number of outbreaks on ships has grown in recent weeks, causing some ports to turn away ships. Last week, dozens of people on a Royal Caribbean International ship tested positive after it set sail from Fort Lauderdale, Fla., and a Carnival Cruise Line ship returned to Miami on Sunday after positive tests among "a small number on board."

Calling the C.D.C.'s decision "perplexing," the cruise industry's trade group, Cruise Lines International Association, said in a statement that the number of cases onboard made up a very slim minority of the total population and that "the majority of cases were asymptomatic or mild in nature, posing little to no burden on medical resources onboard or onshore."

Before the C.D.C.'s warning on Thursday, Royal Caribbean Group, one of the biggest cruise companies, said its ships had carried 1.1 million guests since it had restarted U.S. operations in June, with 1,745 people testing positive. While the majority of passengers had mild or no symptoms, 41 people were hospitalized.

"Omicron is having a big short-term impact on everyone, but many observers see this as a major step towards Covid-19 becoming endemic rather than epidemic," said Richard D. Fain, chairman and chief executive of Royal Caribbean Cruises.

Despite the increase in cruise ship cases, Mexico's government announced this week that it would let cruise ships dock at its ports even if passengers have tested positive for the coronavirus, and also allow asymptomatic travelers to disembark on its shores.

The announcement came after two cruise ships with Covid outbreaks were refused permission by the authorities in Jalisco State in the last week to let passengers or crew disembark at Puerto Vallarta, a popular tourist destination on Mexico's Pacific coast.

"Our country maintains its policy of solidarity and fraternity, as well as the principle of non-discrimination towards all people," the government said in a statement. "The health and tourism authorities remain attentive to provide the necessary medical assistance to those who visit us."

The coronavirus wreaked havoc on the cruise industry in the early stages of the pandemic, infecting hundreds of cruise passengers and workers and requiring the sector to shut down for 18 months. To begin sailing, cruise ships had to agree to the C.D.C.'s Conditional Sailing Order, which is valid until Jan. 15.

On most cruises out of U.S. ports, almost all crew members and adult passengers are vaccinated and masks are required indoors except for when passengers are eating or drinking.

Among the safety measures the order requires — beyond submitting the daily number of

coronavirus cases — is a prevention and control plan for each cruise ship.

Most cruise companies do not publicly announce the number of coronavirus cases identified during sailings, but all cruise ships operating to and from U.S. ports must submit daily numbers to the C.D.C., which uses a color-coded system to inform the public whether the number of cases is above or below the agency's threshold for an investigation.

Currently 88 cruise ships are being monitored by the C.D.C. because of reported coronavirus cases onboard. The agency does not publicly specify the number of cases on each ship.

# Plaintiffs' Exhibit 154

## Cruises should be avoided regardless of vaccination status, CDC says

Marnie Hunter and Naomi Thomas, CNN • Updated 30th December 2021

The US Centers for Disease Control and Prevention on Thursday increased the risk level for cruise ship travel to its highest level and said it should be avoided, regardless of vaccination status.

The agency bumped up the travel risk level for cruise travel from Level 3 to Level 4, indicating the risk for Covid-19 is "very high."

The move "reflects increases in cases onboard cruise ships since identification of the Omicron variant," the CDC website says.

"Since the identification of the Omicron variant, there has been an increase in the number of COVID-19 cases among cruise passengers and crew reported to CDC. Additionally, there has been an increase in the number of cruise ships meeting the COVID-19 case threshold for CDC investigation," the agency said.

In addition to including cruise travel in its wider list of travel advisories looking at countries worldwide, the agency has created a color status classification for cruise ships.

On December 30, the agency listed 91 ships in its yellow category that indicates that the volume of Covid cases reported has met the CDC's threshold for investigation. That's five more ships than were listed as yellow on December 28. On December 30, no ships were listed as red, which indicates that reported cases are at or above the threshold for investigation.

Three ships were listed as orange on December 30, indicating that reported cases are below the CDC's threshold for investigation. Sixteen ships were listed as green, meaning that the ships had no reported cases of Covid-19.

Green, orange, yellow and red designations indicate a ship's Covid situation from best to worst. A gray designation is reserved for ships that the CDC has not reviewed for Covid safety.

Decision is 'perplexing,' industry association says

Cruise Lines International Association, a trade association, expressed disappointment at the CDC's elevated risk level.

"The decision by the CDC to raise the travel level for cruise is particularly perplexing considering that cases identified on cruise ships consistently make up a very slim minority of the total population onboard -- far fewer than on land -- and the majority of those cases are asymptomatic or mild in nature, posing little to no burden on medical resources onboard or onshore," CLIA said in a statement.

The association said that "cruise ships offer a highly controlled environment with science-backed measures, known testing and vaccination levels far above other venues or modes of transportation and travel, and significantly lower incidence rates than land."

At least four ocean cruise ships were turned away from ports of call or were prohibited from letting passengers disembark in the Americas this week because of Covid-19 cases aboard.

A statement from the U.S. Travel Association also indicated frustration with the CDC's advisory.

"The U.S. Travel Association sincerely hopes today's CDC advisory singling out recreational cruise travel -- enacted despite the sector's robust health practices and high rate (95%) of onboard vaccination -- is brief and temporary," said the statement from Tori Emerson Barnes, the association's executive vice president of public affairs and policy.

Advice if you decide to cruise anyway

While the CDC says to "avoid cruise travel, regardless of vaccination status," it advises those who do travel on a cruise ship to make sure they are fully vaccinated and boosted, if eligible. People who go on a cruise should also get tested one to three days before their trip, and three to five days after, regardless of vaccination status.

The unvaccinated should also self-quarantine for a five full days after. People on cruise ships should also wear masks in shared places, CDC says.

Most cruise lines are requiring all or the vast majority of passengers and crew to be vaccinated, in compliance with a CDC Conditional Sailing Order that was implemented to allow cruise operations to resume more than a year after the industry came to a standstill at the start of the pandemic.

Many cruise lines also require pre-departure testing, regardless of vaccination status.

Some lines, including Royal Caribbean, require all passengers 2 and older to be masked in indoor public areas, except while actively eating and drinking.

Before coronavirus variants brought a rise in breakthrough cases among the vaccinated, some lines did not require vaccinated passengers to wear masks in areas reserved for vaccinated guests.

https://www.cnn.com/travel/article/cdc-cruise-travel-risk-level/index.html

Plaintiffs' Exhibit 155

washingtonpost.com

# Healthy, boosted people unlikely to develop severe omicron infections, but jury's out on older, at-risk populations

*Yasmeen Abutaleb*

9-11 minutes                    12-28-21

---

==Healthy individuals who have been vaccinated, and especially those who have been boosted, appear unlikely to develop severe infections from the omicron variant== that would land them in the hospital, say medical experts who have monitored the effects of the newest coronavirus variant since it was identified over four weeks ago.

==While omicron has sent U.S. infections soaring to levels not seen since last winter's wave, it appears to have less severe effects than the delta variant,== according to a handful of international studies and early data from several U.S. hospitals.

Those infected by the omicron variant are 15 to 20 percent less likely to go to an emergency room, and 40 percent less likely to be hospitalized overnight, compared with those infected with delta, according to English data analyzed by scientists from Imperial College London. That aligns with early U.S. data from some hospitals.

At the Houston Methodist hospital system, about 15 percent of symptomatic individuals have ended up hospitalized — about a 70 percent reduction compared with those infected by the delta variant, said James Musser, chair of pathology and genomic medicine.

A separate study from Britain, which is not yet peer-reviewed, found that people infected with omicron were almost 60 percent less likely to enter the hospital than those infected with delta.

"What is absolutely clear is there is a lower rate of hospitalization with our omicron patients in our hospital system," Musser said. "That does not necessarily mean that this variant is quote-unquote 'less virulent.' The jury's still out on that. What we know now is that … if you are immunized and, more importantly, if you are boosted, you're going to stay out of substantial trouble."

He and other experts warn against complacency, however, cautioning that millions of Americans, particularly the unvaccinated, remain vulnerable to more serious disease from the most transmissible coronavirus variant to date.

Other factors that might lead to greater risk include an individual's age, the type of vaccine or booster they received, and whether they have underlying health problems, such as heart disease or obesity, said Michael Osterholm, director of the Center for Infectious Disease Research and Policy at the University of Minnesota and a member of President Biden's covid-19 transition task force.

"Have you previously had infection? Were you vaccinated? How many doses of vaccine, and was it more than six months ago? So in some ways this is almost like a calculus problem. It's got a lot of

moving parts to it and we're trying to figure it out," Osterholm said.

White House and public health officials on Dec. 26 said the U.S. has tools to fight the latest coronavirus wave, but warned hospitalizations will still rise. (JM Rieger/The Washington Post)

Doctors also caution that far more people will become infected with omicron simply because of its transmissibility. If even a small fraction of those land in the hospital, they worry that health-care systems that are already short-staffed because of delta infections could be overwhelmed — with potentially dire results for those needing critical care as a result of car accidents, heart attacks, strokes, or any number of things that bring people to emergency rooms.

"We need to be respectful of the fact that our hospital system has been under this kind of duress for such a long time," said Larry Corey, a virologist at the Fred Hutchinson Cancer Research Center in Seattle. "We need to do everything we can to not allow the situation, where there's such crowding and such intensity that we can't optimally take care of the people who get severe disease."

Anthony S. Fauci, Biden's chief medical adviser, said the rapid increase in the numbers of people getting infected with the omicron variant will invariably put additional strain on the system.

"We're going to have a real challenge to the health-care delivery system — namely the number of beds, the number of ICU beds and even the number of health-care providers," Fauci said in an interview. "Even vaccinated people are getting breakthrough infections. So if you get enough nurses and doctors infected, they are going to temporarily be out of action. And if you get enough of them out of action, you could have a double stress on the health-care system."

The welcome news for most people who are vaccinated and boosted is that omicron infections often mimic the symptoms of the common cold. Those with two shots of vaccine, but no booster, also appear to fare relatively well, though they may develop more intense symptoms that may last longer, experts said.

In a series of Twitter posts, Craig Spencer, who teaches emergency medicine at Columbia University Medical Center, said every boosted patient he has seen in the emergency room has had no difficulty breathing or shortness of breath. Those who have had two doses of either the Pfizer or Moderna vaccines also have had mild symptoms, he said, "but more than those who had received a third dose."

But almost every patient who had to be hospitalized was unvaccinated, he said.

"No matter your political affiliation, or thoughts on masks, or where you live in this country, as an ER doctor you'd trust with your life if you rolled into my emergency room at 3am, I promise you that you'd rather face the oncoming Omicron wave vaccinated," Spencer wrote.

Experts cautioned that those at higher risk of severe infection to previous variants probably remain vulnerable to this one.

It's not yet clear whether older, boosted individuals and those with underlying conditions, such as diabetes and heart disease, face the same lowered risk with omicron. Answering such questions is key to assessing the likely trajectory of the variant in the United States because the nation's population is older and less healthy than those of many of its global peers.

So far, though, early U.S. data echoes what has been seen in South Africa and Britain, where omicron waves are slightly ahead of this country's.

A group of Scottish scientists said recently that vaccinated people appear to have some protection against symptomatic infection from omicron, although less than they did against delta. A third dose or booster of an mRNA vaccine was associated with a 57 percent reduction in the odds of developing a symptomatic omicron case.

In the Johns Hopkins Hospital emergency department, physicians are seeing more infections than at any other point in the pandemic, but most of the cases are not severe, said Stuart Ray, a professor of medicine in the division of infectious diseases. But he warned that there is not yet "reassuring evidence" the United States will be spared from a disruptive wave of infections and complications.

The country faces other challenges with omicron in terms of its medicine cabinet. Two of the three existing intravenous treatments called monoclonal antibodies — those from Regeneron and Eli Lilly — do not work against the variant. Some Republican governors had touted the ability of those with covid-19 to receive monoclonal antibodies, spurring some Americans to see those treatments as an alternative to getting vaccinated.

The only monoclonal antibody that does work, sotrovimab from Vir Biotechnology and GlaxoSmithKline, is in short supply and will not be available to many of those who become infected. The Food and Drug Administration authorized two easy-to-take antiviral pills last week and one has high efficacy against omicron, but it will be in initial short supply. Distribution of the pills is expected to begin shortly.

It is also unclear whether the surge in the United States will follow the same pattern as South Africa's, which rapidly passed the peak of omicron cases last week.

South Africa's population is significantly younger and has far lower vaccination rates, with about 35 percent of the population immunized, and virtually no one boosted. The country also grappled with a delta variant wave that infected a far greater portion of the population than it did in the United States.

The significant number of South African residents infected with delta compared with the United States could prove to be an important distinction that might make more Americans vulnerable to omicron, said Chris Beyrer, an epidemiologist at the Johns Hopkins Bloomberg School of Public Health.

Beyrer also noted that infections in the United States, Britain and Germany seemed to be increasing at a significantly faster rate than they were in South Africa.

"This is an incredibly infectious virus and it is moving right along," Beyrer said. He added that the United States has numerous tools — including ready access to vaccines and booster shots, the new antiviral medicines, testing and masking — that could help curb its effects.

But referring to those who have refused to follow public health guidelines, Beyrer said, "We have a lot of resistance so that makes us vulnerable to infection."

Plaintiffs' Exhibit 156

🇺🇸 An official website of the United States government   Here's how you know

**COVIDtests.gov**                                                                English ▼

# Get free at-home COVID-19 tests

Every home in the U.S. is eligible to order 4 free at-home COVID-19 tests. Orders will usually ship in 7-12 days. Order your tests now so you have them when you need them.

**Order Free At-Home Tests**

Need help placing an order for your at-home tests?
Call 1-800-232-0233 (TTY 1-888-720-7489).



OTHER TESTING RESOURCES

## If you need a COVID-19 test now, are looking for another type of COVID-19 test, or need more than 4 tests, the resources below are available.

## At-Home Tests at Retailers and Pharmacies

At-home tests are available for sale around the U.S. Check with local retailers and pharmacies to see where at-home tests are available.

## Insurance Reimbursement for At-Home Tests

If you have health insurance through an employer or Marketplace, your insurance will pay you back for 8 at-home tests each month for each person on your plan.

**Learn more about insurance reimbursement**

## 20,000+ Free Testing Sites

No-cost antigen and PCR COVID-19 tests are available to everyone in the U.S., including the uninsured, at more than 20,000 sites nationwide.

**Find resources in your state**



ABOUT THE AT-HOME COVID-19 TESTS

### The tests available for order:

- Are rapid antigen at-home tests, not PCR

- Can be taken anywhere

- Give results within 30 minutes (no lab drop-off required)

- Work whether or not you have COVID-19 symptoms

- Work whether or not you are up to date on your COVID-19 vaccines

- Are also referred to as self-tests or over-the-counter (OTC) tests

Read more frequently asked questions



**Take an at-home test:**

- If you begin having COVID-19 symptoms like fever, sore throat, runny nose, or loss of taste or smell, or

- At least 5 days after you come into close contact with someone with COVID-19, or

- When you're going to gather with a group of people, especially those who are at risk of severe disease or may not be up to date on their COVID-19 vaccines  .

## What if you test  Positive?

A **positive** at-home test result means that the test found the virus, and you very likely have COVID-19.

If you test positive on your at-home test, follow the <u>latest CDC guidance for isolation</u>    .

## What if you test  Negative?

A **negative** at-home test result means that the test did not find the virus, and you may have a lower risk of spreading COVID-19 to others. Check your test kit's instructions for specific next steps. If you test negative, you should test again within a few days with at least 24 hours between tests.

If you test negative, follow the <u>latest CDC guidance for self-testing</u>    .



VACCINATION, MASKING, AND SOCIAL DISTANCING





Abbott

# BinaxNOW™

## COVID-19

### ANTIGEN SELF TEST
### FOR INFECTION DETECTION

If you have symptoms of COVID-19, you can use a single test. If you do not have symptoms of COVID-19, you will need at least two tests per person. You may need to purchase additional tests to perform serial (repeat) testing. This test is more likely to give you a false negative result when you have COVID-19 than a lab-based molecular test.

DOWNLOAD THE
NAVICA™ APP

**EN**

A rapid test for the qualitative detection of COVID-19 antigens in nasal swab specimens.

**Contents:**
- 2 BinaxNOW™ COVID-19 Test Cards
- 2 Nasal Swabs
- 2 Reagent Bottles
- 1 Patient Instructions
- 1 Fact Sheet for Individuals

Store between 35.6–86° F (2–30° C) until use

**Abbott Diagnostic Scarborough, Inc.**
10 Southgate Road
Scarborough, Maine 04074 USA
www.binaxnow-selftest.abbott

REF 195-160

© 2021 Abbott. All rights reserved. All trademarks referenced are trademarks of either the Abbott group of companies or their respective owners.

PK195160 Rev. 5  2021/12

This product has not been FDA cleared or approved; but has been authorized by FDA under an EUA.

This product has been authorized only for the detection of proteins from SARS-CoV-2, not for any other viruses or pathogen; and,

The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19 under Section 564(b)(1) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.§ 360bbb-3(b)(1), unless the declaration is terminated or authorization is revoked sooner.

REF 195-160
LOT 2023-04-27  184787

(01) 00811877011408
(17) 230427
(10) 184787
LJB 195160 Rev 2

Plaintiffs' Exhibit 157

# GAO@100

### U.S. GOVERNMENT ACCOUNTABILITY OFFICE
*A Century of Non-Partisan Fact-Based Work*

**441 G St. N.W.**
**Washington, DC  20548**

# Decision

**Matter of:**   Centers for Disease Control and Prevention—Applicability of
Congressional Review Act to Requirement for Persons to Wear Masks
While on Conveyances and at Transportation Hubs

**File:**   B-333501

**Date:**   December 14, 2021

---

**DIGEST**

On February 3, 2021, the Centers for Disease Control and Prevention (CDC)
published a document in the Federal Register entitled *Requirement for Persons to
Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025
(Mask Requirement).  Under the CDC's Mask Requirement all persons using public
conveyances such as planes, trains, and buses must wear facial coverings while on
the conveyance and at transportation hubs such as airports and bus stations. CDC
did not submit a CRA report to Congress or the Comptroller General on the Mask
Requirement.

The Congressional Review Act (CRA) requires that before a rule can take effect, an
agency must submit the rule to both the House of Representatives and the Senate
as well as the Comptroller General, and provides procedures for congressional
review where Congress may disapprove of rules.  We conclude that the Mask
Requirement meets the definition of a rule for purposes of CRA and, therefore, is
subject to CRA's requirements for submission and congressional review.  With this
decision, we are not taking a position on the policy of imposing a mask requirement
or what steps the agency or Congress may take next; our decision only addresses
CDC's compliance with CRA's procedures for congressional review.

---

**DECISION**

The Centers for Disease Control and Prevention (CDC), a component of the U.S.
Department of Health and Human Services (HHS), issued a document entitled
*Requirement for Persons to Wear Masks While on Conveyances and at
Transportation Hubs*, 86 Fed. Reg. 8025 (Mask Requirement) that was published in
the Federal Register on February 3, 2021.  Senator Rand Paul, M.D., subsequently
requested our legal decision as to whether the Mask Requirement is a rule for
purposes of the Congressional Review Act (CRA).  Letter from Senator Rand Paul,

M.D., to Comptroller General (Aug. 9, 2021).  ==For the reasons explained below, we conclude that it is.==

Our practice when rendering decisions is to contact the relevant agencies to obtain their legal views on the subject of the request.  GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* https://www.gao.gov/products/gao-06-1064sp.  Accordingly, we reached out to HHS to obtain the agency's legal views.  Letter from Managing Associate General Counsel, GAO, to Acting General Counsel, HHS (Aug. 12, 2021).  We received HHS's response on September 28, 2021.  Letter from Acting General Counsel, HHS, to Managing Associate General Counsel, GAO (Sept. 28, 2021) (Response Letter).

BACKGROUND

CDC Mask Requirement

On January 31, 2020, in response to confirmed cases of Novel Coronavirus Disease 2019 (COVID-19), the Secretary of HHS declared a public health emergency under the Public Health Service Act.[1]  The Secretary has renewed that declaration, most recently on October 15, 2021.[2]  Subsequently, the President declared that the COVID-19 outbreak constitutes a national emergency under the National Emergencies Act.  Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020).  The national emergency declaration was continued on February 24, 2021.  86 Fed. Reg. 11,599 (Feb. 26, 2021).

On January 29, 2021, CDC issued the Mask Requirement pursuant to its regulatory authorities under the Public Service Health Act with an effective date of February 1, 2021.[3]  Mask Requirement, at 8025-26.  It was published in the Federal Register on February 3, 2021.

---

[1] HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited Oct. 26, 2021).

[2] HHS, *Public Health Emergency Declarations*, *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx (last visited Nov. 2, 2021).

[3] Regulations implementing the Public Health Service Act empower CDC to take measures to prevent the introduction or spread of communicable diseases.  42 U.S.C. § 264; 42 C.F.R. §§ 70.2, 71.31, 71.32.  Actions CDC can take include inspection, fumigation, disinfection, sanitation, and pest extermination, among others.  42 C.F.R. §§ 70.2, 71.31, 71.32.

B-333501

The Mask Requirement states that masks help prevent the spread of COVID-19. Mask Requirement at 8028.  The stated intent of the Mask Requirement is to preserve human life; maintain a safe and secure operating transportation system; mitigate further introduction, transmission, and spread of COVID–19 into and within the United States; and support response efforts.  *Id.* at 8027 (statement of intent).

Under the Mask Requirement, a person must wear a mask while boarding, disembarking, and traveling on any conveyance (such as an aircraft, train, road vehicle, or vessel) into or within the United States.  *Id.* at 8026, 8029.  A person also must wear a mask while at a transportation hub (such as an airport, bus terminal, port, or subway station) that provides transportation within the United States.  *Id*.  It also requires conveyance operators to only provide service to masked passengers and to use best efforts to ensure passengers stay masked during the entire trip.  *Id* at 8029.

The Mask Requirement provides several exemptions based on the characteristics of a passenger or the travel scenario.  *Id.* at 8027-28.  For instance, passengers under the age of two are exempt, as is travel by private conveyance for personal, non-commercial use.  *Id.* at 8027, 8029.  Other federal agencies are required to take additional steps to enforce the Mask Requirement.  *Id.* at 8028, 8030.  The Mask Requirement will remain in effect until rescinded by CDC or the public health emergency is ended by the Secretary of HHS.  *Id.* at 8026.

Congressional Review Act

CRA, enacted in 1996 to strengthen congressional oversight of agency rulemaking, requires federal agencies to submit a report on each new rule to both Houses of Congress and to the Comptroller General for review before a rule can take effect. 5 U.S.C. § 801(a)(1)(A).  The report must contain a copy of the rule, "a concise general statement relating to the rule," and the rule's proposed effective date.  *Id*. Each House of Congress is to provide the report on the rule to the chairman and ranking member of each standing committee with jurisdiction.  5 U.S.C. § 801(a)(1)(C).  The CRA allows Congress to review and disapprove rules issued by federal agencies for a period of 60 days using special procedures.  5 U.S.C. § 802. If a resolution of disapproval is enacted, then the new rule has no force or effect.  *Id*.

CRA adopts the definition of rule under the Administrative Procedure Act (APA), 5 U.S.C. § 551(4), which states that a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. § 804(3).  CRA excludes three categories of rules from coverage: (1) rules of particular applicability; (2) rules relating to agency management or personnel; and (3) rules of agency organization, procedure, or practice that do not substantially affect the rights or obligations of non-agency parties.  *Id*.

CDC did not submit a CRA report to Congress or the Comptroller General on the Mask Requirement. In its response to us, CDC stated the Mask Requirement was not subject to the CRA because it was an emergency action under CDC's regulatory authorities and that any delays could result in serious harms. Response Letter, at 1.

DISCUSSION

The issue here is whether the CDC Mask Requirement is a rule under CRA. Applying the statutory framework of CRA, we first address whether the Mask Requirement meets the definition of a rule under APA. We conclude that it does. Second, we address whether any of the CRA exceptions apply. We conclude they do not. Therefore, we conclude the Mask Requirement is a rule for purposes of CRA.

CDC considers the Mask Requirement to be an order issued under its regulatory authorities implementing the Public Health Service Act. *See* Response Letter, at 1-2 ("[t]he mask order is an emergency action taken under 42 C.F.R. §§ 70.2, 71.31(b), and 71.32(b) . . . implementing regulations of 42 U.S.C. § 264"). Although an agency's characterization should be considered in deciding whether its action is a rule under the APA definition (and whether, for example, it is subject to notice and comment rulemaking requirements), "[an] agency's own label . . . [is] not dispositive." *Chamber of Commerce of the U.S. v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980); B-329272, Oct. 19, 2017.

The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4). By contrast, the APA defines an order to be "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). As we have noted in our prior decisions, these two definitions make rules and orders mutually exclusive categories. *See* B-332233, Aug. 13, 2020, at 3.

Here the Mask Requirement meets the APA definition of a rule rather than an order. Regarding the first element of a rule, the Mask Requirement is an agency statement because it is an official document published in the Federal Register by CDC. Mask Requirement at 8025-26. It is of future effect, satisfying the second element, because the order states that it remains in place until rescinded or the public health emergency is terminated. *Id.* at 8026. Third, it implements and prescribes law or policy as it requires all travelers to wear a mask where previously they were not required to do so. *Id.* at 8028-29. Thus, the Mask Requirement falls within the APA's definition of rule.

Conversely, despite its label, the Mask Requirement is not an order for purposes of the APA because it is not the result of an adjudicatory process. *See Coalition for*

*Common Sense in Gov't Procurement v. Sec'y for Veterans Affairs*, 464 F.3d 1306, 1316-17 (Fed. Cir. 2006).  As noted previously, an order is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form."  5 U.S.C. § 551(6).  Thus, an order results from an adjudicatory process.  *See Coalition for Common Sense in Gov't Procurement*, 463 F.3d at 1316-17.  Here, the Mask Requirement was not the result of an adjudicatory process but a prospective requirement setting process.  In its response to us, CDC described its process for drafting the Mask Requirement.  "[It] was drafted and cleared by the CDC program (Division of Global Migration and Quarantine), Center (National Center for Emerging and Zoonotic Infectious Diseases), and CDC's Office of the Director before it was provided to HHS for Departmental review.  Following HHS review and clearance, it was provided to OMB."  Response Letter at 2.  This is a process used to draft rules, not an adjudicatory proceeding.

In support of its position that the agency action here is an order not a rule, CDC asserted that its long-standing regulations permit it to act quickly to prevent the spread of communicable diseases and any delay in issuance of the Mask Requirement "could result in serious harm."  Response Letter, at 1.  CDC further stated that the order was an emergency action and requiring the order to go through notice and comment before taking effect "would exacerbate the substantial harm that the order was intended to mitigate."  *Id*.

While CRA does not provide an emergency exception from its procedural requirements to submit rules for congressional review, CRA and APA address an agency's need to take emergency action without delay.  Agencies can waive the required delay in effective date requirement when an agency for "good cause" finds (and incorporates the finding and a brief statement of reasons in the rule issued) that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C §§ 553(b), 808(2).  Therefore, an agency can provide for a rule to take effect immediately while still complying with the agency's statutory obligation to submit the rule to Congress for review.[4]

==Having determined the Mask Requirement meets the definition of a rule, we must determine if any of the CRA exceptions apply.  We conclude they do not.==  First, it is not a rule of particular applicability as it applies to all travelers using public conveyances and is not limited to specific parties.  Mask Requirement, at 8028-29.  Second, it does not deal with agency management or personnel but with travelers and conveyance operators.  *Id*. at 8026.  Finally, it is not a rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties as it imposes new requirements on people who are traveling to wear masks while in transit and at transportation hubs. *Id*. at 8028-

---

[4] Over the course of the COVID-19 public health emergency, several agencies have submitted rules for congressional review while waiving the delay in effective date by invoking CRA's good cause exception.  *See, e.g.,* B-333486, Aug. 10, 2021; B-333381, Jul. 9, 2021; B-332918, Feb. 5, 2021.

29.  It also requires operators to only provide service to masked passengers.  *Id*. Thus, no exception applies.

CONCLUSION

The Mask Requirement is a rule for purposes of CRA because it meets the APA definition of a rule and no CRA exception applies. Accordingly, before it can take effect, the Mask Requirement is subject to the requirement that it be submitted to both Houses of Congress and the Comptroller General for review, which provides Congress a period of 60 days in which it may disapprove the rule using special procedures in accordance with the CRA.  While CDC asserted the need to act quickly as its justification for not submitting the Mask Requirement for congressional review, there is not an emergency exception under CRA.  An agency may, however, invoke the CRA's good cause exception and provide for a rule to take effect immediately while still complying with the agency's statutory obligation to submit the rule to Congress for review.  With this decision, we are not taking a position on the policy of imposing a mask requirement or what steps the agency or Congress may take next; our decision only addresses CDC's compliance with CRA's procedures for congressional review.

Edda Emmanuelli Perez
General Counsel

Plaintiffs' Exhibit 158



Congressional
Research Service
Informing the legislative debate since 1914

# Airline Passenger Rights: The Federal Role in Aviation Consumer Protection

**Rachel Y. Tang**
Analyst in Transportation and Industry

August 17, 2016

**Congressional Research Service**
7-5700
www.crs.gov
R43078

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

The 1978 deregulation of the airline industry in the United States eliminated federal control over many airline business practices, including pricing and domestic route selection. However, the federal government continues to legislate and enforce certain consumer protections for airline passengers. Congress largely determines the degree to which the rights of airline passengers are codified in law or developed through regulatory rulemaking.

The House Committee on Transportation and Infrastructure and the Senate Committee on Commerce, Science, and Transportation are the primary congressional committees of jurisdiction over airline passenger rights. Congress can authorize or require the U.S. Department of Transportation (DOT) to enact rules on certain issues, and it can enact requirements for airlines through direct legislation. In specific cases, DOT may take enforcement actions against air carriers that violate consumer protection rules.

Most of DOT's consumer rules are based on 49 U.S.C. §41712, which directs it to "protect consumers from unfair or deceptive practices." Some are based on DOT's authority to require air carriers in interstate transportation to provide "safe and adequate service" (49 U.S.C. §41702). The interpretation of the phrase "unfair or deceptive" can significantly affect the scope of DOT's enforcement authority.

In December 2009, DOT issued a comprehensive final rule, "Enhancing Airline Passenger Protections," that expanded regulatory protections for aviation consumers. The rule established procedures related to extended ground delays involving aircraft with passengers aboard, required air carriers to address chronically delayed flights, and mandated more information disclosure to consumers. In April 2011, DOT completed a further rulemaking that strengthened the rights of air travelers in the event of oversales, flight cancellations, and delays. The rule also required consumer access to accurate and adequate information when selecting flights, and improvements in agency responsiveness to customer complaints. A key provision of the 2011 rules, requiring airlines to prominently disclose to the consumer the total cost of a flight, including all government and airline taxes and fees, was upheld in the federal courts.

The FAA Extension, Safety, and Security Act of 2016 (P.L. 114-190), signed into law by the President on July 15, 2016, included a few provisions regarding the rights of airline passengers and created a firmer statutory basis for certain rules already adopted by DOT. However, the legislation did not address a number of consumer-related subjects, including disclosure of code-share arrangements on domestic flights, compensation of passengers "bumped" from oversold flights, and disclosure of ancillary fees. Proposals to overturn a DOT policy requiring that airline and travel websites give most prominent display to the total cost of a flight, including taxes and fees, were not included in the act. Such action would have allowed airlines to advertise base airfares, even though consumers would not be able to purchase transportation at those prices.

# Contents

Introduction ............................................................................................................................. 1

Three Levels of Airline Passenger Protection ......................................................................... 1

    The Role of Congress ......................................................................................................... 1

    The Role of the U.S. Department of Transportation (DOT) ............................................... 2

        DOT Regulatory Authority ............................................................................................ 2

        DOT Enforcement Authority ......................................................................................... 3

    Airline Deregulation and Contracts of Carriage ................................................................ 4

Major Passenger Air Service Provisions in 2016 FAA Reauthorization .................................. 5

    Training Policies Regarding Assistance for Persons with Disabilities ............................... 5

    Air Travel Accessibility ..................................................................................................... 5

    Refunds for Delayed Baggage ............................................................................................ 6

    Tarmac Delays .................................................................................................................... 6

    Family Seating .................................................................................................................... 6

    Advisory Committee for Aviation Consumer Protection .................................................... 6

Consumer Complaints to DOT ............................................................................................... 7

DOT Regulatory Actions ........................................................................................................ 8

Ongoing Airline Passenger Consumer Issues ........................................................................ 10

    Code-Share Agreements ................................................................................................... 10

    Oversale/Overbooking ...................................................................................................... 11

    Ancillary Fees and Disclosure of Full Fares ..................................................................... 11

## Figures

Figure 1. Number of Airline Consumer Complaints Filed with DOT ........................................ 7

## Contacts

Author Contact Information ................................................................................................... 12

# Introduction

The deregulation of the airline industry in the United States in 1978 eliminated governmental control over most business practices of airlines. However, the federal government continues to regulate certain practices for the protection of the airlines' customers, in addition to its long-standing role in overseeing air safety.

Congressional interest in the rights of airline passengers became intense between 2007 and 2009, when a series of delays stranded passengers aboard airplanes at U.S. airports for 10 hours or longer. Since then, Congress has strengthened passengers' rights under federal law, and many Members of Congress have continued to follow aviation consumer issues closely.

This report examines aviation consumer protections in the post-deregulation era. It explains the roles of Congress and the U.S. Department of Transportation (DOT) in protecting airline consumers, and discusses some major passenger rights issues and related laws and regulations.

# Three Levels of Airline Passenger Protection

The rights of domestic airline passengers are set forth at three different levels: in federal laws, in regulations, and in the airlines' own policies. Congress, under its constitutional power to "regulate Commerce with foreign Nations, and among the several States,"[1] has authority over airline passengers' rights. State and local governments are generally preempted by law from regulating "price, route, or service of an air carrier."[2]

## The Role of Congress

By and large, the rights of airline passengers are defined by Congress. Congress determines the extent to which airline consumer rights are codified in law, authorizes federal agencies to enforce those rights, and directs or authorizes federal agencies to define and enforce passenger rights that are not specifically enumerated in legislation. The House Committee on Transportation and Infrastructure and the Senate Committee on Commerce, Science, and Transportation are the primary congressional committees of jurisdiction, and exercise routine oversight over DOT, the principal department responsible for executing and enforcing airline passenger rights laws. In many cases, Members of Congress become aware of passenger rights issues by receiving complaints from constituents, and congressional office staff members are often called upon to advise constituents about their rights as air passengers, to provide guidance on filing complaints with DOT, and to communicate with DOT about constituent concerns.

The controversy surrounding tarmac delays illustrates the ways in which Congress exercises its oversight authority. Between 2007 and 2009, hundreds of incidents occurred in which passengers were held aboard planes that had either departed airport gates but were not allowed to take off or had landed but were not allowed to disembark passengers. These incidents were extensively reported in the news media, and congressional offices received numerous complaints from

---

[1] U.S. Constitution, Article I, Section 8.

[2] 49 U.S.C. §41713(b) (1). Consumers may sue airlines for damages or breach of contract in a state or local court, but state or local consumer protection laws generally do not apply to air carriers. In one recent case, a federal court dismissed a lawsuit filed in a New York state court by passengers who claimed to have been stranded for more than seven hours aboard JetBlue flights on October 29, 2011, under "inhumane and intolerable" conditions. The court ruled that all the claims were preempted by federal law. *Joseph v. JetBlue*, No. 5:11-CV-1387 (TJM/ATB), April 11, 2012.

constituents who had been aboard planes that were unable to provide passengers with drinking water or on which lavatories stopped functioning. Congressional hearings ensued in 2009.[3] In the wake of this attention, DOT issued rules on tarmac delays in 2010. Language on this subject, providing a firmer statutory footing for the federal rules that had already entered into effect, was incorporated into the FAA Modernization and Reform Act of 2012 (P.L. 112-95). The 2016 FAA reauthorization incorporated language that defined excessive tarmac delays, but also altered how the tarmac delay threshold is measured, which could afford airlines more leeway in dealing with delayed flights.

Some Members of Congress also have expressed concern about issues related to flight schedules, aircraft capacity, and frequency of service. Although these matters are no longer subject to federal regulation, they are often raised in the context of business dealings between air carriers that do require federal approval, such as mergers and code-share arrangements. For example, the proposed merger between American Airlines and US Airways led to objections that the combination would reduce competition and limit consumer choices. These concerns were expressed by some Members of Congress and witnesses during congressional hearings in February and March 2013,[4] before completion of the merger in December 2013 and the final court approval of a settlement between the airlines and the U.S. Department of Justice Antitrust Division was granted in April 2014.

## The Role of the U.S. Department of Transportation (DOT)

### DOT Regulatory Authority

DOT is responsible for executing and enforcing airline consumer rights laws established by Congress. It may also develop regulations based on more general statutory authority, giving it broad powers to prescribe regulations, standards, and procedures related to air travel.[5] More specifically, DOT has authority "under 49 U.S.C. Section 41712, in concert with 49 U.S.C. Sections 40101(a)(4), 40101(a)(9), and 41702 to protect consumers from unfair or deceptive practices and to ensure safe and adequate service in air transportation."[6] DOT's authority in this

---

[3] Congressional Testimony, Airline Delays and Consumer Issues; Committee: House Transportation and Infrastructure; Subcommittee: Aviation, May 20, 2009; Bill McGee, "Passenger rights debate on glide path to Congress," *USA Today*, September 30, 2009.

[4] House Committee on the Judiciary, Subcommittee on Regulatory Reform, Commercial, and Antitrust Law, hearing on "Competition and Bankruptcy in the Airline Industry: The Proposed Merger of American Airlines and US Airways," February 26, 2013; Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy, and Consumer Rights, hearing on "The American Airlines/US Airways Merger: Consolidation, Competition, and Consumers," March 19, 2013.

[5] 49 U.S.C. §40113.

[6] Department of Transportation, "Enhancing Airline Passenger Protections," 74 *Federal Register* 68982-69004, December 30, 2009. DOT may also issue passenger protection rules governing international flights to and from the United States, depending on practicality and within the bounds of international agreements and treaties. Liability issues, such as compensation for lost baggage and passenger injury on international flights, are generally covered by international agreements ratified by the United States, notably the Montreal Convention of 1999, rather than by U.S. laws or regulations. Itineraries between certain countries may be subject to the older Warsaw Convention. DOT consumer-protection regulations may not apply to flights between foreign points undertaken by U.S. carriers' code-share partners, even if the flight carries a U.S. airline's flight number. For example, a United Airlines passenger traveling from Newark, NJ, to Istanbul, Turkey, might be booked from Newark to Munich, Germany, aboard a United flight, and then from Munich to Istanbul aboard a flight operated with a United flight number by Lufthansa, a German carrier. In such a case, the flight between Munich and Istanbul would not be subject to U.S. regulations concerning tarmac delays, overbooking, and other consumer matters.

area is exercised by the Office of the Secretary, not by the Federal Aviation Administration (FAA), which is responsible for aviation safety. DOT does not have authority over matters related to aviation security and airport security screening, which are administered by the Transportation Security Administration (TSA), an agency of the Department of Homeland Security.

DOT's statutory authority is generally used as the basis for rulemaking. Occasionally, it is also used in direct enforcement actions. Most of DOT's consumer rules are based on the "unfair or deceptive practices" provision, with a few based on the "ensure safe and adequate service" provision. The definition and interpretation of the phrase "unfair or deceptive practices" can significantly affect the scope of DOT's rulemaking and enforcement authorities.

Separately, DOT enforces regulations to ensure that individuals with disabilities have nondiscriminatory access to the air transportation system, and that airlines do not subject passengers to unlawful discrimination on the basis of race, gender, religion, or national origin.[7]

The DOT Aviation Consumer Protection Division's booklet *Fly-Rights: A Consumer Guide to Air Travel* is published online. It covers a wide array of topics, from flight delays and cancellations to travel scams. It also provides information about DOT rules on consumer complaints.[8]

## DOT Enforcement Authority

The Office of the Assistant General Counsel for Aviation Enforcement and Proceedings in DOT (OAEP), including its Aviation Consumer Protection Division, monitors airline compliance, investigates reported violations of DOT regulations, and enforces rules and regulations. It may negotiate consent orders with air carriers and fine violators. In 2015, DOT issued 15 consent orders related to aviation consumer rule violations and assessed $2,435,000 in civil penalties.

OAEP considers a number of factors in determining the civil penalty it would seek in an enforcement proceeding, such as the harm caused by the violations, the alleged violator's compliance disposition, the alleged violator's financial condition and ability to pay, how long the violations continued, and the strength of the case.[9] Currently, air carriers are subject to a maximum civil penalty of $32,140 per violation, under 49 U.S.C. §46301 and 14 C.F.R. §383. Small businesses[10] or individuals are subject to a maximum penalty of $1,414. Notwithstanding this limit, small businesses and individuals are subject to higher maximum penalties for discrimination ($12,856 per violation) and for engaging in unfair or deceptive practices ($3,214 per violation).[11]

OAEP may look into possible violations based on complaints from individuals, groups, other government agencies, or its own staff members' observations and research. Usually, its first action is to send a letter to the air carrier, setting forth the complaint or issues involved and requesting a response. This gives the air carrier a chance to look into the matter and to resolve the complaint, deny the complaint, or provide an explanation. This may be the end of the process, but

---

[7] 14 C.F.R. §382.

[8] http://www.dot.gov/airconsumer/fly-rights.

[9] Office of Aviation Enforcement and Proceedings, DOT, "Answers to Frequently Asked Questions Concerning the Enforcement of the Final Rule on Enhancing Airline Passenger Protections," April 28, 2010, p. 2.

[10] A domestic or foreign air carrier is a small business if it provides air transportation only with small aircraft (i.e., aircraft with up to 60 seats/18,000-pound payload capacity). See 14 C.F.R. 399.73 Definition of small business for Regulatory Flexibility Act.

[11] 14 C.F.R. §383.2 (b). The penalty amounts were adjusted August 10, 2016; see *Federal Register*, Vol. 81, No. 154, pp. 52763-52766.

OAEP may issue a warning letter if it concludes violations occurred but were inadvertent or minor.

If OAEP believes enforcement action is appropriate, it would seek a civil penalty and consent order. A consent order typically relates the facts of the case to law and regulation, sets forth the penalty the violator has agreed to pay, and incorporates language ordering the air carrier to cease and desist from further violations. If the air carrier refuses to settle, the case may go to an enforcement hearing before a DOT administrative law judge.[12] DOT also may request injunctive relief from a federal district court, although this is unusual.

## Airline Deregulation and Contracts of Carriage

The third source of airline passengers' rights is each air carrier's "Contract of Carriage," the legal agreement between an airline and its ticket holders. Contracts of carriage typically define the rights, duties, and liabilities of parties to the contract. For example, United Airlines' contract of carriage lists 30 rules, covering matters from reservations and ticketing to cancellation and refund policies to medical ground transfer services.[13]

Before the age of electronic tickets, contracts of carriage were usually evidenced by standard terms and conditions printed on the reverse of paper tickets. Now, they are often available for download via airlines' websites or at an airline's ticketing facilities. Passengers may take legal action in federal courts based on the contracts.

Contracts of carriage replace the pre-deregulation-era-rules "tariffs" that were subject to approval by the Civil Aeronautics Board (CAB).[14] The CAB could take action against an air carrier that violated its approved tariffs. Since the economic deregulation of the domestic airline industry in 1978, the federal government no longer has control over airlines' prices or routes, and contracts of carriage are not subject to federal review or approval. However, a contract of carriage that conflicts with federal laws or regulations may not be enforceable by the airline.

With respect to passenger rights, the deregulated environment differs from the former regulated environment in two major ways. First, under regulation, the CAB had authority to approve carriers' proposed fares and even to set fares itself. The airlines' profitability was protected by this price setting and by barriers to the entry of new competitors. Airlines, for the most part, competed on service and frequency rather than price. Since deregulation, and especially with the advent of low-cost carriers, the primary means of competition has become price, not service.

In recent years airlines have "unbundled" their offerings, charging separately for services that once were included in the price of a ticket. Among these charges are fees for checked baggage, early/priority boarding, and seat change on a flight. Such ancillary fees have become major causes of consumer complaints.

Second, because the CAB used a cost-plus basis for approving fares, airlines could afford to maintain a significant amount of extra capacity, which made it relatively simple for them to deal with problems arising from flight delays or cancellations. Carriers' treatment of passengers booked on delayed or canceled flights is now a major cause of complaints (see **Text Box**).

---

[12] This is a simplified description of the process. Underlying this process is usually an ongoing process of negotiation between OAEP and the air carriers and OAEP and the complainants.

[13] https://www.united.com/web/format/pdf/Contract_of_Carriage.pdf, viewed on August 3, 2016.

[14] Pursuant to the Airline Deregulation Act of 1978, the CAB ceased operations on December 31, 1984.

---

### Clarification of "Rule 240" and Rerouting of Stranded Passengers

During the era of regulation, Tariff Rule 240 was the number commonly used in air carrier tariffs that stated the airline's rules on rerouting of passengers when a flight was canceled or delayed. Since airfares and routes were then regulated, airlines generally had comparable price structures. This made it easier for them to enter and/or honor interline agreements for rerouting passengers at times of service disruption. Although Tariff Rule 240 has often been referred to in the press as a "federal rule,"[15] it was not. Each airline's version of Tariff Rule 240 was written by the carrier itself, although it was subject to CAB approval.

Today, competing airlines' fares on a given route may differ, and the fares paid by passengers on any single plane may vary widely, depending upon the date of purchase, the passenger's ability to change flights without penalty, and other factors. Although some airlines maintain interline agreements with other carriers allowing passenger rebooking in the event of cancellation or delay, others, particularly "low-cost" carriers, may not have such agreements. An airline that cancels a flight may be unable to rebook its passengers aboard another carrier without significant costs, which it may be unwilling to incur.

Additionally, in a deregulated environment in which profitability is not guaranteed, market forces have led many airlines to reduce the number of seats they offer to improve load factors. According to DOT's Bureau of Transportation Statistics (BTS), air carriers' average load factor on domestic flights in 2015 was nearly 85%, meaning that many flights operated at or near capacity. The lack of spare capacity can make it difficult for carriers to accommodate passengers in the event of flight disruptions. Consequently, today's airline contracts of carriage are less likely to provide for rerouting of passengers on competing airlines' flights than was the case prior to deregulation.

---

# Major Passenger Air Service Provisions in 2016 FAA Reauthorization

The FAA Extension, Safety, and Security Act of 2016 (P.L. 114-190), signed into law on July 15, 2016, included a few provisions relating to passenger rights.[16] Some of the passenger-rights provisions put forth during the debate over FAA reauthorization were not included in the final bill, as similar protections had meanwhile been implemented through the DOT rulemaking process. Relevant passenger-rights provisions of P.L. 114-190 are summarized below.

## Training Policies Regarding Assistance for Persons with Disabilities

Section 2107 requires the Government Accountability Office to submit a report to Congress assessing air carrier personnel and contractor training programs regarding assistance to persons with disabilities, as well as reporting instances since 2005 in which DOT has requested an air carrier to take corrective action following a review of its training programs.

Section 2107 also requires DOT to disseminate to air carriers such best practices as it deems necessary to improve the reviewed training programs.

## Air Travel Accessibility

Section 2108 requires DOT, no later than one year from enactment of the law, to issue a supplemental notice of proposed rulemaking regarding accessibility-related matters such as pressurized oxygen in a tank, transport of service animals, and provision of accessible lavatories.

---

[15] *Wall Street Journal*, "Passenger Rights? What Passenger Rights?," March 28, 2013.

[16] P.L. 112-95, Title IV Air Service Improvements, Subtitle A—Passenger Air Service Improvements.

## Refunds for Delayed Baggage

Section 2305 requires DOT to issue a final rule requiring domestic and foreign airlines to provide a refund of a checked-bag fee if a bag is delayed 12 hours or longer on a domestic flight or 15 hours on an international flight.

The provision provides DOT latitude to expand the aforementioned window (up to 18 hours for domestic flights and up to 30 hours for international flights), if the Secretary decides that a shorter time frame is not feasible or would adversely affect consumers in certain cases.

## Tarmac Delays

Section 2308 amends 49 U.S.C. §42301, which addresses airline tarmac delays. It specifies that "excessive tarmac delay" means a delay that lasts more than three hours for an interstate flight or more than four hours for an international flight. The section directs DOT to issue regulations to implement the statute.

Language in Section 2308(a) alters how excessive tarmac delays are defined. Under existing DOT regulations (14 C.F.R. §259.4), excessive delay is measured from the time that passengers last have an opportunity to deplane, which could be well before an aircraft actually departs the gate to the point at which the air carrier permits passengers to deplane in the event of delay. The statutory change requires that delay be measured from the time the main aircraft door is closed in preparation for departure to the point at which the air carrier "shall begin to return the aircraft to a suitable disembarkation point." Depending upon the length of time required to move the aircraft from its position during the delay to a disembarkation point such as a gate at the terminal, the actual amount of delay permitted before passengers are allowed to disembark may be significantly greater than under the previous regulations.

In addition, the new legislation does not specify the maximum time an air carrier has to complete the deplaning of passengers after returning to a disembarkation point. This may require a change in the existing DOT rule, which simply requires that passengers be given the opportunity to deplane no later than the three-hour or four-hour point in a tarmac delay.

## Family Seating

Section 2309 requires DOT to review and, if appropriate, to establish a policy directing airlines to establish policies that would enable a child who is age 13 or under to be seated adjacent to an accompanying family member over age 13 "to the maximum extent practicable" at no additional cost.

This requirement would not apply when assignment to an adjacent seat would require an upgrade to another cabin class or a seat with extra legroom or seat pitch for which additional payment is normally required.

## Advisory Committee for Aviation Consumer Protection

Section 1102(j) extends the Advisory Committee for Aviation Consumer Protection through FY2017. This advisory committee was established by the Secretary of Transportation in 2012, fulfilling the requirement in the 2012 FAA reauthorization to establish a four-member committee

for aviation consumer protection to advise the Secretary in carrying out passenger service improvements.[17]

# Consumer Complaints to DOT

Despite the fact that the 15 largest U.S. airlines' on-time arrival rate was nearly 80% in calendar year 2015, flight delays and cancellations continue to be a prevalent passenger complaint to DOT. In 2015, there were about 6,433 such complaints in total, accounting for nearly 32% of all complaints.[18] Mishandled baggage, problems with reservations, ticketing, and boarding, customer service, and refunds are also among the most frequent complaints (see **Figure 1**).

**Figure 1. Number of Airline Consumer Complaints Filed with DOT**
2014-2015



**Source:** U.S. Department of Transportation, Air Travel Consumer Report (February 2016), p. 43.

**Note:** "Other" includes complaints regarding frequent flyer programs, smoking, cargo problems, airport facilities, security, etc.

While DOT continues to receive many complaints about mishandled baggage, improved tracking systems have helped U.S. air carriers reduce the proportion of bags that are lost or sent to the wrong destinations. In 2015, the U.S. carriers reported 4.04 mishandled bags per 1,000

---

[17] See http://www.gpo.gov/fdsys/pkg/FR-2012-06-13/html/2012-14456.htm.

[18] Flight-related problems are predominantly delays and cancellations, but also include any other deviations from schedule.

passengers, which was among the lowest annual rates of mishandled baggage since DOT first collected data on the subject in 1987.[19]

---

### How DOT Handles Aviation Consumer Complaints

When DOT receives a consumer complaint about an airline, it sends a copy to the airline and asks it to reply directly to the customer. If it is a complaint about a subject covered by DOT rules, DOT requires the airline to send DOT a copy of its response to the consumer, which DOT may evaluate to determine if the reply complies with DOT rules. A pattern of violations of a rule as reflected in complaints can lead to enforcement action. Even where no rule applies, if DOT determines an airline's practice, as reflected in complaints, to be deceptive, it may conduct an investigation, initiate a rulemaking, or commence enforcement action. This possibility gives airlines an incentive to monitor complaints made to DOT.

On the other hand, airlines often receive complaints directly from customers. The number of consumer complaints submitted directly to the air carriers is believed to be much higher than the number filed with DOT. However, airlines are not required by law to report consumer complaints to DOT, except those related to treatment of disabled passengers. The Air Carrier Access Act (49 U.S.C. §41705) prohibits discriminatory treatment of persons with disabilities in air transportation. The Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (P.L. 106-181) requires the Secretary of Transportation to "regularly review all complaints received by air carriers alleging discrimination on the basis of disability" and "report annually to Congress on the results of such review."

DOT's annual reports to Congress on disability-related air travel complaints are available on its website: http://www.transportation.gov/airconsumer/annual-report-disability-related-air-travel-complaints. In 2014, a total of 27,556 such disability-related complaints were submitted to DOT by airlines, of which 24,044 came from U.S. carriers.[20]

---

# DOT Regulatory Actions

Airline flight delays and cancellations were addressed in a final rule issued in December 2009 by DOT, "Enhancing Airline Passenger Protections."[21] The rule expanded on previous regulations to address tarmac delays and chronically delayed flights and to require greater information disclosure to consumers. While language in the FAA Extension, Safety, and Security Act of 2016 (P.L. 114-190) alters how tarmac delays are measured, the rest of the tarmac delay rule is unaffected by the statutory change.

The existing rule requires large U.S. carriers to provide assurance that they will not permit an aircraft to remain on the tarmac for more than three hours without providing passengers an opportunity to deplane. An air carrier's failure to comply subjects the carrier to civil penalties of up to $32,140 per passenger.[22] This final rule contains the following mandates:

- Each air carrier is required to develop and implement a contingency plan for lengthy tarmac delays.

- Each contingency plan must include an assurance that, for domestic flights, the air carrier will not allow a tarmac delay to exceed three hours unless the pilot-in-

---

[19] Data pertain to all U.S. airlines with at least 1% of total domestic scheduled-service passenger revenues, as determined by DOT's Bureau of Transportation Statistics (BTS). More information on rules, guidance, and other related issues regarding aviation baggage can be found on the DOT website: http://www.dot.gov/airconsumer/baggage. The lowest annual rate of mishandled baggage since 1987 was the 2012 rate of 3.09 mishandled bags per 1,000 passengers. In 2015, the rate of mishandled baggage was 4.04 mishandled bags per 1,000 passengers. See U.S. Department of Transportation, Air Travel Consumer Report (February 2016), p. 30.

[20] https://www.transportation.gov/airconsumer/2014-disability-related-complaints-overview.

[21] http://www.dot.gov/airconsumer/final-rule-enhancing-airline-passenger-protections.

[22] Ibid.

command determines there is a safety-related or security-related impediment to deplaning passengers, or unless air traffic control has advised the pilot-in-command that deplaning would significantly disrupt airport operations. The plan must include assurance that adequate food and water will be provided within two hours after the aircraft leaves the gate, as well as assurance of operable lavatory facilities and adequate medical attention.

- For international flights, air carriers must commit to a set number of on-tarmac hours to be determined by air carrier and set forth in its plan.[23]

The tarmac delay rule took effect for domestic flights in April 2010. There has been a significant reduction in lengthy tarmac delays since the rule was published. In 2014, airlines reported the lowest number of tarmac delays longer than three hours on record—30 domestic flights with tarmac delays longer than three hours and nine international flights with tarmac delays longer than four hours at U.S. airports.[24]

- The rule issued in December 2009 also contained several other consumer protection provisions: Air carriers must display flight delay information for each domestic flight they operate on their websites and designate employees to monitor the impacts of flight delays and cancellations, respond to consumer complaints, and tell consumers where and how to file complaints.

- Air carriers are prohibited from applying changes to their contracts of carriage retroactively.

- Under the rule, any chronically delayed flight[25] scheduled by an air carrier is considered an unfair and deceptive practice and an unfair method of competition within the meaning of 40 U.S.C. §41712.

On April 25, 2011, DOT issued a further rulemaking to strengthen the rights of air travelers in the event of oversales, flight cancellations, and delays; to ensure consumers have accurate and adequate information when selecting flights; and to improve responsiveness to customer complaints.[26] These rules, fully effective January 26, 2012, include the following:

- Baggage fees must be reimbursed for lost bags;

- Additional fees must be prominently disclosed on airline websites; and

- The ban on excessive tarmac delay is expanded to foreign airlines' operations at U.S. airports, with a four-hour limit on international flights.

---

[23] A year later, the ban on lengthy tarmac delays was expanded to foreign airlines' operations at U.S. airports, with a limit of four-hour delay set for international flights.

[24] DOT press release DOT 13-15, February 10, 2015. See http://www.rita.dot.gov/bts/press_releases/dot013_15. However, critics have argued that the rule may have caused more cancellations by air carriers, as cancelling a flight eliminates the risk that it might be delayed extensively after boarding.

[25] A chronically delayed flight is defined as any domestic flight that is operated at least 10 times a month, and arrives more than 30 minutes late (including canceled flights) more than 50% of the time during that month (http://www.gpo.gov/fdsys/pkg/CFR-2012-title14-vol4/pdf/CFR-2012-title14-vol4-sec399-81.pdf).

[26] http://www.dot.gov/airconsumer/rule-two-amendment-concerning-baggage-and-other-consumer-issues-pdf.

# Ongoing Airline Passenger Consumer Issues

## Code-Share Agreements[27]

Over the past few decades, large U.S. carriers (also known as mainline carriers) have increasingly moved to joint marketing agreements, known as "code-share agreements." In domestic code-share agreements, mainline carriers, such as Delta and American Airlines, purchase seat capacity from regional airlines or contract for the services of regional carriers to fly passengers to their hub airports. Such agreements often allow a regional carrier to (1) use the mainline carrier's airline designator code to identify flights and fares in computer reservation systems; (2) use the mainline carrier's brand—for example, logos and uniforms; and (3) participate in joint promotion and advertising activities.

It is also common for major U.S. carriers to establish international alliances with foreign carriers, which almost always include a code-share component, although in international code-share agreements there is no distinctive large or mainline carrier. The DOT code-share disclosure rule (14 C.F.R. §257) applies equally to domestic and international air transportation to and from the United States. It requires that U.S. airlines and foreign air carriers that participate in code-share agreements or long-term "wet leases" tell consumers clearly when the air transportation involves such an agreement, and that they disclose the transporting carrier's identity.[28]

DOT does not review most domestic code-share agreements,[29] but does require ticket sellers to disclose which airline is operating the flight prior to booking to ensure consumer transparency.[30] However, some confusion still appears to exist among passengers because airlines, travel agencies, and advertisers may disclose this information differently. In some cases, the name of the operating carrier may not be displayed prominently. Also, some regional carriers have code-share agreements with multiple mainline carriers and use different "doing business as" names when operating on different domestic routes.[31]

---

[27] More information on disclosure of code-share air service can be found on the DOT website, http://www.dot.gov/airconsumer/notice-codeshare.

[28] 14 C.F.R. §257.3 (e); long-term wet lease means a lease by which the lessor provides both an aircraft and crew dedicated to a particular route(s) for more than 60 days or is part of a series of such leases that amounts to a continuing arrangement lasting more than 60 days.

[29] Under 49 U.S.C. §41720, DOT's Office of the Secretary (OST) must review any agreement "between two or more major air carriers that affects more than 15 percent of the total number of available seat miles offered by the major air carriers." OST is required to assess the potential economic impact on competition of domestic code-share agreements between major carriers. An international code-share agreement, on the other hand, needs DOT approval. For more information, see https://www.transportation.gov/policy/aviation-policy/competition-data-analysis/alliance-codeshares.

[30] In 2011, DOT added a new subsection (c) to 49 U.S.C. §41712 that specifically requires airlines and ticket agents to disclose in any oral, written, or electronic communication to the public, prior to a ticket sale, the name of the carrier providing the service of each segment of a passenger's itinerary. In addition, the amendment explicitly requires that on websites, disclosure must be made "on the first display of the Web site following a search of a requested itinerary in a format that is easily visible to a viewer." Office of the Secretary, DOT, "Guidance on Disclosure of Code-Share Service Under Recent Amendments to 49 U.S.C. §41712," January 14, 2011 (http://www.dot.gov/airconsumer/notice-codeshare).

[31] Office of Inspector General, U.S. Department of Transportation, "Growth of Domestic Airline Code Sharing Warrants Increased Attention," report AV-2013-045, February 14, 2013, p. 4.

## Oversale/Overbooking[32]

Most airlines overbook their scheduled flights to a certain degree to compensate for "no-shows." Such oversale or overbooking is not illegal. When a flight is oversold, DOT requires airlines to ask passengers to give up their seats voluntarily (voluntary bumping), in exchange for compensation, before bumping anyone involuntarily.

A DOT rule (14 C.F.R. §250) requires airlines to properly inform and compensate passengers who are bumped involuntarily. Air carriers are required to establish and disclose boarding priority rules and criteria for determining which passengers shall be denied boarding on an oversold flight. Boarding priority criteria may include factors such as a passenger's time of check-in, the fare paid, and passenger's frequent flyer status.[33]

In April 2011, DOT issued an amended final rule to address issues regarding denied boarding or involuntary bumping compensation, especially inadequate denied boarding compensation to passengers. The amendment increased denied boarding compensation rates and dollar limits, with dollar limits subject to inflation-related adjustment every two years. When a passenger is bumped involuntarily and the airline arranges substitute transportation that is scheduled to reach the passenger's final destination within one hour of the original arrival time, no compensation is required. However, if the scheduled arrival time via substitute transportation[34] is more than one hour later than the original arrival time, the following rules apply:

- If the substitute domestic transportation arranged by the airlines is scheduled to arrive between one and two hours later than the original arrival time, the airline must pay the passenger an amount equal to 200% of the one-way fare (including all taxes and mandatory fees), with a $675 maximum, effective August 25, 2015.[35] On international flights departing the United States, this limit applies when a bumped passenger is delayed up to four hours.

- If the substitute transportation is scheduled to arrive more than two hours later on domestic flights (four hours on international flights), or if the airline does not make any substitute transportation arrangements for the passenger, the compensation doubles to 400% of the one-way fare, with a $1,350 maximum, effective August 25, 2015.[36]

- An air carrier must refund any unused ancillary fees for optional services paid by a passenger if he or she was denied boarding, voluntarily or involuntarily.

## Ancillary Fees and Disclosure of Full Fares[37]

Many U.S. air carriers have held down ticket prices by advertising cheap base airfares and adding separate optional fees for services that traditionally have been included in the price of a ticket. These ancillary charges, including checked baggage fees, reservation cancellation or change fees,

---

[32] More information on oversales can be found at http://www.dot.gov/airconsumer/oversales.

[33] http://www.ecfr.gov/cgi-bin/text-idx?SID=54358562bcfe8b187765c7395f37bc33&mc=true&node=se14.4.250_13&rgn=div8.

[34] Substitute transportation may involve flights by the same or another carrier or transportation by train or bus.

[35] http://www.transportation.gov/sites/dot.gov/files/docs/Inflation_2015.pdf.

[36] Ibid.

[37] More information on this topic can be found on DOT websites, http://www.dot.gov/airconsumer/advertising and http://www.dot.gov/airconsumer/baggage-optional-fees.

seat selection fees, priority boarding fees, and charges for in-flight meals, are generating considerable revenue. In 2015, the U.S. passenger airline industry collected more than $3.8 billion in baggage fees[38] and over $3 billion in reservation cancellation/change fees.[39]

In order to make it easier for consumers to know how much they will have to pay for airline transportation and to ensure that airlines' fee-related practices are fair and transparent, the DOT rule issued in 2011 requires that an airline's most prominently advertised airfare must be the full cost of the ticket, with government taxes, mandatory fees, and optional surcharges included. For both domestic and international markets, carriers must disclose the full price to be paid, including government taxes and fees and any carrier surcharges, in their advertising, on their websites, and on the passenger's e-ticket confirmation. In addition, carriers must disclose all fees for optional services through a prominent link on their home pages, and must include information on e-ticket confirmations about the free baggage allowance and applicable fees for the first and second checked bags and carry-on bags. Airlines must refund charges for lost bags.

Spirit Airlines, Allegiant Air, and Southwest Airlines challenged in federal court that portion of DOT's April 2011 rule that requires airlines and ticket agents to most prominently display the total cost of a ticket, including taxes, when advertising airfares. In July 2012, the U.S. Court of Appeals for the Washington, DC, circuit rejected the airlines' contention that the rule violates their rights to engage in commercial and political speech and is an effort by the government to conceal taxes in airfares.[40] The airlines subsequently appealed to the U.S. Supreme Court, which, on April 1, 2013, refused to consider their challenge and left the rule intact.

On July 28, 2014, the House of Representatives passed the Transparent Airfares Act of 2014 (H.R. 4156, 113th Congress) by a voice vote. The bill would have allowed airlines' advertisements and websites to give greatest prominence to "base airfare," as long as they "clearly and separately" disclose government taxes and fees and the total cost of air transportation. While the bill would have enabled airlines to call greater attention to the many government taxes and fees on passenger aviation, it could have made price comparisons more difficult, as some advertisements or websites might have displayed the "base airfare" most prominently while others might have advertised the after-tax price. The Senate did not act on the legislation.

The FAA Extension, Safety, and Security Act of 2016 (P.L. 114-190), signed into law on July 15, 2016, did not address disclosure of ancillary fees.

## Author Contact Information

Rachel Y. Tang
Analyst in Transportation and Industry
rtang@crs.loc.gov, 7-7875

---

[38] ttp://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/subject_areas/airline_information/baggage_fees/html/2015.html.

[39] http://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/subject_areas/airline_information/ reservation_cancellation_change_fees/html/2015.html.

[40] *Spirit Airlines v. U.S. DOT*, 402 U.S. App. D.C. 70, July 24, 2012.

Plaintiffs' Exhibit 159

# G A O
**Accountability ∗ Integrity ∗ Reliability**

United States General Accounting Office
Washington, DC 20548

Resources, Community, and
Economic Development Division

B-283477

September 10, 1999

The Honorable Ron Wyden
United States Senate

Subject: Aviation: Comparison of Airline "Customer Service Commitment" With Contracts of Carriage and Federal Law

Dear Senator Wyden:

Airlines transport their passengers in accordance with various terms and conditions as well as federal statutes and regulations. These terms and conditions are referred to as conditions of contracts or more commonly as contracts of carriage. A contract of carriage is the agreement between the passenger and the airline that encompasses all contractual rights, liabilities, and duties of the two parties. For example, contracts of carriage include such provisions as airline liability limits for lost baggage and passenger entitlements when flights are delayed or canceled. Any term or condition of this contract is legally binding on the airline and the passenger and may be enforced in state court.[1] Federal regulations[2] require that airlines retain a copy of their contracts of carriage at each of their ticket offices for review by passengers requesting to do so.[3]

In addition to being able to sue an airline for breach of contract, a passenger could file a complaint with the Department of Transportation (DOT) alleging that an airline has violated a federal statute or regulation. For example, a passenger could claim that an airline engaged in an unfair or deceptive practice. As a result of such a complaint, DOT could bring an enforcement action against the airline.

In June 1999, the Air Transport Association[4] (ATA), responding to Congress's interest in ensuring that airlines make every effort to provide passengers with the best service available, announced its "Customer Service Commitment." The Commitment, developed in consultation with congressional leaders and DOT, consisted of several general measures designed to improve customer service. According to ATA officials, each of its member airlines will develop detailed customer service plans on the basis of the ATA proposal by September 15, 1999, and implement them by December 15, 1999.

---

[1] American Airlines v. Wolens, 513 U.S. 219 (1995).
[2] 14 C.F.R. § 253.4.
[3] The full text of contracts of carriage for the airlines we reviewed varied from 25 to 45 pages and can be obtained from an airline upon written request to the airline's headquarters.
[4] The Association is a trade organization representing the principal U.S. airlines.

*167758* GAO/RCED-99-281R Customer Service Plans

B-283477

You requested that we compare the airlines' existing contracts of carriage with ATA's
Customer Service Commitment. We performed this comparison for the 10 major U.S.
passenger airlines. We also compared the airlines' contracts of carriage and the Customer
Service Commitment with the federal statutes and regulations to determine what provisions,
if any, are required by statutes or regulations.

## Summary of Comparisons

ATA's Customer Service Commitment extends the airlines' commitment beyond the current
contracts of carriage by either adding new provisions or augmenting existing terms.  The
Customer Service Commitment includes new provisions concerning reservations; offering the
lowest fare available over the telephone, refunds, and on-time baggage delivery; meeting
customers' needs during on-aircraft extended delays; and handling customer complaints.  For
example, airlines are to allow passengers to hold a reservation for 24 hours or cancel a
reservation within 24 hours without penalty.

Several other measures in the Customer Service Commitment (notifying customers about
known delays, cancellations, and diversions; petitioning DOT for an increase in the minimum
baggage liability limits; disclosing information on various airline policies; and ensuring
customer service for code-share partners[5]) augment terms provided for in the contracts of
carriage.  The remaining measures (accommodating special needs passengers and fairly
handling "bumped" passengers) are currently included in the contracts of carriage.
Enclosure I summarizes our comparison of the measures contained in the Customer Service
Commitment.

The officials at the 10 major airlines that we contacted[6] indicated that they were considering
revisions to their contracts of carriage to reflect at least some aspects of their customer
service plans.  However, these officials said that the decision about what specific changes to
make would involve a side-by-side comparison of their current contracts of carriage and their
final customer service plan.  Because the plans are still being developed, the officials could
not say to what extent the contracts would be revised.  One airline official, however, did say
that the minimum baggage liability limit would certainly be changed to reflect the anticipated
regulatory change in the baggage liability minimum.[7]  Most of these officials believed that any
revisions to their airline's contracts of carriage would be made by the end of 1999.

Federal statutes and regulations have a significant impact on a number of the measures in the
Customer Service Commitment, such as the following:  providing baggage liability, providing
prompt ticket refunds, accommodating special needs passengers, handling bumped
passengers, notifying customers about aircraft changes and aircraft type and configuration,
and ensuring customer service from an airline's code-sharing partners.  Several of these
measures (fairly handling bumped passengers, ensuring customer service from an airline's
code-sharing partners, providing prompt ticket refunds, accommodating special needs

---

[5]Code-sharing allows an airline to sell seats on another airline's airplanes, as if they were its own.  This enables the airlines that
have partnered to expand their route networks without adding any airplanes.

[6]The 10 major passenger airlines, each with more than a billion dollars in annual revenues, are Alaska, American, America West,
Continental, Delta, Northwest, Southwest, Trans World, United, and U.S. Airways.

[7]DOT has proposed that the minimum baggage liability be increased from $1,250 to $2,500, 64 Fed. Reg. 34592, June 28, 1999.

B-283477

passengers, and providing passengers with information on airline policies and aircraft configuration) reflect what is in the statutes and regulations.

In addition, the Customer Service Commitment seeks to change the current minimum baggage liability limit regulation. In June of 1999, DOT issued a supplemental notice proposing to raise the minimum baggage liability limit from $1,250 to $2,500. DOT has yet to finalize this proposed rule. One of the ATA measures calls for airline officials to petition DOT to increase its minimum baggage liability limit.

DOT officials said that under federal law, DOT could bring an enforcement action against an airline that engages in what it considers an unfair and deceptive trade practice.[8] As examples of unfair and deceptive trade practices, DOT cited an airline's failure to (1) follow through on promises that would be made in an airline's customer service plan; (2) provide the lowest fare available over the telephone to a passenger who requests it; (3) adhere to promised flight schedules that have been changed as a result of flight cancellations due to economic considerations; and (4) provide passengers with cash refunds within 20 days of receiving complete claim information.

## Scope and Methodology

We interviewed ATA officials to better understand the context in which the Customer Service Commitment was developed. We also interviewed officials from the 10 major passenger airlines to determine if they intended to incorporate their customer service plans into their contracts of carriage. We did not determine the extent to which existing contracts of carriage reflect actual airline practices. In addition, we interviewed DOT officials to determine the Department's interpretation of the pertinent federal statutes and regulations. However, we did not review all federal involvement in airline operations such as DOT enforcement decisions and federal law outside of DOT's and the Federal Aviation Administration's statutes and regulations.

We discussed the information in this report with DOT and ATA officials. They provided technical corrections, which we incorporated into the report as appropriate.

Our work was performed from July through August 1999 in accordance with generally accepted government auditing standards.

- - - - -

We are sending copies of this report to the Honorable Rodney E. Slater, Secretary of Transportation; appropriate congressional committees; and other interested parties. We will make copies available to others upon request.

---

[8]49 U.S.C. § 41712.

B-283477

If you have any further questions, please contact me at (202) 512-3650. Major contributors to this report were David Hooper, Paul Lacey, Richard Scott, and Robert White.

Sincerely yours,

Gerald L. Dillingham
Associate Director,
 Transportation Issues

Enclosure I

## Comparison of Customer Service Commitment
## With Contracts of Carriage and Federal Law

Each airline has its own contract of carriage, which sets out the terms and conditions of
the agreement between the passenger and the airline when a passenger purchases an
airline ticket.  Because of the similarity among the contracts, we have summarized them
and indicate major differences in the notes to table I.1.

Table I.1:  Comparison of Customer Service Commitment With Airlines' DomesticContracts of
Carriage and Pertinent Federal Statutes and Regulations

| Customer Service Commitment | Airlines' domestic contracts of carriage | Pertinent federal statutes and regulations |
|---|---|---|
| The lowest fare that a customer is entitled to will be offered through the telephone reservations system. | Service not addressed.[a] | According to DOT officials, it would be an unfair and deceptive trade practice under 49 U.S.C. § 41712 for an airline to provide other than the lowest fare available by telephone to a customer if requested to do so. |
| Customers will be informed about delays, cancellations, and diversions in a timely manner. | Service not addressed. | According to DOT officials, it would be an unfair and deceptive trade practice under 49 U.S.C. § 41712 for an airline to inform passengers that cancellations were due to weather, mechanical reasons, etc., when, in fact, the cancellations were due to economic reasons. |
| Clear and concise policies regarding accommodations for passengers delayed overnight will be established and made available to them. | The airlines will provide amenities (including overnight accommodations) for passengers whose flight has been diverted to an unscheduled point.  Hotel accommodations are provided if the delay exceeds 4 hours during the period of 10 p.m. to 6 a.m.[b] | Service not addressed. |
| Every reasonable effort will be made to return checked baggage to passengers within 24 hours and to contact any passenger whose unclaimed checked luggage contains a name and address or telephone number. | Service not addressed. | Service not addressed. |
| Airlines will petition DOT to increase the current minimum baggage liability.[c] | Contracts reflect federal regulation's minimum liability limit of $1,250.[d] | Federal regulations currently set the minimum amounts for the airlines liability limits at $1,250 for each passenger.[e]  The airlines are required to provide passengers with written notice (included on or with a ticket) of such monetary limits on baggage liability. |
| Airlines will issue credit card refunds within 7 days and cash refunds within 20 days. | Service not addressed.[f] | Under federal regulations,[g] a creditor (in this case the airline) has 7 business days to provide a refund for tickets purchased with a credit card.  In addition, DOT has taken |

GAO/RCED-99-281R Customer Service Plans

Enclosure I

| Customer Service Commitment | Airlines' domestic contracts of carriage | Pertinent federal statutes and regulations |
|---|---|---|
| | | enforcement actions against airlines for failure to provide refunds for tickets purchased with cash or check within 20 business days. DOT officials consider any period longer than 20 days to be an unfair and deceptive trade practice under 49 U.S.C. § 41712. |
| Airlines will disclose policies and procedures for accommodating unaccompanied minors. | Contracts specify the age that an unaccompanied child will be accepted for travel and address the requirements for such travel on both nonstop and connecting flights. | Service not addressed. |
| Airlines will disclose policies and procedures for accommodating disabled persons. | Contracts reflect federal regulations requiring airlines to provide specific services and facilities for passengers with disabilities. Contracts include former legal liability limit for assistive devices such as wheelchairs. | Federal regulations require airlines to provide specific services and facilities to accommodate passengers with disabilities both in the airport and on the aircraft. Airlines are required to make available, on request, information on facilities and services. Currently, airlines may not limit liability for assistive devices.[h] |
| Airlines will make reasonable efforts to provide food, water, restroom facilities, and access to medical treatment for passengers aboard an aircraft that is grounded for an extended period of time without access to the terminal consistent with passenger and employee safety and security concerns. Each airline will prepare contingency plans to address such circumstances. | Service not addressed. | Service not addressed. |
| Airlines will establish and disclose to customers the policies and procedures, including applicable requirements such as check-in deadlines, for managing their inability to board all passengers with confirmed reservations. | Under federal regulations, all airlines have established policies (and incorporated such policies into the contracts of carriage) for managing their inability to board all passengers with confirmed reservations. The provisions in each airline's conditions of contract, with respect to bumped passengers, are virtually identical and mirror the requirements and procedures found in the regulations. | Federal regulations specify policies for handling passengers who are denied boarding because of overbooking by the airline. Each airline must<br>• request volunteers who will agree not to board an airplane before using any other boarding priority;[i]<br>• establish criteria for determining which passengers shall be denied boarding;<br>• compensate qualified passengers[j] who are involuntarily denied boarding;[k] and<br>• display a sign located so as to |

GAO/RCED-99-281R Customer Service Plans

Enclosure I

| Customer Service Commitment | Airlines' domestic contracts of carriage | Pertinent federal statutes and regulations |
|---|---|---|
| | | be clearly visible and readable to the traveling public, describing the airline's deliberate overbooking policy; and<br>• furnish passengers with a written statement explaining the terms, conditions, and limitations of compensation for denied boarding. |
| Each airline will disclose to the customer any change of aircraft on a single flight with the same flight number. | Service not addressed. | Federal regulations require that a change of aircraft on a single flight number be disclosed directly to passengers.[l] |
| Each airline will disclose its cancellation policies due to passengers' failure to use flight segment coupons. | Some airlines[m] specifically prohibit "hidden city" ticketing[n] in their contracts of carriage. All airlines prohibit "back-to-back" ticketing.[o] If the passenger fails to comply with these restrictions, the airline has the right to cancel or confiscate the unused portion of the passenger's ticket.[p] | Federal regulations require airlines to make copies of the contracts of carriage available at airports and ticket offices so that passengers may view the full text of the contracts upon request.[q] Many contracts of carriage include airlines' rules with regard to unused flight segments. In addition, according to DOT officials, misrepresentations regarding airline policies would be prohibited as unfair and deceptive practices under 49 U.S.C. § 41712. |
| Rules, restrictions, and an annual report on frequent flyer program redemptions. | Service not addressed. | According to DOT officials, misrepresentations regarding airline policies would be prohibited as unfair and deceptive practices under 49 U.S.C. § 41712. |
| Information regarding aircraft configuration, including seat size and pitch. | Service not addressed. | For international flights, each tariff must include the type of aircraft and the seating configuration for each class of passenger service, including the number of seats abreast, the seat pitch, and the number of lounge seats.[s] In addition, according to DOT officials, misrepresentations regarding airline policies would be prohibited as unfair and deceptive practices under 49 U.S.C. § 41712. |
| Each airline will ensure that domestic code-share partners make a commitment to provide comparable consumer plans and policies. | Airlines limit their responsibility to transportation over their own lines.[t] When an airline issues a ticket, checks baggage, or makes other arrangements for transportation over the lines of another carrier, it will act only as an agent for the other and will not assume responsibility for the acts or omissions of the other carrier. | Service not addressed. |

Enclosure I

| Customer Service Commitment | Airlines' domestic contracts of carriage | Pertinent federal statutes and regulations |
|---|---|---|
| Each airline will<br>• assign a customer service representative to handle passenger complaints and ensure a response to written complaints within 60 days;<br>• develop and implement a customer service plan within 6 months;<br>• publish and make the customer service plans available on the Internet, at airports, at ticket offices, and with travel agents; and<br>• respond fully to Congress's request for the periodic review of compliance with the Customer Service Commitment. | Service not addressed. | Federal regulations require that a carrier respond to a disability complaint within 30 days of its receipt."<br><br>According to DOT officials, it would be an unfair and deceptive practice under 49 U.S.C. § 41712 for an airline to engage in a practice of providing false or deceptive responses to complaints. |

Legend

DOT = Department of Transportation

---

<sup>a</sup>All airlines (except Southwest and U.S. Airways) state that if, after purchasing a ticket, the fare decreases, the passenger will be reimbursed the difference upon request.

<sup>b</sup>Neither American Airlines nor Southwest Airlines includes provisions for overnight accommodations for passengers with flights that are diverted to unscheduled points.

<sup>c</sup> The $1,250 amount in the DOT rule is a minimum limit that sets the floor for an airline's liability.

<sup>d</sup>The Airline Transportation Association filed a petition with DOT on August 27, 1999, supporting the Department in raising the current domestic baggage minimum liability limit. Docket OST-1996-1340-38.

<sup>e</sup>The current liability limitation is found in 14 C.F.R. Part 254; however, DOT has proposed increasing the airlines' liability limit from $1,250 to $2,500. (See 64 Fed. Reg. 34592 (1999).)

<sup>f</sup>The airlines specify the circumstances in which refunds are permitted but do not address the promptness with which the passenger will receive the refund.

<sup>g</sup>12 C.F.R., Part 226.12(c) and 14 C.F.R. Part 374.

<sup>h</sup> DOT recently lifted the $2,500 liability limit for mobility aids making liability unlimited (64 Fed. Reg. 41781, Aug. 2, 1999). This regulation became effective Sept. 1, 1999 (14 C.F.R. § 382.43).

<sup>i</sup> 4 C.F.R. § 250.2b.

<sup>j</sup>The federal regulations require compensation only for those passengers who comply with the terms in the carrier's contract of carriage regarding ticketing, reconfirmation, and check-in times. Compensation is also not required if comparable transportation permits the passenger to arrive within 1 hour of the original arrival time. (See 14 C.F.R. § 250.6.)

<sup>k</sup>If the carrier arranges for comparable transportation that arrives within 2 hours of the original arrival time (4 hours on an international flight), the maximum compensation is $200; otherwise, the maximum compensation is $400. (See 14 C.F.R. § 250.5.)

<sup>l</sup>14 C.F.R. Part 258.5(b) and (c).

<sup>m</sup>Delta, Trans World, American, Continental, and U.S. Airways specifically prohibit hidden city ticketing in the contracts of carriage.

<sup>n</sup>Hidden city ticketing occurs when a passenger purchases a ticket with a stopover/connecting flight at a specific destination, intending only to begin or end his travel at this destination and not continue or use the remaining segments of the purchased flight.

<sup>o</sup>Back-to-back ticketing occurs when a passenger purchases two roundtrip tickets, intending to use only one segment of each ticket to circumvent minimum stay requirements.

<sup>p</sup>In addition to specifically addressing "back-to-back" ticketing, all airlines assert a general right to dishonor any or all portions of the ticket if a passenger fails to occupy space that has been reserved.

<sup>q</sup>14 C.F.R. § 253.5.

GAO/RCED-99-281R Customer Service Plans

Enclosure I

---

'A tariff is a public document that sets forth rates and charges with respect to international services and governing rules and regulations and practices relating to those services.

'14 C.F.R. § 221.38.

' Southwest Airlines does not have a provision in its contracts of carriage concerning responsibility/liability for a passenger's travel with another carrier.  Southwest also does not currently code-share with any other airline.

'14 C.F.R. § 382.65.

(348186)

(Lat. 46°36′24″ N, long. 111°59′0.0″ W)

That airspace extending upward from the surface within an area bounded by a line beginning at Lat. 46°34′18.57″ N, long. 111°51′30.319″ W, to Lat. 46°38′5.89″ N, Long. 111°51′24.53 ″ W, to Lat. 46°37′12.53″ N, long. 111°45′24.67 ″ W, to Lat. 46°32′22.72″ N, Long. 111°46′31.44″ W, to Lat. 46°33′24.13″ N, Long. 111°54′20.01″ N, then counter-clockwise along the 4.4-mile radius of the airport to Lat. 46°34′20.01″ N, long. 111°53′22.03″ W, then to the point of beginning, and within an area bounded by a line beginning at Lat. 46°38′39.95″ N, long. 112°06′47.50″ W to Lat. 46°36′47.49″ N, long. 112°07′53.41″ W to Lat. 46°37′22.52″ N, long. 112°11′37.80″ W, to Lat. 46°39′19.40″ N, long. 112°10′58.64″ W, then to the point of beginning west of Helena Regional Airport.

*Paragraph 6005. Class E Airspace Areas Extending Upward from 700 feet or more above the Surface of the Earth.*

\* \* \* \* \*

**ANM MT E5 Helena, MT [Amended]**

Helena Regional Airport, MT
(Lat. 46°36′24″ N, long. 111°59′0.0″ W)

That airspace extending upward from 700 feet above the surface within an 8.3-mile radius of the airport, and within 1 mile each side of the 103° bearing from the airport, extending from the 8.3-mile radius to 10.7 miles east of the airport, and within 1.8 miles each side of the 281° bearing from the airport, extending from the 8.3-mile radius to 18.1 miles west of the airport; and that airspace extending upward from 1,200 feet above the surface within a 36-mile radius of Helena Regional Airport.

Issued in Seattle, Washington, on December 1, 2020.

**B. G. Chew,**

*Acting Group Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2020–26816 Filed 12–4–20; 8:45 am]

**BILLING CODE 4910–13–P**

# DEPARTMENT OF TRANSPORTATION

## Office of the Secretary

## 14 CFR Part 399

**[Docket No. DOT–OST–2019–0182]**

**RIN 2105–AE72**

## Defining Unfair or Deceptive Practices

**AGENCY:** Office of the Secretary (OST), U.S. Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** The U.S. Department of Transportation (DOT or Department) is issuing a final rule codifying its longstanding definitions for the terms "unfair" and "deceptive" in the Department's regulations implementing its aviation consumer protection statute. The final rule also describes the

Department's procedural requirements for its rulemaking and enforcement actions when based on the Department's authority to prohibit unfair or deceptive practices. Most of the Department's aviation consumer protection regulations, such as the Department's rules on overbooking, are based on the Department's authority to prohibit unfair or deceptive practices. This rule is intended to provide regulated entities and other stakeholders with greater clarity and certainty about the Department's interpretation of unfair or deceptive practices and the Department's process for making such determinations in the context of aviation consumer protection rulemaking and enforcement actions.

**DATES:** Effective on January 6, 2021.

**FOR FURTHER INFORMATION CONTACT:** Robert Gorman, Kimberly Graber, or Blane Workie, Office of Aviation Consumer Protection, U.S. Department of Transportation, 1200 New Jersey Ave. SE, Washington, DC 20590, 202–366–9342, 202–366–7152 (fax); *robert.gorman@dot.gov; kimberly.graber@dot.gov; blane.workie@dot.gov* (email).

**SUPPLEMENTARY INFORMATION:**

## I. Rulemaking Background

Much of the background information presented here also appears in the preamble to the Department's Notice of Proposed Rulemaking on Defining Unfair and Deceptive Practices published on February 28, 2020.[1] We have presented background information again here to assist the public in understanding the issues involved.

### A. The Department's Unfair and Deceptive Practices Statute

The Department's authority to regulate unfair and deceptive practices in air transportation or the sale of air transportation is found at 49 U.S.C. 41712 ("Section 41712") in conjunction with its rulemaking authority under 49 U.S.C. 40113, which states that the Department may take action that it considers necessary to carry out this part, including prescribing regulations. Section 41712 gives the Department the authority to investigate and decide whether an air carrier, foreign air carrier, or ticket agent is engaged in an unfair or deceptive practice in air transportation or the sale of air transportation. Under Section 41712, after notice and an opportunity for a hearing, the Department has the authority to issue orders to stop an unfair or deceptive practice. A different

statute, 49 U.S.C. 46301, gives the Department the authority to issue civil penalties for violations of Section 41712 or for any regulation issued under the authority of Section 41712.

### B. Request for Regulatory Reform

On February 24, 2017, President Trump signed Executive Order 13777, Enforcing the Regulatory Reform Agenda, which requires each Federal agency to establish a Regulatory Reform Task Force to evaluate existing regulations, and make recommendations for their repeal, replacement, or modification. As part of this process, the Department is directed to seek input and assistance from entities significantly affected by its regulations. On October 1, 2017, the Department issued a Notice of Regulatory Reform seeking written input from the public on existing regulations and other actions that are good candidates for repeal, replacement, or modification.[2] In response to the Notice, Airlines for America (A4A), an airline trade association, urged the Department to adopt policies defining unfairness and deception in Section 41712 consistent with principles articulated in Federal Trade Commission (FTC) and Federal court precedent interpreting those terms.[3] A4A also urged the Department to adopt various procedures which would, in its view, ensure that the Department's enforcement and rulemaking activities were rooted in fairness, due process, and an adequate factual foundation.

### C. Department's Comprehensive Update of Rulemaking and Enforcement Procedures

On December 27, 2019, the Department issued a comprehensive update and consolidation of its procedural requirements for the Department's rulemaking and enforcement actions.[4] This update reflects the Department's policy that regulations should be straightforward and clear, incorporate best practices for economic analyses, and provide for appropriate public participation.[5] It also reflects the Department's policy that enforcement actions should satisfy principles of due process and remain

---

[1] "Defining Unfair or Deceptive Practices," 85 FR 11881 (February 28, 2020).

[2] "Notification of Regulatory Review," 82 FR 45750 (October 1, 2017).

[3] See Comment of A4A, Docket DOT–OST–2017–0069–2753, available at *www.regulations.gov.*

[4] "Administrative Rulemaking, Guidance, and Enforcement Procedures," 84 FR 71714 (December 27, 2019), amending 49 CFR part 5 and other provisions.

[5] 84 FR 71718–71826.

lawful, reasonable, and consistent with Administration policy.[6]

### D. Summary of Notice of Proposed Rulemaking (NPRM)

On February 28, 2020, the Department published an NPRM proposing to define the terms "unfair" and "deceptive" found in Section 41712, the Department's aviation consumer protection statute. The NPRM also proposed a series of amendments to the Department's aviation consumer protection procedures with respect to both regulation and enforcement. The proposals were issued to provide greater clarity, transparency, and due process in future aviation consumer protection rulemakings and enforcement actions.

By way of background, the Department described the origin of section 41712 and explained how it was modeled on Section 5 of the Federal Trade Commission (FTC) Act. The Department explained that while Section 5 vests the FTC with broad authority to prohibit unfair or deceptive practices in most industries, Congress granted the Department the exclusive authority to prohibit unfair or deceptive practices of air carriers and foreign air carriers. The Department noted that DOT and FTC share the authority to prohibit unfair or deceptive practices by ticket agents in the *sale* of air transportation.

Next, the Department explained that in December 1980, the FTC issued a Policy Statement to Congress, which articulated general principles drawn from FTC decisions and rulemakings that the Commission applies in enforcing its mandate to address unfairness under the FTC Act.[7] These principles were applied in FTC enforcement cases and rulemakings, and approved by reviewing Federal courts.[8] The FTC explained that unjustified consumer injury is the primary focus of the FTC Act. This concept contains three basic elements. An act or practice is unfair where it: (1) Causes or is likely to cause substantial injury to consumers; (2) cannot be reasonably avoided by consumers; and (3) is not outweighed by countervailing benefits

to consumers or to competition. The FTC also considers public policy, as established by statute, regulation, or judicial decisions, along with other evidence in determining whether an act or practice is unfair.

These principles are now reflected in the FTC Act itself. In 1994, Congress enacted 15 U.S.C. 45(n), which states that the FTC shall have no enforcement authority or rulemaking authority to declare an act or practice unfair unless it is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. Congress further provided in Section 45(n) that the FTC could rely on public policy, along with other evidence, for making a determination of unfairness, but public policy may not be the primary basis of its decision.

Next, the Department explained that in 1983, the FTC issued a Policy Statement on Deception.[9] Like the 1980 Policy Statement on Unfairness, the 1983 Policy Statement clarified the general principles that the FTC applies in enforcing its mandate to address deception under the FTC Act. As explained in the Policy Statement, an act or practice is deceptive where: (1) A representation, omission, or practice misleads or is likely to mislead the consumer; (2) a consumer's interpretation of the representation, omission, or practice is considered reasonable under the circumstances; and (3) the misleading representation, omission, or practice is material.

In the NPRM, the Department proposed to adopt definitions of "unfair" and "deceptive" that echo FTC precedent. The Department explained that adopting these definitions would simply codify existing practice and would not reflect a change of policy, because the Department's Office of Aviation Consumer Protection (formerly known as the Office of Aviation Enforcement and Proceedings), a unit within the Office of the General Counsel that enforces aviation consumer protection requirements, has often explicitly relied on those definitions in its enforcement orders.

Next, the Department proposed a set of procedural rules that would govern the Department's future discretionary rulemaking and enforcement efforts in the area of aviation consumer protection. With respect to rulemaking actions, the Department proposed three measures. First, future rulemakings

declaring certain practices to be "unfair" or "deceptive" would use the Department's proposed definitions of those terms.[10] In prior rulemakings, the Department tended to make a conclusory statement that a practice was unfair or deceptive and did not provide its reasoning for that conclusion. In arriving at these conclusions that certain practices were unfair or deceptive, DOT employed the same definitions that are set forth in this rule, though that analysis was done informally at the Department and not further described in rule preambles.

Second, future discretionary rulemakings would be subject to a hearing procedure. Specifically, if the Department proposes that a practice was unfair or deceptive in a rulemaking, and that rulemaking raised scientific, technical, economic, or other factual issues that are genuinely in dispute, then interested parties may request an evidentiary hearing to gather evidence on those disputed issues of fact. Third, future rulemakings would explain the Department's basis for finding a practice to be unfair or deceptive.

With respect to enforcement, the Department proposed three measures. First, when taking enforcement action against an airline or ticket agent for unfair or deceptive practices, the Department would use the proposed definitions of "unfair" and "deceptive" set forth above (unless a specific regulation issued under the authority of section 41712 applied to the practice in question, in which case the terms of the specific regulation would apply). Second, in future enforcement actions, the Department would provide the airline or ticket agent with the opportunity to be heard and to present mitigating evidence. This final rule codifies the longstanding practice of allowing regulated entities to present mitigating evidence during the course of informal DOT enforcement actions. In a typical enforcement action, the Office of Aviation Consumer Protection issues an investigation letter to an airline or ticket agent, seeking information about the extent and nature of the violations. During that process, the Office also allows airlines and ticket agents to present mitigating evidence (*e.g.,* that consumer harm was low, or that the airline or ticket agent has taken steps to mitigate the harm to consumers). While the rule now makes this process explicit, we do not expect an *expansion* in its usage; instead, we expect that it

---

[6] 84 FR 71729–71733.

[7] Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science and Transportation, United States Senate, Commission Statement of Policy on the Scope of Consumer Unfairness Jurisdiction (December 17, 1980), appended to *International Harvester Co.,* 104 F.T.C. 949, 1070, 1073 (1984).

[8] See, *e.g., International Harvester,* 104 F.T.C. 949 (1984); Credit Practices Rule, Statement of Basis and Purpose, 49 FR 7740 (1984) ("Credit Practices Rule SBP"); *Orkin Exterminating Co.,* Inc., 108 F.T.C. 263 (1986); aff'd, *FTC* v. *Orkin,* 849 F.2d 1354 (11th Cir. 1988).

[9] FTC Policy Statement on Deception (Oct. 14, 1983), 103 F.T.C. 174, 175 (1984) (appended to *Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)).

[10] The proposal recognized that if Congress directed the Department to issue a rule declaring a specific practice to be unfair or deceptive, then the Department would do so without reference to the Department's own definitions.

will continue unchanged after the issuance of this final rule. Third, in future enforcement orders, if a specific regulation does not apply to the practice in question, the Department would explain the basis for its finding that a practice was unfair or deceptive. The Department is of the view that these measures generally codify existing practice.

In addition, the Department solicited comment on related matters. For example, the Department asked whether the term "practice" should be defined. The Department also noted that it relies on its general unfair and deceptive practices authority in certain specialized areas (e.g., privacy, frequent flyer programs, and air ambulance service) and asked whether the proposed general definitions of "unfair" or "deceptive" were sufficient to provide stakeholders sufficient notice of what constitutes an unfair or deceptive practice in these or other subject areas.

The comment period for the NPRM was originally scheduled to expire on April 28, 2020. However, in response to a request by consumer advocacy organizations, the comment period was extended to May 28, 2020.

## II. Summary of NPRM Comments and the Department's Responses

### A. Overview

The Department received a total of 224 comments by the end of the comment period. Approximately 180 comments were filed by individual consumers, who almost uniformly opposed the NPRM. Individual consumers typically did not comment on any specific provision, but instead opposed the NPRM as a whole, viewing it as a weakening of aviation consumer protection. Many consumers noted with disapproval that the NPRM was initiated at the request of airlines, which in their view engage in practices that are anti-consumer.

Consumer advocacy organizations [11] and two FTC Commissioners [12] generally opposed the proposals on the ground that they were either unnecessary or weakened consumer protection. Four Senators and one Member of Congress [13] urged the Department to discontinue the NPRM

for many of the same reasons identified by consumer advocates and the FTC Commissioners.

Airline associations, individual airlines, and a nonprofit public policy organization [14] broadly supported the proposals in the NPRM on the ground that they provided greater transparency and due process in the Department's rulemaking and enforcement activities. Airlines also suggested that the Department adopt additional provisions, which will be discussed in greater detail below.

Travel agent representatives and a large travel agency [15] generally supported the NPRM for the reasons expressed by airlines; however, they opposed the proposal to adopt hearing procedures relating to discretionary aviation consumer protection rulemakings.

We will discuss the comments in further detail below.

### B. Definitions

#### 1. Definitions of "Unfair" and "Deceptive"

Consumer advocacy organizations generally recognized that the proposed definitions of "unfair" and "deceptive" mirror the FTC's interpretation of those terms. They argued, however, that the Department should not limit itself to those specific definitions. They contended that the flexibility of undefined terms serves as a deterrent to engaging in practices that do not fit within the proposed definitions, but which may nevertheless be unfair or deceptive.

They argued that this flexibility is especially important in the field of air transportation because the Airline Deregulation Act (ADA) prohibits States from regulating the unfair and deceptive practices of airlines. They contended that outside of the field of aviation, State consumer protection laws serve as a backstop to the FTC's authority, and that many consumer protection agencies take aggressive and successful action under State law with respect to practices that would not qualify as unfair or deceptive under the FTC's definitions. They also observed that because of ADA preemption, relief in court is generally limited to Federal class-actions or small claims. Consumer organizations concluded that the FTC definitions may be used for guidance,

but should not be transformed into regulatory text.

FTC Commissioner Chopra urged the Department not to adopt the FTC's definitions, for many of the reasons identified by consumer advocacy organizations. He also raised several additional concerns. First, he argued that after the FTC adopted its Policy Statement on Unfairness in 1980, the Commission's "number of enforcement actions and rulemakings plummeted, leaving a vacuum that hobbled development of the law." [16] Commissioner Chopra also argued that "the key planks undergirding the FTC's unfairness definition—competitive markets, consumer choice, and a de-emphasis on public policy—are poorly suited to airline regulation," because the aviation market is not competitive, in his view, and because the Transportation Code affirmatively requires the Secretary to emphasize certain public policies.[17] He also argued that the proposed definitions do not adequately take these policies into account.

Airlines and travel agents supported the proposed definitions, arguing that they provide much-needed transparency and predictability to regulated industries. Southwest Airlines argued that the lack of clear definitions has led DOT to overreach in certain past rulemakings and enforcement actions. Southwest also argued that the third prong of the unfairness definition (i.e., that the harm of the practice "is not outweighed by countervailing benefits to consumers or to competition") correctly reflects departmental policy to place "maximum reliance on competitive market forces and on actual and potential competition." [18] Spirit Airlines suggested that the proposed definition of "deceptive," which currently refers to misleading a singular "consumer" acting reasonably under the circumstances, should be written in the plural to reflect that the practice must be misleading to "consumers" in the aggregate. Travel agents argued that because DOT and FTC share jurisdiction over them, it is important for the two regulatory standards to be harmonious.

[11] Travelers United, Flyersrights.org, National Consumers League, Consumer Action, American Association for Justice (formerly American Trial Lawyers' Association), Travel Fairness Now, Consumer Reports, Consumer Federation of America, and US PIRG.

[12] Commissioners Rebecca Kelly Slaughter and Rohit Chopra.

[13] Senators Edward J. Markey, Tammy Baldwin, Maria Cantwell, and Richard Blumenthal and Representative Katie Porter.

[14] Airlines for America (A4A), International Air Transport Association (IATA), National Business Aviation Association (NBAA), U.S. Tour Operators Association (USTOA), Spirit Airlines, Southwest Airlines, and the Competitive Enterprise Institute (CEI).

[15] Travel Tech and BCD Travel USA.

[16] Comment of Commissioner Chopra at 2. He particularly noted that in the years after adoption of the Policy Statement, the FTC failed to take action against predatory lending and the deceptive practices of the tobacco industry; instead, states took the lead, and the FTC's authority over consumer lending practices was transferred to the Consumer Financial Protection Bureau (CFPB), which has a broader standard for taking enforcement action than the FTC. Id. at 6–8.

[17] Id. at 10.

[18] Southwest comment at 4, citing 49 U.S.C. 40101(a)(6), (12).

After reviewing the comments, the Department remains of the view that it should adopt the definitions of "unfair" and "deceptive" as proposed. We are guided by the principles set forth in our recent final rule, "Administrative Rulemaking, Guidance, and Enforcement Procedures," which seeks to provide greater transparency to regulated entities when conducting enforcement actions and adjudications.[19] Offering clear definitions of "unfair" and "deceptive" will serve this goal. We note that transparency and clarity is particularly needed with respect to ticket agents, which are subject to both FTC and DOT jurisdiction.

We stress that the definitions that we adopt do not reflect a substantive departure from past DOT practice. As we explained in the NPRM, DOT has traditionally relied on these definitions when taking enforcement and discretionary rulemaking actions. Therefore, the Department is not of the view that codifying these definitions will diminish the Department's authority to take enforcement action or to regulate effectively.

We recognize the argument of consumer advocacy organizations and Commissioner Chopra that the ADA preempts State consumer protection agencies from acting as a more aggressive backstop to DOT action. At present, however, we are of the view that the proposed definitions are adequate to ensure regulations continue to prohibit unfair and deceptive practices while at the same time providing necessary transparency to the regulated industry. We also recognize that under FTC practice, the role of public policy is explicitly deemphasized,[20] while Congress has directed the Department to take into account a variety of policies in conducting economic regulation of air transportation.[21] We are not convinced that this distinction compels a different result. While the definitions of "unfair" and "deceptive" will remain the guiding principles for regulation and enforcement, in doing so, the Department recognizes its statutory

responsibility to consider the public policies enumerated by Congress. These policies include safety, ensuring economic competition, *and* preventing unfair and deceptive practices.[22]

**2. Intent as an Element of Unfairness or Deception**

The proposed rule would clarify that intent is not an element of either unfairness or deception. We received relatively few comments on this issue. FTC Commissioners Chopra and Slaughter both expressed the view that the Department's position was legally correct. A4A and IATA, however, urged the Department to adopt an "intent to deceive" standard for both unfairness and deception. In the alternative, they urged the Department to give lack of intent "significant weight" when exercising its enforcement discretion. We remain of the view that intent is not an element of either unfairness or deception.[23] We also reject A4A and IATA's suggestion to adopt an intent requirement. Such a requirement would place the Department's view of unfairness and deception substantially out of step with FTC precedent. It would also limit the Department's consumer protection actions to only those matters where parties establish the private intent of carriers and ticket agents. In light of the revisions to the Department's rulemaking and enforcement procedures adopted in this final rule to enhance the justifications for actions taken under the Department's statutory authority, we view this as an unnecessary and unacceptably high bar. We also decline to include in the regulation the weight that lack of intent should be given in any future enforcement action, because the proper exercise of enforcement discretion generally involves an individualized consideration of a variety of factors.[24]

**3. Definition of Additional Terms**

Airlines urged the Department to define further the component elements of unfairness and deception, such as "substantial harm," "likely to mislead,"

"reasonably avoidable," and "acting reasonably under the circumstances." In general, airlines asked the Department to adapt into regulatory text certain aspects (but not all of the aspects) of the FTC's guidance on these terms, as found in the 1980 Policy Statement on Unfairness and the 1983 Policy Statement on Deception. We decline this invitation, because the regulatory text adequately explains the necessary elements of unfairness and deception.[25] The Department will continue to look to the FTC Policy Statements, as well as FTC precedent and the Department's own precedent, for guidance in determining whether any specific practice meets all of the component elements of unfairness and deception.

**4. Definition of "Practice"**

In the NPRM, the Department noted that neither the DOT nor the FTC Act defines "practice." The Department indicated that it did not believe that a definition of "practice" was necessary, because its aviation consumer protection regulations are always directed to "practices" rather than individual acts. The Department also explained that its enforcement efforts include a determination that the conduct in question reflects a practice or policy affecting multiple consumers, rather than an isolated incident. We concluded that "in general, the Department is of the view that proof of a practice in the aviation consumer

---

[19] 84 FR 71716, citing Executive Order 13892, "Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication" (October 9, 2019).

[20] As noted above, pursuant to 15 U.S.C. 45(n), the FTC may rely on public policy, along with other evidence, for making a determination of unfairness, but public policy may not be the primary basis of its decision.

[21] 49 U.S.C. 40101 (directing the Department, when engaging in economic regulation of air transportation, to consider 16 matters, "among others, as being in the public interest and consistent with public convenience and necessity.")

[22] See 49 U.S.C. 40101(a)(1), (4), (6), (7), (9), and (12).

[23] See 85 FR 11885 (intent is not required under Federal case law interpreting the FTC Act, and noting that the definition of "false advertisement" in the FTC Act makes no reference to intent to deceive).

[24] See 49 CFR 5.97 ("Where applicable statutes vest the agency with discretion with regard to the amount or type of penalty sought or imposed, the penalty should reflect due regard for fairness, the scale of the violation, the violator's knowledge and intent, and any mitigating factors (such as whether the violator is a small business)").

[25] For example, A4A/IATA asks the Department to define "substantial harm" as not involving merely trivial or speculative harm. A4A/IATA comment at 6, citing 1980 FTC Policy Statement on Unfairness. We are of the view that this clarification is unnecessary because the term "substantial harm" would necessarily exclude "trivial or speculative harm." (We also observe, however, that in keeping with 15 U.S.C. 45(n), a practice is unfair not only if it causes substantial harm, but if also it is *likely* to cause substantial harm.)

Similarly, A4A/IATA asks us to define "not reasonably avoided" as excluding circumstances where a consumer's willful, intentional, or reckless conduct leads to harm (for example, by intentionally taking advantage of a mistakenly published fare). We are of the view that in general, the term "not reasonably avoided" would necessarily exclude the types of self-imposed harms described by A4A and IATA. We also note that mistaken fares are governed by a specific regulation relating to post-purchase price increases (14 CFR 399.88). The Department has issued guidance with respect to mistaken fares at *https://www.transportation.gov/sites/dot.gov/files/docs/Mistaken_Fare_Policy_Statement_05082015_0.pdf*.

Finally, A4A, IATA, Southwest, and Spirit all stress under the 1983 FTC Policy Statement on Deception, deception should be judged by reference to reasonable consumers as a whole, and that a single consumer's unreasonable interpretation of a statement does not make it deceptive. We agree that deception is judged in reference to a reasonable consumer and believe that these concepts are adequately reflected in the phrase "acting reasonably under the circumstances," regardless of whether the word "consumer" is singular or plural.

protection context requires more than a single isolated incident. On the other hand, even a single incident may be indicative of a practice if it reflects company policy, training, or lack of training." [26] We sought comment, however, on whether a definition of "practice" was necessary.

We received relatively few comments on this issue. Consumer advocacy organizations largely did not address it. Spirit, Travel Tech, and FTC Commissioner Slaughter opined that a definition was not necessary. The NBAA and USTOA urged the Department to adopt a definition that reflected the Department's current understanding, described above. A4A and IATA urged the Department to define "practice" as "a pattern of repetitive conduct that harmed multiple consumers rather than a single act." [27] A4A and IATA stated that under this standard, one "mistaken advertisement" would not be a practice even if the same advertisement runs multiple times.[28] Relatedly, A4A and IATA urged the Department to refrain from taking enforcement action with respect to "a single act or isolated acts by a carrier," and instead take action only if the conduct is repeated after a warning.[29]

After reviewing the comments on this issue, we remain of the view that it is not necessary to define "practice." The Department notes that this issue will arise in relatively rare instances where the Department seeks to take enforcement action in an area where no specific regulation applies, and where there is a reasonable disagreement over whether the conduct reflects a truly isolated incident. In such cases, regulated entities will have the opportunity to be heard and to present evidence that the conduct at issue does not constitute a practice, as set forth in this rule.

### C. Rulemaking Proposals

In the NPRM, the Department proposed a hearing procedure that would be available when the Department proposed a discretionary aviation consumer protection rulemaking declaring a practice to be unfair or deceptive. To summarize, after the issuance of an NPRM, interested parties could request a formal hearing on the ground that the proposed rule raised one or more disputed technical, scientific, economic, or other complex factual issues. The General Counsel would have the authority to grant or

deny the hearing using criteria set forth in this rule. If the hearing is granted, an Administrative Law Judge or other neutral hearing officer would conduct the formal hearing using procedures adapted from the Administrative Procedure Act (APA) or similar rules adopted by the Secretary. The hearing officer would issue a detailed report on the disputed factual issue(s), after which the General Counsel would determine whether the proposed rule should be continued, amended, or terminated.

Consumer advocacy organizations strongly urged the Department not to adopt these hearing procedures. They argued that the Department did not demonstrate that the typical notice-and-comment procedures of the APA were inadequate to gather a proper factual basis for discretionary rulemakings. Some commenters noted that these hearing procedures were unnecessary given the updates to the Department's general rulemaking procedures in 49 CFR part 5. They also contended that formal hearing procedures will inevitably create lengthy delays and numerous opportunities for regulated entities to lobby against the proposed rule. Some commenters argued that the proposed rulemaking has more liberal standards for granting a hearing than there are for denying a hearing; as a result, hearings will threaten to become the norm. Other advocates observed that the proposal does not have a clear mechanism for consumers to argue that a hearing is not necessary.

FTC Commissioner Slaughter commented on the FTC's own experience with similar formal hearing procedures, which were imposed by Congress, known as "Mag-Moss" procedures.[30] Commissioner Slaughter argued that such hearing procedures do not make rulemaking impossible, but "the great difficulty of undergoing a Mag-Moss rulemaking compared with rulemaking under the APA should not be understated. The additional procedural requirements represent an enormous drain on staff resources, to say nothing of the additional time and effort they require of stakeholders." [31] She argued that there is a growing bipartisan consensus for the FTC to issue privacy regulations not under Mag-Moss, but instead under APA procedures. Commissioner Slaughter argued that if the Department issues its own privacy regulations using the proposed formal hearing procedures, the

Department will "create a regulatory incongruence in which the Department is the slowest and least capable regulator in the privacy arena." [32]

Ticket agents also urged the Department not to adopt formal hearing procedures, for many of the reasons cited by consumer advocates and Commissioner Slaughter. Travel Tech noted the incongruity of the Department requiring heightened hearing procedures only for its highest-cost rules and for discretionary aviation consumer protection rules, which generally do not impose nearly such a high economic burden.[33] Travel Tech also argued that the Department's institutional expertise in aviation consumer protection matters ensures that formal hearing will generally not be necessary. Travel Tech contended that formal hearings should only be required when directed by Congress or under very limited and unusual circumstances.[34]

Airlines generally favored the proposal on the ground that it provides regulated entities with an opportunity to test thoroughly the factual assumptions on which discretionary consumer protections are based. They argued that such hearings are helpful to determine whether a market failure has taken place such that regulation is necessary.[35]

After careful review of the comments in this area, the Department has decided to retain a hearing procedure that would be available when the Department proposes a discretionary aviation consumer protection rulemaking declaring a practice to be unfair or deceptive. This is consistent with section 41712, which requires notice and an opportunity for a hearing before a finding that an air carrier, foreign air carrier, or ticket agent is engaged in an

[26] 85 FR 11885.
[27] Comment of A4A/IATA at 12.
[28] *Id.*
[29] *Id.* at 13.

[30] See 15 U.S.C. 57a (codifying the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act of 1975, Public Law 93–637 ("Mag-Moss").
[31] Comment of Commissioner Slaughter at 3.

[32] *Id.* at 4.
[33] Comment of Travel Tech at 6–7.
[34] *Id.* at 9 ("Travel Tech thus proposes that a formal fact-finding hearing would only be appropriate in the very unusual circumstance when either Congress directs that a specific rule be adopted only after an on the record hearing or when the agency's General Counsel finds that a specific factual issue critical to a claim that a particular practice is unfair or deceptive (and not an economic or policy consideration) is in dispute and cannot be adequately resolved through the usual notice-and-comment process.)"
[35] A4A Comment at 16, citing 49 CFR 5.11 (before initiating a rulemaking, the Department should identify "the need for the regulation, including a description of the market failure or statutory mandate necessitating the rulemaking"). See also comment of Spirit Airlines (arguing that the Department's repealed NPRM on dissemination of ancillary fees to third party ticket sellers was based on conflicting/misleading information regarding passengers' ability to get this information). Spirit also argued that the Department should engage in Advance Notice of Proposed Rulemaking (ANPRM) to gather comment on whether practices are unfair or deceptive.

unfair or deceptive practice or an unfair method of competition. The Department sees value in offering additional hearing procedures for low-cost discretionary aviation consumer protection rules where scientific, technical, economic, or other factual issues are genuinely in dispute. At the same time, the Department recognizes the concerns raised by commenters that formal hearing procedures may add time to the rulemaking process. As such, the hearing procedures for discretionary aviation consumer protection rules set forth in this final rule differ from the procedures set forth in the Department's general rulemaking procedures in 49 CFR part 5 for the Department's high-impact or economically significant rules. For example, under this final rule, the General Counsel would be free to adopt more flexible rules for the hearing than would be required for a high-impact or economically significant rulemaking. The General Counsel also has more flexibility with respect to appointing an appropriate hearing officer for such hearings. Finally, the presiding officer is not required to issue a report; the officer need only place on the docket minutes of the hearing with sufficient detail as to reflect fully the evidence and arguments presented on the disputed issues of fact, along with proposed findings addressing those issues. By adopting hearing procedures for discretionary aviation consumer protection rulemakings that are less stringent and more flexible than the formal hearing procedures for high impact or economically significant rules, the Department ensures that interested parties have an opportunity to test factual assumptions on which discretionary consumer protection rulemaking actions are based, consistent with the underlying statutory authority under which the Department is regulating, while minimizing the likelihood of extensive delays or a drain on staff resources.

These procedures, as modified, reflect the Department's continued view that interested parties should have the opportunity to be heard when the Department proposes discretionary rulemakings that may be based on complex and disputed economic, technical, or other factual issues. We also note that the ordinary notice and comment procedures of the APA remain the default process: To obtain a hearing, the party requesting the hearing has the initial burden of showing that, among other factors, the ordinary notice and comment procedures are unlikely to provide an adequate examination of the issues to permit a fully informed

judgment. The rule retains the safeguard that the General Counsel may decline a hearing if it would unreasonably delay the rulemaking. We also generally disagree with commenters who stated that the standards for granting a hearing are necessarily more lenient than the standards for denying them.

We also note that the Department's use of similar procedures to supplement traditional notice-and-comment is not new.[36] For example, in 2011, the Department's Bureau of Transportation Statistics held a public meeting to gather information about industry practices for processing and accounting for baggage and wheelchairs, in connection with a pending rulemaking.[37] More recently, the Department asked the Architectural and Transportation Barriers Compliance Board (Access Board) to hold a hearing to gather public input on potential new standards for on-board wheelchairs, also in connection with a pending rulemaking.[38] The Department recognizes certain differences between the public meetings that sometimes were held in the context of earlier rulemakings[39] and the hearings contemplated by this rule. For example, hearings will be held before a neutral officer, who must make findings on the record, while public meetings were previously led by staff from the government office involved in the rulemaking and findings were not separately summarized and placed on the record but rather were noted in the preamble if they were relied on in the rulemaking. Moreover, this rule clearly identifies procedures to all interested persons that hearings may be requested, while previously there was no formal process to request a public meeting so they were more likely to have been instituted by the Department or requested only by those parties that knew that the Department was open to holding public meetings in appropriate instances. In sum, while the hearing procedures reflected in the final rule may result in some additional delays to the rulemaking process beyond what

was experienced with public meetings, on the whole the new procedures will promote fairness, due process, and well-informed rulemaking, without unduly delaying the proceeding itself, and represent a reasonable and balanced approach consistent with the Department's rulemaking and enforcement policies.

*D. Enforcement Proposals*

In the NPRM, the Department proposed to codify certain enforcement practices. First, the Department proposed that before the Office of Aviation Consumer Protection determined how to resolve a matter involving a potential unfair or deceptive practice, it would provide an opportunity for the alleged violator to be heard and to present relevant evidence in its defense. Such evidence would include, but not be limited to, the following: (1) Evidence that the consumer protection regulation at issue was not violated; (2) evidence that the conduct was not unfair or deceptive (if no specific regulation applied); and (3) evidence that that consumer harm was limited or that the alleged violator has taken steps to mitigate the harm. The Department also proposed that when the Office issued a consent order declaring that a practice was unfair or deceptive, and no specific regulation applied to the conduct at issue, then the Office would explain the basis for its finding that the conduct was unfair or deceptive, using the definitions set forth in this rule. Finally, the Department clarified that if the Office took enforcement action against a regulated entity by filing a complaint with an Administrative Law Judge, then the entity would have the opportunity for notice and a hearing as set forth in 14 CFR part 302. We noted that these procedures reflected the longstanding practices of the Office of Aviation Consumer Protection.

We received few comments on this element of the proposed rule. Most consumer advocates did not opine on the issue, while National Consumers League and Consumer Action advised that they were unnecessary. Travel Fairness Now generally did not object to the measures, but urged the Department to declare that an unfair or deceptive practice with limited consumer harm would still be subject to enforcement action. Airlines and ticket agents generally supported these proposals.

In the final rule, we will adopt these measures as proposed in the NPRM. They reflect current practice, and afford reasonable due process to regulated entities. These specific measures are also consistent with the general principles set forth in the Department's

---

[36] See *https://cms7.dot.gov/regulations/rulemaking-process*, under ''May an agency supplement the APA requirements?'' (''We may use public meetings or hearings before or after a proposal is issued for a variety of reasons. Public meetings allow us to ask questions. They allow for interaction among participants with different views on the issues involved, and they provide a better opportunity for members of the public who believe they are more effective making oral presentations than submitting written comments.'')

[37] See *https://www.regulations.gov/document?D=RITA-2011-0001-0280.*

[38] 84 FR 43100 (August 20, 2019); see *https://www.regulations.gov/document?D=ATBCB-2019-0002-0001.*

[39] *E.g.,* 77 FR 25105 (April 27, 2012).

recent final rule relating to enforcement.[40]

## E. Privacy, Air Ambulance, and Frequent Flyer Programs

The Department solicited comment on whether the general definitions of "unfair" or "deceptive" were sufficient to give notice to stakeholders of what constitutes unfair or deceptive practices with respect to the specialized fields of privacy, air ambulance service, and frequent flyer programs. While we did not receive specific comments related to frequent flyer programs, we did receive comment with respect to privacy and air ambulance service.

A4A asked the Department to declare that the Department has exclusive jurisdiction over airlines with respect to privacy practices. A4A also asked the Department to adopt detailed privacy regulations. A4A's proposal would declare that "mishandling private information may be considered an unfair or deceptive practice," and that "specific examples of unfair or deceptive practices with regard to the private information of consumers include" violating the terms of the airline's privacy policy, failing to maintain reasonable data security measures for passengers' private information, and violating various privacy statutes.

We generally agree with the substance of A4A's proposal; indeed, it appears to be adapted from the privacy page of the Department's consumer protection website, which recites many of these principles.[41] Nevertheless, we decline to adopt it for procedural reasons. As noted above, one of the Department's stated policies is to improve transparency and public participation in the rulemaking process. If the Department were to adopt detailed privacy regulations affecting air transportation and the sale of air transportation, it should first engage in the full notice-and-comment procedures of the APA, as well as the procedures set forth in this final rule.

Next, we received comments from insurers, air ambulance providers, and other interested parties about the regulation of air ambulance services. The National Association of Insurance Commissioners and nine researchers on health law, economics, and policy[42] urged the Department to declare that balance billing is an unfair practice because it imposes substantial harm on patients who had no ability to avoid the charges, without countervailing benefits to consumers or to competition. Separately, the researchers urged the Department to find that charging full out-of-network prices for air ambulance service is an unfair practice, in part because of its effect on the private insurance market. Air ambulance operators[43] argued that specific regulation of air ambulance providers in this rulemaking would be premature at best, because the Air Ambulance and Patient Billing (AAPB) Advisory Committee has been established to address these issues comprehensively. Air ambulance operators also argued that balance billing should not be considered an unfair or deceptive practice. They contend that much of the consumer harm from balance billing arises from the practices of insurers, rather than air ambulance providers (for example, by under paying out-of-network air ambulance bills, or denying claims that were medically necessary). They also argue that many patients who receive a large balance bill ultimately pay a small fraction of that amount out-of-pocket.

After consideration of the comments submitted on this issue, we decline to adopt specific regulations relating to air ambulance providers. Section 418 of the FAA Reauthorization Act of 2018 (FAA Reauthorization Act) requires the Secretary, in consultation with the Secretary of Health and Human Services, to establish an advisory committee to review options to improve the disclosure of charges and fees for air medical services, better inform consumers of insurance options for such services, and protect consumers from balance billing. The FAA Reauthorization Act also contemplates that the Advisory Committee's report and recommendations will serve as the basis for future regulations or other guidance as deemed necessary to provide other consumer protections for customers of air ambulance providers.[44] We agree that the most prudent course of action is to allow the work of the AAPB Advisory Committee to run its course, rather than to issue more detailed regulations relating to air ambulance providers in this final rule.

## F. Other Comments

We will address briefly a number of comments that do not fall squarely within the categories described above. First, A4A and IATA urge the Department to adopt a "clear and convincing evidence" standard for enforcement of unfair and deceptive practices. We decline to enact such a burden of proof standard here, particularly in light of the fact that most enforcement cases are adjudicated not through the courts, but rather through voluntary consent orders. We also note that during these informal proceedings, regulated entities have the opportunity to present mitigating evidence as set forth above.

Next, A4A and IATA urge the Department to require the Office of Aviation Consumer Protection to present evidence on all of the elements of unfairness and deception, even in cases where a specific regulation enacted under the authority of section 41712 applies to the conduct in question. We decline this request because doing so would be unduly burdensome with limited or no benefit. By enacting a regulation under the authority of section 41712, the Department has already determined, after notice and comment, that the conduct in question is unfair or deceptive; in such cases, it should be sufficient to establish that the regulation itself was violated.[45] A4A and IATA also urge that they should be able to present mitigating evidence with respect to all of the prongs of unfairness and deception. We note that in informal enforcement proceedings involving the violation of specific regulations, regulated entities would have the opportunity to present relevant evidence, including evidence that consumer harm was limited.

Next, A4A and IATA argue that the Office of Aviation Consumer Protection should affirmatively furnish "exculpatory evidence" in its possession. We agree with this practice, and the Office is required to do so under the Department's existing enforcement procedures, which are set forth in another rule.[46]

---

[40] See, *e.g.*, 49 CFR 5.57 ("Enforcement adjudications require the opportunity for participation by directly affected parties and the right to present a response to a decision maker, including relevant evidence and reasoned arguments"); 49 CFR 5.59 (Department's enforcement action should conclude with, among other things, a "well-documented decision as to violations alleged and any violations found to have been committed.")

[41] *https://www.transportation.gov/individuals/aviation-consumer-protection/privacy*.

[42] See *https://www.regulations.gov/document?D=DOT-OST-2019-0182-0193*.

[43] Association of Air Medical Services, Air Methods, and PHI Health, LLC.

[44] For further information about the AAPB Advisory Committee, see *https://www.transportation.gov/airconsumer/AAPB* and the Committee's docket, available at *https://www.regulations.gov/docket?D=DOT-OST-2018-0206*.

[45] See Comment of Travel Fairness Now (urging the Department to clarify that it will not use this final rule as a vehicle for repealing existing regulations, because they were well justified).

[46] 49 CFR 5.89 (duty to disclose exculpatory evidence).

*G. Formal Enforcement Proceedings*

In the NPRM, the Department proposed to clarify that if regulated entities do not enter into a negotiated settlement with the Office of Aviation Consumer Protection with respect to potential violations of section 41712, then the Office may initiate a formal enforcement proceeding, and that hearings are available through this process. The Department did not receive comments on this provision, which restates current procedures found in 14 CFR part 302. In this final rule, the Department has made nonsubstantive editorial changes to the regulatory text such as adding a citation to a specific section of part 302. The Department has determined that good cause exists to dispense with notice and comment for these nonsubstantive editorial changes because they are ministerial in nature; therefore, public comment is unnecessary under 5 U.S.C. 553(b)(B).

**III. Regulatory Analyses and Notices**

*A. Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs), Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures (49 CFR Part 5)*

This final rule is a significant regulatory action under section 3(f) of E.O. 12866, "Regulatory Planning and Review" (Oct. 4, 1993), supplemented by E.O. 13563, "Improving Regulation and Regulatory Review" (Jan. 21, 2011). Accordingly, the Office of Management and Budget (OMB) has reviewed it under that Order. This final rule is issued in accordance with the Department's rulemaking procedures found in 49 CFR part 5 and DOT Order 2100.6.

This rule primarily involves agency procedure and interpretation. It clarifies how the Department interprets the terms "unfair" and "deceptive" and requires enhanced departmental procedures for regulation and enforcement in the area of aviation consumer protection. Clarifying and explicitly defining terminology advances the Department's goal of improved transparency. Adopting enhanced procedures for future rulemaking and enforcement activities will help to ensure that the activities are rooted in fairness, due process, and an adequate factual foundation. These goals are described in the Department's final rule, "Administrative Rulemaking, Guidance, and Enforcement Procedures." [47]

This rule aligns the Department's policies and rules involving unfairness and deception in aviation consumer protection explicitly with principles adopted by the FTC. In the Department's view, aligning the terms "unfair" and "deceptive" does not represent a substantive departure from past DOT practice. The definitions simply provide additional clarification to the public and regulated industries, and are not expected to affect the Department's ability to prohibit unfair and deceptive practices. While clarifying the terms is not expected to lead to changes that would impact the Department, public, or any regulated entity, it provides a foundation for the other elements of this rule pertaining to future rulemaking and enforcement actions.

Effects on Future Rulemakings

This final rule will require the Department to use specific definitions of the terms "unfair" and "deceptive" when declaring certain practices to be unfair or deceptive in future discretionary rulemakings.

Specifically, this final rule requires the Department to support a finding of an "unfair" practice by demonstrating that the harm to consumers is (1) substantial; (2) not reasonably avoidable; and (3) not outweighed by offsetting benefits to consumers or competition. Similarly, it requires the Department to support a finding that a practice is "deceptive" by showing that: (1) The practice actually misleads or is likely to mislead consumers; (2) who are acting reasonably under the circumstances; (3) with respect to a material matter.

The Department has declared certain practices to be unfair or deceptive in several prior rulemakings, including the full fare advertising rule (14 CFR 399.84) and oversales rule (14 CFR part 250). In the supporting analysis for these rulemakings, the Department justified its finding of unfairness or deception without using the full three-pronged analysis for unfairness or deception found in this final rule. [48]

In other instances, the Department has based its discretionary regulations on both section 41712 and other statutes. For example, the rule requiring on-time performance information during booking (14 CFR 234.11(b)) was based on both section 41712 and section 41702 (requiring carriers to provide safe and adequate interstate air transportation). [49] While the Department partly relied on a finding of consumer

harm under section 41712 as the basis for that requirement, it did not engage in the full three-part analysis for unfairness found in this final rule.

Demonstrating support for findings of unfairness or deception requires an analysis of data, which is generally collected and organized as part of a regulatory impact analysis (RIA). Factors such as potential harm to consumers, benefits to consumers or competition, whether a consumer can avoid harm, and whether a harm is "material" relate to the economic benefits and costs of regulating a practice. These benefits and costs are analyzed in an RIA and offer a rationale for finding a practice "unfair" or "deceptive."

The Department customarily prepares a RIA or other regulatory evaluation as part of the E.O. 12866 review process for rulemakings involving aviation consumer protection. Further, the Department's final rule on "Administrative Rulemaking, Guidance, and Enforcement Procedures" requires that all rulemakings including a supporting economic analysis. The Department will therefore need to continue to collect, organize, and analyze data and facts to address economic impacts.

The Department's current practice of collecting and analyzing data, either for E.O. 12866 or departmental review, allows it to generate the necessary factual basis to support an explicit discussion of unfair or deceptive findings with little additional effort. While this final rule may result in the Department expending additional resources to prepare future discretionary aviation consumer protection rules and supporting analyses, the resources are expected to be small and more than justified by better, more deliberative internal decisions. Better internal decisions will improve rulemaking efficiency by reducing the resources needed to follow E.O. 12866 processes. The additional procedures required by this rule are expected to result in improved regulations that achieve their goals of protecting consumers without imposing any more burdens on regulated industry than necessary.

This rule does not require that the Department review existing rules to determine whether previous "unfair" or "deceptive" declarations would have been supported by the criteria described above. Existing rules are subject to retrospective review requirements under the Department's rulemaking procedures found in 49 CFR part 5, DOT Order 2100.6, and other legal requirements, as applicable. The Department will consider whether

---

[47] 84 FR 71714 (Dec. 27, 2019).

[48] See 76 FR 23110 (April 25, 2011).
[49] See 73 FR 74586 (December 8, 2008) (NPRM: "Enhancing Passenger Airline Protections").

existing discretionary aviation consumer protection rules such as full fare advertising, oversales and refunds meet the standards found in this rule when performing the retrospective reviews, but it is not possible to judge the impact of this rule on the rules until the Department conducts the reviews. The Department considers many factors when conducting its retrospective reviews, including the continuing need for the rule and whether the rule has achieved its intended outcomes. It is unlikely that an existing rule would fail the standards set forth in this rule without failing existing standards that would prompt the Department to revise or rescind the rule. Judging the impact of this rule is confounded further because some existing rules do not rely solely on section 41712, as is the case with the rule requiring on-time performance information during booking noted above.

Under this rule, future discretionary rulemakings could be subject to a hearing procedure. The rule allows interested parties to request a hearing when the Department proposes a rule to classify a practice as unfair or deceptive, when the issuance of the NPRM raises one or more disputed technical, scientific, economic, or other complex factual issues, or when the NPRM may not satisfy the requirements of the Information Quality Act. Allowing interested parties an opportunity for a hearing ensures that they can test the information informing discretionary consumer protection regulations. However, following this rule's requirements to provide a sufficient factual basis to support an "unfair" or "deceptive" finding should reduce the need for the Department to hold such hearings.

Nevertheless, requests for hearings are expected to occur occasionally. While the Department lacks data that would allow it to distinguish the costs and time of conducting the hearings from the costs of conducting its normal business operations, the Department believes that any incremental costs and time would be small relative to the baseline scenario in which the Department did not enact the rule. Previous discretionary rulemakings involving unfair and deceptive practices in aviation consumer protection have attracted substantial interest from consumer advocates, airline industry advocates, and the general public. The Department engaged with these interested parties without the benefit of a formal process, and the engagements required investments of time and resources by the Department and interested parties. Because these

engagements were informal and with uncertain scopes, they were not as efficient as would be expected under a more formal process as would be the case under this rule. Without a formal process, parties tend to overinvest in preparation, incurring unnecessary costs, or underinvest, leading to additional engagements and administrative costs. For future rulemakings, establishing formal hearing procedures may reduce costs and time for both groups by increasing certainty about opportunities for engagement.

The hearing procedures established in this final rule are less stringent and more flexible than the hearing procedures for high-impact or economically significant rules detailed in the Department's general rulemaking procedures in 49 CFR part 5 and DOT Order 2100.6. In addition, the Department has experience using hearing procedures to supplement traditional notice-and-comment rulemaking, as described earlier for baggage and wheelchair accounting and for potential on-board wheelchair standards. Finally, the hearing procedures will provide consistency in the Department's exercise of its 41712 authority by mirroring the statute's hearing requirement to ensure rulemakings enacted under the same authority ensure due process, and are grounded in fairness and supported by an adequate factual foundation.

The Department believes that its experience with hearings, coupled with reduced complexity of the hearing procedures, will limit the additional staff resources needed to comply with the requirement and prevent it from leading to excessive delays in issuing aviation consumer protection rules. The General Counsel may also decline a hearing request if following the procedures would unreasonably delay the rulemaking. When deciding to decline a hearing request, the General Counsel will balance the impact of the hearing on departmental resources against the potential value of any information to be collected during the hearing process, and consider the quality of evidence presented, including but not limited to that presented by interested parties and in the Department's RIA and other supporting analyses.

### Effects on Future Enforcement Actions

This final rule adds requirements for future enforcement actions analogous to the requirements for discretionary aviation consumer protection rulemakings. The Department will use the same definitions of unfair and

deceptive when taking enforcement action against an airline or ticket agent for unfair or deceptive practices. In future enforcement actions, the Department would also provide the airline or ticket agent with the opportunity to be heard and to present mitigating evidence. The opportunity for a hearing before a finding that any air carrier, foreign air carrier, or ticket agent is engaged in an unfair or deceptive practice or an unfair method of competition already exists under section 41712. Finally, in future enforcement orders, if a specific regulation does not apply to the practice in question, the Department would explain the basis for its finding that a practice was unfair or deceptive.

As explained in the NPRM, the Department views these measures as a codification of existing practice, rather than a change in policy, because the Department has typically relied on the explicit definitions of "unfair" and "deceptive" in prior enforcement orders. Applying these terms and providing an opportunity for a hearing in enforcement proceedings is largely noncontroversial, and the Department received few comments on this element of the rule at the NPRM stage. The Department does not expect to need to expend additional resources in aviation consumer protection proceedings due to this rule, or expect that the rule will increase the amount of time needed to come to resolution. The Department believes that regulated entities could see some benefit, however, from upfront clarification of the guidelines and criteria that the Department follows when enforcing aviation consumer protection regulations involving unfair and deceptive practices.

This rule is not an E.O. 13771 regulatory action because it is does not impose any more than de minimis regulatory costs. This final rule provides an additional mechanism for industry to provide input to the Department on its discretionary aviation consumer protection rulemakings. Private industry should not experience more than minimal additional costs relative to the status quo because it already engages in significant information exchange with the Department. Industry has the option of continuing use of historical mechanisms for providing input to discretionary aviation consumer protection, and is not required to make use of the alternatives set forth in this rule. The Department should not experience significant additional costs because it has considerable experience conducting analysis in support of aviation consumer protection rules as well as hearings analogous to those in

this rule. Such efforts are consistent with the Department's normal business operations, and any additional resources needs could be accommodated through a simple and temporary realignment of internal resources.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) requires an agency to review regulations to assess their impact on small entities unless the agency determines that a rule is not expected to have a significant economic impact on a substantial number of small entities. A direct air carrier or foreign air carrier is a small business if it provides air transportation only with small aircraft (*i.e.,* aircraft with up to 60 seats/18,000-pound payload capacity). See 14 CFR 399.73. The Department has determined that this rule does not have a significant economic impact on a substantial number of small entities.

*C. Executive Order 13132 (Federalism)*

This final rule has been analyzed in accordance with the principles and criteria contained in Executive Order 13132 (''Federalism''). This final rule does not include any provision that: (1) Has substantial direct effects on the States, the relationship between the national government and the States, or the distribution of power and responsibilities among the various levels of government; (2) imposes substantial direct compliance costs on State and local governments; or (3) preempts State law. States are already preempted from regulating in this area by the Airline Deregulation Act, 49 U.S.C. 41713. Therefore, the consultation and funding requirements of Executive Order 13132 do not apply.

*D. Executive Order 13175*

This final rule has been analyzed in accordance with the principles and criteria contained in Executive Order 13175 (''Consultation and Coordination with Indian Tribal Governments''). Because this final rule does not significantly or uniquely affect the communities of the Indian Tribal governments or impose substantial direct compliance costs on them, the funding and consultation requirements of Executive Order 13175 do not apply.

*E. Paperwork Reduction Act*

The Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501 *et seq.*) requires that DOT consider the impact of paperwork and other information collection burdens imposed on the public and, under the provisions of PRA section 3507(d), obtain approval from the Office of Management and Budget

(OMB) for each collection of information it conducts, sponsors, or requires through regulations. The DOT has determined there are no new information collection requirements associated with this final rule.

*F. Unfunded Mandates Reform Act*

The Department has determined that the requirements of Title II of the Unfunded Mandates Reform Act of 1995 do not apply to this rulemaking.

*G. National Environmental Policy Act*

The Department has analyzed the environmental impacts of this final rule pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*) and has determined that it is categorically excluded pursuant to DOT Order 5610.1C, Procedures for Considering Environmental Impacts (44 FR 56420, Oct. 1, 1979). Categorical exclusions are actions identified in an agency's NEPA implementing procedures that do not normally have a significant impact on the environment and therefore do not require either an environmental assessment (EA) or environmental impact statement (EIS). *See* 40 CFR 1508.4. In analyzing the applicability of a categorical exclusion, the agency must also consider whether extraordinary circumstances are present that would warrant the preparation of an EA or EIS. Id. Paragraph 10.c.16.h of DOT Order 5610.1D categorically excludes ''[a]ctions relating to consumer protection, including regulations.'' Since this rulemaking relates to the definition of unfair and deceptive practices under Section 41712, the Department's central consumer protection statute, this is a consumer protection rulemaking. The Department does not anticipate any environmental impacts, and there are no extraordinary circumstances present in connection with this rulemaking.

*H. Privacy Act*

Anyone may search the electronic form of all comments received into any of OST's dockets by the name of the individual submitting the comment, or signing the comment if submitted on behalf of an association, business, labor union, or any other entity. You may review USDOT's complete Privacy Act Statement published in the **Federal Register** on April 11, 2000, at 65 FR 19477–8.

*I. Statutory/Legal Authority for This Rulemaking*

This rulemaking is issued under the authority of 49 U.S.C. 40113(a), which grants the Secretary the authority to take action that the Secretary considers

necessary to carry out 49 U.S.C. Subtitle VII (Aviation Programs), including conducting investigations, prescribing regulations, standards, and procedures, and issuing orders.

*J. Regulation Identifier Number*

A Regulation Identifier Number (RIN) is assigned to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in Spring and Fall of each year. The RIN set forth in the heading of this document can be used to cross-reference this action with the Unified Agenda.

**List of Subjects in 14 CFR Part 399**

Consumer protection, Policies, Rulemaking proceedings, Enforcement, Unfair or deceptive practices.

For the reasons discussed in the preamble, the Department amends 14 CFR part 399 as follows:

**PART 399—STATEMENTS OF GENERAL POLICY**

■ 1. The authority citation for part 399 is revised to read as follows:

**Authority:** 49 U.S.C. 41712, 40113(a).

**Subpart F—Policies Relating to Rulemaking Proceedings**

■ 2. Section 399.75 is added to subpart F to read as follows:

**§ 399.75 Rulemakings relating to unfair and deceptive practices.**

(a) *General.* When issuing a proposed or final regulation declaring a practice in air transportation or the sale of air transportation to be unfair or deceptive to consumers under the authority of 49 U.S.C. 41712(a), unless the regulation is specifically required by statute, the Department shall employ the definitions of ''unfair'' and ''deceptive'' set forth in § 399.79.

(b) *Procedural requirements.* When issuing a proposed regulation under paragraph (a) of this section that is defined as high impact or economically significant within the meaning of 49 CFR 5.17(a), the Department shall follow the procedural requirements set forth in 49 CFR 5.17. When issuing a proposed regulation under paragraph (a) of this section that is not defined as high impact or economically significant within the meaning of 49 CFR 5.17(a), unless the regulation is specifically required by statute, the Department shall adhere to the following procedural requirements:

(1) *Request for a hearing.* Following publication of a proposed regulation, and before the close of the comment

period, any interested party may file in the rulemaking docket a petition, directed to the General Counsel, to hold a hearing on the proposed regulation.

(2) *Grant of petition for hearing.* Except as provided in paragraph (b)(3) of this section, the petition shall be granted if the petitioner makes a plausible prima facie showing that:

(i) The proposed rule depends on conclusions concerning one or more specific scientific, technical, economic, or other factual issues that are genuinely in dispute or that may not satisfy the requirements of the Information Quality Act;

(ii) The ordinary public comment process is unlikely to provide an adequate examination of the issues to permit a fully informed judgment; and

(iii) The resolution of the disputed factual issues would likely have a material effect on the costs and benefits of the proposed rule.

(3) *Denial of petition for hearing.* A petition meeting the requirements of paragraph (b)(2) of this section may be denied if the General Counsel determines that:

(i) The requested hearing would not advance the consideration of the proposed rule and the General Counsel's ability to make the rulemaking determinations required by this section; or

(ii) The hearing would unreasonably delay completion of the rulemaking.

(4) *Explanation of denial.* If a petition is denied in whole or in part, the General Counsel shall include a detailed explanation of the factual basis for the denial, including findings on each of the relevant factors identified in paragraph (b)(2) or (3) of this section.

(5) *Hearing notice.* If the General Counsel grants the petition, the General Counsel shall publish notification of the hearing in the **Federal Register**. The document shall specify the proposed rule at issue and the specific factual issues to be considered at the hearing. The scope of the hearing shall be limited to the factual issues specified in the notice.

(6) *Hearing process.* (i) A hearing under this section shall be conducted using procedures approved by the General Counsel, and interested parties shall have a reasonable opportunity to participate in the hearing through the presentation of testimony and written submissions.

(ii) The General Counsel shall arrange for a neutral officer to preside over the hearing and shall provide a reasonable opportunity to question the presenters.

(iii) After the hearing and after the record of the hearing is closed, the hearing officer shall place on the docket

minutes of the hearing with sufficient detail as to fully reflect the evidence and arguments presented on the issues, along with proposed findings addressing the disputed issues of fact identified in the hearing notice.

(iv) Interested parties who participated in the hearing shall be given an opportunity to file statements of agreement or objection in response to the hearing officer's proposed findings. The complete record of the hearing shall be made part of the rulemaking record.

(7) *Actions following hearing.* (i) Following the completion of the hearing process, the General Counsel shall consider the record of the hearing, including the hearing officer's proposed findings, and shall make a reasoned determination whether to terminate the rulemaking; to proceed with the rulemaking as proposed; or to modify the proposed rule.

(ii) If the General Counsel decides to terminate the rulemaking, the General Counsel shall publish a document in the **Federal Register** announcing the decision and explaining the reasons for the decision.

(iii) If the General Counsel decides to finalize the proposed rule without material modifications, the General Counsel shall explain the reasons for the decision and its responses to the hearing record in the preamble to the final rule.

(iv) If the General Counsel decides to modify the proposed rule in material respects, the General Counsel shall publish a new or supplemental notice of proposed rulemaking in the **Federal Register** explaining the General Counsel's responses to and analysis of the hearing record, setting forth the modifications to the proposed rule, and providing additional reasonable opportunity for public comment on the proposed modified rule.

(8) *Interagency review process.* The hearing procedures under this paragraph (b)(8) shall not impede or interfere with the interagency review process of the Office of Information and Regulatory Affairs for the proposed rulemaking.

(c) *Basis for rulemaking.* When issuing a proposed or final regulation declaring a practice in air transportation or the sale of air transportation to be unfair or deceptive to consumers under the authority of 49 U.S.C. 41712(a), unless the regulation is specifically required by statute, the Department shall articulate the basis for concluding that the practice is unfair or deceptive to consumers as defined in § 399.79.

## Subpart G—Policies Relating to Enforcement

■ 3. Section 399.79 is added to subpart G to read as follows:

**§ 399.79   Policies relating to unfair and deceptive practices.**

(a) *Applicability.* This policy shall apply to the Department's aviation consumer protection actions pursuant to 49 U.S.C. 41712(a).

(b) *Definitions.* (1) A practice is "unfair" to consumers if it causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition.

(2) A practice is "deceptive" to consumers if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter. A matter is material if it is likely to have affected the consumer's conduct or decision with respect to a product or service.

(c) *Intent.* Proof of intent is not necessary to establish unfairness or deception for purposes of 49 U.S.C. 41712(a).

(d) *Specific regulations prevail.* Where an existing regulation applies to the practice of an air carrier, foreign air carrier, or ticket agent, the terms of that regulation apply rather than the general definitions set forth in this section.

(e) *Informal enforcement proceedings* (1) Informal enforcement proceedings will be conducted pursuant to the policies and procedures found in 49 CFR part 5, subpart D. Before any determination is made on how to resolve a matter involving a potential unfair or deceptive practice, the U.S. Department of Transportation's Office of Aviation Consumer Protection will provide an opportunity for the alleged violator to be heard and present relevant evidence, including but not limited to:

(i) In cases where a specific regulation applies, evidence tending to establish that the regulation at issue was not violated and, if applicable, that mitigating circumstances apply;

(ii) In cases where a specific regulation does not apply, evidence tending to establish that the conduct at issue was not unfair or deceptive as defined in paragraph (b) of this section; and

(iii) Evidence tending to establish that consumer harm was limited, or that the air carrier, foreign air carrier, or ticket agent has taken steps to mitigate consumer harm.

(2) During this informal process, if the Office of Aviation Consumer Protection reaches agreement with the alleged violator to resolve the matter with the

issuance of an order declaring a practice in air transportation or the sale of air transportation to be unfair or deceptive to consumers under the authority of 49 U.S.C. 41712(a), and when a regulation issued under the authority of section 41712 does not apply to the practice at issue, then the Department shall articulate in the order the basis for concluding that the practice is unfair or deceptive to consumers as defined in this section.

(f) *Formal enforcement proceedings.* When there are reasonable grounds to believe that an airline or ticket agent has violated 49 U.S.C. 41712, and efforts to settle the matter have failed, the Office of Aviation Consumer Protection may issue a notice instituting an enforcement proceeding before an administrative law judge pursuant to 14 CFR 302.407. After the issues have been formulated, if the matter has not been resolved through pleadings or otherwise, the parties will receive reasonable written notice of the time and place of the hearing as set forth in 14 CFR 302.415.

Issued this 24th day of November, 2020, in Washington, DC, under authority delegated in 49 CFR 1.27(n).

**Steven G. Bradbury,**
*General Counsel.*

[FR Doc. 2020–26416 Filed 12–4–20; 8:45 am]

**BILLING CODE 4910–9X–P**

---

**COMMODITY FUTURES TRADING COMMISSION**

**17 CFR Part 3**

**RIN 3038–AE46**

**Exemption From Registration for Certain Foreign Intermediaries**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Final rule.

**SUMMARY:** The Commodity Futures Trading Commission (CFTC or Commission) is adopting amendments (Final Rule) revising the conditions set forth in the Commission regulation under which a person located outside of the United States (each, a foreign located person) engaged in the activity of a commodity pool operator (CPO) in connection with commodity interest transactions on behalf of persons located outside the United States (collectively, an offshore commodity pool or offshore pool) would qualify for an exemption from CPO registration and regulation with respect to that offshore pool. The Final Rule provides that the exemption under the applicable Commission regulation for foreign

located persons acting as a CPO (a non-U.S. CPO) on behalf of offshore commodity pools may be claimed by such non-U.S. CPOs on a pool-by-pool basis. The Commission is also adopting a provision clarifying that a non-U.S. CPO may claim an exemption from registration under the applicable Commission regulation with respect to a qualifying offshore commodity pool, while maintaining another exemption from CPO registration, relying on a CPO exclusion, or even registering as a CPO, with respect to its operation of other commodity pools. Additionally, the Commission is adopting a safe harbor by which a non-U.S. CPO of an offshore pool may rely upon that exemption, if it satisfies several enumerated factors related to its operation of the offshore commodity pool. The Commission is also adopting an amendment permitting U.S. affiliates of a non-U.S. CPO to contribute initial capital to such non-U.S. CPO's offshore pools, without affecting the eligibility of the non-U.S. CPO for an exemption from registration under the applicable Commission regulation. The Commission is also adopting amendments to the applicable Commission regulation originally proposed in 2016 that clarify whether clearing of commodity interest transactions through a registered futures commission merchant (FCM) is required as a condition of the registration exemptions for foreign intermediaries, and whether such exemption is available for foreign intermediaries acting on behalf of international financial institutions.

**DATES:** The effective date for this Final Rule is February 5, 2021.

**FOR FURTHER INFORMATION CONTACT:** Joshua B. Sterling, Director, at 202–418–6056, *jsterling@cftc.gov;* with respect to the finalization of the 2016 Proposal: Frank N. Fisanich, Chief Counsel, at 202–418–5949 or *ffisanich@cftc.gov;* with respect to all other aspects of this release: Amanda Lesher Olear, Deputy Director, at 202–418–5283 or *aolear@cftc.gov;* Pamela Geraghty, Associate Director, at 202–418–5634 or *pgeraghty@cftc.gov;* Elizabeth Groover, Special Counsel, at 202–418–5985 or *egroover@cftc.gov,* Division of Swap Dealer and Intermediary Oversight, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
 A. Statutory and Regulatory Background
 B. Recent Regulatory Proposals Related to Commission Regulation 3.10(c)
 C. The 2020 Proposal
II. Final Rule
 A. General Comments in Response to the 2016 and 2020 Proposals
 B. Reconsidering the 2016 Proposal and Comments Received
 1. The 2016 Proposal's Amendments to Commission Regulation 3.10(c)
 2. Responsive Comments Received Regarding the 2016 Proposal
 3. Finalizing the 2016 Proposal
 C. Pool-by-Pool Exemption
 D. Utilizing the 3.10 Exemption Concurrent With Other Regulatory Relief Available to CPOs
 E. The Safe Harbor for Non-U.S. CPOs With Respect to Inadvertent U.S. Participants in Their Offshore Pools
 F. Exception for Initial Capital Contributions by U.S. Affiliates of a Non-U.S. CPO to Its Offshore Pools
 1. U.S. "Controlling" Affiliates
 2. The Timing of a U.S. Affiliate's Capital Contributions to an Offshore Pool
 3. Additional Anti-Evasion Conditions: The Marketing Prohibition and Prohibiting "Bad Actor" U.S. Affiliates
 4. Analysis Under Section 4(c) of the Act
 G. Additional Relief for Commodity Trading Advisors
 H. Reorganization of Commission Regulation 3.10(c)
III. Related Matters
 A. Regulatory Flexibility Act
 B. Paperwork Reduction Act
 C. Cost-Benefit Considerations
 1. Costs and Benefits Related to Finalizing the 2016 Proposal
 2. Commission Regulation 3.10 (c)(5)(ii): Claiming the 3.10 Exemption on a Pool-by-Pool Basis
 3. Commission Regulation 3.10(c)(5)(iii): Providing A Safe Harbor for Non-U.S. CPOs Whose Offshore Pools May Have Inadvertent U.S. Participants
 4. Commission Regulation 3.10(c)(5)(iv): Utilizing the 3.10 Exemption Concurrent with Other Available Exclusions and Exemptions
 5. Commission Regulation 3.10(c)(5)(ii): The Affiliate Contribution Exception
 6. Section 15(a) Factors
 D. Anti-Trust Considerations

**I. Background**

*A. Statutory and Regulatory Background*

Section 1a(11) of the Commodity Exchange Act (CEA or Act)[1] defines the term "commodity pool operator" as any

---

[1] 7 U.S.C. 1a(11). *See also* 17 CFR 1.3 (defining "commodity interest" to include, inter alia, any contract for the purchase or sale of a commodity for future delivery, and any swap as defined in the CEA); Adaptation of Regulations to Incorporate Swaps, 77 FR 66288, 66295 (Nov. 2, 2012) (discussing the modification of the term "commodity interest" to include swaps). The Act is found at 7 U.S.C. 1, *et seq.* (2018), and the Commission's regulations are found at 17 CFR Ch. I (2020). Both are accessible through the Commission's website, *https://www.cftc.gov.*

Plaintiffs' Exhibit 161

cdc.gov

# COVID-19 and Your Health

19-24 minutes

### Summary of Recent Changes

<mark>Effective February 25, 2022, CDC does not require wearing of masks on buses or vans operated by public or private school systems, including early care and education/child care programs.</mark>



Traveling on public transportation increases a person's risk of getting and spreading COVID-19 by bringing people in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and busy airport terminals. Travel by bus, train, and other conveyances used for international, interstate, or intrastate transportation poses similar challenges. Staying 6 feet away from others is often difficult on public transportation conveyances. People may not be able to distance themselves by the recommended minimum of 6 feet from other people seated nearby or from those standing in or passing through the aisles on airplanes, trains, or buses.

Travel contributes to interstate and international spread of COVID-19. Wearing masks that completely cover the mouth and nose reduces the spread of COVID-19. People who never develop symptoms (asymptomatic) or are not yet showing symptoms (pre-symptomatic) might not know that they are infected but can still spread COVID-19 to others. Masks also offer protection to the wearer.

On January 29, 2021, CDC issued an Order that required face masks to be worn by all people while on public transportation (which included all passengers and all personnel operating conveyances) traveling into, within, or out of the United States and U.S. territories. The Order also required all people to wear masks while at transportation hubs (e.g., airports, bus or ferry terminals, train and subway stations, seaports, U.S. ports of entry, and other locations where people board public

transportation in the United States and U.S. territories), including both indoor and outdoor areas.

Effective February 25, 2022, CDC is exercising its enforcement discretion to not require that people wear masks on buses or vans operated by public or private school systems, including early care and education/child care programs. CDC is making this change to align with updated guidance that no longer recommends universal indoor mask wearing in K-12 schools and early education settings in areas with a low or medium COVID-19 Community Level. School systems at their discretion may choose to require that people wear masks on buses or vans.

CDC previously announced that it would use enforcement discretion to not require people to wear a mask in outdoor areas of conveyances (if such outdoor areas exist on the conveyance) or while outdoors at transportation hubs. CDC will continue to evaluate the requirements of its Order and determine whether additional changes may be warranted.

While in indoor areas of conveyances or while indoors at transportation hubs, people are not required to wear a mask under the following circumstances:

- while eating, drinking, or taking medication for brief periods of time;

- while communicating for brief periods of time with a person who is hearing impaired when the ability to see the mouth is essential for communication;

- if, on an aircraft, wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;

- if unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;

- when necessary to temporarily lower or remove the mask to verify one's identity such as during Transportation Security Administration (TSA) screening or when asked to do so by the ticket or gate agent or any law enforcement official;

- when experiencing difficulty breathing or shortness of breath or feeling winded, until able to resume normal breathing with the mask; when vomiting until vomiting ceases; or if wearing a mask interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

The following categories of people continue to be exempt from the requirement to wear a mask:

- A child under the age of 2 years;

- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*);

- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

People on board the following categories of conveyances continue to be exempt from the requirement to wear a mask:

- Private conveyances operated only for personal, non-commercial use;

- Commercial motor vehicles or trucks, if the driver is the only person in the vehicle or truck, or the vehicle or truck is operated by a team who all live in the same household and are the only persons in the vehicle;*

- Conveyances operated or chartered by the U.S. military as long as the operator of the conveyance follows all requirements of U.S. military services to prevent spread of COVID-19 that are equivalent to the requirements in CDC's Order.

\*Non-passenger-carrying commercial vessels operated by a team of mariners who all live on the vessel and are the only people on the vessel are also permitted to use this exemption.

## Frequently Asked Questions

**General**

**What is a public transportation conveyance?**
A public transportation conveyance is any mode of transportation other than a private vehicle. Types of public transportation conveyances include airplanes, trains, subways, buses, taxis, ride-shares, maritime transportation, trolleys, and cable cars.

**Which public transportation conveyances does the order apply to, and in which areas?**
The Order applies to all public transportation conveyances traveling into the United States (i.e., arriving from a foreign country) or within the United States (including within states or territories or traveling between states or territories). The Order also applies to all conveyances leaving the United States until they arrive at a foreign destination.

If a conveyance has outdoor areas (such as on a ferry or an open-air trolley or bus), wearing a mask is not required while outdoors unless otherwise required by the operator, federal, state, tribal, territorial, or local government.

**How is CDC defining "outdoor" areas on conveyances and at transportation hubs?**
Subject to how other federal partners and state and local entities define "outdoors," CDC understands "outdoors" to refer to any open-air area. Examples of outdoor areas of conveyances are the uncovered top decks of buses and open deck areas of ferries or other vessels. Examples of outdoor areas of transportation hubs include surface parking lots and partially enclosed parking garages, passenger pick-up/drop-off areas, railway platforms, piers, open hangars, and airport runways.

**Are masks required on school buses?**
No, CDC does not require people to wear masks on buses or vans operated by public or private K-12 school systems or early care and education/child care (ECE) programs. At their discretion, school systems and ECE programs may choose to require that people wear masks on buses or vans.

**What kind of mask should I wear?**
People must wear masks that completely cover the mouth and nose. Masks should fit snugly against the sides of the face. See attributes of masks needed to fulfill the requirements of the Order. For more information about masks, see Types of Masks and Respirators.

**Can I wear a face shield instead of a mask?**
Face shields do not fulfill the requirements of the Order. Face shields may be worn in addition to a mask that fulfills the requirements of the Order, but face shields may **not** be worn **instead of** a mask. A face shield is effective at protecting the person wearing it from splashes to the face,

WIKIPEDIA

Plaintiffs' Exhibit 162

# Face masks during the COVID-19 pandemic in the United States

The wearing of non-medical face masks in public to lessen transmission of COVID-19 in the United States was first recommended by the CDC on April 3, 2020 as supplemental to hygiene and appropriate social distancing. Over the course of the pandemic, various states, counties, and municipalities have issued health orders requiring the wearing of non-medical face coverings — such as cloth masks — in spaces and/or businesses accessible to the public, especially when physical distancing is not possible. Some areas only mandated their use by public-facing employees of businesses at first, before extending them to the general public.



A crowd of subway users wearing masks at Milpitas station in Milpitas, California.

Federal officials initially discouraged the general public from wearing masks for protecting themselves from COVID-19.[1] In early April, federal officials reversed their guidance, saying that the general public should wear masks to lessen transmission by themselves, particularly from asymptomatic carriers.[2] Public health experts such as Larry Gostin stated that federal officials should have recommended mask-wearing sooner;[2] others noted that US government guidance lagged significantly behind mask recommendations in East Asian countries and likely exacerbated the scale of the pandemic in the United States.[3] In September 2020, it was reported that the government had contemplated leveraging the United States Postal Service to distribute free reusable masks nationwide as early as April, but that it had scrapped the plan due to concerns it could "create concern or panic".[4]

Mask mandates were divisive. Republican-led states were, initially, less likely to impose health orders requiring the wearing of masks than Democratic-led states. Several states, including Arizona, Georgia, and Texas, took actions to block localized health orders requiring masks, but later softened their stances to help control local spikes.[5] Some Americans felt mask mandates to be an infringement of their personal liberties,[6][7] According to a Pew Research survey conducted in fall 2020, 19% of Republican respondents listed masks as a pandemic-related hardship, 27% of whom were skeptical about masks or the severity of the pandemic, compared with 10% of Democrats, 31% of whom expressed anxieties about the politicization of safety regulations and others who were not taking the pandemic seriously.[8]

Former president Donald Trump largely resisted wearing masks in public media appearances,[9][10][11] and did not mandate their use at his rallies and other public campaign events for the 2020 presidential election.[12][13] After briefly encouraging their use in mid-July,[14][15] Trump continued to hold campaign events (such as the 2020 Republican National Convention) where masks were not widely used.[16][17][18] Trump mocked and ridiculed Joe Biden, his Democratic opponent (and the eventual winner) in the election, for wearing face masks in public appearances.[19][20][16] Biden, House Speaker Nancy Pelosi, Michigan Attorney General Dana Nessel, and others criticized Trump's refusal, calling it dangerous and irresponsible.[21][22][23] A lack of precautions (such as masks) taken during crowded White House ceremonies and receptions by Trump on September 26 were credited with having possibly resulted in a COVID-19 outbreak at the White House, which included Trump himself.

After Biden was sworn in as president in January 2021, one of his first executive orders mandated stronger enforcement of COVID-19-related health and safety protocols, including masks, on federal properties. Biden also issued an executive order mandating the wearing of masks on public transport systems. In April 2021, as the country's vaccination program increased in pace, the Centers for Disease Control and Prevention (CDC) issued guidance stating that those who are fully vaccinated did not need to wear masks when in small outdoor gatherings. In May 2021, the CDC went further and issued guidance stating that fully vaccinated people did not need to wear masks nor physically distance in public, unless otherwise mandated by local laws or entities. The announcement faced a mixed reception, with critics arguing that this guidance largely relied on an honor system, and may have been premature given the country's progress on vaccination. The CDC still recommends that masks be worn in public spaces by unvaccinated people.

## Contents

Timeline
    2020
        Early recommendations
        Recommendations on using masks to reduce transmission

        Downplaying by the Trump administration
            Trump criticism of Joe Biden
            In-person campaign events
        Brief change in stance
        Continued downplaying by the Trump administration
        White House outbreak and aftermath
        Presidential debates and town halls
    2021
        Transition to the Biden administration
        Issuance of guidance for vaccinated individuals
            CDC drops mask recommendations for the fully-vaccinated

**Federal policy**
    Calls for federal policies
    Action by the Biden administration

**Supply**
    Theft
    Counterfeit masks

**Attitudes**
    Protection of others
    Political views
    Among minorities
    Confrontations over mask requirements
    Appearance of vulnerability

**Mask use and policies by state**
    Enforcement and challenges
    Political stances
    Summary of orders and recommendations issued by states

**See also**

**References**

# Timeline

### 2020



CDC poster recommending the use of non-medical face masks to slow transmission of COVID-19.

**Early recommendations**

Initially, the U.S. government did not recommend the use of face masks by the general public outside of medical settings to protect themselves from COVID-19, as to prevent shortages of medical-grade personal protective equipment (PPE) for doctors treating COVID-19 patients.[24][25] In February 2020, Surgeon General Jerome M. Adams stated that proper hygiene and getting a flu vaccine were appropriate preventive actions to be taken by the public, and stated on Twitter that masks should be saved for healthcare professionals, and that they were "NOT effective in preventing [the] general public from catching Coronavirus".[26] CDC director Robert R. Redfield also stated that healthy people did not need to wear masks.[27]

In a March 8 interview with *60 Minutes*, Director of the National Institute of Allergy and Infectious Diseases (NIAID) Anthony Fauci similarly argued that "when you're in the middle of an outbreak, wearing a mask might make people feel a little bit better and it might even block a droplet, but it's not providing the perfect protection that people think that it is." Fauci again cited the need to conserve supplies of PPE for medical workers and those who were sick.[28]

In late March 2020, the Centers for Disease Control and Prevention (CDC) published a recommendation that masks be used by

those who are sick, or are caring for someone who is sick and not able to wear a mask themselves, and discouraged their use by healthy members of the general public.[24][1] This guidance was consistent with that of the World Health Organization (WHO) at the time.[1]

### Recommendations on using masks to reduce transmission

In late-March 2020, some government officials began to focus on the wearing of masks to help prevent transmission of COVID-19 as opposed to protecting the wearer; Commissioner of Food and Drugs Scott Gottlieb stated in a report that face masks would be "most effective" at slowing its spread if widely used (citing Hong Kong and South Korea as examples), as "they may help prevent people who are asymptomatically infected from transmitting the disease unknowingly".[24]



A public service announcement from the Government of California encouraging people to wear masks to "slow the spread".

On March 30, Director of the CDC Robert R. Redfield stated that the organization was evaluating data regarding use of masks by the general public. The next day, President Donald Trump suggested in a White House Coronavirus Task Force briefing that scarves or "something else" could be worn as face coverings. COVID-19 response coordinator Deborah Birx stated that the task force was discussing the addition of face masks to its guidance.[24]

On April 3, 2020, the CDC issued guidance recommending that non-medical face coverings be worn in public when social distancing is difficult to maintain, such as at grocery stores and pharmacies, and especially in areas with significant amounts of community transmission.[29][30] The CDC published tutorials on making non-medical face masks, including a design only requiring a t-shirt and rubber bands, and no sewing.[1][24]

When asked by National Public Radio about the April 3 reversal, the CDC cited studies from February and March showing presymptomatic and asymptomatic transmission, and reports from Asian countries regarding the effectiveness of face coverings in this manner.[2] Professor of public health Larry Gostin said that the CDC could have revised its recommendation sooner; by maintaining its initial recommendation throughout March, it had given the public the impression that widespread mask usage was ineffective even though scientific evidence to the contrary was already available.[2] The earlier recommendation damaged the agency's credibility.[31][32][33]

In a May 27 interview with CNN, Fauci urged Americans to wear face masks in public as a sign of "respect" for others, and stated that he had been doing so himself "[because] I want to protect myself and protect others, and also because I want to make it be a symbol for people to see that that's the kind of thing you should be doing."[34][35] On June 5, amid the nationwide protests over the police murder of George Floyd, Fauci warned that people not wearing face masks in crowds may "propagate the further spread of infection".[36]

### Downplaying by the Trump administration

Following the change in recommendations by the CDC, President Donald Trump began to publicly downplay the use of face masks; during a media briefing on April 3, he emphasized that the new guidance was voluntary, and that he himself would not follow them.[6] When asked about his stance by a reporter, he explained that "somehow sitting in the Oval Office behind that beautiful *Resolute* desk, the great *Resolute* desk, I think, and wearing a face mask as I greet presidents, prime ministers, dictators, kings, queens, [..] I just don't see it for myself."[37][38]

Trump and Vice President Mike Pence avoided being seen wearing face masks during media events, such as an April 28 visit to the Mayo Clinic by Pence, and a visit by Trump to a Honeywell factory producing respirators.[39][21] After he was criticized for violating Mayo Clinic policies requiring masks to be worn by staff and visitors, Pence explained that he has been regularly tested negative for COVID-19, and that "I thought it'd be a good opportunity for me to be here, to be able to speak to these researchers, these incredible health care personnel, and look them in the eye and say 'thank you'."[40]



President Donald Trump touring a Honeywell mask factory in May 2020; Trump did not publicly wear a mask at this media event.[39]

On September 17, 2020, the *Washington Post* published a report on documents from the United States Postal Service obtained by American Oversight under the Freedom of Information Act, which included a draft press release dated April 2020 announcing that it planned to distribute 650 million reusable masks in five-packs to each residential address in the United States (beginning with areas identified as being hot spots at the time, including New York City and parts of Louisiana and Washington). An anonymous senior

official told the *Post* that the proposed program had been scrapped due to "concern from some in the White House Domestic Policy Council and the office of the vice president that households receiving masks might create concern or panic."[4]

When visiting a ventilator factory on April 30, Pence was seen wearing a mask.[6] During a visit to a Ford Motor Company plant in Ypsilanti, Michigan on May 21, Trump wore a cloth mask inscribed with the presidential seal, but took it off before appearing for the media. Trump explained that he did not want to give the press the "pleasure" of seeing him wearing a mask.[9][10][11]

Michigan Attorney General Dana Nessel issued a warning to Ford for violations of state health orders.[41] In a CNN interview, Nessel called Trump a "petulant child who refuses to follow the rules", and suggesting that he did not respect the safety and welfare of his potential voters enough "just to engage in the very simple task, the painless task, the easy task of wearing a mask when he was provided one."[21][42] On Twitter, Trump accused Nessel of "taking her anger and stupidity out on Ford Motor", insinuating that "they might get upset with you and leave the state, like so many other companies have — until I came along and brought business back to Michigan."[42]

### Trump criticism of Joe Biden

After former vice president and presumptive Democratic presidential candidate Joe Biden wore a black mask and sunglasses during a Memorial Day ceremony (his first major out-of-home appearance in two months), Trump shared a Twitter post by Fox News commentator Brit Hume that ridiculed the outfit, captioned "This might help explain why Trump doesn't like to wear a mask in public." In an interview the next day, Biden criticized Trump for sharing the post, and for being a bad role model for the American public. He argued that "presidents are supposed to lead, not engage in folly and be falsely masculine."[20][43][19] During a subsequent media appearance, Trump described Biden's decision as being "very unusual", as "he was standing outside with his wife, perfect conditions, perfect weather." He added, "I thought that was fine. I wasn't criticizing him at all. Why would I do a thing like that?"[19] After a reporter refused a request by Trump to take off his mask because it had muffled his voice, Trump accused him of "want[ng] to be politically correct."[44]

In a June 2020 interview with *The Wall Street Journal*, Trump argued that some people were wearing masks to "signal disapproval" of him,[45] and said of Biden's use of masks, "It's like he put a knapsack over his face. He probably likes it that way. He feels good that way because he does. He seems to feel good in a mask, you know, feels better than he does without the mask, which is a strange situation."[46]

### In-person campaign events

Trump returned to holding public campaign events for his 2020 re-election campaign in mid-June 2020, beginning with a rally in Tulsa, Oklahoma on June 20. Masks were optional, and not worn by the majority of participants, nor was social distancing enforced.[47][48]

Trump then appeared at a Students for Trump event in Phoenix, Arizona on June 23. Despite the state of Arizona had recently become a major hotspot for new COVID-19 cases, and Phoenix having enacted a health ordinance requiring the wearing of masks in public, Mayor Kate Gallego stated that the city would "[not] be focused on enforcement during the rally."[49] The owners of the megachurch where the event took place announced that it had installed an ionizing air purifier system that could "kill 99.9% of the virus". The claimed efficacy was disputed by the media.[50] Once again, the majority of attendees did not wear masks.[12][13]

On July 3, Trump also made an appearance at an Independence Day fireworks event at Mount Rushmore in South Dakota (a state that had been known for its *laissez-faire* approach to the pandemic with few public health orders), where masks were once again optional, and social distancing was explicitly left unenforced.[51][52]

By contrast, Biden's campaign employed more "drive-in" rallies, and smaller-scale gatherings with social distancing and mask usage.[53][54]

### Brief change in stance

During a Coronavirus Task Force briefing on June 26 amidst major resurgences of cases in California and multiple Southern states, most of the participants wore masks when not at the podium. However, Pence did not wear a mask, nor did he mention the wearing of masks or social distancing when recapping the government's hygiene recommendations.[55] On June 28 in an interview on *This Week*, House Speaker Nancy Pelosi argued that "the president should be an example. Real men wear masks."[23]

On July 1 in an interview with Fox Business, Trump stated he was "all for masks", but questioned the implementation of a

national mandate since they would apply in "places in the country where people stay very long distance." Trump stated he had "no problem" wearing a mask in public if he were "in a group of people where we're not 10 feet away — but usually I'm not in that position and everyone's tested."[37][56] On July 5, White House Chief of Staff Mark Meadows stated that a national mandate was "not in order", since they are "[used] on a location basis when you can't have social distancing".[57]



President Trump wearing a face mask during a tour of the Bioprocess Innovation Center in late July 2020

A Trump campaign event in New Hampshire originally scheduled on July 11, by contrast, was to be held outdoors, and the wearing of masks was now listed as "strongly encouraged" (although the event would later be postponed, with the White House citing Tropical Storm Fay as justification).[58][59] On July 11, Trump publicly wore a mask for the first time when visiting members of the military at Walter Reed Army Medical Center.[60] Prior to the event, Trump told Sean Hannity that "it's fine to wear a mask out if it makes you feel comfortable", and later commented that hospitals were a location where one is generally expected to wear a mask under these conditions.[61][62]

On July 14, First Lady Melania posted a photo of herself wearing a mask on social media, urging her followers to follow CDC guidance since "the more precaution we take now can mean a healthier & safer country in the Fall."[63] In a CBS News interview the same day, Trump stated that "if it's necessary, I would urge [Americans] to wear a mask and I would say follow the guidelines."[64]

In an interview with *Fox News Sunday* that aired July 19, Trump told Chris Wallace that he was a "believer" in masks, but that he did not intend to enact a federal mandate (leaving it to state governors) because "I want people to have a certain freedom". He also disagreed with CDC Director Redfield's suggestion that the use of masks nationwide could bring the U.S. epidemic under control within weeks, and accused federal health officials of having been inconsistent with their guidance on masks over the course of the pandemic.[14][15]

On July 20, Trump posted a photo of himself in a mask on Twitter, captioned "We are United in our effort to defeat the Invisible China Virus, and many people say that it is Patriotic to wear a face mask when you can't socially distance. There is nobody more Patriotic than me, your favorite President!"[65] The next day during a press briefing, Trump encouraged the wearing of masks by Americans, stating "whether you like the mask or not, they have an impact."[66] It was reported that Trump's advisers had recommended this shift in order to re-gain public approval for his handling of the pandemic.[67]

### Continued downplaying by the Trump administration

During the 2020 Republican National Convention, speeches were held on the South Lawn of the White House. A crowd of 1,500 invited guests were present for Trump's acceptance speech on the final night, who did not wear masks or practice social distancing. When questioned by CNN about the crowd, an official argued that "everybody is going to catch this thing eventually."[17][18] Although Washington D.C. health orders at the time prohibited gatherings of more than 50 people, this does not extend to federal property.[68] At a campaign rally on September 3 in Latrobe, Pennsylvania, Trump continued to mock Biden for wearing masks during campaign appearances — suggesting that it gave him a "feeling of security", but that "If I were a psychiatrist, I'd say this guy has some big issues." He asked the audience, "did you ever see a man that likes a mask as much as him?"[69][70]

On September 21, 2020, William Crews, a public affairs official at the National Institute of Allergy and Infectious Diseases (NIAID), stepped down from his position after *The Daily Beast* published a report that identified him as a pseudonymous managing editor of the conservative website RedState. He had authored several posts promoting COVID-19 disinformation and criticizing masks, which argued they were a "political statement", and referred to Anthony Fauci as a "mask nazi".[71]

### White House outbreak and aftermath

On September 26, 2020, Trump held an outdoor ceremony at the White House Rose Garden to announce Amy Coney Barrett as his nomination to fill a vacancy in the Supreme Court, left by Ruth Bader Ginsburg following her death on September 18. It was observed that social distancing was not practiced, and a large number of the 150 participants (including several senior officials) did not wear masks. Secretary of Health and Human Services Alex Azar was an exception, but was then seen taking off his mask and physically interacting with others as he left. The HHS stated that Azar and the people he interacted with had all tested negative prior to the event.[72][73] Two indoor receptions were also held.[74]

Despite a spokesperson stating that all attendees in proximity to Trump had been tested before the event, guests from Barrett's alma mater Notre Dame (who were seated in the front row) reported that they were not, and stated that they were not told by the White House that tests were a prerequisite.[72][73] Furthermore, the White House stated that attendees did not need to wear masks if they had tested negative.[74]

On September 30, Trump's senior counselor Hope Hicks (who had traveled with Trump)[75] tested positive for COVID-19, but the case was not publicized until an interview with Trump on Fox News's *Hannity* the next evening.[76][77] During the interview, Trump stated that he and Melania had just been tested. Several hours later, Trump announced on Twitter that he and Melania had both tested positive.[78][79]



Trump speaking at the White House Rose Garden on September 26, 2020 to announce Amy Coney Barrett as a Supreme Court nominee.

By October 2, at least seven attendees of the ceremony had tested positive, also including senators Mike Lee and Thom Tilli, former New Jersey governor Chris Christie, former White House adviser Kellyanne Conway, University of Notre Dame president John I. Jenkins (who had apologized after the event for his failure to wear a mask), and an unnamed journalist.[80][81] This resulted in scrutiny of the ceremony as a superspreader event by the media and local officials, due to the lack of precautions generally taken by its participants. Infectious disease physician Robert L. Murphy argued that if the ceremony was responsible for the White House outbreak, general use of masks and social distancing could have prevented it.[82][83][84][68]

### Presidential debates and town halls

At the first presidential debate on September 29, First Lady Melania and other members of Trump's family were seen taking off masks after seating themselves in the audience—violating health protocols specified by the Cleveland Clinic that had been agreed upon by both parties, calling for masks to be worn at the debate by all attendees (excluding the two candidates and the moderator when on-stage).[85] During the debate, Trump once again mocked Biden for his use of face masks, stating "I don't wear a mask like him. Every time you see him, he's got a mask. He could be speaking 200 feet away from them, and he shows up with the biggest mask I've ever seen."[86] Debate moderator Chris Wallace later stated that Trump and his personnel were not tested prior to the debate in Cleveland since they arrived late, and that they were admitted under "an honor system".[87]

In an October 2020 town hall held by NBC News, President Trump incorrectly claimed a CDC study found that 85% of people who wore masks had still contracted COVID-19. The data originated from a "Morbidity and Mortality Weekly Report" published by the CDC, which contained a survey on behaviors exhibited by COVID patients and a control group of those who tested negative: While around 70% of both groups surveyed did say they always wore a mask, the COVID-positive patients were more likely to have engaged in close contact and activities "where mask use and social distancing are difficult to maintain" within the 14 days prior to the onset of symptoms, such as visiting a bar or restaurant. Misinformation related to this report has also been promoted by social network posts and Fox News pundit Tucker Carlson.[88][89][90]

During a rally on October 29, Trump made remarks to the crowd promoting mask use when social distancing is not possible; "If you get close, wear a mask. 'Oh, it's controversial.' It's not controversial to me."[91]

## 2021

### Transition to the Biden administration

On January 20, 2021, in one of his first actions as president following his inauguration,[92] Joe Biden signed Executive Order 13991, which compels the heads of executive departments and agencies to "immediately take action, as appropriate and consistent with applicable law, to require compliance with CDC guidelines with respect to wearing masks, maintaining physical distance, and other public health measures" by visitors and employees of federal land and properties, and commands the Secretary of Health and Human Services to "engage" with political leaders and community members to "[maximize] public compliance with, and addressing any obstacles to, mask-wearing and other public health best practices identified by CDC".[93][94]



A social media post by the Biden administration, promoting executive orders on COVID-19 protocols for federal properties.

The next day, Biden signed another executive order, compelling the Transportation Security Administration (TSA) and other federal agencies to require the wearing of face masks on all forms of public transportation, including planes, trains, buses, ships, and airports.[95] On April 30, the TSA extended this order through September 13.[96]

### Issuance of guidance for vaccinated individuals

On April 27, 2021, Biden and the CDC announced amended guidance on masks, stating that those who are fully vaccinated (14

days after the second dose of a twin-dose vaccine, or 14 days after receiving a single-dose vaccine) did not need to wear a mask during small outdoor gatherings, but that they should still be worn at large outdoor gatherings (such as concerts and sporting events) where large numbers of unvaccinated people may be present, and that vaccinated people should still avoid large indoor gatherings.[97][98]

On May 11, Rochelle Walensky — the CDC's new director under the Biden administration[99] — appeared before the Senate Committee on Health. Amid questioning by Republican senators such as Maine's Susan Collins, Walensky defended the CDC's current guidance on topics such as masks, stating that the public must "maintain public health measures we know will prevent the spread of this virus" as long as community transmission exists. Unbeknownst to the panel, the CDC was already finalizing new guidance, which would be publicly announced two days later.[100][101]

### CDC drops mask recommendations for the fully-vaccinated

On May 13, 2021, the CDC announced new guidance, stating that those who are fully vaccinated do not need to wear a mask or practice social distancing, unless otherwise required by health orders or private entities (such as on all public transportation, and where mandates still exist). In a briefing discussing the change, Biden emphasized that the country still had to work towards its goal of having 70% of its adult population receive at least one vaccine dose by Independence Day, but felt that those who have been fully vaccinated had "earned the right to do something that Americans are known for all around the world — greeting others with a smile." He also asked Americans to respect the decisions of those who may still wear masks as a personal decision; "We have had too much conflict, too much bitterness, too much anger, too much politicization of this issue about wearing masks. Let's put it to rest."[102]

The White House and other federal departments began to implement the new guidance for their staff over the days that followed.[103][102][104] The abruptness of the announcement caught many state and local health officials, as well as federal employees, off-guard.[101][100] Citing the new guidance, the states of Maryland and Virginia announced that they would lift their mask mandates, while Costco and Walmart also announced that, where allowed, they would exempt vaccinated individuals from their corporate mask mandates.[105]

The new guidance has faced criticism for being premature and largely relying on an honor system, as it would be difficult to determine whether someone is fully vaccinated without documentation, only around 36% of Americans had been fully vaccinated at that point, and loosening guidance on masks would encourage complacency by those who are against masks and/or vaccines (who could falsely claim that they were vaccinated).[106][107][100] The federal government had ruled out implementing a national framework for immunity passports due to human rights and privacy concerns, while multiple states have prohibited them outright.[108][109][110]

In an interview with Fox News Sunday, Walensky denied that the CDC had bowed to political pressure to loosen restrictions, and stated that the new guidance was based on evolving science and newly-obtained data, including studies on the real-world effectiveness of the vaccines in the U.S., and another study showing a reduction in viral load among patients that had still contracted COVID-19 after being vaccinated.[100][101] Others felt that the announcement was an attempt by the Biden administration to distract from the Colonial Pipeline cyberattack and the Israel–Palestine conflict.[100] A White House spokesperson stated that the decision had been made solely by the CDC, as part of its current mandate under the Biden administration to operate "based on the science and data, free from political influence".[100]

On May 20, amid an increasing number of states lifting their mask mandates entirely due to the guidance, Fauci told Axios that he thought many Americans were misinterpreting the guidance, stating that "[the CDC] said: If you are vaccinated, you can feel safe — that you will not get infected either outdoors or indoors. It did not explicitly say that unvaccinated people should abandon their masks."[111]

# Federal policy

## Calls for federal policies

The United States Department of Health and Human Services organized a program known as "Project: America Strong", to fund the distribution of reusable masks to "critical infrastructure sectors, companies, healthcare facilities, and faith-based and community organizations."[4]

There were calls for a mask mandate to be implemented nationwide at the federal level: the Retail Industry Leaders Association criticized the patchwork of differing regulations (or lack thereof) between regions, and argued that "despite compliance from the majority of Americans, retailers are alarmed with the instances of hostility and violence front-line employees are experiencing by a vocal minority of customers who are under the misguided impression that wearing a mask is a violation of

their civil liberties."[112] Goldman Sachs projected that such a mandate "could potentially substitute for lockdowns that would otherwise subtract nearly 5% from GDP."[113] The Public Health Service Act grants the secretary of the Department of Health and Human Services authority to implement regulations to "prevent the introduction, transmission, or spread of communicable diseases" into U.S. states or possessions, but it is unclear whether this could be used to implement a general mask mandate.[114]

On June 28, House Speaker Pelosi stated that such a mandate was "long overdue", but that the CDC did not issue one as to not "offend the president."[23] On July 1, Trump questioned the appropriateness of a national mandate since they would apply in "places in the country where people stay very long distance."[37][56] On July 5, White House Chief of Staff Mark Meadows stated that a national mandate was "not in order", arguing that masks were "[used] on a location basis when you can't have social distancing".[57] On July 12, Surgeon General Adams similarly argued that "if we are going to have a mask mandate we need to understand that works best at the local and state level along with education", and questioned if a national order could be reasonably enforced without "having a situation where you're giving people one more reason to arrest a black man."[115]

On July 12, Surgeon General Adams stated that health officials were trying to "correct" their previous messaging, explaining that it was based on an earlier presumption that those who were asymptomatic were less likely to transmit COVID-19. He explained that Americans needed "to understand we follow the science and when we learn more our recommendations change, but it is hard when people are continuing to talk about things from three, four months ago";[115] a clip of the aforementioned *60 Minutes* interview with Fauci (where he was quoted as saying "There's no reason to be walking around with a mask") had often been presented on social media by opponents of face masks as misinformation in support of their arguments. Fauci's statements were consistent with the CDC's guidance at the time, but did not align with current guidance.[28]

On July 14, the House Committee on Appropriations adopted an amendment to its Transportation, Housing and Urban Development, and Related Agencies funding bill for fiscal year 2021, which would include a mandate for passengers and employees of air travel, Amtrak, and "large transit agencies" to wear masks. The bill is scheduled to be voted on by the House of Representatives later in the month.[116][117] The same day, the CDC published a study indicating that the use of masks by two employees of a Missouri hair salon who showed COVID-19 symptoms and later tested positive, as well as the 139 clients they served before their positive tests, "was likely a contributing factor" in preventing their clients from contracting COVID-19 from the employees.[118][119] The *Journal of the American Medical Association (JAMA)* also published an interview with CDC Director Redfield, where he estimated that the epidemic in the U.S. could be brought under control within four to eight weeks "if we could get everybody to wear a mask right now".[120][121]

On July 15, Senator Dianne Feinstein proposed that economic stimulus funding be withheld from states that do not adopt a health order requiring the wearing of masks in public.[122] In a July 19 interview with *Fox News Sunday*, President Trump stated that he did not intend to enact a federal mask mandate, citing the preservation of personal freedoms.[14]

On July 30, Senator Bernie Sanders and Representative of California Ro Khanna introduced the *Masks for All Act*, a proposed bill that would invoke the Defense Production Act to produce "high-quality", reusable face masks for nationwide distribution at no charge (via mail distribution and public pickup locations), with a goal to give three masks each to every individual in the country, and a particular focus on serving the homeless and people who live in communal environments. The total cost of the bill was estimated to be $5 billion, with Khanna noting that "If we can afford a $740 billion defense budget, we can afford to send every American a face mask. And if we're asking folks to wear a mask, which is absolutely essential, it's on us to provide one."[123] On July 31, Peter DeFazio and Rick Larsen introduced the *Healthy Flights Act*, which would authorize the FAA to mandate the wearing of face masks at airports and while on flights.[124]

During an August 2020 campaign appearance, Democratic presidential nominee Joe Biden proposed a national mask mandate of at least three months as part of his platform, explaining that it could "save over 40,000 lives [...] if people act responsibly", and that "it's not about your rights, it's about your responsibilities as an American."[125] On September 16, Biden stated that he believed the president had the legal authority to mandate masks nationwide via an executive order.[126] However, during a CNN town hall the next day, Biden stated that he could not mandate masks nationwide, but could do so for federal property, and that he would urge governors to follow suit at the state level.[127][128]

On September 16, Redfield testified to the Senate Appropriations Committee that masks were the country's "most powerful public health tool", as they had "clear scientific evidence" that they worked. He explained that "This face mask is more guaranteed to protect me against COVID than when I take a COVID vaccine, because the immunogenicity may be 70%, and if I don't get an immune response, the vaccine's not going to protect me. This face mask will."[129]

## Action by the Biden administration

On January 20, 2021, Biden signed an executive order requiring executive departments and agencies to enforce compliance with COVID-19-related guidance issued by the CDC, such as the wearing of face masks by the visitors and staff of federal land.[93][94]

On January 21, 2021, Biden signed another executive order mandating masks be worn in compliance with CDC recommendations on all forms of public transportation, including planes, trains, buses, ships, and airports.[95]



President Joe Biden signs executive orders in a face mask

# Supply

The provision and shipment of PPE to other countries such as China contributed to an early shortage of masks and other supplies in the United States, and was criticized by Democratic officials. *Forbes.com* senior contributor David DiSalvo reported that on March 30 "roughly 280 million masks from warehouses around the U.S. had been purchased by foreign buyers and were earmarked to leave the country".[130] The next day, Vice President Mike Pence suspended the export of protective supplies from the stockpiles of the USAID program in order to investigate. The Trump administration denied that the exported stock came from the national stockpile, and stated that it had come from private donations.[130][131]

On April 2, Trump announced that he would invoke the Defense Production Act to compel 3M, General Electric, and Medtronic to increase their production of N95 respirators.[132][133] By September 2020, N95 respirators were still in short supply. Even though 3M had increased domestic production from 20 million to 95 million respirators a month, they said "the demand is more than we, and the entire industry, can supply for the foreseeable future." Health care workers continued to express fears of shortages.[134][135]

Small U.S.-based manufacturers who invested in manufacturing infrastructure and successfully navigated a nine-month federal approval process reported in February 2021 that they were unable to find buyers for the tens of millions of masks they had produced. The advertising of these masks has been banned on platforms like Google and Facebook and medical supply distributors, hospital systems and state governments, the main purchasers of masks, are wary of locally manufactured masks, which are more expensive than the ones produced in China. Testifying before Congress about the need to support domestic mask manufacturers, one industry executive called the dependence on foreign manufacture "a national security problem".[136]

By February 2021, suppliers had increased production of medical masks, and some manufacturers reported a surplus. 3M and Honeywell had increased their production of N95 respirators to around 120 million each month, but the health sector is estimated to need around 3.5 billion masks each year, and the limited production is directly sent to the medical distributors that supply large hospital systems.[136] Overall shortages were still reported because some hospitals expected healthcare workers to reuse their masks, even as they were building up stockpiles in anticipation of future need. Hospital purchasers were poorly connected with new suppliers, hesitant to buy from new manufacturers, or resistant to pay higher prices for domestic products.[137] Counterfeits also continued to pose problems for purchasers.[138]

N95 manufacturers and other companies were reluctant to invest more in domestic mask production because domestic manufacture in the United States is not profitable. There are some American companies who can shift production temporarily to meet the demand for masks but most of them have not received any funding through the DPA. Some have taken the initiative but experienced problems with the fit of the masks and obtaining regulatory approvals. 3M and other N95 manufacturers have not entered into any corporate partnerships to share intellectual property or increase N95 production.[134]

## Theft

Thefts of face masks and other personal protective equipment were reported at hospitals in the United States[139]

The Naval Medical Center San Diego implemented random bag checks for staff members, after several incidents of theft.[140] Thefts of N95 masks were reported from a locked hospital office in South Carolina and off loading docks at the University of Washington.[141] A hospital employee in Cooperstown, New York was charged with misdemeanor larceny for a similar incident.[142]

## Counterfeit masks

The third-party market was still inundated with a deluge of counterfeit masks in February 2021, one year into the pandemic. Federal agents seized over 10 million fake 3M -branded masks in early 2021. Some were purchased by hospitals even though the masks did not come from authorized distributors.[143] The masks are sold at higher prices than the authentic 3M masks, which retail at around $1.27 each.[144] 3M filed multiple lawsuits against unauthorized sellers for endangering the lives of medical workers. The company issued a statement to say "This is not a problem that is going away".[145]

# Attitudes

## Protection of others

Prior to the COVID-19 pandemic, the public wearing of face masks to protect others from the spread of infectious disease was not a widely accepted phenomenon in the United States, and had historically been more prevalent in East Asian countries.[146][147]



A member of the Rhode Island National Guard sewing handmade face masks.

## Political views

The issue of whether or not to wear a mask in public became, for some, a dividing line in the culture war between the supporters and opponents of President Trump.[148][149] Politico described progressives as considering masks "a sign that you take the pandemic seriously and are willing to make a personal sacrifice to save lives".[6] Supporters of the CDC's recommendations derided what they described as their opponents' ignorance, selfishness, antiscience stance, and lack of respect for fellow citizens.[150]

Masks were cited as a means of controlling COVID-19 without the need to reimpose stay-at-home orders and business closures (which would cause further economic strain).[151][152] Opponents have invoked conspiracy theories to discredit proponents, and accused them of violating their freedoms, and inhibiting development of herd immunity.[153][154] The wearing of face masks has been also been seen by opponents as virtue signaling for liberal values,[155][156][157] and as a symbol of intimidation, social control, and opposition towards President Trump.[158]

While these health orders usually have exceptions for those with medical conditions (such as breathing problems) or disabilities that would make it difficult to wear a mask, false flyers distributed via social media encouraged people to claim to businesses requiring masks that they have a medical condition protected under the Americans with Disabilities Act, but that under the Health Insurance Portability and Accountability Act (HIPAA), they are not required to disclose the medical condition. The HIPAA is a data protection law for the health care industry, and does not actually apply in this manner.[159][160]

Opposing views against masks have also been promoted by conservative media outlets such as Fox News, and radio host Rush Limbaugh — who argued that masks were a "required symbol on the left to promote fear, to promote indecision, to promote the notion that we're nowhere near out of this".[161][162] Initially in March, Fox News pundits Tucker Carlson and Laura Ingraham endorsed the wearing of masks, with Carlson explaining that they were "key" to controlling COVID-19 in East Asian countries, while also criticizing the CDC for initially discouraging their use by the general public. After the practice became politicized, however, both pundits began to display opposition to masks on-air: in May, Carlson criticized Fauci for his fluctuating guidance on masks, and claimed that there was no scientific basis for a mask mandate issued in Los Angeles (referring to its residents as being "hostages" of Mayor Eric Garcetti).[163][158][164] Some Fox News pundits however, including Sean Hannity and Fox & Friends host Steve Doocy, have been more receptive to masks on-air.[161]

The Washington Post reported that in an April 2020 poll, 79% of self-identified Democrats and 59% of Republicans stated that they had worn a mask or other face covering in public. Those who knew someone who had been infected with COVID-19 were 40% more likely to wear a mask in public than those who didn't.[165] A Gallup poll the same month found that 75% of Democrats and 48% of Republicans had worn a mask outside in the past week.[166] In a June 2020 survey by Politico and Morning Consult, 60% of those who said they supported the wearing of masks also stated that their opinion of the Trump administration was "very favorable".[167]

In late-June 2020, amidst a major surge in cases in multiple states (especially in the Sun Belt), support towards masks abruptly emerged among prominent Senate and House Republicans, in an effort to counter resistance towards the practice from President Trump.[149][168] In a June 28 interview on Face the Nation, Pence recommended that Americans follow the advice of local health officials in regards to wearing masks, as "every state has a unique situation."[169][170] Other prominent Republicans also began to abruptly support masks and urge Trump to be a role model for his supporters, including chair of the Senate Health, Education, Labor and Pensions Committee Lamar Alexander and Senate majority leader Mitch McConnell. Alexander commented that "this simple lifesaving practice has become part of a political debate that says: If you're for Trump, you don't wear a mask. If you're against Trump, you do", and argued that Trump could "help end this political debate".[149][168]

A Politico survey in July 2020 found that there was now bipartisan majority support for mask mandates, with 72% of those surveyed saying that they strongly or somewhat supported state-wide mask mandates that that are punishable by fines or jail, with 53% expressing strong support. This included 86% of self-identified Democrats surveyed, 58% of self-identified Republicans surveyed, and 68% of self-identified independents surveyed.[171]

During a rally on September 21, 2020, an attempt by Ohio Lieutenant Governor Jon A. Husted to promote Trump 2020 and

Make America Great Again-branded face masks as campaign merchandise (as part of a stated goal to "[try] to make masks in America great again") to the crowd was met with boos, to which he remarked that they had "made [their] point".[16]

Opposition to the practice of wearing face masks, and to orders mandating face mask use, has led to historical comparisons with the Anti-Mask League of San Francisco that was active during the Spanish flu pandemic of 1918–19.[172][173]

## Among minorities

Concerns surrounding the politicization of masks have been especially prominent among minority communities, such as African and Asian Americans. Concerns were raised by African Americans that the wearing of masks may encourage racial profiling due to their association with their use by criminals to conceal identity, such as an officer shown handcuffing a black doctor wearing a mask steps from his home, and a police officer in Illinois following two black men wearing surgical masks as they exited a Walmart, and falsely claiming that the city prohibited the wearing of masks.[174][175] There have also been incidents of bullying, discrimination, and ethnic violence against Asian Americans who wear masks, as part of ongoing anti-Asian sentiment tied to the pandemic due to its Mainland Chinese origin.[176][177]



Protesters of the killing of George Floyd wearing masks; one is inscribed with the text "#BLACKLIVESMATTER".

The April 2020 poll found that 32% of Hispanic and Latino Americans surveyed, and 30% of African Americans surveyed, were concerned that wearing a mask would cause them to be mistaken for a criminal, as opposed to 19% each of Asian Americans and whites.[165] Despite this, larger proportions of people among minority communities said they had worn a mask in public than whites (66%), at 71% of Hispanic and Latino Americans surveyed, 74% of African Americans surveyed, and 82% of Asian Americans surveyed.[165]

In late-May and early-June 2020, masks printed with slogans related to the Black Lives Matter and police reform movements (such as "I can't breathe") attracted popularity amidst nationwide protests over the police killing of George Floyd. In June 2020, the United States Postal Inspection Service temporarily seized a shipment of face masks with the slogan "STOP KILLING BLACK PEOPLE", ordered by the Movement for Black Lives for distribution to those attending demonstrations in Minneapolis, New York City, St. Louis, and Washington D.C.. The Service stated that there "were indications that they contained non-mailable matter."[178]

Citing these concerns over racial profiling, Lincoln County, Oregon (whose population is 95% white) initially announced that it would provide an exemption for people of color from the county's mask mandate. However, following criticism, the county backtracked on June 24. Officials stated that "The expressions of racism regarding the exception has created a ripple of fear throughout our communities of color. The very policy meant to protect them, is now making them a target for further discrimination and harassment."[179]

## Confrontations over mask requirements

There were incidents of violent confrontations and assaults over disagreements about the masking policies of states and private businesses. Numerous reports were made of retail patrons assaulting employees at retail store's over disagreements about the store's masking policies.[180][181] A man was arrested in October 2020 for threatening to kidnap and murder the mayor of Wichita, Kansas over the city's mask mandate.[182]

By September 2020, over 170 transit workers in New York City had reported being assaulted or harassed for asking passengers to wear face masks, including a 62-year-old man who was knocked unconscious on his route through East New York, Brooklyn,[183] prompting officials to implement a $50 fine for riders who refused to wear a face mask.[184]

There were also instances of assault against persons who refused to comply with masking policies. In Key Largo, a bus driver was arrested for swinging a metal rod at a passenger who lowered his mask to make a call on his cell phone.[185]

## Appearance of vulnerability

Refusal to wear a mask in public may be driven by a fear of being seen as vulnerable and fearful of COVID-19.[186][187] In a May 2020 survey of 2,459 Americans conducted by Valerio Capraro of Middlesex University London and Hélène Barcelo of the Mathematical Science Research Institute, it was found that men surveyed were more likely to display negative stigmas towards wearing masks in public, including being more likely to agree that it was "uncool", "shameful", and a "sign of weakness". Capraro noted that these stigmas were more prevalent among residents of areas that had mandated the wearing of face

masks.[188]

Reporting on the study, Ben Boskovich of *Esquire* wrote that "the phrase toxic masculinity gets thrown around a lot, sometimes more than necessary, if we're being honest. But this thing, this reality, that men are too blinded by their own inherent privilege to acknowledge their vulnerabilities, to admit they're wrong, to let go of the steering wheel, is as real as the president's hats are red.".[189]

## Mask use and policies by state

By mid-November 2020, 37 states had some sort of health order requiring the wearing of face masks or a similar non-medical face covering when in public spaces or specific types of establishments.[190][191][192] Absent a state-level mandate, some municipalities and counties have instituted their own mandates via localized by-laws.[193][194][195]



Woman in Ohio wearing a neck gaiter as a protective face covering.

These orders usually have exceptions for younger children, as well as those with medical conditions (such as breathing problems) or disabilities that would make it difficult to wear a mask.[159][160][196] They are also usually considered an exception to prohibitions on the wearing of masks in public for the purpose of identity concealment, such as general anti-mask laws, and restrictions on wearing masks while carrying a concealed firearm.[197][198][199][200]

Some states, such as Louisiana, Oregon, and Washington, at first only mandated the wearing of masks by the public-facing employees of businesses,[201][202][203] before mandating they be used by the general public as well.[204][205][206]



High school field hockey players in Ohio with and without masks.

### Enforcement and challenges

Violations of mandatory mask orders have often classified as a misdemeanor offence, with some states threatening fines for individuals who do not comply. Some states expressly require businesses to enforce mask mandates, with failure to do so also punishable by fines, and in some cases, being ordered to temporarily close, or have their business license revoked.[190][191][196][207][208]

Whether these mandates are actually enforced may vary; some sheriffs in California, Nevada, North Carolina, and Washington state pledged that they would not enforce the orders; one such sheriff in Lewis County, Washington announced to a crowd outside a church, "don't be a sheep".[209][210][211] By contrast, Governor of California Gavin Newsom threatened to withhold COVID-19 relief funding from counties that do not sufficiently enforce state health orders, including its mask mandate.[212][213] In late-June 2020, Governor of South Carolina Henry McMaster argued that the inability to effectively enforce such an order influenced his decision to not implement an order at that time, stating that "there's no power on Earth that can follow everyone in the state around to be sure that they are following the rules."[214] However, on July 29, McMaster reversed his prior stance and issued a state-wide mandate, as part of an order taking affect August 3 that also allowed more businesses to resume operations.[215]

On October 2, the Michigan Supreme Court unanimously ruled that Governor Gretchen Whitmer had violated the state *Emergency Management Act of 1976* by redeclaring a state of emergency to bypass the Republican-controlled Legislature after it declined to renew it. In a split decision, they ruled that the *Emergency Powers of Governor Act of 1945* was unconstitutional because it violated the nondelegation doctrine.[216] Governor Whitmer has argued that the decision was still subject to a 21-day reconsideration period, during which the orders still stand, and later accused the Court of undermining her efforts to control the pandemic. On October 4, Michigan Attorney General Dana Nessel stated that she would stop enforcing COVID-19-related executive orders.[217][218] On October 12, the Court denied a notion requested by Governor Whitmer for a transition period, thereby voiding all executive orders issued pursuant to the claimed state of emergency.[219][220] The state Department of Health and Human Services (MDHHS) had already begun to issue its own orders to supplant Whitmer's voided orders, under powers that give its director the authority to "establish procedures" and restrict gatherings during an epidemic.[219][220][221] In turn, the MDHHS was sued by a chiropractor (one which had faced warnings from local officials for defying the mask mandate), claiming it did not have the authority to mandate masks.[222]

In Wisconsin, Governor Tony Evers similarly re-declared a public health emergency (which is similarly limited to 60 days without legislative approval) to extend its mask mandate beyond its original period (which began August 1). It was challenged in a state court by the Wisconsin Institute for Law and Liberty, who requested a temporary injunction. Judge Michael Waterman ruled in favor of Governor Evers, stating that "the 60-day limit provides an important check against run-away

executive power, but it does not prevent the governor from issuing a new executive order when the emergency conditions continue to exist."[223]

## Political stances

Opponents of mask mandates have sometimes argued that they are unconstitutional; the American Bar Association cited that there was precedent under the Tenth Amendment (which states that any powers not granted to the federal government are reserved to states) that state governments "have the primary authority to control the spread of dangerous diseases within their jurisdictions."[224][225][226] *Jacobson v. Massachusetts* has also been cited as case law supporting mask orders; it found that the use of police power by states to enforce health orders designed to maintain the safety of their communities (such as, in this case, mandatory vaccinations for smallpox), did not violate individual liberties under the Fourteenth Amendment.[227][228]



A mask compliance officer at a baseball park in Florida.

In June 2020, *The Hill* noted that Democratic-led and coastal states had been more likely to have implemented or considered such mandates over Republican-led states (especially in the conservative South)—which have cited desires to preserve individual liberties and, in some cases, also took steps to overrule local health orders that are stricter than those imposed by the state (including mask mandates).[46][229] Not all Republican-led states refused to do so, however, with noted early examples including Maryland and Massachusetts.[46] Following a major spike in mid-June attributed to the rushed lifting of mitigations around the Memorial Day weekend, Arizona and Texas began to backpedal on their outright prohibition of local orders on the wearing of masks,[46][230][231] and Governor of Texas Greg Abbott then issued a state-wide mandate on July 2.[232]

On July 15, Governor of Georgia Brian Kemp signed an executive order to prohibit any county or municipality from enacting or enforcing a health order requiring the wearing of masks in public spaces.[229] He also filed a lawsuit against Mayor of Atlanta Keisha Lance Bottoms and her city council over a local health order requiring masks, and voluntarily rolling back to "Phase 1" guidelines (discouraging dine-in restaurants), asserting that she "does not have the legal authority to modify, change or ignore Governor Kemp's executive orders."[233][234][235] On August 13, however, Kemp dropped the lawsuit,[236] and announced the next day that localized mask mandates would be allowed if certain "health metrics" and other guidelines are met, and requiring business owners to consent if the mandate is to apply to businesses.[237]

In Kansas, a July 2020 mask mandate by Democratic governor Laura Kelly included the ability for counties to opt out if they (per consultation with health officials) assert that it is not medically necessary; the provision was described as a "bipartisan compromise" to gain support from the state's Republican-majority government.[238] By July 9, 90 of Kansas's 105 counties had opted out,[239][240] while several cities in counties that did opt out, such as Manhattan, Wichita, and Winfield, would enact municipal mandates.[241][238] Out of a sample of counties, 15 counties that chose to enforce the order were shown to have a reduced rate of new cases than those which opted out.[242] Research released in October 2020 by the University of Kansas found that these trends had continued in the by, then, 21 counties that implemented the order.[243] The mayor of Dodge City, Kansas resigned from office in December 2020 after facing violent threats over her support of a local mask mandate.[244][245]

Governor of South Dakota Kristi Noem has discredited studies and research that support the use of face masks, claiming that they have produced "very mixed" outcomes, and arguing that "the science has not proven what's effective and what isn't and what type of mask. We have to stay objective when we look at it".[246][247]

On March 10, 2021, Texas lifted its mask mandate and capacity restrictions, in a move that was considered premature by critics and other politicians following its announcement. The lifting of the mandate also includes a prohibition on enforcing mask mandates; on the day the orders took effect, the Texas Attorney General threatened to sue the city of Austin, Texas for intending to continue its mask mandate.[248][249][250] The number of new cases and hospitalizations in Texas had already begun to decline in the weeks following the announcement, with an UNT Health Science Center professor believing that residents continuing to follow health guidance, as well as vaccination progress and immunity, may have also been factors.[251]

## Summary of orders and recommendations issued by states

☐ No state-wide mandate. No local mandates exist. (3)
☐ A former state-wide mandate has since expired. No local mandates exist. (2)

Plaintiffs' Exhibit 201

PRIMARY CARE DIABETES

# Mask fatigue

Sanjay Kalra[1,2], Sandeep Chaudhary[3], Viny Kantroo[4], Jatin Ahuja [5]

## Abstract

Extended wearing of mask, which has become a part of routine life, has led to the emergence of 'mask fatigue'. Mask fatigue is defined as the lack of energy that accompanies, and/or follows prolonged wearing of a mask. This communication describes the various aspects of mask fatigue, and shares pragmatic tips on its reduction. This discussion is relevant to all health care professionals and to general public to some extent, in the present scenario.

**Keywords:** COVID 19, hypoxia, mask, N 95, fatigue, $CO_2$ retention

## Introduction

COVID-19 is here to stay.[1] With this new pandemic, we have had to modify our lifestyles, focusing on community and personal hygiene. One integral tenet of hygiene is the necessity of wearing masks. All adults and adolescents are now expected to wear masks in public places. As health care professionals, we are duty bound to encourage the public to follow these norms, and other aspects of COVID 19 prevention. It is also incumbent upon us to practice what we preach, and hence wear masks in work places and crowded areas. Health care professionals are more prone to this type of fatigue due to nature of extended hours of work, talking needed to assess and manage the patients and especially use of filtering face piece (FFP) respirators.

## The mask as a helper or a hazard?

A mask acts as a protection against the professional hazards of contracting airborne or droplet infection. Paradoxically, however, it is considered as an impediment to professional work as well.[2-4] This is because of the newly emerging condition, mask fatigue.

## Mask fatigue

The phrase 'mask fatigue' can be used in multiple contexts. Getting tired of using masks, and becoming tired due to the use of masks, both can be described as mask fatigue. We define mask fatigue as the lack of energy that accompanies, and/or is a consequence of extended use of a mask. The mere lack of compliance or reluctance to wear a mask, or easy fatigability, does not qualify as a disorder. Mask fatigue may be considered as a disorder if it interferes with physical, mental, psychological, or social functioning in healthy adults. Table-1 describes the various etiopathophysiologic and clinical aspects of mask fatigue. There is published evidence which shows that extended wearing of mask impairs functioning of health care professionals.[2-5] Health care physicians relate anecdotes which highlight the difficulty associated with wearing masks, and with ensuring that patients and their carers wear masks as well. The situation is compounded by differing guidelines and varying information on the need to wear masks.[6]

## Mask fitness

Table-2[7] shares a few pragmatic tips to help minimize mask fatigue in health care workers. Simple rules if followed, can help minimize the fatigue. The most important tip to prevent this fatigue is to act early. The right choice of mask type depending upon area of work, fit, material, the correct way of donning it, and a graded approach to work while wearing it, help prevent mask fatigue. Primary prevention of mask fatigue also includes inculcating the right attitude to wear a mask, i.e., to consider these new norms as friend rather than as a foe.

**Table-1:** Aspects of mask fatigue.

**Biomedical**
- Mechanical
  - Pressure/pain over ears, cheeks, nose, skin breakdown, aggravation of acne, itching, contact dermatitis
- Laryngeal
  - V oice fatigue, Laryngitis, Sore throat
- Respiratory compromise
  - Hypoxia, Hypercapnia, increased work of breathing
  - Dizziness, Headache, irritability, physical exhaustion, decreased concentration/work efficiency, confusion, disorientation, breathlessness
- Nutritional/metabolic
  - Reduced fluid and food intake
  - chronic health effects on renal and   metabolic functions

**Psychosocial**
- Aggravation of anxiety, depression, feeling of impending doom
- Claustrophobia
- Impaired social interaction/recognition
- Financial impact
- Maskophobia

[1]Departments of Endocrinology, Bharti Hospital, Karnal, India; [2]All India Institute of Medical Science, Rishikesh, India; [3]Department of Endocrinology, NMC Hospital, Dubai, United Arab Emirates; [4]Department of Pulmonology, Critical Care and Sleep Medicine, Indraprastha Apollo Hospitals, New Delhi, India; [5]Department of Infectious Diseases, Dr Ahuja's ID Clinic, New Delhi, India.
**Correspondence:** Sanjay Kalra. e-mail: brideknl@gmail.com



Plaintiffs' Exhibit 202

*International Journal of*
*Environmental Research*
*and Public Health*



*Review*

# Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?

**Kai Kisielinski [1], Paul Giboni [2], Andreas Prescher [3], Bernd Klosterhalfen [4], David Graessel [5], Stefan Funken [6], Oliver Kempski [7] and Oliver Hirsch [8,***

1 Private Practice, 40212 Düsseldorf, Germany; kaikisielinski@yahoo.de
2 Private Practice, 22763 Hamburg, Germany; pgiboni@gmx.de
3 Institute of Molecular and Cellular Anatomy (MOCA), Wendlingweg 2, 52074 Aachen, Germany; aprescher@ukaachen.de
4 Institute of Pathology, Dueren Hospital, Roonstrasse 30, 52351 Dueren, Germany; bernd.klosterhalfen@web.de
5 Institute of Neuroscience and Medicine, Forschungszentrum Jülich, 52425 Jülich, Germany; d.graessel@fz-juelich.de
6 Private Practice, 47803 Krefeld, Germany; dr_funken@colita.net
7 Institute of Neurosurgical Pathophysiology, University Medical Centre of the Johannes Gutenberg University of Mainz Langenbeckstr. 1, 55131 Mainz, Germany; oliver.kempski@unimedizin-mainz.de
8 Department of Psychology, FOM University of Applied Sciences, 57078 Siegen, Germany
* Correspondence: oliver.hirsch@fom.de



**Citation:** Kisielinski, K.; Giboni, P.; Prescher, A.; Klosterhalfen, B.; Graessel, D.; Funken, S.; Kempski, O.; Hirsch, O. Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?. *Int. J. Environ. Res. Public Health* **2021**, *18*, 4344. https://doi.org/10.3390/ijerph18084344

Academic Editor: Paul B. Tchounwou

Received: 20 March 2021
Accepted: 16 April 2021
Published: 20 April 2021

**Publisher's Note:** MDPI stays neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Abstract:** Many countries introduced the requirement to wear masks in public spaces for containing SARS-CoV-2 making it commonplace in 2020. Up until now, there has been no comprehensive investigation as to the adverse health effects masks can cause. The aim was to find, test, evaluate and compile scientifically proven related side effects of wearing masks. For a quantitative evaluation, 44 mostly experimental studies were referenced, and for a substantive evaluation, 65 publications were found. The literature revealed relevant adverse effects of masks in numerous disciplines. In this paper, we refer to the psychological and physical deterioration as well as multiple symptoms described because of their consistent, recurrent and uniform presentation from different disciplines as a Mask-Induced Exhaustion Syndrome (MIES). We objectified evaluation evidenced changes in respiratory physiology of mask wearers with significant correlation of $O_2$ drop and fatigue ($p < 0.05$), a clustered co-occurrence of respiratory impairment and $O_2$ drop (67%), N95 mask and $CO_2$ rise (82%), N95 mask and $O_2$ drop (72%), N95 mask and headache (60%), respiratory impairment and temperature rise (88%), but also temperature rise and moisture (100%) under the masks. Extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields.

**Keywords:** personal protective equipment; masks; N95 face mask; surgical mask; risk; adverse effects; long-term adverse effects; contraindications; health risk assessment; hypercapnia; hypoxia; headache; dyspnea; physical exertion; MIES syndrome



**Copyright:** © 2021 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

At the beginning of the spread of the novel pathogen SARS-CoV-2, it was necessary to make far-reaching decisions even without available explicit scientific data. The initial assumption was that the pandemic emergency measures were set in place to reduce the acute threat of the public health system effectively and swiftly.

In April 2020, the World Health Organization (WHO) recommended the use of masks only for symptomatic, ill individuals and health care workers and did not recommend its widespread use.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In June 2020, they changed this recommendation to endorse the general use of masks in, e.g., crowded places [1,2]. In a meta-analysis study commissioned by the WHO (evidence level Ia), no clear, scientifically graspable benefit of moderate or strong evidence was derived from wearing masks [3].

While maintaining a distance of at least one meter showed moderate evidence with regard to the spreading of SARS-CoV-2, only weak evidence at best could be found for masks alone in everyday use (non-medical setting) [3]. Another meta-analysis conducted in the same year confirmed the weak scientific evidence for masks [4].

Accordingly, the WHO did not recommend general or uncritical use of masks for the general population and expanded its risk and hazard list within just two months. While the April 2020 guideline highlighted the dangers of self-contamination, possible breathing difficulties and false sense of security, the June 2020 guideline found additional potential adverse effects such as headache, development of facial skin lesions, irritant dermatitis, acne or increased risk of contamination in public spaces due to improper mask disposal [1,2].

However, under pressure from increasing absolute numbers of positive SARS-CoV-2 tests, many prescribers further extended mask-wearing according to certain times and situations, always justified by the desire to limit the spread of the virus [5]. The media, numerous institutions and most of the population supported this approach.

Among the medical profession and scientists, the users and observers of medical devices, there have been simultaneous calls for a more nuanced approach [6–8]. While there has been a controversial scientific discussion worldwide about the benefits and risks of masks in public spaces, they became the new social appearance in everyday life in many countries at the same time.

Although there seems to be a consensus among the decision makers who have introduced mandatory masks that medical exemptions are warranted, it is ultimately the responsibility of individual clinicians to weigh up when to recommend exemption from mandatory masks. Physicians are in a conflict of interest concerning this matter. On the one hand, doctors have a leading role in supporting the authorities in the fight against a pandemic. On the other hand, doctors must, in accordance with the medical ethos, protect the interests, welfare and rights of their patient's third parties with the necessary care and in accordance with the recognized state of medical knowledge [9–11].

A careful risk–benefit analysis is becoming increasingly relevant for patients and their practitioners regarding the potential long-term effects of masks. The lack of knowledge of legal legitimacy on the one hand and of the medical scientific facts on the other is a reason for uncertainty among clinically active colleagues.

The aim of this paper is to provide a first, rapid, scientific presentation of the risks of general mandatory mask use by focusing on the possible adverse medical effects of masks, especially in certain diagnostic, patient and user groups.

## 2. Materials and Methods

The objective was to search for documented adverse effects and risks of different types of mouth–nose-covering masks. Of interest here were, on the one hand, readymade and self-manufactured fabric masks, including so-called community masks and, on the other hand medical, surgical and N95 masks (FFP2 masks).

Our approach of limiting the focus to negative effects seems surprising at first glance. However, such an approach helps toprovide us with more information. This methodology is in line with the strategy of Villalonga-Olives and Kawachi, who also conducted a review exclusively on the negative effects [12].

For an analysis of the literature, we defined the risk of mouth–nose protection as the description of symptoms or the negative effects of masks. Reviews and expert presentations from which no measurable values could be extracted, but which clearly present the research situation and describe negative effects, also fulfill this criterion.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

Additionally, we defined the quantifiable, negative effect of masks as the presentation of a measured, statistically significant change in a physiological parameter in a pathological direction ($p < 0.05$), a statistically significant detection of symptoms ($p < 0.05$) or the occurrence of symptoms in at least 50% of those examined in a sample ($n \geq 50\%$).

Up to and including 31 October 2020, we conducted a database search in PubMed/MEDLINE on scientific studies and publications on adverse effects and risks of different types of mouth–nose-covering masks according to the criteria mentioned above (see Figure 1: Review flowchart). Terms searched were "face masks", "surgical mask" and "N95" in combination with the terms "risk" and "adverse effects" as well as "side effects". The selection criteria of the papers were based on our above definition of risk and adverse effect of masks. Mainly English- and German-language publications of evidence levels I to III according to the recommendations of the Agency for Healthcare Research and Quality (AHQR) that were not older than 20 years at the time of the review were considered. The evaluation also excluded level IV evidence, such as case reports and irrelevant letters to the editor that exclusively reflect opinions without scientific evidence.



**Figure 1.** Scoping review flow diagram according to the PRISMA scheme.

After excluding 1113 papers that were irrelevant to the research question and did not meet the criteria mentioned (quantifiable, negative effects of masks, description of symptoms or the negative effects of masks), a total of 109 relevant publications were found for evaluation in the context of our scoping review (see Figure 1: Flow chart).

Sixty-five relevant publications concerning masks were considered being within the scope of the content-related evaluation. These included 14 reviews and 2 meta-analyses from the primary research. For the quantitative evaluation, 44 presentations of nega-

Case 2:22-cv-02383-SSS-AS   Document 1-1   Filed 04/08/22   Page 417 of 586   Page ID #:873

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344
4 of 42

tive effects from the years 2004 to 2020 were eligible. Thirty-one of these studies were experimental (70%), and 13 studies were data collection studies in the sense of simple observational studies, especially in the dermatological field (30%). The observed study parameters and significant results from these 44 publications ($p < 0.05$ or $n \geq 50\%$) were compiled in an overall display (Figure 2). Based on this data, a correlation analysis of the observed mask effects was performed. This included a correlation calculation of the recorded symptoms and physiological changes (for nominally scaled, dichotomous variables according to Fisher using R, R Foundation for Statistical Computing, Vienna, Austria, version 4.0.2).



**Figure 2.** Overview including all 44 considered studies with quantified, significant adverse effects of masks (black dots and black rectangles). Not all studies examined each mentioned parameter, as focused or subject-related questions were often in the foreground. Gray fields correspond to a lack of coverage in the primary studies, white fields represent measured effects. We found an often combination of significant chemical, physical, physiological parameters and complaints. Drowsiness summarizes the symptom for any qualitative neurological deficits described in the scientific literature examined.

In addition, another 64 publications with a neighboring range of topics were consulted in connection with the mask effects we found. These included declarations, guidelines

and legal principles. In order to expand the amount of data for the discussion, we proceeded according to the "snowball principle" by locating citations of selected papers in the bibliographies and including them where appropriate.

Since the findings from the topics presented for discussion were to an unexpected degree subject-related, we decided to divide the results according to the fields of medicine. Of course, there are overlaps between the respective fields, which we point out in detail.

### 3. Results

A total of 65 scientific papers on masks qualified for a purely content-based evaluation. These included 14 reviews and two meta-analyses.

Of the mathematically evaluable, groundbreaking 44 papers with significant negative mask effects ($p < 0.05$ or $n \geq 50\%$), 22 were published in 2020 (50%), and 22 were published before the COVID-19 pandemic. Of these 44 publications, 31 (70%) were of experimental nature, and the remainder were observational studies (30%). Most of the publications in question were English (98%). Thirty papers referred to surgical masks (68%), 30 publications related to N95 masks (68%), and only 10 studies pertained to fabric masks (23%).

Despite the differences between the primary studies, we were able to demonstrate a statistically significant correlation in the quantitative analysis between the negative side effects of blood-oxygen depletion and fatigue in mask wearers with $p = 0.0454$.

In addition, we found a mathematically grouped common appearance of statistically significant confirmed effects of masks in the primary studies ($p < 0.05$ and $n \geq 50\%$) as shown in Figure 2. In nine of the 11 scientific papers (82%), we found a combined onset of N95 respiratory protection and carbon dioxide rise when wearing a mask. We found a similar result for the decrease in oxygen saturation and respiratory impairment with synchronous evidence in six of the nine relevant studies (67%). N95 masks were associated with headaches in six of the 10 studies (60%). For oxygen deprivation under N95 respiratory protectors, we found a common occurrence in eight of 11 primary studies (72%). Skin temperature rise under masks was associated with fatigue in 50% (three out of six primary studies). The dual occurrence of the physical parameter temperature rise and respiratory impairment was found in seven of the eight studies (88%). A combined occurrence of the physical parameters temperature rise and humidity/moisture under the mask was found in 100% within six of six studies, with significant readings of these parameters (Figure 2).

The literature review confirms that relevant, undesired medical, organ and organ system-related phenomena accompanied by wearing masks occur in the fields of internal medicine (at least 11 publications, Section 3.2). The list covers neurology (seven publications, Section 3.3), psychology (more than 10 publications, Section 3.4), psychiatry (three publications, Section 3.5), gynecology (three publications, Section 3.6), dermatology (at least 10 publications, Section 3.7), ENT medicine (four publications, Section 3.8), dentistry (one publication, Section 3.8), sports medicine (four publications, Section 3.9), sociology (more than five publications, Section 3.10), occupational medicine (more than 14 publications, Section 3.11), microbiology (at least four publications, Section 3.12), epidemiology (more than 16 publications, Section 3.13), and pediatrics (four publications, Section 3.14) as well as environmental medicine (four publications, Section 3.15).

We will present the general physiological effects as a basis for all disciplines. This will be followed by a description of the results from the different medical fields of expertise and closing off with pediatrics the final paragraph.

### 3.1. General Physiological and Pathophysiological Effects for the Wearer

As early as 2005, an experimental dissertation (randomized crossover study) demonstrated that wearing surgical masks in healthy medical personnel (15 subjects, 18–40 years old) leads to measurable physical effects with elevated transcutaneous carbon dioxide values after 30 min [13]. The role of dead space volume and $CO_2$ retention as a cause of the significant change ($p < 0.05$) in blood gases on the way to hypercapnia, which was still

Case 2:22-cv-02383-SSS-AS    Document 1-1    Filed 04/08/22    Page 419 of 586    Page ID
#:875

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344                                                                                                                  6 of 42

within the limits, was discussed in this article. Masks expand the natural dead space (nose, throat, trachea, bronchi) outwards and beyond the mouth and nose.

An experimental increase in the dead space volume during breathing increases carbon dioxide ($CO_2$) retention at rest and under exertion and correspondingly the carbon dioxide partial pressure $pCO_2$ in the blood ($p < 0.05$) [14].

As well as addressing the increased rebreathing of carbon dioxide ($CO_2$) due to the dead space, scientists also debate the influence of the increased breathing resistance when using masks [15–17].

According to the scientific data, mask wearers as a whole show a striking frequency of typical, measurable, physiological changes associated with masks.

In a recent intervention study conducted on eight subjects, measurements of the gas content for oxygen (measured in $O_2$ Vol%) and carbon dioxide (measured in $CO_2$ ppm) in the air under a mask showed a lower oxygen availability even at rest than without a mask. A Multi-Rae gas analyzer was used for the measurements (RaeSystems®) (Sunnyvale, California CA, United States). At the time of the study, the device was the most advanced portable multivariant real-time gas analyzer. It is also used in rescue medicine and operational emergencies. The absolute concentration of oxygen ($O_2$ Vol%) in the air under the masks was significantly lower (minus 12.4 Vol% $O_2$ in absolute terms, statistically significant with $p < 0.001$) at 18.3% compared to 20.9% room air concentration. Simultaneously, a health-critical value of carbon dioxide concentration ($CO_2$ Vol%) increased by a factor of 30 compared to normal room air was measured (ppm with mask versus 464 ppm without mask, statistically significant with $p < 0.001$) [18].

These phenomena are responsible for a statistically significant increase in carbon dioxide ($CO_2$) blood content in mask wearers [19,20], on the one hand, measured transcutaneously via an increased $PtcCO_2$ value [15,17,19,21,22], on the other hand, via end-expiratory partial pressure of carbon dioxide ($PETCO_2$) [23,24] or, respectively, the arterial partial pressure of carbon dioxide ($PaCO_2$) [25].

In addition to the increase in the wearer's blood carbon dioxide ($CO_2$) levels ($p < 0.05$) [13,15,17,19,21–28], another consequence of masks that has been experimentally proven is a statistically significant drop in blood oxygen saturation ($SpO_2$) ($p < 0.05$) [18,19,21,23,29–34]. A drop in blood oxygen partial pressure ($PaO_2$) with the effect of an accompanying increase in heart rate ($p < 0.05$) [15,23,29,30,34] as well as an increase in respiratory rate ($p < 0.05$) [15,21,23,35,36] have been proven.

A statistically significant measurable increase in pulse rate ($p < 0.05$) and decrease in oxygen saturation $SpO_2$ after the first ($p < 0.01$) and second hour ($p < 0.0001$) under a disposable mask (surgical mask) were reported by researchers in a mask intervention study they conducted on 53 employed neurosurgeons [30].

In another experimental study (comparative study), surgical and N95 masks caused a significant increase in heart rate ($p < 0.01$) as well as a corresponding feeling of exhaustion ($p < 0.05$). These symptoms were accompanied by a sensation of heat ($p < 0.0001$) and itching ($p < 0.01$) due to moisture penetration of the masks ($p < 0.0001$) in 10 healthy volunteers of both sexes after only 90 min of physical activity [35]. Moisture penetration was determined via sensors by evaluating logs (SCXI-1461, National Instruments, Austin, TX, USA).

These phenomena were reproduced in another experiment on 20 healthy subjects wearing surgical masks. The masked subjects showed statistically significant increases in heart rate ($p < 0.001$) and respiratory rate ($p < 0.02$) accompanied by a significant measurable increase in transcutaneous carbon dioxide $PtcCO_2$ ($p < 0.0006$). They also complained of breathing difficulties during the exercise [15].

The increased rebreathing of carbon dioxide ($CO_2$) from the enlarged dead space volume in mask wearers can reflectively trigger increased respiratory activity with increased muscular work as well as the resulting additional oxygen demand and oxygen consumption [17]. This is a reaction to pathological changes in the sense of an adaptation effect. A mask-induced drop in blood oxygen saturation value ($SpO_2$) [30] or the blood

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

oxygen partial pressure (PaO$_2$) [34] can in turn additionally intensify subjective chest complaints [25,34].

The documented mask-induced changes in blood gases towards hypercapnia (increased carbon dioxide/CO$_2$ blood levels) and hypoxia (decreased oxygen/O$_2$ blood levels) may result in additional nonphysical effects such as confusion, decreased thinking ability and disorientation [23,36–39], including overall impaired cognitive abilities and decrease in psychomotoric abilities [19,32,38–41]. This highlights the importance of changes in blood gas parameters (O$_2$ and CO$_2$) as a cause of clinically relevant psychological and neurological effects. The above parameters and effects (oxygen saturation, carbon dioxide content, cognitive abilities) were measured in a study on saturation sensors (Semi-Tec AG, Therwil, Switzerland), using a Borg Rating Scale, Frank Scale, Roberge Respirator Comfort Scale and Roberge Subjective Symptoms-during-Work Scale, as well as with a Likert scale [19]. In the other main study, conventional ECG, capnography and symptom questionnaires were used in measuring carbon dioxide levels, pulse and cognitive abilities [23]. Other physiological data collection was done with pulse oximeters (Allegiance, MCGaw, USA), subjective complaints were assessed with a 5-point Likert scale and motoric speed was recorded with linear-position transducers (Tendo-Fitrodyne, Sport Machins, Trencin, Slovakia) [32]. Some researchers used standardized, anonymized questionnaires to collect data on subjective complaints associated with masks [37].

In an experimental setting with different mask types (community, surgical, N95) a significant increase in heart rate ($p < 0.04$), a decrease in oxygen saturation SpO$_2$ ($p < 0.05$) with an increase in skin temperature under the mask (face) and difficulty of breathing ($p < 0.002$) were recorded in 12 healthy young subjects (students). In addition, the investigators observed dizziness ($p < 0.03$), listlessness ($p < 0.05$), impaired thinking ($p < 0.03$) and concentration problems ($p < 0.02$), which were also statistically significant when wearing masks [29].

According to other researchers and their publications, masks also interfere with temperature regulation, impair the field of vision and of non-verbal and verbal communication [15,17,19,36,37,42–45].

The above-mentioned measurable and qualitative physiological effects of masks can have implications in various areas of expertise in medicine.

It is known from pathology that not only supra-threshold stimuli exceeding normal limits have disease-relevant consequences. Subthreshold stimuli are also capable of causing pathological changes if the exposure time is long enough. Examples occur from the slightest air pollution by hydrogen sulfide resulting in respiratory problems (throat irritation, coughing, reduced absorption of oxygen) and neurological diseases (headaches, dizziness) [46]. Furthermore, subthreshold but prolonged exposure to nitrogen oxides and particulate matter is associated with an increased risk of asthma, hospitalization and higher overall mortality [47,48]. Low concentrations of pesticides are also associated with disease-relevant consequences for humans such as mutations, development of cancer and neurological disorders [49]. Likewise, the chronic subthreshold intake of arsenic is associated with an increased risk of cancer [50], subthreshold intake of cadmium with the promotion of heart failure [51], subthreshold intake of lead is associated with hypertension, renal metabolic disorders and cognitive impairment [52] or subthreshold intake of mercury with immune deficiency and neurological disorders [53]. Subliminal UV radiation exposure over long periods is also known to cause mutation-promoting carcinogenic effects (especially white skin cancer) [54].

The mask-induced adverse changes are relatively minor at first glance, but repeated exposure over longer periods in accordance with the above-mentioned pathogenetic principle is relevant. Long-term disease-relevant consequences of masks are to be expected. Insofar, the statistically significant results found in the studies with mathematically tangible differences between mask wearers and people without masks are clinically relevant. They give an indication that with correspondingly repeated and prolonged exposure to physical, chemical, biological, physiological and psychological conditions, some of which are

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

subliminal, but which are significantly shifted towards pathological areas, health-reducing changes and clinical pictures can develop such as high blood pressure and arteriosclerosis, including coronary heart disease (metabolic syndrome) as well as neurological diseases. For small increases in carbon dioxide in the inhaled air, this disease-promoting effect has been proven with the creation of headaches, irritation of the respiratory tract up to asthma as well as an increase in blood pressure and heart rate with vascular damage and, finally, neuropathological and cardiovascular consequences [38]. Even slightly but persistently increased heart rates encourage oxidative stress with endothelial dysfunction, via increased inflammatory messengers, and finally, the stimulation of arteriosclerosis of the blood vessels has been proven [55]. A similar effect with the stimulation of high blood pressure, cardiac dysfunction and damage to blood vessels supplying the brain is suggested for slightly increased breathing rates over long periods [56,57]. Masks are responsible for the aforementioned physiological changes with rises in inhaled carbon dioxide [18–28], small sustained increases in heart rate [15,23,29,30,35] and mild but sustained increases in respiratory rates [15,21,23,34,36].

For a better understanding of the side effects and dangers of masks presented in this literature review, it is possible to refer to well-known principles of respiratory physiology (Figure 3).

The average dead space volume during breathing in adults is approximately 150–180 mL and is significantly increased when wearing a mask covering the mouth and nose [58]. With an N95 mask, for example, the dead space volume of approximately 98–168 mL was determined in an experimental study [59]. This corresponds to a mask-related dead space increase of approximately 65 to 112% for adults and, thus, almost a doubling. At a respiratory rate of 12 per minute, the pendulum volume respiration with such a mask would, thus, be at least 2.9–3.8 L per minute. Therefore, the dead space amassed by the mask causes a relative reduction in the gas exchange volume available to the lungs per breath by 37% [60]. This largely explains the impairment of respiratory physiology reported in our work and the resulting side effects of all types of masks in everyday use in healthy and sick people (increase in respiratory rate, increase in heart rate, decrease in oxygen saturation, increase in carbon dioxide partial pressure, fatigue, headaches, dizziness, impaired thinking, etc.) [36,58].

In addition to the effect of increased dead space volume breathing, however, mask-related breathing resistance is also of exceptional importance (Figure 3) [23,36].

Experiments show an increase in airway resistance by a remarkable 126% on inhalation and 122% on exhalation with an N95 mask [60]. Experimental studies have also shown that moisturization of the mask (N95) increases the breathing resistance by a further 3% [61] and can, thus, increase the airway resistance up to 2.3 times the normal value.

This clearly shows the importance of the airway resistance of a mask. Here, the mask acts as a disturbance factor in breathing and makes the observed compensatory reactions with an increase in breathing frequency and simultaneous feeling of breathlessness plausible (increased work of the respiratory muscles). This extra strain due to the amplified work of breathing against bigger resistance caused by the masks also leads to intensified exhaustion with a rise in heart rate and increased $CO_2$ production. Fittingly, in our review of the studies on side effects of masks (Figure 2), we also found a percentage clustering of significant respiratory impairment and a significant drop in oxygen saturation (in about 75% of all study results).

In the evaluation of the primary papers, we also determined a statically significant correlation of the drop in oxygen saturation ($SpO_2$) and fatigue with a common occurrence in 58% of the mask use studies with significant results (Figure 2, $p < 0.05$).

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344



**Figure 3.** Pathophysiology of the mask (important physical and chemical effects): Illustration of the breathing resistance* and of the dead space volume of an N95 mask in an adult. When breathing, there is an overall significantly reduced possible gas exchange volume of the lungs of minus 37% caused by the mask (Lee 2011) [60] according to a decrease in breathing depth and volume due to the greater breathing resistance of plus128%* (exertion when inhaling greater than when exhaling) and due to the increased dead space volume of plus80%**, which does not participate directly in the gas exchange and is being only partially mixed with the environment. (* = averaged inspiration and expiration according to Lee 2011 [60] including moisture penetration according to Roberge 2010 [61], ** = averaged values according to Xu 2015 [59]).

## 3.2. Internistic Side Effects and Dangers

As early as 2012, an experiment showed that walking in the 20 masked subjects compared to the identical activity without masks significantly increased heart rates (average +9.4 beats per minute, $p < 0.001$) and breathing rates ($p < 0.02$). These physiological changes were accompanied by transcutaneous significantly measurable increased transcutaneous carbon dioxide (PtcCO$_2$) levels ($p < 0.0006$) as well as respiratory difficulties in the mask wearers compared to the control group [15].

In a recent experimental comparative study from 2020, 12 healthy volunteers under surgical masks as well as under N95 masks experienced measurable impairments in the measured lung function parameters as well as cardiopulmonary capacity (lower maximum blood lactate response) during moderate to heavy physical exertion compared to exertion without masks ($p < 0.001$) [31]. The mask-induced increased airway resistance led to increased respiratory work with increased oxygen consumption and demand, both of the respiratory muscles and the heart. Breathing was significantly impeded ($p < 0.001$) and participants reported mild pain. The scientists concluded from their results that the cardiac compensation of the pulmonary, mask-induced restrictions, which still functioned in healthy people, was probably no longer possible in patients with reduced cardiac output [31].

In another recent study, researchers tested fabric masks (community masks), surgical masks and FFP2/N95 masks in 26 healthy people during exercise on a cycle ergometer. All

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

masks also showed a measurable carbon dioxide ($CO_2$) retention ($PtcCO_2$) (statistically significant with $p < 0.001$) and, for N95 masks, a decrease in the oxygen saturation value $SpO_2$ (statistically significant at 75 and 100 W with $p < 0.02$ and $p < 0.005$, respectively). The clinical relevance of these changes was shown in an increase in breathing frequency with fabric masks ($p < 0.04$) as well as in the occurrence of the previously described mask-specific complaints such as a feeling of heat, shortness of breath and headaches. The stress perception was recorded on a Borg scale from 1 to 20. During physical exertion under an N95 mask, the group with masks showed a significant increase in the feeling of exhaustion compared to the group without with 14.6 versus 11.9 on the scale of 20. During the exposure, 14 of the 24 subjects wearing masks complained of shortness of breath (58%), four of headaches and two of a feeling of heat. Most of the complaints concerned FFP2 masks (72%) [21].

The aforementioned physiological and subjective physical effects of masks on healthy people at rest and under exertion [21,31] give an indication of the effect of masks on sick and elderly people even without exertion.

In an observational study of ten 20 to 50 year-old nurses wearing N95 masks during their shift work, side effects such as breathing difficulties ("I can't breathe"), feelings of exhaustion, headache ($p < 0.001$), drowsiness ($p < 0.001$) and a decrease in oxygen saturation $SpO_2$ ($p < 0.05$) as well as an increase in heart rate ($p < 0.001$) were statistically significant in association with an increase in obesity (BMI) [19]. The occurrence of symptoms under masks was also associated with older age (statistically significant correlation of fatigue and drowsiness with $p < 0.01$ each, nausea with $p < 0.05$, an increase in blood pressure with $p < 0.01$, headache with $p < 0.05$, breathing difficulties with $p < 0.001$) [19].

In an intervention study involving 97 patients with advanced chronic obstructive pulmonary disease (COPD) the respiratory rate, oxygen saturation and exhaled carbon dioxide equivalents (capnometry) changed unfavorably and significantly after the use of N95 masks (FFP2 equivalent) with an initial 10-minute rest and subsequent 6-minute walking. Seven patients discontinued the experiment due to serious complaints with a decrease in the oxygen saturation value $SpO_2$ and a pathological carbon dioxide ($CO_2$) retention as well as increased end-expiratory partial pressure of carbon dioxide ($PETCO_2$) [23]. In two patients, the $PETCO_2$ exceeded the normal limits and reached values of >50 mmHg. An $FEV1 < 30\%$ and a modified Medical Research Council (mMRC) Dyspnea Scale Score of ≥3, both indicators of advanced COPD, correlated with mask intolerance overall in this study. The most common symptom under mask was breathlessness at 86%. In the dropouts of the study, dizziness (57%) and headaches were also often recorded. In the mask-tolerant COPD patients, significant increases in heart rate, respiratory rate and end-expiratory carbon dioxide partial pressure $PETCO_2$ could be objectified even at rest, after only 10 min of mask-wearing ($p < 0.001$), accompanied by a decrease in oxygen saturation $SpO_2$ ($p < 0.001$) [23]. The results of this study with an evidence level IIa are indicative for COPD mask wearers.

In another retrospective comparative study on COPD and surgical masks, examiners were able to demonstrate statistically an increase in arterial partial pressure of carbon dioxide ($PaCO_2$) of approximately +8 mmHg ($p < 0.005$) and a concomitant mask-related increase in systolic blood pressure of +11 mmHg ($p < 0.02$) [25]. This increase is relevant in hypertensive patients, but also in healthy people with borderline blood pressure values as pathological value range triggered by mask-wearing can be induced.

In 39 hemodialysis patients with end-stage renal disease, a type N95 mask (FFP2 equivalent) caused a significant drop in blood oxygen partial pressure ($PaO_2$) in 70% of patients at rest (on hemodialysis) within only 4 h ($p = 0.006$). Despite a compensatory increased respiratory rate ($p < 0.001$), malaise with chest pain occurred ($p < 0.001$) and even resulted in hypoxemia (drop in oxygen below the normal limit) in 19% of the subjects [34]. The researchers concluded from their findings that elderly or patients with reduced cardiopulmonary function have a higher risk of developing a severe respiratory failure while wearing a mask [34].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In a review paper on the risks and benefits of masks worn during the COVID-19 crisis, other authors provide an equally critical assessment of mandatory mask use for patients with pneumonia, both with and without COVID-19 pneumonia disease [16].

### 3.3. Neurological Side Effects and Dangers

In a scientific evaluation of syncope in the operating theatre, 36 of 77 affected persons (47%) were associated with wearing a mask [62]. However, other factors could not be ruled out as contributory causes.

In their level III evidence review, neurologists from Israel, the UK and the USA state that a mask is unsuitable for epileptics because it can trigger hyperventilation [63]. The use of a mask significantly increases the respiratory rate by about plus 15 to 20% [15,21,23,34,64]. However, an increase in breathing frequency leading to hyperventilation is known to be used for provocation in the diagnosis of epilepsy and causes seizure-equivalent EEG changes in 80% of patients with generalized epilepsy and in up to 28% of focal epileptics [65].

Physicians from New York studied the effects of wearing masks of the surgical-type mask and N95 among medical personnel in a sample of 343 participants (surveyed using standardized, anonymized questionnaires). Wearing the masks caused detectable physical adverse effects such as impaired cognition (24% of wearers) and headaches in 71.4% of the participants. Of these, 28% persisted and required medication. Headache occurred in 15.2% under 1 h of wear, in 30.6% after 1 h of wear and in 29.7% after 3 h of wear. Thus, the effect intensified with increasing wearing time [37].

Confusion, disorientation and even drowsiness (Likert scale questionnaire) and reduced motoric abilities (measured with a linear position transducer) with reduced reactivity and overall impaired performance (measured with the Roberge Subjective Symptoms-during-Work Scale) as a result of mask use have also been documented in other studies [19,23,29,32,36,37].

The scientists explain these neurological impairments with a mask-induced latent drop in blood gas oxygen levels $O_2$ (towards hypoxia) or a latent increase in blood gas carbon dioxide levels $CO_2$ (towards hypercapnia) [36]. In view of the scientific data, this connection also appears to be indisputable [38–41].

In a mask experiment from 2020, significant impaired thinking ($p < 0.03$) and impaired concentration ($p < 0.02$) were found for all mask types used (fabric, surgical and N95 masks) after only 100 min of wearing the mask [29]. The thought disorders correlated significantly with a drop in oxygen saturation ($p < 0.001$) during mask use.

Initial headaches ($p < 0.05$) were experienced by up to 82% of 158, 21–35 year-old mask wearers in another study of N95 respiratory protection with one third (34%) experiencing headaches up to four times daily. Participants wore the mask for 18.3 days over a 30-day period with a mean of 5.9 h per day [66].

Significantly increased headache ($p < 0.05$) could be observed not only for N95 but also for surgical masks in participants of another observational study of health care workers [67].

In another study, the researchers classified 306 users with an average age of 43 years and wearing different types of masks, of whom 51% had an initial headache as a specific symptom related exclusively to increased surgical and N95 mask use (1 to 4 h, $p = 0.008$) [68].

Researchers from Singapore were able to demonstrate in a trial involving 154 healthy N95 health service mask wearers that a significant increase in mask-induced blood carbon dioxide levels (measured by end-expiratory partial pressure of carbon dioxide $PETCO_2$) and a measurably greater vasodilatation with an increase in cerebral artery flow in the cerebri media resulted. This was associated with headaches in the trial group ($p < 0.001$) [27].

According to the researchers, the aforementioned changes also contribute to headaches during the prolonged use of masks with a shift towards hypoxia and hypercapnia. Furthermore, stress and mechanical factors such as the irritation of cervical nerves in the neck and head area caused by the tight mask straps pressuring the nerve strands also contribute to headaches [66].

Case 2:22-cv-02383-SSS-AS   Document 1-1   Filed 04/08/22   Page 425 of 586   Page ID #:881

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344                                                                12 of 42

In the analysis of the primary studies, we were able to detect an association between the N95 mask and headaches. In six out of 10 studies, the significant headache appeared in conjunction with the N95 mask (60% of all studies, Figure 2).

### 3.4. Psychological Side Effects and Dangers

According to an experimental study, wearing surgical masks and N95 masks can also lead to a reduced quality of life owing to reduced cardiopulmonary capacity [31]. Masks, along with causing physiological changes and discomfort with progressive length of use, can also lead to significant discomfort ($p < 0.03$ to $p < 0.0001$) and a feeling of exhaustion ($p < 0.05$ to 0.0001) [69].

Besides the shift in blood gases towards hypercapnia (increase in $CO_2$) and hypoxia (decrease in $O_2$), detailed under general physiological effects (Section 3.1), masks also restrict the cognitive abilities of the individual (measured using a Likert scale survey) accompanied by a decline in psycho-motoric abilities and consequently a reduced responsiveness (measured using a linear position transducer) as well as an overall reduced performance capability (measured with the Roberge Subjective Symptoms-during-Work Scale) [29,32,38,39,41].

The mask also causes an impaired field of vision (especially affecting the ground and obstacles on the ground) and also presents an inhibition to habitual actions such as eating, drinking, touching, scratching and cleaning the otherwise uncovered part of the face, which is consciously and subconsciously perceived as a permanent disturbance, obstruction and restriction [36]. Wearing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others [70,71]. These perceived interferences of integrity, self-determination and autonomy, coupled with discomfort, often contribute to substantial distraction and may ultimately be combined with the physiologically mask-related decline in psycho-motoric abilities, reduced responsiveness and an overall impaired cognitive performance. It leads to misjudging situations as well as delayed, incorrect and inappropriate behavior and a decline in the effectiveness of the mask wearer [36,37,39–41].

The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and dampness, impairments and discomfort predominantly affecting the head and face [19,29,35–37,71–73]. However, the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus) [36].

According to a questionnaire survey, masks also frequently cause anxiety and psycho-vegetative stress reactions in children—as well as in adults—with an increase in psycho-somatic and stress-related illnesses and depressive self-experience, reduced participation, social withdrawal and lowered health-related self-care [74]. Over 50% of the mask wearers studied had at least mild depressive feelings [74]. Additional fear-inducing and often exaggerated media coverage can further intensify this. A recent retrospective analysis of the general media in the context of the 2014 Ebola epidemic showed a scientific truth content of only 38% of all publicly published information [75]. Researchers classified a total of 28% of the information as provocative and polarizing and 42% as exaggerating risks. In addition, 72% of the media content aimed to stir up health-related negative feelings. The feeling of fear, combined with insecurity and the primal human need to belong [76], causes a social dynamic that seems partly unfounded from a medical and scientific point of view.

The mask, which originally served purely hygienic purpose, has been transformed into a symbol of conformity and pseudo-solidarity. The WHO, for example, lists the advantages of the use of masks by healthy people in public to include a potentially reduced stigmatization of mask wearers, a sense of contribution to preventing the spread of the virus and a reminder to comply with other measures [2].

### 3.5. Psychiatric Side Effects and Dangers

As explained earlier, masks can cause increased rebreathing with an accumulation of carbon dioxide in the wearer due to increased dead space volume [16–18,20] (Figure 3), with often statistically significant measurable elevated blood carbon dioxide ($CO_2$) levels in sufferers [13,15,17,19–28] (Figure 2). However, changes that lead to hypercapnia are known to trigger panic attacks [77,78]. This makes the significantly measurable increase in $CO_2$ caused by wearing a mask clinically relevant.

Interestingly, breath provocation tests by inhaling $CO_2$ are used to differentiate anxiety states in panic disorders and premenstrual dysphoria from other psychiatric clinical pictures. Here, absolute concentrations of 5% $CO_2$ already suffice to trigger panic reactions within 15–16 min [77]. The normal exhaled air content of $CO_2$ is about 4%.

It is obvious from experimental studies on masked subjects that concentration changes in the respiratory gases in the above-mentioned range with values above 4% could occur during rebreathing with prolonged mask use [18,23]. The activation of the locus coeruleus by $CO_2$ is used to generate panic reactions via respiratory gases [78,79]. This is because the locus coeruleus is an important part of the system of vegetative noradrenergic neurons, a control center in the brainstem, which reacts to an appropriate stimulus and changes in the gas concentrations in the blood by releasing the stress hormone noradrenaline [78].

From the physiological, neurological and psychological side effects and dangers described above (Sections 3.1, 3.3 and 3.4), additional problems can be derived for the use of masks in psychiatric cases. People undergoing treatment for dementia, paranoid schizophrenia, personality disorders with anxiety and panic attacks, but also panic disorders with claustrophobic components, are difficult to reconcile with a mask requirement, because even small increases in $CO_2$ can cause and intensify panic attacks [44,77–79].

According to a psychiatric study, patients with moderate to severe dementia have no understanding of COVID-19 protection measures and have to be persuaded to wear masks constantly [80].

According to a comparative study, patients with schizophrenia have a lower acceptance of mask-wearing (54.9% agreement) than ordinary practice patients (61.6%) [81]. The extent to which mask-wearing can lead to an exacerbation of schizophrenia symptoms has not yet been researched in detail.

When wearing masks, confusion, impaired thinking, disorientation (standardized recording via special rating and Likert scales, $p < 0.05$) and in some cases a decrease in maximum speed and reaction time (measured with the linear-position transducer, $p < 0.05$) were observed [19,32,36,38–41]. Psychotropic drugs reduce psycho-motoric functions in psychiatric patients. This can become clinically relevant especially with regard to the further reduced ability to react and the additional increased susceptibility to accidents of such patients when wearing masks.

In order to avoid an unintentional $CO_2$-triggered anesthesia [39], fixed and medically sedated patients, without the possibility of continuous monitoring, should not be masked according to the criteria of the Centers for Disease Control and Prevention, USA (CDC). This is because of the possible $CO_2$ retention described above, as there is a risk of unconsciousness, aspiration and asphyxia [16,17,20,38,82,83].

### 3.6. Gynaecological Side Effects and Dangers

As a critical variable, a low blood carbon dioxide level in pregnant women is maintained via an increased respiratory minute volume, stimulated by progesterone [22]. For a pregnant woman and her unborn child, there is a metabolic need for a fetal–maternal carbon dioxide ($CO_2$) gradient. The mother's blood carbon dioxide level should always be lower than that of the unborn child in order to ensure the diffusion of $CO_2$ from the fetal blood into the maternal circulation via the placenta.

Therefore, mask-related phenomena described above (Sections 3.1 and 3.2), such as the measurable changes in respiratory physiology with increased breathing resistance,

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

increased dead space volume (Figure 3) and the retention of exhaled carbon dioxide ($CO_2$) are of importance. If $CO_2$ is increasingly rebreathed under masks, this manifestation could, even with subliminal carbon dioxide increases, act as a disturbing variable of the fetal–maternal $CO_2$ gradient increasing over time of exposure and, thus, develop clinical relevance, also with regard to a reduced compensation reserve of the expectant mothers [20,22,28].

In a comparative study, 22 pregnant women wearing N95 masks during 20 min of exercise showed significantly higher percutaneous $CO_2$ values, with average $PtcCO_2$ values of 33.3 mmHg compared to 31.3 mmHg than in 22 pregnant women without masks ($p = 0.04$) [22]. The heat sensation of the expectant mothers was also significantly increased with masks, with $p < 0.001$ [22].

Accordingly, in another intervention study, researchers demonstrated that breathing through an N95 mask (FFP2 equivalent) impeded gas exchange in 20 pregnant women at rest and during exercise, causing additional stress on their metabolic system [28]. Thus, under an N95 mask, 20 pregnant women showed a decrease in oxygen uptake capacity $VO_2$ of about 14% (statistically significant, $p = 0.013$) and a decrease in carbon dioxide output capacity $VCO_2$ of about 18% (statistically significant, $p = 0.001$). Corresponding significant changes in exhaled oxygen and carbon dioxide equivalents were also documented with increases in exhaled carbon dioxide ($FeCO_2$) ($p < 0.001$) and decreases in exhaled oxygen ($FeO_2$) ($p < 0.001$), which were explained by an altered metabolism due to respiratory mask obstruction [28].

In experiments with predominantly short mask application times, neither the mothers nor the fetuses showed statistically significant increases in heart rates or changes in respiratory rates and oxygen saturation values. However, the exact effects of prolonged mask use in pregnant women remain unclear overall. Therefore, in pregnant women, extended use of surgical and N95 masks is viewed critically [20].

In addition, it is unclear whether the substances contained in industrially manufactured masks that can be inhaled over longer periods of time (e.g., formaldehyde as an ingredient of the textile and thiram as an ingredient of the ear bands) are teratogenic [20,84].

### 3.7. Dermatological Side Effects and Dangers

Unlike garments worn over closed skin, masks cover body areas close to the mouth and nose, i.e., body parts that are involved with respiration.

Inevitably, this leads not only to a measurable temperature rise [15,44,85], but also to a severe increase in humidity due to condensation of the exhaled air, which in turn changes the natural skin milieu considerably of perioral and perinasal areas [36,61,82]. It also increases the redness, pH-value, fluid loss through the skin epithelium, increased hydration and sebum production measurably [73]. Preexisting skin diseases are not only perpetuated by these changes, but also exacerbated. In general, the skin becomes more susceptible to infections and acne.

The authors of an experimental study were able to prove a disturbed barrier function of the skin after only 4 h of wearing a mask in 20 healthy volunteers, both for surgical masks and for N95 masks [73]. In addition, germs (bacteria, fungi and viruses) accumulate on the outside and inside of the masks due to the warm and moist environment [86–89]. They can cause clinically relevant fungal, bacterial or viral infections. The unusual increase in the detection of rhinoviruses in the sentinel studies of the German Robert Koch Institute (RKI) from 2020 [90] could be another indication of this phenomenon.

In addition, a region of the skin that is not evolutionarily adapted to such stimuli is subjected to increased mechanical stress. All in all, the above-mentioned facts cause the unfavorable dermatological effects with mask related adverse skin reactions like acne, rashes on the face and itch symptoms [91].

A Chinese research group reported skin irritation and itching when using N95 masks among 542 test participants and also a correlation between the skin damage that occurred and the time of exposure (68.9% at ≤6 h/day and 81.7% at >6 h/day) [92].

A New York study evaluated in a random sample of 343 participants the effects of frequent wearing of surgical mask type and N95 masks among healthcare workers during the COVID-19 pandemic. Wearing the masks caused headache in 71.4% of participants, in addition to drowsiness in 23.6%, detectable skin damage in 51% and acne in 53% of mask users [37].

On the one hand, direct mechanical skin lesions occur on the nose and cheekbones due to shear force, especially when masks are frequently put on and taken off [37,92].

On the other hand, masks create an unnaturally moist and warm local skin environment [29,36,82]. In fact, scientists were able to demonstrate a significant increase in humidity and temperature in the covered facial area in another study in which the test individuals wore masks for one hour [85]. The relative humidity under the masks was measured with a sensor (Atmo-Tube, San Francisco, CA, USA). The sensation of humidity and temperature in the facial area is more crucial for well-being than other body regions [36,44]. This can increase discomfort under the masks. In addition, the increase in temperature favors bacterial optimization.

The pressure of the masks also causes an obstruction of the flow physiology of lymph and blood vessels in the face, with the consequence of increased disturbance of skin function [73] and ultimately also contributing to acne in up to 53% of all wearers and other skin irritations in up to 51% of all wearers [36,37,82].

Other researchers examined 322 participants with N95 masks in an observational study and detected acne in up to 59.6% of them, itching in 51.4% and redness in 35.8% as side effects [72].

In up to 19.6% (273) of the 1393 wearers of different masks (community masks, surgical, N95 masks), itching could be objectified in one study, in 9% even severely. An atopic predisposition (allergy tendency) correlated with the risk of itching. The length of use was significantly related to the risk of itching ($p < 0.0001$) [93].

In another dermatological study from 2020, 96.9% of 876 users of all mask types (community masks, surgical masks, N95 masks) confirmed adverse problems with a significant increase in itching (7.7%), accompanied by fogging-up of glasses (21.3%), flushing (21.3%), slurred speech (12.3%) and difficulty breathing (35.9%) ($p < 0.01$) [71].

Apart from an increased incidence of acne [37,72,91] under masks, contact eczema and urticaria [94] are generally described in connection with hypersensitivities to ingredients of the industrially manufactured masks (surgical mask and N95) such as formaldehyde (ingredient of the textile) and thiram (ingredient of the ear bands) [73,84]. The hazardous substance thiram, originally a pesticide and corrosive, is used in the rubber industry as a optimization accelerator. Formaldehyde is a biocide and carcinogen and is used as a disinfectant in the industry.

Even isolated permanent hyperpigmentation as a result of post-inflammatory or pigmented contact dermatitis has been described by dermatologists after prolonged mask use [72,91].

### 3.8. ENT and Dental Side Effects and Dangers

There are reports from dental communities about negative effects of masks and are accordingly titled "mask mouth" [95]. Provocation of gingivitis (inflammation of the gums), halitosis (bad breath), candidiasis (fungal infestation of the mucous membranes with Candida albicans) and cheilitis (inflammation of the lips), especially of the corners of the mouth, and even plaque and caries are attributed to the excessive and improper use of masks. The main trigger of the oral diseases mentioned is an increased dry mouth due to a reduced saliva flow and increased breathing through the open mouth under the mask. Mouth breathing causes surface dehydration and reduced salivary flow rate (SFR) [95]. Dry mouth is scientifically proven due to mask wear [29]. The bad habit of breathing through the open mouth while wearing a mask seems plausible because such breathing pattern compensates for the increased breathing resistance, especially when inhaling through the masks [60,61]. In turn, the outer skin moisture [71,73,85] with altered

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

skin flora, which has already been described under dermatological side effects (Section 3.7), is held responsible as an explanation for the inflammation of the lips and corners of the mouth (cheilitis) [95]. This clearly shows the disease-promoting reversal of the natural conditions caused by masks. The physiological internal moisture with external dryness in the oral cavity converts into internal dryness with external moisture.

ENT physicians recently discovered a new form of irritant rhinitis due to N95 mask use in 46 patients. They performed endoscopies and nasal irrigations on mask wearers, which were subsequently assessed pathologically. Clinical problems were recorded with standardized questionnaires. They found statistically significant evidence of mask-induced rhinitis and itching and swelling of the mucous membranes as well as increased sneezing ($p < 0.01$). Endoscopically, it showed an increased secretion and evidence of inhaled mask polypropylene fibers as the trigger of mucosal irritation [96].

In a study of 221 health care workers, ENT physicians objectified a voice disorder in 33% of mask users. The VHI-10 score of 1 to 10, which measures voice disorders, was on average 5.72 higher in these mask users (statistically significant with $p < 0.001$). The mask not only acted as an acoustic filter, provoking excessively loud speech, it also seems to trigger impaired vocal cord coordination because the mask compromises the pressure gradients required for undisturbed speech [43]. The researchers concluded from their findings that masks could pose a potential risk of triggering new voice disorders as well as exacerbating existing ones.

### 3.9. Sports Medicine Side Effects and Dangers

According to the literature, performance-enhancing effects of masks regarding cardiovascular optimization and improvement of oxygen uptake capacity cannot be proven.

For example, in an experimental reference study (12 subjects per group), the training mask that supposedly mimics altitude training (ETM: elevation training mask) only had training effects on the respiratory muscles. However, mask wearers showed significantly lower oxygen saturation values ($SpO_2$%) during exercise ($SpO_2$ of 94% for mask wearers versus 96% for mask-less, $p < 0.05$) [33], which can be explained by an increased dead space volume and increased resistance during breathing. The measured oxygen saturation values were significantly lower than the normal values in the group of mask wearers, which indicates a clinical relevance.

The proven adaptation effect of the respiratory muscles in healthy athletes [33] clearly suggests that masks have a disruptive effect on respiratory physiology.

In another intervention study on mask use in weightlifters, researchers documented statistically significant effects of reduced attention (questionnaire recording, Likert scale) and a slowed maximum speed of movement detectable by means of sensors (both significant at $p < 0.001$), leading the researchers to conclude that mask use in sport is not without risks. As a secondary finding, they also detected a significant decrease in oxygen saturation $SpO_2$ when performing special weight-lifting exercises ("back squats") in the mask group after only 1 min of exercise compared to the mask-free group ($p < 0.001$) [32]. The proven tendency of the masks to shift the chemical parameter oxygen saturation $SpO_2$ in a pathological direction (lower limit value 95%) may well have clinical relevance in untrained or sick individuals.

Sports medicine confirmed an increase in carbon dioxide ($CO_2$) retention, with an elevation in $CO_2$ partial pressure in the blood with larger respiratory dead space volumes [14].

In fact, dead space-induced $CO_2$ retention while wearing a mask during exercise was also experimentally proven. The effects of a short aerobic exercise under N95 masks were tested on 16 healthy volunteers. A significantly increased end-expiratory partial pressure of carbon dioxide ($PETCO_2$) with plus 8 mmHg ($p < 0.001$) was found [24]. The increase in blood carbon dioxide ($CO_2$) in the mask wearers under maximum load was plus 14% $CO_2$ for surgical masks and plus 23% $CO_2$ for N95 masks, an effect that may well have clinical relevance in the pre-diseased, elderly and children, as these values strongly approached the pathological range [24].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In an interesting endurance study with eight middle-aged subjects (19–66), the gas content for $O_2$ and $CO_2$ under the masks was determined before and after exercise. Even at rest, the oxygen availability under the masks was 13% lower than without the masks and the carbon dioxide ($CO_2$) concentration was 30 times higher. Under stress (Ruffier test), the oxygen concentration (% $O_2$) below the mask dropped significantly by a further 3.7%, while the carbon dioxide concentration (% $CO_2$) increased significantly by a further 20% (statistically significant with $p < 0.001$). Correspondingly, the oxygen saturation of the blood ($SpO_2$) of the test persons also decreased significantly from 97.6 to 92.1% ($p < 0.02$) [18]. The drop in the oxygen saturation value ($SpO_2$) to 92%, clearly below the normal limit of 95%, is to be classified as clinically relevant and detrimental to health.

These facts are an indication that the use of masks also triggers the effects described above leading to hypoxia and hypercapnia in sports. Accordingly, the WHO and Centers for Disease Control and Prevention, GA, USA (CDC) advise against wearing masks during physical exercise [82,97].

### 3.10. Social and Sociological Side Effects and Dangers

The results of a Chilean study with health care workers show that masks act like an acoustic filter and provoke excessively loud speech. This causes a voice disorder [43]. The increased volume of speech also contributes to increased aerosol production by the mask wearer [98]. These experimental data measured with the Aerodynamic Particle Sizer (APS, TSI, model 332, TSI Incorporated, Minnesota, MI, USA) are highly relevant.

Moreover, mask wearers are prevented from interacting normally in everyday life due to impaired clarity of speech [45], which tempts them to get closer to each other.

This results in a distorted prioritization in the general public, which counteracts the recommended measures associated with the COVID-19 pandemic. The WHO prioritizes social distancing and hand hygiene with moderate evidence and recommends wearing a mask with weak evidence, especially in situations where individuals are unable to maintain a physical distance of at least 1 m [3].

The disruption of non-verbal communication due to the loss of facial expression recognition under the mask can increase feelings of insecurity, discouragement and numbness as well as isolation, which can be extremely stressful for the mentally and hearing-impaired [16].

Experts point out that masks disrupt the basics of human communication (verbal and nonverbal). The limited facial recognition caused by masks leads to a suppression of emotional signals. Masks, therefore, disrupt social interaction, erasing the positive effect of smiles and laughter but at the same time greatly increasing the likelihood of misunderstandings because negative emotions are also less evident under masks [42].

A decrease in empathy perception through mask use with disruption of the doctor–patient relationship has already been scientifically proven on the basis of a randomized study (statistically significant, with $p = 0.04$) [99]. In this study, the Consultation Empathy Care Measury, the Patient Enablement Instrument (PEI) Score and a Satisfaction Rating Scale were assessed in 1030 patients. The 516 doctors, who wore masks throughout, conveyed reduced empathy towards the patients and, thus, nullified the positive health-promoting effects of a dynamic relationship. These results demonstrate a disruption of interpersonal interaction and relationship dynamics caused by masks.

The WHO guidance on the use of masks in children in the community, published in August 2020, points out that the benefits of mask use in children must be weighed up against the potential harms, including social and communicational concerns [100].

Fears that widespread pandemic measures will lead to dysfunctional social life with degraded social, cultural and psychological interactions have also been expressed by other experts [6–8,42].

### 3.11. Social and Occupational Medicine Side Effects and Hazards

In addition to mask-specific complaints such as a feeling of heat, dampness, shortness of breath and headache, various physiological phenomena were documented, such as the significant increase in heart and respiratory rate, the impairment of lung function parameters, the decrease in cardiopulmonary capacity (e.g., lower maximum blood lactate response) [15,19,21,23,29–31], as well as the changes in oxygen and carbon dioxide both in the end-expiratory and the air under the mask that was measured in the blood of the individuals [13,15,18,19,21–25,27–34]. The significant changes were measurable after only a few minutes of wearing a mask and in some cases reached magnitudes of minus 13% reduced $O_2$ concentration and 30-fold increased $CO_2$ concentration of the inhaled air under masks ($p < 0.001$) [18]. The changes observed were not only statistically significant, but also clinically relevant; the subjects also showed pathological oxygen saturation after exposure to masks ($p < 0.02$) [18].

Shortness of breath during light exertion (6 min walking) under surgical masks has been recorded with statistical significance in 44 healthy subjects in a prospective experimental intervention study ($p < 0.001$) [101]. Here, the complaints were assessed using a subjective, visual analogue scale.

In another study from 2011, all tested masks caused a significantly measurable increase in discomfort and a feeling of exhaustion in the 27 subjects during prolonged usage ($p < 0.0001$) [69].

These symptoms lead to additional stress for the occupational mask wearer and, thus, in relation to the feeling of exhaustion, contribute to the self-perpetuating vicious circle caused by the vegetative sympathetic activation, which further increases the respiratory and heart rate, blood pressure and increased sense of exhaustion [16,20,35,83].

Other studies showed that the psychological and physical effects of the masks can lead to an additional reduction in work performance (measured with the Roberge Subjective Symptoms-during-Work Scale, a Likert scale of 1–5) via increased feelings of fatigue, dissatisfaction and anxiety [58,102,103].

Wearing masks over a longer period of time also led to physiological and psychological impairments in other studies and, thus, reduced work performance [19,36,58,69]. In experiments on respiratory-protective equipment, an increase in the dead space volume by 350 mL leads to a reduction in the possible performance time by approx. −19%, furthermore to a decrease in breathing comfort by −18% (measured via a subjective rating scale) [58]. In addition, the time spent working and the flow of work is interrupted and reduced by putting on and taking off the masks and changing them. The reduced work performance has been recorded in the literature found as described above (especially in Sections 3.1 and 3.2) but has not been quantified further in detail [36,58].

Surgical mask type and N95 protective equipment frequently caused adverse effects in medical personnel such as headaches, breathing difficulties, acne, skin irritation, itching, decreased alertness, decreased mental performance and feelings of dampness and heat [19,29,37,71,85]. Subjective, work performance-reducing, mask-related impairments in users, measured with special survey scores and Likert scales, have also been described in other studies [15,21,27,32,35,43,66–68,72,96,99].

In Section 3.7 on dermatology, we already mentioned a paper that demonstrated a significant temperature increase of 1.9 °C on average (to over 34.5 °C) in the mask-covered facial area ($p < 0.05$) [85]. Due to the relatively larger representation in the sensitive cerebral cortex (homunculus), the temperature sensation in the face is more decisive for the feeling of well-being than other body regions [36,44]. The perception of discomfort when wearing a mask can, thus, be intensified. Interestingly, in our analysis, we found a combined occurrence of the physical variable temperature rise under the mask and the symptom respiratory impairment in seven of eight studies concerned, with a mutual significantly measured occurrence in 88%. We also detected a combined occurrence of significantly measured temperature rise under the mask and significantly measured fatigue in 50% of the relevant primary studies (three of six papers, Figure 2). These clustered associations of

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

temperature rise with symptoms of respiratory impairment and fatigue suggest a clinical relevance of the detected temperature rise under masks. In the worst case scenario, the effects mentioned can reinforce each other and lead to decompensation, especially in the presence of COPD, heart failure and respiratory insufficiency.

The sum of the disturbances and discomforts that can be caused by a mask also contributes to distraction (see also psychological impairment). These, in conjunction with a decrease in psycho-motoric skills, reduced responsiveness and overall impaired cognitive performance (all of which are pathophysiological effects of wearing a mask) [19,29,32,39–41] can lead to a failure to recognize hazards and, thus, to accidents or avoidable errors at work [19,36,37]. Of particular note here are mask-induced listlessness ($p < 0.05$), impaired thinking ($p < 0.05$) and concentration problems ($p < 0.02$) as measured by a Likert scale (1–5) [29]. Accordingly, occupational health regulations take action against such scenarios. The German Industrial Accident Insurance (DGUV) has precise and extensive regulations for respiratory protective equipment where they document the limitation of wearing time, levels of work intensity and defined instruction obligation [104].

The standards and norms prescribed in many countries regarding different types of masks to protect their workers are also significant from an occupational health point of view [105]. In Germany, for example, there are very strict safety specifications for masks from other international countries. These specify the requirements for the protection of the wearer [106]. All these standards and the accompanying certification procedures were increasingly relaxed with the introduction of mandatory masks for the general public. This meant that non-certified masks such as community masks were also used on a large scale in the work and school sectors for longer periods during the pandemic measures [107]. Most recently, in October 2020, the German Social Accident Insurance (DGUV) recommended the same usage time limits for community masks as for filtering half masks, namely, a maximum of three shifts of 120 min per day with recovery breaks of 30 min in between. In Germany, FFP2 (N95) masks must be worn for 75 min, followed by a 30-minute break. An additional suitability examination by specialized physicians is also obligatory and stipulated for occupationally used respirators [104].

### 3.12. Microbiological Consequences for Wearer and Environment: Foreign/Self-Contamination

Masks cause retention of moisture [61]. Poor filtration performance and incorrect use of surgical masks and community masks, as well as their frequent reuse, imply an increased risk of infection [108–110]. The warm and humid environment created by and in masks without the presence of protective mechanisms such as antibodies, the complement system, defense cells and pathogen-inhibiting and on a mucous membrane paves the way for unimpeded growth and, thus, an ideal growth and breeding ground for various pathogens such as bacteria and fungi [88] and also allows viruses to accumulate [87]. The warm and humid mask microclimate favors the accumulation of various germs on and underneath the masks [86], and the germ density is measurably proportional to the length of time the mask is worn. After only 2 h of wearing the mask, the pathogen density increases almost tenfold in experimental observation studies [87,89].

From a microbiological and epidemiological point of view, masks in everyday use pose a risk of contamination. This can occur as foreign contamination but also as self-contamination. On the one hand, germs are sucked in or attach themselves to the masks through convection currents. On the other hand, potential infectious agents from the nasopharynx accumulate excessively on both the outside and inside of the mask during breathing [5,88]. This is compounded by contact with contaminated hands. Since masks are constantly penetrated by germ-containing breath and the pathogen reproduction rate is higher outside mucous membranes, potential infectious pathogens accumulate excessively on the outside and inside of masks. On and in the masks, there are quite serious, potentially disease-causing bacteria and fungi such as *E. coli* (54% of all germs detected), Staphylococcus aureus (25% of all germs detected), Candida (6%), Klebsiella (5%), Enterococci (4%),

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

Pseudomonads (3%), Enterobacter (2%) and Micrococcus (1%) even detectable in large quantities [88].

In another microbiological study, the bacterium Staphylococcus aureus (57% of all bacteria detected) and the fungus Aspergillus (31% of all fungi detected) were found to be the dominant germs on 230 surgical masks examined [86].

After more than six hours of use, the following viruses were found in descending order on 148 masks worn by medical personnel: adenovirus, bocavirus, respiratory syncytial virus and influenza viruses [87].

From this aspect, it is also problematic that moisture distributes these potential pathogens in the form of tiny droplets via capillary action on and in the mask, whereby further proliferation in the sense of self- and foreign contamination by the aerosols can then occur internally and externally with every breath [35]. In this regard, it is also known from the literature that masks are responsible for a proportionally disproportionate production of fine particles in the environment and, surprisingly, much more so than in people without masks [98].

It was shown that all mask-wearing subjects released significantly more smaller particles of size 0.3–0.5 μm into the air than mask-less people, both when breathing, speaking and coughing (fabric, surgical, N95 masks, measured with the Aerodynamic Particle Sizer, APS, TS, model 3329) [98]. The increase in the detection of rhinoviruses in the sentinel studies of the German RKI from 2020 [90] could be a further indication of this phenomenon, as masks were consistently used by the general population in public spaces in that year.

### 3.13. Epidemiological Consequences

The possible side effects and dangers of masks described in this paper are based on studies of different types of masks. These include the professional masks of the surgical mask type and N95/KN95 (FFP2 equivalent) that are commonly used in everyday life, but also the community fabric masks that were initially used. In the case of N95, the N stands for National Institute for Occupational Safety and Health of the United States (NIOSH), and 95 indicates the 95 per cent filtering capacity for fine particles up to at least 0.3 μm [82].

A major risk of mask use in the general public is the creation of a false sense of security with regard to protection against viral infections, especially in the sense of a falsely assumed strong self-protection. Disregarding infection risks may not only neglect aspects of source control, but also result in other disadvantages. Although there are quite a few professional positive accounts of the widespread use of masks in the general populace [111], most of the serious and evident scientific reports conclude that the general obligation to wear masks conveys a false sense of security [4,5]. However, this leads to a neglect of those measures that, according to the WHO, have a higher level of effectiveness than mask-wearing: social distancing and hand hygiene [2,112]. Researchers were able to provide statistically significant evidence of a false sense of security and more risky behavior when wearing masks in an experimental setting [112].

Decision makers in many countries informed their citizens early on in the pandemic in March 2020 that people without symptoms should not use a medical mask, as this created a false sense of security [113]. The recommendation was ultimately changed in many countries. At least Germany pointed out that wearers of certain types of masks such as the common fabric masks (community masks) cannot rely on them to protect them or others from transmission of SARS-CoV-2 [114].

However, scientists not only complain about the lack of evidence for fabric masks in the scope of a pandemic [16,110], but also about the high permeability of fabric masks with particles and the potential risk of infection they pose [108,109]. Ordinary fabric masks with a 97% penetration for particle dimensions of $\geq$0.3 μm are in stark contrast to medical-type surgical masks with a 44% penetration. In contrast, the N95 mask has a penetration rate of less than 0.01% for particles $\geq$ 0.3 μm in the laboratory experiment [108,115].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

For the clinical setting in hospitals and outpatient clinics, the WHO guidelines recommend only surgical masks for influenza viruses for the entire patient treatment except for the strongly aerosol-generating measures, for which finer filtering masks of the type N95 are suggested. However, the WHO's endorsement of specific mask types is not entirely evidence-based due to the lack of high-quality studies in the health sector [108,109,116,117].

In a laboratory experiment (evidence level IIa study), it was demonstrated that both surgical masks and N95 masks have deficits in protection against SARS-CoV-2 and influenza viruses using virus-free aerosols [118]. In this study, the FFP2-equivalent N95 mask performed significantly better in protection (8–12 times more effective) than the surgical mask, but neither mask type established reliable, hypothesis-generated protection against corona and influenza viruses. Both mask types could be penetrated unhindered by aerosol particles with a diameter of 0.08 to 0.2 μm. Both the SARS-CoV-2 pathogens with a size of 0.06 to 0.14 μm [119] and the influenza viruses with 0.08 to 0.12 μm are unfortunately well below the mask pore sizes [118].

The filtering capacity of the N95 mask up to 0.3 μm [82] is usually not achieved by surgical masks and community masks. However, aerosol droplets, which have a diameter of 0.09 to 3 μm in size, are supposed to serve as a transport medium for viruses. These also penetrate the medical masks by 40%. Often, there is also a poor fit between the face and the mask, which further impairs their function and safety [120]. The accumulation of aerosol droplets on the mask is problematic. Not only do they absorb nanoparticles such as viruses [6], but they also follow the airflow when inhaling and exhaling, causing them to be carried further. In addition, a physical decay process has been described for aerosol droplets at increasing temperatures, as also occurs under a mask [15,44,85]. This process can lead to a decrease in size of the fine water droplets up to the diameter of a virus [121,122]. The masks filter larger aerosol droplets but cannot retain viruses themselves and such smaller, potentially virus-containing aerosol droplets of less than 0.2 μm and hence cannot stop the spread of virus [123].

Similarly, in an in vivo comparative studies of N95 and surgical masks, there were no significant differences in influenza virus infection rates [124,125]. Although this contrasts with encouraging in vitro laboratory results with virus-free aerosols under non-natural conditions, even with fabric masks [126], it should be noted that under natural in-vivo conditions, the promising filtration functions of fabric masks based on electrostatic effects also rapidly diminish under increasing humidity [127]. A Swiss textile lab test of various masks available on the market to the general public recently confirmed that most mask types filter aerosols insufficiently. For all but one of the eight reusable fabric mask types tested, the filtration efficacy according to EN149 was always less than 70% for particles of 1 μm in size. For disposable masks, only half of all eight mask types tested were efficient enough at filtering to retain 70% of particles 1 μm in size [128].

A recent experimental study even demonstrated that all mask-wearing people (surgical, N95, fabric masks) release significantly and proportionately smaller particles of size 0.3 to 0.5 μm into the air than mask-less people, both when breathing, speaking and coughing [98]. According to this, the masks act like nebulizers and contribute to the production of very fine aerosols. Smaller particles, however, spread faster and further than large ones for physical reasons. Of particular interest in this experimental reference study was the finding that a test subject wearing a single-layer fabric mask was also able to release a total of 384% more particles (of various sizes) when breathing than a person without [98].

It is not only the aforementioned functional weaknesses of the masks themselves that lead to problems, but also their use. This increases the risk of a false sense of security. According to the literature, mistakes are made by both healthcare workers and lay people when using masks as hygienically correct mask use is by no means intuitive. Overall, 65% of healthcare professionals and as many as 78% of the general population, use masks incorrectly [116]. With both surgical masks and N95 masks, adherence to the rules of use is impaired and not adequately followed due to reduced wearability with heat discomfort and skin irritation [29,35,116,129]. This is exacerbated by the accumulation of carbon dioxide

due to the dead space (especially under the N95 masks with the resulting headaches described [19,27,37,66–68,83]. Increased heart rate, itching and feelings of dampness [15,29,30,35,71] also lead to reduced safety and quality during use (see also social and occupational health side effects and hazards). For this reason, (everyday) masks are even considered a general risk for infection in the general population, which does not come close to imitating the strict hygiene rules of hospitals and doctors' offices: the supposed safety, thus, becomes a safety risk itself [5].

In a meta-analysis of evidence level Ia commissioned by the WHO, no effect of masks in the context of influenza virus pandemic prevention could be demonstrated [130]. In 14 randomized controlled trials, no reduction in the transmission of laboratory-confirmed influenza infections was shown. Due to the similar size and distribution pathways of the virus species (influenza and Corona, see above), the data can also be transferred to SARS-CoV-2 [118]. Nevertheless, a combination of occasional mask-wearing with adequate hand-washing caused a slight reduction in infections for influenza in one study [131]. However, since no separation of hand hygiene and masks was achieved in this study, the protective effect can rather be attributed to hand hygiene in view of the aforementioned data [131].

A recently published large prospective Danish comparative study comparing mask wearers and non-mask wearers in terms of their infection rates with SARS-CoV2 could not demonstrate any statistically significant differences between the groups [132].

### 3.14. Paediatric Side Effects and Hazards

Children are particularly vulnerable and may be more likely to receive inappropriate treatment or additional harm. It can be assumed that the potential adverse mask effects described for adults are all the more valid for children (see Section 3.1 to Section 3.13: physiological internal, neurological, psychological, psychiatric, dermatological, ENT, dental, sociological, occupational and social medical, microbiological and epidemiological impairments and also Figures 2 and 3).

Special attention must be paid to the respiration of children, which represents a critical and vulnerable physiological variable due to higher oxygen demand, increased hypoxia susceptibility of the CNS, lower respiratory reserve, smaller airways with a stronger increase in resistance when the lumen is narrowed. The diving reflex caused by stimulating the nose and upper lip can cause respiratory arrest to bradycardia in the event of oxygen deficiency.

The masks currently used for children are exclusively adult masks manufactured in smaller geometric dimensions and had neither been specially tested nor approved for this purpose [133].

In an experimental British research study, the masks frequently led to feelings of heat ($p < 0.0001$) and breathing problems ($p < 0.03$) in 100 school children between 8 and 11 years of age especially during physical exertion, which is why the protective equipment was taken off by 24% of the children during physical activity [133]. The exclusion criteria for this mask experiment were lung disease, cardiovascular impairment and claustrophobia [133].

Scientists from Singapore were able to demonstrate in their level Ib study published in the renowned journal "nature" that 106 children aged between 7 and 14 years who wore FFP2 masks for only 5 min showed an increase in the inspiratory and expiratory $CO_2$ levels, indicating disturbed respiratory physiology [26].

However, a disturbed respiratory physiology in children can have long-term disease-relevant consequences. Slightly elevated $CO_2$ levels are known to increase heart rate, blood pressure, headache, fatigue and concentration disorders [38].

Accordingly, the following conditions were listed as exclusion criteria for mask use [26]: any cardiopulmonary disease including but not limited to: asthma, bronchitis, cystic fibrosis, congenital heart disease, emphysema; any condition that may be aggravated by physical exertion, including but not limited to: exercise-induced asthma; lower respiratory tract infections (pneumonia, bronchitis within the last 2 weeks), anxiety disorders,

diabetes, hypertension or epilepsy/attack disorder; any physical disability due to medical, orthopedic or neuromuscular disease; any acute upper respiratory illness or symptomatic rhinitis (nasal obstruction, runny nose or sneezing); any condition with deformity that affects the fit of the mask (e.g., increased facial hair, craniofacial deformities, etc.).

It is also important to emphasize the possible effects of masks in neurological diseases, as described earlier (Section 3.3).

Both masks and face shields caused fear in 46% of children (37 out of 80) in a scientific study. If children are given the choice of whether the doctor advising them should wear a mask they reject this in 49% of the cases. Along with their parents, the children prefer the practitioner to wear a face visor (statistically significant with $p < 0.0001$) [134].

A recent observational study of tens of thousands of mask-wearing children in Germany helped the investigators objectify complaints of headaches (53%), difficulty concentrating (50%), joylessness (49%), learning difficulties (38%) and fatigue in 37% of the 25,930 children evaluated. Of the children observed, 25% had new onset anxiety and even nightmares [135]. In children, the threat scenarios generated by the environment are further maintained via masks, in some cases, even further intensified, and in this way, existing stress is intensified (presence of subconscious fears) [16,35,136,137].

This can in turn lead to an increase in psychosomatic and stress-related illnesses [74,75]. For example, according to an evaluation, 60% of mask wearers showed stress levels of the highest grade 10 on a scale of 1 to a maximum of 10. Less than 10% of the mask wearers surveyed had a stress level lower than 8 out of a possible 10 [74].

As children are considered a special group, the WHO also issued a separate guideline on the use of masks in children in the community in August 2020, explicitly advising policy makers and national authorities, given the limited evidence, that the benefits of mask use in children must be weighed up against the potential harms associated with mask use. This includes feasibility and discomfort, as well as social and communication concerns [100].

According to experts, masks block the foundation of human communication and the exchange of emotions and not only hinder learning but deprive children of the positive effects of smiling, laughing and emotional mimicry [42]. The effectiveness of masks in children as a viral protection is controversial, and there is a lack of evidence for their widespread use in children; this is also addressed in more detail by the scientists of the German University of Bremen in their thesis paper 2.0 and 3.0 [138].

### 3.15. Effects on the Environment

According to WHO estimates of a demand of 89 million masks per month, their global production will continue to increase under the Corona pandemic [139]. Due to the composition of, e.g., disposable surgical masks with polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene and polyester [140], an increasing global challenge, also from an environmental point of view, can be expected, especially outside Europe, in the absence of recycling and disposal strategies [139]. The aforementioned single use polymers have been identified as a significant source of plastic and plastic particles for the pollution of all water cycles up to the marine environment [141].

A significant health hazard factor is contributed by mask waste in the form of microplastics after decomposition into the food chain. Likewise, contaminated macroscopic disposable mask waste—especially before microscopic decay—represents a widespread medium for microbes (protozoa, bacteria, viruses, fungi) in terms of invasive pathogens [86–89,142]. Proper disposal of bio-contaminated everyday mask material is insufficiently regulated even in western countries.

## 4. Discussion

The potential drastic and undesirable effects found in multidisciplinary areas illustrate the general scope of global decisions on masks in general public in the light of combating the pandemic. According to the literature found, there are clear, scientifically recorded adverse effects for the mask wearer, both on a psychological and on a social and physical level.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population) [2,4,5].

Contrary to the scientifically established standard of evidence-based medicine, national and international health authorities have issued their theoretical assessments on the masks in public places, even though the compulsory wearing of masks gives a deceptive feeling of safety [5,112,143].

From an infection epidemiological point of view, masks in everyday use offer the risk of self-contamination by the wearer from both inside and outside, including via contaminated hands [5,16,88]. In addition, masks are soaked by exhaled air, which potentially accumulates infectious agents from the nasopharynx and also from the ambient air on the outside and inside of the mask. In particular, serious infection-causing bacteria and fungi should be mentioned here [86,88,89], but also viruses [87]. The unusual increase in the detection of rhinoviruses in the sentinel studies of the German RKI from 2020 [90] could be an indication of this phenomenon. Clarification through further investigations would therefore be desirable.

Masks, when used by the general public, are considered by scientists to pose a risk of infection because the standardized hygiene rules of hospitals cannot be followed by the general public [5]. On top of that, mask wearers (surgical, N95, fabric masks) exhale relatively smaller particles (size 0.3 to 0.5 μm) than mask-less people and the louder speech under masks further amplifies this increased fine aerosol production by the mask wearer (nebulizer effect) [98].

The history of modern times shows that already in the influenza pandemics of 1918–1919, 1957–58, 1968, 2002, in SARS 2004–2005 as well as with the influenza in 2009, masks in everyday use could not achieve the hoped-for success in the fight against viral infection scenarios [67,144]. The experiences led to scientific studies describing as early as 2009 that masks do not show any significant effect with regard to viruses in an everyday scenario [129,145]. Even later, scientists and institutions rated the masks as unsuitable to protect the user safely from viral respiratory infections [137,146,147]. Even in hospital use, surgical masks lack strong evidence of protection against viruses [67].

Originally born out of the useful knowledge of protecting wounds from surgeons' breath and predominantly bacterial droplet contamination [144,148,149], the mask has been visibly misused with largely incorrect popular everyday use, particularly in Asia in recent years [150]. Significantly, the sociologist Beck described the mask as a cosmetic of risk as early as 1992 [151]. Unfortunately, the mask is inherent in a vicious circle: strictly speaking, it only protects symbolically and at the same time represents the fear of infection. This phenomenon is reinforced by the collective fear mongering, which is constantly nurtured by main stream media [137].

Nowadays, the mask represents a kind of psychological support for the general population during the virus pandemic, promising them additional anxiety-reduced freedom of movement. The recommendation to use masks in the sense of "source control" not out of self-protection but out of "altruism" [152] is also very popular with the regulators as well as the population of many countries. The WHO's recommendation of the mask in the current pandemic is not only a purely infectiological approach, but is also clear on the possible advantages for healthy people in the general public. In particular, a reduced potential stigmatization of mask wearers, the feeling of a contribution made to preventing the spread of the virus, as well as the reminder to adhere to other measures are mentioned [2].

It should not go unmentioned that very recent data suggest that the detection of SARS-CoV-2 infection does not seem to be directly related to popular mask use. The groups examined in a retrospective comparative study (infected with SARS-CoV-2 and not infected) did not differ in their habit of using masks: approximately 70% of the subjects in both groups always wore masks and another 14.4% of them frequently [143].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

In a Danish prospective study on mask-wearing carried out on about 6000 participants and published in 2020, scientists found no statistically significant difference in the rates of SARS-CoV-2 infection when comparing the group of 3030 mask wearers with the 2994 mask-less participants in the study ($p = 0.38$) [132].

Indeed, in the case of viral infections, masks appear to be not only less effective than expected, but also not free of undesirable biological, chemical, physical and psychological side effects [67]. Accordingly, some experts claim that well-intentioned unprofessionalism can be quite dangerous [6].

The dermatological colleagues were the first to describe common adverse effects of mask-wearing in larger collectives. Simple, direct physical, chemical and biological effects of the masks with increases in temperature, humidity and mechanical irritation caused acne in up to 60% of wearers [37,71–73,85]. Other significantly documented consequences were eczema, skin damage and overall impaired skin barrier function [37,72,73].

These direct effects of mask use are an important pointer to further detrimental effects affecting other organ systems.

In our work, we have identified scientifically validated and numerous statistically significant adverse effects of masks in various fields of medicine, especially with regard to a disruptive influence on the highly complex process of breathing and negative effects on the respiratory physiology and gas metabolism of the body (see Figures 2 and 3). The respiratory physiology and gas exchange play a key role in maintaining a health-sustaining balance in the human body [136,153]. According to the studies we found, a dead space volume that is almost doubled by wearing a mask and a more than doubled breathing resistance (Figure 3) [59–61] lead to a rebreathing of carbon dioxide with every breathing cycle [16–18,39,83] with—in healthy people mostly—a subthreshold but, in sick people, a partly pathological increase in the carbon dioxide partial pressure ($PaCO_2$) in the blood [25,34,58]. According to the primary studies found, these changes contribute reflexively to an increase in respiratory frequency and depth [21,23,34,36] with a corresponding increase in the work of the respiratory muscles via physiological feedback mechanisms [31,36]. Thus, it is not, as initially assumed, purely positive training through mask use. This often increases the subliminal drop in oxygen saturation $SpO_2$ in the blood [23,28–30,32], which is already reduced by increased dead space volume and increased breathing resistance [18,31].

The overall possible resulting measurable drop in oxygen saturation $O_2$ of the blood on the one hand [18,23,28–30,32] and the increase in carbon dioxide ($CO_2$) on the other [13,15,19,21–28] contribute to an increased noradrenergic stress response, with heart rate increase [29,30,35] and respiratory rate increase [15,21,23,34], in some cases also to a significant blood pressure increase [25,35].

In panic-prone individuals, stress-inducing noradrenergic sympathetic activation can be partly directly mediated via the carbon dioxide ($CO_2$) mechanism at the locus coeruleus in the brainstem [39,78,79,153], but also in the usual way via chemo-sensitive neurons of the nucleus solitarius in the medulla [136,154]. The nucleus solitarius [136] is located in the deepest part of the brainstem, a gateway to neuronal respiratory and circulatory control [154]. A decreased oxygen ($O_2$) blood level there causes the activation of the sympathetic axis via chemoreceptors in the carotids [155,156].

Even subthreshold changes in blood gases such as those provoked when wearing a mask cause reactions in these control centers in the central nervous system. Masks, therefore, trigger direct reactions in important control centers of the affected brain via the slightest changes in oxygen and carbon dioxide in the blood of the wearer [136,154,155].

A link between disturbed breathing and cardiorespiratory diseases such as hypertension, sleep apnea and metabolic syndrome has been scientifically proven [56,57]. Interestingly, decreased oxygen/$O_2$ blood levels and also increased carbon dioxide/$CO_2$ blood levels are considered the main triggers for the sympathetic stress response [38,136]. The aforementioned chemo-sensitive neurons of the nucleus solitarius in the medulla are considered to be the main responsible control centers [136,154,155]. Clinical effects of prolonged mask-wearing would, thus, be a conceivable intensification of chronic stress re-

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

actions and negative influences on the metabolism leading towards a metabolic syndrome. The mask studies we found show that such disease-relevant respiratory gas changes ($O_2$ and $CO_2$) [38,136] are already achieved by wearing a mask [13,15,18,19,21–34].

A connection between hypoxia, sympathetic reactions and leptin release is scientifically known [136].

Additionally important is the connection of breathing with the influence on other bodily functions [56,57], including the psyche with the generation of positive emotions and drive [153]. The latest findings from neuro-psychobiological research indicate that respiration is not only a function regulated by physical variables to control them (feedback mechanism), but rather independently influences higher-level brain centers and, thus, also helps to shape psychological and other bodily functions and reactions [153,157,158]. Since masks impede the wearer's breathing and accelerate it, they work completely against the principles of health-promoting breathing [56,57] used in holistic medicine and yoga. According to recent research, undisturbed breathing is essential for happiness and healthy drive [157,159], but masks work against this.

The result of significant changes in blood gases in the direction of hypoxia (drop in oxygen saturation) and hypercapnia (increase in carbon dioxide concentration) through masks, thus, has the potential to have a clinically relevant influence on the human organism even without exceeding normal limits.

According to the latest scientific findings, blood-gas shifts towards hypoxia and hypercapnia not only have an influence on the described immediate, psychological and physiological reactions on a macroscopic and microscopic level, but additionally on gene expression and metabolism on a molecular cellular level in many different body cells. Through this, the drastic disruptive intervention of masks in the physiology of the body also becomes clear down to the cellular level, e.g., in the activation of hypoxia-induced factor (HIF) through both hypercapnia and hypoxia-like effects [160]. HIF is a transcription factor that regulates cellular oxygen supply and activates signaling pathways relevant to adaptive responses. e.g., HIF inhibits stem cells, promotes tumor cell growth and inflammatory processes [160]. Based on the hypoxia- and hypercapnia-promoting effects of masks, which have been comprehensively described for the first time in our study, potential disruptive influences down to the intracellular level (HIF-a) can be assumed, especially through the prolonged and excessive use of masks. Thus, in addition to the vegetative chronic stress reaction in mask wearers, which is channeled via brain centers, there is also likely to be an adverse influence on metabolism at the cellular level. With the prospect of continued mask use in everyday life, this also opens up an interesting field of research for the future.

The fact that prolonged exposure to latently elevated $CO_2$ levels and unfavorable breathing air compositions has disease-promoting effects was recognized early on. As early as 1983, the WHO described "Sick Building Syndrome" (SBS) as a condition in which people living indoors experienced acute disease-relevant effects that increased with time of their stay, without specific causes or diseases [161,162]. The syndrome affects people who spend most of their time indoors, often with subliminally elevated $CO_2$ levels, and are prone to symptoms such as increased heart rate, rise in blood pressure, headaches, fatigue and difficulty concentrating [38,162]. Some of the complaints described in the mask studies we found (Figure 2) are surprisingly similar to those of Sick Building Syndrome [161]. Temperature, carbon dioxide content of the air, headaches, dizziness, drowsiness and itching also play a role in Sick Building Syndrome. On the one hand, masks could themselves be responsible for effects such as those described for Sick Building Syndrome when used for a longer period of time. On the other hand, they could additionally intensify these effects when worn in air-conditioned buildings, especially when masks are mandatory indoors. Nevertheless, there was a tendency towards higher systolic blood pressure values in mask wearers in some studies [21,31,34], but statistical significance was only found in two studies [25,35]. However, we found more relevant and significant evidence of heart

Case 2:22-cv-02383-SSS-AS    Document 1-1    Filed 04/08/22    Page 440 of 586    Page ID
#:896

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344                                                                        27 of 42

rate increase, headache, fatigue and concentration problems associated with mask wearers (Figure 2) indicating the clinical relevance of wearing masks.

According to the scientific results and findings, masks have measurably harmful effects not only on healthy people, but also on sick people and their relevance is likely to increase with the duration of use [69]. Further research is needed here to shed light on the long-term consequences of widespread mask use with subthreshold hypoxia and hypercapnia in the general population, also regarding possible exacerbating effects on cardiorespiratory lifestyle diseases such as hypertension, sleep apnea and metabolic syndrome. The already often elevated blood carbon dioxide ($CO_2$) levels in overweight people, sleep apnea patients and patients with overlap-COPD could possibly increase even further with everyday masks. Not only a high body mass index (BMI) but also sleep apnea are associated with hypercapnia during the day in these patients (even without masks) [19,163]. For such patients, hypercapnia means an increase in the risk of serious diseases with increased morbidity, which could then be further increased by excessive mask use [18,38].

The hypercapnia-induced effects of sympathetic stress activation are even cycle phase-dependent in women. Controlled by a progesterone mechanism, the sympathetic reaction, measured by increased blood pressure in the luteal phase, is considerably stronger [164]. This may also result in different sensitivities for healthy and sick women to undesirable effects masks have, which are related to an increase in carbon dioxide ($CO_2$).

In our review, negative physical and psychological changes caused by masks could be objectified even in younger and healthy individuals.

The physical and chemical parameters did not exceed the normal values in most cases but were statistically significantly measurable ($p < 0.05$) tending towards pathological ranges. They were accompanied by physical impairments (see Figure 2). It is well known that subthreshold stimuli are capable of causing pathological changes when exposed to them for a long time: not only a single high dose of a disturbance, but also a chronically persistent, subthreshold exposure to it often leads to illness [38,46–48,50–54]. The scientifically repeatedly measurable physical and chemical mask effects were often accompanied by typical subjective complaints and pathophysiological phenomena. The fact that these frequently occur simultaneously and together indicates a syndrome under masks.

Figure 2 sums up the significant mask-dependent physiological, psychological, somatic and general pathological changes and their frequent occurrence together is striking. Within the framework of the quantitative evaluation of the experimental studies, we were actually able to prove a statistically significant correlation of the observed side effects of fatigue and oxygen depletion under mask use with $p < 0.05$. In addition, we found a frequent, simultaneous and joint occurrence of further undesirable effects in the scientific studies (Figure 2). Statistically significant associations of such co-occurring, adverse effects have already been described in primary studies [21,29]. We detected a combined occurrence of the physical parameter temperature rise under the mask with the symptom respiratory impairment in seven of the nine studies concerned (88%). We found a similar result for the decrease in oxygen saturation under mask and the symptom respiratory impairment with a simultaneous detection in six of the eight studies concerned (67%). We detected a combined occurrence of carbon dioxide rise under N95 mask use in nine of the 11 scientific papers (82%). We found a similar result for oxygen drop under N95 mask use with simultaneous co-occurrence in eight of 11 primary papers (72%). The use of N95 masks was also associated with headache in six of the 10 primary studies (60%). A combined occurrence of the physical parameters temperature rise and humidity under masks was even found 100% within six of the six studies with significant measurements of these parameters (Figure 2).

Since the symptoms were described in combination in mask wearers and were not observed in isolation in the majority of cases, we refer to them as general Mask-Induced Exhaustion Syndrome (MIES) because of the consistent presentation in numerous papers from different disciplines. These include the following, predominantly statistically significantly

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

($p < 0.05$) proven pathophysiological changes and subjective complaints, which often occur in combination as described above (see also Section 3.1 to Section 3.11, Figures 2–4):

-   Increase in dead space volume [22,24,58,59] (Figure 3, Sections 3.1 and 3.2).
-   Increase in breathing resistance [31,35,61,118] (Figure 3, Figure 2: Column 8).
-   Increase in blood carbon dioxide [13,15,19,21–28] (Figure 2: Column 5).
-   Decrease in blood oxygen saturation [18,19,21,23,28–34] (Figure 2: Column 4).
-   Increase in heart rate [15,19,23,29,30,35] (Figure 2: Column 12).
-   Decrease in cardiopulmonary capacity [31] (Section 3.2).
-   Feeling of exhaustion [15,19,21,29,31–35,69] (Figure 2: Column 14).
-   Increase in respiratory rate [15,21,23,34] (Figure 2: Column 9).
-   Difficulty breathing and shortness of breath [15,19,21,23,25,29,31,34,35,71,85,101,133] (Figure 2: Column 13).
-   Headache [19,27,37,66–68,83] (Figure 2: Column 17).
-   Dizziness [23,29] (Figure 2: Column 16).
-   Feeling of dampness and heat [15,16,22,29,31,35,85,133] (Figure 2: Column 7).
-   Drowsiness (qualitative neurological deficits) [19,29,32,36,37] (Figure 2: Column 15).
-   Decrease in empathy perception [99] (Figure 2: Column 19).
-   Impaired skin barrier function with acne, itching and skin lesions [37,72,73] (Figure 2: Column 20–22).

It can be deduced from the results that the effects described in healthy people are all more pronounced in sick people, since their compensatory mechanisms, depending on the severity of the illness, are reduced or even exhausted. Some existing studies on and with patients with measurable pathological effects of the masks support this assumption [19,23,25,34]. In most scientific studies, the exposure time to masks in the context of the measurements/investigations was significantly less (in relation to the total wearing and duration of use) than is expected of the general public under the current pandemic regulations and ordinances.

The exposure time limits are little observed or knowingly disregarded in many areas today as already mentioned in Section 3.11 on occupational medicine. The above facts allow the conclusion that the described negative effects of masks, especially in some of our patients and the very elderly, may well be more severe and adverse with prolonged use than presented in some mask studies.

From a doctor's viewpoint, it may also be difficult to advise children and adults who, due to social pressure (to wear a mask) and the desire to feel they belong, suppress their own needs and concerns until the effects of masks have a noticeable negative impact on their health [76]. Nevertheless, the use of masks should be stopped immediately at the latest when shortness of breath, dizziness or vertigo occur [23,25]. From this aspect, it seems sensible for decision makers and authorities to provide information, to define instruction obligations and offer appropriate training for employers, teachers and other persons who have a supervisory or caregiving duty. Knowledge about first aid measures could also be refreshed and expanded accordingly in this regard.

Elderly, high-risk patients with lung disease, cardiac patients, pregnant women or stroke patients are advised to consult a physician to discuss the safety of an N95 mask as their lung volume or cardiopulmonary performance may be reduced [23]. A correlation between age and the occurrence of the aforementioned symptoms while wearing a mask has been statistically proven [19]. Patients with reduced cardiopulmonary function are at increased risk of developing serious respiratory failure with mask use according to the referenced literature [34]. Without the possibility of continuous medical monitoring, it can be concluded that they should not wear masks without close monitoring. The American Asthma and Allergy Society has already advised caution in the use of masks with regard to the COVID-19 pandemic for people with moderate and severe lung disease [165]. Since the severely overweight, sleep apnea patients and overlap-COPD sufferers are known to be prone to hypercapnia, they also represent a risk group for serious adverse health effects under extensive mask use [163]. This is because the potential of masks to produce additional

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

$CO_2$ retention may not only have a disruptive effect on the blood gases and respiratory physiology of sufferers, but may also lead to further serious adverse health effects in the long term. Interestingly, in an animal experiment an increase in $CO_2$ with hypercapnia leads to contraction of smooth airway muscles with constriction of bronchi [166]. This effect could explain the observed pulmonary decompensations of patients with lung disease under masks (Section 3.2) [23,34].



**Figure 4.** Unfavorable mask effects as components of Mask-Induced Exhaustion Syndrome (MIES). The chemical, physical and biological effects, as well as the organ system consequences mentioned, are all documented with statistically significant results in the scientific literature found (Figure 2). The term drowsiness is used here to summarize any qualitative neurological deficits described in the examined scientific literature.

Patients with renal insufficiency requiring dialysis are, according to the literature available, further candidates for a possible exemption from the mask requirement [34].

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

According to the criteria of the Centers for Disease Control and Prevention, GA, USA (CDC), sick and helpless people who cannot remove a mask on their own should be exempted from the mask requirement [82].

Since it can be assumed that children react even more sensitively to masks, the literature suggests that masks are a contraindication for children with epilepsies (hyperventilation as a trigger for seizures) [63]. In the field of pediatrics, special attention should also be paid to the mask symptoms described under psychological, psychiatric and sociological effects with possible triggering of panic attacks by $CO_2$ rebreathing in the case of predisposition and also reinforcement of claustrophobic fears [77–79,167]. The mask-related disturbance of verbal [43,45,71] and non-verbal communication and, thus, of social interaction is particularly serious for children. Masks restrict social interaction and block positive perceptions (smiling and laughing) and emotional mimicry [42]. The proven mask-induced mild to moderate cognitive impairment with impaired thinking, decreased attention and dizziness [19,23,29,32,36,37,39–41,69], as well as the psychological and neurological effects [135], should be additionally taken into account when masks are compulsory at school and in the vicinity of both public and non-public transport, also regarding the possibility of an increased risk of accidents (see also occupational health side effects and hazards) [19,29,32,36,37]. The exclusion criteria mentioned in pediatric studies on masks (see pediatric impairments, Section 3.14) [26,133] should also apply to an exclusion of these children from the general mask obligation in accordance with the scientific findings for the protection of the sick children concerned. The long-term sociological, psychological and educational consequences of a comprehensive masking requirement extended to schools are also unpredictable with regard to the psychological and physical development of healthy children [42,135]. Interestingly, according to the Corona Thesis Paper of the University of Bremen children "are infected less often, they become ill less often, the lethality is close to zero, and they also pass on the infection less often", according to the Thesis Paper 2.0 of the German University of Bremen on page 6 [138]. Studies conducted under real-life conditions with outcome endpoints showing hardly any infections, hardly any morbidity, hardly any mortality and only low contagiousness in children are clearly in the majority, according to Thesis Paper 3.0 of the German University of Bremen [138]. A recent German observational study (5600 reporting pediatricians) also showed a surprisingly low incidence of COVID-19 disease in children [168]. The infection of adults with SARS-CoV-2 by children has been considered in only one suspected case, but could not be proven with certainty, since the parents also had numerous contacts and exposure factors for viral infections due to their occupation. In this case, the circulating headlines in the public media that children contribute more to the incidence of infection are to be regarded as anecdotal.

In pregnant women, the use of masks during exertion or at rest over long periods of time is to be regarded as critical as little research has been done on this [20]. If there is clear scientific evidence of increased dead space ventilation with possible accumulation of $CO_2$ in the mother's blood, the use of masks by pregnant women for more than 1 h, as well as under physical stress, should be avoided in order to protect the unborn child [20,22]. The hypercapnia-promoting masks could act as a confounder of the fetal/maternal $CO_2$ gradient in this case (Section 3.6) [20,22,28].

According to the literature cited in the Section 3.5 on psychiatric side effects (personality disorders with anxiety and panic attacks, claustrophobia, dementia and schizophrenia), masking should only be done, if at all, with careful consideration of the advantages and disadvantages. Attention should be paid to possible provocation of the number and severity of panic attacks [77–79].

In patients with headaches, a worsening of symptoms can be expected with prolonged mask use (see also Section 3.3., neurological side effects) [27,66–68]. As a result of the increase in blood carbon dioxide ($CO_2$) when the mask is used, vasodilatation occurs in the central nervous system and the pulsation of the blood vessels decreases [27]. In this connection, it is also interesting to note radiological experiments that demonstrate an increase in brain volume under subthreshold, but still within normal limits of $CO_2$ increase

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

in the blood by means of structural MRI. The blood carbon dioxide increase was produced in seven subjects via rebreathing with resulting median carbon dioxide concentration of 42 mmHg and an interquartile range of 39.44 mmHg, corresponding to only a subthreshold increase given the normal values of 32–45 mmHg. In the experiment, there was a significant increase in brain parenchymal volume measurable under increased arterial $CO_2$ levels ($p < 0.02$), with a concomitant decrease in CSF spaces ($p < 0.04$), entirely in accordance with the Monroe–Kelly doctrine, according to which the total volume within the skull always remains the same. The authors interpreted the increase in brain volume as an expression of an increase in blood volume due to a $CO_2$ increase-induced dilation of the cerebral vessels [169]. The consequences of such equally subthreshold carbon dioxide ($CO_2$) increases even under masks [13,15,18,19,22,23,25] are unclear for people with pathological changes inside the skull (aneurysms, tumors, etc.) with associated vascular changes [27] and brain volume shifts [169] especially due to longer exposure while wearing a mask, but could be of great relevance due to the blood gas-related volume shifts that take place.

In view of the increased dead space volume, the long-term and increased accumulation and rebreathing of other respiratory air components apart from $CO_2$ is also unexplained, both in children and in old and sick people. Exhaled air contains over 250 substances, including irritant or toxic gases such as nitrogen oxides (NO), hydrogen sulfide (H2S), isoprene and acetone [170]. For nitrogen oxides [47] and hydrogen sulfide [46], pathological effects relevant to disease have been described in environmental medicine even at a low but chronic exposure [46–48]. Among the volatile organic compounds in exhaled air, acetone and isoprene dominate in terms of quantity, but allyl methyl sulfide, propionic acid and ethanol (some of bacterial origin) should also be mentioned [171]. Whether such substances also react chemically with each other underneath masks and in the dead space volume created by masks (Figure 3), and with the mask tissue itself, and in what quantities these and possible reaction products are rebreathed, has not yet been clarified. In addition to the blood gas changes described above ($O_2$ drop and $CO_2$ rise), these effects could also play a role with regard to undesirable mask effects. Further research is needed here and is of particular interest in the case of prolonged and ubiquitous use of masks.

The WHO sees the integration of individual companies and communities that produce their own fabric masks as a potential social and economic benefit. Due to the global shortage of surgical masks and personal protective equipment, it sees this as a source of income and points out that the reuse of fabric masks can reduce costs and waste and contribute to sustainability [2]. In addition to the question of certification procedures for such fabric masks, it should also be mentioned that due to the extensive mask obligation, textile (artificial) substances in the form of micro- and nanoparticles, some of which cannot be degraded in the body, are chronically absorbed into the body through inhalation to an unusual extent. In the case of medical masks, disposable polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene and polyester should be mentioned [140]. ENT physicians have already been able to detect such particles in the nasal mucosa of mask wearers with mucosal reactions in the sense of a foreign body reaction with rhinitis [96]. In the case of community masks, other substances from the textile industry are likely to be added to those mentioned above. The body will try to absorb these substances through macrophages and scavenger cells in the respiratory tract and alveoli as part of a foreign body reaction, whereby toxin release and corresponding local and generalized reactions may occur in an unsuccessful attempt to break them down [172]. Extensive respiratory protection in permanent long-term use (24/7), at least from a theoretical point of view, also potentially carries the risk of leading to a mask-related pulmonary [47] or even generalized disorder, as is already known from textile workers chronically exposed to organic dusts in the Third World (byssinosis) [172].

For the general public, from a scientific angle, it is necessary to draw on the long-standing knowledge of respiratory protection in occupational medicine in order to protect children in particular from harm caused by uncertified masks and improper use.

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

32 of 42

The universal undefined and extended mask requirement—without taking into account multiple predispositions and susceptibilities—contradicts the claim of an increasingly important individualized medicine with a focus on the unique characteristics of each individual [173].

A systematic review on the topic of masks is necessary according to the results of our scoping review. The primary studies often showed weaknesses in operationalization, especially in the evaluation of cognitive and neuropsychological parameters. Computerized test procedures will be useful here in the future. Mask research should also set itself the future goal of investigating and defining subgroups for whom respiratory protection use is particularly risky.

## 5. Limitations

Our approach with a focus on negative effects is in line with Villalonga-Olives and Kawachi [12]. With the help of such selective questioning in the sense of dialectics, new insights can be gained that might otherwise have remained hidden. Our literature search focused on adverse negative effects of masks, in particular to point out risks especially for certain patient groups. Therefore, publications presenting only positive effects of masks were not considered in this review.

For a compilation of studies with harmless results when using masks, reference must, therefore, be made to reviews with a different research objective, whereby attention must be paid to possible conflicts of interest there. Some of the studies excluded by us lacking negative effects have shown methodological weaknesses (small, non-uniform experimental groups, missing control group even without masks due to corona constraints, etc.) [174]. In other words, if no negative concomitant effects were described in publications, it does not necessarily mean that masks have exclusively positive effects. It is quite possible that negative effects were simply not mentioned in the literature and the number of negative effects may well be higher than our review suggests.

We only searched one database, so the number of papers on negative mask effects may be higher than we reported.

In order to be able to describe characteristic effects for each mask type even more extensively, we did not have enough scientific data on the respective special designs of the masks. There is still a great need for research in this area due to the current pandemic situation with extensive mandatory masking.

In addition, the experiments evaluated in this paper do not always have uniform measurement parameters and study variables and, depending on the study, take into account the effect of masks at rest or under stress with subjects having different health conditions. Figure 2, therefore, represents a compromise. The results of the primary studies on mask use partially showed no natural variation in parameters, but often showed such clear correlations between symptoms and physiological changes, so that a statistical correlation analysis was not always necessary. We found a statistically significant correlation of oxygen deprivation and fatigue in 58% of the studies ($p < 0.05$). A statistically significant correlation evidence for other parameters has been previously demonstrated in primary studies [21,29].

The most commonly used personal particulate matter protective equipment in the COVID-19 pandemic is the N95 mask [23]. Due to its characteristics (better filtering function, but greater airway resistance and more dead space volume than other masks), the N95 mask is able to highlight negative effects of such protective equipment more clearly than others (Figure 3). Therefore, a relatively frequent consideration and evaluation of N95 masks within the studies found (30 of the 44 quantitatively evaluated studies, 68%) is even advantageous within the framework of our research question. Nevertheless, it remains to be noted that the community masks sold on the market are increasingly similar to the protective equipment that has been better investigated in scientific studies, such as surgical masks and N95 masks, since numerous manufacturers and users of community masks are striving to approximate the professional standard (surgical mask, N95/FFP2). Recent

Case 2:22-cv-02383-SSS-AS    Document 1-1    Filed 04/08/22    Page 447 of 586    Page ID #:903

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

34 of 42

mask-wearing would have the potential, according to the facts and correlations we have found, to cause a chronic sympathetic stress response induced by blood gas modifications and controlled by brain centers. This in turn induces and triggers immune suppression and metabolic syndrome with cardiovascular and neurological diseases.

We not only found evidence in the reviewed mask literature of potential long-term effects, but also evidence of an increase in direct short-term effects with increased mask-wearing time in terms of cumulative effects for: carbon dioxide retention, drowsiness, headache, feeling of exhaustion, skin irritation (redness, itching) and microbiological contamination (germ colonization) [19,22,37,66,68,69,89,91,92].

Overall, the exact frequency of the described symptom constellation MIES in the mask-using populace remains unclear and cannot be estimated due to insufficient data.

Theoretically, the mask-induced effects of the drop in blood gas oxygen and increase in carbon dioxide extend to the cellular level with induction of the transcription factor HIF (hypoxia-induced factor) and increased inflammatory and cancer-promoting effects [160] and can, thus, also have a negative influence on pre-existing clinical pictures.

In any case, the MIES potentially triggered by masks (Figures 3 and 4) contrasts with the WHO definition of health: "health is a state of complete physical, mental and social well-being and not merely the absence of disease or infirmity." [178].

All the scientific facts found in our work expand the knowledge base for a differentiated view of the mask debate. This gain can be relevant for decision makers who have to deal with the issue of mandatory mask use during the pandemic under constant review of proportionality as well as for physicians who can advise their patients more appropriately on this basis. For certain diseases, taking into account the literature found in this study, it is also necessary for the attending physician to weigh up the benefits and risks with regard to a mask obligation. With an overall strictly scientific consideration, a recommendation for mask exemption can become justifiable within the framework of a medical appraisal (Figure 5).



**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

In addition to protecting the health of their patients, doctors should also base their actions on the guiding principle of the 1948 Geneva Declaration, as revised in 2017. According to this, every doctor vows to put the health and dignity of his patient first and, even under threat, not to use his medical knowledge to violate human rights and civil liberties [9]. Within the framework of these findings, we, therefore, propagate an explicitly medically judicious, legally compliant action in consideration of scientific factual reality [2,4,5,16,130,132,143,175–177] against a predominantly assumption-led claim to a general effectiveness of masks, always taking into account possible unwanted individual ef-

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

==fects for the patient and mask wearer concerned, entirely in accordance with the principles of evidence-based medicine and the ethical guidelines of a physician.==

The results of the present literature review could help to include mask-wearing in the differential diagnostic pathophysiological cause consideration of every physician when corresponding symptoms are present (MIES, Figure 4). In this way, the physician can draw on an initial complaints catalogue that may be associated with mask-wearing (Figure 2) and also exclude certain diseases from the general mask requirement (Figure 5).

For scientists, the prospect of continued mask use in everyday life suggests areas for further research. In our view, further research is particularly desirable in the gynecological (fetal and embryonic) and pediatric fields, as children are a vulnerable group that would face the longest and, thus, most profound consequences of a potentially risky mask use. Basic research at the cellular level regarding mask-induced triggering of the transcription factor HIF with potential promotion of immunosuppression and carcinogenicity also appears to be useful under this circumstance. Our scoping review shows the need for a systematic review.

==The described mask-related changes in respiratory physiology can have an adverse effect on the wearer's blood gases sub-clinically and in some cases also clinically manifest and, therefore, have a negative effect on the basis of all aerobic life, external and internal respiration, with an influence on a wide variety of organ systems and metabolic processes with physical, psychological and social consequences for the individual human being.==

**Author Contributions:** Conceptualization, K.K. and O.H.; methodology, K.K. and O.H.; software, O.H.; formal analysis, K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K.; investigation, K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K.; writing—original draft preparation, K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K.; writing—review and editing K.K., O.H., P.G., A.P., B.K., D.G., S.F. and O.K. All authors have read and agreed to the published version of the manuscript.

**Funding:** This research received no external funding.

**Institutional Review Board Statement:** Not applicable.

**Informed Consent Statement:** Not applicable.

**Data Availability Statement:** Not applicable.

**Acknowledgments:** We thank Bonita Blankart, for translation of the manuscript. For support in their special field we wish to thank: Tanja Boehnke (Psychology), Nicola Fels (Pediatrics), Michael Grönke (Anesthesiology), Basile Marcos (Psychiatry), Bartholomeus Maris (Gynecology) and Markus Veit (Pharmacist).

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1. World Health Organization. *WHO-Advice on the Use of Masks in the Context of COVID-19: Interim Guidance, 6 April 2020*; World Health Organization: Geneva, Switzerland, 2020; Available online: https://apps.who.int/iris/handle/10665/331693 (accessed on 7 November 2020).
2. World Health Organization. *WHO-Advice on the Use of Masks in the Context of COVID-19: Interim Guidance, 5 June 2020*; World Health Organization: Geneva, Switzerland, 2020; Available online: https://apps.who.int/iris/handle/10665/332293 (accessed on 7 November 2020).
3. Chu, D.K.; Akl, E.A.; Duda, S.; Solo, K.; Yaacoub, S.; Schünemann, H.J.; Chu, D.K.; Akl, E.A.; El-harakeh, A.; Bognanni, A.; et al. Physical Distancing, Face Masks, and Eye Protection to Prevent Person-to-Person Transmission of SARS-CoV-2 and COVID-19: A Systematic Review and Meta-Analysis. *Lancet* **2020**, *395*, 1973–1987. [CrossRef]
4. Jefferson, T.; Jones, M.; Ansari, L.A.A.; Bawazeer, G.; Beller, E.; Clark, J.; Conly, J.; Mar, C.D.; Dooley, E.; Ferroni, E.; et al. Physical Interventions to Interrupt or Reduce the Spread of Respiratory Viruses. Part 1-Face Masks, Eye Protection and Person Distancing: Systematic Review and Meta-Analysis. *medRxiv* **2020**. [CrossRef]
5. Kappstein, I. Mund-Nasen-Schutz in der Öffentlichkeit: Keine Hinweise für eine Wirksamkeit. *Krankenh. Up2date* **2020**, *15*, 279–295. [CrossRef]
6. De Brouwer, C. Wearing a Mask, a Universal Solution against COVID-19 or an Additional Health Risk? 2020. Available online: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3676885 (accessed on 12 November 2020). [CrossRef]
7. Ewig, S.; Gatermann, S.; Lemmen, S. Die Maskierte Gesellschaft. *Pneumologie* **2020**, *74*, 405–408. [CrossRef] [PubMed]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

8.   Great Barrington Declaration Great Barrington Declaration and Petition. Available online: https://gbdeclaration.org/ (accessed on 9 November 2020).

9.   WMA-The World Medical Association-WMA Declaration of Geneva. Available online: https://www.wma.net/policies-post/wma-declaration-of-geneva/ (accessed on 7 November 2020).

10.  WMA-The World Medical Association-WMA Declaration of Helsinki–Ethical Principles for Medical Research Involving Human Subjects. Available online: https://www.wma.net/policies-post/wma-declaration-of-geneva/ (accessed on 7 November 2020).

11.  WMA-The World Medical Association-WMA Declaration of Lisbon on the Rights of the Patient. Available online: https://www.wma.net/policies-post/wma-declaration-of-lisbon-on-the-rights-of-the-patient/ (accessed on 7 November 2020).

12.  Villalonga-Olives, E.; Kawachi, I. The Dark Side of Social Capital: A Systematic Review of the Negative Health Effects of Social Capital. *Soc. Sci. Med.* **2017**, *194*, 105–127. [CrossRef]

13.  Butz, U. Rückatmung von Kohlendioxid bei Verwendung von Operationsmasken als hygienischem Mundschutz an medizinischem Fachpersonal. Ph.D. Thesis, Fakultät für Medizin der Technischen Universität München, Munich, Germany, 2005.

14.  Smolka, L.; Borkowski, J.; Zaton, M. The Effect of Additional Dead Space on Respiratory Exchange Ratio and Carbon Dioxide Production Due to Training. *J. Sports Sci. Med.* **2014**, *13*, 36–43. [PubMed]

15.  Roberge, R.J.; Kim, J.-H.; Benson, S.M. Absence of Consequential Changes in Physiological, Thermal and Subjective Responses from Wearing a Surgical Mask. *Respir. Physiol. Neurobiol.* **2012**, *181*, 29–35. [CrossRef] [PubMed]

16.  Matuschek, C.; Moll, F.; Fangerau, H.; Fischer, J.C.; Zänker, K.; van Griensven, M.; Schneider, M.; Kindgen-Milles, D.; Knoefel, W.T.; Lichtenberg, A.; et al. Face Masks: Benefits and Risks during the COVID-19 Crisis. *Eur. J. Med. Res.* **2020**, *25*, 32. [CrossRef]

17.  Roberge, R.J.; Coca, A.; Williams, W.J.; Powell, J.B.; Palmiero, A.J. Physiological Impact of the N95 Filtering Facepiece Respirator on Healthcare Workers. *Respir. Care* **2010**, *55*, 569–577.

18.  Pifarré, F.; Zabala, D.D.; Grazioli, G.; de Yzaguirre i Maura, I. COVID 19 and Mask in Sports. *Apunt. Sports Med.* **2020**. [CrossRef]

19.  Rebmann, T.; Carrico, R.; Wang, J. Physiologic and Other Effects and Compliance with Long-Term Respirator Use among Medical Intensive Care Unit Nurses. *Am. J. Infect. Control* **2013**, *41*, 1218–1223. [CrossRef]

20.  Roeckner, J.T.; Krstić, N.; Sipe, B.H.; Običan, S.G. N95 Filtering Facepiece Respirator Use during Pregnancy: A Systematic Review. *Am. J. Perinatol.* **2020**, *37*, 995–1001. [CrossRef]

21.  Georgi, C.; Haase-Fielitz, A.; Meretz, D.; Gäsert, L.; Butter, C. Einfluss gängiger Gesichtsmasken auf physiologische Parameter und Belastungsempfinden unter arbeitstypischer körperlicher Anstrengung. *Deutsches Ärzteblatt* **2020**, 674–675. [CrossRef]

22.  Roberge, R.J.; Kim, J.-H.; Powell, J.B. N95 Respirator Use during Advanced Pregnancy. *Am. J. Infect. Control* **2014**, *42*, 1097–1100. [CrossRef]

23.  Kyung, S.Y.; Kim, Y.; Hwang, H.; Park, J.-W.; Jeong, S.H. Risks of N95 Face Mask Use in Subjects with COPD. *Respir. Care* **2020**, *65*, 658–664. [CrossRef]

24.  Epstein, D.; Korytny, A.; Isenberg, Y.; Marcusohn, E.; Zukermann, R.; Bishop, B.; Minha, S.; Raz, A.; Miller, A. Return to Training in the COVID-19 Era: The Physiological Effects of Face Masks during Exercise. *Scand. J. Med. Sci. Sports* **2020**. [CrossRef]

25.  Mo, Y.; Wei, D.; Mai, Q.; Chen, C.; Yu, H.; Jiang, C.; Tan, X. Risk and Impact of Using Mask on COPD Patients with Acute Exacerbation during the COVID-19 Outbreak: A Retrospective Study. *Res. Sq.* **2020**. [CrossRef]

26.  Goh, D.Y.T.; Mun, M.W.; Lee, W.L.J.; Teoh, O.H.; Rajgor, D.D. A Randomised Clinical Trial to Evaluate the Safety, Fit, Comfort of a Novel N95 Mask in Children. *Sci. Rep.* **2019**, *9*, 18952. [CrossRef]

27.  Bharatendu, C.; Ong, J.J.Y.; Goh, Y.; Tan, B.Y.Q.; Chan, A.C.Y.; Tang, J.Z.Y.; Leow, A.S.; Chin, A.; Sooi, K.W.X.; Tan, Y.L.; et al. Powered Air Purifying Respirator (PAPR) Restores the N95 Face Mask Induced Cerebral Hemodynamic Alterations among Healthcare Workers during COVID-19 Outbreak. *J. Neurol. Sci.* **2020**, *417*, 117078. [CrossRef]

28.  Tong, P.S.Y.; Kale, A.S.; Ng, K.; Loke, A.P.; Choolani, M.A.; Lim, C.L.; Chan, Y.H.; Chong, Y.S.; Tambyah, P.A.; Yong, E.-L. Respiratory Consequences of N95-Type Mask Usage in Pregnant Healthcare Workers—A Controlled Clinical Study. *Antimicrob. Resist. Infect. Control* **2015**, *4*, 48. [CrossRef]

29.  Liu, C.; Li, G.; He, Y.; Zhang, Z.; Ding, Y. Effects of Wearing Masks on Human Health and Comfort during the COVID-19 Pandemic. *IOP Conf. Ser. Earth Environ. Sci.* **2020**, *531*, 012034. [CrossRef]

30.  Beder, A.; Büyükkoçak, U.; Sabuncuoğlu, H.; Keskil, Z.A.; Keskil, S. Preliminary Report on Surgical Mask Induced Deoxygenation during Major Surgery. *Neurocirugía* **2008**, *19*, 121–126. [CrossRef]

31.  Fikenzer, S.; Uhe, T.; Lavall, D.; Rudolph, U.; Falz, R.; Busse, M.; Hepp, P.; Laufs, U. Effects of Surgical and FFP2/N95 Face Masks on Cardiopulmonary Exercise Capacity. *Clin. Res. Cardiol.* **2020**, *109*, 1522–1530. [CrossRef] [PubMed]

32.  Jagim, A.R.; Dominy, T.A.; Camic, C.L.; Wright, G.; Doberstein, S.; Jones, M.T.; Oliver, J.M. Acute Effects of the Elevation Training Mask on Strength Performance in Recreational Weight Lifters. *J. Strength Cond. Res.* **2018**, *32*, 482–489. [CrossRef]

33.  Porcari, J.P.; Probst, L.; Forrester, K.; Doberstein, S.; Foster, C.; Cress, M.L.; Schmidt, K. Effect of Wearing the Elevation Training Mask on Aerobic Capacity, Lung Function, and Hematological Variables. *J. Sports Sci. Med.* **2016**, *15*, 379–386.

34.  Kao, T.-W.; Huang, K.-C.; Huang, Y.-L.; Tsai, T.-J.; Hsieh, B.-S.; Wu, M.-S. The Physiological Impact of Wearing an N95 Mask during Hemodialysis as a Precaution against SARS in Patients with End-Stage Renal Disease. *J. Formos. Med. Assoc.* **2004**, *103*, 624–628.

35.  Li, Y.; Tokura, H.; Guo, Y.P.; Wong, A.S.W.; Wong, T.; Chung, J.; Newton, E. Effects of Wearing N95 and Surgical Facemasks on Heart Rate, Thermal Stress and Subjective Sensations. *Int. Arch. Occup. Environ. Health* **2005**, *78*, 501–509. [CrossRef]

36.  Johnson, A.T. Respirator Masks Protect Health but Impact Performance: A Review. *J. Biol. Eng.* **2016**, *10*, 4. [CrossRef]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

37. Rosner, E. Adverse Effects of Prolonged Mask Use among Healthcare Professionals during COVID-19. *J. Infect. Dis. Epidemiol.* **2020**. [CrossRef]

38. Azuma, K.; Kagi, N.; Yanagi, U.; Osawa, H. Effects of Low-Level Inhalation Exposure to Carbon Dioxide in Indoor Environments: A Short Review on Human Health and Psychomotor Performance. *Environ. Int.* **2018**, *121*, 51–56. [CrossRef]

39. Drechsler, M.; Morris, J. Carbon Dioxide Narcosis. In *StatPearls*; StatPearls Publishing: Treasure Island, FL, USA, 2020.

40. Noble, J.; Jones, J.G.; Davis, E.J. Cognitive Function during Moderate Hypoxaemia. *Anaesth. Intensive Care* **1993**, *21*, 180–184. [CrossRef]

41. Fothergill, D.M.; Hedges, D.; Morrison, J.B. Effects of CO$_2$ and N$_2$ Partial Pressures on Cognitive and Psychomotor Performance. *Undersea Biomed. Res.* **1991**, *18*, 1–19.

42. Spitzer, M. Masked Education? The Benefits and Burdens of Wearing Face Masks in Schools during the Current Corona Pandemic. *Trends Neurosci. Educ.* **2020**, *20*, 100138. [CrossRef]

43. Heider, C.A.; Álvarez, M.L.; Fuentes-López, E.; González, J.A.; León, N.I.; Verástegui, D.C.; Badía, P.I.; Napolitano, C.A. Prevalence of Voice Disorders in Healthcare Workers in the Universal Masking COVID-19 Era. *Laryngoscope* **2020**. [CrossRef]

44. Roberge, R.J.; Kim, J.-H.; Coca, A. Protective Facemask Impact on Human Thermoregulation: An Overview. *Ann. Occup. Hyg.* **2012**, *56*, 102–112. [CrossRef]

45. Palmiero, A.J.; Symons, D.; Morgan, J.W.; Shaffer, R.E. Speech Intelligibility Assessment of Protective Facemasks and Air-Purifying Respirators. *J. Occup. Environ. Hyg.* **2016**, *13*, 960–968. [CrossRef]

46. Simonton, D.; Spears, M. Human Health Effects from Exposure to Low-Level Concentrations of Hydrogen Sulfide. *Occup. Health Saf. (Waco Tex.)* **2007**, *76*, 102–104.

47. Salimi, F.; Morgan, G.; Rolfe, M.; Samoli, E.; Cowie, C.T.; Hanigan, I.; Knibbs, L.; Cope, M.; Johnston, F.H.; Guo, Y.; et al. Long-Term Exposure to Low Concentrations of Air Pollutants and Hospitalisation for Respiratory Diseases: A Prospective Cohort Study in Australia. *Environ. Int.* **2018**, *121*, 415–420. [CrossRef]

48. Dominici, F.; Schwartz, J.; Di, Q.; Braun, D.; Choirat, C.; Zanobetti, A. *Assessing Adverse Health Effects of Long-Term Exposure to Low Levels of Ambient Air Pollution: Phase 1 Research Report*; Health Effects Institute: Boston, MA, USA, 2019; pp. 1–51.

49. Alleva, R.; Manzella, N.; Gaetani, S.; Bacchetti, T.; Bracci, M.; Ciarapica, V.; Monaco, F.; Borghi, B.; Amati, M.; Ferretti, G.; et al. Mechanism Underlying the Effect of Long-Term Exposure to Low Dose of Pesticides on DNA Integrity. *Environ. Toxicol.* **2018**, *33*, 476–487. [CrossRef]

50. Roh, T.; Lynch, C.F.; Weyer, P.; Wang, K.; Kelly, K.M.; Ludewig, G. Low-Level Arsenic Exposure from Drinking Water Is Associated with Prostate Cancer in Iowa. *Environ. Res.* **2017**, *159*, 338–343. [CrossRef]

51. Deering, K.E.; Callan, A.C.; Prince, R.L.; Lim, W.H.; Thompson, P.L.; Lewis, J.R.; Hinwood, A.L.; Devine, A. Low-Level Cadmium Exposure and Cardiovascular Outcomes in Elderly Australian Women: A Cohort Study. *Int. J. Hyg. Environ. Health* **2018**, *221*, 347–354. [CrossRef] [PubMed]

52. Kosnett, M. Health Effects of Low Dose Lead Exposure in Adults and Children, and Preventable Risk Posed by the Consumption of Game Meat Harvested with Lead Ammunition. In *Ingestion of Lead from Spent Ammunition: Implications for Wildlife and Humans*; The Peregrine Fund: Boise, ID, USA, 2009. [CrossRef]

53. Crinnion, W.J. Environmental Medicine, Part Three: Long-Term Effects of Chronic Low-Dose Mercury Exposure. *Altern. Med. Rev.* **2000**, *5*, 209–223. [PubMed]

54. Wu, S.; Han, J.; Vleugels, R.A.; Puett, R.; Laden, F.; Hunter, D.J.; Qureshi, A.A. Cumulative Ultraviolet Radiation Flux in Adulthood and Risk of Incident Skin Cancers in Women. *Br. J. Cancer* **2014**, *110*, 1855–1861. [CrossRef] [PubMed]

55. Custodis, F.; Schirmer, S.H.; Baumhäkel, M.; Heusch, G.; Böhm, M.; Laufs, U. Vascular Pathophysiology in Response to Increased Heart Rate. *J. Am. Coll. Cardiol.* **2010**, *56*, 1973–1983. [CrossRef]

56. Russo, M.A.; Santarelli, D.M.; O'Rourke, D. The Physiological Effects of Slow Breathing in the Healthy Human. *Breathe* **2017**, *13*, 298–309. [CrossRef]

57. Nuckowska, M.K.; Gruszecki, M.; Kot, J.; Wolf, J.; Guminski, W.; Frydrychowski, A.F.; Wtorek, J.; Narkiewicz, K.; Winklewski, P.J. Impact of Slow Breathing on the Blood Pressure and Subarachnoid Space Width Oscillations in Humans. *Sci. Rep.* **2019**, *9*, 6232. [CrossRef]

58. Johnson, A.T.; Scott, W.H.; Lausted, C.G.; Coyne, K.M.; Sahota, M.S.; Johnson, M.M. Effect of External Dead Volume on Performance While Wearing a Respirator. *AIHAJ-Am. Ind. Hyg. Assoc.* **2000**, *61*, 678–684. [CrossRef]

59. Xu, M.; Lei, Z.; Yang, J. Estimating the Dead Space Volume between a Headform and N95 Filtering Facepiece Respirator Using Microsoft Kinect. *J. Occup. Environ. Hyg.* **2015**, *12*, 538–546. [CrossRef]

60. Lee, H.P.; Wang, D.Y. Objective Assessment of Increase in Breathing Resistance of N95 Respirators on Human Subjects. *Ann. Occup. Hyg.* **2011**, *55*, 917–921. [CrossRef]

61. Roberge, R.; Bayer, E.; Powell, J.; Coca, A.; Roberge, M.; Benson, S. Effect of Exhaled Moisture on Breathing Resistance of N95 Filtering Facepiece Respirators. *Ann. Occup. Hyg.* **2010**, *54*, 671–677. [CrossRef]

62. Jamjoom, A.; Nikkar-Esfahani, A.; Fitzgerald, J. Operating Theatre Related Syncope in Medical Students: A Cross Sectional Study. *BMC Med. Educ.* **2009**, *9*, 14. [CrossRef]

63. Asadi-Pooya, A.A.; Cross, J.H. Is Wearing a Face Mask Safe for People with Epilepsy? *Acta Neurol. Scand.* **2020**, *142*, 314–316. [CrossRef]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

64. Lazzarino, A.I.; Steptoe, A.; Hamer, M.; Michie, S. Covid-19: Important Potential Side Effects of Wearing Face Masks That We Should Bear in Mind. *BMJ* **2020**, *369*, m2003. [CrossRef]

65. Guaranha, M.S.B.; Garzon, E.; Buchpiguel, C.A.; Tazima, S.; Yacubian, E.M.T.; Sakamoto, A.C. Hyperventilation Revisited: Physiological Effects and Efficacy on Focal Seizure Activation in the Era of Video-EEG Monitoring. *Epilepsia* 2005, *46*, 69–75. [CrossRef]

66. Ong, J.J.Y.; Bharatendu, C.; Goh, Y.; Tang, J.Z.Y.; Sooi, K.W.X.; Tan, Y.L.; Tan, B.Y.Q.; Teoh, H.-L.; Ong, S.T.; Allen, D.M.; et al. Headaches Associated With Personal Protective Equipment A Cross-Sectional Study among Frontline Healthcare Workers During COVID-19. *Headache* **2020**, *60*, 864–877. [CrossRef]

67. Jacobs, J.L.; Ohde, S.; Takahashi, O.; Tokuda, Y.; Omata, F.; Fukui, T. Use of Surgical Face Masks to Reduce the Incidence of the Common Cold among Health Care Workers in Japan: A Randomized Controlled Trial. *Am. J. Infect. Control* 2009, *37*, 417–419. [CrossRef]

68. Ramirez-Moreno, J.M. Mask-Associated de Novo Headache in Healthcare Workers during the Covid-19 Pandemic. *medRxiv* **2020**. [CrossRef]

69. Shenal, B.V.; Radonovich, L.J.; Cheng, J.; Hodgson, M.; Bender, B.S. Discomfort and Exertion Associated with Prolonged Wear of Respiratory Protection in a Health Care Setting. *J. Occup. Environ. Hyg.* 2011, *9*, 59–64. [CrossRef]

70. Rains, S.A. The Nature of Psychological Reactance Revisited: A Meta-Analytic Review. *Hum. Commun. Res.* **2013**, *39*, 47–73. [CrossRef]

71. Matusiak, Ł.; Szepietowska, M.; Krajewski, P.; Białynicki-Birula, R.; Szepietowski, J.C. Inconveniences Due to the Use of Face Masks during the COVID-19 Pandemic: A Survey Study of 876 Young People. *Dermatol. Ther.* **2020**, *33*, e13567. [CrossRef]

72. Foo, C.C.I.; Goon, A.T.J.; Leow, Y.; Goh, C. Adverse Skin Reactions to Personal Protective Equipment against Severe Acute Respiratory Syndrome–a Descriptive Study in Singapore. *Contact Dermat.* 2006, *55*, 291–294. [CrossRef]

73. Hua, W.; Zuo, Y.; Wan, R.; Xiong, L.; Tang, J.; Zou, L.; Shu, X.; Li, L. Short-Term Skin Reactions Following Use of N95 Respirators and Medical Masks. *Contact Dermat.* 2020, *83*, 115–121. [CrossRef]

74. Prousa, D. Studie zu psychischen und psychovegetativen Beschwerden mit den aktuellen Mund-Nasenschutz-Verordnungen. *PsychArchives* 2020. [CrossRef]

75. Sell, T.K.; Hosangadi, D.; Trotochaud, M. Misinformation and the US Ebola Communication Crisis: Analyzing the Veracity and Content of Social Media Messages Related to a Fear-Inducing Infectious Disease Outbreak. *BMC Public Health* 2020, *20*, 550. [CrossRef]

76. Ryan, R.M.; Deci, E.L. Self-determination theory and the role of basic psychological needs in personality and the organization of behavior. In *Handbook of Personality: Theory and Research*, 3rd ed.; The Guilford Press: New York, NY, USA, 2008; pp. 654–678. ISBN 1-59385-836-0.

77. Kent, J.M.; Papp, L.A.; Martinez, J.M.; Browne, S.T.; Coplan, J.D.; Klein, D.F.; Gorman, J.M. Specificity of Panic Response to CO(2) Inhalation in Panic Disorder: A Comparison with Major Depression and Premenstrual Dysphoric Disorder. *Am. J. Psychiatry* 2001, *158*, 58–67. [CrossRef] [PubMed]

78. Morris, L.S.; McCall, J.G.; Charney, D.S.; Murrough, J.W. The Role of the Locus Coeruleus in the Generation of Pathological Anxiety. *Brain Neurosci. Adv.* **2020**, *4*. [CrossRef] [PubMed]

79. Gorman, J.M.; Askanazi, J.; Liebowitz, M.R.; Fyer, A.J.; Stein, J.; Kinney, J.M.; Klein, D.F. Response to Hyperventilation in a Group of Patients with Panic Disorder. *Am. J. Psychiatry* **1984**, *141*, 857–861. [CrossRef] [PubMed]

80. Tsugawa, A.; Sakurai, S.; Inagawa, Y.; Hirose, D.; Kaneko, Y.; Ogawa, Y.; Serisawa, S.; Takenoshita, N.; Sakurai, H.; Kanetaka, H.; et al. Awareness of the COVID-19 Outbreak and Resultant Depressive Tendencies in Patients with Severe Alzheimer's Disease. *JAD* 2020, *77*, 539–541. [CrossRef]

81. Maguire, P.A.; Reay, R.E.; Looi, J.C. Nothing to Sneeze at-Uptake of Protective Measures against an Influenza Pandemic by People with Schizophrenia: Willingness and Perceived Barriers. *Australas. Psychiatry* 2019, *27*, 171–178. [CrossRef]

82. COVID-19: Considerations for Wearing Masks | CDC. Available online: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (accessed on 12 November 2020).

83. Lim, E.C.H.; Seet, R.C.S.; Lee, K.-H.; Wilder-Smith, E.P.V.; Chuah, B.Y.S.; Ong, B.K.C. Headaches and the N95 Face-mask amongst Healthcare Providers. *Acta Neurol. Scand.* 2006, *113*, 199–202. [CrossRef]

84. Badri, F.M.A. Surgical Mask Contact Dermatitis and Epidemiology of Contact Dermatitis in Healthcare Workers. *Curr. Allergy Clin. Immunol.* 2017, *30*, 183–188.

85. Scarano, A.; Inchingolo, F.; Lorusso, F. Facial Skin Temperature and Discomfort When Wearing Protective Face Masks: Thermal Infrared Imaging Evaluation and Hands Moving the Mask. *Int. J. Environ. Res. Public Health* 2020, *17*, 4624. [CrossRef]

86. Luksamijarulkul, P.; Aiempradit, N.; Vatanasomboon, P. Microbial Contamination on Used Surgical Masks among Hospital Personnel and Microbial Air Quality in Their Working Wards: A Hospital in Bangkok. *Oman Med. J.* 2014, *29*, 346–350. [CrossRef]

87. Chughtai, A.A.; Stelzer-Braid, S.; Rawlinson, W.; Pontivivo, G.; Wang, Q.; Pan, Y.; Zhang, D.; Zhang, Y.; Li, L.; MacIntyre, C.R. Contamination by Respiratory Viruses on Outer Surface of Medical Masks Used by Hospital Healthcare Workers. *BMC Infect. Dis.* 2019, *19*, 491. [CrossRef]

88. Monalisa, A.C.; Padma, K.B.; Manjunath, K.; Hemavathy, E.; Varsha, D. Microbial Contamination of the Mouth Masks Used by Post-Graduate Students in a Private Dental Institution: An In-Vitro Study. *IOSR J. Dent. Med. Sci.* 2017, *16*, 61–67.

89. Liu, Z.; Chang, Y.; Chu, W.; Yan, M.; Mao, Y.; Zhu, Z.; Wu, H.; Zhao, J.; Dai, K.; Li, H.; et al. Surgical Masks as Source of Bacterial Contamination during Operative Procedures. *J. Orthop. Transl.* 2018, *14*, 57–62. [CrossRef]

90. Robert Koch-Institut. *Influenza-Monatsbericht*; Robert Koch-Institut: Berlin, Germany, 2020.

91. Techasatian, L.; Lebsing, S.; Uppala, R.; Thaowandee, W.; Chaiyarit, J.; Supakunpinyo, C.; Panombualert, S.; Mairiang, D.; Saengnipanthkul, S.; Wichajarn, K.; et al. The Effects of the Face Mask on the Skin Underneath: A Prospective Survey During the COVID-19 Pandemic. *J. Prim. Care Community Health* **2020**, *11*, 2150132720966167. [CrossRef]

92. Lan, J.; Song, Z.; Miao, X.; Li, H.; Li, Y.; Dong, L.; Yang, J.; An, X.; Zhang, Y.; Yang, L.; et al. Skin Damage among Health Care Workers Managing Coronavirus Disease-2019. *J. Am. Acad. Dermatol.* **2020**, *82*, 1215–1216. [CrossRef]

93. Szepietowski, J.C.; Matusiak, Ł.; Szepietowska, M.; Krajewski, P.K.; Białynicki-Birula, R. Face Mask-Induced Itch: A Self-Questionnaire Study of 2,315 Responders during the COVID-19 Pandemic. *Acta Derm.-Venereol.* **2020**, *100*, adv00152. [CrossRef]

94. Darlenski, R.; Tsankov, N. COVID-19 Pandemic and the Skin: What Should Dermatologists Know? *Clin. Dermatol.* **2020**. [CrossRef]

95. Muley, P.; 'Mask Mouth'-a Novel Threat to Oral Health in the COVID Era–Dr Pooja Muley. Dental Tribune South Asia 2020. Available online: https://in.dental-tribune.com/news/mask-mouth-a-novel-threat-to-oral-health-in-the-covid-era/ (accessed on 12 November 2020).

96. Klimek, L.; Huppertz, T.; Alali, A.; Spielhaupter, M.; Hörmann, K.; Matthias, C.; Hagemann, J. A New Form of Irritant Rhinitis to Filtering Facepiece Particle (FFP) Masks (FFP2/N95/KN95 Respirators) during COVID-19 Pandemic. *World Allergy Organ. J.* **2020**, *13*, 100474. [CrossRef]

97. COVID-19 Mythbusters–World Health Organization. Available online: https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters (accessed on 28 January 2021).

98. Asadi, S.; Cappa, C.D.; Barreda, S.; Wexler, A.S.; Bouvier, N.M.; Ristenpart, W.D. Efficacy of Masks and Face Coverings in Controlling Outward Aerosol Particle Emission from Expiratory Activities. *Sci. Rep.* **2020**, *10*, 15665. [CrossRef]

99. Wong, C.K.M.; Yip, B.H.K.; Mercer, S.; Griffiths, S.; Kung, K.; Wong, M.C.; Chor, J.; Wong, S.Y. Effect of Facemasks on Empathy and Relational Continuity: A Randomised Controlled Trial in Primary Care. *BMC Fam. Pract.* **2013**, *14*, 200. [CrossRef]

100. World Health Organization; United Nations Children's Fund. *WHO-Advice on the Use of Masks for Children in the Community in the Context of COVID-19: Annex to the Advice on the Use of Masks in the Context of COVID-19, 21 August 2020*; World Health Organization: Geneva, Switzerland, 2020.

101. Person, E.; Lemercier, C.; Royer, A.; Reychler, G. Effet du port d'un masque de soins lors d'un test de marche de six minutes chez des sujets sains. *Rev. Mal. Respir.* **2018**, *35*, 264–268. [CrossRef]

102. Johnson, A.T.; Scott, W.H.; Phelps, S.J.; Caretti, D.M.; Koh, F.C. How Is Respirator Comfort Affected by Respiratory Resistance? *J. Int. Soc. Respir. Prot.* **2005**, *22*, 38.

103. Koh, F.C.; Johnson, A.T.; Scott, W.H.; Phelps, S.J.; Francis, E.B.; Cattungal, S. The Correlation between Personality Type and Performance Time While Wearing a Respirator. *J. Occup. Environ. Hyg.* **2006**, *3*, 317–322. [CrossRef]

104. Deutsche Gesetzliche Unfallversicherung. *DGUV Grundsätze für Arbeitsmedizinische Vorsorgeuntersuchungen*; Alfons, W., Ed.; Gentner Verlag: Stuttgart, Germany, 2010; ISBN 978-3-87247-733-0.

105. Browse by Country-NATLEX. Available online: https://www.ilo.org/dyn/natlex/natlex4.byCountry?p_lang=en (accessed on 28 January 2021).

106. BAuA-SARS-CoV-2 FAQ Und Weitere Informationen-Kennzeichnung von Masken Aus USA, Kanada, Australien/Neuseeland, Japan, China Und Korea-Bundesanstalt Für Arbeitsschutz Und Arbeitsmedizin. Available online: https://www.baua.de/DE/Themen/Arbeitsgestaltung-im-Betrieb/Coronavirus/pdf/Kennzeichnung-Masken.html (accessed on 28 January 2021).

107. Veit, M. Hauptsache Maske!? *DAZ.Online*. 2020, p. S26. Available online: https://www.deutsche-apotheker-zeitung.de/daz-az/2020/daz-33-2020/hauptsache-maske (accessed on 12 November 2020).

108. MacIntyre, C.R.; Seale, H.; Dung, T.C.; Hien, N.T.; Nga, P.T.; Chughtai, A.A.; Rahman, B.; Dwyer, D.E.; Wang, Q. A Cluster Randomised Trial of Cloth Masks Compared with Medical Masks in Healthcare Workers. *BMJ Open* **2015**, *5*, e006577. [CrossRef]

109. MacIntyre, C.R.; Chughtai, A.A. Facemasks for the Prevention of Infection in Healthcare and Community Settings. *BMJ* **2015**, *350*, h694. [CrossRef]

110. MacIntyre, C.R.; Wang, Q.; Seale, H.; Yang, P.; Shi, W.; Gao, Z.; Rahman, B.; Zhang, Y.; Wang, X.; Newall, A.T.; et al. A Randomized Clinical Trial of Three Options of N95 Respirators and Medical Masks in Health Workers. *Am. J. Respir. Crit. Care Med.* **2013**, *187*, 960–966. [CrossRef]

111. Dellweg, D.; Lepper, P.M.; Nowak, D.; Köhnlein, T.; Olgemöller, U.; Pfeifer, M. Position Paper of the German Respiratory Society (DGP) on the Impact of Community Masks on Self-Protection and Protection of Others in Regard to Aerogen Transmitted Diseases. *Pneumologie* **2020**, *74*, 331–336. [CrossRef]

112. Luckman, A.; Zeitoun, H.; Isoni, A.; Loomes, G.; Vlaev, I.; Powdthavee, N.; Read, D. Risk Compensation during COVID-19: The Impact of Face Mask Usage on Social Distancing. *OSF Preprints*. 2020. Available online: https://osf.io/rb8he/ (accessed on 25 October 2020).

113. Sharma, I.; Vashnav, M.; Sharma, R. COVID-19 Pandemic Hype: Losers and Gainers. *Indian J. Psychiatry* **2020**, *62*, S420–S430. [CrossRef] [PubMed]

114. BfArM-Empfehlungen Des BfArM-Hinweise Des BfArM Zur Verwendung von Mund–Nasen-Bedeckungen (z.B. Selbst Hergestellten Masken, "Community-Oder DIY-Masken"), Medizinischen Gesichtsmasken Sowie Partikelfiltrierenden Halbmasken (FFP1, FFP2 Und FFP3) Im Zusammenhang Mit Dem Coronavirus (SARS-CoV-2/Covid-19). Available online: https://www.bfarm.de/SharedDocs/Risikoinformationen/Medizinprodukte/DE/schutzmasken.html (accessed on 12 November 2020).

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

115. MacIntyre, C.R.; Wang, Q.; Cauchemez, S.; Seale, H.; Dwyer, D.E.; Yang, P.; Shi, W.; Gao, Z.; Pang, X.; Zhang, Y.; et al. A Cluster Randomized Clinical Trial Comparing Fit-Tested and Non-Fit-Tested N95 Respirators to Medical Masks to Prevent Respiratory Virus Infection in Health Care Workers. *Influenza Other Respir. Viruses* **2011**, *5*, 170–179. [CrossRef] [PubMed]

116. Gralton, J.; McLaws, M.-L. Protecting Healthcare Workers from Pandemic Influenza: N95 or Surgical Masks? *Crit. Care Med.* **2010**, *38*, 657–667. [CrossRef] [PubMed]

117. Smith, J.D.; MacDougall, C.C.; Johnstone, J.; Copes, R.A.; Schwartz, B.; Garber, G.E. Effectiveness of N95 Respirators versus Surgical Masks in Protecting Health Care Workers from Acute Respiratory Infection: A Systematic Review and Meta-Analysis. *CMAJ* **2016**, *188*, 567–574. [CrossRef] [PubMed]

118. Lee, S.-A.; Grinshpun, S.A.; Reponen, T. Respiratory Performance Offered by N95 Respirators and Surgical Masks: Human Subject Evaluation with NaCl Aerosol Representing Bacterial and Viral Particle Size Range. *Ann. Occup. Hyg.* **2008**, *52*, 177–185. [CrossRef] [PubMed]

119. Zhu, N.; Zhang, D.; Wang, W.; Li, X.; Yang, B.; Song, J.; Zhao, X.; Huang, B.; Shi, W.; Lu, R.; et al. A Novel Coronavirus from Patients with Pneumonia in China, 2019. *N. Engl. J. Med.* **2020**. [CrossRef]

120. Oberg, T.; Brosseau, L.M. Surgical Mask Filter and Fit Performance. *Am. J. Infect. Control* **2008**, *36*, 276–282. [CrossRef]

121. Eninger, R.M.; Honda, T.; Adhikari, A.; Heinonen-Tanski, H.; Reponen, T.; Grinshpun, S.A. Filter Performance of N99 and N95 Facepiece Respirators Against Viruses and Ultrafine Particles. *Ann. Occup. Hyg.* **2008**, *52*, 385–396. [CrossRef]

122. Morawska, L. Droplet Fate in Indoor Environments, or Can We Prevent the Spread of Infection? *Indoor Air* **2006**, *16*, 335–347. [CrossRef]

123. Ueki, H.; Furusawa, Y.; Iwatsuki-Horimoto, K.; Imai, M.; Kabata, H.; Nishimura, H.; Kawaoka, Y. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2. *mSphere* **2020**, *5*, e00637-20. [CrossRef]

124. Radonovich, L.J.; Simberkoff, M.S.; Bessesen, M.T.; Brown, A.C.; Cummings, D.A.T.; Gaydos, C.A.; Los, J.G.; Krosche, A.E.; Gibert, C.L.; Gorse, G.J.; et al. N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel: A Randomized Clinical Trial. *JAMA* **2019**, *322*, 824–833. [CrossRef]

125. Loeb, M.; Dafoe, N.; Mahony, J.; John, M.; Sarabia, A.; Glavin, V.; Webby, R.; Smieja, M.; Earn, D.J.D.; Chong, S.; et al. Surgical Mask vs N95 Respirator for Preventing Influenza Among Health Care Workers: A Randomized Trial. *JAMA* **2009**, *302*, 1865–1871. [CrossRef]

126. Konda, A.; Prakash, A.; Moss, G.A.; Schmoldt, M.; Grant, G.D.; Guha, S. Aerosol Filtration Efficiency of Common Fabrics Used in Respiratory Cloth Masks. *ACS Nano* **2020**, *14*, 6339–6347. [CrossRef]

127. Chughtai, A. Use of Cloth Masks in the Practice of Infection Control–Evidence and Policy Gaps. *Int. J. Infect. Control* **2013**, *9*. [CrossRef]

128. Labortest-Schutzmasken im Härtetest: Die Meisten Filtern Ungenügend. Available online: https://www.srf.ch/news/panorama/labortest-schutzmasken-im-haertetest-die-meisten-filtern-ungenuegend (accessed on 12 November 2020).

129. MacIntyre, C.R.; Cauchemez, S.; Dwyer, D.E.; Seale, H.; Cheung, P.; Browne, G.; Fasher, M.; Wood, J.; Gao, Z.; Booy, R.; et al. Face Mask Use and Control of Respiratory Virus Transmission in Households. *Emerg. Infect. Dis.* **2009**, *15*, 233–241. [CrossRef]

130. Xiao, J.; Shiu, E.Y.C.; Gao, H.; Wong, J.Y.; Fong, M.W.; Ryu, S.; Cowling, B.J. Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures. *Emerg. Infect. Dis.* **2020**, *26*, 967–975. [CrossRef]

131. Aiello, A.E.; Murray, G.F.; Perez, V.; Coulborn, R.M.; Davis, B.M.; Uddin, M.; Shay, D.K.; Waterman, S.H.; Monto, A.S. Mask Use, Hand Hygiene, and Seasonal Influenza-like Illness among Young Adults: A Randomized Intervention Trial. *J. Infect. Dis.* **2010**, *201*, 491–498. [CrossRef]

132. Bundgaard, H.; Bundgaard, J.S.; Raaschou-Pedersen, D.E.T.; von Buchwald, C.; Todsen, T.; Norsk, J.B.; Pries-Heje, M.M.; Vissing, C.R.; Nielsen, P.B.; Winsløw, U.C.; et al. Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers. *Ann. Intern. Med.* **2020**. [CrossRef]

133. Smart, N.R.; Horwell, C.J.; Smart, T.S.; Galea, K.S. Assessment of the Wearability of Facemasks against Air Pollution in Primary School-Aged Children in London. *Int. J. Environ. Res. Public Health* **2020**, *17*, 3935. [CrossRef]

134. Forgie, S.E.; Reitsma, J.; Spady, D.; Wright, B.; Stobart, K. The "Fear Factor" for Surgical Masks and Face Shields, as Perceived by Children and Their Parents. *Pediatrics* **2009**, *124*, e777–e781. [CrossRef]

135. Schwarz, S.; Jenetzky, E.; Krafft, H.; Maurer, T.; Martin, D. Corona Children Studies "Co-Ki": First Results of a Germany-Wide Registry on Mouth and Nose Covering (Mask) in Children. *Monatsschrift Kinderheilkde* **2021**, 1–10. [CrossRef]

136. Zoccal, D.B.; Furuya, W.I.; Bassi, M.; Colombari, D.S.A.; Colombari, E. The Nucleus of the Solitary Tract and the Coordination of Respiratory and Sympathetic Activities. *Front. Physiol.* **2014**, *5*, 238. [CrossRef]

137. Neilson, S. The Surgical Mask Is a Bad Fit for Risk Reduction. *CMAJ* **2016**, *188*, 606–607. [CrossRef]

138. SOCIUM Research Center on Inequality and Social Policy, Universität Bremen. Available online: https://www.socium.uni-bremen.de/ueber-das-socium/aktuelles/archiv/ (accessed on 28 January 2021).

139. Fadare, O.O.; Okoffo, E.D. Covid-19 Face Masks: A Potential Source of Microplastic Fibers in the Environment. *Sci. Total Environ.* **2020**, *737*, 140279. [CrossRef]

140. Potluri, P.; Needham, P. *Technical Textiles for Protection (Manchester EScholar-The University of Manchester)*; Woodhead Publishing: Cambridge, UK, 2005.

141. Schnurr, R.E.J.; Alboiu, V.; Chaudhary, M.; Corbett, R.A.; Quanz, M.E.; Sankar, K.; Srain, H.S.; Thavarajah, V.; Xanthos, D.; Walker, T.R. Reducing Marine Pollution from Single-Use Plastics (SUPs): A Review. *Mar. Pollut. Bull.* **2018**, *137*, 157–171. [CrossRef]

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

142. Reid, A.J.; Carlson, A.K.; Creed, I.F.; Eliason, E.J.; Gell, P.A.; Johnson, P.T.J.; Kidd, K.A.; MacCormack, T.J.; Olden, J.D.; Ormerod, S.J.; et al. Emerging Threats and Persistent Conservation Challenges for Freshwater Biodiversity. *Biol. Rev. Camb. Philos. Soc.* **2019**, *94*, 849–873. [CrossRef]

143. Fisher, K.A.; Tenforde, M.W.; Feldstein, L.R.; Lindsell, C.J.; Shapiro, N.I.; Files, D.C.; Gibbs, K.W.; Erickson, H.L.; Prekker, M.E.; Steingrub, J.S.; et al. Community and Close Contact Exposures Associated with COVID-19 among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities-United States, July 2020. *MMWR Morb. Mortal. Wkly. Rep.* **2020**, *69*, 1258–1264. [CrossRef]

144. Belkin, N. The Evolution of the Surgical Mask: Filtering Efficiency versus Effectiveness. *Infect. Control Hosp. Epidemiol.* **1997**, *18*, 49–57. [CrossRef]

145. Cowling, B.J.; Chan, K.-H.; Fang, V.J.; Cheng, C.K.Y.; Fung, R.O.P.; Wai, W.; Sin, J.; Seto, W.H.; Yung, R.; Chu, D.W.S.; et al. Facemasks and Hand Hygiene to Prevent Influenza Transmission in Households: A Cluster Randomized Trial. *Ann. Intern. Med.* **2009**, *151*, 437–446. [CrossRef]

146. Cowling, B.J.; Zhou, Y.; Ip, D.K.M.; Leung, G.M.; Aiello, A.E. Face Masks to Prevent Transmission of Influenza Virus: A Systematic Review. *Epidemiol. Infect.* **2010**, *138*, 449–456. [CrossRef]

147. Institute of Medicine (US). Committee on Personal Protective Equipment for Healthcare Personnel to Prevent Transmission of Pandemic Influenza and Other Viral Respiratory Infections: Current Research Issues. In *Preventing Transmission of Pandemic Influenza and Other Viral Respiratory Diseases: Personal Protective Equipment for Healthcare Personnel: Update 2010*; Larson, E.L., Liverman, C.T., Eds.; National Academies Press (US): Washington, DC, USA, 2011; ISBN 978-0-309-16254-8.

148. Matuschek, C.; Moll, F.; Fangerau, H.; Fischer, J.C.; Zänker, K.; van Griensven, M.; Schneider, M.; Kindgen-Milles, D.; Knoefel, W.T.; Lichtenberg, A.; et al. The History and Value of Face Masks. *Eur. J. Med. Res.* **2020**, *25*, 23. [CrossRef] [PubMed]

149. Spooner, J.L. History of Surgical Face Masks. *AORN J.* **1967**, *5*, 76–80. [CrossRef]

150. Burgess, A.; Horii, M. Risk, Ritual and Health Responsibilisation: Japan's "safety Blanket" of Surgical Face Mask-Wearing. *Sociol. Health Illn.* **2012**, *34*, 1184–1198. [CrossRef] [PubMed]

151. Beck, U. *Risk Society, towards a New Modernity*; SAGE Publications Ltd: Thousand Oaks, CA, USA, 1992.

152. Cheng, K.K.; Lam, T.H.; Leung, C.C. Wearing Face Masks in the Community during the COVID-19 Pandemic: Altruism and Solidarity. *Lancet* **2020**. [CrossRef]

153. Melnychuk, M.C.; Dockree, P.M.; O'Connell, R.G.; Murphy, P.R.; Balsters, J.H.; Robertson, I.H. Coupling of Respiration and Attention via the Locus Coeruleus: Effects of Meditation and Pranayama. *Psychophysiology* **2018**, *55*, e13091. [CrossRef] [PubMed]

154. Andresen, M.C.; Kunze, D.L. Nucleus Tractus Solitarius–Gateway to Neural Circulatory Control. *Annu. Rev. Physiol.* **1994**, *56*, 93–116. [CrossRef] [PubMed]

155. Kline, D.D.; Ramirez-Navarro, A.; Kunze, D.L. Adaptive Depression in Synaptic Transmission in the Nucleus of the Solitary Tract after In Vivo Chronic Intermittent Hypoxia: Evidence for Homeostatic Plasticity. *J. Neurosci.* **2007**, *27*, 4663–4673. [CrossRef]

156. King, T.L.; Heesch, C.M.; Clark, C.G.; Kline, D.D.; Hasser, E.M. Hypoxia Activates Nucleus Tractus Solitarii Neurons Projecting to the Paraventricular Nucleus of the Hypothalamus. *Am. J. Physiol. Regul. Integr. Comp. Physiol.* **2012**, *302*, R1219–R1232. [CrossRef]

157. Yackle, K.; Schwarz, L.A.; Kam, K.; Sorokin, J.M.; Huguenard, J.R.; Feldman, J.L.; Luo, L.; Krasnow, M.A. Breathing Control Center Neurons That Promote Arousal in Mice. *Science* **2017**, *355*, 1411–1415. [CrossRef]

158. Menuet, C.; Connelly, A.A.; Bassi, J.K.; Melo, M.R.; Le, S.; Kamar, J.; Kumar, N.N.; McDougall, S.J.; McMullan, S.; Allen, A.M. PreBötzinger Complex Neurons Drive Respiratory Modulation of Blood Pressure and Heart Rate. *eLife* **2020**, *9*, e57288. [CrossRef]

159. Zope, S.A.; Zope, R.A. Sudarshan Kriya Yoga: Breathing for Health. *Int. J. Yoga* **2013**, *6*, 4–10. [CrossRef]

160. Cummins, E.P.; Strowitzki, M.J.; Taylor, C.T. Mechanisms and Consequences of Oxygen and Carbon Dioxide Sensing in Mammals. *Physiol. Rev.* **2020**, *100*, 463–488. [CrossRef]

161. Jafari, M.J.; Khajevandi, A.A.; Mousavi Najarkola, S.A.; Yekaninejad, M.S.; Pourhoseingholi, M.A.; Omidi, L.; Kalantary, S. Association of Sick Building Syndrome with Indoor Air Parameters. *Tanaffos* **2015**, *14*, 55–62.

162. Redlich, C.A.; Sparer, J.; Cullen, M.R. Sick-Building Syndrome. *Lancet* **1997**, *349*, 1013–1016. [CrossRef]

163. Kaw, R.; Hernandez, A.V.; Walker, E.; Aboussouan, L.; Mokhlesi, B. Determinants of Hypercapnia in Obese Patients with Obstructive Sleep Apnea: A Systematic Review and Metaanalysis of Cohort Studies. *Chest* **2009**, *136*, 787–796. [CrossRef]

164. Edwards, N.; Wilcox, I.; Polo, O.J.; Sullivan, C.E. Hypercapnic Blood Pressure Response Is Greater during the Luteal Phase of the Menstrual Cycle. *J. Appl. Physiol.* **1996**, *81*, 2142–2146. [CrossRef]

165. AAFA Community Services. What People with Asthma Need to Know about Face Masks and Coverings during the COVID-19 Pandemic. Available online: https://community.aafa.org/blog/what-people-with-asthma-need-to-know-about-face-masks-and-coverings-during-the-covid-19-pandemic (accessed on 29 January 2021).

166. Shigemura, M.; Lecuona, E.; Angulo, M.; Homma, T.; Rodríguez, D.A.; Gonzalez-Gonzalez, F.J.; Welch, L.C.; Amarelle, L.; Kim, S.-J.; Kaminski, N.; et al. Hypercapnia Increases Airway Smooth Muscle Contractility via Caspase-7-Mediated MiR-133a-RhoA Signaling. *Sci. Transl. Med.* **2018**, *10*, eaat1662. [CrossRef]

167. Roberge, R. Facemask Use by Children during Infectious Disease Outbreaks. *Biosecur. Bioterror.* **2011**, *9*, 225–231. [CrossRef]

168. Schwarz, S.; Jenetzky, E.; Krafft, H.; Maurer, T.; Steuber, C.; Reckert, T.; Fischbach, T.; Martin, D. Corona bei Kindern: Die Co-Ki Studie. *Mon. Kinderheilkde* **2020**. [CrossRef]

169. van der Kleij, L.A.; De Vis, J.B.; de Bresser, J.; Hendrikse, J.; Siero, J.C.W. Arterial $CO_2$ Pressure Changes during Hypercapnia Are Associated with Changes in Brain Parenchymal Volume. *Eur. Radiol. Exp.* **2020**, *4*, 17. [CrossRef]

Case 2:22-cv-02383-SSS-AS   Document 1-1   Filed 04/08/22   Page 455 of 586   Page ID #:911

*Int. J. Environ. Res. Public Health* **2021**, *18*, 4344

42 of 42

170. Geer Wallace, M.A.; Pleil, J.D. Evolution of Clinical and Environmental Health Applications of Exhaled Breath Research: Review of Methods: Instrumentation for Gas-Phase, Condensate, and Aerosols. *Anal. Chim. Acta* **2018**, *1024*, 18–38. [CrossRef] [PubMed]

171. Sukul, P.; Schubert, J.K.; Zanaty, K.; Trefz, P.; Sinha, A.; Kamysek, S.; Miekisch, W. Exhaled Breath Compositions under Varying Respiratory Rhythms Reflects Ventilatory Variations: Translating Breathomics towards Respiratory Medicine. *Sci. Rep.* **2020**, *10*, 14109. [CrossRef] [PubMed]

172. Lai, P.S.; Christiani, D.C. Long-Term Respiratory Health Effects in Textile Workers. *Curr. Opin. Pulm. Med.* **2013**, *19*, 152–157. [CrossRef] [PubMed]

173. Goetz, L.H.; Schork, N.J. Personalized Medicine: Motivation, Challenges and Progress. *Fertil. Steril.* **2018**, *109*, 952–963. [CrossRef]

174. Samannan, R.; Holt, G.; Calderon-Candelario, R.; Mirsaeidi, M.; Campos, M. Effect of Face Masks on Gas Exchange in Healthy Persons and Patients with COPD. *Ann. ATS* **2020**. [CrossRef]

175. Streeck, H.; Schulte, B.; Kuemmerer, B.; Richter, E.; Hoeller, T.; Fuhrmann, C.; Bartok, E.; Dolscheid, R.; Berger, M.; Wessendorf, L.; et al. Infection Fatality Rate of SARS-CoV-2 Infection in a German Community with a Super-Spreading Event. *medRxiv* **2020**. [CrossRef]

176. Ioannidis, J. The Infection Fatality Rate of COVID-19 Inferred from Seroprevalence Data. *medRxiv* **2020**. [CrossRef]

177. Executive Board: Special Session on the COVID-19 Response. Available online: https://www.who.int/news-room/events/detail/2020/10/05/default-calendar/executive-board-special-session-on-the-covid19-response (accessed on 13 November 2020).

178. International Health Conference. WHO-Constitution of the World Health Organization. 1946. *Bull. World Health Organ.* **2002**, *80*, 983–984.

Plaintiff's Exhibit 203

  

The National Preparedness Leadership Initiative is a joint program of the Harvard T.H. Chan School of Public Health and the Harvard Kennedy School of Government, Center for Public Leadership

**Aviation Public Health Initiative**

# Assessment of Risks of SARS-CoV-2 Transmission During Air Travel and Non-Pharmaceutical Interventions to Reduce Risk

## Phase One Report:
## Gate-to-Gate Travel Onboard Aircraft

Prepared by

## Faculty and Scientists at the
## Harvard T.H. Chan School of Public Health

ACKNOWLEDGEMENTS

This project arose in response to a complex set of problems during an unprecedented crisis. Three months into the COVID-19 pandemic, the aviation industry faced a significant decline in passenger traffic and revenue. There was interest in finding an independent, science-based resource to answer difficult public health safety questions, critical to both protect the workforce and the public, and essential to restarting this important segment of the national economy.

Out of that interest to reopen the sector safely, discussions began between Airlines for America (A4A) and faculty at the National Preparedness Leadership Initiative (NPLI), a joint program of the Harvard T.H, Chan School of Public Health and the Harvard Kennedy School of Government.

Those conversations led to development of the Aviation Public Health Initiative (APHI). As lead sponsoring organization, A4A engaged their member organizations, along with a group of manufacturers and airport operators. These companies generously provided financial support, shared data and information, facilitated conversations with airline COVID-19 working groups, and opened opportunities to speak with the airline crewmembers. That breadth of conversation and data access was critical to collecting the body of knowledge required to reach the findings and recommendations in this report. That interest led to discussions and briefs with numerous government officials associated with the aviation industry. Through it all, this group of industry and government leaders respected the independence of the APHI scientists and their research. The APHI team deeply appreciates the numerous contributions, the support, and the commitment of these sponsors and leaders to the scientific objectives of this inquiry.

The APHI project team includes faculty and associates of the Harvard T.H. Chan School of Public Health. The leadership includes Director Leonard J. Marcus, PhD; Deputy Director Vice Admiral Peter V. Neffenger, USCG (ret); Science Director John D. Spengler, PhD.; and Deputy Science Director John F. McCarthy, ScD, C.I.H. The project team includes Senior Project Manager Leila Roumani, DMD, MPH; Communications Specialist Richard Ades; Infectious Disease Consultant, Edward A. Nardell, MD; and Lead Science and Technical Writer Wendy M. Purcell, PhD, FRSA. The science and technology research team includes Ramon Alberto Sanchez, PhD; Ted Myatt, ScD; Jose Guillermo Cedeno Laurent, PhD; Jerry F. Ludwig, PhD; Steve Hanna, PhD; Judith Irene Rodriquez, MS; and Steve Bloom, MS. Susan Flaherty, Regina Jungbluth, Michelle Tracanna, and Joan Arnold provided essential administrative support.

The findings and recommendations of this report are the independent conclusions of the Harvard T.H. Chan School of Public Health Aviation Public Health Initiative. The APHI team hopes its contents will underscore the importance of following science, to save lives, to reinvigorate economic well-being, and to lead the country and the world to overcome the COVID-19 crisis.

Leonard J. Marcus, PhD
Director, Aviation Public Health Initiative
Harvard T.H. Chan School of Public Health

susceptibility of the person exposed, the biological dose of virus particles delivered to a target organ and the duration over which the exposure occurs. The infectious dose for SARS-CoV-2 is yet unknown. Particles (detectable, viable, and infectious) are estimated from source measurements, but include many particles that do not cause infection due to viability, infectivity, host defenses, etc. In such situations, the concept of quanta is used (see Section 3.2.6) to describe whatever that unknown number might be, and probability is applied to estimate the likelihood of inhaling an infectious dose, i.e., quanta of infection. Quanta are therefore agnostic about the actual number of particles, but quantifies the number of doses generated by the source under specific circumstances and considering the probability of inhaling an infectious dose. As such, quanta allows quantification of risk reductions for mitigation strategies and calculations of comparative risk for different social activities, and it applies to analysis of disease transmission in the unique circumstances of an aircraft cabin.

2. **The Layered Approach to Risk Reduction:** The NPI (Non-Pharmaceutical Interventions) proposed for risk mitigation of SARS-CoV-2 transmission includes the consistent operation of ventilation systems, disinfection of surfaces, consistent wearing of face masks, and procedures during boarding and deplaning to maximize social distancing among passengers and crewmembers. The efficacy of these combined strategies is given in Table 1.1. Details underpinning the approach are found in the thematic sections of the Report that present the detailed scientific rationale and evidence in support of the strategy. This layered NPI approach serves to reduce significantly the risks of disease transmission in the aircraft environment.

3. **Ventilation Systems on Aircraft:** These sophisticated systems deliver high amounts of clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Aircraft ventilation offers enhanced protection for diluting and removing airborne contagions in comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles, when coupled with consistent compliance with mask-wearing policies.

4. **Crew and Passenger Behavior:** Deterrence of behaviors that increase the likelihood of transmission of SARS-CoV-2 from one person to the next is the most critical factor in enhancing public health safety onboard aircraft. Health attestations and screening for crew and passengers who show symptoms of COVID-19 reduce the likelihood that an infectious individual will board a plane until rapid, reliable, and inexpensive testing becomes available. Face masks significantly reduce transmission and airlines now require passengers to wear

strategies. ==Particular emphasis is placed on the effectiveness of aircraft ventilation systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft.==

**Air travel demands the design of effective strategies to mitigate transmission given people are typically in close proximity to one another. These conditions may be exacerbated onboard. Prior to arrival at the airport, at check-in and/or before boarding, passengers may be subject to health screening and testing (see Section 6.0), with those of concern isolated or refused boarding. Passengers can be required to wear an appropriate face covering, typically a mask (see Section 7.0). Upon boarding and deplaning, an orderly process can be implemented to support physical distancing and reduced density (see Section 8.0). In reality, 100% compliance with these measures will be difficult to achieve in all settings. The success of these NPI depends upon educating travelers to the benefits they offer travelers and workers associated with their travel. Compliance and enforcement are essential. Furthermore, transmission is reduced by enhanced cleaning protocols and disinfection of surfaces (see Section 9.0) along with physical engineering controls and ventilation (see Section 10.0). New technologies and innovative techniques are being developed and implemented to meet the continuing challenges posed by the COVID-19 pandemic.**

The risk of transmission on an aircraft can be reduced to very low levels with full compliance of the recommended NPI. ==Few peer-reviewed reports have been published on in-flight transmission of communicable illnesses, including COVID-19.== As of September 30, 2020, there were 13 peer-reviewed case studies available for analysis that focused on COVID-19 transmission and exposure mitigation on aircraft. Of these studies, eight were commercial flights and five were evacuation or repatriation flights. Section 2.0 provides a critical account of each case study, including type of flight, number of passengers, number of potential cases, and transmission mitigation procedures reportedly in use.

==**After detailed analysis of these reports, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel.**== **Also, had transmission mitigation procedures, i.e., maintaining appropriate physical distancing prior to travel and use of face masks throughout the trip, been used consistently on these flights a further reduced probability of transmission of COVID-19 during the flights would be anticipated. When masks were used by crewmembers (Yang et al., 2020), no transmission to crew was found. A significant finding from the evaluation of the evacuation flight procedures was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases. The lack of transmission to air medical crews indicates the effectiveness of the layering approach to reduce the risk of COVID-19 transmission.**

warning to passengers who refuse to follow airline public health safety rules, such as properly wearing masks. After reaching the limit of successive warnings, most major airlines make it clear to the public that offenders will be placed on a no-fly list. It is noteworthy that while each airline developed its own protocols, there is overall uniformity in how the airlines address risk reduction for passengers and crew.

The airlines have issued hundreds of no-fly determinations during the COVID-19 crisis. After the limit of successive warnings have been issued, passengers may receive a yellow slip on board or a notification after the flight to signify this designation. In order to avoid in-air conflict, crewmembers may also gently request onboard compliance. If it is not given, notification of service denial occurs only after the flight is completed. The vast majority of passengers and crew conform to mandated protocols. In the most egregious situations, pilots have interrupted a flight and landed in order to discharge a defiant passenger. Though notification procedures vary, the airlines are uniformly unwavering in their stance about compliance. It is a powerful motivator to achieve passenger behavioral compliance, and it is essential for achieving consistent public health-protecting behaviors during flight.

In addition to the face mask policies, most airlines require a **health attestation** prior to boarding. The enforcement policies extend to compliance with physical distancing in the gate area prior to boarding, and include aircraft boarding and deplaning procedures. The airlines vary on their load factors, with some though not all keeping the middle seat on larger aircraft or the aisle seat on smaller aircraft unoccupied. All airlines have policies that address concerns about crowding on aircrafts, in some cases allowing passengers to rebook flights when they learn that their booked flight is at more than 70% capacity.

*Safety as a Signal for Potential Fliers*

The combination of mandate and strict enforcement will likely be required for the course of the COVID-19 public health crisis. Should fast and definitive pre-boarding viral testing become available, this may change such requirements. Passengers routinely comply with requirements for security screening, seat belt use, and other safety protocols. However, in the U.S. behaviors relating to wearing face masks and/or physical distancing during the pandemic have assumed a level of symbolic significance, translating nonconformity into a statement on politics or injustices, contrary to the science-based recommendations.

For prospective passengers, confidence in their safety from COVID-19 is a key factor in their decision to fly (Lamb et al., 2020). This involves the universal adoption of face masks and enforcement of face mask policies, along with other risk-reducing procedures (Graham et al., 2020). These interventions support public health safety, and trust in their enforcement has become equivalent to trust in the airworthiness of the plane and security from a terrorist threat. As with any activity, such as driving, playing sports, or lifestyle choices, there are risks.

with mild to moderate disease (Wolfel et al., 2020; He et al., 2020; Zhou et al., 2020), and can be much longer in patients with severe COVID-19 disease (Pan et al., 2020). One case study reported that infectivity of asymptomatic people may be weak (Gao et al., 2020), while another reported that infectiousness may last for as long as 21 days in asymptomatic individuals (Hu et al., 2020). Approximately 40-45% of SARS-COV-2 infections are considered asymptomatic (Oran et al., 2020), although it has been reported that mild or asymptomatic cases could be as high as 80% (WHO, 2020c). This is an important consideration for the aviation industry, as asymptomatic and pre-symptomatic passengers and/or crew could board aircraft and pose a risk. For this reason, strict enforcement of face mask policies are critical, since such cases cannot be identified.

## 2.4    CRITICAL REVIEW OF POSSIBLE TRANSMISSION ON AIRCRAFT

Although the CDC has stated that *"the risk of getting a contagious disease on an airplane is low",* they have developed specific protocols to contact and investigate travelers who may have been exposed to a passenger harboring a contagious disease on a flight (CDC, 2019). The CDC document states that the major contacts of concern are within two rows of the *"Index patient (case)"* and specifies that *"Identifying contacts is based on the disease, how it spreads, and where a passenger was seated in relation to the index patient."* It recommends contact tracing for those individuals seated two rows in front and two rows behind the index case for highly contagious infectious diseases, such as measles and tuberculosis that have recognized airborne or droplet transmission vectors.

Airline travel presents many unique environments and opportunities to come into close contact with possible infectious people and materials. The chance for infectious contact can occur in many locations during a trip, such as in the general population at the origin or destination city, during transit to the airport, in the terminal, at an amenity destination or at the gate, besides being on an aircraft. Specifically, when onboard an aircraft, which is the focus of this Report, there are several physical factors such as very high air exchange rates, limited mobility in cabins and cabin crews that are trained in management processes to identify and segregate ill passengers, that are particular to air travel and likely help to mitigate potential exposure. During 2020, the aviation industry and the government in the United States have engaged in discussions to introduce contact-tracing systems when a case is identified on board a flight. At the time of writing, these proposed policies and practices have not been implemented.

### 2.4.1    Summary of Case Studies

Few reports have been published on **in-flight transmission of communicable illnesses**, including COVID-19. Indeed, a transmission event is a trigger for development of an academic paper; as such, non-transmissions are likely under-represented in the literature. As of September 28, 2020, there were 13 peer-reviewed case studies, describing 12 flights (two authors

**Based on the available scientific evidence, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel.** **Also, had transmission mitigation procedures, i.e., maintaining appropriate physical distancing prior to travel and use of face masks throughout the trip, been used consistently on these flights, a further reduced probability of transmission of COVID-19 during the flights would be anticipated.**

The use of masks is an important consideration when drawing conclusions from these studies. The case study with the highest estimated COVID-19 transmission rate (7%) reported that masks were not mandatory during the flight (Khanh et al., 2020). The cases that had the next highest COVID-19 transmission rate (up to 2%) either did not provide masks, or provided masks to passengers on the plane instead of prior to boarding; this posed a risk of transmission among passengers during the check-in and boarding process (Hoehl et al., 2020). Other studies that described the use of masks reported a transmission rate of less than 1%. When masks were employed on commercial flights by infectious cases (Ng et al., 2020; Nir-Paz et al., 2020; Schwartz et al., 2020) close contacts on the aircraft remained uninfected. (Note: The son of one patient in the Ng et al. 2020 study tested positive on quarantine day 3, possibly indicating transfer on the aircraft or possibly exposure prior to boarding.) **When masks were used by crewmembers (Yang et al., 2020), no transmission to crew was found.**

The next most common reported transmission mitigation strategy was the use of **temperature checks and/or medical screening of passengers prior to boarding the flight**. The practice of temperature checking as a pre-boarding screening method has come into question, simply because presymptomatic positive cases may not be exhibiting a fever even though they are infectious. It can be effective at identifying symptomatic individuals so that they might be isolated and prevented from exposing passengers in the terminal or on the flight, though its limitations must be acknowledged. Without quick and reliable pre-boarding viral testing, it will be difficult to distinguish a COVID-19 symptomatic passenger from a passenger experiencing another respiratory illness. Temperature screenings and symptom self-declarations have limitations and can still result in the boarding of symptomatic passengers; therefore, these approaches should not be relied upon as the only implemented transmission mitigation strategy.

The only studies that reported implementing **social distancing outside the flight**, for example at check-in and during onboarding, were evacuation flights. Similarly, case studies on evacuation or repatriation flights were the only ones that reported the use of barriers on the plane to segregate patients; enhanced ventilation on the plane was also noted with cabin ventilation remaining on at all times, including while on the ground and at the gate (Cornelius et al., 2020), and specific decontamination procedures during the flight were also reported. One study described using nearly all the transmission mitigation strategies listed in Table 2.1. This study summarized multiple flights that resulted in the repatriation of over 2,000 individuals flown on

39 flights, all of whom were either COVID-19 positive, persons under investigation (PUI), or individuals who were asymptomatic. These evacuation flights all employed a layered approach to risk mitigation, implementing multiple levels of transmission mitigation strategies. **A significant finding from the evaluation of these evacuation flight procedures was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases.** **The lack of transmission to air medical crews supports the effectiveness of the layering approach to reduce the risk of COVID-19 transmission.**

### 2.4.2   Summary of Past Transmission of Diseases Attributed To Air Travel

**Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide, the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent.** Outbreaks of respiratory diseases associated with air travel have however been reported, such as severe acute respiratory syndrome (SARS), measles, tuberculosis, and influenza (Olsen et al., 2003; Lei, 2018; Amler et al., 1982; CDC, 1983; CDC, 2004; Mangili & Gendreau, 2005; de Barros et al., 2006). Generally, these diseases are transmitted via aerosols (e.g., measles, tuberculosis) or via multiple routes (e.g., influenza). Each disease differs in the susceptibility of non-infected persons and the degree of infectiousness of the virus concerned. These cases however did not involve use of protective measures, such as wearing a face mask, now being employed. Furthermore, most of these appear to have occurred on aircraft that were likely in-service before 1990 when HEPA filters became standard equipment on most commercial aircraft. Regardless, useful information relevant to the COVID-19 pandemic can be gleaned from such accounts.

While there are occurrences of transmissibility that could inform the current crisis, **SARS** is the most closely related disease to COVID-19. In a SARS-related investigation, passengers and crew on three flights that included an infected person were interviewed. On one flight with a pre-symptomatic SARS case, no infection was documented among the passengers (Olsen et al., 2003). Another flight carried four SARS symptomatic people, with reported potential transmission to one passenger (Olsen et al., 2003). A flight with one symptomatic passenger confirmed SARS infections in 16 persons, two others were diagnosed as probable SARS, and four were reported to have SARS but could not be interviewed (Olsen et al., 2003). Illness in passengers was related to physical proximity to the index (i.e., infected) patient, with illness reported in eight of the 23 persons seated in the three rows in front of the index patient; this compared with 10 of the 88 persons seated elsewhere. Based on the locations of the secondary cases, the report suggested that airborne transmission had occurred (Olsen et al., 2003).

Lei et al. (2018) conducted a meta-analysis of 10 studies with possible **influenza** outbreaks on aircraft. The analysis showed that the risk of acquiring influenza was greater for passengers within two rows of the infected person; the risk was greater the longer the duration of the flight and the total infectivity of the index cases (Lei et al., 2018).

**Measles** is transmitted via aerosols and is highly infectious (CDC, 2018). However, measles transmission onboard aircrafts is believed to be uncommon (Amornkul et al., 2004; Mangili & Gendreau, 2005), with few case studies describing measles transmission during commercial air travel (Amler et al., 1982; CDC, 1983; CDC, 2004; Mangili & Gendreau, 2005; de Barros et al., 2006). In one of the most recent cases, an infectious individual traveled on six flights (one international flight arriving in Brazil and five local flights within Brazil) over a short period of

time while infected, and the investigation identified just six confirmed cases (de Barros et al., 2006).

Several studies about the in-flight transmission of **tuberculosis** have been reported, with most undertaken in the mid-1990s (MacFarland, 1993; Driver, 1994; CDC, 1995; Kenyon, 1996; WHO, 1998; Wang, 2000). Of these six investigations, two revealed a probable link to onboard transmission. In one case (Kenyon et al., 1996), four of 15 fellow passengers seated within two rows of the index passenger had a positive tuberculin skin test conversion. Overall, transmission of tuberculosis onboard aircraft is a rare event, most likely to happen to those in close proximity to the infectious passenger (within two rows) and/or exposed over a long time (greater than eight hours).

**Based on the investigations of outbreaks of other respiratory diseases on aircraft, it appears that transmission on aircraft is relatively infrequent.** Where transmission does occur, those close to the infectious passenger are at a higher risk than those seated at some distance. Depending on the transmissibility of the particular disease agent, determining how transmission occurs on aircraft (e.g., aerosol, direct contact, fomite) can be difficult. For example, did the transmission occur prior to boarding, during the use of a public lavatory or on the flight? In none of the published cases of respiratory disease transmission on aircraft did the authors indicate that the reference case(s) or the passengers were wearing protective face masks, as they must do on U.S. airlines today.

In many of the case reports, the difficulty of contact tracing due to lack of contact information was noted. Therefore, it would be beneficial to improve contact information to be able to respond more efficiently to a disease outbreak (Sevilla, 2018).

### 2.4.3   Potential Transmission of SARS-Cov-2 on a Flight from Singapore to Hangzhou, China: An Epidemiological Investigation (Chen et al., 2020)

An outbreak of COVID-19 among 324 passengers accompanied by 11 crew on a 5-hour flight from Changi Airport, Singapore to Hangzhou, China on January 24, 2020, was investigated (Chen et al., 2020). Though the flight originated in Singapore, it was strictly managed upon arrival in Hangzhou because approximately 100 passengers had departed from Wuhan to Singapore on a flight on January 19, 2020.

On the flight, face coverings were not required. No Personal Protective Equipment (PPE) was provided to the passengers and no barriers were erected on the plane. The flight operated at 89% seating capacity; the middle seat was not left unoccupied. The Boeing 787-9 aircraft was equipped with standard air handling systems.

Upon arrival in Hangzhou, passengers' temperatures were taken before deplaning. All passengers were required to follow medical isolation and observation protocols for at least 14 days. During this time, passengers were asked to take their temperature twice daily and report any upper respiratory symptoms. Crewmembers (n=11), all Singaporean, returned to Singapore on January 26, 2020, and were not part of this investigation.

All infected passengers from the January 24, 2020, flight to Hangzhou were also on the January 19, 2020, flight to Singapore. Three cases reported symptoms before the January 24, 2020, flight: two on January 23, 2020, and one on the day of the flight. On January 26, 2020, all passengers were tested for SARS-CoV-2 by RT-PCR; eight passengers tested positive, six of whom reported symptoms and two of whom were asymptomatic. On January 31, 2020, one passenger reported symptoms and on February 2, 2020, an additional two passengers reported symptoms. All passengers were tested again for SARS-CoV-2 by RT-PCR and no additional cases were identified by February 6, 2020. On February 8, 2020, all passengers not originating from Wuhan were released and the rest were released on February 15, 2020.

All the cases belonged to tour groups while in Singapore, denoted as Tour Groups A, B, C and D. There were 15 members of Tour Group A and 12 of them were confirmed SARS-CoV-2 positive. Therefore, investigators in this study attributed all infections among Tour Group A to activities amongst the tour group members prior to the flight. Three other cases, one from Tour Group B and two from Tour Group C (all asymptomatic) were identified by RT-PCR on January 26, 2020. As such, investigators ruled out transmission during the flight given the incubation time of COVID-19 being inconsistent with that timeline. Investigators concluded there was only evidence that one case, identified on February 2, 2020 and part of Tour Group D, was attributable to transmission during the flight. They reasoned that this case was consistent with the incubation time expected for COVID-19, was the only member of the tour group to become infected and was the only one not to have been on the January 19, 2020, flight from Wuhan to Singapore. This case reported that he removed his mask to eat and drink during the flight and that when he spoke, he had not worn the mask "tightly" and had his nose exposed. This actually implies that the true attack rate was 0.3%.

### 2.4.4   Asymptomatic Transmission of SARS-CoV-2 on Evacuation Flight (Bae et al., 2020)

A cohort study of passengers on an evacuation flight from Milan, Italy to South Korea on March 31, 2020, was evaluated (Bae et al., 2020). Prior to the flight, medical staff performed physical examinations, medical interviews, and temperature checks on 310 planned passengers; 11 were subsequently excluded from the flight. The investigation followed 299 passengers who boarded the 11-hour flight. During pre-boarding, passengers were kept 2 meters (6.56-feet) apart and were provided with N95 respirators. During the flight, most passengers wore the N95s the entire time, except for mealtimes and restroom use, though they were not required to do so. No other PPE was provided. Physical barriers were not in place during the flight and middle seats

All nine airlines prohibited masks with holes, vents, valves, openings, or made from mesh materials. In addition, face shields cannot be worn without wearing a mask underneath. One airline updated their policy to prohibit powered air purifying respirators (PAPRs) or breathing apparatus that enclose the face or the head. For passengers without a mask or with a non-compliant mask, all nine airlines provide one. Airlines have surgical-style or disposable masks available for crewmembers and passengers. A few airlines have branded masks or face shields available for crew or are considering offering face shields to their flight crew.

> *"...we've restricted face mask types to either the surgical mask or to the cotton mask that would be worn, not N95 mask, and not a gaitor or a neck gaitor or a bandana... not a valve mask either."* (Airline #3)

All nine airlines deny boarding to passengers without a mask and have a process to handle non-compliance during a flight. Flight attendants and pilots remind people to wear their masks, and issue warnings to non-compliant passengers. The warning process varies among the airlines, albeit most provide three warnings, verbal and written; a final warning is issued before filing a report or instituting a flight ban. Such no-fly bans remain in place for a defined period, which can be a year, for the duration of the passenger's passport, or until the airline's mask policy subsides; the latter is the most common ban among the airlines examined. Only one airline indicated that non-compliance could lead to a permanent no-fly ban on the airline. Overall, the airlines reported having good compliance, but on average, an airline may handle up to 15 reports per day where passengers had not complied but have fewer than 65 people listed on a no-fly ban.

> *"What we have done though is ensure that we are enforcing the mask policy. So essentially we have a three strikes or you are out, so we tell you about it before you get on board the aircraft, once you do get on, we reiterate it from both the captain and attendants, and if you take it off during flight, you can only do that if you're eating or drinking..."* (Airline #3)

> *"For in flight, we've actually adopted a three strike policy. ... at the third time they actually provide them this face mask policy enforcement card... if there is no further compliance from the passenger then the flight attendant brings up an in-flight incident report and reviews the situation ... we have been basically suspending travel ...for a period of a year."* (Airline #6)

==The only time a passenger onboard is permitted to remove their mask briefly is while eating and/or drinking.== Most airlines have limited the beverage and snack service on board, and/or have suspended it altogether on shorter flights, and/or suspended offering food for purchase. Some airlines only offer or sell bottled water or have available a pre-sealed snack bag for customers, which can be self-served or provided upon request. One airline has straws available upon request.

> *"... we're trying to get our customers to stay seated when they're deplaning ... getting them to deplane a little bit more slowly, ... it's something we're going to have to work on how do we get that behavior to change* (Airline #1)

> *"... additional information for our customers, whether it be on a seat back TV screens, for example, so upon landing it will it queue up a brief commercial or a brief kind of reminder for the deplaning processes, 'Please remain seated until the front row in front of you deplanes'."* (Airline #7)

The lower load factors airlines are experiencing have helped to maintain physical distancing in the cabin, as well as while boarding and deplaning. Three of the airlines continue to block the middle seat to provide more spacing between travelers. For capacity control on seating, one airline caps non-revenue flying and stand-by boarding while another offers to rebook passengers where a flight has a 70% loading factor. Several airlines do not block the middle seat and noted that there is no evidence currently on how blocking seats might help to reduce COVID-19 infections. In order to attract customers and reinstate trust, all nine airlines have loosened the flight change policies, most have eliminated fees altogether, and a couple have eliminated change fees permanently.

### 2.5.4   Aircraft Cleaning and Disinfection

The airlines' disinfection processes have changed significantly in order to reduce any contaminated surfaces or fomites inside the cabin. All airlines have added additional cleaning, prioritizing between flights highly touched areas, and adding additional disinfection overnight or when there is enough time between flights or "turns." Between turns, most disinfection activities require wiping down the high touch areas, lavatories, and galleys. Deeper cleaning is done mostly overnight and often includes use of electrostatic spraying (see Section 9.2.1).

Seven of the airlines have implemented electrostatic spraying of disinfectants, which should reach most areas inside the cabin. Some airlines perform electrostatic spraying at least once per day, or between flights, when having at least two to six hours or more. The other two airlines are not undertaking electrostatic spraying and have instead implemented use of fogging disinfectants overnight or once a week. In addition to antiviral spraying, three airlines have incorporated antimicrobial spraying, ranging from a weekly application to once a month. In order to carry out these extensive cleaning protocols, almost all airlines have included additional cleaning training.

> *"... before onboard the aircraft, we do go through an extensive cleaning process ... we've done really two significant enhancements. One, ... we've increased just the number of touch points on the aircraft. ... The other ... has been the electrostatic spraying, which I think there's been a lot about that in the media...."* (Airline #3)

*"we're looking at thermal, heating aircraft to a certain temperature... waiting for their studies to come out because there's a lot of things that need to happen to heat up to a certain temperature and sustain that."* (Airline #6)

### 2.5.5   Healthy Air in the Cabin: Ventilation During Different Stages

An aircraft cabin has inherently a high airflow volume and high-quality air filtration during cruising, which are managed through the environmental control system (ECS) that also controls the temperature and cabin pressurization. All nine airlines mentioned having high air exchange rates of approximately every 2 to 3 minutes (20 to 30 ACH) while cruising, a rate that is similar to, or even higher than the recommended air exchange rates for an operating room in a hospital.

*"...we've accomplished a fair amount of work on understanding onboard air quality, being so important to our customers...."*  (Airline #3)

The ECS air supply when flying is bleed air, or air that is compressed and sent to the air conditioning units, known as A/C packs. The ECS has been designed to recirculate some of the air inside the cabin. Air recirculation happens mostly when cruising, where about 40% to 50% of the cabin air is recirculated and filtered through a high-efficiency particulate air filter, also known as a HEPA filter. All the airlines interviewed have aircraft that are equipped with HEPA filters, and one of the airlines has increased the replacement frequency of their HEPA filters.

*"For the most part, onboard air is composed of approximately 50% fresh air from the engine-driven pneumatic system and 50% recycled air, the recycled air goes through every circulation system through HEPA filters. We began by increasing the frequency by which we maintained and replace the HEPA filters."* (Airline #3)

Once an aircraft is on the ground, the source of air supply can come from various sources, it is then mixed and distributed to the cabin. One source is through the airplane auxiliary power unit (APU) with the engine in operation, which consumes fuel and can generate noise and emissions at the airport. The air supply may also come from airport ground sources (jet-bridge or cart), known as pre-conditioned air (PCA) that supplies the cabin with fresh air, usually outside air, but at a more reduced flow. Whether the airline owns or controls the ground-based systems varies by airport. In many cases, the air that is being supplied by jet-bridge or cart, is managed by the airport. One of the airlines has been conducting air quality studies in their fleet and at different flight stages, to understand when the risk of SARS-CoV-2 might be higher inside the cabin.

*"We then began sampling onboard air at the various stages of flight from the boarding process to ..., push back, taxi out, climb, cruise, descent, landing, ride, and deplaning... as a proxy for clean air we only measured particles, fine particles 0.3 to 25 microns in*



**Figure 2.3**   Example of a Jet-bridge Mounted PCA Unit and Yellow Hose Supplying Air to the Aircraft Parked at the Gate (Source: Munich Airport, retrieved from https://www.munich-airport.com/a-fresh-breeze-thanks-to-pca-1229006#)

One of the airlines noted that the ground pre-conditioned air is not recirculated, so it is 100% fresh air from outside the aircraft that comes into the cabin. Another airline mentioned that when running the APU, the air has a recirculated percentage, as it is outside air that is initially compressed at high temperatures. It is then passed thorough the A/C packs in the ECS to be cooled down, is unfiltered as it enters the cabin, then a certain percentage of cabin air is recirculated and passed through the HEPA filtration, while the rest is vented.

## 4.0    VENTILATION REQUIREMENTS ASSOCIATED WITH AIRCRAFT

The airline cabin is a unique setting given its rigorous requirements for maintaining critical control of its environment and the compact seating arrangements in passenger aircraft. Ventilation, essential in all enclosed spaces for basic respiratory needs, also supports thermal comfort and dilutes and removes gaseous and particulate contaminants from breathing zones. The aircraft Environmental Control System (ECS) is designed to meet these needs and must be able to operate in extremes of temperature, ambient air quality, and air pressure.

Travelers and crewmembers have long expressed potential concerns regarding the air quality inside commercial aircraft cabins (NRC, 1986; NRC, 2002). However, much of that concern is likely due to not having a clear understanding of the way aircraft ventilation systems operate. The cabin environment must be safe and comfortable for occupants, given extreme external environmental conditions. Pressurizing the cabin to meet the metabolic requirements of passengers and crew, means that ventilation must be sufficient to dilute contaminants and odors as well as dissipate the heat emanating from people, entertainment systems, galleys and avionics. Specific industry guidance, Federal Aviation Regulations and international regulations are in place to help ensure acceptable conditions of cabin safety, air quality and thermal comfort are always maintained inside the aircraft. This includes the need to provide adequate control of potential airborne transmission of infectious diseases, including SARS-CoV-2 virus within the aircraft environment.

**The current pandemic demands a critical evaluation of the interaction of the ventilation system components and their performance through the different phases of air travel, from boarding the aircraft to deplaning upon arrival. Since individual airlines are not required to audit actual ventilation performance it is strongly recommended that airlines adopt voluntary programs to ensure OEM recommendations are being met during all phases of travel.**

The aircraft ECS is different from ventilation systems used in most other settings, such as typical buildings and road vehicles, in that it is absolutely essential in enabling the aircraft to operate in the extremes of outside air temperature, ambient air quality, and air pressure encountered while flying. Given the rigorous operating specifications, the ECS can be optimized to reduce the potential risk of exposure to airborne viruses; this analysis is discussed in Section 10.0. The description given here largely apply to narrow body and wide body commercial transport aircraft of recent design; older regional jets or turboprops will not incorporate all these ventilation systems.

The aircraft components include the onboard ECS powered by engines or the auxiliary power unit (APU). When the plane is at the gate, a ground air supply system may be used to provide conditioned air to the cabin. While aircraft systems are generally similar across airplane models

and manufacturers there are a variety of ground preconditioned air units (PCAs). Both the onboard and ground systems have variable settings of airflow rates and thermal conditions. Operating parameters for the ECS, APU, and PCAs are determined by air carriers, with PCA settings (flow/pressure) in practice set for the type of aircraft.

The following sections discuss the various elements of ventilation on the "Gate-to-Gate" journey and evaluates how they may affect potential risk of infection.

## 4.1   AIRCRAFT VENTILATION SYSTEM AND VENTILATION RATES

Ventilation standards for the aircraft cabin vary by country, following the regulations and guidelines of the corresponding international and national aviation authorities. In the USA, the minimum ventilation rates in an aircraft cabin is mandated by FAA regulations, while the ANSI/ASHRAE Standard 161-2018 (ANSI/ASHRAE, 2018) guidance defines the requirements for air quality in the aircraft and specifies methods for measurement and testing. The FAA established FARs to guide the operation of commercial airliners. FAR 14 CFR 25.831 states that *"the cabin ventilation system must provide at least 0.55 lb. (0.25 kg) of fresh air for each passenger per minute"*. This is equivalent to 4.7 L/s/p at 8000-feet and a cabin temperature of 22°C (72°F). The NRC report (NRC, 1986) states, *"This ventilation rate is also specified by the joint design regulation FAR/JAR Part 25 for crewmembers to perform their duties without undue discomfort or fatigue and to provide reasonable passenger comfort."* The ASHRAE standard specifies ventilation requirements for maintenance of air quality within commercial aircraft.

As detailed in Table 4.1, ventilation requirements can vary based on whether an aircraft is in flight or on the ground. As such, it does not discriminate between specific activities that may be occurring at various times i.e., boarding, deplaning, and when seated. With these regulations and standards, the cabin is supplied with outside air and highly filtered "clean air" providing air exchange rates significantly in excess to those found in well-ventilated offices and retail spaces (see Table 4.2). **The high air exchange rates utilized in aircraft ventilation systems mean that any contaminant introduced into the cabin should be flushed out much faster than would occur in other types of spaces, i.e., in the order of two to five minutes.**

**The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses.**

## 4.2   AIR DISTRIBUTION AND CIRCULATION – ENGINES ON AND ECS OPERATING

The air supplied to the cabin to dilute occupant generated gaseous and particulate emissions is a mixture of outside air, and HEPA-filtered recirculated air set to remove particles and aerosols of all sizes with efficiencies greater than 99.97%.



**Figure 4.1**   Typical Cabin Air Distribution System (NRC, 2002)

As shown in Figure 4.1, a common architecture exists for delivering outside air and filtered recirculated air, extracted air from the galley, lavatories, and cabin. Typically, air is supplied and exhausted relatively equally through air inlets distributed along the cabin to avoid overheating or overcooling at any specific location. Personal Airflow Outlets (PAOs) or "gaspers", common for short-haul rather than long-haul aircraft, and while not the main source of air allow limited and fine tuning of air to an occupant's breathing zone. Although the air mixes locally in the cabin, the air supply and air exhaust flow rates are generally well matched along the length of the cabin to minimize net flows along the length of the aircraft. Distribution of the air to the cabin can occur through diffusers located in the center of the ceiling in the aisles, above the windows, or along the overhead baggage compartments. Wide-body aircraft will use multiple ceiling diffusers across the

typically correspond to a MERV 6 rating that have no reliable efficacy for removing 1 um particles. The filtration of smaller particles increases as the MERV value increases.

**Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles.** This far exceeds the ventilation rate in a typical naturally ventilated home of 1,000 $ft^2$ occupied by four persons without mechanical ventilation (8 cfm/person), where the only source of clean dilution air is the outdoor air. In the grocery store and office with no filtration, the only way to dilute virus concentrations in the space is to introduce outdoor air via mechanical systems. As the filtration efficiency increases the percentage of the smaller particles, including viruses, are removed by the systems' recirculated air increases. Another way to look at this is, as the filtration efficiency of recirculated air is increased, the clean air delivery rate will be increased proportionally. The amount of clean air per person is equivalent to the amount of outdoor air per person and the filtration efficiency times the flow of recirculated air per person. In equation form:

$$\text{Clean Air (cfm/person)} = \text{OA cfm/person} + \text{Filter Eff} * \text{Recirculated cfm/person}$$

For example, in an office, increasing the filtration from MERV 6A to MERV 11A will increase filtration efficiency from 0 to 62% for 1 μm particles. With a total supply airflow rate of 1 $cfm/ft^2$ in 1,000 $ft^2$ of space, with the ASHRAE design recommendations of 17 cfm of outdoor air per person, and an occupancy of five persons per 1,000 $ft^2$ of office space, 85 cfm of outdoor air is delivered, with the remaining 915 cfm of air recirculating through the system. Increasing the filtration efficiency of the recirculation air to 62% results in an additional 567 cfm of clean air for five persons (or 113 cfm/person) for a total of 130 cfm/person.

Table 4.3 shows the comparison of clean air delivery expressed in terms of rate of clean air delivery per person, air exchange rates for the volume of the occupied space (air changes per hour), as well as the average age of air for control of potentially infectious particles. It is presented for code compliant conditions and evaluates the effect of using enhanced particulate filtration in the different environments. Note that as filtration efficiency is increased in various environments, as is being currently recommended to reduce the impact of the pandemic, the Clean Air ACH increases and the Average Age of Air decreases.

These values permit comparison of ventilation rates of different environments in which people commonly find themselves. These environments are further compared by increasing the air exchange rates accomplished by improving the filtration efficiency. When the pollutant generation rate is relatively uniformly distributed among occupants over time, such as individually generated bio effluents ($CO_2$, body odors, etc.), they will be best controlled by increasing the outdoor air delivery rate per person. If the source were related to relatively rare, periodic/occasional emissions,

such as one or two individual passengers shedding viruses during a cough or sneeze, then the air exchange rate of total air and the age of air would be more relevant since these terms will better reflect the length of time other passengers could be potentially exposed to infectious aerosols.

The aircraft environment, when meeting current ventilation standards, with 50% recirculation of HEPA-filtered air, supplies a much higher delivery rate of clean air than any other commonly encountered environment. In fact, the aircraft air exchange rate significantly exceeds all normally encountered environments. When infectious particles are released in a typical, code compliant ventilated building and the aerosol has much more volume in which to disperse than that found on an aircraft, mitigating much of the exposure potential.

**This analysis shows that aircraft will have a significantly lower age of air, resulting in a very short residence time for particles, and possibility of exposure to infectious particles than any other commonly encountered environment, which will help offset the counteracting effect of being in a smaller volume and in closer proximity to other passengers.**

**For episodic releases, such as from a cough or a sneeze, the very high air exchange rates in aircraft cabins assume that contaminants released in such events are fully flushed from the cabin in as little as two to five minutes, as opposed to some six hours in a commercial or retail space complying with current codes and standards where these particles will be mixed into the large volume of the space.**

## 11.0   CONCLUDING REMARKS

The Harvard T.H. Chan School of Public Health Aviation Public Health Initiative (APHI) developed this Phase 1 report. The multi-disciplinary academic scientific and technical team were informed by regular dialogue with a consortium of airline operators, aviation industry manufacturers, airport operators, and independent experts at universities and private research organizations. The report is an independent research-led account of the COVID-19 crisis as it affects operations across the aviation industry. It presents the scientific evidence in support of adopting a non-pharmaceutical interventions (NPI) strategy using a layered approach to control the transmission of the novel coronavirus SAR-CoV-2 on board aircraft.  The report provides a series of recommendations for risk mitigation that can be adopted readily by airlines, airline passengers and crewmembers. **This layered NPI approach, of wearing face masks, disinfection of surfaces and maintenance of appropriate ventilation gate-to-gate, will ensure the risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out.**

The pandemic is a health crisis with profound economic impact, with efforts to control its spread exerting a devastating impact on business in general and, relevant here, to the aviation sector in particular. In the United States alone, airline capacity declined seven to 17 times more than during the 2008 global financial crisis (Boin et al. 2020). Many airports closed entirely, others shut one or more terminals and airlines suspended operations or cancelled a significant proportion of flights, with seat miles for US airlines down by 71% in April 2020 (Curley et al. 2020; Dalrymple et al. 2020). To adapt to the COVID-19 crisis, airlines have closed and/or altered routes and frequency, with the number of seats offered by airlines in 2020 some 42-52% less than originally planned (ICAO, 2020). Most airlines furloughed or laid off staff. Recognizing the economic impact of the sector, governments were quick to announce bailout and stimulus packages, with US passenger airlines calling for US$50 billion to survive the crisis (Financial Times, 2020). Reopening and recovery will focus on 'building back better', using science and the best evidence available currently to design and implement risk mitigation strategies that reduce the risk of disease transmission. Adopted widely, the recommendations in this report build upon aviation's central premise of safety.

The charge to APHI was to capture the science of SARS-CoV-2, in a field that is fast moving with new information emerging globally every day. The team then considered this information in light of the unique defined indoor environment presented by an aircraft to understand how the virus and its transmission will be affected by the conditions experienced across the passenger journey. They went on to develop strategies to mitigate transmission in the confined space of an aircraft, taking due account of behavioral change needed by crewmembers and passengers to protect themselves and others nearby them.

This Phase 1 report address the Gate-to-Gate portion, with air travel segmented into the pre-boarding, boarding, cruise and deplaning. The team's balanced view took into account the rigor of scientific studies, published and in pre-print format, and informed original investigation undertaken by the team.  The recommendations also thought through the suitability of the NPI measures to routine and widespread adoption by the airlines and those traveling, including passengers and crewmembers.  The layered approach proposed is thus a unique combination of engineering and physical controls as well as hygiene and physical distancing as applied to air travel.

Key findings from the report highlight the interactions of the different NPI layers to risk mitigation and include:

- Compliance with face mask-wearing and the aircraft's environmental control systems effectively diluting and removing pathogens significantly reduce the risk of passengers and crewmembers from acquiring COVID-19 during the cruise segment of their journey.

- Mask compliance reduces the dispersion of larger droplets that may deposit on surfaces, while general airline cleaning practices and passengers sanitizing hard surfaces around their seats lowers the probability of contacting SARS-CoV-2 infected surfaces (which is already low to begin with).

- Taken together, mask compliance, managed physical distancing and improved ventilation during boarding and deplaning, can effectively reduce the risk of potential transmission to the very low levels encountered during cruise conditions.

- Requiring passengers to attest to the absence of COVID-19 symptomatology, mandating they comply with all the airline's COVID-related procedures including physical distancing during boarding and deplaning provides some degree of protection (yet to be determined). The role of gate and flight crewmembers in assuring compliance will be essential and supported by airlines' policies to hold passengers accountable.

Implementing the layered risk mitigation strategies described in this report will help to ensure that air travel, with respect to SARS-CoV-2 transmission, is as safe as or substantially safer than the routine activities people undertake during these times. The potential effectiveness of any one NPI remains uncertain given that estimates of their effectiveness are based upon models. Thus, assessing the individual effects of any one intervention relative to the cumulative effect of concurrent use of multiple NPI must rely on application of the best available science at the time. Hence, the report recommends a layered NPI strategy so that additive and synergistic benefits can be harnessed to reduce the risk of disease transmission.  As more information becomes available with respect to the spread of SARS-CoV-2, various control measures will continue to evolve and their effectiveness will be quantified.

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

Plaintiff's Exhibit 204

1    **Mask mandate and use efficacy in state-level COVID-19 containment**

2

3    Damian D. Guerra[1,*] and Daniel J. Guerra[2]

4

5    1.        Department of Biology, University of Louisville, Louisville, Kentucky, United States of America

6    2.        Authentic Biochemistry, VerEvMed, Clarkston, Washington, United States of America

7

8    * Corresponding author (damian.guerra@louisville.edu)

9

10   **Abstract**

11   *Background*: Containment of the COVID-19 pandemic requires evidence-based strategies to reduce transmission.

12   Because COVID-19 can spread via respired droplets, many states have mandated mask use in public settings.

13   Randomized control trials have not clearly demonstrated mask efficacy against respiratory viruses, and

14   observational studies conflict on whether mask use predicts lower infection rates. We hypothesized that statewide

15   mask mandates and mask use are associated with lower COVID-19 case growth rates in the United States.

16   *Methods*: We calculated total COVID-19 case growth and mask use for the continental United States with data from

17   the Centers for Disease Control and Prevention and Institute for Health Metrics and Evaluation. We estimated post-

18   mask mandate case growth in non-mandate states using median issuance dates of neighboring states with mandates.

19   *Results*: Case growth was not significantly different between mandate and non-mandate states at low or high

20   transmission rates, and surges were equivocal. Mask use predicted lower case growth at low, but not high

21   transmission rates. Growth rates were comparable between states in the first and last mask use quintiles adjusted for

22   normalized total cases early in the pandemic and unadjusted after peak Fall-Winter infections. Mask use did not

23   predict Summer 2020 case growth for non-Northeast states or Fall-Winter 2020 growth for all continental states.

24   *Conclusions*: Mask mandates and use are not associated with slower state-level COVID-19 spread during COVID-

25   19 growth surges. Containment requires future research and implementation of existing efficacious strategies.

26

27   **Keywords**: COVID-19, SARS-CoV-2, face covering, medical mask, mask mandate, nonpharmaceutical intervention

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

## 28   Introduction

29   Since being linked to SARS-CoV-2 in early 2020, COVID-19 has increased mortality and induced

30   socioeconomic upheaval worldwide [1]. Typical COVID-19 symptoms mirror influenza, with loss of taste

31   and smell being differential indicators [2]. Age, obesity, cardiovascular disease, and diabetes are

32   associated with severe COVID-19 symptoms (e.g., pneumonia, blood clots, cytokine storm) and hence

33   higher risks of hospitalization and death [3, 4]. Given the incidence of comorbidities, evidence-based

34   containment strategies are warranted. Respired droplets and aerosols containing SARS-CoV-2 are

35   intuitively likely modes of community transmission [5]. To reduce COVID-19 spread, governments have

36   issued mandates to wear medical masks or cloth face coverings (henceforth *masks*) in public settings. 40

37   of the United States have issued mask mandates since April 2020. Mask mandates have limited precedent,

38   making efficacy unclear. Therefore, our first objective was to evaluate the efficacy of mask mandates in

39   attenuating COVID-19 case growth at the state level.

40

41   Prior studies have conflicted on whether masks reduce SARS-CoV-2 transmission. For USS Theodore

42   Roosevelt crew, reported mask use was lower among COVID-19 cases (56% vs. 81%) [2]. There were no

43   infections for 47.9% of patrons of two hair stylists with COVID-19 with universal masking [6], but PCR

44   tests were not obtained for the other 52.1% of patrons [6], and first wave COVID-19 hospitalizations were

45   no higher in public schools (high density with minimal masking) than elsewhere in Sweden [7]. A

46   randomized controlled trial (RCT) of Danish volunteers found no protective benefit of medical masks

47   against COVID-19 infection [8]. In RCTs before COVID-19, viral infections were more common for

48   Vietnamese clinicians with cloth masks than medical or no masks (which were indistinguishable from

49   each other) [9], and N-95 respirators (but not medical masks) protected Beijing clinicians from bacterial

50   and viral diseases compared to no masks [10]. To be sure, mask use compliance in RCTs is not always

51   clear [11]. Mask use was 10% and 33% for Beijing households with and without intrahousehold COVID-

52   19 transmission, respectively [12]. This suggests greater mask use may reduce COVID-19 spread. Hence,

2

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

53    our second objective was to assess whether COVID-19 case growth is negatively associated with mask

54    use.

55

56    Earlier studies have not compared COVID-19 case growth rates in states with and without mandates, and

57    effects of compliance (proportion of people masked) are not clear. We assessed if statewide mask

58    mandates and compliance predict (and thus potentially decrease) statewide COVID-19 growth rates after

59    1 June 2020, when test capacity reached a threshold for minimal contact tracing [13]. We found little to

60    no association between COVID-19 case growth and mask mandates or mask use at the state level. These

61    findings suggest that statewide mandates and enhanced mask use did not detectably slow COVID-19

62    spread. We conclude by affirming the need for evidence-based strategies to minimize COVID-19 related

63    morbidity and mortality and briefly discussing mechanisms of spread.

64

## Materials and methods

66    *Data Sources and Terms*

67    We obtained total COVID-19 cases up to 6 March 2021 for the 50 United States from the Centers for

68    Disease Control and Prevention (CDC) [14]. Total cases include confirmed and probable cases as defined

69    by the Council of State and Territorial Epidemiologists. Briefly, confirmed cases require PCR

70    amplification of SARS-CoV-2 RNA from a patient specimen. Probable cases require one of the

71    following: clinical and epidemiologic evidence, clinical or epidemiologic evidence supported by COVID-

72    19 antigen detection in respiratory specimens, or vital records listing COVID-19 as contributing to death.

73    Statewide mask mandates were emergency executive public health orders that require nose and mouth

74    coverings in public settings (including but not limited to retail locations) in more than 50% of counties

75    within a state [15, 16]. Mandate issuance dates were obtained from state health departments and press

76    releases. Early and late mandates were issued before and after 2 August 2020, respectively. Non-mandate

77    states did not have statewide orders as of 6 March 2021.

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

78    Mask use is defined as the percentage of people who always wear masks in public settings. We assessed

79    mask use with the University of Washington Institute for Health Metrics and Evaluation (IHME) COVID-

80    19 model site [17], which estimates mask wearing from Premise, the Facebook Global Symptom Survey

81    (University of Maryland), the Kaiser Family Foundation, and the YouGov Behavior Tracker Survey.

82    To identify regional patterns of COVID-19 case growth, we grouped states into five categories: Northeast

83    (Connecticut, Delaware, Massachusetts, Maryland, Maine, New Hampshire, New Jersey, New York,

84    Pennsylvania, Rhode Island, and Vermont); Midwest (Illinois, Indiana, Iowa, Kentucky, Kansas,

85    Michigan, Minnesota, Missouri, Ohio, West Virginia, Wisconsin); Mountains-Plains (Colorado, Idaho,

86    Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Wyoming); South

87    (Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina,

88    Tennessee, Texas, Virginia); and Pacific (Alaska, Arizona, California, Hawaii, Nevada, Oregon,

89    Washington).

90

91    *Parameter Derivation*

92    We calculated COVID-19 case parameters from total cases per 100,000 state residents (normalized total

93    cases; **Worksheet A in S1 Table**). As infectious diseases such as COVID-19 exhibit exponential growth,

94    we used logarithmic transformation to quantify daily case growth as shown elsewhere [15, 18]:

95    $$\frac{case\ growth}{day} = 100 * \left(\ln \frac{C_x}{C_{x-1}}\right)$$

96    Where $C_x$ is normalized cases on a particular day and $C_{x-1}$ is normalized cases on the prior day. To reduce

97    effects of reporting lags, we used a 7-day simple moving mean.

98    For each state, growth minima and maxima were the 20-day mean lowest and highest cases/day between

99    the end of the Summer infection wave and the height of the Fall-Winter infection wave. *Surge* refers to

100   the difference between maximal and minimal growth rates (the magnitude of growth rate increase) for

101   each state. *Surge rate* refers to the speed at which case growth increased from minimal to maximal levels

102   for each state (Surge/days between minima and maxima), normalized to the mean surge rate for all states.

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

103    Cases or masks at minima and maxima were the 20-day mean number of cases/100,000 state residents or

104    mask use for each state at its growth extrema. Change in masks refers to the percent increase in mask use

105    between extrema for each state.

106    To model post-mask mandate case growth in the 48 contiguous states (excluding Alaska and Hawaii), we

107    calculated the difference of natural logarithms of normalized total cases between 6 March 2021 ($C_{306}$) and

108    the date of mandate issuance ($C_M$) for each state with an early mandate:

109    $$Post\ Mandate\ Growth = \ln\frac{C_{306}}{C_M}$$

110    For states with late or no mandates, effective dates were modeled as medians of issuance dates among

111    bordering states with early mandates. For example, the effective mandate issuance date of Tennessee was

112    the median of issuance dates among the early mandate states Kentucky, Arkansas, Alabama, North

113    Carolina, and Virginia.

114    We reported mask use for Summer (1 June-1 Oct 2020) and Fall-Winter (1 Oct 2020-1 Mar 2021) as

115    mean mask use during these periods for each state. Cases on 1 June or 1 Oct were the 20-day mean

116    number of cases/100,000 on these two dates. Summer and Fall-Winter case growth were defined as

117    differences of natural logarithms of normalized total cases at the beginning and end of each period:

118    $$Summer\ Growth = \ln\frac{C_{1001}}{C_{601}} \qquad Fall/Winter\ Growth = \ln\frac{C_{301}}{C_{1001}}$$

119

120    *Statistics*

121    We used Prism 9.1 (GraphPad; San Diego, CA) to construct figures and perform null hypothesis

122    significance tests (**Worksheet D in S1 Table**). The significance threshold for all tests was $p < \alpha = 0.05$. All

123    datapoints are state-level values, and we performed D'Agostino-Pearson tests to assess normality of

124    residuals.

125    To evaluate mask mandate efficacy, we performed two-tailed, two-sample t-tests (early vs. no mandates)

126    or ordinary one-way ANOVA with Holm-Šídák posttests (early vs. late vs. no mandates) and used

127    Welch's correction for heteroscedastic data. For non-normal data, we performed Mann-Whitney U tests

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

128    (early vs. no mandates) or Kruskal-Wallis with Dunn posttests (early vs. late vs. no mandates). This

129    decision tree conforms with recommended practices for datasets with N > 5 [19]. Hawaii was excluded

130    because its dates of extrema deviated from those of continental US states. Alaska and Hawaii were

131    excluded from post-mandate case growth assessment because they lack contiguous US border states.

132    To determine top and bottom mask use quintiles, we ranked mean mask use among states (excluding

133    Hawaii) from 1 June 2020 to 1 March 2021. For t tests comparing top and bottom quintiles, we assessed

134    days between the indicated normalized case totals and mean mask use over this interval for each state.

135    To evaluate mask use efficacy at and between extrema, we performed simple linear regressions with null

136    hypotheses of zero slope. We similarly evaluated mask use efficacy during the Summer and Fall-Winter

137    infection waves. For the Summer wave, Northeast states were excluded because they deviated from other

138    states with respect to covariation between normalized cases and growth. For the Fall-Winter wave,

139    Hawaii was excluded because it deviated from other states with respect to covariation between

140    normalized cases and growth. Infectious disease research commonly uses OLS [20, 21], with simple

141    linear and simple ln-linear models reported in recent COVID-19 studies [22, 23]. We used ordinary least

142    squares (OLS) for homoscedastic data and weighted least squares (WLS) for heteroscedastic data, as

143    determined by the GraphPad Prism Test for Homoscedasticity. Regardless of statistical significance, $R^2$

144    values denote coefficients of determination for lines of best fit with unconstrained slopes.

145

146    **Results**

147    *COVID-19 growth rates vary with time*

148    Normalized COVID-19 cases increased more than 1500-fold from March 2020 to March 2021 in the

149    United States [14]. To identify patterns of COVID-19 spread, we quantified case growth for each of the

150    50 US States (**Worksheet B in S1 Table**). Natural log (Ln)-linear plots revealed six phases of COVID-19

151    growth up to 6 March 2021: first wave (before May 2020), first minimum (May-June 2020), Summer

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

152    wave maximum (June-August 2020), second minimum (August-October 2020), Fall-Winter wave

153    maximum (October-January 2020), and third minimum (March 2021) (**S1-3 Figs**).

154

155    *Mandates are not associated with state COVID-19 case growth*

156    We next assessed associations between mask mandates and case growth. 33 US states issued statewide

157    mask mandates on or before 2 August 2020 (early), when case growth was low, while 7 other states

158    issued mandates after this date (late). We observed a six-phase pattern in states with early (**S1 Fig**), late

159    (**S2 Fig**), and no mask mandates (**S3 Fig**). This suggests qualitatively comparable courses of viral spread

160    among states regardless of mask mandates.

161

162    A recent study reported negative association between statewide mask mandates and subsequent COVID-

163    19 log growth rates [15]. We hypothesized that case growth would be lower in states with mandates. 64%

164    of early state mandates were issued during the Summer wave, which precluded determination of whether

165    mandates were associated with lower Summer wave case growth. We therefore examined case growth

166    after mandate issuance during the second minimum and the Fall-Winter wave maximum (henceforth

167    *minimum* and *maximum*) (**Fig 1A**). Hawaii was excluded because its minimum and maximum did not

168    chronologically align with continental states. Average Fall-Winter mask use was ~10% higher in early

169    mandate states than in late and no mandate states (Holm-Šídák p≤0.001; **Fig 1B**), confirming that

170    mandates promote greater mask use. Contrary to our hypothesis, early mandates were not associated with

171    lower minimum case growth (Mann-Whitney p=0.087; **Fig 1C**). Maximum case growth was the same

172    among states with early, late, and no mandates (ANOVA p=0.29; **Fig 1D**). This indicates that mask

173    mandates were not predictive of slower COVID-19 spread when community transmission rates were low

174    or high. We wondered if mask mandates were associated with smaller or slower surges in case growth.

175    Differences between minimum and maximum case growth were similar among early, late, and no

176    mandate states (ANOVA p=0.12; **Fig 1E**), and surges from minimum to maximum growth occurred at

7

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

177    similar rates (ANOVA p=0.16; **Fig 1F**). These findings suggest that mask mandates are not predictive of

178    smaller or slower shifts from low to high case growth.

179

180    Normalized COVID-19 cases as of 6 March 2021 were 18.6% lower in states with early mandates than

181    states without mandates (Holm-Šídák p=0.036), but early mandates were issued over a range of dates (15

182    April to 2 August 2020). To assess how early mandates relate to cumulative cases, we calculated

183    normalized case growth for contiguous states between early mandate issuance and 6 March 2021. For

184    states with late and no mandates, we expressed effective dates (when states could have reasonably issued

185    mandates) as median dates of neighboring early mandate states. We expected to find lower case growth

186    among early mandate states. Surprisingly, normalized case growth after mandates (actual and effective)

187    were indistinguishable among state groups (ANOVA p=0.93; **Fig 2A**). Moreover, growth curves after

188    actual and effective mandates were not distinguishable among state groups at any date between mandate

189    issuance and 6 March 2021 (**Fig 2B**). Together, these data do not support an association between

190    statewide mandates and COVID-19 spread.

191

192    *Mask use is not associated with most state COVID-19 case growth*

193    We speculated that statewide mask use, rather than mask mandates per se, may predict COVID-19 case

194    growth. The University of Washington IHME provides robust estimates for mask use (defined as the

195    percentage of people who always wear masks in public settings) [17]. Mask use was associated with

196    lower minimum case growth (WLS p<0.0001; **Fig 3A**), but not normalized total cases at minima (OLS

197    p=0.54; **S4 Fig**). States with the highest first wave normalized cases and July 2020 seroprevalence were

198    primarily in the Northeast [14, 24], which could explain the lack of Summer growth in these states.

199    Excluding Northeast states, normalized cases predicted lower minimum case growth (WLS p=0.001; **S4**

200    **Fig**). Eight Northeast states were among the 10 states with highest mean mask use [17]. Intriguingly,

201    normalized cases grew from 400 to 1350 per 100,000 at similar rates between the first and last 10 states

202    for mask use (unpaired t test p=0.49), albeit ~50 days later for the last 10 states (**Fig 3B**). These findings

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY 4.0 International license.

203    suggest the link between masks and minimum growth may be an artifact of the tendency for faster case

204    growth to occur at lower case prevalence. In support of this, we found no association between mask use

205    and case growth at maxima (OLS p=0.11; **Fig 3C**), when case prevalence differences were smaller among

206    states. There was also no association between mask use and normalized cases at maxima (OLS p=0.073;

207    **S5 Fig**), although residuals were slightly non-normal. The 10 states with highest and lowest mask use

208    exhibited indistinguishable growth rates from 0 to 80 days after maxima (Mann-Whitney p=0.85; **Fig**

209    **3D**), and higher normalized cases predicted lower maximum growth rates among continental states (OLS

210    p<0.0001; **S5 Fig**). While there was unexpected weak association between mask use and surge size (OLS

211    p=0.03; **Fig 3E**), mask use at minima did not predict surge rate (OLS p=0.69; **Fig 3F**). Together, these

212    data suggest that mask use is a poor predicter of COVID-19 growth at the state level.

213

214    *Mask use does not predict Summer and Fall-Winter statewide COVID-19 case totals.*

215    Greater statewide mask use could predict fewer cumulative cases during a growth wave. We tested this by

216    calculating COVID-19 case growth during Summer and Fall-Winter waves (**Fig 4A-B**). Summer wave

217    growth differed notably between Northeast and all other states; excluding the Northeast, greater

218    normalized cases on 1 Jun 2020 predicted lower Summer growth (OLS p<0.0001; **Fig 4C**). By contrast,

219    normalized cases on 1 October 2020 predicted Fall-Winter growth for Northeast and all other states (WLS

220    p<0.0001; **Fig 4D**). Excluding Northeast states, masks were not associated with lower Summer growth

221    between 1 June and 1 October 2020 (OLS p=0.27; **Fig 4E**). We likewise found no association between

222    mask use and Fall-Winter growth between 1 October 2020 and 1 March 2021 (OLS p=0.93; **Fig 4F**).

223    These data indicate that mask use does not predict Summer wave or Fall-Winter wave growth at the state

224    level and that low Summer growth in Northeast states did not predict low Fall-Winter growth. We

225    conclude that statewide SARS-CoV-2 transmission waves are independent of reported mask use [17].

226

227

9

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

### Discussion

228

229    Our main finding is that mask mandates and use are not associated with lower SARS-CoV-2 spread

230    among US states. 80% of US states mandated masks during the COVID-19 pandemic. Mandates induced

231    greater mask compliance but did not predict lower growth rates when community spread was low

232    (minima) or high (maxima). We infer that mandates likely did not affect COVID-19 case growth [15], as

233    growth rates were similar on all days between actual or modeled issuance dates and 6 March 2021. Higher

234    mask use (rather than mandates per se) has been argued to decrease COVID-19 growth rates [11]. While

235    compliance varies by location and time, IHME estimates are robust (derived from multiple sources [17])

236    and densely sampled (day-level precision). Higher mask use did not predict lower maximum growth rates,

237    smaller surges, or less Fall-Winter growth among continental states. Mask-growth rate correlation was

238    only evident at minima. This may be an artifact of faster growth at fewer normalized cases, as well as

239    regional differences in case prevalence early in the pandemic. States in the high mask quintile grew at

240    similar rates as states in the low mask quintile after maxima (when interstate total case differences were

241    smaller than before minima). In addition, mask use did not predict normalized cases at minima, and low

242    mask growth curves trailed those of high mask (particularly Northeast) states before minima. Growth

243    maxima and Fall-Winter surges did not differ between Northeast and other states. Northeast states

244    exhibited the highest seroprevalence up to at least July 2020 [24] and constituted 80% of the top quintile

245    of mask use, which may explain their comparatively lower Summer growth. Overall, mask use appears to

246    be an intra-state lagging indicator of case growth.

247

248    There is inferential but not demonstrable evidence that masks reduce SARS-CoV-2 transmission. Animal

249    models [25], small case studies [6], and growth curves for mandate-only states [16] suggest that mask

250    efficacy increases with mask use [11]. However, we did not observe lower growth rates over a range of

251    compliance at maximum Fall-Winter growth (45-83% between South Dakota and Massachusetts during

252    maxima) [17] when growth rates were high. This complements a Danish RCT from 3 April to 2 June

10

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY 4.0 International license.

253 2020, when growth rates were low, which found no association between mask use and lower COVID-19

254 rates either for all participants in the masked arm (47% strong compliance) or for strongly compliant

255 participants only [8]. Masks have generally not protected against other respiratory viruses. Higher self-

256 reported mask use protected against SARS-CoV-1 in Beijing residents [26], but RCTs found no

257 differences in PCR confirmed influenza among Hong Kong households assigned to hand hygiene with or

258 without masks (mask use 31% and 49%, respectively) [27]. Medical and cloth masks did not reduce viral

259 respiratory infections among clinicians in Vietnam [9] or China [10], and rhinovirus transmission

260 increased among universally masked Hong Kong students and teachers in 2020 compared with prior years

261 [28]. These findings are consistent with a 2020 CDC meta-analysis [29] and a 2020 Cochrane review

262 update [30].

263

264 Our study has implications for respiratory virus mitigation. Public health measures should ethically

265 promote behaviors that prevent communicable diseases. The sudden onset of COVID-19 compelled

266 adoption of mask mandates before efficacy could be evaluated. Our findings do not support the

267 hypothesis that SARS-CoV-2 transmission rates decrease with greater public mask use. As masks are

268 required in public in many US states, it is prudent to weigh potential benefits with harms. Masks may

269 promote social cohesion as rallying symbols during a pandemic [31], but risk compensation can also

270 occur [32]. Prolonged mask use (>4 hours per day) promotes facial alkalinization and inadvertently

271 encourages dehydration, which in turn can enhance barrier breakdown and bacterial infection risk [33].

272 British clinicians have reported masks to increase headaches and sweating and decrease cognitive

273 precision [34]. Survey bias notwithstanding, these sequelae are associated with medical errors [35]. By

274 obscuring nonverbal communication, masks interfere with social learning in children [36]. Likewise,

275 masks can distort verbal speech and remove visual cues to the detriment of individuals with hearing loss;

276 clear face-shields improve visual integration, but there is a corresponding loss of sound quality [37, 38].

277 Future research is necessary to better understand the risks of long-term daily mask use [30]. Conversely, it

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

278    is appropriate to emphasize interventions with demonstrated or probable efficacy against COVID-19 such

279    as vaccination [39] and Vitamin D repletion [40].

280

281    In summary, mask mandates and use were poor predictors of COVID-19 spread in US states. Case growth

282    was independent of mandates at low and high rates of community spread, and mask use did not predict

283    case growth during the Summer or Fall-Winter waves. Strengths of our study include using two mask

284    metrics to evaluate association with COVID-19 growth rates; measuring normalized case growth in

285    mandate and non-mandate states at comparable times to quantify the likely effect of mandates; and

286    deconvolving the effect of mask use by examining case growth in states with variable mask use. Our

287    study also has key limitations. We did not assess counties or localities, which may trend independently of

288    state averages. While dense sampling promotes convergence, IHME masking estimates are subject to

289    survey bias. We only assessed one biological quantity (confirmed and probable COVID-19 infections),

290    but the ongoing pandemic warrants assessment of other factors such as hospitalizations and mortality.

291    Future work is necessary to elucidate better predictors of COVID-19 spread. A recent study found that at

292    typical respiratory fluence rates, medical masks decrease airway deposition of 10-20µm SARS-CoV-2

293    particles but not 1-5µm SARS-CoV-2 aerosols [41]. Aerosol expulsion increases with COVID-19 disease

294    severity in non-human primates, as well as with age and BMI in humans without COVID-19  [42].

295    Aerosol treatment by enhanced ventilation and air purification could help reduce the size of COVID-19

296    outbreaks.

297

298    **Acknowledgments**

299    The authors thank Brandy Jesernik, Jay Bhattacharya, Scott Atlas, and Erik Fostvedt for manuscript input.

300

301

302

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY 4.0 International license.

# References

1.      Zhu N, Zhang D, Wang W, Li X, Yang B, Song J, et al. A Novel Coronavirus from Patients with Pneumonia in China, 2019. N Engl J Med. 2020;382(8):727-33.

2.      Payne DC, Smith-Jeffcoat SE, Nowak G, Chukwuma U, Geibe JR, Hawkins RJ, et al. SARS-CoV-2 Infections and Serologic Responses from a Sample of U.S. Navy Service Members - USS Theodore Roosevelt, April 2020. MMWR Morb Mortal Wkly Rep. 2020;69(23):714-21.

3.      Hojyo S, Uchida M, Tanaka K, Hasebe R, Tanaka Y, Murakami M, et al. How COVID-19 induces cytokine storm with high mortality. Inflamm Regen. 2020;40:37.

4.      Chu Y, Yang J, Shi J, Zhang P, Wang X. Obesity is associated with increased severity of disease in COVID-19 pneumonia: a systematic review and meta-analysis. Eur J Med Res. 2020;25(1):64.

5.      Jayaweera M, Perera H, Gunawardana B, Manatunge J. Transmission of COVID-19 virus by droplets and aerosols: A critical review on the unresolved dichotomy. Environ Res. 2020;188:109819.

6.      Hendrix MJ, Walde C, Findley K, Trotman R. Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy - Springfield, Missouri, May 2020. MMWR Morb Mortal Wkly Rep. 2020;69(28):930-2.

7.      Ludvigsson JF, Engerström L, Nordenhäll C, Larsson E. Open Schools, Covid-19, and Child and Teacher Morbidity in Sweden. N Engl J Med. 2021;384(7):669-71.

8.      Bundgaard H, Bundgaard JS, Raaschou-Pedersen DET, von Buchwald C, Todsen T, Norsk JB, et al. Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers : A Randomized Controlled Trial. Ann Intern Med. 2021;174(3):335-43.

9.      MacIntyre CR, Seale H, Dung TC, Hien NT, Nga PT, Chughtai AA, et al. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. BMJ Open. 2015;5(4):e006577.

10.     MacIntyre CR, Wang Q, Rahman B, Seale H, Ridda I, Gao Z, et al. Efficacy of face masks and respirators in preventing upper respiratory tract bacterial colonization and co-infection in hospital healthcare workers. Prev Med. 2014;62:1-7.

11.     Howard J, Huang A, Li Z, Tufekci Z, Zdimal V, van der Westhuizen H-M, et al. An evidence review of face masks against COVID-19. Proceedings of the National Academy of Sciences. 2021;118(4):e2014564118.

12.     Wang Y, Tian H, Zhang L, Zhang M, Guo D, Wu W, et al. Reduction of secondary transmission of SARS-CoV-2 in households by face mask use, disinfection and social distancing: a cohort study in Beijing, China. BMJ Glob Health. 2020;5(5).

13.     Jha AK, Tsai T, Jacobson B. Why we need at least 500,000 tests per day to open the economy — and stay open: Brown School of Public Health; 2020 [Available from: https://globalepidemics.org/2020/04/18/why-we-need-500000-tests-per-day-to-open-the-economy-and-stay-open/.

14.     United States COVID-19 Cases and Deaths by State over Time. Centers for Disease Control and Prevention (CDC); 2021.

15.     Guy GP, Jr., Lee FC, Sunshine G, McCord R, Howard-Williams M, Kompaniyets L, et al. Association of State-Issued Mask Mandates and Allowing On-Premises Restaurant Dining with County-Level COVID-19 Case and Death Growth Rates - United States, March 1-December 31, 2020. MMWR Morb Mortal Wkly Rep. 2021;70(10):350-4.

16.     Lyu W, Wehby GL. Community Use Of Face Masks And COVID-19: Evidence From A Natural Experiment Of State Mandates In The US. Health Aff (Millwood). 2020;39(8):1419-25.

17.     Institute for Health Metrics and Evaluation COVID-19 model: University of Washington; 2021 [Available from: https://covid19.healthdata.org/.

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

349   18.   Liu Z, Fang CT. A modeling study of human infections with avian influenza A H7N9 virus in
350   mainland China. Int J Infect Dis. 2015;41:73-8.
351   19.   Curtis MJ, Alexander S, Cirino G, Docherty JR, George CH, Giembycz MA, et al. Experimental
352   design and analysis and their reporting II: updated and simplified guidance for authors and peer
353   reviewers. British Journal of Pharmacology. 2018;175(7):987-93.
354   20.   Khan A, Waleed M, Imran M. Mathematical analysis of an influenza epidemic model,
355   formulation of different controlling strategies using optimal control and estimation of basic
356   reproduction number. Mathematical and Computer Modelling of Dynamical Systems. 2015;21(5):432-
357   59.
358   21.   Samaras L, Sicilia M-A, García-Barriocanal E. Predicting epidemics using search engine data: a
359   comparative study on measles in the largest countries of Europe. BMC Public Health. 2021;21(1):100.
360   22.   Ghosal S, Sengupta S, Majumder M, Sinha B. Linear Regression Analysis to predict the number of
361   deaths in India due to SARS-CoV-2 at 6 weeks from day 0 (100 cases - March 14th 2020). Diabetes Metab
362   Syndr. 2020;14(4):311-5.
363   23.   Chu J. A statistical analysis of the novel coronavirus (COVID-19) in Italy and Spain. PloS one.
364   2021;16(3):e0249037.
365   24.   Anand S, Montez-Rath M, Han J, Bozeman J, Kerschmann R, Beyer P, et al. Prevalence of SARS-
366   CoV-2 antibodies in a large nationwide sample of patients on dialysis in the USA: a cross-sectional study.
367   Lancet (London, England). 2020;396(10259):1335-44.
368   25.   Chan JF, Yuan S, Zhang AJ, Poon VK, Chan CC, Lee AC, et al. Surgical Mask Partition Reduces the
369   Risk of Noncontact Transmission in a Golden Syrian Hamster Model for Coronavirus Disease 2019
370   (COVID-19). Clin Infect Dis. 2020;71(16):2139-49.
371   26.   Wu J, Xu F, Zhou W, Feikin DR, Lin CY, He X, et al. Risk factors for SARS among persons without
372   known contact with SARS patients, Beijing, China. Emerg Infect Dis. 2004;10(2):210-6.
373   27.   Cowling BJ, Chan KH, Fang VJ, Cheng CK, Fung RO, Wai W, et al. Facemasks and hand hygiene to
374   prevent influenza transmission in households: a cluster randomized trial. Ann Intern Med.
375   2009;151(7):437-46.
376   28.   Fong MW, Leung NHL, Cowling BJ, Wu P. Upper Respiratory Infections in Schools and Childcare
377   Centers Reopening after COVID-19 Dismissals, Hong Kong. Emerg Infect Dis. 2021;27(5).
378   29.   Fong MW, Gao H, Wong JY, Xiao J, Shiu EYC, Ryu S, et al. Nonpharmaceutical Measures for
379   Pandemic Influenza in Nonhealthcare Settings-Social Distancing Measures. Emerg Infect Dis.
380   2020;26(5):976-84.
381   30.   Jefferson T, Del Mar CB, Dooley L, Ferroni E, Al-Ansary LA, Bawazeer GA, et al. Physical
382   interventions to interrupt or reduce the spread of respiratory viruses. Cochrane Database of Systematic
383   Reviews. 2020(11).
384   31.   Goh Y, Tan BYQ, Bhartendu C, Ong JJY, Sharma VK. The face mask: How a real protection
385   becomes a psychological symbol during Covid-19? Brain Behav Immun. 2020;88:1-5.
386   32.   Yan Y, Bayham J, Richter A, Fenichel EP. Risk compensation and face mask mandates during the
387   COVID-19 pandemic. Scientific Reports. 2021;11(1):3174.
388   33.   Hua W, Zuo Y, Wan R, Xiong L, Tang J, Zou L, et al. Short-term skin reactions following use of N95
389   respirators and medical masks. Contact Dermatitis. 2020;83(2):115-21.
390   34.   Davey SL, Lee BJ, Robbins T, Randeva H, Thake CD. Heat stress and PPE during COVID-19: impact
391   on healthcare workers' performance, safety and well-being in NHS settings. J Hosp Infect. 2021;108:185-
392   8.
393   35.   Rosenberg K. The joint commission addresses health care worker fatigue. Am J Nurs.
394   2014;114(7):17.
395   36.   Spitzer M. Masked education? The benefits and burdens of wearing face masks in schools during
396   the current Corona pandemic. Trends Neurosci Educ. 2020;20:100138.

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY 4.0 International license.

397   37.    Corey RM, Jones U, Singer AC. Acoustic effects of medical, cloth, and transparent face masks on
398   speech signals. J Acoust Soc Am. 2020;148(4):2371.
399   38.    Atcherson SR, Finley ET, Renee McDowell BR, Watson C. More Speech Degradations and
400   Considerations in the Search for Transparent Face Coverings During the COVID-19 Pandemic. Audiology
401   Today. 2020;Nov/Dec.
402   39.    Polack FP, Thomas SJ, Kitchin N, Absalon J, Gurtman A, Lockhart S, et al. Safety and Efficacy of
403   the BNT162b2 mRNA Covid-19 Vaccine. N Engl J Med. 2020;383(27):2603-15.
404   40.    Radujkovic A, Hippchen T, Tiwari-Heckler S, Dreher S, Boxberger M, Merle U. Vitamin D
405   Deficiency and Outcome of COVID-19 Patients. Nutrients. 2020;12(9).
406   41.    Xi J, Si XA, Nagarajan R. Effects of mask-wearing on the inhalability and deposition of airborne
407   SARS-CoV-2 aerosols in human upper airway. Phys Fluids (1994). 2020;32(12):123312.
408   42.    Edwards DA, Ausiello D, Salzman J, Devlin T, Langer R, Beddingfield BJ, et al. Exhaled aerosol
409   increases with COVID-19 infection, age, and obesity. Proceedings of the National Academy of Sciences of
410   the United States of America. 2021;118(8).

411

412

413

414

415

416

417

418

419

420

421

422

423

424

425

426

427

428

429

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

430    **Figure Legends**

431    **Fig 1. Mask mandates are not associated with lower COVID-19 growth rates in continental US**

432    **States**. A. Daily COVID-19 case growth rate for continental US states from 20 April 2020 to 6 March

433    2021. Red horizontal lines denote growth rate minima (Min) and maxima (Max) after the Summer wave.

434    Surge: difference in case growth between min. and max. Thin black line and wide gray bars denote mean

435    and 95% confidence intervals, respectively. B. Early mandate states (blue) exhibited greater mask use

436    than late (green) and no (red) mandate states during the Fall-Winter wave. C. Minimum growth rates were

437    indistinguishable between early (blue) and combined late and no mandate (orange) states. D. Maximum

438    growth rates were indistinguishable among early, late, and no mandate states. E-F. Surge sizes (E) and

439    surge rates (F) were indistinguishable among early, late, and no mandate states. *: $p<0.05$ by Šídák post-

440    test after one-way ANOVA. n.s.: not significant by Mann-Whitney U test (C) or one-way ANOVA (D-F).

441    Error bars: 95% confidence intervals.

442

443    **Fig 2. Statewide mask mandates do not predict lower post-mandate case growth in contiguous US**

444    **states**. A. Case growth was indistinguishable among states with early (blue), late (green), and no (red)

445    mandates. n.s.: not significant by one-way ANOVA. Error bars: 95% confidence intervals. B. Growth

446    curves were indistinguishable for states with early (blue), late (green), and no (red) mandates. Heavy lines

447    and shaded regions denote means and 95% confidence intervals, respectively. Post-mandate case growth

448    refers to cumulative cases between mandate issuance date and 6 March 2021 (A) or growth curves after

449    mandate issuance up to 6 March 2021 (B). For states with late and no mandates, effective dates are

450    medians of issuance dates among bordering states with early mandates.

451

452    **Fig 3. Mask use does not consistently predict COVID-19 case growth in continental US states**. A.

453    Mask use was associated with lower minimum growth rates. B. First and last mask use quintiles grew

454    from 400 to 1350 cases per 100,000 at indistinguishable rates before minima. C. Mask use was not

16

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

455    associated with maximum growth rates. D. Growth rates and normalized cases were indistinguishable

456    after maxima between first and last mask use quintiles.  E. Mask use was associated with larger surge

457    sizes. F. Mask use was not associated with surge rates. A, C, E, F: Each SLR includes both Northeast

458    (solid light blue; ●) and non-Northeast (black; ●) state data. Equations are given when p<0.05 for the null

459    hypothesis of zero slope. $R^2$ values refer to unconstrained lines of best fit.

460

461    **Fig 4. Mask use does not predict lower COVID-19 growth during the Summer or Fall-Winter**

462    **waves**. A-B. Daily COVID-19 case growth rate (A) and total COVID-19 cases (B) for US states from 20

463    April 2020 to 6 March 2021. Red vertical lines denote Summer (Jun-Oct 2020) and Fall-Winter (Oct

464    2020-Mar 2021) waves. Thin black line and wide gray bars denote mean and 95% confidence intervals,

465    respectively. C. Higher normalized cases predicted lower Summer case growth in non-Northeast states

466    (black; ●). D. Higher normalized cases predicted lower Fall-Winter case growth in Northeast (solid light

467    blue; ●) and non-Northeast (●) continental states. E. Summer case growth was independent of mask use

468    in non-Northeast states (●). F. Fall-Winter case growth was independent of mask use in Northeast (●) and

469    non-Northeast (●) continental states. C, E: SLR models exclude Northeast states (○). D, F: SLR models

470    include both Northeast and non-Northeast continental states. Equations are given when p<0.05 for the

471    null hypothesis of zero slope. $R^2$ values refer to unconstrained lines of best fit.

472

473

474

475

476

477

478

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

**Supporting Information Legends**

**S1 Fig. COVID-19 case growth rates in US states with statewide mask mandates issued on or before August 2nd 2020.** Top. COVID-19 growth phases. Y-axis values are differences between the natural logarithm of total cases on a day and the natural logarithm of total cases on the prior day. Thin black and wide gray denote mean and 95% confidence intervals, respectively. Bottom. Individual states. Red vertical lines denote dates of mask mandate issuance. Red horizontal lines indicate growth rate minima (phase 4) and maxima (phase 5) after Summer waves.

**S2 Fig**. **COVID-19 case growth rates in US states with statewide mask mandates issued after August 2nd 2020**. Top. COVID-19 growth phases. Y-axis values are differences between the natural logarithm of total cases on a day and the natural logarithm of total cases on the prior day. Thin black and wide gray denote mean and 95% confidence intervals, respectively. Bottom. Individual states. Red vertical lines denote dates of mask mandate issuance. Red horizontal lines indicate growth rate minima (phase 4) and maxima (phase 5) after Summer waves.

**S3 Fig**. **COVID-19 case growth rates in US states without statewide mask mandates**. Top. COVID-19 growth phases. Y-axis values are differences between the natural logarithm of total cases on a day and the natural logarithm of total cases on the prior day. Thin black and wide gray denote mean and 95% confidence intervals, respectively. Bottom. Individual states. Red horizontal lines indicate growth rate minima (phase 4) and maxima (phase 5) after Summer waves.

**S4 Fig**. **Total cases, growth rates, and mask use at minima in continental US states**. Left. Normalized cases do not predict mask use at minima. Right. More normalized cases predict lower growth rates in non-Northeast states at minima. Black circles (●): all states except Hawaii. Blue hollow circles (○): Excluded Northeast states. Red squares (■): Midwest states. Green triangles (▲): Mountain-Plains States. Grey

medRxiv preprint doi: https://doi.org/10.1101/2021.05.18.21257385; this version posted May 25, 2021. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY 4.0 International license.

504     triangles (▽): South states. Gold diamonds (♦): Pacific states except Hawaii. SLR models include all

505     states except Hawaii (left) or all states except Hawaii and Northeast states (right). $R^2$ values refer to

506     unconstrained lines of best fit.

507

508     **S5 Fig**. **Total cases, growth rates, and mask use at minima in continental US states**. Left. Normalized

509     cases do not predict mask use at maxima. Right. More normalized cases predict lower growth rates in all

510     continental states at maxima. Black circles (●): all states but Hawaii. Light blue circles (●): Northeast

511     states. Red squares (■): Midwest states. Green triangles (▲): Mountain-Plains States. Grey triangles (▽):

512     South states. Gold diamonds (♦): Pacific states but Hawaii. SLR models include all states but Hawaii. $R^2$

513     values refer to unconstrained lines of best fit. ε: Non-normal residuals (D'Agostino-Pearson p=0.008).

514

515     **S1 Table**. **Total normalized cases, daily case growth, mask use, and statistical tests**. Worksheet A.

516     Total normalized cases (cases per 100,000 residents of each US state) from 6 March 2020 to 6 March

517     2021. Total cases obtained from the CDC were divided by 2019 projected state populations and

518     multiplied by 100,000. Worksheet B. Daily case growth for each US state from 2 April 2020 to 1 March

519     2021. 7-day rolling averages are given. Red and gold text denote minima and maxima, respectively. Bold,

520     highlighted text indicate actual mandate issuance dates for early and late mandate states (yellow highlight,

521     bold red) and effective mandate issuance dates for late and no mandate states (blue highlight, bold

522     orange). Worksheet C. Mask use for each US state on specified dates or ranges of dates. Date range mask

523     use values are simple arithmetic means of daily mask use over the specified date range. Blue and red text

524     indicate states in the first and last mask use quintile, respectively (i.e., states with highest and lowest

525     mean mask use between 1 June 2020 and 1 March 2021). Mask use data are estimates provided by the

526     University of Washington Institute for Health Metrics and Evaluation. Worksheet D. Statistical test

527     summaries. Tests are reported in the order they appear in the Results. Red text specifies model

528     assumption violations, followed by alternative tests that fulfill assumptions. All reported statistics and

529     parameters were calculated with GraphPad Prism 9.1 (Prism files available upon request).









Plaintiff's Exhibit 205





Plaintiff's Exhibit 206



Plaintiffs' Exhibit 207

dailymail.co.uk

# Cloth masks are NOT enough to stop the spread of COVID-19 without social distancing

*Mary Kekatos Senior, Luke Andrews*

7-9 minutes

Wearing a cloth mask may not shield the user from coronavirus because too many infected droplets can slip through, a study has claimed.

Scientists at New Mexico State University, in the US, studied five types of face coverings including cloth masks and surgical grade N95 masks.

They found that while all masks blocked at least 95 per cent of droplets from coughs and sneezes - there was still a risk of the disease being passed on.

Although cloth masks stopped 96.4 per cent of sneeze droplets at a distance of six feet, they still let more than 1,000 through - which the scientists said could carry enough virus particles to trigger an infection.

'Wearing a mask will offer substantial, but not complete, protection to a susceptible person,' said Dr Krishna Kota, an associate professor at the university who led the research.

The science behind mask-wearing was hazy at the start of the pandemic and authorities in the UK and other countries hesitated to recommend wearing them.

The World Health Organization did recommend masks until June 8, and then only for people over 60 and those with underlying health conditions.

In Britain, face coverings were first brought in for public transport in June, and later for shops and other indoor spaces in July. In the US regulations vary across the country, with some states setting up rules as early as April but others resisting making masks mandatory.

The general consensus now is that masks may offer only limited protection to the people wearing them, but they are quite good at stopping people spreading the disease if they have it without knowing, because they catch their breath.

Scientists have also suggested that masks could reduce severity of disease by exposing people to the virus in small doses, but this hasn't been proven.

- 
- 
- 
- 
- Copy link to paste in your message
-

Five types of face masks were examined with results showing that the N95 (top right)  blocked the most at 100% of droplets and the regular cloth mask (bottom left)  blocked the least at 96.4% of droplets

'A mask definitely helps, but if the people are very close to each other, there is still a chance of spreading or contracting the virus,' said  Dr Kota.

'It's not just masks that will help. It's both the masks and distancing.'

For the study, published in the journal Physics of Fluid, the team built a machine that mimics coughs and sneezes from humans.

It uses an air generator to blow tiny liquid droplets, like those that would escape from a nose or a mouth.

The machine was tested on five different types of masks: an N95 mask, s surgical mask, a cloth mask, a two-layer cloth mask and a wet two-layer cloth mask.

The researchers say wetting a mask could help because the material's fibers will expand, reducing the pore size accessible for droplets to get through.

Two glass square tubes were joined with a mask tightly fit between them and a camera lens to capture the number of droplets.

Each of the masks were able to block most of the droplets with the best-performing being the N95, which blocked 100 percent of droplets.

Meanwhile, the worst was the regular cloth mask, which only blocked 96.4 percent of the droplets from getting through.

However, at distances of less than six feet, letting in around three percent of droplets could be enough to make someone ill.

Studies have shown that the average infection threshold for COVID-19 is 1,000 virus particles, inhaled either all at once or on separate occasions.

In addition, a single sneeze has the potential to carry up to 200 million virus particles.

The cloth mask let through more than 1,000 sneeze droplets, each of which could have millions of virus particles.

The two-layered cloth mask with a PM2.5 filter let through more than 600 sneeze droplets.

This means that if someone wearing one of these masks is close to an infected individual, enough droplets could escape to make them contract COVID-19.

'Without a face mask, it is almost certain that many foreign droplets will transfer to the susceptible person,' Kota said.

'Wearing a mask will offer substantial, but not complete, protection to a susceptible person by decreasing the number of foreign airborne sneeze and cough droplets that would otherwise enter the person without the mask.

'Consideration must be given to minimize or avoid close face-to-face or frontal human interactions, if possible.'

**THE TRUTH ABOUT FACE MASKS: WHAT STUDIES HAVE SHOWN**

Research on how well various types of masks and face coverings varies but, recently, and in light of the pandemic of COVID-19, experts are increasingly leaning toward the notion that something is better than nothing.

A University of Oxford study published on March 30 concluded that surgical masks are just as effective at preventing respiratory infections as N95 masks for doctors, nurses and other health care workers.

It's too early for their to be reliable data on how well they prevent infection with COVID-19, but the study found the thinner, cheaper masks do work in flu outbreaks.

The difference between surgical or face masks and N95 masks lies in the size of particles that can - and more importantly, can't - get though the materials.

N95 respirators are made of thick, tightly woven and molded material that fits tightly over the face and can stop 95 percent of all airborne particles, while surgical masks are thinner, fit more loosely, and more porous.

This makes surgical masks much more comfortable to breathe and work in, but less effective at stopping small particles from entering your mouth and nose.

Droplets of saliva and mucous from coughs and sneezes are very small, and viral particles themselves are particularly tiny - in fact, they're about 20-times smaller than bacteria.

For this reason, a JAMA study published this month still contended that people without symptoms should not wear surgical masks, because there is not proof the gear will protect them from infection - although they may keep people who are coughing and sneezing from infecting others.

But the Oxford analysis of past studies- which has not yet been peer reviewed - found that surgical masks were worth wearing and didn't provide statistically less protection than N95 for health care workers around flu patients.

However, any face mask is only as good as other health and hygiene practices. Experts universally agree that there's simply no replacement for thorough, frequent hand-washing for preventing disease transmission.

Some think the masks may also help to 'train' people not to touch their faces, while ==others argue that the unfamiliar garment will just make people do it more, actually raising infection risks.==

So what about cloth coverings? Although good quality evidence is lacking, some data suggest that cloth masks may be only marginally (15 per cent) less effective than surgical masks in blocking emission of particles, said Babak Javid, principal investigator at Cambridge University Hospitals wrote in the BMJ on April 9.

He pointed to a study led by Public Health England in 2013 which found wearing some kind of material over the face was fivefold more effective than not wearing masks for preventing a flu pandemic.

The study suggested that a homemade mask 'should only be considered as a last resort to prevent droplet transmission from infected individuals, but it would be better than no protection'.

**Annals of Internal Medicine**  ORIGINAL RESEARCH

# Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers

### A Randomized Controlled Trial

Henning Bundgaard, DMSc; Johan Skov Bundgaard, BSc; Daniel Emil Tadeusz Raaschou-Pedersen, BSc; Christian von Buchwald, DMSc; Tobias Todsen, MD; Jakob Boesgaard Norsk, MD; Mia M. Pries-Heje, MD; Christoffer Rasmus Vissing, MD; Pernille B. Nielsen, MD; Ulrik C. Winsløw, MD; Kamille Fogh, MD; Rasmus Hasselbalch, MD; Jonas H. Kristensen, MD; Anna Ringgaard, PhD; Mikkel Porsborg Andersen, PhD; Nicole Bakkegård Goecke, PhD; Ramona Trebbien, PhD; Kerstin Skovgaard, PhD; Thomas Benfield, DMSc; Henrik Ullum, PhD; Christian Torp-Pedersen, DMSc; and Kasper Iversen, DMSc

**Background:** Observational evidence suggests that mask wearing mitigates transmission of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). It is uncertain if this observed association arises through protection of uninfected wearers (protective effect), via reduced transmission from infected mask wearers (source control), or both.

**Objective:** To assess whether recommending surgical mask use outside the home reduces wearers' risk for SARS-CoV-2 infection in a setting where masks were uncommon and not among recommended public health measures.

**Design:** Randomized controlled trial (DANMASK-19 [Danish Study to Assess Face Masks for the Protection Against COVID-19 Infection]). (ClinicalTrials.gov: NCT04337541)

**Setting:** Denmark, April and May 2020.

**Participants:** Adults spending more than 3 hours per day outside the home without occupational mask use.

**Intervention:** Encouragement to follow social distancing measures for coronavirus disease 2019, plus either no mask recommendation or a recommendation to wear a mask when outside the home among other persons together with a supply of 50 surgical masks and instructions for proper use.

**Measurements:** The primary outcome was SARS-CoV-2 infection in the mask wearer at 1 month by antibody testing, polymerase chain reaction (PCR), or hospital diagnosis. The secondary outcome was PCR positivity for other respiratory viruses.

**Results:** A total of 3030 participants were randomly assigned to the recommendation to wear masks, and 2994 were assigned to control; 4862 completed the study. Infection with SARS-CoV-2 occurred in 42 participants recommended masks (1.8%) and 53 control participants (2.1%). The between-group difference was −0.3 percentage point (95% CI, −1.2 to 0.4 percentage point; *P* = 0.38) (odds ratio, 0.82 [CI, 0.54 to 1.23]; *P* = 0.33). Multiple imputation accounting for loss to follow-up yielded similar results. Although the difference observed was not statistically significant, the 95% CIs are compatible with a 46% reduction to a 23% increase in infection.

**Limitation:** Inconclusive results, missing data, variable adherence, patient-reported findings on home tests, no blinding, and no assessment of whether masks could decrease disease transmission from mask wearers to others.

**Conclusion:** The recommendation to wear surgical masks to supplement other public health measures did not reduce the SARS-CoV-2 infection rate among wearers by more than 50% in a community with modest infection rates, some degree of social distancing, and uncommon general mask use. The data were compatible with lesser degrees of self-protection.

**Primary Funding Source:** The Salling Foundations.

*Ann Intern Med.* 2020. doi:10.7326/M20-6817                     **Annals.org**
For author, article, and disclosure information, see end of text.
This article was published at Annals.org on 18 November 2020.

S evere acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the cause of coronavirus disease 2019 (COVID-19), has infected more than 54 million persons (1,2). Measures to impede transmission in health care and community settings are essential (3). The virus is transmitted person-to-person, primarily through the mouth, nose, or eyes via respiratory droplets, aerosols, or fomites (4,5). It can survive on surfaces for up to 72 hours (6), and touching a contaminated surface followed by face touching is another possible route of transmission (7). Face masks are a plausible means to reduce transmission of respiratory viruses by minimizing the risk that respiratory droplets will reach wearers' nasal or oral mucosa. Face masks are also hypothesized to reduce face touching (8,9), but frequent face and mask touching has been reported among health care personnel (10). Observational evidence supports the efficacy of face masks in health care settings (11,12) and as source control in patients infected with SARS-CoV-2 or other coronaviruses (13).

An increasing number of localities recommend masks in community settings on the basis of this observational evidence, but recommendations vary and controversy

---

**See also:**

Editorial comment
*Web-Only*
Supplement

---

ORIGINAL RESEARCH                     Effectiveness of Mask Recommendation for Preventing SARS-CoV-2 Infection

exists (14). The World Health Organization (WHO) and the U.S. Centers for Disease Control and Prevention (15) strongly recommend that persons with symptoms or known infection wear masks to prevent transmission of SARS-CoV-2 to others (source control) (16). However, WHO acknowledges that we lack evidence that wearing a mask protects healthy persons from SARS-CoV-2 (prevention) (17). A systematic review of observational studies reported that mask use reduced risk for SARS, Middle East respiratory syndrome, and COVID-19 by 66% overall, 70% in health care workers, and 44% in the community (12). However, surgical and cloth masks were grouped in preventive studies, and none of the 3 included non-health care studies related directly to COVID-19. Another systematic review (18) and American College of Physicians recommendations (19) concluded that evidence on mask effectiveness for respiratory infection prevention is stronger in health care than community settings.

Observational evidence suggests that mask wearing mitigates SARS-CoV-2 transmission, but whether this observed association arises because masks protect uninfected wearers (protective effect) or because transmission is reduced from infected mask wearers (source control) is uncertain. Here, we report a randomized controlled trial (20) that assessed whether a recommendation to wear a surgical mask when outside the home among others reduced wearers' risk for SARS-CoV-2 infection in a setting where public health measures were in effect but community mask wearing was uncommon and not recommended.

## METHODS

### Trial Design and Oversight

DANMASK-19 (Danish Study to Assess Face Masks for the Protection Against COVID-19 Infection) was an investigator-initiated, nationwide, unblinded, randomized controlled trial (ClinicalTrials.gov: NCT04337541). The trial protocol was registered with the Danish Data Protection Agency (P-2020-311) (Part 10 of the **Supplement**, available at Annals.org) and published (21). The researchers presented the protocol to the independent regional scientific ethics committee of the Capital Region of Denmark, which did not require ethics approval (H-20023709) in accordance with Danish legislation (Parts 11 and 12 of the **Supplement**). The trial was done in accordance with the principles of the Declaration of Helsinki.

### Participants and Study Period

During the study period (3 April to 2 June 2020), Danish authorities did not recommend use of masks in the community and mask use was uncommon (<5%) outside hospitals (22). Recommended public health measures included quarantining persons with SARS-CoV-2 infection, social distancing (including in shops and public transportation, which remained open), limiting the number of persons seen, frequent hand hygiene and cleaning, and limiting visitors to hospitals and nursing homes (23,24). Cafés and restaurants were closed during the study until 18 May 2020.

Eligible persons were community-dwelling adults aged 18 years or older without current or prior symptoms or diagnosis of COVID-19 who reported being outside the home among others for at least 3 hours per day and who did not wear masks during their daily work. Recruitment involved media advertisements and contacting private companies and public organizations. Interested citizens had internet access to detailed study information and to research staff for questions (Part 3 of the **Supplement**). At baseline, participants completed a demographic survey and provided consent for researchers to access their national registry data (Parts 4 and 5 of the **Supplement**). Recruitment occurred from 3 through 24 April 2020. Half of participants were randomly assigned to a group on 12 April and half on 24 April.

### Intervention

Participants were enrolled and data registered using Research Electronic Data Capture (REDCap) software (25). Eligible participants were randomly assigned 1:1 to the mask or control group using a computer algorithm and were stratified by the 5 regions of Denmark (**Supplement Table 1**, available at Annals.org). Participants were notified of allocation by e-mail, and study packages were sent by courier (Part 7 of the **Supplement**). Participants in the mask group were instructed to wear a mask when outside the home during the next month. They received 50 three-layer, disposable, surgical face masks with ear loops (TYPE II EN 14683 [Abena]; filtration rate, 98%; made in China). Participants in both groups received materials and instructions for antibody testing on receipt and at 1 month. They also received materials and instructions for collecting an oropharyngeal/nasal swab sample for polymerase chain reaction (PCR) testing at 1 month and whenever symptoms compatible with COVID-19 occurred during follow-up. If symptomatic, participants were strongly encouraged to seek medical care. They registered symptoms and results of the antibody test in the online REDCap system. Participants returned the test material by prepaid express courier.

Written instructions and instructional videos guided antibody testing, oropharyngeal/nasal swabbing, and proper use of masks (Part 8 of the **Supplement**), and a help line was available to participants. In accordance with WHO recommendations for health care settings at that time, participants were instructed to change the mask if outside the home for more than 8 hours. At baseline and in weekly follow-up e-mails, participants in both groups were encouraged to follow current COVID-19 recommendations from the Danish authorities.

### Antibody and Viral PCR Testing

Participants tested for SARS-CoV-2 IgM and IgG antibodies in whole blood using a point-of-care test (Lateral Flow test [Zhuhai Livzon Diagnostics]) according to the manufacturer's recommendations and as previously described (26). After puncturing a fingertip with a lancet, they withdrew blood into a capillary tube and placed 1 drop of blood followed by 2 drops of saline in the test chamber in each of the 2 test plates (IgM and IgG). Participants reported IgM and IgG results separately as

Effectiveness of Mask Recommendation for Preventing SARS-CoV-2 Infection

ORIGINAL RESEARCH

"1 line present" (negative), "2 lines present" (positive), or "I am not sure, or I could not perform the test" (treated as a negative result). Participants were categorized as seropositive if they had developed IgM, IgG, or both. The manufacturer reported that sensitivity was 90.2% and specificity 99.2%. A previously reported internal validation using 651 samples from blood donors before November 2019 and 155 patients with PCR-confirmed SARS-CoV-2 infection estimated a sensitivity of 82.5% (95% CI, 75.3% to 88.4%) and specificity of 99.5% (CI, 98.7% to 99.9%) (26). We (27) and others (28) have reported that oropharyngeal/nasal swab sampling for SARS-CoV-2 by participants, as opposed to health care workers, is clinically useful. Descriptions of RNA extraction, primer and probe used, reverse transcription, preamplification, and microfluidic quantitative PCR are detailed in Part 6 of the **Supplement**.

### Data Collection

Participants received 4 follow-up surveys (Parts 4 and 5 of the **Supplement**) by e-mail to collect information on antibody test results, adherence to recommendations on time spent outside the home among others, development of symptoms, COVID-19 diagnosis based on PCR testing done in public hospitals, and known COVID-19 exposures.

### Outcomes

The primary outcome was SARS-CoV-2 infection, defined as a positive result on an oropharyngeal/nasal swab test for SARS-CoV-2, development of a positive SARS-CoV-2 antibody test result (IgM or IgG) during the study period, or a hospital-based diagnosis of SARS-CoV-2 infection or COVID-19. Secondary end points included PCR evidence of infection with other respiratory viruses (**Supplement Table 2**, available at Annals.org).

### Sample Size Calculations

The sample size was determined to provide adequate power for assessment of the combined composite primary outcome in the intention-to-treat analysis. Authorities estimated an incidence of SARS-CoV-2 infection of at least 2% during the study period. Assuming that wearing a face mask halves risk for infection, we estimated that a sample of 4636 participants would provide the trial with 80% power at a significance level of 5% (2-sided α level). Anticipating 20% loss to follow-up in this community-based study, we aimed to assign at least 6000 participants.

### Statistical Analysis

Participants with a positive result on an antibody test at baseline were excluded from the analyses. We calculated CIs of proportions assuming binomial distribution (Clopper-Pearson).

The primary composite outcome (intention-to-treat) was compared between groups using the $\chi^2$ test. Odds ratios and confidence limits were calculated using logistic regression. We did a per protocol analysis that included only participants reporting complete or predominant use of face masks as instructed. A conservative sensitivity analysis assumed that participants with a

positive result on an antibody test at the end of the study who had not provided antibody test results at study entrance had had a positive result at entrance. To further examine the uncertainty of loss to follow-up, we did (post hoc) 200 imputations using the R package smcfcs, version 1.4.1 (29), to impute missing values of outcome. We included sex, age, type of work, time out of home, and outcome in this calculation.

Prespecified subgroups were compared by logistic regression analysis. In a post hoc analysis, we explored whether there was a subgroup defined by a constellation of participant characteristics for which a recommendation to wear masks seemed to be effective. We included sex, age, type of work, time out of home, and outcome in this calculation.

Two-sided $P$ values less than 0.05 were considered statistically significant. Analyses were done using R, version 3.6.1 (R Foundation).

### Role of the Funding Source

An unrestricted grant from the Salling Foundations supported the study, and the BESTSELLER Foundation donated the Livzon tests. The funders did not influence study design, conduct, or reporting.

## RESULTS

### Participants

A total of 17 258 Danish citizens responded to recruitment, and 6024 completed the baseline survey and fulfilled eligibility criteria. The first participants (group 1; $n = 2995$) were randomly assigned on 12 April 2020 and were followed from 14 to 16 April through 15 May 2020. Remaining participants (group 2; $n = 3029$) were randomly assigned on 24 April 2020 and were followed from 2 to 4 May through 2 June 2020. A total of 3030 participants were randomly assigned to the recommendation to wear face masks, and 2994 were assigned not to wear face masks (**Figure**); 4862 participants (80.7%) completed the study. **Table 1** shows baseline characteristics, which were well balanced between groups. Participants reported having spent a median of 4.5 hours per day outside the home.

### Adherence

Based on the lowest adherence reported in the mask group during follow-up, 46% of participants wore the mask as recommended, 47% predominantly as recommended, and 7% not as recommended.

### Primary Outcome

The primary outcome occurred in 42 participants (1.8%) in the mask group and 53 (2.1%) in the control group. In an intention-to-treat analysis, the between-group difference was −0.3 percentage point (CI, −1.2 to 0.4 percentage point; $P = 0.38$) (odds ratio [OR], 0.82 [CI, 0.54 to 1.23]; $P = 0.33$) in favor of the mask group (**Supplement Figure 1**, available at Annals.org). When this analysis was repeated with multiple imputation for missing data due to loss to follow-up, it yielded similar results (OR, 0.81 [CI, 0.53 to 1.23]; $P = 0.32$). **Table 2**

ORIGINAL RESEARCH                    Effectiveness of Mask Recommendation for Preventing SARS–CoV-2 Infection

*Figure 1.* Study flow diagram.



Inclusion and exclusion criteria are described in the Methods section, and criteria for completion of the study are given in the Supplement (available at Annals.org). SARS-CoV-2 = severe acute respiratory syndrome coronavirus 2.

provides data on the components of the primary end point, which were similar between groups.

In a per protocol analysis that excluded participants in the mask group who reported nonadherence (7%), SARS-CoV-2 infection occurred in 40 participants (1.8%) in the mask group and 53 (2.1%) in the control group (between-group difference, −0.4 percentage point [CI, −1.2 to 0.5 percentage point]; *P* = 0.40) (OR, 0.84 [CI, 0.55 to 1.26]; *P* = 0.40). **Supplement Figure 2** (available at Annals.org) provides results of the prespecified subgroup analyses of the primary composite end point. No statistically significant interactions were identified.

In the preplanned psensitivity analysis, those who had a positive result on an antibody test at 1 month but had not provided antibody results at baseline were considered to have had positive results at baseline (*n* = 18)— that is, they were excluded from the analysis. In this analysis, the primary outcome occurred in 33 participants (1.4%) in the face mask group and 44 (1.8%) in the control group (between-group difference, −0.4 percentage point [CI, −1.1 to 0.4 percentage point]; *P* = 0.22) (OR, 0.77 [CI, 0.49 to 1.22]; *P* = 0.26).

Three post hoc (not preplanned) analyses were done. In the first, which included only ==participants reporting wearing face masks "exactly as instructed," infection (the primary outcome) occurred in 22 participants (2.0%) in the face mask group and 53 (2.1%) in the control== ==group== (between-group difference, −0.2 percentage point [CI, −1.3 to 0.9 percentage point]; *P* = 0.82) (OR, 0.93 [CI, 0.56 to 1.54]; *P* = 0.78). The second post hoc analysis excluded participants who did not provide antibody test results at baseline; infection occurred in 33 participants (1.7%) in the face mask group and 44 (2.1%) in the control group (between-group difference, −0.4 percentage point [CI, −1.4 to 0.4 percentage point]; *P* = 0.33) (OR, 0.80 [CI, 0.51 to 1.27]; *P* = 0.35). In the third post hoc analysis, which investigated constellations of patient characteristics, ==we did not find a subgroup where face masks were effective at conventional levels of statistical significance== (data not shown).

A total of 52 participants in the mask group and 39 control participants reported COVID-19 in their household. Of these, 2 participants in the face mask group and 1 in the control group developed SARS-CoV-2 infection, suggesting that the source of most observed infections was outside the home. Reported symptoms did not differ between groups during the study period (**Supplement Table 3**, available at Annals.org).

### Secondary Outcomes

In the mask group, 9 participants (0.5%) were positive for 1 or more of the 11 respiratory viruses other than SARS-CoV-2, compared with 11 participants (0.6%) in the control group (between-group difference, −0.1

Effectiveness of Mask Recommendation for Preventing SARS-CoV-2 Infection | ORIGINAL RESEARCH

percentage point [CI, −0.6 to 0.4 percentage point]; $P$ = 0.87) (OR, 0.84 [CI, 0.35 to 2.04]; $P$ = 0.71). Positivity for any virus, including SARS-CoV-2, occurred in 9 mask participants (0.5%) versus 16 control participants (0.8%) (between-group difference, −0.3 percentage point [CI, −0.9 to 0.2 percentage point]; $P$ = 0.26) (OR, 0.58 [CI, 0.25 to 1.31]; $P$ = 0.19).

## DISCUSSION

In this community-based, randomized controlled trial conducted in a setting where mask wearing was uncommon and was not among other recommended public health measures related to COVID-19, a recommendation to wear a surgical mask when outside the home among others did not reduce, at conventional levels of statistical significance, incident SARS-CoV-2 infection compared with no mask recommendation. We designed the study to detect a reduction in infection rate from 2% to 1%. Although no statistically significant difference in SARS-CoV-2 incidence was observed, the 95% CIs are compatible with a possible 46% reduction to 23% increase in infection among mask wearers. These findings do offer evidence about the degree of protection mask wearers can anticipate in a setting where others are not wearing masks and where other public health measures, including social distancing, are in effect. The findings, however, should not be used to conclude that a recommendation for everyone to wear masks in the community would not be effective in reducing SARS-CoV-2 infections, because the trial did not test the role of masks in source control of SARS-CoV-2 infection. During the study period, authorities did not recommend face mask use outside hospital settings and mask use was rare in community settings (22). This means that study participants' exposure was overwhelmingly to persons not wearing masks.

The observed infection rate was similar to that reported in other large Danish studies during the study period (26,30). Of note, the observed incidence of SARS-CoV-2 infection was higher than we had estimated when planning a sample size that would ensure more than 80% power to detect a 50% decrease in infection. The intervention lasted only 1 month and was carried out during a period when Danish authorities recommended quarantine of diagnosed patients, physical distancing, and hand hygiene as general protective means against SARS-CoV-2 transmission (23). Cafés and restaurants were closed through 18 May, but follow-up of the second randomized group continued through 2 June.

The first randomized group was followed while the Danish society was under lockdown. Reopening occurred (18 May 2020) during follow-up of the second group of participants, but it was not reflected in the outcome because infection rates were similar between groups (Supplement Figure 2). The relative infection rate between mask wearers and those not wearing masks would most likely be affected by changes in applied protective means or in the virulence of SARS-CoV-2, whereas the rate difference between the 2 groups would probably not be affected solely by a higher–or lower–number of infected citizens.

Although we saw no statistically significant difference in presence of other respiratory viruses, the study was not sufficiently powered to draw definite conclusions about the protective effect of masks for other viral infections. Likewise, the study had limited power for any of the subgroup analyses.

*Table 1.* Characteristics of Participants Completing the Study

| Characteristic | Face Mask Group (*n* = 2392) | Control Group (*n* = 2470) |
|---|---|---|
| Mean age (SD), *y* | 47.4 (14) | 47.0 (13) |
| Female sex, *n (%)* | 1545 (64.6) | 1571 (63.6) |
| Smoker, *n (%)* | 478 (20.0) | 499 (20.2) |
| Wears eyeglasses daily, *n (%)* | 956 (40.0) | 929 (37.6) |
| Capital Region resident, *n (%)** | 1220 (51.0) | 1289 (52.2) |
| Provided antibody test results at baseline, *n (%)* | 1916 (80.1) | 2061 (83.4) |
| Occupation, *n (%)* | | |
| Shop employee | 108 (4.5) | 85 (3.4) |
| Cashier | 101 (4.2) | 96 (3.9) |
| Craftsperson | 110 (4.6) | 103 (4.2) |
| Office employee | 265 (11.1) | 312 (12.6) |
| Manager | 111 (4.6) | 108 (4.4) |
| Transportation employee | 617 (25.8) | 625 (25.3) |
| Service employee | 107 (4.5) | 104 (4.2) |
| Home care/nursing home employee | 197 (8.2) | 229 (9.3) |
| Early childhood care staff | 89 (3.7) | 88 (3.6) |
| Salesperson | 37 (1.5) | 47 (1.9) |
| Other | 650 (27.2) | 673 (27.2) |

* According to national authority data, the Capital Region had a higher frequency of coronavirus disease 2019 than other Danish regions; see subgroup analyses in **Supplement Figure 2** (available at Annals.org).

ORIGINAL RESEARCH

Effectiveness of Mask Recommendation for Preventing SARS–CoV-2 Infection

**Table 2.** Distribution of the Components of the Composite Primary Outcome

| Outcome Component | Face Mask Group (n = 2392), n (%) | Control Group (n = 2470), n (%) | Odds Ratio (95% CI)* |
|---|---|---|---|
| Primary composite end point | 42 (1.8) | 53 (2.1) | 0.82 (0.54–1.23) |
| Positive antibody test result† | | | |
| IgM | 31 (1.3) | 37 (1.5) | 0.87 (0.54–1.41) |
| IgG | 33 (1.4) | 32 (1.3) | 1.07 (0.66–1.75) |
| Positive SARS–CoV-2 RT-PCR | 0 (0) | 5 (0.2) | – |
| Health care–diagnosed SARS–CoV-2 or COVID-19 | 5 (0.2) | 10 (0.4) | 0.52 (0.18–1.53) |

COVID-19 = coronavirus disease 2019; RT-PCR = reverse transcriptase polymerase chain reaction; SARS–CoV-2 = severe acute respiratory syndrome coronavirus 2.
* Calculated using logistic regression. The between-group differences in frequencies of positive SARS–CoV-2 RT-PCR were not statistically significant ($P = 0.079$).
† 124 participants in the mask group and 140 in the control group registered "not done" or unclear results of the antibody test–i.e., they were included in the analysis because they sent an oropharyngeal swab for PCR.

The primary outcome was mainly defined by antibodies against SARS–CoV-2. This definition was chosen because the viral load of infected patients may be only transiently detectable (31,32) and because approximately half of persons infected with SARS–CoV-2 are asymptomatic (33,26). Masks have been hypothesized to reduce inoculum size (34) and could increase the likelihood that infected mask users are asymptomatic, but this hypothesis has been challenged (35). For these reasons, we did not rely solely on identification of SARS–CoV-2 in oropharyngeal/nasal swab samples. As mentioned in the Methods section, an internal validation study estimated that the point-of-care test has 82.5% sensitivity and 99.5% specificity (26).

The observed rate of incident SARS–CoV-2 infection was similar to what was estimated during trial design. These rates were based on thorough screening of all participants using antibody measurements combined with PCR, whereas the observed official infection rates relied solely on PCR test–based estimates during the period. In addition, authorities tested only a small subset of primarily symptomatic citizens of the entire population, yielding low incidence rates. On this basis, the infection rates we report here are not comparable with the official SARS–CoV-2 infection rates in the Danish population. The eligibility requirement of at least 3 hours of exposure to other persons outside the home would add to this difference. Between 6 April and 9 May 2020, we found a similar seroprevalence of SARS–CoV-2 of 1.9% (CI, 0.8% to 2.3%) in Danish blood donors using the Livzon point-of-care test and assessed by laboratory technicians (36). Testing at the end of follow-up, however, may not have captured any infections contracted during the last part of the study period, but this would have been true in both the mask and control groups and was not expected to influence the overall findings.

The face masks provided to participants were high-quality surgical masks with a filtration rate of 98% (37). A published meta-analysis found no statistically significant difference in preventing influenza in health care workers between respirators (N95 [American standard] or FFP2 [European standard]) and surgical face masks (38). Adherence to mask use may be higher than observed in this study in settings where mask use is common. Some mask group participants (14%) reported adverse

reactions from other citizens (**Supplement Table 4**, available at Annals.org). Although adherence may influence the protective effect of masks, sensitivity analyses had similar results across reported adherence.

How SARS–CoV-2 is transmitted–via respiratory droplets, aerosols, or (to a lesser extent) fomites–is not firmly established. Droplets are larger and rapidly fall to the ground, whereas aerosols are smaller ($\leq 5$ μm) and may evaporate and remain in the air for hours (39). Transmission of SARS–CoV-2 may take place through multiple routes. It has been argued that for the primary route of SARS–CoV-2 spread–that is, via droplets–face masks would be considered effective, whereas masks would not be effective against spread via aerosols, which might penetrate or circumnavigate a face mask (37,39). Thus, spread of SARS–CoV-2 via aerosols would at least partially explain the present findings. Lack of eye protection may also have been of importance, and use of face shields also covering the eyes (rather than face masks only) has been advocated to halt the conjunctival route of transmission (40, 41). We observed no statistically significant interaction between wearers and nonwearers of eyeglasses (**Supplement Figure 2**). Recent reports indicate that transmission of SARS–CoV-2 via fomites is unusual (42), but masks may alter behavior and potentially affect fomite transmission.

The present findings are compatible with the findings of a review of randomized controlled trials of the efficacy of face masks for prevention (as personal protective equipment) against influenza virus (18). A recent meta-analysis that suggested a protective effect of face masks in the non–health care setting was based on 3 observational studies that included a total of 725 participants and focused on transmission of SARS–CoV-1 rather than SARS–CoV-2 (12). Of 725 participants, 138 (19%) were infected, so the transmission rate seems to be higher than for SARS–CoV-2. Further, these studies focused on prevention of infection in healthy mask wearers from patients with a known, diagnosed infection rather than prevention of transmission from persons in their surroundings in general. In addition, identified comparators (control participants) not wearing masks may also have missed other protective means. Recent observational studies that indicate a protective association between mandated mask use in the community and SARS–CoV-2 transmission are limited by study design

Effectiveness of Mask Recommendation for Preventing SARS–CoV-2 Infection

and simultaneous introduction of other public health interventions (14, 43).

Several challenges regarding wearing disposable face masks in the community exist. These include practical aspects, such as potential incorrect wearing, reduced adherence, reduced durability of the mask depending on type of mask and occupation, and weather. Such circumstances may necessitate the use of multiple face masks during the day. In our study, participants used a mean of 1.7 masks per weekday and 1.3 per weekend day (Supplement Table 4). Wearing a face mask may be physically unpleasant, and psychological barriers and other side effects have been described (44). "Face mask policing" between citizens might reinforce use of masks but may be challenging. In addition, the wearer of a face mask may change to a less cautious behavior because of a false sense of security, as pointed out by WHO (17); accordingly, our face mask group seemed less worried (Supplement Table 4), which may explain their increased willingness to wear face masks in the future (Supplement Table 5, available at Annals.org). These challenges, including costs and availability, may reduce the efficacy of face masks to prevent SARS-CoV-2 infection.

The potential benefits of a community-wide recommendation to wear masks include combined prevention and source control for symptomatic and asymptomatic persons, improved attention, and reduced potential stigmatization of persons wearing masks to prevent infection of others (17). Although masks may also have served as source control in SARS-CoV-2–infected participants, the study was not designed to determine the effectiveness of source control.

The most important limitation is that the findings are inconclusive, with CIs compatible with a 46% decrease to a 23% increase in infection. Other limitations include the following. Participants may have been more cautious and focused on hygiene than the general population; however, the observed infection rate was similar to findings of other studies in Denmark (26,30). Loss to follow-up was 19%, but results of multiple imputation accounting for missing data were similar to the main results. In addition, we relied on patient-reported findings on home antibody tests, and blinding to the intervention was not possible. Finally, a randomized controlled trial provides high-level evidence for treatment effects but can be prone to reduced external validity.

Our results suggest that the recommendation to wear a surgical mask when outside the home among others did not reduce, at conventional levels of statistical significance, the incidence of SARS-CoV-2 infection in mask wearers in a setting where social distancing and other public health measures were in effect, mask recommendations were not among those measures, and community use of masks was uncommon. Yet, the findings were inconclusive and cannot definitively exclude a 46% reduction to a 23% increase in infection of mask wearers in such a setting. It is important to emphasize that this trial did not address the effects of masks as source control or as protection in settings where social distancing and other public health measures are not in effect.

Reduction in release of virus from infected persons into the environment may be the mechanism for mitigation of transmission in communities where mask use is common or mandated, as noted in observational studies. Thus, these findings do not provide data on the effectiveness of widespread mask wearing in the community in reducing SARS-CoV-2 infections. They do, however, offer evidence about the degree of protection mask wearers can anticipate in a setting where others are not wearing masks and where other public health measures, including social distancing, are in effect. The findings also suggest that persons should not abandon other COVID-19 safety measures regardless of the use of masks. While we await additional data to inform mask recommendations, communities must balance the seriousness of COVID-19, uncertainty about the degree of source control and protective effect, and the absence of data suggesting serious adverse effects of masks (45).

From The Heart Center, Rigshospitalet, Copenhagen University Hospital, Copenhagen, Denmark (H.B., J.S.B., D.E.T., M.M.P., C. R.V., U.C.W., A.R.); Rigshospitalet, Copenhagen University Hospital, Copenhagen, Denmark (C.V., T.T., H.U.); Herlev & Gentofte Hospital, Copenhagen University Hospital, Herlev, Denmark (J.B.N., P.B.N., K.F., R.H., J.H.K., K.I.); Nordsjaellands Hospital, Hillerød, and Aalborg University Hospital, Aalborg, Denmark (M.P.A., C.T.); Centre for Diagnostics, Technical University of Denmark, Kongens Lyngby, Denmark (N.B.G.); National Influenza Center, Statens Serum Institut, Copenhagen, Denmark (R.T.); Technical University of Denmark, Kongens Lyngby, Denmark (K.S.); Center of Research & Disruption of Infectious Diseases, Amager and Hvidovre Hospital, Copenhagen University Hospital, Hvidovre, Denmark (T.B.).

**Acknowledgment:** The authors thank Mrs. Kristine Sarah Hedegaard Andersen for valuable technical and logistic assistance and Mrs. Helena Aagaard Glud, Mr. Oscar Mejias Gomez, Mr. Andreas Visbech Madsen, Mr. Shoeib Moradi, Mrs. Louise Brogaard, Mrs. Maria Heinesen, Mrs. Karin Tarp, Mr. Weihua Tian, Mrs. Henriette Vorsholt, and Mrs. Shila Mortensen for valuable assistance in the laboratory work and analyses.

**Grant Support:** By the Salling Foundations.

**Disclosures:** Disclosures can be viewed at www.acponline.org /authors/icmje/ConflictOfInterestForms.do?msNum=M20-6817.

**Data Sharing Statement:** The authors have indicated that they will not be sharing data.

**Corresponding Author:** Henning Bundgaard, DMSc, Department of Cardiology, The Heart Center, Copenhagen University Hospital, Rigshospitalet, Blegdamsvej 9, DK-2100 Copenhagen, Denmark; e-mail, henbundgaard@gmail.com.

Current author addresses and author contributions are available at Annals.org.

## References

1. Helmy YA, Fawzy M, Elaswad A, et al. The COVID-19 pandemic: a comprehensive review of taxonomy, genetics, epidemiology, diagnosis, treatment, and control. J Clin Med. 2020;9. [PMID: 32344679] doi:10.3390/jcm9041225
2. Worldometer. Pandemic, COVID-19 coronavirus. 2020. Accessed at www.worldometers.info/coronavirus on 29 October 2020.

ORIGINAL RESEARCH                    Effectiveness of Mask Recommendation for Preventing SARS–CoV-2 Infection

3. Qualls N, Levitt A, Kanade N, et al. CDC Community Mitigation Guidelines Work Group. Community mitigation guidelines to prevent pandemic influenza – United States, 2017. MMWR Recomm Rep. 2017;66:1-34. [PMID: 28426646] doi:10.15585/mmwr.rr6601a1
4. Richard M, Kok A, de Meulder D, et al. SARS-CoV-2 is transmitted via contact and the air between ferrets. Nat Commun. 2020;11:3496. [PMID: 32641684] doi:10.1038/s41467-020-17367-2
5. Liu Y, Ning Z, Chen Y, et al. Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals. Nature. 2020;582:557-560. [PMID: 32340022] doi:10.1038/s41586-020-2271-3
6. van Doremalen N, Bushmaker T, Morris DH, et al. Aerosol and surface stability of SARS-CoV-2 as compared with SARS-CoV-1 [Letter]. N Engl J Med. 2020;382:1564-1567. [PMID: 32182409] doi:10.1056/NEJMc2004973
7. Kwok YL, Gralton J, McLaws ML. Face touching: a frequent habit that has implications for hand hygiene. Am J Infect Control. 2015;43:112-4. [PMID: 25637115] doi:10.1016/j.ajic.2014.10.015
8. Lucas TL, Mustain R, Goldsby RE. Frequency of face touching with and without a mask in pediatric hematology/oncology health care professionals. Pediatr Blood Cancer. 2020:e28593. [PMID: 32672907] doi:10.1002/pbc.28593
9. Chen YJ, Qin G, Chen J, et al. Comparison of face-touching behaviors before and during the coronavirus disease 2019 pandemic. JAMA Netw Open. 2020;3:e2016924. [PMID: 32725247] doi:10.1001/jamanetworkopen.2020.16924
10. Rebmann T, Carrico R, Wang J. Physiological and other effects and compliance with long-term respirator use among medical intensive care unit nurses. Am J Infect Control. 2013;41:1218-23. [PMID: 23768438] doi:10.1016/j.ajic.2013.02.017
11. Wang X, Ferro EG, Zhou G, et al. Association between universal masking in a health care system and SARS-CoV-2 positivity among health care workers. JAMA. 2020. [PMID: 32663246] doi:10.1001/jama.2020.12897
12. Chu DK, Akl EA, Duda S, et al. COVID-19 Systematic Urgent Review Group Effort (SURGE) study authors. Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis. Lancet. 2020;395:1973-1987. [PMID: 32497510] doi:10.1016/S0140-6736(20)31142-9
13. Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. Nat Med. 2020;26:676-680. [PMID: 32371934] doi:10.1038/s41591-020-0843-2
14. Lyu W, Wehby GL. Community use of face masks and COVID-19: evidence from a natural experiment of state mandates in the US. Health Aff (Millwood). 2020;39:1419-1425. [PMID: 32543923] doi:10.1377/hlthaff.2020.00818
15. Centers for Disease Control and Prevention. CDC calls on Americans to wear masks to prevent COVID-19 spread. 14 July 2020. Accessed at www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html on 29 October 2020.
16. Brooks JT, Butler JC, Redfield RR. Universal masking to prevent SARS-CoV-2 transmission–the time is now. JAMA. 2020. [PMID: 32663243] doi:10.1001/jama.2020.13107
17. World Health Organization. Advice on the use of masks in the context of COVID-19: interim guidance. 5 June 2020.
18. Xiao J, Shiu EYC, Gao H, et al. Nonpharmaceutical measures for pandemic influenza in nonhealthcare settings–personal protective and environmental measures. Emerg Infect Dis. 2020;26:967-975. [PMID: 32027586] doi:10.3201/eid2605.190994
19. Qaseem A, Etxeandia-Ikobaltzeta I, Yost J, et al. Use of N95, surgical, and cloth masks to prevent COVID-19 in health care and community settings: living practice points from the American College of Physicians (version 1). Ann Intern Med. 2020;173:642-649. doi:10.7326/M20-3234
20. Ford I, Norrie J. Pragmatic trials. N Engl J Med. 2016;375:454-63. [PMID: 27518663] doi:10.1056/NEJMra1510059

21. Bundgaard H, Bundgaard JS, Raaschou-Pedersen DET, et al. Face masks for the prevention of COVID-19 - rationale and design of the randomised controlled trial DANMASK-19. Dan Med J. 2020;67. [PMID: 32829745]
22. YouGov. Personal measures taken to avoid COVID-19. 2020. Accessed at https://yougov.co.uk/topics/international/articles-reports/2020/03/17/personal-measures-taken-to-avoid-covid-19 on 27 October 2020.
23. Danish Health Authority. COVID-19: prevention of the spread of infection. 2 October 2020. Accessed at www.sst.dk/da/Udgivelser/2020/COVID-19-Forebyggelse-af-smittespredning on 26 October 2020.
24. Danish Health Authority. General guidance. 22 October 2020. Accessed at www.sst.dk/en/English/Corona-eng/Prevent-infection/General-guidance on 27 October 2020.
25. Harris PA, Taylor R, Thielke R, et al. Research electronic data capture (REDCap)–a metadata-driven methodology and workflow process for providing translational research informatics support. J Biomed Inform. 2009;42:377-81. [PMID: 18929686] doi:10.1016/j.jbi.2008.08.010
26. Iversen K, Bundgaard H, Hasselbalch RB, et al. Risk of COVID-19 in health-care workers in Denmark: an observational cohort study. Lancet Infect Dis. 2020. [PMID: 32758438] doi:10.1016/S1473-3099(20)30589-2
27. Therchilsen JH, von Buchwald C, Koch A, et al. Self-collected versus healthcare worker-collected swabs in the diagnosis of severe acute respiratory syndrome coronavirus 2. Diagnostics. 2020;10:678. doi:10.3390/diagnostics10090678
28. Tu YP, Jennings R, Hart B, et al. Swabs collected by patients or health care workers for SARS-CoV-2 testing [Letter]. N Engl J Med. 2020;383:494-496. [PMID: 32492294] doi:10.1056/NEJMc2016321
29. Bartlett J, Keogh R, Ekström CT, et al. Multiple imputation of covariates by substantive model compatible fully conditional specification. Version 1.4.1. CRAN; 2020.
30. Pedersen OB, Nissen J, Dinh KM, et al. SARS-CoV-2 infection fatality rate among elderly retired Danish blood donors - a cross-sectional study. Clin Infect Dis. 2020. [PMID: 33103182] doi:10.1093/cid/ciaa1627
31. Pan Y, Zhang D, Yang P, et al. Viral load of SARS-CoV-2 in clinical samples [Letter]. Lancet Infect Dis. 2020;20:411-412. [PMID: 32105638] doi:10.1016/S1473-3099(20)30113-4
32. Wölfel R, Corman VM, Guggemos W, et al. Virological assessment of hospitalized patients with COVID-2019. Nature. 2020;581:465-469. [PMID: 32235945] doi:10.1038/s41586-020-2196-x
33. Oran DP, Topol EJ. Prevalence of asymptomatic SARS-CoV-2 infection. A narrative review. Ann Intern Med. 2020;173:362-367. doi:10.7326/M20-3012
34. Gandhi M, Rutherford GW. Facial masking for covid-19. Reply [Letter]. N Engl J Med. 2020;383. [PMID: 33095525] doi:10.1056/NEJMc2030886
35. Rasmussen AL, Escandón K, Popescu SV. Facial masking for covid-19 [Letter]. N Engl J Med. 2020;383. [PMID: 33095523] doi:10.1056/NEJMc2030886
36. Erikstrup C, Hother CE, Pedersen OBV, et al. Estimation of SARS-CoV-2 infection fatality rate by real-time antibody screening of blood donors. Clin Infect Dis. 2020. [PMID:32584966] doi:10.1093/cid/ciaa849
37. Rengasamy S, Miller A, Eimer BC, et al. Filtration performance of FDA-cleared surgical masks. J Int Soc Respir Prot. 2009;26:54-70. [PMID:32661453]
38. Long Y, Hu T, Liu L, et al. Effectiveness of N95 respirators versus surgical masks against influenza: a systematic review and meta-analysis. J Evid Based Med. 2020;13:93-101. [PMID: 32167245] doi:10.1111/jebm.12381
39. Klompas M, Baker MA, Rhee C. Airborne transmission of SARS-CoV-2: theoretical considerations and available evidence. JAMA. 2020;324:441-442. [PMID: 32749495] doi:10.1001/jama.2020.12458

Effectiveness of Mask Recommendation for Preventing SARS–CoV-2 Infection

40. Perencevich EN, Diekema DJ, Edmond MB. Moving personal protective equipment into the community: face shields and containment of COVID-19. JAMA. 2020;323:2252-2253. [PMID: 32347911] doi:10.1001/jama.2020.7477

41. Marra AR, Edmond MB, Popescu SV, et al. Examining the need for eye protection for coronavirus disease 2019 (COVID-19) prevention in the community. Infect Control Hosp Epidemiol. 2020:1-2. [PMID: 32576322] doi:10.1017/ice.2020.314

42. Meyerowitz EA, Richterman A, Gandhi RT, et al. Transmission of SARS-CoV-2. A review of viral, host, and environmental factors. Ann Intern Med. 2020. doi:10.7326/M20-5008

43. Mitze T, Kosfeld R, Rode J, et al. Face masks considerably reduce COVID-19 cases in Germany: a synthetic control method approach. IZA Discussion Papers. June 2020.

44. Lazzarino AI, Steptoe A, Hamer M, et al. Covid-19: important potential side effects of wearing face masks that we should bear in mind [Letter]. BMJ. 2020;369:m2003. [PMID: 32439689] doi:10.1136/bmj.m2003

45. Javid B, Weekes MP, Matheson NJ. Covid-19: should the public wear face masks? [Editorial]. BMJ. 2020;369:m1442. [PMID: 32273278] doi:10.1136/bmj.m1442

**Current Author Addresses:** Drs. Bundgaard, Pries-Heje, Vissing, Winsløw, and Ringgaard; Mr. Bundgaard; and Mr. Raaschou-Pedersen: Department of Cardiology, The Heart Center, Copenhagen University Hospital, Rigshospitalet, Blegdamsvej 9, DK-2100 Copenhagen, Denmark.

Drs. von Buchwald and Todsen: Department of ORL, Head & Neck Surgery and Audiology, Rigshospitalet, 6033, Copenhagen University Hospital, Inge Lehmanns Vej 7, DK 2100 Copenhagen, Denmark.

Drs. Norsk, Nielsen, Fogh, Hasselbalch, Kristensen, and Iversen: Department of Cardiology, Herlev & Gentofte Hospital, Copenhagen University Hospital, Borgmester Ib Juuls Vej 1, 2730 Herlev, Denmark.

Drs. Porsborg Andersen and Torp-Pedersen: Department of Cardiology and Clinical Research, Nordsjaellands Hospital, Dyrehavevej 29, 3400 Hillerød, Denmark.

Drs. Goecke and Skovgaard: Centre for Diagnostics, Technical University of Denmark, Anker Engelunds Vej 1 Bygning 101A, 2800 Kongens Lyngby, Denmark.

Dr. Trebbien: Department of Virus and Microbiological Special Diagnostics, National Influenza Center, Statens Serum Institut, Artillerivej 5, 2300 Copenhagen, Denmark.

Dr. Benfield: Center of Research & Disruption of Infectious Diseases (CREDID), Department of Infectious Diseases, Copenhagen University Hospital, Amager and Hvidovre, Hvidovre Hospital, Kettegård Allé 30, 2650 Hvidovre, Denmark.

Dr. Ullum: Department of Clinical Immunology, The Heart Center, Copenhagen University Hospital, Rigshospitalet, Blegdamsvej 9, DK-2100 Copenhagen, Denmark.

**Author Contributions:** Conception and design: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, T. Todsen, K. Skovgaard, T. Benfield, C. Torp-Pedersen, K. Iversen.

Analysis and interpretation of the data: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, C.R. Vissing, U.C. Winsløw, J.H. Kristensen, N.B. Goecke, K. Skovgaard, T. Benfield, C. Torp-Pedersen, K. Iversen.

Drafting of the article: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, T. Benfield, K. Iversen.

Critical revision of the article for important intellectual content: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, T. Todsen, M.M. Pries-Heje, C.R. Vissing, P.B. Nielsen, U.C. Winsløw, R. Hasselbalch, J.H. Kristensen, A. Ringgaard, K. Skovgaard, T. Benfield, H. Ullum, C. Torp-Pedersen, K. Iversen.

Final approval of the article: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, C. von Buchwald, T. Todsen, J.B. Norsk, M.M. Pries-Heje, C.R. Vissing, P.B. Nielsen, U.C. Winsløw, K. Fogh, R. Hasselbalch, J.H. Kristensen, A. Ringgaard, M. Porsborg Andersen, N.B. Goecke, R. Trebbien, K. Skovgaard, T. Benfield, H. Ullum, C. Torp-Pedersen, K. Iversen.

Provision of study materials or patients: H. Bundgaard, D.E.T. Raaschou-Pedersen, T. Todsen, R. Trebbien, C. Torp-Pedersen.

Statistical expertise: H. Bundgaard, J.S. Bundgaard, C. Torp-Pedersen.

Obtaining of funding: H. Bundgaard, H. Ullum.

Administrative, technical, or logistic support: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, C. von Buchwald, T. Todsen, M.M. Pries-Heje, P.B. Nielsen, K. Fogh, R. Hasselbalch, A. Ringgaard, M. Porsborg Andersen, R. Trebbien, C. Torp-Pedersen, K. Iversen.

Collection and assembly of data: H. Bundgaard, J.S. Bundgaard, D.E.T. Raaschou-Pedersen, J.B. Norsk, M. Porsborg Andersen, H. Ullum, C. Torp-Pedersen, K. Iversen.

Plaintiffs' Exhibit 209

spectator.co.uk

# Landmark Danish study finds no significant effect for facemask wearers | The Spectator

*Carl Heneghan & Tom Jefferson*

5-6 minutes

Masks might stop people passing on a virus. But how much measurable protection do they offer to the wearer?

A Text settings

Comments

Do face masks work? Earlier this year, the UK government decided that masks could play a significant role in stopping Covid-19 and made masks mandatory in a number of public places. But are these policies backed by the scientific evidence?

Yesterday marked the publication of a long-delayed trial in Denmark which hopes to answer that very question. The 'Danmask-19 trial' was conducted in the spring with over 6,000 participants, when the public were not being told to wear masks but other public health measures were in place. Unlike other studies looking at masks, the Danmask study was a randomised controlled trial – making it the highest quality scientific evidence.

Around half of those in the trial received 50 disposable surgical face masks, which they were told to change after eight hours of use. After one month, the trial participants were tested using both PCR, antibody and lateral flow tests and compared with the trial participants who did not wear a mask.

In the end, there was no statistically significant difference between those who wore masks and those who did not when it came to being infected by Covid-19. 1.8 per cent of those wearing masks caught Covid, compared to 2.1 per cent of the control group. As a result, it seems that any effect masks have on preventing the spread of the disease in the community is small.

Some people, of course, did not wear their masks properly. Only 46 per cent of those wearing masks in the trial said they had completely adhered to the rules. But even if you only look at people who wore masks 'exactly as instructed', this did not make any difference to the results: 2 per cent of this group were also infected.

When it comes to masks, it appears there is still little good evidence they prevent the spread of airborne diseases. The results of the Danmask-19 trial mirror other reviews into influenza-like illnesses. Nine other trials looking at the efficacy of masks (two looking at healthcare workers and

seven at community transmission) have found <u>that</u> masks make little or no difference to whether you get influenza or not.

But <mark>overall, there is a troubling lack of robust evidence on face masks and Covid-19.</mark> There have only been three community trials during the current pandemic comparing the use of masks with various alternatives – one in <u>Guinea-Bissau</u>, one in <u>India</u> and this latest trial in Denmark. The low number of studies into the effect different interventions have on the spread of Covid-19 – a subject of global importance – suggests there is a total lack of interest from governments in pursuing evidence-based medicine. And this starkly contrasts with the huge sums they have spent on '<u>boutique relations</u>' consultants advising the government.

The only studies which *have* shown masks to be effective at stopping airborne diseases have been 'observational' – which observe the people who ordinarily use masks, rather than attempting to create a randomised control group. These trials include six studies carried out in the Far East during the SARS CoV-1 outbreak of 2003, which showed that masks can work, especially when they are used by healthcare workers and patients alongside hand-washing.

But observational studies are prone to recall bias: in the heat of a pandemic, not very many people will recall if and when they used masks and at what distance they kept from others. The lack of random allocation of masks can also 'confound' the results and might not account for seasonal effects. A recent observational study paper had to be <u>withdrawn</u> because the reported fall in infection rates over the summer was reverted when the seasonal effect took hold and rates went back up.

This is why large, randomised trials like this most recent Danish study are so important if we want to understand the impact of measures like face masks. Many people have argued that it is too difficult to wait for randomised trials – but Danmask-19 has shown that these kind of studies are more than feasible.

And <mark>now that we have properly rigorous scientific research we can rely on, the evidence shows that wearing masks in the community does not significantly reduce the rates of infection.</mark>

*Due to the large number of people passing comment on the article on social media without reading it, we have updated the headline to emphasise that the study is about facemask <u>wearers</u>. Covid data can be found on our data hub: <u>data.spectator.co.uk</u>*

**Read next**

Latest

0

Matuschek et al. Eur J Med Res   (2020) 25:32
https://doi.org/10.1186/s40001-020-00430-7

Plaintiffs' Exhibit 210

European Journal of Medical Research



---

**REVIEW**                                                                                              **Open Access**

# Face masks: benefits and risks during the COVID-19 crisis

Christiane Matuschek[1†], Friedrich Moll[2†], Heiner Fangerau[2], Johannes C. Fischer[3], Kurt Zänker[4], Martijn van Griensven[5] , Marion Schneider[6], Detlef Kindgen-Milles[7], Wolfram Trudo Knoefel[8], Artur Lichtenberg[9], Balint Tamaskovics[1], Freddy Joel Djiepmo-Njanang[1], Wilfried Budach[1], Stefanie Corradini[10], Dieter Häussinger[11], Torsten Feldt[11], Björn Jensen[11], Rainer Pelka[12], Klaus Orth[13], Matthias Peiper[14], Olaf Grebe[15], Kitti Maas[1], Peter Arne Gerber[14], Alessia Pedoto[16], Edwin Bölke[1*]  and Jan Haussmann[1]

## Abstract

**Background:** The German government has made it mandatory to wear respiratory masks covering mouth and nose (MNC) as an effective strategy to fight SARS-CoV-2 infections. In many countries, this directive has been extended on shopping malls or public transportation. The aim of this paper is to critically analyze the statutory regulation to wear protective masks during the COVID-19 crisis from a medical standpoint.

**Methods:** We performed an extensive query of the most recent publications addressing the prevention of viral infections including the use of face masks in the community as a method to prevent the spread of the infection. We addressed the issues of practicability, professional use, and acceptability based on the community and the environment where the user resided.

**Results:** Upon our critical review of the available literature, we found only weak evidence for wearing a face mask as an efficient hygienic tool to prevent the spread of a viral infection. However, the use of MNC seems to be linked to relevant protection during close contact scenarios by limiting pathogen-containing aerosol and liquid droplet dissemination. Importantly, we found evidence for significant respiratory compromise in patients with severe obstructive pulmonary disease, secondary to the development of hypercapnia. This could also happen in patients with lung infections, with or without SARS-CoV-2.

**Conclusion:** Epidemiologists currently emphasize that wearing MNC will effectively interrupt airborne infections in the community. The government and the politicians have followed these recommendations and used them to both advise and, in some cases, mandate the general population to wear MNC in public locations. Overall, the results seem to suggest that there are some clinically relevant scenarios where the use of MNC necessitates more defined recommendations. Our critical evaluation of the literature both highlights the protective effects of certain types of face masks in defined risk groups, and emphasizes their potential risks.

*Correspondence: boelke@med.uni-duesseldorf.de
†Christiane Matuschek and Friedrich Moll are both considered as first authors
[1] Department of Radiation Oncology, Heinrich Heine University, Dusseldorf, Germany
Full list of author information is available at the end of the article
Dedicated to Prof. Dr. Hans-Jürgen Peiper, Göttingen, on the occasion of his 95th birthday

## Introduction

The knowledge that the use of face masks delays the SARS-CoV-2 transmission is rapidly gaining popularity in the general population. Politicians need guidance on how masks should be used by the public to fight the



© The Author(s) 2020. This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

Matuschek *et al. Eur J Med Res*    (2020) 25:32



**Fig. 1** FFP (*filtering face piece*) mask without valve



**Fig. 2** FFP (*filtering face piece*) mask with valve

COVID-19 pandemic crisis. In this review, we summarize the relevant literature on this topic.

*"The surgical face mask has become a symbol of our times."*

On March 17th, 2020, this was the headline of an article in the New York Times on the role of face masks during the COVID-19 outbreak. Face masks have become a clothing accessory that is worn every day and everywhere. A variety of shapes, forms, and materials are being used and advertised to the point that in 2020 the business of producing and selling face masks was born.

In Germany, the government has ruled that wearing a face mask is obligatory to protect the population from any risks of airborne illness, according to the constitutional law [1] stating that "Protection must be easily provided to every citizen in the country."

The aim of this paper is to analyze and critically discuss the regulations of some Federal States in Germany, which require protective masks in public to conform to similar regulations already in place in other countries.



**Fig. 3** Homemade face mask for everyday use

Most masks covering the mouth are named mouth nose covering (MNC) according to the Robert Koch Institute (RKI; the German federal government agency and research institute responsible for disease control and prevention) and do not protect against respiratory and airborne infections. In the following review, the term "protective masks" will be used to describe any type of face mask.

## Face masks protecting from infections

Respiratory masks (RM) are protective devices covering a part of the face. They are designed to protect both the person who wears them and the immediate environment from breathable pollutants (respiratory poisons or



**Fig. 4** Surgical mask (MNP)

Matuschek *et al. Eur J Med Res*        (2020) 25:32

bacterial/viral pathogenic organisms). Different masks can be classified as I) *full masks* (normed following EN 136) and II) *half and quarter masks* (EN 140) (Figs. 1, 2, 3 and 4). While a *full mask* covers the whole face, a *half-mask* fits from under the chin to above the nose, a *quarter mask* fits from the top of the nose to the top of the chin. The breathing resistance varies proportionally to the density of the mask material.

**FFP masks** (*filtering face piece*) are classified as *half masks*. Their use is required to prevent the entry of pathogens through the airway and have the role of protecting both the wearer and the surrounding people. They are different from medical MNC, (often referred to as "surgical masks"), and from "self-made" masks for everyday use. ==MNCs and self-made masks are not "leak-proof" and do not provide complete respiratory protection since air can escape through them.== FFP masks come without (Fig. 1) or with (Fig. 2) a valve. FFP (filtering face piece) masks with valves provide an air flow from the inside to the outside of the mask. FFP 1 masks are dust masks and mainly used for this purpose. They do not prevent COVID-19 infections. FFP1 masks are suitable for work environments in which only non-toxic dusts are found. FFP2 masks are suitable for work environments where there are pathogens and mutagens in the air composition.

In the context of SARS-CoV-2 the following types of masks are available (WHO, 2020):

1. ==Masks for everyday use (temporary masks made from fabric, etc.; Fig. 3): These masks grant no protection for the user from being infected.== However, it is safe to assume there is a small risk reduction for droplet transmission, especially during exhalation, resulting in a reduction of potential viral spread. These masks should not be used in the health care system, but are commonly recommended for the general population for walking, shopping, or using public transportation.
2. MNP (= medical mouth–nose protection; Fig. 4): often referred to as a "surgical mask". The industrial production of MNP abides to strict rules to provide protections against infection. The filtering capability is like the one for everyday use masks and they are intended to protect patients. They are approved for medical staff use, warrantying only patient-protection, specifically aimed against aerosols.
3. FFP2-mask (= face filtering piece)/N95-mask: FFP2-masks fulfil a set of stricter protective norms. They protect the person wearing them, as > 95% of particles and droplets are held back when inhaling. FFP2-masks also effectively protect the environment as long as there is no exhaling valve. In contrast, masks with an exhaling valve let exhaled air pass out unfil-

tered, with contamination of the immediate environment.
4. FFP3-mask: FFP3-masks protect the user even more effectively than FFP2, as > 99% of droplets and particles are filtered when inhaling. FFP3-masks also protect the environment in the absence of an exhaling valve.

A full face mask in a level-3 biosafety lab is shown in Fig. 5.

==The WHO states that the declared protective effect of these masks recommended during the SARS-CoV-2 pandemic can be severely reduced by their inappropriate use, such as improper donning or doffing, insufficient maintenance, long or repeated use of disposable masks, no dry cleaning of fabric masks, or using masks made of non-protective material== [2].

During an epidemic/pandemic crisis every possible risk reduction strategy is useful. It is likely that the risk of infection and its severity depends on the viral load entering the body. This was the rationale for the Robert Koch Institute (RKI) to recommend the use of masks starting



**Fig. 5** Full face mask in a level-3 biosafety lab (source: Wikipedia https://en.wikipedia.org/wiki/Face_masks_during_the_COVID-19_pandemic)

Matuschek *et al. Eur J Med Res*    (2020) 25:32

from March 2020. Specifically, they looked at the availability of the resources and tailored the supply to the risk of infection. Healthcare workers were considered essential workers at high risk of infection, therefore prioritized to the use of FFP2/3 masks, while MNC or masks for everyday use were to be made available for the general population.

## Current decree on wearing a mouth and nose covering

Due to the German Federalism, the Federal Minister of Health can only make health recommendations, which are then reinforced by the Infection Protection Act of the different Federal States. In the current situation of a pandemic crisis, nearly all measures are taken to prevent an exponential increase of new SARS-CoV-2 infections.

As of June 1st, 2020, the Netherlands considers the public use of protective masks unnecessary. This is based on the assumption that SARS-CoV-2 is only transmitted as a droplet infection via the nasopharynx pathway, which mostly occurs during coughing or sneezing. These droplets do not stay in the air, but rather drop to the ground within a 1.5 m radius if larger than 5 µm [3]. It has been postulated that for SARS-CoV-2—in contrast to other respiratory-driven infections—the droplets in the aerosols are of little relevance for a COVID-19 outbreak. Therefore, securing a 1.5-m social distance is assumed to be an essential and sufficient preventive measure. However, recent data published in 2020 using high-speed cameras show that small droplets of saliva and mucus can fly up to 8 m [4], requiring critical reconsideration of the above-mentioned assumption.

We conducted a Medline survey to scientifically justify this approach with the key words SARS-CoV-2, face masks, COVID-19, pandemic.

Leung and colleagues [5] screened more than 3000 individuals and identified 123 patients suffering from a viral respiratory infection. The viral load in the exhaled aerosol and droplets were different depending on the etiology of the infection, but was exponentially reduced by wearing surgical masks (cat. no. 62356, Kimberly-Clark). More viral particles were released through coughing. Generally, the authors reported a notably higher viral load in nose swabs compared to throat swabs. This data applied to influenza, corona, and rhino virus. No data are available for SARS-CoV-2 yet.

In general, droplets, and hence SARS-CoV-2, can be transferred via direct contact or smear transfection modality when the hands are contaminated from touching the nose or the face and then come in direct contact with others, e.g. by handshaking. For this reason, not only the "*cough etiquette*", but regular and thorough handwashing are a significant and mandatory hygienic rule (6).

As a result of scientific data combined with daily routine, the RIVM (Rijksinstituut voor Volksgezondheid en Milieu, the Dutch equivalent of the RKI) has mandated to wear masks while using public transportation, due to the inability of maintaining enough protective distance, especially when riding during rush hour. This rule does not apply to other public spaces yet.

## Summarizing the arguments in favour of wearing a mask

- Wearing a mask in areas where sufficient distance is not feasible, such as public transportation, most likely reduces the spread of virus-loaded droplets and therefore the risk of transferring SARS-CoV-2.
- It is indisputable that infected patients can transfer SARS-CoV-2 to other people, starting few days before manifesting clinical symptoms or during the incubation period. However, there is no reliable data concerning the amount of virus particles that can be spread by an asymptomatic person, when keeping a minimum safe distance.

## Main arguments against wearing a mask

- If there is a limited supply of protective masks, they should be reserved for health care workers in hospitals and care facilities. This applies for surgical masks and for FFP2 and FFP3 masks.
- Masks give a false sense of security. The main role of MNC is the protection of people standing nearby. MNC do not protect the wearer.
- It is essential to wear the mask correctly. It must fit airtight to the skin, otherwise its effect is lost. Doffing of the mask needs to be properly done as well. The outside of the mask should not be touched. When supply is not an issue, surgical masks should be used only once.
- The lack of nonverbal communication when wearing a mask may make people feel insecure, disheartened or even psychologically troubled. This may be particularly true for people suffering from mental illness or hearing impairment.
- Breathing dampens the mask. If there is excessive moisture, the masks become airtight. Therefore, air is inhaled and exhaled unfiltered around the edges, losing the protective effect for both the wearer and the environment.

Matuschek et al. Eur J Med Res        (2020) 25:32

- If masks are not exchanged regularly (or washed properly when made of cloth), pathogens can accumulate in the mask. When improperly used, the risk of spreading the pathogen—including SARS-CoV-2—might be critically increased.

## Protective masks in context of rivalling concerns

In Germany, the COVID-19 pandemic has been more contained than in other European countries or even worldwide. However, we are not immune to this infection. It is imperative to implement any measure to control the spread of the infection, or at least the speed of diffusion to the population. It is important to make sure that the German health care system does not deplete its resources. Theoretically, we are affected by the scarcity of mask supply like other nations or countries. People who risk their health and even their lives need to be protected. There should be a fine balance when suggesting preventive measures, since reinforcing them indiscriminately may contribute to psychological discomfort, acts of violence, and financial strain.

## Available data

The summarized studies examine different types of masks focussing on FFP/N-95 masks. As expected, there are no scientific studies on economic and social consequences of wearing masks (Table 1).

In the following, the most important results are summarized.

### Study 1—PPE

Chia et al. (2005) [6] used a questionnaire to analyze the perception of doctors, nurses and other personnel on the role of PPE (=personal protective equipment) during the SARS-outbreak in Singapore over a period of 2 months in 2003. In summary, 32.5% of doctors, 48.7% of nurses and 77% of the administrative personnel thought that a simple MNP would be sufficient to prevent the SARS-infection. It was evident that even qualified staff did not have sufficient knowledge on the protective properties of face masks during a pandemic. This study highlights the importance of adequate communication, education and exchange of information in a timely fashion.

### Study 2—MNP masks

Lipp et al. (2005) [7] investigated the pattern of use and the protective effects of masks on wound infections using a questionnaire in two randomized studies. While the use of MNP was statistically beneficial in a smaller study (n=200), the same recommendations were not valid when a larger cohort (n=1250) was studied.

### Study 3—MNP vs. N95 valve masks

Li (2008) [8]: this study compared the protective effects of simple MNP with two different N95 masks with different valve systems. In contrast to the commonly available masks, this model had valves placed on the sides and was studied in an experimental setting with artificial droplets. All masks blocked the inside transmission of droplets from the front. The effectiveness of the regular MNP mask was only 95–97% when compared to the N95, which had a protective effect of 99%. Thus, N95 masks offer considerably better protection from influenza and SARS virus infections when compared to other mask types.

### Study 4—masks for everyday use

Rengasamy (2010) [9]: the protective effect of masks for everyday use made from different materials was tested against 20–1.000 nm particles with different velocities and compared to N95 masks. This study found marginal protective effects against exhaled particles. Specifically, depending on the material and dampness, 40–90% of aerosols were able to penetrate through these masks.

### Study 5—N95 vs. MNP

Smith et al. (2016) [10] analyzed all the available literature from 1990 to 2014, including 3 randomized controlled studies, one cohort study and 2 case–control studies comparing MNP vs N95 masks. Their meta-analyzis assessed: (a) the laboratory-proven infection rate,

**Table 1  Most important publications**

| First author | Year | Recommendation |
| --- | --- | --- |
| Li [8] | 2008 | N95 masks offer considerably better protection from influenza and SARS virus |
| Zhou [11] | 2018 | Protective effect for N95 masks for influenza and rhinovirus |
| Verbeek [13] | 2020 | Protecting the whole body is not superior to protecting different parts separately |
| Konda [12] | 2020 | Cotton masks have a high protective effect |

Matuschek *et al. Eur J Med Res*    (2020) 25:32

(b) influenza-related infections, and (c) work absence secondary to illness in employees. Their results indicated that the overall calculated risk assessment is not considerably improved using more sophisticated N95 masks.

### Study 6—N95

Zhou and colleagues (2018) [11] examined the role of various features on N95 masks, including valves for a more comfortable breathing, on the rate of infection. The endpoint was the retention of small particles of around 2.5 μm. The results revealed that the protective effect was sufficient against the examined viruses including influenza and rhinovirus.

### Study 7—masks for everyday use

Konda et al. (2020) [12] investigated the use of different materials on the effective filtration capabilities of masks for everyday use. They demonstrated that a combination of different materials such as cotton and silk, can be more effective than one material alone. Moreover, they revealed that densely woven cotton provides significantly more protection than cotton with looser weaves. A proper fit is particularly important to avoid leakage. The authors recommended the use of cotton masks that have a high protective effect and only little restriction when breathing.

### Study 8—meta-analysis comparing PPE partial vs. complete protection

Verbeek (2020) [13]: a recent meta-analysis investigating PPE (personal protection equipment) masks looked at 24 studies with a total of 2.278 participants. Fourteen studies were randomized, one was quasi-randomized and nine had no study design with randomization. Eight studies compared different PPE even though personal protective equipment included more than the mask. Six studies evaluated the quality of the protective equipment. 75% of these studies used a simulated exposure with fluorescent markers tagged on harmless microbes. They concluded that protecting the whole body is not superior to protecting different parts separately. Furthermore, proper donning and doffing protocols were more beneficial in preventing the spread of the disease. Both steps require proper training to be effective.

### Conclusion of the studies

Currently, most of the literature available on this topic is from experimental investigations. As expected, all the studies demonstrated an increase in protective effects in the following order: masks for everyday use–MNP–N95/FFP–PPE. Masks for everyday use can have a small protective effect for the wearer. MNP offers a greater protective effect since it was originally designed to decrease

droplet elimination, therefore protecting the user's surroundings. Unfortunately, due to ethical reasons, there is a lack of randomized controlled studies on the protective role of masks in the prevention of SARS-CoV-2 infections when compared to a control group with no masks. Since the Netherlands lack of a law to wear protection masks in public except for public transport since May 2020, it could serve as the control in future studies that compare the infection rates of different countries with different approaches to tackling the pandemic.

In 2016, Smith et al. [10] concluded that possible advantages of wearing a mask were difficult to apply to the social "day-to-day" situation. Konda et al. (12) highlighted the inability to discriminate between the protective effects of the mask on the environment, when worn by an infected person, versus the general protective effect within a given population. This would not have a significant health benefit if only a small percentage of individuals were infected. Only a study done in infected people with and without masks would allow a clear conclusion on the role of masks on the spread of the infection. Finally, a lesson learnt from the COVID pandemic shows significant educational gaps and lack of basic training that need to be addressed. The state should guarantee mask supply for everyone and educate on the proper use. Mass means of communication could be used for this purpose. A commercial broadcast before the daily news about the correct donning and doffing of the mouth and nose protection and its disinfection could reach a vast audience. In addition to public law, private and digital media, as well as healthcare providers such as doctors, pharmacists and nursing staff could also play an important role in education.

### Consequences of the use of protective masks on the wearer—pathophysiologic considerations

Wearing a mask has its own advantages and indisputable protective effects against infections. However, there are also potential risks and side effects that require attention. This specifically applies to the use in the general population.

From a medical standpoint, there is a theoretical possibility of an airflow obstruction when wearing a mask. A subjective feeling of strained breathing rarely occurs when wearing surgical masks. When wearing very dense masks without valves (N95/FFP2-3), breathing occurs against an air flow resistance. Theoretically, an increase in work of breathing can occur, especially during physical exertion.

Depending on the design, masks can increase the lung's dead space. In extreme cases, carbon dioxide retention (hypercapnia) can occur with side effects. Only few investigations are available and addressing this medical

Matuschek et al. Eur J Med Res    (2020) 25:32

==problem.== The available literature examined different types of N95 masks in the industrial setting in detail [14–16], and found relevant effects on the wearer. In this context, Kim et al. [17] studied the role of N95 masks on lung function and heart rate during low-to-moderate exercise/physical work load. Only healthy subjects seem to tolerate wearing such a mask. Studies conducted on employees in advanced stages of pregnancy showed a good tolerance for masks. The results of this study, even though specific to this population, are valuable for the daily use of MNP as a general mean of protection [18]. Finally, the role of N95/FFP-2 masks was tested in 97 patients with advanced COPD while undergoing a 6-min walk test. Seven patients did not tolerate the test and stopped prematurely. The respiratory rate, oxygen saturation and $CO_2$ levels changed significantly while wearing N95/FFP2 masks. These results demonstrated the potential risks of wearing this type of mask in the presence of advanced COPD [19]. Their use should be recommended with caution in this patient population, a questionably relevant recommendation, since the use of these masks is limited to health care workers in direct contact with COVID patients. Finally, people with hearing impairment rely on lip reading to understand others. This is not possible when wearing a mask.

## Conclusion

Measures to prevent infections are necessary in the current pandemic. Face masks have been considered a first step to prevent and contain the spread of the disease. Different types of masks are available on the market for this purpose.

Simple masks covering mouth and nose are primarily used to prevent transmission by holding back droplets. This is useful when the recommended minimum distance of 1.5 m is not feasible. The ==masks provide only limited self-protection for its wearer and this is only when they are used properly.==

High-quality FFP2/3 masks are a more reliable protection from infections. They should always be available for medical staff and people at risk. When used by the general population, specific groups at risk for complications related to the mask use should be educated on what to expect. For example, patients with severe COPD can experience a deterioration of their respiratory parameters. Therefore, patients must be individually educated by their general practitioner about the risk of wearing MNC.

Finally, it is imperative that the user is educated on the different types of masks available, how and when to wear them and, above all, how to handle them correctly, similar to the safety instructions given before take off in an aircraft.

Our results are consistent with the ones recently reported by Chu et al. in Lancet [20]. These publications will help guide the decisions of politicians and caregivers on when and where to use the available tools to fight a viral pandemic.

### Abbreviations

COPD: Chronic obstructive pulmonary disease; COVID-19: Coronavirus disease 2019; EN: European normalization; FFP: Filtering face piece; MNC: Masks covering mouth and nose; MNP: Medical mouth–nose protection; N95: Masks filtering > 95% of particles and droplets; PPE: Personal protective equipment; RIVM: Rijksinstituut voor Volksgezondheid en Milieu the Dutch federal government agency and research institute responsible for disease control and prevention; RKI: Robert Koch Institute the German federal government agency and research institute responsible for disease control and prevention; RM: Respiratory masks; SARS: Severe acute respiratory syndrome; SARS-CoV-2: Severe acute respiratory syndrome coronavirus 2; WHO: World Health Organization.

### Acknowledgements

The authors would like to thank Miriam Barnett and Harsha Swamy (Department of Pharmacology and Physiology, University of Rochester Medical Center, Rochester, NY, USA) for their critical examination of the manuscript.

This work is dedicated to Hans Jürgen Peiper, former president of the German Society of Surgery (1987).



Source: https://de.wikipedia.org/wiki/Hans-Jürgen_Peiper

### Authors' contributions

CM, FM, HF, JCF, KZ, MvG, MS, DKM, WTK, AL, BT, FDN, WB, SC, DH, TF, BJ, RP, KO, MP, OG, KM, EB, AP and JH wrote parts of the manuscript. FM and HF did the literature research and prepared the data for analysis. CM, FM, EB and JH contributed significantly to the discussion on the interpretation of the results. All authors read and approved the final manuscript.

### Funding

There was no funding for this investigation.

### Availability of data and materials

All data and materials can be accessed via CM and FM.

### Ethics approval and consent to participate

There was no ethics approval necessary because this is a review of the literature.

Matuschek et al. Eur J Med Res     (2020) 25:32

**Consent for publication**
All authors gave consent for the publication.

**Competing interests**
The authors declare that they have no competing interests.

**Author details**
[1] Department of Radiation Oncology, Heinrich Heine University, Dusseldorf, Germany. [2] Department of the History, Philosophy and Ethics of Medicine, Heinrich Heine University, Medical Faculty, Dusseldorf, Germany. [3] Institute for Transplant Diagnostics and Cell Therapeutics, Heinrich Heine University, Dusseldorf, Germany. [4] Center for Biomedical Education and Research (ZBAF), University Witten/Herdecke, Witten, Germany. [5] Department cBITE, MERLN Institute for Technology-Inspired Regenerative Medicine, Maastricht University, Maastricht, The Netherlands. [6] Department of Experimental Anesthesiology, University of Ulm, Ulm, Germany. [7] Department of Anesthesiology and Intensive Care Medicine, Heinrich Heine University, Dusseldorf, Germany. [8] Department for General Visceral and Pediatric Surgery, Heinrich Heine University, Dusseldorf, Germany. [9] Department for Cardiac Surgery, Heinrich Heine University, Dusseldorf, Germany. [10] Department of Radiation Oncology, University Hospital, LMU Munich, Germany. [11] Department of Gastroenterology, Hepatology and Infectious Diseases, Heinrich Heine University, Dusseldorf, Germany. [12] Institute for Applied Statistics, Munich, Germany. [13] University of Hannover, Hannover, Germany. [14] Heinrich-Heine-University, Dusseldorf, Germany. [15] Department for Cardiology, Rhythmology and Intensive Care Medicine, Evangelic Hospital, Dusseldorf, Germany. [16] Department of Anesthesiology, Memorial Sloan Kettering Cancer Center, New York, NY, USA.

Received: 18 May 2020   Accepted: 21 July 2020
Published online: 12 August 2020

**References**
1. BVerfG, Urteil des Ersten Senats vom 10. Juni 2009 - 1 BvR 706/08 -, Abs. 171. http://www.bverfg.de/e/rs20090610_1bvr070608.html.
2. Sonntag Grundriß. der gesamten Chirurgie Allgemeine Chirurgie 1. Abschnitt Aseptik Springer: Berlin Heidelberg; 1937.
3. Wells WF, Wells MW. Air-Borne Infection. J Am Med Assoc. 1936;107(21):1698–703.
4. Bourouiba, L., Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19. Jama, 2020.
5. Leung NHL, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. Nat Med. 2020;26(5):676–80.
6. Chia SE, et al. Appropriate use of personal protective equipment among healthcare workers in public sector hospitals and primary healthcare polyclinics during the SARS outbreak in Singapore. Occup Environ Med. 2005;62(7):473–7.
7. Lipp, A. and P. Edwards, Disposable surgical face masks: a systematic review. Can Oper Room Nurs J, 2005. **23**(3): p. 20-21, 24-25, 33-38.
8. Li Y, et al. Transmission of communicable respiratory infections and face-masks. J Multidiscip Healthc. 2008;1:17–27.
9. Rengasamy S, Eimer B, Shaffer RE. Simple respiratory protection–evaluation of the filtration performance of cloth masks and common fabric materials against 20–1000 nm size particles. Ann Occup Hyg. 2010;54(7):789–98.
10. Smith JD, et al. Effectiveness of N95 respirators versus surgical masks in protecting health care workers from acute respiratory infection: a systematic review and meta-analysis. CMAJ. 2016;188(8):567–74.
11. Zhou SS, et al. Assessment of a respiratory face mask for capturing air pollutants and pathogens including human influenza and rhinoviruses. J Thorac Dis. 2018;10(3):2059–69.
12. Konda, A., et al., Aerosol Filtration Efficiency of Common Fabrics Used in Respiratory Cloth Masks. ACS Nano, 2020.
13. Verbeek, J.H., et al., Personal protective equipment for preventing highly infectious diseases due to exposure to contaminated body fluids in healthcare staff. Cochrane Database Syst Rev, 2020. **4**: p. CD011621.
14. Sinkule EJ, Powell JB, Goss FL. Evaluation of N95 respirator use with a surgical mask cover: effects on breathing resistance and inhaled carbon dioxide. Ann Occup Hyg. 2013;57(3):384–98.
15. Roberge RJ. Are exhalation valves on N95 filtering facepiece respirators beneficial at low-moderate work rates: an overview. J Occup Environ Hyg. 2012;9(11):617–23.
16. Roberge RJ, et al. Surgical mask placement over N95 filtering facepiece respirators: physiological effects on healthcare workers. Respirology. 2010;15(3):516–21.
17. Kim JH, Benson SM, Roberge RJ. Pulmonary and heart rate responses to wearing N95 filtering facepiece respirators. Am J Infect Control. 2013;41(1):24–7.
18. Roberge RJ, Kim JH, Powell JB. N95 respirator use during advanced pregnancy. Am J Infect Control. 2014;42(10):1097–100.
19. Kyung SY, et al. Risks of N95 Face Mask Use in Subjects With COPD. Respir Care. 2020;65(5):658–64.
20. Chu DK, Akl EA, Duda S, et al. Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis. Lancet. 2020. https://doi.org/10.1016/S0140-6736(20)31142-9 [published online ahead of print, 2020 Jun 1].

**Publisher's Note**
Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

Ready to submit your research?  Choose BMC and benefit from:

- fast, convenient online submission
- thorough peer review by experienced researchers in your field
- rapid publication on acceptance
- support for research data, including large and complex data types
- gold Open Access which fosters wider collaboration and increased citations
- maximum visibility for your research: over 100M website views per year

**At BMC, research is always in progress.**

**Learn more** biomedcentral.com/submissions



Plaintiffs' Exhibit 211

iata.org

# Cabin Air & Low Risk of On Board Transmission

5-6 minutes

___

The quality of supplied air on board an aircraft is much better than most indoor environments. This along with other cabin features ████████████████ ████████████████ make the risk of contracting COVID-19 to be **very low**.

Nonetheless, here are some features about the cabin air quality.

**How good is the cabin air?**

The risk of transmission in the modern cabin environment is low for a number of reasons: passengers face the same direction, seatbacks act as barriers, air flow is from the top to bottom, and the air is also very clean.

**20-30**

Cabin air is refreshed 20-30 times an hour

About 10 times more than most office buildings

**50/50**

The air supplied on board an aircraft is half HEPA-filtered and half fresh air

**99.993%**

This is the bacteria/virus removal efficiency rate of the HEPA filters onboard

It includes SARS, which is similar to COVID-19

**Top to bottom air flow**

The direction of the air flow in an aircraft is from top to bottom, and not along the length of the aircraft





### HEPA filters

Most modern jet aircraft are equipped with High-Efficiency Particulate Air (**HEPA**) filters. These filters have similar performance to those used in hospital operating theatres and industrial clean rooms.

These HEPA filters are 99.9+% effective at removing viruses, bacteria and fungi.

### Higher rate of air renewal than in other indoor facilities

The air in the aircraft cabin comprises of around 50% fresh air from outside the aircraft and 50% of HEPA filtered air. The air in the cabin is also renewed 20-30 times an hour or once every 2-3 minutes.

### Main conclusions from cabin Air Studies

- **Harvard T.H. Chan School of Public Health**

  Researchers at the Harvard T.H. Chan School of Public Health have released a report on COVID-19 transmission and risk mitigation while flying. They found that the multiple layer of measures, including ██████████████████ more frequent disinfection, together with the aircraft airflow systems, results in a very low risk of COVID-19 transmission on aircraft.

- **US Transportation Command (Transcom), Department of Defense**

  Research by the US Transcom showed that aerosol particles were "rapidly diluted by the high air exchange rates" of a typical aircraft cabin. Aerosol particles remained detectable for a period of less than six minutes on average. Both aircraft models (B777 and B767) tested removed particulate matter 15 times faster than a typical home ventilation system and 5-6 times faster "than the recommended design specifications for modern hospital operating or patient isolation rooms."

  Mannequins with and without face masks sat in various seats on the aircraft while fluorescent tracer particles were released at intervals of two seconds to simulate breathing for a minute during ground and in-flight tests. Real-time fluorescent particle sensors were placed throughout the aircraft at the breathing zone of passengers to measure concentration over time.

- **Airbus**

  Airbus used computational fluid dynamics (CFD) research to create a highly accurate simulation of

the air in an A320 cabin, to see how droplets resulting from a cough move within the cabin airflow. The simulation calculated parameters such as air speed, direction and temperature at 50 million points in the cabin, up to 1,000 times per second. The same tools were used to model a non-aircraft environment, with several individuals keeping six feet (1.8 meters) distance between them. The result was that potential exposure was *lower* when seated side by side on a plane than when staying six feet apart in an environment such as an office, classroom or grocery store.

View the Airbus Presentation (pdf)

- **Boeing**

Using CFD, Boeing researchers tracked how particles from coughing and breathing move around the airplane cabin. Various scenarios were studied including the coughing passenger with and without a mask, the coughing passenger located in various seats including the middle seat, and different variations of passengers' individual overhead air vents (known as gaspers) on and off. The modeling determined the number of cough particles that entered the breathing space of the other passengers. Based on the airborne particle count, passengers sitting next to one another on an airplane is the same as standing more than seven feet (or two meters) apart in a typical building environment.

View the Boeing Presentation (pdf)
Access the Boeing Research (pdf)

- **Embraer**

Using CFD, cabin air flow and droplet dispersion models validated in full-scale cabin environment testing, Embraer analyzed the cabin environment considering a coughing passenger in several different seats and air flow conditions in our different aircraft to measure these variables and their effect. The research Embraer completed shows that risk of onboard transmission is extremely low, and the actual data on in-flight transmissions that may have occurred, supports these findings.

View the Embraer Presentation (pdf)

# Plaintiffs' Exhibit 212

theconversation.com

# Face masks cut disease spread in the lab, but have less impact in the community. We need to know why

*Paul Glasziou*

7-9 minutes

In controlled laboratory situations, face masks appear to do a good job of reducing the spread of coronavirus (at least in hamsters) and other respiratory viruses. However, evidence shows mask-wearing *policies* seem to have had much less impact on the community spread of COVID-19.

Why this gap between the effectiveness in the lab and the effectiveness seen in the community? The real world is more complex than a controlled laboratory situation. The right people need to wear the right mask, in the right way, at the right times and places.

The real-world impact of face masks on the transmission of viruses depends not just on the behaviour of the virus but also on the behaviour of aerosol droplets in diverse settings, and on the behaviour of people themselves.

We carried out a comprehensive review of the evidence about how face masks and other physical interventions affect the spread of respiratory viruses. Based on the current evidence, we believe the community impact is modest and it may be better to focus on mask-wearing in high-risk situations.

***Read more:*** *How a 150-year-old experiment with a beam of light showed germs exist -- and that a face mask can help filter them out*

## The evidence

Simply comparing infection rates in people who wear masks with those who don't can be misleading. One problem is people who don't wear masks are more likely go to crowded spaces, and less likely to socially distance. People who are more concerned often adhere to several protective behaviours — they are likely to avoid crowds and socially distance as well as wearing masks.

That correlation between mask wearing and other protective behaviours might explain why studies comparing mask-wearers with non-mask-wearers (known as "observational studies") show larger effects than seen in trials. Part of the effect is due to those other behaviours.

The most rigorous, but difficult, way to evaluate the effectiveness of masks is to take a large group of people and ask some to wear masks and others not to, in a so-called controlled trial. We found nine such trials have been carried out for influenza-like illness. Surprisingly, when combined, these trials found only a 1% reduction in influenza-like illness among mask-wearers compared with non-mask-wearers, and a 9% reduction in laboratory-confirmed influenza. These small reductions are not statistically significant, and are most likely due to chance.

***Read more:*** *13 insider tips on how to wear a mask without your glasses fogging up, getting short of breath or your ears hurting*

None of these trials studied COVID-19, so we can't be sure how relevant they are to the pandemic. The SARS-CoV-2 coronavirus is a similar size to influenza, but has a different capacity to infect people, so it is possible masks might be more or less effective for COVID-19. A recently published trial in Denmark of 4,862 adults found infection with SARS-CoV-2 occurred in 42 participants randomised to masks (1.8%) compared to 53 control participants (2.1%), a (non-significant) reduction of 18%.

The most comprehensive between-country study of masks for COVID-19 infection is a comparison of policy changes, such as social distancing, travel restrictions, and mask wearing, across 41 countries. It found introducing a mask-wearing policy had little impact, but mask policies were mostly introduced after social distancing and other measures were already in place.



The Conversation, Author provided

### What might diminish the effect of masks?

Why might masks not protect the person wearing them? There are several possibilities. Standard masks only protect your nose and mouth incompletely, for one thing. For another, masks don't protect your eyes.

The importance of eye protection is illustrated by a study of community health workers in India. Despite protection by three-layer surgical masks, alcohol hand rub, gloves, and shoe covers, 12 of 60 workers developed COVID-19. The workers were then supplied with face shields (which provide eye protection) — in addition to the personal protective equipment (PPE) described above — and none of the 50 workers became infected despite higher case load.

Why masks might fail to clearly protect others is more complex. Good masks reduce the spread of droplets and aerosols, and so should protect others.



*Things that might make masks less effective.* Paul Glasziou, Author provided

However, in our systematic review we found three trials that assessed how well mask wearing protects others, but none of them found an obvious effect. The two trials in households where a person with influenza wore a mask to protect others in fact found a slight increase in flu infections; and the third trial, in college dormitories, found a non-significant 10% relative reduction.

We don't know if the failure was the masks or participants' adherence. In most studies adherence was poor. In the trials very few people wear them all day (an average of about four hours by self-report, and even less when directly observed). And this adherence declined with time.

But we also have little research on how long a single mask is effective. Most guidelines suggest around four hours, but studies on bacteria show masks provide good protection for the first hour and by two hours are doing little. Unfortunately, we could not identify similar research examining viruses.





*Making masks mandatory only in crowded places, close-contact settings, and confined and enclosed spaces
may be more effective.* Dan Himbrechts / AAP

### Is it better to focus masks on the 3 Cs: covered, crowded and close contact?

In addition to the completed Danish trial, another ongoing trial in Guinea-Bissau with 66,000
participants randomised as whole villages may shed more light as it tests the idea of source control.
But given the millions of cases and billions of potential masks and mask wearers, more such trials are
warranted.

We know masks are effective in laboratory studies, and we know they are effective as part of
personal protective equipment for health care workers. But that effect appears diminished in
community usage. So in addition to the trials, new research is urgently needed to unravel each of the
reasons why laboratory effectiveness does not seem to have translated into community effectiveness.
We must also develop ways to overcome the discrepancy.

Until we have the needed research, we should be wary about relying on masks as the mainstay for
preventing community transmission. And if we want people to wear masks regularly, we might do
better to target higher-risk circumstances for shorter periods. These are generally places described
by "the three Cs": crowded places, close-contact settings, and confined and enclosed spaces. These
would include some workplaces and on public transport.

We are likely to be better off if we get high usage of fresh masks in the most risky settings, rather than
moderate usage everywhere.

---

***Read more:*** *How should I clean my cloth mask?*

---

Plaintiffs' Exhibit 213

**Perma.cc record**

Captured March 9, 2021 3:51 pm    See the Capture View (/GY2U-26B3)    What is Perma.cc? (/about)

Show record details

View the live page    (https://www.oann.com/cdc-face-masks-dont-prevent-covid-19-study-finds-masks-have-had-negligible-impact-on-coronavirus)



HOME    ABOUT OAN    TV SCHEDULE    SHOWS    SHOP    CONTACT

TOP NEWS    WORLD    BUSINESS    TECHNOLOGY    SPORTS    ENTERTAINMENT    VIDEO    SHOP    Tuesday, March 9th

TRENDING    SEN. SCHUMER PUSHES FOR STUDENT LOAN FORGIVENESS    SEARCH ...

# CDC: Face Masks Don't Prevent COVID-19, Study Finds Masks Have Negligible Impact On Coronavirus Numbers

Ad
New Tesla Device Lowers Your Electric Bill By 90% (Try It Tonight)    States i Longer
Ad by GrowthMax News

Gen Til wears a protective face mask while working out at Planet Granite climbing gym during the coronavirus pandemic in San Francisco, Thursday, March 4, 2021. The gym opened today to allow ten percent capacity. (AP Photo/Jeff Chiu)

Should the United States prevent Iran from acquiring nuclear weapons?

Would you vote for Trump if he ran in 2024?
Yes    No    Not sure
24,722 Votes

People Can't Believe This Incredible Hiking Pole (Get Yours Today)
10,419

Are you still loyal to President Trump?
Yes    No    Not sure
195,114 Votes

Promoted Content

Virginia in a Frenzy: Cannabis Strain Discovery Leaves Doctors Speechless
Ad by Spruce CBD    Read More >

Democratic Lawmakers are Trying to Shutdown OAN
HOW TO HELP

Sen. Lee: Earmarks are a 'corrupting influence' in Congress

Honest Elections Project



Honest Elections Project looks to restore faith in U.S. elections

**Perma.cc record**

Captured March 9, 2021 3:51 pm    See the Capture View (/GY2U-26B3)    What is Perma.cc? (/about)

Not sure



Dr. Gottlieb: COVID 'strains' will not produce new COVID surge

Show record details

2,198 Votes • Promoted Content

OAN Newsroom (https://www.oann.com/cdc-face-masks-dont-prevent-covid-19-study-finds-masks-have-had-negligible-impact-on-coronavirus)

View the live page 8:45 PM PT – Sunday, March 7, 2021

GOP lawmakers call on states to introduce election integrity laws

==The CDC has admitted face masks do little to prevent the spread of COVID-19 amid mounting pressure to lift mask mandates across the U.S. In a **new study**, the CDC found face masks had a negligible impact on coronavirus numbers that didn't exceed statistical margins of error.==



Merchant Jesus Barajas (C) wears a face mask as he shows long stem roses for sale ahead of the Valentine's Day holiday at the Southern California Flower Market on February 12, 2021 in Los Angeles, California. (Photo by PATRICK T. FALLON/AFP via Getty Images)

==The **study** found that between March and December 2020, face mask orders reduced infection rates by 1.5 percent over the rolling periods of two months each. The masks were 0.5 percent effective in the first 20 days of the mandates and less than 2 percent effective after 100 days.==





A traveler wears a face mask while checking their phone on the arrivals level outside the Tom



iHeartRADIO
LISTEN TO
OAN
LIVE
FOR FREE

Listen Now

One America News Network (OAN)
Credible Live National & World

Plaintiffs' Exhibit 214

maciverinstitute.com

# How Effective Are Masks In Stopping The Spread Of COVID-19?

*MacIverNews View More Posts*

22-28 minutes



**The MacIver Institute examines the data and studies on the effectiveness of a mask stopping the spread of COVID-19**

**Review finds clear flaws and limitations in studies that are propped up by mainstream media to support mask mandates**

**Mixed conclusions on asymptomatic spread**

Aug. 14, 2020

The push to require the wearing of masks to fight the spread of COVID-19 has taken on a greater urgency lately, with many state and local governments passing emergency orders to mandate the public wear a mask while in an enclosed space or Orwellianly defined indoor-outdoors in some municipalities.

Proponents of mask mandates, including major media outlets like PolitiFact, say the science is settled. They point to supposedly ironclad research that shows masks are incredibly effective in stopping the spread of germs from person to person and are necessary to win the battle against COVID-19. Many in the mainstream media have refused to ask basic questions about and challenge

whether the research actually *proves* masks are an effective tool in the fight against COVID-19.

Where others say the science is settled, our analysis shows that is not the case. We break down the most widely referenced studies on masking policies so you can see for yourself what the data really says. We should also point out that it is unscientific to claim that the science is settled. Science is always a work-in-progress and we should never make the false claim that a scientific theory is settled as fact.

In reality, coronavirus studies have yet to mature to a point of giving prevailing evidence in favor of universal masking policies.

### Studies Often Referenced On Masks And Mask Mandates

### 1. University of California – San Francisco: A Literature Review

A study out of the University of California-San Francisco(UCSF) made the case that wearing a mask will reduce severe cases of the coronavirus because masks will only let a little bit of the virus into the body and only cause a mild infection. They support their hypothesis by postulating that masks do not prevent all virus particles from entering or escaping the mask.

This study did not include any original research. It was a literature review that examined various anecdotes, including virus mitigation practices used by people on cruise ships, in a pediatric dialysis wing in an Indiana hospital, at food processing plants, and among Swiss soldiers. We should point out that anecdotal investigations are not evidence bearing. They indicate a possible direction for drawing conclusions, but they are by no means factual.

The Swiss example held the most promise. One group of soldiers instituted virus mitigation policies while another group acted as normal. The group that employed these mitigation policies saw no infections, while the group without the policies saw a 30% COVID-19 infection rate. The UCSF study used these anecdotes to conclude that universal masking absolutely causes future infections to be less severe.

The UCSF study ignored the impact of other mitigation practices that were implemented concurrently with facemasks, such as hand washing, social distancing, properly covering coughs and sneezes, and others. We are curious why researchers would disregard the impact of those other measures and not factor in the possibility that the other measures could have had an impact on the results. It is a stretch for the authors to conclude that mask wearing was the single most important factor that mitigated against more severe cases of COVID-19.

### 2. Health Affairs: Public Policy Assumptions

Another study from Health Affairs, referenced by the Journal Sentinel, suggests that mask mandates alone curbed the spread of the coronavirus in 15 states and Washington DC. The authors say that they measured how fast the virus spread in each state and how the spread declined up to 21 days after each state instituted their own mask mandates.

The authors report that the daily rate of the spread declined by up to 2% 21+ days after the mandates were in effect. They don't say what the rate of spread was *before* the mandates were passed.

The study also does not consider other variables at play, like continuously changing social patterns

during the study period. All that is clear from this study is that "the suggested benefits from mandating face mask use are not substitutes for other social distancing measures; the effects are conditional on the other enacted social distancing measures and how communities are complying with them."

Even that last statement is problematic. In a dynamic social system like one would find in any city or community, it is impossible to state that a single factor is the cause for a given outcome. In order to suggest that, you would have to use a control group comparison and none of that was done in the study.

### 3. CDC: According To My Hairdresser…



A study by the CDC points to a case in a Missouri hair salon as more proof for the effectiveness of mask mandates.

Back in May, two hairdressers had COVID-19 and kept seeing customers for over a week after their symptoms began. They wore masks while they worked, the majority of their clients wore masks during their haircuts, and none of the clients became sick after exposure.

There were at least 4 other factors that could have mitigated the spread of the disease. For example: customer's hand washing and general hygiene habits and the stylists working behind the client (not in front of them) could have mitigated spread.

The study says that "no studies have examined SARS-CoV-2 transmission directly." But, "in countries that did not recommend face masks and respirators, the per-capita coronavirus-related mortality increased each week by 54.3% after the index case, compared with 8.0% in those countries with masking policies." Here is another place where the study does not acknowledge the effect of additional protective measures, like distancing, on the spread of the virus.

### 4. CDC: Singling Out Masks At A Massachusetts' Hospital

At the Mass General Brigham hospital system in Massachusetts, another study was conducted before and after a system-wide mask policy was issued. Before requiring masks, the rate of infection among the hospital system's employees reached 21%. Two weeks later, the rate of positive tests among employees dropped from 13.65% to 11.46%.

It is curious that the rate of infection dropped from 21% to 13.65% *before* the effect of a mask mandate could be seen. Despite the preemptive decline, the study authors concluded that "these results support universal masking as part of a multipronged infection reduction strategy in health care settings." The study only recommends this for healthcare settings, and their investigation does not take the effects of the other parts of their mitigation strategy, like testing and quarantine, into account.

## 5. New England Journal of Medicine: False Comparisons

PolitiFact referenced a study from the New England Journal of Medicine that did an experiment on droplets when speaking. Using a green laser to measure droplets spat out by a speaker, the study showed a lot of droplets released when someone speaks, especially at louder volumes and when they make certain sounds with their mouths. The study showed almost no visible droplets when the speaking person covered their face with a damp washcloth. The problem with this study is obvious: a damp washcloth is not the same as the kind of face masks people are wearing now. There's no comparison. Furthermore, unless the viral load of the droplets is measured, there is no way to conclude that droplets from the mouth were causing the spread of a virus.

## 6. Gov. Evers: N95 Respirators And Cloth Masks Are The Same Thing, Right?

Gov. Evers directly referenced statistics from two studies in his emergency mask mandate order. One part of the order reads that, "Published scientific research has shown that the probability of transmission during exposure between a person infected with COVID-19 to an uninfected person is 17.4 percent if face coverings are not worn, and 3.1 percent if face coverings are worn."

This statistic comes from a review published in The Lancet journal in May 2020. The review analyzed 164 studies on the spread of respiratory viruses, including COVID-19, and how the spread is impacted by masks, eye coverings, and social distancing. It concluded that at least 3 feet of social distancing, and up to 6.5 feet, is the most important factor to stopping the spread, not masks. Their data suggests that masks do help mitigate spread. However, the mitigation was more closely associated with N95 respirators than with typical cloth masks. "Nevertheless, given the limitations of the data, we did not rate the certainty of effect modification as high." This is supposition, not confirmation.

## 7. WHO: There Is No Direct Evidence

Finally, the World Health Organization (WHO) reviewed multiple studies on the effectiveness of masking in their June 5, 2020 guidance document. Their review noted that "There are currently no studies that have evaluated the effectiveness and potential adverse effects of universal or targeted continuous mask use by health workers in preventing transmission of SARS-CoV-2."  The report also mentioned some previous studies on how masks may have slowed the spread of the flu in college settings, but those studies "showed no impact on risk of laboratory-confirmed influenza."

The WHO review says "At present, there is no direct evidence (from studies on COVID- 19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including COVID-19."

The WHO does, however, have information in their document on how well non-medical masks work to filter out virus particles. The WHO writes that most homemade cloth face masks, depending on the material, can filter out between 0.7% and 60% of particles. A single layer of a cotton handkerchief

filters out only 1.1 percent of particles, according to the document. If the handkerchief is layered 4 times, it can filter out only 13% of particles. A single layer of a knit cotton sweater can filter out 26% of particles.

Homemade masks filter out more particles the more layers of fabric are used in the mask. However, the guidance document says with each layer it gets harder to breathe with a homemade mask.

Because non-medical masks filter out less particles and are less breathable than a medical-grade mask, the WHO says only people who are infected should be recommended to wear a non-medical mask to keep the virus to themselves. Homemade masks could be used by the general public, the WHO says, in crowded public places, but "should always be accompanied by frequent hand hygiene and physical distancing."

Table 3. Non-medical mask filtration efficiency, pressure drop and filter quality factor*

| Material | Source | Structure | Initial Filtration Efficiency (%) | Initial Pressure drop (Pa) | Filter quality factor, Q ** (kPa⁻¹) |
|---|---|---|---|---|---|
| Polypropylene | Interfacing material, purchased as-is | Spunbond (Nonwoven) | 6 | 1.6 | 16.9 |
| Cotton 1 | Clothing (T-shirt) | Woven | 5 | 4.5 | 5.4 |
| Cotton 2 | Clothing (T-shirt) | Knit | 21 | 14.5 | 7.4 |
| Cotton 3 | Clothing (Sweater) | Knit | 26 | 17 | 7.6 |
| Polyester | Clothing (Toddler wrap) | Knit | 17 | 12.3 | 6.8 |
| Cellulose | Tissue paper | Bonded | 20 | 19 | 5.1 |
| Cellulose | Paper towel | Bonded | 10 | 11 | 4.3 |
| Silk | Napkin | Woven | 4 | 7.3 | 2.8 |
| Cotton, gauze | N/A | Woven | 0.7 | 6.5 | 0.47 |
| Cotton, handkerchief | N/A | Woven | 1.1 | 9.8 | 0.48 |
| Nylon | Clothing (Exercise pants) | Woven | 23 | 244 | 0.4 |

* This table refers only to materials reported in experimental peer-reviewed studies. The filtration efficiency, pressure drop and Q factor are dependent on flow rate. ** According to expert consensus, three (3) is the minimum Q factor recommended.

The authors give a table for when mandatory masking policies should be issued. They say the choice to mask an entire population is dependent on "the local context, culture, availability of masks, resources required, and preferences of the population," but not dependent on the effectiveness of masks.

**Studies On Asymptomatic Spread – Do Masks Stop The Spread Of The Virus By Asymptomatic People?**

Where the science on masking healthy people is uncertain, scientists and public officials say mask mandates must be issued, regardless of the fact that there is no scientific study that definitively proves the effectiveness, in order to stop the spread of the coronavirus by asymptomatic and pre-symptomatic people.

Asymptomatic people are those who are infected with the virus without ever showing symptoms of the virus. Pre-symptomatic people are infected with the virus and have not shown symptoms yet, but do show symptoms of the virus later.

Some scientists are urging mask mandates, while at the same time admitting that the jury is out on how many people are asymptomatic, or infected without symptoms, and how much COVID-19 is spread by asymptomatic people. But that begs the question: How can we say that masks will stop the

spread by asymptomatic people if we do not know how many people are asymptomatic in the first place? It also does not answer the question of: can masks do harm to the people who are wearing them? ==The statements supporting mask mandates all assume no negative side-effects *from* mask wearing. The logic here is inescapable: if wearing a mask can mitigate harm, it can also cause harm.== Can we quantize the level of harm that wearing masks will cause? Where are the studies researching this?

## 1. CDC: Best Guesstimate

A popularly referenced CDC piece analyzes multiple studies on asymptomatic spread and concludes that 40% of COVID-19 infections are asymptomatic. The CDC calls this their "best estimate" because there are more ways to estimate asymptomatic spread than that.

According to the review, anywhere from 10% to 70% of COVID-19 cases could be asymptomatic. The CDC's best guess is that asymptomatic COVID-19 cases spread the virus at 75% the rate that symptomatic infected people do. Estimates on rate of asymptomatic spread range from 25% to 100% the same rate as symptomatic infections. The authors also estimate that, among all infected people, 50% were infected by somebody who did not have symptoms at the time. That estimate ranges from 35% to 70%. If the brakes on your car worked 35 to 70% of the time, would you trust their reliability?

Ultimately, the CDC analysis concludes that:

- "The percent of cases that are asymptomatic, i.e. never experience symptoms, remains uncertain."

- "The relative infectiousness of asymptomatic cases to symptomatic cases remains **highly** uncertain as asymptomatic cases are difficult to identify and transmission is difficult to observe and quantify. The estimates for relative infectiousness are assumptions"

- "The current best estimate is an **assumption**."

## 2. WHO: Best Guesstimate

We referenced a study review earlier by the WHO from June 5, 2020. That review also gave a wide range of estimates for how common asymptomatic infection and spread is. The authors found one review where asymptomatic cases accounted for 6-41% of all COVID-19 cases analyzed. The WHO review mentions another study that found, out of 63 people with asymptomatic cases of COVID-19, 14% of them passed the virus to someone else.

WHO's analysis says that studies and data are very limited on COVID-19, and the studies that do exist suffer from flaws like limited sample sizes of patients and poor reporting of symptoms monitored during the studies.

The authors conclude that, out of the limited studies and evidence worldwide, the data "suggests that asymptomatically-infected individuals are much less likely to transmit the virus than those who develop symptoms."

That throws a wrench in the argument that asymptomatic spread is so dangerous, everybody in a population needs to wear a mask to stop the spread.

## 3. Heritage Foundation: Mixed Case Study Messages

Peter Brookes of the Heritage Foundation comes to a similar conclusion on the effectiveness of

masks for asymptomatic spread. He mentions three case studies, one of them taking place on the Diamond Princess cruise ship. Among cruise ship passengers who tested positive for the coronavirus, 18% had no symptoms. Brookes mentions another case among Japanese evacuees from Wuhan, China at the beginning of the COVID-19 outbreak. 31% of those evacuees who tested positive for the virus had no symptoms of infection. The author then talks about a third instance in Iceland, where the country had tested 5% of their population at the time. Iceland then had reported 50% of their positive diagnoses showed no COVID-19 symptoms.

### Things To Think About When Determining If A Study Is Accurate And Definitive

Studies like the ones above have been highlighted as sound guidance for penning public policy on community masking. However, each of these publications suffer from flaws, assumptions, and limitations. Below are a few of the most common issues we observed in our review. Issues like the ones below should be considered to decide for yourself if a masking or COVID-19 study is accurate and complete:

- COVID-19 is a new virus and, unsurprisingly, there are few studies that have been completed on the virus at this time.

- Many new studies make hypotheses about how to treat COVID-19 based on existing data on SARS, MERS, and the flu. Applying data on SARS, MERS, and the flu to COVID-19 may not be effective or relevant.

- None of the studies here investigate how age may determine the effectiveness of masks or the prevalence of asymptomatic infection. MacIver has found that the age question is crucial to understanding the spread of the virus. It is, therefore, irresponsible to exclude questions about age from these studies. It is also clear from mask mandates around the US that the age at which masks are required range from 3 to 11. It is clear from this that there is no evidence to support which age would be the *right age*.

- Many studies conclude that masks are the X-factor for reducing virus transmission. Authors reach this conclusion, however, by ignoring the effects of other mitigation strategies – hand washing, sanitizing surfaces, physical distancing, properly coughing and sneezing into your elbow, etc. These measures reduce COVID-19 transmission and may very well be more important and effective in the stopping of the spread of the virus. They also completely ignore the fact that regardless of mask wearing, a certain percentage of people within a population will still get the virus. There have been no credible studies nor claims that pretend a given number of people will contract COVID-19.

- Many studies are very limited by the number of people in their study group. If a study looks at COVID-19 infections in 100 people, it is impossibly hard to take conclusions from the study and apply them to a population of millions of people. This is the antithesis of proper scientific research.

- The evidence that studies presented does not support the authors' premises that mask mandates will and must protect an entire population. Their studies also don't prove definitively how often COVID-19 is spread asymptomatically, which defeats the argument that masks should be required to stop the asymptomatic spread of COVID-19.

- Many studies assume that asymptomatic cases are just as dangerous as symptomatic cases, so masks need to be used to prevent both. The limited data does not support this idea.

**They Said At First No Need To Wear A Mask, Now Everyone Must**

In addition to the non-conclusive studies on the effectiveness of masks and asymptomatic spread, early health experts actually discouraged the public from wearing masks.

The US Surgeon General, the CDC, and Dr. Anthony Faucci advised from the beginning that the sick and the medical community will benefit from wearing masks, not the general public.

At the end of February, Surgeon General Jerome Adams was tweeting that masks "are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk!"

Seriously people- STOP BUYING MASKS!

They are NOT effective in preventing general public from catching #Coronavirus, but if healthcare providers can't get them to care for sick patients, it puts them and our communities at risk! https://t.co/UxZRwxxKL9

— U.S. Surgeon General (@Surgeon_General) February 29, 2020

In a 60 Minutes interview in March, Dr. Faucci said wearing a face mask should be reserved for "healthcare providers needing them, and people who are ill."

"There's no reason to be walking around with a mask. When you're in the middle of an outbreak, wearing a mask might make people feel a little bit better, and it might even block a droplet, but it's not providing the perfect protection that people think that it is," Faucci said.



## Wear a facemask if you are sick

- **If you are sick:** You should wear a facemask when you are around other people (e.g., sharing a room or vehicle) and before you enter a healthcare provider's office. If you are not able to wear a facemask (for example, because it causes trouble breathing), then you should do your best to cover your coughs and sneezes, and people who are caring for you should wear a facemask if they enter your room. Learn what to do if you are sick.

- **If you are NOT sick:** You do not need to wear a facemask unless you are caring for someone who is sick (and they are not able to wear a facemask). Facemasks may be in short supply and they should be saved for caregivers.

CDC guidance from late March

Their guidance rapidly changed in early April to recommending masks for the general public.

"The CDC, the World Health Organization, my office, and most public health and health organizations and professionals originally recommended against the general public wearing masks, because based on the best evidence available at the time, it was not deemed that that would have a significant impact on whether or not a healthy person wearing a mask would contract COVID-19," said Surgeon

General Adams at a White House press conference on April 3.

Adams explained that new evidence about asymptomatic spread of the virus had led the COVID-19 task force and the CDC to recommend "wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain. These include places like grocery stores and pharmacies.  We especially recommend this in areas of significant community-based transmission.  It is critical."

Dr. Faucci talked about his changed position with Bloomberg News' David Westin on August 5. Along with hand washing, social distancing, and staying away from crowded places like bars, Faucci says it's fundamentally important to control the spread of COVID-19 by "wearing masks universally, indoor and outdoor."

"For me as a public health official, obviously I would like the consideration that everybody wears a mask," he said to David Westin. But he also acknowledged the pushback by people at the state level against mask mandates. So instead, Faucci says, "If we uniformly and consistently give the message that it is extremely important to wear a mask, that could be as good as a mandate."

The CDC has since changed their message as well. Their website now says that "Everyone should wear a cloth face cover in public settings" because "You could spread COVID-19 to others even if you don't feel sick."

 ## Cover your mouth and nose with a cloth face cover when around others

- You could spread COVID-19 to others even if you do not feel sick.
- The cloth face cover is meant to protect other people in case you are infected.
- Everyone should wear a cloth face cover in public settings and when around people who don't live in your household, especially when other social distancing measures are difficult to maintain.
    - Cloth face coverings should not be placed on young children under age 2, anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance.
- Do NOT use a facemask meant for a healthcare worker. Currently, surgical masks and N95 respirators are critical supplies that should be reserved for healthcare workers and other first responders.
- Continue to keep about 6 feet between yourself and others. The cloth face cover is not a substitute for social distancing.

Current CDC guidance on face masks

National guidance continues to recommend face masks for the sick.

"We have always recommended that symptomatic people wear a mask, because if you're coughing, if you have a fever, if you're symptomatic, you could transmit disease to other people," the Surgeon General said in April.

All sources stressed that masks are not meant to substitute physical distancing and other hygienic practices.

**Media Narrative Does Not Match The Data**

These studies show that masks, social distancing, and eye protection do have some effect on the spread of COVID-19. N95 masks and social distancing appear to be the biggest deterrents to virus transmission.

The studies here also make clear that the science is not clear at all, but you would not know that from reading the media description of the studies. The research hasn't figured out yet how much virus transmission is stopped by wearing a mask, and still hasn't determined how many COVID-19 infections come from the asymptomatic cases that mask proponents say they're targeting.

The current body of research is flawed, vague, and incomplete at best.

Still, scientists, public officials, and pundits recommend or strongly urge mask mandates on a massive scale.

A July 14 editorial by three CDC physicians in the Journal of the American Medical Association (JAMA) sums up this logic nicely: "In the absence of such data, it has been persuasively argued the precautionary principle be applied to promote community masking because there is little to lose and potentially much to be gained."

What mainstream media and well-known medical officials seem to miss is that a "precautionary principle" is not the same as science. In fact, the science we see here gives us no concrete answers yet. Lacking evidence cannot be an excuse for leadership to lie and compel private citizens to all wear masks.

The media narrative continues on saying masks do work, mandating masks will work, and mask orders are the *only* way to stop the further spread of the coronavirus. Based on the studies reviewed here, that conclusion doesn't follow the science.

**Not Seeing Your Favorite Mask Study Here?**

If there's another study being cited in the face mask public policy debate you'd like us to investigate, email us at info@maciverinstitute.com

Plaintiffs' Exhibit 215

nomaskers.org

# Association of American Physicians and Surgeons

*Copyright Benchmark Technologies, Incorporated*

46-59 minutes

---

- Home

- Resources

- View Resource

Published Studies: Masks are INEFFECTIVE 0 Comments 10/18/2020



Definitive study establishes conclusively not only that masks don't work, but WHY.

**Posted By: Fielden Nolan (nolanf)**

curated by Marilyn M. Singleton, M.D., J.D. – http://marilynsingletonmdjd.com/

*Updated September 26, 2020*

**Introduction**

==COVID-19 is as politically-charged as it is infectious. Early in the COVID-19 pandemic, the WHO, the CDC and NIH's Dr. Anthony Fauci discouraged wearing masks as not useful for non-health care workers. Now they recommend wearing cloth face coverings in public settings where other social distancing measures are hard to do (e.g., grocery stores and pharmacies). The recommendation was published without a single scientific paper or other information provided to support that cloth masks actually provide any respiratory protection.== Let's look at the data.

The theory behind mask wearing:

- Source control: Cloth mask can trap droplets that come out of a person's mouth when they cough or sneeze.

- Protection: Personal Protective Equipment (PPE) – only N95 masks

**Transmission of SARS-CoV-2**

Note: A COVID-19 (SARS-CoV-2) particle is 0.125 micrometers/microns (μm); influenza virus size is 0.08 – 0.12 μm; a human hair is about 150 μm.

*1 nm = 0.001 micron; 1000 nm = 1 micron; Micrometer (μm) is the preferred name for micron*

*1 meter is = 1,000,000,000 [trillion] nm or 1,000,000 [million] microns*

*For a complete dissection and explanation of aerosols and airborne particles, please see Understanding Particle Size and Aerosol-based Transmission by Steve Probst.* https://www.4cconference.com/wp-content/uploads/2020/07

/Understanding-Particle-Size-and-Aerosol-Based-Transmission.pdf

Droplets

- Virus is transmitted through respiratory droplets produced when an infected person coughs, sneezes, or talks.

- Larger respiratory droplets (>5 μm) remain in the air for only a short time and travel only short distances, generally <1 meter. They fall to the ground quickly. *https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30245-9/fulltext*

- This idea guides the CDC's advice to maintain at least a 6-foot distance.

- Small (<5 μm) aerosolized droplets can remain in the air for at least 3 hours and travel long distances (up to 27 ft.).

- *https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true;*

- https://www.cidrap.umn.edu/covid-19/podcasts-webinars/special-ep-masks;

- https://www.nap.edu/catalog/25769/rapid-expert-consultation-on-the-possibility-of-bioaerosol-spread-of-sars-cov-2-for-the-covid-19-pandemic-april-1-2020

Air currents

- In an air conditioned environment these large droplets may travel farther.

- Ventilation.  Even the opening of an entrance door and a small window can dilute the number of small droplets to one half after 30 seconds. *(This study looked at droplets from uninfected persons)*. This is clinically relevant because poorly ventilated and populated spaces, like public transport and nursing homes, have high SARS-CoV-2 disease transmission despite physical distancing.

- *https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30245-9/fulltext*

Humidity

- Since 1961, experiments showed that viral-pathogen-carrying droplets were inactivated within shorter and shorter times as ambient humidity was increased. Dryness drives the small aerosol particles. See e.g., review of studies, *https://aaqr.org/articles/aaqr-20-06-covid-0302*

Conclusions

The preponderance of scientific evidence supports that aerosols play a critical role in the transmission of SARS-CoV-2.  Years of dose response studies indicate that if anything gets through, you will become infected.

- Thus, any respiratory protection respirator or mask must provide a high level of filtration and fit to be highly effective in preventing the transmission of SARS-CoV-2.  (Works for Mycobacterium tuberculosis (3μm)

- Public health authorities define a significant exposure to COVID-19 as face-to-face contact within 6 feet with a patient with symptomatic COVID-19 that is sustained for at least a few minutes (and some say more than 10 minutes or even 30 minutes).

- The chance of catching COVID-19 from a passing interaction in a public space is therefore minimal.

---

**MASKS**

**Filter Efficiency and Fit**

*Data from a University of Illinois at Chicago review* *https://www.cidrap.umn.edu/news-perspective/2020/04/commentary-masks-all-covid-19-not-based-sound-data*

- HEPA (high efficiency particulate air) filters are 99.97 to 100% efficient. HEPA filters are tested with particles that are 0.125 μm (the size of SARS-CoV-2).

- Masks and respirators work by collecting particles through several physical mechanisms, including diffusion (small

particles) and interception and impaction (large particles).

- Surgical masks are loose-fitting devices that were designed to be worn by medical personnel to protect accidental contamination of patient wounds, and to protect the wearer against splashes or sprays of bodily fluids. They aren't effective at blocking particles smaller than 100 µm. *https://multimedia.3m.com/mws/media/957730O/respirators-and-surgical-masks-contrast-technical-bulletin.pdf*

- OSHA/CDC:  A surgical mask is not a respirator. It cannot be used to protect workers who perform or assist with aerosol-generating procedures, which may create very fine aerosol sprays. **A surgical mask can only be used to protect workers from contact with the large droplets made by patients when they cough, sneeze, talk or breathe**. *https://www.osha.gov/dts/guidance/flu/healthcare.html*

---

**Laboratory Studies**

- N95 filtering facepiece respirators (FFRs) are constructed from electret (a dielectric material that has a quasi-permanent electric charge.) *An electret generates internal and external electric fields so the filter material has electrostatic attraction for additional collection of all particle sizes. As flow increases, particles will be collected less efficiently.*

- A *properly fitted* N95 will block 95% of tiny air particles down to 0.3 µm from reaching the wearer's face.

- *https://www.honeywell.com/en-us/newsroom/news/2020/03/n95-masks-explained.*

- Problem: no source control. An N95 does not filter exhaled air passing through the exhaust/exhalation valve (for easier breathing and less moisture inside the mask).

- Study measuring filter efficiency (2010)

- *https://academic.oup.com/annweh/article/54/7/789/202744; https://www.cidrap.umn.edu/news-perspective/2020/04/commentary-masks-all-covid-19-not-based-sound-data; https://academic.oup.com/annweh/article/54/7/789/202744*

- Filter efficiency was measured across a wide range of small particle sizes (0.02 to 1 µm) at 33 and 99 L/min.

- All the cloth masks and materials had near zero efficiency at 0.3 µm, a particle size that easily penetrates into the lung (SARS-CoV-2 is 0.125 µm)

- Efficiency for the entire range of particles
- T-shirts — 10%

- Scarves — 10% to 20%

- Cloth masks — 10% to 30%

- Sweatshirts — 20% to 40%

- Towels — 40%

- Study measuring filter efficiency (2014, Korea)

- *https://aaqr.org/articles/aaqr-13-06-oa-0201*

- Evaluated 44 masks, respirators, and other materials with similar methods and small aerosols (0.08 and 0.22 µm)
- N95 FFR filter — >95% efficiency

- Medical masks — 55% efficiency

- General (cloth) masks — 38% efficiency

- Handkerchiefs — 2% (one layer) to 13% (four layers) efficiency.

- **Conclusion:** Wearing masks (other than N95) will not be effective at preventing SARS-CoV-2 transmission, whether worn as source control or as PPE.

- N95s protect health care workers, but are not recommended for source control transmission.

- Surgical masks are better than cloth but not very efficient at preventing emissions from infected patients. Cloth masks must be 3 layers, plus adding static electricity by rubbing with rubber glove.

- The cloth that serves as the filtration for the mask is meant to trap particles being breathed in and out. But it also serves as a barrier to air movement because it forces the air to take the path of least resistance, resulting in the aerosols going in and out at the sides of the mask.

- An August 2020 UCSF study suggested that the mask would decrease the absolute volume of the inoculum. (The concentrations of bacteria upstream and downstream of the test devices were measured with an aerodynamic size spectrometer) *https://ucsf.app.box.com/s/blvolkp5z0mydzd82rjks4wyleagt036*

---

**Human Studies**

- Study of correct use of masks (2020, Singapore).

- *https://www.medpagetoday.com/infectiousdisease/publichealth/86601*

- Overall, data were collected from 714 men and women. Of all ages, only 90 participants (12.6%) passed the visual mask fit test. About 75% performed strap placement incorrectly, 61% left a "visible gap between the mask and skin," and about 60% didn't tighten the nose-clip.

- Study of surgical face mask use in health care workers (2009, Japan).

- *https://pubmed.ncbi.nlm.nih.gov/19216002/*

- Masks did not provide benefit in terms of cold symptoms or getting cold.

- Randomized clinical trial of standard medical/surgical masks in health care workers (2010, Australia).

- *https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1750-2659.2011.00198.x?fbclid=IwAR3kRYVYDKb0aR-su9_me9_vY6a8KVR4HZ17J2A_80f_fXUABRQdhQlc8Wo*.

- Study was spurred by the H1N1 flu. While N95 masks offered protection against respiratory illness, medical mask wearers and control group numbers were similar.

- Review of influenza virus and face masks in health care workers (HCWs) (2010, Hong Kong).

- *https://www.cambridge.org/core/journals/epidemiology-and-infection/article/face-masks-to-prevent-transmission-of-influenza-virus-a-systematic-review/64D3684968EBDE0AFCC6639CCC9D8BC05*

- 6 studies of face mask use, both surgical masks and N-95 respirators in HCWs and community settings. The effectiveness of face masks is probably impacted by compliance issues in both the healthcare and community setting. Various studies show a lower level of compliance with face masks or find lower reported acceptability of face masks compared to hand hygiene behaviors and other non-pharmaceutical interventions.

- Review of masks against influenza (2012, Europe).

- *https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1750-2659.2011.00307.x*

- 17 eligible studies.  One study had improvement with mask plus hand sanitizer.  None of the studies established a conclusive relationship between mask/respirator use and protection against in?uenza infection.

- *The first randomized controlled trial of cloth masks in health care workers (2015, Australia).

- *https://bmjopen.bmj.com/content/5/4/e006577*; *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4420971/pdf/bmjopen-2014-006577.pdf*

- Penetration of:
- Cloth masks by particles — 97%

- Medical masks — 44%,

- 3M Vflex 9105 N95 — 0.1%

- 3M 9320 N95 —  <0.01%

- Cloth masks resulted in significantly higher rates of infection than medical masks, and also performed worse than the control arm some of whom may have worn masks.

- ==The virus may survive on the surface of the face masks==

- ==Self-contamination through repeated use and improper doffing is possible. A contaminated cloth mask may transfer pathogen from the mask to the bare hands of the wearer.==

- ==Moisture retention, reuse of cloth masks, and poor filtration may result in increased risk of infection.==

- Cloth masks should not be recommended for health care workers, particularly in high-risk situations.

- Review of N95 and surgical masks against respiratory infection (2016). *https://www.cmaj.ca/content/cmaj/188/8/567.full.pdf*

- From January 1990 to December 2014.  6 clinical studies:  3 randomized controlled trials (RCTs), 1 cohort study and 2 case–control studies, and 23 surrogate exposure studies.

- In the meta-analysis of the clinical studies, "no significant difference between N95 respirators and surgical masks in associated risk of (a) laboratory-confirmed respiratory infection, (b) influenza-like illness, or (c) reported work-place absenteeism."

- Review of masks and N95s against respiratory infection (2017, Singapore).

- *https://doi.org/10.1093/cid/cix681*

- Separate meta-analyses of 6 randomized controlled trials (RCTs) and 23 observational studies conducted during the 2003 SARS pandemic.

- Compared to medical masks, N95 respirators provided greater protection against clinical respiratory illness (CRI) and bacterial respiratory illness (BRI). These 2 outcomes were common in these trials (average risks of 8.7% and 7.3%, respectively).

- Compared to masks, N95 respirators conferred superior protection against clinical respiratory illness and laboratory-confirmed bacterial, but not viral infections or influenza life illness (ILI).

- Self-reported assessment of clinical outcomes was prone to bias.

- ==Evidence of a protective effect of masks or respirators against verified respiratory infection was not statistically significant (compared to no mask)==

- Randomized Controlled Trial: N95s vs medical masks in health care workers (HCWs) against influenza (2019).

- *https://jamanetwork.com/journals/jama/fullarticle/2749214*

- 2862 randomized participants, 2371 completed the study and accounted for 5180 HCW-seasons.

- Among outpatient health care personnel, N95 respirators (8.2%) vs medical masks (7.2%) resulted in no significant difference in the incidence of laboratory-confirmed influenza. 90% said they wore the mask all the time.

- Review of N95 respirators versus surgical masks against influenza (March 2020, China).

- *https://doi.org/10.1111/jebm.12381*

- 6 randomized controlled trials (RCTs) involving 9,171 participants were included (2015-2020). ==There were no statistically significant differences in preventing laboratory-confirmed influenza, laboratory-confirmed respiratory viral infections, laboratory-confirmed respiratory infection and influenza-like illness using N95 respirators and surgical masks.==

- Meta-analysis indicated a protective effect of N95 respirators against laboratory-confirmed bacterial colonization.

- CDC Review since 1946 of masks and influenza (May 2020)

- Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures." *https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article*

- Systematic review. 10 RCTs that reported estimates of the effectiveness of face masks in reducing laboratory-confirmed influenza virus infections in the community from literature published during 1946–July 27, 2018.

- <mark>There is limited evidence for face masks' effectiveness in preventing laboratory-confirmed influenza virus transmission either when worn by the infected person for source control or when worn by uninfected persons to reduce exposure.</mark>

- "Proper use of face masks is essential because improper use might increase the risk for transmission."

- A study of 4 patients (July 2020, South Korea).

- *https://www.acpjournals.org/doi/10.7326/M20-1342*

- Known patients infected with SARS-CoV-2 wore masks and coughed into a Petrie dish. "Both surgical and cotton masks seem to be ineffective in preventing the dissemination of SARS–CoV-2 from the coughs of patients with COVID-19 to the environment and external mask surface."

- Studied different types of face coverings in non-clinical setting (August 2020).

- *https://advances.sciencemag.org/content/early/2020/08/07/sciadv.abd3083*

- *They used a black box, a laser, and a camera.* A person wears a face mask and speaks into the direction of an expanded laser beam inside a dark enclosure. Droplets that propagate through the laser beam scatter light, which is recorded with a camera. A simple computer algorithm then counts the droplets seen in the video.

- The N95 led to a droplet transmission of below 0.1%.

- Cotton and polypropylene masks, some of which were made from apron material showed a droplet transmission ranging from 10% to 40%.

- Knitted mask had up to 60% droplet transmission.

- Neck fleece had 110% droplet transmission (10% higher than not wearing a mask).

- Speaking through some masks (particularly the neck fleece, bandanas) seemed to disperse the largest droplets into a multitude of smaller droplets … which explains the apparent increase in droplet count relative to no mask in that case.

- See "Positive Effects of Masks" below. A recent study suggested that the mask would decrease the absolute volume of the inoculum. (The concentrations of bacteria upstream and downstream of the test devices were measured with an aerodynamic size spectrometer) *https://ucsf.app.box.com/s/blvolkp5z0mydzd82rjks4wyleagt036*

- Austrian observation (August 2020)

- *https://corona-transition.org/maskenpflicht-brachte-in-osterreich-keinerlei-messbaren-nutzen* (in German)

- <mark>The introduction, retraction and re-introduction of mandatory face masks in Austria had no influence at all on the infection rate.</mark>

- News report (August 13, 2020)

- *https://sentinelksmo.org/more-deception-kdhe-hid-data-to-justify-mask-mandate/*

- <mark>In Kansas, the 90 counties without mask mandates had lower coronavirus infection rates than the 15 counties with mask mandates.</mark> To hide this fact, the Kansas health department tried to manipulate the official statistics and data presentation.

---

Study from France:

Daily New Cases



https://swprs.org/face-masks-evidence/ (Swiss Policy Research)

Johns Hopkins, 9/21/20

### New Confirmed COVID-19 Cases per Day, normalized by population



https://twitter.com/Covid19Crusher/status/1308013900546428928

**Negative Effects of Masks**

<mark>Air inside the mask is definitely stale.  In filtering particles, the mask makes it harder to breathe.</mark>

**Decreased PaO2**

- A 2004 observational study of end stage renal disease patients during dialysis for 4 hours (2004, Taiwan).

- *https://pubmed.ncbi.nlm.nih.gov/15340662/;*

- *https://www.researchgate.net/publication /8371248_The_physiological_impact_of_wearing_an_N95_mask_during_hemodialysis_as_a_precaution_against_SARS_in_patients_with stage_renal_disease*

- 39 patients, mean age, 57 years. 70% had decreased PaO2 (from 100 to 92); 19% had hypoxemia (PaO2 <70); all

patients had increased respiratory rate 16 to 18; chest discomfort (3 baseline patients to 11 patients); respiratory distress (1 baseline patient to 17 patients)

- Stanford engineers estimated that N95 masks cause a 5% to 20% reduction in O2 intake. This can cause dizziness and lightheadedness. This can be life-threatening for someone with lung disease or with respiratory distress.

- *https://engineering.stanford.edu/magazine/article/covid-19-prompts-team-engineers-rethink-humble-face-mask*

- Study of surgeons in the OR (2008, Turkey).

- *http://scielo.isciii.es/pdf/neuro/v19n2/3.pdf*

- Scientists looked at O2 levels of surgeons wearing masks while performing surgery. Found a decrease in the oxygen saturation of arterial pulsations (peripheral capillary O2 saturation/SpO2) fell from 98% to 96% and a slight increase in pulse rates compared to preoperative values in all surgeon groups.

**Increased CO2**

- This may be merely theoretical. Carbon dioxide molecules freely diffuse through the masks, allowing normal gas exchange while breathing.

- $CO_2$ is present in the atmosphere at a level of about 0.04% (400ppm). According to the U.S. Department of Agriculture / OSHA, carbon dioxide becomes toxic at concentrations above 4 percent (40,000ppm); symptoms at 5,000-10,000 ppm. 10,000 ppm has been measured behind mask.

- Experiment (July 2020).

- *https://www.wthr.com/article/news/health/coronavirus/verify-do-face-masks-reduce-oxygen-intake-carbon-dioxide-experiment-multiple-maskss/531-c00c96cb-9273-4947-949c-0807f94454a7*

- Pulse oximeter and exhaled CO2 (via tube in mask) No change with mask. (End-tidal capnography or end-tidal CO2 (EtCO2) monitoring is a non-invasive technique that measures the partial pressure or maximal concentration of carbon dioxide (CO2) at the end of an exhaled breath. The normal values are 5-6% CO2, which is equivalent to 35-45 mmHg.)

- Health care worker study (2005, Scandinavia)

- *https://pubmed.ncbi.nlm.nih.gov/16441251/*

- 37.3% reported face-mask-associated headaches, 32.9% reported headache frequency >6 times per month. 7.6% had taken sick leave from March 2003 to June 2004 (mean 2 days; range 1-4 days) and 59.5% required use of abortive analgesics because of headache.

- Health care worker study (2009, Japan) with similar headache results as Scandinavian study (above).

- *https://pubmed.ncbi.nlm.nih.gov/19216002/*

- While there are some articles reporting OSHA tests, it is not clear they were proper tests.

- Some people have mistakenly claimed that OSHA standards (e.g., the Respiratory Protection standard, 29 CFR 1910.134; the Permit-Required Confined Space standard 29 CFR 1910.146; and the Air Contaminants standard, 29 CFR 1910.1000) apply to the issue of oxygen or carbon dioxide levels resulting from the use of medical masks or cloth face coverings in work settings with normal ambient air (e.g. healthcare settings, offices, retail settings, construction). These standards do not apply to the wearing of medical masks or cloth face coverings in work settings with normal ambient air). These standards would only apply to work settings where there are known or suspected sources of chemicals (e.g., manufacturing facilities) or workers are required to enter a potentially dangerous location (e.g., a large tank or vessel). *https://www.osha.gov/SLTC/covid-19/covid-19-faq.html*

- It is hard to tell if the headaches experienced by HCWs with N95s is CO2 or having a strap around the head.

- But when asked should we be worried about CO2, mask proponents say, "No" because you can exhale around the sides of the mask. This defeats the purpose. (2006) *https://pubmed.ncbi.nlm.nih.gov/16441251/*

**Moisture retention**

- Reuse of cloth masks, frequency and effectiveness of cleaning, and poor filtration may result in increased risk of infection.

- Observations during SARS suggested double-masking and other practices increased the risk of infection because of moisture, liquid diffusion.

- *https://bmjopen.bmj.com/content/5/4/e006577; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4420971/pdf/bmjopen-2014-006577.pdf*

- Recent study (in German) cultured 82 bacterial colonies & 4 mold (fungoid) colonies from a child's masks after 8 hours of wear.

- *https://twitter.com/MMaccruiskeen/status/1307266527662669825?s=20*

**Self-contamination**

- Contamination through repeated use and improper doffing is possible.  The virus may survive on the surface of the mask. The pathogen goes from mask to bare hands.

**"Mask mouth"**

- Reported by dentists.  *https://nypost.com/2020/08/05/mask-mouth-is-a-seriously-stinky-side-effect-of-wearing-masks/*

- Wearing masks increases dryness, which leads to decrease in saliva. It is the saliva that fights bacteria. Result is decaying teeth, receding gum lines and seriously sour breath. Gum disease — or periodontal disease — will eventually lead to strokes and an increased risk of heart attacks."

World Health Organization (WHO), June 2020

- https://apps.who.int/iris/bitstream/handle/10665/332293/WHO-2019-nCov-IPC_Masks-2020.4-eng.pdf?sequence=1&isAllowed=y

- "The likely disadvantages of the use of mask by healthy people in the general public include:
- potential increased risk of self-contamination due to the manipulation of a face mask and subsequently touching eyes with contaminated hands;

- potential self-contamination that can occur if non- medical masks are not changed when wet or soiled. This can create favourable conditions for microorganism to amplify;

- potential headache and/or breathing difficulties, depending on type of mask used;

- potential development of facial skin lesions, irritant dermatitis or worsening acne, when used frequently for long hours;

- difficulty with communicating clearly;

- potential discomfort;

- a false sense of security, leading to potentially lower adherence to other critical preventive measures such as physical distancing and hand hygiene;

- poor compliance with mask wearing, in particular by young children;

- waste management issues; improper mask disposal leading to increased litter in public places, risk of contamination to street cleaners and environment hazard;

- difficulty communicating for deaf persons who rely on lip reading;

- disadvantages for or difficulty wearing them, especially for children, developmentally challenged persons, those with mental illness, elderly persons with cognitive impairment, those with asthma or chronic respiratory or breathing problems, those who have had facial trauma or recent oral maxillofacial surgery, and those living in hot and humid environments.

The Hamburg Environmental Institute (July 2020) warned of the inhalation of chlorine compounds in polyester masks as well as problems in connection with face mask disposal. https://swprs.org/face-masks-evidence/; https://corona-transition.org/maskentragen-noch-ungesunder-als-gedacht (in German)

Psychological Damage in Children (September 11, 2020).

*https://www.world-today-news.com/70-doctors-in-open-letter-to-ben-weyts-abolish-mandatory-mouth-mask-at-school-belgium/*

- 70 Belgian doctors begged for cancellation of mask mandate at school. "In recent months, the general well-being of children and young people has come under severe pressure. We see in our practices an increasing number of children and young people with complaints due to the rules of conduct that have been imposed on them.  We diagnose anxiety and sleep problems, behavioral disorders and fear of contamination. We are seeing an increase in domestic violence, isolation and deprivation. Many lack physical and emotional contact; attachment problems and addiction are obvious.  **'The mandatory mouth mask in schools is a major threat to their development. It ignores the essential needs of the growing child. The well-being of children and young people is highly dependent on the emotional connection with others.** (…) The aim of education is to create an optimal context so that a maximum development of young people is possible. The school environment must be a safe practice field. **The mouth mask obligation, on the other hand, makes the school a threatening and unsafe environment, where emotional connection becomes difficult. 'In addition, there is no large-scale evidence that wearing face masks in a non-professional environment has any positive effect on the spread of viruses, let alone on general health.'**

**Unanswered questions**

- Can virions escape an evaporating droplet stuck to a mask fiber?

- What are long-term health effects on HCW, such as headaches, arising from impeded breathing?

- Are there negative social consequences to a masked society?

- Are there negative psychological consequences to wearing a mask, as a fear-based behavioral modification?

- What are the environmental consequences of mask manufacturing and disposal?

- __ ___ _____ _____ _____ _____

- 

- ;__ _____ _____

- __ _____ _____

- 

- ___ ___ _____ _____

- 

- __ ___ _____ _____ _____

- 

- __ _____ _____

-

- Fabric masks can also be a form of cultural expression, encouraging public acceptance of protection measures in general.

- The safe re-use of fabric masks will also reduce costs and waste and contribute to sustainability."

- Dr. Nancy Messonnier, director of the Center for the National Center for Immunization and Respiratory Diseases (January 31, 2020):

- *https://www.cdc.gov/media/releases/2020/t0131-2019-novel-coronavirus.html*

- "We don't routinely recommend the use of face masks by the public to prevent respiratory illness…. And we certainly are not recommending that at this time for this new virus."

- The Centers for Disease Control and Prevention (CDC)

- *https://www.cdc.gov/flu/professionals/infectioncontrol/maskguidance.htm*

- In March 5, 2019 regarding the flu: "Masks are not usually recommended in non-healthcare settings; however, this guidance provides other strategies for limiting the spread of influenza viruses in the community":

- *Cover their nose and mouth when coughing or sneezing,

- *Use tissues to contain respiratory secretions and, after use, to dispose of them in the nearest waste receptacle, and

- *Perform hand hygiene (e.g., handwashing with non-antimicrobial soap and water, and alcohol-based hand rub if soap and water are not available) after having contact with respiratory secretions and contaminated objects/materials.

- On August 7, 2020
- Masks are recommended as a simple barrier to help prevent respiratory droplets from traveling into the air and onto other people when the person wearing the mask coughs, sneezes, talks, or raises their voice. This is called source control.

- CDC recommends that people wear masks in public settings and when around people who don't live in your household, especially when other social distancing measures are difficult to maintain.

- Masks may help prevent people who have COVID-19 from spreading the virus to others.

- Masks are most likely to reduce the spread of COVID-19 when they are widely used by people in public settings.

- Masks should NOT be worn by children under the age of 2 or anyone who has trouble breathing, is unconscious, incapacitated, or otherwise unable to remove the mask without assistance.

- Masks with exhalation valves or vents should NOT be worn to help prevent the person wearing the mask from spreading COVID-19 to others (source control).

- From the New England Journal of Medicine, Universal Masking in the Covid-19 Era, July 9, 2020;

- *https://www.nejm.org/doi/full/10.1056/NEJMp2006372*

- "We know that wearing a mask outside health care facilities offers little, if any, protection from infection. Public health authorities define a significant exposure to Covid-19 as face-to-face contact within 6 feet with a patient with symptomatic Covid-19 that is sustained for at least a few minutes (and some say more than 10 minutes or even 30 minutes). The chance of catching Covid-19 from a passing interaction in a public space is therefore minimal. In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic." It is also clear that masks serve symbolic roles. **Masks are not only tools, they are also talismans that may help increase health care workers' perceived sense of safety**, well-being, and trust in their hospitals. Although such reactions may not be strictly logical, we are all subject to fear and anxiety, especially during times of crisis. One might argue that fear and anxiety are better countered with data and education than with a marginally beneficial mask.

- But later authors said, "A growing body of research shows that the risk of SARS-CoV-2 transmission is strongly correlated with the duration and intensity of contact: the risk of transmission among household members can be as high as 40%, whereas the risk of transmission from less intense and less sustained encounters is below 5%. This finding is also borne

Plaintiffs' Exhibit 216

<u>thenewamerican.com</u>

## CDC Admits: No Conclusive Evidence Cloth Masks Work Against COVID - The New American

6-8 minutes



Janna Danilova/iStock/Getty Images Plus

In a recent <u>report</u> in *Emerging Infectious Diseases*, the U.S. Centers for Disease Control and Prevention (CDC) suggests what experts have stated all along: There is no conclusive evidence that cloth masks protects users from coronavirus, especially since most people do not use them correctly and do not keep them clean.

The report states:

More research on cloth masks is needed to inform their use as an alternative to surgical masks/respirators in the event of shortage or high-demand situations. To our knowledge, only 1 randomized controlled trial has been conducted to examine the efficacy of cloth masks in healthcare settings, and the results do not favor use of cloth masks.

More randomized controlled trials should be conducted in community settings to test the efficacy of cloth masks against respiratory infections.

There is increasing evidence that cloth masks not only may be ineffective against stopping coronavirus transmission, but that they may actually increase the spread of the virus, as well as worsening other health conditions.

A September report by the CDC found that more than 70 percent of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14 percent of the patients who said they "often" wore masks were also infected. Meanwhile, just four percent of the COVID-positive patients said they "never" wore masks in the 14 days before the onset of their illness.

Likewise, the CDC's October journal report references a 2015 study on cloth mask efficacy that found that rates of infection were "consistently higher" among those in the cloth mask group versus that of the medical mask and control groups. The authors of the study suggested it was likely that the cloth masks were problematic because they retained moisture and had poor filtration.

The CDC writes of that study, "This finding suggest that risk for infection was higher for those wearing cloth masks."

The *California Globe* also observed that extensive randomized control trial (RCT) studies and meta-analysis reviews of those studies have shown that masks and respirators are ineffective against the spread of influenza-like illnesses and respiratory illnesses believed to be spread by droplet and aerosol particles. The *Globe* cited an analysis of 10 "randomized controlled tests" (RCTs) by the Center for Disease Control found "no significant reduction in influenza transmission with the use of face masks."

"There is limited evidence for their [masks] effectiveness in preventing influenza virus transmission," the studies found. This applied to masks "worn by the infected person for source control OR when worn by uninfected persons." They concluded that there was "no significant effect of face masks on transmission of laboratory-confirmed influenza."

Yet the CDC continues to recommend cloth masks for public use, even as the organization has flip-flopped on whether the virus is airborne. Their latest assertion is that airborne transmission is "sometimes" possible "under special circumstances."

However, some experts have been sounding the alarm on the widespread use of masks, asserting they may cause more harm than good.

In fact, a group of doctors in Oklahoma is suing the Tulsa mayor and the Tulsa Health Department over the city's mask mandate, asserting masks cause healthy people to become sick.

"On the OSHA website it states that employers shouldn't make employees work in an environment where they have less than a 19.5 percent oxygen level," said Clayton Clark, one of the plaintiffs. "And the mandated masks cause employees to dip below a 19.5 percent oxygen level within 10 seconds of wearing a mask, so I don't want to make my healthy employees sick."

Another plaintiff, Dr. James Meehan, MD, said he has seen an increase in patients with facial rashes, as well as fungal and bacterial infections, and has heard from colleagues around the globe that bacterial pneumonia is on the rise. He asserts this increase stems directly from mask wearing.

"Why might that be? Because untrained members of the public are wearing medical masks, repeatedly … in a non-sterile fashion…. They're becoming contaminated," he said at an August press conference. "They're pulling them off of their car seat, off the rearview mirror, out of their pocket, from their countertop, and they're reapplying a mask that should be worn fresh and sterile every single time."

"New research is showing that cloth masks may be increasing the aerosolization of the SARS-COV-2 virus into the environment causing an increased transmission of the disease," he added.

Dentists have also reported increases in oral hygiene issues, which they have dubbed "mask mouth."

"We're seeing inflammation in people's gums that have been healthy forever, and cavities in people who have never had them before," says Dr. Rob Ramondi, a dentist and co-founder of One Manhattan Dental. "About 50% of our patients are being impacted by this, [so] we decided to name it 'mask mouth' — after 'meth mouth.'"

On the other hand, Sweden has declared virtual victory over the coronavirus, absent any draconian responses to the pandemic such as mask mandates and lockdowns, opting instead for "herd immunity."

"Sweden has gone from being the country with the most infections in Europe to the safest one," Sweden's senior epidemiologist Dr. Anders Tegnell told Italian newspaper *Corriere della Sera.*

"The findings that have been produced through face masks are astonishingly weak, even though so many people around the world wear them," Tengell states.

The European Center for Disease Control and Prevention confirmed Sweden's reduction in infection rates, with just 12 cases per million, Summit News reported.

Reports by the CDC reveal that just six percent of reported COVID-19 deaths came directly from the virus, while a whopping 94 percent of the deaths attributed to the coronavirus were from people who had two to three serious underlying conditions, in addition to COVID-19.

# Plaintiffs' Exhibit 217

nomaskers.org

# NOMASKERS.ORG

*Copyright Benchmark Technologies, Incorporated*

17-21 minutes



Posted By: Dr. Sircus (drsircus) on 05/17/2021

The Science – Facemasks Worse than Useless

https://nomaskers.org/index.cfm?key=browse_news&PostDate=all

### Mask Madness – The Death of Science

Published on May 3, 2021

If you wanted to grow up to be a mass murderer, destroyer of health and happiness, if you wanted to inflict maximum harm on the entire human race, what profession would you choose? Besides being a CEO of a big pharmaceutical company like Pfizer or a maniac like Gates, the perfect job description with the ability to do the most harm would be a public health official.

A group of men and women executed a plan under development for decades to drive people's health into the toilet. Terrorists without equal, they have armed themselves with the tools to attack the very foundations of life and health. They have deprived people, en mass, of the life/health-giving rays of the sun (depressing vitamin D levels) with their lockdowns.

*Top German scientists: chemical cocktail found in some face masks.*

*Quebec: Potentially toxic masks distributed in schools and daycares.*

Through wearing masks, public health officials forced practically the entire human race into hypoxic breathing conditions. Wearing a mask reduces the oxygen we breathe in and increases the $CO_2$ intake. Masks are muzzling suffocation devices that science says are causing great harm. Public health officials and the politicians who ride on their coattails have not the slightest interest in science about masks or vitamin D., And they cannot admit they were wrong, dead wrong even when science tells them they are.

DAILY NEW DEATHS PER 1M
HUNGARY & SWEDEN



*Which party has imposed the most brutal, economy-eviscerating
lockdowns and the most punitive mask mandates, while
steadily ratcheting up the fearmongering at every opportunity?*
<u>Mike Whitney</u>

Special Offer: My 100 lesson course on cancer at eighty percent off the regular price of 500 dollars.
So your cost will be only 99 dollars. The course is part of a doctoral program at Da Vinci University
and, when taken for credit, costs 1,000 Euros for both parts. I want! »

Since the beginning of COVID, we were told to "listen to the public health experts." Dr. Fauci, Rachel
Levine, Tedros Adhanom, Bill Gates (who pretends to know something about medicine), and groups
like the CDC, WHO, Gates Foundation, Imperial College, etc. These people and organizations are
supposedly the best resources out there for dealing with pandemics and disease spread, **but it turns
out they are the worst**. They got it wrong on just about everything, and the price in terms of suffering
and even death is astonishing.



<u>The States Without Mask Mandates Have Lower COVID Rates</u>

<mark>The number of new Texas COVID cases has dropped to record lows on the year in the weeks since
the state moved to scrap mask mandates, despite hysterical warnings from mainstream media and
the Biden regime that ditching the masks would result in mass casualties.</mark> One has to wonder about
the scale of the harm done to the public with mask mandates. The science presented below begins to
answer, but when you read that some want to have two-year-olds wearing masks, we deal with
exceptional stupidity, cruelty, or both.

If you think my languaging is overstrong or that I am overblowing the case, read John Whitehead's

words, "I have studied enough of this country's history—and world history—to know that governments (the U.S. government is no exception) are at times indistinguishable from the evil they claim to be fighting, whether that evil takes the form of <u>terrorism</u>, torture, <u>drug trafficking</u>, <u>sex trafficking</u>, murder, violence, theft, <u>scientific experimentations</u> or some other <u>diabolical means of inflicting pain, suffering, and servitude on humanity</u>.

Don't think that everyone is passive about masks. <u>People all over are demonstrating against mask mandates</u>.

**The Science – Facemasks Worse than Useless**



A recent Stanford study showed that masks do absolutely nothing to help prevent the spread of COVID-19, and their use is harmful. The data suggest that both medical and non-medical facemasks are ineffective in blocking the human-to-human transmission of viral and infectious diseases such as SARS-CoV-2 and COVID-19. Wearing facemasks has been demonstrated to have <u>substantial adverse physiological and psychological effects</u>.

These include hypoxia, hypercapnia, shortness of breath, increased acidity and toxicity, activation of fear and stress response, rise in stress hormones, immunosuppression, fatigue, headaches, a decline in cognitive performance, predisposition for viral and infectious illnesses, chronic stress, anxiety, and depression. Long-term consequences of wearing a facemask can cause health deterioration, development and progression of chronic diseases, and premature death.

<u>A peer-reviewed study</u> published by the International Journal of Environmental Research and Public Health (IJERPH) in the Multidisciplinary Digital Publishing Institute (MDPI) last week and entitled *Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?* concludes that "extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields."

Effects of mask-wearing examined in the study include an increase in breathing resistance, increase in blood carbon, dioxide decrease in blood oxygen saturation, increase in heart rate, decrease in

==cardiopulmonary capacity, feeling of exhaustion, increase in respiratory rate, difficulty breathing, and shortness of breath, headache, dizziness, feeling of dampness and heat, drowsiness (qualitative neurological deficits), decrease in empathy perception, impaired skin barrier function with acne, itching and skin lesions.==

Gates, who pretends to be smarter than everyone, thinks there is no downside to wearing masks. He must be right, and science is wrong. Back to the dark ages is what COVID, Bill Gates, Fauci (I hate to call him a doctor), and the World Health Organization has brought us. Gates does not have the intelligence to understand why people resist wearing masks. Both he and his wife believe, "**Every single person should be wearing a mask without exception." Fauci and the CDC want us to wear two masks to double the trouble with mask side-effects, which can be quite severe.**



Who should we believe, medical scientists at Stanford or the Gates? Nick Dearden, executive director of Global Justice Now, characterized Gates' remarks — and the ideological framework behind them — as "disgusting." "Who appointed this billionaire head of global health?" asked Dearden. "Oh yeah, he did."

The pore size of cloth face coverings ranges from ~ 20-100 microns.  The COVID virus is 200-1000x smaller than that, at 0.1 microns. Putting up a chain-link fence will not keep out a mosquito. Even the most esteemed medical journals admit their purpose is to calm anxiety. =="Expanded masking protocols' greatest contribution may be to reduce the transmission of anxiety," writes Dr. Simonie Gold.==

The publication of a long-delayed trial in Denmark was one of the first current studies in the Age of COVID to pour cold water on masks. The 'Damask-19 trial' was conducted in the spring with over 6,000 participants when the public was not being told to wear masks, but other public health measures were in place. Unlike other studies looking at masks, the Danmask study was a randomized controlled trial – making it the highest quality scientific evidence.

In the end, there was no statistically significant difference between those who wore masks and those who did not when it came to being infected by Covid-19. 1.8 percent of those wearing masks caught Covid, compared to 2.1 percent of the control group. As a result, it seems that any effect masks have on preventing the spread of the disease in the community is small.





**Older Science Confirms Masks Are Worthless**

A May 2020 meta-study on pandemic influenza published by the US CDC found that face masks had no effect, neither as personal protective equipment nor as a source control.

A July 2020 review by the Oxford Centre for Evidence-Based Medicine found that there is no evidence for the effectiveness of cloth masks against virus infection or transmission.

A Covid-19 cross-country study by the University of East Anglia came to the conclusion that a mask requirement was of no benefit and could even increase the risk of infection.

An April 2020 review by two U.S. professors in respiratory and infectious disease from the University of Illinois concluded that face masks have no effect in everyday life, neither as self-protection nor to protect third parties (so-called source control).

An article in the *New England Journal of Medicine* from May 2020 came to the conclusion that cloth face masks offer little to no protection in everyday life.

A July 2020 study by Japanese researchers found that cloth masks "offer zero protection against coronavirus" due to their large pore size and generally poor fit.

A 2015 study in the British Medical Journal BMJ Open found that cloth masks were penetrated by 97% of particles and may increase infection risk by retaining moisture or repeated use.

**Oxygen Deprivation**



In Massachusetts, people are fined if they are not wearing masks outdoors – even children as young as five are forced to do so by law. In some places like Michigan the governor wants children as young as two. She should be brought up on charges of serial child abuse.

Eric Toner, a senior scholar at the Johns Hopkins Center for Health Security, one of the inside organizations for pandemic planning, said,  "I think that mask-wearing and some degree of social distancing, we will be living with — hopefully living with happily — for several years." The original title

of this essay was 'Psychotic Belief in Masks.' Toner certainly qualifies in terms of being psychotic about masks.

Requiring children to wear masks does more harm than good, Dr. Jay Bhattacharya, a professor of medicine at Stanford University, told The Epoch Times. Bhattacharya advised Florida Gov. Ron DeSantis not to make children don face coverings.

What will be the effect will be of depriving oxygen to billions of people for years? How happy will that make people? Or inhaling dangerous amounts of CO2, what is that going to do to peoples' health after several years or even after only a few weeks or months.

In one study, researchers examined the blood oxygen levels in 53 surgeons using an oximeter. They measured blood oxygenation before surgery as well as at the end of surgeries.4 The researchers found that the mask reduced the blood oxygen levels (pa02) significantly. **The longer the duration of wearing the mask, the greater the fall in blood oxygen levels.**[1]

A drop in oxygen levels (hypoxia) is associated with an impairment in immunity. Studies have shown that hypoxia can inhibit the type of primary immune cells used to fight viral infections called the CD4+ T-lymphocyte. This occurs because the hypoxia increases the level of a compound called hypoxia-inducible factor-1 (HIF-1), which inhibits T-lymphocytes and stimulates a powerful immune inhibitor cell called the Tregs.

Decreasing the amount of oxygen people breathe by forcing people to wear masks is cruel and medically stupid. Under the mask, O2 readings drop from a regular 21 to an unhealthy 17.5, ringing the alarm of the official OSHA devices that measure such things. No one has mentioned or measured what happens when two masks are simultaneously worn.

The usual amount of CO2 in the air is approximately 400 ppm. When measured around the nose or the mouth, it would be higher. But wear a mask, and concentrations shoot up into thousands of ppm. This is not healthy! Carbon dioxide in the air we breathe usually is at 0.0390 percent. When we breathe out, it is 4.0 percent.

The minimum oxygen concentration in the air required for human breathing is 19.5 percent. Approximately 78 percent of the air we breathe is nitrogen gas, while only about 20.9 percent is oxygen. The Occupational Safety and Health Administration, OSHA, determined the optimal range of oxygen in the air for humans runs between 19.5 and 23.5 percent.

**Not Enough Oxygen: Side Effects**



Serious side effects can occur if the oxygen levels drop outside the safe zone. When oxygen
concentrations drop from 19.5 to 16 percent and engage in physical activity, your cells fail to receive
the oxygen needed to function correctly. So wearing masks is not indicated for any reason because
masks represent slow suffocation.  Not quite as bad as strangling a person or killing them outright by
completely cutting off their breath, but across the board, health will be depressed, and death from all
causes will increase.

In Oregon, a high school track coach, Dave Turnbull, called for an end to rules mandating mask-
wearing during the competition after one of his student-athletes collapsed from "complete oxygen
debt." Track star Maggie Williams was running the 800-meter race when *she collapsed to the
ground* just meters short of the finish line.

**Psychotic Beliefs in Masks**



A vast swath of the populace has a borderline psychotic belief that a thin piece of cloth will save them
from COVID flu, which will not kill 99.9% of Americans. One clear example of mask-induced mental
illness is seen in a report that an extremely tolerant, mostly peaceful journalist named Kurt
Eichenwald wanted to beat an anti-masker to death. He tweeted: "It's at a moment like this that I want
to find an anti-masker and beat them to death. Since they believe they have the right to kill others,
they have surrendered any right to object."

The CDC is on record about masks– "14 randomized controlled trials did not support a substantial
effect on transmission. There is limited evidence for their effectiveness in preventing influenza virus
transmission either when worn by the infected person for source control or when worn by uninfected
persons to reduce exposure. Our systematic review found no significant effect of face masks on the
transmission of laboratory-confirmed influenza."



**More Mask Madness – Governments and Police Loose It**

A judge at the Weimar District Court, Christian Dettmar, had his house searched today. His office, private premises, and car were searched. The judge's cell phone was confiscated by the police. The judge had made a sensational decision on April 8, 2021, which was very inconvenient for the government's anti Coronavirus measures policy.

*Masks could be delaying development among babies.*

At the suggestion of a mother, the judge had ruled in a child welfare proceeding pursuant to Section 1666 of the German Civil Code (BGB), Ref.: 9 F 148/21, that two Weimar schools were prohibited with immediate effect from requiring students to wear mouth-nose coverings of any kind.

Some places like Oregon seek to keep COVID mask mandates' indefinitely.'

American judges are removing children from parental custody for not wearing a mask.

Spain has passed a new law forcing people to wear face masks everywhere outside and even while swimming in the sea. Yes, really.

A New York City judge has removed a 6-year-old girl from her mother because she did not wear a mask while dropping her off outside of the school.

The CDC Thinks 2-Year-Olds Should Wear Masks in Schools, Even If Everyone Else Is Vaccinated

**Who Cares About the Planet? Not Health Officials**

Certainly not the FDA or Dr. Fauci. The planet may be facing a new plastic crisis, similar to the one brought on by bottled water, but this time involving discarded face masks. "Mass masking" continues to be recommended by most public health groups during the **COVID-19** pandemic, despite research showing masks do not significantly reduce the incidence of infection. ==As a result, it's estimated that 129 billion face masks are used worldwide each month, which works out to about 3 million masks a minute. Most of these are the disposable variety, made from plastic microfibers.==

| | |
|---|---|
|  | Public Comment This guidance is being issued to address the Coronavirus Disease 2019 (COVID-19) public health emergency. This guidance is being implemented without prior public comment because the Food and Drug Administration (FDA or Agency) has determined that prior public participation for this guidance is not feasible or appropriate (see section 701(h)(1)(C) of the Federal Food, Drug, and Cosme...  READ MORE |
|  | - April 28, 2021Download the .PDF belowABSTRACTThe knowledge of biotechnology increases the risk of using biochemical weapons for mass destruction. Prions are unprecedented infectious pathogens that cause a group of fatal neurodegenerative diseases by a novel mechanism. They are transmissible particles that are devoid of nucleic acid. Due to their singular characteristics, Prions emerge as potenti...  READ MORE |
|  | - April 27, 2021(Download .PDF below)"Long-term Consequences of Wearing Facemask Can Cause Health Deterioration, Developing and Progression of Chronic Diseases, and Premature Death."Note: FactCheck.org has this to say about the study:Stanford Medicine says it "strongly supports the use of face masks to control the spread of COVID-19." Yet viral stories falsely claim a "...  READ MORE |

# Plaintiffs' Exhibit 218

aier.org

## Masking: A Careful Review of the Evidence

*Paul Alexander*

67-85 minutes

---

1. AIER

   \>>

2. Daily Economy



The question on whether to wear a face mask or not during the Covid-19 pandemic remains emotional and contentious. Why? This question about the utility of face coverings (which has taken on a talisman-like life) is now overwrought with steep politicization regardless of political affiliation (e.g. republican or liberal/democrat).

Importantly, the evidence just is and was not there to support mask use for asymptomatic people to stop viral spread during a pandemic. While the evidence may seem conflicted, the evidence (including the peer-reviewed evidence) actually does not support its use and leans heavily toward masks having no significant impact in stopping spread of the Covid virus.

In fact, it is not unreasonable at this time to conclude that surgical and cloth masks, used as they currently are, have absolutely no impact on controlling the transmission of Covid-19 virus, and current evidence implies that face masks can be actually harmful. All this to say and as so comprehensively documented by Dr. Roger W. Koops in a recent American Institute of Economic Research (AIER) publication, there is no clear scientific evidence that masks (surgical or cloth) work to mitigate risk to

the wearer or to those coming into contact with the wearer, as they are currently worn in everyday life and specifically as we refer to Covid-19.

We present the evidence in full below. We also state that should adequate evidence emerge that supports the effectiveness of surgical and cloth masks in this Covid pandemic (or any similar type masks), then we will change our position and conclude otherwise. Our focus is on face masks for Covid but we will touch gently on the issue of school closures and lockdowns, as these three issues remain the key public health policy catastrophes we have faced as global societies.

Back in August 2020, a survey by Pew indicated that 85% of Americans wore masks when in public all or most of the time. So, the public has been using masks extensively. We thus set the table in this review on the effectiveness of masking for Covid by asking, if these surgical and cloth masks are effective, why did incidence of the virus (or actual disease; and they're not the same thing) escalate so rapidly despite widespread use? Why is there no evidence across US States and global nations showing that when use is mandated (or not mandated given the general uptake of masking by the public), this contributes to reduced viral transmission? Is there any such evidence?

**Orofecal transmission?**

Understanding the transmission of this respiratory SARS-CoV-2 pathogen is also evolving given evidence of orofecal spread as having a potentially larger contributor role in non-respiratory transmission of Covid. As an example, a recent open-evidence review brief by Oxford researchers (Jefferson, Brassey, Heneghan) and its publication in CEBM, reveals the growing recognition that SARS-CoV-2 can infect and be shed from the gastrointestinal (GI) tract of humans. Orofecal spread demands urgent study and if orofecal spread is shown to be definitive and more consequential in Covid transmission, then this could impact mitigation strategies beyond those for respiratory transmission.

**Where do we begin on masks? How about infection fatality rate/IFR?**

Moreover, we are addressing here highly irrational, punitive, capricious, and groundless societal restrictions for a virus with an infection fatality rate (IFR), based on Stanford University John Ioannidis's calculations, of 0.05% in persons under 70 years old (across different global nations). Ioannidis's research was followed up recently by a reported non-institutionalized IFR in the state of Indiana (persons aged > 12 years) of 0.12% (95% CI 0.09 to 0.19) when age 40-59/60 years (reported in the Annals of Internal Medicine), and an IFR when < 40 years old of 0.01% (95% CI 0.01 to 0.02). Persons 60 or older had an IFR of 1.71% (overall IFR was 0.26%).

So why would we continue this way with these unsound and very punitive restrictive policies and for so long once the factual characteristics of this virus became evident and as alluded to above, we finally realized that its infection fatality rate (IFR) which is a more accurate and realistic reflection of mortality than CFR, was really no worse than annual influenza?

**How did we get here?**

How did we arrive at the confusion and misinformation surrounding mask use which is our focus, yet by extension, the crushing societal lockdowns and harmful school closures? There are serious harms and downsides due to these crushing restrictive policies and we understand that one would think reflexively if there is a pathogen, we should just lock and shut everything down and away. We understand this initial instinct.

However, there are benefits and risks to any action and the harms of these lockdowns and school closures far outweighed the benefits based on what has transpired. We even knew this soon after implementing lockdowns yet we continued catastrophic policies and are still continuing. How did we get here societally? How have our government bureaucratic leaders failed so disastrously?

We lay heavy blame on our government leaders but argue that the so-called 'medical experts' who are part of Covid Task Forces and guidance panels have been largely unscientific, illogical, and irrational in their guidance and statements.

Untethered from the reality of things. In many instances just flat out misleading and wrong! The incessant campaign by the media that has worked to drive fear and hysteria in the public is also partly to blame. There appears to be an unholy alliance between the government bureaucrats, the aforementioned 'medical experts,' and a willing print and digital media. A vast lot of what these experts say on Covid makes no sense anymore, at times unhinged and lacking of any credibility.

In such incredibly important  Covid-related input and guidance, these television medical experts and many government leaders have failed in profound and often unimaginable ways and we are left asking how they got things so very wrong. Is it that these medical experts do not read the science? Or maybe cannot understand the data or science? Which? They talk about following the science but seem blinded to it. They clearly don't follow the science else we would not be here. They seem to not understand the devastation they have visited upon the lives of so many.

We argue that the messaging by the media and medical experts initially suggested that all persons are of equal risk of severe illness from Covid infection. This is where it all went wrong and where societies were greatly deceived by those who should not have done that. We were never 'all' at equal risk. This was deeply flawed and has crippled the US and global nations since day one of this pandemic. This was and remains a flat-out falsehood (untrue) and it has driven irrational fear by the public. This clearly erroneous intimation has stuck in the minds of the public and severely impacted the public's perception of their risk and how they would move forward.

**School closure policy mirrors face mask policy?**

What did we know? Let's address masks by first looking at school closures as it bears mentioning about the disaster the flawed school closure policies directed by our government leaders have caused in our children's lives. The school closure catastrophe mirrors the masking catastrophe and similar unsound policies. We knew early on in 2020 for example, that the key risk group was elderly persons with medical conditions (though Covid gave way to age due to serious medical conditions or obesity based on existing data). But just look at the complete disaster experts have created with our children in terms of school closures.

Look at what is now known in <u>Ontario, Canada with the union</u> and fees paid to 'conflicted' medical experts to drive a school closure message. This is reckless and scandalous! In spite of extremely low transmission rates and very low likelihood of spreading Covid virus among children (or of becoming severely ill from Covid), they have gone on and destroyed a year of the school lives of children due to these nonsensical medical experts and hysterical media and this will carry a huge long-term loss to our children. Who is going to pay for this?

**What did CDC and NIH know about risk to children and when did they know it?**

Did we have any data or science? Of course we did. <u>Quality research</u> "in the leading journal *Nature* estimated the Covid-19 survival rate to be approximately 99.995% in children and teens." We knew

this very early on but that did not stop public health agencies and experts from deceiving or failing to inform about the true risk. A recent publication by CDC reported that among in excess of 90,000 students and staff in 11 North Carolina school districts, they found that in-school virus transmission was "very rare." A similar finding emerged in 17 rural Wisconsin schools.

_The Atlantic's_ Derek Thompson wrote in January 2021 that "We've known for months that young children are less susceptible to serious infection and less likely to transmit the coronavirus. Let's act like it." This piece by Thompson was driven by CDC 'coming' out in the last week for school reopenings when the data was clear for a very long time that the risk was very low, if at all. Then we are, as is Thompson in his piece, provoked to ask, why did the media, our bureaucratic government leaders, and the medical experts seemingly collude to damage our children with their baseless school closures? Why did they deceive the public for so long? Catastrophic long-term losses for our children's educational but importantly, their social and emotional/psychological development has accumulated. We know that suicides among children have been escalating. Parents are struggling with the pandemic and homeschooling and children are failing out. This type of unfounded fear has been driven by the media "despite a thousandfold difference in risk between old and young." They always knew this but continued a bold-faced lie! As a result, this has underpinned an atmosphere of gross distrust of our government officials and medical experts.

And the CDC is now in January/February 2021 racing to any open podium and microphone it can find to tell us it's time to reopen schools and it can be done safely. Yet this is not new data the CDC is stumbling upon for the first time. No, they have always known this. The CDC always knew it was safe to reopen schools for many many months now. They, like the rest of the globe, had the publicly available published pediatric-children data since mid-2020 which has been consistent and clear that there is very low risk to children and schools should not have been closed in the first place or kept closed. The data has been stable and clear just after the start of the pandemic that there is far less susceptibility for children, or severe illness for children, and very low risk of hospitalization or death for children when it comes to Covid.

Why this substantially reduced risk? We are not yet entirely sure but preliminary research points to less expression of ACE2 receptor proteins on the surface of the nasal epithelium in children (4-9 years old). This is well known globally for many, many months that children are at very low risk of spreading infection to their classmates, to their adults, teachers, or even taking it home. Secondary transmission evidence is nonexistent. Based on a high-quality McMaster University review, researchers found that "Transmission was traced back to community and home settings or adults, rather than among children within daycares or schools, even in jurisdictions where schools remained open or have since reopened."

International research had been clear that there was no consistent relationship between in-person schooling for children and virus transmission. Any medical expert or agency implying otherwise that this is new science and 'we now understand the data' or 'the data is now available' is flat out duplicitous. But why has this happened to our children yet did not happen for seasonal influenza each year which is far more deadly than Covid for children? Or for H1N1 when it struck in 2009? Were decisions made based on evidence or other factors?

Who is at fault here? What was the reason for this very flawed policy? It surely is not based on science. Why has the CDC and other US health agencies such as the NIH been so slow to react to the known science (strong evidence from Norway, Ireland, Singapore, North Carolina etc.) and thus guide the optimal policy decisions based on this clear prior accumulated science (_Washington Post_

piece September 2020, _The Atlantic_, October 2020)? These health agencies had the evidence but continued advocating devastatingly flawed school closure policies that have damaged our children. Just look at the repeated sparring between Senator Rand Paul and Dr. Anthony Fauci whereby the senator has been ongoingly pilloried by the media for calling out Dr. Fauci who has routinely changed statements and been confusing on a range of issues and particularly on the issue of school closures. Dr. Fauci replied: "We don't know everything about this virus, and we really ought to be very careful, particularly when it comes to children." Surely Dr. Fauci was aware of the global Covid data as it related to risk in children.

While children drive seasonal influenza and do take influenza home, this is not the case with Covid. We knew this very early on. We do recognize that there is risk of infection and transmission but it is very negligible when it comes to children and Covid. We cannot say zero risk but we are talking about extremely low likelihood and we knew this very early on. Yet if you turned on the daily news you will not know this because the message being sent out on practically a 24/7 basis is one of doom and gloom for our children! Surely the media and medical experts know that what they state is factually incorrect based on the science. Our governments and unions have closed schools with irrational knee-jerk nonsensical, unscientific policies similar to lockdowns, that results in known (i.e. not theoretical) immeasurable harms to our children given the losses that accrue. Again, who is going to pay for the unnecessary devastation these seemingly oblivious, arrogant, and nonsensical medical experts caused?

The truth also is that many children – and particularly those less advantaged, our minority, our African-American, Latino, and South Asian children – get their main needs met at school, including nutrition, eye tests and glasses, and hearing tests. Importantly, schools often function as a strong protective system or watchguard for children who are sexually or physically abused and the visibility of it declines with school closures.

Due to the lockdowns and the lost jobs, adult parents are very angry and bitter, and the stress and pressure in the home escalates due to lost jobs/income and loss of independence and control over their lives as well as the dysfunctional remote schooling that they often cannot optimally help with. Some are tragically reacting by lashing out at each other and their children. There are even reports that children are being taken to the ER with parents stating that they think they may have killed their child who is unresponsive.

In fact, since the Covid lockdowns were initiated in Great Britain as an example, it has been reported that incidence of abusive head trauma in children has risen by _almost 1,500%!_ Similar catastrophic head trauma in babies that is linked to the Covid pandemic has been reported in Canada! There has been a devastating trend in Ottawa, Canada hospitals with a rise in the number of little children and babies being seen with catastrophic head injuries during the second wave of Covid-19. Covid-19 has cost lives and our government leaders and health agencies with television medical experts are partly to blame for their nonsensical and seemingly politicized decision-making that had no scientific basis. Look at what they have done!

Sadly, our children will bear the catastrophic consequences and not just educationally, of the deeply flawed school closure policy for decades to come (particularly our minority children who were least able to afford this). They have done this, the CDC, NIH etc. have cost children lives and done immeasurable damage to our children by increasingly recognized deeply destructive, and nonsensical policies.

These experts and agencies have known for a long time, certainly many, many months now (since

summer of 2020 and before) that children are at little if any risk of spreading the infection or taking it home. They knew that schools offer a sort of vanguard safety net protection in our society for children and that children are often way better off within the school setting.

Yet despite what the available science showed, they continued their school closure positions and policies and urgings, that emboldened the unions and teachers to react and behave as they currently are despite the overwhelming science. Why wouldn't teachers and unions be petrified out of their minds based on the consistently illogical and nonsensical information emerging from our government agencies and medical experts? Yet this misguided policy continues and with mask-use and other mandates. Are we to believe that all aspects of the pandemic's response i.e. lockdowns, masking, vaccine etc., are fraught with these policy irregularities and aberrancies that are devastating to the public? As an example, we have doctors presently trying to mainstream early outpatient treatment for Covid in high-risk patients using established safe, cheap, effective, and available drugs but getting pilloried by the nihilistic medical experts and establishment. Such early ambulatory sequenced and combination treatment is a potential option that may reduce hospitalization and death.

**Questions on masking mirrors questions on social distancing?**

Specifically, from what sources did the CDC rely upon to designate that a distance of 6 feet between individuals is needed to mitigate Covid viral spread? And why, for example, do Europeans from various countries only have to stand about 1 meter apart (approximately 3 feet)? Do they know something that we don't? Or were both values arrived at arbitrarily? Were these recommendations based on evidence or were they set arbitrarily? If the latter, then why not 4 feet, 10 feet or 20 feet? Turns out "the World Health Organization recommends a distance of "at least one meter (3.3 feet)." China, France, Denmark and Hong Kong went with one meter. South Korea opted for 1.4 meters; Germany, Italy and Australia for 1.5 meters.

The CDC said 6 feet and we still don't know how they arrived at this distance and yet this pandemic has been active since at least February 2020. Unfortunately, then we can similarly at best only make unsound and disingenuous statements in favor of the use of masks but which are not backed with evidence or data. Yet the issues at hand are so serious given large societal implications and reorganization that it is difficult to reconcile with logic the absence of any such studies.

**Focusing on face masks**

With a focus on facial masks, where do we stand? Well, our position is based on the science. We contend that surgical and cloth masks are basically facial coverings that lack any scientific data to support their use. And that they are largely cosmetic and function more to give the user a sense of confidence and security as it pertains to the Covid pandemic. We are basing this on an examination of the totality of the evidence to date presented below. Except for the N95 masks (typically for hospital and high-risk settings and usually accompanied by gowns, gloves and other PPE) and only when properly fitted to allow for an optimal seal to the face, and only when changed often, is there effectiveness in mitigating respiratory virus spread.

And in relation to this, such protection is generally required only when clinicians treat highly infectious patients and under isolation conditions! Effectiveness also depends on a filter that could effectively deal with virus-sized particles. The Covid-19 virus is 120 nanometers in size while the filtration potential of a N95 mask is 150-300 nanometers. We also suggest that such fitting would actually be needed as a person places a fresh mask on their face, in order to retain functionality of the N95 respirator. Perhaps, it is important to note that the "N95" terminology means that the mask filters 95%

of the particulate material. Moreover, prolonged use of fitted N95 type masks (particulate filtering facepiece respirators) are uncomfortable, and can potentially cause harm.

In light of the above we hold that most of the populace would favor the use of the typical surgical 'blue' masks (or worse; cloth masks or home-made cloth masks) and even considering the fit issues discussed here regarding N95 masks, they cannot provide similar protection (from being infected or passing on infection) as might N95s.

There is simply no defensible rationale to treat this pandemic other than using an age and risk-targeted approach and fostering optimal hand washing hygiene. The vastly rational and sensible way is to target high-risk people (i.e. those at risk of developing severe disease and/or dying) and allow everyone else to get on with their lives. We ensure hospitals are well prepared (we hope) and we have had one year to do this as outlined by our governments when they asked us to help 'bend the curve,' and we simultaneously triple down on protecting the high-risk persons.

With this in place, we strive to safely and with sensible precautions, reopen society and schools in full. It is as simple as that, and on top of this, we have strong evidence of the use early on of repurposed existing, safe, cheap, and effective therapeutics in higher-risk Covid positive persons in private homes or nursing home settings who are showing initial symptoms. When used early in the outpatient setting, these drugs (sequenced combined antivirals, corticosteroids, and anti-thrombotic anti-clotting drugs) can help reduce isolation, mitigate transmission, and cut hospitalization and death significantly.

The implications of the policies like restrictions and masking are far-reaching and such policies must be based on evidence. The current policies cause crushing harms to our societies and cannot be based on the notion of stopping Covid at all costs. Stopping Covid at all costs without factoring in the implication societally is a completely illogical, irrational, damaging, and unattainable goal.

**Asymptomatic spread and masks?**

Before proceeding to the key evidence on the effectiveness (or not) of face coverings (masks), we wish to highlight research that is highly applicable. This surrounds recently emerging evidence that Covid-19 spread is so exceedingly rare in asymptomatic persons as to have virtually no impact in the grand scheme. Given that there are very strong data to support this contention, then we state at the outset that universal masking has no merit and cannot be supported by reliable data or research.

In an article published in *Nature Communications* (November 2020) that studied 10 million eligible persons, it was demonstrated that asymptomatic spread was not merely rare but in fact, does not appear to happen at all! Not one instance was found in the study whereby researchers reported that there were positive tests emerging even amongst close contacts of asymptomatic cases in this sample of 10 million. Why would we even consider then the need for universal masking when there is evidence like this of limited asymptomatic spread?

We also point out (and we also recognize and appreciate that this argument is far from being one based in strong evidence *per* se) that if ten's of studies or more are required to prove, one way or another, whether a procedure is effective or not (and to therefore lead to changes in standard of care), and there are still no reliable data, the effects are either minimal or nonexistent. Hence it can be reasoned that there is no meaningful effect in the first place; such an argument can be used for the masking dilemma.

All this is to say that there is and was no scientific justification to mandate or call for 'voluntary'

masking of healthy people. None! And we also suggest that this straightforward reasoning can be applied to most of the other 'mitigation' efforts being implemented to date; specifically societal lockdowns, and school closures. In fact, we can find no definitive research-based evidence to support masking, societal lockdowns, or school closures at the time of writing this piece. We continue to argue that most of this has been arbitrarily construed by the government leaders and their medical experts.

These policies are not merely misguided, but they are also not without serious and adverse consequences; they have caused crushing harms and have been very injurious at a personal and societal level. Restrictive policies have not been thought through as to the implications at large! The benefits have not been assessed or considered alongside the potential (and documented) harms and this is a catastrophic omission from the perspective of sound public health policy and principles. In short, the bureaucracy has provided us with confused and often contradictory policy supported by a lack of clarity, sheer assumptions, and nonsense in general, and in this case, in relation to universal masking. Our leadership and 'experts' have failed to recognize the crushing harms that result from their arbitrary and even worse, capricious policies that lack any reliable evidentiary support!

It might also be expected that in light of the apparent groundbreaking seminal research to which we alluded above, this would not only be covered widely by the mainstream media and of course our experts but that this would clarify and help settle issues pertaining to asymptomatic spread, lockdowns in general, school closures, and of course in this case, masking. Amazingly though, there has been no acknowledgement of this work. And yet such findings that could bear on evidence-informed decision-making were ignored entirely.

**Double masking?**

Moreover, Dr. Anthony Fauci of the NIAID is now supporting (or at the least not discouraging) the call for the use of double masks! To paraphrase him, it makes 'common sense' to wear two masks instead of one. Yet this flies in the face of the extant data showing that the use of single masks has not provided any protection insofar as progress of the pandemic is concerned (in fact just the opposite… in virtually every jurisdiction in which mask wearing was mandated, there were very large increases in the rates of infection or at least PCR positivity to be more accurate). Despite this Dr. Fauci has responded by raising the double-mask approach, stating that "it likely does" work in relation to offering more protection.

What happened to "following the science" and the need for randomized controlled trials on the use of double masks? It seems that we follow the science only when it supports preconceived notions or goals. What was stated on double masking was utter nonsense. Dr. Fauci likely did not read the marine recruit CHARM NEJM study whereby the recruits consistently wore double layered masks yet there was still spread in the most heavily, monitored for compliance, and restricted to military environments.

Did Dr. Fauci also consider the possibility that with double masks, wearers will likely experience more difficulty in simply breathing comfortably? And what would be the consequences for those with pulmonary diseases, upper respiratory infections, others with difficulty breathing without a mask, and most importantly for children? Wearing a mask, let alone two, potentially simulates COPD/chronic obstructive pulmonary disease, akin to what smokers commonly get. Masks can make it difficult for one to breathe out, especially during stressful situations. We cannot say here because we don't know, absent scientific data, but neither does Dr. Fauci. At worst the advice regarding the use of double masking (why not triple or even four or five masks?) is arbitrary and has no scientific basis. Then why

put it out there? This reflects a dissonance to anything that disrupts the set narrative that at this stage
of the pandemic happens to be more political in our view than scientific or evidence-based. To add to
the confusion, Dr. Fauci followed this up by stating when questioned about this statement by the
media, that there is no data to show that double masks work. So, what then is the public to believe?
We cannot claim to think for Dr. Fauci and similar medical experts, but why do medical experts with a
podium consistently in this Covid pandemic lend so much misinformation and confusion to the public?
They consistently make statements with no data or evidence to back it up. They cause great
confusion and distrust by this.

**Mask mandates?**

As noted above, the data show that Dr. Fauci's confusing about-faces concerning advice as to
management of the pandemic issues, including on masking, was perhaps arbitrary at best. As
regards to masking, it is simply impossible to understand ongoing recommendations for this when we
know that there are multiple US States where it can be shown clearly that *after* implementing mask
mandates (indoor and outdoor), the number of cases went up! We are not suggesting that the
addition of mask mandates in any way caused case numbers to soar, but clearly they had no positive
or beneficial effects either. There are 37 US states including but not limited to California, Texas,
Hawaii, Maine, Delaware, Florida, Oregon, and Pennsylvania that currently mandate face coverings
in public. Outside of the USA, there are also global data showing that when mask mandates were
implemented in Austria, Germany, France, Spain, UK, Belgium, Italy, to name only a few, case
numbers went up, not down.

Moreover, the EPOCH Times reported that "in states (US) with a mandate in effect, there were
9,605,256 confirmed Covid-19 cases, which works out to an average of 27 cases per 100,000 people
per day. When states didn't have a statewide order—including states that never had mandates,
coupled with the period of time masking states didn't have the mandate in place—there were
5,781,716 cases, averaging 17 cases per 100,000 people per day; a notable reduction as compared
to the number of cases observed during mask mandates! States with mandates in place produced an
average of 10 more reported infections per 100,000 people per day than states without mandates."
The blind acceptance of the current unsupported dogma that has become so entrenched that if cases
do go up, the experts wedded to the universal use of masks claim that this is good news such that the
masking prevented even more cases from occurring; this is truly incredible.

The reality is that there is significant evidence that masks are not effective for controlling a pandemic.
To reiterate we agree, though, that within the context of a clinician treating an obviously infected
patient (with any communicable disease), the use of masks is important but even then this must also
be augmented by the use of other PPE (goggles, and even hazmat clothing with isolated oxygen
supplies for example) and this simply cannot be compared to population wide use of masks The
effects on populations are catastrophic and masks, perhaps unintentionally have constrained our
ability to return to a semblance of normal life!

**What is the actual Evidence on Masking?**

What does the best overall body of evidence show at this time as to the effectiveness of masks? To
answer this, we refer to a recent tantalizing piece by Jenin Younes published in the American Institute
for Economic Research (AIER) that sets the table for making a strong argument against the
effectiveness of masks and also raises very troubling questions. Given what is available, we must
also draw on data derived from the study of other respiratory viruses (e.g. influenza) in regard to the

use of masks to prevent spread of disease, and we also argue that this evidence is very pertinent to the virus (SARS CoV-2) associated with Covid-19 disease.

Overall, the available research on the use of masks to mitigate transmission of pathogens in a pandemic is of very poor methodological quality using largely indirect unadjusted evidence, and not the optimal clinical research that is needed. A major limitation is the use of the same evidence base by all reviews and thus arrival at similar findings. However, this low-quality evidence is what we have and is, we believe, still useful enough to guide and inform us.

At the same time, we do recognize the urgent need for well-designed clinical research in order to address as definitively as possible questions pertaining to the utility of face masks in curtailing or stopping spread of Covid-19 (and future similar respiratory 'pandemic' pathogens). In fact, we find it remarkable that researchers have not been commissioned to develop adequate studies on the use of face masks to prevent the spread of SARS CoV-2 by asymptomatic people. It's also noteworthy that there have also been no reliable studies that can demonstrate one way or the other whether social distancing truly can be used to impede viral spread, especially in asymptomatic people.

It appears that this issue is now fraught with politics and agendas promulgated by a wide array of medical experts on television and the media as opposed to being related to a reliable base of knowledge. We suggest that various populations are being hurt by this type of 'academic sloppiness,' which feeds into what we would call the reckless behavior of many experts and ill-informed media outlets who rely on these authorities. Conclusions around the use of masks during the Covid pandemic (and other actions that have been taken but are not addressed here in detail such as lockdowns and school closures) are often baseless and we submit that the research community has not studied the mask issue appropriately, principally because they are reticent and possibly even wary as to what the findings might reveal. After all, those who object to masking are often immediately labeled as 'deniers' and heretics.

The public remains confused by the messaging from senior medical experts across the US. This can be exemplified by comments made by Dr. Anthony Fauci early on in the pandemic (March 2020) as part of his Covid-19 Task Force role when he stated categorically that (para), "wearing a mask might make people feel a little bit better" but "it's not providing the perfect protection that people think it is." Then and now, he actually echoed the current scientific consensus and this was in line with the World Health Organization's guidance.

 However, as we know, the guidance coming from experts was still somewhat confusing at best and downright unscientific and flawed at worst.  Interestingly, this type of advice (also given by others including Canada's Chief Medical Officer, Dr. Theresa Tam), was changed (initially dismissive of mask use) under the notion that in fact the experts were intentionally saying these things so as to prevent runs on surgical masks that were in short supply at the time and needed by healthcare workers. We put forward the notion that this is not the case and that in fact at that time, the experts actually *were* relying on available data as alluded to above. All this is to say that such changes in advice provided by top medical experts only served to confuse a public desperately in need of honesty and optimal guidance.

In relation to the above we point out that the World Health Organization (WHO) stated that "the widespread use of masks by healthy people in the community setting is not yet supported by high quality or direct scientific evidence and there are potential benefits and harms to consider."

A strong argument against the use of masks in the current Covid-19 pandemic gained traction when a recent CDC case-control study reported that well over 80% of cases always or often wore masks.

This CDC study further called into question the utility of masks in the Covid-19 emergency.

A recent publication asserts that face masks become nonconsequential and do not work after 20 minutes due to saturation. "Those masks are only effective so long as they are dry," said Professor Yvonne Cossart of the Department of Infectious Diseases at the University of Sydney." As soon as they become saturated with the moisture in your breath they stop doing their job and pass on the droplets." In a similar light, there are indications that wearing a mask that is already used is riskier that if one wore no mask.

Moreover, accumulating data and evidence *in toto* suggests a lack of evidence to support mask use (in adults or children) including any broad mask mandate. For example, the CDC in its examination of Nonpharmaceutical Measures (NPIs) for Pandemic Influenza in Nonhealthcare Settings, Oxford's CEBM, CIDRAP and policy questions unsound mask data, Klompas (NEJM) and universal masking, Jefferson et al., CDC 2, Brainard et al.'s research on preventing respiratory illness (Norwich School of Medicine), Marks's Covid-19 transmission clusters in Catalonia (*Lancet*), Spain, Jenin Younes's persuasive AIER piece on masking in the US, and research evidence by Hunter et al. regarding NPIs.

More specifically, research done by the CDC (May 2020) and published in *Emerging Infectious Diseases* (EID) examined personal protective measures and environmental hygiene measures for the effectiveness of such measures in reducing transmission of laboratory-confirmed influenza in the community. Researchers focused on disposable surgical or medical (typical blue coloured) face masks and identified 7 studies involving influenza and influenza-like illness (ILI) and reported that there was in fact no significant reduction in the transmission of influenza when face masks were used. Overall, the CDC reported that there is no significant effect of face masks in the transmission of laboratory-confirmed influenza and we hold that these findings could be extrapolated to SARS-CoV-2.

Researchers from the University of Oxford's Center for Evidence-Based Medicine (CEBM) examined the data regarding the effectiveness of the use of masks within the current highly charged backdrop of politics. They concluded that after nearly 20 years of preparedness for coming pandemics, the evidence on face mask use remains very conflicted. They examined evidence that revealed that "masks alone have no significant effect in interrupting the spread of ILI or influenza in the general population, nor in healthcare workers." They ask why had the correct applicable comparative effectiveness research not been conducted and we agree, that is, until the recent marine study (NEJM publication (CHARM study) and the Danish study published in the Annals of Internal Medicine which we describe. The Oxford researchers also speculate that there is likely and elevated rate of harm (infection) when using cloth face masks. They looked specifically at 6 RCTs in 2010 that examined face masks in respiratory viruses whereby 2 studies were in healthcare employees and 4 were in family and student groups. The trials for ILI showed very poor mask wearing compliance and seldom reported the harms that might be associated with the use of masks (harm evidence to be presented later in this discussion). Taken together though this fits with the premise outlined above where we state that if masking could be used to effectively prevent viral spread, there would have been clear evidence by now.

In 2013, the Canadian Agency for Drugs and Technologies in Health (an Agency specializing in Systematic Review/Meta-Analysis), stated: "No evidence was found on the effectiveness of wearing surgical face masks to protect staff from infectious material in the operating room, no evidence was found to support the use of surgical face masks to reduce the frequency of surgical site infections,

and guidelines recommend the use of surgical face masks by staff in the operating room to protect both operating room staff and patients (despite the lack of evidence)."

Similarly, Jefferson et al. studied physical interventions to interrupt or reduce the spread of respiratory viruses (updating a prior Cochrane review (2011) to include 15 RCTs (n=13,259 persons) exploring the impact of masks (14 trials) in healthcare workers, the general population and those in quarantine (1 trial)). When compared to non-masking, researchers found no significant reduction of ILI cases or influenza when masks were used in the general population and in healthcare workers. Somewhat surprisingly, there was also no difference between surgical masks and N95 respirators for ILI or for influenza.

However, this might comport with the fact that although N95 masks can be effective at filtering 95% of the particulate matter, the masks must be properly fitted. And in this regard, when an individual places a fresh mask on their face, there is no guarantee whatsoever that it will be placed in the precise location used when fit tests were done. This would mean therefore, that the filtering effectiveness of N95 masks can't really be predicted or guaranteed. The body of evidence was considered to be of 'low' quality based on included study limitation, even though these were RCTs, and they were plagued with serious methodological concerns.

Marks et al. reported on transmission clusters of Covid-19 in Catalonia, Spain (post-hoc analysis of data collected in the BCN PEP CoV-2 Study), looking at a cohort that was part of a RCT (314 patients with Covid-19, with 282 (90%) having at least one contact, 753 contacts in total, resulting in 282 clusters. Ninety (32%) of 282 clusters had at least one transmission event). Researchers reported no association of risk of transmission with mask usage by contacts.

The New England Journal of Medicine (NEJM) recently published an article on Covid-19 and masks which appeared to suggest that masks have become no more than a psychological crutch, and stated that "We know that wearing a mask outside health care facilities offers little, if any, protection from infection. Public health authorities define a significant exposure to Covid-19 as face-to-face contact within 6 feet with a patient with symptomatic Covid-19 that is sustained for at least a few minutes (and some say more than 10 minutes or even 30 minutes).

The chance of catching Covid-19 from a passing interaction in a public space is therefore minimal. In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic." They also stated that "it is also clear that masks serve symbolic roles. Masks are not only tools, they are also talismans that may help increase health care workers' 'perceived' sense of safety, well-being, and trust in their hospitals. Although such reactions may not be strictly logical, we are all subject to fear and anxiety, especially during times of crisis. One might argue that fear and anxiety are better countered with data and education than with a marginally beneficial mask."

A recent WHO-sponsored systematic review and meta-analysis published in the *Lancet* included 39 nonrandomized observational studies (weaker study designs) that were not always adjusted fully for confounders and reported that face masks *could* be effective. These studies had small sample sizes with small event numbers, and were plagued with potential selection bias and residual confounding bias. The body of evidence was judged to be of low quality and was also open to the risk of recall, and measurement bias. The studies focused principally on mask use in households or contacts of cases that arose from investigations of the SARS and MERS epidemics (but with limited date for Covid-19 too). The researchers argued though that this indirect evidence can be regarded as the most direct information that would apply also to Covid-19.

Following publication in the *Lancet* of the WHO-sponsored review, researchers led by University of

Toronto epidemiology professor Peter Jueni, have now come forward asking *Lancet* to retract the study, citing numerous serious methodological flaws such as (but not limited to):

**i)** 7 studies being unpublished and non-peer-reviewed observational studies

**ii)** failure to consider the randomized evidence

**iii)** 25 included studies are about the SARS-1 virus or the MERS coronavirus, both of which have very different transmission characteristics than SARS-CoV-2: they were transmitted almost exclusively by severely ill hospitalized patients and there was no assessment of community transmission; a serious concern in regard to the issues being discussed in this document

**iv)** of the 4 studies relating to the SARS-CoV-2, 2 were misinterpreted by the authors of the *Lancet meta-study*, 1 is inconclusive, and 1 focused on the impact of using N95 (FFP2) respirators which is irrelevant insofar as community transmission, especially in regard to asymptomatic people and also did not address the use of medical grade or cloth masks

**v)** this review is being used to guide global face mask policy for the general population whereby one included study was judged to be misclassified (relating to masks in a hospital environment), one showed no benefit of face masks, and one is a poorly designed retrospective study about SARS-1 in Beijing based on telephone interviews. None of the studies refer to SARS-CoV-2.

Similarly, a recent study published in *PNAS* surrounding airborne transmission and face masks has also provoked substantial consternation and argued to be a politically motivated study more than a scientific one. It has led to over 40 leading scientists calling for its withdrawal due to it being very flawed because of the use of very suboptimal statistical analyses.

A review by the Norwich School of Medicine (preprint) studied the effectiveness of wearing face masks and examined 31 published studies of all research designs. They reported that "the evidence is not sufficiently strong to support widespread use of face masks as a protective measure against Covid-19. However, there is enough evidence to support the use of face masks for short periods of time by particularly vulnerable individuals when in transient higher risk situations."

A recent Danish Study published in the *Annals of Internal Medicine* sought to assess whether recommending surgical mask utilization outside of the home would help reduce the wearer's risks of acquiring SARS-CoV-2 infection in a setting where masks were uncommon and not among recommended public health measures. The sample included a total of 3,030 participants who were assigned randomly to wear masks, and 2,994 who were told to not wear masks (i.e. the control arm). The researchers reported that 4,862 persons completed the study. Infection with SARS-CoV-2 occurred in 42 participants who wore masks (1.8%) while 53 participants in the control group developed infection (2.1%). The between-group difference was −0.3 percentage point in favor of mask-use (95% CI, −1.2 to 0.4 percentage point; *p* = 0.38). Based on the analysis of the findings though, the authors concluded that there was no statistically or clinically significant impact of mask-use in regard to the rate of infection with SARS CoV-2.

Interestingly, these results emerged in a setting where social distancing and other public health measures were in effect, *except* for mask-wearing. In point of fact, the use of masks in this population was in general quite low. In any case, based on these findings it might be expected on the basis of this study alone that there would be serious doubt raised as to the need for the initiation and maintenance of mandatory use of masks in the public domain. Unfortunately, as of this date, this does not seem to be the case and is inexplicable quite frankly.

Additionally, with a focus on cloth face masks, recent reports suggest that they should never be used as a protective barrier as they offer no transmission protection (as PPE or as source control; see Tokyo report and BMJ study).

In the BMJ cluster randomized study, researchers sought to compare the efficacy of cloth masks to medical masks in hospital workers (in 14 Vietnamese hospitals utilizing 1,607 workers over 18 years of age). Wards were randomized so that in some, medical masks were worn while in other wards cloth masks were used. Another ward was assigned as a control group for 'usual practice' which included the use of masks on every shift for 4 consecutive weeks. The rates of all infection outcomes were highest in the cloth mask arm, with the rate of ILI significantly higher in the cloth mask arm (relative risk (RR)=13.00, 95% CI 1.69 to 100.07) compared with the medical mask arm. There were also significantly higher rates of ILI in the cloth mask group as compared with the control arm.

An analysis by mask use showed that ILI (RR=6.64, 95% CI 1.45 to 28.65) and laboratory-confirmed virus (RR=1.72, 95% CI 1.01 to 2.94) were significantly higher in the cloth mask group compared with the medical mask group. Researchers found that penetration of the cloth masks by particles was in the range of 97% (filtering out only 3% of viral particles) and for medical masks, it was still only 44%. This being the first RCT of cloth masks, the researchers cautioned against the use of cloth masks. There is extensive moisture retention and poor filtration with reuse which results in increased risk of infection, including by bacterial microorganisms. They concluded that cloth masks should not be recommended for healthcare workers, especially in high-risk settings.

The Norwegian Institute of Public Health (NIPH) conducted a recent rapid review to assess if individuals in the community without respiratory symptoms should wear face masks to reduce the spread of Covid-19. They proceeded on the assumption that 20% of 'infected' people are asymptomatic and that with a risk reduction of 40% when wearing masks, approximately 200,000 persons would need to wear a mask to prevent one new infection per week. Researchers concluded that based on the existing epidemic/pandemic in Norway, "wearing face masks to reduce the spread of Covid-19 is not recommended for individuals in the community without respiratory symptoms who are not in near contact with people who are known to be infected."

In a May 2020 communication report in Nature (Medicine), Leung et al. examined the importance of respiratory droplets as well as aerosol routes of spread with a specific focus on coronaviruses, influenza viruses, and rhinoviruses. They measured the quantity of respiratory virus in exhaled breath of participants with acute respiratory infections (ARIs) and determined the possible efficacy of surgical face masks to prevent respiratory virus transmission.

As part of the study, they screened 3,363 persons in two study phases, eventually enrolling 246 participants with ARI who provided exhaled breath samples, with 122 (50%) of the participants being randomized to either not wearing a face mask during the first exhaled breath collection or randomized to wearing a face mask (n=124 (50%)). Seasonal human coronaviruses, influenza viruses and rhinoviruses within exhaled breath and coughs of children as well as adults with ARI were identified. In this study, it was found that surgical face masks can significantly reduce detection of influenza virus RNA in respiratory droplets and coronavirus RNA in aerosols, and with a trend toward reduced detection of coronavirus RNA in respiratory droplets. Their results suggest that surgical masks can potentially reduce the release of influenza virus particles into the environment in respiratory droplets, but not in aerosols. And it must be emphasized that this study relied on people who had symptomatic disease, something vastly different from the issues under consideration here.

Perhaps one of the most seminal and rigorous studies (along with the Danish study published in the

Annals of Internal Medicine) emerged from a United States Marine Corps study performed in an isolated location; Parris Island. As reported in a recent NEJM publication (CHARM study), researchers studied SARS-CoV-2 transmission among Marine recruits during quarantine. Marine recruits at Parris Island (n=1,848 of 3,143 eligible recruits) who volunteered underwent a 2-week quarantine at home that was followed by a 2nd 2-week quarantine in a closed college campus setting.

As part of the study, participants wore masks and socially distanced while symptoms were monitored with daily checks of temperature. RT-PCR testing was used to assess the effectiveness of these strategies insofar as the presence or absence of SARS CoV-2 mRNA was concerned. Samples were obtained by the use of nasal swabs which were collected between arrival and the 2nd day of supervised quarantine and on days 7 and 14 (the 2nd quarantine used to mitigate infection among recruits). All recruits were required to have a negative RT-PCR result prior to entering Parris Island. It was found that within 2 days following arrival on the closed campus, 16 participants now tested positive for SARS-CoV-2 mRNA (15 being asymptomatic) and 35 more tested positive on day 7 or on day 14 (n=51 in total).

More specifically, of the 1,801 recruits who tested negative with PCR at study enrollment, 24 (1.3%) tested positive on day 7. On day 14, a total of 11 of 1,760 (0.6%) of the previously PCR-test negative participants tested positive; none of these participants were seropositive on day 0. As such, 35 participants who had had negative PCR test results within the first 2 days post arrival at the campus then became positive during the strict supervised quarantine. Of the 51 total participants who had at least one positive PCR test, 22 had positive tests on more than 1 day. Phylogenetic analysis was conducted whereby 6 independent monophyletic transmission clusters (independent viral strains) indicative of local transmission were uncovered during the supervised quarantine. The majority of clusters principally included members of the same platoon, and numerous infected recruits had an infected roommate.

The authors reported that about 2% who had earlier negative tests for SARS-CoV-2 at the beginning of strict supervised quarantine (we ask the reader to think; *military grade supervision*), and less than 2% of recruits who had unknown prior status, tested positive by day 14. Positive volunteers were mainly asymptomatic and transmission clusters occurred within platoons. The predominant finding was that despite the very strict and enforced quarantine (including 2 full weeks of supervised confinement and then forced social distancing and masking protocols), the rate of transmission was not reduced and in fact seemed to be higher than expected! Hence, we point out that not only was masking ineffective in preventing the spread of disease, but even *made things worse*. Despite quarantines, social distancing, and masking, in this cohort of mainly young male recruits, roughly 2% still went on to become infected and tested positive for SARS-CoV-2. Sharing of rooms and platoon membership were reported risk factors for viral transmission.

As with the Danish investigation this study of Marine recruits who were kept under stringent military level supervision raises serious questions about the utility of quarantines, as it appears that not only do masks appear to be ineffective in preventing communal disease spread but also that quarantines do not work even when supervised for 2 weeks in a closed college. As we have stated elsewhere, it seems that quarantines are ineffective and that would also seem to include enforced social distancing! At the risk of repeating ourselves, all this is to say that in this study where compliance was monitored and enforced, and the conditions are favourable enough to support a rigorous study, so called 'mitigation' strategies just *do not work and cannot work amongst the general population*. This

study stands as one of the higher-quality and more robust studies on the question of masking.

A 1981 British publication by Dr. Neil Orr reported on a trial in patients in a 40-bed surgical ward that focused on cholecystectomies, gastrectomies, thyroidectomies, bowel resections, prostatectomies, herniorrhaphies as well as cystoscopies, bronchoscopies, and gastroscopies. The analysis looked at throughput, wounds, and infection rates during a 6-month period (March-August) each year from 1976 to 1980. Remarkably it was concluded that the effectiveness of a mask in reducing contamination varied with the mask's shape, the materials of which the masks were made, and the way the masks were worn. Importantly, it was shown that wearing a mask did not reduce incidents of contamination in the theatre. In fact, results suggested the opposite in that wearing no mask correlated with the greatest reductions in contamination (also associated with performing the operations under conditions of silence… no speaking by the staff during any of the procedures).

A publication in Annals of Internal Medicine by Bae et al. "Effectiveness of Surgical and Cotton Masks in Blocking SARS-CoV-2" was retracted on a request by the ACP journal. We are thus unable to comment on the findings.

Based on the foregoing evidence cited above, we find no conclusive evidence to support the use of masks for Covid-19 (except N-95 type masks in a hospital setting and when appropriately fitted and utilized). In fact, masking appears to carry substantial risks to the user. And we reiterate that our conclusions are not based on the absence of evidence for ineffectiveness alone, *but actual evidence of ineffectiveness*.

And we reiterate that our conclusions are not based on the absence of evidence for ineffectiveness alone, *but actual evidence of ineffectiveness*.

Possibly the one study that could only be construed as pseudo-science, is based on a recent MMWR by the CDC on the use of double masks, this even after Dr. Anthony Fauci backtracked and said there is no evidence that this is effective. This is why this study was left for last in our review. Along comes the CDC with a study on maximizing fit for cloth and medical procedure masks by placing a cloth mask over a surgical mask and knotting the ear loops of a medical procedure mask and then tucking in and flattening the extra material close to the face. A pliable elastomeric head form was used to simulate a person under various conditions e.g. coughing etc. CDC reported that "the unknotted medical procedure mask alone blocked 42.0% of the particles from a simulated cough (standard deviation [SD] = 6.70), and the cloth mask alone blocked 44.3% (SD = 14.0). The combination of the cloth mask covering the medical procedure mask (double mask) blocked 92.5% of the cough particles (SD = 1.9)".

Incredulously, CDC then went on to declare that "the findings of these simulations should neither be generalized to the effectiveness of all medical procedure masks or cloths masks nor interpreted as being representative of the effectiveness of these masks when worn in real-world settings" and findings are not to be extrapolated to children "because of their smaller size or to men with beards and other facial hair, which interfere with fit". In addition, CDC stated "although use of double masking or knotting and tucking are two of many options that can optimize fit and enhance mask performance for source control and for wearer protection, double masking might impede breathing or obstruct peripheral vision for some wearers, and knotting and tucking can change the shape of the mask such that it no longer covers fully both the nose and the mouth of persons with larger faces". We are then left to ask, what was the purpose of this publication if it cannot be generalized to real-world settings and may impact breathing? Incidentally, in the SARS-CoV-2 Transmission among Marine Recruits during Quarantine (CHARM) study on Parris Island, the military recruits used double-layered masks

and findings were that masks and social distancing did not stop spread of COVID infection.

**What about possible harms from wearing masks?**

But what about harms from mask use? The information that is accumulating involves mask wearers within a Covid-19 environment and raises many concerns especially regarding psychological damage and especially to infants and children, with potential catastrophic impacts on the cognitive development of children. This is even more critical in relation to children with special needs or who are on the autism spectrum who need to be able to recognize facial expressions as part of their ongoing development. The accumulating evidence also suggests that prolonged mask use in children or adults can cause harms:

**i)** difficulty with breathing

**ii)** inhalation of toxic substances such as microplastics and chlorine compounds located in the masks (these are potentially serious risks)

**iii)** $CO_2$ intoxication

**iv)** sudden cardiac arrest seen in children

**v)** a reduction in blood oxygenation (hypoxia) or an elevation in blood CO2 (hypercapnia)

**vi)** psychological damage

**vii)** (N95 masks) a reduction in the PaO2 level, increases in respiratory rate, and increases the occurrence of chest discomfort and respiratory distress with prolonged use

**viii)** dizziness and light-headedness, headaches especially among healthcare workers

**ix)** bacterial and mould buildup in children's masks that can then be inhaled

**x)** anxiety and sleep problems, behavioral disorders and fear of contamination in children

**xi)** deoxygenation during surgery

**xii)** potentially life-threatening damage to the lungs (e.g. Stanford engineers report that masks can make it much more difficult to breathe, estimating that N95 masks as an example, reduce oxygen intake from 5% to 20% and if worn for a prolonged period)

**xiii)** as reported by Koops, facial skin infections, nose/throat and sinus infections, a change in breathing patterns.

**Predominant finding?**

The predominant conclusion is that face masks have a very important role in places such as hospitals, but there exists very little evidence of widespread benefit for members of the public (adults or children) as well as evidence that masking is truly an ineffectual way to manage pandemic-related spread of viral disease. As Kolstoe stated, it has become less about the science and more about politics and a symbol of solidarity.

Our view is that masks as they are worn now, and the masks that are in use, offer zero protection. They can be viewed as ineffective while others consider them as being better than nothing but without evidence to support that view. Masks are not sealed properly to the face and do not effectively stop *virion* penetration. We state emphatically that public health policy, or any policy for that matter, must be undergirded by sound data and evidence. As we have said, the reality is that widespread use of

masks is *not* supported by science and in fact just the opposite. This mask hysteria is driving unnecessary fear in the population and must end. Those who deliver statements relentlessly on the use of masks are doing so without the luxury of any credible evidence to support those views. They speak on assumption or speculation and this is *not* science! However, it is important to understand that as we await definitive research, given the situation and the desire to prevent spread to higher-risk persons (e.g. elderly), when consistent social distancing is not possible (our previous concerns about distancing notwithstanding), and out of an abundance of caution, face coverings among symptomatic individuals *might reduce the spread* of droplets with SARS-CoV-2 infection to others.

This must also be considered when a setting is experiencing elevated transmission rates. Moreover, this is sensible to the degree that it does not support generalized mask wearing by the entire population! We urge always common-sense reasonable precautions to be taken and on an individual basis, as the case may be, with an age and hazard targeted approach to reducing risk, always endeavoring to do our utmost in order to protect the high-risk persons among us.

It is very sensible that one would use a face mask when visiting an elderly person who is high-risk or even if the setting is controlled such as a healthcare setting in a nursing home. This makes complete sense (even though again, we know that evidence does not support this notion)! It is reasonable to be cautious, even in the light of limited or nonexistent evidence (especially strong peer-review evidence) of effectiveness and the increasing information suggesting that there's now evidence of harms related to mask (over)use. Situation-by-situation decisions can be made that depend on the risk at hand. The full context must be considered but if you are adequately socially distanced, there is no reason to wear a mask. There is no evidence for this. Though we would also contend that one should wear a mask if that is what is expected but adhere to meticulous hand hygiene and socially isolate if ill.

Danish reporting of a higher-quality mask study on Covid and masks that was actually rejected or sidelined by top journals including *Lancet, New England Journal of Medicine*, and the American Association's *JAMA* is alarming if true and suggests a pattern of politicization of research and of the medical community, journal editors and the peer-reviewers.  We look forward to its future publication.

**Conclusion**

In closing, perhaps Yinon Weiss, who is a U.S. military veteran, and who holds a degree in bioengineering from U.C. Berkeley, captures our current face mask calamity by reminding us how masks constrain our return to a more normal life. As outlandish as this might seem could this be the aim of those using the pandemic for the purpose of advancing various political ideologies? Masking drives fear in the population and a perennial sense of 'illness' that is crippling. As stated eloquently by Weiss, "Our universal use of unscientific face coverings is therefore closer to medieval superstition than it is to science, but many powerful institutions have too much political capital invested in the mask narrative at this point, so the dogma is perpetuated."

Our paper sought to examine the complete and most updated mask-related scientific evidence, along with anecdotal data and reports. Our current belief remains that asymptomatic individuals do not drive the pandemic and that the time-tested method of Ignaz Philipp Semmelweis of washing hands remains the best-established mechanism of limiting most microbial infections. People with symptomatic disease should not go into work! Unfortunately, since the economic downturn around 2008, the incidence of 'presenteeism' has increased due to the fear of losing one's job if one does not show up to work, even if ill. This behaviour has to be taken very seriously and must be stopped.

We also agree with the words of Klompas in the NEJM publication: "What is clear, however, is that

universal masking alone is not a panacea. A mask will not protect providers caring for a patient with active Covid-19 if it's not accompanied by meticulous hand hygiene, eye protection, gloves, and a gown. A mask alone will not prevent health care workers with early Covid-19 from contaminating their hands and spreading the virus to patients and colleagues. **Focusing on universal masking alone may, paradoxically, lead to more transmission of Covid-19 if it diverts attention from implementing more fundamental infection-control measures."**

In sum, when we look at the science, there is emerging and troubling evidence of harms from mask use in the absence of any benefits. This is also related to things as mundane as simple incorrect use of masking, as well as the development of complacency that emerges due to mask use and thus the relaxation of other mitigation steps, as well as mask contamination.

We also cannot discount the possible harms on our immune systems and general health from such constant and prolonged use of masks, given we have never done this before. We are in uncharted territory and especially so with the possible implications for our children. Their immune systems are still being developed and we are forcing lockdowns, school closures, and masking on a developing child and we have no prior experience on the subsequent outcomes pertaining to children's development, health, and well-being.

Most discomforting is that those government bureaucrats in charge and particularly the 'medical experts' continue to fail to admit they were exceptionally incorrect with regard to most of what they have stated in terms of pandemic policies and response related to the Covid pandemic. They have harmed the very societies they are supposed to help protect. They have failed to look at the evidence or follow it, and continue to operate in an arbitrary nonscientific, nonevidence informed manner. They 'attack,' with the assistance of the mass media, those of us who question their policies and actions despite the disastrous outcomes of those public health policies. Indeed, we are often blamed for the failures (called 'deniers' or 'heretics') and crushing harms of all of their policies when it has actually been their specious, illogical, and unsound actions and recommendations that deserve public outcry.

**Suggested points to consider**

In line with Koops and as published in the journal of the AIER, we embrace and suggest the following in terms of mask use for this Covid pandemic (based on individual decision-making):

i) Persons who have been infected and experienced Covid, are not required to wear any facial coverings

**ii)** No facial covering/masking is needed when in ventilated, open air surroundings; the risk for becoming infected with SARS CoV-2 is extremely small to non-existent

**iii.)** Facial coverings/masks are potentially of use when in close proximity to a high-risk person, e.g. elderly or if you are in a health care setting e.g. hospital or nursing home, long-term care facility, assisted-living facility, care home etc. This will also limit the spread of bacteria etc. to high-risk persons but again it must be stressed that this pertains most specifically to those visitors who have active symptomatic disease as opposed to those who are entirely asymptomatic

**iv.)** Children are at very low risk of acquiring SARS-CoVC-2 virus, or getting severely ill from infection; they are at also very low risk of spreading to other children, or to adults, and their teachers etc. Children should not be masked under any condition and only in instances when they are high-risk (immunocompromised), have contributory medical conditions.

**v)** Children must be allowed to interface with their natural environments (environments in general) so

that their immune systems remain constantly taxed and 'tuned up' and is   optimal for immune system development as well as their cognitive development, particularly in children with special needs such as autism

**vi)** People who are "post-convalescent" Covid should not wear masks. People with Covid-19, if they must be in the presence of others, should wear masks, although only minorly helpful at best.

**vii)** We implore that all government leaders and so-called medical experts include risk-benefit analyses each and any time they seek to advocate for or implement societal policies. We must have evidence of the benefits as well as harms and examine the trade-offs and most importantly, consider the implications to the public. If the policy is destructive, you end it!

**Contributing Authors**

- **Paul E Alexander MSc PhD**, McMaster University and GUIDE Research Methods Group, Hamilton, Ontario, Canada elias98_99@yahoo.com

- **Howard C. Tenenbaum DDS, Dip. Perio., PhD**, FRCD(C) Centre for Advanced Dental Research and Care, Mount Sinai Hospital, and Faculties of Medicine and Dentistry, University of Toronto, Toronto, ON, Canada

- **Ramin Oskoui, MD**, CEO, Foxhall Cardiology, PC, Washington, DC  oskouimd@gmail.com

- **Harvey A. Risch, MD, PhD**, Yale School of Public Health, New Haven, CT USA harvey.risch@yale.edu

- **Peter A. McCullough, MD, MPH**, Baylor University Medical Center, Baylor Heart and Vascular Institute, Baylor Jack and Jane Hamilton Heart and Vascular Hospital, Dallas, TX, USA peteramccullough@gmail.com

- **Nicholas E. Alexander**

  Paul E. Alexander

Paul E. Alexander received his bachelor's degree in epidemiology from McMaster University in Hamilton, Ontario, a master's degree from Oxford University, and a PhD from McMaster University's Department of Health Research Methods, Evidence, and Impact.

Get notified of new articles from Paul E. Alexander and AIER.