Plaintiffs' Exhibit 219

# Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings— Personal Protective and Environmental Measures

Jingyi Xiao,[1] Eunice Y. C. Shiu,[1] Huizhi Gao, Jessica Y. Wong, Min W. Fong, Sukhyun Ryu, Benjamin J. Cowling

There were 3 influenza pandemics in the 20th century, and there has been 1 so far in the 21st century. Local, national, and international health authorities regularly update their plans for mitigating the next influenza pandemic in light of the latest available evidence on the effectiveness of various control measures in reducing transmission. Here, we review the evidence base on the effectiveness of nonpharmaceutical personal protective measures and environmental hygiene measures in non-healthcare settings and discuss their potential inclusion in pandemic plans. Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza. We similarly found limited evidence on the effectiveness of improved hygiene and environmental cleaning. We identified several major knowledge gaps requiring further research, most fundamentally an improved characterization of the modes of person-to-person transmission.

Influenza pandemics occur at irregular intervals when new strains of influenza A virus spread in humans (1). Influenza pandemics cause considerable health and social impact that exceeds that of typical seasonal (interpandemic) influenza epidemics. One of the characteristics of influenza pandemics is the high incidence of infections in all age groups because of the lack of population immunity. Although influenza vaccines are the cornerstone of seasonal influenza control, specific vaccines for a novel pandemic strain are not expected to be available for the first 5–6 months of the next pandemic. Antiviral drugs will be available in some locations to treat more severe infections but are unlikely to be available in the

quantities that might be required to control transmission in the general community. Thus, efforts to control the next pandemic will rely largely on nonpharmaceutical interventions.

Most influenza virus infections cause mild and self-limiting disease; only a small fraction of case-patients require hospitalization. Therefore, influenza virus infections spread mainly in the community. Influenza virus is believed to be transmitted predominantly by respiratory droplets, but the size distribution of particles responsible for transmission remains unclear, and in particular, there is a lack of consensus on the role of fine particle aerosols in transmission (2,3). In healthcare settings, droplet precautions are recommended in addition to standard precautions for healthcare personnel when interacting with influenza patients and for all visitors during influenza seasons (4). Outside healthcare settings, hand hygiene is recommended in most national pandemic plans (5), and medical face masks were a common sight during the influenza pandemic in 2009. Hand hygiene has been proven to prevent many infectious diseases and might be considered a major component in influenza pandemic plans, whether or not it has proven effectiveness against influenza virus transmission, specifically because of its potential to reduce other infections and thereby reduce pressure on healthcare services.

In this article, we review the evidence base for personal protective measures and environmental hygiene measures, and specifically the evidence for the effectiveness of these measures in reducing transmission of laboratory-confirmed influenza in the community. We also discuss the implications of the evidence base for inclusion of these measures in pandemic plans.

Author affiliation: University of Hong Kong, Hong Kong, China

DOI: https://doi.org/10.3201/eid2605.190994

[1]These first authors contributed equally to this article.

## Methods and Results

We conducted systematic reviews to evaluate the effectiveness of personal protective measures on influenza virus transmission, including hand hygiene, respiratory etiquette, and face masks, and a systematic review of surface and object cleaning as an environmental measure (Table 1). We searched 4 databases (Medline, PubMed, EMBASE, and CENTRAL) for literature in all languages. We aimed to identify randomized controlled trials (RCTs) of each measure for laboratory-confirmed influenza outcomes for each of the measures because RCTs provide the highest quality of evidence. For respiratory etiquette and surface and object cleaning, because of a lack of RCTs for laboratory-confirmed influenza, we also searched for RCTs reporting effects of these interventions on influenza-like illness (ILI) and respiratory illness outcomes and then for observational studies on laboratory-confirmed influenza, ILI, and respiratory illness outcomes. For each review, 2 authors (E.Y.C.S. and J.X.) screened titles and abstracts and reviewed full texts independently.

We performed meta-analysis for hand hygiene and face mask interventions and estimated the effect of these measures on laboratory-confirmed influenza prevention by risk ratios (RRs). We used a fixed-effects model to estimate the overall effect in a pooled analysis or subgroup analysis. No overall effect would be generated if there was considerable heterogeneity on the basis of $I^2$ statistic $\geq$75% (6). We performed quality assessment of evidence on hand hygiene and face mask interventions by using the GRADE (Grading of Recommendations Assessment, Development and Evaluation) approach (7). We provide additional details of the search strategies, selection of articles, summaries of the selected articles, and quality assessment (Appendix, https://wwwnc.cdc.gov/EID/article/26/5/19-0994-App1.pdf).

### Personal Protective Measures

#### Hand Hygiene

We identified a recent systematic review by Wong et al. on RCTs designed to assess the efficacy of hand hygiene interventions against transmission of laboratory-confirmed influenza (8). We used this review as a starting point and then searched for additional literature published after 2013; we found 3 additional eligible articles published during the search period of January 1, 2013–August 13, 2018. In total, we identified 12 articles (9–20), of which 3 articles were from the updated search and 9 articles from Wong et al. (8). Two articles relied on the same underlying dataset (16,19); therefore, we counted these 2 articles as 1 study, which resulted in 11 RCTs. We further selected 10 studies with >10,000 participants for inclusion in the meta-analysis (Figure 1). We excluded 1 study from the meta-analysis because it provided estimates of infection risks only at the household level, not the individual level (20). We did not generate an overall pooled effect of hand hygiene only or of hand hygiene with or without face mask because of high heterogeneity in individual estimates ($I^2$ 87 and 82%, respectively). The effect of hand hygiene combined with face masks on laboratory-confirmed influenza was not statistically significant (RR 0.91, 95% CI 0.73–1.13; $I^2$ = 35%, p = 0.39). Some studies reported being underpowered because of limited sample size, and low adherence to hand hygiene interventions was observed in some studies.

We further analyzed the effect of hand hygiene by setting because transmission routes might vary

**Table 1.** Summary of literature searches for systematic review on personal and environmental nonpharmaceutical interventions for pandemic influenza*

| Types of interventions | No. studies identified | Study designs included† | Main findings |
|---|---|---|---|
| Hand hygiene | 12 | RCT | The evidence from RCTs suggested that hand hygiene interventions do not have a substantial effect on influenza transmission. |
| Respiratory etiquette | 0 | NA | We did not identify research evaluating the effectiveness of respiratory etiquette on influenza transmission. |
| Face masks | 10 | RCT | The evidence from RCTs suggested that the use of face masks either by infected persons or by uninfected persons does not have a substantial effect on influenza transmission. |
| Surface and object cleaning | 3 | RCT, observational studies | There was a limited amount of evidence suggesting that surface and object cleaning does not have a substantial effect on influenza transmission. |

*NA, not available; RCT randomized controlled trial.
†In these systematic reviews, we prioritized RCTs, and only considered observational studies if there were a small number of RCTs. Our rationale was that with evidence from a larger number of RCTs, additional evidence from observational studies would be unlikely to change overall conclusions.



**Figure 1.** Meta-analysis of risk ratios for the effect of hand hygiene with or without face mask use on laboratory-confirmed influenza from 10 randomized controlled trials with >11,000 participants. A) Hand hygiene alone; B) hand hygiene and face mask; C) hand hygiene with or without face mask. Pooled estimates were not made if there was high heterogeneity ($I^2 \geq 75\%$). Squares indicate risk ratio for each of the included studies, horizontal line indicates 95% CIs, dashed vertical line indicates pooled estimation of risk ratio, and diamond indicates pooled estimation of risk ratio. Diamond width corresponds to the 95% CI.

in different settings. We found 6 studies in household settings examining the effect of hand hygiene with or without face masks, but the overall pooled effect was not statistically significant (RR 1.05, 95% CI 0.86–1.27; $I^2$ 57%, p = 0.65) (Appendix Figure 4) (11–15,17). The findings of 2 studies in school settings were different (Appendix Figure 5). A study conducted in the United States (16) showed no major effect of hand hygiene, whereas a study in Egypt (18) reported that hand hygiene reduced the risk for influenza by >50%. A pooled analysis of 2 studies in university residential halls reported a marginally significant protective effect of a combination of hand hygiene plus face masks worn by all residents (RR 0.48, 95% CI 0.21–1.08; $I^2$ 0%, p = 0.08) (Appendix Figure 6) (9,10).

In support of hand hygiene as an effective measure, experimental studies have reported that influenza virus could survive on human hands for a short time and could transmit between humans and contaminated surfaces (2,21). Some field studies reported that influenza A(H1N1)pdm09 and influenza A(H3N2) virus RNA and viable influenza virus could be detected on the hands of persons with laboratory-confirmed influenza (22,23), supporting the potential of direct and indirect contact transmission to play a role in the spread of influenza. Other experimental studies also demonstrated that hand hygiene could reduce or remove infectious influenza virus from human hands (24,25). However, results from our meta-analysis on RCTs did not provide evidence to support a protective effect of hand hygiene against transmission of laboratory-confirmed influenza. One study did report a major effect, but in this trial of hand hygiene in schools in Egypt, running water had to be installed and soap and hand-drying

POLICY REVIEW

material had to be introduced into the intervention schools as part of the project (18). Therefore, the impact of hand hygiene might also be a reflection of the introduction of soap and running water into primary schools in a lower-income setting. If one considers all of the evidence from RCTs together, it is useful to note that some studies might have underestimated the true effect of hand hygiene because of the complexity of implementing these intervention studies. For instance, the control group would not typically have zero knowledge or use of hand hygiene, and the intervention group might not adhere to optimal hand hygiene practices (11,13,15).

Hand hygiene is also effective in preventing other infectious diseases, including diarrheal diseases and some respiratory diseases (8,26). The need for hand hygiene in disease prevention is well recognized among most communities. Hand hygiene has been accepted as a personal protective measure in >50% of national preparedness plans for pandemic influenza (5). Hand hygiene practice is commonly performed with soap and water, alcohol-based hand rub, or other waterless hand disinfectants, all of which are easily accessible, available, affordable, and well accepted in most communities. However, resource limitations in some areas are a concern when clean running water or alcohol-based hand rub are not available. There are few adverse effects of hand hygiene except for skin irritation caused by some hand hygiene products (27). However, because of certain social or religious practices, alcohol-based hand sanitizers might not be permitted in some locations (28). Compliance with proper hand hygiene practice tends to be low because habitual behaviors are difficult to change (29). Therefore, hand hygiene promotion programs are needed to advocate and encourage proper and effective hand hygiene.

**Respiratory Etiquette**

Respiratory etiquette is defined as covering the nose and mouth with a tissue or a mask (but not a hand) when coughing or sneezing, followed by proper disposal of used tissues, and proper hand hygiene after contact with respiratory secretions (30). Other descriptions of this measure have included turning the head and covering the mouth when coughing and coughing or sneezing into a sleeve or elbow, rather than a hand. The rationale for not coughing into hands is to prevent subsequent contamination of other surfaces or objects (31). We conducted a search on November 6, 2018, and identified literature that was available in the databases during 1946–November 5, 2018. We did not identify any published research on

the effectiveness of respiratory etiquette in reducing the risk for laboratory-confirmed influenza or ILI. One observational study reported a similar incidence rate of self-reported respiratory illness (defined by >1 symptoms: cough, congestion, sore throat, sneezing, or breathing problems) among US pilgrims with or without practicing respiratory etiquette during the Hajj (32). The authors did not specify the type of respiratory etiquette used by participants in the study. A laboratory-based study reported that common respiratory etiquette, including covering the mouth by hands, tissue, or sleeve/arm, was fairly ineffective in blocking the release and dispersion of droplets into the surrounding environment on the basis of measurement of emitted droplets with a laser diffraction system (31).

Respiratory etiquette is often listed as a preventive measure for respiratory infections. However, there is a lack of scientific evidence to support this measure. Whether respiratory etiquette is an effective nonpharmaceutical intervention in preventing influenza virus transmission remains questionable, and worthy of further research.

**Face Masks**

In our systematic review, we identified 10 RCTs that reported estimates of the effectiveness of face masks in reducing laboratory-confirmed influenza virus infections in the community from literature published during 1946–July 27, 2018. In pooled analysis, we found no significant reduction in influenza transmission with the use of face masks (RR 0.78, 95% CI 0.51–1.20; $I^2$ = 30%, p = 0.25) (Figure 2). One study evaluated the use of masks among pilgrims from Australia during the Hajj pilgrimage and reported no major difference in the risk for laboratory-confirmed influenza virus infection in the control or mask group (33). Two studies in university settings assessed the effectiveness of face masks for primary protection by monitoring the incidence of laboratory-confirmed influenza among student hall residents for 5 months (9,10). The overall reduction in ILI or laboratory-confirmed influenza cases in the face mask group was not significant in either study (9,10). Study designs in the 7 household studies were slightly different: 1 study provided face masks and P2 respirators for household contacts only (34), another study evaluated face mask use as a source control for infected persons only (35), and the remaining studies provided masks for the infected persons as well as their close contacts (11–13,15,17). None of the household studies reported a significant reduction in secondary laboratory-confirmed influenza virus infections in the face





**A**

| Author (reference) | Mask Events | Total | Control Events | Total | Weight | Risk ratio (95% CI) |
|---|---|---|---|---|---|---|
| Aiello et al. 2010 (19) | 5 | 347 | 3 | 487 | 5.7% | 2.34 (0.56–9.72) |
| Aiello et al. 2012 (10) | 12 | 392 | 16 | 370 | 37.3% | 0.71 (0.34–1.48) |
| Barasheed et al. 2014 (33) | 1 | 11 | 0 | 28 | 0.7% | 7.43 (0.33–169.47) |
| Cowling et al. 2008 (12) | 4 | 61 | 12 | 205 | 12.5% | 1.12 (0.37–3.35) |
| MacIntyre et al. 2009 (34) | 1 | 94 | 0 | 100 | 1.1% | 3.19 (0.13–77.36) |
| MacIntyre et al. 2016 (35) | 0 | 302 | 1 | 295 | 3.4% | 0.33 (0.01–7.96) |
| Suess et al. 2012 (17) | 6 | 69 | 19 | 82 | 39.4% | 0.38 (0.16–0.89) |
| Fixed effect model | | 1,276 | | 1,567 | 100.0% | 0.78 (0.51–1.20) |

Heterogeneity: $I^2 = 30\%$, $\tau^2 = 0.1899$, $p = 0.20$
Test for overall effect: $z = -1.15$ ($p = 0.25$)

**B**

| Author (reference) | Mask Events | Total | Control Events | Total | Weight | Risk ratio (95% CI) |
|---|---|---|---|---|---|---|
| Aiello et al. 2010 (9) | 2 | 316 | 3 | 487 | 1.6% | 1.03 (0.17–6.11) |
| Aiello et al. 2012 (10) | 6 | 349 | 16 | 370 | 10.8% | 0.40 (0.16–1.00) |
| Cowling et al. 2009 (11) | 18 | 258 | 28 | 279 | 18.8% | 0.70 (0.39–1.23) |
| Larson et al. 2010 (13) | 25 | 938 | 24 | 904 | 17.1% | 1.00 (0.58–1.74) |
| Simmerman et al. 2011 (15) | 66 | 291 | 58 | 302 | 39.7% | 1.18 (0.86–1.62) |
| Suess et al. 2012 (17) | 10 | 67 | 19 | 82 | 11.9% | 0.64 (0.32–1.29) |
| Fixed effect model | | 2,219 | | 2,424 | 100.0% | 0.91 (0.73–1.13) |

Heterogeneity: $I^2 = 35\%$, $\tau^2 = 0.0511$, $p = 0.17$
Test for overall effect: $z = -0.85$ ($p = 0.39$)

**C**

| Author (reference) | Mask Events | Total | Control Events | Total | Weight | Risk ratio (95% CI) |
|---|---|---|---|---|---|---|
| Aiello et al. 2010 (9) | 7 | 663 | 3 | 487 | 2.1% | 1.71 (0.45–6.59) |
| Aiello et al. 2012 (10) | 18 | 741 | 16 | 370 | 13.0% | 0.56 (0.29–1.09) |
| Barasheed et al. 2014 (33) | 1 | 11 | 0 | 28 | 0.2% | 7.43 (0.33–169.47) |
| Cowling et al. 2009 (11) | 18 | 258 | 28 | 279 | 16.3% | 0.70 (0.39–1.23) |
| Cowling et al. 2008 (12) | 4 | 61 | 12 | 205 | 3.3% | 1.12 (0.37–3.35) |
| Larson et al. 2010 (13) | 25 | 938 | 24 | 904 | 14.9% | 1.00 (0.58–1.74) |
| MacIntyre et al. 2009 (34) | 1 | 94 | 0 | 100 | 1.1% | 3.19 (0.13–77.36) |
| MacIntyre et al. 2016 (35) | 0 | 302 | 1 | 295 | 0.9% | 0.33 (0.01–7.96) |
| Simmerman et al. 2011 (15) | 66 | 291 | 58 | 302 | 34.6% | 1.18 (0.86–1.62) |
| Suess et al. 2012 (17) | 16 | 136 | 19 | 82 | 14.4% | 0.51 (0.28–0.93) |
| Fixed effect model | | 3,495 | | 3,052 | 100.0% | 0.92 (0.75–1.12) |

Heterogeneity: $I^2 = 30\%$, $\tau^2 = 0.0593$, $p = 0.17$
Test for overall effect: $z = -0.84$ ($p = 0.40$)

**Figure 2.** Meta-analysis of risk ratios for the effect of face mask use with or without enhanced hand hygiene on laboratory-confirmed influenza from 10 randomized controlled trials with >6,500 participants. A) Face mask use alone; B) face mask and hand hygiene; C) face mask with or without hand hygiene. Pooled estimates were not made if there was high heterogeneity ($I^2 \geq 75\%$). Squares indicate risk ratio for each of the included studies, horizontal lines indicate 95% CIs, dashed vertical lines indicate pooled estimation of risk ratio, and diamonds indicate pooled estimation of risk ratio. Diamond width corresponds to the 95% CI.

mask group (11–13,15,17,34,35). Most studies were underpowered because of limited sample size, and some studies also reported suboptimal adherence in the face mask group.

Disposable medical masks (also known as surgical masks) are loose-fitting devices that were designed to be worn by medical personnel to protect accidental contamination of patient wounds, and to protect the wearer against splashes or sprays of bodily fluids (36). There is limited evidence for their effectiveness in preventing influenza virus transmission either when worn by the infected person for source control or when worn by uninfected persons to reduce exposure. Our systematic review found no significant effect of face masks on transmission of laboratory-confirmed influenza.

We did not consider the use of respirators in the community. Respirators are tight-fitting masks that can protect the wearer from fine particles (37) and should provide better protection against influenza virus exposures when properly worn because of higher filtration efficiency. However, respirators, such as N95 and P2 masks, work best when they are fit-tested, and these masks will be in limited supply during the next pandemic. These specialist devices should be reserved for use in healthcare settings or in special subpopulations such as immunocompromised persons in the community, first responders, and those performing other critical community functions, as supplies permit.

In lower-income settings, it is more likely that reusable cloth masks will be used rather than

disposable medical masks because of cost and availability (38). There are still few uncertainties in the practice of face mask use, such as who should wear the mask and how long it should be used for. In theory, transmission should be reduced the most if both infected members and other contacts wear masks, but compliance in uninfected close contacts could be a problem (12,34). Proper use of face masks is essential because ==improper use might increase the risk for transmission== (39). Thus, education on the proper use and disposal of used face masks, including hand hygiene, is also needed.

### Environmental Measures

#### Surface and Object Cleaning

For the search period from 1946 through October 14, 2018, we identified 2 RCTs and 1 observational study about surface and object cleaning measures for inclusion in our systematic review (40–42). One RCT conducted in day care nurseries found that biweekly cleaning and disinfection of toys and linen reduced the detection of multiple viruses, including adenovirus, rhinovirus, and respiratory syncytial virus in the environment, but this intervention was not significant in reducing detection of influenza virus, and it had no major protective effect on acute respiratory illness (41). Another RCT found that hand hygiene with hand sanitizer together with surface disinfection reduced absenteeism related to gastrointestinal illness in elementary schools, but there was no major reduction in absenteeism related to respiratory illness (42). A cross-sectional study found that passive contact with bleach was associated with a major increase in self-reported influenza (40).

Given that influenza virus can survive on some surfaces for prolonged periods (43), and that cleaning or disinfection procedures can effectively reduce or inactivate influenza virus from surfaces and objects in experimental studies (44), there is a theoretical basis to believe that environmental cleaning could reduce influenza transmission. As an illustration of this proposal, a modeling study estimated that cleaning of extensively touched surfaces could reduce influenza A infection by 2% (45). However, most studies of influenza virus in the environment are based on detection of virus RNA by PCR, and few studies reported detection of viable virus.

Although we found no evidence that surface and object cleaning could reduce influenza transmission, this measure does have an established impact on prevention of other infectious diseases (42).

It should be feasible to implement this measure in most settings, subject to the availability of water and cleaning products. Although irritation caused by cleaning products is limited, safety remains a concern because some cleaning products can be toxic or cause allergies (40).

### Discussion

In this review, we did not find evidence to support a protective effect of personal protective measures or environmental measures in reducing influenza transmission. Although these measures have mechanistic support based on our knowledge of how influenza is transmitted from person to person, ==randomized trials of hand hygiene and face masks have not demonstrated protection against laboratory-confirmed influenza,== with 1 exception (18). We identified only 2 RCTs on environmental cleaning and no RCTs on cough etiquette.

Hand hygiene is a widely used intervention and has been shown to effectively reduce the transmission of gastrointestinal infections and respiratory infections (26). However, in our systematic review, updating the findings of Wong et al. (8), we did not find evidence of a major effect of hand hygiene on laboratory-confirmed influenza virus transmission (Figure 1). Nevertheless, hand hygiene might be included in influenza pandemic plans as part of general hygiene and infection prevention.

==We did not find evidence that surgical-type face masks are effective in reducing laboratory-confirmed influenza transmission, either when worn by infected persons (source control) or by persons in the general community to reduce their susceptibility== (Figure 2). However, as with hand hygiene, face masks might be able to reduce the transmission of other infections and therefore have value in an influenza pandemic when healthcare resources are stretched.

It is essential to note that the mechanisms of person-to-person transmission in the community have not been fully determined. Controversy remains over the role of transmission through fine-particle aerosols (3,46). Transmission by indirect contact requires transfer of viable virus from respiratory mucosa onto hands and other surfaces, survival on those surfaces, and successful inoculation into the respiratory mucosa of another person. All of these components of the transmission route have not been studied extensively. The impact of environmental factors, such as temperature and humidity, on influenza transmission is also uncertain (47). These uncertainties over basic transmission modes and mechanisms hinder the optimization of control measures.

**Table 2.** Knowledge gaps for personal protective and environmental nonpharmaceutical interventions for pandemic influenza*

| Intervention | Knowledge gaps | Suggested studies |
|---|---|---|
| Hand hygiene | There are major gaps in our knowledge of the mechanisms of person-to-person transmission of influenza, including the role of direct and indirect contact, the degree of viral contamination on hands and various types of surfaces in different settings, and the potential for contact transmission to occur in different locations and under different environmental conditions. There is little information on whether greater reductions in transmission could be possible with combinations of personal intervention (e.g., isolation away from family members as much as possible, plus using face masks and enhancing hand hygiene). | Additional high-quality RCTs of efficacy of hand hygiene against laboratory-confirmed influenza in other nonhealthcare settings, except households and university residential halls, would be valuable. In particular, studies in school settings are needed to solve the discrepancy between the two studies from the United States and Egypt. |
| Respiratory etiquette | There is no evidence about the quantitative effectiveness of respiratory etiquette against influenza virus. | RCTs of interventions to demonstrate the effectiveness of respiratory etiquette in reducing influenza transmission would be valuable. |
| Face mask | There are major gaps in our knowledge of the mechanisms of person-to-person transmission of influenza, including the importance of transmission through droplets of different sizes including small particle aerosols, and the potential for droplet and aerosol transmission to occur in different locations and with environmental conditions. | Additional high-quality RCTs of efficacy of face masks against laboratory-confirmed influenza would be valuable. Effectiveness of face masks or respirator use to prevent influenza prevention in special subpopulation, such as immunocompromised persons, would be valuable. |
| Surface and object cleaning | The effectiveness of different cleaning products in preventing influenza transmission–in terms of cleaning frequency, cleaning dosage, cleaning time point, and cleaning targeted surface and object material–remains unknown. | RCTs of interventions to demonstrate the effectiveness of surface and object cleaning in reducing influenza transmission would be valuable. Studies that can demonstrate the reduction of environmental detection of influenza virus through cleaning of surfaces and objects would also be valuable. |

*RCT, randomized control trial.

In this review, we focused on 3 personal protective measures and 1 environmental measure. Other potential environmental measures include humidification in dry environments (48), increasing ventilation (49), and use of upper-room UV light (50), but there is limited evidence to support these measures. Further investigations on the effectiveness of respiratory etiquette and surface cleaning through conducting RCTs would be helpful to provide evidence with higher quality; evaluation of the effectiveness of these measures targeting specific population groups, such as immunocompromised persons, would also be beneficial (Table 2). Future cost-effectiveness evaluations could provide more support for the potential use of these measures. Further research on transmission modes and alternative interventions to reduce influenza transmission would be valuable in improving pandemic preparedness. Finally, although our review focused on nonpharmaceutical measures to be taken during influenza pandemics, the findings could also apply to severe seasonal influenza epidemics. Evidence from RCTs of hand hygiene or face masks did not support a substantial effect on transmission of laboratory-confirmed influenza, and limited evidence was available on other environmental measures.

This study was conducted in preparation for the development of guidelines by the World Health Organization on the use of nonpharmaceutical interventions for pandemic influenza in nonmedical settings.

This study was supported by the World Health Organization. J.X. and M.W.F. were supported by the Collaborative Research Fund from the University Grants Committee of Hong Kong (project no. C7025-16G).

## About the Author

Ms. Xiao is a postgraduate student at the School of Public Health, University of Hong Kong, Hong Kong, China. Her primary research interests are influenza epidemiology and the dynamics of person-to-person transmission.

## References

1. Uyeki TM, Katz JM, Jernigan DB. Novel influenza A viruses and pandemic threats. Lancet. 2017;389:2172–4. https://doi.org/10.1016/S0140-6736(17)31274-6
2. Bean B, Moore BM, Sterner B, Peterson LR, Gerding DN, Balfour HH Jr. Survival of influenza viruses on environmental surfaces. J Infect Dis. 1982;146:47–51. https://doi.org/10.1093/infdis/146.1.47
3. Tellier R. Aerosol transmission of influenza A virus: a review of new studies. J R Soc Interface. 2009;6(Suppl 6):S783–90. https://doi.org/10.1098/rsif.2009.0302.focus

4. Siegel JD, Rhinehart E, Jackson M, Chiarello L; Health Care Infection Control Practices Advisory Committee. 2007 guideline for isolation precautions: preventing transmission of infectious agents in health care settings: Atlanta: Centers for Disease Control and Prevention; 2007.

5. World Health Organization. Comparative analysis of national pandemic influenza preparedness plans, 2011 [cited 2019 Jun 25]. https://www.who.int/influenza/resources/documents/comparative_analysis_php_2011_en.pdf

6. Guyatt GH, Oxman AD, Kunz R, Woodcock J, Brozek J, Helfand M, et al.; GRADE Working Group. GRADE guidelines: 7. Rating the quality of evidence—inconsistency. J Clin Epidemiol. 2011;64:1294–302. https://doi.org/10.1016/j.jclinepi.2011.03.017

7. Guyatt G, Oxman AD, Akl EA, Kunz R, Vist G, Brozek J, et al. GRADE guidelines: 1. Introduction-GRADE evidence profiles and summary of findings tables. J Clin Epidemiol. 2011;64:383–94. https://doi.org/10.1016/j.jclinepi.2010.04.026

8. Wong VW, Cowling BJ, Aiello AE. Hand hygiene and risk of influenza virus infections in the community: a systematic review and meta-analysis. Epidemiol Infect. 2014;142:922–32. https://doi.org/10.1017/S095026881400003X

9. Aiello AE, Murray GF, Perez V, Coulborn RM, Davis BM, Uddin M, et al. Mask use, hand hygiene, and seasonal influenza-like illness among young adults: a randomized intervention trial. J Infect Dis. 2010;201:491–8. https://doi.org/10.1086/650396

10. Aiello AE, Perez V, Coulborn RM, Davis BM, Uddin M, Monto AS. Facemasks, hand hygiene, and influenza among young adults: a randomized intervention trial. PLoS One. 2012;7:e29744. https://doi.org/10.1371/journal.pone.0029744

11. Cowling BJ, Chan KH, Fang VJ, Cheng CK, Fung RO, Wai W, et al. Facemasks and hand hygiene to prevent influenza transmission in households: a cluster randomized trial. Ann Intern Med. 2009;151:437–46. https://doi.org/10.7326/0003-4819-151-7-200910060-00142

12. Cowling BJ, Fung RO, Cheng CK, Fang VJ, Chan KH, Seto WH, et al. Preliminary findings of a randomized trial of non-pharmaceutical interventions to prevent influenza transmission in households. PLoS One. 2008;3:e2101. https://doi.org/10.1371/journal.pone.0002101

13. Larson EL, Ferng YH, Wong-McLoughlin J, Wang S, Haber M, Morse SS. Impact of non-pharmaceutical interventions on URIs and influenza in crowded, urban households. Public Health Rep. 2010;125:178–91. https://doi.org/10.1177/003335491012500206

14. Ram PK, DiVita MA, Khatun-e-Jannat K, Islam M, Krytus K, Cercone E, et al. Impact of intensive handwashing promotion on secondary household influenza-like illness in rural bangladesh: findings from a randomized controlled trial. PLoS One. 2015;10:e0125200. https://doi.org/10.1371/journal.pone.0125200

15. Simmerman JM, Suntarattiwong P, Levy J, Jarman RG, Kaewchana S, Gibbons RV, et al. Findings from a household randomized controlled trial of hand washing and face masks to reduce influenza transmission in Bangkok, Thailand. Influenza Other Respir Viruses. 2011;5:256–67. https://doi.org/10.1111/j.1750-2659.2011.00205.x

16. Stebbins S, Cummings DA, Stark JH, Vukotich C, Mitruka K, Thompson W, et al. Reduction in the incidence of influenza A but not influenza B associated with use of hand sanitizer and cough hygiene in schools: a randomized controlled trial. Pediatr Infect Dis J. 2011;30:921–6. https://doi.org/10.1097/INF.0b013e3182218656

17. Suess T, Remschmidt C, Schink SB, Schweiger B, Nitsche A, Schroeder K, et al. The role of facemasks and hand hygiene in the prevention of influenza transmission in households: results from a cluster randomised trial; Berlin, Germany, 2009–2011. BMC Infect Dis. 2012;12:26. https://doi.org/10.1186/1471-2334-12-26

18. Talaat M, Afifi S, Dueger E, El-Ashry N, Marfin A, Kandeel A, et al. Effects of hand hygiene campaigns on incidence of laboratory-confirmed influenza and absenteeism in schoolchildren, Cairo, Egypt. Emerg Infect Dis. 2011;17:619–25. https://doi.org/10.3201/eid1704.101353

19. Azman AS, Stark JH, Althouse BM, Vukotich CJ Jr, Stebbins S, Burke DS, et al. Household transmission of influenza A and B in a school-based study of non-pharmaceutical interventions. Epidemics. 2013;5:181–6. https://doi.org/10.1016/j.epidem.2013.09.001

20. Levy JW, Suntarattiwong P, Simmerman JM, Jarman RG, Johnson K, Olsen SJ, et al. Increased hand washing reduces influenza virus surface contamination in Bangkok households, 2009–2010. Influenza Other Respir Viruses. 2014;8:13–6. https://doi.org/10.1111/irv.12204

21. Mukherjee DV, Cohen B, Bovino ME, Desai S, Whittier S, Larson EL. Survival of influenza virus on hands and fomites in community and laboratory settings. Am J Infect Control. 2012;40:590–4. https://doi.org/10.1016/j.ajic.2011.09.006

22. Macias AE, de la Torre A, Moreno-Espinosa S, Leal PE, Bourlon MT, Ruiz-Palacios GM. Controlling the novel A (H1N1) influenza virus: don't touch your face! J Hosp Infect. 2009;73:280–1. https://doi.org/10.1016/j.jhin.2009.06.017

23. Simmerman JM, Suntarattiwong P, Levy J, Gibbons RV, Cruz C, Shaman J, et al. Influenza virus contamination of common household surfaces during the 2009 influenza A (H1N1) pandemic in Bangkok, Thailand: implications for contact transmission. Clin Infect Dis. 2010;51:1053–61. https://doi.org/10.1086/656581

24. Grayson ML, Melvani S, Druce J, Barr IG, Ballard SA, Johnson PD, et al. Efficacy of soap and water and alcohol-based hand-rub preparations against live H1N1 influenza virus on the hands of human volunteers. Clin Infect Dis. 2009;48:285–91. https://doi.org/10.1086/595845

25. Larson EL, Cohen B, Baxter KA. Analysis of alcohol-based hand sanitizer delivery systems: efficacy of foam, gel, and wipes against influenza A (H1N1) virus on hands. Am J Infect Control. 2012;40:806–9. https://doi.org/10.1016/j.ajic.2011.10.016

26. Aiello AE, Coulborn RM, Perez V, Larson EL. Effect of hand hygiene on infectious disease risk in the community setting: a meta-analysis. Am J Public Health. 2008;98:1372–81. https://doi.org/10.2105/AJPH.2007.124610

27. Löffler H, Kampf G. Hand disinfection: how irritant are alcohols? J Hosp Infect. 2008;70(Suppl 1):44–8. https://doi.org/10.1016/S0195-6701(08)60010-9

28. Ahmed QA, Memish ZA, Allegranzi B, Pittet D; WHO Global Patient Safety Challenge. Muslim health-care workers and alcohol-based handrubs. Lancet. 2006;367:1025–7. https://doi.org/10.1016/S0140-6736(06)68431-6

29. Pittet D. Improving adherence to hand hygiene practice: a multidisciplinary approach. Emerg Infect Dis. 2001;7:234–40. https://doi.org/10.3201/eid0702.010217

30. Centers for Disease Control and Prevention. Respiratory hygiene/cough etiquette in healthcare settings, 2009 [cited 2019 Jul 8]. https://www.cdc.gov/flu/professionals/infectioncontrol/resphygiene.htm

31. Zayas G, Chiang MC, Wong E, MacDonald F, Lange CF, Senthilselvan A, et al. Effectiveness of cough etiquette maneuvers in disrupting the chain of transmission of

infectious respiratory diseases. BMC Public Health. 2013;13:811. https://doi.org/10.1186/1471-2458-13-811

32. Balaban V, Stauffer WM, Hammad A, Afgarshe M, Abd-Alla M, Ahmed Q, et al. Protective practices and respiratory illness among US travelers to the 2009 Hajj. J Travel Med. 2012;19:163–8. https://doi.org/10.1111/j.1708-8305.2012.00602.x

33. Barasheed O, Almasri N, Badahdah AM, Heron L, Taylor J, McPhee K, et al.; Hajj Research Team. Pilot randomised controlled trial to test effectiveness of facemasks in preventing influenza-like illness transmission among Australian Hajj pilgrims in 2011. Infect Disord Drug Targets. 2014;14:110–6. https://doi.org/10.2174/1871526514666141021112855

34. MacIntyre CR, Cauchemez S, Dwyer DE, Seale H, Cheung P, Browne G, et al. Face mask use and control of respiratory virus transmission in households. Emerg Infect Dis. 2009;15:233–41. https://doi.org/10.3201/eid1502.081166

35. MacIntyre CR, Zhang Y, Chughtai AA, Seale H, Zhang D, Chu Y, et al. Cluster randomised controlled trial to examine medical mask use as source control for people with respiratory illness. BMJ Open. 2016;6:e012330. https://doi.org/10.1136/bmjopen-2016-012330

36. US Food and Drug Administration. Masks and N95 respirators, 2018 [cited 2019 Jul 10]. https://www.fda.gov/medicaldevices/productsandmedicalprocedures/general-hospitaldevicesandsupplies/personalprotectiveequipment/ucm055977.htm

37. Centers for Disease Control and Prevention. Respirator fact sheet, 2012 [cited 2019 Jul 10]. https://www.cdc.gov/niosh/npptl/topics/respirators/factsheets/respsars.html

38. Chughtai AA, Seale H, MacIntyre CR. Use of cloth masks in the practice of infection control—evidence and policy gaps. Int J Infect Control. 2013;9:1–12. https://doi.org/10.3396/IJIC.v9i3.020.13

39. World Health Organization. Advice on the use of masks in the community setting in Influenza A (H1N1) outbreaks, 2009 [cited 2019 Jul 10]. http://www.who.int/csr/resources/publications/Adviceusemaskscommunityrevised.pdf

40. Casas L, Espinosa A, Borràs-Santos A, Jacobs J, Krop E, Heederik D, et al. Domestic use of bleach and infections in children: a multicentre cross-sectional study. Occup Environ Med. 2015;72:602–4. https://doi.org/10.1136/oemed-2014-102701

41. Ibfelt T, Engelund EH, Schultz AC, Andersen LP. Effect of cleaning and disinfection of toys on infectious diseases and micro-organisms in daycare nurseries. J Hosp Infect. 2015;89:109–15. https://doi.org/10.1016/j.jhin.2014.10.007

42. Sandora TJ, Shih MC, Goldmann DA. Reducing absenteeism from gastrointestinal and respiratory illness in elementary school students: a randomized, controlled trial of an infection-control intervention. Pediatrics. 2008;121:e1555–62. https://doi.org/10.1542/peds.2007-2597

43. Oxford J, Berezin EN, Courvalin P, Dwyer DE, Exner M, Jana LA, et al. The survival of influenza A(H1N1)pdm09 virus on 4 household surfaces. Am J Infect Control. 2014;42:423–5. https://doi.org/10.1016/j.ajic.2013.10.016

44. Tuladhar E, Hazeleger WC, Koopmans M, Zwietering MH, Beumer RR, Duizer E. Residual viral and bacterial contamination of surfaces after cleaning and disinfection. Appl Environ Microbiol. 2012;78:7769–75. https://doi.org/10.1128/AEM.02144-12

45. Zhang N, Li Y. Transmission of influenza A in a student office based on realistic person-to-person contact and surface touch behaviour. Int J Environ Res Public Health. 2018;15:E1699. https://doi.org/10.3390/ijerph15081699

46. Shiu EY, Leung NHL, Cowling BJ. Controversy around airborne versus droplet transmission of respiratory viruses: implication for infection prevention. Curr Opin Infect Dis. 2019;32:372–9. https://doi.org/10.1097/QCO.0000000000000563

47. Marr LC, Tang JW, Van Mullekom J, Lakdawala SS. Mechanistic insights into the effect of humidity on airborne influenza virus survival, transmission and incidence. J R Soc Interface. 2019;16:20180298. https://doi.org/10.1098/rsif.2018.0298

48. Reiman JM, Das B, Sindberg GM, Urban MD, Hammerlund ME, Lee HB, et al. Humidity as a non-pharmaceutical intervention for influenza A. PLoS One. 2018;13:e0204337. https://doi.org/10.1371/journal.pone.0204337

49. Gao X, Wei J, Cowling BJ, Li Y. Potential impact of a ventilation intervention for influenza in the context of a dense indoor contact network in Hong Kong. Sci Total Environ. 2016;569-570:373–81. https://doi.org/10.1016/j.scitotenv.2016.06.179

50. McDevitt JJ, Rudnick SN, Radonovich LJ. Aerosol susceptibility of influenza virus to UV-C light. Appl Environ Microbiol. 2012;78:1666–9. https://doi.org/10.1128/AEM.06960-11

Address for correspondence: Benjamin J. Cowling, World Health Organization Collaborating Centre for Infectious Disease Epidemiology and Control, School of Public Health, Li Ka Shing Faculty of Medicine, University of Hong Kong, 1/F Patrick Manson Bldg (North Wing), 7 Sassoon Rd, Hong Kong, China; email: bcowling@hku.hk

Plaintiffs' Exhibit 220

# The Potential for Cloth Masks to Protect Health Care Clinicians From SARS-CoV-2: A Rapid Review

*Ariel Kiyomi Daoud*

*Jessica Kole Hall*

*Haylie Petrick*

*Anne Strong*

*Cleveland Piggott, MD, MPH*

Department of Family Medicine, University of Colorado School of Medicine, Aurora, Colorado



**MORE ONLINE**
www.annfammed.org

## ABSTRACT

**PURPOSE** The coronavirus disease 2019 (COVID-19) pandemic has led at times to a scarcity of personal protective equipment, including medical masks, for health care clinicians, especially in primary care settings. The objective of this review was to summarize current evidence regarding the use of cloth masks to prevent respiratory viral infections, such as severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), among health care clinicians.

**METHODS** We searched 5 databases, the Centers for Disease Control and Prevention website, and the reference lists of identified articles on April 3, 2020. All identified publications were independently screened by 2 reviewers. Two authors independently extracted data and graded the studies. Randomized control trials (RCTs) were graded using the Consolidated Standards of Reporting Trials (CONSORT) checklist, and observational and nonhuman subject studies were graded using 11 domains common across frequently used critical appraisal tools. All discrepancies were resolved by consensus.

**RESULTS** Our search identified 136 original publications. Nine studies met inclusion criteria. We performed a qualitative synthesis of the data from these studies. Four nonrandomized trials, 3 laboratory studies, 1 single-case experiment, and 1 RCT were identified. The laboratory studies found that cloth materials provided measurable levels of particle filtration but were less efficacious at blocking biologic material than medical masks. The RCT found that cloth masks were associated with significantly more viral infections than medical masks.

**CONCLUSIONS** The current literature suggests that cloth materials are somewhat efficacious in filtering particulate matter and aerosols but provide a worse fit and inferior protection compared to medical masks in clinical environments. The quality and quantity of literature addressing this question are lacking. Cloth masks lack evidence for adequate protection of health care clinicians against respiratory viral infections.

*Ann Fam Med* 2021;19:55-62. https://doi.org/10.1370/afm.2640.

## INTRODUCTION

In December 2019, the novel coronavirus, severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), emerged in Wuhan, China and quickly became a global pandemic as the coronavirus disease 2019 (COVID-19) respiratory syndrome. At the time of this article's writing, more than 68 million cases were reported worldwide, with more than 1,500,000 deaths.[1] In the United States, health care clinicians have been faced with a scarcity of personal protective equipment (PPE) including N95 respirators and disposable medical masks.[2] As the United States has focused primarily on supporting large urban hospitals to care for the surge of severely ill patients, primary care offices have experienced severe PPE shortages.[3] During the week of this article's writing in April 2020, 58% of primary care clinicians reported in a national survey to have resorted to the use of homemade and/or used PPE. Seven months later, 32% reported that they were either lacking PPE or felt that their required level of PPE reuse was unsafe.[4]

*Conflicts of interest: authors report none.*

**CORRESPONDING AUTHOR**

Cleveland Piggott
Department of Family Medicine
University of Colorado School of Medicine
13001 E 17th Pl
Aurora, CO 80045
Cleveland.Piggott@cuanschutz.edu

Hospitals, health care systems, and the National Strategic Stockpile have insufficient supply to provide adequate PPE for health care clinicians. This leaves primary care practices and other resource-limited organizations, such as rural hospitals, to determine how to protect their clinicians. Conflicting information from the popular media, messaging from various health care systems, and constantly changing societal guidelines complicate decisions regarding appropriate mask usage in clinical settings during times of scarcity. Creative solutions include rationing supplies, extending the use of PPE, recycling masks, and devising alternative face protection.[2] The US Centers for Disease Control and Prevention (CDC) notes that health care clinicians may used cloth masks as a last resort.[5] The CDC notes that cloth masks are not considered PPE and that their capability to protect health care clinicians is not currently known. The CDC does not offer information regarding the degree of protection a cloth mask might provide compared to a medical mask. In addition, there is no recommendation for what the best design of a cloth mask might be in the face of a shortage of PPE. This rapid review summarizes current evidence on the efficacy and effectiveness of cloth masks compared with medical masks to prevent respiratory viral infections among health care clinicians.

## METHODS

### Criteria for Study Consideration
We followed Cochrane rapid review methods for this review.[6] We included all studies examining the efficacy and/or effectiveness of cloth masks in filtering biologic materials or comparing a cloth mask to an industrial medical or surgical mask. Efficacy refers to the performance of mask materials in a laboratory setting (ie, filtration, fit factor, pressure gradient), whereas effectiveness considers the performance of masks when used by human subjects in clinical environments (ie, infection rate). Biologic materials were defined as bacteria or viruses. The term cloth was applied broadly and included any type of woven nonsynthetic material or woven polyester fabric that might be used to create a homemade cloth mask. Studies examining filtering ability of cloth masks against environmental exposures, such as diesel particles, foundry exposure, welding fumes, or pollution, were excluded. Reviews, opinion pieces, letters to the editor, commentaries, research briefs, and anecdotes were also excluded.

### Main Outcome Measures
Inclusion in this review required at least 1 of the following outcome measures:

- Efficacy or effectiveness of cloth masks
- Respiratory illness/infection rate of health care clinicians wearing cloth masks
- Filtration efficiency of cloth masks compared to medical or surgical masks
- Percentage aerosol penetration of cloth masks compared to medical or surgical masks
- Comparison of mask fit between cloth and medical or surgical masks

### Search Methods
We performed a search of MEDLINE, the Cochrane Library, Embase, the Cumulative Index to Nursing and Allied Health Literature (CINAHL), and the Web of Science databases on April 3, 2020, to identify relevant studies for this review. Gray literature was searched briefly via the CDC's website. Reference lists of identified studies were consulted for additional publications. Publication dates before 1970 were not considered. No exclusion criteria were applied on the basis of study quality grade or language. A health science librarian was consulted for the identification of appropriate databases and assistance with search term definitions. See Supplemental Table 1, https://www.AnnFamMed.org/content/19/1/55/suppl/DC1/, for search strategies.

### Data Collection and Analysis
#### Study Selection
All studies retrieved via database searches were downloaded to citation manager software. Duplicates were removed. Two authors (JKH and AS) independently screened identified studies via title and abstract content and then independently reviewed full-text publications of the screened studies. Any discrepancies in eligibility were resolved via discussion and consensus between the independent reviewers and additional authors as needed.

#### Data Extraction and Management
Two authors (HP and AKD) independently extracted data from the final list of eligible studies to separate spreadsheets. Data were compared and discrepancies resolved via discussion and consensus, including additional author(s) as necessary. They then independently appraised each study and resolved discrepancies via discussion and consensus. Study appraisal was implemented to identify flaws in methodology and assess bias. Randomized control trials (RCTs) were appraised using the Consolidated Standards of Reporting Trials (CONSORT) checklist.[7] The diversity of study type included prevented implementation of a single critical appraisal tool. Reviewers considered observational and nonhuman subjects studies using 11 domains common across frequently used critical appraisal tools.[8]

## RESULTS

### Publication Identification

Our search of 5 databases and gray literature yielded 136 nonduplicate original publications (Figure 1). Ten of the publications required title or added abstract translation from non-English languages; all were irrelevant to our study question and were excluded. Thirty-six articles were identified for full-text evaluation, and 27 were excluded (Supplemental Table 2, https://www.AnnFamMed.org/content/19/1/55/suppl/DC1/). Nine studies were included for analysis after screening and selection. Four nonrandomized trials, 3 laboratory efficacy studies, 1 single-case experiment, and 1 RCT were included.[9-17] We excluded several studies that investigated cloth mask protection against air pollution or industrial debris. Although those studies might provide insight regarding physical characteristics of cloth materials, we chose to include only studies that explicitly considered mask use to prevent disease or measured particles of biologic significance such as bacteria, viruses, or particles intended to be of similar size to respiratory droplets or aerosols.

Overall quality assessment and appraisal details of the observational and nonhuman subject studies are summarized in Table 1. The 11 domains[8] for which each study was considered were not equally weighted for determination of overall study quality. The low-quality studies[15,16] had small trial numbers, did not report statistical significance, failed to address potential sources of bias, and did not report funding sources. The moderate-quality studies[13,14] had higher-quality methods but did not fully discuss limitations. The most-commonly neglected criterion among the high-quality studies[9-12] was lack of a no-mask control for comparison with cloth masks. We considered these appraisal findings when reporting results and drawing conclusions from each publication.

The 9 studies that met inclusion for analysis were then appraised (Table 2).[9-17] The RCT by MacIntyre et al[17] closely followed CONSORT guidelines but notably did not include a control group without masks, owing to the clinical setting. In addition, the authors disclosed a former relationship with 3M, which produces commercial masks. Although they reported that 3M was not involved in their RCT, it remains a source of potential bias.

### Filtration

Seven publications addressed the filtration efficacy of commercial cloth masks or materials used to create homemade masks, such as polyester, cotton, tea towel, and scarves, in a laboratory setting.[9-11,13-15,17] These studies used various experimental techniques



**Figure 1. Study flowchart for selection of articles.**

CDC = Centers for Disease Control and Prevention; CINAHL = Cumulative Index to Nursing and Allied Health Literature.

[a] Ten studies were non-English and did not answer identified outcome measures.

to investigate filtration of aerosolized virus,[9,14] aerosolized particles,[11,17] or bacteria.[9,10,13,15] Of the studies that evaluated pathogen penetration, 4 detected viable pathogens via colony formation,[9,10,13,15] and 1 detected postfiltration virus via polymerase chain reaction (PCR).[14] Regardless of the filtered substance or detection method, all concluded that cloth materials prevent some level of penetration but generally had lesser filtration efficiency and greater variability than medical masks. These findings suggest some, though highly variable, filtration by cloth mask materials.

Two of the identified studies investigated the effect of multiple layers of material on viral filtration.[9,14] Both reported that use of multiple layers increased the viral filtration efficacy of cloth mask material. Ma et al also specifically selected experimental material for physical similarity to SARS-CoV-2.[14] That study concluded that 1 layer of polyester combined with 4 layers of paper towel was similarly efficacious to a medical mask.[14] Both types of mask, polyester alone and combined with paper

**Table 1. Observational and Nonhuman Subjects Study Appraisal Results**

| Publication | Study Type | Overall Study Assessment[a] | Appropriate Study Design | Prospective Calculation of Study Size | Blinding of Patients and Personnel | Patient Selection/ Inclusion Criteria |
|---|---|---|---|---|---|---|
| Davies et al[9] | Nonrandomized trial | High | Yes | No | No | Yes |
| Liu et al[10] | Nonrandomized trial | High | Yes | No | No | No |
| Rengasamy et al[11] | Laboratory efficacy study | High | Yes | No | No | ... |
| van der Sande et al[12] | Nonrandomized trial | High | Yes | No | No | No |
| Furuhashi[13] | Laboratory efficacy study | Moderate | Yes | No | No | ... |
| Ma et al[14] | Laboratory efficacy study | Moderate | Yes | No | No | ... |
| Quesnel[15] | Single-case experiment | Low | Yes | No | No | No |
| Sellers et al[16] | Nonrandomized trial | Low | Yes | No | No | Yes |

[a] Determined by review of 11 appraisal domains in context of study strengths and weaknesses.

towel, blocked ~95% of viral particles similar in size to SARS-CoV-2, as detected by PCR. However, the authors of the study considered this insufficient protection for health care clinicians and suggested use of N95 respirators.[14]

## Fit and Airflow

Four studies investigated fit, particle leakage, or airflow of cloth masks in human volunteers.[9,10,12,16] One study used a commercial fit-testing system for cloth masks that were constructed and worn by volunteers,[9] and

**Table 2. Summary of Included Studies**

| Publication | Study Type | Population | Pathogen/Particle | Filtration | Fit | Airflow | Infection |
|---|---|---|---|---|---|---|---|
| | | **Characteristics** | | **Efficacy**[a] | | | **Effectiveness**[b] |
| MacIntyre et al[17] | Randomized trial | Health care clinicians in high-risk wards in Vietnam (N = 1,607) | Viral respiratory infection,[c] aerosolized particles | Cloth < medical | ... | ... | Cloth < medical (↑ infection in cloth) |
| Davies et al[9] | Nonrandomized trial | Volunteers, general population (N = 21) | Aerosolized virus,[d] aerosolized bacteria[d] | Cloth < medical | Cloth < medical | Cloth < medical | ... |
| Liu et al[10] | Nonrandomized trial | Surgeons (N = 50) | Bacteria[d] | Cloth < medical | ... | Cloth < medical | ... |
| Sellers et al[16] | Nonrandomized trial | Human subjects exposed to hand-and-foot virus (N = 8) | Picornavirus[e] | ... | ... | ... | Cloth = medical (↑ infection in both) |
| van der Sande et al[12] | Nonrandomized trial | Volunteers, general population (N = 39) | Particles (0.02-1 μm) | ... | Cloth < medical | ... | ... |
| Furuhashi[13] | Laboratory efficacy study | ... | Bacteria[d] | Cloth < medical | ... | Cloth < medical | ... |
| Ma et al[14] | Laboratory efficacy study | ... | Aerosolized virus[f] | Cloth = medical | ... | ... | ... |
| Rengasamy et al[11] | Laboratory efficacy study | ... | Aerosolized particles (20-1,000 nm) | Cloth < N95 | ... | ... | ... |
| Quesnel[15] | Single-case experiment | Single human test subject, general population | Bacteria[d] | Cloth = medical | ... | ... | ... |

hMPV = human metapneumovirus; PCR = polymerase chain reaction.

Note: < indicates less effective or efficacious; = indicates no difference in effectiveness or efficacy; ↑ indicates increased incidence.

[a] Efficacy refers to the performance of mask materials in a laboratory setting.
[b] Effectiveness refers to the performance of masks when used by human subjects in clinical environments.
[c] Influenza-like illness and/or pharyngeal swab multiplex PCR-confirmed infection (rhinovirus, hMPV, influenza, etc).
[d] Viable pathogen detected via postfiltration colony formation.
[e] Viral colony formation from nasal swab.
[f] Virus detected via postfiltration PCR.

| Subject Comparability | Appropriate Endpoints | Assessment of Outcomes/ Exposure | Follow-Up/ Handling of Missing Data | Reporting | Confounding | Appropriate Statistical Analysis |
|---|---|---|---|---|---|---|
| Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| ... | Yes | Yes | ... | Yes | Yes | Yes |
| Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| ... | Yes | Yes | ... | Yes | Yes | Yes |
| ... | Yes | Yes | ... | Yes | Yes | Yes |
| Yes | Yes | Yes | Yes | Yes | Yes | No |
| No | Yes | Yes | No | No | No | Yes |

another quantified fit by measuring inward particle leakage by homemade tea towel masks compared to medical masks.[12] These investigations concluded that cloth masks provide a measurable barrier but have worse fit and a greater level of particle leakage compared to medical masks.[9,12]

Limited airflow through cloth materials can contribute to breathing difficulties and particle leakage. Thus, airflow is an important consideration in cloth mask design. Airflow was assessed in 2 studies with human subjects.[9,10] The materials with the greatest filtration efficacy (vacuum bag and tea towel) were countered by very low airflow, which made breathing difficult and limits use of these materials.[9,10]

### Infection Risk

Two studies evaluated cloth mask effectiveness outside of laboratory conditions.[16,17] The only RCT published to date reported the differences in infectious outcomes with standardized use of cloth masks, medical masks, and usual practice and called into question their effectiveness in clinical environments.[17] Usual practice in that study included variable cloth mask use. Participants in that study arm were permitted to choose the type and duration of mask use throughout the study; therefore, there was no true unmasked control arm. Both intention-to-treat and post hoc analyses adjusting for compliance and confounders found greater rates of influenza-like illness (ILI) in the cloth mask arm compared to the medical mask arm. Of note, the relative risk of ILI was 13.25, and the 95% CI ranged broadly, from 1.74 to 100.97. Comparing participants from all arms who exclusively wore medical masks to those who only wore cloth masks, the incidences of ILI and laboratory-confirmed virus were significantly greater among health care clinicians who used cloth masks. The RCT's authors could not definitively determine whether these results reflected superior protection from medical masks or a harmful effect of cloth masks. Considering their prior findings of negligible effect of medical masks against viral infection compared to N95 respirators,[18,19] and that the medical mask used had particularly poor filtration, they concluded that the increased incidence of ILI in cloth mask users might be due to a detrimental effect of cloth masks.

Sellers et al evaluated cloth mask effectiveness against the transmission of foot-and-mouth virus.[16] That study compared viral transmission of foot-and-mouth virus in exposed subjects wearing industrial gauze and cotton masks, cloth surgical masks, or paper masks. They concluded that the industrial and cloth masks minimally decreased total virus inhalation, and paper masks had no effect.

### DISCUSSION

The current COVID-19 pandemic has at times caused a shortage of PPE worldwide. Communities across the United States have mobilized efforts to provide health care clinicians with homemade cloth masks[20] as a reusable and accessible last-resort face covering. Primary care clinicians must decide how to protect themselves and their colleagues when adequate numbers of medical masks are not available. Several reports published during this pandemic addressed the effectiveness of cloth mask use in the community to prevent viral spread[21-25]; however, the use of cloth masks for protection of health care clinicians has not been thoroughly explored. This rapid review identified the relevant literature and brings together the disparate variables

of filtration, fit and airflow, and clinical effectiveness to evaluate the potential for cloth masks to protect health care clinicians.

## Filtration

Our qualitative synthesis suggested that cloth materials provide a measurable level of particle filtration. On this basis alone, cloth masks are superior to complete lack of face protection. However, this cannot serve as reassurance of sufficient protection for health care clinicians. The level of filtration provided is highly variable and consistently inferior to standard medical masks.[9-11,13-15] Studies included in this review that considered protection for the wearer suggested that the filtration capabilities of cloth masks would not adequately protect health care clinicians against viral infection.[12,14,17] For clinicians treating patients with COVID-19, it is notable that none of the studies in this review specifically tested SARS-CoV-2 transmission, and only 1 study selected experimental bioaerosols for physical similarity to SARS-CoV-2.[14] In addition, conclusions regarding filtration were based on investigations of aerosolized particles including noncoronaviruses,[9,11,14,16] bacteria,[8,13,17] and simulated biologic particles.[12,15] According to the World Health Organization, contact and respiratory droplets are the primary method of SARS-CoV-2 spread,[26] and aerosols are thought to play a smaller role.[22] The majority of efficacy studies examined here investigate filtration of aerosolized particles or virus rather than droplet or contact protections. Thus, we must interpret these results with caution in the context of COVID-19.

## Fit and Airflow

When considering a cloth mask as opposed to medical masks or a bandana or scarf, fit and airflow are essential elements to consider. These are also elements that distinguish medical masks from N95 respirators. Poor fit decreases protection because particles can pass through gaps between the wearer's face and the mask, while poor airflow causes breathing difficulty, causing compliance issues.[9,14] No current studies compared variable designs of cloth masks for fit or airflow, but multiple studies showed inferior fit of cloth masks compared to medical masks. Two studies found that the studied designs and materials of cloth masks limit both proper fit and airflow, leading to decreased protection and breathing difficulties.[8,14] This poses a significant challenge to cloth mask use and presents an opportunity for future research and development.

## Clinical Effectiveness

Although multiple studies indicated that cloth masks might be somewhat efficacious, the single clinical investigation suggests that they provide inferior protection in clinical settings and might even increase risk to health care clinicians. Whereas that work suggested that clinicians should exercise caution when choosing to use cloth masks, there are no similar real-world studies to support or refute this conclusion and no investigations as to why cloth masks might have increased risk of viral infection. Although they considered poor filtration, moisture retention, ineffective cleaning, and reuse of cloth masks as possible contributors, the authors did not detail how health care clinicians used their 5 provided cloth masks over their 8-hour shifts. This prevents conclusions regarding length of use and moisture retention. The authors noted that 80% of cloth mask wearers washed their masks at home with soap and water rather than in hospital-grade laundry.[17] In addition, the RCT isolated *human metapneumovirus*, rhinoviruses, and influenza B virus, which differ in transmission and pathogenic properties from SARS-CoV-2.[21]

## Strengths and Limitations

To our knowledge, this is the only contemporary rapid review of cloth face masks specifically for health care clinician protection. Strengths of this rapid review include a comprehensive search of high-yield databases, in consultation with a health sciences librarian. Owing to the limited number of eligible articles, studies of all grade scores were included. This review excluded studies considering environmental contaminants such as diesel particles. The body of literature on environmental contaminants might provide additional insight regarding the protective qualities of cloth masks that were not addressed by this review. Other considerations, including virus viability on masks or mask materials and behavior change associated with mask use, lack definitive understanding.[27] Given the lack of quantity and quality of literature available, this review cannot remark definitively on protection for health care clinicians from COVID-19 by cloth masks.

## Recommendations

Current CDC guidelines recommend use of an N95 respirator for care of patients with COVID-19 because medical masks cannot provide the same level of protection against aerosolized particles.[28] Whereas there is some evidence for SARS-CoV-2 aerosol transmission,[22,26] protective measures against droplet transmission should also be considered. For a primary care clinician without access to medical masks, our qualitative synthesis of the literature suggests that it is better to wear a cloth mask than no mask but not without careful consideration of harm reduction. The psychologic theory of risk compensation refers to the concept that

humans might behave less conservatively when they believe their risk to be decreased.[27] This is essential to consider when creating policies regarding the use of cloth masks and messaging to health care clinicians regarding their risks when wearing cloth masks.

We emphasize the CDC's recommendation of pairing cloth masks with a plastic face shield.[5] Considering the findings of MacIntyre et al,[17] it is important to address the potential for increased risk of viral infection to the wearer. We recommend frequent cloth mask changes to reduce the risk of moisture retention and washing according to hospital laundry standards to decrease the risk of ineffective cleaning. The rapidly evolving nature of research and literature regarding protective face coverings during the COVID-19 pandemic presents a challenge for those trying to stay up to date. The CDC has published a running list of studies on masks that might provide additional guidance for health care clinicians considering cloth masks.[29]

## CONCLUSIONS

Review of the current literature suggests that cloth materials are somewhat effective in filtering particles and aerosols, but cloth masks provide inferior protection, with poorer fit and airflow, compared to medical masks. Some data also suggest a potential harm to health care clinicians using cloth masks for extended periods in the clinical setting. Cloth masks should not be considered equivalent to medical masks, and if clinicians choose to use them, level of fit, type of material, and number of layers should be considered. Overall, we conclude that cloth masks lack evidence for adequate protection of health care clinicians against viral respiratory infections, and health care clinicians should use caution when deciding whether to use cloth masks for extended clinical work.

Additional research is needed to provide a complete understanding of cloth mask effectiveness in health care environments. Future work should include systematic comparison of different cloth mask designs and cloth types against standard surgical masks and N95 respirators in a controlled laboratory setting to optimize fit and material properties. Additional RCTs are required to assess the realities of cloth mask use by health care clinicians.

**To read or post commentaries in response to this article, see it online at https://www.AnnFamMed.org/content/19/1/55.**

**Key words:** COVID-19; personal protective equipment; PPE; pandemic

Submitted April 17, 2020; submitted, revised, July 20, 2020; accepted August 3, 2020.

**Acknowledgments:** We thank Kristen DeSanto, MSLS, MS, RD, AHIP, for support in designing search strategy and defining search terms, and Austin Jolly, BA, for editing support.

**Supplemental materials:** Available at https://www.AnnFamMed.org/content/19/1/55/suppl/DC1/.

## References

1. World Health Organization. Coronavirus disease (COVID-19) pandemic. Published 2020. Updated Dec 12, 2020. Accessed Dec 12, 2020. https://www.who.int/emergencies/diseases/novel-coronavirus-2019

2. Ranney ML, Griffeth V, Jha AK. Critical supply shortages - the need for ventilators and personal protective equipment during the Covid-19 pandemic. *N Engl J Med.* 2020;382(18):e41.

3. Quick COVID-19 primary care survey: series 5, fielded April 10-13, 2020. Primary Care Collaborative and the Larry A. Green Center. Accessed Dec 9, 2020. https://static1.squarespace.com/static/5d7f f8184cf0e01e4566cb02/t/5e99a8c2d06cf505d38ac3cc/15871285 15653/C19+Series+5+National+Executive+Summary.pdf

4. Primary Care Collaborative and the Larry A. Green Center. COVID-19 survey. Accessed Dec 11, 2020. https://www.pcpcc.org/covid

5. Centers for Disease Control and Prevention. Strategies for optimizing the supply of facemasks. Published 2020. Updated Nov 23, 2020. Accessed Dec 11, 2020. https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html

6. Garritty C, Gartlehner G, Kamel C, et al. Cochrane Rapid Reviews. Interim guidance from the Cochrane Rapid Reviews Methods Group. Published Mar, 2020. Accessed Dec 9, 2020. https://methods.cochrane.org/rapidreviews/sites/methods.cochrane.org.rapidreviews/files/public/uploads/cochrane_rr_-_guidance-23mar2020-final.pdf

7. Moher D, Hopewell S, Schulz KF, et al. CONSORT 2010 explanation and elaboration: updated guidelines for reporting parallel group randomised trials. *BMJ.* 2010;340:c869.

8. Quigley JM, Thompson JC, Halfpenny NJ, Scott DA. Critical appraisal of nonrandomized studies-a review of recommended and commonly used tools. *J Eval Clin Pract.* 2019;25(1):44-52.

9. Davies A, Thompson KA, Giri K, Kafatos G, Walker J, Bennett A. Testing the efficacy of homemade masks: would they protect in an influenza pandemic? *Disaster Med Public Health Prep.* 2013;7(4):413-418.

10. Liu Z, Yu D, Ge Y, et al. Understanding the factors involved in determining the bioburdens of surgical masks. *Ann Transl Med.* 2019;7(23):754.

11. Rengasamy S, Eimer B, Shaffer RE. Simple respiratory protection--evaluation of the filtration performance of cloth masks and common fabric materials against 20-1000 nm size particles. *Ann Occup Hyg.* 2010;54(7):789-798.

12. van der Sande M, Teunis P, Sabel R. Professional and home-made face masks reduce exposure to respiratory infections among the general population. *PLoS One.* 2008;3(7):e2618.

13. Furuhashi M. A study on the microbial filtration efficiency of surgical face masks--with special reference to the non-woven fabric mask. *Bull Tokyo Med Dent Univ.* 1978;25(1):7-15.

14. Ma QX, Shan H, Zhang HL, Li GM, Yang RM, Chen JM. Potential utilities of mask-wearing and instant hand hygiene for fighting SARS-CoV-2. *J Med Virol.* 2020;92(9):1567-1571.

15. Quesnel LB. The efficiency of surgical masks of varying design and composition. *Br J Surg.* 1975;62(12):936-940.

16. Sellers RF, Donaldson AI, Herniman KA. Inhalation, persistence and dispersal of foot-and-mouth disease virus by man. J Hyg (Lond). 1970;68(4):565-573.

17. MacIntyre CR, Seale H, Dung TC, et al. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. *BMJ Open.* 2015;5(4):e006577.

18. MacIntyre CR, Wang Q, Seale H, et al. A randomized clinical trial of three options for N95 respirators and medical masks in health workers. *Am J Respir Crit Care Med.* 2013;187(9):960-966.

19. MacIntyre CR, Wang Q, Cauchemez S, et al. A cluster randomized clinical trial comparing fit-tested and non-fit-tested N95 respirators to medical masks to prevent respiratory virus infection in health care workers. *Influenza Other Respir Viruses.* 2011;5(3):170-179.

20. American Hospital Association. 100 million mask challenge. Accessed Apr 8, 2020. https://www.100millionmasks.org/

21. Bae S, Kim M-C, Kim JY, et al. Effectiveness of surgical and cotton masks in blocking SARS-CoV-2: a controlled comparison in 4 patients. *Ann Intern Med.* 2020;173(1):W22-W23. [Retracted in: *Ann Intern Med.* 2020;173(1):79]

22. Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nat Med.* 2020;26(5): 676-680. [Author correction in: *Nat Med.* 2020;26(6):981]

23. Besser R, Fischoff B. Rapid expert consultation on the effectiveness of fabric masks for the COVID-19 pandemic. In: *Rapid Expert Consultations on the COVID-19 Pandemic: March 14, 2020-April 8, 2020.* National Academies of Sciences, Engineering, and Medicine; 2020.

24. Eikenberry SE, Mancuso M, Iboi E, et al. To mask or not to mask: modeling the potential for face mask use by the general public to curtail the COVID-19 pandemic. *Infect Dis Model.* 2020;5:293-308.

25. Chu DK, Akl EA, Duda S, Solo K, Yaacoub S, Schünemann HJ; COVID-19 Systematic Urgent Review Group Effort (SURGE) study authors. Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis. *Lancet.* 2020;395(10242): 1973-1987.

26. World Health Organization. Transmission of SARS-CoV-2: implications for infection prevention precautions. Published Jul 9, 2020. Accessed Dec 14, 2020. https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

27. Braun CC, Foust JW. Behavioral response to the presence of personal protective equipment: implications for risk compensation. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting.* 1998;42(15):1058-1062.

28. Centers for Disease Control and Prevention. Using personal protective equipment (PPE). Updated Aug 19, 2020. Accessed Dec 9, 2020. https://www.cdc.gov/coronavirus/2019-ncov/hcp/using-ppe.html

29. Centers for Disease Control and Prevention. Considerations for wearing masks. Published 2020. Updated Dec 7, 2020. Accessed Dec 11, 2020. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html

Articles

Plaintiffs' Exhibit 221

# Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a cohort study



*Michael Marks, Pere Millat-Martinez, Dan Ouchi, Chrissy h Roberts, Andrea Alemany, Marc Corbacho-Monné, Maria Ubals, Aurelio Tobias, Cristian Tebé, Ester Ballana, Quique Bassat, Bàrbara Baro, Martí Vall-Mayans, Camila G-Beiras, Nuria Prat, Jordi Ara, Bonaventura Clotet, Oriol Mitjà*

## Summary

**Background** Scarce data are available on what variables affect the risk of transmission of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the development of symptomatic COVID-19, and, particularly, the relationship with viral load. We aimed to analyse data from linked index cases of COVID-19 and their contacts to explore factors associated with transmission of SARS-CoV-2.

**Methods** In this cohort study, patients were recruited as part of a randomised controlled trial done between March 17 and April 28, 2020, that aimed to assess if hydroxychloroquine reduced transmission of SARS-CoV-2. Patients with COVID-19 and their contacts were identified by use of the electronic registry of the Epidemiological Surveillance Emergency Service of Catalonia (Spain). Patients with COVID-19 included in our analysis were aged 18 years or older, not hospitalised, had quantitative PCR results available at baseline, had mild symptom onset within 5 days before enrolment, and had no reported symptoms of SARS-CoV-2 infections in their accommodation or workplace within the 14 days before enrolment. Contacts included were adults with a recent history of exposure and absence of COVID-19-like symptoms within the 7 days preceding enrolment. Viral load of contacts, measured by quantitative PCR from a nasopharyngeal swab, was assessed at enrolment, at day 14, and whenever the participant reported COVID-19-like symptoms. We assessed risk of transmission and developing symptomatic disease and incubation dynamics using regression analysis. We assessed the relationship of viral load and characteristics of cases (age, sex, number of days from reported symptom onset, and presence or absence of fever, cough, dyspnoea, rhinitis, and anosmia) and associations between risk of transmission and characteristics of the index case and contacts.

**Findings** We identified 314 patients with COVID-19, with 282 (90%) having at least one contact (753 contacts in total), resulting in 282 clusters. 90 (32%) of 282 clusters had at least one transmission event. The secondary attack rate was 17% (125 of 753 contacts), with a variation from 12% when the index case had a viral load lower than $1 \times 10^6$ copies per mL to 24% when the index case had a viral load of $1 \times 10^{10}$ copies per mL or higher (adjusted odds ratio per $\log_{10}$ increase in viral load 1·3, 95% CI 1·1–1·5). Increased risk of transmission was also associated with household contact (3·0, 1·59–5·65) and age of the contact (per year: 1·02, 1·01–1·04). 449 contacts had a positive PCR result at baseline. 28 (6%) of 449 contacts had symptoms at the first visit. Of 421 contacts who were asymptomatic at the first visit, 181 (43%) developed symptomatic COVID-19, with a variation from approximately 38% in contacts with an initial viral load lower than $1 \times 10^7$ copies per mL to greater than 66% for those with an initial viral load of $1 \times 10^{10}$ copies per mL or higher (hazard ratio per $\log_{10}$ increase in viral load 1·12, 95% CI 1·05–1·20; p=0·0006). Time to onset of symptomatic disease decreased from a median of 7 days (IQR 5–10) for individuals with an initial viral load lower than $1 \times 10^7$ copies per mL to 6 days (4–8) for those with an initial viral load between $1 \times 10^7$ and $1 \times 10^9$ copies per mL, and 5 days (3–8) for those with an initial viral load higher than $1 \times 10^9$ copies per mL.

**Interpretation** In our study, the viral load of index cases was a leading driver of SARS-CoV-2 transmission. The risk of symptomatic COVID-19 was strongly associated with the viral load of contacts at baseline and shortened the incubation time of COVID-19 in a dose-dependent manner.

**Funding** YoMeCorono, Generalitat de Catalunya.

**Copyright** © 2021 Elsevier Ltd. All rights reserved.

## Introduction

According to current evidence, COVID-19 is primarily transmitted from person to person through respiratory droplets, as well as indirect contact through transfer of the virus from contaminated fomites to the mouth, nose, or eyes.[1,2] As with most respiratory viral infections, some transmission through smaller aerosols is likely to occur, but their relative contribution compared with droplets remains unclear. Several outbreak investigation reports have shown that COVID-19 transmission can be particularly effective in confined indoor spaces such as workplaces, including factories, churches, restaurants, shopping centres, and health-care settings.[3–6] In Spain and many other countries, health-care workers have had a high rate of COVID-19 infection.[7]

*Lancet Infect Dis* 2021;
21: 629–36

Published Online
February 2, 2021
https://doi.org/10.1016/
S1473-3099(20)30985-3

See **Comment** page 580

For the Catalan translation of the abstract see **Online** for appendix 1

Clinical Research Department,
Faculty of Infectious & Tropical
Diseases, London School of
Hygiene & Tropical Medicine,
London, UK (M Marks PhD,
C h Roberts PhD); Hospital for
Tropical Diseases, University
College London Hospital,
London, UK (M Marks);
Barcelona Institute for Global
Health, Hospital Clínic,
University of Barcelona,
Barcelona, Spain
(P Millat-Martinez MD,
Prof Q Bassat PhD, B Baro PhD);
IrsiCaixa AIDS Research
Institute, Badalona, Spain
(D Ouchi MSc, E Ballana PhD,
B Clotet PhD); Fight AIDS and
Infectious Diseases
Foundation, Badalona, Spain
(A Alemany BM,
M Corbacho-Monné BM,
M Vall-Mayans PhD,
C G-Beiras PhD, B Clotet,
O Mitjà PhD); Parc Tauli
Hospital Universitari, Institut
d'Investigació i Innovació Parc
Tauli I3PT, Sabadell, Spain
(M Corbacho-Monné); Catalan
Institution for Research and
Advanced Studies, Barcelona,
Spain (Prof Q Bassat); Infectious
Disease Department, Hospital
Universitari Germans Trias i
Pujol, Badalona, Spain
(M Ubals MD, E Ballana,
M Vall-Mayans, N Prat MSc,
J Ara PhD, B Clotet, O Mitjà);
Institute of Environmental
Assessment and Water
Research, Spanish Council for
Scientific Research, Barcelona,
Spain (A Tobias PhD);
Biostatistics Unit, Institut
d'Investigació Biomèdica de
Bellvitge, L'Hospitalet de
Llobregat, Barcelona, Spain
(C Tebé PhD); Department of
Clinical

**Articles**

Sciences, Faculty of Medicine and Health Sciences, University of Barcelona, Barcelona, Spain (C Tebé, O Mitjà); Càtedra de Malalties Infeccioses i Immunitat, Universitat de Vic, Universitat Central de Catalunya, Vic, Spain (B Clotet, O Mitjà); Lihir Medical Centre, International SOS, Lihir Island, Papua New Guinea (O Mitjà)

Correspondence to:
Dr Michael Marks, Clinical Research Department, London School of Hygiene & Tropical Medicine, London WC1E 7HT, UK
michael.marks@lshtm.ac.uk

### Research in context

**Evidence before this study**

On Sept 20, 2020, we searched PubMed for articles reporting on factors influencing transmission of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) and the risk of developing symptomatic COVID-19. Search terms included "COVID-19", "SARS-CoV-2", "transmission", "incubation time", and "risk", no language restrictions. Various authors had reported on retrospective analyses of clusters of index cases and their corresponding contacts, as well as series of patients who developed symptomatic COVID-19 after a positive PCR result. Besides describing the secondary attack rate, these studies identified risk factors for transmission associated with the place and duration of exposure and not using personal protective equipment. A single study suggested that individuals who were symptomatic might be more likely to transmit than those without symptoms, but we found no clear evidence regarding the influence of viral load of the index case on transmission risk. Similarly, although various retrospective series of patients with positive PCR results had reported incubation times elsewhere, the characteristics of index case and contacts that might influence the risk of developing symptomatic COVID-19 and the time to this event had been barely addressed.

**Added value of this study**

We analysed data from a large cluster-randomised clinical trial on post-exposure therapy for COVID-19 that provided new information on SARS-CoV-2 transmission dynamics. Several design components add value to this dataset. Notably, quantitative PCR was available for the index cases to estimate risk of transmission. Additionally, quantitative PCR was also done on asymptomatic contacts at the time of enrolment allowing us to investigate the dynamics of symptomatic disease onset among them. We found that the viral load of the index case was the leading determinant of the risk of SARS-CoV-2 PCR positivity among contacts. Among contacts who were SARS-CoV-2 PCR positive at baseline, viral load significantly influenced the risk of developing the symptomatic disease in a dose-dependent manner. This influence also became apparent in the incubation time, which shortened with increasing baseline viral loads.

**Implications of all the available evidence**

Our results provide important insights into the knowledge regarding the risk of SARS-CoV-2 transmission and COVID-19 development. The fact that the transmission risk was primarily driven by the viral load of index cases, more than other factors such as their symptoms or age, suggests that all cases should be considered potential transmitters irrespective of their presentation and encourages the assessment of viral load in patients with a larger number of close contacts. Similarly, our results regarding the risk and expected time to developing symptomatic COVID-19 encourage risk stratification of newly diagnosed SARS-CoV-2 infections on the basis of the initial viral load.

The availability of data regarding the factors that might enhance transmission is essential for designing interventions to control the spread of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). Available data provide information on the risk of transmission related to the place and duration of exposure and the use of respiratory and eye protection,[1,3–5,8] but not on other factors related to the characteristics of index cases and their contacts. Over the course of infection, the virus has been identified in respiratory tract specimens 1–2 days before the onset of symptoms, and it can persist for prolonged periods, over several weeks after the onset of symptoms in mild cases.[9] However, the detection of viral RNA by PCR does not necessarily equate with infectivity, and the exact relationship between viral load and risk of transmission from a case is still not clear.[10,11] Studies investigating case-contact pairs have reported highly variable secondary attack rates (ie, ranging from 0·7% to 75%), depending on the type of exposure–duration, place, pre-symptomatic or post-symptomatic.[12–15]

Another challenge for public health interventions is the risk stratification of individuals who are infected for developing symptomatic illness. A living systematic review estimated that the proportion of PCR-positive infected contacts that progress to symptomatic disease is approximately 70–80%.[16,17] Mean or median incubation period has been consistently estimated to be between 5 to 7 days.[18–20] Although studies have suggested that the viral load of cases might be associated with risk of disease or transmission, no published data so far have directly addressed this question, and little is known about factors that might contribute to variation in the risk of developing COVID-19 symptoms or the incubation periods among individuals who are infected.

The overall aim of this study was to evaluate transmission dynamics of SARS-CoV-2 in the context of a trial of post-exposure prophylaxis. Specifically, the objectives of our study were threefold: to investigate the association between clinical and demographic features of cases and viral load, to evaluate the effect of viral load on SARS-CoV-2 transmission to close contacts, and to determine the influence of viral load in the exposed individuals on development of symptoms and on the incubation period.

## Methods

### Study design

This study was a post-hoc analysis of data collected in the BCN PEP CoV-2 Study (NCT04304053), a cluster-randomised trial that included individuals with PCR-confirmed COVID-19 and their close contacts. The trial occurred between March 17 and April 28, 2020, during the initial wave of the SARS-CoV-2 outbreak, in three of

nine health-care areas in Catalonia (northeast Spain)—*Catalunya Central, Àmbit Metropolità Nord,* and *Barcelona Ciutat*—with a total target population of 4206440 people. The study protocol of the BCN PEP CoV-2 Study was approved by the ethics committee of Hospital Germans Trias Pujol (Badalona, Spain). Written informed consent was obtained from all participants. Full details of the original study are reported elsewhere.[21]

COVID-19 cases were identified by use of the electronic registry of the Epidemiological Surveillance Emergency Service of Catalonia of the Department of Health.[22] Following government ordinance, the surveillance service registered all new COVID-19 diagnoses that occurred from March 16, 2020 onwards. The surveillance system included active tracing of all contacts with recent history of exposure, defined as being in contact with a case of SARS-CoV-2 confirmed by PCR within 2 m of distance for more than 15 min.

## Study participants

All patients with COVID-19 included in our analysis were adults (aged 18 years or older) who were not hospitalised and had quantitative PCR results available at baseline, mild symptom onset within 5 days before enrolment, and no reported symptoms of SARS-CoV-2 infections in their accommodation (ie, household or nursing home) or workplace within the 14 days before enrolment. Contacts selected for the analysis were adults with a recent history of exposure and absence of COVID-19-like symptoms within the 7 days preceding enrolment. Contacts were exposed to the index case as either a health-care worker, a household contact, a nursing home worker, or a nursing home resident.

We selected all eligible individuals within the original trial population for each of the three analyses done in this study. As in the original trial, we found no evidence of an effect of hydroxychloroquine on either transmission or development of symptomatic disease; therefore, we included individuals from both groups of the trial in this study. First, all COVID-19 cases with quantitative PCR data were included in an analysis of the association between clinical and demographic features of cases and viral load. Second, we identified factors associated with transmission using all clusters of an index case (ie, a COVID-19 case with at least one close contact) and their corresponding contacts for which quantitative viral load was available for the index case. Finally, we assessed the risk of developing symptomatic disease and the variation in the incubation period among all contacts with a positive PCR result at baseline, irrespective of available data of their index case.

## Study procedures and data collection

A dedicated outbreak field team visited cases and contacts at home or nursing home on days 1 (enrolment) and 14. At the first clinical assessment on day 1, the team did a baseline assessment, including a questionnaire

for symptoms of COVID-19, and collected relevant epidemiological information by use of a structured interview: time of first exposure to the index case, place of contact (hospital, home, or nursing care facility), routine use of a mask by the contact when in close proximity to the index case and sleep location concerning the index case (eg, same room or same house). Symptom surveillance consisted of active monitoring by phone on days 3 and 7, a home visit on day 14, and passive monitoring whenever the participants developed symptoms. Participants who developed symptoms were visited the same day they notified the symptom onset (unscheduled visits) by the field team, who recorded the date of symptom onset, type of symptoms from a prespecified checklist, and symptom severity, graded on a scale of 1 to 4.

All participants underwent serial SARS-CoV-2 PCR test and viral load titration from nasopharyngeal swabs on day 1 and day 14 and on any unscheduled visit when the participant notified the onset of COVID-19 symptoms (appendix 2 p 1). The detection of SARS-CoV-2 virus was done by PCR from nasopharyngeal swabs at SYNLAB Diagnostics (Barcelona, Spain) by use of the TaqMan 2019-nCoV assay kit according to the manufacturer's protocol (Thermo Fischer Scientific, Waltham, MA, USA). Viral load was quantified from nasopharyngeal swabs at IrsiCaixa laboratory (Badalona, Spain) by PCR amplification, on the basis of the 2019 novel coronavirus real-time RT-PCR diagnostic panel guidelines and protocol developed by the US Centers for Disease Control and Prevention.[23] For absolute quantification, a standard curve was built using 1/5 serial dilutions of a SARS-CoV-2 plasmid (2019-nCoV_N_Positive Control, $2\times10^5$ copies

See **Online** for appendix 2

| | Value |
|---|---|
| Cluster size | 2 (1–3) |
| **Index cases (n=282)** | |
| Age, years | 42 (13) |
| **Sex** | |
| Men | 80 (28%) |
| Women | 202 (72%) |
| Log viral load | 8 (6–9) |
| **Contacts (n=753)** | |
| Age, years | 42 (15) |
| **Sex** | |
| Men | 305 (41%) |
| Women | 385 (51%) |
| Missing | 63 (8%) |
| Baseline positive PCR of contact case | 93 (12%) |
| **Form of contact** | |
| Health-care worker | 254 (34%) |
| Household | 382 (51%) |
| Nursing home | 21 (3%) |
| Unknown | 96 (13%) |

Data are n (%), mean (SD), or median (IQR).

*Table 1:* Baseline characteristics of linked transmission clusters

**Articles**

| | Log$_{10}$ viral load per mL | Unadjusted β coefficient (95% CI) | p value | Adjusted β coefficient (95% CI) | p value |
|---|---|---|---|---|---|
| Case age | NA | 0.00 (−0.02 to 0.02) | 0.78 | 0.01 (−0.01 to 0.02) | 0.38 |
| **Case sex** | | | | | |
| Men | 8.15 (7.54 to 8.77) | Reference | .. | Reference | .. |
| Women | 8.04 (7.47 to 8.60) | −0.24 (−0.72 to 2.40) | 0.33 | −0.22 (−0.61 to 0.34) | 0.59 |
| Days from symptom onset | NA | −0.17 (−0.26 to 0.08) | 0.0002 | −0.16 (−0.24 to 0.07) | 0.0004 |
| **Symptoms** | | | | | |
| **Cough** | | | | | |
| Absent | 7.82 (7.24 to 8.41) | Reference | .. | Reference | .. |
| Present | 8.37 (7.78 to 8.95) | 0.66 (0.22 to 1.10) | 0.0032 | 0.41 (−0.02 to 0.84) | 0.055 |
| **Dyspnoea** | | | | | |
| Absent | 7.97 (7.50 to 8.43) | Reference | .. | Reference | .. |
| Present | 8.22 (7.45 to 8.99) | 0.27 (−0.40 to 0.94) | 0.42 | 0.28 (−0.35 to 0.92) | 0.38 |
| **Fever** | | | | | |
| Absent | 7.77 (7.16 to 8.38) | Reference | .. | Reference | .. |
| Present | 8.42 (7.86 to 8.98) | 0.80 (0.36 to 1.24) | 0.0004 | 0.43 (0.00 to 0.87) | 0.054 |
| **Anosmia** | | | | | |
| Absent | 8.32 (7.76 to 8.88) | Reference | .. | Reference | .. |
| Present | 7.87 (7.25 to 8.49) | −0.57 (−1.00 to −0.09) | 0.019 | −0.54 (−1.00 to 0.09) | 0.019 |
| **Rhinitis** | | | | | |
| Absent | 7.60 (7.23 to 7.98) | Reference | .. | Reference | .. |
| Present | 8.59 (7.65 to 9.52) | 0.88 (−0.05 to 1.82) | 0.064 | 0.77 (−0.11 to 1.66) | 0.087 |

NA=not applicable.

*Table 2:* Univariable and multivariable linear regression of association between index case variables and log$_{10}$ viral load

per μL, Integrated DNA Technologies, Coralville, IA, USA) and run in parallel to all PCR determinations.

### Outcomes and definitions

Transmission was characterised by examining the number of individuals infected and uninfected among close contacts of an index case. We defined transmission events as PCR positivity at any timepoint (ie, days 1, 14, or at any other unscheduled PCR testing when participants referred symptoms) of a contact in the same household or workplace within 14 days after enrolment. We defined secondary attack rate of viral transmission as the ratio of individuals with a positive PCR test among close contacts, according to WHO guidelines.

Development to symptomatic disease was defined as presence of at least one of the following symptoms: fever, cough, difficulty breathing, myalgia, headache, sore throat, new olfactory and taste disorder, or diarrhoea) and a positive SARS-CoV-2 RT-PCR test. The incubation period was defined as time from first exposure to symptom onset, with later confirmation of infection by PCR.[24] The earliest possible exposure with the symptomatic index case was determined for each contact individually.

### Statistical analysis

We used log-transformed viral loads that were approximately normally distributed and that also aligned with common reporting norms. The relationship between characteristics of cases and viral load was assessed by use of linear regression considering age (in years), sex, number of days from reported symptom onset, and presence or absence of five key clinical features: fever, cough, dyspnoea, rhinitis, and anosmia. To identify risk factors for transmission, we used logistic regression modelling for the risk of transmission using a random-effect model to allow for within-cluster variation in the risk of transmission. Factors with potential influence on the risk of transmission included characteristics of the potential transmitter (ie, age, sex, viral load, and the presence or absence of respiratory symptoms) and contacts (ie, age, sex, and the type of contact they had with the index case). Finally, the risk of developing symptomatic COVID-19 was assessed by fitting a Cox-regression model considering the age (in years) and sex of the individual, the presence or absence of cardiovascular disease and chronic respiratory disease, and the initial viral load relative to the time to development of symptomatic disease. Data at 14 days after the first study visit were censored, in line with the follow-up done in the original trial. All analyses were done in R, version 4.0.

### Role of the funding source

The funder of the study had no role in the study design, data collection, data analysis, data interpretation, or writing of the report. All authors had full access to all the data in the study and had final responsibility for the decision to submit for publication.

### Results

Between March 17 and April 28, 2020, we identified 314 patients with COVID-19 in whom the viral load was tested. Of these, 220 (70%) were women, 94 (30%) were men, and the median age was 41 years (IQR 31–52). Of the 314 patients, 282 (90%) had at least one close contact, resulting in 282 corresponding clusters with a total of 753 contacts. Clusters had a median of two contacts (IQR 1–3) and a maximum of 19 contacts. Most index cases of the clusters were women (202 [72%]), with an average age of 42 years (SD 13; table 1).

The first study visit was done a median of 4 days (IQR 3–5) after symptom onset. At the first study visit, the median viral load among patients with COVID-19 was 1×10$^8$ copies per mL (IQR 1×10$^6$ to 1×10$^9$). In multivariable linear regression, the viral load among cases was positively associated with the presence of fever and negatively associated with the presence of anosmia (table 2), but no association was observed with age or sex of the COVID-19 case nor with the presence of reported dyspnoea or cough. As anticipated, viral load was negatively associated with the number of days from symptom onset.

For our risk factor analysis on SARS-CoV-2 transmission, we used linked case and contact data of 282 clusters with 753 contacts. At the cluster level,

**Articles**



| | Unadjusted odds ratio (95% CI) | p value | Adjusted odds ratio (95% CI) | p value |
|---|---|---|---|---|
| **Index case** | | | | |
| Age, per year | 1·02 (0·99–1·05) | 0·069 | 1·01 (0·99–1·03) | 0·46 |
| Sex | | | | |
| Men | 1 (ref) | NA | 1 (ref) | NA |
| Women | 0·74 (0·40–1·36) | 0·33 | 0·71 (0·37–1·39) | 0·32 |
| Viral load, per $\log_{10}$ change | 1·27 (1·09–1·48) | 0·0020 | 1·29 (1·10–1·50) | 0·0012 |
| Cough | 1·00 (0·55–1·82) | 0·99 | 1·13 (0·64–2·00) | 0·66 |
| Dyspnoea | 0·80 (0·31–2·07) | 0·64 | 0·75 (0·30–1·89) | 0·55 |
| Rhinitis | 1·46 (0·46–4·63) | 0·52 | 1·31 (0·42–4·11) | 0·64 |
| **Contact** | | | | |
| Age, per year | 1·03 (1·01–1·05) | 0·0085 | 1·02 (1·01–1·04) | 0·0008 |
| Sex | | | | |
| Men | 1 (ref) | NA | 1 (ref) | NA |
| Women | 0·93 (0·58–1·49) | 0·77 | 1·33 (0·79–2·23) | 0·28 |
| **Mask use by the contact** | | | | |
| Never | 1 (ref) | NA | 1 (ref) | NA |
| Always | 0·93 (0·47–1·83) | 0·84 | 1·55 (0·76–3·16) | 0·23 |
| Unknown | 1·18 (0·59–2·36) | 0·47 | 1·49 (0·74–3·01) | 0·26 |
| **Contact type** | | | | |
| Health-care work | 1 (ref) | NA | 1 (ref) | NA |
| Household | 3·07 (1·68–5·62) | 0·0003 | 3·00 (1·59–5·65) | 0·0006 |
| Nursing home | 1·75 (0·19–16·01) | 0·62 | 1·90 (0·30–1·91) | 0·49 |
| Other | 0·32 (0·03–3·05) | 0·32 | 1·19 (0·10–4·31) | 0·89 |

NA=not applicable. SARS-CoV-2=severe acute respiratory syndrome coronavirus 2.

*Table 3:* Risk factors for transmission of SARS-CoV-2

*Figure 1:* Transmission in a cluster

(A) Number of secondary cases per cluster. (B) Relationship between viral load of the index case and the proportion of contacts developing COVID-19: 36 of 284 contacts in group <1 × 10⁷ copies per mL, 72 of 398 in group 1 × 10⁷ to <1 × 10¹⁰, and 17 of 71 in group ≥1 × 10¹⁰.

90 (32%) of 282 clusters had at least one transmission event, with a highly skewed distribution of the number of transmission events per cluster (figure 1A). The first visit for contacts took place a median of 5 days (IQR 4–7) after their first possible exposure to the index case. 125 (17%) of 753 contacts had a PCR positive result over the study period. The proportion of contacts who tested positive for SARS-CoV-2 within a cluster (secondary attack rate) progressively increased with the viral load of the index case: from 12% when the index case had a viral load lower than 1 × 10⁶ copies per mL to 24% when the index case had

a viral load of 1 × 10¹⁰ copies per mL or higher (figure 1B). According to the multivariate analysis, the viral load of the index case was strongly associated with the risk of onward transmission (adjusted odds ratio per $\log_{10}$ increase in viral load 1·3, 95% CI 1·1–1·5; table 3). 114 (90%) of 125 transmission events occurred in clusters where the index case had a viral load of 5·1 $\log_{10}$ copies per mL or higher, and 61 (50%) occurred in clusters where the index case had a viral load of 8·8 $\log_{10}$ copies per mL or higher. Other factors associated with an increased risk of transmission were household contact (adjusted OR 3·0, 95% CI 1·59–5·65) and age of the contact (1·02, 1·01–1·04). We observed no association of risk of transmission with reported mask usage by contacts, with the age or sex of the index case, or with the presence of respiratory symptoms in the index case at the initial study visit (table 3).

We did not find any evidence of an association between the viral load of the index cases and the first viral load of incident positive results among contacts (p=0·10, appendix 2 p 2), and this remained true when adjusting for both the day of illness on which the baseline viral load of the index case was measured and the number of days until the contact was enrolled (p=0·18). Additionally, after excluding contacts who were PCR positive at the first study visit, we found no association between the viral load of the index case and

**Articles**



***Figure 2:*** **Risk of developing symptomatic COVID-19 according to characteristics of the contact at enrolment**
(A) Probability of symptomatic disease by viral load. (B) Time to symptomatic disease by viral load.

the time to onset of incident SARS-CoV-2 infection (hazard ratio [HR] 1·01, 95% CI 0·83–1·23).

Overall, 449 contacts had a positive PCR result at first visit, whether viral load data of their index case was available (n=125) or not (n=324). 28 (6%) of 449 contacts had symptoms at the first visit. Of 421 contacts who were asymptomatic at the first visit, 181 (43%) developed symptomatic COVID-19 within the follow-up period. The multivariable cox-regression analysis, after adjusting for age and sex, showed that increasing viral load levels of the contact at day 1 were associated with an increased risk of developing symptomatic disease. Among contacts not already symptomatic at baseline, the risk of symptomatic disease was approximately 38% among individuals with

an initial viral load lower than $1 \times 10^7$ copies per mL compared with a risk greater than 66% among those with an initial viral load of $1 \times 110^{10}$ copies per mL or higher (HR per $\log_{10}$ increase in viral load 1·12, 95% CI 1·05–1·20; p=0·0006; figure 2A). In the multivariable analysis, no association was found between sex or age of individuals, the presence of diabetes, or presence of cardiovascular or respiratory disease and the risk of or time to developing symptomatic COVID-19.

The median time from exposure to symptom onset was 7 days (IQR 5–9). The time to onset of symptomatic disease decreased from a median of 7 days (5–10) for individuals with an initial viral load lower than $1 \times 10^7$ copies per mL to 6 days (4–8) for those with an initial viral load between $1 \times 10^7$ and $1 \times 10^9$ copies per mL, and 5 days (3–8) for those with an initial viral load of $1 \times 10^{10}$ copies per mL or higher (figure 2B). Overall, 110 (61%) of 181 participants who developed symptoms did so before day 8, 45 (25%) between days 8–10, and 22 (12%) between days 11–14.

## Discussion

In our study, we found that increasing viral load values in nasopharyngeal swabs of patients with COVID-19 were associated with the greater risk of transmission, measured by SARS-CoV-2 PCR positivity among contacts, and with a higher risk of transmission in a household environment compared with that in other indoor situations. Additionally, we found that higher viral loads in swabs of asymptomatic contacts were associated with higher risk of developing symptomatic COVID-19, and that these contacts had shorter incubation periods than those with a lower viral load. Relationships between viral load and infectivity have been described for other respiratory viruses, and our study shows that the same is true for SARS-CoV-2.

To our knowledge, this is the largest study that evaluated the relationship of viral load in patients with COVID-19 and risk of transmission. In our cohort, a high proportion (192 [68%] of 282) of index cases did not cause secondary infections. However, we identified 90 (32%) clusters with transmission events, and the multivariate analysis revealed that clusters centred on index cases with high viral load were significantly more likely to result in transmission. In line with previous analyses of case-contact clusters,[9,12,14] we also found that household exposure to an index case was associated with a higher risk of transmission than other types of contact, presumably reflecting duration and proximity of exposure. Increasing age of the contact was also identified in our multivariate analysis as a significant–albeit modest–determinant of transmission risk. This factor has shown uneven influence across results reported elsewhere but seems to play a secondary role among adults.[13,14] Finally, unlike previous analyses that reported a relationship between coughing and transmission,[13] we did not find any association. This finding suggests that

the absence of cough does not preclude significant onward transmission, particularly if the viral load is high. Taken together, our results indicate that the viral load, rather than symptoms, might be the predominant driver of transmission.

Importantly, we report that high viral load shortly after exposure in asymptomatic contacts was strongly associated with the risk of developing symptomatic COVID-19 disease. We found an approximately 40% risk of developing symptomatic disease among individuals with an initial viral load lower than $1 \times 10^7$ copies per mL compared with a risk higher than 66% among individuals with a viral load of $1 \times 110^{10}$ copies per mL or higher. These data might provide rationale for risk stratification for developing illness. Moreover, the initial viral load significantly shifted the incubation time, which ranged from 5 days in participants with a high viral load to 7 days in participants with a low viral load. To our knowledge, our study was the first analysis of prospective data that investigated the association between initial viral load and incubation time.

The study has several limitations. First, asymptomatic people were not enrolled as index cases, affecting our ability to fully characterise all types of transmission chain. Second, we did not find any evidence of decreased risk of transmission in individuals who reported mask use. Although this finding collides with the evidence reported elsewhere,[8] we did not have fine-grained data on type of mask (surgical *vs* FFP2) or use of other measures of personal protective equipment (PPE) or other infection control practices, thus limiting our ability to make clear inferences about the effect of PPE on transmission risk. Mask use is probably correlated with type of exposure, which might further confound associations, but we did not note any association between mask use and risk either in our unadjusted analysis (table 3) or in a multivariable model excluding type of exposure (data not shown). Third, we used time to symptom onset (with later confirmation of infection) rather than time to positive PCR test based on serial testing. Nonetheless, accurate calculation of the incubation period was feasible because of the prospective nature of the study, accurate identification of exposure by face-to-face interview, and intensive active and passive monitoring of exposed contacts. We followed up participants over 14-day periods, thus incubation periods longer than 14 days might not have been detected. Within each cluster, we cannot be completely certain about the directionality of transmission, but our inclusion criteria including the absence of COVID-19-like symptoms in the 2 weeks preceding enrolment is consistent with transmission from a case to a contact. We also cannot exclude that some individuals might have been infected by individuals outside of study clusters but, as per national guidelines, all contacts were quarantined after exposure to index cases, reducing the chance of transmission from elsewhere. Samples were available from index cases a median of 4 days after symptom onset, and the initial

sample in contacts was taken on average 5 days after exposure, which might limit our ability to detect associations with peak viral load. Despite this, we still showed clear dose effects in relation to both risk of transmission and time to symptom onset. Finally, our study population is reflective of the trial from which the study sample was drawn and is, therefore, biased towards female participants and participants with few comorbidities and predominantly mild to moderate infection; additional data are needed on the risk of transmission in other populations.

In summary, our results provide evidence regarding the determinants of SARS-CoV-2 transmission, particularly on the role of the viral load. The higher risk of transmission among individuals with higher viral loads adds to existing evidence and encourages the assessment of the viral load in patients with a large number of close contacts. When a patient with high viral load is identified, the implementation of reinforced contact tracing measures and quarantines might be crucial to reduce onward transmission. Similarly, our results regarding the risk and expected time to developing symptomatic COVID-19 encourage risk stratification of newly diagnosed SARS-CoV-2 infections on the basis of initial viral load.

**Contributors**
MM, DO, and OM accessed and verified the data. MM, DO, CHR, and OM conceived of the study. MM did the analysis. PM-M, AA, MC-M, MU, MV-M, CG-B, NP, JA, BC, and OM led the randomised controlled trial from which study data are derived. MM and OM wrote the first draft of the manuscript. All authors gave critical input into interpretation and revised the manuscript.

**Declaration of interests**
CT reports personal fees from Boehringer Ingelheim and Amgen, outside the submitted work. All other authors declare no competing interests.

**Data sharing**
A complete de-identified patient dataset, accompanied by the original trial protocol, will be made available to researchers on request. Individuals wishing to access the data should send a request to mcorbacho@flsida.org. The dataset will be available between Dec 15, 2020, and Dec 15, 2021.

**Acknowledgments**
We would like to thank Gerard Carot-Sans for providing medical writing support during the preparation of the manuscript. Our study had support from the crowdfunding campaign YoMeCorono and Generalitat de Catalunya. Support for laboratory equipment was provided by the Foundation Dormeur. ISGlobal receives support from the Spanish Ministry of Science and Innovation through the "Centro de Excelencia Severo Ochoa 2019-2023" Programme (CEX2018-000806-S), and support from the Generalitat de Catalunya through the CERCA Programme. Bàrbara Baro is a Beatriu de Pinós postdoctoral fellow granted by the Government of Catalonia's Secretariat for Universities and Research, and by the Marie Sklodowska-Curie Actions COFUND Programme (BP3, 801370).

For **YoMeCorono** see https://www.yomecorono.com/

**References**
1    La Rosa G, Bonadonna L, Lucentini L, Kenmoe S, Suffredini E. Coronavirus in water environments: occurrence, persistence and concentration methods—a scoping review. *Water Res* 2020; **179:** 115899.
2    Umakanthan S, Sahu P, Ranade AV, et al. Origin, transmission, diagnosis and management of coronavirus disease 2019 (COVID-19). *Postgrad Med J* 2020; **96:** 753–58.
3    Leclerc QJ, Fuller NM, Knight LE, Funk S, Knight GM. What settings have been linked to SARS-CoV-2 transmission clusters? *Wellcome Open Res* 2020; **5:** 83.

**Articles**

4    Qian H, Miao T, LIU L, Zheng X, Luo D, Li Y. Indoor transmission of SARS-CoV-2. *Indoor Air* 2020; published online Oct 31. https://doi.org/10.1111/ina.12766.

5    Hamner L, Dubbel P, Capron I, et al. High SARS-CoV-2 attack rate following exposure at a choir practice—Skagit County, Washington, March 2020. *MMWR Morb Mortal Wkly Rep* 2020; **69**: 606–10.

6    Park SY, Kim YM, Yi S, et al. Coronavirus disease outbreak in call center, South Korea. *Emerg Infect Dis* 2020; **26**: 1666–70.

7    Muñoz MA, López-Grau M. Lessons learned from the approach to the COVID-19 pandemic in urban primary health care centres in Barcelona, Spain. *Eur J Gen Pract* 2020; **26**: 106–07.

8    Chu DK, Akl EA, Duda S, et al. Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis. *Lancet* 2020; **395**: 1973–87.

9    Bi Q, Wu Y, Mei S, et al. Epidemiology and transmission of COVID-19 in 391 cases and 1286 of their close contacts in Shenzhen, China: a retrospective cohort study. *Lancet Infect Dis* 2020; **20**: 911–19.

10   Wölfel R, Corman VM, Guggemos W, et al. Virological assessment of hospitalized patients with COVID-2019. *Nature* 2020; **581**: 465–69.

11   La Scola B, Le Bideau M, Andreani J, et al. Viral RNA load as determined by cell culture as a management tool for discharge of SARS-CoV-2 patients from infectious disease wards. *Eur J Clin Microbiol Infect Dis* 2020; **39**: 1059–61.

12   Böhmer MM, Buchholz U, Corman VM, et al. Investigation of a COVID-19 outbreak in Germany resulting from a single travel-associated primary case: a case series. *Lancet Infect Dis* 2020; **20**: 920–28.

13   Wu J, Huang Y, Tu C, et al. Household transmission of SARS-CoV-2, Zhuhai, China, 2020. *Clin Infect Dis* 2020; published online May 11. https://doi.org/10.1093/cid/ciaa557.

14   Cheng HY, Jian SW, Liu DP, Ng TC, Huang WT, Lin HH. Contact tracing assessment of COVID-19 transmission dynamics in Taiwan and risk at different exposure periods before and after symptom onset. *JAMA Intern Med* 2020; **180**: 1156–63.

15   Huang L, Zhang X, Zhang X, et al. Rapid asymptomatic transmission of COVID-19 during the incubation period demonstrating strong infectivity in a cluster of youngsters aged 16–23 years outside Wuhan and characteristics of young patients with COVID-19: a prospective contact-tracing study. *J Infect* 2020; **80**: e1–13.

16   Liu T, Gong D, Xiao J, et al. Cluster infections play important roles in the rapid evolution of COVID-19 transmission: a systematic review. *Int J Infect Dis* 2020; **99**: 374–80.

17   Buitrago-Garcia D, Egli-Gany D, Counotte MJ, et al. Occurrence and transmission potential of asymptomatic and presymptomatic SARS-CoV-2 infections: a living systematic review and meta-analysis. *PLoS Med* 2020; **17**: e1003346.

18   Backer JA, Klinkenberg D, Wallinga J. Incubation period of 2019 novel coronavirus (2019-nCoV) infections among travellers from Wuhan, China, 20-28 January 2020. *Euro Surveill* 2020; **25**: 20–28.

19   Li Q, Guan X, Wu P, et al. Early transmission dynamics in Wuhan, China, of novel coronavirus-infected pneumonia. *N Engl J Med* 2020; **382**: 1199–207.

20   Leung C. The difference in the incubation period of 2019 novel coronavirus (SARS-CoV-2) infection between travelers to Hubei and nontravelers: the need for a longer quarantine period. *Infect Control Hosp Epidemiol* 2020; **41**: 594–96.

21   Mitjà O, Corbacho-Monné M, Ubals et al. A cluster-randomized trial of hydroxychloroquine for prevention of COVID-19. *N Engl J Med* 2020; published online Nov 24. https://doi.org/10.1056/NEJMoa2021801.

22   Catalan Ministry of Health. Catalan epidemiological surveillance system. 2020. http://salutpublica.gencat.cat/ca/ambits/vigilancia_salut_publica/ (accessed March 28, 2020; in Catalan).

23   US Centers for Disease Control and Prevention. CDC 2019-novel coronavirus (2019-nCoV) real-time RT-PCR diagnostic panel. Cat. 2019-NCoVEUA-01. 2020. https://www.fda.gov/media/134922/download (accessed May 21, 2020).

24   WHO. The First Few X (FFX) Cases and contact investigation protocol for 2019-novel coronavirus (2019-nCoV) infection, version 2. https://www.who.int/docs/default-source/coronaviruse/20200129-generic-ffx-protocol-2019-ncov.pdf?sfvrsn=595eb313_4 (accessed Sept 21, 2020).

Plaintiffs' Exhibit 222

nomaskers.org

# What is the science behind your mask mandate?

*Copyright Benchmark Technologies, Incorporated*

13-16 minutes



**Posted By:** Fielden Nolan (nolanf)

**Post Date:** 02/18/2021

Is the wearing of masks to reduce the spread of the COVID-19 virus "settled science?" Countless articles in the mainstream media simply label critical thinkers as "conspiracy theorists" or "vaccine deniers" without consideration of the facts.

Everybody loves "fact checks." Let's "fact check" the "settled science." Here is an example of the kind of "settled science" you will find in the mainstream narrative:

*Both the Centers for Disease Control and Prevention (CDC) and the World Health Organization now recommend cloth masks for the general public... (UC San Francisco)*

FACT CHECK: The UCSF Medical Center, which is educating a host of young, enthusiastic medical students, is wrong in the claim that the CDC and the WHO recommend cloth masks:

*More research on cloth masks is needed to inform their use as an alternative to surgical masks/respirators in the event of shortage or high-demand situations. To our knowledge, only 1 randomized controlled trial has been conducted to examine the efficacy of cloth masks in healthcare settings, and the results do not favor use of cloth masks.*

*More randomized controlled trials should be conducted in community settings to test the efficacy of cloth masks against respiratory infections. (CDC, October 2020, Source)*

In fact, that same month, in a report in Emerging Infectious Diseases, the CDC revealed:

*...more than 70 percent of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14 percent of the patients who said they "often" wore masks were also infected. Meanwhile, just four percent of the COVID-positive patients said they "never" wore masks in the 14 days before the onset of their illness. (Source)*

It gets worse. In the same study, the CDC stated:

*"This finding suggest that risk for infection was higher for those wearing cloth masks."*

The CDC does not recommend cloth masks in protecting yourself and others from the virus. Don't believe me. One needs only to take the time to look at their published position.

As of late March, 2020, the efficacy of any face mask in reducing the spread of COVID-19 was generally questioned. In April 2020, the World Health Organization stated that healthy people don't need to wear face masks to prevent coronavirus spread. Masks, they said, should be for the sick, their caretakers, and healthcare workers. At the very end of 2020, the WHO updated their guidelines, noting that any kind of mask was ineffective if the wearer come into close contact with someone for 15 minutes or more. By the end of the year, the WHO was equivocating; they admitted there was no real evidence to support the wearing of ANY mask, but nevertheless recommended them. Their "interim guidance" for the wearing of ANY face masks now contains this:

*The World Health Organization (WHO) advises the use of masks as part of a comprehensive package of prevention and control measures to limit the spread of SARS-CoV-2, the virus that causes COVID-19.* **A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control.**

The European Centre for Disease Prevention and Control reached a similar conclusion:

*"It is not known how much the use of masks in the community can contribute to a decrease in transmission in addition to the other countermeasures" (Source)*

It can be safely concluded that the World Health Organization or CDC have NEVER explicitly supported the wearing of cloth masks. It's clear that both organizations are reluctant to endorse the effectiveness of cloth face masks in reducing the spread of the COVID-19 virus. FACT CHECK: FALSE

If upon actual investigation the oft-quoted WHO and CDC will not commit themselves to the wearing of masks as being effective in reducing the spread of the COVID-19 virus, how can their effectiveness be "settled science?"

Once again: it gets worse.

In September of 2020, the CDC reported that 85% of COVID-19 cases in July were people who often or always wear masks. (Source)

Briefly, let's do some simple math. According to a 2015 randomized clinical trial conducted by the University of South Wales, in testing the effectiveness of cloth masks among health care workers in Hanoi against bacterial infections among schoolchildren, cloth masks were found to be wholly ineffective.

*Remember streptococcus cells are between 0.5 and 2 microns, roughly 5-20 times larger than SARS-CoV-2 virions (which are about 0.06-0.14 microns), yet the masks still failed to protect against them and perhaps contributed to the spread of the bacteria. (Source)*

Unless you can establish that a BB cannot easily get through a fish net, or that a chain-link fence can stop a sandstorm, you cannot establish that ANY mask (let alone a cloth one) is effective in

any sense against the spread of the COVID-19 virus. It really is that simple.

*The size of the virus based on electron micrographs show that the virus varies from 60 to 140 nanometers in diameter (.06 to .14 microns). <u>N95</u> filters provide filtration down to .3 microns. On this basis alone, they should not be relied on for protection from small virus particles such as those of SARS-CoV-2. (<u>Source</u>)*

*..the pores in <u>surgical</u> masks are about 30 times larger than the average size of SARS-CoV-2 virions, and some of the cheap (but more comfortable) cotton masks that are commonly worn have pores hundreds of times larger than the virus particles. (<u>Source</u>)*

At .1 micrometers, the size of the COVID-19 virus is about 1000X smaller than the width of a human hair! Until the invention of the electron microscope in the 1930's, a pathogen this tiny could not be seen – even with the best optics. Yet here is another study offered as "<u>evidence</u>" by UCSF Medical Center that that wearing a mask is effective in preventing COVID-19:

*An experiment using high-speed video found that hundreds of droplets ranging **from 20 to 500 micrometers** were generated when saying a simple phrase, but that nearly all these droplets were blocked when the mouth was covered by a damp washcloth. (NEJM: <u>Visualizing Speech-Generated Oral Fluid Droplets with Laser Light Scattering</u>)*

Of course, attempting to prove that a wet washcloth can inhibit the spread of droplets which are thousands of times greater in size than the COVID-19 virus is of course silly and makes no sense. Moreover, within this simple mechanistic study, the authors stated:

*We did not assess the relative roles of droplets generated during speech, droplet nuclei, and aerosols in the transmission of viruses.*

There you have it. The assumption driving the test was the validity of the still-unsubstantiated "droplet theory" promoted by the CDC, as well as their well-documented avoidance of the possibility of aerosol involvement in in viral spread. Your taxpayer money probably funded this study. Preschoolers with a box of crayons could have been as persuasive as this one.

How many times have you seen a person wearing a mask below their nose, are constantly adjusting it, or are not changing their mask frequently? According to the World Health Organization (WHO) these are practices which can actually increase the likelihood of COVID-19 transmission!

*The <u>following from WHO</u> is listed as behavior that can increase transmission:*

- *Touching mouth and nose*

- *Touching a mask in use*

- *Touching a clean mask with unwashed hands*

- *Not washing hands every time after touching a dirty mask*

- *Wearing a mask that is not new and clean*

- *Continuing to wear a mask after it has become damp*

- *Re-using a single-use mask*

- *Not discarding a single-use mask immediately upon removal, as opposed to leaving it in the immediate environment*

*(Source: Alan Stevo)*

What do you actually know about masks? A properly-fitted N95 mask is designed for use in a contaminated environment, and can be effective, for instance, in dealing with chemical spills, or working in a fabrication shop, but not in dealing with viruses. If you purchase a domestically-produced N95 mask, read the CDC statement on the box:

*The Centers for Disease Control and Prevention (CDC) does not recommend that the general public wear N95 respirator masks to protect themselves from respiratory diseases, including coronavirus (COVID-19) (Source)*

The CDC continues:

'*Cloth masks actually risk your health rather than protect it. The moisture caught in these masks will become mildew-ridden in thirty minutes. Dry coughing, enhanced allergies, sore throat are all symptoms of a micro-mold in your mask'*

So far, we've been mostly focused only on the combined, dubious wisdom of the CDC and the WHO. There isn't enough room and time to cover all the studies, going back decades, which all call into question the use of masks (particularly cloth masks) in reducing the spread of the COVID-19 virus. Nomaskers.org is full of resources so you can do your own research. Studies from the Annals of Internal Medicine, Association of American Physicians and Surgeons, World Health Organization, U.S. Navy and more can be found from the Resources menu.

But, again, it gets worse.

The wearing of masks can harm your health. Masks can come from anywhere, and often contain all kinds of toxic substances and material used in their manufacture. Here is an excerpt from a study which contains a long list of them:

*Disposable surgical face masks are made of synthetic fibers, including polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene or polyester. There is an inner layer of soft fibers and a middle layer, which is a melt-blown filter, as well as a water-resistant outer layer of nonwoven fibers.9 This study shows FT-IR spectra of the degrading fibers of disposable masks. It found that disposable face masks "could be emerging as a new source of microplastic fibers, as they can degrade/fragment or break down into smaller size/pieces . . . .*

*Research on synthetic fibers has shown a correlation between the inhalation of synthetic fibers and various bronchopulmonary diseases, such as asthma, alveolitis, chronic bronchitis, bronchiectasis, fibrosis, spontaneous pneumothorax and chronic pneumonia. Cellular proliferation made up of histiocytes and fibroblasts were found in the lungs of those exposed to synthetic fibers in ambient air. Focal lesions in the lungs showed granulomas and collagen fibers containing both fine dust and long fibers. Some of the lung illnesses from this exposure could be reversed, while others had already proceeded to pulmonary fibrosis. (Source)*

==Scores of dermatologists, dentists, immunologists, virologists, pediatricians all over the world have been sounding the alarm for months over the continued use of face masks.== They consistently try communicate to anyone who will listen that patients generally have no training or real understanding of how masks work.

*... untrained members of the public are wearing medical masks, repeatedly… in a non-sterile fashion… They're becoming contaminated. They're pulling them off of their car seat, off the rearview mirror, out of their pocket, from their countertop, and they're reapplying a mask that should be worn fresh and sterile every single time.* (Dr. James Meehan, MD)

Prolonged wearing of face masks has been tied to advanced stage lung cancer. It should be noted here that would-be debunkers like USA Today have attempted to dispute this finding by deceptively tying its source to a Facebook post, rather than a reputable medical journal. Ethylene Oxide, a carcinogen which is found in Teflon, is often used in the sterilizing process of cheap surgical masks. Even though the Occupational Health & Safety Agency (OSHA) has recommended them only for short-term use, our executive figures, the major media, Big Tech, fake science proponents support a mandate that you wear them for many hours you spend at work. In some states, you were even required to wear them in your home! OSHA has also concluded that surgical masks do not reliably provide protection against "smaller airborne particles." Of course, 100 nanometers is about as small as an airborne particulate can get.

Active duty and defense support personnel know the drill. Handlers in pharmaceutical products production know the drill. So do EMTs and medical professionals. They've all had formal training regarding the selection and fitment of PPE (Personal Protective Equipment). I suspect that all these people should all have spotted by now the many problems with mask mandates.

Face masks for use in limiting the spread of pathogens are classified as Class 1 medical devices by the FDA. Your governors, mayors, grocer, neighbors or evening news announcers are not qualified to prescribe medical devices to you, regardless of how convincing they appear. The use of medical devices require informed consent by the patient. Like many other medical devices, face masks can save your life, but they can also harm you. Know the science about masks, and don't believe everything you hear. *After you have become informed, and you do not agree you should wear a mask, simply do not consent.*

Mask mandates are useless and potentially harmful. There is no "science" behind them. For every resource the major media presents to you in building the case supporting mask efficacy, you can easily respond with ten resources endorsing the opposite position. Truly, their mask "science" is not settled.

-

Plaintiffs' Exhibit 223

principia-scientific.com

# WHO: You Do NOT Need to Wear a Mask | Principia Scientific Intl.

4-5 minutes

Published on January 25, 2021

Written by John O'Sullivan



The World Health Organization admits there is no scientific medical reason for any healthy person to wear a mask outside of a hospital. Sadly, our corrupt politicians and mainstream media only relate the bad news.

If you do not have any respiratory symptoms, such as fever, cough, or runny nose, you do not need to wear a medical mask. When used alone, masks can give you a false feeling of protection and can even be a source of infection when not used correctly.

The most recent press announcement is at www.who.int

**Update & Correction (January 26, 2021): Our apologies for omitting a**

**reference for the above. The following is added as evidence on current WHO advice:**

Last month (December, 2020) WHO issued the following advice that masks are only of some benefit if used in conjunction with a range of other measures and of limited value.

WHO tells us that:

**"…the use of a mask alone, even when correctly used (see below), is insufficient to provide an adequate level of protection for an uninfected individual or prevent onward transmission from an infected individual**." [1]

As Dr Joseph Mercola, who analysed the WHO advice pointed out in *WHO Admits: Not Clear Masks Prevent Viral Infection'*

"….the literature rather strongly suggests the usefulness of masks depends on a significant number of factors — type, fit, length of use, purpose and circumstances — which are effectively impossible to account for in public universal-masking policies.

The science, contrary to the ignorant platitudes we are bombarded with, has NOT proven that universal masking is effective for viral containment, and has instead provided substantial grounds for skepticism of such a policy."

[1] 'Mask use in the context of COVID-19 Interim guidance', December 01, 2020, https://apps.who.int/iris/bitstream/handle/10665/337199/WHO-2019-nCov-IPC_Masks-2020.5-eng.pdf?sequence=1&isAllowed=y

**Update January 30, 2021:**

**So angered that our original link to the latest WHO press announcement did not contain a specific suggestion for people not to wear masks USATODAY and other haters have been on our case saying we 'lied' and WHO did not say you did not need to wear a mask.**

Well, to all you misinformed haters, you are clearly not good at checking your facts because in December 2020 WHO stated that:

*"…the use of a mask alone, even when correctly used (see below), is insufficient to provide an adequate level of protection for an uninfected individual or prevent onward transmission from an infected individual."*

Moreover, Dr. Mike Ryan, an epidemiologist who specializes in infectious diseases and public health and who is the executive director of the WHO health emergencies program is on record stating that:

"WHO stands by recommendation to not wear masks if you are not sick or not caring for someone who is sick. There is no specific evidence to suggest that the wearing of masks by the mass population has any potential benefit. In fact, there's some evidence to suggest the opposite in the misuse of wearing a mask properly or fitting it properly" (source).

USATODAY have written to us saying they are going to do a 'fact check' hit piece on us. We gladly welcome them addressing this important topic and will be delighted to offer further scientific evidence that mask wearing is nothing more than a 'talisman' and will likely do more harm than good for healthy, uninfected wearers.

If you doubt that, simply check out the photo below:



# Plaintiffs' Exhibit 224

Standard Interpretations  /  Voluntary use of surgical masks

---

- **Standard Number:**   1910.134

---

OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at https://www.osha.gov.

---

December 20, 2017

Mr. John Boren
3633 Wareham Drive
Thompsons Station, TN 37179

Dear Mr. Boren:

Thank you for your letter to the Occupational Safety and Health Administration (OSHA). Your letter has been referred to the Directorate of Enforcement Programs for an answer to your question. Your letter requested clarification of OSHA's Respiratory Protection Standard, 29 CFR 1910.134, pertaining to the voluntary use of surgical masks. This letter constitutes OSHA's interpretation only of the requirements discussed herein, and may not be applicable to any questions not delineated within your original correspondence. Your paraphrased question and our response are below.

**Question:** Is it permissible to allow surgical masks to be worn on a voluntary basis when respiratory protection is not required to meet any OSHA standards? And if so, is it permissible for employers to provide surgical masks for voluntary use?

**Response:** Yes. The employer may allow the voluntary use of surgical masks even where an exposure assessment shows respirator use is not required and the employer may provide surgical masks for voluntary use. However, surgical masks may not be used in lieu of required respiratory protection. Surgical masks are not considered respirators by OSHA and, as such, are not covered by 29 CFR 1910.134. They are fluid resistant, disposable, and loose-fitting protection that create a physical barrier between the mouth and nose of the wearer and potential contaminants in the immediate environment. They are commonly used in health care settings for the protection of the patient and they are also often used to prevent splashes from contacting the face of the wearer. However, surgical masks do not seal tightly to the wearer's face, nor do they provide a reliable level of protection from inhaling smaller airborne particles.

If the hazard to which your employees are exposed to is a combination of splashes and respirable contaminants, your company may want to consider NIOSH approved surgical N95 respirators which also are cleared by the Food and Drug Administration (FDA) for use as a surgical mask. Surgical N95s are filtering facepiece respirators equipped with spray- or splash-resistant facemask material on the outside to protect the wearer from splashes. Regardless of which type is used, the employees should be informed on the different varieties and their unique set of cautions, limitations, and restrictions of use. This information will facilitate employee involvement in the respirator program and/or the overall safety and health program.

For more information on surgical masks and surgical respirators, please review the *Hospital Respiratory Protection Program Toolkit* at https://www.osha.gov/Publications/OSHA3767.pdf. OSHA also has a fact sheet that compares

respirators and surgical masks titled Respiratory Infection Control: Respirators Versus Surgical Masks that is available at https://www.osha.gov/Publications/respirators-vs-surgicalmasks-factsheet.html.

Please be aware that the Tennessee Department of Labor and Workforce Development operates its own occupational safety and health program under an OSHA-approved State Plan. The Tennessee Occupational Safety and Health Administration (TOSHA) adopts and enforces standards and investigates safety and health concerns in workplaces throughout the state. State Plans are required to have standards and an enforcement program that are "at least as effective" as OSHA's, but may have different or additional requirements. Please contact TOSHA directly at the address below, for further information and to discuss your specific compliance issue:

Tennessee Department of Labor and Workforce Development

220 French Landing Drive
Nashville, Tennessee
Telephone: (615) 741-2793
https://www.tn.gov/workforce/employees/safety-health/tosha.html

Thank you for your interest in occupational safety and health. We hope you find this information helpful. OSHA's requirements are set by statute, standards, and regulations. Our letters of interpretation do not create new or additional requirements but rather explain these requirements and how they apply to particular circumstances. This letter constitutes OSHA's interpretation of the requirements discussed. From time to time, letters are affected when the agency updates a standard, a legal decision impacts a standard, or changes in technology affect the interpretation. To assure that you are using the correct information and guidance, please consult OSHA's website at http://www.osha.gov. If you have further questions, please feel free to contact the Office of Health Enforcement at (202) 693-2190.

Sincerely,


Thomas Galassi, Director
Directorate of Enforcement Programs

---

# UNITED STATES
# DEPARTMENT OF LABOR

Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210
☎ 800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Severe Storm and Flood Recovery Assistance
Disaster Recovery Assistance
DisasterAssistance.gov

Plaintiffs' Exhibit 225

welovetrump.com

# WATCH: CNN Admits Cloth Masks Are Useless

*by daniel_g*

4-5 minutes          `12-28-21`

The entire Covid-19 narrative is collapsing.

Biden recently gave up the fight on Covid-19, The CDC has halved the quarantine period, and now ==CNN is saying that masks are basically useless== despite what they said last week…

I am not sure if this is because we have beaten back their claims outright, or if they are trying to make Democrats look good in the upcoming primaries by saying that the pandemic is over.

I have said time and time again that if left unchecked this situation will lead to a civil war.

Now I believe that no matter what happens going forward this will *never* be forgotten—in short it will definitely lead to a civil war or the complete breakdown in the state eventually because people *aren't* going to forget this.

It represents a crack in the pillars—a rot that will eat away at the very core of the country until nothing is left, kind of like an unfaithful spouse. Some things can be forgiven in a marriage, other things destroy the sanctity of that marriage.

How can we forget that our neighbors, teachers, and friends essentially lost their minds and gave into tyranny? Where do we go from here?

We cannot just go back to our normal lives now—not after the events of the last 2 years.

Some things can be forgiven, but enforcing the will of the state? Trying to force involuntary vaccinations on people? Ignoring data which is contrary to that of government authorities and large pharmaceutical conglomerates?

Trying to cost your neighbor their job because they refuse to take an unnecessary drug forced on them for profit?

These things cannot be forgotten. The fear, the tyranny, the incessant paranoia —these are wounds which will not heal ever.

So to the people who willingly went along with the government and the establishment congratulations….you're going to have an *extremely* tough road ahead of you.

Here's more. on the story:

This new CNN declaration that masks "are not appropriate in this pandemic" is an Orwellian escalation. Can the media produce amnesia on demand? And will the people cooperate by wiping their own memories?

Completely intentional. The ultimate power move

pic.twitter.com/RVtN0BZlLf

— Walter Kirn (@walterkirn) December 28, 2021

"There's no place for them in light of Omicron," Dr. Leana Wen told CNN's Victor Blackwell, but there wasn't any place for them in light of Delta, Beta, or any other variant either.

CNN expert: Cloth masks are useless "face decorations" at this pointhttps://t.co /hOQb5tpzsd

— Ed Morrissey (@EdMorrissey) December 21, 2021

Reason took note of CNN's recent comments:

*Wen is a supporter of mandates, so perhaps she thinks the higher quality masks should be required in some settings. Yet if she's right, it means the masks that the overwhelming majority of people are wearing in order to comply with mandates—in public schools, on public transportation, in many workplaces, gyms, and even social settings—aren't doing any good.*

*They represent another element of pandemic hygiene theater: a public health requirement that makes people feel safer without offering them much actual protection.*

Also, can we burn our masks? CNN chick declared (inadvertently) that they were useless, so now that the corrupt media has said out loud what sensible people have been saying for many months, can we do away with this idiocy?

— Admiral Trish (@TrishStuth) December 27, 2021

Masks worn like that are useless, masks over the nose provide some protection, but not as much as N95s. I got none of this info from CNN

— Mordicai A.V.A O'Shea (@mordicaioshea) December 27, 2021

Town Hall had this to say:

*As Katie covered back in August, another CNN guest — former Biden advisor and University of Minnesota Center for Infectious Disease Research and Policy Director Michael Osterholm — similarly said that "many of the face cloth wearings people wear today are not very effective in reducing any of the virus movement in or out." But the White House, via Press Secretary Jen Psaki, rejected Osterholm's conclusion.*

Plaintiffs' Exhibit 226

beckernews.com

# Dr. Scott Gottlieb Gives Unbelievable Confession: 'A Cloth Mask is Not Going to Protect You' from an Airborne Virus

*Written by Kyle Becker*

7-8 minutes         1-2-22

Dr. Scott Gottlieb, the former FDA chief who quickly transitioned after leaving office to become a Pfizer board member, has made an admission about cloth masks that should make Americans question the "science" they have been told was unquestionable all along.

Gottlieb appeared on CBS's "Face the Nation" with host Margaret Brennan and punctured the widespread belief that cloth masks provide any significant protection from airborne respiratory viruses, such as Covid-19.

"I have been looking at pediatric hospitalizations at this record high," Brennan claimed. "And concerned about sending my son back into a pre-school even with a mask on."

"What do you tell parents?" she asked breathlessly. "Are cloth masks just not good enough anymore?"

"Cloth masks aren't going to provide a lot of protection, that's the bottom line," he said. "This is an airborne illness. We now understand that. And a cloth mask is not going to protect you from a virus that spreads through airborne transmission. It could protect better through droplet transmission, something like the flu, but not this coronavirus."

Dr. Gottlieb goes on to make wild claims about the severity of Covid-19 among the pediatric population, claiming that more than 600 pediatric deaths (95% of them with underlying health conditions) among a population of 73 million under age 18 is a cause for masking children and mandating they be immunized despite the vaccines failing to significantly stop the spread. Covid-related mortality is approximately *one percent* of all pediatric deaths in the past two years.

Margaret Brennan, for her part, also fed the hysteria of the risk in Covid to children by making a misleading claim about child hospitalizations. Dr. Anthony Fauci recently disabused parents of this notion.

Fauci: "If you look at the children that are hospitalized, many of them are hospitalized with Covid, as opposed to because of Covid." pic.twitter.com/57Rdx8gPg3

— The Post Millennial (@TPostMillennial) December 31, 2021

"And what we mean by that: If a child goes into the hospital, they automatically get tested for COVID and they get counted as a COVID-hospitalized individual, when, in fact, they may go in for

a broken leg or appendicitis or something like that. So it's over counting the number of children who are, quote, hospitalized with COVID as opposed to because of COVID," Fauci said.

Fauci had once shared a similarly candid assessment as Gottlieb's on the efficacy of masks in a February 2020 email to an HHS official.

"Masks are really for infected people to prevent them from spreading infection to people who are not infected rather than protecting uninfected people from acquiring infection," he wrote in the email.

"The typical mask you buy in the drug store is not really effective in keeping out virus, which is small enough to pass through material," he said. "It might, however, provide some slight benefit in keep out gross droplets if someone coughs or sneezes on you."

That was *two years* ago.

Dr. Leanna Wen, who is a regular Covid doomer on CNN, also shared a rare moment of honesty on the network.

.@DrLeanaWen: "Don't wear a cloth mask. Cloth masks are little more than facial decorations. There's no place for them in light of Omicron." pic.twitter.com/Kpoj18sxdi

— Townhall.com (@townhallcom) December 21, 2021

"Don't wear a cloth mask," she said. "Cloth masks are little more than facial decorations. There's no place for them in light of Omicron."

Now, let's be perfectly clear: The reason that public health officials are backing off the narrative now is because it has crumbled completely. Despite more than 99% mask compliance in countries like South Korea, there is still an explosion of infections no different than in countries that have much lower mask usage rates. This is called "no significant difference."

Ironically, Margaret Brennan recently addressed the mental health crisis among schoolchildren that has been exacerbated by ineffective and aggravating Covid policies.

"They will be paying for our generation's decisions the rest of their lives": @JanCBS explains why she thinks 2021's biggest underreported story was the devastating impact of COVID policies on children pic.twitter.com/AUU1f6AFNi

— Face The Nation (@FaceTheNation) December 26, 2021

"They will be paying for our generation's decisions the rest of their lives," she said.

The nation's largest teacher's unions don't seem to appreciate the significance of policies like school masking and remote learning on children's psychosocial development. In May, the CDC was going to issue guidance lifting school mask guidance, but the nation's largest teacher's union, the NEA, raised enough of a fuss to get the "science" changed.

Masking in schools has been one of the most contentious aspects of Covid policies throughout the pandemic. The Atlantic recently called out CDC Director Walensky for misleading the public about a school mask study.

"Seen in this context, the CDC has taken an especially aggressive stance, recommending that all

kids 2 and older should be masked in school," the article notes. "The agency has argued for this policy amid an atmosphere of persistent backlash and skepticism, but on September 26, its director, Rochelle Walensky, marched out a stunning new statistic: Speaking as a guest on CBS's *Face the Nation*, she cited a study published two days earlier, which looked at data from about 1,000 public schools in Arizona. The ones that didn't have mask mandates, she said, were *3.5 times* as likely to experience COVID outbreaks as the ones that did."

Of course, this is patently false, and The Atlantic article usefully explains why.

As OSHA has stated, neither cloth masks nor surgical masks are designed to protect wearers from airborne pathogens, particularly respiratory viruses. The confidence intervals for the efficacy of cloth masks and surgical masks to slow the spread of respiratory viruses are poor. N95 masks, which are not designed to be worn by the general public for 6 to 8 hours a day, fare only slightly better. These are the facts, regardless of the spin by authoritarian Covid policy advocates.

In January, CDC Director Walensky explained why the general public should not wear N95 masks for long hours over the course of a day.

"They're very hard to breathe in when you wear them properly," Walensky said. "They're very hard to tolerate when you wear them for long periods of time."

The good news is that Omicron is a small fraction as harmful as earlier Covid variants, and new research shows it has a transfer of natural immunity to other variants, such as Delta.

**NOW READ:**

---

**OPINION:** This article contains commentary which reflects the author's opinion.

---

Plaintiffs' Exhibit 227

ashmedai.substack.com

# Facemasks Are Not an 'Inconvenience', Facemasks Are Not Trivial: A List of Some of the Underappreciated and Hard-to-Articulate Reasons Forced Masking is so Distressing

*Ashmedai*

21-26 minutes          12-25-21

"Experience has shown that communities faced with epidemics or other adverse events respond best and with the least anxiety when the normal social functioning of the community is least disrupted"

- DA Henderson, Disease Mitigation Measures in the Control of Pandemic Influenza, 2006

One of the most trenchant arguments made by proponents of forced masking is some variation of "it's just an inconvenience", so/and/or "why do you have to make such a big deal about it". (To be clear, this is not a legitimate scientific or factual argument for the adoption of any policy, but that is not what this article is about.) I am largely going to avoid the issues unique to masking children - what is plainly institutionalized child abuse - and for people with disabilities or past trauma, as many of the harms inflicted by masks are readily apparent and easily articulable.

On the surface, this contention seems like a morally and factually compelling argument. After all, if masks had any meaningful efficacy, wouldn't it be a worthwhile tradeoff to endure a little discomfort to reduce the far worse suffering and death that would otherwise be inflicted by covid?

Yet this argument - "what's the big deal" - does not square with how many people experience masks and mask mandates, including practically everyone who disagrees with masking as a policy. It is undeniable that millions of people are considerably more tormented by facemasks than what we would expect is reasonable or even possible for something that is indeed merely an "inconvenience". People generally do not profoundly suffer from trivialities.

In other words, clearly facemasks are a considerably greater burden for many people than how they superficially appear; and yet few people are able to work out for themselves what about them is so abusive or terrible. The goal of this article is to enumerate some of the myriad harms and emotional abuses inflicted by forced masking, specifically those that are difficult to articulate or identify the connection to masking.

## So what exactly is the big deal about wearing masks?

In a nutshell - as was just stated - mask wearing is to many people something that is enormously stressful, and something that evokes inordinately powerful negative emotions. This is simply the

reality, irrespective of whether such feelings "make sense".

Now, as a general rule, if someone feels powerfully about something, there's a reason; or in other words, there is something that is provoking the strong emotions. And the source of these feelings does not have to be the thing that the feelings attach to. The only thing that matters is that the feelings exist, however misguided they may be.

This is not to say that the reality of feelings should be the dominant consideration above everything else. The current radical 'social justice' movement that has elevated one's subjective "identity" as the defining characteristic of a person is the Reductio ad Absurdum of enshrining subjective feelings in place of objective reality itself.

What is true however is that the emotional distress and suffering of people is quite real. So even if you happen to be in favor of mask mandates and not at all bothered by mask wearing, that does not make the profoundly distressing experience of someone else any less real of an experience.

The following list is not exhaustive, just a collection of some of the factors that make mask wearing, especially forced masking, so distressing to many people.

A few important things to keep in mind:

1. Not every listed issue is true for every person who finds masks distressing.

2. Each issue amplifies the other ones, so that the cumulative distress is far greater than the sum of its parts. It's like the difference between 1+2+3+…10 and 1x2x3x…10 (55 vs 3,628,800).

3. This list is not exhaustive.

4. The short explanations are intended to give a bit more insight into how people might typically experience that particular stress. They are not intended to comprehensively define the issue.

### Emotional Stresses of Mask Mandates

**Deprivation of Personal Autonomy**

Depriving someone of their personal autonomy is stressful and demeaning. This is amplified when it is about something that is emotionally fraught, subject to strong opinions and feelings, relates to morality/values, and/or is something that has an implication that you lack the capacity to look out for your own interest. Free will is a defining trait of being human, and the abrogation thereof is experienced as an assault on ones individuality.

**A Sense of Helplessness**

Being at the mercy of the arbitrary and capricious whims of others makes you feel a sense of helplessness, which is extremely stressful and grueling, and can eventually break a person mentally and emotionally, and is therefore a favored tactic used by tyrants to break the will of the population so that they are too broken to revolt (see Stalin's reign of terror).

**Invalidating Your Personal Identity**

Masking is now - regardless of the factual merits - a political symbol in society. Being forced to

mask is by definition being forced to yield in ones own actions - and worse, in ones public appearance - to your ideological and/or political opposition. Imagine if the government decided to make wearing a religious skullcap mandatory for everyone - you can make the same argument that is being made for masking - what's the big deal, you barely notice it, etc - I am quite confident that atheists for instance would would feel very keenly the assault on their personal identity.

**Assaulting Your Sense of Morality** / **Making You Feel Like You're Immoral and Selfish**

Mask mandates force people opposed to internalize that they are acting immorally and selfishly for two reasons. The first is that society is enshrining into law that how you act is immoral and selfish, which is a public declaration to the world that you are immoral and selfish. The second is that how you act outwardly always exerts influence in how you fell and identify internally, so constantly wearing a mask eats away at your internal convictions - even if you can withstand this, it creates some degree of cognitive dissonance internally. No one likes to feel like they are evil or selfish.

**Deprives / Ruins Human Interactions**

The quality and nature of social interactions is greatly reduced. Every interaction behind masks is fundamentally different. Interacting in this way can feel sad, despondent, isolating, cold, and/or cruel, among other things.

**Over Time Changes Your Personality**

Facemasks are a radical and unnatural impingement on normal mental and emotional functioning. Over time, this can change your personality - such as making you less social, less outgoing, more suspicious, decreased tendency or desire to be kind and so on.

**Turns Other People Into Abusive Tyrants**

This is meant to capture the phenomenon of a subset of people who have turned into cruel and vicious individuals, and abuse people whom they have power over.

**A General Feeling of Being Trapped in a Nightmare**

Many people feel a clear and distinct sense of being trapped in some sort of perverse nightmare as a result of covid policies, which is an extremely distressing experience, especially when there feels like there is no end in sight.

**Elementary Lack of Fairness**

People are very sensitive to fairness, and can feel enormous stress and distress when treated unfairly, especially when the unfair treatment is egregious. Mask policies are literally imposing on some people so other people can feel safer - a grotesquely unequal treatment, that in order to help the emotional health of the scared-to-death-of-covid pro-maskers, everyone else's mental & emotional health will be trampled on by forced masking. Moreover, mask mandates preferentially enshrines the political, moral, and ideological views and sensibilities of one segment of society without any justification.

**Repeated Experience of "Losing" in Public Policy Decisions**

The experience of losing again, and again, and again in substantial, significant public policy decisions is itself very distressing. This happens to be one of the more prominent animating forces that drove Trump's voter base - that they felt they always lost again and again and again and again. Covid policy for a substantial portion of the population has been a series of devastating losses as practically every policy choice cuts against them.

**Feeling That Other People Matter While I Don't**

This is a distinct distress in addition to the lack of fairness - that "I don't matter"; this is amplified considerably when "other people matter". This is what people who are systematically disregarded tend to feel, and it is very painful.

And this is especially pronounced in racial minorities who already feel this way from previous history -- mostly white liberal elites are forcing their preferences on blacks and other minorities.

**The Stress of Difficulty Communicating**

The frustration that comes from difficulty communicating is underappreciated, and tends to leave people feeling annoyed, frustrated and stressed.

**The Damage From Failed Communication**

This particular harm also has another, more tangible dimension - often, people having a hard time communicating simply give up, and giving up is itself an added stress factor that leaves people frazzled. If you're talking to your doctor and you "give up" instead of making sure you understood what he was trying to tell you - especially older people who psychologically tend to both give up faster and have more innate difficulty physically hearing to begin with - that could be a big problem.

**The Distress of Constant Harassment**

Mask mandates are a constant intrusion into people's personal lives that leaves people feeling exasperated - "just leave me alone already" / "just let me live in peace". It is a basic human need to not be constantly harassed by others.

**Living In Constant State of Worry, Fear, and Anger**

Knowing that you have to submit to the mask mandates in many places where you need to go leaves you always feeling a variety of negative and unhealthy emotions about it.

**Saps the Joy From Many Different Activities**

Take shopping, for instance. For many people, shopping is a leisure activity that can be an effective emotional detox from life stresses… but not when you have to wear a mask to do it.

**Living In Perpetual Stress From Social Enforcers**

Inevitably, people opposed to mask mandates will not be particularly zealous about following them

to a "T", whether it be letting the mask slide down your face, taking it off for a few minutes here and there, or just munching on a bag of peanuts for 3 hours. There is always a baseline stress of constantly having to be alert for the "mask police" (whether they are actual police or just really annoying Karens).

**Public Humiliation**

The aforementioned "mask police" are often extremely zealous - unhinged, really - a non-masking-compliant person getting dressed down in public is a common occurrence. Public humiliation can be a traumatic experience.

**Emotional Abuse**

Mask mandates leave many people feeling emotionally abused. This is both from the masking being forced upon people despite all the mental and emotional distress it causes - in other words, abuse - and from the constant manipulation that is characteristic of abusers that is part and parcel of mask mandates.

**Bullying Plain & Simple**

Mask mandates are forced coercion jammed down the throats of those who strongly resent them. This is vicious bullying. No one enjoys feeling bullied, or having someone else's will imposed on them against their own will.

**The Distress of Being Under the Control of Someone You Loathe**

Think of it this way: Imagine two ppl vying for the same promotion who hate each others guts, and then the winner is made the boss of the loser. This is an added, separate affront to the loser. Same idea here - the anti- mask people are being specifically dictated to by the very opponents they despise, and on the very issue that they're fighting over. This isn't just at a national level - this is more true about local county or school board fights, and this is a reliable recipe for bad blood and lasting enmity to boot.

**The "Tax" of Buying Masks that are Less Unpleasant**

Many people choose to buy fancier masks than the nasty surgical masks widely available everywhere, because they are far less unpleasant (and far more sanitary and subject to manufacturing standards and quality control). This itself is a further indignity - if the government wants to impose a draconian mandate on us, the least the government can do is to make comfortable masks available, especially considering the government is throwing cash everywhere because of covid - it's an added insult and disrespecting of the people being imposed upon, in the sense that it's just plain coldhearted to act this way to someone else, at least have a little sensitivity and try to make your own mandates as tolerable as possible on the people you're imposing on.

**Irrational Government Actions Breed A Sense of Fear and Instability**

Watching the government act in such a factually irrational manner is itself very stressful to many

people, as is living under an irrational regime. One's sense of stability and trust in the world is rooted by necessity in the belief that rationality is a limiting principle at some point upon what government and people/institutions with power in society are able and willing to do.

**Makes People Doubt Their Sense of Reality**

The very fact of making a crazy policy is itself deeply destructive to people's sense of reality. In other words, there is tremendous cognitive dissonance of on the one hand knowing that masking is nuts, but on the other hand, watching the government make mask mandates - it is very hard to have a genuine emotional conviction that essentially the entire medical community and all of society's institutions have gone stark raving mad. Such cognitive dissonance is very damaging psychologically to your sense of self and your sense of reality, and is also mentally and emotionally exhausting.

**Destroys People's Sense of Trust & Stability**

Being forced to do irrational and insane things erodes a person's sense of confidence that there is a baseline rationality in society -- something that provides people with a sense of stability and security in life generally. It is distressing to feel like there is absolutely no rational limiting principle on government actions or policies, since this by definition means that there is nothing that you can trust is sacred and beyond government (or someone else) coming and destroying. (This also actively erodes the social fabric that relies upon people being rational.)

**Destructive of People's Humanity and Dignity**

Being forced to act irrationally causes you to lose your sense of dignity as a human being with an intellectual faculty that distinguishes man from animals. In other words, the more you are suppressed from acting in accordance with intelligence, the less you feel the unique transcendence of being a human being - treating people like animals makes them feel like animals.

**Dehumanization Through Forced Anonymity**

The face is the most visibly manifest characteristic that sets you apart as a unique individual. Masks, by covering your face, strip you to some degree of your sense of being a unique individual and instead makes you feel more like a number than a person. It also distorts your sense of the humanity of others, as you inevitably become trained to perceive other people as lacking human-ness.

**They're so Darn Uncomfortable**

Masks can be extremely uncomfortable to wear, especially for long stretches at a time. They can also be quite gross to wear - if you sneeze into the mask, well……

## Pragmatic Harms of Mask Mandates

## Promotes Authoritarianism and Fascism

This is true as written - the ascendance of authoritarian and tyrannical governance has been as

shocking as it was swift. Mask mandates - which are objectively draconian and authoritarian regardless of whether they are scientifically warranted - internalize in people that authoritarian governance is normal, acceptable, and not evil. This is a problem. Every genocidal regime started this way. This by itself is sufficient justification to fight mask mandates "to the death".

On a more relatable level, mask mandates accustom government officials to acting like tyrants, and enjoying their newfound dictatorial powers, a 'perk' they are very unlikely to part with willingly.

## Promotes Religious Cultism

Masks have become a religious symbol of virtuosity of a fanatical cult of irrational beliefs that has completely forsaken thinking for the cult members (like lone drivers wearing masks in their cars). Cults have committed some of the most horrific and bizarre atrocities over the past century.

## Socially Conditions the Citizenry to Be Docile and Unthinking

Authoritarian mandates that are based only upon the word of people (the "experts"), especially in stark contradiction to facts and common sense, conditions people to be docile, and to not think about anything (as their intellects and opinions are scorned and said to be of too poor quality to be legitimate sources of knowledge for anyone, including themselves). This destroys the vibrancy and energy of the society, and conditions people to not think of themselves as individually capable beings who have the potential to achieve greatness, a critical driving force necessary to impel people to make something of themselves.

## Balkanizes Society

Mask mandates help to further sow division and enmity between the factions of society by oppressing one faction while also giving the other faction the moral grounds to claim that the anti-mask faction by not going along with the mandate policies are in violation of the law, and are acting immorally as defined by societal approbation of mask mandates as a crucial health measure.

## All-Encompassing Harms of Mask Mandates

### Stress

The most obvious general harm of mask mandates is stress. Stress is known to be aggressively destructive to your health, and something that significantly exacerbates every known medical condition. Everything listed above causes the people afflicted to be stressed.

### Breach of the Social Compact

When part of society is so wantonly destructive towards another part of society, the society loses its legitimacy in the eyes of the oppressed, and the rule of law is incorrigibly eroded, since one side simply inflicts their will upon the other side regardless of the laws, conventions, and norms of society; and without any limiting principle. "Rule of law for thee but not for me" is not rule of law, and has no moral legitimacy for the "thee" to respect or comply.

## Indefinite Nature of the Suffering

The indefinite-ness of the situation is itself a source of considerable suffering, or a powerful amplification of the suffering one is already experiencing. It is infinitely easier and more bearable to handle suffering that you can see its end, when it will pass, versus suffering that seems inescapable and endless. (The feeling that the suffering is inescapable is a ubiquitous factor that leads people to commit suicide.)

## C'mon, most of these are silly?

The ultimate refuge of someone trapped by the facts is scorn and mockery. Human nature drives a person to feel and act derisive about something that requires depth to grasp. Human nature also strongly tends towards not just denying but mocking anything that challenges the morality and prudence of your opinions and actions. Thus people are told that their experiences and suffering from mask mandates is not real and makes no sense - one of the most insidious and abhorrent forms of abusive manipulation.

It is very difficult to gain an appreciation and understanding of most of the things on this list. On the other hand, it is far easier to destroy any sense of comprehension and emotional awareness of these - all that is necessary is one pithy line scorning this whole notion as delusional. Such is the power of mockery, that one witty zinger can completely vanquish the awareness gained from many hours of thoughtfulness and introspection.

So no, these are not silly, and feeling these does not make you a baby. This accusation is nothing more than the panicked derision that is the last defense of someone who can't debate the actual facts.

### The Manipulative Nature of an Abusive Relationship

One of the textbook tactics utilized by abusers to maintain control in an abusive relationship is to define the context and facts of anything related to the relationship so as to get in the victim's head so to speak and distort their sense of reality so that they are unable to articulate - even to themselves - the fact of their abuse and victimization.

As we all can see, the constant claims of "facemasks are not a big deal", "there's no conceivable reason for anyone to think that masks can be harmful", etc, accomplished this quite effectively. The goal of this article was to unwind this pernicious and abusive lie in order to re-empower victims of forced masking against the proponents of mask policies who are abusive and manipulative. (Sometimes mask policies are reluctantly put in place in order to accommodate political or legal realities where masking is the least destructive option.)

This can be summed up as one more type of emotional distress inflicted by mask mandate proponents:

**The contention that "facemasks are just an inconvenience" amounts to abusive manipulation that steals the ability of the victims of forced masking to identify and articulate the suffering and harm they experience from forced mask wearing.**

To conclude, the quote at the top of this article from DA Henderson - widely credited with the

eradication of smallpox - is very revealing:

"Experience has shown that communities faced with epidemics or other adverse events respond best and with the least anxiety when the normal social functioning of the community is least disrupted"

It is hard to imagine a greater disruption to normal living than the highly visible and symbolic masks ubiquitously worn everywhere.

More than 150 Comparative Studies and Articles on Mask Ineffectiveness and Harms · Brownstone Institute

Anyone come up with more examples that I missed please feel free to comment.

# Plaintiffs' Exhibit 228

brownstone.org          167 studies          12-20-21

## More than 150 Comparative Studies and Articles on Mask Ineffectiveness and Harms ⋆ Brownstone Institute

*Paul Elias Alexander*

89-112 minutes

Dr. Paul Alexander is a former assistant professor at McMaster University in evidence-based medicine and research methods. He's also a former COVID Pandemic evidence-synthesis consultant advisor to WHO-PAHO Washington, D.C., and former senior advisor to COVID Pandemic policy in Health & Human Services (HHS) Washington, D.C.

It is not unreasonable to conclude that surgical and cloth masks, used as they currently are being used (without other forms of PPE protection), have no impact on controlling the transmission of Covid-19 virus. Current evidence implies that face masks can be actually harmful. The body of evidence indicates that face masks are largely ineffective.

My focus is on COVID face masks and the prevailing science that we have had for nearly 20 months. Yet I wish to address this mask topic at a 50,000-foot level on the lockdown restrictive policies in general. I build on the backs of the fine work done by Gupta, Kulldorff, and Bhattacharya on the Great Barrington Declaration (GBD) and similar impetus by Dr. Scott Atlas (advisor to POTUS Trump) who, like myself, was a strong proponent for a focused type of protection that was based on an age-risk stratified approach.

Because we saw very early on that the lockdowns were the single greatest mistake in public health history. We knew the history and knew they would not work. We also knew very early of COVID's risk stratification. Sadly, our children will bear the catastrophic consequences and not just educationally, of the deeply flawed school closure policy for decades to come (particularly our minority children who were least able to afford this). Many are still pressured to wear masks and punished for not doing so.

I present the masking 'body of evidence' below (n=167 studies and pieces of evidence), comprised of comparative effectiveness research as well as related evidence and high-level reporting. To date, the evidence has been stable and clear that masks do not work to control the virus and they can be harmful and especially to children.

| MASK-INEFFECTIVENESS | |
|---|---|
| 1) Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers, Bundgaard, 2021 | "Infection with SARS-CoV-2 occurred in 42 participants recommended masks (1.8%) and 53 control participants (2.1%). The between-group difference was −0.3 percentage point (95% CI, −1.2 to 0.4 percentage point; P = 0.38) (odds ratio, 0.82 [CI, 0.54 to 1.23]; P = 0.33). Multiple imputation accounting for loss to follow-up yielded similar results…the recommendation to wear surgical masks to supplement other public health measures did not reduce the SARS-CoV-2 infection rate |

| | among wearers by more than 50% in a community with modest infection rates, some degree of social distancing, and uncommon general mask use." |
|---|---|
| 2) SARS-CoV-2 Transmission among Marine Recruits during Quarantine, Letizia, 2020 | "Our study showed that in a group of predominantly young male military recruits, approximately 2% became positive for SARS-CoV-2, as determined by qPCR assay, during a 2-week, strictly enforced quarantine. Multiple, independent virus strain transmission clusters were identified…all recruits wore double-layered cloth masks at all times indoors and outdoors." |
| 3) Physical interventions to interrupt or reduce the spread of respiratory viruses, Jefferson, 2020 | "There is low certainty evidence from nine trials (3507 participants) that wearing a mask may make little or no difference to the outcome of influenza-like illness (ILI) compared to not wearing a mask (risk ratio (RR) 0.99, 95% confidence interval (CI) 0.82 to 1.18. There is moderate certainty evidence that wearing a mask probably makes little or no difference to the outcome of laboratory-confirmed influenza compared to not wearing a mask (RR 0.91, 95% CI 0.66 to 1.26; 6 trials; 3005 participants)…the pooled results of randomised trials did not show a clear reduction in respiratory viral infection with the use of medical/surgical masks during seasonal influenza." |
| 4) The Impact of Community Masking on COVID-19: A Cluster-Randomized Trial in Bangladesh, Abaluck, 2021 Heneghan et al. | A cluster-randomized trial of community-level mask promotion in rural Bangladesh from November 2020 to April 2021 (N=600 villages, N=342,126 adults. Heneghan writes: "In a Bangladesh study, surgical masks reduced symptomatic COVID infections by between 0 and 22 percent, while the efficacy of cloth masks led to somewhere between an 11 percent increase to a 21 percent decrease. Hence, based on these randomized studies, adult masks appear to have either no or limited efficacy." |
| 5) Evidence for Community Cloth Face Masking to Limit the Spread of SARS-CoV-2: A Critical Review, Liu/CATO, 2021 | "The available clinical evidence of facemask efficacy is of low quality and the best available clinical evidence has mostly failed to show efficacy, with fourteen of sixteen identified randomized controlled trials comparing face masks to no mask controls failing to find statistically significant benefit in the intent-to-treat populations. Of sixteen quantitative meta-analyses, eight were equivocal or critical as to whether evidence supports a public recommendation of masks, and the |

| | |
|---|---|
| | remaining eight supported a public mask intervention on limited evidence primarily on the basis of the precautionary principle." |
| 6) Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures, CDC/Xiao, 2020 | "Evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza…none of the household studies reported a significant reduction in secondary laboratory-confirmed influenza virus infections in the face mask group…the overall reduction in ILI or laboratory-confirmed influenza cases in the face mask group was not significant in either studies." |
| 7) CIDRAP: Masks-for-all for COVID-19 not based on sound data, Brosseau, 2020 | "We agree that the data supporting the effectiveness of a cloth mask or face covering are very limited. We do, however, have data from laboratory studies that indicate cloth masks or face coverings offer very low filter collection efficiency for the smaller inhalable particles we believe are largely responsible for transmission, particularly from pre- or asymptomatic individuals who are not coughing or sneezing…though we support mask wearing by the general public, we continue to conclude that cloth masks and face coverings are likely to have limited impact on lowering COVID-19 transmission, because they have minimal ability to prevent the emission of small particles, offer limited personal protection with respect to small particle inhalation, and should not be recommended as a replacement for physical distancing or reducing time in enclosed spaces with many potentially infectious people." |
| 8) Universal Masking in Hospitals in the Covid-19 Era, Klompas/NEJM, 2020 | "We know that wearing a mask outside health care facilities offers little, if any, protection from infection. Public health authorities define a significant exposure to Covid-19 as face-to-face contact within 6 feet with a patient with symptomatic Covid-19 that is sustained for at least a few minutes (and some say more than 10 minutes or even 30 minutes). The chance of catching Covid-19 from a passing interaction in a public space is therefore minimal. In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic…The calculus may be different, however, in health care settings. First and foremost, a mask is a core component of the personal protective equipment (PPE) clinicians need when caring for |

| | |
|---|---|
| | symptomatic patients with respiratory viral infections, in conjunction with gown, gloves, and eye protection… universal masking alone is not a panacea. A mask will not protect providers caring for a patient with active Covid-19 if it's not accompanied by meticulous hand hygiene, eye protection, gloves, and a gown. <mark>A mask alone will not prevent health care workers with early Covid-19 from contaminating their hands and spreading the virus to patients and colleagues. Focusing on universal masking alone may, paradoxically, lead to more transmission of Covid-19 if it diverts attention from implementing more fundamental infection-control measures.</mark>" |
| 9) Masks for prevention of viral respiratory infections among health care workers and the public: PEER umbrella systematic review, Dugré, 2020 | <mark>"This systematic review found limited evidence that the use of masks might reduce the risk of viral respiratory infections.</mark> In the community setting, a possible reduced risk of influenza-like illness was found among mask users. In health care workers, the results show no difference between N95 masks and surgical masks on the risk of confirmed influenza or other confirmed viral respiratory infections, although possible benefits from N95 masks were found for preventing influenza-like illness or other clinical respiratory infections. Surgical masks might be superior to cloth masks but data are limited to 1 trial." |
| 10) Effectiveness of personal protective measures in reducing pandemic influenza transmission: A systematic review and meta-analysis, Saunders-Hastings, 2017 | <mark>"Facemask use provided a non-significant protective effect</mark> (OR = 0.53; 95% CI 0.16–1.71; $I^2$ = 48%) against 2009 pandemic influenza infection." |
| 11) Experimental investigation of indoor aerosol dispersion and accumulation in the context of COVID-19: Effects of masks and ventilation, Shah, 2021 | "Nevertheless, high-efficiency masks, such as the KN95, still offer substantially higher apparent filtration efficiencies (60% and 46% for R95 and KN95 masks, respectively) than the more commonly used cloth (10%) and surgical masks (12%), and therefore are still the recommended choice in mitigating airborne disease transmission indoors." |
| 12) Exercise with facemask; Are we handling a devil's sword?- A physiological hypothesis, Chandrasekaran, 2020 | "Exercising with facemasks may reduce available Oxygen and increase air trapping preventing substantial carbon dioxide exchange. The hypercapnic hypoxia may potentially increase acidic environment, cardiac overload, anaerobic metabolism and renal overload, |

| | which may substantially aggravate the underlying pathology of established chronic diseases. Further contrary to the earlier thought, <mark>no evidence exists to claim the facemasks during exercise offer additional protection from the droplet transfer of the virus.</mark>" |
|---|---|
| 13) Surgical face masks in modern operating rooms–a costly and unnecessary ritual?, Mitchell, 1991 | "Following the commissioning of a new suite of operating rooms air movement studies showed a flow of air away from the operating table towards the periphery of the room. Oral microbial flora dispersed by unmasked male and female volunteers standing one metre from the table failed to contaminate exposed settle plates placed on the table. <mark>The wearing of face masks by non-scrubbed staff working in an operating room with forced ventilation seems to be unnecessary.</mark>" |
| 14) Facemask against viral respiratory infections among Hajj pilgrims: A challenging cluster-randomized trial, Alfelali, 2020 | "By intention-to-treat analysis, <mark>facemask use did not seem to be effective against laboratory-confirmed viral respiratory infections</mark> (odds ratio [OR], 1.4; 95% confidence interval [CI], 0.9 to 2.1, p = 0.18) nor against clinical respiratory infection (OR, 1.1; 95% CI, 0.9 to 1.4, p = 0.40)." |
| 15) Simple respiratory protection–evaluation of the filtration performance of cloth masks and common fabric materials against 20-1000 nm size particles, Rengasamy, 2010 | "Results obtained in the study show that common fabric materials may provide marginal protection against nanoparticles including those in the size ranges of virus-containing particles in exhaled breath." |
| 16) Respiratory performance offered by N95 respirators and surgical masks: human subject evaluation with NaCl aerosol representing bacterial and viral particle size range, Lee, 2008 | "The study indicates that N95 filtering facepiece respirators may not achieve the expected protection level against bacteria and viruses. An exhalation valve on the N95 respirator does not affect the respiratory protection; it appears to be an appropriate alternative to reduce the breathing resistance." |
| 17) Aerosol penetration and leakage characteristics of masks used in the health care industry, Weber, 1993 | "We conclude that <mark>the protection provided by surgical masks may be insufficient in environments containing potentially hazardous sub-micrometer-sized aerosols.</mark>" |
| 18) Disposable surgical face masks for preventing surgical wound infection in clean surgery, Vincent, 2016 | "We included three trials, involving a total of 2106 participants. <mark>There was no statistically significant difference in infection rates between the masked and unmasked group in any of the trials</mark>…from the limited results it is unclear whether the wearing of surgical face masks by members of the surgical team has any impact |

| | on surgical wound infection rates for patients undergoing clean surgery." |
|---|---|
| 19) Disposable surgical face masks: a systematic review, Lipp, 2005 | "From the limited results it is unclear whether wearing surgical face masks results in any harm or benefit to the patient undergoing clean surgery." |
| 20) Comparison of the Filter Efficiency of Medical Nonwoven Fabrics against Three Different Microbe Aerosols, Shimasaki , 2018 | "We conclude that the filter efficiency test using the phi-X174 phage aerosol may overestimate the protective performance of nonwoven fabrics with filter structure compared to that against real pathogens such as the influenza virus." |
| 21) The use of masks and respirators to preventtransmission of influenza: a systematic review of thescientific evidence21) The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence, Bin-Reza, 2012 | The use of masks and respirators to preventtransmission of influenza: a systematic review of thescientific evidence"None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection. Some evidence suggests that mask use is best undertaken as part of a package of personal protection especially hand hygiene." |
| 22) Facial protection for healthcare workers during pandemics: a scoping review, Godoy, 2020 | "Compared with surgical masks, N95 respirators perform better in laboratory testing, may provide superior protection in inpatient settings and perform equivalently in outpatient settings. Surgical mask and N95 respirator conservation strategies include extended use, reuse or decontamination, but these strategies may result in inferior protection. Limited evidence suggests that reused and improvised masks should be used when medical-grade protection is unavailable." |
| 23) Assessment of Proficiency of N95 Mask Donning Among the General Public in Singapore, Yeung, 2020 | "These findings support ongoing recommendations against the use of N95 masks by the general public during the COVID-19 pandemic.[5] N95 mask use by the general public may not translate into effective protection but instead provide false reassurance. Beyond N95 masks, proficiency among the general public in donning surgical masks needs to be assessed." |
| 24) Evaluating the efficacy of cloth facemasks in reducing particulate matter exposure, Shakya, 2017 | "Standard N95 mask performance was used as a control to compare the results with cloth masks, and our results suggest that cloth masks are only marginally beneficial in protecting individuals from particles<2.5 μm." |

| | |
|---|---|
| 25) Use of surgical face masks to reduce the incidence of the common cold among health care workers in Japan: a randomized controlled trial, Jacobs, 2009 | "Face mask use in health care workers has not been demonstrated to provide benefit in terms of cold symptoms or getting colds." |
| 26) N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel, Radonovich, 2019 | "Among outpatient health care personnel, N95 respirators vs medical masks as worn by participants in this trial resulted in no significant difference in the incidence of laboratory-confirmed influenza." |
| 27) Does Universal Mask Wearing Decrease or Increase the Spread of COVID-19?, Watts up with that? 2020 | "A survey of peer-reviewed studies shows that universal mask wearing (as opposed to wearing masks in specific settings) does not decrease the transmission of respiratory viruses from people wearing masks to people who are not wearing masks." |
| 28) Masking: A Careful Review of the Evidence, Alexander, 2021 | "In fact, it is not unreasonable at this time to conclude that surgical and cloth masks, used as they currently are, have absolutely no impact on controlling the transmission of Covid-19 virus, and current evidence implies that face masks can be actually harmful." |
| 29) Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities — United States, July 2020, Fisher, 2020 | Reported characteristics of symptomatic adults ≥18 years who were outpatients in 11 US academic health care facilities and who received positive and negative SARS-CoV-2 test results (N = 314)* — United States, July 1–29, 2020, revealed that 80% of infected persons wore face masks almost all or most of the time. |
| 30) Impact of non-pharmaceutical interventions against COVID-19 in Europe: a quasi-experimental study, Hunter, 2020 | Face masks in public was not associated with reduced incidence. |
| 31) Masking lack of evidence with politics, CEBM, Heneghan, 2020 | "It would appear that despite two decades of pandemic preparedness, there is considerable uncertainty as to the value of wearing masks. For instance, high rates of infection with cloth masks could be due to harms caused by cloth masks, or benefits of medical masks.  The numerous systematic reviews that have been recently published all include the same evidence base so unsurprisingly broadly reach the same conclusions." |
| 32) Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a | "We observed no association of risk of transmission with reported mask usage by contacts, with the age or sex of |

| | |
|---|---|
| cohort study, Marks, 2021 | the index case, or with the presence of respiratory symptoms in the index case at the initial study visit." |
| 33) Non-pharmaceutical public health measures for mitigating the risk and impact of epidemic and pandemic influenza, WHO, 2020 | "Ten RCTs were included in the meta-analysis, and ==there was no evidence that face masks are effective in reducing transmission of laboratory-confirmed influenza.==" |
| 34) The Strangely Unscientific Masking of America, Younes, 2020 | "One report reached its conclusion based on observations of a "dummy head attached to a breathing simulator."  Another analyzed use of surgical masks on people experiencing at least two symptoms of acute respiratory illness. Incidentally, not one of these studies involved cloth masks or accounted for real-world mask usage (or misusage) among lay people, and ==none established efficacy of widespread mask-wearing by people not exhibiting symptoms.  There was simply no evidence whatsoever that healthy people ought to wear masks when going about their lives,== especially outdoors." |
| 35) Facemasks and similar barriers to prevent respiratory illness such as COVID-19: A rapid systematic review, Brainard, 2020 | "31 eligible studies (including 12 RCTs). Narrative synthesis and random-effects meta-analysis of attack rates for primary and secondary prevention in 28 studies were performed. Based on the RCTs we would conclude that wearing facemasks can be very slightly protective against primary infection from casual community contact, and modestly protective against household infections when both infected and uninfected members wear facemasks. However, the RCTs often suffered from poor compliance and controls using facemasks." |

| 36) The Year of Disguises, Koops, 2020 | "The healthy people in our society should not be punished for being healthy, which is exactly what lockdowns, distancing, mask mandates, etc. do… Children should not be wearing face coverings. We all need constant interaction with our environments and that is especially true for children. This is how their immune system develops. They are the lowest of the low-risk groups. Let them be kids and let them develop their immune systems… The "Mask Mandate" idea is a truly ridiculous, knee-jerk reaction and needs to be withdrawn and thrown in the waste bin of disastrous policy, along with lockdowns and school closures. You can vote for a person without blindly supporting all of their proposals!" |
|---|---|
| 37) Open Schools, Covid-19, and Child and Teacher Morbidity in Sweden, Ludvigsson, 2020 | "1,951,905 children in Sweden (as of December 31, 2019) who were 1 to 16 years of age, were examined… social distancing was encouraged in Sweden, but wearing face masks was not…No child with Covid-19 died." |
| 38) Double-Masking Benefits Are Limited, Japan Supercomputer Finds, Reidy, 2021 | "Wearing two masks offers limited benefits in preventing the spread of droplets that could carry the coronavirus compared to one well-fitted disposable mask, according to a Japanese study that modeled the dispersal of droplets on a supercomputer." |
| 39) Physical interventions to interrupt or reduce the spread of respiratory viruses. Part 1 – Face masks, eye protection and person distancing: systematic review and meta-analysis, Jefferson, 2020 | "There was insufficient evidence to provide a recommendation on the use of facial barriers without other measures. We found insufficient evidence for a difference between surgical masks and N95 respirators and limited evidence to support effectiveness of quarantine." |
| 40) Should individuals in the community without respiratory symptoms wear facemasks to reduce the spread of COVID-19?, NIPH, 2020 | "Non-medical facemasks include a variety of products. There is no reliable evidence of the effectiveness of non-medical facemasks in community settings. There is likely to be substantial variation in effectiveness between products. However, there is only limited evidence from laboratory studies of potential differences in effectiveness when different products are used in the community." |
| 41) Is a mask necessary in the operating theatre?, Orr, 1981 | "It would appear that minimum contamination can best be achieved by not wearing a mask at all but operating in silence. Whatever its relation to contamination, |

| | |
|---|---|
| | bacterial counts, or the dissemination of squames, <mark>there is no direct evidence that the wearing of masks reduces wound infection."</mark> |
| 42) The surgical mask is a bad fit for risk reduction, Neilson, 2016 | "As recently as 2010, <mark>the US National Academy of Sciences declared that, in the community setting, "face masks are not designed or certified to protect the wearer from exposure to respiratory hazards."</mark> A number of studies have shown the inefficacy of the surgical mask in household settings to prevent transmission of the influenza virus." |
| 43) Facemask versus No Facemask in Preventing Viral Respiratory Infections During Hajj: A Cluster Randomised Open Label Trial, Alfelali, 2019 | "<mark>Facemask use does not prevent clinical or laboratory-confirmed viral respiratory infections</mark> among Hajj pilgrims." |
| 44) Facemasks in the COVID-19 era: A health hypothesis, Vainshelboim, 2021 | "<mark>The existing scientific evidences challenge the safety and efficacy of wearing facemask as preventive intervention for COVID-19.</mark> The data suggest that both medical and non-medical facemasks are ineffective to block human-to-human transmission of viral and infectious disease such SARS-CoV-2 and COVID-19, supporting against the usage of facemasks. <mark>Wearing facemasks has been demonstrated to have substantial adverse physiological and psychological effects. These include hypoxia, hypercapnia, shortness of breath, increased acidity and toxicity, activation of fear and stress response, rise in stress hormones, immunosuppression, fatigue, headaches, decline in cognitive performance, predisposition for viral and infectious illnesses, chronic stress, anxiety and depression."</mark> |
| 45) The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence, Bin-Reza, 2011 | "<mark>None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection.</mark> Some evidence suggests that mask use is best undertaken as part of a package of personal protection especially hand hygiene." |
| 46) Are Face Masks Effective? The Evidence., Swiss Policy Research, 2021 | "<mark>Most studies found little to no evidence for the effectiveness of face masks in the general population, neither as personal protective equipment nor as a source control."</mark> |

| 47) Postoperative wound infections and surgical face masks: A controlled study, Tunevall, 1991 | "These results indicate that the use of face masks might be reconsidered. Masks may be used to protect the operating team from drops of infected blood and from airborne infections, but have not been proven to protect the patient operated by a healthy operating team." |
| --- | --- |
| 48) Mask mandate and use efficacy in state-level COVID-19 containment, Guerra, 2021 | "Mask mandates and use are not associated with slower state-level COVID-19 spread during COVID-19 growth surges." |
| 49) Twenty Reasons Mandatory Face Masks are Unsafe, Ineffective and Immoral, Manley, 2021 | "A CDC-funded review on masking in May 2020 came to the conclusion: "Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza… None of the household studies reported a significant reduction in secondary laboratory-confirmed influenza virus infections in the face mask group." If masks can't stop the regular flu, how can they stop SAR-CoV-2?" |
| 50) A cluster randomised trial of cloth masks compared with medical masks in healthcare workers, MacIntyre, 2015 | "First RCT of cloth masks, and the results caution against the use of cloth masks. This is an important finding to inform occupational health and safety. Moisture retention, reuse of cloth masks and poor filtration may result in increased risk of infection…the rates of all infection outcomes were highest in the cloth mask arm, with the rate of ILI statistically significantly higher in the cloth mask arm (relative risk (RR)=13.00, 95% CI 1.69 to 100.07) compared with the medical mask arm. Cloth masks also had significantly higher rates of ILI compared with the control arm. An analysis by mask use showed ILI (RR=6.64, 95% CI 1.45 to 28.65) and laboratory-confirmed virus (RR=1.72, 95% CI 1.01 to 2.94) were significantly higher in the cloth masks group compared with the medical masks group. Penetration of cloth masks by particles was almost 97% and medical masks 44%." |
| 51) Horowitz: Data from India continues to blow up the 'Delta' fear narrative, Blazemedia, 2021 | "Rather than proving the need to sow more panic, fear, and control over people, the story from India — the source of the "Delta" variant — continues to refute every current premise of COVID fascism… Masks failed to stop the spread there." |

| | |
|---|---|
| 52) An outbreak caused by the SARS-CoV-2 Delta variant (B.1.617.2) in a secondary care hospital in Finland, May 2021, Hetemäli, 2021 | Reporting on a nosocomial hospital outbreak in Finland, Hetemäli et al. observed that "both symptomatic and asymptomatic infections were found among vaccinated health care workers, and secondary transmission occurred from those with symptomatic infections despite use of personal protective equipment." |
| 53) Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021, Shitrit, 2021 | In a hospital outbreak investigation in Israel, Shitrit et al. observed "high transmissibility of the SARS-CoV-2 Delta variant among twice vaccinated and masked individuals." They added that "this suggests some waning of immunity, albeit still providing protection for individuals without comorbidities." Again, despite use of personal protective equipment. |
| 54) 47 studies confirm ineffectiveness of masks for COVID and 32 more confirm their negative health effects, Lifesite news staff, 2021 | "No studies were needed to justify this practice since most understood viruses were far too small to be stopped by the wearing of most masks, other than sophisticated ones designed for that task and which were too costly and complicated for the general public to properly wear and keep changing or cleaning. It was also understood that long mask wearing was unhealthy for wearers for common sense and basic science reasons." |
| 55) Are EUA Face Masks Effective in Slowing the Spread of a Viral Infection?, Dopp, 2021 | The vast evidence shows that masks are ineffective. |
| 56) CDC Study finds overwhelming majority of people getting coronavirus wore masks, Boyd/Federalist, 2021 | "A Centers for Disease Control report released in September shows that masks and face coverings are not effective in preventing the spread of COVID-19, even for those people who consistently wear them." |
| 57) Most Mask Studies Are Garbage, Eugyppius, 2021 | "The other kind of study, the proper kind, would be a randomised controlled trial. You compare the rates of infection in a masked cohort against rates of infection in an unmasked cohort. Here things have gone much, much worse for mask brigade. They spent months trying to prevent the publication of the Danish randomised controlled trial, which found that masks do zero. When that paper finally squeaked into print, they spent more months trying desperately to poke holes in it. You could feel their boundless relief when the Bangladesh study finally appeared to save them in early September. Every last Twitter blue-check could now proclaim that |

| | |
|---|---|
| | Science Shows Masks Work. Such was their hunger for any scrap of evidence to prop up their prior convictions, that none of them noticed the sad nature of the Science in question. ==The study found a mere 10% reduction in seroprevalence among the masked cohort, an effect so small that it fell within the confidence interval. Even the study authors couldn't exclude the possibility that masks in fact do zero.==" |
| 58) Using face masks in the community: first update, ECDC, 2021 | "==No high-quality evidence in favor of face masks== and recommended their use only based on the 'precautionary principle." |
| 59) Do physical measures such as hand-washing or wearing masks stop or slow down the spread of respiratory viruses?, Cochrane, 2020 | "Seven studies took place in the community, and two studies in healthcare workers. ==Compared with wearing no mask, wearing a mask may make little to no difference in how many people caught a flu-like illness== (9 studies; 3507 people); and probably makes no difference in how many people have flu confirmed by a laboratory test (6 studies; 3005 people). Unwanted effects were rarely reported, but included discomfort." |
| 60) Mouth-nose protection in public: No evidence of effectiveness, Thieme/ Kappstein, 2020 | "==The use of masks in public spaces is questionable simply because of the lack of scientific data.== If one also considers the necessary precautions, ==masks must even be considered a risk of infection in public spaces== according to the rules known from hospitals… ==If masks are worn by the population, the risk of infection is potentially increased,== regardless of whether they are medical masks or whether they are so-called community masks designed in any way. If one considers the precautionary measures that the RKI as well as the international health authorities have pronounced, all authorities would even have to inform the population that ==masks should not be worn in public spaces at all.== Because no matter whether it is a duty for all citizens or voluntarily borne by the citizens who want it for whatever reason, ==it remains a fact that masks can do more harm than good in public.==" |
| 61) US mask guidance for kids is the strictest across the world,  Skelding, 2021 | "Kids need to see faces," Jay Bhattacharya, a professor of medicine at Stanford University, told The Post. Youngsters watch people's mouths to learn to speak, read and understand emotions, he said."We have this idea that this disease is so bad that we must adopt any means necessary to stop it from spreading," he said. |

| | |
|---|---|
| | "It's not that masks in schools have no costs. They actually do have substantial costs." |
| 62) <u>Masking young children in school harms language acquisition</u>, Walsh, 2021 | "This is important because children and/or students do not have the speech or language ability that adults have — they are not equally able and the ability to see the face and especially the mouth is critical to language acquisition which children and/or students are engaged in at all times. Furthermore, <mark>the ability to see the mouth is not only essential to communication but also essential to brain development."</mark> |
| 63) <u>The Case Against Masks for Children</u>, Makary, 2021 | "It's abusive to force kids who struggle with them to sacrifice for the sake of unvaccinated adults… Do masks reduce Covid transmission in children? Believe it or not, we could find only a single retrospective study on the question, and its results were inconclusive. Yet two weeks ago the Centers for Disease Control and Prevention sternly decreed that 56 million U.S. children and adolescents, vaccinated or not, should cover their faces regardless of the prevalence of infection in their community. Authorities in many places took the cue to impose mandates in schools and elsewhere, on the theory that masks can't do any harm. That isn't true. Some children are fine wearing a mask, but others struggle. Those who have myopia can have difficulty seeing because the mask fogs their glasses. (This has long been a problem for medical students in the operating room.) <mark>Masks can cause severe acne and other skin problems. The discomfort of a mask distracts some children from learning. By increasing airway resistance during exhalation, masks can lead to increased levels of carbon dioxide in the blood. And masks can be</mark> <u>vectors for pathogens</u> <mark>if they become moist or are used for too long."</mark> |
| 64) <u>Face Covering Mandates</u>, Peavey, 2021 | "Face Covering Mandates And Why They AREN'T Effective." |
| 65) <u>Do masks work?</u> <u>A Review of the evidence</u>, Anderson, 2021 | "In truth, the CDC's, U.K.'s, and WHO's earlier guidance was much more consistent with the best medical research on masks' effectiveness in preventing the spread of viruses. <mark>That research suggests that Americans' many months of mask-wearing has likely provided little to no health benefit and might even have been counterproductive in preventing the spread of the</mark> |

| | |
|---|---|
| | novel coronavirus." |
| 66) Most face masks won't stop COVID-19 indoors, study warns, Anderer, 2021 | "New research reveals that cloth masks filter just 10% of exhaled aerosols, with many people not wearing coverings that fit their face properly." |
| 67) How face masks and lockdowns failed/the face mask folly in retrospect, Swiss Policy Research, 2021 | "Mask mandates and lockdowns have had no discernible impact." |
| 68) CDC Releases School COVID Transmission Study But Buries One of the Most Damning Parts, Davis, 2021 | "The 21% lower incidence in schools that required mask use among students was not statistically significant compared with schools where mask use was optional… With tens of millions of American kids headed back to school in the fall, their parents and political leaders owe it to them to have a clear-sighted, scientifically rigorous discussion about which anti-COVID measures actually work and which might put an extra burden on vulnerable young people without meaningfully or demonstrably slowing the spread of the virus…that a masking requirement of students failed to show independent benefit is a finding of consequence and great interest." |
| 69) World Health Organization internal meeting, COVID-19 – virtual press conference – 30 March 2020, 2020 | "This is a question on Austria. The Austrian Government has a desire to make everyone wear a mask who's going into the shops. I understood from our previous briefings with you that the general public should not wear masks because they are in short supply. What do you say about the new Austrian measures?… I'm not specifically aware of that measure in Austria. I would assume that it's aimed at people who potentially have the disease not passing it to others. In general WHO recommends that the wearing of a mask by a member of the public is to prevent that individual giving the disease to somebody else. We don't generally recommend the wearing to masks in public by otherwise well individuals because it has not been up to now associated with any particular benefit." |
| 70) Face masks to prevent transmission of influenza virus: a systematic review, Cowling, 2010 | "Review highlights the limited evidence base supporting the efficacy or effectiveness of face masks to reduce influenza virus transmission."None of the studies reviewed showed a benefit from wearing a mask, in either HCW or community members in households (H)." |

| | |
|---|---|
| 71) Effectiveness of N95 respirators versus surgical masks in protecting health care workers from acute respiratory infection: a systematic review and meta-analysis, Smith, 2016 | "Although N95 respirators appeared to have a protective advantage over surgical masks in laboratory settings, our meta-analysis showed that there were insufficient data to determine definitively whether N95 respirators are superior to surgical masks in protecting health care workers against transmissible acute respiratory infections in clinical settings." |
| 72) Effectiveness of Masks and Respirators Against Respiratory Infections in Healthcare Workers: A Systematic Review and Meta-Analysis, Offeddu, 2017 | "We found evidence to support universal medical mask use in hospital settings as part of infection control measures to reduce the risk of CRI and ILI among HCWs. Overall, N95 respirators may convey greater protection, but universal use throughout a work shift is likely to be less acceptable due to greater discomfort… Our analysis confirms the effectiveness of medical masks and respirators against SARS. Disposable, cotton, or paper masks are not recommended. The confirmed effectiveness of medical masks is crucially important for lower-resource and emergency settings lacking access to N95 respirators. In such cases, single-use medical masks are preferable to cloth masks, for which there is no evidence of protection and which might facilitate transmission of pathogens when used repeatedly without adequate sterilization…We found no clear benefit of either medical masks or N95 respirators against pH1N1…Overall, the evidence to inform policies on mask use in HCWs is poor, with a small number of studies that is prone to reporting biases and lack of statistical power." |
| 73) N95 Respirators vs Medical Masks for Preventing Influenza Among Health Care Personnel, Radonovich, 2019 | "Use of N95 respirators, compared with medical masks, in the outpatient setting resulted in no significant difference in the rates of laboratory-confirmed influenza." |
| Effectiveness of N95 respirators versus surgical masks againstinfluenza: A systematic review and meta-analysis74) Masks Don't Work: A Review of Science Relevant to COVID-19 Social Policy, Rancourt, 2020 | The use of N95 respirators compared with surgical masks is not associated with alower risk of laboratory-confirmed influenza. It suggests that N95 respirators should not be rec-ommended for general public and nonhigh-risk medical staff those are not in close contact withinfluenza patients or suspected patients. "No RCT study with verified outcome shows a benefit for HCW or community members in households to wearing a mask or respirator. There is no such study. There are no exceptions. Likewise, no study exists that shows a |

| | |
|---|---|
| | benefit from a broad policy to wear masks in public (more on this below). Furthermore, if there were any benefit to wearing a mask, because of the blocking power against droplets and aerosol particles, then there should be more benefit from wearing a respirator (N95) compared to a surgical mask, yet several large meta-analyses, and all the RCT, prove that there is no such relative benefit." |
| 75) More Than a Dozen Credible Medical Studies Prove Face Masks Do Not Work Even In Hospitals!, Firstenberg, 2020 | "Mandating masks has not kept death rates down anywhere. The 20 U.S. states that have never ordered people to wear face masks indoors and out have dramatically lower COVID-19 death rates than the 30 states that have mandated masks. Most of the no-mask states have COVID-19 death rates below 20 per 100,000 population, and none have a death rate higher than 55. All 13 states that have death rates higher 55 are states that have required the wearing of masks in all public places. It has not protected them." |
| 76) Does evidence based medicine support the effectiveness of surgical facemasks in preventing postoperative wound infections in elective surgery?, Bahli, 2009 | "From the limited randomized trials it is still not clear that whether wearing surgical face masks harms or benefit the patients undergoing elective surgery." |
| 77) Peritonitis prevention in CAPD: to mask or not?, Figueiredo, 2000 | "The current study suggests that routine use of face masks during CAPD bag exchanges may be unnecessary and could be discontinued." |
| 78) The operating room environment as affected by people and the surgical face mask, Ritter, 1975 | "The wearing of a surgical face mask had no effect upon the overall operating room environmental contamination and probably work only to redirect the projectile effect of talking and breathing. People are the major source of environmental contamination in the operating room." |
| 79) The efficacy of standard surgical face masks: an investigation using "tracer particles, Ha'eri, 1980 | "Particle contamination of the wound was demonstrated in all experiments. Since the microspheres were not identified on the exterior of these face masks, they must have escaped around the mask edges and found their way into the wound." |
| 80) Wearing of caps and masks not necessary during cardiac catheterization, Laslett, 1989 | "Prospectively evaluated the experience of 504 patients undergoing percutaneous left heart catheterization, seeking evidence of a relationship between whether caps and/or masks were worn by the operators and the incidence of infection. No infections were found in any |

| | patient, regardless of whether a cap or mask was used. Thus, we found no evidence that caps or masks need to be worn during percutaneous cardiac catheterization." |
|---|---|
| 81) Do anaesthetists need to wear surgical masks in the operating theatre? A literature review with evidence-based recommendations, Skinner, 2001 | "A questionnaire-based survey, undertaken by Leyland' in 1993 to assess attitudes to the use of masks, showed that 20% of surgeons discarded surgical masks for endoscopic work. Less than 50% did not wear the mask as recommended by the Medical Research Council. Equal numbers of surgeons wore the mask in the belief they were protecting themselves and the patient, with 20% of these admitting that tradition was the only reason for wearing them." |
| 82) Mask mandates for children are not backed by data, Faria, 2021 | "Even if you want to use the 2018-19 flu season to avoid overlap with the start of the COVID-19 pandemic, the CDC paints a similar picture: It estimated 480 flu deaths among children during that period, with 46,000 hospitalizations. COVID-19, mercifully, is simply not as deadly for children. According to the American Academy of Pediatrics, preliminary data from 45 states show that between 0.00%-0.03% of child COVID-19 cases resulted in death. When you combine these numbers with the CDC study that found mask mandates for students — along with hybrid models, social distancing, and classroom barriers — did not have a statistically significant benefit in preventing the spread of COVID-19 in schools, the insistence that we force students to jump through these hoops for their own protection makes no sense." |
| 83) The Downsides of Masking Young Students Are Real, Prasad, 2021 | "The benefits of mask requirements in schools might seem self-evident—they have to help contain the coronavirus, right?—but that may not be so. In Spain, masks are used in kids ages 6 and older. The authors of one study there examined the risk of viral spread at all ages. If masks provided a large benefit, then the transmission rate among 5-year-olds would be far higher than the rate among 6-year-olds. The results don't show that. Instead, they show that transmission rates, which were low among the youngest kids, steadily increased with age—rather than dropping sharply for older children subject to the face-covering requirement. This suggests that masking kids in school does not provide a major benefit and might provide none at all." |

| | |
|---|---|
| | And yet many officials prefer to double down on masking mandates, as if the fundamental policy were sound and only the people have failed." |
| 84) Masks In Schools: Scientific American Fumbles Report On Childhood COVID Transmission, English/ACSH, 2021 | "Masking is a low-risk, inexpensive intervention. If we want to recommend it as a precautionary measure, especially in situations where vaccination isn't an option, great. But that's not what the public has been told. "Florida governor Ron DeSantis and politicians in Texas say research does not support mask mandates," SciAm's sub-headline bellowed. "Many studies show they are wrong."If that's the case, demonstrate that the intervention works before you mandate its use in schools. If you can't, acknowledged what UC San Francisco hematologist-oncologist and Associate Professor of Epidemiology Vinay Prasad wrote over at the Atlantic:"No scientific consensus exists about the wisdom of mandatory-masking rules for schoolchildren … In mid-March 2020, few could argue against erring on the side of caution. But nearly 18 months later, we owe it to children and their parents to answer the question properly: Do the benefits of masking kids in school outweigh the downsides? The honest answer in 2021 remains that we don't know for sure." |
| 85) Masks 'don't work,' are damaging health and are being used to control population: Doctors panel, Haynes, 2021 | "The only randomized control studies that have ever been done on masks show that they don't work," began Dr. Nepute. He referred to Dr. Anthony Fauci's "noble lie," in which Fauci "changed his tune," from his March 2020 comments, where he downplayed the need and efficacy of mask wearing, before urging Americans to use masks later in the year. "Well, he lied to us. So if he lied about that, what else has he lied to you about?" questioned Nepute.Masks have become commonplace in almost every setting, whether indoors or outdoors, but Dr. Popper mentioned how there have been "no studies" which actually examine the "effect of wearing a mask during all your waking hours.""There's no science to back any of this and particularly no science to back the fact that wearing a mask twenty four-seven or every waking minute, is health promoting," added Popper." |
| 86) Aerosol penetration through surgical masks, Chen, 1992 | "The mask that has the highest collection efficiency is not necessarily the best mask from the perspective of the filter-quality factor, which considers not only the |

|  | capture efficiency but also the air resistance. Although surgical mask media may be adequate to remove bacteria exhaled or expelled by health care workers, they may not be sufficient to remove the sub-micrometer-sized aerosols containing pathogens to which these health care workers are potentially exposed." |
|---|---|
| 87) CDC: Schools With Mask Mandates Didn't See Statistically Significant Different Rates of COVID Transmission From Schools With Optional Policies, Miltimore, 2021 | "The CDC did not include its finding that "required mask use among students was not statistically significant compared with schools where mask use was optional" in the summary of its report." |
| 88) Horowitz: Data from India continues to blow up the 'Delta' fear narrative, Howorwitz, 2021 | "Rather than proving the need to sow more panic, fear, and control over people, the story from India — the source of the "Delta" variant — continues to refute every current premise of COVID fascism…Unless we do that, we must return to the very effective lockdowns and masks. In reality, India's experience proves the opposite true; namely:1) Delta is largely an attenuated version, with a much lower fatality rate, that for most people is akin to a cold.2) Masks failed to stop the spread there.3) The country has come close to the herd immunity threshold with just 3% vaccinated. |
| 89) Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers, Vietnam, Chau, 2021 | While not definitive in the LANCET publication, it can be inferred that the nurses were all masked up and had PPE etc. as was the case in Finland and Israel nosocomial outbreaks, indicating the failure of PPE and masks to constrain Delta spread. |
| 90) Aerosol penetration through surgical masks, Willeke, 1992 | "The mask that has the highest collection efficiency is not necessarily the best mask from the perspective of the filter-quality factor, which considers not only the capture efficiency but also the air resistance. Although surgical mask media may be adequate to remove bacteria exhaled or expelled by health care workers, they may not be sufficient to remove the submicrometer-size aerosols containing pathogens to which these health care workers are potentially exposed." |
| 91) The efficacy of standard surgical face masks: an investigation using "tracer particles", Wiley, 1980 | "Particle contamination of the wound was demonstrated in all aexperiments. Since the microspheres were not identified on the exterior of these face masks, they must have escped around the mask edges and found their |

| | way into the wound. The wearing of the mask beneath the headgear curtails this route of contamination." |
|---|---|
| 92) An Evidence Based Scientific Analysis of Why Masks are Ineffective, Unnecessary, and Harmful, Meehan, 2020 | "Decades of the highest-level scientific evidence (meta-analyses of multiple randomized controlled trials) overwhelmingly conclude that medical masks are ineffective at preventing the transmission of respiratory viruses, including SARS-CoV-2…those arguing for masks are relying on low-level evidence (observational retrospective trials and mechanistic theories), none of which are powered to counter the evidence, arguments, and risks of mask mandates." |
| 93) Open Letter from Medical Doctors and Health Professionals to All Belgian Authorities and All Belgian Media, AIER, 2020 | "Oral masks in healthy individuals are ineffective against the spread of viral infections." |
| 94) Effectiveness of N95 respirators versus surgical masks against influenza: A systematic review and meta-analysis, Long, 2020 | "The use of N95 respirators compared with surgical masks is not associated with a lower risk of laboratory-confirmed influenza. It suggests that N95 respirators should not be recommended for general public and nonhigh-risk medical staff those are not in close contact with influenza patients or suspected patients." |
| 95) Advice on the use of masks in the context of COVID-19, WHO, 2020 | "However, the use of a mask alone is insufficient to provide an adequate level of protection or source control, and other personal and community level measures should also be adopted to suppress transmission of respiratory viruses." |
| 96) Farce mask: it's safe for only 20 minutes, The Sydney Morning Herald, 2003 | "Health authorities have warned that surgical masks may not be an effective protection against the virus."Those masks are only effective so long as they are dry," said Professor Yvonne Cossart of the Department of Infectious Diseases at the University of Sydney."As soon as they become saturated with the moisture in your breath they stop doing their job and pass on the droplets."Professor Cossart said that could take as little as 15 or 20 minutes, after which the mask would need to be changed. But those warnings haven't stopped people snapping up the masks, with retailers reporting they are having trouble keeping up with demand." |
| 97) Study: Wearing A Used Mask Is Potentially Riskier Than No Mask At | "According to researchers from the University of Massachusetts Lowell and California Baptist University, |

| | |
|---|---|
| <u>All</u>, Boyd, 2020<br><u>Effects of mask-wearing on the inhalability and deposition of airborne SARS-CoV-2 aerosols in human upper airway</u> | a three-layer surgical mask is 65 percent efficient in filtering particles in the air. That effectiveness, however, falls to 25 percent once it is used."It is natural to think that wearing a mask, no matter new or old, should always be better than nothing," <u>said</u> author Jinxiang Xi."Our results show that this belief is only true for particles larger than 5 micrometers, but not for fine particles smaller than 2.5 micrometers," he continued." |
| <mark>MASK MANDATES</mark> | |
| 1) <u>Mask mandate and use efficacy for COVID-19 containment in US States</u>, Guerra, 2021 | "Calculated total COVID-19 case growth and mask use for the continental United States with data from the Centers for Disease Control and Prevention and Institute for Health Metrics and Evaluation. We estimated post-mask mandate case growth in non-mandate states using median issuance dates of neighboring states with mandates…<mark>did not observe association between mask mandates or use and reduced COVID-19 spread in US states."</mark> |
| 2) <u>These 12 Graphs Show Mask Mandates Do Nothing To Stop COVID</u>, Weiss, 2020 | "Masks can work well when they're fully sealed, properly fitted, changed often, and have a filter designed for virus-sized particles. This represents none of the common masks available on the consumer market, <mark>making universal masking much more of a confidence trick than a medical solution…Our universal use of unscientific face coverings is therefore closer to medieval superstition than it is to science,</mark> but many powerful institutions have too much political capital invested in the mask narrative at this point, so the dogma is perpetuated. The narrative says that if cases go down it's because masks succeeded. It says that if cases go up it's because masks succeeded in preventing more cases. <mark>The narrative simply assumes rather than proves that masks work, despite overwhelming scientific evidence to the contrary."</mark> |
| 3) <u>Mask Mandates Seem to Make CCP Virus Infection Rates Climb, Study Says</u>, Vadum, 2020 | "Protective-mask mandates aimed at combating the spread of the <u>CCP virus</u> that causes the disease <u>COVID-19</u> appear to promote its spread, according to a report from RationalGround.com, a clearinghouse of COVID-19 data trends that's run by a grassroots group of data analysts, computer scientists, and actuaries." |

| | |
|---|---|
| 4) Horowitz: Comprehensive analysis of 50 states shows greater spread with mask mandates, Howorwitz, 2020<br>Justin Hart | "How long do our politicians get to ignore the results?… The results: When comparing states with mandates vs. those without, or periods of times within a state with a mandate vs. without, there is absolutely no evidence the mask mandate worked to slow the spread one iota. In total, in the states that had a mandate in effect, there were 9,605,256 confirmed COVID cases over 5,907 total days, an average of 27 cases per 100,000 per day. When states did not have a statewide order (which includes the states that never had them and the period of time masking states did not have the mandate in place) there were 5,781,716 cases over 5,772 total days, averaging 17 cases per 100,000 people per day." |
| 5) The CDC's Mask Mandate Study: Debunked, Alexander, 2021 | "Thus, it is not surprising that the CDC's own recent conclusion on the use of nonpharmaceutical measures such as face masks in pandemic influenza, warned that scientific "evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission…" Moreover, in the WHO's 2019 guidance document on nonpharmaceutical public health measures in a pandemic, they reported as to face masks that "there is no evidence that this is effective in reducing transmission…" Similarly, in the fine print to a recent double-blind, double-masking simulation the CDC stated that "The findings of these simulations [supporting mask usage] should neither be generalized to the effectiveness …nor interpreted as being representative of the effectiveness of these masks when worn in real-world settings." |
| 6) Phil Kerpin, tweet, 2021<br>The Spectator | "The first ecological study of state mask mandates and use to include winter data: "Case growth was independent of mandates at low and high rates of community spread, and mask use did not predict case growth during the Summer or Fall-Winter waves." |
| 7) How face masks and lockdowns failed, SPR, 2021 | "Infections have been driven primarily by seasonal and endemic factors, whereas mask mandates and lockdowns have had no discernible impact" |
| 8) Analysis of the Effects of COVID-19 Mask Mandates on Hospital Resource Consumption and Mortality at the County Level, | "There was no reduction in per-population daily mortality, hospital bed, ICU bed, or ventilator occupancy of COVID-19-positive patients attributable to the implementation of a mask-wearing mandate." |

| Schauer, 2021 | |
|---|---|
| 9) Do we need mask mandates, Harris, 2021 | "But masks proved far less useful in the subsequent 1918 Spanish flu, a viral disease spread by pathogens smaller than bacteria. California's Department of Health, for instance, reported that the cities of Stockton, which required masks, and Boston, which did not, had scarcely different death rates, and so advised against mask mandates except for a few high-risk professions such as barbers….Randomized controlled trials (RCTs) on mask use, generally more reliable than observational studies, though not infallible, typically show that cloth and surgical masks offer little protection. A few RCTs suggest that perfect adherence to an exacting mask protocol may guard against influenza, but meta-analyses find little on the whole to suggest that masks offer meaningful protection. WHO guidelines from 2019 on influenza say that despite "mechanistic plausibility for the potential effectiveness" of masks, studies showed a benefit too small to be established with any certainty. Another literature review by researchers from the University of Hong Kong agrees. Its best estimate for the protective effect of surgical masks against influenza, based on ten RCTs published through 2018, was just 22 percent, and it could not rule out zero effect." |
| **MASK HARMS** | |
| 1) Corona children studies: Co-Ki: First results of a German-wide registry on mouth and nose covering (mask) in children, Schwarz, 2021 | "The average wearing time of the mask was 270 minutes per day. Impairments caused by wearing the mask were reported by 68% of the parents. These included irritability (60%), headache (53%), difficulty concentrating (50%), less happiness (49%), reluctance to go to school/kindergarten (44%), malaise (42%) impaired learning (38%) and drowsiness or fatigue (37%)." |
| 2) Dangerous pathogens found on children's face masks, Cabrera, 2021 | "Masks were contaminated with bacteria, parasites, and fungi, including three with dangerous pathogenic and pneumonia-causing bacteria." |
| 3) Masks, false safety and real dangers, Part 2: Microbial challenges from masks, Borovoy, 2020/2021 | "Laboratory testing of used masks from 20 train commuters revealed that 11 of the 20 masks tested contained over 100,000 bacterial colonies. Molds and yeasts were also found. Three of the masks contained more than one million bacterial colonies… The outside |

| | |
|---|---|
| | surfaces of surgical masks were found to have high levels of the following microbes, even in hospitals, more concentrated on the outside of masks than in the environment. Staphylococcus species (57%) and Pseudomonas spp (38%) were predominant among bacteria, and Penicillium spp (39%) and Aspergillus spp. (31%) were the predominant fungi." |
| 4) Preliminary report on surgical mask induced deoxygenation during major surgery, Beder, 2008 | "Considering our findings, pulse rates of the surgeon's increase and SpO2 decrease after the first hour. This early change in SpO2 may be either due to the facial mask or the operational stress. Since a very small decrease in saturation at this level, reflects a large decrease in PaO2, our findings may have a clinical value for the health workers and the surgeons." |
| 5) Mask mandates may affect a child's emotional, intellectual development, Gillis, 2020 | "The thing is we really don't know for sure what the effect may or may not be. But what we do know is that children, especially in early childhood, they use the mouth as part of the entire face to get a sense of what's going on around them in terms of adults and other people in their environment as far as their emotions. It also has a role in language development as well… If you think about an infant, when you interact with them you use part of your mouth. They are interested in your facial expressions. And if you think about that part of the face being covered up, there is that possibility that it could have an effect. But we don't know because this is really an unprecedented time. What we wonder about is if this could play a role and how can we stop it if it would affect child development." |
| 6) Headaches and the N95 face-mask amongst healthcare providers, Lim, 2006 | "Healthcare providers may develop headaches following the use of the N95 face-mask." |
| 7) Maximizing Fit for Cloth and Medical Procedure Masks to Improve Performance and Reduce SARS-CoV-2 Transmission and Exposure, 2021, Brooks, 2021 | "Although use of double masking or knotting and tucking are two of many options that can optimize fit and enhance mask performance for source control and for wearer protection, double masking might impede breathing or obstruct peripheral vision for some wearers, and knotting and tucking can change the shape of the mask such that it no longer covers fully both the nose and the mouth of persons with larger faces." |

| | |
|---|---|
| 8) [Facemasks in the COVID-19 era: A health hypothesis](), [Vainshelboim](), 2021 | "Wearing facemasks has been demonstrated to have substantial adverse physiological and psychological effects. These include hypoxia, hypercapnia, shortness of breath, increased acidity and toxicity, activation of fear and stress response, rise in stress hormones, immunosuppression, fatigue, headaches, decline in cognitive performance, predisposition for viral and infectious illnesses, chronic stress, anxiety and depression." |
| 9) [Wearing a mask can expose children to dangerous levels of carbon dioxide in just THREE MINUTES, study finds](), Shaheen/Daily Mail, 2021 | "European study found that children wearing masks for only minutes could be exposed to dangerous carbon dioxide levels…Forty-five children were exposed to carbon dioxide levels between three to twelve times healthy levels." |
| 10) [How many children must die?]() Shilhavy, 2020 | "How long are parents going to continue masking their children causing great harm to them, even to the point of risking their lives? [Dr. Eric Nepute]() in St. Louis took time to record a video rant that he wants everyone to share, after the 4-year-old child of one of his patients almost died from a bacterial lung infection caused by prolonged mask use." |
| 11) [Medical Doctor Warns that "Bacterial Pneumonias Are on the Rise" from Mask Wearing](), Meehan, 2021 | "I'm seeing patients that have facial rashes, fungal infections, bacterial infections. Reports coming from my colleagues, all over the world, are suggesting that the bacterial pneumonias are on the rise…Why might that be? Because untrained members of the public are wearing medical masks, repeatedly… in a non-sterile fashion… They're becoming contaminated. They're pulling them off of their car seat, off the rear-view mirror, out of their pocket, from their countertop, and they're reapplying a mask that should be worn fresh and sterile every single time." |
| 12) [Open Letter from Medical Doctors and Health Professionals to All Belgian Authorities and All Belgian Media](), AIER, 2020 | "Wearing a mask is not without side effects. Oxygen deficiency (headache, nausea, fatigue, loss of concentration) occurs fairly quickly, an effect similar to altitude sickness. Every day we now see patients complaining of headaches, sinus problems, respiratory problems and hyperventilation due to wearing masks. In addition, the accumulated CO2 leads to a toxic acidification of the organism which affects our immunity. Some experts even warn of an increased transmission |

| | of the virus in case of inappropriate use of the mask." |
|---|---|
| 13) Face coverings for covid-19: from medical intervention to social practice, Peters, 2020 | "At present, there is no direct evidence (from studies on Covid19 and in healthy people in the community) on the effectiveness of universal masking of healthy people in the community to prevent infection with respiratory viruses, including Covid19. Contamination of the upper respiratory tract by viruses and bacteria on the outside of medical face masks has been detected in several hospitals. Another research shows that a moist mask is a breeding ground for (antibiotic resistant) bacteria and fungi, which can undermine mucosal viral immunity. This research advocates the use of medical / surgical masks (instead of homemade cotton masks) that are used once and replaced after a few hours." |
| 14) Face masks for the public during the covid-19 crisis, Lazzarino, 2020 | "The two potential side effects that have already been acknowledged are: (1) Wearing a face mask may give a false sense of security and make people adopt a reduction in compliance with other infection control measures, including social distancing and hands washing. (2) Inappropriate use of face mask: people must not touch their masks, must change their single-use masks frequently or wash them regularly, dispose them correctly and adopt other management measures, otherwise their risks and those of others may increase. Other potential side effects that we must consider are: (3) The quality and the volume of speech between two people wearing masks is considerably compromised and they may unconsciously come closer. While one may be trained to counteract side effect n.1, this side effect may be more difficult to tackle. (4) Wearing a face mask makes the exhaled air go into the eyes. This generates an uncomfortable feeling and an impulse to touch your eyes. If your hands are contaminated, you are infecting yourself." |
| 15) Contamination by respiratory viruses on outer surface of medical masks used by hospital healthcare workers, Chughtai, 2019 | "Respiratory pathogens on the outer surface of the used medical masks may result in self-contamination. The risk is higher with longer duration of mask use (> 6 h) and with higher rates of clinical contact. Protocols on duration of mask use should specify a maximum time of continuous use, and should consider guidance in high contact settings." |

| 16) Reusability of Facemasks During an Influenza Pandemic, Bailar, 2006 | "After considering all the testimony and other information we received, the committee concluded that there is currently no simple, reliable way to decontaminate these devices and enable people to use them safely more than once. There is relatively little data available about how effective these devices are against flu even the first time they are used. To the extent they can help at all, they must be used correctly, and the best respirator or mask will do little to protect a person who uses it incorrectly. Substantial research must be done to increase our understanding of how flu spreads, to develop better masks and respirators, and to make it easier to decontaminate them. Finally, the use of face coverings is only one of many strategies that will be needed to slow or halt a pandemic, and people should not engage in activities that would increase their risk of exposure to flu just because they have a mask or respirator." |
|---|---|
| 17) Exhalation of respiratory viruses by breathing, coughing, and talking, Stelzer-Braid, 2009 | "The exhaled aerosols generated by coughing, talking, and breathing were sampled in 50 subjects using a novel mask, and analyzed using PCR for nine respiratory viruses. The exhaled samples from a subset of 10 subjects who were PCR positive for rhinovirus were also examined by cell culture for this virus. Of the 50 subjects, among the 33 with symptoms of upper respiratory tract infections, 21 had at least one virus detected by PCR, while amongst the 17 asymptomatic subjects, 4 had a virus detected by PCR. Overall, rhinovirus was detected in 19 subjects, influenza in 4 subjects, parainfluenza in 2 subjects, and human metapneumovirus in 1 subject. Two subjects were co-infected. Of the 25 subjects who had virus-positive nasal mucus, the same virus type was detected in 12 breathing samples, 8 talking samples, and in 2 coughing samples. In the subset of exhaled samples from 10 subjects examined by culture, infective rhinovirus was detected in 2." |
| 18) [Effect of a surgical mask on six minute walking distance], Person, 2018 | "Wearing a surgical mask modifies significantly and clinically dyspnea without influencing walked distance." |
| 19) Protective masks reduce resilience, Science ORF, 2020 | "The German researchers used two types of face masks for their study – surgical masks and so-called FFP2 |

masks, which are mainly used by medical personnel. The measurements were carried out with the help of spiroergometry, in which patients or in this case the test persons exert themselves physically on a stationary bicycle – a so-called ergometer – or a treadmill. The subjects were examined without a mask, with surgical masks and with FFP2 masks. The masks therefore impair breathing, especially the volume and the highest possible speed of the air when exhaling. The maximum possible force on the ergometer was significantly reduced."

| 20) Wearing masks even more unhealthy than expected, Coronoa transition, 2020 | "They contain microplastics – and they exacerbate the waste problem…"Many of them are made of polyester and so you have a microplastic problem." Many of the face masks would contain polyester with chlorine compounds: "If I have the mask in front of my face, then of course I breathe in the microplastic directly and these substances are much more toxic than if you swallow them, as they get directly into the nervous system," Braungart continues." |
|---|---|
| 21) Masking Children: Tragic, Unscientific, and Damaging, Alexander, 2021 | "Children do not readily acquire SARS-CoV-2 (very low risk), spread it to other children or teachers, or endanger parents or others at home. This is the settled science. In the rare cases where a child contracts Covid virus it is very unusual for the child to get severely ill or die. Masking can do positive harm to children – as it can to some adults. But the cost benefit analysis is entirely different for adults and children – particularly younger children. Whatever arguments there may be for consenting adults – children should not be required to wear masks to prevent the spread of Covid-19. Of course, zero risk is not attainable – with or without masks, vaccines, therapeutics, distancing or anything else medicine may develop or government agencies may impose." |
| 22) The Dangers of Masks, Alexander, 2021 | "With that clarion call, we pivot and refer here to another looming concern and this is the potential danger of the chlorine, polyester, and microplastic components of the face masks (surgical principally but any of the mass-produced masks) that have become part of our daily lives due to the Covid-19 pandemic. We hope those with persuasive power in the government will listen to this |

| | plea. We hope that the necessary decisions will be made to reduce the risk to our populations." |
|---|---|
| 23) [13-year-old mask wearer dies for inexplicable reasons](#), Corona Transition, 2020 | "The case is not only causing speculation in Germany about possible poisoning with carbon dioxide. Because the student "was wearing a corona protective mask when she suddenly collapsed and died a little later in the hospital," writes Wochenblick.Editor's Review: The fact that no cause of death was communicated nearly three weeks after the girl's death is indeed unusual. The carbon dioxide content of the air is usually about 0.04 percent. From a proportion of four percent, the first symptoms of hypercapnia, i.e. carbon dioxide poisoning, appear. If the proportion of the gas rises to more than 20 percent, there is a risk of deadly carbon dioxide poisoning. However, this does not come without alarm signals from the body. According to the medical portal netdoktor, these include "sweating, accelerated breathing, accelerated heartbeat, headaches, confusion, loss of consciousness". The unconsciousness of the girl could therefore be an indication of such poisoning." |
| 24) [Student Deaths Lead Chinese Schools to Change Mask Rules](#), that's, 2020 | "During the month of April, three cases of students suffering sudden cardiac death (SCD) while running during gym class have been reported in Zhejiang, Henan and Hunan provinces. Beijing Evening News noted that ==all three students were wearing masks at the time of their deaths, igniting a critical discussion over school rules on when students should wear masks.==" |
| 25) [Blaylock: Face Masks Pose Serious Risks To The Healthy](#), 2020 | "As for the scientific support for the use of face mask, a recent careful examination of the literature, in which 17 of the best studies were analyzed, concluded that, "==None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection.=="[1]   Keep in mind, no studies have been done to demonstrate that either a cloth mask or the N95 mask has any effect on transmission of the COVID-19 virus. Any recommendations, therefore, have to be based on studies of influenza virus transmission. And, as you have seen, there is no conclusive evidence of their efficiency in controlling flu virus transmission." |
| 26) [The mask requirement is](#) | "In fact, the mask has the potential to "trigger strong |

| | |
|---|---|
| [responsible for severe psychological damage and the weakening of the immune system](), Coronoa Transition, 2020 | psychovegetative stress reactions via emerging aggression, which correlate significantly with the degree of stressful after-effects". Prousa is not alone in her opinion. Several psychologists dealt with the mask problem — and most came to devastating results. Ignoring them would be fatal, according to Prousa." |
| 27) [The physiological impact of wearing an N95 mask during hemodialysis as a precaution against SARS in patients with end-stage renal disease](), Kao, 2004 | "Wearing an N95 mask for 4 hours during HD significantly reduced PaO2 and increased respiratory adverse effects in ESRD patients." |
| 28) [Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?](), [Kisielinski](), 2021 | "We objectified evaluation evidenced changes in respiratory physiology of mask wearers with significant correlation of $O_2$ drop and fatigue ($p < 0.05$), a clustered co-occurrence of respiratory impairment and $O_2$ drop (67%), N95 mask and $CO_2$ rise (82%), N95 mask and $O_2$ drop (72%), N95 mask and headache (60%), respiratory impairment and temperature rise (88%), but also temperature rise and moisture (100%) under the masks. ==Extended mask-wearing by the general population could lead to relevant effects and consequences in many medical fields.==""Here are the pathophysiological changes and subjective complaints: 1) Increase in blood carbon dioxide 2) Increase in breathing resistance 3) Decrease in blood oxygen saturation 4) Increase in heart rate 5) Decrease in cardiopulmonary capacity 6) Feeling of exhaustion 7) Increase in respiratory rate 8) Difficulty breathing and shortness of breath 9) Headache 10) Dizziness 11) Feeling of dampness and heat 12) Drowsiness (qualitative neurological deficits) 13) Decrease in empathy perception 14) Impaired skin barrier function with acne, itching and skin lesions" |
| 29) [Is N95 face mask linked to dizziness and headache?](), Ipek, 2021 | "Respiratory alkalosis and hypocarbia were detected after the use of N95. Acute respiratory alkalosis can cause headache, anxiety, tremor, muscle cramps. In this study, it was quantitatively shown that the participants' symptoms were due to respiratory alkalosis and hypocarbia." |

| | |
|---|---|
| 30) [COVID-19 prompts a team of engineers to rethink the humble face mask](), Myers, 2020 | "But in filtering those particles, the mask also makes it harder to breathe. N95 masks are estimated to reduce oxygen intake by anywhere from 5 to 20 percent. That's significant, even for a healthy person. It can cause dizziness and lightheadedness. <mark>If you wear a mask long enough, it can damage the lungs. For a patient in respiratory distress, it can even be life threatening."</mark> |
| 31) [70 doctors in open letter to Ben Weyts: 'Abolish mandatory mouth mask at school' – Belgium](), World Today News, 2020 | "In an open letter to the Flemish Minister of Education Ben Weyts (N-VA), 70 doctors ask to abolish the mandatory mouth mask at school, both for the teachers and for the students. Weyts does not intend to change course. The doctors ask that Minister Ben Weyts immediately reverses his working method: no mouth mask obligation at school, only protect the risk group and only the advice that people with a possible risk profile should consult their doctor." |
| 32) [Face masks pose dangers for babies, toddlers during COVID-19 pandemic](), UC Davis Health, 2020 | <mark>"Masks may present a choking hazard for young children. Also, depending on the mask and the fit, the child may have trouble breathing.</mark> If this happens, they need to be able to take it off," said UC Davis pediatrician [Lena van der List](). "Children less than 2 years of age will not reliably be able to remove a face mask and could suffocate. Therefore, masks should not routinely be used for young children…"The younger the child, the more likely they will be to not wear the mask properly, reach under the mask and touch potentially contaminated masks," said [Dean Blumberg](), chief of pediatric infectious diseases at [UC Davis Children's Hospital](). "Of course, this depends on the developmental level of the individual child. But I think masks are not likely to provide much potential benefit over risk until the teen years." |
| 33) [Covid-19: Important potential side effects of wearing face masks that we should bear in mind](), Lazzarino, 2020 | "Other potential side effects that we must consider, however, are 1) The quality and volume of speech between people wearing masks is considerably compromised and they may unconsciously come closer2) Wearing a mask makes the exhaled air go into the eyes. This generates an impulse to touch the eyes. 3) If your hands are contaminated, you are infecting yourself, 4) <mark>Face masks make breathing more difficult.</mark> Moreover, a fraction of carbon dioxide previously exhaled is inhaled at each respiratory cycle. Those |

| | |
|---|---|
| | phenomena increase breathing frequency and deepness, and ==they may worsen the burden of covid-19 if infected people wearing masks spread more contaminated air.== This may also worsen the clinical condition of infected people if the enhanced breathing pushes the viral load down into their lungs, 5) The innate immunity's efficacy is highly dependent on the viral load. If masks determine a humid habitat where SARS-CoV-2 can remain active because of the water vapour continuously provided by breathing and captured by the mask fabric, they determine an increase in viral load (by re-inhaling exhaled viruses) and therefore they can cause a defeat of the innate immunity and an increase in infections." |
| 34) Risks of N95 Face Mask Use in Subjects With COPD, Kyung, 2020 | "Of the 97 subjects, 7 with COPD did not wear the N95 for the entire test duration. This mask-failure group showed higher British modified Medical Research Council dyspnea scale scores and lower $FEV_1$ percent of predicted values than did the successful mask use group. A modified Medical Research Council dyspnea scale score ≥ 3 (odds ratio 167, 95% CI 8.4 to >999.9; P = .008) or a $FEV_1$ < 30% predicted (odds ratio 163, 95% CI 7.4 to >999.9; P = .001) was associated with a risk of failure to wear the N95. Breathing frequency, blood oxygen saturation, and exhaled carbon dioxide levels also showed significant differences before and after N95 use." |
| 35) Masks too dangerous for children under 2, medical group warns, The Japan Times, 2020 | "Children under the age of 2 shouldn't wear masks because they can make breathing difficult and increase the risk of choking, a medical group has said, launching an urgent appeal to parents as the nation reopens from the coronavirus crisis…==Masks can make breathing difficult because infants have narrow air passages," which increases the burden on their hearts, the association said, adding that masks also raise the risk of heat stroke for them.==" |
| 36) Face masks can be problematic, dangerous to health of some Canadians: advocates, Spenser, 2020 | "==Face masks are dangerous to the health of some Canadians and problematic for some others…Asthma Canada president and CEO Vanessa Foran said simply wearing a mask could create risk of an asthma attack.==" |

| | |
|---|---|
| 37) COVID-19 Masks Are a Crime Against Humanity and Child Abuse, Griesz-Brisson, 2020 | "The rebreathing of our exhaled air will without a doubt create oxygen deficiency and a flooding of carbon dioxide. We know that the human brain is very sensitive to oxygen depravation. There are nerve cells for example in the hippocampus, that can't be longer than 3 minutes without oxygen – they cannot survive. The acute warning symptoms are headaches, drowsiness, dizziness, issues in concentration, slowing down of the reaction time – reactions of the cognitive system. However, when you have chronic oxygen depravation, all of those symptoms disappear, because you get used to it. But your efficiency will remain impaired and the undersupply of oxygen in your brain continues to progress. We know that neurodegenerative diseases take years to decades to develop. If today you forget your phone number, the breakdown in your brain would have already started 20 or 30 years ago…The child needs the brain to learn, and the brain needs oxygen to function.  We don't need a clinical study for that. This is simple, indisputable physiology. Conscious and purposely induced oxygen deficiency is an absolutely deliberate health hazard, and an absolute medical contraindication." |
| 38) Study shows how masks are harming children, Mercola, 2021 | "Data from the first registry to record children's experiences with masks show physical, psychological and behavioral issues including irritability, difficulty concentrating and impaired learning.Since school shutdowns in spring 2020, an increasing number of parents are seeking drug treatment for attention deficit hyperactivity disorder (ADHD) for their children.Evidence from the U.K. shows schools are not the super spreaders health officials said they were; measured rates of infection in schools were the same as the community, not higher.A large randomized controlled trial showed wearing masks does not reduce the spread of SARS-CoV-2." |
| 39) New Study Finds Masks Hurt Schoolchildren Physically, Psychologically, and Behaviorally, Hall, 2021 https://www.researchsquare.com /article/rs-124394/v2 | "A new study, involving over 25,000 school-aged children, shows that masks are harming schoolchildren physically, psychologically, and behaviorally, revealing 24 distinct health issues associated with wearing masks…Though these results are concerning, the study also found that 29.7% of children experienced shortness |

| | |
|---|---|
| | of breath, 26.4% experienced dizziness, and hundreds of the participants experiencing accelerated respiration, tightness in chest, weakness, and short-term impairment of consciousness." |
| 40) Protective Face Masks: Effect on the Oxygenation and Heart Rate Status of Oral Surgeons during Surgery, Scarano, 2021 | "In all 20 surgeons wearing FFP2 covered by surgical masks, a reduction in arterial $O_2$ saturation from around 97.5% before surgery to 94% after surgery was recorded with increase of heart rates. A shortness of breath and light-headedness/headaches were also noted." |
| 41) Effects of surgical and FFP2/N95 face masks on cardiopulmonary exercise capacity, Fikenzer, 2020 | "Ventilation, cardiopulmonary exercise capacity and comfort are reduced by surgical masks and highly impaired by FFP2/N95 face masks in healthy individuals. These data are important for recommendations on wearing face masks at work or during physical exercise." |
| 42) Headaches Associated With Personal Protective Equipment – A Cross-Sectional Study Among Frontline Healthcare Workers During COVID-19, Ong, 2020 | "Most healthcare workers develop de novo PPE-associated headaches or exacerbation of their pre-existing headache disorders." |
| 43) Open letter from medical doctors and health professionals to all Belgian authorities and all Belgian media, The American Institute of Stress, 2020 | "Wearing a mask is not without side effects.  Oxygen deficiency (headache, nausea, fatigue, loss of concentration) occurs fairly quickly, an effect similar to altitude sickness. Every day we now see patients complaining of headaches, sinus problems, respiratory problems, and hyperventilation due to wearing masks. In addition, the accumulated CO2 leads to a toxic acidification of the organism which affects our immunity. Some experts even warn of increased transmission of the virus in case of inappropriate use of the mask." |
| 44) Reusing masks may increase your risk of coronavirus infection, expert says, Laguipo, 2020 | "For the public, they should not wear facemasks unless they are sick, and if a healthcare worker advised them."For the average member of the public walking down a street, it is not a good idea," Dr. Harries said."What tends to happen is people will have one mask. They won't wear it all the time, they will take it off when they get home, they will put it down on a surface they haven't cleaned," she added.Further, she added that behavioral issues could adversely put themselves at more risk of getting the infection. For instance, people |

| | "go out and don't wash their hands, they touch parts of the mask or their face, and they get infected." |
|---|---|
| 45) What's Going On Under the Masks?, Wright, 2021 | "Americans today have pretty good chompers on average, at least relative to most other people, past and present. Nevertheless, we do not think enough about oral health as evidenced by the almost complete lack of discussion regarding the effect of lockdowns and mandatory masking on our mouths." |
| 46) Experimental Assessment of Carbon Dioxide Content in Inhaled Air With or Without Face Masks in Healthy ChildrenA Randomized Clinical Trial, Walach, 2021 | "A large-scale survey in Germany of adverse effects in parents and children using data of 25 930 children has shown that 68% of the participating children had problems when wearing nose and mouth coverings." |
| 47) NM Kids forced to wear masks while running in 100-degree heat; Parents are striking back, Smith, 2021 | "Nationally, children have a 99.997% survival rate from COVID-19.  In New Mexico, only 0.7% of child COVID-19 cases have resulted in hospitalization. It is clear that children have an extremely low risk of severe illness or death from COVID-19, and mask mandates are placing a burden upon kids which is detrimental to their own health and well-being." |
| 48) Health Canada issues advisory for disposable masks with graphene, CBC, 2021 | "Health Canada is advising Canadians not to use disposable face masks that contain graphene. Health Canada issued the notice on Friday and said wearers could inhale graphene, a single layer of carbon atoms. Masks containing the toxic particles may have been distributed in some health-care facilities." |
| 49) COVID-19: Performance study of microplastic inhalation risk posed by wearing masks, Li, 2021 Is graphene safe? | "Wearing masks considerably reduces the inhalation risk of particles (e.g., granular microplastics and unknown particles) even when they are worn continuously for 720 h. Surgical, cotton, fashion, and activated carbon masks wearing pose higher fiber-like microplastic inhalation risk, while all masks generally reduced exposure when used under their supposed time (<4 h). N95 poses less fiber-like microplastic inhalation risk. Reusing masks after they underwent different disinfection pre-treatment processes can increase the risk of particle (e.g., granular microplastics) and fiber-like microplastic inhalation. Ultraviolet disinfection exerts a relatively weak effect on fiber-like microplastic inhalation, and thus, it can be recommended as a treatment process for reusing masks if proven effective |

| | from microbiological standpoint. Wearing an N95 mask reduces the inhalation risk of spherical-type microplastics by 25.5 times compared with not wearing a mask." |
|---|---|
| 50) Manufacturers have been using nanotechnology-derived graphene in face masks — now there are safety concerns, Maynard, 2021 | "Early concerns around graphene were sparked by previous research on another form of carbon — carbon nanotubes. It turns out that some forms of these fiber-like materials can cause serious harm if inhaled. And following on from research here, a natural next-question to ask is whether carbon nanotubes' close cousin graphene comes with similar concerns.Because graphene lacks many of the physical and chemical aspects of carbon nanotubes that make them harmful (such as being long, thin, and hard for the body to get rid of), the indications are that the material is safer than its nanotube cousins. But safer doesn't mean safe. And current research indicates that this is not a material that should be used where it could potentially be inhaled, without a good amount of safety testing first… As a general rule of thumb, engineered nanomaterials should not be used in products where they might inadvertently be inhaled and reach the sensitive lower regions of the lungs." |
| 51) Masking young children in school harms language acquisition, Walsh, 2021 | "This is important because children and/or students do not have the speech or language ability that adults have — they are not equally able and the ability to see the face and especially the mouth is critical to language acquisition which children and/or students are engaged in at all times. Furthermore, the ability to see the mouth is not only essential to communication but also essential to brain development."Studies show that by age four, kids from low-income households will hear 30 million less words than their more affluent counterparts, who get more quality face-time with caretakers." (https://news.stanford.edu/news/2014/november/language-toddlers-fernald-110514.html)." |
| 52) Dangerous pathogens found on children's face masks, Rational Ground, 2021 | "A group of parents in Gainesville, FL, sent 6 face masks to a lab at the University of Florida, requesting an analysis of contaminants found on the masks after they had been worn. The resulting report found that five masks were contaminated with bacteria, parasites, and fungi, including three with dangerous pathogenic and |

|  |  |
|---|---|
|  | ==pneumonia-causing bacteria.== Although the test is capable of detecting viruses, including SARS-CoV-2, only one virus was found on one mask (alcelaphine herpesvirus 1)…Half of the masks were contaminated with one or more strains of pneumonia-causing bacteria. One-third were contaminated with one or more strains of meningitis-causing bacteria. One-third were contaminated with dangerous, antibiotic-resistant bacterial pathogens. In addition, less dangerous pathogens were identified, including pathogens that can cause fever, ulcers, acne, yeast infections, strep throat, periodontal disease, Rocky Mountain Spotted Fever, and more." |
| 53) Face mask dermatitis" due to compulsory facial masks during the SARS-CoV-2 pandemic: data from 550 health care and non-health care workers in Germany, Niesert, 2021 | "The duration of wearing masks showed a significant impact on the prevalence of symptoms (p < 0.001). Type IV hypersensitivity was significantly more likely in participants with symptoms compared to those without symptoms (p = 0.001), whereas no increase in symptoms was observed in participants with atopic diathesis. HCWs used facial skin care products significantly more often than non-HCWs (p = 0.001)." |
| 54) Effect of Wearing Face Masks on the Carbon Dioxide Concentration in the Breathing Zone, AAQR/Geiss, 2020 | "Detected carbon dioxide concentrations ranged from 2150 ± 192 to 2875 ± 323 ppm. The concentrations of carbon dioxide while not wearing a face mask varied from 500–900 ppm. Doing office work and standing still on the treadmill each resulted in carbon dioxide concentrations of around 2200 ppm. A small increase could be observed when walking at a speed of 3 km h–1 (leisurely walking pace)…concentrations in the detected range can cause undesirable symptoms, such as fatigue, headache, and loss of concentration." |
| 55) Surgical masks as source of bacterial contamination during operative procedures, Zhiqing, 2018 | "The source of bacterial contamination in SMs was the body surface of the surgeons rather than the OR environment. Moreover, we recommend that surgeons should change the mask after each operation, especially those beyond 2 hours." |
| 56) The Damage of Masking Children Could be Irreparable, Hussey, 2021 | "When we surround children with mask-wearers for a year at a time, are we impairing their face barcode recognition during a period of hot neural development, thus putting full development of the FFA at risk? Does the demand for separation from others, reducing social interaction, add to the potential consequences as it |

| | might in autism? When can we be sure that we won't interfere with visual input to the face recognition visual neurology so we don't interfere with brain development? How much time with stimulus interference can we allow without consequences? Those are all questions currently without answers; we don't know. Unfortunately, <mark>the science implies that if we mess up brain development for faces, we may not currently have therapies to undo everything we've done."</mark> |
|---|---|
| 57) Masks can be Murder, Grossman, 2021 | "Wearing masks can create a sense of anonymity for an aggressor, while also dehumanizing the victim. This prevents empathy, empowering violence, and murder." <mark>Masking helps remove empathy and compassion, allowing others to commit unspeakable acts on the masked person."</mark> |
| 58) London high school teacher calls face masks an 'egregious and unforgivable form of child abuse, Butler, 2020 | "In his email, Farquharson called the campaign to legislate mask wearing a "shameful farce, a charade, an act of political theatre" that's more about enforcing "obedience and compliance" than it is about public health. <mark>He also likened children wearing masks to "involuntary self-torture," calling it an "egregious and unforgivable form of child abuse and physical assault."</mark> |
| 59) UK Government Advisor Admits Masks Are Just "Comfort Blankets" That Do Virtually Nothing, ZeroHedge, 2021 | "As the UK Government heralds "freedom day" today, which is anything but, <mark>a prominent government scientific advisor has admitted that face masks do very little to protect from coronavirus and are basically just "comfort blankets.</mark>…the professor noted that "those aerosols escape masks and will render the mask ineffective," adding "The public were demanding something must be done, they got masks, it is just a comfort blanket. But now it is entrenched, and we are entrenching bad behaviour…<mark>all around the world you can look at mask mandates and superimpose on infection rates, you cannot see that mask mandates made any effect whatsoever,"</mark> Axon further noted, adding that "The best thing you can say about any mask is that any positive effect they do have is too small to be measured." |
| 60) Masks, false safety and real dangers, Part 1: Friable mask particulate and lung vulnerability, Borovoy, 2020 | "Surgical personnel are trained to never touch any part of a mask, except the loops and the nose bridge. Otherwise, the mask is considered useless and is to be replaced. Surgical personnel are strictly trained not to touch their masks otherwise. However, the general |

| | |
|---|---|
| | public may be seen touching various parts of their masks. Even the masks just removed from manufacturer packaging have been shown in the above photos to contain particulate and fiber that would not be optimal to inhale… Further concerns of macrophage response and other immune and inflammatory and fibroblast response to such inhaled particles specifically from facemasks should be the subject of more research. If widespread masking continues, then the potential for inhaling mask fibers and environmental and biological debris continues on a daily basis for hundreds of millions of people. This should be alarming for physicians and epidemiologists knowledgeable in occupational hazards." |
| 61) Medical Masks, Desai, 2020 | "Face masks should be used only by individuals who have symptoms of respiratory infection such as coughing, sneezing, or, in some cases, fever. Face masks should also be worn by health care workers, by individuals who are taking care of or are in close contact with people who have respiratory infections, or otherwise as directed by a doctor. Face masks should not be worn by healthy individuals to protect themselves from acquiring respiratory infection because there is no evidence to suggest that face masks worn by healthy individuals are effective in preventing people from becoming ill." |

**Table 1**                     Plaintiffs' Exhibit 229

Physiological and Psychological Effects of Wearing Facemask and Their Potential Health Consequences.

| Physiological Effects | Psychological Effect | Health Consequences |
|---|---|---|
| • Hypoxemia<br>• Hypercapnia<br>• Shortness of breath<br>• Increase lactate concentration<br>• Decline in pH levels<br>• Acidosis<br>• Toxicity<br>• Inflammation<br>• Self-contamination<br>• Increase in stress hormones level (adrenaline, noradrenaline and cortisol)<br>• Increased muscle tension<br>• Immunosuppression | • Activation of "fight or flight" stress response<br>• Chronic stress condition<br>• Fear<br>• Mood disturbances<br>• Insomnia<br>• Fatigue<br>• Compromised cognitive performance | • Increased predisposition for viral and infection illnesses<br>• Headaches<br>• Anxiety<br>• Depression<br>• Hypertension<br>• Cardiovascular disease<br>• Cancer<br>• Diabetes<br>• Alzheimer disease<br>• Exacerbation of existing conditions and diseases<br>• Accelerated aging process<br>• Health deterioration<br>• Premature mortality |

Plaintiffs' Exhibit 230



Plaintiffs' Exhibit 231

ncbi.nlm.nih.gov

# Facemasks in the COVID-19 era: A health hypothesis

*Baruch Vainshelboim*∗

37-47 minutes

## Abstract

Many countries across the globe utilized medical and non-medical facemasks as non-pharmaceutical intervention for reducing the transmission and infectivity of coronavirus disease-2019 (COVID-19). Although, scientific evidence supporting facemasks' efficacy is lacking, adverse physiological, psychological and health effects are established. Is has been hypothesized that facemasks have compromised safety and efficacy profile and should be avoided from use. The current article comprehensively summarizes scientific evidences with respect to wearing facemasks in the COVID-19 era, providing prosper information for public health and decisions making.

**Keywords:** Physiology, Psychology, Health, SARS-CoV-2, Safety, Efficacy

## Introduction

Facemasks are part of non-pharmaceutical interventions providing some breathing barrier to the mouth and nose that have been utilized for reducing the transmission of respiratory pathogens [1]. Facemasks can be medical and non-medical, where two types of the medical masks primarily used by healthcare workers [1], [2]. The first type is National Institute for Occupational Safety and Health (NIOSH)-certified N95 mask, a filtering face-piece respirator, and the second type is a surgical mask [1]. The designed and intended uses of N95 and surgical masks are different in the type of protection they potentially provide. The N95s are typically composed of electret filter media and seal tightly to the face of the wearer, whereas surgical masks are generally loose fitting and may or may not contain electret-filtering media. The N95s are designed to reduce the wearer's inhalation exposure to infectious and harmful particles from the environment such as during extermination of insects. In contrast, surgical masks are designed to provide a barrier protection against splash, spittle and other body fluids to spray from the wearer (such as surgeon) to the sterile environment (patient during operation) for reducing the risk of contamination [1].

The third type of facemasks are the non-medical cloth or fabric masks. The non-medical facemasks are made from a variety of woven and non-woven materials such as Polypropylene, Cotton, Polyester, Cellulose, Gauze and Silk. Although non-medical cloth or fabric facemasks are neither a medical device nor personal protective equipment, some standards have been developed by the French Standardization Association (AFNOR Group) to define a minimum performance for filtration and breathability capacity [2]. The current article reviews the scientific evidences with respect to safety and efficacy of wearing facemasks, describing the physiological and psychological effects and the potential long-term consequences on health.

## Hypothesis

On January 30, 2020, the World Health Organization (WHO) announced a global public health emergency of severe acute respiratory syndrome-coronavirus-2 (SARS-CoV-2) causing illness of coronavirus disease-2019 (COVID-19) [3]. As of October 1, 2020, worldwide 34,166,633 cases were reported and 1,018,876 have died with virus diagnosis. Interestingly, 99% of the detected cases with SARS-CoV-2 are asymptomatic or have mild condition, which contradicts with the virus name (*severe* acute respiratory syndrome-coronavirus-2) [4]. Although infection fatality rate (number of death cases divided by number of reported cases) initially seems quite high 0.029 (2.9%) [4], this overestimation related to limited number of COVID-19 tests performed which biases towards higher rates. Given the fact that asymptomatic or minimally symptomatic cases is several times higher than the number of reported cases, the case fatality rate is considerably less than 1% [5]. This was confirmed by the head of National Institute of Allergy and Infectious Diseases from US stating, "the overall clinical consequences of COVID-19 are similar to those of severe seasonal influenza" [5], having a case fatality rate of approximately 0.1% [5], [6], [7], [8]. In addition, data from hospitalized patients with COVID-19 and general public indicate that the majority of deaths were among older and chronically ill individuals, supporting the possibility that the virus may exacerbates existing conditions but rarely causes death by itself [9], [10]. SARS-CoV-2 primarily affects respiratory system and can cause complications such as acute respiratory distress syndrome (ARDS), respiratory failure and death [3], [9]. It is not clear however, what the scientific and clinical basis for wearing facemasks as protective strategy, given the fact that facemasks restrict breathing, causing hypoxemia and hypercapnia and increase the risk for respiratory complications, self-contamination and exacerbation of existing chronic conditions [2], [11], [12], [13], [14].

Of note, hyperoxia or oxygen supplementation (breathing air with high partial $O_2$ pressures that above the sea levels) has been well established as therapeutic and curative practice for variety acute and chronic conditions including respiratory complications [11], [15]. It fact, the current standard of care practice for treating hospitalized patients with COVID-19 is breathing 100% oxygen [16], [17], [18]. Although several countries mandated wearing facemask in health care settings and public areas, scientific evidences are lacking supporting their efficacy for reducing morbidity or mortality associated with infectious or viral diseases [2], [14], [19]. Therefore, it has been hypothesized: 1) the practice of wearing facemasks has compromised safety and efficacy profile, 2) Both medical and non-medical facemasks are ineffective to reduce human-to-human transmission and infectivity of SARS-CoV-2 and COVID-19, 3) Wearing facemasks has adverse physiological and psychological effects, 4) Long-term consequences of wearing facemasks on health are detrimental.

## Evolution of hypothesis

### Breathing Physiology

Breathing is one of the most important physiological functions to sustain life and health. Human body requires a continuous and adequate oxygen ($O_2$) supply to all organs and cells for normal function and survival. Breathing is also an essential process for removing metabolic byproducts [carbon dioxide ($CO_2$)] occurring during cell respiration [12], [13]. It is well established that acute significant deficit in $O_2$ (hypoxemia) and increased levels of $CO_2$ (hypercapnia) even for few minutes can be

severely harmful and lethal, while chronic hypoxemia and hypercapnia cause health deterioration, exacerbation of existing conditions, morbidity and ultimately mortality [11], [20], [21], [22]. Emergency medicine demonstrates that 5–6 min of severe hypoxia during cardiac arrest will cause brain death with extremely poor survival rates [20], [21], [22], [23]. On the other hand, chronic mild or moderate hypoxemia and hypercapnia such as from wearing facemasks resulting in shifting to higher contribution of anaerobic energy metabolism, decrease in pH levels and increase in cells and blood acidity, toxicity, oxidative stress, chronic inflammation, immunosuppression and health deterioration [24], [11], [12], [13].

**Efficacy of facemasks**

The physical properties of medical and non-medical facemasks suggest that facemasks are ineffective to block viral particles due to their difference in scales [16], [17], [25]. According to the current knowledge, the virus SARS-CoV-2 has a diameter of 60 nm to 140 nm [nanometers (billionth of a meter)] [16], [17], while medical and non-medical facemasks' thread diameter ranges from 55 μm to 440 μm [micrometers (one millionth of a meter), which is more than 1000 times larger [25]. Due to the difference in sizes between SARS-CoV-2 diameter and facemasks thread diameter (the virus is 1000 times smaller), SARS-CoV-2 can easily pass through any facemask [25]. In addition, the efficiency filtration rate of facemasks is poor, ranging from 0.7% in non-surgical, cotton-gauze woven mask to 26% in cotton sweeter material [2]. With respect to surgical and N95 medical facemasks, the efficiency filtration rate falls to 15% and 58%, respectively when even small gap between the mask and the face exists [25].

Clinical scientific evidence challenges further the efficacy of facemasks to block human-to-human transmission or infectivity. A randomized controlled trial (RCT) of 246 participants [123 (50% symptomatic)] who were allocated to either wearing or not wearing surgical facemask, assessing viruses transmission including coronavirus [26]. The results of this study showed that among symptomatic individuals (those with fever, cough, sore throat, runny nose ect…) there was no difference between wearing and not wearing facemask for coronavirus droplets transmission of particles of >5 μm. Among asymptomatic individuals, there was no droplets or aerosols coronavirus detected from any participant with or without the mask, suggesting that asymptomatic individuals do not transmit or infect other people [26]. This was further supported by a study on infectivity where 445 asymptomatic individuals were exposed to asymptomatic SARS-CoV-2 carrier (been positive for SARS-CoV-2) using close contact (shared quarantine space) for a median of 4 to 5 days. The study found that none of the 445 individuals was infected with SARS-CoV-2 confirmed by real-time reverse transcription polymerase [27].

A *meta*-analysis among health care workers found that compared to no masks, surgical mask and N95 respirators were not effective against transmission of viral infections or influenza-like illness based on six RCTs [28]. Using separate analysis of 23 observational studies, this *meta*-analysis found no protective effect of medical mask or N95 respirators against SARS virus [28]. A recent systematic review of 39 studies including 33,867 participants in community settings (self-report illness), found no difference between N95 respirators versus surgical masks and surgical mask versus no masks in the risk for developing influenza or influenza-like illness, suggesting their ineffectiveness of blocking viral transmissions in community settings [29].

Another *meta*-analysis of 44 non-RCT studies (n = 25,697 participants) examining the potential risk reduction of facemasks against SARS, middle east respiratory syndrome (MERS) and COVID-19 transmissions [30]. The *meta*-analysis included four specific studies on COVID-19 transmission (5,929 participants, primarily health-care workers used N95 masks). Although the overall findings showed reduced risk of virus transmission with facemasks, the analysis had severe limitations to draw conclusions. One of the four COVID-19 studies had zero infected cases in both arms, and was excluded from *meta*-analytic calculation. Other two COVID-19 studies had unadjusted models, and were also excluded from the overall analysis. The *meta*-analytic results were based on only one COVID-19, one MERS and 8 SARS studies, resulting in high selection bias of the studies and contamination of the results between different viruses. Based on four COVID-19 studies, the *meta*-analysis failed to demonstrate risk reduction of facemasks for COVID-19 transmission, where the authors reported that the results of *meta*-analysis have low certainty and are inconclusive [30].

In early publication the WHO stated that "facemasks are not required, as no evidence is available on its usefulness to protect non-sick persons" [14]. In the same publication, the WHO declared that "cloth (e.g. cotton or gauze) masks are not recommended under any circumstance" [14]. Conversely, in later publication the WHO stated that the usage of fabric-made facemasks (Polypropylene, Cotton, Polyester, Cellulose, Gauze and Silk) is a general community practice for "preventing the infected wearer transmitting the virus to others and/or to offer protection to the healthy wearer against infection (prevention)" [2]. The same publication further conflicted itself by stating that due to the lower filtration, breathability and overall performance of fabric facemasks, the usage of woven fabric mask such as cloth, and/or non-woven fabrics, should only be considered for infected persons and not for prevention practice in asymptomatic individuals [2]. The Central for Disease Control and Prevention (CDC) made similar recommendation, stating that only symptomatic persons should consider wearing facemask, while for asymptomatic individuals this practice is not recommended [31]. Consistent with the CDC, clinical scientists from Departments of Infectious Diseases and Microbiology in Australia counsel against facemasks usage for health-care workers, arguing that there is no justification for such practice while normal caring relationship between patients and medical staff could be compromised [32]. Moreover, the WHO repeatedly announced that "at present, there is no direct evidence (from studies on COVID-19) on the effectiveness face masking of healthy people in the community to prevent infection of respiratory viruses, including COVID-19"[2]. Despite these controversies, the potential harms and risks of wearing facemasks were clearly acknowledged. These including self-contamination due to hand practice or non-replaced when the mask is wet, soiled or damaged, development of facial skin lesions, irritant dermatitis or worsening acne and psychological discomfort. Vulnerable populations such as people with mental health disorders, developmental disabilities, hearing problems, those living in hot and humid environments, children and patients with respiratory conditions are at significant health risk for complications and harm [2].

**Physiological effects of wearing facemasks**

Wearing facemask mechanically restricts breathing by increasing the resistance of air movement during both inhalation and exhalation process [12], [13]. Although, intermittent (several times a week) and repetitive (10–15 breaths for 2–4 sets) increase in respiration resistance may be adaptive for strengthening respiratory muscles [33], [34], prolonged and continues effect of wearing facemask is maladaptive and could be detrimental for health [11], [12], [13]. In normal conditions at the sea level, air

contains 20.93% $O_2$ and 0.03% $CO_2$, providing partial pressures of 100 mmHg and 40 mmHg for these gases in the arterial blood, respectively. These gas concentrations significantly altered when breathing occurs through facemask. A trapped air remaining between the mouth, nose and the facemask is rebreathed repeatedly in and out of the body, containing low $O_2$ and high $CO_2$ concentrations, causing hypoxemia and hypercapnia [35], [36], [11], [12], [13]. Severe hypoxemia may also provoke cardiopulmonary and neurological complications and is considered an important clinical sign in cardiopulmonary medicine [37], [38], [39], [40], [41], [42]. Low oxygen content in the arterial blood can cause myocardial ischemia, serious arrhythmias, right or left ventricular dysfunction, dizziness, hypotension, syncope and pulmonary hypertension [43]. Chronic low-grade hypoxemia and hypercapnia as result of using facemask can cause exacerbation of existing cardiopulmonary, metabolic, vascular and neurological conditions [37], [38], [39], [40], [41], [42]. Table 1 summarizes the physiological, psychological effects of wearing facemask and their potential long-term consequences for health.

**Table 1**

Physiological and Psychological Effects of Wearing Facemask and Their Potential Health Consequences.

| Physiological Effects | Psychological Effect | Health Consequences |
|---|---|---|
| • Hypoxemia | • Activation of "fight or flight" stress response | • Increased predisposition for viral and infection illnesses |
| • Hypercapnia | • Chronic stress condition | • Headaches |
| • Shortness of breath | • Fear | • Anxiety |
| • Increase lactate concentration | • Mood disturbances | • Depression |
| • Decline in pH levels | • Insomnia | • Hypertension |
| • Acidosis | • Fatigue | • Cardiovascular disease |
| • Toxicity | • Compromised cognitive performance | • Cancer |
| • Inflammation | | • Diabetes |
| • Self-contamination | | • Alzheimer disease |
| • Increase in stress hormones level (adrenaline, noradrenaline and cortisol) | | • Exacerbation of existing conditions and diseases |
| • Increased muscle tension | | • Accelerated aging process |
| • Immunosuppression | | • Health deterioration |
| | | • Premature mortality |

In addition to hypoxia and hypercapnia, breathing through facemask residues bacterial and germs components on the inner and outside layer of the facemask. These toxic components are repeatedly rebreathed back into the body, causing self-contamination. Breathing through facemasks also increases temperature and humidity in the space between the mouth and the mask, resulting a release of toxic particles from the mask's materials [1], [2], [19], [26], [35], [36]. A systematic literature

review estimated that aerosol contamination levels of facemasks including 13 to 202,549 different viruses [1]. Rebreathing contaminated air with high bacterial and toxic particle concentrations along with low $O_2$ and high $CO_2$ levels continuously challenge the body homeostasis, causing self-toxicity and immunosuppression [1], [2], [19], [26], [35], [36].

A study on 39 patients with renal disease found that wearing N95 facemask during hemodialysis significantly reduced arterial partial oxygen pressure (from $PaO_2$ 101.7 to 92.7 mm Hg), increased respiratory rate (from 16.8 to 18.8 breaths/min), and increased the occurrence of chest discomfort and respiratory distress [35]. Respiratory Protection Standards from Occupational Safety and Health Administration, US Department of Labor states that breathing air with $O_2$ concentration below 19.5% is considered oxygen-deficiency, causing physiological and health adverse effects. These include increased breathing frequency, accelerated heartrate and cognitive impairments related to thinking and coordination [36]. A chronic state of mild hypoxia and hypercapnia has been shown as primarily mechanism for developing cognitive dysfunction based on animal studies and studies in patients with chronic obstructive pulmonary disease [44].

The adverse physiological effects were confirmed in a study of 53 surgeons where surgical facemask were used during a major operation. After 60 min of facemask wearing the oxygen saturation dropped by more than 1% and heart rate increased by approximately five beats/min [45]. Another study among 158 health-care workers using protective personal equipment primarily N95 facemasks reported that 81% (128 workers) developed new headaches during their work shifts as these become mandatory due to COVID-19 outbreak. For those who used the N95 facemask greater than 4 h per day, the likelihood for developing a headache during the work shift was approximately four times higher [Odds ratio = 3.91, 95% CI (1.35–11.31) p = 0.012], while 82.2% of the N95 wearers developed the headache already within ≤10 to 50 min [46].

With respect to cloth facemask, a RCT using four weeks follow up compared the effect of cloth facemask to medical masks and to no masks on the incidence of clinical respiratory illness, influenza-like illness and laboratory-confirmed respiratory virus infections among 1607 participants in 14 hospitals [19]. The results showed that there were no difference between wearing cloth masks, medical masks and no masks for incidence of clinical respiratory illness and laboratory-confirmed respiratory virus infections. However, a large harmful effect with more than 13 times higher risk [Relative Risk = 13.25 95% CI (1.74 to 100.97) was observed for influenza-like illness among those who were wearing cloth masks [19]. The study concluded that cloth masks have significant health and safety issues including moisture retention, reuse, poor filtration and increased risk for infection, providing recommendation against the use of cloth masks [19].

**Psychological effects of wearing facemasks**

Psychologically, wearing facemask fundamentally has negative effects on the wearer and the nearby person. Basic human-to-human connectivity through face expression is compromised and self-identity is somewhat eliminated [47], [48], [49]. These dehumanizing movements partially delete the uniqueness and individuality of person who wearing the facemask as well as the connected person [49]. Social connections and relationships are basic human needs, which innately inherited in all people, whereas reduced human-to-human connections are associated with poor mental and physical health [50], [51]. Despite escalation in technology and globalization that would presumably foster social connections,

scientific findings show that people are becoming increasingly more socially isolated, and the prevalence of loneliness is increasing in last few decades [50], [52]. Poor social connections are closely related to isolation and loneliness, considered significant health related risk factors [50], [51], [52], [53].

A *meta*-analysis of 91 studies of about 400,000 people showed a 13% increased morality risk among people with low compare to high contact frequency [53]. Another *meta*-analysis of 148 prospective studies (308,849 participants) found that poor social relationships was associated with 50% increased mortality risk. People who were socially isolated or fell lonely had 45% and 40% increased mortality risk, respectively. These findings were consistent across ages, sex, initial health status, cause of death and follow-up periods [52]. Importantly, the increased risk for mortality was found comparable to smoking and exceeding well-established risk factors such as obesity and physical inactivity [52]. An umbrella review of 40 systematic reviews including 10 *meta*-analyses demonstrated that compromised social relationships were associated with increased risk of all-cause mortality, depression, anxiety suicide, cancer and overall physical illness [51].

As described earlier, wearing facemasks causing hypoxic and hypercapnic state that constantly challenges the normal homeostasis, and activates "fight or flight" stress response, an important survival mechanism in the human body [11], [12], [13]. The acute stress response includes activation of nervous, endocrine, cardiovascular, and the immune systems [47], [54], [55], [56]. These include activation of the limbic part of the brain, release stress hormones (adrenalin, neuro-adrenalin and cortisol), changes in blood flow distribution (vasodilation of peripheral blood vessels and vasoconstriction of visceral blood vessels) and activation of the immune system response (secretion of macrophages and natural killer cells) [47], [48]. ==Encountering people who wearing facemasks activates innate stress-fear emotion, which is fundamental to all humans in danger or life threating situations, such as death or unknown, unpredictable outcome. While acute stress response (seconds to minutes) is adaptive reaction to challenges and part of the survival mechanism, chronic and prolonged state of stress-fear is maladaptive and has detrimental effects on physical and mental health.== The repeatedly or continuously activated stress-fear response causes the body to operate on survival mode, having sustain increase in blood pressure, pro-inflammatory state and immunosuppression [47], [48].

**Long-Term health consequences of wearing facemasks**

==Long-term practice of wearing facemasks has strong potential for devastating health consequences.== Prolonged hypoxic-hypercapnic state compromises normal physiological and psychological balance, deteriorating health and promotes the developing and progression of existing chronic diseases [23], [38], [39], [43], [47], [48], [57], [11], [12], [13]. For instance, ischemic heart disease caused by hypoxic damage to the myocardium is the most common form of cardiovascular disease and is a number one cause of death worldwide (44% of all non-communicable diseases) with 17.9 million deaths occurred in 2016 [57]. Hypoxia also playing an important role in cancer burden [58]. Cellular hypoxia has strong mechanistic feature in promoting cancer initiation, progression, metastasis, predicting clinical outcomes and usually presents a poorer survival in patients with cancer. Most solid tumors present some degree of hypoxia, which is independent predictor of more aggressive disease, resistance to cancer therapies and poorer clinical outcomes [59], [60]. Worth note, cancer is one of the leading causes of death worldwide, with an estimate of more than 18 million new diagnosed cases and 9.6

million cancer-related deaths occurred in 2018 [61].

With respect to mental health, global estimates showing that COVID-19 will cause a catastrophe due to collateral psychological damage such as quarantine, lockdowns, unemployment, economic collapse, social isolation, violence and suicides [62], [63], [64]. Chronic stress along with hypoxic and hypercapnic conditions knocks the body out of balance, and can cause headaches, fatigue, stomach issues, muscle tension, mood disturbances, insomnia and accelerated aging [47], [48], [65], [66], [67]. This state suppressing the immune system to protect the body from viruses and bacteria, decreasing cognitive function, promoting the developing and exacerbating the major health issues including hypertension, cardiovascular disease, diabetes, cancer, Alzheimer disease, rising anxiety and depression states, causes social isolation and loneliness and increasing the risk for prematurely mortality [47], [48], [51], [56], [66].

## Conclusion

The existing scientific evidences challenge the safety and efficacy of wearing facemask as preventive intervention for COVID-19. The data suggest that both medical and non-medical facemasks are ineffective to block human-to-human transmission of viral and infectious disease such SARS-CoV-2 and COVID-19, supporting against the usage of facemasks. Wearing facemasks has been demonstrated to have substantial adverse physiological and psychological effects. These include hypoxia, hypercapnia, shortness of breath, increased acidity and toxicity, activation of fear and stress response, rise in stress hormones, immunosuppression, fatigue, headaches, decline in cognitive performance, predisposition for viral and infectious illnesses, chronic stress, anxiety and depression. Long-term consequences of wearing facemask can cause health deterioration, developing and progression of chronic diseases and premature death. Governments, policy makers and health organizations should utilize prosper and scientific evidence-based approach with respect to wearing facemasks, when the latter is considered as preventive intervention for public health.

## CRediT authorship contribution statement

**Baruch Vainshelboim:** Conceptualization, Data curation, Writing - original draft.

## Declaration of Competing Interest

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

## References

1. Fisher E.M., Noti J.D., Lindsley W.G., Blachere F.M., Shaffer R.E. Validation and application of models to predict facemask influenza contamination in healthcare settings. Risk Anal. 2014;34:1423–1434. [PMC free article] [PubMed] [Google Scholar]

2. World Health Organization. Advice on the use of masks in the context of COVID-19. Geneva, Switzerland; 2020.

3. Sohrabi C., Alsafi Z., O'Neill N., Khan M., Kerwan A., Al-Jabir A. World Health Organization declares global emergency: A review of the 2019 novel coronavirus (COVID-19) Int J Surg. 2020;76:71–76. [PMC free article] [PubMed] [Google Scholar]

4. Worldometer. COVID-19 CORONAVIRUS PANDEMIC. 2020.

5. Fauci A.S., Lane H.C., Redfield R.R. Covid-19 - Navigating the Uncharted. N Engl J Med. 2020;382:1268–1269. [PMC free article] [PubMed] [Google Scholar]

6. Shrestha S.S., Swerdlow D.L., Borse R.H., Prabhu V.S., Finelli L., Atkins C.Y. Estimating the burden of 2009 pandemic influenza A (H1N1) in the United States (April 2009-April 2010) Clin Infect Dis. 2011;52(Suppl 1):S75–S82. [PubMed] [Google Scholar]

7. Thompson W.W., Weintraub E., Dhankhar P., Cheng P.Y., Brammer L., Meltzer M.I. Estimates of US influenza-associated deaths made using four different methods. Influenza Other Respir Viruses. 2009;3:37–49. [PMC free article] [PubMed] [Google Scholar]

8. Centers for Disease, C., Prevention. Estimates of deaths associated with seasonal influenza --- United States, 1976-2007. MMWR Morb Mortal Wkly Rep. 2010,59:1057-62. [PubMed]

9. Richardson S., Hirsch J.S., Narasimhan M., Crawford J.M., McGinn T., Davidson K.W. Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area. JAMA. 2020 [PMC free article] [PubMed] [Google Scholar]

10. Ioannidis J.P.A., Axfors C., Contopoulos-Ioannidis D.G. Population-level COVID-19 mortality risk for non-elderly individuals overall and for non-elderly individuals without underlying diseases in pandemic epicenters. Environ Res. 2020;188 [PMC free article] [PubMed] [Google Scholar]

11. American College of Sports Medicine . Sixth ed. Lippincott Wiliams & Wilkins; Baltimore: 2010. ACSM's Resource Manual for Guidelines for Exercise Testing and Priscription. [Google Scholar]

12. Farrell P.A., Joyner M.J., Caiozzo V.J. second edition. Lippncott Williams & Wilkins; Baltimore: 2012. ACSM's Advanced Exercise Physiology. [Google Scholar]

13. Kenney W.L., Wilmore J.H., Costill D.L. 5th ed. Human Kinetics; Champaign, IL: 2012. Physiology of sport and exercise. [Google Scholar]

14. World Health Organization. Advice on the use of masks in the community, during home care and in health care settings in the context of the novel coronavirus (2019-nCoV) outbreak. Geneva, Switzerland; 2020.

15. Sperlich B., Zinner C., Hauser A., Holmberg H.C., Wegrzyk J. The Impact of Hyperoxia on Human Performance and Recovery. Sports Med. 2017;47:429–438. [PubMed] [Google Scholar]

16. Wiersinga W.J., Rhodes A., Cheng A.C., Peacock S.J., Prescott H.C. Pathophysiology, Transmission, Diagnosis, and Treatment of Coronavirus Disease 2019 (COVID-19): A Review. JAMA. 2020 [PubMed] [Google Scholar]

17. Zhu N., Zhang D., Wang W., Li X., Yang B., Song J. A Novel Coronavirus from Patients with Pneumonia in China, 2019. N Engl J Med. 2020;382:727–733. [PMC free article] [PubMed] [Google Scholar]

18. Poston J.T., Patel B.K., Davis A.M. Management of Critically Ill Adults With COVID-19. JAMA. 2020 [PubMed] [Google Scholar]

19. MacIntyre C.R., Seale H., Dung T.C., Hien N.T., Nga P.T., Chughtai A.A. A cluster randomised trial of cloth masks compared with medical masks in healthcare workers. BMJ open. 2015;5 [PMC free article] [PubMed] [Google Scholar]

20. Patil K.D., Halperin H.R., Becker L.B. Cardiac arrest: resuscitation and reperfusion. Circ Res. 2015;116:2041–2049. [PMC free article] [PubMed] [Google Scholar]

21. Hazinski M.F., Nolan J.P., Billi J.E., Bottiger B.W., Bossaert L., de Caen A.R. Part 1: Executive summary: 2010 International Consensus on Cardiopulmonary Resuscitation and Emergency Cardiovascular Care Science With Treatment Recommendations. Circulation. 2010;122:S250–S275. [PubMed] [Google Scholar]

22. Kleinman M.E., Goldberger Z.D., Rea T., Swor R.A., Bobrow B.J., Brennan E.E. American Heart Association Focused Update on Adult Basic Life Support and Cardiopulmonary Resuscitation Quality: An Update to the American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care. Circulation. 2018;137:e7–e13. [PubMed] [Google Scholar]

23. Lurie K.G., Nemergut E.C., Yannopoulos D., Sweeney M. The Physiology of Cardiopulmonary Resuscitation. Anesth Analg. 2016;122:767–783. [PubMed] [Google Scholar]

24. Chandrasekaran B., Fernandes S. "Exercise with facemask; Are we handling a devil's sword?" - A physiological hypothesis. Med Hypotheses. 2020;144 [PMC free article] [PubMed] [Google Scholar]

25. Konda A., Prakash A., Moss G.A., Schmoldt M., Grant G.D., Guha S. Aerosol Filtration Efficiency of Common Fabrics Used in Respiratory Cloth Masks. ACS Nano. 2020;14:6339–6347. [PMC free article] [PubMed] [Google Scholar]

26. Leung N.H.L., Chu D.K.W., Shiu E.Y.C., Chan K.H., McDevitt J.J., Hau B.J.P. Respiratory virus shedding in exhaled breath and efficacy of face masks. Nat Med. 2020;26:676–680. [PubMed] [Google Scholar]

27. Gao M., Yang L., Chen X., Deng Y., Yang S., Xu H. A study on infectivity of asymptomatic SARS-CoV-2 carriers. Respir Med. 2020;169 [PMC free article] [PubMed] [Google Scholar]

28. Smith J.D., MacDougall C.C., Johnstone J., Copes R.A., Schwartz B., Garber G.E. Effectiveness of N95 respirators versus surgical masks in protecting health care workers from acute respiratory infection: a systematic review and meta-analysis. CMAJ. 2016;188:567–574. [PMC free article] [PubMed] [Google Scholar]

29. Chou R., Dana T., Jungbauer R., Weeks C., McDonagh M.S. Masks for Prevention of Respiratory Virus Infections, Including SARS-CoV-2, in Health Care and Community Settings: A Living Rapid Review. Ann Intern Med. 2020 [PMC free article] [PubMed] [Google Scholar]

30. Chu D.K., Akl E.A., Duda S., Solo K., Yaacoub S., Schunemann H.J. Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis. Lancet. 2020;395:1973–1987. [PMC free article] [PubMed] [Google Scholar]

31. Center for Disease Control and Prevention. Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission. Atlanta, Georgia; 2020.

32. Isaacs D., Britton P., Howard-Jones A., Kesson A., Khatami A., Marais B. Do facemasks protect against COVID-19? J Paediatr Child Health. 2020;56:976–977. [PMC free article] [PubMed] [Google Scholar]

33. Laveneziana P., Albuquerque A., Aliverti A., Babb T., Barreiro E., Dres M. ERS statement on respiratory muscle testing at rest and during exercise. Eur Respir J. 2019;53 [PubMed] [Google Scholar]

34. American Thoracic Society/European Respiratory, S ATS/ERS Statement on respiratory muscle testing. Am J Respir Crit Care Med. 2002;166:518–624. [PubMed] [Google Scholar]

35. Kao T.W., Huang K.C., Huang Y.L., Tsai T.J., Hsieh B.S., Wu M.S. The physiological impact of wearing an N95 mask during hemodialysis as a precaution against SARS in patients with end-stage renal disease. J Formos Med Assoc. 2004;103:624–628. [PubMed] [Google Scholar]

36. United States Department of Labor. Occupational Safety and Health Administration. Respiratory Protection Standard, 29 CFR 1910.134; 2007.

37. ATS/ACCP Statement on cardiopulmonary exercise testing Am J Respir Crit Care Med. 2003;167:211–277. [PubMed] [Google Scholar]

38. American College of Sports Medicine . 9th ed. Wolters Kluwer/Lippincott Williams & Wilkins Health; Philadelphia: 2014. ACSM's guidelines for exercise testing and prescription. [Google Scholar]

39. Balady G.J., Arena R., Sietsema K., Myers J., Coke L., Fletcher G.F. Clinician's Guide to cardiopulmonary exercise testing in adults: a scientific statement from the American Heart Association. Circulation. 2010;122:191–225. [PubMed] [Google Scholar]

40. Ferrazza A.M., Martolini D., Valli G., Palange P. Cardiopulmonary exercise testing in the functional and prognostic evaluation of patients with pulmonary diseases. Respiration. 2009;77:3–17. [PubMed] [Google Scholar]

41. Fletcher G.F., Ades P.A., Kligfield P., Arena R., Balady G.J., Bittner V.A. Exercise standards for testing and training: a scientific statement from the American Heart Association. Circulation. 2013;128:873–934. [PubMed] [Google Scholar]

42. Guazzi M., Adams V., Conraads V., Halle M., Mezzani A., Vanhees L. EACPR/AHA Scientific Statement. Clinical recommendations for cardiopulmonary exercise testing data assessment in specific patient populations. Circulation. 2012;126:2261–2274. [PMC free article] [PubMed] [Google Scholar]

43. Naeije R., Dedobbeleer C. Pulmonary hypertension and the right ventricle in hypoxia. Exp Physiol. 2013;98:1247–1256. [PubMed] [Google Scholar]

44. Zheng G.Q., Wang Y., Wang X.T. Chronic hypoxia-hypercapnia influences cognitive function: a possible new model of cognitive dysfunction in chronic obstructive pulmonary disease. Med Hypotheses. 2008;71:111–113. [PubMed] [Google Scholar]

45. Beder A., Buyukkocak U., Sabuncuoglu H., Keskil Z.A., Keskil S. Preliminary report on surgical mask induced deoxygenation during major surgery. Neurocirugia (Astur) 2008;19:121–126. [PubMed] [Google Scholar]

46. Ong J.J.Y., Bharatendu C., Goh Y., Tang J.Z.Y., Sooi K.W.X., Tan Y.L. Headaches Associated With Personal Protective Equipment - A Cross-Sectional Study Among Frontline Healthcare Workers During COVID-19. Headache. 2020;60:864–877. [PubMed] [Google Scholar]

47. Schneiderman N., Ironson G., Siegel S.D. Stress and health: psychological, behavioral, and biological determinants. Annu Rev Clin Psychol. 2005;1:607–628. [PMC free article] [PubMed] [Google Scholar]

48. Thoits P.A. Stress and health: major findings and policy implications. J Health Soc Behav. 2010;51(Suppl):S41–S53. [PubMed] [Google Scholar]

49. Haslam N. Dehumanization: an integrative review. Pers Soc Psychol Rev. 2006;10:252–264. [PubMed] [Google Scholar]

50. Cohen S. Social relationships and health. Am Psychol. 2004;59:676–684. [PubMed] [Google

Scholar]

51. Leigh-Hunt N., Bagguley D., Bash K., Turner V., Turnbull S., Valtorta N. An overview of systematic reviews on the public health consequences of social isolation and loneliness. Public Health. 2017;152:157–171. [PubMed] [Google Scholar]

52. Holt-Lunstad J., Smith T.B., Layton J.B. Social relationships and mortality risk: a meta-analytic review. PLoS Med. 2010;7 [PMC free article] [PubMed] [Google Scholar]

53. Shor E., Roelfs D.J. Social contact frequency and all-cause mortality: a meta-analysis and meta-regression. Soc Sci Med. 2015;128:76–86. [PubMed] [Google Scholar]

54. McEwen B.S. Protective and damaging effects of stress mediators. N Engl J Med. 1998;338:171–179. [PubMed] [Google Scholar]

55. McEwen B.S. Physiology and neurobiology of stress and adaptation: central role of the brain. Physiol Rev. 2007;87:873–904. [PubMed] [Google Scholar]

56. Everly G.S., Lating J.M. 4th ed. NY Springer Nature; New York: 2019. A Clinical Guide to the Treatment of the Human Stress Response. [Google Scholar]

57. World Health Organization. World health statistics 2018: monitoring health for the SDGs, sustainable development goals Geneva, Switzerland; 2018.

58. World Health Organization. World Cancer Report 2014. Lyon; 2014.

59. Wiggins J.M., Opoku-Acheampong A.B., Baumfalk D.R., Siemann D.W., Behnke B.J. Exercise and the Tumor Microenvironment: Potential Therapeutic Implications. Exerc Sport Sci Rev. 2018;46:56–64. [PubMed] [Google Scholar]

60. Ashcraft K.A., Warner A.B., Jones L.W., Dewhirst M.W. Exercise as Adjunct Therapy in Cancer. Semin Radiat Oncol. 2019;29:16–24. [PMC free article] [PubMed] [Google Scholar]

61. Bray F., Ferlay J., Soerjomataram I., Siegel R.L., Torre L.A., Jemal A. Global Cancer Statistics 2018: GLOBOCAN Estimates of Incidence and Mortality Worldwide for 36 Cancers in 185 Countries. CA Cancer J Clin. 2018 [PubMed] [Google Scholar]

62. Brooks S.K., Webster R.K., Smith L.E., Woodland L., Wessely S., Greenberg N. The psychological impact of quarantine and how to reduce it: rapid review of the evidence. Lancet. 2020;395:912–920. [PMC free article] [PubMed] [Google Scholar]

63. Galea S., Merchant R.M., Lurie N. The Mental Health Consequences of COVID-19 and Physical Distancing: The Need for Prevention and Early Intervention. JAMA Intern Med. 2020;180:817–818. [PubMed] [Google Scholar]

64. Izaguirre-Torres D., Siche R. Covid-19 disease will cause a global catastrophe in terms of mental health: A hypothesis. Med Hypotheses. 2020;143 [PMC free article] [PubMed] [Google Scholar]

65. Kudielka B.M., Wust S. Human models in acute and chronic stress: assessing determinants of individual hypothalamus-pituitary-adrenal axis activity and reactivity. Stress. 2010;13:1–14. [PubMed] [Google Scholar]

66. Morey J.N., Boggero I.A., Scott A.B., Segerstrom S.C. Current Directions in Stress and Human Immune Function. Curr Opin Psychol. 2015;5:13–17. [PMC free article] [PubMed] [Google Scholar]

67. Sapolsky R.M., Romero L.M., Munck A.U. How do glucocorticoids influence stress responses? Integrating permissive, suppressive, stimulatory, and preparative actions. Endocr Rev.

Plaintiffs' Exhibit 232

blacklistednews.com

# Long-Term Mask Use May Contribute to Advanced Stage Lung Cancer, Study Finds

4-5 minutes



A recent study in the journal Cancer Discovery found that inhalation of harmful microbes can contribute to advanced stage lung cancer in adults. Long-term use of face masks may help breed these dangerous pathogens.

Microbiologists agree that frequent mask wearing creates a moist environment in which microbes are allowed to grow and proliferate before entering the lungs. Those foreign microbes then travel down the trachea and into two tubes called the bronchi until they reach small air sacks covered in blood vessels called alveoli.

*"The lungs were long thought to be sterile, but we now know that oral commensals–microbes normally found in the mouth–frequently enter the lungs due to unconscious aspirations." – Leopoldo Segal, Study Author and Director of the Lung Microbiome Program and Associate Professor of Medicine at New York University Grossman School of Medicine*

According to the study, after invading the lungs these microbes cause an inflammatory response in

proteins known as cytokine IL-17.

*"Given the known impact of IL-17 and inflammation on lung cancer, we were interested in determining if the enrichment of oral commensals in the lungs could drive an IL-17-type inflammation and influence lung cancer progression and prognosis,"* said Segal.

While analyzing lung microbes of 83 untreated adults with lung cancer, the research team discovered that colonies of Veillonella, Prevotella, and Streptococcus bacteria, which may be cultivated through prolonged mask wearing, are all found in larger quantities in patients with advanced stage lung cancer than in earlier stages. The presence of these bacterial cultures is also associated with a lower chance of survival and increased tumor growth regardless of the stage.

Additionally, research into the cultivation of Veillonella bacteria in the lungs of mice found that the presence of such bacteria leads to the emergence of immune suppressing cells as well as inflammatory ones such as cytokine IL-17.

*"Given the results of our study, it is possible that changes to the lung microbiome could be used as a biomarker to predict prognosis or to stratify patients for treatment."* – Leopoldo Segal

As more evidence emerges pertaining to the long-term effects of mask mandates and lock downs, doctors and scientists are beginning to reconsider whether these authoritarian measures really are doing more harm than good. One Canadian public health expert named Dr. Aji Joffe found in a related study that lock downs cause "at least ten times" more damage than benefit.

In a recent working paper by researchers at Harvard, Duke, and John Hopkins Universities, academics concluded that *"for the overall population, the increase in the death rate following the COVID-19 pandemic implies a staggering 0.89 and 1.37 million excess deaths over the next 15 and 20 years, respectively."*

Since forced mask wearing began, dermatologists have coined the term 'maskne' to describe an onset of pimples near the mouth caused by masks clogging up pores with oil and bacteria. This can be caused by either disposable or cloth masks.

Dentists have also been warning about a phenomenon known as 'mask mouth' in which patients are arriving back to the dental office with an increase in gingivitis and tooth decay as high as 50% in a period of just a few months since mask mandates began.

This discovery sheds light on the growing evidence of harm caused by long-term mask wearing.

**About the Author**

Phillip Schneider is a staff writer for Blacklisted News. To see more of his work, you can follow his Facebook Page, become a subscriber on the free speech social network Minds, or support his efforts by becoming a contributor via Patreon.

Plaintiffs' Exhibit 233

tulsaworld.com

# Do mask requirements violate civil rights? How can businesses accommodate the disabled? Get answers to these questions and more

*Kendrick Marshall Tulsa World*

7-8 minutes

---

Do mask requirements violate civil rights? How can businesses accommodate the disabled? Get answers to these questions and more

Get answers to questions about what the city's mask ordinance means for Tulsans.

**Disabilities or medical conditions that make mask wearing difficult**

Disabilities or medical conditions that make mask wearing difficult

- *In some situations, wearing a cloth face covering may exacerbate a physical or mental health condition, lead to a medical emergency, or introduce significant safety concerns, the Center for Disease Control explains.*

- *People who are deaf or hard of hearing — or those who care for or interact with a person who is hearing impaired—may be unable to wear cloth face coverings if they rely on lipreading to communicate.*

- *Some people, such as people with intellectual and developmental disabilities, mental health conditions or other sensory sensitivities, may have challenges wearing a cloth face covering.*

- *Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. People with respiratory disabilities should consult their own medical professional for advice about using face masks.*

- *Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety.*

- *A person who has cerebral palsy may have difficulty moving the small muscles in the hands, wrists, or fingers.*

- *A person who uses mouth control devices such as a sip and puff to operate a wheelchair or assistive technology, or uses their mouth or tongue to use assistive ventilators.*

*MIKE SIMONS/Tulsa World*

**Are individuals without disabilities exempt under ADA guidelines?**

Are individuals without disabilities exempt under ADA guidelines?

*According to the ADA, people without disabilities or medical conditions are not protected under the ADA. MIKE SIMONS/Tulsa World*

**Are mask mandates a violation of civil rights?**

Are mask mandates a violation of civil rights?

*While opinions vary on the validity of face covering requirements, Tulsa attorney Jim Milton, of the law firm Hall Estill, said the city can exercise its government powers to impose an ordinance.*

*"So far, the city of Tulsa meets the requirements of, 'Do they have the power?' and 'Is this a reasonable way to exercise that power?'" Milton said. "But what folks are really talking about is whether there's a prohibition to their rights, their constitutional rights in the Bill of Rights and otherwise in the constitution and prevent them from this particular exercise of power ..."*

*Milton, in familiarizing himself with similar mask ordinances across the country, said he's yet to come across language that would prevent any municipality from requiring masks be worn in public to protect the health and safety of citizens.*

*"You know I haven't studied the details of the rule that is being proposed (for Tulsa), but presumably there are exceptions," he said. "Presumably they (the city) are giving the proper amount of exception for people who have health conditions. Presumably they are not requiring me to wear a mask when I'm home alone and don't have anyone else around me.*

*When I go to the grocery store, or when I fill up my gas tank and I'm going to be in a reasonable proximity of another person, I don't have any constitutional right that would be violated by the simple act of me being asked to wear a mask."*

*The Under the U.S. Constitution's 10th Amendment and U.S. Supreme Court decisions over nearly 200 years, state governments have the primary authority to control the spread of dangerous diseases within their jurisdictions. The 10th Amendment, which gives states all powers not specifically given to the federal government, allows them the authority to take public health emergency actions, such as setting quarantines and business restrictions.*

*IAN MAULE/Tulsa World*

**Current Oklahoma jurisdictions with face covering ordinances**

Current Oklahoma jurisdictions with face covering ordinances

Plaintiffs' Exhibit 234

naturalnews.com

# Doctor raises serious doubts about effectiveness of face masks, busts common misconceptions

*Divina Ramirez*

5-6 minutes





([Natural News](#)) Governments worldwide have urged people to wear face masks amid the pandemic, claiming that the use of the masks will protect them from getting infected with

the Wuhan coronavirus. But not all health experts are convinced this is true, and some have even sounded the alarm about the apparent effectiveness of face masks against the coronavirus.

One such expert, Lee Merritt, an orthopedic surgeon with the organization *America's Frontline Doctors*, gave a presentation last year during a summit that the group organized. In her presentation, Merritt debunked various misconceptions about masks, including the idea that masks can ward off the coronavirus.

Merritt said the justification for mask-wearing is based on a nonsense narrative with little to no scientific basis. To illustrate her point, she showed a video of a man installing drywall while wearing a surgical mask with ear loops, similar to the mask that health authorities encourage people to wear to prevent infection.

However, when the man removed his mask, he still had flecks of drywall stuck around his nose and mouth. The mask failed to filter out drywall dust, which is about 10 micrometers (um) in size. Yet health authorities have been claiming that such surgical masks can protect against SARS-CoV-2, which measures about 0.125 um.

## Surgeon debunks misconceptions about masks

Surgical face masks do protect against some viruses, but size matters immensely. That is because viral particles come in different sizes. The same holds true for bacterial particles. For instance, surgical masks are effective against the bacterium that causes tuberculosis because it is large, measuring about two to four um in length.

Merritt also underscored some of the most common misconceptions about face masks and busted each one. An especially popular misconception is the idea that masks keep particles in when the wearer talks, coughs or sneezes. These activities generate small liquid droplets called aerosols, which bacteria or viruses can latch onto.

Merritt explained that when the wearer sneezes, coughs or even just talks, the aerosols generated would simply take the path of least resistance. Depending on the type of face mask, aerosols may travel right through the material or exit through gaps along the sides of the face mask.

Moreover, another popular misconception is that face masks filter out most of the viral particles, thus reducing the total number of viral particles entering the body. The idea that a person is less likely to have a serious infection if there are fewer viral particles is not based on scientific studies or evidence, said Merritt.

But aside from not being as effective against the coronavirus as so-called health experts claim, masks may even pose a risk to human health. For instance, a recently published review of studies on mask-related adverse health effects suggested that mask-wearing

may seriously harm people without any notable benefit.

The review, which was prepared by former physics professor Denis Rancourt, showed multiple ways masks can inflict damage and undermine health. Some of the mask-related adverse health effects included in the review are discomfort, irritation and psychological impact.

Merritt pointed out that the psychological effects of mask-wearing are particularly detrimental to children. For instance, because face masks cover up most of the person's face, children may find it difficult to develop facial recognition skills and be unable to pick up on non-verbal communication cues.

In addition, face masks block emotional signaling and may even severely impair children's ability to connect or bond with others. Pathogenic viruses and bacteria can also rapidly accumulate on the surface of improperly used face masks. In such cases, masks may actually increase the risk of spreading viruses, noted Merritt.

To sum up, Merritt's presentation raised serious doubts about the supposed effectiveness of face masks against the coronavirus. The good news is, mask-wearing is not the only way people may reduce their risk of contracting the dreaded virus.

Drinking water, eating clean, nutrient-dense foods, exercising and getting enough sleep each night are some of the ways you can strengthen your immune system naturally. (Related: Restore your immune system with a detox.)

Go to Pandemic.news for more articles about how face masks are ineffective against the coronavirus.

**Sources include:**

NaturalHealth365.com

NYTimes.com

Healthline.com

Plaintiffs' Exhibit 235

dailymail.co.uk

# Scientists find evidence of toxic chemicals in some face masks

*Joe Pinkstone*

13-17 minutes

Scientists have found evidence that some face masks which are on sale and being used by members of the general public are laced with toxic chemicals.

Preliminary tests have revealed traces of a variety of compounds which are heavily restricted for both health and environmental reasons.

This includes formaldehyde, a chemical known to cause watery eyes; a burning sensations in the eyes, nose, and throat; coughing; wheezing; and nausea.

Experts are concerned that the presence of these chemicals in masks which are being worn for prolonged periods of time could cause unintended health issues.

Evidence obtained by Ecotextile News and shared with MailOnline reveals that although face masks should meet specific standards, not all do.

Masks have been mandated in much of the world as they are a highly effective way of preventing transmission of coronavirus particles.

But face coverings designed for use by the general public are not regulated and fail to meet the same standards as medical grade PPE.

Scroll down for video

- 
- 
- 
- 
- Copy link to paste in your message
- 

Experts are concerned that the presence of these chemicals in masks which are being worn for prolonged periods of time could cause unintended health issues. In March, the UK Government issued advice saying children and teachers alike should wear masks in school

- 
- 
- 
-

- Copy link to paste in your message

- 

Pictured, a GCMS chromatogram of the chemicals and compounds found on a face mask. The data comes from the unique analytical technique developed by Dr Dieter Sedlak

Professor Michael Braungart, director at the Hamburg Environmental Institute, conducted tests on masks which had caused people to break out in rashes.

'What we are breathing through our mouth and nose is actually hazardous waste,' Professor Braungart said.

These used masks were found to contain formaldehyde and other chemicals.

Formaldehyde is the chemical which gives the 'clean' smell when a new pack of masks is opened. He also found aniline, a known carcinogen.

'We found formaldehyde and even aniline and noticed that unknown artificial fragrances were being applied to cover any unpleasant chemical smells from the mask,' he said.

'In the case of the blue-coloured surgical masks, we found cobalt – which can be used as a blue dye.

'All in all, we have a chemical cocktail in front of our nose and mouth that has never been tested for either toxicity or any long-term effects on health.'

- 

- 

- 

- 

- Copy link to paste in your message

- 

Professor Michael Braungart, director at the Hamburg Environmental Institute, conducted tests on masks which had caused people to break out in rashes. 'What we are breathing through our mouth and nose is actually hazardous waste,' he said

Dr Dieter Sedlak, managing director and co-founder of Modern Testing Services in Augsburg, found other chemicals with his own unique testing method.

As well as detecting formaldehyde, he spotted clear evidence of hazardous fluorocarbons, which are heavily restricted.

Fluorocarbons are toxic to human health and scientists have recently called for them to be banned for non-essential use.

This group of chemicals was featured in the recent Mark Ruffalo hit film 'Dark Waters' where a water supply of an entire town was polluted by chemical giant DuPont.

'Honestly, I had not expected PFCs would be found in a surgical mask, but we have special routine methods in our labs to detect these chemicals easily and can immediately identify them. This is a big issue,' said Dr Sedlak.

'It seems this had been deliberately applied as a fluid repellent – it would work to repel the virus in an aerosol droplet format – but PFC on your face, on your nose, on the mucus membranes, or on the

eyes is not good.'

**Formaldehyde in face masks causes dermatitis**

A 2020 case study of a 38-year-old lab technician.

As part of her job she worked with various chemicals, including formaldehyde.

She did not wear a mask to work but did wear gloves. She began suffering rashes which were itchy and burning.

Doctors determined she was allergic to some of the chemicals.

She then changed jobs and became a hospital nurse.

Her rashes went away rapidly but then when working on a Covid-19 ward in April 2020 the dermatitis returned.

Symptoms flared up 'a few hours following the prolonged use of a particular polypropylene ('plastic') surgical mask.

The researchers and mask manufacturers believe 'trace impurities of formaldehyde' in the masks was causing the relapse.

The doctors wrote in their case study: 'Because formaldehyde is a frequent contact sensitizer, and given that health care workers, patients, and consumers now often have to wear (polypropylene) surgical masks at work and in the public environment, similar cases might be expected in the future.

'To propose safer alternatives, the contact sensitizers potentially present in facial masks, and related medical devices, should be labelled, or at least be easily retrievable as in the present case.'

-   
-   
-   
-   
- Copy link to paste in your message
-   

Pictured, (A) a nurse, wearing a polypropylene surgical mask, (B) who developed rosacea-like allergic contact dermatitis from formaldehyde contained in the mask; (C) the positive patch test to formaldehyde revealing her allergy to the chemical

PFCs are commonly used in textiles to add a protective coating to items like rucksacks and jackets, but are not intended to be inhaled.

The concentrations of PFCs found on masks lie within the safe limit of 16 mg/kg, Dr Sedlak found, but when placed on a mask, just millimetres from a person's mouth, the level of exposure soars past the safe limit over time.

Both the academics say their work is not enough to conclude that all surgical face masks are dangerous or comparable, but believe some masks in circulation are of concern.

'Based on my practical experience there is certainly an elevated unreasonable risk,' says Dr Sedlak.

Face coverings designed to be worn by the public are not classed as PPE and therefore are not

subjected to the same level of scrutiny as those which are intended for use by medical professionals.

Guidelines for their use and quality is determined by the Department for Business, Energy & Industrial Strategy.

MailOnline has approached BEIS for comment.

- 
- 
- 
- 
- Copy link to paste in your message
- 

Face coverings designed to be worn by the public are not classed as PPE and therefore are not subjected to the same level of scrutiny as those which are intended for use by medical professionals

However, the responsibility for ensuring masks meet the laid out criteria lies with the mask manufacturer and their local authorities.

But instead of having to reach medical grade standards and pass regular quality checks, these coverings only have to meet general safety laws.

'The General Product Safety Regulations 2005 (GPSR) sets out the responsibilities of the producers and distributors of these products,' the UK government website states.

'As face coverings are not medical devices, we do not regulate these products.'

China was the world's leading mask manufacturer before the pandemic, and has solidified this position amid the Covid-19 outbreak, making 85 per cent of all masks.

In the first five months of 2020, for example, over 70,000 new companies registered to make or sell face masks in China, as companies seek to cash in on the virus.

The boom in demand for such products has led to concerns that masks are being recklessly made, and opaque supply chains in China raise further concerns.

**Potentially toxic masks dished out in Canadian schools**

Canada last week recalled millions of masks that were distributed to schools, transport workers and daycares by the government.

Health Canada has warned they may be toxic to the lungs after being urged to inspect the safety of the coverings.

The grey and blue masks are identified by the code SNN200642 and are from the supplier Metallifer.

Analysis found evidence of graphene nanoparticles shed by the masks.

If graphene gets into the lungs it can be dangerous as it is highly abrasive and durable, leading to some people saying they felt like they were breathing in cat hair.

Another mask made by another  company is also under investigation.

'Health Canada is currently reviewing data from two manufacturers of graphene-coated face masks to determine the safety and effectiveness of their devices, and will take appropriate action as necessary,' said Health Canada spokesman André Gagnon.

Millions of masks were distributed in Quebec but people have now been told to 'immediately store the boxes of masks in a secure and isolated location'.

**Belgium gave pharmacists 15 million TOXIC Covid face masks**

Health chiefs in Belgium are concerned that 15 million fabric masks given to pharmacists may be toxic and cause pneumonia.

According to a preliminary report carried out by Sciensano, the Belgian Institute for Public Health, the masks contain nanoparticles of silver and titanium dioxide that when inhaled could damage the respiratory tract.

The face masks were made in Asia by Luxembourg-based company Avrox.

Two toxicologists warned that those who wear the masks could develop pneumonia, according to a report in Dutch-language newspaper HLN.

The nanoparticles of silver and titanium dioxide are used to whiten the fabric of the face masks.

Dr Julian Tang told MailOnline: 'The use of metal ions may help to inactivate the virus and such ions may be safely, securely embedded in the mask material so that they do not pose an inhalation risk - and this feature/design could be specific to these Belgian masks only.'

But he says more research is needed if there are valid concerns over specific masks.

The findings of these early studies come as the quality of masks used in Belgium and Canada has been called into question, with graphene and metal ion contamination.

Dr Julian Tang, a clinical virologist and honorary associate professor in the respiratory sciences department at the University of Leicester, echoed the sentiment of Dr Sedlak and Professor Braungart that more vigorous research is needed.

'Further studies on specific mask designs need to be performed if there is a perceived possible risk for any particular mask - and masks made by different manufacturers may not pose the same risks - if any exist,' he said.

He says if people are concerned about their masks, one option is to use professional surgical masks which do have to meet stricter standards.

'Southeast Asian countries have been using millions of surgical masks since the first SARS-COV-1 outbreaks in 2003 - with no reported ill effects,' he adds.

'But even before this, globally, surgical masks have been used in surgery by teams around the world - for decades - with no reported ill effects.'

Liz Cole, co-founder of the Us For Them organisation that advocates for children's rights, says the findings are particularly concerning for youngsters.

The recent reopening of schools in the UK was dependent on children wearing face coverings for long periods of time, including when walking around the premises and in communal areas.

'UsforThem are concerned that the recommendations for children to wear face coverings in classrooms seems to be informed by no new scientific evidence nor does any harm assessment

Plaintiffs' Exhibit 236

# Carbon Dioxide
# Health Hazard Information Sheet

### What is carbon dioxide?

Carbon dioxide ($CO_2$) is a colorless, odorless, non-flammable gas that naturally occurs in the atmosphere. $CO_2$ is produced by body metabolism and is a normal component of exhaled breath. It also results from the burning of fossil fuels and natural sources such as volcanic eruptions. $CO_2$ levels in outdoor air typically range from 300 to 400 ppm (0.03% to 0.04%) but can be as high as 600-900 ppm in metropolitan areas. Although it is most commonly present as a gas, $CO_2$ can also exist in a solid (dry ice) form.

### How are FSIS employees exposed to carbon dioxide?

The most common exposure to $CO_2$ for FSIS employees results from the off-gassing of $CO_2$ gas from the use of dry ice for chilling and packing product. Dry ice is also sometimes blended with meat product. $CO_2$ levels directly next to an open bin of dry ice can be as high as 11,000 to 13,000 ppm. When dry ice is used in rooms without adequate ventilation $CO_2$ has been measured as high as 25,000 to 30,000 ppm. However, levels at poultry plant inspection stations range from about 900 to 3,500 ppm (depending on how close the inspection station is to the dry ice use). In a few cases elevated levels, in excess of 5,000 ppm have been found at inspection stations.

$CO_2$ gas is also used to euthanize both poultry and swine. This process is typically fully contained and $CO_2$ is vented to the atmosphere (outside the building). In some cases, compressed $CO_2$ gas is added to plant water (eg. chillers) to make carbonic acid for pH regulation. $CO_2$ is denser than air and can collect in high concentrations in open pits, low lying areas and confined spaces where it can displace oxygen creating a serious health hazard.

### What are the health effects of carbon dioxide?

$CO_2$ is considered to be minimally toxic by inhalation. The primary health effects caused by $CO_2$ are the result of its behavior as a simple asphyxiant. A simple asphyxiant is a gas which reduces or displaces the normal oxygen in breathing air.

Symptoms of mild $CO_2$ exposure may include headache and drowsiness. At higher levels, rapid breathing, confusion, increased cardiac output, elevated blood pressure and increased arrhythmias may occur.

Breathing oxygen depleted air caused by extreme $CO_2$ concentrations can lead to death by suffocation.

### What are the symptoms of different levels of exposure?

| 5,000 ppm (0.5%) | OSHA Permissible Exposure Limit (PEL) and ACGIH Threshold Limit Value (TLV) for 8-hour exposure |

**Carbon Dioxide
Health Hazard Information Sheet**

| | |
|---|---|
| **10,000 ppm (1.0%)** | Typically no effects, possible drowsiness |
| **15,000 ppm (1.5%)** | Mild respiratory stimulation for some people |
| **30,000 ppm (3.0%)** | Moderate respiratory stimulation, increased heart rate and blood pressure, ACGIH TLV-Short Term |
| **40,000 ppm (4.0%)** | Immediately Dangerous to Life or Health (IDLH) |
| **50,000 ppm (5.0%)** | Strong respiratory stimulation, dizziness, confusion, headache, shortness of breath |
| **80,000 ppm (8.0%)** | Dimmed sight, sweating, tremor, unconsciousness, and possible death |

The response to $CO_2$ inhalation various greatly even in healthy individuals. The seriousness of the symptoms is dependent on the concentration of $CO_2$ and the length of time a person is exposed. Since $CO_2$ is odorless and does not cause irritation, it is considered to have poor warning properties. Fortunately, conditions from low to moderate exposures are generally reversible when a person is removed from a high $CO_2$ environment.

Another health hazard caused by $CO_2$ is frostbite by contact with solid $CO_2$ (dry ice) and vapors off-gassing from dry ice. Precautions should be taken to prevent direct skin and eye contact with dry ice or with vessels/bins containing dry ice. Similar effects may occur from compressed $CO_2$ gas as it is being released from a cylinder if it comes in contact with the skin or eyes. $CO_2$ gas at room temperature will not injure the skin or eyes.

## What OSHA standards and exposure guidelines apply?

OSHA has established a Permissible Exposure Limit (PEL) for $CO_2$ of 5,000 parts per million (ppm) (0.5% $CO_2$ in air) averaged over an 8-hour work day (time-weighted average or TWA.) The American Conference of Governmental Industrial Hygienists (ACGIH) recommends an 8-hour TWA Threshold Limit Value (TLV) of 5,000 ppm and a Ceiling exposure limit (not to be exceeded) of 30,000 ppm for a 10-minute period. A value of 40,000 is considered immediately dangerous to life and health (IDLH value).

The TLVs are intended to minimize the potential for asphyxiation and undue metabolic stress. The ACGIH TLV supporting document states that: "Based on the long-term exposure studies, even though the majority of references are concerned with studies on physically fit males in confined spaces, a TLV-TWA of 5,000 ppm, is recommended. This value provides a good margin of safety from asphyxiation and from undue metabolic stress provided normal amounts of oxygen are present in the inhaled air." The TLV-STEL is based on short-term studies which showed that "concentrations of 27,600 to 39,500 ppm produced increased pulmonary ventilation rates. Therefore, a TLV-STEL of 30,000 ppm is considered appropriate."

## How are occupational exposures monitored or measured?

$CO_2$ concentrations in air can be measured using detector tubes (for immediate short term samples) and passive indicator tubes or dosimeters (for longer TWA full or partial shift sampling). The primary OSHA method for the sampling and analysis of $CO_2$ involves using a

gas sampling bag followed by gas chromatography or infrared spectrophotometry analysis. If you would like to arrange for CO2 monitoring at your workplace, please contact your district's Occupational Safety and Health Specialist.

## What are the safety precautions protect for carbon dioxide?

Employees should receive training and be knowledgeable of the potential sources and symptoms of exposure to CO2.

If you are working near any sources of dry ice and develop any of the symptoms of exposure, move to an area of fresh air immediately, and report the incident to your supervisor. (Fresh air or oxygen is the primary remedy for CO2 exposure.

If you are pregnant consult with your supervisor and your physician about limiting exposure to CO2.

If CO2 is used to euthanize poultry or livestock ensure that you are aware of the location of the gas sources and emission vents, alarm signals and any special precautions for working in those areas.

Do not enter areas where CO2 levels exceed 20,000 ppm until ventilation has been provided to bring the concentration down to safe levels.

Do not stand directly next to open bins that contain dry ice or in vapors from these bins. Do not touch dry ice or a bin containing dry ice.

## How should training for this Health Hazard Information Sheet be recorded?

Per requirements found in FSIS Directive 4791.1 Section IX, all occupational health and safety training is to be recorded using either AgLearn or FSIS form 3530-12. Training records are to include the topics covered, date, and employee name. The Agency is to retain all training records for a minimum of five years."

## Resources

For more information, see the OSHA website:
**https://www.osha.gov/dts/chemicalsampling/data/CH_225400.html**

**About the ESHG**

The FSIS Environmental Safety and Health Group (ESHG) is devoted to providing a safe and healthful work environment for FSIS employees. More information on safety topics can be found on the intranet site http://www.tinyurl.com/FSIS-ESHG or by email askemployeesafety@fsis.usda.gov

Plaintiffs' Exhibit 237

vox.com

## This is why flying on a plane makes you feel terrible

*Joseph Stromberg*

6-8 minutes

---

Do you feel inexplicably crappy — tired, dehydrated, and headachy — every time you fly?

It's not your imagination. People talk a lot about the many awful aspects of flying nowadays, but one that gets less attention is the way that sitting in a small, pressurized metal tube at 35,000 feet for several hours wreaks havoc on your body.

"Anytime you fly, you're exposing yourself to a different environment than your body is used to," says Jeffrey Sventek, director of the Aerospace Medical Association and a longtime aerospace physiologist for the Air Force.

For some people, this environment — with lower oxygen levels than the ground, extremely little humidity, and sudden changes in air pressure — can cause a bunch of negative symptoms. This is how flying can make you feel terrible.

**Planes have lower oxygen levels**

As a plane flies, air that flows through the engine gets sucked in, compressed, cooled, filtered, and pumped into the cabin. If this didn't happen, everyone inside the plane would die, as the low air pressure at the elevations planes fly (typically 35,000 feet or so) means there isn't enough oxygen present for your body to function.





*(Lufthansa)*

Still, the amount of air pumped inside doesn't result in quite as much oxygen as you'd normally breathe at sea level. "The cabin is only pressurized to simulate an elevation of 6,000 to 8,000 feet on modern jets," says Brent Blue, a doctor and longtime pilot. In other words, to your body, flying is like sitting on a 6,000 to 8,000 foot mountain for several hours. As Blue says, "that's a significant difference for people who live at sea level, and aren't used to it."

For people with conditions — like heart or lung disease — that cause them to have special oxygen requirements, this is a big deal, and means they might need to fly with an oxygen concentrator, or not fly at all. But even for healthy people who are used to the abundant levels of oxygen present at sea level, it can have an effect.

"If you're flying for six hours and dropping your blood's oxygen saturation by five or ten percent, the fatigue factor is significant," Blue says. Even if they don't cause fatigue, reduced oxygen levels can also make your thinking a bit less sharp.

What's more, other aspects of the flying environment exacerbate this effect. Sitting for extended periods of time causes your blood to disproportionately pool in your thighs and feet, which means your body is less efficient at circulating and oxygenating the blood, and your brain gets even less oxygen.

Theoretically, planes could be somewhat more heavily pressurized to eliminate this effect. Federal regulations only require them to be pressurized to 8,000 feet, though some experts have criticized this as a substandard level.

Moreover, because planes are designed to be lightweight, they aren't nearly strong enough hold in enough air to simulate pressures that you'd find closer to sea level. (The new Boeing 787 Dreamliner, it's worth noting, will have slightly higher levels of air pressure and humidity.) Finally, intaking and pumping all this air uses fuel — so airlines are reluctant to pressurize any more than they need to.

**What you can do to stay sharp**

Though you can't solve this problem entirely, there are a few things you can do.

**1)** Don't drink alcohol. This makes the oxygen problem even worse, by interfering with your cells' metabolism so they too are less efficient at taking in oxygen. (This is also why

it's underlined easier to get drunk on a plane, or for that matter, at high elevations on Earth.) Alcohol also exacerbates the problem of dehydration (more on that below).

**2)** Get up and walk around during flights, or do in-seat leg exercises if you don't want to deal with the dirty looks from flight attendants. This will improve circulation, and also reduce the chance of a blood clot in your legs.

**3)** Blue recommends taking an aspirin the day before and the day of flying, to further improve blood flow, and to wear support compression stockings, to reduce the amount of blood pooled in your legs.

### How head colds make flying even worse

When a plane descends below 6,000 feet, this pressurization system is shut down. This causes the air pressure inside the plane to fluctuate as it matches the pressure outside the plane.

"As this happens, you'll notice your ears popping," Blue says. "That's a good thing — it's the opening and closing of the eustachian tubes, which connect the oral cavities to the middle ear." The air flowing through these tubes allows the pressure inside your middle ear to match the pressure outside your head.

If you have a head cold or sinus infection, however, these tubes won't open and close as easily — so the pressure won't be equalized as easily. This causes your eardrums to bulge inward, which hurts like hell. In extreme cases, this can even cause the eardrum to rupture.
.

(*Merck Manuals*)

If you're already very congested and scheduled to fly, Sventek recommends getting a prescription decongestant. Additionally, as your plane is descending, try to chew, yawn, or swallow repeatedly to get your eustachian tubes to open. If that doesn't work, you can try what scientists call the Valsalva maneuver: pinch your nose and forcefully exhale, which forces air into your middle ear.

### Why planes make you dehydrated





*(Shutterstock.com)*

Because the air drawn into the plane to pressurize it comes from extremely dry, high-altitude regions of the atmosphere, the plane environment itself is drier than a desert. "About 30 minutes after takeoff, the relative humidity in the cabin drops down to nearly zero," Blue says. "This makes it relatively easy to get dehydrated, especially on long overseas trips.

The most obvious effect of this is dry mouth, as much of the moisture inside it is quickly evaporated into the surrounding air. But on longer flights, this effect — coupled with little water consumption — can cause your body as a whole to get dehydrated, leading to headaches and dizziness.

The key to avoiding this, Sventek says, is to hydrate *before* you fly, and keep drinking water when you're onboard. Bring a water bottle so you don't need to rely on flight attendants' refills. And don't drink alcohol or caffeinated beverages, because they act as diuretics and dehydrate you further.

**Further reading:** The Aerospace Medical Association has a number of detailed publications on the health effects of flying.

# Plaintiffs' Exhibit 238

February 22, 2022

Rochelle P. Walensky, MD, MPH
Director, Centers for Disease Control and Prevention
1600 Clifton Road, NE
Atlanta, GA 30333

Anthony S. Fauci, MD
Director, National Institute of Allergy and Infectious Diseases
National Institutes of Health
31 Center Dr # 7A03
Bethesda, MD 20892

Honorable Senator Ronald H. Johnson
328 Hart Senate Office Building
Washington DC 20510

Douglas L. Parker,
Assistant Secretary of Labor for Occupational Safety and Health
Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210

Mr. Jeffrey Zients
Coordinator and Counselor to the President
COVID-19 Pandemic Response
The White House
1600 Pennsylvania Ave. NW
Washington, DC  20500

Sent via US Mail Certified Return Receipt and e-mail

**Re:    Request for Immediate Corrections to the CDC Guidance on Masks and Respirators**

Dear Dr. Walensky, Dr. Fauci, Senator Johnson, Mr. Parker, and Mr. Zients:

We the undersigned, professional experts in the field of industrial hygiene, with combined experience of nearly 150 years, are highly concerned with the inaccurate and misleading guidance being promoted by the CDC on its website regarding efficacy of masking to prevent COVID-19 and now similar guidance regarding respirators and request for immediate correction to said guidance.  The guidance is overly broad, inaccurate, and especially inappropriate for children and the general public.

1

For reference, the field of industrial hygiene is defined as:

> "That science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among of the citizens of the community" (https://www.aiha.org/about-ih/Pages/default.aspx).

The AIHA defines an Industrial Hygienist (https://www.aiha.org/ih-careers/discover-industrial-hygiene) as:

> "Scientists and engineers committed to protecting the health and safety of people in the workplace and the community."

Thus, our profession is dedicated, in part, to providing controls to exposures and rely upon what is known as the hierarchy of controls.  The hierarchy of controls was first developed by the National Safety Council (NSC) in 1950.  This guides us as to the most effective to least effective exposure controls (see Figure 1):



**Figure 1: Hierarchy of Controls**

Note that masks do not fit into the hierarchy of controls simply because they are not even personal protective equipment.  This is recognized in the recent ASTM Face Covering (mask) Standard [ASTM F3502-21 – Standard Specification for Barrier Face Coverings (BFCs)] illustrated in Figure 2:

> 3.1.8 *respirator, n*—personal protective equipment (PPE) designed to protect the wearer from inhalation of hazardous contaminants.
> 3.1.8.1 *Discussion*—Barrier face coverings are not designed to meet the performance requirements of NIOSH-approved respirators. For the purpose of this specification, healthcare

**Figure 2: ASTM 2021 BFC Standard – Masks Not PPE (Respirators)**

The best industrial hygiene solution has for decades been engineering controls of dilution with fresh air, filtration, and/or destruction – all of which are readily available technologies.

Given this background, we the undersigned have been increasingly concerned about the mis-information provided by the CDC to the public; often reflected by inappropriately conclusive language that *omits technical limitations and documented negative effects associated with masks and face coverings*.  Examples of our concerns follow:

**Issue #1:**     **Recommending N-95 type masks is inappropriate for the general population and children:**

The CDC's January 14, 2021 and January 28, 2021 webpage language have instructed people to move away from masks and toward N95-type respirators (see for example https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html), including KN95 respirators (Figure 3):

**Respirators**

When choosing a respirator, look at how well it fits and read the manufacturer instructions. These instructions should include information on how to wear, store, and clean or properly dispose of the respirator. Respirators have markings printed on the product to indicate they are authentic, see appropriate N95 markings 🔗 and KN95 markings.

COVID-19                                                                                          4/8

in and out around the edges of the respirator. Gaps can be caused by choosing the wrong size or type of respirator or when a respirator is worn with facial hair. **For information about how to use your N95 correctly, see** How to Use Your N95 Respirator. The information on this page is about N95 respirators but also applies to international respirators, like KN95 respirators.

Most publicly available respirators are disposable and should be discarded when they are dirty, damaged, or difficult to breathe through.

More information on these two types of respirators is provided below.

**Figure 3: CDC January 14 & January 28, 2022 Guidance on Respirators – pgs. 4-5**

Under the topic of respirators, the CDC lists both N95 and KN95 respirators.

Moreover, as the CDC knows, persons or entities providing respirators in the workplace (unlike masks) must follow OSHA's Personal Protective Equipment Standard (OSHA 29 CFR 1910.132) to establish the nature of the hazard (Hazards Assessment) and the Respiratory Protection Standard (RPS) requirements (29 CFR 1910.134).   Non-employees must also follow the RPS under the manufacturers' instructions (as we shall show later).  These RPS requirements are substantial and include factors such as:

➢  Written RPS Plan

➢  Medical Clearance

➢  Initial Fit Test

➢  Annual Fit Test

➢  Training by a professional such as an IH on fit testing, cleaning, storage, and changeout.

As the CDC knows, or should know, movement from masks to respirators comes with significant requirements or as the manufacturers such as 3M state on their instructions, improper usage "may result in sickness or death".

In this context, we have recently been provided by the following request, and rejection by OSHA, to investigate improper usage of KN respirators by an employer (Figure 4):

**U.S. Department of Labor**

Occupational Safety and Health Administration
Toledo Area Office
420 Madison Ave, Suite 600
Toledo, OH 43604



February 9, 2022



RE: OSHA Complaint No. 1864651

Dear

The Occupational Safety and Health Administration (OSHA) has received your notice of alleged workplace hazard(s) against notified Gun Lake Casino. After careful review we have decided not to conduct an inspection because:

On the basis of the information provided to our office during our phone conversation the employer has provided and is requiring employees to wear KN95 masks which are not NIOSH certified respirators and would not be covered by OSHA's respiratory protection standard.

If you do not agree with this decision, you may contact me for a clarification of the matter at (419) 259-7542.

Section 11(c) of the OSH Act provides protection for employees against discrimination because of their involvement in protected safety and health related activity. If you believe you are being treated differently or action is being taken against you because of your safety or health activity, you may file a complaint with OSHA. You should file this complaint as soon as possible, since OSHA normally can accept only those complaints filed within 30 days of the alleged discriminatory action.

Thank you for your concern for a safe and healthful workplace.

Respectfully,

Todd Jensen
Area Director

**Figure 4: OSHA February 9, 2022 Response Letter to Gun Lake Casino Complaint**

OSHA rejected the employee complaint on a technicality that the employer was not following the OSHA RPS because the respirator was a KN95 rather than an N95. And, as shown in Figure 5, NIOSH does not approve KN95's:





# NIOSH–approved N95 Particulate Filtering Facepiece Respirators

This list is reviewed and updated weekly.

## Manufacturers Listed from A to Z – L

The N95 respirator is the most common of the seven types of particulate filtering facepiece respirators. This product filters at least 95% of airborne particles but is not resistant to oil-based particles.

This web page provides a table of NIOSH-approved N95 respirators listed by manufacturer from A-Z. You can find a specific manufacturer by clicking on the first letter of their name on the index below. Web links in the table go to the NIOSH Approval Holder's website. See the Notes section for information about private labels.

NIOSH entered a Memorandum of Understanding ⧉ (MOU) in 2018 with the Food and Drug Administration (FDA). This MOU granted NIOSH the authority to approve surgical N95 filtering facepiece respirators. Prior to this MOU, both NIOSH and FDA approved and cleared surgical N95s. The **Model Number/Product Line in bold text followed by (FDA)** indicates these surgical N95 respirators in the table below. NIOSH also provides a table of the surgical N95 respirators approved prior to the MOU. Surgical N95 respirators approved under the MOU do not require FDA's 510(k) clearance. These NIOSH-approved surgical N95 respirators are only on the Certified Equipment List (CEL).

A respirator labeled as a KN95 respirator is expected to conform to China's GB2626 standard. NIOSH does not approve KN95 products or any other respiratory protective devices certified to international standards. For more information, view Factors to Consider When Planning to Purchase Respirators from Another Country.

**Figure 5: NIOSH Language Regarding Approval of KN95 Respirators**

So, in an obvious case of deception, the CDC recommends the usage of N95 and KN95 respirators (see Figure 3) yet must know they are not approved by NIOSH and that OSHA will not enforce the RPS. The irony here is that NIOSH is part of the CDC (see Figure 5 letterhead), so the CDC clearly knows this. Note that it is known that KN95 respirators from China are known to be less expensive than those made with the N95 designation and find widespread usage; this too was known, or should have been known, by the CDC.

Thus, the CDC pushes KN95 respirators as part of the move toward respirators, knowing they are not approved by their sub-agency NIOSH, which allows employers to make employees wear respirators without the protections of OSHA's Respiratory Protection Standard (RPS). This is an unconscionable breach of the public health function and should be corrected immediately.

**Issue #2:** ==**CDC has issued harmful guidance for masking children that contradicts manufacturers' recommendations, world-wide standard practice and CDC's own guidance, and without appropriate risk-benefit analysis:**==

The CDC's January 28, 2021 webpage language misleadingly implies respirators are acceptable for children yet knows that this is not the case simply based on manufacturer instructions, they link the reader to https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html – see Figure 6:

## Considerations for Children

### Masks

Anyone ages 2 years or older who is not vaccinated or not up to date on vaccines should wear masks in indoor public spaces. This recommendation also applies to people who are up to date on their vaccines when they are in an area of substantial or high transmission. CDC also currently recommends universal indoor masking for all teachers, staff, students, and visitors to K-12 schools, regardless of their vaccination status or the area's transmission rates. The benefits of mask-wearing are well-established.

### Respirators

Parents and caregivers may have questions about NIOSH-approved respirators (such as N95s) for children. Although respirators may be available in smaller sizes, they are typically designed to be used by adults in workplaces, and therefore have not been tested for broad use in children.

### Selecting Masks

- Masks and respirators should not be worn by children younger than 2 years.
- Choose a well-fitting and comfortable mask or respirator that your child can wear properly. A poorly fitting or uncomfortable mask or respirator might be worn incorrectly or removed often, and that would reduce its intended benefits.
  - Choose a size that fits over the child's nose and under the chin but does not impair vision.
- Follow the user instructions for the mask or respirator. These instructions may show how to make sure the product fits properly.
- Some types of masks and respirators may feel different if your child is used to wearing a regular cloth or disposable procedure masks.

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html                    6/8

**Figure 6: Misleading CDC Language Regarding Children
Wearing Masks and Respirators**

As illustrated in detail below, ==the CDC provided language in its January 28, 2022 guidance for children that is particularly misleading by obfuscating and omitting information readily known, or likely to have been known by the CDC.==

"The benefits of mask-wearing are well-established:"

==First, the benefits of children, or anyone for that matter, of wearing masks being well==

7

==established is simply false.==   A Brownstone paper by Paul Elias Alexander published December 21, 2021 (https://brownstone.org/articles/more-than-150-comparative-studies-and-articles-on-mask-ineffectiveness-and-harms/) shows both the effectiveness of masks and their harms, citing 150 studies.  One of these author's testified in the Western District Court of Michigan on September 28, 2021, in a half-dozen interviews (e.g., Jeff Hayes Films:   https://rumble.com/vrfoox-covid-revealed-episode-8b-bonus-video-stephen-petty.html), in his own podcasts (https://rumble.com/c/PettyPodcasts) and in the Liberty Dispatch in Canada  (https://podcasts.apple.com/us/podcast/episode-99-masks-dont-work-an-interview-with-ppe/id1559570986?i=1000550149187).   During this testimony it was shown that ==the nearly 50 studies cited by the CDC purportedly showing masks are effective did not support statements made by the CDC and most suffered from a lack of a control group (group similar to the mask study group not wearing masks) or cofounding factors (multiple factors such as changes in HVAC systems, distancing, quarantining, and masks) wherein one cannot determine the specific contribution by masking.==

But the most egregious part of this statement is that it only addresses supposed benefits, not liabilities.  Even the WHO - UNICEF (https://www.who.int/publications/i/item/WHO-2019-nCoV-IPC_Masks-Children-2020.1) understands that risk-rewards analysis should be done before recommending unproven, unscientifically-supported policies before masking them.  Remember – do no harm – is the overarching principle (Figures 7 & 8):

Advice to decision makers on the use of masks for children in the community

**Overarching guiding principles**

Given the limited evidence on the use of masks in children for COVID-19 or other respiratory diseases, including limited evidence about transmission of SARS-CoV-2 in children at specific ages, the formulation of policies by national authorities should be guided by the following overarching public health and social principles:

- Do no harm: the best interest, health and well-being of the child should be prioritized.
- The guidance should not negatively impact development and learning outcomes.
- The guidance should consider the feasibility of implementing recommendations in different social, cultural and geographic contexts, including settings with limited resources, humanitarian settings and among children with disabilities or specific health conditions.

**Figure 7: WHO UNICEF Recommendations for Children and Masks**

From Figure 7, the overarching guiding principle is to do no harm.

**Advice on the use of masks in children**

WHO and UNICEF advise decision makers to apply the following criteria for use of masks in children when developing national policies, in countries or areas where there is known or suspected community transmission[a] of SARS-CoV-2 and in settings where physical distancing cannot be achieved.

1.  Based on the expert opinion gathered through online meetings and consultative processes, children aged up to five years should not wear masks for source control. This advice is motivated by a "do no harm" approach and considers:
    - childhood developmental milestones[b 41]
    - compliance challenges and
    - autonomy required to use a mask properly.

The experts (following the methods described above) recognized that the evidence supporting the choice of the age cut-off is limited (see above, section related to transmission of COVID-19 in children), and they reached this decision mainly by consensus. The rationale included consideration of the fact that by the age of five years, children usually achieve significant developmental milestones, including the manual dexterity and fine motor coordination movements needed to appropriately use a mask with minimal assistance.

In some countries, guidance and policies recommend a different and lower age cut-off for mask use[42-45]. It is recognized that children may reach developmental milestones at different ages and children five years of age and under may have the dexterity needed to manage a mask. Based on the do no harm approach, if the lower age cut-off of two or three years of age is to be used for recommending mask use for children, appropriate and consistent supervision, including direct line of sight supervision by a competent adult and compliance need to be ensured, especially if mask wearing is expected for an extended period of time. This is both to ensure correct use of the mask and to prevent any potential harm associated with mask wearing to the child.

Children with severe cognitive or respiratory impairments who have difficulties tolerating a mask should, under no circumstances, be required to wear masks.

Other IPC, public health and social measures should be prioritized to minimize the risk of SARS-CoV-2 transmission for children five years of age and under; specifically maintaining physical distance of at least 1 meter where feasible, educating children to perform frequent hand hygiene and limiting the size of school classes. It is also noted that there may be other specific considerations, such as the presence of vulnerable persons or other local medical and public health advice that should be considered when determining if children five years of age and under need to wear a mask.

2.  For children between six and 11 years of age, a risk-based approach should be applied to the decision to use of a mask. This approach should take into consideration:
    - intensity of transmission in the area where the child is and updated data/available evidence on the risk of infection and transmission in this age group;
    - social and cultural environment such as beliefs, customs, behaviour or social norms that influence the community and population's social interactions, especially with and among children;
    - the child's capacity to comply with the appropriate use of masks and availability of appropriate adult supervision;
    - potential impact of mask wearing on learning and psychosocial development; and
    - additional specific considerations and adaptions for specific settings such as households with elderly relatives, schools, during sport activities or for children with disabilities or with underlying diseases.

3.  Advice on mask use in children and adolescents 12 years or older should follow the WHO guidance for mask use in adults[1] and/or the national mask guidelines for adults.

    Even where national guidelines apply, additional specific considerations (see below) and adaptions for special settings such as schools, during sport, or for children with disabilities or with underlying diseases will need to be specified.

### Figure 8: WHO UNICEF Recommendations for Children and Masks by Age

Note that from Figure 8, WHO recommends against masking below age 6 and that children ages 6 to 11 may be masked upon completion of a risk assessment. England has similar guidance. But the CDC requires masks for children down to age 2 against WHO guidance and based on extensive reviews, has yet to perform any risk assessment on the net benefits of children wearing masks.

Specifically, it is well established that significant harms (i.e., reduced learning and development and physical, emotional, and social harms) have been reported in the literature (Figures 9-18):



**Figure 9: Curriculum Associates – Nov. 2021 – Title Page**



**Figure 10: Curriculum Associates – Reading Deficits in 2021 vs. Prior Years**



**Figure 11: Curriculum Associates – Math Deficits in 2021 vs. Prior Years**



**Figure 12: Brown University – Cognitive Deficits**



**Figure 13: Brown University Study – Learning Loss of 23% for Children Born Since Pandemic**



**Figure 14: Brown University Study – Non-Verbal and Verbal Development Losses**



## ENGLAND DEPARTMENT OF EDUCATION STUDY – January 2022

Department for Education

123 schools in England used masks and compared that to others that did not use masks during the Delta wave of Covid.

### Evidence Summary

Coronavirus (COVID-19) and the use of face coverings in education settings

January 2022

13

**Figure 15: England Department of Education**

## January 2022 England Dept. of Education Study – Masks Negatively Affected Learning

*The review acknowledged the use of face coverings are harmful:*

*"A survey conducted by the Department for Education in April 2021 found that almost all secondary leaders and teachers (94%) thought that wearing face coverings has made communication between teachers and students more difficult, with 59% saying it has made it a lot more difficult"*

*"Wearing face coverings may have physical side effects and impair face identification, verbal and non-verbal communication between teacher and learner."*

Evidence Summary

**Figure 16: England Department of Education – Loss of Communication and Physical Effects**



**Figure 17: Kisielinski et al. – Mask Meta Study – Reviewed 1,226 Studies**





**Figure 18: Kisielinski et al., – Areas of Quantitated Adverse
Effects on Children and Adults**

==Clearly, the CDC has not conducted a net risk assessment and should have, and must do so to avoid continuing harms to children.==

Even more disturbing, in their innocent looking, new Guidance for Children (Learn the Signs, Act Early) the CDC has in part, extended the timeframes for children to achieve learning outcomes (https://www.cdc.gov/ncbddd/actearly/milestones/index.html). Regarding these changes – Figure 19, CDC refers the reader to an American Academy of Pediatrics (AAP) webpage (https://publications.aap.org/pediatrics/article-abstract/doi/10.1542/peds.2021-052138/184748/Evidence-Informed-Milestones-for-Developmental?redirectedFrom=fulltext):



## CDC's Developmental Milestones

CDC's milestones and parent tips have been updated and new checklist ages have been added (15 and 30 months). Due to COVID-19, updated photos and videos have been delayed but will be added back to this page in the future. For more information about the recent updates to CDC's developmental milestones, please view the *Pediatrics* journal article ⧉ describing the updates.

**Figure 19: CDC Learn the Signs, Act Early New Webpage – Reference to AAP**

The headlines for the reference paper are reproduced as Figure 20:

Evidence-Informed Milestones for Developmental Surveillance Tools | Pediatrics | American Acad

SPECIAL ARTICLE | FEBRUARY 08 2022

## Evidence-Informed Milestones for Developmental Surveillance Tools 🛒

Jennifer M. Zubler, MD ✉; Lisa D. Wiggins, PhD; Michelle M. Macias, MD; Toni M. Whitaker, MD; Judith S. Shaw, EdD, MPH, RN; Jane K. Squires, PhD; Julie A. Pajek, PhD; Rebecca B. Wolf, MA; Karnesha S. Slaughter, MPH; Amber S. Broughton, MPH; Krysta L. Gerndt, MPH; Bethany J. Mlodoch; Paul H. Lipkin, MD

\* Contributed equally as co-senior authors.

Address correspondence to Jennifer M. Zubler, MD, National Center on Birth Defects and Developmental Disabilities, Centers for Disease Control and Prevention, 4770 Buford Hwy NE, MS S106-4, Atlanta, GA 30341. E-mail: wyv4@cdc.gov

**Figure 20: CDC Referenced AAP Paper by Zubler (CDC) et al.
Dated February 8, 2022**

Zubler et al., write in part:

"*The Centers for Disease Control and Prevention's (CDC) Learn the Signs. Act Early. program, funded the American Academy of Pediatrics (AAP) to convene an expert working group to revise its developmental surveillance checklists.* The goals of the group were to identify evidence-informed milestones to include in CDC checklists, clarify when most children can be expected to reach a milestone (to discourage a wait-and-see approach), and support clinical judgment regarding screening between recommended ages. Subject matter experts identified by the AAP established 11 criteria for CDC milestone checklists, including using milestones most children (≥75%) would be expected to achieve by specific health supervision visit ages and those that are easily observed in natural settings.  A database of normative data for individual milestones, common screening and evaluation tools, and published clinical opinion was created to inform revisions.  ***Application of the criteria established by the AAP working group and adding milestones for the 15- and 30-month health supervision visits*** <u>***resulted in a 26.4% reduction***</u> ***and 40.9% replacement of previous CDC milestones.*** <u>***One third of the retained milestones were transferred to different ages; 67.7% of those transferred were moved to older ages.***</u> *Approximately 80% of the final milestones had normative data from ≥1 sources*. Social-emotional and cognitive milestones had the least normative data. These criteria and revised checklists can be used to support developmental surveillance, clinical judgment regarding additional developmental screening, and research in developmental surveillance processes. Gaps in developmental data were identified particularly for social-emotional and cognitive milestones.

Thus, at least 22.3% [67.7% of 33%] of the CDC child developmental milestones in place for ~18 years, were moved from a younger age to an older age in February 2022.

==One must conclude the CDC, rather than acknowledging the harms being done to children's development by their COVID policies, including masking, is simply moving the goalposts for what constitutes normal child development rather than admitting and moving away from failed policies.==

Statements under "Respirators" and "Selecting Masks":

➢ Parents and caregivers may have questions about NIOSH-approved respirators (such as N95s) for children.  *Although respirators may be available in smaller sizes,* ***<u>they are typically designed to be used by adults in workplaces</u>***, *and therefore have not been tested for broad use in children*.

➢ ***<u>Masks and respirators should not be worn by children younger than 2 years.</u>***

➢ Choose a size that fits over the child's nose and under the chin but does not impair vision.  ***<u>Follow the user instructions for the mask or respirator.</u>***  *<u>These instructions may show how to make sure the product fits properly.</u>*

==***This language may be the most misleading and egregious given that the links CDC provides to manufacturers' instruction state that their N95s are not for use with children – the CDC has to know this.***==

The links to manufacturers' instructions from the January 28, 2022 mask and January 25, 2022 How to Use Your N95 Respirator are shown in Figures 21 and 22 respectively:

**Related Pages**

› Your Guide to Masks
› Improve How Your Mask Protects You
› How to Use Your N95 Respirator

Last Updated Jan. 28, 2022

**Figure 21: CDC January 28, 2022 Link – Bottom of Page and CDC January 25, 2022 Link to Manufacturers' Guidance and Warnings**

The "How to Use Your N95 Respirator" is at the bottom of the CDC January 28, 2022 webpage.

COVID-19

## How to Use Your N95 Respirator

Updated Jan. 25, 2022

Wear Your N95 Properly So It Is Effective

- N95s must form a seal to the face to work properly. This is especially important for people at increased risk for severe disease. Wearing an N95 can make it harder to breathe. If you have heart or lung problems, talk to your doctor before using an N95.
- Some N95s may contain latex in the straps. If you have natural rubber latex allergies, see the manufacturers' website for information about your specific model.

For specific manufacturer's instructions for your N95 model, see Free N95 Respirator Manufacturers.

**Figure 22: CDC January 15, 2022 Link to How to Use Your N-95 Respirator – Link to Manufacturers**

The link in turn takes one to the following page (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/free-n95-manufacturers.html) (Figure 23):





## COVID-19

Free N95 Respirator Manufacturers

Distributed from the Strategic National Stockpile

Updated Jan. 25, 2022

### What You Need to Know

- The Strategic National Stockpile has distributed N95 respirators to pharmacy distribution centers throughout the country.
- You can find specific manufacturer's instructions for your N95 model below.

For information about how to use your N95 correctly, see How to Use Your N95 Respirator.

### 3M



MODEL
**3M Model 8210+**

NIOSH APPROVAL
**TC-84A-0007**

General and Occupational/Workplace 8210, 8110S, 8210Plus N95 Particulate Respirator User Instructions (3m.com) 🅰 ☐



MODEL
**3M Model 8110S**

NIOSH APPROVAL
**TC-84A-0007**

General and Occupational/Workplace 8210, 8110S, 8210Plus N95 Particulate Respirator User Instructions (3m.com) 🅰 ☐

MODEL

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/free-n95-manufacturers.html                 1/

**Figure 23: CDC January 15, 2022 Link to How to Use Your N-95 Respirator – Link to Manufacturers – pg. 1**

From this webpage, four manufacturers are listed representing 12 respirators:

➢   3M (6 models)

➢   Drager (1 model)

➢   Honeywell (2 models)

➢   Moldex (3 models).

For each model, the link can be clicked to get directly to the manufacturers' instructions for each respirator.  For 3M and Moldex, major suppliers, only one set of instructions is used for each of their individually listed respirators.  In other words, the same instructions were provided for each of the manufacturers' listed products.

Both 3M and Moldex explicitly state that their masks are not to be use by children (Figure 24).

Occupational/Workplace Use: 3M™ 8210, 8110S, 8210Plus N95 User Instructions

**Use Instructions**

1)   Failure to follow all instructions and limitations on the use of this respirator and/or failure to wear this respirator during all times of exposure can reduce respirator effectiveness and **may result in sickness or death.**

2)   In the U.S., before occupational use of this respirator, a written respiratory protection program must be implemented meeting all the requirements of OSHA 29 CFR 1910.134, such as training, fit testing, medical evaluation, and applicable OSHA substance specific standards. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. Follow all applicable local regulations.

3)   The particles which can be dangerous to your health include those so small that you cannot see them.

4)   Leave the contaminated area immediately and contact supervisor if dizziness, irritation, or other distress occurs.

5)   Store the respirator away from contaminated areas when not in use.

6)   Inspect respirator before each use to ensure that it is in good operating condition. Examine all the respirator parts for signs of damage including the two headbands, attachment points, nose foam, and noseclip. The respirator should be disposed of immediately upon observation of damaged or missing parts. Filtering facepieces are to be inspected prior to each use to assure there are no holes in the breathing zone other than the punctures around staples and no damage has occurred. Enlarged holes resulting from ripped or torn filter material around staple punctures are considered damage. Immediately replace respirator if damaged. Staple perforations do not affect NIOSH approval (For 8110S only).

7)   Conduct a user seal check before each use as specified in the Fitting Instructions section. **If you cannot achieve a proper seal, do not use the respirator.**

8)   Dispose of used product in accordance with applicable regulations.

**Use Limitations**

1)   This respirator does not supply oxygen. Do not use in atmospheres containing less than 19.5% oxygen.

2)   Do not use when concentrations of contaminants are immediately dangerous to life and health, are unknown or when concentrations exceed 10 times the permissible exposure limit (PEL) or according to specific OSHA standards or applicable government regulations, whichever is lower.

3)   Do not alter, wash, abuse or misuse this respirator.

4)   Do not use with beards or other facial hair or other conditions that prevent a good seal between the face and the sealing surface of the respirator.

5)   Respirators can help protect your lungs against certain airborne contaminants. They will not prevent entry through other routes such as the skin, which would require additional personal protective equipment (PPE).

6)   This respirator is designed for occupational/professional use by adults who are properly trained in its use and limitations. This respirator is not designed to be used by children.

7)   Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use.

**Figure 24: 3M Instructions for CDC Listed 3M N95 Respirators – Not Designed to be Used by Children**

Note the following observations from Figure 24:

➢ ***This respirator is not designed to be used by children***!

➢ The respirator is only intended to be used for occupational or professional adults properly trained (e.g., under the RPS).

➢ Failure to follow instructions may result in sickness or death.

➢ A written respiratory protection plan, under the requirements of 29 CFR 1910.134 (RPS) must be in place prior to use of this respirator.

The Moldex instructions are essentially the same.

Moreover, 3M warns it is not protective against infectious diseases (Figure 25):

Biological Particles

This respirator can help reduce inhalation exposures to certain airborne biological particles (e.g. mold, *Bacillus anthracis*, *Mycobacterium tuberculosis*, etc.) but cannot eliminate the risk of contracting infection, illness or disease. OSHA and other government agencies have not established safe exposure limits for these contaminants.

5

**Figure 25: 3M Instructions for CDC Listed 3M N95 Respirators – Not Protective Against Infection, Illness, or Disease**

Note that anthrax and TB are much larger particles than virus particles like the COVID-19 virus.

In light of this discussion, the CDC should immediately correct their webpage stating explicitly that respirators, according to manufacturers' instructions, "Are not designed to be used by Children" and that anyone using a respirator must be doing so under a written respiratory protection plan that follows the OSHA RPS.

**Issue #3:       The CDC continues to ignore the fact that COVID-19 is primarily spread by aerosols (not droplets) making mask use mostly ineffective:**

The CDC continues to make the misleading argument that masks stop COVID droplets. This is misleading because while masks do stop some droplets (> 50 to 10 micron), the vast majority of COVID particles are smaller aerosols (≤ 5 microns) – see Figure 26:

> ## Types of Masks and Respirators
>
> Masks are made to contain droplets and particles you breathe, cough, or sneeze out. If they fit closely to the face, they can also provide you some protection from particles spread by others, including the virus that causes COVID-19.
>
> Respirators are made to protect you by filtering the air and fitting closely on the face to filter out particles, including the virus that causes COVID-19. They can also contain droplets and particles you breathe, cough, or sneeze out so you do not spread them to others.

**Figure 26: CDC – Misleading Guidance on Masks and Droplets**

We are not the only ones who have written you regarding this issue. On February 15, 2001, the following scientists wrote a lengthy memo to you regarding your misleading language in this area and asked you to correct it:

➢ Rick Bright, PhD, Former Director of BARDA, Dept of Health and Human Services

➢ Lisa M. Brosseau, ScD, CIH, University of Minnesota CIDRAP

➢ Lynn R. Goldman, MD, MS, MPH, George Washington University

➢ Céline Gounder, MD, ScM, NYU Grossman School of Medicine & Bellevue Hospital Center

➢ Jose Jimenez, PhD, University of Colorado at Boulder

➢ Yoshihiro Kawaoka, DVM, PhD, University of Wisconsin-Madison and University of Tokyo

➢ Linsey Marr, PhD, Virginia Tech

➢ David Michaels, PhD, MPH, George Washington University

➢ Donald K. Milton, MD, DrPH, University of Maryland

➢ Michael Osterholm, PhD, MPH, University of Minnesota CIDRAP

➢ Kimberly Prather, PhD, University of California San Diego

➢ Robert T. Schooley, MD, University of California San Diego

➢ Peg Seminario, MS, AFL-CIO (retired)

They wrote in part:

"To address and limit transmission via inhalation exposure and prevent COVID infections and deaths, we urge the Biden administration to take the following immediate actions:

●　　Update and strengthen CDC guidelines to fully address transmission via inhalation exposure to *small inhalable particles* from infectious sources at close, mid and longer range. Updated guidelines should be informed by a risk assessment model that focuses on source and pathway (ventilation) controls first, followed by respiratory protection…

- *Issue an OSHA emergency standard on COVID-19 that recognizes the importance of aerosol inhalation, includes requirements to assess risks of exposure, and requires implementation of control measures following a hierarchy of controls*…

Edwards et al. (https://www.pnas.org/content/118/8/e2021830118) demonstrated that that the vast majority of COVID particles emitted during illness are aerosols not droplets (see Figure 27):



**Figure 27: Edwards et al., 2021 – Particle Size Emissions by Size and Time**

Edwards et al. concluded their paper with the following statements:

➢ Our finding that *the proportion of small respiratory droplets (i.e., aerosols) were the majority of particles exhaled in all subjects*.

➢ There may be an elevated risk of the airborne transmission of SARS CoV 2 by way of the very small droplets (aerosols) that transmit through conventional masks and *traverse distances far exceeding the conventional social distance of 2 m (~7')*.

➢ Exhaled aerosol numbers appear to be not only an indicator of disease progression, *but a marker of disease risk in non-infected individuals.*

While the mask may contain droplets, they only do so for a period. As the masks are exposed to heat and moisture they suffer from degradation within a few hours.

We ask that the CDC immediately suspend misleading statements in all their public information that masks stop droplets when the vast majority of particles are smaller aerosols that stay suspended for days to weeks (vs. minutes for droplets), readily pass through gaps around the masks, and can reach deep into the lungs (see for example Fennelly, Kevin, P., 2020, Particle sizes of infectious aerosols: implications for infection control, Lancet Respir Med 2020; 8: 914–24).

**Issue #4:**     **CDC's position for masks used by the general public lacks proper scientific justification and creates potential harm based on a false sense of security:**

Statements that a mask can provide protection are false and mislead the public into a false sense of security.   Industrial Hygiene solutions seek a more than 90% relative risk reduction, and this publication continues to focus on the lowest form of non-protection that does not meet the least desirable mode of protection (PPE) in the Hierarchy of Controls with PPE.   The September 9, 2020 guidance from AIHA illustrated this concept of the need for a super reduction in relative risk, not a minor one (https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Reducing-the-Risk-of-COVID-19-using-Engineering-Controls-Guidance-Document.pdf - pg. 4).

Moreover, the CDC continues to provide guidance that gaps in masks can be eliminated; in the real world that never happens (Figure 28):

## Choosing a Mask or Respirator for Different Situations

Masks and respirators (i.e., specialized filtering masks such as "N95s") can provide different levels of protection depending on the type of mask and how they are used. Loosely woven cloth products provide the least protection, layered finely woven products offer more protection, well-fitting disposable surgical masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection.

Whatever product you choose, it should provide a good fit (i.e., fitting closely on the face without any gaps along the edges or around the nose) and be comfortable enough when worn properly (covering your nose and mouth) so that you can keep it on when you need to. Learn how to improve how well your mask protects you by visiting CDC's Improve How Your Mask Protects You page.

A respirator has better filtration, and if worn properly the whole time it is in use, can provide a higher level of protection than a cloth or procedural mask. A mask or respirator will be less effective if it fits poorly or if you wear it improperly or take it off frequently. Individuals may consider the situation and other factors when choosing a mask or respirator that offers greater protection.

**Do NOT wear cloth masks with**

- Gaps around the sides of the face or nose
- Exhalation valves, vents, or other openings (see example)
- Single-layer fabric or those made of thin fabric that don't block light
- Wet or dirty material

**Figure 28: CDC Guidance Suggesting Gaps in Masks Can be Eliminated**

The CDC statement that masks should not be worn if gaps cannot be eliminated is meaningless because this cannot occur; only properly selected and fitted respirators can accomplish this.

Masks cannot ever obtain a perfect fit to the face and efficiencies of masks when worn in real world scenarios (day-long usage). When the mask has more than a 3% gap, it offers effectively zero protection (Figure 29):



**Figure 29: Loss of Mask Effectiveness in the Real World**

Thus, the core issue with masks, and even respirators, is the seal – small gap areas effectively render these devices ineffective.

The American Society for Testing and Materials (ASTM) Standard Specification for Barrier Face Coverings F3502-21 Note 2 states, "There are currently no established methods for measuring outward leakage from a barrier face covering, medical mask, or respirator.  Nothing in this standard addressed or implied a quantitative assessment of outward leakage and no claims can be made about the degree to which a barrier face covering reduces emission of human-generated particles."

As well as, importantly, Note 5, "There are currently no specific accepted techniques that are available to measure outward leakage from a barrier face covering or other products.  Thus, no claims may be made with respect to the degree of source control offered by the barrier face covering based on the leakage assessment."

Every breath increases atmospheric viral load, or the amount of viral matter held aloft in an enclosed space. In instances when it does not take very much of an airborne pathogen for vulnerable individuals to get sick, a contagious individual should not wear a mask or respirator that creates a concentrated plume of aerosols, thinking they are protecting others from their respiratory emissions.

Explosive force-generating events, such as coughs and sneezes, increase the pressure behind exhaled matter. Masks can exacerbate the spread of airborne pathogens by creating focused plumes of fine particulates, in turn increasing emission trajectory, with the added concern of aerosolization of droplets through the mask membrane.

Finally, what is now most concerning, is that public entities are taking CDC guidance and making respirators available for free (Figure 30):

 

**Figure 30: "Free" Open Contaminated N95s Being Given Away
to the Public at Grocery Stores**

These entities, based on CDC guidance, likely and/or unknowingly, do not address the requirements of the Respiratory Protection Standard and causing additional harm to the public by such a lack of understanding.  Inevitably, this practice will result in harm and liability to their employees and customers for improper distribution and storage of respirators under the RPS.

**Conclusion:**

The CDC has built a series of recommendations for masking that are inconsistent with the technical and medical literature.  The policy and procedural recommendations exaggerate the benefits, while ignoring the limitations and harms, especially for children and the general population.  In addition, the CDC has taken a policy position of "it might work" and "it can't hurt" and use selective and weak observational data in the place of actual controlled scientific study to justify inappropriate recommendations for masks and face coverings.

Recently, the CDC has deployed a respiratory protection policy (i.e., masks to N95s) that dismisses the key principles in any Safety and Health program regarding the use of respirators – namely the Respiratory Protection Program.  There is no mention of potential risks if the respirator is not properly used or fitted correctly.  Moreover, it is clear that respirators are not intended for use with children.  In our profession, if PPE and respiratory protection guidance was to ever be delivered without risk identification, fit testing, and training, we would be liable for putting personnel in a high-risk scenario, which is what the CDC is doing with their policy.

We would ask the CDC to accept these basic industrial hygiene facts that we have presented, update their public guidance accordingly regarding the issue of droplets vs. aerosols, stop confusing the public regarding the effectiveness of masks, and stop implying respirators are acceptable for children, and to be given generally to the public. In addition, it is clear the CDC knows, or should know, that gaps between the face and mask are a major problem for real mask effectiveness and could never have met our industry's requirement of 90% relative risk reduction.

The CDC is doing enormous damage to science and scientists by allowing politics to dictate public health policy rather than actual science.  Increasingly, and for good reason as we have illustrated, the public does not trust the CDC and its science; this must change.

We recognize that it is easy to judge from afar and know that you and your team are under tremendous stress during this period.  Our desire is to see the CDC and our country succeed in these efforts.  As such, instead of just being critical, we want to offer our time to your organization to find solutions together.  We would be willing to collaborate in the creation of a competent plan that will be based on the Hierarchy of Controls and will be tailored to various work and living environments.  We will also help develop data points we can use to monitor and measure this program to enable proper adjustments as needed.

We look forward to your responses to our concerns as we continue to work to protect the public.

Sincerely:

Stephen E. Petty, P.E., C.I.H., C.S.P.*
EES Group, Inc.
Pompano Beach, FL 33030
(spetty@eesgroup.us)

James R. Casciano, MS, CIH
Certified Industrial Hygienist
Lafayette, Colorado
(jamescasciano@gmail.com)

Tammy Clark
Occupational and Environmental Health and Safety Professional
(tammy@standupmichigan.com)

Tyson Gabriel, IH, OEHS Pro
Premier Risk Management
4501 N 22nd St, Unit 190
Phoenix, AZ 85016
tydgabe@yahoo.com)

Dave Howard, Founder
Premier Risk Management
4501 N 22nd St, Unit 190
Phoenix, AZ 85016
(dhoward@premierrm.com)

Nathaniel Kelly, MPH, M.S. OSH, GSP
Health and Safety Manager
Hudsonville, MI
nathanielkelly1@yahoo.com

Megan K. Mansell
Risk Assessment, Compliance, and Accommodations for Special Populations
Tallahassee, FL 32303
(MeganKristenMansell@gmail.com)

Kristen Meghan Kelly, M.S. OSH
Senior Industrial Hygienist
(kristenmeghan@gmail.com)

* Corresponding Author

27

# Plaintiffs' Exhibit 301

businessinsider.com

## Airline passengers who refuse to wear masks have turned violent — and now that the TSA has extended the mask mandate, it's going to get even uglier

*Max Ufberg*

9-11 minutes

`3-1-22; updated 3-10-22`

---

Across the US, mask mandates are being lifted by retailers, colleges, theme parks, music festivals, and even state governments. But that's not the case on airplanes, where the Transportation Security Administration is still enforcing a mask requirement on all commercial flights. Despite coming with hefty fines and the threat of criminal prosecution, the policy has spawned an epidemic of shouting matches — and worse — between defiant passengers and flight crews.

The mandate was set to expire March 18 but has just been extended by a month. A major union of flight attendants had pushed for another extension, citing safety for the flight attendants, the immunocompromised, and children under 5, the only age group still ineligible for vaccination in the US. This marks the third time the TSA has extended the mandate (which also covers buses, trains, and transportation hubs), and it may not be the last. "The data and potential for the emergence of new variants points to retaining the mandate until the summer, at least," says Bob Mann, an airline-industry analyst.

But if airlines are the last place in America to require masks, the skies are likely to become even less friendly for flight crews. Last year the Federal Aviation Administration reported 5,981 instances of unruly passengers, 71% of which were related to the mask mandate. There was the guy who threatened to break the neck of a fellow passenger who intervened during a mask-related confrontation with a United Airlines attendant. The woman who slapped and spit on a fellow Delta passenger who scolded her for not wearing a mask. The man who refused to mask up on a Delta flight and decided to expose himself to a flight attendant instead. It was the worst year on record for buffoonish behavior on planes — and that was before the Centers for Disease Control and Prevention lifted indoor mask restrictions across most of the US. Imagine the fury among anti-mask passengers if the federal government continues to enforce a mask requirement on airlines into the late spring and even the summer summer, when no one's making people mask up anywhere else.

That's why flight attendants, along with Delta Air Lines, are proposing a bold new maneuver in the mask war: prohibit unruly passengers from flying. Earlier this month, Delta CEO Ed

Bastian sent a letter to the Justice Department asking for the creation of a national "no fly" list
that would bar passengers with a history of unruly behavior from boarding *any* commercial
flight, not just the one where they transgressed. Bastian wrote that such a list would "help
prevent future incidents and serve as a strong symbol of the consequences of not complying
with crew member instructions on commercial aircraft."

People were acting like idiots on airplanes long before the pandemic, of course. (Remember
this guy?) Research points to a host of explanations for in-flight aggression: Planes are
cramped spaces, passengers often feel uncomfortable or anxious, and there's no exit when
the going gets rough. There's a highly visible social ladder between the haves and the have-
nots, with first-class passengers receiving far better treatment and way more space than
those stuck in coach. And alcohol is freely available to soothe — or inflame — all these fears
and frustrations.

But the level of in-flight fracas has gotten exponentially worse in the past two years, with most
cases involving disputes over masking. The political divisions over the coronavirus pandemic
are amplified on flights, where Americans who would normally be separated by vast swaths
of culture and geography are thrown together in the close quarters of an airplane cabin. "As
the nation has become more divided, we've seen more and more of such cases," says Mann,
the analyst.

To make matters worse, many US passengers hail from parts of the country that take the
pandemic far less seriously than others. And the mask opponents often assume, falsely, that
the mask requirement is an airline policy, not a federal regulation. "They don't even think it's a
law," Mann says. "They think it's an advisory of some sort."

That's part of the reason flight attendants had pushed to extend the mask mandate and back
it up with a no-fly list: to bring the formality of federal authority to a realm that many
passengers dismiss as ignorable corporate policy. Last October, Transportation Secretary
Pete Buttigieg told CNN that the idea for a no-fly list "should be on the table" after an
American Airlines flight attendant had several bones in her face broken during a mask-related
altercation with a passenger.

Still, the list is a long shot, with opposition across the political spectrum. Eight Republican
senators have written a letter to Attorney General Merrick Garland, arguing that a no-fly list
would equate unruly passengers with "terrorists" for whom the FBI already maintains a no-fly
list. And the senators have an unlikely ally in the American Civil Liberties Union. Though the
ACLU has lobbied for mask mandates, it has also challenged the FBI's terrorism no-fly list in
court, and it's already questioning the lack of due process for unruly passengers.

"The proposals I've seen would allow airlines to put people on the list," Jay Stanley, a senior
policy analyst at the ACLU, told me. "Better proposals would require that you actually be
convicted in court of interfering with aviation or the like on an aircraft."

Moreover, it's not even clear that most airlines want a no-fly list. Other than Delta, they've
been mum on the subject, referring questions to Airlines for America, an industry trade group.

Katherine Estep, the group's spokeswoman, told me only that airlines "remain in communication with the FAA, TSA, and other relevant agencies to identify ways to further mitigate this ongoing challenge." (The TSA did not respond to a request for comment, and a representative for the Justice Department said it would be referring Delta's letter to "appropriate departments.")

==Should the mask mandate continue into the summer and beyond, airlines could expect the bad behavior to increase, as customers grow accustomed to going maskless everywhere else.== Through mid-February of this year, according to FAA data, airlines have reported 607 cases of unruly passengers — far higher than pre-pandemic levels. A few weeks ago, a Portland, Oregon, man was charged with trying to open an emergency door while on a Delta flight en route from Salt Lake City. The reason for his disturbance? An affidavit filed in support of the arrest warrant says he wanted to get other passengers to film the incident, "thereby giving him the opportunity to share his thoughts on COVID-19 vaccines."

All of which means airlines are likely to be stuck in the worst of all possible worlds: requiring masks in the midst of a nationwide war over masks, without any means to prevent unruly passengers with a record of lashing out from doing so again. "There are some very legitimate reasons why airlines may want to have the mask requirement extended," says Henry Harteveldt, the president of the travel consultancy Atmosphere Research Group. "Unfortunately, even though we know COVID is not over, a lot of people are over COVID."

*This article, originally published on March 1, has been updated to reflect that on March 10 the Transportation Security Administration extended the airplane mask mandate.*



Keep reading

Receive a selection of our best stories daily based on your reading preferences.

More: mask mandates COVID-19 Airlines FAA

# Plaintiffs' Exhibit 302

dallasnews.com

## Southwest Airlines flight attendants ask Biden to drop face mask mandate

*By Kyle Arnold 9:15 AM on Mar 22, 2022 CDT*

5-7 minutes



Flight status boards show flights canceled for Southwest Airlines at Dallas Love Field after a winter storm moved through Dallas-Fort Worth on Feb. 3.(Smiley N. Pool / Staff Photographer)

The union for flight attendants at Dallas-based Southwest Airlines is asking the White House and other aviation regulators to drop face mask mandates that have become a hallmark of flying during the COVID-19 pandemic.

The TWU Local 556 union that represents that carrier's 16,000 flight attendants said in a letter to President Joe Biden and other regulators that "Serving onboard during these contentious times and enforcing mask compliance is one of the most difficult jobs we have ever faced as flight attendants."

"We strongly believe it is now time to give our members and passengers the opportunity to choose if they prefer to wear a mask while flying," the letter from TWU Local 556's executive board said. "In the spirit of bringing normalcy back to our front lines as aviation's first responders, we ask that you consider lifting the federal mask mandate for airline travel and will move expeditiously to restore choice to aviation professionals and the flying public."

The request comes weeks after the Transportation Security Administration said it would extend the face mask mandate from March 18 to April 18 and that the CDC was working on a set of guidelines to determine when masking on airplanes and in airports could be dropped. Passengers can face fines of

$500 to $1,000 for a first offense for not wearing masks and $1,000 to $3,000 for a second offense.
Airlines have also been banning passengers who refuse to follow mask rules.

But with the omicron surge of COVID-19 receding, a number of state and local governments along with school districts have been reducing public health requirements for face masks in public places and businesses. The CDC earlier this month eased face mask rules in most of the country.

"It is a sensitive issue, and we wanted to make sure that we really responded to our members," TWU Local 556 president Lyn Montgomery said in an interview. "We took a poll that a large majority of our flight attendants are very fatigued from wearing the masks."

Montgomery said the union would not release the poll results.

Airplanes have been a greater arena for debate since the confined space of a commercial jet gives very little room for social distancing. But airlines have also had to deal with people who decide they will no longer abide by the government rules on face masks that have been in place since January 2021. The FAA received 4,290 reports of mask-related incidents in 2021, which was nearly two-thirds of all unruly passenger incidents. Airlines have enforced their own mask mandates since the spring and summer of 2020.

"The number of physical and verbal assaults in our workplace has increased dramatically, many of which are related to mask compliance," TWU Local 556 wrote in the letter. "Through it all, our members have continued to respond professionally and responsibly with safety and security as our main priority."

"It is important to note that a large portion of our membership has expressed that they would like the freedom to choose whether to wear a mask at work."

Scientists have been cautious about dropping face mask mandates.

Harvard researcher Leonard Marcus, who co-leads the school's Aviation Public Health Initiative, said masks still reduce the transmission of COVID-19 on airplanes.

"If you put that together — so you've got a lot of people on an airplane, everybody's wearing a mask — you've done something, in combination with the ventilation system, that really reduces the likelihood of transmission," Marcus told New Zealand's Stuff for an article on March 1.

Airline officials have stressed their research shows the risk for COVID-19 spread in commercial airplanes is low because of air filter systems and the way the ventilation systems move air from the roof to the floor.

"I think the case is very strong that masks don't add much, if anything, in the air cabin environment," said Gary Kelly, the former Southwest Airlines CEO who retired in February, during a Congressional hearing in late 2021. "It is very safe, very high-quality compared to any other indoor setting."

Unions for flight attendants at American Airlines and United Airlines have taken a more nuanced approach.

The Association of Professional Flight Attendants representing American Airlines workers said in February that "Flight attendants are looking forward to the day when face coverings are no longer a requirement for air travel; however our primary focus must be to ensure confidence in our global air transportation system." But the union has not taken an official stance on whether face mask mandates should be extended.

# Plaintiffs' Exhibit 303

## List of YouTube Videos Documenting Mask Confrontations on Flights & at Airports:

1.   "***Mother and 5-year-old with autism kicked off Southwest flight for not wearing mask***; 'Ava Breiterman is struggling with her emotions after a traumatic event over the weekend. A Brighton woman and her daughter were kicked off a Southwest Flight …daughter who is autistic wouldn't wear a mask…has level 2 autism, sensory issues, causes meltdowns…'"; Denver7 – The Denver Channel; Sep 29, 2020. https://youtu.be/5RAXbHmd4KU

2.   "***Passengers removed from Detroit plane for not wearing mask***; 'A Delta flight from Detroit Metropolitan Wayne County Airport to Hartsfield-Jackson Atlanta International Airport was delayed for about an hour Thursday when two people refused to wear a mask.'"; Click On Detroit | Local 4 | WDIV channel; Jul 29, 2020. "A passenger was escorted off of Delta flight 654 operating from Aruba to Atlanta by security personnel (as crowd claps and cheers) after refusing to wear a mask on board the aircraft in compliance with Delta's mask wearing requirements. A Delta flight from Detroit Metropolitan Wayne County Airport to Hartsfield-Jackson Atlanta International Airport was delayed for about an hour Thursday when two people refused to wear a mask. Not sure what happened to them." https://youtu.be/q0WMBhvF6fo

3.     "***A Woman Kicked Out of an American Airlines Plane After Refusing to do one Thing***; '…because she wasn't wearing a mask.'"  Woman had a medical condition, asked staff to board first.  Other passengers were shouting at her, told her to hurry up and get off, clapping as she was escorted off the plane. American Airlines had issued a rule that 'Every passenger must wear a face mask in the airport and on the plane."  Video narrator states that "Crisis airline companies" conspired to make the mask rules [4:24 timestamp], and cites American Airlines' policy to require each and every passenger to wear a mask… over the age of 2.  Video taken by Jordan Slade.  Wonderbot channel; Oct 22, 2020. https://youtu.be/MKqJtViTL-I

4.     "***New Hampshire 2-yr old and mother get tossed from plane for mask policy violation***; 'New Hampshire mom (Rachel Star Davis) says she was thrown off a plane because her 2-yr-old son refused to wear a coronavirus mask.'"; NEWS CENTER Maine channel June 15, 2020.  https://youtu.be/ivgc0O3Ddm4

5.   "***Flight passenger removed for refusing to wear mask***; A passenger was forced off of a crowded American Airline flight after refusing to wear a mask. 'This is the first time we're hearing about something like this happening since American Airlines announced plans to more strictly enforce masks.'" The passenger, Brandon Straka, was ordered off and told not to record the video (video

seen on Twitter). The airline has permanently banned him for the duration of the
Coronavirus pandemic. KTNV Channel 13 Las Vegas channel. June 19, 2020.
https://youtu.be/djZytYu9exM and https://youtu.be/gxizFmZ6Dy8

6. "***Family kicked off flight***: 'A Houston area family is removed from a
Southwest Airlines flight over a face covering issue; ...3 year old son had autism
and a doctor's note would not wear a mask" on Southwest Airlines at Hobby
Airport. Alyssa Sadler, mother.      KPRC 2 Click2Houston; August 11, 2020.
https://youtu.be/3XpnZAmEuxs

7. "***Family kicked off JetBlue flight over 2-year-old's mask refusal:***  '
Eyewitness News ABC7NY; Aug 20, 2020.  https://youtu.be/MXEaSmxOi6Q
"A Brooklyn mother is speaking out after JetBlue Airways forced her and her six
children off a plane this week when her 2-year-old daughter refused to wear a
mask. "I was shaken," Chaya Bruck said. "My kids started crying. They didn't know
what was going on."  Passengers on the Orlando-to-Newark flight stood up for the
family... The 39-year-old Bruck was heading home from a family vacation in
Florida Wednesday. Everyone in her party was wearing the mandatory masks,
except her young daughter. "She never wore masks this entire few months," she
said. "I would never make her wear a mask, She's a baby." Bruck said three crew
members told her she had to put a mask on her daughter, and one of them
happened to be on her outbound flight and had told her the same thing. JetBlue
requires masks for all passengers ages 2 and up.  Read More:
https://7ny.tv/2EakuEg

8. "***Airlines strictly enforcing mask policy***;  'Passengers who refuse to wear
a mask or face coverings may get banned from flying with some of the major U.S.
airlines [American, Delta, united, Southwest named].'";  ABC15 Arizona channel;
614K subscribers.    June 15, 2020.    https://www.youtube.com/watch?v=-
nU2q8bmdrE&list=PL1f7fFhGIAu9G38QbpPu-focnPp71ZbUw&index=109

9. "***Man Refuses To Wear Maks [sic] On Plane***;  'Police had to be called
inside a Fort Lauderdale-bound plane in New York when a man (unnamed) refused
to wear a mask while onboard a plane [Spirit Airlines].'";  CBS Miami channel;
June 15, 2020. "No mask, no flight. That's the rule on almost every airline these
days..."  https://youtu.be/1cjkLFqAqBM

10.  "***Police arrest belligerent passenger on flight at Jacksonville
International Airport***:  '...latest in the uptick in reports of unruly passengers
according to the Federal Aviation Administration from Jan 1- May 24th there were
approximately 2500 reports...surge in complaints especially with the mask
mandate."    News4JAX channel; Jun 4, 2021. https://youtu.be/QEomO2VEn2U

11. "***Man in Trump gear booted from <mark>Southwest</mark> flight for removing mask to eat | New York <mark>Post:</mark>*** <mark>'A black man wearing a "Trump 2020" mask was kicked off a Southwest</mark> Airlines after lowering it to eat a snack, a video appears to show.  The passenger — who was also sporting a "Black Voices for Trump" hat — is seen talking to a crew member while holding a bag of mixed nuts and wearing a face mask under his chin....'"; New York Post channel; Oct 15, 2020. https://youtu.be/q8WlF8eU5Rg

12. "***Caught-on-video brawl erupts after maskless passengers pulled off plane | New York Post***; '...brawl erupted at a Florida airport after two women who were kicked off a plane for not wearing masks were mocked by other passengers in the terminal... when the covidiots [sic] who were escorted through the American Airlines terminal were booed by other travelers, WSVN reported.'"; New York Post channel; Mar 19, 2021. https://youtu.be/irOqodUbobQ

Plaintiffs' Exhibit 304

washingtonpost.com

# With virus spreading fast, airlines around the world cancel flights

*María Luisa Paúl, Hannah Knowles, Rachel Weiner*

16-20 minutes          Updated 12-24-21

Thousands of Christmastime flights have been canceled around the world as airlines say the fast-spreading omicron variant of the coronavirus is preventing staffers from working and causing travelers to rethink their plans.

As of late Friday afternoon, about 3,860 flights were canceled globally for Christmas Eve and Christmas Day, according to the website FlightAware, and 2,000 other flights were scrapped Thursday. FlightAware said about a quarter of those canceled for Friday involved travel within, into or out of the United States. Airlines cited staffing shortages and falling demand amid a new pandemic wave and other issues.

**United Airlines** said in a statement Thursday that it was canceling 120 flights Friday because the variant has had "a direct impact on our flight crews and the people who run our operation."

**Delta Air Lines** in a statement said its teams had "exhausted all options and resources — including rerouting and substitutions of aircraft and crews to cover scheduled flying." On Friday morning, it said it had canceled 135 flights on Christmas Eve because of weather and staffing problems and still had nearly 3,100 scheduled for the day.

**American Airlines** spokesman Derek Walls said Friday that the company was not experiencing higher-than-usual cancellations.

## Travelers hastily change and scrap their plans

While some people struggled to rebook flights, others scrapped their travel plans entirely out of concerns about a new coronavirus wave driven by the omicron variant.

Elizabeth Horton of Northern Virginia was planning to fly to Missouri on Friday to see family after avoiding planes earlier during the pandemic — worried mostly about infecting her parents, who are in their 80s. She said she booked her ticket in early December and was reluctant to fly but was reassured by the fact her family is vaccinated and boosted.

"And then with the new variant coming in, it was like, 'Oh, you know what? No,' " Horton said.

She said she will stay put for Christmas and join the family festivities over Zoom.

Eliot Salant said a flight cancellation delayed his return to Israel and led him to spend nearly $180

on additional coronavirus testing, which Israel requires for reentry.

Salant, who came to visit his brother in the hospital, said he scrambled to book a flight back to Israel after rising coronavirus caseloads led the Israeli government to bar its citizens from traveling to the United States.

He said he was at a D.C.-area airport Thursday when he learned his flight to Tel Aviv was canceled. Staffers at the airport said they were stretched thin, he said, so he called his airline's customer service to discuss his options. He flew to New York and said he was able to book another flight for Friday.

He said he also wound up paying $179 for a coronavirus test at a New York airport, after delays meant he could not use his initial test.

The prices at the airport were "outrageous," he said, but "I didn't want to risk going to the free public [testing site] today, the day before for Christmas." His thinking: "Who knows if they're going to have the capacity, you know, and then how long it's going to take?"

## Cancellations pale in comparison to summer stops, analyst says

Compared with cancellations this summer and fall, aviation analyst Henry Harteveldt said what he's seen today "is really small." Of course, he added, "if your flight is the one that's been canceled, the world has just ended. This is not a meltdown, as some have described it, but it is unfortunate."

Harteveldt, co-founder of Atmosphere Research Group, said he anticipates similar spikes in cancellations for the next few weeks, as long as the omicron-variant wave lasts.

"The airlines took a lot of steps to ensure their airlines would be healthy and to reduce the risk that covid would disrupt their operations, but you can't build impenetrable walls," he said Friday.

"The timeline is really dictated by the course of the virus. … No one anticipated that … we would see something like omicron."

Harteveldt said domestic flights are being canceled more often than international ones because flight routes out of the country have already been pared back by omicron-related border restrictions.

"Airlines already proactively reduced international schedules at Christmastime as a result of the more stringent entry requirements into so many countries," he said. He also noted, for those looking at websites tracking international cancellations, that some probably have nothing to do with the coronavirus. For example, he said, Chinese airlines are regularly forced to cancel flights at the last minute because of military maneuvers.

Despite new restrictions and last-minute headaches, he said, "we're seeing very strong demand for travel. … There were a lot of people who were determined to enjoy some kind of getaway for Christmas and New Year's this year."

## Photos: Travelers cope with cancellations

Thousands of flights have been canceled or delayed around the world as the highly infectious
omicron variant disrupts holiday travel.

## Cancellations are a blip as air travel moves 'closer to normality,' analyst says

Airlines seemed headed "closer and closer to normality" this year after taking hits during the
pandemic, said Robert Mann, an airline industry analyst and former airline executive. Then came
"a unique factor that no one really forecast very well," he said — the omicron variant.

Mann said he expects "a lot of stress on the system" through Jan. 3, as travel peaks around the
holidays. Weather does not seem to be a major factor in the latest cancellations, he said. "I would
chalk them up to crew unavailability."

He noted that there are typically 20,000 flights a day in the United States and that 115,000 airline
flights are expected globally on a peak day — a figure that does not include business jets and
operators of general aviation aircraft. As of Friday afternoon, about 2,300 flights were canceled
globally for Christmas Eve, according to the site FlightAware.

"It's more than it should be; it's more than anybody wanted it to be," Mann said of the
cancellations. "But, you know, it's not the end of the Earth."

"If it's your flight, it is the end of the Earth," he added.

## Airlines seek shortened isolation periods as flight attendant group pushes back

Airlines are asking federal health officials to shorten their recommended isolation period for people
who have breakthrough coronavirus infections, but a flight attendants union is pushing back,
saying leaders should "err on the side of caution."

Writing Thursday to the head of the Centers for Disease Control and Prevention, Airlines for
America President Nicholas E. Calio suggested "an isolation period of no more than 5 days from
symptom onset" for vaccinated people who contract the coronavirus. That is half the 10-day period
the CDC recommends for infected people, regardless of their vaccination status.

The CDC on Thursday cut recommended isolation time for health-care workers as hospitals brace
for a surge of patients. New guidance says that they can return to work after seven days with a
negative test if they are asymptomatic, and that "isolation time can be cut further if there are
staffing shortages."

JetBlue chief executive Robin Hayes wrote Wednesday that the "vast majority" of the company's
crew members are vaccinated against the coronavirus "and like so many others are being relied
upon by the American public for providing the essential service of travel."

Responding Thursday to a similar letter from Delta's chief executive, the Association of Flight Attendants-CWA — which says it represents 50,000 workers at 17 airlines — said flight attendants should not have to return to work until they are symptom-free and test negative. International President Sara Nelson wrote in a letter to the CDC that the group does "not see the justification" for reducing the isolation period.

Most crew members are vaccinated, Nelson said, but they may have not received a booster shot — which federal health officials have strongly recommended to protect against the omicron variant of the virus.

"The current climate in the passenger cabin is highly stressed. We are experiencing a record high number of aggressive passenger incidents, many of which are fueled by alcohol and refusal to comply with onboard mask rules," Nelson wrote. "Staffing flights with crewmembers who may still be symptomatic, infectious, or both by shortening them on necessary isolation time will only make this situation worse."

*Hannah Sampson contributed to this report.*

## How to get refunds if your Christmas flight is canceled

The emotional roller coaster that accompanies life in a pandemic took another plunge Thursday night when airlines began announcing thousands of cancellations for Christmas Eve flights. After U.S. airlines navigated the Thanksgiving bump relatively unscathed, this is the "messy" holiday travel season some experts envisioned.

U.S.-based carriers such as United and Delta; Germany-based Lufthansa; and Jetstar, Qantas and Virgin in Australia are blaming the surge in omicron variant for sending their crews to sick leave or isolation after being identified in contact tracing.

Back in the summer, a chaotic travel season when airlines such as Spirit and Southwest were facing staffing shortages, By The Way compiled a guide for what to do if your flight gets canceled and how to get a refund you are owed. Here's a helpful reminder.

## Staff illnesses and lack of demand are to blame for cancellations, airlines say

Some international airlines have canceled thousands of flights scheduled for this weekend and beyond, citing staff illness and lack of demand as the omicron variant spreads and prompts new travel restrictions.

Lufthansa said in a statement Friday that "a high rate of people calling in sick" and lack of demand had led it to cancel a dozen flights this holiday weekend.

Scandinavian Airlines canceled nearly five dozen flights that had been scheduled for the next week.

"We have staff who are ill, have symptoms or someone who is ill in their household, and the

Plaintiffs' Exhibit 305

washingtonpost.com

## Sneezed on, cussed at, ignored: Airline workers battle mask resistance with scant government backup

*Michael Laris*

13-17 minutes

---

Other passengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements, treating the potentially lifesaving act as a pandemic game of cat-and-mouse. A loophole allowing the removal of masks while consuming food and beverages is a favorite dodge.

Asked to mask up, one passenger pulled out a large bag of popcorn and nibbled her way through it, kernel by kernel, stymieing the cabin crew for the length of the flight. Others blew off requests by chomping leisurely on apple slices, between occasional coughs, or lifting an empty plastic cup and declaring: "I am drinking!"

The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic and reviewed by The Washington Post. The reports provide an unguarded accounting of bad behavior by airline customers, something executives hit by a steep drop in travel and billions in pandemic-related losses are loath to share themselves.

Some reports raise safety concerns beyond the risk of coronavirus infection. A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing.

One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart. The error was caught, and "there was no conflicting traffic," the captain wrote.

The Boeing 737 Max was grounded for 20 months following two crashes that killed 346 people. Now, after design changes, the aircraft is returning to service. (The Washington Post)

Some passengers are portrayed as oblivious, obstinate, foul-mouthed and, at times, dangerous. One called a flight attendant a "Nazi." Another "started to rant how the virus is a political hoax and that she doesn't wear a mask," a flight attendant reported.

With millions of passengers ignoring warnings from the Centers for Disease Control and Prevention to refrain from holiday travel, the reports offer an X-ray into the country's deeper failures against the coronavirus — and insights into the pitfalls and possibilities facing a new presidential administration.

While the White House under President Trump has, at times, been dismissive or hostile toward masks, President-elect Joe Biden is making a patriotic appeal to "mask up for 100 days," whatever people's politics. Biden has said he will sign an order on his first day requiring masks for "interstate travel on planes, trains and buses." How well those efforts will work remains to be seen.

Experts in psychology and decision-making say hostility toward wearing masks, even within the shared confines of a passenger jet, has been fueled by politicization — but also by skewed incentives and inconsistent messaging.

"The reinforcement principles are backward," said Paul Slovic, who studies the psychology of risk at the University of Oregon.

The usual signs of danger, and rewards for following potentially bothersome rules, are thrown off by a virus that is spread easily by people who don't know they have it, Slovic said.

"You get an immediate benefit for not following the guidelines because you get to do what you want to do," Slovic said. "And you don't get punished for doing the wrong thing" because it's not immediately clear who is being harmed.

The "squishiness of the requirement" to wear masks on planes also undermines the message that they are critical for public health, Slovic said. In contrast, he cites the rigid clarity of the ban on flying with a firearm. "It's not, 'You can carry it as long as you don't use it,' " Slovic said.

But passengers are allowed to drop their masks to snack and sip beverages. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said.

Applying mask rules also worsens the already strained position of flight attendants, who are front-line enforcers even as they keep their usual safety responsibilities, experts said.

"Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority."

The Department of Transportation in October rejected a petition to require masks on airplanes, subways and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department "embraces the notion that there should be no more regulations than necessary."

The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June hearing "we do not plan to provide an enforcement specifically on that issue."

Such matters are more appropriately left to federal health authorities, Dickson argued. "As Secretary Chao has said, we believe that our space is in aviation safety, and their space is in public health," Dickson said, referring to the CDC and other health officials.

Airline representatives say they take mask usage seriously and the overwhelming majority of customers comply. Some airlines have banned passengers for the length of the pandemic for refusing to mask up. Many have eliminated medical exemptions in their mask requirements.

"Of the hundreds of thousands of passengers who have flown with us, we have only needed to ban

about 370 customers for not complying," United Airlines spokeswoman Leslie Scott said. Delta said its mask-related no-fly list includes about 600 people, despite carrying about 1 million people each week.

Resistance by some passengers prompted Alaska Airlines to begin issuing yellow cards, akin to the warnings in soccer, to problem passengers.

The initial yellow card said employees would file a report that could result in a passenger being suspended. A later version was more aggressive, saying continued defiance would lead to a flight ban "immediately upon landing," even if the customer had a connecting flight.

Alaska Airlines has barred 237 passengers since August, and "in more than half of these incidents we also canceled onward or returning travel," spokeswoman Cailee Olson said.

American Airlines declined to release numbers of banned customers, as did Southwest, which said in a statement it appreciates "the ongoing spirit of cooperation among customers and employees as we collectively take care of each other while striving to prevent the spread of COVID-19."

Yet a small, uncooperative minority can wreak outsize havoc, safety reports show.

The anonymous reports are collected in a National Aeronautics and Space Administration database, part of a program meant to increase aviation safety by encouraging employees to provide candid descriptions of emerging problems without fear of reprisal. Names of people filing the reports, and their airlines, are removed by NASA before they are made available to regulators at the FAA and the public.

NASA analysts screen the reports to weed out irrelevant filings and may call back filers to clarify safety points. But its analysts do not try to verify people's identities or the accuracy of the reports.

The database shows some fliers treat airline mask requirements as a seemingly asinine rule to evade, akin to sneaking a late look at text messages after phones are supposed to be in airplane mode. Passengers berate flight attendants about their noncompliant cabin mates. Some reports read like cries for help.

"It all has to stop," pleaded one flight attendant.

"In the future I would like to feel safe while doing my job," said another.

● A woman refused to wear her mask as the plane rolled away from the terminal, saying it made her ill, and the pilot pulled over temporarily to try to avoid returning to the gate. She continued to resist but finally agreed.

"As soon as we took off, she took it off again and kept it off the entire flight," the flight attendant reported.

● A man started down the aisle, pausing about 18 inches from a flight attendant.

"He sneezed directly in my face, making no attempt to cover his mouth, pull up his mask or turn towards the row 1 window," the employee wrote. The flight attendant, who was wearing a face covering, judged the act unintentional and tried to blot away the remnants.

● A woman propped her foot up and painted her toenails with her mask below her chin, despite

several requests to wear it properly. After another passenger appealed for more to be done, the woman acquiesced, then loudly instructed the flight attendant to "go away!"

After landing, she cut in line to rush off the plane. "Although we understand the importance of wanting to retain customer loyalty, this kind of behavior should not be tolerated for the sake of one over an entire cabin of guests and employees," the flight attendant wrote.

● An immunocompromised passenger was furious at the lack of enforcement as another customer snacked incessantly on chocolate. The concerned passenger then removed his mask to complain to the flight attendant.

● A passenger claimed discrimination, arguing he was singled out for enforcement because of his tattoos. "He said 'I am complying, #%$^!' His nostrils were clearly visible," the flight attendant wrote.

● A pilot flouted the mask requirement with what appeared to be a passive-aggressive display, donning a flimsy, see-through veil described as useless for containing airborne particles.

● Flight attendants made an exception and allowed a distraught mother, whose daughter may have had a disability and screamed about the mask requirement, to remain on the plane. They tried cookies, which didn't help, then moved the family to seats three rows from other passengers, who were supportive.

● A customer, after earlier warnings, stuck his mask-free head in the aisle during the safety demonstration, "making a total mockery out of me," a flight attendant wrote. He repeated his taunt when the plane was fourth in line for takeoff. The captain turned around, and the man was taken off the plane.

The obstinacy cuts against basic health precautions. Experts in cabin air say masks are critical tools for safety. Cabin air is run through powerful filters, mixed with outside air and recirculated. But it takes several minutes for all air to be vented out of the cabin, giving the coronavirus and other viruses the opportunity to spread.

A Harvard study funded by the aviation industry said flying can be done with a relatively low risk of coronavirus infection if precautions are followed. It said masks are "perhaps the most essential layer" among measures to reduce transmission.

The study said removing masks to eat should be kept to an "absolute minimum," and straws should be used when feasible. "When one passenger briefly removes a mask to eat or drink, other passengers in close proximity should keep their masks on," researchers said.

Trump and some of his advisers, meanwhile, have stoked divisions over masks.

The president mocked Biden's frequent mask use, presided over White House events that flouted mask guidelines and relied on a former pandemic adviser who wrongly argued masks were ineffective. The White House also blocked a nationwide order, drafted by the CDC, that would have required masks on all forms of public transportation.

"Masks have been made a political issue from the start of the pandemic, and people don't believe they need to wear them," said Garland, whose union represents about 50,000 flight attendants.

"We do not have a president who tells people to wear a mask, and the federal government, not just in aviation but across the board, has declined to mandate it in any way, shape or form," she added, saying her members are eager to see a Biden administration set a different tone.

An FAA spokesman declined to answer questions about the risks involved with passengers refusing to wear masks.

After inquiries from The Post about enforcement, the agency distributed a news release touting its role in pursuing civil penalties in two assault cases but reiterated that "the failure to wear a face covering is not itself a federal violation."

The cases show how mask disputes can escalate.

On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him and grabbed his phone as he described a mask-related dispute to the captain, according to the FAA. The agency said it is pursuing a $15,000 civil penalty for assault and interfering with a flight attendant.

Allegiant declined to say whether anyone was arrested or charged.

On a SkyWest Airlines flight to Chicago in August, a passenger took off a mask, "continually bothered" fellow customers and "at one point, grabbed a flight attendant's buttock as she walked by the passenger's row of seats," according to the FAA, which is seeking a $7,500 penalty.

Beyond addressing such extreme cases, some outside experts say federal and corporate leaders have fallen short.

"Both industry and government have failed the people on the front line who need to administer these rules," said Baruch Fischhoff, a psychologist and professor at Carnegie Mellon University who researches decision-making.

Politics often has driven responses to the pandemic, while critical public health communication on things like masks has not been tested to make sure it hits the right notes or is convincing, Fischhoff said. "Neither have fulfilled that responsibility for clear, consistent, tested communications," he said.

Fischhoff said that with 330 million people in the United States, it's not surprising the safety reports received by NASA reveal examples of poor behavior.

"Part of the reason they stand out is, I think, the vast majority of people are polite and civil to one another," Fischhoff said. Still, the reports probably represent a dramatic undercount because it takes time and initiative for busy employees to file them.

"If you see 100, there are probably 1,000 or 10,000. This is a widespread enough phenomenon that it needs to be taken seriously," he said. "You have to give credit to people who lodge just complaints and recognize they're just a fraction of the people who are observing things that threaten our health and our economy."

Plaintiffs' Exhibit 306

nbcnews.com

# FAA reports 'off the charts' spike in unruly, dangerous passenger behavior on flights

*By Tom Costello*

3-4 minutes

---

The Federal Aviation Administration is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes.

In a typical year, the transportation agency sees 100 to 150 formal cases of bad passenger behavior. But since the start of this year, the agency said, the number of reported cases has jumped to 1,300, an even more remarkable number since the number of passengers remains below pre-pandemic levels.

The behavior in question includes passengers refusing to wear masks, drinking excessively and engaging in alleged physical or verbal assault, including what the agency describes as political intimidation and harassment of lawmakers.

In Fort Lauderdale, Florida, for example, a fistfight broke out amid a dispute over mask-wearing. In Washington, D.C., a passenger was escorted off a flight after arguing with flight attendants over the mask rule.

In another case, a flight bound for Los Angeles was diverted to Denver and forced to make an emergency landing after a passenger allegedly tried to open an emergency exit.

In recent days, Alaska Airlines banned an Alaska state senator for refusing to comply with mask requirements, according to The Anchorage Daily News.

"It is not permissible and we will not tolerate interfering with a flight crew and the performance of their safety duties," Stephen Dickson, the administrator of the FAA, said of the wave of incidents. "Period."

The FAA is now taking a "zero-tolerance" approach to poor behavior: Unruly passengers face potential criminal charges, fines up to $35,000 or lifetime bans on

certain airlines.

The bad behavior appears to be taking a toll. ==Angela Hagedorn, a former flight attendant with Alaska Airlines,== <u>tweeted that she recently resigned</u>.

=="It has been an exhausting time for all the employees who are just trying to do their job according to their company's policies," she said. "The constant arguing and pushback from guests, it's ridiculous."==

Sara Nelson, president of the Association of Flight Attendants union, said airline employees have reported a wide range of troubling incidents.

=="What we have seen on our planes is flight attendants being physically assaulted, pushed, choked," Nelson said. "We have a passenger urinate. We had a passenger spit into the mouth of a child on board.==

=="These are some of the things that we have been dealing with," Nelson said, adding that the physical and verbal abuse that flight attendants have allegedly experienced this year has been "way off the charts" compared to the last 20 years.==

In the months ahead, as parts of the United States begin to rebound from the pandemic and a greater number of people take to the skies, the FAA — along with the Transportation Security Administration and Air Marshals — plan to watch closely for behavior that threatens crew members or passenger safety.

Tom Costello

Tom Costello is an NBC News correspondent based in Washington, D.C.

Daniel Arkin contributed.

Plaintiffs' Exhibit 307

dallasnews.com

## American Airlines joins Southwest in delaying alcoholic beverage sales due to bad passenger behavior

*By Kyle Arnold 6:50 PM on May 29, 2021 CDT*

4-5 minutes

American Airlines will delay selling alcoholic beverages this summer to main cabin passengers due to the uptick in bad passenger behavior in recent months that includes refusing to wear masks and several assaults on flight attendants.

Fort Worth-based American Airlines told crew members that it won't reintroduce the sale of beer, wine and spirits to main cabin class passengers until at federal government officials drop the mask mandate aboard aircraft and airports. The mask mandate is currently set to expire Sept. 14. American was scheduled to bring back alcohol sales Tuesday.

**Featured on Dallas News**

Researchers evaluating how District Attorney John Creuzot's relaxing marijuana enforcement affects…

American Airlines joins Dallas-based Southwest Airlines in pushing back the reintroduction of the sale of alcoholic beverages after flight attendants expressed concern about the recent increase in bad passenger behavior. The concerns peaked after the bloody assault of a Southwest flight attendant last week on a flight landing in San Diego.

"Over the past week we've seen some of these stressors create deeply disturbing situations on board aircraft," said American Airlines vice president of flight safety Brady Byrnes said in a letter to crew members Saturday. "Let me be clear: American Airlines will not tolerate assault or mistreatment of our crews.

"We also recognize that alcohol can contribute to atypical behavior from customers on board, and we owe it to our crew not to potentially exacerbate what can already be a new and stressful situation for our customers."





American Airlines dropped alcoholic beverage service in March 2020 to create less contact between flight attendants and passengers during the COVID-19 pandemic. It also cut back service of soft drinks, juices, snacks and foods. Airlines are beginning to bring those services back, and American started selling alcohol to some premium class customers earlier this year.

But for everyone else, alcohol will have to wait a few more months.

"It is no secret that the threats flight attendants face each day have dramatically increased," said a letter to union members from Julie Hedrick, president of the Association of Professional Flight Attendants, which represents American's 13,400 flight attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance. These altercations are often exacerbated when customers have consumed alcohol in the airport or alcohol they have brought on board."

Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks, a COVID-19 precaution that took on deep political symbolism after the November presidential election and the Jan. 6 storming of the U.S. Capitol by Trump supporters who refused to accept Electoral College results.

The Federal Aviation Administration has noted more than 2,500 reports of passenger misbehavior this year, and a spokesman for the agency said there was a sharp uptick starting late last year.

Flight attendants have often been caught in the middle of the issue and heavily lobbied for a federal mandate for face masks on planes. President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office.

But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA. Several of those fines stemmed from passengers drinking alcohol they had bought in airports.

Airlines are now dealing with their largest crowds since the pandemic began. Nearly 2 million passengers passed through Transportation Security Administration checkpoints on Friday, nearly 80% as many as did on the same date in 2019.

Atlanta-based Delta Airlines began serving alcohol to passengers again in July 2020. Chicago-based United is scheduled to resume sales of alcoholic beverages in June, and a company spokesman said United hasn't made a decision to change that.

# Plaintiffs' Exhibit 308

cnbc.com

## Unruly behavior from plane passengers has never been this bad, says flight attendant union chief

*Kevin Stankiewicz*

3-4 minutes

---

Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend.

"This is an environment that we just haven't seen before, and we can't wait for it to be over," the president of the Association of Flight Attendants-CWA said on "Squawk Box."

The behavior has become "complete nuts," added Nelson, whose union represents around 50,000 cabin crew members across more than a dozen carriers. "It's a constant combative attitude. ... It's got to stop."

Nelson's comments follow a recent violent confrontation that resulted in a Southwest Airlines flight attendant sustaining facial injuries and losing two teeth. In a statement to NBC News earlier this week, Southwest said the passenger "repeatedly ignored standard inflight instructions and became verbally and physically abusive upon landing."

A 28-year-old woman has been charged with felony battery in the incident, which occurred on a Sacramento to San Diego flight.

The Federal Aviation Administration said Monday it has received around 2,500 reports of unruly passenger behavior since Jan. 1, roughly three-quarters of which involve failure to adhere to the federal face mask mandate that has been instituted due to the coronavirus pandemic.

That's more than 20 times higher than what's normally recorded in an entire year, Nelson told CNBC. She noted the role masks are playing in the surge and expressed disappointment that health protocols on planes are seen as "a political issue."

The federal mask requirement is on the books until Sept. 14, and the FAA intends to keep its zero-tolerance policy for passenger disturbances in place as long as the mandate applies.

While airline travel has picked up in recent months as Covid vaccinations become more available, TSA checkpoint data shows travel is still notably below 2019 levels.

"Typically what flight attendants will do, when we see a conflict arise on the plane, we're trained to deescalate. We look for our helpers," Nelson said. However, she said the passenger mix is different than pre-Covid.

"It's very difficult when you don't have people on the plane who are regularly flying, who sort of know the program, who are our typical people that we'd go to, at least, create peer pressure but also help to try to calm down these incidents," she said.

Nelson said increased messaging around the consequences for passengers who act out — such as FAA fines — would be helpful. That includes not only on-board messages from the flight captain, but also throughout airports, she said.

Temporary restrictions on alcohol sales also would be beneficial, Nelson said.

"A lot of times these events are exacerbated by alcohol, so we've been asking the government and the airlines to make sure they're not selling alcohol right now because that's only adding to the problem that is clearly out of control."

Plaintiffs' Exhibit 309

skift.com

# 1 in 5 Flight Attendants Have Had Physical Altercations With Unruly Passengers so Far This Year

— *Ruthy Muñoz*

5-6 minutes          July 29, 2021

One in five flight attendants so far this year has been involved in physical altercations with unruly passengers and 85 percent of cabin crew members have dealt with disruptive passengers this year as more are returning to travel, a survey released by the Association of Flight Attendants-CWA (AFA) revealed on Thursday.

The online survey of 5,000 flight attendants across 30 airlines found more than half have experienced at least five incidents with unruly passengers, with flight attendants reporting incidents of swearing, yelling, aggressive behaviors, racial and homophobic slurs, and physical assaults.

Unwilling to accept this new normal, the AFA is calling on the Federal Aviation Administration and the U.S. Department of Justice to make the 'zero tolerance' policy permanent.

**Don't miss another mission critical story**

Get Unlimited Access To Daily News Coverage With Skift Pro

"This survey confirms what we all know, the vitriol, verbal and physical abuse from a small group of passengers is completely out of control, and is putting other passengers and flight crew at risk. This is not just about masks as some have attempted to claim. There is a lot more going

on here and the solutions require a series of actions in coordination across

aviation," said Sara Nelson, President of AFA-CWA.

In response to the rise of disruptive passengers, the Federal Aviation Administration in January enacted new security measures for airlines by issuing a temporary "zero tolerance" policy, making bad behavior an enforceable federal offense and extending it at the end of March.

But union officials representing 50,000 flight attendants across 17 airlines, feel it's not enough. The AFA said existing measures in place are failing to address the problem and wants the FAA and DOJ to protect passengers and crew from verbally, physically abusive, and disruptive travelers.

One survey respondent reported being on the ground at the back of the aircraft without the other crew members noticing until after the attacker had deplaned.

"We tell them (passengers) that it is a federal offense to not comply with crew member instructions, use foul and/or threatening language onboard, and then the plane is met by airline supervisors or airport law enforcement and the passenger gets a slap on the wrist and sent on their way," wrote one flight attendant in the survey.

The flight attendant who said she's been threatened, yelled, and cursed at countless times in the last year and has only seen at most a temporary suspension of travel for the passenger.

"We need real consequences if flight attendants are ever going to feel safe at work again," the unnamed flight attendant said.

For airline frontline workers, the incessant rise of bad behavior inflight is taking a toll with many flight attendants feeling unheard and unprotected.

Survey data found 71 percent of flight attendants who filed incident reports with their management didn't receive a follow-up and a majority didn't observe efforts by the airlines to address issues with unruly passengers.

"It is time to make the FAA 'zero tolerance' policy permanent, the Department of Justice to utilize existing statute to conduct criminal prosecution, and implement a series of actions proposed by our union to keep problems on the ground and respond effectively in the event of incidents," Nelson said.

Flight attendants cite multiple factors contributing to disruptive incidents and

point to mask compliance, flight delays, routine safety reminders, alcohol, and cancelations as common factors when dealing with unruly passengers, an AFA spokesperson said.

To date, the FAA has received 3,615 unruly passenger complaints, more than half of them mask-related incidents. The agency has initiated 610 investigations and 95 enforcement cases, said the FAA's website.

Additionally, many flight attendants reported facing extensive verbal abuse from visibly drunk passengers, being subjected to yelling and swearing for federal mask mandate directions. Survey respondents also reported being aggressively challenged by unruly passengers in other ways including kicking seats, shoving, being thrown thrash at and passengers defiling a restroom in defiance of instructions, it said.

The FAA has been enforcing some cases and issuing historic fines for unruly passengers.

AFA said its union has fought discrimination and prejudice for decades, and won't allow this moment to set it back.

"Aviation is about bringing people together, not tearing us apart," it said.

Airlines joined unions asking the U.S. Attorney General to prosecute unruly passengers in June.

Photo Credit: Passengers and flight attendant on an aircraft. StockSnap / Pixabay

Plaintiffs' Exhibit 310

travelpulse.com

# Is It Time to End the Mask Mandate in Airports and on Planes?

4-5 minutes          July 15, 2021

The Centers for Disease Control and Prevention (CDC) and the Biden Administration have a difficult decision to make in two months.

The federal mask mandate expires on Sept. 13. The mandate requires passengers on public transportation to wear a mask at all times, including while in airports and during flight – whether that flight is 50 minutes or five hours.

It's time.

It's time to stop enforcing this policy.

And I understand this is likely an unpopular opinion but, then again, I have hundreds of those. Like, Van Halen was better with Sammy Hagar as the lead singer instead of David Lee Roth, or Reggie Jackson wasn't a true Yankee because he only played five years in New York, or Skor is the better toffee candy bar than Heath.

Trending Now



Or, the CDC should let the deadline on the mask mandate pass without further action.

The mandate is in place to better prevent the spread of the COVID-19 virus, and for the better part of a year that has been a worthy goal.

But it has also proven problematic.

Physical confrontations on airplanes have dramatically increased this year, and of the 3,000+ that have been recorded by the Federal Aviation Administration so far in 2021, nearly three-quarters of them have been a direct result of arguments over wearing a face mask – whether between crew members and passengers, or passengers vs. passengers.

The whole idea of face masks was that it was something the airlines encouraged in the summer of 2020, at the height of the pandemic – they wanted a uniform policy mandated by the federal government instead of having various, or differing, policies set by each airline.

Here we are a year later, and the irony has set in. The airlines see the unintended consequence of face masks in every disagreement aboard a flight; they see the efficacy that the vaccines are having; they have noted that nearly 70 percent of the country has had at least one shot against the virus, and now they want the CDC to let the mandate quietly expire on Sept. 13 without being renewed for another four months.

For many reasons, I believe this is the best course of action.

People who are vaccinated can now come and go as they please, except for some stores and businesses that still require a mask. The vaccinated still have their reasons and still have the option to wear a mask if they so choose. You don't need a mandate to wear one if you believe it protects you.

The unvaccinated have their reasons. And they, too, have the option to not wear a mask if they so choose. See, the thing is, anti-vaxxers are not going to have their minds changed. But should they be denied the privilege of flying over a mask?

That's the touchy question.

When first proposed a year ago, we can't deny that the idea of wearing a mask was a comfort zone for an airline industry struggling with the dramatic loss of customers. Simply put, having the entire plane wear a mask encouraged more people to fly. It made them feel safer.

To be blunt, while I say it's time to rescind the mask mandate, I still regard it as a minor inconvenience. Honestly, wearing a mask is about as big a problem to me as having to take my shoes and belt off. And we've been doing that for the better part of 20 years now.

My fear, however, is that the mandate is going to someday cause a far bigger problem while in the air than just some unruly passenger being eventually duct-taped to a seat.

One of these days, a confrontation is going to escalate far further than the crew member who had a finger bitten or the flight attendant who caught an errant punch square in the face and had two teeth knocked out.

Ask yourself, is it worth it to have a mandate that ostensibly is for your safety but only leads further to unsafe conditions?

That's not something I want to find out.

Plaintiffs' Exhibit 311

thehill.com

# Only two people cited by TSA for mask violations have agreed to pay fine | TheHill

*Alex Gangitano*

7-8 minutes

---

Only two people have agreed to pay fines to the Transportation Security Administration (TSA) among more than 2,400 incidents of noncompliance since a federal mask mandate took effect this year, according to new data provided to The Hill.

TSA said it has received referrals concerning 2,413 incidents of possible noncompliance and has completed investigations into 1,793 incidents.

The agency issued more than 1,690 warning notices and referred 38 matters for civil penalties. Only two individuals did not challenge their fines of $250 each, TSA said in response to a Freedom of Information Act request.

The eye-opening figures come amid an uproar over the federal mask mandate for transportation that has been linked to numerous reports of scuffles and obnoxious behavior by airplane passengers.

"One explanation could be that the people who already violated it to start with are people who feel very strongly to begin with and don't think the federal government could even mandate something like that. They do it partially as a protest, so it's not surprising they haven't paid the fine," said Retsef Levi, professor at the MIT Sloan School of Management specializing in risk management and analytics.

Such incidents could very well persist as the Centers for Disease Control and Prevention (CDC) and other public health officials say masks are increasingly needed again, even for those who are fully vaccinated.

"It's perhaps not surprising that the people who are most adamant about not wearing a mask are also the most adamant about not paying a fine and feeling their personal liberties are infringed upon," said Gretchen Chapman, a professor in social and decision sciences at Carnegie Mellon University.

The Federal Aviation Administration (FAA), which proposes fines against passengers for behavior on aircrafts, said that it takes "significant time" to settle cases against unruly passengers but that passengers who face fines have the right to due process.

"Developing a case that we believe will hold up in court takes a considerable amount of work from our safety inspectors and attorneys, and they currently are working a record number of cases," an FAA spokesperson said.

The FAA has received more than 3,600 reports of unruly behavior by passengers, including 2,666 reports of passengers refusing to comply with federal mask mandates. It has identified potential violations in 610 cases and has initiated enforcement action in 95 cases.

Fines can range from $250 to $52,500. Earlier this month, the FAA said it had issued a $10,500 fine to a passenger who refused to wear a mask during a February flight.

TSA's authorization to fine passengers who fail to comply with mask requirements on public transportation systems stems from an executive order



signed by President Biden                    Joe BidenBriahna Joy Gray: White House thinks extending student loan pause is a 'bad look' Biden to meet with 11 Democratic lawmakers on DACA: report Former New York state Senate candidate charged in riot MORE on his first day in office. TSA has since extended the mask mandate, which was set to expire in May, to September.

When mask mandates for vaccinated people indoors were lifted, it remained in place for people traveling on public transportation: on airplanes, buses and trains.

The CDC on Tuesday revised its mask recommendations to say fully

vaccinated people should wear masks in indoor settings in areas of the country with "substantial" or "high" levels of transmission, which includes much of the South and West.

Meanwhile, ==Republicans have pressured the Biden administration to end the federal mask mandate for public transportation.==



Sen. Rand Paul                         Randal (Rand) Howard Paul Only two people cited by TSA for mask violations have agreed to pay fine Senators reach billion deal on emergency Capitol security bill GOP Rep. Cawthorn says he wants to 'prosecute' Fauci MORE (R-Ky.) earlier this month introduced legislation that would prohibit the federal government from imposing a mask mandate when using any "conveyance" or "transportation hub."

"Right now, the CDC is doubling down on indoor mask guidance. The last thing that we need is any masking to be lifted. It would be a major mistake while delta is surging and infections are skyrocketing again to lift any restrictions. In fact, we should be implementing more," said Leana Wen, an emergency physician and public health professor at George Washington University, referring to the new delta variant of COVID-19.



A group of GOP senators led by Sen. Ted Cruz                         Rafael (Ted) Edward Cruz GOP, Democrats battle over masks in House, Senate Human rights can't be a sacrificial lamb for climate action Only two people cited by TSA for mask violations have agreed to pay fine MORE (Texas) introduced a resolution in June calling on the CDC to lift the public transportation mask mandate. That effort came before the July surge in cases.

"The problem right now is the unvaccinated are making it much harder for the rest of us. If the requirement is lifted, it would take us back to an honor system, which we have already seen that does not work," Wen added.

White House press secretary Jen Psaki                                 Jen PsakiWhy in the world are White House reporters being told to mask up again? Only two people cited by TSA for mask violations have agreed to pay fine Democrats ramp up pressure for infrastructure deal amid time crunch MORE on Monday said she doesn't want to get ahead of any guidance by the CDC when asked if air travelers who have been required to wear a mask should anticipate the mandate will likely stay in place.

There was a surge in aggressive and violent behavior at airports and on flights this month, with the FAA recording nearly 100 cases of unruly passengers in just one week. In one instance, an American Airlines flight was delayed for a day after a passenger wouldn't comply with the mask mandate and became disruptive.

In May, a Southwest Airlines flight attendant lost two teeth when she was punched by a passenger over a disagreement about the mask policy. Spirit Airlines in April removed all passengers from a flight when a maskless family got in an argument with a flight attendant over the mandate.

Chapman, of Carnegie Mellon, suggested other ways for TSA to collect fines, like a disclaimer when a traveler purchases a ticket that their credit card could be charged if they do not comply with mask mandates or charging ticket purchasers an extra $50 that is removed if you comply with mandates.

"They don't want to collect people's money, they want people to wear masks. But those two things are linked. There's no sense in having a rule that you have to do this and if you don't do it, you have to pay a fine, and no one actually pays the fine," she said.

Plaintiffs' Exhibit 312

washingtonpost.com

# Unruly airplane passengers are straining the system for keeping peace in the sky

*Michael Laris, Lori Aratani*

17-21 minutes          July 18, 2021

Both men were arrested earlier this year in Denver, charged with the same broad federal crime: interference with flight crew members and attendants.

They were, in many ways, the exceptions.

The system for keeping the peace in America's skies is creaking under the pressure of what airlines and regulators say is an unprecedented proliferation of misbehavior.

The Federal Aviation Administration has received more than 3,400 reports of "unruly" passengers this year. But despite launching a "zero-tolerance" enforcement policy in January — amid a rise in conflicts often tied to mask requirements in the air — the agency said that as of mid-July it had "completely closed" just seven cases.

The sprawling, multitiered system for enforcing regulations and federal laws covering passengers can take years to play out. As travel rebounds, that structure is being strained by confrontations fueled by alcohol, hostility to mask mandates and small conflicts that career out of control. One passenger hit a woman holding an infant amid an apparent dispute over a window shade. Another ran through business class and stomped on a flight attendant's foot after the power outlet at her seat wouldn't charge her phone, according to court records.

The system involves airline employees, FAA inspectors and lawyers, Transportation Department judges, local authorities, state and federal courts, FBI agents and U.S. attorneys, who all have roles in a sometimes messy and protracted process.

**An escalation in 'air rage'**

The incidents that take place miles high in pressurized cabins are filled with many of the same pathologies and clashes that occur on the ground.

A review of federal cases by The Washington Post points to alcohol, drug use and mental illness as key factors in outbursts that have terrified passengers and crew members,

sometimes leaving them hospitalized. The tools for dealing with those problems in the air are more limited than on land.

Court records describe ad hoc policing teams made up of passengers recruited by flight attendants to help subdue rampaging fellow fliers using plastic handcuffs and seat belt straps. The records detail several instances of passengers trying to pry open doors on planes, leading to scenes of panic and violence.

"I am waiting for a signal," a distressed passenger declared on a Hawaiian Airlines flight from Los Angeles in October before lunging for the emergency door and smashing a flight attendant's head against it, causing a "ping pong ball sized hematoma" on her temple, federal prosecutors said.

After the third lunge, passengers and crew members zip-tied the man's ankles to a seat. His lawyer said he "was in an altered state of mind when he tried to exit a commercial aircraft mid-flight. … This activity was not violent and was not driven by anger towards any other person."

The flight attendant's injuries, after she "properly blocked him," were minor, the lawyer added. Authorities said that after the man's arrest, he choked a nurse at a Hawaii hospital until he lost consciousness. The passenger, in his early 30s, was detained for eight months and released to his parents with an order that he take medication pending a March trial.

Earlier this month, a woman tried to open an airplane door on a flight from Dallas, then bit a flight attendant, according to American Airlines. She was duct-taped to her seat. In May, a Southwest Airlines flight attendant had two teeth knocked out, allegedly by a passenger who refused to remain seated.

Aviation experts say cases of "air rage" are nothing new, but verbal attacks are turning physical more quickly.

"What we're really seeing is an increased level of hostility on the aircraft, which is something I don't think we've ever seen before in this industry," said Paul Hartshorn, spokesman for the Association of Professional Flight Attendants, which represents American Airlines employees. "It's just incredibly dangerous."

**'My life is changed forever'**

Federal prosecutions in cases where "interference with flight crew members and attendants" is the lead charge were down sharply in the past decade following a rise after the Sept. 11, 2001, terrorist attacks, according to a Post examination of federal prosecution data housed at Syracuse University, raising questions about resources and priorities.

For most of the 2000s, there were more than 50 such prosecutions annually, with case counts sometimes topping 70, according to data compiled by the university's Transactional

Records Access Clearinghouse. Over the past decade, that number has been in the teens and 20s each year, according to the research center, which built a vast database through decades of public records requests.

The Justice Department said prosecutions under the "interference" statute — by its count there were 20 in fiscal year 2019, 16 in 2020 and 14 through this month in 2021 — do not reflect the scope of its efforts because other charges are also used. At a Senate hearing in June, Attorney General Merrick Garland said the Justice Department takes the recent onboard assaults "extremely seriously."

"Even if not intended to bring the plane down, you can imagine the kind of pandemonium on planes that we've seen in some of these videos that people have taken that can cause an incredibly dangerous accident," Garland said.

In a June letter to Garland, a consortium of airline industry and labor groups called on the Justice Department to "direct federal prosecutors to dedicate resources for egregious cases." It noted inconsistencies in which cases are prosecuted in different jurisdictions, and said more criminal prosecutions are needed. The department is reviewing the letter, an agency spokesman said.

In selecting which airborne cases to pursue, federal prosecutors said they weigh damage to victims, airlines and threats to public safety. Considerations include whether flights were diverted, lives were endangered, the quality of the evidence and a suspect's mental health status, federal prosecutors said.

In Congress, some lawmakers want the Justice Department to create a new "no-fly list" for passengers convicted of assault or who have paid civil penalties in such cases. Airlines, which have banned more than 2,700 customers for refusing to wear masks, don't share information about customers who cause problems. Someone barred by one carrier can simply book a flight on another airline.

The incidents can leave a lasting mark.

Delta Air Lines flight attendant Eunice DePinto was shoved after trying to pull a first-class passenger off the airplane door he was fighting to open on a 2017 flight from Seattle. A second flight attendant was punched in the face, prosecutors said. The raging passenger — and another customer who aided flight attendants — were smashed in the head with bottles of red wine during the struggle, according to court records. Airline employees said the pressure at high altitude would have kept the door from opening, but it could have opened as the plane descended.

"In the galley there were flying objects, toppled galley equipment, yelling, physical blows and blood," DePinto told a federal court in Washington state.

Six passengers eventually cuffed and subdued the Florida man, Joseph Hudek IV, who

pleaded guilty to interfering with a flight crew and assault resulting in serious bodily injury. Hudek was sentenced to two years in prison and barred from commercial flights until next year.

"My life is changed forever," the assaulted flight attendant told the court. "I am always aware of passengers — where they are and what they are doing at times — to the point of distrust."

Airlines have sought restitution from convicted passengers, although results have been mixed.

Hudek, whose consulting doctor said he had a psychotic episode after eating cannabis gummies, was ordered to pay restitution of $67,000, including $60,000 to Delta. As of January, a court report indicated he still owed the airline $59,000 and was making regular payments of $171.

A passenger on a 2019 flight from Las Vegas falsely told a flight attendant that a woman on the plane had a knife, prompting the pilot to make an emergency landing in Denver. He pleaded guilty to interfering with a flight crew and was sentenced to the nearly six months he had served. American Airlines asked a judge to order him to pay $32,800 in restitution. Among the costs cited by American: $6,119 for fuel, $13,623 for "passenger inconvenience," including vouchers, and $2,497 for "goodwill lost," according to court filings.

The Illinois man's lawyer said he earned $125 a week collecting scrap before his father's truck broke down and that he wouldn't be able to pay. The judge rejected the airline's request and ordered him to pay $100.

**Passengers are on edge**

As flight attendants endured taunts and abuse last year over airline mask requirements, the FAA resisted calls to help with enforcement, reflecting the Trump administration's approach to the pandemic. But after increasing reports of conflicts and rowdy groups returning home from the Jan. 6 riot at the Capitol, FAA Administrator Stephen Dickson ordered stricter enforcement to tame the behavior, marking the start of a more aggressive approach.

Over the past six months, the FAA has taken "much quicker and transparent [action] on this issue than we have seen in decades," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, the nation's largest flight attendants union. "It's the first time flight attendants feel like there are real consequences on the ground for unruly behavior on our planes."

Still, the vast number of cases and messy mechanics of trying to ensure those consequences stick have, at times, overwhelmed the agency.

Part of the FAA's latest strategy to combat the rise in airplane incidents is to publicize large

proposed penalties and promote a message of deterrence on social media. "You could have spent $35,000 on a brand new truck. But instead you are paying a fine because you punched a flight attendant," said one agency tweet.

The FAA said three-quarters of its 3,400 unruly passenger reports are related to a federal mask requirement on planes and public transportation, even though it often takes more than refusing to wear a mask for the FAA to take action.

Sara Nelson, international president of the Association of Flight Attendants-CWA, said that after more than a year grappling with the global pandemic, flight attendants' stress levels are high and passengers are on edge.

"People get on a plane and they're taking it out on each other, or most commonly, on the flight attendants," she said. "And what we're really seeing is that you're having like entire airplanes full of people who are aggressive rather than the one-off passenger."

Rick Domingo, who oversees onboard safety as executive director of the FAA's Flight Standards Service, echoed that sentiment.

"It used to be individual events," Domingo said during a recent FAA forum. Now, "it's group events. You have a number of people exhibiting that same behavior on aircraft."

As of July 13, the FAA had opened 555 investigations in unruly passenger cases — triple its total for all of last year. It has taken action against passengers in 80 cases.

That's just the beginning of a labyrinthine process written into FAA regulations, in which the agency sends a Notice of Proposed Civil Penalty. Passengers can try to demonstrate they did not violate FAA regulations; seek a shrunken penalty; or request an informal or formal hearing and an appeal.

While international aviation groups for years have noted concerns about passenger problems aboard aircraft, the recent U.S. surge appears to be an outlier.

In Canada, where passengers who refuse to comply with crew member instructions face fines up to $100,000 (about $80,000 in U.S. dollars) and as much as five years' imprisonment, the nation had recorded 14 reports of unruly passengers through May. In 2020, 73 incidents were reported.

"Canadian airlines have not seen a significant uptick in the number of passengers acting out on flights," said Frederica Dupuis, a spokeswoman for Transport Canada.

Willie Walsh, director general of the International Air Transport Association, a trade group that represents nearly 300 carriers worldwide, said "it's not completely isolated to the U.S., but it is predominantly a U.S. domestic issue that we're witnessing at the moment."

In addition to masks, alcohol has been a contributor to bad behavior. Some airlines aren't serving alcohol during the pandemic, so some passengers are drinking before boarding or

bringing their own, which is against federal rules.

Of the 43 enforcement cases this year for which the FAA has made some details public, nearly one-third involved alcohol. About the same number involved alleged assaults. A flight had to be diverted from its original destination in eight cases.

Some aviation industry officials said there are early signs that the frequency of incidents could be falling, but it's too soon to know whether that signals a downward trend.

**'Reaching for the hammer'**

In the past, the FAA might rely on warning letters or counseling to deal with passenger misbehavior. But under its "zero-tolerance" policy toward passengers interfering with crew members, aviation safety inspectors are required to fill out investigative reports that could lead to sanctions.

"It's one strike and you're out," said Arjun Garg, a former chief counsel at the FAA who is a partner at law firm Hogan Lovells. "There's no more of just counseling an offending passenger about behaving better. They are immediately reaching for the hammer."

Behind the scenes, the agency is struggling to keep up with the barrage. FAA officials are seeking to better prioritize the torrent of reports coming from airlines and rushing to train personnel on the basics of building cases that can stand up to challenge. The investigative process can be slow.

"We have to collect evidence, do due diligence to prove our case," the FAA said in a statement. "This takes time."

An FAA document tracking potential cases shows that information provided by airline employees sometimes falls short, undercutting would-be investigations.

The FAA has issued public statements touting more than $680,000 in proposed penalties this year. But the agency has sometimes struggled to force passengers to pay more limited amounts in the past, raising questions about the success of its enforcement push.

The FAA is seeking $10,500 from a Southwest Airlines passenger who allegedly made a maskless phone call while the plane sat on a runway in February, then swore at flight attendants before being removed.

But in a case resolved in June, a D.C. man made a call one hour into a November 2018 flight to Minneapolis. The FAA sought a $5,000 penalty, but after pursuing the case for more than 18 months — and an appeal by the passenger to the U.S. Court of Appeals for the D.C. Circuit — the FAA agreed to settle for an undisclosed amount.

Following an unfavorable ruling by an administrative law judge last year, the FAA settled another case — a proposed $10,000 penalty for alleged abusive behavior on a 2009 flight

from Miami — 10 years after the incident.

Other rulings and arguments made by the same judge, J.E. Sullivan, challenged the FAA's interpretation of what it means for someone to "interfere" with a flight crew. As one of a handful of judges in the Transportation Department's Office of Hearings, Sullivan provides interpretations that help shape how the FAA can enforce its rules, including its push to control unruly passengers.

In a case involving vaping on a plane, a passenger on a flight to Portland, Ore., set off a lavatory smoke alarm in 2019. The FAA charged the passenger with smoking — and also with violating a rule against interfering with a crew member performing their duties.

By putting on oxygen masks, making queries to gauge the threat and communicating with dispatchers over the incident, the flight crew was distracted from its regular safety preparations, an FAA lawyer argued. "We consider that an interference with their duties," the lawyer said.

Sullivan countered that "there's no interference," adding, "the activity that they engaged in is the activity that they're trained to engage in as part of their flight crew duties."

It's unclear whether mask-related cases working through the system could encounter similar issues. An internal FAA memo in February said persistent refusals to wear masks, requiring multiple instructions from a flight attendant, could be considered interference because of "the consequent distraction from safety-related duties." Sullivan declined to be interviewed.

Regulators have given little attention to some onboard safety concerns raised years ago.

Congress passed a law in October 2018 giving the FAA administrator one year to issue an order requiring the installation of a "secondary cockpit barrier" on new planes as added protection against would-be intruders. Nearly three years later, the FAA is still working on it.

The legislation was named after Capt. Victor J. Saracini, who was killed on United Airlines Flight 175, which terrorists crashed into the South Tower of the World Trade Center on Sept. 11, 2001. The barriers are meant to be installed between the cabin and cockpit door to block passengers from rushing in when the door is opened for food or restroom breaks.

Beyond addressing hijacking fears, a 2020 advisory report to the FAA noted that the barriers also could stop disturbed and impaired passengers. The Biden administration put the barriers on its "priority list for 2021," the FAA said.

On June 4, a passenger on a Delta Air Lines flight from Los Angeles to Nashville allegedly rushed up and started pounding on the cockpit door, forcing the plane to divert to Albuquerque. He was charged in U.S. District Court for New Mexico with interfering with a member of a flight crew.

Plaintiffs' Exhibit 313

nytimes.com

# Flight Attendants' Hellish Summer: 'I Don't Even Feel Like a Human'

*Tacey Rychter*

13-16 minutes                8-26-21

For cabin crews, the peak travel season has turned into a chronic battle involving frequent delays, overwork and unruly passengers that leaves them feeling battered by the public and the airlines.







Credit...Michelle Litvin for The New York Times

Aug. 26, 2021

As stranded Spirit Airlines travelers grew desperate at San Juan Airport in Puerto Rico during a chaotic night of cancellations on Aug. 1, banging on a gate door and yelling at staff, police officers rounded up the airline's cabin crews to hide them.

A 28-year-old flight attendant recounted being rushed to a jet bridge, behind a secure metal door, and then later to an office on the tarmac.

There, about 35 Spirit employees were told by a manager to change out of their uniforms for their safety.

"We were scared," said the attendant, who asked not to be identified by name because of the airline's media policy. "I've seen some crazy stuff, but this moved into number one."

Air travelers have faced an unusually high number of disruptions this summer because of widespread labor shortages, bad weather and technical problems. Nearly a quarter of U.S. passenger planes between June and mid-August were delayed, while almost 4 percent of flights were canceled in the first half of August, according to data from Flight Aware, a flight tracking service. Spirit alone canceled nearly 2,500 flights between Aug. 1 and 15.

Flight attendants across the country say they are struggling to cope, facing not only these prolonged operational issues, but also an increase in aggressive passenger behavior. Nearly 4,000 unruly passenger incidents have been reported to the Federal Aviation Administration in 2021, a figure described by the agency as "a rapid and significant increase."

Most of those reports deal with attendants enforcing rules on proper masking in the cabin, with passengers who range from careless to belligerent, and at times verbally or physically abusive. Shaky, vertical footage of brawls and insults are now a familiar staple on social media.

A 28-year-old American Airlines flight attendant who asked not to be identified for fear of losing her job said she had law enforcement called following verbal assaults twice since June, after six years of flying with no incidents. Both confrontations were related to mask

==enforcement.==

"What really hurts are the people who won't even look at you in the eye," she said. "I don't even feel like a human anymore."

In interviews with more than a dozen attendants from major and regional carriers, crew members said they were getting squeezed on both sides — from passengers and the airlines. They described regularly working shifts of more than 14 hours, being assigned up to four or five flights a day, not being given sufficient time to sleep and being deterred from taking leave if fatigued or unwell.

==The tense situation in the air this summer has led many attendants to say that they feel exhausted, afraid for their personal safety and, in some cases, concerned that the situation could turn dangerous.==

A spokeswoman for Airlines for America, a trade group, said its member airlines "recognize the importance of prioritizing the safety and well-being of all employees, who are the backbone of our industry," and "comply fully with robust F.A.A. regulations, which include stringent rest requirements and limitations on duty, as well as with all federal policies."



Image





Credit...Tom Williams/CQ Roll Call

Sara Nelson, president of the Association of Flight Attendants union that represents nearly 50,000 flight attendants at 17 airlines, noted that the difference in passenger response to the pandemic compared with the Sept. 11 terrorist attacks has been "night and day."

Twenty years ago, "every single person who came on our plane was completely on our team," she said. But now, flight attendants have become "punching bags for the public."

### Staffing can't keep up with demand

This spring, as vaccination rates increased, coronavirus cases dropped and restrictions melted away, demand for summer travel rebounded more quickly than many had expected. On July 1, 2.1 million air travelers passed through Transportation Security Administration airport checkpoints, even more than on the same day in 2019. Many airlines ramped up their scheduling and added new routes.

But while airlines are eager to capitalize on the demand, many appear to lack the staffing to keep up.

Bureau of Transportation Statistics data show that the number of full-time-equivalent employees at U.S. scheduled passenger airlines was nearly 14 percent lower in June 2021 than in March 2020. Tens of thousands of flight attendants took leave during the pandemic, the A.F.A. union said. American Airlines said about 3,300 flight attendants have yet to return from leave.

"So many people were let go so quickly on extended leave of absence, early retirement, that they're struggling to meet the travel demand," said Paul Hartshorn, a flight attendant and spokesman for the Association of Professional Flight Attendants, which represents about 24,000 American Airlines attendants. "And staffing is tight, there's not a lot of wiggle room for storms and maintenance delays."

At Southwest Airlines, the chief operating officer, Mike Van de Ven, shared a message
with staff on Aug. 20, saying that the increase in bookings has "taken a toll on our
operation and put a significant strain on all of you. And for that, I am sincerely sorry." He
also said that "historical staffing models have not been effective in this pandemic
environment."

"There's not enough people," said Nas Lewis, a flight attendant with a major U.S. airline
and founder of th|AIR|apy, a website and Facebook group that addresses flight attendants'
mental health. Ms. Lewis, who asked that the name of her airline not be published
because of its media policy, said the situation generates anxiety for attendants "because
we don't know what we're going to deal with on any given day."

A shortage of pilots is another critical pain point for air travel, as is inadequate numbers of
gate agents, baggage handlers and delivery drivers, all of which can easily throw a
wrench into getting a flight out on time.

When a cabin is short staffed, the airlines depend on on-call, or "reserve," flight
attendants. This summer, airlines have been stretching their reserves to the maximum, to
the point where they are running low or out of available attendants before the day has
even begun.

American Airlines' staff scheduling system for Chicago on Aug. 10, which a flight attendant
for the company described as an average day this summer, showed that by 7 a.m. every
reserve attendant based there was either already scheduled or unavailable.

When an airline runs out of reserves, flight attendants who are already assigned to a flight
can be abruptly rescheduled to work hours longer than expected, which attendants and
union representatives say occurs more frequently now and adds to their fatigue.

## Long days, minimum rest

Jacqueline Petzel, a Chicago-based flight attendant with American Airlines who is
currently working on reserve, said that during the first week of August, she was woken up
repeatedly at 2 a.m. by American and had only two hours to race to the airport and then
work a 15-hour shift.

Between some recent shifts, Ms. Petzel, 34, said she had been given only the minimum
10 hours of rest at the hotel.

During that time, she had to get dinner, shower, call family, wind down, sleep, eat
breakfast and get ready for the next shift, leaving just four or five hours for actual sleep,
Ms. Petzel said.

"It's hard to keep your eyes open when you're up that early and it's a long flight," Ms.

Petzel said. On a recent layover in Las Vegas after a 15-hour day, she fell asleep in her uniform.

A 30-year-old flight attendant who works with United Airlines, who asked not to be identified for fear of jeopardizing her job, said she had to work a double red-eye during a four-day trip in July.

"I actually felt kind of tipsy, almost kind of drunk," she said. "I was slow, and I know that even if something comes up the adrenaline will kick in, but I know that my decisions aren't going to be the best."

In response, Rachael Rivas, a spokeswoman for United, said: "We have what we believe is an industry-leading, safety-focused Fatigue Risk Management Program, which includes a strong collaboration between union representatives and in-flight management."

Flight attendants have a maximum number of hours that they can be assigned to work, although many say scheduling teams are increasingly pressuring them to accept longer and longer shifts. When an attendant exceeds the maximum hours, it's known colloquially as "going illegal."

Attendants say it has become difficult to push back.

"They have it in the computer that you're getting to the gate at 14 hours and 59 minutes, but it's obvious that's not going to happen," said the 28-year-old attendant with American, where domestic shifts are limited to 15 hours.

"There's this saying: fly now, grieve later," she said. "You fly the illegal reassignment now, and you grieve it with your union later."

Whitney Zastrow, a spokeswoman for American Airlines, said, "we've taken and continue to take steps to materially improve the quality of our flight attendants' work life, including working closely with our hotel and limo vendor."

### Facing conflict and discouraged from taking leave

A video circulating online earlier this month of Frontier flight attendants duct taping a belligerent passenger to his seat made news reports and shocked viewers. While this is an extreme incident, attendants and unions say that encountering unruly passengers, once rare, is now almost expected.



Image



Credit...

An F.A.A. spokeswoman said that before 2021, the numbers of disturbances were fairly
consistent year over year, with the agency investigating on average less than 150
incidents annually. As of Aug. 23, the F.A.A. has launched investigations into 693 incidents
in 2021.

"You would think a pandemic affecting a ton of people would cause people to maybe pause and be more compassionate to each other," said Ms. Petzel, the American Airlines attendant. "For whatever reason, it's made it go the complete other way."

==Flight attendants across many airlines say the situation is wearing on their mental health and physical well-being.==

"I have never experienced this level of anxiety, depression in my entire life," said the 28-year-old flight attendant who works for American. "We're really breaking down."

"We're used to getting B.S. from the company, from the passengers, we're used to weather — but not all at the same time for an extended period of time. It's every single day, it's every single trip," she said.

Many attendants say they fear retribution for taking leave, especially now.

Some airlines have a point-based attendance policy, whereby if a flight attendant has an unplanned absence when scheduled to work (say, because they call in sick), they accrue a point. Too many points can trigger an investigation or even termination.

JetBlue warned crew members that they would incur double attendance points if they took an unplanned absence over a weekend between July 23 through to Labor Day weekend.

One JetBlue flight attendant, who requested anonymity for fear of losing his job, said that last month he worked more than 17 hours on a shift and had been given only the legal minimum amount of rest, eight hours, between some flights.

He has called in sick a number of times but worries that he may accrue too many attendance points and face termination.

"When you try to talk to people about it, they say, 'This is what you signed up for,'" he said, referring to a conversation he had with his manager.

"Our attendance policy is similar to most airlines, and on peak periods (like holidays) it's especially important that crew members show up for assigned trips so that customers can get where they plan on going," said Derek Dombrowski, a JetBlue spokesman. JetBlue is also offering financial incentives to encourage crews to take shifts.

Normally, Southwest Airlines is contractually obliged to let attendants call in sick without requiring a physician's note. But the company can invoke an "emergency sick-call procedure," requiring staff to verify their illness with a company doctor. Southwest has invoked this policy three times this summer.

"It should not be used as a usual or normal way of controlling the operation," said Lyn Montgomery, the president of Transport Workers Union Local 556, which represents Southwest Airlines flight attendants. The last time this procedure was used was in 2017.

"While never a desired option, Southwest may, when operationally necessary, enact emergency sick call procedures to protect the airline's schedule and support working flight attendants," said Brian Parrish, a spokesman for Southwest Airlines. "Southwest Airlines supports employees' physical, emotional and mental health with a variety of programs and offerings — including free employee assistance services that are available 24/7."

The union and attendants said they felt that these doctors could be dismissive of symptoms. Staff also may not feel comfortable seeing the airline's doctor, especially if dealing with mental health concerns.

"Our mental health has never been more disrupted than now, obviously since 9/11," said a 30-year-old flight attendant for Southwest, who asked not to be identified for fear of losing her job. "You can't even call out sick if you're having major anxiety or depression episodes. It doesn't matter."

Ms. Lewis, of th|AIR|apy, said in May she was shoved by a hostile passenger who was upset about an overbooked flight. She did not report the incident, she said, because she was too exhausted.

"As flight attendants, we are at our wits' end," she said.

Plaintiffs' Exhibit 314

orlandosentinel.com

# Family kicked off Spirit Airlines flight from Orlando after 2-year-old doesn't wear mask

*David Harris*

2-3 minutes

A family was asked to leave a Spirit Airlines flight before takeoff from Orlando International Airport to Atlantic City, N.J., after their 2-year-old child didn't have a mask on while eating, according to videos of the confrontation.

The videos, which started making the rounds on social media Monday afternoon, showed the young girl on her mother's lap eating when a flight attendant, relaying a message from the pilot, said the girl had to have a mask on.

The mother told the flight attendant the girl had just turned 2. Much like other airlines, Spirit requires passengers 2 and older wear masks except while eating, which the girl is doing.

"If you're not compliant, you will have to get off," a flight attendant told the family as the father, who was seen on the video taking his own mask on and off, asked for an explanation and threatened to call his lawyer.

Orlando police also responded to the scene shortly before noon.

"Seven months pregnant with special needs kids … on a flight trying to get this [mask] on but she's refusing to keep it on, but we are all getting kicked off," the mother said in one of the videos.

All the passengers had to deplane and then re-board the plane with a new flight attendant crew, according to the video.

There was applause after the announcement about the crew change was made over the PA system.

The father posted a video after getting back on the plane.

"Happy ending," he said. "We're back on."

A spokesperson for the Orlando Police Department said its "officers stood by while Spirit Airlines resolved the issue."

Spirit Airlines did not return a message for comment. The flight was delayed by over two hours, according to FlightAware.

*dharris@orlandosentinel.com*

Plaintiffs' Exhibit 315

viewfromthewing.com

# Flight Attendant Removed After Taking Two Year Old To Task Over Mask - View from the Wing

*About Gary Leff*

3 minutes

---

On a Spirit Airlines flight on Monday from Orlando to New York, a family was kicked off when their two year old, who was eating yogurt, removed their mask.

The mother of the two year old girl is seven months' pregnant, and their other child – traveling with them – is special needs.

> NEW – Family is being thrown off a @SpiritAirlines flight from Orlando to NY because their two-year-old child is eating without a mask.pic.twitter.com/dOIZrbbJt6
>
> — Disclose.tv 🚨 (@disclosetv) April 5, 2021

More of the @SpiritAirlines incident.

> FYI, following the @FlyFrontier incident a few weeks back, @FAANews sent warning letters to passengers who at the time were not even accused of not wearing masks that they were in violation of the mask rule. Letter can'r even be appealed! pic.twitter.com/e7ZgQzA4NV
>
> — Yossi Gestetner (@YossiGestetner) April 5, 2021

Here's a video of the family walking off the plane, including their disabled child.

Perhaps the most amazing thing about this incident was that an hour after everyone was deplaned in order to remove the mask offending two year old the entire group of passengers was allowed back on the plane – including the family whose two year old was caught eating. Everyone returned, that is, except reportedly the crewmember who made an issue of the two year old's mask in the first place.

> ORLANDO: UPDATE: @SpiritAirlines flight attendant who ordered the family off

the flight was removed, family allowed back on. Passengers are reboarding with a new flight crew. pic.twitter.com/u5yEA9McZZ

— KolHaolam (@KolHaolam) April 5, 2021

Numerous two year olds have been kicked off of flights when they had difficulty maintaining their masks. This is now a federal regulation but many of these incidents occurred when it was merely an airline rule that two year olds had to wear masks on planes.

However we've even seen one airline remove an 18 month old over failure to wear a mask even though it's not required (nor advisable, according to the CDC) and eating is considered a justifiable reason to temporarily remove a mask (some have tried to milk this exception).

While mask wearing does seem to provide some protection, and I have favored mask wearing since the beginning of the pandemic, its benefits are frequently exaggerated. And while studies of this issue continue, significant evidence suggests that very young children do not spread the virus nearly as often as older children or adults. When there's enough vaccine so that anyone who wants a shot can get one, we should lift mask rules.

## Plaintiffs' Exhibit 316

businessinsider.com

# Spirit Airlines is defending its decision to de-board an entire flight after it says a family refused to wear masks

*Katie Canales*

6-7 minutes

---

- Spirit Airlines said it removed a family of four from a flight because they refused to wear masks.

- Video of the incident shows the masked parents being told to leave as their maskless child eats.

- Spirit says what is not shown is the parents not complying with mask mandates moments earlier.

- See more stories on Insider's business page.

Spirit Airlines is defending its decision to deplane a flight over what it said was one family's mask violations.

The Monday fight from Orlando, Florida, to Atlantic City, New Jersey, was ultimately delayed more than two hours after passengers were deplaned and the family was allowed to reboard the flight.

A video from a portion of the incident was posted on Twitter, but the full event remains unclear. In one widely shared video, a father, a pregnant mother, and their two children are seen being told to exit the plane. In the video, the mother and father are both wearing masks, though the father is seen removing his at some points to speak with the flight attendant.

One of their children is sitting on the mother's lap, not wearing a mask, and eating.

"I told you, noncompliance — you'll have to get off. I didn't want to do this," a flight attendant, who appears to be a different person from the one who originally confronted the family, is heard saying in the video posted by Disclose.TV.

The flight attendant later points to the child on the woman's lap when asked by both parents who isn't complying.

In the video, the flight attendant tells the family to leave the aircraft, saying "I'll have to deplane the aircraft and call the police" if they do not comply.

├─Disclose.tv 🛡 (@disclosetv) April 5, 2021

The video was shared widely, with many on social media expressing anger over the family's removal from the airplane. Some said it appeared the family was removed because of the young child's failure to wear a mask. Republican Sen. Ted Cruz shared the video on Twitter with the caption, "This is lunacy."

├─Yossi Gestetner (@YossiGestetner) April 6, 2021

├─Bernard B. Kerik (@BernardKerik) April 6, 2021

├─Jake Ducey (@jakeduceyauthor) April 5, 2021

In a statement posted to Spirit's Twitter account, the company said, "We're aware of incorrect

information circulating about Spirit Airlines Flight 138 from Orlando to Atlantic City. The flight was delayed due to compliance issues with the federal mask requirement. We allowed our Guests to continue on the flight to their destination after assurances of compliance. The safety of our Guests and Team Members is our top priority."

Federal law requires all passengers over the age of 2 to wear a mask when they're not eating aboard a flight. President Joe Biden signed an executive order in January that required all air travelers to wear masks on planes, and the Centers for Disease Control and Prevention has also mandated face masks on multiple modes of transportation, including buses and subways.

It's unclear how old the child not wearing the mask is, but in one video of the incident, the parents say the child is just one month older than 2 years old, Newsweek reported.

On its website, Spirit Airlines says it enforces a mask policy in line with Biden's executive order and other federal requirements. It requires all travelers to wear face coverings while on board the aircraft and says they may be removed only when passengers are eating, drinking, or taking medicine.

Spirit told Insider it directed the family to exit because the parents were not complying with mask mandates, which the company said was not captured on video and came before the widely shared video was filmed.

The airline said it was standard protocol in the airline industry to de-board the entire plane if there was an incident with a passenger. The company also said the couple initially refused to leave, adding that was why it made all the passengers deplane. If the family had agreed to deplane, Spirit said, the rest of the passengers would have remained on board.

Newsweek reported that after the family spoke with a supervisor and agreed to comply, it departed on that same flight.

According to another video of the event, the father in the incident said one flight attendant did not reboard the plane. Spirit said the crew was swapped out but did not clarify if that was standard protocol for scenarios such as this.

The Orlando police confirmed to Newsweek that they were called.

"Just before noon today, our officers were called to a general disturbance involving a Spirit Airlines flight scheduled to depart from the Orlando International Airport," a police spokesperson told Newsweek. "Upon arrival, officers saw that the flight was in the middle of de-boarding. Our officers stood by while Spirit Airlines resolved the issue."

Workers in the airline, food, and retail industries have been tasked in the past year with enforcing mask mandates among customers. Mask-wearing has become largely politicized since March 2020, with some Republicans driving a narrative that the COVID-19 pandemic is less severe than it seems.



Plaintiffs' Exhibit 317

elliott.org

## What happens if you refuse to wear a mask on the flight? This… - Elliott Advocacy

14-17 minutes



You can probably guess what would happen if you refuse to wear a face mask on your next flight. But Arden Dmitrenko seems to have been surprised by United Airlines' reaction to his mask rebellion during his recent trip.  (Reprint)

During the coronavirus pandemic, the Elliott Advocacy team has received requests for guidance from both sides of this debate. Some travelers are alarmed by the partially masked or completely maskless passengers they see on their flights. These travelers feel their safety has been put at risk. Others believe the mask enforcements are encumbering their civil rights and oxygen levels.

**Elliott Advocacy is underwritten by battleface** -- At battleface, we deliver insurance that doesn't quit when circumstances change. We provide specialty travel insurance services and benefits to travelers visiting or working internationally, including in the world's most hard to reach places. Currently selling in 54 countries and growing, our mission is to deliver simple solutions to travelers worldwide heading out on their next adventure.

To be clear — if your upcoming plans include a flight, those plans also had better include wearing your favorite mask. If not, you won't be going anywhere but back to your house — guaranteed. This is why.

### Trouble on this United Airlines flight during the coronavirus

Dmitrenko and his family were flying from Los Angeles to Houston on United Airlines last week.

Because the group could not preselect their seats, the problems started at the check-in counter. They were traveling with their young son and wanted the airline to seat them together in one row.

"Our 3-year old boy cannot sit separate from his mother or from me," Dmitrenko explained. "He starts panicking. The flight attendant told me to wait until all passengers were seated. Then we could ask if others were willing to switch spots with us."

Once onboard, Dmitrenko says he waited patiently. Then he started asking passengers to switch seats with him so his family could sit together.

*The other passenger seated next to my family agreed to switch spots. But the United Airlines flight attendant, \*\*\*\* (possibly her name), didn't allow the move. She kept refusing to let us switch seats even though both of us were okay with it.*

However, before takeoff, the family was permitted to make the switch and before long, the aircraft was on its way to Houston.

Then the troubles really began.

### "My son doesn't want to wear a mask on the flight."

Soon into the relatively short three-hour journey, the same flight attendant noticed that Dmitrenko's son had removed his mask. She approached the family and reiterated the same information that United Airlines repeatedly announced upon boarding the aircraft.

*United Airlines requires all passengers over age 2 to wear a mask at all times during the flight. You may lower your masks temporarily to eat or drink, but they must remain on at all other times.*

Dmitrenko says that he told the flight attendant that his son wasn't going to wear a mask. In fact, he wasn't capable of wearing a mask.

*We calmly explained to [the flight attendant] that my son could not wear a mask. I told her that his medical conditions prevent him from doing so. Then I explained that he gets panic attacks and cries when something is covering his face.*

*I DID NOT need to explain the circumstances as to why he could not wear a mask and [why I] was taking [his mask] off. I told her that I'm not going to give my child a mask and make him suffer. Out of courtesy I explained all this to her. LEGALLY, I do not need to explain, nor should the flight attendant have asked why my son cannot wear a mask.*

### Not the end of the story

After Dmitrenko told the flight attendant that he refused to make his child wear a mask, she walked away. But when she returned, she had a face covering for the boy.

"She wasn't wearing gloves and the mask wasn't in a package," he recalled. "This is not called 'practicing safety.' For all I know, [the flight attendant] could have passed something to my child from the exposed mask!"

Confident that he was within his rights to refuse to force his child to wear any mask on the flight, Dmitrenko thought that was the end of the story. He settled back into his seat and tried to enjoy the rest of the trip.

But he would soon find out that it definitely wasn't the end of the story.

## Fact: Don't plan a flight during the pandemic if you won't cover your nose and mouth

When the flight landed in Texas, things went from bad to worse for the family. And the repercussion of Dmitrenko's misunderstanding of the mask rules onboard United Airlines flights was made clear.

As he left the aircraft, Dmitrenko was surprised when he learned that security wanted to speak to him.

*The flight attendant was shouting at me from one end of the plane that security officers were waiting for me. She waved her arms, yelling, 'here he is!' and 'This is him!' As if I were a criminal or a murderer on an airplane. THAT WAS SO HUMILIATING!*

Dmitrenko said that he then had a calm conversation with the security officers.

"They explained the mask rules on flights during the pandemic again and that a child over age two must wear one," Dmitrenko remembered. "I did appreciate that they were able to talk to me respectfully. I wasn't given this [mask requirement] information before boarding at LAX."

But despite the airport security officers' low-key nature, a simple lesson of mask etiquette wasn't their primary intent. Dmitrenko soon learned that his refusal to make his son wear a mask on the flight was a significant transgression.

The interview concluded with the agents making a copy of Dmitrenko's identification. Afterward, they informed the family that United Airlines had canceled their return flight. They were not welcome on board United Airlines again.

Dmitrenko couldn't believe what he was hearing.

"I was totally humiliated," Dmitrenko recalled.

## Fact: You can't refuse to wear a mask on your flight during the coronavirus crisis

When Dmitrenko's request for help landed on my desk, I was more than a little confused. I had just flown cross-country on United Airlines the same week. So I knew that to check in, you must click a button that you agree to wear a mask throughout the flight. If you do not, you can't check-in.

That information is also displayed on your digital boarding pass.



🔒 united.com

Face coverings required for all travelers

For everyone's safety, all travelers are required to wear a face covering with no vents or openings that fully covers their nose and mouth. Face coverings must be

## Plaintiffs' Exhibit 318

newsweek.com

# Autistic 4-Year-Old Kicked off Plane for Not Wearing Face Mask Despite Exemption

*Aatif Sulleyman*

5-6 minutes

A 4-year-old boy with nonverbal autism has been kicked off a flight for not wearing a face mask.

Callie Kimball and her husband said that they and their son, Carter, were removed from a Spirit Airlines flight from Las Vegas to their home city of Little Rock on Monday morning, despite showing staff a doctor's note stating that he's exempt from wearing a face-covering.

According to his parents, Carter "holds his breath" or "starts freaking out" and "will harm himself" whenever he wears a face mask.

Spirit Airlines, which is attracting widespread criticism for the incident on social media, said that its current face mask policy "does not provide for medical exemptions, regardless of diagnosis," but that it plans to introduce an exemption application process for customers with "a medical disability" later this week.

The company has also issued a refund to the Kimball family.

"Regardless of local or state ordinances federal law requires all travelers to wear face-coverings in compliance with CDC guidelines on flights and in airports," Spirit Airlines' COVID-19 Information Center currently states.

"Children under the age of 2 years old are exempt. We will continue to evaluate this policy as the situation evolves."

However, the Centers for Disease Control and Prevention's (CDC) mask guidelines explain that people "with a disability who cannot wear a mask, or cannot safely wear a mask, for reasons related to the disability," are also exempt from the requirement to wear a face mask.

In September, Spirit Airlines staff asked the parents of a 4-year-old boy with autism to leave a plane because their son wouldn't wear a face mask.

When they refused, Spirit Airlines ordered all passengers off the plane and called the police. The parents were subsequently banned from flying with the airline.

The FAQ section of Spirit Airlines' COVID-19 Information Center contains a section specifically for people who are unable to wear a face-covering because of a disability.

"Spirit is aware of and analyzing a new federal directive regarding a requirement for masks to be worn in airports and onboard flights. We will promptly share any information regarding exemptions or policy changes," the section reads.

"At this time, our current policy still stands that all guests, except children under the age of 2 years old, are required to wear an appropriate face-covering."

Spirit Airlines says that it reminds customers of its face-covering policy "throughout the booking process, in a pre-trip email sent prior to departure, and in a required acknowledgment that is part of the check-in procedure."

However, in response to the incident involving Callie Kimball, the company has said that from Friday customers who are due to fly with Spirit Airlines from Monday will be able to "apply for an exemption as provided for in the federal mandate requiring masks in airports and on planes."

A Spirit Airlines spokesperson told *Newsweek* in a statement via email: "We sympathize with families facing additional burdens while traveling, including those dealing with medical conditions. Like most airlines, Spirit Airlines started requiring face coverings in May 2020 with the only exemption being one for children under age 2.

"We remind Guests of our face covering policy throughout the booking process, in a pre-trip email sent prior to departure, and in a required acknowledgement that is part of the check-in procedure. Our existing policy does not provide for medical exemptions, regardless of diagnosis.

"Starting March 19, 2021, Guests with a medical disability who are traveling on or after March 22, 2021 can apply for an exemption as provided for in the federal mandate requiring masks in airports and on planes.

"We plan to add information to our website about the exemption later this week. Please visit our Information Center for more information on what we are doing to keep our Guests and Team Members safe."



*A Spirit Airlines plane is seen at the Las Vegas International Airport (LAS) gate on August 30, 2020 in Las Vegas, Nevada. The airline does not currently accept medical exemptions for not wearing a face mask on flights. Daniel Slim/AFP via Getty Images*

*Newsweek, in partnership with NewsGuard, is dedicated to providing accurate and verifiable vaccine and health information. With NewsGuard's HealthGuard browser extension, users can verify if a website is a trustworthy source of health information. Visit the Newsweek VaxFacts website to learn more and to download the HealthGuard browser extension.*

*Update 3/16/21, 11 a.m. ET: This article was updated with comment from Spirit Airlines.*

Plaintiffs' Exhibit 319

fox32chicago.com

# 3-year-old with autism banned from airline over not wearing mask, Chicago family says

*Tia Ewing*

3 minutes

---

**Published** September 28, 2020

**3-year-old with autism banned from airline over not wearing mask, Chicago family says**

A Chicago family says their 3-year-old boy with autism has been banned from an airline since he would not wear a mask.

**CHICAGO** - A Chicago family says their 3-year-old boy with autism has been banned from an airline since he would not wear a mask.

The family says Spirit Airlines kicked them off the flight, but the airline says the family started swearing at flight attendants and would not cooperate.

The mom says she did swear, but was not belligerent. It all started over her autistic son not being able to keep a mask on for the 4-hour flight.

"They just put him on the autism spectrum. He has sensory delay and speech delay," said Zana Shelton.

Cebastian Lewis, 3, is nonverbal and at his age cannot read yet.

"It was a layover and everything, so it was two flights that we took to go there and he didn't wear a mask," Zana said.



Zana, her son and two other family members took the 1,700 mile trek to visit family when it was time to return on Spirit.

"On the way back, she stopped us. She said if he doesn't wear a mask he can't get on the plane. I'm like well he's autistic and we didn't have this problem coming up here," Zana said.

The family got the 3-year-old to wear the mask right before takeoff, but it did not last long.

"Soon as he sat in the seat he took it right back off," Zana said. "Everybody had to deplane and then the police were called and they put in a police report on him."

Spirit released a statement, saying they require face covering during the entire flight. The only exceptions are children under 2. Travelers unable to wear them for any reason, including medical, won't be able to fly Spirit.

GET FOX 32 NEWS ON THE GO BY CLICKING HERE

Days later, letters arrived in the mail, one to Zana's sister and another addressed to 3-year-old Cebastian, banning the toddler from flying Spirit for non-compliance of the airlines face-covering policy. In 2 years, he can write a letter explaining why the carrier should reconsider.

Spirit says the letter sent to the child was a mistake, but that the family refused to cooperate and a family member used profanity towards the flight attendants while refusing to get off the plane.

Spirit did refund the family their money for the ticket back home. In total, the family spent $1,400 one-way to return to Chicago on Southwest Airlines.

Plaintiffs' Exhibit 320

nbcbayarea.com

## Family Says Child With Autism Was Removed From Flight to SJ for Not Wearing Mask

*Ian Cull*

3 minutes

A family boarding a San Jose-bound flight says they were forced to remove their special needs daughter from the airplane because she wasn't wearing a mask.

Fifteen-year-old Mya was told she had to get off the Southwest Airlines plane before it departed Portland if she didn't put on her mask.

Her father guided her out after discussions with the crew, but he says Mya has autism and sensory sensitivity and that's the reason she wasn't wearing one.

"She was really upset, crying, she was so excited for the ride and for the trip," said Tim Cleary.

Her mother says they firmly believe in masks, and even though Mya will put it on, after a few minutes it feels constraining in a way most people can't understand.

"This isn't like we're protesting masks or anything," said Jeniffer Tharp. "My daughter cannot wear the mask, and I think there should be, and I thought that there were exceptions for people who can't comply with that."

**Local**





Passenger Jennifer Clymer of Turlock saw it all. She was seated two rows ahead on the Southwest flight.

"We were all very unhappy and thought it was very unfair that the family couldn't take a trip just because an autistic child didn't understand why she had to wear a mask," said Clymer.

Mya and her mom had to get off the flight.  The rest of the Portland area family continued their vacation in California.

Tharp says the pilot was apologetic, but higher ups said she couldn't continue on.  She hopes airlines will be more understanding.

"We were looking forward to this, but everything went wrong. I just assumed it would be no different from when she's gone into a grocery store or a doctor's appointment," Tharp said.

Southwest airlines sent a statement that reads, in part,  "Although we do not discuss specific information regarding customers, we can share that … customers and employees age two and older are required to wear face coverings or masks, in accordance with public health guidance issued by the CDC."

 Eating and drinking are the exception.

 The family argues – the CDC says on its website, mask use may be exempt for a person with a disability, mental health condition, or sensory sensitivity like Mya.

# Plaintiffs' Exhibit 321

travelpulse.com

## Southwest Prohibits Family From Boarding After Autistic Child Could Not Wear Mask

3-4 minutes

---

An Iowa family says they were prohibited from boarding a Southwest Airlines flight because their autistic son could not wear his face mask.

Instead, the family said they were forced to rent a car and drive home to Des Moines from St. Louis. The family – parents Cody and Paige Petek and their two children – were waiting on a connecting flight in St. Louis after arriving from Florida, where they had been on vacation.

ADVERTISING

But their 5-year old non-verbal son has autism and a sensory processing disorder, making it difficult for him to wear a face mask. A fellow passenger on the flight, Dr. Vince Hassel, said other customers were lobbying to get the boy on board when the Southwest Airlines crew refused.

"They weren't going to let the kid on the plane if he didn't put his mask on," Hassel said. "He just wasn't having it and throwing a fit. Just to watch this play out was absolutely horrible."

As this was playing out, the family said their son had a seizure, but his medication was on board the flight to Des Moines.

Transportation Security Administration (TSA) policy calls for people with disabilities who cannot wear a mask because of the disability are exempt from having to wear a mask.

The Peteks' lawyer said he thinks Southwest Airlines violated the Americans with Disabilities Act.

"There's clear guidance from the department of transportation about what the airline should do," said Anthony L. Marchetti Jr, the Petek's lawyer. "None of that happened here."

In a statement, Southwest said "While we regret any inconvenience this family experienced while traveling, federal law requires each person, 2 years of age and older, to wear a mask at all times throughout the travel journey... To assist travelers with disabilities, there is a narrow exception to the mask mandate for specific types of disabilities that prevent a person from wearing a mask. Southwest Airlines considers applications for exemptions from this mask requirement from passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability.

"… In this case, a traveler was not wearing a face covering prior to boarding and did not have an exemption to the federal mask mandate. Southwest Employees tried to assist the family by encouraging the child's face covering be placed over the mouth and nose. Once the family was unable to meet the federal requirement, Southwest offered the family a hotel for the night and to rebook them on a flight today to allow them additional time to comply. Instead, the family chose not to fly and was granted a full refund. It's the responsibility of Southwest employees to enforce federal regulations. As always, we appreciate the spirit of compliance to the federal mask mandate and the ongoing cooperation among our customers and employees as we work collectively to support the comfort and wellbeing of all who travel with us during the ongoing COVID-19 pandemic."

Plaintiffs' Exhibit 322

fox5atlanta.com

# Family says they were kicked off flight because 2-year-old son with autism wouldn't wear a mask

*Janice Yu*

3 minutes

---

**Family kicked off flight over son with autism**

A Georgia family was kicked off a Southwest flight because their 2-year-old son with autism couldn't wear a mask.

**ATLANTA** - A Georgia family heading to New York said they were kicked off a Southwest Airlines flight because their 2-year-old son with autism wouldn't wear a mask.

"You really fought a battle with a 2-year-old," said Edwin Rios, the father.

The couple said they've flown with their son, Elias, before but have never encountered this problem. The family of five was leaving Atlanta for a trip to New York.

"They don't understand those types of things when they're little. It just makes it harder when it's a kid that has a disability," said Maria Rios, the mother.

According to an advocacy group called Autism Speaks, it can be difficult for some on the autism spectrum to wear a mask.

CDC guidelines state exemptions can be made for those with disabilities.



The couple said they explained this to the crew when they pre-boarded their flight.

"We told you we can't force him to wear a mask. We told you his disability. You see our tickets because we preboarded his disability because we explained that to him at the front counter," Edwin Rios said.

The couple said they even tried to show the staff Elias would not keep his mask on.

"I forced it on him, fighting with him to put the mask over him, he ripped it right off and threw it on the floor," he said.

The family was eventually asked to get off the plane, but Edwin Rios said he told them he would only do so if the family was able to get their checked bags back.

He said he knew they would have to go back home and the key to their house was in one of the bags.

FOX 5 reached out to Southwest Airlines for comment and the company said it regrets the inconvenience the family faced but federal law requires Southwest to ensure everyone over the age of two to wear a mask at all times.

When asked about exemptions for those with disabilities, the company sent a link with steps one must take in order to be exempt.

The family said they were not made aware of this at any time during their interaction.

WATCH: FOX 5 Atlanta live news coverage

_____

Sign up for FOX 5 email alerts

Download the FOX 5 Atlanta app **for breaking news and weather alerts.**

Plaintiffs' Exhibit 323

washingtonpost.com

# Southwest removes family from flight after 3-year-old with autism is unable to wear mask

*Shannon McMahon*

3 minutes

---

When Southwest Airlines updated its mask policy to require "all customers over the age of two to wear a face covering or mask while traveling to help prevent the transmission of COVID-19," many travelers rejoiced. The no-tolerance policy is in line with guidance from the Centers for Disease Control and Prevention that face coverings be worn by everyone over the age of 2.

But on Aug. 10, the airline confirms, Southwest removed a family from one of its flights when a 3-year-old was unable to wear his mask on a flight from Midland, Tex., to Houston. The child has autism and doesn't like his face covered, the mother told Houston's KPRC-TV, and she had a doctor's note confirming as much.

"He was screaming. He was throwing a fit. He was screaming 'No, no, no!'" she told the news station. "I think there needs to be something in place for children or even adults with disabilities who can't wear a mask. They should have some kind of exemption."

She also took to social media to voice her frustration.

"When you get kicked off your flight because your 3 year old autistic child won't wear a mask... looks like I'm stuck here in midland," she wrote in a Facebook post, commenting on her own post that she was "disgusted by how my son was treated and how I was treated." Customers weighed in supporting the mother on social media, as well.

In a statement to The Washington Post, Southwest said it regrets "any inconvenience this family experienced. Customers are informed of the policy on our website during booking, in a pre-trip email sent prior to departure, and during a required acknowledgment that's part of the Customer Health Declaration Form which appears during the online check-in process on the Southwest app, Southwest.com and Southwest's mobile website."

The airline also says that it issues a full refund in cases where an individual is removed from a flight for being unable to wear a mask.

On Wednesday, Southwest chief executive Gary Kelly tweeted a reminder about its updated policies as the story circulated on social media.

Alaska, American, Frontier, JetBlue, United and Spirit airlines all have similar policies in place, requiring face coverings for travelers over the age of 2 without mention of any exceptions for medical conditions or disabilities.

Plaintiffs' Exhibit 324

aviationtravelwriter.com

# ADA and Child Mask Policy

11-14 minutes



American Airlines and Southwest Airlines were the first carriers to institute a blanket ban on passengers with ADA disabilities who cannot not wear a face mask. Southwest stated that it would "temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask."

That's 7 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986.

## These airlines still permit disabled people to fly without a face mask

If you or someone you are traveling with has any of these conditions or is unable to wear a mask due to a legitimate disability, you will only be able to fly on the following carriers:

Allegiant Air — "Those with medical conditions that prevent the use of a face covering must provide documentation from a medical physician to the gate agent one hour prior to departure."

Delta Air Lines — "Customers with underlying conditions that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you require this exemption, please arrive early to complete the process during check-in and avoid missing your flight – this process can take over one hour."

Hawaiian Airlines — "Guests with a medical condition or disability preventing its use, will be exempt

from the policy."(wheelchairtravel.org)

*Please keep in mind that airline mask policies for ADA Passengers are quite fluid at the moment and changing without notice. A passenger could book an expensive out of town life saving surgery or medical treatment. They may arrive at the airport a few weeks later only to find out that they are no longer welcome onboard without a mask due to a policy change. There are only 3 airlines left with some limited type of ADA travel policy.

However, this only addresses the flight. It is a catch 22 situation for the ADA Disabled Passenger since there are Mandatory Mask requirements now for being inside the airport and going through TSA. There are no exemptions for these areas. Therefore, an ADA Disabled passenger could have the exemption for the particular flight but has no legal way to make it onto the flight without a mask in the secured and common areas.

**No Exceptions for Autistic Children and Toddlers 2 Years or older:**

These Child Mask Policies are all over the map and may change at the drop of a hat. As of today, Delta is not requiring compliance for young children who cannot maintain a face covering and unaccompanied minors are exempt from the mask requirement and do not require a pre-travel clearance. However, they are one of the most stringent in the news for banning adults for even the slightest non-compliance. Therefore, I do not know how trustworthy that policy statement is or how long it will remain in effect.

Allegiant may be the last semi-flexible hold out. We will see just how long this one lasts. As of today Allegiant is the only one of the remaining 3 carriers in America with some vague type of ADA Waiver policy. Allegiant currently only requires a Doctors Note and is not requiring the hour long airport Virtual Medical Evaluation for the ADA Disabled Traveler Mask Wavier. Allegiant seems to be the only airline offering ADA Waiver for their actual Airline Employees as well. The airline will make exceptions for those employees with medical conditions that prevent the use of a face covering.

The harshest Child and Toddler enforcement policies appear to be at Southwest and Jet Blue:

This past week Southwest Airlines removed a passenger and her 3-year-old son from a Monday flight after the boy, who has autism, refused to wear a face mask and became upset. Passenger Alyssa Sadler, who was also traveling with her 1-year-old daughter, told CNN affiliate KPRC that the family was deplaned from the Southwest flight from Midland, Texas, to Houston, Texas. "It was just not a good morning," said Sadler. "He was screaming. He was throwing a fit. He was screaming no, no, no."Sadler told KPRC her son has a sensory processing disorder and doesn't like his face being touched and that she had a medical note explaining the condition. (cnntravel)

# Strict mask policy





Sadler told CNN she would have to wait several days for a ride home.

**Southwest Mask Policy:**

All travelers 2 years and older must wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, while in flight and deplaning. Masks with vents or exhalation valves are not permitted. Plastic face shields may be worn in addition to a face covering but not in place of one. Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place.

- **ONLY** young children under the age of 2 are exempt.

- If a Customer is unable to wear a face covering for any reason (even a verifiable medical condition), we regret that we **are unable to transport the Customer at this time**, due to safety risk of asymptomatic COVID-19 transmission by Customers without face coverings. In other words, because of public health guidance recognizing the important role of face coverings in preventing the transmission of COVID-19, Southwest will temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask.

- In the future, if there is a change in public health guidance on face coverings or other changed circumstances impacting Safety, Southwest looks forward to welcoming all passengers on board again safely.  In the meantime, Southwest encourages all Customers who are unable to wear a face covering (even due to a verifiable medical condition) to postpone air travel, or consider other forms of transportation.

This past week a Family with 6 children were removed at JetBlue:

A Brooklyn mother traveling with six children from Orlando to New York was kicked off a JetBlue flight on Wednesday because her 2-year-old would not wear a face mask as required. Videos of the mother, Chaya Bruck, speaking with a flight attendant before the plane took off have been shared widely on social media. A video posted on social media shows Bruck talking to a flight attendant about her daughter not wearing a mask. "You realize she's 2?" Bruck says."I do, and also, it's not something we can excuse," the flight attendant responds in the video.

"So should I tie her hands? What should I do?" Bruck asks the flight attendant in the video. The toddler sitting next to her appears to be visibly uncomfortable by the arguing. JetBlue told CBS News that Bruck told a flight attendant her child was not going to wear a mask. The doors of the flight were still open and the flight attendant followed procedure by calling a JetBlue airport supervisor to handle the situation.  Videos of the incident show fellow passengers becoming frustrated, many of them coming to Bruck's defense, saying the 2-year-old should be excused for not keeping the mask on.

JetBlue said the cabin became boisterous and a decision to deboard the plane was made.(cbsnews.com)



This screenshot of a video taken by Chardette Poinsette shows Bruck speaking with the flight attendant before passengers deboarded.

**JetBlue Mask Policy:**

All travelers 2 years and older must wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, while in flight and deplaning. Masks with vents or exhalation valves are not permitted. Plastic face shields may be worn in addition to a face covering but not in place of one. Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place.



Flying for families with small children or ADA Disabled Passengers has become a very slippery slope these days. The policies for children and the disabled are changing without notice. Therefore, you can not really plan or know how things will go. Families with children and disabled may have to travel by car or postpone travel for the near future. This leaves the ADA Disabled customers who are traveling for medical treatments or surgeries to out of state specialized medical procedures at a great

disadvantage. The numbers of Cancer Deaths has skyrocketed globally since these new rules went into place. This is mainly attributed to these patients not having access to their Cancer Screenings and Cancer Treatments.

## Report Airlines for ADA and ACAA Violations:

Airlines violate the **Air Carrier Access Act** and **Americans with Disabilities Act** at the expense of disabled travelers every day. Most travelers take these violations in stride and put the negative experiences behind them. As a result, airlines have little incentive to comply with the law. This article outlines the process for enforcing your rights under the ACAA and holding airlines responsible for any violations. When violations occur, **passengers should first report the violation to the airline within 45 days**. This is best done through a comment or complaint form on the carrier's website. This allows for the airline to respond in writing and creates a paper trail. After you have received a response to your complaint with the airline, you may **file a complaint with the DOT at** www.transportation.gov. This allows the agency to investigate violations of the ACAA, impose sanctions, and require the airline to demonstrate efforts to prevent future violations. You can file an Americans with Disabilities Act (ADA) complaint alleging disability discrimination against a State or local government or a public accommodation (private business including, for example, an airline, restaurant, doctor's office, retail store, hotel, etc.). A complaint can be filed online using the link below, by mail, or by facsimile. (wheelchairtravel.org) (ADA.gov)

ADA Americans with Disabilities Act: Online Complaint Form

It seems as though the ADA Laws have just been thrown out the window for the time being. This combined with just the combative, hostile and miserable travel experience these days has caused travel bookings to plummet by 75 percent. Those kind of load factors are not sustainable for airlines to survive. Many passengers have instead chosen to do more car trips at nearby vacation spots. The more affluent wealthier and business travelers which are the bread and butter for commercial airline profit margins have opted for Private Jet Travel. Corporate Jet business is up 250 percent for 2020 while commercial aviation is down 75 percent.

Business Travelers are now working remotely and doing business conferences as well as meetings via Zoom. This is a very dangerous trend for the First Class and Business Class Markets. These travelers are making major changes to how they travel and do business. The million dollar question is to whether any of those passengers will be back if and when commercial aviation ever normalizes again. Only time will tell.

Aviation Travel Writer: The Flight Times Blog

aviationtravelwriter.com

Link: cbsnews.com

Link: cnntravel

Link: wheelchairtravel.org

Link: wheelchairtravel.org

Link: ADA.gov

Plaintiffs' Exhibit 325

[travelpulse.com](travelpulse.com)

## More Than 4,000 Passengers Banned From Airlines Over Mask Mandate

2-3 minutes     May 8, 2021

Since the onset of the COVID-19 pandemic last year, and the introduction of face mask-wearing mandates aboard flights, the number of naughty passengers has increased exponentially.

But this much?

ADVERTISING

The airlines and the Federal Aviation Administration have been cracking down on unruly behavior, to the point where more than 4,000 fliers have been banned in the last year according to CBS News.

In fact, some passengers are facing fines of up to $30,000 for their activities on some flights.

Trending Now



Here's a breakdown of the top 10 U.S. carriers and the number of passengers they've banned:

– Alaska: 538 since May 11, 2020

– Allegiant: 15 since July 2, 2020

– American: does not report

– Delta: more than 1,200 since May 4, 2020

– Frontier: 830 since May 8, 2020

– Hawaiian: 106 since May 8, 2020

– JetBlue: 140 since May 4, 2020

– Spirit: 604 since May 11, 2020

– Southwest: does not report

– United: 750 since May 4, 2020

That's 4,183 without two major airlines reporting.

And we haven't even talked about the FAA fines yet. The agency has its sights set on four passengers, including one that owes more than $30,000 in penalties.

CBS noted that this includes a February 7 JetBlue flight headed to New York that had to return to the Dominican Republic after a passenger refused to wear a face mask after being asked by flight attendants to wear one. The passenger threw an empty alcohol bottle and food, cursed at crew members, grabbed one flight attendant and hit another and drank alcohol that wasn't served to her.

At least one airline said it isn't as bad as it seems.

"With the federal mandate for air travel (including airports), and our face covering policy designed to ensure to the greatest degree that issues are addressed on the ground and potential violators do not board an aircraft, we find that the great majority comply," says a statement from Allegiant. "For the most part, those few who may need a reminder in flight also comply."

Plaintiffs' Exhibit 401

flightglobal.com

# Eliminating passenger mask mandate is 'next step': Spirit Airlines CEO

*Jon Hemmerdinger*

2-3 minutes

The US government can help reduce the incidence of unruly air passenger behavior by doing away with the requirement that travellers wear face coverings, says the chief executive of Spirit Airlines.

"That's got to be the next step – when facial [covering requirements] are relaxed on airplanes," CEO Ted Christie says during the Routes Americas conference on 23 June. "That is going to take a lot of steam out of things."



*Source: Max Kingsley-Jones/FlightGlobal*

Frontier Airlines CEO Barry Biffle agrees: face coverings are a prime contributor to a string of recent in-flight disruptions.

"The reality is, a lot of people don't want to wear masks," says Biffle, who also spoke at the event. "You don't have to wear a mask here, you don't have to wear [masks] at Walmart, but yet you've got to do it on a plane."

"People are agitated," he adds.

In January, the US Centers for Disease Control and Prevention mandated that air travellers must wear face masks to prevent the spread of Covid-19.

Meanwhile, the FAA has reported a surge in incidents involving allegations of unruly, even violent, passengers – events the FAA has said are often related to the face mask requirement.

"The masks make everyone uncomfortable, and it does drive a lot of friction," Christie says. "We are going to have to make a step here, where we are creating less abrasive" conditions.

The FAA responded to the trend by instituting a "zero tolerance" policy and dishing out hefty fines – some in the tens of thousands of dollars – to a number of passengers accused of airborne outbursts.

"We are focusing on the symptom, rather than the root cause," says Biffle, adding that such disturbances are uncommon but become high-profile thanks to social media. "The root cause is…. you've got to [war a mask] on a plane."

Plaintiffs' Exhibit 402

*TRAVEL NEWS*

≡

# A4A Won't Push for a Federal Transportation Mask Mandate Extension

 John Michael Jayme | July 25, 2021



03:54

**15 KEY TRAVEL ADVISO**

The federal transportation mask mandate is about to end on September 13. According to this mandate, people will have to wear masks in public transportation including airports and planes. Since CDC eased on masking rules, airports and airplanes have been the few remaining places where you are required to wear a mask.

It's also the number one reason why there's an increased report of unruly passengers on planes. The majority of these unruly passengers refused to wear masks.

Southwest Airlines CEO Gary Kelly, who is also the chairman of Airlines for America (A4A), said that the trade group and Southwest are not recommending an extension of the federal transportation mask mandate.

## Federal Transportation Mask Mandate Extension As Delta Variant Spreads?

President Biden announced the federal transportation mask mandate in January. The goal is to protect the passengers' and flight crews' health and improve mask compliance. This means that travelers will have to wear masks on trains, buses, planes, airports, and other transportation hubs. It was originally only up to May. But with the COVID situation in the US, it was extended until September 13.

Kelly said that airlines support the mask guidelines set by the US Centers for Disease Control and Prevention. According to the latest guidance, only unvaccinated individuals should be wearing a mask. He added though that "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate".

03:54                    15 KEY TRAVEL ADVISO

Kelly isn't sure if the Transportation Security Administration will extend or lift the mandate. According to Kelly, "That's a political question, to a degree".

The recent surge of COVID cases in the US is something that can affect the decision of TSA. Delta variant is now the dominant strain in the US. CDC currently has no comment regarding the status of the mask mandate. Caitlin Shockey in an email said that "We can't comment on pending regulatory discussions as to the future of the order".

American Airlines CEO Doug Parker said that "What they decide, we'll enforce".



**John Michael Jayme**
*John Michael Jayme is a Travel Analyst for The Jet Set. He writes about news and events affecting the travel industry.*

# READ MORE

03:54                                    15 KEY TRAVEL ADVISO

Plaintiffs' Exhibit 403

viewfromthewing.com

# Southwest Airlines CEO: Let Our Vaccinated Passengers Take Off Their Masks! - View from the Wing

*About Gary Leff*

2-3 minutes

---

Southwest Airlines CEO Gary Kelly says he – and the airline lobbying group he leads – wants to see the federal transportation mask mandate end September 13 and he also says he believes airline passengers should be able to follow the same guidance set out by the CDC for everyone else – that no mask is needed if you've been vaccinated.

That would be cumbersome to enforce – think wristbands, for instance – but might actually encourage air travelers to get vaccinated.

In any case, enforcement might not be needed since the primary route of virus spread is from one unvaccinated person to another, which for most is an individual choice they're making to remain at risk. Those choosing to get the vaccine, and protect themselves and others, shouldn't have a cost imposed on them by other passengers unwilling to do so. And the paper and string that counts as a mask on board isn't very protective in any case.

While Southwest's Kelly is being reported as "the first U.S. airline

executive to publicly state what is in effect support for letting the mandate expire" for comments made during the carrier's earnings call, earlier this week United Airlines CEO Scott Kirby told CNBC that he hopes the federal transportation mask mandate expires September 13 as well.

While American Airlines CEO Doug Parker dodged the question on his own earnings call this week, he has told American Airlines employees he expects the mask mandate to be lifted September 13 and that's when the airline can serve alcohol in coach again.

Parker says "we've got to get to" September 13th, and that because most inflight incidents are over masks things are going to get even harder on board as that date approaches. In the meantime they're seeing more passengers bring their own booze on board planes.

Plaintiffs' Exhibit 404

usatoday.com

# Will the mask mandate for flights be extended? Southwest Airlines CEO says airlines not pushing for it

3-4 minutes     `July 22, 2021; updated July 27`

Airplanes and airports are among the few remaining places where face masks are required, but they might not be after Sept. 13if the rule isn't extended.

Southwest Airlines CEO Gary Kelly, chairman of industry lobbying group Airlines for America (A4A), said Thursday that Southwest and the trade group are not recommending another extension of the federal transportation mask mandate.

The mandate, which airlines and their unions requested to help with passenger mask compliance and to protect the health of flight crews, was put in place by President Joe Biden in January. The mandate, which applies to trains, planes and airports, buses and transportation hubs, was initially due to expire in May but was extended through Sept. 13, with the blessing of airlines.

Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews.

Kelly, answering reporter questions during Southwest's quarterly earnings conference call, said airlines support following Centers for Disease Control and Prevention guidance on masks, which says vaccinated individuals don't need one but unvaccinated individuals should wear one.

**New rules**: CDC lifts indoor mask requirement for fully vaccinated people

Unless that advice changes, he said, "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate."

Kelly said he doesn't know whether the mandate, enforced by the

Transportation Security Administration, will be extended or lifted.

"That's a political question, to a degree," he said.

Kelly said the government is studying the matter, given the spreading delta variant, which has caused a spike in COVID-19 cases, but he is not aware of "any efforts underway" to extend the mask mandate.

**COVID-19 and travel:** The delta variant is spreading. Should travelers be concerned?

The CDC has had no comment on the status of the mandate beyond Sept. 13.

"We can't comment on pending regulatory discussions as to the future of the order," spokesperson Caitlin Shockey said via email.

Kelly is the first U.S. airline executive to publicly express what is in effect support for letting the mandate expire, though United Airlines CEO Scott Kirby said he expected it to be lifted in September.

"What they decide, we'll enforce," American Airlines CEO Doug Parker said earlier Thursday on the airline's quarterly earnings conference call. "It's not for us to opine."

Last week, Delta CEO Ed Bastian told Wall Street analysts and investors he didn't know the fate of the mandate.

He said there are as many "pros to taking the mask requirement off as there are to keeping it on at the present time."

"I think it's important that medical experts make those decisions, not airline professionals, as we've learned through the pandemic," he said on the airline's earnings call. "They're the ones that have all the insight and the information and keeping people safe. I appreciate people not wanting to wear the mask. I don't like wearing the mask when I'm on board either, but it's something that we need to do to keep each other safe."

Los Angeles County, the most populated county in the USA, will once again require people to wear masks indoors – regardless of vaccination status – after a surge in COVID-19 cases.

Plaintiffs' Exhibit 405

forbes.com

# Why Some In The Airline Industry Want To End The Mask Mandate On Planes

*Ben Baldanza*

8-7-21

6-7 minutes



Edit Story

Aug 7, 2021,03:40pm EDT|6,517 views



I write about airlines and travel to explain this crazy industry.



The airline mask mandate is scheduled to expire in September, and some in the airline industry agree ... [+] with this though others feel it should be extended.

getty

The airline mask mandate is scheduled to expire on September 13, 2021. With this mandate in place, there has been a rise in onboard incidents that have harmed flight attendants, delayed or cancelled flights, and shown some of the worst of how society can behave.

In July, Southwest Airlines CEO Gary Kelly, the chairman of the industry group Airlines For America, indicated that U.S. airlines would like to see the mandate mandate lapse. Not extending the mandate would prevent some risks, mostly from onboard aggression and what people will continue to see as unfair and inconsistent policy application, some in the airline industry believe. When combined with the relatively safe environment of an aircraft cabin and an upcoming seasonal drop in travel, it makes sense to some to let the mandate end as scheduled in September.

Yet the rapid spread of the Delta variant of the coronavirus is making everyone re-think what the next steps should be – Airlines For America is not taking a public position on the issue — and certainly the federal government will consider extending the mask mandate on airplanes if it determines that the Delta variant presents too much risk.

**Airplanes Are Safer Than Most Places**

By now, it's old news that airplane air flows vertically and is replaced with new outside air every few minutes. Thanks to this, several studies have suggested that the transmission of viruses onboard a plane is rare, which is one key point that proponents of dropping the

mask mandate on planes point to. Yet the higher rate of contagion with the Delta variant
will challenge this view. Letting the mask mandate expire on its current chosen date with
the Delta variant active poses some risk not found with the original virus.

**Emotions Run High When Flying**

Flying is a stressful time for many flyers. People who normally have a lot of control in their
lives give up all control, and are subject to delays, unexpected events, and more and must
adapt. Not everyone is good at this. When this atmosphere is combined with tensions
around mask policy, we have seen a summer with more onboard skirmishes and more
people injured than ever before. The FAA has suggested big fines in some cases, but
these will take years to go through the courts and likely be dropped or settled for pennies
on the dollar. The fines make good headlines and may deter some otherwise bad
behaviors, but the root cause of most of these incidents has been the mandated mask
policy. It's not the policy itself, but the inconsistency of that policy with other parts of life.
While many of us may be able to clearly understand why we must wear a mask on a plane
but don't have to in restaurant, to others this makes no sense. Put that view in the
stressful and emotional environment of an airline flight and the results we've seen this
summer are not totally surprising.

**Many Flight Attendants Are Vaccinated**

Flight attendants are on the front line of the abusive behavior by passengers, and the
national flight attendant unions supported the initial mask mandate and its extension to
September. That is understandable, but also during the summer vaccinations are
continuing and now 70% of adults in the U.S. have had at least one shot of a vaccine.
Further, United Airlines is now requiring all employees to be vaccinated and so it's
reasonable to assume that more flight attendants are vaccinated than the population as a
whole. As travel reduces naturally in the fall, letting the mandate expire would lower the
tensions onboard significantly and greatly reduce the number of potentially dangerous
confrontations that flight attendants must face.

But then there's the health risks to passengers and those they come into contact with after
their trip.

The fairly widespread distribution of vaccines in the U.S. and Europe has made a huge
difference. Today, nearly all of the deaths related to Covid are in people who have chosen
not to be vaccinated.

However, the delta variant is far more contagious than previous forms of the coronavirus –
research suggests it's anywhere from 40% to 60% more transmissible than the alpha
variant and twice more than the original Wuhan form of the virus. And research that
showed that vaccinated people who are infected pose as much of a risk to spread the

virus to others as unvaccinated people led the Centers for Disease Control to recommend last week that vaccinated people wear masks in areas where the virus is spreading rapidly – which is most of the U.S. right now.

A number of cities and businesses have moved to reinstate mask mandates. All this may make it less likely that the federal government will let the mask mandate on airplanes lapse.

Managing risk does not mean eliminating risk. Managing risk means mitigating the most significant risk, and finding a good balance between different types of risk. There would be no inflight incidents or onboard transmission if we made it illegal to fly, for example, but the cost of that to society is far worse than the risk of onboard incidents. In a similar way, ==we know that the mask mandate upsets enough customers to have created a difficult summer for flight attendants and airlines.== We also know that more people are vaccinated each day, and that travel will seasonally drop once we hit September. Given these balancing forces, there will be arguments to both let the mandate expire and to extend it. In either case, clearly the answer is to get more people vaccinated!

Follow me on LinkedIn. Check out my website.



I am the former CEO of Spirit Airlines, where my strong team transformed the company into the highest margin airline in North America and created a new model for air

…

- Print
- Reprints & Permissions

SpaceX Launches Its 'Operational' Flight To The ISS

Plaintiff's Exhibit 406

TRAVEL ALERT                                    Sign up for our latest deals!

We are committed to you and your well-being. Learn more.



# COMMITTED TO YOU

Frontier remains committed to ensuring that the sky is for everyone. This means going the extra mile in all that we do for you.



**HEALTH & SAFETY**
Learn More



**TRAVEL TIPS**
Learn More



**HELPFUL VIDEOS**
Learn More



**CHANGE FEES**
Learn More

Find the Spanish Committed To You page here

## FROM CHECK-IN TO ARRIVAL AT YOUR DESTINATION, WE ARE COMMITTED TO YOUR HEALTH AND SAFETY

The next time you fly with us, you'll notice that we've made several changes. We've been working around the clock to improve our customer experience and to safeguard your well-being. Whether you are planning a trip back home to give mom a hug or dreaming of planting your feet in the sand, rest assured that the extra measures we are taking are designed to provide a safe and pleasant travel experience from the time you check-in until you arrive at your destination.

*We'd like to share how Frontier is 'Committed to You' and what that means for you and your family when you're ready to travel again.*



Frontier Airlines Magic

## STEPS WE'RE TAKING TO SUPPORT YOUR WELL-BEING & COMFORT



### ENHANCED CLEANING ON & OFF THE PLANE

Our **Ticket Counters, Gate Areas, and Aircraft** are getting extra attention. We've increased cleaning intervals with EPA approved anti-virus cleaning solutions. Here's a more specific look at what we're doing onboard:

- **Before Every Flight** the aircraft is cleaned with a focus on passenger seating, cabin walls, overhead bins, galleys and lavatories.
- **Aircraft with Extended Time Between Flights** are cleaned to include a wipe down of all customer and crew touchpoints - lavatories, seats, armrests, tray tables, walls, overhead panels and bins, window shades and galleys - with a disinfectant EPA rated to be effective against viruses, including SARS-CoV-2, the virus that causes COVID-19.
- **Every night** while our planes are positioned overnight, our Aircraft Appearance Team spends 4 to 6 hours thoroughly cleaning the aircraft's interior from top to bottom using industry-recommended disinfectant.
- **Monthly** enhanced deep cleaning of the entire aircraft



## TEMPERATURE SCREENING

To help ensure the well-being of everyone onboard, a non-invasive temperature screening taken on the forehead using a touchless thermometer will be taken at the gate for all passengers and crew.

Anyone with a temperature of 100.4 degrees Fahrenheit or higher will not be able to board the plane. If time allows, we will give customers the opportunity to rest before receiving a second check. If the second temperature screening is 100.4 degrees or higher, our team will help the customer to rebook travel on a later date when they are feeling better.



## QUICK & EASY HEALTH ACKNOWLEDGEMENT

When you check-in for your flight on our website or mobile app, you will be asked to accept the following health acknowledgment:

- You will have your temperature screened by a touch-less thermometer prior to boarding. Anyone with a temperature of 100.4 degrees or higher will not be allowed to fly.
- You will **wear a face covering over your nose and mouth throughout your journey,** including ticket counters, gate areas, and onboard our aircraft.
- In the last 14 days, neither you, nor anyone in your household or that you have come in close contact with, has tested positive for, exhibited symptoms of, or been advised to quarantine for COVID-19.
- You will wash your hands/sanitize before boarding the flight.

# Plaintiffs' Exhibit 407

## Two Major Airline CEOs Question the Need for Masks on Planes

By Chris Isidore, CNN Business
Updated 11:29 PM ET, Wed December 15, 2021

New York (CNN Business) The CEOs of two of the nation's major airlines say they don't think wearing masks on planes does much to help limit exposure to Covid.

The comments from American Airlines (AAL) CEO Doug Parker — the nation's largest carrier — and Southwest (LUV) CEO Gary Kelly came during a hearing about the financial support that airlines received from the federal government in 2020 and 2021. But the topic of masks arose via a question from Sen. Roger Wicker, the ranking Republican on the Senate committee holding the hearing.

"I think the case is very strong that masks don't add much, if anything, in the air cabin environment. It is very safe and very high quality compared to any other indoor setting," said Kelly.

Both Kelly and Parker, who each have announced plans to retire as CEOs in the coming months, mentioned that high-grade HEPA air filters on planes capture virtually all airborne contamination and air quality is helped by how frequently cabin air is exchanged with fresh air from outside the cabin.

"I concur. An aircraft is the safest place you can be," said Parker. "It's true of all of our aircraft — they all have the same HEPA filters and air flow."

After the hearing, American Airlines tried to walk back Parker's remarks. It issued a statement claiming that his concurrence with Kelly was on the point about the quality of the air in the aircraft cabin, not mask requirements.

Sara Nelson, the president of the Association of Flight Attendants, testified at the hearing that not all aircraft are equipped with the same quality of air filters. For example, some older planes do not have HEPA filters, she said.

The mask requirement is still a source of controversy. Much of the steep rise of in incidents involving unruly passengers over the last two years have revolved around passengers being ordered to wear masks.

"I think that is probably for the medical community to decide rather than me," Nelson added. "What I will add is that the studies that have been done [on masks]....were done with mannequins that were sitting straight forward with masks on, not removing them, not eating."

"It is important to recognize that the safe, controlled environment on planes...includes the HEPA filters that are not on all aircraft," she concluded.

Masks on planes are required by the federal government, following the guidance of the Centers for Disease Control. The DOT did not immediately respond to a request for comment on the testimony.
The remarks by Kelly and Parker were criticized by one committee member, Sen. Ed Markey, a Massachusetts Democrat.

"I'm shocked that some of the CEOs here today have suggested we no longer need masks mandates on planes," he said. "In the face of Omicron, children under five who still cannot be vaccinated....and that we still allow unvaccinated people on planes." He said it was "immoral" to take the position that people on planes could be forced to sit next to unvaccinated people who are not wearing masks.

Nelson, who Markey was questioning, agreed that while she hopes that one day masks will not be required, she does not support lifting the mask mandate at this time.

"I believe that the government has taken a very responsible approach to this," she said. "We believe it should continue to stay in place. It's a workplace safety issue. We do need a consistent message though. It troubles me too to hear different messages. I would hope we are going to stay on the same messages and follow the medical experts and do what's necessary to keep everybody safe."
Nelson said that the confidence in the safety of air travel is the reason people are willing to buy airline tickets in near pre-pandemic levels today. She said that the mask mandate is one of the factors leading to that confidence by airline passengers.

https://www.cnn.com/2021/12/15/business/airline-ceos-question-masks-on-plane-rule/index.html

dallasnews.com

# Southwest Airlines CEO says face masks 'don't add much' with airplane filtration systems

*By Kyle Arnold3:55 PM on Dec 15, 2021 CST*

4-5 minutes

---

Update: American Airlines CEO Doug Parker initially said "I concur" with comments from Gary Kelly in Wednesday's U.S. Senate Hearing, but American later clarified that Parker "concurred with the comments made by other witnesses about the high quality of aircraft cabin air, and did not intend to cast doubt on the necessity of face masks on planes."

Southwest Airlines CEO Gary Kelly told U.S. senators Wednesday that the air in airplane cabins is clean enough that face masks don't provide significant additional protection to passengers from COVID-19.

"I think the case is very strong that masks don't add much, if anything, in the air cabin," said Kelly, who runs Dallas-based Southwest. "The environment is very safe, very high quality compared to any other indoor setting."

"I concur," said Doug Parker, CEO of Fort Worth-based American Airlines. "The aircraft is the safest place you can be. That's true of all of our aircraft."

American later clarified that Parker's remarks were intended to agree with "the comments made by other witnesses about the high quality of aircraft cabin air, and did not intend to cast doubt on the necessity of face masks on planes," spokeswoman Stacy Day said.

The airline executives made the comments at a U.S. Senate committee hearing into how the airlines have used $54 billion in federal grants since March 2020 to help them financially survive the pandemic.





Kelly's face mask comments contradict efforts by the Biden administration to require them on airplanes, in airports and on other forms of interstate transportation, such as buses and trains. President Joe Biden made airplane face mask mandates among his first executive orders when he took office in January and has since renewed the face mask mandate through March 18, 2022.

Airlines have been requiring face masks on airplanes since the summer of 2020 and then subsequently partnered with the Department of Defense and research universities such as Harvard to show that HEPA filtration systems on airplanes make it difficult for coronavirus to spread among passengers.

Over the last year, the Federal Aviation Administration and the Department of Transportation have noted a sharp uptick in reports of unruly passengers, often violent outbursts that have resulted in assaults on crew members such as flight attendants and gate agents. There have been 5,664 reports so far this year, according to the FAA's data through Dec. 14, and 4,072 of those incidents have been tied to mask-related problems.

Kelly, who announced he is retiring in February, is also the chairman of Airlines 4 America, the main trade group for major airlines.

Parker, in a statement provided to the committee ahead of the hearing, said: "Airlines have required masks since early in the pandemic as an additive health and safety measure, and our industry strongly supported the introduction of the federal mask mandate."

Scott Kirby, CEO of Chicago-based United Airlines, said several studies show that airplane cabins are safe. Those studies are often industry-funded.

"The conclusion of that is that effectively anywhere that you're going to be indoors, the airplane is the safest place that you can be indoors," Kirby said. "It's because the air filters are safer than a theater, safer actually than an intensive care unit because we have HEPA-grade filters."

Kirby said airplane filters cycle air 20 to 30 times an hour, as opposed to twice or three times an hour in a hospital ICU. The studies from airlines also show that the way the air flows in cabins, from the ceiling to the floor, also reduces the risk of COVID-19 spread among passengers.

However, those studies were conducted on mannequins and may not be sufficient to cover the complexity of humans, said Sara Nelson, president of the Association of Flight Attendants-CWA. She also said that not all passengers have been vaccinated or have access to vaccines.

Nelson said she believes the mask mandate should stay in place for now.

"The filtration system is different from airline to airline or from aircraft to aircraft, so not all aircraft have the HEPA filtration," Nelson said. "What I will tell you is we look forward to the day that we no longer have the mask requirement. We are simply trying to get through this pandemic and have had to enforce this to keep everyone safe."

foxbusiness.com

# Southwest CEO: 'Masks don't add much, if anything' against COVID-19 on planes

*Breck Dumas*

4-5 minutes

`12-15-21`

---

Southwest Airlines CEO Gary Kelly told a U.S. Senate panel on Wednesday that "masks don't add much, if anything" in fighting the spread of COVID-19 on airplanes, calling into question the reasoning behind mask mandates on flights imposed both by airlines and the Biden administration.

Kelly made the comment during a hearing on airline oversight before the Senate Committee on Commerce, Science and Transportation, and other industry chiefs joined him in emphasizing that commercial aircraft filtration systems make them the safest indoor space there is.



Gary Kelly, chief executive officer of Southwest Airlines Co., speaks during a Senate Commerce, Science and Transportation Committee hearing in Washington, D.C., U.S., on Wednesday, Dec. 15, 2021. (Photographer: Chip Somodevilla/Getty Images/Bloomber (Photographer: Chip Somodevilla/Getty Images/Bloomberg via Getty Images / Getty Images)

**AIR TRAVELERS TO US SET TO FACE TOUGHER COVID-19 TESTING**

Ranking member Sen. Roger Wicker, R-Miss., asked the CEOs about air quality on planes while posing the question, "Will we ever be able, do you think, to get on an airplane without masks?"

Speaking to discussions on air quality, Kelly said, "The statistics I recall is that 99.97% of airborne

pathogens are captured by the [high efficiency particulate air] filtering system, and it's turned over every two or three minutes."

"I think the case is very strong that masks don't add much, if anything, in the air cabin environment," Kelly said. "It's very safe, and very high quality compared to any other indoor setting."



Sen. Roger Wicker (R-Miss.) during hearing at the Senate Commerce, Science, and Transportation Committee on January 26, 2021, in Washington, DC. (Photo by Tom Williams-Pool/Getty Images) (Photo by Tom Williams-Pool/Getty Image / Getty Images)

**FATHER SAYS AUTISTIC SON BANNED BY AIRLINE, DENIED MEDICAL MASK EXEMPTION: 'MIND-BLOWING'**

Wicker then asked for a response from American Airlines CEO Doug Parker, who replied, "I concur. The aircraft is the safest place you can be – it's true of all of our aircraft. They all have these HEPA filters and the same airflow."

United Airlines CEO Scott Kirby told Wicker that, in fact, air quality on planes is "safer, actually, than an intensive care unit," adding that "being next to someone on an airplane – sitting next to them – is the equivalent of being 15 feet away from them in a typical building."

But most places in the U.S. no longer require masks indoors, save for certain Democrat-controlled jurisdictions and areas under federal oversight.

Airlines imposed mask requirements on their own in 2020 during the COVID-19 pandemic, and several welcomed President Biden's federal mandate for wearing masks on commercial flights after he took office. The federal rule was slated to expire in September, but the Transportation Security Administration extended it through Jan. 18.



President Joe Biden addresses the 76th Session of the U.N. General Assembly on September 21, 2021 at U.N. headquarters in New York City. . (Photo by Timothy A. Clary-Pool/Getty Images) ((Photo by Timothy A. Clary-Pool/Getty Images) / Getty Images)

**GET FOX BUSINESS ON THE GO BY CLICKING HERE**

The mask requirements have caused major headaches for airlines in the way of compliance, with mask violations being the major cause of a sharp uptick in unruly behavior from passengers. In response, the FAA has upped the fines on violations for fliers who disrupt air travel and urged airlines to "take more action" on unruly passenger incidents.

Airlines have not pushed back publicly against the mandate.

When asked by FOX Business for further explanation on Kelly's comments, Southwest said in a statement, "Southwest Airlines continues to abide by the federal mask mandate for customers and employees both within the airport environment and onboard all Southwest aircraft."

Plaintiffs' Exhibit 408

   

**Mr. Jeffrey Zients**
Mr. Jeffrey Zients
Coronavirus Response Coordinator
The White House
Washington, DC  20500

February 25, 2022

Dear Mr. Zients:

We, the undersigned organizations representing the American travel and tourism business community, are grateful for the Biden Administration's continued leadership in the fight against COVID-19. With declining hospitalization rates, increased immunity, widely available vaccines and cutting-edge treatments on the horizon, America is reaching an inflection point where endemic-focused policies can replace pandemic-driven restrictions. As leading U.S. travel and business organizations, we respectfully urge the Administration to chart a clear course for replacing pandemic-era travel advisories, requirements and restrictions with endemic-focused policies of a "new normal" that enable travel to resume fully, freely and safely.

Throughout the pandemic, many of us have strongly supported federal policies to combat COVID-19 and keep travel moving, including a vaccine requirement to restart international travel and the federal mask mandate. Travel businesses also implemented a layered approach to public health and safety that aligned with or exceeded guidance from the Centers for Disease Control and Prevention (CDC).

Unfortunately, many of these same policies also came with the devastating—although, at the time, necessary—consequences of severely limiting and discouraging travel. In 2021, as many other sectors of the economy reached a full recovery:

- Business travel spending was approximately 50% below 2019 levels; and
- International travel spending was down a staggering 78% compared to 2019.

Given travel's slow economic recovery, and in light of the improved public health metrics in the U.S. and medical advancements to prevent the worst outcomes of COVID-19, we encourage the Administration to immediately remove travel requirements that no longer fit with the current environment and to set clear timelines and metrics for when others will be lifted.

For example, we strongly encourage the Biden Administration to immediately repeal the pre-departure testing requirement for vaccinated inbound international air travelers. This would accelerate the return of international travel to and from the U.S. without increasing the spread of COVID-19. For other travel protocols, such as the federal mask mandate for public transportation and the vaccination requirement for inbound international travel, it is time to set clear timetables and metrics for when these pandemic-focused travel requirements can be lifted.

Please find attached a list of federal travel advisories, requirements and restrictions that we believe should be reevaluated, updated or removed. Of course, reasonable and effective risk-based policies can be reinstated at any time if new variants of concern emerge or if the public health situation deteriorates. However, we believe it is time for the Administration to begin leading the country toward a new normal for travel and on a faster road to a full economic recovery.

Sincerely,

Airlines for America
American Hotel & Lodging Association
U.S. Chamber of Commerce
U.S. Travel Association

1

## RECOMMENDATIONS FOR A PATHWAY TO THE NEW NORMAL:

- **Remove the pre-departure testing requirement for all fully vaccinated inbound international arrivals.** Because of the pervasiveness of the omicron variant, increased immunity and higher vaccination in the U.S., the pre-departure testing requirement can be eliminated for fully vaccinated individuals without increasing the spread of COVID-19. Removing the pre-departure testing requirement will incentivize vaccination, increase demand for international travel to and from the U.S., and better align passenger aviation entry requirements with those at U.S. land border points of entry and other major travel-trade partners abroad (e.g., the United Kingdom and European Union).

- **By March 18, repeal the Federal mask mandate for public transportation or provide a clear roadmap to remove the mask mandate within 90 days.** The federal mask mandate for transportation networks is set to expire on March 18. The Administration should use this date as a decision point for either repealing this mandate or announcing a plan and timeline to repeal the federal mask mandate within the subsequent 90 days. Airplanes are already equipped with advanced air filtration systems, and airports have made large investments in air filtration, sanitation and layouts. COVID-19 hospitalization rates have decreased significantly and the mask mandate should be lifted to reflect the improved public health environment.

- **End "avoid travel" advisories and the use of travel bans.** The CDC should ensure that Americans are not dissuaded from traveling to any place with COVID-19 case rates that are equal to, or less than, the case rates prevailing in the U.S. As conditions continue to improve, the CDC should end all "avoid travel" advisories for vaccinated individuals. In the future, the Biden Administration should avoid the use of travel bans from specific countries, which are not recommended by the World Health Organization (WHO) and have proven to be an ineffective means of preventing the spread of COVID-19.

- **Work with other countries to normalize travel conditions and entry requirements.** As the pandemic abates and the Administration works to ease domestic and international travel requirements, it should encourage other nations to do the same and ensure that Americans are afforded the same travel privileges to other nations that their citizens have in the U.S. This should include an effort to align entry protocols with countries representing the top 20 inbound travel markets for the U.S., which include the United Kingdom and several nations in the European Union, as well as a coordinated effort within the State Department to resume routine visa processing in those aforementioned inbound travel markets. This will not only help avoid a confusing patchwork of different vaccination, testing and entry requirements across the globe, but it will also help the U.S. economy achieve the full recovery that it has been searching for since the pandemic's beginning.

- **By June 1, develop benchmarks and timelines for a pathway to the new normal that repeals pandemic-focused travel restrictions.** As COVID-19 and its variants become no more deadly than many other illnesses which are not closely monitored—or for which there are no travel implications—all remaining restrictions, including international vaccine and testing mandates, as well as any remaining mask mandates, should be removed. We strongly encourage the Administration to chart a path to the new normal and announce a plan to replace pandemic-focused travel restrictions with more permanent travel policies.

- **Send a clear message to the American public and the world that it is safe to travel again, particularly for vaccinated individuals.** Nations around the world are delivering public messages from high-level government officials and investing in travel promotion campaigns to encourage the resumption of domestic and international travel. Since the start of the pandemic, the federal government's advisories, policies and public messaging have focused on discouraging or actively restricting domestic and international travel. It is time for high-level officials within the Administration to publicly encourage travel to and within the U.S. Doing so would send a clear message to U.S. businesses, trading partners and travelers alike that America is once again open for business.

Plaintiffs' Exhibit 409



**Airlines for America®**
We Connect the World

March 23, 2022

The Honorable Joseph R. Biden Jr.
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear Mr. President:

We appreciate your leadership throughout the COVID-19 crisis and now as the country recovers from the impacts of the pandemic. During the global health crisis, U.S. airlines have supported and cooperated with the federal government's measures to slow the spread of COVID-19. We are encouraged by the current data and the lifting of COVID-19 restrictions from coast to coast, which indicate it is past time to eliminate COVID-era transportation policies.

Our industry has leaned into science at every turn. At the outset, we voluntarily implemented policies and procedures -- mandating face coverings; requiring passenger health acknowledgements and contact tracing information; and enhancing cleaning protocols – to form a multi-layered approach to mitigate risk and prioritize the wellbeing of passengers and employees. We supported the Centers for Disease Control and Prevention (CDC) as they made some of these policies federal mandates and imposed additional measures, like predeparture testing and vaccination requirements for international travelers, in an to attempt to slow the introduction of variants into the United States.

However, much has changed since these measures were imposed and they no longer make sense in the current public health context. The persistent and steady decline of hospitalization and death rates are the most compelling indicators that our country is well protected against severe disease from COVID-19. Given that we have entered a different phase of dealing with this virus, we strongly support your view that "COVID-19 need no longer control our lives." **Now is the time for the Administration to sunset federal transportation travel restrictions – including the international predeparture testing requirement and the federal mask mandate – that are no longer aligned with the realities of the current epidemiological environment**.

<u>**Predeparture Test Requirement**</u>

The predeparture test requirement, imposed to slow the introduction of variants into the U.S., has outlived its utility and stymies the return of international travel. The United Kingdom (UK), the European Union and Canada have recognized this reality and lifted travel restrictions. The U.S. inconsistency with these practices creates a competitive disadvantage for U.S. travel and tourism by placing an additional cost and burden on travel to the U.S. Further, many outbound travelers are not willing to risk being stranded overseas. In the Tenth Meeting of the Emergency Committee on January 19, 2022, the World Health Organization (WHO) noted that **"the failure**

March 23, 2022
Page 2

of travel restrictions introduced after the detection and reporting of Omicron variant to limit international spread of Omicron demonstrates the ineffectiveness of such measures over time." The WHO recommended that countries consider a risk-based approach to the facilitation of international travel by lifting measures, like testing and/or quarantine requirements, for individual travelers who are fully vaccinated with COVID-19 vaccines listed by the WHO.[1] Finally, a recent study by Oxera and Edge Health that examined the effectiveness of travel restrictions in Europe concluded that such measures have failed to prevent the spread of COVID-19.[2]

**Mask Mandate**

The science clearly supports lifting the mask mandate, as demonstrated by the recently released CDC framework indicating that 99 percent of the U.S. population no longer need to wear masks indoors. Several studies completed **before we had the added layer of widespread availability of vaccines**, including one from Harvard's T.H. Chan School of Public Health[3] and another from the U.S. Department of Defense[4], have concluded that an airplane cabin is one of the safest indoor environments due to the combination of highly filtered air and constant air flow coupled with the downward direction of the air. Lifting the mask mandate in airports and onboard aircraft can be done safely as England has done. Importantly, the effectiveness and availability of high-quality masks for those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so. It makes no sense that people are still required to wear masks on airplanes, yet are allowed to congregate in crowded restaurants, schools and at sporting events without masks, despite none of these venues having the protective air filtration system that aircraft do.

It is critical to recognize that the burden of enforcing both the mask and predeparture testing requirements has fallen on our employees for two years now. This is not a function they are trained to perform and subjects them to daily challenges by frustrated customers. This in turn takes a toll on their own well-being.

The high level of immunity in the U.S., availability of high-quality masks for those who wish to use them, hospital-grade cabin air, widespread vaccine availability and newly available therapeutics provide a strong foundation for the Administration to lift the mask mandate and predeparture testing requirements. We urge you to do so now.

We are requesting this action not only for the benefit the of the traveling public, but also for the thousands of airline employees charged with enforcing a patchwork of now-outdated regulations implemented in response to COVID-19.

Respectfully,

---

[1] https://www.who.int/news/item/19-01-2022-statement-on-the-tenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(covid-19)-pandemic
[2] https://www.iata.org/contentassets/31f976cb5de0427cbe4a85958857a472/oxera.pdf
[3] https://npli.sph.harvard.edu/resources-2/aviation-public-health-initiative-aphi/
[4] https://www.ustranscom.mil/cmd/panewsreader.cfm?ID=C0EC1D60-CB57-C6ED-90DEDA305CE7459D

March 23, 2022
Page 3

Ben Minicucci
CEO
Alaska Air Group

W. Douglas Parker
Chairman & CEO
American Airlines

John W. Dietrich
President & CEO
Atlas Air Worldwide

Ed Bastian
CEO
Delta Air Lines

Scot Struminger
EVP & CEO, Aviation
FedEx Express

Peter R. Ingram
President & CEO
Hawaiian Airlines

Robin Hayes
CEO
JetBlue Airways

Gary C. Kelly
Chairman
Southwest Airlines

Scott Kirby
CEO
United Airlines Holdings

Brendan Canavan
President
UPS Airlines

Nicholas E. Calio
President & CEO
Airlines for America

March 23, 2022
Page 4


cc:    The Honorable Pete Buttigieg, U.S. Secretary of Transportation
        The Honorable Alejandro Mayorkas, U.S. Secretary of Homeland Security
        The Honorable Gina Raimondo, U.S. Secretary of Commerce
        The Honorable Ron Klain, White House Chief of Staff
        The Honorable Steve Ricchetti, Counselor to the President
        The Honorable Jeffrey Zients, White House Coronavirus Response Coordinator
        The Honorable Brian Deese, Director of the National Economic Council

Plaintiffs' Exhibit 410

iata.org

# Air Travel Sees Strong Demand Recovery in January but Impacted by Omicron

9-11 minutes                    3-10-22

---

**Translations:**

国际航协：2022年1月份客运需求强劲复苏 但仍受奥密克戎影响 (pdf)

**Geneva** - The International Air Transport Association (IATA) announced that the recovery in air travel slowed for both domestic and international in January 2022 compared to December 2021, owing to the imposition of travel restrictions following the emergence of Omicron last November.

**Note: We are returning to year-on-year traffic comparisons, instead of comparisons with the 2019 period, unless otherwise noted. Owing to the low traffic base in 2021, some markets will show very high year-on-year growth rates, even if the size of these markets is still significantly smaller than they were in 2019.**

- Total demand for air travel in January 2022 (measured in revenue passenger kilometers or RPKs) was up 82.3% compared to January 2021. However, it was down 4.9% compared to the previous month (December 2021) on a seasonally adjusted basis.

- January domestic air travel was up 41.5% compared to the year-ago period but fell 7.2% compared to December 2021 on a seasonally adjusted basis.

- International RPKs rose 165.6% versus January 2021 but fell by 2.2% month-on-month between December 2021 and January 2022 on a seasonally adjusted basis.

"The recovery in air travel continued in January, despite hitting a speed bump called Omicron. Strengthened border controls did not stop the spread of the variant. But where population immunity was strong, the public health systems were not overwhelmed. Many governments are now adjusting COVID-19 polices to align with those for other endemic viruses. This includes lifting travel restrictions that have had such a devastating impact on lives, economies and the freedom to travel," said Willie Walsh, IATA's Director General.

| AIR PASSENGER MARKET DETAIL (jAN 2022) | wORLD sHARE | rpk | ask | plf (%-PT)[2] | plf (LEVEL)[3] |
|---|---|---|---|---|---|
| **Total Market** | **100%** | **82.3%** | **51.8%** | **10.8%** | **64.5%** |

| AIR PASSENGER MARKET DETAIL (jAN 2022) | wORLD sHARE | rpk | ask | plf (%-PT)[2] | plf (LEVEL)[3] |
|---|---|---|---|---|---|
| Africa | 1.9% | 21.3% | 10.6% | 5.5% | 62.3% |
| Asia Pacific | 27.5% | 19.4% | 15.7% | 1.8% | 57.6% |
| Europe | 24.9% | 161.4% | 106.7% | 14.3% | 68.2% |
| Latin America | 6.5% | 80.5% | 59.2% | 9.2% | 78.2% |
| Middle East | 6.5% | 128.1% | 64.8% | 16.4% | 59.1% |
| North America | 32.7% | 109.7% | 59.0% | 16.0% | 66.3% |

**International Passenger Markets**

**European carriers'** January international traffic rose 225.1% versus January 2021, which was up slightly compared to a 223.3% increase in December 2021 versus the same month in 2020. Capacity rose 129.9% and load factor climbed 19.4 percentage points to 66.4%.

**Asia-Pacific airlines** saw their January international traffic climb 124.4% compared to January 2021, down significantly from the 138.5% gain registered in December 2021 versus December 2020. Capacity rose 54.4% and the load factor was up 14.7 percentage points to 47.0%, still the lowest among regions.

**Middle Eastern airlines** had a 145.0% demand rise in January compared to January 2021, well down compared to the 178.2% increase in December 2021, versus the same month in 2020. January capacity rose 71.7% versus the year-ago period, and load factor climbed 17.5 percentage points to 58.6%.

**North American carriers** experienced a 148.8% traffic rise in January versus the 2021 period, significantly decreased versus the 185.4% rise in December 2021 compared to December 2020. Capacity rose 78.0%, and load factor climbed 17.0 percentage points to 59.9%.

**Latin American airlines** saw a 157.0% rise in January traffic, compared to the same month in 2021, an upturn over the 150.8% rise in December 2021 compared to December 2020. January capacity rose 91.2% and load factor increased 19.4 percentage points to 75.7%, which easily was the highest load factor among the regions for the 16th consecutive month.

**African airlines'** traffic rose 17.9% in January 2022 versus a year ago, a slowdown compared to the 26.3% year-over-year increase recorded in December 2021. January 2022 capacity was up 6.3% and load factor climbed 6.0 percentage points to 60.5%.

**Domestic Passenger Markets**

| AIR PASSENGER MARKET DETAIL (jAN 2022) | WORLD SHARE | rpk | ask | plf (%-PT)[2] | plf (LEVEL)[3] |
|---|---|---|---|---|---|
| **Domestic** | **62.4%** | **41.5%** | **27.2%** | **6.8%** | **67.4%** |
| Domestic Australia | 0.7% | 33.4% | 43.0% | -3.8% | 53.4% |
| Domestic Brazil | 1.9% | 35.5% | 32.3% | 2.0% | 83.5% |
| Domestic China P.R. | 17.8% | -0.1% | 3.2% | -2.0% | 60.6% |
| Domestic India | 2.2% | -18.0% | -13.7% | -3.4% | 65.6% |
| Domestic Japan | 1.1% | 107.0% | 51.1% | 11.7% | 43.4% |
| Dom. Russian Fed. | 4.5% | 23.8% | 21.5% | 1.6% | 84.4% |
| Dom. US | 25.7% | 97.8% | 51.7% | 16.1% | 69.0% |

**Japan's** domestic demand was up 107%, which was the fastest year-on-year growth recorded, although on a seasonally adjusted basis, January 2022 traffic slipped 4.1% from December.

**India's** domestic RPKs fell by 18% year-on-year in January , which the biggest decline recorded for any of the domestic markets tracked by IATA. On a month-on-month basis, seasonally adjusted RPKs dropped by nearly 45% between December and January.

## 2022 vs 2019

Despite the strong traffic growth recorded in January 2022 compared to a year ago, passenger demand remains far below pre-COVID-19 levels. Total RPKs in January were down 49.6% compared to January 2019. International traffic was down 62.4%, with domestic traffic off by 26.5%.

| AIR PASSENGEr MARKET (jAN 2022 VS JAN 2019) | wORLD sHARE in 2021 | RPK | ask | plf (%-PT)[2] | plf (LEVEL)[3] |
|---|---|---|---|---|---|
| **TOTAL MARKET** | **100%** | **-49.6%** | **-37.7%** | **-15.2%** | **64.5%** |
| International | 37.6% | -62.4% | -51.3% | -18.2% | 61.7% |

| AIR PASSENGEr MARKET (jAN 2022 VS JAN 2019) | wORLD sHARE in 2021 | RPK | ask | plf (%-PT)[2] | plf (LEVEL)[3] |
|---|---|---|---|---|---|
| Domestic | 62.4% | -26.5% | -13.3% | -11.0% | 67.4% |

**Russia-Ukraine Conflict**

January figures do not include any impact from the Russia-Ukraine conflict which began at the end of February. The resulting sanctions and airspace closures are expected to have a negative impact on travel, primarily among neighboring countries.

- The Ukraine market accounted for 3.3% of European passenger traffic and 0.8% of global traffic in 2021.

- The Russian international market represented 5.7% of European traffic (excluding Russia domestic market) and 1.3% of global traffic in 2021.

- Airspace closures have led to rerouting or cancellations of flights on some routes, mostly in the Europe-Asia but also in Asia-North America market. This impact is mitigated owing to greatly diminished flight activity since borders in Asia were largely closed owing to COVID-19. In 2021, RPKs flown between Asia-North America and Asia-Europe accounted for 3.0%, and 4.5%, respectively, of global international RPKs.

In addition to these disruptions, the sudden spike in fuel prices is putting pressure on airline costs.

"When we made our most recent industry financial forecast last autumn, we expected the airline industry to lose $11.6 billion in 2022 with jet fuel at $78/barrel and fuel accounting for 20% of costs. As of 4 March, jet fuel is trading at over $140/barrel. Absorbing such a massive hit on costs just as the industry is struggling to cut losses as it emerges from the two-year COVID-19 crisis is a huge challenge. If the jet fuel price stays that high, then over time, it is reasonable to expect that it will be reflected in airline yields," said Walsh.

**The Bottom Line**

"The past few weeks have seen a dramatic shift by many governments around the world to ease or remove COVID-19-related travel restrictions and requirements as the disease enters its endemic phase. It's vital that this process continue and even accelerate, to more quickly restore damaged global supply chains and enable people to resume their lives. One step to encourage a return to normality is to remove mask mandates for air travel. It makes no sense to continue to require masks on airplanes when they are no longer being required in shopping malls, theatres or offices. Aircraft are equipped with highly sophisticated hospital quality filtration systems and have much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed," said Walsh.

View the full January 2022 Air Passenger Market Analysis (pdf)

For more information, please contact:

Corporate Communications
Tel: +41 22 770 2967
Email: corpcomms@iata.org

**Notes for Editors**

- IATA (International Air Transport Association) represents some 290 airlines comprising 83% of global air traffic.

- You can follow us at twitter.com/iata for announcements, policy positions, and other useful industry information.

- COVID-19 media kit

- Travel Pass news & media kit

- Fly Net Zero

- Statistics compiled by IATA Economics using direct airline reporting complemented by estimates, including the use of FlightRadar24 data provided under license.

- All figures are provisional and represent total reporting at time of publication plus estimates for missing data. Historic figures are subject to revision.

- Domestic RPKs accounted for about 62.4% of the total market; the 7 domestic markets in this report accounted for 53.9% of global RPKs in 2021

- Explanation of measurement terms:

- RPK: Revenue Passenger Kilometers measures actual passenger traffic

- ASK: Available Seat Kilometers measures available passenger capacity

- PLF: Passenger Load Factor is % of ASKs used.

- IATA statistics cover international and domestic scheduled air traffic for IATA member and non-member airlines.

- Total passenger traffic market shares for 2021 by region of carriers in terms of RPK are: Asia-Pacific 27.5%, Europe 24.9%, North America 32.7%, Middle East 6.5%, Latin America 6.5%, and Africa 1.9%.

# Plaintiffs' Exhibit 411

travelweekly.co.uk

## Iata chief calls for removal of mask mandates on flights | Travel Weekly

*Jacobs Media Group Ltd*

2-3 minutes

3-10-22

Iata director general Willie Walsh has called for the removal of requirements to wear face masks on flights.

The demand came as the airline trade body revealed that recovery in domestic and international air travel slowed at the start of the new year due to travel restrictions imposed following the emergence of Omicron last November.

Total demand grew 82.3% year-on-year in January but was down 4.9% on the previous month, according to Iata.

Walsh said: "One step to encourage a return to normality is to remove mask mandates for air travel.

"It makes no sense to continue to require masks on airplanes when they are no longer being required in shopping malls, theatres or offices.

"Aircraft are equipped with highly sophisticated hospital quality filtration systems and have much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed."

Jet2 last week became the first major airline to drop the rule for passengers to wear face masks on its flights.

Reviewing airlines' January performance, Walsh said: "The recovery in air travel continued in January, despite hitting a speed bump called Omicron.

"Strengthened border controls did not stop the spread of the variant. But where population immunity was strong, the public health systems were not overwhelmed.

"Many governments are now adjusting Covid-19 polices to align with those for other endemic viruses.

"This includes lifting travel restrictions that have had such a devastating impact on lives, economies and the freedom to travel.

"The past few weeks have seen a dramatic shift by many governments around the world to ease or remove Covid-19-related travel restrictions and requirements as the disease enters its endemic phase.

"It's vital that this process continue and even accelerate, to more quickly restore damaged global supply chains and enable people to resume their lives."

The Iata statists show that international air travel rose 165.6% year-on-year but fell by 2.2% month-on-month between December 2021 and January 2022 on a seasonally adjusted basis.

Domestic air travel was up 41.5% over January 2021 but fell 7.2% compared to December.

Plaintiffs' Exhibit 412

**Willie Walsh**
Director General

8 March 2022

Mr. Jeffrey Zients
White House Coronavirus Response Coordinator
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500
United States of America

Dear Mr. Zients,

I viewed with great interest President Biden's State of the Union address and his call for a reset on COVID-19 policies.  As Director General of the international Air Transport Association (IATA) and our more than 290 international airline members, including six of the largest US passenger airlines, I strongly support the President's conclusion that COVID-19 need no longer control our lives.

As you know, the international airline industry has been significantly harmed by COVID-19 and the myriad government responses to the virus.  While we have begun to see signs of a recovery, the industry today has nearly 50% less passenger traffic than it did prior to COVID-19, and we have suffered total losses in 2020-21 of $189.5 billion with a further $11.6 billion in losses expected this year.  We do not expect global passenger numbers to return to 2019 levels until 2024.  When healthy, the global airline industry supports $3.5 trillion in global GDP and contributes $779 billion to US GDP.

Throughout the pandemic, IATA and the airlines we represent have done their best to support governments as they attempted to control the spread of this dangerous disease.  Airlines across the world voluntarily implemented health and safety protocols to provide maximum protection to our customers and crew.  We have also worked with the US Government and other governments around the world to provide operational know-how and support on various proposed COVID-19 policies.  While we have not always agreed with governments' approach on these policies, we are confident that industry and government have both benefitted from this ongoing cooperation.

The past few weeks have seen a dramatic shift by many governments around the world, including most recently my native Ireland, to ease or remove COVID-19 travel restrictions and requirements as the disease enters its endemic phase.  I understand that under your leadership the Biden Administration is studying when and how to remove COVID-19 travel restrictions. To that end, I offer the following recommendations for your consideration:

./2

**International Air Transport Association,**

800 Place Victoria, P.O. Box 113
Montréal, QC, Canada H4Z 1M1

IATA Center, 33 Route de l'Aéroport, P.O. Box 416,
Geneva 15 Airport – 1215, Switzerland.

Tel: +41 (0) 22 770 2903
Email: iatadg@iata.org

**iata.org**

- 2 –

Mask mandate: We urge the Biden Administration not to renew its mask mandate for transportation when it lapses on March 18, 2022.  It makes no sense to continue to require masks on airplanes when they are no longer being required in shopping malls, theatres or offices. Aircraft are equipped with highly sophisticated hospital quality filtration systems and have much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed. Several Scandinavian countries have removed their mask mandates while other leading governments have made mask wearing either explicitly voluntary or are no longer enforcing a masking requirement.  If the Biden Administration believes that further study of this requirement is necessary before it is lifted, we urge you to extend the mandate for only an additional 30 days or until mask mandates are removed for any other form of transportation.

Pre-departure testing:  We strongly support the growing list of leading countries that have decided to remove their pre-departure testing requirement.  President Biden is rightfully proud of the high level of full vaccination achieved in the US and the various therapeutics now available to keep those who become infected out of hospitals. Any minimal remaining public health benefits from testing are far outweighed by the detrimental impact this policy continues to have on people's travel freedom and livelihoods.

Passenger attestation:  Concurrent with removing pre-departure testing should be the removal of the requirement that passengers complete a long intrusive questionnaire on their testing and vaccination status.  The attestation results in large costs for airlines and potential threats to passengers' privacy while offering little to no health or law enforcement benefits.  We recommend that the attestation be eliminated in favor of language outlining civil and criminal penalties for presentation of false vaccination records to airline staff by non-US citizens.

While decisions as to whether or not to remove travel restrictions should be based solely on the health concerns that resulted in their being promulgated in the first place, it is important to note that countries that have removed these no-longer fit for purpose travel restrictions have already seen a significant upswing in forward bookings.  International travel was artificially constrained by COVID-19 and government policies. We expect a robust recovery when the United States and other leading countries join the European Commission, the United Kingdom and countries across the globe that have concluded that travel restrictions are no longer necessary from a public health perspective.

Over the longer term, we look forward to working with the Biden Administration to remove or modify all remaining COVID-19 travel restrictions, including the vaccination mandate for non-US citizens and the contact tracing program.

Thank you in advance for your consideration.

Yours sincerely,

**Willie Walsh**
Director General
International Air Transport Association

Plaintiffs' Exhibit 413

travelsort.com

# United, AA, Delta, JetBlue Require Face Masks for Passengers

3-4 minutes                    5-1-20



**United, American Airlines and** ==**Delta are Joining JetBlue in Requiring Passengers to Wear Face Masks**== on Flights Effective May 4 (May 11 for AA). ==JetBlue was the first U.S. airline to require passengers to don face masks during flights, announcing the measure on April 27, for flights starting on May 4, 2020.==

==Now American Airlines, Delta, Frontier and United Airlines have all also instituted the requirement to wear a face mask on board the flight, and most are also encouraging passengers to wear a face mask while at the airport as well,== in line with CDC guidance to wear face coverings in public where social distancing is difficult to maintain.

The good news is that, compared to other public transit options such as trains and buses, or even leisure transport such as cruise ships, most aircraft have high efficiency air particulate (HEPA) filters that remove over 99.9% of particles, including bacteria viruses,

with all cabin air changed every 3-5 minutes. And currently most people are wisely avoiding any nonessential flights.

Closely packed seats, especially in the main cabin, however, are antithetical to social distancing, so it's great that U.S. airlines are finally adopting these measures for passengers, in addition to crew members. After all, face masks are primarily about protecting others from the wearer, which is important given the ease of COVID-19 transmission, including by those who are asymptomatic or have very mild symptoms.

Delta Requires Face Masks for All Passengers Starting May 4

- Starting May 4, face masks will be required not only on Delta flights, but also in the check-in lobby, Delta SkyClubs, boarding gate, and jetway
- Only exceptions are for meal service and young children

American Requires Face Masks for All Passengers Starting May 11

- Passengers will be required to wear face masks on all AA flights starting May 11
- Only exceptions are for young children and those with medical conditions that prevent them from wearing a face covering

JetBlue Requires Face Masks for All Passengers Starting May 4

- Starting May 4, JetBlue will require passengers to wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, while in flight and deplaning.
- Exempt: Small children who are not able to maintain a face covering

**Recommended Posts**

New York Requires Masks in Public

Earn Frequent Flyer Miles During Coronavirus Without Flying

Review: Delta One A330 Paris to NYC

Coronavirus: Tips for Staying Healthy (and Sane)

**If you enjoyed this, join 200,000+ readers:** follow TravelSort on Twitter **or** like us on Facebook **to be alerted to new posts.**

Subscribe to TravelSort on YouTube **and** TravelSort on Instagram **for travel inspiration.**

Become a TravelSort Client **and Book 5-Star Hotels with Virtuoso or Four Seasons Preferred Partner Benefits**

# Plaintiffs' Exhibit 414

**US** | Change To **UK**

NEWS
CARDS
POINTS & MILES
REVIEWS
TRAVEL
TOOLS
COVID-19

Subscribe

Advertiser Disclosure



NEWS

# Most US airlines will soon require passenger masks

  **Zach Honig**
May 3, 2020

This post contains references to products from one or more of our advertisers. We may receive compensation when you click on links to those products. Terms apply to the offers listed on this page. For an explanation of our Advertising Policy, visit this page.

*Editor's note: This is a recurring post and has been updated with the latest airline information.*

Without any specific requirements from the federal government, U.S.-based airlines are developing their own

policies to help keep employees and passengers safe, limiting the potential for exposure to coronavirus throughout their journeys.

Earlier this week, JetBlue announced a new requirement for passengers to wear face masks beginning on May 4. Now Alaska, American, Delta, Frontier, Hawaiian, Southwest, Spirit and United have joined the fight with similar policies of their own.

## Alaska

All Alaska employees who can't maintain six feet of separation are required to wear face masks, and, as of May 11, all passengers are required to wear masks as well. The airline will have masks available for passengers who forget theirs at home.

## American

Beginning May 11, all passengers will be required to wear a face covering onboard all American Airlines flights.The carrier had already said it would require all flight attendants to wear masks as of May 1. The airline will begin issuing sanitizing wipes and masks to travelers as well — those amenities should be available across American's network within the next few weeks.

## Delta

Delta customers are required to wear a face covering or mask. Similarly, all Delta employees and contractors are required to wear face masks when they can't maintain a separation of at least six feet. According to the airline, "Face coverings will be required starting in the check-in lobby and across Delta touchpoints including Delta Sky Clubs, boarding gate areas, jet bridges and on board the aircraft for the duration of the flight – except during meal service." Face masks will be available upon request at ticket counters, gates and onboard flights.

## Frontier

Frontier customers will be required to wear masks onboard all flights beginning May 8, as an expansion of the carrier's policy for flight crews, which went into effect on April 13. Unlike with American and Delta, Frontier won't be making face masks available to customers — they'll need to bring their own.

## Hawaiian

Hawaiian Airlines is requiring all passengers to wear face coverings starting on May 8, joining a previous requirement for crew members.

The airline will also be creating more personal space at check-in, boarding and on flights. Guests will be asked to remain seated at the gate area until their row is called. In addition, if you're seated in the Main Cabin, you'll board from the rear of the plane in groups of three to five rows at a time. If you require special assistance or are seated in First Class, you'll be able to pre-board.

The airline will also be blocking middle seats to provide more personal space on board, and will continue to use electrostatic spraying with hospital-grade disinfectants to clean and sanitize cabins.

## JetBlue

All JetBlue crew members and passengers are required to cover their nose and mouth, with the exception of small children who are unable to wear a face covering.

## Southwest

All Southwest employees will be required to wear face masks when interacting with customers, while customers will be required to wear masks as of May 11. Face masks and sanitizing wipes will be available upon request.

## Spirit

As of May 11, all Spirit passengers and customer-facing employees will be required to wear masks or face coverings. According to the airline, "guests will be expected to bring their own face coverings and will be required to wear them both at the airport and throughout the flight."

## United

All passengers must cover their faces, and the airline will provide masks to travelers free of charge. Additionally, face coverings will be mandatory for all United employees onboard an aircraft, joining a previous requirement for flight attendants, which went into effect on Apr. 24.

## Bottom line

In addition to blocked seats and enhanced cleaning measures, mandatory face masks should offer an important layer of protection for travelers and airline staff. Still, with stay-at-home orders in place in many U.S. states, individuals should only travel if necessary. If you do need to fly, be sure to check out our detailed guide for more on what to expect during booking, at the airport and onboard.

The moves drew the support of Sara Nelson, president of the Association of Flight Attendants, who has been

[asking the government to intervene](#) and make masks mandatory.

"We're happy to see airlines taking action to require masks or face coverings for passengers, crew and other front-line employees," Nelson said in a statement that acknowledge the latest airline updates. "We continue to call on the federal  government — whether it be DOT, FAA, HHS, CDC — to require masks for crew, front-line employees and all passengers."

*Featured photo by GREG BAKER/AFP via Getty Images.*

# Sign up for our daily newsletter

Enter your email address                                          

☑ I would like to subscribe to The Points Guy
newsletters and special email promotions.
The Points Guy will not sell your email. See
PRIVACY POLICY.

---

Zach Honig is Editor-at-Large at TPG, with contributions ranging from articles digging deep on loyalty programs and credit cards to delivery flight coverage to drone photography and much more.

  

---

## Delta SkyMiles® Platinum American Express Card

Earn 50,000 bonus miles and 5,000 Medallion® Qualification Miles (MQMs) after you spend $2,000 in purchases on your new card in the first three months of card membership. Plus, earn up to $100 back in statement credits for eligible purchases at U.S. restaurants in the first three months of card membership.

With Status Boost™, earn 10,000 Medallion Qualification Miles (MQMs) after you spend $25,000 in purchases on your Card in a calendar year, up to two times per year getting you closer to Medallion Status. Earn 3X Miles on Delta purchases and purchases made directly with hotels, 2X Miles at restaurants and at U.S. supermarkets and earn 1X Mile on all other eligible purchases. Terms Apply.





Plaintiffs' Exhibit 415

newsroom.hawaiianairlines.com

## Hawaiian Airlines Implements Comprehensive Program of Face Covering, Spacing and Cleaning Measures

*Hawaiian Airlines | Newsroom*

4-6 minutes

May 1, 2020

HONOLULU – Hawaiian Airlines is enhancing health measures throughout its system by requiring travelers to wear face coverings starting May 8 and creating more personal space at check-in, boarding and during the flight. The airline, whose airport employees and flight attendants already wear face masks, last month also began electrostatic spraying of cabins – a safe disinfecting technology that provides additional and effective protection against coronaviruses.

"Taking care of our guests and employees has always been our primary focus, and these new health measures will help us maintain a safe travel experience, from our lobbies to our cabins, as Hawai'i continues to make progress in containing COVID-19," said Peter Ingram, president and CEO at Hawaiian Airlines. "We appreciate our guests' understanding and flexibility as we adapt our operations with their wellbeing guiding every decision we make."

Face Coverings

Effective May 8, Hawaiian's guests will need to wear a face mask or covering that effectively covers the mouth and nose, from checking-in at the airport to deplaning at their destination. Young children unable to keep a face covering on or guests with a medical condition or disability preventing its use will be exempted from the policy.



# Plaintiffs' Exhibit 416

📍 US  |  Change To **UK**

NEWS
CARDS
POINTS & MILES
REVIEWS
TRAVEL
TOOLS
COVID-19

🔍

Subscribe

Advertiser Disclosure



NEWS

# United and American may ban passengers who don't wear masks



**Zach Wichter**
Jun 16, 2020

---

This post contains references to products from one or more of our advertisers. We may receive compensation when you click on links to those products. Terms apply to the offers listed on this page. For an explanation of our Advertising Policy, visit this page.

American and United Airlines are stepping up their mask policy enforcement.

Both airlines announced on Monday that all passengers will be required to wear masks per existing rules, but now those who refuse will face real consequences.

Beginning June 16 at American and June 18 at United, any passenger who does not wear a mask while traveling could be flagged for each airline's list of restricted flyers, possibly causing them to be barred from flying with the carrier again.

United offered slightly more details in announcing its policy, saying that the travel prohibition would last for a period of time that will be determined by the company after a "comprehensive incident review."

[Sign up for the free daily TPG newsletter for more aviation news.](#)



## AA and United Enforce Stricter Mask Policies

Both airlines have technically [required passengers](#) to wear masks onboard since May, but many U.S. carriers [had reportedly advised crews](#) not to be heavy-handed in enforcing the policy and risk an in-flight incident with a passenger that refused to comply.

Now, the companies seem ready to bring down the hammer on unmasked flyers.

"Every reputable heath institution says wearing a mask is one of the most effective things people can do to protect others from contracting COVID-19, especially in places like an aircraft where social distancing is a challenge," Toby Enqvist, United's chief customer officer said in a statement. "Today's announcement is an unmistakable signal that we're prepared to take serious steps, if necessary, to protect our customers and crew."

**Read more:** [Airline unions say government is failing flyers by not implement coronavirus rules.](#)





*(Photo by DANIEL SLIM/AFP via Getty Images)*

Both airlines will permit passengers to fly without a mask if they have a medical condition or disability that prevents them from wearing one. And all travelers can temporarily remove their masks to eat, drink or take medicine.

United also provided a few more details about exactly how the policy will be enforced. Passengers who refuse to wear a mask will be reminded by cabin crews of the airline's policy, and those who continue not to refuse to wear a mask could eventually be flagged for possible future travel restrictions.

"Any final decision or actions regarding a customer's future flight benefits will not occur onboard but instead take place after the flight has reached its destination and the security team has investigated the incident," the airline said in a press release.

**Related:** Sanitizer with your Stroopwafel? Many airlines are now providing cleaning supplies to passengers.

The policy updates by American and United's policy updates coincided with a Monday announcement from the Airlines for America (A4A) trade group, which said many of its members were stepping up enforcement of their onboard mask policies.

According to A4A, members would all enforce their mask requirements more strenuously and increase efforts to notify passengers about the rules before they travel. A4A represents big U.S. carriers, including American, Delta, Southwest and United

**Related:** United Airlines to mortgage MileagePlus for coronavirus funds, anticipates no impact to members.

Among current efforts: some airlines now require customers to acknowledge mask policies during check-in along with onboard announcements about the rules.

"U.S. airlines are very serious about requiring face coverings on their flights. Carriers are stepping up enforcement of face coverings and implementing substantial consequences for those who do not comply with the rules," A4A president and CEO Nicholas Calio said in a statement. "Face coverings are one of several public health measures recommended by the CDC as an important layer of protection for passengers and customer-facing employees."

**Related:** DOT will distribute almost 100 million face masks across the transportation sector.

For its part Southwest has required passengers to wear masks onboard since May 1, and said it will continue to bar passengers without a mask from boarding.

TPG has reached out to Delta to see if there are any changes to their mask policy enforcement practices. This post will be updated as that information becomes available.

Plaintiffs' Exhibit 417

hklaw.com

## Preventing Airline Liability for Spread of Communicable Diseases | Insights | Holland & Knight

*Judy R. Nemsick*

13-16 minutes

The international health scare triggered by Atlanta attorney Andrew Speaker, who earlier this year traveled on a series of international commercial flights from the United States to Europe for his wedding and honeymoon while infected with multidrug-resistant tuberculosis (MDR-TB),[1] has once again heightened the concerns about an outbreak of a serious communicable disease during air travel. Although Mr. Speaker was warned not to board any long-haul flights for his return travel (as health authorities believed at that time that he was infected with a more severe drug-resistant form of tuberculosis), he nonetheless flew home on commercial flights via Prague and Montreal, crossing the U.S. border by car. By traveling with tuberculosis, Mr. Speaker potentially exposed numerous passengers and crew members to his disease.

Transporting a passenger like Mr. Speaker raises concerns about the potential liability exposure of an airline in the event of an infectious disease outbreak. In addition to lawsuits for fear of exposure to and/or actual contraction of a communicable disease, airlines would likely face an increase in cancelled flights and denied boarding claims, along with an overall decrease in public air travel. Discussed below are some relevant international and federal regulations, potential bases for airline liability for outbreaks on domestic and international flights, and several suggested precautions for airlines to take to prevent or limit their liability exposure.

### International Regulations

Airlines are expected to comply with a new set of international health regulations (IHR (2005)) developed by the World Health Organization (WHO), which entered into force on June 15, 2007.[2] The International Air Transport Association, International Civil Aviation Organization and the U.S. Centers for Disease Control and Prevention all collaborated with WHO in developing these regulations and guidelines.

The new legal framework establishes rules for international coordination in the detection, investigation and response to diseases, including treatment, and sets forth special procedures addressing a public health emergency. The regulations seek to avoid unnecessary interference with international travel and trade, while at the same time strengthening global public health awareness and detection. Airlines also are expected to familiarize themselves with specific laws and regulations concerning infectious diseases in the countries in which they operate.

## Federal Regulations

Airlines often are faced with the difficult task of balancing the safety of their crew and passengers against the interests and rights of a passenger traveling with a communicable disease. For example, the Air Carrier Access Act (ACAA) prohibits airlines from discriminating against a passenger with a disability, which includes a person with a communicable disease or infection, in the provision of air transportation.[3] A carrier may deny boarding, require a medical
certificate, or impose conditions on a passenger (such as wearing a mask) only in cases where a passenger with a communicable disease poses a "direct threat" to the safety and health of others.[4] In determining whether a passenger poses such a threat, the airline makes an "individualized assessment" by relying on current medical knowledge, the likelihood of potential harm to others, and whether reasonable procedures or modifications could mitigate the risk.[5]

The airline, however, must transport a passenger with a communicable disease or infection if he or she presents a medical certificate describing conditions or precautions that would prevent transmission and the airline can feasibly carry out these measures.[6] Airlines must be careful not to discriminate against passengers who have a communicable disease but do not necessarily pose a threat of transmission to other passengers.[7]

Airlines also must comply with the Federal Public Health Regulations, which concern the control of communicable disease and are intended to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into and within the United States. For example, airlines are required by these regulations to notify public health authorities of any death or ill person among passengers or crew, and may be penalized for failing to do so.[8] Proposed amendments to the regulations expand reporting requirements for ill passengers, require more detailed passenger contact information, and impose substantial penalties for violation of the federal quarantine rules and regulations (*e.g.*, up to $500,000 per event by an organization).[9]

## Potential Airline Liability: The Airline's Duty of Care

# Plaintiffs' Exhibit 418

onemileatatime.com

## Airline Crews Told Not To Enforce Face Mask Policy | One Mile at a Time

4-5 minutes          5 - 1 3 - 2 0

---

**Update:** *US airlines will start to enforce face mask policies as of mid-June.*

Within the past week major US airlines (with the exception of Allegiant Air) have introduced a policy requiring all passengers to wear face masks or some sort of face coverings on flights. While the messaging strong, flight attendants and pilots are being told that they shouldn't actually enforce this rule.

- Flight attendants told to inform, not enforce

- Why create policies that won't be enforced?

- Bottom line

## Flight attendants told to inform, not enforce

The way the new policy works, airlines are allowed to deny boarding to those passengers not wearing face masks, but once passengers are onboard, it's a different story.

Reuters shares a memo that American Airlines sent to pilots, making it clear that once onboard the plane the face mask policy becomes more lenient. The crew's role is to inform rather than to enforce.

As the memo reads:

"Once on board and off the gate, the face covering policy becomes more lenient. The flight attendant's role is informational, not enforcement, with respect to the face covering policy.

Bottom line to the pilots: a passenger on board your aircraft who is being compliant with the exception of wearing a face covering is NOT considered disruptive enough to trigger a Threat Level 1 response."

In a separate memo to flight attendants, American Airlines said the following:

"If the customer chooses not to comply for other reasons, please encourage them to

comply, but do not escalate further.

Likewise, if a customer is frustrated by another customer's lack of face covering, please use situational awareness to de-escalate the situation."

## Why create policies that won't be enforced?

I'm guessing there are a couple of reasons that US airlines are basically telling crews not to enforce the rules.

First of all, I can only imagine the endless diversions that would be caused by passengers not wearing masks. This is potentially yet another point of conflict on planes.

That being said, I suspect the bigger reason for this is liability. The major airlines have exceptions so that young children and those with medical issues don't have to wear masks.

Presumably the airlines would be opening themselves up to a lawsuit if they forced someone to put on a mask when they claim they have a medical condition.

For example, Alaska Airlines' statement regarding exceptions for wearing masks is interesting, making it clear that people don't have to disclose or prove the condition they have:

**If a guest is exempt, how should they notify Alaska Airlines?**

Guests are encouraged to communicate their exemption with an Alaska Airlines representative when they arrive at the airport. Note: In line with health privacy laws, guests are not required to disclose or prove their specific medical condition to airline employees and are asked to notify our airport staff upon boarding. Airport staff will inform the flight attendants of guests who have a medical exemption.

Understandably airlines want to avoid confrontations where passengers argue they were humiliated and scorned by the crew for not wearing a mask, claiming they have a condition. At least that's the best logic I can come up with.

## Bottom line

It's not unreasonable to essentially say that the face mask rule will be enforced at the gate, while onboard the crew will provide reminders that are simply informational. At least that would be reasonable if people were reasonable.

Hopefully everyone takes the face mask requirement seriously, and we don't see people taking off face masks inflight in order to "protest" the policy, or in order to create a viral video.

Plaintiffs' Exhibit 419

onemileatatime.com

# US Airlines May Ban People Who Don't Wear Masks | One Mile at a Time

6-7 minutes                6-16-20

---

<u>While most US airlines</u> <u>have been asking</u> <u>passengers to wear face masks</u> for the past several weeks, <u>it hasn't actually been that widely enforced.</u> <u>That's going to be changing</u>…

- <u>The face mask problem that US airlines have had</u>
- <u>There will be increased enforcement for face masks</u>
- <u>United Airlines' updated policy</u>
- <u>American Airlines' updated policy</u>
- <u>Bottom line</u>

## The face mask problem that US airlines have had

Around late April we saw most major US airlines (<u>with the exception of Allegiant Air</u>) start to make <u>wearing face masks on planes mandatory.</u> The problem has been that:

- Airline crews have been largely <u>told not to enforce this policy</u>; they've largely been told that if a passenger doesn't comply they should be "encouraged" to wear one, but the situation shouldn't be escalated further

- There are <u>exceptions for those who have to wear face masks</u>, as these rules don't apply to young passengers and <u>those with certain health conditions</u>

All of this creates serious issues:

- <u>Wearing a face mask</u> isn't just about protecting yourself, but it's also about protecting others near you

- Airlines have been messaging in a way that suggests face masks must be worn, but then refused to enforce it

- This has caused anger among a lot of people who are wearing face masks, who aren't happy that others near them aren't wearing face masks, since that's also endangering them

Because of all that, it seems we can soon expect face mask usage to actually be enforced…

## There will be increased enforcement for face masks

Airlines for America, the trade group representing many US airlines, has announced that member airlines will begin "vigorously enforcing face covering policies."

With this update, Alaska Airlines, American Airlines, Delta Air Lines, Hawaiian Airlines, JetBlue Airways, Southwest Airlines, and United Airlines, will be implementing the following policies:

1. Preflight Communications: Each airline will clearly articulate its individual face covering policy in communications with customers, which may require passengers to acknowledge the specific rules during the check-in process

2. Onboard Announcements: Onboard the aircraft, crew members will announce specific details regarding the carrier's face covering policy including the consequences passengers could face for violating the policy

3. Consequences for Noncompliance: Each carrier will determine the appropriate consequences for passengers who are found to be in noncompliance of the airline's face covering policy up to and including suspension of flying privileges on that airline



*Airlines will start enforcing face mask policies*

### United Airlines' updated policy

United Airlines was the first to announce an updated policy as a result of this restriction. As of June 18, 2020, any passenger not complying onboard a flight will be placed on an internal travel restriction list. Customers on the list will lose travel privileges on United for a duration of time to be determined pending a comprehensive incident review.

The only exceptions to this requirement are individuals who have a medical condition or a disability that prevents them from wearing a face covering, those who cannot put on or remove a face covering themselves, and small children.

How will this enforcement work in practice?

- If a flight attendant notices or is informed of a customer onboard who is not wearing a face covering and that passenger does not fall within an exception, the flight attendant will proactively inform the customer that for the health and safety of everyone, face coverings are mandatory for all customers and crew on board

- They will also offer to provide the customer with a mask if needed

- If the customer continues to be non-compliant, flight attendants will do their best to de-escalate the situation, again inform the customer of United's policy, and provide the

passenger with an inflight mask policy reminder card

- If a customer continues to not comply, the flight attendant will file a report of the incident, which will initiate a formal review process

- Any final decision or actions regarding a customer's future flight benefits will not occur onboard but instead take place after the flight has reached its destination and the security team has investigated the incident



*United will start enforcing face mask rules*

### American Airlines' updated policy

American Airlines has also [announced](#) plans to increase enforcement of the face mask policy as of June 16, 2020. As it's explained:

- American already enforces this policy at the gate, and will deny boarding to customers who don't comply

- Beyond that, [American may now "deny future travel" for customers who refuse to wear a face covering](#)

- Details of the updated policy for face coverings will be communicated to American Airlines team members this week

Some passengers are exempt from the face covering requirement, such as young children and those with a disability or medical reason for why they cannot wear a face covering.



*American will start enforcing face mask rules*

## Bottom line

Major US airlines claim that they will start actually enforcing the face mask policy going forward, which makes a lot of sense. People book flights expecting that those around them are wearing masks as well, so this is an area where empty threats can't be made.

American and United are both threatening to ban passengers who don't comply with this policy.

The one major potential challenge is that there are exclusions for those with a "medical reason" for why they can't wear a mask. That's reasonable, but the problem is that I fear this might be taken advantage of by anti-mask crowd.

Am I the only one who fears that those who currently refuse to wear masks will simply claim they have a medical condition? After all, the crew isn't qualified to assess medical conditions, so there shouldn't be any follow-up questions. To people who are in that camp — being a jerk isn't a medical condition.

**Are you happy to see US airlines starting to enforce face mask policies?**

Plaintiffs' Exhibit 420

airlines.org

## Major U.S. Airlines Announce Increased Enforcement of Face Coverings | Airlines For America

*Emily G*

5-6 minutes

---

Safety & Security

June 15, 2020

*Passengers who do not wear face coverings could have flying privileges revoked*

**WASHINGTON, June 15, 2020 –** Today, Airlines for America (A4A), the industry trade organization representing the leading U.S. airlines, announced that its member carriers will be vigorously enforcing face covering policies, putting rigor around rules requiring passengers and customer-facing employees to wear facial coverings over their nose and mouth. This is one critical element of the multiple layers that A4A carriers are implementing to mitigate risk and protect passengers and crew.

Alaska Airlines, American Airlines, Delta Air Lines, Hawaiian Airlines, JetBlue Airways, Southwest Airlines and United Airlines will be implementing the following policy updates regarding face coverings:

1. **Preflight Communications:** Each airline will clearly articulate its individual face covering policy in communications with customers, which may require passengers to acknowledge the specific rules during the check-in process.

2. **Onboard Announcements:** Onboard the aircraft, crew members will announce specific details regarding the carrier's face covering policy including the consequences passengers could face for violating the policy.

3. **Consequences for Noncompliance:** Each carrier will determine the appropriate consequences for passengers who are found to be in noncompliance of the airline's face covering policy up to and including suspension of flying privileges on that airline.

"U.S. airlines are very serious about requiring face coverings on their flights. Carriers are stepping up enforcement of face coverings and implementing substantial consequences

==highlight start== for those who do not comply with the rules," said A4A President and CEO Nicholas E. Calio. ==highlight end== "Face coverings are one of several public health measures recommended by the CDC as an important layer of protection for passengers and customer-facing employees."

The measures are expected to remain in place throughout the COVID-19 public health crisis.

**"Fly Healthy. Fly Smart."**

Last month, A4A unveiled a new public awareness campaign, "Fly Healthy. Fly Smart." which helps educate the traveling public on measures airlines are implementing as well as reminding the traveling public of steps they can take to help prevent the spread of COVID-19.

**Airlines Take Action**

In addition to enforcement of face covering policies, passengers may see several other changes and updates to the travel experience.

- At check-in counters and gate areas, travelers may see agents sanitizing counters and kiosks. Some airlines have installed plexiglass shields over the counters to provide additional protection, and some have marked the floors to ensure appropriate distance is maintained.

- All A4A member airlines have aircraft equipped with HEPA filters, which help generate hospital-grade air quality. The CDC has said that, "Because of how air circulates and is filtered on airplanes, most viruses and other germs do not spread easily on flights."

- U.S. airlines have implemented intensive cleaning protocols, in some cases to include electrostatic cleaning and fogging procedures. Carriers are working around the clock to sanitize cockpits, cabins and key touchpoints – including tray tables, armrests, seatbelts, buttons, vents, handles and lavatories – with EPA-approved disinfectants. Airlines have increased the frequency of deep cleaning procedures for both domestic and international flights.

- Carriers have implemented a range of policies – including back-to-front boarding and adjusting food and beverage services – to help allow for distancing between people.

- As an additional layer of protection, A4A's member airlines have encouraged the Transportation Security Administration (TSA) to begin conducting temperature screenings.

**Passenger Responsibilities**

- All passengers are required to wear a face covering throughout the travel journey on the leading U.S. airlines, as clearly stated on each airline's website.

- Additionally, travelers are urged to stay home when ill, frequently wash their hands and to

==wear a face covering throughout their air travel journey,== consistent with CDC guidance.

For more information about how carriers are working to protect traveling public and what travelers can do to protect themselves and others, please visit www.AirlinesTakeAction.com.

**Latest News Articles**

**Media Contacts**

Katherine Estep (Spokesperson)

Managing Director, Communications

Phone: 202-626-4034

Carter Yang (Spokesperson)

Managing Director, Industry Communications

Phone: 202-626-4141

Plaintiffs' Exhibit 421





*July 2, 2020*
*All Flight Service team members*

## Don't let your guard down on COVID-19

Unfortunately, we're seeing an increase in the number of COVID-19 cases in our department and company. While the numbers remain below the national average for our team, we're deeply concerned about any increase. This mirrors the rise in infections in states where we have large operations, such as Texas, Florida and Arizona. Now is definitely not the time to let our guard down when it comes to health and safety.

- **Check your temperature and monitor your health.** If you are experiencing any symptoms, do not come to work. Call Crew Scheduling and Daily Ops to let them know you are not feeling well. Take advantage of Premise Health and Doctor on Demand to schedule a test, if you feel you may have COVID-19.

- **Wear your face covering at all times**. You must wear a face mask on aircraft, in airports, crew rooms and any time you are in close proximity to other team members. You should also wear face coverings in airport shuttles and on public transportation.

- **Remember to wash your hands frequently**, avoid touching your eyes, nose, mouth or face. Soap and water is best, but there are also sanitizing gel/wipes in the PPE drawer to help.

- **Observe social distancing when possible.** It's difficult to create distance on aircraft, that's why it's so important that crew members wear face coverings. If everyone wears a face covering, it significantly reduces the risk of COVID-19 transmission according to the CDC. Even though onboard space is limited, avoid crowding in galleys when possible. This is especially important if a crew member briefly has their face covering off, like when they are eating or drinking. Observe social distancing in crew rooms and while on layovers. Until this illness dies down, consider avoiding large group dinners or outings.

- **Avoid crowds while away from work.** Please follow CDC guidelines on social gatherings and take precautions to keep yourself safe. If you feel you may have been exposed, please tell your Flight Service manager.

- **Set a good example for customers.** It's important to show our customers that we are doing our part to remain vigilant. If you properly wear your face covering at all times, they will be more likely to do the same.

The company continues to take steps to prevent the spread of COVID-19. We've adjusted flight attendant service procedures to reduce unnecessary customer contact. We've enhanced cleaning on aircraft, in airports and crew rooms. We're also conducting crew member temperature checks at key airports and asking customers to fill out a health assessment before travel. In a recent letter to employees, Chief Operating Officer David Seymour detailed many of the actions the company is taking. Read his note on Jetnet.

Ultimately, we are all responsible for monitoring our own health and taking precautions to remain healthy. By protecting yourself from COVID-19, you are also protecting other crew members and our customers.

## Flight Service Virtual Town Hall

Thank you to everyone who took part in today's Flight Service Virtual Town Hall. We had more than 1,000 people on the call. We received more than 230 questions.

Here are some of the big questions that we got today:

- **Since we have an overage of 7,000 – 8,000 flight attendants, does that mean we will furlough that many people?**
  No. We hope that a combination of early out and voluntary leaves will reduce or even eliminate the overage and lower the number of flight attendants who may be subject to a furlough. We will be offering more leaves and early out opportunities in the next few weeks.

- **What happens if I get furloughed? Can I keep insurance? Do I accrue longevity/pay seniority?**
  Your benefits will continue until your pay furlough date. After that, you'll have the opportunity to continue benefits under COBRA. When you are on furlough, you will not accrue pay seniority. Once you return, your seniority and pay will start where you left off. We're working on a frequently asked questions list and will post it soon.

- **What bases could see the most reductions? Why? Do we know how many flight attendants will be displaced?**
  In addition to the closures of SLT and RDU, we expect to see sizeable reductions in LAX, PHX and MIA. Since the size of our airline will shrink, we need to think strategically about our network. While these bases are still very important, we will need more flight attendants in other domiciles. We expect that LAX, PHX and MIA could decrease by around 800 or more. These number are estimates and will adjust as the network does. The number of potential displacements depends on how many people at those bases take voluntary leaves, early outs or voluntarily transfers to other bases.

- **Is there anything management is doing to reduce costs, other than possible flight attendant furloughs?**
  Earlier this week, we made some painful job cuts impacting our Flight Service management and support staff. We reduced the number of management

positions in Flight Service by about 37%. Across the company, leadership and support positions are being reduced by an average of 30%. These were tough decisions, but necessary to prepare us to become a smaller airline. A few months ago, we reduced the salaries of all director level and above team members. We've also reduced costs by retiring aircraft and making changes to the network. So far, we've reduced our costs by about $14.5 billion. We went from burning through $100 million a day in April to around $35 million today – but we still have a long way to go.

- **When will our normal food and beverage service return?**
  We don't see a return to our pre-pandemic onboard service for a while. Any change will be slow and incremental, since we'll continue to minimize customer/flight attendant touchpoints. In response to both customer and flight attendant feedback, we'll soon add a new First Class fruit and cheese plate on most domestic flights 2.5 hours or longer. This will be in addition to our snack bags on flights 2.5-4.5 hours, and it will be in place of the streamlined tray service we currently offer on Domestic/NIPD flights over 4.5 hours. These changes more closely align us to what our competitors currently offer. AFS, HFS, and IPD flights will continue to receive our current, streamlined tray service. And we will continue to offer full beverage service on longer flights, and beverages upon request on shorter flights, including alcoholic beverages in First Class. So, if a customer asks for a beverage in any cabin, please be sure to accommodate them.

**We'll be hosting another Virtual Town Hall on July 9 at 1100 CT**. Please watch your CCI messages for more information on how to join in.

Have more questions? Email them to FA.Questions@aa.com.  My team will do their best to get you an answer, and we may feature your question in an upcoming edition of Flight Service Forum.

## Update: Face coverings now required in crew rooms and break areas

We continue to update our face covering policy. Team members are now required to wear face coverings at all times while in indoor common areas, including breakrooms, hallways, restrooms, crew rooms and office buildings — regardless of whether 6 feet of social distance can be maintained. Face coverings are also required outdoors unless you can maintain 6 feet of social distance.

**There are exceptions:**

- When eating or drinking
- When performing an official duty like delivering a PA
- When sitting at a desk and 6 feet of distance can be maintained
- The Flight Deck per the Flight Deck safety exception
- If you have a medical condition that prevents you from wearing one

Please see Jetnet for more information.

## Lands' End face coverings are now available in crew rooms

Please visit your local Crew Service Center to get your set of three Lands' End face coverings. The masks are fully washable and carry the OEKO-TEX Standard 100 certification. See the CCI message from your Base Manager for more information on how to pick up your set.

**Request from stations:** Please pick-up these reusable face coverings at your base rather than repeatedly asking for disposable masks at out-station airports. We need to conserve as many face coverings as possible. Agents are not able to give you Lands' End masks, you must pick them up at your base. Disposable face coverings will continue to be available in the PPE drawer.

For more information on the Lands' End face coverings, visit the Flight Service website.

## Please follow hotel and local rules on face coverings

Many hotels now require guests to wear face coverings in airport shuttles, lobbies and other common areas. Please abide by these rules when laying over. Depending on local orders, you may also have to wear a face covering when entering restaurants, shops and other local businesses. If you have a question about what's required, please ask the hotel staff. It is your responsibility to follow local rules and hotel policies.

## Need a thermometer? Visit a Crew Service Center

While temperature checks are being conducted at many key airports, it's a good idea to take your own temperature often. You can easily slip a thermometer in your bag and take it with you on a trip. If you don't have one, pick up a disposable thermometer in a Crew Service Center. There's a limited supply in each base.

## Reminder: Fill out a CERS report if a customer refuses to wear a face covering

Please provide as much detail as possible, including what the customer said, where s/he was sitting, etc., so that Corporate Security can follow-up and investigate. Do not attempt to argue or escalate the situation. If a customer tells you they have a medical or religious exemption, please do not ask them to provide proof.  For more information, see the FAQs about customer face coverings on the Flight Service website.

## Viasat Wi-Fi

A big thanks to our partners at Viasat for giving off-duty flight attendants free inflight Wi-Fi for the last few months. Now that customer demand is starting to return, Viasat is no longer offering free crew member internet access. The previous code expired at the end of June. I'll let you know if they offer another freebie.

## Extra care appreciated

We don't always know what our customers are going through and why they're in our care.  A customer on a recent DTW-CLT flight wrote in to tell us about the extra care she received from PHL flight attendant Caitlin Gough:

*My aunt passed away. As I was having an emotional breakdown while in the air, flight attendant Caitlin took care of me like she was my mom.  I want to make sure she gets recognized for the traits that make her so amazing at her job.  If she can somehow read this – thank you, Caitlin.  So much.  You calmed me down when I was alone in the sky.*

Caitlin -- I'm glad to give you the recognition to deserve. Your compassion was truly appreciated.

 Thanks for checking in!

Jill Surdek
Senior Vice President, Flight Service



**July 10, 2020**
*All Flight Service team members*

## Flight Service Virtual Town Hall

Thank you to everyone who joined in on our Virtual Town Hall yesterday. We've had more than 1,000 participants. Here are some of the questions we received:

1. **When are we going to see the early out and leave program?  We have been waiting a long time.**
   The company has been working to assess new options to address suggestions for new early out and leave options.  The goal is to create programs that minimize or hopefully eliminate the need for furloughs.  We hope to have more to share in the next week or so.  Thanks for your patience as I know you are very interested to review.

2. **If flight attendants are furloughed, will they get paid for unused vacation time?**
   In the event of a furlough, you'll have the option to get accrued and unused vacation time either paid out or carried over for when you return to work. If it's necessary to furlough, we'll communicate more details on this process to any affected flight attendants.

3. **Do furloughed flight attendants get travel benefits? Do they still have the ability to sit on the jumpseat.**
   If you are furloughed, you will have D2R travel benefits for 24 months per company policy. You will not have jumpseat privileges. Additional information about travel privileges – including D1, D3 and other airline travel – will be communicated if it becomes necessary to furlough.

4. **What if a pilot or flight attendant doesn't follow our face covering policy?**
   Some crew members have medical exemptions. Pilots have certain exemptions on wearing masks in the flight deck for safety reasons. (I.e. A mask may interfere with their ability to see or don an oxygen mask.) Pilots are asked to put on a face covering if another crew member enters the flight deck and requests it. The pilots do not have to put on a face covering if they feel it could impact safety. Pilots are encouraged to notify flight attendants about their decision to wear face coverings in the flight deck during the crew briefing.  If you believe a crew member isn't following company policy, please fill out a CERS report. Just as you would handle a similar situation with a customer, try to avoid escalating the issue. In addition, you may also report

the incident and individual to the APFA's and/or APA's Professional Standards team.

5. **Some airlines have returned to providing a regular beverage service? What are we doing to keep up with our competitors**?
   We're keeping a close watch on what other airlines are doing while listening to your feedback. Some of you say it's time for beverage service to return on all flights, while others say you don't yet feel comfortable performing a full service. We provision beverages on every flight, and even on flights where we currently don't do a full beverage service, we offer them on customer request. Any changes to our onboard service will happen gradually. To stay competitive, we're adding a new First Class fruit and cheese plate on certain domestic flights starting next week. Read more about that enhancement below.

## Reminder: For now, it's ok for customers to move to different seats in the same cabin

Customers may move to any seat within their ticketed cabin, including from Main Cabin to Main Cabin Extra without any additional charges. In March, we relaxed our policy on switching from MC to MCE in response to the pandemic to let people spread out if there are empty seats.  If a customer moves into an exit row, you're required to provide them an exit row briefing.

On flights with very low load factors, gate agents may need to coordinate customer seat moves before take-off to avoid aircraft weight & balance issues. In this case, agents will discuss this with the FA1/Purser during the Departure Dependability Briefing. We're working with the Airport Customer Service team to improve this process. This also underscores the need for FA1 and the gate agent to always have a departure dependability briefing – where this and other important information about the flight can be discussed.

We've also updated the Health and Safety Departure PAs as REV 52.9 effective July 9 in response to increased load factors. PAs can be found in the PA Card in Comply365.

## New COVID-19 folder in Comply365



In just the last few months, our company has experienced a tremendous amount of change in response to COVID-19. We can expect to see even more change as best safety practices and government regulations evolve. I know it can be a challenge to keep up with so many changes to flight attendant procedures, both inflight and on the ground. To make your job a little easier, we've created a COVID-19 folder in Comply365. This will be your central location to find the most recent COVID-19 inflight and operational updates.

*Comply365>My Publications > 01IFM/PAs/COVID19*

Inside this folder, you'll find destination updates, including forms and destination specific PAs, FAA exemptions, COVID-19 onboard service procedures, COVID-19 policies and procedures and safety briefings.

You'll find COVID-19 PAs (that are not destination-specific) in the English PA card. This includes the pre-departure snack bag service PA, the Health & Safety departure and mid-flight PAs and arrival/taxi-in PAs.

**Please make sure you Sync and check Comply365 at the start of every duty day**, to ensure you have the latest information.

## Coming soon: New domestic First Class fruit and cheese plate

Beginning July 15, we're enhancing our domestic First Class service by offering customers a boxed fruit and cheese plate on flights 900 miles or longer. The fruit and cheese plate will be served after level-off. We'll continue to offer snack bags during boarding to customers in all cabins on flights between 900 – 2,199 miles. Transcon (LAX/SFO to JFK), long haul Hawaii (DFW/ORD to Hawaii), and long haul International (IPD) flights will continue to receive tray meal service.

As a reminder, we provide a beverage service on all flights over 2,200 miles. On flights shorter than 2,200 miles (including snack bag flights), beverages should be delivered on request. Alcohol is available to customers in the First and Business Class cabin on all flights. It is also available to Main Cabin customers on IPD flights. If a customer asks for a beverage, please fulfill their request, providing cans and liquor minis unopened, or pouring juice, water and wine as requested.

## New: AA Inflight Portal to access onboard Wi-Fi

We've started rolling out the new American Airlines Inflight Portal across the narrow body fleet. This is great news since it will make it easier for our customers to use the high-speed Wi-Fi service. Customers will connect to the same "AA-Inflight" Wi-Fi signal and view a similar sign-on screen regardless of whether they are onboard an aircraft with equipped with Viasat or Gogo. They'll also be able to seamlessly use promotion codes or credit cards associated with an AAdvantage account to purchase Wi-Fi access. We plan to have the new AA Inflight portal rolled out to all narrow body aircraft by the end of the month.

## Impressing our customers

A customer sent us a note saying he was impressed by LGA-based flight attendants Carlos Warner, Annmarie Cook, Jordan Meinholz and Alexa Panopoulos:

*Yesterday, my flight from Phoenix to JFK (Flight 2339 on 25 June) was wonderful. The attention to safety precautions, and the service and care provided was exceptional.  The [flight attendants] carefully and thoughtfully provided a safe and welcoming experience given the circumstances under which they had to work. Carlos, in particular, ensured everyone followed the safety requirement and also attended to service needs cordially and warmly.  He and his team should be commended for their efforts and service which [should make] American Airlines proud.*

What a great compliment Carlos, Annmarie, Jordan and Alexa.  It sounds like you provided great service and made sure everyone was comfortable in your care.

 Thanks for checking in!

*Jill*

Jill Surdek
Senior Vice President, Flight Service

Plaintiffs' Exhibit 422

liveandletsfly.com

# A Captain Explains Why Few Pilots Wear Masks In Cockpit - Live and Let's Fly

*121pilot*

4-5 minutes

---

*121pilot, our resident airline captain on Live and Let's Fly, returns today to discuss pilots wearing masks inside the cockpit.*

---



In light of a controversial recent decision by American Airlines to dock pay from a captain who forced his first officer to wear a mask, I want to address the issue of pilots wearing masks in the cockpit.

**Why Pilots Wearing Masks In the Cockpit Are A Whole Different**

When COVID-19 first became a threat, most airlines prohibited crews from wearing masks. Given the CDC guidance at the time, this was not without reason. But even when mask usage started to become more common and ultimately permitted for flight attendants, it remained prohibited for cockpit crews by the FAA.

Then two welcome changes occurred. First and foremost, in recognition of the latest science and the possible germ pool that a cockpit oxygen mask represented, the requirement to don and wear the oxygen mask when one pilot left the cockpit above 25,000 feet was lifted. Given that this was probably one of the most violated rules in all of commercial aviation, this move was greeted with universal enthusiasm. Additionally, the FAA issued a ruling that was adopted by most if not all airlines in the US, that allowed *but did not require* pilots to wear masks in the cockpit.

**Three Reasons Why Masks Don't Belong In Cockpits**

There are a number of issues that come with wearing a mask in the cockpit and those reasons are why most crew members don't wear one in flight. First, in an explosive decompression getting your facial mask off and the oxygen mask on adds seconds to a procedure that is already time critical. Second is the issue of rebreathing $CO_2$ for hours on end while at altitude in a safety critical position. Third, for those who wear glasses, masks represent a challenge that frequently leads to those glasses becoming fogged. This can be a challenge even for those with perfect vision during daytime flights when you need to wear sunglasses. Even with the built-in shades, it can get very bright in the cockpit at altitude. Consequently, wearing a mask while operating the aircraft compromises safety. With what we know about how air flows on aircraft, the risks posed by wearing a mask greatly outweigh the risks that come from not wearing one inside the flight deck.

**One Great Exception Toward A Greater Goal**

The above does come with a very large caveat, however, and leads me to how I brief all my first officers (FO) on the subject. When I meet an FO for the first time, I tell them that I'm not planning on wearing my mask and that they do not need to wear theirs if they do not want to. I am very clear, though, that

# Plaintiffs' Exhibit 423

onemileatatime.com

# Airlines Remove Face Mask Policy Loopholes | One Mile at a Time

*Ben*

6-7 minutes

---

Up until this point Delta has been leading major US airlines when it comes to enforcing its mask policies, though both American and Southwest have just taken their policies to the next level. ==Get ready for people to start threatening lawsuits…==

In this post:

- American & Southwest eliminate medical exemptions for masks
- What Southwest Airlines is telling employees
- This sure makes things easier…
- "That's illegal, I'm going to sue the airlines!"
- Bottom line

## ==American & Southwest eliminate medical exemptions for masks==

Both American Airlines and Southwest Airlines have been requiring passengers to wear face coverings for several weeks now. However, enforcement has been getting progressively better.

Up until now, both airlines have had a fairly open-ended policy — masks don't need to be worn by people "with conditions that prevent them from wearing a face mask."

That has been left open to interpretation, but both airlines are now adopting a much stricter policy. American Airlines and Southwest Airlines will both only exempt those under two years old from wearing masks, as of July 29 and July 27, respectively.

Everyone else will have to wear a mask, even if they claim to have a condition that prevents them from doing so.



*American has eliminated medical exemptions for its mask policy*

## What Southwest Airlines is telling employees

View from the Wing notes an internal Southwest Airlines document making this policy explicit:

Due to the Safety risk posed by someone not wearing a mask, we are not able to allow any other exemptions at this time, including those for disabilities or medical conditions. If a Customer cannot travel safely while wearing a mask, the Customer will be refused transportation.

In other words, effective July 27, 2020, if a Customer is unable to wear a face covering for any reason (even a verifiable disability or medical condition), we regret that we will be unable to transport him/her at this time, due to the safety risk of COVID-19 transmission by Customers without face coverings. This includes any Customer who is unable to remove the mask without assistance.



*Southwest has eliminated medical exemptions for its mask policy*

## This sure makes things easier…

In the US we sure love to sue, and we sure love freedom. The combination of those two things hasn't been great when it comes to getting the population to wear masks.

We know we're not supposed to ask people what their medical conditions are, and largely that's for good reason. However, I think it's safe to say that "freedom" and "the Constitution" and a desire to use "God's breathing system" all aren't scientifically-backed conditions.

I'm no medical expert, though I have spoken to more than one medical doctor who has explained that if you can fly on a plane, you can also wear a loose face covering. But then I also see a bunch of people on Facebook who say that's not true, so I'm really not sure what to believe anymore… 🙄

The further challenge has been that not wearing a mask puts those around you at increased risk. To what extent should the safety of other people be compromised to accommodate the conditions of others?

That brings us to the next point…

## "That's illegal, I'm going to sue the airlines!"

No doubt we'll soon hear threats of people suing airlines, claiming that this is a violation of the Americans with Disabilities Act. Well, as it turns out, the airlines are within their rights here.

Live and Let's Fly has a good rundown of the situation, and why this is legal. What has to be looked at here is the Air Carrier Access Act. While airlines aren't allowed to discriminate on the basis of disabilities, they are allowed to refuse transportation to people on the basis of disability if that person would be inimical to the safety of the flight:

"While airlines may not refuse transportation to people on the basis of disability, airlines may exclude anyone from a flight if carrying the person would be inimical to the safety of the flight. If a carrier excludes a person with a disability on safety grounds, the carrier must provide a written explanation of the decision."

Here's how the decision making process for airlines is described in more detail:

(1) You can determine that there is a disability-related safety basis for refusing to provide transportation to a passenger with a disability if you are able to demonstrate that the passenger poses a direct threat. In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:

(i) The nature, duration, and severity of the risk;

(ii) The probability that the potential harm to the health and safety of others will actually occur; and

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

(2) If you determine that the passenger does pose a direct threat, you must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal.

Based on this, airlines sure do seem to be allowed to deny transportation over refusal to wear a mask, even if there is a medical condition. After all, transporting someone without a mask does pose a threat to other people on the plane.

## Bottom line

We're now seeing two major US airlines require all passengers two years of age and older to wear face coverings. There are no longer exclusions for those who claim to have medical issues.

I'm sure some will threaten to sue airlines, and will also claim that this is an ADA violation, though the regulations suggest that's not the case. I also have to imagine the legal departments of airlines studied this very closely before making a policy change.

Plaintiffs' Exhibit 424

wheelchairtravel.org

## U.S. Government: Airlines Must Waive Face Mask Rule for Disabled Passengers - Wheelchair Travel

*John Morris*

15-18 minutes

---

One truth that is widely accepted around the world, but which has been met with skepticism and in some cases vitriol in the United States, is that some disabled people cannot wear face masks. The Southeast ADA Center, in partnership with Syracuse University, released a list of medical and psychiatric conditions that prevent mask use last year, which I shared with readers of this website.

In the Summer of 2020, airlines instituted policies requiring passengers to wear face masks. Only a handful of carriers offered an exception for disabled people — a list which grew smaller as the months wore on. Entering the new year, only two of those carriers maintained a face mask exception for disabled passengers. On this website and in interviews with the news media, I shared my belief that airlines who refused to transport disabled people who could not wear face masks were violating the Air Carrier Access Act, a civil rights law.

Recent action from the federal government suggests that I was right. On February 1, the Centers for Disease Control, under the direction of President Joe Biden, introduced new requirements for the use of face masks on interstate transportation — including on planes, trains, buses and ferries. The order stated clearly that the following groups are exempt:

- A child under the age of 2 years.

- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).

- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

The CDC notes that the disability exception is intended to be narrow, meaning someone like me, who is disabled but can wear a mask, is required to comply, but a person whose disability prevents mask use cannot be forced to do so.

## Airline policies relating to face mask exemptions for disabled people

The CDC's order takes precedence over any airline policy that may have been in place prior to the president's executive action. On February 5, the DOT's Office of Aviation Consumer Protection finally informed airlines that they must grant face mask exceptions to qualified disabled people, giving carriers **45 days of immunity from enforcement action** to develop necessary procedures. Some carriers intend to delay for the full 45 days, but others have already implemented policies to comply with the CDC order.

Below, you will find the current policies for disability-related face mask exceptions on the 10 latest U.S. airlines. This page will be regularly updated to include the latest information.

## Alaska Airlines

On its travel advisories webpage, Alaska Airlines states that "federal law requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport." The airline makes no mention of an exception for disabled passengers. Because the DOT's 45 day pause on enforcement action ends March 22, 2021, we expect that Alaska Airlines will publish a clear policy on face mask exceptions by that date.

## Allegiant Air

Following the CDC's order, the Allegiant Air policy was updated and now reads that only "only children under the age of 2 and those with limited mobility who are unable to remove a face covering without assistance are exempt" from the face mask mandate. Requests for exemption status should be emailed to ACAA@allegiantair.com at least 72 hours prior to departure.

## American Airlines

Previously refusing to accommodate disabled people in violation of federal civil rights law, American has now updated its policy to list an exception for customers with disabilities. It reads:

*If you may be exempt because you have a disability that prevents you from safely wearing a mask as defined by the Americans with Disabilities Act (42 USC 12101 et. seq) you must contact us at least 72 hours before you plan to travel and travel with documentation confirming a negative COVID test or recovery.*

*Call Special Assistance: 800-237-7976*

Note that American requires a negative COVID test result or confirmation that the passenger has previously recovered from the coronavirus in order to fly. Whether this requirement is (or should be) legal is discussed later in this article.

**Delta Air Lines**

Delta Air Lines had previously granted waivers to the face mask requirement for disabled passengers, and its policy remains unchanged. The carrier asks customers with a disability who require an exemption to the face mask policy to arrive early "to complete a 'Clearance-to-Fly' process prior to departure at the airport." The process involves a virtual consultation with a third-party medical professional at the airline's expense.

**Frontier Airlines**

Frontier Airlines has published that it will grant an exception to the face mask policy for disabled passengers only if the following conditions are met:

- At least 10 days prior to departure:
- Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act. (Frontier Medical Form)
- State license number (or, if applicable, other medical license information) from the medical provider must be included on the letter.

- Frontier will contact your licensed medical provider to validate the document.

- Any customer who presents falsified medical documentation will be subject to suspension of their privileges for future travel on Frontier.

- Failure to provide 10 days' notice will result in denial of the request.

- At the airport on each day of travel:
- The customer must check in at the Frontier ticket counter a minimum of 2 hours prior to departure.

- Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight. This evidence must be shown to the Frontier representative at the airport before boarding each flight.

- These testing requirements apply to return travel.

Whether these requirements are (or should be) legal is discussed later in this article.

**Hawaiian Airlines**

Hawaiian Airlines had previously granted waivers to the face mask requirement for disabled passengers, and its exception policy remains unchanged.

*Guests who are unable to wear a face mask due to a medical condition or disability will be*

*required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment.*

The mandatory telephone consultation with a medical professional is provided at the airline's expense.

**JetBlue Airways**

On its coronavirus travel notices webpage, JetBlue states that "federal law requires masks to be worn by all travelers 2 years and older at all times throughout the flight including during boarding and deplaning, and in the airport." It makes no mention of the disability exception mandated by the CDC and DOT, but we should expect that policy to be published by March 22, 2021.

**Southwest Airlines**

Southwest has previously refused to accommodate disabled people who could not wear a mask, but has posted the following statement to its website:

*Southwest is currently finalizing steps for a Customer to take to apply for a disability-related exemption from the mask requirement. The first date Southwest would allow a Customer with an exemption to travel is March 21. When the process is finalized in the coming weeks, Southwest will post more information in this FAQ.*

Southwest's statement indicates that it intends to use the full 45 days of immunity granted by the DOT to further delay disabled people's right to travel.

**Spirit Airlines**

Spirit Airlines has previously refused to accommodate disabled people who cannot wear a mask, and it continues to do so according to the following entry in its list of Frequently Asked Questions:

*Spirit is aware of and analyzing a new federal directive regarding a requirement for masks to be worn in airports and onboard flights. We will promptly share any information regarding exemptions or policy changes. At this time, our current policy still stands that all guests, except children under the age of 2 years old, are required to wear an appropriate face covering.*

Spirit has promised to "promptly share any information regarding exemptions on policy changes," but three weeks has already passed since the CDC order to grant disabled people a face mask exception.

**United Airlines**

The policy on face mask exceptions for disabled people at United Airlines has always been murky. Previously, the only mention of an exception appeared in a July 22 press release, wherein the carrier states that "if a passenger believes that there are extraordinary circumstances that warrant an exception, they should contact United or speak to a representative at the airport." Repeated requests for clarification were refused and, because the statement was not included on the airline's customer-facing website, I did not believe that United was willing to serve disabled passengers who cannot wear a mask.

Following the federal mandate for an exception, I contacted the carrier by telephone to enquire about the process for receiving one. A customer service representative told me that there were no exceptions for anyone over the age of 2. I requested a supervisor, and was told that no one at the contact center could grant an exception, but that passengers should speak to a supervisor at the airport. The telephone supervisor could not say what a customer's interaction at the airport might look like or under what circumstances an exception might be granted. She did say that "an exception is very unlikely," even for a legitimately disabled person who cannot wear a face mask. When pressed about the lack of a clearly communicated policy and the harm that could do to disabled people, she said that if the airline published reasons for an exception, "bad people would try to circumvent the policy."

It is my hope that United's failure to disclose its policy will be remedied by the deadline set in the DOT's February 5th notice. United's previous refusal to clarify its exception policy was a clearly calculated action that violated disabled people's civil rights, an action which WheelchairTravel.org denounces.

## What barriers can airlines legally erect around face mask exceptions for disabled people?

The Department of Transportation is the final arbiter of what is legal under the Air Carrier Access Act. In its February 5th notice to airlines, the agency laid out several ways in which carriers can make traveling harder (or perhaps impossible) for disabled people who cannot wear a face mask. I have reproduced some of those below:

- Airlines are permitted to "require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask."

- Airlines can require passengers to check-in early in order to go through the required clearance processes.

- Airlines can "require passengers with disabilities who are unable to wear masks to request an accommodation in advance."

- Airlines can require "a negative result from a SARS-CoV-2 test, taken at the passenger's own expense, during the days immediately prior to the scheduled flight."

- Carriers may arrange (i.e. require) "for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight."

Some carriers, such as American and Frontier, have created policies designed to make it exceedingly difficult or impossible for disabled people to fly without a mask. It is clear that testing requirements impose an undue burden on disabled travelers as there are few places in the country that guarantee a test result within 72 hours. In areas where rapid testing is possible, it is often not covered by health insurance plans and can cost hundreds of dollars.

The DOT's decision to grant airlines the authority to dictate which flights disabled people can take is ripe for abuse and further demonstrates that the Office of Aviation Consumer Protection has little to no interest in protecting the rights of disabled people.

Although I strongly disagree with many of these actions, the DOT has determined that they are permissible. Travelers who are inconvenienced or unable to travel as a result of these hurdles should file a complaint with the DOT, while also writing to elected officials and perhaps even the President of the United States.

## What to do if you cannot wear a mask and have been prevented from flying

WheelchairTravel.org believes that a violation of the Air Carrier Access Act has occurred if you are disabled, cannot wear a face mask due to your disability and any of the following are true:

- An airline refused to grant an exception to its face mask policy and you were denied boarding on a flight for which you held a valid ticket.

- You chose not to take a trip that you had previously booked because an airline's policy stated that you could not receive an exception to its face mask policy.

- You decided not to book a trip because an airline's policy stated that you could not receive an exception to its face mask policy.

- You paid more to fly another airline, or purchased an itinerary that was less convenient because your preferred flights were operated by a carrier that refused to grant exceptions to its face mask policy.

If any of the circumstances described above match your experience, please file a

complaint with the U.S. Department of Transportation's Aviation Consumer Protection Division. Describe your disability, explain why you are unable to wear a face mask, speak to how the airline's policy has harmed you (financially, emotionally or through some other means), and allege that the carrier has violated your rights under the Air Carrier Access Act. Airlines must be held to account for what has been a gross violation of the civil rights of disabled people, and your complaints can inform the DOT's future action.

### An important note on face masks and my perspective

My commentary on accessible travel comes from the perspective that disabled people possess a clear right to freedom from discrimination. That belief influences my thinking at all times, even during this global pandemic. While many have said disabled people should be forced to stay inside, I have advocated for safety precautions that will allow every person access to society, with at least some expectation of safety. I have also stated, clearly and repeatedly, that those who can wear face masks should be required to do so. By wearing our masks, we can create an environment where our disabled peers, including those who cannot wear masks, can safely exist and participate in the community.

Plaintiffs' Exhibit 425

thewindowflyer.com

# Alaska Airlines strengthens its mask policy — The Window Flyer

*The Window Flyer*

3 minutes                                    8-5-20



On Wednesday, Seattle-based Alaska Airlines announced a strengthening of their mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7th. Alaska's announcement comes the same day as New York-based jetBlue's, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th.

Alaska, along with jetBlue, now join American and Southwest, which announced similar zero-exceptions policies in recent weeks, as the airlines

with the strictest face covering policies in the United States. Meanwhile, another airline with a strict policy, Delta Air Lines, still allows medical exceptions, but now requires passengers who claim a medical exemption to consult with a medical professional via telehealth at the airport where a decision will be made if the passenger can fly maskless, be rebooked onto another flight, or denied boarding and given a refund.

It is important to note that while some people claim the moves are illegal and discriminatory, the US Department of Justice had already issued a statement at the end of June that "The ADA does not provide a blanket exemption to people with disabilities from complying with legitimate safety requirements necessary for safe operations." The key phrase in the statement pertains to "safe operations." In conjunction with the U.S. Department of Transportation's Air Carrier Access Act, which states that "airlines may not refuse transportation to people on the basis of disability. Airlines may exclude anyone from a flight if carrying the person would be inimical to the safety of the flight.", it appears to be well within an airline's right to require all passengers to wear masks, regardless of medical condition.

In addition to making masks mandatory for all passengers, Alaska has also extended its blocking of middle seats until October 31st, and its rebooking and cancellation fee waiver through September 8th.

Plaintiffs' Exhibit 426

wheelchairtravel.org

# Only 2 Airlines Permit Disabled People Who Cannot Wear Face Masks to Fly - Wheelchair Travel

*John Morris*

6-8 minutes

---

**Face Mask Exemption for Disabled People** — As of February 2021, the Centers for Disease Control and U.S. Department of Transportation require airlines to waive the face mask requirement for qualified disabled people. To learn more about the procedures for getting an exemption at the 10 largest U.S. airlines, click here.

In July, American Airlines and Southwest Airlines were the first carriers to institute a blanket ban on passengers with disabilities who cannot not wear a face mask. Southwest stated that it would "temporarily refuse to transport any passenger who is unable to wear a mask even if the Customer has a verifiable medical condition that prevents them from wearing a mask."

The majority of other U.S. airlines followed with similar policies, including:

- **Alaska** Airlines — "If you are unable to wear a mask throughout the airport and for the duration of your flight for any reason, you will not be able to fly with us."

- **Allegiant** Airlines — "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel."

- **Frontier** Airlines — "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim and onboard all flights. The only exception is for children under the age of 2."

- **JetBlue** Airways — "Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place."

- **Spirit** Airlines — "Any other Guest who is unable to wear an appropriate face covering for any reason, including medical, will not be permitted to travel with us at this time."

Buried in a July 22 press release, United Airlines states that "if a passenger believes that there are extraordinary circumstances that warrant an exception, they should contact United or speak to a representative at the airport." Repeated requests for clarification were refused and, because the statement is not included on the airline's customer-facing website, I do not believe that United is willing to serve disabled passengers who cannot wear a mask.

That's 8 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986.

## These airlines still permit disabled people to fly without a face mask

If you or someone you are traveling with has any of these conditions or is unable to wear a mask due to a legitimate disability, you will only be able to fly on the following carriers:

**Delta Air Lines** — "Customers with underlying conditions that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you require this exemption, please arrive early to complete the process during check-in and avoid missing your flight – this process can take over one hour." (Read the policy)

**Hawaiian Airlines** — "Guests who are unable to wear a face covering due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment." (Read the policy)

Delta and Hawaiian both require passengers to submit to a virtual medical examination. It is unclear whether these are permitted under the Air Carrier Access Act, but it nonetheless provides a pathway to access that other airlines do not.

## Can airlines really ban disabled people from flying?

It is my belief that policies which restrict disabled people from accessing air transportation are a violation of the Air Carrier Access Act, specifically §382.19(a), which states that carriers "must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability."

Although airlines are permitted to refuse disabled passengers who pose a "direct threat" to the health and safety of others, they are required to conduct an "individualized assessment" of each disabled passenger to consider the following:

1. The nature, duration, and severity of the risk;

2. The probability that the potential harm to the health and safety of others will actually occur; and

3. Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

Blanket bans like those instituted by 8 of the 10 largest U.S. airlines are not permitted by the ACAA and fail to consider a number of circumstances that would result in a passenger being deemed a non-threat, such as a negative COVID-19 test or self-isolation prior to travel.

## What if you booked a flight before stricter face mask policies were put into place?

As recently as August 5th, Alaska Airlines policy stated that "Mask and face covering exceptions include: children under age 2, anyone with trouble breathing, anyone who cannot remove a mask without assistance or anyone with a disability that prevents wearing a mask." Passengers who purchased tickets at a time when disabled people were granted an exception to face mask policies should ask to be accommodated on another airline free of charge. If your request is refused, file a complaint with the DOT as described below.

## What to do if you cannot wear a mask and have been prevented from flying

If you have have a disability, cannot wear a mask and have been prevented from booking a new trip or taking a previously booked trip due to these airline policies, please file a complaint with the U.S. Department of Transportation's Aviation Consumer Protection Division. Describe your disability and allege a violation of the Air Carrier Access Act.

*Note: The Centers for Disease Control has advised that any person who is able to wear a mask should do so. By wearing our masks, we can create an environment where our disabled peers, including those who cannot wear masks, can safely exist and participate in the community.*

Plaintiffs' Exhibit 427

aarp.org

# Airlines Change Safety Protocol as Travel Increases

*Elaine Glusac*

8-10 minutes



Annebel van den heuvel/Alamy Stock Photo

En español | Some travelers have taken to the skies again despite the surging pandemic, and some are contemplating doing so during the holiday season and beyond. Those who do will find that flying in the COVID-19 era is a very different experience than it once was. Among other changes, passengers now have few if any food options, must follow carefully choreographed boarding procedures to allow for social distancing, and, along with airline staff, are required to wear masks, with very few exceptions.

Here's more on what to expect if you plan to fly this winter.

**Pre-flight**

Once you are through security (see new rules) and arrive at the gate, don't expect an empty concourse. The number of airline passengers screened by the Transportation Safety Administration (TSA) ticked up from about 88,000 a day in mid-April to about 867,000 on Nov. 12, though it's still down substantially from about 2.3 million on that day a year ago. Some airlines, including Alaska Airlines, Delta Air Lines, JetBlue and Southwest Airlines, are limiting the number of passengers per flight to prevent the crowded conditions that might lead to infection. American Airlines and United Airlines do not have capacity constraints, though both will allow customers to move to another flight free of charge if their scheduled flight is 70 percent or more full.

The major airlines are now serious about enforcing their requirements that passengers (unless they are age 2 and under, usually) wear face masks during boarding and on the plane, as well as in areas throughout airports they serve, such as customer service counters and gates. The only time masks may be removed is for eating or drinking — which experts suggest you keep to a minimum. They've announced that travelers who refuse to wear masks onboard will not be allowed to fly. Delta has reportedly blacklisted nearly 550 passengers who have refused to wear a mask since the mandate was issued in May. "If a customer is unable to wear a face covering or mask for any reason, Southwest regrets that we will be unable to transport the individual," the company said in a statement.

Like American, United and Southwest, Delta doesn't permit masks with vents or valves, which allow air to be expelled, nor face shields (unless worn with a mask). It offers customers complimentary replacements if they show up wearing masks with valves. Exemptions require completing a "clearance to fly" procedure that, according to the airline's website, "can take over one hour."

Many airlines are also handling boarding differently to encourage physical distancing. Southwest Airlines, for one, previously asked customers to line up in two adjacent lines of 30, but it's now boarding just one line of 10 people at a time.

Alaska Airlines, Allegiant, Delta, Frontier, JetBlue and United are boarding their planes from the rear rows forward, to avoid crowding in the aisles.

American Airlines continues to board passengers by groups — it says the row system works only if everyone is at the gate, which is impossible with the number of connecting flights it operates — though agents space people out during boarding.

Spirit asks passengers to scan their own boarding pass and will allow anyone to board at the end of the boarding process to reduce their time on the plane.

Frontier is the first U.S. airline to take passengers' temperatures with a touchless thermometer before boarding, and will block anyone with a temperature of 100.4 F or higher from flights. Frontier says it "will work with that customer to rebook travel on a later date or otherwise accommodate the traveler's preferences with respect to their reservation." Like other airlines, it's also asking passengers to complete an online "health acknowledgment" before check-in to confirm, among other things, that they will wash or sanitize their hands before boarding, will check their temperature before heading to the airport, and have had no symptoms related to COVID-19 in the previous 14 days.

Air Canada is taking passengers' temperatures before boarding now as well.

Proof of negative results from a COVID-19 test in order to avoid quarantine restrictions is required by a growing list of destinations, including New York, Hawaii and Jamaica. For international fliers, American is piloting a new app called VeriFLY for Jamaica-bound fliers that allows them to learn the travel requirements of the destinations and safely store required documentation, such as COVID-19 test results. A growing number of airports have begun offering COVID-19 tests to departing passengers.

---

**In-flight**

**Seat spacing:** As traffic in the air increases, empty middle seats are becoming less common, and passengers may have to fly next to strangers, especially on American and United. JetBlue is taking a gradual approach to filling its planes, limiting them to 70 percent full through Dec. 1, then to 85 percent through Jan. 7, after which it will resume selling to capacity as demand permits.

Both Alaska and Delta have said they will block middle seats through Jan. 6. Southwest is blocking middle seats through Nov. 30. Allegiant says it spaces people out as practicable "but on fuller flights, that's not always possible," according to a spokesperson. Allegiant fliers can opt to be notified if their flight exceeds 65 percent capacity and can request a credit voucher or choose another flight, though they must pay any fare difference.

**Cleaning:** All carriers have announced enhanced aircraft cleaning procedures, including the use of hospital-grade disinfectants. Southwest reports, "We deep clean each plane from nose to tail for nearly 6-7 hours every night," and says the airline uses "a sophisticated air recirculation system that introduces fresh air into the cabin every second while in flight." Delta claims that the airline is using "state-

of-the-art air circulation systems with industrial-grade HEPA filters on many Delta aircraft that extract more than 99.99 percent of particles, including viruses." And Air Canada notes that, among other cleaning procedures, "We're rigorously grooming all headrest covers." Several airlines are touting a new study by the Harvard T.H. Chan School of Public Health that put the risk of in-flight disease transmission at low and safer than everyday activities like grocery shopping.

**Food:** Galleys are largely retired for now. JetBlue's beverages and snacks come in a sealed bag. Frontier planes will carry only a limited amount of bottled water for sale. In the main cabin on flights between 900 and 2,199 miles, American hands out snacks and bottled water only at boarding; on flights over 2,200 miles, snacks and nonalcoholic drinks are available in-flight. Delta encourages travelers to bring their own snacks and nonalcoholic beverages. Southwest serves water and a snack mix on flights over 250 miles "when available."

**Entertainment:** Many airlines have removed seat-back literature, including in-flight magazines (American's publication, *American Way*, is a prominent exception). Alaska has moved the content to its app. Unless you're flying JetBlue, don't assume you'll have a seat-back screen; most major carriers, including United and American, were already moving their video entertainment to their apps for in-flight viewing before the pandemic. JetBlue will enable your personal electronic device to act as the seat-back television remote control on some planes.

**Personal protection:** All domestic carriers require that customers wear face masks in flight (see above, under Preflight).

**Wearing masks off the plane:** Depending on your destination, expect to keep your face covering on after landing until you leave the airport. Reagan National and Dulles International airports, in Virginia, and Los Angeles International Airport are among the many large airports that require everyone in public spaces to wear face coverings.

*Editor's note: This article was originally published on June 5. It's been updated to reflect new airline procedures.*

Plaintiffs' Exhibit 428

newsroom.hawaiianairlines.com

# Hawaiian Airlines Adopts Stricter Mask Policy

*Hawaiian Airlines | Newsroom*

4-5 minutes                August 17, 2020

HONOLULU – Hawaiian Airlines today enhanced its comprehensive "Keeping You Safe" program for guests and employees by requiring all travelers 2 years of age and older to wear a face mask or covering at the airport and during the flight, disallowing masks made with mesh or sheer material or equipped with valves, and initiating a new health screening for those unable to wear a face mask or covering due to a medical condition or disability.

Hawaiian, whose face mask requirement has been in place since May 8, no longer allows guests wearing mesh or sheer face coverings or valve masks, including exhaust vents of any kind, to board flights following a determination by the U.S. Centers for Disease Control and Prevention that they don't effectively block respiratory droplets. A plastic face shield may be worn in addition to a mask, but not in lieu of one.

Additionally, guests unable to wear a face mask or covering due to a medical condition or disability must now undergo a personal medical assessment at the airport to be cleared to board. Guests requesting an exemption should arrive at the airport early as the assessment may take up to one hour.

"We are adjusting and reinforcing our layered safety protocols to ensure we're providing the highest level of comfort and protection for our employees and guests," said Jeff Helfrick, vice president of airport operations at Hawaiian Airlines. "We appreciate everyone's understanding and cooperation in keeping Hawai'i a safe destination."

As part of its "Keeping You Safe" program, Hawaiian last month added a new step to its check-in process requiring guests to complete a health acknowledgment form indicating they are free of COVID-19 symptoms and will wear a face mask or covering for the entirety of their journey. The health and safety program for guests and employees also features enhanced cleaning measures, including frequent disinfecting of lobby areas, kiosks, and ticket counters, electrostatic aircraft cabin spraying, plexiglass barriers at staffed airport counters, and sanitizer wipe distribution to all

guests.

The carrier, which has been operating a reduced schedule since March due to the pandemic and travel restrictions, will continue to cap cabin capacity at 70 percent through September to allow for onboard distancing.

**About Hawaiian Airlines**

Hawaiian® has led all U.S. carriers in on-time performance for each of the past 16 years (2004-2019) as reported by the U.S. Department of Transportation. Consumer surveys by *Condé Nast Traveler*, *Travel + Leisure* and *TripAdvisor* have placed Hawaiian among the top of all domestic airlines serving Hawaiʻi.

Now in its 91st year of continuous service, Hawaiian is Hawaiʻi's biggest and longest-serving airline. In 2019, Hawaiian offered nonstop flights between Hawaiʻi and more U.S. gateway cities (13) than any other airline, along with service connecting the islands with Japan, South Korea, Australia, New Zealand, American Samoa and Tahiti. As a result of the COVID-19 pandemic, Hawaiian is operating an adjusted schedule of daily flights within the Hawaiian Islands and between Hawaiʻi and the U.S. west coast to support essential travel and critical cargo services.

The airline is committed to the health and safety of its guests and employees and has reinforced enhanced cleaning procedures across its business. While the experience may be a little different, the authentic Hawaiian hospitality remains unchanged. Additional details on how Hawaiian is keeping guests and employees safe can be found at HawaiianAirlines.com/KeepingYouSafe.

# Plaintiffs' Exhibit 429

usatoday.com

## Will the mask mandate for flights be extended? Southwest Airlines CEO says airlines not pushing for it

3-4 minutes          July 22, 2021; updated July 27

---

Airplanes and airports are among the few remaining places where face masks are required, but they might not be after Sept. 13if the rule isn't extended.

Southwest Airlines CEO Gary Kelly, chairman of industry lobbying group Airlines for America (A4A), said Thursday that Southwest and the trade group are not recommending another extension of the federal transportation mask mandate.

The mandate, which airlines and their unions requested to help with passenger mask compliance and to protect the health of flight crews, was put in place by President Joe Biden in January. The mandate, which applies to trains, planes and airports, buses and transportation hubs, was initially due to expire in May but was extended through Sept. 13, with the blessing of airlines.

Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews.

Kelly, answering reporter questions during Southwest's quarterly earnings conference call, said airlines support following Centers for Disease Control and Prevention guidance on masks, which says vaccinated individuals don't need one but unvaccinated individuals should wear one.

**New rules**: CDC lifts indoor mask requirement for fully vaccinated people

Unless that advice changes, he said, "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate."

Kelly said he doesn't know whether the mandate, enforced by the

Transportation Security Administration, will be extended or lifted.

"That's a political question, to a degree," he said.

Kelly said the government is studying the matter, given the spreading delta variant, which has caused a spike in COVID-19 cases, but he is not aware of "any efforts underway" to extend the mask mandate.

**COVID-19 and travel:** The delta variant is spreading. Should travelers be concerned?

The CDC has had no comment on the status of the mandate beyond Sept. 13.

"We can't comment on pending regulatory discussions as to the future of the order," spokesperson Caitlin Shockey said via email.

Kelly is the first U.S. airline executive to publicly express what is in effect support for letting the mandate expire, though United Airlines CEO Scott Kirby said he expected it to be lifted in September.

"What they decide, we'll enforce," American Airlines CEO Doug Parker said earlier Thursday on the airline's quarterly earnings conference call. "It's not for us to opine."

Last week, Delta CEO Ed Bastian told Wall Street analysts and investors he didn't know the fate of the mandate.

He said there are as many "pros to taking the mask requirement off as there are to keeping it on at the present time."

"I think it's important that medical experts make those decisions, not airline professionals, as we've learned through the pandemic," he said on the airline's earnings call. "They're the ones that have all the insight and the information and keeping people safe. I appreciate people not wanting to wear the mask. I don't like wearing the mask when I'm on board either, but it's something that we need to do to keep each other safe."

Los Angeles County, the most populated county in the USA, will once again require people to wear masks indoors – regardless of vaccination status – after a surge in COVID-19 cases.

Plaintiffs' Exhibit 430

thewindowflyer.com

# Alaska Airlines strengthens its mask policy — The Window Flyer

*The Window Flyer*

3 minutes

8-5-20



On Wednesday, Seattle-based Alaska Airlines announced a strengthening of their mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7th. Alaska's announcement comes the same day as New York-based jetBlue's, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th.

Alaska, along with jetBlue, now join American and Southwest, which announced similar zero-exceptions policies in recent weeks, as the airlines

with the strictest face covering policies in the United States. Meanwhile, another airline with a strict policy, Delta Air Lines, still allows medical exceptions, but now requires passengers who claim a medical exemption to consult with a medical professional via telehealth at the airport where a decision will be made if the passenger can fly maskless, be rebooked onto another flight, or denied boarding and given a refund.

It is important to note that while some people claim the moves are illegal and discriminatory, the US Department of Justice had already issued a statement at the end of June that "The ADA does not provide a blanket exemption to people with disabilities from complying with legitimate safety requirements necessary for safe operations." The key phrase in the statement pertains to "safe operations." In conjunction with the U.S. Department of Transportation's Air Carrier Access Act, which states that "airlines may not refuse transportation to people on the basis of disability. Airlines may exclude anyone from a flight if carrying the person would be inimical to the safety of the flight.", it appears to be well within an airline's right to require all passengers to wear masks, regardless of medical condition.

In addition to making masks mandatory for all passengers, Alaska has also extended its blocking of middle seats until October 31st, and its rebooking and cancellation fee waiver through September 8th.

Plaintiffs' Exhibit 431

yahoo.com

# No more medical exemptions: Alaska Airlines says anyone who can't or won't wear a mask won't be allowed to fly

*dslotnick@businessinsider.com (David Slotnick)*

4-5 minutes                    8 – 5 – 2 0



While other airlines demand documentation of medical conditions or connect fliers with doctors, Alaska has wiped away the complication with a blanket requirement.

Ted S. Warren/AP

- Alaska Airlines is the latest airline to announce it will no longer allow medical exemptions from its mask-wearing requirement.

- The carrier said that if a passenger was unwilling or unable to wear one, they would not be permitted to fly.

- Despite evidence that wearing masks can significantly limit the spread of the coronavirus, masks have become a flashpoint for conflicts aboard flights (as well as elsewhere).

- Visit Business Insider's homepage for more stories.

Alaska Airlines said on Wednesday that it will no longer fly passengers who are unwilling or unable to wear a mask — even when there's a legitimate and documented medical reason — following similar moves by American Airlines and Southwest.

US airlines have largely implemented on-board mask requirements since air travel demand began ticking back up this spring.

At first, those policies were criticized as toothless: Flight attendants were discouraged from confronting passengers who wouldn't wear masks, and airlines offered little clarity on the consequences for those customers. In June, airlines including Alaska, United, American, and Delta said they would ban passengers who refuse to comply with mask requirements.

The question of medical exemptions, however, has continued to vex airlines. Although airlines have said they would make exceptions for anyone with a medical reason for not wearing a mask, gate agents and flight attendants have been faced with passengers who claim exemptions without providing documentation. As mask use has become politicized in the US, exemption claims made in bad faith have become increasingly problematic.

In late-July, Delta Air Lines said that any passenger claiming a medical exemption would be required to consult with a medical professional at the airport, through a telehealth service. Passengers would either be cleared to fly maskless, rebooked on another flight, or refused service and given a refund. United said it would no longer accept medical exemption claims without documentation.

Alaska's new policy wipes away the complication by simply eliminating all exemptions.

"If a guest is unwilling or unable to wear a mask for any reason while at the airport, they will not be permitted to travel," the airline said in a statement. "If a

==guest refuses to wear a mask after boarding their flight, they will be suspended from future travel."==

It was not immediately clear whether a refusal to accommodate medical exemptions for legitimate medical reasons would violate any federal or state disability protection laws. However, the Department of Justice said in June that the Americans with Disabilities Act "does not provide a blanket exemption to people with disabilities from complying with legitimate safety requirements necessary for safe operations."

==This policy follows a "yellow card" program that Alaska rolled out in June, in which flight attendants would issue a formal notice to passengers who refuse to wear masks. The airline said that going forward, any passenger who does not comply with the mask requirement after receiving a yellow card will be banned from flying with it immediately on landing, and will have any connecting or return flights cancelled.==

Alaska also said it will continue to block middle seats on flights through at least October 31, a one-month extension.

Read the original article on Business Insider

Plaintiffs' Exhibit 432

 

# Accessible travel services

For the best travel experience when requesting these services:

- Make reservations as early as possible and request services while booking online, or call our dedicated accessible services line at 1-800-503-0101 (dial 711 for relay services).
- Arrive at the airport at least 2 hours prior to departure.
- Let us know about any special requirements - at check-in, in the boarding area, and on the aircraft.

**New:** Download our free mobile app called Fly for All, designed for those with cognitive and developmental disabilities, first-time flyers, and unaccompanied minors. It's available now on the App Store  and Google Play  .

**Federal law**  requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport. Visit our travel advisories to learn more about our mask requirement.

If you have a disability and are unable to wear a mask, please call our dedicated accessible services line at 1-800-503-0101 (dial 711 for relay services) to request an exemption from the mask requirement.

Exemptions will require:

- Documentation from a licensed health care provider as to your inability to wear a mask due to your disability; and
- Proof of a negative test result from an FDA approved molecular NAAT or PCR Covid-19 test taken within 72 hours of your scheduled flight departure

Documentation from your health care provider must be submitted to Alaska Airlines **at least 72 hours before your flight.** We recommend that you contact us at least one week before departure to start the exemption process.

Airport accessibility

Developmental and intellectual disabilities

Hearing

## Alaska Airlines -- Masks are Required to Fly

### Policy and guidelines

Federal law requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport.

- Masks are required even if you are fully vaccinated.
- Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.
- The FAA has also implemented stricter legal enforcement and fines against guests who refuse to comply with crew instructions. In addition, we reserve the right to refuse transportation in the future to guests who refuse to comply with mask requirements.
- While guests are allowed to temporarily remove their masks when briefly drinking or eating or when taking medication, masks must otherwise be worn at all times, including between sips of beverages or bites of food.
- If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.
- Information about medical accommodations may be found in our accessible services section.

### Acceptable masks

The following are required to meet CDC requirements.

- A properly worn mask completely covers your nose and mouth.
- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).
- If gaiters are worn, they should have two layers of fabric or be folded to make two layers.
- Masks should be secured to the head with ties, ear loops, or elastic bands that go behind the head.
- A mask should fit snugly but comfortably against the side of the face.
- Masks should be a solid piece of material without slits, exhalation valves, or punctures.
- Additionally, the following are acceptable as long as your mask meets the requirements above.
- Masks can be either manufactured or homemade.
- Masks can be reusable or disposable.
- Masks can have inner filter pockets.
- Clear masks or cloth masks with a clear plastic panel may be used to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators are acceptable.

**<u>Unacceptable masks</u>**

The following DO NOT meet CDC requirements.

- Masks worn in a way that does not cover both the mouth and nose.
- Face coverings that do not cover a guest's nose and mouth
- Scarves, ski masks, balaclavas, or bandannas.
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose.
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through.
- Masks made from materials that are hard to breathe through (such as vinyl, plastic or leather).
- Masks containing slits, exhalation valves, or punctures.
- Masks that do not fit properly (large gaps, too loose or too tight).
- Face shields or goggles (face shields or goggles may be worn to supplement a mask that meets above required attributes).

https://www.alaskaair.com/content/advisories/travel-advisories
Visited May 24, 2021

Plaintiffs' Exhibit 433

onemileatatime.com

# Why Doesn't Allegiant Air Require Face Masks? | One Mile at a Time

5-6 minutes          6-19-20

---

***Update****: [Allegiant Air will require customers to wear face masks as of July 2, 2020](#).*

[Wearing face coverings on planes](#) has become [a shockingly controversial topic](#). At this point, most US airlines require passengers to wear face masks, and some have even [promised to step up enforcement](#).

What some people don't realize is that there's one major US airline that doesn't require face masks to be worn.

- [Allegiant Air's face mask policy](#)

- [What's Allegiant Air's logic for not requiring masks?](#)

- [Is there an ulterior motive to Allegiant Air's policy?](#)

- [To the anti-mask crowd: vote with your wallet](#)

- [Bottom line](#)

## Allegiant Air's face mask policy

[Ultra-low-cost carrier Allegiant Air](#) doesn't require passengers to wear face masks. To my knowledge, there's no other major US airline with such a policy.

[Allegiant has a webpage](#) titled ["Going the Distance for Health and Safety,"](#) which describes all the initiatives the airline is taking. In some ways, Allegiant is more progressive than other airlines, as each passenger gets a complimentary health and safety kit with a face mask, gloves, and two sanitizing wipes.

At the same time, the airline doesn't require passengers to wear face masks. Heck, the above webpage doesn't even encourage passengers to wear masks.

Ironically the airline makes the following claim:

We work closely with the Centers for Disease Control and Prevention (CDC), Word Health Organization (WHO) and other authorities and experts. Based on their direction, we

ensure our actions not only follow current guidance, but exceed the recommended standards so you can fly with confidence.

The CDC does recommend that people should wear face masks in situations where social distancing isn't possible, so I'm not sure how exactly Allegiant is exceeding recommended standards.

## What's Allegiant Air's logic for not requiring masks?

I reached out to Allegiant Air to ask about the company's logic for not making face masks mandatory, and here's what I was told:

"We're constantly evaluating our policies to ensure they best meet our customers' needs. We strongly encourage passengers to wear face masks in all of our communications with them. We send reminder emails before their flights and make announcements at the gate and on board each flight. However, we find that most of our passengers have already adopted mask-wearing as a standard practice. We've also heard from customers with asthma and other health conditions who say they can't wear masks. We want to ensure our policies accommodate them, as well.

As an extra precaution, we provide each passenger with a free health and safety kit as they board their flights. The kits include a mask, gloves and sanitizing wipes. Passengers tend to already have their own wipes and masks but they appreciate the extra supplies we provide."

## Is there an ulterior motive to Allegiant Air's policy?

In some way, I respect the fact that Allegiant Air is doing a better job of managing expectations than other airlines. Other airlines "require" face masks, but face mask usage isn't as common or consistent as you'd hope, as I recently experienced firsthand.

Meanwhile, if you fly Allegiant, you should have no expectations that someone seated next to you is wearing a face mask, because there's no requirement to do so. Then you also won't be disappointed.

Is Allegiant Air's policy that straightforward, though, or does the airline have an ulterior motive? I've been in Nevada, Arizona, and Utah, the past couple of days, and have been in complete disbelief about how coronavirus is viewed here. I'll save that for another post, but simply put, a vast majority of people don't wear masks here.

When you look at the markets Allegiant Air serves, I can see how for some people this policy may actually be a selling point.

## To the anti-mask crowd: vote with your wallet

Flying Allegiant Air seems like the perfect solution for the anti-face mask crowd:

- You can support an airline that doesn't require face masks

- You can fly with like-minded people

That seems like a much better option than giving your money to a greedy company that's infringing on your personal liberties, no? 😊

While Allegiant obviously has a slightly different route network than other major airlines, odds are decent that they at least fly somewhat close to where you may need to go within the US, even if a bit of extra driving is needed.

## Bottom line

Allegiant is the only major US airline to not require passengers to wear face masks. The airline does offer face masks and gloves to passengers, but there's no requirement to wear them.

The airline notes that passengers are "encouraged" to wear masks, but because some passengers have health issues, the airline doesn't want to make it mandatory.

I have a hard time believing that this isn't a more deliberate move, though. With every other airline requiring masks, Allegiant is an outlier. I think the most likely explanation is that this is a reflection of some of the markets that Allegiant serves, and therefore the perception that many Allegiant passengers may have towards face masks.

**What do you make of Allegiant Air's decision to not require passengers to wear face masks?**

# Plaintiffs' Exhibit 434

onemileatatime.com

## Allegiant Air Will (Finally) Require Face Coverings | One Mile at a Time

2-3 minutes                6-26-20

---

Better late than never, I suppose?

- Allegiant Air will require face coverings

- Why did it take Allegiant so long to add this rule?

- Bottom line

For quite a while now, Allegiant Air has been the only major US airline to not require passengers to wear masks. That will finally be changing. **As of July 2, 2020, Allegiant Air will require passengers to wear face masks at all times when traveling, including at the ticket counter and gate, during boarding, and while onboard the aircraft.**

https://twitter.com/braden_duran/status/1276528402464256006

## Why did it take Allegiant so long to add this rule?

Last week I wrote about how Allegiant Air was the only major US airline to not require face coverings during travel. Here's how the airline justified the policy:

"We're constantly evaluating our policies to ensure they best meet our customers' needs. We strongly encourage passengers to wear face masks in all of our communications with them. We send reminder emails before their flights and make announcements at the gate and on board each flight. However, we find that most of our passengers have already adopted mask-wearing as a standard practice. We've also heard from customers with asthma and other health conditions who say they can't wear masks. We want to ensure our policies accommodate them, as well.

As an extra precaution, we provide each passenger with a free health and safety kit as they board their flights. The kits include a mask, gloves and sanitizing wipes. Passengers tend to already have their own wipes and masks but they appreciate the extra supplies we provide."

On the one hand, I can appreciate the challenge some other airlines have when it comes

to enforcing face mask policies. I don't love the fact that airlines have created face mask policies they can't enforce, especially since many people rely on others to wear masks in order to feel comfortable on planes.

On the other hand, at least trying to require face masks to be used seems better than not requiring it.

## Bottom line

Allegiant Air will become the last major US airline to require passengers to wear face masks as of July 2, 2020. Welcome to the club, Allegiant!

Meet Ben Schlappig, OMAAT Founder

Plaintiff's Exhibit 435

Expand All | Collapse All

## Face Covering Policy

### Am I required to wear a face covering?

Yes, ==federal law requires every person to wear a face covering that covers the nose and mouth at all times while traveling.== Face coverings must be made of a solid material, fully cover the mouth and nose, fit snugly against the face, and be secured under the chin. Prohibited coverings include those with exhalation valves, holes (such as lace or mesh), neck gaiters, and bandanas. Face shields may be worn in addition to a face covering, but not as an alternative.

Learn more about the CDC's face covering recommendations here.

### Are Allegiant employees required to wear face coverings?

Yes, federal law requires every person to wear a face covering at all times. However, the law states face coverings can be briefly removed when communicating with a person who is deaf or hard of hearing or when the ability to see the mouth is essential for communication.

### Can I remove my face covering to eat, drink, or take oral medication?

Yes, you may briefly remove your face covering to eat, drink, or take oral medication, but prolonged removal is not permitted. Face coverings must be worn between bites and sips.

### Can I wear a bandana?

No, face coverings must be secured under the chin.

### Can I wear a face mask with a valve?

No, face coverings with exhalation valves are prohibited.

### Can I wear a face shield instead of a face mask?

No, face shields may be worn in addition to a face covering, but not as an alternative.

### Can I wear a neck gaiter?

No, neck gaiters are prohibited.

## Do children have to wear a face covering?

Children under the age of 2 are not required to wear a face covering.

## Do I have to wear a face covering at the airport?

Yes, federal law requires every person to wear a face covering at all times in airports and on commercial aircraft.

## Does Allegiant provide face coverings?

Yes, you can use your own face covering, but we also provide complimentary health and safety kits upon request that contain a single-use face mask and two sanitizing wipes. Please be advised that federal regulations require face masks to enter the airport.

## What if I choose not to wear a face covering?

Refusal to wear a face covering is a violation of federal law and can result in denial of boarding, removal from the aircraft and additional penalties.

## What should I do if I have a disability that prevents me from removing a face covering without assistance?

Those with limited mobility who are unable to remove a face covering without assistance are exempt from the requirement. To request face mask exemptions, please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved, a negative COVID test will be required within 3 days of each flight segment. Details for submission of negative tests will be provided upon exemption approval.

## What should I do if I have a medical condition that prevents me from wearing a face covering?

To request face mask exemptions, please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved, a negative COVID test will be required within 3 days of each flight segment. Details for submission of negative tests will be provided upon exemption approval.

**allegiant**

IWA to HOU   One way  |  Jun 20  |  1 Seated  |  Modify ▼

🔵 Log in

Trip Total:
**$110.00**

CANCEL

## Special Assistance

Allegiant is happy to assist passengers with disabilities. An Allegiant representative must be notified at the airport to receive disability accommodations.  Please visit our FAQs ⬈ page for more information.

☐ Wheelchair Assistance

☐ Traveling with personal wheelchair/scooter

☐ Traveling with Portable Oxygen Concentrator (POC)

☐ Service Animal (i.e. trained guide dog)

☐ Deaf/Hard of Hearing (Assistance is required)

☐ Blind/Low Vision (Assistance is required)

☐ Intellectual or Developmental Disability

### Other Services Information

mask exemption

Please note that, for safety reasons, all passengers must be able to sit upright unassisted during taxi, take off and landing, or provide an FAA approved Orthotic Positioning device which enables upright positioning without attachment to the seat. For more information, visit our FAQs ⬈ .

Plaintiffs' Exhibit 436

Home   **LOG IN**    English ▼   Search AA.com®   



**PLAN TRAVEL   TRAVEL INFORMATION   ADVANTAGE®**   

⌂ Home   ›   Travel updates

# Travel updates

ⓘ ## Testing requirements to enter the U.S. have changed

All travelers to the U.S. – 2 years and older – must show proof of a negative COVID-19 test taken 1 day before departure (or proof of recovery) regardless of citizenship or vaccination status.

Read more about vaccine and testing requirements »



## Health and testing requirements

The U.S. and countries around the world have a range of travel restrictions and testing requirements due to COVID-19. You may not be allowed to travel to certain destinations or may be required to self-quarantine when you arrive.

Travel requirements are updated often, so we recommend checking the latest entry requirements before your trip.

Travel and health restrictions by destination ⧉

## U.S. entry requirements

The U.S. government has changed requirements to enter the U.S. based on citizenship / residence and vaccination status. All travelers 2 and older entering the U.S. must provide their contact information within 72 hours of departure and a negative COVID-19 test. Travelers must also sign an attestation form confirming they meet U.S. entry requirements or will not be allowed to board the plane.

⌄ How U.S. travel requirements apply to you

⌄ Vaccine and testing requirements

⌄ Attestation forms

⌄ Contact tracing

# Face coverings

U.S. federal law requires that you wear a face covering at all times while indoors at the airport and on board your flight, regardless of vaccination status. If you refuse to wear one, you may be denied boarding and future travel on American. You may also face penalties under federal law.

These rules do not apply to children under 2, or if you have a disability that prevents you from wearing a face covering and meet the exemption requirements.

Visit the Centers for Disease Control and Prevention (CDC) website for more information about the mask requirement.

Requirement for face masks on planes and in airports ⧉

You should bring your own face covering to use while traveling. While limited quantities of face coverings may be available at the gate, they will not be available for every customer on every flight.

⌄ Acceptable face coverings

⌄ During your flight

⌄ Exemption for customers with disabilities*

If you may be exempt because you have a disability that prevents you from safely wearing a mask as defined by the Americans with Disabilities Act (42 USC 12101 et. seq) you must contact us at least 72 hours before you plan to travel and travel with documentation confirming a negative COVID test or recovery.

Please note, making false claims of a disability or a health condition to obtain an exemption from wearing a face covering may result in denial of travel on American for the duration of the U.S. federal mask requirement.

Call Special Assistance: 800-237-7976

*This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. It is not meant to cover persons for whom mask-wearing may only be difficult.

# Travel flexibility

We're making travel easier by giving you even more flexibility and the freedom to make your own choices when you fly with us.

Here's what you can expect:

- No more change fees for all domestic, short-haul international and select long-haul international flying on Premium Cabin, Premium Economy and Main Cabin fares. Basic Economy fares bought on or after April 1, 2021 are non-refundable and non-changeable.
- Fly standby for free on earlier domestic flights, including Puerto Rico and the U.S. Virgin Islands, to the same destination on the same day.
- If you buy Basic Economy fares you may now buy extras like upgrades, seats, priority boarding and same-day flight changes.

Plaintiffs' Exhibit 437

wcjb.com

## Confusion over Delta face mask policy causes trouble for one local mom

4-5 minutes

---

GAINESVILLE, Fla. (WCJB) - Traveling alone with a toddler is already a stressful experience, but the airline face mask policies can cause some big headaches for parents - especially when airline employees are not consistently interpreting the policy the same way.

"I was trying but at the end of the day she is three," said an emotional Krystyn Linville.

Krystyn and her daughter, Finley, were traveling to see her mother in North Carolina. Krystyn, knowing the Delta face mask policy, was prepared for the flight. The mother packed three different masks, a tablet and plenty of snacks for her three-year-old daughter.

After some initial fussiness and a mask selfie, Finley was slowly adjusting - thats when things took a turn.

"Flight attendant was going through her walk through, and I guess Finley's mask had fallen down, and it was down her chin area," Krystyn told TV20. "She said to me, 'I need you to put her mask on or I am going to call the gate attendant and have you guys removed from the plane – that was the very first sentence she ever said to me."

Krystyn says the flight attendants continued to harass her and her daughter about the mask throughout the flight, even though Finley only removed her mask when she was snacking - which is allowed.

Snacks that the flight attendants, Krystyn says, did not even want to provide to her - despite other passengers receiving them.

Their constant presence stressed an already frazzled Finley and made the situation worse for the toddler and the mother.

In Atlanta, Krystyn tried to ask someone at Delta customer service about the face mask policy.

"Here is the policy," she told the Delta representative. "I pulled out my phone and went onto Delta's website, and I showed him the policy, and he said, 'that's not what the policy said."

The rep then appeared at the gate at her connecting flight to warn the next flight crew that

her daughter "was a problem."

Krystyn flew on Endeavor Air, which is a Delta partner and abides by Delta policies.

She argued that the part of the face mask policy that exempts 'young children who cannot maintain a face covering' fit her situation. The policy even exempts unaccompanied minors from wearing a face mask - those kids ranging from 5 to 17-years- old.

In a statement to TV20, Delta writes: "Wearing a mask or face covering is one of the most important ways customers and employees stay safe while flying. We apologize for any confusion or miscommunication that may have occurred on this trip, and we are in touch with our Delta Connection partner that operated the flight to look in to the situation."

"There is no federal mandate, so everything is airline to airline," said Travelers United President and co-founder Charles Leocha. "But not only is it airline to airline, it's flight attendant to flight attendant."

Leocha, who works for a travel advocacy group that lobbies in Washington, has seen a spike in cases of families getting kicked off of flights.

"It's foolishness," said Leocha, who says flight crews should be more reasonable when dealing with younger children.

Although Krystyn says the Delta rep spoke to the second flight crew, the flight attendant on the flight, realizing the situation, offered Finley a bottle of water - which would allow the three-year-old girl to take a break from wearing a mask if she wanted to.

"Just frustrating to not wanting to have this trip taken away from my mom and to not let grown people treat my child the way they were treating her," said Krystyn.

Krystyn and her daughter are set to return home to Gainesville on Friday, and she is anxious about her upcoming trip.

"It is already going to be stressed flying with a toddler. They already present their own challenges, but then to not know if the staff is going to treat us appropriately or treat my daughter appropriately and just be educated or aware of their policy."

*Copyright 2020 WCJB. All rights reserved.*

Plaintiffs' Exhibit 438

naturalnews.com

# Delta Air Lines bans over 100 people from flying with them for refusing to comply with company's mask mandate

*Arsenio Toledo*

5-7 minutes

8 - 8 - 2 0



(Natural News) Delta Air Lines CEO Ed Bastian said that his company's no-fly list has greatly expanded after they started banning passengers from flying with Delta if they refuse to comply with the company's COVID-19 mask mandate.

"We've had well over 100 people that have refused to keep their mask on during the flight," Bastian said in an interview. The CEO further said that while a vast majority of Delta's flyers have complied with the company's mask mandate, the few who did not have been blamed for causing flight disruptions.

A company spokesperson confirmed that these people have lost their ability to book future flights with Delta.

Bastian said during his interview that passengers are not allowed to board a plane if they

aren't wearing masks. However, employees have reported that once people are on the plane many try to take off their masks. Flight attendants have regularly tried to get the passengers to keep their masks on for the duration of the flight, warning that if they continue with their behavior they will not be allowed to fly with the company.

One infamous incident occurred on July 23. A Delta flight going to Atlanta, Georgia, went back to Detroit, Michigan after two passengers refused to keep their face coverings on. The flight later departed for its original destination. Social media has been flooded with viral videos of people asserting their individual rights. (Related: Harvard doctor wants US to enforce national mask mandate; Surgeon General says order may lead to REBELLION.)

Mask fight on a plane. The goal of all global corporate media is to create then grow this kind of division amongst people so that the most evil people in the world can consolidate wealth & power. They are satan's mouthpiece pic.twitter.com/MbQRUigPQ9

— George (@jitotweets) August 2, 2020

Bastian has urged people who are considering flying without a mask to consider traveling with other airlines that have fewer restrictions, to figure out other means of traveling or to simply not travel at all.

Listen to this episode of the *Health Ranger Report*, a podcast by Mike Adams, the Health Ranger, as he talks about how people can use the logic employed by the lunatic liberal mob in order to claim that they are wearing a face mask despite their objections over being forced to wear one.

## Delta Air Lines more focused on profits than on upholding individual rights

In a letter Bastian sent to Delta employees on Thursday, August 6, the CEO talked about how the company needs to not only keep customers happy, but to also ensure that public health protocols are met. He emphasized that this was going to be Delta's business strategy for the foreseeable future.

"We want to ensure that those who travel now are choosing Delta," the letter read. This strategy will allow the company to bring in additional revenue, which will help keep them afloat and also "build additional loyalty and affinity for our brand, which will power our growth when demand begins to come back."

Delta and other major American airline companies are focused on making sure that they make enough money, as the COVID-19 pandemic has tanked much of their revenue due to the slowdown in worldwide travel.

From April to June, the company reported that it had 93 percent fewer passengers than it did during the same three months last year. In July, the company's second quarter report showed that Delta had a net loss of $5.7 billion, the largest since the 2008 financial crisis.

Delta and several other airlines announced early in June that they would be forcing their passengers to wear face masks whenever they fly on their planes. Other airline companies that have announced similar mask mandates include United Airlines and American Airlines.

Delta's own mandatory mask policy came into effect on May 1 and it required all of the company's passengers to wear a mask for the duration of the flight. The company has distinguished itself as having some of the strictest rules regarding masks among airline companies, such as preventing middle seats from being sold in order to maintain some level of social distancing between passengers.

Delta's policy also requires people who want to be exempted from wearing a mask due to health concerns to go through a process known as the "Clearance to Fly screening process" before being allowed to board a Delta plane.

This screening takes place over the phone and is conducted in partnership with the _University of Pittsburgh Medical Center_ (UPMC). A physician has the final say over whether or not a person looking to fly can board the Delta plane without a mask. It can take up to an hour to complete.

If the physician finds that they are not allowed to fly without a mask, the customer can ask to be rebooked for a later flight or get a refund. If they insist on boarding the plane or if they make false medical claims, Delta can temporarily blacklist customers from booking flights with their company. The worst offenders, the company warns, can be permanently banned from flying with Delta.

Delta has not stated when their mask mandate will end.

Learn about all the other companies that are using the Wuhan coronavirus pandemic to impose their will upon their potential customers with tyrannical policies such as mask mandates by reading the articles at Pandemic.news.

**Sources include:**

DailyMail.co.uk

Edition.CNN.com

BusinessInsider.com

FoxBusiness.com

Plaintiffs' Exhibit 439

news.delta.com

# Delta expands safety commitment by requiring all customers to wear face coverings across travel

5-6 minutes        4-30-20

In keeping with best practice guidelines from the CDC, <mark>starting May 4 Delta will require all customers to wear a face mask or appropriate face covering when traveling.</mark>



Delta employees and customers will experience an extra layer of protection starting May 4, as we require all customers to wear a face mask or appropriate face covering when traveling with us.

In keeping with best practice guidelines from the Centers for Disease Control, this move comes on the heels of our announcement earlier this week requiring employees worldwide to wear face masks if they are unable to maintain six feet of distance with customers or each other. This requirement for our

people helps set the example for our customers to follow as well.

This action is one more way we are working to protect our people and customers, as well as doing our part in the broader community to help slow and stop the spread of the virus. Other measures include:

- New temporary requirements for employees to wear masks or face coverings when within six feet of others while at work, starting this week

- Employee temperature checks

- Enhanced cleaning measures implemented in airports and on aircraft

- Expanding electrostatic spraying procedures, which disinfect employee work and break areas, to more locations

"Nothing is more important than the health and safety of our people and our customers," said Bill Lentsch, Chief Customer Experience Officer. "While we remain committed to our new standard of clean and to providing more space for our customers when they travel, we take seriously the CDC guidelines for adding this extra layer of protection. We believe this change will give customers and employees some additional comfort when traveling with us."

Please visit the CDC website for guidance on:

- Recommendations for masks, including how to make one at home

- Use of Cloth Face Covering to Help Slow the Spread of COVID-19

Face coverings will be required starting in the check-in lobby and across Delta touchpoints including Delta Sky Clubs, boarding gate areas, jet bridges and on board the aircraft for the duration of the flight – except during meal service. Their use is also strongly encouraged in high-traffic areas including security lines and restrooms. People unable to keep a face covering in place, including children, are exempt.

This temporary requirement will be communicated to customers using the same channels we have shared changes to service and experiences throughout this pandemic. Delta.com, Pre-flight emails and Fly Delta app push notifications will serve as reminders before heading to the airport, while

signage, displays and, of course, our incredible Delta people will support this effort via announcements once traveling. And while we continue to encourage customers to bring their own face covering when traveling with us, supplies will be available for customers who need them.

**Delivering on Delta's New Standard of Clean**

Delta will continue evaluating our practices and new opportunities to support personal safety. Requiring customers and employees to wear face coverings throughout their journey is one of many steps Delta has taken to protect their health and safety, while providing an essential service to the communities we continue to serve. These efforts and our new standard of clean include:

- Expanding electrostatic sanitizing spraying – to all aircraft and adopting extensive pre-flight cleaning practices that disinfect high-touch areas – on top of existing cleaning measures and the use of state-of-the-art air circulation systems with HEPA filters that extract more than more than 99.999% of even the tiniest viruses on many Delta aircraft

- Taking steps to give customers and employees more space for safer travel on the ground and in the air by blocking middle seats, reducing the number of customers on each flight and pausing automatic Medallion Complimentary Upgrades

- Adjusting the boarding process to encourage more space for safer travel by boarding all flights from back-to-front — reducing the instances of customers needing to pass by one another to reach their seats

- Streamlining onboard food and beverage service on all flights and encouraging customers to pack their own food and beverages to decrease touch points

- Providing supplies directly to customers when available, including hand sanitizers, amenity kits and other protective equipment to minimize the spread of COVID-19 and other viruses

- Connecting with health experts, partners and healthcare industry leaders on best practices

*A comprehensive list of onboard changes can be found on delta.com.*

Plaintiffs' Exhibit 440

onemileatatime.com

## Delta Air Lines Adds Face Mask Requirement | One Mile at a Time

3 minutes

4-30-20

---

And now all airlines seem to be following one another. We've just seen announcements from JetBlue, Frontier, and American, regarding passengers having to wear face masks. Now Delta is joining the club as well.

- Delta Air Lines will require face masks
- Delta will have masks for those who need them
- Bottom line

### Delta Air Lines will require face masks

As of May 4, 2020, Delta Air Lines will require all employees and customers to wear a face masks or appropriate face covering.

Face coverings will be required throughout the journey, including at check-in, in Delta SkyClubs, at boarding gates, in jet bridges, and onboard flights.

There are a couple of exceptions:

- People unable to keep a face covering in place, including children, are exempt
- Face coverings don't have to worn during meal services

Delta also notes that face masks are "strongly encouraged" in high-traffic areas at the airport that aren't Delta-specific, like security lines and restrooms.

This is a temporary requirement, and they'll be communicating this with customers through the same channels they have shared all other changes.

As Delta's Chief Customer Experience Officer describes this decision:

"Nothing is more important than the health and safety of our people and our customers. While we remain committed to our new standard of clean and to providing more space for our customers when they travel, we take seriously the CDC guidelines for adding this extra layer of protection. We believe this change will give customers and employees some

additional comfort when traveling with us."



## Delta will have masks for those who need them

While Delta encourages customers to bring their own face coverings when traveling, <mark>the airline will have supplies available to those who need them.</mark> Presumably they would be available starting at check-in, since a face covering is required throughout the Delta journey.

## Bottom line

It seems like we're quickly getting to the point where most (and probably eventually all) US airlines will require passengers to wear face masks. I firmly believe that this is the right move for now, given the lack of social distancing that's possible on aircraft.

Hopefully this requirement doesn't last as long as the ban on liquids… 

Meet Ben Schlappig, OMAAT Founder

Plaintiffs' Exhibit 441

paddleyourownkanoo.com

## Delta Becomes First U.S. Airline to Require Customers Who Claim a Medical Exemption for Not a Wearing Face Mask to Get Pre-Clearance

*by Mateusz Maszczynski 17th July 2020*

3-4 minutes

Delta Air Lines has become the first major U.S. carrier to require passengers who claim a medical exemption for not wearing a face mask on one of its planes to first obtain clearance from a physician. Despite mandatory face mask rules, passengers have been able to claim a medical reason for not wearing one without providing any proof.

"Customers with health conditions or disabilities that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport," an updated FAQ's section on Delta's website informs passengers.

The process for passengers who need pre-clearance, Delta warns, could take up to an hour and will involve a virtual consultation with a healthcare professional.

The Atlanta-based airline does not provide a list of possible exemptions, suggesting passengers will be considered on a case-by-case basis. Details will be passed to gate staff and flight attendants to ensure they know which passengers won't be wearing a mask.

The new rules won't take effect until Monday, July 20th and the service will be available 24 hours a day.

"Medical research tells us that wearing a mask is one of the most effective ways to reduce the COVID-19 infection rate," a spokesperson for the airline explained.

"That's why Delta remains committed to requiring customers and employees to wear a mask or face covering as a consistent layer of protection across all Delta touchpoints. We encourage customers who are prevented from wearing a mask due to a health condition to reconsider travel."

"If they decide to travel, they will be welcome to fly upon completing a virtual consultation

prior to departure at the airport to ensure everyone's safety, because nothing is more important."

Several weeks ago, Delta joined other U.S. including American and United in threatening to ban passengers who simply refuse to wear a face mask. Flight attendants don't have the power to enforce face mask rules if someone doesn't wear a mask onboard a flight but they file a report after the flight and passengers face being added to a 'no fly' list.

Several international airlines, including Dutch flag-carrier KLM, have required passengers who have a medical reason for not wearing a face covering to seek pre-clearance since mandatory face mask policies were introduced.

Federal authorities have declined to mandate the wearing of face masks onboard flights despite calls from lawmakers and flight attendant leaders.

**Sign Up for the Cabin Crew Brief**

Get the latest cabin crew recruitment news delivered to your inbox once a week...

[Mateusz Maszczynski](#)

Mateusz Maszczynski is a serving international flight attendant with experience at a major Middle East and European airline. Mateusz is passionate about the aviation industry and helping aspiring flight attendants achieve their dreams. Cabin crew recruitment can be tough, ultra-competitive and just a little bit confusing - Mateusz has been there and done that. He's got the low down on what really works.

Plaintiffs' Exhibit 442

travelsort.com

## Delta: For Face Mask Exemption Must Have Pre-Flight Medical Evaluation

4-5 minutes            7-19-20



.

==Delta Airlines, as with Most Other Airlines Flying During Covid-19, Requires that Passengers Wear Face Masks While Aboard==, as well as during check-in, boarding, and in Delta Sky Clubs. Delta's face mask requirement is expected to remain through at least December 31, 2020, and could well be extended.

==There are exceptions for children and for passengers with health conditions or disabilities that prevent wearing a mask,== and passengers are also able to remove a mask to consume food and drink.

In the absence of a U.S. federal mandate (or even a DoT mandate) however, some adult passengers without a disability or medical reason that prevents wearing a mask have not

complied with Delta's (or other airlines') face mask requirements, potentially putting other passengers needlessly at risk of being infected with coronavirus. There's only so much flight crew can do vis-a-vis the more intransigent passengers, since crew are supposed to de-escalate situations with any non-compliant passengers.

Delta is now taking a stronger approach that may prevent non-compliant (but otherwise healthy) individuals from boarding in the first place: urging passengers that are unable to wear a mask not to fly ("strongly encouraged to reconsider travel"), or otherwise face a mandatory "Clearance to Fly" pre-flight evaluation conducted virtually by STAT-MD prior to the flight.

STAT-MD is Delta's in-flight emergency medical partner, staffed by physicians that are also knowledgeable about FAA regulations and the Air Carrier Access Act, which prohibits discrimination on the basis of disability when it comes to air travel.

Since the ACA prohibits airlines from requiring advance notice that a person with a disability is traveling, the new "Clearance to Fly" procedure will be conducted at the airport; Delta's coronavirus FAQ says to arrive early as the process can take over 1 hour.

While Delta can make a note on the passenger's profile of a medical exemption, after successfully undergoing the "Clearance to Fly" pre-flight evaluation, the airline can require it for future flights, such that those requiring a medical exemption may need to continue to arrive earlier for their Delta flights.

United and American Airlines have threatened to ban passengers who refuse to wear face masks but don't have a medical exemption. That can be difficult to enforce once such passengers are already on the plane. Delta's approach makes more sense, since it requires all passengers who want to claim a medical exemption to declare this prior to boarding, and be interviewed by a licensed physician. For those with true medical exemption needs, that won't pose an issue, other than arriving an hour earlier, but it may well deter those who don't have a legitimate medical reason for not wearing a face mask, since Delta plans to ban passengers who make false claims, bolding mine:

"**Any false claims** of a disability or health condition **to obtain an exemption from wearing a mask** or face covering may result in the **suspension of travel privileges on any Delta flight** for the duration of the mask/face covering requirement."

**If you've flown on a Delta flight recently, how compliant were other passengers about wearing face masks?**

**Recommended Posts**

United, AA, Delta, JetBlue Require Face Masks for Passengers

Review: Delta One A330 Paris to NYC

Plaintiffs' Exhibit 443

delta.com

# Face Masks | Delta Air Lines

5-6 minutes



**For everyone's safety, face masks are required.**

Delta customers, employees and partners are required to wear a face mask or appropriate cloth face covering over their nose and mouth throughout their travel.

Federal law requires each person to wear a mask at all times while in the airport and when using public transit, during boarding and deplaning, and for the duration of the flight. Refusal to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties





## When Masks Are Required

Masks or face coverings are required from curb to claim throughout the airport, including these Delta touchpoints:

- Lobby Check-in
- Delta Sky Clubs
- Boarding Gate Areas
- Jet Bridges
- On board the aircraft for the duration of the flight

Masks must be worn at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking – masks must be worn between bites and sips.

If oxygen masks are needed due to loss of cabin pressure or other events affecting aircraft ventilation, personal face masks should be removed to accommodate oxygen masks.

## Types of Masks

To comply with federal law and for the protection of our customers and employees, Delta has specified the types of masks allowed onboard in compliance with CDC guidance. Masks or face coverings should be secured to the head with ties or ear loops and should fit snugly but comfortably against the side of the face to ensure proper fit.

### Permitted Masks:

- Disposable surgical or medical masks
- Cloth masks with tightly woven fabric (2 or 3 ply masks are recommended)

- Valve-free respirator masks (N95 or KN95)

- Fabric masks with a clear plastic window

- Gaiters with two layers (single layer gaiters should be doubled over)

- Plastic face shields or goggles may be worn in addition to a mask but are not approved mask replacements

**Masks Not Permitted:**

- Any mask with an exhaust valve

- Masks with slits, punctures or holes

- Bandanas, scarves, ski masks, and balaclavas

- Novel and battery-operated masks that do not meet the specifications of the permitted masks listed above

## Mask Exemptions

Children under the age of two are exempt from the mask requirement.

Customers with a disability who cannot wear a mask for reasons related to their individual disability are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you are a customer with a disability who requires this exemption, please arrive early to complete the process during check-in to avoid missing your flight. This process can take over one hour and requests are now evaluated pursuant to the CDC and TSA's federal mask requirement for air transportation (adopted in February 2021). Mask exemptions only apply for travel onboard flights operated by Delta Air Lines and Delta Connection and do not exempt customers from any requirements that may be imposed by governments, including local, state or foreign countries, (at the origin or destination) or from requirements on other airlines. An exemption request is required for each unique itinerary, and each request is conducted on a case-by-case basis pursuant to law. Please consult your departure, connection and arrival locations for local mask mandate requirements.

Any false claims of a disability to obtain an exemption from wearing a mask or face coverings may result in the suspension of travel privileges on any Delta flight for the duration of the mask/face covering requirement and may be reported to appropriate government authorities.

Learn about Delta Partner carrier face mask policies.

## Related Links

Plaintiffs' Exhibit 444

[delta.com](delta.com)

# Face Masks | Delta Air Lines

5-6 minutes

---



**For everyone's safety, face masks are required.**

Delta customers, employees and partners are required to wear a face mask or appropriate cloth face covering over their nose and mouth throughout their travel.

Federal law requires each person to wear a mask at all times while in the airport and when using public transit, during boarding and deplaning, and for the duration of the flight. Those who have received a COVID-19 vaccination are still required to wear a mask. Refusal to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties.





## When Masks Are Required

Masks or face coverings are required from curb to claim throughout the airport, including these Delta touchpoints:

- Lobby Check-in

- Delta Sky Clubs

- Boarding Gate Areas

- Jet Bridges

- On board the aircraft for the duration of the flight

Masks must be worn at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking – masks must be worn between bites and sips.

If oxygen masks are needed due to loss of cabin pressure or other events affecting aircraft ventilation, personal face masks should be removed to accommodate oxygen masks.

## Types of Masks

To comply with federal law and for the protection of our customers and employees, Delta has specified the types of masks allowed onboard in compliance with CDC guidance. Masks or face coverings should be secured to the head with ties or ear loops and should fit snugly but comfortably against the side of the face to ensure proper fit.

### Permitted Masks:

- Disposable surgical or medical masks

- Cloth masks with tightly woven fabric (2 or 3 ply masks are recommended)

- Valve-free respirator masks (N95 or KN95)

- Fabric masks with a clear plastic window

- Gaiters with two layers (single layer gaiters should be doubled over)

- Plastic face shields or goggles may be worn in addition to a mask but are not approved mask replacements

### Masks Not Permitted:

- Any mask with an exhaust valve

- Masks with slits, punctures or holes

- Bandanas, scarves, ski masks, and balaclavas

- Novel and battery-operated masks that do not meet the specifications of the permitted masks listed above

## Mask Exemptions

Children under the age of two are exempt from the mask requirement.

Customers with a disability who cannot wear a mask for reasons related to

their individual disability are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you are a customer with a disability who requires this exemption, please arrive early to complete the process during check-in to avoid missing your flight. This process can take over one hour and requests are now evaluated pursuant to the CDC and TSA's federal mask requirement for air transportation (adopted in February 2021). Mask exemptions only apply for travel onboard flights operated by Delta Air Lines and Delta Connection and do not exempt customers from any requirements that may be imposed by governments, including local, state or foreign countries, (at the origin or destination) or from requirements on other airlines. An exemption request is required for each unique itinerary, and each request is conducted on a case-by-case basis pursuant to law. Please consult your departure, connection and arrival locations for local mask mandate requirements.

Any false claims of a disability to obtain an exemption from wearing a mask or face coverings may result in the suspension of travel privileges on any Delta flight for the duration of the mask/face covering requirement and may be reported to appropriate government authorities.

Learn about Delta Partner carrier face mask policies.

## Related Links

Plaintiffs' Exhibit 445

TRAVEL ALERT

Sign up for our latest deals!

We are committed to you and your well-being. <u>Learn more</u>.



# COMMITTED TO YOU

Frontier remains committed to ensuring that the sky is for everyone. This means going the extra mile in all that we do for you.



### HEALTH & SAFETY
<u>Learn More</u>



### TRAVEL TIPS
<u>Learn More</u>



### HELPFUL VIDEOS
<u>Learn More</u>



### CHANGE FEES
<u>Learn More</u>

Find the Spanish Committed To You page <u>here</u>

## FROM CHECK-IN TO ARRIVAL AT YOUR DESTINATION, WE ARE COMMITTED TO YOUR HEALTH AND SAFETY

The next time you fly with us, you'll notice that we've made several changes. We've been working around the clock to improve our customer experience and to safeguard your well-being. Whether you are planning a trip back home to give mom a hug or dreaming of planting your feet in the sand, rest assured that the extra measures we are taking are designed to provide a safe and pleasant travel experience from the time you check-in until you arrive at your destination.

*We'd like to share how Frontier is 'Committed to You' and what that means for you and your family when you're ready to travel again.*



Frontier Airlines Magic

## STEPS WE'RE TAKING TO SUPPORT YOUR WELL-BEING & COMFORT



### ENHANCED CLEANING ON & OFF THE PLANE

Our **Ticket Counters, Gate Areas, and Aircraft** are getting extra attention. We've increased cleaning intervals with EPA approved anti-virus cleaning solutions. Here's a more specific look at what we're doing onboard:

- **Before Every Flight** the aircraft is cleaned with a focus on passenger seating, cabin walls, overhead bins, galleys and lavatories.
- **Aircraft with Extended Time Between Flights** are cleaned to include a wipe down of all customer and crew touchpoints - lavatories, seats, armrests, tray tables, walls, overhead panels and bins, window shades and galleys - with a disinfectant EPA rated to be effective against viruses, including SARS-CoV-2, the virus that causes COVID-19.
- **Every night** while our planes are positioned overnight, our Aircraft Appearance Team spends 4 to 6 hours thoroughly cleaning the aircraft's interior from top to bottom using industry-recommended disinfectant.
- **Monthly** enhanced deep cleaning of the entire aircraft

utilizing an anti-microbial agent that reaches virtually every surface and forms a protective shield that continues to be effective against viruses for 30 days.



## FACE COVERINGS

As required by federal law, the Centers for Disease Control (CDC) Order and Transportation Security Administration (TSA) Security Directive, all* passengers and employees must wear a face covering over nose and mouth throughout the Frontier travel experience including at ticket counters, gate areas, baggage claim and onboard all flights. Face coverings are not required for children under the age of 2. Face coverings must fit snugly over your nose and mouth and be secured under the chin. Open-chin triangle bandanas, face coverings containing vents, valves or mesh material, and face shields are not acceptable as face-coverings. This level of protection is important for everyone's well-being. Not wearing an approved face covering is a violation of federal law and you may lose future travel privileges on Frontier.

Check out our blog post on 'How to Make a No Sew Face Mask' - link here.



## STATE-OF-THE-ART AIR FILTRATION TECHNOLOGY

Did you know, the air in the cabin is passed through an air filtration system that mixes with fresh air drawn from outside? This occurs up to every 3 minutes circulating the cabin with new air and sending the old air directly outside.

Our system uses HEPA filters capable of capturing respiratory virus particles at more than 99.9% efficiency. These are the same filters used in hospitals and doctors' offices.



## TEMPERATURE SCREENING

To help ensure the well-being of everyone onboard, a non-invasive temperature screening taken on the forehead using a touchless thermometer will be taken at the gate for all passengers and crew.

Anyone with a temperature of 100.4 degrees Fahrenheit or higher will not be able to board the plane. If time allows, we will give customers the opportunity to rest before receiving a second check. If the second temperature screening is 100.4 degrees or higher, our team will help the customer to rebook travel on a later date when they are feeling better.



## QUICK & EASY HEALTH ACKNOWLEDGEMENT

When you check-in for your flight on our website or mobile app, you will be asked to accept the following health acknowledgment:

- You will have your temperature screened by a touch-less thermometer prior to boarding. Anyone with a temperature of 100.4 degrees or higher will not be allowed to fly.
- You will **wear a face covering over your nose and mouth throughout your journey,** including ticket counters, gate areas, and onboard our aircraft.
- In the last 14 days, neither you, nor anyone in your household or that you have come in close contact with, has tested positive for, exhibited symptoms of, or been advised to quarantine for COVID-19.
- You will wash your hands/sanitize before boarding the flight.



## MAINTAINING SOCIAL DISTANCE

We're making space for you at our check-in counters and gate areas. Signage and floor markers have been placed throughout the gate and ticket areas encouraging customers to maintain social distancing.

At the gate, our boarding process has changed to load passengers from the back of the aircraft to the front. This helps to minimize "passing" contact with other passengers during the boarding process.

We're currently installing plexiglass partitions at our ticket counters for the added safety of both employees and passengers.

## OUR EVERYDAY DISINFECTION PROCEDURE AT A GLANCE

Let us take you through our everyday disinfection procedure. Aircraft disinfection is performed in accordance with the Airbus Aircraft Maintenance Manual (AMM).



1. Aircraft doors are opened.
2. Touchpoints and surfaces are sprayed and cleaned with a disinfectant cleaner.

3. All trash and waste is removed from the aircraft.
4. Anti-bacterial hand soap is added to the restrooms.

*The daily cleaning process takes several hours to complete. We have taken a variety of proactive measures with respect to COVID-19 including increased heavy cleaning of aircraft and increased supplies of cleaning and disinfection products on board.*



## FRESH AIR

The air onboard our planes is cleaner than many of the public places you visit daily. From outside the plane, clean air flows into the cabin via a sophisticated filtration system – using a hospital-grade HEPA filter - while old air is pushed back outside. Within every 3 minutes, you're breathing fresh outside-air.

## TOUCHLESS THERMOMETER SCREENINGS

Jake Filene, SVP Customers, talks about Frontier's new temperature screenings for both passengers and crew.





## HEPA FILTERS

Learn more about our HEPA (High-Efficiency Particulate Arrestors) aircraft filtration systems which filter 99.99% of dust particles and airborne contaminants such as viruses and bacteria.

## FACE COVERINGS REQUIRED FOR CUSTOMERS

At Frontier, your health and safety are our top priority. **Frontier customers are required to wear a face-covering over their nose and mouth throughout their journey**. This includes all ticket counters, gate areas, and onboard our aircraft.

Frontier flight crews are also required to wear face-coverings while working.



Committed to You - Face Masks

Based on CDC guidance, a suitable face covering should be an item of cloth that should fit snugly against the side of the face and that should be secured with ties or ear loops. It should also include multiple layers of fabric and allow for unrestricted breathing. The CDC recommends surgical masks and N-95 respirators be reserved for healthcare workers and other medical first responders. The policy will not apply to very young children who are unable to maintain a face covering.



Committed to You - Fogging

**CABIN FOGGING**



## CUSTOMER WELLBEING



## DISINFECTION



## HEALTHY TRAVEL TIPS

## STEPS WE ENCOURAGE WHEN TRAVELING

✓ **1 - Upon entering the airport, put your face-covering over your nose and mouth.**

✓ **2 - Bring your own gloves, hand sanitizer, and cleaning wipes.**

✓ **3 - Limit your touchpoints – for instance, download your mobile boarding pass prior to arrival.**
**It also saves time! And, bring your own snacks to avoid additional contact.**

✓ **4 - While in the terminal, maintain social distancing whenever possible.**



**Barry Biffle**
CEO, Frontier Airlines

**C. Jeffrey Knittel**
CEO, Airbus Americas, Inc

open

# A Special Message From Frontier and Airbus CEOs

## *FEDERAL & EXPERT GUIDELINES THAT WE

# FOLLOW

Frontier Airlines continues to closely monitor developments with respect to COVID-19.

- Mask Exemptions for Customers with Disabilities
  Customers with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) can apply for a face mask exemption. To learn about pre-travel exemption requirements, click here. This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. It is not meant to cover persons for whom mask-wearing may only be difficult.
- As a U.S.-based commercial airline, we coordinate closely with multiple federal and other agencies to ensure we are continuously operating under established best practices for aircraft cleanliness and sanitation. Among those, we follow the recommendations set forth by the **CDC for 'Preventing Spread of Disease on Commercial Aircraft'** as well as adhere to our own stringent internal guidelines.
- All of our aircraft are regularly cleaned using disinfectant deemed by the U.S. Environmental Protection Agency (EPA) as effective against COVID-19.
- If you need travel advice, we recommend visiting the U.S. Centers for Disease Control's (CDC) website at cdc.gov/travel.

From our family to yours, we look forward to welcoming you onboard again soon!



TRAVEL ALERT                                    Sign up for our latest deals!

We are committed to you and your well-being. Learn more.

Travel / Travel Info / **Special Services**



# SPECIAL SERVICES

Need a little extra help? We are happy to assist you. Here is some information on our services and policies.

If you seek additional assistance with booking a flight, flight information, or have a special services request, please call us at 801-401-9004 or fill out our Contact Us Form.

# PICK A TOPIC FOR MORE INFORMATION

## Mask Exemptions for Customers with Disabilities                    open

If you are a person with a disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) and that disability prevents you from safely wearing a mask, and you are requesting an exemption to the CDC order requiring masks to be worn during air travel, the following requirements must be met:

- At least 10 days prior to departure:
  - Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act. Form Here
    - State license number (or, if applicable, other medical license information) from the medical provider must be included on the letter.
    - Frontier will contact your licensed medical provider to validate the document.
    - Any customer who presents falsified medical documentation will be subject to suspension of their privileges for future travel on Frontier.
    - Failure to provide 10 days' notice will result in denial of the request.
- At the airport on each day of travel:
  - The customer must check in at the Frontier ticket counter a minimum of 2 hours prior to departure.
    - Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight. This evidence must be shown to the Frontier representative at the airport before boarding each flight.
- These testing requirements apply to return travel.



# Face Mask Exemption

This form should only be used by customers requesting an exemption to the Centers for Disease Control (CDC) Order and Transportation Security Administration (TSA) Security Directive requiring masks to be worn during air travel and who meet the following requirements:

- Customers with a disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) whose disability prevents them from safely wearing a mask.
- The request is being submitted at least 10 days before departure.
- The request includes:
    - Documentation from a licensed medical provider on professional letterhead stating the customer requesting the exemption is a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)
    - The documentation includes the medical professional's state license number (or, if applicable, medical license information)

A representative from Frontier Airlines will contact the licensed medical provider to validate the document.

Any customer who presents falsified medical documentation will be subject to suspension of their privileges for future travel on Frontier Airlines.

Enter the information for the customer that is requesting the mask exemption.

**Email Address** *

**Frontier Confirmation Code** *

**Passenger First Name** *

**Passenger Middle Name**

**Passenger Last Name** *

Please note that the Passenger Name entered must match the Reservation.

## Origin Departure Date

**MM      DD       YYYY** *

| 5 ⌄ | 24 ⌄ | 2021 ⌄ |

Please note: failure to provide 10 days' notice will result in denial of the request.

---

**Attach Documentation (PDF preferred and size should be less than 10 MB)** *

Browse...   No file selected.

---

Continue...

Earn **507 mi.** on this trip! Learn More

Add Additional Services & Information

| Special Services [-] | Cabin Pet [+] | Redress Number [+] | Known Traveler Number/TSA Pre✓/® [+] |

We make sure to take care of passengers who need special assistance.

Select Special Service(s)

Wheelchair Services

☐ Can walk some short distances/need help to/from gate

☐ Can walk short distance/cannot use stairs/need help to/from gate

☐ Aisle chair needed, transfer assist to/from aircraft seat

☐ I have my own wheelchair

Special Assistance

☐ Blind or Vision Impairment

☐ Deaf or Hearing Impairment

☐ Cognitive or Developmental Disability

☐ Request Trained Service Animal

For more information about special services at Frontier, please visit our special services page.

Please Note: For safety reasons, passengers must be able to sit upright (unassisted) during taxi, take off and landing to travel on Frontier Airlines.

Plaintiffs' Exhibit 446

hawaiianairlines.com

## Keeping You Safe | Hawaiian Airlines

8-10 minutes

---

Our primary concern is always the health and safety of our guests and employees. In line with recommendations by leading public health authorities, we have reinforced and enhanced cleaning procedures across our business, including regularly reviewing our safety measures to align with new research as it becomes available. Recent studies from respected researchers such as the **Harvard T.H. Chan School of Public Health** and the **Department of Defense** have validated that the risk of viral transmission on board a commercial aircraft is extremely low.

**At the Airport** | **On Board Our Aircraft** | **Changes to In-Flight Services**

**At the Airport**
**On Board Our Aircraft**
**Changes to In-Flight Services**

### At the airport





- Hawaiian Airlines airport employees wear face masks when interacting with guests.

- Federal law requires that all guests two years and older wear a mask at the airport, while boarding, through the duration of the flight and while deplaning at their destination. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft and/or penalties under federal law.

- Masks worn during travel must meet **CDC's requirements**, including:

- The mask must completely cover the nose and mouth and should fit snugly against the side of the face, secured to the head with ties or ear loops. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.

- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).

- Masks should be a solid piece of material without vents, mesh, slits, exhalation valves, punctures, or other obviously transparent cloth coverings.

- Scarves, ski masks, balaclavas and bandannas are not acceptable forms of face masks.

- Guests must wear their masks at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking; masks must be worn between bites and sips.

- Face shields or goggles cannot be used in lieu of a face mask, but may be used in addition to an appropriate mask.

- Personal air purifiers can be brought on board, but cannot be used or charged on board and must be stowed away properly.

- Guests who are unable to wear a face mask due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment. If you are unable to meet this requirement, we recommend that you reconsider your travel. Please note that any face covering exemptions apply only to travel on Hawaiian Airlines.

- We disinfect our common areas, such as our counters and kiosks, multiple times each day.



- Hand sanitizers are readily available for travelers at airports statewide and on the mainland.

- TSA is allowing passengers to bring liquid hand sanitizer up to 12 ounces in carry-on bags until further notice.

- We have temporarily closed the Kauai and Hawaii Island Premier Club locations. **The Plumeria Lounge** and **Premier Club** location at Honolulu's Daniel K. Inouye International Airport have

reopened, as well as the Premier Club location at Kahului Airport in Maui.

## On board our aircraft





- We have detailed protocols, guided by the CDC and industry research, for cleaning and disinfecting our aircraft.

- Our transpacific aircraft are thoroughly cleaned after every flight with hospital-grade, EPA- approved disinfectants that are effective against COVID-19.

- Our neighbor island aircraft are cleaned and disinfected daily.

- We pay special attention to areas that our guests frequently touch, such as seats, seatbacks, headrests, IFE monitors, tray tables, overhead bins, walls, windows and shades, as well as galleys and lavatories, among other areas within the aircraft.



- Hawaiian Airlines airport employees wear face masks when interacting with guests.

- Federal law requires that all guests two years and older wear a mask at the airport, while boarding, through the duration of the flight and while deplaning at their destination. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft and/or

penalties under federal law.

- Masks worn during travel must meet **CDC's requirements**, including:
- The mask must completely cover the nose and mouth and should fit snugly against the side of the face, secured to the head with ties or ear loops. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.

- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).

- Masks should be a solid piece of material without vents, mesh, slits, exhalation valves, punctures, or other obviously transparent cloth coverings.

- Scarves, ski masks, balaclavas and bandannas are not acceptable forms of face masks.

- Guests must wear their masks at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking; masks must be worn between bites and sips.

- Face shields or goggles cannot be used in lieu of a face mask, but may be used in addition to an appropriate mask.

- Personal air purifiers can be brought on board, but cannot be used or charged on board and must be stowed away properly.

- Guests who are unable to wear a face mask due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment. If you are unable to meet this requirement, we recommend that you reconsider your travel. Please note that any face covering exemptions apply only to travel on Hawaiian Airlines.

- On transpacific flights, our cabin air is cleaned through high-efficiency particulate air (HEPA) filters that create a dry and essentially sterile environment, inhospitable to the growth of viruses.

- On flights between the Islands, the air in our Boeing 717 cabins is not recirculated but instead continuously replaced with fresh, outside air controlled for temperature.

## Changes to in-flight service



Plaintiffs' Exhibit 447



Español 

FLIGHT | HOTEL | CAR | VACATIONS    SPECIAL OFFERS    RAPID REWARDS®    🔍

# Customers with Disabilities

Notice of Disability

Assistance in the Airport

Security Screening

Wheelchairs & Other Devices

Allergies

Cognitive Disabilities

Deaf or Hard of Hearing

Blind Or Low Vision

Medication

Trained Service Animals

Medical Oxygen

Portable Oxygen Concentrators

Non-Passenger Escort

Mask Exemptions

Your Rights

### Advance notice of disability

==Customers with disabilities are not required to provide advance notice of the need for assistance;== however, doing so helps us better prepare for the number of Customers who will need our help.

We give Customers the opportunity to proactively notify Southwest Airlines of any specific disability-related needs during and after booking.

When booking a new reservation, Customers may use the "Special Assistance" link on the Passenger & Payment Info page to indicate that he/she requires assistance. When booking online, Customers may notice that there is a link (identified with an italicized "i") that directs the user to the details of our policies for assisting Passengers with disabilities. After the Customer has selected his/her option(s), the Customer should scroll down and complete the booking process.

If a reservation has already been created, simply click on the "FLIGHT | HOTEL | CAR | VACATIONS" link located on the top of our home page. Then, select "Manage Reservations" from the "Flight" column, input the required information, and select "Search." From that page, click on the "Special Assistance" link under the Passenger name. Once a Customer has added his/her option(s), the Customer should click "Update Information" and the information will be saved to the Customer's reservation.

Customers may also advise us of any disability-related travel needs at the time of booking by telephone or, if a reservation has already been made, by calling 1-800-I-FLY-SWA (1-800-435-9792) prior to travel.

We recommend that Customers arrive at the airport no later than the recommended airport arrival time. If traveling with a power wheelchair, in the event that we need to prepare the wheelchair for stowage, we may ask that Customers relinquish his/her power wheelchair up to an hour in advance of departure. In this case, the Customer will be transferred to an airport wheelchair until boarding begins.

If traveling in a group of 10 or more Customers who use wheelchairs, please advise us at least 24 hours in advance by calling 1-800-I-FLY-SWA (1-800-435-9792) so that we can ensure adequate staffing and room in the cargo compartment of the aircraft for the wheelchairs.

---

## How May We Help You? Search Customer Service

| Enter Keyword(s) | Search |

### Join the Discussion
Share knowledge and learn from travelers just like you.
Community 🗗

**Need Help?**
We're a click away.
Contact Us

---

**Need help?**
Contact Us

**Subscribe**
Wanna receive

**Connect with us** 🗗



## Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines

Please complete the information below and submit to Southwest Airlines for review of a mask exception application.  You are submitting the information below and as outlined in this Application for Exemption in order for Southwest to evaluate and process your request for an exemption from the federal mask mandate while flying with Southwest Airlines. Southwest Airlines may share this information with a third-party medical provider, the CDC and other government authorities, and our agents, vendors, and service providers for purposes of managing and fulfilling your travel reservations and assisting Southwest Airlines with the evaluation and processing of your application for an exemption.

Please check the box below that applies:

- I am completing this form for myself.
- I am completing this form for the minor named herein.  I am either the parent or guardian of the minor child and have the authority to and, by completing this form, hereby attest to the information provided below.

Passenger First Name:  _____

Passenger Middle Initial: _____

Passenger Last Name: _____

Contact Email address: _____

Contact Phone number: _____

Reason for Mask Exception Request:

_____

_____

_____

Is flight already booked?  Yes_____ No_____

If flight is already booked, please include the following information:

Date(s) of Travel: _____

City Pair: _____

Confirmation Number (if flight already booked): _____

Does Passenger possess a WN Employee ID? _____

If Passenger possesses a WN Employee ID, please include the following information:

WN Employee ID of Traveling Passenger: _____


By submitting this request and signing below, I [name of passenger or authorized representative] [on behalf of _____] have read and understand the disclosures and requirements included above pertaining to my application to receive an exemption from the federal requirement to wear a mask while flying on Southwest Airlines, including, without limitation, Southwest's collection, use, and sharing of information and that Southwest Airlines may change my travel dates and/or flights should one or more of my originally scheduled flights have a capacity of 75% or more, or another Passenger approved for a mask exemption booked on such flight.

_____
Passenger Signature or Signature of Passenger Parent or Guardian

_____
Printed Name of Passenger or Parent or Guardian


Date: _____

## Southwest Airlines – Masks FAQ

**Should I wear a mask in the airport and on the plane? What forms of masks are acceptable?**

Yes, Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law. On the aircraft, if wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.

Masks are also required in the airport.
If you forget your mask at home, a mask will be available for you.

Acceptable forms of masks
In accordance with the Federal law, a properly worn mask completely covers the nose and mouth, is secured to the head with ties, ear loops, or elastic bands that go behind the head, and fits snugly against the side of the face. Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source). Neck gaiters (also called multi-bands) may be worn as mask so long as they have two layers of fabric or may be folded to make two layers and cover the nose and mouth and are secured under the chin.

In addition, if your mask meets the requirements noted above, the following are acceptable:

- Clear masks or cloth masks with a clear plastic panel to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators.
- The following are some examples of coverings that will not be accepted:
- Masks not made of a solid piece of material, including those made of mesh or lace fabrics or with slits, exhalation valves or punctures
- Face shields (face shields may be worn in addition to a mask that meets the above required attributes)
- Bandanas, scarves, ski masks, or balaclavas
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through
- Masks that do not fit properly (large gaps, too loose or too tight)

Exemptions to face coverings
Young children under the age of 2.

Beginning March 14, 2021, Southwest Airlines will consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability. Several conditions apply that must be completed/adhered to prior to travel and receiving a mask exemption. For more details on this policy and for access to the submission form, please visit here.

When the Federal law requires Customers to wear a mask

Customers will be required to wear a mask over their nose and mouth at all times during their Southwest travel experience—while checking in, boarding, while in flight, deplaning, retrieving baggage; and any other time they may engage with a Southwest Employee or another Customer. Customers are required to wear a mask in order to board the plane.

The following are times when a Customer may need to briefly remove their mask:

- When necessary for identity verification purposes such as during Transportation Security Administration screening or when asked to do so by our Employees or any law enforcement official
- While eating, drinking, or taking oral medications. Prolonged periods of mask removal are not permitted for eating or drinking; the mask must be worn between bites and sips.
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication
- If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance

**If I have received the COVID-19 vaccine, am I required to adhere to the federal mask mandate and/or other travel requirements?**

Yes, per federal mask mandate, the requirement to wear a mask applies to all passengers ages 2 and over, including vaccinated persons. Please continue to adhere to all current travel requirements, including United States Government requirements for flights arriving in the United States and other federal, state, international, and local COVID-19 travel restrictions that apply to your specific itinerary. For more information regarding travel requirements for specific destinations, please click here.

https://www.southwest.com/airline-cleanliness-social-distance/#mask-faq
Visited May 24, 2021

**Exemption to Federal Mask Requirement on Southwest Airlines**

Federal law requires each person, 2 years of age and older, to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

Southwest Airlines will consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability.

Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement.  These requirements/conditions are described below.

Important Notice:  Flight must be less than 75% full
As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less-crowded flight. Therefore, Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 75% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption. If the passenger's preferred flight ends up being more than 50 percent full on the day of travel, Southwest Airlines will work to reaccommodate Passengers who obtain a mask exemption. Please note that Passengers may be required to travel on a different date than their scheduled itinerary. That may also require the Passenger to provide documentation of new (updated) test results at the Passenger's expense in line with Southwest Airlines' requirements to receive a mask exemption.

Please comply with the following pre-travel steps:
- At least seven (7) days prior to the Passenger's  planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit the following via Southwest.com>Contact Us>Send a Message.>Email Us: Comment/Question>Disability>Future Travel Assistance:
- A fully completed copy of this form executed by the Passenger making the request, or if the Passenger requesting a mask exemption is a minor child, the parent or guardian of such minor child; and
- A signed letter from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability.

Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider (Southwest Airlines' vendor StatMD).

If Southwest preliminarily approves a mask exemption after reviewing the Passenger's PDF document and the Medical Physician's letter and after receiving the third party medical provider's affirmation for travel, if required, Southwest will contact you at the phone number or email address provided below to discuss any need to change your travel dates and/or flights and remind you of the need to obtain a qualifying COVID negative viral test.

No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result. A qualifying COVID negative viral test result is defined as:

A physical or electronic documentation of a qualifying COVID negative viral test taken within three (3) calendar days preceding the Passenger's scheduled date of travel. A viral test means a viral detection test for current infection, which is a nucleic acid amplification test with observation approved or authorized by the relevant national authority for the detection of SARS-CoV-2.

Note: Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure, unless the Passenger's return flight is within three (3) calendar days of the date of the initial negative COVID-19 departure test. Also, if the Passenger's originally scheduled date of travel is changed as a result of the flight having a capacity of 75% or more or another Passenger approved for a mask exemption, then you will be required to obtain a qualifying COVID negative viral test result within three (3) calendar days preceding the Passenger's new scheduled date of departure or return travel, as applicable and at your own expense.

https://www.southwest.com/html/customer-service/unique-travel-needs/customers-with-disabilities-pol.html
Visited May 24, 2021



FLIGHT | HOTEL | CAR | VACATIONS       SPECIAL OFFERS

# Customers with Disabilities

Notice of Disability

Assistance in the Airport

Security Screening

Wheelchairs & Other Devices

Allergies

Cognitive Disabilities

Deaf or Hard of Hearing

Blind Or Low Vision

Medication

Trained Service Animals

Medical Oxygen

Portable Oxygen Concentrators

Non-Passenger Escort

**Mask Exemptions**

Your Rights

### Exemption to Federal Mask Requirement on Southwest Airlines

Federal law requires each person, 2 years of age and older, to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

**Southwest Airlines will consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability.**

Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement.

**Please comply with the following pre-travel steps:**

At least seven (7) days prior to the Passenger's  planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit the following via **Southwest.com>Contact Us>Send a Message.>Email Us: Comment/Question>Disability>Future Travel Assistance**:

1. A fully completed copy of this form executed by the Passenger making the request, or if the Passenger requesting a mask exemption is a minor child, the parent or guardian of such minor child; and

2. A signed letter from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability.

Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider (Southwest Airlines' vendor StatMD).

If Southwest preliminarily approves a mask exemption after reviewing the Passenger's PDF document and the Medical Physician's letter and after receiving the third party medical provider's affirmation for travel, if required, Southwest will contact you at the phone number or email address provided below to discuss any need to change your travel dates and/or flights and remind you of the need to obtain a qualifying COVID negative viral test.

No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result. A qualifying COVID negative viral test result is defined as:

A physical or electronic documentation of a qualifying COVID negative viral test taken within three (3) calendar days preceding the Passenger's scheduled date of travel. A viral test means a viral detection test for current infection, which is a nucleic acid amplification test with observation approved or authorized by the relevant national authority for the detection of SARS-CoV-2.

**Note:**  Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure, underline the Passenger's return flight is within three (3) calendar days of the date of the initial negative COVID-19 departure test.

## Join the Discussion

Share knowledge and learn from travelers just like you.

Plaintiffs' Exhibit 448

paddleyourownkanoo.com

# Southwest Introduces Tough New Face Mask Exemption Rule That Still Complies With CDC Rules

*by Mateusz Maszczynski* 11th March 2021

4-5 minutes

Southwest Airlines will introduce tough new face mask rules that will make it even more difficult for passengers with a legitimate medical exemption to fly with the airline while still complying with a Centers for Disease Control and Prevention (CDC) federal mask mandate.

Along with requiring a pre-travel questionnaire at least seven days before departure and written proof of their medical exemption from a physician, passengers will also need to obtain a negative pre-departure COVID-19 test certificate within 72-hours of departure and undergo a private medical screening with a third-party medical provider.

Once a passenger has jumped through those hoops, Southwest Airlines will still refuse to board them if the flight is booked to 50 per cent capacity or more. Even on a near-empty flight, an exempt passenger may still be refused boarding if there is more than one exempt passenger booked on the same flight.

One of President Biden's first acts on entering the White House was to introduce a federal face mask mandate for passengers and employees on public transport including airplanes. The order came into effect on February 1 but the mandate actually eased the strict face mask rules that some airlines had introduced.

Like American Airlines and United, Dallas-based Southwest airlines barred anyone over the age of two years old from flying with them if they claimed to have a medical condition that prevented them wearing a face mask. Instead, Southwest told passengers to either delay travel indefinitely or find another airline to fly with.

The federal mask mandate, however, included a specific exemption for passengers with medical issues that made it impossible for them to wear a mask. Airlines like United and Southwest have been forced to comply, although they can add conditions.

"As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less-crowded flight. Therefore, Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 50% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption," the airline explains on its website.

Southwest says it will accommodate passengers on a different flight at no extra cost but this might be on a later date. If that were to happen, passengers would be responsible for covering the cost of a new COVID-19 test themselves.

According to TSA data, passenger numbers are slowly ticking up with travel demand currently sitting around 45 to 50 per cent of what it was at this time in 2019. However, many airlines have slashed schedules and consolidated flights, meaning that passenger numbers often exceed 50 per cent

<mark>capacity.</mark>

The CDC still recommends that people avoid all but the most essential of air travel – including those who are fully vaccinated against COVID-19. The agency also says passengers should continue to wear a face mask on airplanes, in airports and anywhere else in a crowded public environment.

**Sign Up for the Cabin Crew Brief**

Get the latest cabin crew recruitment news delivered to your inbox once a week...

Mateusz Maszczynski

Mateusz Maszczynski is a serving international flight attendant with experience at a major Middle East and European airline. Mateusz is passionate about the aviation industry and helping aspiring flight attendants achieve their dreams. Cabin crew recruitment can be tough, ultra-competitive and just a little bit confusing - Mateusz has been there and done that. He's got the low down on what really works.

Plaintiffs' Exhibit 449

*TRAVEL NEWS*

≡

# A4A Won't Push for a Federal Transportation Mask Mandate Extension



John Michael Jayme | July 25, 2021



The federal transportation mask mandate is about to end on September 13. According to this mandate, people will have to wear masks in public transportation including airports and planes. Since CDC eased on masking rules, airports and airplanes have been the few remaining places where you are required to wear a mask.

It's also the number one reason why there's an increased report of unruly passengers on planes. The majority of these unruly passengers refused to wear masks.

Southwest Airlines CEO Gary Kelly, who is also the chairman of Airlines for America (A4A), said that the trade group and Southwest are not recommending an extension of the federal transportation mask mandate.

## Federal Transportation Mask Mandate Extension As Delta Variant Spreads?

President Biden announced the federal transportation mask mandate in January. The goal is to protect the passengers' and flight crews' health and improve mask compliance. This means that travelers will have to wear masks on trains, buses, planes, airports, and other transportation hubs. It was originally only up to May. But with the COVID situation in the US, it was extended until September 13.

Kelly said that airlines support the mask guidelines set by the US Centers for Disease Control and Prevention. According to the latest guidance, only unvaccinated individuals should be wearing a mask. He added though that "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate".

## 03:54                    15 KEY TRAVEL ADVISO

Kelly isn't sure if the Transportation Security Administration will extend or lift the mandate. According to Kelly, "That's a political question, to a degree".

The recent surge of COVID cases in the US is something that can affect the decision of TSA. Delta variant is now the dominant strain in the US. CDC currently has no comment regarding the status of the mask mandate. Caitlin Shockey in an email said that "We can't comment on pending regulatory discussions as to the future of the order".

American Airlines CEO Doug Parker said that "What they decide, we'll enforce".



**John Michael Jayme**
John Michael Jayme is a Travel Analyst for The Jet Set. He writes about news and events affecting the travel industry.

# READ MORE

03:54                              15 KEY TRAVEL ADVISO

Plaintiffs' Exhibit 450

usatoday.com

# Will the mask mandate for flights be extended? Southwest Airlines CEO says airlines not pushing for it

3-4 minutes     July 22, 2021; updated July 27

Airplanes and airports are among the few remaining places where face masks are required, but they might not be after Sept. 13if the rule isn't extended.

Southwest Airlines CEO Gary Kelly, chairman of industry lobbying group Airlines for America (A4A), said Thursday that Southwest and the trade group are not recommending another extension of the federal transportation mask mandate.

The mandate, which airlines and their unions requested to help with passenger mask compliance and to protect the health of flight crews, was put in place by President Joe Biden in January. The mandate, which applies to trains, planes and airports, buses and transportation hubs, was initially due to expire in May but was extended through Sept. 13, with the blessing of airlines.

Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews.

Kelly, answering reporter questions during Southwest's quarterly earnings conference call, said airlines support following Centers for Disease Control and Prevention guidance on masks, which says vaccinated individuals don't need one but unvaccinated individuals should wear one.

**New rules**: CDC lifts indoor mask requirement for fully vaccinated people

Unless that advice changes, he said, "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate."

Kelly said he doesn't know whether the mandate, enforced by the

Transportation Security Administration, will be extended or lifted.

"That's a political question, to a degree," he said.

Kelly said the government is studying the matter, given the spreading delta
variant, which has caused a spike in COVID-19 cases, but he is not aware of
"any efforts underway" to extend the mask mandate.

**COVID-19 and travel:**The delta variant is spreading. Should travelers be
concerned?

The CDC has had no comment on the status of the mandate beyond Sept. 13.

"We can't comment on pending regulatory discussions as to the future of the
order," spokesperson Caitlin Shockey said via email.

Kelly is the first U.S. airline executive to publicly express what is in effect
support for letting the mandate expire, though United Airlines CEO Scott Kirby
said he expected it to be lifted in September.

"What they decide, we'll enforce," American Airlines CEO Doug Parker said
earlier Thursday on the airline's quarterly earnings conference call. "It's not for
us to opine."

Last week, Delta CEO Ed Bastian told Wall Street analysts and investors he
didn't know the fate of the mandate.

He said there are as many "pros to taking the mask requirement off as there are
to keeping it on at the present time."

"I think it's important that medical experts make those decisions, not airline
professionals, as we've learned through the pandemic," he said on the airline's
earnings call. "They're the ones that have all the insight and the information and
keeping people safe. I appreciate people not wanting to wear the mask. I don't
like wearing the mask when I'm on board either, but it's something that we need
to do to keep each other safe."

Los Angeles County, the most populated county in the USA, will once again
require people to wear masks indoors – regardless of vaccination status – after
a surge in COVID-19 cases.

# Plaintiffs' Exhibit 451

**Mask Exemption Request**

*Must be submitted a minimum of 7 days prior to scheduled departure*

| Initial | *This section must be completed by <u>passenger or designated assistant/guardian</u>* |
|---|---|
| | Passenger name *(print)*:_____ |
| | Reservation and itinerary information:_____ |
| _____ | I understand that United, in its sole discretion and in accordance with CDC/DOT/TSA standards, will determine whether to approve my mask exemption request. |
| _____ | I understand that United requires that I provide proof of a negative COVID-19 PCR test result taken within 72 hours of my scheduled departure. |
| _____ | I understand that United may require me or my travelling party to move to alternate seats in the cabin and/or change our itinerary to less-full flights to allow for greater social distancing from other customers on board, if possible. United will advise regarding the alternatives, and changes to flights under these circumstances will be made at no additional cost. |
| _____ | I understand that if United approves my mask exemption request, I need to print the approval letter and carry it on my person at all times while traveling and will need to show it to TSA at the security checkpoint prior to being screened. |
| _____ | I understand that my mask exemption request is applicable only to flights in a single reservation, and any exemption for future travel or travel in separate reservations will need to be applied for anew. |
| _____ | I authorize the release of medical information pertaining to this mask exemption request and authorize my treating physician to speak with a United Airlines medical representative or any agent acting on its behalf. |
| _____ | I understand that if I choose to request a mask exemption, United will use the information on this form to handle my request. In order to assess and manage my request I understand that it may be necessary for United to disclose information relating to my health information to third parties such as medical professionals, airport staff, health agencies, United Express and Star Alliance carriers, and their employees, among others.<br><br>INDIVIDUALS LOCATED OUTSIDE OF THE UNITED STATES: If you are located outside of the United States and you choose to request a mask exemption, United will use the information on this form to handle your request. You understand that this form will be transferred to the United States, where data protection laws may not be equivalent to those in your home country. By signing below and affirmatively submitting this form, you give specific consent to United to process and transfer the information for these purposes. To exercise rights granted pursuant to |

| | applicable law, including withdrawal of consent, contact privacy@united.com. Withdrawal of consent does not affect the lawfulness of information processed until the withdrawal, and this information will continue to be maintained for compliance with legal obligations and for the establishment, exercise or defense of legal claims. |
|---|---|
| | Passenger or designated assistant/guardian name *(print)*: _____<br>Passenger or designated assistant/guardian signature:_____<br>Date:_____<br>Phone contact:_____   Email contact:_____ |

| *Initial* | **This section must be completed by a _medical provider_ specifically treating the passenger's disability** |
|---|---|
| | Patient/passenger name *(print)*:_____ |
| _____ | I am a licensed medical provider currently treating the passenger's disability. |
| _____ | **Pursuant to federal law, only individuals with a disability who cannot wear a mask or cannot safely wear a mask because of the disability, for example, individuals who do not know how to remove their masks, cannot remove them on their own, or cannot communicate promptly to ask someone else to remove their mask are eligible to request a mask exemption. Individuals for whom mask wearing may only be difficult are not eligible to request a mask exemption.**<br><br>I attest that the passenger cannot safely wear a mask in connection with the flight(s) for the itinerary above for the following reason(s):<br>_____<br>_____<br>_____<br>_____<br><br>Can the passenger wear a face shield? Yes ___◯___   No ___◯___ |
| | Medical provider's license information:<br><br>Date and type of the license:_____<br><br>License Number:_____<br><br>State or other jurisdiction in which license was issued: _____ |
| | Your name *(print)*: _____<br>Your Specialty:_____<br>Signature and Date:_____<br>Business phone contact:_____ |

| | Business email contact:_____ |
|---|---|

# Plaintiffs' Exhibit 452

allegiantair.com

## Contract of Carriage | Allegiant Air

55-69 minutes

---



Effective on and after May 20, 2021

Passenger transportation by Allegiant Air, LLC. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on or in any Ticketless Travel Confirmation, specified on Carrier's Internet site with respect to electronic ticketing, or published in Carrier's schedules. By purchasing or accepting transportation, the passenger agrees to be bound thereby.

Review Allegiant's Terms and Conditions on ticketing, non-refundability, baggage and check-in.

Review Allegiant's Luggage Limitations of Liability

Review Allegiant's Notice - Overbooking of Flights

### 1. Definitions

Baggage means all luggage, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, typewriters, and similar articles, whether carried by the passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the passenger in the passenger cabin, will not be considered as baggage.

Baggage tag/Baggage Check means a document issued by Carrier solely for identification of checked baggage, a portion of which (Tag) is affixed by Carrier to a particular article of checked baggage for routing purposes and a portion of which (Check) is given to the passenger for the purpose of claiming the baggage.

Carriage means the transportation of passengers and/or baggage by air, gratuitously or for hire, and all services of Carrier incidental thereto.

Carrier means Allegiant Air, LLC.

Checked baggage means baggage of which Carrier takes sole custody and for which Carrier has attached a baggage tag(s) and/or issued a baggage check(s).

Individual with a disability means a person who:

1. has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities;

2. has a record of such an impairment; or

3. is regarded as having such impairment, as further defined in U.S. Department of Transportation regulations at 14 C.F.R. § 382.3.

Nonstop flight means a flight scheduled to operate between the origin and destination points without intermediate stops.

One–way means travel from one point to another on Carrier's scheduled air service assigned for travel between the two points.

Passenger means any person, except members of the crew, carried or to be carried in an aircraft with the consent of Carrier.

Qualified individual with a disability means an individual with a disability who:

1. with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares, or policies, takes those actions necessary to avail himself or herself of facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by Carrier;

2. with respect to obtaining air transportation on Carrier, offers, or makes a good faith attempt to offer, to purchase or otherwise to validly obtain air transportation; or

3. with respect to obtaining air transportation or other services or accommodations, as provided by U.S. Department of Transportation regulations on Nondiscrimination on the Basis of Disability in Air Travel, 14 C.F.R. Part 382:

1. purchases or possesses a valid Ticketless Travel Confirmation for air transportation on Carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the Confirmation has been purchased or obtained;

2. meets reasonable, nondiscriminatory requirements of this Contract of Carriage applicable to all passengers; and

3. whose carriage will not violate the requirements of the Federal Aviation Regulations or jeopardize the safe completion of the flight or the health or safety of other persons.

Roundtrip means travel from one point to another and return to the first point.

Scheduled air service means any flight scheduled in the current edition of the Official Airline Guide (OAG), Carrier's published schedule, Carrier's Internet site, or the computer reservation system used by Carrier.

Ticketless Travel Confirmation means the electronically–recorded information in Carrier's computer reservation system that provides for the carriage of the passenger occupying a single seat and his or her baggage.

Unchecked baggage is baggage other than checked baggage.

**2. Not Used**

**3. Application of Conditions**

The terms and conditions contained in this Contract of Carriage shall govern the application of all fares, rates, and charges published by Carrier and will apply only to Carrier's routes and services. No agent, servant, or representative of Carrier has authority to change or waive any provision of this Contract of Carriage unless authorized by a corporate officer of Carrier.

**4. International Travel**

In the event that any passenger purchasing transportation on Carrier may be determined to be in international transportation under the Montreal Convention, Carrier's liability in the event of a passenger's death or bodily injury is limited, in most cases, to proven damages not to exceed 128,821 Special Drawing Rights per passenger, with liability up to this limit not dependent upon negligence on the part of Allegiant.

**5. Electronic Surveillance of Passengers and Baggage**

Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent or knowledge.

**6. – 9. Not Used**

**10. Refusal to Transport**

Carrier will refuse to transport, or will remove from an aircraft at any point, any passenger in the following circumstances:

A. Safety and Government Request or Regulation – Whenever such action is necessary for reasons of aviation safety or to comply with any Federal Aviation Regulation or other applicable U.S. or foreign government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense, or whenever

such action is necessary or advisable by reason of weather or other conditions beyond Carrier's control (including, without limitation, acts of God, force majeure, strikes, civil commotions, embargoes, wars, hostilities, or disturbances, whether actual, threatened, or reported).

B. Search of Passenger or Property – Any passenger who refuses to permit the search of his or her person or property for explosives or a concealed, deadly, or dangerous weapon or article.

C. Proof of Identity – Any passenger who refuses on request to produce positive identification.
NOTE: Carrier shall have the right to require, but shall not be obligated to require, positive identification of persons purchasing ticketless travel and/or presenting a Ticketless Travel Confirmation for the purpose of boarding aircraft.

D. Special Medical Requirements – Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Carrier's aircraft: medical oxygen for use onboard the aircraft, incubators, respiratory assistance devices that must receive power from the aircraft's electrical power supply, or persons who must travel on a stretcher. The user must have a sufficient power supply during the flight to power the device, including a conservative estimate of any unanticipated delays. Spare lithium batteries for POCs are prohibited from being carried in checked baggage. Devices may not be charged using on-board power outlets.

E. Qualified Individuals with a Disability – Carrier will transport qualified individuals with a disability in accordance with the conditions and requirements of U.S. Department of Transportation regulations, 14 C.F.R. Part 382, unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 CFR § 382.27, Carrier requires 48 hour minimum advance notice and 1 hour advance check–in for a qualified individual with a disability who wishes to receive the following services available on the carrier's flights: (1) Provision by the carrier of hazardous material packaging for a battery for a wheelchair or other assistive device, (2) Accommodations for a group of ten or more qualified individuals with a disability, who make reservations and travel as a group, (3) Provision of an on–board wheelchair on aircraft that does not have an accessible lavatory. However, pursuant to 14 C.F.R. § 382.113, Carrier will not provide certain extensive in–flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, Carrier may require that a qualified individual with a disability be accompanied by an attendant as a condition of being provided air transportation in the following circumstances:

1. When the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from Carrier's Employees, including the safety briefing required by 14 C.F.R. §§ 121.571(a)(3) & (a)(4);

2. When the individual has a mobility impairment so severe that the individual is unable to assist in his or her own evacuation of the aircraft; or

3. When the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with Carrier's Employees adequate to permit transmission of the safety briefing required by 14 C.F.R. §§ 121.571(a)(3) & (a)(4)—and to enable the individual to assist in his or her own evacuation of the aircraft in the event of an emergency.
If Carrier determines that an individual meeting the criteria of Article 10.E. (1), (2), or (3) above must travel with an attendant, contrary to the individual's self–assessment that he or she is capable of traveling independently, Carrier will not charge the individual with the disability for the transportation of the attendant while accompanying such individual. Furthermore, if, because there is not a seat available on a flight for an attendant whom Carrier has determined to be necessary, an individual with a disability having a confirmed reservation is unable to travel on the flight, such individual will be eligible for denied boarding compensation under Article 105 below. For purposes of determining whether a seat is available for an attendant, the attendant shall be deemed to have checked in at the same time as the individual with the disability.

F. Comfort and Safety – Carrier may refuse to transport or remove from the aircraft at any point any passenger in the following categories as may be necessary for the comfort or safety of such passenger or other passengers:

1. Persons whose conduct are or have been known to be disorderly, abusive, offensive, threatening, intimidating, or violent;
NOTE: Carrier will not refuse to provide transportation to a qualified individual with a disability solely because the individual's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

2. Persons who are barefoot (other than infants);

3. Persons who are unable to occupy a seat with the seat belt fastened;

4. Persons who appear to be intoxicated or under the influence of drugs;

5. Persons who are known to have a contagious disease, if the Carrier determines the person's condition poses a direct threat as defined in 14 CFR § 382.3;

6. Persons who have an offensive odor, except where such condition is the result of a qualified disability;

7. Persons who have clothing/attire/accessories that are deemed patently offensive or obscene by other passengers and choose not to remove, change or cover the article(s).

8. Persons who wear or have on or about their persons concealed or unconcealed deadly or dangerous weapons; provided, however, that Carrier will carry passengers who meet the qualifications and conditions established in Federal Aviation Regulation, 14 C.F.R. § 108.11;

9. Manacled persons in the custody of law enforcement personnel; persons brought into the airport in manacles; persons who have resisted escorts; or escorted persons who express to Carrier's Employees an objection to being transported on the flight;

10. Persons who have misrepresented a condition which becomes evident upon arrival at the airport, and the condition renders the passenger unacceptable for carriage;

11. Infants fourteen (14) days of age or younger, unless approved for carriage in writing by an attending physician; or

12. Persons who are unwilling or unable to abide with Carrier's non–smoking rules.

Disposition of the fare of any passenger denied transportation or removed from Carrier's aircraft enroute under the provisions of Article 10 is governed by Article 90 of this Contract of Carriage.

**11. – 14. Not Used**

**15. Ticketless Travel Confirmation – General**

A. No person shall be entitled to transportation except upon presentation of a valid Ticketless Travel Confirmation or proof of identification acceptable to Carrier that transportation has been purchased through Carrier's electronic ticketing or Ticketless travel systems. Such electronic ticketing documentation shall entitle the person to transportation only between the points of origin and destination.

B. A Ticketless Travel Confirmation is valid for 365 calendar days from the date of issue, except as noted below:

1. Ticketless Travel Confirmations issued with fare restrictions, i.e., nonrefundable fares, are valid only on the flight and date shown on the Ticketless Travel Confirmation. If a Customer purchases transportation with fare restrictions but chooses not to travel on the flight and date for which the Ticketless Travel Confirmation is issued, the fare paid may, within 365 calendar days from the date of purchase, be applied toward the purchase of another Ticketless Travel Confirmation; however, the new Confirmation may be subject to a change fee and be more expensive or subject to different terms, conditions, or restrictions. No cash refund or credit card adjustments will be made for Ticketless Travel

Confirmations with fare restrictions.

C. Ticketless Travel Confirmations are not transferable unless specified thereon, but Carrier is not liable to the owner of a Confirmation for honoring or refunding such Confirmation when presented by another person.

**16. – 19. Not Used**

**20. Reservations**

A. A reservation on a given flight is valid when the availability and allocation of space is confirmed by a Reservations Sales Agent of Carrier or upon issuance of a Ticketless Travel Confirmation number, and the passenger's name is entered into Carrier's reservations system.

B. Airport check–in time limits: Carrier may cancel the reservation of any passenger who fails to check–in at least 45 minutes and arrive at the boarding gate at least 30 minutes before the scheduled departure time of the flight for which the reservation was made.

C. Carrier will refuse to carry any person when such refusal is necessary to comply with an applicable governmental regulation.

D. When a roundtrip or multi–segment reservation has been made and the passenger fails to claim his or her reservation for the first portion of the trip, Carrier reserves the right to cancel the return or continuing portions of the passenger's reservation for purposes of reservation inventory management.  Carrier does not prohibit or penalize what is commonly known as "back–to–back" or "hidden–city" ticketing.

**21. Groups Policies**

A. Groups of ten (10) or more will need to be booked on multiple reservations.

**22. – 24. Not Used**

**25. Ground Transportation**

Carrier does not assume responsibility for the ground transportation of any passenger or his or her baggage between any airport used by Carrier and any other location. Ground transportation is at the passenger's risk and expense. An exception to this article is if, for reasons outside Carrier's control, the Carrier is unable to land at the airport of the scheduled destination and is diverted to another airport as described in article 85.G.

**26. – 29. Not Used**

**30. Application of Fares – General**

A. Transportation is subject to the fares and charges in effect on the date on which such Ticketless Travel Confirmation was issued. If a Ticketless Travel Confirmation has been issued before an increase in the fare becomes effective, it shall be honored for transportation between the points, and at the class of service, for which it was purchased. The only exception for a post-purchase price increase would apply if the full amount of the itinerary has not yet been paid. This includes, but is not limited to, an increase in the price of seats, an increase in the price for the carriage of passenger baggage, an increase in an applicable fuel surcharge, or an increase in a government-imposed tax or fee. Fares may fluctuate and are subject to change without notice. No refunds or airline system credits will be provided after a reservation has been made through Customer Care. However, customer can make changes to reservations online at www.allegiantair.com.

B. Fares are published in Carrier's reservations system and may be obtained from an Allegiant Air Reservations Sales Agent by telephone at (702) 505-8888 on Carrier's Internet site at www.allegiantair.com, or through an authorized travel agent. Some travel agencies, however, may impose an additional charge for this service.

C. All published fares and charges are stated in U.S. currency.

D. No stopovers are permitted on published fares, except upon combination of local fares.

**31. – 34. Not Used**

**35. Carriage of Children**

A. Children Under Two (2) Years of Age – One child under two (2) years of age, not occupying a seat, will be carried without charge when accompanied by a fare–paying passenger fifteen (15) years of age or older. Carrier cannot guarantee that an unoccupied seat will be available for any child traveling without charge and without a confirmed reservation. Proof of age, such as a birth certificate, is required. Safety seats for children without a confirmed reservation may have to be transported as checked baggage if unoccupied seats are not available.

B. Children under two (2) years of age traveling on a confirmed reservation, with or without the use of a safety seat, will be charged the applicable fare.

C. Unaccompanied Minor Children
1. Carrier does not accept reservations for carriage of fare-paying Unaccompanied Minors or unescorted children under the age of fifteen (15) years.

2. Children fourteen (14) years and younger must be accompanied by an adult fifteen (15) years or older.

3. Special supervision for any travelers is not offered.

D. Responsibilities of Carrier – Carrier assumes no responsibilities for travelers fifteen (15) to seventeen (17) years old beyond those applicable to adult passengers.

E. In the case of a flight for which Carrier has issued a weather advisory, Carrier will refuse carriage to any passenger under the age of 18 if not traveling with a passenger age 18 or older.  Carrier will provide passengers refused carriage under this provision transportation on Carrier's next flight to passenger's destination that is not subject to a weather advisory and on which space is available, or a refund of the unused portion of passenger's fare in accordance with Article 90 below.  A "weather advisory" is issued by Carrier and notified to passengers when weather conditions may prevent the flight from landing at the planned destination because airport conditions or visibility fall below FAA or Carrier safety requirements, meaning Carrier may be unable to operate the flight or may have to land at an alternate airport.

**36. Not Used**

**37. – 41. Not Used**

**42. Internet Fares**

Special promotional fares may be available via the Internet on Carrier's website (Internet address: www.allegiantair.com). Seat availability, fares, and fare restrictions are published in the website presentation.

**43. Stopovers**

A. Carrier's local fares for a flight or flights between a passenger's point of origin and destination shall apply only to published nonstop flights, except as provided in Article 85.A. below.

B. A stopover shall occur when a passenger arriving at an intermediate or connection point on his or her itinerary fails to depart from such intermediate point on the published connecting flight to the passenger's next intermediate or destination. In the event of a single stopover, the passenger's fare shall be the sum of the appropriate local fares between the point of origin and stopover and the appropriate local fare between the point of stopover and destination. In the event of multiple stopovers, the passenger's fare shall be the sum of:

1. the appropriate local fare between the point of origin and first stopover; plus

2. the appropriate local fare(s) between each stopover point and the next subsequent stopover point, if any; plus

3. the appropriate local fare(s) between the point of last stopover and destination.

**44. Not Used**

**45. Acceptance of Baggage – General**

A. Inspection – All baggage tendered to Carrier for transportation is subject to inspection by Carrier.

B. Acceptance – Carrier will accept as baggage such personal property as is necessary or appropriate for the wear, use, comfort, or convenience of the passenger, as the personal property of the fare–paying passenger and not intended for sale to other persons, subject to the following conditions:

1. Carrier will refuse to accept baggage for transportation on any flight other than the flight on which the passenger is transported;

2. Carrier will refuse to accept any baggage for transportation if it or its contents cannot withstand ordinary handling, or if its weight, size, or character renders it unsuitable for transportation on the particular aircraft on which it is to be carried, unless the passenger releases Carrier from liability;

3. Each piece of baggage tendered to Carrier for carriage must have affixed thereto a current identification tag or label with the passenger' s name, address, and telephone number (if available);

4. With the exception of wheelchairs, other mobility aids, and assistive devices used by an individual with a disability, Carrier will not accept as baggage any item having outside measurements (i.e., the sum of the greatest outside length plus the greatest outside height plus the greatest outside width) that exceed eighty (80) inches, or that weigh more than forty (40) pounds, except as provided in Article 65 below;

5. Carrier will refuse to accept baggage that, because of its nature, contents, or characteristics (such as sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to passengers or Carrier's Employees, damage to aircraft or other equipment, or damage to other baggage; and

6. Carrier will not accept baggage that cannot safely be carried in the baggage compartment of the aircraft.

**46. Carry–on Baggage**

A. Carrier will determine whether or not any baggage of a passenger, because of its weight, size, contents, or character, may be carried in the passenger cabin of the aircraft. Each item of carry–on baggage may have external dimensions no larger than nine inches by fourteen inches by twenty-two inches (9 in. x 14 in. x 22 in.). All carry–on baggage must be stowed underneath a seat or in an overhead compartment. Hard–sided items (i.e.,

those with inflexible surfaces) may be placed only on the floor of the overhead compartment (i.e., not on top of other items in the compartment) or underneath a seat. Carry–on baggage is the sole responsibility of the passenger. Claims for damaged, lost, forgotten, or stolen carry–on baggage will not be accepted by Carrier. Allegiant Air will charge a fee for a carry-on bag as well as for items intended to carry–on board the aircraft, but which exceed the specified dimensions, and/or require the services of gate checking at the aircraft door.

B. In accordance with FAA/TSA Security Directives, passengers are restricted to one (1) item of carry–on baggage that does not exceed external dimensions of nine inches by fourteen inches by twenty-two inches (9 in. x 14 in. x 22 in.) (e.g., roll–aboard bag, garment bag, tote bag) plus one smaller personal–type item (e.g., purse, briefcase, laptop computer, small backpack), not to exceed external dimensions of seven inches by fifteen inches by sixteen inches (7 in. x15 in. x16 in.), provided that such items are capable of being carried onboard the aircraft by one person without assistance and are capable of being stowed in an overhead compartment or completely underneath a seat. If requested, qualified individuals with a disability will be provided assistance by Carrier's Representatives in loading, stowing, and retrieving carry–on items, including authorized assistive devices. Carrier reserves the right to further restrict the size and number of carry–on items.

C. In addition to the carry-on baggage allowance provided herein, items such as reading material, food for en route consumption, a diaper bag, a small camera, and a coat, jacket, wrap, or similar outer garment, may be carried onboard the aircraft.

D. Mobility and other assistive devices authorized for carriage in the aircraft cabin upon which a qualified individual with a disability is dependent may be carried in addition to the two (2) item cabin baggage allowance.

E. Unless unoccupied seats are available on a flight, Carrier requires a reservation and purchase of transportation at the appropriate fare to ensure that a safety seat or infant seat may be used during flight. Only federally–approved and labeled safety seats or infant seats are permitted for use aboard Carrier's aircraft. Federal regulations prohibit the use of child booster seats and harness–type or vest–type restraining devices, except for the AmSafe Aviation CARES.

F. The following conditions apply to acceptance for carriage in the aircraft passenger cabin of bass violas, cellos, guitars, and other musical instruments, and electronic, computer, and audio/video equipment and parts thereof, whose size prevents such instruments or equipment from being handled as normal carry–on baggage:

1. the instrument or equipment must be contained in a case;

2. a reservation must be made for the instrument or equipment at the applicable fare;

3. the instrument or equipment must be secured in the first window seat aft of a floor–to–ceiling bulkhead. Such seats are limited in availability.

G. Carrier will refuse to transport items of carry–on baggage that may be harmful or dangerous to a passenger, the flight crew, or the aircraft.

**47. Live Animals – Pets**

*A. General Rules and Conditions*

The passenger assumes full responsibility for the conduct of his or her accompanying pet. In the event Allegiant incurs any loss, damage, delay, expense or legal liability of any kind in connection with the transport of such animal, ***the passenger accepts full responsibility for same and will reimburse Allegiant for the full amount of such loss, damage, delay, expense or legal liability incurred by Allegiant***.

Transportation of animals in the aircraft cabin must meet the following conditions:

- Allegiant will transport live animals only in the passenger cabin on flights within the contiguous 48 United States.

- All animals must be at least eight (8) weeks of age.

- Allegiant will not transport animals as checked baggage. Pets that can be carried on board include domestic dogs and cats only, and the pet must be transported in a hard-sided or soft-sided, leak-proof carrier that can fit under a seat.

- Pets must remain in the carrier at all times in the airport gate area and while aboard the aircraft. If a passenger does not comply, the animal may be denied boarding for future flights.

- All pet carriers may not exceed external dimensions of nine inches by sixteen inches by nineteen inches (9 in. X 16 in. x 19 in.).

- An Allegiant representative at the departure airport will determine if there is adequate room in the carrier for any pet. In the event of a disagreement, the Allegiant representative's decision will control.

- Animals cannot be ill or in distress.

- There is a non-refundable fifty dollar ($50.00) fee for each one-way flight for a pet carrier.

- Customers with animals in a carrier may not occupy a bulkhead row, an exit row, or the rows in front of or behind an exit row.

- Pets or pet carriers may NOT be placed in or strapped into a passenger seat and must be placed under the seat directly in front of the passenger bringing the pet. All animals are

required to be harmless, non-disruptive and odorless.

- Passengers with a pet carrier may bring one personal item, not to exceed exterior dimensions of 7 in. x 15 in. x 16 in. (17.8 cm x 38.1 cm x 40.6 cm), which may be stored in the overhead bin space free of charge.

- Passengers who choose to bring a carry-on bag along with a pet carrier, will be charged accordingly for the carry-on bag and must ensure that the carry-on bag does not exceed exterior dimensions of 9 in. x 14 in. x 22 in. (22.9 cm x 35.6 cm x 55.9 cm).

- Allegiant assumes no responsibility for the health or well-being of pets before, during or after a flight.

### 48. Service Animals

*48.1. General Rules and Conditions*

The passenger assumes full responsibility for the conduct of his or her accompanying service animal(s). In the event Allegiant incurs any loss, damage, delay, expense or legal liability of any kind in connection with the transport of such animal, ***the passenger accepts full responsibility for same and will reimburse Allegiant for the full amount of such loss, damage, delay, expense or legal liability incurred by Allegiant***.

*48.2 Service Animals*

A service animal is a dog, regardless of breed or type, that is individually trained to do work or perform task for the benefit of a qualified individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. To assist Allegiant in verifying the training of the animal and determining whether the service animal poses a direct threat to the health or safety of others, Allegiant requires the following form to be fully completed and emailed or mailed to Allegiant at least 48 hours prior to scheduled departure. If travel is purchased within 48 hours of scheduled departure, the passenger must present the fully completed form to an Allegiant representative at least 30 minutes prior to departure.

U.S. Department of Transportation Service Animal Air Transportation Form

*48.4 Animal Transport and Miscellaneous*

1. Allegiant only permits domestic dogs that are being used as service animal(s) by individuals with disabilities to accompany such individuals in the aircraft cabin at no charge.

2. Allegiant permits a service animal to accompany a qualified individual with a disability at either a bulkhead seat or a seat other than a bulkhead seat, as the individual prefers, unless the animal obstructs an aisle or other area that must remain unobstructed in order

to facilitate an emergency evacuation. All seating accommodation requests must be made at least 24 hours prior to scheduled departure. If a seat request is made within 24 hours of scheduled departure, Allegiant will make a reasonable effort to accommodate the request without displacing another passenger.

3. Passengers are limited to two (2) fully trained service animals if required to perform work or tasks directly related to the passenger's disability. All such animal(s) must remain under the control of the passenger at all times and be leashed, harnessed or tethered to the passenger at all times.

4. All animals are required to fit within the foot space of the disabled passenger and are prohibited from encroaching on the foot space of another passenger. If the animal encroaches on another passenger's foot space, the disabled passenger may be required to purchase a second seat to accommodate the animal. Animals are prohibited from occupying a seat and from sitting on or eating off of tray tables. Allegiant reserves the right to deny the transport of any animal that is improperly cleaned and/or has a foul odor, that appears to be ill or in physical distress, or that in the judgment of an Allegiant representative at the departure airport poses a direct threat to the health or safety of others.

5. Service animals in-training and Law Enforcement/Search and Rescue dogs may be considered for by Allegiant for transport on a case-by-case basis. Allegiant requires at least 72 hours prior notification and submission of any supporting documentation requested by Allegiant.

6. All animals are expected to be trained to behave in a public setting. Per the Code of Federal Regulations, Title 14, Part 382 (administered by the U.S. Department of Transportation), Allegiant reserves the right to deny transport to any animal displaying disruptive behavior, such as, but limited to:

1. Growling, snarling, biting, attempting to bite or acting in an aggressive manner

2. Running around or jumping on other passengers

3. Relieving itself in the airport terminal or in the aircraft cabin

4. Barking excessively (other than alerting passenger as trained)

If a passenger or a fully trained service animal does not meet the requirements of this Article 48, Allegiant reserves the right to deny boarding and/or transport of the animal.

**49. – 54. Not Used**

**55. Checking of Baggage**

A. Carrier will accept baggage for checking from a fare–paying passenger when tendered to

Carrier no earlier than two (2) hours in advance of flight departure time at Carrier's airport ticket counter or curb–side check–in station, or at an earlier time on the day of commencement of travel as may be authorized by Carrier's Employees at the departure airport. Carrier will not check baggage tendered:

1. to a point beyond the destination indicated on the passenger's Ticketless Travel Confirmation;

2. to an intermediate stop or connection point;

3. for a flight to be operated on a later date.

**56. – 59. Not Used**

**60. Checked Baggage Allowance**

Upon presentation of a bag to be checked by a fare–paying passenger of a valid Ticketless Travel Confirmation, a checked baggage fee will apply.

Each piece of sporting equipment will be considered a checked bag with all applicable fees applied per person, per bag, per segment. All Baggage Fees are non-refundable except as provided in Article 65 below. Each bag must weigh 40 lbs or less and the outside measurements of each bag must not exceed eighty (80) inches. Applicable fees will be applied for those bags exceeding the weight and size limits. The total number of bags allowed may not exceed 5 per passenger.

- Firearms – Carrier will not accept assembled firearms and ammunition for transportation except as follows:

1. All passengers must declare their firearm at time of check-in.

2. Passengers must be 18 years of age to check a firearm.

3. Firearms and ammunition cannot be carried on board the aircraft but are accepted in checked baggage only.

4. Firearms must be unloaded and encased in a locked, hard-sided container acceptable to Allegiant for withstanding normal checked baggage handling without sustaining damage to the firearm. Only the individual checking the baggage should retain the key or combination.

1. Firearm parts, including magazines, clips, bolts and firing pins, are prohibited in carry-on baggage, but may be transported in checked baggage.

2. Replica firearms, including firearm replicas that are toys, may be transported in checked baggage only.

3. Rifle scopes are permitted in carry-on and checked baggage.

5. There is no limit to the number of firearms or corresponding accessories a passenger can carry in the locked hard-sided container.

1. Carrier will accept no more than a total gross weight of eleven (11) pounds of ammunition per passenger

2. Oversize / overweight restrictions still apply.

3. Ammunition must be in the manufacturer's original container or equivalent fiber, wood, or metal container specifically designed to carry ammunition, including removed handgun magazine. This carrier must provide sufficient cartridge separation.

- If a mobility aid or assistive device, upon which a passenger who is a qualified individual with a disability is dependent, cannot be carried in the passenger cabin due to space limitations, such aid or device will be checked and carried in addition to the 2 piece maximum without charge.

**61. – 64. Not Used**

**65. Excess Baggage Charges**

A. Application – Excess baggage charges specified in this Article will be applicable from the point at which the baggage is accepted to the point to which the baggage is checked.

B. Charges:

1. Baggage in excess of the five (5) bag maximum specified in Article 60 above will incur a charge of fifty dollars ($50.00) per piece per segment.

2. Baggage in excess of eighty (80) inches but not more than one hundred fifteen (115) inches (sum of outside length plus outside height plus outside width) will incur an oversize charge of seventy–five dollars ($75.00) per item in addition to the assessed Baggage Fee.

3. Baggage weighing between forty–one (41) and seventy (70) pounds will be accepted as checked baggage for an excess weight charge of fifty dollars ($50.00) per item in addition to the assessed Baggage Fee. Baggage weighing between seventy–one (71) and ninety-nine (99) pounds will be accepted as checked baggage for an excess weight charge of seventy–five dollars ($75.00) per item in addition to the assessed Baggage Fee.

C. No baggage more than 99 lbs. will be accepted.

**66. – 74. Not Used**

**75. Baggage – Limitation of Liability**

A. The liability, if any, of Carrier for loss of, damage to, or delay in the delivery of checked or unchecked baggage and/or its contents, with the exception of wheelchairs, mobility aids,

and assistive devices used by an individual with a disability, is limited to the proven amount of damage or loss, but in no event shall be greater than three-thousand, eight-hundred dollars ($3,800) Domestic or 1,288 Special Drawing Rights International per fare-paying passenger. Carrier will compensate the passenger for reasonable, actual and documented damages incurred as a result of the loss of, damage to, or delayed delivery of such baggage up to the limit of liability or declared valuation, whichever is higher, provided the passenger has exercised reasonable effort to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage.

B. Carrier will be liable for such personal property only for the period in which it is in the custody of Carrier. While every reasonable effort will be made to return items inadvertently left behind by passengers onboard an aircraft, Carrier assumes no custody or responsibility for property carried onboard an aircraft by a passenger.

C. Carrier's liability with respect to damage to wheelchairs, other mobility aids, and assistive devices upon which an individual with a disability is dependent shall be the documented cost of repair. If a wheelchair, mobility aid, or assistive device is lost or irreparably damaged, the criteria for calculating the compensation for a lost, damaged, or destroyed wheelchair or other assistive device shall be the original purchase price of the device without depreciation. Carrier will also compensate the passenger for other reasonable expenses incurred as a result of the loss of, damage to, or delayed delivery of the wheelchair, mobility aid, or assistive device.

D. Carrier assumes no responsibility and will not be liable for money, jewelry, cameras, photographic, video and electronic equipment (including computers), silverware, natural fur products, precious gems and metals, medication, negotiable papers, securities, business documents, samples, items intended for sale, paintings and other works of art, antiques, collectors' items, photographs, artifacts, antiques, heirlooms, manuscripts, furs, keys, spirits, irreplaceable books or publications, and similar valuables, except for claims arising from international flights covered by the Montreal Convention. Carrier discourages the foregoing items being placed in checked baggage.

**76. Fragile and Perishable Items as Baggage**

Carrier may, but is not obligated to, conditionally accept previously damaged, improperly packed, fragile, or perishable items for carriage as checked baggage subject to the passenger's assumption of risk for damage to or destruction of such items. Fragile or perishable items will not be accepted as checked baggage unless they are properly packed in an original factory–sealed carton or case designed for shipping such items and if the item does not pose a risk of damage to other checked baggage.

**77. – 79. Not Used**

**80. Claims**

A. In the case of loss of, damage to, or delay in delivery of baggage, no claim will be entertained by Carrier unless preliminary written notice of such claim is presented to Carrier at the airport, within four (4) hours after arrival of the flight on which the loss, damage, or delay is alleged to have occurred or within twenty-four (24) hours for missing contents. The preliminary notice may thereafter be amended in writing; however, such amended claim must be presented to Carrier no later than twenty–one (21) days after the occurrence of the event giving rise to the claim.

B. Failure to provide notice within the foregoing time limits will not bar a claim if the claimant establishes to the satisfaction of Carrier that he or she was unable, through no fault or omission of the claimant, to provide notice within the specified time limits.

C. To the maximum extent permitted by law, no legal action on any claim described above may be maintained against Carrier unless commenced within one (1) year of Carrier's written denial of a claim, in whole or in part.

**81. Class Action Waiver**

Any person who purchases air transportation and/or any ground accommodation or service from Carrier agrees, on behalf of such purchaser and anyone on whose behalf he or she makes such a purchase, that any lawsuit brought against Carrier, any of its affiliated entities, or any of its agents, directors, employees or officials related to this Contract of Carriage, any air transportation and/or ground accommodation or service purchased from Carrier, or any use of or dealings with Carrier's website shall be brought only in an individual capacity, and shall not be brought in or asserted as part of a class action proceeding. Purchaser warrants that all persons described in the foregoing sentence are bound thereby and by all other provisions of this Contract of Carriage.

**82. Smoking**

Smoking aboard Carrier's aircraft is prohibited by federal law.

**83. Health Risks**

An inherent risk of air travel is the possibility that one or more passengers on a flight may have a communicable disease, and that one or more other passengers may contract the disease. This could include Covid-19 or other serious disease. Despite the efforts of Carrier, public health authorities and others to minimize the spread of disease, Carrier can offer no assurance that a passenger will not contract a viral or other disease while aboard

an aircraft operated by Carrier or while using airport facilities utilized by Carrier. Accordingly, you hereby agree on behalf of yourself and anyone on whose behalf you make a purchase from Carrier, that neither Carrier nor any of its agents, directors, employees, officials or affiliated entities shall have any liability whatsoever in respect of disease, however contracted.

**84. Photos & Videos Onboard**

The use of small cameras or mobile devised for photography and video is permitted onboard provided you keep the purpose of your photography and video to capturing personal events. Photographing or recording other customers or airline personnel without their express consent is prohibited. Airline personnel reserve the right to prohibit photos and videos onboard the aircraft if it becomes a disturbance to them or other passengers.

**85. Failure to Operate as Scheduled**

A. This article covers:

1. Canceled Flights (both voluntarily changed by the carrier and for reasons beyond the carrier's control)

2. Late or Irregular Operations (both voluntarily changed by the carrier and for reasons beyond the carrier's control)

3. Schedule Changes

B. Cancel/Delay reasons beyond the carrier's control include, but are not limited to, acts of God, governmental actions, fire, weather, mechanical difficulties, Air Traffic Control, strikes or labor disputes, or inability to obtain fuel for the flight in question.

C. Carrier shall use its best efforts to notify all affected passengers promptly of planned schedule changes and service withdrawals.

D. If Carrier delays, cancels, or fails to operate any flight according to Carrier's published schedule, provided in the case of delay that the delay is significant, Carrier will, at the request of a passenger confirmed on an affected flight:

1. transport the passenger on another of Allegiant's flights on which space is available at no additional charge; or

2. refund the unused portion of the passenger's fare in accordance with Article 90 below; or

3. in the case of a schedule change made voluntarily by Carrier, and provided the schedule change is significant, refund the unused portion of the passenger's fare in accordance with Article 90 below.

E. Carrier shall not be liable for any consequential damages or incidental costs incurred by

the passengers such as, but not limited to, loss of wages/income/salaries/emotional
distress that arise from the failure or delay in operating any flight.

F. Carrier will attempt to transport passengers and their baggage promptly and as scheduled.
Flight schedules, however, are subject to change without notice, and the times shown in or
on Carrier's published schedules and advertising are not guaranteed. At times, without
prior notice to passengers, Carrier may need to substitute other aircraft, airlines or means
of transportation and may change, add, or omit intermediate or connecting stops. Carrier
cannot guarantee that passengers will make connections to other flights of its own or
those of other airlines. In the event of flight schedule changes, Carrier will attempt to notify
affected passengers as soon as possible at the airport or en route.

G. If a flight is unable to land at the destination airport and is diverted to another airport, the
carriage by air shall, unless the aircraft continues to the original destination, be deemed to
be completed when the aircraft arrives at the diversion airport. Carrier may, however,
arrange or designate alternative transportation, whether by Carrier's own service or by
other means of transportation specified by Carrier (which may include ground
transportation) to transport passengers to the original destination without additional cost.
Exceptions may include situations where alternative transportation is prevented by safety
concerns. When alternative transportation to the original destination is provided by or at
the direction of Carrier, any arrangements made by one or more passengers on their own
will not be paid for or reimbursed by Carrier and are at the passengers' own risk.

**86. – 89. Not Used**

**90. Refunds**

A. Nonrefundable fares – Nonrefundable fares are not eligible for refunds, except as
provided in Articles 85.A above and 90.B.through 90.D. below.

B. Flight terminations or involuntary cancellations – If a passenger's scheduled transportation
is canceled, or terminated before the passenger has reached his or her final destination as
a result of a flight cancellation or omission of a scheduled stop, Carrier will, at the
passenger's option, transport the passenger on another of Carrier's flights on which space
is available at no additional charge, or refund the fare for the unused transportation, or
provide a credit voucher for such amount toward the purchase of future travel.

C. Denied boarding – If Carrier denies boarding or removes a passenger from an aircraft
under conditions described in Article 10 (except Articles 10.B, 10.C, and 10.F) or Article
35.F above, Carrier will refund the fare paid for the unused portion thereof. If Carrier
denies boarding or removes a passenger under any of the circumstances enumerated in
Article 10.B, 10.C or 10.F, fares paid for any unused travel segment shall be forfeited and

non-refundable.

D. Eligible fare refunds and credits will be made by Carrier as follows:

1. when no portion of the transportation has been provided, the refund or credit will be issued in an amount equal to the fare paid (subject to Article 90.C above) less applicable change fees;

2. when a portion of the transportation has been provided, the refund or credit will be made in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided, (subject to Article 90.C above) less applicable change fees; or

3. if a customer cancels an entire air transportation itinerary within 24 hours after booking the itinerary and the scheduled time of departure of the initial flight in the itinerary was at least one week (168 hours) away at the time of booking, a full refund will be issued; provided, this does not apply when the air transportation was purchased as part of a package consisting of air and ground elements. Such cancellation may be accomplished online via the customer's "My Allegiant" account or by contacting the Allegiant Reservation Center by telephone.

E. Carrier shall make eligible refunds according to the original form of payment. Refunds for fares purchased with a debit or credit card shall be processed for crediting back to the same card account no later than seven (7) days from the date the refund request is received by Carrier. All credit refunds will be issued in the currency used at purchase (USD). Refunds for fares purchased with cash or by check will be issued by check no later than twenty (20) days after the refund request is received by Carrier; provided that, with regard to fares purchased by check, in cases where Carrier has reasonable cause to suspect fraud, Carrier may delay making an otherwise eligible refund until such time as the check by which the fare was purchased has cleared the financial institution on which it was drawn and Carrier has received payment from such institution. Refunds for fares purchased with instalment payments offered through a third party company, must be requested to Allegiant for the cancelation of the itinerary but the third party company will manage the settlement of the credit line and the final refund to the Customer.

**91. – 104. Not Used**

**105. Denied Boarding Compensation**

A. The following definitions, as prescribed in 14 C.F.R. § 250.1, pertain solely to the denied boarding compensation provisions of this Article:

• Airport means the airport at which the direct or connecting flight, on which the passenger holds confirmed reserved space, is planned to arrive or some other airport serving the

same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the passenger.

- Comparable air transportation means transportation provided to passengers at no extra cost by a direct air carrier holding a certificate of public convenience and necessity or commuter authority issued by the U.S. Department of Transportation, or by a foreign air carrier holding a foreign air carrier permit issued by the U.S. Department of Transportation authorizing the scheduled air transportation of persons.

- Confirmed reserved space means space on a specific date and on a specific flight of Carrier which has been requested by a passenger and which Carrier or its authorized agent has verified, by appropriate notation on the ticket or Ticketless Travel Confirmation, or in any other manner provided by this Contract of Carriage, as being reserved for the accommodation of the passenger.

- Stopover means a deliberate interruption of a journey by the passenger, scheduled to exceed four (4) hours, at a point between the place of departure and the place of final destination.

- The sum of the values of the passenger's remaining flight coupons means the sum of the applicable one–way fares, including any surcharges, airport or passenger facility charges, and air transportation taxes, less any applicable discounts.

B. Request for Volunteers – In the event of an unintentional overbooked flight, Carrier shall request volunteers for denied boarding. A volunteer is a person who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation, in any amount, in exchange for relinquishing his or her confirmed reserved space. Any other passenger denied boarding is considered to have been denied boarding involuntarily, even if that passenger accepts denied boarding compensation. If an insufficient number of volunteers come forward, Carrier may deny boarding to other passengers. However, Carrier will not deny boarding to any passenger involuntarily who was earlier asked to volunteer without having been informed about the possibility of being denied boarding involuntarily and the amount of compensation specified in Article 105.E. below.

C. Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversell – Subject to the exception in Article 105.D. below, Carrier will tender to a passenger the amount of compensation specified in Article 105.E. below, when:

1. the passenger holds a ticket for confirmed reserved space and presents himself or herself for carriage at the appropriate time and place, having complied fully with Carrier's requirements as to ticketing, reconfirmation, check-in, and acceptability for transportation in accordance with this Contract of Carriage; and

2. other than for reasons set forth in Article 10 above, or when resulting from substitution for

operational or safety reasons of an aircraft having a lesser seating capacity than the aircraft originally scheduled, Carrier is unable to accommodate the passenger on the flight for which the passenger holds confirmed reserved space, and such flight departs without the passenger.

D. Exception – The passenger will not be eligible for compensation if Carrier offers comparable air transportation, or other transportation used by the passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the passenger's next stopover or, if none, at the airport of the passenger's final destination not later than one (1) hour after the planned arrival time of the passenger's original flight or flights.

E. Amount of Compensation Payable to Passengers Involuntarily Denied Boarding Due to an Oversell:

1. Domestic Transportation Passengers traveling between points within the United States (including the territories and possessions) who are denied boarding involuntarily from an oversold flight are entitled to: (1) No compensation if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover not later than one hour after the planned arrival time of the passenger's original flight; (2) 200% of the fare to the passenger's destination or first stopover, with a maximum of $775, if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover more than one hour but less than two hours after the planned arrival time of the passenger's original flight; and (3) 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,550, if the carrier does not offer alternate transportation that is planned to arrive at the airport of the passenger's destination or first stopover less than two hours after the planned arrival time of the passenger's original flight.

| 0 to 1 hour arrival delay. | No compensation. |
|---|---|
| 1 to 2 hour arrival delay. | 200% of one-way fare (but no more than $775). |
| Over 2 hours arrival delay. | 400% of one-way fare (but no more than $1,550). |

2. Except as provided below, the airline must give each passenger who qualifies for involuntary denied boarding compensation a payment by cash or check for the amount specified above, on the day and at the place the involuntary denied boarding occurs. If the airline arranges alternate transportation for the passenger's convenience that departs before the payment can be made, the payment shall be sent to the passenger within 24 hours. The air carrier may offer free or discounted transportation in place of the cash payment. In that event, the carrier must disclose all material restrictions on the use of the free or discounted transportation before the passenger decides whether to accept the

transportation in lieu of a cash or check payment. The passenger may insist on the
cash/check payment or refuse all compensation and bring private legal action.

3. Acceptance of the compensation may relieve Allegiant Air from any further liability to the
passenger caused by its failure to honor the confirmed reservation. However, the
passenger may decline the payment and seek to recover damages in a court of law or in
some other manner.

**106. – 115. Not Used**

**116. Ticketless Travel Acceptability**

Carrier will accept only its own electronic Ticketless Travel Confirmation, and then only if
all transportation written thereon uses the services of Carrier. Any tickets issued in
conjunction with travel on another carrier will not be accepted.

**117. – 123. Not Used**

**124. Check Acceptance**

Allegiant accepts most major credit and debit cards. Allegiant does not accept cash,
check, or money orders in-flight or at any airport location.

**125. - 126. Not Used**

**127. Right to Change Contract**

Carrier reserves the right, to the extent not prohibited by federal law, to change, delete, or
add to any of the terms of this Contract of Carriage without prior notice. All changes must
be in writing and approved by a corporate officer of Carrier.

Plaintiffs' Exhibit 453

Home    LOG IN     English ▾    Search AA.com®    



PLAN TRAVEL    TRAVEL INFORMATION    AADVANTAGE®    

⌂ Home    ›    Legal, privacy & copyright    ›    Conditions of carriage

# Conditions of carriage

Updated January 1, 2022

## The contract between you, the passenger, and us, American Airlines

At American Airlines, we fly over borders – across the country and the world – to connect people and communities. Providing this service and making the world a smaller, more inclusive place, is a huge part of who we are.

Flying with American »

All transportation of passengers and bags provided by American Airlines is subject to the terms of these Conditions of Carriage, in addition to any:

- Terms printed on any ticket, ticket jacket or ticket receipt
- Published fare rules; and
- Applicable tariffs filed by American Airlines in accordance with U.S. Department of Transportation regulations.

All terms, fare rules, and tariffs are incorporated herein by reference and constitute part of your agreement with American Airlines.

American Airlines General Rules of the International Tariff ⧉

## You

Passenger responsibilities »

Children traveling »

Customers with special needs »

## Your flight

Check-in and arrival »

Changes to schedules / operations »

Events beyond our control »

Oversold flights »

Delays, cancellations and diversions »

## Your ticket, bags & refunds

Baggage »

Baggage liability (domestic flights) »

Liability for international flights »

Ticket types and refunds »

Ticket validity »

## Contact us

Good or bad, we want to hear from you. Please contact us with your comments, concerns and feedback. Our Customer Relations team is here for you and will respond promptly.

Call Customer Relations: 682-278-9000

Email Customer Relations »

Facebook ⧉

Twitter ⧉

⌄ Contract details

⌄ The words we use

# You

As a passenger, you're required to act in way that's consistent with ensuring the safety of everyone on board. This includes complying with the laws and travel requirements of the countries we fly to, from or over. Traveling can be stressful, and we appreciate your patience and courtesy for other passengers and American Airlines team members.

⌃ Passenger responsibilities

## Complying with the law and government regulations

To fly on American, you must:

- Have a valid photo ID accepted by the TSA (like a driver's license or other government issued ID).
- Have a valid passport, visa and any travel documents required if you're traveling internationally.
- Allow your baggage to be inspected by Customs, the TSA or other government officials.

Be sure your driver's license complies with REAL ID and that your passport is valid or you may not be allowed to board your flight. Some countries require your passport be valid for 3 – 6 months beyond your departure date, so be sure you know the rules before you travel.

We are not responsible for any loss, damage or expense if you do not meet the travel document requirements.

More about ID requirements »

## Complying with airline rules for safety

The safety and comfort of our customers and team members is our top priority. We will respond seriously to any language or behavior that threatens the well-being or functionality of our crew or any American Airlines team member. Violent or inappropriate actions may result in the denial of boarding, removal from the terminal or legal prosecution.

To ensure a safe environment for everyone, you must:

- Allow you and your bags to be searched for explosives, dangerous weapons or banned substances.
- Show a valid ID.
- Understand and comply with all safety instructions.
- Release us from responsibility for any loss, damage or expense if you do not meet the travel document requirements.
- Behave appropriately and respectfully with other passengers, crew or any American Airlines team member.
- Postpone your flight if you have a dangerous disease deemed transmissible by a federal public health authority.
- Be respectful that your odor isn't offensive (unless it's caused by a disability or illness).
- Dress appropriately; bare feet or offensive clothing aren't allowed.
- Not threaten the safety of the flight in any way.
- Have the right travel documents and be allowed to travel to, from or through any countries in your itinerary.
- Be able to sit with your seatbelt fastened.

If your physical or mental condition is such that in American's sole opinion, you are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an attendant, American may refuse to transport

you.

In addition, you may be asked to give up your seat if a government official needs space, for weather conditions requiring reduced aircraft load, or for other conditions beyond our control.

## Failing to comply

We may not let you fly (temporarily or permanently) for any reason, including if you:

- Don't obey the law
- Are uncooperative, abusive, harassing, or show the potential to be while on board
- Pose a risk to safety or security
- Appear intoxicated or under the influence of drugs
- Attempt to interfere with the flight crew or refuse to obey instructions
- Fail to comply with American Airlines rules or policies
- Need to be removed for your safety or the safety of other passengers or the crew
- Have a communicable disease or virus, or if we suspect you have a communicable disease or virus
- Are traveling with an animal that causes a delay or damage to the plane or other passengers

You may also be liable for any loss, damage or expense resulting from your conduct. For example, you may be liable for the costs if we have to divert to another city because of your conduct. Also, under U.S. law you may be liable if you assault a federal, airport or airline employee with security duties. Failing to meet passenger responsibilities is a material breach of this contract.

## ⌃ Children traveling

We welcome children of all ages on board. Be sure you know the rules for your child based on his or her age. We count "age" based on the child's age the day of departure.

Traveling with children and infants »

### Infants (under 2 years)

- One infant under 2 can travel in your lap. You are not required to pay for a separate seat unless you have an FAA approved car seat you plan to use on board.
- There may be a fee for infants traveling outside the U.S.
- Infants as young as 2 days old can fly, but any infant under 7 days old needs a passenger medical form filled out by your doctor before flying.
- Infants must be accompanied by a parent (any age) or someone 16 years or older in the same cabin.

### Children (2 years or older)

- Children 2 and older must have a purchased seat. If your child turns 2 during a trip, the child will need their own seat for the remainder of the trip.
- Children under 5 years cannot travel alone.

Traveling with children and infants »

## Unaccompanied minor service

Our unaccompanied minor service ensures your child is escorted on the plane, introduced to the flight attendant, chaperoned during connections and brought to the person you designate when they arrive. Keep in mind, flight attendants can't continuously monitor children during flight.

Unaccompanied minor service »

## ⌄ Customers with special needs

We're dedicated to providing customers with special needs dignified, professional and courteous service at all times. Customers with special needs may need to board the plane early.

You can request special assistance when you book on aa.com (our site is accessible) or call us anytime at (800) 433-7300.

## Special assistance coordinators

When you request special assistance, a coordinator will contact you before your flight to make sure necessary medical paperwork is complete and requests are arranged.

They can help with:

- Wheelchair assistance
- Mobility assistance, getting in and out of the plane
- Traveling with a service animal*
- Traveling with a portable oxygen concentrator (POCs)*
- Battery-powered medical devices

- Traveling within 7 days of your due date or after your delivery
- Adjacent seating for yourself and your personal care attendant
- Disassembly and packaging for mobility assistive devices when needed

*We require at least 48 hours advance notice if you need to travel with a service animal, or a POC.

Call us anytime:

- 800-433-7300
- For hearing or speech impaired assistance dial 711 to be connected through the National Relay Service

Special assistance »

## Mobility and medical devices

If you're traveling with any medical device, a wheelchair or other mobility device, we're here to help. If we're able, we offer early boarding, help getting off the plane and airport assistance. Contact us to make sure your device is approved for travel and to make any special requests.

Mobility and medical devices »

## Special assistance issues

If you had a special-assistance issue on your trip, please go to the American Airlines customer service desk. We have local complaint resolution officials (LCRO) available during operating hours, and a corporate complaint resolution official is available to assist our LCROs 24/7. You can also call our disability team 24/7 at 800-892-3624.

# Your flight

When it comes to checking in and arriving at the airport, earlier is better. Give yourself extra time if you're checking bags or traveling internationally.

Before you head to the airport, you can check for travel alerts that impact the cities in your trip and get flight status information like gates and times.

Travel alerts »

Get flight status information »

Download the American Airlines app to get real time updates about your travel.

American Airlines app »

## Check-in and arrival

### Check-in times

You can check in on aa.com and in the app beginning 24 hours before departure. All airports have minimum check-in times. If you're not checked in by the minimum check-in time, we may reassign your seat to another passenger.

In most cities, you must be checked in:

- At least 45 minutes before scheduled departure, for flights within the U.S.
- At least 60 minutes before scheduled departure, for flights to or from airports outside of the U.S.

Some airports require you to check in earlier.

Check-in and arrival »

### Arriving at the gate

Be at the gate and ready to board the plane at least:

- 30 minutes before departure on domestic flights
- 45 minutes before departure for international flights

You must have a boarding pass with a valid seat assignment to board the plane.

Boarding ends 15 minutes before departure. If you're not on board, we may reassign your seat to another passenger. You will not be allowed to board once the doors close.

If you're on a codeshare flight operated by one of our partners, check with that airline.

## Our responsibilities when there are schedule / operations changes

Sometimes we have to make adjustments to our operation, and between the time you book and the day you are scheduled to depart, there may be changes to:

- Your flight number
- The type of plane you're flying on and the available amenities
- Your seat assignment
- The airline that operates your flight
- The number of stopovers or stopover cities
- Departure or arrival times

When there are changes or cancellations that affect your trip, we'll try to contact you in advance to rebook another flight or move you to a similar seat or cabin, though we can't make any guarantees.

We do our best to be on time but our flight schedule is not guaranteed and not part of this contract. We are not liable if:

- We're late or you don't make your connection
- We change the schedule of any flight
- We (or our partners) cancel a flight or route
- Your checked baggage is late (except as required by statute, regulation, or Convention)
- There are special, incidental or consequential damages because of these changes

If we or our airline partner fails to operate or delays your arrival more than 4 hours, our sole obligation is to refund the remaining

ticket value and any optional fees according to our involuntary refunds policy, subject to our policy for rebooking your delayed / canceled flight.

Refunds »

Rules for delays on international trips are governed by the Montreal Convention and Warsaw Convention. The full linked page provides more information and is incorporated by reference.

Montreal Convention and Warsaw Convention »

## ⌃ Events beyond our control (Force Majeure)

When there's an event we can't control like weather, a strike or other civil disorder, we may have to cancel, divert or delay flights. If your ticket still has value (if you were, for example, re-accommodated in a different class of service) we'll refund the unused portion to the original form of payment, but beyond that we are not liable.

Such "Force Majeure" events include:

- Meteorological or weather conditions
- Civil disturbances including war, embargoes or unsettled international conditions (real or threatened)
- Acts of terror
- Public health emergencies of domestic or international concern
- Labor disputes that involve or affect our service
- Government regulations or requirements
- Shortage of labor, fuel or facilities of American or others
- Any fact not reasonably foreseen or predicted by American

International air transportation liability is regulated by the Montreal Convention and Warsaw Convention.

Montreal Convention and Warsaw Conventions »

## ⌃ Oversold flights

A flight is "oversold" when there are more checked-in passengers than seats. When this happens, our team gets involved as early as possible to find volunteers to change flights.

When, despite our best efforts, we don't have enough volunteers, we'll have to choose customers to change flights involuntarily, and deny boarding. If this happens, we will follow the DOT's compensation rules. We will do our best to get those customers on the next possible flight.

We will not involuntarily remove a revenue passenger who has already boarded to give a seat to another passenger.

## Voluntary denied boarding

We will ask for passengers who are willing to voluntarily give up their seats in exchange for compensation in an amount and form to be determined solely at American's discretion.

When you volunteer to give up your confirmed seat on a flight, we will compensate you in a form and in an amount we think is fair.

## Involuntary denied boarding

If there aren't enough volunteers, we will choose customers to change flights involuntarily and deny boarding.

Boarding priority is given to certain customers, including those who:

- Have special assistance needs

- Are traveling as an unaccompanied minor
- Have AAdvantage elite status
- Paid for First, Business or Premium Economy
- Checked in earliest

The selection of customers who are involuntarily denied seats is solely at American's discretion.

You will not receive involuntary denied boarding compensation if:

- You fail to comply with American's ticketing, check-in and reconfirmation requirements, or you're not acceptable for transportation under American's usual rules and practices.
- Your flight is canceled.
- We switch to a smaller plane for safety or operational reasons.
- Your plane has 60 or fewer seats and there are safety-related weight/balance restrictions.
- You're offered a seat in a section of the plane that's different from your original ticket. If you are seated in a section for which a lower fare is charged, you will be given an appropriate refund.
- We're able to get you to your next stopover or final destination within 1 hour of your original arrival time.

## Compensation for involuntary denied boarding

DOT rules determine how much you're compensated based on how late you'll be to your stopover or destination. Our goal is to get you to your next scheduled stopover or final destination as soon as possible, so we may offer flights on other airlines and non-air travel such as by train. If your flight is oversold and you're not allowed to board, we'll give you a check or travel credit the same day at the airport or mail it within 24 hours.

### Travel within U.S.

- Up to 1 hour arrival delay – not compensated
- 1 - 2 hour arrival delay – 200% of one-way fare (max. $775)
- 2+ hour arrival delay – 400% of one-way fare (max. $1,550)

### International

- Up to 1 hour arrival delay – not compensated
- 1 - 4 hour arrival delay – 200% of one-way fare (max. $775)
- 4+ hour arrival delay – 400% of one-way fare (max. $1,550)

### Travel from European Union countries (EU)

If you're not allowed to board an oversold, nonstop flight from the EU to the U.S., you may be eligible to receive one of these:

- A travel voucher that can be used for 1 ticket to anywhere American flies
- A check for 300 EUR (arrival delays under 4 hours) or 600 EUR (arrival delays more than 4 hours)

### Travel to or from Canada

If you're not allowed to board a flight to or from Canada, the Canada Air Passenger Protection Regulations may provide additional protections, including compensation.

Canada passengers »

⌃ Delays, cancellations and diversions

Our goal is to provide timely, frequent and helpful updates – from the time you are ticketed, at the airport and on board – when there are delays, cancellations and diversions.

## Rebooking your delayed / canceled flight

When your flight is canceled or a delay will cause you to miss your connection, we'll rebook you on the next American Airlines or American partner flight with available seats. We'll rebook you in your originally ticketed cabin or class with your original form of payment. If your flight was delayed or canceled and you don't accept our alternative arrangements, or none were available, we'll refund the remaining ticket value and any optional fees according to our involuntary refunds policy. Beyond that, we have no further contractual obligation.

### Delays caused by us

If the disruption is our fault or you're diverted to another city, and we don't board before 11:59 p.m. local time on your scheduled arrival day, we'll arrange an overnight stay or cover the cost of an approved hotel, if available. We don't guarantee reimbursement for hotel expenses if you book directly without written authorization from American Airlines.

### Delays beyond our control (like weather)

If the delay is beyond our control, or you book your own arrangements without written authorization from American Airlines, you're responsible to pay for your hotel, meals and other expenses. An American Airlines agent may be able to help you find a hotel.

## Taking care of delayed passengers

We'll do our best to ensure delayed passengers are as comfortable as possible. Gate agents are asked to look after customers with special needs including unaccompanied minors, customers with disabilities and the elderly.

For long delays on the plane, we'll make every reasonable effort to ensure you have food (such as crackers or biscuits), water, access to the restroom and basic medical assistance if needed.

We are not responsible for any special, incidental or consequential damages if we're unable to meet this commitment.

Customer service plan »

## Travel to or from Canada

If your flight is delayed or cancelled due to reasons within our control, the Canada Air Passenger Protection Regulations may provide additional protections, including compensation.

Canada passengers »

# Your ticket, bags and refunds

⊙ Baggage

⊙ Baggage liability (domestic flights)

⊙ Liability for international flights

⊙ Ticket types and refunds

# Plaintiffs' Exhibit 454

**DELTA DOMESTIC GENERAL RULES TARIFF**
**[Last Modified April 13, 2021]**

RULE 1:    General Provisions ........................................................................................................ 2
RULE 2:    SCHEDULES AND OPERATIONS ............................................................................... 2
RULE 3:    DEFINITIONS ................................................................................................................ 3
RULE 4:    PERSONAL DATA.......................................................................................................... 5
RULE 5:    INTER-AIRPORT TRANSPORTATION ........................................................................ 5
RULE 6:    CARRIAGE OF PERSONS WITH DISABILITIES ...................................................... 5
RULE 7:    REFUSAL TO TRANSPORT ......................................................................................... 8
RULE 8:    ACCEPTANCE OF CHILDREN................................................................................... 9
RULE 9:    SPECIALLY TRAINED SERVICE DOGS .................................................................. 11
RULE 10:   SMOKE FREE SERVICE ............................................................................................ 11
RULE 11:   PASSENGER MEDICAL OXYGEN ............................................................................ 11
RULE 12:   TICKETS...................................................................................................................... 11
RULE 13:   CONFIRMATION OF RESERVATIONS ................................................................... 12
RULE 14:   CANCELLATION OF RESERVATIONS .................................................................... 12
RULE 15:   VOLUNTARY STANDBY TRAVEL ............................................................................ 13
RULE 16:   FARES ......................................................................................................................... 14
RULE 17:   BAGGAGE.................................................................................................................... 15
RULE 18:   ELECTRONIC SURVEILLANCE ............................................................................... 17
RULE 19:   FLIGHT DELAYS/CANCELLATIONS ....................................................................... 17
RULE 20:   DENIED BOARDING COMPENSATION................................................................... 18
RULE 21:   REROUTING ............................................................................................................... 21
RULE 22:   REFUNDS .................................................................................................................... 23
RULE 23:   CURRENCY; DECLINED OR DISPUTED FORMS OF PAYMENT........................... 24
RULE 24:   GOVERNING LAW; ENTIRE AGREEMENT; LIMITATION OF LIABILITY ............... 25

**RULE 1:**    <u>**General Provisions**</u>

**A.    Contract of Carriage**

When you buy a ticket from or travel on Delta, you enter into a contract with us, and you agree to be bound by its terms.  The terms of your contract are set forth in:

- your Ticket;
- these Conditions of Carriage; and
- our published fare rules and regulations, which may govern the calculation of the fare and other charges that apply to your itinerary.

This document is Delta's Domestic Conditions of Carriage. It applies only to travel entirely within the United States of America and states the terms upon which Delta offers to transport passengers.

Any reference to "Delta" in this contract refers to Delta Air Lines, the Delta Shuttle, and the Delta Connection carriers.  Some flights marketed by Delta may be operated by the other carriers. If any Carrier other than Delta is operating a flight, we will identify that Carrier in our schedules and in written or oral communications with you during the booking process. The terms of transportation applicable to Delta specified in these Conditions of Carriage apply to flights operated by the Delta Connection and Delta Shuttle carriers, and to codeshare flights marketed by Delta.

Delta may act as an agent to issue tickets, check baggage and book reservations for transportation via other Carriers which have interline agreements with Delta. For interline flights operated by other Carriers, the conditions of carriage of the operating Carrier will apply.   Other Carriers may have different terms and conditions applicable to their flights, and these may be obtained directly from the other Carriers.

**B.    Amendments to Conditions of Carriage**

Delta may amend these Conditions of Carriage at any time, except as provided by law.  Your travel is governed by the rules that were in effect on the date you purchased your ticket; provided, however, that Delta reserves the right to apply rules currently in effect on the date of your travel where reasonably necessary for operational reasons and where the change in rule does not have a material negative impact upon you. No Delta employee or ticketing agent has the authority to modify any provision of the Conditions of Carriage unless authorized in writing by a Delta corporate officer.

**RULE 2:**    <u>**SCHEDULES AND OPERATIONS**</u>

Delta will exercise reasonable efforts to transport you and your baggage from your origin to your destination with reasonable dispatch, but published schedules, flight times, aircraft types, seat assignments, and similar details reflected in the ticket or Delta's published schedules are not guaranteed and form no part of this contract.   Delta may substitute alternate Carriers or aircraft, change its schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Delta's sole discretion. Delta's sole liability in the event of such changes is set forth in Rule 22.  Delta is not responsible or liable for making connections, failing to operate any flight according to schedule, changing the schedule or any flight, changing seat assignments or aircraft types, or revising the routings by which Delta carries the passenger from the ticketed origin to destination.

**RULE 3:      DEFINITIONS**

Animals, in addition to the usual connotation, include reptiles, birds, and fish.

Applicable Full Fare means the one-way fares, whether specifically published or derived by construction, for the class of service designated in the Carrier's official general schedule for the aircraft, or cabin of the aircraft used by the passenger.

Carrier means any air carrier shown as a participant in this tariff.

Co-Terminal - Two or more relatively adjacent airports which for the purpose of these fares will be considered the same point.

Days - Full calendar days, including weekend days and legal holidays (but not including the date that any notice is sent).

Dependent – The spouse and children of U.S. Military Personnel or U.S. embassy personnel stationed overseas who are dependent upon such personnel for financial support.

Dot Hazardous Materials Regulations means the hazardous materials regulations issued by the Materials Transportation Bureau of the Department of Transportation in Title 49 of the Code of Federal Regulations, Parts 171 through 177 (49 CFR 171-177).

Fare Component - The fare paid for the portion of the itinerary between the origin and destination/Stopover point.

Government Transport Request (GTR) - Form used for ticket payment and travel authorization for passengers traveling on official business for the federal government by the U.S.

Group means the minimum number of passengers specified in conjunction with the fare as provided for in the applicable fare rules.  Less than the minimum number of passengers may not travel at group fares, even upon payment of the minimum number of fares, unless specifically permitted in a given fare rule.

Immediate Family means spouse, domestic partner, children, step-children, grandchildren, parents, step-parents, grandparents, brothers, step-brothers, sisters, step-sisters, daughters-in-law, sons-in-law, fathers-in-law, mothers-in-law, aunts, uncles, nieces, nephews, brother-in-law and sisters-in-law.

Interlining means utilizing the services of more than one Carrier in connection with a particular fare.

Military Agencies means departments of the Army, Navy and Air Force; the Marine Corps; the Coast Guard; the respective academies of the Army, Navy, Air Force and Coast Guard; and the National Guard.  The Reserve Officer Training Corps is not included.

Military Passenger means military personnel of the U.S. Military Agencies who are on active duty status or who have been discharged from active military service within seven Days of the date of travel.

Person with a Disability means any person who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of

such an impairment, or is regarded as having such an impairment.  This term shall be further defined as required by applicable law, including 14 C.F.R. 382.3.

Personal Attendant means the travel companion of a Person with a Disability that is attending to the personal needs of the passenger with a disability.

Qualifying Alternative Transportation means comparable air transportation, or other transportation used by the passenger, at no extra cost to the passenger, that at the time such arrangements are made is scheduled to arrive at the passenger's next Stopover, or, if none, final destination within two hours after the planned arrival time of the passenger's original flight or flights.

Reroute means to issue a new ticket, or honor an existing ticket, covering transportation to the original destination, but via a different routing than that designated on the ticket.

Round Trip means any trip, the ultimate destination of which is the point of origin, and which is legal routing and comprised of an outbound and return segment.  Reservations for all segments of a trip for tickets issued at round-trip fares must be confirmed in the same (a single) passenger name record (PNR)

Routing means the Carrier(s) and/or the cities and/or class of service and/or type of aircraft (jet or propeller) via which transportation is provided between two points.

Safety Assistant means a person required by Delta to travel with a Person with a Disability, pursuant to Rule 6(C): to attend to the Person with a Disability's in-flight medical needs; to assist the Person with a Disability's communication with crewmembers; or to assist the Person with a Disability's evacuation from the aircraft in the event of an emergency.

Self-reliant means that a person does not require services related to a disability beyond that normally provided by the Carrier or beyond that which applicable law requires the Carrier to provide.

Standby Passenger - Passenger who will be enplaned on a flight subject to the availability of space at departure time and only after all passengers having reservations for such flight, have been enplaned on such flight.  Not all flights will be available for standby.  All specific standby rules are governed by Rule 15.

Stopover means a deliberate interruption of a journey by the passenger, agreed to in advance by the Carrier, at a point between the place of departure and the place of destination.  Unless otherwise noted, a stopover will occur when a passenger arrives at a point and fails to depart from such point on:
    a) The first flight on which space is available, or
    b) The flight that will provide for the passenger's earliest arrival at an intermediate or junction point(s) or destination point, via the Carrier and class of service as shown on the passenger's ticket, provided however, that in no event will a stopover occur when the passenger departs from the intermediate/junction point on a flight shown in the Carrier's official general schedule as departing within four hours after arrival at such point.

United States of America- The area comprising the 50 states; the District of Columbia; Puerto Rico; the U.S. Virgin Islands; American Samoa;  Kanton; Guam; Midway and Wake Islands.

U.S. Armed Forces/U.S. Military Agencies - Department of the Army, Navy, Air Force, Marine Corps, and Coast Guard of the United States of America, the respective academies of the Army, Navy, Air Force, and Coast Guard, and does not include the National Guard Bureau or the Reserve Officer Training Corps, or members of the reserves not holding a valid duty armed forces of the United States green identification card.

U.S. Military Personnel - Unless otherwise indicated, refers only to active duty military personnel, and means Military personnel of the United States Military Agencies holding a valid active duty U.S. Armed Forces green identification card, on active duty status and traveling on authorized furlough, leave, or pass, but expressly excluding Military Personnel on temporary duty orders traveling to or from their temporary duty station.

**RULE 4:**     **PERSONAL DATA**

The passenger recognizes that personal data has been given to Carrier for the purposes of making a reservation for carriage, obtaining ancillary services, facilitating immigration and entry requirements, and making available such data to government agencies. For these purposes, the passenger authorizes Carrier to retain such data and to transmit it to its own offices, other Carriers, or the providers of such services, in whatever country they may be located.   All passenger information shall be handled in accordance with Delta's Privacy Policy (https://www.delta.com/content/www/en_US/privacy-and-security.html).

**RULE 5:**     **INTER-AIRPORT TRANSPORTATION**

When a metropolitan area is served by more than one airport and the passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.  Baggage must be claimed and rechecked by the passenger.

**RULE 6: CARRIAGE OF PERSONS WITH DISABILITIES**

A) Acceptance for Carriage

Delta will make every effort to accommodate a Person with a Disability and will not refuse to transport a person solely based on the person's disability, except as permitted or required by law.

B) Acceptance of Declaration of Self-Reliance

Unless Delta determines a Safety Assistant is essential for safety, pursuant to Rule 6(C), Delta will accept the determination made by or on behalf of a Person with a Disability as to self-reliance.  Once advised that the person is "self-reliant", Delta shall not refuse such passenger transportation on the basis that the Person with a Disability is not accompanied by a Personal Attendant or based on the assumption that the passenger may require extraordinary assistance from airline employees in meeting the passenger's needs.

C) Accompanying Safety Assistant Required for Certain Passengers

Delta may require that a Safety Assistant accompany a Person with a Disability as a condition of providing transportation if Delta determines that such an assistant is essential for safety, such as in, but not limited to, the following circumstances:

1) A passenger is unable to comprehend or respond appropriately to safety related instructions due to a mental disability;
2) A passenger is unable to physically assist in the passenger's own evacuation from the aircraft due to a severe mobility impairment; or
3) A passenger is unable to establish a means of communication with Delta personnel sufficient to receive the safety briefing due to having both severe hearing and vision impairments.

D)  Medical Clearance

Delta will not require a medical clearance for a Person with a Disability as a condition of travel, except as permitted by law.  Delta may require a medical certificate when, in good faith and using its reasonable discretion, Delta determines there is reasonable doubt that a passenger can complete the flight safely without requiring extraordinary medical assistance.

E)  Seating Restrictions and Assignments

When a person identifies the nature of his or her disability, Delta will, to the extent possible, accommodate the passenger with a seat assignment that suits the passenger's needs, including seating the passenger together with any Safety Assistant or Personal Attendant traveling with the passenger. Persons with a disability will not be prohibited from occupying seats in designated emergency exit rows, except to the extent required by law.

F)  Acceptance of Aids

In addition to the regular baggage allowance, Delta will accept, without charge, as priority checked baggage, mobility aids, including but not limited to:

1)  an electric wheelchair, a scooter or a manually operated rigid-frame wheelchair;
2)  a manually operated, folding wheelchair;
3)  a walker, a cane, crutches or braces;
4)  any device that assists the person to communicate; and
5)  any prosthesis or medical device.

Where space permits, Delta will, without charge, permit the passenger to store a manually operated, folding wheelchair and other small mobility aids in the passenger cabin during the flight.  The assembling and disassembling of mobility aids will be provided by Delta, without charge.  Wheelchairs and mobility aids will be the last items to be stowed in the aircraft hold and the first items to be removed.

G)  Manually Operated Wheelchair Access

To the extent permitted by space and facilities, Delta will permit a passenger using a manually operated wheelchair to remain in the wheelchair:

1)  until the passenger reaches the boarding gate;
2)  while the passenger is moving between the terminal and the aircraft door; and
3)  while the passenger is moving between the terminal and the aircraft.

H)  Service Animals

Delta will accept for transportation, without charge, a service Animal required to assist a Person with a Disability. Service Animals are defined as only dogs, regardless of breed, specifically trained to assist a Person with a Disability. To the extent possible, Delta will assign a seat to the person that provides sufficient space for the person and the service Animal.   Delta will permit the service Animal to accompany the person onboard the aircraft and to remain on the floor at the person's seat.  The service Animal will not be permitted to occupy a passenger seat.  To the extent permitted or required by law, Delta reserves the right to deny transportation to any service animal when reasonably necessary, in Delta's sole discretion, for the comfort or safety of passengers or crewmembers or for the prevention of damage to the property of Delta or its passengers or employees.

I)  Services to be Provided to Persons with Disabilities

Upon request, Delta will provide the following services to a Person with a Disability:

1) assistance with registration at the check-in counter;
2) assistance in proceeding to the boarding area;
3) assistance in boarding and deplaning;
4) assistance in stowing and retrieving carry-on baggage and retrieving checked baggage;
5) assistance in moving to and from an aircraft lavatory;
6) assistance in proceeding to the general public area or, in some cases, to a representative of another Carrier;
7) transfer between the person's own mobility aid and a mobility aid provided by Delta;
8) transfer between a mobility aid and the passenger's seat;
9) limited assistance with meals, such as opening packages, identifying items, and cutting large food portions;
10) inquiring periodically during a flight about a passenger's needs; and
11) briefing individual passengers with disabilities and any attendant on emergency procedures and the layout of the cabin.

J) Advance Notice for Special Services

To the extent permitted by law, Delta may require advance notice for certain special services desired by a Person with a Disability.  Services applicable under this rule include but are not limited to:

1) transportation of an electric wheelchair on an aircraft of less than 60;
2) provision of hazardous materials packaging for batteries or other assistive device that are required to have such packaging;
3) accommodation for a Group of 10 or more passengers with disabilities traveling as a Group;
4) provision of an onboard wheelchair on an aircraft of 60 seats or more;
5) transportation of a Service Animal in the cabin (unless the ticket is purchased less than 48 hours prior to departure);
6) transportation of a Service Animal on a Segment scheduled to take 8 or more hours; or
7) accommodation of a passenger with both severe vision and hearing impairments.

Such requests should be made by the passenger at the time of reservation and as far in advance as possible.  If a passenger requests a special service at least 48 hours prior to departure, Delta will, to the extent possible, provide the service.  If a passenger requests a service less than 48 hours prior to departure, Delta will make a reasonable effort to provide the service.

K) Boarding and Deplaning

Where a Person with a Disability requests assistance in boarding or seating or in stowing carry-on baggage, Delta will allow the passenger to board the aircraft in advance of other passengers where time permits.

L) Communication and Confirmation of Information

Delta will use reasonable efforts ensure that announcements to passengers concerning stops, delays, schedule changes, connections, on-board services, and claiming baggage are communicated to any person with a disability in a manner sufficient for the person to understand the communication.

M) Inquire Periodically

When passengers in wheelchairs that are not independently mobile are waiting to board an aircraft, Delta will inquire periodically about their needs and shall attend to those needs where the services required are usually provided by Delta.

**RULE 7:** <u>**REFUSAL TO TRANSPORT**</u>

Delta may refuse to transport any passenger, and may remove any passenger from its aircraft at any time, for any of the following reasons:

A) Government Request or Force Majeure
Whenever necessary to comply with any law, regulation or government directive or request; or when advisable in Delta's sole discretion due to weather or other conditions beyond Delta's control including Acts of God, strikes, civil unrest, embargoes, war, and other similar matters of force majeure.

B) Search of Passenger or Property

When a passenger refuses to permit search of his person or property for explosives, weapons, dangerous materials, or other prohibited items.

C) Proof of Identity
When a passenger refuses to produce positive identification on request;

D) Failure to Comply with Delta's Rules or Contract of Carriage

When a passenger fails or refuses to comply with any of Delta's rules or regulations, or any term of the Contract of Carriage.

E) Passenger's Conduct or Condition

Delta will not refuse to provide transportation to a Person with a Disability, as defined in 14 C.F.R. § 382.5 and 382.31, based upon the passenger's disability, except as allowed or required by law. Delta will not refuse to provide transportation based upon race, color, national origin, religion, sex, or ancestry. Subject to those qualifications, Delta may refuse to transport any passenger, or may remove any passenger from its aircraft, when refusal to transport or removal of the passenger is reasonably necessary in Delta's sole discretion for the passenger's comfort or safety, for the comfort or safety of other passengers or Delta employees, or for the prevention of damage to the property of Delta or its passengers or employees. By way of example, and without limitation, Delta may refuse to transport or may remove passengers from its aircraft in any of the following situations:

1) When the passenger's conduct is disorderly, abusive or violent, or the passenger appears to be intoxicated or under the influence of drugs;
2) When the passenger is barefoot;
3) When the passenger interferes with the flight crew's activities, or fails to obey the instruction of any member of the flight crew;
4) When the passenger has a contagious disease that may be transmissible to other passengers during the normal course of the flight;
5) When the passenger is unable to sit in a seat with the seatbelt fastened;
6) When the passenger's behavior may be hazardous or creates a risk of harm to himself/herself, the crew, or other passengers or to the Carrier's aircraft and/or property, or the property of other passengers;
7) When the passenger is seriously ill, unless the passenger provides a physician's written permission to fly; or
8) When the passenger's conduct, attire, hygiene or odor creates an unreasonable risk of offense or annoyance to other passengers.

G) Recourse of Passenger

Delta Domestic General Rules Tariff                                                                 Page 8 of 25

Passengers shall not engage in any conduct that would authorize Delta to refuse transport under this Rule.  The sole recourse of any passenger refused carriage or removed for any reason specified in this Rule shall be recovery of the refund value of the unused portion of his or her ticket as provided in Rule 22.

**RULE 8:**     **ACCEPTANCE OF CHILDREN**

**A) Accompanied Children**

**(1) General Rule**

Except as set forth in this Rule, children under the age of 15 will not be accepted for transportation unless they are accompanied on the same flight in the same cabin by a parent, legal guardian, or other passenger at least 18 years of age.  Delta may require documentation verifying the child's age at check-in.  A valid passport, birth certificate or other government-issued identification are all acceptable.

**(2) Accompanied Children Less Than 2 Years Old.**

One child less than 2 years old not occupying a seat may travel with an adult fare-paying passenger at least 18 years old or parent/legal guardian at no additional charge.  Additional infants, and infants occupying a seat, must pay the applicable adult fare. A maximum of 2 infants is permitted for each adult. Delta recommends that any child occupying a seat be placed in an approved safety seat.  Infants who will reach their second birthday during a journey must occupy a seat and pay the applicable adult fare for the entire journey.

**(3) Accompanied Children 2 Years and Older**

The fare for children ages 2 years and older will be the Applicable Adult Fare.

**B) Unaccompanied Children Under the age of 15.**

Children under the age of 15 may travel unaccompanied on Delta only under the following conditions:

**(1) Children under the age of 5**

No child under the age of 5 will be accepted for unaccompanied travel.

**(2) Children aged 5 through 14**

Children ages 5 through 7 may travel unaccompanied on non-stop flights only and may not connect to other airlines.  Children ages 8 through 14 may travel unaccompanied on Delta's non-stop or connecting flights, but may not connect to other airlines with the exception of Delta Connection, KLM and Air France.

**C)**     **Unaccompanied Minor Service**

**(1) When Unaccompanied Minor Service is Required**

Except as otherwise provided in this Rule, Unaccompanied Minor Service is required for all passengers under the age of 15 that Delta accepts for transportation.

**(2) Unaccompanied Minor Service Defined**

Unaccompanied Minor Service means that Delta will provide supervision for the child from the time of boarding until the child is met at the stop over point or destination.  Delta will assume no financial or guardianship responsibilities for unaccompanied children beyond those applicable to an adult passenger. Delta has the right, but is not obligated to require identification of the responsible party meeting the child at a transfer point or final destination.  An unaccompanied minor must be confirmed to destination and may not be confirmed on the last connecting flight of the evening (with the exception of markets where there is only one connection and it is the last flight of the day, or for flights to or from Alaska or Hawaii), nor may an unaccompanied minor travel on a flight expected to terminate short of, or bypass, the child's destination.  Delta may temporarily suspend unaccompanied minor travel and/or rebook the child on an alternate flight if there is a possibility that weather, irregular operations, or other conditions may cause a flight to be diverted. Delta requires that a parent or responsible adult accompany the child until boarding, and this adult must provide the name, telephone number, and address of the party meeting the child at the transfer point or final destination.    Delta reserves the right to refuse to release an unaccompanied child to anyone other than the pre-designated party.  Delta representatives cannot administer medicine to children flying alone. An unaccompanied minor may not travel on any domestic flight greater than 2 hours in length which departs between 9 PM and 5 AM ("red-eye flight"). This restriction does not apply for red-eye flights to/from Hawaii and Alaska, however, an unaccompanied minor on a red-eye flight from Hawaii or Alaska may not connect to a domestic red-eye flight or to the last flight of the day unless it is the only flight option for the day.

**D)**     **Unaccompanied Children Ages 15-17**

Although not required, a parent or guardian may request Unaccompanied Minor Service for unaccompanied minors ages 15-17.  The applicable unaccompanied minor service charge will apply.

**E)**     **Unaccompanied Minor Service Charge**

In addition to the applicable fare, unaccompanied minors for whom Unaccompanied Minor Service is required or has been requested must pay an unaccompanied minor service charge in the amounts set forth below. Delta reserves the right to refuse to transport any unaccompanied minor for whom Unaccompanied Minor Services are required or requested but for whom the applicable unaccompanied minor service fee has not been paid.  If 2 or more unaccompanied minors who are members of the same Immediate Family and ticketed together are traveling together, only one service charge will be assessed.

The unaccompanied minor service charge will be specified at: https://www.delta.com/content/www/en_US/traveling-with-us/special-travel-needs/children.html and is incorporated by reference.

**RULE 9: SPECIALLY TRAINED SERVICE DOGS**

Delta accepts for transportation, without charge, dogs trained: (1) to lead the blind, when the dog accompanies a passenger with impaired vision dependent upon such dog; (2) to assist the deaf, when the dog accompanies a passenger with impaired hearing dependent upon such dog; (3) to assist the physically and psychiatrically impaired passengers dependent upon such dog, or (4) in explosive detection or search and rescue, only when such dogs are accompanied by U.S. military and U.S. government handlers.  In the cases of (1) and (2) above, Delta will also accept such dogs when accompanied by the dog's trainer and is en-route to the domicile of the owner for completion of training. In all cases, the service dog will be permitted to accompany such passenger into the cabin but will not be permitted to occupy a seat.


**RULE 10:     SMOKE FREE SERVICE**

Delta prohibits smoking and the use of all smokeless tobacco products (including e-cigarettes) on all flights.


**RULE 11:     PASSENGER MEDICAL OXYGEN**

On flights operated by Delta or Delta Connection, only portable oxygen concentrators (POCs) approved by the FAA are accepted for inflight medical oxygen. A 48-hour notice is required. Please see https://www.delta.com/content/www/en_US/traveling-with-us/special-travel-needs/disabilities.html to obtain information regarding the required medical certificate from a licensed physician and medical screening prior to flight. Medical screening service is provided by Delta at no cost to the passenger. If the passenger makes any voluntary change to his/her itinerary after completion of the medical screening, re-screening may be required.  Passengers using POCs on a Delta flight must be seated in a row other than an emergency exit or bulkhead.


**RULE 12:     <u>TICKETS</u>**

A)  You must present a valid ticket for transportation, which entitles you to transportation only between points of origin and destination via the ticketed routing.

B)  Tickets are not transferable. The purchaser of the ticket and the passenger are responsible for ensuring that the ticket accurately states the passenger's name.  Presentation of a ticket for transportation by someone other than the passenger named on the ticket renders the ticket void.

C)  Tickets are valid for travel only when used in accordance with all terms and conditions of sale.

D)  Where a ticket is invalidated as the result of the passenger's non-compliance with any term or condition of sale, Delta may:

    A)  Cancel any remaining portion of the passenger's itinerary or bookings,

    B)  Confiscate any unused portion of the ticket,

    C)  Refuse to board the passenger or check the passenger's baggage, and/or

    D)  Assess the passenger for the reasonable remaining value of the ticket, which shall be no less than the difference between the fare actually paid and the lowest fare applicable to the passenger's actual itinerary.

E)  Ticket Expiration

A ticket is valid for one year from the date of issue, and all travel must be completed within the validity period.  If exchanged, whether travel has commenced or not, the ticket must be reissued and all travel completed within one year from the original date of issue. However, certain fares may have different periods of validity, in which case the specific rules associated with the fare will apply.  If the passenger is prevented from using the ticket, or a portion of the ticket, before the one-year expiration date due to lack of space or flight cancellation, the ticket will remain valid until space can be provided.

F)   An electronic ticket (E-Ticket/ET) is the record of agreement maintained and processed within the Carrier's electronic reservation system.  A written receipt is provided to the purchaser of the electronic ticket which contains a reference for retrieving the record within the Carrier's reservation system and summary of the ticket information.  The Carrier may mandate the issuance of an electronic ticket (ET) regardless of market, Carrier, form of payment, and customer type (including SkyMiles and participating Carrier frequent flyer members).

G)   External Reissue Charge

Delta will collect a nonrefundable fee of USD $50.00 for reissue by Delta of tickets originally issued in the United States or Canada by any ticketing source other than Delta,    however, the charge does not apply to same day confirmed transactions, IROP or schedule change situations, SkyMiles upgrade reissues, tickets reissued on delta.com, or tickets issued at military or government fares. This fee applies to all changes to tickets issued at the request of the passenger.

H)   Capacity Limitations

Delta will limit the number of passengers carried on any one flight in any fare class or cabin, and such fares and fare classes will not necessarily be available on all flights or in all markets.  The number of seats which Delta makes available on a given flight is determined by Delta's best judgment of the anticipated t otal passenger load on each flight.

**RULE 13:    CONFIRMATION OF RESERVATIONS**

No reservation on Delta is valid until the availability and allocation of the reserved space is confirmed by Delta or its agent and entered in Delta's electronic reservations system.

Unless an earlier ticketing deadline is imposed by the applicable fare rule or other agreement between Delta and the passenger, Delta must receive payment and the reservation must be ticketed at least 30 minutes prior to the scheduled flight departure time.   Failure to comply with this ticketing deadline or an earlier ticketing deadline imposed by the applicable fare rule or other agreement with the passenger will result in cancellation of the reservation without notice.  A list of airports imposing an earlier ticketing deadline is set forth at delta.com and incorporated herein by reference.

**RULE 14:    CANCELLATION OF RESERVATIONS**

A)   <u>Delta Will Cancel</u> reservations of any passenger whenever such action is necessary to comply with any governmental regulation, or to comply with any governmental request for emergency transportation in connection with the national defense, or whenever such action is necessary or advisable by reason of weather or other conditions beyond its control.

B)   The Transportation Security Agency's (TSA) Secure Flight Program requires that Delta collect

the following additional information from passengers when making a reservation to fly within, into or out of the United States and reservations for point-to-point international flights operated by U.S.- based airlines:

> 1) Full Name (required), as it appears on government-issued I.D. approved for use when traveling
> 2) Date of Birth (required)
> 3) Gender (required)
> 4) Redress Number (optional)

Delta may cancel your reservation if the reservation does not include the required Secure Flight Passenger Data (full name, date of birth and gender) at least 72 hours prior to your scheduled departure.  This cancellation policy applies to all Delta tickets, including tickets for our codeshare partners' flights.

C) <u>Failure To Appear</u>

If you fail to appear for any flight in your itinerary without giving Delta notice in advance of the departure of the flight, Delta may cancel your reservation for all remaining flights in your itinerary.

D) <u>Airport Check-In Time Limits</u>

1) Reservations Subject to Cancellation for Failure to Meet Check-in and Boarding Deadlines

Your reservation may be cancelled if you do not comply with all applicable check-in procedures by the check-in deadline for your flight, or if you not at the gate and ready for boarding by the applicable boarding deadline. The check-in and boarding deadlines in effect on the date of travel will apply and are posted on delta.com.

2) Passenger Responsibility to Allow Sufficient Time

You must arrive at the airport with sufficient time to comply with all check-in procedures, complete security screening, comply with all other government requirements and departure processing, and arrive at the gate by the applicable boarding deadline.  Delta will not delay flights for passengers who are not at the gate and ready to board on time, and is not liable for any loss or expense due to the passenger's failure to comply with this provision.

**RULE 15:** **<u>VOLUNTARY STANDBY TRAVEL</u>**

Tickets may not be used for voluntary standby travel on any flight other than the ticketed flight unless expressly permitted by the fare rules of the ticket. When voluntary standby travel on another flight is permitted, the following provisions apply:

> 1) Voluntary standby travel is subject to the availability of seats at departure time in the same cabin as originally ticketed and does not guarantee transportation on the requested flight(s) including the origin, downline, or connecting flights.   Request for voluntary standby travel may be made up to 24 hours prior to original ticketed departure time. Notwithstanding anything set forth herein, Same Day Paid Standby travel is not permitted for Basic Economy fares.

> 2) Voluntary standby travel is limited to passengers with a confirmed ticketed reservation for a later flight on the same day of travel.   Delta will not permit changes to the origin, destination, or co-terminals, or to the routing for fares that are flight-specific or require specific routing.

3) Delta reserves the right to charge a nonrefundable same day standby fee when a passenger requests to standby for an alternate flight for which the passenger does not hold a confirmed reservation. The fee, if any, may be assessed based on each Segment from the passenger's origin to destination or next point of stop over. These fees will be charged if the passenger flies any portion of the Segment, therefore, passengers that are removed at intermediate points on through flights and/or voluntarily deplaned at a destination other than the destination for which the fee was intended will not be eligible for a partial or whole refund. Refer to delta.com for current standby fees.

4) Delta is not liable to pay compensation, including but not limited to, denied boarding compensation and amenities, for a failure to provide transportation and/or accommodate the passenger's request for voluntary standby travel.

5) Delta reserves the right to discontinue accepting and placing passengers on the airport standby list.

6) Eligibility for same day standby is at Delta's discretion and may be restricted based on operational considerations or limited to selected flights, specified booking classes, payment by credit card only.   Eligibility may also be restricted by the fare rules governing the passenger's ticket.

7) Delta may choose to accommodate passengers from the airport standby list in any specified order and may take into account ticket value, frequent flyer status, check-in time, and other factors.

 8) Delta reserves the right to limit the number of passengers on the airport standby list, only accept the passenger's standby request at an airport location, and limit the minimum and maximum time frames that airport standby listing is allowed.


**RULE 16:**     **FARES**

A)     Fares Applicable Only For Ticketed Itinerary

Fares apply for travel only between the points for which they are published. Tickets may not be issued at fare(s) published to and/or from a more distant point(s) than the points being traveled, even when issuance of such tickets may produce a lower fare.

B)     Erroneous Fares

Delta will exercise reasonable efforts to ensure that all fares it publishes are accurate and available for sale, but Delta, as a policy, does not file nor intend to file tickets priced at a zero fare or that are erroneous or reasonably apparent as erroneous. If an erroneous fare is inadvertently published for sale and a ticket is issued at the erroneous fare before it has been corrected, Delta reserves the right to cancel the ticket purchase and refund all amounts paid by the purchaser or, at the purchaser's option, to reissue the ticket for the correct fare.
In this event, Delta will also reimburse any reasonable, actual, and verifiable out-of-pocket expenses incurred by the purchaser in reliance upon the ticket purchase. The purchaser must provide receipts or other evidence of such actual costs incurred in support of any reimbursement request.

C)     Circumvention of Published Fares

Delta prohibits ticketing practices intended to circumvent the published fare that Delta intends to offer for your true itinerary.  These practices include:

1)   Back to Back Ticketing - The purchase or usage of two or more tickets issued at round trip fares, or the combination of two or more round trip fares end to end on the same ticket for the purpose of circumventing minimum stay requirements.

2)   Throwaway Ticketing - The purchase or usage of round trip fares for one way travel.

3)   Hidden City/Point Beyond Ticketing - The purchase or usage of a fare from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D)  When the fare between any 2 points is not specifically published via the desired routing, the fare will be constructed by combining two or more separate fares, via the desired routing from the passenger's point of origin to point of destination, which produce the lowest fare for the class of service used; provided, however, that combined fare will not exceed the lowest fare determined in accordance with this rule and the applicable fare rules.  Delta's direct sales channels will offer customers the lowest applicable published fare for itineraries between points in the United States on Delta, Delta Connection,  Delta Shuttle and Delta Codeshare flights for the flights, dates and class of service requested to which our representatives have access.  Please note that Delta will quote lowest published fare that we offer for the specific airports and type of itinerary that you request.  We do not search for or quote fares for other itineraries, including by combining one-way or other fares.  Fares not accessible directly from Delta may include, but are not limited to, unpublished fares, consolidator fares, negotiated fares, tour or package fares, and discounts available only via Internet web sites.

E)  Duplicate, Fictitious and impossible/illogical bookings

Delta prohibits duplicate, impossible, or fictitious bookings, including but not limited to multiple conflicting itineraries for the same passenger on the same day or bookings with connections that depart before the arrival of the inbound flight.  Delta reserves the right to cancel any such booking which has not been ticketed, and to cancel and refund any such booking which is ticketed at a refundable fare.


**RULE 17:  BAGGAGE**

**A.      Checked and Carry-On Baggage Policies and Restrictions**

Ticketed passengers may check baggage and carry baggage on board Delta aircraft, subject to this rule.  Delta's baggage policies and baggage fees are available at www.delta.com/bags  and  are  incorporated  by reference as if set forth in this contract of carriage.  These policies restrict the quantity, size and weight of baggage, and govern the carriage of hazardous and dangerous goods, and special items (such as sporting equipment, medical equipment and mobility aids, musical instruments, and fragile and perishable items).


**B.      Baggage Liability**

**1.      General Limitation of Liability for Loss of, Damage to, or Delay in Delivery of Baggage**

Delta's liability for loss, damage, or delay in the delivery of a passenger's checked baggage, carry-on baggage, or other personal property tendered to Delta in connection with air transportation on Delta shall be limited to proven damage or loss.  Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less any applicable depreciation for prior usage.  Under no circumstances shall the liability for loss, damage, or delay in the delivery of baggage exceed

$3,800 per fare-paying passenger. These limitations shall also apply to baggage or personal property if and to the extent accepted by Delta for temporary storage at a city or airport ticket office or elsewhere before or after the passenger's trip.

### 2.  Preexisting Damage/ Ordinary Wear and Tear

Delta is not liable for preexisting damage (including minor cuts, scratches, and broken zippers as a result of over packing) or for wear and tear resulting from ordinary handling of baggage.

### 3.  Special Items

#### a)  Wheelchairs and Personal Assistive Devices

The maximum liability limitations set forth above shall not apply to claims for loss, damage, or delay in the delivery of wheelchairs or other assistive devices.   Delta will accept these items as checked baggage regardless of packaging, but will not be responsible for repair or replacement of such items due to damage existing at the time of acceptance (which will be noted by Delta on a release form at the time of acceptance).

#### b)  No Liability for Loss or Damage to Fragile, Perishable, or Precious Items Not Identified to Delta at the Time of Check-In

Delta is not liable for any loss or damage to precious items, nor for deterioration or spoilage resulting from delay in delivery of any perishable items, nor for damage to or damage caused by, fragile articles that are unsuitably packed, if such items are included in the passenger's checked baggage without Delta's knowledge.  The passenger must identify such items to Delta at the time of check-in.

#### c)  Fragile or Perishable Items Accepted Pursuant to Limited Liability Release

Delta is not liable for loss, damage, or delay in the delivery of a passenger's baggage or other property accepted by Delta pursuant to the execution of a Limited Liability Release form executed by the passenger for the purpose of inducing Delta to carry the item, except as expressly provided by the Limited Liability Release.

### 4.  Loss Due To Government or Airport Action

Delta is not liable for loss, damage, or delay of a passenger's checked baggage, carry-on baggage, wheelchair or assistive device, or any personal item that may result from a security search of such items conducted by an agent of any local, state, or federal agency in charge of airport security screening, or from confiscation by an agent of any local, state, or federal agency.

### 5.  Time Limitations for Baggage Claims

Delta is not liable for any loss, damage, or delay in the delivery of baggage arising out of or in connection with transportation of, or failure to transport any baggage unless notice of a claim is presented to a Delta office within 24 hours after the alleged occurrence of the events causing the claim, and unless the action is commenced within one year after such alleged occurrence.  Any notification received within 24 hours that informs Delta of the nature of the claim will suffice, and Delta may deny any claim not presented within 24 hours of the alleged occurrence. Written notification of loss must be received by Delta's system baggage within 21 Days after the alleged occurrence, and Delta may deny any claim for failure to provide written notice within 21 Days.

### 6.  Carriage By Multiple Carriers

When the transportation includes Delta and one or more Carriers with a limitation of liability exceeding $3,800 for each fare-paying passenger and responsibility for loss, damage, or delay in delivery of baggage cannot be determined, the liability limit of $3,800 for each fare-paying passenger will be applied to all Carriers.  Whenever responsibility for loss, damage, or delay in delivery of baggage cannot be determined and when transportation is via Delta and one or more Carriers which exclude certain items in checked baggage from their liability, Delta will not be liable for the excluded items.

C.      **Governing Rules for Domestic Codeshare Flights**

When the passenger's travel involves domestic flights operated by a Delta domestic codeshare partner other than a Delta Connection carrier, the baggage rules of the marketing carrier on the first Segment of a round trip, or the marketing carrier on the first Segment of each one way trip will govern when determining baggage acceptance policies and applicable baggage fees.  Notwithstanding the foregoing, the baggage liability provisions set forth above shall govern the liability of Delta and/or any Delta Connection carrier with respect to any transportation subject to this contract of carriage.


**RULE 18:      ELECTRONIC SURVEILLANCE**

Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent or knowledge.


**RULE 19:      FLIGHT DELAYS/CANCELLATIONS**

### A. Delta's Liability in the Event of Schedule Changes, Delays and Flight Cancellations

If there is a flight cancellation, diversion, delay of greater than 120 minutes, or that will cause a passenger to miss connections, Delta will (at passenger's request) cancel the remaining ticket and refund the unused portion of the ticket and unused ancillary fees in the original form of payment in accordance with Rule 22.  If the passenger does not request cancellation and refund of the remaining portion of the ticket, Delta will transport the passenger to the destination on Delta's next flight on which seats are available in the class of service originally purchased. At Delta's sole discretion and if acceptable to the passenger, Delta may arrange for the passenger to travel on another Carrier or via ground transportation. If acceptable to the passenger, Delta may provide transportation in a lower class of service, in which case the passenger may be entitled to a partial refund. If space on the next available flight is available only in a higher class of service than purchased, Delta will transport the passenger on the flight, although Delta reserves the right to upgrade other passengers on the flight according to its upgrade priority policy to make space in the class of service originally purchased.  Delta will not be liable under any circumstances for any special, incidental or consequential damages arising from the foregoing.

### B. Delta's Liability for Additional Amenities in the Event of Schedule Changes, Delays and Flight Cancellations

Except as provided above, Delta shall have no liability if the flight cancellation, diversion or delay was due to force majeure.  As used in this rule, "force majeure" means actual, threatened or reported:

(1)  Weather conditions or acts of God;
(2)  Riots, civil unrest, embargoes, war, hostilities, or unsettled international conditions;
(3)  Strikes, work stoppages, slowdowns, lockout, or any other labor-related dispute;
(4)  Government regulation, demand, directive or requirement;
(5)  Shortages of labor, fuel, or facilities; or
(6)  Any other condition beyond Delta's control or any fact not reasonably foreseen by Delta.

However, when a passenger's travel is interrupted for more than 4 hours after the scheduled departure time as a result of flight cancellation or delay on the date of travel <u>other than</u> from force majeure, Delta will provide the passenger with the following additional amenities during the delay:

(a)    **Hotels**

If overnight accommodations are available at Delta contracted facilities, Delta will provide the passenger with a voucher for one night's lodging when the delay is during the period of 10:00 pm to 6:00 am. Delta will provide free public ground transportation to the hotel if the hotel does not offer such service. If accommodations are not available, Delta will provide the passenger with a voucher that may be applied to future travel on Delta equal in value to the contracted hotel rate, up to $100 USD.

(b)    **Ground Transportation**

In lieu of lodging or other amenities, Delta will furnish ground transportation to the destination airport if a passenger's flight is diverted to an alternative airport and if the destination on the ticket and the diverted airport destination are within the following city groups:

San Francisco, CA (SFO)/ Oakland, CA (OAK)/ San Jose, CA (SJC)
Los Angeles, CA (LAX)/ Long Beach, CA (LGB)/ Ontario, CA (ONT)/ Santa Ana, CA (SNA)
Denver, CO (DEN)/ Colorado Springs (COS)
O'Hare – Chicago, IL (ORD)/ Midway – Chicago, IL (MDW)
Dallas-Ft. Worth, TX (DFW)/ Dallas, TX Love Field (DAL)
Bush Intercontinental – Houston, TX (IAH)/ Hobby – Houston, TX (HOU)
Fort Lauderdale, FL (FLL)/ Miami, FL (MIA)/ West Palm Beach, FL (PBI)
Baltimore, MD (BWI)/ National – Washington, DC (DCA)/ Dulles – Washington, DC (IAD)
Newark, NJ (EWR)/ LaGuardia – New York, NY (LGA)/ John F. Kennedy – New York, NY (JFK)
Orlando, FL (MCO)/ Tampa, FL (TPA)/ Daytona Beach, FL (DAB)/ Melbourne, FL (MLB)/Sarasota Bradenton, FL (SRQ)

(c)    **Additional Amenities**

Delta will provide such additional or alternative amenities as are necessary to maintain the safety and/or welfare of customers with special needs such as unaccompanied children and customers with disabilities.  Such amenities will be furnished consistent with special needs and/or circumstances.

C. **Extended Tarmac Delays – Codeshare Services**

In the event of extended tarmac delays on flights operated by a Delta codeshare partner, the contingency plan for lengthy tarmac delays of the operating Carrier will apply.


**RULE 20:**    **DENIED BOARDING COMPENSATION**

A)    Overbooking of Flights
Because passengers with confirmed reservations on a flight sometimes fail to show, Delta reserves the right to sell more tickets for travel on each flight than there are seats available on the aircraft. In some cases, this may result in a flight in which Delta cannot accommodate one or more passengers with confirmed reservations (an "oversold flight"). Delta may deny boarding to passengers with confirmed reservations on an oversold flight as set forth in this rule. The rights of passengers who are denied boarding shall be governed by this rule.

B)    Request For Volunteers

Before denying boarding to any passenger holding a confirmed reservation on an oversold flight, Delta will ask other passengers on the flight to voluntarily give up their seat in exchange for compensation in an amount and form to be determined by Delta in its sole discretion. If a sufficient number of volunteers agree to give up their seats in response to Delta's offer, then no passenger with a confirmed reservation will be involuntarily denied boarding due to the oversale of the flight. If there are more volunteers than required, selection of the volunteer(s) to receive compensation will be determined in Delta's sole discretion.

C) <u>Involuntary Denied Boarding</u>

If an insufficient number of passengers volunteer to give up their seats in response to Delta's offer, Delta may involuntarily deny boarding to one or more passengers on the oversold flight according to the following boarding priority rules:

1) <u>Passengers Holding Tickets for Travel in Premium Cabin, SkyMiles members identified with a Diamond Medallion ("DM"), Platinum Medallion ("PM"), or Gold Medallion ("GM") elite-status designation, and passengers holding tickets purchased under a DL corporate travel agreement.</u>

Passengers holding tickets for confirmed space in the First or Business class cabin, SkyMiles members identified with a DM, PM, or GM elite-status designation, and passengers holding tickets purchased under a DL corporate travel agreement will be accommodated before other passengers holding tickets and/or boarding passes for confirmed space in the Coach cabin.

2) <u>Passengers With Boarding Passes</u>

Subject to the terms set forth in Rule 20(c)(1) and (4), passengers holding boarding passes who check in and present themselves at the departure gate in compliance with Rule 13 will be accommodated before passengers traveling in the same cabin who have not been issued boarding passes or who fail to comply with applicable check-in requirements. Subject to the availability of seats on the aircraft, boarding passes may be obtained by passengers who hold tickets for confirmed reserved space in the following manner:

a) for passengers traveling on electronic tickets, through the Online Check-in feature on Delta.com within 24 hours of scheduled departure

b) for passengers traveling on electronic tickets, through a Delta airport kiosk within four hours of scheduled departure

c) from a Delta airport ticket counter and/or the check-in desk located in the departure area.

3) <u>Passengers Without Boarding Passes</u>

Passengers with confirmed reservations who have not been issued a boarding pass and present themselves at the departure gate in compliance with Rule 13 will be accommodated according to the following priority rules:

a) Passengers who have been rebooked to the present flight as a result of an irregular operation (e.g., delay, cancellation) of a previously booked flight.

b) SkyMiles members identified with a Silver Medallion ("FO") elite-status designation.

c) Passengers with a SkyTeam Elite or Elite Plus status.

d)   Passengers without any elite-status designation.

Within each of the foregoing groups, passengers are prioritized first by class of service and then by time of check-in.

4)   Special Needs Passengers

Because of the special needs of passengers with disabilities, unaccompanied minors, and aged or infirm passengers, and active members of the U.S. Armed Forces on travel orders, Delta reserves the right to accommodate such passengers without regard to the boarding priorities established by this provision.

D)   Transportation For Passengers Denied Boarding
Delta will provide transportation to passengers who volunteer to relinquish their seats or who are denied boarding involuntarily due to the oversale of a flight as follows:

1)   Next Available Flight

Delta will transport the passenger on its next flight on which space is available to the passenger's next Stopover, or if none, to the passenger's destination, at no additional cost to the passenger.

2)   Transportation on Other Airlines

At Delta's sole discretion, Delta may instead arrange for transportation on any other Carrier or combination of Carriers to the passenger's next Stopover, or if none, to the passenger's destination, at no additional cost to the passenger.

3)   Overnight Stay Required

If the transportation provided to a passenger pursuant to this section requires that the passenger stay overnight before continuing his/her travel, Delta will provide hotel accommodations to the passenger at no additional cost. If hotel accommodations are unavailable, Delta will compensate the passenger with a credit voucher valid for future purchases from Delta in an amount commensurate in value with the local average contracted hotel rate up to $100 USD, to be determined by Delta.

E)   Compensation For Involuntary Denied Boarding
When a passenger with a confirmed reservation is involuntarily denied boarding on an oversold flight pursuant to this rule, Delta's sole liability to the passenger shall be to provide alternative transportation as provided in paragraph D, above, and to pay denied boarding compensation, if applicable, pursuant to the terms and conditions of this rule.

1)   Conditions For Payment of Involuntary Denied Boarding Compensation
The passenger shall not be entitled to any compensation for involuntary denied boarding if:

a)   Passenger's Failure to Comply with Contract of Carriage
The passenger has not complied fully with Delta's contract of carriage or tariff provisions regarding ticketing, reconfirmation, check-in, or acceptability for transportation

b)   Substitution of Equipment

The flight for which the passenger holds confirmed space is unable to accommodate that passenger because of substitution of equipment of lesser capacity when required by operational or safety reasons; or, on an aircraft with a designed passenger capacity of 60 or fewer seats, the flight for which the passenger holds confirmed reserved space is unable to accommodate that passenger due to weight/balance restrictions when required by operational or safety reasons.

c) <u>Carriage in Alternative Cabin</u>
Delta offers to accommodate the passenger in a section of the aircraft other than that specified on his/her ticket at no extra charge; provided however that if a passenger is seated in a section for which a lower fare applies, the passenger will be entitled to a refund of the difference in fare.

d) <u>Alternative Transportation</u>
Delta arranges comparable air transportation, or other transportation used by the passenger, at no extra cost to the passenger, that at the time such arrangements are made is scheduled to arrive at the passenger's next Stopover, or, if none, final destination within one hour after the planned arrival time of the passenger's original flight or flights.

F) <u>Amount of Involuntary Denied Boarding Compensation</u>
If all conditions for compensation are met, then Delta shall pay compensation to passengers involuntarily denied boarding in an amount to be calculated as follows:

1) <u>When Delta arranges Qualifying Alternative Transportation</u>
If Delta arranges Qualifying Alternative Transportation, then Delta will pay denied boarding compensation in an amount equal to 200% of the fare (including any surcharges and air transportation taxes) to the passenger's next Stopover, or if none, to his/her final destination, but no more than $775.00.

2) <u>Where Delta cannot arrange Qualifying Alternative Transportation</u>
If Delta cannot arrange Qualifying Alternative Transportation, then Delta will pay denied boarding compensation in an amount equal to 400% of the fare (including any surcharges and air transportation taxes) to the passenger's next Stopover, or if none, to his/her final destination, but no more than $1550.00.

G) <u>Time of Payment for Involuntary Denied Boarding Compensation</u>
If all conditions for compensation are met, Delta will pay any involuntary denied boarding compensation on the day and at the place where the denial of boarding occurred, in cash or immediately negotiable check; provided, however, that if the alternative transportation arranged for the passenger's convenience departs before the payment can be made to the passenger, then payment will be made by mail or other means within 24 hours after the denied boarding occurs.

## RULE 21:   <u>REROUTING</u>

### A      General Provisions

1. Fare Applicable To Rerouting Or Change In Destination
a.  Unless otherwise specified in the fare rule, a passenger may change the routing, destination, Carrier(s), class of service, or dates of travel specified on an unused ticket in accordance with paragraph 2) below, provided that, after transportation has commenced, a one-way ticket will not be converted into any other type of ticket (such as a round-trip, circle-trip or open-jaw trip ticket).

b.  Except as otherwise provided in Rule 19, the fares and charges applicable, when a rerouting or change in ultimate destination is made at passenger's request prior to arrival at the ultimate destination named on the original ticket, shall be the applicable fare and charges for the entire revised itinerary in effect on the date that the rerouting or change in ultimate destination is entered on the passenger's new ticket.

c.  Rule 12(E) applies for validity of voluntarily exchanged/reissued tickets.

2. Fare Applicable To Upgrading Class Of Service While In Flight
When a passenger moves from one class of service to another while in flight, an additional collection will be made in an amount equal to the difference between:

1.  The one-way fare applicable to the class of service used from passenger's point of origin on such flight to the last scheduled stop prior to the passenger's change in class of service, plus the one-way fare in the new class of service from such stop to the passenger's destination on such flight, and

2.  The fare paid for transportation from the passenger's origin to destination on such flight.

When the amount described in 1) above is less than the amount described in 2) above, no additional collection will be made. The acceptance of such passenger in the class of service to which he/she is moving for travel beyond the next scheduled stopping point in the flight is subject to availability.  Discounts will not apply.

**B.   Ticket reissue procedures**

-Unless otherwise specified in a fare rule, the following procedures will apply to Delta ticket reissues.

  For nonrefundable fares:
- If the price of the new ticket is lower than the ticket being reissued, the difference in ticket price will be provided to the passenger in the form of a non-refundable Delta travel voucher at the time of reissue.
- If the price of the new ticket is equal to or higher than the ticket being reissued any difference in fare will be collected at the time of reissue.

  For refundable fares:
- If the price of the new ticket is lower than the ticket being reissued, any difference
 In fare will be refunded to the original form of payment at the time of reissue.
- If the price of the new ticket is higher than the ticket being reissued, the
    difference in fare will be collected at the time of reissue.

-Flights must be rebooked and the ticket reissued at the time of the change.

1.  Unused tickets
When making changes to an unused ticket, Delta will cancel the itinerary and start over, issuing a new ticket using current fares subject to all applicable fare rules.  The value of the original ticket may be applied toward the purchase of the new ticket.  If the unused fare is refundable, the value of the original ticket may be applied toward the purchase of the new ticket.
2.  Partially Used Tickets
a.  When making changes to partially used tickets, Delta will apply one of the following procedures resulting in the lowest fare:

i.  Reprice the itinerary, attempting to keep fares of the fully flown fare components and replacing the unflown fare components using current fares.  No changes are permitted to the fare break points of the fully flown fare components.  Delta will validate all fare rules at the time of reissue. The new ticket may be a lower or equal or higher price than the previous ticket.

-OR-

ii.  Issue a new ticket using current fares and validating all fare rules at the time of reissue.  If the original fare is nonrefundable, the Carrier will apply the remaining value for the unflown Segments of the partially used ticket, if any toward the purchase of a new ticket.  For refundable fares, Delta will apply the remaining value from the partially used ticket, if any, toward the purchase of a new ticket.

### C.  Same Day Confirmed

Unless otherwise specified in the fare rules, a passenger holding a nonrefundable ticket may change to another flight to the same destination operated by Delta or a Delta Connection carrier on the same day, subject to the policies set forth at https://www.delta.com/content/www/en_US/traveling-with-us/ticket-changes-refunds/sameday-travel-changes.html and incorporated herein.

## RULE 22:   REFUNDS

### A.   Involuntary Refunds

If a refund is required because of Delta's failure to operate on schedule or refusal to transport (except as a result of passenger's failure to comply with the contract of carriage), the following refund will be made directly to you:

1)  If no portion of the ticket has been used, the refund will be an amount equal to the fare paid.

2)  If a portion of the ticket has been used and termination (interruption) occurs:

a)  At A Fare Breakpoint - The refund will be an amount equal to the fare paid for the unused transportation from the point of termination (interruption) to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed.  No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

b)  Within A Fare Component - The refund will be an amount equal to the percentage of unflown mileage to fare component total mileage by prorating the fare paid for the fare component, from the point of termination/interruption to the destination, or next Stopover point named on the ticket, or to the point at which transportation is to be resumed.  No refund will apply when alternate transportation is provided by Delta and accepted by the passenger.

### B.   Voluntary Refunds

#### 1.   Nonrefundable Tickets

Most tickets issued by Delta are nonrefundable.  Delta will not refund any portion of a fare that is nonrefundable, and Delta will not refund any taxes, fees or charges collected upon nonrefundable tickets. Delta may permit a portion of the fare paid for an unused nonrefundable ticket to be applied toward the

purchase of future travel on Delta, or to upgrade or downgrade those tickets after purchase, as set forth in the applicable fare rule. Delta may charge an administrative service charge for processing any permitted changes to nonrefundable tickets, which will be deducted from any credit toward the purchase of future travel on Delta, or collected at the time the change is processed, as applicable.

In the event of death of the passenger prior to the date of travel, tickets issued at nonrefundable fares will be refunded to the deceased passengers' estate upon request.

### 2.     Fully Refundable Tickets

If your ticket was purchased at a fare that is fully refundable, Delta will issue a refund of any unused refundable portion of your ticket at your request.  You must surrender any unused portion of the ticket at the time of the refund request. No refund will be issued on any ticket unless Delta receives a request for the refund and any unused coupons are surrendered to Delta within one year of the original issue date of the ticket.  The amount of the refund will be calculated as follows:

1.       If no portion of the ticket has been used, Delta will refund the total fare and all taxes, fees or charges paid.

2.       If a portion of the ticket has been used, Delta will refund an amount equal to (a) the total fare and all taxes, fees or charges paid, minus (b) the fare and taxes, fees or charges for the used portion of the ticket.

### C.     Time Limit for Refund Requests

No refund will be issued on any ticket unless Delta receives a request for the refund and any unused coupons are surrendered to Delta within one year of the original issue date of the ticket.

### D.     Form of Refund

Delta will issue refunds on eligible tickets as follows:

1.       Tickets paid for by credit card will be refunded to the credit card account used to purchase the ticket, typically within seven business days of Delta's initial receipt of refund request.

2.       Tickets paid for by cash, if cash is accepted by Delta, will be refunded by check issued to the person named as a passenger on the ticket, typically within 20 business days of Delta's receipt of initial refund request.

3.       Tickets charged under a universal air travel plan will be refunded to the subscriber against whose account the ticket was charged.

4.       Tickets issued against governmental transportation requests shall be issued as required by applicable government regulation.

5.       Tickets paid with any other form of payment will be issued back to the original form of payment.

### D.     Overcharges

No claims for overcharge shall be valid and DL shall have no liability if claim is more than forty five (45) days after the date of issue of the ticket.

### RULE 23:     CURRENCY; DECLINED OR DISPUTED FORMS OF PAYMENT

Except as otherwise provided, all fares and charges between points in the United States are stated in dollars and cents of the lawful currency of the United States. Except as set forth in this contract of carriage, a

passenger is liable for the entire ticket price and fees for an issued ticket, notwithstanding any dispute, chargeback or declined form of payment. Delta reserves the right to collect all such amounts at any time, including after transportation has been provided.

**RULE 24:**     **<u>GOVERNING LAW; ENTIRE AGREEMENT; LIMITATION OF LIABILITY</u>**

Any and all matters arising out of or relating to this Contract of Carriage and/or the subject matter hereof shall be governed by and enforced in accordance with the laws of the United States of America and, to the extent not preempted by Federal law, the laws of the State of Georgia without regard to conflict of law principles, regardless of the legal theory upon which such matter is asserted. This Contract of Carriage, including the Ticket and Fare Rules, represents the entire agreement between the parties relating to transportation by Carrier, and shall supersede all prior representations, understandings or agreements pertaining thereto, either oral or written. No other covenants, warranties, undertakings or understandings may be implied, in law or in equity.

Delta shall not be liable for any punitive, consequential or special damages arising out of or in connection with carriage or other services performed by Delta, whether or not Delta had knowledge that such damage might be incurred.  Delta shall not be liable for any damage arising out of its compliance with any laws, government regulations, orders, rules, requirements or security directives or as a result of a passenger's failure to comply with such laws, government regulations, orders, rules, requirements or security directives or as a result of Passenger's reliance on advice provided by Delta regarding such laws, regulations, orders, rules, requirements or security directives.

Election or failure by Delta to enforce any provision of the contract of carriage shall not constitute a waiver of its rights and remedies with regard to such provision or any other provision.

# Plaintiffs' Exhibit 455

**HAWAIIAN AIRLINES**

**DOMESTIC CONTRACT OF CARRIAGE**

**(Revised November 22, 2021)**

## RULE 1: DEFINITIONS

As used in this Contract of Carriage, the following terms have the meanings ascribed to them below, unless otherwise defined herein:

"Adult" means a person who has reached his/her eighteenth birthday as of the date of travel.

"Alternate transportation" means air transportation with a confirmed reservation at no additional charge (by any scheduled airline licensed by the DOT), or other transportation accepted and used by you in the case of denied boarding.

"Applicable adult fare" means the fare which would be applicable to an adult for the transportation, but, excluding any special fares applicable to a guest's status, e.g., Military fares, adult standby, etc.

"Baggage" means such reasonable articles, effects, and other personal property of a ticketed guest as are reasonably necessary or appropriate for the wear, use, comfort, or convenience of the guest in connection with the guest's trip.  Unless otherwise specified, it shall include both checked and carry-on-baggage and property of the guest.

"Baggage Check Tag" mean those portions of the Ticket that identify your checked baggage and that are issued by the carrier as a receipt for your checked baggage.

"Bicycle Case" means a sealed box, hard-sided, or soft-sided case containing a bicycle, and/or bicycle accessories, that has an Outside Linear Dimension greater than 62 inches (157 cm) and less than 115 inches (292 cm).

"Board Item."  See Rule 18(D)(22).

"Carriage" means transportation of guests and their baggage by air or ground, either gratuitously or for payment.

"Carrier" means Hawaiian Airlines, Inc. and/or other carrier(s) participating with Hawaiian in interline transportation.

"Carry-on-baggage" means baggage, other than checked baggage, carried on board an aircraft by a ticketed guest.  It may also be referred to as unchecked baggage.

"Checked baggage" means baggage, other than carry-on baggage, that a ticketed guest has requested be carried by the carrier and for which the carrier has issued a Baggage Check Tag to the guest.

"Claim."  See Rule 20(B)(1)(a).

"Claim Date."  See Rule 20(B)(1)(c)(i).

"Codeshare Flight" means any flight operated by another carrier with our designator code "HA" followed by a 4-digit flight number.

"Codeshare Partner" means any carrier that we have an agreement with for Codeshare Flights.

"Comparable air transportation" means transportation provided by air carriers or foreign air carriers holding certificates of public convenience and necessity or foreign permits as applicable.

"Confirmed reserved space" means space on a specific date and on a specific flight and class of service that has been requested by a guest, and that Hawaiian or one of our agents has verified against an appropriate notation on the Ticket as being reserved for that guest.

"Connecting Carrier(s)." See Rule 21(B)(1).

"Connecting Point." See Rule 21(B)(2).

"Consequential damages" means any direct and/or indirect damages you may incur as the result of any flight irregularity (delay or cancellation) or arising out of or relating to this Contract of Carriage, including but not limited to loss of wages/income/salary/profits, the purchase of new ticket, unused hotel accommodation, unused ground transportation, missed scheduled events, and similar damages.

"Continental USA" means the District of Columbia and all contiguous states of the USA.  Alaska and Hawaii are not included.

"Contract of Carriage" means the terms and conditions contained in this document, as amended from time to time by Hawaiian.

"Days" means full calendar days, including Sundays and legal holidays, provided that for the purposes of notification, the balance of the day upon which notice is sent shall not be counted; and that for purposes of determining the duration of a validity period, the balance of the day upon which the ticket is issued or the flight commenced shall not be counted.

"Delivering Carrier." See Rule 21(B)(3).

"Destination" means the ultimate point of the guest's journey as shown on the Ticket.

"Domestic" means occurring within the USA.

"DOT" means United States Department of Transportation.

 "eTicket" is the record of the ticket agreement maintained and processed within the carrier's electronic reservation system.  A receipt is provided to the purchaser of the Ticket that contains a reference for retrieving the record within the carrier's reservation system and summary of the Ticket information.  The carrier may mandate the issuance of an e-ticket, regardless of market, carrier, form of payment, and customer type.

"FAA" means Federal Aviation Administration.

"Force Majeure Event." See Rule 21(B)(4).

"Government Laws" means all applicable laws, regulations, rules, and security directives imposed by any federal, state, local, or other government agencies including, but not limited to, those imposed during or because of a national emergency, war, civil unrest, or any terrorist activity.

"Guardian" means one who legally has the care and management of an infant/minor.

"Guest" means any person, except members of the crew, carried or holding a confirmed reservation to be carried in a civil aircraft pursuant to a Ticket.

"Hawaiian" means Hawaiian Airlines, Inc.

"HawaiianMiles" means Hawaiian Airlines, Inc.'s frequent flyer program.

"Immediate Family" means spouse, parents and grandparents, children and grandchildren, brothers and sisters, mother-in-law and father-in-law, brothers-in-law and sisters-in-law, daughters-in-law and sons-in-law.  Adopted, half and step members of the foregoing are also included in Immediate Family.

"Infant" means a person who has not reached his/her second birthday as of the date of travel.

"Irregular Operation."  See Rule 21(B)(6).

"MedAire" is the medical advisory group that we contract with for MedLink and other services.

"MedLink" is a service that allows crew-to-physician phone contact from anywhere in the world.

"Mental Patient" means a guest with a mental condition causing him/her to be deranged, or a guest involuntarily committed patient of a mental health institution, and who is allowed to travel pursuant to Rule 13(F)(7).

"Military" means departments of the USA Army, Navy, Air Force, Marine Corps, and Coast Guard; the respective academies of the USA Army, Navy, Air Force, and Coast Guard; and the USA National Guard.  The Reserve Officer Training Corps (ROTC) is not included.

"Minor" means any person under 18 years of age.

"Misconnection."  See Rule 21(B)(5).

"'Ohana by Hawaiian" refers to Empire Airlines' flights marketed under the DBA 'Ohana by Hawaiian.

"Online transportation" means air transportation wholly on the same carrier.

"Our" means Hawaiian Airlines, Inc.

"Outside Linear Dimension" means the sum of the greatest outside length plus the greatest outside width plus the greatest outside height.

"Oversold flight" means a flight where there are more guests holding valid confirmed Tickets that check in for a flight, within the prescribed check in time, than there are available seats.

"PAP" means a positive airway pressure device used to aid individuals with sleep apnea and includes (i) continuous positive airway pressure (CPAP) devices, (ii) automatic positive airway pressure (APAP) devices and (iii) variable positive airway pressure (VPAP/bilevel) devices

"Pet" or "pets" means dogs, cats, and birds only.

"POC" means portable oxygen concentrator.

"Qualified individual with a disability" means any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.  The phrases used in this definition are further defined in 14 CFR §382.3.

"Reroute" means a change of routing, fare, carriers, class of service, flight, or date from that originally provided for on the ticket.

"Round-trip" means any trip, the ultimate destination of which is the point of origin, and which is made via the same routing in both directions.

"Routing" means the cities and/or class of service and/or type of aircraft via which carriage is provided by carrier(s) between two points.

"Service Animal" means a dog, individually trained to do work or perform tasks for the benefit of a guest who is a qualified individual with a disability

"Standard Bag." See Rule 18(B)(1).

"Stopover" means a deliberate interruption of more than four hours of a journey by the guest at a point between the place of departure and the place of destination.  For example, a stopover occurs when the connecting time between two flights on a ticket is longer than four hours.

"Ticket" means the record of agreement, including electronic tickets, e.g., "Hawaiian Electronic Tickets" or "eTickets," for guest air transportation provided by Hawaiian under certain terms and conditions to the guest named on the Ticket and in accordance with applicable governing tariffs and regulations.

"TSA" means Transportation Security Administration.

"Unaccompanied Minor" means a person 5 to 11 years of age when traveling alone or not accompanied on the same flight and in the same compartment by a companion guest at least 15 years of age or with a guardian or parent.

"USA" means the 50 federated states and the District of Columbia, Puerto Rico, U.S. Virgin Islands, American Samoa, Guam, Northern Mariana, Islands, and the Minor Outlying Islands.

"We" means Hawaiian Airlines, Inc.

"Windsurfing Item."  See Rule 18(D)(24).

"You" or "your."  See definition of "Guest" above.

## RULE 2: GENERAL PROVISIONS

### A.   GENERAL PROVISIONS.

1.  The rules contained in this Contract of Carriage constitute the terms and conditions upon which Hawaiian agrees to provide Domestic transportation to you, and they are expressly agreed to by you.

2.  This Contract of Carriage is subject to Government Laws.  In the event of a conflict between any rules contained in this Contract of Carriage and any Government Laws, the Government Laws shall prevail.

3.  We are responsible for the furnishing of transportation for you and your baggage only on the flights we operate.  We are not liable or responsible for the acts or omissions of any other carrier, even if we, as an agent of another carrier, have issued a Ticket, checked baggage, or made any other arrangements or provided any other services for transportation on flights operated by any other carrier.

4.  No employee, agent, or representative of Hawaiian has the authority to alter, modify, or waive any provision of this Contract of Carriage unless authorized by a corporate officer of Hawaiian.  Hawaiian's appointed agents and representatives are only authorized to sell Tickets for air transportation pursuant to approved fares, rules, and regulations of Hawaiian.

5.  Hawaiian's obligations under the rules of this Contract of Carriage apply only to you.  There are no third-party beneficiaries to these rules.

6. All transportation is subject to this Contract of Carriage and charges in effect on the date on which the Ticket is issued, except as may otherwise be provided within specific fare rules. Any references to the rules of this Contract of Carriage are coterminous and include revisions and supplements to, and reissues of, this Contract of Carriage.

7. If your Ticket has been purchased and issued before the effective date of an increase in the fare related to your travel, the increase in the fare will not be collected provided there is no change in the origin, destination, Stopover point(s), flight(s), or dates shown on the original Ticket. These provisions apply whether the increase results from a change in the fare level, a change in conditions governing the fare, or a cancellation of the fare itself.

8. Our conditions of carriage, rules, and fares are subject to change without notice, unless prohibited by Government Laws. However, no such change shall apply to any Tickets issued prior to the effective date of any such change.

9. Any times stated in published timetables or elsewhere are not guaranteed. We may substitute alternate carriers or aircraft and alter or omit stopping places shown on the Ticket in case of necessity without notice. Schedules are subject to change without notice. We are not responsible or liable in any way for failing to operate any flight according to schedule, or for changing the schedule of any flight, even if, as a result, you suffer any losses.

10. We reserve the right to cancel Tickets issued with an erroneous fare due to a technical failure or mistake including, for example, a fare filing error, computer error, or third-party error (either human or mechanical). We do not intend to publish fares that are erroneous or are reasonably apparent as erroneous. Essentially, such fares do not make any economic sense. Although we have warning mechanisms to try to prevent such occurrences, we occasionally publish mistaken fares. Where an erroneous fare has been published and a Ticket has been issued at the erroneous fare, we will void the Ticket and notify you that the Ticket has been cancelled (i) within 72 hours of becoming aware of erroneous fare, or (ii) at least 24 hours prior to your scheduled departure time in cases where the Ticket is purchased less than 72 hours before the scheduled departure from the point of origin. In this event, we will provide a refund of the total cost of your Ticket purchased at the erroneous fare.

11. We may charge you for, or seek reimbursement of, any damages, repairs, and/or cleaning costs incurred because of your actions or the actions of your minor children, Service Animals, or pets.

12. The invalidity of any provision of this Contract of Carriage by any Government Law shall not affect the validity of any other provision of this Contract of Carriage, which shall remain in full force and effect.

13. We will not be liable for any compensatory, consequential, or punitive damages arising out of or relating to the performance of our obligations under this Contract of Carriage, except where any such limitation would expressly violate any Government Law.

14. All fares and charges for Domestic travel are expressed in the lawful currency of the USA.

15. Domestic travel includes travel to Puerto Rico, U.S. Virgin Islands, American Samoa, Guam, Northern Mariana, Islands, and the Minor Outlying Islands. Each guest traveling to any Domestic location is solely responsible for obtaining all required travel documents and for

complying with the laws of each Domestic location from, through or to which he or she
travels.

**16.** You shall indemnify us for any loss, damage, or expense we suffer or incur by your failure to
comply with Section (A)(15) of this Rule 2 above, including, but not limited to, the applicable
fare to return you to your point of origin or elsewhere due to your inadmissibility to or
deportation from any Domestic location.

**B. EMERGENCY SITUATIONS.** Every one of our pilots in command of a flight has authority to
exercise his/her judgment depending on the circumstances and to declare and take any action
necessary to respond to any emergency situation which may arise in compliance with FAA
Regulations and Government Laws.

If you require emergency medical attention on one of our flights, our flight crew has a set of
procedures they will follow.  As part of those procedures, they will request the assistance of any
qualified medical person (physician, nurse, physician's assistant, EMT) on-board the aircraft.
They will also make the on-board medical emergency kit available, and the pilot in command will
utilize on-board communications equipment to obtain additional medical support and
assistance.

Hawaiian has contracted with a medical advisory group MedAire for MedLink services.  MedLink
allows pilot-to-physician phone contact from anywhere in the world.  When contacted by the
cockpit crew, the advising physician will help to provide the appropriate treatment instructions.

If the medical emergency occurs while the aircraft is still on the ground, we will request that air
traffic control provide expedited taxi clearance to the terminal or dispatch the airport's
emergency response medical staff to the airplane depending on the circumstances.

If the medical emergency occurs during flight, MedAire will assist in determining whether a
flight diversion is necessary.  If the pilot in command decides to divert the flight, an emergency
may be declared.  In that event, MedAire, the flight crew, and other parties will determine what
other actions to take to provide emergency medical assistance.  MedAire can also arrange for
emergency transport to a medical facility capable of treating your condition if necessary.

We will not honor any "Do Not Resuscitate" order or any "Do Not Resuscitate" jewelry and your
travel with us indicates your informed consent to be treated.  However, if we are aware of any
such order or jewelry, we will notify MedAire of its existence when seeking medical assistance.

## RULE 3: RESERVATIONS AND TICKETING

**A. VALIDITY OF RESERVATION**.  A reservation for space on any of our flights is valid when the
space is confirmed by Hawaiian or one of our reservations' agents and entered into our
electronic reservations system.  Upon payment of the applicable fare, you will be issued an
electronic confirmation of your confirmed reserved space and a ticket number.  Please note that
a confirmation code or number is separate and distinct from a ticket number.  You need both a

confirmed reserved space and Ticket to board our aircraft.  A valid reservation may be cancelled by Hawaiian for any of the reasons set forth in <u>Rule 4: Cancellation of Reservations</u>.

**B.   SURCHARGES FOR RESERVATIONS, TICKETING, AND CHANGES.**

**1.   Surcharges for Ticketing with Our Call Center or at Airport Ticket Counter**.  You will pay a surcharge for ticketing and ticketing changes when made through Hawaiian's reservation call center or at one of our airport ticket counters.  This surcharge is non-refundable and (i) is in addition to the fare price and any other applicable charges for ticketing, and (ii) is in addition to any change fees and fare differences for ticketing changes.  The surcharge is applied at the time of ticketing and for each re-ticketing, on a per guest basis as follows:

**a.**   Hawaiian reservations call center - $25.00 for Domestic travel.

**b.**   Hawaiian ticket counter - $35.00 for Domestic travel.

**2.   Surcharges for Ticketing Changes Made by Us for Tickets Issued by Others**.  We will charge you a surcharge for any requested ticket changes on our flights that you make to Tickets issued by any travel agencies, online travel agencies, or other airlines.  Our reservations call center or airport ticket counters' agents will assess a per ticket handling surcharge of $25.00, for each ticketing change, regardless of whether any portion(s) of the Ticket has been used.  These ticket handling surcharges are in addition to any change fees and fare differences and are non-refundable.

**3.   Surcharge Exception**.  No surcharge shall be added for any changes in ticketing due to overbooking, a change to a smaller aircraft, or a flight cancellation that prevents you from travel on your original flight.

**C.   OVERBOOKING**.  All of Hawaiian's flights are subject to overbooking which could result in our inability to provide you with your previously confirmed reserved space for a given flight.  How we deal with an overbooking situation and your rights as a guest in the event you are denied boarding in that situation can be found in <u>Rule 22: Denied Boarding and Compensation Due to Oversales</u>.

**D.   MISSING RESERVATIONS.**  Once you obtain a valid Ticket that reflects confirmed reserved space for a specific flight and date from one of our authorized agents, your reservation is confirmed even if the record of that reservation is missing from our electronic reservations system, unless our records indicate that the reservation was cancelled after the Ticket was issued.

**E.   FEE DETAILS.**  For a list of change fees and other applicable fees, please see <u>https://www.hawaiianairlines.com/legal/list-of-all-fees</u> for details.

## RULE 4: CANCELLATION OF RESERVATIONS

We may cancel your complete reservation for any of the following reasons, whether your reservation is confirmed or not, and whether you have completed any portion of travel covered under your reservation:

**A.   FACTORS OUTSIDE OF OUR CONTROL**.  We may cancel your reservation: (i) whenever necessary to comply with any Government Laws; (ii) upon any government request for emergency

transportation relating to national defense; and (iii) whenever necessary or advisable because of weather or other conditions beyond our control, including any Force Majeure Event.

**B.** **FAILURE TO TIMELY RECEIVE TICKET NUMBERS FOR ADVANCE PURCHASES**.  Some ticket fares have an advance purchase requirement.  We may cancel your reservation if we have not received your ticket number from any third-party travel agent by the advance purchase requirement date.

**C.** **YOUR FAILURE TO COMPLY WITH THIS CONTRACT OF CARRIAGE**.  We may cancel your reservation due to your failure to comply with the rules of this Contract of Carriage including, but not limited to, your failure to pay for your Ticket or abide by the fare conditions relating to your Ticket.

**D.** **YOUR FAILURE TO BOARD YOUR FLIGHT**.  We may cancel your reservation (whether or not confirmed) and seat assignments on any subsequent flight segments if (i) you fail to board any reserved flight operated or marketed by Hawaiian, or (ii) any other carrier cancels your reservation for failing to board its flight.

**E.** **YOUR FAILURE TO PURCHASE TICKETS, CHECK IN OR BE PRESENT AT THE GATE ON-TIME**.  We may cancel your reservation and refuse your travel if you fail to check in or fail to meet any of the following deadlines:

    **1.** **Deadline to Purchase Tickets.**  We may cancel your reservations if you have not purchased your Tickets at least one hundred twenty (120) minutes prior to scheduled departure time.

    **2.** **Deadline for Checking-In**.  We may cancel your reservations and/or cancel any pre-reserved seating arrangements if you fail to check in and obtain a boarding pass (i) no less than forty-five (45) minutes prior to your scheduled departure time for travel between the State of Hawaii and the Continental USA., and (ii) no less than thirty (30) minutes prior to scheduled departure time for travel wholly within the State of Hawaii.  We recommend that you check in well in advance of your flight due to lengthy TSA security screening checkpoint waiting times.  Guest and baggage processing times may differ from airport to airport, and it is your responsibility to take that into consideration in scheduling enough time for you to meet our deadlines.  If you are checking-in baggage, we recommend that you do so at least 3 hours prior to your scheduled departure time for travel to and from Pago Pago International Airport, 2.5 hours prior to your scheduled departure time for travel between the State of Hawaii and the Continental USA and ninety (90) minutes prior to your scheduled departure time for travel wholly within the State of Hawaii.

    NOTE: We may refuse to accept any baggage for travel if it is not checked-in prior to the above check in deadlines, even if we allow you to check in.

    **3.** **Deadline for Being Present at the Boarding Gate.**  We may cancel your reservation if you are not present at the boarding gate and available to board the aircraft at least thirty (30) minutes prior to the scheduled departure time of your reserved flight, whether or not you have checked in for your flight.  Further, we reserve the right to close the aircraft doors ten (10) minutes prior to our scheduled departure time.

NOTE WE ARE NOT LIABLE TO YOU FOR ANY COMPENSATORY, CONSEQUENTIAL, OR PUNITIVE DAMAGES FOR ANY CANCELLATION OF RESERVATIONS PURSUANT TO THIS THIS RULE 4.  FOR

ANY RIGHTS YOU MAY HAVE WITH RESPECT TO A CANCELLATION OF YOUR RESERVATIONS, PLEASE SEE <u>RULE 21: FLIGHT DELAYS, CHANGES, CANCELLATIONS, AND AIRCRAFT CHANGES</u>.

**RULE 5: TICKETS AND FLIGHT COUPONS**

**A.** **TICKET REQUIRED FOR TRAVEL**.  You must present a valid Ticket for travel on our aircraft.  Your Ticket entitles you only to transportation from the designated point of origin to the designated destination, via the designated route.  Any Ticket that has not been validated, or which has been altered, mutilated, improperly issued, or written in pencil, will not be valid and will not be accepted for travel.

**B.** **TICKETS ARE NOT TRANSFERABLE**.  You may not transfer your Ticket to any person.  Notwithstanding the non-transferability of a Ticket, we are not liable to you for honoring or refunding your Ticket when presented by another person.

**C.** **RESPONSIBILITY FOR TICKET ACCURACY**.  You are responsible for ensuring that any Ticket accurately reflects your full name and matches your valid identification.  We will void any Ticket that is presented to us for travel by someone other than the guest named on the Ticket.  Voided Tickets may not be used, are subject to confiscation, and will not be refunded.

**D.** **FLIGHT COUPONS**.  Flight coupons will be honored only in the order in which they are issued for use on a trip.  A "flight coupon" is a boarding document for travel on one segment only of a ticketed flight.  Any flight coupon that has not been validated, or which has been altered, mutilated, improperly issued, or written in pencil will not be valid and shall not be accepted for travel.

**E.** **PROHIBITION ON ABUSE/MISUSE OF TICKETS AND FLIGHT COUPONS.**  Use of flight coupons from two or more issued round-trip Tickets to circumvent any applicable fare rules (such as advance purchase or minimum stay requirement) is not permitted.  Hawaiian and its authorized travel agents are prohibited from issuing such "back to back" Tickets under circumstances where there is an obvious intent to abuse and/or misuse the restricted round-trip fares.  Thus, we may deny you transportation if you are found to be utilizing Tickets or flight coupons in this manner unless you remit to us the difference between the fare paid and the fare for the transportation you would have paid had you not violated this rule.

**F.** **VALIDITY OF TICKETS**.

**1** **General Rule**.  Tickets are generally valid for transportation for one year from the date of issuance of the original Ticket.  After the expiration of the one-year period, the Ticket is void and has no value.

**2** **Date Expressly Stated**.  If a Ticket contains or is subject to an express date through which a Ticket is valid, then the Ticket shall remain valid only through that express date.

**G.** **TICKET CHANGES; TRAVEL CREDIT FOR UNUSED TICKETS.**

**1** **General Rule**.  Ticket changes are allowed only during the period of their validity.  You will be charged any fare difference between the original fare and the fare applicable to the new

Ticket, in addition to any surcharges for ticket changes as provided for in Rule 3: Reservations and Ticketing.

**2   Prevention of Use**.  If you are prevented from using a valid Ticket or portion of a valid Ticket, due to overbooking, a change to a smaller aircraft, or a flight cancellation, and we are unable to accommodate you on another flight in a comparable class of service prior to the expiration of your Ticket, we will issue you a travel credit for the original amount of the unused Ticket or portion thereof, as applicable, or other amount required by Government Laws.

**3   Illness, Physical Incapacity or Death**.  If you are unable to commence or continue your travel prior to the expiration of your Ticket due to your illness or physical incapacity, or the illness, physical incapacity or death of a member of your Immediate Family, or an associate with whom you are traveling, we may, in our sole discretion, issue you a travel credit for the original amount of the unused Ticket or portion thereof, provided, however, that you present us with sufficient written proof of your illness or physical incapacity, or of the illness, physical incapacity or death of the affected family member or traveling associate. For any death, we will require a valid death certificate issued by the proper governmental authority.

**4   Minimum Stay Requirements.** In the event during your travel, you are required to return to your point of origin as a result of any illness, physical incapacity or death as described in Section G(3) of this Rule, you will be allowed to return early based on space availability, without incurring any additional fees for not meeting any minimum stay requirements, provided, however, that you also provide us with the documentation required by Section G(3) of this Rule. In all cases, you will be subject to any fare differences

NOTE: If, pursuant to Sections (G)(3) or (G)(4) of this Rule, you are unable to obtain the required written proof, or we have reason to doubt its validity, you may be denied any travel credit or travel extensions pending our receipt of that proof.  You may also be charged for any travel changes or other fees that apply.  Once adequate written proof is provided to us, we can process your claim for any refund equal to the difference between what you actually paid and the amount that you would have paid pursuant to Sections (G)(3) or (G)(4) of this Rule, had you provided us with timely written proof.

**5   Void or Expired Tickets**.  We do not allow changes to or issue travel credit on void or expired Tickets.

## RULE 6: FARES

### A. GENERAL RULES.

**1.**   Each fare for travel from a point of origin to a point of destination is specific to the described route, whether the fare applicable to the described route is higher or lower than the combination of fares that make up the described route.

**2.**   Fares apply only to transportation in the class of service and on the type of aircraft identified and are governed by this Contract of Carriage.

3. The flight number, departure time, and arrival time specified with any fare, refers to the flight bearing such flight number designation, departure time, and arrival time as set forth in our flight schedule, unless noted otherwise.

4. Fares apply only to air transportation between the airports named in connection with such fares that are served by us or by other carriers whom, or on whose behalf, such fares and charges are published.

B. **CHANGES IN FARES AND CHARGES.** If, for any Ticket (excluding any Tickets purchased as part of any travel package) either purchased (i) through Hawaiian's reservations department or (ii) through Hawaiian's web site HawaiianAirlines.com, we decrease the fare or any charges applicable to your Ticket after it has been issued, we will issue you a travel credit for future travel on Hawaiian in the amount equal to the difference in the fare and/or any applicable charges subject to the following terms and conditions:

1. The decrease in the fare and/or any applicable charges exceeds $40.00;

2. You notify us of the decrease in the fare and/or any applicable charges prior to using any portion of your Ticket;

3. The original ticket was not purchased with a travel credit, e-certificate, award, or bulk coupon; and

4. At the time you provide notice to us of the decrease in the fare and/or any applicable charges, all conditions of the decreased fares and/or any applicable charges are met, including any booking code, seat availability, advance reservations, ticketing requirements, and other stated requirements.

NOTE: The decrease in fare and/or any applicable charges must be for the identical flight(s) as stated on the initial Ticket, including the same origin, destination, Stopover points, flight numbers and dates of travel. Further, no additional travel credit will be provided for any Ticket issued in exchange for your original Ticket.

**RULE 7: CHECK ACCEPTANCE**

We do not accept checks as payment for purchase, except in the case of certain group travel reservations when approved by us in advance. If we approve the acceptance of a personal check, it must include your imprinted name, mailing address and telephone number, and be made payable to "Hawaiian Airlines" for the exact amount of the purchase. You will also be required to present a valid driver's license with picture (or valid passport) as personal identification. We reserve the right to require that checks be approved by a third-party check approval system.

We will assess you a service charge of twenty dollars ($20) on all returned checks. This service charge will be in addition to any applicable bank charges assessed against us.

**RULE 8: GUESTS WITH DISABILITIES, BREATHING DEVICES AND PRE-PLANNED OXYGEN SERVICE**

A. **GUESTS WITH DISABILITIES**

1. **Acceptance of Carriage.**  We will make every effort to accommodate any qualified individual with a disability and we will not refuse to transport you solely based upon your disability, except for valid safety and other reasons, or as required by Government Laws.

2. **When Advance Notice Is Required.**  In certain situations, we require that you notify our reservations department not later than forty-eight (48) hours prior to your flight, and that you check in at our ticket counter not later than one hour prior to the minimum check in time for your flight as set forth in Rule 4(E)(2).  Following are some examples of situations that require this advance notice:

   a.  When you are traveling in a stretcher or with an incubator.

   b.  When you are bringing on board a respirator, ventilator, CPAP machine, or portable oxygen concentrator for use during your flight.

   c.  When you are traveling as part of a group with ten (10) or more guests with disabilities.

   d.  If hazardous materials packaging for your batteries or other assistive devices is required.

   e.  Transporting your Support Animal in the cabin.

   f.  Transporting your Service Animal in the cabin on any flight segment scheduled to take eight (8) hours or more.

   g.  Transporting your electric wheelchair on any aircraft operated by 'Ohana by Hawaiian.

   h.  If you have both a severe vision and hearing impairment.

   NOTE: Stretcher service is only available between Pago Pago International Airport and Daniel K. Inouye International Airport and must be arranged in advance with LBJ Tropical Medical Center and Hawaiian.

3. **Self-Assessment of Self Reliance.**  We will accept your self-assessment indicating that you are self-reliant, and we will not make any assumptions regarding the extent of assistance that you may need to travel.  However, we may still determine that a safety assistant is essential for your safety and required for travel as provided in Section (A)(4)(b) – (d) of this Rule 8.

   If we determine against your self-assessment that a safety assistant is required to accompany you for travel, we will not charge you for that safety assistant.  However, we are not required to find or provide the safety assistant.  Thus, we may require you to do so in order to travel.  We reserve the right to override your choice of safety assistant in our sole discretion to another person which may be one of our employees or another guest on the flight.  If we do not ask you to choose a safety assistant and you require a specific person as your safety assistant, you will be charged the applicable adult fare for your safety assistant.

**4. When A Safety Assistant Is Required.**  We will require you to be accompanied by a safety assistant in the following circumstances:

**a.** You are Traveling in a Stretcher or Incubator.  We will require that you are accompanied by a safety assistant when you are traveling in a stretcher or incubator to attend to your in-flight medical needs and assist you in the event of an evacuation.

**b.** You have a Severe Mental Impairment.  We will require that you are accompanied by a safety assistant because of a mental disability if you are unable to comprehend or respond appropriately to safety instructions, including the required safety briefing, from our in-flight personnel.

**c.** You have a Severe Physical Impairment.  We will require that you are accompanied by a safety assistant because of a mobility impairment so severe that you would be unable to assist in your own evacuation from the aircraft.

**d.** You have Both a Severe Hearing and a Severe Vision Impairment.  We will require that you are accompanied by a safety assistant because you have both a severe hearing impairment and a severe vision impairment if you are unable to establish some means of communication with our in-flight personnel that is sufficient to permit the transmission of the required safety briefing.

**5. Services We Provide for Guests With Disabilities.**  If you are a qualified individual with a disability then, upon your request, we will provide you with the following assistance:

**a.** Assist you in moving from the terminal entrance (or a vehicle drop-off point adjacent to the entrance) through the airport to the gate for a departing flight, or from the gate to the terminal entrance (or a vehicle pick-up point adjacent to the entrance after an arriving flight).

**b.** Assist you with enplaning, deplaning, making your flight connections, and transportation between gates.

**c.** Assist you in moving to and from your seat, as part of the enplaning and/or deplaning processes.

**d.** Assist in your preparation for eating, such as opening any packages and identifying the food being served.

**e.** Assist you with the use of the on-board wheelchair to enable you to move to and from a lavatory.

**f.** Assist you in moving to and from the lavatory if you are semi-ambulatory and if it does not involve carrying you.

**g.** Assist you in loading and retrieving any of your carry-on baggage, mobility aids, and other assistive devices stowed onboard.

**h.** Escort you and your animal to the animal relief area if you have a Service Animal.

NOTE: CERTAIN EXTENSIVE INFLIGHT SERVICES WILL NOT BE PROVIDED.  FOR EXAMPLE:

**a.** We will not assist you in actual eating.

**b.** We will not assist you with any elimination functions in the lavatory or at your seat.

**c.** We will not provide any medical services to you.

**B. BREATHING DEVICES - PORTABLE OXYGEN CONCENTRATORS, POSITIVE AIRWAY PRESSURE DEVICES, RESPIRATORS AND VENTILATORS FOR USE ON AIRCRAFT.**

A portable oxygen concentrator (POC) is a device used to provide oxygen therapy to people that require greater oxygen concentrations than the levels of ambient air.  A POC does not contain liquid oxygen.

NOTE:  THERE IS A COMPLETE PROHIBITION AGAINST THE TRANSPORT OF ANY PERSONAL OXYGEN SYSTEMS (E.G. BOTTLES, TANKS, ETC.) THAT CONTAIN LIQUID OXYGEN IN THE CABIN OR AS CHECKED BAGGAGE ON-BOARD ANY OF OUR AIRCRAFT.

Positive airway pressure (PAP) devices are used to aid individuals with sleep apnea and include continuous positive airway pressure (CPAP) devices, automatic positive airway pressure (APAP) devices and variable positive airway pressure (VPAP/bilevel) devices.

Respirators and ventilators assist an individual with breathing in order to maintain proper levels of oxygen in the blood.

You may carry a POC, PAP, respirator or ventilator on-board for use on flights operated on Hawaiian and 'Ohana by Hawaiian if you meet all of the following requirements.  Any POC, PAP, respirator or ventilator for your personal use will not be counted against your carry-on baggage and personal item allowance.

**1. POC Must be FAA Approved**.  Your POC must be approved by the Federal Aviation Administration ("FAA") and (i) have the manufacturer's label attached which includes the following statement in red lettering: "The manufacturer of this POC has determined that this device conforms to all applicable FAA acceptance criteria for POC carriage and use on board aircraft" or (ii) appear in the following list of approved POCs for use on aircraft.

- AirSep Focus

- AirSep Freestyle

- AirSep Freestyle 5

- AirSep Lifestyle

- Delphi RS-00400

- DeVilbiss Healthcare iGo

- Inogen One

- Inogen One G2

- Inogen One G3

- Inova Labs LifeChoice

- Inova Labs LifeChoice ActivOx

- International Biophysics LifeChoice

- Invacare Solo 2

- Invacare XPO2

- Oxlife Independence Oxygen Concentrator

- Oxus RS-00400

- Precision Medical EasyPulse

- Respironics EverGo

- Respironics SimplyGo

- SeQual Eclipse

- SeQual eQuinox Oxygen System (Model 4000)

- SeQual Oxywell Oxygen System (Model 4000)

- SeQual SAROS

- VBox Trooper Oxygen Concentrator

NOTE – Generally, no separate FAA certification is required for any PAP, respirator or ventilator. However, no PAP, respirator or ventilator may be used during taxi, takeoff or landing, unless (i) the FAA has approved the device for such use and (ii) you provide us with proof of that approval or certification.

2. **Lithium Ion Battery Not to Exceed 160 WH.** Your POC, PAP, respirator or ventilator may not contain a lithium ion battery that exceeds 160-watt hours (160 WH).

   NOTE:  No more than two individually protected lithium ion batteries each exceeding 100-watt hours (100 WH), but not exceeding 160-watt hours (160 WH), may be carried per person as spare batteries in carry-on baggage only.

3. **Notice and Check In Required**.  You must (i) notify us of your plans to use a POC, PAP, respirator or ventilator at least 48 hours prior to the scheduled departure time of the first flight in your itinerary, and (ii) check in for that flight no later than one (1) hour prior to the minimum check in time for your flight.

   NOTE: In some cases, you may be required to submit to a fit-to-fly evaluation at the airport and be cleared by MedAire before you will be allowed to travel.

4. **Guest Requirements for POC, PAP, Respirator or Ventilator Use on Aircraft.**  You agree, understand, and represent that:

   a. The POC, PAP, respirator or ventilator is your responsibility.

   b. We are not responsible for the physical condition or care of your device.

   c. We are not responsible for providing batteries, on board power, or any medical related equipment.

   d. You are prohibited from using outlets onboard the aircraft to power and/or charge any respiratory assistive device.

**e.** You are capable of completing the flight safely without extraordinary medical assistance.

**f.** For any POC, ventilator or respirator, you have ample charged batteries to power the POC, ventilator or respirator for 150% of the scheduled time duration of the flight to cover any unexpected delays, gate holds, diversions, or cancellations.

NOTE:  This requirement is not applicable to PAPs.

**g.** You are responsible to ensure that your device is in good working condition.

**h.** If you are not using the device on-board the aircraft, (i) you comply with all rules relating to carry-on baggage as set forth in Rule 17: Carry-On Baggage, and (ii) you remove and package the batteries separately from the device unless it has at least two (2) effective protective features to prevent its accident operation.

**5. Inflight Restrictions on POC, PAP, Respirator or Ventilator Use on Aircraft.**  If you will be using a POC, PAP, respirator or ventilator on-board our aircraft, you are subject to the following rules:

**a.** You are prohibited from sitting in the bulkhead row, in any exit row, and in any seat that would block another guest from access to the aisle.

**b.** During taxi, takeoff, and landing, the device must be properly stowed under the seat in front of you or in the overhead bin.

**c.** If you require the use of a POC, PAP, respirator or ventilator during taxi, takeoff, or landing, we may further restrict where you may sit for safety purposes.

**d.** Your device may not obstruct any guest's egress to the aisle and exits of the aircraft.

**e.** You may use your device while moving about the cabin as long as the "Fasten Seat Belt" sign is not illuminated.

**f.** Use of your device must not cause interference with the electrical, navigation, or communication equipment on our aircraft.

**g.** You are prohibited from the use of any POC satellite conserver.

## RULE 9: WHEELCHAIRS AND OTHER ASSISTIVE DEVICES

**A. GENERAL RULES.**  We will accept your required wheelchair, or other assistive devices free of charge for transport when you are traveling, subject to limited exceptions as noted below.  We will disassemble and reassemble your wheelchair or other assistive devices without charge as necessary to accommodate them for carriage.  Required assistive devices do not count towards any limits on checked baggage or carry-on baggage.

**B. MANUALLY OPERATED WHEELCHAIRS - COLLAPSIBLE.**  We provide storage for one guest's collapsible, manually operated wheelchair in the cabin of each jet aircraft.  This service is available on a first-come, first-served basis, and has priority over carry-on baggage belonging to other customers who board at the same city, if you follow the pre-boarding procedure. Although in-cabin stowage space for wheelchairs cannot be pre-reserved, nor are we required to accept more than one wheelchair in the cabin, we will accept additional wheelchairs in in the

cabin, provided they collapse to fit in an overhead bin or under a seat and there is space available for your wheelchair at the time you board the aircraft.

NOTE**:** On some of our aircraft, we use the seat-strapping method to stow a manual guest wheelchair.  On those aircraft, we will ensure that there is space for two manual wheelchairs provided that the stowage of the second wheelchair will not cause us to deny boarding to any guests.

C.   **MANUALLY OPERATED WHEELCHAIRS - NON-COLLAPSIBLE.**  Non-collapsible manually operated wheelchairs may only be carried in the baggage compartment.

D.   **BATTERY POWERED WHEELCHAIRS AND SCOOTERS.**  Battery-powered wheelchairs and scooters may only be carried in the baggage compartment.  These items may be checked in at the main ticket counter or at the departure gate, and are subject to the following conditions:

1.   **Wet-cell battery operated units**.  Wet-cell batteries must be removed and placed in an appropriate box for travel.  If you do not have an appropriate box and/or packing materials, we will provide them for you.  The battery terminals must be protected from exposure and from short circuit.

2.   **Dry-cell and gel-cell battery operated units**.  Dry-cell and gel-cell batteries may remain attached to the wheelchair only if:

   a.   battery cables are disconnected from the battery;

   b.   battery terminals are covered to prevent contact with anything that could cause a short circuit; and

   c.   batteries are securely attached to the wheelchair or scooter.

   NOTE:  Gel-cell batteries are permitted in the cabin for operation of acceptable life support equipment only.

3.   **Lithium battery operated units.**

   a.   All removable lithium batteries must be removed and carried in the guest compartment of the aircraft as carry-on baggage.

   NOTE: LITHIUM BATTERIES IN EXCESS OF 300-WATT HOURS (300 WH) ARE COMPLETELY PROHIBITED.

   NOTE: A MAXIMUM OF ONE SPARE BATTERY NOT EXCEEDING 300 WH OR TWO SPARES NOT EXCEEDING 160 WH EACH MAY BE CARRIED.

   b.   Wheelchairs or scooters with non-removable lithium batteries in excess of 100-watt hours (100 WH) are prohibited for transport.

   c.   Wheelchairs or scooters with non-removable lithium batteries of 100-watt hours (100 WH) or less will be accepted only if (i) the battery cables are disconnected from the battery and (ii) the battery terminals are covered and to prevent contact with anything that could cause a short circuit.

NOTE: To best assist you with the safe transportation of your battery-powered wheelchair, please consider notifying our Reservations team in advance and complete, and bring a copy of, our Mobility Device Form, which can be found at

https://apps.hawaiianairlines.com/resources/faq/pdf/ha_wheelchair_form.pdf, to the airport on the day of your departure.

E. **PROSTHETIC DEVICES.**  Prosthetic devices necessary for your use, such as crutches, canes, and braces will be accepted without charge for transport (i) as carry-on baggage with you in the cabin of the aircraft, except because of safety or space limitations, or (ii) as checked baggage.

**RULE 10: SERVICE ANIMALS**

This Rule 10 only applies to Service Animals.  A Service Animal means a dog individually trained to do work or perform tasks for the benefit of a guest who is a qualified individual with a disability.  For the transport of pets, please see Rule 19: Acceptance of Dogs, Cats, and Birds for Travel of this Contract of Carriage.  For cargo arrangements, please visit our cargo page at: www.hawaiianaircargo.com, or call us at 1-877-HA-CARGO (422-2746).

We accept trained service animals, , as provided for under the Air Carrier Access Act (ACAA) and the relevant United States Department of Transportation (DOT) regulations, for travel without charge when they are accompanying a qualified individual with a disability upon the terms and conditions in this Rule 10.

A. **GENERAL CONDITIONS OF TRAVEL FOR SERVICE ANIMALS.**  We know that Service Animals provide valuable services to our guests.  If you are a qualified individual with a disability, we welcome your Service Animals for travel free of charge with you in the cabin of the aircraft. However, for the safety and security of everyone, and to meet our operational needs, this rule sets out the conditions, restrictions, and requirements of bringing your Service Animals on board our aircraft.  We strongly recommend that you read and understand the provisions in this rule before traveling with any Service Animal so that you and your animal(s) are best prepared for your journey.  Although we do not charge to transport your Service Animals as set forth below, we reserve the right to charge you for any repairs and/or cleaning costs to our aircraft beyond normal wear and tear associated with the transport of your animal.

1. **Number of Service Animals.**  In no event will we accept more than two (2) Service Animals per person that meet the requirements of this Rule 10.  Additional Service Animals will be treated as pets in accordance with Rule 19: Acceptance of Dogs, Cats, and Birds for Travel.

2. **Credible Verbal Assurances.**  As part of our vetting process, we may ask you if the animal is required to accompany you because of a disability and what work or task the animal has been trained to perform.

3. **Required Form.**  For all Service Animals, we require you to complete and submit to us the Department's ''U.S. Department of Transportation Service Animal Air Transportation Form'' ("DOT Service Animal Form").  This form is can be found on our website at https://www.hawaiianairlines.com/ServiceAnimalForm.  For reservations made more than 48 hours in advance of travel, you must provide notice of your intent to travel with a Service Animal by submitting a hardcopy or electronic version of the DOT Service Animal Form to us not later than 48 hours prior to your first originally scheduled departure time.  For reservations made 48 hours or less in advance of travel, you must complete the DOT Service Animal Form and submit a hardcopy of the form to our agent at your departure gate on the date of travel.

4. **No Disruptive Behavior.**  All Service Animals must remain harnessed, leashed, or otherwise tethered and under your control at all times.  For the safety of everyone on board the

aircraft, we reserve the right to deny transport of any Service Animal in the cabin of the aircraft in our sole discretion for disruptive behavior.  Disruptive behavior shall include, among other things, running freely around an aircraft, boarding area, or airport, growling repeatedly at other people, biting, nipping at, or jumping on people (other than on the owner guest as trained for a health alert), or urinating or defecating in undesignated relief areas such as at the gate or in the cabin of the aircraft.  An animal that engages in these types of disruptive behaviors has not been adequately trained to behave in public settings.  An animal that engages in disruptive behavior will not be considered a Service Animal, regardless of other factors.  As such, the animal would need to be transported as a pet in accordance with <u>Rule 19: Acceptance of Dogs, Cats, and Birds for Travel</u>.

5. **Additional Documentation on Long Flights**.  On any flight of eight (8) hours or more, you will be required to remit a completed version of the DOT's ''U.S. Department of Transportation Service Animal Relief Attestation'' ("DOT Animal Relief Form") as a condition of transportation.  A copy of that form can be found on our website at <u>https://www.hawaiianairlines.com/ServiceAnimalReliefAttestation</u>.  For reservations made more than 48 hours in advance of travel, you must provide a hardcopy or electronic version of the DOT Animal Relief Form to us not later than 48 hours prior to your first originally scheduled departure time.  For reservations made 48 hours or less in advance of travel, you must complete the DOT Animal Relief Form and submit a hardcopy of the form to our agent at your departure gate on the date of travel..

6. **Restricted Seating**.  A qualified individual with a disability accompanied by one or more Service Animals will not be allowed to sit in (i) any exit row, (ii) any seat where an animal would obstruct an aisle, or (iii) any seat that must remain unobstructed to facilitate an emergency evacuation.  No Service Animal may occupy an empty seat.  All Service Animals are limited to your floor space and any floor space of an adjacent empty seat only, or your lap, provided that the animal is no larger than a lap child, as determined in our sole discretion.

7. **Large, Heavy Animals.**  If any Service Animal in our sole discretion is too large to fit safely in the floor space in front of you, we will try to accommodate you and your animal by relocating you to empty adjacent seats in the same class of service, provided that (i) space is available that does not otherwise obstruct emergency evacuation routes, and (ii) your relocation will not cause a delay in the flight.  If there are no adequate alternatives available for you to travel with your Service Animals in the same class of service as the seat you purchased, we will try to accommodate you and your animal in the same class of service on a later flight with more room, or offer to transport your animal(s) as checked baggage in the cargo hold of our aircraft.

8. **Assumption of Responsibility.**  You assume full responsibility for the safety, well-being, and conduct of your Service Animals, including, but not limited to, the interaction of the animal with other guests who may encounter the animal while on board the aircraft.  You agree to indemnify us for any losses associated with your Service Animals other than for any repair and cleaning costs solely related to normal wear and tear.

9. **Permits and Governmental Compliance.**  You are responsible for compliance with all Government Laws, requirements and restrictions relating to your Service Animals, which includes, for example, obtaining entry permits and required health certificates of the state or territory from and/or to which the animal is being transported, and producing such

documentation upon demand.  You also agree to indemnify us for any costs and expenses
we may incur because of your failure to comply with this paragraph.

NOTE:  The State of Hawaii has strict laws regarding the import of animals.  Some animals
that may be allowed in other states may be restricted or prohibited in Hawaii.  YOU ARE
SOLELY RESPONSIBLE FOR UNDERSTANDING AND COMPLYING WITH STATE OF HAWAII
REQUIREMENTS.  You should contact the State of Hawaii Animal Industry Division – Animal
Quarantine Branch at http://hdoa.hawaii.gov/ai/aqs/animal-quarantine-information-page/
as soon as possible to make sure that your Service Animals meets their requirements for
entry into the state.  Because of all the necessary procedures, the process must generally
begin months in advance of travel to Hawaii.

Dogs may be quarantined for up to 120 days upon arrival in the State of Hawaii unless they
meet all the State's 5-Day-Or-Less program requirements, which include certain
vaccinations, a blood test, and waiting periods.  A health certificate stating that your Service
Animal is fit for travel must be signed and dated by a licensed veterinarian within 14-days of
your arrival in Hawaii and shown to one of our agents.  A Neighbor Island Inspection Permit
issued by the State of Hawaii Industry Division is also required if your Service Animal is
traveling from North America direct to OGG, LIH, or KOA.  If you do not have the required
documents, your Service Animal will not be allowed to travel.

NOTE:  We do not accept any Service Animals that are in training for transport under this rule.

**B. SPECIALTY PURPOSE TRAINED DOGS.**  We will accept dogs trained in explosives detection, drug
and other searches, search and rescue, and other specific functions for travel without charge,
provided that the following conditions are met:

   **1. Official Duty.**  The dog and its handler are on official duty for the Military or a government
   agency, and the handler's credentials are current and verified as authentic.

   **2. Accompanied by Handler**.  The dog is accompanied by its handler for the duration of the
   travel.

   **3. Harnessed or Leashed.**  The dog is properly harnessed or leashed.

   **4. Proper Placement.**  The dog can be accommodated in a non-exit row at the feet of the
   guest.  The dog may not physically occupy a seat in the aircraft.


**RULE 11: SCREENING OF GUESTS AND BAGGAGE**

You and/or your baggage are subject to security screening including, but not limited to, security
profiling, physical pat-downs and inspections, x-ray screening, manual bag searches, questioning, and
use of electronic or other detectors, screening, or security devices, in the sole discretion of the
government, the airport, or Hawaiian, and with or without your presence, consent, or knowledge.
Neither Hawaiian, nor its employees or agents, is liable for any damage, loss, delay (including refusal to
transport), confiscation of property, injury, or other harm relating to or arising out of any such security
screening or as a result of your failure to submit to or comply with such security screening.

**RULE 12: ACCEPTANCE OF CHILDREN AND INFANTS**

   **A. GENERAL RULE.**  Children ages 12 – 17 are accepted for travel unaccompanied.  Children ages 5
   through and including age 11 (ages 5 - 11) will be accepted for travel if accompanied by another

guest who is at least 15 years of age and is travelling in the same cabin of service as the child. Children ages 5 - 11 not traveling with another guest who is at least 15 years of age and in the same cabin of service as the child are referred to as "Unaccompanied Minors" and are subject to special rules contained in this Rule 12. Infants are also subject to special rules contained in this Rule 12. The age of the infant or child in each case is determined at the date of the travel segment, and all fees and rules will apply accordingly.

**B.   CHILDREN AGES 12 AND UP.**  Children ages 12 - 17 can travel alone and are subject to the terms and conditions of this Contract of Carriage.

**C.   CHILDREN AGES 5 – 11.**

NOTE: See Section (E) of this Rule 12 for allowable use of a child restraint seat or booster seat on aircraft.

**1.   Unaccompanied Minors.**  Children ages 5 - 11 that travel alone or in the company of one or more other children ages 5 - 11 only are considered "Unaccompanied Minors." Any child travelling as an Unaccompanied Minor must have reached his or her 5th birthday by the date of travel and will be subjected to the following:

**a.   Fees.**  The mandatory Unaccompanied Minor fee noted below is payable at the time of check in.

i.   For Travel Within the State of Hawaii.  In addition to the cost of the Ticket, there is a fee of $35.00 per Unaccompanied Minor for each segment from the designated point of origin to the designated destination, via the designated route of a Ticket. The parent or guardian of the Unaccompanied Minor will also be required to complete and sign Hawaiian's Form HA O20 – Request for Unaccompanied Minor form located at https://apps.hawaiianairlines.com/Resources/FAQ/pdf/HA-Request-Unaccompanied-Minors.pdf.

ii.   For Travel between the Continental USA and Hawaii.  In addition to the cost of the Ticket, there is a fee of $100.00 per Unaccompanied Minor for travel between the State of Hawaii and the Continental USA (each way).  Unaccompanied Minors will only be accepted on non-stop direct flights operated by Hawaiian.  For any interisland connecting flights, the Unaccompanied Minor fees of Section (C)(1)(a)(i) of this Rule 12 shall also apply.  The parent or guardian of the Unaccompanied Minor will also be required to complete and sign Hawaiian's Form HA O20 – Request for Unaccompanied Minor form located at https://apps.hawaiianairlines.com/Resources/FAQ/pdf/HA-Request-Unaccompanied-Minors.pdf.

NOTE: We will accept up to two (2) Unaccompanied Minors belonging to the same Immediate Family for a single fee provided that the drop-off and pick-up information and contact details are identical.

**b.   Documentation.**  The parent, guardian, or responsible adult for the Unaccompanied Minor(s) must complete our required paperwork and documentation, furnish a valid and unexpired government-issued photo identification, and provide us with the name, phone number and address of (i) the parent, guardian, or responsible adult who will be meeting the Unaccompanied Minor at his/her destination and (ii) where possible, an

alternate responsible adult authorized to pick up the Unaccompanied Minor at his/her destination.

**c.**   Prior to Flight.   A parent, guardian, or responsible adult must escort the Unaccompanied Minor to the gate for his/her departing flight and remain at the gate until the flight has departed.  We will provide a gate pass to the parent, guardian, or responsible adult to accompany the Unaccompanied Minor to the gate of departure.

**d.**   Pick-up at Destination.   A parent, guardian, or responsible adult must be present and available at the destination to receive the Unaccompanied Minor at the baggage claim or other designated area immediately upon arrival.  If requested and there is adequate staff on duty, we will provide a gate pass to the parent, guardian, or responsible adult to meet the Unaccompanied Minor at the arrival gate. The receiving parent, guardian, or responsible adult must be one of the contact people listed on the Unaccompanied Minor form submitted at the time of departure.  We will not release any Unaccompanied Minor to a person not named on the form.

**e.**   Restrictions and Exceptions.

   i.    We may refuse to accept an Unaccompanied Minor for travel or change the Unaccompanied Minor's flight schedule, including departure date, in our sole discretion when we believe there is any reasonable possibility that the flight upon which the Unaccompanied Minor holds a reservation could be diverted to another airport.

   ii.   We may refuse to accept an Unaccompanied Minor for travel or change the Unaccompanied Minor's flight schedule, including departure date, in our sole discretion if a flight is delayed and we believe that there is a reasonable possibility that the Unaccompanied Minor will not be able to make his/her connecting flight.

   iii.  We will not accept any Unaccompanied Minors for travel on any Hawaiian flight departing between the hours of 9:00 p.m. and 5:00 a.m. unless (i) travel is on a flight operating out of Honolulu, Hawaii, and (ii) the flight is the only flight to the Unaccompanied Minor's destination for the day.

   iv.   We will not accept any Unaccompanied Minors for travel on any flight connecting to any other flight when such other flight is the last flight of the day to the Unaccompanied Minor's destination.

   v.    We will not accept Unaccompanied Minors where the connection time between flights is greater than two (2) hours or less than one (1) hour, except when there are no scheduled arrivals or departures that would allow for a connecting time within those parameters and we, in our sole discretion, determine to make an exception upon considering all the relevant information available to us.

   vi.   We will not accept Unaccompanied Minors when any connecting flight would require an overnight stay.

   vii.  We will not accept Unaccompanied Minors who are connecting to or connecting from any flight operated by any other air carrier other than 'Ohana by Hawaiian.

   viii. We will not accept Unaccompanied Minors on any flight we operate that is ticketed by another carrier with a flight number other than that of Hawaiian's.

ix.     We will not accept Unaccompanied Minors for travel in extra-comfort.
Unaccompanied Minors may be ticketed in coach or first-class only upon payment
of the appropriate fare in addition to the Unaccompanied Minor fees.

**f.**   <u>Other</u>.

i.      If we are unable to locate the person responsible for receiving the
Unaccompanied Minor at the destination, you agree that we may contact the local
police or government agency for assistance or to take custody of the
Unaccompanied Minor.

ii.     You agree to reimburse us for any costs and expenses we incur that result from
the receiving parent, guardian, or responsible adult not being present at the
baggage claim or other designated area immediately upon arrival of the
Unaccompanied Minor at the destination airport.

2.   **Accompanied Minors.**  Children 11 years of age or younger are accepted for transportation
between the Continental USA and the State of Hawaii or for travel wholly within the State of
Hawaii on flights operated by Hawaiian only, when accompanied on the same flight(s) and in
the same compartment by a guest at least 15 years of age. Please see <u>Section D</u> of this <u>Rule
12</u> as it relates to children under the age of 2.

**D.   INFANTS (LESS THAN 2 YEARS OLD) AND CHILDREN AGES 2 - 4.**

NOTE: See <u>Section (E)</u> of this <u>Rule 12</u> for allowable use of a child restraint seat or booster seat on
aircraft.

1.   **Infants (Children Less than 2 years old).**  Children under the age of 2 are considered Infants.
No infant under seven (7) days of age will be accepted for transportation without a signed
physician's letter stating that the infant is approved for travel.  An infant may be carried on
the lap (lap infant) of a person 15 years of age or older (qualified person)for no additional
fee, provided that only one infant is permitted as a lap infant per qualified person.  You may
purchase a seat for an infant at the then applicable adult fare.  If a seat is purchased for an
infant, we recommend that the infant is placed in an approved infant safety seat during
travel.

2.   **Children 2 - 4.**  Each child ages 2 - 4 must be ticketed at the then applicable adult fare, be
accommodated individually in his/her own seat, and be accompanied by a ticketed guest at
least 15 years of age.

3.   **CARES Harness.**  The FAA-approved CARES Child Aviation Restraint System harness is
designed specifically for aviation use for children ages 1 and older who weigh between 22
and 44 pounds (10 - 20 kg).  You may use a CARES harness for your child in the guest
compartment of our aircraft only when a seat adjacent to you is available and/or ticketed
for the infant or child and the CARES harness is properly secured to the aircraft seat.

**E.   USE OF CHILD RESTRAINT SEAT OR BOOSTER SEAT ON AIRCRAFT.**

NOTE:  See Rule 17(C) for additional limitations on travelling with child restraint seats, booster seats and strollers in the cabin of our aircraft.

1.   **Child Restraint Seat**.  You may use a child restraint seat on the aircraft for your infant/child only upon the following conditions:

   a.   Hard-backed and Government Approved.  The child restraint seat must be a hard-backed child safety seat that is approved by the Federal Aviation Administration or other government agency for use in an aircraft.

   b.   Adjacent Purchased/Ticketed Seat Available.  You must have purchased and/or ticketed a seat adjacent to you for the infant/child's seat, which seats may not be in an exit row.

   c.   Properly Secured.  The child restraint seat can be and is properly secured by the aircraft seat belt and the infant/child can be and is properly secured in the child restraint seat.

   NOTE: We reserve the right to make changes to your seat assignments in our sole discretion to accommodate an FAA approved child restraint seat.

2.   **Booster Seat.**  You may use a booster seat on the aircraft for your child only upon the following conditions:

   a.   During Flight Only.  You may use a booster seat for your child during the flight only between (i) the time when the airplane has reached its cruising altitude and the flight attendants have first announced your ability to move around the cabin and (ii) the time the flight attendants have announced that the aircraft is preparing for landing and that the seatbacks and tray tables must be in the upright and locked position.

   b.   Adjacent Seat Available.  You must have purchased and/or ticketed a seat adjacent to you for the child using the booster seat, which seats may not be in an exit row

   c.   Properly Secured.  The booster seat can be and is properly secured by the aircraft seat belt and the infant/child can be and is properly secured in the booster seat.

   d.   Stowage Space Available.  The booster seat can be and is stowed beneath the seat or in an approved overhead compartment for all surface movement, during takeoff and landing, and at any other time other than for when its use is expressly allowed pursuant to Section (E)(2)(a) of this Rule 12.

**RULE 13:  REFUSAL TO TRANSPORT**

We may refuse to transport you and have the right to remove you from any aircraft at any point in our sole discretion for any of the following reasons:

A.   **BREACH OF OUR CONTRACT OF CARRIAGE.**  We may refuse to transport you and have the right to remove you from any aircraft for any failure to comply with the rules of our Contract of Carriage.

B.   **TO COMPLY WITH GOVERNMENT REQUESTS OR REGULATIONS.**  We may refuse to transport you and have the right to remove you from any aircraft whenever necessary or advisable to comply with any Government Law, or government request for emergency transportation relating to the United States Department of Defense or other government entity.

**C. FOR FORCE MAJEURE EVENTS AND OTHER UNFORESEEABLE CONDITIONS.**  We may refuse to transport you and have the right to remove you from any aircraft whenever necessary or advisable due to weather or other conditions beyond our control.  These may include, for example, acts of God, strikes, civil commotions, embargoes, wars, hostilities, terrorist activities, or disturbances, whether actual, threatened, or reported.

**D. REFUSAL TO ALLOW A SEARCH OF YOURSELF OR YOUR PROPERTY.**  We may refuse to transport you and have the right to remove you from any aircraft if you refuse to allow any electronic screening or surveillance or other physical or non-physical search of you or your property.

**E. LACK OF, OR REFUSAL TO PROVIDE, PROOF OF IDENTITY.**  We may refuse to transport you and have the right to remove you from any aircraft if you refuse our request to provide, or are unable to provide, personal identification that is satisfactory to us.  We may also refuse to transport you if your proof of identification does not match the name on the Ticket.  We have the right to require identification of persons purchasing Tickets and/or presenting Tickets to board an aircraft.

**F. FOR THE SAFETY AND COMFORT OF GUESTS AND CREW.**  We may refuse to transport you and have the right to remove you from any aircraft if:

**1.** Your conduct is disorderly, abusive, or violent.

**2.** You are unable or unwilling to sit in your seat with the seatbelt fastened.

**3.** You appear to be intoxicated or under the influence of drugs.

**4.** You have any outstanding warrants for your arrest or you have a criminal history of violence, abuse, or abusive behaviors.

**5.** You:

  **a.** are incapable of completing a flight safely, without requiring extraordinary medical assistance during the flight;

  **b.** appear to have symptoms of or have a communicable disease or condition that could pose a direct threat to the health or safety of others on the aircraft; or

  **c.** refuse a screening for such communicable disease or condition.

  NOTE:  If you have, or appear to have symptoms of, a communicable disease or condition that could pose a direct threat to the health or safety of others on the aircraft, we will require a medical certificate signed by your physician and dated within ten (10) days of your scheduled departure date stating that the disease or infection would not, under present conditions, be communicable to other persons during your flight.

**6.** You fail to follow the instruction of our flight crew with respect to the manner or timing of use of any carry-on baggage in the cabin of the aircraft.  Some common prohibitions include:

  **a.** cell phone use during the flight;

  **b.** computer, laptop, or tablet use during takeoff, turbulence, and landing;

  **c.** personal air purifiers and powered air filtration systems used or charged onboard;

    **d.**  portable humidifiers used or charged onboard;

    **e.**  electronic smoking devices used or charged onboard;

    **f.**  respiratory assistive devices plugged into onboard power sources; and

    **g.**  any travel accessories which attach to aircraft seats, are inserted between the seats, or otherwise block access to seat rows or aisles.  For example, this includes inflatable cubes, "bed boxes," "leg hammocks," and restrictive seat recline devices.

**7.**  You have a mental condition causing you to be deranged, or you are an involuntarily committed patient of a mental health  institution (each a "Mental Patient").  However, we will accept a Mental Patient under the following conditions:

    **a.**  We receive written assurance from an acceptable medical authority that the Mental Patient Guest can be transported safely with an escort.

    **b.**  There will only be one Mental Patient on a flight.

    **c.**  The flight is operated by Hawaiian or 'Ohana by Hawaiian.

    **d.**  The escort provides credible verbal assurances that:

        i.  the Mental Patient will be accompanied at all times;

        ii.  the escort has physical control over the Mental Patient;

        iii.  the Mental Patient does not possess or have access to any items that could be used as deadly or dangerous weapons; and

        iv.  the escort has adequate restraining devices if needed.

    **e.**  The escort agrees to comply with the following procedures and restrictions in the transport of the Mental Patient:

        i.  The Mental Patient will be boarded first, deplaned last, and will be seated in the rear-most available seats.  The escort must be seated between the Mental Patient and the aisle.

        ii.  The escort must be able to control the Mental Patient at all times and the escort must ensure that the Mental Patient is not carrying any matches.

        iii.  We will not provide any food, beverage, or utensils to the Mental Patient without the express authorization of the escort.  We will not provide or serve, nor shall the escort or Mental Patient drink, any alcoholic beverages while on board the aircraft.

**8.**  You have a foul or offensive body odor not attributable to a disability or illness.

**9.**  You wear, or possess on or about you, any concealed or unconcealed deadly or dangerous weapons, provided, however, that we will carry law enforcement personnel who meet the qualification and conditions who meet the qualifications and conditions established in 49 C.F.R. §1544.219.

**10.**  You are manacled or in the custody of law enforcement personnel.

11. You are an Escorted Guest and have resisted your escort in the past or are believed to be capable of resisting your escort.

12. You have misrepresented a medical or other condition currently or in the past, which would make you or have made you unacceptable for travel.

13. You are pregnant or have very recently given birth and do not meet the following requirements:

   a. For travel wholly within the State of Hawaii.  If within seven (7) days of your projected due date or within seven (7) days following your delivery date, you shall have provided a medical certificate to us from your obstetrician dated not more than three (3) days prior to your travel date stating that you are fit for travel.

   b. For travel between the State of Hawaii and the Continental USA.  If in your ninth month of pregnancy (i) you shall have been examined by your obstetrician within 48 hours of your departure date and (ii) you shall have provided us with a written certification from your obstetrician stating that you are medically fit to travel.  If within seven (7) days following your delivery date, you shall have provided a medical certificate to us from your obstetrician dated not more than three (3) days prior to your travel date stating that you are fit for travel.

   NOTE: IN ALL CASES, WE RESERVE THE RIGHT TO CONSULT WITH MEDAIRE AND DENY YOU TRAVEL UNLESS THEY PROVIDE A 'FITNESS TO TRAVEL' OPINION.

14. You do not meet Hawaiian's standards for dress and attire as follows:

   a. Clothing must cover the upper part of the torso.  Tank tops, tube tops, and halter tops are allowed.

   b. Clothing must cover the lower part of the torso.  Shorts are allowed.  However, speedos and bikini bottoms are not allowed.

   c. Footwear is required for safety reasons unless you are unable to do so because of a disability or physical condition that prevents you from wearing footwear.

   d. In all cases, clothing must not be lewd, obscene, or patently offensive to others.

G. **LIABILITY.**  We are not liable for refusing to transport you or for removing you from any aircraft for any of the reasons provided in this <u>Rule 13</u>.  However, we will refund you in accordance with <u>Rule 24: Refunds</u> in such cases upon your request.

NOTE: IF YOU ARE REFUSED TRAVEL OR REMOVED FROM ANY OF OUR AIRCRAFT FOR ANY REASON SET FORTH IN <u>SECTION (A)</u>, <u>(D)</u>, <u>(E)</u> OR <u>(F)</u> OF THIS <u>RULE 13</u>, WE MAY BAN YOU FROM ANY FUTURE TRAVEL ON HAWAIIAN IN OUR SOLE DISCRETION.

## <u>RULE 14:  NO-SMOKING POLICY</u>

You are prohibited from smoking (including the use of electronic simulated smoking materials, such as electronic cigarettes, pipes or cigars, and smokeless cigarettes) on any flights operated by Hawaiian.

Federal law also prohibits smoking in any airplane lavatory and tampering with, disabling, or destroying any smoke detector installed in any airplane lavatory.  Federal law provides for a penalty of up to $2,000 for tampering with the smoke detector installed in any aircraft lavatory.  You are also subject to FAA

enforcement action and substantial monetary penalties for violation of this law and the related regulations, and we may ban you from all future travel on Hawaiian.

By purchasing a Ticket or accepting transportation on Hawaiian, you agree to comply with our no-smoking policy and applicable federal law.  We reserve the right to seek reimbursement, and you agree to reimburse us, for any loss, damage, or expense we may incur because of your failure to abide by this Rule 14.

**RULE 15: CODESHARE FLIGHTS**

We have entered into codeshare arrangements with certain other air carriers (our "Codeshare Partners") that allow us to offer you air transportation services on flights operated by these Codeshare Partners.  You can identify a flight operated by one of our Codeshare Partners by its flight number.  A flight operated by a Codeshare Partner will have a flight number that includes our two-letter airline designator code, "HA" followed by a 4 -digit flight number (a "Codeshare Flight").  We also identify each Codeshare Flight on our website during the booking process.

If you purchase a Ticket on a Codeshare Flight, you are subject to our Contract of Carriage with respect to ticketing and most general matters, regardless of the airline that operates the flight.

Each Codeshare Partner promulgates rules that apply to the operation of its own flights, and some of those rules may differ from our rules.  For example, a Codeshare Partner may have rules governing check in requirements, carriage of animals, baggage, baggage liability, carriage of musical instruments, smoking, unaccompanied minors and/or denied boarding compensation that differ from our rules for flights that we operate.  Those terms and conditions, which are found in the Codeshare Partner's contract of carriage for that partners Codeshare Flights, are incorporated into our Contract of Carriage by reference.  Thus, a Codeshare Partner's contract of carriage applies to flight services and operations on Codeshare Flight, and its rules supersede our rules that would otherwise be applicable.  If you are traveling on a Codeshare Flights, you should review the applicable conditions of carriage for that Codeshare Partner to ensure your familiarity and compliance with all its rules and terms.

We also enter codeshare relationships where other airlines place their codes on some flights that we operate.  If you have purchased a Ticket on a flight operated by us but your Ticket includes another airline's designator code in the flight number, your condition of carriage is with that airline, not us.

**RULE 16: INTERLINE TRANSPORTATION**

NOTE**:** For Codeshare Flights, please see Rule 15 Codeshare Flights.

In some cases, we may issue a Ticket, check baggage, or make other arrangements for transportation over the lines of another air carrier, which are not Codeshare Flights.  We refer to these situations as interline arrangements performed by interline carriers.  For interline arrangements, we act only as an agent for that other carrier, and we do not assume any responsibility for the acts or omissions of the other carrier.  This includes, for example, any acts or omissions relating to flight status information, any travel delays, and any other situations that arise from their flight operations.

Transportation on any interline carrier is governed by that carrier's contract or conditions of carriage. WE SHALL NOT BE LIABLE FOR ANY DEATH OR INJURY TO ANY GUEST THAT OCCURS ON A FLIGHT THAT WE DO NOT OPERATE.  If we operate any flight as part of another carrier's interline arrangement, then

your transportation is governed by our Contract of Carriage, except in the following areas where the other carrier's rules may apply:

**A.** Baggage acceptance, policies, and fees including, but not limited to, size, weight, and quantity, as well as acceptance of certain items, including musical instruments.

**B.** Carriage of Unaccompanied Minors and/or guests under the age of 18.

**C.** Carriage of pets in the cabin of the aircraft.

**D.** Policies for carriage of pregnant guests.

**E.** Changes, cancellations, and refunds.

For example, the DOT requires that baggage service charges for your entire itinerary are determined by the marketing carrier for the first segment of your itinerary.  That carrier is the airline whose flight number is assigned to the first segment of your itinerary.  If we are not that carrier, then different charges may apply.  Baggage service charges are those in effect on the date of ticketing.

For more information, please see the contract of carriage or conditions of carriage of the relevant interline carrier.

**RULE 17 CARRY-ON BAGGAGE**

**A.** **GENERAL RULE.**  You are limited to one (1) carry-on bag and one (1) personal item on any flights that we operate, except as stated otherwise in this Contract of Carriage.

**1.** **Carry-on bag.**  Your allotted carry-on bag must fit safely under the seat in front of you or in an approved overhead compartment and is subject to the following additional conditions**:**

**a.** not to exceed 9L x 14W x 22H or 45 linear inches (114 cm) (length + width + height)

**b.** limited to 25 pounds (11 kg).

NOTE: We reserve the right to stow any carry-on baggage in the cargo compartment of the aircraft when necessary based on aircraft type, size of storage units, and storage availability in our sole discretion.

**2.** **Personal Item**:  Your allotted personal item must be small enough to fit safely under the seat in front of you.  Personal items are generally such things as a purse, briefcase, laptop computer, small backpack, or similar piece.  In each case, it must fit safely under the seat in front of you.

**B.** **EXCEPTIONS TO THE GENERAL RULE.**

**1.** **Musical instrument.**  One musical instrument may be taken onboard as your allotted one carry-on bag regardless of size if (i) it can be safely stowed in an approved carry-on stowage location and (ii) space is available upon boarding the aircraft.

**2.** **Assistive Devices**.  Any assistive device carried onboard the aircraft for use by that qualified individual with a disability is not subject to any size or quantity limitation provided (i) it can be safely stowed in an approved carry-on stowage location and (ii) space is available upon boarding the aircraft.

**3. Ancillary Items.**  We will allow you to carry onboard the following ancillary items in addition to your allotted carry-on baggage at no extra charge, subject to any safety restrictions and space availability:

   **a.**   a handbag or pocketbook;

   **b.**   an overcoat, jacket or wrap;

   **c.**   a small foot rug;

   **d.**   an umbrella or walking stick;

   **e.**   a camera and/or a pair of binoculars;

   **f.**   a reasonable amount of reading matter for the flight; and

   **g.**   food (includes baby food) for consumption on the flight.

**C.  OTHER ITEMS.**

**1.  Child Restraint Seats and Booster Seats.**

   **a.**   <u>Generally Counts as Carry-on Bag</u>.  A child restraint seat or booster seat may be taken onboard the aircraft, shall count against your allotted carry-on baggage allowance, and is subject to any space and storage limitations of the aircraft, <u>provided</u>, <u>however</u>, that a child restraint seat that (i) meets the requirements of <u>Rule 12(E)(1)</u> and (ii) is used for the duration of the flight, shall not count against your allotted carry-on baggage allowance.

   **b.**   <u>Use on Aircraft</u>.  See <u>Rule 12(E)</u> for conditions and restrictions on the use of a child restraint seats and booster seats on our aircraft.

**2.  Strollers.**

   **a.**   <u>Traveling with Child Using Stroller</u>.  We will allow you to carry a stroller onboard the aircraft without counting against your allotted carry-on baggage allowance if:

       i.   you are traveling with a child using the stroller; and

       ii.   there is room on the aircraft for the stroller to be stowed safely beneath the seat in front of you or in and overhead compartment.

   If your stroller cannot be accommodated on the cabin of our aircraft, we will accept it for travel in the baggage compartment as a gate checked item.  Upon arrival, we will return your stroller to you at the arrival gate.

   **b.**   <u>Stroller Only</u>.  If you are not traveling with a child using the stroller, we will allow you to carry a stroller onboard the aircraft in lieu of one of your carry-on items if there is room on the aircraft for the stroller to be stowed safely beneath the seat in front of you or in an overhead compartment.

   If your stroller cannot be accommodated in the cabin of our aircraft, we will accept it for travel in the baggage compartment as a gate checked item to your final destination, where you may retrieve it at the baggage claim area.

**3.  Wagons, Carts, and Similar Items.**  Wagons, carts, and other similar items that do not meet the requirements of <u>Rule 17A</u> above will not be accepted for travel in the cabin of our aircraft.  You must check these items to your final destination as baggage at one of our

kiosks or ticket counters in the airport lobby and pay any applicable baggage fees.  See Rule 18: Checked Baggage.

**4. Dry Ice as Carry-On Baggage.**  The total amount of dry ice that may be carried per guest is 5.5 pounds (2.5 kg), whether as carry-on baggage or checked baggage.  You may carry up to 5.5 pounds (2.5 kg) of dry ice in your carry-on baggage when used to refrigerate perishables subject to the following conditions:

**a.** you identify the package to one of our representatives upon your initial check in;

**b.** you clearly mark or label the package "Dry Ice" or "Carbon Dioxide Solid" and include the weight of the dry ice; and

**c.** the package the dry ice is contained in allows for the release of gas pressure during transport.

**5. Other Items Not Addressed Above.**  There may be an occasion where you would like to carry onboard an item that would otherwise be acceptable for travel, except for it being too fragile or bulky to be placed in an overhead bin or under the seat in front of you.  In that case, we may allow you to carry the item onboard and secure it in the seat next to you (a "seated item") upon the following terms and conditions:

**a.** Bulkhead Seats Must be Available**.**  For safety reasons, any seated item must be carried in a bulkhead seat.  Thus, there must be two adjoining bulkhead seats available – one for you and one for your seated item.

**b.** Seat Purchase Required.  You must pay for the extra seat for your seated item.  We will charge you 100% of the then applicable adult fare.  As a result, you will be entitled to same amenities for that additional purchased seat you are with respect to your own seat.  This includes any meals, mileage credit, and baggage allowances applicable to the fare and itinerary.  However, for mileage credit to be credited to your account for the extra seat, you must contact the HawaiianMiles department after travel is completed.

**c.** Properly Secured**.**  You must be able to properly secure your seated item in the aircraft seat next to you.

NOTE: We are not liable for any damages to any seated items.

**D. RESTRICTED ITEMS.**  See Rule 18(F) for a list of restricted items that apply to both carry-on baggage and checked baggage and any related exceptions.

**E. FIREARMS AND LAW ENFORCEMENT OFFICERS OR DIPLOMATIC COURIERS.**  We may allow certain authorized persons e.g., a law enforcement officer or diplomatic courier, to be permitted to retain custody of his/her firearm or taser/electroshock weapon, and any ammunition upon duly identifying himself/herself to one of our agents at the time of check in.

## RULE 18: CHECKED BAGGAGE

You may check baggage for carriage in the cargo compartment of the aircraft, subject to the provisions of this Rule 18.

NOTE: SEE SECTION (F) OF THIS RULE 18 FOR RESTRICTED ITEMS AND ANY EXCEPTIONS.

NOTE: A PORTION OF TRAVEL FOR SOME ITINERARIES THAT WE MARKET MAY BE OPERATED BY EMPIRE AIRLINES DBA 'OHANA BY HAWAIIAN.  ALL OF THE PROVISIONS OF THIS RULE 18 APPLY TO FLIGHTS OPERATED BY 'OHANA BY HAWAIIAN, EXCEPT AS OTHERWISE STATED HEREIN.

**A.   GENERAL CONDITIONS OF ACCEPTANCE.**  Acceptance of your baggage is subject to the following general conditions:

1. **Valid Ticket**.  You must present a valid Ticket for transportation on Hawaiian or 'Ohana by Hawaiian, or on Hawaiian or 'Ohana by Hawaiian and one or more other carriers with which Hawaiian has an interline transportation or codeshare agreement.

2. **Same Flight**.  Your baggage must be scheduled for transport on your flight.  We may refuse to accept your baggage for transport on any flight other than the one you are scheduled on.

3. **Name and Phone Number Required**.  Your name and contact phone number must appear on each piece of checked baggage.  If you do not have an identification label, we will provide one to you free of charge.

4. **Size and Weight Limits**.  Your checked bag must not exceed an Outside Linear Dimension of 62 inches (157 cm) or a maximum weight of 50 pounds (22.5 kg).  However, we may accept larger or heavier baggage, upon the payment of additional overweight or oversize baggage fees as stated elsewhere in this rule.

5. **Inspection.**  Your baggage must be available for inspection by Hawaiian and/or any authorized government agencies with or without your consent or knowledge.  At any time we may remove, or refuse to transport, any baggage that you refuse to submit for inspection.

6. **Suitable for Transportation**.  Your baggage must be suitable for travel in our sole discretion. We will not accept any baggage that:

   a.  is prohibited by any Government Law;

   b.  cannot be carried safely in the baggage compartment of the aircraft;

   c.  might cause injury or damage, or pose a safety risk to Hawaiian, its employees, its guests, any aircraft or other equipment, or baggage, because of its packaging, nature, contents, or characteristics (e.g. sharp objects, paints, corrosives or other hazardous materials, baggage secured by "bungee" type cords, or items with foul or offensive or odors such as durian fruit and fermented fish sauces); or

   d.  is not suitable or adequately packaged to withstand ordinary handling, unless the guest executes a release form.

7.  **Valid Destination**.  Your baggage must be checked through to a valid destination.  Baggage will not be checked:

   a.  To a point that is not on your ticketed routing.

   b.  Beyond your next point of Stopover or if there is no Stopover beyond the final destination designated on your Ticket.

   c.  Beyond a point at which you want to reclaim the baggage or any portion of your baggage.

   d.  Beyond the point to which you have paid all applicable charges.

**e.** Beyond a point at which you transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which you are scheduled to arrive.

**B. BAGGAGE FEES.** Baggage in excess of the free carry-on baggage allowance set forth in <u>Rule 17: Carry-On Baggage</u> and any other baggage not subject to a fee exclusion under any Hawaiian sponsored baggage program, will be accepted for transportation (subject to the provisions of this <u>Rule 18</u>) only upon payment of the applicable checked baggage fees.  For the avoidance of doubt, if you are allowed two free bags and are transporting a third bag, you would pay the fee associated with that third bag.  Baggage fees are assessed based upon the destination to which your baggage is checked.  If any checked baggage falls into more than one charge category, then each separate fee is charged for each category (e.g., if a checked bag Is overweight, then both the fee for a Standard Bag and the additional fees for overweight baggage will apply), unless stated otherwise in this rule.  We will not charge any checked baggage fees for your wheelchair, mobility aids, or assistive devices that are subject to 14 CFR 382.

**1. Fees for Standard Baggage**.  A Standard Bag is a checked bag up to 50 pounds (22.5 kg) in weight with an Outside Linear Dimension that does not exceeds 62 inches (157 cm) and that meets the general conditions of acceptance in <u>Section (A)</u> of this <u>Rule 18</u>.  The following fees will be charged for Standard Bags.

**a.** <u>For travel between points within the State of Hawaii</u>:

| Checked Standard Bag | Per Piece Charge (Each way) |
|---|---|
| First | $25.00 |
| Second | $35.00 |
| Third and each additional | $50.00 |

**b.** <u>For all Domestic travel that is not wholly within the State of Hawaii</u>:

| Checked Standard Bag | Per Piece Charge (Each way) |
|---|---|
| First | $30.00 |
| Second | $40.00 |
| Third and each additional | $100.00 |

**2. Additional Fees for Overweight Baggage**.  When a bag exceeds 50 pounds (22.5 kg), it will incur an additional overweight charge as follows, which is in addition to the Standard Bag fee and any oversize fees.

**a.** <u>Baggage weight is 51-70 pounds (23 – 31.5 kg)</u>:

i. Between points within the State of Hawaii, the additional overweight baggage fee is $35.00 per overweight piece.

ii. For Domestic travel that is not wholly within the State of Hawaii, the additional overweight baggage fee is $50.00 per overweight piece.

    **b.** <u>Baggage weight is 71-100 pounds (32 – 45 kg)</u>:

        i. Between points within the State of Hawaii, the total additional overweight baggage fee is $70.00 per overweight piece.

        ii. For Domestic travel that is not wholly within the State of Hawaii, the total additional overweight baggage fee is $200.00 per overweight piece.

        iii. Baggage in excess of 100 pounds (45 kg) is not accepted, except as expressly provided elsewhere in this <u>Rule 18</u>.

**3. Additional Fees for Oversize Baggage**.  When a bag exceeds an Outside Linear Dimension of 62 inches (157 cm), it will incur an additional oversize charge as follows, which is in addition to the Standard Bag fee and any overweight fees.

    **a.** <u>Baggage with an Outside Linear Dimension greater than 62 inches (157 cm), but not exceeding an Outside Linear Dimension of 80 inches (203 cm)</u>:

        i. Between points within the State of Hawaii, the additional oversize baggage fee is $35.00 per oversized piece.

        ii. For Domestic travel that is not wholly within the State of Hawaii, the additional oversize baggage fee is $100.00 for each oversized piece.

    **b.** <u>Baggage in excess of the stated dimensions above will not be accepted, except as expressly provided elsewhere in this Rule 18</u>.

NOTE: IN ALL CASES, NO BAGGAGE WITH (I) AN OUTSIDE LINEAR DIMENSION GREATER THAN 72 INCHES (182 CM) OR (II) A WIDTH GREATER THAN 30 INCHES (72 CM) WILL BE ACCEPTED FOR TRANSPORTATION AS BAGGAGE ON FLIGHTS OPERATED BY 'OHANA BY HAWAIIAN.

**4. Separate Bag Fees for Rechecking Bags Following Any Stopover**. When you book a flight containing a Stopover (the connecting time between two flights on a ticket is longer than four hours), you will be required to reclaim your baggage at the Stopover point.  If following the Stopover, you recheck your baggage, you will be required to pay the applicable baggage fees for that flight.

**C. DELIVERY AND RECEIPT OF BAGGAGE.**

**1. Delivery.**  We will deliver your bag to the baggage claim area at the airport indicated on the Baggage Check Tag.

**2. Receipt.**  Receipt of baggage by a holder of the Baggage Check Tag without written complaint at the time of delivery is presumptive evidence that the checked baggage and its contents have been delivered to you in good condition and in compliance with this Contract of Carriage.

**D. SPECIAL ITEMS.**  (In alphabetical order).  All the above provisions remain applicable to the following special items unless stated otherwise.  We will accept the special items listed below upon the terms and conditions provided for each special item.  See <u>Rule 20(B)(1)(k)</u> for checked baggage items that are excluded from liability.

**1. Ammunition.**  Ammunition will be accepted as checked baggage subject to the baggage conditions and fees set forth in <u>Sections (A)</u> and <u>(B)</u> of this <u>Rule 18</u> and the following terms

and conditions.  You must declare all ammunition in advance of travel.  Government Laws at your origin of travel, any intermediate destination(s), and your final destination may also apply and may impose further requirements or restrictions on your transport of ammunition.  If the transport of ammunition is not in compliance with or is prohibited by Government Laws, it may be denied acceptance or confiscated, and you may also be subject to criminal and/or civil liability.  You agree to indemnify Hawaiian for any costs and expenses Hawaiian incurs because of your non-compliance with this Rule 18 or any Government Laws relating to your transport of Ammunition.  All ammunition must be transported as checked baggage and carried in the baggage compartment of the aircraft, except for ammunition carried by authorized persons in accordance with Rule 17(E).

**a.**  Conditions of acceptance

  i.  You are limited to a maximum of 11 pounds (5 kg) of ammunition.  No more than one guest's ammunition may be contained in a single bag.

  ii.  All ammunition must be packed in the manufacturer's original packaging or securely packed in a fiber, wood or metal container suitable for travel.  Furthermore, the ammunition inside the container must be protected against shock and secured against movement.

  iii.  All ammunition must be packed separate and apart from any firearm unless the firearm's case has a designated storage space for ammunition that secures it and protects it from shock and movement.

**b.**  Prohibitions

  i.  Loose or "bulk" packaging of ammunition in bags, boxes, or containers is prohibited.

  ii.  Ammunition with explosive or incendiary projectiles is prohibited.

  iii.  Ammunition may not be transported in clips or magazines. This requirement does not apply to law enforcement personnel with proper documentation and US Military personnel on official orders with proper documentation.

NOTE:  Advance arrangements must be made for any Military unit movement involving the transport of ammunition.

2.  **Animals (Live).**  See Rule 10: Service Animals and Support Animals and Rule 19: Acceptance of Dogs, Cats, and Birds for Travel.

3.  **Archery Equipment**.  Archery equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

4.  **Baseball Equipment**.  Baseball equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

5. **Bicycles.**  We will accept non-motorized touring or racing bicycles with single seats and
bicycles with tandem seats upon the following terms and conditions.

   **a.** <u>Conditions of Acceptance</u>.  The following conditions of acceptance apply to bicycles.

      i.   Total weight of the bicycle (including its case) must not exceed 100 pounds (45
           kg).

      ii.  Handlebars must be turned side-ways and protruding pedals must be removed
           unless enclosed in plastic foam other protective materials.

      iii. Bicycles and any bicycle accessories should be enclosed in a cardboard bike box or
           hard-sided case, unless qualifying as a Standard Bag.

      iv.  Any sealed box, hard-sided, or soft-sided case, containing a bicycle, and/or bicycle
           accessories, that has an Outside Linear Dimension greater than 62 inches (157 cm)
           and less than 115 inches (292 cm), is referred to as a "Bicycle Case."

      v.   A liability release form must be signed upon checking in a Bicycle Case

      vi.  Acceptance of a Bicycle Case is subject to space availability and may be further
           conditioned upon aircraft size and load conditions.

      vii. We are not responsible for the ground delivery of any Bicycle Case not
           accommodated on the flight for which it was accepted as checked baggage.

   NOTE:  No Bicycle Case exceeding 72 inches (182 cm) in length will be accepted on a
   flight operated by 'Ohana by Hawaiian.

   **b.** <u>Bicycle Case Charges</u>.  You will be charged a fee for each Bicycle Case, which is in lieu of
   the Standard Bag fee, as follows:

      i.   For ticketed travel between points within the State of Hawaii: $35.00.

      ii.  For ticketed travel between the State of Hawaii and any point not within the State
           of Hawaii: $100.00.

   NOTE: The Bicycle Case fee is payable regardless of whether or not you would have
   incurred a Standard Bag fee.

   NOTE: Any checked baggage containing a bicycle and/or bicycle parts that qualifies as a
   Standard Bag is only subject to the baggage conditions and fees set forth in <u>Sections</u> <u>(A)</u>
   and <u>(B)</u> of this <u>Rule 18</u>.

   **c.** <u>Bicycle Case Charges– Excess Weight</u>.  You will be charged a total per Bicycle Case fee,
   which is in lieu of any other Bicycle Case charges, if your Bicycle Case exceeds 50 pounds
   (22.5 kg) as follows:

      i.   If your Bicycle Case weight is 51 – 70 pounds (23 – 31.5 kg), you will be charged a
           fee as follows:

         a.   Between points within the State of Hawaii: $60.00.

         b.   Between any other points within the USA not wholly within Hawaii: $150.00.

    ii.   If your Bicycle Case weight is 71 - 100 pounds (32 – 45 kg), you will be charged a fee as follows:

        a.   Between points within the State of Hawaii: $120.00.

        b.   Between any other points within the USA not wholly within Hawaii: $250.00.

**6.**   **Boogie Boards and Skim Boards.**  Boogie boards and skim boards will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

**7.**   **Bowling Equipment.**  Bowling equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

**8.**   **Canoe Paddles**.  Canoe paddles will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

**9.**   **Child Restraint Seats, Booster Seats, and Strollers.**  Child restraint seats, booster seats, and strollers will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.  However, for each child traveling with you that uses a child restraint seat, booster seat, and/or stroller, we will allow you to check in one of each such items the child uses, free of charge.

**10.**  **Dry Ice as Checked Baggage.**  The total amount of dry ice that may be carried per guest is 5.5 pounds (2.5 kg), whether as carry-on baggage or checked baggage.  You may carry up to 5.5 pounds (2.5 kg) of dry ice in checked baggage when used to refrigerate perishables subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18, and the following conditions:

    **a.**  you must identify the package to one of our representatives upon your initial check in;

    **b.**  you clearly mark or label the package "Dry Ice" or "Carbon Dioxide Solid" and include the weight of the dry ice; and

    **c.**  the package the dry ice is contained in must allow for the release of gas pressure during transport.

**11.**  **Firearms**.  Firearms will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18, and the following terms and conditions.  Please note that regulations at your origin of travel, any intermediate destination(s) and your final destination may also apply and may impose further requirements or restrictions on your transport of any firearm.  If your firearm is not in compliance with or is prohibited by Government Laws, it may be confiscated or denied acceptance and you may also be subject to criminal and/or civil liability.  All references to "firearms" in this Contract of Carriage include firearm parts.

    **a.**  You must declare all firearms in advance of travel.

    **b.**  You must remove all magazines and clips from all firearms.

    **c.**  All magazines and clips must be empty.  See Rule 18(D)(1)(b)(iii) for an exception for certain law enforcement and Military personnel.

    **d.**  You agree to indemnify Hawaiian for any costs and expenses Hawaiian incurs because of your non-compliance with this Section (D)(11) or any Government Laws relating to the transport of your firearm.

**e.** Firearms must be unloaded and packed in a commercial hard-sided case manufactured specifically for the type of firearm.

**f.** The container must be locked with a key or lock combination which should remain in your possession to prevent unauthorized access to the firearm.

NOTE: ALL FIREARMS MUST BE CHECKED-IN AS BAGGAGE AND TRANSPORTED IN THE BAGGAGE COMPARTMENT OF THE AIRCRAFT, EXCEPT AS MAY BE CARRIED BY AUTHORIZED PERSONS IN ACCORDANCE WITH RULE 17(E).

NOTE: ADVANCE ARRANGEMENTS MUST BE MADE FOR ANY MILITARY UNIT MOVEMENT INVOLVING THE TRANSPORT OF FIREARMS.

**12. Fishing Equipment.** Fishing equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.  We will accept fishing poles up to 115 inches (292 cm) in length on any Hawaiian operated flight as a Standard Bag, subject to any overweight baggage fees, provided they are contained in a PVC, cardboard, or hardcovered case.

NOTE: No fishing poles exceeding 72 inches (182 cm) in length will be accepted on a flight operated by 'Ohana by Hawaiian.

**13. Football Equipment.**  Football equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

**14. Golfing Equipment**.  Golf equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18, and the following terms and conditions:

**a.** We are not liable for, and you will be required to sign a liability release form at the time of check in for, any golfing equipment not contained in a hard-shell case.

**b.** We will waive the oversize baggage fees of Section (B)(3) of this Rule 18 for a golf bag or hard-shell case that exceeds an Outside Linear Dimension of 62 inches (157 cm). However, any golf bag or hard-shell case with an Outside Linear Dimension of more than 115 inches (292 cm) is not allowed.

NOTE: No golf bag or hard-shell case exceeding 72 inches (182 cm) in length will be accepted on a flight operated by 'Ohana by Hawaiian.

**15. Hockey/Lacrosse Equipment.**  Hockey/Lacrosse equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18, and the following terms and conditions:

**a.** We are not liable for, and you will be required to sign a liability release form at the time of check n for, any hockey/lacrosse equipment not packaged in a rigid and/or hard-shell container specifically designed for shipping.

**b.** We will accept any hockey/lacrosse equipment baggage item that includes at least one hockey or lacrosse stick as a Standard Bag provided that the Outside Linear Dimension is not more than 115 inches (292 cm), subject to any overweight baggage fees.

NOTE: No hockey/lacrosse equipment exceeding 72 inches (182 cm) in length will be accepted on a flight operated by 'Ohana by Hawaiian.

**16. Musical Instruments.**  Musical instruments qualifying as a Standard Bag as set forth in Section (B)(1) of this Rule 18 will be accepted accordingly, provided you also meet the conditions of Sections (D)(16)(d) – (f) below of this Rule 18.  For musical instruments not qualifying as a Standard Bag, the following terms and conditions apply.

NOTE: Any (i) separately packaged items and each additional musical instrument and (ii) any other item included with your musical instrument causing your musical instrument to exceed the standard baggage size or weight requirements, will be treated as separate items and will be subject to any applicable baggage fees.

**a.**  The Outside Linear Dimension of the musical instrument (including the case) does not exceed 150 inches (381 cm) or the applicable size restrictions for the aircraft.

**b.**  The weight of the musical instrument (including the case) does not exceed the lesser of (i) 165 pounds (74.5 kg) or (ii) the applicable weight restrictions for the aircraft.

**c.**  Your musical instrument may be subject to a visual inspection for any pre-existing damage.

**d.**  Your musical instrument must be adequately and suitably packed in a bag or other container to protect it from damage.

**e.**  For all string instruments, the strings must be loosened prior to transport.

**f.**  Your additional baggage charges on musical instruments not qualifying as a Standard Bag are as follows:

  i.  Musical instrument is 51-70 pounds (23 – 31.5 kg):

    a.  Between points within the State of Hawaii, the additional overweight baggage fee is $35.00 per overweight piece.

    b.  For Domestic travel that is not wholly within the State of Hawaii, the additional overweight baggage fee is $50.00 per overweight piece.

  ii.  Musical instrument is 71-165 pounds (32 – 74.5 kg):

    a.  Between points within the State of Hawaii, the excess additional overweight baggage fee is $70.00 per overweight piece.

    b.  For Domestic travel that is not wholly within the State of Hawaii, the total additional overweight baggage fee is $200.00 per overweight piece.

  iii.  Musical instrument with an Outside Linear Dimension greater than 62 inches (157 cm), but not exceeding an Outside Linear Dimension of 150 inches (381 cm):

    a.  Between points within the State of Hawaii, the additional oversize baggage fee is $35.00 per oversized piece.

    b.  For Domestic travel that is not wholly within the State of Hawaii, the additional oversize baggage fee is $100.00 for each oversized piece.

**17. Paintball and Airsoft Guns.**  Paintball and airsoft guns will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) above of this Rule 18 and the following terms and conditions.  Please note that regulations at your origin of travel, any intermediate destination(s), and your final destination may also apply and may impose further requirements or restrictions on your transport of any paintball or airsoft guns.  If your paintball

or airsoft gun is not in compliance with or is prohibited by Government Laws, it may be denied acceptance, or confiscated, and you may also be subject to criminal and/or civil liability.

    **a.** You must declare all paintball and airsoft guns and parts in advance of travel.

    **b.** You agree to indemnify Hawaiian for any costs and expenses Hawaiian incurs because of your non-compliance with this <u>Section (D)(17)</u> or any Government Laws relating to the transport of any paintball and airsoft guns.

    **c.** CO2 or other gas tank must be removed and must be empty.

    **d.** Barrel and hopper must be removed.

    **e.** Hopper or magazine, as applicable must be empty.

    **f.** Paintball or airsoft gun must be placed inside a case suitable for travel.

**18. Scuba Diving Equipment.**  Scuba diving equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in <u>Sections</u> <u>(A)</u> and <u>(B)</u> of this <u>Rule 18</u> and the following terms and conditions:

    **a.** You must notify and make available for inspection by Hawaiian personnel any tanks you intend to check through as baggage.

    **b.** The regulator valve must be completely disconnected from any tank and the tank must be open and not sealed (i.e. has an open end) that allows for a visual inspection of the empty tank.  No sealed tank or any tank with an attached regulator will be permitted, regardless of any pressure gauge reading.

**19. Skateboards.**  Skateboards will be accepted as checked baggage subject to the baggage conditions and fees set forth in <u>Sections</u> <u>(A)</u> and <u>(B)</u> of this <u>Rule 18</u>.

**20. Skiing Equipment.**  Skiing equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in <u>Sections</u> <u>(A)</u> and <u>(B)</u> of this <u>Rule 18</u>, and the following terms and conditions:

    **a.** We are not liable for, and you will be required to sign a liability release form at the time of check in for, any skiing equipment not packaged in a rigid and/or hard-shell container specifically designed for shipping.

    **b.** We will accept any skiing equipment baggage item that includes a pair of skis as a Standard Bag provided that the Outside Linear Dimension is not more than 115 inches (292 cm), subject to any overweight baggage fees.

NOTE: No skiing equipment exceeding 72 inches (182 cm) in length will be accepted on a flight operated by ʻOhana by Hawaiian.

**21. Snowboard Equipment**.  Snowboard equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in <u>Sections</u> <u>(A)</u> and <u>(B)</u> of this <u>Rule 18</u>. For any Snowboard that exceeding 72 inches (182 cm) in length, <u>Section (D)(22)</u> below of this <u>Rule 18</u> applies.

**22. Surfboards, Kiteboards, Paddleboards, and Wakeboards.**  We will accept surfboards, kiteboards, paddleboards, and wakeboards upon the following terms and conditions**.**  When packaged together, one "Board Item" will count as one bag containing one or more surfboards, kiteboards, paddleboards, and/or wakeboards, and reasonable packing

materials to prevent board damage.  Each Board Item is subject to the additional terms and conditions stated below.

NOTE: Any separately packaged items and each additional piece of equipment or other item included with your Board Item will be treated as a separate item and will be subject to any applicable baggage fees.

**a.** Conditions of acceptance.

    i.    We will not accept any Board Item weighing more than 50 pounds (22.5 kg).

    ii.    We will not accept any Board Item greater 115 inches (292 cm) in length.

    iii.    Your board(s) may be subject to a visual inspection for any pre-existing damage.

    iv.    Your board(s) must be adequately and suitably packed in a bag or other container to protect your board(s) from damage.

    v.    Board fin(s) must be removed or well-padded and protected from damage or from causing damage to other bags.

    vi.    Transportation is subject to space availability and you agree that Hawaiian is not liable for any such delays, nor for ground delivery of your Board Item at your destination, resulting from Hawaiian being unable to accommodate your Board Item on the flight for which it was accepted as checked baggage.

**b.** Fees.  You will incur the following baggage charges on each Board Item in lieu of the baggage fees set forth in Section (B) of this Rule 18:

    i.    Between points within the State of Hawaii: $35.00 per Board Item.

    ii.    Between any other points within the USA not wholly within Hawaii: $100.00 per Board Item.

NOTE: No Board Item exceeding 72 inches (182 cm) in length will be accepted on a flight operated by 'Ohana by Hawaiian.

**23. Tennis Equipment.**  Tennis equipment will be accepted as checked baggage subject to the baggage conditions and fees set forth in Sections (A) and (B) of this Rule 18.

**24. Windsurfing Equipment.**  We will accept windsurfing equipment upon the following terms and conditions.  When packaged together, one "Windsurfing Item" will count as one bag containing up to one (1) windsurfing board with a boom, one (1) mast and sail, or any one (1) portion of the windsurfing equipment as defined above.

NOTE: Any separately packaged items and each additional piece of equipment or other item included with your Board Item will be treated as a separate item and will be subject to any applicable baggage fees.

**a.** Conditions of acceptance.

    i.    We will not accept any Windsurfing Item weighing more than 100 pounds (45 kg).

    ii.    We will not accept any Windsurfing Item greater 115 inches (292 cm) in length.

    iii.    Your equipment may be subject to a visual inspection for any pre-existing damage.

    iv.    Your equipment must be adequately and suitably packed in a bag or other container to protect it from damage.

     v.     Board fin(s) must be removed or well-padded and protected from damage or from causing damage to other bags.

     vi.     Transportation is subject to space availability and you agree that Hawaiian is not liable for any such delays, nor for ground delivery of your Windsurfing Item at your destination, resulting from Hawaiian being unable to accommodate your Windsurfing Item on the flight for which it was accepted as checked baggage.

**b.**   Fees. You will incur the following additional baggage charges on each Windsurfing Item in addition to any baggage allowance fees set forth in Section (B) of this Rule 18:

     i.     Between points within the State of Hawaii: $35.00 per Windsurfing Item.

     ii.     Between any other points within the USA not wholly within Hawaii: $100.00 per Windsurfing Item.

NOTE: No Windsurfing Item exceeding 72 inches (182 cm) in length will be accepted on a flight operated by 'Ohana by Hawaiian.

**E.**  **FRAGILE, PERISHABLE, AND OTHER SPECIAL ITEMS.** We may accept your fragile, perishable, and other special items including, but not limited to those in Rule 20(B)(1)(k). All such items accepted, with or without our knowledge, are excluded from all liability for loss, damage to, or delay in delivery pursuant to Rule 20(B)(1)(k). Notwithstanding that these items are excluded from liability, you represent that each such item is appropriately packaged for transport as baggage and, in the case of any fragile item, is (i) in an original factory sealed carton, cardboard mailing tube, or container or case designed for shipping the fragile items, or packed with protective internal material and (ii) the factory sealed carton, cardboard mailing tube, container, case, or packaging materials provides adequate protection to the fragile items.

**F.**  **RESTRICTED ITEMS.** We reserve the right to refuse transport of any items or property (whether carried in the cabin or as checked baggage) that we, in our sole judgment or discretion, determine to be (i) potentially hazardous to the safety, security, and comfort of any guests, crew, or others, (ii) a risk to other baggage or cargo, (iii) capable of causing interference with equipment or other assets, or (vi) otherwise unsuitable for transport.

**1.**   **Regulatory restrictions**. We will not accept as checked baggage or carry-on baggage, and you are prohibited from checking-in or carrying aboard, any article which is listed in the DOT hazardous materials regulations (49 CFR 171-177), the International Civil Aviation Organization Technical Instruction for the Safe Transport of Dangerous Goods by air, and/or the IATA Dangerous Goods Regulations (See Section (D)(10) of this Rule 18 for exception for dry ice). In addition, we will not accept, and you are prohibited from providing, any item for carriage either as a carry-on baggage or as checked baggage that may be deemed unacceptable by TSA , DOT, FAA or any government agency or that may be in violation of any Government Law.

NOTE: Some items that are restricted from checked baggage and carry-on baggage may be transported via our cargo operations, subject to any legal, regulatory, or other restrictions. Please check separately with our cargo department for more information at https://www.hawaiianaircargo.com/ or by calling us at 1-877-HA-CARGO (422-2746).

2. **Representative List of Restricted Items**.  Common items used every day may seem harmless.  However, when transported in an aircraft, they can become dangerous or noxious.  Below are examples of restricted hazardous items that are strictly prohibited in both checked baggage and carry-on baggage, unless an exception is stated.  Please note that this list is not meant to be a complete and comprehensive list of restricted items.  Even if an item is not listed below, it may still be hazardous and may be restricted from transport by Hawaiian.

    **a.** <u>Items that interfere with avionics and other equipment, such as:</u>

        i.   Powerful magnetized materials are prohibited.

        ii.   Swingless golf clubs are prohibited.

    **b.** <u>Flammable or combustible items, such as:</u>

        i.   Camping stoves and heating devices (new, used, cleaned, purged) are prohibited.

        ii.   Cannisters for fuel (new, used, cleaned, purged) are prohibited.

        iii.   Canned compressed gasses (e.g., oxygen) are prohibited.

        iv.   Fire dance apparatuses (new, used, cleaned, purged) are prohibited.

        v.   Explosives, munitions, fireworks, and flares are prohibited.

        vi.   Gas, flammable liquid, or fuel of any kind (e.g., lighters, heating fuels, lighter refills, and lighter fluid) are prohibited.

            a.   Exception 1: One common lighter (butane or absorbed liquid) OR one book of safety matches may be carried in the aircraft cabin without special packaging.

            b.   Exception 2: Up to two fueled lighters are permitted in checked baggage if properly packaged in special DOT-approved containers.

        vii.   Flammable solids (e.g., strike-anywhere matches, Sterno, and articles which are easily ignited) are prohibited.

            a.   Exception 1: One common lighter (butane or absorbed liquid) OR one book of safety matches may be carried in the aircraft cabin without special packaging.

        viii.   Substances which on contact with water emit flammable gases are prohibited.

        ix.   Any internal combustion engines (e.g., gas-powered chainsaws, weed-eaters, blowers, and similar items) are prohibited.

        x.   Engine or car parts that may be deemed flammable, combustible, or explosive are prohibited.

        xi.   Powder-actuated cartridges are prohibited.

        xii.   Individual self-heating pouches, packs, or containers (e.g., MREs/Meals Ready to Eat, food heating pouches, self-heating hand/toe warmers, self-heating beverage containers, flameless meal products such as HeaterMeals, etc.) are prohibited.

    **c.** <u>Electronics including drones that are lithium or lithium-ion battery operated</u>.  Lithium and lithium-ion batteries can overheat and ignite or explode.  Electronics that are lithium or lithium-ion battery operated and exceed the regulatory limits are prohibited,

other than for (i) certain permitted assistive devices like electric wheelchairs and (ii) certain other items pursuant to an exception stated below.  The following are some common examples of prohibited and non-prohibited items and permitted exceptions:

i.  Lithium Drones are permitted if all power sources are removed and packed as stated in of Sections (F)(2)(c)(vi)(a) - (vi)(c) below of this Rule 18 and do not exceed regulatory limits.

ii.  E-cigarettes or electronic smoking devices are prohibited in checked baggage.

Exception: Electronic smoking devices shall only be permitted in the guest's carry-on baggage.

iii.  Tasers and other electroshock weapons are prohibited, unless carried onboard the aircraft by law enforcement personnel who have met the requirements of Rule 17(E).

iv.  Hoverboards – two-wheeled, self-balancing personal transporter scooters are prohibited.

v.  Smart Bags.

a.  Check In Baggage: Smart bags are accepted as checked baggage if the battery is removable.  The battery must be removed prior to check in.  The detached battery, must be carried in the cabin, and must have its terminals isolated to prevent a short circuit.

b.  Carry-On Baggage: Smart bags are accepted as carry-on baggage if the battery is removable.  Smart bags featuring removable batteries may be carried on and stored in the overhead bin provided that they remain turned off for the duration of the flight.

vi.  Spare lithium and lithium-ion batteries must be transported in carry-on baggage only and must be packed as follows:

a.  Each guest is permitted to carry-on two (2) spare batteries, not to exceed regulatory limits.

b.  Spare batteries must be kept away from metal objects, such as coins, keys, and jewelry.

c.  Spare batteries should be kept in original retail packaging.  If original packaging is not available, tape should be placed across battery terminals, or each battery should be placed in its own individual plastic bag or protective pouch.

**d.**  Toxic Gases or Biohazardous Materials.

i.  Mercury or oxidizing substances are prohibited.

ii.  Self-defense spray including but not limited to pepper spray and mace are prohibited.

iii.  Vaccines are generally prohibited without prior approval by Hawaiian.  For the safety of our employees and guests, we may evaluate multiple elements before approving any specific vaccine for transport, including, for example, (i) the vaccine component itself, (ii) the adequacy of any packaging and (iii) the quantity of any

dry-ice necessary for transport, if applicable. Notwithstanding this general prohibition, U.S. Government-approved COVID-19 vaccines may be carried on board our aircraft, provided, however, that the vaccines are properly identified, adequately packaged and do not otherwise violate any other terms and conditions of this Domestic Contract of Carriage

iv. Substances which on contact with water emit toxic or noxious gases are prohibited.

**e.** Corrosive or Noxious Materials.

i. Any item that may be a corrosive substance or, in the opinion of HA, may cause damage to the aircraft is prohibited.

ii. Acids, alkalis, and wet cell batteries are prohibited except as provided in Rule 9: Wheelchairs and Other Assistive Devices.

iii. Salt water samples and/or any specimens contained or transported in salt water are prohibited.

iv. Paints - any water or oil based paints, except for small tubes for individual use are prohibited.

v. Fermented fish sauces of all types regardless of packaging are prohibited.

vi. Nail polish and remover, except for small quantities for individual use, are prohibited.

**f.** Miscellaneous Prohibited Items.

i. Briefcases and attaché cases installed with alarm devices are prohibited.

ii. Styrofoam containers (unless packed inside an outer container or box) are prohibited.

iii. Spare light bulbs except those that are energy efficient and in retail packaging sufficient to prevent breakage and intended for personal or home use are prohibited.

iv. LED decorative lights are prohibited unless they are (i) sufficiently packaged to prevent breakage and (ii) not attached to any flammable item or power source.

v. Tires meant for road, recreational, or terrain vehicles, are prohibited.  Standard bicycle tires are not prohibited.

vi. Wet ice except if in sealable drink containers carried on board the aircraft for immediate consumption is prohibited.


**RULE 19: ACCEPTANCE OF DOGS, CATS, AND HOUSEHOLD BIRDS FOR TRAVEL**

**IMPORTANT NOTE:  This Rule 19 does not apply to the transportation of Service Animals, nor to animals transported as cargo.  For Service Animals, please see Rule 10: Service Animals of this**

**Contract of Carriage.  For cargo arrangements, please visit our cargo page at: www.hawaiianaircargo.com, or call us at 1-877-HA-CARGO (422-2746).**

This Rule 19 applies to dogs, cats, and household birds only.  For purposes of this Rule 19, the use of the word "pet," or "pets," refers only to dogs, cats and household birds.

YOU ASSUME FULL FINANCIAL AND OTHER RESPONSIBILITY FOR COMPLIANCE WITH THIS RULE 19 AND ALL GOVERNMENTAL REQUIREMENTS, REGULATIONS, OR RESTRICTIONS, INCLUDING ENTRY PERMITS AND REQUIRED HEALTH CERTIFICATES FOR YOUR ANIMALS.  IF YOU FAIL TO MEET THE REQUIREMENTS OF ANY GOVERNING JURISDICTION, YOUR ANIMAL MAY BE DENIED TRANSPORT.  YOU AGREE TO REIMBURSE US FOR ANY COSTS AND EXPENSES, LOSSES, OR DAMAGES INCURRED THAT: (1) RESULT FROM YOUR FAILURE TO COMPLY WITH THIS RULE 19 INCLUDING, BUT NOT LIMITED TO, BOARDING FEES, ADDITIONAL TRANSPORT FEES, VETERINARIAN COSTS, AND ANY OTHER RELATED SERVICE EXPENSES; (2) RELATE TO ANY CHANGE IN TRAVEL PLANS, INCLUDING A CHANGE IN SEATING ACCOMODATIONS, CHANGE OF AIRCRAFT, CANCELLATION OF TRAVEL, ALTERNATIVE TRAVEL ARRANGEMENTS, OR OTHERWISE AS A RESULT OF OR RELATING TO YOUR ANIMAL BEING REMOVED FROM A FLIGHT OR NOT ACCEPTED FOR TRAVEL IN ACCORDANCE WITH THIS RULE 19; AND (3) RESULT FROM THE BEHAVIOR OF YOUR ANIMAL, INCLUDING ANY DAMAGE AND HARM TO ANY PERSON OR PROPERTY.

We recommend that you provide us with advance notification of your intent to travel with your dog, cat or bird by calling us at 1-800-367-5320 or by emailing us using our Ask a Question page located at https://www.hawaiianairlines.com/contact-us/email/general-questions.

A. **GENERAL CONDITIONS OF TRAVEL FOR ALL DOGS, CATS, AND HOUSEHOLD BIRDS ONLY.**  We will not accept poultry (including but not limited to chickens, ducks, pigeons, etc.) wild birds (including but not limited to peacocks, falcons, etc.)  ferrets, rodents (i.e., guinea pigs, mice, rats, etc.), spiders, mosquitoes, reptiles (i.e., snakes, turtles, etc.), or live fish for transportation as carry-on baggage or checked baggage under any circumstances.

For us to accept your dog, cat, or household bird (also referred to as "pet" or "pets"), you must be a ticketed guest traveling on the same flight as your pet(s) and satisfy all the required terms and conditions of this Rule 19.  For pets needing travel that do not meet the requirements for of this Rule 19, and for any other types of animals, please see our cargo page at: www.hawaiianaircargo.com, or call us at 1-877-HA-CARGO (422-2746) to make other arrangements.

The purpose of this Rule 19 is to ensure the safety and security of our guests and crew, and the well-being of your pets.  We strongly recommend that you read and understand all the provisions of this Rule 19 before attempting to travel with any pets.

You must satisfy all the general conditions of this Section (A) below to travel with your pet(s).

NOTE:  WE WILL NOT TRANSPORT ANY PET TO OR FROM NEW YORK, MASSACHUSETTS, FLORIDA, TEXAS, OR AMERICAN SAMOA OTHER THAN THROUGH OUR CARGO SERVICES.  PLEASE SEE OUR CARGO CONTACT INFORMATION ABOVE.

1. **We Must Have Space Available**.  We will only accept a limited number of kennels per flight in the aircraft cabin or baggage compartment.  We recommend that you notify us in advance if you plan to travel with your pet(s) so that we can confirm that space on the aircraft is available for your pet(s).

2. **No Dogs or Cats Less Than 8 Weeks Old; No Household Birds Less Than 2 Weeks Old.**  We will not accept any dog or cat less than eight (8) weeks old and any household bird less than two (2) weeks old, and we reserve the right to require documentation from your veterinarian that your pet(s) meets the stated requirements.

3. **No Interline Transfers.**  Live animals will not be accepted for interline transfer to or from any other airline.  We will only accept pets for travel on our flights when: (i) you check in at one of our ticket counters; (ii) you do not have a connecting flight operated by another carrier, and (iii) you satisfy all of the applicable requirements stated in this <u>Rule 19</u>.

4. **You Have an Approved Kennel.**  In addition to meeting any other kennel requirements set forth in this <u>Rule 19</u>, your kennel must also meet the requirements of (i) the United States Department of Agriculture Animal Welfare Act (AWA) which can be found at <u>https://www.nal.usda.gov/awic/animal-welfare-act</u> and (ii) the United States Department of Agriculture (USDA) Animal and Plant Inspection Service which can be found at <u>https://www.aphis.usda.gov/aphis/pet-travel</u>.

5. **You Obtained an Animal Heath Certificate (Except for Interisland Travel).**  You must provide us with a copy of an animal health certificate for each pet traveling to or from the State of Hawaii dated not earlier than fourteen (14) days prior to arrival at your destination. The animal health certificate must be from a licensed veterinarian and indicate that the designated animal is healthy enough for the intended travel.

6. **You Comply With Any Applicable Special Rules.**  There are special rules applicable to travel to and/or from specific states.  You are responsible for ensuring that your pet meets all applicable state specific requirements.

7. **You Satisfy the State of Hawaii Restrictions for Any Animals Arriving in Hawaii.**  The State of Hawaii has strict laws regarding the import of animals.  Some animals that may be allowed in other states may be restricted or prohibited in Hawaii.  PLEASE NOTE THAT YOU ARE SOLELY RESPONSIBLE FOR UNDERSTANDING AND COMPLYING WITH STATE OF HAWAII REQUIREMENTS.  If you are considering bringing your pet to Hawaii, you should contact the State of Hawaii Animal Industry Division – Animal Quarantine Branch at <u>http://hdoa.hawaii.gov/ai/aqs/animal-quarantine-information-page/</u> as soon as possible to make sure that your animal meets their requirements for entry into the state.  Because of all the necessary procedures, the process must generally begin months in advance of travel to Hawaii.

   a. <u>Special Rules for travel from North America direct to Neighbor Islands</u>:  A Neighbor Island Inspection Permit issued by the State of Hawaii Industry Division is required for cats and dogstraveling from North America direct to OGG, LIH, or KOA.  If you do not have the required document, your pet will not be allowed to travel. Household birds are not permitted to travel directly into OGG, LIH, or KOA

   b. <u>Dogs and Cats</u>:  Dogs and cats may be quarantined for up to 120 days upon arrival in the State of Hawaii unless they meet all the State's 5-Day-Or-Less program requirements, which include certain pet vaccinations, a blood test, and waiting periods.  A Neighbor Island Inspection Permit issued by the State of Hawaii Industry Division must be shown

to the airline and is required to fly a cat or dog directly to an approved neighbor island airport from the Continental USA and Alaska.

**c.**   Household Birds: Most bird species, require two (2) permits – a Plant Quarantine Import Permit AND a Poultry and Bird Permit from the Livestock Disease Control Branch. Furthermore, many bird species are prohibited from entry into the State of Hawaii or may only enter under specific conditions.  Household Birds are also not permitted to travel directly into (i) Kahului, Maui, (ii) Lihue, Kauai, and (iii) Kailua-Kona, Hawaii, on a State of Hawaii Direct Entry Permit.

**B.   TRAVEL IN THE AIRCRAFT CABIN (DOGS AND CATS ONLY).  HOUSEHOLD BIRDS ARE NOT ALLOWED.**  We may accept small dogs and cats only as pets for travel in the main cabin of our aircraft if you meet all the applicable requirements this Section (B).  Any dog or cat that does not meet the requirements of this Section (B) may be checked for travel in the baggage compartment of our aircraft upon meeting all the requirements of Section (C) below of this Rule 19.  Any animal not meeting the applicable requirements of Section (B) or Section (C) of this Rule 19 will be refused transport.  We will not accept any birds for travel in the aircraft cabin.

YOU ASSUME FULL RESPONSIBILITY FOR THE SAFETY, WELL-BEING, AND CONDUCT OF YOUR DOG OR CAT, INCLUDING THE INTERACTION OF YOUR DOG OR CAT WITH OTHER GUESTS WHILE ON BOARD THE AIRCRAFT.

**1.   You satisfy all the General Conditions.**  No dog or cat will be accepted for travel in the cabin of our aircraft unless you satisfy all the conditions of Section (A) above of this Rule 19.

**2.   Special Rules for Cabin Travel from North America to Hawaii.**  The State of Hawaii has very stringent import restrictions that apply to live animals.  Hawaii is the only state that remains rabies free.  To ensure that each pet brought to Hawaii is properly screened by the State of Hawaii Animal Industry Division – Animal Quarantine Branch ("HNL Quarantine"), you must wait to deplane until you are met by one of our guest services agents on arrival in Hawaii and be escorted to be inspected by the Hawaii Department of Agriculture.  Pets traveling in the aircraft cabin on any flights from North America to HNL that arrive at HNL Quarantine after 4:30 PM HST may not be released by HNL Quarantine on the same day and may be required to remain at HNL Quarantine overnight.  We do not accept pets for travel in the aircraft cabin for any flights from New York, Massachusetts, Florida and Texas.

**3.   You Provide an Acceptable Kennel.**  A kennel is required for cabin travel, and it must:

**a.**   be soft-sided and leak proof;

**b.**   be large enough to allow the animal(s) to sit, stand upright, turn around, and lie down in a natural position.

**c.**   be no larger than 16 inches (40 cm) long by 10 inches (25 cm) wide by 9.5 inches (24 cm) tall; and

**d.**   be in proper working condition to safely secure the animal(s) in a manner that ensures that the animal will remain in the carrier for the duration of the flight (i.e., animal will not be able to escape).

NOTE: NO MORE THAN (I) ONE (1) MATURE DOG OR CAT, OR (II) TWO (2) PUPPIES OR KITTENS OF THE SAME BREED OR LITTER MAY OCCUPY A SINGLE KENNEL; PROVIDED, HOWEVER, THAT THE TOTAL WEIGHT, INCLUDING THE KENNEL, DOES NOT EXCEED 25

POUNDS (11 KG).  WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO DETERMINE WHETHER THE KENNEL IS ACCEPTABLE FOR TRAVEL.

4.  **You Pay the Required Kennel Fee and Do Not Exceed the Carry-On Limit.**  You must pay the applicable kennel fee to transport your dog or cat in the cabin.  Upon payment of the kennel fee, you are allowed one (1) kennel in addition to your one (1) carry-on bag and one (1) personal item.  The kennel fee is as follows:

   a.  Travel within the State of Hawaii:                     $35.00.

   b.  Travel between the State of Hawaii and North America:  $125.00.

5.  **No Offensive or Disruptive Behavior.**  We will refuse to accept, and may remove from any flight, any dog or cat that is offensive or disruptive.  The decision on whether a dog or cat is offensive or disruptive shall be in our sole discretion based on one or more factors, which may include, for example:

   a.  the displays of certain behaviors or traits such as excessive barking (for dogs only);

   b.  emitting strong odors;

   c.  aggressiveness;

   d.  growling or hissing; and

   e.  failure to be housebroken.

6.  **Special Seating Requirements.**  The following rules apply to seating:

   a.  No pets are permitted in:

      i.   the first-class section of the aircraft (except for interisland travel);

      ii.  the bulkhead rows;

      iii. the emergency exit rows; and

      iv.  and any other seating location that in our sole discretion may pose a safety risk.

   b.  You must stow your kennel under the seat directly in front of you.

   c.  Your animal(s) must remain in its kennel at all times while in the boarding area and any airport lounge, during boarding and deplaning, and always while on board the aircraft.

C.  **TRAVEL IN THE AIRCRAFT BAGGAGE COMPARTMENT (DOGS, CATS, AND HOUSEHOLD BIRDS).**  We may accept dogs, cats, and household birds for travel in the baggage compartment of our aircraft if you meet all the requirements of this Section (C).  For flights arriving in Honolulu, Hawaii, we will transport your pet upon arrival from baggage to the Airport Animal Quarantine Holding Facility, where you will pick-up your pet after it has been inspected.  You are responsible for understanding their hours of operation, any fees, inspection and release procedures, and any other rules applicable to animals entering the State of Hawaii.

1.  **You satisfy all the General Conditions.**  No dog, cat, or household bird will be accepted for travel in the baggage compartment of our aircraft unless you satisfy all the conditions of Section (A). above of this Rule 19.

2.  **We Have Space Available.**  For the safety of your animals, we are limited to transporting three (3) kennels in the baggage compartment of any flight operated by Hawaiian.  Space is booked on a first-come first-served basis.

3. **No Pets accepted for travel to or from New York, Massachusetts, Florida, Texas and American Samoa.**  We will not transport any pet to or from New York, Massachusetts, Florida, Texas and American Samoa other than through our cargo services.

4. **No Animals in the Baggage Compartment from April 15 Through October 15 for Select Cities.**  We will not accept any animals in the baggage compartment of our aircraft from April 15 through October 15 for travel to or from the following cities:

   a. San Jose, California (SJC);

   b. Sacramento, California (SMF);

   c. Las Vegas, Nevada (LAS); and

   d. Phoenix, Arizona (PHX).

5. **You Sign a Liability Release.**

   a. <u>All animals</u>.  We require that you sign our general liability release form prior to accepting your pet for transport in the baggage compartment of our aircraft.

   b. <u>Snub Nose/Short Nose Pets.</u>  For any snub nose/short nose dog or cat, you: (1) acknowledge our warning regarding the risk to the snub nosed/short nosed animal(s); (2) release us from all liability resulting from the transportation of your snub nosed/short nosed animal(s); and (3) agree not to file any claim with us relating to the transportation of your snub nosed/short nosed animal(s).  Snub nose/short nose pets have been shown to suffer severe respiratory difficulties either in transit, or because of Hawaii's tropical climate.  Thus, we discourage the transport of these animals if they cannot be transported in the cabin of the aircraft.

6. **You Provide an Acceptable Kennel.**  A kennel is required for any animal traveling in the baggage compartment of our aircraft.  The kennel must:

   a. be non-folding and non-collapsible;

   b. be hard-sided (e.g., wood, metal, or a material of comparable strength), leak-proof, designed to prevent escape, and have adequate handholds to enable lifting the kennel without coming into contact with the animal;

   c. be in a proper working condition that will safely secure the animal in a manner that ensures that the animal will remain in the carrier while in our possession and for the duration of the flight (i.e., animal will not be able to escape);

   d. be large enough to allow the animal to sit, stand upright, turn, and lie down in a natural position;

   e. not exceed 36"L x 25"W x 27"H; and

   f. for any flights between the Continental USA and Hawaii, have two dishes (one for food and one for water) attached to the inside of the kennel which are accessible from the outside of the kennel, so they can be filled from outside the kennel without opening the kennel door.  Note, however, **household** birds are unable to be fed or provided with water from outside the kennel when a mosquito net is required per State of Hawaii Animal Industry Division rules and regulation.

NOTE: NO MORE THAN: (A) ONE (1) MATURE DOG OR CAT, (B) TWO (2) PUPPIES OR KITTENS OF THE SAME LITTER OR BREED NOT MORE THAN SIX (6) MONTHS OLD, OR (C) TWO

HOUSEHOLD BIRDS, OF THE SAME SPECIES MAY OCCUPY A SINGLE KENNEL; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE TOTAL WEIGHT, INCLUDING THE KENNEL, DOES NOT EXCEED 70 POUNDS (31.5 KG), AND THE WEIGHT OF ANY ANIMAL(S) CARRIED IN THE KENNEL DOES NOT EXCEED THE MAXIMUM WEIGHT RECOMMENDED BY THE MANUFACTURER OF THE KENNEL.  WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO DETERMINE WHETHER THE KENNEL IS ACCEPTABLE FOR TRAVEL.

7. **You Pay the Required Kennel Fee.**  You must pay the applicable kennel fee to transport your pets in the baggage compartment.  The fee per kennel is as follows:

    **a.**  Travel within the State of Hawaii:                                  $ 60.00.

    **b.**  Travel from North America to Hawaii:                          $225.00.

    **c.**  Travel from the State of Hawaii to North America:        $225.00.

8. **The Environmental Conditions Are Adequate.**  We will not accept animals for travel in the baggage compartment of our aircraft, if we determine, in our sole discretion, that current environmental conditions may pose a hazard to the safety or comfort of the animal.  In making our determination, we may consider, for example, the following maximum and minimum temperature conditions:

    **a.**  <u>Maximum Temperature</u> – Whether the local temperature at the origin, destination, or connecting airport is, or is expected to be, above 85F/29C, determined at the time you present your animal for travel.

    **b.**  <u>Minimum Temperature</u> - Whether the local temperature at the origin, destination, or connecting airport is, or is expected to be, below 45F/7C, determined at the time you present your animal for travel.  If the temperature at any location is, or is expected to be, below 45F/7C, we may take into consideration an acclimation certificate issued and signed by a licensed veterinarian and dated within ten (10) days of travel stating the minimum temperature at which the animal may travel safely.  Animals will never be accepted to/from any Continental USA destination if the temperature is, or is expected to be, less than 20F/-7C at any point during transport.

    IF WE ARE UNABLE TO ACCEPT AN ANIMAL DUE TO ENVIRONMENTAL CONDITIONS, YOU MAY REBOOK TO THE NEXT AVAILABLE FLIGHT THAT HAS SPACE AVAILABLE FOR YOU AND YOUR ANIMAL, SUBJECT TO SATISFACTORY ENVIRONMENTAL CONDITIONS.  ANY APPLICABLE FARE DIFFERENCES OR DATE CHANGE PENALTIES WILL BE WAIVED, PROVIDED THAT ANY TRAVEL IS REBOOKED TO THE SAME CLASS OF SERVICE AS ORIGINALLY TICKETED.

9. **Special Additional Rules for Household Birds Only**

    **a.**  Certain species of birds are considered "injurious bird species" and require a permit from Hawaii's Division of Forestry and Wildlife (DOFAW) prior to travel.  It is your responsibility to comply with any DOFAW rules and regulations, and to obtain any necessary permits for travel.

    **b.**  Household Birds traveling on interisland flights must be inspected by the Hawaii Department of Agriculture prior to being accepted by Hawaiian for travel.

    **c.**  In certain cases, a mosquito net is required per State of Hawaii Animal Industry Division rules and regulations.  You are responsible for complying with these rules and regulations.

    **d.**  We will not accept any household birds for travel to and from Phoenix, Arizona.

**RULE 20:  LIABILITY AND CLAIMS**

    **A.**  **GENERAL RULES REGARDING OUR LIABILITY.**

        **1.**  **Sole Negligence and Willful Misconduct Only**.  We are not liable to you for (i) personal injury or death; (ii) damage, loss or delay, of any baggage or goods; and (iii) any other damages of any kind, (collectively "damages") arising out of or because of any flight or other services we provided, unless the damages are proven to have been caused by Hawaiian's sole negligence or willful misconduct and you have not been contributorily negligent.

        **2.**  **Applicable Laws and Regulations**.  We are not liable to you for any damage arising out of our compliance with any laws, government regulations, orders, rules, requirements, or security directives, or because of your failure to comply with, or your reliance on us with respect to, any laws, government regulations, orders, rules, requirements, or security directives.

        **3.**  **Compensatory, Consequential, and Punitive Damages**.  We are not liable to you for any compensatory, consequential, or punitive damages arising out of or because of any flight or other services we provided, whether or not we had knowledge that such damages might occur.

        **4.**  **Our Agents and Representatives**.  Any limitations or exclusions of liability of Hawaiian shall apply to and be for the benefit of our agents, employees, vendors, and representatives acting within the scope of their employment, and to any person whose aircraft we use, and its agents, employees, or representatives acting within the scope of their employment.

    **B.**  **SPECIFIC LIABILITY LIMITATIONS AND EXCLUSIONS.**

        **1.**  **Checked Baggage.**  These additional limitations on liability and notice requirements apply to checked baggage:

            **a.**  <u>Maximum Liability</u>.  Our liability for the loss of, damage to, or delay in delivery of your baggage, when it has been checked with us, is limited to $3,800 per ticketed guest, except as provided in <u>Section (B)(2)</u> below of this <u>Rule 20</u>.  You are responsible for documenting and proving the actual value of any loss.  Any reimbursement will be limited the actual loss for which you provide documented proof acceptable to us, less the value of any items which are excludable as stated below (the total amount of reimbursement sought by you for any alleged loss is referred to as your "Claim"). If your bag is delayed, we will pay reasonable expenses you incur while you wait for the delayed bag, **e.g., the purchase of toiletries and a change of underwear.  We** require that you submit a claim and provide documentation such as sales receipts to back up the claims in order to be compensated.  If your bag has not been returned to you within seven (7) days, we will treat it as a lost bag.

            **b.**  <u>Special Rules for Checked Baggage When Travel Includes Other Carriers</u>.  When transportation is on one or more carriers with a liability limitation not exceeding $3,800 for each fare-paying guest and the responsibility for any loss, damage, or delay in the delivery of baggage cannot be determined, the liability limitation of $3,800 for any ticketed guest is the total amount that will be applied across all carriers.  When

transportation is on Hawaiian and one or more carriers, we are not liable to you for any items in your baggage that the other carriers exclude in their rules from liability.

**c.** Required Notices.  In the case of loss of, damage to, or delay in delivery of any of your checked baggage:

    I.    You must submit a preliminary notice of your Claim to us within four hours after the arrival of the flight on which the baggage or personal property was transported, or should have been, transported.  The date of that flight's arrival is referred to as the "Claim Date."

    II.    You must also deliver to the attention of Hawaiian Corporate Offices at P.O. Box 30008, Honolulu, HI  96820, a written itemization of your Claim and the facts and circumstances that give rise to your Claim within thirty (30) days of the Claim Date.

    III.    You must have initiated any legal action with respect to your Claim within one (1) year following the Claim Date if we have not otherwise fully settled it.

NOTE: In the event you fail to meet any of the above deadlines with respect to your Claim (absent extraordinary circumstances to be determined in our sole discretion), you waive any rights to that Claim against Hawaiian.

**d.** Baggage Retrieval.  When, at your request, we voluntarily retrieve your baggage at the baggage claim area following your flight on a separate Ticket with a different air carrier and transport that baggage to your ultimate destination, because you did not claim the baggage from the first air carrier and recheck your baggage with us to your final destination.  In this case, any alleged Claim shall instead be governed by the Release, Waiver, Indemnification and Hold Harmless Agreement you will be asked to sign, and which you are otherwise deemed to have agreed to be bound once we have retrieved your baggage.

**e.** Inherent Defect, Poor Quality, or Unsuitability.  We are not liable for the destruction, loss, or damage of any baggage caused by its inherent defect, poor quality, or unsuitability of such item(s) as checked baggage and/or the inadequacy of its packaging.

**f.** Perishable Items.  We are not liable for any loss of, damage to contents, or delay in the delivery of any perishable item(s).

**g.** Fair Wear and Tear and Ordinary Handling.  We are not liable for any damage arising from the fair wear and tear and ordinary handling of your baggage that results in scratches, scuffs, punctures, dents, stains and marks, and minor cuts, for example.

**h.** Previously Damaged Baggage.  We are not liable for any previously damaged baggage.

**i.** Attached Items.  We are not liable for loss of or damage to articles which are strapped, fastened, or otherwise secured to your checked baggage and which are not independently tagged and/or packaged.  Such items include but are not limited to, sleeping bags, luggage racks, luggage carriers, and umbrellas.

**j.** Interline Exclusions.  We are not liable for the loss of, damage to, or delay in delivery of any baggage accepted by another air carrier for interline transfer to Hawaiian if the items are not acceptable for transportation as checked baggage pursuant to this Contract of Carriage.

**k.** <u>Exclusions from Liability</u>.  We are not liable for the loss of, damage to, or delay in delivery of any of the following items:

I. antiques, artifacts, collectibles, and religious items;

II. antlers;

III. backpacks with aluminum frames, outside pockets, protruding straps, or buckles, or that otherwise not designed for travel, and sleeping bags and knapsacks made of plastic, vinyl, or other easily torn material;

IV. business equipment and business samples;

V. portable multimedia players including, but not limited to, CD, DVD, and MP3 players;

VI. chinaware, glass, glassware, bottles, ceramics, pottery, and mirrors;

VII. computer hardware/software and electronic components/equipment;

VIII. items checked in sacks or paper/plastic bags that do not have sufficient durability, do not have secure closures, or do not provide sufficient protection to the contents;

IX. items checked in corrugated/cardboard boxes, including cardboard boxes provided by us, except for items that otherwise would be suitable for transportation without the cardboard box;

X. electronic and mechanical items, including cell phones, electronic games, televisions, radios amplifiers, speakers, and other related items;

XI. eyeglasses, binoculars, prescription and non-prescription sunglasses, and all other eyewear and eye/vision devices;

XII. flowers and plants;

XIII. garment bags not designed for travel;

XIV. irreplaceable items;

XV. items made of paper (e.g., advertising displays, blueprints, maps, manuscripts, business/personal documents, sketches, historical documents, photos, books, negotiable papers, securities, etc.);

XVI. jewelry;

XVII. keys;

XVIII. liquids, perfumes, alcohol/liquor;

XIX. medicines and medical equipment (that are not assistive devices pursuant to 14 CFR 382.3);

XX. money, gift cards, and gift certificates;

XXI. musical instruments (e.g., guitars, violins, violas, cellos, organs, harps, and drums);

XXII. natural fur products;

XXIII.   perishable items such as medicine, flowers, and food (e.g., fruits, vegetables, meats poultry, seafood, cheese, fresh or frozen foods of any kind, baked goods, dry ice, and tobacco);

XXIV.   photographic/cinematographic/audio/video equipment, cameras, lenses, bulbs, and related items;

XXV.   precious metals/stones;

XXVI.   science-related equipment (e.g. microscopes, oscilloscopes, meters, polygraph equipment, and other related or similar items);

XXVII.   tools, battery-powered hand tools, tool boxes/containers, automotive tow bars;

XXVIII.   totally unprotected items such as tennis racquets and umbrellas, either individually checked or tied/strapped to the outside of luggage;

XXIX.   recreational and sporting goods, including but not limited to, archery equipment, baseball equipment, boogie/kite/skim/speed/skate boards, bowling equipment, camping equipment, fencing equipment, golfing equipment, gymnastic equipment, hockey/lacrosse sticks, javelins, oars, paintball equipment, parachutes and parasails, pool cues, skating equipment, tennis equipment, water skiing/snow skiing/snowboards/wakeboards, hang gliding equipment, kayaks/canoes, personal human transporters, fishing rods, sculls, surfboards, windsurfing sailboards, vaulting poles, scuba diving masks and pressure gauges, scopes, and sporting trophies;

XXX.   silverware, knives, and swords;

XXXI.   strollers, bassinets, and infant carrying seats;

XXXII.   watches and other timepieces;

XXXIII.   works of art such as paintings and sculptures; and

XXXIV.   any other similar **valuable property or irreplaceable property included in the guest's checked or carry-on baggage with or without the knowledge of Hawaiian.**

**2.   Wheelchairs and Other Assistive Devices.**

**a.**   Liability Limits Do Not Apply.  The baggage liability limits of Sections (B)(1)(a) and (B)(1)(b) of this Rule 20 do not apply to claims for loss of, damage to, or delay of wheelchairs or other assistive devices.  However, the notice requirements of Section (B)(1)(d) of this Rule 20 do apply.

**b.**   Proof of Loss/Damage; Option to Repair.  In the case of a lost, damaged, or destroyed wheelchair or other assistive device, documentary proof of loss is required from you to process a claim for damages.  If the wheelchair or other assistive device can be returned to you in the condition in which it was received by making reasonable repairs, we may make the repairs.

**c.**   Inspection Rights; Refusal to Transport.  We have the right to inspect and document any pre-existing damage prior to accepting your wheelchair or other assistive devices as checked baggage.  We reserve the right to refuse to transport large wheelchairs or other assistive devices that, due to the physical size of an aircraft compartment, cannot be carried upright safely without risk of serious damage to the wheelchair, or that would

cause a load imbalance in a small baggage compartment and violate weight and balance safety requirements.  In such a case, we will use reasonable efforts to assist you in identifying a flight using an aircraft that can accommodate your wheelchair.

3. **Carry-On Baggage and Property**:  We are not liable for loss of or damage to baggage or other items carried with you in the cabin of our aircraft

4. **Pets and Animals**.  We are not liable for any loss or expense resulting from your pet or animal being refused passage through any county, state, or territory due to your failure to comply with all Government Laws and restrictions, including furnishing valid health and rabies vaccination certificates when required.

## RULE 21: FLIGHT DELAYS, CHANGES, CANCELLATIONS, AND AIRCRAFT CHANGES

### A.  GENERAL RULES.

1. **Applicability**.  The provisions of this <u>Rule 21</u>, other than for <u>Section (G)</u> below, applies to you only if you have a Ticket and a confirmed reserved space on one of our flights and there is a flight delay, flight change, flight diversion, or flight cancellation.  If you are a standby guest, your rights are governed by <u>Section (G)</u> of this <u>Rule 21</u>.

2. **Notification**.  We will promptly notify you of any delay, change, diversion, or cancellation of your confirmed reserved space as soon as reasonably possible after it is confirmed.  However, we not liable for any misstatements or other errors or omissions in connection with providing that information.

3. **Schedules are Subject to Change Without Notice**.  Any times shown on Tickets, timetables, published schedules or elsewhere, as well as any aircraft type and similar details reflected on any Tickets or in any of our flight schedules are not guaranteed and are not a part of this contract.  We may (i) substitute alternate carriers or aircraft, (ii) delay or cancel flights, and (iii) alter or omit stopping places or connections shown on the Ticket at any time.

4. **Liability**.  Except to the extent provided in this <u>Rule 21</u>, we are not liable for failing to operate any flight according to schedule, or for any change in flight schedule, with or without notice to you.

### B.  DEFINITIONS.  For this <u>Rule 21</u>, the following terms have the meaning indicated below:

1. **Connecting Carrier(s)** means the carrier or combination of carriers on whose flight(s) you originally held or hold confirmed reserved space from a Connecting Point to a destination, next Stopover or Connecting Point.

2. **Connecting Point** means a point to which on one Ticket you hold or held confirmed reserved space on one carrier, and out of which you hold or held confirmed reserved space on the same or another carrier.  All airports through which a city is served by any carrier will be deemed to be a single Connecting Point when the receiving carrier has confirmed reservations from the delivering carrier.

3. **Delivering Carrier** means the carrier on whose flight you hold or held confirmed reserved space to a Connecting Point.

4. **Force Majeure Event** means any of the following situations:

    **a.** Any condition beyond our control including, but not limited to meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened, or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition.

    **b.** Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting Hawaiian's services.

    **c.** Any Government Law, demand, or requirement.

    **d.** Any shortage of labor, fuel, or facilities of Hawaiian or others.

    **e.** Damage to our Aircraft or equipment caused by another party.

    **f.** Any emergency requiring immediate care or protection for a person or property.

    **g.** Any event not reasonably foreseen, anticipated, or predicted by Hawaiian.

5. **Misconnection** occurs at a Connecting Point when as part of a single Ticket for confirmed reserved space, the Delivering Carrier was unable to deliver you to the Connecting Point in time to connect with the Connecting Carrier.

    NOTE: The same rules apply at any subsequent point(s) of Misconnection as apply at the point of the original Misconnection.

6. **Irregular Operations** means any of the following irregularities:

    **a.** Delay in scheduled departure or arrival of a carrier's flight resulting in a Misconnection;

    **b.** Flight or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a carrier's flight;

    **c.** Substitution of an aircraft type that provides a different class of service;

    **d.** Schedule changes which result in your reroute at the departure time of the original flight; or

    **e.** Cancellation of a reservation pursuant to Rule 4: Cancellation of Reservations.

**C. IRREGULAR OPERATIONS.** The following rules apply to any Irregular Operation:

1. **Liability**.  Except as provided by law, we are not liable for any Irregular Operations.

2. **Delay, Misconnection or Cancellation**.  When your Ticket is affected by any delay, Misconnection or cancellation caused by Hawaiian, we will take one the following actions:

    **a.** we will transport you, subject to availability and without Stopover, to your destination, next Stopover point, or transfer point shown on our portion of your Ticket, in the same class of service, at no additional cost to you;

    **b.** in our sole discretion, we may arrange for you to travel on another carrier; or

    **c.** we will refund you in accordance with Rule 24: Refunds.

NOTE: A cancellation caused by Hawaiian means (i) that a particular flight number for which you have a ticketed reservation is removed from our schedule or will not operate on one or more dates and (ii) we are unable to confirm you on an alternate flight(s) scheduled to depart within two hours before or after your originally scheduled departure time and arrive within two hours before or after your originally scheduled arrival time.  In this event, the receipt of a refund in lieu of travel credit is in your sole discretion if you refuse to be rebooked on another flight.

NOTE: If we are unable to transport you in the same class of service as provided in Section (C)(2)(A) of this Rule 21, we will provide a refund of the difference in fare.  See <u>Rule 24(C)(1)</u>.

NOTE**:**  In the event you miss a flight on a Connecting Carrier on which space is reserved because the Delivering Carrier did not operate its flight as scheduled due to Irregular Operations or cancellation of its flight, the Delivering Carrier is responsible to arrange for your carriage or to make a refund.

**D.  FORCE MAJEURE EVENT**.  In the event of a Force Majeure Event, we may cancel, terminate, divert, postpone, or delay any flight, right of carriage, or reservations (whether or not confirmed) without any prior notice to you and determine if any departure or landing should be made, without any liability to Hawaiian.  We may re-accommodate you on another available Hawaiian flight or on another carrier or combination of carriers, or may refund any unused portions of your Ticket in the form of a travel certificate.

**E.  AMENITIES AND SERVICES FOR DELAYED GUESTS.**  Subject to the exceptions listed in <u>Section (E)(5)</u> below of this <u>Rule 21</u>, we will provide certain amenities to you as follows in the in the event of a lengthy delay caused by us:

1.  **Hotel Rooms**.  If (i) the delay is expected to exceed 4 hours and extend into the period 10:00 pm through 6:00 am, and (ii) no scheduled alternate transportation is available to your destination or Stopover point, we will provide one-night's lodging at an accommodation we select, <u>provided</u>, <u>however</u>, that we will not provide lodging for you if you reside in the city where the delay occurs.

2.  **Meals**.  We will provide you with one meal voucher if the delay will extend beyond four (4) hours.  No alcoholic beverages will be provided to any guests.

3.  **Ground Transportation.**  When lodging is provided to you in accordance with <u>Section (E)(1)</u> above of this <u>Rule 21</u> and ground transportation is not furnished by the hotel, then, if available, we will provide ground transportation to the place of lodging or reimburse you for reasonable transportation expenses when accompanied by a receipt.  Where ground transportation has been offered but not accepted by you for whatever reason, we are not liable to reimburse you for expenses relating to alternative ground transportation secured by you.

4.  **Alternatively**.  We may provide you a with a travel credit in lieu of any of the above.  Your acceptance of a travel credit indicates your waiver of any of the above amenities.  Travel

credit (i) will be valid for travel only on Hawaiian within 365 days of the date of issue, (ii) will apply only to online transportation via Hawaiian, (iii) may not be endorsed to or accepted by any other carrier, and (iv) is not refundable, nor saleable, transferable, or assignable by you.

5. **Exceptions**.

    **a.** <u>Force Majeure Event or Weather</u>.  The provision of the above amenities does not apply when a flight is delayed because of a Force Majeure Event or because of weather conditions, unless:

        i. You are deplaned by us at a point other than your Connecting Point, destination, or point of origin;

        ii. Your onward transportation on us is delayed or cancelled at a Connecting Point intermediate to your destination; or

        iii. In our sole discretion, we believe that special circumstances require the provision of such amenities (e.g. for unaccompanied children, elderly persons, invalids, and incapacitated and/or ill guests, and qualified individuals with a disability, to maintain the safety, health and welfare of such guests).

    **b.** <u>You Accept the Delay Risk</u>.  We will not provide any of the above amenities, when a Hawaiian flight is delayed, cancelled, or diverted in a situation where you elected to fly after being informed prior to boarding that environmental conditions at the airport of destination will be such that, at the time of arrival of your flight, the airport may be closed, or that weather conditions may cause your flight to be diverted.  If (i) you hold a confirmed reserved space and (ii) while at the airport, and after being informed of the above risk, you elect not to travel, we will provide you ground transportation from the airport, back to your residence or hotel only.  No other amenities will be provided.

NOTE:  If you are at a Connecting Point and Hawaiian is the Connecting Carrier, we will provide you with the above amenities, whether (i) you elect to remain at the Connecting Point or (ii) you elect to travel and are landed at a point other than your final destination or Stopover point.

**F.**  **CONTINGENCY PLAN FOR LENGTHY TARMAC DELAYS.**  We are committed to providing our customers with a service quality and on-time performance level that ranks among the highest in the industry.  The impact of weather, air traffic flow control, airport operations, and safety factors have occasionally caused tarmac delays.  We have adopted detailed plans to manage and minimize lengthy tarmac delays, while providing a safe and pleasant travel experience to our customers.  A copy of our Contingency Plan for Lengthy Tarmac Delays can be found at https://www.hawaiianairlines.com/legal/tarmac-delays.

**G.**  **STANDBY GUESTS.**

    **1.** **Liability.**  Except to the extent provided in <u>Section (G)(2)</u> below of this <u>Rule 21</u>, we are not liable for failing to operate any flight according to schedule, or for any change in flight schedule, with or without notice to you.

    **2.** **Your Options**.  Whenever we fail to operate any flight according to schedule or change the schedule of any flight, we will, at your request, either:

        **a.** transport you on another of our flights on which space is available; or

    **b.**  refund you an amount determined in accordance with <u>Rule 24: Refunds</u> upon surrender of the unused portion of your Ticket.

## <u>RULE 22: DENIED BOARDING AND COMPENSATION DUE TO OVERSALES</u>

If we are unable to provide you with your previously confirmed reserved space due to an oversold flight, the following provisions apply:

    **A.**  **WE WILL MAKE A REQUEST FOR VOLUNTEERS**.  In the case of an oversold flight (more guests hold confirmed reserved spaces than there are seats available), we will first request guest volunteers who are willing to voluntarily relinquish their confirmed reserved space in exchange for compensation in an amount determined by us in our sole discretion.  If you are specifically asked to voluntarily relinquish your seat and refuse, we will not later deny you boarding unless you were specifically informed at the time you were asked to volunteer (i) that there was a chance that you would be denied boarding involuntarily and (ii) of the amount of compensation to which you have been entitled in that event.  The request for volunteers and the selection of any persons to be denied space will be in a manner determined by us in our sole discretion.

    NOTE: In exchange for voluntarily relinquishing your confirmed reserved space, we will compensate you with the agreed upon compensation.  Any travel credit will be valid for travel on Hawaiian within 365 days from the date of issue and (i) will apply only to online transportation via Hawaiian, (ii) may not be endorsed to or accepted by any other carrier, and (iii) will not be refundable to, or saleable, transferable, or assignable by the guest.

    **B.**  **BOARDING PRIORITIES ON AN OVERSOLD FLIGHT.**  When a flight is oversold, we will not deny you boarding against your will until we first ask for volunteers who hold their reservations willingly, in exchange for compensation as provided in <u>Section (A)</u> above of this <u>Rule 22</u>.  If there are not enough volunteers, you and other guests may be denied boarding involuntarily, in accordance with our boarding priority.

        **1.**  Generally, all guests holding seat assignments will be boarded.  The priority of guests who are not holding seat assignment and, if necessary, other guests may be determined based on a guest's fare class, itinerary, status of frequent flyer program membership, and the time in which the guest presents him/herself for check in without an advanced seat assignment.

        **2.**  Guests who are qualified individuals with a disability, minors under the age of 18 years who are traveling alone and Unaccompanied Minors, will be the last to be involuntarily denied boarding if it is determined by us in our sole discretion that such denial of boarding would constitute a hardship.

    **C.**  **TRANSPORTATION FOR GUESTS DENIED BOARDING**.  When we are unable to provide your previously confirmed reserved space due to an oversold flight, we will provide you with alternate transportation in accordance with the following provisions:

        **1.**  We will transport you without Stopover on our next flight on which space is available at no additional cost to you, regardless of the class of service.

        **2.**  If space is available on another Carrier's flight regardless of class of service, such flights may be used upon Hawaiian's sole discretion and the guest's request at no additional cost to the guest only if such flight provides an earlier arrival than the Hawaiian flight offered in <u>Section (C)(1)</u> above of this <u>Rule 22</u>.

    **D.**  **COMPENSATION FOR INVOLUNTARY DENIED BOARDING**.  In addition to providing transportation as described in <u>Section (C)</u> above of this <u>Rule 22</u>, when you are involuntarily

denied boarding from an oversold flight, we will compensate you for our failure to transport you on that flight subject to and in accordance with the provisions below:

1. **Conditions for Payment of Compensation.**

   a. You Meet All Requirements.  You must be holding a Ticket for confirmed reserved space and must have presented yourself for carriage at the appropriate time and place, having complied fully with our requirements for ticketing, check in, and reconfirmation procedures, and having met all the requirements for acceptance for transportation published in this Contract of Carriage.

   b. You Have Been Denied Boarding Involuntarily.  The flight for which you hold confirmed reserved space is unable to accommodate you and departs without you, and you have not voluntarily given up your reservation in exchange for compensation in accordance with Section (A) of this Rule 22.

   c. Exceptions to Compensation.  You will not be eligible for compensation in each of the following cases:

      i. The flight on which you hold confirmed reserved space is unable to accommodate you (1) because of any government requisition of space or (2) because we substitute any aircraft with another aircraft of lesser capacity when required by operational or safety reasons.

      ii. We have cancelled your reservation in accordance with Rule 4: Cancellation of Reservations.

      iii. You are accommodated on comparable air transportation, or other transportation scheduled to arrive at your next Stopover or, if none, initial destination within one (1) hour after the scheduled arrival time of your original flight or flights.

      iv. You are offered accommodations or are seated in a section of the aircraft other than that specified on your Ticket at no extra charge, except that if you are seated in a section with a lower available fare, you shall be entitled to a refund for the difference between your original fare and the lower applicable fare.

2. **Amount of Compensation**.  If you are traveling in interstate transportation between points within the USA and meet the satisfy all the conditions of Section (D)(1) of this Rule 22, you are entitled to the following compensation based on the length of your delay:

   a. Not Later Than One Hour.  If we offer you alternate transportation that is planned to arrive at your destination or first Stopover not later than one hour after the planned arrival time of your original flight, you are not entitled to any compensation.

   b. More Than One Hour but Less Than Two Hours.  If we offer you alternate transportation that is planned to arrive at your destination or first Stopover more than one hour but less than two hours after the planned arrival time your original flight we will pay you 200% of the one-way fare to your destination or first Stopover, with a maximum of $775.

   c. More Than Two Hours.  If we offer you alternate transportation that is planned to arrive at your destination or first Stopover more than two hours after the planned arrival time

your original flight we will pay you 400% of the one-way fare to your destination or first Stopover, with a maximum of $1,550.

| Summary Denied Boarding Compensation (see rules above) | |
|---|---|
| 0 to 1-hour arrival delay | No compensation |
| 1 to 2-hour arrival delay | 200% of one-way fare, not to exceed $775 |
| Over 2 hours arrival delay | 400% of one-way fare, not to exceed $1,550 |

NOTE**:** In addition to the denied boarding compensation for involuntarily denied boarding as specified in this Rule 22, we will refund all unused ancillary fees for optional services you paid for if you are voluntarily or involuntarily denied boarding.  However, we will not refund any ancillary fees for services that are provided as part of your alternate transportation.

NOTE: At your option, we may compensate you with a travel credit valid for transportation on Hawaiian instead of monetary compensation.  Any travel credit will be equal to or greater than any monetary compensation due.  Travel credits are nontransferable, have no refund value, and are subject to reroute and reissue by Hawaiian only.

## RULE 23: REROUTING

**A.  GENERAL RULE.**  Unless the fare you purchased does not allow for reroute, we will reroute you at your request upon the following terms and conditions when you (i) provide us with your unused Ticket or remaining unused portion of your Ticket and (ii) pay any applicable fees, charges, and fare differentials relating to rerouting you.

**B.  SPECIAL RULES**

**1.**  Unless provided otherwise in accordance with Rule 21: Flight Delays, Changes, Cancellations, and Aircraft Changes, the fare and charges applicable to your requested rerouting or change in your ultimate destination made prior to your arrival at your ultimate destination named on the original Ticket, will be the fare and charges that would have been applicable had the original Ticket designated the routing and/or ultimate destination of the new revised Ticket.  Any difference between the fare and charges applicable to the new revised Ticket and the fare and charges applicable to the original Ticket issued to the guest will be collected from or refunded to the guest, as the case may be.

**2.**  Notwithstanding the provisions of this Rule 23, we will not accept for any purposes under this Rule 23, any guest Tickets or related transportation documents issued by any carrier which is in substantial default of its interline obligations ("Defaulting Carrier").  However, Tickets issued by the Defaulting Carrier or its sales agent prior to the default will be accepted solely for transportation over the lines of Hawaiian provided that the Tickets were issued by the Defaulting Carrier in its capacity as agent for Hawaiian and specified transportation via Hawaiian.  When Tickets are accepted, no adjustments in fare will be made that would require us to refund money to you.

**3.**  We shall have no obligation to honor another carrier's Ticket that does not reflect a confirmed reserved space on Hawaiian.  However, in this event, we may accept the other

carrier's ticket for travel as stated or reroute you only over our own lines between the points named on the original Ticket.

## RULE 24: REFUNDS

**A.   INVOLUNTARY REFUNDS.**   We will refund you as follows when (i) you refuse, or we refuse to allow you, to travel for reasons relating to Rule 12: Acceptance of Children and Infants, Rule 13: Refusal to Transport and Rule 21: Flight Delays, Changes, Cancellations, and Aircraft Changes, (ii) you surrender the unused portion of your Ticket to us, and (iii) the reason for you not traveling is through no fault of your own.

**1.   Involuntary Refund Ticket is Unused.**   If no portion of your Ticket has been used, you are entitled to a refund of an amount equal to the fare and charges applicable to the original Ticket issued to you.

**2.   Involuntary Refund Ticket Partially Used**.   If a portion of your Ticket has been used, you are entitled to a refund of an amount equal to the difference between (i) the fare and charges applicable to the original issued Ticket and (ii) the fare and charges applicable to the used portion of the Ticket.

**EXCEPTION 1**: We will not provide a refund as follows:

| When the destination designated on the guest's ticket is: | and the flight on which the guest is being transported terminates at |
|---|---|
| SFO | OAK |
| OAK | SFO |
| SFO | SJC |
| SJC | SFO |

**EXCEPTION 2.**   We will not accept for refund any guest Tickets or related transportation documents issued by any carrier which is in substantial default of its interline obligations.

**B.   VOLUNTARY REFUNDS – REFUNDABLE TICKETS**

**1.   General Rule.**   For Tickets eligible for refund, upon your surrender of the unused or voided portion of a Ticket, we will refund you in accordance with the following terms and conditions:

**a.**   Hawaiian Issued Tickets Only.   Ticket must have been issued on Hawaiian Ticket Stock. The term "Hawaiian Ticket Stock" means Tickets which are identified with Hawaiian's carrier code (173) as part of the Ticket serial number.

**b.**   Amount of Refund.

i.   Ticket Not Used.   If no portion of the Ticket has been used, the refund will be an amount equal to the fare and charges applicable to the original Ticket issued to you.

ii.   Ticket Partially Used.   If a portion of the Ticket has been used, the refund will be an amount equal to the difference between (i) the fare and charges applicable to

the original issued Ticket and (ii) the fare and charges applicable to the used
portion of the Ticket.

**c.**  Time Limit for Refunds.  No refunds for any Tickets surrendered to us after 12 months of
the original issue date of the Ticket.

**d.**  Service Fees.  Unless (i) you elect to accept a refund in the form of a travel credit valid
for one year from the date of issue or (ii) the ticketed fare states otherwise in its terms
and conditions, you will be assessed the following service fee on any refunded Ticket as
follows:

  i.  If the refunded Ticket was for travel wholly within the State of Hawaii: $25.00.

  ii.  If the refunded Ticket was for travel wholly within the Continental USA: $100.00.

  iii.  If the refunded Ticket was for travel between the State of Hawaii and the
  Continental USA: $100.00.

  NOTE:  No service fees will be withheld from any refunded Military and government
  fares.

**e.**  Time to Issue Refunds.  Upon meeting the above requirements, we will issue refunds for
eligible Tickets within seven (7) business days for credit card purchases and twenty (20)
business days for purchases made with cash, check, or other forms of payment.

**2.  Person to Whom Refund is Made.**  We will make a refund in accordance with this Rule 24 to
the purchaser of the Ticket except for purchases as made as follows:

**a.**  Under a Universal Air Travel Plan:  The refund will be made to the subscriber against
whose account the Ticket was charged.

**b.**  Against a Transportation Request, issued by a government agency, other than a U.S.
Government Agency: The refund will be made to the government agency, which issued
the Transportation Request.

**c.**  Against a U.S. Government Transportation Request:  The refund will be made to the U.S.
Government Agency which issued the U.S. Government Transportation Request with a
check payable to the "Treasurer of the United States."

**d.**  Tickets issued against a credit card: The refund will be made to the account of the
person to whom such credit card has been issue

**e.**  Tickets issued via cash payment: When cash is the acceptable form of payment by
Hawaiian, the ticket will be refunded by a check payment to whom delivered such
cash payment.

**f.**  Tickets purchased through a travel agency or as part of a travel package: If a refund
is authorized, the travel agency that issued the tickets will process the applicable
refund to the ticketed customer.

**3.  Exception.**  Notwithstanding the provisions of this Rule 24, we will not accept for any
purposes under this rule, any Tickets or related transportation documents issued by any
other carrier that is in substantial default of its interline obligations.

**C.OTHER REFUNDS**

1.  **Change in Paid-For Class of Service**.  If you paid for an Extra Comfort seat and you are
moved to an Economy Seat, we will refund the Extra Comfort fee you paid. If you paid for a

first-class upgrade and were downgraded, we will refund you the first-class upgrade fee you paid. If you paid for a first-class seat and were downgraded, we will refund you the difference between the fare you paid and the applicable economy fare if there is a fare difference.

## RULE 25: CUSTOMER RELATIONS

**A.  GENERAL RULE.**  Customer compliments and complaints may be made by email or mail to the following:

- **If by Email, through our Website portal located at**: https://www.hawaiianairlines.com/contact-us/email.

- **Mailing address**:

  Consumer Affairs Office
  Hawaiian Airlines, Inc.
  P.O. Box 30008
  Honolulu, HI  96820

**B.  TIME LIMITATIONS.**  We will not take any action on any complaint seeking restitution unless you have provided notice in writing to our *Consumer Affairs Office* not later than two (2) years after the event occurred for which you are seeking restitution.  However, your failure to meet the notice requirement above may be excused if you can show good cause for your failure to bring your claim within the two-year notice period.

**C.  ADDITIONAL INFORMATION REQUEST NOTICE.**  In any case where you do not provide sufficient information or documentation for us to resolve the issue, we will notify you of what further information or documentation is needed.  In this case, we will not take any further action to investigate and resolve the issue until you provide the requested information or documentation. Your obligation to provide the requested information or documentation is subject to the limitations in Section (B) above of this Rule 25.

**D.  COMPENSATION SETTLEMENTS.**  If we determine that you are owed any compensation, then we will pay that compensation to you, whether you are the actual purchaser of the Ticket or not.  The form of compensation will be determined by us, subject to any limitation set forth in this Contract of Carriage, or as provided by law.  If you are unable to claim your compensation settlement due to death or illness, the compensation settlement will be issued: (i) to the person you designate in writing; (ii) in the event of death, to the person designated in your Will; or (iii) in the absence of (i) or (ii), as otherwise determined by a court of law.  If the recipient of any compensation is under the age of 12 years, the compensation will be issued to an appointed guardian of the child.

NOTE: Some complaints, e.g. those relating to a refund or baggage issue, may be directed to the appropriate internal department for a determination and response.  If we direct your complaint to another department, we will notify you in writing that we have done so.

**E.  RESPONSIVENESS.**  Hawaiian is dedicated to resolving your complaints expediently.  If we receive a complaint, we will acknowledge the complaint and respond substantively to it within thirty (30) days.

Plaintiffs' Exhibit 456



## Southwest Airlines Co.

## Contract of Carriage - Passenger

**(CoC) – English Version**

**Revision: 33rd Revised**              **Effective Date:** 08/05/2021

# Southwest Airlines Co. Contract of Carriage

## Table of Contents

Southwest Airlines Co. Contract of Carriage ....................................................................... 1

1. Introduction ..................................................................................................................... 3
   a. Application of Conditions of Contract ....................................................................... 3
   b. Definitions .................................................................................................................. 3

2. Reservations .................................................................................................................... 7
   a. Reservations ............................................................................................................... 7
   b. Group Policies ............................................................................................................ 9

3. Fares ................................................................................................................................ 10
   a. Application of Fares ................................................................................................... 10
   b. Stopovers ................................................................................................................... 10
   c. Special Fares .............................................................................................................. 11

4. Tickets ............................................................................................................................. 14
   a. Tickets ........................................................................................................................ 14
   b. Ticket Acceptability ................................................................................................... 15
   c. Refunds ...................................................................................................................... 15

5. Check-in .......................................................................................................................... 17
   a. Boarding Passes ......................................................................................................... 17
   b. Check-in Requirements ............................................................................................. 17

6. Acceptance of Passengers .............................................................................................. 18
   a. Refusal to Transport – General ................................................................................. 18
   b. Refusal to Transport – Unruly/Disruptive Passenger .............................................. 19
   c. Carriage of Children .................................................................................................. 22
   d. Carriage of Passengers with Disabilities .................................................................. 24
   e. Pets ............................................................................................................................. 26
   f. Law Enforcement and Search and Rescue Dogs ....................................................... 27

7. Baggage ........................................................................................................................... 28
   a. Carryon Baggage ....................................................................................................... 28
   b. Acceptance of Checked Baggage .............................................................................. 29
   c. Surveillance and Inspection of Baggage ................................................................... 30

d.    Checking of Baggage ..................................................................... 30

e.    Free Checked Baggage Allowance ................................................ 30

f.    Excess, Oversize, and Overweight Baggage Charges .................. 32

g.    Special Items ................................................................................. 33

h.    Unsuitable Baggage Subject to Limited Release of Liability ......... 33

i.    Limitations of Liability ................................................................... 34

8.    International Travel ................................................................................... 37

a.    Application of Montreal or Warsaw Convention ........................... 37

b.    Death or Injury of Passengers ..................................................... 37

c.    Delay of Passengers ..................................................................... 38

d.    Destruction, Loss, or Delay of Baggage ...................................... 39

e.    Time Limitations on Claims and Actions ...................................... 40

f.    International Travel Documents .................................................... 40

g.    Foreign Currency .......................................................................... 40

h.    Partial Tax Refunds in Limited Circumstances ............................ 41

i.    Check-in Times for International Flights ....................................... 41

j.    Travel by Minors ........................................................................... 41

k.    Carriage of Animals ...................................................................... 41

l.    Firearms ........................................................................................ 41

9.    Service Interruptions ............................................................................... 42

a.    Failure to Operate as Scheduled ................................................. 42

b.    Denied Boarding Procedures ........................................................ 42

c.    Ground Transportation .................................................................. 45

10.   Miscellaneous ......................................................................................... 46

a.    Claims ............................................................................................ 46

b.    Customer Service Commitment .................................................... 46

c.    Choice of Law, Entire Agreement ................................................. 46

# 1. Introduction

a. Application of Conditions of Contract

(1) Transportation by Southwest Airlines Co. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on any Ticket, or specified on the Carrier's website. The terms and conditions contained in this *Contract of Carriage* shall govern all published routes and services provided by the Carrier as well as all fares and charges published by the Carrier. This *Contract of Carriage* is subject to applicable laws, regulations and rules imposed by U.S. or foreign governmental agencies. In the event of a conflict between the terms of this Contract and such applicable laws, regulations or rules, the latter shall apply. By purchasing a Ticket or accepting transportation, the Passenger agrees to be bound by all of the following terms and conditions.

(2) Carrier reserves the right, in its sole discretion and to the extent not prohibited by federal law, to change, delete, or add to any of the terms of this *Contract of Carriage* without prior notice. All changes must be in writing and approved by a corporate officer of the Carrier. To the extent there is a conflict between the *Contract of Carriage* and information printed on the Ticket or specified on the Carrier's website, the *Contract of Carriage* governs.

(3) By purchasing and accepting transportation, the Passenger agrees to adhere to and comply with all the requirements of this *Contract of Carriage* and applicable laws and regulations, including but not limited to federal laws protecting federal, airport, and air carrier employees who have security duties from assault and interference with the performance of duties. Transportation offered by the Carrier under this *Contract of Carriage* is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage*.

(4) Applicable terms and conditions are those in effect as of the date a Passenger commences travel on a given itinerary. In the event these conditions of Carriage are amended after a Ticket is purchased but prior to commencement of travel in a way that substantially affects the terms and conditions of a Passenger's Carriage, a full refund of the Ticket price may be requested if the Passenger does not agree to be bound by the conditions as amended.

b. Definitions

**Baggage** means all luggage and contents contained inside, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, musical instruments, and similar articles, whether carried by the Passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the Passenger in the passenger cabin, will not be considered as Baggage.

**Boarding Pass** means a document issued by Carrier entitled Boarding Pass bearing the Passenger's first and last name, flight number and date, departure and destination airports, and a boarding group letter and number, which represents the Passenger's boarding group and reserved spot in the boarding group line. A Passenger must have a Boarding Pass to be considered as having Confirmed Reserved Space as defined in Section 9(b)(1). Boarding Passes may be obtained at Southwest.com®, or at the airport from Southwest at:

(1) E-Ticket Check-In kiosks (where available), (2) skycap podiums (where available), (3) ticket counters, or (4) departure gate podiums. Carrier reserves the right to restrict Boarding Pass distribution to the departure gate podium.

**Carriage** means the transportation of Passengers and/or Baggage by air, gratuitously or for hire, and all services of Carrier related thereto.

**Carrier** means Southwest Airlines Co. and its officers and employees, contractors and agents acting in their official capacities.

**Checked Baggage** means Baggage of which Carrier takes sole custody and for which Carrier has issued a Baggage Claim Check and affixed a Baggage Tag.

**Fare Component** means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

**Flight Coupon** means the portion of the Passenger Ticket that is valid for Carriage.

**Force Majeure Event** means any event outside of Carrier's control, including, without limitation, acts of God, and meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

**Limited Release of Liability** means Passenger's tender, and Carrier's acceptance, of Checked Baggage in a condition, or of a nature, unsuitable for Carriage where Carrier limits or excludes liability for loss, damage, or delay under Section 7.

**Montreal Convention** means, unless the context requires otherwise, the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal, May 28, 1999 ("Montreal Convention").

**Nonstop Flight** means a flight scheduled to operate between origin and destination airports without any intermediate stops.

**Nonrevenue Passenger** means a Passenger who is traveling on a Southwest reduced-rate pass of any kind (e.g., employee travel, companion pass, buddy/guest pass, dependent pass or other airline industry employee travel).

**One-way** means Scheduled Air Service on Carrier from an originating airport to a destination airport.

**Passenger** means any person, except members of the Crew working on the flight, who is carried or will be carried in an aircraft with the consent of Carrier and is bound by this *Contract of Carriage*.

**Qualified Individual with a Disability**, as defined in 14 CFR § 382.3, means an individual with a disability who, as a Passenger:

1. With respect to obtaining a Ticket for air transportation on Carrier, offers, or makes a good faith attempt to offer, purchase, or otherwise validly obtain a Ticket.

2. With respect to obtaining air transportation, or other services or accommodations.

    a. Buys or otherwise validly obtains, or makes a good faith effort to obtain, a Ticket for air transportation on Carrier and presents himself at the airport for the purpose of traveling on the flight to which the Ticket pertains.

    b. Meets reasonable, nondiscriminatory *Contract of Carriage* requirements applicable to all Passengers.

3. With respect to accompanying or meeting a traveler, using ground transportation, using terminal facilities, or obtaining information about schedules, fares, reservations, or policies, takes those actions necessary to use facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by the Carrier.

**Roundtrip** means Scheduled Air Service on Carrier from an originating airport to a destination airport and back to the originating airport or Carrier-recognized co-terminal.

**Same-Plane Service** means service between an origin and destination airport with scheduled stops at one or more intermediate airports. With the exception of unexpected ground delays or other unforeseen flight disruptions, Passengers on Same-Plane Service are not required to disembark the aircraft at any intermediate stop.

**Scheduled Air Service** means any current or future flight published on Carrier's website or in computer reservation system used by Carrier.

**Special Drawing Rights (SDR)** means a unit of currency created by the International Monetary Fund (IMF) in 1969, which operates as a supplement to the existing reserves of member countries. The current value of an SDR in U.S. dollars is provided daily by the IMF at http://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

**Standby Passengers** means Passengers who will be enplaned on a flight subject to availability of space at departure time and only after all Passengers with confirmed reserved space for such flight have been enplaned on such flight.

**Ticket** means the electronic six-digit alpha-numeric confirmation number issued by Carrier or an authorized travel agent, which provides for the Carriage of the Passenger occupying a single seat.

**Ticketing Time Limit (TTL)** means the time by which the Passenger must secure his/her ticket for a confirmed reservation.

**Trained Service Animal** means a dog, regardless of breed or type that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. A Trained Service Animal also must be trained to behave properly in a public setting, remain under the control of the handler and to avoid engaging in disruptive behavior at all times. Animal species other than dogs, emotional support animals, comfort animals, companionship animals, and service animals in training are not Trained Service Animals for the purposes of this *Contract of Carriage*.

## 2. Reservations

a. Reservations

(1)    Confirmation of Reservations. A reservation on a given flight is confirmed by the issuance of a Ticket.

(2)    Cancellation of Confirmed Reservations.

(i)    Passenger Initiated Cancellation Prior to Date of Travel. If a Passenger cancels his/her reservation prior to the date of travel, his/her ticket is eligible for a refund or the funds will be available for future use consistent with the fare rule and refund procedures specified in Section 4c.

(ii)    Check-in Requirements. Failure of the Passenger to obtain a Boarding Pass and be present, available, and appropriate as discussed in Section 6 for boarding in the flight's boarding gate area at least ten minutes before the scheduled departure time may result in cancellation, at the Carrier's sole discretion, of the Passenger's reservation without notice. Section 5 contains additional information on Carrier's check-in procedures.

(iii)    No Show Policy.

(a)    If a Wanna Get Away Fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the Wanna Get Away Fare segment(s) are forfeited.

(b)    If a Business Select Fare, Anytime Fare, Child Fare, or Infant Fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the Business Select Fare, Anytime Fare, Infant Fare, or Child Fare  segment(s) are held as travel credit for use by the Passenger on Southwest Airlines.

(c)    When a ticket contains flight segments with mixed fare types and the ticket is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments of the reservation are canceled and the individual flight segments will follow the aforementioned rules associated with the fare type in regard to forfeiture of funds under Section 2a(2)(iii)(a) and (b) .

(d)    When a ticket is purchased using Rapid Rewards points and the ticket is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, but the points will be returned to the Rapid Rewards account from which the points were initially debited. Taxes and fees associated with Rapid Rewards points and Companion Pass tickets follow the aforementioned rules under Section 2a(iii)(a)(b), and (c).

(e)    Conditions Beyond Carrier's Control. Carrier will refuse to carry and will cancel the reservations of any Passenger when such refusal is necessary to comply with a government regulation, a request for emergency transportation in connection with the national defense, or when necessary or advisable by reason of weather or other conditions beyond Carrier's control.

(f)  Prohibited Booking Practices

(i)  Fraudulent, fictitious and/or abusive bookings violate Southwest Airlines' rules. Bookings made or Tickets issued by Passengers must be made only in respect of a Passenger's genuine travel requirements. Reservations made to exploit or circumvent fare and ticket rules are strictly prohibited. Examples include (but are not limited to):

1.  Purchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities);

2.  Purchasing a Ticket without intent to travel, including to gain access to our facilities;

3.  Combining two or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing);

4.  Booking a Ticket in someone's name without the person's consent; and

5.  Booking duplicate or impossible trips, for example multiple trips for the same Passenger around the same time (i.e., trips a Passenger physically could not complete) or multiple trips for the same Passenger departing from the same city on the same date.

(ii)  If Southwest Airlines finds evidence that the Passenger or the Passenger's travel agent is using a prohibited practice, then without advance notice to the Passenger or purchaser, Southwest Airlines reserves the right to cancel any unused part of the ticket or any other reservations that it believes, in its sole discretion, were made without intent to travel, refuse to let the Passenger fly and check bags, not refund an otherwise refundable ticket, charge the Passenger for what the ticket would have cost if the Passenger or the travel agent hadn't booked it fraudulently and/or require the Passenger or the travel agent refund to us any compensation Southwest Airlines provided (such as costs for delivering bags or reimbursements for clothes or toiletries).

(iii)  With the exception of Southwest® gift cards, funds from proactively canceled reservations by Southwest will be returned to the original form of payment. Reservations paid for with a Southwest® gift card will have the amount applied from the Southwest® gift card held as travel funds for use by the Customer on a future Southwest Airlines flight.

(g)  Limitation of Liability. Carrier is not liable for any type of special, incidental or consequential damages when it cancels the reservations of any Passenger pursuant to Section 2a(2); however, the fare paid for the unused portions of travel that are canceled by Carrier may be refunded or applied toward the purchase of future travel in accordance with the applicable fare rules and Section 9.

b.  Group Policies

(1)  Groups Booked as Individuals. When ten or more Passengers are booked by a single individual, company, corporation, booking agency, or other entity for travel on the same scheduled flight(s), the reservations must be made as a group through the Carrier's Group Desk, and all applicable group policies and procedures must be followed. If a booking entity fails to make such reservations as a group, Carrier reserves the right, in its sole discretion, to assess a penalty upon and/or revoke the authority of the booking entity to sell Carrier's transportation services.

(2)  Multiple Group Reservations. Carrier reserves the right to:

(i)  Limit seats by flight for group reservations.

(ii)  Cancel group reservation requests.

(iii)  Make changes to group reservations to accommodate Carrier's flight schedule.

(iv)  Not accept group reservations.

(v)  Require that group reservations be converted to ticketed individual reservations at the applicable individual fare or be forfeited if group reservation utilization reveals what Carrier considers, in its sole discretion, to be an inadequate usage of reserved seats.

(3)  Travel on Group Reservations is valid on flights operated by Southwest Airlines only and is not available for travel on itineraries that combine flights with other carriers.

## 3. Fares

a. Application of Fares

(1) Transportation is subject to the fares and charges in effect when the Ticket is purchased. The fare is guaranteed once a reservation is made and a Ticket is purchased. If a Ticket is purchased before an increase in the fare becomes effective, the Ticket shall be honored for transportation between the airports and at the fare for which it was purchased.

(2) Changes to any portion of a Ticket initiated by the purchaser, Passenger, or his/her authorized agent after its original issue will be subject to the fares, fare rules, tax increases, and charges in effect on the date the change is initiated. A change constitutes a change in flight number, origin, destination, intermediate points, flight date, class of service, or fare.

Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new ticket. Our unrestricted fares are fully refundable if canceled and then refunded instead of exchanging or changing your Ticket.

(3) Fares may be obtained on Carrier's website at Southwest.com®; through the Southwest Airlines mobile app; from Southwest Airlines by telephone at 1-800-435-9792 (1-800-I-FLY-SWA), in Spanish at 1-800-826-6667 (1-800-VAMONOS), from Mexico (Border Cities) at 001-800-435-9792 (English) or 001-800-826-6667 (Spanish), through TTY service at 1-800-533-1305; at a Southwest Airlines ticket counter; or through an authorized travel agent.

(4) All published fares and charges are stated in U.S. currency.

(5) At the airport, on the day of travel, when Passengers voluntarily request to travel standby on an itinerary differing from their purchased Ticket, Carrier will quote an estimated amount for that standby travel, including taxes and fees, in line with the planned standby itinerary at the time of request by the Passenger. Voluntary standby travel is subject to the availability of seats at departure time. Passengers flying standby have an unconfirmed status for all scheduled stops at any intermediate or connecting points on the flight and must receive confirmation of reserved space for each intermediate or connecting points on the flight in order to be provided travel on such flight.

Because the Passenger's requested (voluntary standby) itinerary may not be available as originally planned, and a new itinerary may be required, the amount of the taxes and fees may vary from the initial estimated amount at the time that the Passenger made the request for standby travel. Passengers who travel on an itinerary of a standby nature are responsible for any increase or decrease in taxes and/or fees that result from the Passenger's final completed ticketed routing, regardless of the initial proposed standby upgrade quote.

b. Stopovers

(1) A stopover is an intentional interruption of the itinerary by the Passenger. No stopovers are permitted on published fares, except upon combination of individually

purchased One-way fares.

c.   Special Fares

(1)   Infant Fares

**<u>NOTE</u>**: Beginning June 1, 2021, Infant fares are no longer available for purchase.

(i)   Infants at least 14 days old and younger than two years of age on the date of
travel, traveling on a confirmed reservation and occupying a reserved seat, with or
without the use of an FAA-approved child restraint device, are eligible for Infant
Fares. This rule also applies to infants younger than 14 days of age traveling on a
confirmed reservation and who are permitted to fly in accordance with <u>Section 6c</u>.

(ii)   At the time of check-in, either government-issued photo identification or another
identification document acceptable to Carrier bearing the birth date of the
Passenger who is traveling on an Infant Fare must be presented to Carrier.

(iii)   Infant Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter. Those Passengers traveling on an Infant Fare whose ages have not been previously verified at a Southwest Airlines ticket counter or as a member of Southwest's Rapid Rewards program must secure their Boarding Passes at the airport and are not eligible to check in online.

(2)   Child Fares

**NOTE**: Beginning June 1, 2021, Child fares are no longer available for purchase.

(i)   Children ages two through 11 who are accompanied by a Passenger at least 12 years of age or older on the date of travel are eligible for Child Fares.

(ii)   At the time of check-in, either government-issued photo identification or another identification document acceptable to Carrier bearing the birth date of the Passenger who is traveling on a Child Fare must be presented to Carrier.

(iii)   Child Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter. Those Passengers traveling on a Child Fare whose ages have not been previously verified at a Southwest Airlines ticket counter or as a member of Southwest's Rapid Rewards program must secure their Boarding Passes at the airport and are not eligible to check in online.

(3)   Military Fares

(i)   United States military personnel on active duty (including reservists, National Guard members, and Coast Guard members with active orders, cadets/midshipmen attending the US Air Force Academy, US Naval Academy, US Military Academy [West Point], and the US Coast Guard Academy) and their authorized dependents are eligible for Military Fares. Military dependents ages two through 11 years old must be accompanied by a military Passenger or a military dependent Passenger at least 12 years of age. Military personnel who have been discharged from active military duty and their authorized dependents traveling together remain eligible for Military Fares if travel will be completed within seven days of the military member's date of discharge.

(ii)   Government Transportation Requests (GTRs) are not permitted or accepted for purchase of transportation booked at a Military Fare.

A valid United States Uniformed Services Active Duty Identification Card or a copy of discharge orders must be presented at the time of check-in for military personnel. Dependents, other than dependents traveling with a discharged military member within seven days of the member's discharge from active duty, must present a United States Uniformed Services Identification and Privilege Card marked Active.

(4)    Military Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter. Passengers travelling on a Military Fare will be able to check-in and secure a boarding position at 24 hours; however, since eligibility verification is required, Passengers will need to verify ID at the airport ticket counter in order to receive a boarding pass.

(5)    Government Fares

(i) For information on both Federal Government (GVT) and State Government (GST) Fares, including Policies & Procedures specific to Federal Government bookings, contact Southwest Business at 1-800-I-FLY-SWA.

(6)    Wanna Get Away Fares

(i) Wanna Get Away Fares are discounted, restricted, nonrefundable fares. Unused funds can be used toward the purchase of future Tickets as long as the Passenger has canceled the confirmed reservation at least ten (10) minutes prior to the scheduled departure time for the flight. Passengers who do not cancel their confirmed reservation will forfeit any unused funds pursuant to Section 2a(2)(iii).

## 4. Tickets

a. Tickets

(1)  No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification acceptable to Carrier to confirm that transportation has been purchased. Such Ticket shall entitle the Passenger to transportation subject to this *Contract of Carriage* and, in particular, certain terms and conditions as follows.

(i)  Such Ticket is valid between the points of origin and destination via the specific routing designated on the Passenger's itinerary only.

(ii)  Passenger is in compliance with fare requirements as provided in Section 3c, including proof of age and status where applicable, that entitle the Passenger to special or military fares.

(iii)  Passenger is in compliance with any other requirements of the Passenger's fare class.

(iv)  The Passenger's Ticket is in the Passenger's own name.

(v)  The Ticket has not been altered or improperly issued.

(2)  Tickets are Nontransferable. Tickets, and any travel credit issued for unused Tickets, are nontransferable unless specified explicitly on the Ticket. Carrier is not liable to the holder of a Ticket for use or refund of such Ticket when presented by a person other than the person to whom the Ticket was issued. If a Ticket is used by a person other than the person to whom it was issued, Carrier shall not be liable for the loss, destruction, damage, or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

(3)  Purchase of Additional Seat. The purchase of more than one seat for use by a single Passenger is required when necessary to transport large musical instruments or electronic audio/video, medical, or otherwise sensitive equipment unsuitable for Carriage as Checked Baggage, as specified in Section 7.

It is the Passenger's responsibility to notify Carrier of any unique seating needs. In accordance with Section 6, Carrier may refuse to transport individuals who are unable or unwilling to comply with Carrier's seating requirements. Purchase of more than one seat for use by a single Passenger for the sole purpose of ensuring additional personal space is prohibited, except in limited circumstances when the Carrier, in its discretion, permits it.

(4)  Tickets Issued Outside of Southwest Airlines Systems

(i)  For Passengers holding a Ticket issued by an entity other than Southwest Airlines (such as an authorized travel agent), flight changes, Ticket cancelations, and Ticket exchanges and refunds must be processed via the Ticket's original booking source/agent in order to retain the forms of payment on the initial Ticket and keep the Ticket and funds associated with such Ticket accessible to the initial booking source/agent.

(ii)   If a Passenger holding a Ticket issued by an authorized travel agent exchanges such Ticket or cancels such Ticket via a Southwest Airlines system or by a Southwest Airlines Agent then funds associated with such Ticket become nonrefundable but remain reusable for travel on Southwest Airlines upon cancelation in accordance with the Ticket's validity period. Section 4 (c) (3) below will apply to the funds associated with such Ticket.

b.   Ticket Acceptability

(1)   Tickets Accepted. Carrier will accept only its own Tickets. Any Tickets issued in conjunction with travel on another airline will not be accepted unless required by federal government regulation or at the Carrier's sole discretion.

(2)   In the event that a Passenger does not comply with the terms and conditions in this *Contract of Carriage*, his/her Ticket shall be invalidated, and Carrier has the right to:

(i)   Cancel any remaining portion of the Passenger's itinerary.

(ii)   Refuse to allow the Passenger to board or check Baggage.

(iii)   Confiscate the Ticket.

c.   Refunds

(1)   Refundable Tickets.

(i)   Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new Ticket. The fare paid for unused travel by Passengers who purchase fully refundable, unrestricted Tickets, including taxes, security fees, and Passenger Facility Charges, may, for any reason and upon surrender or cancellation of the unused Ticket, either be refunded if canceled and refunded instead of exchanging or changing the Ticket or applied as travel credit toward the purchase of future travel for the originally ticketed Passenger in accordance with the form of payment utilized for the Ticket. Such refund or travel credit must be requested within the Ticket's eligibility period. Refund or credit requests will not be honored after the Ticket's expiration date.

(ii)   If a fully refundable fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the fully refundable fare segment(s) are held as travel credit for use by the Passenger on Southwest Airlines. Reservations paid for with a Southwest® gift card will have the amount applied from the Southwest® gift card held as travel funds for use by the Customer on a future Southwest Airlines flight.

(iii)   When the Ticket combines a fully refundable fare with a Wanna Get Away nonrefundable fare and the Passenger does not travel on the Wanna Get Away segment and has not canceled, the reservation at least ten (10) minutes prior to the scheduled departure time, all unused travel funds will be forfeited or held in accordance with Section 2a(2)(iii) and all remaining segments of the reservation are canceled.

(2)    Eligible fare refunds procedures:

    (i)    When no portion of the transportation has been provided, the refund or credit will be issued in an amount equal to the fare paid.

    (ii)    When a portion of the transportation has been provided, the refund or credit will be made in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided.

    (iii)    Carrier shall make eligible refunds in the same form as the original payment. Refunds for Tickets purchased with a credit card shall be processed for crediting to the same credit card account no later than seven business days from the date the refund request is received by Carrier. Refunds for Tickets purchased with cash will be issued by check no later than 20 business days after the refund request is received by Carrier. Refunds for tickets purchased with an exchanged ticket will be processed to the form of a travel credit for use by the Passenger on Southwest Airlines.

    (iv)    Carrier shall make all refunds in U.S. dollars. See Section 8 for additional information for international travel.

(3)    Nonrefundable Tickets.

    (i)    General. The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, except as provided in this Section and Section 9b. Taxes, security fees, and Passenger Facility Charges associated with a nonrefundable fare are also not eligible for refund except as required by applicable regulations.

    (ii)    Travel Credit. Unless otherwise stated by Carrier, the fare paid for unused nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied toward the purchase of future travel on Carrier for the originally ticketed Passenger only. The new Ticket may be more or less expensive or subject to different terms, conditions, or restrictions from the original Ticket.  If the fare is lower, travel credit will be issued for the difference. No cash refund or credit card adjustments will be made for nonrefundable Tickets.

    (iii)    Travel Credit Eligibility. The expiration date of any travel credit will apply to any Tickets purchased with these funds. If a Ticket is purchased with multiple travel credits, the earliest expiration date will apply to the entire Ticket.

    (iv)    Travel Credit Forfeiture. Should a Passenger fail to apply the nonrefundable Ticket or travel credit toward the purchase of future travel within the eligibility period, the entire amount of the fare, including all taxes, security fees, and Passenger Facility Charges, will be forfeited.

(4)    Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is canceled, terminated, or delayed before the Passenger has reached his/her final destination as a result of a flight cancellation, Carrier-caused missed connection, flight delay, or omission of a scheduled stop, Carrier will either transport the Passenger at no additional charge on another of Carrier's flights, refund the fare for the unused transportation in accordance with the form of payment utilized for the Ticket, or provide a credit for such amount toward the purchase of future travel.

## 5. Check-in

a. Boarding Passes

(1) General. Boarding Passes may be obtained at Southwest.com®, the Southwest mobile app, or at the airport from Southwest at:

(i) E-Ticket Check-In kiosks (where available)

(ii) Skycap podiums (where available)

(iii) Ticket counters, or

(iv) Departure gate podiums. Carrier reserves the right, in its sole discretion, to restrict Boarding Pass distribution to the departure gate podium.

(2) Standby Travel. Boarding Passes for Standby Passengers are available for issuance only at the flight's departure gate. A Boarding Pass must be retrieved by Standby Passengers at the flight's departure gate for each scheduled stop at any intermediate or connecting points on the flight.

(3) Invalid Boarding Passes. A Boarding Pass that has been altered or improperly issued shall not be valid and will not be accepted by Carrier.

(4) Transferability. Boarding Passes are nontransferable unless explicitly stated on the Boarding Pass. Carrier is not liable to the holder of a Boarding Pass for use of such Boarding Pass when presented by a person other than the person to whom it was issued. If a Boarding Pass is used by a person other than the person to whom it was issued, Carrier shall not be liable for the loss, destruction, damage or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

b. Check-in Requirements

(1) Ten-Minute Rule. Failure of a Passenger to obtain a Boarding Pass and be present, available, and appropriate as described in Section 6 for boarding in the flight's boarding gate area at least ten minutes before the scheduled departure time may result in cancellation of the Passenger's reservation without notice at the Carrier's sole discretion. Refer to Section 8 for information regarding check-in requirements for international travel.

(2) Early Departure. Carrier reserves the right, in its sole discretion, to depart early when all Passengers who have met the check-in requirements as outlined in Section 5.b.(1) are onboard the aircraft. The scheduled departure and arrival times as published for the flight will not be changed or otherwise affected if the Carrier departs early. It is the Passenger's responsibility to arrive at the departure airport with adequate time to allow for check-in requirements and security screening.

# 6. Acceptance of Passengers

By purchasing and accepting carriage under this *Contract of Carriage,* the Passenger agrees to adhere to and comply with all the requirements of this Section 6. Transportation offered by the Carrier under this *Contract of Carriage*, including International Travel described in Section 8, is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage*.

a.  Refusal to Transport – General

Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances listed below. The fare of any Passenger denied transportation or removed from Carrier's aircraft en route under the provisions of Section 6a will be refunded in accordance with Section 9. The sole recourse of any Passenger refused transportation or removed en route under Section 6a will be the recovery of the refund value of the unused portion of his/her Ticket. Under no circumstances shall Carrier be liable to any Passenger for any type of special, incidental, or consequential damages.

(1)  Safety. Whenever such action is necessary, with or without notice, for reasons of aviation safety.

(2)  Force Majeure Event: Whenever advisable due to Force Majeure Events outside of Carrier's control, including, without limitation acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

(3)  Government Request or Regulation. Whenever such action is necessary to comply with any Federal Aviation Regulation or other applicable government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense.

(4)  Incompatible Medical Requirements. Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Carrier's aircraft: medical oxygen for use onboard the aircraft except FAA-approved and Carrier accepted Portable Oxygen Concentrators (POCs), incubators, medical devices requiring electrical power from the aircraft, or travel on a stretcher.

(5)  Comfort and Safety. Carrier may refuse to transport, or remove from the aircraft at any point, any Passenger in any of the circumstances listed below as may be necessary for the comfort or safety of such Passenger or other Passengers and Crew members:

(i)  Persons who are barefoot and older than five years of age, unless required due to a disability.

(ii)   Persons who are unable to occupy a seat with the seatbelt fastened.

(iii)   Persons who have an offensive odor, unless caused by a disability.

(iv)   Any person who cannot be transported safely for any reason.

(6)   Prisoners. Prisoners (persons charged with or convicted of a crime) under escort of law enforcement personnel; other persons in the custody of law enforcement personnel who are being transported while wearing manacles or other forms of restraint; persons brought into the airport in manacles or other forms of restraint; persons who have resisted escorts; or escorted persons who express to Carrier an objection to being transported on the flight.

b.   Refusal to Transport – Unruly/Disruptive Passenger

Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances described below. A Passenger who is so refused or removed is without further recourse to Carrier for any damages claimed by Passenger, including the refund value of any unused portion of his/her Ticket, and may be liable to Carrier for costs and damages as set forth in this Section 6b.

(1)   The Passenger, at all times, agrees to conduct himself or herself in a manner that is not disruptive, unruly or in contravention of any laws of any state which has jurisdiction over the aircraft.

Conduct is considered to be disruptive or unruly when a Passenger fails to adhere to orderly rules of conduct while embarking upon or being carried onboard Carrier's aircraft or fails to follow the instructions of the Crew and thereby disturbs the good order and discipline onboard the aircraft. (In this Section, the term "Crew" shall mean flight crew, cabin crew, or any other employee of Carrier.) Disruptive or unruly conduct includes, but is not limited to:

(i)   Interfering in any way with or disrupting the operation of the aircraft or any of its components or parts;

(ii)   Interfering in any way with or disrupting the Crew, including, but not limited to: failing to cooperate or interfering with the Crew's duties, refusing to follow instructions to board or leave the aircraft, using portable electronic devices in contravention of instructions from the Crew;

(iii)   Refusing to comply with safety instructions (e.g., instructions to fasten a seat belt, not to smoke, turn off a portable electronic device or disrupting a safety announcement);

(iv)   Verbal confrontation with Crew members or other passengers;

(v)   Physical confrontation with Crew members or other passengers;

(vi)   Refusing to permit the search of his/her person or property by Carrier, Crew or an authorized government agency for explosives, hazardous materials, contraband, or concealed, deadly, or dangerous weapons or articles;

(vii) Refusing to produce positive identification acceptable to the Carrier upon request. For international travel, any Passenger that has not obtained and completed all documentation required for entry into and exit from each country, as well as compliance with the laws, requirements or procedures of each country listed on such itinerary;

(viii) Making an intentional misrepresentation in response to a question or inquiry by the Carrier or Crew, or otherwise attempting to commit, or committing, a fraudulent act against the Carrier;

(ix) Making threats against the safety of the Crew, passengers and aircraft (includes all types of threats, whether directed against a person, e.g., threat to injure someone, or intended to cause confusion and chaos, such as statements referring to a bomb threat, or simply any threatening behavior that could affect the safety of the Crew, passengers and aircraft);

(x) Boarding or attempting to board an aircraft when the passenger has an infectious disease or infection that poses a direct threat (as defined in 14 CFR § 382.3) to the health or safety of passengers and/or Crew;

(xi) Boarding or attempting to board an aircraft with a weapon (Carrier will carry Passengers who meet the qualifications and conditions established in 49 CFR § 1544.219);

(xii) Being or appearing to be intoxicated or under the influence of drugs or alcohol;

(xiii) Engaging in, or threatening, sexual abuse or harassment;

(xiv) Engaging in lewd, obscene or patently offensive behavior, including wearing clothes that are lewd, obscene or patently offensive;

(xv) Refusing to comply with instructions given by Carrier or Crew prohibiting the solicitation of items for sale or purchase, including airline Tickets, reduced-rate travel passes, or travel award certificates;

(xvi) Smoking or attempting to smoke onboard the aircraft;

(xvii) Other types of riotous, disorderly, offensive, threatening, intimidating, violent or belligerent behavior (e.g., screaming; annoying behavior; kicking and/or banging seat backs/tray tables; harassment related to race, color, gender, religion, national origin, disability, age, ethnicity, or sexual orientation).

(2)    Carrier Action

If the Carrier determines, in its sole discretion, that a Passenger has failed or is failing to comply with any of the requirements of this Section 6.b, the Carrier may take any of the following actions that it considers necessary to prevent the continued disruptive or unruly conduct, protect aircraft passengers and/or Crew, and/or protect the good order, safety and discipline onboard the aircraft.

- Physical restraint of that Passenger
- Diversion of the aircraft
- Removal of that Passenger from the aircraft and termination of carriage of that Passenger
- Refusal to carry that Passenger on ticketed and/or future flights
- Reporting of that Passenger to law enforcement authorities

(3)    Exoneration of Liability

That Passenger is without recourse against the Carrier for any actions described in Section 6b(2)

In any action for damages, however founded, if the Carrier proves that the loss or damage was caused or contributed to by the disruptive or unruly conduct of the Passenger claiming compensation, the Carrier shall be exonerated from liability to the extent the conduct caused or contributed to the damage.

When the loss or damage is claimed by a person other than that Passenger, the Carrier, to the extent permitted by applicable law, shall likewise be exonerated from its liability to the extent it proves that the damage was caused or contributed to by the unruly or disruptive conduct of that Passenger.

In the case of damage occasioned by delay the Carrier shall not be liable if it proves that: (a) the delay was caused by the disruptive or unruly conduct of that Passenger; or (b) in the case of International Travel, it and its servants and agents took all measures that could reasonably be required to avoid the damage caused wholly or partly by that Passenger's unruly or disruptive conduct, or that it was impossible for it or them to take such measures.

(4)     Carrier's Right of Recourse Against that Passenger

Passenger agrees that he or she shall be liable, upon demand by the Carrier, for all of the Carrier's costs and damages incurred as a result of that Passenger's disruptive or unruly conduct within the meaning of Section 6b including, but not limited to:

- Repair or replacement of property, including baggage, that was damaged or destroyed by the disruptive or unruly conduct of that Passenger or that resulted from efforts to subdue, restrain, or remove that disruptive or unruly Passenger;
- Any damage, including death or bodily injury, of any passenger or Crew member caused or contributed to by the disruptive or unruly conduct of that Passenger;
- Compensation for delay to passengers, Crew members, and Carrier caused by the disruptive or unruly conduct of that Passenger; and
- The costs incurred by Carrier attributable to any diversion or delay or other interference with the operation of the aircraft due to the disruptive or unruly conduct of that Passenger, including landing and parking fees, fuel purchases, and payments for food and lodging made available to passengers as a result of the diversion.

The Carrier expressly preserves, any other right of recourse or remedy it may have under applicable law against any Passenger engaged in disruptive or unruly conduct, including without limitation, all rights of contribution and indemnity.

c.  Carriage of Children

(1)     Accompanied Minor Children

(i)     Infants younger than 14 days of age.  Carrier will not provide transportation services to any infant younger than 14 days of age, unless a written statement is provided by an attending physician approving such infant for air travel. Infants must be accompanied by a Passenger 12 years old or older.

(ii)     Children 14 days old and younger than two years old. One child 14 days up to two years old on the date of travel may be carried on the lap of an accompanying Passenger 12 years of age or older.  If an adjacent unoccupied seat is available, the child may be secured in an FAA-approved child restraint device without charge. However, if the child is traveling without a confirmed reservation and no adjacent unoccupied seats are available, the child restraint device may have to be transported as Checked Baggage.

(iii)     See Section 8 for additional requirements for the Carriage of Children for international travel.

(2)   Unaccompanied Minor Children

    (i)   Children younger than five years old. Carrier will not accept for Carriage any child less than five years old unless accompanied by a Passenger at least 12 years of age.

    (ii)   Children five through 11 years old. Unaccompanied children ages five through 11 years old will be required to use Carrier's unaccompanied minor service and will be accepted for Carriage by Carrier provided the child has a confirmed reservation and the flight on which he or she travels does not require a change of aircraft or flight number.  However, any unaccompanied child age five through 11 years old will not be accepted for Carriage if, because of operational disruptions, the Carrier determines, in its sole discretion, that the flight on which the child holds a reservation is anticipated to terminate short of or bypass the child's destination. Carrier will not transport unaccompanied minor children on international itineraries. See Section 8 for additional information.

    (iii)   Child drop off and pick up. The parent or guardian who brings an unaccompanied minor child to the departure airport will be required to remain at the departure gate until the flight is airborne. Carrier must be furnished with documentation (duplicate of which must be in the child's possession) that the child will be met by another parent or guardian upon deplaning at his or her destination. The parent or guardian meeting the child at his or her destination will be required to present a valid government-issued photo ID and sign a release form designated by Carrier.

    (iv)   Unaccompanied Minor Charge. In addition to the applicable fare, children for whom unaccompanied minor Carriage is required must pay the applicable unaccompanied minor charge. The unaccompanied minor charge may be refundable under the following circumstances:
- The reservation is canceled by the Customer.
- The Carrier cancels the flight, and the Customer elects to not rebook.
- The child does not travel unaccompanied (i.e., the fee was paid, but an accompanying adult ultimately travels with the child).

(3)   Child Restraint Devices

    (i)   Unless unoccupied seats are available on a flight, Carrier requires a reservation and purchase of a Ticket for Carriage of a child restraint device on board the aircraft to ensure that a child restraint device may be used during flight. Only federally approved child restraint devices are permitted for use aboard Carrier's aircraft. Federal regulations prohibit the use of child booster seats and harness-or vest-type restraining devices, unless such devices have been specifically approved by the Federal Aviation Administration under a Type Certificate (TC), Supplemental Type Certificate (STC), or Technical Standard Order (TSO). Customers are responsible for providing Carrier copies of TC, STC, or TSO documentation for review at the departure gate. Child restraint devices will be considered as items of carryon Baggage counting toward the adult Passenger's carryon allowance, unless the child has been ticketed and a seat reserved for use of the CRD.

d.  Carriage of Passengers with Disabilities

(1)  Carrier will transport Qualified Individuals with a Disability in accordance with the requirements of the U.S. Department of Transportation regulations, 14 CFR Part 382, unless the Carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 CFR § 382.113, the Carrier will not provide certain extensive inflight special services such as assistance in eating, assistance with elimination functions in the lavatory or at the Passenger's seat, or provision of medical services. Carrier may require, at its sole discretion, pursuant to 14 CFR § 382.29, that a Qualified Individual with a Disability be accompanied by a safety assistant as a condition of being provided air transportation in the following circumstances:

   (i)  When the Passenger is unable to comprehend or respond appropriately to safety instructions from Carrier, including the safety briefing required by 14 CFR §§ 121.571(a)(3) and (a)(4) because of a mental disability;

   (ii)  When the Passenger has a mobility impairment so severe that the Passenger is unable to physically assist in his or her own emergency evacuation of the aircraft; or

   (iii)  When the Passenger has both severe hearing and severe vision impairments that prevent the Passenger from establishing a means of communication with Carrier in order to permit transmission of the safety briefing required by 14 CFR §§ 121.571 (a)(3) and (a)(4).

      If Carrier determines, in its sole discretion, that an individual meeting the criteria above must travel with a safety assistant and the individual disagrees and believes he/she is capable of traveling independently, Carrier will not charge the individual for Carriage of a safety assistant of the Carrier's choosing. If a seat is not available for the safety assistant and the individual with a disability is unable to travel on the flight, the individual will be eligible for denied boarding compensation.  For purposes of determining whether a seat is available, the safety assistant shall be deemed to have checked in at the same time as the individual with the disability.

(2)  Assistive Devices. Mobility and other assistive devices used by a Qualified Individual with a Disability may be carried in the aircraft cabin in addition to the carryon Baggage allowance. If necessary due to the Passenger's disability, Carrier will provide assistance in loading, stowing, and retrieving carryon items, including assistive devices. If the device cannot be carried in the Passenger cabin in accordance with FAA regulations, the device will be checked and carried free of charge in addition to the free Baggage allowance. No oversize or excess weight charges will be assessed.  Assistive devices not for the personal use of the Passenger will be accepted subject to a limited release of liability, and may be subject to oversized or overweight charges as described in Section 7f.

(3)  Limitation of Liability. Carrier's liability with respect to damage to or loss of mobility and other assistive devices shall not exceed the documented original purchase price of the assistive device pursuant to 14 CFR § 382.131. Carrier will also compensate the Passenger for other reasonable expenses incurred as a direct result of the loss of, damage to, or delayed delivery of the mobility or assistive device.

(4)   Trained Service Animals

(i)   Per 14 CFR §§382.72 to 382.80, Carrier permits fully Trained Service Animals used by a Qualified Individual with a Disability, as that term is defined in this Contract of Carriage, to accompany the Passenger onboard the aircraft at no charge. See Section 8 for additional information for international travel.

(ii)   Per 14 CFR §382.73, to determine if an animal is a Trained Service Animal that must be accepted for transport, Carrier may ask appropriate questions of the Qualified Individual with a Disability, or may observe the behavior of the animal.To travel with a Trained Service Animal, a Qualified Individual with a Disability must provide a completed form – a U.S. Department of Transportation Service Animal Air Transportation Form.

(iii)  Per 14 CFR §382.79, Carrier may refuse to transport a Trained Service Animal if (a) the animal poses a direct threat to the health or safety of others; (b) the animal causes a significant disruption in the cabin or at an airport gate area, or its behavior on the aircraft or at an airport gate area indicates that it has not been trained to behave properly in public (e.g., running freely, barking or growling repeatedly at other persons on the aircraft, biting or jumping on people, or urinating or defecating in the cabin or gate area); or (c) the animal's carriage would violate applicable safety or health requirements of any U.S. federal agency, U.S. territory, or foreign government.

(iv)  For large Trained Service Animals, which do not fit in the passenger's lap or foot space, Carrier will follow the procedures set forth in 14 CFR §382.77.

(v)   The Trained Service Animal must be harnessed, leashed, or otherwise tethered at all times by the Trained Service Animal user or handler while in the airport and on the aircraft.

(vi)  Carrier will accept a maximum of two (2) Trained Service Animals per Qualified Individual with a Disability.

(vii)  A Trained Service Animal accompanied by a trainer will be permitted to travel aboard Carrier's aircraft only if the animal is being delivered to the domicile of a Qualified Individual with a Disability who either owns or, upon delivery, will take immediate ownership of the animal for that individual's personal use. No charge will be assessed for Carriage of a Trained Service Animal being delivered to the domicile of the animal's owner under such circumstances.

(viii) Southwest Airlines only accepts service animals in training from Canine Companions for Independence (CCI). CCI dogs are transported at no charge and are exempt from the requirements for pets. The following guidelines apply to the transport of CCI dogs:

- CCI ID or letter must be presented.

- Current vaccination record on CCI or veterinarian letterhead must be presented.

- Young or small puppies may need to be transported in carriers.

- Trainers and dogs preboard after Customers with disabilities.

- Cabin seating restrictions apply (e.g., no exit row, must not block egress).

(ix) Local laws and regulations at a Qualified Individual with a Disability's final or intermediate destination(s) may apply and impose further requirements or restrictions. Qualified Individuals with a Disability assume full responsibility for compliance with all governmental laws and regulations, including but not limited to, health certificates, permits and vaccinations required by the country, state, or territory from and/or to which the Trained Service Animal is being transported. Carrier is not liable for any assistance or information provided by the Carrier or any employee or agent thereof to any Qualified Individual with a Disability relating to compliance with such laws and regulations. Subject to applicable laws and regulations, a Qualified Individual with a Disability is solely responsible for any expenses incurred or any consequences resulting from his or her failure to comply with applicable laws and regulations. Carrier expressly reserves the right to seek reimbursement from a Qualified Individual with a Disability for any loss, damage, or expense suffered or incurred by Carrier resulting from such Qualified Individual with a Disability's failure to comply with applicable laws and regulations.

e. Pets

(1) Pets Allowed in the Cabin. Carrier accepts small vaccinated domestic cats and dogs at least eight weeks old contained in a pet carrier and traveling with a Passenger. One pet carrier is allowed per Passenger. The carrier may contain up to two animals of the same species. Unaccompanied Minors may not travel with a pet. Carrier reserves the right to limit the number of pet carriers per flight to six, and pets will be accepted on a first-come, first-served basis.

(2) Pet Carriers. All pets in the cabin must be carried in an appropriate pet carrier and remain in the carrier at all times (including head and tail) while in the gate area, during boarding/deplaning, and while onboard the aircraft. The carriers must be leak-proof and well-ventilated, and the pet(s) must be able to stand up and move around the carrier with ease. The carrier must be of a size small enough to fit under the seat in front of the Passenger and must remain stowed under the seat in front of the Passenger during the entire duration of the flight.  Passengers traveling with a pet may not occupy an exit row seat or a seat with no forward under seat stowage.

(3) Pet Fares. All occupied pet carriers are subject to the applicable pet fare. Pet reservations can only be booked by calling Southwest Airlines. The pet fare must be collected at the airport ticket counter and may not be applied toward future travel if unused. Passenger traveling with a pet must check the pet in at the airport ticket counter and pay the pet fare before proceeding to the departure gate. The pet fare may be refundable under the following circumstances:
- The reservation is canceled by the Customer.
- The Carrier cancels the flight, and the Customer elects not to rebook.

(4) Pets Incompatible with Air Travel. Carrier retains the right, at its sole discretion, to refuse to transport any pet that exhibits aggressive behavior or any other characteristics that appear to Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft. The pet(s) must be healthy, harmless, inoffensive, odorless, and require no attention during the flight. If the pet becomes ill during the flight, oxygen or other first aid procedures will not be administered. In the event of an emergency, an oxygen mask will not be available for the pet.   Carrier assumes no liability for the heath or wellbeing of carryon pets.

(5)     No Pets Carried in Cargo Compartment. Carrier will not transport pets in the aircraft cargo compartments.

(6)     No Pets are accepted on international itineraries. See Section 8 for additional information.

(7)     In accordance with Section 4.(a).3, purchase of an additional seat may be required, at discretion of Carrier, to accommodate the pet of a Passenger with unique seating needs.

(8)     No pets are accepted on itineraries between the continental United States and Hawaii.

f.   Law Enforcement and Search and Rescue Dogs

(1)     Law Enforcement and Search and Rescue Dogs Allowed in the Cabin. Carrier accepts fully-trained law enforcement service dogs trained in explosives or drug detection (or other specific functions) and search and rescue dogs for transportation, without charge, when accompanied by their respective handlers on official business. See Section 8 for additional information for international travel.

(2)     Documentation. Each Customer traveling with a law enforcement or search and rescue dog must present a letter of mission and a copy of the animal's certification.

(3)     Law enforcement and search and rescue animals in training will not be accepted by Carrier for transport.

(4)     Law Enforcement and Search and Rescue Dogs Incompatible with Air Travel. Carrier retains the right, at its sole discretion, to refuse to transport any dog that exhibits aggressive behavior or any other characteristics that appear to Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft.

(5)     No Law Enforcement or Search and Rescue Dogs Carried in Cargo Compartment. Carrier will not transport law enforcement or search and rescue dogs in the aircraft cargo compartments.

## 7.  Baggage

a.  Carryon Baggage

(1)  General. Carrier, in its sole discretion, will determine whether or not any Baggage, because of its weight, size, contents, or character, may be carried in the Passenger cabin of the aircraft. All carryon Baggage must be stowed underneath a seat or in an overhead bin.

(2)  Responsibility of Passenger. Carryon Baggage is the sole responsibility of the Passenger.

(3)  Allowable Carryon Baggage. Passengers are restricted to one item of carryon Baggage (e.g., roller bag, garment bag, tote bag) that does not exceed external dimensions of 10" x 16" x 24" plus one smaller personal type item (e.g., purse, briefcase, laptop computer case, backpack, small camera), provided that such items are capable of being carried onboard the aircraft by one Passenger without additional assistance, unless the Passenger requires assistance due to a disability, and are capable of being stowed under a seat or in an overhead compartment. Sizing boxes or charts with 10" x 16" x 24" dimensions are located at many of Carrier's curbside check-in locations (where available), ticket counters, departure gates, boarding locations, and on many jetbridges. Carrier reserves the right to further restrict the number of carryon items.

(i)  A roller bag that otherwise would meet the 10" x 16" x 24" dimensions if the wheels were removed will be accepted.

(ii)  Oversized articles of reasonable carryon size that protrude from only one side of the sizing box or chart and, because of their fragile nature, would be at greater than normal risk of damage if carried in the cargo hold (e.g., blueprints, map tubes, fishing poles, artwork, media cameras/video equipment) are considered personal type items and may be carried in the passenger cabin if remaining onboard space permits and the item fits in an overhead bin without depriving other Passengers of sufficient overhead bin space.

(iii)  A small musical instrument is considered a personal-type item and may be carried in the passenger cabin regardless of whether it meets the 10" x 16" x 24" dimensions if the instrument can be stowed safely in a suitable baggage compartment in the aircraft cabin or under a passenger seat, and there is space for such stowage at the time the Passenger boards the aircraft.

(iv)  Other medical assistance items (e.g., breast pumps, breast milk) may be carried in the aircraft cabin in addition to the carryon baggage allowance when they can be stowed in accordance with FAA regulations. For assistive devices for qualified Customers with disabilities, reference 6.d(2).

(4)  Outerwear. In addition to the carryon Baggage allowance provided herein, a coat, jacket, wrap, or similar outer garment may be carried onboard the aircraft.

(5)    Instruments and Equipment. The following conditions apply to acceptance for
Carriage in the cabin of large musical instruments and electronic, computer,
audio/video, or other equipment and parts thereof, the size or shape of which
prevents such instruments or equipment from being handled as normal carryon
Baggage.

(i)    The instrument or equipment must be contained in a case or covered so as to
avoid injury to other Passengers.

(ii)    A reservation must be made for the instrument or equipment at a charge no greater
than the Child Fare for each seat used.

(iii)    The instrument or equipment must be stowed in accordance with FAA
requirements for carriage of carryon baggage.

(6)    Carrier, at its sole discretion, will not transport items of carryon Baggage that it
determines may be harmful or dangerous to a Passenger(s), the flight crew, or the
aircraft.

b.  Acceptance of Checked Baggage

(1)    General. Carrier, in its sole discretion, will accept personal property of the Passenger
as Baggage subject to the following conditions:

(i)    Carrier will only accept Baggage for transportation on a flight on which the
Passenger is transported.

(ii)    Carrier will only accept Baggage for transportation if it and its contents can
withstand ordinary handling, and if its weight, size, and character render it suitable
for transportation on the particular aircraft on which it is to be carried, unless the
Passenger agrees to assume the risk of checking the Baggage and the Carrier
accepts the Baggage subject to a limited release of liability, as outlined in Section
7h.

(iii)    Each piece of Baggage tendered to Carrier must have a current identification tag or
label with the Passenger's name, address, and telephone number.

(iv)    With the exception of musical instruments and wheelchairs, mobility aids, and other
assistive devices used by a Qualified Individual with a Disability, Carrier will not
accept as Baggage any item having outside measurements (i.e., the sum of the
greatest outside length plus height plus width) that exceed 80 inches or that weigh
more than 100 pounds. Carrier will not accept as Baggage any musical instrument
if the sum of the length, height, and width of the outside linear dimensions of the
instrument (including case or covering) exceeds 150 inches, or the weight of the
musical instrument exceeds 165 pounds (including case or covering).

(v)    Carrier will not accept Baggage to an intermediate stop or connection point on the
Passenger's Ticket or to a point beyond the Passenger's final ticketed destination.

(vi)    Carrier will not accept Baggage that, because of its nature, contents, or
characteristics (e.g., sharp objects, paint, corrosives, or other prohibited hazardous
materials), might cause injury to Passengers or Carrier, damage to aircraft or other
equipment, or damage to other Baggage.

(vii) Carrier will not accept Baggage that it determines cannot safely be carried in the Baggage compartment of the aircraft for any reason.

c.  Surveillance and Inspection of Baggage

(1)  All Baggage tendered to Carrier for transportation is subject to surveillance and inspection by electronic and/or physical means with or without the Passenger's consent or knowledge by Carrier and/or authorized government agencies.

d.  Checking of Baggage

(1)  Carrier will not accept or hold Baggage from a Passenger on day of travel at Carrier's airport ticket counter or curbside check-in locations (where available) if tendered to Carrier earlier than four hours in advance of flight departure time.

(2)  Where available, Baggage may be accepted at an earlier time at authorized offsite Baggage check-in facilities.

(3)  Baggage must be checked at Carrier's airport ticket counter or curbside check-in locations (where available) at least 45 minutes prior to the flight's scheduled departure time, See Section 8 for additional requirements for international travel.

(4)  Baggage checked in 45 minutes or less prior to a flight's scheduled departure time is subject to Section 7h(8).

(5)  Baggage for international flights will not be accepted if presented to Carrier 60 minutes or less (75 minutes or less for flights departing from Aruba) prior to scheduled departure. Passengers cannot voluntarily separate from luggage on international flights.

e.  Free Checked Baggage Allowance

(1)  General. Upon presentation by a Passenger of a valid Ticket, Carrier will transport two pieces of Baggage without charge, each piece of which has outside measurements (i.e., the sum of the greatest outside length plus width plus height) not exceeding 62 inches, does not weigh more than 50 pounds per piece, and provided such Baggage is suitable to be checked for Carriage in the cargo hold of the aircraft.

(2)  Military Baggage Allowance. Military Passengers traveling on active duty or permanent change of station (PCS) orders will be exempt from the two-piece Baggage limit and will not be subject to excess, oversize, or overweight Baggage charges, provided that none of the pieces of Baggage exceeds 100 pounds in weight and 80 inches in size (outside length plus height plus width).

(3)  Travel Equipment for Infants and Small Children. One stroller and one Child Restraint Device (car seat) per fare-paying Passenger will be accepted subject to a limited release of liability, as outlined in Section 7h. Carrier will accept the items without charge and will not count toward a Passenger's free Checked Baggage allowance.

(4)  Firearms. Carrier will not accept assembled firearms and ammunition for transportation, except as provided below and subject to the size and weight specifications contained below and in Section 7f. Carrier will not accept firearms or ammunition for international travel.  See Section 8 for additional information.

(i)    General. Firearms (e.g., sport rifles, shotguns, and handguns) may be transported as Checked Baggage, so long as they are unloaded and encased in a hard sided, locked container acceptable to Carrier for withstanding normal Checked Baggage handling without sustaining damage to the firearm, with the Passenger retaining possession of the key or combination to the container lock. Firearms may not be packed loose inside a checked bag. Locking, hard-sided baggage will not be considered an acceptable container.

(ii)   Ammunition. Small arms ammunition intended for sport or hunting will be accepted only if carried within sturdy Checked Baggage and in the manufacturer's original container or an equivalent fiber, wood, or metal container specifically designed to carry ammunition and providing for sufficient cartridge separation. Magazines and clips containing ammunition must be securely packaged so as to protect the cartridge primers. Carrier will accept no more than 300 rounds of pistol (rim fire) ammunition, 120 rounds of rifle (center fire) ammunition, or 150 shotgun shells per Passenger, with a total gross weight of the ammunition plus containers not to exceed 11 total pounds per Passenger.

(iii)  Gun Boxes. Gun boxes designed to hold no more than two sporting rifles, shotguns or handguns are exempt from oversize Baggage charges; however, they will be subject to excess Baggage and weight charges if applicable.

(5)    Sporting Equipment. Any of the items listed below may be checked in substitution of one piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis. If the item of sporting equipment exceeds 50 pounds in weight or 62 inches in size (outside length plus height plus width), excess weight and size charges may apply in accordance with Section 7f.

(i)    Archery equipment, including a bow, arrows, and an average size target (large target stands cannot be accepted), so long as the bow and arrows are encased in a container acceptable to Carrier for withstanding normal Baggage handling without sustaining damage to the equipment.

(ii)   Baseball/Softball equipment, including one bag generally consisting of four bats, one helmet, one pair of cleats, one uniform, one glove, and one pair of batting gloves. The catcher may have additional equipment.

(iii)  Bicycles (defined as nonmotorized and having a single seat) properly packed in a hard-sided bicycle box that fall within the dimensions and weight limits established for normal Checked Baggage, (i.e., 62 inches or less in overall dimensions and less than 50 pounds in weight). Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage. Bicycles packaged in cardboard or soft-sided cases will be accepted subject to a limited release of liability, as outlined in Section 7h.

(iv)   Boogieboard, kneeboard or wakeboard.

(v)    Bowling bag, including ball(s) and shoes.

(vi)   Fishing tackle box and fishing rod, so long as the rod is encased in a cylindrical fishing rod container suitable to Carrier for withstanding normal Checked Baggage handling without sustaining damage to the rod.

(vii) Golf bag in hard-sided golf bag carrying case provided by Passenger, including clubs, balls, and shoes. (Hooded golf bags or golf bags in a soft-sided carrying case provided by the Passenger will be accepted subject to a limited release of liability, as outlined in Section 7h).

(viii) Hockey and/or lacrosse stick(s), two hockey or lacrosse sticks taped together and one equipment bag generally consisting of pads, helmets, pants, jersey, gloves, and skates.

(ix) SCUBA equipment, provided air tanks are empty and all accompanying equipment (e.g., BCD, weight belt, one regulator, one tank harness, one tank pressure gauge, one mask, two fins, one snorkel, one knife, and one safety vest) are encased together in a container acceptable to Carrier.

(x) Skateboard.

(xi) Snow ski equipment, including skis or snowboards, ski boots, and ski poles, including one pair of skis or one snowboard, one set of poles, and one pair of ski/snowboard boots encased in a container(s) acceptable to Carrier.

(xii) Water ski equipment encased in a container(s) acceptable to Carrier and including no more than one pair of water skis and one life preserver.

(6) Musical Instruments. Musical instruments may be checked in substitution of one piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis. If the musical instruments exceed 50 pounds (including case or covering) in weight or 62 inches in size (outside length plus height plus width, including case or covering), excess weight and size charges may apply in accordance with Section 7f.

f.  Excess, Oversize, and Overweight Baggage Charges

(1) Excess Baggage. Each piece of Baggage in excess of the free Baggage allowance specified above that is not in excess of 62 inches (outside length plus height plus width) and 50 pounds or less will be accepted for a charge of $75.00 per item One-way.

(2) Oversize Baggage. Subject to Section 7f(4), Baggage in excess of 62 inches but not more than 80 inches (outside length plus height plus width) and musical instruments in excess of 62 inches but not more than 150 inches (outside length plus height plus width, including case or covering) will incur an oversize charge of $75.00 per item One-way.

(3) Overweight Baggage. Subject to Section 7f(4), Baggage weighing between 51 and 100 pounds and musical instruments weighing between 51 and 165 pounds (including case or covering)will be accepted as Checked Baggage for an excess weight charge of $75.00 per item One-way.

(4) Excess, Oversize and/or Overweight Baggage Embargos. Excess, oversize and/or overweight Baggage may not be accepted on flights to/from certain cities during certain specified dates. Contact Southwest Airlines Reservations or Southwest.com® Baggage Policies for a list of cities and effective dates.

(5)     Prohibited Baggage. Baggage in excess of 80 inches (outside length plus height plus width) and/or Baggage weighing more than 100 pounds will not be accepted for Carriage, except if mobility or other assistive devices, hanging garment sample bags with outside length, width, and height measurements up to a maximum of 110 inches, if flexible, or as provided in Section 7e.

g.  Special Items

The items listed below shall be acceptable for Carriage as Checked Baggage upon the Passenger's compliance with the special packing requirements and payment of the applicable One-way charge as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(1)     Bicycle (defined as nonmotorized and having a single seat) properly packed in a bicycle box or hard sided case larger than 62 inches in total dimensions will be accepted as Checked Baggage. Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage. Bicycles packaged in cardboard or soft sided cases will be accepted subject to a limited release of liability, as outlined in Section 7h.

(2)     Camera, film, video, lighting, and sound equipment will be accepted when tendered by representatives of network or local television broadcasting companies or commercial film-making companies. A charge will be applied for each item in excess of the free Baggage allowance.

(3)     Javelins in a single bag, regardless of the number of javelins encased together, will be accepted.

(4)     Kayak (other than a sea kayak).  Paddle(s) must be secured.

(5)     Life Raft

(6)     Surfboard and Kiteboards

(i)     Surfboards and Kiteboards may be subject to a limited release of liability, as outlined in Section 7h.

(ii)    Intrastate Hawaii Travel: Surfboards checked on an itinerary that is for wholly intrastate Hawaii travel (tickets that have an origin and destination solely in the state of Hawaii) are not subject to applicable One-way charges as long as they meet weight restrictions as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(7)     Vaulting poles will be accepted in a single bag, regardless of the number of poles in the bag.

(8)     Wind surfing board, sail, boom.

h.  Unsuitable Baggage Subject to Limited Release of Liability

Carrier may, at its sole discretion, but is not obligated to, accept Baggage unsuitable for Carriage as Checked Baggage, subject to a Limited Release of Liability, as provided below:

(1)     Voluntary Separation for which Carrier is not liable for delay;

(2)     Fragile and unsuitably packed items for which Carrier is not liable for damage and loss of contents;

(3)     Previously damaged items for which Carrier is not liable for damage and loss of contents;

(4)     Inadequately packaged or over-packed items for which Carrier is not liable for damage and loss of contents;

(5)     Perishable items for which Carrier is not liable for spoilage, damage, or delay;

(6)     Soft-sided cases or unprotected/unpacked items, for which Carrier is not liable for damage and loss of contents;

(7)     High-Value Items described in paragraph (i) of this Section, for which Carrier assumes no responsibility for loss, damage, or delay;

(8)     Late-tendered Baggage for which Carrier is not liable for delay; and

(9)     Items where specific requirements under this Section are not met, for which Carrier is not liable for loss, damage, or delay.

Passenger's tender of unsuitable baggage for check-in constitutes Passenger's agreement to the Limited Release of Liability specified in this paragraph. Carrier, in its sole discretion, may require Passenger to sign a Limited Release of Liability form, but it is not necessary.

i.   Limitations of Liability

(1)     General. The liability, if any, of Carrier for loss of, damage to, or delay in the delivery of Checked or carryon Baggage and/or its contents, with the exception of wheelchairs, mobility aids, and assistive devices used by a Qualified Individual with a Disability, is limited to the proven amount of damage or loss, but in no event shall be greater than $3,800.00 per fare paying Passenger pursuant to 14 CFR § 254.4 unless the Passenger at time of check-in has declared the value of the baggage to be in excess of Three Thousand Eight Hundred Dollars ($3,800.00) ("excess valuation") and has paid an additional charge of One Dollar ($1.00) for each One Hundred Dollars ($100.00) of excess valuation. See Paragraph (2) below for excess valuation limitations and Section 8 for information regarding international travel.

(i)     Carrier will compensate the Passenger for reasonable, documented damages incurred as a direct result of the loss of, damage to, or substantially delayed delivery of such Baggage up to the limit of liability, provided the Passenger has exercised reasonable efforts and good judgment to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage.

(ii)    Southwest does not assume liability for claims of missing or damaged articles if a Passenger's Checked Baggage is not damaged, delayed, or lost.

(2)    Excess Valuation

(i)    The declared excess valuation for baggage shall not exceed One Thousand Two Hundred and Fifty Dollars ($1,250.00) above the Three Thousand Eight Hundred Dollar ($3,800.00) limitation of Carrier's liability established by this *Contract of Carriage*, for a total maximum declared valuation of Five Thousand and Fifty Dollars ($5,050.00). Excess valuation coverage is not available for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable papers; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables.

(ii)    When excess value is declared, the Passenger's baggage and its contents may be inspected by Carrier's Employees. Such baggage must be checked, and excess valuation coverage will apply only to the point to which it is checked by Carrier and claimed by the Passenger.

(3)    Baggage Delivery

(i)    General. Carrier will pay delayed Checked Baggage delivery charges only so long as such Baggage was tendered to the Carrier by the Passenger at least 45 minutes prior to the scheduled departure time of the Passenger's first flight. If a Passenger's Baggage is tendered to Carrier less than 45 minutes prior to the scheduled departure of the Passenger's first flight, Carrier will make reasonable efforts, but cannot guarantee, to transport such Baggage on the Passenger's flights, and Carrier will not assume responsibility for delivery charges if such Baggage arrives at the Passenger's destination on a subsequent flight. See Section 8 for conditions applicable to international travel.

(4)    Personal Property Carried Onboard Aircraft. Except as otherwise provided in Section 8, Carrier assumes no responsibility and will not be liable for loss of or damage to personal property carried onboard an aircraft by a Passenger.

(5)    High-Value Items Unsuitable for Checked Baggage. Carrier assumes no responsibility for and will not be liable for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable instruments; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables contained in carryon or Checked Baggage. For the Passenger's protection, these items should not be transported in or as Checked Baggage.  See Section 8 for information about coverage for international travel.

(6)    Normal Wear and Defects. Carrier assumes no responsibility and will not be liable for loss or damage arising from normal wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt. Furthermore, Carrier assumes no liability for defects in Baggage manufacture.

(7)     Previously Damaged Items. Carrier assumes no responsibility and will not be liable for further damage to previously damaged items. Carrier may, but is not obligated to, accept previously damaged items subject to a limited release of liability, as outlined in in Section 7h.

(8)     Claims. In the case of loss of, damage to, or substantial delay in delivery of Checked Baggage, a claim will not be entertained by Carrier unless the following steps are completed by Passenger:

    (i)     In all cases, Passenger must notify Carrier of the claim and receive a Baggage report number not later than four hours after either: (1) arrival of the flight on which the loss, damage, or delay is alleged to have occurred or (2) receipt of the Baggage, whichever is applicable to the claim; and

    (ii)    In all cases, Passenger must submit either: (1) the completed Lost/Delayed Report Receipt form provided by Carrier or (2) a written correspondence that includes the Baggage report number to the Carrier not later than 21 days after the occurrence of the event giving rise to the claim; and

    (iii)   In the case of lost Baggage, Passenger must also submit a completed Property Loss Claim form to Carrier. The form will be mailed to the Passenger upon receipt of written notice of the claim as stated in 7i(8)(ii). The form must be completed and postmarked within 30 days of date of issue by the Carrier.

## 8. International Travel

a. Application of Montreal or Warsaw Convention

(1)  For the purposes of international carriage governed by the Montreal Convention or the Warsaw Convention, whichever may apply, the liability rules set out in the applicable Convention as implemented by this Section are fully incorporated by reference in this *Contract of Carriage* and shall supersede any other provisions of this contract which may be inconsistent with those rules.

b. Death or Injury of Passengers

(1)  The Carrier shall be liable under Article 17 of the Montreal Convention or Warsaw Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a Passenger, as provided in the following paragraphs:

(i)  The Carrier shall not be able to exclude or limit its liability for damages not exceeding 128,821 Special Drawing Rights for each Passenger.

(ii)  The Carrier shall not be liable for damages to the extent that they exceed 128,821 Special Drawing Rights for each Passenger if the Carrier proves that: (a) such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

(iii)  The Carrier reserves all other defenses and limitations available under the Montreal Convention or Warsaw Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (i) and (ii) hereof.

(iv)  With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

(v)  The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the Passenger.

(2)  In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger as provided in the following paragraphs:

(i)  Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

(ii)   The Carrier shall make the advance payment as an advance against the Carrier's liability under the Montreal Convention or the Warsaw Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the Passenger.

(iii)   The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

(iv)   The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

(v)   The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the Passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

c.   Delay of Passengers

(1)   Carrier shall be liable for damage occasioned by delay in the carriage of Passengers by air, as provided in the following paragraphs or in accordance with local law for flights departing from an international location:

(i)   The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

(ii)   Airport, Air Traffic Control, security, and other facilities or personnel, whether public or private, not under the control and direction of the Carrier are not servants or agents of the Carrier, and the Carrier is not liable to the extent the delay is caused by these kinds of facilities or personnel.

(iii)   Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Montreal Convention and the Warsaw Convention, whichever may apply. They include foreseeable compensatory damages sustained by a Passenger and do not include mental injury damages.

(iv)   The Carrier reserves all defenses and limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per Passenger. The limits of liability shall not apply in cases described in Article 22 (5) of the Montreal Convention or Article 25 of the Warsaw Convention, whichever may apply.

d.   Destruction, Loss, or Delay of Baggage

(1)   The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked Baggage, as provided in the following paragraphs:

(i)   Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Rights for each passenger in the case of destruction, loss, damage, or delay of Baggage, whether checked or unchecked, under the Montreal Convention or the Warsaw Convention, whichever may apply. Unless the Passenger proves otherwise: (a) all Baggage checked by a Passenger shall be considered to be the property of that Passenger; (b) a particular piece of Baggage, checked or unchecked, shall not be considered to be the property of more than one Passenger; (c) unchecked Baggage, including personal items, shall be considered to be the property of the Passenger in possession of the Baggage at the time of embarkation.

(ii)   If a Passenger makes, at the time checked Baggage is handed to the Carrier, a special declaration of interest and has paid a supplementary sum, if applicable, the Carrier will be liable for destruction, loss, damage, or delay of such checked Baggage in an amount not exceeding the declared amount, unless the Carrier proves that the declared amount is greater than the Passenger's actual interest in delivery at destination. The declared amount, and the Carrier's liability, shall not exceed the total amount of declaration permissible under the Carrier's regulations, inclusive of the limitation of paragraph (1)(i) hereof. In the case of transportation under the Warsaw Convention, no supplementary sum shall apply unless the declared amount exceeds 22 Special Drawing Rights per kilogram of the total recorded weight of the checked Baggage at the time the Baggage is handed to the Carrier. Nevertheless, the Carrier may impose charges for pieces of Baggage in excess of any free allowance the Carrier may provide.

(iii)   In the case of unchecked Baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents.

(iv)   The Carrier is not liable for destruction, loss, damage, or delay of baggage not in the charge of the Carrier, including Baggage undergoing security inspections or measures not under the control and direction of the Carrier.

(v)   The Carrier reserves all defenses and limitations available under the Montreal Convention and the Warsaw Convention, whichever may apply, to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph (i) hereof.  The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

e.  Time Limitations on Claims and Actions

(1)  Under the Montreal Convention and the Warsaw Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the Carrier no later than seven calendar days in the case of damage to baggage, and 21 calendar days in the case of delay thereof.

f.  International Travel Documents

(1)  Each Passenger traveling on an international itinerary is solely responsible for obtaining and completing all documentation required for entry into and exit from each country, as well as for complying with the laws, requirements or procedures of each country listed on such itinerary. Carrier is not liable for any assistance or information provided by any employee or agent of Carrier to any Passenger relating to such documents or compliance with such laws.

(2)  Parents/guardians of minor children are responsible for compliance with all requirements and procedures for minor children traveling internationally, which may include, but may not be limited to, documentary evidence, such as a notarized letter of relationship and permission for the child's travel from the birth parent(s) or legal guardian(s) not present.

(3)  Carrier reserves the right, in its sole discretion, to deny boarding to any Passenger whose documentation is deemed by either Southwest or a governmental agency to be insufficient for travel or who otherwise does not comply with laws, requirements or procedures of the specific country the Passenger is traveling to, departing from, transiting through, or returning to.

(4)  Subject to applicable laws and regulations, the Passenger is solely responsible for any expenses incurred or any consequences resulting from his or her failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations. Carrier expressly reserves the right to seek reimbursement from the Passenger for any loss, damage, or expense suffered or incurred by Carrier resulting from Passenger's failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations.

g.  Foreign Currency

(1)  To the extent permitted by local law, Passenger agrees to contract exclusively in U.S. dollars.

(2)  All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

(3)  Refunds will be made in the currency in which the fare was paid, or, at Carrier's election where legally permissible, in U.S. dollars in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

h.  Partial Tax Refunds in Limited Circumstances

   (1)  Customers traveling on an international itinerary may be exempt from certain taxes or charges if applicable criteria are met. The Carrier will refund taxes or other charges collected for international transportation only where required by law or where such taxes or other charges were collected in error and the passenger submits evidence of exemption from the taxes or other charges to: Southwest Airlines Refunds Department, P.O. Box 36649, Dallas, Texas 75235-1649.

i.  Check-in Times for International Flights

   (1)  Minimum check-in time for Passengers (with or without checked baggage) is at least 60 minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight. For flights departing Aruba, the minimum check-in time for Passengers (with or without checked baggage) is at least 75 minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight.

   (2)  Passengers must arrive at the gate and be ready to board at least 10 minutes prior to scheduled departure. See Section 2a(2) for complete information on check-in requirements.

j.  Travel by Minors

   (1)  Unaccompanied Minor Travel.  Carrier will not transport unaccompanied minor children on international itineraries. No person under the age of 18 is permitted to travel on an international flight unless accompanied by a parent or companion at least 18 years of age or older.

   (2)  Minors Accompanied by One Parent or Someone who is not a Parent. Special documentation may be required for admission to or departure from certain countries when a minor child is accompanied by only one parent or a person who is not the minor's legal guardian.  See Section 8(f) International Travel Documents herein.

k.  Carriage of Animals

   (1)  Pets. No pets are accepted on international itineraries.

   (2)  Law Enforcement and Search and Rescue Dogs. Law enforcement and search and rescue dogs are allowed subject to the requirements contained in Section 6f, except where prohibited due to a conflict of law.

   (3)  Trained Service Animals. Trained Service Animals for Qualified Individuals with a Disability are accepted as required by 14 CFR § 382, except where prohibited due to a conflict of law. See Section 6.c.(4) Trained Service Animals  for more information.

l.  Firearms

   (1)  Carrier will not accept firearms or ammunition for international travel.

## 9. Service Interruptions

Refer to Section 8 for conditions applicable to international travel.

a. Failure to Operate as Scheduled

    (1)    Canceled Flights or Irregular Operations. In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule, or changes the schedule of any flight, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:

        (i)    Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination, in accordance with Carrier's established reaccommodation practices; or

        (ii)    Refund the unused portion of the Passenger's fare in accordance with Section 4c.

    (2)    Diverted Flights. In the event Carrier diverts any flight, Carrier, at its sole discretion, will take reasonable steps to transport Passenger to his/her final destination or to provide reasonable accommodations.

    (3)    Flight Schedule Changes. Flight schedules are subject to change without notice, and the times shown on Carrier's published schedules, Tickets, and advertising are not guaranteed. At times, without prior notice to Passengers, Carrier may need to substitute other aircraft and may change, add, or omit intermediate stops. Carrier cannot guarantee that Passengers will make connections to other flights by the Carrier or by other airlines. In the event of flight schedule changes or service withdrawals, Carrier will attempt to notify affected Passengers as early as possible.

    (4)    Limitation of Liability. Except to the extent provided in Section 9a, Carrier shall not be liable for any failure or delay in operating any flight, with or without notice for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, including, without limitation, acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

b. Denied Boarding Procedures

    (1)    The following definitions, as prescribed in 14 CFR § 250.1, pertain solely to the denied boarding compensation provisions of this Section:

        **Airport** means the airport at which the direct or connecting flight on which the Passenger holds confirmed reserved space is planned to arrive, or some other airport serving the same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the Passenger.

**Alternate transportation** means air transportation with a confirmed reservation at no additional charge, operated by a Carrier as defined below, or other transportation accepted and used by the Passenger in the case of denied boarding.

**Class of service** means seating in the same cabin class such as First, Business, or Economy class, or in the same seating zone if the Carrier has more than one seating product in the same cabin such as Economy and Premium Economy class.

**Confirmed reserved space** means space on a specific date and on a specific flight and class of service of a Carrier which has been requested by a Passenger, including a Passenger with a ''zero fare ticket,'' and which the Carrier or its agent has verified, by appropriate notation on the ticket or in any other manner provided therefore by the Carrier, as being reserved for the accommodation of the Passenger.

**Fare** means the price paid for air transportation including all mandatory taxes and fees. It does not include ancillary fees for optional services.

**Stopover** means a deliberate interruption of a journey by the Passenger, scheduled to exceed four hours, at a point between the place of departure and the place of final destination.

**Zero fare ticket** means a ticket acquired without a substantial monetary payment such as by using frequent flyer points or vouchers, or a consolidator ticket obtained after a monetary payment that does not show a fare amount on the ticket. A zero fare ticket does not include free or reduced rate air transportation provided to airline employees and guests.

(2)   Request for Volunteers.

   (i)   In the event of an oversold flight, Carrier shall request volunteers for denied boarding before using any other boarding priority in accordance with 14 CFR § 250.2b. A "volunteer" is a person, including the holder of a zero fare ticket, who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation, in any amount, in exchange for relinquishing his/her confirmed reserved space. Any other Passenger denied boarding is considered to have been denied boarding involuntarily, even if that Passenger accepts denied boarding compensation.

   (ii)   Carrier will advise each Passenger solicited to volunteer for denied boarding, no later than the time the Carrier solicits that Passenger to volunteer, whether he or she is in danger of being involuntarily denied boarding and, if so, the compensation the Carrier is obligated to pay if the Passenger is involuntarily denied boarding.  If an insufficient number of volunteers come forward, Carrier may deny boarding to other Passengers in accordance with Carrier's boarding priority rules as specified in Section 6.

(3)     Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversale. Subject to the exception in Section 4, Carrier will tender to a Passenger the amount of compensation specified in Section 5, provided that:

   (i)     The Passenger holds a Ticket, including a Zero Fare Ticket, for confirmed reserved space and presents himself for Carriage at the appropriate time and place, having complied fully with Carrier's requirements as to ticketing, check-in, and acceptability for transportation in accordance with this *Contract of Carriage*; and

   (ii)    Other than for reasons set forth in Section 6, or when resulting from substitution, for operational or safety reasons, of an aircraft having a lesser seating capacity than the aircraft originally scheduled, Carrier is unable to accommodate the Passenger on the flight for which the Passenger holds confirmed reserved space, and such flight departs without the Passenger.

(4)     Comparable Transportation. The Passenger will not be eligible for compensation if Carrier offers comparable air transportation, or other transportation used by the Passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next stopover or, if none, at the airport of the Passenger's final destination no later than one hour after the planned arrival time of the Passenger's original flight or flights.

(5)     Involuntarily Denied Boarding Compensation for an Oversale in Accordance with 14 CFR Part 250(c).

   (i)     Compensation shall be at least 200% of the fare to the Passenger's destination or first stopover, or $775.00, whichever is lower, if the Carrier offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's first stopover, or if none, the airport of the Passenger's final destination:

   •      More than one (1) hour but less than two (2) hours after the planned arrival time of the Passenger's original flight on a domestic itinerary; or

   •      More than one (1) hour but less than four (4) hours after the planned arrival time of the Passenger's original flight on an international itinerary; and

   (ii)    Compensation shall be at least 400% of the fare to the Passenger's destination or first stopover, or $1550.00, whichever is lower, if the Carrier does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's first stopover, of if none, the airport of the Passenger's final destination:

   •      Less than two (2) hours after the planned arrival time of the Passenger's original flight on a domestic itinerary; or

   •      Less than four (4) hours after the planned arrival time of the Passenger's original flight on an international itinerary.

(iii)   Compensation will be paid by Carrier on the day and at the place where the denied boarding occurs, except that if Carrier arranges, for the Passenger's convenience, alternate means of transportation that departs before the payment can be made, payment will be sent by mail or other means within 24 hours after the time the denied boarding occurs.

(iv)   Compensation will initially be provided in the form of a draft payable to the Passenger. With the Passenger's consent, Carrier may also offer travel credit to be applied toward future travel in lieu of the draft. The Passenger may refuse Carrier's offer of travel credit and insist on receiving compensation by draft in the amount specified in Section 5.

(v)   Acceptance of compensation by the Passenger relieves Carrier from any further liability to the Passenger caused by Carrier's failure to honor the confirmed reservation.

(6)   Denied Boarding Priority Rules. Carrier's boarding priority is established on a first-come, first served basis in the order boarding positions are secured. In determining which Passengers holding confirmed reserved space shall be denied boarding involuntarily, Carrier shall deny boarding in reverse order from the order in which the Passengers' boarding positions were secured (i.e., the last Passenger who receives a boarding position will be the first Passenger denied boarding involuntarily in an oversale situation), with no preference given to any particular person or category of fares.

(7)   Written Explanation of Denied Boarding Compensation and Boarding Priority Rules. When a denied boarding occurs, Carrier will give Passengers who are denied boarding involuntarily a written explanatory statement describing the terms and conditions of denied boarding compensation and Carrier's boarding priority rules.

(8)   In addition to the denied boarding compensation specified herein Carrier shall refund all unused ancillary fees for optional services paid by a Passenger who is voluntarily or involuntarily denied boarding. Carrier is not required to refund the ancillary fees for services that are provided with respect to the Passenger's alternate transportation.

c.   Ground Transportation

(1)   Unless provided at the direction of Carrier, Carrier does not assume responsibility for the ground transportation of any Passenger or his/her Baggage between any airport used by Carrier and any other location. Ground Transportation is at the Passenger's expense.

## 10.    Miscellaneous

a.  Claims

    (1)  No claim for personal injury or death of a Passenger will be entertained by Carrier unless written notice of such claim is received by Carrier within 21 days after the occurrence of the event giving rise to the claim.

    (2)  No legal action on any claim described above may be maintained against Carrier unless commenced within one year of the Carrier's written denial of a claim, in whole or in part.

    (3)  See Section 8 for additional information for international travel.

b.  Customer Service Commitment

    (1)  The *Southwest Airlines Customer Service Commitment (CSC)* is incorporated by reference in this *Contract of Carriage*. Carrier's CSC further explains, augments, and expands upon Carrier's policies, procedures, methods of operation, obligations, and dedication to Customer safety, service, and satisfaction in accordance with 14 CFR § 259.5.

c.  Choice of Law, Entire Agreement

    (1)  Any and all matters arising out of or relating to this *Contract of Carriage* and/or the subject matter hereof shall be governed by, construed, and enforced in accordance with the laws of the United States of America and, to the extent not preempted by Federal law, the laws of the State of Texas without regard to conflict of law principles, regardless of the legal theory upon which such matter is asserted. This *Contract of Carriage* represents the entire, integrated agreement between the parties relating to transportation by Carrier, and shall supersede all prior representations, understandings or agreements pertaining thereto, either oral or written. No other covenants, warranties, undertakings or understandings may be implied, in law or in equity.

Plaintiffs' Exhibit 457

**FRONTIER** AIRLINES # Contract of Carriage

**Effective Date:**   04/13/2021

For a summary of changes, click here.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

# LIST OF EFFECTIVE PAGES

| REVISION NUMBER | **77** | REVISION DATE | 04/13/21 |
|---|---|---|---|

| Chapter/Page | Revision/Date |
|---|---|
| 00.00 Pg. 1 | Rev36 04/13/11 |
| 00.00 Pg. 2 | Rev36 04/13/11 |
| 00.00 Pg. 3 | Rev77 04/13/21 |
| Pg. 1 | Rev77 04/13/21 |
| Pg. 2 | Rev77 04/13/21 |
| Pg. 3 | Rev77 04/13/21 |
| Pg. 4 | Rev77 04/13/21 |
| Pg. 5 | Rev77 04/13/21 |
| Pg. 6 | Rev77 04/13/21 |
| Pg. 7 | Rev77 04/13/21 |
| Pg. 8 | Rev77 04/13/21 |
| Pg. 9 | Rev77 04/13/21 |
| Pg. 10 | Rev77 04/13/21 |
| Pg. 11 | Rev77 04/13/21 |
| Pg. 12 | Rev77 04/13/21 |
| Pg. 13 | Rev77 04/13/21 |
| Pg. 14 | Rev77 04/13/21 |
| Pg. 15 | Rev77 04/13/21 |
| Pg. 16 | Rev77 04/13/21 |
| Pg. 17 | Rev77 04/13/21 |
| Pg. 18 | Rev77 04/13/21 |
| Pg. 19 | Rev77 04/13/21 |
| Pg. 20 | Rev77 04/13/21 |
| Pg. 21 | Rev77 04/13/21 |
| Pg. 22 | Rev77 04/13/21 |
| Pg. 23 | Rev77 04/13/21 |
| Pg. 24 | Rev77 04/13/21 |

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev77 04/13/21

## Table Of Contents

| Section | Subject | Page |
|---------|---------|------|

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3. Refusal to Transport and Special Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
4. International Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
5. Child Passengers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
6. Service Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
7. Smoking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
8. Tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
9. Ticket Validity and Itinerary Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
10. Check-in Times . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
11. Fares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
12. Checked Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
13. Carry-On Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
14. Cabin-Seat Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
15. Conditions and Charges for Special Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
16. Limitations of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
17. Claim Limits and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
18. Failure to Operate on Schedule or Failure to Carry . . . . . . . . . . . . . . . . . . . . . . . . . . 19
19. Denied Boarding Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
20. Refunds; No-Show Cancellations and Service Charges . . . . . . . . . . . . . . . . . . . . . . . . 21
21. Currency and Mode of Payment and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
22. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.



**CONTRACT OF CARRIAGE**                                                Rev77 04/13/21

---

## 1.   Introduction

The following terms and conditions as well as such additional terms and conditions presented on Frontier Airlines' website, fare rules, published schedules or printed on or in any ticket or ticket-less travel authorization apply to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier"), as well as that transportation, regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used ("Contract of Carriage").

This document is available for public inspection at all Frontier locations. Copies may be obtained by visiting the Frontier's web site at www.FlyFrontier.com or by writing to: Frontier Airlines, Inc., Customer Relations, 4545 Airport Way, Denver, CO 80239.

## 2.   Definitions

A. **Codeshare** -- A marketing and business arrangement in which two airlines "share" the same flight (which might include connecting legs). One airline places its designator code and flight number on a flight operated by the other airline, and markets and sells tickets for that shared flight as part of its published schedule.

B. **Code** -- The U.S. Internal Revenue Code of 1986, as amended.

C. **DOT** -- U.S. Department of Transportation.

D. **FAA** -- U.S. Federal Aviation Administration.

E. **Fare Rules** -- The rules and requirements associated with a ticket.

F. **IATA** -- International Air Transport Association.

G. **No-Show Cancellation** -- The automatic cancellation of a passenger's ticket upon such passenger failing to either (i) check-in for such passenger's flight, or (ii) board such passenger's flight, in either instance within the required times. The automatic cancellation will apply to all subsequent flights, including return flights, on the itinerary. Presentation of a ticket by someone other than the named passenger renders the ticket void and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 20. )

H. **Qualified Individual with a Disability** -- An individual with a disability who: (i) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (ii) has a record of such an impairment; or, (iii) is regarded as having such an impairment, as further defined in 14 CFR 382.5.

I. **Standby Passenger** -- A passenger boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.

J. **Stopover** -- An intentional interruption in a passenger's trip in excess of 4 hours at a point between the place of departure and the final destination.

K. **STRETCH Seat** - A seat located in the front rows and exit rows of certain Frontier aircraft that have additional legroom. These seats are made available to passengers for a fee.

L. **Ticket** -The record of agreement, including electronic tickets, for passenger air transportation provided by the airline under certain terms and conditions to the passenger as described on the ticket, in the fare rules, and in this Contract of Carriage.

M. **TSA** -- U.S. Transportation Security Administration.

---

**Introduction**                                                                **Pg. 2 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

## 3.   Refusal to Transport and Special Conditions

A.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case Frontier will provide a refund of the amount paid for their ticket, which will be the limit of Frontier's liability.

   1)  Government Request -- To comply with a government requisition of space or request for emergency transportation (e.g., in connection with national defense or natural disaster (actual, threatened, or reported)).

   2)  No Seat for Safety Assistant - If a passenger requires a safety assistant (see section 3. B.6) and there is not a seat available on the applicable flight and, thus, both the passenger and the safety assistant are denied transportation. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

B.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case no refund will be due and Frontier will have no further liability.

   1)  Government Direction - To comply with a direction of a government official acting in their official capacity to remove or not provide transportation to a specific individual.

   2)  Identification -- The passenger refuses to produce a government-issued identification as required by Frontier's representatives or as required by law.

   3)  Passports/Visas -- The passenger intending to travel across any international border fails to possess and present all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over, or into which the passenger will fly, which will in all cases be the passenger's exclusive responsibility.

   4)  Failure to Check In or Appear - The passenger fails to check-in for their flight within the required times or appear for boarding of that flight within the required times. (The ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

   5)  Special Medical Requirements -- The passenger will be refused transport if the passenger requires medical equipment be used in flight or services (i) not provided by Frontier, (ii) that may not be used in flight, or (iii) does not have sufficient supplies therefor. The foregoing includes any medical equipment that would require use of power from the aircraft, medical equipment for which the passenger does not have sufficient batteries for the duration of the flight plus unexpected delays. Passengers must be able to sit in a single seat with the seat in the full and upright position, which precludes passengers that must lie flat or that must be transported on a stretcher. Frontier does not provide medical oxygen.

   *EXCEPTION:*  A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge provided that all batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits, and provided that if the device is to be used in flight: (i) the passenger must carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays, (ii) the device must be approved by the FAA with stickers indicating such, and (iii) prior to traveling, the passenger must complete the Portable Oxygen Concentrator Medical Authorization (form 30881) available on Frontier's website or obtain a medical statement from the passenger's physician addressing the points on the POC Medical Authorization form.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                              Rev77 04/13/21

NOTE:   *Passengers are referred to 14 CFR Part 121, SFAR No. 106 for regulations regarding and a list of Portable Oxygen Concentrators that are approved for use on aircraft.*

6) Qualified Individual with a Disability -- If transportation is refused because the passenger fails to comply with the following: Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 C.F.R. § 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 C.F.R. § 382.113, Frontier does not provide certain extensive in flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances: (i) when the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing, (ii) when the individual has a mobility impairment so severe that the individual is unable to assist in the passenger's own evacuation of the aircraft, (iii) when the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing, (iv) on the day of departure, if it is determined that an individual meeting the criteria of (i), (ii) or (iii) must travel with a safety assistant, contrary to the individual's self-assessment that the passenger is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

7) Prisoners - If transportation is refused because of a failure to comply with the following: Frontier accepts up to two "low risk" prisoners with hand restraints per flight. If the flight is 4 hours or less, at least one armed or unarmed law enforcement officer must accompany the prisoners. If the flight is more than 4 hours, at least two armed or unarmed law enforcement officers must accompany the prisoners. At no time may any prisoner be left unattended. No prisoners are accepted on codeshare itineraries.

8) Resistant Prisoners - Any prisoner who has resisted or is reasonably believed to be capable of resisting the prisoner's escort.

9) Proper Attire - Any passenger who is barefoot and over 3 years of age, unless required to be barefoot for medical reasons, or who is not otherwise fully clothed in clothing that is not lewd or obscene, threatening, intimidating, or would be objectionable to reasonable persons.

10) Malodorous Condition - Any passenger who has a severe or offensive body odor that is not due to a disability.

11) Intoxication - Any passenger who appears to be intoxicated or under the influence of drugs.

12) Communicable Disease or Infection - A passenger who has a communicable disease or infection (that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight) may be denied boarding by Frontier. If such a passenger presents a medical certificate dated within 10 days of the date of the flight for which it is being presented that includes specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not reasonable or feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight. Unacceptable measures include, but are not limited to: a required separation between the passenger and other persons, use of medical equipment not permitted to be used on the aircraft, or a requirement that any other passenger wear protective gear.

---

**Refusal to Transport and Special Conditions**                          Pg. 4 of 24

**FRONTIER**

a) 2019 Novel Coronavirus (COVID-19) – Frontier may screen passengers during the check-in and boarding process, and may deny boarding to passengers who Frontier reasonably believes do not meet Frontier's COVID-19 screening measures. Screening will include, but is not be limited to: completion of a health acknowledgment, required wearing of facial coverings, and submission to a temperature check. Notwithstanding Section 11 above, a passenger who presents a medical certificate dated within 10 days of the date of the flight for which it is being presented may be denied boarding if, on the planned date of travel, the passenger fails to meet Frontier's COVID-19 screening measures.

13) Refusal or Inability to Sit - Any passenger who is unwilling or unable to sit in an upright position during takeoff and landing with the seat belt fastened.

14) Failure to Follow Instructions - Any passenger who refuses to obey instructions from an employee or crewmember.

15) Use of Ticket Issued to Other Person - Any passenger who attempts to use a ticket not issued to that person. (This ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

16) Interference - Any passenger who interferes with any member of the flight crew in pursuit of their duties or attempts to do so.

17) Smoking - Any passenger who smokes or attempts to smoke on an aircraft.

18) Weapon - Any passenger who, except as permitted by law (see 49 C.F.R. § 1544.219), wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons.

19) Purchase in Violation of Contract of Carriage - Any passenger that purchases a ticket in violation of this Contract of Carriage or any fare rule. In addition, Frontier may (i) invalidate the tickets or any other that may have been purchased in the same manner, (ii) cancel any remaining portion of the passenger's itinerary, or (iii) confiscate any unused portions of the ticket.

20) General Refusal - Any person whom Frontier has informed is not permitted to purchase transportation from Frontier.

C. Refusal to Sell Transportation - Frontier may refuse to sell transportation to any person, including the following, and may inform such persons that they are not permitted to purchase transportation from Frontier:

1) Refusal to Comply - A person who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

2) Prior Conduct - A person who has disrupted airline operations, mistreated employees, or has not complied with Frontier's policies or otherwise violates this Contract of Carriage.

3) Misconduct - A person who has committed a fraudulent act against Frontier.

D. Customer of Size - If, in Frontier's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either or both armrests and occupying all or a portion of the adjacent seats, or encroaching into the aisle or adjacent seats, the passenger will be required to purchase a ticket for an additional seat (or more, if required to accommodate the passenger) at the price then applicable. If sufficient, contiguous seats are not available, the passenger will be given the option to switch to flights on which such seats are available (for which applicable fees will apply) or be given a refund.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

E. Allergies (Peanut, Pet, or Chemical) - Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Passengers are advised to consult a healthcare professional regarding the risks of onboard exposure to any allergen.

F. Pregnancy - Passengers who are pregnant are urged to consult with their doctor on whether it is safe to travel by air, including with due consideration to the possibility of turbulence, cabin pressurization, significantly increased risk of deep vein thrombosis associated with pregnancy, and lack of ready access to medical care. This is particularly important for women in their ninth month of pregnancy, who are urged to obtain an examination from their physician shortly before flying to confirm air travel will be safe. Women with a history of complications or premature delivery should not fly if pregnant. By traveling with Frontier, pregnant women acknowledge and accept these risks.Different policies for passengers who are pregnant may apply on any leg of a codeshare flight that is operated by the codeshare airline.

G. Electronic Surveillance of Passengers and Baggage - Passengers and their baggage are subject to inspection, including via electronic means, with or without the passenger's consent or knowledge.

H. Diversion While in Flight or Return to Gate- In the event that Frontier is required to divert an aircraft while in flight or return to gate because a passenger requires medical attention or due to the passenger's conduct, the passenger may be required to reimburse Frontier for the costs that Frontier incurs, including the cost to accommodate other passengers. The amount due will be as determined by Frontier.

## 4. International Transportation

A. Compliance with Regulations - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying therewith (including as may be provided in this Contract of Carriage) or the consequences to any passenger resulting from the passenger's failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B. Compliance with Foreign Country Regulations regarding Importation of Goods - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

C. Customs Inspection - If required, a passenger must attend the inspection of the passenger's baggage, checked or unchecked, by customs or other government officials. Frontier accepts no responsibility to the passenger if they fail to observe this condition.

D. Government Regulation - No liability shall attach to Frontier if, based on what it understands to be applicable law, government regulation, demand, order, or requirement, it refuses to carry passenger. If, however, it is ultimately determined that Frontier was incorrect, the limit of its liability will be to refund the amount paid for the ticket on which transportation was refused.

E. International Operations - Frontier is required to make an attempt to obtain emergency contact information from a passenger traveling into or out of a foreign country. If a passenger refuses to provide emergency contact information, Frontier will document the attempt and may require the passenger to sign the document.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE** Rev77 04/13/21

F. Indemnification - A passenger shall indemnify Frontier for any loss, damage, or expense suffered or incurred by Frontier by reason of the passenger's failure to possess any required travel documents or other failure to comply with the provisions of this section, including the applicable fare if Frontier is required to transport the passenger home from a country. Frontier is not liable to the passenger for loss or expense due to the passenger's failure to comply with this provision.

G. Baggage Limitation - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements regarding baggage size and weight limitations of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

## 5.  Child Passengers

A. Accompanied Children -- Children from 7 days through 14 years of age may travel with another passenger who is at least 15 years old.

B. Unaccompanied Children

1) Frontier does not allow children under the age of 15 years old to travel unaccompanied; they must be accompanied by a passenger who is at least 15 years old. Passengers who are 15 years old or older may travel on Frontier without an adult companion. A birth certificate, official school ID, or other form of ID may be requested for age verification purposes if the child's age appears questionable.

   NOTE:  *Passengers under age 18 traveling without both parents may need additional documentation to travel across international borders, depending on the country's requirements.*

C. Infant and Child Fares (except as otherwise provided in a specific fare rule) are as follows:

1) Infants under 2 years of age are accepted, without charge, when the infant does not occupy a separate seat and is accompanied by a fare-paying passenger at least 15 years old. A birth certificate may be requested for age verification purposes if the infant's age appears questionable.

   NOTE:  *Due to supplemental equipment considerations, the number of infants accepted per flight may be limited based on aircraft type.*

2) One adult may accompany up to two infants under the age of 2.

   a)  When an adult passenger is traveling with two infants under 2 years of age, a seat must be purchased for at least one infant. The fare is the same as an adult fare.

3) Children 7 days - 14 years of age occupying a seat are charged the same fare as an adult passenger.

   NOTE:  *Passengers under age 2 traveling as lap children (not purchasing a seat) are subject to international taxes. These taxes must be paid prior to boarding the originating departure flight.*

D. Child Restraint Systems - Frontier accepts infant and child restraint systems (car seat or harness) approved for air travel that fit in the applicable aircraft seat with the arm rest down that meet the following requirements:

1) Approved seats manufactured to U.S. standards between January 1, 1981, and February 25, 1985, must bear the label: "This child restraint system conforms to all applicable Federal motor vehicle safety standards."

2) Seats manufactured to U.S. standards on or after February 26, 1985, must bear two labels: (i) "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and (ii) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT" in red lettering.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

3) Seats not meeting the above criteria must bear a label or markings showing: (i) the seat was approved by a foreign government, (ii) the seat was manufactured under the standards of the United Nations, (iii) the seat or child restraint device furnished by the certificate holder was approved by the FAA through Type Certificate or Supplemental Type Certificate, or (iv) the seat or child restraint device was approved by the FAA in accordance with 14 C.F.R § 21.8(d), or FAA Technical Standard Order C-100b, or a later version.

> NOTE 1:   *A child under the age of 2 must be held in the passenger's lap or be seated in an approved car seat for taxi, takeoff, and landing.*

> NOTE 2:   *Frontier encourages all adults traveling with infants under 2 years of age to secure the infant in an approved car seat or harness in the infant's own purchased seat.*

4) Child Harness - The FAA-approved AMSafe Aviation C.A.R.E.S. child harness device may be used on-board the aircraft. It is designed for children weighing between 22 and 44 pounds (between 10 and 20 kilograms) and must bear the label "FAA Approved in accordance with 14 CFR 21.305(d) approved for aircraft use only."

5) Car Seats - A car seat may be used by a child between the ages of 7 days and 2 years if seat space is available after boarding, even if a seat has not been purchased for the child. A car seat may be used by any child when a separate seat has been purchased. To use a car seat onboard the aircraft:

   a) It must bear manufacturer labels identifying approval for aircraft use, as described in subsection (1) and (2) above.

   b) It must have a solid seat and solid back.

   c) It must have restraint straps installed to hold the child in the car seat.

   d) The child may not exceed the weight limitation of the car seat.

   e) It may not be placed in the emergency exit rows, in the seats immediately in front of or behind the exit rows, or in any seat that has an airbag seatbelt installed.

   f) Window seats are the preferred location for a car seat, so it does not impede a passenger's movement or egress into the aisle. Other seat assignments are permitted provided the car seat is not obstructing the egress of any passenger.

   g) It must be secured by a seat belt at all times.

6) Booster Seats - Booster seats may be carried onboard aircraft but must be stowed in an overhead compartment or underneath the seat for takeoff and landing. Once the aircraft has reached cruising altitude, the passenger may use the seat during the flight. The booster seat must be stowed when the aircraft begins its descent.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                        Rev77 04/13/21

## 6.  Service Animals

A.  General - The following categories of service animals are allowed in the cabin without charge:

   1)  Trained service dogs that assist passengers with disabilities. Passengers traveling with a service dog must complete and submit the Department of Transportation Service Animal Air Transportation Form, attesting to the dog's health, behavior, and training. For reservations booked more than 48 hours prior to travel, passengers must submit the completed form no later than 48 hours prior to travel. For reservations booked less than 48 hours prior to travel, passengers must submit the completed form in person to a Customer Service Agent upon arrival at the airport. Only dogs will be accepted as trained service animals. The animal must be at least 4 months old. The passenger is required to keep the animal under control at all times, with the animal on a leash or harness while in the boarding area and onboard the aircraft. Psychiatric support animals are recognized as trained service animals. Comfort animals, companionship animals, or any other non-task-trained animals are not recognized as service animals. Service animals in training will not be accepted.

   2)  Service Animals trained in explosive detection, contraband search, or search and rescue on active duty and traveling for that purpose will be accepted for travel. The passenger must present credible documentation the animal is traveling for that purpose.

B.  Seating - The passenger may sit anywhere, except in an emergency exit row, provided the animal does not obstruct an aisle or egress of passengers in an emergency evacuation. The animal must fit under the seat or on the passenger's lap. If the passenger is seated in row 1, the animal will not be allowed on the passenger's lap. The animal may not occupy a seat. An animal that cannot or does not comply with the foregoing will not be accepted.

C.  International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel with a service animal or emotional support animal. Different policies may apply on any leg of a codeshare flight that is operated by the codeshare airline.

D.  Oxygen - No oxygen will be administered to a service animal in the event of an emergency.

## 7.  Smoking

A.  Smoking is prohibited on all flights.

B.  Federal law prohibits tampering with, disabling, or destroying any smoke detector installed in an aircraft lavatory.

C.  The use of electronic smoking devices is prohibited at all times on all aircraft.

## 8.  Tickets

A.  A passenger is entitled to transportation only upon presentation of a valid electronic ticket (e-ticket). The ticket entitles the passenger to transportation between the point of origin and the destination.

   *NOTE:*   *Paper tickets are not issued on Frontier ticket stock. Only electronic tickets are issued for travel on Frontier. However, paper tickets from other airlines may be accepted for travel at Frontier's discretion.*

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                      Rev77 04/13/21

B.  Tickets are honored only in the order in which they are issued.

C.  The following practices are prohibited:

   1)  Back to Back Ticketing -- The purchase or use of portions of tickets from two or more tickets issued as round-trip fares or other scheme for circumventing minimum stay requirements.

   2)  Throwaway Ticketing -- The purchase or use of round-trip tickets for one-way travel.

   3)  Hidden City/Point Beyond Ticketing -- The purchase or use of a ticket from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D.  A ticket which has not been properly issued or paid for, or which has been altered, mutilated, or improperly issued by an unauthorized party is not valid for travel or refund.

E.  The purchaser of a ticket and the passenger intending to use it are responsible for ensuring that the ticket accurately states the name of the passenger.

F.  A ticket may only be used by the person named on the ticket. Frontier is not liable to the purchaser of a ticket if the ticket is used by someone other than the person named on the ticket.

G.  Presentation of a ticket by someone other than the named passenger renders the ticket void. The ticket is subject to confiscation, and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 20. )

H.  An additional processing fee may apply to each ticket purchased or changed via Frontier's reservation center.

## 9.  Ticket Validity and Itinerary Changes

A.  Period of Validity

   1)  Tickets issued by Frontier are valid for transportation only on the flights and dates shown on the ticket and have no value and are not valid for transportation thereafter. If a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee will be retained for 90 days from the date of cancellation of the ticket in the form of an electronic credit. The credit has no cash or refund value and may only be applied to a single subsequent ticket on a Frontier flight for the same passenger as the original ticket. In the case of a No-Show Cancellation, see section 20.

   2)  Except as required by law or as provided in this Contract of Carriage, Frontier shall have no obligation of any kind to reschedule any passengers who cancels a ticket before the scheduled flight departure time or to provide them with any refund or other credit for unused tickets.

   3)  Except as required by law or as provided in this Contract of Carriage, in the case of a No-Show Cancellation, Frontier shall have no obligation of any kind to reschedule any such passengers on any other flight, and the rules respecting No-Show Cancellations shall apply (see section 20. ).

B.  Except for tickets purchased for travel within 7 days (168 hours) of purchase, all tickets may be canceled within twenty-four (24) hours of the purchase and a full refund will be given. After that time, except for tickets that are purchased as refundable, all tickets are non-refundable.

## 10.  Check-in Times

A.  Airport Check-In - It is the passenger's responsibility to arrive at the airport, taking into consideration travel time both to and within the applicable airport, including processing through the security check point with enough time to complete check-in and security screening processes.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

B. Passengers can check in beginning 2 hours before departure at Frontier's airport check-in counters or 24 hours before departure at www.FlyFrontier.com or on the Frontier mobile app, if the reservation is eligible for online or mobile app check-in.

C. Check-In Times

    1) For domestic flights (originating and to a destination within the United States), the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 45 minutes prior to scheduled departure whether or not checking bags.

    2) For international flights, the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 60 minutes prior to scheduled departure.

D. Time Limit for Checking Bags - Baggage to be checked must be presented at the airport within the minimum check-in time. Passengers who present baggage after the minimum check-in time may be refused transport. At some airports, the counter may close at the check-in cut-off time, in such cases, passenger and baggage check-in are not permitted after the check-in deadline. In the event that baggage is accepted after the minimum check-in time, the passenger will be liable for any costs and fees for the bag to be delivered in the event that it is not carried on the same flight.

E. Availability for Boarding - Tickets and seat assignments are subject to cancellation for passengers who fail to make themselves available for boarding at the departure gate at least 20 minutes prior to scheduled departure.

F. Failure to Check In or Appear - If a passenger fails to check in or board the flight within the required time, the ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20).

G. Misconnected Passengers - The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by Frontier will be accommodated on the next available flight operated by Frontier to the same destination. Frontier will not provide transportation on another airline or reimburse the cost of transportation purchased from another airline. The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operated by any other airline will be canceled and no refund or accommodation on another flight will be due unless available and purchased at the applicable price by the passenger.

## 11. Fares

A. Fares apply for transportation only between the airports for which they are published.

B. When a passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.

C. Fares are subject to change without notice until a ticket is issued.

## 12. Checked Baggage

A. Fees applicable to checked baggage:

    1) Baggage fees apply to each checked bag.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                          Rev77 04/13/21

2) Active U.S. military personnel, with Common Access Card (CAC), may check two bags at no charge for all types of tickets. Overweight and oversize charges for the first two free bags are also waived. This policy is for active U.S. military personnel only and does not extend to family members or traveling companions.

B. Baggage Allowance Exceptions - The following may be checked or carried on at no charge and do not count toward the passenger's baggage allowance.

1) Medical Assistive Devices - Canes, crutches, braces, wheelchairs, etc. for the use of the passenger. There is no limit to the number of mobility aids a passenger may check. Medical assistive devices must be packed separately, in protective packaging, for baggage fees to be waived.

2) Wheelchairs - In compliance with federal law, wheelchairs or other types of mobility devices for the passenger are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Certain Frontier aircraft can accommodate up to two wheelchairs up to 40 inches (101 cm) high, 50 inches (127 cm) long, 13 inches (33 cm) wide, and weighing no more than 70 pounds (31 kilograms) in the cabin of the aircraft on a first-come, first-served basis. Wheelchairs carried in the cabin of the aircraft will be brought to the front of the aircraft after all other passengers have deplaned.

3) Essential Infant or Child Items - Child restraint devices, car seats, strollers, diaper bags, and other essential baby items when the infant is traveling. These items must be packed separately, in protective packaging, for baggage fees to be waived.

C. Acceptable Baggage - Frontier will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

1) Checked baggage may not exceed 62 inches (157 cm) in linear dimension (height plus length plus width), nor more than 180 inches (457 cm) in any of those dimensions, or weigh more than 50 pounds (22.6 kilograms). Additional fees apply to items that exceed those size and weight limitations. Baggage weighing 100 or more pounds (45 kilograms) is not accepted.

*NOTE 1:*    *For baggage checked to or from Canada, no baggage weighing more than 70 pounds (31.75 kilograms) will be accepted.*

2) The TSA website maintains a list of items that passengers are not permitted to check in baggage. See www.tsa.gov for a complete list. Baggage containing any items on that list will not be accepted.

3) An item for transportation not suitably packaged to withstand ordinary handling and turbulence, or of a size, weight, or character that renders it unsuitable for transportation will not be accepted.

4) The passenger is responsible for ensuring that all items packed in checked baggage are properly packaged and padded to resist handling and turbulence. (Refer to section 17. )

5) All baggage is subject to inspection by Frontier. Frontier is not, however, obligated to perform an inspection. Frontier will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.

6) Frontier will not accept baggage or other personal property for storage.

7) Frontier will check baggage only when the passenger presents a valid ticket for transportation on the applicable flight.

8) The passenger's name, address, and telephone number must appear on the baggage.

9) Frontier has the right to refuse to transport baggage on any flight other than the one carrying the passenger.

10) Baggage will not be checked:

---

**Checked Baggage**                                          Pg. 12 of 24

**FRONTIER**

    a) To a point that is not reflected on the passenger's ticket.

    b) Other than the passenger's destination on the applicable flight, but if the flight is a connecting flight, to the final destination, but if that connecting flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive then only to the destination of the first leg.

11) Live animals are not accepted as checked baggage.

12) Agricultural items, perishable items, or products that do not conform with customs or agricultural government law at the flight's destination will not be accepted.

13) Frontier will not accept for carriage any restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 C.F.R. §§ 171-177) and IATA Dangerous Goods Regulations. Examples of such goods are (i) liquor products over 140 proof, (ii) gasoline-powered tools, (iii) compressed gases, (iv) corrosives (such as acids and wet batteries), (v) explosives (such as dynamite and fireworks), (vi) flammables (such as matches and lighter fuels), (vii) poisons, and (viii) magnetic and radioactive materials. Electronic smoking devices (commonly referred to as e-cigarettes or personal vaporizers) pose a safety risk and are not permitted in checked baggage. These items are permitted in carry-on baggage. Spare lithium batteries are not allowed in checked baggage.

14) Perishable items must be packaged properly such that they cannot leak through their packaging. (Refer to section 17. )

D. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 13. Carry-On Baggage

A. Passengers are permitted up to two carry-on items:

    1) One free personal item not larger than 8" x 14" x 18" (20 cm x 35 cm x 45 cm) that must fit within the personal item portion of the bag sizer.

    2) One carry-on item not larger than 10"H x 16"W x 24"L (25 cm x 40 cm x 114 cm) and weighing not more than 35 pounds (15 kilograms) that may be placed in the overhead compartment or under the seat. A fee for the carry-on item may apply based on the ticket type purchased. Active U.S. military personnel, with Common Access Card (CAC), may take a carry-on item free of charge for all types of tickets.

    3) Items that exceed these dimensions or are in excess of the allowance will be gate checked to which a fee will apply.

B. The TSA website maintains a list of items that passengers are not permitted to carry onboard an aircraft. See www.tsa.gov for a complete list. Carry-on items containing any items on that list will not be accepted.

C. The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment.

D. Use of Portable Electronic Devices (PEDs)

    1) Small authorized PEDs are devices under 2 pounds and are of a size that can easily be placed in a seat pocket along with the other materials that are normally found in the seat pocket (Passenger Safety Information Card, Menu or airsickness bag). They include devices like tablets, readers, and mobile phones and may be used during all phases of flight when in airplane mode including taxi, takeoff, and landing. However, if using them during taxi, takeoff, and landing, you must secure these devices by holding them, putting them in your pocket or holster, or placing them in a seatback pocket.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

2) Large authorized PEDs are devices 2 pounds or more such as full-size laptops. They must be turned off and stowed during taxi, takeoff, and landing. You may stow them under the seat in front of you or in an overhead compartment. These devices may be used above 10,000 feet when authorized by a Flight Attendant announcement.

3) On all flights operating outside U.S. airspace, PEDs cannot be used during taxi, takeoff, and landing, but may be used in airplane mode above 10,000 feet when authorized by a Flight Attendant announcement.

E. Sound Emitting Devices - Portable electronic devices that emit sound (e.g., music or video players or games) may be used only with headphones and provided the sound, even via the headphones, cannot be heard by others.

F. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 14. Cabin-Seat Baggage

A. Cargo stowed inside the main cabin of the aircraft and occupying a passenger seat is referred to as "Cabin-Seat Baggage." Cabin-Seat Baggage may be transported on flights operated by Frontier subject to the following conditions:

1) The full fare for the ticket for the applicable seat is paid. There is no carry-on baggage allowance or baggage allowance for that ticket. If the Cabin-Seat Baggage must be accommodated into a STRETCH seat due to its size or at the passenger's request, the STRETCH seat fee applies.

2) The Cabin-Seat Baggage must be packaged or covered in a manner to avoid possible injury to passengers and crew.

3) The Cabin-Seat Baggage must be carried aboard the aircraft by the passenger.

4) The Cabin-Seat Baggage may not weigh more than 100 pounds (45 kilograms).

5) The Cabin-Seat Baggage cannot exceed size dimensions of 57" height x 17.84" width x 9.3" depth (144.78 cm x 45.31 cm x 23.62 cm).

6) The Cabin-Seat Baggage must fit in the seat without blocking aircraft signage or extending into the aisle and be secured with a seatbelt or other approved method.

7) Certain seats may not accommodate Cabin-Seat Baggage. Frontier will assign seats as appropriate.

8) Except as provided herein, Frontier is not responsible for damage to Cabin-Seat Baggage.

9) Cabin-Seat Baggage does not count toward the passenger's baggage allowance.

## 15. Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable fees.

*NOTE:* *Refer to the Sports Equipment and Special/Fragile Items chart hosted at* www.FlyFrontier.com *for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.*

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                          Rev77 04/13/21

A. Firearms -- Firearms are accepted as checked baggage on flights within the United States, but not international flights. Carriage of any firearm is subject to the following conditions:

   1) In accordance with federal law, a passenger who presents baggage that contains a firearm must (i) ensure the firearm is unloaded, (ii) pack the firearm in a lockable, hard-sided container, (iii) declare the firearm unloaded at the time of check-in, and (iv) sign a "Firearms Unloaded" declaration.

   2) If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, that container.

   3) If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the container.

   4) After screening, the passenger must lock the firearm container and retain the key or combination.

   5) The passenger must make arrangements for and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

B. Ammunition - Ammunition for firearms (whether or not the firearm is also being carried) is accepted as checked baggage on flights within the United States, but not international flights, subject to the following conditions:

   1) The ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood, or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

   2) Each passenger is allowed up to 11 pounds (4.9 kilograms) of ammunition.

   3) Loaded ammunition clips and magazines must also be securely boxed.

   4) Ammunition may be packed with the firearm.

C. Live Animals -- Frontier accepts live animals only in the cabin of the aircraft, not as checked baggage. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

   EXCEPTION:  See separate rules with respect to service animals referred to in *6. Service Animals*.

   1) Only the following animals are permitted:

      a) Domestic Flights -- Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds.

      b) International Flights -- Domesticated dogs and cats.

   2) The passengers carrying the animal are responsible for making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

   3) The passengers carrying the animal are responsible for paying any import/export fees, duties, or taxes that may apply as well as any fines for failing to comply with applicable law.

   4) International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel.

   5) The passengers carrying the animal are responsible for making advance reservations because no more than ten pet containers will be accepted per flight.

   6) No passenger may carry more than one pet container.

   7) The animal must remain in a pet container at all times and may not be fed while onboard the aircraft.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

8) The pet container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.

9) The animal may not disrupt other passengers and the passenger must be able to quiet the animal without removing it from the container.

10) The container counts toward the carry-on baggage allowance.

11) No oxygen will be administered to an animal in the event of an emergency.

D. Human Remains:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage subject to the following conditions:

   a) The container must be made of a material such as wood or plastic that can be successfully screened by the TSA. If the container cannot be screened, it will not be allowed.

   b) If the container is checked, it must be sufficiently packaged in a well-insulated and sturdy container.

   c) If the container is carried onboard the flight, it counts toward the passenger's carry-on allowance and it must meet carry-on baggage dimensions.

2) Human remains in caskets are not accepted.

E. Dry Ice (frozen carbon dioxide) -- Dry ice may be carried under the following conditions:

1) A maximum of 5.5 pounds (2.5 kilograms) of dry ice per passenger is accepted in checked or carry-on baggage.

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

F. Bicycle - Bicycles may be carried under the following conditions:

1) The handlebars must be fixed sideways, and the pedals removed or wrapped in plastic foam or similar material and the entire bicycle is encased in a hard-sided case.

2) Bicycles may only be carried as checked baggage.

3) A fee applies for each bicycle checked as baggage.

4) Bicycles are excluded from baggage liability unless packaged in a hard-sided case.

G. Special Items - The following items may exceed carry-on baggage dimensions but may be taken as a carry-on item (and count toward the carry-on bag allowance) as long as they fit in the overhead bin: fishing rods, tennis rackets, wedding attire, poster tubes, and musical instruments. If any such items are comprised of more than one piece, they must be packaged together to be considered one item. The carry-on bag fee applies.

H. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

# 16. Limitations of Liability

A. Consequential Damages – Unless it is specifically stated otherwise in this Contract of Carriage, or as required by any applicable law, Frontier is not liable for any indirect, special, or consequential damages arising out of or resulting from transportation provided, delay in transportation, or any failure to provide transportation.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev77 04/13/21

B. International Transportation – With respect to international transportation, as defined in the following referenced conventions, as applicable, Frontier's liability will be limited as specified in, as and if applicable, (i) the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, October 12, 1929, as amended ("Warsaw Convention"), but subject to the Agreement entered into by Frontier pursuant to 14 C.F.R. Part 203 or (ii) the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999 ("Montreal Convention").

## 17. Claim Limits and Procedures

A. Limitations of Liability

1) Domestic Flights – With respect to domestic flights (i.e., those flights originating and ending within the United States) without any scheduled stops outside of the United States, or international flights to which neither the Warsaw Convention or the Montreal Convention apply, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of checked baggage shall be limited to $3,800 for all bags checked under a single ticketed passenger's name. Frontier will not be liable for:

   i) The following items included in checked baggage, with or without the knowledge of Frontier:

   - alcohol
   - antiques
   - art, paintings
   - art supplies
   - artifacts
   - bags made from lightweight material not designed for shipping
   - blueprints
   - books
   - business documents
   - CDs
   - cell phones
   - Cigars, cigarettes, electronic cigarettes, vape pens
   - collectibles
   - computer equipment (including hardware, software and all accessories)
   - dentures
   - drugs prohibited by federal or state law
   - DVDs
   - eyeglasses
   - files
   - food/perishables
   - fragile articles or other similar valuable items and commercial effects
   - hand and power tools
   - heirlooms
   - irreplaceable items
   - jewelry
   - keys
   - machinery and its parts
   - manuscripts
   - medication
   - money
   - natural fur products
   - negotiable papers/ instruments
   - optics
   - orthodontics
   - orthotics
   - photographic/video/ electronic equipment and accessories
   - precious metals or stones
   - publications
   - samples
   - securities
   - silverware
   - sound reproduction equipment
   - sunglasses
   - surgical supports
   - toys

   ii) Articles strapped, taped, or tied to other pieces of baggage, which may become separated as a result of normal handling during transportation

   iii) Damage to the following items when not packed in a hard-sided case or other packing that is suitable for the item:

   - Prosthetic devices
   - Medical equipment

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev77 04/13/21

- Musical instruments
- Recreational or sporting equipment
- Baby items including car seats and strollers

iv) Damage to handles, straps, wheels, and zippers arising from normal wear and tear caused by ordinary handling of baggage

v) Damage arising from ordinary wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt

vi) Damage resulting from over-packing or misuse

vii) Damage arising from liquids on or in baggage; including weather (e.g., rain, snow)

2) International Flights/Montreal Convention – With respect to international flights to which the Montreal Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of baggage (whether checked or carry-on) shall be limited to 1,288 Special Drawing Rights per ticketed passenger. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount.

3) International Flights/Warsaw Convention – With respect to international flights to which the Warsaw Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay of (i) checked baggage shall be limited to 17 Special Drawing Rights per pound, or actual value, whichever is less, (ii) carry-on baggage shall be limited to 332 Special Drawing Rights or actual value, whichever is less. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount. Absent evidence to the contrary, bags will be presumed to weigh 20 pounds.

4) Frontier does not accept declarations of higher value or accept fees based on such declarations.

5) Subject to the above specified limits of liability, Frontier will compensate a passenger whose baggage has been lost, damaged or delayed for reasonable, documented direct damages up to the specified limit of liability, provided the passenger has made reasonable effort to minimize the amount of damage and provided documentation of the loss. The compensation due for lost or damaged property will be determined by the lesser of the documented original purchase price less applicable depreciation or the cost to make repairs.

6) Frontier's liability for wheelchairs, mobility aids, and assistive devices used by a passenger with a disability if lost or damaged by Frontier shall be up to the original purchase price of the device without regard to the above limitations of liability.

7) Passengers who incur incidental expenses as a result of delayed baggage delivery will be reimbursed per established DOT guidelines, subject to the above limitations of liability (as applicable). Any amounts paid to the passenger for incidental expenses will be deducted from the total loss amount prior to check issuance.

8) Frontier will not be liable for loss or damage to carry-on baggage unless such damage is caused by Frontier's or its agent's negligence, which does not include damage resulting from turbulence, shifting of items during flight, or ordinary handling, including placing the baggage in overhead compartments or under seats.

9) Frontier's employees and agents are not liable to passengers.

B. Time Limit to Make Claims and Procedures

---

**Claim Limits and Procedures**                                    **Pg. 18 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

1) With respect to domestic flights and those international flights to which the Montreal Convention does not apply, any claim based on damage, delay, or loss of baggage must be reported to Frontier within 4 hours of the arrival of the flight on which the loss or damage is claimed to have occurred. Claims for pilferage may be made up to 24 hours after flight arrival. Any documentation required to support the claim must be submitted within 30 days from the date the requesting passenger receives the claim form packet from Frontier; Frontier will not be liable if the completed claims are not submitted, with documentation, within that time period.

2) With respect to international flights to which the Montreal Convention applies, in the case of baggage damage, the person entitled to delivery must submit in writing to Frontier as soon as possible after discovery of the damage, and at the latest in writing 7 days from receipt of checked baggage and in the case of delay or loss, complaints must be made at the latest within 21 days from the date on which the baggage has been placed at the passenger's disposal or should have been placed at the passenger's disposal in the case of loss. All claims must be made in writing and must be accompanied by supporting documentation. Any subsequent request for documentation from Frontier must be provided to Frontier within 21 days of the request.

## 18. Failure to Operate on Schedule or Failure to Carry

A. Liability Limited - Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage. Frontier may substitute alternate aircraft, change schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Frontier's sole discretion. Frontier's obligations for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule or type of equipment used on any flight, with or without notice to the passenger, are set forth below.

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket.

C. Delay, Misconnection, or Cancellation - In the event (i) a passenger's flight is canceled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.

D. For purposes of involuntary reroute, the following groups of cities are considered to be the same point. If Frontier is able to provide transportation to one of the specified alternative cities, Frontier has met its obligation for transport to the final destination.

- Chicago-O'Hare (ORD) /Milwaukee (MKE)
- Ft. Lauderdale (FLL) /West Palm Beach (PBI) / Miami (MIA)
- Los Angeles (LAX) /Orange County (SNA)
- Madison (MSN)/Milwaukee (MKE)

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                            Rev77 04/13/21

- New York La Guardia (LGA) /Trenton (TTN) /Philadelphia (PHL)
- Orange County (SNA) /San Diego (SAN)
- Orlando (MCO) /St. Augustine (UST)
- Orlando (MCO) /Tampa (TPA)
- Washington Dulles (IAD) /Washington National (DCA)

E. Schedule Change Prior to Day of Travel -- When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:

1) Transport the passenger over its own route system to the destination; or

2) In the event Frontier determines that the schedule modification is significant, Frontier shall, if requested, provide passengers a refund of the cost of the unused portion of the ticket.

F. Extended Onboard Ground Delays -- In accordance with FAA regulations, Frontier maintains and complies with a separate Contingency Plan for Lengthy Tarmac Delays. Frontier's Contingency Plan for Lengthy Tarmac Delays may be found on Frontier's website at https://az832049.vo.msecnd.net/media/1567/f9-contingency-plan-for-extended-tarmac-delays-2015.pdf. Frontier's Contingency Plan for Lengthy Tarmac Delays is subject to change without notice and is not part of this Contract of Carriage.

## 19. Denied Boarding Compensation

When a seat cannot be provided due to an inadequate number of seats for the number of passengers holding confirmed reservations (overbooking), the actions described in this section will be taken.

A. Voluntary -- Passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel and for compensation in the form of an Electronic Travel Certificate for future transportation within 90 days on Frontier. The request and selection of volunteers will be in a manner determined solely by Frontier.

B. Involuntary -- If insufficient passengers volunteer, passengers who cannot be accommodated on the flight will be denied boarding and Frontier will provide transportation on Frontier's flights to the same destination. After a passenger's boarding pass is collected or scanned and accepted by the gate agent, and the passenger has boarded, a passenger may be removed from a flight only for safety or security reasons or in accordance with Section 3 of this Contract of Carriage.

C. Amount of Compensation -- Frontier will compensate a passenger for involuntary-denied boarding based on the new arrival time after the originally scheduled arrival time as follows:

| Domestic | International | Compensation |
|---|---|---|
| New arrival time within :59 | New arrival time within :59 | No Compensation |
| New arrival time within 1 - 1:59 | New arrival time within 1 - 3:59 | 200% (2x) of the one-way fare, not to exceed $775 |
| New arrival time 2 hours or more | New arrival time 4 hours or more | 400% (4x) of the one-way fare, not to exceed $1550 |

*NOTE 1:*  *Frontier will not provide compensation for denied boarding when an aircraft of lesser capacity is substituted due to operational or safety reasons.*

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

*NOTE 2:*    *No compensation will be due if boarding is denied for reasons other than overbooking (e.g.,*
*pursuant to applicable law or other provisions of this Contract of Carriage).*

D.  Onward Transportation for Passengers Denied Boarding

1)  A passenger denied boarding, voluntarily or involuntarily, pursuant to this section, will be transported on
Frontier's next available flight on which space is available and at no additional charge.

2)  If a passenger who has been denied boarding, voluntarily or involuntarily, pursuant to this section, wishes
to modify the travel date, if space is available, a ticket will be provided for travel within 72 hours at no
additional charge.

E.  Electronic Travel Certificates - Frontier may offer passengers denied boarding involuntarily an Electronic Travel
Voucher good for transportation on Frontier in lieu of cash compensation otherwise due under this section.
Passengers may decline such offer in favor of the applicable cash compensation. The Electronic Travel
Certificate has no refund value, will expire 90 days from date of issuance, is not transferable and may only
be used to purchase tickets for the passenger to whom it is issued. Only one Electronic Travel Certificate may
be used per ticket at the time of purchase. Electronic Travel Certificates may not be applied to ancillary fees
and charges (e.g., seat fees, baggage fees) applied to group travel, or combined with other offers. If a ticket
purchased with an Electronic Travel Certificate costs less than the amount of the certificate, no residual value
remains. Changes to a ticket purchased with an Electronic Travel Certificate may result in a change fee and
any additional fare difference based on the rules of the issued ticket.

F.  Time of Offer and Payment of Compensation

1)  The offer of compensation for overbooking will be made by Frontier on the day and at the place where the
failure to provide confirmed space occurred. If accepted, compensation will be given to the passenger. If
the alternative transportation arranged for the passenger's convenience departs before the payment can
be made, payment will be made by mail or other means within 24 hours after the denied boarding occurs.

2)  Acceptance of any Denied Boarding Compensation constitutes full compensation for damages incurred
by the passenger as a result of Frontier's failure to provide the passenger with a confirmed seat.

# 20.  Refunds; No-Show Cancellations and Service Charges

A.  The provisions of this Section (20.A) shall apply with respect to refunds for tickets under this Contract of
Carriage:

1)  All refunds will be subject to government laws, rules, regulations, or orders of the country in which the
ticket was originally purchased and of the country in which the refund is being made.

2)  The first portion of any amount refunded will be the full amount of taxes and fees imposed on the ticket
purchase.

3)  If applicable, cancellation fees or service charges will be assessed in a separate transaction and netted
against the refunded amount.

4)  No Use - If no portion of the ticket has been used, the refund amount will be equal to the fare, plus any
ancillary purchases (checked or carry-on bag, seat assignments, etc.) and all charges, taxes, and fees
paid for the ticket issued to the passenger.

5)  Partial use - If a portion of the ticket has been used:

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                      Rev77 04/13/21

a) One-way ticket: If travel was terminated at an intermediate or stopover point, the refund amount will be equal to the amount of the fare and all ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid from the point of termination to the destination or to the point at which transportation is to resume and will be the lowest one-way fare for the class of service paid for minus any discount, plus all charges, taxes, and fees proportionately attributable, which shall be reasonably determined by Frontier.

b) Round-trip ticket purchased: the refund amount will be equal to the amount of the fare and ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid on the unused portion of the ticket, plus all charges, taxes, and fees proportionately attributable, which shall be reasonably determined by Frontier.

B. In addition to the provisions of Section 20.A, in situations other than No-Show Cancellations, the provisions of this Section (20.B) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) For refundable tickets that are canceled prior to flight departure, passengers should fill out an online request, available at www.FlyFrontier.com.

2) For tickets that are canceled up to 24 hours after the time of purchase (excluding tickets purchased within seven days before travel, which will be held as a credit, subject to a cancellation fee), passengers should cancel their tickets online at www.FlyFrontier.com.

3) <u>Payment</u> - A refund will be provided only to the original purchaser's form of payment. However, if, at the time of the application for refund, evidence is submitted that a company purchased the ticket on behalf of its employee or a travel agency has made a refund to its client, the refund will be made directly to the employee's company or the travel agency. The Table below illustrates other rules respecting payment:

| Payment Type | Refunded To |
|---|---|
| Universal Air Travel Plan | The subscriber against whose account the ticket was charged |
| Transportation Request issued by a government agency other than a U.S. government agency | The government agency that issued the transportation request |
| U.S. Government Transportation Request | The U.S. government agency that issued the U.S. Government Transportation Request with a check payable to the "Treasurer of the United States" |
| Credit Card | The account of the person to whom the credit card was issued |
| Travel Voucher | The original voucher will be reinstated if the cancellation is within 90 days of the voucher issue date |

4) <u>Identity</u> - Frontier does not assume responsibility to confirm that the person using or presenting a ticket for refund is the true owner of the ticket.

C. In situations involving a No-Show Cancellation, in addition to the provisions of Section 20.A, the provisions of this Section (20.C) shall apply with respect to refunds for tickets under this Contract of Carriage.

1) Automatic Refund; No Additional Submission Required – In the case of a No-Show Cancellation, the refund described in Section 20.A shall be automatically refunded to the purchaser.

2) Automatic Imposition of a No-Show Cancellation Service Charge.

---

**Refunds; No-Show Cancellations and Service Charges**                    **Pg. 22 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

   a) Refund – The refund described in Section 20.A shall be given, but will be netted against the No-Show Cancellation Service Charge in a separate transaction.

   b) Imposition of a No-Show Cancellation Service Charge – A No-Show Cancellation Service Charge will apply with respect to the ticket (or the segment for which the No-Show Cancellation applies) in the amount of the fare plus all ancillary purchases plus all charges, taxes and fees attributable to the fare and ancillary purchases.

   c) The payment of the No-Show Cancellation Service Charge shall not entitle the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) to transportation.

D. To the extent required by applicable law, including Code § 6415(a) and the regulations promulgated thereunder, the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) hereby consents to Frontier recovering any allowance of a credit or refund of any overpayment of governmental fees or tax imposed, including pursuant to Code § 4261, including in each case which overpayment arises directly or indirectly as a result of a No-Show Cancellation as contemplated in this Contract of Carriage.

## 21. Currency and Mode of Payment and Fees

A. Fares, fees, charges, and taxes charged or collected by Frontier are due in United States dollars, except for bookings made through available Canadian online travel sites, which are due in Canadian dollars. Any purchases made in connection with such bookings would also be due in Canadian dollars.

B. All amounts due to Frontier must be paid with a credit card. Frontier does not accept cash for any transactions, including those on Frontier's aircraft.

C. Frontier does not accept personal checks, traveler's checks, certified (cashier's) checks, or money orders.

D. A service charge will apply to any improper chargeback on a credit card and may be charged to the same credit card via which the chargeback is made.

## 22. Miscellaneous

A. Subordination to Law - In all cases, this Contract of Carriage will be subordinate to any applicable law.

B. Metric References - Conversion of British units to metric units are approximate and for reference only. The British unit will apply.

C. Change Without Notice - Except as may be required by applicable laws, government regulations, orders, and requirements, Frontier reserves the right to amend this Contract of Carriage without notice, provided that no such change shall apply to carriage that has commenced.

D. No Waiver/Modification of Terms - No employee or agent of Frontier has the authority to waive, modify, or alter any provisions of the Contract of Carriage unless authorized by a corporate officer of Frontier. Accommodations provided beyond what is required by the Contract of Carriage do not alter the Contract of Carriage. Frontier's employees and agents, including third party travel agents and online travel sites, are only authorized to sell tickets for air transportation on Frontier subject to the Contract of Carriage.

E. Changes in Rules, Fares, and Charges - Unless otherwise provided within specific fare rules, transportation is subject to the rules, fares, and charges in effect on the date a ticket is issued, determined by the validation stamped or imprinted on the ticket, or valid electronic ticket.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                 Rev77 04/13/21

F.  Taxes and Charges - When the ticket is issued for the effective date, all government, airport, vendor, or other charges that apply to passenger travel into foreign countries are the responsibility of the passenger to whom the ticket was originally issued and are in addition to the published fare and charges.

G.  Fares/Charges - Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

H.  No Class Action - Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

I.  Time Limit for Action - No legal action may be brought by a passenger against Frontier unless commenced within 6 months from the date of the alleged incident.

J.  Choice of Law - This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law. All right to trial by jury in any action, proceeding or counterclaim arising out of or in connection with this Contract of Carriage is irrevocably waived.

K.  Codeshare Flights – Except for baggage policies (see section 12. , section 13. , and section 15. ), the policies, rules, and procedures of the operating airline will apply on any codeshare flight.

---

**Miscellaneous**                                                         **Pg. 24 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

# FRONTIER

**REVISION FILING
INSTRUCTIONS / HIGHLIGHTS**

## Contract of Carriage

REVISION NUMBER: ___77___

REVISION DATE: 04/13/21

«FirstName» «LastName»
«Dist_Loc»

**Instructions for paper manuals:**            For an online version of Contract of Carriage, click here.

1. Insert the attached revision as instructed below.
   - o   Pages to be removed are listed in the left-hand column. A horizontal line in this column means no pages are to be removed.
   - o   Pages to be inserted are listed in the middle column. A horizontal line in this column means no pages are to be inserted.
   - o   A description of the revision is found in the right-hand column.
2. Fill in the Revision Date, Date Posted, and Posted By fields on the **Record of Revisions** page.
3. Direct questions regarding this revision to: **Tech Pubs at 720-374-4341.**

| REMOVE PAGES | INSERT PAGES | REVISION HIGHLIGHTS | Page 1 of 1 |
|---|---|---|---|
| 00.00 Pg. 3 | 00.00 Pg. 3 | <u>Changes made per PCR 21-210</u><br><br>**List of Effective Pages** – Updated | |
| Pgs. 1-24 | Pgs. 1-24 | **Updated:**<br>Table of Contents<br>3. Refusal to Transport and Special Conditions<br>17. Claim Limits and Procedures<br>19. Denied Boarding Compensation | |

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

Plaintiffs' Exhibit 458

# Contract of Carriage Document

(revised November 8, 2021)

Transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express, are subject to the following terms and conditions, in addition to any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt. To the extent there is a conflict between this Contract of Carriage and any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, this Contract governs. By purchasing a ticket or accepting transportation, the passenger agrees to be bound by these controlling terms of this Contract of Carriage, and no covenants at law or in equity shall be implied or incorporated. Note, only the English version of United's Contract of Carriage governs the transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express.

# Table of Contents

- Rule 1 Definitions
- Rule 2 Standard Format of Electronic Rules For Tariff Filing Purpose
- Rule 3 Application of Contract
- Rule 4 Reservations – Confirmation/Fare Quotes/Disclosures
- Rule 5 Cancellation of Reservations
- Rule 6 Tickets
- Rule 7 Ticket Validity Period
- Rule 8 Returned Check Charge
- Rule 9 Deleted
- Rule 10 Transatlantic Surcharges
- Rule 11 Pacific Surcharges
- Rule 12 Western Hemisphere Surcharges
- Rule 13 Acceptance of Children/Minors and Infants
- Rule 14 Special Services
- Rule 15 Medical Services
- Rule 16 Service Animals
- Rule 17 Ground Transfer Service
- Rule 18 Service Provided by United Express and Other Codeshare Partners
- Rule 19 Travel Documents
- Rule 20 Screening of Passengers and Baggage
- Rule 21 Refusal of Transport
- Rule 22 Smoking Policy
- Rule 23 Baggage
- Rule 24 Flight Delays/Cancellations/Aircraft Changes
- Rule 25 Denied Boarding Compensation
- Rule 26 Rerouting
- Rule 27 Refunds
- Rule 28 Additional Liability Limitations
- Rule 29 Customer Service Complaints
- Rule 30 Consent to use of Personal Data

# Rule 1 Definitions

As used in this Contract of Carriage, the following terms, whether or not capitalized, shall have the meanings ascribed below:

Add-On-Fare: See "Arbitrary"

Adult means a person who has reached his/her eighteenth birthday as of the date of commencement of travel.

Africa means the area composed of all the countries on the continent of Africa, other than Algeria, Morocco, Sudan, Tunisia, and Egypt, but including the following islands: Cape Verde, Comoros, Madagascar, Mauritius, Reunion, Sao Tome y Principe, and Seychelles.

Alternate Transportation means air transportation with a confirmed reservation at no additional charge (by any scheduled airline licensed by DOT), or other transportation accepted and used by the passenger in the case of denied boarding.

Animals means domesticated cats and dogs.

Applicable Adult Fare means the fare which would be applicable to an adult for the transportation excepting those special fares applicable to a passenger's status, e.g., military fares, adult standby, etc.

Airline Designator Code is the two letter identification code that reflects the Marketing Carrier, which may be different from the carrier operating the flight.

Arbitrary means an amount published for use only in combination with other fares for the construction of Through Fares. It is also referred to as "Proportional Fare", "Basing Fare", and "Add-On-Fare".

Area No. 1 (or "Area 1") means the area composed of all of the North and South American continents and the islands adjacent thereto, Greenland, Bermuda, the West Indies, the islands of the Caribbean Sea, and the Hawaiian Islands (including Midway and Palmyra).

Area No. 2 (or "Area 2") means the area composed of all of Europe (including that part of the Russian Federation in Europe) and the islands adjacent thereto, Iceland, the Azores, all of Africa and the islands adjacent thereto, Ascencion Island and that part of Asia lying west of and including Iran.

Area No. 3 (or "Area 3") means the area composed of all of Asia and the islands adjacent thereto except that portion included in Area No. 2, all of the East Indies, Australasia, the islands of the Pacific Ocean except those included in Area No. 1, and the Russian Federation (East of the Ural Mountains).

Asia means the area composed of Afghanistan, Bangladesh, Bhutan, Brunei, China, Hong Kong, India, Indonesia, the islands of the Pacific in Area No. 3 north of the equator, Japan, Kazakhstan, Kampuchea, Korea, Kyrgyzstan, Laos, Malaysia, Maldive Islands, Myanmar, Nepal, Outer Mongolia, Pakistan, Philippines, Russian Federation (East of the Ural Mountains), Singapore, Sri Lanka, Taiwan, Tajikistan, Timor, Thailand, Turkmenistan, Uzbekistan and Viet Nam.

Australasia means the area composed of Australia, New Caledonia, New Zealand, New Hebrides, Fiji, Samoa, Cook Islands, Papua, New Guinea, Tahiti and the islands adjacent thereto.

Baggage means such reasonable articles, effects and other personal property of a ticketed Passenger as are reasonably necessary or appropriate for the wear, use, comfort or convenience of the Passenger in connection with the Passenger's trip. Unless otherwise specified, it shall include both checked and unchecked baggage and property of the Passenger.

Baggage Check or Baggage Claim Tag mean those portions of the ticket that identify the carriage of a Passenger's checked baggage and that are issued by the carrier as a receipt for the Passenger's checked baggage.

Baggage Rules mean the conditions associated with the acceptance of baggage, including all applicable service charges, and services incidental to the transportation of baggage. See Rule 23 for more information.

Baggage Tag means a document issued by the carrier solely for identification of checked baggage, the portion of which is attached by the carrier to a particular article of checked baggage.

Banker's Buying Rate ("BBR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will purchase a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Banker's Selling Rate ("BSR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will sell a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Basing Fare: See "Arbitrary"

Cabin Baggage means Carry-On-Baggage that due to its size and nature requires the purchase of a seat on board the aircraft to transport the piece of baggage.

Calendar Month means the period of time starting with the start of any day of a month, identified by number, and ending with the start of the same day of the following month. When the same day does not occur in the following month, this period ends on the last day of the month.

Calendar Week means a period of seven days starting at 12:01 a.m. Sunday and ending at midnight of the following Saturday, provided that when used in reference to service offered only once a week between points of travel, it shall mean a period of eight days commencing with 12:01 a.m. on the day the flight operates.

Caribbean Area means the area composed of Anguilla, Antigua, Aruba, Bahamas, Barbados, Barbuda, Bermuda, Bonaire, British Virgin Islands, Cayman Islands, Cuba, Curacao, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Leeward Islands, Martinique, Montserrat, Netherlands Antilles, Nevis, Saba, St. Barthelemy, St. Eustatius, St. Kitts, St. Lucia, St. Maarten, St. Vincent, Trinidad and Tobago, Turks and Caicos Islands, West Indies and Windward Islands.

Carriage means transportation of Passengers and their baggage by air or ground, either gratuitously or for payment.

Carrier means the carrier (air or ground) issuing the ticket and all carriers that carry or undertake to carry the Passenger and/or his baggage thereunder.

Carry-on-Baggage means baggage, other than Checked Baggage, carried on board an aircraft by a ticketed Passenger also known as unchecked baggage.

Central Africa means the area composed of Malawi, Zambia and Zimbabwe.

Central America means the area composed of Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua and Panama.

Checked Baggage means baggage that a ticketed Passenger has requested be carried by the carrier and for which the carrier has issued a Baggage Claim Tag to the Passenger.

Child means a person who has reached his/her second birthday but not his/her 12th birthday as of the date of commencement of travel.

Circle Trip means travel from a point and return thereto by a continuous, circuitous air route (including journeys comprising two (2) fare components but which do not meet the conditions of the round trip definition), provided, that where no reasonable direct scheduled air route is available between two points, a break in the circle may be traveled by any other means of transportation without prejudice to the circle trip.

Civic Aeronautics Board ("C.A.B.") means the United States Department of Transportation ("DOT").

Codeshare means an arrangement by which UA offers transportation service to a Passenger who is ticketed with the two letter airline designator code "UA" on a flight that is operated by a carrier other than UA.

Comparable air transportation means transportation provided by air carriers or foreign air carriers holding certificates of public convenience and necessity or foreign permits.

Confirmed reserved space means space on a specific date and on a specific flight and class of service that has been requested by a passenger, and that UA or its agent has verified by appropriate notation on the ticket as being reserved for the accommodation of the passenger.

Conjunction Ticket means two or more tickets concurrently issued to a Passenger and which together constitute a single contract of carriage.

Connection means a stop at an intermediate point on the route to be traveled where a change of planes is made and which does not fall within the definition of a stopover.

Consequential Damages means damages which are the result of an act but are not direct or immediate.

Contiguous United States or Continental United States mean the District of Columbia and all states of the United States other than Alaska or Hawaii.

Contract of Carriage means the terms and conditions contained in this document, as amended from time to time by the Carrier.

Country of Commencement of Transportation means the country from which travel on the first international sector takes place.

Country of Payment means the country where payment is made by the purchaser to the carrier or its agent. Payment by check, credit card or other banking instruments shall be deemed to have been made at the place where such instrument is accepted by the carrier or its agent.

Days means full calendar days, including Sunday and legal holidays, provided that for the purposes of notification, the balance of the day upon which notice is dispatched shall not be counted; and that for purposes of determining the duration of a validity period, the balance of the day upon which the ticket is issued or the flight commenced shall not be counted.

Department of Transportation ("DOT") means the United States Department of Transportation.

Destination means the ultimate point of the Passenger's journey as shown on the Ticket.

Domestic Carriage ("Domestic") means (except as otherwise specified) carriage in which, according to the Contract of Carriage, the place of departure, the place of destination or stopover, and the entire transportation is between points within the United States, or points within another sovereign state.

DOT Hazardous Materials Regulations are those regulations issued by the Materials Transportation Bureau of the Department of Transportation in Title 49 of the Code of Federal Regulations, Parts 171 through 180 (49 CFR 171-180).

Down Line Carrier means any carrier, other than the selecting carrier, who is identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

East Africa means the area composed of Burundi, Djibouti, Ethiopia, Kenya, Rwanda, Somalia, Tanzania and Uganda.

Europe means the area composed of Albania, Algeria, Andorra, Armenia, Austria, Azerbaijan, Azores, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Canary Islands, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Lichtenstein, Lithuania, Luxembourg, Madeira, Malta, Monaco, Morocco, Netherlands, Norway, Poland, Portugal, Romania, Russian Federation (West of the Ural Mountains), San Marino, Slovakia, Slovenia, Spain, Sweden, Switzerland, Tunisia, Turkey in Europe and Asia, Ukraine, and the United Kingdom.

Fare Component means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

Flight Coupon means a portion of the Ticket that indicates travel points between which the coupon is good for carriage.

Force Majeure Event – any of the following situations: (a) Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition; (b) Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services; (c) Any governmental regulation, demand or requirement; (d) Any shortage of labor, fuel, or facilities of UA or others; (e) Damage to UA's Aircraft or equipment caused by another party; (f) Any emergency situation requiring immediate care or protection for a person or property; or (g) Any event not reasonably foreseen, anticipated or predicted by UA.

Foreign Air Transportation means transportation between a point in the United States and a point outside thereof.

Half Round Trip Fare means 50 percent of a specified or constructed round trip normal or special fare. In the absence of a specified or constructed round trip normal fare, the one way normal fare is considered to be a half round trip normal fare. If a specified or constructed one way special fare may be doubled to establish a round trip special fare, the one way special fare is considered to be a half round trip special fare.

Hawaii means Hilo, Honolulu, Kona, Lihue, and Maui.

IATA Rate of Exchange means the published rate of exchange issued by IATA from time to time.

Iberian Peninsula means the area composed of Gibraltar, Portugal (including Azores and Madeira) and Spain (including Balearic and Canary Islands).

Immediate Family Member means spouse, children, step-children, foster children, legally adopted wards, son/daughter-in-law, grandchildren, parents, step-parents, legal guardians, mother/father-in-law, grandparents, brother/sister, step-brother/sister, half-brother/sister, brother/sister-in-law, aunts/uncles and nieces/nephews.

Indian Ocean Islands means Comoros, Madagascar, Mauritius, Mayotte, Reunion and Seychelles.

Indian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Republic of Maldives and Sri Lanka.

Infant means a person who has not reached his/her second birthday as of the date of commencement of travel.

Interchange flight means a flight operated over the routes of two or more carriers without change of equipment.

Interline Transfer Point means any point at which the Passenger transfers from the services of one carrier to the services of another carrier.

Interline Transportation/Interline Agreement means carriage on the services of more than one carrier where carriers agree to accept each other's tickets and baggage.

Interline Itinerary means flights reflected on a single ticket involving more than one carrier.

International Carriage ("International") means any carriage other than Domestic Carriage, however, when the Warsaw and/or Montreal Conventions are applicable, the stated definitions of "International" therein shall prevail.

International Sector means a Sector of uninterrupted air travel for which the arrival and departure points are in two different countries.

NOTE: For purposes of applying fares under this Contract of Carriage:

1. Travel on a sector between the U.S.A. and Canada is not considered international, and

2. For fare construction purposes, when transoceanic travel is involved in a fare component, travel on the transoceanic sector shall be considered the international sector.

Interstate Transportation means transportation between a point in any state of the United States and the District of Columbia and a point in any other state of the United States or the District of Columbia.

Intraline Transportation or "On-line" transportation means carriage solely over the services of a single air carrier.

Journey means all travel included on a Ticket or group of Conjunction Tickets.

Legal Guardian means one who legally has the care and management of an infant/minor.

Local Currency Fares means fares and related charges expressed in the currency of the Country of Commencement of Transportation.

Major Life Activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Marketing Carrier means the carrier that sells flights under its Airline Designator Code, which code is identified on the first flight segment of the Passenger's ticket (i.e., Selected/Selecting Carrier for purposes of Interline Transportation to Canada only).

Maximum Outside Linear Dimensions means the sum of the greatest outside length plus the greatest outside width, plus the greatest outside height.

Medical Certificate means a letter or form from the Passenger's treating physician or hospital, where applicable, which must be signed and dated within one week of the first affected flight departure by the treating physician, or hospital in the country where the illness or treatment arose and which certifies the nature of the Passenger's illness and treatment.

Micronesia means the area composed of Guam, Johnston Island, Marshall Islands, Caroline Islands, Palau Island and Mariana Islands.

Mid-Atlantic Area means the area composed of Anguilla, Antigua, Bahamas, Barbuda, Barbados, Bermuda, Bolivia, Bonaire, Belize, Cayman Islands, Colombia, Costa Rica, Cuca, Curacao, Dominican Republic, Ecuador, El Salvador, French Guiana, Guadeloupe, Guyana, Haiti, Honduras, Jamaica, Martinique, Montserrat, Navis, Nicaragua, Panama, Peru, Puerto Rico, St. Kitts, St. Croix, St. Maarten, St. Thomas, Surinam, Trinidad, Tobago, and Venezuela.

Middle East means the area composed of Aden, Bahrain, Cyprus, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Muscat and Oman, Qatar, Saudi Arabia, Sudan, Syria, Trucial, United Arab Emirates and Yemen.

Military Agencies mean departments of the U.S.A. Army, Navy, and Air Force, the Marine Corps, the Coast Guard, the respective academies of the Army, Navy, Air Force, and Coast Guard, and the National Guard. The Reserve Officer Training Corps is not included.

Military Passenger means military personnel of the Military Agencies who are on active duty status or who have been discharged from active military service within seven days of the date of travel.

Minor means a person who has reached his/her second birthday but not his/her 18th birthday as of the date of commencement of travel.

Montreal Convention means the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999.

Netherlands Antilles means the islands of Bonaire, Curacao and St. Maarten.

Normal Fare means the full fare established for regular or usual service, the application of which is not dependent upon any limited period of ticket validity or other special circumstances. Unless otherwise herein specified, Normal Fares shall be considered to include the following, all year one-way, round trip, circle trip and open jaw trips, First Class, Business Class, Executive Class, Economy Class, Basic Economy, one-class Standard Service, Standard Services, Tourist/Coach Class service, Thrift Class service fares, and on-season and off-season fares.

North America means the area composed of Alaska, Canada, the Continental U.S.A. and Mexico.

North Central Pacific means all routes between points in Canada/U.S.A. and points in Area No. 3, except points in the Southwest Pacific, via the Pacific Ocean.

On-line means air transportation wholly on the same carrier.

On-line Tariff Data Base means the remotely accessible, on-line version, maintained by the filer, of (1) the electronically filed tariff data submitted to the "official DOT tariff database," and (2) the DOT approvals, disapprovals and other actions required by DOT.

On-line Transfer Point means any point at which the Passenger transfers from one service of a carrier to another service of the same carrier (bearing a different flight number).

Open-Jaw Trip means travel which is essentially of a round trip nature but the outward point of departure and inward point of arrival and/or outward point of arrival and inward point of departure are not the same.

Operating Carrier means the carrier that operates the actual flight.

Origin means the initial starting place of the journey.

Other Charges means charges such as taxes, fees, etc., not to be shown in the fare construction box of the ticket, excluding excess baggage charges.

Outward point means the stopover point on the passenger's itinerary that is the furthest from the passenger's point of origin.

Oversold Flight means a flight where there are more Passengers holding valid confirmed Tickets that check-in for the flight within the prescribed check-in time than there are available seats.

Participating Carrier includes both the selecting carrier and the down line carrier who has been identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

Passenger means any person, except members of the crew, carried or holding a confirmed reservation to be carried in an aircraft with the consent of the carrier.

Passenger Coupon means that portion of the Ticket constituting the Passenger's written evidence of the Contract of Carriage.

Proportional Fare: See "Arbitrary" above.

Qualified Individual with a Disability means any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more Major Life Activities, has a record of such an impairment, or is regarded as having such an impairment. The phrases used in this definition are further defined in 14 CFR Part 382.3.

Related Charges means those charges to be shown in the fare construction box of the ticket and excess baggage charges.

Reroute means a change of routing, carriers, fares, class of service, flight or date from that originally provided on the ticket, but does not apply to open tickets.

Resident ("a Resident") means a person whose usual residence is in a certain country, provided that a more restricted definition may apply under local law.

Round-Trip means travel from one point to another and return by any air route for which the same normal all year through one way fare of the same class applies from the point of origin, provided that this definition shall not apply to travel for which the same all year through one way fare is established, between two points, in either direction around the world.

Routing means the cities and/or class of service and/or type of aircraft via which carriage is provided by the carrier(s) between two points.

Scandinavia means the area composed of Denmark, Norway and Sweden.

Search and Rescue Animals means a trained animal that assists law enforcement officers in the search of contraband and or other items, or which provides assistance with rescue efforts.

Sector or Segment is the portion of a journey covered by a single Flight Coupon.

Selected Carrier means the carrier whose baggage rules apply to the entire interline itinerary.

Selecting Carrier means the carrier whose designator code is identified on the first flight segment of the passenger's ticket at the beginning of an interline itinerary.

Service Animal means a dog, regardless of breed or type, that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability or a Search and Rescue Animal.

Service Animal Relief Attestation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(b) concerning the U.S. Department of Transportation Service Animal Air Relief Attestation Form.

Service Animal Transportation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(a) concerning the U.S. Department of Transportation Service Animal Air Transportation Form.

Single Ticket means the record of agreement that permits travel from origin to destination, and may include interline, code-share, and intraline segments.

South America means the area composed of Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, French Guiana, Guyana, Paraguay, Peru, Surinam, Uruguay and Venezuela.

South Asian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Maldives and Sri Lanka.

South East Asia means the area composed of Brunei Darussalam, China, Guam, Hong Kong, Indonesia, Kampuchea, Kazakhstan, Kyrgyzstan, Laos, People's Democratic Republic of, Malaysia, Mongolia, Myanmar, Philippines, Singapore, Taiwan, Province of, Tajikistan, Thailand, Turkmenistan, Russian Federation (East of the Ural Mountains), Uzbekistan and Viet Nam.

South Pacific means the area composed of all routes between points in the U.S.A./Canada and points in the Southwest Pacific via the Pacific Ocean.

Southwest Africa means points within Africa composed of Botswana, Lesotho, Mozambique, Namibia, South Africa and Swaziland.

Southwest Pacific means that area composed of American Samoa, Australia, Cook Islands, Fiji, French Polynesia, Gilbert and Ellice Islands, Loyalty Islands, New Caledonia, New Hebrides, New Zealand, Papua, New Guinea, Samoa, Society Islands, Tonga, and intermediate islands.

Special Drawing Right ("SDR") means a special unit of currency, the value of which fluctuates and is recalculated each banking day. These values are known to most commercial banks and are reported in some newspapers and in the IMF Survey, published weekly by the International Monetary Fund, Washington, D.C. 20431.

Special Fare means a fare other than a normal fare.

Stopover means a deliberate interruption of travel by the Passenger, agreed to in advance by the carrier, at a point between the place of departure and the place of destination. For International flights a Stopover will also be deemed to occur at an intermediate point from which the Passenger is not scheduled to depart on the date of arrival, but if there is no connecting departure scheduled on the date of arrival, departure on the next day within 24 hours of arrival shall not constitute a Stopover. If a portion of the routing is traveled by surface transportation, one Stopover shall be deemed to have been taken for such portion. For Domestic flights, a Stopover will also occur when a Passenger arrives at a point and fails to depart from such point on:

1. The first flight on which space is available; or

2. The flight that will provide for the Passenger's earliest arrival at intermediate or junction transfer point(s) or destination point, via the carrier and class of service as shown on the Passenger's Ticket; provided, however, that in no event will a Stopover occur when the Passenger departs from the intermediate/junction point on a flight shown in the carrier's official general schedule as departing within four hours after arrival at such point.

Summary Page at the End of an Online Purchase (for Rule 23 I) only) means a page on the Carrier's website which summarizes the details of a ticket purchase transaction just after the passenger has agreed to purchase the ticket from the Carrier and has provided a form of payment.

Surface Sector means transportation by means other than air between two intermediate points in a Fare Component.

Through Fare means a fare applicable for travel between two consecutive fare construction points via an intermediate point(s).

Ticket means the record of agreement, including electronic tickets, e.g., "United Electronic Tickets" or "eTickets," for Passenger air transportation provided by UA under certain terms and conditions to the Passenger named on the Ticket and in accordance with applicable governing tariffs and regulations. An "eTicket" is the record of the ticket agreement maintained and processed within the carrier's electronic reservation system. A receipt is provided to the purchaser of the ticket that contains a reference for retrieving the record within the carrier's reservation system and summary of the ticket information. The carrier may mandate the issuance of an e-ticket, regardless of market, carrier, form of payment, and customer type.

Ticketed Point means points shown in the 'good for passage' section of the ticket plus any other point(s) used for fare construction and shown in the fare construction box of the ticket, provided that two flight numbers of two carriers such as for an interchange flight will not be permitted on one Flight Coupon.

Transatlantic Sector means that portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 2 and vice versa.

Transfer means a change from the flight on one carrier to the flight of another carrier, or a change from the flight of a carrier to another flight of the same carrier bearing the same flight number, or a change from the flight of a carrier to another flight that is a service bearing a different flight number of the same carrier, irrespective of whether or not a change of aircraft occurs.

Transfer Point means any point at which the Passenger Transfers.

Transit Point means any stop at an intermediate point on the route to be traveled (whether or not a change of aircraft is made) which does not fall within the definition of a Stopover.

Transoceanic means the portion of travel covering the area over an ocean and may refer to travel that is either transatlantic or transpacific.

Transpacific Sector means the portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 3 and vice versa.

UA means United Airlines, Inc.

UA Ticket Stock means tickets printed, imprinted or issued electronically with the UA carrier code (016) as part of the ticket serial number.

Ultimate ticketed destination applies only to situations where a passenger's origin is a non-Canadian point and the itinerary includes at least one stop in Canada, as well as at least one stop outside of Canada. If the stop in Canada is the farthest checked point and the stop is more than 24 hours, the ultimate ticketed destination is Canada. (For Rule 23 I) only).

United means United Airlines, Inc.

United Express carriers are Carriers not wholly owned or operated by United Airlines, Inc. but operating with the UA designator code under the trade name "United Express."

Unaccompanied Minor means a Child/Minor 5 to 14 years of age when traveling alone or not accompanied on the same flight and in the same compartment by a companion Passenger at least 18 years of age or with a Legal Guardian or parent.

United Kingdom (or "U.K.") means the area composed of England, Scotland, Wales, Northern Ireland, Channel Islands and Isle of Man.

United States of America (or the "United States" or the "U.S.A.") means, unless otherwise specified, the area composed of the 48 contiguous states, the District of Columbia, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Midway, and Wake Islands.

United States Department of Defense means the U.S.A. Department of the Army, Navy, and Air Force, and the U.S.A. Marine Corps.

Validate means a confirmation that the Ticket has been officially issued by the carrier.

Warsaw Convention means the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929, or where applicable, that Convention, as amended, including without limitation, by the Protocol signed at The Hague September 28, 1955.

West Africa means the area composed of Angola, Benin, Burkina Faso, Cameroon, Cape Verde, Central African Republic, Chad, Congo (Brazzaville), Cote D'Ivoire, Equatorial Guinea, Gabon, The Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Mauritania, Niger, Nigeria, Sao Tome y Principe, Senegal, Sierra Leone, Togo and Congo (Kinshasa).

Western Hemisphere means the area composed of the Continental United States, Alaska, Hawaii, Puerto Rico, U.S. Virgin Islands, Canada, Greenland, Mexico, Central and South America, and the Caribbean Area.

Back to Top

# Rule 2 Standard Format of Electronic Rules For Tariff

# Filing Purpose

Rule number reserved for Airline Tariff Publishing Company ("ATPCO") filings.

Back to Top

# Rule 3 Application of Contract

A. These rules constitute the conditions of carriage upon which UA agrees to provide Domestic and International Carriage and are expressly agreed to by the Passenger. These Rules are also the tariffs filed by UA in accordance with certain government regulations.

B. This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies, including but not limited to those imposed during or as a result of a national emergency, war, civil unrest or terrorist activities. In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on UA's operation, the latter shall prevail.

C. The rules herein are applicable to transportation of Passengers and Baggage provided by UA. See Rule 18 regarding application of these rules to Codeshare services provided by UA on flights operated by a carrier other than UA.

D. Certain International Carriage is subject to the rules relating to liability established by, and to all other provisions of the Warsaw and/or Montreal Conventions. Any provisions of these rules that are inconsistent with any provision of the applicable Convention shall, to that extent, but only to that extent, be inapplicable to International Carriage.

E. Except as otherwise provided within specific fare rules, transportation is subject to the Contract of Carriage and charges in effect on the date on which the Ticket is issued. References to pages, rules, items and notes are coterminous and include revisions, supplements and reissues thereof.

F. Where the Ticket has been purchased and issued before the effective date of an increase in the applicable fare, the increase will not be collected, provided there is no change in Origin, Destination, Stopover point(s), flight(s) or dates shown on the original Ticket. These provisions apply whether an increase results from a change in fare level, a change in conditions governing the fare or a cancellation of the fare itself.

G. UA is responsible only for transportation of Passengers and Baggage provided by UA, which includes Codeshare services provided by UA on flights operated by a carrier other than UA. See Rule 18 regarding application of these rules to Codeshare services. When UA undertakes to issue a Ticket, check baggage, or make any other arrangements for transportation over the lines of any other carrier on an interline basis (whether or not such transportation is part of a through service), UA will act only as agent for the other carrier in these limited capacities, and will assume no responsibility for the acts or omissions of such other carrier, including but not limited to providing flight status information, delays and other acts or omissions that arise from their flight operations.

H. No employee or agent of UA has the authority to alter, modify, or waive any fare rules or any provision of the Contract of Carriage unless authorized by a corporate officer of UA. UA's appointed agents and representatives are only authorized to sell Tickets for air transportation pursuant to approved fares, rules, and regulations of UA. Failure or delay on the part of either party to exercise any right or power herein shall not operate as a waiver thereof.

I. Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, UA shall not be liable for any consequential, compensatory, indirect, incidental or punitive damages arising out of or in connection with the performance of its obligations under these rules.

J. UA's obligations hereunder extend only to the Ticketed Passenger. There are no third party beneficiaries to these rules.

K. Except where provided otherwise by law, UA's conditions of carriage, rules and tariffs are subject to change without notice, provided that no such change shall apply to Tickets issued prior to the effective date of such change.

L. The invalidity of any provision herein by local law shall not affect the validity of any other provision that shall remain in full force and effect.

M. If UA makes arrangements for Passengers with any third party to provide any services other than carriage by air, or if UA issues a ticket or voucher relating to transportation or services (other than carriage by air) provided by a third party such as hotel reservations or car rental, UA does not assume responsibility for the ground transportation of any Passenger or his or her baggage. The terms and conditions of the third party service provider will apply, as well as Rule 17 B) below.

N. Except as otherwise provided below, fare rule provisions, local or joint fares, including Arbitraries, contained in the On-line Tariff Database maintained by Airline Tariff Publishing Company on behalf of UA is considered to be part of International Passenger Rules and Fares Tariff No. IPR-2, C.A.B. No. 376, NTA(A) No. 210.I EXCEPTION: For Fares Published by Rule, see C.A.B. No. 737, NTA(A) No. 476.

O. By purchasing a ticket or accepting transportation under this Contract of Carriage, the Passenger agrees to be bound by the Federal Aviation Act (49 U.S.C. 40101, et seq.), including the Airline Deregulation Act (49 U.S.C. 41713).

P. By purchasing a ticket or accepting transportation under this Contract of Carriage, Passenger agrees that any lawsuit brought by Passenger against UA and Carriers doing business as United Express will be brought only in Passenger's individual capacity, and may not be brought in or asserted as part of a class action proceeding.

Q. You agree that you will notify United of any dispute arising out of or related to transportation covered by this Contract by submitting your concerns via the form at https://www.united.com/en/us/customercare, including a description of the nature of the dispute. Following delivery of such submission, you agree to allow United a period of sixty (60) days to provide a substantive response and to try to resolve the dispute prior to filing any lawsuit, arbitration, administrative or any other proceeding against United related to the dispute. Compliance with the notification procedures set forth herein shall be a condition precedent to your right to file any lawsuit, arbitration, administrative or any other proceeding against United. You agree that your failure to comply with the notification procedures set forth herein prior to filing a lawsuit, arbitration,