administrative or any other proceeding against United shall entitle United to recover reasonable attorneys' fees incurred in defending the lawsuit, arbitration, administrative or other proceeding.

Back to Top

# Rule 4 Reservations – Confirmation/Fare Quotes/Disclosures

A. A reservation for space on a given flight of UA is valid when the availability and allocation of such space is confirmed by UA or an authorized agent of UA and entered into the carrier's reservations system. At the time of reservation, UA requires the full name consisting of full first and last name for each passenger to be entered into the name field of the reservation, and other government mandated information, including but not limited to date of birth and gender.
   EXCEPTION: Only one name will be required for reservations for passengers whose passports reflect only one name. Reservations that do not contain the full name of each passenger, other required information, or fraudulent information will be automatically cancelled within 72 hours of reservation confirmation. UA requires ticketing at the time of reservation. UA will allow a 100% refund to the original form of payment if the request is made within 24 hours of ticketing and if the reservation is made one week or more prior to the scheduled flight departure and the ticket is purchased directly through UA.

B. Subject to payment or other satisfactory credit arrangements, a validated Ticket will be issued by UA or the authorized agent of UA indicating such confirmed reserved space provided the Passenger applies to UA or the authorized agent of UA for such Ticket within the Check-In Time Limits specified in Rules 5 D) and E). Such reservation of space is subject to cancellation by UA without notice if the Passenger does not comply with this Rule.
   EXCEPTION: Where other rules, including fare rules, provide for the issuance, validation, or purchase of a Ticket within specific time limits, these specific time limits will apply.

C. Once a Passenger obtains a Ticket indicating confirmed reserved space for a specific flight and date either from UA or its authorized agent, the reservation is confirmed even if there is no record thereof in UA's reservation system.
   EXCEPTION: Tickets shall not be valid if reservations are cancelled pursuant to Rule 5 or cancelled by the passenger or his/her representative.

D. Seat assignments, regardless of class of service, are not guaranteed and are subject to change without notice. UA reserves the right to reseat a Passenger for any reason, including from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which the applicable fee has been paid, and if a Passenger is improperly or erroneously upgraded to a different class of service. If a Passenger is removed from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee has been paid-, the Passenger may be eligible for a refund in accordance with Rule 27. UA also prohibits Passengers from selling their seat assignments at any time and/or exchanging them at the time of boarding without first advising a member of the crew.

E. UA may limit the number of Passengers carried at any fare level and certain fares will not necessarily be available on all flights. The number of seats which UA shall make available on a given flight will be determined by UA.

Back to Top

# Rule 5 Cancellation of Reservations

A. UA has the right to cancel reservations (whether or not confirmed) of any Passenger whenever such action is necessary to comply with any governmental regulation, upon any governmental request for emergency transportation in connection with the national defense, or whenever such action is necessary or advisable by reason of weather or other conditions beyond UA's control, (including, but not limited to acts of God, force majeure events, strikes, civil commotions, embargoes, wars, hostilities, or other disturbances, whether actual, threatened, or reported).

B. UA has the right to cancel reservations (whether or not confirmed) due to the Passenger's failure to comply with the rules set forth herein, including but not limited to, the Passenger's failure to pay for the applicable Ticket under the conditions applicable to the fare for such travel.

C. Failure to Occupy Space - If a Passenger fails to occupy space which has been reserved for him/her on a flight of UA and UA fails to receive notice of the cancellation of the reservation before the departure, or if any carrier cancels the reservation of any Passenger, UA may cancel all reservations (whether or not confirmed) held by such Passenger on the flights of UA or any carrier for continuing or return space.

D. Check-In Time Limits - UA has the right to cancel reservations (whether or not confirmed), deny boarding and/or refuse the acceptance of checked baggage of any Passenger who fails to present himself/herself within the applicable check-in or loading gate time limits for Passengers and/or Baggage.
   1. Domestic flights, except those departing Guam:
      a. For Passengers who do not need to check baggage, Passenger must complete the purchase of the ticket(s), check-in and obtain a boarding pass at least 30 minutes prior to scheduled departure.
         EXCEPTIONS: At the following airports, Passengers must complete check-in at least 45 minutes prior to scheduled departure: Baltimore, MD; Aguadilla, Puerto Rico; and San Juan, Puerto Rico.
      b. For Passengers who do need to check baggage, Passenger must complete the purchase of the ticket(s), check-in, obtain a boarding pass,

and complete baggage check-in at least 45 minutes prior to scheduled departure.

    1. EXCEPTION: At the following airports, Passengers must complete baggage check-in at least 60 minutes prior to scheduled departure: San Juan, Puerto Rico.

  c. All Passengers must be present at the loading gate for boarding at least 15 minutes prior to scheduled departure.

  NOTE: If the Passenger's itinerary includes an international destination, the international time limits in D) 2) below apply to all flights in the itinerary.

2. All non-stop International flights (including flights departing Guam and St. Thomas, U.S. Virgin Islands):

  a. Passenger must complete the purchase of the ticket(s), check-in, check baggage, and obtain a boarding pass at least 60 minutes prior to scheduled departure.

  EXCEPTIONS:

    1. At Dublin, Ireland, Lima, Peru, and for all international flights departing from Honolulu, U.S., Passengers must complete check-in, check baggage and obtain a boarding pass at least 75 minutes (1 hour, 15 minutes) prior to scheduled departure.

    2. At Tel Aviv, Israel, Passengers must complete check-in, check baggage and obtain a boarding pass at least 70 minutes (1 hour, 10 minutes) prior to scheduled departure.

    3. Within the Federated States of Micronesia, Republic of the Marshall Islands, Commonwealth of the Northern Mariana Islands, Republic of Palau, Toronto, Canada, St. Thomas, U.S. Virgin Islands, and Manila, Philippines, Passengers must complete check-in, check baggage and obtain a boarding pass at least 90 minutes (1 hour, 30 minutes) prior to scheduled departure.

  b. All Passengers must be at the loading gate for boarding at least 30 minutes prior to scheduled departure.

  EXCEPTIONS: Within the Federated States of Micronesia, Republic of the Marshall Islands, and Brussels, Belgium, Passengers must be at the loading gate for boarding at least 60 minutes (1 hour) prior to scheduled departure.

E. The time limits provided by UA in this Rule are minimum time requirements. Passenger and baggage processing times may differ from airport to airport. It is the Passenger's responsibility to arrive at the airport with enough time to complete any ticketing, check-in, baggage and security screening processes, and boarding requirements within these minimum time limits. NOTE: Please see www.united.com for more information.

F. UA is not liable for any consequential, compensatory, or other damages when it cancels reservations (whether or not confirmed) of any Passenger in accordance with this Rule, but if the reservation was canceled according to paragraph A) of this Rule, see Rule 24.

G. All of UA's flights are subject to overbooking which could result in UA's inability to provide previously confirmed reserved space for a given flight or for the class of service reserved. In that event, UA's obligation to the Passenger is governed by Rule 25.

H. In addition to exercising any of its remedies in Rule 6 K) below, UA reserves the right to cancel bookings and/or reservations which it deems fraudulent, abusive, illogical, fictitious, which are booked and/or reserved with no intention of flying, or for which the passenger makes a misrepresentation without notice to the passenger or the individual making the booking. The types of improper reservations that UA will cancel without notice include, but are not limited to: reservations made without having been requested by or on behalf of the named passenger; reservations made to hold or block seats for the purpose of obtaining lower fares, MP award inventory, travel certificates, or upgrades that may not otherwise be available; reservations made to manipulate, abuse, or circumvent any of UA's fare rules, policies or provisions; reservations made for the same passenger on flights traveling on or about the same date between one or more of the same or nearby origin or destination cities; and reservations with connections that depart before the arrival on the inbound flight.

Back to Top

# Rule 6 Tickets

A. When more than one Ticket must be issued to properly reflect all of the information required for a complete flight itinerary, the individual Tickets will be cross-referenced by their Ticket numbers and are considered to be a single Ticket or "Conjunction Ticket."

B. A Ticket will not be issued, and in any case UA will not be obligated to carry any Passenger until the Passenger has paid the applicable fare or has complied with credit arrangements established by UA.

C. No person will be entitled to transportation except upon presentation of a valid Ticket.

D. Lost Tickets. See Rule 27 F).

E. A Ticket which has not been validated or which has been altered, mutilated, or improperly issued, is not valid.

F. Flight Coupons will be honored only in the order in which they were intended to be used and, in the case of written Tickets, only if all unused Flight Coupons and Passenger Coupons are presented together.

G. Tickets are not transferable unless otherwise stated on the Ticket at the time it was issued. The purchaser of a Ticket and/or the Passenger intending to use such Ticket is responsible for ensuring that the Ticket accurately states the Passenger's name. Presentation of a Ticket by someone other than the ticketed Passenger renders the Ticket void, and UA is not liable to the owner of a ticket for honoring or refunding such ticket when presented by another person. If a Ticket is in fact used by an unauthorized person with or without the knowledge or consent of the person to whom the Ticket was issued, UA will not be liable for the destruction, damage, or delay of such unauthorized person's baggage or other personal property, or for the death or injury of such unauthorized person arising from or in connection with such unauthorized use. As used herein, "unauthorized person" means any person other than the person to whom the ticket is issued and who is entitled to be transported or to a refund in accordance with the rules in this Contract of Carriage.

H. A Ticket will be valid only for flight(s) for which reservation(s) have been made and only between the points named on the ticket or applicable Flight Coupons. A Passenger holding an unused open-date Ticket or portion thereof or Exchange Order for onward travel, or who wishes to change a ticketed reservation to another date, shall not be entitled to any preferential right with respect to the obtaining of reservations.

I. Passengers Occupying Two Seats – Upon request, or if determined necessary by UA, and given availability, a Passenger will be permitted to the exclusive use of two seats subject to the payment of two applicable fares for the points between which the two seats will be used. A Ticket will be issued for each seat and the normal Checked Baggage Allowances will apply in connection with each such Ticket presented to UA. The carry-on allowance is limited to the allowance for one individual.

J. Prohibited Practices:

1. Fares apply for travel only between the points for which they are published. Tickets may not be purchased and used at fare(s) from an initial departure point on the Ticket which is before the Passenger's actual point of origin of travel, or to a more distant point(s) than the Passenger's actual destination being traveled even when the purchase and use of such Tickets would produce a lower fare. This practice is known as "Hidden Cities Ticketing" or "Point Beyond Ticketing" and is prohibited by UA.

2. The purchase and use of round-trip Tickets for the purpose of one-way travel only, known as "Throwaway Ticketing" is prohibited by UA.

3. The use of Flight Coupons from two or more different Tickets issued at round trip fares for the purpose of circumventing applicable tariff rules (such as advance purchase/minimum stay requirements) commonly referred to as "Back-to-Back Ticketing" is prohibited by UA.

4. The failure to comply with applicable stayover requirements, the failure to meet the purpose or status requirement associated with the Ticket's fare category, and the purchase or use of a Ticket that UA determines circumvents the applicable fare rules.

5. Any practice that United believes, in its sole discretion, is exploitative, abusive or that manipulates/bypasses/overrides United's fare and ticket rules.

K. UA's Remedies for Violation(s) of Rules - Where a Ticket is booked, held, purchased and/or used in violation of the law, these rules or any fare rule (including Hidden Cities Ticketing, Point Beyond Ticketing, Throwaway Ticketing, or Back-to-Back Ticketing), UA, without notice to the passenger, has the right in its sole discretion to take all actions permitted by law, including but not limited to, the following:

1. Invalidate the Ticket(s);

2. Cancel any remaining portion of the Passenger's itinerary;

3. Confiscate any unused Flight Coupons until the amount reflected in 5) below is collected;

4. Permanently ban or refuse to board the Passenger and to carry the Passenger's baggage, unless the difference between the fare paid and the fare for transportation used is collected prior to boarding;

5. Assess the Passenger for the actual value of the Ticket which shall be the difference between the lowest fare applicable to the Passenger's actual itinerary and the fare actually paid;

6. Delete miles in the Passenger's frequent flyer account (UA's MileagePlus Program), revoke the Passenger's Elite status, if any, in the MileagePlus Program, terminate the Passenger's participation in the MileagePlus Program, terminate any other air transportation agreement between UA and the Passenger, or take any other action permitted by the MileagePlus Program Rules in UA's "MileagePlus Rules;"

7. Charge a delivery fee and penalty, set at United's discretion, to send Checked Baggage to the Passenger; and

8. Take legal action with respect to the Passenger.

L. UA may mandate the issuance of an e-Ticket regardless of market, carrier, form of payment, or customer type (including mileage plus and participating carrier frequent flyer members). In addition to all applicable charges, UA will assess a 50.00 USD fee for issuance of a paper ticket.

M. UA will assess a 50.00 USD/50.00 CAD fee to assist with a voluntary change on tickets originally issued via any external ticketing source (travel agency, internet agency, other airline, etc.). The fee is non-refundable and applies in addition to all applicable charges.

N. Within the 50 U.S. states and Canada, UA will assess a 50.00 USD/50.00 CAD charge for tickets purchased at any airport location, a 25.00 USD/25.00 CAD charge for tickets purchased through Contact Centers, and a 30.00 USD/30.00 CAD charge for tickets purchased or changed through a City Ticket Office. Charges may vary outside the 50 U.S. states and Canada. These booking service charges are non-refundable and apply in addition to all applicable charges.

O. Unless prohibited by local law, UA may restrict acceptable forms of payment for its tickets, products, or services to debit or credit card.

Back to Top

# Rule 7 Ticket Validity Period

A. Nonrefundable Fares: Nonrefundable fares have no value after ticketed departure time. EXCEPTION: When the Passenger cancels the ticketed flight reservations prior to the ticketed departure time, the period of validity for that ticket applies.

B. Period of Validity - Except as otherwise provided in this Rule or required by the applicable local law of a foreign jurisdiction, any eligible Ticket issued by UA or its authorized agent on UA Ticket Stock must begin travel within one year from the date of issuance and will be valid for transportation for one year from the date on which transportation commences at the point of origin as designated on the original Ticket or, if no portion of the Ticket is used, one year from the date of issuance of the original Ticket. When an unused fare Ticket is completely exchanged, the original ticket validity applies. When fares are combined to create Round/Circle/Open-Jaw Trips, the most restrictive provisions will apply to the entire transportation.

C. Extension of Validity Period:

1. If the Passenger is prevented from using the Ticket, or a portion thereof during the period of validity specified in this Rule due to a UA flight cancellation or because UA is unable to provide space on the flight, UA will, without additional collection of fare, extend the ticket validity period of such Passenger's Ticket until the first flight of UA on which space is available in the class of service for which the fare has been paid.

2. If a Passenger is unable to commence or continue travel because of the death or serious illness of the Passenger, the Passenger's immediate family member(s), or the Passenger's traveling companion(s), UA may, in its sole discretion, waive or refund any applicable change fees

associated with changing the ticket(s). See Rule 27 or visit UA's website, united.com, for details regarding UA's Refund Policy.

D. Waiver of Minimum Stay Requirements - Special Fare - In the event of the death of a Passenger enroute, the minimum stay and group travel requirements with regard to any special fares will be waived for Passengers who are immediate family members of the deceased Passenger or were otherwise actually accompanying the deceased Passenger, on the following conditions:

1. The ticket must be endorsed "earlier return on account of death of (name of Passenger)"; and

2. A copy of the death certificate duly executed by the competent authorities under the applicable laws of the country in which death has occurred must be presented to UA at the time of reticketing. Passengers will be accommodated under this provision only in the class of service originally ticketed.
   NOTE: If the death certificate is not available at the time the Passenger requests reticketing under this provision, or if documentation satisfactory to UA has not been provided, the Passenger(s) requesting reticketing will be accommodated only upon payment of the fare applicable to transportation actually used and a request for a refund may later be filed with UA with the documents required. Upon receipt of the request for a refund and all supporting documents, UA will determine whether a refund to the Passenger is appropriate. If so, the maximum refund will be the difference between the total fare paid by the Passenger and the amount such Passenger would have paid if a waiver had been originally furnished under the provisions of this Rule.

E. Ticket Issue Date - The date when payment is made by credit card, or the ticket invoice date established when payment is made by other acceptable form of payment, will constitute the date a Ticket is "issued" in determining the validity period under this Rule.

Back to Top

# Rule 8 Returned Check Charge

UA will collect 25 USD/25 CAD for each returned check. This charge is non-refundable and is not subject to any discount.

Back to Top

# Rule 9 Deleted

Back to Top

# Rule 10 Transatlantic Surcharges

For details concerning transatlantic surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

Back to Top

# Rule 11 Pacific Surcharges

For details concerning transpacific surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

Back to Top

# Rule 12 Western Hemisphere Surcharges

For details concerning Western Hemisphere surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

Back to Top

# Rule 13 Acceptance of Children/Minors and Infants

A. Children/Minors/Infants Traveling Accompanied

1. Children under the age of five (5) must be "accompanied" by an Adult Passenger or the child's Parent/Legal Guardian on the same flight and in the same compartment. UA reserves the right to require and charge the applicable service charge for Unaccompanied Minor service when a child age five (5) to fourteen (14) is traveling with a passenger who is not at least 18 years old or the child's Parent/Legal Guardian.

2. United does not accept infants in incubation (except as permitted under Rule 15C) or infants under seven days old.

3. Lap Children (infants under the age of two years):
   a. Additional infants under the age of two years must occupy a seat and be ticketed at the applicable adult fare.

   b. Infants under the age of two years for whom a seat at the applicable adult fare has not been purchased, may not occupy a seat. NOTE: Infants who are carried in an adult's lap do not require a Ticket for domestic travel. Infants traveling internationally and to and from Canada require a Ticket, which may be discounted off of the applicable fare. In many cases a Ticket is required for an infant to travel on international flights even if no fare is paid. In addition, some international destinations may carry service charges. A USD 0 value or fee only Ticket may be issued for an infant.

4. Children who have reached their second birthday are required to purchase a seat and occupy a seat with a separate seat belt. Infants reaching their second birthday after outbound flights will be required to purchase a Ticket and occupy a seat for continuing/return flights only.

5. Infant/child Seats: Children unable to sit upright with the seat belt fastened must be carried in an approved infant/child seat, if not being held by an Adult Passenger as a lap child. Infant/child seats:
   a. Must be FAA approved and be clearly marked with the original NHTSA label, must be approved by a foreign government with a label showing that the seat was manufactured under the standards of the United Nations, or must conform to the Canadian Motor Vehicle Safety Standard (CMVSS) 213 or 213.1 whereby a label of compliance must be affixed to the seat indicating compliance with the same.

   b. Must be used in unoccupied aircraft seats and cannot be held in an adult's lap.

   c. Cannot be used in an Exit Row.

   d. Must remain properly secured to an aircraft seat at all times unless stored as a carry-on.

6. Proof of age may be required by UA for any child, minor, or infant traveling accompanied.

B. Children/Minors Traveling Unaccompanied

1. UA requires Unaccompanied Minor service for children/minors age five (5) to fourteen (14) who are not accompanied by a passenger who is at least 18 years old or a Parent/Legal Guardian. The policies for UA's Unaccompanied Minor service apply only to flights operated by UA and Carriers doing business as United Express. UA does not offer unaccompanied minor service to or from other carriers.

2. Unaccompanied children under five (5) years of age are not accepted on flights operated by UA and Carriers doing business as United Express.

3. UA's Unaccompanied Minor service is mandatory for unaccompanied children age five (5) to fourteen (14) years old. For minors age fifteen (15) through seventeen (17) for whom UA's Unaccompanied Minor service is not purchased, UA will assume no financial or guardianship responsibilities beyond those applicable to an adult Passenger.

4. Unaccompanied children/minors must be brought to the airport of departure by a parent, legal guardian, or responsible adult 30 minutes early (in addition to regular airport processing times shown for the airport). This parent, legal guardian, or responsible adult shall remain with the unaccompanied child(ren)/minor(s) until the unaccompanied child(ren)/minor(s) has boarded and the plane is airborne, and who shall confirm that the unaccompanied child(ren)/minor(s) will be met by another parent, legal guardian, or responsible adult upon deplaning at the final destination and shall furnish UA with that individual's name, address, and phone number(s).

5. The parent, legal guardian, or responsible adult receiving the unaccompanied child(ren)/minor(s) upon deplaning at the final destination may be required to present a government-issued photo ID that matches the name and address provided by the parent or guardian who delivered the child to the departure airport, and may also be required to complete and sign documentation relating to such unaccompanied child(ren)/minor(s). UA reserves the right to refuse to release an unaccompanied minor to anyone other than the pre-designated individual.

6. When two or more unaccompanied minors are traveling together, the most restrictive age requirement will apply.

7. Proof of age may be required by UA.

C. Unaccompanied Minor Service Charge

1. Service charges for Unaccompanied Minor service is subject to change at UA's discretion. The fare for Unaccompanied Minor service for children age five (5) to fourteen (14) years old includes the applicable adult fare in addition to a service charge of 150 USD/150 CAD assessed for each one-way journey from the child's boarding point to the child's final destination. One service charge assessed for each one-way journey applies to two or more children traveling together on the same reservation.

2. For purposes of this Rule, Unaccompanied Minor service includes reasonable supervision for Unaccompanied Minors from boarding until deplaning at the final destination.

Back to Top

# Rule 14 Special Services

A. Definition of Non-Ambulatory under this Rule:

1. Persons who are unable to move themselves or need the support of another person to walk or move, but who are otherwise capable of caring

for themselves without assistance throughout the flight are considered Non-Ambulatory.

   2. If a Passenger uses a wheelchair for convenience, the Passenger is not considered to be Non-Ambulatory.

   3. A child or infant is not considered to be Non-Ambulatory merely because of his/her age, except when requiring an Infant Transport System.

   4. If the Passenger can move himself/herself from his/her seat to the nearest emergency exit without the aid of another person, the Passenger is not considered to be Non-Ambulatory, regardless of the degree of impairment.

B. Qualifications for Acceptance of Non-Ambulatory Passengers - Non-Ambulatory Passengers are accepted when accompanied by an assistant able to assist the Non-Ambulatory Passenger to evacuate the aircraft in accordance with 14 CFR Part 382.29. See Rule 21.

C. Qualified Individual with a Disability - UA requires a Passenger, including a Qualified Individual with a Disability, to provide up to 48 hours' advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E) if such Passenger wishes to receive any of the following service accommodations:

   1. Transportation of an electric wheelchair on an aircraft with fewer than 60 seats.

   2. Provision by UA of hazardous materials packaging for a battery for a wheelchair or other assistive device.

   3. Accommodation for a group of ten or more Qualified Individuals with Disabilities who make reservations and travel as a group.

   4. Provision of an on-board wheelchair on an aircraft with more than 60 seats that does not have an accessible lavatory.

   5. Provision by UA of carrier-supplied in-flight medical oxygen (if applicable).

   6. Use of a ventilator, respirator, Continuous Positive Airway Pressure (CPAP) machine, or Passenger's own Personal Oxygen Concentrator (POC).

Qualified Individuals with a Disability traveling with Service Animals must comply with the requirements of Rule 16.

D. When Travel Assistance is Required:

   1. If UA determines that an assistant is essential for safety, UA may require that a Passenger, including a Qualified Individual with a Disability, meeting any of the following criteria travel with an assistant as a condition of being provided air transportation:

      a. A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from UA personnel, including the safety briefing required by 14 CFR, Part 121.571(a)(3), (a)(4) and 135.117(b);

      b. A person with a mobility impairment so severe that the person is unable to physically assist in his or her evacuation of the aircraft; or

      c. A person who has both severe hearing and severe vision impairments if the person cannot establish some means of communication with UA personnel adequate to permit the transmission of the required safety briefing.
      NOTE: If UA determines that a person meeting the criteria in subparagraphs (a), (b) or (c) above must travel with an assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, UA will not charge for the transportation of the assistant.
      EXCEPTION: For Passengers traveling to/from Canada, UA will accept a disabled person's determination of his/her self-reliance.

   NOTE: Flight attendants and other crew members cannot assist with any medical services, assistance inside the lavatory, or in actual feeding.

   2. If, because there is not a seat available on a flight for an assistant whom UA has determined to be necessary, a Qualified Individual with a Disability with only one confirmed reservation is unable to travel on the flight, the Qualified Individual with a Disability shall be eligible for denied boarding compensation in accordance with Rule 25. For purposes of determining whether a seat is available for an assistant, the assistant shall be deemed to have checked in at the same time as the Qualified Individual with a Disability.

E. For Rules regarding wheelchairs, see Rules 23 and 28.

Back to Top

# Rule 15 Medical Services

A. Onboard Medical Oxygen Service – UA may provide on-board medical oxygen service when requested in advance and only in limited markets in the Micronesia area. Passengers requesting on-board medical oxygen service will be required to give UA a minimum 48 hours advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E). Contact UA to verify availability and additional conditions of service. UA is not liable for failure to provide this service in emergency or other circumstances beyond its control.

B. Passenger-Provided Portable Oxygen Concentrators - Portable oxygen concentrators (POCs) approved by the Federal Aviation Administration (FAA) may be carried and used on board flights operated by UA worldwide, at no charge, in accordance with specific FAA requirements. Passengers utilizing POCs are required to give UA a minimum 48 advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E) and must also meet the following conditions:

   1. Check united.com for a list of specific POCs currently approved by the FAA.

   2. Non-approved POC brands and models that do not contain compressed or liquid oxygen may be carried in the cabin if they meet United's carry-on size and weight requirements. Alternatively, they may be transported as checked baggage. UA may accept other brands and models for use on board in the future as they become approved by the FAA and UA.

   3. Passengers must satisfy specific requirements prior to boarding the aircraft. The Passenger must:

      a. provide advance notice in the reservation record that he/she is planning to use a POC on board the flight.

      b. have a signed written Doctor's statement that:

         i. states the user of the POC has the physical and cognitive ability to see, hear and understand the device's aural and visual cautions and

warnings and is able, without assistance, to take appropriate action in response to those cautions and warnings.

    ii. states whether or not oxygen use is medically necessary for all or a portion of the flight(s) listed on the Passenger's itinerary.

    iii. specifies the maximum oxygen flow rate in liters per minute corresponding to the pressure in the cabin of the aircraft under normal operating conditions.

    iv. may be reviewed at the airport prior to boarding and must be kept by the Passenger and provided upon request by UA personnel at any time during travel. Passenger's may use and print out the Medical Verification Statement available on UA's website, united.com.

  c. ensure that he/she has ample batteries to power the POC for the duration of his/her flight plus 3.0 additional hours to allow for unanticipated delays and any ground connection time where the POC is planned to be used.(NOTE: aircraft in -seat electrical power is not available for Passenger use with POCs).

  d. ensure that all extra batteries are properly protected from short circuiting by either:
    i. having recessed battery terminals or;

    ii. packing them so that the batteries do not contact metal objects including the terminals of other batteries.

4. Failure to meet the requirements will result in denied use of the POC during travel. Passengers planning on traveling with POCs are solely responsible for advising UA as soon as reservations are confirmed, regardless of whether the reservations were made through a travel agent, on the internet or directly with UA, in order to confirm specific requirements and to provide the airline with required information.

5. When travelling on or connecting to or from any flight other than a UA or a United Express flight, the Passenger is responsible for notifying and making independent arrangements directly with the other airline.

6. POCs are assistive devices for Passengers with disabilities. As such, they do not count toward carry-on or checked baggage limits, whether or not they are used on board. They must be able to fit underneath the seat or in an overhead storage compartment. A Passenger using a POC may not sit in an exit row or bulkhead seat. Additionally, a Passenger using a POC during takeoff and landing may not sit in an aisle seat.

7. UA is not liable for POC equipment failures, failure of the batteries that power the POC, or any other losses or damages alleged by the Passenger or any other person arising out of the use or possession of the POC, unless caused by the gross negligence or willful misconduct of UA.

C. Medical Transport Services - These services are limited and provided only in the Micronesia region. Passengers must provide 48 hours' advance notice for these services (UA will make reasonable efforts to accommodate Passengers who fail to meet the 48-hour reservation/notification requirement, but will not be obligated to do so). Subject to UA's approval based upon the availability of space, appropriate equipment, aircraft type, and pursuant to the following conditions:
1. Passengers on Stretchers

  a. Passenger must comply with UA's medical procedures;

  b. Passenger must pay for all seats required for stretcher transportation as determined by UA;

  c. Passenger must be accompanied by two assistants, provided at the Passenger's expense, one being a medical escort and the other a family member or guardian;

  d. The cost of ambulance service, hospitalization and other ground services shall be paid by the Passenger;

  e. The normal Baggage Allowance will apply to each fare paid; and

  f. The loading and unloading of the stretcher Passenger is the responsibility of the stretcher Passenger's assistants and must be arranged by the Passenger at his or her own expense.

2. All necessary medical documentation must be completed and provided to UA prior to flight.

Back to Top

# Rule 16 Service Animals

A. Service Animals: UA accepts for transportation, without charge, trained Service Animals for travel with a Qualified Individual with a Disability who requires the animal to assist them in the performance of necessary activities. The animal will be permitted to accompany the Passenger in the cabin, if it meets the conditions of acceptance noted below.
1. Conditions of Acceptance

  a. Other than for Search and Rescue Animals, the Passenger must submit to United a Service Animal Air Transportation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide a fully and accurately completed Service Animal Air Transportation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

  b. Evidence that an animal is a Service Animal include identification cards, other written documentation, the type of harness or markings on the harness, tags, or other credible assurances of the Qualified Individual with a Disability using the animal. UA, in its sole discretion, will determine if the evidence is sufficient.

  c. Service Animals must be properly harnessed or leashed and remain under the direct control of the Passenger. A Service Animal in addition to its owner-Passenger will be denied boarding, removed from the flight by UA, and in UA's sole discretion, permanently banned if the animal is too large or heavy to be accommodated in the cabin in the space immediately in front of the Passenger, cannot be contained or controlled by the Passenger, or otherwise exhibits behavior that poses a threat to the health or safety of other passengers or a significant

threat of disruption.

   d. On a flight segment scheduled to take 8 hours or more, the Passenger with a Service Animal other than a Search and Rescue Animal must submit to United a Service Animal Relief Attestation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and accurately completed Service Animal Relief Attestation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

2. UA accepts for transportation, without charge, a properly harnessed dog trained in explosive detection, drug search, and rescue, or other specific functions, when accompanied by its handler on official emergency business as authorized by an appropriate federal, state, or local government agency. Such official duty status must be documented in writing to the satisfaction of UA. The dog will be permitted to accompany its handler into the cabin, but not to occupy a seat.

3. Local regulations at the Passenger's final or intermediate destination(s) may apply and impose further requirements or restrictions, including but not limited to, carriage in the passenger cabin, limitations on the designation of Service Animals to dogs only, or the non-recognition of animals as trained and qualified Service Animals.

4. Trainers are permitted to bring one Service Animal onboard free of charge that is training to assist disabled passengers. This service animal must not occupy a seat, and a must meet all other conditions specified in this Rule. Trainers transporting service animals who are not in training must check these animals as cargo through the PetSafe® program.

B. Service Animals may not occupy a seat. Service Animals will be transported in the Passenger's lap or in the Passenger's foot space, unless this would be inconsistent with safety requirements set by the US Federal Aviation Administration, and may not encroach into another Passenger's foot space. If no other seat accommodation can be made and the animal is too big to fit safely in the cabin, the animal must be transported as cargo through the PetSafe® program, and as a result, may require the Passenger to re-book his or her flight.

C. Passengers with Service Animals will not be seated in emergency exit rows. They may not obstruct an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation.

D. The Passenger affirms that to the best of his or her knowledge, the Service Animal has not behaved aggressively or caused serious injury to another person or dog and does not pose a threat to the health and safety of others, and assumes full responsibility for the safety, well-being, and conduct of its animal, including the interaction of the animal with crew and other Passengers or Passenger property that may come in contact with the animal while on board the aircraft, and for compliance with all UA and governmental requirements, regulations, or restrictions, including entry permits and required health certificates of the country, state, or territory from and/or to which the animal is being transported. Any Passenger or his or her Service Animal who, by failing to comply with this Section, causes UA or its passengers any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense.

Back to Top

# Rule 17 Ground Transfer Service

A. UA may provide or procure ground transfer service between airports and city centers, between airports and any point in a Passenger's itinerary, or to places of lodging.

B. Except where ground transfer service is directly operated by UA, it is agreed that any such service is performed by independent operators. Such independent operators are not agents or servants of UA, and UA assumes no responsibility for the ground transfer of any passenger and/or his/her baggage. Anything done by an employee, agent or representative of UA in assisting the Passenger to make arrangements for such independent ground transfer service shall in no way make UA liable for the acts or omissions of such independent operator.

C. In cases where UA maintains and directly operates local transfer services for its Passengers, the terms, conditions, rules and regulations of UA, including but not limited to, those stated or to which reference is made in UA's Tickets, Baggage Checks and baggage valuation agreements shall be deemed applicable to such local ground transfer services. No portion of the air transportation fare shall be refundable in the event local ground services are not used by the Passenger.

Back to Top

# Rule 18 Service Provided by United Express and Other Codeshare Partners

A. UA has arrangements with certain other carriers to enable UA to provide Codeshare services to Passengers on flights operated by these carriers. Transportation provided by UA under a Codeshare arrangement with these carriers is designated by a flight number that includes UA's two-letter airline designator code, "UA". NOTE: For travel to or from the European Union and for reservations made in the European Union, UA will indicate the identity of the operating carrier at the time of reservation or as soon as administratively feasible.

B. For Codeshare services on flights operated by another carrier, UA is responsible for the entirety of the Codeshare journey for all obligations to Passengers established in these rules. The rules contained herein with respect to ticketing will apply to UA Codeshare services on flights operated by partner airlines. Notwithstanding the foregoing, the baggage liability provisions set forth in Rule 28 shall govern the liability of UA with respect

to any transportation subject to this Contract.

C. When another foreign or U.S. Codeshare partner operates a flight on which UA's designator code "UA" appears, the operating carrier's contingency plan for lengthy tarmac delays will apply to that flight.

Back to Top

# Rule 19 Travel Documents

A. Each Passenger desiring transportation across any international boundary is responsible for obtaining prior to travel and presenting upon request at any time all necessary travel documents, which shall be in good condition, and for complying with the laws of each country flown from, through or into which he/she desires transportation. Any Passenger who, by failing to comply with the laws of each country flown from, through or into which he/she desires transportation, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such documents or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to obtain and present such documents, which shall be in good condition, or to comply with such laws. Where legally permitted, UA reserves the right to hold, photocopy or otherwise reproduce a travel document presented by any Passenger. UA also reserves the right to deny boarding to any Passenger whose necessary travel documents are not in good condition according to UA's reasonable belief, or which otherwise do not comply with laws of the specific country the Passenger is departing from, transiting through, or traveling to.

B. Subject to applicable laws and regulations, the Passenger must pay the applicable fare whenever UA, on government order, is required to return a Passenger to his/her point of origin or elsewhere due to the Passenger's inadmissibility into/or deportation from a country. The fare will be the applicable fare in effect at the time of the rebooking for the return travel. Any difference between the applicable fare and the fare paid will be collected from the Passenger. UA will apply to the payment of such fares any funds paid by the Passenger for unused carriage or any funds of the Passenger in possession of or accessible/available to UA. The fare collected for carriage to the point of refusal of entry or deportation, as well as for return travel, will not be refunded by UA unless the law of such country requires that the fare be refunded.

C. This Rule and its limitations include, but are not limited to, Travel Documents related to travel by minors. Parents/guardians of minors are responsible for compliance with all requirements and procedures for minors travelling internationally, including, but not limited to documentary evidence, such as a notarized letter of relationship and permission for the minor's travel from the parent or legal guardian not present.

Back to Top

# Rule 20 Screening of Passengers and Baggage

Passengers and/or their baggage are subject to security screening, including but not limited to, security profiling, physical pat-downs and inspections, x-ray screening, manual bag searches, questioning of Passengers, and use of electronic or other detectors or screening or security devices, in the sole discretion of the government, airport or UA, and with or without the Passenger's presence, consent or knowledge. Neither UA nor its employees or agents is liable for any damage, loss, delay (including refusal to transport), confiscation of property, injury or other harm relating to or arising out of security screening conducted by an agent of the airport or any local, state, or federal agency or a Passenger's failure to submit to or comply with such security screening.

Back to Top

# Rule 21 Refusal of Transport

UA shall have the right to refuse transport on a permanent or temporary basis or shall have the right to remove from the aircraft at any point, any Passenger for the following reasons:

A. Breach of Contract of Carriage – Failure by Passenger to comply with the Rules of the Contract of Carriage.

B. Government Request, Regulations or Security Directives – Whenever such action is necessary to comply with any government regulation, Customs and Border Protection, government or airport security directive of any sort, or any governmental request for emergency transportation in connection with the national defense.

C. Force Majeure and Other Unforeseeable Conditions – Whenever such action is necessary or advisable by reason of weather or other conditions beyond UA's control including, but not limited to, acts of God, force majeure, strikes, civil commotions, embargoes, wars, hostilities, terrorist activities, or disturbances, whether actual, threatened, or reported.

D. Search of Passenger or Property – Whenever a Passenger refuses to submit to electronic surveillance or to permit search of his/her person or property.

E. Proof of Identity – Whenever a Passenger refuses on request to produce identification satisfactory to UA or who presents a Ticket to board and

whose identification does not match the name on the Ticket. UA shall have the right, but shall not be obligated, to require identification of persons purchasing tickets and/or presenting a ticket(s) for the purpose of boarding the aircraft.

F. Failure to Pay – Whenever a Passenger has not paid the appropriate fare for a Ticket, Baggage, or applicable service charges for services required for travel, has not paid an outstanding debt or Court judgment, or has not produced satisfactory proof to UA that the Passenger is an authorized non-revenue Passenger or has engaged in a prohibited practice as specified in Rule 6.

G. Across International Boundaries – Whenever a Passenger is traveling across any international boundary if:

1. The government required travel documents of such Passenger appear not to be in order according to UA's reasonable belief; or

2. Such Passenger's embarkation from, transit through, or entry into any country from, through, or to which such Passenger desires transportation would be unlawful or denied for any reason.

H. Safety – Whenever refusal or removal of a Passenger may be necessary for the safety of such Passenger or other Passengers or members of the crew including, but not limited to:

1. Passengers or Passengers' Service Animals whose conduct is unlawful; indecent, lewd, or sexual in nature; harassing; disruptive; disorderly; offensive; abusive; unsanitary; or violent;

2. Passengers who fail to comply with or interfere with the duties of the members of the flight crew, federal regulations, or security directives;

3. Passengers who assault any employee of UA, including the gate agents and flight crew, any employees of carriers doing business as United Express, any UA or United Express vendor employee, or any UA Passenger;

4. Passengers who, through and as a result of their conduct, cause a disturbance such that the captain or member of the cockpit crew must leave the cockpit in order to attend to the disturbance;

5. Passengers who are barefoot, not properly clothed, or whose clothing is lewd, obscene or offensive;

6. Passengers who appear to be intoxicated or under the influence of drugs (other than a qualified individual whose appearance or involuntary behavior may make them appear to be intoxicated or under the influence of drugs);

7. Passengers wearing or possessing on or about their person concealed or unconcealed deadly or dangerous weapons; provided, however, that UA will carry law enforcement personnel who meet the qualifications and conditions established in 49 C.F.R. §1544.219;

8. Passengers who are unwilling or unable to follow UA's policy on smoking or use of other smokeless materials;

9. Unless they comply with Rule 6 I), Passengers who are unable to sit in a single seat with the seat belt properly secured, and/or are unable to put the seat's armrests down when seated and remain seated with the armrest down for the entirety of the flight, and/or passengers who significantly encroach upon the adjoining passenger's seat;

10. Passengers who are manacled or in the custody of law enforcement personnel;

11. Passengers who have resisted or may reasonably be believed to be capable of resisting custodial supervision;

12. Pregnant Passengers in their ninth month, unless such Passenger provides a doctor's certificate dated no more than 72 hours prior to departure stating that the doctor has examined and found the Passenger to be physically fit for air travel to and from the destination requested on the date of the flight, and that the estimated date of delivery is after the date of the last flight;

13. Passengers who are incapable of completing a flight safely, without requiring extraordinary medical assistance during the flight, and Passengers who appear to have symptoms of or have a communicable disease (or there is reason to believe there was exposure to a communicable disease) or other condition that could pose a direct threat to the health or safety of themselves or others on the flight, or who refuse a medical screening for such disease or condition, whether suspected or actual. (NOTE: UA requires a medical certificate for Passengers who wish to travel under such circumstances. Visit UA's website, www.united.com, for more information regarding UA's requirements for medical certificates);

14. Passengers who fail to travel with the required safety assistant(s), advance notice and/or other safety requirements pursuant to Rules 14 and 15;

15. Passengers who do not qualify as acceptable Non-Ambulatory Passengers (see Rule 14);

16. Passengers who have or cause a malodorous condition (other than individuals qualifying as disabled);

17. Passengers whose physical or mental condition is such that, in United's sole opinion, they are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an escort. The escort must accompany the escorted passenger at all times;

18. Unaccompanied passengers who are both blind and deaf, unless such passenger is able to communicate with representatives of UA by either physical, mechanical, electronic, or other means. Such passenger must inform UA of the method of communication to be used;

19. Passengers who are unwilling to follow UA's policy that prohibits voice calls after the aircraft doors have closed, while taxiing in preparation for takeoff, or while airborne;

20. Passengers who refuse to wear a mask or face covering while at the airport and/or onboard UA and United Express flights if UA or United Express believe, in their sole discretion, that a failure to wear such a mask or facial covering may pose a risk to the health or safety of others; and

21. Passengers flying into the U.S. from a foreign country who: i) refuse to provide proof of full vaccination, ii) proof of a negative pre-departure test result for COVID-19, and iii) contact tracing information within 72 hours of their flight's departure, the sufficiency of which for each of the three items is subject to UA's approval.

I. Any Passenger who, by reason of engaging in the above activities in this Rule 21, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA has the right to refuse transport, on a permanent basis, any passenger who engages in any of the activities in this Rule. In addition, the activities enumerated in this Rule shall constitute a material breach of contract, for which UA shall be excused from performing its obligations under this contract.

J. UA is not liable for its refusal to transport any passenger or for its removal of any passenger in accordance with this Rule. A Passenger who is

removed or refused transportation in accordance with this Rule may be eligible for a refund upon request. See Rule 27 A). As an express precondition to issuance of any refund, UA shall not be responsible for damages of any kind whatsoever. The passenger's sole and exclusive remedy shall be Rule 27 A).

Back to Top

# Rule 22 Smoking Policy

Smoking (including use of electronic simulated smoking materials and smokeless cigarettes) is not permitted on any flights operated by UA. Use of betel nut (i.e., betel chewing) or any other type of chewing tobacco is also prohibited on all flights operated by United. Federal law also prohibits smoking in an airplane lavatory and tampering with, disabling, or destroying any smoke detector installed in any airplane lavatory. Federal law provides for a penalty of up to $2,000 for tampering with the smoke detector installed in this lavatory. Individuals are subject to FAA enforcement action and substantial monetary penalties for violation of this law and related regulations. By purchasing a ticket or accepting transportation, the Passenger agrees to comply with UA's policy on smoking and use of other smokeless materials, as well as applicable federal law, and UA reserves the right to seek reimbursement from any Passenger whose failure to do so causes UA any loss, damage or expense.

Back to Top

# Rule 23 Baggage

A. General Conditions of Acceptance - Passengers may check Baggage for carriage in the cargo compartment of the aircraft and/or may carry Baggage on board the aircraft subject to provisions in this Rule. UA will accept Baggage subject to the following conditions:

1. Passengers must present a valid Ticket for transportation over the lines of UA or over the lines of UA and one or more other carriers with which UA has an Interline Transportation agreement.

2. UA has the right to refuse to transport Baggage on any flight other than the one carrying the Passenger.

3. UA will refuse to accept property for transportation when the size, weight, character or type of packaging renders it unsuitable for transportation on the particular aircraft which is to transport it, or when the property cannot be accommodated without harming or annoying Passengers or which poses a risk to other baggage or cargo, or which is not suitable or adequately packed to withstand ordinary handling, unless the passenger executes a release form.

4. All Baggage or other property for which UA assumes custody and for which it issues a Baggage Claim Check shall be deemed acceptable for transportation by air.

5. Baggage will not be checked:
   a. To a point that is not on the Passenger's Routing;

   b. Beyond the Passenger's next point of Stopover or, if there is no Stopover, beyond the final Destination of the Ticket;

   c. Beyond a point to which all applicable charges have been paid;

   d. Beyond a point at which the Passenger is to Transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which the Passenger is scheduled to arrive; or

   e. To an intermediate point unless the intermediate point to which the Baggage is to be checked is a permissible Stopover point at the fare paid (except if the Passenger is making a connection to the first available UA flight departing from such intermediate point and the connection exceeds four hours, the Passenger may reclaim his/her Baggage at such intermediate connecting point).

6. UA has the right to refuse to accept Baggage from the Passenger if the Passenger fails to present the Baggage within the Check-in time limits specified in Rules 5 D) and E), or if the Passenger will be voluntarily separated from his or her Baggage (other than those Passengers whose flight is oversold and who volunteer to take a later flight). UA may require a signed release of liability as a condition of Baggage acceptance in these circumstances.

7. It is the Passenger's responsibility to attach proper identification to Baggage, and UA is not liable for a Passenger's failure to do so. It is also the Passenger's responsibility to claim the checked baggage at the baggage claim area, and UA assumes no obligation to verify the identity of the bearer at the destination airport.

8. Checked Baggage will generally be carried on the same aircraft as the Passenger unless such carriage is deemed impractical by UA, in which event the carrier will make arrangements to transport the Baggage on the next flight on which space is available. UA will charge fees to a Passenger for the delivery of Baggage when the Passenger fails to check-in within the applicable check-in time and it results in his/her Baggage traveling on a different flight.

9. All baggage is subject to inspection by UA and/or the TSA. However, there is no obligation that UA perform an inspection. UA will refuse to transport or will remove at any point baggage that the passenger refuses to submit for inspection.

10. UA will not accept baggage or other personal property for storage.

B. Baggage Allowance - When a Passenger presents a valid Ticket for transportation between points on UA, transportation of the Passenger's Baggage between such points will be subject to the terms and conditions of this Rule, as well as the Additional Liability Limitations found in Rule 28. For purposes of this Rule, "Baggage Allowance" is defined as the number of pieces of Baggage that will be carried subject to payment of applicable service charge(s), either as Checked Baggage or Carry-on Baggage, provided such Baggage meets the specified Maximum Outside

Linear Dimensions and maximum weight of each piece.

1. Checked Baggage Allowance - UA will accept up to two pieces of Checked Baggage weighing less than 51 pounds (23.1 kg) and a Maximum Outside Linear Dimension of 62 inches (158cm) (measured by adding the width + length + height) subject to payment of the applicable service charge(s). First and second Checked Baggage service charges, available on UA's Baggage Calculator, vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport). In addition, the following provisions apply for Checked Baggage:

   a. UA may, at its sole discretion, change, consider and make exceptions to its Baggage Allowance policy (e.g., to the number, size, weight, type, and/or applicable service charges) for certain MileagePlus members, First Class and Business customers, certain credit card holders, active military personnel, and/or other Passengers depending on the fare class purchased.

   b. Applicable Baggage service charges(s) paid are non-refundable. A Passenger who does not travel as a result of a cancellation, Schedule Change, or Irregular Operations will be eligible for a refund upon request. See Rule 27 C). United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

   c. UA may allow certain sporting equipment and other items to be checked in lieu of one piece of Baggage. See Rule 23 E) for more information.

   d. Boxes weighing less than 51 pounds (23.1 kg) and 42 linear inches (107 cm) may be accepted as Checked Baggage on flights operating as United Express to the Caribbean, Central America, and Mexico.

   e. For travel to, from or within Micronesia, Baggage is limited to two checked bags, 1 checked bag and 1 checked box or 1 checked bag and 1 checked cooler not to exceed Maximum Outside Linear Dimensions of 62 linear inches (158 cm) and weighing less than 51 pounds (23.1 kg).

   f. If bags exceed the maximum linear dimensions, weight, or allowance, excess baggage charges may also apply. Baggage weighing 100 pounds (45 kg) or more will not be accepted as checked baggage.

   g. The items listed below will not be included as part of the Checked Baggage Policy, and can be checked free of charge:
   i. Assistive devices (e.g. cane, one set of crutches, one set of braces, prosthetic devices, or a wheelchair). For additional information on wheelchairs, see G) 4) below.

   ii. For flights departing from Hawaii, one box of pre-packaged fruit up to a maximum weight of 30 pounds.

   iii. For each accompanied child, one child/infant's car restraint seat and one of the following items: a collapsible stroller, a compact folding stroller, or a folding wagon.

2. Carry-on Free Baggage Allowance - UA will accept one piece of Carry-on Baggage free of charge, which, for purposes of this Rule, is referred to as the "Carry-on Free Baggage Allowance", and one personal item such as a shoulder bag, backpack, briefcase, laptop bag or similar item, except, however, UA will not accept any Carry-on Baggage for passengers traveling on a Basic Economy fare and Basic Economy passengers whose baggage is checked at the gate will be charged the applicable checked bag service charge, plus a 25 USD/25 CAD gate handling service charge. Carry-on Baggage must not exceed the Maximum Outside Linear Dimensions of 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm), which includes its wheels and handles. Personal items must not exceed 9 inches (22 cm) x 10 inches (25 cm) x 17 inches (43 cm), which includes any wheels and handles. A personal item that exceeds these maximum linear dimensions but is not greater than 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm) will be considered as Carry-on Baggage. Carry-on Baggage or personal items suspected of being oversized may require being placed into a sizing unit to determine acceptability. Carry-on Baggage that exceeds the Maximum Linear Dimensions allowed or that exceeds the Carry-on Free Baggage Allowance will be considered as Checked Baggage and is subject to Checked Baggage service charges. For flights departing Yap, Federated States of Micronesia (YAP), the maximum weight of carry-on baggage is 25 lbs/11.3 kg; any bag heavier than this amount will be considered as Checked Baggage and is subject to Checked Baggage service charges, such as Excess and Oversize/Overweight Baggage charges. Carry-on Baggage may be stored in carry-on compartments of the aircraft if so equipped, or it must be retained in the Passenger's custody and stored under a seat or in an overhead compartment approved for the carriage of such Baggage. See Rule 23 F) 5) below for UA's Carry-on policy regarding musical instruments. Carry-on Baggage is subject to the following additional conditions:
   a. Operations, space constraints, security directives and/or other safety considerations may require limitations to the allowable Carry-on Baggage on a specific flight.

   b. UA reserves the right in its sole and absolute discretion to determine the suitability and place of storage of any items to be carried in the cabin of the aircraft.

   c. UA reserves the right to check a Passenger's Carry-on Baggage for any reason, including if the Carry-on Baggage cannot be safely stowed, or the Carry-on Baggage is not compliant with the Maximum Outside Linear Dimensions specified in section 2) above.

   d. In addition to the Carry-on Free Baggage Allowance listed above, the following items do not count toward the one Carry-on plus one personal item:
   i. An overcoat or wrap.

   ii. An umbrella.

   iii. A reasonable amount of reading material.

   iv. A pet carrier (charges apply) (the carrier must be small enough to fit underneath the seat without blocking any person's path to the main aisle of the aircraft, and it must be stowed properly before the forward customer entry door to the aircraft is closed).

   v. A collapsible wheelchair.

   vi. A government approved child/infant restraint seat meeting Federal Motor Vehicle and FAA Approval Standards.

   vii. A camera.

   viii. A diaper bag.

   ix. A breast pump.

   x. A limited amount of Airport Duty Free items, merchandise purchased in the airport, or food. These items must be stowed in the same manner as Carry-on Baggage.

xi. Assistive devices (a cane, one set of crutches, prescription medications and any medical devices needed to administer the medications, a Portable Oxygen Concentrator (POC), etc.). These items must be stowed in the same manner as Carry-on Baggage.

xii. A compact folding stroller that complies with the Carry-on Baggage restrictions above.

3. Baggage Allowance for Children:

    a. Children paying for a seat will receive the appropriate baggage allowance for that seat in addition to one stroller or folding wagon and one car seat;

    b. Lap children will be granted a Baggage Allowance of one stroller or folding wagon and one car seat. Infants traveling internationally on 10% of an Adult fare are also allowed one stroller or folding wagon and one car seat in addition to their standard Baggage Allowance.

4. Passenger Reroutes - A Passenger rerouted in accordance with Rule 24 will be entitled to the maximum Baggage Allowance applicable for the trip originally purchased, regardless of whether the Passenger is transferred to a different class of service or whether the Passenger is entitled to a fare refund.

C. Excess and Oversize/Overweight Baggage Limits and Charges

1. Except as otherwise provided in the terms of this Contract of Carriage or by law, articles transported as Checked Baggage may not exceed the Maximum Outside Linear Dimensions of 115 linear inches (292 cm) or a maximum weight of 99.9 pounds (45.3 kg).

2. UA may, in its sole discretion, change, consider or make exceptions to its Excess or Oversize/Overweight Baggage policy (e.g., to the number, size, weight, type and/or applicable service charges).

3. Charges apply for Excess and Oversize/Overweight Baggage, in addition to applicable Baggage service charges(s) required to be paid pursuant to UA's general Baggage Allowance policy. These charges apply each way (i.e., based on a one-way trip) and are cumulative (i.e., Baggage that is excess and also oversized and/or overweight will be subject to both Excess Baggage *and* Oversize/Overweight Baggage charges).

4. Excess and Oversize/Overweight Baggage charges, available on UA's Baggage Calculator, may vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where Baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport).

5. UA's acceptance of Excess and Oversize/Overweight Baggage shall be on a space-available basis only, and shall be subject to the load capacities of the aircraft in use. United may prohibit Checked Baggage exceeding either 70 lbs or more than 115 linear inches.

6. Excess and/or Oversize/Overweight Baggage charges will apply from the point at which Baggage is accepted for transportation to the point at which Baggage is checked or transported in the Passenger compartment. Baggage connecting to other airlines also may be subject to the connecting airline's Excess and/or Oversize/Overweight Baggage charges, in addition to UA's Excess and/or Oversize/ Overweight Baggage charges.

7. Excess Baggage Embargos – Excess and Oversize/Overweight Baggage may not be accepted on flights to/from certain destinations during certain specified dates (usually holiday periods). Contact United's Customer Contact Center for a list of cities and effective dates.

8. Additional Limits on Excess and Oversize/Overweight Baggage for Certain International Travel

    a. For travel between the U.S.A./Canada and points in Mexico (except during embargo periods) upon payment of the applicable Excess Baggage charges:

        i. Leon - one article of Baggage in excess of the Baggage Allowance will be accepted.

        ii. Guadalajara, Mexico City and Veracruz – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

        iii. Mexico on flights operating as United Express - one article of Baggage in excess of the Baggage Allowance will be accepted.

        iv. Mexico (all other cities and flights) – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

    b. For travel between the U.S.A./Canada and points in the Caribbean (except during embargo periods) upon payment of the applicable Excess Baggage charges:

        i. Dominican Republic, Tortola, British Virgin Islands - No Baggage in excess of the Baggage Allowance will be accepted.

        ii. Caribbean on flights operating as United Express - one article of Baggage in excess of the Baggage Allowance will be accepted.

        iii. Jamaica – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

        iv. Trinidad - one article of Baggage in excess of the Baggage Allowance will be accepted.

        v. Caribbean (all other flights) - up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

    c. For travel between the U.S.A./Canada and points in Central America/Panama (except during embargo periods) upon payment of the applicable Excess Baggage charges:

        i. Belize and/or Costa Rica – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

        ii. Honduras:

            a. Tegucigalpa - No Baggage in excess of the Baggage Allowance will be accepted.

            b. San Pedro Sula and Roatan – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

        iii. To El Salvador - No Baggage in excess of the Baggage Allowance will be accepted.

        iv. From El Salvador – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

        v. Central America/Panama on flights operating as United Express - one article of Baggage in excess of the Baggage Allowance will be accepted.

        vi. Applicable for travel between the U.S.A./Canada and Central America/Panama (all other flights) – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

    d. For travel between the U.S.A./Canada and South America (except during embargo periods) upon payment of the applicable Excess Baggage charges:

        i. Peru, Venezuela and Colombia - No Baggage in excess of the Baggage Allowance will be accepted.

ii. Brazil – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

iii. Ecuador – up to two articles of Baggage in excess of the Baggage Allowance will be accepted.

iv. South America (all other flights) – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

e. For travel between the U.S.A./Canada and the Philippines – up to three articles of Baggage in excess of the Baggage Allowance will be accepted for transportation upon payment of the applicable Excess Baggage charges. Additional articles may be carried as airfreight only and subject to applicable freight rates and availability.

9. Declaration of Higher Value for Checked Baggage

a. Passengers are not permitted to declare a higher value for Checked Baggage on UA or carriers doing business as United Express. When personal property, including Baggage, is tendered for transportation via two or more carriers other than UA with different maximum limits on declared value, the lowest limit for any such carrier shall apply to all carriers participating in such transportation.

D. Cabin Baggage Requiring a Seat - When a Passenger requests that an item be carried in the Passenger cabin of the aircraft as Cabin Baggage, and it is determined by UA in its sole and absolute discretion that the item is acceptable in the cabin but is so fragile and/or bulky as to require the use of a seat, the items will be accepted and considered Cabin Baggage. Examples include, but are not limited to, large or valuable musical instruments, media cameras, artifacts, garment bags, and similar items of a delicate nature or unusual size. In addition to the Carry-on Baggage conditions specified in Section B 2) a) and b) above, the following provisions also apply to Cabin Baggage Requiring a Seat:
1. Ticketed items are subject to thorough inspection.

2. Such items must be able to withstand the rigors of flight and should be packaged or covered, as necessary, to prevent contents from escaping and to avoid possible injury to other passengers. It is prohibited for either the instrument or the case to contain any object not otherwise permitted to be carried in an aircraft cabin because of the rules contained in this Contract, or any applicable law, regulation, rule, and/or security directive.

3. Ticketed items must be carried aboard the aircraft and strapped in a seat adjacent to the owner using the seatbelt securely (eliminating the possibility of shifting).

4. The weight of the item (including any case or covering) is not to impose any load on these seats or floor structure that exceeds the load limitations for these components, and cannot exceed 165 pounds, or the applicable weight restrictions for the aircraft.

5. No article secured to a seat may obstruct access to, or use of, any emergency or regular exit; block or protrude into any aisle or exit path; or obstruct any passenger's view of the overhead fasten seatbelt and no smoking signs or any required exit sign or video monitor/screens.
NOTE: Due to the cabin configuration and FAA regulations, Cabin Baggage locations may vary.

6. No article may be secured in an emergency exit seat.

7. A seat for ticketed Cabin Baggage must be reserved in advance and the applicable charges must be paid.

8. UA will charge 100 percent of the applicable Adult fare for the portion of the trip on which the extra seat is used. The Cabin Baggage will not be included in determining Baggage Allowance or Excess Baggage Charges.

NOTE: Cabin-Seat baggage may not be accepted on some aircraft with weight/size restrictions.
NOTE: UA personnel, including flight attendants and other crew members, cannot assist with the movement or placement of Cabin Baggage Requiring a Seat.

E. Sports Equipment/Special Items – The sports items listed below, and which must weigh less than 51 pounds (23.1 kg) and a maximum outside linear dimension of 62 inches (158cm), will be accepted as Baggage by UA in accordance with the following provisions, accepted at applicable first and second checked bag service charges, and/or special item handling charges specified below. Charges are based on a one-way trip and are applicable from the point at which the item is accepted to the point to which the item is transported. Where an item is not included in the Baggage Allowance, and not specified as a special item listed below, it will be treated as excess baggage (first bag service charge, second bag service charge or excess bag service charge may apply, as well as applicable oversize and overweight service charges). Special item fees are based on a per item basis. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to the Sports Equipment/Special items specified below when carried as Checked Baggage.
NOTE: Flights operating as United Express do not accept certain items listed below.
1. Archery Equipment - One item of archery equipment (a bow case containing bows, a quiver with arrows, or a maintenance kit of sufficient strength to protect items from damage) will be considered as one item of sporting equipment and allowed in place of one checked bag. United is not liable for damage to archery equipment that is not contained in a hard-sided case.

2. Baseball Equipment – One bag of baseball equipment will be considered as one item of sporting equipment and will be allowed in place of one checked bag. Baseball bats are not permitted in carry-on baggage.

3. Bicycles - United accepts non-motorized bicycles with single or double seats (including tandem) or up to two non-motorized bicycles packed in one case as checked baggage. If the bicycle(s) are packed in a container that is over 51 pounds (23.1 kg) and/or 62 linear inches (158 cm) service charges apply, it will be subject to standard oversize and overweight charges, and first and second bag fees may also apply. If the bicycle(s) are packed in a container that is less than 51 pounds (23.1 kg) and 62 (158 cm) total linear inches, there is no bicycle service charge, but, if applicable, the first or second bag service charge applies. Handlebars must be turned sideways and protruding pedals and accessories must be removed, or all loose items must be enclosed in plastic foam or similar protective material, or the bicycle must be enclosed in a sealed box. United is not liable for damage to bicycles that do not have the handlebars fixed sideways and pedals removed, handlebars and pedals encased in plastic foam or similar material, or bicycles not contained in a cardboard containers or hard-sided cases. If your itinerary includes a United Express flight, please contact United for information regarding aircraft cargo hold. Bicycles will not be accepted during excess baggage embargos.

4. Boogie/Skim/Speed Boards - One boogie/skim/speed board or one boogie/skim/speed board bag containing up to two boards will be considered as one item of sporting equipment and allowed in place of one checked bag.

5. Bowling Equipment - One set of bowling equipment consisting of a bowling bag (up to three in one bag), one to three bowling balls, and one pair of shoes will be considered as one item of sporting equipment and allowed in place of one checked bag. Bowling equipment weighing more than 51 pounds (23.1 kg) will be subject to overweight baggage charges.

6. Camping Equipment – Tents, backpacks or knapsacks, and sleeping bags will be accepted as checked baggage. Certain items made of cloth, plastic, vinyl or other easily torn material and those having aluminum frames, outside pockets, straps, buckles and other protruding parts will be accepted as fragile items. UA shall not be liable for fragile items. Lanterns, stoves and heating equipment which use liquid fuel, propane, butane or similar will not be accepted as checked or carry-on baggage in accordance with DOT hazardous materials regulations.

7. Fencing Equipment – One suitable container or packaging securely encasing fencing equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. EXCEPTION: Fencing containers that do not contain only fencing equipment will be subject to Overweight/Oversize Excess Baggage Charges.

8. Firearms/Shooting Equipment/Stun Guns – One item of shooting equipment per Passenger will be considered as one checked bag only when permitted by governmental regulations, and subject to the conditions below including UA's firearm policy. One item of shooting equipment is defined as: One hard-sided shooting equipment case containing up to five firearms, with or without scopes, and 11 pounds (five kgs.) of ammunition. Firearms carried in addition to this allowance will be assessed at the current excess baggage charge.

   a. International firearm regulations and laws vary by destination and transiting country. Contact appropriate consulates or embassies to obtain specific entry requirements applicable to destination(s). UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such regulations or laws.

   b. A Firearm will be accepted only from a customer who is 18 years of age or older.

   c. Curbside check-in of a firearm is not permitted.

   d. Advanced arrangements must be made.

   e. The firearm, including a hand gun, must be packed in a hard-sided container with a lock. The container must be locked at the time of acceptance by UA and the key or combination must remain in the customer's possession. The locked hard-sided container holding a handgun may be placed inside an unlocked soft-side piece of luggage. Containers may be purchased from UA. United is not liable for damage to a firearm or a hand gun that is not contained in a hard-sided case. EXCEPTION: For travel to/from the United Kingdom, handguns, pistols, rifles, and shotguns must be packed in a hard side rifle case.

   f. Baggage containing firearms will not be accepted knowingly for transportation by UA at any point unless a declaration, signed by the Passenger presenting such Baggage and dated on the day the Baggage is accepted for transportation, is attached to the inside of the case declaring that the firearm is not loaded.

   g. Properly packaged small arms ammunition up to a maximum of 11 pounds (five kgs.) may be checked as Baggage. The ammunition may be packed in the same container as the firearm or in a separate container. Ammunition must be packed in the manufacturer's original package or securely packed in fiber, wood or metal containers and the ammunition inside the container must be protected against shock and secured against movement. The Passenger shall make a written declaration confirming that the above provisions are met. Ammunition with explosive or incendiary projectiles will not be accepted.

   h. Except for military missions (e.g., CRAF), at no time will fully automatic weapons be acceptable as Checked or Carry-on Baggage.

   i. When a firearm that is used for sporting purposes is carried on the aircraft, the Passenger must have entry permits for the country/countries of transit and Destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such entry permits, or for the consequences to any Passenger resulting from his/her failure to obtain such entry permits.

      i. EXCEPTION: This provision may not apply to authorized persons who are performing a duty on board an aircraft, such as a law enforcement officer or diplomatic courier. Such Passenger may be permitted to retain custody of a firearm and ammunition upon identification at the time of check-in. The firearm will be transported in a section of the aircraft that is inaccessible to the customer.

   j. Stun Guns- Stun guns with their dry cell batteries removed are accepted in checked baggage only and solely for domestic travel, and when permitted by local, state, and/or governmental laws and regulations, which vary by destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such laws or regulations. Tasers are prohibited as either carry-on or checked baggage.

   UA, at any time, without notice and for any reason, can suspend the carriage of firearms, shooting equipment, and stun guns.

9. Fishing Equipment - Two rods, one reel, one landing net, one pair of fishing boots and one fishing tackle box (all properly encased) will be considered as one item of sporting equipment and allowed in place of one checked bag. The total of all fishing equipment must weigh less than 51 pounds (23.1 kg), or overweight charges may apply. Fishing equipment containers must not exceed 115 linear inches or oversized charges may apply. For United Express flights, fishing equipment exceeding 80 linear inches will not be accepted as checked baggage.

10. Golfing Equipment – One standard-sized golf bag containing golf related equipment and personal items will be permitted and accepted as Checked Baggage, subject to the limits set forth in Rule 23(B)(1). Applicable overweight charges based on a customer's baggage allowance will apply. All contents must be properly encased in a suitable container. The golf bag must be covered or enclosed in a heavy, rigid carrying case. UA assumes no liability for damages to items contained in a soft-sided case.

11. Gymnastic Equipment –One item of gymnastic equipment or one suitable container or packaging that securely contains gymnastic equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. EXCEPTION: Gymnastic cases weighing over 51 lbs (23.1 kg) that do not contain only gymnastic equipment will be subject to Overweight/Oversize Excess Baggage Charges.

12. Hang Gliding Equipment - Subject to the conditions and charges specified below, individual components of hang-gliding equipment can generally be packed in separate bags for each component. United will accept a maximum of two items per bag for a set of four component bags. Hang gliding equipment must not exceed 99.9 pounds (45.4 kg), and maximum length allowed varies by aircraft type.

   a. United will accept hang gliding equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

   b. Hang gliding equipment is not accepted as checked baggage on United Express flights, and is not accepted during excess baggage embargoes.

   c. Allow an extra 30 minutes at check-in.

13. Hockey/Lacrosse Sticks/Curling Brooms or Brushes – Up to two hockey, curling brooms/brushes, or lacrosse sticks taped together plus one hockey, curling or lacrosse bag will be considered as one item of sporting equipment and allowed in place of one checked bag. A duffel bag containing hockey, lacrosse, or curling equipment is treated as a normal checked bag. A duffel bag containing hockey equipment is subject to applicable overweight and oversize excess baggage charges. Hockey, curling brooms/brushes, or lacrosse sticks carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

14. Javelins – One hard sided container encasing javelins that are taped together will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked bag. Javelins carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

15. Kiteboards - Subject to the conditions and charges specified below, United will accept one kiteboard or one bag containing kite board equipment as checked baggage. The board must be well padded or the entire board must be encased in a suitable container to avoid scratching.

    a. United will accept kiteboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    b. Kiteboards greater than 115 linear inches (292 cm) will not be accepted as checked baggage. Kite boards greater than 80 linear inches (203 cm) will not be accepted as checked baggage on United Express flights. Kiteboards are not allowed during excess baggage embargos (except to Costa Rica).

    c. Allow an extra 30 minutes at check-in.

16. Oars - One pair of oars or one oar case containing up to two oars will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Oars carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

17. Paintball Equipment - One bag containing equipment used in the paintball sport will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Paintball guns are not permitted as carry-on baggage. A paintball gun may be checked in an unlocked soft or hard sided case. Paintball ammunition must be packed in the manufacturer's original package or securely packed in a container that will protect the paint balls from breakage. Compressed gas cylinders must be empty and have the regulator removed to allow for a visual inspection by a TSA Security Screener. Unopened paintball air canisters in original plastic packaging are sold empty and Passengers do not need to demonstrate that the canisters are empty.

18. Parachutes/Parasails - A sports parachute or parasail will be considered as one items of sporting equipment and allowed in place of one checked item. A parachute or parasail taken onboard the aircraft must meet carry-on size restrictions for placement underneath an aircraft seat. When checked as baggage, all excess, oversize and overweight charges will apply.

19. Poles vaults- Subject to the conditions and charges specified below, one pole vault properly encased in a suitable container will be accepted as Checked Baggage.

    a. Pole vault acceptance is restricted by aircraft type. Please contact United's Customer Contact Center for maximum length restrictions, which vary by aircraft type.

    b. United will accept pole vaults as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    c. Pole vaults are not accepted as checked baggage on United Express flights, and are not accepted during excess baggage embargos.

20. Pool cues –One pool cue case containing pool cues will be accepted as Checked Baggage.

21. Scuba/Diving Equipment – One suitable dive bag securely containing scuba/diving equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. Dive bags measuring more than 51 pounds and/or that are over 62 linear inches will be charged as sporting equipment and special item charges apply. An empty dive tank or up to 3 rebreather tanks will not be included in determining the free baggage allowance and will be subject to a 150 USD/150 CAD service charge (each way) for flights within the U.S., Canada, Puerto Rico and the U.S. Virgin Islands. A 200 USD service charge (each way) applies for all other travel.
NOTE: The empty dive/rebreather tank must have the regulator valve completely disconnected from the tank. The tank must not be sealed (i.e. the tank has an open end). The tank must have an opening to allow for a visual inspection by a TSA Security Screener. For rebreather equipment, soda lime that is 4% Sodium Hydroxide or less will be accepted in checked baggage. Soda lime that is 4.1% Sodium Hydroxide will not be accepted in checked baggage.

22. Skating Equipment – One pair of ice skates, roller skates, and rollerblades will be considered as one item of sporting equipment and allowed in place of one checked bag. For Domestic Carriage only, ice skates are permitted in carry-on baggage. Skating equipment carried in addition to the baggage allowance will be assessed at the current excess baggage charge. Skating equipment is subject to applicable overweight and oversize excess baggage charges.

23. Surfboards – Subject to the conditions and charges specified below, one surfboard or one surfboard bag containing up to four boards per customer with a maximum weight less than 51 pounds (23.1 kg) and maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any surfboard that is greater than 62 (158 cm) linear inches. The skeg/fin must be removed or well padded. The entire board must be encased in a suitable container to avoid scratching.

    a. United will accept surfboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    b. Surfboards or surfboard bags more than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, surfboards or surfboard bags more than 80 linear inches (203 cm) will not be accepted as checked baggage, and will not be accepted during baggage embargos (except for Costa Rica). If your itinerary includes United Express, please contact United for information regarding aircraft cargo hold limits.

    c. Allow an extra 30 minutes at check-in.

24. Tennis Equipment – One tennis racket case containing tennis rackets and balls will be considered as one item of sporting equipment and allowed in place of one checked bag. Tennis equipment must be properly protected or a limited liability form must be signed.

25. Water Skiing/Snow Skiing/Snowboard Equipment/Wakeboards

a. One item of ski equipment (one pair of water skis, one snowboard, one wakeboard, up to two pairs of snow skis and associated equipment in one snowboard bag , or one ski boot) with a weight less than 51 pounds (23.1 kg) is allowed in place of one checked bag. If more than one set of ski equipment is checked, each additional set of equipment (as outlined above) will be counted as one item, and the associated service charge(s) will apply. Acceptance is subject to aircraft size and load conditions.

b. Ski Bags and ski boot bags weighing more than 51 pounds (23.1 kg) that contain other items in addition to or in place of appropriate snow or water skiing equipment or ski boots will be subject to Overweight/Oversize Excess Baggage Charges.

26. Wave Ski - Subject to the conditions and charges specified below, one wave ski or one bag containing equipment used in wave skiing with a weight less than 51 pounds (23.1 kg) and maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any wave ski that is greater than 62 (158 cm) linear inches. The board must well-padded or the entire board must be encased in a suitable container to avoid scratching.

a. United will accept wave skis as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

b. Wave skis greater than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, wave skis greater than 80 linear inches (203 cm) will not be accepted as checked baggage. Wave skis will be transported subject to load capacities of the aircraft on any itinerary involving a United Express flight. Wave skis will not be accepted during excess baggage embargos.

27. Windsurfing Equipment- Subject to the conditions and charges specified below, windsurfing boards will be accepted as Checked Baggage. For purposes of this provision, one windsurfing board not exceeding 115 linear inches and not exceeding 99.9 pounds (45.3 kg) with one boom, one mast, one sail and necessary hardware will be considered as one item of windsurfing equipment.

a. Windsurfing equipment must be padded and enclosed in suitable packing sufficient to protect from scratches or dents or other damage.

b. United will accept windsurfing equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

c. Windsurfing equipment cannot be accommodated on any itinerary involving a United Express flight, and is not accepted during excess baggage embargos. Additional size or acceptance limitations may apply dependent upon aircraft type and configuration.

d. Allow an extra 30 minutes at check-in.

F. Fragile and Perishable Items –Fragile and perishable items include, but are not limited to, examples in Limitation of Liability, Rule 28 K). Upon request and subject to operational needs or space availability, a fragile or perishable item may be carried in a seat subject to the provisions and applicable charges in D) above. A fragile or perishable item may be accepted as Checked Baggage in accordance with this Rule only if it is packaged appropriately (g., in an original, factory-sealed carton, in a cardboard mailing tube, in a container/case designed for shipping such item or packed with protective internal material). Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for loss or damage of contents or delay in delivery which result from the unsuitability of such item(s) as Checked Baggage and/or the inadequacy of its packaging and not from the carrier's failure to exercise the ordinary standard of care. UA is not liable for damage to a customer's Carry-on Baggage or other in-cabin property that contains fragile or perishable items when such damage is caused by the fragile or perishable items. Customers are responsible for all damage caused by their property, whether such damage is to their own property or to someone else's property.

1. Antlers – Subject to the conditions and charges specified below, one set of antlers retained as hunting trophies per ticketed Passenger will be accepted as Checked Baggage, if aircraft size and load conditions permit.

a. Antlers will not be included in determining the Baggage Allowance and will be subject to a service charge of 150 USD/150 CAD per item. For international travel, a 200 USD/200 CAD per item service charge applies.

b. Antlers must be as free of residue as possible.

c. The skull must be wrapped and tips protected.

d. Maximum Outside Linear Dimensions must not exceed 120 inches. However, on United Express Canadair regional jet flights the linear dimensions of the antlers cannot exceed 33 in. x 43 in. (83 cm x 109 cm) and overall linear dimensions must not exceed 98 in. (248 cm).

e. The Passenger must make all arrangements and assume full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the county, state or territory to and from which the antlers are being transported.

2. Automotive Towbars - Towbars will be accepted inside a checked bag. The towbar must be packaged to prevent damage to it and other bags. Towbars are subject to excess, overweight and oversize excess baggage charges. Baggage containing towbars in excess of 70 pounds (32 kilograms) or 115 linear inches (292 cm) will not be accepted as checked baggage.

3. Dry Ice and Other Restricted and Prohibited Articles

a. Any articles deemed a hazardous material pursuant to DOT Hazardous Materials Regulations (49 CFR 171-177), the IATA Dangerous Goods Regulations and revisions and reissues thereof (hereinafter the "Haz-Mat Regulations") will only be accepted subject to advance arrangements and compliance with the Haz-Mat Regulations. (NOTE: Any obligations of UA which may arise under this Rule or Rule 28 are not applicable when undeclared articles deemed hazardous material are discovered in checked baggage and confiscated and/or destroyed.)

b. Limited quantities of dry ice, a maximum of 5.5 pounds (2.5 kilograms) per Passenger, will be accepted for carriage as checked or Carry-on Baggage provided the Baggage is properly designed to permit the release of carbon dioxide, and the container is labeled, "DRY ICE" or "CARBON DIOXIDE SOLID." The packaging must also show the net weight and identify the perishable item being preserved by the dry ice. Each container cannot have more than the maximum allowed per customer. Multiple Passengers cannot pool their portions together, even within the same traveling party.

c. A 150 USD/150 CAD service charge applies to the transportation of dry ice as checked baggage on flights within or between the U.S. and Canada, and a 200 USD service charge applies to the transportation of dry ice as checked baggage on flights to all other destinations.

d. UA may require acceptance of such articles at locations other than the passenger terminal.

e. E-Cigarettes or Personal Vaporizers will not be accepted in Checked Baggage.

f. Hoverboards, smart wheels, and any other self-balancing or self-propelled luggage, vehicles or devices are not accepted as checked or

carry-on baggage.

g. Lithium batteries, power banks, and spare batteries are not accepted as checked baggage. These types of batteries must be removed from any checked or carry-on baggage, including baggage checked at the gate. All batteries integrated as a part of the bag themselves (sometimes referred to as a smart bags) must also be removed if checked or brought on as carry-on baggage. Any items with non-removeable lithium batteries are not allowed on any United or United Express flights. Cell phones and computers installed with a lithium battery of less than 100 watt hours are permitted in carry-on and checked baggage.

h. The following items are prohibited as checked and carry-on baggage: Avalanche packs; fuel; mace and other self-defense sprays; fireworks, gunpowder, flares, flare guns and holiday poppers; gasoline-powered equipment; bleach, drain cleaners, epoxy, fuel, gel fuel, glue, insecticides, paint, torch lighters, spray starch, strike-anywhere matches and certain aerosols; ready-to-eat meals (MREs); and shock absorbers.

i. Any items prohibited by the TSA.

j. Illegal drugs, marijuana, and any cannabis infused products, such as Cannabidiol (CBD) oil are prohibited in checked or carry-on Baggage.
2) Except as otherwise provided in Rule

4. Liquor - Subject to the conditions below, alcoholic beverages in retail packaging may be checked as baggage.
a. For alcoholic beverages less than 24 percent alcohol by volume (including most wines and beers) there are no restrictions on the amount that may be accepted in checked baggage or purchased after completing security screening at the checkpoint (Duty Free). If traveling internationally, alcoholic beverages may be subject to customs limits in the arrival country.

b. For alcoholic beverages between 24 and 70 percent alcohol by volume there is a limit of 5 liters (1.3 gallons) per customer that may be accepted in checked baggage, or that may be purchased after completing security screening at the checkpoint (Duty Free). Packaging must be in receptacles smaller than 5 liters. Alcoholic beverages more than 70 percent alcohol by volume will not be accepted.

c. All alcoholic beverages must be packed to prevent leakage and damage to other bags. UA shall not be liable for breakage or spillage of alcoholic beverages. Normal checked baggage allowance limits, excess charges and carry-on limits apply.

d. Up to 3 oz. (100ml) of an alcoholic beverage may be taken through the security checkpoint provided it is less than 70 percent alcohol by volume, in a container that is 3 oz. or smaller, and is carried in a plastic zip-top bag.

e. Alcohol transported on an airplane cannot be consumed on board

5. Musical Instruments - Musical instruments may be carried as Checked Baggage or as Cabin Baggage subject to the provisions in D) above. As part of a Passenger's one carry-on plus one personal item allowance and subject to UA's Carry-on Baggage conditions specified in Section B 2) a) and b) above, a small musical instrument such as a violin or a guitar can be carried in lieu of a carry-on bag if the instrument can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. If the musical instrument appears too large or irregularly shaped to fit under the seat or in the overhead compartment, or, if at the time the customer boards the aircraft, there is no space to stow it, it will not be accepted for in cabin stowage and will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. In the case of Basic Economy passengers, a small musical instrument may be carried on in addition to a personal item if it can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. A larger musical instrument brought to the gate as a carry-on by a Basic Economy passenger and any instrument that cannot fit under the Passenger's seat or in open overhead bin space available at the time the Basic Economy passenger boards will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. All musical instruments, whether carry-on or checked, should be in a hard sided case, and stringed instruments should have the strings loosened to protect the neck from damage due to expansion and contraction which result from temperature variations. Checked instruments cannot exceed 165 pounds and 150 linear inches (or the applicable weight/size restriction for the aircraft) and will be included in determining the Baggage Allowance, and when in excess (over 2 checked items), overweight or oversize (115 linear inches is considered oversized, and over 51 pounds (23.1 kg) is considered overweight), will be subject to the Excess, Oversize, and Overweight Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to musical instruments or musical instrument cases.

6. Seafood - Seafood will be accepted and included in determining the Checked Baggage Allowance only if it is wrapped in a sealed protective material and packed in a leak-proof container. Seafood is subject to applicable excess, overweight and/or oversize charges. UA is not liable for seafood. Seafood will not be accepted if packed in wet ice or in a Styrofoam container.

7. UA will not accept wet ice or items containing wet ice as Checked or Carry-on Baggage.

8. UA will not accept perishable items packed in Styrofoam containers.

9. For travel to, from or within Micronesia, perishable items will only be accepted for transportation if within the Checked Baggage Allowance.

10. ZAM ZAM Water - Subject to the conditions below, one container or jerkin containing up to 10 liters (2.64 gallons) of ZAMZAM water will be accepted as checked baggage by UA at no extra charge in addition to the Baggage Allowance.
a. Containers or jerkins containing ZAMZAM water must be properly packed in a plastic covering to prevent leakage and damage to other bags. UA is not liable for breakage or spillage of ZAMZAM water and/or containers.

b. ZAMZAM containers or jerkins are not permitted as Carry-on or Cabin Baggage.

c. Jerkins or ZAMZAM water containers in excess of one will be subject to excess baggage charges.

G. Other Checked Baggage Items - The items listed below will be accepted as Baggage by UA in accordance with the following specified provisions.
1. Government approved child/infant seat - A government approved child/infant seat that conforms to all applicable Federal Motor Vehicle standards and approved in accordance with US FAR 121.311, including car seats approved for airline travel, will be accepted in addition to a Passenger's baggage allowance. When checked as baggage, all oversize and overweight charges will apply. First and second bag charges do not apply. A government approved child/infant seat for use in the Passenger compartment is permitted only when an additional seat is reserved for the infant, a Ticket is purchased, and the seat can be secured properly by a seat belt. The accompanying Adult Passenger is responsible for ensuring that the seat functions correctly, that the infant does not exceed the seat's limitations, that the infant is properly secured in the seat and that the seat is secured to the aircraft seat. UA is not liable for damage to child/infant seats when carried or brought onboard as anything other than Checked Baggage.

2. U.S. Military Baggage Allowance - Active U.S. military and their accompanying dependents on personal travel are allowed three (3) bags up to 70 pounds each with a maximum dimension of 62 linear inches without excess or overweight charges being assessed. Active U.S. military personnel on orders and active U.S. military personnel and their dependents (whether accompanying or non-accompanying) on orders for relocation are allowed five (5) bags up to 100 pounds each in United Economy, United Business, United Polaris business class, United First and United Polaris first class with a maximum dimension of 115 linear inches without excess, overweight or oversize charges being assessed. Non-accompanying dependents on travel not related to an order for relocation are not entitled to this additional baggage allowance.

3. Strollers and Folding Wagons – United accepts one collapsible stroller, one compact folding stroller or one folding wagon in addition to a Passenger's baggage allowance. One non-collapsible stroller may be carried as Checked Baggage in lieu of one piece of Baggage (62 inches Maximum Outside Linear Dimensions). This item will be included in determining the Baggage Allowance, and when in excess, overweight or oversize, such item will be subject to the Excess Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to strollers or folding wagons when carried as Checked Baggage.

4. Wheelchairs - One wheelchair per Passenger will be accepted as Baggage by UA at no extra charge in addition to the Baggage Allowance. Excess and/or Oversize/Overweight baggage charges pursuant to Rule 23 C) may apply for checking in additional wheelchair(s) that are used for recreational purposes.

   a. In-cabin stowage of a wheelchair shall be in accordance with 14 CFR, Part 382, Subpart I.

   b. If no in-cabin storage space is available, the wheelchair will be carried in the cargo compartment of the aircraft.

   c. All types of wheelchairs will be accepted (collapsible, noncollapsible or powered wheelchairs with wet cell, dry cell or lithium batteries).

   d. For battery powered wheelchairs:

      i. Passenger must check in at least one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E).

      ii. The battery must be disconnected and/or wheelchairs with dry cell/lithium batteries must be secured to prevent accidental activation.

      iii. Wheelchairs containing lithium ion batteries will be accepted as checked baggage provided the battery is securely attached to the wheelchair, and has a means to prevent unintentional activation or short circuiting.

      iv. Lithium ion batteries for collapsible wheelchairs must be removed and carried in carry-on baggage only. A maximum of one spare battery not exceeding 300 WH or two spare batteries not exceeding 160 WH must be carried in carry-on baggage only.

H. Animals Other than Service Animals (For rules applicable to these animals, see Rule 16) - The transportation of live animals (other than Service Animals) in the cabin of the aircraft is subject to the provisions of this Rule. Carriage of animals not permitted in the cabin may be transported via PetSafe® through UA's Live Animal Service. UA will accept domesticated cats and dogs for transportation as in-cabin Baggage for domestic carriage and travel between U.S.A./Canada and Mexico, the Caribbean, Central and South America. (Exception: In-cabin pets will not be accepted for travel to/from Hawaii and Argentina.) Certain unusual animals/reptiles pose unavoidable safety and/or public health concerns and UA will not accept dogs of the Pit Bull breed, Snakes, other reptiles, ferrets, rodents and spiders as in-cabin baggage. Carriage of any other pets as in-cabin Baggage will be at UA's discretion.

   1. General Conditions of Acceptance

      a. Advance arrangements must be made. Space must be reserved for animals in either the passenger or cargo compartment. Animals without reserved space will be accepted, if space is available, only after the animals for whom space has been reserved have been accommodated.

      b. The animal must be harmless, inoffensive, odorless and require no attention during transit.

      c. The animal must be confined in a cage or container subject to inspection and approval by UA before acceptance and must meet the department of agriculture requirements prior to acceptance.

      d. The container must be stored under the seat directly in front of the Passenger at all times, and the animal must remain in the container at all times. The passenger will not be permitted in a row immediately behind a bulkhead, or adjacent to an emergency exit. In the event the animal becomes offensive or causes a disturbance during transit, the animal may be removed, at the Captain's discretion, at the first stop and placed on an alternative carrier or carried as cargo by UA at the Passenger's expense.

      e. The Passenger must make all arrangements and assumes full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the country, state or territory to and from which the animal is being transported, including furnishing valid health and rabies vaccination certificate when required. UA will not be liable for loss or expense due to the passenger's failure to comply with this provision, and UA will not be responsible if any pet is refused passage into or through any country, state, or territory.

      f. UA will accept no more than one in-cabin pet container per Ticketed Passenger, except that two puppies/kittens (age: minimum 8 weeks/maximum 6 months) will be permitted in a single container.

      g. There may be only one cat or dog per container, and the animal must be able to stand up and turn around comfortably.

      h. UA will not transport an animal as in-cabin Baggage if the animal is in the custody of an Unaccompanied Minor age five (5) to fourteen (14) years old.

      i. The total number of Passengers carrying pet and the total number of in-cabin pets permitted on a single flight is limited by aircraft type and cabin.

      j. UA reserves the right to refuse carriage of animals in cabin or as cargo via PetSafe® at any time.
      NOTE: Animals will not be accepted for carriage on some United Express flights.

   2. Pet Containers

      a. Containers must be leak-proof and subject to inspection and approval by UA prior to acceptance. UA may refuse to accept any animal if, in its sole discretion, the animal is not properly confined in a container approved by UA.

      b. Containers must be made of metal, wood, polyethylene, fiberglass or composite material of similar strength.

      c. Containers must be ventilated on at least two sides and prevent any part of the animal from protruding outside of the container.

      d. Containers made totally of wire are not accepted.

e. Approved soft side carriers specifically designed as pet carriers are acceptable.

f. In-cabin animal containers must not exceed 17.5 inches in length by 12 inches in width by 7.5 inches in height for hard sided containers and 18 inches in length by 11 inches in width by 11 inches in height for soft sided containers.

g. Containers in such condition as to allow possible escape by an animal will not be accepted for transportation.

h. Passengers are responsible for ensuring that the containers meet all governmental requirements for the safe and humane transportation of the animal being transported, including, but not limited to being large enough to allow the animal to stand upright, turn around, and lie in a natural position.

i. Containers for transporting dogs and cats may be purchased from UA.

3. Carriage of Animals – (including their containers) is subject to the applicable service charge of a 125 USD/ 125 CAD each way (250 USD/250 CAD for round-trip travel).

4. Abandonment of Animals – An animal that is unclaimed by its owner or its owner's agent for a period of more than three (3) days after the scheduled carriage has occurred or was to occur, shall be deemed abandoned and UA will make reasonable efforts to return the animal to the owner or the owner's agent designated for that purpose. If the owner or the owner's agent cannot (or refuses to) be located after a period of three days, then the animal may be turned over to a local animal shelter or pound or otherwise handled as UA may deem proper without any liability to UA. Any costs associated with: (1) returning the animal deemed abandoned to the owner or the owner's agent or (2) caring, feeding, or transporting the abandoned animal, among other things, shall be borne solely by the owner or owner's agent.

5. Limitation of Exclusion from Liability
   a. UA will not be liable for illness or injury to an animal or death of an animal.

   b. UA will not be liable for loss or expense due to the Passenger's failure to comply with the provisions of this Rule, including, without limitation, if any animal is refused passage into or through any state or country.

I. Interline Baggage Acceptance
1. Applicability-Rule 23 I) solely applies to interline itineraries on a Single Ticket whose origin or ultimate ticketed destination is in Canada. For definitional understanding of the terms used in this Rule, see Rule 1 for clarification.

2. Baggage Rules Determination
   a. Checked Baggage: When UA is the Selecting Carrier it will select and apply its own checked baggage rules found in Rule 23 throughout the Passenger's Interline Itinerary. When a Passenger makes a voluntary change to his or her itinerary, the checked baggage rules of the new Selected Carrier apply. The Selected Carrier's checked baggage service charges apply at any point where bags are checked, including stopovers. See Rule 23 B) 1) above for UA's Baggage Rules concerning special status, Rule 23 C) 7) regarding embargoes that may affect interline travel, and Rules 23 D), E), F), G) and H) regarding the transportation of special items.

   b. Carry-On Baggage: Each Operating Carrier's carry-on baggage allowances and policies will apply to each flight segment in an Interline Itinerary, other than carry-on baggage charges, which are governed by the Selected Carrier's baggage rules. See Rule 23 B) above for UA's Carry-On Baggage allowances and policies.

   c. Where UA is a Participating Carrier or is not the Selected Carrier on an Interline Itinerary but is an Interlining Carrier that is providing transportation to the passenger based on ticket issued, UA will apply the Selected Carrier's baggage rules throughout the Interline Itinerary.

3. Disclosure of Baggage Rules-For baggage rules provisions related to a passenger's first and second checked bag and the passenger's carry-on baggage (i.e., the passenger's "standard" baggage allowance), when UA sells and issues a ticket for an interline itinerary, it will disclose to the passenger on a summary page at the end of an online purchase and/or on the passenger's e-ticket receipt at the time of ticketing, the baggage information relevant to the passenger's itinerary and the applicable baggage rules of the Selected Carrier.

Back to Top

# Rule 24 Flight Delays/Cancellations/Aircraft Changes

A. General
1. U.S.A. Origin Flights – Where the UA flights originate in the U.S.A., the provisions of this Rule apply to a Passenger who has a Ticket and a confirmed reservation on a flight that incurs a Schedule Change, Force Majeure Event or Irregular Operations.

2. Non-U.S.A. Origin Flights – Where the UA flight originates outside the U.S.A., the following provisions apply to a Passenger who has a Ticket and a confirmed reservation on a flight:
   a. If local or international laws regulate a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will not be applied.

   b. If no local law otherwise regulates a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will be applied.

3. Schedules are Subject To Change Without Notice – Times shown on tickets, timetables, published schedules or elsewhere, and aircraft type and similar details reflected on tickets or UA's schedule are not guaranteed and form no part of this contract. UA may substitute alternate carriers or aircraft, delay or cancel flights, and alter or omit stopping places or connections shown on the ticket at any time. UA will promptly provide Passengers the best available information regarding known delays, cancellations, misconnections and diversions, but UA is not liable for any misstatements or other errors or omissions in connection with providing such information. No employee, agent or representative of UA can bind UA legally by reason of any statements relating to flight status or other information. Except to the extent provided in this Rule, UA shall not be liable for failing to operate any flight according to schedule, or for any change in flight schedule, with or without notice to the passenger.

B. Definitions - For the purpose of this Rule, the following terms have the meanings below:

1. Schedule Change – an advance change in UA's schedule (including a change in operating carrier or itinerary) that is not a unique event such as Irregular Operations or Force Majeure Event as defined below.

2. Connecting Point – a point to which a Passenger holds or held confirmed space on a flight of one carrier and out of which the Passenger holds or held confirmed space on a flight of the same or another carrier. All airports through which a city is served by any carrier will be deemed to be a single Connecting Point when the receiving carrier has confirmed reservations to the Delivering Carrier.

3. Delivering Carrier – a carrier on whose flight a Passenger holds or held confirmed space to a Connecting Point.

4. Force Majeure Event – any of the following situations:
   a. Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition;
   
   b. Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services;
   
   c. Any governmental regulation, demand or requirement;
   
   d. Any shortage of labor, fuel, or facilities of UA or others;
   
   e. Damage to UA's Aircraft or equipment caused by another party;
   
   f. Any emergency situation requiring immediate care or protection for a person or property; or
   
   g. Any event not reasonably foreseen, anticipated or predicted by UA.

5. Misconnection – occurs at a Connecting Point when a Passenger holding confirmed space on an Original Receiving Carrier is unable to use such confirmed space because the Delivering Carrier was unable to deliver him/her to the Connecting Point in time to connect with the Original Receiving Carrier's flight.
   NOTE: The same rules regarding Delivering and Original Receiving Carrier responsibilities apply at the subsequent point(s) of Misconnection as would apply at the point of original Misconnection.

6. Original Receiving Carrier(s) – a carrier or combination of connecting carriers on whose flight(s) a Passenger originally held or holds confirmed space from a Connecting Point to a destination, next Stopover or Connecting Point.

7. Irregular Operations – any of the following irregularities:
   a. Delay in scheduled departure or arrival of a carrier's flight resulting in a Misconnection;
   
   b. Flight or service cancellation, omission of a scheduled stop, or any other delay or interruption in the scheduled operation of a carrier's flight;
   
   c. Substitution of aircraft type that provides different classes of service or different seat configurations;
   
   d. Schedule changes which require Rerouting of Passengers at departure time of the original flight; or
   
   e. Cancellation of a reservation by UA pursuant to Rule 5.

   EXCEPTION: UA shall have no obligation to honor another carrier's ticket that does not reflect a confirmed reservation on UA, unless the issuing carrier reissues the ticket for any changes in routing. In the event such carrier is not available to do so, UA reserves the right to reroute passengers only over its own lines between the points named on the original ticket.

C. Schedule Change - When a Passenger's Ticketed flight is affected because of a Schedule Change that modifies the original departure and/or arrival time by 30 minutes or more, UA will, at its election, arrange one of the following:

1. Transport the Passenger on its closest available flight to the Destination, next Stopover point, or transfer point shown on its portion of the Ticket, without Stopover in the same class of service (subject to availability), at no additional cost to the Passenger; provided that if such alternate transportation results in a significant change to the originally scheduled departure or arrival times and the Passenger chooses not to accept such alternate transportation, United will (at the Passenger's request) provide a refund;

2. When a Schedule Change results in the cancellation of all UA service between two cities, at UA's sole discretion, UA may reroute Passengers over the lines of one or more carriers in an equivalent class of service; provided that if such alternate transportation results in a significant change to the originally scheduled departure or arrival times and the Passenger chooses not to accept such alternate transportation, United will (at the Passenger's request) provide a refund;

3. Advise the Passenger that the value of his or her Ticket may be applied toward future travel on United within one year from the date of issue without a change or reissue fee; or

4. If the Passenger is not offered transportation as provided in C) 1) or 2) above and does not choose to apply the value of his or her Ticket toward future travel as provided in C) 3) above, the Passenger will be eligible for a refund upon request. See Rule 27 A).

D. Force Majeure Event - In the event of a Force Majeure Event, UA without notice, may cancel, terminate, divert, postpone, or delay any flight, right of carriage or reservations (whether or not confirmed) and determine if any departure or landing should be made, without any liability on the part of UA. UA may re-accommodate Passengers on another available UA flight or on another carrier or combination of carriers, or via ground transportation, or may refund, in its sole discretion, any unused portions of the Ticket in the form of a travel certificate or travel credit.

E. Irregular Operations
1. Liability - Except to the extent provided in this Rule and the Warsaw and/or Montreal Conventions, UA shall not be liable for any Irregular Operations.

2. Delay, Misconnection or Cancellation
   a. When a Passenger's ticket is affected because of Irregular Operations caused by UA, UA will take the following measures:
      i. Transport the Passenger on its own flights, subject to availability, to the Destination, next Stopover point, or transfer point shown on its portion of the Ticket, without Stopover in the same class of service, at no additional cost to the Passenger; or
      
      ii. At its sole discretion, UA may arrange for the passenger to travel on another carrier. United may also, at its sole discretion, and if acceptable to the passenger, arrange for the passenger to travel via ground transportation.

b. In the event a Passenger misses an onward connecting flight on which space is reserved because the Delivering Carrier did not operate its flight due to Irregular Operations or a Schedule Change, the Delivering Carrier is responsible to arrange for carriage of the Passenger or to make a refund.

3. If a Passenger is not transported as provided in E) 2) above, the Passenger will be eligible for a refund upon request. See Rule 27 A).

4. If space is only available and used on a UA flight(s) of a lower class of service than originally purchased by the passenger, UA will provide a refund of the difference in fare pursuant to Rule 27 C) 5).

F. Amenities for Delayed Passengers

1. Lodging – UA will provide at its option either one night's lodging, or, if no lodging is provided and upon the passenger's request only, reimbursement for one night's lodging in the form of an electronic travel certificate that may be applied to future travel on UA up to a maximum amount determined by UA when a UA flight on which a Passenger is being transported incurs Irregular Operations and the Passenger incurs a delay that is expected to exceed four hours between the hours of 10:00 p.m. to 6:00 a.m. local time. Where lodging has been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to alternative lodging secured independently by the Passenger.
EXCEPTION: Lodging will not be furnished:

a. To a Passenger whose trip is interrupted at a city which is his/her permanent domicile, origin point, or stopover point, or

b. When the destination city airport that is designated on the Passenger's Ticket and the city airport that the Passenger is diverted to are both within the following city groups:

i. Baltimore, MD (BWI)/Washington D.C. Dulles IAD)/Washington D.C. National (DCA)

ii. Brownsville, TX (BRO/Harlingen, TX (HRL)/McAllen, TX (MFE)

iii. Burbank, CA (BUR)/Los Angeles, CA (LAX)/Ontario, CA (ONT)/Orange County, CA (SNA)/Long Beach, CA (LGB)

iv. Chicago, IL O'Hare (ORD)/Chicago, IL Midway (MDW)/Milwaukee, WI (MKE)

v. Colorado Springs, CO (COS)/Denver, CO (DEN)

vi. Dallas, TX Dallas-Ft. Worth International (DFW)/Dallas, TX Love Field (DAL)

vii. Lauderdale, FL (FLL)/Miami, FL (MIA)/West Palm Beach, FL (PBI)

viii. Houston, TX Bush Intercontinental (IAH)/Houston, TX Ellington AFB (EFD)/Houston, TX Hobby(HOU)

ix. Oakland, CA (OAK)/San Francisco, CA (SFO)/San Jose, CA (SJC)

x. Newark, NJ Newark International (EWR)/New York, NY La Guardia (LGA)/New York, NY Kennedy (JFK)/White Plains, NY (HPN)

xi. London, UK Gatwick (LGW)/London, UK Heathrow (LHR)

c. When such interruption is due to circumstances outside UA's control.

2. Snacks and Meals – UA will provide snacks and/or food and beverage vouchers in the event of an extensive delay caused by UA. Where food and beverage vouchers have been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to food and beverage secured independently by the Passenger.

3. Ground Transportation – When lodging is furnished in accordance with 1) above and ground transportation is not furnished by the hotel, UA will provide ground transportation to the place of lodging via public conveyance. Rule 17 also governs any provision of ground transportation to a place of lodging. Where ground transportation has been offered but not accepted by a Passenger for whatever reason, UA is not liable to reimburse the Passenger for expenses relating to alternative ground transportation secured by the Passenger.

4. The sole and exclusive remedy for a passenger who has a claim under this Rule shall be the express amenities provided in this Rule. The passenger shall have no other claims or law or equity for actual, compensatory, or punitive damages. The provision of services in addition to those specifically set forth in this Rule to all or some passengers shall not be construed as a waiver of UA's rights or an expansion of its obligations. Neither shall any delay on the part of UA in exercising or enforcing its rights under this Rule be construed as a waiver of such rights.

G. Carrier in Default – Notwithstanding the provisions of this Rule, UA will not accept for any purposes passenger tickets or related transportation documents issued by any carrier that is in substantial default of its Interline obligations or that voluntarily or involuntarily has become the subject of bankruptcy proceedings (the "Defaulting Carrier"). EXCEPTION: Notwithstanding the provisions of this paragraph, tickets issued by the Defaulting Carrier or its sales agent prior to the default will be accepted solely for transportation over the lines of UA provided such tickets were issued by such Defaulting Carrier in its capacity as agent for UA and specified transportation via UA. When tickets are accepted, no adjustments in fare will be made that would require UA to refund money to the passenger.

H. In the event of a strike or work stoppage which causes any cancellation or suspension of operations of any other carrier, the provisions of this Rule will not apply with respect to passengers holding tickets for transportation on that carrier.

I. "Class of service" in this Contract of Carriage refers to classes of service as determined by UA without regard to the specific level of ancillary services or amenities provided in that class of service (as compared to any originally scheduled flight). Any ancillary service or amenity, including but not limited to live television, wi-fi services, priority boarding, advance seat assignments, and meal service, are not guaranteed. Regardless of whether there is a Schedule Change, Irregular Operations, Force Majeure Event, or other change or circumstance that results in an ancillary service or amenity not being available on any flight, UA shall have no liability for, and shall owe no refund with respect to any failure to provide that amenity or ancillary service. EXCEPTION: If a Passenger has paid for a specific ancillary service or amenity in advance of the flight as a separate fee specifically designated for such ancillary service or amenity and that ancillary service or amenity is not provided, the Passenger is eligible for a refund of the amount paid if a refund request is made within 90 days of the date the fee was originally paid or the flight date, whichever is later. UA is not liable to refund this fee otherwise eligible for refund if the request is received after that time.

Back to Top

# Rule 25 Denied Boarding Compensation

A. Denied Boarding (U.S.A./Canadian Flight Origin) - When there is an Oversold UA flight that originates in the U.S.A. or Canada, the following provisions apply:

1. Request for Volunteers

   a. UA will request Passengers who are willing to relinquish their confirmed reserved space in exchange for compensation in an amount determined by UA (including but not limited to check or an electronic travel certificate). The travel certificate will be valid only for travel on UA or designated Codeshare partners for one year from the date of issue and will have no refund value. If a Passenger is asked to volunteer, UA will not later deny boarding to that Passenger involuntarily unless that Passenger was informed at the time he was asked to volunteer that there was a possibility of being denied boarding involuntarily and of the amount of compensation to which he/she would have been entitled in that event. The request for volunteers and the selection of such person to be denied space will be in a manner determined solely by UA.

2. Boarding Priorities - If a flight is Oversold, no one may be denied boarding against his/her will until UA or other carrier personnel first ask for volunteers who will give up their reservations willingly in exchange for compensation as determined by UA. If there are not enough volunteers, other Passengers may be denied boarding involuntarily in accordance with UA's boarding priority:

   a. Passengers who are Qualified Individuals with Disabilities and their Service Animal or travel assistant, unaccompanied minors under the age of 18 years, or minors between the ages of 5 to 14 years who use the unaccompanied minor service, and for Canada departures only, families traveling together, will be the last to be involuntarily denied boarding if it is determined by UA that such denial would constitute a hardship.

   b. The priority of all other confirmed passengers may be determined based on a passenger's fare class, itinerary, status of frequent flyer program membership, whether the passenger purchased the ticket under select UA corporate travel agreements, and the time in which the passenger presents him/herself for check-in without advanced seat assignment.

3. Transportation for Passengers Denied Boarding - When UA is unable to provide previously confirmed space due to an Oversold flight, UA will provide transportation to such Passengers who have been denied boarding whether voluntarily or involuntarily in accordance with the provisions below.

   a. UA will transport the Passenger on its own flight to the Destination without Stopover on its next flight on which space is available at no additional cost to the Passenger, regardless of class of service.

   b. If space is available on another Carrier's flight regardless of class of service, such flights may be used upon United's sole discretion and the Passenger's request at no additional cost to the Passenger only if such flight provides an earlier arrival than the UA flight offered in 3) a) above.

4. Compensation for Passengers Denied Boarding Involuntarily

   a. For passengers traveling in interstate transportation between points within the United States, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 200% of the fare to the Passenger's first Stopover or, if none, Destination, with a maximum of 775 USD if UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than one hour but less than two hours after the planned arrival time of the Passenger's original flight. If UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than two hours after the planned arrival time of the Passenger's original flight, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 400% of the fare to the Passenger's first Stopover or, if none, Destination with a maximum of 1550 USD.

   b. For passengers traveling from the United States to a foreign point, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight originating at a U.S. airport at the rate of 200% of the fare to the Passenger's first Stopover or, if none, Destination, with a maximum of 775 USD if UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than one hour but less than four hours after the planned arrival time of the Passenger's original flight. If UA offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Passenger's Destination or first Stopover more than four hours after the planned arrival time of the Passenger's original flight, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight at the rate of 400% of the fare to the Passenger's first Stopover or, if none, Destination with a maximum of 1550 USD.

   c. For passengers traveling from Canada to a foreign point, subject to the exceptions in section d) below, UA shall pay compensation to Passengers denied boarding involuntarily from an Oversold Flight originating at a Canadian airport as follows: 900 CAD if the passenger reaches his final destination within six hours of the time stated on the original ticket; 1800 CAD if the passenger reaches his final destination between six and nine hours of the time stated on the original ticket; and 2400 CAD if the passenger reaches his final destination more than nine hours after the time stated on the original ticket.

   d. EXCEPTIONS: A Passenger denied boarding involuntarily from an Oversold Flight shall not be eligible for denied boarding compensation if:

      i. The flight is cancelled;

      ii. The Passenger holding a Ticket for confirmed reserved space does not comply fully with the requirements in this Contract of Carriage Requirements regarding ticketing, check-in, reconfirmation procedures, and acceptance for transportation;

      iii. The flight for which the Passenger holds confirmed reserved space is unable to accommodate the Passenger because of substitution of equipment of lesser capacity when required by operational or safety reasons or, on an aircraft with a designed passenger capacity of 60 or fewer seats, the flight for which the passenger holds confirmed reserved space is unable to accommodate that passenger due to weight/balance restrictions when required by operational or safety reasons;

      iv. The Passenger is offered accommodations or is seated in a section of the aircraft other than that specified on his/her ticket at no extra charge. Provided, if a Passenger is seated in a section for which a lower fare applies, the Passenger will be entitled to a refund applicable to the difference in fares;

      v. The Passenger is accommodated on Alternate Transportation at no extra cost, which at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next Stopover, (if any), or at the Destination, not later than 60 minutes after the

planned arrival time of the flight on which the Passenger held confirmed reserved space;

    vi. The Passenger is an employee of UA or of another Carrier or other person traveling without a confirmed reserved space; or

    vii. The Passenger does not present him/herself at the loading gate for boarding at least 15 minutes prior to scheduled domestic departures, and 30 minutes prior to scheduled international departures. See Rule 5 D) for additional information regarding boarding cut-off times.

5. Payment Time and Form for Passengers Traveling Between Points within the United States or from the United States to a Foreign Point

    a. Compensation in the form of check will be made by UA on the day and at the place where the failure to provide confirmed reserved space occurs, and if accepted by the Passenger, the Passenger will provide a signed receipt to UA. However, when UA has arranged, for the Passenger's convenience, Alternate Transportation that departs before the compensation to the Passenger under this provision can be prepared and given to the Passenger, the compensation shall be sent by mail or other means to the Passenger within 24 hours thereafter.

    b. UA may offer free or reduced rate air transportation in lieu of a check payment due under this Rule, if the value of the transportation credit offered is equal to or greater than the monetary compensation otherwise due and UA informs the Passenger of the amount and that the Passenger may decline the transportation benefit and receive the monetary compensation.

6. Payment Time and Form for Passengers departing Canada

    a. Compensation will be issued no later than either before the next scheduled departure time for the Passenger or within 48 hours after the Passenger has been denied boarding.

    b. Compensation may be paid in form of cash, prepaid card, EFT, bank check or, with the Passenger's written agreement, a travel voucher.

7. Limitation of Liability - If UA's offer of compensation pursuant to the above provisions is accepted by the Passenger, such payment will constitute full compensation for all actual or anticipatory damages incurred or to be incurred by the Passenger as a result of UA's failure to provide the Passenger with confirmed reserved space. If UA's offer of compensation pursuant to the above provisions is not accepted, UA's liability is limited to actual damages proved not to exceed 1350 USD per Ticketed Passenger as a result of UA's failure to provide the Passenger with confirmed reserved space. Passenger will be responsible for providing documentation of all actual damages claimed. UA shall not be liable for any punitive, consequential or special damages arising out of or in connection with UA's failure to provide the Passenger with confirmed reserved space.

B. Denied Boarding Non-U.S.A./Canada Flight Origin - Where there is an Oversold UA flight that originates outside the U.S.A. or Canada, no compensation will be provided except where required by local or international laws regulating Oversold flights.

Back to Top

# Rule 26 Rerouting

A. Rerouting Eligibility - Unless the fare purchased otherwise indicates, UA will reroute a Passenger at the Passenger's request and upon presentation of the Ticket or portion thereof then held by the Passenger plus payment of any applicable fees, charges, and fare differentials.

B. Fare Applicable to Rerouting or Change in Destination

1. Passengers may change the routing and/or the ultimate destination designated on his/her Ticket in accordance with paragraph 2 below provided that, after transportation has commenced, a one-way Ticket will not be converted into a Round-Trip, Circle-Trip, or Open-Jaw Trip Ticket.

2. Except as otherwise provided in Rule 25, the fare and charges applicable to any changes in itinerary, class of service, or change in ultimate destination made at the Passenger's request at an office of UA prior to arrival at the ultimate destination named on the original Ticket, shall be the fare and charges in effect on the date when the revised routing and/or ultimate destination is entered on the Passenger's new Ticket. Any difference between the fare and charges so applicable to the original Ticket issued to the Passenger will be either collected from or refunded to the Passenger, as the case may be. Basic Economy tickets, even if unused, have no residual value and cannot be applied towards the purchase of future travel.

C. Fare Applicable to Upgrading Class of Service While in Flight

1. When a Passenger moves from one compartment to another compartment of a combination compartment aircraft while in flight, an additional collection will be made in an amount equal to the difference between:

    a. The one-way fare from Passenger's point of origin on such flight to the last scheduled stop prior to the Passenger's change in compartment, applicable to the class of service used, plus the one-way fare from such stop to the Passenger's destination on such flight, applicable to transportation in the compartment to which the Passenger is moving, and

    b. The fare paid for transportation from the Passenger's origin to destination on such flight. When the amount described in a) above is less than the amount in b) above, no additional payment will be required.
    EXCEPTION: Passengers traveling at a Round-Trip fare or any fare not having a one-way value, may upgrade all or any portion of their itinerary only upon payment of the full normal fare for the total itinerary.

    c. The passenger expressly authorizes UA to collect any additional applicable charges from the passenger arising out of a passenger occupying a class of service which is different than the class reflected on the passenger's boarding pass.

2. The acceptance of such Passenger in the compartment to which he/she is moving for travel beyond the next scheduled stopping point in the flight will be subject to the availability of space. Discounts, other than for children, will not apply.

Back to Top

# Rule 27 Refunds

**A. Ticket Refunds - Involuntary**

1. The amount UA will refund upon surrender of the unused portion of the Passenger's Ticket for reasons pursuant to Rule 21 or Rule 24 will be as follows:

   a. If no portion of the Ticket has been used: An amount equal to the fare and charges paid.
   EXCEPTION: UA shall not be obligated to refund any portion(s) of a fully unused Ticket which does not reflect a confirmed reservation on a UA flight involved in Irregular Operations, unless such Ticket was issued by UA.

   b. If a portion of the Ticket has been used:

      i. One-way fares – An amount equal to the prorated value of the unused segment based on the fare component. UA will make no refund when alternate transportation is provided by UA and accepted by the passenger.

      ii. Round-Trip, Circle-Trip, or Open-Jaw fare – An amount equal to the fare paid for the unused transportation from the point of termination to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed.  If both outbound and inbound fares on a domestic roundtrip ticket are the same, then 50% of the round-trip fare for the class of service paid, and for the unflown segment only.

      iii. Area fare/flat rate fare – the refund amount will be computed by applying the same rate of discount, if any, applied in computing the original fare from the point of termination to the destination named on the Ticket, next Stopover, or the point where air transportation will be resumed via:
         a. The Routing specified on the Ticket, if the point of termination was on the Routing of the Ticket, or
         b. If the point of termination was not on the Routing specified on the Ticket, the direct Routing of any carrier operating service between such points.

      iv. If no fare of the type (fare basis) paid by the Passenger is published between the point of termination and the Passenger's destination or next Stopover point, the amount of the refund will be the same proportion of the normal coach (Y) fare published between the point of termination and the Passenger's destination or next Stopover point, as the fare paid is of the normal coach (Y) fare between the Passenger's point of origin or previous Stopover point and destination or next Stopover point.
      Exception: UA shall not be obligated to refund any portion(s) of a Ticket which does not reflect a confirmed reservation on a UA flight involved in Irregular Operations, unless such ticket was issued by UA.

      v. The amount of refund will not exceed the fare component for the portion of the ticket from the last point of stopover to the next point of stopover or final destination.

   c. Refund will be made in accordance with this Rule, provided request for such refund has been made prior to the expiration of Ticket, where required.

2. UA will make no refund but may, at its discretion, provide ground transportation to the destination airport without charge when the destination city airport designated on the Passenger's Ticket and the city airport where the flight terminates are both within any of the following city groups:

   a. Baltimore, MD (BWI)/Washington D.C. Dulles (IAD)/Washington D.C. National (DCA)

   b. Brownsville, TX (BRO)/Harlingen, TX (HRL)/McAllen, TX (MFE)

   c. Burbank, CA (BUR)/Los Angeles, CA (LAX)/Ontario, CA (ONT)/Orange County, CA (SNA)/Long Beach, CA (LGB)

   d. Chicago, IL O'Hare (ORD)/Chicago, IL Midway (MDW)/Milwaukee, WI (MKE)

   e. Colorado Springs, CO (COS)/Denver, CO (DEN)

   f. Dallas, TX Dallas-Ft. Worth International (DFW)/Dallas, TX Love Field (DAL)

   g. Lauderdale, FL (FLL)/Miami, FL (MIA)/West Palm Beach, FL (PBI)

   h. Houston, TX Bush Intercontinental (IAH)/Houston, TX Ellington AFB (EFD)/Houston, TX Hobby (HOU)

   i. Oakland, CA (OAK)/San Francisco, CA (SFO)/San Jose, CA (SJC)

   j. Newark, NJ Newark International (EWR)/New York, NY La Guardia (LGA)/New York, NY/Kennedy (JFK)/White Plains, NY (HPN)

   k. London, UK Gatwick (LGW)/London, UK Heathrow (LHR)

3. When a Passenger holding a Ticket for a higher class of service between a point of Origin and a Destination is required by the carrier to use a lower class of service for any portion of such carriage the amount of refund will be as follows:
   a. FOR UNRESTRICTED PREMIUM FARES: 50% of the prorated fare for that segment plus applicable variable taxes and fees.

   b. FOR SPECIAL AND RESTRICTED FARES: the lowest applicable fare at the time the ticket was purchased or the difference between the upgradeable and non-upgradeable fare type.

   c. This section does not apply to Passengers who purchase upgrades through miles and/or cash. If a Passenger pays for an upgrade that he does not receive, any recovery is limited to the amount paid for the upgrade in miles and/or cash.

**B. Ticket Refunds - Voluntary**

For Tickets eligible for refunds, unless it is a refund as stated in Paragraph (A) above, UA will, upon the Passenger's surrender of the unused portion of a UA issued ticket or voided Ticket, refund to the Passenger as follows:

1. If no portion of the Ticket has been used, in accordance with these rules, the refund will be an amount equal to the total fare and charges paid.

2. If a portion of the Ticket has been used, in accordance with these rules, the refund will be an amount equal to the positive difference if any, between the fare and charges applicable to the Ticket issued to the Passenger, and the fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket.

3. Refund will be made, provided request for such refund has been made not later than the expiration date of the Ticket.

4. UA assumes no obligation to issue a voluntary refund unless such Ticket was issued by UA on UA Ticket Stock.

5. Any applicable administrative service charge or cancellation fee included as part of the published fare rule for the Ticket in question will be deducted from the amount to be refunded under 1) and 2) above.

6. UA will issue refunds for eligible tickets within seven (7) business days of determining that a refund is due for credit card purchases and twenty (20) business days after receiving a complete refund request for purchases made with cash, check, or other forms of payment.

C. Other Refunds

1. Baggage service charges are non-refundable, but a Passenger who does not travel as a result of a flight cancellation, Schedule Change, or Irregular Operations will be eligible for a refund upon request. United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

2. Booking service charges are non-refundable, but a Passenger maybe eligible for a full refund upon request if the reservation is canceled within 24 hours of purchase and if the reservation is made one week or more prior to scheduled flight departure and purchased directly through UA.

3. Day-of-departure upgrade fees are non-refundable, but if a flight for which an upgrade fee has been paid is affected by a flight cancellation, Schedule Change, or Irregular Operations, and the Passenger cannot be accommodated in First Class on a later flight, Passenger will be eligible for a refund upon request.

4. Passengers who are eligible for a refund of service or other fee(s), must request refund within 90 days of the date the fee(s) was originally paid or flight date, whichever is later. UA is not liable to refund service or other fees otherwise eligible for refund if the request is received after that time.

5. If a Passenger is removed from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee has been paid, the Passenger is eligible for a refund of this fee upon request.

D. Persons to Whom Refund is Made - Except as provided below, UA will refund in accordance with this Rule only to the person named as the Passenger on the Ticket.
EXCEPTION 1:

1. Tickets issued under a Universal Air Travel Plan (UATP) will be refundable only to the subscriber against whose account the Ticket was charged.

2. Tickets issued against a Transportation Request issued by a government agency, other than the U.S.A Government, will be refunded only to the government agency that issued the Transportation Request.

3. Tickets issued against a U.S.A Government Transportation Request (GTR) will be refunded only to the U.S.A. Government agency which issued the GTR by check made payable to the "Treasurer of the United States".

4. Tickets issued against a credit card honored by UA will be refunded only to the account of the person to whom such credit card was issued.

5. Tickets issued in the name of a minor will be refunded to the parent, guardian, or a third party as designated in accordance with EXCEPTION 2 below.

EXCEPTION 2: If at the time of purchase, the purchaser designates on the Ticket another person or entity to whom refund shall be made, the refund will be made to the person so designated. A refund made in accordance with this procedure to a person representing his/herself as the person so designated on the Ticket exchange order shall be deemed a valid refund, and UA will not be liable to the purchaser, or any other person for another refund.

EXCEPTION 3: If at the time of application for refund, evidence is submitted that a company purchased the Ticket on behalf of its employees, or the travel agent has made a refund to its client, such refund will be made directly to the employee's company or the travel agent.

E. Non-refundable Tickets:

1. General Rule – Except as provided in Rules 4 and 27 C), UA will not refund any portion of a Ticket that is purchased with a non-refundable fare, including the fare and any taxes, fees, or other charges included within the total price paid for the Ticket.

2. Application of Unused Ticket toward Future Ticket Purchase - UA may allow a portion of the non-refundable fare paid for an unused and unexpired non-refundable UA Ticket to be applied towards the purchase of future travel on UA, provided it is done in accordance with the applicable fare rule in place at the time of such request. Change fees and other administrative charges may apply. Basic Economy tickets, even if unused, have no residual value after date of departure and cannot be applied towards the purchase of future travel. Any portion not so applied will not be refunded in any form.

F. Lost Tickets

1. Amount of Refund - When a Passenger loses a UA issued Ticket eligible for a refund, or the unused portion thereof, UA will, subject to the conditions set forth below, make a refund to the Passenger in the following amounts, as applicable.

   a. If no portion of the Ticket has been used, the refund will be an amount equal to the fare and charges paid, less service charges as indicated below.

   b. If a portion of the Ticket has been used, and

      i. The Passenger has purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, the refund will be an amount equal to the fare and charges paid for such new Ticket, or

      ii. The Passenger has not purchased a new Ticket covering the same transportation as that covered by the unused portion of the lost Ticket, and free transportation is not provided by UA, the refund will be an amount equal to the positive difference, if any, between the fare and charges paid, and the full normal fare and charges applicable to the transportation of the Passenger covered by the used portion of the Ticket, or

      iii. Where, in UA's judgment, a hardship exists and UA provides a free Ticket covering the lost portion(s) upon payment of service charges shown below, no further refund shall be due.

2. Application for Refund of Lost Tickets

   a. A refund will be made for eligible tickets in accordance with 1) above, provided application has been made no later than one month after the expiration date of the lost Ticket.

   b. The application must be made on forms provided by UA for such refunds.

   c. A refund will be made by UA upon application for such refund, provided that the lost Ticket or lost portion thereof has not previously been honored for transportation or refunded to any person during a period of three months from the date the loss is reported, and provided that the person to whom the refund is made agrees, in such form as may be provided by UA, to indemnify UA, including agreeing to return to UA such refund, for any loss or damage which it may sustain by reason of the use of the lost Ticket or portion thereof.

3. Service Charge - UA will impose a service charge of 150.00 USD/150.00 CAD per ticket for handling request for refund of a lost Ticket or portion thereof.
EXCEPTION: No service charge will be imposed for Military Passengers when transportation is paid for with a U.S. Government Transportation Request (Form No. 1169).

4. Non-refundable Tickets - UA will not refund any portion of a lost non-refundable Ticket, including the fare and any taxes, fees, or other charges. For applicable service charge, the Ticket will be reissued, if application is submitted prior to scheduled travel. Non-refundable Tickets will not be reissued after the date of travel reflected on each Flight Coupon.

G. Foreign Currency Refunds

1. All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

2. Refunds will be made in the currency in which the fare was paid, or, at UA's election, in lawful currency of the country of the carrier making the refund in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

H. Overcharge Refunds - Refund claims for overcharges must be submitted to UA in writing within 45 days after the operation of the flight Segment to which such overcharge claim relates, after which time no claim or legal action based on such overcharge can be maintained.

I. Optional Services – Ticket refund will include fees charged to a Passenger for optional services that the Passenger was unable to use due to an oversale situation or flight cancellation.

Back to Top

# Rule 28 Additional Liability Limitations

For the purposes of international carriage governed by the Montreal Convention, the liability rules set out in the Montreal Convention are fully incorporated by reference herein and shall supersede and prevail over any provisions of this tariff which may be inconsistent with those rules.

A. The Carrier shall be liable under Article 17 of the Warsaw Convention or Montreal Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a passenger, as provided in the following paragraphs:
1. The Carrier shall not be able to exclude or limit its liability for damages not exceeding 128,821 Special Drawing Rights for each passenger.

2. The Carrier shall not be liable for damages to the extent that they exceed 128,821 Special Drawing Rights for each passenger if the Carrier proves that:
a. such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or

b. such damage was solely due to the negligence or other wrongful act or omission of a third party.

3. The Carrier reserves all other defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (1) and (2) hereof.

4. With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

5. The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the passenger.

B. In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a passenger as provided in the following paragraphs:
1. Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

2. The Carrier shall make the advance payment as an advance against the Carrier's liability under the Warsaw Convention, or the Montreal Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the passenger.

3. The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Warsaw Convention, or the Montreal Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

4. The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

5. The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

C. The Carrier shall be liable for damage occasioned by delay in the carriage of passengers by air, as provided in the following paragraphs:

1. The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

2. Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a Court with proper jurisdiction over a claim.

3. The Carrier reserves all defenses and limitations available under the Warsaw Convention or the Montreal Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 SDR per passenger. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

D. The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked baggage, as provided in the following paragraphs:

1. Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Rights for each passenger in the case of destruction, loss, damage, or delay of baggage, whether checked or unchecked, under the Warsaw Convention or the Montreal Convention, whichever may apply. Unless the passenger proves otherwise:

   a. all baggage checked by a passenger shall be considered to be the property of that passenger;

   b. a particular piece of baggage, checked or unchecked, shall not be considered to be the property of more than one passenger; and

   c. unchecked baggage, including personal items, shall be considered to be the property of the passenger in possession of the baggage at the time of embarkation.

2. If a passenger makes, at the time checked baggage is handed to the Carrier, a special declaration of interest and has paid a supplementary sum, if applicable, the Carrier will be liable for destruction, loss, damage, or delay of such checked baggage in an amount not exceeding the declared amount, unless the Carrier proves that the declared amount is greater than the passenger's actual interest in delivery at destination. The declared amount, and the Carrier's liability, shall not exceed the total amount of declaration permissible under the Carrier's regulations, inclusive of the limitation of paragraph D (1) hereof. In the case of transportation under the Warsaw Convention, no supplementary sum shall apply unless the declared amount exceeds 19 Special Drawing Rights per kilogram of the total recorded weight of the checked baggage at the time the baggage is handed to the Carrier. Nevertheless, the Carrier may impose charges for pieces of baggage in excess of any free allowance the Carrier may provide.

3. For purposes of determining liability with respect to lost, damaged or destroyed baggage under the Warsaw Convention, the weight of each piece of such baggage shall be deemed to be the maximum allowable weight for each piece of such baggage under the applicable restrictions, unless the actual weight is stated on the Baggage Check.

4. In the event of delivery to the Passenger of part but not all of the Passenger's Checked Baggage, or in the event of damage to part but not all of such Baggage, the liability of UA with respect to the undelivered or damaged portion under the Warsaw Convention shall be reduced proportionately on the basis of weight, regardless of the value of any part of the Baggage or contents thereof.

5. In the case of unchecked baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents. The Carrier is not liable for baggage carried in the passenger compartment of the aircraft and remaining in the personal possession of the passenger.
NOTE: Assistance provided by crewmembers to properly store such items does not transfer liability to the Carrier.

6. The Carrier is liable for damage sustained in case of destruction or loss of checked baggage upon condition only that the event which caused the destruction or loss took place on board the aircraft or during any period within which the checked baggage was in the charge of the Carrier. However, the Carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage. Further, the Carrier's liability for the destruction, loss, damage or delay of baggage is subject to the terms, limitations and defenses set forth in the Warsaw Convention and the Montreal Convention, whichever may apply, in addition to any limitation or defense recognized by a Court with proper jurisdiction over a claim.

7. The Carrier reserves all defenses and limitations available under the Warsaw Convention and the Montreal Convention, whichever may apply to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph (1) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the Montreal Convention, whichever may apply.

E. Under the Warsaw Convention and the Montreal Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the carrier within seven calendar days in the case of damage to baggage, and 21 calendar days in the case of delay thereof. For baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to UA.
For purposes of all other carriage (including Domestic Carriage) not governed by the Montreal Convention or other applicable international law, the following liability limitations and other exclusions apply:

F. UA shall not be liable for any death, injury, delay, loss or other damage of whatsoever nature (hereafter referred to collectively as "damage") arising out of or in connection with carriage or other services performed by UA, unless such damage is proven to have been caused by the sole negligence or willful misconduct of UA and there has been no contributory negligence on the part of the Passenger.

G. UA shall not be liable for any damage arising out of UA's compliance with any laws, government regulations, orders, rules, requirements or security directives or as a result of a Passenger's failure to comply with such laws, government regulations, orders, rules, requirements or security directives or as a result of Passenger's reliance on advice provided by UA regarding such laws, regulations, orders, rules, requirements or security directives. See also Rule 19.

H. UA shall not be liable for any punitive, consequential or special damages arising out of or in connection with carriage or other services performed by UA, whether or not UA had knowledge that such damage might be incurred.

I. Any limitations or exclusions of liability of UA shall apply to and be for the benefit of UA's agents, employees, vendors and representatives acting within the scope of their employment and also to any person whose aircraft is used by UA and its agents, employees or representatives acting within the scope of their employment.

J. Nothing herein shall be deemed to affect the rights and liability of UA with regard to any claims brought by, on behalf of, or in respect to any person who has willfully caused damage which resulted in death, wounding, or other bodily injury of a Passenger.

K. Additional Baggage Liability Limitations and Exclusions:

1. If all of the Passenger's Ticketed segments are for carriage within the U.S.A., the following apply:

   a. Liability for the loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage, when such personal property or Baggage has been checked (unless a higher value is declared in advance and additional charges are paid and personal property is not otherwise excludable), is limited to USD 3,800 per Ticketed Passenger. Passenger will be responsible for documenting and proving the actual value of the loss. For baggage claims, reimbursement for any expenses will be based upon proof of claim acceptable to UA.

   b. When transportation is over the lines of UA and one or more carriers with a liability limitation exceeding USD 3,800 for each fare-paying Passenger and responsibility for loss, damage, or delay in the delivery of baggage cannot be determined, the liability limitation of USD 3,800 for each fare-paying Passenger will be applied to all carriers. When transportation is via UA and one or more carriers, which exclude certain items in checked baggage from liability, UA will not be liable for the excluded items.

   c. UA assumes no responsibility or liability for Baggage or other items carried in the Passenger compartment of the aircraft.

   d. In the case of loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage, a preliminary notice of claim must be submitted to UA by the Passenger within twenty-four hours after arrival of the flight on which the Baggage was or was to be transported. In the event of failure to give such preliminary notice of claim (absent extraordinary circumstances to be determined at UA's discretion), no action shall lie against UA.

   e. After preliminary notice of claim to UA by the Passenger, the Passenger must obtain a written claim form from UA.

   f. The completed written claim form pertaining to the claimed loss of, damage to or delay in delivery of a Passenger's personal property, including Baggage must be received by UA's System Tracing Center from the Passenger within 45 days after the flight date. If the Passenger fails to return the completed written claim form within the specified time period (absent extraordinary circumstances to be determined at UA's discretion), no action shall lie against UA. No employee, agent or representative of UA can bind UA legally by reason of any statements relating to the baggage claims process or any other information, it is the Passenger's responsibility to follow the claims process in this Rule.

2. Wheelchairs and Other Assistive Devices

   a. With respect to Domestic Carriage and carriage to/from Canada only, the baggage liability limits authorized by 14 CFR 254 do not apply to claims for loss, damage or delay concerning wheelchairs or other assistive devices. The notice and claim requirements, however, do apply.

   b. In the case of a lost, damaged, or destroyed wheelchair or other assistive device, documentary proof of loss is required from the Passenger to process a claim for damages. If a wheelchair or other assistive device can be returned to the Passenger in the condition in which it was received by making reasonable repairs, UA may, at the Passenger's request, make the repairs.

   c. UA has the right to inspect and document any pre-existing damage prior to acceptance of wheelchairs or other assistive devices as Checked Baggage. UA reserves the right to refuse to transport large wheelchairs or other assistive devices that, due to the physical size of an aircraft compartment, cannot be carried upright safely without risk of serious damage to the wheelchair, or that would cause a load imbalance in a small baggage compartment and violate weight and balance safety requirements. In such case, UA will use reasonable efforts to assist the Passenger in identifying a flight using an aircraft that can accommodate the wheelchair.

3. EXCLUSIONS: UA shall not be liable for the loss of, damage to or delay in delivery of any of the following:

   a. Antiques, artifacts, collectibles, religious items;

   b. Antlers;

   c. Backpacks not designed for travel, sleeping bags and knapsacks made of plastic, vinyl or other easily torn material with aluminum frames, outside pockets or with protruding straps and buckles;

   d. Business equipment and business samples;

   e. Portable multimedia players including, but not limited to, CD, DVD or MP3 players;

   f. Chinaware, glass, ceramics, pottery;

   g. Computer hardware/software and electronic components/equipment;

   h. Items checked in sacks or paper/plastic bags that do not have sufficient durability, do not have secure closures or do not provide sufficient protection to the contents;

   i. Items checked in corrugated/cardboard boxes, including cardboard boxes provided by UA, except for items that otherwise would be suitable for transportation without the cardboard box (e.g., bicycle, garment bag);

   j. Electronic and mechanical items, including cell phones, electronic games, and other related items;

   k. Eyeglasses, Binoculars, Prescription Sunglasses and Non-Prescription Sunglasses and all other eyewear and eye/vision devices;

   l. Flowers and plants;

   m. Garment bags not designed for travel;

   n. Irreplaceable items;

   o. Items made of paper (e.g., advertising displays, blueprints, maps, manuscripts, business/personal documents, historical documents, photos, books, negotiable papers, securities, etc.);

   p. Jewelry;

q. Keys;

r. Liquids, perfumes, alcohol/liquor, jerkins, ZAM ZAM water;

s. Medicines and medical equipment (not used as assistive devices pursuant to 14 CFR 382.3);

t. Money, gift cards and gift certificates;

u. Musical instruments-Guitars, violins, violas, cellos, organs, harps, drums;

v. Natural fur products;

w. Perishable items such as medicine, flowers, and food (e.g., fruits and vegetables, cheese, fresh or frozen meat or poultry, seafood, baked goods, dry ice, and tobacco);

x. Photographic/cinematographic/audio/video equipment, cameras and related items;

y. Precious metals/stones;

z. Tools, battery powered hand tools, tool boxes/containers, automotive towbars;

aa. Totally unprotected items such as tennis racquets and umbrellas, either individually checked or tied/strapped to the outside of luggage;

ab. Recreational and sporting goods, including but not limited to, archery equipment, baseball equipment, boogie/kite/skim/speed/skate boards, bicycles, bowling equipment, camping equipment, fencing equipment, golfing equipment, gymnastic equipment, hockey/lacrosse sticks, javelins, oars, paintball equipment, parachutes and parasails, pool cues, skating equipment, tennis equipment, water skiing/snow skiing/snowboards/wakeboards, hang gliding equipment, kayaks/canoes, personal human transporters, fishing rods, sculls, surfboards, windsurfing sailboards, vaulting poles, scuba diving masks and pressure gauges, copes, and sporting trophies.

ac. Silverware, knives, swords;

ad. Strollers, folding wagons, bassinets, and infant carrying seats;

ae. Watches (Timepieces);

af. Works of art such as paintings or sculptures; or

ag. Any other similar valuable property or irreplaceable property included in the Passenger's Checked or Carry-on Baggage with or without the knowledge of UA.

4. Assistance rendered to the Passenger by UA's employees and/or agents in loading, unloading, or storing unchecked, Carry-On Baggage or Cabin Baggage shall be considered as gratuitous service to the Passenger for which UA shall not be liable.

5. UA's liability for Baggage is also limited in all of the following respects:
   a. UA shall not be liable for Baggage not claimed by Passenger immediately upon arrival.

   b. UA shall not be liable for damage caused by a Passenger's property, whether such damage is to the Passenger's own property or to other's property.

   c. UA shall not be liable for the loss of, damage to or delay in delivery of any Baggage accepted by another carrier for Interline Transfer to UA, if the Baggage is not acceptable for transportation as Checked Baggage by UA.

   d. A Passenger traveling with an animal shall be responsible for compliance with all governmental regulations and restrictions, including furnishing valid health and rabies vaccination certificates when required. UA will not be liable for loss or expense due to the Passenger's failure to comply with this provision, and UA will not be responsible if any animal is refused passage into or through any country, state or territory. (See Rule 23.)

   e. UA shall not be liable for any Baggage that has pre-existing damage, or for which UA has received a signed release form from the Passenger.

   f. UA shall not be liable for damage to Checked Baggage which does not impair the ability of such Baggage to function and specifically shall not be liable for damage arising from the normal wear and tear of handling, including minor cuts, scratches, scuffs, dents, punctures, marks or soil.

   g. UA shall not be liable for loss of or damage to protruding parts such as wheels, feet, external pockets, pull and extending handles, hanger hooks, external locks, pull straps and security straps if this loss or damage occurred as a result of normal wear and tear.

   h. UA shall not be liable for loss of or damage to articles due to a manufacturer's defect or due to overpacked Baggage, or for the destruction, loss or damage that results from an inherent defect, quality or vice of the Baggage.

   i. UA shall not be liable for loss of or damage to articles which are strapped, fastened or otherwise secured to other Checked Baggage and which are not independently tagged and/or packaged. Such items include, but are not limited to, sleeping bags, luggage racks, luggage carriers and umbrellas.

   j. UA shall not be liable for damage caused by improperly packed Checked Baggage or Carry-on Baggage.

   k. UA shall not be liable for the loss of, damage to or delay in delivery of any Checked Baggage of a person traveling on a Ticket who is other than the Passenger to whom the Ticket was issued.

   l. UA shall not be liable for the loss of, damage to or delay in delivery of any Checked Baggage of an employee of an airline other than UA or such employee's family or friends traveling on a non-revenue Ticket. EXCEPTION: If the other airline has a ZED agreement with UA, UA will comply with its terms regarding loss of, damage to or delay in delivery of any Checked Baggage of an employee of another airline or such employee's family or friends traveling on a non-revenue Ticket.

   m. UA will not be liable for delivery or interim expenses incurred by the Passenger with delayed baggage if Passenger fails to meet the check-in time requirements set out in Rule 5 D.

   n. UA is not liable for loss, damage, or delay of a Passenger's Checked Baggage, Carry-on Baggage, wheelchair or other assistive device, or any personal item that may result from a security search of such items conducted by an agent of any local, state, or federal agency, or from

confiscation by an agent of any local, state, or federal agency

6. Services of Other Carriers

   a. UA's liability for damage, if any, shall be limited to occurrences on its own flights.

   b. A carrier issuing a ticket or checking baggage for carriage over the lines of others (e.g., a carrier providing Interline Transportation) does so only as agent and is not liable for actions on the part of the operating carrier.

   c. UA shall not be liable for the death or injury of a Passenger not occurring on its own operated flights.

Back to Top

# Rule 29 Customer Service Complaints

Customer compliments and complaints may be made by email or mail to the following:

- Website address:
  www.united.com/en/us/customercare
- Mailing address:
  Customer Care – NHCCR
  United Airlines, Inc.
  900 Grand Plaza Dr.
  Houston, TX 77067-4323

If a third-party submits a complaint on behalf of a customer, the third party must provide evidence along with the complaint that it has the authority to act on the customer's behalf. Evidence of authorization shall include a signed letter from the customer or an executed power of attorney authorizing the third party to act on behalf of the customer. Third-parties must submit this evidence of authorization along with the complaint. United will not reply if evidence of third-party authorization is not provided or if United determines in its sole discretion that the evidence is incomplete or insufficient.

Back to Top

# Rule 30 Consent to use of Personal Data

Upon booking a ticket for transportation, purchasing other services, or participating in any UA program or service such as MileagePlus or the United Club, you hereby authorize UA and its affiliates and authorized agents to (i) collect, process, retain and use, and (ii) transfer to third parties, including, but not limited to, subcontractors, agents, affiliates, marketing partners, other carriers, and government agencies, for their use, processing and retention, any and all personal data you provide when UA believes in good faith that it is in the interests of aviation security or that disclosure is otherwise necessary or advisable or as UA deems necessary to carry out any and all business purposes related to the program or services being requested and/or in the promotion of other information, goods, and services that may be of interest to you, including, but not limited to, the following purposes: making a reservation; purchasing a ticket; purchasing cargo services; participating in MileagePlus services; obtaining ancillary services, including accommodating special service requests; accounting, billing and auditing; checking credit or other payment mechanisms; operating frequent flyer programs; systems testing, maintenance and development; customer relations; sales and marketing; promotions for UA and/ or its affiliates goods and services and third party goods and services; statistical analysis; developing and tailoring current and future services; facilitating travel, including obtaining immigration, security, and customs clearance; complying with applicable laws, regulations, government requests, law enforcement requests, and/or valid court orders; providing data to third parties or governmental or law enforcement agencies to comply with, or assist in the development of, security, safety, or health measures for passengers, baggage or cargo, or to provide for the prevention or detection of imminent criminal acts or the apprehension or prosecution of offenders; protecting the legal rights of UA and/or its affiliates.

If a passenger wants to learn more about UA's Privacy Policy, it may be viewed at www.united.com. This policy is merely a statement of administrative protocol; it is not a contract, nor is it made, or intended to be made, a part of this Contract of Carriage, nor does it create any contractual or legal rights.

Back to Top

Plaintiffs' Exhibit 501

ncd.gov

# National Council on Disability Topical Overviews - Access to Transportation by People with Disabilities Illustrations of Implementation from the United States

35-44 minutes

Lex Frieden, Chairperson

Publication date: August 2, 2005

Foreword

The National Council on Disability (NCD) is an independent Federal agency with 15 members appointed by the President of the United States and confirmed by the U.S. Senate. The overall purpose of NCD is to promote policies, programs, practices, and procedures that guarantee equal opportunity for all individuals with disabilities regardless of the nature or significance of the disability and to empower individuals with disabilities to achieve economic self-sufficiency, independent living, and inclusion and integration into all aspects of society. This topic paper is part of a series of topic papers designed to provide brief background information on United States disability policy for use by the delegates in their deliberations on the United Nations Ad Hoc Committee on a Comprehensive and Integral International Convention on Protection and Promotion of the Rights and Dignity of Persons with Disabilities.

I. Introduction

The ability to access transportation is a precondition to the full enjoyment of many human rights by people with disabilities. Inadequate transportation to places of work, education, healthcare, recreation, polling stations and countless other venues constitutes a significant barrier to the enjoyment of human rights by people with disabilities, and consequently their full participation and inclusion in our communities and societies. This fact is recognized in Draft Article 19 (Accessibility) of a proposed UN convention/treaty,[1] which would require States to take appropriate measures to ensure that transportation is accessible to people with disabilities.

As governments and other actors undertake the drafting and implementation of this new

human rights convention, it may be helpful to consider the experience of other countries in ensuring access to transportation by people with disabilities. This paper seeks to provide illustrations from the experience of the United States, and provides examples of legislative and other initiatives that have been undertaken to increase the accessibility of transportation. It is not the intent to argue that the approach adopted in the United States are the best or only way of ensuring access for people with disabilities, but instead to provide this information as a resource to those engaged in ultimately implementing the new convention. Although it is beyond the scope of this paper to provide an in-depth assessment of the impact of the legislation, programs, policies, and practices described here, documents providing such assessments are available and referenced in the footnotes for those interested in learning more.

Specifically, the paper seeks to:

- • provide an overview of human rights concepts related to transportation and their relevance for supporting the enjoyment of human rights by people with disabilities;

- • provide an overview of barriers which can impede access to transportation by people with disabilities;

- • provide examples of legislation, programs, policies and practices that promote access to transportation by people with disabilities; and

- • provide some recommendations for the convention context

II. Access to transportation by people with disabilities

- a) What concepts in international human rights instruments are relevant to this issue?

International human rights law does not recognize a 'right to transportation' per se. Rather, it guarantees the right to liberty of movement, which is elaborated in Article 12 of the International Covenant on Civil and Political Rights (ICCPR).[2] Specifically, Article 12 states:

1) Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence,

2) Everyone shall be free to leave any country, including his own,

3) The above-mentioned rights shall not be subject to any restrictions except those which are provided by law, are necessary to protect national security, public order (ordre public), public health or morals or the rights and freedoms of others, and are consistent with the other rights recognized in the present Covenant,

4) No one shall be arbitrarily deprived of the right to enter his own country.

The Human Rights Committee, which is mandated to interpret the implementation of the

ICCPR by States Parties, has noted, "Liberty of movement is an indispensable condition for the free development of a person." [3] As long as a person is lawfully within a State, the State must not place restrictions on their liberty of movement, save those permitted under specific circumstances as outlined in Article 12(3).[4] Thus, the duty of the State is to ensure the removal of barriers and other restrictions that impermissibly interfere with the individual's liberty or freedom of movement. Moreover, the enjoyment of the right should not be dependent upon the individual providing any particular reason for wanting to leave or stay in a place,[5] or be dependent upon the decision of a third party, such as a relative.[6]

Transportation constitutes an important means of exercising the right to freedom of movement, and as noted by the Committee on Economic, Social and Cultural Rights, adequate "transportation is crucial to the realization by persons with disabilities of virtually all the rights recognized in the Covenant." [7] Failure to provide accessible transportation that truly facilitates freedom of movement for people with disabilities not only inhibits their ability to fully enjoy human rights, it seriously undermines the very dignity and autonomy of people with disabilities.[8]

- b) What barriers can inhibit the enjoyment of this right by people with disabilities?

If lack of transportation can constitute a barrier to the enjoyment of other rights, what can operate as barriers to the provision of adequate transportation for people with disabilities? Barriers may include:[9]

• Physical barriers – such as vehicle thresholds that do not permit entry by people with disabilities, sidewalks and streets that do not permit access to vehicles or independent mobility by people with disabilities, transport facilities (such as train and bus stations) that do not permit access by people with disabilities or that limit full access to services (including, e.g. restrooms, lounges) by people with disabilities;
• Informational barriers – such as signage or announcements that cannot be easily understood by those with sensory or developmental disabilities, insufficient information regarding the nature and availability of transportation services;
• Legal barriers – such as legislative prohibitions against people with disabilities operating or using certain kinds of transport, or laws that prohibit people with disabilities from obtaining and using legal papers (such as passports or other forms of identification) that may be needed to facilitate travel;
• Attitudinal barriers – such as the beliefs of transport operators and employees that people with disabilities do not or should not wish to utilize their services, or that it is sufficient to provide services for people with disabilities that are not of the same quality and functionality as services for the rest of the public.

III. Illustrations of implementation of accessible transportation in the United States

On February 1, 2001, President Bush announced the "New Freedom Initiative," which is a comprehensive national plan to remove barriers to community living for people with disabilities.[10] Because of the key role that transportation plays in linking Americans with disabilities to jobs, education, healthcare services and many other aspects of community living, expanding transportation options for people with disabilities is a core component of the New Freedom Initiative.[11] Below is an examination of the core legislative frameworks that exist to promote accessible transportation for people with disabilities in the United States, as well as several examples of inter-agency collaborations designed to increase effectiveness of transportation initiatives, and also address specific issues, such as the needs of rural populations.

a. Americans with Disabilities Act of 1990 (ADA)

In recognition of the importance of transportation in the lives of people with disabilities, Congress included in Title II of the Americans with Disabilities Act a part dealing exclusively with the prevention of discrimination against people with disabilities in their access to public transportation.[12] With the exception of air carriers (who must comply instead with the Air Carrier Access Act of 1986, addressed below), Title II requires public entities to ensure that "no individual shall be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination" by public entities providing transportation services, on the basis of disability.[13] The subparts of Title II then address entities providing different forms of transport, with Subpart i addressing fixed route systems (such as buses and certain types of rail that run on fixed schedules), paratransit, and demand response systems (such as taxis, that do not run on fixed schedules), and Subpart ii addressing intercity and commuter rail. Public entities providing these services include requirements that: transit systems purchase and lease vehicles "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs;" [14] that paratransit be provided as a complement to fixed route systems[15] and that people with disabilities using such mode of transit be allowed to be accompanied by one other person;[16] that entities alter existing facilities to make them accessible to people with disabilities[17] and ensure the accessibility of new facilities;[18] and that at least one car per intercity rail transportation be accessible to people with disabilities.[19] Regulations on each subpart of Title II of the ADA have been issued by both the Department of Justice[20](DOJ) (relating to Subtitle A of Title II) and the Department of Transportation[21] (relating to Subtitle B of Title II) which share responsibility for enforcement.

Title III of the ADA (Public Accommodations and Services Operated by Private Entities) also has application in the context of transportation, as it contains provisions explicitly

prohibiting discrimination on the basis of disability by private entities "primarily engaged in the business of transporting people."[22] Essentially, failure to provide services and equipment accessible to people with disabilities constitutes discrimination,[23] and relevant private entities are obliged to purchase or lease equipment accessible to people with disabilities, and to remanufacture vehicles (to extend their usable life by 10 years or more) in a manner that makes the vehicles readily accessible to people with disabilities.[24] The Department of Transportation has promulgated regulations giving specificity to the provisions of Title III.[25] The Department of Justice has also promulgated regulations,[26] and has also published a technical assistance manual providing advice to entities seeking to comply with Title III.[27]

As noted already, the Department of Transportation and Department of Justice have authority for promulgating regulations and enforcing various aspects of the ADA's provisions related to transportation. In addition, private individuals may initiate lawsuits and may also approach relevant agencies to investigate alleged violations of the ADA. For example, a number of individuals approached DOJ to ask them to investigate possible violations of Title III by Greyhound Lines, Inc., alleging that Greyhound had failed to remove barriers to people with disabilities at some of its facilities, and that Greyhound staff had failed on certain occasions to provide appropriate assistance to people with disabilities. To avoid litigation, expedite payment of compensatory damages to the individuals affected by the alleged violations, and effect the removal of barriers and changes in service to comply with Title III, Greyhound entered into a settlement agreement with DOJ.[28] As a result of this agreement, Greyhound undertook actions such as improvements to its internal dispute resolution procedures, training of its employees regarding ADA requirements, and creation of an advisory committee on disability issues that included representatives of organizations advocating for the rights of people with disabilities or specializing in travel for people with disabilities.[29]

## b. Air Carrier Access Act of 1986 (ACAA)

As noted above, Title II (B)(I) of the ADA expressly exempts coverage of aircraft, which are instead addressed by the Air Carrier Access Act (ACAA).[30] The stated purpose of the ACAA is to prevent discrimination against people with disabilities by air carriers in the provision of air transportation,[31] and it achieves this by elaborating a "general prohibition of discrimination," [32] and also by placing specific requirements on relevant air transport facilities and services in order to ensure their accessibility to people with disabilities. It should be noted that while foreign air carriers need not comply with the specific accessibility provisions of the ACAA, following amendments in 2000, they are compelled to comply with the general prohibition against discrimination.[33] Similarly, contracts that

carriers have with contractors must include a clause guaranteeing that the contractor will not discriminate on the basis of disability in the course of performing activities on behalf of the carrier.[34]

Issues of accessibility relevant to both aircraft and air transportation facilities are addressed with great specificity in the ACAA, thus decreasing ambiguity for those seeking to comply with the Act. For example, on aircraft (of specified size and age) there are requirements addressing the provision of folding aisle armrests, in-cabin stowage for folding wheelchairs, accessible lavatories, and wheelchairs for on-board use.[35] In addition, there are provisions specifying that activities to refurbish air cabins should not decrease accessibility below the level specified.[36] Airports must be accessible to people with disabilities (including wheelchair users), and carriers are deemed in compliance if they comply with Department of Justice Regulations implementing Title III of the Americans with Disabilities Act.[37]

Even greater detail is provided regarding services, such as those related to seat assignments, boarding assistance, stowage of personal equipment, passenger information, treatment of mobility aids and assistive devices, accommodations for people with hearing impairments, and advance notice requirements.[38] The ACAA does not permit carriers to refuse carriage on the basis of a person's disability,[39] or "solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers."[40] Furthermore, the carrier may not restrict the number of people with disabilities on any given flight.[41] Essentially, as long as carriage of a given individual does not violate Federal Aviation Administration regulations,[42] the carrier may not refuse transport for a given traveler with disabilities, nor may the carrier require that the individual travel with an attendant.[43] Furthermore, the carrier may not charge travelers with disabilities for the use of equipment or services required by the regulations.[44] The application of these provisions is bolstered by the requirement that carriers train their personnel in how to comply with the regulations, and also provide awareness-raising training on how to appropriately address disability-related issues.[45]

The Department of Transportation (DOT) is mandated to enforce the ACAA, and requires carriers to implement a complaint resolution mechanism and report regularly to DOT regarding complaints filed against the carrier.[46] DOT is also authorized to take enforcement actions against air carriers alleged to be in violation of the ACAA and related regulations, and in January 2004 DOT began issuing a biannual report of steps it has taken to enforce the ACAA.[47] DOT also provides information to consumers on how to file



Plaintiffs' Exhibit 502

# Guidance on Accessible Air Travel in Response to COVID-19
## Edition 1 – 31 August, 2020



## Disclaimer

The purpose of this document is to provide guidance and best practice examples for airlines to support passengers with disabilities within their organization in response to COVID-19.  The guide is not intended to endorse any current regulation, nor to provide any mandatory requirements.  The intended audience for this guide is IATA member airlines. It may also be a useful reference for other aviation stakeholders such as airports, regulatory bodies, and organizations dealing with accessibility.  The information contained in this publication is subject to constant review in the light of changing requirements and regulations. No reader should act on the basis of any such information without referring to applicable laws and regulations applicable to reader jurisdiction and/or without taking appropriate professional as well as technical advice.  Although every effort has been made to ensure accuracy, IATA shall not be held responsible for any loss or damage caused by errors, omissions, misprints or misinterpretation of the contents hereof. Furthermore, IATA expressly disclaim any and all liability to any person or entity in respect of anything done or omitted by any such person or entity in reliance on the contents of this publication. This document was produced by IATA. The party asserts the right to control the distribution and use of the content.

**All IATA Covid19 related guidance materials can be found at**
https://www.iata.org/en/programs/covid-19-resources-guidelines/

For additional information on the IATA accessibility policy please contact IATA at gia@iata.org



# Contents

Revision record .................................................................................................................................... 3

Introduction ......................................................................................................................................... 4

1      Regulation ................................................................................................................................. 4

2      ICAO Council Aviation Recovery Taskforce (CART) Take off Guidance ........................... 5

3      Key principles ........................................................................................................................... 6

    3.1      Safety and security ................................................................................................................ 6

    3.2      Assistance to passengers with disabilities ........................................................................ 6

    3.3      Access ..................................................................................................................................... 6

    3.4      Communication ....................................................................................................................... 6

    3.5      Application of consistent measures .................................................................................... 7

4      Persons with disabilities and COVID-19 ............................................................................... 7

5      Establishing an airline policy ................................................................................................. 8

6      Information to employees ........................................................................................................ 8

7      Information to passengers ...................................................................................................... 9

    7.1      Search and book .................................................................................................................... 9

    7.2      On your way .......................................................................................................................... 10

    7.3      At destination ....................................................................................................................... 10

8      Assistance to passengers ..................................................................................................... 10

    8.1      Passengers with reduced mobility .................................................................................... 10

    8.2      Passengers with sensory disabilities ............................................................................... 11

    8.3      Passengers with intellectual disabilities .......................................................................... 12

9      Health measures ..................................................................................................................... 12

    9.1      Physical distancing ............................................................................................................. 12

    9.2      Use of face covering, mask and protective personal equipment .................................. 13

    9.3      Hygiene measures ............................................................................................................... 13

    9.4      Cleaning and disinfection of equipment ........................................................................... 14

10     Staff training ........................................................................................................................... 14

11     Conclusion .............................................................................................................................. 15

Annex A - Helping Blind Travelers During COVID-19 ................................................................. 16



# Introduction

Accessibility is not just a requirement exclusively designed to meet the need of persons with disabilities. It is important to consider accessibility in the design of aviation-related policy and in the development of inclusive products and services to ensure air travel is open to all. Done with empathy and scientific rigour, the act of mainstreaming accessibility within the field of the overall passenger experience will benefit not just airlines but the aviation ecosystem as a whole.

To help airlines craft an inclusive response to COVID-19, the IATA Accessibility Working Group has developed this guidance document in collaboration with international, national and local partners as well as the disability community such as Open Doors Organization[1] and Reduced Mobility Rights Limited[2].

The purpose of this guidance document is to explore, in brief, the aspects that should be considered within the concept of accessible travel in order to appropriately adapt existing policies during COVID-19 and beyond. IATA hopes that these recommendations will ensure consistency and identify opportunities to improve the overall travel experience for passengers with disabilities. As the COVID-19 pandemic is still evolving with myriad unknown variables, this guidance document should be considered as a live tool that will be revised and updated as necessary.

# 1  Regulation

Further to the UN Convention on the Rights of Persons with Disabilities (CRPD)[3] , efforts were made to change the focus by considering the environment as a disabling factor and by taking a more positive view, oriented towards accessibility as a measure to create inclusive environments, irrespective of the capabilities of each individual, i.e. environments for all.

Instead of being seen as solely a characteristic of the individual, the CRPD asserts that "disability results from the interaction between persons with impairments and attitudinal and environmental barriers that hinders their full and effective participation in society[4]." This more positive view challenges governments and corporations to create accessible and welcoming environments, i.e., environments for all that function for everyone irrespective of their capabilities, size or age.

Among other crucial accessibility topics, Article 9 of the CRPD requires state regulators to ensure that persons with disabilities can access transport services on an equal basis with others. One of the most important changes generated by the so-called social model[5] and stated in the UN International Convention is the adoption of a new term: person with disabilities.

---

[1] https://opendoorsnfp.org/
[2] https://www.reducedmobility.eu/
[3] United Nations Organization (2006), Convention on the Rights of Persons with Disabilities: https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-15&chapter=4
[4] UN CRPD, Art.1
[5] In response to the medical view, the UNCRPD termed the 'social model': disability is recognized as the consequence of the interaction of the individual with an environment that does not accommodate that individual's differences. This lack of accommodation impedes the individual's participation in society. Inequality is not due to the impairment, but to the inability of society to eliminate barriers challenging persons with disabilities. This model puts the person at the centre, not his/her impairment, recognizing the values and rights of persons with disabilities as part of society.



As the social model of accessibility has evolved, the concept of accessibility for passengers with disabilities is laid out in several standards, rules, regulations and guidelines, including the following:

- ICAO Annex 9, Chapter 8 H
- Manual on Access to Air Transport by Persons with Disabilities (ICAO Doc 9984)
- Regulation (EC) No 1107/2006
- US Air Carrier Access Act (ACAA)
- Canadian Accessible Transportation for Persons with Disabilities Regulations, Phase 1
- ECAC Doc 30, Part I, Section 5 Recommendations
- IATA Resolution 700
- IATA AGM Resolution on Passengers with disabilities and its core principles

# 2 ICAO Council Aviation Recovery Taskforce (CART) Take off Guidance

The deliverables of the ICAO Council's Aviation Recovery Task Force (CART)[6] are aimed at providing practical, aligned guidance to governments and industry operators in order to restart the international air transport sector and recover from the impacts of COVID-19 on a coordinated global basis.

When developing their policy and mitigation procedures to restore passenger air travel, airlines should be guided by the ICAO CART Take off guidance.

The guidance recommends a phased approach (from stage 0 to stage 4) to enable the safe return to high-volume domestic and international air travel. It is important to note that there are several different phases to resuming full operations.



In all the above stages, airlines should consider the need to raise additional awareness and educational messaging for passengers with disabilities and older adults before the re-start of operations.

[6] https://www.icao.int/covid/cart/Pages/CART-Take-off.aspx



# 3  Key principles

## 3.1    Safety and security

In developing the assistance measures airlines should be guided by the underpinning principles of aviation: Safety and Security. Any measure applied to support passengers with disabilities should be commensurate with the health risk level of the country and shall not compromise the safety and security of the ground staff, the crew nor the passengers themselves.

## 3.2    Assistance to passengers with disabilities

Assistance to passengers with disabilities should include safe handling, transferring, and storing of their mobility equipment during travel in addition to supporting passengers themselves.

Passengers with disabilities should be allowed to access the terminal with their family members, travel companions, personal assistants and if applicable qualified, trained assistance dog meeting existing travel criteria (training, certificate by an accredited entity, Pet Passport, required vaccinations).

This means that physical distancing measures and restrictions on non-traveling individuals should not hinder passengers with disabilities from being in close contact with their family members, travel companions and assistants. This may mean allowing a non-passenger to enter a terminal in order to assist or meet a passenger with a disability even when other non-passengers are barred from entry. Staff of transport services should be aware of this

## 3.3    Access

Ensuring access to aviation facilities, services and information is fundamental to a disability inclusive COVID-19 response and recovery. If public health information, airport terminals, transport, communications, technologies and goods and services are not accessible, persons with disabilities may not be able to live and travel independently.

When changing the circulation patterns of passengers to facilitate physical distancing, it is important to maintain accessible entrances and step-free routes and minimize lengthen walking distances.

## 3.4    Communication

Governments, travel agents, airports and airlines all have a role to play to communicate COVID-19 measures and identify the best channels to reach out to passengers with disabilities. This could include websites, social media, text messages, signage, print brochures, etc.  Information, prior to travel and throughout the travel process should be universally accessible, clear, accurate, simple and as consistent as possible across the entire passenger journey and all channels of communication.

Airlines should adapt their communication to passengers with all types of disabilities—physical, sensory, cognitive, hidden, medical--and explain why certain requirements are in place as well as the additional measures that they are taking to ensure the health and safety of those who require assistance services.



For their safety and reassurance, passengers, including those with disabilities and older adults should seek information ahead of their journey to clear all the formalities to which they may be subject. Whereas passengers might have been familiar with the previous travel policies will likely be less familiar with the additional health measures required to prevent the spread of COVID-19 especially as these may change over time. It is therefore critical that passengers are informed before reaching the airport.

## 3.5   Application of consistent measures

In principle, passengers with disabilities require a consistent level of accessible conditions and services that are adapted to meet their individual needs, wherever they travel. Airlines, governments and airports should therefore strive to apply international measures and standards as much as possible. This principle is especially important to strengthen passengers' confidence during COVID-19 pandemic. While national and regional needs may require different safety approaches, it is of paramount importance to avoid a global patchwork of incompatible health safety measures. Measures that impose unreasonable costs or burdens on the industry, without any scientific basis, must be avoided. Instead, carefully considered and justifiable measures should be adopted to promote safety and public health while boosting confidence of passengers and crew[7].

# 4  Persons with disabilities and COVID-19

Some persons with disabilities may be more likely to experience severe or fatal symptoms if they contract COVID-19, particularly older individuals or those with chronic health conditions such as Chronic Obstructive Pulmonary Disease (COPD), heart disease or diabetes. The fact that they are at higher risk, however, does not mean that they should be subject to a more stringent medical screening or clearance than that required for other passengers. To be equitable, the standards applied should be the same.

In the interests of safety, a passenger whose medical condition may pose a "direct threat" to his or her safe transportation or to the health of other passengers and the crew may be asked to provide additional medical documentation (e.g. MEDIF[8] ) to ensure that they are fit-to-fly.

Certain government regulations regarding accessibility in air travel do not prohibit air carriers from assessing whether a passenger is fit-to-fly. They provide grounds for requiring a medical clearance to support that assessment in situations where the person in question has a medical condition or communicable disease that threatens his or her safe transportation or the health of other passengers and the crew.  Other government regulations regarding accessibility in air travel do not address communicable diseases, as this is a topic separate from disability[9].

---

[7] https://www.icao.int/covid/cart/Pages/CART-Report---Executive-Summary.aspx
[8] The MEDIF is the name given to the forms used by airlines to manage passengers requiring special assistance and medical clearance. For additional guidance see the IATA medical manual   For example the U.S. Air Carrier Access Act regulations (14 CFR Part 382) define "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services."  In accordance with public health guidelines, this currently includes passengers whose symptoms, e.g., a fever, indicate that they may have COVID-19.
For additional guidance, see Air Carrier Access Act, part 382.19 and part 382.21 which address medical clearance for persons with disabilities and passengers with communicable diseases : https://www.ecfr.gov/cgi-bin/text-idx?node=pt14.4.382&rgn=div5
[9] This is the case for European regulation EC1107/2006 and for the Canadian Accessible Transportation for Persons with Disabilities Regulations (ATPDR).



# 5  Establishing an airline policy

Airlines should develop a specific and detailed company policy for the assistance and support to passengers with disabilities that is consistent across their network during the COVID-19 crisis. This policy should be robust, based on science and endorsed by senior management.

It is recommended that company policy be properly communicated to all airline employees who assist passengers with disabilities as well as their managers and supervisors. It needs to be workable and translatable into practical operational procedures.

It is recommended that such a policy be guided by the underpinning principles of aviation: Safety and Security. Any applied measure should be commensurate to the risk level and shall not compromise the safety and security of passengers with disabilities, other passengers, ground staff and the crew.

The policy should consist of the following provisions:

- Modifications of assistance services to minimize health risks while remaining responsive to specific needs;
- Provide appropriate training to employees (e.g. ground staff and cabin crew) to assist passengers with disabilities during COVID-19;
- Provide appropriate and consistent information to passengers' pre-travel and throughout all airline channels;
- Develop processes to manage specific health procedures such as physical distancing; and
- Inform passengers on what to do in specific cases when recommended health procedures are not possible due to a person's medical condition or disability, e.g. in case of face masks/coverings.

Airlines should provide reasonable accommodation to passengers aligned with measures recommended by health authorities. Provision of such accommodation must be consistent with operational feasibility and without imposing a disproportionately high safety burden on fellow passengers. This will help to ensuring that all passengers exercise their human rights and their fundamental freedoms in an equitable manner.

# 6  Information to employees

It is recommended that the company policy related to accessibility and safety measures during COVID-19 be communicated throughout the organization and especially to frontline ground employees and crew members who may be the first point of contact with passengers with disabilities and their assistants.

Effective and consistent internal communication on how to assist passengers with disabilities travelling during COVID-19 will reassure employees that they are supported by management and encourage them to work with peace of mind.

A communication campaign could be launched and implemented to inform employees and passengers about the safety and security as well as cleaning protocols in place at airports and onboard aircraft.



gloves, wipes, hand sanitizer and masks where needed. This is particularly important during the processes of wheelchair transport, securement and lift transfer during boarding and de-boarding.

Where transport wheelchairs, electric buggies, ambu-lifts, boarding chairs or other types of equipment are provided, airlines or service companies should consider additional cleaning procedures, e.g., cleaning them after each use.

## 8.2    Passengers with sensory disabilities

During COVID-19, airlines should address the communication and assistance needs of passengers with hearing and/or vision loss. Ground staff and cabin crew should take measures to ensure that these passengers can access information through easily findable, clear and easy to understand instructions at the airports and onboard[13].

Communication systems employed by airlines before and during the journey should be inclusive and accessible to all. This may be achieved by means of multiple, redundant means of communication, i.e., verbal, visual and virtual (digital).

For passengers who are blind or have low vision, information may be provided audibly via public announcements and spoken instructions, visually by use of larger fonts with good colour contrast and no glare, or virtually on an accessible website, mobile application or via text message.

For those who require a sighted guide to navigate the airport, airlines should develop a set of procedures to ensure that this assistance service is provided as safely as possible despite the lack of physical distancing. Ground staff and cabin crew providing assistance should first ask how the passenger wishes to be guided. Some passengers may wish to receive verbal instructions or to hold the end of their cane, while others may want to hold a shoulder rather than an elbow or give their guide dog a "follow" command. To reassure these passengers regarding safety, ground and cabin staff should let them know that staff and other passengers are wearing masks and respecting physical distance guidelines[14].

For passengers who are deaf or hard of hearing, the availability of detailed information pre-trip via websites, apps, emails, text messages and chat lines minimize the need for communication at the airport. This is especially important during COVID-19 when the use of non-transparent masks creates a communication barrier for those who rely on lip reading, and physical distancing also limits the ability to hear. Having visors or transparent masks available for frontline staff can help alleviate the problem. Also helpful are counter and gate hearing/induction loops, visual information on gate and flight information displays (GIDS and FIDS), plexiglass shields at counters to allow for closer approach, and pen and paper or tablet readily at hand to write a message if necessary. Some airports now offer Video Remote Interpreting (VRI) to facilitate communication via sign language.

---

[13] EDF Recommendations on exit measure for transport services in light of COVID-19- May 2020
[14] Guidance on this topic is available online from Open Doors Organization (https://opendoorsnfp.org/wp-content/uploads/2020/05/Guidance-for-Airline-Service-Companies.doc).



## 9.2   Use of face covering, mask and protective personal equipment

Face coverings for passengers, ground staff and cabin crew is a critical part of a layered approach to safety measures implemented temporarily to prevent the spread of COVID-19.

All operators, including airline ground staff, handlers and cabin crew assisting passengers with disabilities, should be equipped with personal protective equipment (PPE)[16]. Ground staff and airline crew should wear face coverings consistent with the applicable public health guidelines and government regulations.

The type of face covering (non-medical or medical) should be selected based on the level of risk and the availability of such masks while taking into consideration the potential risks and disadvantages of wearing masks.

Best practices should be followed regarding when and how to wear, remove, replace, and dispose of masks and face coverings, as well as the adoption of hand hygiene after removal. It is recommended that PPE of staff assisting passengers with disabilities be changed after each time assistance is provided to a passenger.

Some passengers, such as those who cannot put on or remove a face mask themselves, small children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period. Airlines should consider this within their risk assessment process and identify whether additional questions and/or supporting medical documentation as permitted by local laws and regulations are necessary at pre-screening stage(s), and whether any exceptions in the acceptance of these passengers can be made within their policy. Exceptions should be made in consideration of the health authorities' recommendations and the risk level. Where exceptions are made, other passengers may need to be advised of the reasons and additional steps to mitigate the risks in order to reassure them and prevent discomfort between passengers.

The use of fraudulent documentation by passengers to obtain an exemption from the requirement to wear face masks has been drawn to IATA's attention and is of concern. Airlines should consult with their legal department on procedures for addressing the validity of exemption documentation under local requirements.

## 9.3   Hygiene measures

Hygiene materials should always be available for all passengers. These should be at easily reachable accessible locations, and easy to find with accessible signage indicating their location at transport facilities. The mechanism and information to dispose of hygiene and sanitary materials must be accessible as well.

---

[16] PPE could include gloves, medical masks, goggles or a face shield, and gowns or aprons



# 11  Conclusion

The aviation industry is experiencing unprecedented challenges from COVID-19, as the pandemic has forced the world to a standstill. Persons with disabilities might have underlying health needs that can increase the morbidity and mortality of the disease and/or may require assistance that limits social distancing. In this scenario, <mark>it is important to note how persons with disabilities are uniquely impacted by the pandemic in various aspects, including in the transport area.</mark> As countries relax their border control systems and airlines resume their services, <mark>accessibility and inclusion of persons with disabilities in aviation's COVID-19 response and recovery is a vital part of achieving the pledge to leave no one behind.</mark> Such inclusive strategies are central to the IATA's commitment in order to achieve transformative and lasting change regarding disability inclusion and accessibility.

*Product Responsibility Best Practices*

| SUBJECT | | LAST UPDATE |
|---|---|---|
| FDA Emergency Use Authorization **Plaintiffs' Exhibit 503** | | January 2021 |

| APPLIES TO | FOCUS ON |
|---|---|
| · Suppliers    · Distributors | Emergency FDA Guidance |

**QUICK LINKS**
· PPAI Corporate Responsibility: ppai.org/corporate-responsibility/
· Consumer Product Safety Commission: www.cpsc.gov

**Intended for intermediate compliance programs**

*Italic grey text indicates a hyperlink listed in the Online Resources section of this document.*

The Food and Drug Administration (FDA) has employed regulatory flexibility to alleviate medical product shortages and augment the availability of medical products that are necessary for mitigating the impact of COVID-19. The FDA has two methods available to implement this policy. One option employed by the FDA is the Immediately-in-Effect (IIE) guidance, and the other option is the Emergency Use Authorization (EUA).

## Immediately-In-Effect Guidance

The *FDA's IIE guidance* outlines the intended use of face masks for source control. According to the FDA, source control is described as preventing the transmission of infection through a person's respiratory secretions which are produced when speaking, coughing, or sneezing. Considering the public health emergency, and provided that a face mask does not create an undue risk, the FDA does not object to a mask's distribution and use intended for a medical purpose, even if the mask does not comply with specific regulations outlined in the guidance document. The normally applicable regulation includes a registration requirement, a quality system requirement, protocols for corrections and removals, and a unique device requirement. This guidance applies whether the mask is being used by medical personnel or the general public.

There are solutions available for determining whether a mask creates an undue risk. The product must be labeled as a face mask, not a surgical mask or respirator. The product must also include a list of body contacting materials, and not include any *drugs* or biologics. The product's label should include recommendations for further reducing the risk of use, for example not using the mask in a surgical setting. Another recommendation for minimizing risk associated with use of the product includes not using the mask if there could be exposure to hazardous fluids. It is also important to ensure the product does not have any additional antimicrobial or anti-viral claims made within its labelling.

## Emergency Use Authorization

The FDA has also issued *Emergency Use Authorizations* regarding facemasks in pursuit of its policy related to COVID-19. FDA policies regarding facemasks include clarification that, in accordance with the federal *Food, Drug, and Cosmetic Act*, the masks comprise medical devices only when they are intended for use in the diagnosis, cure, mitigation, treatment or prevention of diseases. This is an important distinction; unlike respirators and surgical masks, face masks are not considered *Personal Protective Equipment (PPE)*.

Under the EUA, face masks are also intended to help stop the spread of COVID-19 by providing source control. Conditions for authorization include labeling requirements of the product and waivers of certain FDA requirements, including quality system regulation and the Unique Device Identifier (UDI). This is an "umbrella" EUA, which means the manufacturer does not need to take any further action and does not need to submit a request to the FDA for inclusion under the EUA. However, it is important to note that adverse event reporting and record keeping are still required.

When working under an EUA, the Department of Health and Human Services (HHS) provides liability coverage under the *Public Readiness and Emergency Preparedness (PREP) Act*. The PREP Act authorizes the HHS Secretary to make a declaration that provides immunity from potential liability, except for cases of intentional misconduct, regarding claims related to loss caused by using covered countermeasures associated with the public health emergency.

When the public health emergency is officially terminated for products that are either in use or in warehouses, the FDA will issue policies that outline the transition process. It is important to keep in mind that face masks are products that are exempt from the *premarket notification requirements* implemented under the Federal Food, Drug, and Cosmetic Act. That means

*-1-*

© 2021 Promotional Products Association International (PPAI). This information is furnished by PPAI for educational and informational purposes only. PPAI makes no and expressly disclaims any and all representations and warranties, express or implied, including any warranty of fitness for a particular purpose and/or statements about specific dates, coverage, application or otherwise. Users are advised to consult with appropriate legal counsel or other professional about the specific application of the law or this information to the user's business and products.

PROMOTIONAL PRODUCTS ASSOCIATION INTERNATIONAL

premarket submissions are not necessary with some face masks, however the other regulations that are waived during the public health emergency would be in effect. Some examples of those requirements include registration and listing, quality systems, and reports of corrections and removals. It will be important for companies to maintain compliance with those requirements if they intend to maintain products in the market, after the EUAs expire.

## *Online Resources:*

**FDA Regulated Face Masks:** https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/face-masks-including-surgical-masks-and-respirators-covid-19

**FDA Enforcement Policy:** https://www.fda.gov/media/136449/download

**N95 Respirators, Surgical Masks, and Face Masks:** https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-surgical-masks-and-face-masks

**Importing Medical Devices During the COVID-19 Pandemic:** https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/importing-medical-devices-during-covid-19-pandemic

**Surgical Masks - Premarket Notification [510(k)] Submissions:** https://www.fda.gov/regulatory-information/search-fda-guidance-documents/surgical-masks-premarket-notification-510k-submissions



PRODUCT
RESPONSIBILITY™
POWERED BY **PPAI**

© 2021 Promotional Products Association International (PPAI). This information is furnished by PPAI for educational and informational purposes only. PPAI makes no and expressly disclaims any and all representations and warranties, express or implied, including any warranty of fitness for a particular purpose and/or statements about specific dates, coverage, application or otherwise. Users are advised to consult with appropriate legal counsel or other professional about the specific application of the law or this information to the user's business and products.

Plaintiffs' Exhibit 504

 

 **3M**

# Particulate Respirator N95

*User Instructions*
8210*Plus*/8210*Plus*MX/
8210/8210MX/07048/8110S



| ⚠ WARNING |
| --- |

This respirator helps protect against certain particles. **Misuse may result in sickness or death.** For correct use, consult supervisor and these *User Instructions*, or call 3M in U.S.A., 1-800-247-3941. In Canada, call Technical Service at 1-800-267-4414. In Mexico, call 01-800-712-0646.

## IMPORTANT
Before use, wearer must read and understand these *User Instructions*. Keep these instructions for reference.

## Use For
Particles such as those from grinding, sanding, sweeping, sawing, bagging, or processing minerals, coal, iron ore, flour, metal, wood, pollen, and certain other substances. Liquid or non-oil based particles from sprays that do not also emit oil aerosols or vapors. Follow all applicable local regulations. For additional information on 3M use recommendations for this class of respirator please consult the 3M Respirator Selection Guide found on the Personal Safety web site at www.3M.com/respiratorselector or call 1-800-243-4630 in U.S.A. In Canada, call 1-800 267-4414.

## Do Not Use For
Do not use for gases and vapors, oil aerosols, asbestos, or sandblasting; particulate concentrations that exceed either 10 times the occupational exposure limit or applicable government regulations, whichever is lower. In the United States, do not use when the U.S. Occupational Safety and Health Administration (OSHA) substance specific standards, such as those for arsenic, cadmium, lead in the construction industry, or 4,4'-methylene dianiline (MDA), specify other types of respiratory protection. This respirator does not supply oxygen.

## Biological Particles
This respirator can help reduce inhalation exposures to certain airborne biological particles (e.g. mold, *Bacillus anthracis*, *Mycobacterium tuberculosis*, etc.) but cannot eliminate the risk of contracting infection, illness or disease. OSHA and other government agencies have not established safe exposure limits for these contaminants.

## Use Instructions
1. Failure to follow all instructions and limitations on the use of this respirator and/or failure to wear this respirator during all times of exposure can reduce respirator effectiveness and **may result in sickness or death.**
2. In the U.S., before occupational use of this respirator, a written respiratory protection program must be implemented meeting all the requirements of OSHA 29 CFR 1910.134, such as training, fit testing, medical evaluation, and applicable OSHA substance specific standards. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. Follow all applicable local regulations.
3. The particles which can be dangerous to your health include those so small that you cannot see them.
4. Leave the contaminated area immediately and contact supervisor if dizziness, irritation, or other distress occurs.
5. Store the respirator away from contaminated areas when not in use.
6. Inspect respirator before each use to ensure that it is in good operating condition. Examine all the respirator parts for signs of damage including the two headbands, attachment points, nose foam, and noseclip. The respirator should be disposed of immediately upon observation of damaged or missing parts. Filtering facepieces are to be inspected prior to each use to assure there are no holes in the breathing zone other than the punctures around staples and no damage has occurred. Enlarged holes resulting from ripped or torn filter material around staple punctures are considered damage. Immediately replace respirator if damaged. Staple perforations do not affect NIOSH approval (For 8110S only).
7. Conduct a user seal check before each use as specified in the Fitting Instructions section. **If you cannot achieve a proper seal, do not use the respirator.**
8. Dispose of used product in accordance with applicable regulations.

## Use Limitations
1. This respirator does not supply oxygen. Do not use in atmospheres containing less than 19.5% oxygen.
2. Do not use when concentrations of contaminants are immediately dangerous to life and health, are unknown or when concentrations exceed 10 times the permissible exposure limit (PEL) or according to specific OSHA standards or applicable government regulations, whichever is lower.
3. Do not alter, wash, abuse or misuse this respirator.
4. Do not use with beards or other facial hair or other conditions that prevent a good seal between the face and the sealing surface of the respirator.
5. Respirators can help protect your lungs against certain airborne contaminants. They will not prevent entry through other routes such as the skin, which would require additional personal protective equipment (PPE).
6. This respirator is designed for occupational/professional use by adults who are properly trained in its use and limitations. This respirator is not designed to be used by children.

1

7. Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use.

8. When stored in accordance with temperature and humidity conditions specified below, the product may be used until the "use by" date specified on the packaging.

## Storage Conditions and Shelf Life

Before use, store respirators in the original packaging away from contaminated areas, dust, sunlight, extreme temperatures, excessive moisture and damaging chemicals. When stored in accordance with temperature and humidity conditions specified below, the product may be used until the "use by" date specified on packaging. Always inspect product and conduct a user seal check before use as specified in the *User Instructions*. **If you cannot achieve a proper seal, do not use the respirator.**


End of Shelf Life
Use respirators before the "use by" date specified on packaging


Storage Temperature Range
-20°C (-4°F) to +30°C (+86°F).


Storage Maximum Relative Humidity
<80% RH

## Time Use Limitation

If respirator becomes damaged, soiled or breathing becomes difficult, leave the contaminated area immediately and replace the respirator.

## Fitting Instructions
**Must be followed each time respirator is worn.**

1. Prestretch top and bottom straps before placing respirator on the face (8210/8210MX only) (Fig. 1).
2. Cup the respirator in your hand, with the nosepiece at your fingertips, allowing the headbands to hang freely below your hand (Fig. 2).
3. Position the respirator under your chin with the nosepiece up. Pull the top strap over your head resting it high at the top back of your head. Pull the bottom strap over your head and position it around the neck below the ears (Fig. 3).
4. Place your fingertips from both hands at the top of the metal nosepiece. Using two hands, mold the nose area to the shape of your nose by pushing inward while moving your fingertips down both sides of the nosepiece (Fig. 4).
   ⚠ Pinching the nosepiece using one hand may result in improper fit and less effective respirator performance. Use two hands.
5. Perform a User Seal Check prior to each wearing. To check the respirator-to-face seal, place both hands completely over the respirator and exhale sharply. Be careful not to disturb the position of the respirator. If air leaks around nose, readjust the nosepiece as described in step 4. If air leaks at the respirator edges, work the straps back along the sides of your head (Fig. 5). **If you CANNOT achieve a proper seal, DO NOT enter the contaminated area. See your supervisor.**


Fig. 1

Fig. 2

Fig. 3

Fig. 4

Fig. 5

## Removal Instructions

See step 3 of *Fitting Instructions* and cup respirator in hand to maintain position on face. Pull bottom strap over head. Still holding respirator in position, pull top strap over head and remove respirator.

This respirator contains no components made from natural rubber latex.

Plaintiffs' Exhibit 505



# Children's
## Health Defense

## NOTICE FOR EMPLOYERS, UNIVERSITIES AND OTHER INSTITUTIONS MANDATING COVID-19 MASKS
### *April 26, 2021*

This serves as notice that the mandate for any individual to wear a mask against COVID-19 for employment or attendance at a university or other institution violates federal law. All COVID-19 masks, whether surgical, N95 or other respirators, are authorized, not approved or licensed, by the federal government; they are Emergency Use Authorization (EUA) only. They merely "may be effective." Federal law states:

Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) states:

**individuals to whom the product is administered are informed—**

**(I)** that the Secretary has authorized the emergency use of the product;
**(II)** of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
**(III) of the option to accept or refuse administration of the product,** of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

EUA products are by definition experimental and thus require the right to refuse. Under the Nuremberg Code, the foundation of ethical medicine, no one may be coerced to participate in a medical experiment. Consent of the individual is "absolutely essential." A federal court held that even the U.S. military could not mandate EUA vaccines to soldiers. *Doe #1 v. Rumsfeld*, 297 F.Supp.2d 119 (2003).

In a letter dated April 24, 2020, the Food and Drug Administration stated that authorized face masks must be labelled accurately and may not be labeled in a way that misrepresents the product's intended use as "source control to help prevent the spread of SARS-CoV-2." The letter specifies that the labeling "may not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction." Any EUA mandate requiring individuals to wear face masks conflicts with Section 360bbb-3(e)(1)(A)(ii)(I-III), which provides that the person must be informed of the option to refuse to wear the device.

Liability for forced participation in a medical experiment, including possible injury, may be incalculable. Children's Health Defense urges U.S. employers, universities and other institutions to respect and uphold the rights of individuals to refuse to wear EUA masks.

# HEALTH FREEDOM
## D E F E N S E   F U N D

## Plaintiffs' Exhibit 506
### FREQUENTLY ASKED QUESTIONS RE MASKS

1.    Q:    Can my employer force me to wear a mask at this time?

A:    Currently, masks are authorized for use by the general public as "investigational products" under an Emergency Use Authorization ("EUA").  They are not an approved product, and are referred to in the law as "unapproved products" because they have not been fully tested and approved for use by the FDA.  Under the federal law that allows the FDA to issue EUAs (21 U.S.C. § 360bbb-3), you cannot be forced to wear a mask.  The law provides that recipients of a product authorized for use under and EUA can refuse to take the product.  In this instance, the mask is the product.

2.    Q:    Can my employer fire me for refusing to wear a mask?

A:    This issue has yet to be decided by the courts.  Some attorneys take the position that employers can fire employees who refuse to wear a mask.  However, this conclusion conflicts with the language of the critical statute, 21 U.S.C. § 360bbb-3, which provides that an unapproved product authorized for emergency use only, such as masks, can only be used if:

**(i)** Appropriate conditions designed to ensure that health care professionals administering the product are informed—

**(I)** that the Secretary has authorized the emergency use of the product;

**(II)** of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and

**(III)** of the alternatives to the product that are available, and of their benefits and risks.

**(ii)** Appropriate conditions designed to ensure that **individuals to whom the product is administered are informed—**

**(I)** that the Secretary has authorized the emergency use of the product;

**(II)** of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

**(III)** of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

**(iii)** Appropriate conditions for the monitoring and reporting of adverse events associated with the emergency use of the product.

(emphasis added)

Note that the recipient of the product (the mask) must be informed of the option to refuse administration of the product.  An employer who fires an employee for refusing to wear a mask would therefore be firing an employee for asserting a right guaranteed under federal law.  Moreover, the health care professionals administering the product would be administering the

product in violation of federal law, and beyond the scope of the authorized use of the product. We therefore conclude that employers may not fire employees who refuse to wear a mask at this time.

3.       Q:       Can my employer subject me to special treatment, such as forcing me to work from home, or work in separate areas should I refuse to wear a mask.

         A:       This question has not been addressed by any court to date.  An employer taking actions of nature noted above would seem to be punishing an employee for asserting the federally protected right of refusing to wear an emergency device that has yet to be approved by the FDA. The employer subjecting a healthy person, exhibiting no signs of illness or contagion, differently than other employees simply because that person asserted the federally protected right to refuse to wear a mask could be seen as attempting to coerce that employee into wearing a mask against their will, a violation of the federal law quoted above.

4.       Q:       What should I do if my employer tries to force me to wear a mask?

         A:       You should provide your employer with the HFDF Employer Mask Notice, that can be downloaded HERE. If your employer continues to insist that you wear a mask, please contact us by email, and we will attempt to refer you to a lawyer in your area who has been educated on this issue who may be able to assist you.  We cannot guarantee that we will be able to assist every person who contacts us, but we will do our best to try to help you.

5.       Q:       My employer says that I am threatening the health of my co-workers because I refuse to wear a mask.  What should I do?

         A:       Your employer is incorrect that the masks have been authorized by the FDA on the basis that they prevent the transmission of a virus like COVID-19.  Here is a quote from the FDA's emergency use authorization for the use of masks by the general public:

         Authorized face masks must meet the following requirements:

         1. The product is labeled accurately to describe the product as a face mask and includes a list of the body contacting materials (which does not include any drugs or biologics);

         2. The product is labeled accurately so that it does not claim to be intended for use as a surgical mask or to provide liquid barrier protection;

         3. The product labeling includes recommendations against use in a clinical setting where the infection risk level through inhalation exposure is high;

         4. **The product is not labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction**;

         (emphasis added)

Thus, any statement by your employer that the mask is required to protect against microbes or viruses, or is required to prevent or reduce infection is contrary to the use authorization for masks.

Plaintiffs' Exhibit 507

# HEALTH FREEDOM

## D E F E N S E   F U N D

## NOTICE TO EMPLOYERS
### March 2, 2021

This serves as notice to all employers that any compulsory face mask requirement imposed upon an employee violates federal law.[1] Title 21, Section 360bbb-3 of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") vests the Secretary of Health and Human Services with the permissive authority to grant Emergency Use Authorizations ("EUAs"). However, the statute requires that:

**individuals to whom the product is administered are informed—**
**(I)** that the Secretary has authorized the emergency use of the product;
**(II)** of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
**(III)** **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

On April 24, 2020 the Food and Drug Administration ("FDA") issued an EUA letter to all "Manufacturers of Face Masks; Health Care Personnel; Hospital Purchasing Departments and Distributors; and Any Other Stakeholders," allowing manufacturers to produce cloth and non-surgical face masks to sell and distribute to the general public and health care practitioners, so long as, "[the] product is not labeled in such a manner that would misrepresent the product's intended use; for example, **the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction[.]**"

Thus, by the FDA's own admission, face masks such as those in common use by the public are not intended to protect the wearer or others from the COVID-19 virus, *as they do not prevent or reduce infection.*

Even if wearing a face mask were effective enough to protect the wearer and the general public from COVID-19, which they are not, the EUAs issued pursuant to FD&C Act's authority are extremely limited in legal scope and effect. Specifically, as long as EUAs pertaining to face masks remain in force and effect, any mandate requiring employees to wear face masks would conflict with Section 360bbb-3(e)(1)(A)(ii)(I-III), *which requires that the employee be informed of the option to refuse the wearing of such 'device.'*

We at the Health Freedom Defense Fund urge U.S. employers to comply with the FD&C Act, not misrepresent the use of a mask as being intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction, and advise all employees that they have the right to refuse to wear a mask as a measure to prevent or reduce infection from COVID-19.  Any other course of action is contrary to federal law.

---

[1] Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III).

Plaintiffs' Exhibit 508

icandecide.org

## ICAN RESPONDS TO THE DOJ'S INCORRECT CONCLUSION THAT AN EMERGENCY USE VACCINE CAN BE MANDATED

3-4 minutes

---

**Aug 05, 2021, 21:40ET**





**ICAN RESPONDS TO DOJ'S OPINION REGARDING VACCINE MANDATES DURING EMERGENCY USE AUTHORIZATION AND EXPLAINS WHY THE DOJ REACHED THE WRONG CONCLUSION**

Since the three COVID-19 vaccines were granted emergency use authorization (**EUA**) in the U.S., the question of whether employers, schools, and others can mandate the vaccines has been heavily debated.  At the crux of the debate is Section 564 of the Food, Drug, and Cosmetic Act (**FDCA**), codified at 21 U.S.C. § 360bbb-3 (**Section 564**), which provides "required conditions" for EUA products including that:

the Secretary … shall … establish … [a]ppropriate conditions designed to ensure that individuals to whom the product is administered are informed … of **the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

On July 26, 2021, an opinion written by the Acting Assistant Attorney General of the

Department of Justice ("**DOJ**") was released to the public.  The opinion was addressed to the Deputy Counsel to the President, part of an administration whose stated goal is to vaccinate as many Americans as possible, and concludes "that section 564 of the FDCA does not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs."

ICAN promptly and thoroughly responded in a letter to the DOJ. ICAN's attorneys explain in careful detail how this conclusion runs contrary to the text of Section 564, its statutory framework, the history surrounding its passage, and its consistent interpretation by the FDA, Centers for Disease Control and Prevention (**CDC**), the Department of Defense (**DOD**), and other federal agencies.  ICAN's response highlights the experimental nature of EUA products and the long settled legal precedent which establishes that it is not legal to coerce an individual to accept an experimental product.

It further provides the historical background and evidence that Congress' intent in enacting Section 564 was to provide only one limited exception to the option to accept or refuse EUA products – that exception applies only to military personnel and only when national security is at risk.  Federal agencies have also historically interpreted Section 564 as a prohibition on mandates of EUA products, and ICAN's letter highlights these interpretations from the CDC, FDA, DOD, and the U.S. General Services Administration.

ICAN also pointed out it would be illogical that Congress would require that individuals be informed of a freedom of choice if that choice is illusory at the whim of any public or private entity, and concluded its letter by urging the DOJ to revise its Slip Opinion and enforce Section 564 by making clear that it **prohibits** entities from requiring the use of an EUA product.

Read the full letter here and share it far and wide so that the correct interpretation of Section 564 and the fundamental right to be free from coercion with respect to unlicensed medical products ultimately prevails.

Plaintiffs' Exhibit 509

# Siri | Glimstad

NEW YORK  |  LOS ANGELES  |  MIAMI
PHOENIX  |  DETROIT  |  DENVER

200 Park Avenue, 17th Floor, New York, NY 10166
sirillp.com  |  P: (212) 532-1091  |  F: (646) 417-5967

August 4, 2021

**VIA EMAIL AND FEDERAL EXPRESS**

The Honorable Dawn Johnsen
Acting Assistant Attorney General
Office of Legal Counsel
United States Department of Justice
Washington, DC 20530
dawn.johnsen@usdoj.gov

> Re:   Slip Opinion: *Whether Section 564 of the FDCA Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization*

Dear Ms. Johnsen:

We write on behalf of our client, the Informed Consent Action Network, regarding your Slip Opinion to the Deputy Counsel to the President, titled "Whether Section 564 of the FDCA Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization," (the "**Slip Opinion**") released to the public on July 26, 2021.

Section 564 of the Food, Drug, and Cosmetic Act ("**FDCA**"), codified at 21 U.S.C. § 360bbb-3 ("**Section 564**"), permits the Food and Drug Administration ("**FDA**") to issue an emergency use authorization ("**EUA**") for a medical product prior to licensure by the FDA.  In your Slip Opinion, you conclude that Section 564 "does not prohibit public or private entities from imposing vaccination requirements, even when the only vaccines available are those authorized under EUAs."[1]  This conclusion runs contrary to the text of Section 564, its statutory framework, the history surrounding its passage and its consistent interpretation by the FDA, Centers for Disease Control and Prevention ("**CDC**"), the Department of Defense ("**DOD**"), and other federal agencies.  Our client strongly urges you to reconsider your interpretation and guidance regarding Section 564, revise your Slip Opinion, and enforce Section 564 by making clear that it prohibits entities from requiring the use of an EUA product.

**The Question Answered by Your Slip Opinion**

Your Slip Opinion states that the Deputy Counsel to the President asked "whether the 'option to accept or refuse' condition in section 564 prohibits entities from imposing …

---

[1] https://www.justice.gov/sites/default/files/opinions/attachments/2021/07/26/2021-07-06-mand-vax.pdf.

vaccination requirements while the only available vaccines for COVID-19 remain subject to EUAs."  The "option to accept or refuse" refers to one of the "[r]equired conditions" in Section 564 for each EUA product.  As provided in Section 564:

> the Secretary … shall … establish … [a]ppropriate conditions designed to ensure that individuals to whom the product is administered are informed … of **the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

Section 564, 21 U.S.C. § 360bbb-3(e)(1)(A) (emphasis added).  The Department of Justice ("**DOJ**") is the entity primarily tasked with enforcing Section 564.  *See* 21 U.S.C. § 337. Nevertheless, your Slip Opinion circumvents any enforcement of the foregoing required condition by concluding that the "language of section 564 specifies only that certain information be provided to potential vaccine recipients and does not prohibit entities from imposing vaccination requirements."[2]  As discussed below, this conclusion is incorrect.

**Entrenched Principle to Not Coerce Acceptance of Unlicensed Medical Products**

To be licensed, the FDA must find that a medical product is "safe for use and … effective in use."[3]  Until licensed, a medical product remains investigational, even after issuance of an EUA. As the National Institutes of Health ("**NIH**") explains with regard to a vaccine granted EUA: "The issuance of an EUA is different than an FDA approval (licensure) of a vaccine. A vaccine available under emergency use authorization is still considered investigational."[4]  And as the FDA explains, "an investigational drug can also be called an experimental drug" because these two terms are synonymous.[5]  For example, the EUA fact sheet for an intravenous drug to treat H1N1 granted EUA by the FDA explains that it is "an experimental drug."[6]  Similarly, after an EUA was granted

---

[2] *Id.*

[3] 21 U.S.C. § 355(b)(1)(A)(i) (an application for licensure requires "full reports of investigations which have been made to show that such drug is safe for use and whether such drug is effective in use").

[4] https://www.niaid.nih.gov/diseases-conditions/covid-19-vaccine-faq

[5] Until a medical product's Investigational New Drug Application is approved by the FDA, and hence licensed, it is considered experimental.  https://www.fda.gov/media/138490/download ("an investigational drug can also be called an experimental drug");  https://www.northwell.edu/coronavirus-covid-19/vaccine/frequently-asked-questions ("Vaccines that receive EUA are considered experimental until the FDA formally approves it.").

[6] https://web.archive.org/web/20100222172129/http://www.cdc.gov/h1n1flu/eua/pdf/patient_fact_sheet_peramivir_IV_23Oct2009.pdf.  Peer review studies found that using the term "experimental" in reference to an EUA medical product reduced their uptake and hence advised against informing the public that these products are still "experimental." *See*, *e.g.*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7893369/ ("A 2010 survey examining the acceptance of peramivir, approved as an EUA, found that use of the term 'experimental' on the fact sheet decreased willingness across the board. … FDA and the sponsor must … avoid language that stimulates negative responses (i.e., experimental)."); https://pubmed.ncbi.nlm.nih.gov/25882123/ ("In late 2009, peramivir was granted an EUA" and its "CDC fact sheet" stated it is an "experimental drug" but the study found that "the use of the term 'experimental', while necessary and accurate, presented real impediments for willingness" to take the EUA product.).

for the COVID-19 vaccine co-developed by the NIH and Moderna, it was described by the NIH as an "[e]xperimental coronavirus vaccine."[7]

Long settled legal precedent establishes that it is not legal to coerce an individual to accept an unlicensed, and hence experimental, medical product.  An individual must voluntarily agree, free from any undue influence, to accept same.  This principle was first codified long-ago by American jurists.[8]  It was then incorporated into the United States Code, the Code of Federal Regulations, and guidance from federal health agencies.  *See e.g.*, 21 U.S.C. § 360bbb-0a (Even for patients with a life-threatening condition, an unlicensed medical product cannot be coerced, rather Congress required obtaining the patient's "written informed consent.") 42 U.S.C. § 9501 (Same for mental health patients);[9] 45 C.F.R. § 46.116 (For an unlicensed medical product, the "Basic elements of informed consent" include that "participation is voluntary," "refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled" and that consent be obtained without "coercion or undue influence.");[10]  FDA *Information Sheet: Informed Consent* ("Coercion occurs when an overt threat of harm [such as expulsion from school or employment] is intentionally presented by one person to another in order to obtain compliance.")[11]

The principle that individuals should not be coerced to receive an unlicensed medical product is also codified in the law of at least 84 countries and is an accepted principle of international common law.  *See, e.g.*, *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 184 (2nd Cir. 2009) ("We have little trouble concluding that a norm forbidding nonconsensual human medical experimentation [which includes unlicensed medical products] is every bit as concrete – indeed even more so – than the norm prohibiting piracy.…  The Nuremberg Code, Article 7 of the ICCPR, the Declaration of Helsinki, the Convention on Human Rights and Biomedicine, the Universal Declaration on Bioethics and Human Rights, the 2001 Clinical Trial Directive, and the domestic laws of at least eighty-four States all uniformly and unmistakably prohibit medical experiments on human beings without their consent, thereby providing concrete content for the norm.").

In your Slip Opinion, you assert that expulsion from a job, school, and civil society are only "secondary consequences" which does not remove the "option to accept or refuse."  Not only does this argument defy common sense, but Section 564's history, statutory framework, and

---

[7] https://www.nih.gov/news-events/nih-research-matters/experimental-coronavirus-vaccine-highly-effective.

[8] "The Nuremberg Code is the most important document in the history of the ethics of medical research.  The Code was formulated 50 years ago, in August 1947 … by American judges … It served as a blueprint for today's principles that ensure the rights of subjects in medical research [which includes unlicensed medical products]."  https://www.nejm.org/doi/full/10.1056/NEJM199711133372006.  *See also* https://history.nih.gov/display/history/Nuremberg+Code, 313 BMJ 1448 (1996) ("The voluntary consent of the human subject is absolutely essential [for unlicensed medical interventions]. This means that the person … [is] able to exercise free power of choice, without the intervention of any element of … coercion.").

[9] *See also* 38 U.S.C. § 7331 (Same for veterans); 42 U.S.C § 300ff-61 ("in testing for HIV/AIDS, the applicant will test an individual only after the individual confirms that the decision of the individual with respect to undergoing such testing is voluntarily made").

[10] *See also* 21 C.F.R § 50.20 (sets forth conditions for obtaining informed consent for use of an unlicensed medical product and reiterating that consent should be free from "coercion or undue influence")

[11] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/informed-consent#coercion

implementation all reflect that "the option to accept or refuse" was intended to continue <mark>the longstanding principle that it is not permissible to coerce anyone to receive an unlicensed medical product.</mark>

## Section 564 Incorporates the Principle that Unlicensed Medical Products Cannot be Mandated

Section 564 was enacted after the United States experienced September 11, 2001, and subsequent acts of terror, including envelopes with anthrax being sent through the United States Postal Service.[12]  To create a legal route to distribute an unlicensed and therefore, experimental, medical product in the event of bioterrorism, or a similar emergency, and create a narrow exception to allow mandates of such a product to members of the military, Congress passed Section 564 (permitting an EUA) and 10 U.S.C. § 1107a ("**Section 1107a**") (permitting the President to waive "the option to accept or refuse" requirement in Section 564 for members of the military under limited circumstances of national security).

*i.    Congress' Intent When Passing Section 564*

There is no indication that Congress, in passing Section 564 and Section 1107a, intended to deviate from the long-standing principle and entrenched state, federal, and international principle that unlicensed medical products generally cannot be anything but completely voluntary. That this principle was carried forward when Congress included the words "the right to accept or refuse" in Section 564 is reinforced by the legislative discussions surrounding the passing of Section 564.  On July 16, 2003, in deliberating Section 564, Representative Hays said, without any objection, that:

> …<mark>any authority to actually use experimental drugs or medical devices in emergency situations has to be defined and wielded with nothing less than surgical precision. Prior informed consent in connection with the administration of experimental therapy is a basic human right, a right no one should be asked to surrender…</mark>[13]

Similarly, on <mark>May 19, 2004, Senator Kennedy said while deliberating regarding Section 564 that "[t]he authorization for the emergency use of unapproved products also includes strong provisions on informed consent for patients."</mark>[14]

---

[12] *See* https://wwwnc.cdc.gov/eid/article/13/7/06-1188_article  (detailing "the need for and genesis of the EUA, its requirements, its broad application to civilian and military populations, and its features of particular importance to physicians and public health officials.").

[13] https://www.congress.gov/congressional-record/2003/7/16/house-section/article/h6908-1.

[14] https://www.congress.gov/congressional-record/2004/05/19/senate-section/article/S5744-1.   This same Senator also reiterated that Section 564 "allows the FDA to authorize the emergency use of medicines under the tightly controlled conditions outlined in this legislation." *Id.* Those conditions are, of course, specifically outlined in Section 564. In a congressional hearing on Section 564 held a few months later, Representative Maloney added that "unapproved drugs and devices, whose risks and benefits are not fully tested, impose an unprecedented responsibility on the government. The FDA must be vigilant in protecting the public against unnecessary risks from these products. In part because of these concerns, the bill has been modified to require that health care providers and patients be informed that the products have not been approved and of their risks. … These conditions [in Section 564] are essential

ii.     *The Exception that Proves the Rule*

That Congress intended "the option to accept or refuse" as a prohibition on mandating an unlicensed medical product comes into sharp focus by the fact that Congress specifically carved out only one exception for when an individual would not have "the option to accept or refuse administration of the product."  Congress permitted required use of an EUA product when the President of the United States finds that providing an individual in the military with the option to accept or refuse the product would not be in the interests of national security.  As provided in Section 1107a:

> In the case of the administration of a product authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) of such Act and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

Thus, Congress so highly valued the right to individual choice that it allowed only a threat to national security to trump that right, and even then, only with regard to military personnel.  As your Slip Opinion admits, this is how members of Congress understood Section 564 and Section 1107a when they were enacted.  *See* Slip Opinion at 16-17.  It is also how the DOD understood these sections following their enactment, stating in DOD Instruction 6200.02 § E3.4, adopted February 27, 2008:

> In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients **are provided an option** to refuse administration of the product, the President may … waive **the option** to refuse … administration of the medical product to members of the armed forces.[15]

Your interpretation of Section 564 renders Section 1107a meaningless and nonsensical. If the military was permitted to create any consequences it deemed appropriate in the event an armed forces member refused an EUA vaccine, it would be unnecessary to create a separate statute and require a written presidential national security finding to remove a requirement that, in your words, "concerns only the provision of information[.]"

---

for the safe use of unapproved products, and they should be imposed in all cases, except in truly extraordinary circumstances."  https://www.congress.gov/congressional-record/2004/07/14/house-section/article/H5721-3

[15] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/620002p.pdf  (emphasis added).

### iii.     Consistent Agency Interpretation of Section 564

The FDA likewise viewed Section 564 as providing a substantive right to refuse when it explained the military exception:

> [A]s a general rule, persons **must be made aware of their right to refuse the product** (or to refuse it for their children or others without the capacity to consent) and of the potential consequences, if any, of this choice. An exception to this rule is that the president, as commander in chief, **can waive military personnel's right to refuse this product**. If the right is not specifically waived by the president for a particular product given under EUA, military personnel **have the same right to refuse as civilians**.[16]

The FDA thus makes clear that Section 564 provides a substantive right to refuse, and this right does not exist in the presence of a requirement that imposes negative consequences for refusing.

Similarly, the CDC's Advisory Committee on Immunization Practices ("**ACIP**") has interpreted Section 564 as a consent provision and not merely a requirement to inform. When responding to an inquiry regarding whether the COVID-19 vaccines can be required, the Executive Secretary of ACIP publicly stated that "under an EUA, vaccines are not allowed to be mandatory. Therefore, early in the vaccination phase individuals **will have to be consented** and **cannot be mandated to be vaccinated**."[17]   ACIP's Executive Secretary then reaffirmed to the FDA's Vaccine and Related Biological Products Advisory Committee that no organization, public or private – including hospitals – can mandate the EUA COVID-19 Vaccines:

> Organizations, such as hospitals, with licensed products do have [the] capability of asking their workers to get the vaccine. But in the setting of an EUA, patients and individuals will have **the right to refuse** the vaccine.[18]

Consistent with the foregoing, the U.S. General Services Administration's ("**GSA**") Safer Federal Workforce website, applicable to all federal employees and contractors, expressly provided that the EUA COVID-19 vaccines cannot be mandatory, stating:

> Employees should receive paid time off to be vaccinated and to deal with any side effects. At present, COVID-19 vaccination should generally not be a pre-condition for employees or contractors at executive departments and agencies … to work in-person in Federal buildings, on Federal lands, and in other settings as required by their job duties. Federal employees and contractors may voluntarily share

---

[16] Nightingale SL, Prasher JM, Simonson S. Emergency Use Authorization (EUA) to Enable Use of Needed Products in Civilian and Military Emergencies, United States. *Emerging Infectious Diseases*. 2007;13(7):1046. doi:10.3201/eid1307.061188 available at https://wwwnc.cdc.gov/eid/article/13/7/06-1188_article#r1 (emphasis added).

[17] https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf at 56 (emphasis added).

[18] https://www.fda.gov/media/143982/download at 156 (emphasis added).

> information about their vaccination status, but agencies should not require federal employees or contractors to disclose such information.[19]

The GSA only changed this interpretation *after* you released your Slip Opinion.

The foregoing consistent guidance from the FDA, CDC, DOD, and GSA all reflect the fact that federal agencies have long understood that an EUA product cannot be mandatory.

 *iv. Section 564 Prohibits Consequences Beyond Those Authorized by the Secretary*

In line with the foregoing, Congress provided in Section 564 that only the Secretary of the U.S. Department of Health and Human Services (the "**Secretary**") may provide consequences for refusing an EUA product. As provided in that section, "the Secretary … shall … establish … the consequences, if any, of refusing administration of the product." The FDA makes plain that "the option to accept or refuse" and the "consequences" for refusing an EUA product established by the Secretary cannot be modified or added to:

> … section 564 does provide EUA conditions to ensure that recipients are informed about the MCM [medical countermeasure] they receive under an EUA. For an unapproved product … the statute requires that FDA ensure that recipients are informed … [t]hat they have the option to accept or refuse the EUA product and of any consequences of refusing administration of the product. The President may under certain circumstances waive the option for members of the armed forces to accept or refuse administration of an EUA product…
>
> In an emergency, **it is critical that the conditions that are part of the EUA … be strictly followed, and that no additional conditions be imposed**.[20]

The authorized labeling (the "**Fact Sheets**") for each EUA COVID-19 vaccine includes a question and answer section that expressly asks the question: "What if I decide not to get the … COVID-19 vaccine?," and the response reflects that the Secretary chose to not provide any "consequences" for refusing these products when it states: "Should you decide to not receive it, it will not change your standard of medical care."[21] Consistent with Section 564, and as reflected in the FDA's guidance, the required conditions on the Fact Sheets for each EUA COVID-19 vaccine are to "be strictly followed" and "no additional conditions [may] be imposed." And the Secretary's

---

[19] https://web.archive.org/web/20210727233714/https://www.saferfederalworkforce.gov/faq/vaccinations/.

[20] https://www.fda.gov/media/97321/download (emphasis added).

[21] https://www.fda.gov/media/144414/download (Pfizer); https://www.fda.gov/media/144638/download (Moderna); https://www.fda.gov/media/146305/download (Janssen).

conditions for each EUA COVID-19 vaccine provide that there will not be any consequences for refusing this product.[22]

The interpretation of Section 564 that you apply in your Slip Opinion is therefore incorrect in stating that "[n]either the statutory conditions of authorization nor the Fact Sheet itself purports to restrict public or private entities from insisting upon vaccination in any context." The Slip Opinion runs directly counter to Section 564 and the FDA's guidance by permitting additional conditions on a person's refusal to receive an EUA product. For example, it would permit public or private entities to impose conditions such as a person's continued employment, or their right to receive certain benefits, on that person's acquiescence to receive an EUA product. These are obviously additional conditions beyond those established by the EUA for the COVID-19 vaccines, and as such, these conditions are not permitted. [23]

### v.   The Dictionary and Common Sense

Your Slip Opinion cites to the dictionary definition of "inform" but ignores the definition of the more important word "option" in Section 564 which the dictionary defines as "the power or right to choose; freedom of choice."[24] The Slip Opinion's interpretation of Section 564 would permit eliminating any real "freedom of choice." It is illogical that Congress would require that individuals be informed of a freedom of choice if that choice is illusory at the whim of any public or private entity.

If not clear on its face from Section 564, it is certainly made clear by the fact that Congress found it necessary to craft an exception to this freedom of choice for the military. If the "option to accept or refuse" were not a substantive right, there would be no need for the President to make a national security finding to require the military to receive an EUA product. The military exception was also unnecessary if Congress intended to permit any entity to impose its own "consequences" for refusing an EUA product.

### vi.   Putting it All Together

In sum, your reading of Section 564 as a requirement that an individual be informed that they have a "choice" while at the same time allowing the product to be mandated is illogical and contrary to the plain meaning, intent, and history of Section 564. There is no logical way to interpret Section 1107a other than as creating the only exception to the general rule in Section 564 that no one can be mandated to receive an EUA product except for the military in the event of a national security threat. Section 564 requires that this be an actual choice, which is incompatible

---

[22] *Id*. While the Secretary may include "consequences," consistent with the remainder of Section 564 and its statutory framework, those consequences cannot be coercive or unduly influence consent to an EUA product.

[23] The Slip Opinion focuses on the language "to the extent practicable given the applicable circumstances" to indicate the Secretary could potentially even eliminate the "required condition" of informing of "the option to accept or refuse." However, the "to the extent practicable" language plainly modifies the words "appropriate conditions" that the Secretary can impose, but those appropriate conditions must still "ensure that individuals to whom the product is administered are informed … of the option to accept or refuse."

[24] https://www.merriam-webster.com/dictionary/option.

with levying serious adverse consequences if someone refuses an EUA product, such as expulsion from school, employment, or the armed forces.

Your Slip Opinion did not meaningfully consider the foregoing in concluding that the "language of section 564 specifies only that certain information be provided to potential vaccine recipients and does not prohibit entities from imposing vaccination requirements."[25]

**Conclusion**

Rights exist to limit those in power.  Congress entrusts the DOJ with the duty to enforce the long-standing principal that no individual should be coerced or unduly influenced to accept an unlicensed medical product.  Whatever short term gain the Office of the President and the DOJ officials who authored the Slip Opinion believe will be achieved by casting aside this fundamental right pales in comparison to the harm likely to result from its elimination over the long arc of our great nation.[26]

We live in an unprecedented time, making it all the more important to hold tight to the principles that we have learned from history.  We respectfully request that the DOJ officials that drafted the Slip Opinion reconsider their interpretation and guidance regarding Section 564, that you revise the Slip Opinion to accord with the foregoing, and that the DOJ fulfill its duty by enforcing this provision which prohibits mandates of an EUA product, rather than casting this important and longstanding right aside.

Sincerely Yours,

Aaron Siri, Esq.
Elizabeth A. Brehm, Esq.
Caroline Tucker, Esq.
Allison Lucas, Esq.
Gabrielle Palmer, Esq.
Jessica Wallace, Esq.

cc: Danielle Conley, Deputy Counsel to the President

---

[25] https://www.justice.gov/sites/default/files/opinions/attachments/2021/07/26/2021-07-06-mand-vax.pdf.

[26] Most medical products have historically been given to a small segment of the population, and hence when an unexpected result occurs, only a small segment of the population is impacted.  Recent innovations have made it feasible and affordable to deploy drugs to large portions of the population.  Unexpected consequences from an EUA product can therefore have far wider implications.  This makes it even more important to hold fast to the longstanding principal that nobody should be coerced to take an unlicensed medical product.

Plaintiffs' Exhibit 510

troutman.com

# Liability Considerations for Manufacturers of Face Masks Intended for Source Control in the Age of COVID-19

8-10 minutes

In April, the Centers for Disease Control and Prevention ("CDC") began recommending that the public wear face masks as "source control" to limit the spread of COVID-19.[1] In response to this recommendation, the Food and Drug Administration ("FDA") extended its prior Emergency Use Authorization ("EUA") to cover face masks intended for use as source control. In May 2020, FDA again updated its guidance documents and defined face masks used for source control as medical devices subject to FDA regulation and requirements. To aid in increasing the availability of products intended to help curb the spread of COVID-19, the Department of Health and Human Services ("HHS") issued a declaration that provides potential manufacturers of countermeasures with immunity from liability in certain cases. Now that FDA has defined face masks used for source control as medical devices covered by its EUA, face mask manufacturers may be able to claim protection under these immunity provisions. FDA regulation and potential civil products liability still pose legal risks, and would-be manufacturers should understand the regulatory requirements, immunities, and protections surrounding face mask manufacturing before wading into this highly regulated industry.

**Manufacturing Guidance from FDA**

In response to the CDC's recommendations that members of the public use face masks to cover their noses and mouths, FDA issued a Letter of Authorization for the use of face masks (hereafter "Authorization Letter").[2] Under FDA's most recent guidance, all face masks intended for use as "source control" are considered medical devices.[3] In this context, source control "refers to the use of a face mask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19."[4] Simply put: manufacturers producing even simple cloth face coverings are now producing medical devices regulated by FDA and must therefore comply with certain regulatory requirements.[5]

Although this may sound daunting, FDA's Authorization Letter makes compliance very straightforward. First, manufacturers acting under the Authorization Letter may only produce masks intended for source control.[6] In other words, the Authorization Letter does not permit a manufacturer to produce a face mask intended for another medical purpose, like a surgical mask or respirator. Second, they must comply with the following labeling requirements:

1. The product is labeled accurately to describe the product as a face mask and includes a list of the body contacting materials (which does not include any drugs or biologics);

2. The product is labeled accurately so that it does not claim to be intended for use as a surgical mask or to provide liquid barrier protection;

3. The product labeling includes recommendations against use in a clinical setting where the infection risk level through inhalation exposure is high;

4. The product is not labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction;

5. The product is not labeled as a respiratory protective device, and therefore should not be used for particulate filtration; and

6. The product is not labeled for use in high risk aerosol generating procedures.[7]

Finally, they must comply with the Conditions of Authorization as detailed in the Authorization Letter.[8] The Conditions of Authorization reiterate the labeling requirements while also requiring the manufacturer to (1) take steps to ensure that the labeling information is available to the end user; (2) include instructions regarding the recommended cleaning of the materials; (3) implement a process to report adverse events; (4) maintain records related to the Emergency Use Authorization; (4) maintain records related to the production and distribution of the masks; and (5) comply with certain requirements for advertising and promoting the masks.[9] If a manufacturer complies with these requirements, they "do not need to take any action . . . to be authorized under th[e] [Emergency Use Authorization]."[10]

**Health and Human Services Liability Immunity**

A byproduct of FDA's designation of face masks as medical devices covered by FDA's Letter of Authorization is that face mask manufacturers now may qualify for liability immunity under a declaration by HHS.[11] Under this declaration, manufacturers of "Covered Countermeasures" are immune from liability for all claims "under Federal and State law . . . for loss caused by, arising out of, relating to, or resulting from the

==administration to or use by an individual of a covered countermeasure.==”[12] The only exception to this immunity is for "death or serious physical injury proximately caused by willful misconduct" on the part of the entity otherwise entitled to immunity.[13]

The term "Covered Countermeasure" includes, among other things,

a drug (as such term is defined in section 201(g)(1) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(g)(1)), biological product (as such term is defined by section 262(i) of this title), or ==device== (as such term is defined by section 201(h) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 321(h)) that is authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic Act . . . .[14]

==In this context, face masks for source control may qualify as "Covered Countermeasures" because FDA views face masks intended for this purpose as "devices"[15] and "authorized [them] for emergency use" in its Authorization Letter. Accordingly, face mask manufacturers may be able to take advantage of the broad liability immunity established by HHS's declaration.==

**Closing Thoughts**

Despite FDA's efforts to simplify regulatory compliance for face mask manufacturers, liability and regulatory risks remain. Those interested in producing face masks should seek guidance from an attorney experienced in FDA and regulatory compliance to ensure full compliance with FDA's requirements, as well as an attorney experienced in issues surrounding products liability to ensure that the immunity protections provided by HHS will apply to the manufacturer's actions in producing face masks.

---

[1] See CDC's recommendations here: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[2]See U.S. FOOD & DRUG ADMIN., FACE MASK LETTER OF AUTHORIZATION (April 24, 2020) (hereafter "AUTHORIZATION LETTER").

[3] MASK GUIDANCE, at 5 ("FDA pronounced that "[f]ace masks . . . are devices when they are intended for a medical purpose, such as prevention of infectious disease transmission (including uses related to COVID-19)."

[4]Id. at 4.

[5] Face masks not intended for a medical purpose are not considered medical devices. See MASK GUIDANCE, at 3-4. Accordingly, a manufacturer producing, for example, dust masks or masks intended for use in industrial applications, are not regulated by FDA's new face mask guidance. See id.

[6] AUTHORIZATION LETTER, at 3.

[7]*Id.* at 3-4.

[8]*Id.* at 5.

[9]*Id.* at 5-7.

[10]*Id.* at 4.

[11]*See* Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (March 17, 2020) (hereafter "Declaration").

[12] 42 U.S.C. §247d-6d(a)(1).

[13]*Id.* at § 247d-6d(d)(1).

[14]*Id. at* § 247d-6d(i)(1)(C) (footnote omitted).

[15] The term "device" is defined by the Food, Drug & Cosmetic Act as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals . . . ." 21 U.S.C. § 321(h)(2). As discussed above, FDA's Mask Guidance clearly states that face masks intended for source control are included in this definition. *See*, MASK GUIDANCE, at 5.

## Plaintiffs' Exhibit 511

americanlibrariesmagazine.org

# Are There Exceptions to Face-Mask Requirements? | American Libraries Magazine

*By Mary Minow |*

8-10 minutes



*Our online column Letters of the Law explores the wide range of legal issues that arise in libraries, with the help of a pair of leading authorities: Mary Minow, a librarian who became a lawyer, and Tomas A. Lipinski, a lawyer who became a librarian. Together they have authored four books on the subject, including The Library's Legal Answer Book (ALA Editions, 2003, with a new edition forthcoming in 2021), and led forums at American Library Association (ALA) conferences in collaboration with the Public Library Association (PLA).*

In this edition, Minow addresses legal issues that have arisen around the COVID-19 pandemic, including exceptions to face-mask requirements and *force majeure* clauses in contracts, as well as the legality of taking time off to vote.

**If a library has a policy requiring users to wear face masks, how do patrons with disabilities that directly conflict with mask-wearing use the library?**

As libraries navigate the complicated process of reopening while providing a safe environment within the confines of the law, they would do well to read Theresa Chmara's recommended guidelines, approved by ALA's Intellectual Freedom Committee, for common questions and concerns. (Chmara is general counsel of the Freedom to Read Foundation.)

First, know that there are fake exemption cards circulating on social media, some bearing the seal of the US Department of Justice (DOJ), claiming the holder has a disability that prevents them from wearing a mask. The cards say it's illegal for any business to ask bearers to disclose their condition. These cards are not issued or endorsed by DOJ. Read more about the phenomenon here.

The Centers for Disease Control and Prevention (CDC) states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask or cloth face covering. Other examples may include individuals with respiratory conditions such as asthma, chronic obstructive pulmonary disease, or cystic fibrosis. Additionally, people with post-traumatic stress disorder, severe anxiety, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask.

The Americans with Disabilities Act (ADA) does not specifically address face masks, but the Atlanta-based Southeast ADA Center and Burton Blatt Institute at Syracuse University offer a useful fact sheet on the topic. Under the ADA, a library must consider reasonable modifications —changing policies, practices, or procedures—for individuals with disabilities so they can participate in or benefit from library programs and services.

Reasonable modifications to mask requirements may include:

- allowing a person to wear a scarf, loose face covering, or full-face shield
- allowing curbside pickup or no-contact delivery in a timely manner
- offering phone or video appointments

There are three reasons a state or local government agency or private library may not have to provide a reasonable modification under the ADA:

- **Fundamental alteration.** A library may not have to provide a reasonable modification if the modification would change the nature of the service, program, activity, goods, services, or facilities. A fundamental alteration is a change to such a degree that the original program, service, or activity is no longer the same. An example would be a request for home delivery when the library does not already offer that service.

- **Undue burden,** such as a significant difficulty or expense. This could include a request to visit the library before or after its regular hours, as it would place an undue burden on limited staff.

- **Direct threat,** or a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. If an individual with a disability poses a direct threat despite reasonable accommodation, they are not protected by the ADA.

In order to limit a direct threat around COVID-19, state and local government agencies and businesses may:

- develop policies and procedures to promptly identify and isolate patrons with symptoms of COVID-19

- offer face masks to patrons (public libraries should include a free option)

- inform library users about symptoms of COVID-19

- limit in-person access to buildings as appropriate

For guidance on the decision-making process for reasonable accommodations, see discussion of two DOJ settlement agreements (one involving a YMCA, one involving the District of Columbia) from the Southeast ADA Center. For more on reasonable accommodation for employees, along with other pandemic-related employment issues, consult the Equal Employment Opportunity Commission's guidance.

**With everything going on in the world, why should I bother looking at provisions in old contracts the library has signed in the past?**

A boilerplate clause in most types of library contracts known as *force majeure* (French for "superior force") has suddenly become important amid the COVID-19 pandemic. Sometimes known as "acts of God" clauses, they refer to natural catastrophes and can allow one or both parties to get out of or change its obligations.

The clauses are not uniform, and whether they apply to the library or vendor and what they affect (payment, timing, nonperformance) depends entirely on their wording. I recommend looking at your library's most important contracts now rather than later because invoking *force majeure* generally requires timely notice.

Sample *force majeure* clauses and checklists abound (here's one good example). Especially useful with respect to electronic licenses are the samples given at the Liblicense project hosted by the Center for Research Libraries. Liblicense, a rich resource for libraries negotiating vendor contracts for many years, evaluates two sample *force majeure* clauses from a library's point of view, primarily making the point that libraries should ensure that the clause applies equally to the library as well as the vendor.

A court in Illinois recently excused a restaurant from paying 75% of its rent because the governor had ordered the restaurant to shut down most of its operations. A typical *force majeure* clause says that it does not excuse an obligation to pay money, but this particular one did not carve out monetary obligations. *Forbes* reports that although probably only a minority of clauses may allow a party to reduce rent, this shows how important it is to closely read even boilerplate language.

**A common reason people give for not voting is that they're too busy with work demands. May (or must) libraries give employees time off to vote?**

Illinois passed a law in June that expands early voting and vote by mail and also makes November 3, 2020, a legal holiday for public schools and state and local government offices. But what about other dates and other libraries?

The federal government has a longstanding policy of granting federal library employees a limited amount of administrative leave to vote in elections (read more here). And most state and local governments require employers to allow employees time off to vote, particularly when their working hours do not permit sufficient time to do so.

State laws vary widely in their details. Workplace Fairness and XpertHR offer state-by-state guides. Read your state law with an eye to see if it requires paid time, whether it requires notice by employees, whether employers may designate the hours off, and whether the employer can demand written proof of voting or penalize employees who take time off to vote.

Private library employers may set their own policies. Time to Vote is a current movement in the corporate world to encourage paid time off.

Even in states with no voting leave law, it is good practice to encourage voting by giving up-to-date information about early and absentee voting options.

*The information in this column does not constitute legal advice, nor does it necessarily reflect the views of ALA or PLA. It is meant to serve as a starting point for librarians and library lawyers who wish to research the law and consider its applications. Different jurisdictions will have different laws and may even apply the same laws differently. If you require legal advice or expert assistance, we urge you to seek the services of a competent legal professional.*

*Look for a new column by Lipinski this fall. Send questions or ideas to Associate Editor Sallyann Price at sprice@ala.org.*

Plaintiff's Exhibit 512

tulsaworld.com

# Do mask requirements violate civil rights? How can businesses accommodate the disabled? Get answers to these questions and more

*Kendrick Marshall Tulsa World*

7-8 minutes

---

Do mask requirements violate civil rights? How can businesses accommodate the disabled? Get answers to these questions and more

Get answers to questions about what the city's mask ordinance means for Tulsans.

**Disabilities or medical conditions that make mask wearing difficult**

Disabilities or medical conditions that make mask wearing difficult

- *In some situations, wearing a cloth face covering may exacerbate a physical or mental health condition, lead to a medical emergency, or introduce significant safety concerns, the Center for Disease Control explains.*

- *People who are deaf or hard of hearing — or those who care for or interact with a person who is hearing impaired—may be unable to wear cloth face coverings if they rely on lipreading to communicate.*

- *Some people, such as people with intellectual and developmental disabilities, mental health conditions or other sensory sensitivities, may have challenges wearing a cloth face covering.*

- *Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. People with respiratory disabilities should consult their own medical professional for advice about using face masks.*

- *Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety.*

- *A person who has cerebral palsy may have difficulty moving the small muscles in the hands, wrists, or fingers.*

- *A person who uses mouth control devices such as a sip and puff to operate a wheelchair or assistive technology, or uses their mouth or tongue to use assistive ventilators.*

*MIKE SIMONS/Tulsa World*

**Are individuals without disabilities exempt under ADA guidelines?**

Are individuals without disabilities exempt under ADA guidelines?

*According to the ADA, people without disabilities or medical conditions are not protected under the ADA. MIKE SIMONS/Tulsa World*

**Are mask mandates a violation of civil rights?**

Are mask mandates a violation of civil rights?

*While opinions vary on the validity of face covering requirements, Tulsa attorney Jim Milton, of the law firm Hall Estill, said the city can exercise its government powers to impose an ordinance.*

*"So far, the city of Tulsa meets the requirements of, 'Do they have the power?' and 'Is this a reasonable way to exercise that power?'" Milton said. "But what folks are really talking about is whether there's a prohibition to their rights, their constitutional rights in the Bill of Rights and otherwise in the constitution and prevent them from this particular exercise of power ..."*

*Milton, in familiarizing himself with similar mask ordinances across the country, said he's yet to come across language that would prevent any municipality from requiring masks be worn in public to protect the health and safety of citizens.*

*"You know I haven't studied the details of the rule that is being proposed (for Tulsa), but presumably there are exceptions," he said. "Presumably they (the city) are giving the proper amount of exception for people who have health conditions. Presumably they are not requiring me to wear a mask when I'm home alone and don't have anyone else around me.*

*When I go to the grocery store, or when I fill up my gas tank and I'm going to be in a reasonable proximity of another person, I don't have any constitutional right that would be violated by the simple act of me being asked to wear a mask."*

*The Under the U.S. Constitution's 10th Amendment and U.S. Supreme Court decisions over nearly 200 years, state governments have the primary authority to control the spread of dangerous diseases within their jurisdictions. The 10th Amendment, which gives states all powers not specifically given to the federal government, allows them the authority to take public health emergency actions, such as setting quarantines and business restrictions.*

*IAN MAULE/Tulsa World*

**Current Oklahoma jurisdictions with face covering ordinances**

Current Oklahoma jurisdictions with face covering ordinances

Plaintiffs' Exhibit 513

americanlibrariesmagazine.org

# Are There Exceptions to Face-Mask Requirements? | American Libraries Magazine

*By Mary Minow |*

8-10 minutes



 *Our online column Letters of the Law explores the wide range of legal issues that arise in libraries, with the help of a pair of leading authorities: Mary Minow, a librarian who became a lawyer, and Tomas A. Lipinski, a lawyer who became a librarian. Together they have authored four books on the subject, including The Library's Legal Answer Book (ALA Editions, 2003, with a new edition forthcoming in 2021), and led forums at American Library Association (ALA) conferences in collaboration with the Public Library Association (PLA).*

In this edition, Minow addresses legal issues that have arisen around the COVID-19 pandemic, including exceptions to face-mask requirements and *force majeure* clauses in contracts, as well as the legality of taking time off to vote.

**If a library has a policy requiring users to wear face masks, how do patrons with disabilities that directly conflict with mask-wearing use the library?**

As libraries navigate the complicated process of reopening while providing a safe environment within the confines of the law, they would do well to read Theresa Chmara's recommended guidelines, approved by ALA's Intellectual Freedom Committee, for common questions and concerns. (Chmara is general counsel of the Freedom to Read Foundation.)

First, know that there are fake exemption cards circulating on social media, some bearing the seal of the US Department of Justice (DOJ), claiming the holder has a disability that prevents them from wearing a mask. The cards say it's illegal for any business to ask bearers to disclose their condition. These cards are not issued or endorsed by DOJ. Read more about the phenomenon here.

The Centers for Disease Control and Prevention (CDC) states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask or cloth face covering. Other examples may include individuals with respiratory conditions such as asthma, chronic obstructive pulmonary disease, or cystic fibrosis. Additionally, people with post-traumatic stress disorder, severe anxiety, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask.

The Americans with Disabilities Act (ADA) does not specifically address face masks, but the Atlanta-based Southeast ADA Center and Burton Blatt Institute at Syracuse University offer a useful fact sheet on the topic. Under the ADA, a library must consider reasonable modifications—changing policies, practices, or procedures—for individuals with disabilities so they can participate in or benefit from library programs and services.

Reasonable modifications to mask requirements may include:

- allowing a person to wear a scarf, loose face covering, or full-face shield
- allowing curbside pickup or no-contact delivery in a timely manner
- offering phone or video appointments

There are three reasons a state or local government agency or private library may not have to provide a reasonable modification under the ADA:

- **Fundamental alteration.** A library may not have to provide a reasonable modification if the modification would change the nature of the service, program, activity, goods, services, or facilities. A fundamental alteration is a change to such a degree that the original program, service, or activity is no longer the same. An example would be a request for home delivery when the library does not already offer that service.

- **Undue burden,** such as a significant difficulty or expense. This could include a request to visit the library before or after its regular hours, as it would place an undue burden on limited staff.

- **Direct threat,** or a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. If an individual with a disability poses a direct threat despite reasonable accommodation, they are not protected by the ADA.

In order to limit a direct threat around COVID-19, state and local government agencies and businesses may:

- develop policies and procedures to promptly identify and isolate patrons with symptoms of COVID-19

- offer face masks to patrons (public libraries should include a free option)

- inform library users about symptoms of COVID-19

- limit in-person access to buildings as appropriate

For guidance on the decision-making process for reasonable accommodations, see discussion of two DOJ settlement agreements (one involving a YMCA, one involving the District of Columbia) from the Southeast ADA Center. For more on reasonable accommodation for employees, along with other pandemic-related employment issues, consult the Equal Employment Opportunity Commission's guidance.

**With everything going on in the world, why should I bother looking at provisions in old contracts the library has signed in the past?**

A boilerplate clause in most types of library contracts known as *force majeure* (French for "superior force") has suddenly become important amid the COVID-19 pandemic. Sometimes known as "acts of God" clauses, they refer to natural catastrophes and can allow one or both parties to get out of or change its obligations.

The clauses are not uniform, and whether they apply to the library or vendor and what they affect (payment, timing, nonperformance) depends entirely on their wording. I recommend looking at your library's most important contracts now rather than later because invoking *force majeure* generally requires timely notice.

Sample *force majeure* clauses and checklists abound (here's one good example). Especially useful with respect to electronic licenses are the samples given at the Liblicense project hosted by the Center for Research Libraries. Liblicense, a rich resource for libraries negotiating vendor contracts for many years, evaluates two sample *force majeure* clauses from a library's point of view, primarily making the point that libraries should ensure that the clause applies equally to the library as well as the vendor.

A court in Illinois recently excused a restaurant from paying 75% of its rent because the governor had ordered the restaurant to shut down most of its operations. A typical *force majeure* clause says that it does not excuse an obligation to pay money, but this particular one did not carve out monetary obligations. *Forbes* reports that although probably only a minority of clauses may allow a party to reduce rent, this shows how important it is to closely read even boilerplate language.

**A common reason people give for not voting is that they're too busy with work demands. May (or must) libraries give employees time off to vote?**

Illinois passed a law in June that expands early voting and vote by mail and also makes November 3, 2020, a legal holiday for public schools and state and local government offices. But what about other dates and other libraries?

The federal government has a longstanding policy of granting federal library employees a limited amount of administrative leave to vote in elections (read more here). And most state and local governments require employers to allow employees time off to vote, particularly when their working hours do not permit sufficient time to do so.

State laws vary widely in their details. Workplace Fairness and XpertHR offer state-by-state guides. Read your state law with an eye to see if it requires paid time, whether it requires notice by employees, whether employers may designate the hours off, and whether the employer can demand written proof of voting or penalize employees who take time off to vote.

Private library employers may set their own policies. Time to Vote is a current movement in the corporate world to encourage paid time off.

Even in states with no voting leave law, it is good practice to encourage voting by giving up-to-date information about early and absentee voting options.

*The information in this column does not constitute legal advice, nor does it necessarily reflect the views of ALA or PLA. It is meant to serve as a starting point for librarians and library lawyers who wish to research the law and consider its applications. Different jurisdictions will have different laws and may even apply the same laws differently. If you require legal advice or expert assistance, we urge you to seek the services of a competent legal professional.*

*Look for a new column by Lipinski this fall. Send questions or ideas to Associate Editor Sallyann Price at sprice@ala.org.*

Plaintiffs' Exhibit 514

wheelchairtravel.org

## The Government Has Leverage Over Airlines — Here's What They Should Do With It - Wheelchair Travel

*John Morris*

5-7 minutes

---

The CEO of American Airlines, Doug Parker, recently told CNBC that the coronavirus pandemic has been far worse for the airline industry than the 9/11 terrorist attacks. Demand has cratered and many carriers have cut capacity by more than 50% — but planes are still flying empty.

In the midst of this crisis which threatens the jobs of tens of thousands of employees, distressed airlines have turned to the federal government for financial assistance. Earlier this week, industry trade group Airlines for America asked for $50 billion in aid in the form of tax relief, grants and low-interest loans. At least half of that amount would not have to be repaid.

In recent years, when airline profits have been at an all-time high, carriers have spent nearly $45 billion on stock buybacks, rather than saving for a rainy day. Caught penniless and with their pants down, they want a government handout. Taxpayers will be forced to foot the bill.

Because the government holds all of the cards, it should take the following actions before handing over a single dollar.

### Introduce passenger protections like those found in EC 261/2004.

European Union regulation EC 261/2004 provides compensation to airline passengers in the event of denied boarding, lengthy delays or flight cancellations. The compensation amount varies based on the length of the delay and flight distance, but ranges from €250 to €600 — a substantial payout, and an incentive for carriers to provide service as advertised.

The United States does regulate compensation for passengers who have been denied boarding due to oversales, but there is no requirement to make passengers whole in the

event of missed meetings or events due to a lengthy delay or flight cancellation.

### Require accessible lavatories on all jet aircraft.

The Department of Transportation recently released a notice of proposed rulemaking or
NPRM concerning the accessibility of lavatories on single-aisle aircraft. The proposed
regulation would not require airlines to increase the size of lavatories on such aircraft,
meaning wheelchair users (and many able-bodied passengers of larger size) will still be
unable to use the toilet in the air.

Although the DOT does ultimately intend to require larger wheelchair accessible lavatories
through a future rulemaking, that is still years away and would not apply to existing aircraft
or any new aircraft delivered within the next 10 years. I propose that agreement to an
expanded accessible lavatory regulation be a condition of any financial assistance offered
to air carriers.

### Set minimum standard for seat pitch.

Economy class is becoming uncomfortably cramped as airlines are installing more seats
by reducing legroom. Some airlines offer as little as 28 inches of pitch — that's the
measurement from the same position on two seats, one behind the other.

Many passenger rights groups have raised the alarm about the speed of airplane
evacuations in an emergency with densified seating, and have called on Congress to take
action. With airlines stuck between a rock and a hard place in the current economic
climate, now is the time to set a minimum seat pitch standard for the benefit of all
passengers.

### Define accessibility requirements for business class seats.

As I wrote last month, airlines are restricting disabled passengers from business class
seats by prioritizing privacy features over accessibility. They are literally erecting walls
around seats which prevent safe, dignified and/or independent transfers from the onboard
aisle chair.

While many long-haul aircraft are grounded around the world, the DOT should require
dramatic accessibility improvements to recently installed seats that are largely
inaccessible to disabled flyers. An agreement between U.S. airlines and the DOT should
also be reached to draft a new rule that would better define requirements for accessible
seating in premium cabins.

### Add a private right of action to the Air Carrier Access Act.

At its annual meeting held last month, the American Bar Association voted to support a private right of action for airline passengers with disabilities.

When an airline violates the civil rights of a disabled passenger (outlined in the Air Carrier Access Act), that passenger cannot sue for damages or injunctive relief. The power of ACAA enforcement rests solely with the DOT, which rarely takes action.

Congress should attach a rider to any financial aid package for airlines, granting disabled air travelers the right to be heard in a court of law.

## Final Thoughts

When the stock market closed on Friday, the combined market capitalization of the three largest U.S. airlines was just over $24 billion — American at $4.42 billion, Delta at $13.67 billion and United at $6.07 billion.

Given that the U.S. airline industry has asked for financial assistance equal to more than twice the value of those three airlines, it would be a dereliction of duty and a betrayal of taxpayers if Congress did not extract substantial concessions in return. The ball is in their court; let's hope they don't turn it over to the big corporations.

*Featured image courtesy Philadelphia International Airport.*

Plaintiffs' Exhibit 515

southwestada.org

## DLRP May 2003 Legal E-Bulletin

13-16 minutes

---

### Punitive Damages under § 504 of the Rehabilitation Act and Title II of the ADA.

In *Barnes v. Gorman*1, the Supreme Court ruled that punitive damages were not an available remedy in a private cause of action under Title II of the Americans with Disabilities Act or § 504 of the Rehabilitation Act. This case helped clarify an issue that many lower courts had disagreed - - whether money damages were even available with the lack of specific guidance provided by Congress in legislating Title II and § 504.

The plaintiff, Jeffrey Gorman lacks voluntary control over the lower half of his body and uses a wheelchair. He must also wear a catheter attached to a urine bag around his waist since he doesn't have control over his bladder. Gorman was involved in an altercation at a Kansas City nightclub and was arrested. While waiting for a police van to take him to the station, Gorman was denied permission to empty his urine bag in a restroom. The van that arrived was not wheelchair accessible and over Gorman's objections, the police officer removed him from his wheelchair and strapped him to a bench in the van with the seatbelt tightened over his urine bag. Gorman later released his seatbelt because of the pressure placed on his urine bag, ultimately falling off the bench. His wheelchair was also damaged in the ride. Gorman continues to suffer serious medical problems related to this incident.

Title II of the ADA prohibits discrimination on the basis of disability by state and local governmental entities while § 504 of the Rehabilitation Act prohibits discrimination by recipients of federal funding. The Kansas City police department is a public entity that receives federal funding. By failing to follow appropriate policies for the proper arrest and transportation of people with disabilities, they had in effect discriminated against Gorman.

Gorman sued the police for violating Title II and § 504 and received a jury verdict of $1 million in compensatory damages and $1.2 million in punitive damages. The district court vacated the punitive damages, holding that they were unavailable under Title II and § 504 respectively. The Federal Court of Appeals for the Eighth Circuit reversed this decision, contending that punitive damages are a traditional remedy available to the courts, and

their availability should not be disturbed unless Congress declares they are not available.

Punitive damages are a traditional court-ordered remedy designed to punish the defendant through their pocketbook as opposed to compensatory damages, which help compensate the victim. Courts will usually only award punitive damages when there has been intentional wrongdoing, wanton and reckless misconduct, or some sort of outrageous behavior.

If one looks at the statute prescribing remedies available under Title II2 , it refers to the statute discussing remedies for § 504 of Rehabilitation Act3. If one then looks at the Rehab Act statute, it states that the remedies are the same as those under Title VI of the Civil Rights Act4, which prohibits racial discrimination in federally funded programs and activities. So the remedies under both Title II and § 504 are the same as those available under Title VI.

This maddeningly convoluted attempt to find out what remedies are indeed available does not end there. Title VI doesn't mention any remedies in a private cause of action. However, the Supreme Court had interpreted Title IX of the Education Amendments of 19725 consistent with Title VI and ruled that monetary damages were available in a private cause of action under Title IX in *Franklin v. Gwinnett County Public Schools*6 : "Absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." The Eighth Circuit had relied on Franklin and justified punitive damages as being "appropriate relief" for the courts to award under Title II. The Supreme Court stepped in and overruled.

Justice Scalia, in writing for a unanimous Supreme Court, noted that *Franklin* never defined the scope of "appropriate relief" available. Congress first passed Title VI and later the Rehabilitation Act under the Spending Clause of the United States Constitution. The Supreme Court likened legislation that utilizes the Spending Clause to a contract. Under the Spending Clause, Congress can place certain conditions upon granting federal funds. Under Title VI, the recipient agrees not to discriminate on the grounds of race by accepting the money. A similar analogy applies to § 504 with disability discrimination. When a recipient of federal funds discriminates, he is essentially breaking his agreement with Congress.

"A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." (citing *Franklin*)

So the proper scope of remedies available under Title VI is the traditional remedies available in a breach of contract. The Supreme Court reiterated that punitive damages, unlike compensatory damages or injunctions, are traditionally not available in a breach of

contract. Since compensatory damages by themselves can sometime exceed a recipient's level of federal funding, the Supreme Court reasoned that the recipient would never have accepted the money if they were to be additionally exposed to punitive liability. Therefore, punitive damages are not an available remedy under Title VI. Since both Title II and § 504's remedies derive from Title VI, punitive damages aren't available for Mr. Gorman either.

This decision exposes a tragic oversight by Congress when it fashioned Title II's remedial scheme after § 504's [remedial scheme] and ultimately Title VI's. Technically, as Justice Stevens noted in his concurring opinion, Title II, unlike Title VI and § 504 was not passed under the Spending Clause. Congress had passed the ADA using its power under the Fourteenth Amendment to enact legislation that enforces equal protection under the law. Public entities don't really have much of a choice when told not to discriminate under Title II, and this mandate is not conditioned on the receipt of federal funds. So the contract analogy would not have worked had Title II's remedies not been derived from § 504's. If Congress had intended punitive damages to be an available remedy under Title II, it could have explicitly legislated that as *Franklin* suggested rather than allow the courts to guess and possibly undermine their original intentions.

It is clear from the *Barnes* decision that punitive damages are not an available remedy under Title II and Section 504. The Supreme Court did not disturb Gorman's compensatory damage award.

Presumably, compensatory damages will remain an available remedy since compensatory damages are "traditionally available for a breach of contract." Two important obstacles still remain in obtaining compensatory damages. The first is that many courts require the showing of intentional discrimination before the award of such compensation. Many § 504 and Title II violations by state and local government are often due to ignorance and indifference to the obstacles that people with disabilities face in obtaining services and programs. The second obstacle in acquiring compensatory damages is the sovereign immunity issue. Courts are divided on whether state governments are even liable for money damages under Title II or Section 504 when sued by private individuals. A discussion on the contentious issue of sovereign immunity and its impact on civil rights legislation is outside the scope of this E-bulletin. The important thing to know is that only states have this immunity. Individuals can still recover compensation for local government violations of the ADA or Rehabilitation Act as long as such compensation is deemed "proper" by the courts.

---

1. 536 U.S. 181 (2002)
2. 42 U.S.C. § 12133
3. 29 U.S.C. § 794a(a)(2)



Plaintiffs' Exhibit 516

# Face-covering policy for passengers with disabilities travelling during a pandemic

## Introduction

- The requirement to wear face masks onboard aircraft can be imposed by government regulations, and/or by a carrier's contract of carriage.

- Some government regulations regarding accessibility in air travel do not prohibit air carriers from assessing whether a passenger is fit-to-fly. They provide grounds for requiring a medical clearance to support that assessment in situations where the person in question has a medical condition or communicable disease that threatens his or her safe transportation or the health of other passengers and the crew.

- Other government regulations regarding accessibility in air travel do not address communicable diseases, as this is a topic separate from disability[1].

- Recently, state regulators and airlines have expressed concerns over a possible increase in non-compliance from passengers with health regulations (including those on the wearing of face masks or equivalent face shields). Unfortunately, several member airlines have had to deal with incidents, some of which received high profile reporting in social media for passengers who have refused to wear a face covering.

- At the same time denied boarding and passenger bans have raised criticism on airlines' policies that restrict people with disabilities from accessing air transportation as a violation of anti-discrimination and disability rights regulations.

- This paper intends to clarify the position of IATA members on face-covering for passengers who have disabilities (or underlying medical conditions) that make them unable to wear face-coverings.

## IATA policy position

- IATA recognizes that face-covering for passengers, ground staff, and cabin crew is a critical part of a layered approach to biosafety to allow passengers to travel safely during a pandemic.

- Airlines should provide reasonable accommodation to passengers aligned with measures recommended by states' health authorities. Provision of such accommodation must be consistent with operational feasibility and without compromising the safety of fellow passengers. This will help to ensure that all passengers exercise their human rights and their fundamental freedoms in an equitable manner.

- The type of face-covering (non-medical or medical) should be selected based on the level of risk and the availability of such masks while taking into consideration the potential risks and disadvantages of wearing a specific mask type.

---

[1] This is the case for European regulation EC1107/2006 and for the Canadian Accessible Transportation for Persons with Disabilities Regulations (ATPDR).



- Best practices should be followed regarding when and how to wear, remove, replace, and dispose of masks and face coverings, as well as the adoption of hand hygiene after removal. It is recommended that the PPE of staff assisting passengers with disabilities be changed after each time assistance is provided to a passenger.

- A general practice, <mark>rules applied by a carrier as part of a contract of carriage should be clearly communicated in advance to passengers.</mark> Carriers should consider drawing special attention to a requirement to wear a face mask during booking, online check-in, and via other communication channels.

- <mark>Some passengers, such as those who cannot put on or remove face masks themselves, very young children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period -or at all.</mark>

- Airlines should consider this within their risk assessment process and identify whether additional questions are necessary at the pre-screening stage(s) and whether any exceptions in the acceptance of these passengers can be made within their policy. Exceptions should be made in consideration of the health authorities' recommendations and the risk level. Where exceptions are made, other passengers may need to be advised of the reasons and additional steps to mitigate the risks in order to reassure them and prevent discomfort between passengers.

- In the interests of all passengers' safety, a passenger whose medical condition may pose a "direct threat" to his or her safe transportation or to the health of other passengers and the crew may be asked to provide additional medical documentation (e.g. MEDIF2 ) to ensure that they are fit-to-fly.

- The phenomenon of fraudulent claims by passengers to obtain an exemption from the requirement to wear face masks has been drawn to IATA's attention and is of concern. Airlines should consult with their legal department on procedures for addressing the validity of exemption documentation under local government requirements.

- In the implementation of safety measures, care should be taken to follow all applicable laws, regulations, requirements, standards, and guidance issued by relevant sub-national, national, and international authorities. IATA position is not intended to supersede or contradict such requirements.

## SSRs codes on additional documentation checks and mask exemptions

- Airlines may develop their own policies around additional documentation requirements and wearing of masks

---

[2] The MEDIF is the name given to the forms used by airlines to manage passengers requiring special assistance and medical clearance. For additional guidance see the IATA medical manual  For example the U.S. Air Carrier Access Act regulations (14 CFR Part 382) define "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." In accordance with public health guidelines, this currently includes passengers whose symptoms, e.g., a fever, indicate that they may have COVID-19.
For additional guidance, see Air Carrier Access Act, part 382.19 and part 382.21 which address medical clearance for persons with disabilities and passengers with communicable diseases : https://www.ecfr.gov/cgi-bin/text-idx?node=pt14.4.382&rgn=div5



- New bilateral SSRs have been adopted for the collection and exchange of information regarding additional documentation checks and mask exemptions

- Where airlines wish to identify passengers that have been cleared to travel (e.g. where additional documentation s such as a valid test have been checked), new standards have been developed to allow airlines to capture this information and communicate this with third party ground handlers or internal airport teams. This standard is a new bilateral Special Service Request (SSR) ADOC (Additional Documentation)  which may be included within a passenger name record (PNR) at check-in, to be exchanged with ground handlers using existing industry standards, to be visible at time of boarding.

- Where airlines wish to identify passengers that have a valid exemption from wearing a face mask (such as a medical condition or a disability that prevents them to wear a face mask), a new standard has also been developed to allow airlines to capture this information and communicate this with third party ground handlers, cabin-crew, partner carriers or internal airport teams. This standard is a new bilateral Special Service Request (SSR) NMOK (No Mask OK) which may be included within a passenger name records (PNR) at check-in, to be exchanged with ground handlers using existing industry standards, to be visible at time of boarding.

- Both SSRs have been developed and adopted by IATA member airlines and will take effect from 1 June 2021 (subject to government filing).

- Regulation is changing rapidly.   For up to date information on current requirements, member airlines should refer to the IATA Travel Centre at travelcentre.iata.org

Plaintiffs' Exhibit 517

Doc 9984



# Manual on Access to Air Transport by Persons with Disabilities

Approved by the Secretary General
and published under his authority

First Edition — 2013

**International Civil Aviation Organization**

Published in separate English, Arabic, Chinese, French, Russian and Spanish editions by the
INTERNATIONAL CIVIL AVIATION ORGANIZATION
999 University Street, Montréal, Quebec, Canada H3C 5H7

For ordering information and for a complete listing of sales agents and booksellers, please go to the ICAO website at www.icao.int

Doc 9984, *Manual on Access to Air Transport by Persons with Disabilities*
Order Number: 9984
ISBN 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-193-2

© ICAO 2013

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, without prior permission in writing from the International Civil Aviation Organization.

# TABLE OF CONTENTS

*Page*

Foreword ............................................................................................................................ (ix)

Acronyms and abbreviations ............................................................................................ (xi)

Definitions ......................................................................................................................... (xiii)

**Chapter 1.   General issues** .......................................................................................... **1-1**

    Accessible air travel ..................................................................................................... 1-1
    Consultations with organizations representing persons with disabilities.................... 1-1
    Seamless service ......................................................................................................... 1-1
    No refusal of carriage except for safety reasons ........................................................ 1-1
    No charges for assistance ............................................................................................ 1-2
    Service level targets .................................................................................................... 1-2
    Allocation of responsibilities ........................................................................................ 1-2

**Chapter 2.   Training** ..................................................................................................... **2-1**

    General principles ........................................................................................................ 2-1
    Who should be trained? ................................................................................................ 2-1
    Scope and content of training programmes.................................................................. 2-1
    Initial training ................................................................................................................ 2-3
    Refresher training ......................................................................................................... 2-3

**Chapter 3.   Pre-journey** ................................................................................................ **3-1**

    Communication of information on services and facilities .............................................. 3-1
    Reservation assistance ................................................................................................ 3-2
    Advance notice ............................................................................................................. 3-2
    Self-identification .......................................................................................................... 3-3
    Travelling with an assistant .......................................................................................... 3-3
    Seat reservations — general ........................................................................................ 3-3
    Seat reservations for persons travelling with service animals ..................................... 3-4
    Transmission of reservation confirmation..................................................................... 3-4

**Chapter 4.   Arrival and moving through an airport**..................................................... **4-1**

    Timely service ............................................................................................................... 4-1
    Use of facilities ............................................................................................................. 4-1
    Information desks .......................................................................................................... 4-1
    Check-in services .......................................................................................................... 4-1
    Availability of wheelchairs ............................................................................................ 4-1
    Baggage assistance ..................................................................................................... 4-2
    Seating .......................................................................................................................... 4-2

Leaving persons with disabilities unattended ........................................................................ 4-2
Review of processes ........................................................................................................... 4-2

**Chapter 5.   Airport facilities** ................................................................................................. **5-1**

Consultations in planning stages........................................................................................ 5-1
Accessible routes and passageways................................................................................... 5-1
Wayfinding........................................................................................................................... 5-2
Signage ............................................................................................................................... 5-2
Automated kiosks ................................................................................................................ 5-2
Accessible communications systems .................................................................................. 5-2
Public announcements ........................................................................................................ 5-3
Arrival and departure monitors ........................................................................................... 5-3
Seating areas ...................................................................................................................... 5-3
Relieving areas for service animals .................................................................................... 5-4
Maintenance of accessible features and equipment ........................................................... 5-4

**Chapter 6.   Security screening and border checks** ......................................................... **6-1**

Maintaining dignity.............................................................................................................. 6-1
Security screening options .................................................................................................. 6-1
Passes for non-travelling companions ................................................................................ 6-1

**Chapter 7.   Boarding and disembarking an aircraft** ........................................................ **7-1**

Assistance with boarding and disembarking ....................................................................... 7-1
Lifts and ramps ................................................................................................................... 7-2
Transfer of mobility aids ..................................................................................................... 7-2

**Chapter 8.   Aircraft operators' services on board** ........................................................... **8-1**

Carriage of mobility aids and assistive devices .................................................................. 8-1
Signage on board ................................................................................................................ 8-1
Seat allocation .................................................................................................................... 8-1
Service animals ................................................................................................................... 8-2
Communication of safety briefings and information on equipment features ......................... 8-3
On-board wheelchairs ......................................................................................................... 8-3
Periodic enquiries ............................................................................................................... 8-3
Moving through the cabin .................................................................................................... 8-4
Services **not** required of operators ..................................................................................... 8-4

**Chapter 9.   Aircraft** ............................................................................................................... **9-1**

Accessible aircraft features ................................................................................................. 9-1
Accessible washrooms ........................................................................................................ 9-2
Stowage space for mobility aids ......................................................................................... 9-3

**Chapter 10.   Connections and leaving an airport** ............................................................. **10-1**

Loss or delay of or damage to mobility aids ....................................................................... 10-1
Baggage retrieval ............................................................................................................... 10-1

**Chapter 11.   Ground transportation** ...... **11-1**

Availability of accessible ground transportation ...... 11-1
Information on and reservations for accessible ground transportation ...... 11-1
Ground transportation within an airport ...... 11-1
No extra charges ...... 11-1
Accessible ground transportation to remote aircraft stands ...... 11-1
Accessible transportation between airports ...... 11-2
Signage ...... 11-2
Adapted rental vehicles or equivalent service ...... 11-2

**Chapter 12.   Complaints** ...... **12-1**

**Chapter 13.   Monitoring and enforcement of compliance** ...... **13-1**

# FOREWORD

Persons with disabilities make up a significant and growing percentage of the world's population and constitute the world's largest minority. The World Health Organization (WHO) reports that this number is increasing through population growth, medical advances and the ageing process.

Aviation, like all other transport modes, needs to recognise and accommodate this growing passenger segment. Persons with disabilities have the same international rights as other citizens, such as accessibility, and full and effective participation and inclusion in society, including freedom of movement and freedom of choice (United Nations *Convention on the Rights of Persons with Disabilities*, articles 3.c and 3.f). Persons with disabilities should have equivalent access to air travel.

These international rights apply to air travel as to all areas of life. There have been many changes in the provision of accessible facilities and services to persons with disabilities in air transportation worldwide, and this trend requires renewed attention at an international level.

In keeping with the general obligations of States under the *Convention on the Rights of Persons with Disabilities*, to promote universal design, to provide accessible information, and to promote the training of professionals and staff working with persons with disabilities (article 4, paragraph 1, f, h, and i), this manual provides general guidance on services and features needed to meet the needs of persons with disabilities in air transportation. The guidance material in this manual was created by the Facilitation Panel's Working Group on Persons with Disabilities for the purpose of elaborating on the relevant Standards and Recommended Practices in Annex 9 — *Facilitation* and assisting the civil aviation community in their implementation.

This manual should be read in conjunction with other key documents in this field, which provide more detailed guidance, and the legal frameworks which apply to various jurisdictions.

———————————

# DEFINITIONS

***Person with disabilities***. <mark>Any person whose mobility is reduced due to a physical incapacity</mark> (sensory or locomotor), an intellectual deficiency, age, illness <mark>or any other cause of disability when using transport and whose situation needs special attention and the adaptation to the person's needs of the services made available to all passengers.</mark>

***Aircraft operator***. A person, organization or enterprise engaged in or offering to engage in an aircraft operation. For the purposes of this manual, the term also includes operators operating under code sharing and wet-leasing arrangements.

***Service animals***. Animals, normally being dogs or other animals, specified in national regulations, for the purpose of accompanying persons with disabilities with the objective of providing them with physical or/and emotional support, being under the control of the person with disabilities and provided that their presence on board an aircraft:

a)   does not endanger the safety of flight operations;

b)   is not reasonably considered as a threat to other passengers; and

c)   does not cause health concerns related to hygiene.

Member States should encourage aircraft and airport operators and travel agents to use common definitions for different categories of persons with disabilities. Such entities should follow the standard system of classification and codification developed by the International Air Transport Association (IATA) for this purpose, as amended from time to time.

———————————

# Chapter 1

# GENERAL ISSUES

### ACCESSIBLE AIR TRAVEL

1.1      All procedures forming part of an air travel journey, including reservations, check-in, immigration and customs, security clearances, transfers within airports, embarkation and disembarkation, departure, carriage and arrival should be adapted to the needs of persons with disabilities in order to facilitate the clearance and air transportation of such persons in a dignified manner.

1.2      In some instances, the aircraft operator with whom the passenger enters into a contract of carriage may be a separate entity from the actual aircraft operator. Aircraft operators should ensure, as far as possible, that the services that they provide to persons with disabilities are also provided by the operator that operates their flights.

### CONSULTATIONS WITH ORGANIZATIONS REPRESENTING PERSONS WITH DISABILITIES

1.3      Airport and aircraft operators should consult with organizations that represent persons with disabilities when developing services and training programmes and when designing facilities and equipment to ensure that persons with disabilities have equal access to air transportation. Airport and aircraft operators should consider involving organizations that represent persons with disabilities in evaluating services, training programmes, facilities and equipment.

### SEAMLESS SERVICE

1.4      The service provided at the request of persons with disabilities should be professional and "seamless", that is, with no points at which such persons may be left stranded or without assistance.

1.5      Seamless is a concept that includes a comfortable, safe and uninterrupted journey, with the provision of assistance that is adapted to the needs of each individual person with disabilities.

### NO REFUSAL OF CARRIAGE EXCEPT FOR SAFETY REASONS

1.6      Aircraft operators should not refuse to transport persons with disabilities on the basis of their disabilities except for safety requirements.

**NO CHARGE FOR ASSISTANCE**

1.7        Assistance to meet disability-related needs should be provided without charge to persons with disabilities.


**SERVICE LEVEL TARGETS**

1.8        This manual presents the minimum recommended service level targets that Member States should meet, and urges them to exceed these service level targets wherever possible.

1.8.1       Recommended service level targets should be set for each request for assistance. These should be mutually agreed on by airport and aircraft operators, as well as by all other stakeholders. Organizations representing persons with disabilities should be consulted in the development of these service level targets which should be included in contractual arrangements.


**ALLOCATION OF RESPONSIBILITIES**

1.9        Some States' legislation and regulations assign responsibilities for providing accessible services at airports to airport operators, while others assign them to aircraft operators. Further references in the manual to airport and aircraft operators should be read in that context.


_____

Plaintiffs' Exhibit 518

wheelchairtravel.org

# List of Disabilities that Could Make Wearing a Mask Impossible - Wheelchair Travel

*John Morris*

6-7 minutes

---

Many states, cities and businesses are requiring the use of face masks in public spaces due to the COVID-19 pandemic. Everyone who can reasonably wear a face mask should do so, if not for their own protection, then at least for the protection of others. As countless medical and health professionals have said, there is no good argument against face mask use, except for certain people with disabilities for whom a face mask could cause further harm.

Numerous stories have documented nondisabled people using the ADA as a way to get an exemption from mandatory face mask policies. These impostors have made things much more difficult for disabled people who cannot wear masks, as the public assumes that they too are taking advantage of the law. Social media posters often use the refrain, "If I can jog with a mask in the summer heat, you can wear one in a grocery store," or something of the like. That anecdote is worthless, of course, but many still find the argument compelling.

The Centers for Disease Control has issued guidance stating that face coverings should not be worn by "anyone who has trouble breathing" or "anyone who is unconscious, incapacitated, or otherwise unable to remove the cloth face covering without assistance."

We know that many disabilities can cause breathing difficulty, or limit one's physical function to the point where they cannot attach or remove a face mask. Since the CDC guidance provides little specificity, nondisabled members of the community have little context for who might require an exemption to the face mask rule. Fortunately, the Southeast ADA Center, together with Syracuse University, has released a disability issues brief entitled The ADA and Face Mask Policies. That brief contains the following examples of persons who might not be able to wear a face mask:

- Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing. The CDC also states that anyone who has trouble breathing should not wear a face mask.

- People with post-traumatic stress disorder (PTSD), severe anxiety, or claustrophobia (an abnormal fear of being in enclosed or narrow places), may feel afraid or terrified when wearing a face mask. These individuals may not be able to stay calm or function when wearing a face mask.

- Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety.

- A person who has cerebral palsy may have difficulty moving the small muscles in the hands, wrists, or fingers. Due to their limited mobility,  they may not be able to tie the strings or put the elastic loops

of a face mask over the ears. This means that the individual may not be able to put on or remove a face mask without assistance.

- A person who uses mouth control devices such as a sip and puff to operate a wheelchair or assistive technology, or uses their mouth or tongue to use assistive ventilators will be unable to wear a mask.

This list, of course, is not exhaustive. But it is useful for government officials and business owners to understand the sizable population who would find it difficult or impossible to comply with mask mandates, and who would be eligible for a reasonable accommodation.

There is some debate over whether people with a legitimate reason not to wear a mask should be permitted to move about as normal, such as into a grocery store or other public accommodation. Both Title II and Title III of the ADA include a "Direct Threat" clause which states that the ADA "does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others."

Some would argue that, given the persistence of COVID-19 transmission through asymptomatic carriers, every person not wearing a mask is a "direct threat" to the health of others. Of course, in choosing whether to deny service to a customer under this clause, an entity must "make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur…"

That last point, about the need to assess of the probability that the injury will actually occur, raises an important question. With fewer than 1% of Americans having a confirmed, active case of the coronavirus, what is the probability that the lone disabled person not wearing a mask actually poses a direct threat? That is ultimately a question for the courts to answer, but it is worthy of consideration by those who are asked to grant an exemption or an accommodation to a disabled customer.

I have written this article for information purposes only, and not with any particular agenda in mind. It is worth noting that I am able to (and do) wear a mask on the rare occasion that I leave my home, a practice that we should all follow. That said, people who have a legitimate reason not to wear a mask should not face undue barriers in accessing public accommodations as a result of their circumstance. Let's all be safe – and sensible, together.



Follow along as I travel the world with one hand, a passport and my power wheelchair!

Plaintiffs' Exhibit 519

ncd.gov

## National Council on Disability Topical Overviews - Access to Transportation by People with Disabilities Illustrations of Implementation from the United States - Quick Reference

6-7 minutes

Access to Transportation by People with Disabilities
Illustrations of Implementation from the United States – Quick Reference

National Council on Disability
1331 F Street, NW, Suite 850
Washington, DC 20004
202-272-2004 Voice
202-272-2074 TTY
202-272-2022 Fax

Lex Frieden, Chairperson
Publication date: August 2, 2005

This paper provides examples of the implementation of U.S. disability laws pertaining to accessible transportation. A more detailed description is provided in the attached policy paper.

Legislation
Under the Americans with Disabilities Act (ADA), individuals cannot be denied transportation services because of a disability. The Air Carrier Access Act (ACAA) is a separate statute specifically for air travel, but provides the same nondiscrimination requirement. In promulgating these statutes, federal agencies were mindful of several types of existing barriers and addressed these issues when crafting regulations, which apply to all public entities, and those private entities whose primary business is transporting individuals.

• Physical Barriers
Federal law and regulations require modifications which include providing alternative transportation systems (paratransit) to individuals with disabilities; installing wheelchair

lifts and securement devices on buses and ensuring that these lifts and devices are properly maintained; providing accessible rest stops, stations, and airport facilities (including restrooms, elevators, and station platforms); assisting in boarding passengers with disabilities when needed; allowing service animals to accompany individuals with disabilities in facilities and vehicles; ensuring accessible public rights-of-way (including curb cuts and ramps on sidewalks); and making any other reasonable modifications to policies or practices in order to comply with the ADA or ACAA. One example of a modification in a policy or practice is allowing passengers with disabilities to give their bus fare directly to the bus driver rather than to place the coinage in the fare machine.

• Informational Barriers
Federal regulations also require accessible travel information. These modifications include announcing bus stop and transfer points on buses and providing signage that can be easily understood by individuals with sensory or developmental disabilities.

• Attitudinal Barriers
The Department of Transportation (DOT) regulations also require proper training of transit employees, which includes treating passengers with disabilities in a respectful and courteous manner, while also recognizing the differences in types of disabilities.

DOT awards grants annually for new local programs and initiatives that improve accessible transportation. In addition, DOT, along with the Department of Justice (DOJ), has implemented several safeguards to help ensure that individuals are not discriminated against because of a disability.

• Technical Assistance
DOT and DOJ offer technical assistance to help the transportation industry, the disability community, and other individuals or entities that have rights and responsibilities under the ADA and ACAA provisions better understand the law. Technical assistance is offered through a variety of methods, including the dissemination of literature and several websites that provide guidance on the implementation of the statutes.

• Compliance Monitoring
DOT will periodically review ADA and ACAA compliance reports, which must be furnished by entities receiving federal transportation funding. Reports usually contain the background of the entity's transportation system, findings and observations of ADA compliance, and recommendations. Along with the report, entities are required to keep all complaints on file.

• Enforcement
Upon receiving a complaint against a public entity for an ADA violation, DOT will investigate the complaint, attempt conciliation, and if necessary, take action against the entity, including making cuts in financial assistance. DOT can only enforce complaints

against public entities for ADA violations involving transportation; complaints against private entities are under the jurisdiction of DOJ. <mark>Individuals who have experienced discrimination can also pursue an ADA claim through the courts.</mark> Under the ACAA, air carriers are required to implement their own grievance process; however, violations of the ACAA can result in enforcement action by DOT. For many years most courts recognized an implied private right of action to enforce the ACAA, but in the last few years the courts have moved to prohibit hearing these claims.

Other Initiatives

President George W. Bush has established the Federal Interagency Coordinating Council on Access and Mobility, a collaboration between various federal agencies. The Council has launched a "United We Ride" initiative, providing resources to promote governmental and non-governmental collaboration in the provision of improved transportation for individuals with disabilities. One resource under the initiative is a "Framework for Action" self-assessment tool, to assist states and local communities in identifying areas for improvement in transportation.

Several agencies and the disability community have engaged in informal collaboration to eliminate barriers for people with disabilities in the context of airport security screening. The collaboration has led to the development of guidelines and training programs to increase awareness of disability issues among security staff and ensure the rights of travelers with disabilities and their traveling companions during security screenings.

The U.S. Department of Agriculture (USDA) and DOT have collaborated to improve access to transportation by people with disabilities in rural areas. The USDA, for example, offers direct and guaranteed loans and grants to facilitate the development of public transportation facilities serving rural populations, where an estimated 40 percent of Americans with disabilities have no public transportation available to them.

Plaintiffs' Exhibit 520

ncd.gov

# Enforcing the Civil Rights of Air Travelers with Disabilities: Recommendations for the Department of Transportation and Congress

264-336 minutes

---

February 26, 1999

This report is also available in braille and large print, on diskette and audiocassette, and on the Internet at the National Council on Disability's award-winning website (www.ncd.gov).

The views contained in this report do not necessarily represent those of the administration, as this document has not been subjected to the A-19 Executive Branch review process.

---

LETTER OF TRANSMITTAL

February 26, 1999

The President
The White House
Washington, D.C. 20500

Dear Mr. President:

On behalf of the National Council on Disability (NCD), I am pleased to submit a report entitled *Enforcing the Civil Rights of Air Travelers with Disabilities: Recommendations for the Department of Transportation and Congress.*

This report is the first in a series on enforcement of federal laws protecting the civil rights of children and adults with disabilities. Title IV of the Rehabilitation Act requires NCD to gather information about the implementation, effectiveness, and impact of the Americans with Disabilities Act (ADA), among other duties. NCD was encouraged to monitor and evaluate federal enforcement efforts of ADA and other civil rights laws when we convened a diverse group of more than 300 leaders from the disability community for a policy summit in 1996. In response, we initiated the Disability Civil Rights Monitoring Project. In addition to this study of enforcement of the Air Carrier Access Act (ACAA), NCD will in the

coming months issue reports evaluating enforcement of the Americans with Disabilities Act, the Fair Housing Act, and the Individuals with Disabilities Education Act.

As you know, air travel is an essential component of many jobs in the global economy. For people with disabilities to be part of that economy, participate in the world community, and compete effectively for jobs requiring air travel, air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope.

NCD stands ready to work with you and stakeholders outside the government to address the problems identified in this report and to advance the civil rights of all Americans with disabilities and their families.

Sincerely,

Marca Bristo
Chairperson

(This same letter of transmittal was sent to the President Pro Tempore of the U.S. Senate and the Speaker of the House of Representatives.)

---

## NATIONAL COUNCIL ON DISABILITY
## MEMBERS AND STAFF

Members

Marca Bristo, Chairperson

Kate Pew Wolters, First Vice Chairperson

Hughey Walker, Second Vice Chairperson

Yerker Andersson, Ph.D.

Dave N. Brown

John D. Kemp

Audrey McCrimon

Gina McDonald

Bonnie O'Day, Ph.D.

Lilliam Rangel-Diaz

Debra Robinson

Shirley W. Ryan

Michael B. Unhjem

Rae E. Unzicker

Ela Yazzie-King

Staff

Ethel D. Briggs, Executive Director

Andrew J. Imparato, General Counsel and Director of Policy

Mark S. Quigley, Public Affairs Specialist

Jamal Mazrui, Program Specialist

Kathleen A. Blank, Attorney/Program Specialist

Lois T. Keck, Research Specialist

Janice Mack, Administrative Officer

Brenda Bratton, Executive Secretary

Stacey S. Brown, Staff Assistant

---

PREFACE

This report on federal enforcement of the Air Carrier Access Act (ACAA) is the first in a series on enforcement of federal laws protecting the civil rights of children and adults with disabilities. When the National Council on Disability (NCD) brought together a diverse group of disability community leaders from around the country in 1996, one of the strongest themes to emerge from three days of policy development in 11 different areas was the need for stronger and more consistent enforcement of federal civil rights laws for people with disabilities. In fact, the first overarching recommendation from the summit was that existing civil rights laws should be more vigorously enforced. In its role as an independent federal agency, NCD was encouraged by disability community leaders to monitor and evaluate federal enforcement efforts. Moreover, NCD is required by Title IV of the Rehabilitation Act to gather information on the implementation, effectiveness and impact of the Americans with Disabilities Act (ADA).

After NCD published the recommendations that emerged from the 1996 Disability Policy Summit in *Achieving Independence*, it began to study four key civil rights statutes for people with disabilities as part of the Disability Civil Rights Monitoring Project. The statutes selected were ACAA, Part B of the Individuals with Disabilities Education Act (IDEA), ADA, and the Fair Housing Act. This report is the first in a series of four that will evaluate the effectiveness of federal enforcement of disability civil rights laws.

Next year, the United States will celebrate the 10th anniversary of the passage of ADA and the 25th anniversary of the passage of IDEA. These milestones present an opportunity to retool and reinvigorate federal enforcement of disability civil rights laws so that more Americans with disabilities and their families can enjoy equal access to the American dream. Too many children and adults with disabilities and their families are unaware of their right under federal law to be free from discrimination and are often unable to enforce that right. The Disability Civil Rights Monitoring Project will assess federal civil rights enforcement in the past and evaluate how these important laws can be translated

into real equality of opportunity for all Americans.

This report focuses on federal enforcement of ACAA. As the economy becomes increasingly global, the ability of employees with disabilities to travel by air is critical to their success and upward mobility. As the President has recognized, the employment rate of working- age adults with disabilities is approximately 30 percent, and this is unacceptable. NCD commends the President for creating a Presidential Task Force on Employment of Adults with Disabilities to bring together cabinet leaders and agency heads to work on improving employment outcomes for this population. NCD supports the work of the task force and sees this report on ACAA implementation as an important call to action for members of the task force, including the secretary of transportation.

This report, like the others that will follow, is grounded in the real world experiences of people with disabilities who have endured countless violations of their rights as air travelers under ACAA. More accommodations are available for air travelers with disabilities today than ever before, but the availability of accommodations is inconsistent, and discriminatory treatment continues. It is important to recognize that the negative experiences of disabled travelers go beyond the typical hassles to which frequent travelers are accustomed. Notwithstanding the fact that ACAA has been the law for more than 12 years, people who use wheelchairs continue to encounter regular problems, from not being given a bulkhead seat to being mishandled and occasionally dropped by poorly trained or insensitive staff. Flight crews continue to refuse to stow adaptive equipment such as walkers and folding wheelchairs in the aircraft cabin. Travelers with disabilities who are accompanied by able-bodied friends, colleagues, or relatives often find that airline personnel have a tendency to direct questions and instructions to their travel partners rather than address them directly. In short, air travelers with disabilities frequently find air travel unnecessarily humiliating and upsetting. Many problems stem from the unwillingness of some airline staff to recognize that a request for an accommodation in air travel invokes civil rights protections. ACAA is a rights law, but it has been largely implemented with the consistency of a customer service policy.

NCD urges the President, Congress, the federal enforcement agencies, and covered entities to work together to address the inadequacies described in this report and the three reports to follow. For laws like ACAA to achieve the desired effect, they must be taken seriously and owned by government and industry. The ultimate test of any civil rights law is the extent to which people in the protected class can count on the law for real protection.

CONTENTS

ACKNOWLEDGMENTS

EXECUTIVE SUMMARY

INTRODUCTION

Background
Purpose of this Report
Scope of the Report
Research Approach
Research Activities
Report Structure

PART I. THE LAW, THE REGULATION, AND THE CONTEXT

1.0 The Law: The Air Carrier Access Act of 1986

1.1 Why the Air Carrier Access Act?
1.2 ACAA Impact: Progress but Persistent Problems
1.3 Background on the Air Carrier Access Act of 1986

2.0 The Implementing Regulation: 14 CFR Part 382--Nondiscrimination on the Basis of Disability in Air Travel

2.1 Definitions
2.1.1 Who is an "Individual with a Disability"?
2.1.2 Who is a "Qualified Individual with a Disability"?
2.1.3 Nondiscrimination: What It Means

2.2 Implementation Requirements
2.2.1 Implementation Issues
2.2.2 Airline Administrative Responsibilities
2.2.3 Department of Transportation Administrative Responsibilities

3.0 Recently Approved Changes to the Regulation and Proposed Changes to the Law

3.1 Final Rule Amending Part 382, Issued March 4, 1998
3.1.1 Clarification of the Definition of Nondiscrimination
3.1.2 Procedures for Providing Seating Accommodations
3.1.3 In-Cabin Stowage of Collapsible Electric Wheelchairs
3.1.4 Issues Not Addressed by the Final Rule

3.2 Proposed Amendments to the Air Carrier Access Act
3.2.1 Draft Miller Amendment
3.2.2 Inclusion of Code-Sharing Foreign Carriers

PART II. THE ROLE OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION (DOT)

[4.0 Background on DOT Enforcement Philosophy and Operations](#)

4.1 Regulation of the Aviation Industry and Consumer Protection

4.2 The Transition to Industry Deregulation

4.3 Impact on the DOT Organization

4.4 Consumer Protection in a Postregulation Environment

4.5 Civil Rights Enforcement as a Function of Consumer Protection

[5.0 DOT Organizational Components Involved in ACAA Enforcement](#)

5.1 Office of General Counsel

5.2 Regulation and Enforcement

5.3 Aviation Enforcement and Proceedings

5.4 Office of Environment, Energy, and Safety

5.5 Departmental Office of Civil Rights

5.6 Analysis and Recommendations

[6.0 Implementation and Enforcement Functions](#)

[6.1 Consumer Information Explaining the Law](#)

6.1.1 Public Information: Print Material

6.1.2 Website Information

6.1.3 Available Formats

6.1.4 Methods of Dissemination

6.1.5 Analysis and Recommendations

[6.2 General Guidance to the Aviation Industry](#)

6.2.1 Letters to the Airline Industry

6.2.2 Consumer Complaint Review Meetings

6.2.3 General Compliance Review Meetings

6.2.4 DOT Presentations at Industrywide Conferences

6.2.5 Analysis and Recommendations

[6.3 Technical Assistance to the Aviation Industry](#)

6.3.1 Aircraft Accessibility Federal Advisory Committee

6.3.2 Analysis and Recommendations

[6.4 Informal Complaints Alleging Potential Violations of 14 CFR Part 382](#)

6.4.1 The Informal Consumer Complaint Process

6.4.2 Characteristics of Informal Complaints Received by DOT

6.4.3 Complaint Data from the Airlines: A Different Picture

6.4.4 Analysis and Recommendations

[6.5 Formal Complaints and Enforcement Actions](#)

6.5.1 Filing a Formal Complaint

6.5.2 The Formal Complaint Process

6.5.3 Informal Enforcement Strategy

6.5.4 Enforcement Orders

6.5.5 Formal Enforcement Proceedings

6.5.6 Amicus Briefs

6.5.7 Analysis and Recommendations

6.6 Compliance Monitoring

6.6.1 Review of Airline Compliance and Personnel Training Plans

6.6.2 Analysis and Recommendations

6.7 ACAA Rulemaking--14 CFR Part 382 and Modifications

6.7.1 The Rulemaking Process

6.7.2 Analysis and Recommendations

6.7.3 The Regulatory Negotiation Process

6.7.4 Analysis and Recommendations

6.8 Monitoring the Law

PART III. STAKEHOLDER VIEWS ON ACAA ENFORCEMENT

7.0 Aviation Industry Perspectives

8.0 Perspectives of Air Travelers with Disabilities

8.1 Accessibility of Air Travel--A Customer Perspective

8.2 Industry Compliance with ACAA and DOT Enforcement of ACAA: A Sample of
Customer Complaints

8.3 Analysis

PART IV. CONCLUSIONS

9.0 Summary of Recommendations

9.1 Recommendations for Organizational Changes

9.2 Recommendations for Process Changes

9.3 Recommendations for Statutory Changes and Increased Appropriations

ENDNOTES

APPENDICES

Appendix A -- 14 CFR Part 382 Requirements Summary

Appendix B -- Summaries of Complaints Filed Directly with a Major Air Carrier

Appendix C -- Summarized Selected Complaints from the Consumer Protection Division

Appendix D -- Glossary of Acronyms

Appendix E -- 14 CFR 302.3 Filing of Documents

Appendix F -- List of Interviews and Consultations

LIST OF FIGURES

Figure 1 -- U.S. Department of Transportation Air Carrier Access Act Implementation and
Enforcement Functions

Figure 2 -- U.S. Department Of Transportation Organizational Chart

Table 1 -- Summary of ACAA Informal Consumer Complaints--April 5, 1990-October 23,
1997

Table 2 -- ACAA Informal Complaints against Major U.S. Carriers Received by DOT
Aviation Consumer Protection Division

Table 3 -- Informal ACAA Complaints: Disability Categories

Table 4 -- ACAA Informal Complaints: Types of Disability Complaints Received

Table 5 -- Complaints Filed Directly with a Major Air Carrier--January 1993-November
1996

Table 6 -- Complaints Filed Directly with a Major Air Carrier--January 1993-through
November 1996--Rank Ordering of Recurring Complaint

ACKNOWLEDGMENTS

All research, data collection, and analysis for this study were conducted under contract for
the National Council on Disability's (NCD) Disability Civil Rights Monitoring Project by the
Disability Rights Education and Defense Fund (DREDF). Kathleen Blank, J.D., was the
principal researcher and lead author for this report before she joined the NCD staff in the
spring of 1998. Nancy Mudrick, Ph.D., senior data and methodological consultant; Mary
Lou Breslin, project director; and Jane West, Ph.D., research director, were co-authors.
Statistical analysis of complaint data was performed under the direction of Nancy Mudrick.
Jennifer Thau and Anne Marie Sullivan, social work graduate students at Syracuse
University, provided research assistance.

We wish to acknowledge the many individuals, including members of the support staff, at
the U.S. Department of Transportation (DOT) who helped the researchers with this study.
With few exceptions, DOT staff cooperated fully in providing information, recommending
valuable alternative sources of information and facilitating internal access to key DOT
personnel. We particularly appreciate the candor of the DOT interviewees and the
opportunity to speak candidly with them about the Air Carriers Access Act (ACAA)
enforcement from a disability community perspective. The thorough review and valuable
comments on the final draft provided by the Office of General Counsel contributed

significantly to the quality of this report.

Finally, we wish to thank the many stakeholder group representatives, from both the aviation industry and the disability community, who generously gave their time and expertise to provide information to our researchers. Their input helped to clarify where change is most critically needed and alternative strategies for achieving enforcement goals. In particular, we acknowledge the many members and representatives of the disability community who shared their firsthand knowledge and experience of ACAA implementation and enforcement. Their observations added a real-world perspective to our research.

---

EXECUTIVE SUMMARY

The Air Carrier Access Act (ACAA) became law in 1986, prohibiting discrimination against passengers with disabilities by air carriers in providing air transportation services.[1] Congress charged the Secretary of Transportation with promulgating the implementing regulations within 120 days of the statute's enactment. Following deadlocked regulatory negotiations and a notice of proposed rulemaking that produced more than 300 stakeholder comments, 14 CFR Part 382 went into effect on April 5, 1990, with many issues still unresolved.[2] These unresolved issues, coupled with a regulatory environment dating back to the Reagan administration that encourages voluntary compliance and minimizes federal oversight, have contributed to an enforcement effort that is both inconsistent and limited in scope.

The findings of this study show that the Department of Transportation (DOT) model for ACAA enforcement relies heavily on monitoring of complaints and voluntary compliance by air carriers. This approach does not emphasize traditional investigation and prosecution of complaints similar to other federal civil rights enforcement agencies. Accordingly, the National Council on Disability (NCD) believes that DOT's approach is critically lacking in the key areas of compliance monitoring, complaint handling, and leadership by the Department of Transportation. Despite DOT's stated commitment to ACAA enforcement, there is no regular monitoring program to ensure compliance in day-to-day airline operations. DOT's informal complaint-handling process serves more as a tool for monitoring general compliance across the industry than as a system for resolving individual discrimination claims. Even the formal complaint process focuses only on issues of broad public interest, so that individual complainants have no reliable administrative means to obtain satisfaction unless the airline voluntarily cooperates. Research data show that a long-standing lack of resources has substantially limited DOT's leadership in addressing difficult compliance problems (i.e., providing lifts and other boarding devices, providing regular training of airline personnel, and ensuring that new aircraft meet accessibility standards).

The problems of ACAA enforcement arise from inadequacies not only in DOT's enforcement mechanism but in the law itself. Unlike some other civil rights laws, the ACAA does not establish a private right of action and contains no provisions for attorneys' fees and damages. Neither does the law extend the nondiscrimination mandate to foreign air carriers operating in the United States, including code-sharing partners of domestic airlines. The law's general language invites contradictory interpretations. In lieu of an adequate budget and specific enforcement provisions in the law, DOT has adopted a minimalist approach that has delayed full compliance and consistent implementation across the industry.

Although the regulations mandate clear requirements for services such as boarding assistance, teletypes in airports, and other accommodations to make air travel accessible for passengers with disabilities, widespread implementation and compliance problems persist 12 years after ACAA became law. Obtaining service accommodations continues to be a major challenge at airports, ticketing offices, and travel services across the nation. When they fly, people with disabilities still face uncertainty about whether air carriers will provide accommodations such as effective communication of flight information, accessible seats, appropriate boarding assistance, and careful handling and stowage of their wheelchairs and other assistive devices.

This study examines federal ACAA enforcement efforts and the impact of these efforts on the civil rights of persons with disabilities.

Key Findings

The key findings indicate that ACAA implementation and enforcement efforts over the past 12 years have been so lacking in several essential areas as to constitute nonenforcement. A significant part of the problem is an extreme lack of resources that has affected DOT's capacity to develop and maintain a credible enforcement program or to adequately support ACAA implementation.

- DOT's budget and staff for ACAA enforcement are drastically inadequate.
  The impact of changing political and fiscal priorities on ACAA enforcement cannot be underestimated. Since the 1970s, Congress has steadily cut the budget of the Office of the Secretary within DOT. As a result, the staff required for a credible ACAA enforcement program is simply not there. The Consumer Protection Division, where most ACAA-related activity originates, has less than one full-time equivalent assigned to ACAA enforcement.

- Most informal ACAA complaints are not individually investigated as are discrimination complaints filed with other federal agencies.

- DOT enforcement of ACAA is not within the purview of a civil rights office.
  The Office for Aviation Enforcement and Proceedings and the Aviation Consumer

Protection Division are primarily responsible for ACAA enforcement, using an approach that combines customer service, consumer protection, and civil rights enforcement perspectives. Informal ACAA complaints are classified as "Category C" (Reservations/Ticketing/Boarding) consumer complaints and are reported monthly in DOT's *Air Travel Consumer Report* as an aggregate figure. Although ACAA complaints are subject to a higher standard of review (based on Part 382) than other consumer complaints, the vast majority are not individually investigated, like discrimination complaints filed with most other federal agencies.

- DOT has taken little initiative to educate the public in general, and people with disabilities in particular, about their rights under the law.

  Most of the ACAA public information materials provided during October 1997 were sparse, giving only a general overview of ACAA provisions. *New Horizons*, the most detailed DOT consumer publication on ACAA, was still awaiting incorporation of new information resulting from the November 1996 amendment to Part 382. DOT staff reported that *New Horizons* was usually sent only on request and not routinely to ACAA complainants with their acknowledgment letters. Now it is available on DOT's website. On the other hand, DOT publishes and disseminates its monthly *Air Travel Consumer Report* to many aviation industry and consumer constituencies. The report provides performance rating information (i.e., on-time flights and consumer complaint statistics) for each of the major and national air carriers. Disability-related complaints, however, are reported in a single aggregate figure, precluding any comparisons among carriers.

- DOT's informal complaint-handling system functions primarily to track, not investigate, complaints.

  Between April 1990 and October 1997, DOT received 1,831 disability-related complaints. DOT did not investigate the majority of these complaints, even though Part 382 directs complainants to contact DOT for assistance. The recorded message on DOT's customer assistance line tells callers that DOT is not staffed to return phone calls or mediate individual complaints but will register their complaints in the database and send an acknowledgment letter for any complaints made in writing. In addition, DOT sends a letter of notification to the airline(s) cited in the written complaint instructing them to respond to the complainant and forward a copy of their response to DOT within thirty days. DOT personnel record the airline response in the complaint record, and followup with the airline if no response has been made within the 30-day time frame. However, DOT follow-up does not always occur, and a response by the airline does not mean that any resolution was reached from the complainant's point of view. Once the airline response is recorded in the complaint record, the complaint is typically closed, regardless of the result. Only complaints determined to involve an airline's established policy or procedure that is out of compliance with the ACAA receive additio nal follow-up. The majority of complaints are

determined not to be matters of established policy or procedure.

- DOT rarely evaluates the ACAA complaints passengers send directly to airlines.
Under Part 382, passengers alleging an ACAA violation are first required to seek
resolution directly with the airlines involved. Airlines are then required to take the
necessary steps to correct the problem and inform complainants about their right to
elevate their complaints to DOT. Our research showed conclusively that DOT receives
only a fraction of the ACAA complaints actually registered with airlines. Despite its
authority under the law to request any reports it requires to enforce DOT
regulations,[3] DOT does not request even summary data on the complaints received
directly by an airline, unless investigating in connection with a potential enforcement
action. An independent analysis of one major airline's complaint data conducted by our
researchers showed a ratio of 36 to 1 for airline v. DOT complaints. By DOT's own
account, an airline receives about 100 ACAA complaints for every 1 DOT receives.
Furthermore, the yearly number of ACAA complaints received for the past eight years has
either increased or remained constant each year. From a consumer perspective, these
numbers would indicate marginal improvement in compliance.

- The ACAA provides no private remedy for individuals alleging civil rights violations.
The ACAA statute does not provide a private right of action, but Part 382 directs any
consumer wishing to file a formal complaint to do so in accordance with 14 CFR Part 302.
Part 302 sets forth an administrative enforcement process adopted during the 1950s for
complaints alleging violations of federal aviation statutes and DOT rules or orders. Like
the administrative enforcement mechanisms for adjudicating complaints brought under the
Americans with Disabilities Act, the Rehabilitation Act (Section 504), and other disability
civil rights laws, DOT cannot assess damages on behalf of successful complainants. DOT
can only require air carriers to take prompt action to change policies and procedures not in
compliance with ACAA and assess civil penalties. The private right of action established
through ACAA case law should be codified to ensure the individual plaintiff's right of
redress.

- DOT has yet to file a single amicus brief on an ACAA case.
DOT is not authorized under ACAA to file amicus briefs in cases alleging ACAA violations
but can petition the Department of Justice (DOJ) for permission to do so. DOT also reports
that it has been asked only once to participate as an amicus. In this case, DOT intervened
through private correspondence with both the plaintiff and defendant, resulting in the
defendant agreeing to modify its policies and procedures to comply with the rule. DOT
chose not to petition DOJ to file an amicus brief after the defendant failed to appeal the
court's verdict of liability.

It should be noted that agencies with responsibility for enforcing civil rights statutes

routinely request permission to file amicus briefs, and DOJ typically approves these requests. By not filing amicus briefs, DOT takes no initiative to influence the development of case law as it applies to ACAA enforcement. DOT's failure to take a position on the litigated issues has slowed the development of a positive and consistent body of case law.

- DOT's ACAA compliance monitoring is infrequent, inconsistent, and largely ineffective. Under Part 382, DOT was required to review the ACAA compliance programs and training plans by December 1990. By 1992, DOT had reviewed the compliance and training plans of between 30 and 40 air carriers, and had required changes to any plans found out of compliance with Part 382. Since then, DOT has conducted no regular monitoring to ensure airline implementation of their ACAA compliance and training plans.

  Part 382 requires airlines to train all new personnel and conduct periodic refresher training for all personnel with job duties affected by ACAA requirements. Initially, researchers were told that DOT typically does not review ACAA training programs or records, the complaint handling process, or complaint records when conducting routine on-site reviews with airlines, unless complaints received by DOT indicate a problem. Later, researchers were told that these on-site visits did include such reviews. Despite the request of researchers for reports documenting the scope and findings of these on-site reviews, none were provided.

- DOT has not satisfactorily addressed significant gaps in the application of ACAA. Foreign air carriers operating in the United States are presently not bound either by the ACAA or by U.S. aviation safety laws and regulations. Although a general nondiscrimination provision of the Federal Aviation (FA) Act has applied to foreign carriers since the 1950s,[4] DOT has generally invoked it in connection with rate or fare issues. As of the date of this report, DOT has based only two formal enforcement actions on this provision for discrimination on the basis of disability.[5] Although consumers generally benefit from the competition resulting from the globalization of air travel networks, Americans with disabilities continue to encounter discrimination during international air travel. As the executive agency primarily responsible for international air transportation policy, DOT negotiates the terms of international agreements under which foreign carriers must operate in the United States. Foreign air carriers enjoying access to the U.S. airport facilities and air travel market, especially through code-sharing arrangements with U.S. carriers, must conform to the requirements of the same civil rights laws that bind U.S. carriers.

- Part 382 lacks provisions requiring DOT to undertake implementation activities such as public education and to engage in enforcement activities regularly such as compliance monitoring and investigation of informal complaints.
  Other than the provisions to review airline compliance programs and training plans and

ensure that they conform to the requirements of the regulation, Part 382 has no provisions requiring DOT to engage in implementation and regular compliance-monitoring activities to ensure airline follow-through. Without authorizing DOT to engage in proactive monitoring of airline compliance, the mandate to enforce ACAA carries little substance.

Below are key recommendations addressing organizational, process, and statutory changes needed to address and correct the deficiencies in ACAA enforcement.

Key Recommendations

DOT must make substantive organizational and process changes if ACAA enforcement is to become effective. It must

- Establish a discrete unit for ACAA civil rights enforcement that is independent of the Consumer Protection Division, within either the Departmental Office on Civil Rights or the Office of General Counsel.

- Request that Congress appropriate the funds necessary for adequate staff and resources to effectively run an enforcement office, including a line item for an aggressive public education initiative.

- Develop and carry out strategic ACAA education campaigns geared to persons with disabilities and to the general public.

- Further articulate and consistently apply the assessment criteria for determining when an ACAA violation has occurred and when enforcement action is appropriate.

- As for other civil rights laws, any ACAA complaint alleging a prima facie violation, including an informal complaint, should have standing. DOT should investigate all prima facie violations to determine whether a violation has likely occurred and take appropriate corrective action.

- Expand enforcement action for ACAA complaints beyond the Part 302 administrative process to allow remedies for individual plaintiffs. Administrative action under Part 302 was never intended as a means for redressing individual civil rights complaints.

- Redesign DOT's database dedicated to complaint processing and compliance monitoring to maintain the data necessary for an accurate picture of ACAA compliance.

- Require air carriers to submit to DOT at regular intervals their Part 382 complaint data in a standardized summary format that tracks and compares the numbers and types of complaints, as well as trends in their complaint data. Publish the results of the summarized complaint data for all major airlines in the DOT *Air Travel Consumer Report*.

- Undertake more extensive investigation and analyses of the causes of Part 382 noncompliance among air carriers and airports.

- Expand compliance monitoring and enforcement activities and commit more resources (both staff and funds) to them. Regularly analyze the summaries prepared by air carriers of their Part 382 complaint data to identify noncompliance areas and to monitor potential "pattern and practice" trends.

- Review noncompliance areas identified in the airline complaint data summaries with airline representatives at quarterly intervals and require airlines to submit correction plans, including objective measures of success and a time frame for achieving compliance.

- Provide more training and targeted technical assistance to the aviation industry in all aspects of ACAA implementation and compliance.

- Exercise leadership in facilitating resolution of the remaining technical issues impeding ACAA compliance as well as ongoing disagreements concerning appropriate accommodations.

The weaknesses of Part 382 and DOT's current enforcement mechanism make an effective private right of action especially important. DOT's efforts to create the necessary incentives for ACAA compliance have been grossly inadequate. If ACAA's nondiscrimination mandate is to be realized, the disability community will have to use private right of action to create effective incentives. For this reason, a private right of action must be made more accessible through the same statutory right to attorneys' fees and damages as plaintiffs under Title VII and the Americans with Disabilities Act. Such statutory rights have a common goal: to minimize the cost of litigation to plaintiffs and maximize the incentive of potential defendants to stop discriminatory policies and practices.

In light of the above, we recommend that Congress

- Amend the ACAA to establish

- a statutory private right of action;

- the award of plaintiffs' attorney's fees; and

- the award of compensatory and punitive damages to successful litigants.

- Amend the ACAA to authorize the Access Board to develop standards in consultation with the Federal Aviation Administration (FAA) for accessible cabin interiors and for any equipment related to air travel access, including boarding assistance equipment.

- Amend ACAA to expand DOT's authority to:

- conduct public education activities geared to consumers with disabilities and the general public;

- conduct regular ACAA compliance monitoring with the airlines; and

- levy fines when the finding of an individual informal complaint investigation indicates a violation has occurred, and impose civil penalties for findings of pattern and practice violations.

- Amend ACAA to include foreign air carriers operating in the U.S. travel market and using U.S. airport facilities within the scope of the law and its implementing regulation.

While the FA Act prohibits unreasonable discrimination by foreign air carriers in providing foreign air transportation, it has been applied only twice in cases of disability discrimination. In both cases, the foreign carrier disputed that their treatment of the passengers was discriminatory and challenged the statute's applicability on this and other grounds. The ACAA mandate of nondiscrimination, on the other hand, is clear in its legislative history: "to provide equal access to air transportation,"[6] ensuring that people with disabilities are "treated equally when they [use] commercial air carriers"[7] and not as "second class citizens when it comes to air travel."[8] This mandate should apply equally to domestic and foreign air transportation service providers operating regularly within the U.S. air travel market.

This report candidly assesses current federal enforcement of the ACAA and recommends changes necessary to fully realize its mandate.

---

INTRODUCTION

Background

The Disability Civil Rights Monitoring Project is a policy initiative of the National Council on Disability (NCD) to research, evaluate, and report to Congress on federal implementation and enforcement of disability civil rights laws. The impetus for this project was the 1996 National Summit on Disability Policy, at which a diverse group of disability community leaders from across the country recommended that NCD

- work with the responsible federal agencies to develop strategies for greater enforcement of existing disability civil rights laws "consistent with the philosophy of...ADA (Americans with Disabilities Act)" ;[9]

- continue working "toward elimination of contradictory laws, regulations and programs"; and

- "promote coordination and commonality of goals across agencies."[10]

NCD responded to these directives with a request for proposals to assess the Federal Government's compliance, enforcement, and public information efforts for ADA, Part B of the Individuals with Disabilities Education Act (IDEA), the Fair Housing Act with 1988 Amendments, and the Air Carrier Access Act (ACAA).[11] NCD selected the Disability

Rights Education and Defense Fund to assess and report on federal enforcement of each of the four laws and on the cumulative impact of federal enforcement of all four laws.

Purpose of this Report

This first report evaluates the effectiveness of the Department of Transportation (DOT) in implementing and enforcing ACAA. Areas of assessment include

- responsiveness of the regulation and approved modifications in addressing key areas of discriminatory practice;

- clarity of the provisions;

- timeliness in issuing and implementing the regulation;

- quality and availability of public information to consumers on the provisions of ACAA;

- quality and timeliness of guidance to the aviation industry in implementing the provisions of ACAA;

- effectiveness of compliance and enforcement activities in identifying and eliminating patterns of discriminatory practice, reducing the overall frequency of incidents of alleged violations, and creating equal access to quality air transportation service for persons with disabilities;

- overall effectiveness of the agency in orchestrating interdepartmental (intermodal) collaboration and coordination of resources to achieve industry compliance; and

- effectiveness of agency leadership in helping to resolve obstacles to the elimination of discriminatory practices and access barriers.

Scope of the Report

Although this report addresses federal enforcement of the ACAA carried out by DOT, it does not cover several significant aspects of implementation or enforcement. Specifically, it does not address private litigation or the activities of the federally funded protection and advocacy system. Nor does this report advocate specific solutions to the many unresolved ACAA implementation issues. Finally, the report does not attempt to evaluate DOT enforcement procedures in relation to the Administrative Procedures Act.

Research Approach

ACAA federal enforcement activities are assessed from two perspectives. The "whole agency" approach examines the effectiveness of DOT internal coordination and collaboration in achieving all enforcement objectives for which it is responsible. The "whole law" approach examines the overall effectiveness of external coordination and collaboration (i.e., interagency and with the private sector) in achieving all the enforcement

objectives of the law.

Research Activities

The research activities for this study included the following:

- identifying the functions and organizational components of the overall federal ACAA enforcement mechanism;

- identifying, collecting, and analyzing data on ACAA implementation, compliance monitoring, and enforcement activities of the agency;

- identifying, collecting, and analyzing data on ACAA public information activities of the agency and its contractors;

- conducting interviews with the responsible agency staff to validate understanding of the day-to-day operation of ACAA enforcement functions;

- analyzing interactions and interrelationship of enforcement functions and their net impact in addressing noncompliance;

- reviewing and evaluating overall enforcement operations in light of the requirements, legislative history, and judicial interpretations of the regulation;

- identifying issues and areas for improvement in the enforcement mechanism and operations (i.e., gaps, duplication, overlaps, inconsistencies);

- conducting a literature review to add dimension and perspective to research findings on identified issues, including model practices for enhancing compliance; and

- deriving conclusions and developing preliminary recommendations from the entire analysis.

Report Structure

The report is presented in four parts. Part I provides background on the enactment of ACAA, as well as a brief overview of the current law, regulation, and proposed amendments. An overview of DOT's role in implementing and enforcing ACAA is presented in Part II. This part includes research findings, analysis, conclusions, and recommendations with respect to each of the major ACAA enforcement functions. Part III presents feedback from representatives of the primary ACAA stakeholder groups (the aviation industry and the disability community) on DOT's role in implementing and enforcing ACAA. Part IV summarizes NCD's recommendations for strengthening federal ACAA enforcement.

PART I: THE LAW, THE REGULATION, AND THE CONTEXT

1.0 The Law: The Air Carrier Access Act (ACAA) of 1986

1.1 Why the Air Carrier Access Act?

Historically, air travel for people with disabilities has not been for the faint of heart. Often, people with certain disabilities either chose not to fly or traveled by air knowing they would probably face prejudice, hostility, disability stereotyping, as well as architectural and other physical barriers; sometimes they faced an outright denial of their right to travel.

Before enactment of ACAA, airlines commonly refused to transport motorized wheelchairs, alleging that the wet cell batteries were hazardous. Airline workers frequently either drained the acid from the batteries before loading the chair or left the batteries behind without notifying the passengers, who then were stranded when they arrived at their destination. Often travelers were required to sign liability waivers to protect the airlines from responsibility for damaging wheelchairs, scooters, and other assistive devices. Because aircraft lacked accessible lavatories, some people with mobility disabilities would limit fluid intake hours before and often during their flight to avoid needing to use the bathroom, especially for long flights. Assistance with boarding and deplaning the aircraft for people with mobility disabilities was often unavailable. When available, it was often unpredictable and even dangerous because of the lack of personnel training and uniform policies on boarding assistance.

Last-minute denials and capricious and arbitrary requirements were commonplace. A passenger told by a customer service representative that a guide dog would be allowed in the passenger cabin would be told at the airport that the dog must travel in the baggage compartment. Travelers with certain disabilities were commonly told they could fly only if accompanied by a person who did not have a disability, whether or not they needed or wanted assistance. Passengers were told on the phone that they could travel unaccompanied, only to learn at the airport that they would not be allowed to fly alone. People perceived as having HIV/AIDS were denied the right to board flights because of fears and misperceptions about their illness.

In the terminal and on the aircraft, deaf and hearing-impaired passengers had little or no access to publicly announced flight information and safety instructions. Access to information about flight delays or changes in departure gates and times often depended on the willingness of an airline worker or fellow traveler to pass on the necessary information. Telephone communication from an airport for a passenger with a hearing disability was virtually impossible.

Although passage of the Federal Aviation Act of 1958 (FA Act)[12] created a legal duty of nondiscrimination for air carriers, the will to implement and enforce both the spirit and letter of this provision concretely on behalf of persons with disabilities did not exist until much more recently. Airlines and airports did little or nothing to accommodate persons with disabilities. The inconsistency with which the same airline provided the meager

==accommodations available resulted in a denial of access to many disabled travelers.==

==The intent of Congress in legislating the ACAA was to mandate nondiscrimination by requiring the accommodations necessary for travelers with disabilities to have equal access to air travel and related services.==[13] Despite some significant improvements over the past 10 years, most of the scenarios described above could well have taken place in many airports around the country during the past six months. The remaining challenge is to remove the barriers to full implementation of ACAA's mandate of nondiscrimination.

1.2 ACAA Impact: Progress but Persistent Problems

More accommodations are available for air travelers with disabilities today than at any time in history. Yet the availability of accommodations is inconsistent, and discriminatory treatment continues. The following recent experiences of air travelers with disabilities were reported by several technical assistance organizations serving individuals with disabilities.

*Wheelchair Delivery: "It's against our policy"*

A woman with muscular dystrophy who uses a motorized wheelchair fractured her leg shortly before traveling from New Zealand to Los Angeles. She was experiencing much pain when she boarded her flight. A frequent traveler, she requested that a tag be placed on her wheelchair instructing the Los Angeles ground crew to deliver it to the arrival gate immediately after the flight landed. Upon arriving, she was told by airline officials that airline policy prevented them from delivering wheelchairs to the gate. She would have to transfer into an airport chair and be pushed to the baggage claim area to retrieve her own chair. She refused, telling the officials she was in great pain and could not endure being lifted unnecessarily. The officials insisted their policy was valid and in force, and that she must deplane. She refused, citing the ACAA and drawing attention to the extenuating circumstances created by her recently fractured leg. An hour passed before the airline officials relented and arranged to have her chair delivered to the plane.

Following the incident, she wrote a letter to the airline complaining about her treatment citing ACAA violations. In a telephone interview, the complainant said, "I have never been so humiliated and embarrassed. They treated me with such hostility. At one point I broke down and cried, I was so frustrated and in pain."

*"We do not provide escort service"*

The parent of a 12-year-old child with a cognitive impairment made an advance request for airline personnel assistance to help her child travel between gates to make a connecting flight. The child had flown several times before, but on direct flights. On this occasion, there were no direct flights to the child's destination city. In various communications, including letters, airline agents repeatedly told the child's parent that they do not provide "escort service" (i.e., supervision to ensure that the passenger does not

wander off) or "custodial assistance" for children. The parent had requested neither; she had simply requested that someone help her child travel from one gate to another to wait for her connecting flight.

*"Sorry, no refunds for unused oxygen"*

A woman with severe arthritis and heart problems was charged $300 for six canisters of medical oxygen for in-flight use. According to FAA safety regulations, passengers may not bring their own oxygen on board and must pay for oxygen canisters provided by the airline. Two canisters of oxygen were unused at the conclusion of her trip. When she requested a refund, the airline said it was not their policy to issue refunds for unused oxygen. Another passenger who requested a refund for unused oxygen from a different airline complained that the price of oxygen canisters had tripled (from $50 to $150) between 1995 and 1997. This passenger received a modest refund for several unused canisters and assurances that the airline was working to reduce the cost.

*"Sorry, we don't have time to board you"*

A man who uses a manual wheelchair was en route from Houston to Billings with a plane change in Denver. He had notified the airline that he would require a boarding chair and boarding assistance for each leg of the trip. Upon arriving in Denver he reminded the gate agent for the departing flight that he required a boarding chair. The gate agent told him a boarding chair was not available and the airline did not have time to board him. He objected, informing the agent that he had provided advance notice that he required a boarding chair. The passenger missed his flight and was forced to spend the night in Denver. He elected not to file a complaint because he felt it would not result in any significant change in the system.

*"Please deplane immediately"*

A man and his wife, both of whom have Tourette syndrome, had boarded a flight from New York bound for San Francisco. Tourette syndrome is a condition characterized by involuntary vocalizations exacerbated by stress. Upon learning of their presence on the plane, the captain asked them to deplane because he believed they would be disruptive. They provided literature on Tourette syndrome to the captain, explaining that their vocalizations were involuntary and would subside when the stress of the moment had passed. The pilot refused to allow the passengers to remain on the flight. The couple filed a lawsuit against the airline.

Each of the incidents above describes a potential ACAA violation. The following section gives a brief history of the ACAA and explains the intent of Congress to remedy discrimination against air travelers with disabilities.

1.3 Background on the Air Carrier Access Act of 1986

The ACAA was enacted after an extended and unsuccessful struggle to establish through case law the illegality of discriminatory practices against air travelers with disabilities.[14] The legal obligation of nondiscrimination created by the FA Act in 1958 was based on two provisions addressing air carriers' service. Section 404(a) required air carriers to provide "safe and adequate" service.[15] Section 404(b), as originally written, prohibited "undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic."[16]

Gradually, the legal meaning of these two provisions became linked and any kind of unjustified discrimination toward air travelers was understood to be a violation of the air carriers' duty to provide adequate air transportation service. The Civil Aeronautics Board (CAB),[17] however, generally invoked the provision in connection with rate or fare issues. While acknowledging section 404's potential application to cases of noneconomic discrimination that directly affected the provision of air transportation, CAB never applied it to any specific case involving alleged discrimination on the basis of disability, race, gender, or ethnicity.[18] Consequently, these provisions had little actual impact on improving access to air transportation for persons with disabilities. Airline and airport policies, as a rule, remained unresponsive to the unique service requirements of persons with disabilities, justified on the basis of safety, economics, and the convenience of other passengers.[19]

Fifteen years after the FA Act was enacted, discrimination on the basis of disability was specifically prohibited by law with the passage of the Rehabilitation Act of 1973.[20] Section 504, as amended, prohibits discrimination on the basis of disability in any federally assisted program.[21] This provision, along with the provisions of sections 404(a) and (b) of the FA Act, formed the legal basis for the original nondiscrimination regulation (old Part 382).[22] Subpart A contained a general prohibition against discrimination on the basis of disability in providing air transportation; subpart B contained specific requirements for service to disabled passengers; and subpart C outlined record-keeping, reporting, and enforcement responsibilities. The general prohibition contained in subpart A was based on section 404 of the FA Act and applied to all certificated air carriers. The specific requirements of subparts B and C, based on the Section 504 provisions, applied only to certificated carriers receiving direct federal subsidies under the Essential Air Service program.[23]

The Paralyzed Veterans of America (PVA) challenged the limited application of subparts B and C in court, arguing that all carriers benefit from federal assistance in the form of Federal Aviation Administration (FAA) air traffic control services and federal grants for improving airport facilities. Therefore, PVA argued, Part 382 should be applied in its

entirety to all air carriers, in accordance with section 504. Although the U.S. District Court
agreed with PVA's reasoning,[24] the Supreme Court did not, holding that unsubsidized
carriers were not recipients of federal assistance and thus outside the scope of section
504.[25] The Supreme Court's decision exempted most air carriers from the duty to make
specific accommodations in providing services to passengers with disabilities.

In response to this decision, Congress enacted and President Reagan signed into law the
Air Carrier Access Act of 1986.[26] Codified as section 404_ of the FA Act, the amendment
prohibits discrimination on the basis of disability by all air carriers, and authorizes DOT to
issue regulations "to ensure nondiscriminatory treatment of qualified handicapped
individuals consistent with safe carriage of all passengers on air carriers."

Congress's multiple objectives are clear in the statute's legislative history. First, all air
carriers were to be bound by affirmative responsibilities similar to those set forth in
subparts B and C of the existing regulation. Second, the statute was specifically intended
to remedy "discriminatory, inconsistent and unpredictable treatment" of air travelers with
disabilities. Finally, the statute affirmed that rules for accommodation were to be consistent
with safety regulations, and that restrictions not based on safety and applied solely to
passengers with disabilities were to be eliminated.

The new ACAA rule, replacing the old Part 382, took more than four years to develop.
Stakeholders in the aviation industry and the disability community provided significant
input to the final rule through a regulatory negotiation process. In promulgating the final
rule, the Department of Transportation (DOT) clarified five core issues:

First, DOT applied the section 504 "undue burden" principle to strike a balance between
requiring accommodations sufficient to enable equal access while containing the costs to
the aviation industry in making those accommodations.[27]

Second, DOT clarified that air carrier discretion in imposing additional requirements or
restrictions on air travelers with disabilities is limited to what is required by FAA safety
rules.[28]

Third, DOT emphasized that the new Part 382 resulted from a regulatory negotiation
requested by the parties.[29] DOT used much of the information generated through the
process to develop the new, more detailed regulation to supersede the old Part 382.

Fourth, DOT declared that Part 382 should preempt state regulations protecting persons
with disabilities in the area of air transportation services but should be applied on a case-
by-case basis.[30]

Finally, DOT declared its responsibility to implement the ACAA by prohibiting
discriminatory practices. Given the continued prevalence of many discriminatory practices

mobility disabilities; and ensuring passengers with disabilities priority in stowing assistive devices.

Recommendation No. 23: Tighten up the regulation with guidelines and definitions developed by stakeholder groups.

DOT has stated that the regulation provides flexibility in determining on a case-by-case basis whether its provisions constitute an undue burden or fundamentally alter the nature of an airline's program.[184] At the same time, the many implementation problems indicate that more guidance is needed on how to comply without creating undue burden or fundamental program alteration. Finding solutions to difficult implementation problems requires joint participation by the concerned stakeholders in developing practical guidelines for eventual incorporation to the regulation. DOT should create avenues and encourage experimentation with alternative approaches to working through implementation issues.

6.8 Monitoring the Law

As the executive agency responsible for ACAA enforcement, DOT plays a key role in monitoring its impact and assessing what changes are needed to achieve its legislative objectives. This monitoring responsibility includes not only ensuring compliance with the regulation by airlines and airport operators but also examining where regulatory changes are needed to clarify the requirements of the law. One area where discrimination continues legally in spite of the law is international air travel. Although the legal authority to extend a general nondiscrimination mandate to foreign air carriers exists under 49 U.S.C. §41310, DOT has applied this provision only twice in discrimination cases against foreign air carriers on the basis of disability (in September and December 1998). As the federal agency responsible for international air transportation policy, DOT negotiates the terms of international agreements under which foreign carriers must operate in the United States. DOT must ensure that foreign air carriers that have access to U.S. airport facilities and air travel markets conform to the requirements of the same civil rights laws that bind U.S. carriers. NCD urges DOT to continue exercising its authority to require all air travel service providers operating in U.S. markets to comply with the established standard of nondiscrimination.

Part III explores the views of stakeholders in the aviation industry and the disability communities on DOT's role in enforcing ACAA compliance.

## PART III. STAKEHOLDER VIEWS ON ACAA ENFORCEMENT

7.0 Aviation Industry Perspectives

As part of this study, researchers met with representatives from the operations and legal

divisions in the Air Transport Association (ATA) for their thoughts on Air Carrier Access Act (ACAA) implementation.[185] In addition to its stakeholder participation in ACAA regulatory negotiations, ATA supports ACAA implementation, including being the prime mover behind a task force to develop design specifications for accessible lavatories in wide-body aircraft. ATA was involved in another task force to develop solutions to problems with transporting power wheelchairs. "Products" of the task force included (1) a training video on disassembling and reassembling power wheelchairs; (2) successful passage of a regulation to label all batteries as "spillable" or "nonspillable"; (3) packaging instructions for spillable batteries; and (4) a portable placard for the back of wheelchairs illustrating proper disassembly and reassembly.[186]

ATA developed a model ACAA training plan in 1990 and coordinated with the Federal Aviation Administration for the inclusion of the ACAA segment in flight attendant training programs. Recently ATA sponsored a joint meeting of all airline executives responsible for the complaint resolution officer (CRO) function.[187]

The persons interviewed raised several important points. They readily admitted that ACAA compliance has been uneven across the major airlines but generally felt that the situation has vastly improved since 1990. They also believed that Access to the Skies conferences and other joint forums have strengthened communication between disability groups and the aviation industry on ACAA issues. However, they conceded the following points: these forums do not provide an ongoing process for moving toward consensus or actually resolving compliance problems; many compliance problems might stem from the market-driven, decentralized decision-making processes characteristic of the industry; there is a need for an ongoing process to resolve issues arising from "poor service decisions" and to design programs that permit "flexible accommodation based on responsible decision-making."[188]

The ATA executives interviewed readily agreed that some follow-up mechanism is needed to improve compliance and suggested that ATA would like to help facilitate it. ATA represents most of the passenger and cargo airline operations in the United States, and has the "infrastructure for communicating with 97 percent of the industry." They recognize that continuing dialogue on these issues is necessary to finding solutions that meet the needs and can be successfully implemented.

---

8.0 Perspectives of Air Travelers with Disabilities

Enacted almost 12 years ago, the ACAA prohibits commercial air carriers from discriminating against travelers with disabilities. Despite the sweep of the law and its potential impact on travelers with disabilities, limited research has been conducted measuring its effectiveness from the perspectives of persons with disabilities.

Nevertheless, the available research, written ACAA complaints, and personal anecdotes reveal patterns of continued discrimination by air carriers and weak enforcement by DOT. The following perspectives illustrate the problems that remain and suggest areas for improving implementation and enforcement of the law.

8.1 Accessibility of Air Travel--A Customer Perspective

"[I]f you are a wheelchair user and travel even occasionally by air, it's a safe bet that you have had trouble on just about every flight you have ever taken."[189]

The Paralysis Society of America (PSA) conducted a year-long poll completed in 1996 that reveals mixed air travel experiences by persons with disabilities.[190] Although flying conditions for people with disabilities have improved since ACAA's enactment, many air travelers with disabilities still fare poorly. The PSA poll, responded to by 550 self-selected individuals answering survey questions by toll-free number or on the Internet, revealed:

- about one-third of respondents requesting specific seats (i.e., bulkhead, aisle) did not receive them (accessible seating was addressed in the March 1998 notice of proposed rulemaking that became effective September 30, 1998);

- 41 percent of respondents specifically requesting bulkhead seats did not receive them;

- only 16 percent of people who requested seats with movable armrests received them;

- of 56 people traveling on flights not serviced by jet bridges, 19 (34%) had to be carried up the stairs in a boarding chair or by hand;[191]

- 17 people said they were charged a fee for a requested service, including charges for a wheelchair as extra baggage, a fee for retrieving a wheelchair, and a fee for connection assistance;

- more than half the people responding to the poll (52.18%) said their mobility aids had not been returned to them in good working order; and

- 49 percent said that airline personnel communicated with someone other than them concerning service, rather than directly with them.

It must be noted that the March 1998 amendment to Part 382 contains provisions addressing most of the issues related to seating assignments and requests mentioned in this survey. Many survey respondents said that airline personnel need more and better training, especially regarding disassembly and reassembly of motorized wheelchairs, lifting and transferring travelers with mobility disabilities, and persons with hidden disabilities. Airline personnel frequently told wheelchair users they could not stow their folding chairs in the aircraft cabin and failed to communicate gate information effectively. The PSA survey results suggest that DOT's weak ACAA enforcement and monitoring

result in inconsistent access to safe and reliable air transportation services by people with disabilities.[192]

8.2 Industry Compliance with ACAA and DOT Enforcement of ACAA: A Sample of Customer Complaints

Review of a sample of written complaints filed during 1997 with DOT by individuals with disabilities, their families, or attorneys reveals problems similar to those identified in the PSA poll.

- A frequent complaint involved air carrier response to requests for special needs accommodations such as boarding assistance, stowage of a power wheelchair or seating requirements. Despite giving advance notice in accordance with ACAA regulations, travelers with special needs encountered the following situations at the airport:

- the airline's computer database contained no record at all of the advance request;

- airline personnel had not noted the advance request in the database and were unprepared to provide the requested assistance;

- airline personnel failed to act in a timely manner or simply did not act at all to provide the requested assistance; and

- in some cases, airline personnel refused outright to provide the requested assistance.

- One passenger with a heart condition requested boarding and deplaning assistance. When her flight was rerouted because of weather conditions, her daughter telephoned the airline to inform them of her mother's requirements. She encountered an airline official whom she described as "very confrontational--rather than trying to diffuse the situation and see how he might be able to help, he [said] 'perhaps your mother should not be flying at all if she has a heart condition,' then he hung up."[193]

- One traveler alleged that an air-carrier-operated frequent flyer lounge was not accessible to him. Only after he wrote three letters of complaint and his attorney contacted both DOT and the airline was a method to access the lounge provided.[194]

- Several complaints alleged that flight crews, ramp agents, and other ground personnel were unaware of the ACAA requirement for a CRO at each airport, who the airport CRO was, or even what a CRO was. However, passengers reported that problems were resolved when CROs were available to assist. For example, one complainant who had been unable to convince the flight crew to allow his wife's manual wheelchair to be stowed in the passenger storage area asked to speak to the CRO. He wrote " [she] moved mountains. Within minutes, the wheelchair that wouldn't fit did fit like I said it would. [She] showed a lot of sensitivity and concern. When [she] spoke, it was a done deal."[195]

- Many of the complaints alleged that flight crews frequently refused to stow adaptive equipment such as walkers and folding wheelchairs in the aircraft cabin. For example, one complainant wrote that she was told by a flight attendant, "We never allow wheelchairs in the cabin--you have to gate-check it."[196]

- Several travelers alleged that advance special seat assignments (e.g., bulkhead and aisle) either could not be scheduled or were not honored at flight time.

- Many complaints alleged that airline contractors, such as those who provide boarding assistance or transport passengers to and from flights, are not trained adequately and are insensitive to the rights and requirements of travelers with disabilities.

- One complainant reported that an airline contract escort service at New York's Kennedy Airport would not allow her husband, who has a mobility disability, to use a wheelchair provided by the airline beyond the passenger arrival area. The contractor told her husband the chair was needed for another passenger, a claim that proved false.[197]

The following sample of case summaries of ACAA complaints filed with various airlines and DOT during 1997 further illustrate common experiences of air travelers with disabilities.

*DOT Case Summary No. 1*: An elderly woman who had recently undergone knee surgery was traveling with her husband from Philadelphia to Detroit. He had made their airline reservations well in advance, requesting bulkhead seating to accommodate his wife's inability to bend her knee. He received a letter from the airline confirming the reservations and bulkhead seat assignments. When they arrived at the airport they learned that their seat assignments had been changed. The ticket agent refused to try to accommodate them in bulkhead seating, indicating the flight was full although the woman's husband observed vacant seats on the flight. In a letter to airline officials he said, "we boarded and endured the flight. This resulted in a very painful flight and a couple of painful nights. I hope this episode has not set back her [his wife's] recovery."[198]

The man wrote twice to the airline complaining of poor treatment. A copy of his complaint was forwarded to DOT's Consumer Protection Division. At the time, the current regulation requiring airlines to accommodate individuals having certain impairments with accessible seats had not been written. Eventually the airline responded saying advanced seating is offered as a courtesy and cannot be guaranteed. The letter also stated that it is the responsibility of the traveler to confirm the flight in advance, but the letter did not state that a change of schedule regarding this particular flight had taken place. It also stated that it was not the policy of the airlines to compensate in these instances; however, two $25 dollar vouchers toward future flights were provided.

*DOT Case Summary No. 2*: Traveling with her husband on a round trip flight from

Pittsburgh to Ft. Lauderdale, a woman who used a manual wheelchair requested permission to stow her chair in the passenger cabin's storage area. Their flights required a plane change on both legs of the trip. The cabin crews for each of four flights insisted that she stow her chair in baggage, although her husband explained that the chair was frequently damaged when it was stowed in the luggage area. Armed with DOT's booklet entitled *New Horizons for the Air Traveler with a Disability*, the passenger's husband showed the flight crews the provision for on- board storage of manual wheelchairs but was told the storage area was not "approved" or was reserved for coats. He explained that her chair would fit easily in the cabin's storage area but the crew insisted it be stored below.

He sent a complaint letter to DOT requesting a definition of approved storage. DOT referred his letter to the airline and sent the complainant a copy of Fly Rights. Because DOT did not explain the meaning of "approved storage", the complainant sent a second letter in an effort to obtain an answer to his original question. His second letter triggered a written explanation by DOT of the ACAA rules providing for on-board stowage of manual wheelchairs. This letter was copied to the airline. His second inquiry also triggered an internal DOT memo in which the airline personnel's conduct was characterized as "egregious" and the airline's response to the complainant called "a classic nonresponse that doesn't come close to the 'dispositive' reply required by section 382.65."[199] The airline wrote the complainant acknowledging that it permits stowage of folding wheelchairs in most of its aircraft and informing him of its plans to issue a bulletin to "airport personnel reminding them of the applicable regulations." It also gave the couple vouchers for $150 each toward the purchase of future tickets.

*DOT Case Summary No. 3*: A woman with multiple sclerosis traveling from Miami to Chicago was not permitted to stow her walker in the aircraft's storage area although she had been allowed to keep the walker with her on a previous flight. She was taking various medications for her medical condition, including diuretics and steroids that caused frequent urination. She was unable to walk to the aircraft's lavatory without the walker. In a letter to DOT's Consumer Protection Division, her daughter stated that a member of the flight crew said she didn't care what had been allowed on a previous flight, the passenger couldn't carry the walker on with her. The daughter went on to state, " My mother was forced to sit the entire flight without being able to go to the rest room. She suffered not only from discomfort but from the humiliation and fear of being unable to control her bladder."[200] DOT forwarded the letter to the airline, which issued an apology and two $200 travel vouchers.

8.3 Analysis

The preceding case summaries and anecdotes illustrate some of the problems air travelers with disabilities still encounter. Taken as a whole, they reveal inconsistent ACAA

implementation by the airline industry and weak, inconsistent enforcement of the law by DOT.

Each time they travel, passengers with disabilities must cope with a myriad of potential disability-related complications above and beyond those faced by travelers who do not have disabilities. They must arrive for their flights armed with information about their rights and prepared to advocate for themselves or their traveling companions. When their complaints do receive attention from an air carrier, the solution is often an apology and a ticket voucher. Carriers appear to respond to ACAA violations in the same manner in which they respond to customer service complaints involving lost baggage or flight delays, rather than as civil rights violations. There is little evidence to suggest that carriers take action to resolve systemic ACAA violations or that DOT fully exercises its enforcement authority and responsibility when it is aware of such problems.

Private litigation is not a reasonable option for many people with disabilities because ACAA itself does not provide explicitly for monetary damages and attorneys' fees. Although an attorney can recover reasonable fees if the complainant prevails in a litigation matter regarding other civil rights laws, few attorneys are willing to represent clients with disabilities in ACAA claims because clients cannot afford to pay the legal fees. It is imperative that DOT fulfill its public trust to ensure that persons with disabilities are given equal access to air travel service at a level of quality and comfort comparable to that afforded the traveling public generally.

---

**PART IV: CONCLUSION**

9.0 Summary of Recommendations

Disability policy has clearly established full participation and integration of people with disabilities as a national goal. Access to transportation is a lynchpin for that participation and integration. As airline travel increasingly becomes a major mode of travel for Americans, it is essential that people with disabilities have full access to air travel. The Air Carriers Access Act (ACAA) is the federal law ensuring that access. Yet federal enforcement of the law falls far short of protecting people with disabilities from discrimination in airline travel.

Our recommendations for change are far-reaching and fall into three major categories: organizational change, process change, and changes to the law and regulation.

9.1 Recommendations for Organizational Changes

- DOT should establish an ACAA civil rights enforcement unit that is separate from consumer affairs monitoring.

- Such a unit might be located in the Office of General Counsel or in the Department of

Plaintiffs' Exhibit 521

hearingaidclinics.ca

## Travelling With Hearing Loss, and Now Face Masks - Pt. 2 - Hearing Aid Clinics

3 minutes

In our last blog post, we addressed what steps people who experience hearing loss can take to make travel more comfortable. Let's now take a look at what airline staff can do to assist hearing-impaired people while traveling.

1. CLEAR FACE MASKS

International travel signifies fun, exploration, rest, and relaxation for most people. Those with hearing loss experience both excitement and trepidation, and navigating new and unpredictable listening situations isn't always easy. Face masks have complicated the situation even further, since those with hearing loss rely heavily on facial expressions, non-verbal cues, and sign language to comprehend people. By encouraging airline staff to wear clear masks, this problem will decrease to some degree.

2. TRAIN AIRCREW IN SIGN LANGUAGE

Another step to making travel more inclusive is by adding sign language to the list of languages that aircrew can converse in.



3. VISUAL CUES

It's a good idea for airlines to provide visual cues – for instance, tablets with important boarding/disembarking/emergency instructions and menus (please don't just say, "Chicken or pasta") – so that passengers with hearing issues feel safe and at ease throughout the journey.



The correct disability service

When we reserve online, there is a space to note a disability and the kinds of services offered. Why, then, is someone who checks "Deaf and Hard of Hearing" offered a wheelchair? Airlines should ask people with hearing loss to specify what kind of services they would need beforehand.



Pre-boarding the plane

Air carriers should provide electronic displays that will tell a person with hearing loss what zone is boarding, as well as information about upgrades and standby status. A gate attendant shouldn't just tell a person to go sit until their zone is called. This is against the Air Carrier Access Act, when someone identifies themselves as a person with hearing loss, the gate attendant must provide equal access to the boarding announcements, even if that means coming over to where the passenger is sitting to repeat the announcement. Better still, passengers with hearing loss should be offered pre-boarding.

Captioned safety announcements (and movies!)

Airlines should live-caption important information on the screens right in front of a passenger with hearing loss. Oh and movies as well!



# Plaintiffs' Exhibit 522

onemileatatime.com

## Will Masks Be Required On Airplanes Forever? | One Mile at a Time

5-6 minutes          4-9-21

___

While I think the mask mandate on planes and at airports has made a lot of sense during the pandemic (and continues to make sense, until things are more under control), I can't help but wonder when it will be lifted… if at all.

- Airline safety policies are often added, rarely reversed

- Masks could be helpful long-term, but at what cost?

- Bottom line

### Airline safety policies are often added, rarely reversed

When you look at the pain points of airline travel, it's interesting the extent to which some policies have been introduced in the name of safety, but have never been undone. There are some changes that absolutely make sense, like reinforced cockpit doors, which are an easy, permanent solution, that don't inconvenience anyone.

But then look at some of the other policies in the airline industry that are more questionable:

- We're still not allowed to take liquids of over 100ml through security, out of fear that they might be explosive

- We're still (for the most part) required to take our shoes off at airport security, because in 2001 there was an attempted "shoe bomber"

- We're still not allowed to "congregate" near bathrooms, exits, or lavatories, on US-bound flights, out of fear that we might be coordinating some sort of an attack on the plane

- Whenever a pilot uses the bathroom, a cart needs to be set up to block the way

  Heck, forget safety for a moment, and just look at airline fuel surcharges. They were added when oil prices spiked, but have never been eliminated, even when oil prices were at an all-time low.

The point is, I can't think of many policy changes in the airline industry that were added and then later undone.

## Masks could be helpful long-term, but at what cost?

Coronavirus has taught me a lot about health and human interaction in general. To some extent the way I interact with humans will probably never be the same. For example:

- I have a hard time imagining going to a social event where there are dozens of people you're expected to hug and talk to in close proximity

- Having gotten the flu a few years back on a trip to Asia, I have a new appreciation for how this was probably preventable to some extent

- I have a new appreciation for the outdoors, maintaining distance, etc.

As I always say, I'm an introvert, so in some ways coronavirus hasn't been as tough on me as on others. If I never have to awkwardly hug someone again or have unnecessary small talk with strangers at some sort of a social event, I'd be absolutely delighted.

Anyway, that's a bit of a tangent. Specific to airlines, at what point could we actually realistically expect an airplane mask mandate to be lifted?

- It seems highly unlikely that coronavirus will ever fully die out, so is it once we're at the point where annual coronavirus deaths are less than average flu deaths, or at some other point?

- Even if we're at that point, with the new knowledge we have, isn't there merit to wearing masks on planes, at least during flu season (we've seen some people do this in Asia for years)? There does seem to be some potential upside in terms of saving lives, at least in comparison to liquids and shoe restrictions, no?

- As good as air filtration is on planes, there aren't any public spaces I can think of where you're forced to sit so close to a stranger for such a long period of time

To be clear, I hope that masks aren't required on planes forever. Personally I don't think the mask mandate will be lifted in the coming months (I'd be shocked if it's lifted in 2021), though I think it could be within a couple of years. Then again, I can't help but wonder if this will just be another policy that the airline industry keeps in place forever, as with so many policies that came before this.

## Bottom line

At this point wearing masks on airplanes has become the norm, and it's something travelers have gotten used to. That's good during the pandemic, though I think we're all

hoping that the mask mandate is eventually lifted.

That being said, <mark>I can't help but wonder if it's here to stay forever.</mark> I'd argue that there's more upside in terms of saving lives with a mask mandate on planes than with liquids and shoe restrictions, yet those have stuck around for a couple of decades now.

And to be clear, that's not to say that I think the mask mandate should stick around forever, but rather that it has more relative merit than some of the other policies that have stuck around.

I could see myself voluntarily wearing a mask in the future when flying during flu season, but I don't think it should be mandated forever.

**What do you think — could a mask mandate become a permanent aspect of flying, or at what point do you think it will be lifted?**

Plaintiffs' Exhibit 523

wheelchairtravel.org

# Barriers to Equal Access for Disabled Remain in Air Travel, After 30 Years of DOT Inaction - WheelchairTravel.org

*John Morris*

9-11 minutes



*"It is not possible to be in favor of justice for some people and not be in favor of justice for all people."*

I saw this quote, attributed to Dr. Martin Luther King, Jr., featured in a blog post highlighting his legacy in the civil and disability rights movements. The quote got me thinking about the challenges to justice for people with disabilities, particularly in relation to the Air Carrier Access Act (ACAA).

The ACAA is largely regarded as civil rights legislation. I disagree, and believe that it is little more than a guideline for how travelers such as myself (a triple amputee and wheelchair user) *should* be treated.

Disability rights activists have long held that the ACAA does not go far enough. Its lack of a private right of action forces travelers with disabilities to rely on the Department of Transportation (DOT) to investigate potential violations and hold airlines accountable to the law. On the matter of enforcing the law, the DOT has failed – unequivocally. The rights and dignity of travelers requiring special assistance and accommodation are violated

==frequently, while the department remains silent.==

## A History of Discrimination in Air Travel

The discriminatory practices of airlines and their contracted agents have existed since the ACAA became law in 1986. The National Council on Disability (NCD), an independent federal agency focused on disability policy, released a report in 1999 investigating the DOT's success (or lack thereof) in enforcing the ACAA. Taken from the attached cover letter:

*"…air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope."*

This report, which was sent to President Bill Clinton and to leaders in both houses of Congress, exposed a pattern of significant disability service failures at airlines, and ==revealed a DOT that was either unwilling or unable to enforce the law. It is tragic that this report, released nearly 17 years ago, reads as though it were written yesterday. The realities of air travel for persons with disabilities have changed little over the past two decades.==



## The DOT's Inaction

The DOT collects and investigates complaints regarding potential violations of the law via their online web form. I encourage my readers and all travelers with disabilities to file these complaints. Submissions are tracked in the monthly Air Travel Consumer Reports, which tally the number of complaints filed and violations charged for each carrier operating to, from and/or within the United States.

The agency has been afforded the ability to respond to violations with enforcement action against the offending air carrier, in the form of civil penalties and policy directives. If a passenger's rights under the ACAA have been curtailed, the DOT can fine the airline $27,500 per violation. The fine amount is significant, and was set as such to deter airlines from violating the rights of the most vulnerable – travelers with disabilities.

How often does the DOT pursue action? Not often. In the past three years, only five penalties have been levied against airlines for violations of the ACAA. Typically, the DOT receives between 100-200 disability service complaints per month. With so many travelers uninformed about their rights and the applicable complaint procedures, this is only a small fraction of the violations that do occur. Complaints made directly to the airline are not included in this monthly account. Five actions after thousands of complaints – that is not enforcement.

Travelers with disabilities rightly expect the DOT to levy enforcement action when it is warranted. The department refuses to issue fines on a per-case basis, instead holding them until a major media story generates negative public opinion. In October, the story of a man forced to crawl off a United Airlines flight swept through the news media. Just this month, the DOT filed an enforcement order – their first since July 2014 – against United Airlines. The lesson is this: If you want the DOT to act on your behalf, in defense of your rights, you have to become a headline.



## Congress must act.

Rules governing the ACAA were last updated in 2008, and the changes took effect in May 2009. The NCD's 1999 report recommended the following amendments to the law, which

have still not been established:

- *a statutory private right of action;*

- *the award of plaintiffs' attorney's fees; and*

- *the award of compensatory and punitive damages to successful litigants.*

Travelers with disabilities, myself included, have no way to ensure that air travel providers will honor the rights they have been guaranteed under the ACAA. Violations occur throughout the travel experience, from booking to baggage claim. Depending on the right that is violated, costs to the passenger may include disrupted travel, financial loss, pain and suffering, emotional distress, physical injury, an affront to personal dignity, or a combination of them all. The NCD's report noted the varied nature of these service failures:

*"…people who use wheelchairs continue to encounter regular problems, from not being given a bulkhead seat to being mishandled and occasionally dropped by poorly trained or insensitive staff. Flight crews continue to refuse to stow adaptive equipment such as walkers and folding wheelchairs in the aircraft cabin. Travelers with disabilities who are accompanied by able-bodied friends, colleagues, or relatives often find that airline personnel have a tendency to direct questions and instructions to their travel partners rather than address them directly. In short, air travelers with disabilities frequently find air travel unnecessarily humiliating and upsetting."*

These same issues occur today, perhaps in greater frequency, and are as much a violation of the ACAA now as they were in 1999. It is disheartening to know that the DOT, the agency wholly responsible for enforcement of the law, has failed to protect your rights and mine so miserably.

Congress must act to protect travelers with disabilities, by including the private right of action that was proposed by the NCD. The ability for travelers to seek damages for ACAA violations will disincentivize the airlines' blatant disregard for the law. It is the only solution that makes sense after three decades of DOT inaction.

## The ACAA is not a Civil Rights law.

What are Civil Rights? According to Wikipedia, they are a "class of rights that protect individuals' freedom from infringement by governments, social organizations and private individuals, and which ensure one's ability to participate in the civil and political life of the society and state without discrimination or repression." These rights include, among other things, "the ensuring of peoples' physical and mental integrity, life and safety; protection from discrimination on grounds such as race, gender, national origin, colour, sexual orientation, ethnicity, religion, or disability."

I contend that a civil right does not and cannot exist where an individual can take no definitive action to enforce it before the law or protect against its violation.

The crux of the issue is this: The only venues within civil society where persons with disabilities cannot seek recourse before the law for discrimination on the basis of disability are on airplanes and in airports. A civil right is meant to be guaranteed. Numerous federal courts have ruled that Congress withheld a private right of action under the ACAA, reserving that right exclusively to the DOT.

Airlines have violated the rights afforded to me by the law, and I have been denied equal access to air travel. I have submitted complaints to the DOT, and the agency has affirmed the legitimacy of 100% of my claims. No action has been taken. Those same airlines continue to violate those very same rights, repeatedly and as if they are immune from the law. If my government will not stand up for me, and I cannot seek a redress for my own grievances before the court, what rights do I truly have?

By definition, civil rights are a class of protections that must be protected to have merit and value. If the air travel industry is permitted to ignore the ACAA without threat of challenge, the protections under the law cannot be classified as civil rights. To the travelers with disabilities who have been denied a voice, they are nothing but recommendations that are trampled on by the very airlines which they were meant to regulate.

I encourage the United States Congress to heed Dr. King's warning, by recognizing that the right to justice cannot be provided only to some of us – it must be available to everyone.

**Join the conversation on** Facebook**,** Twitter **and** Instagram**!**
**Share your thoughts & use the hashtag, #AirAccessForAll**

Plaintiffs' Exhibit 524

washingtonpost.com

# Coronavirus risk calculations get harder as a study suggests rapid tests may be less effective at detecting omicron

*Joel Achenbach, Yasmeen Abutaleb*

9-11 minutes

As the coronavirus spawns a record-breaking wave of infections, new research suggests that rapid tests widely used to identify potential covid-19 cases might be less effective at identifying illness caused by the swiftly spreading omicron variant.

The finding is the latest complication for anyone trying to strike a common-sense balance between being vigilant and returning to normalcy as the country approaches the third year of the pandemic.

The research, issued Tuesday by the Food and Drug Administration and produced by the National Institutes of Health, said the rapid antigen tests — which have been in high demand and often hard to find this holiday season — "do detect the omicron variant but may have reduced sensitivity."

Although rapid tests showed reduced sensitivity to omicron compared with earlier variants in a lab study, the real-world implications are not clear and are still under investigation, said Bruce J. Tromberg, director of NIH's National Institute of Biomedical Imaging and Bioengineering and lead of RADx Tech, an effort to assess and speed up the development of tests in cooperation with the FDA. The findings do not necessarily mean the tests will be less sensitive in the real world.

President Biden has promised to distribute 500 million rapid tests to the American public. People should still use these tests regularly, Tromberg said, because either way they remain a highly effective tool for combating an extremely contagious virus.

"The diminished sensitivity from the [lab experiments] pales in comparison" with the increased transmissibility of omicron, Tromberg said. "Even with reduced performance, it will still pick up infections and it will help individuals [isolate and] get treatment sooner."

There are plenty of infections out there — a record number in fact. The seven-day average for daily new infections jumped to 301,000 Wednesday, up from about 89,000 on Dec. 1, according to health department data compiled by The Washington Post.

Hospitalizations have increased more modestly, to about 85,000 confirmed or suspected covid patients, but that is still well below the level of last year's winter surge. Deaths are up as well, with a seven-day average of 1,532 deaths each day.

The FDA said it has always known antigen tests overall are less sensitive than the PCR molecular tests, which are typically performed in a lab and have about 98 percent accuracy. If people have symptoms consistent with covid-19 and get a negative rapid test result, the agency recommends a follow-up PCR test.

The news on the rapid tests came in a busy week of updates, revisions and recalculations. On Monday, the Centers for Disease Control and Prevention issued new guidance that lowered the isolation recommendations for people infected with the coronavirus, and who are asymptomatic or showing improvement in symptoms, from 10 days to five.

Quarantine — the period for people exposed to someone known to be infected — dropped by the same amount for people who are vaccinated but not yet boosted. Those who have received a booster shot do not need to quarantine but should wear a mask.

The altered guidance, ambiguous research findings and continuing unknowns about omicron — and, perhaps most of all, the overwhelming desire after two years of a pandemic to return to normal life — have left people once again in the predicament of making personal risk calculations that may be not terribly better than wild guesses.

Those calculations can take into account increasing evidence that omicron, the variant causing the majority of new infections, is less likely to cause severe illness, Anthony S. Fauci, Biden's chief medical adviser for the pandemic, said Wednesday in an interview with The Post.

"It may turn out that omicron, at least among those who are vaccinated and/or previously infected, is going to turn out to be more of a bothersome upper-respiratory infection than something that causes the degree of morbidity and mortality that we've seen with other viruses," Fauci said.

But for people who are unvaccinated and have not been infected previously, he cautioned, "It is not going to be just a common cold."

So what about New Year's Eve? Party? No party? Fauci's guidance is to keep it small, ideally with family and close friends known to be vaccinated and prudent in their behavior.

"You can't ask the American public to lock themselves in their closet alone for New Year's Eve. Because that's the only way you're going to be completely without risk," he said.

And don't get too wild. In a White House briefing Wednesday, Fauci offered a vision of what's too risky: "If your plans are to go to a 40-to-50-person New Year's Eve party with

all the bells and whistles and everybody hugging and kissing and wishing each other a happy new year? I would strongly recommend that this year we do not do that."

The new information and guidance on testing accuracy, isolation requirements, rising case counts and changes in virus pathogenicity are a lot to take in, and there is some inherent ambiguity to some of this. For example, the latest guidance from the CDC states that people who have tested positive can stop isolating after five days if they are asymptomatic or their symptoms are "resolving" — which can be a subjective assessment.

"There's a big difference between having a policy that is just based on people not having symptoms versus one that says your symptoms are resolving. That's as vague as it gets for a guidance," said Walid F. Gellad, professor of medicine at the University of Pittsburgh. "I did not understand what that means."

CDC Director Rochelle Walensky said the decision was based on a growing body of science, as well as internal agency modeling, showing that people are most infectious over a five-day period that starts about two days before symptoms. Transmissibility drops dramatically after that.

After five days, the rapid tests are not likely to be sensitive enough to be reliable indicators of whether transmission is happening, Walensky said. The PCR tests, meanwhile, are more accurate in detecting the presence of the virus but are so sensitive they can identify traces of the virus many weeks after a person is no longer infectious.

Some outside experts also have questioned why the CDC is not calling for people to have a negative test — a rapid test or a PCR test — before exiting isolation.

Questions about the accuracy of rapid tests factored into the decision to not recommend a negative test before exiting isolation, Walensky said in an interview with The Post. She said the CDC saw unclear results when people performed the tests three days in a row. The tests also don't indicate how transmissible a person may be later in their infection, she said.

"We actually don't know how well it works and its predictive value when we use it as an individual test for the purposes of transmissibility later in disease," Walensky said.

Scott Gottlieb, a former FDA commissioner who is on the board of drugmaker Pfizer, said it is reasonable to adjust the official guidance given the fluid nature of the pandemic and the mutations that have given the virus a different level of transmissibility and virulence. But he said the messaging has not always been clear.

"It makes sense that we'd approach this wave differently, but we've struggled to explain that effectively, or to make accommodations for how we'll continue to protect the pockets of vulnerability that remain, especially people who have weakened immune systems and young children who haven't been offered vaccines," Gottlieb said.

"We haven't used all the tools we have to allow people to adjust the measures they should be taking based on their individual risk," Gottlieb said.

Officials said masks remain important, along with booster shots for people who are vaccinated and eligible for another shot. And officials emphasized overwhelming evidence shows vaccination creates a much better layer of protection against severe illness. The CDC said people exiting isolation and quarantine should wear a mask for an additional five days to reduce any risk of transmissibility that may remain.

This week's guidance on isolation and quarantine followed updates the agency issued for health-care workers last week to stave off staff shortages. Some experts lauded the move, while some doctors and nurses said they could wind up being forced to work when still sick.

Omicron accounts for about 59 percent of new infections, according to new estimates from the CDC — a lower percentage than the agency reported earlier this month. The trend is still remarkably vertical and a sign that omicron is rapidly overtaking the delta variant.

Walensky said infections have increased 60 percent during the past week, while hospitalizations have risen only 14 percent. Hospitalizations always lag behind the rise in infections amid a wave of cases, but Fauci said multiple lines of evidence, including laboratory experiments on mice and hamsters, suggest the omicron variant is innately less likely to cause severe disease than previous variants.

That fundamental change, possibly attributable to the omicron variant of the virus remaining high in the respiratory tract and not penetrating deep into the lungs, may be combining with widespread immunity in the population to create the lower rates of severe disease, he said in the briefing.

*Jacqueline Dupree contributed to this report.*

Plaintiffs' Exhibit 525

**More negative Covid results overturned in Australia testing bungle**

8:09 a.m. ET, December 28, 2021

From CNN's Angus Watson in Sydney

Hundreds of people who were told they did not have Covid-19 have now discovered they do, after a Sydney testing center admitted it sent out incorrect PCR results.

SydPath, operated by St. Vincent's Hospital, said Tuesday 486 of 950 people who received negative results by SMS have had that result overturned.

On Monday SydPath said it sent negative results by SMS to 995 people tested on December 23 and 24 despite their PCR tests not having been processed. That number has since been revised to 950 people.

The blunder was detected by the hospital as it investigated how a further 400 people swabbed on December 22 and 23 received a negative result despite being positive for Covid-19.

SydPath said Tuesday the mistake came from a human error, as the clinic "moved from an automated system to a manual system to expedite the release of negative test results."
""Unfortunately during this manual process a simple data processing error was made which led to the wrong test results being released. We have reverted to our automated systems to ensure this type of error cannot happen again," a SydPath statement read."

A surge in cases and a requirement for domestic travelers to gain a negative PCR result has strained the testing system in New South Wales (NSW).

On Tuesday, NSW recorded a further 6,062 cases and one death, while the state of Victoria recorded 2,737 cases and four deaths.

There are currently 60 Covid-19 patients in ICU in NSW and 69 receiving active ICU treatment in Victoria.

Plaintiffs' Exhibit 526

usatoday.com

## Hours in line or a $110 test: How the COVID test shortage is 'frustrating' Puerto Rico visitors

6-8 minutes

Puerto Rico resident Sarah Molinari was looking forward to spending time in New York this week to catch up with family and celebrate the holidays. What she didn't see coming were the hours spent scrolling through COVID-19 testing center websites to make sure she could fly home Tuesday.

While traveling to the U.S. territory used to be a breeze for Molinari and other vaccinated travelers, that changes Monday when Puerto Rico starts requiring all travelers to test negative for COVID before arriving.

The new rule comes as the U.S. finds itself in the midst of yet another coronavirus test shortage, with consumers facing limited sales at retailers and long lines at testing centers.

"I was getting really frustrated, thinking about how do I plan and make sure I get this test in time?" Molinari said. "I have no problem with the policy itself. It's more of the inadequacy of testing on a national scale right now that's making these policies really complicated."

Testing requirements are nothing new in the age of COVID-19, but travelers are finding it more difficult – and more expensive – to visit certain domestic destinations amid the latest testing shortage.

### New COVID testing requirements to enter Puerto Rico begin Dec. 27

Gov. Pedro Pierluisi announced the rule change Monday, one week before the new rules were set to go into effect.

Starting Dec. 27, all passengers arriving on domestic flights must show a negative coronavirus test taken no more than 48 hours before arrival, regardless of vaccination status. (Currently, only unvaccinated domestic travelers are required to show proof of a negative test.)





Discover Puerto Rico, the territory's destination marketing organization, told USA TODAY that PCR and rapid tests are accepted, but at-home tests cannot be used.

"The government of Puerto Rico, along with Discover Puerto Rico, are committed to protecting and prioritizing the health and safety of all on the Island; residents and visitors alike," reads a statement from Discover Puerto Rico. "The changes to local guidelines made by Governor Pierluisi and the Health Department this week reflect the recent and rapidly changing landscape of COVID-19, which required immediate action."

Officials "highly suggest" travelers test before departure, but passengers who arrive without a negative coronavirus test will have 48 hours to take a test upon arrival. Tests are available at the Luis Muñoz Marín International Airport, and Discover Puerto Rico noted that travelers can also schedule a test at a local pharmacy. Those who don't get tested in time face a $300 fine.

Travelers who test on the island do not need to quarantine while they wait for results, according to Discover Puerto Rico, but unvaccinated travelers will need to quarantine seven days after arrival, even with a negative test.

**NERVOUS ABOUT TRAVEL (AGAIN?)** What to know about airline, hotel and cruise cancellation policies as omicron surges

### Difficulties getting tested

While post-arrival testing is an option, Molinari said the Caribbean island has its own testing supply issues. Discover Puerto Rico's website says travelers can get a test on site at the Luis Muñoz Marín International Airport after arrival, but travelers should be prepared to pay $110 for the service.

"I can't do that," said Molinari, who was surprised to learn the test's price tag.

But finding a test stateside is also a challenge.

"Friends that were going to the public testing sites around New York were telling me about hours-long waits," she said. "Some of them show up at one site, wait for hours and then they would run out of tests. So my thought was ... I really just might not get a test when I need it."

Eventually, after about four hours trying to track down a test her insurance would cover, Molinari found a clinic that could offer her an antigen test at no cost.

"I have access to the technology and the information, and I have the time to navigate this process, whereas for many others, that's not the situation that they're in," Molinari said. "So if this was hard for me, my question is, how is someone else supposed to do this?"

Other travelers have taken to social media with their concerns over finding a test in time.

**IS IT SAFE TO TRAVEL RIGHT NOW?** What health experts are doing for the holidays this year

### Hawaii, US Virgin Islands: Other testing requirements for domestic flights

White House press secretary Jen Psaki reiterated Thursday that the federal government does not plan to require testing for domestic air travel at this time.

"We still require masks on airplanes, of course. We've also increased the fee on, if people do not wear masks on airplanes," she said. "Rules, as you know, for international travel are different ... to help keep COVID cases out of this country and delay any new possible variant from coming into the country."

All U.S. flights – domestic and international – require masks through at least March 18. International flights into the U.S. also require a negative pre-departure viral coronavirus test taken no more than one day before travel.



Even so, some domestic destinations have taken it into their own hands to add more stringent entry requirements.

► **Hawaii:** Unvaccinated U.S. travelers flying into Hawaii can take a test to avoid a 10-day quarantine. The state accepts Nucleic Acid Amplification Tests (NAATs) from a trusted travel partner taken no more than 72 hours before departure.

► **U.S. Virgin Islands:** Domestic travelers 5 and older flying into the U.S. Virgin Islands must submit a negative antigen or NAAT test within five days of travel, including those who have been fully vaccinated outside the Virgin Islands.

►**Northern Mariana Islands:**As of Monday, all fully vaccinated travelers must be tested for the coronavirus upon arrival. Travelers must quarantine while they wait for their results. Unvaccinated travelers must quarantine at a designated government facility for seven days and will be tested after the quarantine period ends. If their test is positive, they will be isolated another 10 days at the facility.

► **American Samoa:** The U.S. territory currently limits entry to essential purposes.

*Follow USA TODAY reporter Bailey Schulz on Twitter: @bailey_schulz.*

# Plaintiffs' Exhibit 527

## Biden grapples with a Covid-19 testing failure that could have been foreseen

Analysis by Stephen Collinson, CNN
Updated 1:25 AM ET, Tue December 28, 2021

CNN)President Joe Biden and his team repeatedly promised more Covid-19 testing, including at-home kits that deliver rapid results, but they are now admitting a virus that is more adaptable than the politicians who fight it has outpaced them again.
For many Americans, this holiday season may be remembered for hours spent in long testing lines, or fruitlessly searching pharmacy shelves for antigen tests as the Omicron variant took over the previous Delta wave. Already patchy testing has been exposed by the latest highly transmissible variant, and the US is being compared unfavorably to other developed nations where citizens have easy access to rapid tests for free.
Biden told governors in a virtual meeting Monday that his administration should have done more to speed up the availability of rapid testing, before his pledge this month for 500 million kits due to begin distribution in January, which will be too late to help this week's holiday crunch.

Are vaccine mandates for domestic flights our ticket out of the pandemic?
Are vaccine mandates for domestic flights our ticket out of the pandemic?
"It's not enough. It's clearly not enough. If we'd have known, we'd have gone harder, quicker if we could have," the President said, referring to the Omicron storm that has quickly overwhelmed existing testing capacity. In an interview with ABC News just before Christmas, Biden denied that shortfall in at-home testing represented a "failure." But he added: "You could argue that we should have known a year ago, six months ago, two months ago, a month ago." The President said he wished he had thought about ordering 500 million at-home tests "two months ago."

Such comments by the President, while candid, are unlikely to improve public confidence in a White House that vowed to shut Covid-19 down but sometimes seems to have underestimated the staying power of the virus and the scale of the challenge. The administration has had some important successes in fighting the emergency despite the politically motivated reluctance of millions of Americans to take the President's advice on the vaccines that could save their lives. And on Monday, the US Centers for Disease Control and Prevention changed its guidance in a way that may make the current outbreak less disruptive to everyday life, shortening the recommended times that people should isolate when they've tested positive for Covid-19 from 10 days to five days if they don't have symptoms -- and if they wear a mask around others for at least five more days.

But not for the first time, when it comes to testing, the White House is being forced to play catch-up following successive waves of a pandemic uncannily able to exploit political divides, slow moving bureaucracy and the impatience and weariness of the public with a crisis soon to enter its third year.
Another political blow

The frustrating search for tests endured by many Americans may also have a political consequence for Biden as he searches for a bounce back after a grim few months that saw his approval ratings tumble. He is, after all, on the record promising to fix a dearth of testing that has been laid bare by the recent viral surge.
Running on competence, he put the issue at the center of his 2020 campaign, which was partly rooted in highlighting ex-President Donald Trump's failures during the first year of the pandemic. And in an

address to the nation last March, for instance, the President said: "We continue to work on making at-home testing available."

Between Christmas and New Year&#39;s, doctors expect the US Omicron surge to grow

Between Christmas and New Year's, doctors expect the US Omicron surge to grow

More than nine months later, he is now admitting not enough has been done. Such comments make it hard to accept arguments that the White House was taken off guard by the Omicron variant. Many experts have said for months that rapid testing needs to be more available to the public. It's hardly a secret that new variants of the virus were inevitable. And a recent episode in which White House press secretary Jen Psaki mocked the idea of sending a test to all Americans -- a goal Biden has now embraced -- further muddled the administration's stance on this new phase of the pandemic.

The confusion has frustrated some public health professionals who say there simply aren't enough kits to permit people who are sick, those exposed to someone who has been infected with the virus, and people who want to travel and attend gatherings to get tested.

"It really is shameful that we don't have the amount of tests that are necessary to be able to use it as the robust containment tool that we know it is when used effectively," Dr. Chris Pernell, a public health physician and fellow of the American College of Preventive Medicine, told CNN's Alisyn Camerota on Monday.

All of this may give credence to midterm election messaging from Republicans that Biden has failed in his self-appointed number one task -- beating the virus -- even though it's the GOP's repeated attempts to politicize the struggle that have often set back the pandemic response. The party's continuing devotion to Trump, who once urged public health officials to do less testing so they would uncover fewer Covid-19 cases, also casts doubt on its sincerity on this issue.

A dangerous turn in the crisis

New controversy over testing follows another critical twist in the pandemic. There were more than 200,000 new cases of Covid-19 alone on Sunday, and some experts expect that figure to hit half a million per day soon. While there are hopeful indications that this variant causes fewer hospitalizations than previous incarnations of Covid-19, even a tiny proportion of serious cases could swamp health systems given this level of infections. This is especially the case in areas still battling a surge in the Delta variant of the virus and in parts of the country where vaccination rates remain comparatively low.

The government's top infectious diseases specialist, Dr. Anthony Fauci, admitted on CNN's "New Day" on Monday that the testing situation could be better, despite consistent warnings by experts for months that it isn't sufficiently expansive.

New Omicron variant fills up children&#39;s hospitals

New Omicron variant fills up children's hospitals

"You know, testing has always been an issue," Fauci told CNN's Kaitlan Collins, adding that the situation had been exacerbated by hordes of Americans wanting to travel during the holidays just as Omicron struck.

"It's been a very, very strong run on testing," said Fauci, director of the National Institute of Allergy and Infectious Diseases. "Obviously, not making any excuses for it: we should have had more tests available. But hopefully now as we get into the first couple of weeks in January, that'll get much better."

Biden has made several recent moves designed to fix the shortfall. At the beginning of December, he ordered health insurers to reimburse Americans for the cost of at-home testing, which can run to $20 for a kit or more. Then he promised Americans that he would make half a billion rapid tests available for free, though they will not start rolling out until at least next month. While that influx could be critical as Omicron spreads, it can't ease the Christmas surge or frustration among people who think they are infected now.

Washington caught off guard again

At-home tests are not infallible and are not a panacea for ending the pandemic. They are less important than vaccines and boosters in battling the building Omicron wave. But they are a useful tool that could allow Americans to make informed decisions about their own health and plans. They could confirm whether a sniffle is in fact Covid-19 and help people protect vulnerable relatives or decide to stay out of work to avoid infecting others.

Doctor explains how to tell the difference between Covid-19 and a cold

Doctor explains how to tell the difference between Covid-19 and a cold 01:33

The shortage of testing is all the more remarkable since the US led the world in the rapid deployment of vaccines, in a program that started under the Trump administration and was deployed by the Biden White House team.

Some companies that sought to roll out rapid tests have complained about a prohibitively difficult regulatory process at the US Food and Drug Administration. There have also been complaints about a flood of testing options, including some from abroad that have swamped the capacity to evaluate them. This is a critical issue since rushing approvals of tests or allowing those with deficiencies to get into the system could harm the credibility of testing more broadly -- and be a net negative in the drive to end the pandemic.

Yet this situation also appears to have some of the classic ingredients of a Washington screw-up. A White House consumed by crises seems to have taken its eye off the ball to some extent. It's also possible that increasingly urgent signals from the Oval Office and the suddenness of the Omicron wave haven't effectively worked their way down the bureaucratic chain. Events have overtaken the politicians and now there's a risk of a blame game. None of which is likely to move a country closer to the deliverance from the pandemic that it craves in 2022.

# Plaintiff's Exhibit 528

**BRIEFING ROOM**

# Remarks by President Biden at COVID-19 Response Team's Regular Call With the National Governors Association

**DECEMBER 27, 2021** • **SPEECHES AND REMARKS**

South Court Auditorium
Eisenhower Executive Office Building

11:33 A.M. EST

THE PRESIDENT: A lot of govs. We ready?

MR. ZIENTS: We are ready. Governors, can you hear me okay?

Welcome, Mr. President. This is actually the 40th time we've convened this group of governors, and we're — in addition, we're in constant one-on-one contact with the governors and their teams.

THE PRESIDENT: That's more times than I've seen you. (Laughter.)

MR. ZIENTS: Their leadership on the ground — they are on the frontline, as you know — has been essential to the progress we've made so far.

I'm going to turn to Governor Hutchinson, who has done an outstanding job as chair of the National Governors Association, leading this group and ensuring we're all working together every step of the way.

Over to you, Governor Hutchinson.

GOVERNOR HUTCHINSON: Thank you, Jeff. And I want to thank all of the White House team for being such great support to the governors.

And I want to thank, Mr. President — your address to the nation last week. Thank you for your comments designed to de-politicize our COVID response. I think that was helpful.

As we face Omicron, the governors and your administration must be working together more closely than ever. I particularly appreciate your comments