about increasing the supply chain on rapid COVID tests.  This has become a real challenge for the governors.

And your task force, led by Jeff Zients, has been responsive and has kept us informed every step of the way.  A good example is this last week: I asked for more monoclonal antibody treatments; we received them last week.  Still, we have a limited supply, but the responsiveness is very much appreciated.

I would like to give you a glimpse of Arkansas today.  First, hospitalizations are down by half from where they were this time last year, but our Omicron case count and the demand for testing has increased.  In Arkansas, we have a test-to-stay school program that's a pilot in 50 schools.  We want to expand that, and right now we have sufficient tests to be able to do that.

But we also, as governors, are getting pressure to do more, and the need is great to do more in terms of the rapid tests and the availability of it.  And so, one word of concern or encouragement for your team is that as the — as you look towards federal solutions that will help alleviate the challenge, make sure that we do not let federal solutions stand in the way of state solutions.

And the — the production of 500 million rapid tests that will be distributed by the federal government is great, but, obviously, that dries up the supply chain for the solutions that we might offer as governor.

And so, just that brief comment before I turn it over to you, Mr. President.

But I want to say, personally, I've enjoyed working with you when I was in Congress as head of the DEA.  And I appreciate your leadership.  And thank you so much for giving us the time today to hear from us, but also so that we can hear from you personally about the challenge that we face.

So, Mr. President, the microphone is yours.  Thank you, President Biden.

THE PRESIDENT:  Asa — thank you very much, Asa.  Look, there is no federal solution.  This gets solved at a state level.  I'm looking at Governor Sununu on the board here.  He talks about that a lot.

And then it ultimately gets down to where the rubber meets the road, and that's where the patient is in need of help or preventing the need for help.

Look, Gov, thank you for — for what you're doing.  Thank you for the National Governors Association and Vice Chair Murphy across the river. All's well in New Jersey, I assume, Gov.  And —

GOVERNOR MURPHY:  Amen, Mr. President.

THE PRESIDENT:  — and here today, Democrats and Republicans.

We've discussed the rising COVID cases, especially coming out of the holidays.  And as — as I said last week, Omicron is a source of concern, but it should not be a source of panic.  If you're fully vaccinated and you get your booster shot, you're highly protected.  If you're unvaccinated, you're at a high risk of getting severely ill from COVID-19, being hospitalized, and, in rare cases, even dying.

And this is not like March of 2020, the beginning of the pandemic.  We're prepared and we know what it takes to save lives, protect people, and keep schools and businesses open.  We just have to stay focused and continue to work together.

My message to the governors is simple: If you need something, say something — and we — we're going to have your back in any way we can.

Last week, we took steps to bolster support for you with, number one, more capacity to get shots in arms, with more places, more vaccinators, more times for folks to get vaccinated or get a booster shot.  And we've added appointments for booster shots, adding hours, and getting more convenient to get a booster every day.

The second thing we're doing is more testing.  Seeing how tough it was for some folks to get a test this weekend shows that we have more work to do, and we're doing it.

First, let's talk about how we got here.  When I took office 10 months into — we were 10 months into the pandemic and, even so, we had no — zero — over-the-counter home tests in the United States.  None.  And if you — and if you wanted to get one — to get a test, you had to go to a clinic or a drugstore to have someone give you the test.  And that was — there were very few places to go.

So, we got to work.  We quadrupled the number of pharmacies offering free tests, and there are now more than 20,000 places where you can get tested for free.  At many locations, you can book an appointment online in advance to minimize your wait.

We've worked with Google so you can now search "COVID tests near me" on Google to find a location.

And now, I know ==the lines have gotten very long in some states==. That's why I ordered FEMA to set up pop-up sites in places with high demand to shorten the wait. We stood up six new sites in New York City in five days, and there are more coming.

For over-the-counter, at-home test, as I said, there — there were none when we took office. None. Now we have eight on the market. And just three days ago, another test was cleared. We went from no over-the-counter tests in January to 46 million in October, 100 million in November, and almost 200 million in December.

==But it's not enough. It's clearly not enough==. If I had — we had known, we would have gone harder, quicker if we could have.

Because of steps we have been taking to increase the number of authorized tests, we're now able to purchase 500 million at-home rapid tests to be sent to the American people for free when they request it.

And we're going to continue to use the Defense Production Act to produce as many tests as possible.

And starting in two weeks, private insurance will reimburse you for the cost of at-home tests. We're providing access to free tests for folks who don't have insurance. But we have to do more. We have to do better, and we will.

The third point I'd like to make is: more support for your hospitals. On hospitalizations, let me start with this: Because we have had so many vaccinated and boosted, we're not seeing hospitalization rise as sharply as we did in March of 2020 or even this past fall. Americans — America has made progress. Things are better.

But we do know that with a rise in cases, we still have tens of millions of unvaccinated people and we're seeing hospitalizations rise. It means our hospitals in some places are going to get overrun, but in terms of equipment — both in terms of equipment and staff. That's why we stockpiled and prepositioned millions of gowns, gloves, masks, and ventilators. We're mobilizing an additional 1,000 military doctors and nurses and medics to help staff hospitals.

FEMA is deploying hundreds of ambulances and EMS crews to transport patients. We've already deployed emergency response teams in Colorado, Michigan, Minnesota, Vermont, New Hampshire, and New Mexico. We're ready to provide more hospital beds as well.

The bottom line is: We want to assure the American people that we're prepared.  We know what it takes.  And as a — as this group of bipartisan governors has shown, we're going to get through it by working together.

I want to thank the governors for their partnership, and I mean that sincerely.

With that, I'd like to — to turn it back over to Jeff.  And I understand you guys may have some questions.

Jeff.

MR. ZIENTS:  Good.  I think we're going to clear the press first.  Just give us a minute, Governors, while we —

Q   Mr. President, do you support the minimizing of the quarantine period from 10 days to 5 as the airline groups have recommended?

THE PRESIDENT:  I listen to my medical team.  When I get a recommendation, I follow it.

11:43 A.M. EST



# CONSUMER PROTECTION IN THE AIRLINE INDUSTRY

Plaintiffs' Exhibit 529

by

**Dr. Paul Stephen Dempsey**

Tomlinson Professor of Law

Director, Institute of Air & Space Law

McGill University

Copyright © 2014 by the author

3

# The Civil Aeronautics Board

- Prior to the Airline Deregulation Act of 1978, carriers filed their Contracts of Carriage in tariffs, which were reviewed by the CAB, and approved if "just and reasonable."

- After deregulation, carrier Contracts of Carriage were no longer subjected to governmental review and approval.

- However, provisions in the carriers' Contracts of Carriage were void if they conflicted with federal law or regulation.

- Prior to deregulation, the economic health of airlines was not as stressed. Load factors were lower, and carriers offered other carriers discounted fares if they needed to reaccommodate passengers stranded by delays or flight cancellations.

- After deregulation, load factors increased so there were fewer empty seats, and some carriers became less willing to accommodate passengers of other airlines.



McGill

Plaintiffs' Exhibit 530

**The John Marshall Journal of Information Technology & Privacy Law**

Volume 30 | Issue 4                                                                 Article 1

Summer 2014

# The Right To Travel And Privacy: Intersecting Fundamental Freedoms, 30 J. Marshall J. Info. Tech. & Privacy L. 639 (2014)

Richard Sobel

Follow this and additional works at: http://repository.jmls.edu/jitpl

Part of the Computer Law Commons, Internet Law Commons, Privacy Law Commons, and the Science and Technology Law Commons

Recommended Citation

Richard Sobel, The Right To Travel And Privacy: Intersecting Fundamental Freedoms, 30 J. Marshall J. Info. Tech. & Privacy L. 639 (2014)

http://repository.jmls.edu/jitpl/vol30/iss4/1

This Article is brought to you for free and open access by The John Marshall Institutional Repository. It has been accepted for inclusion in The John Marshall Journal of Information Technology & Privacy Law by an authorized administrator of The John Marshall Institutional Repository.

# ARTICLES

# THE RIGHT TO TRAVEL AND PRIVACY: INTERSECTING FUNDAMENTAL FREEDOMS*

RICHARD SOBEL⁺

## ABSTRACT

As a fundamental right inherent in American citizenship and the nature of the federal union, the right to travel in the United States is basic to American liberty. The right precedes the creation of the United States and appears in the Articles of Confederation. The U.S. Constitution and Supreme Court recognize and protect the right to interstate travel. The travel right entails privacy and free domestic movement without governmental abridgment.

In the era of surveillance, the imposition of official photo identification for travel, watchlist prescreening programs, and invasive airport scans and searches unreasonably burden the right to travel. They undermine citizen rights to travel and to privacy. These regulations

---

    *    An earlier version of this research was presented by Richard Sobel & Ramon Torres as "The Right to Travel: Intersection with the Right to Privacy and a Personal Liberty," at the Northwestern University Transportation Center Seminar Series on January 6, 2011. It formed a basis for Sobel & Torres, *The Right to Travel a Fundamental Right of Citizenship*, in the Journal of Transportation Law, Logistics & Policy, Spring 2013. The current Article updates portions of the earlier presentation and publication. The author thanks Dawid Danek, Kevin Doran, Brian Kebbekus, Tim Lamoureux, Catherine Nance, Allison Trzop and Michael Zhang, for research assistance and comments on the Article. He also appreciates the insights and suggestions of Barry Horwitz, Gerald Jenkins, Diana Marek, Matthew Beamer, and Ramon Torres, and the assistance of the Buffett Center, Transportation Center, NICO, Hutchins Institute, Houston Institute, Journal of Transportation Law, Logistics & Policy, and The John Marshall Journal of Information Technology & Privacy Law.

    +    Buffett Center for International and Comparative Studies, Northwestern University, at richard-sobel@northwestern.edu. In addition to being a Visiting Scholar at the Buffett Center, he is also a faculty affiliate of the Transportation Center at Northwestern, an associate of the Hutchins Institute, and a consultant to the Houston Institute at Harvard.

impermissibly require citizens to relinquish one fundamental right of privacy in order to exercise another fundamental right of travel. The government must preserve these rights in addressing policy goals. The original conception of the right to travel embodies it as a broadly-based freedom that encompasses all modes of transport. Its explicit articulation in the Articles of Confederation became implicit in the Privileges and Immunities Clause of the Constitution. Contrary to the appellate "single mode doctrine," abridgement of any mode of transportation undermines the constitutionally enshrined travel right. The U.S. Supreme Court needs to rearticulate an originally consistent and politically robust multi-modal right to travel.

## INTRODUCTION:  TRAVEL AS A FUNDAMENTAL RIGHT OF CITIZENSHIP

As a foundational political liberty that precedes the adoption of the U.S. Constitution, the right to travel in the United States is inherent both in citizenship and in the nature of the federal union. The Constitution and the U.S. Supreme Court recognize and protect the right to interstate travel.[1] The travel right empowers U.S. citizens to move interstate without abridgement by government interference. Laws and regulations that impede citizens' ability to exercise a fundamental right like travel to preserve another like privacy are inherently suspect. The Ninth Circuit stated in *United States v. Davis*, "exercise of the constitutional right to travel may not be conditioned upon the relinquishment of another constitutional right absent a compelling state interest."[2]

The original conception of the travel right is explicitly stated in Article IV of the Articles of Confederation and remains in force in the parallel article of the U.S. Constitution. Travel embodies a broadly based personal, political, and economic right that encompasses all modes of transportation and movement. Abridgement of any mode violates the right. The so-called "single mode doctrine," constructed by some circuit courts truncates the plenary scope of the travel right.[3]   The imposition

---

1.   *See* Saenz v. Roe, 526 U.S. 489, 498 (1999) (noting that the right to travel is "firmly embedded" within the jurisprudence of the Supreme Court); Shapiro v. Thompson, 394 U.S. 618, 630 (1969); RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 4.8 (4th ed. 2007).

2.   United States v. Davis, 482 F.2d 893, 913 (9th Cir. 1973).

3.   *See* John Doe No. 1 v. Ga. Dep't. of Pub. Safety, 147 F. Supp. 2d 1369, 1375 (N.D. Ga. 2001) ("[T]he denial of a single mode of transportation does not rise to the level of a violation of the fundamental right to interstate travel."); *see, e.g.*, Town of Southold v. Town of East Hampton, 477 F.3d 38, 54 (2d Cir. 2007); Gilmore v. Gonzales, 435 F.3d 1125, 1137 (9th Cir. 2006); Duncan v. Cone, 2000 WL 1828089 (6th Cir. 2000); Miller v. Reed, 176 F.3d 1202, 1205 (9th Cir.1999); Houston v. F.A.A., 679 F.2d 1184, 1198 (5th

of governmental requirements, such as official photo identification for travel, watch-list prescreening programs, no-fly lists, and intrusive airport scanning and searches, unreasonably burden the right to travel in privacy.

This Article traces the development of the travel right from its robust early conceptualization to its modern-day misconstruction. Part I presents the historical origins of the travel right. Part II conceptualizes the historic travel right around privacy concerns for the modern era. Part III critiques unjustified circuit court limitations on the rights to travel and privacy in a surveillance age. The Conclusion argues that the Supreme Court needs to reconstruct and rearticulate an originally consistent and expansive right to travel.

