# EXHIBIT B



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **KLEANTHIS N. ANDREADAKIS,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:22-cv- 052 |
| | : | |
| **CENTERS FOR DISEASE** | : | Jury Demand |
| **CONTROL & PREVENTION,** | : | |
| | : | |
| **DEPARTMENT OF HEALTH &** | : | |
| **HUMAN SERVICES,** | : | |
| | : | |
| **AMERICAN AIRLINES,** | : | |
| | : | |
| **JETBLUE AIRWAYS,** | : | |
| | : | |
| **SOUTHWEST AIRLINES,** | : | |
| | : | |
| **UNITED AIRLINES,** | : | |
| | : | |
| **NUMEROUS YET-TO-BE-NAMED** | : | |
| **EMPLOYEES OF THE 4 AIRLINES, and** | : | |
| | : | |
| **STAT-MD,** | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

**I. STATEMENT OF THE CASE**

Plaintiff Kleanthis N. Andreadakis brings this suit to vacate and permanently enjoin enforce-

ment of the Federal Transportation Mask Mandate ("FTMM")[1] and International Traveler Testing

---

[1] The *ultra vires* Federal Transportation Mask Mandate consists of: 1) Executive Order 13998, 86
Fed. Reg. 7,205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan.
27, 2021); 3) Centers for Disease Control & Prevention Order "Requirement for Persons to Wear
Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4)

Requirement ("ITTR")[2] put into place by orders of the Centers for Disease Control & Prevention ("CDC") – under the purported authority of its parent agency, the Department of Health & Human Services ("HHS") (collectively "the Federal Defendants). I also seek to end the unlawful discrimination against the disabled such as myself who can't safely wear a mask because of a medical condition by four airlines I have flown on or attempted to fly on during the COVID-19 pandemic: American Airlines, JetBlue Airways, Southwest Airlines, and United Airlines (collectively "the Airline Defendants"). Also charged are Numerous Yet-to-Be-Named Employees of the 4 Airlines (the "Individual Defendants"), whose names will be learned during discovery. The final defendant is STAT-MD, a medical vendor that evaluates mask-exemption demands for airlines including Southwest.

By mandating masks for all American travelers and requiring a negative COVID-19 test before any airline passenger may board a flight to the United States, the Federal Defendants have acted without statutory authorization or following the rulemaking process required by the Administrative Procedure Act ("APA"). These policies also raise serious constitutional concerns. Because of the FTMM, numerous state, local, and regional transportation agencies are told to enforce a federal mandate that is in direct conflict with the laws and policies of 43 states that prohibit mask mandates or do not require face coverings.

---

Transportation Security Administration Health Directives 1542-21-01C, 1544-21-02C, and 1582/84-21-01C (Jan. 19, 2022); and 5) TSA Emergency Amendment 1546-21-01C (Jan. 19, 2022). Only the CDC order is challenged in this Complaint since it appears the Courts of Appeals have jurisdiction over the TSA Health Directives and Emergency Amendment and the president's executive order can be challenged by suing the agencies he directed to carry it out.

[2] Centers for Disease Control & Prevention Order "Requirements for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country." 86 Fed. Reg. 69,256 (Dec. 7, 2021).

The Court should vacate worldwide[3] the FTMM and ITTR because they are an improper, illegal, and unconstitutional exercise of executive authority. The mask mandate and testing requirement are procedurally defective because the Federal Defendants adopted them without following the APA's notice-and-comment requirements or considering the impact on millions of disabled travelers such as myself. They also ignored countless scientific and medical studies and articles showing that face masks are totally ineffective in reducing coronavirus spread but are harmful to human health in at least 68 ways. Congress never intended for the Executive Branch to have the authority to promulgate this policy – and even if it did, the FTMM and ITTR are unconstitutional. CDC and HHS may not exercise their authority in a manner that is inconsistent with the administrative structure that Congress enacted.

I have been restricted from flying by the Airline Defendants for more than 1½ years because of their enforcement of mask mandates that violate numerous provisions of federal and international laws, plus breach their contracts and violate tort law and the Constitution.

The evidence is indisputable that the Airline Defendants since Summer 2020 have illegally discriminated against flyers with disabilities by refusing to grant any mask exemptions and/or requiring such an onerous exemption process that makes it nearly impossible for those of us medically unable to cover our face to obtain a waiver. The disabled are essentially banned from using the nation's commercial aviation system unless we don a mask, creating a danger to our health. I have avoided flying as much as possible because I can't obstruct my oxygen intake. All defendants have illegally failed to give passengers – whether disabled or not – our legally guaranteed option

---

[3] The FTMM applies aboard flights to and from the United States, even when the aircraft is outside U.S. airspace. It likewise applies to ships calling on U.S. ports even when such vessels are in the open sea thousands of miles from American shores, far outside U.S. jurisdiction. The ITTR only applies in foreign countries (for flights departing to the United States).

under the Food, Drug, & Cosmetic Act ("FDCA") to refuse to use a medical device (face mask) not approved by HHS' Food & Drug Administration ("FDA") or allowed only under an Emergency Use Authorization ("EUA").

In mandating masks for all passengers, the Airline Defendants have violated the Rehabilitation Act ("RA"), Air Carrier Access Act ("ACAA"), international law, Virginia law, and their contracts with passengers – especially when it comes to illegally discriminating against travelers with disabilities who can't medically tolerate wearing a face covering with first a complete ban and then arduous exemption requirements that aren't supported by law.

Making this matter worse is that the airlines' regulatory agency, the Department of Transportation ("DOT"), has given them guidance that actually supports their illegal behavior and failed to enforce the ACAA against violations. Ex. 51. Therefore, I bring this suit to enforce the ACAA since the administrative agency has neglected its statutory duty to do so. Because the agency charged by Congress to enforce the rights of passengers with disabilities has failed to protect me and countless numbers of others similarly situated, my only recourse is a private suit in this Court to ensure the Airline Defendants cease and desist from their unlawful conduct. The ACAA should also be enforced via the RA and Virginia law.

The Airline Defendants have acted without statutory or regulatory authority to demand that every passenger obstruct our breathing by wearing an unauthorized or EUA medical device that covers our nose and mouth. The Airline Defendants have illegally required face coverings for the last 20 months or so not only on board their property (aircraft) but also in public areas of airports they do not own or control. The Court must stop them from continuing to discriminate against flyers with disabilities and force them to follow the RA, ACAA, and other laws because DOT has refused to do its job.

4

## II. PARTIES

Plaintiff Kleanthis N. Andreadakis resides at 5108 Hunters Meadow Pl., Henrico, VA 23231. I am a frequent traveler subject to the FTMM and the airlines' mask policies. Because of the mandates, I have had to cancel flight plans when airlines have refused my mask-exemption requests even though I have qualifying disabilites. The only airline to grant me a mask waiver is United, but it's process for doing so is cumbersome, conditional on me meeting certain parameters not defined in the ACAA and not authorized by law.

Defendant Centers for Disease Control & Prevention is an agency of HHS. It is headquartered at 1600 Clifton Rd., Atlanta, GA 30329.

Defendant Department of Health & Human Services is a department of the Executive Branch. It is headquartered at 200 Independence Ave., SW, Washington, DC 20201.

Defendant American Airlines is a Delaware corporation. Its headquarters is at 1 Skyview Dr., Fort Worth, TX 76155. Its registered agent in Virginia is C.T. Corporation System, Suite 285, 4701 Cox Rd., Glen Allen, VA 23060-6808.

Defendant JetBlue Airways is a Delaware corporation. Its headquarters is at 27-01 Queens Plaza N., Long Island City, NY 11101. Its registered agent in Virginia is Corporation Service Company, 2nd Floor, 100 Shockoe Slip, Richmond, VA 23219.

Defendant Southwest Airlines is a Texas corporation. Its headquarters is at 2702 Love Field Dr., Dallas, TX, 75235. Its registered agent in Virginia is Corporation Service Company, 2nd Floor, 100 Shockoe Slip, Richmond, VA 23219.

Defendant United Airlines is a Delaware corporation. Its headquarters is at 233 S. Wacker Dr., Chicago, IL 60606. Its registered agent in Virginia is C.T. Corporation System, Suite 285, 4701 Cox Rd., Glen Allen, VA 23060-6808.

Defendants Numerous Yet-to-Be-Named Employees of the 3 Airlines consist of all officers, executives, and staff who participate in the conspiracy to interfere with my civil rights and/or neglected to prevent such interference. Their names will be learned during discovery. Until then, their interests should be adequately represented by attorneys for the Airline Defendants.

Defendant STAT-MD describes itself as providing "Airline Consultation Services" including In-flight emergency consultation as well as fitness-to-fly ground screening. STAT-MD is a non-profit organization backed by the resources of the University of Pittsburgh Medical Center. Its headquarters is at 200 Lothrop St. #F1301, Pittsburgh, PA 15213.

## III. JURISDICTION, VENUE, & STANDING

The Court has jurisdiction under 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." My claims against the Federal Defendants arise under federal law including the U.S. Constitution, U.S. Code, Code of Federal Regulations, and international treaties ratified by the United States.

The Court has the authority to grant declaratory relief and to vacate the FTMM under the Declaratory Judgment Act, the APA, and the Court's inherent equitable powers. 28 U.S.C. §§ 2201, 2202; 5 USC §§ 702, 706.

Venue is proper in this judicial district because a substantial part of the events giving rise to this lawsuit occurred in Richmond. "A civil action in which a defendant is … an agency of the United States … may, except as otherwise provided by law, be brought in any judicial district in which … a substantial part of the events or omissions giving rise to the claim occurred…" 28 U.S.C. § 1391(e)(1).

I have standing to sue the Federal Defendants because the FTMM restricts my freedom of travel and unlawfully discriminates against me as a disabled passenger, *inter alia*. A court order declaring unlawful and setting aside the FTMM would redress my injuries because my freedom to travel without covering my face would be restored.

My claims against the Airline Defendants, Individual Defendants, and STAT-MD arise under the Constitution, RA (29 U.S.C. § 794), ACAA (49 USC § 41705), DOT regulations (14 CFR Part 382), treaties ratified by the United States, the Constitution, other provisions of federal laws and regulations, and Virginia law.

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42; (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent; … (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights…" 28 USC § 1343(a).

This Court has jurisdiction for my state statutory and common-law tort and breach-of-contract claims pursuant to 28 USC § 1367: "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

7

It also has diversity jurisdiction under 28 USC § 1332 since I am a citizen of Virginia and the Airline Defendants and STAT-MD have their principal place of business in New York, Texas, Illinois, and Pennsylvania. The amount is controversy is greater than $75,000.

This Court has the authority to grant declaratory and injunctive relief as well as award monetary damages against the Airline Defendants, the Individual Defendants, and STAT-MD under the Declaratory Judgment Act and this Court's inherent powers. 28 USC §§ 2201 & 2202.

Venue is proper in this judicial district because a substantial part of the events giving rise to this lawsuit occurred in Richmond. All of the Airline Defendants operate flights from at least one airport located in this district. "A civil action may be brought in … a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred…" 28 U.S.C. § 1391(b)(2).

I have standing to sue the Airline Defendants, the Individual Defendants, and STAT-MD because they illegally discriminate against me on the basis of my medical conditions by denying me to ability to fly without wearing a mask as well as forcing me in violation of federal law and in breach of contract to wear unauthorized and/or EUA masks against my will to the detriment of my health. A court order declaring unlawful and enjoining the nongovernment defendants' illegal discrimination and contract breaches – plus an award of compensatory and punitive damages – would redress my injuries.

I demand a trial by jury for all claims so triable.

## IV. STATEMENT OF FACTS

**A. I can't wear a face mask or shield due to Tourette Syndrome and other qualifying disabilities, my travel history and attempts to obtain medical exemptions since August 2020, my future travel plans, Department of Transportation complaints, and I can't use surface public transport.**

1. **I CAN'T TOLERATE WEARING A FACE MASK OR SHIELD:** Due to my Tourette Syndrome and other qualifying disabilities, it's harmful for me to wear a mask or shield. Covering my nose and mouth inhibits my natural ability to breath, causes ongoing pain and discomfort, interferes with my ability to communicate, exacerbates my medical conditions, and could result in serious long-term health related concerns including the potential for death.

2. Tourette Syndrome is a condition of the nervous system and classified as a first-definition neurological disorder by the American with Disabilities Act (ADA). TS causes people to have symptoms including but not limited to involuntary tics and spasms, which are sudden twitches, movements, or sounds that people do repeatedly. People who have tics can't stop their body from doing these things.

3. "People with Tourette syndrome have struggled during the pandemic in a number of ways, including difficulty wearing masks because of facial tics and stigma related to coughing tics." Ex. 1.

4. "Stress, isolation, and face mask requirements related to COVID-19 may be worsening symptoms for the estimated 1% of the world's population who suffer from Tourette Syndrome… In a June study published in the journal Movement Disorders Clinical Practice, 48% of adults with Tourette syndrome reported their tics had worsened since the pandemic was declared in March [2020]. … Others said masks had made their tics worse." *Id.*

5. I have two doctor's note exempting me from masking. Ex. 2.

6. My doctor wrote that "Because of this disability and other medical conditions, he is not able to safely wear a mask or face shield. The wearing of a mask/face shield exacerbates the Tourette's Syndrome by increasing the frequency of involuntary tics and spasms, to the point they may become painful and interfere with other major life activities. It is my professional recommendation that he not be mandated to wear a face mask or shield, because it is detrimental to his health." *Id.*

7. Medical experts agree with my physician that "For many individuals with different types of disabilities the effects of wearing a mask are far more severe than being slightly uncomfortable. Wearing a face mask can have a significant impact on their health, wellbeing, and ability to function." Ex. 3.

8. **MY FLIGHTS & ATTEMPTED FLIGHTS SINCE AUGUST 2020:** I've attempted to take at least two flights on American since it began refusing mask exemptions July 29, 2020. Ex. 4.

9. I've attempted to take at least two flights on JetBlue since it began refusing mask exemptions Aug. 10, 2020.

10. For example, I was denied the ability to fly by JetBlue from Richmond to Boston, Massachusetts, solely because I'm unable to wear a face covering (DOT Case # AT-2021-90016).

11. On May 24, 2021, I inquired with JetBlue about obtaining a mask exemption for upcoming travel. I needed to fly from RIC to BOS to assist my son, who was retiring from the U.S. Coast Guard in Massachusetts and relocating to Virginia.

12. The mask-exemption process was not detailed anywhere on the JetBlue website.

13. I was advised by JetBlue via a chat portal I needed to purchase a ticket, then submit my request for a mask exemption "no less than five days prior to travel." The request required me to provide specific details about my "permanent disability" for JetBlue to process it. Ex. 5.

14. I was then advised that "submitting documentation does not guarantee approval for a mask exemption. After JetBlue reviews your documentation, you will get an email letting you know if the exception is approved or denied. Arrive at the airport no less than 3 hours before departure and check in at the ticket counter, where a JetBlue crewmember will review the documents and confirm that the exempted customer is wearing a face shield. The face shield must be worn at all times." *Id.*

15. I was not able to purchase a ticket because I was not guaranteed "approval" and had I been approved, I would have been required to wear a face shield, which I am medically unable to wear. And had my request been denied, I would not have received a refund for the unused ticket.

16. I've attempted to take at least eight flights on Southwest since it began refusing mask exemptions July 27, 2020. Ex. 6.

17. Southwest refused all my mask-exemption demands. Ex. 7.

18. For example, I was denied the ability to fly by Southwest from Richmond to Boston, Massachusetts, solely because I'm unable to wear a face covering (DOT Case # AT-2021-50050).

19. On May 20, 2021, I submitted a completed "Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines" along with a copy of the requested medical certification via e-mail.

20. On May 21, 2021, Southwest responded: "Based on guidance from our third-party medical provider [STAT-MD], we regret to inform you that you do not qualify for an exemption and will be required to wear a mask during your upcoming travel."

21. After I filed a complaint with DOT, Southwest replied June 17: "Southwest is fully aware of all laws and regulations protecting passengers with disabilities. We are active in the airline

industry in sharing best practices about how best to accommodate passengers with disabilities." This is such a lie.

22. Attached are receipts for expenses I incurred as a direct result of having to drive my car from Virginia to Massachusetts because JetBlue and Southwest conspired to deprive disabled flyers of our civil rights. I was going to fly up to Boston to help my son move. Because I had to drive as a result of the defendants' illegal discrimination, I had to rent a trailer to attach to the moving truck to tow my car back to Virginia. This cost me an extra $249 for the trailer, which the defendants are liable for plus gas and other extra expenses incurred. Ex. 8.

23. I've taken two flights on United since it began refusing mask exemptions July 22, 2020. Ex. 9. United later modified its policy to allow certain waivers but only if the disabled traveler agrees to numerous procedures unauthorized by law.

24. For my November 2021 trip from Richmond to Newark, New Jersey, and return, United conditionally approved my mask-exemption demand but required numerous illicit hurdles to actually obtain final approval. *Id.*

25. I am a dual citizen of the United States and Greece.

26. My family owns a home in Greece, requiring my presence at least once a year.

27. For my Nov. 26, 2021, flight from Athens, Greece, to Newark, I was forced to submit a negative COVID-19 test due to the ITTR ordered by CDC and HHS. Ex. 43.

28. This test cost me €60 ($67).

29. **MY FUTURE TRAVEL PLANS:** My next flight is scheduled Feb. 14 on United from Richmond to Redding, California. I'll be returning Feb. 18, also on United. Ex. 10.

30. For the remainder of this year, I expect to need to fly about 10 times including for personal and business reasons.

31. **DOT & OTHER COMPLAINTS:** I filed two discrimination complaints against American with DOT for violations of the ACAA. Ex. 4.

32. DOT has failed to resolve any of my complaints against American.

33. I filed two discrimination complaints against JetBlue with DOT for violations of the ACAA. Ex. 11.

34. JetBlue responded to one of my complaints Oct. 5, 2021, confirming its exemption procedures violate at least four provisions of the ACAA (advance notice, wearing a face shield, submitting a medical certificate, and COVID-19 test). Ex. 12.

35. JetBlue lied when it wrote me that "As JetBlue's policy is in full accordance with the Federal Mask Mandate, we respectfully deny that we acted in violation of DOT regulations in this instance." *Id.*

36. DOT has resolved only one of my complaints against JetBlue, ruling that it violated the law by refusing to grant medical exemptions. However, DOT did not fine or otherwise penalize Jet-Blue for violating the ACAA. Ex. 223.

37. I filed eight discrimination complaints against Southwest with DOT for violations of the ACAA. Ex. 13.

38. DOT has resolved only one of my eight complaints against Southwest, the earliest one, ruling that it violated the law by refusing to grant medical exemptions. However, DOT did not fine or otherwise penalize Southwest for violating the ACAA citing Southwest's subsequent policy amendment which should have corrected the issues brought in this complaint. Ex. 223. I note that the remainder of the DOT complaints were filed as a result of Southwest's continuing, repeated failure to correct their own policy and acknowledge the rights guaranteed to the disabled under ACAA.

39. I filed a complaint against Southwest on Oct. 21, 2021, with the Virginia Office of Civil Rights. Ex. 14.

40. I filed three discrimination complaints against United with DOT for violations of the ACAA. Ex. 15.

41. DOT has failed to resolve any of my complaints against United.

42. I filed a complaint against STAT-MD with the U.S. Department of Justice Civil Rights Division on Oct. 21, 2021. Ex. 16.

43. I filed a complaint against STAT-MD with HHS on Oct. 21, 2021. Ex. 17.

44. **SURFACE PUBLIC TRANSPORTATION:** When I travel, I often like to use mass transit such as rideshare cars, subways, trains, buses, and ferries to get around.

45. However, the FTMM applies to intrastate ground transportation. All public-transportation operators therefore must enforce the mask mandate even though it conflicts with the laws of 43 states.

46. I've found that most transit agencies do not easily provide information about how to obtain a medical exemption.

47. I therefore can't use mass transit anywhere in the country because of the FTMM.

**B. Defendant HHS' COVID-19 pandemic declarations.**

48. Jan. 31, 2020: The secretary of HHS declared COVID-19 a public-health emergency in the United States under § 319 of the Public Health Service Act. Ex. 52; *see also* 42 U.S.C. § 247(d).

49. A § 319 determination remains in effect for 90 days or until the secretary determines that the emergency no longer exists, whichever occurs first. If the same or additional conditions continue to warrant a public-health emergency, the secretary may renew the determination for additional 90-day periods without end. Ex. 52.

50. The Public Health Emergency Declaration for COVID-19 has been renewed numerous times, most recently effective Jan. 16, 2022, by HHS Secretary Xavier Becerra. Ex. 53.

51. Per the 90-day limit, the current emergency declaration expires April 16, 2022 (however it appears HHS can extend it indefinitely so long as it believes COVID-19 presents a public-health emergency). *Id.*

**C. Federal Transportation Mask Mandate.**

52. **PRESIDENTIAL ACTION:** The day after taking office (Jan. 21, 2021), President Joseph Biden issued "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); Ex. 54. This executive order set in motion the FTMM issued by CDC and HHS as well as other federal agencies.

53. President Biden's action marked an abrupt change of policy from the former administration. DOT "in October [2020] rejected a petition to require masks on airplanes, subways, and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department 'embraces the notion that there should be no more regulations than necessary.'" Ex. 55.

54. "The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June [2020] hearing 'we do not plan to provide an enforcement specifically on that issue.'" *Id.*

55. **DHS ACTION:** To carry out E.O. 13998, the Department of Homeland Security ("DHS") issued Determination 21-130 on Jan. 27, 2021: "Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using & Employed by the Transportation System." Ex. 56.

56. DHS directed its agency TSA to take actions to enforce CDC's FTMM order. *Id.*

57. **CDC ACTION:** Without providing public notice or soliciting comment, CDC – an agency within HHS – issued an order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" on Feb. 1, 2020, effective immediately. 86 Fed. Reg. 8,025 (Feb. 3, 2021). Ex. 57. This is the mask mandate I challenge in this Complaint.

58. "This Order will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists." *Id.*

59. As authority for the FTMM, CDC invoked § 361 of the Public Health Service Act (42 USC § 264) and CDC regulations implementing that statute (42 CFR §§ 70.2, 71.31(b), & 71.32(b)). *Id.*

60. CDC's FTMM order applies to wholly intrastate transportation, including taking a rideshare, city bus, subway, or other mode of transit less than one mile – or even just sitting alone at a bus stop or train station reading a newspaper or talking on a cellphone without any intent to travel. *Id.*

61. "This Order exempts the following categories of persons: • A child under the age of 2 years; • A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act … This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability." *Id.*

62. "Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including

**medical consultation by a third party**, **medical documentation by a licensed medical pro-vider**, and/or other information as determined by the operator, as well as **require evidence that the person does not have COVID–19 such as a negative result from a SARS–CoV–2 viral test or documentation of recovery from COVID–19**. … Operators may further require that persons seeking exemption from the requirement to wear a mask **request an accommodation in advance**." *Id.* (emphasis added to show provisions that violate the ACAA).

63. CDC's FTMM order makes no mention of the ACAA (49 USC § 41705) or the regulations promulgated thereunder (14 CFR Part 382).

64. "This Order applies to persons on conveyances and at transportation hubs **directly operated by U.S. state**, local, territorial, or tribal **government authorities**, as well as the operators themselves. **U.S. state**, local, territorial, or tribal **government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions**, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities." *Id.* (emphasis added to illustrate 10th Amendment problems).

65. CDC's FTMM order makes numerous false claims about the effectiveness of face coverings. *Id.*

66. The order fails to note that the scientific consensus for decades has been that face masks do not reduce the transmission of respiratory viruses and that covering one's face causes at least 68 harms to human health. *See* 227 scientific studies, medical articles, and videos at https://bit.ly/masksarebad.

67. CDC's FTMM order contradicts numerous World Health Organization recommendations and standards, including that children under six should never wear masks. Ex. 58.

68. "Individuals traveling into or departing from the United States, traveling interstate, **or travel-ing entirely intrastate**, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transportation, must comply with the mask-wearing requirements set forth in this Order." *Id.* (emphasis added to illustrate 10th Amendment problem).

69. Without citing any authority allowing it to delegate its supposed statutory and regulatory authority to an agency contained in a department outside of HHS, CDC's order includes a provision that "To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration…" *Id.*

70. On its website, CDC falsely claims that "Most people, including those with disabilities, can tolerate and safely wear a mask..." Ex. 59.

71. **TSA ACTIONS:** Based on CDC's questionable delegation of its authority to an agency contained in a separate executive department, TSA issued three "Security Directives" (more accurately labeled "Health Directives") and one Emergency Amendment Feb. 1, 2021, to transportation operators requiring them to vigorously enforce the mask mandate. These four orders were effective until May 11, 2021, and have been renewed thrice until March 18, 2022.

72. I am part of a group of 14 disabled Americans challenging TSA's three Health Directives and one Emergency Amendment enforcing CDC's FTMM order. There are six Petitions for Review currently before the U.S. Court of Appeals for the District of Columbia Circuit: *Wall v. TSA*, No. 21-1220; *Faris v. TSA*, No. 21-1221; *Marcus v. TSA*, No. 21-1225; *Eades v. TSA*, No. 21-1236; *Andreadakis v. TSA*, No. 21-1237; and *Abadi v. TSA*, No. 21-1258.

