# Table of Exhibits

| No. | Name of Exhibit | Page #'s |
|---|---|---|
| 1 | TSA Brief, Filed 26 May 2022 (82 pages) | 3-85 |
| 2 | Defendants' Threat to Pay Legal Fees (24 pages) | 86-109 |
| 3 | Seklecki Hearing, 11 Feb 2022 (32 pages) | 111-142 |
| 4 | Circuit Court Denies Petition for Review of Agency Action for Lack of Jurisdiction, after DOT Refuses to Enforce ACAA (1 page) | 144-145 |
| 5 | DOT Mask Notice Issued on Feb 5 2021 (9 pages) | 146-154 |
| 6 | DOT Response to Abadi, 21 Jan 2021 (2 pages) | 156-157 |
| 7 | DOT Letter to Abadi, 25 Mar 2022 (2 pages) | 159-160 |
| 8 | Masks create 68 Dangers to Human Health (4 pages) | 162-165 |

# EXHIBIT 01

## TSA Brief, Filed 26 May 2022

## [ORAL ARGUMENT NOT SCHEDULED]

### Nos. 21-1220, 21-1221, 21-1225, 21-1236, 21-1237 & 21-1258

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

LUCAS WALL, LEONARDO McDONNELL, MICHAEL SEKLECKI (on behalf of himself and his minor child M.S.), MICHAEL FARIS, CHARITY ANDERSON, ANGELA BYRD, MICHAEL CLARK, URI MARCUS, LARRY JAMES BONIN JR., ANTHONY EADES, KLEANTHIS ANDREADAKIS, THERESA MULLINS and AARON ABADI,

Petitioners,

v.

TRANSPORTATION SECURITY ADMINISTRATION,

Respondent.

———————

Petition for Review of TSA Security Directives 1542-21-01, 1544-21-02, 1582/84-21-02 and Emergency Amendment 1546-21-01

———————

### BRIEF FOR RESPONDENT

———————

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

DANIEL TENNY
JENNIFER L. UTRECHT
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7710*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-9039*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Petitioners, who are all proceeding *pro se*, are Lucas Wall, Leonardo McDonnell, Michael Seklecki (on behalf of himself and his minor child M.S.), Michael Faris, Charity Anderson, Angela Byrd, Michael Clark, Uri Marcus, Larry James Bonin Jr., Kleanthis Andreadakis, Theresa Mullins, and Aaron Abadi.

Respondent is the Transportation Security Administration.

Amicus briefs have been lodged by a group of 309 pilots and flight attendants, all proceeding *pro se*; Darren Aquino, separately proceeding *pro se*; Tyson D. Gabriel, David M. Howard, and Stephen E. Petty, separately proceeding *pro se*; and Leia Montgomery and Kristen Meghan Kelly.

### B.    Rulings Under Review

These consolidated petitions for review challenge three security directives and one emergency amendment first issued by the Transportation Security Administration on February 1, 2021:  Security

Directive 1542-21-01, Security Directive 1544-21-02, Security Directive
1582/84-21-01, and Emergency Amendment 1546-21-01.  These
directives were initially set to expire on May 11, 2021, but were
subsequently renewed four times without substantive change.  These
petitions for review were filed after the second extension of the
challenged directives issued on August 20, 2021.  The most recent
iteration of the directives, which expired on April 18, 2022, can be found
in the petitioners' appendix.  *See* App. 26-45.  The preceding iterations
are substantively identical to the version in the petitioners' appendix
except for the dates of effect and expiration.

## C.    Related Cases

These six consolidated petitions for review all originated in other
courts of appeals and were transferred to this court pursuant to 28
U.S.C. § 2112(a)(5) because they challenge the same Security Directives
and Emergency Amendment at issue in *Corbett v. Transportation Sec.
Admin.*, 19 F.4th 478 (D.C. Cir. 2021).  Undersigned counsel is not
aware of any other related cases pending in this Circuit.  Challenges to
the legality of the Security Directives and Emergency Amendment at
issue in this case have been raised in several other cases pending in

courts outside of this Circuit. *See, e.g.*, *Family Research Council v. CDC*, No. 4:22-cv-209 (N.D. Tex.); *Florida v. Walensky*, No. 8:22-cv-718 (M.D. Fla.).


*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht


iii

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION........................................ 3

STATEMENT OF THE ISSUES ............................................ 6

PERTINENT STATUTES AND REGULATIONS.................. 7

STATEMENT OF THE CASE............................................... 7

    A.    Statutory Background ........................................ 7

    B.    Factual Background........................................... 10

        1.  The National Emergency Caused by COVID-19............. 10

        2.    The CDC Order and Notice Requiring Masks While on Conveyances and Transportation Hubs...... 12

        3.  The Challenged TSA Mask Directives............................ 18

    C.    Prior Proceedings.................................................... 19

SUMMARY OF ARGUMENT................................................ 23

STANDARD OF REVIEW ................................................... 30

ARGUMENT...................................................................... 30

I.    This Court Has Already Determined that the Mask Directives are a Permissible Exercise of TSA's Statutory and Regulatory Authority to Issue Security Directives to Protect Transportation Security................................................ 30

iv

II.     Petitioners' As-Applied Challenges are Meritless Because the Mask Directives do not Prohibit Individuals with Disabilities from Traveling............................................................ 46

CONCLUSION....................................................................... 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

v

# TABLE OF AUTHORITIES

**Cases:** <u>Page(s)</u>

*Abdi v. Wray,*
942 F.3d 1019 (10th Cir. 2019) ............................................................ 52

*Alabama Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ................................................................... 27, 41

*Corbett v. TSA,*
19 F.4th 478 (D.C. Cir. 2021) ............................ 2, 21, 22, 23, 24, 30, 31,
32, 33, 35, 36, 37, 38

*County of Los Angeles v. Davis,*
440 U.S. 625 (1979) ........................................................................ 6

*Cramer v. Skinner,*
931 F.2d 1020 (5th Cir. 1991) .......................................................... 52

*Doe v. Moore,*
410 F.3d 1337 (11th Cir. 2005) ......................................................... 52

*Federal Commc'ns Comm'n v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) ................................................................. 37-38

*Haig v. Agee,*
453 U.S. 280 (1981) ...................................................................... 52

*League of United Latin Am. Citizens v. Bredesen,*
500 F.3d 523 (6th Cir. 2007) ............................................................ 52

*Medellin v. Texas,*
552 U.S. 491 (2008) ...................................................................... 54

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ........................................................................ 25

vi

*Murphy v. National Collegiate Atheletic Ass'n,*
  138 S. Ct. 1461 (2018) .......................................................................... 46

*National Black Police Ass'n v. District of Columbia,*
  108 F.3d 346 (D.C. Cir. 1997) ............................................................... 6

*National Fed'n of Indep. Bus. v. Department of Labor, OSHA,*
  142 S. Ct. 661 (2022) .......................................................................... 34

*National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,*
  301 U.S. 1 (1937) ................................................................................ 45

*Olivares v. TSA,*
  819 F.3d 454 (D.C. Cir. 2016) ............................................................. 31

*Reno v. Condon,*
  528 U.S. 141 (2000) ............................................................................ 46

*Saenz v. Roe,*
  526 U.S. 489 (1999) ............................................................................ 51

*Sosa v. Alvarez-Machain,*
  542 U.S. 692 (2004) ............................................................................ 54

*Town of Southold v. Town of E. Hampton,*
  477 F.3d 38 (2d Cir. 2007) .................................................................. 52

*Wall v. CDC,*
  No. 6:21-cv-975, 2022 WL 1238613 (M.D. Fla. Mar. 4, 2022),
  *appeal pending*, No. 22-11532 (11th Cir.) .......................... 5, 26, 40-41

*Wickard v. Filburn,*
  317 U.S. 111 (1942) ............................................................................ 45

*Wyeth v. Levine,*
  555 U.S. 555 (2009) ............................................................................ 45

vii

**Statutes:**

Pub. L. No. 96-88, 93 Stat. 668 (1979)................................................... 13

Pub. L. No. 107-71, 115 Stat. 597 (2001)................................................. 9

5 U.S.C. § 706(2)(A)................................................................................ 30

20 U.S.C. § 3508(b) ................................................................................. 13

21 U.S.C. § 360bbb-3(e)(1)(A)........................................................... 42-43

21 U.S.C. § 360bbb-3(*l*) ......................................................................... 43

28 U.S.C. § 2112(a)(5) ............................................................................ 21

42 U.S.C. § 264(a) .............................................................................13, 41

49 U.S.C. § 114(f)................................................................................... 32

49 U.S.C. § 114(f)(2) .............................................................................. 31

49 U.S.C. § 114(f)(3) ...........................................................................7, 31

49 U.S.C. § 114(f)(4) ...........................................................................7, 31

49 U.S.C. § 114(f)(11) ............................................................................. 7
49 U.S.C. § 114(g) .............................................................................32, 33

49 U.S.C. § 114(g)(1) ............................................................................... 8

49 U.S.C. § 114(g)(1)(B) .................................................................... 32-33

49 U.S.C. § 114(g)(1)(D) .................................................................... 32-33

49 U.S.C. § 114(*l*)(2) ............................................................................... 8

49 U.S.C. § 114(*l*)(2)(B) .......................................................................... 8

viii

49 U.S.C. § 115(b) ........................................................................... 8

49 U.S.C. § 41705(a) ...................................................................... 48

49 U.S.C. § 41705(c)(1) .................................................................. 51

49 U.S.C. § 44901 ............................................................................ 9

49 U.S.C. § 46110(a) ..................................................................3, 53

49 U.S.C. § 46110(c) ...................................................................... 30

**Constitution:**

U.S. Const. art. VI, cl. 2 .................................................................45

**Regulations:**

14 C.F.R. § 382.19(c)(1) ................................................................ 51

14 C.F.R. § 382.159 ....................................................................... 52

21 C.F.R. § 50.20 ........................................................................... 45

42 C.F.R. § 70.2 ............................................................................. 13
42 C.F.R. § 71.31(b) ...................................................................... 13

42 C.F.R. § 71.32(b) ...................................................................... 13

49 C.F.R. § 1540.105(a)(1) .............................................................. 9

49 C.F.R. § 1542.101(a)(1) .............................................................. 9

49 C.F.R. § 1542.105(c)-(d) ........................................................... 10

49 C.F.R. § 1542.303(a) ................................................................. 10

ix

49 C.F.R. § 1542.303(b).................................................................. 10

49 C.F.R. § 1542.303(d).................................................................. 10

49 C.F.R. § 1544.103........................................................................ 9

49 C.F.R. § 1544.105(c)-(d)............................................................ 10

49 C.F.R. § 1544.305(a).................................................................. 10

49 C.F.R. § 1544.305(b).................................................................. 10

49 C.F.R. § 1544.305(d).................................................................. 10

49 C.F.R. § 1546.105........................................................................ 9

49 C.F.R. § 1546.105(c)-(d)............................................................ 10

## Other Authorities:

CDC, *COVID Data Tracker*,
    https://go.usa.gov/xuhw8 (last visited May 26, 2022)........................ 11

CDC, *Omicron Variant: What You Need to Know*
    (updated Dec. 20, 2021), https://perma.cc/UH3B-FESV..................... 17
CDC, *Order: Wearing of face masks while on
    conveyances and at transportation hubs*,
    https://go.usa.gov/xuh2R (last visited May 26, 2022)................... 15, 16

CDC, *When You've Been Fully Vaccinated*
    (updated July 27, 2021), https://perma.cc/C3LC-HMLF................... 17

*Declaring a Nat'l Emergency Concerning the Novel
    Coronavirus Disease (COVID-19) Outbreak*,
    85 Fed. Reg. 15,337 (Mar. 18, 2020)............................................. 10-11

x

Department of Homeland Security, *Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System* (Jan. 27, 2021)................................................. 12

31 Fed. Reg. 8855 (June 25, 1966)........................................................ 13

54 Fed. Reg. 28,982 (July 10, 1982)...................................................... 10

67 Fed. Reg. 8340 (Feb. 22, 2002)........................................................... 9

86 Fed. Reg. 7205 (Jan. 25, 2021)........................................................ 11

86 Fed. Reg. 8025 (Feb. 3, 2021)............................... 12-13, 14, 15, 16, 37

86 Fed. Reg. 8217 (Feb. 4, 2021)........................................................ 33

86 Fed. Reg. 13,971 (Mar. 12, 2021) .................................................... 19

86 Fed. Reg. 26,825 (May 18, 2021)..................................................... 19

Office of Legal Counsel, *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* (July 6, 2021), https://go.usa.gov/xJrwu................................................................. 43-44

Press Release, *TSA Extends Face Mask Requirement Through May 3, 2022* (Apr. 13, 2022), https://go.usa.gov/xuSpg.............................................4

Press Release, TSA, *Statement Regarding Face Mask Use on Public Transportation* (Apr. 18, 2022), https://go.usa.gov/xuSpN.......................................................................5

Sanitation, *Merriam-Webster.com Dictionary*, https://perma.cc/9ARR-YKYH (last visited May 26, 2022) .................42

xi

U.S. Dep't of Transp., *Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft* (Feb. 5, 2021), https://go.usa.gov/xJrfj ........................................................50

*Why Doctors Wear Masks*, Yale Medicine (Sept. 1, 2020), https://perma.cc/TE77-8PBH.............................................42

xii

## GLOSSARY

| | |
|---|---|
| CDC | Centers for Disease Control and Prevention |
| TSA | Transportation Security Administration |
| FDA | Food and Drug Administration |
| OSHA | Occupational Safety and Health Administration |

# INTRODUCTION

Starting in January 2021, the Centers for Disease Control and Prevention (CDC) required that all persons in transportation hubs and on transport conveyances wear masks covering their noses and mouths for the duration of travel in order to combat the spread of a highly dangerous and contagious disease (COVID-19), which has infected millions of people throughout the United States and the world.

In issuing that order, the CDC expressly contemplated that other federal agencies, including the Transportation Security Administration (TSA), would exercise their own relevant statutory and regulatory authorities to assist in the enforcement and implementation of this critical requirement.  TSA, in turn, issued a series of mandatory directives, *see* App. 26-45 (collectively, the Mask Directives), to four categories of regulated entities likewise requiring that, subject to certain limited exceptions, all persons in transportation hubs and on transport conveyances wear masks in order to ensure the safety and security of persons using or working in the nation's transportation system.  After a district court vacated the CDC's order on April 18,

2022, the TSA Mask Directives were permitted to expire without renewal.

In a published opinion issued on December 10, 2021, this Court denied a petition for review of the TSA Mask Directives. *See Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021). The petitioner in that case argued, as petitioners do here, that the Mask Directives are *ultra vires* and exceed TSA's statutory and regulatory authority. This Court rejected that argument and held that the Mask Directives were a permissible exercise of TSA's broad statutory and regulatory authority to protect transportation, because "the scale of death wrought by COVID-19, its established adverse effects on our nation's economy, its specific tendency to spread at high rates in transportation areas, and its threats to persons employed to operate transportation services (as well as to people who use those services), make it a clear threat to transportation security and safety." *Id.* at 488. Indeed, the COVID-19 pandemic poses "one of the greatest threats to the operational viability of the transportation system and the lives of those on it seen in decades." *Id.* at 480.

2

Petitioners here, who are all proceeding *pro se*, bring a litany of
challenges to the TSA Mask Directives, including challenges that have
already been rejected by this Court in *Corbett*.  In addition to those
foreclosed statutory and regulatory arguments, petitioners claim that
the Mask Directives are arbitrary and capricious or procedurally infirm
under the Administrative Procedure Act, and that they violate various
international treaties and the United States Constitution.  Underlying
these challenges is petitioners' contrarian position that face masks do
"not stop[] the spread of COVID-19" and "are harmful to human
health."  Br. 68.  All of petitioners' claims are meritless—both on the
science and on the law.  The petitions for review should be denied.

## STATEMENT OF JURISDICTION

The Security Directives and Emergency Amendment challenged
by petitioners were first issued on January 31, 2021.  Those orders were
initially scheduled to expire on May 11, 2021, but were extended four
times without substantive change.  On October 19, 2021, petitioners
filed these six petitions for review pursuant to 49 U.S.C. § 46110(a),
challenging the second extension of the Mask Directives.  The petitions
are timely because those orders were issued on August 20, 2021.  *See*

3

SD 1542-21-01B; SD 1544-21-02B; SD 1582/84-21-01B; EA 1546-21-01B; 49 U.S.C. § 46110(a) (60-day deadline).

After these petitions for review were filed, TSA twice extended the expiration of the Mask Directives, first until January 18, 2022, and most recently, until April 18, 2022. *See* SD 1542-21-01D (App. 26-30); SD 1544-21-02D (App. 31-35); SD 1582/84-21-01 (App. 36-40); EA 1546-21-01 (App. 41-45). Shortly before the directives were set to expire in April 2022, TSA announced that it would extend the Mask Directives for an additional fifteen days through May 3, 2022, while the federal government monitored the continued spread of COVID-19 and determined whether any changes to the mask requirements were appropriate. *See* Press Release, *TSA Extends Face Mask Requirement Through May 3, 2022* (Apr. 13, 2022), https://go.usa.gov/xuSpg.

On April 18, 2022, the day that the Mask Directives were set to expire absent the extension, a district judge in the United States District Court for the Middle District of Florida vacated the separate CDC Order requiring the wearing of masks in transportation hubs and on transportation conveyances, ruling that the order exceeds the CDC's statutory authority, that it is arbitrary and capricious, and that the

4

CDC did not have good cause to make the order effective without delay. *See* Order Granting Summary Judgment, *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022), appeal pending No. 22-11287 (11th Cir.).[1]  Shortly after that district court's ruling, TSA elected to rescind the forthcoming extension of its own Mask Directives.  Press Release, TSA, *Statement Regarding Face Mask Use on Public Transportation* (Apr. 18, 2022), https://go.usa.gov/xuSpN.

The agency orders challenged in this case thus expired on April 18, 2022, and are no longer in effect.   Because the COVID-19 pandemic remains ongoing, however, TSA may elect to promulgate new directives related to the wearing of masks should it determine that such measures are necessary to prevent an ongoing threat to transportation security.   Accordingly, although some of petitioners' arguments related to the previous Mask Directives have been superseded by intervening

---

[1]   *Health Freedom* is one of several cases challenging the CDC Order in district courts across the country, including several cases brought by petitioners here.  Another judge in the same district as *Health Freedom* has reached the opposite conclusion and upheld the CDC Order in a case brought by one of the petitioners in this litigation. *See Wall v. CDC*, No. 6:21-cv-975, 2022 WL 1238613 (M.D. Fla. Mar. 4, 2022), *appeal pending*, No. 22-11532 (11th Cir.).

5

==events—for example, petitioners' arguments regarding the appropriate remedy if they are successful does not present a live controversy because there is no agency order to vacate—the case as a whole is not moot.== *See, e.g.*, *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (holding that voluntary cessation of a challenged activity "generally" "does not moot a case" unless a court concludes that "'(1) there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation'" (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979))).

## STATEMENT OF THE ISSUES

1. Whether, as this Court has already held in *Corbett v. TSA*, the Mask Directives were a permissive exercise of TSA's statutory and regulatory authority to protect transportation security.

2. Whether the Mask Directives are otherwise unlawful on their face because they are arbitrary and capricious; violate the Federal Food, Drug, and Cosmetic Act; or violate the Tenth Amendment.

3. Whether the Mask Directives are otherwise unlawful as applied to individuals with disabilities because they violate the Air

Carrier Access Act, various international treaties, or the United States Constitution.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Transportation Security Administration is empowered to, among other things, "develop policies, strategies, and plans for dealing with threats to transportation security," including by "coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States."  49 U.S.C. § 114(f)(3), (4).  And TSA is specifically empowered to "oversee the implementation, and ensure the adequacy, of security measures at airports and other transportation facilities."  *Id.* § 114(f)(11).  Further, during an emergency, TSA has the additional responsibilities, subject to the direction of the Secretary of Homeland Security, to "coordinate domestic transportation"; "coordinate and oversee the transportation-related responsibilities of other departments and agencies of the Federal Government"; "coordinate and provide notice" to other portions of the

7

government and appropriate agencies of state and local governments "about threats to transportation"; and "carry out such other duties, and exercise such other powers, relating to transportation . . . as the Secretary of Homeland Security shall prescribe." *Id.* § 114(g)(1).

TSA also has broad authority to issue regulations and security directives necessary to protect all modes of transportation security.  For example, TSA can issue regulations or security directives "without providing notice or an opportunity for comment and without prior approval of the Secretary [of Homeland Security]" if it determines that such orders "must be issued immediately in order to protect transportation security."  49 U.S.C. § 114(*l*)(2).  Regulations and security directives issued under this authority are subject to review by the Transportation Security Oversight Board—a board consisting of the heads of various interested Cabinet agencies, or their designees, and a representative of the National Security Council, *see id.* § 115(b)—and "shall remain effective for a period not to exceed 90 days" unless submitted to and ratified by the Board.  *Id.* § 114(*l*)(2)(B).

In addition to its authority to issue orders related to all forms of transportation (including air transportation), Congress specified that

TSA would inherit additional regulatory authority from the Federal Aviation Administration specific to operators of aircraft and airports. TSA thus has parallel regulatory authority to ensure the security of civil aviation.  Aviation and Transportation Security Act, Pub. L. No. 107-71, § 141(b), 115 Stat. 597, 643 (2001); *see also id.* § 141(f), 115 Stat. at 644; 49 U.S.C. § 44901; 67 Fed. Reg. 8340, 8340 (Feb. 22, 2002).

Pursuant to these transferred authorities and consistent with the Federal Aviation Administration's practice, TSA continues to require regulated aircraft and airport operators to adopt security programs that provide for "the safety and security of persons and property" traveling on air transportation "against an act of criminal violence, aircraft piracy, and the introduction of an unauthorized weapon, explosive, or incendiary onto an aircraft."  49 C.F.R. § 1542.101(a)(1) (addressing airports); *see also id.* §§ 1544.103 (addressing domestic airlines), 1546.105 (addressing foreign airlines); *see also* 67 Fed. Reg. at 8344-45. The regulations also prohibit all persons, including passengers, from circumventing approved security programs.  49 C.F.R. § 1540.105(a)(1). The programs are subject to change, including when TSA determines

9

that "safety and the public interest require an amendment." *Id.*
§§ 1542.105(c)-(d), 1544.105(c)-(d), 1546.105(c)-(d).

Finally, TSA may issue "[s]ecurity [d]irectives" that apply to all regulated entities when "additional security measures are necessary to respond to a threat assessment or to a specific threat against civil aviation." 49 C.F.R. §§ 1542.303(a), 1544.305(a); *see also* 54 Fed. Reg. 28,982, 28,982 (July 10, 1989) (Federal Aviation Administration regulation explaining that "Security Directives . . . will eliminate the need to amend the air carriers' ongoing security programs"). Each airport and aircraft operator required to have an approved security program "must comply with each Security Directive issued," 49 C.F.R. §§ 1542.303(b), 1544.305(b), and if an operator is unable to implement the measures in the security directive, the operator must inform TSA and submit proposed alternative measures to TSA for approval, *id.* §§ 1542.303(d), 1544.305(d).

**B.    Factual Background**

**1.  The National Emergency Caused by COVID-19**

There is currently a global pandemic of a respiratory disease, COVID-19, caused by a novel coronavirus.  *See Declaring a Nat'l*

10

*Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337 (Mar. 18, 2020).  As of the date of this filing, COVID-19 has infected more than 83 million and killed more than 1 million people in the United States alone, and many more around the world.  *See* CDC, *COVID Data Tracker*, https://go.usa.gov/xuhw8 (last visited May 26, 2022).

