# Table of Exhibits

| No. | Name of Exhibit | Page #'s |
|---|---|---|
| **1** | CDC: Total Deaths Attributable to COVID ONLY. (1 page) | **3** |
| **2** | CDC: "Our performance did not reliably meet expectations." (3 pages) | **5-7** |
| **3** | Amicus Curiae Brief of the Association of American Physicians and Surgeons in Support of Plaintiffs-Appellees Health Freedom Defense Fund, Inc. (35 pages) | **9-43** |
| **4** | The Nuremberg Code and voluntary consent to medical experiments. (11 pages) | **45-55** |
| **5** | SELECKI v. CDC (Transcript). (32 pages) | **57-88** |
| **6** | U.S. Court of Appeals: "Petition is dismissed for lack of jurisdiction." (1 page) | **90** |
| **7** | CDC: "The exemption is not meant to cover people with disabilities for whom wearing a mask might only be difficult." (3 pages) | **92-94** |
| **8** | DOT Promises "to provide reasonable accommodations to persons with disabilities who are unable to safely wear masks." (9 pages) | **96-104** |
| **9** | DOT to Southwest Airlines and JetBlue: "You are guilty of discrimination, but we are not going to do anything about it." (8 pages) | **106-113** |

# EXHIBIT 01

## CDC: Total Deaths Attributable to COVID ONLY


**CDC** Centers for Disease Control and Prevention

## National Center for Health Statistics

# Weekly Updates by Select Demographic and Geographic Characteristics

Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)

Note: Provisional death counts are based on death certificate data received and coded by the National Center for Health Statistics as of August 17, 2022. Death counts are delayed and may differ from other published sources (see Technical Notes). Counts will be updated every Wednesday by 5pm. Additional information will be added to this site as available.

## Comorbidities and other conditions

Table 3 shows the types of health conditions and contributing causes mentioned in conjunction with deaths involving coronavirus disease 2019 (COVID-19). The number of deaths that mention one or more of the conditions indicated is shown for all deaths involving COVID-19 and by age groups. For over 5% of these deaths, COVID-19 was the only cause mentioned on the death certificate. For deaths with conditions or causes in addition to COVID-19, on average, there were 4.0 additional conditions or causes per death. For data on deaths involving COVID-19 by time-period, jurisdiction, and other health conditions, [ Click here to download ].



| Table 3. Number of COVID-19 deaths with contributing conditions, by time-period, jurisdiction of occurrence, and age-group. | | | | | | | | | | | Data as of: 8/16/2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|

**State:** United States
**Attribute:** COVID-19 Deaths
**Condition Group:** All
**Condition:** All
**Year:** All

| Year in which death occurred | Conditions contributing to deaths where COVID-19 was listed on the death certificate [1] | All Ages | 0-24 years | 25-34 years | 35-44 years | 45-54 years | 55-64 years | 65-74 years | 75-84 years | 85+ years | ICD-10 Codes | State |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020-2022 | Influenza and pneumonia | 496,075 | 1,396 | 5,608 | 14,622 | 36,387 | 79,740 | 122,183 | 127,943 | 108,185 | J09-J18 | United States |
| 2020-2022 | Chronic lower respiratory diseases | 93,669 | 176 | 427 | 1,016 | 2,977 | 11,305 | 24,135 | 30,410 | 23,222 | J40-J47 | United States |
| 2020-2022 | Adult respiratory distress syndrome | 103,434 | 459 | 1,780 | 4,643 | 11,308 | 22,430 | 29,248 | 21,838 | 11,727 | J80 | United States |
| 2020-2022 | Respiratory failure | 402,144 | 953 | 3,896 | 10,525 | 27,331 | 63,116 | 101,081 | 108,064 | 87,171 | J96 | United States |
| 2020-2022 | Respiratory arrest | 21,112 | 69 | 215 | 515 | 1,220 | 2,835 | 4,535 | 5,540 | 6,183 | R09.2 | United States |
| 2020-2022 | Other diseases of the respiratory system | 53,034 | 298 | 724 | 1,749 | 4,011 | 8,717 | 12,946 | 13,530 | 11,059 | J00-J06, J22-J39, J60-J70, J81-J86, J90-J95, J97-J99, U04 | United States |
| 2020-2022 | Hypertensive diseases | 190,525 | 91 | 817 | 3,401 | 10,003 | 25,484 | 43,290 | 51,403 | 56,030 | I10-I15 | United States |
| 2020-2022 | Ischemic heart disease | 111,432 | 30 | 252 | 975 | 3,720 | 12,072 | 24,960 | 34,223 | 35,194 | I20-I25 | United States |
| 2020-2022 | Cardiac arrest | 122,722 | 437 | 1,539 | 3,881 | 9,565 | 20,282 | 29,564 | 30,231 | 27,222 | I46 | United States |
| 2020-2022 | Cardiac arrhythmia | 80,363 | 86 | 267 | 713 | 2,292 | 7,232 | 15,901 | 24,649 | 29,223 | I44, I45, I47-I49 | United States |
| 2020-2022 | Heart failure | 81,359 | 69 | 291 | 802 | 2,383 | 7,014 | 15,117 | 23,797 | 31,885 | I50 | United States |
| 2020-2022 | Cerebrovascular diseases | 52,012 | 95 | 261 | 776 | 2,224 | 6,201 | 11,647 | 14,758 | 16,049 | I60-I69 | United States |
| 2020-2022 | Other diseases of the circulatory system | 77,910 | 401 | 1,057 | 2,429 | 5,622 | 12,045 | 17,976 | 19,490 | 18,889 | I00-I09, I26-I43, I51, I52, I70-I99 | United States |
| 2020-2022 | Sepsis | 106,231 | 371 | 1,303 | 3,657 | 9,364 | 20,674 | 29,643 | 25,566 | 15,651 | A40-A41 | United States |
| 2020-2022 | Malignant neoplasms | 57,657 | 148 | 242 | 762 | 2,398 | 8,251 | 16,053 | 17,451 | 12,352 | C00-C97 | United States |
| 2020-2022 | Diabetes | 154,982 | 262 | 1,191 | 4,097 | 11,785 | 27,293 | 42,750 | 40,973 | 26,627 | E10-E14 | United States |
| 2020-2022 | Obesity | 50,855 | 678 | 2,757 | 5,698 | 9,539 | 13,163 | 11,895 | 5,771 | 1,353 | E65-E68 | United States |
| 2020-2022 | Alzheimer disease | 30,204 | 0 | 2 | 3 | 33 | 269 | 2,056 | 8,891 | 18,950 | G30 | United States |
| 2020-2022 | Vascular and unspecified dementia | 80,728 | 0 | 2 | 10 | 82 | 1,088 | 6,975 | 24,463 | 48,106 | F01, F03 | United States |
| 2020-2022 | Renal failure | 116,367 | 250 | 1,147 | 3,225 | 8,775 | 19,453 | 30,199 | 29,833 | 23,482 | N17-N19 | United States |
| 2020-2022 | Intentional and unintentional injury, poisoning, and other adverse events | 26,352 | 316 | 698 | 1,171 | 1,979 | 3,826 | 5,625 | 6,062 | 6,672 | S00-T98, V01-X59, X60-X84, X85-Y09, Y10-Y36, Y40-Y89, U01 | United States |
| 2020-2022 | All other conditions and causes (residual) | 418,053 | 1,938 | 4,866 | 11,431 | 27,142 | 62,509 | 99,016 | 108,758 | 102,381 | A00-A39, A42-B99, D00-E07, E15-E64, E70-E90, F00, F02, F04-G26, G31-H95, K00-K93, L00-M99, N00-N16, N20-N98, O00-O99, P00-P96, Q00-Q99, R00-R08, R09.0, R09.1, R09.3, R09.8, R10-R99 | United States |
| 2020-2022 | **COVID-19** | **1,033,450** | 3,617 | 11,329 | 28,277 | 67,949 | 150,389 | 236,112 | 267,125 | 268,631 | U071 | **United States** |

**6% of 1,033,450 = 62,007 deaths in 2020-2022 from COVID ONLY.**

# EXHIBIT 02

## CDC: "Our performance did not reliably meet expectations."

# CDC announces sweeping reorganization, aimed at changing the agency's culture and restoring public trust

**By Brenda Goodman**

🕐 Updated 1741 GMT (0141 HKT) August 17, 2022

**(CNN) —** Big changes are coming to the United States Centers for Disease Control and Prevention, which recently celebrated its 75th anniversary as the nation's lead public health agency.

CDC director Dr. Rochelle Walensky met with senior leadership at the agency this morning to lay out her plans for overhauling how the agency works. She plans to remake the culture to help the agency move faster when it responds to a public health crisis. She also wants to make it easier for other parts of the government to work with the CDC, and wants to simplify and streamline the website to get rid of overlapping and contradictory public health guidance.

"My goal is a new, public health action-oriented culture at CDC that emphasizes accountability, collaboration, communication, and timeliness. I look forward to working with the incredible people at CDC and our partners to realize the agency's fullest potential to benefit the health and well-being of all Americans," Walensky said in a statement on Wednesday.



ERIK S LESSER/EPA-EFE/SHUTTERSTOCK

**Related Article:** High hopes but tempered expectations as CDC launches review of agency's structure and systems

Staff was notified of the plans by email. More than 12,000 people work at the agency, which is headquartered in Atlanta.

The changes will be aimed at improving the culture and restoring public trust after the agency's acknowledged missteps in its response to the Covid-19 pandemic.

The reforms follow a period of review and introspection at the CDC. In April, Walensky announced Jim Macrae, an administrator at the US Department of Health and Human Services, would lead a one-month review of the agency's Covid-19 response efforts. At the same time, she charged three of her deputies to scrutinize operations and recommend strategic changes. Walensky has been meeting with groups of staff in person as employees return to their office after months of remote work.



**Related Article:** Walensky pushes back on Gottlieb's criticism of CDC monkeypox response



**Related Article:** CDC to all domestic travelers: Test as close as possible to departure time

The new marching orders come after significant stumbles at the agency in response to the Covid-19 pandemic. The US had little capacity to test for infection during the early months of the pandemic, largely because the agency released a flawed test to public health laboratories. That kept the nation blind, for months, to the extent of the virus's spread.

The agency has also been criticized throughout the pandemic for issuing public health guidance that some saw as confusing and ineffective. Many also felt it wasn't moving fast enough to respond.

"For 75 years, CDC and public health have been preparing for Covid-19, and in our big moment, our performance did not reliably meet expectations," Walensky acknowledged in her statement.

Walensky will bring in former HHS Deputy Secretary Mary Wakefield to the CDC to oversee the reorganization.

Among the key moves announced today, the Division of Laboratory Science and the Office of Sciences will now report directly to the CDC director, a shift aimed at making them more accountable and speeding the results of their work to the public.

The agency will also create a new office of intergovernmental affairs -- a hub where state's health departments and other federal agencies with interact with CDC.

Walensky will convene an executive council that will determine agency priorities, track its progress, and weigh in on budget decisions.

The agency will start a new equity office which aims to increase diversity both in the CDC's workforce and add that lens to its public health activities.



**Related Article:** CDC ends recommendations for social distancing and quarantine for Covid-19 control, no longer recommends test-to-stay in schools

The CDC also plans to create a new online mechanism for the pre-publication delivery of science, and it will give its website a makeover, by streamlining and simplifying its guidance to the public and health care providers**.**

Walensky also plans to ask Congress to grant the agency new powers, including mandating that jurisdictions share their data. Currently, CDC depends on states and counties to voluntarily do that.

She's also going to ask for new flexibilities in the agency's funding. Right now, when Congress earmarks money for the CDC, it has to be spent on specific programs. That has created more than 150 individual budget lines that fund the agency. That can be a problem when a public health emergency comes along. In 2014, when the Ebola epidemic began, Dr. Tom Frieden, who was then CDC director, had to borrow money from other parts of the federal government to respond.

"We literally didn't have money for plane tickets and per diem to send staff into the field," said Frieden, who was interviewed by Macrae for his review.

"I had, quite literally, 20 times more flexible dollars as New York City health commissioner than I did as CDC Director," Frieden said in an interview with CNN. Frieden now leads the nonprofit Resolve to Save Lives.

Some of those changes have already started, including a reorganization of the agency's communications operations.

Earlier this year, the CDC filled a long-vacant post when it hired Kevin Griffis, a veteran of public affairs at the Department of Health and Human Services and Planned Parenthood, to lead its communications efforts. Along with communicating the CDC's health information, part of his job is to manage "risk communication and reputational issues for the agency," according to the CDC website. The agency hasn't had a head of communications for four years, according to a senior official with knowledge of the changes who was not authorized to speak to reporters.

## Get CNN Health's weekly newsletter

Sign up here to get **The Results Are In with Dr. Sanjay Gupta** every Tuesday from the CNN Health team.

A final draft of Macrae's review is expected to be released Wednesday. Key recommendations will include:

• Share scientific findings and data faster

• Do a better job of translating science into practical, easy-to-understand policy

• Prioritize public health communications

• De-emphasize publication of scientific findings for career promotion

• New training for agency staff so that multiple people can fill the same role in public health emergencies

# EXHIBIT 03

**Amicus Curiae Brief of the Association of American Physicians and Surgeons in Support of Plaintiffs-Appellees Health Freedom Defense Fund, Inc.**

No. 22-11287

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**HEALTH FREEDOM DEFENSE FUND, INC., *et al.*,**

**Plaintiffs - Appellees,**

**v.**

**JOSEPH R. BIDEN, JR., President of the United States, *et al.*,**

**Defendants - Appellants.**

---

On appeal from the United States District Court for the
Middle District of Florida

---

***AMICUS CURIAE* BRIEF OF THE ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS IN SUPPORT OF PLAINTIFFS-APPELLEES HEALTH FREEDOM DEFENSE FUND, INC., *ET AL.*, IN SUPPORT OF AFFIRMANCE**

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
(908) 934-9207 (fax)
aschlafly@aol.com

Counsel for *Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The case number for this *amicus curiae* brief is No. 22-11287, *Health Freedom Defense Fund, Inc., et al., v. Joseph R. Biden, Jr., President of the United States, et al.*

*Amicus Curiae* Association of American Physicians and Surgeons is a non-profit corporation which has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Pursuant to Eleventh Circuit Rule 26.1-1(a)(1), the undersigned counsel of record certifies that the parties', including *amici*'s, list of persons and entities having an interest in the outcome of this case is complete, to the best of the undersigned counsel's knowledge, with the following additions:

Association of American Physicians and Surgeons, *Amicus Curiae*

Andrew L. Schlafly, counsel for *Amicus Curiae*.

