# In the United States Court of Appeals for the Eleventh Circuit

No. 22-11287

HEALTH FREEDOM DEFENSE FUND INC., ET AL.,

*Plaintiffs-Appellees,*

v.

JOSEPH R. BIDEN, JR., PRESIDENT OF THE UNITED STATES, ET AL.,

*Defendants-Appellants.*

## AMICUS BRIEF OF THE STATE OF FLORIDA AND THE STATES OF ALABAMA, ALASKA, ARIZONA, ARKANSAS, GEORGIA, IDAHO, INDIANA, IOWA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OHIO, OKLAHOMA, SOUTH CAROLINA, TEXAS, UTAH, VIRGINIA, AND WEST VIRGINIA

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

ASHLEY MOODY
*Attorney General*
HENRY C. WHITAKER
*Solicitor General*
JEFFREY PAUL DESOUSA
*Chief Deputy Solicitor General*
EVAN EZRAY
*Deputy Solicitor General*

JAMES H. PERCIVAL
*Deputy Attorney General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
*evan.ezray@myfloridalegal.com*

No. 22-11287, *Health Freedom Defense Fund v. Biden*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Amici States certify that the following is a complete list of interested persons,

in addition to those already listed in the parties' briefs, as required by Federal Rule of

Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Brnovich, Mark, Attorney General of Arizona

2. Cameron, Daniel, Attorney General of Kentucky

3. Carr, Christopher, Attorney General of Georgia

4. DeSousa, Jeffrey, Counsel for Amicus

5. Ezray, Evan, Counsel for Amicus

6. Fitch, Lynn, Attorney General of Mississippi

7. Knudsen, Austin, Attorney General of Montana

8. Landry, Jeff, Attorney General of Louisiana

9. Marshall, Steve, Attorney General of Alabama

10. Miyares, Jason, Attorney General of Virginia

11. Moody, Ashley, Attorney General of Florida

12. Morrisey, Patrick, Attorney General of West Virginia

13. O'Connor, John, Attorney General of Oklahoma

14. Paxton, Ken, Attorney General of Texas

15. Percival, James, Counsel for Amicus

16. Peterson, Dough, Attorney General of Nebraska

17. Reyes, Sean, Attorney General of Utah

18. Rokita, Theodore, Attorney General of Indiana

19. Rutledge, Leslie, Attorney General of Arkansas

No. 22-11287, *Health Freedom Defense Fund v. Biden*

20. Schmidt, Derek, Attorney General of Kansas

21. Schmitt, Eric, Attorney General of Missouri

22. State of Alabama, Amicus

23. State of Alaska, Amicus

24. State of Arizona, Amicus

25. State of Arkansas, Amicus

26. State of Florida, Amicus

27. State of Georgia, Amicus

28. State of Idaho, Amicus

29. State of Indiana, Amicus

30. State of Iowa, Amicus

31. State of Kansas, Amicus

32. State of Kentucky, Amicus

33. State of Louisiana, Amicus

34. State of Mississippi, Amicus

35. State of Missouri, Amicus

36. State of Montana, Amicus

37. State of Nebraska, Amicus

38. State of Ohio, Amicus

39. State of Oklahoma, Amicus

40. State of South Carolina, Amicus

41. State of Texas, Amicus

42. State of Utah, Amicus

No. 21-13657, *City of S. Miami, et al. v. Governor of the State of Florida et al.*

43. State of Virginia, Amicus

44. State of West Virginia, Amicus

45. Taylor, Treg, Attorney General of Alaska

46. Thompson, Jeffrey, Solicitor General of Iowa

47. Wasden, Lawrence, Attorney General of Idaho

48. Wilson, Alan, Attorney General of South Carolina

49. Whitaker, Henry, Counsel for Amicus

50. Yost, Dave, Attorney General of Ohio

*/s/ Evan Ezray*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT................................................................................i

TABLE OF CONTENTS .....................................................................................i

TABLE OF AUTHORITIES ...............................................................................ii

STATEMENT OF THE ISSUES ....................................................................... 1

INTRODUCTION AND INTEREST OF AMICI ........................................... 2

SUMMARY OF ARGUMENT ........................................................................ 3

ARGUMENT ...................................................................................................... 5

I.      CDC lacks statutory authority to issue a nationwide mask mandate.................. 5

        A.     The mask mandate is not a "sanitation" measure ...................................... 5

        B.     CDC cannot require an "examination," as the mask mandate
               demands, without making a particularized risk finding........................... 15

II.     CDC failed to establish good cause to avoid notice and comment................... 17

III.    The mask mandate is arbitrary and capricious ...................................... 20

IV.     The district court properly vacated the mask mandate nationwide................... 23

CONCLUSION ................................................................................................. 25

CERTIFICATE OF COMPLIANCE ............................................................. 28

CERTIFICATE OF SERVICE ....................................................................... 29

# TABLE OF AUTHORITIES

Page(s)

Cases

*Action on Smoking & Health v. Civ. Aeronautics Bd.*,
 713 F.2d 795 (D.C. Cir. 1983)...................................................................17, 19

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
 141 S. Ct. 2485 (2021)....................................................................... Passim

*Ala. Envt'l Council v. Adm'r U.S. EPA*,
 711 F.3d 1277 (11th Cir. 2013) .............................................................. 24

*Badgerow v. Walters*,
 142 S. Ct. 1310 (2022)............................................................................ 10

*Biden v. Missouri*,
 142 S. Ct. 647 (2022)............................................................................. 18

*Biden v. Texas*,
 142 S. Ct. (2022) ................................................................................... 24

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
 781 F.3d 1271 (11th Cir. 2015) .............................................................. 23