## I. THE HISTORICAL ORIGINS OF THE RIGHT TO TRAVEL

The right to travel precedes the American union and the U.S. Constitution. In shaping medieval English law in 1215, the Magna Carta articulated travel rights for personal liberties and unfettered commerce in assuring "merchants are . . . safe and secure in . . . traveling in England."[48] Blackstone's 1795 *Commentaries on the Laws of England* identified freedom of movement as a natural liberty inherent by birth.[5] "This personal liberty consists in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct, unless by due course of law."[6] Blackstone defined it as a "strictly natural" right.[7]

The right to travel pervades U.S. history. In 1770, Thomas Jefferson argued that freedom of movement is a personal liberty by birth. "Under the law of nature, all men are born free, everyone comes into the world with a right to his own person, which includes the liberty of moving and using it at his own will. This is what is called a personal liberty."[8] The appearance in Article IV of the Articles of Confederation in 1777 of a right to travel informed its implicit incorporation in the

---

Cir. 1982); Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc., 466 F.2d 552, 554 (9th Cir. 1972).

    4.   PETER LINEBAUGH, MAGNA CARTA MANIFESTO: LIBERTIES AND COMMONS FOR ALL 179 (2008); NICHOLAS VINCENT, MAGNA CARTA, A VERY SHORT INTRODUCTION, 118 (2012) ("All merchants are to be safe and secure in leaving and entering England, and in staying and traveling in England . . . ").

    5.   *See generally* SIR WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND: BOOK THE FIRST OF THE RIGHTS OF PERSONS (1765).

    6.   *Id.* at 130. The Delaware Chancery Court agreed with Blackstone, in *Douglass v. Stephens*, and established that freedom of movement is fundamental for "the enjoyment and defense of liberty." Douglass v. Stephens, 1 Del. Ch. 465, 471 (1821).

    7.   BLACKSTONE, *supra* note 5, at 130.

    8.   THOMAS JEFFERSON, ARGUMENT IN THE CASE OF HOWELL v. NETHERLAND, THE WRITINGS OF THOMAS JEFFERSON 474 (1892).

Privileges and Immunities Clause of Article IV of the U.S. Constitution in 1789. In short, the Confederation travel right was fundamentally inaugurated for the founding era and beyond.[9]

> The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States . . . shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce. . . . [10]

Early courts explicated this broad conception. In the 1823 decision, *Corfield v. Coryell*,[11] the Supreme Court recognized the travel right in explaining the relationship between the "free ingress and regress" clause in Article IV of the Articles and the Privileges and Immunities Clause in the Constitution.[12] The Court affirmed that the privileges and immunities of citizenship encompass "the right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuit, or otherwise."[13] The imperative of free interstate travel was "better to secure and perpetuate mutual friendship" of the states.[14] Moreover, in 1824, the Supreme Court established in *Gibbons v. Ogden*, that commerce, as intercourse between the states, encompasses a right from the creation and adoption of the U.S. Constitution.[15]

The original expansive conception of the right to travel encompasses all available modes of transportation. The 1831 Court ruling in *Beckman v. Saratoga & Schenectady Railroad* established that whenever there is a compelling public interest in a technology available to the public, for instance, a new mode of transport like railways, then all citizens are equally entitled to enjoy its benefits and to access it and its instrumentalities.[16] This ruling established transportation service providers as common carriers,[17] and scheduled passenger transport of various kinds.

---

9.   ARTICLES OF CONFEDERATION of 1781, art. IV.

10.   *Id.*

11.   Corfield v. Coryell, 6 F.Cas. 546, 550-51 (C.C.E.D. Pa. 1823).

12.   U.S. CONST. art. IV, § 2.

13.   *Corfield*, 6 F.Cas. at 552.

14.   *Id.* (citing ARTICLES OF CONFEDERATION of 1781, art. IV).

15.   Gibbons v. Ogden, 22 U.S. 1, 193(1824).

16.   Beckman v. Saratoga & Schenectady R.R., Co., 3 Paige Ch. 45, 45 (N.Y. 1831).

17.   "[T]he public [has] an interest in the use of the road, and the owners of the franchise are liable to respond in damages, if they refuse to transport an individual or his property upon such road, without any reasonable excuse, upon being paid the usual rate of fare." *Beckman*, 3 Paige Ch. at 75; *see* the section herein on common carriage and travel rights.

### THE RIGHT TO TRAVEL ACROSS THE UNITED STATES

The right to interstate travel has connected the parts of the nation since its founding. Travel is fundamental and structural to maintaining a strong political and economic union of sovereign states. As Ronald Kahn articulated, "The [Supreme] Court views the concepts of the federal union and personal liberty rights in the Constitution as closely related. Their union requires that all citizens be free to travel, uninhibited by regulations that unreasonably burden their movement."[18]

Because the national government does not possess "general police power," its authority is restricted to what the Constitution expressly grants it.[19] The Ninth and Tenth Amendments reserve all other unenumerated rights to the states and the people to ensure that citizens may not be deprived of those rights not delegated to the federal and state governments without due process under the Fifth and Fourteenth Amendments.[20] The right to travel, inherent in intercourse among the states, is one of the implied and unenumerated rights reserved to the People.[21]

The 1849 *Passenger Cases* declared the right to travel may be exercised without interference. The Court established that state taxation of imports and exports unconstitutionally imposed on commerce and interstate travel.[22] It ruled against New York and Massachusetts' imposition of taxes on alien passengers arriving from ports out of state.[23] To ensure uniform treatment of citizens across the states, and to bind together the Union, the Constitution empowered Congress alone with the power to regulate commerce between the United States and among the States.[24]

The right to travel is "so rooted in the traditions and conscience of our people as to be ranked as fundamental."[25] The 1867 case of *Crandall v. Nevada*, for example, recognized that necessity for interstate travel to exercise other personal rights and liberties. A Nevada-imposed fee constituted "a tax on the passenger for the privilege of passing

---

18.   RONALD KAHN, THE SUPREME COURT AND CONSTITUTIONAL THEORY, 1953-1993 50 (1994).

19.   *See, e.g.*, LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-2 (1988).

20.   *See* Griswold v. Connecticut, 381 U.S. 479, 487 (1965) (Goldberg, J., concurring); McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 372, (1819) (argument of counsel).

21.   *See, e.g.*, Crandall v. Nevada, 73 U.S. 35, 48-49 (1867); Shapiro v. Thompson, 394 U.S. 618, 629-31 (1969).

22.   The Passenger Cases, 48 U.S. 283, 283 (1849).

23.   Congress may impose taxes on common carriers and ports. However, these taxes are regulated and uniform throughout the nation since, in accordance to the Constitution: "all duties, imposts and excises shall be uniform throughout the United States." U.S. CONST. art. 1, § 8, cl.1.

24.   *The Passenger Cases*, 48 U.S. at 492 (Taney, C.J., dissenting).

25.   Griswold v. Connecticut, 381 U.S. 479, 493 (1964) (citing Snyder v. Massachusetts, 291 U.S. 97, 105 (1934)).

through the State by the ordinary modes of transportation."[26] Even one state's imposition of a tax on those leaving the state could weaken the federation of states. "If one State can [levy such a tax], so can every other State. And thus one or more States covering the only practicable routes of travel from the east to the west, or from the north to the south, may totally prevent or seriously burden all transportation of passengers from one part of the country to the other."[27]

The *Crandall* court determined that Nevada's imposition of a per passenger tax on railroad or stagecoach companies for passengers transported out of the state unconstitutionally limited citizens' right to travel.[28] The tax levied by Nevada on passengers for the privilege of passing through the state unconstitutionally burdened the travel right.[29] "We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own States."[30] The tax hindered citizens' exercise of other fundamental rights, such as approaching the government for redress of grievances and accessing ports where commerce was conducted.[31]

As in *Corfield v. Coryell, The Slaughter House Cases*[32] in 1873 affirmed the right to travel by determining that "the privileges and immunities intended [in Articles IV of the Articles of Confederation and U.S. Constitution] are the same in each."[33] By asserting such a close link, the Court confirmed the right to interstate travel is protected, as in the Articles of Confederation, by the Constitution's Commerce Clause and as a Privilege and Immunity of citizens under Article IV.[34] In *Williams v. Fears*, the Supreme Court in 1900 declared, "[u]ndoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily of free transit from or through the territory of any State is a right secured by the 14th amendment and by other provisions of the Constitution."[35]

---

26.   Crandall v. Nevada, 73 U.S. 35, 49 (1867).
27.   *Id*. at 35.
28.   *Id*. at 44-45.
29.   The Court described the tax power as "being in its nature unlimited," and interfering with powers of the federal government. *See id*. at 36, 46-48.
30.   *Id*. at 49.
31.   *See id*. at 43-44.
32.   *The Slaughter House Cases*, 83 U.S. 36, 79 (1873).
33.   *Id*. at 75.
34.   *See generally* Ward v. Maryland, 79 U.S. 418 (1870); Hoxie v. New York, N.H. & H.R. Co., 82 Conn. 352 (1909).
35.   Williams v. Fears, 179 U.S. 270, 274 (1900), *quoted in* Schactman v. Dulles, 225 F.2d 938, 944 (1955).

Complementing Fifth Amendment due process guarantees,[36] the Court established in *Edwards v. California* in 1941 that the Fourteenth Amendment extends due process protections to all citizens of the United States.[37] It thereby protects citizens from infringement by states and the federal government. In concurring, Justice Douglas held that "the right of persons to move from state to state occupies a more protected position in our constitutional system . . . "[38] As the Supreme Court affirmed in 1958 in *Kent v. Dulles*, "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law."[39]

In 1966 in *United States v. Guest*, the Court rearticulated that the Constitution did not explicitly mention the right to travel because:

> a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. . . . The constitutional right to travel from one State to another . . . occupies a position so fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized. . . .[40]

Indeed, *Guest* affirmed "[t]he constitutional right of interstate travel is virtually unqualified."[41] Today the travel right remains crucial to the formation and ongoing prosperity of the political union and common market.

The importance of such connectivity appears in *Shapiro v. Thompson* in 1969.[42] The *Shapiro* Court stated:

> This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.[43]

The *Shapiro* decision highlighted that "[t]his constitutional right . . . is not a mere conditional liberty subject to regulation and control under conventional due process or equal protection standards." Furthermore, the decision reaffirmed the right to travel, as "a right broadly assertable

---

36.  *See, e.g.,* United States v. Guest, 383 U.S. 745, 759 n.17 (1966); Kent v. Dulles, 357 U.S. 116, 125 (1958).

37.  Edwards v. California, 314 U.S. 160, 176 (1941).

38.  *Id.* at 177.

39.  *Kent*, 357 U.S. at 125.

40.  *Guest*, 383 U.S. at 757-58.

41.  *Id.*

42.  *See generally* Shapiro v. Thompson, 394 U.S. 618 (1969). As Justice Brennan added in his concurrence in *Zobel v. Williams*, the origin of the travel rights' "unmistakable essence [is] that document that transformed a loose confederation of States into one Nation." Zobel v. Williams, 457 U.S. 55, 67 (1982) (Brennan, J., concurring).

43.  *Shapiro*, 394 U.S. at 629.

against private interference as well as governmental action."[44] In short, the travel right protects against both restrictive public and private actions, and it empowers those availing themselves of the right's protections. The right to travel constitutes a fundamental freedom government may not abridge.

Quoting *Guest* in *Dunn v. Blumstein* in 1972, the Supreme Court ruled that, "freedom to travel throughout the U.S. has long been recognized as a basic right under the Constitution."[45] The *Dunn* court held, "since the right to travel was a constitutionally protected right, any classification which serves to penalize the exercise of the right . . . is unconstitutional."[46]

The Court more recently affirmed the fundamental constitutional right to travel in 1999 in *Saenz v. Roe*.[47] The first of three components is most relevant to interstate travel: "citizens have the right to enter and leave another State."[48] The decision held unconstitutional a state welfare statute that discriminated against new residents.[49] The ruling agreed with *Shapiro* in that "a classification that has the effect of imposing a penalty on the right to travel violates the Equal Protection Clause 'absent a compelling governmental interest.'"[50] While *Saenz* focused on state-to-state travel, the holding was not specific to states alone. Thus, the case features a travel right that extends across the nation.

Travel is an instrumentality of commerce that Congress may regulate in order to encourage commercial activities and intercourse. *Kent* established that the Interstate Commerce Clause[51] protects interstate travel and its instrumentalities against governmental infringement.[52] *Guest* affirmed "[t]he constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities

---

44.   *Id.* at 630-31.

45.   Dunn v. Blumstein, 405 U.S. 330, 338 (1972); United States v. Guest, 383 U.S. 745, 758 (1966).

46.   *Dunn*, 405 at 338-39 (striking down a residency requirement restricting voting rights).

47.   *See generally* Saenz v. Roe, 526 U.S. 489 (1999).

48.   *Id.* at 500.

49.   *Id.* at 507-08.

50.   *Id.* at 490.

51.   U.S. CONST., art. I, § 8, cl. 3; *see* Daniel A. Farber, *National Security, the Right to Travel, and the Court*, 1981 SUP. CT. REV. 263, 263-87 (1981).

52.   President Woodrow Wilson would not abridge American citizens' rights to travel and engage in commerce, even during wartime. Responding to Senator W. J. Stone's letter that "this government tak[e] definite steps toward preventing American citizens from embarking upon armed merchant vessels," Wilson wrote, "[f]or my own part, I cannot consent to any abridgement of the rights of American citizens in any respect. . . . To forbid our people to exercise their rights for fear we might be called upon to vindicate them would be a deep humiliation indeed." *President Wilson's Letter to Senator Stone Announcing His Stand on Armed Liner Issue*, N.Y. TIMES, Feb. 25, 1916.

of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized."[53] The right to interstate commerce encompasses both the freedom of movement and the instrumentalities of transportation needed to so move.