**D. Congress has never enacted a mask mandate.**

18

73. CDC and HHS' imposition of the FTMM goes against the express wishes of Congress. The Legislative Branch has explicitly failed to mandate masks in any setting, including the transportation sector. This shows clear, unambiguous congressional intent.

74. The federal legislative response to coronavirus has been enormous with dozens of bills related to the COVID-19 pandemic enacted into law.

75. Not a single provision in any of the enacted bills grant CDC and HHS the authority to require face masks.

76. Numerous bills have been introduced in Congress to require masks in the transportation sector. None have been passed out of committee in either chamber.

**E. CDC and HHS ignore better options than imposing the FTMM.**

77. The Federal Defendants have not used more-effective options than the FTMM to reduce COVID-19 infections in the transportation sector.

78. For example, in June 2007, CDC and HHS developed a public-health Do Not Board ("DNB") list, enabling domestic and international health officials to request that individuals with communicable diseases be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States.

79. CDC published a notice more than six years ago concerning the "Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers." 18 Fed. Reg. 16,400 (March 27, 2015); Ex. 60.

80. There also exists a complimentary Public Health Border Lookout Record ("Lookout") system for individuals with communicable diseases that pose a public-health threat to travelers to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. *Id.*

19

81. Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any commercial flight. Individuals included on the DNB list are assigned a Lookout record that assists in ensuring that an infected individual is detected if he or she attempts to enter or depart the United States through a port of entry. *Id.*

82. "Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a Do Not Board list to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a Lookout list so they will be detected if they attempt to enter the United States by land or sea. These tools can be used for anyone who poses a threat to the public's health." Ex. 61.

83. But there is no evidence in the administrative record, media reports, or anywhere else that the defendants are using the DNB list and Lookout system to stop people who have tested positive for COVID-19 from traveling during the time they are a danger to spread the virus to others (typically considered to be about 10 days).

**F. The Airline Defendants ignore better options than imposing unlawful and discriminatory mask mandates.**

84. The Airline Defendants have more effective tools to combat COVID-19 spread than requiring their passengers be muzzled (and refusing to grant medical exemptions). However, the defendants have not worked to implement these better procedures to reduce infections in the transportation sector.

85. There's no evidence that the airlines have sought the government's cooperation in using existing federal procedures that actually target the sick.

86. For example, the Airline Defendants have not worked with the Federal Defendants to use the public-health DNB and Lookout lists to prevent passengers who have recently tested positive for COVID-19 from flying.

87. If the Airline Defendants truly cared about preventing COVID-19 transmission on their planes, they would work with CDC, HHS, DHS, TSA, and other federal agencies to use the DNB and Lookout systems. Instead, they illegally treat every single passenger as having the coronavirus and mandating they wear masks in defiance of the science that face coverings do nothing to prevent COVID-19 infections and deaths but harm human health. https:// bit.ly/masksarebad.

88. It appears Frontier is the only airline using a simple mitigation strategy that doesn't discriminate against anyone who isn't actually ill: "Frontier is the first U.S. airline to take passengers' temperatures with a touchless thermometer before boarding, and will block anyone with a temperature of 100.4 F or higher from flights." Ex. 62.

89. It's a mystery why the other Airline Defendants don't appear to be utilizing this simple measure to check for fevers (a key symptom of COVID-19) before check in or boarding.

**G. All defendants fail to take into account that airplane cabins pose little risk for coronavirus spread.**

90. There's nothing in the administrative record showing that CDC and HHS considered the ample evidence provided by the aviation industry and others that masks aren't necessary and do nothing to reduce COVID-19 spread.

91. U.S. air carriers commissioned a lengthy report "Assessment of Risks of SARS-CoV-2 Transmission During Air Travel & Non-Pharmaceutical Interventions to Reduce Risk" by the Harvard TH.B. Chan School of Public Health as part of the Aviation Public Health Initiative ("APHI"). Ex. 63.

92. This is yet another scientific/medical study the Federal Defendants ignored when promulgating the FTMM without any public notice or comment period.

93. "Ventilation Systems on Aircraft: These sophisticated systems deliver high amounts of clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Aircraft ventilation offers enhanced protection for diluting and removing airborne contagions in comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles…" *Id.*

94. "Particular emphasis is placed on the effectiveness of aircraft ventilation systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft." *Id.*

95. The study confirms what the airlines themselves have been promoting to customers: There is little-to-no risk of contracting COVID-19 aboard an aircraft. "After detailed analysis of these reports*, it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel*." *Id.* (emphasis added).

96. CDC itself admitted *"the risk of getting a contagious disease on an airplane is low."* *Id.* (emphasis added).

97. "A significant finding from the evaluation of these evacuation flight procedures [from China early in the pandemic] was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases." *Id.*

22

98. "Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide, *the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent*." *Id.* (emphasis added).

99. "Based on the investigations of outbreaks of other respiratory diseases on aircraft, it appears that transmission on aircraft is relatively infrequent." *Id.*

100.    "Air recirculation happens mostly when cruising, where about 40% to 50% of the cabin air is recirculated and filtered through a high-efficiency particulate air filter, also known as a HEPA filter. All the airlines interviewed have aircraft that are equipped with HEPA filters, and one of the airlines has increased the replacement frequency of their HEPA filters." *Id.*

101.    "The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses." *Id.*

102.    "Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles." *Id.*

103.    "[T]he risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out." *Id.*

104.    "[T]he aircraft's environmental control systems effectively diluting and removing pathogens significantly reduce the risk of passengers and crewmembers from acquiring COVID-19 during the cruise segment of their journey." *Id.*

105.    Several top airline officials and the industry's largest trade association have spoken out against the FTMM, saying it's unnecessary and actually hurts transportation security.

106.    Frontier Airlines CEO Barry Biffle said June 23, 2021, that face coverings are a prime
contributor to a string of recent in-flight disruptions: "The reality is, a lot of people don't want
to wear masks," Biffle said. "You don't have to wear a mask here [at the convention], you
don't have to wear [masks] at Walmart, but yet you've got to do it on a plane." Ex. 64.

107.    Spirit Airlines CEO Ted Christie also said June 23 that the U.S. government can help re-
duce the incidence of unruly air passenger behavior by doing away with the requirement that
travelers wear face coverings: "That's got to be the next step – when facial [covering require-
ments] are relaxed on airplanes," Christie said. "That is going to take a lot of steam out of
things." *Id.*

108.    Southwest Airlines CEO Gary Kelly and Airlines for America, the trade group representing
most major U.S. carriers, lobbied for the FTMM to terminate Sept. 13, 2021. Exs. 65-67.

109.    Southwest's and American's CEOs testified to a Senate committee Dec. 15, 2021, that
masks do not reduce the spread of COVID-19 and airplane cabins are already safe because of
their excellent air filtration and recirculation. Ex. 68.

**H. All defendants fail to take into account the voluminous scientific and medical research
showing masks are totally ineffective in reducing COVID-19 transmission.**

110.    The CDC official responsible for the FTMM admitted masks are worthless and are just for
show: "[W]e mask because it's the way we take care and express our concern for each other,"
said Marty Cetron, director of CDC's Division of Global Migration & Quarantine. Ex. 69.

111.    There's nothing in the administrative record showing that CDC and HHS considered the
robust scientific and medical evidence documenting how masks are totally ineffective in re-
ducing COVID-19 infections, hospitalizations, and deaths. *See* https://bit.ly/ masksarebad for

24

227 scientific studies, medical articles, and videos totaling more than 1,500 pages detailing
how masks do not reduce virus transmission but hurt human health.

112.  For example, a study released May 25, 2021, by the University of Louisville found state
mask mandates didn't help slow COVID-19 transmission. *Id.*

113.  Mask manufacturers themselves admit their products are "not for medical use," "cannot
eliminate the risk of contracting an infectious disease," "are not personal protective equip-
ment," and "are not intended … to prevent any disease or illness." Exs. 70-71 (photographs of
various masks for sale).

114.  Supporting the vigorous scientific evidence that masks aren't effective, the FTMM and the
Airline Defendants' policies have not stopped widespread COVID-19 infections among trans-
portation personnel when they are not on board a plane with excellent air filtration and recir-
culation. (Airline employees must wear masks at all times even when not flying.)

115.  Despite forcing their workers and passengers to wear masks, numerous airlines have can-
celed tens of thousands of flights during the past month because so many of their staff have
tested positive for coronavirus or been exposed to coworkers or passengers who have been
infected, stranding hundreds of thousands of muzzled travelers at airports across the United
States. This clearly shows masks are not effective in reducing COVID-19 transmission. Exs.
72-80.

116.  The federal government's experience also confirms masks aren't effective, data that CDC
and HHS failed to consider. TSA admits that more than 17,000 of its employees[4] – all of whom
must wear masks – have tested positive for COVID-19. Ex. 81.

---

[4] Since about half of those infected with COVID-19 don't have symptoms and might not realize
they are infected, health authorities indicate that the real prevalence of the virus is typically at least
double the number of cases confirmed by testing. TSA admits 17,252 of its workers have tested

117.    As of Jan. 11, 2022, "TSA has 3,694 employees with active COVID-19 infections." *Id*.

118.    CDC and HHS fail to answer a simple question: "If masks are effective, why have so many TSA workers contracted COVID-19?"

119.    Wearing a cloth mask does not shield the user from coronavirus because too many infected droplets can slip through, according to a study by scientists at New Mexico State University. https://bit.ly/masksarebad.

120.    Masks can't be worn while transportation passengers are eating and drinking, thereby eliminating any effectiveness they might have in reducing virus transmission from infected travelers.

121.    One of the first real-world studies to conclude that face masks don't reduce COVID-19 infections was published in November 2020 by Danish scientists. The study divided thousands of Danish into groups of maskwearers and nonmaskwearers. "4,862 completed the study. Infection with SARS-CoV-2 occurred in 42 participants [wearing] masks (1.8%) and 53 control participants [who did not cover their faces] (2.1%). The between-group difference was 0.3 percentage point ... *the difference observed was not statistically significant*..." https://bit.ly/masksarebad (emphasis added).

122.    "When it comes to masks, it appears there is still little good evidence they prevent the spread of airborne diseases. ... overall, *there is a troubling lack of robust evidence on face masks and Covid-19*." Ex. 83 (emphasis added).

---

positive for coronavirus (27% of its employees). Ex. 81. This means that some 34,000 TSA workers, slightly more than half of its workforce of 65,000, have likely had coronavirus. Yet they all have been forced to wear masks for more than 1½ years. So how exactly are masks effective in stopping COVID-19?

123.    "[N]ow that we have properly rigorous scientific research we can rely on, *the evidence shows that wearing masks in the community does not significantly reduce the rates of infection*." *Id.* (emphasis added).

124.    "Upon our critical review of the available literature, we found only weak evidence for wearing a face mask as an efficient hygienic tool to prevent the spread of a viral infection," according to a study published in the European Journal of Medical Research. https://bit.ly/masksarebad.

125.    "In controlled laboratory situations, face masks appear to do a good job of reducing the spread of coronavirus (at least in hamsters) and other respiratory viruses. However, evidence shows maskwearing policies seem to have had much less impact on the community spread of COVID-19. Why this gap between the effectiveness in the lab and the effectiveness seen in the community? The real world is more complex than a controlled laboratory situation." Ex. 84.

126.    "The most comprehensive between-country study of masks for COVID-19 infection is a comparison of policy changes, such as social distancing, travel restrictions, and mask wearing, across 41 countries. *It found introducing a mask-wearing policy had little impact* …" *Id.* (emphasis added).

127.    "CDC has admitted face masks do little to prevent the spread of COVID-19 amid mounting pressure to lift mask mandates across the U.S. In a new study, the CDC found face masks had a negligible impact on coronavirus numbers that didn't exceed statistical margins of error." Ex. 85.

128.    "*Where others say the science is settled, our analysis shows that is not the case*. We break down the most widely referenced studies on masking policies so you can see for yourself what the data really says. We should also point out that *it is unscientific to claim that the science is*

27

*settled*. Science is always a work-in-progress and we should never make the false claim that a
scientific theory is settled as fact." https://bit.ly/masksarebad (emphasis added).

129.   "COVID-19 is as politically-charged as it is infectious. Early in the COVID-19 pandemic,
the WHO, the CDC, and NIH's Dr. Anthony Fauci discouraged wearing masks as not useful
for non-health care workers. Now they recommend wearing cloth face coverings in public set-
tings where other social distancing measures are hard to do (e.g., grocery stores and pharma-
cies). *The recommendation was published without a single scientific paper or other infor-
mation provided to support that cloth masks actually provide any respiratory protection*,"
according to the Association of American Physicians & Surgeons. *Id.* (emphasis added).

130.   "Conclusion: *Wearing masks (other than N95) will not be effective at preventing SARS-
CoV-2 transmission*, whether worn as source control or as PPE." *Id.* (emphasis added).

131.   CDC constantly ignores its own research: "In a recent report in Emerging Infectious Dis-
eases, … CDC suggests what experts have stated all along: There is no conclusive evidence
that cloth masks protects users from coronavirus, especially since most people do not use them
correctly and do not keep them clean." Ex. 86.

132.   "There is increasing evidence that cloth masks not only may be ineffective against stopping
coronavirus transmission, but that *they may actually increase the spread of the virus, as well
as worsening other health conditions*." *Id.* (emphasis added).

133.   "A September report by the CDC found that more than 70% of COVID-positive patients
contracted the virus in spite of faithful mask wearing while in public. Moreover, 14% of the
patients who said they 'often' wore masks were also infected. Meanwhile, just 4% of the
COVID-positive patients said they 'never' wore masks in the 14 days before the onset of their
illness." *Id.*

28

134.    "A Covid-19 cross-country study by the University of East Anglia came to the conclusion that a mask requirement was of no benefit and could even ***increase the risk of infection***." Ex. 87.

135.    "A July 2020 study by Japanese researchers found that ***cloth masks 'offer zero protection against coronavirus'*** due to their large pore size and generally poor fit." *Id.* (emphasis added).

136.    "Importantly, ***the evidence just is and was not there to support mask use for asymptomatic people to stop viral spread during a pandemic***. While the evidence may seem conflicted, the evidence (including the peer-reviewed evidence) actually does not support its use and ***leans heavily toward masks having no significant impact in stopping spread of the COVID virus***. In fact, it is not unreasonable at this time to conclude that surgical and cloth masks, used as they currently are, have absolutely no impact on controlling the transmission of Covid-19 virus, and ***current evidence implies that face masks can be actually harmful***." Ex. 88 (emphasis added).

137.    CDC and HHS "have failed to look at the evidence or follow it, and ***continue to operate in an arbitrary nonscientific, nonevidence informed manner***." *Id.* (emphasis added).

138.    "The history of modern times shows that already in the influenza pandemics of 1918-1919, 1957-58, 1968, 2002, in SARS 2004–2005, as well as with the influenza in 2009, ***masks in everyday use could not achieve the hoped-for success in the fight against viral infection scenarios***." Ex. 89 (emphasis added).

139.    CDC admitted in its "Emerging Infectious Diseases" May 2020 publication that "Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from

14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza. ... The effect of hand hygiene combined with face masks on laboratory-confirmed influenza was not statistically significant ..." Ex. 90.

140.    The University of Colorado School of Medicine published an article in the January/February 2021 edition of Annals of Family Medicine concluding: "Cloth masks lack evidence for adequate protection of health care clinicians against respiratory viral infections. The CDC notes that cloth masks are not considered [personal protective equipment] and that their capability to protect health care clinicians is not currently known. The CDC does not offer information regarding the degree of protection a cloth mask might provide compared to a medical mask." Ex. 91.

141.    "Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a Cohort Study," published Feb. 2, 2021, in Lancet Infectious Diseases, "***observed no association of risk of transmission with reported mask usage by contacts*** ..." https://bit.ly/masksarebad   (emphasis added).

142.    "At the very end of 2020, the WHO updated their guidelines, noting that any kind of mask was ineffective if the wearer come into close contact with someone for 15 minutes or more. ... A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control." Ex. 92.

143.    "The World Health Organization admits there is no scientific medical reason for any healthy person to wear a mask outside of a hospital. ... If you do not have any respiratory symptoms, such as fever, cough, or runny nose, you do not need to wear a medical mask. When used alone, masks can give you a false feeling of protection and can even be a source of infection when not used correctly." Ex. 93.

144.    The U.S. Department of Labor's Occupational Health & Safety Administration ("OSHA")

states "Surgical masks are not considered respirators by OSHA … surgical masks do not seal

tightly to the wearer's face, nor do they provide a reliable level of protection from inhaling

smaller airborne particles." Ex. 94.

145.    New studies and articles come out every few days showing that masks don't reduce

COVID-19 spread but harm human health. For a few recent examples, *see* Exs. 95-98.

**I. All Defendants fail to consider that masks pose serious health risks to humans forced to
wear them. By requiring masks, the Airline Defendants recklessly endanger the well-being
of all passengers.**

146.    In addition to the science showing that masks have proven totally ineffective in reducing

coronavirus spread and deaths, there's nothing in the administrative record showing that CDC

and HHS considered the serious health risks to human beings of forced muzzling.

147.    Hundreds of scientific and medical studies illustrate the frightening number of negative

health consequences of covering your face. https://bit.ly/ masksarebad.

148.    A table succinctly summarizes the numerous "Physiological & Psychological Effects of

Wearing Facemasks & Their Potential Health Consequences." Ex. 99.

149.    "It is not clear however, what the scientific and clinical basis for wearing facemasks as

protective strategy, given the fact that facemasks restrict breathing, causing hypoxemia and

hypercapnia, and increase the risk for respiratory complications, self-contamination, and exac-

erbation of existing chronic conditions," according to a paper published by the National Insti-

tutes of Health, a part of HHS. Ex. 100.

150.    The leading authority on this subject is a 42-page paper published April 20, 2021, by eight

German doctors and scientists in the International Journal of Environmental Research & Public

Health. Ex. 89.

151. They found: "Up until now, there has been no comprehensive investigation as to the adverse health effects masks can cause." The doctors reviewed 65 scientific papers on masks – and determined dozens of adverse health effects of covering your nose and mouth. *Id.*

152. These German doctors and scientists coined a new disease: Mask-Induced Exhaustion Syndrome ("MIES"). *Id.*

153. Symptoms of MIES include "an increase in breathing dead space volume, increase in breathing resistance, increase in blood carbon dioxide, decrease in blood oxygen saturation, increase in heart rate, increase in blood pressure, decrease in cardiopulmonary capacity, increase in respiratory rate, shortness of breath and difficulty breathing, headache, dizziness, feeling hot and clammy, decreased ability to concentrate, decreased ability to think, drowsiness, decrease in empathy perception, impaired skin barrier function with itching, acne, skin lesions and irritation, overall perceived fatigue and exhaustion." *Id.*

154. Scientists have identified at least 68 dangers to human health from maskwearing including adverse skin reactions such as acne, alveolitis (an inflammatory lung disorder), anxiety, asthma, bacterial pneumonia, blood-oxygen depletion, breathing difficulties, bronchiectasis (a condition in which the lungs' airways become damaged), carbon-dioxide retention, candidiasis (fungal infestation of the mucous membranes), cheilitis (inflammation of the lips), chronic bronchitis, chronic pneumonia, confusion, concentration problems, decrease in psychomotoric abilities, decreased thinking ability and disorientation, depression, dental impacts such as cavities, discouragement, disrupted nonverbal and verbal communication, disrupted social interaction, disruption of the basics of human communication (verbal and non-verbal), dizziness, drowsiness, dry mouth, elevated risk of COVID-19 through self-contamination, elevated transcutaneous carbon-dioxide values, exhaustion, facial deformities, facial itching, facial

32

rashes, fatigue, fibrosis (excess tissue deposition), gingivitis (inflammation of the gums), halitosis (bad breath), headaches, hypercapnia hyperventilation, hypoxia, impaired clarity of speech, impaired cognitive abilities, impaired field of vision, impaired learning, impetigo (a bacterial infection that produces red sores and can lead to kidney damage), increased blood pressure, increased feelings of insecurity, increased heart rate, increased risk of infection because masks are an ideal growth and breeding ground for various pathogens such as bacteria and fungi, increased stress, inhalation of toxic substances such as microplastics and chlorine compounds located in the masks, irritability, irritation of the respiratory tract, isolation, malaise, microbiological contamination (germ colonization), neuropathological and cardiovascular consequences, numbness, panic attacks, physiological changes and discomfort, reduced cardiopulmonary capacity, reduced happiness, reduced performance capability, skin irritation, social withdrawal, spontaneous pneumothorax, vascular damage, and voice disorders. https://bit.ly/masksarebad.

155. Numerous other medical and scientific studies warn us of the dangers of wearing face masks: "A recent study in the journal Cancer Discovery found that inhalation of harmful microbes can contribute to advanced stage lung cancer in adults. *__Long-term use of face masks may help breed these dangerous pathogens__*. Microbiologists agree that frequent mask wearing creates a moist environment in which microbes are allowed to grow and proliferate before entering the lungs." Ex. 101 (emphasis added).

156. "Since forced mask wearing began, dermatologists have coined the term 'maskne' to describe an onset of pimples near the mouth caused by masks clogging up pores with oil and bacteria. This can be caused by either disposable or cloth masks." *Id.*

157.    "Dentists have also been warning about a phenomenon known as 'mask mouth' in which patients are arriving back to the dental office with an increase in gingivitis and tooth decay as high as 50% in a period of just a few months since mask mandates began. ***This discovery sheds light on the growing evidence of harm caused by long-term mask wearing***." *Id.* (emphasis added).

158.    "In some situations, wearing a cloth face covering may exacerbate a physical or mental health condition, lead to a medical emergency, or introduce significant safety concerns, the Center[s] for Disease Control explains." Ex. 102.

159.    "Breathing is one of the most important physiological functions to sustain life and health. Human body requires a continuous and adequate oxygen (O2) supply to all organs and cells for normal function and survival. … Long-term practice of wearing facemasks has ***strong potential for devastating health consequences***." Ex. 100.

160.    "Vulnerable populations such as people with mental health disorders … are at significant health risk for complications and harm … Wearing [a] facemask mechanically restricts breathing by increasing the resistance of air movement during both inhalation and exhalation process. … ***prolonged and continuous effect of wearing facemask is maladaptive and could be detrimental for health***." *Id.* (emphasis added).

161.    "***Cloth masks actually risk your health rather than protect it***. The moisture caught in these masks will become mildew-ridden in 30 minutes. Dry coughing, enhanced allergies, sore throat are all symptoms of a micro-mold in your mask." Ex. 92 (emphasis added).

162.    "Scores of dermatologists, dentists, immunologists, virologists, [and] pediatricians all over the world have been sounding the alarm for months over the continued use of face masks." *Id.* (emphasis added).

163.   "But aside from not being as effective against the coronavirus as so-called health experts claim, masks may even pose a risk to human health. For instance, a recently published review of studies on mask-related adverse health effects suggested that *mask-wearing may seriously harm people without any notable benefit*." Ex. 103 (emphasis added).

164.   "Scientists have found evidence that some face masks which are on sale and being used by members of the general public are laced with toxic chemicals. Preliminary tests have revealed traces of a variety of compounds which are heavily restricted for both health and environmental reasons. This includes formaldehyde, a chemical known to cause watery eyes; a burning sensations in the eyes, nose, and throat; coughing; wheezing; and nausea. Experts are concerned that the presence of these chemicals in masks which are being worn for prolonged periods of time could cause unintended health issues." Ex. 104.

165.   "Carbon dioxide ($CO_2$) is a colorless, odorless, non-flammable gas that naturally occurs in the atmosphere. $CO_2$ is produced by body metabolism and is a normal component of exhaled breath. … $CO_2$ is denser than air and can collect in high concentrations in … confined spaces [such as within face masks] where it can displace oxygen creating a serious health hazard." Ex. 105.

166.   "The primary health effects caused by $CO_2$ are the result of its behavior as a simple asphyxiant. A simple asphyxiant is a gas which reduces or displaces the normal oxygen in breathing air. Symptoms of mild $CO_2$ exposure may include headache and drowsiness. At higher levels, rapid breathing, confusion, increased cardiac output, elevated blood pressure and increased arrhythmias may occur." *Id.*

167.   Airplanes contain lower oxygen levels than most passengers who live at sea level are used to. Most airplanes are pressurized to an elevation of 8,000 feet. As most people know, oxygen

levels decrease with altitude. "For people with conditions – like heart or lung disease – that
cause them to have special oxygen requirements, this is a big deal, and means they might need
to fly with an oxygen concentrator, or not fly at all. But even for healthy people who are used
to the abundant levels of oxygen present at sea level, it can have an effect." Ex. 106.

## J. The Airline Defendants' mask policies recklessly endanger passengers by failing to comply with OSHA rules for face coverings.

168.    OSHA sets standards for respiratory protection. None of the Airline Defendants appear to
be following these legal requirements. Exs. 107-108.

169.    OSHA's standards apply to employees. There's no evidence the defendants are following
these legal requirements for their workers. OSHA also does not permit employers to mandate
masks for customers.

170.    Due to the dangers of obstructing a person's breathing, OSHA requires that a Respirator
Medical Evaluation Questionnaire be completed by anyone who will be required to wear a
mask. Ex. 109.

171.    If any company demands someone wear a mask, OSHA requires it "Must provide respira-
tors, training, and medical evaluations at no cost..." Ex. 110.