In recognition of the continuing threat posed by COVID-19, on January 21, 2021, the President issued Executive Order 13,998.  86 Fed. Reg. 7205 (Jan. 25, 2021) (*see also* App. 2-7).  That order concluded, consistent with recommendations from the CDC, the Surgeon General, and the National Institutes of Health, that "mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19" and allow "all Americans, including the millions of people employed in the transportation industry, to travel and work safely." *Id.* at 7205.  To that end, the executive order directed federal agencies, including the Department of Homeland Security through TSA, to coordinate and "immediately take action[] . . . to require masks to be work in

11

compliance with CDC guidelines" by all persons in or on airports, aircraft, and other forms of public transportation. *Id.*

In response, on January 27, 2021, the Acting Secretary of the Department of Homeland Security issued a Determination of National Emergency that invoked his emergency powers and directed TSA to support "the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system, including passengers and employees, from COVID-19 and to mitigate the spread of COVID-19 through the transportation system." Department of Homeland Security, *Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System* (Jan. 27, 2021) (App. 8-9).

### 2. The CDC Order and Notice Requiring Masks While on Conveyances and Transportation Hubs

On January 29, 2021, the CDC issued an order mandating that, with limited exceptions, all persons "wear masks over the mouth and nose" when "at transportation hubs," such as airports, bus terminals, marinas, and subway stations, and when "traveling on conveyances into and within the United States." 86 Fed. Reg. 8025, 8026 (Feb. 3, 2021)

12

(App. 10-15).  That Order was issued pursuant to the CDC's authority to "make and enforce . . . regulations . . . necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession," 42 U.S.C. § 264(a),[2] and to regulations authorizing the CDC to take measures to prevent the spread of communicable diseases if measures taken by state or local health authorities are inadequate to do so, 42 C.F.R. § 70.2, to issue conditions for aircraft or vessels to freely conduct business at ports of entry without being held in quarantine, *id.* § 71.31(b), and to require detention, disinfection, disinfestation, fumigation, or other related measures of infected articles on arriving carriers, *id.* § 71.32(b).

The CDC Order explained that robust scientific evidence showed that "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets produced

---

[2]   Although the statute refers to the Surgeon General, all statutory powers and functions of the Surgeon General were transferred to the Secretary of Health and Human Services in 1966.  31 Fed. Reg. 8855 (June 25, 1966); *see also* Pub. L. No. 96-88, § 509(b), 93 Stat. 668, 695 (1979) (codified at 20 U.S.C. § 3508(b)).

13

when an infected person coughs, sneezes, or talks," and that mask wearing "is one of the most effective strategies available for reducing COVID-19 transmission." 86 Fed. Reg. at 8026, 8028-29. Further, "[t]raveling on multi-person conveyances," such as buses, airplanes, and trains, "increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces." *Id.* at 8029. This is particularly true for air travel, which "often requires spending time in security lines and crowded airport terminals," as well as on aircraft, where "[p]eople may not be able to distance themselves by the recommended 6 feet from individuals seated nearby or those standing in or passing through the aircraft's aisles." *Id.*

Accordingly, to prevent the continued introduction, transmission, and spread of COVID-19, the CDC mandated that all persons must wear a mask "when traveling on conveyances into and within the United States" and when at "transportation hubs." 86 Fed. Reg. at 8026-27.[3] In addition, the Order directs that conveyance operators

---

[3] Persons on certain categories of conveyances are exempt from this requirement, including "private conveyances operated solely for

14

"must require all persons onboard to wear masks for the duration of
travel," and operators of transportation hubs must use "best efforts to
ensure that any person entering or on the premises of the
transportation hub wears a mask." *Id.*

The Order further provides that the requirement to wear a mask
shall not apply in a few limited circumstances, including, as
particularly relevant here, to persons "with a disability who cannot
wear a mask, or cannot safely wear a mask, because of the disability as
defined by the Americans with Disabilities Act." 86 Fed. Reg. at 8027;
*see also id.* at n.9 (explaining that this is a "narrow exception that
includes a person with a disability who cannot wear a mask for reasons
related to the disability"). CDC guidance issued in March 2021 explains
that the exemption extends to persons whose disability might inhibit
their ability to remove a mask if their breathing became obstructed, and
might extend to others for whom the wearing of a mask would cause
respiratory distress, inhibit an assistive device, or cause an imminent
threat of harm based on a severe sensory or mental-health disability.

---

personal, non-commercial use" and "commercial motor vehicles or
trucks . . . if the driver is the sole occupant of the vehicle or truck." 86
Fed. Reg. at 8028.

15

CDC, *Order: Wearing of Face Masks While on Conveyances and at Transportation Hubs*, https://go.usa.gov/xuh2R (last visited May 26, 2022). CDC noted that the exemption is "narrow" and "is not meant to cover people with disabilities for whom wearing a mask might only be difficult or whose disability does not prevent them from wearing a mask or wearing a mask safely." *Id.*

The CDC Order took immediate effect, as the CDC determined that there was "good cause to dispense with prior public notice and comment" in light of the "public health emergency caused by COVID-19." 86 Fed. Reg. at 8030. Further, although the CDC specified that these requirements could be enforced by the CDC "through criminal penalties," it "d[id] not intend to rely primarily on these criminal penalties but instead strongly encourage[d] and anticipate[d] widespread voluntary compliance as well as support from other federal agencies in implementing additional civil measures enforcing the provisions of this Order." *Id.* at 8030 n.33. In particular, the CDC anticipated that the Order would largely be enforced by TSA under its "appropriate statutory and regulatory authorities." *Id.* at 8030.

16

Since the issuance of the CDC Order in January 2021, the CDC has revised its mask-wearing recommendations and guidance as needed based on the latest available data and sound public-health policy.  In spring of 2021, for example, after significant progress had been made with vaccinations and falling case counts in the United States, the CDC relaxed its mask-wearing guidance for fully vaccinated individuals in some settings other than public transportation.  But shortly thereafter, more transmissible variants of the virus began circulating, leading the CDC to recommend that even fully vaccinated individuals should "wear a mask indoors in public" when "in an area of substantial or high transmission."  CDC, *When You've Been Fully Vaccinated* (updated July 27, 2021), https://perma.cc/C3LC-HMLF; *see also* CDC, *Omicron Variant: What You Need to Know* (updated Dec. 20, 2021), https://perma.cc/UH3B-FESV.

The CDC Order requiring that masks generally be worn in transportation hubs and on transportation conveyances regardless of vaccination status remained in effect from its promulgation in January 2021 until April 18, 2022, when it was vacated by the United States District Court for the Middle District of Florida.  *See* Order Granting

17

Summary Judgment, *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-01693, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022).  The government's appeal from that decision is pending.

### 3.  The Challenged TSA Mask Directives

On January 31, 2021, TSA issued a number of mandates designed to implement and support enforcement of the CDC Order.  Security Directive 1542-21-01; Security Directive 1544-21-02; Security Directive 1582/84-21-01; Emergency Amendment 1546-21-01.  In particular, these directives require regulated entities—airport operators, airlines, and owner/operators of surface transportation—to require that individuals on transportation conveyances and in transportation hubs within their control wear masks, except as allowed by the exemptions initially outlined in the CDC Order.  And as further relevant here, the Mask Directives provide that regulated entities may "require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance," and that they may likewise "impose requirements, or conditions of carriage" on such people, including by requiring "medical consultation by a third party, medical documentation by a licensed medical provider, and/or other

18

information" that the regulated entity finds is necessary to determine whether the person is entitled to an exemption. *E.g.*, Security Directive 1544-21-02D at 3 n.8 (App. 28). To that end, most, if not all, airlines established procedures that travelers may use to request an exemption from masking requirements in advance of a flight.

Each of the Mask Directives has been ratified by the Transportation Security Oversight Board. 86 Fed. Reg. 13,971 (Mar. 12, 2021); 86 Fed. Reg. 26,825, 27,826 (May 18, 2021). The directives were initially set to expire on May 11, 2021, but were extended four times without substantive change. Most recently, TSA announced that it was going to extend the Mask Directives once more from April 18, 2022, until May 3, 2022. After the CDC Order was vacated, however, the agency rescinded that extension before it went into effect. Accordingly, the Mask Directives expired on April 18, 2022.

### C.    Prior Proceedings

**1.**  These consolidated cases are among a number of cases pursued by one or more of the petitioners here seeking to invalidate mask requirements imposed by government entities or airlines. Most relevant here, in June 2021, Petitioner Lucas Wall filed a complaint in

19

the United States District Court for the Middle District of Florida against, *inter alia*, the CDC, TSA, the Department of Transportation, and President Biden, seeking (among other things) to enjoin the federal government from enforcing any mask requirement on public transportation. *See* Complaint, *Wall v. CDC*, No. 6:21-cv-975 (M.D. Fla. June 7, 2021), Dkt. No. 1. The claims against TSA were dismissed for lack of jurisdiction because challenges to TSA orders must be brought in the courts of appeals under 49 U.S.C. § 46110. Report and Recommendation, *Wall v. CDC*, No. 6:21-cv-975 (Oct. 7, 2021), Dkt. No. 155; Order, *Wall v. CDC*, No. 6:21-cv-975 (Dec. 18, 2021), Dkt. No. 187. The remaining claims have been rejected on the merits. *See* Order, *Wall v. CDC*, No. 6:21-cv-975, 2022 WL 1238613 (M.D. Fla. Mar. 4, 2022), *appeal pending*, No. 22-11532 (11th Cir.).

In recent months, several of the other petitioners filed complaints against the CDC and the airlines by filing complaints substantially similar to—and often copied verbatim from—Petitioner Wall's earlier-filed complaints in the Middle District of Florida. *See, e.g.*, *Seklecki v. CDC*, No. 1:22-cv-10155 (D. Mass. Jan. 28, 2022), Dkt. No. 1; *Andreadakis v. CDC*, No. 3:22-cv-52 (E.D. Va. Jan. 28, 2022), Dkt. No.

20

1; *Faris v. CDC*, No. 3:22-cv-23 (W.D. Ky. Jan. 17, 2022), Dkt. No. 1;

*Marcus v. CDC*, No. 2:22-cv-2383 (C.D. Cal. Apr. 8, 2022), Dkt. No. 1.

    **2.** These consolidated cases were instituted in multiple circuits on

October 19, 2021. Petitioners, who are all proceeding *pro se*, all filed

"substantially similar petitions for review" of the Mask Directives and

later filed substantially similar "motions to stay in a coordinated effort

to enjoin the Mask Directives" across multiple circuits. Order at 1 n.1,

*Faris v. TSA*, No. 21-3951 (6th Cir. Nov. 9, 2021) (citing cases). On the

government's motion, the cases were transferred to this Court under 28

U.S.C. § 2112(a)(5) because an earlier case challenging the same orders,

*Corbett v. TSA*, No. 21-1074 (D.C. Cir.), had already been fully briefed

and was pending before a merits panel in this Court. All emergency

motions for stay were denied, either by this Court or by the circuit court

in which the petitions originated prior to transfer. Thereafter, this

Court, on its own motion, held these cases in abeyance pending the

resolution of *Corbett*.

    In a published opinion issued on December 10, 2021, this Court

denied the petition for review in *Corbett v. TSA*, 19 F.4th 478 (D.C. Cir.

2021). As relevant to these consolidated petitions for review, this Court

21

began by noting that (unlike the petitioners in this case) the petitioner
in *Corbett* did not argue "that TSA's determinations regarding the
seriousness of the threats posed by COVID-19 are unreasonable," or
"contend that TSA's enforcement of its directives somehow runs afoul of
the arbitrary-and-capricious standard under the Administrative
Procedure Act." *Id.* at 485.  The petitioner in *Corbett* did, however,
advance an argument repeated by petitioners here, which is that the
Mask Directives are *ultra vires* and exceed TSA's statutory and
regulatory authority to take actions necessary to protect transportation
security.

> This Court rejected this claim, noting that the rapid spread of
> COVID-19 to transportation workers and passengers "can lead to cuts
> in service that threaten the essential movement of people and goods,
> and, consequently, our national supply chains, the economy, and
> national security." 19 F.4th at 487-88.  Because the Mask Directives
> "seek to contain this threat, they are in line with the agency's core
> mission." *Id.* at 488; *see also id.* ("[T]he scale of death wrought by
> COVID-19, its established adverse effects on our nation's economy, its
> specific tendency to spread at high rates in transportation areas, and its

22

threats to persons employed to operate transportation services (as well as to people who use those services), make it a clear threat to transportation security and safety."). Judge Henderson issued a dissenting opinion, stating that the case should be dismissed for lack of standing, but agreeing with the majority that "[o]n the merits, this petition for review is a slam dunk loser." *See id.* at 490-91 (Henderson, J., dissenting).

The petitioner in *Corbett* filed for rehearing en banc, and petitioners here moved to participate as amici in support of rehearing en banc. Both requests were denied without noted dissent. Order, *Corbett v. TSA*, No. 21-1074 (D.C. Cir. Feb. 2, 2022). Petitioners here also filed a joint petition for initial hearing en banc of these consolidated cases, which was denied without any member of the court calling for a vote. Order, *Wall v. TSA*, No. 21-1220 (D.C. Cir. Feb. 2, 2022).

## SUMMARY OF ARGUMENT

**I. A.** A substantial portion of petitioners' facial challenge to the Mask Directives is foreclosed by this Court's recent decision in *Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021), which held that the Mask

23

Directives are a permissible exercise of TSA's statutory and regulatory authority to take actions necessary to protect against threats to transportation security.  Indeed, as this Court noted in *Corbett*, "[t]he COVID-19 global pandemic poses one of the greatest threats to the operational viability of the transportation system and the lives of those on it seen in decades."  *Id.* at 480.  Although petitioners dispute this central holding, they provide no basis for deviating from this Court's reasoned and binding analysis on this score.

Petitioners also argue, as the petitioner in *Corbett* did, that the substantive requirements of Mask Directives are "health" requirements and not "security" requirements as the petitioners understand that term.  And petitioners extrapolate from that premise that TSA lacked regulatory authority to impose any substantive masking requirement through security directives, and instead had to engage in notice-and-comment rulemaking.  But this Court has already rejected petitioners' "extraordinarily narrow view" of the circumstances that constitute a threat to security, *Corbett*, 19 F.4th at 486, and thus, petitioners' procedural argument is without merit.

24

**B.** For similar reasons, although not directly addressed by
*Corbett*, petitioners' argument that the Mask Directives are arbitrary
and capricious must fail. In support of this argument, petitioners
contend that COVID-19 does not pose a threat to transportation safety
and that masks are ineffective at preventing this threat. But that
argument cannot be squared with this Court's holding that the Mask
Directives are a permissive exercise of TSA's authority to protect
transportation security, and petitioners' contrarian view of the scientific
evidence regarding masks provides no basis for this Court to accept
their invitation to "substitute [their] judgment for that of the agency."
*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29, 43 (1983).

Further, this Court should decline petitioners' invitation to opine
on the legality of the CDC's separate order, which is not directly at
issue in this case and is subject to litigation elsewhere, including by
some of the petitioners here. Petitioners note in a recent letter to this
Court that a judge in the United States District Court for the Middle
District of Florida recently vacated the CDC Order on the ground that,
*inter alia*, that Order exceeded CDC's statutory authority and was

25

procedurally infirm under the Administrative Procedure Act. *See* Letter to Clerk, *Wall v. TSA*, No. 21-1220 (D.C. Cir. Apr. 19, 2022); *see also* Order Granting Summary Judgment, *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693 (M.D. Fla. Apr. 18, 2022). But a different judge in the United States District Court for the Middle District of Florida recently upheld the CDC Order against a challenge brought by Petitioner Wall. *See Wall v. CDC*, No. 6:21-cv-975, 2022 WL 1238613 (M.D. Fla. Mar. 4, 2022), *appeal pending*, No. 22-11532 (11th Cir.). Petitioner Wall, at a minimum, should not be permitted to relitigate that challenge in this separate forum.

In any event, petitioners are mistaken in their assertion that the Mask Directives are unlawful because they were predicated, in significant part, on factual findings made by the CDC in its own order requiring the wearing of masks on public transportation. This Court has already determined that TSA has independent statutory and regulatory authority to issue the Mask Directives. The vacatur of the CDC Order that contained the findings on which TSA relied when assessing the threat posed by COVID-19 has no bearing on the question whether it was reasonable for TSA to rely upon those expert findings.

26

And to the extent that petitioners claim that the challenged Mask
Directives—which were initially issued in significant part to assist in
the implementation and enforcement of the CDC Order—cannot exist in
their previous form so long as the CDC Order remains vacated, that
argument is not properly before this Court because TSA rescinded the
planned extension of the Mask Directives after the district court
decision in *Health Freedom* vacating the CDC Order.  While TSA may
elect to issue new mask-related directives to the extent that it
determines that a masking requirement is necessary to protect
transportation security, there is no indication that any future directives
will be predicated on implementing or enforcing the currently-vacated
CDC Order.

Finally, petitioners' collateral challenge to the CDC Order is
wrong on the merits.  As the Supreme Court recently explained, CDC
has authority to require measures that "directly relate to preventing the
interstate spread of disease by identifying, isolating, and destroying the
disease itself." *Alabama Ass'n of Realtors v. Department of Health &
Human Servs.*, 141 S. Ct. 2485, 2488 (2021) (per curiam).  That is
precisely what masks do:  they isolate the disease itself by trapping

27

virus particles exhaled by infected people and preventing non-infected people from inhaling virus particles.

C.  Petitioners fare no better in presenting several novel challenges that the Mask Directives are unlawful on their face because they violate assorted other provisions such as the Federal Food, Drug, and Cosmetic Act or the Tenth Amendment.  The Mask Directives do not violate those provisions.

II.  In addition to petitioners' various facial challenges to the Mask Directives, they argue that the Mask Directives are unlawful as applied to individuals with disabilities who cannot safely wear masks, on the theory that the Mask Directives' mandate effectively prohibits such individuals from flying or traveling in violation of the Air Carrier Access Act, various international treaties, and the United States Constitution.

The central premise of petitioners' argument is erroneous.  The Mask Directives explicitly exempt any "[p]eople with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability."  *E.g.*, SD 1544-21-02D at 3 (App. 33).  And indeed, several

petitioners have successfully flown while the Mask Directives were in effect, either with a mask, or with an exception.

To the extent that petitioners believe it is too onerous to show that they have a legitimate medical need for an exemption, that complaint lies not with the Mask Directives themselves, but with the airlines who make individual assessments regarding whom they permit to board without a mask and what alternative mitigation measures are appropriate in lieu of masking. If petitioners believe that an airline has improperly denied an exemption and thus discriminated on the basis of disability, they may file a complaint with the Department of Transportation through well-established complaint procedures. But any action or inaction of the Department of Transportation regarding such complaints is not properly before this Court in this petition for review of the Mask Directives, which were issued by TSA (a component of the Department of Homeland Security).

Finally, petitioners' arguments that the Mask Directives violate various international treaties and the United States Constitution are likewise predicated on petitioners' erroneous belief that the Mask Directives prohibit people with disabilities from flying or that

29

petitioners cannot obtain federal review of an airline's decision not to permit an exemption.  The Mask Directives contain no such restrictions, and as discussed, there is an established process for complaints of airline discrimination of the kind petitioners allege here.  Accordingly, petitioners' other as-applied challenges are entirely without merit.

## STANDARD OF REVIEW

This Court's review of the Mask Directives is governed by 49 U.S.C. § 46110(c) and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  Under that standard, TSA's "[f]indings of fact . . . , if supported by substantial evidence, are conclusive," 49 U.S.C. § 46110(c), and the orders must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

## ARGUMENT

### I.   This Court Has Already Determined that the Mask Directives are a Permissible Exercise of TSA's Statutory and Regulatory Authority to Issue Security Directives to Protect Transportation Security

**A.**  Petitioners' challenge to the Mask Directives reiterates many of the arguments already rejected by this Court in *Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021).  Petitioners argue, for example, that TSA's

30

authority to protect transportation security is limited to orders that
protect against "intentional attack," *see* Br. 62-71, and likewise, that
TSA's regulatory authority to issue security directives without notice
and comment is limited to directives that address security threats, not
"health measure[s]," Br. 76-81.  These arguments are foreclosed by
*Corbett*, which squarely rejected petitioners' "extraordinarily narrow"
view of TSA's statutory and regulatory authority.  19 F.4th at 486.

 **1.**  As this Court explained in *Corbett*, "Congress gave TSA 'broad
authority to assess potential risks to aviation and national security' and
respond to those risks."  19 F.4th at 486 (quoting *Olivares v. TSA*, 819
F.3d 454, 466 (D.C. Cir. 2016)); *see also* 49 U.S.C. § 114(f)(2) (directing
TSA to "assess threats to transportation"); *id.* § 114(f)(3) (directing TSA
to "develop policies, strategies, and plans for dealing with threats to
transportation security"); *id.* § 114(f)(4) (directing TSA to additionally
"make other plans related to transportation security, including
coordinating countermeasures with appropriate departments, agencies,
and instrumentalities of the United States Government").

 "In light of the language of the Act, it cannot seriously be doubted
that Congress' delegations of authority to TSA authorize the Mask

31

Directives issued to contain the spread of the COVID-19 virus."

*Corbett*, 19 F.4th at 486.  Indeed, "[t]he COVID-19 global pandemic

poses one of the greatest threats to the operational viability of the

transportation system and the lives of those on it seen in decades," *id.*

at 480, because the "uncontrolled spread of COVID-19 among

passengers and [transportation] workers can lead to cuts in service that

threaten the essential movement of people and goods, and,

consequently, our national supply chains, the economy, and national

security," *id.* at 487.  Thus, "TSA, which is tasked with maintaining

transportation safety and security, plainly has the authority to address

[this] threat[] under" 49 U.S.C. § 114(f).  *Id.* at 480.

Further, in addition to TSA's broad authority under 49 U.S.C.

§ 114(f), "Congress conferred upon the agency an expansive power to act

in relation to the transportation system during a national emergency."

*Corbett*, 19 F.4th at 486.  In particular, 49 U.S.C. § 114(g) "grants TSA

expansive powers and responsibilities 'during a national emergency,'"

including "the authority to 'coordinate and oversee the transportation-

related responsibilities of other departments and agencies' and to 'carry

out such other duties, and exercise such other powers, relating to

32

transportation during a national emergency as the Secretary of Homeland Security shall prescribe.'" *Id.* at 490 (quoting 49 U.S.C. §§ 114(g)(1)(B), (D)).

Here, the Acting Secretary of Homeland Security had declared "that the COVID-19 pandemic constituted a national emergency" and directed TSA to take actions consistent with its statutory authorities to implement the President's Executive Order regarding masks and to support the CDC "in the enforcement of any orders or other requirements necessary to protect the transportation system . . . from COVID-19." *Corbett*, 19 F.4th at 490 (alteration in original) (quoting 86 Fed. Reg. 8217, 8218-19 (Feb. 4, 2021)).  Because these directions "expressly authorized TSA to issue the challenged Mask Directives," the orders "were properly promulgated pursuant to" TSA's authority under 49 U.S.C. § 114(g), "regardless of whether [TSA] already had the power" to issue them.  *Corbett*, 19 F.4th at 490.

Petitioners seemingly recognize that their claim that the Mask Directives are *ultra vires* is foreclosed by *Corbett*, but nevertheless argue (Br. 63) that *Corbett* has been superseded by the Supreme Court's subsequent decision to stay a separate order issued by the Occupational

33

Safety and Health Administration (OSHA) that compelled employers with at least 100 employees to require their employees to be vaccinated against COVID-19 or submit to regular testing. *See National Fed'n of Indep. Bus. v. Department of Labor, OSHA*, 142 S. Ct. 661, 662-63 (2022) (per curiam). There, the Court concluded that OSHA had exceeded its authority to regulate workplace hazards by issuing an order that extended beyond the agency's mandate to regulate workplace safety. *Id.* at 665. The Court's analysis of a different order issued by a different agency pursuant to a different statutory scheme is not particularly relevant here, and the most relevant features of the Court's opinion do not aid petitioners. The Court recognized that even in that context, "[w]here the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible" and, in particular, that OSHA could "regulate risks associated with working in particularly crowded or cramped environments." *Id.* at 665-66. At a minimum, nothing in that decision provides a basis to ignore this Court's holding that Congress has authorized TSA to address the threat COVID-19 poses to transportation safety and security.