These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/ Andrew L. Schlafly
Andrew L. Schlafly
Dated:  August 5, 2022                   *Counsel for Association of American Physicians and Surgeons*

ii

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................... ii

Table of Contents ................................................................................... iii

Table of Authorities ...............................................................................iv

Identity, Interest and Authority to File .................................................... 1

Preliminary Statement.............................................................................. 2

Statement of the Issues............................................................................. 4

Summary of Argument ............................................................................. 4

Argument.................................................................................................. 7

I.    "Major Questions Doctrine" Requires Affirmance of the
       Decision Below............................................................................... 7

       A. The Recent Decision by the Supreme Court in *West Virginia v.*
          *EPA* Requires Affirmance ........................................................ 8

       B. Controlling Precedents Prior to *West Virginia v. EPA* Likewise Require
          Affirmance................................................................................12

II.   The Mask Mandate Is Unjustified Scientifically...........................14

       A. The Government's Brief Completely Fails to Support the Mask
          Mandate .................................................................................15

       B. The *Amicus* Briefs Likewise Fail to Support the Mask Mandate............20

       C. Studies Show that Mask Mandates Do Not Work ...................24

       D. Mask Mandates Are Political, Not Scientific, and Thus Should Be
          Addressed by Congress Rather than by a Federal Agency ....................26

III.  The Nationwide Scope of the Relief Should Be Affirmed,
       or the Issue Declared Moot..........................................................26

Conclusion .............................................................................................27

Certificate of Compliance ......................................................................28

Certificate of Service .............................................................................28

iii

## TABLE OF AUTHORITIES

**Cases**                                                                          **Pages**

*62 Cases of Jam v. United States*, 340 U.S. 593 (1951) .......................................11

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021)..........................................22

*Association of American Physicians & Surgeons v. Clinton*,
   997 F.2d 898 (D.C. Cir. 1993)...........................................................................1

*Association of American Physicians & Surgeons v. Mathews*,
   423 U.S. 975 (1975)........................................................................................1

*Biden v. Missouri*, 142 S. Ct. 647 (2022) ............................................................16

*Cheney v. United States Dist. Court*, 542 U.S. 367 (2004) ....................................1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................................1

*\*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).....9, 10, 11, 12

*Gonzales v. Oregon*, 546 U.S. 243 (2006)...........................................................9, 13

*Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693-KKM-AEP,
   2022 U.S. Dist. LEXIS 71206, at \*17 (M.D. Fla. Apr. 18, 2022) .............3, 4

*King* v. *Burwell*, 576 U. S. 473 (2015) ...................................................................9

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*,
   512 U.S. 218 (1994)...................................................................................9, 12

*New York* v. *United States*, 505 U. S. 144 (1992) ...................................................9

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661 (2022)................... 13-14

*Spector* v. *Norwegian Cruise Line Ltd.*, 545 U. S. 119 (2005) ...............................14

iv

*Springer v. Henry*, 435 F.3d 268 (3d Cir. 2006)........................................................1

*Stenberg v. Carhart*, 530 U.S. 914 (2000).................................................................1

*Texas v. United States*, 945 F.3d 355 (5th Cir. 2019)................................................1

*United States v. Article of Drug Bacto-Unidisk*, 394 U.S. 784 (1969) ...................11

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014)..................................8, 9, 13

\*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)................................................*passim*

## Statutes and Rule

42 U.S.C. § 264(a) ........................................................................................................3

N.Y. Penal Law § 240.35(4) .......................................................................................4

Fed. R. App. P. 29(a)(4)(E) ........................................................................................1

## Other Authorities

AARP, "State-by-State Guide to Face Mask Requirements"
    https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-
    coronavirus.html ..........................................................................................26

Gholamhossein Bagheri et al., *An Upper Bound on One-to-One Exposure to
    Infectious Human Respiratory Particles*,
    118 PNAS e2110117118 (2021) ................................................................21

Madeleine Brand, "Sweden refused to lock down during the pandemic. How is the
    country faring now?" *KCRW* (Apr. 15, 2021)
    https://www.kcrw.com/news/shows/press-play-with-madeleine-brand/edu-
    coronavirus-crime-food/sweden-covid.................................................. 18-19

v

*John T. Brooks et al., Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, 325 JAMA 998 (2021)
https://jamanetwork.com/journals/jama/fullarticle/2776536 ................. 23-24

The Editorial Board, "A sensible shift away from COVID mask mandates," *Raleigh News & Observer* (Apr. 28, 2022)
https://www.newsobserver.com/opinion/article260672382.html#storylink=copy ............................................................................................................... 19

E. Thomas Ewing, "Flu Masks Failed In 1918, But We Need Them Now," *Health Affairs Forefront* (May 12, 2020)
https://www.healthaffairs.org/do/10.1377/forefront.20200508.769108/ ...... 18

Paul French, "In the 1918 Flu Pandemic, Not Wearing a Mask Was Illegal in Some Parts of America. What Changed?," *CNN* (Apr. 4, 2020)
https://perma.cc/WL95-2WDF ...................................................................... 18

Yanni Li et al., "Face Masks to Prevent Transmission of COVID-19: A Systematic Review and Meta-Analysis," 49 Am. J. Infection Control 900 (2021) ................................................. 22-23

Makary & Høeg, "U.S. Public Health Agencies Aren't 'Following the Science,' Officials Say," *Common Sense* (July 14, 2022)
https://www.commonsense.news/p/us-public-health-agencies-arent-following ....................................................................................................... 22

*Reuters*, "CDC recommends Americans wear 'most protective mask you can'" (Jan. 15, 2022)
https://www.jpost.com/breaking-news/article-692575 ................................. 23

Robby Soave, "Anthony Fauci Says If We Could Do It Again, COVID-19 Restrictions Would Be 'Much, Much More Stringent'" (July 25, 2022)
https://reason.com/2022/07/25/anthony-fauci-interview-covid-restrictions-masks/ ............................................................................................................ 23

vi

Neeraj Sood, Shannon Heick, Josh Stevenson, Tracy Høeg, "Association between
School Mask Mandates and SARS-CoV-2 Student Infections: Evidence
from a Natural Experiment of Neighboring K-12 Districts in North Dakota"
*Research Square* (July 1, 2022)
https://www.researchsquare.com/article/rs-1773983/v1 ......................... 24-25

Eric Ting, "Do mask mandates work? Bay Area COVID data from June says no."
SFGATE (June 29, 2022)
https://www.sfgate.com/coronavirus/article/bay-area-mask-mandate-results-
17271294.php .............................................................................................19

Peter Vincent, "Top Australian professor says it's unlikely mask mandates work to
stop the spread of the Omicron Covid variant - and explains how you can
protect yourself from the virus," *Daily Mail* (June 30, 2022)
https://www.dailymail.co.uk/news/article-10967731/Covid-19-Australian-
professor-Peter-Collignon-says-mask-mandates-DONT-work-stop-
Omicron.html..............................................................................................25, 26

"Why Doctors Wear Masks," *Yale Medicine* (Sept. 1, 2020)
https://perma.cc/TE77-8PBH .....................................................................17

Elizabeth Wolfe, "Philadelphia to lift mask mandate less than a week after it was
reinstated," CNN (Apr. 22, 2022)
https://www.cnn.com/2022/04/22/us/philadelphia-rescinds-mask-
mandate/index.html .....................................................................................19

*Worldometers*, https://www.worldometers.info/coronavirus/ ................................19

*Authorities primarily relied upon

vii

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Association of American Physicians and Surgeons ("AAPS"),
is a national association of physicians.  Founded in 1943, AAPS has been
dedicated to the highest ethical standards of the Oath of Hippocrates and to
preserving the sanctity of the patient-physician relationship.  AAPS has been a
litigant in federal courts.  *See, e.g., Cheney v. United States Dist. Court*, 542 U.S.
367, 374 (2004) (citing *Association of American Physicians & Surgeons v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993)); *Association of American Physicians & Surgeons v.
Mathews*, 423 U.S. 975 (1975).  In addition, the U.S. Supreme Court has expressly
made use of *amicus* briefs submitted by AAPS in high-profile cases. *See, e.g.,
Stenberg v. Carhart*, 530 U.S. 914, 933 (2000); *id.* at 959, 963 (Kennedy, J.,
dissenting); *District of Columbia v. Heller*, 554 U.S. 570, 704 (2008) (Breyer, J.,
dissenting).  Over the span of more than a decade, the Fifth and Third Circuits have
expressly cited an *amicus* brief by AAPS in the first paragraph of one of its
decisions. *See Texas v. United States*, 945 F.3d 355, 369 (5th Cir. 2019); *Springer
v. Henry*, 435 F.3d 268, 271 (3d Cir. 2006).

---

[1] All parties have consented to the filing of this brief by *Amicus*.  Pursuant to FED.
R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: counsel for the *Amicus*
authored this brief in whole; no counsel for a party authored this brief in any
respect; and no person or entity – other than *Amicus*, its members, and its counsel –
contributed monetarily to this brief's preparation or submission.

1

AAPS members include many who object to a mask mandate on travelers.

AAPS thus has direct and vital interests in the issues presented here.

## PRELIMINARY STATEMENT

Without explicit congressional authorization or its specific approval of any

kind, federal agencies ("government" or "CDC") assert broad, unprecedented

authority to impose a mask mandate on travelers nationwide.  The intrusive burden

by this on nearly all Americans in their daily lives is self-evident.  Travel is a

fundamental constitutional right, and yet a small group of unelected officials

within government agencies demand unlimited authority to substantially burden

that right by requiring nearly all to wear masks, typically ineffective ones, while in

transit.  The CDC has not yet attempted to reinstate its mask requirement after it

expired in the wake of the ruling below amid substantial public opposition to its

mandate, but on appeal the CDC demands broad authorization by this Court to

reinstate a mask mandate on travelers at any time and for virtually any reason.  A

few like-minded officials, such as in some areas of California, sporadically demand

mask mandates in an on-again-off-again manner even though widely viewed

outside of government as constituting an ineffective burden.

The mask mandate imposed by the CDC was intermittent for each individual

because the mask is to be taken off when "eating, drinking, or taking medication,"

or to verify identity, or to catch one's breathe when "feeling winded," or to speak

2

with anyone who is hearing impaired. *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693-KKM-AEP, 2022 U.S. Dist. LEXIS 71206, at *55 (M.D. Fla. Apr. 18, 2022) (quoting the Federal Register). This mask mandate did not require use of an effective mask; cheap, ineffective masks incapable of blocking the tiny Covid-19 particles were commonly worn to satisfy the mandate.

The CDC rests its sweeping assertion of authority to impose masks on the statutory term "sanitation", which the government repeats 16 times in the body of its brief. Specifically, the government relies on the statutory provision that:

> the Secretary may provide for "such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."

(Govt Br. 5, quoting 42 U.S.C. § 264(a)). This plain text of the statute merely authorizes the CDC to take sanitation measures with respect to goods, not to intrusively interfere with constitutional rights to speech and travel.

The district court below found that masks at issue in this appeal do not sanitize anything.

> The context of § 264(a) indicates that "sanitation" and "other measures" refer to measures that clean something, not ones that keep something clean. Wearing a mask cleans nothing. At most, it traps virus droplets. But it neither "sanitizes" the person wearing the mask nor "sanitizes" the conveyance. Because the CDC required mask wearing as a measure to keep something clean—explaining that it limits the spread of COVID-19 through prevention, but never contending that it actively destroys or removes it—the Mask Mandate falls outside of § 264(a).

3

*Health Freedom Def. Fund*, 2022 U.S. Dist. LEXIS 71206, at *17.  On that basis

the district court invalidated the CDC's mask mandate, resulting in this appeal.

The district court issued nationwide relief as this is inherently a national

issue, affecting not only the plaintiffs in this case but nearly every American,

including those with whom the plaintiffs would like to travel.  The government

argues on appeal that the court below should have "confine[d] any relief to the five

individuals who identified themselves in this case."  (Govt Br. 3)  Under this view

of the government, the CDC mask mandate should have been blocked with respect

to only the plaintiffs, without relief to anyone else traveling with them or likewise

objecting to the mask mandate as plaintiffs have.

## STATEMENT OF THE ISSUES

*Amicus* AAPS fully adopts and incorporates herein the Statement of the

Issues by Appellees.  (Appellees Br. 6)

## SUMMARY OF ARGUMENT

Mask mandates infringe on two fundamental rights:  freedom of speech and

freedom of travel.  The ability to see another's demeanor while he is speaking is

often as important as the content of what he says.  Historically many American

states and towns *prohibited* the wearing of masks, in order to avoid the harm they

cause.  *See, e.g.*, N.Y. Penal Law § 240.35(4) (predecessor enacted in 1845, then

4

reenacted in 1965, and then repealed amid Covid-19 in 2020).  Determinations of

credibility essential to courtroom trials are just as important in everyday life, as

millions of decisions are made daily, based on not merely what one says, but on

how he is perceived as saying it.

Whether and how government may impose a mask mandate on travelers is a

substantial issue involving a major question, and the recent adoption by the

Supreme Court of "major questions doctrine" requires affirming the decision

below.  On June 30, 2022, after Appellants filed their opening brief, the Supreme

Court issued its ruling in the consolidated case of *West Virginia v. EPA*, 142 S. Ct.

2587 (2022), and expressly embraced major questions doctrine for the first time.  It

requires invalidating agency decision-making on major questions in the absence of

express congressional authorization.  Such is the case here.

Mask mandates are more politics than science, and politics is to be sorted

out in the halls of Congress rather than at a politically unaccountable

administrative agency.  Congress uses a time-proven process that includes public

hearings, feedback by constituents, vigorous public debate, and political

accountability.  All of these elements are essential before a burden as draconian as

a traveler mask mandate is imposed, and yet none of this exists for agency

decision-making by the CDC.  The Constitution protects against government

controlling what people say, and likewise protects against government controlling

5

how people look when they say it.  What is said with a slight smile can often mean something entirely different from what is said with clenched teeth.  The CDC incorrectly insists that it should have immense unchecked power to decide what to allow on this, without any express congressional authorization.

As further explained by Justice Neil Gorsuch in his concurrence in *West Virginia v. EPA*, "major questions doctrine" is not new.  Courts have rejected many prior agency attempts to grab breathtaking authority never authorized by Congress, as the CDC attempts here.  Nothing in the relevant statute or its prior implementations remotely support the mandate that all travelers wear masks, let alone require ineffective mask-wearing.  As a "major question" this is one for Congress to decide as part of the political process, not for agency employees to impose without hearings and meaningful public debate.

The *amicus* brief submitted by the AMA fails to cite or address a single legal authority.  The *amicus* brief submitted by the Public Health *amici* cites only four legal precedents other than the decision below, one of which is a 1925 Georgia Supreme Court decision concerning the meaning of the word "sanitation", along with numerous citations to various dictionaries.  All the *amici* in support of the government fail to address major questions doctrine and the long line of Supreme Court precedents that led to its formal adoption in *West Virginia v. EPA.*

6

Just as glaring is the failure by the government's *amici* to provide any justification for the travelers' mask mandate. Mask mandates failed to work during the 1918 flu pandemic, and yet the briefs submitted by the government's *amici* cite their unsuccessful use then as a reason to mandate them again. The medical briefs could have cast some scientific light on the matter at hand, but there is no science in support of requiring intermittent use of porous masks by travelers. In the briefing by the government *amici*, only one paragraph in each of their briefs even alludes to any general scientific support for a travelers' mask mandate, and those allusions do not survive scrutiny.

Finally, with respect to the nationwide relief, it is necessary because travel is not an isolated activity. People travel with friends and family, and it would be senseless to hold that merely one within such a group is free of an unauthorized mandate, while the others within the group must still comply with what is unauthorized. The nationwide scope of the relief below was proper.

## ARGUMENT

### I.    "Major Questions Doctrine" Requires Affirmance of the Decision Below.

The recent Supreme Court decision in *West Virginia v. EPA* precludes this appeal by the government. There the Supreme Court expressly embraced "major questions doctrine," which requires congressional authorization before federal

7

agencies decide issues of major significance.  It can hardly be doubted that the

issue of requiring all American travelers to wear a mask is a "major question."

As explained further in the concurrence in *West Virginia v. EPA*, a long line

of precedents by the Supreme Court has been applying major questions doctrine

without using that actual name.  It is understandable that the government never

mentions the *West Virginia v. EPA* decision because it was rendered after the filing

of its brief here, but it is a telling omission that many of the similar, older

precedents are likewise not addressed by the government or its *amici*.  The long

line of precedents on which the recent *West Virginia v. EPA* is based compels

rejection of the government's arguments on appeal here.

### B.   The Recent Decision by the Supreme Court in *West Virginia v. EPA* Requires Affirmance.

The express adoption of "major questions doctrine" by the Supreme Court in

its recent decision of *West Virginia v. EPA* precludes this appeal by the

government.  Chief Justice John Roberts, writing for the 6-3 Court, explained that:

> A requirement of "clear congressional authorization," *ibid.*—confirms that
> the approach under the major questions doctrine is distinct.
>
> As for the major questions doctrine "label[ ]," *post*, at 13, it took hold
> because it refers to an identifiable body of law that has developed over a
> series of significant cases all addressing a particular and recurring problem:
> agencies asserting highly consequential power beyond what Congress could
> reasonably be understood to have granted. Scholars and jurists have
> recognized the common threads between those decisions. So have we.
> See *Utility Air*, 573 U. S., at 324, 134 S. Ct. 2427, 189 L. Ed. 2d

8

372 (citing *Brown & Williamson* and *MCI*); *King* v. *Burwell*, 576 U. S. 473, 486, 135 S. Ct. 2480, 192 L. Ed. 2d 483 (2015) (citing *Utility Air*, *Brown & Williamson*, and *Gonzales*).

…

Under our precedents, this is a major questions case.

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

The *West Virginia v. EPA* case concerned an issue comparable in significance to Covid-19:  man-made climate change and the authority of the EPA to promulgate regulations under a stated purpose of combatting it.  The Supreme Court decided that it is up to Congress, not a federal agency, to decide such major questions.  The Court explained:

> Capping carbon dioxide emissions at a level that will force a nationwide transition away from the use of coal to generate electricity may be a sensible "solution to the crisis of the day." *New York* v. *United States*, 505 U. S. 144, 187, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992). But it is not plausible that Congress gave EPA the authority to adopt on its own such a regulatory scheme in Section 111(d). ***A decision of such magnitude and consequence rests with Congress itself***, or an agency acting pursuant to a clear delegation from that representative body.

*West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (emphasis added).

Likewise here:  it is not plausible that Congress gave to the CDC the sweeping authority to require, without legislative hearings and a vote in the House of Representatives, that nearly all travelers and public commuters wear masks.  This is too much of a political issue to have it decided anywhere else but in

9

Congress.  Like a nationwide transition away from coal to renewable energy, this issue whether travelers must wear a mask is for Congress to decide.

Simply put, "this is a major questions case" here at bar, as it was in this recent decision of *West Virginia v. EPA*.  The Court precedents on which that precedent relied are likewise fully applicable here.  The invalidation of an attempt by the FDA to regulate tobacco is conceptually similar to the case at bar.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).  There, as here, public health authorities insisted that their regulation would save lives.  There, as here, the authorities insisted on an expansion in their power far beyond anything they had done before.  There, as here, the authorities went beyond anything expressly authorized by any statute.  There the Supreme Court struck down the attempt by the FDA to expand its authority, just as this Court should affirm the reining in of CDC authority by the district court below.