*Blink Design, Inc. v. United States*,
 986 F. Supp. 2d 1348 (Ct. Int'l Trade 2014) ........................................ 16

*Bowen v. Georgetown Univ. Hosp.*,
 488 U.S. 204 (1988)............................................................................... 24

*Cnty. of L.A. v. Shalala*,
 192 F.3d 1005 (D.C. Cir. 1999) ............................................................. 20

*Com. v. Hanright*,
 989 N.E.2d 883 (Mass. 2013)................................................................ 16

*Corbett v. Transp. Sec. Admin.*,
 19 F.4th 478 (D.C. Cir. 2021) ............................................................... 20

*Dames & Moore v. Regan*,
 453 U.S. 654 (1981) .............................................................................. 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020).....................................................................20, 22

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) ................................................................. 10, 11, 24

*Florida v. Becerra*,
 544 F. Supp. 3d 1241 (M.D. Fla. 2021) ......................................... Passim

*Florida v. Dep't of Health & Hum. Servs.*,
 19 F.4th 1271 (11th Cir. 2021).............................................................. 18

*Health Freedom Def. Fund, Inc. v. Biden*,
 8:21-CV-1693-KKM-AEP, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022)........ Passim

ii

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ................................................................. 24

*Loughrin v. United States*,
  573 U.S. 351 (2014) ...................................................................... 8

*Medellin v. Texas*,
  552 U.S. 491 (2008) ...................................................................... 13

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................. 20, 21

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ...................................................................... 25

*Muwekma Ohlone Tribe v. Salazar*,
  708 F.3d 209 (D.C. Cir. 2013) ..................................................... 20

*N. Arapahoe Tribe v. Hodel*,
  808 F.2d 741 (10th Cir. 1987) ..................................................... 18

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  142 S. Ct. 661 (2022) .................................................................... 2

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998) ................................................... 24

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ..................................................... 21

*Nazareth Hosp. v. Sec'y U.S. Dept. of Health & Human Services*,
  747 F.3d 172 (3d Cir. 2014) ......................................................... 20

*Simmons v. Block*,
  782 F.2d 1545 (11th Cir. 1986) ................................................... 22

*State v. Denis L.R.*,
  699 N.W.2d 154 (Wis. 2005) ....................................................... 16

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*,
  992 F.3d 518 (6th Cir. 2021) ......................................................... 9

*Tiger Lily, LLC v. U.S Dep't of Hous. & Urban Dev.*,
  5 F.4th 666 (6th Cir. 2021) ........................................................... 9

*West Virginia v. EPA*,
  136 S. Ct. 1000 (2016) ............................................................ 24, 25

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ............................................... 10, 11, 12, 24

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) ................................................... 20

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...................................................................... 11

*Yates v. United States*,
  574 U.S. 528 (2015) ...................................................................... 9

## Statutes

5 U.S.C. § 553 ......................................................................................................... 17
5 U.S.C. § 705 ......................................................................................................... 23
5 U.S.C. § 706 ..................................................................................................... 5, 23
42 U.S.C. § 243 ....................................................................................................... 15
42 U.S.C. § 252 ....................................................................................................... 17
42 U.S.C. § 264 ................................................................................................. Passim
42 U.S.C. § 267 ....................................................................................................... 15
42 U.S.C. § 269 ...................................................................................... 4, 9, 10, 15
42 U.S.C. § 280g-4a(b) ......................................................................................... 17
42 U.S.C. § 280g(a)(2) ........................................................................................... 17
42 U.S.C. § 299b-5(d)(B) ..................................................................................... 17
42 U.S.C. § 300gg-19a(b)(2)(B)(i) ..................................................................... 17
42 U.S.C. § 300mm(b)(1) ..................................................................................... 17

## Regulations

42 C.F.R. § 70.1 ..................................................................................................... 17
42 C.F.R. § 70.2 .................................................................................................. 3, 22
65 Fed. Reg. 49906 ............................................................................................... 13
68 Fed. Reg. 62353 ............................................................................................... 14
74 Fed. Reg. 33030-01 .................................................................................... 13, 14
86 Fed. Reg. 8025 ...................................................................... 16, 18, 19, 21, 22

## Other Authorities

Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*,
    111 Colum. L. Rev. 939 (2011) ...................................................................... 25
Mila Sohoni, *The Lost History of the "Universal" Injunction*,
    133 Harv. L. Rev. (2020) ................................................................................. 25
Mila Sohoni, *The Power to Vacate A Rule*,
    88 Geo. Wash. L. Rev. 1121 (2020) ............................................................. 25

## STATEMENT OF THE ISSUES

1.   Whether the Centers for Disease Control and Prevention has statutory authority to require that virtually all persons wear masks while traveling interstate.

2.   Whether CDC lawfully issued the mask mandate without going through notice and comment rulemaking.

3.   Whether CDC's mask mandate is arbitrary and capricious.

4.   Whether the district court properly vacated the mask mandate rule nationwide.

## INTRODUCTION AND INTEREST OF AMICI

"No one doubts that the COVID–19 pandemic has posed challenges for every American." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 667 (2022) (Gorsuch, J. concurring). But the question in this case is not how best to confront those challenges. Rather, it is who decides—is it "an administrative agency in Washington," or "state and local governments across the country and the people's elected representatives in Congress"? *Id.*

If that sounds familiar, it should. Throughout the pandemic, this administration has turned to novel, expansive, and dubious readings of its authorities. CDC has been among the worst offenders, making "unprecedented assertion[s] of power." *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1270 (M.D. Fla. 2021). It has not fared well. The Supreme Court summarily rejected CDC's position that 42 U.S.C. § 264 authorized a nationwide eviction moratorium. *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2488 (2021). CDC's order grounding cruise ships also was soundly rejected. *See Becerra*, 544 F. Supp. 3d at 1276. It is now déjà vu all over again, as CDC advances still another novel interpretation of section 264 in support of an unprecedented masking mandate regulating every breath of millions of Americans. The Court should reject CDC's latest overreach and affirm.