Congress may not pass legislation that unreasonably burdens the right to travel. "One has the right, as against any prohibitory or other restrictive legislation, whether by Congress,[54] or by the States, to engage in the interstate or foreign commerce, that is, to transport persons or articles from State to State, or to or from a foreign country."[55] Thus, Congress must not infringe citizens' travel rights.

The travel right ensures the vitality of the government through the free movement of citizens in purposive travel. Specifically, the right preserves and facilitates citizens' ability to journey to their representative seats of government, both statewide and nationally, in order to petition under the First Amendment to have their grievances redressed. Foreclosing such a right would have offended the Founders in their suspicion of governmental overreaching into citizens' rights. Therefore, the Founders laid down protections for political speech and association inherent in the travel right. Even in an era of few travel modes, the Founders conceived the travel right as broad and plenary.

Consequently, domestic requirements for passports, identification, or permits for traveling in the United States hamper exercising the right to interstate travel. They also invert the proper consent relationship between citizens and government.[56] Government derives its "license" to operate from the people: when the government instead requires the people to obtain or present a license in order to travel domestically, it abrogates foundational rights. As Justice Ginsburg stated in a public forum: "[t]here is a right to travel. We have had a common market in that respect from the very beginning; you can go from one state to another without any passport."[57]

---

53. United States v. Guest, 383 U.S. 745, 758 (1966).

54. "Congress can set the regulations, conditions, or prohibitions regarding the permissibility of interstate travel or shipments if the law does not contravene a specific constitutional guarantee." ROTUNDA & NOWAK, *supra* note 1.

55. Frederick H. Cooke, *The Right to Engage in Interstate and Foreign Commerce as an Individual or as a Corporation*, 8 MICH. L. REV. 458, 459 (1910).

56. Richard Sobel & John A. Fennel, *Troubles with Hiibel: How the Court Inverted the Relationship between Citizens and the State*, 48 S. TEX. L. REV. 613, 639 (2007).

57. Associate Justice Ruth Bader Ginsburg, Remarks at the Northwestern University Law School (Sept. 15, 2009), *available at* http://www.c-spanvideo.org/program/288900-1 (responding in a public discussion to a question by Dr. Richard Sobel); *see* Louis Brandeis & Samuel Warren, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890); *see also* Olmstead v. United States, 277 U.S. 438, 471-85 (1928) (Brandeis, J., dissenting); *see also* MELVIN UROFSKY, LOUIS D. BRANDEIS: A LIFE 562 (2009) (quoting Brandeis that the Fourteenth Amendment protects the right to travel: "the 14th

In short, the right to travel preceded modern means of transportation like railroads and airplanes. It was conceived as an inherent liberty within citizenship, personhood, and union. The right was not linked to a particular instrumentality for exercise of personal liberty. Accordingly, the right to travel is not tied to any specific mode of transportation. Consequently, it encompasses all means of travel.

### The Right to Travel as a Foundation for Citizens and Union

From the perspective of individual rights, the ability to move freely in the United States is a personal liberty, inherent by birth and U.S. citizenship. The travel right is essential to guaranteeing equality of opportunities, and *the pursuit* of happiness for citizens of the federal union. Freedom of personal movement is a natural liberty that citizens exercise among fundamental rights and privileges.

Moreover, the right to interstate travel encompasses rights and privileges to personal, political, and commercial movement. This interconnection between the right of individuals and the character of the nation guarantees unrestricted geographical mobility to citizens in the American political and economic union. The right to interstate travel is based on the Founders' desire to structure a federal union under the Constitution to create a strong political union and a common market composed of sovereign states. By "place[ing] the citizens of each State upon the same footing with citizens of other States . . . ,"[58] the Privileges and Immunities Clause in Article IV of the U.S. Constitution guarantees the freedom to move from state to state and set up residence anywhere in the country. In securing that liberty, citizens of one state are entitled to the same privileges and immunities as the citizens of any other state.

An essential element in the notion that the states belong to a more perfect union manifests itself in the right to travel between the states on a basis of equality.[59] The Court recognized that without this constitutive dimension, "the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists."[60] Therefore, the right to travel is fundamental and structural to

---

amendment due process clause . . . had to be applied . . . to protect . . . fundamental rights—speech, education, choice of profession, and the right to travel . . . ").

58.    Paul v. Virginia, 75 U.S. 168, 180 (1869); *see* Sonia Sotomayor, *Statehood and the Equal Footing Doctrine: The Case for Puerto Rican Seabed Rights*, 88 YALE L. J. 825, 835-51 (1979); *see also* Associate Justice Sonia Sotomayor, Address at the Northwestern University Law School (Mar. 7, 2011) (distinguishing travel rights for constitutional versus statutory citizenship).

59.    Seth F. Kreimer, *The Law of Choice and Choice of Law: Abortion, the Right to Travel, and Extraterritorial Regulation in American Federalism*, 67 N.Y.U. L. REV. 451, 519 (1992).

60.    *Paul,* 75 U.S. at 180.

a larger union because without it, the founding vision of a transcontinental nation could not be attained.

As a commercial union, the United States is a common market that enjoys the right of free interstate movement of people and goods in order to guarantee economic prosperity of the political union. The Founders had a desire to create one nation with regard to economic movement and change. Thus, the Founders established national control of commerce[61] to enable individuals to move from state to state for economic reasons.[62] In short, the commercial and political intersect.

American political history and Supreme Court jurisprudence crafted the right to travel as a fundamental one accruing naturally to every U.S. citizen and to the nation. The Court has consistently recognized a right to travel as one of citizenship preceding and contributing to the establishment of a federal constitution. Although the text of the Constitution no longer explicates the right to travel, Articles I and IV, and the First, Fifth, Ninth, Tenth, and Fourteenth Amendments protect the right. Here, facilitation of imports and exports (Article I, Section 9) coincides with the Privileges and Immunities of citizens of all states (Article IV). Due process and equal protection (Fifth and Fourteenth Amendments) intersect with rights reserved to the people and states (Ninth and Tenth Amendments).[63] In short, multiple constitutional provisions underlie and ally with the right to travel and related rights.

---

61.    *See* U.S. CONST., art. I, § 8 (enumerating the powers of Congress to regulate commerce under § 9).

62.    KAHN, *supra* note 18, at 39.

63.    Freedom of movement within a country is internationally recognized as a right and embodied in national constitutions. *See* CONSTITUCIÓN POLÍTICA DE LOS ESTATOS UNIDOS MEXICANOS [C.P.] art. 11 (the right to travel is embedded in the Mexican Constitution, Article 11, guaranteeing the right of any person to enter, leave, or travel within the Mexican territory without the need of any means of identification); *see e.g,* Grundgesetz Fur Die Bundesrepublik Deutschland [GG] (GER), INDIA CONST., CONSTITUCIÓN NACIONAL [CONST. NAC.] (Arg.), CONSTITUCIÓN ESPAÑOLA [C.E.] (Spain), CONSTITUTION OF ROMANIA, USTAV REPUBLIKE HRVATSKE (Croat.), CONSTITUTION OF THE REPUBLIC OF TURKEY, and S. AFR. CONST (providing for the right to move freely within the respective countries).  For the right to travel recognized in international law *see American Declaration of the Rights and Duties of Man,* OEA/Ser.L./V.II.23, doc. 21, rev. 6 (1948) (noting the right to travel in the Organization of American States); *see also Universal Declaration of Human Rights,* G.A. Res. 217 (III) A, U.N. Doc. A/RES/217(III) (Dec. 10, 1948) (discussing right to travel in Article 12); *see also* Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 222; *see also* The Helsinksi Act, Aug. 1, 1975, 14 I.L.M. 1292 (the United States and thirty-five countries are signatories); *see also* African Charter on Human and Peoples' Rights, June 27, 1981, 1520 U.N.T.S. 217; *see also* International Covenant on Civil and Political Rights, Dec. 16, 1966, S. Exec. Rep. 102-23, 999 U.N.T.S. 171.

## II. THE MODERN CONTEXT OF THE RIGHT TO TRAVEL

Fundamental rights must expand to encompass new technologies, and case law needs to evolve by retaining the essence of the basic protections. When the right to travel appeared in the Articles of Confederation, for example, it preceded the formulation of the related right to privacy. Yet, the expansive nature of the travel right drives the construction of privacy provisions. The travel right also preceded and catalyzed progressive non-discrimination policies included in current federal definitions of and access to common carriers. There, the government sought equal and uniform protection of rights to common carriage. The evolution of privacy and other rights parallels the protections inherent in the right to travel. Evolution may not, in short, fundamentally alter the original rights.

### INTERSECTION OF THE RIGHT TO TRAVEL AND THE RIGHT TO PRIVACY

In a parallel path to the travel right, the right to privacy has evolved from a focus on the protection of an individual's physical property[64] to encompass a broader swath of privacy safeguards and expectations pertaining to an individual as a constitutionally-protected person in both private and public.[65] The oldest protections to personal privacy resides in the Fourth Amendment safeguards against unreasonable searches and seizures without probable cause of criminal activity.[66] These protections now intersect with travel rights.

The fundamental right to privacy protects individuals' choices to conduct their personal lives free from governmental interference.[67] In *Griswold* v. *Connecticut*, the Court established that the right to privacy protects individuals engaging in private acts from government

---

64. *See, e.g.,* Boyd v. United States, 116 U.S. 616, 622-23 (1886) (recognizing that a search and seizure was equivalent to a compulsory production of a man's private papers and was unreasonable within the meaning of the Fourth Amendment).

65. *See, e.g.,* Griswold v. Connecticut, 381 U.S. 479 (1964).

66. J. NOWAK & R. ROTUNDA, CONSTITUTIONAL LAW 734-35 (2d ed. 1983) ("the oldest constitutional right to privacy is that protected by the Fourth Amendment's restriction on governmental searches and seizures."); *see generally* Richard Sobel, Barry Horwitz, & Gerald Jenkins, *The Fourth Amendment beyond Katz, Kyllo and Jones: Reinstating Justifiable Reliance as a More Secure Constitutional Standard for Privacy,* 22 B.U. PUB. INT. L.J. 1 (2013).

67. Meyer v. Nebraska, 262 U.S. 390, 402-03 (1923) (using the right to privacy to protect the freedom of schools to teach subjects in languages other than English); *see* Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925) (using the right to privacy to protect parents' decision to have their children attend private schools); *see, e.g.,* Lawrence v. Texas, 539 U.S. 558 (2003); *see, e.g.,* Village of Belle Terre v. Boraas, 416 U.S. 1 (1974) (to protect the intimate and family lives of citizens).

interference.[68] The "emanations" of several constitutional rights protect a range of privacy interests.[69]

These constitutional rights also protect the right to privacy in travel.[70] The right to travel entails the right to privacy in its fundamental elements of individual choice regarding when, where, and how to move.[71] The intersection of the right to travel and the right to privacy as fundamental liberties allow individuals to engage in private and anonymous travel. Indeed, anonymous travel represents the concurrent exercise of these overlapping personal liberties.

The right to travel in anonymity, without having to identify oneself or carry identification documents, was articulated clearly in *Kolender v. Lawson*.[72] Edward Kolender was an African-American who frequently walked in white California neighborhoods where police repeatedly stopped, asked him for identification, and at times arrested him, even though he was pursuing legal activity.[73] In *Kolender*, the Court struck down the California statute that required "persons who loiter or wander on the streets to provide a 'credible and reliable' identification and to account for their presence when requested by a peace officer."[74] The Court invalidated the statute on the basis that it was "constitutionally vague within the meaning of the Due Process Clause of the Fourteenth Amendment by failing to clarify what is contemplated by the requirement that a suspect provide a 'credible and reliable' identification."[75]

The basis of *Kolender* on vagueness affirmed the Ninth Circuit's judgment that the statute violated the Fourth Amendment. "The appellate court determined that the statute was unconstitutional in that it violates the Fourth Amendment's proscription against unreasonable searches and seizures, it contains a vague enforcement standard that is susceptible to arbitrary enforcement, and it fails to give fair and adequate notice of the type of conduct prohibited."[76]

---

68.   *Griswold*, 381 U.S. at 483; *see* Roe v. Wade, 410 U.S. 113, 153 (1973); *see also* Planned Parenthood v. Casey, 505 U.S. 822, 851 (1982) (upholding the bodily autonomy of individuals); *see also* Oral Argument Transcript at 43, Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S.Ct. 2566 (Mar. 27 2012) (referencing "means of travel").

69.   *See* Doe v. Bolton, 410 U.S. 179, 209 (Douglas, J., concurring).

70.   *See supra* Part I.

71.   Kent v. Dulles, 357 U.S. 116, 125-26 (1958); Shapiro v. Thompson, 394 U.S. 618, 629 (1969). *Kent* and *Shapiro* established that the right to travel must be free from government interference, thus associating the right to privacy with the exercise of the right to travel. *Kent*, 357 U.S. at 125-26; *Shapiro*, 394 U.S. at 629.

72.   Kolender v. Lawson, 461 U.S. 352, 353-54 (1983).

73.   *Id.*

74.   *Id.* at 353.

75.   *Id.* at 353-54.

76.   *Id.* at 355.

Moreover, in a telling concurrence, Justice Brennan clarified that the demand for identification was a search when he held that even if the statute had not been vague, it would still have violated the Fourth Amendment.[77] "Even if the defect identified by the Court were cured, however, I would hold that this statute violates the Fourth Amendment" because "States may not authorize the arrest . . . for failing to produce identification."[78] In short, the *Kolender* court struck down the requirement to provide identification when involved in legal behavior.