172.    There is no evidence that the Airline Defendants provide training and medical evaluations
to their passengers before forcing them to block our oxygen intake.

173.    "All oxygen-deficient atmospheres (less than 19.5% O2 by volume) [such as airplane cab-
ins] shall be considered IDLH," according to OSHA. IDLH stands for "immediately dangerous
to life or health." *Id.*

174.    "The percentage oxygen on a plane traveling around [8,000 feet] is equivalent to 15.1%

36

oxygen at sea level. ... in people with existing respiratory difficulties, there is a risk of hypoxia." Ex. 111.

175.   "You cannot wear masks in this atmosphere because it can cause serious injury or death. ... This is likely why the airlines are having customers who become violent or try to open the emergency exits at 35,000-plus feet. These people are experiencing hypoxemia due to oxygen deprivation from having their nose and mouth covered." Ex. 112.

176.   OSHA requires that before any human be required to don a mask, a company must: 1) provide a medical evaluation to determine person's ability to use a respirator, before fit testing and use; 2) identify a physician or other licensed health care professional to perform medical evaluations using a medical questionnaire or an initial medical examination that obtains the same information as the medical questionnaire; and 3) obtain a written recommendation regarding the employee's ability to use the medical device. Ex. 110.

177.   OSHA requires companies mandating masks to "provide effective training to respirator users, including: why the respirator is necessary and how improper fit, use, or maintenance can compromise the protective effect of the respirator; limitations and capabilities of the respirator; use in emergency situations; how to inspect, put on and remove, use and check the seals; procedures for maintenance and storage; recognition of medical signs and symptoms that may limit or prevent effective use; and general requirements of this standard." *Id.*

178.   There's no evidence the Airline Defendants have provided the required training to employees or passengers forced to don face coverings.

**K. All defendants ignore that mask mandates have created chaos in the skies and on the ground, recklessly endangering aviation and transit security.**

179.   All defendants fail to take into account that in addition to the millions of Americans who can't safely obstruct our breathing because of a medical condition, tens of millions of Americans vehemently object to anyone ordering them to wear face masks. This is evidenced by more than 5,000 incidents of "unruly" behavior aboard airplanes reported to the Federal Aviation Administration ("FAA") during the pandemic.

180.   This conduct is understandable since the FDCA protects all Americans' right to refuse administration of an FDA unauthorized or EUA medical device such as a face covering, and masks make it difficult to breathe and function.

181.   The FTMM and the Airline Defendants' mask policies worsen transportation safety as some people violently stand up for their right to breathe freely, and flight crews have become increasingly hostile to any passenger who dares remove his/her mask for any reason.

182.   There are numerous videos posted to YouTube of in-flight conflicts between flight crews and passengers over the illegal mask mandates. A small sample of these videos is listed at Ex. 113.

183.   As of May 8, 2021, when the Airline Defendants' mask policies had been in place a year, "more than 4,000 fliers have been banned" for exercising their right under the FDCA to refuse an FDA unauthorized or EUA medical device. Ex. 114.

184.   "The current climate in the passenger cabin is highly stressed. We are experiencing a record high number of aggressive passenger incidents, many of which are fueled by … refusal to comply with onboard mask rules," the president of a major flight-attendant union said Dec. 24, 2021. Ex. 72.

185.   All of the "unruly" behavior we've seen aboard airplanes when airlines try to enforce the FTMM and/or their own mask policies is explained by science, none of which any defendant

has considered: "Wearing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others. These perceived interferences of integrity, self-determination and autonomy, coupled with discomfort, often contribute to substantial distraction and may ultimately be combined with the physiologically mask-related decline in psychomotoric abilities, reduced responsiveness, and an overall impaired cognitive performance." Ex. 89.

186.    Being forced to cover a person's only two sources of oxygen – breathing is of course essential to maintaining life – "leads to misjudging situations as well as delayed, incorrect, and inappropriate behavior and a decline in the effectiveness of the mask wearer." *Id.*

187.    "The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and dampness, impairments, and discomfort predominantly affecting the head and face. However, the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus)." *Id.*

188.    "[P]assengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements…" Ex. 55.

189.    "A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing. One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart." *Id.*

190.    But passengers are allowed to drop their masks to eat and sip beverages, negating any possible positive impact of forced muzzling. "When you start opening it up to eating, the whole thing kind of weakens." *Id.*

191.    "Flight attendants are dealing with mask compliance issues on every single flight they work right now." *Id.*

192.    "The Federal Aviation Administration is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes." Ex. 115.

193.    The Airline Defendants are recklessly endangering the health and welfare of their passengers and employees by continuing to require masks 22 months into the pandemic.

194.    "It is no secret that the threats flight attendants face each day have dramatically increased," states a letter from Julie Hedrick, president of the Association of Professional Flight Attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance." Ex. 116.

195.    "Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks …" *Id.*

196.    "President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office. But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA." *Id.*

197.    May 28, 2021: "Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of the Memorial Day holiday weekend. 'This is an environment that we just haven't seen before, and

we can't wait for it to be over,' the president of the Association of Flight Attendants-CWA said … She noted the role masks are playing in the surge…" Ex. 117.

198. Carrying out mask rules also worsens the already strained position of flight attendants, who are frontline enforcers even as they keep their usual safety responsibilities, experts say. "Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority." *Id.*

199. "One in five flight attendants so far this year has been involved in physical altercations with unruly passengers and 85% of cabin crew members have dealt with disruptive passengers this year…" Ex. 118.

200. "[M]any flight attendants reported … being subjected to yelling and swearing for federal mask mandate directions." *Id.*

201. The FTMM and Airline Defendants' muzzling requirements have "proven problematic. Physical confrontations on airplanes have dramatically increased this year, and of the 3,000+ that have been recorded by the Federal Aviation Administration so far in 2021, nearly three-quarters of them have been a direct result of arguments over wearing a face mask – whether between crew members and passengers, or passengers vs. passengers." Ex. 119.

202. "My fear, however, is that the mandate is going to someday cause a far bigger problem while in the air than just some unruly passenger being eventually duct-taped to a seat. One of these days, a confrontation is going to escalate far further than the crew member who had a finger bitten or the flight attendant who caught an errant punch square in the face and had two

41

teeth knocked out. Ask yourself, is it worth it to have a mandate that ostensibly is for your safety but only leads further to unsafe conditions?" *Id.*

203.    The defendants' reckless continual enforcement of mask mandates has led to "a surge in aggressive and violent behavior at airports and on flights…" Ex. 120.

204.    "The system for keeping the peace in America's skies is creaking under the pressure of what airlines and regulators say is an unprecedented proliferation of misbehavior. … As travel rebounds, that structure is being strained by hostility to mask mandates…" Ex. 121.

205.    "Even if not intended to bring the plane down, you can imagine the kind of pandemonium on planes that we've seen in some of these videos that people have taken that can cause an incredibly dangerous accident," said U.S. Attorney General Merrick Garland. *Id.*

206.    These incidents would vanish if this Court vacates the FTMM and enjoins the Airline Defendants from enforcing their illegal and discriminatory mask mandates.

207.    "The FAA has seen a disturbing increase in incidents where airline passengers have disrupted flights with threatening or violent behavior. These incidents have stemmed … from passengers' refusals to wear masks…" Ex. 122.

208.    "The tense situation in the air this summer has led many attendants to say that they feel exhausted, afraid for their personal safety and, in some cases, concerned that the situation could turn dangerous." Due to the unlawful mask mandates, "encountering unruly passengers, once rare, is now almost expected." Ex. 123.

209.    "Flight attendants across many airlines say the situation is wearing on their mental health and physical well-being," which is dangerous for aviation safety. *Id.*

210. With mask mandates "in place, there has been a rise in onboard incidents that have harmed flight attendants, delayed or cancelled flights … When this atmosphere is combined with tensions around mask policy, we have seen a summer with more onboard skirmishes and more people injured than ever before," wrote Ben Baldanza, former CEO of Spirit Airlines. Ex. 124.

211. "[T]he root cause of most of these incidents has been the mandated mask policy. It's not the policy itself, but the inconsistency of that policy with other parts of life. While many of us may be able to clearly understand why we must wear a mask on a plane but don't have to in restaurant, to others this makes no sense. Put that view in the stressful and emotional environment of an airline flight and the results we've seen this summer are not totally surprising." *Id.*

212. "[L]etting the [mask] mandate expire would lower the tensions onboard significantly and greatly reduce the number of potentially dangerous confrontations that flight attendants must face." *Id.*

213. Although most well-publicized incidents have occurred in the air, there have also been countless confrontations over mask wearing on the ground, including on mass transit: "There were incidents of violent confrontations and assaults over disagreements about the masking policies of states and private businesses. … By September 2020, over 170 transit workers in New York City had reported being assaulted or harassed for asking passengers to wear face masks…" Ex. 125.

214. "There were also instances of assault against persons who refused to comply with masking policies. In Key Largo, a bus driver was arrested for swinging a metal rod at a passenger who lowered his mask to make a call on his cell phone." *Id.*

**L. The FTMM violates the Food, Drug, & Cosmetic Act by forcing travelers to wear Food & Drug Administration unauthorized or Emergency Use Authorization medical devices without our consent. The Airline Defendants' mask mandates constitute practicing medicine without a license.**

215.    CDC itself admits a mask does "NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection." Ex. 126.

216.    Mask manufacturers concede their products are ineffective in preventing COVID-19 infection: "It is also important to ensure the product does not have any additional antimicrobial or anti-viral claims made within its labelling." Ex. 127.

217.    FDA, an agency within HHS, regulates most face masks under EUAs. Ex. 128.

218.    HHS and FDA state: "On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks, [FDA] issued an [EUA] authorizing the use of face masks for use by members of the general public... A face mask is a device ... that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. ... Face masks are regulated by FDA when they meet the definition of a 'device' under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. ... Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public ... to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic." Ex. 129.

219.    "Face masks are not personal protective equipment." Ex. 130.

220.    The HHS secretary authorized EUAs for COVID-19 countermeasures (85 Fed. Reg. 17,335; Ex. 131) including respiratory devices (85 Fed. Reg. 13,907; Ex. 132).

221.    FDA published an EUA for face masks July 14, 2020. 85 Fed. Reg. 42,410; Ex. 133.

222.    Another mask EUA was published Nov. 20, 2020. 85 Fed. Reg. 74,352; Ex. 134.

223. FDA states face masks must not be "labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction... No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask *may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic*." Ex. 129 (emphasis added).

224. The instruction manual for a 3M N95 respirator mask, which is FDA approved, makes clear its wearing still has risks: "Misuse may result in sickness or death. ... [It] cannot eliminate the risk of contracting infection, illness, or disease... Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use." Ex. 135.

225. Despite the lack of data that masks are effective, FDA issued an umbrella EUA for 41 types of surgical masks, many of which are used by passengers to comply with the FTMM and the Airline Defendants' mask policies. Ex. 136.

226. Notably five types of masks have been withdrawn from the EUA after FDA found them to be defective. *Id.*

227. FDA has also revoked the EUA for respirator masks made in China for being faulty. Ex. 137.

228. CDC's National Institute for Occupational Safety & Health ("NIOSH") found many masks made in China "authorized under the April 3, 2020, EUA did not meet the expected performance standards." *Id.*

229. An astounding 167 respirator mask brands from China had their EUAs revoked by FDA.

45

Another 54 were previously revoked. *Id.*

230. FDA revokes EUAs when "appropriate to protect the public health or safety." Ex. 138.

231. Surgical masks (typically light blue in color) made in China are also not authorized by FDA.

232. Although these 221 respirator mask brands (plus all surgical masks) manufactured in China may no longer be legally sold in the United States, there are likely tens or even hundreds of millions of these face coverings still being used by passengers due to the FTMM and the Airline Defendants' policies.

233. So not only are quality masks worthless in CDC's goal of reducing transmission of COVID-19 (https://bit.ly/masksarebad), but the vast majority sold in the United States are actually *defective*, according to FDA. Ex. 140.

234. "The 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals." Ex. 138.

235. Even a well-informed consumer would find it nearly impossible to understand what types and brands of face masks have been authorized and which – if any – are regarded as safe to use by NIOSH to comply with the FTMM and the Airline Defendants' mask policies.

236. The Federal Defendants' administrative record shows no indication these issues were considered.

237. There's no indication these issues were considered as part of the Airline Defendants' conspiracy to interfere with the civil rights of the disabled.

238. When a mask manufacturer applies for an EUA, it must agree it may not "misrepresent the product or create an undue risk in light of the public health emergency. For example, the la-

46

beling must not include any express or implied claims for: … antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency." Ex. 141.

239.    "All COVID-19 masks … are authorized, not approved or licensed, by the federal government; they are Emergency Use Authorization (EUA) only. They merely 'may be effective.' … EUA products are by definition experimental and thus require the right to refuse. Under the Nuremberg Code, the foundation of ethical medicine, no one may be coerced to participate in a medical experiment. Consent of the individual is 'absolutely essential.' A federal court held that even the U.S. military could not mandate EUA vaccines to soldiers. *Doe #1 v. Rumsfeld*, 297 F.Supp.2d 119 ([D.D.C.] 2003)." Ex. 142.

240.    "[M]asks are authorized for use by the general public as 'investigational products' under an Emergency Use Authorization ('EUA'). They are not an approved product, and are referred to in the law as 'unapproved products' because they have not been fully tested and approved for use by the FDA. Under the federal law that allows the FDA to issue EUAs (21 U.S.C. § 360bbb-3), you cannot be forced to wear a mask. The law provides that recipients of a product authorized for use under and EUA can refuse to take the product." Ex. 143.

241.    "[T]he recipient of the product (the mask) must be informed of the option to refuse administration of the product." *Id.*

242.    All defendants do not inform passengers of their legal right to refuse administration of the medical device.

243.    "[B]y the FDA's own admission, face masks such as those in common use by the public are not intended to protect the wearer or others from the COVID-19 virus, as they do not prevent or reduce infection." Ex. 144.

244.   EUA medical devices are experimental in nature. There's "long settled legal precedent which establishes that it is not legal to coerce an individual to accept an experimental product. It further provides the historical background and evidence that Congress' intent in enacting Section 564 [of the FDCA] was to provide only one limited exception to the option to accept or refuse EUA products – that exception applies only to military personnel and only when national security is at risk. Federal agencies have also historically interpreted Section 564 as a prohibition on mandates of EUA products..." Ex. 145.

245.   "To be licensed, the FDA must find that a medical product is 'safe for use and … effective in use.' Until licensed, a medical product remains investigational, even after issuance of an EUA. … Long settled legal precedent establishes that it is not legal to coerce an individual to accept an unlicensed, and hence experimental, medical product. An individual must voluntarily agree, free from any undue influence, to accept same." Ex. 146.

246.   "Lay people and manufacturers of just about every type of business are lending assistance to create masks. Companies that once made mattresses, shoes, apparel and many other products are now turning efforts toward the manufacturing face masks. Even a business that manufactures sports jerseys for professional athletes is now making masks using the same jersey material from its products." Ex. 147.

247.   None of these pop-up mask manufactures have FDA certification that their medical devices are safe to place on human faces.

248.   "The FDA is waiving regulatory requirements, including submission of premarket notification under the 510(k) process, registration and listing requirements, quality system regulation requirements, reports or corrections and removals, and unique device identification requirements. … the labeling should not include that the mask can be used for antimicrobial or

antiviral protection or be used for infection prevention." *Id.*

249.   "FDA notes that because it cannot confirm the authenticity of any alternative respirators from abroad, it recommends that people take appropriate steps to verify the authenticity of the products before importing them. ... FDA is now welcoming the opportunity to work with any manufacturer with interest in manufacturing masks and respirators – even if the manufacturer has no previous experience in medical device manufacturing." *Id.*

250.   "Counterfeit medical devices have been a danger in the U.S. supply chain for years, but their presence has been especially of concern during the current pandemic, when there have been shortages of products considered to be medical devices by the FDA, such as medical masks..." Ex. 148.

251.   Additional details about the FDA unauthorized or EUA nature of most masks used by airline passengers against our will is available at Exs. 149-151.

252.   "Simply put: manufacturers producing even simple cloth face coverings are now producing medical devices regulated by FDA and must therefore comply with certain regulatory requirements." Ex. 152.

**M. The FTMM and airlines' mask policies violate the International Covenant on Civil & Political Rights by interfering with several fundamental human rights established by treaty.**

253.   The United States is a signatory to the International Covenant on Civil & Political Rights ("ICCPR"). Treaty Doc. 95-20 (ratified by the Senate April 2, 1992). Ex. 153.

254.   "[I]n accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world..." *Id.*

255.   The protection of the rights of the disabled is of international concern. "[I]n accordance

with the Universal Declaration of Human Rights, the ideal of free human beings enjoying civil
and political freedom and freedom from fear and want can only be achieved if conditions are
created whereby everyone may enjoy his civil and political rights, as well as his economic,
social and cultural rights…" *Id.*

256. Face masks are classified by FDA as experimental medical devices. However, "[N]o one
shall be subjected without his free consent to medical or scientific experimentation." ICCPR
Art. 7. *Id.*

257. "No one shall be deprived of his liberty except on such grounds and in accordance with
such procedure as are established by law." ICCPR Art. 9. *Id.*

258. However, Congress has not passed a law requiring passengers wear masks or authorizing
the Airline Defendants to mandate muzzling, nor is there a law enacted by Congress allowing
airlines to discriminate against the disabled. In fact, the ACAA prohibits such discrimination.
49 USC § 41705.

259. "International human rights law does not recognize a 'right to transportation' per se. Ra-
ther, it guarantees the right to liberty of movement, which is elaborated in Article 12 of the
International Covenant on Civil and Political Rights," according to the National Council on
Disability ("NCD"), an independent federal agency. Ex. 154.

260. "1. Everyone lawfully within the territory of a State shall, within that territory, have the
right to liberty of movement … 2. Everyone shall be free to leave any country, including his
own. 3. The above-mentioned rights shall not be subject to any restrictions except those which
are provided by law… 4. No one shall be arbitrarily deprived of the right to enter his own
country." ICCPR Art. 12. Ex. 153.

261.    The FTMM restricts, especially for the disabled, our liberty of movement, freedom to leave
        any country, and ability to enter our own country.

262.    "1. No one shall be subjected to arbitrary or unlawful interference with his privacy ... 2.
        Everyone has the right to the protection of the law against such interference or attacks." ICCPR
        Art. 17. *Id.*

263.    All defendants' onerous requirements for the disabled to obtain a mask exemption arbitrar-
        ily and unlawfully interfere with my privacy by forcing me to disclose sensitive medical infor-
        mation to airline employees who are not my physician.

**N. The FTMM and airlines' mask policies violate the Convention on International Civil Avi-
ation by requiring the disabled such as myself to submit a medical certificate to obtain a
mask exemption.**

264.    The United States ratified the Convention on International Civil Aviation ("CICA") on
        Aug. 9, 1946. This treaty is also known as the "Chicago Convention." Ex. 155.

265.    "Each contracting State undertakes to collaborate in securing the highest practicable degree
        of uniformity in regulations, standards, procedures, and organization in relation to aircraft,
        personnel, airways and auxiliary services in all matters in which such uniformity will facilitate
        and improve air navigation. To this end the International Civil Aviation Organization shall
        adopt and amend from time to time, as may be necessary procedures dealing with: ... such other
        matters concerned with the safety, regularity, and efficiency of air navigation as may from time
        to time appear appropriate." CICA Art. 37. Ex. 156.

266.    "Any State which finds it impracticable to comply in all respects with any such interna-
        tional standard or procedure, or to bring its own regulations or practices into full accord with
        any international standard or procedure after amendment of the latter, or which deems it nec-

51

essary to adopt regulations or practices differing in any particular respect from those established by an international standard, shall give immediate notification to the International Civil Aviation Organization of the differences between its own practice and that established by the international standard." CICA Art. 38. *Id.*

267.   The 15th Edition of Annex 9 to CICA became effective Oct. 23, 2017, and became applicable Feb. 23, 2018. *Id.*

268.   I have found no evidence that the United States has given notification to ICAO that is practices differ from that established by the international standard pursuant to CICA Art. 38. Therefore, Annex 9 to CICA is binding in this country as part of the treaty.

269.   Annex 9 defines "person with disabilities" as "Any person whose mobility is reduced due to a physical incapacity (sensory or locomotor), an intellectual deficiency, age, illness, or any other cause of disability when using transport and whose situation needs special attention and the adaptation to the person's needs of the services made available to all passengers." *Id.*

270.   Pursuant to CICA Art. 37, "ICAO has adopted, *inter alia*, Annex 9 – Facilitation to the Chicago Convention, which contains provisions on facilitation of air transport, namely Standards and Recommended Practices (SARPS), including provisions on facilitation of the transport of passengers requiring special assistance." Ex. 157.

271.   Annex 9 requires that all airport facilities and services are adapted to the needs of persons with disabilities and that persons with disabilities have adequate access to air services.

272.   "Contracting States shall take the necessary steps to ensure that persons with disabilities have equivalent access to air services." CICA Annex 9 § 8.34.

273.   However, the FTMM and the Airline Defendants' policies exclude persons with disabilities who can't wear masks from having access to air services.

274. "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance. Aircraft operators should only be permitted to require persons with disabilities to obtain a medical clearance in cases of a medical condition where it is not clear that they are fit to travel and could compromise their safety or well-being or that of other passengers." CICA Annex 9 § 8.39.

275. However, the FTMM allows airlines to require customers seeking mask exemptions to submit a medical clearance in the form of a letter or form from their doctor every time we wish to fly.

276. The Airline Defendants all require medical clearances to obtain a mask exemption.

**O. CDC and HHS failed to consider that masks damage the environment.**

277. There's nothing in the administrative record showing that CDC and HHS considered the horrible impact masks have on our environment.

278. Due to the FTMM and other requirements to wear face masks to supposedly combat COVID-19, "it's estimated that 129 billion face masks are used worldwide each month, which works out to about 3 million masks a minute. Most of these are the disposable variety, made from plastic microfibers." Ex. 87.

279. "Three million face masks are discarded every minute as a result of mass adoption during the coronavirus pandemic, and experts warn it could soon lead to environmental catastrophe." Ex. 158.

280. "Due to the composition of, e.g., disposable surgical masks with polymers such as polypropylene, polyurethane, polyacrylonitrile, polystyrene, polycarbonate, polyethylene, and polyester, an increasing global challenge, also from an environmental point of view, can be expected, especially outside Europe, in the absence of recycling and disposal strategies. The

aforementioned single use polymers have been identified as a significant source of plastic and plastic particles for the pollution of all water cycles up to the marine environment. A significant health hazard factor is contributed by mask waste in the form of microplastics after decomposition into the food chain. Likewise, contaminated macroscopic disposable mask waste – especially before microscopic decay – represents a widespread medium for microbes (protozoa, bacteria, viruses, fungi) in terms of invasive pathogens. Proper disposal of bio-contaminated everyday mask material is insufficiently regulated even in western countries." Ex. 89.

**P. 43 states do not require masking.**

281. CDC's FTMM order overrides the mask policies of the 43 states that don't require muzzling. Ex. 159.

282. 10 states never adopted a statewide mask mandate. Another 33 states including Virginia – seeing that mandatory masking had no effect on their COVID-19 cases, hospitalizations, and fatalities – have repealed their face-covering dictates. *Id.*

283. CDC's director herself admitted that local authorities, not airlines or the federal government, should be determining mask mandates. Dr. Rochelle Walensky said in June 2021 the U.S. agency is leaving it up to states and local health officials to set guidelines around maskwearing. The CDC has "always said that local policymakers need to make policies for their local environment," she said. Ex. 160.

284. However, Dr. Walensky has not repealed the FTMM.

285. President Biden acknowledged Dec. 27, 2021, to a meeting of state governors that "Look, there is no federal solution" to COVID-19. "This gets solved at a state level." Exs. 161-162.

286. However, the president has not repealed Executive Order 13998 that ordered CDC and HHS to mandate masks in the transportation sector.

**Q. Many Americans with disabilities can't wear face masks.**

287.   CDC "states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask … Additionally, people with post-traumatic stress disorder, severe anxiety, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask." Ex. 163.

288.   "People who are deaf or hard of hearing – or those who care for or interact with a person who is hearing impaired – may be unable to wear cloth face coverings if they rely on lipreading to communicate. Some people, such as people with intellectual and developmental disabilities, mental health conditions, or other sensory sensitivities, may have challenges wearing a cloth face covering." Ex. 164.

289.   "Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing." *Id.*

290.   "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety." *Id.*

291.   A wide range of disabled people should not wear masks. *Id.*

**R. The FTMM unlawfully discriminates against travelers with disabilities.**

292.   Because of the FTMM, many airlines have illegally banned passengers with disabilities who request face-mask exemptions, including children as young as two, in violation of the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR Part 382).

293.   Reports abound of unlawful discrimination against the disabled as a direct result of CDC's FTMM order. A small sample is available at Exs. 165-174.

294.   CDC itself states that passengers with numerous medical conditions should not be required to wear face coverings, but does nothing to enforce this due to the FTMM. Ex. 175.

295.   "Masks or Cloth Face Covering: Recommendation: Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (*excluding* children under age 2, or *anyone who has a medical condition that causes trouble breathing*…,)" according to a July 2020 report issued by HHS and other federal agencies. Ex. 176.