34

Further, the fact that other courts have "blocked" other "significant Executive Branch pandemic mandate[s]," *see* Br. 64, in cases involving different statutes and different COVID-19 mitigation measures has no bearing on this Court's interpretation of TSA's enabling statutes.  Thus, although petitioners disagree with this Court's decision in *Corbett,* they cannot overcome this Court's sound and binding reasoning.

**2.**   Petitioners' fare no better in arguing (Br. 77) that the Mask Directives must be declared invalid "[b]ecause the Mask Mandate is a health measure, not a security policy," and thus, in their view, TSA could not issue a masking requirement as a security directive and instead had to promulgate the requirements through notice-and-comment rulemaking.  Although this Court's decision in *Corbett* did not address the need for notice-and-comment rulemaking, it did reject the premise of petitioner's argument, holding that the rapid spread of a highly communicable disease on public transportation during a global health crisis was a threat to transportation security.  *See Corbett*, 19 F.4th at 488-90.

**B.** For similar reasons, although not squarely addressed by

*Corbett*, *see* 19 F.4th at 485, petitioners' various arguments that the

Mask Directives are arbitrary and capricious (Br. 72-75, 81-88) must

fail. In support of this contention, petitioners argue variously that

COVID-19 does not pose a threat to transportation safety and also that

masks are ineffective at preventing this threat. Neither argument is

sufficient to support petitioners' claim that the Mask Directives are

arbitrary and capricious.

**1.** As this Court recognized in *Corbett*, "[i]n issuing the Mask

Directives, TSA relied on CDC findings that the risk of transmission of

COVID-19 is particularly high in transportation hubs and on

conveyances." 19 F.4th at 487. "The spread of COVID-19 in the

transportation system, the CDC has concluded, can aggravate the

outbreak in the general population, put passengers and workers at risk,

and threaten the 'essential' movement of medical providers, the

workforce, and goods like food and medicine." *Id.*

Furthermore, "TSA relied on the CDC's finding that appropriately

worn masks reduce the transmission of COVID-19." *Corbett*, 19 F.4th

at 488. "In the crowded, tight quarters of airports and aircrafts, face

36

masks" reduce the emission and inhalation of "virus-laden droplets," and "[t]he cumulative effect of universal masking, . . . can 'prevent the need for lockdowns' and 'protect . . . workers who frequently come into close contact with other people (*e.g.*, at transportation hubs).'" *Id.* (third alteration in original) (quoting 86 Fed. Reg. at 8029-29).

Petitioners take a contrarian view of the scientific evidence regarding the wearing of masks, and insist that masks are both "ineffective in reducing COVID-19 spread and deaths," Br. 78 n.9, and "harmful to human health," Br. 68. But the CDC findings on which TSA relied closely align with the widespread medical consensus at the time the Mask Directives were promulgated (as well as today) that masks work effectively to slow the spread of COVID-19. *See* 86 Fed. Reg. at 8028 ("Seven studies have confirmed the benefit of universal masking in community level analyses[] . . . .").

Even accepting the (dubious) premise that there is significant uncertainty about either the efficacy or safety of mask wearing during a global pandemic of an airborne respiratory virus, the Administrative Procedure Act does not require unanimity or certainty in the scientific literature before an agency can act. *Cf. Federal Commc'ns Comm'n v.*

*Prometheus Radio Project*, 141 S. Ct. 1150, 1160 ("[T]he [Federal Communications Commission] did not have perfect empirical or statistical data. Far from it. But that is not unusual in day-to-day agency decisionmaking within the Executive Branch."). Petitioners' speculation about the efficacy of masks thus provides no reason to doubt this Court's sound and binding conclusion that "it is entirely within TSA's authority to require that masks be worn to contain th[e] threat" "posed by COVID-19 to the security and safety of the transportation system." *Corbett*, 19 F.4th at 488.

**2.** Nor was it arbitrary and capricious for TSA to rely upon CDC's findings when it issued the Mask Directives. Petitioners argue (Br. 72) that the Mask Directives are invalid because they were predicated on an independent CDC Order which petitioners claim was unlawful. For several reasons, that issue is not properly before the Court, and in any event, petitioners' claim is meritless.

As an initial matter, there is no dispute that the only orders properly before this Court under 49 U.S.C. § 46110 are the TSA Mask Directives, not the CDC Order. As noted, this Court has already determined that TSA has independent statutory and regulatory

38

authority to issue the Mask Directives, regardless of the propriety of the

CDC Order.  The only question in this case is thus whether it was

arbitrary and capricious for TSA to rely upon CDC's fact findings to

determine that the Mask Directives were necessary to address a specific

threat to transportation security.  But the CDC's ability to provide

recommendations regarding ongoing health crises is not dependent

upon its ability to promulgate substantive regulations, and petitioners'

challenges to CDC's authority to issue its own order provide no basis to

question TSA's reasonable decision to rely upon that expert agency's

findings.

    To the extent that TSA determined that the Mask Directives were

appropriate based not only on the CDC's factual findings but also on the

presence of the CDC Order itself, any dispute regarding the propriety of

that determination no longer presents a live controversy.  Once the

CDC Order was invalidated, TSA rescinded its extension of the Mask

Directives and allowed them to expire.  Petitioners contend that this

case is not moot because TSA could issue new directives requiring the

wearing of masks.  The government does not dispute this assertion, but

even if TSA were to determine that it continues to be necessary to

39

require masks to protect transportation security and issue new directives, there is no indication that TSA would issue identical orders premised on the currently enjoined CDC Order. And if a later action by TSA were to rely on a subsequent CDC Order, or on the January 2021 CDC Order if its vacatur were reversed on appeal, any analysis of whether TSA's new action was arbitrary and capricious would need to consider the changed circumstances that gave rise to the new action.

Petitioners' attempt to obtain what is essentially an advisory opinion on the propriety of the CDC Order is particularly anomalous given that several of the petitioners are currently challenging the CDC Order directly in other courts. *See Wall v. CDC*, No. 6:21-cv-975 (M.D. Fla.); *Andreadakis v. CDC*, No. 3:22-cv-52 (E.D. Va.); *Seklecki v. CDC*, No. 1:22-cv-10155, (D. Mass.); *Faris v. CDC*, No. 3:22-cv-23, (W.D. Ky.); *Marcus v. CDC*, No. 2:22-cv-2383 (C.D. Cal.). Indeed, a different judge in the United States District Court for the Middle District of Florida has repeatedly denied Petitioner Wall's requests to preliminarily enjoin the CDC Order, and recently granted summary judgment in the government's favor upholding the Order. *See Wall v. CDC*, No. 6:21-cv-975, 2022 WL 1238613 (M.D. Fla. Mar. 4, 2022), *appeal pending*,

40

No. 22-11532 (11th Cir.).  Petitioner Wall, at a minimum, should not be permitted to relitigate that challenge in this separate forum.

In any event, although this Court should not reach the issue, petitioners' claim that the CDC Order is *ultra vires* is meritless.  The CDC Order falls within the CDC's authority to "make and enforce such regulations as . . . are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."  42 U.S.C. § 264(a).  As the Supreme Court recently explained, the next sentence of that provision "informs the grant of authority by illustrating the kinds of measures that could be necessary."  *Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 141 S. Ct. 2485, 2488 (2021) (per curiam).  Such measures "directly relate to preventing the interstate spread of disease by identifying, isolating, and destroying the disease itself," *id.*, including "sanitation" measures, 42 U.S.C. § 264(a).

That is precisely what masks do:  they isolate the disease itself by trapping virus particles exhaled by infected people and preventing non-infected people from inhaling virus particles.  Indeed, despite

41

petitioners' protests to the contrary (Br. 73-75), masking is a paradigmatic sanitation measure. Masks reduce the release of viral particles into the air, which easily meets the modern and contemporaneous definition of "sanitation" as "the promotion of hygiene and prevention of disease by maintenance of sanitary conditions." Sanitation, *Merriam-Webster.com Dictionary*, https://perma.cc/9ARR-YKYH (last visited May 26, 2022). And "doctors have been wearing medical-grade N95 or surgical masks . . . during surgeries or patient interactions as part of their daily routines, for many decades." *Why Doctors Wear Masks*, Yale Medicine (Sept. 1, 2020), https://perma.cc/TE77-8PBH (Sept. 1, 2020). It is difficult to imagine a more direct way to control the spread of communicable disease than a measure that traps infectious particles to prevent their spread.

    **C.** Petitioners' remaining facial challenges to the Mask Directives are unavailing.

    **1.** There is no merit to petitioners' argument (Br. 88-91) that the Mask Directives violate the Federal Food, Drug, and Cosmetic Act. That statute simply authorizes the Food and Drug Administration (FDA) to establish, in an emergency use authorization, conditions on

42

the introduction into interstate commerce of certain medical devices. Such conditions may include, "to the extent practicable given the applicable circumstances" and as the FDA finds "necessary or appropriate to protect the public health," the condition that individuals to whom the product is to be administered be informed "of the option to accept or refuse administration of the product" and of the "consequences, if any, of refusing administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A).

In petitioners' view, the Mask Directives violate the Federal Food, Drug, and Cosmetic Act by "forc[ing] travelers" to wear face masks that have been approved by the FDA under an emergency use authorization. Br. 90. But the Mask Directives do not authorize or require TSA or anyone else to introduce any medical device into interstate commerce, which renders the emergency use authorization provision largely irrelevant. *See* 21 U.S.C. § 360bbb-3(*l*) (stating that the provision "only has legal effect on a person who carries out an activity for which an authorization under this section is issued"); *see also* Office of Legal Counsel, *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an*

43

*Emergency Use Authorization* (July 6, 2021) (describing limited scope of
this provision).[4]  The Mask Directives do not even require the use of a
mask that is authorized under an emergency use authorization.  To the
contrary, the directives simply require "material covering the nose and
mouth of the wearer," that is "either manufactured or homemade and
should be a solid piece of material without slits, exhalation valves, or
punctures."  *E.g.*, SD 1542-21-01D, at 2 & n.4 (App. 27).  Compliant
masks include, but are not limited to, "[m]edical masks and N-95
respirators."  *Id.*  Thus, if petitioners have concerns about wearing a
mask authorized under an emergency use authorization, they can select
another mask that is not.

Petitioners also argue (Br. 89-90) that the free masks that TSA
provides to travelers who forget or decline to bring a mask to the airport
are masks subject to emergency use authorizations.  But that practice is
not required by the Mask Directives, and petitioners' argument that the
practice violates the Federal Food, Drug, and Cosmetic Act is thus not
properly before this Court.  And in any event, petitioners cannot
identify any condition of the emergency use authorization that TSA is

---

[4] https://www.justice.gov/olc/file/1415446/download.

violating, pointing instead to a regulation governing human trials. *See*
Br. 90 (citing 21 C.F.R. § 50.20). The distribution of free masks for
those who choose not to bring their own is not a human trial.

**2.** Petitioners' constitutional arguments are equally unavailing.
First, petitioners argue that the Mask Directives violate the Tenth
Amendment because TSA "can[not] overrule state mask rules . . . that
prohibit public entities from requiring face coverings." Br. 53 (emphasis
omitted). But the Supremacy Clause of the United States Constitution
permits exactly that supremacy of federal law, U.S. Const. art. VI, cl. 2,
including via federal regulation, *see Wyeth v. Levine*, 555 U.S. 555, 576
(2009).

Second, petitioners posit (Br. 54-55, 58) that Congress lacked
power to authorize TSA to regulate intrastate transportation. But the
Supreme Court has long rejected any argument that wholly intrastate
activity is beyond the reach of Congress's commerce power. *See, e.g.*,
*National Labor Relations Bd. v. Jones & Laughlin Steel Corp.*, 301 U.S.
1, 37 (1937); *Wickard v. Fillburn*, 317 U.S. 111, 125 (1942).

Third, petitioners contend that, because the Mask Directives
apply to state-operated transportation hubs, it "commandeer[s]" some

45

state employees in violation of the Tenth Amendment.  Br. 56.  But the Mask Directives are generally applicable to all public and private mass transportation systems.  "The anticommandeering doctrine does not apply when" the government "evenhandedly regulates an activity in which both States and private actors engage."  *Murphy v. National Collegiate Athletic Ass'n,* 138 S. Ct. 1461, 1478 (2018)); *see also Reno v. Condon,* 528 U.S. 141, 151 (2000).

## II. Petitioners' As-Applied Challenges are Meritless Because the Mask Directives do not Prohibit Individuals with Disabilities from Traveling

In addition to their broad arguments challenging the validity of the Mask Directives on their face, petitioners claim that the Mask Directives are unlawful as applied.  In particular, petitioners claim (Br. 23) that they each have "medical conditions making it impossible for [them] to tolerate covering [their] face[s]."  They further assert that, because they are unable to safely wear masks, the Mask Directives' mandate effectively bars them from traveling, and that this de facto prohibition violates the Air Carrier Access Act and the United States Constitution.

46

**A.** The underlying premise of petitioners' arguments is incorrect.

The Mask Directives explicitly exempt any "[p]eople with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability" from the requirement to wear a mask. *E.g.*, SD 1544-21-02B at 3 (App. 33). Indeed, at least two of the petitioners have flown with an exemption while the Mask Directives remained in effect. *See* Airline Defendants' Amended Notice of Flight Taken by Plaintiff at 2, *Andreadakis v. CDC*, No. 3:22-cv-52-DJN (E.D. Va. Feb. 15, 2022), Dkt. No. 33 ("[O]n February 14, 2022 the Plaintiff flew from Richmond, Virginia to Redding, California . . . and was not required to wear a facemask."); Br. 31-32 (acknowledging that airlines have granted Petitioner Andreadakis an exemption a "few times"); Complaint ¶ 36, *Seklecki v. CDC*, No. 22-cv-10155 (D. Mass. Jan. 28, 2022), Dkt. No. 1 (Petitioner Seklecki acknowledging that an airline has granted a medical exemption to his minor son, M.S.); *see also* Br. 24 (suggesting that Petitioner McDonnell has "fl[own] Delta Air Lines without a mask" "several times").[5]

---

[5] Further belying petitioners' claims that it is impossible for them to travel while the Mask Directives remain in place is the fact that

47

There is thus no basis for petitioners' insistence (Br. 35-43) that the Mask Directives violate the Air Carrier Access Act. That Act prohibits an "air carrier" from "discriminat[ing] against" individuals who either have a "physical or mental impairment that substantially limits one or more major life activities," who have a record of such an impairment, or who are "regarded as" having such an impairment. 49 U.S.C. § 41705(a). But TSA is not an "air carrier," *id.*, and neither the Mask Directives nor the airlines implementing them "discriminate against" passengers on the basis of a disability. To the contrary, the Mask Directives expressly account for the airlines' obligation to provide accommodations for travelers with disabilities by providing that persons with disabilities who cannot safely wear a mask because of the disability are exempt from that requirement.

---

petitioners' previous filings in this case suggest that several petitioners have flown regularly while the Mask Directives were in effect. *See, e.g.*, Emergency Motion for Injunction, Exhibit 1 ¶ 14, *Faris v. TSA*, No. 21-3951 (6th Cir. Oct. 27, 2021) (stating that Petitioner Faris "travel[s] by commercial airlines every 12 days" for work); Br. 25-26 (same); Emergency Motion for Stay, Exhibit 2 ¶ 10, *Wall v. TSA*, No. 21-13619 (11th Cir. Nov. 4, 2021) (Petitioner Seklecki and his minor child M.S. flew "regularly" while the Mask Directives were in effect).

48

Petitioners do not dispute that the Mask Directives explicitly permit such exemptions, but they claim (Br. 37-39) that the directives are nevertheless unlawful because they contemplate that airlines may require travelers to request an exemption in advance of travel and to establish reasonable procedures designed to evaluate a traveler's alleged medical need for an exemption. Their claims are largely premised on a set of Department of Transportation regulations in 14 C.F.R. Part 382 that prohibit discrimination based on disability or perceived medical conditions. But the Mask Directives do not force airlines to discriminate based on disability or perceived medical conditions, much less refuse to provide transportation to persons with disabilities. Rather, the Directives posit that individuals who seek, based on a disability, exemptions from the requirements applicable to all other passengers must follow appropriate procedures and provide appropriate documentation. The Department of Transportation regulations on which petitioners rely do not prohibit airlines from requesting such information in advance of travel so that the airline may make an individualized assessment of an individual's request for accommodation. To the contrary, the regulations expressly require such

49

individualized assessments. *See generally* U.S. Dep't of Transp., *Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft* (Feb. 5, 2021), https://go.usa.gov/xJrfj (DOT Notice of Enforcement Policy) (App. 18-25).

Relatedly, petitioners are wrong to suggest (Br. 36) that the Department of Transportation's regulations prohibit airlines from imposing alternative mitigation measures on passengers who wish to fly without a mask, such as requiring the traveler to provide a negative COVID-19 test before flying or to sit in a different part of the airplane. Such requirements are not imposed based on the passenger's disability, but instead based on the passenger's desire to travel without a mask. Ensuring that an accommodation is reasonable and does not unduly endanger others is a staple of discrimination law. *See* DOT Notice of Enforcement Policy at 6-7 (App. 23-24) ("Under the Department's disability regulation in [14 C.F.R.] Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask."); *see also* 14 C.F.R. § 382.19(c)(1).

50

Petitioners' various allegations that they have had previous difficulty convincing airlines to permit them to fly without a mask are not properly before this Court. The proper procedure for lodging complaints against airlines based on alleged disability discrimination is to submit a complaint to the Department of Transportation for further investigation and potential enforcement action. 49 U.S.C. § 41705(c)(1); 14 C.F.R. § 382.159. Petitioners have availed themselves of this procedure, claiming to have collectively filed "more than 100 complaints" with the Department of Transportation. Br. 37. But petitioners do not and cannot challenge any action or inaction related to their complaints with the Department of Transportation in this petition for review against TSA (which is part of the Department of Homeland Security) regarding the Mask Directives themselves.

**B.** No more successful is petitioners' claim (Br. 46-52) that the Mask Directives interfere with their constitutional right to travel. Although the Supreme Court has recognized, in certain instances, a constitutional right to travel, those cases generally involved residency requirements or other measures that prohibit individuals from moving from state to state. *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 498 (1999).

51

As numerous courts have recognized, "mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel." *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005); *see also Abdi v. Wray*, 942 F.3d 1019, 1030-31 (10th Cir. 2019) (holding that both "the freedom to travel interstate" and "the freedom to travel abroad" are "'subject to reasonable government regulation'" (quoting *Haig v. Agee*, 453 U.S. 280, 306 (1981))); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right." (quotations omitted)).  Nor is the constitutional right to travel generally implicated by travel delays or inconvenience. *Cramer v. Skinner*, 931 F.2d 1020, 1030 (5th Cir. 1991) (finding no violation of the right to travel where a statutory restriction on airline service "makes travel less convenient" but "does not bar travelers from using the airport"); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007).

As here, as discussed, the Mask Directives do not prohibit any individual from engaging in travel.  They simply require that any traveler wear a mask, unless that traveler qualifies for one of the listed

52

exceptions, including if the traveler has a disability and cannot safely wear a mask because of that disability.

For similar reasons, petitioners' due process claim (Br. 43-45), which is premised on the alleged deprivation of petitioners' ability to travel, is without merit. The Mask Directives do not prohibit petitioners from traveling, and to the extent that petitioners are in fact individuals who cannot safely wear masks because of a disability, the requirement that they wear a mask does not apply. Further, as discussed *infra*, to the extent that petitioners have been unsuccessful in persuading private companies that they should be permitted to fly without a mask because they are unable to safely wear a mask due to a disability, they may file a complaint with the Department of Transportation using well-established complaint procedures, and any final order issued in response to such a complaint is reviewable in federal court. *See* 49 U.S.C. § 46110(a). But there is simply no support for petitioners' insistence (Br. 45) that the Constitution entitles them to appeal an airline's refusal to permit them to fly without a mask directly to TSA.

53

Finally, petitioners' claim (Br. 91-94) that the challenged directives conflict with the International Covenant on Civil and Political Rights and the Convention on International Civil Aviation is entirely without merit.  Even if Mask Directives arguably violated any of the assorted provisions of the international treaties listed by petitioners, such provisions do not create legal obligations that can be enforced in federal court.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004) (stating that the International Covenant on Civil and Political Rights does not "create obligations enforceable in the federal courts"); *Medellin v. Texas*, 552 U.S. 491, 504-05 (2008) (explaining that treaties are "ordinarily" not self-executing).

In any event, on the merits, petitioners' claims are premised on their mistaken argument that the Mask Directives "ban[] the disabled who can[not] don masks from flying" and thus, in petitioners' view, violate international rights "to liberty of movement, freedom to leave any country, and ability to enter our own country."  Br. 92.  Again, the central premise of this argument is erroneous; the Mask Directives do not prohibit any individuals from traveling.

54

Similarly, petitioners argue (Br. 93) that the Convention on International Civil Aviation prohibits aircraft operators from requiring persons with disabilities to obtain medical clearance before traveling. But the Mask Directives do not require persons with disabilities to obtain a medical clearance prior to traveling. The directives simply state that travelers must wear masks unless they meet one of the listed exceptions, and they permit airlines to create a reasonable process to properly assess whether an individual in fact has a disability and cannot safely wear a mask because of that disability, and thus has a legitimate medical need for an accommodation.

55

# CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

DANIEL TENNY

*/s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*
  *Jennifer.l.utrecht@usdoj.gov*

May 2022

56

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,413 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

# ADDENDUM

# TABLE OF CONTENTS

49 U.S.C. § 114.............................................................................A1

**49 U.S.C. § 114 (excerpts)**

**§ 114. Transportation Security Administration**

**(a) In general.**--The Transportation Security Administration shall be an administration of the Department of Homeland Security.

\* \* \*

**(d) Functions.**--The Administrator shall be responsible for security in all modes of transportation, including--

> **(1)** carrying out chapter 449, relating to civil aviation security, and related research and development activities; and

> **(2)** security responsibilities over other modes of transportation that are exercised by the Department of Transportation.

**(e) Screening operations.**--The Administrator shall--

> **(1)** be responsible for day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation under sections 44901 and 44935;

> **(2)** develop standards for the hiring and retention of security screening personnel;

> **(3)** train and test security screening personnel; and

> **(4)** be responsible for hiring and training personnel to provide security screening at all airports in the United States where screening is required under section 44901, in consultation with the Secretary of Transportation and the heads of other appropriate Federal agencies and departments.

**(f) Additional duties and powers.**--In addition to carrying out the functions specified in subsections (d) and (e), the Administrator shall--

> **(1)** receive, assess, and distribute intelligence information related to transportation security;

> **(2)** assess threats to transportation;

> **(3)** develop policies, strategies, and plans for dealing with threats to transportation security;

A1

**(4)** make other plans related to transportation security, including coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States Government;

**(5)** serve as the primary liaison for transportation security to the intelligence and law enforcement communities;

**(6)** on a day-to-day basis, manage and provide operational guidance to the field security resources of the Administration, including Federal Security Managers as provided by section 44933;

**(7)** enforce security-related regulations and requirements;

**(8)** identify and undertake research and development activities necessary to enhance transportation security;

**(9)** inspect, maintain, and test security facilities, equipment, and systems;

**(10)** ensure the adequacy of security measures for the transportation of cargo;

**(11)** oversee the implementation, and ensure the adequacy, of security measures at airports and other transportation facilities;

**(12)** require background checks for airport security screening personnel, individuals with access to secure areas of airports, and other transportation security personnel;

**(13)** work in conjunction with the Administrator of the Federal Aviation Administration with respect to any actions or activities that may affect aviation safety or air carrier operations;

**(14)** work with the International Civil Aviation Organization and appropriate aeronautic authorities of foreign governments under section 44907 to address security concerns on passenger flights by foreign air carriers in foreign air transportation;

**(15)** establish and maintain a National Deployment Office as required under section 44948 of this title; and

**(16)** carry out such other duties, and exercise such other powers, relating to transportation security as the Administrator considers appropriate, to the extent authorized by law.