In a seminal precedent relied upon by the *West Virginia* decision, *Brown & Williamson*, the Court expressly acknowledged that "[t]he agency has amply demonstrated that tobacco use, particularly among children and adolescents, ***poses perhaps the single most significant threat to public health in the United States***."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161, 120 S. Ct. 1291, 1315 (2000) (emphasis added).  But convincing a court that the problem being solved is "the single most significant threat to public health" is not enough to

10

justify an asserted expansion in agency control over the American public. Vast

portions of the briefing in support of the CDC here are devoted to assertions of

how important Covid-19 is. But its significance is not the issue; the scope of the

authority of mere federal agencies to burden every American traveler is.

As the Supreme Court explained in *Brown & Williamson*:

> no matter how "important, conspicuous, and controversial" the issue, and
> regardless of how likely the public is to hold the Executive Branch
> politically accountable, post, at 31, an administrative agency's power to
> regulate in the public interest must always be grounded in a valid grant of
> authority from Congress. And "'in our anxiety to effectuate the
> congressional purpose of protecting the public, *we must take care not to*
> *extend the scope of the statute beyond the point where Congress indicated*
> *it would stop*.'" *United States v. Article of Drug ... Bacto-Unidisk*, 394 U.S.
> 784, 800, 22 L. Ed. 2d 726, 89 S. Ct. 1410 (1969) (quoting *62 Cases of Jam*
> *v. United States*, 340 U.S. 593, 600, 95 L. Ed. 566, 71 S. Ct. 515 (1951)).

*Brown & Williamson*, 529 U.S. 120, 161, 120 S. Ct. 1291, 1315 (2000) (emphasis

added).

Requiring everyone to wear a mask in interstate travel is far beyond any

legitimate authority delegated to an agency. Even if such a mandate were justified

– and it is not – then it would be up to Congress to consider enacting it.

Congressional hearings would be held on the issue as part of that process, and the

many valid objections to mask mandates would thereby be heard. The advocates

of mask mandates would be properly questioned about their evidence and

11

reasoning.  Congress can act very quickly and decisively as exigencies may require.

Allowing a small group of unaccountable administrators to require every American in interstate travel to wear a mask is neither democratic nor beneficial. The mask mandate was never justified by the Covid-19 pandemic, and did not bring the pandemic to an end as predicted.  Many high-profile advocates of mask mandates, such as Dr. Anthony Fauci and President Joe Biden, caught Covid-19 anyway.  Many who generally eschewed wearing a mask, such as Donald Trump, also caught Covid-19 but quickly recuperated as tens of millions of other Americans have.  Imposition of a national mask mandate is for Congress alone to consider and decide.

**B.  Controlling Precedents Prior to *West Virginia v. EPA* Likewise Require Affirmance.**

Justice Gorsuch recounted the many historical and compelling reasons for requiring more of an authorization from Congress than we have here, before a federal agency imposes a draconian burden such as the travelers' mask mandate. Justice Gorsuch, joined by Justice Alito, concurred in *West Virginia* as follows:

> So, for example, in *MCI* this Court rejected the Federal Communication Commission's attempt to eliminate rate regulation for the telecommunications industry based on a "subtle" provision that empowered the FCC to "'modify'" rates. 512 U. S., at 231, 114 S. Ct. 2223, 129 L. Ed. 2d 182. In *Brown & Williamson*, the Court rejected the Food and Drug Administration's attempt to regulate cigarettes based a "cryptic" statutory

12

provision that granted the agency the power to regulate "drugs" and "devices." 529 U. S., at 126, 156, 160, 120 S. Ct. 1291, 146 L. Ed. 2d 121. And in *Gonzales*, the Court doubted that Congress gave the Attorney General "broad and unusual authority" to regulate drugs for physician-assisted suicide through "oblique" statutory language. 546 U. S., at 267, 126 S. Ct. 904, 163 L. Ed. 2d 748.

*West Virginia v. EPA*, 142 S. Ct. 2587, 2622-23 (2022) (Gorsuch, J., concurring).

In language particularly apt here, Justice Gorsuch observed that "an agency's attempt to deploy an old statute focused on one problem to solve a new and different problem may also be a warning sign that it is acting without clear congressional authority." *Id.* at 2623 (Gorsuch, J., concurring). Congress, not a federal agency acting without congressional authorization, should be crafting a response to the Covid-19 pandemic. Reliance on an archaic reference to "sanitation" in a statute enacted in 1944, nearly 80 years ago, is not enough to bootstrap authority today for a federal agency to impose unprecedented mask mandates.

As Justice Gorsuch wrote:

[C]ourts may examine the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address. As the Court puts it today, it is unlikely that Congress will make an "[e]xtraordinary gran[t] of regulatory authority" through "vague language" in "'a long-extant statute.'" *Ante*, at 18-20 (quoting *Utility Air*, 573 U. S., at 324, 134 S. Ct. 2427, 189 L. Ed. 2d 372). Recently, too, this Court found a clear statement lacking when OSHA sought to impose a nationwide COVID-19 vaccine mandate based on a statutory provision that was adopted 40 years before the pandemic and that focused on conditions specific to the workplace rather than a problem faced by society at large. See *NFIB* v. *OSHA*, 595 U. S., at

13

___, 142 S. Ct. 661, 211 L. Ed. 2d 448 (GORSUCH, J., concurring) (slip op.,
at 3).

*West Virginia v. EPA*, 142 S. Ct. 2587, 2623 (2022) (Gorsuch, J., concurring).

This concurrence by Justice Gorsuch, as joined Justice Alito, emphasized

that:

> "[O]blique or elliptical language" will not supply a clear statement. ...;
> see *Spector* v. *Norwegian Cruise Line Ltd.*, 545 U. S. 119, 139, 125 S. Ct.
> 2169, 162 L. Ed. 2d 97 (2005) (plurality opinion) (cautioning against
> reliance on "broad or general language").

*West Virginia v. EPA*, 142 S. Ct. 2587, 2622 (2022) (Gorsuch, J., concurring).

The government and its *amici* fail to cite these cases, let alone distinguish

them.  Arguably, the government has waived this issue of major questions doctrine

by failing to address the substance of the doctrine, after the district court expressly

relied on it.  See *Health Freedom Def. Fund, Inc. v. Biden*, 2022 U.S. Dist. LEXIS

71206, at *30 ("But there is an independent bar to the government's invocation

of *Chevron*: the major questions doctrine.").

## II.    The Mask Mandate Is Unjustified Scientifically.

Like the government's brief they support, the two *amicus* briefs by the

American Medical Association (AMA) and the Public Health and Public Health

Law Experts fail to confront the basic issue:  mask mandates on travelers have not

limited the spread of Covid-19, for obvious reasons that neither the government

nor its *amici* ever come to terms with.  Intermittent use of masks, which is how

14

travelers use them, is useless because the virus spreads while travelers eat, drink, and otherwise take off their masks.  Moreover, the masks commonly used are porous to the Covid-19 virus, as Dr. Fauci implicitly concedes.  *See infra* p. 23.

The burden is on the government on this appeal to provide some justification for the travelers' mask mandate, and yet the government and its *amici* fall short of satisfying their burden.  Without any justification presented to this Court by Appellants' for the travelers' mask mandate, it cannot possibly be upheld as a rational or reasonable exercise of the CDC's authority.

### A. The Government's Brief Completely Fails to Support the Mask Mandate.

The Court need not do a deep dive into science to conclude that the government has not satisfied its burden on appeal for its traveler's mask mandate.  In its brief the government repeats the word "spread" 32 times, yet never justifies its bald assertion that a mandate for intermittent use of porous masks somehow blocks the spread of Covid-19 in any significant way.  People have always been free to wear industrial-grade masks to protect themselves, and what the government fails to show is that requiring a reluctant traveler to intermittently wear a porous mask confers any benefit on those around him.  The uncomfortable traveler inevitably takes off his mask to eat, drink, breathe, and communicate, and thereby transfers into the surrounding air whatever germs he has.  Moreover, the

15

mask mandate never required the wearing of an industrial-grade mask that would block the transmission of the sub-microscopic Covid-19 virus particles.  The CDC mask mandate lacked medical justification, and cannot withstand a merely cursory logical or scientific analysis.

In each of the 32 references to "spread" in its appellate brief, the government fails to cite support for its assertion that a wear-any-type-of-mask and take-it-off to eat, drink, or breathe mandate has any helpful effect on the existence of a sub-microscopic virus in the surrounding air.  The CDC compares its mask mandate to the practice of surgeons wearing masks in an operating room, but in that situation the surgeons do not take their masks off to eat, drink, or breathe.  Once that is done, presumably the benefits of mask-wearing are lost.  The government misplaces reliance on the 5-4 decision upholding mandatory vaccination of health care workers, which is a context nothing like ordinary Americans engaging in routine travel.  *See Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) ("[U]nprecedented circumstances provide no grounds for limiting the exercise of authorities the agency has long been recognized to have," in that case requiring vaccination of health care workers.).

Proper judicial deference is not blind deference, and to be successful on appeal the government has do more than merely argue, in essence, "because the CDC said so."  Where, as here, there are strong political overtones – candidate

16

Biden supported mask mandates while candidate Trump opposed them – the need for the CDC to justify a draconian burden is heightened.  A political agenda should not be allowed to result in a senseless infringement by a federal agency on constitutional rights.  On an appeal, the appellant bears the burden of doing more than merely making superficial assertions without support.  Unscientific pronouncements by the CDC that infringe on constitutional rights – here the rights to free speech and travel – are not worthy of any deference by a court of law.

The government does not cite to a single relevant medical or scientific authority in its brief, and its less than a dozen citations to secondary sources include dictionaries, CNN, a turtle and other irrelevant regulations, and circular citations back to the CDC itself.  Several of the government's own citations actually weigh against the CDC's mask mandate.  For example, the government relies on an article in Yale Medicine entitled, "Why Doctors Wear Masks*," Yale Medicine*, for the proposition that "doctors have been wearing **medical-grade N95 or surgical masks** ... during surgeries or patient interactions as part of their daily routines, for many decades." (Govt Br. 14, emphasis added)[2]  But the CDC's mask mandate for travelers does not require continuous use of effective masking as done in surgery, and instead requires only intermittent use of ineffective porous masks.

---

[2] Why Doctors Wear Masks, *Yale Medicine* (Sept. 1, 2020)
https://perma.cc/TE77-8PBH (viewed July 28, 2022).

17

The government further cites as an authority *CNN*, which asserted that "the United States ... led the world in mask wearing" to prevent the spread of the 1918 flu pandemic.  (*Id.*, citing Paul French, "In the 1918 Flu Pandemic, Not Wearing a Mask Was Illegal in Some Parts of America. What Changed?" *CNN* (Apr. 4, 2020)).[3]  In fact, as widely acknowledged today, even by vocal supporters of mask mandates, the wearing of masks did ***not*** prevent the spread of the 1918 pandemic:

> Experts reviewing evidence from 1918 concluded that flu masks failed to control infection.

E. Thomas Ewing, "Flu Masks Failed In 1918, But We Need Them Now," *Health Affairs Forefront* (May 12, 2020).[4]  The utter failure of mask mandates to work in 1918 cannot in any way support an imposition of a mask mandate by the CDC now.

Perhaps the reason why the government fails in its brief to cite any substantive justification for a public mask mandate is that the evidence stands against it.  Sweden rejected mask mandates (and lockdowns) and fared better than the United States with respect to Covid-19.  "[T]he pandemic wasn't as bad [in Sweden] as it was in other regions, such as California."  Madeleine Brand, "Sweden refused to lock down during the pandemic.  How is the country faring

---

[3] https://perma.cc/WL95-2WDF (viewed July 28, 2022).
[4]  https://www.healthaffairs.org/do/10.1377/forefront.20200508.769108/  (viewed July 16, 2022).

now?" *KCRW* (Apr. 15, 2021).[5]  Indeed, Sweden has performed very well in

addressing Covid-19, ranking as only 56th in the world in Covid mortality per

capita, while the wealthy United States is 17th highest in mortality per capita with

all of its mask mandates.[6]

Multiple recent articles about public mask mandates in the United States

confirm that they do not work.  Eric Ting, "Do mask mandates work? Bay Area

COVID data from June says no," SFGATE (June 29, 2022).[7]  Based on another

review of data, "Philadelphia to lift mask mandate less than a week after it was

reinstated."[8]  As concluded by the Editorial Board of the *Raleigh News &*

*Observer*, "whether we like it or not, mask mandates are not really working.

People take them off to eat and keep them off, whether on planes or at a

restaurant."  The Editorial Board, "A sensible shift away from COVID mask

mandates," *Raleigh News & Observer* (Apr. 28, 2022).[9]  Moreover, as the latter

---

[5]       https://www.kcrw.com/news/shows/press-play-with-madeleine-brand/edu-coronavirus-crime-food/sweden-covid (viewed July 28, 2022).

[6] https://www.worldometers.info/coronavirus/ (viewed July 6, 2022).

[7]       https://www.sfgate.com/coronavirus/article/bay-area-mask-mandate-results-17271294.php (viewed July 28, 2022).

[8] Elizabeth Wolfe, "Philadelphia to lift mask mandate less than a week after it was reinstated," CNN (Apr. 22, 2022). https://www.cnn.com/2022/04/22/us/philadelphia-rescinds-mask-mandate/index.html (viewed July 28, 2022).

[9]       https://www.newsobserver.com/opinion/article260672382.html#storylink=cpy (viewed July 28, 2022).

19

article observed about a video that went viral, "The crowd cheered" when told by a
JetBlue pilot that they did not have to wear masks on the airline.[10]

Without citing any justification for a travelers' mask mandate, the
government is on no firmer ground than if it argued for the authority to prohibit
every American from speaking, in order to stop spreading germs.  Just as such an
unjustified mandate should fail in court, the government's mask mandate was
appropriately vacated below.

### B. The *Amicus* Briefs Likewise Fail to Support the Mask Mandate.

The two *amicus* briefs submitted in support of the government do not fill in
this gap of no justification for the travelers' mask mandate.  Both briefs overuse
the term "spread" and talk about how masking was used for the 1918 pandemic,
but fail to recognize that the masking was unsuccessful then, as it has been today.
"Mask mandates and use are not associated with slower state-level COVID-19
spread during COVID-19 growth surges," concluded a major study of the first year
of the pandemic.  Damian D. Guerra, Daniel J. Guerra, "Mask mandate and use
efficacy in state-level COVID-19 containment," medRxiv (May 18, 2021).[11]

*Amicus* American Medical Association (AMA) fails to address the copious
evidence against any effectiveness of mask mandates.  Instead, the AMA relies on

---

[10] *Id.*
[11] https://www.medrxiv.org/content/10.1101/2021.05.18.21257385v1.full  (viewed
July 25, 2022).

a mere modeling study, based on hypothetical scenarios rather than observed data, to argue that universal uninterrupted use of N95 or other airtight masks can help reduce infection by an airborne virus: "Data from modeling studies have further demonstrated that 'universal masking is the most effective method for limiting airborne transmission of SARS-CoV-2,'" the AMA asserts.  (AMA Br. 9, quoting Gholamhossein Bagheri et al., *An Upper Bound on One-to-One Exposure to Infectious Human Respiratory Particles*, 118 PNAS e2110117118, at 7 (2021)).

But that hypothetical study (not observed data) failed to factor in what travelers actually do.  Travelers obviously take off their masks to eat, drink, breathe, speak, adjust their masks, and simply enjoy a break from the nuisance.  Travelers do not behave as surgeons do in highly regimented operations having brief duration.  Moreover, the porous masks intermittently worn by travelers are typically not the effective masks worn in studies cited by the AMA.

"Put simply, if an infected person wears a mask, it reduces their ability to infect others," the AMA baldly asserts without any reference to a data-based study to confirm this with respect to travelers, the types of masks they wear, and the inevitable interruptions to that mask-wearing.  (AMA Br. 9)  Actual studies show the opposite of what the AMA asserts.[12]

---

[12] Johns Hopkins medical school Professor Marty Makary M.D., M.P.H. and Florida Department of Health consulting epidemiologist Tracy Beth Høeg M.D.,

The *amici* brief by Public Health *et al.* fails to provide what the AMA brief

lacks.  The Public Health brief relies heavily on the Supreme Court decision to

terminate the CDC's moratorium on evictions, but that decision was based on the

same reason that the travelers' mask mandate is invalid:  Congress did not

authorize it.  "If a federally imposed eviction moratorium is to continue, ***Congress***

***must specifically authorize it***."  *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485,

2490 (2021) (emphasis added).