Amici are the State of Florida and 22 other States. They share an interest in protecting their sovereign authority to enact quarantine measures of their choosing to combat the spread of disease in the manner best adapted to their distinctive local

conditions—authority historically reserved to the States, *see Becerra*, 544 F. Supp. 3d at 1259, as CDC's own regulations reflect even today, *see* 42 C.F.R. § 70.2. Amici are also directly regulated by the mask mandate in, for example, their state-owned airports.

## SUMMARY OF ARGUMENT

**I.** CDC grounds its authority to issue a mask mandate in its power to require "sanitation" measures. 42 U.S.C. § 264(a). That authority cannot support the mask mandate.

**A.** The statute permits CDC to "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures" that "may be necessary." *Id.* In context, "sanitation" authorizes CDC to demand cleaning, but it does not authorize CDC to require any action that may result in cleanliness, much less on a nationwide basis. A mask does not clean anything. Rather, it traps respiratory droplets in place, without regard to whether infection is present.

Many features of the statute support that view. If "sanitation" is read as CDC suggests—to mean anything that may promote cleanliness—then much of the statute is superfluous. For example, the same subsection of the statute also permits CDC to require "disinfection" or "fumigation" measures. But on CDC's reading, those measures are already justified by the term "sanitation."

Moreover, the statute joins "sanitation" in a list with "inspection, fumigation, disinfection, . . . pest extermination, [and] destruction" of infected animals and articles. *Id.* Those terms are all focused on identifying a disease-causing condition, isolating it, and then destroying it, while a mask mandate merely impedes the breathing of individuals without regard to whether they are diseased. Where Congress wished to permit CDC to impose broader measures to promote cleanliness, it didn't say "sanitation," it said "secur[e] the best sanitary condition." 42 U.S.C. § 269(c). That difference suggests a narrower meaning of the freestanding term "sanitation."

The major-questions doctrine also counsels against CDC's position. On CDC's view, Congress gave the agency vast power to impact the economy in the fourth term of a seven-word list buried in the second sentence of a statute. The court should presume that Congress did not give CDC sweeping authority in such a backhanded fashion.

Finally, the history of the statute suggests that "sanitation" be read in the context of quarantine measures. Historically, the power to "provide for . . . sanitation" meant that a diseased vessel could be cleaned, not that CDC's predecessors could order economy-wide preventative cleanliness rules.

**B.** Regardless, under the statute CDC cannot demand that domestic travelers be examined without evidence that they are carrying disease. *See* 42 U.S.C. § 264(c), (d)(1). But that is exactly what the mask mandate requires. It demands that every traveler be visually inspected—that is, examined—without any individualized suspicion.

4

**II.** The mask mandate is invalid as well because it failed to go through notice and comment procedures. CDC defends its rule by invoking the good cause exception. But CDC offered no specifics about why *this* rule needed to be issued without notice and comment, and this Court has been careful to avoid blessing a freestanding pandemic exception to notice and comment procedures.

**III.** The mask mandate is also arbitrary and capricious. For one, the mandate has numerous exceptions that CDC did not explain or justify. Beyond that, the mandate violates CDC's own regulations. CDC regulations say that it cannot act unless it finds local measures inadequate. But here, CDC never even studied local measures, much less developed a method to determine whether those measures are adequate.

**IV.** Last, the district court correctly vacated the rule nationwide. The APA permits a court to "set aside" an unlawful rule. 5 U.S.C. § 706(2). That language allows a court to invalidate a rule entirely without respect to the parties before it. Congress chose those words deliberately. The APA was drafted to mirror appellate review. Much like a reversing court renders a lower court order without effect entirely, a reviewing court in the APA context acts on the rule itself when it vacates.

## ARGUMENT

## I.   CDC lacks statutory authority to issue a nationwide mask mandate.

*A.*   *The mask mandate is not a "sanitation" measure.*

**1.** CDC (at 13) grounds its authority to promulgate the mask mandate in 42 U.S.C. § 264(a). That provision says:

> The [CDC] is authorized to make and enforce such
> regulations as in [its] judgment are necessary to prevent the
> introduction, transmission, or spread of communicable
> diseases from foreign countries into the States or
> possessions, or from one State or possession into any other
> State or possession. For purposes of carrying out and
> enforcing such regulations, the [CDC] may provide for such
> inspection, fumigation, disinfection, sanitation, pest
> extermination, destruction of animals or articles found to be
> so infected or contaminated as to be sources of dangerous
> infection to human beings, and other measures, as in [the
> CDC's] judgment may be necessary.

42 U.S.C. § 264(a). The first sentence of that provision "gives the CDC broad authority

to take whatever measures it deems necessary to control the spread of" disease. *Ala.

Ass'n of Realtors*, 141 S. Ct. at 2488. "But the second sentence informs the grant of

authority by illustrating the kinds of measures that could be necessary." *Id.* And for that

reason, all agree that this case turns on the meaning of the second sentence—and in

particular the meaning of the term "sanitation" (and "other measures" like sanitation).