In *Hiibel v. Nevada*, the Supreme Court reaffirmed that unless there is reasonable suspicion of a crime and a state law requiring identification under that circumstance, police may not require individuals to provide identification.[79] Like previous cases where, for instance, Kolender had simply been walking, Hiibel was a pedestrian at roadside when confronted by the officer, though first pursued under reasonable suspicion based on an observer's report that an assault had been observed in a motor vehicle.[80] The Nevada statute, the Supreme Court ruled 5-4, required Hiibel to disclose his name, but not to produce an identification document.[81] Nonetheless, contrary to *Kolender,* the demand in *Hiibel* to produce a name as identification contradicts the now-famous principles in *Miranda v. Arizona*[82] and a series of cases of strong dicta that protect the right to remain silent.[83]

Thus, an individual moving around has the right to be private and anonymous in his or her affairs, free from government intrusion. Hence, the demand for identification, without probable cause that the individual is engaging in an illegal activity, interferes not only with privacy, but also with travel rights. In short, the travel right entails the right to privacy, and it encompasses freedom to travel anonymously and free

---

77.   *Id.* at 362 (Brennan, J., concurring).

78.   Kolender v. Lawson, 461 U.S. 352, 362 (1983) (Brennan, J., concurring).

79.   Hiibel v. Sixth Jud. Dist. Ct. of Nev., 542 U.S. 177, 185 (2004).

80.   *Id.* at 177.

81.   *Id.* at 185.

82.   *See generally* Miranda v. Arizona, 384 U.S. 436 (1966).

83.   *See* Sobel & Fennell, *supra* note 56, at 618 (discussing the right to remain silent); *see* Terry v. Ohio, 392 U.S. 1, 34 (1968) (White, J., concurring) (discussing that "the person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest"); *Kolender*, 461 U.S. at 365 (noting that a *Terry* suspect "must be free to leave after a short time and to decline to answer the questions put to him") (Brennan, J., concurring); Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984) (stating that the "officer may ask the . . . detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond"); Illinois v. Wardlow, 538 U.S. 119, 125 (2000) (explaining that stopping a fleeing suspect "is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning").

from governmental infringement.[84]

In *The Right of Mobility*, Gerald Houseman identifies how the right to travel is essential for the exercise of other fundamental rights, including employment.[85] "Mobility is a right which makes many other rights we hold dear both tenable and possible—the rights of association, privacy, and equality of opportunity, for example."[86] He notes, a national identification system, including worker identification cards, constitute an "internal passport" which he calls the "hallmark of repressive regimes such as [Apartheid] South Africa, the [former] Soviet Union, or Nazi Germany."[87]

In the concurrent exercise of two fundamental rights, one right, for example travel (or employment, often travel-related), may not be conditioned on abrogating another right like privacy.[88] In summary, travel and privacy rights are intimately linked in their constitutional protections.

COMMON CARRIAGE IN TRAVEL RIGHTS[89]

The travel right also includes the right to movement on common carriers. "A carrier becomes a common carrier when it 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it."[90] That means that any individual or corporation becomes a common carrier by promoting to the public the ability and willingness to provide

---

84.   GERALD L. HOUSEMAN, THE RIGHT OF MOBILITY 7 (1979).  In the late 1970's, Congress first considered establishing "a system of 'forgery-proof' Social Security cards, complete with photographs . . . for everyone entitled to have one." *Id.*  While its sponsors denied "that this could easily be turned into a national identification system, it is not difficult to imagine this being done in the name or bureaucratic efficiency, national security, or . . . to snoop and perhaps to limit mobility." *Id.* at 17. Houseman identified the proposed Social Security card as a national passport – internal passport – acting as a work ID. *Id.* "Any potential employer must then refuse to hire anyone who fails to produce this card." *Id.* at 42. Houseman argues that a national ID system confronts the American with "a totalitarian potential of invasion of privacy, harassment, and denial of mobility." *Id.* at 43. A national ID can easily become an internal passport as an instrument of "mobility control" and feature of totalitarian governments. *Id.*

85.   *Id.*

86.   *Id.* at 17.

87.   *Id.*

88.   United States v. Davis, 482 F.2d 893, 913 (9th Cir. 1973); *see also* United States v. Kroll, 481 F.2d 884, 886 (8th Cir.1973).

89.   *See* Ramon L. Torres, The Right to Travel: Intersection with the Right to Privacy and a Personal Liberty (2010) (unpublished Master's Thesis, Northwestern University) (on file with author).

90.   WILLIAM T. BRENNAN, FED. AVIATION ADMIN., PRIVATE CARRIAGE VERSUS COMMON CARRIAGE OF PERSONS OR PROPERTY, (Apr. 24, 1986), *available at* http://www.faa.gov/documentLibrary/media/Advisory_Circular/AC%20120-12A.pdf.

transportation service, including air travel.[91]

Air transport providers operating in, to, or from the United States act under common carrier rules.[92] "An air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry."[93] If there are available places, the charge is paid, and there are no reasonable grounds to refuse the service to an individual, the air carrier is legally bound to provide the transportation of passengers or goods. Denying someone passage violates federal law.[94]

The national government has broad federal jurisdiction.[95] When vehicles engage in commerce, the United States has jurisdiction over them, even if they travel outside the specific U.S. areas.[96] Under aircraft jurisdiction in *Special Aircraft Jurisdiction of the United States*, the U.S. government exercises national jurisdiction over its territory and "in-flight" aircraft, even outside national airspace.[97] Thus, travel conducted between contiguous and non-contiguous United States by air remains within national jurisdiction. And its regulation requires following U.S. federal law and rules, the Constitution, and specific rights and privileges of citizenship. Accordingly, the expansiveness of this

---

91.   *But see* Gonzales v. Williams, 192 U.S. 1, 13 (1904). In the related series of "Insular Cases," the Court considered whether or not to extend full constitutional protection to territories the United States gained in the Spanish-American War; it distinguished between travel rights for continental versus territorial citizens, *e.g.* a U.S. citizen traveling from the non-continental U.S. (e.g., Alaska or Hawaii) to the continental part would have more rights than a citizen of a territory or commonwealth like Puerto Rico traveling to the continental U.S. The distinction depends partly on the difference between birth, naturalized or granted (statutory) citizenship. *See generally* De Lima v. Bidwell, 182 U.S. 1 (1901); Goetze v. United States, 182 U.S. 221 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Huus v. N.Y. & Peurto Rico Steamship Co., 182 U.S. 392 (1901); *see also* SONIA SOTOMAYOR, MY BELOVED WORLD 179 (2013).

92.   Brennan, *supra* note 90.

93.   49 U.S.C. § 40127 (2006).

94.   *Id.*

95.   *See* 18 U.S.C. § 7 (2006) (defining "Special Maritime and Territorial Jurisdiction of the United States" and concluding that the United States has federal jurisdiction over their territory and any vessel registered, licensed, or enrolled under the United States).

96.   *See* 49 U.S.C. §§ 10501, 13502(a), 13521(a) (2006). Rail vehicle carrier, motor carrier, and water carrier operations are subject to U.S. jurisdiction when operating within the area defined in 18 U.S.C. § 7 (2006) and outside it when traveling to/from/between U.S. destinations. *Id.* Motor carriers are exempt when traveling through Canada between Alaska and the contiguous United States. *Id.* at § 13502(a).

97.   § 46501(2) (included in the special U.S. jurisdiction are any "in-flight" civil or military aircraft of the United States, as well as any aircraft in the United States, including foreign aircraft that are scheduled to land or last departed from the United States); *see id.* at § 46501 (explaining that an aircraft "in-flight" corresponds to an aircraft from the time the door is closed to when it is opened at the destination; the law also covers any aircraft leased to an American resident or business, even when the lease is made outside the United States and/or using a non-U.S. registered aircraft).

jurisdiction empowers citizens to exercise broadly their right to travel.[98]

*Sovereignty and Use of Airspace* assigned control of the airspace of the United States to the government, and it guarantees citizens the right to use and access the space.[99] Air commerce and safety regulations establish an air transportation network consistent with public convenience and necessity.[100] The air travel network is a part of the public infrastructure open for wide use and enjoyment. The national government advances these goals by ensuring by law that all citizens have adequate access to the air system.

U.S. law, pursuant to 49 U.S.C. § 40103, pertaining to sovereignty and the use of airspace holds under "Sovereignty and Public Right to Transit" that (1) "[t]he United States Government has exclusive sovereignty of airspace of the United States; (2) [a] citizen of the United States has a public right of transit through the navigable airspace."[101] Moreover, 49 U.S.C. § 40101, "Policy," notes under "General Safety Considerations" that in carrying out regulation, the administrator for the Federal Aviation Administration (FAA) shall consider "the public right to freedom of transit through the navigable airspace."[102] Therefore, under not only general U.S. sovereignty but also the public right of transit, freedom of travel includes air travel.

### THE INFIRMITIES OF THE "SINGLE MODE DOCTRINE"

Historically and fundamentally, the right to travel in the United States is broad and encompasses all modes of transportation. In conflict, however, with the nature of this expansive right in a large Union, some circuit courts have maintained that limitations on one mode of transportation do not implicate the right to travel. A modern construction that inaptly degrades the travel right, however, is the so-called "single mode doctrine," which maintains that if someone can travel by any mode of transportation, his right to travel is sustained.[103]

---

98.   This is applicable when travel adheres to the U.S. Code statutes for the mode of transportation. The same also applies to travel on common carriers by ground or water. The U.S. Code for transportation of goods and passenger differs across modes of transportation. Rail, coach buses, aircraft, and ships have different sets of rules and different situations where American jurisdiction applies. A motor coach, for example, is outside U.S. jurisdiction when traveling in or through Canada, even if the trip starts and ends in the United States.

99.   § 40103(a)(2).

100.   § 40101-46507.

101.   § 40103.

102.   § 40101.

103.   *See* John Doe No. 1 v. Ga. Dep't of Pub. Safety, 147 F. Supp. 2d 1369, 1375 (N.D. Ga. 2001) ("[T]he denial of a single mode of transportation does not rise to the level of a violation of the fundamental right to interstate travel.").

In *Monarch Travel Services v. Associated Cultural Clubs* in 1972[104] the Ninth Circuit ruled that the inability of a person to pay the fare of a common carrier in the form of charter flight fees, was not an unconstitutional limitation of the person's travel rights, since there was no state action in government interference.[105] In 1999 in *Miller v. Reed*, the same circuit used the *Monarch* argument to construct what is now known as "the single mode doctrine."[106] The court asserted that "burdens on a single mode of transportation do not implicate the right to interstate travel."[107] Under the construction, Miller was deprived of his privilege to operate a motor vehicle, but not the right to ride as a passenger or to travel by other means.[108] When the circuit court proffered its doctrinal opinion, however, it created an unconstitutional limitation on the fundamental interstate travel right.[109] Moreover, the Ninth Circuit again inappropriately relied on the "single mode doctrine" in *Gilmore v. Gonzales* when it restricted freedom of movement based on John Gilmore's refusal to submit to an identification requirement in order to fly from California to the seat of government in Washington, D.C.[110]

---

104.    *See generally* Monarch Travel Serv., Inc. v. Ass'n Cultural Clubs, Inc., 466 F.2d 552 (9th Cir. 1972).

105.    The Court only mentioned limitations on travel derived from lack of personal wealth. *Id.* at 554; *see generally* Harris v. McRae, 448 U.S. 297 (1980) (establishing a similar economic argument as *Monarch* in that the government does not have to allocate funds or resources to facilitate the exercise of certain rights).

106.    Miller v. Reed, 176 F.3d 1202, 1204 (9th Cir. 1999).

107.    *Id. at* 1205.

108.    *Id.* at 1206. Miller could still use his personal vehicle, but could not legally drive it, since he had no license (indicating the required skills to do so). He could, however, have someone else drive his vehicle for him. Miller could also ride public transit or other modes of transportation. *Id.*; *see generally* Roger I. Roots, *The Orphaned Right: The Right to Travel by Automobile, 1890-1950*, 30 OKLA. CITY. U. L. REV. 245 (2005) (discussing the right to drive); *see also* Karl Manheim, *The Right to Travel,* CON LAW II BLOG (Nov. 2, 2005), http://manheimk.lls.edu/blog/conlaw2/archives/2005/11/the_right_to_tr.html (noting that due to constitutional right to travel questions and strong protests, drivers were initially neither required to get license plates containing numbers for automobiles nor to obtain licenses to drive them).

109.    The Ninth Circuit's holding conflicted with the Supreme Court's emphasis in *Shapiro* that the right to travel should be free of regulations that unreasonably burden or restrict it. *See* Shapiro v. Thompson, 394 U.S. 618, 638 (1969).