296.   "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks or cloth face coverings. … Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis." *Id.*

**S. The Airline Defendants conspired to put illegal mask polices in place starting in Spring 2020. The conspiracy soon involved interfering with the civil rights of the disabled such as myself with medical conditions who can't safely wear a face covering, totally banning us from using air transportation unless we agree to endanger our health.**

297.   **ORIGINAL MASK POLICIES:** JetBlue was the first U.S. airline to require passengers to don face masks during flights, announcing the measure on April 27 for flights starting on May 4, 2020. "Exempt: Small children who are not able to maintain a face covering." Ex. 177.

298.   Delta simultaneously announced it would also mandate face masks on flights effective May 4, 2020. "Only exceptions are for meal service and young children." *Id.*

299.   United simultaneously announced it would also mandate face masks on flights effective May 4, 2020. *Id.*

300.   Frontier simultaneously announced it would also mandate face masks on flights effective May 8, 2020. Ex. 178.

301.    American simultaneously announced it would also mandate face masks on flights effective May 11, 2020. "Only exceptions are for young children and those with medical conditions that prevent them from wearing a face covering." Ex. 177.

302.    Alaska simultaneously announced it would also mandate face masks on flights effective May 11, 2020. Ex. 178.

303.    Spirit simultaneously announced it would also mandate face masks on flights effective May 11, 2020. *Id.*

304.    Southwest simultaneously announced it would also mandate face masks. "Southwest has required passengers to wear masks onboard since May 11, and said it will continue to bar passengers without a mask from boarding." Ex. 179.

305.    **LEGAL ADVICE & EARLY EXCEPTIONS:** Lawyers advised the industry at the start of the COVID-19 pandemic that the ACAA prohibits airlines from discriminating against a passenger with a disability in the provision of air transportation. Ex. 180.

306.    Airlines were provided legal advice that "A carrier may deny boarding, require a medical certificate, or impose conditions on a passenger (*such as wearing a mask*) only in cases where a passenger *with a communicable disease* poses a 'direct threat' to the safety and health of others. In determining whether a passenger poses such a threat, the airline makes an '*individualized assessment*' by relying on current medical knowledge, the likelihood of potential harm to others, and whether reasonable procedures or modifications could mitigate the risk." *Id.* (emphasis added).

307.    The Airline Defendants conspired to impose mask mandates anyway, ignoring this legal guidance.

308. All major U.S. airlines except Allegiant Air conspired to mandate masks in early May 2020. Ex. 181.

309. Recognizing that requiring masks violates the RA, ACAA, FDCA, other federal and international laws, and their contracts of carriage, the Airline Defendants at first told their flight attendants and pilots they shouldn't enforce their mask rules on board planes. *Id.*

310. Passengers were still denied boarding if they didn't wear a mask at the gate, however. At this point, it appears the conspiracy to implement masks was undertaken with some understanding that the defendants could not interfere with the civil rights of the disabled. This would soon change, however.

311. It was reported in May 2020: "The major airlines have exceptions so that young children and those with medical issues don't have to wear masks." *Id.*

312. There was compliance with the ACAA at first. The author of this article noted: "Presumably the airlines would be opening themselves up to a lawsuit if they forced someone to put on a mask when they claim they have a medical condition." *Id.*

313. **STRICT ENFORCEMENT EXCEPT FOR PILOTS:** By mid-June 2020, major airlines extended their conspiracy to ban flyers who refused to – or medically can't – wear masks from flying. Ex. 182. I need discovery to determine to what extent the Airline Defendants have conspired to share their "no-fly lists" among each other.

314. Through the trade group they belong to, Airlines for America ("A4A"), Alaska, American, Delta, JetBlue, Southwest, and United announced they were conspiring to begin "vigorously enforcing face covering policies." *Id.*

315. Acknowledging that pilots and flight attendants are not licensed medical providers, the conspirators at this phase continued to permit some medical exemptions because "the crew

isn't qualified to assess medical conditions, so there shouldn't be any follow-up questions" when someone self-declares a disability that makes it impossible for them to cover their nose and mouth. *Id.*

316.  "U.S. airlines are very serious about requiring face coverings on their flights. Carriers are stepping up enforcement of face coverings and implementing substantial consequences for those who do not comply with the rules," said A4A President & CEO Nicholas Calio. Ex. 183.

317.  "Beginning June 16[, 2020] at American and June 18 at United, any passenger who does not wear a mask while traveling could be flagged for each airline's list of restricted flyers, possibly causing them to be barred from flying with the carrier again. … The policy updates by American and United coincided with a Monday announcement from the Airlines for America (A4A) trade group, which said many of its members were stepping up enforcement of their onboard mask policies." Ex. 179.

318.  While the Airline Defendants were stepping up their mask enforcement in early Summer 2020, they were exempting pilots from the muzzling rule because of the need for safety in the cockpit. American, for example, issued a memo to staff July 2, 2020, noting there is a "Flight Deck safety exception." Ex. 184. I believe discovery will reveal similar pilot exceptions issued by the Airline Defendants.

319.  In a July 10, 2020, memo, American detailed its flight deck safety exception: "Pilots have certain exemptions on wearing masks in the flight deck for safety reasons. (i.e. A mask may interfere with their ability to see or don an oxygen mask.) … The pilots do not have to put on a face covering if they feel it could impact safety." *Id.*

320.  These memos obtained from an American employee show how the airline industry was well aware that obstructing a person's breathing by mandating face coverings is dangerous.

321.  "When COVID-19 first became a threat, most airlines prohibited crews from wearing masks. … But even when mask usage started to become more common and ultimately permitted for flight attendants, it remained prohibited for cockpit crews by the FAA." Ex. 185.

322.  "Additionally, the FAA issued a ruling that was adopted by most if not all airlines in the US, that allowed but did not require pilots to wear masks in the cockpit." *Id.*

323.  "There are a number of issues that come with wearing a mask in the cockpit and those reasons are why most crew members don't wear one in flight. First, in an explosive decompression getting your facial mask off and the oxygen mask on adds seconds to a procedure that is already time critical. Second is the issue of rebreathing $CO_2$ for hours on end while at altitude in a safety critical position. Third, for those who wear glasses, masks represent a challenge that frequently leads to those glasses becoming fogged. This can be a challenge even for those with perfect vision during daytime flights when you need to wear sunglasses. Even with the built-in shades, it can get very bright in the cockpit at altitude. Consequently, wearing a mask while operating the aircraft compromises safety. With what we know about how air flows on aircraft, the risks posed by wearing a mask greatly outweigh the risks that come from not wearing one inside the flight deck." *Id.*

324.  The Airline Defendants ignored that numerous current and former flight attendants said all flight crew and passengers also should not wear masks for safety reasons because decreased oxygen levels reduce reaction time in an emergency. A cabin full of muzzled, oxygen-deprived flight attendants and passengers could result in a disaster if they are slow to respond to an inflight emergency.

325.  Masks also impair the critical ability for passengers and crew to communicate during an emergency.

326.    The conspiracy now involved endangering the health and safety of the Airline Defendants'
        passengers.

327.    The crew on board every aircraft is there for one main reason: to guarantee the safety of
        the flight, including the crew and passengers on board the aircraft. To limit the oxygen intake
        of the crew and the passengers in an already low-oxygen environment like a plane is beyond
        dangerous as it impedes an optimum oxygen level in our bodies – not only for any pre-existing
        medical conditions any passenger or crew member might already have but also because it en-
        dangers the safety of the flight in case of emergency.

328.    Not only would passengers and crew members lose precious time to wear an oxygen mask
        in case of a decompression because they would have to remove their own unauthorized or FDA
        EUA face covering first, but also the flight attendants would be not be fit to handle an emer-
        gency because the already low oxygen level in their own bodies would incapacitate them from
        performing the emergency procedures that they have all been trained for.

329.    **PROHIBITING THE DISABLED FROM FLYING:** The conspiracy would soon
        evolve to indisputably interfere with the civil rights of disabled passengers by totally banning
        us from using air transportation unless we agreed to harm out health by wearing a mask.

330.    The Individual Defendants should have known forbidding disabled passengers from flying
        violated numerous federal and international laws, but they did nothing to stop the conspiracy.

331.    American and Southwest were the first carriers to institute a total ban on passengers with
        disabilities who can't wear a face mask. Exs. 186 & 204.

332.    "Some carriers, such as American and Frontier, have created policies designed to make it
        exceedingly difficult or impossible for disabled people to fly without a mask. It is clear that
        testing requirements impose an undue burden on disabled travelers as there are few places in

the country that guarantee a test result within 72 hours. In areas where rapid testing is possible, it is often not covered by health insurance plans and can cost hundreds of dollars. The DOT's decision to grant airlines the authority to dictate which flights disabled people can take is ripe for abuse and further demonstrates that the Office of Aviation Consumer Protection has little to no interest in protecting the rights of disabled people." Ex. 187.

333.    The other airline conspirators soon followed in prohibiting the disabled from flying.

334.    "Alaska Airlines announced a strengthening of [its] mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7[, 2020]. Alaska's announcement comes the same day as New York-based JetBlue's, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th. Alaska, along with JetBlue, now join American and Southwest, which announced similar zero-exceptions policies in recent weeks, as the airlines with the strictest face covering policies in the United States." Ex. 188.

335.    JetBlue said "Customers with conditions that prevent them from wearing a face covering should postpone travel until this temporary requirement is no longer in place." Ex. 189.

336.    Allegiant adopted a rule: "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel." *Id.*

337.    Frontier said "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim and onboard all flights. The only exception is for children under the age of 2." *Id.*

338.    Spirit likewise prohibited any passengers with medical conditions from flying, effective Aug. 5, 2020. "[E]very Spirit passenger must wear a mask from check-in through baggage claim. The only exception to this policy is children under the age of 2. No one else will be permitted to fly with Spirit unless they're wearing a mask. ... 'We decided to remove exemptions to further protect our Team Members and Guests onboard and give them greater peace of mind. Guests who travel with us and choose not to comply with our face covering requirement will lose future flight privileges with Spirit.' ... Spirit's take: If you can't wear a mask, don't fly. American Airlines and Southwest are also doing the same." Ex. 190.

339.    "Buried in a July 22 press release, United Airlines states that 'if a passenger believes that there are extraordinary circumstances that warrant an exception, they should contact United or speak to a representative at the airport.' Repeated requests for clarification were refused and, because the statement is not included on the airline's customer-facing website, I do not believe that United is willing to serve disabled passengers who cannot wear a mask." Ex. 189.

340.    "That's 8 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety, and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986." *Id.*

341.    These policies were all implemented in late July and early August 2020, demonstrating both intracorporate and intercorporate conspiracies to interfere with civil rights by prohibiting all disabled Americans who can't obstruct our breathing from flying.

342.    A ban such as the one imposed by the conspirators leaves disabled "customers who are traveling for medical treatments or surgeries to out of state specialized medical procedures at a great disadvantage. The numbers of Cancer Deaths has skyrocketed globally since these new

rules went into place. This is mainly attributed to these patients not having access to their Cancer Screenings and Cancer Treatments." Ex. 191.

343.    "The major airlines are now serious about enforcing their requirements that passengers (unless they are age 2 and under, usually) wear face masks during boarding and on the plane, as well as in areas throughout airports they serve, such as customer service counters and gates. The only time masks may be removed is for eating or drinking … They've announced that travelers who refuse to wear masks onboard will not be allowed to fly." Ex. 192.

344.    The conspiracy continued into January 2021, when the defendants collectively lobbied for the Federal Transportation Mask Mandate. "[A]irlines and their unions requested [the FTMM] to help with passenger mask compliance…" Ex. 193.

**T. Once the Federal Transportation Mask Mandate went into effect Feb. 1, 2021, the Department of Transportation finally forced the Airline Defendants to offer exemptions. But the conspiracy to prevent the disabled from flying continues as the exemption process each airline created is illegal and a farce, making it virtually impossible to get a waiver.**

345.    **AMERICAN'S ILLEGAL POLICIES:** American makes little information about its mask-exemption process available on its website.

346.    "If you may be exempt because you have a disability that prevents you from safely wearing a mask as defined by the Americans with Disabilities Act (42 USC 12101 et. seq) you must contact us at least 72 hours before you plan to travel and travel with documentation confirming a negative COVID test or recovery." Ex. 194.

347.    Additional unlawful American policies were described to me during a phone call Jan. 26, 2022. Ex. 4.

348.   **JETBLUE'S ILLEGAL POLICIES:** JetBlue blatantly shows contempt for the civil liberties of passengers with disabilities by telling us: "Customers with conditions that prevent them from wearing a mask should consider postponing travel." Ex. 195.

349.   "Exemptions will be limited on board each flight and will require specific documentation." *Id.*

350.   JetBlue tries to conceal its illegal mask policies by not even publishing on its website what its exemption rules are.

351.   Passengers have been advised by JetBlue via a chat portal they need to prepurchase a ticket, then submit a request for a mask exemption no less than five days prior to travel. They were then advised that "submitting documentation does not guarantee approval for a mask exemption. After JetBlue reviews your documentation, you will get an email letting you know if the exception is approved or denied. Arrive at the airport no less than 3 hours before departure and check in at the ticket counter, where a JetBlue crewmember will review the documents and confirm that the exempted customer is wearing a face shield. The face shield must be worn at all times."

352.   JetBlue advised a passenger in an e-mail that "Customers with disabilities who cannot safely wear a mask because of a permanent disability as defined by the Americans with Disabilities Act (ADA), may contact us via phone or chat to apply for an exemption from this requirement. Exemptions will be limited on board each flight and will require specific documentation submitted no less than five (5) days in advance of travel." Ex. 234.

353.   JetBlue falsely misrepresents that "federal law" requires passengers wear masks. *Id.* But Congress has never enacted such a law, and JetBlue cites no provision of the U.S. Code to support its statement.

354.    "For those customers who are permitted an exemption, they must provide printed or digital copies of submitted documentation and proof of negative PCR COVID-19 test results. Additionally, they will be required to wear a face shield in place of the mask at all times, including at the airport, during the flight including boarding and deplaning." *Id.*

355.    **SOUTHWEST'S ILLEGAL POLICIES:** "Customers with disabilities are not required to provide advance notice of the need for assistance…" Southwest correctly states on one of its webpages. Ex. 196.

356.    However, Southwest then illegally makes passengers needing a mask exemption complete a "Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines" form and submit it at least seven days in advance. *Id.*

357.    Southwest's form requires passengers to acknowledge an illegal policy that "Southwest Airlines may change his travel dates and/or flights should one or more of his originally scheduled flights have a capacity of 75% or more, or another Passenger approved for a mask exemption booked on such flight." *Id.*

358.    "Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement. These requirements/conditions are described below." *Id.* Southwest fails to advise customers these requirements or conditions are prohibited by the RA and ACAA.

359.    Because DOT's guidance (Ex. 51) is illegal, there's no remedy for the disabled for the violation of our rights under the ACAA, therefore giving us a private right of action to enforce the ACAA since DOT has failed its statutory duty to do so.

360.    "As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less crowded flight," according to Southwest. Ex. 196.

361.   "Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 75% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption. If the passenger's preferred flight ends up being more than 50% full on the day of travel, Southwest Airlines will work to reaccommodate Passengers who obtain a mask exemption. Please note that Passengers may be required to travel on a different date than their scheduled itinerary." *Id.*

362.   "At least seven (7) days prior to the Passenger's planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit [the form]..." *Id.*

363.   "A signed letter [is required] from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability." *Id.*

364.   "Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider..." *Id.*

365.   "No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result." *Id.* This sets different requirements for passengers without and with disabilities to fly; those who can mask don't need a test, those who can't mask must get an expensive test *for each segment of their journey*.

366.   "Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure..." *Id.*

367.    No provision of federal law or regulations permit an airline to require that any person be tested for a disease as a condition of carriage, and such a provision is not contained in Southwest's contract of carriage.

368.    The most outrageous and discriminatory policy of Southwest is that "if the Passenger's originally scheduled date of travel is changed as a result of the flight having a capacity of 75% or more or another Passenger approved for a mask exemption, then you will be required to obtain a qualifying COVID negative viral test result within three (3) calendar days preceding the Passenger's new scheduled date of departure or return travel, as applicable and at your own expense." *Id.*

369.    So in other words, Southwest violates the law by refusing to carry a disabled person because the flight is pretty full and/or because there's another disabled person on board, and then it is going to violate the law AGAIN by mandating you get ANOTHER negative COVID-19 test when nondisabled passengers are not subject to the testing requirement.

370.    "Southwest Airlines will introduce tough new face mask rules that will make it even more difficult for passengers with a legitimate medical exemption to fly with the airline…" Ex. 197.

371.    "Once a passenger has jumped through those hoops, Southwest Airlines will still refuse to board them if the flight is booked to 50% capacity or more. Even on a near-empty flight, an exempt passenger may still be refused boarding if there is more than one exempt passenger booked on the same flight." *Id.*

372.    Before the FTMM, "Southwest Airlines barred anyone over the age of two years old from flying with them if they claimed to have a medical condition that prevented them wearing a face mask. Instead, Southwest told passengers to either delay travel indefinitely or find another airline to fly with." *Id.*

68

373.    Southwest finally changed its tune, saying publicly it wants to withdraw from the conspiracy to interfere with the civil rights of disabled travelers.

374.    Southwest CEO Gary Kelly lobbied for the FTMM to terminate Sept. 13, 2021. Exs. 198-199.

375.    He testified to a Senate committee on Dec. 15, 2021, that masks are worthless in trying to reduce the spread of COVID-19 on planes. Ex. 68.

376.    Yet Southwest still makes obtaining disability exemptions nearly impossible, and it has not actually withdrawn from the conspiracy.

377.    Mr. Kelly serves as A4A chairman. He said the aviation interest group wants the mandate ended due in part because "Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews." Ex. 66.

378.    However, the FTMM was extended from Sept. 13 to Jan. 18, 2022, and again until March 18, 2022. None of the Airline Defendants have sued the federal government to block it even though they realize how discriminatory and dangerous it is.

379.    **UNITED'S ILLEGAL POLICIES:** United requires a mask-exemption demand form must be submitted a minimum of seven days prior to scheduled departure. Ex. 207.

380.    United requires proof of a negative COVID-19 PCR test result taken within 72 hours of scheduled departure. *Id.*

381.    United may require a mask-exempt customer and anyone traveling with him/her to move to alternate seats in the cabin and/or change their itinerary to less-full flights to allow for greater social distancing from other customers on board. *Id.*

396.     American, JetBlue, Southwest, and United have all received federal funding during the COVID-19 pandemic.

397.     "Under the Spending Clause, Congress can place certain conditions upon granting federal funds. Under Title VI, the recipient agrees not to discriminate on the grounds of race by accepting the money. A similar analogy applies to § 504 with disability discrimination. When a recipient of federal funds discriminates, he is essentially breaking his agreement with Congress." Ex. 213.

398.     "A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.*

**V. The Airline Defendants are unlawfully discriminating against millions of travelers with disabilities including me.**

399.     The Airline Defendants have a long track record during the pandemic of illegally banning passengers with disabilities who request face-mask exemptions, including children as young as two, in violation of the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR Part 382). There are thousands of media reports of ACAA violations by the defendants.

400.     "The ability to access transportation is a precondition to the full enjoyment of many human rights by people with disabilities," according to NCD. Ex. 154.

401.     The Airline Defendants' mask policies violate guidelines from the International Air Transport Association, the major trade group for the worldwide aviation industry.

402.     The Airline Defendants' "lack of accommodation impedes the individual's participation in society. Inequality is not due to the impairment, but to the inability of society to eliminate barriers challenging persons with disabilities. This model puts the person at the center, not

382.    If granted, a United mask exemption request is applicable only to flights in a single reservation, and any exemption for future travel or travel in separate reservations will need to be applied for anew. *Id.*

383.    Mask-demand applicants must agree: "I authorize the release of medical information pertaining to this mask exemption request and authorize my treating physician to speak with a United Airlines medical representative or any agent acting on its behalf." *Id.* This is an invasion of privacy.

384.    "In order to assess and manage my request I understand that it may be necessary for United to disclose information relating to my health information to third parties such as medical professionals, airport staff, health agencies, United Express and Star Alliance carriers, and their employees, among others." *Id.* This is an invasion of privacy.

385.    A section of United's mask-exemption demand form "must be completed by a medical provider specifically treating the passenger's disability," making it a medical certificate. *Id.*

**U. The Airline Defendants accepted federal pandemic funding, subjecting them to the Rehabilitation Act, which prohibits recipients of federal financial assistance from discriminating against the disabled.**

386.    Most passenger airlines have historically not been subject to the RA, however that changed in 2020 when they accepted $25 billion in federal assistance from Congress in the Coronavirus Aid, Relief, & Economic Security Act ("CARES Act"), signed into law March 27, 2020 (P.L. 116-136). The act provides assistance to consumers and businesses, including aid to air carriers, according to the Congressional Research Service ("CRS"). Ex. 208.

387.    "Treasury data show that, by October 5, 2020, more than $28 billion in payroll support had been approved for disbursement to 610 recipients, including 352 passenger airlines…" *Id.*

388.    Another $29 billion in federal loans were made available to airlines. Ex. 209.

389. "In the midst of this crisis which threatens the jobs of tens of thousands of employees, distressed airlines have turned to the federal government for financial assistance." Ex. 210.

390. Section 504 of the RA applies to programs receiving federal funds. Ex. 211.

391. Legislative intent in passing the RA: "The time has come to firmly establish the right of these Americans to dignity and self-respect as equal and contributing members of society, and to end the virtual isolation of millions of children and adults from society." *Id.*

392. "The definition of disability applicable to Section 504 was amended by the ADA Amendments Act of 2008 to conform with the new definition of disability for the ADA. ... ***the definition of disability shall be construed in favor of broad coverage*** to the maximum extent permitted by the terms of the act... The ADA Amendments Act specifically lists examples of major life activities including ... ***breathing***..." *Id.* (emphasis added).

393. The Supreme Court has determined that "Section 504 requires even-handed treatment and an opportunity for individuals with disabilities to participate and benefit from programs receiving federal funds." *Id.*

394. "The Spending Clause empowers Congress to tax and spend for the general welfare. Under this authority, which is subject to several limitations, Congress may offer federal funds to non-federal entities and prescribe the terms and conditions under which the funds are accepted and used by recipients." Ex. 212.

395. By agreeing to accept $25 billion from the CARES Act and more money from subsequent appropriations, the Airline Defendants entered into a contract with the federal government to protect the rights of disabled travelers pursuant to the RA, the ACAA, and other federal and international laws.

his/her impairment, recognizing the values and rights of persons with disabilities as part of society." Ex. 214.

403. IATA adopted standards in August 2020 for serving the disabled during the COVID-19 pandemic. "Ensuring access to aviation facilities, services and information is fundamental to a disability inclusive COVID-19 response and recovery. If public health information, airport terminals, transport, communications, technologies and goods and services are not accessible, persons with disabilities may not be able to live and travel independently." *Id.*

404. IATA's standards state that the disabled should not "be subject to a more stringent medical screening or clearance than that required for other passengers. To be equitable, the standards applied should be the same." *Id.*

405. "Airlines should develop a specific and detailed company policy for the assistance and support to passengers with disabilities that is consistent across their network during the COVID-19 crisis. This policy should be robust, based on science…" *Id.*

406. The Airline Defendants' mask policies are NOT based on science. https:// bit.ly/masksare-bad.

407. The Airline Defendants' policies are out of step with international standards set by IATA: "Airlines should provide reasonable accommodation to passengers … This will help to ensuring that all passengers exercise their human rights and their fundamental freedoms in an equitable manner." Ex. 214.

408. "Some passengers, such as those who cannot put on or remove a face mask themselves, small children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period." *Id.*

409.    "[I]t is important to note how persons with disabilities are uniquely impacted by the pandemic in various aspects, including in the transport area. As countries relax their border control systems and airlines resume their services, accessibility and inclusion of persons with disabilities in aviation's COVID-19 response and recovery is a vital part of achieving the pledge to leave no one behind." *Id.*

410.    In another document, IATA made clear that "denied boarding and passenger bans have raised criticism on airlines' policies that restrict people with disabilities from accessing air transportation as a violation of anti-discrimination and disability rights regulations." Ex. 215.

411.    "Airlines should provide reasonable accommodation to passengers … This will help to ensure that all passengers exercise their human rights and their fundamental freedoms in an equitable manner." *Id.*

412.    IATA advised airlines worldwide: "Some passengers, such as those who cannot put on or remove face masks themselves, very young children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period – or at all." *Id.*

413.    The Airline Defendants' mask policies also violate guidelines from the International Civil Aviation Organization ("ICAO").

414.    "Aviation, like all other transport modes, needs to recognize and accommodate this growing passenger segment. Persons with disabilities have the same international rights as other citizens, such as accessibility, and full and effective participation and inclusion in society, including freedom of movement and freedom of choice (United Nations Convention on the Rights of Persons with Disabilities, articles 3.c and 3.f). Persons with disabilities should have equivalent access to air travel. These international rights apply to air travel as to all areas of

74

life," according to ICAO's Manual on Access to Air Transport by Persons with Disabilities. Ex. 216.