**(g) National emergency responsibilities.--**

A2

**(1) In general.**--Subject to the direction and control of the Secretary of Homeland Security, the Administrator, during a national emergency, shall have the following responsibilities:

**(A)** To coordinate domestic transportation, including aviation, rail, and other surface transportation, and maritime transportation (including port security).

**(B)** To coordinate and oversee the transportation-related responsibilities of other departments and agencies of the Federal Government other than the Department of Defense and the military departments.

**(C)** To coordinate and provide notice to other departments and agencies of the Federal Government, and appropriate agencies of State and local governments, including departments and agencies for transportation, law enforcement, and border control, about threats to transportation.

**(D)** To carry out such other duties, and exercise such other powers, relating to transportation during a national emergency as the Secretary of Homeland Security shall prescribe.

**(2) Authority of other departments and agencies.**--The authority of the Administrator under this subsection shall not supersede the authority of any other department or agency of the Federal Government under law with respect to transportation or transportation-related matters, whether or not during a national emergency.

**(3) Circumstances.**--The Secretary of Homeland Security shall prescribe the circumstances constituting a national emergency for purposes of this subsection.

* * *

**(*l*) Regulations.--**

**(1) In general.**--The Administrator is authorized to issue, rescind, and revise such regulations as are necessary to carry out the functions of the Administration.

**(2) Emergency procedures.--**

A3

**(A) In general.**--Notwithstanding any other provision of law or executive order (including an executive order requiring a cost-benefit analysis), if the Administrator determines that a regulation or security directive must be issued immediately in order to protect transportation security, the Administrator shall issue the regulation or security directive without providing notice or an opportunity for comment and without prior approval of the Secretary.

**(B) Review by Transportation Security Oversight Board.**--Any regulation or security directive issued under this paragraph shall be subject to review by the Transportation Security Oversight Board established under section 115. Any regulation or security directive issued under this paragraph shall remain effective for a period not to exceed 90 days unless ratified or disapproved by the Board or rescinded by the Administrator.

**(3) Factors to consider.**--In determining whether to issue, rescind, or revise a regulation under this section, the Administrator shall consider, as a factor in the final determination, whether the costs of the regulation are excessive in relation to the enhancement of security the regulation will provide. The Administrator may waive requirements for an analysis that estimates the number of lives that will be saved by the regulation and the monetary value of such lives if the Administrator determines that it is not feasible to make such an estimate.

**(4) Airworthiness objections by FAA.**--

**(A) In general.**--The Administrator shall not take an aviation security action under this title if the Administrator of the Federal Aviation Administration notifies the Administrator that the action could adversely affect the airworthiness of an aircraft.

**(B) Review by Secretary.**--Notwithstanding subparagraph (A), the Administrator may take such an action, after receiving a notification concerning the action from the Administrator of the Federal Aviation Administration under subparagraph (A), if the Secretary of Transportation subsequently approves the action.

**(m) Personnel and services; cooperation by Administrator.**--

A4

**(1) Authority of Administrator.**--In carrying out the functions of the Administration, the Administrator shall have the same authority as is provided to the Administrator of the Federal Aviation Administration under subsections (l) and (m) of section 106.

**(2) Authority of agency heads.**--The head of a Federal agency shall have the same authority to provide services, supplies, equipment, personnel, and facilities to the Administrator as the head has to provide services, supplies, equipment, personnel, and facilities to the Administrator of the Federal Aviation Administration under section 106(m).

* * *

**(p) Law enforcement powers.**--

**(1) In general.**--The Administrator may designate an employee of the Transportation Security Administration or other Federal agency to serve as a law enforcement officer.

**(2) Powers.**--While engaged in official duties of the Administration as required to fulfill the responsibilities under this section, a law enforcement officer designated under paragraph (1) may--

**(A)** carry a firearm;

**(B)** make an arrest without a warrant for any offense against the United States committed in the presence of the officer, or for any felony cognizable under the laws of the United States if the officer has probable cause to believe that the person to be arrested has committed or is committing the felony; and

**(C)** seek and execute warrants for arrest or seizure of evidence issued under the authority of the United States upon probable cause that a violation has been committed.

**(3) Guidelines on exercise of authority.**--The authority provided by this subsection shall be exercised in accordance with guidelines prescribed by the Administrator, in consultation with the Attorney General of the United States, and shall include adherence to the Attorney General's policy on use of deadly force.

**(4) Revocation or suspension of authority.**--The powers authorized by this subsection may be rescinded or suspended should

A5

the Attorney General determine that the Administrator has not complied with the guidelines prescribed in paragraph (3) and conveys the determination in writing to the Secretary of Homeland Security and the Administrator.

**(q) Authority to exempt.**--The Administrator may grant an exemption from a regulation prescribed in carrying out this section if the Administrator determines that the exemption is in the public interest.

\* \* \*

**(u) Enforcement of regulations and orders of the Secretary of Homeland Security.--**

**(1) Application of subsection.--**

**(A) In general.**--This subsection applies to the enforcement of regulations prescribed, and orders issued, by the Secretary of Homeland Security under a provision of chapter 701 of title 46 and under a provision of this title other than a provision of chapter 449 (in this subsection referred to as an "applicable provision of this title").

**(B) Violations of chapter 449.**--The penalties for violations of regulations prescribed and orders issued by the Secretary of Homeland Security or the Administrator under chapter 449 of this title are provided under chapter 463 of this title.

**(C) Nonapplication to certain violations.--**

**(i)** Paragraphs (2) through (5) do not apply to violations of regulations prescribed, and orders issued, by the Secretary of Homeland Security under a provision of this title--

**(I)** involving the transportation of personnel or shipments of materials by contractors where the Department of Defense has assumed control and responsibility;

**(II)** by a member of the armed forces of the United States when performing official duties; or

**(III)** by a civilian employee of the Department of Defense when performing official duties.

A6

**(ii)** Violations described in subclause (I), (II), or (III) of clause (i) shall be subject to penalties as determined by the Secretary of Defense or the Secretary of Defense's designee.

**(2) Civil penalty.—**

**(A) In general.**--A person is liable to the United States Government for a civil penalty of not more than $10,000 for a violation of a regulation prescribed, or order issued, by the Secretary of Homeland Security under an applicable provision of this title.

**(B) Repeat violations.**--A separate violation occurs under this paragraph for each day the violation continues.

**(3) Administrative imposition of civil penalties.--**

**(A) In general.**--The Secretary of Homeland Security may impose a civil penalty for a violation of a regulation prescribed, or order issued, under an applicable provision of this title. The Secretary shall give written notice of the finding of a violation and the penalty.

**(B) Scope of civil action.**--In a civil action to collect a civil penalty imposed by the Secretary of Homeland Security under this subsection, a court may not re-examine issues of liability or the amount of the penalty.

**(C) Jurisdiction.**--The district courts of the United States shall have exclusive jurisdiction of civil actions to collect a civil penalty imposed by the Secretary of Homeland Security under this subsection if--

**(i)** the amount in controversy is more than--

**(I)** $400,000, if the violation was committed by a person other than an individual or small business concern; or

**(II)** $50,000 if the violation was committed by an individual or small business concern;

**(ii)** the action is in rem or another action in rem based on the same violation has been brought; or

A7

**(iii)** another action has been brought for an injunction based on the same violation.

**(D) Maximum penalty.**--The maximum civil penalty the Secretary of Homeland Security administratively may impose under this paragraph is--

**(i)** $400,000, if the violation was committed by a person other than an individual or small business concern; or

**(ii)** $50,000, if the violation was committed by an individual or small business concern.

**(E) Notice and opportunity to request hearing.**--Before imposing a penalty under this section the Secretary of Homeland Security shall provide to the person against whom the penalty is to be imposed--

**(i)** written notice of the proposed penalty; and

**(ii)** the opportunity to request a hearing on the proposed penalty, if the Secretary of Homeland Security receives the request not later than 30 days after the date on which the person receives notice.

**(4) Compromise and setoff.--**

**(A)** The Secretary of Homeland Security may compromise the amount of a civil penalty imposed under this subsection.

**(B)** The Government may deduct the amount of a civil penalty imposed or compromised under this subsection from amounts it owes the person liable for the penalty.

**(5) Investigations and proceedings.**--Chapter 461 shall apply to investigations and proceedings brought under this subsection to the same extent that it applies to investigations and proceedings brought with respect to aviation security duties designated to be carried out by the Secretary of Homeland Security.

A8

# EXHIBIT 02

## Defendants' Threat to Pay Legal Fees

**From:** "Goldberg, Roy" <roy.goldberg@stinson.com>
**Date:** March 18, 2022 at 5:12:12 AM EDT
**To:** aa@neg.com
**Subject:** RE: NMOK  JOFVXV April 24, 2022 AARON ABADI

Mr. Abadi,

I can assure you that I oppose unlawful discrimination in any form.  And I am interested in helping my clients comply with the laws.  You and your fellow Americans Against Mask Mandates (AAMM) coalition members have a lot of issues with the Federal Transportation Mask Mandate (FTMM) – I understand that – and there are regulations and policies of the federal government with which you disagree.  That is your right.

But you do not have the right to threaten and pursue baseless claims.  At least you should be advised that there will be a significant financial cost for doing so.   Allow me to explain something to you.  Your threats to sue my clients and me personally for your groundless legal allegations will have real world consequences.  I realize you are a serial pro se plaintiff who has sued various entities and persons and will likely continue to do so.   But just so we are clear and there is no misunderstanding down the road, the conspiracy claims you make against the airlines, their employees and me personally under the Civil War era civil rights statutes – 42 U.S.C. 1985(3) and 1986 -- are baseless, and will subject you to having to pay the attorneys' fees incurred to respond to your baseless claims, pursuant to 42 U.S.C. 1988 (as well as Rule 11, FRCP).   If you sue persons and entities under 42 U.S.C. 1985 and 1986 and lose and they parties you sued are "prevailing parties," the fee shifting provision in 42 U.S.C. 1988 requires the plaintiff to pay the defendants for their attorneys' fees.  This is a real thing.  The airlines' request for attorneys' from another member of your coalition who also filed similar claims is now pending.   See the opposition filed by the Airline Defendants in the WD Ky case filed by your fellow AAMM member Michael Faris, who may now have to pay the airlines' legal bills because of the same legal theory that you have been threatening since at least last December.  In addition, per the Farese case (also attached) you cannot sue a lawyer for civil conspiracy because he was representing his client, and you are now fully advised that if you ignore these authorities and pursue these claims anyway, there will be a financial consequence to you.

Ideally, you and the airlines can find a way to coexist and we all look forward to the day that the FTMM is no longer in place because of the science.   But if you persist with your threats then that is also a situation with which we are more than prepared to deal, per the above.

Roy Goldberg
STINSON LLP
1775 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006
(202) 728-3005
Email: roy.goldberg@stinson.com

**Roy Goldberg**
Partner

STINSON LLP

1775 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-4605
Direct: 202.728.3005 \ Mobile: 301.908.3268 \ Bio

Assistant: WDC.LSSTeam@stinson.com \ 202.572.9910

**STINSON.COM**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MICHAEL FARIS,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )        Case No. 3:22-cv-23-BJB-RSE
                                  )
CENTERS FOR DISEASE               )
CONTROL & PREVENTION, *et al.*,   )
                                  )
        Defendants.               )

**AIRLINE DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION TO ADD 15 INDIVIDUAL DEFENDANTS AND REQUEST
FOR ATTORNEYS' FEES UNDER 42 U.S.C. § 1988**

Defendants, American Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines
Co., Spirit Airlines, Inc. and United Airlines, Inc. (collectively the "Airline Defendants"), by and
through undersigned counsel, oppose Plaintiffs' Motion to Add 15 Individual Defendants (Doc.
65). Plaintiff's attempt to add the individual defendants to his claims under 42 U.S.C. §§ 1985(3)
and 1986 alleging a conspiracy to engage in discriminatory conduct against airline passengers with
a disability is legally untenable, and indeed frivolous. First, 42 U.S.C. §§ 1985(3) and 1986 do
not apply to claims for discrimination on the basis of disability. These statutes were enacted to
attack virulent racial discrimination and to protect the Freedmen (and women) in the aftermath of
the Civil War. *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S.
825, 836 (1983) ("The predominate purpose of § 1985(3) was to combat the prevalent animus
against" the freed slaves and their supporters); 56 Wash. & Lee L. Rev. 461, 471 (1999) ("Sections
1985 and 1986 were enacted in 1871, as part of the Civil Rights Act, which also contained the
more commonly construed 1983. The Act was passed against the backdrop of brutal and pervasive
[Ku Klux] Klan violence in the South.").

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 88 of 165   Page ID
Case 3:22-cv-00023-BJB-RSE   Document 62-5   Filed 03/14/22   Page 2 of 23 PageID #: 2413
#:2734

Fatal to Plaintiff's claim is the fact that the Sixth Circuit has clearly stated that 42 U.S.C.

§ 1985(3) <u>does not apply to claims for discrimination on the basis of disability</u>. *Sanders v. City of*

*Pembroke*, No. 5:19-CV-23-TBR, 2020 WL 4572360, *3 (W.D. Ky. Aug. 7, 2020) (citing

*Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994) (holding that

**"[n]o existing legal precedent supports the plaintiffs' argument" that § 1985(3) covers**

**discriminatory conspiracies against the disabled**) (emphasis added)); *Bartell v. Lohiser*, 215

F.3d 550, 559-60 (6th Cir. 2000) (plaintiff's **"claim that Defendants discriminated against her**

**on account of her mental disabilities . . . is not actionable"**) (emphasis added) (quoting *Browder*

*v. Tipton*, 630 F.2d 1149 (6th Cir. 1980)); *also Kuerbitz v. Meisner*, No. 17-2284, 2018 WL

5310762, at *3 (6th Cir. July 11, 2018) ("Although Kuerbitz alleges a disability, **§ 1985(3) does**

**not cover claims based on disability-based discrimination or animus"**) (emphasis added);

*Diemond v. Michigan Dep't of Corr.*, No. 1:17-CV-928, 2018 WL 1150023, at *7 (W.D. Mich.

Mar. 5, 2018), *aff'd*, No. 18-1344, 2018 WL 7890769 (6th Cir. Oct. 31, 2018) ("Plaintiff has no

actionable conspiracy claim under § 1985(3), however, because that statute 'does not cover claims

based on disability-based discrimination or animus.'"); *Oliver v. Lexington Fayette Urban County*

*Gov't*, No. 20-5639, 2020 WL 7346025 (6th Cir. Oct. 16, 2020) ("Although Oliver alleges a

disability, a conspiracy claim under § 1985(3) 'does not cover claims based on disability-based

discrimination or animus"). Plaintiff's pursuit of his Section 1985(3) claim despite this clear Sixth

Circuit precedent to the contrary is baseless and lacking in good faith.

Second, section 1985(3) does not apply to the conduct or omissions of airlines or their

employees, because disability discrimination claims by disabled airline passengers are

exhaustively covered by the Air Carrier Access Act of 1986, 49 U.S.C. § 47105 ("ACAA"), and

the implementing regulations promulgated and enforced by the United States Department of

2

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 89 of 165   Page ID
#:2735
Case 3:22-cv-00023-BJB-RSE   Document 6-7   Filed 03/14/22   Page 3 of 23 PageID #: 2414

Transportation ("DOT"), 14 C.F.R. Part 382.  The procedure set forth in the ACAA and the regulations implementing it provide the exclusive remedy to passengers seeking to pursue a disability discrimination claim.  "Allowing [plaintiff] to pursue his claim through the mechanism of section 1985(3) would impermissibly intrude on the statutory scheme of both" the ACAA and section 1985(3).  *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1487 (7th Cir. 1985); *Sauter v. State of Nevada*, 142 F.3d 445, 1998 WL 196630, *1 (9th Cir. 1998) ("Sauter's allegations of a conspiracy to violate his ADA and ADEA rights implicate an animus toward a congressionally protected class. These claims are not cognizable under § 1985, however, because that section cannot serve as a vehicle to enforce statutory rights when the statute in question has its own remedial structure") (citing *Great Am. Fed. Sav. & Loan Assn. v. Novotny,* 442 U.S. 366 (1979)).

Third, as in-house counsel for American Airlines, Peter Soares cannot properly be named as a defendant with regard to Plaintiff's claims under sections 1985(3) and 1986.  *Farese v. Scherer*, 342 F.3d 1223, 1230-32 (11th Cir. 2003) ("as an attorney's conduct falls within the scope of the representation of his client, such conduct is immune from an allegation of a § 1985 conspiracy").

Further, because Plaintiff's claims against the individuals under 42 U.S.C. 1985(3) and 1986 are frivolous, pursuant to 42 U.S.C. § 1988, Plaintiff should be ordered to pay the Airline Defendants' reasonable attorneys' fees in having to respond to the baseless motion.

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 90 of 165   Page ID
#:2736
Case 3:22-cv-00023-BJB-RSE   Document 57-5   Filed 03/14/22   Page 4 of 23 PageID #: 2415

## STATEMENT OF FACTS

A review of the relevant statutes and regulations implicated by Plaintiff's proposed amendment follows.

### The Air Carrier Access Act of 1986

The Air Carrier Access Act of 1986 ("ACAA"), 49 U.S.C. § 41705, is titled "Discrimination against handicapped individuals." It states that, in "providing air transportation, an air carrier . . . may not discriminate against an otherwise qualified individual on the following grounds: (1) "the individual has a physical or mental impairment that substantially limits one or more major life activities"; (2) "the individual has a record of such an impairment"; (3) and "the individual is regarded as having such an impairment." Section 41705(a). The statute provides that the Secretary of Transportation "shall investigate each complaint of a violation of subsection (a)." Section 41705(c)(1).

To implement and enforce the ACAA, the DOT issued a robust set of regulations, in 14 C.F.R. Part 382, titled "Nondiscrimination on the Basis of Disability in Air Travel." The purpose of Part 382 "is to carry out the Air Carrier Access Act of 1986, as amended." 14 C.F.R. § 382.1. The rule "prohibits both U.S. and foreign carriers from discriminating against passengers on the basis of disability; requires carriers to make aircraft, other facilities, and services accessible; and requires carriers to take steps to accommodate passengers with a disability." *Id*. Pursuant to the regulations, an air carrier may "not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation." 14 C.F.R. § 382.11(a)(1). The DOT is the agency charged with enforcing the ACAA as against air carriers, and it has a detailed set of regulations which apply the ACAA to air carriers, including the following provisions:

- SUBPART B—NONDISCRIMINATION AND ACCESS TO SERVICES AND INFORMATION

4

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 91 of 165   Page ID
Case 3:22-cv-00023-BJB-RSE   Document 67-5   Filed 03/14/22   Page 5 of 23 PageID #: 2416
#:2731

- o   § 382.11 What is the general nondiscrimination requirement of this part?
- o   § 382.13 Do carriers have to modify policies, practices, and facilities to ensure nondiscrimination?
- o   § 382.15 Do carriers have to make sure that contractors comply with the requirements of this Part?
- o   § 382.17 May carriers limit the number of passengers with a disability on a flight?
- o   § 382.19 May carriers refuse to provide transportation on the basis of disability?
- o   § 382.21 May carriers limit access to transportation on the basis that a passenger has a communicable disease or other medical condition?
- o   § 382.23 May carriers require a passenger with a disability to provide a medical certificate?
- o   § 382.25 May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight?
- o   § 382.27 May a carrier require a passenger with a disability to provide advance notice in order to obtain certain specific services in connection with a flight?
- o   § 382.29 May a carrier require a passenger with a disability to travel with a safety assistant?
- o   § 382.31 May carriers impose special charges on passengers with a disability for providing services and accommodations required by this rule?
- o   § 382.33 May carriers impose other restrictions on passengers with a disability that they do not impose on other passengers?
- o   § 382.35 May carriers require passengers with a disability to sign waivers or releases?

Passengers such as Plaintiff who claim to have been discriminated against by an airline because of a disability do not have a private right of action to pursue a claim in federal district court against an airline that allegedly has discriminated in violation of the ACAA.  Congress did not create a private right of action to sue airlines for an alleged violation of the ACAA.  *Love v. Delta Air Lines, Inc.*, 310 F.3d 1347, 1360 (11th Cir. 2002); *see also Dilldine v. Am. Airlines, Inc.*, No. 3:18-cv-178, 2019 WL 3821789, *4 (S.D. Ohio Aug. 12, 2019) ("there is no private right of action created by the Act");  *Boswell v. Skywest Airlines, Inc.,* 61 F.3d 1263, 1270 (10th Cir. 2004) ("Congress's creation of specific means of enforcing the statute indicates that it did not intend to allow an additional remedy—a private right of action—that it did not expressly mention at all"); *Stokes v. Southwest Airlines Co.*, 887 F.3d 199, 202 (5th Cir. 2018) (ACAA did not provide private cause of action against airline for mother of young passenger with autism); *Segalman v. Southwest*

5

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 92 of 165   Page ID
Case 3:22-cv-00023-BJB-RSE   Document 52-1 Filed 03/14/22   Page 6 of 23 PageID #: 2417
#:2758

*Airlines Co.*, 895 F.3d 1219 (9th Cir. 2018) (ACAA did not create an implied private cause of

action); *Lopez v. JetBlue Airways Corp.*, 662 F.3d 593, 597 (2d Cir. 2011) ("the text and structure

of the ACAA manifests no congressional intent to create a private right of action in a federal

district court"). Rather, a passenger alleging discrimination by an airline on the basis of disability

in violation of the ACAA can file an administrative complaint with the DOT, and if that person

disputes the DOT's final decision in its administrative proceeding, the passenger can file a petition

for review of the DOT action in the U.S. Court of Appeals, pursuant to 49 U.S.C. § 46110.

The ACAA preceded the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-

12213. Because the ACAA applies to discrimination claims against the airlines, the ADA does

not apply to claims that an airline discriminated against a person with a disability in connection

with the circumstances onboard the aircraft. In *Mapp-Leslie v. Norwegian Airlines*, No. 19-cv-

7142 (PKC), 2020 WL 264919, *2 (E.D.N.Y. Jan. 17, 2020), the plaintiff alleged that Norwegian

Airlines discriminated against her in violation of the ADA by refusing to allow her to bring her

service animal onboard the flight. In dismissing the disability claim, the court stated:

> The Court, *sua sponte*, next considers a claim under Title III of the ADA, which
> provides that "[n]o individual shall be discriminated against on the basis of
> disability in the full and equal enjoyment of the goods, services, facilities,
> privileges, advantages, or accommodations of any place of public accommodation
> by any person who owns, leases (or leases to), or operates a place of public
> accommodation." 42 U.S.C. § 12182(a). Title III covers "[s]pecified public
> transportation" but specifically excludes "aircraft." *See* 42 U.S.C. §
> 12181(10) ("The term 'specified public transportation' means transportation by
> bus, rail, or any other conveyance (other than by aircraft) that provides the general
> public with general or special service (including charter service) on a regular and
> continuing basis."); *see also Lopez v. Jet Blue Airways*, 662 F.3d 593, 598–99 (2d
> Cir. 2011) ("Air carriers are not liable under [Title III] for disability discrimination
> in the provision of services related to air transportation. . . . [P]ublic transportation
> terminals, depots, or stations used primarily to facilitate air transportation are not
> 'public accommodations' for purposes of Title III of the ADA." (internal brackets
> omitted)). Thus, the Court finds that Plaintiff does not state a viable claim under
> Title III of the ADA.

6

**42 U.S.C. § 1985(3)**

The Civil Rights statute upon which Plaintiff relies, Section 1985(3), 42 U.S.C., states:

**(3) Depriving persons of rights or privileges**

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Section 1985 "permits suits against those who conspire to deprive others 'of the equal protection of the laws, or of the equal privileges and immunities under the law.'"  To establish a civil conspiracy under § 1985(3), "the claimant must show that (1) 'two or more persons . . . conspire[d]' (2) 'for the purpose of depriving . . . [the claimant] of the equal protection of the laws' due to racial or class-based animus and that the conspirators (3) committed an act 'in furtherance of the object of such conspiracy' (4) that 'injured' the claimant." *Maxwell v. Dodd*, 662 F.3d 418, 422 (6th Cir. 2011) (quoting 42 U.S.C. 1985(3)). A claimant under section 1985(3) must allege "both membership in a protected class and discrimination on account of it." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 765 (6th Cir. 2010) (citing *Bartell, supra,* 215 F.3d at 559); *see also Vakilian v. Shaw*, 335 F.3d 509, 518-19 (6th Cir. 2003); *Sanders v. City of Pembroke*, *supra*, 2020 WL 4572360, *3 (W.D. Ky. Aug. 7, 2020) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d

7

837, 839 (6th Cir. 1994)). "A plaintiff "must also establish that the conspiracy **was motivated by a class-based animus**." *Id.* (citing *Johnson*, 40 F.3d at 839) (emphasis added). "A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, **such as race, national origin, or gender**." *Id.* (emphasis added) (citing *Haverstick, supra*, 32 F.3d at 994).