As to the imaginary effectiveness of travelers' mask mandates, the Public

Health *amici* cite in a circular manner back to the AMA, the CDC, and the World

Health Organization.  "[T]he epidemiologic support for masking's efficacy in

minimizing COVID-19 infections in crowded spaces is extensive," the Public

Health *amici* declare.  But a close look at the two articles cited by the Public

Health *amici* reveals they are inconclusive.  Their first citation reviewed merely 6

studies in 4 countries, and could only conclude that "that wearing a mask ***could***

reduce the risk of COVID-19 infection."  Yanni Li et al., "Face Masks to Prevent

---

Ph.D., recently wrote about mask mandates for schools: "First, the [federal
agencies] demanded that young children be masked in schools. On this score, the
agencies were wrong. Compelling studies later found schools that masked children
had no different rates of transmission. And for social and linguistic development,
children need to see the faces of others." Makary & Høeg, "U.S. Public Health
Agencies Aren't 'Following the Science,' Officials Say," *Common Sense* (July 14,
2022)
https://www.commonsense.news/p/us-public-health-agencies-arent-following
(viewed July 25, 2022).

22

Transmission of COVID-19: A Systematic Review and Meta-Analysis," 49 Am. J. Infection Control 900 (2021) (emphasis added). That "could" speculation hardly justifies requiring everyone to wear intermittently porous masks. Scrupulous wearing of an N95 mask by an individual may protect the mask-wearer against catching the virus, but that says nothing about requiring everyone to wear masks that are predominantly not of the expensive, high-quality N95 type. It was not until January 2022 that the CDC began recommending that people wear N95 masks,[13] and in July 2022 Dr. Fauci began stressing the importance of that compared with the porous masks typically worn:

> Right now, we are very, very clear that masks do work in prevention of acquisition and transmission. ***But you've got to get a well-fitted mask that is of a high quality***. And the two we know are high quality are N95 and KN95.[14]

These effective, but impractical, masks were never mandated for travelers.

The second article cited by the Public Health *amici* is, alas, authored by an official at CDC itself, whose order is at issue here, and was published in the journal of the AMA, which filed an *amicus* brief on the side of the government. *See John*

---

[13] *Reuters*, "CDC recommends Americans wear 'most protective mask you can'" (Jan. 15, 2022) https://www.jpost.com/breaking-news/article-692575 (viewed July 28, 2022).

[14] Robby Soave, "Anthony Fauci Says If We Could Do It Again, COVID-19 Restrictions Would Be 'Much, Much More Stringent'" (July 25, 2022) https://reason.com/2022/07/25/anthony-fauci-interview-covid-restrictions-masks/ (emphasis added, viewed July 28, 2022).

*T. Brooks et al., Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, 325 JAMA 998 (2021).[15]  This is akin to citing oneself as an authority.  The article defectively refers to an extensive study in Denmark about masking that was "inconclusive", while additional studies included in the table in that AMA-published article are riddled with flaws.  The studies focus on the benefits of mask-wearing on the person who wears the mask, not on benefits of mask-wearing to others which is the premise of the travelers' mask-wearing ban.  In the first study cited in the article's table, only half of the mask-wearing visitors to a hair salon, where encounters are briefer than on an airplane flight and thus not indicative of traveling, were followed up on.  School settings, as discussed further below, are far more indicative of traveling scenarios and the school studies show no benefit to mask-wearing.

### C.    Studies Show that Mask Mandates Do Not Work.

"Our findings contribute to *a growing body of literature* which suggests school-based mask mandates *have limited to no impact on the case rates of COVID-19* among K-12 students."  Neeraj Sood, Shannon Heick, Josh Stevenson, Tracy Høeg, "Association between School Mask Mandates and SARS-CoV-2 Student Infections: Evidence from a Natural Experiment of Neighboring K-12

---

[15] https://jamanetwork.com/journals/jama/fullarticle/2776536 (viewed July 28, 2022).

Districts in North Dakota" *Research Square* (July 1, 2022) (emphasis added).[16]

Led by a University of Southern California researcher, the "study took advantage

of a unique natural experiment of two adjacent K-12 school districts in Fargo,

North Dakota, one which had a mask mandate and one which did not in the fall of

the 2021-2022 academic year." *Id.* There was no difference in impact from the

use of a mask mandate in one of the schools compared with its non-use in the

adjacent school district.

An eminent infectious diseases physician with the Australian National

University, Professor Peter Collignon, points out that Covid-19 is contagious

through exposure of eyes, and thus there is a lack of justification for mask

mandates, which continue to exist in Australia but are widely ***unenforced***. "Your

eyes are also a good portal for introducing infection into your respiratory tract,"

Prof. Collignon observed. [17] Similarly, Dr. Monica Gandhi of the University of

California, San Francisco (UCSF) recommended that mask mandates be eliminated

throughout the United States. "Most well-done studies evaluating mask mandates

---

[16] https://www.researchsquare.com/article/rs-1773983/v1 (viewed July 20, 2022).
[17] Peter Vincent, "Top Australian professor says it's unlikely mask mandates work to stop the spread of the Omicron Covid variant - and explains how you can protect yourself from the virus," *Daily Mail* (June 30, 2022) https://www.dailymail.co.uk/news/article-10967731/Covid-19-Australian-professor-Peter-Collignon-says-mask-mandates-DONT-work-stop-Omicron.html (viewed July 28, 2022).

do not show an association between mask mandates and the containment of spread or hospitalizations," she observed.[18]

### D. Mask Mandates Are Political, Not Scientific, and Thus Should Be Addressed by Congress Rather than by a Federal Agency.

The inherently political nature of mask mandates is obvious from a glance at which jurisdictions have prohibited them: "Several states, including Florida, Iowa, Montana, Tennessee and Texas, have moved via legislation or executive action to prevent local governments and school districts from doing so."[19] These states share common views about freedom, which underscores how this issue of travelers' mask-wearing is more a political one for Congress than for an agency.

### III. The Nationwide Scope of the Relief Should Be Affirmed, or the Issue Declared Moot.

This issue does not lend itself to piecemeal litigation. The constitutional rights of freedom of speech and travel include rights to hear and be visited.

The government proposes limiting the relief from the decision below to only the plaintiffs in this case. But these plaintiffs have family members and friends, and there are many others who should not continue to be subjected to an unjustified mask mandate while the plaintiffs' constitutional rights to free speech

---

[18] *Id.*

[19] AARP, "State-by-State Guide to Face Mask Requirements" https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html (emphasis added, viewed July 28, 2022).

26

and travel are restored.  Once a traveler's right not wear a mask is recognized, it is inherent in that ruling that the traveler has the right to receive unrestrained communications from other travelers preferring not to wear a mask.

Just as a full internet experience requires protecting the right of nearly everyone to access it, likewise for a full travel experience.  Moreover, the decision by government not to extend its own objectionable rule arguably renders the scope of the relief moot, as its scope is no longer a live controversy suitable for adjudication on appeal.  If and when government ever attempts to revive its mask mandate, only then should the scope of the relief entered against it be considered a justiciable element of this case or controversy.

## CONCLUSION

For the foregoing reasons and those stated in Appellees' brief, the decision below should be affirmed.

Respectfully submitted,

/s/ Andrew L. Schlafly

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
Phone:  (908) 719-8608
Fax:  (908) 934-9207
Email: aschlafly@aol.com

27

Dated:  August 5, 2022                    *Counsel for Amicus Curiae Association of
American Physicians & Surgeons*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit of

Federal Rule of Appellate Procedure 32 because:

1. This brief has been prepared using Times New Roman 14-point,

proportionately spaced, serif typeface, in Microsoft Word.

2. This brief complies with FED. R. APP. P. 29(a)(5) and 32(a)(7)(B) because

it contains a total of 6,454 words, excluding material not counted under Rule 32(f).

Dated:  August 5, 2022

s/ Andrew L. Schlafly
Andrew L. Schlafly
*Counsel for Amicus Curiae
Association of American Physicians
and Surgeons*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 5, 2022, I electronically filed the foregoing

brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh

Circuit by using the Appellate CM/ECF system.  Participants in the case who are

registered CM/ECF users will be served by the CM/ECF system.

s/ Andrew L. Schlafly
Andrew L. Schlafly
*Counsel for Amicus Curiae
Association of American Physicians
and Surgeons*

# EXHIBIT 04

**The Nuremberg Code and
voluntary consent to medical experiments.**

# The Nuremberg Code

## 75th Anniversary Commemorative Edition

## Introduction by Ken McCarthy

# The Nuremberg Code

# 1.

The voluntary consent of the human subject is absolutely
essential.

This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved, as to enable them to make an understanding and enlightened decision.

This latter element requires that, before the acceptance of an affirmative decision by the experimental subject, there should be made known to them the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon their health or person, which may possibly come from their participation in the experiment.

13

The Nuremberg Code

# 2.

The experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random and unnecessary in nature.

14

The Nuremberg Code

# 3.

The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study, that the anticipated results will justify the performance of the experiment.

15

The Nuremberg Code

# 4.

The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury.

16

The Nuremberg Code

# 5.

No experiment should be conducted, where there is an a priori reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects.

17

The Nuremberg Code

# 6.

The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment.

18

The Nuremberg Code

# 7.

Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability, or death.

19

The Nuremberg Code

# 8.

The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment.

20

The Nuremberg Code

# 9.

During the course of the experiment, the human sub-
ject should be at liberty to bring the experiment to an end,
if they have reached the physical or mental state, where
continuation of the experiment seemed to them to be im-
possible

21

The Nuremberg Code

# 10.

During the course of the experiment, the scientist in charge must be prepared to terminate the experiment at any stage, if they have probable cause to believe, in the exercise of the good faith, superior skill, and careful judgement required of them, that a continuation of the experiment is likely to result in injury, disability, or death to the experimental subject.

22

# EXHIBIT 05
## SELECKI v. CDC (Transcript)

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   PRO SE LITIGANT MICHAEL SELECKI,   )
     on behalf of himself and his       )
 4   minor child M.S.,                  )
                                        )
 5                   Plaintiff          )   CA No. 22-10155-PBS
                                        )   Pages 1 - 31
 6            -VS-                       )
                                        )
 7   CENTERS FOR DISEASE CONTROL &      )
     PREVENTION, et al,                 )
 8                                      )
                     Defendants         )
 9


10                 STATUS CONFERENCE BY VIDEO

11
              BEFORE THE HONORABLE PATTI B. SARIS
12               UNITED STATES DISTRICT JUDGE

13

14

15

16
                         United States District Court
17                       1 Courthouse Way
                         Boston, Massachusetts  02210
18                       February 11, 2022, 3:23 p.m.

19

20

21

22
                     LEE A. MARZILLI
23               OFFICIAL COURT REPORTER
              United States District Court
24            1 Courthouse Way, Room 7200
                 Boston, MA  02210
25                 leemarz@aol.com
```

```
1    A P P E A R A N C E S:

2        MICHAEL SELECKI, 2024 Courtyard Loop #104, Sanford,
     Florida, 32771, appearing Pro Se.
3
         STEPHEN MICHAEL PEZZI, ESQ., United States Department
4    of Justice Civil Division, Federal Programs Branch,
     1100 L Street NW, Washington, DC, 20005, for the Defendant,
5    Centers for Disease Control & Prevention and the Department
     of Health and Human Services.
6
         CHRISTOPHER A. DUGGAN, ESQ. and PAULINE A. JAUQUET, ESQ.,
7    Smith Duggan Buell & Rufo LLP, 55 Old Bedford Road, Lincoln,
     Massachusetts, 01773, for the Defendants American Airlines
8    and Southwest Airlines.

9        M. ROY GOLDBERG, ESQ., Stinson LLP,
     1775 Pennsylvania Avenue NW, Suite 800, Washington, DC,
10   20006, for the Defendants American Airlines and Southwest
     Airlines.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  Good afternoon, Judge.

THE COURT:  Good afternoon.  Hold on.  Let me just get everybody open.

THE CLERK:  Okay.

THE COURT:  Good, thank you.

THE CLERK:  Okay, I will call the case.  The Court calls Civil Action 22-10155, Seklecki v. Centers for Disease Control & Prevention, et al.  Could counsel and the plaintiff please identify themselves for the record.

MR. SEKLECKI:  Yes.  Michael Seklecki, plaintiff.

THE COURT:  And, Mr. Seklecki, I understand you're not able to get the video up and running.  Do you prefer to reschedule this, or are you okay with proceeding this way?

MR. SEKLECKI:  Your Honor, if you're okay with proceeding, I am.  Unfortunately, due to the scheduling, my wife and I work different schedules, and I was unable to do video because I currently have my thee-year-old and four-year-old in my care.  Otherwise I would be on video.

THE COURT:  That's fine.  I just wanted to make sure you were content.

MR. SEKLECKI:  Yes.

THE COURT:  All right.  All right, now, who else is on the phone?

MR. PEZZI:  Good afternoon, your Honor.  This is

         1    Stephen Pezzi from the Department of Justice on behalf of the

         2    federal government defendants, which are the CDC and the

         3    Department of Health and Human Services.

         4              THE COURT:  So TSA is not part of this?

         5              MR. PEZZI:  TSA is not a defendant, that's correct.

         6              THE COURT:  Okay, thank you.

         7              MR. DUGGAN:  Good afternoon, your Honor.  Chris Duggan

         8    on behalf of American Airlines and Southwest Airlines.

         9              THE COURT:  Thank you.

03:25   10              MR. GOLDBERG:  Good afternoon, your Honor.  I am

        11    cocounsel with Mr. Duggan for American Airlines and for

        12    Southwest Airlines, Roy Goldberg, Stinson LLP.

        13              THE COURT:  Okay.

        14              MS. JAUQUET:  Good afternoon, your Honor.  My name is

        15    Pauline Jauquet.  I'm also cocounsel with Attorney Duggan and

        16    Attorney Goldberg for defendants Southwest and American

        17    Airlines.

        18              THE COURT:  Thank you.  Do I have everybody?  Okay.

        19    All right, so there are two from the Department of Justice on,

03:26   20    right, Mr. Beckenhauer as well?

        21              MR. BECKENHAUER:  Good afternoon, your Honor.  I'm a

        22    colleague of Mr. Pezzi's.  He'll be speaking for the government

        23    today.

        24              THE COURT:  Okay, thank you, thank you.  Today is

        25    primarily a status conference.  I got the pleadings; they're

```
 1   voluminous.  I am not prepared to rule on anything today.
 2   Well, that's not quite true.  There are a couple of minor
 3   housekeeping things I will rule on.  I am not inclined to
 4   strike Mr. Goldberg for pro hac vice.  He's moved to be
 5   admitted.  I don't know what allegations you say are about to
 6   come, but they're certainly not here yet, and I will allow him
 7   to represent American Airlines and Southwest.  So I admit you
 8   pro hac vice.
 9          With respect to, there was a request that Mr. Seklecki
03:26 10  made to be able to file on CM/ECF.  That was granted.  I hope
11   you saw that, Mr. Seklecki.  And so you have I think at this
12   point very recently filed quite a few documents.  Is that
13   right?
14          MR. SEKLECKI:  That is correct, your Honor.
15          THE COURT:  Okay.  So there were two big issues, or
16   actually three big issues.  One is whether I should transfer
17   the venue of this case to one of the jurisdictions that has
18   already addressed it, this kind of claim with Mr. Seklecki
19   himself and his son, although not to be the same defendants.
03:27 20  So that's one big venue issue.  I understand the DC Circuit
21   ruled on this, but that was primarily against the government,
22   as I see it.  This is where I need to focus on things.  This is
23   also against the airlines, which makes it a little different.
24   So one possibility is, I ship part of it off back to the
25   District of Columbia, and I keep the part against the airlines.
```

That's one possibility.

So one issue is venue or transfer motions, and I'm not prepared to rule on that today, especially since we have different defendants.  I think that's right, although Mr. Seklecki himself was a plaintiff in the DC litigation.  So that's number one.

I am assuming that, Mr. Seklecki, you will file an opposition to the motion to transfer venue.  Do you know when you can do that?

MR. SEKLECKI:  I will be doing that shortly, your Honor, and I am strongly opposed to that transfer due to the fact that I am involved in no cases in the Middle District of Florida, and I fly to Boston Children's Hospital for presently care, and the flight originates from Boston and to Boston. Therefore I filed it in Boston, and I am a part of no lawsuit or litigation cases in the Middle District of Florida.

THE COURT:  Well, you are listed in one of these, *Lucas Wall, et al v. TSA*?

MR. SEKLECKI:  Yes, but not in the airlines case.

THE COURT:  Okay.  No, I understand that.  That's why I haven't done it.  I mean, I understand there are differences, so I will consider the motion to transfer.

The second thing is, and you've just touched on it, I am not going to decide in an expedited way whether to enjoin the entire mandate in the United States of America.  If I keep

1    the case, I will want to do it thoughtfully and based on a full

2    record and an evaluation of the case law, if I keep it.  But

3    the part that seemed more critical for the next week or two was

4    this allegation that his son had a medical appointment in

5    Boston.  Apparently -- I don't want to disclose anything -- but

6    has a medical condition that he needs to be treated in Boston.

7    It's not clear from the record what that is, and I wanted to

8    know whether or not the airlines were working with Mr. Seklecki

9    to make sure that he properly is able to get the medical

03:30 10    exception for his son, if it's appropriate.