The district court correctly recognized that "sanitation" could have one of two

meanings. "First, sanitation may refer to measures that clean something or that remove

filth, such as trash collection, washing with soap, incineration, or plumbing." *Health

Freedom Def. Fund, Inc. v. Biden*, 8:21-CV-1693-KKM-AEP, 2022 WL 1134138, at *5

(M.D. Fla. Apr. 18, 2022). "Second, sanitation may refer to measures that keep

something clean." *Id.* CDC (at 14) points to Merriam-Webster to claim that "sanitation"

must mean "the promotion of hygiene and prevention of disease by maintenance of

sanitary conditions." But that is the secondary definition. The primary definition from

CDC's own cited dictionary is the "act or process of making sanitary," Sanitation, *Merriam-Webster*, https://perma.cc/9ARR-YKYH, which fits the narrower meaning of the term. Other dictionaries are in accord. Sanitation, *Webster's Third New International Dictionary* 2012 (1976) ("'[T]he act or process of making sanitary[.]'"); Sanitation, *Webster's New International Dictionary* 2214 (2d ed. 1957) ("A rendering sanitary[.]").

**2.** When Congress uses a word that can take two meanings, context reflects which meaning was meant. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 418 (2012). Here, five contextual points show that "sanitation" (and "other measures" like sanitation) possesses the narrower meaning.

*First*, that reading is the only way to avoid substantial superfluidity. "Sanitation" is the fourth term in a seven-term list. The others are "inspection, fumigation, disinfection . . . pest extermination, destruction of animals or articles" and "other measures." 42 U.S.C. § 264(a). If, as CDC insists (at 14–16), "sanitation" means "prevention of disease by maintenance of sanitary conditions," such that it expansively permits any measure that "prevent[s] the spread of communicable disease," then much of the list "sanitation" appears in would be superfluous. Consider, for example, "fumigation" and "disinfection": on CDC's view of the statute, those terms are always a subset of "sanitation"; they are just another means to sanitize, that is to "maint[ain] [a] sanitary condition."

CDC (at 18) waves away that incoherency as "unremarkable" because Congress often uses "overlapping" terms. But the difficulty is not mere "overlap"—"sanitation"

would entirely subsume "fumigation" and "disinfection," which rules out CDC's theory. *See Loughrin v. United States*, 573 U.S. 351, 358 & n.4 (2014) (distinguishing between statutory overlap and superfluidity).

The district court's interpretation, by contrast, better harmonizes the disparate terms in section 264(a). True enough, as CDC notes (at 19), sometimes a "direct cleaning" meaning of "sanitation" would overlap with disinfection. When an infected or dirtied article is disinfected, it is no doubt also sanitized. But the district court's reading, unlike CDC's, avoids "sanitation" entirely subsuming "disinfection." CDC, for instance, could require a plane to be disinfected regardless of whether there is any indication that the plane is diseased or dirtied.[1] But if there is nothing to clean up (because the plane is not dirty or infected) then that process would not involve direct cleaning—"sanitation"—in the narrower sense of the term as the district court correctly construed it in section 264(a).[2]

---

[1] One definition of "disinfect" is "to treat (something) with a disinfectant." Disinfect, *Merriam-Webster Dictionary Online* (last visited August 5, 2022), https://www.merriam-webster.com/dictionary/disinfect.

[2] The same is true for "fumigation," which means applying "smoke, vapor, or gas" "especially for the purpose of disinfecting or of destroying pests." Fumigate, *Merriam-Webster Dictionary Online* (last visited August 5, 2022), https://www.merriam-webster.com/dictionary/fumigation. Because "fumigation" means the application of smoke, vapor, or gas, it is possible to fumigate an area even if the area is not dirty or infected. A person can fumigate, therefore, without sanitizing.

*Second*, the noscitur a sociis canon—which teaches that the meaning of words in a list are informed by each other—reinforces the district court's reading of "sanitation." *See Yates v. United States*, 574 U.S. 528, 543 (2015) (explaining the canon). Again, the statute links "sanitation" with "inspection, fumigation, disinfection, . . . pest extermination, [and] destruction." Those terms are aimed at "identifying, isolating, and destroying the disease itself." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. And they do that in a specific way, by finding the disease (or its carrier) and destroying it. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*, 992 F.3d 518, 523 (6th Cir. 2021) (reading section 264(a) to permit the government "to sanitize and dispose of infected matter"); *Tiger Lily, LLC v. U.S Dep't of Hous. & Urban Dev.*, 5 F.4th 666, 669–71 (6th Cir. 2021) ("adher[ing] to our prior reasoning" in the earlier *Tiger Lily* opinion). Contrary to CDC's argument (at 15) masking does not work in that same way. It does not isolate and destroy a disease or its vector. It just "traps" some respiratory droplets that may, or may well not, contain "infectious particles." And it certainly does not "clean" anything—on the contrary, the one thing it does with certainty is make the mask quite dirty.

*Third*, the broader statutory context also supports the district court's reading. When Congress in the Public Health Service Act authorized broader measures to promote cleanliness, it did so using different words. In particular, for certain vessels (mostly those entering the United States from abroad), the statute authorizes CDC to develop regulations to "secur[e] the best sanitary condition of such vessels, their cargoes, passengers, and crews." 42 U.S.C. § 269(c). That language permits not only

sanitation (direct cleaning), but also broader measures to preserve cleanliness. The distinct, narrower term "sanitation" should be read to have a narrower meaning. *See Badgerow v. Walters*, 142 S. Ct. 1310, 1318 (2022) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate." (internal quotation marks omitted)).

That inference is bolstered by the content of section 269. Section 269 governs (for the most part) vessels entering the United States from foreign ports. In subsection (a), it requires the vessel to secure a bill of health setting forth "the sanitary history and condition" of the vessel. 42 U.S.C. § 269(a). To ensure that those vessels remain clean, subsection (c) then permits regulations to "secur[e] sanitary conditions" "during the course of the voyage, and also during inspection, disinfection, or other quarantine procedure." 42 U.S.C. § 269(c). Those "other quarantine procedures" are, in turn, the measures permitted in section 264(a). That structure suggests that section 264(a)—and the term "sanitation" in it—authorizes cleaning a quarantined vessel, while section 269 permits broader measures to keep a vessel clean.