110.    Gilmore v. Gonzales, 435 F.3d 1125, 1136-37 (9th Cir. 2006). However, in *Gilmore*, the government revealed that identification was not absolutely required in order to fly. "The identification policy requires that airline passengers either prevent identification or be subjected to a more extensive search." *Id.* at 1155. Philip Mocek was also arrested for declining to provide identification to fly (and photographing the TSA response) in Albuquerque, New Mexico. In the trial acquitting him on all charges, the government also acknowledged that people can fly on commercial airlines without providing identification. *See State of New Mexico v. Phillip Mocek (2011)*, PAPERSPLEASE.ORG, http://www.papersplease.org/wp/mocek/ (last visited May 25, 2014); *see also* Mocek v. City of Albuquerque, 2013 WL 312881 (D.N.M. Jan. 14, 2013). Commentary on the *Mocek* case notes under, "Do you have a right to travel by air? Answers Yes," how The Airline Deregulation Act of 1978 guarantees the "public right of freedom of transit" by air, and that the

The deficiencies of the "single mode doctrine" are particularly apparent when a citizen needs to travel between the contiguous and the non-contiguous United States.[111] Commercial air service is the only mode of passenger common carrier transportation available between many U.S. locations, especially American states and territories outside the continental union. Particularly for non-continental interstate travel, where the only viable means of travel is by airplane, the "single mode doctrine" imposes on citizens an onerous, unreasonable, and unjustifiable burden.[112] It cannot stand constitutional scrutiny.

In sum, contrary to the Ninth Circuit rulings, burdens on a single mode of transportation do implicate the right to interstate travel. This is clearest when there is only one mode of common carrier travel, such as flying by commercial airline, available between the two non-continental U.S. locations, for instance, between the mainland and Hawaii. It may also be an unconstitutional burden when there is only one practicable mode of travel for long distances.   In *Gilmore*, for example, the only way for Gilmore to get to Washington, D.C. from California to petition the federal government in a timely manner was to travel by air.[113]

For non-continental travel, the only other hypothetical way to reach offshore locations is by ship, but commercial ship service by U.S. carriers rarely exists.[114] Here, the "single mode doctrine" proves deficient

---

TSA is required by federal law (49 USC § 40101) to consider this right when it issues regulations. *State of New Mexico v. Phillip Mocek*, PAPERSPLEASE.ORG, http://www.papersplease.org/wp/mocek/ (last visited May 25, 2014). Airlines are common carriers. Mocek's attempted trip was an exercise of "the right . . . peaceably to assemble" as guaranteed by the First Amendment. Freedom of movement is also guaranteed by Article 12 of the International Covenant on Civil and Political Rights, a human rights treaty signed and ratified by the United States. *Id.*; *see also Identity Project tells UN Human Rights Committee that US Violates the Right to Travel*, PAPERSPLEASE.ORG (Jan. 8, 2013), http://www.papersplease.org/wp/2013/01/08/identity-project-tells-un-human-rights-comm ittee-that-us-violates-the-right-to-travel/ (discussing submissions to the UNHRC); *see also Update to the U.N. Human Rights Committee concerning Violations of the Right to Freedom of Movement (ICCPR Article 12) by the Government of the U.S.A.*, PAPERSPLEASE.ORG (Feb. 10, 2014), *available at* http://papersplease.org/wp/wp-content/uploads/2014/02/idp-iccpr-update-travel.pdf (Identity Project stating to the U.N. Human Rights Committee that the United States violates the right to travel).

111.   The United States comprises the forty-eight contiguous states and the non-contiguous U.S. states of Alaska and Hawaii, plus Puerto Rico, Guam, the U.S. Virgin Islands, and other offshore territories.

112.   Richard Sobel & Ramon L. Torres, *The Right to Travel*, 80 J. OF TRANSP. L., LOGISTICS & POL'Y 13 (2013).

113.   *See Want to Fly? Papers Please*, PAPERSPLEASE.ORG, http://papersplease.org/gilmore/facts.html (last updated Aug. 16, 2006).

114.   For example, common carrier passenger ship service does not exist between the continental United States and Puerto Rico. *See Tourist Information*, WELCOME TO PUERTO RICO, http://www.topuertorico.org/tinfo.shtml (last visited May 26, 2014). The Passenger Vessel Services Act of 1886 established that passenger transport within the United States could only be carried out on a U.S. registered vessel. This would make any common-

because burdens imposed on individuals whose only alternative is the one mode of air travel lose entirely their right to interstate travel. Especially in the non-contiguous United States, when a single mode becomes the sole mode of travel, a citizen's constitutional protections for travel are broadest. To be plenary and efficacious, the right to travel must include protections for using all possible modes of travel.

Indeed, the "single mode doctrine" is also inapt for travel within the contiguous United States. This is especially so because of limitations in national air transportation. The general provisions of the *Air Commerce and Safety Regulations*[115] recognize that it is in the public's interest[116] to have an air transportation network. This ensures "the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination or unfair or deceptive practices."[117] The federal government has invested broadly in creating and maintaining the requisite air network.

As Congress recognized through codification, there is a compelling public interest in maintaining a national air transportation network available to all citizens.[118] Therefore, as in *Beckman v. Saratoga*, the mandate that railroad common carrier services be available to all citizens analogously requires that U.S. air transportation network and air common carrier services be available to all American citizens domestically, regardless of location.[119] The "single mode doctrine" also contravenes this congressional intent.

Air transportation is not only typically the most convenient method of even moderately distant interstate travel, but in many cases, it is the only feasible mode of interstate and in some cases of intrastate travel.[120] The Eighth Circuit held in *United States v. Kroll* that "flying may

---

carrier scheduled ship passenger service expensive, unprofitable, and therefore non-existent. 46 App. U.S.C. §289 (2006).  For Puerto Rico, see the section pertaining to the transportation of passengers between Puerto Rico and other United States ports; foreign-flag vessels; unavailability of United States flag service. 46 App. U.S.C. § 289c (2006). This section authorizes passenger service between the contiguous U.S. and Puerto Rico under certain conditions. This allows cruise ship services to stop in Puerto Rico when traveling directly between U.S. territories. *Id.* But this does not constitute common carrier water passenger service between the contiguous U.S. and Puerto Rico. *Id.* Hence, leisure cruise ships do not provide service between non-contiguous parts of the U.S., since their business purpose and schedule are not intended for point-to-point passenger and freight transportation. *Id.*

115.    49 U.S.C. § 40101 (2006).

116.    *Id*.

117.    *Id*. at § 40101(a)(4).

118.    *See id*. at § 40101, § 40103.

119.    Beckman v. Saratoga & Schenectady R.R., Co., 3 Paige Ch. 45, 75 (N.Y. 1831).

120.    Some cities within Alaska, for instance, the capital Junea, are only accessible by air or sea, air being the only timely mode. Intrastate travel in some states is more convenient by air for travel between cities within a state separated by great distances and/or natural barriers, e.g., California, Florida, Illinois, New York, and Texas.

be the only practical means of transportation;" when limited, it often deprives an individual of the right to travel.[121] Even if other modes of travel exist, the Second Circuit held in *United States v. Albarado,* it is not acceptable to force travelers to forego using air travel because "it would work a considerable hardship on many air travelers to be forced to utilize an alternate form of transportation, assuming one exists at all."[122] More recently, in *Mohamed v. Holder*, the district court held that:

> The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and the inability to fly to a significant extent defines the geographical area in which he may live his life. . . . An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment and professional opportunities. It is difficult to think of many job[s] . . . . where an inability to fly would not affect the prospects for employment or advancement. . . . An inability to fly likewise affects the possibility of recreational and religious travel . . . particularly those who are employed.[123]

In short, courts recognize the unique nature of flight as a necessarily accessible and protected mode of transportation under the travel right and federal law.

Passenger travel by airline common carriage also constitutes the only mode for covering large distances in a timely manner within the continental United States. People today do not have the luxury to journey for days across widely disbursed coastal areas within the United States from California to Maine. Citizens have responsibilities, and time is valuable. Jobs do not allow people to spend a great amount of time traveling.[124] Exercising constitutional rights requires timely access to travel great distances for citizens to petition the national government and exercise political liberties.[125]

---

121.    United States v. Kroll, 481 F.2d 884, 886 (8th Cir. 1973).

122.    United States v. Alvarado, 495 F.2d 799, 806 (2d Cir. 1974). However, in *Town of Southold v. Town of East Hampton*, the Second Circuit stated that travelers do not have "a constitutional right to the most convenient way of travel" and that minor restrictions do not abridge the right to travel. 477 F.3d 38, 54 (2d Cir. 2007) (referencing City of Houston v. F.A.A., 679 F.2d 1184, 1198 (5th Cir.1982)). This decision conflicts with *Kroll* and *Alvarado*, and with the right of citizens to enjoy the benefits and access to all public transportation modes. *Alvarado*, 495 F.2d at 806.

123.    Mohamed v. Holder, 2014 WL 243115, at *6 (E.D.Va. Jan. 22, 2014).

124.    Air travel has allowed for Congress to remain in session more days throughout the year and for members to return home for every recess and even weekly. CAL JILLSON, AMERICAN GOVERNMENT: POLITICAL DEVELOPMENT AND INSTITUTIONAL CHANGE 234 (2009).

125.    An individual needing to reach the seat of the federal government in Washington, D.C. or of the  state government in Juneau to petition the government for redress of

Traveling long distances within the contiguous United States relies on only one mode of travel: commercial airlines. Therefore, restricting this single mode of travel, by air, abridges the right to travel and the right to exercise political and personal liberties. The single mode construction thus contravenes the right to travel within the U.S. territory.[126] By threatening to prevent the use of what is often the only viable method of transportation—airline travel—and by imposing corollary chilling effects on citizens' right to seek redress from government, the "single mode doctrine" abridges the right to interstate travel and freedoms of expression and assembly. In doing so, it undermines the right to travel that is broadly non-discriminatory. The "single mode doctrine" fails historically and constitutionally. If any single mode is limited, the right to travel is abridged. Instead, the travel right is a multi-modal one that encompasses all forms of transport.

## III. ABRIDGING THE RIGHT TO TRAVEL

As *Shapiro* articulated, the right to travel is a "fundamental right" guaranteed by the Constitution.[127] "An individual's liberty may be harmed by an act that causes or reasonably threatens a loss of physical locomotion or bodily control."[128] As *Guest* found, the right is "virtually unqualified."[129]

Especially in the surveillance age after 9/11, federal impediments to domestic travel particularly by air have undermined and abridged the rights of millions of passengers.[130] The major limitations on travel rights consist in identification and informational requirements, as well as intrusive physical screening. On the one hand, these limitations involve official air identification requirements in order to fly, watchlists and "no-fly" designations, and passenger pre-screening schemes to get a reservation. On the other hand, they involve whole body scanning and

---

grievances, as guaranteed by the First Amendment, may require air traveling as the only available mode to reach the government.

126.    The "single mode doctrine" also conflicts with federal law requiring that modes of transportation be accessible. The federal government mandates that most public buildings, including airports and train stations, be accessible to people with disabilities. *See* 49 U.S.C. § 40101 (2006) (addressing handicap accessibility); *id.* at § 41705 (addressing discrimination laws); *see also id.* at § 4151-57. Similarly, federal law ensures that citizens living in remote areas are entitled to subsidized scheduled air service. A regular, subsidized minimum air service is maintained to many small communities in the United States. *See State of New Mexico v. Phillip Mocek, supra* note 110.

127.    Shapiro v. Thompson, 394 U.S. 618, 630-31 (1969) (overruled parts unrelated to the right to travel by *Edema v. Jordan*); *see generally* Edema v. Jordan, 415 U.S. 651 (1974).

128.    Elizabeth P. Foley, Liberty for All: Reclaiming Individual Privacy in a New Era of Public Morality 49 (2006).

129.    United States v. Guest, 383 U.S. 745, 757 (1966).

130.    Sobel & Torres, *supra* note 112.

"enhanced" pat down searches. Each burdens citizens' rights to travel and to privacy. They abrogate citizens' rights without materially improving security procedures.[131] Since 1996, air passengers have faced the requirement to provide official identification in order to board aircraft.[132] This essentially creates an internal passport requirement to fly in the United States, abridging the right to move freely around the nation.

Invasive scans and searches at the airports also violate the fundamental conception of the Fourth Amendment and the right to privacy.[133] These intrusions essentially function as mass searches without even the "protection" of the general warrants and writs that the Founding Fathers despised.  During a trial challenging the use of writs of assistance in the pre-Revolutionary colonies, James Otis presciently "attacked the Writ of Assistance because its use placed the liberty of every man in the hands of every petty officer."[134] Quite simply, historically and today invasive general search schemes directly contradict the underpinning of the Fourth Amendment.

The intrusiveness of recent airport searches is currently sanctioned by another questionable doctrine of "administrative searches"[135] that further erodes Fourth Amendment protections.[136] Again, this administrative construction, like the "single mode doctrine's" undermining travel rights, degrades the fundamental Fourth Amendment protections by resurrecting the equivalent of governmental use of general warrants.[137]

Despite quoting John Adams as a signer of the Declaration of Independence, about the detriment of unreasonable searches without warrants, *Frank v. State of Maryland* in 1959 sanctioned non-criminal public safety searches that required no warrants.[138] This first major departure from the founding principles of the Fourth Amendment opened the door to further government intrusions. The Court held that a health

---

131.    *See* Sobel & Torres, *The Right to Travel: Part III Unjustified Limitations on the Rights to Travel*, 80 J. OF TRANSP. L., LOGISTICS & POL'Y 13, 28 (2013).

132.    *See* Sean Holstege, *Case Centers on Secret ID Directive*, INSIDE BAY AREA, Dec. 9 2005.

133.    *See* United States v. Davis, 482 F.2d 893, 913 (9th Cir. 1973) (stating that the "election to submit to a search is essentially a 'consent' granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment").

134.    Otis's argument so impressed his audience and the people of the Colonies that John Adams maintained that "American Independence was then and there born." Frank v. State of Md., 359 U.S. 360, 364 (1959).