415.    "All procedures forming part of an air travel journey, including reservations, check-in, immigration and customs, security clearances, transfers within airports, embarkation and disembarkation, departure, carriage, and arrival should be adapted to the needs of persons with disabilities in order to facilitate the clearance and air transportation of such persons in a dignified manner." *Id.*

416.    "The service provided at the request of persons with disabilities should be professional and 'seamless,' that is, with no points at which such persons may be left stranded or without assistance." *Id.*

417.    "Aircraft operators should not refuse to transport persons with disabilities on the basis of their disabilities…" *Id.*

418.    The Airline Defendants fail to understand there's a "sizable population who would find it difficult or impossible to comply with mask mandates… With fewer than 1% of Americans having a confirmed, active case of the coronavirus, what is the probability that the lone disabled person not wearing a mask actually poses direct threat?" Ex. 217.

419.    "People who have a legitimate reason not to wear a mask should not face undue barriers in accessing public accommodations as a result of their circumstance." *Id.*

420.    "Under the Americans with Disabilities Act (ADA), individuals cannot be denied transportation services because of a disability. The Air Carrier Access Act (ACAA) is a separate statute specifically for air travel, but provides the same nondiscrimination requirement," according to NCD. Ex. 218.

421.   "The Department of Transportation (DOT) regulations also require proper training of transit employees, which includes treating passengers with disabilities in a respectful and courteous manner, while also recognizing the differences in types of disabilities." *Id.*

422.   The Airline Defendants clearly are not training their employees to treat the disabled in a "respectful and courteous manner" by banning us from flying just because we can't wear a mask.

423.   "[A]ir travel is an essential component of many jobs in the global economy. For people with disabilities to be part of that economy, participate in the world community, and compete effectively for jobs requiring air travel, air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope." Ex. 219.

424.   "As the economy becomes increasingly global, the ability of employees with disabilities to travel by air is critical to their success and upward mobility. ... More accommodations are available for air travelers with disabilities today than ever before, but the availability of accommodations is inconsistent, and discriminatory treatment continues. It is important to recognize that the negative experiences of disabled travelers go beyond the typical hassles to which frequent travelers are accustomed." *Id.*

425.   "[A]ir travelers with disabilities frequently find air travel unnecessarily humiliating and upsetting. Many problems stem from the unwillingness of some airline staff to recognize that a request for an accommodation in air travel invokes civil rights protections. ... For laws like

76

ACAA to achieve the desired effect, they must be taken seriously and owned by government and industry. ***The ultimate test of any civil rights law is the extent to which people in the protected class can count on the law for real protection***." *Id.* (emphasis added).

426.   "Historically, air travel for people with disabilities has not been for the faint of heart. Often, people with certain disabilities either chose not to fly or traveled by air knowing they would probably face prejudice, hostility, disability stereotyping, as well as architectural and other physical barriers; sometimes they faced an outright denial of their right to travel." *Id.*

427.   "The intent of Congress in legislating the ACAA was to mandate nondiscrimination by requiring the accommodations necessary for travelers with disabilities to have equal access to air travel and related services. ... the statute was specifically intended to remedy 'discriminatory, inconsistent, and unpredictable treatment' of air travelers with disabilities. Finally, the statute affirmed that rules for accommodation were to be consistent with safety regulations, and that restrictions not based on safety and applied solely to passengers with disabilities were to be eliminated." *Id.*

428.   "DOT clarified that air carrier discretion in imposing additional requirements or restrictions on air travelers with disabilities is limited to what is required by FAA safety rules." *Id.*

429.   FAA has no safety rule requiring passengers to wear masks. FAA in June 2020 specifically refused to issue such a rule. Ex. 220.

430.   "Each time they travel, passengers with disabilities must cope with a myriad of potential disability-related complications above and beyond those faced by travelers who do not have disabilities. ... Disability policy has clearly established full participation and integration of

people with disabilities as a national goal. Access to transportation is a lynchpin for that participation and integration. As airline travel increasingly becomes a major mode of travel for Americans, it is essential that people with disabilities have full access to air travel." Ex. 219.

431.    In conspiring to put into place their illegal mask mandates, the Airline Defendants and the Individual Defendants did not consider the special needs of the disabled – even those who are able to tolerate having their breathing blocked. "Face masks have complicated the situation even further, since those with hearing loss rely heavily on facial expressions, non-verbal cues, and sign language to comprehend people." Ex. 221.

432.    I am extremely concerned the Airline Defendants, without action by this Court, will be permitted to enforce their mask mandates forever – excluding the disabled from so many important facets of life. Right now there's no end game for these unlawful requirements.

433.    "It seems highly unlikely that coronavirus will ever fully die out, so [will mask mandates end when] we're at the point where annual coronavirus deaths are less than average flu deaths, or at some other point? ... Then again, I can't help but wonder if this will just be another policy that the airline industry keeps in place forever, as with so many policies that came before this." Ex. 222.

434.    "Airlines must be held to account for what has been a gross violation of the civil rights of disabled people..." Ex. 187.

**W. The Department of Transportation fails to enforce the Air Carrier Access Act and its own regulations.**

435.    The Office of Aviation Consumer Protection ("OACP"), a unit within the Office of the General Counsel of DOT, issued a Notice of Enforcement Policy ("NEP") Feb. 5, 2021, "Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear

Masks While on Commercial Aircraft" "to remind U.S. and foreign air carriers of their legal

obligation to accommodate the needs of passengers with disabilities when developing proce-

dures to implement the Federal mandate on the use of masks to mitigate the public health risks

associated with the Coronavirus Disease 2019 (COVID-19)." Ex. 51.

436.    "OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date

of this notice to be in compliance with their obligation under the Air Carrier Access Act

('ACAA') and the Department's implementing regulation in 14 CFR Part 382 ('Part 382') to

provide reasonable accommodations to persons with disabilities who are unable to wear or

safely wear masks, so long as the airlines demonstrate that they began the process of compli-

ance as soon as this notice was issued." *Id.*

437.    The 45-day deadline was March 22, 2021. But there is no evidence DOT has taken any

enforcement action against the Airline Defendants for violating the ACAA as these airlines

continue to enforce their illegal discriminatory policies requiring, for example, that passengers

with a disability that prevents them from wearing a mask must submit a request in advance in

violation of 14 CFR § 382.25.

438.    "[T]he ACAA and Part 382, which are enforced by OACP, require airlines to make rea-

sonable accommodations, based on individualized assessments, for passengers with disabilities

who are unable to wear or safely wear a mask due to their disability." *Id.*

439.    "To ensure that only qualified persons under the exemptions would be able to travel with-

out a mask, the CDC Order permits operators of transportation conveyances, such as airlines,

to impose requirements, or conditions for carriage, on persons requesting an exemption, in-

cluding requiring a person seeking an exemption to request an accommodation in advance,

submit to medical consultation by a third party, provide medical documentation by a licensed

79

medical provider, and/or provide other information as determined by the operator. The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or other-wise." *Id. But see* 14 CFR Part 382.

440.    OACP's NEP did not advise airlines that the CDC's order allowing carriers to impose ad-ditional requirements is illegal (such as requesting a mask exemption in advance, submitting to a third-party medical consultation, submitting a medical certificate, and requiring a negative COVID-19 test). *Id. See* 14 CFR Part 382.

441.    In its Feb. 5 NEP, OACP admitted it had failed to enforce the ACAA and its regulations in 2020 when many airlines banned all passengers with disabilities who could not wear a face covering: "Some carriers have adopted policies that expressly allow 'no exceptions' to the mask requirement other than for children under the age of two. OACP has received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a 'no exceptions allowed' mask policy." *Id.*

442.    "The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties..." *Id.*

443.    OACP informed the airlines they had violated the law from Summer 2020 to January 2021 when they banned all travelers with disabilities: "It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for … individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disa-bilities would pose a greater health risk to others." *Id.*

444.  In two of the few mask complaints to be resolved by DOT, the department determined JetBlue and Southwest broke the law by refusing to grant any medical exemptions. But DOT did not fine either airline or impose any other penalty. Ex. 223.

445.  In these two cases, DOT's investigation took 13 and 14 months. That does not provide an adequate remedy for a disabled person who needs to fly next week.

446.  "The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability. When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities …" Ex. 51.

447.  OACP illegally advised airlines that "In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that ***treat passengers presumptively as potential carriers of the SARS-CoV-2 virus*** and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew." *Id. But see* 14 CFR § 382.23(c)(1), which provides that an airline must have evidence that the passenger ***"has"*** a communicable disease, e.g. has tested positive for the coronavirus. A "presumptive" determination that every single airline passenger is infected with COVID-19 is not only scientifically impossible, it goes against the plain language of 14 CFR § 382.23(c)(1).

448.  OACP wrongly informed airlines Feb. 5 that "both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline

that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask." *Id. But see* 14 CFR § 382.23(a).

449.   OACP wrongly informed airlines that "Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance." *But see* 14 CFR § 382.25.

450.   OACP wrongly informed airlines that they "may impose protective measures to reduce or prevent the risk to other passengers. For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test, taken at the passenger's own expense, during the days immediately prior to the scheduled flight." *Id.* As noted above, there is no provision of the ACAA or 14 CFR Part 382 that allows airlines to require a negative test to board a plane.

451.   "Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382." *Id.*

452.   However, DOT has failed its duty to enforce the ACAA and its regulations, as evidenced by the Airline Defendants' continuance of policies that violate Part 382 more than 11 months after the DOT issued its faulty NEP.

453.   Information provided to passengers by DOT contradicts OACP's Feb. 5 NEP as well as the Airline Defendants' mask policies. In a document "New Horizons: Information for the Air Traveler with a Disability," DOT informs flyers that "***Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability* …**" Ex. 224 (emphasis added).

454. "A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care. A disability is not sufficient grounds for a carrier to request a medical certificate. ***Carriers shall not require passengers to present a medical certificate unless the person: ... Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight***." *Id.* (emphasis added).

455. "If a person who seeks passage ***has an infection or disease*** that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: ... ***Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)***." *Id.* (emphasis added).

456. DOT publishes a 190-page handbook "What Airline Employees, Airline Contractors, & Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities: A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382." Relevant excerpts of this handbook are attached at Ex. 225. (CFR citations appear to be different; presumably Part 382 has been reorganized and renumbered since this document was published.)

457. "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation... ***Generally, you may not make inquiries about an individual's disability or the nature or severity of the disability***." *Id.* (emphasis added).

458. "***You must not refuse transportation to a passenger solely on the basis of a disability***." *Id.* (emphasis added).

459. "*You shall not require a passenger with a disability* to travel with an attendant or *to present a medical certificate*, except in very limited circumstances." *Id.* (emphasis added).

460. "*You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability* except as provided below." *Id.* (emphasis added).

461. "If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, *you must make an individualized assessment* based on a reasonable judgment, relying on current medical knowledge or the best available objective evidence." No presumptive judgment that every single person has a communicable disease or infection is permitted. *Id.* (emphasis added).

462. "If, in your estimation, a passenger *with a communicable disease or infection* poses a direct threat to the health or safety of other passengers, you may … (iii) impose on that passenger a special condition or restriction *(e.g., wearing a mask)*." *Id.* (emphasis added).

463. "Except under the circumstances described below, *you must not require medical certification of a passenger with a disability as a condition for providing transportation*. You may require a medical certificate only if the passenger with a disability is an individual who is traveling on a stretcher or in an incubator (where such service is offered); needs medical oxygen during the flight (where such service is offered); or has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight. *Id.*

464. "In addition, if you determine that a passenger *with a communicable disease or infection* poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger. *Id.* (emphasis added).

465. "Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection." *Id.*

466. "Discrimination is Prohibited: Management of carriers are required to ensure that the carrier … does not discriminate against qualified individuals with a disability by reason of such disability. *Id.*

467. The yet-to-be-named Individual Defendants have failed their legal duties to ensure the disabled are not discriminated against.

468. "Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted by the ACAA and part 382." *Id.*

469. As a result of DOT's refusal to obey its statutory duty to enforce the ACAA, millions of Americans have been barred from flying.

470. DOT has told the Airline Defendants they must accommodate passengers who are unable to tolerate wearing a face mask, however there is no evidence that DOT has actually initiated any civil enforcement proceedings against any air carrier for failure to grant mask exemptions.

471. "Masks or Cloth Face Covering: Recommendation: Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (***excluding*** children under age 2, or ***anyone who has a medical condition that causes trouble breathing*** …," according to the July 2020 report issued by DOT, DHS, and HHS. Ex. 176 (emphasis added).

472. "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks … Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis." *Id.*

473.    DOT issued updated guidance in December 2020, stressing a key point: "Mask Use, *specifically the need to accommodate those who cannot wear masks*." Ex. 227 (emphasis added).

474.    But again, there is no evidence I have located that DOT's OACP has fined any airline who banned customers with disabilities from flying, showing how DOT has failed its statutory duty to enforce the ACAA.

475.    "Masks Recommendation: Everyone should wear a mask per CDC guidance, over their nose and mouth, at all times in the passenger air transportation system (excluding children under age 2, *or anyone who has a medical condition for which wearing a mask is contraindicated ... Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks*." *Id.* (emphasis added).

476.    "Under the Air Carrier Access Act, *U.S. and foreign air carriers have legal obligations to accommodate the needs of passengers with disabilities when the airlines develop and implement policies requiring the use of masks* to mitigate the public health risks associated with COVID-19." *Id.* (emphasis added).

477.    "The Air Carrier Access Act and its implementing regulations in 14 CFR Part 382 require airlines to ensure that their mask policies provide for reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear a face covering for medical reasons." *Id.*

478.    "On the matter of enforcing the law, the DOT has failed – unequivocally. The rights and dignity of travelers requiring special assistance and accommodation are violated frequently, while the department remains silent," wrote John Morris. Ex. 228.

479.    "How often does the DOT pursue action? Not often. In the past three years, only five pen-

alties have been levied against airlines for violations of the ACAA. Typically, the DOT re-

ceives between 100-200 disability service complaints per month. ... Five actions after thou-

sands of complaints – that is not enforcement." *Id.*

480.    "Travelers with disabilities, myself included, have no way to ensure that air travel provid-

ers will honor the rights they have been guaranteed under the ACAA. Violations occur through-

out the travel experience, from booking to baggage claim. Depending on the right that is vio-

lated, costs to the passenger may include disrupted travel, financial loss, pain and suffering,

emotional distress, physical injury, an affront to personal dignity, or a combination of them

all." *Id.*

481.    "It is disheartening to know that the DOT, the agency wholly responsible for enforcement

of the law, has failed to protect your rights and mine so miserably." *Id.*

*482.*    "[A] civil right does not and cannot exist where an individual can take no definitive action

to enforce it before the law or protect against its violation. The crux of the issue is this: The

only venues within civil society where persons with disabilities cannot seek recourse before

the law for discrimination on the basis of disability are on airplanes and in airports. A civil

right is meant to be guaranteed." *Id.*

483.    "I have submitted complaints to the DOT, and the agency has affirmed the legitimacy of

100% of my claims. No action has been taken. Those same airlines continue to violate those

very same rights, repeatedly and as if they are immune from the law. If my government will

not stand up for me, and I cannot seek a redress for my own grievances before the court, what

rights do I truly have?" *Id.*

484.    "By definition, civil rights are a class of protections that must be protected to have merit and value. If the air travel industry is permitted to ignore the ACAA without threat of challenge, the protections under the law cannot be classified as civil rights. To the travelers with disabilities who have been denied a voice, they are nothing but recommendations that are trampled on by the very airlines which they were meant to regulate." *Id.*

485.    "[T]he National Council on Disability (NCD) believes that DOT's approach is critically lacking in the key areas of compliance monitoring, complaint handling, and leadership by the Department of Transportation. ... The key findings indicate that ACAA implementation and enforcement efforts over the past 12 years have been so lacking in several essential areas as to constitute nonenforcement." Ex. 219.

## X. International Traveler Testing Requirement.

486.    Without providing public notice or soliciting comment, on Jan. 12, 2021, Defendant CDC announced an order (the ITTR) requiring all passengers flying to the United States from a foreign country to get tested no more than three days before their flight departs and to present the negative result (or documentation of having recovered from COVID-19) to the airline before boarding the plane.

487.    The day after taking office (Jan. 21, 2021), President Biden issued "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); Ex. 54. This Executive Order directed the ITTR be continued.

488.    The revised ITTR took effect Jan. 26, 2021. 86 Fed. Reg. 7,387 (Jan. 28, 2021).

489.    The next version of the ITTR took effect Nov. 8, 2021. It made a minor change: modifying the requirement for unvaccinated flyers to get tested within one day of departure (keeping the mandate at three days for fully vaccinated passengers).

490. Defendant CDC amended the ITTR order again, effective Dec. 6, 2021. This is the version presently in effect that I'm challenging ("Requirements for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country"). 86 Fed. Reg. 69,256; Ex. 44.

491. This latest version made another slight change: requiring all passengers, regardless of vaccination status, to submit a negative COVID-19 test taken within one day of departure. *Id.*

492. Before checking in for an international flight to the United States, CDC requires travelers to complete a "Passenger Disclosure & Attestation to the United States of America" form. All airlines must provide the disclosure to their passengers and collect the attestation prior to embarkation. Ex. 45.

493. Defendant CDC prohibits airlines from boarding any passenger who does not submit the form with an accompanying negative COVID-19 test taken within one day of departure.

494. Congress has explicitly declined to require COVID-19 testing of international air travelers. There is no law authorizing the ITTR.

**Y. CDC and HHS fail to consider that the ITTR doesn't apply to travelers entering the United States by land and sea, imposes significant financial and time burdens on travelers for no discernable benefit, and can leave American citizens stranded abroad indefinitely.**

495. CDC and HHS have not explained why the ITTR applies only to air travel, not to those entering the United States by land or sea, including illegal aliens crossing the southern border from Mexico to the United States, who are much more likely to be unvaccinated than U.S. citizens flying home from abroad.

496. CDC and HHS have not presented any evidence that air travelers pose a greater risk to bringing COVID-19 into the country than land and sea passengers. Numerous COVID-19 out-breaks among illegal immigrants detained by the U.S. Border Patrol along the Mexican border as well as passengers and crew aboard cruiseships docking in the United States illustrate this point.

497. For example, CDC has told Americans not to cruise because of the high risk of COVID-19 transmission. Ex. 46-47.

498. The ITTR imposes significant financial and time burdens on international travelers. Yet there is no discernable benefit as the purported reason for the latest version of the ITTR – to stop the Omicron coronavirus variant from entering the United States – is moot because the variant is already widely circulating domestically, comprising about 99% of positive tests in the past month, according to CDC data.

499. Healthy people are unlikely to develop severe illness from Omicron. Ex. 48.

500. Testing is not reliable. "[N]ew research suggests that rapid tests widely used to identify potential covid-19 cases might be less effective at identifying illness caused by the swiftly spreading omicron variant." Ex. 49.

501. Testing is prone to errors. "Hundreds of people who were told they did not have Covid-19 have now discovered they do, after a Sydney testing center admitted it sent out incorrect PCR results." Ex. 205.

502. If a passenger is in a country or region where rapid COVID-19 testing is not available and it's impossible to obtain a test result within a day of departure, the ITTR prohibits that person (including U.S. citizens) from flying to the United States indefinitely because the ITTR con-tains no exemption process for such a situation.

503.    When an American citizen visits a foreign country, he/she has no guarantee that he/she will ever be able to return home due to the ITTR's stringent one-day testing requirement. This is a major concern for me because I need to travel to my ancestral homeland of Greece at least once a year.

504.    The ITTR provides no exemptions in the case a country or region that normally does have rapid coronavirus testing availability experiences a shortage of available COVID-19 tests.

505.    Unavailability of rapid testing is hardly speculative. It's occurring right now around the world including right here in the United States. "[T]he U.S. finds itself in the midst of yet another coronavirus test shortage, with consumers facing limited sales at retailers and long lines at testing centers." Ex. 50.

506.    "The confusion has frustrated some public health professionals who say there simply aren't enough kits to permit people who are sick, those exposed to someone who has been infected with the virus, and people who want to travel and attend gatherings to get tested." Ex. 82.

507.    President Biden admitted finding rapid COVID-19 tests is a "real challenge" and "the need is great to do more in terms of the rapid tests and the availability of it." Ex. 162.

508.    CDC does not reimburse and is unable to help travelers get reimbursements for travel expenses as a result of canceled or delayed travel because of COVID-19 testing requirements for air passengers flying to the United States.

509.    For example, CDC does not reimburse travelers for the costs of new plane tickets, lodging, meals, and other expenses as a result of being stranded in a foreign country as a result of an inability to obtain a COVID-19 negative test result within one day of departure.

510.    CDC does not reimburse travelers for COVID-19 testing fees, which can cost as much as $200 depending on the location and type of test.

511.    If an airline passengers pays $200 for a coronavirus test and the results do not come back within a day, not only does that person have to pay for another airline ticket, lodging, and meals, he/she must also pay $200 for another virus test – with no guarantee the results will come in time.

512.    If a flight is canceled or delayed until the next day, an airline passenger is forced to obtain another expensive COVID-19 test. The ITTR makes no exceptions for situations like this wholly outside passengers' control.

**Z. CDC and HHS failed to consider that the ITTR violates the International Covenant on Civil & Political Rights by interfering with several fundamental human rights established by treaty.**

513.    As recognized in the ITTR, many COVID-19 tests are experimental medical products authorized by FDA only for emergency use. Ex. 44.

514.    Not only does forced use of an emergency medical product without consent violate the Food, Drug, & Cosmetic Act, it breaks America's commitment to basic human rights under international law: "[N]o one shall be subjected without his free consent to medical or scientific experimentation." ICCPR Art. 7.

515.    Congress has not passed a law requiring airline passengers be refused transportation unless they present a negative COVID-19 test. However, "No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." ICCPR Art. 9.

516.    "International human rights law does not recognize a 'right to transportation' per se. Rather, it guarantees the right to liberty of movement, which is elaborated in Article 12 of the International Covenant on Civil and Political Rights," according to the National Council on Disability, an independent federal agency.

517.    "No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art.

12.4.

518.    The ITTR restricts my liberty of movement including the freedom to re-enter my country

of citizenship.

## V. CAUSES OF ACTION

**Count 1: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The Federal Transportation Mask Mandate exceeds CDC and HHS' statutory authority under the Public Health Service Act.**

519.    For this count, I incorporate by reference the facts stated in ¶¶ 52-76.

520.    The FTMM exceeds Defendants CDC and HHS' authority under § 361 of the Public Health

Service Act. 42 U.S.C. § 264.

521.    Section 361 does not authorize CDC and HHS to make a decision of such economic and

political significance.

522.    The agencies' interpretation of § 361 as authorizing the FTMM is not entitled to *Chevron*

deference.

523.    The Court should hold unlawful and set aside the FTMM because CDC acted in excess of

its statutory authority. 5 U.S.C. § 706(2)(C).

**Count 2: Violation of the Administrative Procedure Act against Defendants CDC and HHS: Failure to observe the notice-and-comment procedure required by law before ordering the Federal Transportation Mask Mandate.**

524.    For this count, I incorporate by reference the facts stated in ¶¶ 52-72.

525.    The FTMM is an "[a]gency action made reviewable by statute and final agency action for

which there is no other adequate remedy in a court." 5 U.S.C. § 704. It represents the consum-

mation of CDC and HHS' decision-making process with respect to requiring masks in the entire U.S. transportation sector. And it affects my legal rights and obligations because it has been the direct cause of me being unable to fly in many situations where I wanted to.

526. The APA requires agencies to issue rules through a notice-and-comment process. 5 U.S.C. § 553.

527. The FTMM is a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 USC § 551(4).

528. CDC issued the FTMM without engaging in the notice-and-comment process. 5 U.S.C. § 553.

529. Good cause does not excuse CDC's failure to comply with the notice-and-comment process. 5 U.S.C. § 553(b)(3)(B).

530. Had CDC and HHS put the FTMM through the required APA notice-and-comment period, I would have submitted the following concerns: 1) data shows states without mask mandates suffered fewer deaths per capita than states that imposed such requirements; 2) the FTMM is out of step with the current policies of nearly every state plus numerous businesses that don't require their customers cover their faces; 3) requiring masks in the transportation sector leads to widespread chaos in the skies and on the ground, endangering aviation and transit safety; 4) the FTMM unlawfully discriminates against travelers who can't wear a face covering due to a disability; 5) the gargantuan amount of scientific and medical evidence showing that masks have proven to be totally ineffective in reducing COVID-19 spread and deaths (*see* 227 scientific studies, medical articles, and videos at https://bit.ly/masksarebad); 6) scientists have

94

known for a long time that masks aren't effective in reducing transmission of respiratory vi-

ruses (*Id.*); 7) masks pose serious health risks to humans forced to wear them (*Id.*); 8) many

experts consider forcing kids to wear masks child abuse (*Id.*); 9) masks have contributed to a

surge in serious crime; 10) masks contribute to the huge problem of racism in America; 11)

masks are damaging the environment (*Id.*); 12) people who have recovered from COVID-19

have long-lasting immunity; and 13) airplane cabins pose little risk for coronavirus spread and

there have been few, if any, reports of coronavirus transmission on aircraft.

531.    The Court should hold unlawful and set aside the FTMM because it violates the APA's

notice-and-comment requirement. 5 U.S.C. § 706(2)(D).

**Count 3: Violation of the Administrative Procedure Act against Defendants CDC and HHS: Arbitrary and capricious agency action in ordering the Federal Transportation Mask Mandate.**

532.    For this count, I incorporate by reference the facts stated in ¶¶ 52-72 and those indicated

below.