Importantly, and fatal to Plaintiff's motion, is the fact that the Sixth Circuit has held that "§ 1985(3) only covers conspiracies against: 1) classes who receive heightened protection under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the purpose of asserting certain fundamental rights.'" *Sanders*, at *3 (citing *Bartell, supra*, at 560). In *Sanders* the court stated that **"[T]he Supreme Court has not conferred suspect or quasi-suspect status on statutory classifications covering the disabled**." 2020 WL 4572360, *3 (emphasis added) (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442 (1985)); *see also Haverstick*, 32 F.3d at 994 (holding that "[n]o existing legal precedent supports the plaintiffs' argument" that § 1985(3) covers discriminatory conspiracies against the disabled). "**Therefore, claims of disability-based discrimination or animus are not actionable under § 1985(3).**" *Sanders*, at *3 (emphasis added). As the court stated in *Sanders*: "**To the extent that Plaintiffs' § 1985(3) claims are based on disability discrimination, they are not actionable and must be dismissed.**" *Sanders,* at *3 (emphasis added).[1]  *See Toro v. Rhode Island*, 253 F.R.D. 31, 32 (D.R.I. 2008) ("Plaintiff's proposed amendment to change the cause of action would be futile because his complaint provides no allegation of fact that would support a cause of action under either § 1985 or § 1986").

---

[1]The Sixth Circuit in *Bartell* also stated that because the plaintiff's "§ 1986 claim is derivative and conditioned on establishing a § 1985 violation, [plaintiff's] § 1986 claim must also be dismissed." 215 F.3d at 560.

8

Exhibits: MEM. IN OPP. TO
AIRLINE DEFs' MTD

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 95 of 165   Page ID
Case 3:22-cv-00023-BJB-RSE   Document 6-27   Filed 03/14/22   Page 9 of 23 PageID #: 2420
#:2741

"The civil-conspiracy prohibition contained in § 1985(3) was enacted as a significant part of the civil rights legislation passed in the aftermath of the Civil War." *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017) (*citing Carpenters v. Scott*, 463 U.S. 825, 834–837 (1983) (detailing the legislative history of § 1985(3)); *Griffin v. Breckenridge*, 403 U.S. 88, 99–101 (1971) (same); *Great American Fed. Sav. & Loan Assn. v. Novotny*, 442 U.S. 366, 379 (1979) (Powell, J., concurring) (describing § 1985(3) as a "Civil War Era remedial statute"). "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Novotny*, *supra,* 442 U.S at 373.  A conspiracy under section 1985(3) requires a plaintiff "to allege that the conspiracy was motivated by 'some racial or perhaps otherwise class-based, invidiously discriminatory animus.'" *Dallas v. Holmes*, 137 F. App'x 746, 752 (6th Cir. 2005) (quoting *Bartell*, 215 F.3d at 559-60); *see also Ohio ex rel. Moore v. Brahma Inv. Grp., Inc.*, 723 F. App'x 284, 288 (6th Cir. 2018) ("To state such a claim, plaintiffs must prove a conspiracy to deprive a person or class of persons of the equal protection of the laws, and an act in furtherance of the conspiracy which causes the constitutional deprivation").  *See Dallas*, 137 F. App'x at 752 ("Failure to allege membership in a protected class, and discrimination based upon such membership, requires dismissal of Plaintiff's § 1985(3) claim").

### 42 U.S.C. § 1986

42 U.S.C. § 1986 applies to allegations that a "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . ."  A prerequisite for a claim under section 1986 for

9

neglect to prevent a civil rights conspiracy is the existence of an actionable conspiracy under section 1985. *Bartell*, 215 F.3d at 560.

<u>**PROCEDURAL STATUS**</u>

<u>**Plaintiff's Claims for Violation of 42 U.S.C. §§ 1985(3) and 1986.**</u>

In Count 12 of his original Complaint, Plaintiff claims that the Airline Defendants and "yet-to-be-named Individual Defendants" are liable under 42 U.S.C. 1985(3) because they "conspired to deprive disabled Americans" of their "civil rights by adopting policies in Summer 2020 that banned anyone medically unable to wear a face mask from using the nation's air-transportation system." Doc. 1 at 131 (¶ 616). In Count 13, Plaintiff asserts that the "yet-to-be named Individual Defendants (whose names will be obtained during discovery)" are liable under 42 U.S.C. § 1986 because they "were aware of the conspiracy to interfere with the civil rights of the disabled by banning [them] from all flights but did nothing to stop it." Doc. 1 at 134 (¶ 627).

<u>**Plaintiff's Motion to Add Airlines Employees as Individual Defendants for Allegedly Conspiring against Plaintiff in Violation of 42 U.S.C. §§ 1985(3) and 1986.**</u>

On March 10, 2022, Plaintiff filed his motion to add the Airline employees as additional named defendants. Doc. 65. He contends that the individual defendants he seeks to add to this case are liable for having engaged in an unlawful conspiracy to interfere with Plaintiff's rights as a disabled person, pursuant to 42 U.S.C. §§ 1985(3) and 1986. Plaintiff lists the names of various persons whom he claims are employed by the Airline Defendants and accuses them of engaging in acts or omissions objected to by Plaintiff. With regard to Peter Soares, an in-house attorney for American Airlines, Plaintiff asserts that Mr. Soares is "American Airlines' managing director of legal affairs," and has allegedly "allowed American to ban hundreds – perhaps thousands – of

10

disabled passengers including [Plaintiff] for doing nothing more than requesting a mask exemption." Doc. 65, at 1.

Plaintiff claims that the persons he seeks to add as defendants "are the first 15 of what I expect will be several dozen employees of Defendants American Airlines, JetBlue Airways, Southwest Airlines, Spirit Airlines, and United Airlines (collectively "the Airline Defendants") that [Faris] will be adding as their names and roles in the conspiracy to interfere with the civil rights of the disabled are discovered." Doc. 65, at 1

## LEGAL STANDARD

Plaintiff's motion cites Rule 21, Fed. R. Civ. P. (Doc. 65, at 6), which states that, "On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Plaintiff also refers to Rule 15, Fed. R. Civ. P. Doc. 65, at 7. Rule 15 provides that leave to amend "shall be freely given when justice so requires." However, "futility" is a basis for denying an amended pleading. *Curtis v. Sumerall*, No. 3:20-cv-735-BJB, 2022 WL 586773, *1 (W.D. Ky. Feb. 25, 2022) ("Though courts 'should freely give leave when justice so requires,' . . . leave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." (Citing *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)).

For purposes of Rule 15(a), an amendment is futile if it would not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000); *Miller v. Calhoun County*, 408 F.3d 803, 817 (6th Cir. 2005) (an amendment is "futile" if "the proposed amendment would not permit the complaint to survive a motion to dismiss").[2]

---

[2]Plaintiff also cites Rule 20, Fed. R. Civ. P., titled "Permissive Joinder of Parties." Doc. 65, at 7.

11

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 98 of 165   Page ID
Case 3:22-cv-00023-BJB-RSE   Document 67-1   Filed 03/14/22   Page 12 of 23 PageID #: 2423
#:2744

## ARGUMENT

Plaintiff's motion to add individual Airlines employees to his claims for civil conspiracy in violation of 42 U.S.C. §§ 1985(3) and 1986 should be denied as futile because Plaintiff has no cause of action against the Airline Defendants or their employees under those two Civil War era civil rights statutes. *See McIlwain v. Dodd*, No. 3:21-cv-406-RGJ, 2022 WL 492986, *7 (W.D. Ky. Feb. 17, 2022) ("nether the Complaint nor the Amended Complaint contain any plausible facts showing that [plaintiff] falls within a protected class or that the alleged conspiracy was motivated by class-based discriminatory animus. As a result, the Court finds that amendment is futile and DENIES [Plaintiff's] motion for leave to amend as to this claim. Defendants' Motion to Dismiss the § 1985(3) claim in [plaintiff's] original Complaint is GRANTED").

I.   **IT WOULD BE FUTILE TO ADD THE AIRLINES EMPLOYEES AS DEFENDANTS UNDER 42 U.S.C. §§ 1985(3) AND 1986 BECAUSE PLAINTIFF HAS NO CLAIM UNDER THOSE CIVIL RIGHTS STATUTES AGAINST THE AIRLINES OR THEIR EMPLOYEES.**

   A.   **Section 1985(3) Does Not Apply to Claims for Disability Discrimination.**

Plaintiff cannot rely on the Civil War era statute of 42 U.S.C. §§ 1985(3) to challenge the alleged disability discrimination because it does not apply to claims for disability discrimination. *See Haverstick Enters., supra,* 32 F.3d at 994 (the Sixth Circuit held that "[n]o existing legal precedent supports the plaintiffs' argument" that § 1985(3) covers discriminatory conspiracies against the disabled)); *Bartell v. Lohiser*, *supra*, 215 F.3d at 559-60 (plaintiff's "claim that Defendants discriminated against her on account of her mental disabilities . . . is not actionable. As noted earlier, the Supreme Court has not conferred suspect or quasi-suspect status on statutory classifications covering the disabled"); *Kuerbitz v. Meisner*, *supra*, 2018 WL 5310762, at *3 ("§ 1985(3) does not cover claims based on disability-based discrimination or animus").

12

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 99 of 165   Page ID
#:2745
Case 3:22-cv-00023-BJB-RSE   Document 67-1   Filed 03/14/22   Page 13 of 23 PageID #: 2424

In *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474 (7th Cir. 1985), the plaintiff, who suffered from acrophobia and was terminated from his position with a government contractor, asserted that the defendants were liable under 42 U.S.C. § 1985(3) for allegedly conspiring with the company to deny him "effective administrative review of the complaint he filed . . . ." *Id*. at 1485. In dismissing the plaintiff's conspiracy claim, the Seventh Circuit stated that, in "order to recover under Section 1985(3), a plaintiff must establish that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action exists." *Id*. at 1485-86 (citing *Griffin v. Breckenridge*, 403 U.S 88, 102 (1971)).

In *D'Amato*, the court stated that the legislative history behind section 1985(3) "counsels that" the courts "interpret the statute carefully to be sure the scope of Congressional intention is not exceeded. . . . The legislative history of section 1985(3) does not suggest a concern for the handicapped. The handicapped as a class differ radically from the racially based animus motivating the Ku Klux Klan and white supremacists against which Congress directed Section 1985(3). Handicaps vary greatly from immediately noticeable physical handicaps to ones not at first obvious or those revealed only by a medical examination." 760 F.2d at 1486. The court added that "Being handicapped is not a historically suspect class such as race, national origin, or sex . . ." *Id*.; *see also Wilhem v. Continental Title Co*., 720 F.2d 1173, 1177 (10th Cir. 1983) ("We must conclude that class of "handicapped persons" was not in the contemplation of Congress in 187 and was not included as a class in what is now § 1985(3)").

Similarly, in *Isaac v. Trustees of Dartmouth College*, No. 17-cv-040-LM, 2017 WL 2982954 (D.N.H. July 12, 2017), the plaintiff alleged the existence of a section 1985(3) conspiracy because "neither Dartmouth nor the Board of Medicine wants any disabled persons to become Doctors." *Id*. at *7. In dismissing the claim, the court stated: "the court of appeals for the [First]

13

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 100 of 165   Page ID
#:2746
Case 3:22-cv-00023-BJB-RSE   Document 67   Filed 03/14/22   Page 14 of 23 PageID #: 2425

circuit has held that § 1985 does not provide a remedy for [Americans with Disability Act, 42
U.S.C. §§ 12101-12213] violations." *Id.* at *7 (citing *D.B. ex rel. Elizabeth B. v. Esposito*, 675
F.3d 26, 44 (1st Cir. 2012)).  In *Esposito*, the First Circuit stated: "Disabilities Education Act]
violations . . . or for Rehabilitation Act or ADA violations . . . . We see no reason why § 1985
should be any different."  *Id.*; *see also Isaac*, at *8 ("Because plaintiff's § 1985(3) claims rest
solely upon his membership in a class of disabled individuals and because discriminatory animus
based upon disability does not give rise to liability under § 1985(3), it is crystal clear that the
plaintiff cannot prevail" on any of his section 1985(3) claims).  *See Dallas*, 137 F. App'x at 752
("Failure to allege membership in a protected class, and discrimination based upon such
membership, requires dismissal of Plaintiff's § 1985(3) claim").

Plaintiff's attempt to add the Airline employees must fail because claims for discrimination
on the basis of disability are not covered by 42 U.S.C. § 1985(3) and § 1986.

### B.   Section 1985(3) Does Not Apply Where, as Here, there is a Statutory and Administrative Framework for Discrimination Claims on the Basis of Disability.

Plaintiff's section 1985(3) claim fails for another reason: there is a preexisting statute and
regulatory structure for discrimination claims against the airlines – namely, the ACAA.  In other
words, a plaintiff cannot try to use section 1985(3) to circumvent the detailed administrative
regulations and procedures which the DOT has promulgated and enforces for the purpose of
responding to passenger complaints for disability discrimination against airlines.

In *D'Amato v. Wisconsin Gas Co.*, 760 F.2d at 1474, the Seventh Circuit addressed this
issue and held that a plaintiff alleging a civil conspiracy to deprive him of his rights as a disabled
person could not use section 1985(3) because that would allow him to circumvent the statutory
and regulatory structure in place under Section 503 of the Rehabilitation Act, 29 U.S.C. § 793,

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 101 of 165   Page ID
#:2747
Case 3:22-cv-00023-BJB-RSE   Document 67-7   Filed 03/14/22   Page 15 of 23 PageID #: 2426

which "provides its own administrative remedy."  760 F.2d at 1487.  The Court explained: "no

private right of action is available and the administrative complaint is the only recourse available

to a private plaintiff.  This situation makes the allowance of an action under Section 1985(3), which

would avoid entirely the administrative procedures provided in Section 503(b) and its

accompanying regulations, even more suspect as a breach of the Congressional intent underlying

Section 503 than it was in *Novotny*."  *Id*. at 1487.

The *D'Amato* Court further reasoned, "Allowing [plaintiff] to pursue his claim through the

mechanism of section 1985(3) would impermissibly intrude on the statutory scheme of both

sections 503 and 1985(3)."  760 F.2d at 1487.  Similarly here, allowing Plaintiff to pursue his claim

against the Airline Defendants and the Airline employees "would impermissibly intrude on the

statutory scheme" of both the ACAA and section 1985(3).  *See also Burkhardt v. Intuit Inc, No.*

*cv-02-675-JUC-CKS*, 2009 WL 528603, *8 (D. Ariz. March 2, 2009) ("The Ninth Circuit has

reasoned that even if disabled persons constitute a protected class under section 1985(3) . . . section

1985(3) cannot serve to circumvent the remedial structure of the" Americans with Disabilities Act)

(citing *Sauter v. State, supra,* 1998 WL 196630, at *1 (section 1985(3) "cannot serve as a vehicle

to enforce statutory rights when the statute in question has its own remedial structure")); *Doe v.*

*U.S. Dep't of Vet. Affairs*, No. 08-14958-BL, 2009 WL 2023663, *4 (E.D. Mich. July 17, 2009)

("Moreover, Plaintiff has not identified a class protected by 42 U.S.C. § 1985, such as race, gender

or political affiliation.  Indeed, Plaintiff's response brief acknowledges that its claim is based on

age and disability discrimination, which are not cognizable under 42 U.S.C. § 1985 because a

delineated avenue of relief is available under the ADEA and ADA");  *See Novotny*, *supra,* 442

U.S. at 373 (reasoning that a violation of Title VII could not be advanced under 42 U.S.C. § 1985

because a complainant could avoid most if not all of the [] detailed and specific provisions of the

law); *Hagen v. Berkshire County ARC, Inc.*, No. 3:16-cv-30141-KAR, 2018 WL 907407, *6 (D.

Mass. Feb. 15, 2008) ("The Supreme Court's holding in . . . *Novotny* . . . dooms Plaintiff's proposed

Title VII conspiracy claim.  In *Novotny*, the court 'held that Section 1985(3) cannot be invoked to

redress violations of Title VII"); *Rice v. New England College*, 676 F.2d 9, 11 (1st Cir. 1982)

("Title VII rights cannot form the basis of a § 1985(3) action"); *Medvey v. Oxford Health Plans*,

313 F. Supp. 2d 94, 100 (D. Conn. 2004) ("Because plaintiff has alleged violations of state and

federal anti-discrimination laws which have their own enforcement mechanisms and remedies,

defendant's motion to dismiss is granted, and plaintiff's conspiracy count based on section 1985

is dismissed").

Because  the  use  of  42  U.S.C.  § 1985(3)  to  challenge  alleged  discrimination  against

disabled passengers would contravene the anti-discrimination enforcement mechanisms in the

ACAA and 14 C.F.R. Part 382, it would be futile to allow Plaintiff to amend his Complaint to

bring Section 1985(3) and Section 1986 claims against the Airline personnel targeted by Plaintiff.

"The air carrier is now answerable to the DOT for ACAA regulation violations, and it appears that

Congress intended that this be the exclusive remedy in cases not involving breach of contract or

bodily injury or death." *Compass Airlines, LLC v. Montana Dep't of Labor and Indus.*, No. CV

12-105-H-CCL, 2013 WL 4401045, *14 (D. Mont. Aug. 12, 2013).[3]

---

[3]Similarly, Plaintiff cannot try to bootstrap his claims against Airline Defendants' employees by
referring to the ACAA, because as stated above, there is no private right of action to sue the Airline
Defendants under the ACAA.  *See Love v. Delta Air Lines, supra*, 310 F.3d at 1360; *Dilldine v.
Am. Airlines, supra*, 2019 WL 3821789, *4 ("there is no private right of action created by the
Act"); *Boswell v. Skywest, supra,* 61 F.3d at 1270; *Stokes v. Southwest Airlines, supra*, 887 F.3d
at 202; *Segalman v. Southwest Airlines, supra*, 895 F.3d 1219; *Lopez v. JetBlue Airways, supra,*
662 F.3d at 597.

II.     **PLAINTIFF CANNOT PURSUE A CLAIM AGAINST AMERICAN AIRLINES'
        IN-HOUSE COUNSEL.**

There is yet a third reason why Plaintiff cannot bring a claim against Attorney Soares for

supposedly violating Plaintiff's civil rights: Mr. Soares is in-house attorney counsel for American

Airlines and Plaintiff admits that Mr. Soares was acting as attorney for American at all relevant

times.  A plaintiff cannot sue counsel for a defendant by asserting that counsel is involved as a co-

conspirator under section 1985 simply by representing a client.  For example, in *Farese v. Scherer*,

342 F.3d 1223 (11th Cir. 2003) a federal prisoner filed a civil rights action against his former

business partner and business partner's attorneys, alleging that they engaged in a conspiracy to

force him to withdraw a shareholder's lawsuit.  The prisoner filed a second action against the same

defendants under RICO.  The Eleventh Circuit Court of Appeals held that the defendant attorneys'

alleged actions, if proven, could not be the basis for holding the lawyers liable under section 42

U.S.C. § 1985.  The Court dealt with this issue exhaustively:

> Because Farese alleges a conspiracy among Dude and Dude's attorneys, his appeal
> raises an issue of first impression in our circuit: whether attorneys operating within
> the scope of their representation may be deemed conspirators in a § 1985
> conspiracy.  Unless we conclude that attorneys acting within the scope of their
> representation may be deemed conspirators in a § 1985 conspiracy, Farese's § 1985
> claim would fail to state a claim upon which relief may be granted, as he would not
> have alleged a conspiracy.
>
> Few circuits have addressed the issue presented. The Third Circuit in *Heffernan v.
> Hunter,* 189 F.3d 405 (3d Cir. 1999), embarked on an exhaustive discussion of §
> 1985 conspiracies in the attorney-client context.  In *Heffernan,* the plaintiff, an
> official with the Securities and Exchange Commission, filed suit pursuant to § 1985
> against Hunter, an individual under investigation for insider trading, and Hunter's
> attorney, alleging that they conspired to file frivolous lawsuits and disseminate
> defamatory information to the media to intimidate and prevent him from testifying
> as a witness against Hunter in federal-court proceedings. *See Heffernan,* 189 F.3d
> at 408. The *Heffernan* court held that when an attorney's conduct falls within the
> scope of his representation of his client, a § 1985 conspiracy cannot exist. *See id.*
> at 413.  The court stated that "[t]he right of a litigant to independent and zealous
> counsel is at the heart of our adversary system and, indeed, invokes constitutional
> concerns." *Id.*

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 104 of 165   Page ID
#:2750
Case 3:22-cv-00023-BJB-RSE   Document 62-7 Filed 03/14/22   Page 18 of 23 PageID #: 2429

Noting that disciplinary structures are currently in place to address any wrongful conduct by an attorney, the court stated that an attorney's conduct "within the scope of representation is regulated and enforced by disciplinary bodies established by the courts." *Id.* In fact, "[a]buses in litigation are punishable by sanctions administered by the courts in which the litigation occurs." *Id.; see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 46–47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (finding that federal courts enjoy inherent powers to sanction attorney conduct and that "the inherent power extends to a full range of litigation abuses"). Moreover, the court noted that an offended third party may also proceed against the offending attorney under state law or report the conduct to state disciplinary bodies. *See Heffernan,* 189 F.3d at 413.

The court concluded that this regulatory framework "provides third parties with protection that is lacking in the corporate field." *Id.*

The *Heffernan* court further stated that as long as an attorney's conduct falls within the scope of his representation, the attorney is immune from allegations of § 1985 conspiratorial conduct. *See id.* The court noted, however, that it is "axiomatic that if the challenged conduct occurs outside the scope of representation, no reason for immunity exists and the attorney and the client, as individuals, could form a conspiracy." *Id.* The court cautioned that the scope of the attorney-client relationship is broad and that even if the challenged activity violates the canons of ethics, "so long as it is within the scope of representation, it does not eliminate the exemption from a conspiracy charge under section 1985." *Id.* Therefore, the Third Circuit explained that in order to plead a § 1985 conspiracy involving a client and his attorneys, one must prove that the attorneys were operating outside the scope of their representation. *See id.; see also Travis v. Gary Cmty. Mental Health Ctr., Inc.,* 921 F.2d 108, 111 (7th Cir.1990) (holding that no conspiracy existed between corporate executives and outside counsel in violation of § 1985(2) and stating that "[t]reating involvement of a lawyer as the key unlocking § 1985 would discourage corporations from obtaining legal advice before acting, hardly a sound step to take"); *Doherty v. Am. Motors Corp.,* 728 F.2d 334, 339–40 (6th Cir.1984) (concluding that the plaintiff did not present any evidence proving the existence of a conspiracy between the defendant and the defendant's attorneys because the attorneys "were motivated not by personal concerns but by concerns for their clients").

We agree with the well-reasoned opinion of the Third Circuit and hold that as long as an attorney's conduct falls within the scope of the representation of his client, such conduct is immune from an allegation of a § 1985 conspiracy. Although Farese alleged that Dude and his attorneys engaged in conspiratorial conduct in violation of § 1985, the attorneys did not engage in any conduct outside the scope of their representation. Furthermore, the actions and advocacy of the attorneys appear to have been for the sole benefit of their client rather than for their own personal benefit.

> Because we cannot say that the actions of Dude's attorneys were beyond the scope
> of the attorney-client relationship so as to make them susceptible to characterization
> as a conspiracy under § 1985, we affirm the district court's dismissal of Farese's §
> 1985 claims against them. . . .