11          MR. GOLDBERG:  Your Honor, Roy Goldberg, if I can be

12    heard first on that.  And I may not have a definitive answer --

13    we can get it for you -- because there are three of these cases

14    that have been filed in the same time frame, Kentucky, Eastern

15    District of Virginia, and Massachusetts, so we've been, you

16    know, actively quickly trying to get up to speed on these.

17          THE COURT:  Excuse me.  All filed by Mr. Seklecki?

18          MR. GOLDBERG:  No.  There's a group.  They're against

19    this mask mandate.

03:30 20          THE COURT:  Oh, I see.

21          MR. GOLDBERG:  And that's the relationship to Florida.

22    The leader of the group has been litigating these issues in

23    Florida in the two Florida cases against the federal government

24    and against seven airlines since June of 2011.  He's had a lot

25    of problems down there, so now he's working with his group

1   members to quote/unquote "pro se" file three new complaints

2   just like the one you have but also in Virginia and Kentucky.

3   They all came in at the same time.

4         I can tell you, the airlines have a process that's

5   been directed to them by the DOT that reflects the CDC orders.

6   They take serious consideration of all the medical claims of

7   mask exemptions, and they work them through looking at various

8   issues, and I believe they typically involve a medical

9   consultant.  So we can get the answer to you, your Honor.

03:31 10        THE COURT:  Well, this is what I would like to do is:

11   I would like to do this thoughtfully.  I don't want to rush it.

12   I'm jam-packed with hearings next week, and I'm out of town at

13   the end of the week.  I would like to at least work out the

14   fact I think -- excuse me, Mr. Seklecki.  When is your son's

15   medical appointment?  Is it Wednesday or Thursday or something?

16        MR. SEKLECKI:  Yes.  Yes, your Honor.  He sees a

17   specialist in Boston, and he has an appointment on the 24th of

18   February, which is the 23rd of February we would need to fly;

19   and the airlines denied medical exemptions despite the fact

03:32 20   that a licensed pediatrician signed a form, stamped and dated

21   it, and the airlines are refusing to accept that and allowing

22   him to board a plane.  And he sees numerous --

23        THE COURT:  So, excuse me, can I say, I don't want

24   to -- I'm just very wary of discussing healthcare information

25   over the Internet, but I understand that with respect to your

1  son, there's a claim that he has various cognitive disabilities

2  that interfere with his --

3          MR. SEKLECKI:  Severe.

4          THE COURT:  He's four, and that he has various issues,

5  which I'm reluctant to discuss on the Internet because I don't

6  know who's here.

7          MR. SEKLECKI:  Yes.  No, absolutely I agree about

8  that.

9          THE COURT:  -- that interfere with his ability to wear

03:32 10  a mask.  Now, I understand there's a claim under the Americans

11  with Disabilities Act.  It is the only thing that is at all

12  emergency.  Otherwise, I can deal with all of this in my own

13  sweet time in terms of reading all the briefs and really

14  understanding it and digging in, et cetera, if I don't remove

15  it back to another court.

16          But is there a way that the attorneys could work with

17  him to make sure that this child is able to get on the plane,

18  if it is appropriate, as an exception to the mask mandate?  It

19  sounds like he has the kind of cognitive disability where it

03:33 20  might be hard for a four-year-old having that issue to wear a

21  mask.

22          MR. GOLDBERG:  Your Honor, Roy Goldberg again for the

23  defendants.  I mean, generally speaking, without getting into

24  specifics on this matter, there's some guidance, and the

25  airlines have been giving exemptions for qualified medical

1    reasons when the outside consultant looks at the documentation.

2    I will say that there's no general exception for anytime

3    somebody says it's difficult to wear a mask, and that may be

4    the case; it may be a difference between Mr. Seklecki who's an

5    adult and the four-year-old son.

6            THE COURT:  Sure.

7            MR. GOLDBERG:  We can look into what the situation is

8    with the son.  This was presented to us, as it was with the

9    Supreme Court, as it was with the DC Circuit, as a, you know,

03:34 10   "We both need to be exempt --"

11           THE COURT:  I'm not dealing right now with him.

12           MR. GOLDBERG:  Right.

13           THE COURT:  The only thing that's an emergency here

14   is, apparently the boy has a medical appointment with Boston

15   Children's Hospital.  And I don't know what the nature of it

16   is.  I think you probably need to supplement, Mr. Seklecki,

17   with respect to why it's such an emergency, as opposed to just

18   a checkup or something that could be done on telemedicine.  But

19   assuming for a minute that it's a really serious appointment

03:34 20   and he needs to fly here and he also has the cognitive

21   disability, I'm just thinking that the two of you could talk

22   and make sure that he has the right documentation and can get

23   that exemption and make the appointment.  I think it's hard.

24   He's a kid.  He's a baby, really.  He's four.

25           MR. SEKLECKI:  Yes.  Yes, your Honor, and I really

|     |     |
| --- | --- |
| 1 | graciously appreciate your attention in this because the child |
| 2 | is getting surgery, and he has critical medical conditions that |
| 3 | require him to see the specialist in Boston that Florida cannot |
| 4 | treat.  And he has a surgery appointment the first week of |
| 5 | March as well, so we have to be at the hospital for a |
| 6 | substantial amount of time.  They're going to do a big surgery |
| 7 | on him.  And due to his severe cognitive delays as well as his |
| 8 | medical problems, the child cannot wear a mask, and it has been |
| 9 | recommended from Boston, his specialist in Boston and Florida |
| 03:35 10 | that he is not to wear a mask despite the fact of all -- even |
| 11 | though due to all of his medical conditions -- |
| 12 | THE COURT:  Well, I'd like you to call your doctor in |
| 13 | Boston as well as the -- I did see the letter from Hunt Club |
| 14 | Pediatrics, but it was undated.  And you filed hundreds and |
| 15 | hundreds yesterday.  Just, like, I hate to say, it was so many |
| 16 | documents, I'm not sure I've seen them all.  But, in any event, |
| 17 | the one that I'm noticing is undated.  So can you get -- I |
| 18 | think it's Dr. Chaban?  Is that his name?  Yes, yes -- Carlos |
| 19 | Chaban to FedEx a letter to the American and Southwest -- what |
| 03:36 20 | flight do you have, which airline? |
| 21 | MR. SEKLECKI:  The ticket for the 23rd of February was |
| 22 | not booked yet.  It was booked on Delta, but it was canceled |
| 23 | because we only are allowed to fly on Delta.  And the problem |
| 24 | is that Delta fully accommodates Michael to fly, and it's |
| 25 | costing my wife and I thousands of dollars to book flights |

1   because American and Frontier Airlines and Southwest Airlines

2   is refusing to grant him these medical exemptions, and we can't

3   afford it.  And the child cannot fly on these airlines, and we

4   can't get a reasonable flight, and we're only allowed to fly on

5   Delta, and it's just not -- it doesn't seem legal or --

6           THE COURT:  Well, it is high season in Florida, so, I

7   mean, I understand the rates might be higher, but I do think, I

8   at least want the clearance for medical for at least this set

9   of appointments on -- what's it, the 23rd and the 1st? -- so

03:37 10   then I can deal with the very weighty legal issues, I mean, the

11   bigger issues.  And it's hard for a person.  You're a father of

12   a kid with problems who needs surgery.  I'll brag, we have some

13   of the best hospitals in the world here in Boston, so let me

14   say that, so I see why he wants to come here.

15           So is there a way we can have you -- not on the

16   government, that's not your hunt -- but have you, Mr. Goldberg,

17   or whoever it is from American or Southwest, be the person who

18   gets a certificate from Boston children's and/or from his own

19   doctor -- I think it says Dr. Chaban at Hunt Club Pediatrics --

03:38 20   and just basically, how long do you need it in advance?

21           MR. GOLDBERG:  I'm sorry.  Do you mean the airlines,

22   your Honor?

23           THE COURT:  Yes.

24           MR. GOLDBERG:  Both airlines, it could be a little

25   different.  I will get back to you.  I will make it a high

```
 1   priority.  We will find out what the situation is.  My
 2   recollection of this record is that it's mostly about
 3   Mr. Seklecki, and there's some allegations about the son
 4   doesn't like it when Mr. Seklecki wears a mask.  But we'll dig
 5   into this.  I mean, obviously if there's a --
 6           THE COURT:  I have nothing in this record that would
 7   support, at least at this point, irreparable harm with respect
 8   to Mr. Seklecki, but that's quite different with respect to his
 9   son.
 10          MR. SEKLECKI:  I agree with you, your Honor.
 11          MR. GOLDBERG:  We've also heard that it's the Delta
 12   that he does have.  The caption of this case is United
 13   Airlines, and yet he's sued American and Southwest.  But we
 14   will look into it, your Honor.  If there has been a legitimate
 15   exemption request for the son, the airlines do take this very
 16   seriously, and we'll commit to report back to the Court by
 17   Tuesday, if that works for the Court.
 18          THE COURT:  That does work for me.  I mean, what I
 19   want you to do is -- so what's the sequence of events?  Does he
 20   have to book a flight first, or do you give him the exemption
 21   first and then he books a flight?
 22          MR. GOLDBERG:  The exemptions are flight by flight,
 23   your Honor, so you have to book the flight and ask for an
 24   exemption.
 25          THE COURT:  All right, so today you can go online,
```

03:38 — line 10
03:39 — line 20

1    Mr. Seklecki, book a flight, pick probably the cheapest flight,

2    whatever is American or Southwest, book a flight, send that to

3    the attorneys for the airlines, send them hopefully -- what's

4    the name of the doctor from Children's?

5         MR. SEKLECKI:  He sees numerous specialists, but the

6    main one that has been under his direct care is the Director of

7    the Center for Motility Disorders, and that is Samuel Nurko.

8         THE COURT:  Any what kind of disorders?

9         MR. SEKLECKI:  Gastrointestinal.

03:40 10       THE COURT:  What's his name, Surko?

11        MR. SEKLECKI:  Samuel, and last name Nurko, N-u-r-k-o.

12        THE COURT:  Yes, and so maybe, I don't know whether

13    the certification from him is what makes sense or from his

14    pediatrician in Florida.  I don't have strong views about that,

15    but, in any event, a medical certification that the child

16    can't/won't wear a mask, but that he has an urgently needed

17    surgical appointment in Boston on whatever those two days are,

18    the 23rd and 1st or something?  Are you staying up here in

19    Boston?

03:41 20       MR. SEKLECKI:  Yes, your Honor.  We will be required

21    to be in Boston for an undisclosed amount of time.  The child

22    has a surgery booked on March 3 at Children's Hospital, and,

23    you know, he's going to be requiring several days inpatient and

24    then recovery time in a local hotel.  He can't fly back right

25    away.

1    And I just wanted to also note, your Honor, I do

2  believe in the exhibits there is a note there that is dated.  I

3  do understand that there were several things that were submitted,

4  but I just wanted to make sure that -- I'm pretty sure there

5  was a date on that physician's letter, but regardless, I would

6  be happy to provide a --

7    THE COURT:  Well, there was one from October 26, 2021?

8  Is that the one?

9    MR. SEKLECKI:  Yes.

03:41 10    THE COURT:  So maybe that's it, but let me ask you.  I

11  don't know if that's good enough, but it would be better to get

12  one that was more current.

13    MR. SEKLECKI:  Absolutely, and no objection to that.

14  We would be happy to provide anything that we need for the

15  child, and his providers understand the severity and would be

16  happy to write you specifically any document you're requesting

17  or --

18    THE COURT:  No, no, no.  This is about going through

19  this process.  So, ideally speaking, you're going to get the

03:42 20  consent or the medical -- not the consent, I got the wrong word

21  there -- you're going to get the opinion of the doctor that he

22  can't, because of his cognitive disorder, two things:  A, that

23  he can't or won't wear a mask, it's too upsetting to him given

24  that disorder; and, B, that he's having emergency surgery and

25  he has to be in Boston.

1          Now, this is what's confusing to me:  Let's assume you

2     grant that, how long does it -- he needs to make a plane

3     reservation -- how long does it take for turnaround there?

4          MR. GOLDBERG:  Your Honor, the airlines have a

5     process.  It's airline by airline.  It's a relatively quick

6     process.  It's not like you go to the check-in gate and then

7     ask for it there.  It's a couple days, I believe, but it could

8     be a little longer.

9          THE COURT:  I understand.  You can't just have some

03:43 10     poor lady at the desk trying to make a medical evaluation.  But

11     let's say, for example -- that was terrible of me -- some lady

12     or a man at the desk trying to make an evaluation.  So, ideally

13     speaking, you'll get your stuff, you know, in, Mr. Seklecki, on

14     Monday, and hopefully by Tuesday -- let's see, the 23rd is when

15     he has to be on the plane, right?  Yikes, we're not moving that

16     fast.  So hopefully by Tuesday or Wednesday you can get back to

17     him.  You'll have to tell him what flights you're on, so it

18     will depend on which airline.  And then what?  Okay, let's

19     assume all goes well, he gets the approval, blah-blah-blah, he

03:44 20     gets on the flight, does the little boy then have to take some

21     sort of a test?

22          MR. GOLDBERG:  Your Honor, there have been cases where

23     people have been given exemptions subject to that, but that's

24     not automatic.  Some people have had to submit negative COVID

25     tests, but, again, that is one possibility.  I can't say that

1      it's a certainty in this case.  There could be a requirement

2      that he has to sit on a separate part of the plane and maybe

3      not, you know, next to other people on seats.  So there are

4      various things that the --

5           MR. SEKLECKI:  I object to that one hundred percent.

6           THE COURT:  Excuse me.  My number one priority is to

7      get your son to a medical appointment he apparently urgently

8      needs, and he has such profound, apparently, issues that it's

9      upsetting to him to wear a mask.  So I'm not even dealing with

03:44 10   that right now.  That will be the longer-term litigation

11     because that's not irreparable harm.  But what is irreparable

12     harm is if you can't make that appointment.

13          MR. SEKLECKI:  Yes.

14          THE COURT:  So, ideally speaking, let's say they say,

15     "Okay, you've got the clearance, but we want a test within --"

16     sometimes it's 72 hours, right?

17          MR. GOLDBERG:  Yes, your Honor.

18          THE COURT:  So do you have rapid tests at home,

19     Mr. Seklecki?

03:45 20        MR. SEKLECKI:  Your Honor, I do not have rapid tests.

21     I would have to bring the child in to be tested, and per the

22     CDC Guidelines, your Honor, only international travelers need

23     to be tested for COVID, not inter-continentally in the United

24     States.  And I strongly object to Mr. Goldberg's statement that

25     he would potentially have to sit in the back of the aircraft.

1     That is total discrimination for a medically complex boy who

2     just can't wear a mask due to severe issues.  I mean, that is

3     ridiculous.

4              THE COURT:  I know, but right now we're talking about

5     irreparable harm, okay?  We're not talking about the total

6     merits.  We're talking about -- I'm not going to sit and rule

7     on all this.  So I just need to get him on that plane so he can

8     see that great doctor from Children's.

9              So what kind of test does he need?  Does anyone know?

03:46 10   Does he need the antigen or the PCR?  What does he need?  Does

11    anyone know?

12             MR. GOLDBERG:  Your Honor, it's a case-by-case basis.

13    It's not an one size fits all and --

14             THE COURT:  He's just a little boy.  I mean, I have

15    grandchildren -- maybe you do too -- none of them are

16    vaccinated, but they're not that contagious either.  You know

17    where we are in Boston, just bragging?  We're at 3 percent.  So

18    I don't know if it's necessary to get a test, but it looks

19    like -- I actually Googled this pediatrics.  They look so

03:46 20   friendly.  I mean, maybe they'd be willing to give it, or

21    maybe, you know, you just get one of those rapid tests that you

22    get at the -- I don't know what the drugstore would be in

23    Florida but like a CVS.

24             MR. SEKLECKI:  Yes.

25             THE COURT:  But I need it all to be spelled out so he

```
 1   can get on that plane because that is the only thing I am
 2   seeing is potentially irreparable.
 3         MR. SEKLECKI:  But, your Honor, what would happen if
 4   the airlines continue to deny him and he can't get to his
 5   appointment despite the fact that we follow all your
 6   recommendations with Mr. Goldberg and the defendants' attorneys?
 7         THE COURT:  Let me get to it because then I might --
 8   unfortunately, as I mentioned, I'm out of town at the end of
 9   the week, but, ideally speaking, we will at that point address
03:47 10   the issues of likelihood of success and irreparable harm.  It's
11   a very narrow claim, a violation of the Americans with
12   Disabilities Act; and rather than try and brief all that,
13   whether he's being denied a reasonable accommodation, I would
14   rather have you settle it and get this done.
15         MR. SEKLECKI:  Okay.
16         THE COURT:  I want this boy to get appropriate medical
17   care.  So if it doesn't work out, well, at some point you're
18   going to have to let me know.
19         What's actually happening?  You didn't put that in on
03:47 20   the 23rd.  Is that just like a pre-op appointment?
21         MR. SEKLECKI:  Yes, and he's got pre-op appointments
22   and different appointments stemming from the 24th of -- yeah,
23   the 23rd of February on and off through March 2.  The
24   appointments end March 2, and he has a surgical procedure on
25   March 3, time to be determined.
```

1          THE COURT:  Well, okay.  So I'm hoping that you all

2    can work this out, and then I will not -- I deny the request

3    for expedited briefing on all these thousand other issues that

4    were raised.  You will go in due course.