*Fourth*, the major-questions doctrine supports a narrow reading. Under the doctrine, courts should "hesitate" before concluding that Congress delegated substantial authority over matters of "economic and political significance" to an agency. *West Virginia v. EPA*, 142 S. Ct. 2587, 2599 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). That hesitation is warranted because Congress typically would not provide an "[e]xtraordinary grant[] of regulatory authority" through

"'modest words,' 'vague terms,' or 'subtle devices.'" *Id.* (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

The doctrine is fully applicable here. CDC asserts incredibly broad power—on its view (at 14–15), it can take any measures necessary "'to prevent' the spread of communicable disease" by "devising and applying . . . measures for preserving and promoting public health." That claimed power is basically the same "breathtaking" claim "of authority" that the Supreme Court found implicated the major-questions doctrine in *Alabama Ass'n of Realtors. See* 141 S. Ct. at 2489. And just like in *Alabama Ass'n of Realtors*, CDC bases its "claim of expansive authority" on a "wafer-thin reed." *Id.* Here, CDC claims that Congress buried that vast vein of authority in the term "sanitation," the fourth item on a seven-word list. Congress does not, however, "delegate" broad power "in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160.

For its part, CDC (at 19) objects that the major-questions doctrine does not apply because, on its view, the mask mandate is not itself a novel regulation with widespread economic impact. It tells us (*id.*) that "masks are a longstanding means to prevent the spread of communicable disease." But it is unprecedented for CDC to require, on pain of heavy penalties, every American man, woman, and child (aged 2 and older) to wear a mask during virtually all interstate travel. As the district court pointedly observed, the closest recent regulatory analogue (apart from the swiftly invalidated nationwide eviction moratorium and cruise-ship bans of course) "was a decision to ban small turtles due to a risk of salmonella." *Health Freedom Def. Fund*, 2022 WL 1134138, at *11 (citing

a 1975 CDC regulation). In any event, the major-questions doctrine is concerned with "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. That is precisely what CDC is "asserting" here. *See* CDC Br. at 14–16.

*Fifth*, statutory history supports the district court's analysis. Section 264 was enacted in 1944 to codify "the gist of a long and complex provision of the act of February 15, 1893" that governed CDC's predecessor agencies. *See* Wen Shen, Congressional Research Service, *Scope of CDC Authority Under Section 361 of the Public Health Service Act (PHSA)* at 9 (Apr. 13, 2021). The 1893 Act, in turn, gave the Supervising Surgeon-General of the Marine Hospital the power to issue "quarantine regulations" and to "perform all the duties in respect to quarantine and quarantine regulations." *See* Ch. 114, 450–51 (1893).[3] Traditionally, those quarantine regulations were "limited to a discrete action, such as inspection and sanitation at a port of entry, as well as detention for the duration of a disease's incubation period." *Becerra*, 544 F. Supp. 3d at 1264. A narrow definition of "sanitation" fits that traditional pattern—a ship could be cleaned, say, by "fumigation of cargo" or "steaming" as a condition to clear a quarantine station. *Id.* at 1261–62. A broader definition, which would embrace any measure that secures a sanitary condition—would permit measures that CDC has "never" before implemented on such a broad economy-wide scale. *Id.* at 1264.

---

[3] https://uscode.house.gov/statviewer.htm?volume=27&page=450#.

**3.** CDC's counterarguments fall flat.

CDC (at 15) is wrong that the district court's conclusion means that section 264 does not authorize measures "to prevent" the spread of disease. Of course it can. It may, for instance, require inspection, fumigation, and disinfection, as well as other similar measures. *See* 42 U.S.C § 264(a). And CDC may require "sanitation"—if it involves active cleaning. But saying that CDC has the power to prevent the spread of disease does not mean that CDC has the power to adopt any "preventative" regulation. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489–90.

For the first time on appeal, CDC cites a bevy of regulations (at 16–17) that, it claims, are analogous to the mask mandate. But that argument can only get CDC so far because "past practice does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)).

That practice is of dubious relevance to the issue here anyway. To begin with, CDC does not claim that those previous regulations were "sanitation" measures like the mask mandate. Nor could it; the regulations it points to appear to have been based on the first sentence of section 264—which speaks of CDC regulations "necessary to prevent" the "spread of communicable diseases"—and were not "sanitation" measures. *E.g.*, 74 Fed. Reg. 33030-01 (justifying salmonella in eggs rule by reference to the first sentence); 65 Fed. Reg. 49906-01 (relying on the first sentence). But the Supreme Court has now rejected CDC's broad reading of the first sentence. *Ala. Ass'n of Realtors*, 141 S.

13

Ct. at 2489. Those old rules offer no persuasive evidence about the meaning of "sanitation" in section 264(a).

In any case, the regulations that CDC's appellate lawyers have unearthed are best understood as being authorized by inapposite parts of section 264 or other statutes. Several of the regulations, for instance, plausibly appear to be justified by CDC's authority to destroy "animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings." 42 U.S.C. § 264(a). CDC has long understood that authority, when combined with the "other measures" clause, to permit regulations of infected animals and articles short of destruction. For example, in justifying its rule preventing the capture, distribution, and release of certain animals to prevent monkeypox, CDC explained that section 264 "also provides for such inspection and destruction of articles found to be so infected or contaminated as to be sources of dangerous infection to humans, and other measures, as may be deemed by the Secretary to be necessary." 68 Fed. Reg. 62353. And if CDC is right about that authority, then it can regulate the dangerous animals and articles that it lists in its survey of historical regulations (like infected turtles (at 16–17), unpasteurized milk (at 16), and improperly stored food (at 16)) without relying on its sanitation power. Section 264 also authorizes CDC to require inspection, which allows CDC's regulation (at 16) to adopt measures to "detect the presence of communicable diseases."