135.    Eva Primus, *Disentangling Administrative Searches*, 111 COLUM. L. REV. 254, 262 (2011).

136.    *See Frank*, 359 U.S. at 365; *compare e.g.*, FTC v. Am. Tobacco Co., 264 U.S. 298 (1924); Boyd v. United States, 116 U.S. 616 (1886); I.C.C. v. Brinson, 154 U.S. 447 (1894); Tropicana v. United States, 789 F. Supp. 1154 (Ct. Int'l Trade 1992).

137.    *See Frank*, 359 U.S. at 364.

138.    *Id.* at 366.

inspector may enter a home without a warrant to find a public health hazard.[139] The *Frank* holding began a series of expansions of invasion of privacy.[140]

Justice Douglas's dissent in *Frank* eloquently identifies the majority's mistake: the Fourth Amendment was not "designed to protect criminals only."[141] His dissent clarifies, "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."[142] Douglas also highlights the confusion that arises when administrative searches can lead to criminal penalties or are carried out by a police force: "This is a strange deletion to make from the Fourth Amendment. In some States the health inspectors are none other than the police themselves. In some States the presence of unsanitary conditions gives rise to criminal prosecutions."[143]

The place of privacy against unreasonable personal searches has been apparent for over a century in the Supreme Court jurisprudence since the *Boyd* decision in 1886.[144] While the majority in *Frank* explored the relation of the Fourth Amendment and the Fifth Amendment in criminal law, Justice Frankfurter mistook criminality as the key to whether a search is reasonable.[145] Earlier decisions like *Boyd,* which Frankfurter cites, did not require criminality for a search to necessitate a warrant.[146] Instead, *Boyd* states all "official acts and proceedings" are subject to the Fourth Amendment.[147] *Boyd* placed the primary importance on the object of the search as "a material ingredient, and [it] affects the sole object and purpose of search and seizure," whether the case involved a crime was merely dicta.[148]  The dilution of the distinction in administrative search doctrine by requiring criminality has weakened the Fourth Amendment, just as Justice Douglas warned in *Frank*.[149]

The Fourth Amendment protection against unwarranted government searches "applies to governmental actions."[150] The amendment is "intended as a restraint upon the activities of sovereign authority."[151]

---

139.     *Id.* at 373.
140.     *See* Frank v. State of Md., 359 U.S. 360, 375 (1959).
141.     *Id.* at 377 (Douglas, J., dissenting).
142.     *Id.* at 375.
143.     *Id.*
144.     Boyd v. United States, 116 U.S. 616, 633 (1886); *see* Griswold v. Connecticut, 381 U.S. 479, 484 (1964).
145.     Frank v. State of Md., 359 U.S. 360, 372 (1959).
146.     *See generally* Boyd v. United States, 116 U.S. 616 (1886).
147.     *Id.* at 624.
148.     *Id.* at 622.
149.     *Frank*, 359 U.S. at 373.
150.     Bureau v. McDowell, 256 U.S. 465, 475 (1921).
151.     *Id.*

Searches or seizures, like those at airports, are "ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."[152]

The privacy rights inherent in the Constitution have eroded over time as the Supreme Court continues to undervalue privacy rights. Some courts find exceptions to the Fourth Amendment based on administrative convenience or alleged necessity.[153] As Justice Scalia wrote in *Kyllo v. United States*, "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology."[154]

The Fourth Amendment has now been further eroded by choices made by the Court. Technology advances in myriad ways, some privacy enhancing and some privacy inhibiting. When the Court insists on keeping the protections of the Fourth Amendment intact, technology more likely advances in a way that simultaneously retains full Fourth Amendment protections and meets the alleged requirements of convenience and necessity. Necessity as the mother of invention will lead technology to follow different and more privacy enhancing courses if the Court makes full protection of the Fourth Amendment a necessity for technological innovations.

Despite the protections embodied in the Fourth Amendment, courts have diluted the historical search and seizure doctrine over time.[155] Now, the government may often search persons to find evidence of a crime without a warrant, probable cause, or reasonable suspicion.[156] Thus, even when the potential criminality making a warrant necessary in *Frank* is present, the administrative search concept allows searching a person's body without probable cause or a judicial warrant.[157]

In fact, the privacy associated with a person's house should extend to one's body, since it is in essence more private than the home.[158] In 1924, the Court stated in *Federal Trade Commission v. Interstate Tobacco Company*:

---

152.   City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000); *see also* William W. Greengage, *In Defense of the 'Per Se' rule: Justice Stewart's Struggle to Preserve the Fourth Amendment's Warrant Clause*, 31 AM. CRIM. L. REV. 4, 10-14 (1994).

153.   "Airport screening searches . . . are constitutionally reasonable administrative searches because they are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings." United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973); *but see* Katz v. United States, 389 U.S. 347, 357 (1967).

154.   Kyllo v. United States, 533 U.S. 27, 33-34 (2001); *but see* Sobel, Horwitz, & Jenkins, *supra* note 66.

155.   Primus, *supra* note 135.

156.   Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec., 653 F.3d 1, 1 (D.C. Cir. 2011).

157.   *Id.* at 10.

158.   *See* Frank v. State of Md., 359 U.S. 360, 375 (1959).

664      J. INFORMATION TECHNOLOGY & PRIVACY LAW      [Vol. XXX

> Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime.[159]

Wide-ranging searches into private papers and houses are anathema to liberty guaranteed by the Fourth Amendment. Expeditions into a person's body are even more repugnant to the Fourth Amendment's purposes as a cornerstone of liberty.[160]  As the court stated in *McDonald v. United States*:

> The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals, nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted.[161]

The Supreme Court in *United States v. Lefkowitz* articulated the straightforward notion: "Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime."[162] In short, warrant requirements protect privacy. With each additional assault on the Fourth Amendment, Justice Douglas' prophetic dissent in *Frank* rings even truer now: "We live in an era 'when politically controlled officials have grown powerful through an ever increasing series of minor infractions of civil liberties.' One invasion of privacy by an official of government can be as oppressive as another."[163]

The efficacy of many technologies that intrude on the rights to travel and privacy are unproven. Instead, many air travel requirements and procedures represent what security expert Bruce Schneier has called "security theater."[164] They are mainly "measures that make people feel more secure without doing anything to actually improve their

---

159.   FTC v. Am. Tobacco Co., 264 U.S. 298, 305-06 (1924) (citing I.C.C. v. Brinson, 154 U.S. 447, 479 (1894)).

160.   York v. Story, 324 F.2d 450, 455 (9th Cir. 1963).

161.   McDonald v. United States, 335 U.S. 451, 455-56 (1959).

162.   United States v. Lefkowitz, 285 U.S. 452, 464 (1932).

163.   *Frank*, 359 U.S. at 382 (1959) (citing *Health Inspection of Private Dwelling Without Search Warrant*, 17 U. CHI L. REV. 733, 740 (1950)).

164.   Bruce Schneier, *Flying on Someone Else's Airplane Ticket*, SCHNEIER ON SECURITY (Feb. 8, 2005), *available at* http://www.schneier.com/blog/archives/2005/02/flying_on_someo_1.html.

security."[165] The key point is that each of these "requirements" and technologies infringes on the rights to travel and privacy. Yet, the burden in a free society is on the government when it pursues, for instance, security to find ways that preserve basic rights while addressing valid policy goals.

While the variety of assaults on the right to travel are the most obvious today in air travel, the intrusions are beginning to appear in other modes of transportation as the governmental agencies seek to extend their authority to other transportation modes and nodes.[166] These inaptly expand the scope of abridgement of the right to travel: what happens at the airport checkpoint can extend to the subway turnstile.[167]

## CONCLUSION: TOWARD A ROBUST RIGHT TO TRAVEL

As a fundamental political liberty since the Magna Carta, Blackstone's *Commentaries*, and the Articles of Confederation, the right to travel is essential for individual freedom and national unity. Its interstate manifestation has been broadly based in the privileges and immunities since the Articles of Confederation and the U.S. Constitution and encompasses all modes of travel across the federal union.

The travel right encompasses personal, political, and commercial movement fundamental to the nature of the United States by effectively stitching the union together. The right to travel guarantees the free movement of people and goods throughout the nation. It allows citizens to exercise other fundamental rights guaranteed by the Constitution and the Bill of Rights, like petitioning for redress of grievances and

---

165.   None of the 911 hijackers who used their real names were identified beforehand. The would-be terrorist traveling on Christmas 2009 under his own name hid powdered explosive compound, PETN, in his clothing, despite both the physical and watchlist layers of security. The failure of the security procedures to prevent him from trying to ignite the explosive, exemplifies the failings of the system. Investigators concluded body-scanning devices would likely have not detected the compound. *Id.*; *see also* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-04-385, AVIATION SECURITY: COMPUTER-ASSISTED PASSENGER PRESCREENING SYSTEM FACES SIGNIFICANT IMPLEMENTATION CHALLENGES (2004).

166.   Aviation and Transportation Security Act, Pub. L. No. 107-71, § 115 Stat. 579 (2001) (assigning responsibility to TSA for security in all modes of transportation). TSA could expand pre-screening like Secure Flight to trains, subways and buses, create similar "no-travel lists," and implement them on all possible modes of interstate travel, including Amtrak. This could abridge the right to travel by every single transportation mode. *See* Thom Patterson, *TSA Rail, Subway Spot-Checks Raise Privacy Issues*, CNN (Jan. 28, 2012); Jen Quraishi, *Surprise! TSA Is Searching Your Car, Subway, Ferry, Bus, AND Plane*, MOTHER JONES (June 20, 2011), http://www.motherjones.com/mojo/2011/06tsa-swarms-800-bus-stations-public-transit-systems-yearly; see also Gilmore v. Gonzales, 435 F.3d 1125 (9th Cir. 2006) (discussing the prospects of IDs on other modes of travel).

167.   For a more detailed discussion of the conflict between the right to travel, air identification, Secure Flight, and Whole Body Scanning system, *see* Sobel & Torres, *supra* note 112.

protecting privacy. In short, the right to travel freely implies respect for other liberties and rights.

The federal government's extensive national jurisdiction provides American citizens with constitutional protection for traveling domestically on common carriers. The "single mode doctrine" fails for its inconsistencies with the potent original historical and political underpinnings of travel rights. It also fails for its undue burdens on long distance travel, especially from the non-continental United States, but also within the contiguous U.S. territory, necessary here to live and carry out economic and political activities.

The impositions of burdens and regulations, like government identification requirements, passenger watch-list matching and pre-screening programs, undermine the nature and exercise of the travel right, what it means to be an American citizen, and personal privacy. These abridgments transform travel from a foundational right into a privilege requiring governmental permission. They form the basis for a domestic passport system that undermines the right to travel and other fundamental freedoms.

The travel right is multi-modal and encompasses all methods of transportation. Contrary to the inaptly constructed "single mode doctrine," if any mode of transportation is restricted, then the constitutionally enshrined right of travel is abridged. Moreover, the lawful and beneficial relationship between the government and those governed by their consent is inverted by requirements for government ID and permission to travel. In the post-9/11 era, overreaching government agencies have assaulted the foundational travel and privacy rights by replacing "consent of the governed" with "permission from the government."

Contrary to certain circuit courts' truncation of the broad scope and strength of the travel right, a plenary right to travel, enshrined in the Constitution strengthens both liberty of the individual citizen and the very nature of a more perfect union. The Supreme Court of these United States needs to correct the misplotted course in some appellate opinions by rearticulating a plenary, original, and multi-modal constitutional right to travel.

Plaintiffs' Exhibit 531

nytimes.com

# Air Travel Is No Holiday as Covid-19 and Winter Storms Cancel Flights

*Niraj Chokshi, Heather Murphy*

10-12 minutes

Airlines and passengers are ending the year with many of their plans upended. And New Year's weekend may be bumpy, too.







Credit...Karsten Moran for The New York Times

Dec. 30, 2021

Airlines may have thought their pandemic troubles were behind them in the fall as a coronavirus wave subsided and travelers increasingly took to the skies. But a new virus surge and winter storms have left the carriers and their passengers in a holiday mess.

Heading into the New Year's weekend, when return flights will produce another crest in air travel, airlines have been canceling more than 1,000 flights a day to, from or within the United States. More than 1,300 flights on Friday were canceled. Carriers and their employees say the latest chapter of the pandemic, the Omicron variant, has cut deeply into the ability to staff flights, even though a vast majority of crew members are vaccinated.

"I've never seen a meltdown like this in my life," said Angelo Cucuzza, the director of organizing at the Transport Workers Union, which represents flight attendants at JetBlue. "They just can't keep up with the amount of folks that are testing positive."

JetBlue has been one of the airlines hardest hit, canceling 17 percent of its flights on Thursday, according to the air travel data site FlightAware. The carrier said Wednesday that it would cut about 1,280 flights through mid-January, citing the rise in virus cases in the Northeast, where its operations and crews are concentrated.

And then there was the weather, always a volatile element in holiday travel but particularly challenging in recent days — notably in the Pacific Northwest, where heavy snowfall and record low temperatures grounded planes last weekend.



Image





Credit...Nicole Craine for The New York Times

The next few days may be just as frustrating. Storms in Southern California and the Northwest could combine to dump snow on airline hubs in Denver and Chicago, with severe thunderstorms threatening Dallas Fort Worth International Airport, too, according to Dan DePodwin, director of forecast operations at AccuWeather.

Alaska Airlines, whose main hub is Seattle-Tacoma International Airport, went so far as to suggest that people put off nonessential travel until the new year. The carrier was hit hard again Thursday, with 14 percent of its flights canceled, as Seattle got more snow.