533.    The administrative record shows that CDC and HHS ignored better options than imposing

the FTMM such as requiring COVID-19 test providers to report all positive results to the

agency so those infected could be placed on the "Do Not Board" and "Lookout" lists, prohib-

iting them from flying for about two weeks while they capable of transmitting the virus to

others. ¶¶ 77-83.

534.    The administrative record shows that CDC and HHS failed to take into account that air-

plane cabins prose little risk for coronavirus spread. ¶¶ 90-109.

535.    The administrative record shows that CDC and HHS failed to take into account the volu-

minous scientific and medical research showing masks have proven to be totally ineffective in

reducing COVID-19 spread and deaths. ¶¶ 110-145.

536. The administrative record shows that CDC and HHS failed to consider that masks pose serious health risks to humans forced to wear them. ¶¶ 146-167.

537. The administrative record shows that CDC and HHS ignored that mask mandates have created chaos in the skies and on the ground, endangering aviation and transit security. ¶¶ 179-214.

538. The administrative record shows that CDC and HHS failed to consider that masks damage the environment. ¶¶ 277-280.

539. The Court should hold unlawful and set aside the FTMM because it is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A).

**Count 4: Violation of the separation of powers against Defendants CDC and HHS: The Federal Transportation Mask Mandate is an improper delegation of legislative power.**

540. For this count, I incorporate by reference the facts stated in ¶¶ 52-72.

541. The U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1. Under the nondelegation doctrine, Congress cannot transfer legislative power to the Executive Branch. Acts of Congress must supply an intelligible principle to guide the Executive Branch's enforcement discretion.

542. If the Court finds it does authorize the FTMM, § 361 of the Public Health Service Act (42 U.S.C. § 264) violates Article I's Vesting Clause and the separation of powers because Congress delegated legislative power to CDC with no intelligible principle to guide its discretion. That section authorizes CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases … from one State or possession into any other State or possession." 42 U.S.C. § 264(a). The

statute further provides that CDC may take certain specific measures as well as "other measures, as in [its] judgment may be necessary." *Id.*

543. If § 361 is so broad as to authorize the FTMM, then Congress provided no intelligible principle to guide CDC's discretion to take actions that "are" or "may be necessary" to "prevent the introduction, transmission, or spread of communicable diseases." *Id.* Vesting CDC with such broad authority and discretion without an intelligible principle violates the nondelegation doctrine.

544. Notably Congress has declined numerous times during the 22-month-long COVID-19 pandemic to enact into law any mask requirement.

545. The Court should declare that § 361 of the Public Health Service Act is unconstitutional because it violates Article I and the separation of powers.

546. The Court should hold unlawful and set aside the FTMM because it is "found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## Count 5: Violation of the 10th Amendment against Defendants CDC and HHS: The Federal Transportation Mask Mandate applies to intrastate transportation in direct conflict with the mask policies of 43 states, infringes on the states' sovereign police power to regulate public health, and commandeers state officials to enforce a federal order.

547. For this count, I incorporate by reference the facts stated in ¶¶ 281-286.

548. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. 10.

549. The 10th Amendment precludes CDC and HHS from applying any national mask mandate to intrastate transportation. The federal government only has constitutional authority to regulate interstate commerce. Most modes of transportation affected by the FTMM such as city

buses, school buses, subways, light rail, commuter trains, and rideshare cars never cross state lines.

550.    In addition to 43 states not requiring masks, several states prohibit any public agency such as an airport or transit authority from requiring face coverings. The federal government may not pre-empt state authority when it comes to regulating public health within its borders.

551.    The FTMM unconstitutionally commandeers state officials to enforce a federal mandate.

552.    The Court should declare the FTMM is unconstitutional because it violates the 10th Amendment.

553.    The Court should hold unlawful and set aside the FTMM as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**Count 6: Violation of the Fifth Amendment against Defendants CDC and HHS: Deprivation of due process by assigning Federal Transportation Mask Mandate enforcement and exemption powers to private companies as well as state, regional, and local agencies with no ability to appeal to a federal decisionmaker.**

554.    For this count, I incorporate by reference the facts stated in ¶¶ 1-47 & 52-72.

555.    I have been denied mask exemptions by private corporations JetBlue and Southwest with no opportunity to appeal their decision to a neutral federal decisionmaker.

556.    "No person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. 5.

557.    When a government action deprives an individual of a protected life, liberty, or property interest, the Due Process Clause requires, at minimum, fair notice and an opportunity to be heard.

558.    Travelers hold constitutionally protected liberty interests in being able to breathe without the obstruction caused by a face mask, to make our own medical decisions without government

interference, and to not have a policy imposed on us that results in numerous adverse health effects.

559.    The FTMM deprives travelers of our liberty without satisfying the requirements of due process. CDC and HHS have improperly delegated to private businesses as well as state, regional, and local transportation authorities the sole enforcement power to determine whether a disabled traveler should be granted a mask exemption. There is no right to a hearing – yet alone a rapid pre-deprivation hearing – before a neutral federal decisonmaker to challenge a denial of an exemption.

560.    The Court should declare the FTMM is unconstitutional because it violates the Fifth Amendment.

561.    The Court should hold unlawful and set aside the FTMM as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**Count 7: Violation of the constitutional right to freedom of travel against Defendants CDC and HHS: The Federal Transportation Mask Mandate blocks Americans who can't or won't wear a face mask from traveling.**

562.    For this count, I incorporate by reference the facts stated in ¶¶ 1-47 & 52-72.

563.    Ever since adoption of the Articles of Confederation, Americans have had a fundamental right to travel to other states and territories. The Supreme Court has also interpreted that right to include travel to foreign nations.

564.    Although the Constitution does not expressly mention the freedom to travel, the Supreme Court has long interpreted rights reserved to the people as including the freedom to move about the nation (and world) without unnecessary government restrictions.

565.    Congress affirmed the constitutional right to fly for disabled Americans by enshrining it into statute: "A citizen of the United States has a public right of transit through the navigable

airspace. To further that right, the Secretary of Transportation shall consult with the Architectural and Transportation Barriers Compliance Board … before prescribing a regulation or issuing an order or procedure that will have a significant impact on the accessibility of commercial airports or commercial air transportation for handicapped individuals." 49 USC § 40103.

566.    The FTMM imposes unnecessary government restrictions on my constitutional right to travel, especially since I have a disability that precludes me from safely wearing a mask.

567.    The Court should declare the FTMM is unconstitutional because it violates the freedom to travel.

568.    The Court should hold unlawful and set aside the FTMM as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**Count 8: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The Federal Transportation Mask Mandate does not comply with the Air Carrier Access Act and its underlying regulations.**

569.    For this count, I incorporate by reference the facts stated in ¶¶ 52-72 & 287-296.

570.    The ACAA, 49 USC § 41705, and its accompanying regulations promulgated by DOT, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who have disabilities and/or a communicable disease.

571.    The FTMM allows transportation carriers to declare that all passengers are assumed to be infected with COVID-19. However, airlines are prohibited from requiring a passenger to wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR § 382.21.

572.    The FTMM's presumption that every single traveler is infected with COVID-19 and there-
        fore must wear a face covering violates the regulation that "In determining whether an indi-
        vidual poses a direct threat, you must make an individualized assessment." 14 CFR §
        382.19(c)(1).

573.    The FTMM allows airlines to refuse to transport any disabled person who can't wear a face
        mask. However, "[Y]ou must not refuse to provide transportation to a passenger with a disa-
        bility on the basis of his or her disability, except as specifically permitted by this part." 14 CFR
        § 382.19(a).

574.    The FTMM allows airlines to demand a medical certificate from a passenger who demands
        a mask exemption. However, "Except as provided in this section, you must not require a pas-
        senger with a disability to have a medical certificate as a condition for being provided trans-
        portation." 14 CFR § 382.23(a). "You may also require a medical certificate for a passenger if
        he or she *has* a communicable disease or condition that could pose a direct threat to the health
        or safety of others on the flight." 14 CFR § 382.23(c)(1) (emphasis added).

575.    The FTMM permits airlines to require passengers seeking mask exceptions to undergo an
        evaluation with a third-party medical vendor such as STAT-MD. However, since airlines may
        not require a medical certificate for a passenger unless he/she "has" a communicable disease
        (14 CFR § 382.23(a)), they may also not require a third-party medical consultation. "[Y]ou
        may require that a passenger *with a medical certificate* undergo additional medical review by
        you if there is a legitimate medical reason for believing that there has been a significant adverse
        change in the passenger's condition since the issuance of the medical certificate…" 14 CFR §
        382.23(d) (emphasis added).

576. The FTMM allows airlines to require a negative COVID-19 test from anyone seeking a mask exemption. However, no provision of the ACAA or its accompanying regulations (nor any other law) permits CDC and HHS to allow airlines to require that passengers submit a negative test for any communicable disease. Mandating disabled flyers needing a mask exemption submit an expensive COVID-19 test before checking in but not requiring the same of nondisabled travelers is illegal discrimination. "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation..." 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

577. The FTMM allows airlines to limit the number of mask-exempt passengers on a flight. However, "[Y]ou must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

578. The FTMM permits airlines to change the seat assignments of mask-exempt customers, e.g. moving them to the back of the plane. However, "[Y]ou must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability, except to comply with FAA or applicable foreign government safety requirements." 14 CFR § 382.87(a).

579. The FTMM permits airlines to require advance notice (usually via an application submitted up to 10 days before a flight) from a disabled passenger needing a mask exemption. However, "As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight." 14 CFR § 382.25.

580. CDC and HHS may not issue an order that violates a statute such as the ACAA or the regulations duly promulgated thereunder (as codified in the U.S. Code and Code of Federal Regulations).

581. The Court should hold unlawful and set aside the FTMM because it violates the ACCA and its regulations concerning transportation of passengers with disabilities and/or communicable diseases, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

**Count 9: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The Federal Transportation Mask Mandate violates federal law prohibiting the mandatory use of any medical device unauthorized or approved under an Emergency Use Authorization by the Food & Drug Administration.**

582. For this count, I incorporate by reference the facts stated in ¶¶ 215-252.

583. CDC and HHS force American travelers to use a medical device (face masks), most of which are approved by FDA – an agency within HHS – under Emergency Use Authorization, or have no authorization at all.

584. CDC and HHS failed to consider that airline employees are not individuals with the appropriate ethics and scientific education, training, and qualifications to order passengers to use experimental medical devices unauthorized by FDA or issued under an EUA.

585. CDC and HHS failed to consider that airline employees are not competent and appropriately qualified physicians or other healthcare professionals able to evaluate who can't medically tolerate covering their nose and mouth.

586. The FTMM is dangerous because it forces passengers to use a medical device, the vast majority of which are unauthorized or approved by FDA under an EUA.

587. CDC and HHS, through their partner agency TSA, provide unauthorized and/or EUA masks to passengers, introducing these experimental medical devices into interstate commerce.

588. The FTMM violates the Food, Drug, & Cosmetic Act by not giving passengers our legal option to refuse administration of an FDA unauthorized or EUA medical device (a face mask).

589. "The principle that individuals should not be coerced to receive an unlicensed medical product is also codified in the law of at least 84 countries and is an accepted principle of international common law. *See, e.g., Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 184 (2nd Cir. 2009) ('We have little trouble concluding that a norm forbidding nonconsensual human medical experimentation is every bit as concrete – indeed even more so – than the norm prohibiting piracy... The Nuremberg Code, Article 7 of the ICCPR, the Declaration of Helsinki, the Convention on Human Rights and Biomedicine, the Universal Declaration on Bioethics and Human Rights, the 2001 Clinical Trial Directive, and the domestic laws of at least 84 States all uniformly and unmistakably prohibit medical experiments on human beings without their consent, thereby providing concrete content for the norm.')" Ex. 146.

590. It's a "longstanding principle that it is not permissible to coerce anyone to receive an unlicensed medical product." *Id.*

591. Legislative history of Section 564 of the FDCA indicates that "any authority to actually use experimental drugs or medical devices in emergency situations has to be defined and wielded with nothing less than surgical precision. Prior informed consent in connection with the administration of experimental therapy is a basic human right, a right no one should be asked to surrender..." *Id.*

592. "[T]he authorization for the emergency use of unapproved products also includes strong provisions on informed consent for patients." *Id.*

593. "Congress specifically carved out only one exception for when an individual would not have 'the option to accept or refuse administration of the product.' Congress permitted required use of an EUA product when the President of the United States finds that providing an indi-

vidual in the military with the option to accept or refuse the product would not be in the interests of national security." *Id.*; *see also* 10 USC § 1107a.

594.  "Congress so highly valued the right to individual choice that it allowed only a threat to national security to trump that right, and even then, only with regard to military personnel." *Id.*

595.  Individuals to whom any EUA product is offered must be informed "of the option to accept or refuse administration of the product..." 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

596.  There's good reason for the law prohibiting forced use of EUA medical devices. Requirements for EUA products are waived for, among other things, "current good manufacturing practice otherwise applicable to the manufacture, processing, packing ... of products subject to regulation under this chapter..." 21 USC § 360bbb-3(e)(3)(A).

597.  "Nothing in this section provides the [HHS] Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section..." 21 USC § 360bbb-3(l).

598.  Congress' prohibition of mandatory mask use is consistent with HHS' regulations requiring that participants in trials of experimental medical devices must be informed that "participation is voluntary, refusal to participate will involve no penalty..." 45 CFR § 46.116(a)(8).

599.  Likewise FDA regulations state that no human shall participate in research trials of uncertified medical devices unless "the investigator has obtained the legally effective informed consent of the subject..." 21 CFR § 50.20.

600.  Most masks being used by Americans to comply with the FTMM meet the legal definition of an EUA "eligible product" that is "intended for use to prevent ... a disease..." 21 USC § 360bbb-3(a).

601.    A person may freely choose to accept medical risks for the benefit of others; they cannot be compelled by the federal government. We don't harvest organs without consent, even if doing so would save many lives. Those who make such sacrifices for others must truly be volunteers, not conscripts.

602.    The Federal Defendants have no authority to order passengers to obstruct our breathing, causing numerous harms, to perhaps spare another customer from catching a virus. Passengers willingly take on the risk of catching a communicable disease when they buy an airline ticket, knowing they will squeezed into a metal tube like sardines in a can. If they don't want to take that risk, they have the option not to fly.

603.    "Protection of others" does not relieve the Federal Defendants from the central canon of medical ethics requiring voluntary and informed consent.

604.    The Court should hold unlawful and set aside the FTMM because it violates the FDCA, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

**Count 10: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The Federal Transportation Mask Mandate does not comply with the International Covenant on Civil & Political Rights.**

605.    For this count, I incorporate by reference the facts stated in ¶¶ 253-263.

606.    The United States has ratified the International Covenant on Civil & Political Rights, which makes it binding treaty law upon all persons and corporations in our country.

607.    In carrying out all federal aviation laws, the transportation secretary and FAA administrator "shall act consistently with obligations of the United States Government under an international agreement." 49 USC § 40105(b)(1)(A).

608.    By banning the disabled from flying by including illegal exemption procedures in the

FTMM, CDC and HHS violate our rights under international law to liberty of movement, freedom to leave any country, and ability to enter our own country. Congress has not passed any law allowing CDC and HHS to restrict a person's movement based on their inability (or unwillingness) to impede our breathing.

609.     "[N]o one shall be subjected without his free consent to medical or scientific experimentation." ICCPR Art. 7.

610.     "No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." ICCPR Art. 9.

611.     "1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement ... 2. Everyone shall be free to leave any country, including his own. 3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law... 4. No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art. 12.

612.     As a dual citizen of the United States and Greece, the FTMM interferes with my rights to be free to leave any country and enter my own countries.

613.     "1. No one shall be subjected to arbitrary or unlawful interference with his privacy ... 2. Everyone has the right to the protection of the law against such interference or attacks." ICCPR Art. 17.

614.     The FTMM's onerous requirements for the disabled to obtain a mask exemption arbitrarily and unlawfully interfere with our privacy by forcing us to disclose sensitive medical information to airline employees who are not our physicians. I have a right under international law for this Court to protect me against such interference and attacks on my privacy.

615.  The Court should hold unlawful and set aside the FTMM because it violates the ICCPR, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

**Count 11: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The Federal Transportation Mask Mandate does not comply with the Convention on International Civil Aviation.**

616.  For this count, I incorporate by reference the facts stated in ¶¶ 264-276.

617.  The United States has ratified the Convention on International Civil Aviation, which makes it binding treaty law upon all persons and corporations in our country.

618.  In carrying out all federal aviation laws, the transportation secretary and FAA administrator "shall act consistently with obligations of the United States Government under an international agreement." 49 USC § 40105(b)(1)(A).

619.  CDC and HHS allow airlines to require passengers with disabilities needing a mask exemption to submit a medical clearance.

620.  "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance. Aircraft operators should only be permitted to require persons with disabilities to obtain a medical clearance in cases of a medical condition where it is not clear that they are fit to travel and could compromise their safety or well-being or that of other passengers." CICA Annex 9 § 8.39.

621.  The Court should hold unlawful and set aside the FTMM because it violates the CICA, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

**Count 12: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The International Traveler Testing Requirement exceeds the agencies' statutory authority under the Public Health Service Act.**

622. For this count, I incorporate by reference the facts stated in ¶¶ 486-494.

623. I have been restricted from flying internationally because of the ITTR.

624. The ITTR exceeds CDC and HHS' authority under § 361 of the Public Health Service Act. 42 U.S.C. § 264. Section 361 does not include any authority to test all international flyers for a communicable disease.

625. Section 361 does not authorize CDC and HHS to make a decision of such economic and political significance.

626. The agencies' interpretation of Section 361 as authorizing the ITTR is not entitled to *Chevron* deference.

627. The Court should hold unlawful and set aside the ITTR because CDC and HHS acted in excess of statutory authority. 5 U.S.C. § 706(2)(C).


**Count 13: Violation of the Administrative Procedure Act against Defendants CDC and HHS: failure to observe the notice-and-comment procedure required by law before ordering the International Traveler Testing Requirement.**

628. For this count, I incorporate by reference the facts stated in ¶¶ 486-494.

629. I have been restricted from flying internationally because of the ITTR.

630. The ITTR is an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. It represents the consummation of CDC's decision-making process with respect to requiring testing for anyone flying into the United States. And it affects my legal rights and obligations because it prevents me from flying into the U.S. without obtaining an expensive, time-consuming, and unreliable COVID-19 test.

631.     The APA requires agencies to issue rules through a notice-and-comment process. 5 U.S.C. § 553.

632.     The ITTR is a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

633.     CDC issued the ITTR without engaging in the notice-and-comment process. 5 U.S.C. § 553.

634.     Good cause does not excuse CDC's failure to comply with the notice-and-comment process. 5 U.S.C. § 553(b)(3)(B).

635.     The Court should hold unlawful and set aside the ITTR because it violates the APA's notice-and-comment requirement. 5 U.S.C. § 706(2)(D).

**Count 14: Violation of Administrative Procedure Act against Defendants CDC and HHS: arbitrary and capricious agency action in ordering the International Traveler Testing Requirement.**

636.     For this count, I incorporate by reference the facts stated in ¶¶ 486-512.

637.     I have been restricted from flying internationally because of the ITTR.

638.     The administrative record shows that CDC and HHS failed to consider the burden of requiring all airline passengers to obtain a negative COVID-19 test within one day of departure.

639.     The administrative record shows that CDC and HHS failed to consider that travelers arriving into the United States by land or sea – including millions of illegal aliens crossing the border from Mexico – pose the same or higher risk of bringing coronavirus into the country than travelers arriving by airplane.

640.   The administrative record produced by CDC and HHS fails to articulate any rationale for why airplane travelers should be tested for COVID-19 within a day of entering the United States but not those crossing by land or sea.

641.   The Court should hold unlawful and set aside the ITTR because it is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A)

**Count 15: Violation of the separation of powers against Defendants CDC & HHS: The International Traveler Testing Requirement is an improper delegation of legislative power.**

642.   For this count, I incorporate by reference the facts stated in ¶¶ 486-494.

643.   I have been restricted from flying internationally because of the ITTR.

644.   The U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1. Under the nondelegation doctrine, Congress cannot transfer legislative power to the Executive Branch. Acts of Congress must supply an intelligible principle to guide the Executive Branch's enforcement discretion.

645.   If the Court finds it does authorize the ITTR, § 361 of the Public Health Service Act (42 U.S.C. § 264) violates Article I's Vesting Clause and the separation of powers because Congress delegated legislative power to CDC and HHS with no intelligible principle to guide their discretion. That section authorizes CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases ... from one State or possession into any other State or possession." 42 U.S.C. § 264(a). The statute further provides that CDC may take certain specific measures as well as "other measures, as in [its] judgment may be necessary." *Id.*

646.   If § 361 is so broad as to authorize the ITTR, then Congress provided no intelligible principle to guide CDC's discretion to take actions that "are" or "may be necessary" to "prevent

the introduction, transmission, or spread of communicable diseases." *Id.* Vesting CDC with
such broad authority and discretion without an intelligible principle violates the nondelegation
doctrine.

647.   Notably Congress has declined numerous times during the 22-month-long COVID-19 pan-
demic to enact into law any traveler testing requirement.

648.   The Court should declare that § 361 of the Public Health Service Act is unconstitutional
because it violates Article I and the separation of powers.

649.   The Court should hold unlawful and set aside the FTMM because it is "found to be …
contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**Count 16: Violation of the constitutional right to freedom of travel against Defendants CDC
and HHS: The International Traveler Testing Requirement interferes with Americans' right
to travel internationally.**

650.   For this count, I incorporate by reference Count 7 and the facts stated in ¶¶ 486-494.

651.   The ITTR imposes unnecessary government restrictions on my constitutional right to travel
internationally. If I'm abroad and can't obtain a rapid COVID-19 test, I am prohibited from
flying home to the United States.

652.   The Court should declare the ITTR is unconstitutional because it violates the freedom to
travel.

653.   The Court should hold unlawful and set aside the FTMM as "contrary to constitutional
right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

**Count 17: Violation of the Administrative Procedure Act against Defendants CDC and HHS:
The International Traveler Testing Requirement violates federal law prohibiting the man-
datory use of any medical device unauthorized or approved under an Emergency Use Au-
thorization by the Food & Drug Administration.**

654. For this count, I incorporate by reference Count 9 and the facts stated in ¶¶ 215-252 & 486-494.

655. CDC and HHS force American travelers to use a medical device (COVID-19 tests), most of which are approved by FDA – an agency within HHS – under Emergency Use Authorization, or have no authorization at all.

656. The ITTR acknowledges that many COVID-19 tests are only approved for emergency use. "Viral Test means a viral detection test for current infection (i.e., a nucleic acid amplification test [NAAT] or a viral antigen test) cleared, approved, or issued an emergency use authorization (EUA) by the U.S. Food and Drug Administration…" Ex. 44.

657. Since the ITTR only applies in foreign countries, there is no way for an airline passenger to determine if a testing procedure available locally is authorized by FDA, which lacks jurisdiction outside the United States.

658. CDC and HHS have no way to verify the authenticity and reliability of COVID-19 tests manufactured abroad without FDA authorization.

659. The ITTR violates the Food, Drug, & Cosmetic Act by not giving passengers our legal option to refuse administration of an FDA unauthorized or EUA medical device (a COVID-19 test).

660. Individuals to whom any EUA product is offered must be informed "of the option to accept or refuse administration of the product…" 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

661. "Nothing in this section provides the [HHS] Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an authorization under this section…" 21 USC § 360bbb-3(l).

662.     The Court should hold unlawful and set aside the FTMM because it violates the FDCA, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

**Count 18: Violation of the Administrative Procedure Act against Defendants CDC and HHS: The International Traveler Testing Requirement does not comply with the International Covenant on Civil & Political Rights.**

663.     For this count, I incorporate by reference Count 10 and the facts stated in ¶¶ 486-494 & 513-518.

664.     In carrying out all federal aviation laws, the transportation secretary and FAA administrator "shall act consistently with obligations of the United States Government under an international agreement." 49 USC § 40105(b)(1)(A).

665.     "2. Everyone shall be free to leave any country, including his own. 3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law… 4. No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art. 12.

666.     Congress has never passed a law mandating virus testing before boarding a fight to the United States.

667.     As a dual citizen of the United States and Greece, the ITTR interferes with my freedom to leave any country and arbitrarily deprives me of the right to enter my own countries.

668.     The Court should hold unlawful and set aside the FTMM because it violates the ICCPR, making it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 USC § 706(2)(C).

**Count 19: Conspiracy to interfere with civil rights against Defendants American, JetBlue, Southwest, United, and STAT-MD as well as the yet-to-be-named Individual Defendants.**

669.     For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

670.   The disabled are a class Congress has designated for protection against civil-rights viola-
       tions. In adopting the RA, the ACAA, and the Americans with Disabilities Act, *inter alia*,
       Congress has made unmistakably clear that the national policy of the United States to protect
       the disabled as a class from discrimination in all facets of American life.

671.   The Airline Defendants conspired to deprive disabled Americans, a protected class, of our
       civil rights by adopting policies in Summer 2020 that banned anyone medically unable to wear
       a face mask from using the nation's air-transportation system.

672.   STAT-MD has participated in the conspiracy by denying mask-exemption demands for its
       airline clients submitted by disabled passengers without speaking to the passenger or his/her
       doctor.