*Id*. at 1230-1232.

In *Hunter v. Henderson,* 189 F.3d 405 (3d Cir. 1999), relied on heavily by the *Farese* Court,

a Securities and Exchange Commission ("SEC") investigator sued the target of an insider trading

investigation and his attorney, under Civil Rights conspiracy statutes, alleging that they sought to

intimidate the investigator, as a potential witness in an SEC prosecution, by filing a frivolous

lawsuit against him and using it to generate unfavorable publicity.  The district court granted the

defendants' motion to dismiss, and the investigator appealed.  The Third Circuit Court of Appeals

held that the investigator failed to establish an actionable conspiracy between the target and his

attorney under the Civil Rights conspiracy statute.  The Court explained:

> Both the section 1985(1) and 1985(2) claims require a conspiracy. Whether
> Heffernan has set out actionable conspiracies is therefore a threshold issue and one
> that we find dispositive.
>
> Looking to state law, the District Court concluded that no conspiracy can exist
> where an attorney's advice or advocacy is for the benefit of his client rather than
> for the attorney's "sole personal benefit." The Court found this principle consistent
> with federal law that perceives no conspiracy in the concerted activity of an
> employee and a corporation, usually termed the "intracorporate conspiracy
> doctrine." There are few cases in the Courts of Appeals discussing attorney-client
> conspiracies in the section 1985 context, but two opinions do provide some
> guidance. In *Doherty v. American Motors Corp.,* 728 F.2d 334 (6th Cir. 1984), the
> plaintiff alleged a conspiracy under section 1985(2) between a corporation and its
> inside, as well as its outside, counsel. Citing the general rule that a corporation
> cannot conspire with its agents, the Court found that no conspiracy existed,
> remarking, "it is clear from the record that the actions of [the corporation's]
> attorneys were motivated not by personal concerns but by concerns for their
> clients." *Id.* at 339–40.
>
> The other case, *Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d
> 108 (7th Cir. 1990), included a claim under section 1985(2) by an employee who
> alleged a retaliatory discharge by the defendant's employees. The Court concluded

19

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 106 of 165   Page ID
#:2752
Case 3:22-cv-00023-BJB-RSE   Document 67   Filed 03/14/22   Page 20 of 23 PageID #: 2431

> that joint conduct by employees did not amount to a conspiracy. *Id.* at 110. Of
> particular relevance is the Court's discussion about the defendant's consultation
> with its outside counsel. Holding that this too was not a conspiracy, the Court
> reasoned that "[t]reating involvement of a lawyer as the key unlocking § 1985
> would discourage corporations from obtaining legal advice before acting, hardly a
> sound step to take." *Id.* at 111.

*Id*. at 411-412.

The Court added that, "[a]lthough the case law on intra-corporate conspiracies provides a
convenient analogy for the attorney-client situation, there are important differences between the
agency relationships involved in private corporate activities and those arising in the practice of
law. The right of a litigant to independent and zealous counsel is at the heart of our adversary
system and, indeed, invokes constitutional concerns. Counsels' conduct within the scope of
representation is regulated and enforced by disciplinary bodies established by the courts. Abuses
in litigation are punishable by sanctions administered by the courts in which the litigation
occurs." *Id*. at 412.

These considerations apply to Plaintiff's improper attempt to sue American Airlines' in -

house attorney.  The law does not allow for such a claim and there is no valid reason that Plaintiff

should be allowed to file an Amended Complaint adding Mr. Soares that will be subject to an

immediate Motion to Dismiss.

**III.    BECAUSE PLAINTIFF'S ATTEMPT TO ARGUE AN ACTIONABLE CIVIL
CONSPIRACY UNDER 42 U.S.C. §§ 1985(3) AND 1986 IS FRIVOLOUS,
PLAINTIFF SHOULD BE ORDERED TO COMPENSATE THE AIRLINE
DEFENDANTS FOR THEIR REASONABLE ATTORNEYS' FEES UNDER 42
U.S.C. § 1988.**

In addition to denying Plaintiff's motion to add individual defendants, the Court should

also order Plaintiff to pay the Airline Defendants' reasonable attorneys' fees in having to respond

to this frivolous motion.  Title 42, U.S.C. § 1988(b) provides, in pertinent party, that "[i]n any

action or proceeding to enforce a provision of sections . . . 1985, and 1986 of this title, . . . the

court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the

costs . . . ."  The Supreme Court has held that a prevailing defendant may recover attorneys' fees

under § 1988 if the plaintiff's action is "frivolous, unreasonable, or groundless, or . . . the plaintiff

continued to litigate after it clearly became so." *Hughes v. Rowe,* 449 U.S. 5, 15 (1980) (quoting

20

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)).  "Defendants are not required to show either subjective or objective bad faith on the part of the plaintiff in order to recover § 1988 attorneys' fees."  *Munson v. Milwaukee Bd. of School Directors*, 969 F.2d 266, 269 (7th Cir. 1992) (citing *Hamer v. County of Lake*, 819 F.2d 1362, 1366 (7th Cir. 1987).  It is sufficient if the plaintiff's claim was "meritless in the sense that it [was] groundless or without foundation." *Hughes*, 449 U.S. at 14.   "[W]hen a civil rights suit is lacking in any legal or factual basis . . . , an award of fees to the defendant is clearly appropriate to deter frivolous filings and to ensure that the ability of the courts to remedy civil rights violations is not restricted by dockets crowded with baseless litigation." *Coates v. Bechtel,* 811 F.2d 1045, 1050 (7th Cir.1987) (citation omitted).  *See Brown v. Fairleigh Dickinson Univ.*, 560 F. Supp. 391, 414 (D.N.J. 1983) ("Plaintiff's § 1985 . . . claim[] against FDU and all individual defendants [was] frivolous.  Plaintiff is ordered to pay defendants" their attorneys' fees).

Here, as stated above, there is simply no legal support for Plaintiff's attempt to pursue claims under 42 U.S.C. §§ 1985(3) and 1986.  The claims are frivolous.  Consequently, Plaintiff should be ordered to pay attorneys' fees to the Airline Defendants under 42 U.S.C. § 1988.

## CONCLUSION

For the reasons set forth above, the Airline Defendants respectfully request that the Plaintiffs' Motion to Add 15 Individual Defendants (Doc. 65) be denied.  In addition, because Plaintiff's claim that the Airline Defendants and their individual employees are liable under 42 U.S.C. §§ 1985(3) and 1986 is frivolous, Plaintiff should be ordered pursuant to 42 U.S.C. § 1988 to reimburse the Airline Defendants' for their attorneys' fees in responding to Plaintiff's frivolous motion.

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 108 of 165   Page ID
Case 3:22-cv-00023-BJB-RSE   Document 67   Filed 03/14/22   Page 22 of 23 PageID #: 2433
#:2754

Respectfully submitted:

M. Roy Goldberg                    /s/Carol Dan Browning_____
STINSON LLP                        Carol Dan Browning
1775 Pennsylvania Avenue, N.W.     STITES & HARBISON, PLLC
Suite 800                          400 W Market St # 1800
Washington, D.C. 20006             Louisville, KY 40202
(202) 728-3005                     (502) 681-0516
Email: roy.goldberg@stinson.com    Email: cbrowning@stites.com
Admitted *Pro Hac Vice*

Counsel for Airline Defendants

Dated: March 14, 2022

Case 2:22-cv-02383-SSS-AS   Document 129-1   Filed 08/08/22   Page 109 of 165   Page ID
#:2795
Case 3:22-cv-00023-BJB-RSE   Document 67   Filed 03/14/22   Page 23 of 23 PageID #: 2434

## CERTIFICATE OF SERVICE

I certify that on March 14, 2022, I caused a true and accurate copy of the foregoing reply in support of motion to transfer to be served on all parties of record via the CMC/ECF system, and emailed a copy of the foregoing pleading to Michael Faris, using the following email address: michael.faris@blueskycopters.com

*/s/Carol Dan Browning*_____
Carol Dan Browning

23

# EXHIBIT 03
## Seklecki Hearing, 11 Feb 2022

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    PRO SE LITIGANT MICHAEL SELECKI,    )
      on behalf of himself and his        )
 4    minor child M.S.,                    )
                                           )
 5                     Plaintiff           )   CA No. 22-10155-PBS
                                           )   Pages 1 - 31
 6             -VS-                         )
                                           )
 7    CENTERS FOR DISEASE CONTROL &        )
      PREVENTION, et al,                   )
 8                                         )
                       Defendants          )
 9

10                    STATUS CONFERENCE BY VIDEO

11
               BEFORE THE HONORABLE PATTI B. SARIS
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16
                                    United States District Court
17                                  1 Courthouse Way
                                    Boston, Massachusetts  02210
18                                  February 11, 2022, 3:23 p.m.

19

20

21

22
                            LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                      United States District Court
24                    1 Courthouse Way, Room 7200
                          Boston, MA  02210
25                        leemarz@aol.com
```

2

```
 1   A P P E A R A N C E S:

 2        MICHAEL SELECKI, 2024 Courtyard Loop #104, Sanford,
     Florida, 32771, appearing Pro Se.
 3
          STEPHEN MICHAEL PEZZI, ESQ., United States Department
 4   of Justice Civil Division, Federal Programs Branch,
     1100 L Street NW, Washington, DC, 20005, for the Defendant,
 5   Centers for Disease Control & Prevention and the Department
     of Health and Human Services.
 6
          CHRISTOPHER A. DUGGAN, ESQ. and PAULINE A. JAUQUET, ESQ.,
 7   Smith Duggan Buell & Rufo LLP, 55 Old Bedford Road, Lincoln,
     Massachusetts, 01773, for the Defendants American Airlines
 8   and Southwest Airlines.

 9        M. ROY GOLDBERG, ESQ., Stinson LLP,
     1775 Pennsylvania Avenue NW, Suite 800, Washington, DC,
10   20006, for the Defendants American Airlines and Southwest
     Airlines.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  Good afternoon, Judge.

 3            THE COURT:  Good afternoon.  Hold on.  Let me just

 4   get everybody open.

 5            THE CLERK:  Okay.

 6            THE COURT:  Good, thank you.

 7            THE CLERK:  Okay, I will call the case.  The Court

 8   calls Civil Action 22-10155, Seklecki v. Centers for Disease

 9   Control & Prevention, et al.  Could counsel and the

10   plaintiff please identify themselves for the record.

11            MR. SEKLECKI:  Yes.  Michael Seklecki, plaintiff.

12            THE COURT:  And, Mr. Seklecki, I understand you're

13   not able to get the video up and running.  Do you prefer to

14   reschedule this, or are you okay with proceeding this way?

15            MR. SEKLECKI:  Your Honor, if you're okay with

16   proceeding, I am.  Unfortunately, due to the scheduling, my

17   wife and I work different schedules, and I was unable to do

18   video because I currently have my thee-year-old and

19   four-year-old in my care.  Otherwise I would be on video.

20            THE COURT:  That's fine.  I just wanted to make

21   sure you were content.

22            MR. SEKLECKI:  Yes.

23            THE COURT:  All right.  All right, now, who else

24   is on the phone?

25            MR. PEZZI:  Good afternoon, your Honor.  This is
```

```
 1   Stephen Pezzi from the Department of Justice on behalf of the
 2   federal government defendants, which are the CDC and the
 3   Department of Health and Human Services.
 4           THE COURT:  So TSA is not part of this?
 5           MR. PEZZI:  TSA is not a defendant, that's correct.
 6           THE COURT:  Okay, thank you.
 7           MR. DUGGAN:  Good afternoon, your Honor.  Chris Duggan
 8   on behalf of American Airlines and Southwest Airlines.
 9           THE COURT:  Thank you.
10           MR. GOLDBERG:  Good afternoon, your Honor.  I am
11   cocounsel with Mr. Duggan for American Airlines and for
12   Southwest Airlines, Roy Goldberg, Stinson LLP.
13           THE COURT:  Okay.
14           MS. JAUQUET:  Good afternoon, your Honor.  My name is
15   Pauline Jauquet.  I'm also cocounsel with Attorney Duggan and
16   Attorney Goldberg for defendants Southwest and American
17   Airlines.
18           THE COURT:  Thank you.  Do I have everybody?  Okay.
19   All right, so there are two from the Department of Justice on,
20   right, Mr. Beckenhauer as well?
21           MR. BECKENHAUER:  Good afternoon, your Honor.  I'm a
22   colleague of Mr. Pezzi's.  He'll be speaking for the government
23   today.
24           THE COURT:  Okay, thank you, thank you.  Today is
25   primarily a status conference.  I got the pleadings; they're
```

Lines 10 and 20 marked with times 03:25 and 03:26 in the left margin.

voluminous.  I am not prepared to rule on anything today.

Well, that's not quite true.  There are a couple of minor

housekeeping things I will rule on.  I am not inclined to

strike Mr. Goldberg for pro hac vice.  He's moved to be

admitted.  I don't know what allegations you say are about to

come, but they're certainly not here yet, and I will allow him

to represent American Airlines and Southwest.  So I admit you

pro hac vice.

With respect to, there was a request that Mr. Seklecki

made to be able to file on CM/ECF.  That was granted.  I hope

you saw that, Mr. Seklecki.  And so you have I think at this

point very recently filed quite a few documents.  Is that

right?

MR. SEKLECKI:  That is correct, your Honor.

THE COURT:  Okay.  So there were two big issues, or

actually three big issues.  One is whether I should transfer

the venue of this case to one of the jurisdictions that has

already addressed it, this kind of claim with Mr. Seklecki

himself and his son, although not to be the same defendants.

So that's one big venue issue.  I understand the DC Circuit

ruled on this, but that was primarily against the government,

as I see it.  This is where I need to focus on things.  This is

also against the airlines, which makes it a little different.

So one possibility is, I ship part of it off back to the

District of Columbia, and I keep the part against the airlines.

1    That's one possibility.

2          So one issue is venue or transfer motions, and I'm not

3    prepared to rule on that today, especially since we have

4    different defendants.  I think that's right, although

5    Mr. Seklecki himself was a plaintiff in the DC litigation.  So

6    that's number one.

7          I am assuming that, Mr. Seklecki, you will file an

8    opposition to the motion to transfer venue.  Do you know when

9    you can do that?

03:28 10          MR. SEKLECKI:  I will be doing that shortly, your

11   Honor, and I am strongly opposed to that transfer due to the

12   fact that I am involved in no cases in the Middle District of

13   Florida, and I fly to Boston Children's Hospital for presently

14   care, and the flight originates from Boston and to Boston.

15   Therefore I filed it in Boston, and I am a part of no lawsuit

16   or litigation cases in the Middle District of Florida.

17          THE COURT:  Well, you are listed in one of these,

18   *Lucas Wall, et al v. TSA*?

19          MR. SEKLECKI:  Yes, but not in the airlines case.

03:29 20          THE COURT:  Okay.  No, I understand that.  That's why

21   I haven't done it.  I mean, I understand there are differences,

22   so I will consider the motion to transfer.

23          The second thing is, and you've just touched on it, I

24   am not going to decide in an expedited way whether to enjoin

25   the entire mandate in the United States of America.  If I keep

1    the case, I will want to do it thoughtfully and based on a full

2    record and an evaluation of the case law, if I keep it.  But

3    the part that seemed more critical for the next week or two was

4    this allegation that his son had a medical appointment in

5    Boston.  Apparently -- I don't want to disclose anything -- but

6    has a medical condition that he needs to be treated in Boston.

7    It's not clear from the record what that is, and I wanted to

8    know whether or not the airlines were working with Mr. Seklecki

9    to make sure that he properly is able to get the medical

03:30 10   exception for his son, if it's appropriate.

11         MR. GOLDBERG:  Your Honor, Roy Goldberg, if I can be

12   heard first on that.  And I may not have a definitive answer --

13   we can get it for you -- because there are three of these cases

14   that have been filed in the same time frame, Kentucky, Eastern

15   District of Virginia, and Massachusetts, so we've been, you

16   know, actively quickly trying to get up to speed on these.

17         THE COURT:  Excuse me.  All filed by Mr. Seklecki?

18         MR. GOLDBERG:  No.  There's a group.  They're against

19   this mask mandate.

03:30 20        THE COURT:  Oh, I see.

21         MR. GOLDBERG:  And that's the relationship to Florida.

22   The leader of the group has been litigating these issues in

23   Florida in the two Florida cases against the federal government

24   and against seven airlines since June of 2011.  He's had a lot

25   of problems down there, so now he's working with his group

1    members to quote/unquote "pro se" file three new complaints

2    just like the one you have but also in Virginia and Kentucky.

3    They all came in at the same time.

4         I can tell you, the airlines have a process that's

5    been directed to them by the DOT that reflects the CDC orders.

6    They take serious consideration of all the medical claims of

7    mask exemptions, and they work them through looking at various

8    issues, and I believe they typically involve a medical

9    consultant.  So we can get the answer to you, your Honor.

03:31 10        THE COURT:  Well, this is what I would like to do is:

11   I would like to do this thoughtfully.  I don't want to rush it.

12   I'm jam-packed with hearings next week, and I'm out of town at

13   the end of the week.  I would like to at least work out the

14   fact I think -- excuse me, Mr. Seklecki.  When is your son's

15   medical appointment?  Is it Wednesday or Thursday or something?

16        MR. SEKLECKI:  Yes.  Yes, your Honor.  He sees a

17   specialist in Boston, and he has an appointment on the 24th of

18   February, which is the 23rd of February we would need to fly;

19   and the airlines denied medical exemptions despite the fact

03:32 20  that a licensed pediatrician signed a form, stamped and dated

21   it, and the airlines are refusing to accept that and allowing

22   him to board a plane.  And he sees numerous --

23        THE COURT:  So, excuse me, can I say, I don't want

24   to -- I'm just very wary of discussing healthcare information

25   over the Internet, but I understand that with respect to your

1    son, there's a claim that he has various cognitive disabilities

2    that interfere with his --

3         MR. SEKLECKI:  Severe.

4         THE COURT:  He's four, and that he has various issues,

5    which I'm reluctant to discuss on the Internet because I don't

6    know who's here.

7         MR. SEKLECKI:  Yes.  No, absolutely I agree about

8    that.

9         THE COURT:  -- that interfere with his ability to wear

03:32 10   a mask.  Now, I understand there's a claim under the Americans

11   with Disabilities Act.  It is the only thing that is at all

12   emergency.  Otherwise, I can deal with all of this in my own

13   sweet time in terms of reading all the briefs and really

14   understanding it and digging in, et cetera, if I don't remove

15   it back to another court.

16        But is there a way that the attorneys could work with

17   him to make sure that this child is able to get on the plane,

18   if it is appropriate, as an exception to the mask mandate?  It

19   sounds like he has the kind of cognitive disability where it

03:33 20   might be hard for a four-year-old having that issue to wear a

21   mask.

22        MR. GOLDBERG:  Your Honor, Roy Goldberg again for the

23   defendants.  I mean, generally speaking, without getting into

24   specifics on this matter, there's some guidance, and the

25   airlines have been giving exemptions for qualified medical

1    reasons when the outside consultant looks at the documentation.

2    I will say that there's no general exception for anytime

3    somebody says it's difficult to wear a mask, and that may be

4    the case; it may be a difference between Mr. Seklecki who's an

5    adult and the four-year-old son.

6            THE COURT:  Sure.

7            MR. GOLDBERG:  We can look into what the situation is

8    with the son.  This was presented to us, as it was with the

9    Supreme Court, as it was with the DC Circuit, as a, you know,

03:34 10    "We both need to be exempt --"

11            THE COURT:  I'm not dealing right now with him.

12            MR. GOLDBERG:  Right.

13            THE COURT:  The only thing that's an emergency here

14    is, apparently the boy has a medical appointment with Boston

15    Children's Hospital.  And I don't know what the nature of it

16    is.  I think you probably need to supplement, Mr. Seklecki,

17    with respect to why it's such an emergency, as opposed to just

18    a checkup or something that could be done on telemedicine.  But

19    assuming for a minute that it's a really serious appointment

03:34 20    and he needs to fly here and he also has the cognitive

21    disability, I'm just thinking that the two of you could talk

22    and make sure that he has the right documentation and can get

23    that exemption and make the appointment.  I think it's hard.

24    He's a kid.  He's a baby, really.  He's four.

25            MR. SEKLECKI:  Yes.  Yes, your Honor, and I really

 1   graciously appreciate your attention in this because the child

 2   is getting surgery, and he has critical medical conditions that

 3   require him to see the specialist in Boston that Florida cannot

 4   treat.  And he has a surgery appointment the first week of

 5   March as well, so we have to be at the hospital for a

 6   substantial amount of time.  They're going to do a big surgery

 7   on him.  And due to his severe cognitive delays as well as his

 8   medical problems, the child cannot wear a mask, and it has been

 9   recommended from Boston, his specialist in Boston and Florida

03:35 10   that he is not to wear a mask despite the fact of all -- even

11   though due to all of his medical conditions --

12         THE COURT:  Well, I'd like you to call your doctor in

13   Boston as well as the -- I did see the letter from Hunt Club

14   Pediatrics, but it was undated.  And you filed hundreds and

15   hundreds yesterday.  Just, like, I hate to say, it was so many

16   documents, I'm not sure I've seen them all.  But, in any event,

17   the one that I'm noticing is undated.  So can you get -- I

18   think it's Dr. Chaban?  Is that his name?  Yes, yes -- Carlos

19   Chaban to FedEx a letter to the American and Southwest -- what

03:36 20   flight do you have, which airline?

21         MR. SEKLECKI:  The ticket for the 23rd of February was

22   not booked yet.  It was booked on Delta, but it was canceled

23   because we only are allowed to fly on Delta.  And the problem

24   is that Delta fully accommodates Michael to fly, and it's

25   costing my wife and I thousands of dollars to book flights

       1    because American and Frontier Airlines and Southwest Airlines

       2    is refusing to grant him these medical exemptions, and we can't

       3    afford it.  And the child cannot fly on these airlines, and we

       4    can't get a reasonable flight, and we're only allowed to fly on

       5    Delta, and it's just not -- it doesn't seem legal or --

       6         THE COURT:  Well, it is high season in Florida, so, I

       7    mean, I understand the rates might be higher, but I do think, I

       8    at least want the clearance for medical for at least this set

       9    of appointments on -- what's it, the 23rd and the 1st? -- so

03:37 10    then I can deal with the very weighty legal issues, I mean, the

      11    bigger issues.  And it's hard for a person.  You're a father of

      12    a kid with problems who needs surgery.  I'll brag, we have some

      13    of the best hospitals in the world here in Boston, so let me

      14    say that, so I see why he wants to come here.

      15         So is there a way we can have you -- not on the

      16    government, that's not your hunt -- but have you, Mr. Goldberg,

      17    or whoever it is from American or Southwest, be the person who

      18    gets a certificate from Boston children's and/or from his own

      19    doctor -- I think it says Dr. Chaban at Hunt Club Pediatrics --

03:38 20    and just basically, how long do you need it in advance?

      21         MR. GOLDBERG:  I'm sorry.  Do you mean the airlines,

      22    your Honor?

      23         THE COURT:  Yes.

      24         MR. GOLDBERG:  Both airlines, it could be a little

      25    different.  I will get back to you.  I will make it a high

         1   priority.  We will find out what the situation is.  My

         2   recollection of this record is that it's mostly about

         3   Mr. Seklecki, and there's some allegations about the son

         4   doesn't like it when Mr. Seklecki wears a mask.  But we'll dig

         5   into this.  I mean, obviously if there's a --

         6           THE COURT:  I have nothing in this record that would

         7   support, at least at this point, irreparable harm with respect

         8   to Mr. Seklecki, but that's quite different with respect to his

         9   son.

03:38   10           MR. SEKLECKI:  I agree with you, your Honor.

        11           MR. GOLDBERG:  We've also heard that it's the Delta

        12   that he does have.  The caption of this case is United

        13   Airlines, and yet he's sued American and Southwest.  But we

        14   will look into it, your Honor.  If there has been a legitimate

        15   exemption request for the son, the airlines do take this very

        16   seriously, and we'll commit to report back to the Court by

        17   Tuesday, if that works for the Court.

        18           THE COURT:  That does work for me.  I mean, what I

        19   want you to do is -- so what's the sequence of events?  Does he

03:39   20   have to book a flight first, or do you give him the exemption

        21   first and then he books a flight?

        22           MR. GOLDBERG:  The exemptions are flight by flight,

        23   your Honor, so you have to book the flight and ask for an

        24   exemption.

        25           THE COURT:  All right, so today you can go online,

1   Mr. Seklecki, book a flight, pick probably the cheapest flight,

2   whatever is American or Southwest, book a flight, send that to

3   the attorneys for the airlines, send them hopefully -- what's

4   the name of the doctor from Children's?

5        MR. SEKLECKI:  He sees numerous specialists, but the

6   main one that has been under his direct care is the Director of

7   the Center for Motility Disorders, and that is Samuel Nurko.

8        THE COURT:  Any what kind of disorders?

9        MR. SEKLECKI:  Gastrointestinal.

03:40 10        THE COURT:  What's his name, Surko?

11        MR. SEKLECKI:  Samuel, and last name Nurko, N-u-r-k-o.

12        THE COURT:  Yes, and so maybe, I don't know whether

13   the certification from him is what makes sense or from his

14   pediatrician in Florida.  I don't have strong views about that,

15   but, in any event, a medical certification that the child

16   can't/won't wear a mask, but that he has an urgently needed

17   surgical appointment in Boston on whatever those two days are,

18   the 23rd and 1st or something?  Are you staying up here in

19   Boston?

03:41 20        MR. SEKLECKI:  Yes, your Honor.  We will be required

21   to be in Boston for an undisclosed amount of time.  The child

22   has a surgery booked on March 3 at Children's Hospital, and,

23   you know, he's going to be requiring several days inpatient and

24   then recovery time in a local hotel.  He can't fly back right

25   away.