5          And I wanted to ask you this question I'm a little not

6    sure about, is whether I should sever off the piece of it

7    against the federal government and move it to -- was it DC, or

8    would it be the Eleventh Circuit, from the government's point

9    of view?

03:48 10          MR. PEZZI:  Good afternoon, your Honor.  Stephen

11   Pezzi.  We, the government -- well, actually, before I answer

12   that question, as a threshold matter, I'd just like to make

13   clear that the federal government has not been served, so we

14   preserve all objections relating to service of process, and I

15   may return to that issue in a moment.  But to answer your

16   question, we agree with the airlines that the litigation should

17   be transferred to the Middle District of Florida, and in fact,

18   absent further direction from your Honor, would intend to file

19   our own transfer motion shortly after being served.

03:49 20          THE COURT:  You know, I'm totally sympathetic to that

21   when it comes to the big motion, which is to enjoin the

22   entire -- was it an executive order?  I would be receptive to

23   that, but I've got a different situation.  I have one little

24   boy who needs to come to Boston, so that's a different kind of

25   situation than you're in.

1          MR. PEZZI:  Certainly, your Honor, from the

2     government's perspective, we also share your desire that

3     Mr. Seklecki's son gets whatever medical treatment he needs and

4     that he's able to work that out.  I do think it's worth calling

5     your Honor's attention very briefly to Paragraphs 34 through 36

6     of the complaint, which I at least read to suggest, and I

7     didn't hear anything inconsistent with this reading today, that

8     Mr. Seklecki and his son have successfully flown between

9     Orlando and Boston more than a dozen times since this order

03:50 10     went into effect.  It also sounds as if he routinely flies on

11     Delta, which, as I understand, has all sorts of direct flights

12     between Orlando and Boston.  And I assume it is not a

13     coincidence that Delta has not been named as a defendant in

14     this case.  And so certainly recognizing the importance of the

15     medical treatment at issue, it is not at all clear to me, even

16     on plaintiff's version of the facts, whether relief from this

17     Court with respect to, I mean, certainly not the federal

18     government but even the two airlines that have been named as a

19     defendant are necessary for that to happen.

03:50 20          THE COURT:  I agree, that's a good point, but the

21     bottom line is, I don't want to rule.  I want to just get this

22     boy on the plane and not have to have me have a heavy-duty

23     preliminary injunction hearing, you know, on the eve of a

24     medical appointment.  This can be worked out.  He's four years

25     old.  We all have children and grandchildren and we know kids,

1    and I just -- and he's got problems.

2          MR. SEKLECKI:  Your Honor, I just wanted to also

3    briefly state that Mr. Pezzi just stated that the government

4    has not been served.  The government has been served, and it

5    has been filed via certified mail.  They have been served.

6          THE COURT:  Mr. Seklecki, are you a lawyer?

7          MR. SEKLECKI:  I am not.

8          THE COURT:  Okay, so I should treat you probably as --

9    you must have had some help because I've read the stuff.  Is

03:51 10   that because there's a cluster of cases?  Because I'm not going

11   to repeat and do what other courts have done.  You were a

12   plaintiff in the case that just went up to the DC Circuit on

13   behalf of yourself and your son against -- we found it --

14   against -- I guess it was actually against Transportation

15   Security Administration?  I'm not going to redo that.  You

16   can't forum shop.  I'm not redoing the basic merits of that

17   suit.  And I don't know, has the Middle District of Florida

18   judge issued an opinion yet?

19         MR. GOLDBERG:  Your Honor, if I could be heard on

03:52 20   that, on the Middle District of Florida, Roy Goldberg.  Those

21   two cases were filed both against the government, and Mr. Pezzi

22   is handling those cases; and then our firm and another firm in

23   Florida are handling a defense for seven airlines led by the

24   leader of Mr. Seklecki's group, Lucas Wall, who is a

25   co-petitioner with them in the DC Circuit and Eleventh Circuit

1   cases.  And those cases are, frankly, having major issues

2   because of Mr. Wall's antics down there; and that's why,

3   frankly, Mr. Wall is using his associates in their anti-mask

4   coalition to file these other cases, including unfortunately

5   the case we're talking about today.

6           THE COURT:  Right, and so that may be part of the

7   motion to transfer --

8           MR. GOLDBERG:  It is.

9           THE COURT:  -- or there may be part of this which is

03:53 10  governed by res judicata.  I mean, I haven't sorted it all

11  through.  There were some clerical issues right in the

12  beginning; you know, did he have access to CM/ECF?  Who was in,

13  who was out, that kind of thing.  That's why I wanted to hold

14  this status hearing.  But I don't want to do that, okay?  I

15  don't want to do it in a rush.  I want to be thoughtful about

16  it.  But I will be in a rush about getting this boy on the

17  plane.

18          And, also, can I just say, if they tell you to take

19  a -- does Delta make you take a test before you get on the

03:53 20  plane with the little boy?

21          MR. SEKLECKI:  They do not, your Honor, absolutely

22  not.

23          THE COURT:  I don't know the answer to that, whether

24  you have to or not.  I don't know.  But I do know one big

25  difference is that most children over the age of two, is it,

1    are wearing masks, so perhaps that's why they're not required

2    to take tests.  And the test is the most unintrusive thing.  I

3    must have had hundreds of them already, you know?  So I don't

4    think it's overly intrusive to ask for a test.  That said, I

5    want this to move fast and not have it be sort of, "Oh, you

6    didn't file this right paper," or, "You didn't file that right

7    paper."  Let's just get this done, or I'll have a hearing just

8    on this tiny piece of this big litigation.  Okay?

9         MR. GOLDBERG:  Your Honor, there is a Southwest

03:54 10  process that I don't want to speak finally for the record, but

11   I wouldn't be surprised if there is a COVID test required.  And

12   I can't say it's in every case.  I know it's happened in other

13   cases.  And we can get you the specifics of what Southwest and

14   American's procedures are, and certainly we will address any

15   request that is made by Mr. Seklecki, as we would for any

16   passenger.

17        THE COURT:  Right, but I think what's critically

18   important is that a doctor's letter -- and hopefully it's more

19   barebones than what I've got in my record, Mr. Seklecki --

03:55 20  explains the cognitive impairment and the problem with the

21   little boy wearing the mask.  And then what's triggered is the

22   Americans with Disabilities Act and what is a reasonable

23   accommodation, and it may not be wearing a mask, but it may

24   involve taking a test, because you also have to balance the

25   needs of the other passengers on the plane.

25

1          So good luck.  I hope this happens.  And meanwhile you

2    have the full period of time to respond to the motion for a

3    preliminary injunction.

4          Mr. Seklecki, you have the full period of time --

5    that's 14 days -- to respond to the motion to transfer venue.

6    And then, when I get everything, I will set up a hearing date.

7          MR. GOLDBERG:  Your Honor, this is Roy Goldberg.  Just

8    one thing so the record is clear.  And, again, you know, I

9    believe there is at least a testing rule for one airline, but

03:55 10   we will get you that.  So the record is clear, we haven't filed

11   any motion to dismiss or our opposition yet.  Technically

12   speaking, these cases go to the DOT actually, not under the

13   Americans with Disabilities Act but actually under the Air

14   Carrier Access Act.  And as we will be presenting to the Court,

15   the attempt to go to Federal Court rather than the DOT is

16   actually preempted by very good case law that says no prior

17   right of action to make a disability claim in Federal Court

18   against the airline.  You've got to go through the agency and

19   then back to DC or the First Circuit --

03:56 20   THE COURT:  Can we get the agency involved here?

21         MR. GOLDBERG:  No, your Honor.  It's just a question

22   of there's been no exhaustion.  You can't just go to Federal

23   Court --

24         THE COURT:  I know, but what if he has an appointment

25   next week?  How long does it take to exhaust?  I don't know, at

1    some point there's always an emergency exception.  I mean,

2    you're right, he should exhaust.  In the long term, maybe

3    that's where he's going, but there's almost always an

4    opportunity to come into Federal Court if there's a true

5    emergency.

6              MR. GOLDBERG:  It's just there's no private right of

7    action with the Air Carrier Act in effect, your Honor, and I

8    just wanted to make sure the record was clear on that, and

9    there's no private right of action under the Americans with

03:57 10    Disabilities Act either.

11              THE COURT:  Well, suppose there's a lady who wants to

12    travel on a wheelchair and the airline says "no," you're saying

13    that she can't get on the plane and has to go through a

14    six-month exhaustion process?

15              MR. GOLDBERG:  No.  I mean, that would be a clear

16    violation of the DOT requirements, and the airline could face

17    significant fines and sanctions.

18              THE COURT:  But what happens in the meantime, this

19    little disabled lady who wants to get on a plane and she's

03:57 20    going to her daughter's wedding, and they say "no"?

21              MR. GOLDBERG:  If it were me, your Honor, I would go

22    to the DOT.  I would immediately then say, "DOT, you didn't act

23    quickly enough," and I would do it the right, proper channel.

24    There's a federal statute, 49 U.S.C. 46110, that that's the

25    only one way to do it, your Honor.  I mean, that's just what

1    the law is.  But obviously we'll take very seriously the

2    concerns and any medical issues and any emergency timing with

3    regard to a four-year-old minor.  I just wanted to make sure

4    the record is clear this is not an ADA typical case because the

5    airline industry does have separate rules that apply.

6              THE COURT:  All right, well, I don't know about that,

7    but I sure don't want to decide that in a split second.  I just

8    think that this is easily worked out.  Everyone acknowledges

9    you can have a medical exception.  Everyone acknowledges he

03:58 10    needs a doctor's notes.  Everyone acknowledges that he needs to

11    do that before he gets on the flight, and then there's some

12    dispute about exactly what the rules are on testing.  So we're

13    talking only about the child, not Mr. Seklecki.  I have nothing

14    in my record to support irreparable harm for Mr. Seklecki, but

15    I do for the child, so there it is.

16              And I wish you a happy --

17              THE CLERK:  Judge --

18              THE COURT:  And we're not going to set another hearing

19    now, Maryellen.  I might have to do this on the papers.

03:58 20              THE CLERK:  That's okay, but do we have a deadline for

21    them to let us know, the court, before, you know, a deadline to

22    report to us by next week whether this is happening or not, or

23    what do we do?  You mentioned the 15th they're to report

24    whether or not --

25              THE COURT:  Yes, maybe what you could know is tell

1   Maryellen.  I'm gone all Wednesday afternoon.  I have another

2   situation.  I mean, I have something else I have to do.  Maybe

3   if we had to, an emergency hearing on Wednesday morning, but

4   I'd prefer not to.  I'd prefer to just have it go away until we

5   can brief it on the merits and I can hear about all the

6   interesting exhaustion issues.  Okay.

7              MR. PEZZI:  To that end, your Honor, I'm sorry, if I

8   could just very briefly note that I certainly agree that

9   there's been no showing of irreparable harm with respect to

03:59 10   Mr. Seklecki; and I also took your Honor to be saying, I think

11   also correctly, that there's no basis in this record for the

12   worldwide injunction that Mr. Seklecki in his papers requests

13   with respect to this nationally applicable order.  And so I

14   think, consistent with your Honor's desire to first resolve

15   this issue with respect to Mr. Seklecki's son's medical

16   appointment, it might be more efficient to stay briefing with

17   respect to the preliminary injunction motion, at least the one

18   against the federal government defendants, pending resolution

19   of this issue, and then the transfer issue next.

04:00 20             THE COURT:  No, I think you should brief it.  If you

21   need more time, you can tell me you need more time.  I mean,

22   it's a big deal.  It's a huge deal, but --

23             MR. PEZZI:  Certainly, your Honor.

24             THE COURT:  But it's slightly different than the other

25   cases, to the extent I can say, because it's -- I'm likely to

1    defer to the other courts on the, as you say, the

2    across-the-board facial attack, but there is this unique issue

3    having to do with the medical exemption that I'm just not sure

4    I understand well enough.

5         Let me ask you -- you're the guardian of the gate of

6    the federal government -- do you agree that there's no way that

7    on an emergency you can go to a Federal Court if you haven't

8    exhausted first?

9         MR. PEZZI:  Respectfully, your Honor, I'd prefer not

04:01 10   to freelance on that question as a claim against the airline

11   defendants.  I will say Mr. Goldberg is correct that there are

12   a variety of complicated statutes that apply to airlines that

13   displace the Americans with Disabilities Act in some context,

14   but I'll mostly leave that to Mr. Goldberg.  I will just say to

15   be clear -- as a matter of full transparency, I don't want

16   Mr. Seklecki or your Honor to be surprised about this -- but we

17   respectfully disagree with Mr. Seklecki that service of process

18   has been completed in compliance with Rule 4(i) of the Federal

19   Rules of Civil Procedure, and I direct Mr. Seklecki to that

04:01 20   rule for the details of how service of process is accomplished

21   on the federal government.  Our plan would be to file a

22   preliminary injunction opposition no earlier than the time

23   provided by the local rules, which is 14 days running from the

24   date of proper service, and that date has not yet come, so

25   absent another order from the Court --

1       THE COURT:  Yes, but you know what I don't want?  I

2  don't want to spend the next six months fighting about what the

3  rules are.  Why don't you just tell him?  What is it that he

4  didn't do correctly?

5       MR. PEZZI:  To my knowledge, your Honor, and I spoke

6  to the U.S. Attorney's Office yesterday, Mr. Seklecki has not

7  served the U.S. Attorney for the District of Massachusetts.

8       THE COURT:  Okay, so do it, Mr. Seklecki, okay?

9       MR. SEKLECKI:  All right, your Honor.  I --

04:02 10       THE COURT:  I just don't want to get hung up on this

11  technicality.  I mean, I may well --

12       MR. SEKLECKI:  No, I would --

13       THE COURT:  -- to the South, either Florida or DC

14  or -- now I just heard about Kentucky and EDVA.  So I may be

15  switching it all down there, but I don't want this hung up with

16  wrangling over something that a pro se person might not know.

17       Can you take service for the government?

18       MR. PEZZI:  Unfortunately, your Honor, I am not

19  authorized to waive service.  The DOJ's longstanding position

04:02 20  is that the provisions of Rule 4(i) are mandatory and cannot be

21  waived.  But, you know, the instructions are all there, and I'm

22  sure Mr. Seklecki can find a way --

23       THE COURT:  -- clear as mud, but why don't we -- what

24  you need to do, Mr. Seklecki, is to serve the U.S. Attorney's

25  Office.  That's a little hard because he's not here, but

1    maybe --

2         MR. SEKLECKI:  No, I did.  I did, your Honor.  I did,

3    your Honor, and it was delivered today.

4         THE COURT:  Oh, okay, all right.  Okay, well, thank

5    you.  Listen, have a great Valentine's Day.

6         MR. SEKLECKI:  Thank you.  You too, your Honor.

7         THE COURT:  It's going to be 50 degrees tomorrow in

8    Massachusetts, not quite as nice as Florida but we're getting

9    there.  And I look forward to having this piece of it resolved

04:03 10   so that I can be thoughtful about the rest, okay?  Thank you

11   very much to everyone, and I'll hopefully see you in a much

12   longer-term way.  Okay, thank you.  Bye-bye.

13         MR. Seklecki:  Thank you, your Honor.

14         MR. GOLDBERG:  Thank you, your Honor.

15         (Adjourned, 4:03 p.m.)

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )

5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 31 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 22-10155-PBS,

11  Michael Seklecki v. Centers for Disease Control & Prevention,

12  et al, and thereafter by me reduced to typewriting and is a

13  true and accurate record of the proceedings.

14          Dated this 14th day of February, 2022.

15

16

17

18

19                  /s/ Lee A. Marzilli
                    _____
20                  LEE A. MARZILLI, CRR
                    OFFICIAL COURT REPORTER
21

22

23

24

25

# EXHIBIT 06

## U.S. Court of Appeals:
## "Petition is dismissed for lack of jurisdiction"

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 22-1012**                                                    **September Term, 2021**

**Filed On:** April 14, 2022

In re: Aaron Abadi,

      Petitioner

    **BEFORE:**  Millett, Pillard, and Wilkins, Circuit Judges

## O R D E R

Upon consideration of the court's order to show cause filed February 23, 2022, and the response thereto; the "petition for review of agency action," which was docketed as a petition for a writ of mandamus; the motion to reclassify the petition; and the motion for a preliminary injunction, it is

**ORDERED** that the order to show cause be discharged.  It is

**FURTHER ORDERED** that the petition be dismissed for lack of jurisdiction. Petitioner states that his petition is not for a writ of mandamus but rather for review of an agency's failure to act.  A claim under the Administrative Procedure Act for failure to act "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004) (emphases in original).  Petitioner has identified neither a legal requirement that the Department of Transportation ("DOT") resolve his complaints against airlines within a certain time period, nor a legal requirement that DOT take any other discrete action that it allegedly has failed to take.  Accordingly, petitioner has not demonstrated any basis for this court to exercise jurisdiction over his petition for review of a failure to act.  See Pub. Citizen, Inc. v. FERC, 839 F.3d 1165, 1172-74 (D.C. Cir. 2016); In re Aiken Cty., 645 F.3d 428, 437-38 (D.C. Cir. 2011).  Because petitioner has disclaimed mandamus relief, he also has not demonstrated any basis for this court to address a claim of unreasonable agency delay.  See Telecomms. Research & Action Ctr. v. FCC ("TRAC"), 750 F.2d 70, 76 (D.C. Cir. 1984) (concluding that mandamus authority may be used to address claims of unreasonable delay in order to protect future jurisdiction).  It is

**FURTHER ORDERED** that petitioner's remaining motions be dismissed as moot.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.