The remaining regulations CDC cites are justified by other statutes entirely. Take CDC's authority to prevent salmonella in eggs, which is justified by the Food, Drug,

and Cosmetic Act. 74 Fed. Reg. 33030-01 (explaining that the FDCA permits regulation of foods held in "insanitary conditions"). Likewise, CDC's authority to establish vaccination clinics comes from its power to cooperate with the states (42 U.S.C. § 243) and to create quarantine stations (42 U.S.C. § 267).

> B.    *CDC cannot require an "examination," as the mask mandate demands, without making a particularized risk finding.*

Independently, the district court noted that structurally, the statute is divided into two parts: subsection (a) focuses on property and the remaining subsections focus on people. *Health Freedom Def. Fund*, 2022 WL 1134138, at *8–9. Even assuming, however, section 264(a) granted CDC some authority to regulate people, this rule still exceeds CDC's statutory authority because it conflicts with sections 264(c) and (d).

As the district court correctly recognized, section 264(c) and (d) sensibly establish that CDC has more limited authority to restrict the liberty of persons than it does to regulate infected property or articles. Section 264(c) does so through a broad prohibition: "[e]xcept as provided in subsection (d)," CDC cannot require "apprehension, detention, examination, or conditional release of individuals," except for "individuals coming into a State or possession from a foreign country." 42 U.S.C. § 264(c). Subsection (d), in turn, is a narrow exception allowing "apprehension and examination" of domestic travelers, provided CDC "reasonably believe[s]" the person "to be infected with a communicable disease in a qualifying stage." 42 U.S.C. § 264(d)(1).

15

Those provisions are applicable to the mask mandate. Here, CDC has required an "examination" of nearly every traveler—it says they must be "monitor[ed]," 86 Fed. Reg. 8026—without any evidence that anyone is infected. Such a measure may only be imposed on all travelers if CDC "reasonably believe[s]" such a person to be infected, 42 U.S.C. § 264(d)(1)—which the mandate unquestionably does not require.

CDC proclaims (at 19), without explanation, that the mask mandate does not authorize "examination." But the ordinary meaning of the term "examination," its context, and the regulatory scheme show otherwise.

An "examination" is the "[a]ct of examining," *Webster's New International Dictionary* 886 (2d ed. 1957), which is "inspect[ing] visually" or "look[ing] over," *Blink Design, Inc. v. United States*, 986 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2014) (citing dictionary definitions of "examine"); *State v. Denis L.R.*, 699 N.W.2d 154, 163 (Wis. 2005); *Com. v. Hanright*, 989 N.E.2d 883, 892 n.2 (Mass. 2013) (Lenk, J., dissenting) (same). That is what the mask mandate requires. It authorizes TSA agents and "other federal authorities" to enforce the requirement that all passengers wear masks. And it does that by empowering those officers to visually inspect passengers to ensure that they are properly wearing a mask throughout their journeys.

The statutory context and regulatory scheme bolster the view that a visual inspection is an "examination" as the word is used in section 264(d)(1). "Examination" is used throughout chapter 6A of title 42 (where section 264 is found). But when it is used to denote a more searching test, it generally takes an adjective. For example, the

16

statute talks about "medical forensic examinations," 42 U.S.C. § 280g-4a(b), "medical evidentiary examinations," 42 U.S.C. § 299b-5(d)(B), "physical and mental examinations," 42 U.S.C. § 252, "medical screening examination[s]," 42 U.S.C. § 300gg-19a(b)(2)(B)(i), "clinical examinations," 42 U.S.C. § 300mm(b)(1), and "physical examinations," 42 U.S.C. § 280g(a)(2). The regulations also use an adjective to denote more probing examinations. They define "medical examination," as "the assessment of an individual by an authorized and licensed health worker to determine the individual's health status and potential public health risk to others." 42 C.F.R. § 70.1. The fact that in both the statute and the regulations a more exacting examination demands a modifying adjective suggests that the unadorned term "examination" in section 264(c) takes its ordinary meaning.

Altogether, the statute is best understood to require individualized suspicion that someone is diseased before CDC may use section 264(a) to require visual inspections that someone is wearing a mask. Because the mask mandate dispenses with that requirement, it exceeds CDC's statutory authority.

## II.   CDC failed to establish good cause to avoid notice and comment.

**1.** Under the Administrative Procedure Act, the default requirement for rulemaking is notice and comment. *See* 5 U.S.C. § 553. There is a narrow exception to that default when an agency establishes "good cause" that "notice and public procedure" is "impracticable, unnecessary, or contrary to the public interest." *Id.* The "onus is on the [agency] to establish" good cause. *Action on Smoking & Health v. Civ.*

*Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983); *see also Biden v. Missouri*, 142 S.

Ct. 647, 660 (2022) (Alito, J., dissenting) (citing authorities); *N. Arapahoe Tribe v. Hodel*,

808 F.2d 741, 751 (10th Cir. 1987). And in carrying that burden, the agency needs to

point to "something specific." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (per curiam).

That is why this Court has been clear that the general existence of the pandemic does

not "*always*" justify an agency bypassing notice and comment. *Florida v. Dep't of Health

& Hum. Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021). Instead, the agency must "identif[y]

specific reasons why . . . [there was] good cause for dispensing with the usual notice-

and-comment requirements" in the particular "environment" the agency intended to

regulate. *Id.* Thus, for example, in *Missouri*, the Supreme Court approved the

Department of Health and Human Services' good cause finding not just because of the

pandemic, but because of the rapidly approaching winter flu season. 142 S. Ct. at 654.