As many as 10 million people may fly from Thursday through Monday, according to Transportation Security Administration estimates. For months, airlines have been preparing reserves of workers for the holiday crush. But those measures were inadequate in a fast-changing situation, and many passengers were frustrated.

"Even though it's been two years with Covid, it does not seem like they have this figured out," said Sabine Malloy, whose plan to rendezvous with her boyfriend in Alaska to see the northern lights was upended on Tuesday when both their flights on Delta Air Lines — hers from Southern California, his from Denver — were canceled. Delta told them that it could not rebook them for several days, she said, so they canceled their plans — after her boyfriend had driven seven hours from South Dakota for his flight.

Trying to change plans before departing was also daunting. A traveler trying to rebook a family trip on American Airlines encountered a recording saying to expect a four-hour wait for a callback from an agent.

Some say airlines shoulder some of the blame for the turmoil. The industry received $54 billion in federal aid to keep workers employed throughout the pandemic, assistance that came with a ban on layoffs. But carriers were able to thin their ranks by offering buyouts and early-retirement packages to thousands of workers.

Airlines started hiring again as the travel rebound took off this year, but most have yet to fully restore their work forces: The industry employed nearly 413,000 people in October, down almost 9 percent from the same month in 2019, according to federal data. Airlines have had trouble turning

a profit as passenger volumes remain about 15 percent below prepandemic levels.



Image



Credit...Karsten Moran for The New York Times

The industry looked to the Centers for Disease Control and Prevention in recent days for a partial solution to its staffing problems, lobbying for the 10-day isolation period recommended for those infected with the coronavirus to be reduced to five days. Some scientists, unaffiliated with airlines, made a similar suggestion to bolster strained work forces in other realms, like hospitals.

On Monday, the C.D.C. shifted its guidance to five days of isolation for people whose symptoms have ended or are abating, followed by five days wearing a mask. The agency said the change was motivated by findings that the coronavirus was mostly transmitted one to two days before

symptoms appear and two to three days afterward.

On Tuesday, in a memo seen by The New York Times, JetBlue told employees that it would expect those "who have no symptoms, or whose symptoms are improving, to come back to work after five days." Crew members may remain on leave if they provide a doctor's note, but they won't be paid as if they were working, according to Mr. Cucuzza of the Transport Workers Union.

Asked for comment, JetBlue said, "The health and safety of our crew members and customers remains our top priority as we work through this pandemic."

Delta is providing five days' sick leave for infected workers, with two additional paid sick days if they choose to be tested on Day 5 and the results are positive.

The shorter isolation time is fueling a debate in the industry. The Association of Flight Attendants-CWA, which represents nearly 50,000 flight attendants at 17 airlines, urged maintaining a 10-day isolation period in a letter to airlines on Tuesday.

"We believe this is the wrong move for aviation as it accepts that infectious people will be put back on the job or flying as passengers on our planes," Sara Nelson, the union's president, wrote. Several flight attendants interviewed expressed concerns that potentially contagious colleagues might return to work without being tested.

Airlines always prepare for turmoil, particularly around the holidays, when bad winter weather in one place can knock an entire system off balance. But the industry has been hit especially hard this year.



Image





Credit...Nicole Craine for The New York Times

After two airlines, American and Southwest, canceled thousands of flights in October because of fierce weather and a brief shortage of air traffic controllers, they vowed to address the problems, offering bonuses to encourage employees to work throughout the holiday period, stepping up hiring and pruning flight plans. Both have avoided widespread cancellations this holiday season.

"We realized that we have got to make sure that we have staffing in place," David Seymour, American's chief operating officer, said in an interview. The airline recalled several thousand flight attendants from leave last month and this month and hired almost 600 more.

When chaos strikes, airlines engage in a complicated choreography to get out of it.

The main goal, airlines and aviation experts say, is to minimize the effect on passengers. But that's easier said than done.

Alaska Airlines spent months laying plans for this holiday season, investing in staff and equipment to deal with the winter weather and lining up backup flight crews, according to Constance von Muehlen, its chief operating officer.

The airline managed staff calling in sick at high rates by offering extra pay for others to fill in, but sustained snowfall and record low temperatures in the Seattle area forced it to cancel nearly one-third of its flights on Sunday, about one-quarter on Monday and about one-fifth on Tuesday.

"Once you get your day off poorly, there's nothing you can do to catch up," Ms. von Muehlen said.

On Tuesday, the airline issued a stark announcement. Alaska would cut about 20 percent of flights out of Seattle in the coming days to allow extra time to de-ice planes. It also "strongly" urged customers to delay nonessential travel until after this weekend.

"Our values guided our decision," she said. "We need to be as realistic as possible in what we will be able to operate and to let people know, as difficult as it is for us to do that."

Getting flight crews in place can be especially tricky, with workers dispersed throughout the country and subject to various regulations. Flight attendants are generally required to have nine hours of rest between shifts, for example.

The Omicron variant has only confounded that already complicated process.

Capt. James Belton, a spokesman for the roughly 13,500 United Airlines pilots in the Air Line Pilots

Association, confirmed that the variant is creating challenges.



Image



Credit...Karsten Moran for The New York Times

"Our sick calls are above normal," he said. Many pilots have helped fill gaps by picking up additional shifts, he said, but they are limited to flying 100 hours a month under federal law.

Operations on the ground are also being affected. The Federal Aviation Administration warned on Thursday that rising infections among employees, including air traffic control staff, might result in delays.

The Transportation Security Administration said that it was concerned about rising virus infections, too, but that it had adequate staffing. Average wait times in airport security lines were about five

minutes in recent days, a spokesman said.

Getting through security, of course, is no guarantee that the rest of the trip will be smooth.

Elizabeth Barnhisel and her husband were heading off on a delayed honeymoon when a canceled connection forced an unexpected overnight layover on Tuesday at Seattle-Tacoma International Airport. Entering a baggage claim area, they found what looked like hundreds of bags lined up and crowds of miserable people — some crying, some napping, because they had been waiting so long for their bags.

Every few hours, someone would offer a different reason for the fiasco: frozen carousels, Omicron, weather. After about 10 hours, Ms. Barnhisel's bag arrived from across the airport.

The couple eventually made it to their destination, Vancouver, but it was not the honeymoon experience Ms. Barnhisel had counted on. "We're flabbergasted," she said. "We definitely took a risk by taking this trip. But at the end of the day, we've got to get back to normal somehow."

Lauren Hirsch contributed reporting.

Plaintiffs' Exhibit 532

kiro7.com

# Alaska Airlines urges passengers to consider rescheduling holiday flights

*Graham Johnson*

2-3 minutes    12-29-21

---

SEATTLE — Holiday travel is such a mess at Sea-Tac Airport that on Tuesday, Alaska Airlines said passengers who don't have to fly between now and Sunday should consider rescheduling.

The airline says with more snow coming and staffing problems, it's taking at least three days to rebook passengers.

Hold times on Alaska's reservation lines are now pushing 20 hours as people try to rebook after canceled flights.

Planes and workers are scattered because of the winter storm, and the airline doesn't expect to have enough seats in the coming days to move everyone who wants to go.

"We will not get our hopes up until we are wheels up," said Kaitlin Vintertun, who was trying to get to Alaska with her husband and son to visit family.

"We've been trying to get out since Sunday," she said on Tuesday.

By 11 a.m. Tuesday, Alaska Airlines, Sea-Tac's largest carrier, canceled more than 150 flights for the day, with more expected.

Workers handed out water to people stuck in long lines for rebooking, which were not quite as dramatic as the day before.

Still, there were plenty of stories like Chris Henry's.

"It was a lot of mayhem this morning in terms of the line, and people didn't know where to go," Henry said.

After waiting in line an hour and a half to check a bag, he missed his flight to Dallas.

"I had to get in another line to get a new flight, and I waited in that for the last three and a half hours," Henry said.

He was booked to leave nearly 12 hours after his original flight, if the plane goes at all.

Alaska Airlines initially said Tuesday that de-icing each plane was taking more than an hour, and canceling flights eases congestion.

By Tuesday evening, the airline reported that de-icing time had been reduced to an average of 22 minutes.

Then there's the staffing problem.

Alaska officials said the airline had been able to backfill employees out because of COVID, but now the storm has disrupted operations to the point where all those reserves are tapped.

An [Alaska Airlines blog post](#) provides advice for passengers stuck in the mess.

©2021 Cox Media Group

Plaintiffs' Exhibit 533

[washingtonpost.com](washingtonpost.com)

## Flight cancellations ease slightly, but airlines warn of more disruption ahead

*Lori Aratani, Ian Duncan*

6-8 minutes     12-29-21

Even as flight disruptions eased slightly Wednesday, airlines warned that cancellations and delays could continue as they struggle to rebound from coronavirus-related staffing shortages and wintry weather.

Aviation data provider FlightAware reported more than 970 cancellations of flights Wednesday evening within, out of and into the United States, down from more than 1,200 a day earlier and more than 1,400 on Sunday and Monday. United Airlines canceled the most flights among major U.S. carriers, with 161 flights — or roughly 7 percent — not departing, while regional carrier SkyWest grounded even more of its fleet.

The modest decline in Wednesday's cancellations, however, may provide little solace to travelers nearly a week into a holiday meltdown that has resulted in the cancellation of more than 6,400 flights.

Delta Air Lines, which said it was canceling 250 flights Wednesday — a number that includes regional flights operated by partner carriers — because of weather and rising coronavirus caseloads among employees. It warned of more possible disruptions because of weather forecasts for Seattle, Detroit and Salt Lake City.

Meanwhile, Alaska Airlines, which canceled 81 flights Wednesday — 12 percent of its scheduled flights — urged passengers to reconsider nonessential travel before Jan. 2 because of limited capacity to rebook travelers. In addition to staffing shortages and rising virus cases, the airline is struggling to recover after heavy weekend snow in Seattle, where it is headquartered. The city received 3.4 inches of snow Sunday, more than the amount that fell in all of 2020.

The carrier said it is reducing departures from Seattle-Tacoma International Airport by 20 percent to allow for time to de-ice planes.

U.S. airlines canceled hundreds of flights for a third day in a row on Dec. 26, as spiking coronavirus cases grounded flight crews. (Reuters)

"We deeply apologize for the inconvenience this winter storm has on our guests and employees and are working hard to return to the level of service you know and expect from us, while operating safely," said Constance von Muehlen, Alaska Airlines' chief operating officer and executive vice president.

JetBlue Airways canceled about 100 flights Wednesday, about a tenth of its schedule. The low-

cost airline said in a statement it would reduce its schedule through Jan. 13, a warning that JetBlue said was intended to give customers time to make alternative plans.

The carrier said new guidance this week by the Centers for Disease Control and Prevention that shortens the recommended isolation period from 10 days to five days for people who test positive for the virus — but who do not show symptoms or whose symptoms are resolved — could ease its staffing crunch. Still, it cautioned that operations could be affected because of rapidly rising caseloads.

"While the new CDC guidelines should help get crew members back to work sooner, and our schedule reduction and other efforts will further ease day-of cancellations, we expect the number of COVID cases in the Northeast — where most of our crew members are based — to continue to surge for the next week or two," JetBlue said in a statement. "This means there is a high likelihood of additional cancellations until case counts start to come down."

Low-cost carrier Allegiant Air canceled 41 flights Wednesday, according to FlightAware, about 9 percent of its schedule. Spokeswoman Hilarie Grey said more cancellations were likely, blaming a mix of bad weather and coronavirus cases.

Airlines began preemptively canceling flights just before Christmas after employees began calling in sick with the coronavirus. While scientists are still assessing the impact of the omicron variant, indications are that it is more easily transmissible than previous variants.

On Tuesday, the United States set a record for the number of coronavirus infections, at 266,889, surpassing the 248,209 reported Jan. 12. The number could be higher since it does not include thousands of at-home tests taken by individuals who might not report positive results to health officials.

The rising number of infections has renewed questions about whether the Biden administration should require vaccination for domestic flights. Most international travelers coming to the United States must show proof of vaccination before traveling to the country.

Anthony S. Fauci, Biden's chief medical adviser, said the vaccine requirement for those traveling from international destinations was put into place to keep infections and, in particular, new variants out of the country. In the United States, he said, requirements that people wear masks when flying — combined with air filtration systems on commercial aircraft — offer "sufficient" protection for domestic travelers.

"We will seriously consider [a vaccine requirement] as new information arrives," he said Wednesday. "It's just keeping an open mind that the situation may change. But at this particular time, we do not feel that is necessary to make that a requirement for domestic flights."

After missing holiday celebrations with family and friends during the pandemic, many Americans have been eager to reunite. Travel forecasts predicted the number of people flying would be close to pre-pandemic levels. Despite the omicron variant surfacing just after Thanksgiving, many were reluctant to cancel their travel plans.

The Transportation Security Administration screened just under 2 million people Tuesday nationwide, a slight drop from Sunday and Monday.

Omicron is the fifth coronavirus variant of concern and is spreading rapidly around the world. Here's what we know. (Luis Velarde/The Washington Post)

Experts said the reluctance to cancel holiday plans was fueled by confidence in vaccines and booster shots, but also by mounting pandemic fatigue. Lisa Lee, an epidemiologist and public health expert at Virginia Tech, said battling the virus becomes more challenging this holiday travel season with more people on the move.

"You just have more chance of getting it because people are not, perhaps rightfully so, people are not shuttered in their homes anymore avoiding everyone," she said. "We are saying to ourselves as a society, we must do more than be in isolation."