673.   All Americans, especially the disabled, have a statutory right to use commercial air trans-
       portation. "A citizen of the United States has a public right of transit through the navigable
       airspace. To further that right, the Secretary of Transportation shall consult with the Architec-
       tural and Transportation Barriers Compliance Board established under section 502 of the Re-
       habilitation Act of 1973 (29 U.S.C. 792) before prescribing a regulation or issuing an order or
       procedure that will have a significant impact on the accessibility of commercial airports or
       commercial air transportation for handicapped individuals." 49 USC § 40103.

674.   After the FTMM took effect Feb. 1, 2021, the Airline Defendants continued to conspire
       against disabled Americans by making mask exemptions impossible to obtain by requiring
       applicants to jump through numerous illegal hoops in violation of the RA and ACAA.

675.   Congress has declined numerous times to amend the ACAA during the pandemic to allow
       the defendants to impose mask mandates on the disabled.

676. The Airline Defendants are not required to enforce the FTMM because it was issued ille-
gally by the Executive Branch and is unconstitutional. *See* Counts 1-11.

677. The Airline Defendants' conspiracy continues today as millions of disabled Americans
who can't safely wear masks are banned from our statutory right to use the nation's airspace
solely because of our disability that precludes us from safely wearing a mask.

678. "If two or more persons in any State or Territory conspire … for the purpose of depriving,
either directly or indirectly, any person or class of persons of the equal protection of the laws,
or of equal privileges and immunities under the laws… in any case of conspiracy set forth in
this section, if one or more persons engaged therein do, or cause to be done, any act in further-
ance of the object of such conspiracy, whereby another is injured in his person or property, or
deprived of having and exercising any right or privilege of a citizen of the United States, the
party so injured or deprived may have an action for the recovery of damages occasioned by
such injury or deprivation, against any one or more of the conspirators." 42 USC § 1985(3).

679. The essential elements of a § 1985 claim are: 1) a conspiracy; 2) to deprive plaintiffs of
equal protection or equal privileges and immunities; 3) an act in furtherance of the conspiracy;
and 4) an injury or deprivation resulting therefrom. I meet all four elements in bringing this
claim against the Airline Defendants and STAT-MD.

680. I expect to prove through discovery that the Airline Defendants conspired – with each
other, with other air carriers, within their own companies, and with STAT-MD – to ban disa-
bled flyers because of a discriminatory motive. The conspiracy is not driven by public-health
considerations since masks are totally worthless in reducing the transmission of respiratory
viruses such as COVID-19 and harm human health. Rather the defendants are motivated by a

class-based, invidiously discriminatory animus resulting in an unfounded, ridiculous fear that healthy, uninfected disabled travelers who can't wear a face mask are somehow a grave danger.

681.   The conspiracy applies to both intercorporate and intracorporate actions.

## Count 20: Neglecting to prevent interference with civil rights against the yet-to-be-named Individual Defendants.

682.   For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

683.   The yet-to-be-named Individual Defendants (whose names will be obtained during discovery) were aware of the conspiracy to interfere with the civil rights of the disabled by banning us from all flights but did nothing to stop it.

684.   These Individual Defendants possess the power to stop the conspiracy today but have not taken any action to do so. This claim is thus ongoing and the one-year statute of limitations does not apply.

685.   "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action..." 42 USC § 1986.

686.   Section 1986 creates a remedy against persons whose acquiescence make conspiracies to interfere with civil rights possible.

687.    Designed to provide private remedies to individuals deprived of their civil rights, these statutes were written in general terms that have been interpreted broadly to protect individuals from a wide range of discriminatory conduct.

**Count 21: Violation of the Rehabilitation Act against Defendants American, JetBlue, Southwest, and United.**

688.    For this count, I incorporate by reference the facts stated in ¶¶ 386-398.

689.    The Airline Defendants have accepted federal financial assistance during the COVID-19 pandemic, subjecting them to the Rehabilitation Act.

690.    Recipients of federal funds are prohibited from discriminating against the disabled. But the Airline Defendants have banned from their aircraft all passengers with medical conditions that prohibit us from safely covering our faces.

691.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

692.    "[T]he term 'program or activity' means all of the operations of … an entire corporation, partnership, or other private organization, or an entire sole proprietorship — (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole…" 29 USC § 794(b).

693.    "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-

5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 USC § 794a(2).

694.    The rights of the disabled to be free from discrimination in all facets of society were later articulated by Congress in the Americans with Disabilities Act. Although the ADA does not apply to airlines, its statutory purpose should be used in interpreting the RA and ACAA.

695.    "Congress finds that — (1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination; (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (3) discrimination against individuals with disabilities persists in such critical areas as … transportation … (4) … individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion… (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; (7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and (8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an

equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 USC § 12101(a).

696. "It is the purpose of this chapter — (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities..." 42 USC § 12101(b).

697. "[M]ajor life activities include, but are not limited to, ... breathing ... a major life activity also includes the operation of a major bodily function, including but not limited to, ... neurological, brain, respiratory ... functions. ... The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter..." 42 USC § 12102.

698. A recipient of federal funds is subject to suit under the RA for compensatory damages, which traditionally includes damages for both pecuniary and nonpecuniary injuries. Examples of nonpecuniary damages include pain and suffering, emotional trauma/distress, deprivation of constitutional and legal rights, and diminished quality of life.

**Count 22: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Refusing to provide mask exemptions to the disabled.**

699. For this count, I incorporate by reference the facts stated in ¶¶ 1-47, 297-385, & 399-485.

700. The Airline Defendants have since Summer 2020 illegally discriminated against disabled passengers with medical conditions who seek exemptions from mask requirements. They first banned all disabled flyers entirely, then modified their policies in February/March 2021 to supposedly permit exceptions but make it nearly impossible to obtain them.

701.   "In providing air transportation, an air carrier ... may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment." 49 USC § 41705(a).

702.   DOT found JetBlue and Southwest violated the law by refusing to grant any medical exemptions. Ex. 223.

703.   Some courts have determined that a private right of action does not exist under the ACAA because aggrieved passengers may file a complaint with DOT.

704.   Even if this Court determines that in normal circumstances, there is not a right of private action for the disabled to enforce the ACAA, none of the prior caselaw is relevant to this lawsuit because never before has DOT put out a Notice of Enforcement Policy (Ex. 51) telling airlines they may violate the law. This creates an issue of first impression, which the Court must resolve by deciding a private right of action exists when the administrative agency tasked with enforcing a statute blatantly abdicates its legal duty by telling the companies it regulates that they don't have to obey the law.

705.   Congress passes civil-rights laws to protect classes of people subject to discrimination – including the disabled. If the executive department tasked with enforcing the statute neglects its duty, Congress intends for those illegally discriminated against to have a remedy – and in this case, the only remedy is a private lawsuit.

706.   Because DOT hasn't sanctioned the Airline Defendants for their illegal discrimination – and actually put out a notice telling airlines they may violate numerous ACAA regulations – the only remedy for me is this lawsuit.

707. Even if the Court fails to allow a private right of action under the ACAA, it should enforce the statute and its underlying regulations via the Rehabilitation Act, which has a clearly defined private right to sue for monetary damages and injunctive relief, as well as Virginia state anti-discrimination law.

708. Even if this Court upholds the FTMM, it still must enjoin the Airline Defendants' illegal mask-exemption procedures. The FTMM itself states that passengers with medical conditions who can't tolerate wearing a face mask are exempt from the order, but the defendants have put into place numerous illegal onerous requirements that make obtaining an exemption virtually impossible – essentially banning all Americans who medically can't wear a mask from utilizing the nation's air-transportation system, which we have a statutory right to. 49 USC § 40103.

709. In considering congressional intent, this Court has to review actions Congress has taken during the COVID-19 pandemic. Airline mask policies – and especially their discriminatory refusal to follow the law in granting exemptions to those with disabilities – without any doubt go against the express wishes of Congress. The Legislative Branch has explicitly failed to mandate masks in any setting. This shows clear, unambiguous congressional intent.

710. No law passed by Congress during the COVID-19 pandemic has waived the legal requirement that the Airline Defendants shall not discriminate against passengers with disabilities.

711. "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 USC § 794(a).

**Count 23: Violation of the Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Requiring passengers not known to have a communicable disease to wear a face covering.**

712. For this count, I incorporate by reference the facts stated in ¶¶ 297-385.

713. The Airline Defendants require passengers who do not have a communicable disease to don a face mask or be refused transportation.

714. The ACAA, 49 USC § 41705, and its accompanying regulations, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who are ***known*** to have a communicable disease. The Airline Defendants' mask policies violate these regulations by assuming that every passenger has a communicable disease such as COVID-19.

715. Airlines are prohibited from requiring that a passenger wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR § 382.21.

716. The Airline Defendants' rules illegally assume every single traveler is infected with COVID-19. This violates the regulation that "In determining whether an individual poses a direct threat, you must make an individualized assessment." 14 CFR § 382.19(c)(1).

717. The Airline Defendants' mask policies don't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. They do not use the federal government's Do Not Board and Lookout systems to identify passengers who have tested positive for coronavirus or another communicable disease to prevent them from boarding a flight, using the knowledge from these databases that a person "has" a virus. The defendants instead impose a blanket policy that every single traveler must wear a face covering, even though more than 99% of passengers every day are virus-free.

718. According to DOT, "If a person who seeks passage ***has an infection or disease*** that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: …

*Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)*." Ex. 224 (emphasis added). This is the only scenario airlines are permitted to force any passenger to don a face covering.

## Count 24: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Refusing transportation solely on the basis of a passenger's disability.

719.    For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

720.    The Airline Defendants refuse to carry disabled passengers who can't safely wear a mask. The only alternative is to wear a mask to the detriment of our health.

721.    "As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part." 14 CFR § 382.19(a).

722.    DOT found JetBlue and Southwest violated 14 CFR § 382.19 by refusing to grant any medical exemptions. Ex. 223.

723.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

## Count 25: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Refusing transportation to disabled passengers who are healthy and don't pose a direct threat to anyone.

724.    For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

725.    I have never tested positive for COVID-19.

726. The Airline Defendants refuse to transport a disabled person who can't wear a face mask even when there's no evidence that person is positive for COVID-19 or any other communicable disease.

727. "If you determine that the passenger does pose a direct threat, you must select the least restrictive response from the point of view of the passenger ... For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2).

728. DOT found JetBlue and Southwest violated 14 CFR § 382.19 by refusing to grant any medical exemptions. Ex. 223.

729. "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 USC § 794(a).

**Count 26: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Requiring passengers seeking mask exemptions to do so in advance.**

730. For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

731. The Airline Defendants require passengers asking for a mask exemption to do so in advance (three days for American, five days for JetBlue, seven days for Southwest, and seven days for United).

732. The Airline Defendants' advance-notice policy discriminates against the disabled by forcing us to book a ticket a certain number of days in advance, a policy that doesn't apply to nondisabled customers. This precludes the disabled who can't safely wear a mask from having

the ability to book a ticket within a few days of departure, which limits the ability to travel for work obligations and emergencies such as a death in the family.

733.    "May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight? As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight." 14 CFR § 382.25.

734.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

**Count 27: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Requiring a medical certificate from disabled passengers who ask for a mask exemption.**

735.    For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

736.    American, JetBlue, and Southwest require disabled passengers wanting a mask exemption to submit a doctor's letter, also known as a medical certificate.

737.    JetBlue vaguely states customers applying for a mask exemption "must provide printed or digital copies of submitted documentation…" Ex. 234. It's unclear whether JetBlue requires a medical certificate. The airline will have to prove it does not.

738.    "Except as provided in this section, you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a).

739.    "You may … require a medical certificate for a passenger if he or she *has* a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight." 14 CFR § 382.23(c)(1) (emphasis added).

740. This requirement does not include *speculation* that a person *might* have a communicable disease such as COVID-19; evidence is required that the passenger *has* a communicable disease, i.e. has tested positive for the coronavirus.

741. "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

**Count 28: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendant Southwest: Requiring disabled passengers needing a mask exemption to undergo a medical screening.**

742. For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

743. Southwest mandates a disabled passenger needing a mask exception undergo a health screening with third-party medical vendor STAT-MD.

744. Since airlines may not require a medical certificate for a passenger unless he/she has a communicable disease, they may also not require a third-party medical consultation.

745. "As a carrier, you may require that a passenger with a medical certificate undergo additional medical review by you if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition since the issuance of the medical certificate …" 14 CFR § 382.23(d).

746. "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

**Count 29: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American, JetBlue, Southwest, and United: Requiring disabled passengers who seek a mask exemption to submit a negative COVID-19 test for each flight when nondisabled customers aren't subject to this same requirement.**

747.    For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

748.    The Airline Defendants won't grant anyone a mask exemption unless they submit a negative COVID-19 test.

749.    No provision of the ACAA or its accompanying regulations promulgated by DOT (nor the RA or any other law enacted by Congress) permits airlines to require passengers submit a negative test for any communicable disease.

750.    Mandating disabled flyers submit an expensive COVID-19 test before checking in but not requiring the same of nondisabled travelers is illegal discrimination. The only legal way airlines could possibly impose a testing requirement is if ALL customers, regardless of disability, were forced to submit virus test results.

751.    "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation…" 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

752.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

**Count 30: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants Southwest and United: Banning mask-exempt passengers from flying if a plane is more than a certain percentage full.**

753.    For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

754. Southwest and United refuse to board a disabled mask-exempt passenger (if he/she somehow obtained an exception) if a flight is over a set percentage full.

755. Southwest even states "Passengers may be required to travel on a different date than their scheduled itinerary." Ex. 196.

756. "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

757. "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation..." 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

758. "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 USC § 794(a).

**Count 31: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants American and United: Changing the seat assignment of a mask-exempt passenger without his/her consent.**

759. For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

760. American and United have a policy instructing gate agents and/or flight attendants to move a mask-exempt passenger to the back of the aircraft or other alternate seats he/she did not select.

761. American requires mask-exempt passengers sit in the last row of Economy Class or the first row of First Class. They must sit in a window seat even if they select an aisle seat.

762. "As a carrier, you must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability, except to comply with FAA or applicable foreign government safety requirements." 14 CFR § 382.87(a).

763. "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 USC § 794(a).

**Count 32: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendants JetBlue and Southwest: Limiting the number of disabled passengers on a flight.**

764. For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

765. JetBlue states "Exemptions will be limited on board each flight..." Ex. 195.

766. "Southwest requires that Passenger obtaining a mask exemption travel on a flight with ... no other Passengers on board approved for a mask exemption." Ex. 196.

767. "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

768. "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 USC § 794(a).

**Count 33: Violation of the Rehabilitation Act and Air Carrier Access Act against Defendant JetBlue: Requiring the disabled who obtain a mask exemption to wear a face shield.**

769. For this count, I incorporate by reference the facts stated in ¶¶ 297-385 & 399-434.

770.    JetBlue is the only airline known to require mask-exempt customers to wear a face shield, which many disabled people (including myself) unable to cover their face can't do. JetBlue thus totally deprives numerous disabled passengers of the ability to fly.

771.    Health authorities say face shields do not protect anyone from transmitting or being infected by COVID-19. JetBlue's shield policy thus serves no purpose but to humiliate the disabled who can't wear a mask by forcing us to put a large sheet of plastic on our face.

772.    No provision of federal law nor the FTMM allows an airline to require a disabled person wear a face shield when nondisabled customers are not subject to the same requirement.

773.    "In providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment." 49 USC § 41705(a).

774.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

**Count 34: Violation of the Virginia Human Rights Act against Defendants American, Jet-Blue, Southwest, and United.**

775.    For this count, I incorporate by reference Counts 22-33.

776.    "It is the policy of the Commonwealth to: Safeguard all individuals within the Commonwealth from unlawful discrimination because of … disability in places of public accommodation." Va. Code § 2.2-3900.

131

777. "The provisions of this chapter shall be construed liberally for the accomplishment of its policies. Conduct that violates any Virginia *or federal statute or regulation* governing discrimination on the basis of … disability … is an unlawful discriminatory practice under this chapter." Va. Code § 2.2-3902 (emphasis added).

778. All counts against the Airline Defendants based on the Air Carrier Access Act may be enforced via Virginia law since it adopts federal laws and regulations as the standards the transportation sector must adhere to.

779. "Complaints filed with the Office of Civil Rights of the Department of Law (the Office) in accordance with § 2.2-520 alleging unlawful discriminatory practice under a Virginia statute that is enforced by a Virginia agency shall be referred to that agency. The Office may investigate complaints alleging an unlawful discriminatory practice under a federal statute or regulation and attempt to resolve it through conciliation. Unsolved complaints shall thereafter be referred to the federal agency with jurisdiction over the complaint. Upon such referral, the Office shall have no further jurisdiction over the complaint." *Id.*

780. "It is an unlawful discriminatory practice for any person, including the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation, to refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny any individual, directly or indirectly, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation, or to segregate or discriminate against any such person in the use thereof, or to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, privileges, or services of

any such place shall be refused, withheld from, or denied to any individual on the basis of … disability…" § 2.2-3904(B).

781. "Any person claiming to be aggrieved by an unlawful discriminatory practice may file a complaint in writing under oath or affirmation with the Office of Civil Rights of the Department of Law … The complaint shall be in such detail as to substantially apprise any party properly concerned as to the time, place, and facts surrounding the alleged unlawful discrimination." Va. Code § 2.2-3907(A).

782. "Upon perfection of a complaint filed pursuant to subsection A, the Office shall timely serve a charge on the respondent and provide all parties with a notice informing the parties of the complainant's rights, including the right to commence a civil action…" Va. Code § 2.2-3907(B).

783. "Upon receipt of a written request from the complainant, the Office shall promptly issue a notice of the right to file a civil action to the complainant after (i) 180 days have passed from the date the complaint was filed or (ii) the Office determines that it will be unable to complete its investigation within 180 days from the date the complaint was filed." Va. Code § 2.2-3907(H).

784. "An aggrieved person who has been provided a notice of his right to file a civil action pursuant to § 2.2-3907 may commence a timely civil action in an appropriate general district or circuit court having jurisdiction over the person who allegedly unlawfully discriminated against such person in violation of this chapter." Va. Code § 2.2-3908(A).

785. "If the court or jury finds that unlawful discrimination has occurred, the court or jury may award to the plaintiff, as the prevailing party, compensatory and punitive damages and the court may award reasonable attorney fees and costs and may grant as relief any permanent or

133

temporary injunction, temporary restraining order, or other order, including an order enjoining the defendant from engaging in such practice, or order such affirmative action as may be appropriate." Va. Code § 2.2-3908(B).

786.    I filed a complaint with the Virginia Office of Civil Rights on Oct. 21, 2021. Ex. 14.

787.    The Office of Civil Rights referred my complaint to the U.S. Department of Transportation, dissolving the office of jurisdiction under Va. Code § 2.2-3902.

788.    I have asked the Office of Civil Rights for a "right to sue" letter, but it told me because it no longer has jurisdiction, I do not need such a letter to file a lawsuit against the Airline Defendants for their illegal discrimination.

**Count 35: Breach of contract against Defendants American, JetBlue, Southwest, and United: American, JetBlue, and Southwest force passengers to wear masks when we never agreed to do so in the contract of carriage. United's contract terms requiring face coverings are legally unenforceable.**

789.    For this count, I incorporate by reference the facts stated in ¶¶ 215-252, 297-385 & 399-434.

790.    American's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with American do not agree to obstruct our breathing as a condition of carriage. Ex. 229.

791.    JetBlue's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with JetBlue do not agree to obstruct our breathing as a condition of carriage. Ex. 230.

792.    Southwest's contract of carriage contains no mention of "mask" or "face covering." Passengers who book a ticket with Southwest do not agree to obstruct our breathing as a condition of carriage. Ex. 231.

793.    United's contract of carriage states "UA shall have the right to refuse transport on a permanent or temporary basis or shall have the right to remove from the aircraft at any point, any Passenger for the following reasons: … Passengers who refuse to wear a mask or face covering while at the airport and/or onboard UA and United Express flights if UA or United Express believe, in their sole discretion, that a failure to wear such a mask or facial covering may pose a risk to the health or safety of others… UA has the right to refuse transport, on a permanent basis, any passenger who engages in any of the activities in this Rule." Ex. 233.

794.    United's contract does not include any procedures for the disabled to demand mask exemptions.

795.    United's contract giving it "sole discretion" to refuse to transport anyone who can't wear a mask is legally unenforceable because the ACCA doesn't allow airlines to decline transportation to a disabled passenger except in very limited circumstances. 14 CFR Part 382.

796.    United's contract of carriage mandating passengers wear masks is legally unenforceable because the FDCA doesn't allow any company to mandate use of unauthorized or EUA medical devices. 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

797.    Forcing passengers – especially the disabled who are protected by federal anti-discrimination laws – to wear a mask constitutes a breach of contract.

798.    "[P]rovisions in the carriers' Contracts of Carriage [are] void if they conflict[] with federal law or regulation." Ex. 226.

799.    "[A] contract of carriage that conflicts with federal laws or regulations may not be enforceable by the airline." Ex. 202.

800.    "Consumers may sue airlines for damages or breach of contract in a state or local court." A "source of airline passengers' rights is each air carrier's 'Contract of Carriage,' the legal

agreement between an airline and its ticket holders. ... Passengers may take legal action in federal courts based on the contracts." *Id.*

801.   "A contract of carriage is the agreement between the passenger and the airline that encompasses all contractual rights, liabilities, and duties of the two parties. ... Any term or condition of this contract is legally binding on the airline and the passenger and may be enforced in state court." Ex. 201.

802.   Contracts of carriage must "reflect federal regulations requiring airlines to provide specific services and facilities for passengers with disabilities." *Id.*

803.   Airline contracts of carriage are subject to applicable laws and regulations imposed by governmental agencies such as DOT.

804.   The Airline Deregulation Act does not pre-empt breach-of-contract claims.

**Count 36: Reckless endangerment against Defendants American, JetBlue, Southwest, and United: Their mask policies have created chaos in the skies, recklessly endangering aviation safety; they ignore the massive evidence showing masks have proven totally ineffective at reducing COVID-19 spread but harm human health, recklessly endangering the well-being of all passengers; and they fail to comply with OSHA rules for face coverings.**

805.   For this count, I incorporate by reference the facts stated in ¶¶ 110-214.

806.   Reckless endangerment is defined as acts that create a substantial risk of injury to another person. The accused person isn't required to intend the resulting or potential harm, but must have acted in a way that showed a disregard for the foreseeable consequences of the actions.

807.   Masks have been shown by the global scientific and medical communities for decades to be ineffective at reducing transmission of respiratory viruses such as COVID-19, yet they cause dozens of harms to human health. https://bit.ly/masksarebad. It is reckless endangerment for the defendants to require muzzling of passengers when the known risks of oxygen deprivation are severe – especially at high altitude.

808.   Because of this obstructed breathing by forced masking, the defendants have created chaos in the skies with numerous oxygen-starved passengers taking off their masks to breathe and being met with hostility and battery by flight attendants and pilots, not to mention other passengers.

809.   The Airline Defendants' mask policies endanger the health and safety of their passengers by causing thousands of incidents of customers and flight crews battling over mask enforcement in violation of their legal "duty … to provide service with the highest possible degree of safety in the public interest…" 49 USC § 44702(b)(1)(a).

810.   The Airline Defendants' mask policies recklessly endanger passengers by failing to comply with OSHA's strict rules for masking.

**Count 37: Practicing medicine without a license against Defendants American, JetBlue, Southwest, and United: Prescribing the mandatory use of medical devices unauthorized or approved under an Emergency Use Authorization by the Food & Drug Administration.**

811.   For this count, I incorporate by reference the facts stated in ¶¶ 215-252.

812.   The Airline Defendants force travelers to use a medical device (face masks), most of which are approved by FDA under EUA or have no authorization at all.

813.   Mandating the use of uncertified medical devices without the consent of the passenger means the Airline Defendants are practicing medicine without a license.

814.   Practicing medicine without a license is illegal in every state.

815.   Airline employees are not individuals with the appropriate ethics and scientific education, training, and qualifications to order passengers to use experimental medical devices unauthorized by FDA or issued under an EUA only.

816.   Airline employees are not competent and appropriately qualified physicians or other healthcare professionals able to evaluate who can't medically tolerate covering their nose and

mouth.

817. The Airline Defendants' mask mandates are illegal and dangerous because they force passengers to use a medical device (face masks), the vast majority of which are unauthorized or approved by FDA under an EUA.

818. The Airline Defendants provide unauthorized and/or EUA masks to passengers, introducing these experimental medical devices into interstate commerce.

819. The Airline Defendants violate the FDCA by not giving passengers our legal option to refuse administration of an FDA unauthorized or EUA medical device (a face mask).

820. The Airline Defendants provide illegal and/or EUA masks to their passengers without informing us use of the device is optional and we must give informed consent. This constitutes reckless endangerment.

821. "The principle that individuals should not be coerced to receive an unlicensed medical product is also codified in the law of at least 84 countries and is an accepted principle of international common law. *See, e.g., Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 184 (2nd Cir. 2009) ('We have little trouble concluding that a norm forbidding nonconsensual human medical experimentation is every bit as concrete – indeed even more so – than the norm prohibiting piracy… The Nuremberg Code, Article 7 of the ICCPR, the Declaration of Helsinki, the Convention on Human Rights and Biomedicine, the Universal Declaration on Bioethics and Human Rights, the 2001 Clinical Trial Directive, and the domestic laws of at least 84 States all uniformly and unmistakably prohibit medical experiments on human beings without their consent, thereby providing concrete content for the norm.')" Ex. 146.