```
 1              And I just wanted to also note, your Honor, I do
 2    believe in the exhibits there is a note there that is dated.  I
 3    do understand that there were several things that were submitted,
 4    but I just wanted to make sure that -- I'm pretty sure there
 5    was a date on that physician's letter, but regardless, I would
 6    be happy to provide a --
 7              THE COURT:  Well, there was one from October 26, 2021?
 8    Is that the one?
 9              MR. SEKLECKI:  Yes.
03:41 10         THE COURT:  So maybe that's it, but let me ask you.  I
11    don't know if that's good enough, but it would be better to get
12    one that was more current.
13              MR. SEKLECKI:  Absolutely, and no objection to that.
14    We would be happy to provide anything that we need for the
15    child, and his providers understand the severity and would be
16    happy to write you specifically any document you're requesting
17    or --
18              THE COURT:  No, no, no.  This is about going through
19    this process.  So, ideally speaking, you're going to get the
03:42 20         consent or the medical -- not the consent, I got the wrong word
21    there -- you're going to get the opinion of the doctor that he
22    can't, because of his cognitive disorder, two things:  A, that
23    he can't or won't wear a mask, it's too upsetting to him given
24    that disorder; and, B, that he's having emergency surgery and
25    he has to be in Boston.
```

1          Now, this is what's confusing to me:  Let's assume you

2     grant that, how long does it -- he needs to make a plane

3     reservation -- how long does it take for turnaround there?

4          MR. GOLDBERG:  Your Honor, the airlines have a

5     process.  It's airline by airline.  It's a relatively quick

6     process.  It's not like you go to the check-in gate and then

7     ask for it there.  It's a couple days, I believe, but it could

8     be a little longer.

9          THE COURT:  I understand.  You can't just have some

03:43 10   poor lady at the desk trying to make a medical evaluation.  But

11    let's say, for example -- that was terrible of me -- some lady

12    or a man at the desk trying to make an evaluation.  So, ideally

13    speaking, you'll get your stuff, you know, in, Mr. Seklecki, on

14    Monday, and hopefully by Tuesday -- let's see, the 23rd is when

15    he has to be on the plane, right?  Yikes, we're not moving that

16    fast.  So hopefully by Tuesday or Wednesday you can get back to

17    him.  You'll have to tell him what flights you're on, so it

18    will depend on which airline.  And then what?  Okay, let's

19    assume all goes well, he gets the approval, blah-blah-blah, he

03:44 20   gets on the flight, does the little boy then have to take some

21    sort of a test?

22          MR. GOLDBERG:  Your Honor, there have been cases where

23    people have been given exemptions subject to that, but that's

24    not automatic.  Some people have had to submit negative COVID

25    tests, but, again, that is one possibility.  I can't say that

1    it's a certainty in this case.  There could be a requirement

2    that he has to sit on a separate part of the plane and maybe

3    not, you know, next to other people on seats.  So there are

4    various things that the --

5         MR. SEKLECKI:  I object to that one hundred percent.

6         THE COURT:  Excuse me.  My number one priority is to

7    get your son to a medical appointment he apparently urgently

8    needs, and he has such profound, apparently, issues that it's

9    upsetting to him to wear a mask.  So I'm not even dealing with

03:44 10   that right now.  That will be the longer-term litigation

11   because that's not irreparable harm.  But what is irreparable

12   harm is if you can't make that appointment.

13        MR. SEKLECKI:  Yes.

14        THE COURT:  So, ideally speaking, let's say they say,

15   "Okay, you've got the clearance, but we want a test within --"

16   sometimes it's 72 hours, right?

17        MR. GOLDBERG:  Yes, your Honor.

18        THE COURT:  So do you have rapid tests at home,

19   Mr. Seklecki?

03:45 20   MR. SEKLECKI:  Your Honor, I do not have rapid tests.

21   I would have to bring the child in to be tested, and per the

22   CDC Guidelines, your Honor, only international travelers need

23   to be tested for COVID, not inter-continentally in the United

24   States.  And I strongly object to Mr. Goldberg's statement that

25   he would potentially have to sit in the back of the aircraft.

1   That is total discrimination for a medically complex boy who

2   just can't wear a mask due to severe issues.  I mean, that is

3   ridiculous.

4          THE COURT:  I know, but right now we're talking about

5   irreparable harm, okay?  We're not talking about the total

6   merits.  We're talking about -- I'm not going to sit and rule

7   on all this.  So I just need to get him on that plane so he can

8   see that great doctor from Children's.

9          So what kind of test does he need?  Does anyone know?

03:46 10   Does he need the antigen or the PCR?  What does he need?  Does

11   anyone know?

12          MR. GOLDBERG:  Your Honor, it's a case-by-case basis.

13   It's not an one size fits all and --

14          THE COURT:  He's just a little boy.  I mean, I have

15   grandchildren -- maybe you do too -- none of them are

16   vaccinated, but they're not that contagious either.  You know

17   where we are in Boston, just bragging?  We're at 3 percent.  So

18   I don't know if it's necessary to get a test, but it looks

19   like -- I actually Googled this pediatrics.  They look so

03:46 20   friendly.  I mean, maybe they'd be willing to give it, or

21   maybe, you know, you just get one of those rapid tests that you

22   get at the -- I don't know what the drugstore would be in

23   Florida but like a CVS.

24          MR. SEKLECKI:  Yes.

25          THE COURT:  But I need it all to be spelled out so he

```
 1    can get on that plane because that is the only thing I am

 2    seeing is potentially irreparable.

 3           MR. SEKLECKI:  But, your Honor, what would happen if

 4    the airlines continue to deny him and he can't get to his

 5    appointment despite the fact that we follow all your

 6    recommendations with Mr. Goldberg and the defendants' attorneys?

 7           THE COURT:  Let me get to it because then I might --

 8    unfortunately, as I mentioned, I'm out of town at the end of

 9    the week, but, ideally speaking, we will at that point address

03:47 10    the issues of likelihood of success and irreparable harm.  It's

11    a very narrow claim, a violation of the Americans with

12    Disabilities Act; and rather than try and brief all that,

13    whether he's being denied a reasonable accommodation, I would

14    rather have you settle it and get this done.

15           MR. SEKLECKI:  Okay.

16           THE COURT:  I want this boy to get appropriate medical

17    care.  So if it doesn't work out, well, at some point you're

18    going to have to let me know.

19           What's actually happening?  You didn't put that in on

03:47 20    the 23rd.  Is that just like a pre-op appointment?

21           MR. SEKLECKI:  Yes, and he's got pre-op appointments

22    and different appointments stemming from the 24th of -- yeah,

23    the 23rd of February on and off through March 2.  The

24    appointments end March 2, and he has a surgical procedure on

25    March 3, time to be determined.
```

```
 1          THE COURT:  Well, okay.  So I'm hoping that you all
 2     can work this out, and then I will not -- I deny the request
 3     for expedited briefing on all these thousand other issues that
 4     were raised.  You will go in due course.
 5          And I wanted to ask you this question I'm a little not
 6     sure about, is whether I should sever off the piece of it
 7     against the federal government and move it to -- was it DC, or
 8     would it be the Eleventh Circuit, from the government's point
 9     of view?
03:48 10          MR. PEZZI:  Good afternoon, your Honor.  Stephen
11     Pezzi.  We, the government -- well, actually, before I answer
12     that question, as a threshold matter, I'd just like to make
13     clear that the federal government has not been served, so we
14     preserve all objections relating to service of process, and I
15     may return to that issue in a moment.  But to answer your
16     question, we agree with the airlines that the litigation should
17     be transferred to the Middle District of Florida, and in fact,
18     absent further direction from your Honor, would intend to file
19     our own transfer motion shortly after being served.
03:49 20          THE COURT:  You know, I'm totally sympathetic to that
21     when it comes to the big motion, which is to enjoin the
22     entire -- was it an executive order?  I would be receptive to
23     that, but I've got a different situation.  I have one little
24     boy who needs to come to Boston, so that's a different kind of
25     situation than you're in.
```

```
 1          MR. PEZZI:  Certainly, your Honor, from the
 2     government's perspective, we also share your desire that
 3     Mr. Seklecki's son gets whatever medical treatment he needs and
 4     that he's able to work that out.  I do think it's worth calling
 5     your Honor's attention very briefly to Paragraphs 34 through 36
 6     of the complaint, which I at least read to suggest, and I
 7     didn't hear anything inconsistent with this reading today, that
 8     Mr. Seklecki and his son have successfully flown between
 9     Orlando and Boston more than a dozen times since this order
03:50 10     went into effect.  It also sounds as if he routinely flies on
11     Delta, which, as I understand, has all sorts of direct flights
12     between Orlando and Boston.  And I assume it is not a
13     coincidence that Delta has not been named as a defendant in
14     this case.  And so certainly recognizing the importance of the
15     medical treatment at issue, it is not at all clear to me, even
16     on plaintiff's version of the facts, whether relief from this
17     Court with respect to, I mean, certainly not the federal
18     government but even the two airlines that have been named as a
19     defendant are necessary for that to happen.
03:50 20          THE COURT:  I agree, that's a good point, but the
21     bottom line is, I don't want to rule.  I want to just get this
22     boy on the plane and not have to have me have a heavy-duty
23     preliminary injunction hearing, you know, on the eve of a
24     medical appointment.  This can be worked out.  He's four years
25     old.  We all have children and grandchildren and we know kids,
```

1   and I just -- and he's got problems.

2          MR. SEKLECKI:  Your Honor, I just wanted to also

3   briefly state that Mr. Pezzi just stated that the government

4   has not been served.  The government has been served, and it

5   has been filed via certified mail.  They have been served.

6          THE COURT:  Mr. Seklecki, are you a lawyer?

7          MR. SEKLECKI:  I am not.

8          THE COURT:  Okay, so I should treat you probably as --

9   you must have had some help because I've read the stuff.  Is

03:51 10   that because there's a cluster of cases?  Because I'm not going

11   to repeat and do what other courts have done.  You were a

12   plaintiff in the case that just went up to the DC Circuit on

13   behalf of yourself and your son against -- we found it --

14   against -- I guess it was actually against Transportation

15   Security Administration?  I'm not going to redo that.  You

16   can't forum shop.  I'm not redoing the basic merits of that

17   suit.  And I don't know, has the Middle District of Florida

18   judge issued an opinion yet?

19          MR. GOLDBERG:  Your Honor, if I could be heard on

03:52 20   that, on the Middle District of Florida, Roy Goldberg.  Those

21   two cases were filed both against the government, and Mr. Pezzi

22   is handling those cases; and then our firm and another firm in

23   Florida are handling a defense for seven airlines led by the

24   leader of Mr. Seklecki's group, Lucas Wall, who is a

25   co-petitioner with them in the DC Circuit and Eleventh Circuit

 1   cases.  And those cases are, frankly, having major issues

 2   because of Mr. Wall's antics down there; and that's why,

 3   frankly, Mr. Wall is using his associates in their anti-mask

 4   coalition to file these other cases, including unfortunately

 5   the case we're talking about today.

 6          THE COURT:  Right, and so that may be part of the

 7   motion to transfer --

 8          MR. GOLDBERG:  It is.

 9          THE COURT:  -- or there may be part of this which is

03:53 10   governed by res judicata.  I mean, I haven't sorted it all

11   through.  There were some clerical issues right in the

12   beginning; you know, did he have access to CM/ECF?  Who was in,

13   who was out, that kind of thing.  That's why I wanted to hold

14   this status hearing.  But I don't want to do that, okay?  I

15   don't want to do it in a rush.  I want to be thoughtful about

16   it.  But I will be in a rush about getting this boy on the

17   plane.

18          And, also, can I just say, if they tell you to take

19   a -- does Delta make you take a test before you get on the

03:53 20   plane with the little boy?

21          MR. SEKLECKI:  They do not, your Honor, absolutely

22   not.

23          THE COURT:  I don't know the answer to that, whether

24   you have to or not.  I don't know.  But I do know one big

25   difference is that most children over the age of two, is it,

1   are wearing masks, so perhaps that's why they're not required

2   to take tests.  And the test is the most unintrusive thing.  I

3   must have had hundreds of them already, you know?  So I don't

4   think it's overly intrusive to ask for a test.  That said, I

5   want this to move fast and not have it be sort of, "Oh, you

6   didn't file this right paper," or, "You didn't file that right

7   paper."  Let's just get this done, or I'll have a hearing just

8   on this tiny piece of this big litigation.  Okay?

9        MR. GOLDBERG:  Your Honor, there is a Southwest

03:54 10   process that I don't want to speak finally for the record, but

11   I wouldn't be surprised if there is a COVID test required.  And

12   I can't say it's in every case.  I know it's happened in other

13   cases.  And we can get you the specifics of what Southwest and

14   American's procedures are, and certainly we will address any

15   request that is made by Mr. Seklecki, as we would for any

16   passenger.

17        THE COURT:  Right, but I think what's critically

18   important is that a doctor's letter -- and hopefully it's more

19   barebones than what I've got in my record, Mr. Seklecki --

03:55 20   explains the cognitive impairment and the problem with the

21   little boy wearing the mask.  And then what's triggered is the

22   Americans with Disabilities Act and what is a reasonable

23   accommodation, and it may not be wearing a mask, but it may

24   involve taking a test, because you also have to balance the

25   needs of the other passengers on the plane.

1        So good luck.  I hope this happens.  And meanwhile you

2    have the full period of time to respond to the motion for a

3    preliminary injunction.

4        Mr. Seklecki, you have the full period of time --

5    that's 14 days -- to respond to the motion to transfer venue.

6    And then, when I get everything, I will set up a hearing date.

7        MR. GOLDBERG:  Your Honor, this is Roy Goldberg.  Just

8    one thing so the record is clear.  And, again, you know, I

9    believe there is at least a testing rule for one airline, but

03:55 10    we will get you that.  So the record is clear, we haven't filed

11    any motion to dismiss or our opposition yet.  Technically

12    speaking, these cases go to the DOT actually, not under the

13    Americans with Disabilities Act but actually under the Air

14    Carrier Access Act.  And as we will be presenting to the Court,

15    the attempt to go to Federal Court rather than the DOT is

16    actually preempted by very good case law that says no prior

17    right of action to make a disability claim in Federal Court

18    against the airline.  You've got to go through the agency and

19    then back to DC or the First Circuit --

03:56 20        THE COURT:  Can we get the agency involved here?

21        MR. GOLDBERG:  No, your Honor.  It's just a question

22    of there's been no exhaustion.  You can't just go to Federal

23    Court --

24        THE COURT:  I know, but what if he has an appointment

25    next week?  How long does it take to exhaust?  I don't know, at

1    some point there's always an emergency exception.  I mean,

2    you're right, he should exhaust.  In the long term, maybe

3    that's where he's going, but there's almost always an

4    opportunity to come into Federal Court if there's a true

5    emergency.

6              MR. GOLDBERG:  It's just there's no private right of

7    action with the Air Carrier Act in effect, your Honor, and I

8    just wanted to make sure the record was clear on that, and

9    there's no private right of action under the Americans with

03:57 10    Disabilities Act either.

11              THE COURT:  Well, suppose there's a lady who wants to

12    travel on a wheelchair and the airline says "no," you're saying

13    that she can't get on the plane and has to go through a

14    six-month exhaustion process?

15              MR. GOLDBERG:  No.  I mean, that would be a clear

16    violation of the DOT requirements, and the airline could face

17    significant fines and sanctions.

18              THE COURT:  But what happens in the meantime, this

19    little disabled lady who wants to get on a plane and she's

03:57 20    going to her daughter's wedding, and they say "no"?

21              MR. GOLDBERG:  If it were me, your Honor, I would go

22    to the DOT.  I would immediately then say, "DOT, you didn't act

23    quickly enough," and I would do it the right, proper channel.

24    There's a federal statute, 49 U.S.C. 46110, that that's the

25    only one way to do it, your Honor.  I mean, that's just what

```
 1   the law is.  But obviously we'll take very seriously the
 2   concerns and any medical issues and any emergency timing with
 3   regard to a four-year-old minor.  I just wanted to make sure
 4   the record is clear this is not an ADA typical case because the
 5   airline industry does have separate rules that apply.
 6            THE COURT:  All right, well, I don't know about that,
 7   but I sure don't want to decide that in a split second.  I just
 8   think that this is easily worked out.  Everyone acknowledges
 9   you can have a medical exception.  Everyone acknowledges he
10   needs a doctor's notes.  Everyone acknowledges that he needs to
11   do that before he gets on the flight, and then there's some
12   dispute about exactly what the rules are on testing.  So we're
13   talking only about the child, not Mr. Seklecki.  I have nothing
14   in my record to support irreparable harm for Mr. Seklecki, but
15   I do for the child, so there it is.
16            And I wish you a happy --
17            THE CLERK:  Judge --
18            THE COURT:  And we're not going to set another hearing
19   now, Maryellen.  I might have to do this on the papers.
20            THE CLERK:  That's okay, but do we have a deadline for
21   them to let us know, the court, before, you know, a deadline to
22   report to us by next week whether this is happening or not, or
23   what do we do?  You mentioned the 15th they're to report
24   whether or not --
25            THE COURT:  Yes, maybe what you could know is tell
```

1   Maryellen.  I'm gone all Wednesday afternoon.  I have another

2   situation.  I mean, I have something else I have to do.  Maybe

3   if we had to, an emergency hearing on Wednesday morning, but

4   I'd prefer not to.  I'd prefer to just have it go away until we

5   can brief it on the merits and I can hear about all the

6   interesting exhaustion issues.  Okay.

7          MR. PEZZI:  To that end, your Honor, I'm sorry, if I

8   could just very briefly note that I certainly agree that

9   there's been no showing of irreparable harm with respect to

03:59 10   Mr. Seklecki; and I also took your Honor to be saying, I think

11   also correctly, that there's no basis in this record for the

12   worldwide injunction that Mr. Seklecki in his papers requests

13   with respect to this nationally applicable order.  And so I

14   think, consistent with your Honor's desire to first resolve

15   this issue with respect to Mr. Seklecki's son's medical

16   appointment, it might be more efficient to stay briefing with

17   respect to the preliminary injunction motion, at least the one

18   against the federal government defendants, pending resolution

19   of this issue, and then the transfer issue next.

04:00 20          THE COURT:  No, I think you should brief it.  If you

21   need more time, you can tell me you need more time.  I mean,

22   it's a big deal.  It's a huge deal, but --

23          MR. PEZZI:  Certainly, your Honor.

24          THE COURT:  But it's slightly different than the other

25   cases, to the extent I can say, because it's -- I'm likely to