### Per Curiam

# EXHIBIT 07

**CDC: "The exemption is not meant to cover people with disabilities for whom wearing a mask might only be difficult."**



# Order: Wearing of face masks while on conveyances and at transportation hubs

The Centers for Disease Control and Prevention (CDC) issued an Order 📕 [PDF – 11 pages] on January 29, 2021 requiring the wearing of masks by people on public transportation conveyances or on the premises of transportation hubs to prevent spread of the virus that causes COVID-19. This Order was effective as of 11:59 p.m. February 1, 2021 and was published in the Federal Register ↗ on February 3, 2021. CDC will be amending this Order as soon as practicable, to not require that people wear masks while outdoors on conveyances or while outdoors on the premises of transportation hubs.

On June 10, 2021, CDC announced that, until it can amend the January 29, 2021, Order, it will exercise its enforcement discretion regarding certain aspects of the Order to not require that people wear masks while outdoors on conveyances or while outdoors on the premises of transportation hubs. CDC requests that Federal partners and any cooperating state and local entities exercise similar enforcement discretion. This announcement does not affect any existing exemptions or exclusions of the Order. Subject to how other federal partners and state and local entities define "outdoors," CDC understands "outdoors" to refer to any open-air area.

Conveyance operators must continue to require all people onboard to wear masks when boarding and disembarking, and for the duration of travel, unless they are located in outdoor areas of the conveyance (if such outdoor areas exist on the conveyance). Operators of transportation hubs must require all persons to wear a mask when entering or while located in the indoor premises of a transportation hub.

All passengers on public conveyances (e.g., airplanes, ships*, ferries, trains, subways, buses, taxis, ride-shares) traveling into, within, or out of the United States (including U.S. territories) as well as conveyance operators (e.g., crew, drivers, conductors, and other workers involved in the operation of conveyances), regardless of their vaccination status, are required to wear a mask over their nose and mouth. Unless otherwise required by the operator, or federal, State, tribal, territorial, or local government, people are not required to wear a mask when located in outdoor areas of a conveyance (if such outdoor areas exist on the conveyance).

All people, including workers and members of the public, regardless of their vaccination status, are required to wear a mask while entering or when located in the indoor areas of transportation hubs (e.g., airports, bus or ferry terminals, train or subway stations, seaports, ports of entry) in the United States and U.S. territories. Unless otherwise required by the operator, or federal, State, tribal, territorial, or local government, people are not required to wear a mask when located in outdoor areas of a transportation hub.

While people are no longer required to wear a mask outdoors on conveyances or outdoors at transportation hubs, CDC continues to recommend people who are not fully vaccinated wear a mask in these areas to protect themselves and others. In areas with high numbers of COVID-19 cases, fully vaccinated people should consider wearing a mask in crowded outdoor settings and for activities with close contact with others who are not fully vaccinated.

*CDC also plans to amend the January 29, 2021, Order, as soon as practicable, to grant cruise ship operators subject to the Conditional Sailing Order with greater flexibility regarding how mask requirements are implemented on board cruise ships.  Until it can amend the Order, CDC will exercise enforcement discretion regarding mask requirements applicable to operators of, and crew and passengers on board, such cruise ships and will view cruise ship operators as in compliance with the January 29, 2021, Order provided the operators continue to follow the requirements of any technical instructions and the operations manual available on the Cruise Ship Guidance webpage.

This Order 📕 [PDF – 11 pages] is effective as of February 2, 2021 and was published in the Federal Register ↗ on February 3, 2021.

For frequently asked questions, visit the FAQs.

The following are attributes of masks needed to fulfill the requirements of the Order. CDC will update this guidance as needed.

- A properly worn mask completely covers the nose and mouth.
- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).
- Mask should be secured to the head with ties, ear loops, or elastic bands that go behind the head. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.
- Mask should fit snugly but comfortably against the side of the face.
- Mask should be a solid piece of material without slits, exhalation valves, or punctures.

The following attributes are additionally acceptable as long as masks meet the requirements above.

- Masks can be either manufactured or homemade.
- Masks can be reusable or disposable.
- Masks can have inner filter pockets.
- Clear masks or cloth masks with a clear plastic panel may be used to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators fulfill the requirements of the Order.

The following do not fulfill the requirements of the Order.

- Masks worn in a way that does not cover both the mouth and nose
- Face shields or goggles (face shields or goggles may be worn to supplement a mask that meets above required attributes)
- Scarves, ski masks, balaclavas, or bandannas
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose.
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through
- Masks made from materials that are hard to breathe through (such as vinyl, plastic or leather)
- Masks containing slits, exhalation valves, or punctures
- Masks that do not fit properly (large gaps, too loose or too tight)

Additional guidance on the use of masks to slow the spread of COVID-19 is available on CDC's website.

## Disability Exemptions of the Order

Who is covered by the exemption for "a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act ⧉ (ADA, 42 U.S.C. 12101 *et seq.*)"?

Most people, including those with disabilities, can tolerate and safely wear a mask and are required to wear one as per CDC's Order. However, certain people with disabilities who, because of their disability, cannot wear a mask, or cannot safely wear a mask, are exempted from CDC's mask-wearing requirement.

The exemption is not meant to cover people with disabilities for whom wearing a mask might only be difficult or whose disability does not prevent them from wearing a mask or wearing a mask safely.

The following narrow subset of persons with disabilities are exempt from CDC's requirement to wear a mask:

- A person with a disability who, for reasons related to the disability, would be physically unable to remove a mask without assistance if breathing becomes obstructed. Examples might include a person with impaired motor skills, quadriplegia, or limb restrictions
- A person with an intellectual, developmental, cognitive, or psychiatric disability that affects the person's ability to understand the need to remove a mask if breathing becomes obstructed

The following persons with disabilities might be exempt from CDC's requirement to wear a mask based on factors specific to the person:

- A person with a disability who cannot wear a mask because it would cause the person to be unable to breathe or have respiratory distress if a mask were worn over the mouth and nose. A person with a condition that causes intermittent respiratory distress, such as asthma, likely does not qualify for this exemption because people with asthma, or other similar conditions, can generally wear a mask safely.
- A person with a disability requiring the use of an assistive device, such as for mobility or communication, that prevents the person from wearing a mask and wearing or using the assistive device at the same time. If use of the device is intermittent and the person can remove the mask independently to use the device, then a mask must be worn during periods when the person is not using the device.
- A person with a severe sensory disability or a severe mental health disability who would pose an imminent threat of harm to themselves or others if required to wear a mask. Persons who experience discomfort or anxiety while wearing a mask without imminent threat of harm would not qualify for this exemption.

**How can operators facilitate safer transportation where a passenger is a person with a disability who is exempt from the requirement to wear a mask?**

Operators of conveyances or transportation hubs should consider providing options for  additional protective measures that improve the ability of the people who are subject to the exemption to maintain social distance (separation from others by at least 6 feet/2 meters [about 2 arm lengths]). Examples include—

- If travel is pre-scheduled, schedule travel for people who are exempt at less crowded times or on less crowded conveyances.
- Seat or otherwise situate the person in a less crowded section of the conveyance or transportation hub.
- Inform people with disabilities who cannot wear a mask safely that these additional measures might be taken to facilitate safer transportation.

All people should consider the necessity of using public transportation, especially those with disabilities or underlying conditions that may place them at increased risk for severe illness from COVID-19. Disability alone may not be related to higher risk for getting COVID-19 or having severe illness. Most people with disabilities are not inherently at higher risk for becoming infected with or having severe illness from COVID-19. However, some people with disabilities might be at a higher risk of infection or severe illness, at least in part because of their underlying medical conditions.

People with disabilities should talk with their healthcare providers if they have questions about their health or how their health conditions are being managed.

While this guidance uses the ADA's definition of disability, it does not address other ADA provisions that may be pertinent to issues involving the use of masks.

Page last reviewed: August 20, 2021

# EXHIBIT 08

**DOT Promises "to provide reasonable accommodations to persons with disabilities who are unable to safely wear masks."**



# U.S. Department of Transportation

ABOUT DOT ∨    PRIORITIES ∨    CONNECT ∨    🔍

Home \ Aviation Consumer Protection

Aviation Consumer Protection

What's New

Rules, Guidance, and Enforcement Orders

Other Information  ∨

About Us

## Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft - Notice of Enforcement Policy

📄 Mask Notice Issued on Feb 5.pdf

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation, is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019. OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act and the Department's implementing regulation in 14 CFR Part 382 to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

Last updated: Friday, February 5, 2021

### Contact Us

**Office of Aviation Consumer Protection**

1200 New Jersey Ave, SE
Washington, DC 20590
United States

**Phone:** (202) 366-2220 ✆

**Business Hours:**
8:30am-5:00pm ET, M-F

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

**https://www.transportation.gov/airconsumer/masks-notice-of-enforcement-policy**

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.

---

NOTICE OF ENFORCEMENT POLICY:
ACCOMMODATION BY CARRIERS OF PERSONS WITH DISABILITIES
WHO ARE UNABLE TO WEAR OR SAFELY WEAR MASKS WHILE ON
COMMERCIAL AIRCRAFT

---

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation (DOT or the Department), is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019 (COVID-19).  OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act (ACAA)[1] and the Department's implementing regulation in 14 CFR Part 382 (Part 382) to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

To carry out the Executive Order on Promoting COVID-19 Safety in Domestic and International Travel (Executive Order),[2] the Centers for Disease Control and Prevention (CDC) issued an order on January 29, 2021 (CDC Order)[3] that, among other things, requires U.S. and foreign air carriers to use their best efforts to ensure that persons on flights to, within, or from[4] the United States wear a mask for the duration of travel, including when boarding and disembarking aircraft. The CDC Order exempts certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask

---

[1] The ACAA, signed into law in 1986, prohibits discrimination by airlines against individuals with disabilities in commercial air transportation.  The Americans with Disabilities Act, signed into law after the ACAA in 1990, prohibits discrimination against individuals with disabilities in employment, state or local government, public accommodations, commercial facilities, telecommunications, and transportation other than by commercial airlines.

[2] Exec. Order No. 13998, 86 FR 7205 (Jan. 26, 2021).

[3] Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b): Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (CDC Order), *available at* https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf.

[4] CDC Order specifies that "[c]onveyance operators must also require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons onboard (passengers or conveyance operators) will return to the United States while this Order remains in effect." CDC Order at 9.

---

because of the disability.[5]   However, it allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability.  Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks.[6]   The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD.  At the same time, the ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability.  This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

<u>Background</u>

SARS-CoV-2, the virus that causes COVID-19, spreads most often when an infected person coughs, sneezes, or talks, and droplets from the infected individual's mouth or nose are spread through the air and come in contact with people nearby.[7]   Persons with COVID-19 infection may have symptoms of fever, cough, or shortness of breath,[8] or they may be asymptomatic[9] or pre-symptomatic[10] but still able to spread the virus.[11]  CDC has made clear that appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.[12]

---

[5] CDC Order at 4 and 5 (noting that this is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to disability).

[6] TSA Security Directive 1544-21-02: Security Measures – Face Mask Requirements (January 31, 2021).

[7] *See* Ctrs. for Disease Control & Prevention, *How COVID Spreads*, CDC.gov (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Ctrs. for Disease Control & Prevention, *Considerations for Wearing Masks*, CDC.gov (last updated Dec. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[8] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus*, CDC.gov (last updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[9] An asymptomatic case is an individual infected with SARS-CoV-2, who does not exhibit symptoms during the course of infection.   Ctrs. for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, CDC.gov (last updated Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[10] A pre-symptomatic case of COVID-19 is an individual infected with SARS-CoV-2, who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection.  *COVID-19 Pandemic Planning Scenarios*, *supra* note 8.

[11] *See How COVID Spreads* and *Considerations for Wearing Masks*, *supra* note 6.

[12] CDC Order at 6.

2

As of January 27, 2021, there have been over 99 million confirmed cases of COVID-19 globally and over 25 million confirmed cases of COVID-19 in the United States, with over 2 million deaths globally and over 400,000 deaths in the United States due to the disease.[13]  To slow the spread of COVID-19, on January 21, 2021, President Biden issued Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-wearing in domestic and international transportation.  The Executive Order further provides that the heads of agencies may make categorical or case-by-case exceptions to policies developed under the order, consistent with applicable law, to the extent that doing so is necessary or required by law.

Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.[14]  To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator.  The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.[15]

In response to COVID-19, U.S. and foreign air carriers generally have implemented policies requiring passengers to wear masks onboard aircraft even before the issuance of the Executive Order and the CDC Order.  Some carriers have adopted policies that expressly allow "no exceptions" to the mask requirement other than for children under the age of two.[16] OACP has

---

[13] *Id.* at 5.

[14] 42 U.S.C. 12102(4).  OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation.   See also CDC Order at 4 and 5.

[15] CDC Order at 4. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

[16] It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others.  *See* Ctrs. for Disease Control & Prevention, *Information for Pediatric Healthcare Providers*, CDC.gov (last updated Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-

3

received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a "no exceptions allowed" mask policy.

The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth.[17] The CDC Order provides that a mask is not required in circumstances where an individual is "unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to wear the mask without assistance."[18]  The Order notes that individuals may remove masks "who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask.""[19]  Also, individuals with acute illness may remove the mask if it "interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask."[20]  CDC will issue additional guidance regarding persons who cannot wear a mask on the basis of disability.[21]  Individuals who have a physical or mental impairment that substantially limits one or more major life activities are individuals with a disability for purposes of the ACAA and Part 382.[22]

<u>Legal Authority</u>

The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability.[23]  When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities, provided that the modifications would not constitute an undue burden or fundamentally alter the airline's program.[24]

Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that

---

ncov/hcp/pediatric-hcp.html (stating that "[r]ecent evidence suggests that compared to adults, children likely have similar viral loads in their nasopharynx, similar secondary infections rates, and can spread the virus to others").

[17] Considerations for Wearing Masks, *supra* note 6.

[18] CDC Order at 4.

[19] CDC Order at 4 (footnote 7).

[20] CDC Order at 4 (footnote 7).

[21] CDC Order at 5 (footnote 9).

[22] 49 U.S.C. 41705(a); 14 CFR 382.3.

[23] 49 U.S.C. 41705(a); 14 CFR 382.11.

[24] 14 CFR 382.13.

4

the individual would pose a "direct threat" to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible.[25]  To support a determination that an individual poses such a direct threat, the airline must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," in order to ascertain "(i) [t]he nature, duration, and severity of the risk; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk."[26]  If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must, for example, "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation.[27]  Furthermore, the Department's regulations permit the airline to impose reasonable conditions, restrictions, or requirements on a passenger who has a "medical condition" that may cause the passenger to pose a risk to the health and safety of others.[28]

<u>Enforcement Policy</u>

The authority to pursue or not to pursue enforcement action against airlines with respect to air travel consumer protection and civil rights requirements, including compliance with the ACAA, lies with OACP.[29]

In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that treat passengers presumptively as potential carriers of the SARS-CoV-2 virus and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew.[30]  Notably, however, the CDC Order exempts from the mask mandate a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the

---

[25] 14 CFR 382.19(c)(1), (2).

[26] *Id.*

[27] 14 CFR 382.19(c)(2).

[28] 14 CFR 382.21(a)(3).  The rule recognizes that a passenger with a communicable disease or infection, such as infection with the SARS-CoV-2 virus or other "medical condition," may pose a direct threat to the health and safety of others onboard an aircraft, and the airline may be justified in refusing to transport the passenger or in requiring protective measures to mitigate the risk, consistent with the directives of public health authorities.  14 CFR 382.21(a)–(b).

[29] 49 U.S.C. 41705(c), 46301. The CDC Order requiring aircraft operators to mandate mask use will be enforced by the Transportation Security Administration under its statutory and regulatory authorities, including 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR 1542.303, 1544.305, and 1546.105.