CDC pointed to nothing comparably specific here. Its entire explanation for

foregoing notice and comment was:

> [N]otice and comment and a delay in effective date are not
> required because there is good cause to dispense with prior
> public notice and comment and the opportunity to comment
> on this Order and the delay in effective date. Considering the
> public health emergency caused by COVID-19, it would be
> impracticable and contrary to the public's health, and by
> extension the public's interest, to delay the issuance and
> effective date of this Order.

86 Fed. Reg. 8025. That naked invocation of the pandemic is exactly the type of generic

reasoning that this Court said would not be enough. *Florida*, 19 F.4th at 1290. After all,

"[i]f the existence of a communicable disease alone permitted CDC to find 'good cause,' [then the] CDC would seldom, if ever, need to comply with the statutory requirement for 'good cause' to dispense with notice and comment." *Becerra*, 544 F. Supp. 3d at 1296–97.

**2.** CDC responds (at 24–25) by pointing to general findings about the impacts of COVID-19 in the mask mandate rule. But as the district court explained, CDC never connected those findings to a showing of harm caused by a short delay in issuing the rule. *Health Freedom Def. Fund*, 2022 WL 1134138, at \*16. And without some connecting explanation, CDC has nothing more than a "[b]ald assertion[]," which is not enough. *Action on Smoking*, 713 F.2d at 800.

CDC's perfunctory explanation is especially insufficient here because there are good reasons to think that a short delay would not be harmful. Indeed, CDC's own delay undercuts any claim that alacrity was necessary. "CDC issued the mandate in February 2021, almost two weeks after the President called for a mandate, eleven months after the President had declared COVID-19 a national emergency, and almost thirteen months since the Secretary of Health and Human Services had declared a public health emergency." *Health Freedom Def. Fund*, 2022 WL 1134138, at \*15. That delay is inconsistent with CDC's current claim that taking 30 days to receive comments was against the public interest. And even apart from CDC's own inaction, most States were already requiring masking. By CDC's count, 37 States had imposed a masking requirement of their own. 86 Fed. Reg. 8029 n.29. Even in the States without masking

rules, private conveyers were taking their own precautions. There was thus little reason to think that the public would have been left without protection during notice and comment. Finally, even where state measures left a gap, other federal authorities were also regulating while CDC was considering the mandate, and their regulatory efforts could have protected the public while CDC took 30 days to consider comments. *E.g.*, *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 480 (D.C. Cir. 2021) (TSA imposed a mask mandate on planes).

## III.   The mask mandate is arbitrary and capricious.

The district court was also correct to find that the mask mandate is arbitrary and capricious.

**1.** The APA "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). That basic requirement demands that agencies explain not only their baseline policy choice, but also any exceptions offered to that policy. Thus, "[a]gency action is arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'" *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (quoting *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)); *see also Nazareth Hosp. v. Sec'y U.S. Dept. of Health & Human Services*, 747 F.3d 172, 179–80 (3d Cir. 2014). To have an exception in one case, an agency "must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

Here, however, CDC provided for numerous exceptions to the mask mandate with no explanation whatsoever. 86 Fed. Reg. 8027–28. CDC never explained, for example, why the mask mandate applies to children as young as two. Several organizations, including the World Health Organization, do not recommend masks for children under five.[4] And if CDC was departing from the global norm, it never explained why a two-year old was covered but a younger child was not. Nor did CDC explain why eating and drinking were excepted, but other activities were not.

CDC (at 23) answers that it need not have explained the exceptions because "there is no plausible contention that the exceptions to the mask requirement render it useless in curbing the spread of COVID-19." But although CDC is entitled to deference when it draws lines, it must still "explain" why it is drawing the lines in a particular place in light of the "underlying regulatory concerns." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013). CDC did not do that here.

CDC next says (at 24–25) that its exceptions were justified because they mirror State masking rules and are otherwise reasonable. But the Court may only consider "the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758; *see*

---

[4] *See* World Health Organization, Mask use in the context of COVID-19, Interim Guidance, Dec. 1, 2020, https://apps.who.int/iris/bitstream/handle/10665/337199/WHO-2019-nCov-IPC_Masks-2020.5-eng.pdf?sequence=1&isAllowed=y.

*also Regents of the Univ. of Cal.*, 140 S. Ct. at 1909–10. And CDC did not advance that reasoning when it promulgated the mask mandate.

**2.** Independently, the mask mandate is arbitrary and capricious because it is inconsistent with CDC's own regulatory requirements. A court must "overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986). CDC's regulations demand that before it imposes new quarantine rules, it must find "that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases." 42 C.F.R. § 70.2.

CDC did not do that here. Instead, CDC issued the generic finding that "[a]ny state or territory without sufficient mask-wearing requirements for transportation systems within its jurisdiction has not taken adequate measures to prevent the spread of COVID-19 from such state or territory to any other state or territory." 86 Fed. Reg. 8029. That will not do. CDC's one-sentence explanation does not actually examine any State or local policies, define what measures would be used to assess adequacy, or explain what metrics would show inadequacy. Without doing that, CDC ran afoul of its own regulations. *See Becerra*, 544 F. Supp. 3d at 1293 ("Because CDC neither evaluates nor even mentions measures undertaken or planned by the local health authorities of any state but, nevertheless, finds the measures inherently and inescapably insufficient, the conditional sailing order lacks a reasoned explanation of the insufficiency of those

measures."). For if CDC could satisfy the requirement to find local rules inadequate with a generic claim that any policy other than CDC's chosen one is inadequate, then the requirement to assess adequacy would be meaningless.