Given that reality, Lee and other health experts urge people to continue practices that have become commonplace during the pandemic: mask-wearing, social distancing and frequent hand-washing. They also urged those who were able to get tested before and after travel.

Plaintiffs' Exhibit 534

nytimes.com

# Flight disruptions continue with thousands more cancellations as Omicron thins airline crews.

*Marc Tracy, Daniel Victor, Adeel Hassan, Ana Ley*

5-6 minutes          12-27-21



Credit...David Zalubowski/Associated Press

- Published Dec. 26, 2021Updated Dec. 27, 2021

Flight disruptions in the United States continued on Monday as many people embarked on their first trips in almost two years, and Dr. Anthony S. Fauci, the nation's top infectious disease expert, again raised the possibility of a vaccination requirement for air travel.

At least 2,600 more flights were canceled Monday, including about 1,000 U.S. flights, as the highly transmissible Omicron variant of the coronavirus is sending daily caseloads in parts of the United States soaring to levels higher than last winter's pandemic peak.

While the cancellations were only a small percentage of overall flights, the problem threatened to extend into the holiday week.

"When you make vaccination a requirement, that's another incentive to get more people vaccinated," Dr. Fauci said on MSNBC on Monday. "If you want to do that with domestic flights, I think that's something that seriously should be considered."

Over the holiday weekend, airlines canceled thousands of flights as the Omicron variant hit flight

crews. In all, about 2,300 U.S. flights were canceled on Saturday and Sunday of Christmas weekend, with more than 3,500 more grounded globally, according to FlightAware, which provides aviation data. On Sunday alone, more than 1,300 U.S. flights and nearly 1,700 additional ones worldwide were canceled.

While some of the groundings were caused by bad weather and maintenance issues, several airlines acknowledged that the current wave of coronavirus cases had contributed significantly. A JetBlue spokesman said the airline had "seen an increasing number of sick calls from Omicron."

Twelve percent of JetBlue flights, 6 percent of Delta Air Lines flights, 5 percent of United Airlines flights and 2 percent of American Airlines flights on Sunday were canceled, according to FlightAware.

The stock prices of United, Delta, American and Southwest — the four largest U.S. carriers — were slightly lower on Monday.

Traveling rebounded sharply this year, making the situation at airports worse: Roughly two million people passed through screening checkpoints each day last week, according to the Transportation Security Administration, and on Sunday. The numbers on Christmas Eve and Christmas Day were much higher than last year, and some figures even exceeded those of the same days two years ago, when virtually no Americans were aware of a virus beginning to circulate halfway around the world.

The Omicron variant, which is now responsible for more than 70 percent of the new coronavirus cases in the United States, has already helped push daily case averages in the United States above 200,000 for the first time in nearly 12 months, according to The New York Times's coronavirus tracker.

An airline trade group has asked the Centers for Disease Control and Prevention to shorten the recommended isolation period for fully vaccinated employees who test positive to a maximum of five days, from 10 days, before they can return with a negative test.

"Swift and safe adjustments by the C.D.C. would alleviate at least some of the staffing pressures and set up airlines to help millions of travelers returning from their holidays," said Derek Dombrowski, a JetBlue spokesman.

The flight attendants' union, however, has argued that reductions in recommended isolation times should be decided on "by public health professionals, not airlines."

Some of this weekend's delays had little to do with the pandemic. Alaska Airlines had only a few cancellations related to crew exposures to the coronavirus, said a spokeswoman, Alexa Rudin. Yet it canceled 170 flights those two days, according to FlightAware, including 21 percent of its Sunday flights, because of unusually cold and snowy weather in the Pacific Northwest, which affected its hub, Seattle-Tacoma International Airport.

The pandemic has also caused a shortage of train and bus workers nationwide. In New York City, the Metropolitan Transportation Authority is also dealing with an uptick in positive cases among its staff, which is 80 percent vaccinated. It said subway service on Monday was running on a normal schedule, with scattered exceptions.

"Whatever we can do as riders to help minimize the risk to transit workers will help to reduce the spread," said Lisa Daglian, the executive director of the Permanent Citizens Advisory Committee to the M.T.A., a watchdog group. "The M.T.A. is doing what it can with the resources it has available."

Danny Pearlstein, a spokesman for the Riders Alliance, an advocacy group, said: "My sense is the M.T.A. is once again making the best of a bad situation."

# Plaintiffs' Exhibit 535

**Holiday flight cancellations hit new peak amid Covid, wintry weather**

By Gregory Wallace and Matt McFarland, CNN
Updated 2:06 PM ET, Sat January 1, 2022

Thousands of US flights were canceled on New Year's Day as a combination of Covid-19 and wintry weather have slowed travel. Flight cancellations have trended up steadily since Christmas Eve, hitting a new peak Saturday morning as millions travel over the holidays.

Data from the website FlightAware shows more than 4,200 flights were canceled globally as of midday Saturday, or about 10% of the worldwide schedule.

Airlines have already been dealing with the Omicron variant, which has brought an unprecedented spike in Covid cases. Many airline employees have been unable to work. The Federal Aviation Administration has also warned more of its own employees are testing positive, which may restrict flights.

2022 is starting with a flurry of severe weather
2022 is starting with a flurry of severe weather
Now a new challenge is adding to travelers' woes: a large storm is sweeping across the Rockies and Midwest, bringing ice and heavy snow. Chicago has been especially hard hit. Airlines have canceled more than half of flights from Midway International Airport and more than 40% from O'Hare International Airport. Nearly a third of flights at Kansas City International Airport have been canceled. In Detroit, airlines canceled one in five flights.

Delta Air Lines (DAL) told CNN Business it projects between 200 and 300 of its more than 4,000 daily flights will be canceled during the holiday weekend. It also recommended people traveling in Chicago, Detroit, Salt Lake City, Seattle and the central and southern Rocky Mountain regions consider shifting their travel plans given the weather.

Southwest Airlines (LUV) told CNN Business all of its issues have been caused by weather.
More than 11,000 flights have been canceled since Christmas Eve, according to FlightAware data.

Plaintiffs' Exhibit 536

[dailywire.com](dailywire.com)

# Leaked Airline Memos: Majority Of Employees With Omicron Are Vaxxed, Healthy Pilots Offered More Pay To Cover Shifts

*Tim Meads*

3-4 minutes          1-3-22

---

On Monday, The Daily Wire's "Morning Wire" [podcast](podcast) revealed that in wake of massive absences due to COVID-19, major airlines such as United and Spirit Airlines are reportedly offering employees more pay to help cover shifts for colleagues out of commission due to the illness. In a memo obtained by The Daily Wire, United specifically cited Omicron as having caused a "significant" increase in pilot illness, making the higher pay necessary to keep flights on track. Despite the airline industry being heavily vaccinated, the Omicron variant has caused an uptick in COVID-19 absences.

As the Morning Wire reported, more than 4,000 flights were canceled just this past weekend. While a massive storm in Chicago was partly to blame, it appears the main driver has been amongst pilots.

United Airlines' CEO Scott Kirby had previously [stated](stated) that the company had been forced to fire "just six of its 13,000-strong pilot group" who did not get the vaccine despite a company mandate.

Business Insider reported:

> …Kirby said about 200 employees were terminated because they failed to get the COVID-19 vaccine, six of which were pilots, reported Reuters. Moreover, 80 pilots who received a medical or religious exemption were put on unpaid leave.
>
> The firings represent less than 1% of the company's 67,000-employee workforce, with most employees choosing to get the shot before the September 27 deadline.

Likewise, Delta has bragged that more than 90% of its 80,000 employees are vaccinated. Yet, a Delta memo recently acknowledged that when it comes to "confirmed Omicron cases, including those among airline workers, the majority are occurring in fully-vaccinated individuals," according to the Morning Wire's Georgia

Howe.

"Not only is omicron making more vaccinated employees sick vs. the unvaccinated, but putting those unvaccinated employees on the street without pay means the airline doesn't have much wiggle room when their schedules start to fall apart," Jason Kunisch, co-founder of U.S. Freedom Flyers and a pilot for a major airline told the Morning Wire.

As The Daily Wire's John Bickley observed, COVID-19 was called the "pandemic of the unvaccinated" just a short while ago but that term may now be obsolete given the latest news.

One of the more long-lasting ramifications of the pandemic, according to a report from "Airlines for America," has been an increase in the use of technology in the airport.

"COVID-19 has brought about an acceleration of digital competency across demographic cohorts," the report noted. "We have a lot of different people who fly through the airport. We are constantly thinking about the experience we present to them. And if people have become more technology savvy, more  digitally competent, that means we can accelerate and roll out the contactless passenger  journey across many platforms — and there will be an acceptance of and a desire for them."

For now, though, the industry's only recourse might be to offer more pay to those who can work, such as Spirit Airlines offering flight attendants double pay to pick up extra flights this January.

*The Daily Wire is one of America's fastest-growing conservative media companies and counter-cultural outlets for news, opinion, and entertainment. Get inside access to The Daily Wire by becoming a member.*

Plaintiff's Exhibit 537

thegatewaypundit.com

# Over 6,000 Flights Cancelled During Christmas Weekend

*Cassandra Fairbanks*

2-3 minutes        12-26-21



**Over 6,000 flights were canceled during Christmas weekend, primarily due to COVID-19 related complications.**

Hundreds of flights were canceled on Sunday as the mass cancellation and delay count continued to rise due to people calling in sick and citing omicron.

"The nationwide spike in Omicron cases this week has had a direct impact on our flight crews and the people who run our operation. As a result, we've unfortunately had to cancel some flights and are notifying impacted customers in advance of them coming to the airport," United said in a statement. "We're sorry for the disruption and are working hard to rebook as many people as possible and get them on their way for the holidays."

United alone canceled 201 flights on Friday and 238 flights on Saturday.

Delta cancelled 173 flights just on Christmas Eve and Jet Blue cancelled 80.

"We apologize to our customers for the delay in their holiday travel plans," Delta said in a statement. "Delta people are working hard to get them to where they need to be as quickly and as safely as possible on the next available flight."

Across all airlines, thousands of flights were disrupted over the weekend.

"Almost 700 US flights were canceled and another 1,300 were delayed Sunday, according to FlightAware. Globally, there were over 2,000 cancellations. Delta and JetBlue each saw over 100 cancellations Sunday," the CNN report explains.

**TRENDING:** [Just Like Soviet Russia: T-Mobile Is Erasing Links to Gateway Pundit Articles if You Send Them by Text Message -- MORE UPDATES...](#)

Across the globe, over 6,000 flights were canceled from Christmas Eve through Sunday — including approximately 1,700 originating in or flying to the United States.

Holiday travel was up more than double this year from last, but is still well below the pre-pandemic levels.

# Plaintiffs' Exhibit 538

## The 3 reasons travel ground to a halt this Christmas

By Jordan Valinsky, CNN Business
Updated 11:09 AM ET, Mon December 27, 2021

Over the Christmas weekend, flying was a miserable experience for millions of travelers, as airlines canceled or delayed thousands of flights.

The problems continued Monday, with nearly 900 flights canceled within, into or out of the United States, according to FlightAware. More than 1,600 flights are delayed.

The troubles come at the busiest time of year for air travel: The US Transportation Security Administration said it screened millions of people each day over the holiday weekend, peaking at 2.19 million travelers on Thursday, December 23. Seven of the last 10 days have seen more than 2 million screenings.

A nasty brew of issues has complicated air travel, including the rapid spread of the Omicron variant, the labor shortage and a surge in travelers crowding airports and the skies.

Omicron variant

Just when airlines thought they were on the verge of normalcy and profitability again, along came the Omicron variant to put those hopes in doubt. The variant has sparked a sharp uptick in cases -- New York broke a single-day record with 49,708 new Covid-19 cases reported on Christmas Eve.

United Airlines (UAL)said last week it had to cancel hundreds of flights because it lacked enough crew members to safely fly all of its scheduled routes.

"The nationwide spike in Omicron cases this week has had a direct impact on our flight crews and the people who run our operation," said a United memo obtained by CNN.

Delta Air Lines (DAL) also said the cancellations are due to multiple issues including the Omicron variant.

"We apologize to our customers for the delay in their holiday travel plans," Delta said in a statement. "Delta people are working hard to get them to where they need to be as quickly and as safely as possible on the next available flight."

Airline travel is surging again

Leisure travel is back to near pre-Covid levels. On Friday and Saturday, TSA screened about two-thirds of the passengers it did on those days in 2019 (when Christmas fell on a Wednesday).

AAA recently estimated that more than 109 million Americans will travel over the long Christmas and New Year's week -- a number approaching the pre-pandemic record 119 million travelers of Christmas 2019.

Airlines are projected to carry 6.4 million of those passengers, AAA said. That's about triple the number from last year when the pandemic significantly curtailed holiday travel.

The labor shortage

Airlines were already having trouble finding enough crew to meet the surge in demand for travel. Omicron is making that labor shortage even worse.

Staffing shortages are leading to overworked flight crews and most of the canceled flights. Less choice in flights has led to higher ticket prices. And altercations over masks have been the cherry on the top of a miserable year for travel.

American Airlines (AAL) and Southwest (LUV) blamed service meltdowns in October and November on lacking enough pilots and flight attendants to adjust for weather-related cancellations.

Officials with various airline unions say that their members are stressed to the "breaking point" by work conditions because of understaffing. Many pilots and flight attendants say they're having trouble getting the hotel rooms they need to meet the government-mandated rest requirements while working.

Pilots at American have held informational pickets in recent weeks to complain about work conditions. And the airline unions correctly predicted that the problems would get worse with the pick-up in travel over the holidays.