822. It's a "longstanding principle that it is not permissible to coerce anyone to receive an unlicensed medical product." *Id.*

823.   Legislative history of Section 564 of the FDCA indicates that "any authority to actually use experimental drugs or medical devices in emergency situations has to be defined and wielded with nothing less than surgical precision. Prior informed consent in connection with the administration of experimental therapy is a basic human right, a right no one should be asked to surrender..." *Id.*

824.   "[T]he authorization for the emergency use of unapproved products also includes strong provisions on informed consent for patients." *Id.*

825.   "Congress specifically carved out only one exception for when an individual would not have 'the option to accept or refuse administration of the product.' Congress permitted required use of an EUA product when the President of the United States finds that providing an individual in the military with the option to accept or refuse the product would not be in the interests of national security." *Id.*; *see also* 10 USC § 1107a.

826.   "Congress so highly valued the right to individual choice that it allowed only a threat to national security to trump that right, and even then, only with regard to military personnel." *Id.*

827.   Individuals to whom any EUA product is offered must be informed "of the option to accept or refuse administration of the product..." 21 USC § 360bbb-3(e)(1)(A)(ii)(III).

828.   Congress' prohibition of mandatory mask use is consistent with Defendant HHS' regulations requiring that participants in trials of experimental medical devices must be informed that "participation is voluntary, refusal to participate will involve no penalty..." 45 CFR § 46.116(a)(8).

829.   Likewise FDA regulations state that no human shall participate in research trials of uncertified medical devices unless "the investigator has obtained the legally effective informed consent of the subject..." 21 CFR § 50.20.

830.    There's good reason for the law prohibiting forced use of EUA medical devices. Require-
        ments for EUA products are waived for, among other things, "current good manufacturing
        practice otherwise applicable to the manufacture, processing, packing … of products subject
        to regulation under this chapter…" 21 USC § 360bbb-3(e)(3)(A).

831.    The Airline Defendants have no authority to require any passenger wear a mask authorized
        under EUA. But most masks being used by Americans to comply with the defendant's muz-
        zling requirements meet the legal definition of an EUA "eligible product" that is "intended for
        use to prevent … a disease…" 21 USC § 360bbb-3(a).

832.    A person may freely choose to accept medical risks for the benefit of others; they cannot
        be compelled by the Airline Defendants. We don't harvest organs without consent, even if
        doing so would save many lives. Those who make such sacrifices for others must truly be
        volunteers, not conscripts.

833.    Airline employees have no medical license to order passengers to obstruct our breathing,
        causing numerous harms, to perhaps spare another customer from catching a virus. Passengers
        willingly take on the risk of catching a communicable disease when they buy an airline ticket,
        knowing they will squeezed into a metal tube like sardines in a can. If they don't want to take
        that risk, they have the option not to fly – but the Airline Defendants lack a medical license to
        demand others suffer to mitigate the fear and anxiety of those paranoid about catching COVID-
        19.

834.    "Protection of others" does not relieve the Airline Defendants from the central canon of
        medical ethics requiring voluntary and informed consent.

**Count 38: Invasion of privacy against Defendants American, JetBlue, Southwest, and
United: Forcing a disabled passenger to disclose his/her medical conditions as a condition of
transportation.**

835.    For this count, I incorporate by reference the facts stated in ¶¶ 297-385.

836.    The Airline Defendants require disabled passengers seeking mask exemptions to provide

sensitive, intimate details of our medical conditions to airline personnel, usually in writing and

sometimes verbally in hearing range of other passengers and workers at busy airport check-in

counters and boarding gates.

837.    The Airline Defendants state they may share our medical information with all sorts of other

parties.

838.    The law protects people against many types of harms, including harm to one's personal

space and private life. Infringing on these interests is known as invasion of privacy. Invasion

of privacy has been divided into four distinct categories. Each category covers a different as-

pect of the right to privacy and personal identity but they are all geared towards protecting the

right "to be left alone."

839.    The category at issue here is public disclosure of private facts. Airline passengers do not

have to disclose our private medical history to airline employees, who are not medical profes-

sionals, just to be able to board a flight without obstructing our breathing.

**Count 39: Deceptive & Misleading Trade Practices against Defendants American, JetBlue, Southwest, Spirit, and United.**

840.    For this count, I incorporate by reference the facts stated in ¶¶ 84-178.

841.    The Airline Defendants have deceived their customers regarding masks, misleading us into

believing face coverings are good for our health when the reality is they cause more than 60

documented harms and create havoc in the sky due to oxygen deprivation.

842.    "Intent is not an element of either unfairness or deception." 85 Fed. Reg. 78,707 (Dec. 7,

2020); Ex. 200. However, it's clear the defendants had an intent to deceive passengers that face

masks are effective in reducing COVID-19 spread, are authorized by FDA, etc. They clearly mislead customers that masks may be forced passengers without our consent in violation of the FDCA.

843. DOT defines an unfair trade practice by airlines as "demonstrating that the harm to consumers is (1) substantial; (2) not reasonably avoidable; and (3) not outweighed by offsetting benefits to consumers or competition." *Id.*

844. DOT defines a practice as "deceptive" by showing that: "(1) The practice actually misleads or is likely to mislead consumers; (2) who are acting reasonably under the circumstances; (3) with respect to a material matter." *Id.*

845. The airlines have a statutory duty not to deceive and mislead their customers. 49 USC § 41712. *See also* 14 CFR § 399.79.

**Count 40: Fraudulent Misrepresentation against Defendants American, JetBlue, Southwest, Spirit, and United.**

846. For this count, I incorporate by reference the facts stated in ¶¶ 110-167 & 215-252.

847. The Airline Defendants provide FDA unauthorized or EUA face masks without disclosing that: 1) the masks (if authorized at all) are only designated for emergency use; 2) that there are "significant known and potential benefits and risks of such use" (or "the extent to which such benefits and risks are unknown"); or 3) flyers have the "option to accept or refuse administration of the product."

848. The Airline Defendants have falsely represented on their websites, in e-mails to passengers, signage at airports, etc. that "federal law" requires airline passengers wear face masks. But Congress has never enacted such a law. There is no statute in the U.S. Code requiring airline passengers to cover our faces. This is a fraudulent misrepresentation of the law.

849. The Airline Defendants also haven't told their passengers of the dozens of health risks of covering our sources of oxygen or that the scientific consensus is that masks are totally worthless in reducing COVID-19 spread. https:// bit.ly/masksarebad.

850. Failing to disclose this information pursuant to the FDCA and the Airline Defendants' other legal obligations is a fraudulent misrepresentation.

851. This tort consists of: 1) There was a material representation made that was false; 2) The person who made the representation knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; 3) The person who made the representation intended to induce another to act upon the representation; and 4) The person to whom the material representation was made actually and justifiably relied on the representation, which caused the injury.

## Count 41: Infringement on the constitutional right to travel against Defendants American, JetBlue, Southwest, and United:

852. For this count, I incorporate by reference the facts stated in ¶¶ 297-385.

853. The Constitution protects against Americans' infringement on our freedom of movement by government actors and common carriers.

854. The Airline Defendants deprive disabled Americans and those who refuse to wear masks for health reasons of the ability to fly.

855. By banning travelers who can't wear face masks, the Airline Defendants deprive Americans of our constitutional right to freedom of movement.

856. "As a fundamental right inherent in American citizenship and the nature of the federal union, the right to travel in the United States is basic to American liberty. The right precedes

the creation of the United States and appears in the Articles of Confederation. The U.S. Constitution and Supreme Court recognize and protect the right to interstate travel. The travel right entails privacy and free domestic movement without governmental abridgement." Ex. 139.

857. "The original conception of the right to travel embodies it as a broadly based freedom that encompasses all modes of transport. Its explicit articulation in the Articles of Confederation became implicit in the Privileges and Immunities Clause of the Constitution. … abridgement of any mode of transportation undermines the constitutionally enshrined travel right." *Id.*

858. "Travel embodies a broadly based personal, political, and economic right that encompasses all modes of transportation and movement. … The right to travel, inherent in intercourse among the states, is one of the implied and unenumerated rights reserved to the People." *Id.*

859. The Supreme Court has held that private companies can also be held liable for interfering with a person's constitutional right to travel: "[T]he decision reaffirmed the right to travel, as 'a right broadly assertable against private interference as well as governmental action.' In short, the travel right protects against both restrictive public and private actions, and it empowers those availing themselves of the right's protections." *Id.; see Shapiro v. Thompson*, 394 U.S. 618 (1969).

860. *United States v. Guest*, 383 U.S. 745 (1966), affirmed the "constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce [such as commercial airlines] in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *Id.*

861. Congress affirmed the constitutional right to fly for disabled Americans by enshrining it into statute. 49 USC § 40103.

862. "[T]he right to travel is not tied to any specific mode of transportation. Consequently, it encompasses all means of travel. ... From the perspective of individual rights, the ability to move freely in the United States is a personal liberty, inherent by birth and U.S. citizenship. The travel right is essential to guaranteeing equality of opportunities, and the pursuit of happiness for citizens of the federal union. Freedom of personal movement is a natural liberty that citizens exercise among fundamental rights and privileges." Ex. 139.

863. "The travel right also includes the right to movement on common carriers. 'A carrier becomes a common carrier when it 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it.' That means that any individual or corporation becomes a common carrier by promoting to the public the ability and willingness to provide transportation service, including air travel. Air transport providers operating in, to, or from the United States act under common carrier rules. 'An air carrier ... may not subject a person in air transportation to discrimination...' If there are available places, the charge is paid, and there are no reasonable grounds to refuse the service to an individual, the air carrier is legally bound to provide the transportation of passengers or goods. Denying someone passage violates federal law." *Id.*

864. "The air travel network is a part of the public infrastructure open for wide use and enjoyment. The national government advances these goals by ensuring by law that all citizens have adequate access to the air system. ... Therefore, under not only general U.S. sovereignty but also the public right of transit, freedom of travel includes air travel." *Id.*

865. "Commercial air service is the only mode of passenger common carrier transportation available between many U.S. locations, especially American states and territories outside the continental union." *Id.*

866.   "The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and the inability to fly to a significant extent defines the geographical area in which he may live his life. ... An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment and professional opportunities." *Id.*; *see Mohamed v. Holder*, 2014 WL 243115 (E.D. Va. Jan. 22, 2014).

867.   "Traveling long distances within the contiguous United States relies on only one mode of travel: commercial airlines. Therefore, restricting this single mode of travel, by air, abridges the right to travel and the right to exercise political and personal liberties." *Id.*

868.   The right to travel includes the right to move from state to state and abroad without burdens on a person's body such as obstructing his/her breathing: "An individual's liberty may be harmed by an act that causes or reasonably threatens a loss of physical locomotion or ***bodily control***." *Id.* (emphasis added).

**Count 42: Violation of International Law against Defendants American, JetBlue, Southwest, and United: International Covenant on Civil & Political Rights.**

869.   For this count, I incorporate by reference the facts stated in ¶¶ 253-263.

870.   The United States has ratified the International Covenant on Civil & Political Rights, which makes it binding treaty law upon all persons and corporations in our country.

871.   In carrying out all federal aviation laws, the transportation secretary and FAA administrator "shall act consistently with obligations of the United States Government under an international agreement." 49 USC § 40105(b)(1)(A).

872.   By banning the disabled from flying, the Airline Defendants violate our rights under international law to liberty of movement, freedom to leave any country, and ability to enter our own

146

country. Congress has not passed any law allowing the defendants to restrict a person's move-

ment based on their inability (or unwillingness) to impede our breathing.

873.    "[N]o one shall be subjected without his free consent to medical or scientific experimen-

tation." ICCPR Art. 7.

874.    "No one shall be deprived of his liberty except on such grounds and in accordance with

such procedure as are established by law." ICCPR Art. 9.

875.    "1. Everyone lawfully within the territory of a State shall, within that territory, have the

right to liberty of movement ... 2. Everyone shall be free to leave any country, including his

own. 3. The above-mentioned rights shall not be subject to any restrictions except those which

are provided by law... 4. No one shall be arbitrarily deprived of the right to enter his own

country." ICCPR Art. 12.

876.    "1. No one shall be subjected to arbitrary or unlawful interference with his privacy ... 2.

Everyone has the right to the protection of the law against such interference or attacks." ICCPR

Art. 17.

877.    The Airline Defendants' onerous requirements for the disabled to obtain a mask exemption

arbitrarily and unlawfully interfere with our privacy by forcing us to disclose sensitive medical

information to airline employees who are not our physicians. I have a right under international

law for this Court to protect me against such interference and attacks on my privacy.

**Count 43: Violation of International Law against Defendants American, JetBlue, Southwest, and United: Convention on International Civil Aviation.**

878.    For this count, I incorporate by reference the facts stated in ¶¶ 264-276.

879.    The United States has ratified the Convention on International Civil Aviation, which makes

it binding treaty law upon all persons and corporations in our country.

880.    In carrying out all federal aviation laws, the transportation secretary and FAA administrator "shall act consistently with obligations of the United States Government under an international agreement." 49 USC § 40105(b)(1)(A).

881.    The Airline Defendants require passengers with disabilities needing a mask exemption to submit a medical clearance.

882.    "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance. Aircraft operators should only be permitted to require persons with disabilities to obtain a medical clearance in cases of a medical condition where it is not clear that they are fit to travel and could com-promise their safety or well-being or that of other passengers." CICA Annex 9 § 8.39.

**Count 44: Medical malpractice against Defendant STAT-MD.**

883.    For this count, I incorporate by reference the facts stated in ¶¶ 1-47 & 287-291.

884.    STAT-MD reviews mask-exemption demands submitted by its airline clients, including Defendant Southwest, without ever talking to the passenger and/or his/her physician.

885.    STAT-MD makes arbitrary decisions denying mask exemptions without providing any rationale for its decision-making.

886.    The Air Carrier Access Act does not allow STAT-MD to provide medical consultations to airlines for disability accommodation requests except in very limited circumstances. Those situations do not include mask waivers.

887.    STAT-MD therefore is guilty of medical malpractice.


## VI. PRAYER FOR RELIEF

WHEREFORE, I request the Court grant the following relief:

A.  Declare Defendants CDC and HHS' Feb. 1, 2021, Federal Transportation Mask Mandate order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" (86 Fed. Reg. 8,025 (Feb. 3, 2021)) contrary to statute and unconstitutional, vacate the order, and permanently enjoin its enforcement worldwide.

B.  Issue a permanent injunction directing Defendants CDC and HHS to immediately order all federal agencies, transportation hubs, and transportation operators to remove all signs informing passengers of the requirement to wear a mask from all airports, transportation hubs, conveyances, and other locations worldwide as well as to remove from their websites and publications any references to the Federal Transportation Mask Mandate.

C.  Issue a permanent injunction that Defendants CDC and HHS shall not issue any other orders requiring any person wear a face mask unless such specific authority is enacted into law by Congress.

D.  Declare Defendants CDC and HHS' International Traveler Testing Requirement order effective Dec. 6, 2021, "Requirements for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country" (86 Fed. Reg. 69,256 (Dec. 7, 2021)) contrary to statute and unconstitutional, vacate the order, and permanently enjoin its enforcement worldwide.

E.  Issue a permanent injunction directing Defendants CDC and HHS to immediately order all federal agencies and all airlines flying into the United States to remove all signs informing passengers of the requirement to obtain a negative COVID-19 test before flying to the United States from all airports and other locations worldwide as well as to remove from

their websites and publications any references to the International Traveler Testing Requirement.

F.  Issue a permanent injunction that Defendants CDC and HHS shall not issue any other orders requiring any person to present a negative COVID-19 or other virus test to board an airplane unless such authority is enacted into law by Congress.

G.  Declare that the Airline Defendants, the yet-to-be-named Individual Defendants, and STAT-MD conspired to interfere with the civil rights of the disabled by refusing to transport us solely because we can't safely wear face masks.

H.  Declare that the yet-to-be-named Individual Defendants neglected to prevent interference with the civil rights of the disabled by refusing to stop policies that decline to transport us solely because we can't safely wear face masks.

I.  Declare that the Airline Defendants' mask policies violate the Rehabilitation Act by discriminating against the disabled and issue a permanent injunction prohibiting them from engaging in such future conduct.

J.  Declare that DOT has failed its statutory obligation to enforce the Air Carrier Access Act, thereby creating a private right of action in this Court for the disabled to enforce the anti-discrimination law as Congress intended, and/or declare that the ACAA may be enforced via the Rehabilitation Act against any airline that receives federal financial assistance, and/or declare that the ACAA may be enforced via the Virginia Human Rights Act.

K.  Declare that the Airline Defendants' policies of refusing to provide mask exemptions to the disabled violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

L. Declare that the Airline Defendants' policies requiring passengers not known to have a communicable disease to wear a face covering violate the Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

M. Declare that the Airline Defendants' policies refusing transportation solely on the basis of a passenger's disability violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

N. Declare that the Airline Defendants' policies refusing transportation to disabled passengers who are healthy and don't pose a direct threat to anyone violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

O. Declare that the Airline Defendants' policies requiring passengers seeking mask exemptions to do so in advance violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

P. Declare that the Airline Defendants' policies requiring a medical certificate from disabled passengers who ask for a mask exemption violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

Q. Declare that the Defendant Southwest's policy requiring disabled passengers needing a mask exemption to undergo a medical screening with STAT-MD (or another medical vendor) violates the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting it from engaging in such future conduct.

R. Declare that the Airline Defendants' policies requiring disabled passengers who seek a mask exemption to submit a negative COVID-19 test for each flight when nondisabled

customers aren't subject to this same requirement violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

S. Declare that Defendants Southwest and United's policies banning mask-exempt passengers from flying if a plane is more than a certain percentage full violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

T. Declare that Defendants American and United's policy of changing the seat assignment of a mask-exempt passenger without his/her consent violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting it from engaging in such future conduct.

U. Declare that Defendants JetBlue and Southwest's policies limiting the number of disabled passengers on a flight violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

V. Declare that Defendant JetBlue's policy requiring disabled passengers to wear a face shield violates the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting it from engaging in such future conduct.

W. Declare that the Airline Defendants' mask policies violate the Virginia Human Rights Act prohibiting discrimination against the disabled and issue a permanent injunction prohibiting them from enforcing all of their rules related to face coverings.

X. Declare that the Airline Defendants' policies forcing passengers to wear masks when we never agreed to do so in the contract of carriage constitute a breach of contract and/or the

contracts contain provisions that are unenforceable because they violate federal law and regulations.

Y. Declare that the Airline Defendants' mask policies constitute reckless endangerment by creating chaos in the skies, imperiling aviation safety; ignoring the massive evidence showing masks have proven totally ineffective at reducing COVID-19 spread but harm human health, hurting the well-being of all passengers; and failing to comply with OSHA rules for face coverings.

Z. Declare that the Airline Defendants' mask policies constitute practicing medicine without a license, including violating federal law prohibiting the mandatory use of any medical device unauthorized or approved under an Emergency Use Authorization by the Food & Drug Administration, and issue a permanent injunction prohibiting them from engaging in such future conduct.

AA. Declare that the Airline Defendants' mask policies constitute an invasion of privacy by forcing disabled passengers to disclose our medical conditions as a condition of transportation and issue a permanent injunction prohibiting them from engaging in such future conduct.

BB. Declare that the Airline Defendants' mask policies constitute deceptive and misleading trade practices and issue a permanent injunction prohibiting them from engaging in such future conduct.

CC. Declare that the Airline Defendants' mask policies constitute fraudulent misrepresentation and issue a permanent injunction prohibiting them from engaging in such future conduct.

DD.    Declare that the Airline Defendants' mask policies infringe on the constitutional right to travel and issue a permanent injunction prohibiting them from engaging in such future conduct.

EE.    Declare that the Airline Defendants' mask policies violate the International Covenant on Civil & Political Rights and issue a permanent injunction prohibiting them from engaging in such future conduct.

FF.    Declare that the Airline Defendants' mask policies violate the Convention on International Civil Aviation and issue a permanent injunction prohibiting them from engaging in such future conduct.

GG.    Issue a permanent injunction prohibiting all Airline Defendants from creating and enforcing any future rules that require any passenger to cover his/her face unless the person is known to be infected with a communicable disease as alerted by the federal government's Do Not Board and Lookout systems or other public-health authorities.

HH.    Declare that Defendant STAT-MD's performance of medical consultations for airlines including Southwest constitutes medical malpractice and issue a permanent injunction barring STAT-MD from consulting with any airline or other transportation provider regarding any issue related to passenger use of face masks.

II.    For all causes of action in which monetary damages are available, award me compensatory and punitive damages against American in the amount of $100,000 per offense. Because there are two instances American discriminated against me, my demand against American is $200,000.

JJ.    For all causes of action in which monetary damages are available, award me compensatory and punitive damages against JetBlue in the amount of $100,000 per offense. Because there are two instances JetBlue discriminated against me, my demand against JetBlue is $200,000.

KK.    For all causes of action in which monetary damages are available, award me compensatory and punitive damages against Southwest in the amount of $100,000 per offense. Because there are eight instances Southwest discriminated against me, my demand against Southwest is $800,000.

LL.    For all causes of action in which monetary damages are available, award me compensatory and punitive damages against United in the amount of $100,000 per offense. Because there are four instances United discriminated against me, my demand against United is $400,000.

MM.    For all causes of action in which monetary damages are available, award me compensatory and punitive damages against each yet-to-be named Individual Defendant in the amount of $10,000 per offense. For American employees this totals $20,000 per person; for JetBlue employees, $20,000 per person; for Southwest employees, $80,000 per person; and for United employees, $40,000 per person.

NN.    For all causes of action in which monetary damages are available, award me compensatory and punitive damages against STAT-MD in the amount of $250,000.

OO.    Award me all costs and fees incurred during the prosecution of this lawsuit from all defendants pursuant to 28 USC § 2412, 29 USC § 794a, 42 USC § 1988, Va. Code § 2.2-3908(B), and/or any other applicable statute or authority.

PP.     Award me attorney's fees (if I later hire an attorney to represent me in this lawsuit) incurred during the prosecution of this lawsuit from any defendant found to have acted outside its legal and/or constitutional authority pursuant to 28 USC § 2412, 29 USC § 794a, 42 USC § 1988, Va. Code § 2.2-3908(B), and/or any other applicable statute or authority; or, if I continue representing myself, award me in lieu of attorney's fees reimbursement at the rate of $50 per hour for the time I have spent litigating this matter.

QQ.     Grant such other and further relief as the Court may deem just and proper under the circumstances.

**Certification:** Pursuant to Fed.R.Civ.P. 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) otherwise complies with the requirements of Rule 11.

Respectfully submitted this 28th day of January 2022.

Kleanthis N. Andreadakis, plaintiff
5108 Hunters Meadow Pl.
Henrico, VA 23231
Telephone: 804-988-1402
E-Mail: mrradioactive@protonmail.com

**LOCAL RULE 83.1(M) CERTIFICATION**

I declare under penalty of perjury that no attorney has prepared or assisted in the preparation of this Complaint.

Executed on Jan. 28, 2022.

_____
Kleanthis N. Andreadakis, plaintiff

**CERTIFICATE OF SERVICE**

In addition to formal service of process, due to my intent to immediately seek a preliminary injunction to stop enforcement of the Federal Transportation Mask Mandate and the Airline Defendants' mask policies worldwide, I hereby certify that on Jan. 28, 2022, I e-mailed this Complaint and all accompanying exhibits to the U.S. Department of Justice attorneys who are defending CDC and HHS in other lawsuits over the FTMM and ITTR as well as attorneys for the Airline Defendants.

Andrew Freidah
Counsel for the Federal Defendants
Andrew.F.Freidah@usdoj.gov

Stephen Pezzi
Counsel for the Federal Defendants
Stephen.Pezzi@usdoj.gov

Marcia Kay Sowles
Counsel for the Federal Defendants
Marcia.Sowles@usdoj.gov

Priya Aiyar
Counsel for Defendant American Airlines
Priya.Aiyar@aa.com

Roy Goldberg
Counsel for Defendants JetBlue Airways & Southwest Airlines
Roy.Goldberg@stinson.com

Roberto Torricella, Jr.
Counsel for Defendants JetBlue Airways & Southwest Airlines
Robert@torricellalaw.com

Maurice Baumgarten
Counsel for Defendants JetBlue Airways & Southwest Airlines
Maurice@torricellalaw.com

Robert Rivkin
Counsel for Defendant United Airlines
Robert.Rivkin@united.com

Kleanthis N. Andreadakis, plaintiff

Court Name: UNITED STATES DISTRICT COURT
Division: 3
Receipt Number: 34683052673
Cashier ID: lgarrett
Transaction Date: 01/28/2022
Payer Name: KLEANTHIS ANDREADAKIS
------------------------------------
CIVIL FILING FEE- NON-PRISONER
 For: KLEANTHIS ANDREADAKIS
 Amount:        $402.00
------------------------------------
CREDIT CARD
 Amt Tendered:  $402.00
------------------------------------
Total Due:      $402.00
Total Tendered: $402.00
Change Amt:     $0.00

CIVIL FILING FEE
3:22CV52