```
 1    defer to the other courts on the, as you say, the
 2    across-the-board facial attack, but there is this unique issue
 3    having to do with the medical exemption that I'm just not sure
 4    I understand well enough.
 5         Let me ask you -- you're the guardian of the gate of
 6    the federal government -- do you agree that there's no way that
 7    on an emergency you can go to a Federal Court if you haven't
 8    exhausted first?
 9         MR. PEZZI:  Respectfully, your Honor, I'd prefer not
10    to freelance on that question as a claim against the airline
11    defendants.  I will say Mr. Goldberg is correct that there are
12    a variety of complicated statutes that apply to airlines that
13    displace the Americans with Disabilities Act in some context,
14    but I'll mostly leave that to Mr. Goldberg.  I will just say to
15    be clear -- as a matter of full transparency, I don't want
16    Mr. Seklecki or your Honor to be surprised about this -- but we
17    respectfully disagree with Mr. Seklecki that service of process
18    has been completed in compliance with Rule 4(i) of the Federal
19    Rules of Civil Procedure, and I direct Mr. Seklecki to that
20    rule for the details of how service of process is accomplished
21    on the federal government.  Our plan would be to file a
22    preliminary injunction opposition no earlier than the time
23    provided by the local rules, which is 14 days running from the
24    date of proper service, and that date has not yet come, so
25    absent another order from the Court --
```

1    THE COURT:  Yes, but you know what I don't want?  I

2    don't want to spend the next six months fighting about what the

3    rules are.  Why don't you just tell him?  What is it that he

4    didn't do correctly?

5    MR. PEZZI:  To my knowledge, your Honor, and I spoke

6    to the U.S. Attorney's Office yesterday, Mr. Seklecki has not

7    served the U.S. Attorney for the District of Massachusetts.

8    THE COURT:  Okay, so do it, Mr. Seklecki, okay?

9    MR. SEKLECKI:  All right, your Honor.  I --

04:02  10    THE COURT:  I just don't want to get hung up on this

11    technicality.  I mean, I may well --

12    MR. SEKLECKI:  No, I would --

13    THE COURT:  -- to the South, either Florida or DC

14    or -- now I just heard about Kentucky and EDVA.  So I may be

15    switching it all down there, but I don't want this hung up with

16    wrangling over something that a pro se person might not know.

17    Can you take service for the government?

18    MR. PEZZI:  Unfortunately, your Honor, I am not

19    authorized to waive service.  The DOJ's longstanding position

04:02  20    is that the provisions of Rule 4(i) are mandatory and cannot be

21    waived.  But, you know, the instructions are all there, and I'm

22    sure Mr. Seklecki can find a way --

23    THE COURT:  -- clear as mud, but why don't we -- what

24    you need to do, Mr. Seklecki, is to serve the U.S. Attorney's

25    Office.  That's a little hard because he's not here, but

1    maybe --

2         MR. SEKLECKI:  No, I did.  I did, your Honor.  I did,

3    your Honor, and it was delivered today.

4         THE COURT:  Oh, okay, all right.  Okay, well, thank

5    you.  Listen, have a great Valentine's Day.

6         MR. SEKLECKI:  Thank you.  You too, your Honor.

7         THE COURT:  It's going to be 50 degrees tomorrow in

8    Massachusetts, not quite as nice as Florida but we're getting

9    there.  And I look forward to having this piece of it resolved

04:03 10  so that I can be thoughtful about the rest, okay?  Thank you

11   very much to everyone, and I'll hopefully see you in a much

12   longer-term way.  Okay, thank you.  Bye-bye.

13         MR. Seklecki:  Thank you, your Honor.

14         MR. GOLDBERG:  Thank you, your Honor.

15         (Adjourned, 4:03 p.m.)

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 31 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 22-10155-PBS,

11   Michael Seklecki v. Centers for Disease Control & Prevention,

12   et al, and thereafter by me reduced to typewriting and is a

13   true and accurate record of the proceedings.

14           Dated this 14th day of February, 2022.

15

16

17

18

19                    /s/ Lee A. Marzilli
                      _____
20                    LEE A. MARZILLI, CRR
                      OFFICIAL COURT REPORTER
21

22

23

24

25

# EXHIBIT 04

## Circuit Court Denies Petition for Review of Agency Action for Lack of Jurisdiction, after DOT Refuses to Enforce ACAA

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 22-1012**                                    **September Term, 2021**

**Filed On:** April 14, 2022

In re: Aaron Abadi,

       Petitioner

     **BEFORE:**  Millett, Pillard, and Wilkins, Circuit Judges

### O R D E R

Upon consideration of the court's order to show cause filed February 23, 2022, and the response thereto; the "petition for review of agency action," which was docketed as a petition for a writ of mandamus; the motion to reclassify the petition; and the motion for a preliminary injunction, it is

**ORDERED** that the order to show cause be discharged.  It is

**FURTHER ORDERED** that the petition be dismissed for lack of jurisdiction. Petitioner states that his petition is not for a writ of mandamus but rather for review of an agency's failure to act.  A claim under the Administrative Procedure Act for failure to act "can proceed only where a plaintiff asserts that an agency failed to take a <u>discrete</u> agency action that it is <u>required to take</u>."  <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004) (emphases in original).  Petitioner has identified neither a legal requirement that the Department of Transportation ("DOT") resolve his complaints against airlines within a certain time period, nor a legal requirement that DOT take any other discrete action that it allegedly has failed to take.  Accordingly, petitioner has not demonstrated any basis for this court to exercise jurisdiction over his petition for review of a failure to act.  <u>See</u> <u>Pub. Citizen, Inc. v. FERC</u>, 839 F.3d 1165, 1172-74 (D.C. Cir. 2016); <u>In re Aiken Cty.</u>, 645 F.3d 428, 437-38 (D.C. Cir. 2011).  Because petitioner has disclaimed mandamus relief, he also has not demonstrated any basis for this court to address a claim of unreasonable agency delay.  <u>See</u> <u>Telecomms. Research & Action Ctr. v. FCC</u> ("<u>TRAC</u>"), 750 F.2d 70, 76 (D.C. Cir. 1984) (concluding that mandamus authority may be used to address claims of unreasonable delay in order to protect future jurisdiction).  It is

**FURTHER ORDERED** that petitioner's remaining motions be dismissed as moot.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.

### Per Curiam

# EXHIBIT 05
## DOT Mask Notice Issued on Feb 5 2021



# U.S. Department of Transportation

ABOUT DOT ⌄    PRIORITIES ⌄    CONNECT ⌄    🔍

Home \ Aviation Consumer Protection

Aviation Consumer Protection

What's New

Rules, Guidance, and Enforcement Orders ⌄

Other Information ⌄

About Us

## Contact Us

**Office of Aviation Consumer Protection**

1200 New Jersey Ave, SE
Washington, DC 20590
United States

**Phone:** (202) 366-2220 ↗

**Business Hours:**
8:30am-5:00pm ET, M-F

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

# Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft - Notice of Enforcement Policy

📄 Mask Notice Issued on Feb 5.pdf

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation, is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019. OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act and the Department's implementing regulation in 14 CFR Part 382 to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

Last updated: Friday, February 5, 2021






**https://www.transportation.gov/airconsumer/masks-notice-of-enforcement-policy**

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.

---

NOTICE OF ENFORCEMENT POLICY:
ACCOMMODATION BY CARRIERS OF PERSONS WITH DISABILITIES
WHO ARE UNABLE TO WEAR OR SAFELY WEAR MASKS WHILE ON
COMMERCIAL AIRCRAFT

---

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation (DOT or the Department), is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019 (COVID-19). OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act (ACAA)[1] and the Department's implementing regulation in 14 CFR Part 382 (Part 382) to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

To carry out the Executive Order on Promoting COVID-19 Safety in Domestic and International Travel (Executive Order),[2] the Centers for Disease Control and Prevention (CDC) issued an order on January 29, 2021 (CDC Order)[3] that, among other things, requires U.S. and foreign air carriers to use their best efforts to ensure that persons on flights to, within, or from[4] the United States wear a mask for the duration of travel, including when boarding and disembarking aircraft. The CDC Order exempts certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask

---

[1] The ACAA, signed into law in 1986, prohibits discrimination by airlines against individuals with disabilities in commercial air transportation. The Americans with Disabilities Act, signed into law after the ACAA in 1990, prohibits discrimination against individuals with disabilities in employment, state or local government, public accommodations, commercial facilities, telecommunications, and transportation other than by commercial airlines.

[2] Exec. Order No. 13998, 86 FR 7205 (Jan. 26, 2021).

[3] Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b): Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (CDC Order), *available at* https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf.

[4] CDC Order specifies that "[c]onveyance operators must also require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons onboard (passengers or conveyance operators) will return to the United States while this Order remains in effect." CDC Order at 9.

---

because of the disability.[5]  However, it allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability.  Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks.[6]  The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD.  At the same time, the ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability. This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

<u>Background</u>

SARS-CoV-2, the virus that causes COVID-19, spreads most often when an infected person coughs, sneezes, or talks, and droplets from the infected individual's mouth or nose are spread through the air and come in contact with people nearby.[7]  Persons with COVID-19 infection may have symptoms of fever, cough, or shortness of breath,[8] or they may be asymptomatic[9] or pre-symptomatic[10] but still able to spread the virus.[11]  CDC has made clear that appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.[12]

---

[5] CDC Order at 4 and 5 (noting that this is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to disability).

[6] TSA Security Directive 1544-21-02: Security Measures – Face Mask Requirements (January 31, 2021).

[7] *See* Ctrs. for Disease Control & Prevention, *How COVID Spreads*, CDC.gov (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Ctrs. for Disease Control & Prevention, *Considerations for Wearing Masks*, CDC.gov (last updated Dec. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[8] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus*, CDC.gov (last updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[9] An asymptomatic case is an individual infected with SARS-CoV-2, who does not exhibit symptoms during the course of infection.   Ctrs. for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, CDC.gov (last updated Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[10] A pre-symptomatic case of COVID-19 is an individual infected with SARS-CoV-2, who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection.  *COVID-19 Pandemic Planning Scenarios*, *supra* note 8.

[11] *See How COVID Spreads* and *Considerations for Wearing Masks*, *supra* note 6.

[12] CDC Order at 6.

2

As of January 27, 2021, there have been over 99 million confirmed cases of COVID-19 globally and over 25 million confirmed cases of COVID-19 in the United States, with over 2 million deaths globally and over 400,000 deaths in the United States due to the disease.[13]  To slow the spread of COVID-19, on January 21, 2021, President Biden issued Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-wearing in domestic and international transportation.  The Executive Order further provides that the heads of agencies may make categorical or case-by-case exceptions to policies developed under the order, consistent with applicable law, to the extent that doing so is necessary or required by law.

Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.[14]  To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an accommodation to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator.  The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.[15]

In response to COVID-19, U.S. and foreign air carriers generally have implemented policies requiring passengers to wear masks onboard aircraft even before the issuance of the Executive Order and the CDC Order.  Some carriers have adopted policies that expressly allow "no exceptions" to the mask requirement other than for children under the age of two.[16] OACP has

---

[13] *Id.* at 5.

[14] 42 U.S.C. 12102(4).  OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation.   See also CDC Order at 4 and 5.

[15] CDC Order at 4. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

[16] It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others.  *See* Ctrs. for Disease Control & Prevention, *Information for Pediatric Healthcare Providers*, CDC.gov (last updated Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-

3

received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a "no exceptions allowed" mask policy.

The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth.[17] The CDC Order provides that a mask is not required in circumstances where an individual is "unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to wear the mask without assistance."[18] The Order notes that individuals may remove masks "who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask".[19] Also, individuals with acute illness may remove the mask if it "interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask."[20] CDC will issue additional guidance regarding persons who cannot wear a mask on the basis of disability.[21] Individuals who have a physical or mental impairment that substantially limits one or more major life activities are individuals with a disability for purposes of the ACAA and Part 382.[22]

<u>Legal Authority</u>

The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability.[23] When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities, provided that the modifications would not constitute an undue burden or fundamentally alter the airline's program.[24]

Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that

---

ncov/hcp/pediatric-hcp.html (stating that "[r]ecent evidence suggests that compared to adults, children likely have similar viral loads in their nasopharynx, similar secondary infections rates, and can spread the virus to others").

[17] Considerations for Wearing Masks, *supra* note 6.

[18] CDC Order at 4.

[19] CDC Order at 4 (footnote 7).

[20] CDC Order at 4 (footnote 7).

[21] CDC Order at 5 (footnote 9).

[22] 49 U.S.C. 41705(a); 14 CFR 382.3.

[23] 49 U.S.C. 41705(a); 14 CFR 382.11.

[24] 14 CFR 382.13.

4

the individual would pose a "direct threat" to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible.[25]  To support a determination that an individual poses such a direct threat, the airline must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," in order to ascertain "(i) [t]he nature, duration, and severity of the risk; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk."[26]  If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must, for example, "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation.[27]  Furthermore, the Department's regulations permit the airline to impose reasonable conditions, restrictions, or requirements on a passenger who has a "medical condition" that may cause the passenger to pose a risk to the health and safety of others.[28]

<u>Enforcement Policy</u>

The authority to pursue or not to pursue enforcement action against airlines with respect to air travel consumer protection and civil rights requirements, including compliance with the ACAA, lies with OACP.[29]

In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that treat passengers presumptively as potential carriers of the SARS-CoV-2 virus and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew.[30]  Notably, however, the CDC Order exempts from the mask mandate a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the

---

[25] 14 CFR 382.19(c)(1), (2).

[26] *Id.*

[27] 14 CFR 382.19(c)(2).

[28] 14 CFR 382.21(a)(3).  The rule recognizes that a passenger with a communicable disease or infection, such as infection with the SARS-CoV-2 virus or other "medical condition," may pose a direct threat to the health and safety of others onboard an aircraft, and the airline may be justified in refusing to transport the passenger or in requiring protective measures to mitigate the risk, consistent with the directives of public health authorities.  14 CFR 382.21(a)–(b).

[29] 49 U.S.C. 41705(c), 46301. The CDC Order requiring aircraft operators to mandate mask use will be enforced by the Transportation Security Administration under its statutory and regulatory authorities, including 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR 1542.303, 1544.305, and 1546.105.

[30] CDC Order at 5 ("The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."); *id.* at 7 ("Traveling on public conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces.").

disability.  The Department also requires reasonable accommodations for persons with disabilities who are unable to wear masks or are unable to wear them safely.[31]

Airlines have expressed concerns to OACP that a significant number of passengers may claim medical exemption from the mask requirements without an apparent credible basis.  The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.[32] Similarly, under the Department's disability regulation in 14 CFR Part 382, airlines may impose conditions, restrictions, or requirements on a passenger asserting that a medical condition prevents the passenger from wearing a face mask, because the passenger may pose a direct threat to the health or safety of others, as any passenger is a potential carrier of the SARS-CoV-2 virus.[33]  In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask.

Airlines have also represented to OACP that, given the number of passengers making such claims, it is not practicable for airlines to make the required individualized assessment of appropriate mitigation measures at the airport on the day of the flight.  Under the Department's disability regulation in Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask.[34]  However, Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance. Airlines may also require such passengers to check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel.

In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers.  For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test,[35] taken at the passenger's own expense, during the days immediately

---

[31] 14 CFR 382.13.

[32] *Id.*

[33] 14 CFR 382.21(a)(3).

[34] 14 CFR 382.19(c)(1).

[35] On January 12, 2021, CDC issued an order requiring any passenger flying into the United States from a foreign country to provide, before boarding the flight, proof of a negative pre-departure test result for SARS-CoV-2, the virus that causes COVID-19, or documentation of recovery from COVID-19 after a previous SARS-CoV-2 infection. This order became effective on January 26, 2021.  Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b): Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airlines or Other Aircraft Passengers Arriving into the United States from Any Foreign Country, *available at* https://www.cdc.gov/quarantine/pdf/global-airline-testing-order_2021-01-2_R3-signed-encrypted-p.pdf.

prior to the scheduled flight.[36]  Further, the airline may arrange for additional, appropriate mitigation measures, including arranging for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight.

To ensure travelers are aware of the face mask requirements, airlines should use their best efforts to make this information easily available.  The Department requires airlines provide information on request, to individuals with disabilities, about any service-related or other limitations on the airline's ability to accommodate passengers with a disability.[37]  Also, CDC and TSA require airlines to provide passengers with prominent and adequate notice to facilitate awareness and compliance with the requirement that masks must be worn, subject to certain limited exemptions, to mitigate the spread of COVID-19 during air travel.[38]  Airlines' obligation to provide information on the face mask requirements includes updating airlines' face mask policies on their websites to ensure accuracy and consistency with the ACAA, CDC Order and TSA SD.[39]

In recognition of the CDC Order, as well as airlines' efforts to minimize the potential for transmission of the virus onboard aircraft by implementing policies requiring passengers to wear masks onboard aircraft even before the issuance of the CDC Order, OACP  will exercise its prosecutorial discretion and provide airlines an opportunity to follow the steps described herein to become compliant before taking further action.[40]  Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382.  OACP will refrain from taking enforcement action against an airline for a period of up to 45 days from the date of this notice, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued. This timeframe should provide airlines with adequate time to review and revise their mask procedures as needed to comply with the law.[41]

---

[36] A positive test result for SARS-CoV-2, the virus that causes COVID-19, is a valid reason for an airline to deny transport to any individual, including an individual with a disability.  CDC recommends isolation to separate people infected with SARS-CoV-2 from people who are not infected.  *See* Ctrs. for Disease Control & Prevention, *Isolate if You are Sick*, CDC.gov (last updated Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html.

[37] 14 CFR 382.41.

[38] CDC Order at 1; TSA SD at 2.

[39] *See* 14 CFR 399.79 (b)(2) (defining an airline's practice as "deceptive" to consumers within the meaning of section 41712 if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter).

[40] Every day, we are learning more about how COVID-19 spreads and affects people and communities.  OACP will continue to follow the data and information provided by public health authorities, such as CDC, on actions necessary to limit the spread or impact of SARS-CoV-2 and will make changes to this notice as necessary to be consistent with current medical knowledge and the best available objective evidence.

[41] This document is a temporary notice of enforcement discretion.  Regulated entities may rely on this notice as a safeguard from Departmental enforcement as described herein. To the extent that this notice includes guidance on how regulated entities may comply with existing regulations, it does not have the force and effect of law and is not meant to bind the regulated entities in any way.

7

Questions regarding this Notice may be addressed to the Office of Aviation Consumer Protection (C-70), 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

By:

Blane A. Workie
**Assistant General Counsel for**
**Office of Aviation Consumer Protection**

Dated:  February 5, 2021

*An electronic version of this document is available at http://www.dot.gov/airconsumer*

8

# EXHIBIT 06

**DOT Response to Abadi, 21 Jan 2021**



**U.S. Department of Transportation**
Office of the Secretary
of Transportation

GENERAL COUNSEL

1200 New Jersey Ave., S.E.
Washington, DC 20590

# INVESTIGATION SUMMARY SHEET

**Case Number:** AT2021020041

**Complainant Title:** MR

**Name:** AARON ABADI

**Address:** 82 NASSAU STREET, 140
NEW YORK, NY 10038

**Passenger(s):** Mr. Aaron Abadi

**Airline:** Etihad Airways

**Travel Date(s):** January 22, 2021

**Flight Number(s):** Not Applicable

**City Pair:** Not Provided

**Location of Incident:** Not Applicable

**Complaint/Issue:** Carrier refusal to make an exemption to carrier's mask policy to a passenger with a disability.

**Applicable Section of 14 CFR Part 382:** 382.19

**Section Summary:** 382.19(a) As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part.

(b) You must not refuse to provide transportation to a passenger with a disability because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

(c) You may refuse to provide transportation to any passenger on the basis of safety, as provided in 49 U.S.C. 44902 or 14 CFR 121.533, or to any passenger whose carriage would violate FAA or TSA requirements or applicable requirements of a foreign government.

(1) You can determine that there is a disability-related safety basis for refusing to provide transportation to a passenger with a disability if you are able to demonstrate that the passenger poses a direct threat (see definition in §382.3). In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:

(i) The nature, duration, and severity of the risk;

(ii) The probability that the potential harm to the health and safety of others will actually occur; and

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

(2) If you determine that the passenger does pose a direct threat, you

must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal.

(3) In exercising this authority, you must not act inconsistently with the provisions of this part.

(4) If your actions are inconsistent with any of the provisions of this part, you are subject to enforcement action under Subpart K of this part.

**Rule Violated?**           No

**Remarks:**                Mr. Abadi states that he has a medical disability and cannot wear a mask or face shield.  Mr. Abadi states that he notified the carrier and provided a copy of a doctor's letter regarding his disability. He states that he had recovered from COVID-19 and believed that he did not pose a health risk.  Mr. Abadi states that the carrier refused to accommodate him.

In the carrier's March 4, 2021, reply to Mr. Abadi, Etihad Airways (Etihad) states that its mask policy is based on the latest accepted global medical science and applicable regulations. Etihad provides Mr. Abadi with its process for providing an exemption to the mask policy for passengers with disabilities, including check-in and onboard requirements for such passengers.

On February 5, 2021, the Office of Aviation Consumer Protection (OACP) issued a notice titled, "Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear Masks While on Commercial Aircraft".  The notice reminds U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with COVID-19.  The notice makes clear that airline policies that expressly allow no exceptions to the mask requirement other than for children under the age of two violate the Air Carrier Access Act.

The Air Carrier Access Act (ACAA) and its implementing regulation, 14 CFR Part 382 (Part 382) require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability.  It would be a violation of the ACAA and Part 382 for an airline to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater heath risk to others.

In this instance, we have reviewed Etihad's mask policy at the time of Mr. Abadi's complaint and verified that the carrier provided an exemption process for passengers with disabilities who cannot wear or safely wear a mask due to their disability. We have also been informed by the carrier that passengers with an exemption from the mask requirement are recommended to wear a mask when not seated, but that such passengers are not required to adhere to this recommendation. In light of the foregoing, we are unable to conclude that Etihad was in violation of the ACAA and Part 382.

# EXHIBIT 07
## DOT Letter to Abadi, 25 Mar 2022



**U.S. Department of
Transportation**
Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

March 25, 2022

Mr Aaron Abadi
82 Nassau Street, 140
New York, NY 10038

Dear Mr Abadi:

This letter is in further reference to your disability complaint regarding Etihad Airways. We were sorry to
hear of the incident and appreciate the opportunity to advise you of the outcome of our
investigation. Enclosed you will find an Investigation Summary Sheet that details the results of our
investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. Section 41705, and our
implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382,
provides a brief summary of that section and explains this office's view on whether the carrier has
violated the ACAA and 14 CFR Part 382. If your complaint raises more than one disability issue, an
additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates
the action that we plan to take. We will either pursue formal enforcement action or by copy of this letter
notify the airline specified in your complaint of our determination and warn it that any similar incidents
could lead to formal enforcement action. Generally, we will pursue enforcement action on the basis of a
number of complaints from which we may infer a pattern or practice of discrimination. However, where
one or a few complaints describe particularly egregious conduct on the part of a carrier and those
complaints are supported by adequate evidence, we will pursue enforcement action as our resources
permit. If we decide to seek enforcement action against the airline, your complaint will be among those
considered in the context of this action, which may lead to the issuance of a cease and desist order and
to the assessment of civil penalties. In the event that this enforcement action leads to litigation, it is
possible that we may need sworn statements or witnesses for a hearing. We will advise you if, in fact,
we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing
cease and desist orders and assessing civil penalties not to exceed $34,174 per violation. Such action
can only be accomplished through settlements or formal hearings before administrative law judges. We
cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a
complainant would have to file a private legal action that may be based on private contract rights or on
civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated
the ACAA, we will not pursue enforcement action. Notwithstanding our decision not to pursue
enforcement action, however, private legal action may be pursued in the courts based on private contract
rights or on civil rights statutes that provide for a private right of action and, in such a proceeding,
monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your
complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our
monthly *Air Travel Consumer Report* reflect your complaint. Our monthly report is made available to the

aviation industry, the news media and the general public so that both consumers and air travel companies can compare the overall complaint records of individual airlines, as well as the number of disability complaints filed against particular carriers. This system also serves as a basis for rulemaking, legislation, and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant further action. This ongoing process also enables us to ensure prompt corrective action whenever we determine that an airline's policies or procedures are not in compliance with our ACAA regulations. Your complaint will be among those considered in the context of this overall process.

I hope this further information is useful. Thank you again for taking the time to contact us.

Sincerely,

Livaughn Chapman, Jr.
Deputy Assistant General Counsel
   for Aviation Consumer Protection

/s/

By: Ryan Patanaphan
Senior Trial Attorney

Enclosures
cc: Etihad Airways

# EXHIBIT 08

## Masks create 68 Dangers to Human Health

Scientists have identified at least <mark>**68 dangers**</mark> to human health from mask-wearing including:

- Adverse Skin Reactions Such As Acne

- Alveolitis (An Inflammatory Lung Disorder)

- Anxiety

- Asthma

- Bacterial Pneumonia

- Blood-Oxygen Depletion

- Breathing Difficulties

- Bronchiectasis (A Condition In Which The Lungs' Airways Become Damaged)

- Carbon-Dioxide Retention

- Candidacies (Fungal Infestation Of The Mucous Membranes)

- Cheilitis (Inflammation Of The Lips)

- Chronic Bronchitis

- Chronic Pneumonia

- Confusion

- Concentration Problems

- Decrease In Psychomotoric Abilities

- Decreased Thinking Ability And Disorientation

- Depression

- Dental Impacts Such As Cavities

*Page 1 of 1*

- Discouragement

- Disrupted Nonverbal And Verbal Communication

- Disrupted Social Interaction

- Disruption Of The Basics Of Human Communication (Verbal And Non-Verbal)

- Dizziness

- Drowsiness

- Dry Mouth

- Elevated Risk Of Covid-19 And Its Variants Through Self-Contamination

- Elevated Transcutaneous Carbon-Dioxide Values

- Exhaustion

- Facial Deformities

- Facial Itching

- Facial Rashes

- Fatigue

- Fibrosis (Excess Tissue Deposition)

- Gingivitis (Inflammation Of The Gums)

- Halitosis (Bad Breath)

- Headaches

- Hypercapnia Hyperventilation

- Hypoxia

*Page 2 of 2*

- Impaired Clarity Of Speech

- Impaired Cognitive Abilities

- Impaired Field Of Vision

- Impaired Learning

- Impetigo (A Bacterial Infection That Produces Red Sores And Can Lead To Kidney Damage)

- Increased Blood Pressure

- Increased Feelings Of Insecurity

- Increased Heart Rate

- Increased Risk Of Infection Because Masks Are An Ideal Growth And Breeding Ground For Various Pathogens Such As Bacteria And Fungi

- Increased Stress

- Inhalation Of Toxic Substances Such As Microplastics And Chlorine Compounds Located In The Masks

- Irritability

- Irritation Of The Respiratory Tract

- Isolation

- Malaise

- Microbiological Contamination (Germ Colonization)

- Neuropathological And Cardiovascular Consequences

- Numbness

- Panic Attacks

*Page 3 of 3*

- Physiological Changes And Discomfort

- Reduced Cardiopulmonary Capacity

- Reduced Happiness

- Reduced Performance Capability

- Skin Irritation

- Social Withdrawal

- Spontaneous Pneumothorax

- Vascular Damage

- Voice Disorders

Conspiracy theories? No. This is an abbreviated list extracted from 228 scientific studies and medical articles that demonstrate how masks do NOT reduce the spread of COVID-19 or its variants, but instead harm human health.

https://bit.ly/masksarebad

*Page 4 of 4*