[30] CDC Order at 5 ("The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."); *id.* at 7 ("Traveling on public conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces.").

disability.  The Department also requires reasonable accommodations for persons with disabilities who are unable to wear masks or are unable to wear them safely.[31]

Airlines have expressed concerns to OACP that a significant number of passengers may claim medical exemption from the mask requirements without an apparent credible basis.  The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.[32] Similarly, under the Department's disability regulation in 14 CFR Part 382, airlines may impose conditions, restrictions, or requirements on a passenger asserting that a medical condition prevents the passenger from wearing a face mask, because the passenger may pose a direct threat to the health or safety of others, as any passenger is a potential carrier of the SARS-CoV-2 virus.[33]  In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask.

Airlines have also represented to OACP that, given the number of passengers making such claims, it is not practicable for airlines to make the required individualized assessment of appropriate mitigation measures at the airport on the day of the flight.  Under the Department's disability regulation in Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask.[34]  However, Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance. Airlines may also require such passengers to check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel.

In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers.  For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test,[35] taken at the passenger's own expense, during the days immediately

---

[31] 14 CFR 382.13.

[32] *Id.*

[33] 14 CFR 382.21(a)(3).

[34] 14 CFR 382.19(c)(1).

[35] On January 12, 2021, CDC issued an order requiring any passenger flying into the United States from a foreign country to provide, before boarding the flight, proof of a negative pre-departure test result for SARS-CoV-2, the virus that causes COVID-19, or documentation of recovery from COVID-19 after a previous SARS-CoV-2 infection. This order became effective on January 26, 2021.  Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b): Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airlines or Other Aircraft Passengers Arriving into the United States from Any Foreign Country, *available at* https://www.cdc.gov/quarantine/pdf/global-airline-testing-order_2021-01-2_R3-signed-encrypted-p.pdf.

prior to the scheduled flight.[36]  Further, the airline may arrange for additional, appropriate mitigation measures, including arranging for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight.

To ensure travelers are aware of the face mask requirements, airlines should use their best efforts to make this information easily available.  The Department requires airlines provide information on request, to individuals with disabilities, about any service-related or other limitations on the airline's ability to accommodate passengers with a disability.[37]  Also, CDC and TSA require airlines to provide passengers with prominent and adequate notice to facilitate awareness and compliance with the requirement that masks must be worn, subject to certain limited exemptions, to mitigate the spread of COVID-19 during air travel.[38]  Airlines' obligation to provide information on the face mask requirements includes updating airlines' face mask policies on their websites to ensure accuracy and consistency with the ACAA, CDC Order and TSA SD.[39]

In recognition of the CDC Order, as well as airlines' efforts to minimize the potential for transmission of the virus onboard aircraft by implementing policies requiring passengers to wear masks onboard aircraft even before the issuance of the CDC Order, OACP  will exercise its prosecutorial discretion and provide airlines an opportunity to follow the steps described herein to become compliant before taking further action.[40]  Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382.  OACP will refrain from taking enforcement action against an airline for a period of up to 45 days from the date of this notice, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued. This timeframe should provide airlines with adequate time to review and revise their mask procedures as needed to comply with the law.[41]

---

[36] A positive test result for SARS-CoV-2, the virus that causes COVID-19, is a valid reason for an airline to deny transport to any individual, including an individual with a disability.  CDC recommends isolation to separate people infected with SARS-CoV-2 from people who are not infected.  *See* Ctrs. for Disease Control & Prevention, *Isolate if You are Sick*, CDC.gov (last updated Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html.

[37] 14 CFR 382.41.

[38] CDC Order at 1; TSA SD at 2.

[39] *See* 14 CFR 399.79 (b)(2) (defining an airline's practice as "deceptive" to consumers within the meaning of section 41712 if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter).

[40] Every day, we are learning more about how COVID-19 spreads and affects people and communities.  OACP will continue to follow the data and information provided by public health authorities, such as CDC, on actions necessary to limit the spread or impact of SARS-CoV-2 and will make changes to this notice as necessary to be consistent with current medical knowledge and the best available objective evidence.

[41] This document is a temporary notice of enforcement discretion.  Regulated entities may rely on this notice as a safeguard from Departmental enforcement as described herein. To the extent that this notice includes guidance on how regulated entities may comply with existing regulations, it does not have the force and effect of law and is not meant to bind the regulated entities in any way.

7

Questions regarding this Notice may be addressed to the Office of Aviation Consumer Protection
(C-70), 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

By:

Blane A. Workie
***Assistant General Counsel for***
***Office of Aviation Consumer Protection***

Dated:  February 5, 2021

*An electronic version of this document is available at http://www.dot.gov/airconsumer*

8

# EXHIBIT 09

**DOT to Southwest Airlines and JetBlue: "You are guilty of discrimination, but we are not going to do anything about it."**



**U.S. Department of Transportation**
Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

November 22, 2021



Dear Mr ▮▮▮▮▮

This letter is in further reference to your disability complaint regarding Southwest Airlines.  We were sorry to hear of the incident and appreciate the opportunity to advise you of the outcome of our investigation.  Enclosed you will find an Investigation Summary Sheet that details the results of our investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. Section 41705, and our implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382, provides a brief summary of that section and explains this office's view on whether the carrier has violated the ACAA and 14 CFR Part 382.  If your complaint raises more than one disability issue, an additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates the action that we plan to take.  We will either pursue formal enforcement action or by copy of this letter notify the airline specified in your complaint of our determination and warn it that any similar incidents could lead to formal enforcement action.  Generally, we will pursue enforcement action on the basis of a number of complaints from which we may infer a pattern or practice of discrimination.  However, where one or a few complaints describe particularly egregious conduct on the part of a carrier and those complaints are supported by adequate evidence, we will pursue enforcement action as our resources permit.  If we decide to seek enforcement action against the airline, your complaint will be among those considered in the context of this action, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties.  In the event that this enforcement action leads to litigation, it is possible that we may need sworn statements or witnesses for a hearing.  We will advise you if, in fact, we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing cease and desist orders and assessing civil penalties not to exceed $34,174 per violation.  Such action can only be accomplished through settlements or formal hearings before administrative law judges.  We cannot order compensation for aggrieved parties.  To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated the ACAA, we will not pursue enforcement action.  Notwithstanding our decision not to pursue enforcement action, however, private legal action may be pursued in the courts based on private contract rights or on civil rights statutes that provide for a private right of action and, in such a proceeding, monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our monthly *Air Travel Consumer Report* reflect your complaint.  Our monthly report is made available to the

aviation industry, the news media and the general public so that both consumers and air travel companies can compare the overall complaint records of individual airlines, as well as the number of disability complaints filed against particular carriers.  This system also serves as a basis for rulemaking, legislation, and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant further action.  This ongoing process also enables us to ensure prompt corrective action whenever we determine that an airline's policies or procedures are not in compliance with our ACAA regulations.  Your complaint will be among those considered in the context of this overall process.

I hope this further information is useful.  Thank you again for taking the time to contact us.

Sincerely,

Livaughn Chapman, Jr.
Deputy Assistant General Counsel
  for Aviation Consumer Protection

/s/

By: Stuart Hindman
    Senior Trial Attorney

Enclosures
cc: Southwest Airlines

**U.S. Department of Transportation**
Office of the Secretary of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

## INVESTIGATION SUMMARY SHEET

| | |
|---|---|
| **Case Number:** | |
| **Complainant Title:** | |
| **Name:** | |
| **Address:** | |
| **Passenger(s):** | |
| **Airline:** | Southwest Airlines |
| **Travel Date(s):** | Not Applicable |
| **Flight Number(s):** | Not Applicable |
| **City Pair:** | Richmond to Tampa |
| **Location of Incident:** | On board flights |
| **Complaint/Issue:** | Failure to provide an accommodation to a passenger with a disability with respect to the carrier's mask policy. |
| **Applicable Section of 14 CFR Part 382:** | 382.19 |

**Section Summary:**

(a) As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part.

(b) You must not refuse to provide transportation to a passenger with a disability because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

(c) You may refuse to provide transportation to any passenger on the basis of safety, as provided in 49 U.S.C. 44902 or 14 CFR 121.533, or to any passenger whose carriage would violate FAA or TSA requirements or applicable requirements of a foreign government.

(1) You can determine that there is a disability-related safety basis for refusing to provide transportation to a passenger with a disability if you are able to demonstrate that the passenger poses a direct threat (see definition in §382.3). In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:

(i) The nature, duration, and severity of the risk;

(ii) The probability that the potential harm to the health and safety of others will actually occur; and

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

(2) If you determine that the passenger does pose a direct threat, you

must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal.

(3) In exercising this authority, you must not act inconsistently with the provisions of this part.

(4) If your actions are inconsistent with any of the provisions of this part, you are subject to enforcement action under Subpart K of this part.

| Rule Violated? | Yes |
|---|---|

**Remarks:**

Mr. ███████ states that he has a disability that prevents him from wearing a mask. Mr. ███████ states that he was looking to travel to Tamoa and he reached out to Southwest Airlines (Southwest) for information regarding a mask exemption. Mr. ███████ was informed that anyone not wearing mask will not be allowed to travel on Southwest.

In the carrier's September 21, 2020, reply to Mr. ███████ Southwest confirms Mr. ███████ allegation that it passenger who can not or refuse to wear a mask will not be allowed to travel on Southwest.

On February 5, 2021, the Department of Transportation's Office of Aviation Consumer Protection (OACP) issued a notice titled "Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear Masks While on Commercial Aircraft." The notice reminds U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with COVID-19. The notice makes clear that airline policies that expressly allow no exceptions to the mask requirement other than for children under the age of two violate the Air Carrier Access Act.

The Air Carrier Access Act and its implementing regulation, 14 CFR Part 382 (Part 382), require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disabilities. It would be a violation of the ACAA and Part 382 for an airline to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater heath risk to others.

Southwest's mask policy that was in place at the time Mr. ███████ planned to travel failed to provide an exemption for passengers with disabilities who cannot wear or safely wear a mask due to their disabilities. As a result, Southwest did not conduct an individualized assessment to determine whether Mr. ███████ could not wear or safely wear a mask due to his disability and whether a reasonable accommodation could be made that would permit Mr. ███████ to fly safely without a mask. Therefore, we find that Southwest violated the ACAA and Part 382 in this instance.

Since the issuance of the notice, OACP has exercised its prosecutorial discretion and provided the airlines 45 days from the date of the Enforcement Notice to come into compliance with its obligation under the ACAA and Part 382 by amending their mask polices to provide reasonable accommodations to persons with disabilities who are unable to wear masks or to wear masks safely, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued. A copy of OACP's Enforcement Notice is available on the Department's website at: https://www.transportation.gov/airconsumer/masks-notice-of-enforcement-policy. We note that since the time of this incident, Southwest has informed OACP that it has amended its mask policy to comply with the ACAA and Part 382.



**U.S. Department of Transportation**

Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

November 12, 2021



Dear Mr ▇▇▇▇▇▇ :

This letter is in further reference to your disability complaint regarding JetBlue Airways. We were sorry to hear of the incident and appreciate the opportunity to advise you of the outcome of our investigation. Enclosed you will find an Investigation Summary Sheet that details the results of our investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. Section 41705, and our implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382, provides a brief summary of that section and explains this office's view on whether the carrier has violated the ACAA and 14 CFR Part 382. If your complaint raises more than one disability issue, an additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates the action that we plan to take. We will either pursue formal enforcement action or by copy of this letter notify the airline specified in your complaint of our determination and warn it that any similar incidents could lead to formal enforcement action. Generally, we will pursue enforcement action on the basis of a number of complaints from which we may infer a pattern or practice of discrimination. However, where one or a few complaints describe particularly egregious conduct on the part of a carrier and those complaints are supported by adequate evidence, we will pursue enforcement action as our resources permit. If we decide to seek enforcement action against the airline, your complaint will be among those considered in the context of this action, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties. In the event that this enforcement action leads to litigation, it is possible that we may need sworn statements or witnesses for a hearing. We will advise you if, in fact, we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing cease and desist orders and assessing civil penalties not to exceed $34,174 per violation. Such action can only be accomplished through settlements or formal hearings before administrative law judges. We cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated the ACAA, we will not pursue enforcement action. Notwithstanding our decision not to pursue enforcement action, however, private legal action may be pursued in the courts based on private contract rights or on civil rights statutes that provide for a private right of action and, in such a proceeding, monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our monthly *Air Travel Consumer Report* reflect your complaint. Our monthly report is made available to the

aviation industry, the news media and the general public so that both consumers and air travel
companies can compare the overall complaint records of individual airlines, as well as the number of
disability complaints filed against particular carriers.  This system also serves as a basis for rulemaking,
legislation, and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are
in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant
further action.  This ongoing process also enables us to ensure prompt corrective action whenever we
determine that an airline's policies or procedures are not in compliance with our ACAA regulations.  Your
complaint will be among those considered in the context of this overall process.

I hope this further information is useful.  Thank you again for taking the time to contact us.

Sincerely,

Livaughn Chapman, Jr.
Deputy Assistant General Counsel
  for Aviation Consumer Protection

/s/

By: Clereece Kroha
    Senior Trial Attorney

Enclosures
cc: JetBlue Airways

**U.S. Department of Transportation**
Office of the Secretary of Transportation

GENERAL COUNSEL

1200 New Jersey Ave., S.E.
Washington, DC 20590

## INVESTIGATION SUMMARY SHEET

| | |
|---|---|
| **Case Number:** | |
| **Complainant Title:** | |
| **Name:** | |
| **Address:** | |
| **Passenger(s):** | |
| **Airline:** | JetBlue Airways |
| **Travel Date(s):** | Not Applicable |
| **Flight Number(s):** | Not Applicable |
| **City Pair:** | Richmond to Boston |
| **Location of Incident:** | Not Applicable |
| **Complaint/Issue:** | Failure to provide an accommodation to a passenger with a disability with respect to the carrier's mask policy. |
| **Applicable Section of 14 CFR Part 382:** | 382.19 |
| **Section Summary:** | (a) As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part. |

(b) You must not refuse to provide transportation to a passenger with a disability because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

(c) You may refuse to provide transportation to any passenger on the basis of safety, as provided in 49 U.S.C. 44902 or 14 CFR 121.533, or to any passenger whose carriage would violate FAA or TSA requirements or applicable requirements of a foreign government.

(1) You can determine that there is a disability-related safety basis for refusing to provide transportation to a passenger with a disability if you are able to demonstrate that the passenger poses a direct threat (see definition in §382.3). In determining whether an individual poses a direct threat, you must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain:

(i) The nature, duration, and severity of the risk;

(ii) The probability that the potential harm to the health and safety of others will actually occur; and

(iii) Whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

(2) If you determine that the passenger does pose a direct threat, you

must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others. For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal.

(3) In exercising this authority, you must not act inconsistently with the provisions of this part.

(4) If your actions are inconsistent with any of the provisions of this part, you are subject to enforcement action under Subpart K of this part.

| Rule Violated? | Yes |
|---|---|

**Remarks:**

Mr. ▮▮▮▮▮▮ states that he has a disability that prevents him from wearing a mask. Mr. ▮▮▮▮▮ states that he was looking to travel to Boston for the birth of his first granddaughter and JetBlue Airways (JetBlue) offered non-stop flights. Mr. ▮▮▮▮▮▮ further states that JetBlue's website stipulates that all passengers over the age of 2 must wear a face covering over their nose and mouth throughout their journey.

In the carrier's October 22, 2021, letter to Mr. ▮▮▮▮▮ JetBlue confirms Mr. ▮▮▮▮▮ understanding of its mask policy by stating that it requires all customers over the age of 2 to wear a face covering over their nose and mouth throughout their journey, including during check-in, boarding, in flight and deplaning.

On February 5, 2021, the Department of Transportation's Office of Aviation Consumer Protection (OACP) issued a notice titled "Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear Masks While on Commercial Aircraft." The notice reminds U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with COVID-19. The notice makes clear that airline policies that expressly allow no exceptions to the mask requirement other than for children under the age of two violate the Air Carrier Access Act.

The Air Carrier Access Act and its implementing regulation, 14 CFR Part 382 (Part 382), require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disabilities. It would be a violation of the ACAA and Part 382 for an airline to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater heath risk to others.

JetBlue's mask policy that was in place at the time Mr. ▮▮▮▮▮ planned to travel failed to provide an exemption for passengers with disabilities who cannot wear or safely wear a mask due to their disabilities. As a result, JetBlue did not conduct an individualized assessment to determine whether Mr. ▮▮▮▮▮ could not wear or safely wear a mask due to his disability and whether a reasonable accommodation could be made that would permit Mr. ▮▮▮▮▮ to fly safely without a mask. Therefore, we find that JetBlue violated the ACAA and Part 382 in this instance.

Since the issuance of the notice, OACP has exercised its prosecutorial discretion and provided the airlines 45 days from the date of the Enforcement Notice to come into compliance with its obligation under the ACAA and Part 382 by amending their mask polices to provide reasonable accommodations to persons with disabilities who are unable to wear masks or to wear masks safely, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued. A copy of OACP's Enforcement Notice is available on the Department's website at: https://www.transportation.gov/airconsumer/masks-notice-of-enforcement-policy. We note that since the time of this incident, JetBlue has informed OACP that it has amended its mask policy to comply with