## IV.   The district court properly vacated the mask mandate nationwide.

The district court was also correct to vacate the mask mandate nationwide. As the district court explained, this Court's precedents establish that "'vacatur . . . is the ordinary APA remedy.'" *Health Freedom Def. Fund*, 2022 WL 1134138, at *20 (quoting *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015)). While this Court has held that a reviewing court has the equitable discretion to leave a rule that violates the APA in place, through remanding the action without vacating it, the district court was right that the equities favor vacatur as the appropriate remedy here given how blatantly unlawful the mask mandate is. *Id.* at *21.

CDC makes no attempt to show that the district court abused its discretion in ordering vacatur, rather than remand, of the rule. It instead contends (at 31) that the rule should only be "vacated" as to the "five individuals identified below." But the APA empowers a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). That language is naturally read to operate on the rule itself, without regard to the parties before the court. The APA's preliminary remedies confirm that reading in permitting a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A reviewing court that finds a

23

rule likely unlawful under the APA thus may, in advance of final adjudication, "grant[]
a stay, preventing the rule from taking effect." *West Virginia v. EPA*, 142 S. Ct. 2587,
2604 (2022) (citing *West Virginia v. EPA*, 136 S. Ct. 1000, 1000 (2016) (mem.) (entering
nationwide stay of the regulation establishing the Clean Power Plan)); *see also Little Sisters
of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.28 (2020)
(Ginsburg, J., dissenting) ("The Administrative Procedure Act contemplates nationwide
relief from invalid agency action."). Those APA remedies—both preliminary and
final—are plainly not limited to the named plaintiffs.

That conclusion is confirmed by the nature of the APA's procedural constraints.
If an agency fails to follow procedures required by the APA—if, for instance, it acts
arbitrarily and capriciously—then a reviewing court gives the agency two options:
reconsider the agency action it already took or take a new agency action altogether. *See
Biden v. Texas*, 142 S. Ct. 2548, 2544–46 (2022). It would be bizarre to hold an agency
to that binary choice if a rule could be vacated as to some but not others.

CDC proposes (at 31–32) that the Court give conclusive force to what CDC
takes to be "a background rule" of historic "equity practice" that counsels against
"nationwide injunctions." That atextual proposal conflicts with decades of practice
during which the propriety of vacating administrative action under the APA nationwide
went unquestioned. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 131
(2000); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988); *Ala. Envt'l Council v.
Adm'r U.S. EPA*, 711 F.3d 1277, 1292 (11th Cir. 2013); *Nat'l Min. Ass'n v. U.S. Army

*Corps of Engineers*, 145 F.3d 1399, 1409–10 (D.C. Cir. 1998); *see also* Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121, 1174 & n.270 (2020) (citing many other cases).

CDC's argument is also not well founded on its own terms. CDC's account of the history of nationwide injunctions is questionable, to say the least. *See generally* Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 Harv. L. Rev. 921 (2020). More important, this case involves not a "nationwide injunction," but rather the distinct remedy of vacatur under the APA, which, though CDC lumps them together, are not the same thing. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). As to APA vacatur, the relevant history is "the appellate review model that supplied the rubric for judicial review of administrative action in the pre-APA period and that was then incorporated into the APA." Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. at 1133 (citing Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 940–43 (2011)). Under the appellate review model, the APA treats a reviewing court like an appellate court. The history thus only confirms what the APA's text makes clear: just as an appellate court can invalidate an erroneous lower court decision, so too a reviewing court may invalidate the agency action it is scrutinizing under the APA—all of it, not just as it may apply to specific parties. *Id.* at 1133–34.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

ASHLEY MOODY
*Attorney General*

*/s/ Evan Ezray*
HENRY C. WHITAKER
*Solicitor General*
JEFFREY PAUL DESOUSA
*Chief Deputy Solicitor General*
EVAN EZRAY
*Deputy Solicitor General*
JAMES H. PERCIVAL
*Deputy Attorney General of Legal Policy*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3684
*evan.ezray@myfloridalegal.com*

| | |
|---|---|
| STEVE MARSHALL<br>Attorney General of Alabama | LYNN FITCH<br>Attorney General of Mississippi |
| TREG TAYLOR<br>Attorney General of Alaska | ERIC SCHMITT<br>Attorney General of Missouri |
| MARK BRNOVICH<br>Attorney General of Arizona | AUSTIN KNUDSEN<br>Attorney General of Montana |
| LESLIE RUTLEDGE<br>Attorney General of Arkansas | DOUG PETERSON<br>Attorney General of Nebraska |
| CHRISTOPHER CARR<br>Attorney General of Georgia | DAVE YOST<br>Attorney General of Ohio |
| LAWRENCE G. WASDEN<br>Attorney General of Idaho | JOHN M. O'CONNOR<br>Attorney General of Oklahoma |
| THEODORE E. ROKITA<br>Attorney General of Indiana | ALAN WILSON<br>Attorney General of South Carolina |
| JEFFREY S. THOMPSON<br>Solicitor General of Iowa | KEN PAXTON<br>Attorney General of Texas |
| DEREK SCHMIDT<br>Attorney General of Kansas | SEAN REYES<br>Attorney General of Utah |
| DANIEL CAMERON<br>Attorney General of Kentucky | JASON MIYARES<br>Attorney General of Virginia |
| JEFF LANDRY<br>Attorney General of Louisiana | PATRICK MORRISEY<br>Attorney General of West Virginia |

August 8, 2022

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P.
32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App.
P. 32(f), this document contains 6,397 words.

2.      This document complies with the typeface and type-style requirements of
Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been
prepared in a proportionally spaced typeface using Microsoft Word in 14-point
Garamond font.

*/s/ Evan Ezray*
Evan Ezray

## CERTIFICATE OF SERVICE

I certify that on August 8, 2022, I electronically filed the foregoing Brief with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.


*/s/ Evan Ezray*
Evan Ezray