# Table of Exhibits

| No. | Name of Exhibit | Page #'s |
|---|---|---|
| 1 | The CDC's Mask Order has not be rescinded. (11 pages) | 3-13 |
| 2 | The HHS' renewal of determination that a public health emergency exists. (1 page) | 15 |
| 3 | PODUS: "The Public Health Emergency ends on May 11, 2023." (2 pages) | 17-18 |
| 4 | The ITTR re-imposed or remains in effect for China, Macau, etc. (5 pages) | 20-24 |
| 5 | The TSA's Supplemental Brief, filed September 12, 2022. (25 pages) | 26-50 |
| 6 | SIX TSA Petitions for Review DENIED on February 09, 2023. (4 pages) | 52-55 |
| 7 | Respondent TSA's opposition to Petitioner's Motion to Compel restoration of Pre-Check membership. (17 pages) | 57-73 |
| 8 | The Federal Register's 87 FR 36129, rescinding the ITTR on June 12, 2022. (7 pages) | 75-81 |
| 9 | The ITTR re-imposed or remains in effect for China, Macau, etc., with additional designated airports. (10 pages) | 83-92 |
| 10 | COVID-19 cases have increased in China. (2 pages) | 94-94 |
| 11 | Andreadakis v. Center for Disease Control & Prevention et al., Memorandum Opinion by U.S. District Court Judge David Novak, July 11, 2022. (32 pages) | 97-128 |

# EXHIBIT 01

## The CDC's Mask Order has not be rescinded.

*(11 pages)*

**CENTERS FOR DISEASE CONTROL AND PREVENTION
DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**ORDER UNDER SECTION 361
OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)
AND 42 CODE OF FEDERAL REGULATIONS 70.2, 71.31(b), 71.32(b)**

**REQUIREMENT FOR PERSONS TO WEAR MASKS
WHILE ON CONVEYANCES AND AT TRANSPORTATION HUBS**

<u>SUMMARY</u>:

Notice and Order; and subject to the limitations under "Applicability," pursuant to 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b):

(1) Persons[1] must wear[2] masks over the mouth and nose when traveling on conveyances into and within the United States. Persons must also wear masks at transportation hubs as defined in this Order.

(2) A conveyance operator transporting persons into and within the United States[3] must require all persons onboard to wear masks for the duration of travel.

(3) A conveyance operators operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for the duration of travel as a condition of controlled free pratique.[4]

(4) Conveyance operators must use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel. Best efforts include:

- boarding only those persons who wear masks;
- instructing persons that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law;
- monitoring persons onboard the conveyance for anyone who is not wearing a mask and seeking compliance from such persons;
- at the earliest opportunity, disembarking any person who refuses to comply; and
- providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email;

---

[1] As used in this Order, "persons" includes travelers (*i.e.*, passengers and crew), conveyance operators, and any workers or service providers in the transportation hub.
[2] To "wear a mask" means to wear a mask over the nose and mouth.
[3] This includes international, interstate, or intrastate waterways, subject to the jurisdiction of the United States.
[4] As a condition of this controlled free pratique to commence or continue operations in the United States, conveyance operators must additionally require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons on the conveyance (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. This precaution must be followed regardless of scheduled itinerary.

posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.

(5) Operators of transportation hubs must use best efforts to ensure that any person entering or on the premises of the transportation hub wears a mask. Best efforts include:

- allowing entry only to those persons who wear masks;
- instructing persons that Federal law requires wearing a mask in the transportation hub and failure to comply constitutes a violation of Federal law;
- monitoring persons on the premises of the transportation hub for anyone who is not wearing a mask and seeking compliance from such persons;
- at the earliest opportunity, removing any person who refuses to comply from the premises of the transportation hub; and
- providing persons with prominent and adequate notice to facilitate awareness and compliance with the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.

DEFINITIONS:

*Controlled free pratique* shall have the same definition as under 42 CFR 71.1, meaning "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions."

*Conveyance* shall have the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle,[5] vessel . . . or other means of transport, including military." Included in the definition of "conveyance" is the term "carrier" which under 42 CFR 71.1 has the same definition as conveyance under 42 CFR 70.1.

*Conveyance operator* means an individual operating a conveyance and an individual or organization causing or authorizing the operation of a conveyance.

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[6]

*Interstate traffic* shall have the same definition as under 42 CFR 70.1, meaning

---

[5] This includes rideshares meaning arrangements where passengers travel in a privately owned road vehicle driven by its owner in connection with a fee or service.

[6] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this Order. CDC guidance for attributes of acceptable masks in the context of this Order is available at: https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

"(1):

(i) The movement of any conveyance or the transportation of persons or property, including any portion of such movement or transportation that is entirely within a state or possession–

(ii) From a point of origin in any state or possession to a point of destination in any other state or possession; or

(iii) Between a point of origin and a point of destination in the same state or possession but through any other state, possession, or contiguous foreign country.

(2) Interstate traffic does not include the following:

(i) The movement of any conveyance which is solely for the purpose of unloading persons or property transported from a foreign country or loading persons or property for transportation to a foreign country.

(ii) The movement of any conveyance which is solely for the purpose of effecting its repair, reconstruction, rehabilitation, or storage."

*Intrastate traffic* means the movement of any conveyance or the transportation or movement of persons occurring solely within the boundaries of a state or territory, or on tribal land.

*Possession* shall have the same definition as under 42 CFR 70.1 and 71.1, meaning a "U.S. territory."

*State* shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

*Territory* shall have the same definition as "U.S. territory" under 42 CFR 70.1 and 71.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the [Commonwealth of the] Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

*Transportation hub* means any airport, bus terminal, marina, seaport or other port, subway station, terminal (including any fixed facility at which passengers are picked-up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States.

*Transportation hub operator* means an individual operating a transportation hub and an individual or organization causing or authorizing the operation of a transportation hub.

*U.S. port* shall have the same definition as under 42 CFR 71.1, meaning any "seaport, airport, or border crossing point under the control of the United States."


STATEMENT OF INTENT:

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Preservation of human life;
- Maintaining a safe and secure operating transportation system;
- Mitigating the further introduction, transmission, and spread of COVID-19 into the United States and from one state or territory into any other state or territory; and
- Supporting response efforts to COVID-19 at the Federal, state, local, territorial, and tribal levels.

APPLICABILITY:

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe that (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Such requirements must provide the same level of public health protection as — or greater protection than —the requirements listed herein.

In addition, the requirement to wear a mask shall not apply under the following circumstances:

- While eating, drinking, or taking medication, for brief periods;
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication;
- If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;[7] or
- When necessary to temporarily remove the mask to verify one's identity such as during Transportation Security Administration screening or when asked to do so by the ticket or gate agent or any law enforcement official.

This Order exempts the following categories of persons:[8]

---

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

- A child under the age of 2 years;
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

This Order exempts the following categories of conveyances, including persons on board such conveyances:

- Private conveyances operated solely for personal, non-commercial use;
- Commercial motor vehicles or trucks as these terms are defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle or truck;
- Conveyances operated or chartered by the U.S. military services provided that such conveyance operators observe Department of Defense precautions to prevent the transmission of COVID-19 that are equivalent to the precautions in this Order.

This Order applies to persons on conveyances and at transportation hubs directly operated by U.S. state, local, territorial, or tribal government authorities, as well as the operators themselves. U.S. state, local, territorial, or tribal government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities.

To the extent permitted by law, and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel),[10] Federal agencies are required to implement additional measures enforcing the provisions of this Order.

BACKGROUND:

There is currently a pandemic of respiratory disease (coronavirus disease 2019 or "COVID-19") caused by a novel coronavirus (SARS-COV-2). As of January 27, 2021, there have been 99,638,507 confirmed cases of COVID-19 globally, resulting in more than 2,141,000 deaths. As of January 27, 2021, there have been over 25,000,000 cases identified in the United States and over 415,000 deaths due to the disease. New SARS-CoV-2 variants have emerged in recent weeks, including at least one with evidence of increased transmissibility.[11]

The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets

---

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. CDC will issue additional guidance regarding persons who cannot wear a mask under this exemption. https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

[10] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-promoting-covid-19-safety-in-domestic-and-international-travel/

[11] https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html

produced when an infected person coughs, sneezes, or talks. These droplets can land in the
mouths, eyes, or noses of people who are nearby and possibly be inhaled into the lungs. In-
fected people without symptoms (asymptomatic) and those in whom symptoms have not yet
developed (pre-symptomatic) can also spread the virus. In general, the more closely an in-
fected person interacts with others and the longer those interactions, the higher the risk of
COVID-19 spread. COVID-19 may be transmitted by touching surfaces or objects that have
the virus on them and then touching one's own or another person's eyes, nose, or mouth.

Masks help prevent people who have COVID-19, including those who are pre-symptomatic or
asymptomatic, from spreading the virus to others.[12] Masks are primarily intended to reduce
the emission of virus-laden droplets, i.e., they act as source control by blocking exhaled vi-
rus.[13] This is especially relevant for asymptomatic or pre-symptomatic infected wearers who
feel well and may be unaware of their infectiousness to others, and who are estimated to ac-
count for more than 50% of transmissions.[14,15] Masks also provide personal protection to the
wearer by reducing inhalation of these droplets, i.e., they reduce wearers' exposure through
filtration.[16] The community benefit of wearing masks for SARS-CoV-2 control is due to the
combination of these effects; individual prevention benefit increases with increasing numbers
of people using masks consistently and correctly.

Appropriately worn masks reduce the spread of COVID-19—particularly given the evidence
of pre-symptomatic and asymptomatic transmission of COVID-19.  Seven studies have con-
firmed the benefit of universal masking in community level analyses: in a unified hospital sys-
tem,[17] a  German city,[18] a U.S. State,[19] a panel of 15 U.S. States and Washington, D.C.,[20,21] as

[12] https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html
[13] Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face
masks. *Nature Medicine.* 2020;26(5):676-680.https://dx.doi.org/10.1038/s41591-020-0843-2
[14] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID-19
outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513-17515.10.1073/pnas.2008373117.
https://www.ncbi.nlm.nih.gov/pubmed/32632012
[15] Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19
Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 Jan 4;4(1):e2035057. doi: 10.1001/jamanetworko-
pen.2020.35057.
[16] Ueki H, Furusawa Y, Iwatsuki-Horimoto K, et al. Effectiveness of Face Masks in Preventing Airborne Transmis-
sion of SARS-CoV-2. *mSphere.* 2020;5(5).10.1128/mSphere.00637-20. https://www.ncbi.nlm.nih.gov/pub-
med/33087517
[17] Wang X, Ferro EG, Zhou G, Hashimoto D, Bhatt DL. Association Between Universal Masking in a Health Care
System and SARS-CoV-2 Positivity Among Health Care Workers. *JAMA.* 2020.10.1001/jama.2020.12897.
https://www.ncbi.nlm.nih.gov/pubmed/32663246
[18] Mitze T., Kosfeld R., Rode J., Wälde K. *Face Masks Considerably Reduce COVID-19 Cases in Germany: A Syn-
thetic Control Method Approach.* IZA – Institute of Labor Economics (Germany);2020.ISSN: 2365-9793, DP No.
13319. http://ftp.iza.org/dp13319.pdf
[19] Gallaway MS, Rigler J, Robinson S, et al. Trends in COVID-19 Incidence After Implementation of Mitigation
Measures – Arizona, January 22-August 7, 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(40):1460-
1463.10.15585/mmwr.mm6940e3. https://www.ncbi.nlm.nih.gov/pubmed/33031366
[20] Lyu W, Wehby GL. Community Use Of Face Masks And COVID-19: Evidence From A Natural Experiment Of
State Mandates In The US. *Health Aff (Millwood).* 2020;39(8):1419-1425.10.1377/hlthaff.2020.00818.
https://www.ncbi.nlm.nih.gov/pubmed/32543923
[21] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.gold-
mansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

well as both Canada[22] and the United States[23] nationally. Each analysis demonstrated that, following directives from organizational and political leadership for universal masking, new infections fell significantly. Two of these studies[24,25] and an additional analysis of data from 200 countries that included localities within the United States[26] also demonstrated reductions in mortality. An economic analysis using U.S. data found that, given these effects, increasing universal masking by 15% could prevent the need for lockdowns and reduce associated losses of up to $1 trillion or about 5% of gross domestic product.[27]

Wearing a mask especially helps protect those at increased risk of severe illness from COVID-19[28] and workers who frequently come into close contact with other people (e.g., at transportation hubs). Masks are most likely to reduce the spread of COVID-19 when they are widely used by people in public settings. Using masks along with other preventive measures, including social distancing, frequent handwashing, and cleaning and disinfecting frequently touched surfaces, is one of the most effective strategies available for reducing COVID-19 transmission.

Traveling on multi-person conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and crowded airport terminals. Social distancing may be difficult if not impossible on flights.  People may not be able to distance themselves by the recommended 6 feet from individuals seated nearby or those standing in or passing through the aircraft's aisles. Travel by bus, train, vessel, and other conveyances used for international, interstate, or intrastate transportation pose similar challenges.

Intrastate transmission of the virus has led to—and continues to lead to—interstate and international spread of the virus, particularly on public conveyances and in travel hubs, where passengers who may themselves be traveling only within their state or territory commonly interact with others traveling between states or territories or internationally. Some states, territories, Tribes,

---

[22] Karaivanov A., Lu S.E., Shigeoka H., Chen C., Pamplona S. *Face Masks, Public Policies and Slowing the Spread of Covid-19: Evidence from Canada* National Bureau of Economic Research 2020.Working Paper 27891. http://www.nber.org/papers/w27891

[23] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[24] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[25] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[26] Leffler CT, Ing EB, Lykins JD, Hogan MC, McKeown CA, Grzybowski A. Association of country-wide coronavirus mortality with demographics, testing, lockdowns, and public wearing of masks. Am J Trop Med Hyg. 2020 Dec;103(6):2400-2411. doi: 10.4269/ajtmh.20-1015. Epub 2020 Oct 26.

[27] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[28] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html

and local public health authorities have imposed mask-wearing requirements within their juris-dictional boundaries to protect public health.[29] Any state or territory without sufficient mask-wearing requirements for transportation systems within its jurisdiction has not taken adequate measures to prevent the spread of COVID-19 from such state or territory to any other state or territory. That determination is based on, *inter alia*, the rapid and continuing transmission of the virus across all states and territories and across most of the world. Furthermore, given how inter-connected most transportation systems are across the nation and the world, local transmission can grow even more quickly into interstate and international transmission when infected persons travel on non-personal conveyances without wearing a mask and with others who are not wear-ing masks.

Therefore, I have determined that the mask-wearing requirements in this Order are reasonably necessary to prevent the further introduction, transmission, or spread of COVID-19 into the United States and among the states and territories. Individuals traveling into or departing from the United States, traveling interstate, or traveling entirely intrastate, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transporta-tion, must comply with the mask-wearing requirements set forth in this Order.

America's transportation systems are essential. Not only are they essential for public health, they are also essential for America's economy and other bedrocks of American life. Those transportation systems carry life-saving medical supplies and medical providers into and across the nation to our hospitals, nursing homes, and physicians' offices. Trains, planes, ships, and automobiles bring food and other essentials to our communities and to our homes. Buses bring America's children and teachers to school. Buses, trains, and subways, bring America's workforce to their jobs.

Requiring masks on our transportation systems will protect Americans and provide confidence that we can once again travel safely even during this pandemic. Therefore, requiring masks will help us control this pandemic and aid in re-opening America's economy.

The United States and countries around the world are currently embarking on efforts to vac-cinate their populations, starting with healthcare personnel and other essential workers at in-creased risk of exposure to SARS-CoV-2 and people at increased risk for severe illness from the virus. While vaccines are highly effective at preventing severe or symptomatic COVID-19, at this time there is limited information on how much the available COVID-19 vaccines may reduce transmission in the general population and how long protection lasts.[30] Therefore, this mask requirement, as well as CDC recommendations to prevent spread of COVID-19,[31] additionally apply to vaccinated persons. Similarly, CDC recommends that people who have

---

[29] Based on internet sources, 37 states plus D.C. and Puerto Rico mandate the wearing of masks in public. Among the jurisdictions that have imposed mask mandates, variations in requirements exist. For example, exemptions for children range in cutoff age from 2 to 12, but masks are generally required in indoor public spaces such as restau-rants and stores, on public transit and ride-hailing services, and outdoors when unable to maintain 6 feet of distance from others. *See* https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html (ac-cessed January 28, 2021).

[30] https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html

[31] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

recovered from COVID-19 continue to take precautions to protect themselves and others, in-
cluding wearing masks;[32] therefore, this mask requirement also applies to people who have
recovered from COVID-19.

ACTION:

Until further notice, under 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b), unless
excluded or exempted as set forth in this Order, a person must wear a mask while boarding,
disembarking, and traveling on any conveyance into or within the United States. A person
must also wear a mask at any transportation hub that provides transportation within the United
States.

Conveyance operators traveling into or within the United States may transport only persons
wearing masks and must use best efforts to ensure that masks are worn when embarking, dis-
embarking, and throughout the duration of travel. Operators of transportation hubs must use
best efforts to ensure that any person entering or on the premises of the transportation hub
wears a mask.

As a condition of receiving controlled free pratique under 42 CFR 71.31(b) to enter a U.S. port,
disembark passengers, and begin operations at any U.S. port of entry, conveyances arriving into
the United States must require persons to wear masks while boarding, disembarking, and for the
duration of travel. Conveyance operators must also require all persons to wear masks while
boarding and for the duration of their travel on board conveyances departing from the United
States until the conveyance arrives at the foreign destination, if at any time any of the persons
onboard (passengers, crew, or conveyance operators) will return to the United States while this
Order remains in effect. These travel conditions are necessary to mitigate the harm of further in-
troduction of COVID-19 into the United States.

Requiring a properly worn mask is a reasonable and necessary measure to prevent the introduc-
tion, transmission and spread of COVID-19 into the United States and among the states and terri-
tories under 42 U.S.C. 264(a) and 42 CFR 71.32(b). Among other benefits, masks help prevent
dispersal of an infected person's respiratory droplets that carry the virus. That precaution helps
prevent droplets from landing in the eye, mouth, or nose or possibly being inhaled into the lungs
of an uninfected person, or from landing on a surface or object that an uninfected person may
then touch and then touch his or her own or another's eyes, nose, or mouth. Masks also provide
some protection to the wearer by helping reduce inhalation of respiratory droplets.

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a
Tribe, where the controlling governmental authority: (1) requires a person to wear a mask on
conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires con-
veyances to transport only persons wearing masks. Those requirements must provide the same
level of public health protection as —or greater protection than—the requirements listed herein.

In accordance with 42 U.S.C. 264(e), state, local, territorial, and tribal authorities may impose
additional requirements that provide greater public health protection and are more restrictive than

---

[32] https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

the requirements in this Order. Consistent with other federal, state, or local legal requirements, this Order does not preclude operators of conveyances or transportation hubs from imposing additional requirements, or conditions for carriage, that provide greater public health protection and are more restrictive than the requirements in this Order (e.g., requiring a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or imposing requirements for social distancing or other recommended protective measures).

This Order is not a rule within the meaning of the Administrative Procedure Act ("APA") but rather is an emergency action taken under the existing authority of 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), 71.32(b). In the event that a court determines this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. Considering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Order. Similarly, the Office of Information and Regulatory Affairs has determined that if this Order were a rule, it would be a major rule under the Congressional Review Act, but there would not be a delay in its effective date as the agency has determined that there would be good cause to make the requirements herein effective immediately under the APA.

This order is also an economically significant regulatory action under Executive Order 12866 and has therefore been reviewed by the Office of Information and Regulatory Affairs of the Office of Management and Budget. The agency is proceeding without the complete analysis required by Executive Order 12866 under the emergency provisions of 6(a)(3)(D) of that Order.

If any provision of this Order, or the application of any provision to any carriers, conveyances, persons, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any carriers, conveyances, persons, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration under appropriate statutory and regulatory authorities including the provisions of 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR part 1503, 1540.105, 1542.303, 1544.305 and 1546.105.

This Order shall be further enforced by other federal authorities and may be enforced by cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18 and 71.2.[33]

---

[33] While this Order may be enforced and CDC reserves the right to enforce through criminal penalties, CDC does not intend to rely primarily on these criminal penalties but instead strongly encourages and anticipates widespread voluntary compliance as well as support from other federal agencies in implementing additional civil measures enforcing the provisions of this Order, to the extent permitted by law and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel).

EFFECTIVE DATE:

This Order shall enter into effect on February 1, 2021, at 11:59 p.m. and will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists.

In testimony whereof, the Director of the Division of Global Migration and Quarantine at the Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set his hand at Atlanta, GA, this 29th day of January 2021.

Martin S. Cetron, M.D.
Director, Division of Global Migration and Quarantine
Centers for Disease Control and Prevention

# EXHIBIT 02

**The HHS' renewal of determination that a public health emergency exists.**

*(1 page)*



HHS.gov U.S. Department of Health & Human Services



ASPR HomepagePHE DeclarationsCOVID-19 (January 11, 2023)

# RENEWAL OF DETERMINATION THAT A PUBLIC HEALTH EMERGENCY EXISTS

As a result of the continued consequences of the Coronavirus Disease 2019 (COVID-19) pandemic, on this date and after consultation with public health officials as necessary, I, Xavier Becerra, Secretary of Health and Human Services, pursuant to the authority vested in me under section 319 of the Public Health Service Act, do hereby renew, effective January 11, 2023, the January 31, 2020, determination by former Secretary Alex M. Azar II, that he previously renewed on April 21, 2020, July 23, 2020, October 2, 2020, and January 7, 2021, and that I renewed on April 15, 2021, July 19, 2021, October 15, 2021, January 14, 2022, April 12, 2022, July 15, 2022, and October 13, 2022, that a public health emergency exists and has existed since January 27, 2020, nationwide.

January 11, 2023                                    /s/
_____                    _____
Date                                               Xavier Becerra

# EXHIBIT 03

**PODUS: "The Public Health Emergency ends on May 11, 2023."**

*(2 pages)*



**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF MANAGEMENT AND BUDGET**
WASHINGTON, D.C. 20503

January 30, 2023
(House Rules)

# STATEMENT OF ADMINISTRATION POLICY

### H.R. 382 – A bill to terminate the public health emergency declared with respect to COVID-19
(Rep. Guthrie, R-KY, and 19 cosponsors)

### H.J. Res. 7 – A joint resolution relating to a national emergency declared by the President on March 13, 2020
(Rep. Gosar, R-AZ, and 51 cosponsors)

The COVID-19 national emergency and public health emergency (PHE) were declared by the Trump Administration in 2020. They are currently set to expire on March 1 and April 11, respectively. At present, the Administration's plan is to extend the emergency declarations to May 11, and then end both emergencies on that date. This wind-down would align with the Administration's previous commitments to give at least 60 days' notice prior to termination of the PHE.

To be clear, continuation of these emergency declarations until May 11 does not impose any restriction at all on individual conduct with regard to COVID-19. They do not impose mask mandates or vaccine mandates. They do not restrict school or business operations. They do not require the use of any medicines or tests in response to cases of COVID-19.

However, ending these emergency declarations in the manner contemplated by H.R. 382 and H.J. Res. 7 would have two highly significant impacts on our nation's health system and government operations.

First, an abrupt end to the emergency declarations would create wide-ranging chaos and uncertainty throughout the health care system — for states, for hospitals and doctors' offices, and, most importantly, for tens of millions of Americans. During the PHE, the Medicaid program has operated under special rules to provide extra funding to states to ensure that tens of millions of vulnerable Americans kept their Medicaid coverage during a global pandemic. In December, Congress enacted an orderly wind-down of these rules to ensure that patients did not lose access to care unpredictably and that state budgets don't face a radical cliff. If the PHE were suddenly terminated, it would sow confusion and chaos into this critical wind-down. Due to this uncertainty, tens of millions of Americans could be at risk of abruptly losing their health insurance, and states could be at risk of losing billions of dollars in funding. Additionally, hospitals and nursing homes that have relied on flexibilities enabled by the emergency

declarations will be plunged into chaos without adequate time to retrain staff and establish new billing processes, likely leading to disruptions in care and payment delays, and many facilities around the country will experience revenue losses.  Finally, millions of patients, including many of our nation's veterans, who rely on telehealth would suddenly be unable to access critical clinical services and medications.  The most acutely impacted would be individuals with behavioral health needs and rural patients.

Second, the end of the public health emergency will end the Title 42 policy at the border.  While the Administration has attempted to terminate the Title 42 policy and continues to support an orderly lifting of those restrictions, Title 42 remains in place because of orders issued by the Supreme Court and a district court in Louisiana.  Enactment of H.R. 382 would lift Title 42 immediately, and result in a substantial additional inflow of migrants at the Southwest border.  The number of migrants crossing the border has been cut in half, approximately, since the Administration put in place a plan in early January to deter irregular migration from Venezuela, Cuba, Nicaragua, and Haiti.  The Administration supports an orderly, predictable wind-down of Title 42, with sufficient time to put alternative policies in place.  But if H.R. 382 becomes law and the Title 42 restrictions end precipitously, Congress will effectively be requiring the Administration to allow thousands of migrants per day into the country immediately without the necessary policies in place.

The Administration strongly opposes enactment of H.R. 382 and H.J. Res. 7, which would be a grave disservice to the American people.

* * * * * * *

# EXHIBIT 04

## The ITTR re-imposed or remains in effect for China, Macau, etc.

*(5 pages)*

 CDC Centers for Disease Control and Prevention

Español | Other Languages



# International Travel to and from the United States

Updated Dec. 30, 2022

> ⚠️ Beginning **January 5, at 12:01AM ET,** there are new requirements for air passengers 2 years of age and older traveling to the United States from China, Hong Kong, or Macau, and those traveling from Seoul, Toronto, and Vancouver who have been in China, Hong Kong, or Macau in the past 10 days. These passengers, regardless of citizenship or vaccination status, are required to show a negative COVID-19 test result taken no more than 2 days before their flight departs. Those who had COVID-19 in the 90 days before their travel to the United States can instead show documentation of recovery from COVID-19.

**ALL TRAVELERS**

This page is for all international travelers including U.S. citizens, U.S. nationals, U.S. lawful permanent residents, immigrants, and non-U.S. citizens who are not U.S. immigrants.

## What You Need to Know

- **Protect yourself and others from COVID-19:**
  - Get up to date with your COVID-19 vaccines before you travel.
  - Consider getting tested before travel.
  - Follow CDC's recommendations for wearing masks in travel and public transportation settings.
  - Get tested after arrival.
- Countries may have their own entry and exit requirements ⧉ .
- **ALL travelers 2 years and older:** If you are flying to the U.S. from China, Hong Kong, or Macau, or have been in these areas in the past 10 days and are flying from certain airports, you are required to show a negative COVID-19 test result or documentation of recovery from COVID-19 before you board your flight to the U.S.
- **Non-U.S. citizen, non-U.S. immigrants:** You **must** show proof of being fully vaccinated with the primary series of an accepted COVID-19 vaccine before you board your flight to the United States. Only limited exceptions apply.

 ## Travel Assessment

A tool to help you know the requirements to board a flight to the United States.

 Get Started

**Land Travel**

For information about COVID-19 requirements for land travel and at ferry terminals, visit the U.S. Department of Homeland Security's Fact Sheet: Guidance for Travelers to Enter the U.S. at Land Ports of Entry and Ferry Terminals. ⧉

# Before You Leave the United States

**Make sure to plan ahead:**

- Get up to date with your COVID-19 vaccines before you travel.
  - Find out when you can get your booster and where to get a vaccine or booster.
  - COVID-19 vaccines are effective at protecting people—especially those who are boosted— from getting seriously ill, being hospitalized, and even dying.
- Follow all requirements of transportation operators (such as airlines, cruise lines, buses) and any requirements, including mask wearing, proof of vaccination, or testing at your destination ⬈ .
  - Requirements in other countries may differ from U.S. requirements. If you do not follow your destination's requirements, you may be denied entry and required to return to the United States.
- If you have a weakened immune system or are at increased risk for severe disease, take multiple prevention steps to provide additional layers of protection from COVID-19 even if you are up to date with your COVID-19 vaccines.
  - Talk to your healthcare provider about your risk before travel and consider delaying travel to areas with high COVID-19 levels. Even if you are up to date, you should know what precautions to take.
- If you will be visiting someone who is at higher risk of getting very sick from COVID-19, learn how to protect them

 ## Testing

RECOMMENDED

- Consider getting tested with a viral test as close to the time of departure as possible (no more than 3 days) **before** travel.
  - Make sure you know your test results before travel.
    - Don't travel if your test result is positive.
  - Find a U.S. COVID-19 testing location near you ⬈  or use a self-test.
  - If you already had COVID-19 within the past 90 days, see specific testing recommendations

| Can I travel if ...? | |
| --- | --- |
| I am sick with or tested positive for COVID-19 and am recommended to isolate. | • **Do NOT travel.**<br>• Follow recommendations for isolation. |
| I have ended isolation but still need to continue wearing my mask per CDC's guidance. | • Do not travel on public transportation such as airplanes, buses, and trains if you will not be able to wear a high-quality mask or respirator when around others indoors for the full duration of your trip.<br>• If you travel, wear a high-quality mask or respirator the entire time you are around others indoors.<br>• Traveling by private vehicle (if possible) can lower the chances of spreading COVID-19 to others. |
| I was exposed to a person with COVID-19 in the past 10 days. | • Follow CDC guidance, including getting tested at least 5 full days after your last exposure.<br>• Do not travel on public transportation such as airplanes, buses, and trains if you will not be able to wear a high-quality mask or respirator when around others indoors for the full duration of your trip. |

- If you travel, wear a high-quality mask or respirator the entire time you are around others indoors.
- Traveling by private vehicle (if possible) can lower the chances of spreading COVID-19 to others.

## During Travel

## Protect Yourself and Others



**RECOMMENDED**

- Follow CDC's recommendations for wearing masks in travel and public transportation settings.
- Follow recommendations for protecting yourself and others.
- Follow all recommendations and requirements at your destination ⧉ .

## Before You Travel to the United States



### Testing – ALL Travelers

Who are flying from China, Hong Kong, or Macau, or have been in any of these areas in the past 10 days and are flying from one of these airports: Incheon International Airport in Seoul, Republic of Korea, Toronto Pearson International Airport in Canada, or Vancouver International Airport in Canada

**REQUIRED**

Before boarding a flight to the United States, you are required to show a negative COVID-19 test result taken **no more than 2 days before travel**. There is also an option for people who have documented recovery from COVID-19 in the past 90 days.

Children under 2 years old do not need to test.

Learn more about these requirements.



### Testing – ALL Travelers

**RECOMMENDED**

If traveling from locations where the U.S. does not require proof of a negative COVID-19 test result before travel:

- Consider getting tested with a viral test as close to the time of departure as possible (no more than 3 days) **before** travel.
  - If you already had COVID-19 within the past 90 days, see specific testing recommendations.
- Make sure you know your test results before travel.
  - Don't travel if your test result is positive.

**Non-U.S. Citizen, Non-U.S. Immigrants**
Proof of Vaccination

**REQUIRED**

**Air Travel:** All non-U.S. citizen, non-U.S. immigrants traveling to the United States by air are required to show proof of being fully vaccinated against COVID-19. Only limited exceptions apply. Learn more about this requirement and accepted vaccines.

If you are not fully vaccinated and allowed to travel to the United States by air through an exception, you **will be required** to sign an attestation (legal statement) **before you board your flight** to the United States stating you meet the exception. Depending on the type of exception, you may also have to state you have arranged to take certain protective measures.

For more information see Requirement for Proof of COVID-19 Vaccination for Air Passengers.



## Contact Information – ALL Travelers

**REQUIRED**

All air passengers to the United States are required to provide contact information to airlines before boarding flights to the United States.

- This strengthens a travel process already in place to rapidly identify and contact people in the U.S. who may have been exposed to a communicable disease, such as COVID-19.
- Access to travelers' contact information will allow U.S. federal, state, territorial and local health departments, and agencies to share appropriate health and public health information necessary to help keep the public safe.

# After Arrival in the United States



## ALL Travelers

**RECOMMENDED**

- Get tested with a viral test 3-5 days after arrival.
  - Find a U.S. COVID-19 testing location near you ⬈  or use a self-test.
  - If you already had COVID-19 within the past 90 days, see specific testing recommendations.
- Monitor yourself for COVID-19 symptoms.
- Follow additional guidance if you know you were exposed to a person with COVID-19.
- Follow all state, tribal, local and territorial recommendations or requirements after arrival.
- If you are going to be around someone who is at higher risk of getting very sick with COVID-19, consider additional precautions.

### If Your Test Result is Positive or You Develop COVID-19 Symptoms

Isolate yourself to protect others from getting infected. Learn what to do and when it is safe to be around others.

**Non-U.S. Citizen, Non-U.S. immigrants** who are not fully vaccinated and allowed to travel to the United States by air through an exception **must** follow requirements of the attestation they signed before boarding their flight. For more information, see Requirement for Proof of COVID-19 Vaccination for Air Passengers.

### Summary of Recent Changes

#### Updates as of April 18, 2022

- As a result of a court order, effective immediately and as of April 18, 2022, CDC's January 29, 2021 Order requiring masks on public transportation conveyances and at transportation hubs is no longer in effect. Therefore, CDC will not

enforce the Order. CDC continues to recommend that people wear high-quality masks in indoor public transportation settings at this time.

## More Information

Required Proof of COVID-19 Vaccination

Requirement for Proof of Negative COVID-19 Test or Documentation of Recovery from COVID-19

Frequently Asked Questions about Travel and COVID-19

Health Information for International Destinations

Domestic Travel During COVID-19

US State Department Travel Site ↗ : Safety and security information by country, passport, visas, and entry/exit requirements

US Customs and Border Protection ↗ : Information about what you can and cannot bring back from your trip abroad

US Embassies ↗ : In-country contacts

Transportation Security Administration (TSA) ↗ : Information about flying

Last Updated Dec. 30, 2022

# EXHIBIT 05

## The TSA's Supplemental Brief, filed September 12, 2022.

*(25 pages)*

**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 21-1220, 21-1221, 21-1225, 21-1236, 21-1237 & 21-1258**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

LUCAS WALL, LEONARDO McDONNELL, MICHAEL SEKLECKI (on
behalf of himself and his minor child M.S.), MICHAEL FARIS,
CHARITY ANDERSON, ANGELA BYRD, MICHAEL CLARK, URI
MARCUS, LARRY JAMES BONIN JR., ANTHONY EADES,
KLEANTHIS ANDREADAKIS, THERESA MULLINS and AARON
ABADI,

Petitioners,

v.

TRANSPORTATION SECURITY ADMINISTRATION,

Respondent.

———————————

Petition for Review of TSA Security Directives 1542-21-01, 1544-21-02,
1582/84-21-02 and Emergency Amendment 1546-21-01

———————————

**SUPPLEMENTAL BRIEF FOR RESPONDENT**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

DANIEL TENNY
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff
Civil Division, Room 7710
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-9039*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

Petitioners, who are all proceeding *pro se*, are Lucas Wall, Leonardo McDonnell, Michael Seklecki (on behalf of himself and his minor child M.S.), Michael Faris, Charity Anderson, Angela Byrd, Michael Clark, Anthony Eades, Uri Marcus, Larry James Bonin Jr., Kleanthis Andreadakis, Theresa Mullins, and Aaron Abadi.

Respondent is the Transportation Security Administration.

Amicus briefs have been lodged by a group of 309 pilots and flight attendants, all proceeding *pro se*; Darren Aquino, separately proceeding *pro se*; Tyson D. Gabriel, David M. Howard, and Stephen E. Petty, separately proceeding *pro se*; and Leia Montgomery and Kristen Meghan Kelly.

## B.    Rulings Under Review

These consolidated petitions for review challenge three security directives and one emergency amendment first issued by the Transportation Security Administration on February 1, 2021:  Security

Directive 1542-21-01, Security Directive 1544-21-02, Security Directive 1582/84-21-01, and Emergency Amendment 1546-21-01.  These directives were initially set to expire on May 11, 2021, but were subsequently renewed four times without substantive change.  These petitions for review were filed after the second extension of the challenged directives issued on August 20, 2021.

## C.    Related Cases

These six consolidated petitions for review all originated in other courts of appeals and were transferred to this Court pursuant to 28 U.S.C. § 2112(a)(5) because they challenge the same Security Directives and Emergency Amendment at issue in *Corbett v. Transportation Sec. Admin.*, 19 F.4th 478 (D.C. Cir. 2021), *cert. pending* No. 22-33 (S. Ct.).  Undersigned counsel is not aware of any other related cases pending in this Circuit.  Challenges to the legality of the Security Directives and Emergency Amendment at issue in this case have been raised in several other cases pending in courts outside of this Circuit.  *See, e.g.*, *Family Research Council Action, Inc. v. Biden*, No. 4:22-cv-209 (N.D. Tex.); *Florida v. Walensky*, No. 8:22-cv-718 (M.D. Fla.).

*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

ii

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 1

ARGUMENT ........................................................................................ 5

CONCLUSION..................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Alaska v. U.S. Dep't of Agric.*,
  17 F.4th 1224 (D.C. Cir. 2021)...............................................7, 12, 14, 15

*American Bankers Ass'n v. National Credit Union Admin.*,
  934 F.3d 649 (D.C. Cir. 2019) ............................................................. 6

*American Bar Ass'n v. Federal Trade Comm'n*,
  636 F.3d 641 (D.C. Cir. 2011) ............................................................ 15

*Clarke v. United States*,
  915 F.2d 699 (D.C. Cir. 1990) ......................................3, 6, 7, 9, 14, 15

*Corbett v. TSA*,
  19 F.4th 478 (D.C. Cir. 2021),
  *cert. pending* No. 22-33 (S. Ct.).......................................1, 6, 8, 10, 15

*County of Los Angeles v. Davis*,
  440 U.S. 625 (1979)............................................................................ 15

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009) ........................................................... 15

*Honig v. Doe*,
  484 U.S. 305 (1988).............................................................................. 6

*National Black Police Ass'n v. District of Columbia*,
  108 F.3d 346 (D.C. Cir. 1997) ........................................................6, 15

*National Wildlife Fed'n v. Hodel*,
  839 F.2d 694 (D.C. Cir. 1988) ........................................................... 12

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)............................................................................. 7

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017).......................................................................... 7

**Statutes:**

49 U.S.C. § 114(g) ............................................................. 9

49 U.S.C. § 114(*l*)(2) .....................................................8, 9

49 U.S.C. § 44901 (note) ................................................... 9

**Other Authorities:**

86 Fed. Reg. 8217 (Feb. 4, 2021) ...................................... 8

Order Granting Summary Judgment,
    *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693,
    2022 WL 1134138 (M.D. Fla. Apr. 18, 2022),
    *appeal pending* No. 22-11287 (11th Cir.) ............................ 2

Press Release, TSA, *Statement Regarding Face Mask Use on Public
    Transportation* (Apr. 18, 2022), https://go.usa.gov/xuSpN ................ 15

# GLOSSARY

TSA        Transportation Security Administration

CDC       Centers for Disease Control and Prevention

## INTRODUCTION AND SUMMARY OF ARGUMENT

These consolidated petitions for review challenge four now-expired directives first issued by the Transportation Security Administration (TSA) on January 31, 2021. Those directives were designed in part to aid in implementing and enforcing a related order issued by the Centers for Disease Control and Prevention (CDC) that required the wearing of masks on public transportation in order to mitigate the threat to transportation security posed by the ongoing COVID-19 pandemic. *See generally Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021).

As initially issued, TSA's directives were scheduled to expire on May 11, 2021. However, TSA determined in consultation with the CDC and other government agencies that it was necessary to extend the expiration of directives several times in order to continue to protect against the threat COVID-19 posed to transportation safety and security. *See, e.g.*, Security Directive 1542-21-01A (extending the directive through September 13, 2021); Security Directive 1542-21-01B (extending the directive through January 18, 2022); Security Directive 1542-21-01C (extending the directive through March 18, 2022); Security Directive 1542-21-01D (extending the directive through April 18, 2022).

In April 2022, TSA announced that it intended to extend the

expiration of the directives for an additional 15 days, through May 3,

2022, in order to monitor the continued spread of COVID-19 and

determine, in consultation with the CDC and other government

agencies, whether it was appropriate to change the mask requirements.

On April 18, 2022, the day that the directives were scheduled to expire

absent that extension, a district judge in the United States District

Court for the Middle District of Florida vacated the related CDC order.

Order Granting Summary Judgment, *Health Freedom Def. Fund, Inc. v.*

*Biden*, No. 8:21-cv-1693, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022),

*appeal pending* No. 22-11287 (11th Cir.).  That same evening, TSA

rescinded the forthcoming extension of its Mask Directives, and the

challenged orders expired as scheduled at midnight that evening.

By order dated August 11, 2022, this Court requested that the

parties file supplemental briefs addressing whether any portion of these

petitions for review are moot in light of the expiration of the challenged

directives.  It is without question that the orders challenged by

petitioners are no longer in effect, and thus, that a decision on the

merits of the petitions for review of those orders will not "presently

affect the parties' rights." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (quotation marks omitted). Mootness thus turns on whether there is a "more-than-speculative" chance that a decision on the merits of petitioners' arguments will affect the parties' rights in the future, and if so, whether any of the doctrinal exceptions apply. *Id.* (quotation marks omitted).

As explained in the government's opening brief, there remains a live controversy regarding petitioners' various arguments that TSA's now-expired directives were *ultra vires* or were improperly issued without notice and comment. The government's appeal from the vacatur of the related CDC order in *Health Freedom*—which precipitated the rescission of the latest extension of the challenged directives—is still pending, and the pandemic is ongoing, with new variants having emerged on several occasions. The government has not forsworn its authority to impose mask directives or its desire to do so if circumstances warrant. Any future mask-related directives issued by TSA will invoke the same authorities that petitioners claim are insufficient, including the authority to proceed without notice and comment. As a result, there is a more-than-speculative chance that a

ruling on whether petitioners' arguments that the now-expired directives were *ultra vires* or were improperly issued without notice and comment would affect the parties' rights in the future. Accordingly, although these aspects of petitioners' arguments are answered on the merits by this Court's decision in *Corbett*, they are not moot.

Petitioners' remaining arguments focus on aspects of the directives whose recurrence is far more speculative. For example, petitioners raise various challenges relating to the specific content and justifications for the directives, such as the particular effects of the directives on their ability to fly or on persons with disabilities. But the causal link between petitioners' claimed harms and the now-expired directives was dubious in the first place. And the likelihood that resolution of the legal issues presented would affect petitioners' concrete interests in the future is even more speculative now because of uncertainties regarding whether the particular challenged features of the expired directives would recur in the same form in the event that new directives were issued. Because there is only a speculative chance that these alleged harms will recur in the same manner, this portion of the case is moot.

Even less likely to recur are petitioners' arbitrary-and-capricious

challenges, which ask this Court to evaluate the particular

justifications given for the directives at the time they were first

adopted.  But even if mask-related directives are adopted in the future,

they will necessarily be predicated (at least in part) on the

circumstances that gave rise to those new directives, and any argument

that those directives are arbitrary and capricious will need to be

evaluated by this Court on the basis of that new record.  These

arguments are thus clearly moot.

As to the portions of the case that are moot, none of the doctrinal

exceptions apply.  Accordingly, this Court should reject petitioners'

arguments regarding TSA's authority and its ability to proceed without

notice and comment on the merits based on this Court's prior decision

in *Corbett*, and otherwise dismiss the petitions for review as moot.

## ARGUMENT

Under the mootness doctrine, federal courts are limited to

deciding "actual, ongoing controversies."  *National Black Police Ass'n v.*

*District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting *Honig*

*v. Doe*, 484 U.S. 305, 317 (1988)).  To that end, the doctrine "requires a

federal court to refrain from deciding [a case] if events have so
transpired that" rendering a decision on the merits of the case—or a
portion of the case—"will neither presently affect the parties' rights nor
have a more-than-speculative chance of affecting them in the future."
*Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)
(quotation marks omitted); *American Bankers Ass'n v. National Credit
Union Admin.*, 934 F.3d 649, 661 (D.C. Cir. 2019) (noting that this
"same principle applies to individual claims").  But even if a case is
"superficially moot," courts may review the merits if one of the
exceptions to the mootness doctrine applies.  *Clarke*, 915 F.2d at 703.

A.  Petitioners' primary challenge in these consolidated cases is
that the directives were *ultra vires* because, in their view—as the
petitioner in *Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021), *cert. pending*
No. 22-33 (S. Ct.), unsuccessfully argued—TSA lacks statutory and
regulatory authority to take action to protect against the threat that
COVID-19 poses to transportation safety and security.  That issue is not
moot because there is a "more-than-speculative chance" that this
alleged legal violation will recur.  *Clarke*, 915 F.2d at 701.

6

As this Court recently recognized in *Alaska v. United States
Department of Agriculture*, "[n]o entity of the federal government can
ever guarantee that a statute, a regulation, or an executive order[] . . .
will not be reenacted or reissued." 17 F.4th 1224, 1229 n.5 (D.C. Cir.
2021). This fact alone is not generally sufficient to defeat mootness—
especially where there are "structural obstacles to reimposing a
challenged law" such as the need to undergo notice-and-comment
rulemaking. *Id.* But "actions that can be reversed at the stroke of a
pen or otherwise face minimal hurdles to re-enforcement can thwart
mootness" because, in such circumstances, it is far less speculative
whether the alleged legal violation will recur. *Id.* (first citing *Roman
Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68-69 (2020) (per
curiam); and then citing *Trinity Lutheran Church of Columbia, Inc. v.
Comer*, 137 S. Ct. 2012, 2019 n.1 (2017)).

Here, TSA's authority to issue security directives does not
generally require notice-and-comment rulemaking, *see, e.g.*, 49 U.S.C.
§ 114(*l*)(2), and indeed, the expired directives were issued and rescinded
without any similar structural hurdle. Further, there is a more-than-
speculative chance that TSA will invoke the same authorities

challenged here to issue new mask-related directives similarly unobstructed by substantial structural hurdles.

The termination of the directives came about because the CDC order that TSA sought to enforce through the directives was vacated by a district court in a ruling that is currently on appeal.  TSA has at no time forsworn its authority to issue mask-related directives or announced a change in policy that would foreclose issuance of directives in the future in appropriate circumstances, much less done so through notice-and-comment rulemaking as in *Alaska*.  To the contrary, the national emergency declared by the Acting Secretary of Homeland Security, which directed TSA to support "the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system[] . . . from COVID-19," remains in effect.  86 Fed. Reg. 8217, 8217-19 (Feb. 4, 2021); *see Corbett*, 19 F.4th at 490 (holding that the expired directives were also a valid exercise of TSA's emergency authority under 49 U.S.C. § 114(g)); *see also* Resp. Br. 39-40.

Accordingly, there is a "more-than-speculative chance" that TSA will impose future orders related to masking during the COVID-19 pandemic and that petitioners' claimed legal violation—that TSA lacks

8

authority to do so—will recur.  *Clarke*, 915 F.2d at 701.  For this reason,

petitioners' arguments that the expired directives were *ultra vires* are

not moot.  *See id.*[1]

Likewise, petitioners' argument regarding the need for notice and

comment is not moot.  As noted above, TSA regularly issues security

directives without notice and comment.  *See, e.g.*, 49 U.S.C. § 114(*l*)(2);

49 U.S.C. § 44901 (note) (describing the transfer of the then-existent

functions and authorities of the Federal Aviation Administration to

TSA).  It has not forsworn its authority to do so in connection with

mask-related orders.  Thus, petitioners' arguments regarding TSA's

authority to impose mask directives without notice and comment are

not moot and should be resolved on the merits.  But as discussed in the

government's brief, those arguments require little discussion.  The *ultra*

*vires* claim is squarely foreclosed by *Corbett*.  And as discussed in the

government's response brief (Br. 24) petitioners' argument regarding

---

[1]  For similar reasons, to the extent that petitioners' various
constitutional arguments challenge TSA's general authority to require
masking during the COVID-19 pandemic—as opposed to challenging
the specific contents or enforcement of the old directives—there remains
a live controversy regarding those issues.  As discussed in the
government's response brief, those arguments are entirely meritless.
*See* Resp. Br. 44-46.

notice and comment is premised on the "extraordinarily narrow view" of the circumstances that constitute a threat to security that this Court rejected in *Corbett*. *Corbett*, 19 F.4th at 486.

**B.** Petitioners' remaining arguments concern issues that do not have a more-than-speculative chance of recurring. For example, petitioners raise a number of arguments regarding the specific scope and contents of the directives and their effects on persons with disabilities. It is entirely speculative, however, that any future directive would have the particular features about which petitioners complain. Even less likely to recur are petitioners' arbitrary-and-capricious arguments, which depend upon the particular circumstances in which the directives arose, and which call upon this Court to evaluate the directives in light of the stated justifications at that time. But any future directive would take account of new circumstances and thus would not present the same issues. These arguments should therefore be dismissed as moot.

**1.** Petitioners devote a substantial portion of their brief to arguing that they are medically incapable of wearing masks, and yet were unable to demonstrate that they qualified for an exception to the

10

mask requirement under the expired directives. In petitioners' view, their inability to secure exceptions effectively barred them from traveling, which they believe violates, among other things, the Air Carrier Access Act, the United States Constitution, and various international treaties. *See* Resp. Br. 46-55 (discussing the merits of these claims).

As discussed in the government's brief, even when the directives were in effect, their connection to petitioners' alleged injuries was dubious. Several petitioners were able to travel despite the directives, and many of petitioners' alleged injuries were not attributable to the expired directives but to the actions of others, such as actions taken by airlines in determining whether petitioners qualified for exemptions or by the Department of Transportation in adjudicating petitioners' discrimination claims against airlines. The likelihood that resolution of the issues presented in the petitions would have a concrete effect in the future is even more speculative; even if TSA were to impose future directives during the ongoing pandemic, the precise scope and contents of any future directive would depend upon the circumstances that gave rise to it.

In short, the specific "content of any future regulation is currently

unknowable," and if the issues connected to the specific contents of the

directives do recur in some form, they "'will be reviewable at that time'

in light of a new record." *Alaska*, 17 F.4th at 1229 (quoting *National*

*Wildlife Fed'n v. Hodel*, 839 F.2d 694, 742 (D.C. Cir. 1988)).  Thus, the

possibility that resolution of petitioners' particularized arguments in

these areas will be necessary to redress any future concrete injury is too

speculative to save these issues from being moot.

Even more clearly moot is petitioners' challenge to TSA's

determination that the expired directives were warranted and justified

at the time they were initially issued.  Petitioners argue, for example,

that it was arbitrary and capricious for TSA to premise its conclusions

regarding the necessity of the expired directives on the factual findings

made by the CDC in January 2021.  But any future directives issued in

relation to the ongoing pandemic would not be based on the

circumstances as of January 2021 but would instead be based on an

assessment of the then-current state of affairs regarding COVID-19.

Relatedly, petitioners' argument that the CDC exceeded its authority in

issuing its 2021 order—which was never properly before this Court, *see*

Resp. Br. 38-40—would not be relevant to any challenge to new
directives. Although TSA would likely seek CDC's guidance and
expertise on scientific matters, it would have no need to rely on the
existence of a formal CDC order promulgated in the same manner (even
if there was one in effect at the time) rather than relying on its own
independent authority that has now been upheld by this Court.
Resolution of petitioners' various arbitrary-and-capricious challenges
regarding the now-expired directives would thus be a quintessential
advisory opinion.

**2.** As to the issues in the case whose resolution would not give
rise to a more-than-speculative chance of having any practical effect on
petitioners, none of the doctrinal exceptions to mootness apply.

*First*, the doctrine of voluntary cessation does not apply here.
That exception to mootness "prevent[s] a private defendant from
manipulating the judicial process by voluntarily ceasing the complained
of activity" in order to moot out the litigation and "secur[e] freedom to
'return to his old ways.'" *Alaska*, 17 F.4th at 1227 (first alteration in
original) (quoting *Clarke*, 915 F.2d at 705). But that exception has no
application where, as here, the revocation or expiration of a government

13

order was for reasons other than the avoidance of litigation. *Id.* at 1229-30; *Clarke*, 915 F.2d at 705 (expressing "serious doubts" about whether the "voluntary cessation" rationale applies to such agency decisions because "it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose").

When TSA rescinded the latest planned extension, it did so not because of any desire to avoid litigation but because the related CDC order—which the expired directives were designed in substantial part to implement and enforce—had been vacated on a nationwide basis by the United States District Court for the Middle District of Florida. Press Release, TSA, *Statement Regarding Face Mask Use on Public Transportation* (Apr. 18, 2022), https://go.usa.gov/xuSpN. In such circumstances, the voluntary cessation doctrine does not apply. *Alaska*, 17 F.4th at 1229-30; *American Bar Ass'n v. Federal Trade Comm'n*, 636 F.3d 641, 648 (D.C. Cir. 2011). Relatedly, as discussed above, as to the portions of this case that are moot, there is no "reasonable expectation that the alleged violation will recur." *National Black Police Ass'n*, 108

14

F.3d at 349 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

*Second*, the issues in this case are not capable of repetition yet evading review.  That exception to mootness applies only where the "challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (quoting *Clarke*, 915 F.2d at 704).

Here, the expired directives were in place for nearly 15 months. During that time, another petitioner was able to fully litigate his petition for review of these orders and obtain a published decision on the merits in this Court. *See Corbett*, 19 F.4th at 480-81.  That petitioners were not able to fully litigate their challenge prior to the expiration of the challenged directives in April 2022 is largely due to their own litigation choices.  Rather than challenging the directives promptly after they issued, petitioners waited until October 2021—after *Corbett* had already been fully briefed and scheduled for oral argument—to file their petitions for review, and then resisted the government's reliance on a statutory venue provision, thus delaying the

consolidation of their actions in this Court for orderly briefing.  *See*
Resp. Br. 19-23 (briefly discussing the procedural history of these
cases).  Had petitioners filed their petitions earlier and litigated in the
normal course, they would have received a decision before the directives
expired, as Corbett's experience indicates.

## CONCLUSION

For the foregoing reasons, this Court should find that petitioners' arguments that TSA lacks authority to issue security directives designed to mitigate the threat that COVID-19 or other deadly communicable diseases poses to transportation security, or that such directives cannot be issued without notice and comment, are not moot. Those challenges should be rejected on the merits based on this Court's decision in *Corbett*. Petitioners' remaining challenges should be dismissed as moot.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

DANIEL TENNY

 */s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff
  Civil Division, Room 7710
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9039
  Jennifer.l.utrecht@usdoj.gov*

September 2022

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of
Appellate Procedure 32(a)(7)(B) because it contains 3,053 words.  This
brief also complies with the typeface and type-style requirements of
Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was
prepared using Word for Microsoft 365 in Century Schoolbook 14-point
font, a proportionally spaced typeface.


*/s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

# EXHIBIT 06

## SIX TSA Petitions for Review
## DENIED on February 09, 2023.

*(4 pages)*

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

**No. 21-1220**                                         **September Term, 2022**

FILED ON: FEBRUARY 9, 2023

LUCAS WALL, ET AL.,

PETITIONERS

v.

TRANSPORTATION SECURITY ADMINISTRATION,

RESPONDENT

———

Consolidated with Nos. 21-1221, 21-1225, 21-1236, 21-1237, 21-1258

———

On Petitions for Review of Orders of the Transportation Security Administration

———

Before: MILLETT and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*

**J U D G M E N T**

This case was considered on the record and on the briefs of the parties. We have accorded the issues full consideration and have determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). It is

**ORDERED** and **ADJUDGED** that the petitions for review be **DENIED**.

**I**

In these consolidated cases, thirteen petitioners (to whom we shall refer collectively as "Wall") challenge four now-expired security directives issued by the Transportation Security Administration ("TSA"). Those directives had generally required that facial masks be worn in transportation hubs and on public transit. The TSA had promulgated those directives under 49 U.S.C. § 114(g), which authorizes that agency, "during a national emergency," to "coordinate and oversee the transportation-related responsibilities of other departments and agencies of the Federal

1

Government," and "[t]o carry out such other duties, and exercise such other powers, relating to transportation during a national emergency as the Secretary of Homeland Security shall prescribe." 49 U.S.C. § 114(g)(1)(B), (D).  The TSA allowed those security directives to expire in April 2022 after a decision from the United States District Court for the Middle District of Florida struck down the Centers for Disease Control and Prevention's similar mask order.  *See* Press Release, *Statement Regarding Face Mask Use on Public Transportation*, TSA (April 18, 2022), https://go.usa.gov/xuSpN; *see also Health Freedom Def. Fund, Inc. v. Biden*, 599 F. Supp. 3d 1144 (M.D. Fla. 2022), *appeal pending* No. 22-11287.

## II

Because Wall's challenges are foreclosed by settled precedent, we deny the petitions for review.

### A

We start, as we must, with jurisdiction.  *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1106 (D.C. Cir. 2011).  Ordinarily, the expiration of the challenged security directives would render the petitions for review moot, depriving us of jurisdiction to decide the merits of Wall's claims.  *See North American Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020) (Mootness doctrine "focuses on whether events subsequent to the filing of the complaint have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.") (formatting modified).  These cases, though, fall squarely within the voluntary cessation exception to mootness.  That exception provides that a defendant's voluntary decision to halt challenged conduct will not moot a case unless "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997).  Said another way, a case will not be moot if there is a "more-than-speculative chance" that the court's ruling will affect the parties' rights in the foreseeable future.  *North American Butterfly Ass'n*, 977 F.3d at 1258.

In this case, it is not "absolutely clear" that the TSA will not reinstitute its masking directives. Quite the opposite:  The government is actively seeking to overturn the Middle District of Florida's decision striking down another transportation mask directive.  *See generally* Opening Brief for Appellants, *Health Freedom Def. Fund v. Biden*, No. 22-11287 (11th Cir. May 31, 2022).  And critically, the TSA has told this court directly that "there is a more-than-speculative chance that TSA will invoke the same authorities" to readopt another masking directive in the future.  TSA Suppl. Br. 7–9.  In addition, this court has already affirmed the TSA's statutory authority to issue the challenged directives without notice and comment rulemaking, so the TSA could reinstate the masking directives with relative procedural ease.  *See Corbett v. TSA*, 19 F.4th 478, 486 (D.C. Cir. 2021) (upholding TSA's authority to issue mask directives); *cf. Alaska v. Department of Agric.*, 17 F.4th 1224, 1229 n.5 (D.C. Cir. 2021) (where voluntary cessation by the government is

2

concerned, "structural obstacles to reimposing a challenged law * * * generally moot a case"). Because there is a more-than-speculative chance that the challenged conduct will recur, these cases are not moot.

That said, Wall's challenge *to the administrative record* underlying the TSA's expired orders is moot. That is because, even if the TSA reissues its masking directives, it will necessarily create a new administrative record underlying those orders. So it is certain that the administrative records before us now will not have any continuing legal consequence.

**B**

Turning to the merits, Wall's challenges to the TSA's statutory authority to issue the masking requirements and the related arguments that the TSA failed to promulgate the orders through notice and comment rulemaking are squarely foreclosed by our earlier decision in *Corbett*, 19 F.4th at 486.

Wall's arguments that the directives violate specified provisions of the Food, Drug, and Cosmetics Act, *see* 21 U.S.C. § 360bbb-3(e)(1)(A), and the Air Carrier Access Act, *see* 49 U.S.C. § 41705(a), also fail because the TSA is not a regulated party, and the mask mandate is not regulated conduct under any of the cited provisions. *See* 21 U.S.C. § 360bbb-3(*l*), (e)(1)(A) (regulated parties under this provision of Food, Drug, and Cosmetics Act, entitled "Authorization for medical products for use in emergencies," are only those that introduce medical products into interstate commerce, and regulated conduct is that which runs afoul of conditions on an Emergency Use Authorization set by the Food and Drug Administration); 49 U.S.C. § 41705(a) (regulated parties are air carriers).

Equally lacking in merit are Wall's claims that the masking directives impinge upon the "freedom to travel" and the protections of the Fifth Amendment's Due Process Clause for those whose disabilities prevent them from masking. The TSA's directives required airlines to exempt those with disabilities "who cannot wear a mask, or cannot safely wear a mask, because of the disability[.]" Security Directive No. 1542-21-01D, at 3–4. In addition, the directives did not dictate how private airlines should administer their own exemption processes. *See* Security Directives Nos. 1542-21-01D, 1582/84-21-01D. To the extent that Wall's arguments include challenges to individualized determinations in the past by private airline carriers to grant or deny individual exemptions, relief on those claims must be sought from the Department of Transportation, not the TSA. *See* 49 U.S.C. § 41705(c)(1); 14 C.F.R. § 382.159; 49 U.S.C. § 46110(a).

Wall's remaining constitutional claims fare no better. First, the Commerce Clause empowers Congress and, by delegation, the TSA, to regulate transportation in the manner undertaken here. *See Gonzales v. Raich*, 545 U.S. 1, 16, 22 (2005) (Congress has the power to regulate "channels" and "instrumentalities" of interstate commerce even if such regulation "ensnares some purely intrastate activity[.]"). Second, the Supremacy Clause provides that the TSA's directives override any conflicting state laws on masks. *See Wyeth v. Levine*, 555 U.S. 555, 576 (2009). Third, the

3

masking directives do not implicate anti-commandeering concerns as they are "evenhanded[]
regulat[ion of] an activity"—transportation—"in which both States and private actors engage."
*Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018).

Finally, it is far from clear that the two international treaties Wall invokes—the Convention
on International Civil Aviation, Dec. 7, 1944, 15 U.N.T.S. 295, and the International Covenant on
Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171—provide private causes of action in
federal court. And even if they did, Wall has made no showing that the TSA directives themselves,
which include accommodations for those with disabilities, discriminate against individuals with
disabilities in violation of those treaties.

* * * * *

For the foregoing reasons, the consolidated petitions for review are denied.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed
to withhold issuance of the mandate herein until seven days after resolution of any timely petition
for rehearing or rehearing en banc. See FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

**<u>Per Curiam</u>**


**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk

4

# EXHIBIT 07

**Respondent TSA's opposition to Petitioner's Motion to Compel restoration of Pre-Check membership.**

*(17 pages)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT

URI MARCUS, *et al.*,

Petitioners,

v.

TRANSPORTATION SECURITY
ADMINISTRATION,

Respondent.

No. 21-1225

**RESPONSE TO MOTION TO COMPEL**

**INTRODUCTION AND SUMMARY**

Petitioner, who is proceeding *pro se*, seeks to compel the

Transportation Security Administration to restore his eligibility for TSA

Pre-Check, which provides for an expedited screening process for

persons found after a background check to present a low security risk.

The underlying petition for review concerns a set of TSA orders that

generally require that persons in transportation hubs and on transport

conveyances wear masks covering their noses and mouths for the

duration of travel.  Petitioner asserts that TSA's action to revoke his

eligibility for Pre-Check was taken as retaliation for his filing of the

underlying petition for review.

Petitioner has made an argument like this before.  Before

petitioner's case was transferred to this Court, the Fifth Circuit denied

petitioner's emergency motion that was premised on petitioner's view

that TSA had retaliated against him by adding his name to a terrorist

watch list.  Like that motion, petitioner's current request for injunctive

relief is both procedurally improper and without merit.  Procedurally,

petitioner improperly seeks relief from a TSA action that is separate

from the one that gave rise to this petition for review.  And

substantively, petitioner has entirely failed to establish his entitlement

to the relief he seeks.  The letter petitioner received from TSA provides

a clear and non-retaliatory explanation as to why his Pre-Check

privileges had been revoked: that petitioner had been subjected to a

background check that had concluded that he was no longer a

sufficiently low security risk to allow his continued participation in the

PreCheck program.

Petitioner's argument that the determination was instead

retaliatory is entirely premised on the timing of TSA's action and

petitioner's asserted lack of awareness of any other circumstances that

could have prompted it.  The government will not discuss, in this public

filing, the security considerations that gave rise to TSA's withdrawal of petitioner's PreCheck status.  Petitioner points to two considerations to support his inference of retaliation, neither of which is sufficient to support his position.  First, petitioner points to the timing of TSA's action.  But timing alone is not sufficient to establish that TSA's action was taken in retaliation for this suit, rather than some other, legitimate reason.  Second, petitioner argues that his situation is similar to that of Michael Faris, the petitioner in a related case who made similar allegations of retaliation.  But Mr. Faris's argument that he had been retaliated against was rejected by the Sixth Circuit for failure to establish a likelihood of success on the merits, and petitioner's similar motion was also denied by the Fifth Circuit before this case was transferred to this Court.

The balance of harms also tips sharply against petitioner, who seeks to override TSA's determination regarding whether he should be entitled to a discretionary benefit of the least-probing form of screening that TSA affords the most trusted travelers, and whose only claimed harm is that it will be somewhat less convenient to go through airport security in the same manner as millions of other travelers.  The motion

should be denied.

## BACKGROUND

This petition for review is one of several challenging a series of orders issued by the Transportation Security Administration (TSA) that are designed to prevent the spread of COVID-19 on the nation's transportation systems by generally requiring that persons at transportation hubs and on transport conveyances wear masks (hereinafter the "Mask Directives").  The orders were initially issued on January 31, 2021, and have twice been extended without substantive change.  The President recently announced that TSA will extend the orders again, through March 18, 2022.[1]

This is not the first motion for substantive relief that has been filed in this family of cases, which were all filed on October 19, 2021, by petitioners who have acknowledged that they are "working collectively," *see, e.g.*, Opposition to Motion to Transfer, *Wall v. TSA*, No. 21-13619 (11th Cir.).

In three of the cases, shortly after filing the petition for review, one or more petitioners—including petitioner here—asserted that TSA

_____

[1] https://go.usa.gov/xepJw

had retaliated against them for filing these actions by subjecting them to enhanced screening or placing them on a watch list, and filed motions demanding relief within a matter of days because they alleged they had upcoming flights. All three motions were denied. *See* Order, *Marcus v. TSA*, No. 21-60808 (5th Cir. Oct. 29, 2021); Order, *Faris v. TSA*, No. 21-3951 (6th Cir. Oct. 29, 2021); Order, *Wall v. TSA*, No. 21-13619 (11th Cir. Oct. 29, 2021).

All six sets of petitioners have also moved to stay the TSA orders relating to masks that are at issue in the underlying petitions for review. Each motion has been denied (some before being transferred to this Court under 28 U.S.C. § 2112, some after). *See* Order, *Wall v. TSA*, No. 21-1220 (D.C. Cir. Nov. 10, 2021); Order, *Faris v. TSA*, No. 21-1221 (D.C. Cir. Nov. 12, 2021); Order, *Marcus v. TSA*, No. 12-1225 (D.C. Cir. Nov. 12, 2021); Order, *Andreadakis*, No. 21-2173 (4th Cir. Nov. 12, 2021); Order, *Eades v. TSA*, No. 21-3362 (8th Cir. Nov. 17, 2021); Order, *Abadi v. TSA*, No. 21-2692 (2d Cir. Nov. 18, 2021). Petitioners in one of the cases have sought a stay from the Supreme Court; that motion was denied by the Chief Justice. *See* Order, *Wall v. TSA*, No. 21A198 (S. Ct. Dec. 9, 2021). Another petitioner, whose stay motion was denied by the

Eighth Circuit, has renewed that motion in this Court, stating that he

cannot seek relief from the Supreme Court without doing so.  *See* Mot.

for Stay, *Eades v. TSA*, No. 21-1236 (Dec. 16, 2021).

**C.**   The present motion concerns petitioner's eligibility for

expedited security screening under the TSA Pre-Check Application

Program (hereinafter "Pre-Check").  On November 23, 2021, TSA sent

petitioner a letter informing him that as a participant previously found

eligible for the TSA Pre-Check Application Program, he is "subject to

recurrent checks against various databases, including law enforcement,

immigration, regulatory violation, and intelligence databases," and

that, "[a]s a result of recurrent checks and based on a comprehensive

background check, TSA was unable to determine that [petitioner]

pose[s] a sufficiently low risk to transportation and national security to

continue to be eligible for expedited airport security screening."  Mot.

Ex. 7.  As a result, TSA determined that petitioner is no longer eligible

to participate in the Pre-Check program.  *Id.*

Petitioner now claims that TSA's decision that he was no longer

eligible for expedited screening was made in retaliation for his filing of

this petition for review approximately five weeks before he received a

letter declaring him ineligible.  He requests that this Court issue an

order requiring TSA to "immediately restore" his Pre-Check

membership, and direct TSA "to show cause . . . why it should not be

sanctioned and/or held in contempt" for retaliating against him.  Mot. 9.

## ARGUMENT

1.  Petitioner filed this petition for review to challenge four

generally applicable measures regarding the requirement to wear a

mask during travel.  The current motion does not seek relief from the

Mask Directives challenged in the petition for review, and the

injunction it seeks would not affect those orders in any way.  Instead,

the motion seeks an injunction requiring TSA to restore petitioner's

Pre-Check privileges, which were revoked last month.

Petitioner alleges that TSA's decision regarding his eligibility for

Pre-Check was made in retaliation for his filing of this petition for

review.  But that alleged misconduct has no relation to the orders that

are the subject of the petition for review, and petitioner's effort to set

aside government actions different from the ones he has challenged in

this litigation is not properly before the Court.  Although this Court has

authority, ancillary to its jurisdiction to review the challenged Mask

PLAINTIFFS' SUPPLEMENTAL BRIEF
ON MOOTNESS [DKT. #170]

Directives, to "stay the order or take[] other appropriate action when

good cause for its action exists," 49 U.S.C. § 46110(c), there is no basis

for injecting into this proceeding other alleged actions that are not

within the scope of the underlying petition for review or to obtain relief

that does not affect the orders properly before the Court.

The only authority petitioner cites in support of this Court's

authority to grant his motion to compel TSA to restore his Pre-Check

privileges is the All Writs Act, 28 U.S.C. § 1651(a). As this Court has

explained, a writ of mandamus is a "'drastic and extraordinary remedy

reserved for really extraordinary causes'" and requires, among other

things, for the petitioner to show that his "right to the issuance of the

writ is clear and indisputable"—a heightened showing on the merits

that petitioner has not and cannot come close to making. *In re Flynn*,

973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) (quoting *Cheney v. United

States District Court for the District of Columbia*, 542 U.S. 367, 380-81

(2004)).

The mismatch between the petition for review and the claim

pursued in this motion is illustrated by the presence of undeveloped and

disputed factual allegations that are not covered by the relevant

administrative record. *See* Mot. 6-7 (insisting that TSA "file the
background check and other documents used to rescind [his] Pre-Check
membership in the public record"). Petitioner's motion is thus entirely
procedurally improper, and should be denied on that ground.

2. In any event, petitioner's claim fails on the merits. *See, e.g.*,
*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)
(noting that "injunctive relief" is also "an extraordinary remedy that
may only be awarded upon a clear showing that the plaintiff is entitled
to such relief"); *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)
("[W]e read *Winter* at least to suggest if not hold 'that a likelihood of
success is an independent, free-standing requirement for a preliminary
injunction.'"). Petitioner's unsubstantiated assertion of retaliation does
not even state a plausible claim for relief, let alone establish a
likelihood of success on the merits. *See Aschroft v. Iqbal*, 556 U.S. 662,
681-82 (2009).

Petitioner alleges that TSA decided to revoke his Pre-Check
privileges in response to having filed this lawsuit. But he provides
scant support for that allegation. The letter TSA provided petitioner
states that after recurrent background checks, TSA was "unable to

determine that [petitioner] pose[s] a sufficiently low risk to
transportation and national security to continue to be eligible for
expedited airport security screening," Mot. Ex. 7, and petitioner offers
no basis other than speculation for concluding that this asserted reason
is a pretext for retaliation.

Petitioner's main argument is that TSA's decision was a month
after he sued TSA, and that he can identify no reason other than this
litigation that TSA would have taken its action. We will not discuss in
this public filing the security considerations that gave rise to TSA's
decision. But even on its own terms, petitioner's speculation based on
the timing of TSA's action does not come close to establishing that TSA
must have been retaliating against him. Petitioner observes that he
has not flown since December 2020 and has not been arrested or
charged with a crime. But in-flight disturbances or arrests are not the
only things that can give rise to a determination that a person might
not pose a sufficiently low security risk. And petitioner's own
observations are carefully worded; petitioner neglects to mention that,
according to his own prior declaration in this litigation, although he has
not flown, he has had reservations for airline travel (some of which he

never intended to use) that have been cancelled by various airlines. *See* Emergency Motion to Compel, *Marcus v. TSA*, No. 21-60808 (5th Cir.) (Marcus Decl. ¶¶ 12-14). Petitioner cannot plausibly assert that there is no conceivable difference between him and other travelers other than the filing of this lawsuit.

Petitioner is also not served by his unsupported insistence that TSA also "illegally retaliated" (Mot. 4-5) against another petitioner challenging the TSA Mask Directives. Petitioner is correct that Mr. Faris, along with two other petitioners challenging the Mask Directives—including the petitioner here—alleged that they had been retaliated against by allegedly being placed on a terrorist watchlist shortly after filing their petitions for review. But those motions were rejected by three different circuits without noted dissent. Order, *Faris v. TSA*, No. 21-3951 (6th Cir. Oct. 29, 2021); *Order*, *Marcus v. TSA*, No. 21-60808 (5th Cir. Oct. 29, 2021); Order, *Wall v. TSA*, No. 21-13619 (11th Cir. Oct. 29, 2021). They, too, thus undermine rather than support petitioner's argument here.

Petitioner asserts that the government responded to Mr. Faris's motion by "filing a secret document in the Sixth Circuit" and then

"removed Mr. Faris from the terrorist watchlist." Mot. 5. The

government cannot confirm or deny, on the public record, petitioner's

speculation regarding whether Mr. Faris—or any other individual—is

or ever was on a watch list because that information could reasonably

be expected to cause circumvention of the law and cause harm to the

security of the transportation system. *See* 49 U.S.C. § 114(r); 49 C.F.R.

§ 1520.5(a), (b)(7), (b)(9)(ii); *Elhady v. Kable*, 993 F.3d 208, 215 (4th Cir.

2021); *Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012); *see also*

*United States v. Aukai,* 497 F.3d 955, 961 (9th Cir. 2007). And there

was nothing nefarious about the filing of a so-called "secret document."

Because Mr. Faris sought relief on a highly expedited basis, although

the government urged that his motion was without merit and could be

denied without any consideration of sensitive material, out of an

abundance of caution the government sought leave to file *ex parte* and

under seal a declaration that described the relevant facts. Agreeing

with the government's primary submission, the Sixth Circuit denied the

motion without considering the *ex parte* filing and denied the motion for

leave to file (which Mr. Faris had opposed) as moot. *See* Order*, Faris v.*

*TSA*, No. 21-3951 (6th Cir. Oct. 29, 2021).

The Fifth and Eleventh Circuits likewise disposed of the motions
pending before them without considering sensitive information: the
Fifth Circuit denied petitioner's motion before the government even
filed a response, and the Eleventh Circuit denied a similar motion filed
by Mr. Wall after considering the government's public opposition, which
offered to file an *ex parte* declaration if the court deemed it necessary
(which the court did not request before denying Mr. Wall's motion).

Here, as before, petitioner's claim plainly lacks merit and should
be denied without any need for the consideration of sensitive
information regarding the security review that gave rise to TSA's
decision.  However, to the extent this Court believes more information
is necessary in order to resolve the pending motion, the government is
prepared to provide to the court, upon request, with a declaration, filed
*ex parte* and under seal, for this Court's *in camera* review that describes
the relevant facts and will confirm that petitioner's claim lacks merit.

3.  The remaining equitable factors also counsel against granting
petitioner's motion.

As an initial matter, petitioner does not demonstrate that he will
suffer irreparable harm if this Court denies his request for injunctive

13

relief.  Among other things, the petitioner does not identify any

upcoming scheduled flights for which he would otherwise benefit from

expedited screening.  Nor is the fact that the petitioner may be subject

to regular security screening—just like millions of other passengers—

adequate to establish certain, imminent, and irreparable harm.  *Cf.*

*Ghedi v. Mayorkas*, 16 F.4th 456, 466-67 (5th Cir. 2021) (holding that

enhanced screening does not impose burdens amounting to a

constitutional violation); *Elhady*, 993 F.3d at 219-24 (4th Cir. 2021)

(same); *Beydoun v. Sessions*, 871 F.3d 459, 468-69 (6th Cir. 2017)

(same).

On the other side of the ledger, petitioner asks this Court to

override TSA's determination that petitioner does not pose a sufficiently

low risk to transportation and national security to be eligible for

expedited airport security screening through the TSA Pre-Check

Application Program.  This weighty interest in protecting the

transportation system from threats further establishes that petitioner's

motion should be denied.

## CONCLUSION

For the foregoing reasons, the motion should be denied.

Respectfully submitted,

DANIEL TENNY
   (202) 514-1838

/s/ Jennifer L. Utrecht
JENNIFER L. UTRECHT
   (202) 353-9039
Attorneys
Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 7710
Washington, DC  20530

DECEMBER 2021

15

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the
Clerk of the Court for the United States Court of Appeals for the D.C.
Circuit by using the appellate CM/ECF system on December 20, 2021.  I
certify that all participants in the case are registered CM/ECF users
and that service will be accomplished by the appellate CM/ECF system.

/s/ *Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.  I further certify that this response complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 2,670 words according to the count of Microsoft Word.

s/ *Jennifer L. Utrecht*
Jennifer L. Utrecht

# EXHIBIT 08

**The Federal Register's 87 FR 36129,
rescinding the ITTR
on June 12, 2022.**

*(7 pages)*

**LEGAL STATUS**

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

**LEGAL STATUS**

# Rescinding Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country

A Notice by the Centers for Disease Control and Prevention on 06/15/2022

**DOCUMENT DETAILS**

**Printed version:**
PDF (https://www.govinfo.gov/content/pkg/FR-2022-06-15/pdf/2022-13022.pdf)

**Publication Date:**
06/15/2022 (/documents/2022/06/15)

**Agencies:**
Centers for Disease Control and Prevention (https://www.federalregister.gov/agencies/centers-for-disease-control-and-prevention)

**Dates:**
This rescission was implemented June 12, 2022.

**Document Type:**
Notice

**Document Citation:**
87 FR 36129

**Page:**
36129-36131 (3 pages)

**Document Number:**
2022-13022

**DOCUMENT DETAILS**

**DOCUMENT STATISTICS**

**Page views:**
23,165
as of 02/07/2023 at 12:15 am EST

**DOCUMENT STATISTICS**

**PUBLISHED DOCUMENT**

## AGENCY:

Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

## ACTION:

Notice.

## SUMMARY:

The Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS), is hereby rescinding the Order titled,

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ Start Printed Page 36130 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

"Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country." As subsequently amended, the Order required all air passengers, two years or older, traveling to the United States from a foreign country to present a negative COVID-19 test result from a sample taken no more than one day before departure, or documentation of recovery from COVID-19 in the past 90 days, before boarding a flight.

## DATES:

This rescission was implemented June 12, 2022.

## FOR FURTHER INFORMATION CONTACT:

Candice Swartwood, Division of Global Migration and Quarantine, National Center for Emerging and Zoonotic Infectious Diseases, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16-4, Atlanta, GA 30329; Telephone: 404-498-1600; Email: *dgmqpolicyoffice@cdc.gov (mailto:dgmqpolicyoffice@cdc.gov).*

## SUPPLEMENTARY INFORMATION:

### Background

The Order was one of several actions taken by the Federal government during earlier phases of the COVID-19 pandemic to help mitigate the further transmission and spread of SARS-CoV-2 variants into and within the United States. Since then, many circumstances have changed, including the widespread uptake of effective COVID-19 vaccines and accompanying vaccine- and infection-induced immunity, as well as the availability of effective therapeutics, and CDC remains focused on preventing medically significant disease, hospitalizations, and deaths from COVID-19. Accordingly, CDC has determined that it is not currently necessary to leave the Order in place to prevent introduction of currently circulating SARS-CoV-2 variants into the United States.

CDC continues to recommend that all travelers remain up to date with vaccination against COVID-19 and get tested for current infection with a viral test before and after they travel, and after any known exposure to a person with COVID-19, so they can take appropriate precautions to reduce the risk of exposing others while infectious. Furthermore, CDC continues to recommend that people wear masks in indoor public transportation settings.

## Applicability of the Paperwork Reduction Act

In accordance with this Rescission Order, the Passenger Disclosure and Attestation form (OMB Control No. 0920-1318) has been amended to remove the testing requirement. CDC will publish a separate notice regarding this change under the Paperwork Reduction Act.

## Referenced Order

A copy of the Order is provided below, and a copy of the signed Order can be found at *https://www.cdc.gov/ quarantine/pdf/rescission-global-testing-order-p.pdf.pdf (https://www.cdc.gov/quarantine/pdf/rescission-global-testing-order-p.pdf.pdf).*

## Centers for Disease Control and Prevention Department of Health and Human Services

## Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264 (https://www.govinfo.gov/link/uscode/42/264)) and 42 Code of Federal Regulations 71.20 (https://www.ecfr.gov/current/title-42/section-71.20), 71.31(B) (https://www.ecfr.gov/current/title-42/section-71.31#p-71.31(B))

## Rescinding Requirement for Negative Pre-Departure Covid-19 Test Result or Documentation of Recovery From Covid-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country

## Summary and Action

On January 26, 2021, the Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS), issued an Order titled, "Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country." 86 FR 7387 (/citation/86-FR-7387) (Jan. 28, 2021). As subsequently amended, the Order currently requires all air passengers, 2 years or older, traveling to the United States from a foreign country to present a negative COVID-19 test result from a sample taken no more than one day before departure, or documentation of recovery from COVID-19 in the past 90 days, before boarding a flight. 86 FR 69256 (/citation/86-FR-69256) (Dec. 7, 2021).[1]

The Order was one of several actions taken by the Federal government during earlier phases of the COVID-19 pandemic to help mitigate the further transmission and spread of SARS-CoV-2 variants into and within the United States. At that time, CDC concluded that it was a reasonable and necessary measure in light of the increased risk of transmission and spread of SARS-CoV-2 variants by international air travel into the United States, as well as the low rate of vaccination and infection-induced immunity in the United States, and emergence of new variants of concern. Indeed, when the Order was last amended, it identified the Omicron variant as a variant of concern, noting uncertainty about how easily that variant might spread, the severity of disease it might cause, and the level of protection against it that vaccines might afford. 86 FR at 69259-60.

Since then, many circumstances have changed, including the widespread uptake of effective COVID-19 vaccines and accompanying vaccine- and infection-induced immunity, as well as the availability of effective therapeutics. However, CDC remains focused on preventing medically significant disease, hospitalizations, and deaths from COVID-19. CDC has determined that it is not currently necessary to leave the Order in place to prevent introduction of currently circulating SARS-CoV-2 variants into the United States. In its place, CDC has determined that travelers have access to tools ( *e.g.*, vaccines, therapeutics, and recommended prevention measures) and guidance that allow travelers to make informed choices about the use of pre-departure testing and other prevention measures. CDC continues to recommend that all travelers remain up to date with vaccination against COVID-19 and get tested for current infection with a viral test before and after they travel, and after any known exposure to a person with COVID-19, so they can take appropriate precautions to reduce the risk of exposing others while infectious.

CDC monitors circulating SARS-CoV-2 variants around the world and can enhance prevention measures, including reinstituting testing requirements, as warranted, including if a variant emerges that may present increased risk of severe illness and death. Removing this requirement is consistent with the framework CDC released in February 2022, "COVID-19 Community Levels," reflecting public health's focus on reducing medically significant disease, hospitalization, and deaths.[2]

Start Printed
Page 36131

Vaccines, including boosters, continue to be the most important public health tool for fighting COVID-19, and CDC recommends that all people get vaccinated against COVID-19 as soon as they are eligible and stay up to date with their vaccinations.[3] When the Order was first issued in January 2021, the United States and countries around the world were just embarking on efforts to vaccinate their populations and learn about emerging variants. Now, as of June 9, 2022, 70.9% of the U.S. population five years of age and older has received a primary series.[4] Additionally, booster shots are recommended for and available to individuals five years of age and older; [5] second booster shots are now recommended for adults ages 50 years or older and people ages 12 years and older who are moderately or severely immunocompromised.[6] The increased percentage of individuals who are not only fully vaccinated with a primary series but have also received one or more booster doses strengthens community and individual protection against serious illness from SARS-CoV-2 and reduces the associated strain on healthcare infrastructure. We know that the now-dominant Omicron variant, though more transmissible than prior variants, has generally caused less severe disease among those who are infected. COVID-19 vaccination still remains an effective measure to prevent medically significant disease, hospitalizations, and deaths.

Similarly, the availability of efficacious and accessible treatments adds a powerful layer of protection against severe COVID-19 that was not available in January 2021.[7] The U.S. Government's commitment to making such medications available and the ability to produce variant-specific treatments are critical components of the next phase of the fight against COVID-19. The observed reduction in severity of COVID-19 cases and ongoing effective use of pharmaceutical interventions contribute greatly to minimize medically significant disease and largely prevent excessive strain on the healthcare sector at this stage in the pandemic.[8]

Therefore, based on these considerations, I have concluded that continuation of the Order is not currently necessary.[9] There being no operational need to delay implementation of this rescission for more than a short period of time, it shall take effect for all aircraft departing from their point of origin on or after Sunday, June 12, 2022, at 12:01 a.m. Eastern Daylight Time (EDT). Importantly, CDC continues to recommend that all travelers remain up to date with vaccination against COVID-19 and get tested for current infection with a

viral test before and after they travel, and after any known exposure to a person with COVID-19, so they can take appropriate precautions to reduce the risk of transmission while infectious. Furthermore, CDC continues to recommend that people wear masks in indoor public transportation settings.

## Effective Date

This rescission shall be effective for all aircraft departing their point of origin on or after June 12, 2022, at 12:01 a.m. EDT.

Sherri Berger,

Chief of Staff, Centers for Disease Control and Prevention.

## Footnotes

*1. The Order stems from previous testing requirements, which varied in scope and applicability. For example, on December 27, 2020, the CDC implemented the Order, Requirement for Negative Pre-Departure COVID-19 Test Result for All Airline Passengers Arriving Into the United States From the United Kingdom, in response to the Alpha variant and rising number of COVID-19 cases.*
Back to Citation

*2. This new framework examines three currently relevant metrics for each U.S. county: new COVID-19 hospital admissions per 100,000 population in the past seven days, the percent of staffed inpatient beds occupied by patients with COVID-19, and total new COVID-19 cases per 100,000 population in the past seven days. Indicators for Monitoring COVID-19 Community Levels and Implementing Prevention Strategies, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/ downloads/science/Scientific-Rationale-summary_COVID-19-Community-Levels_2022.02.23.pptx (https://www.cdc.gov/coronavirus/2019-ncov/downloads/science/Scientific-Rationale- summary_COVID-19-Community-Levels_2022.02.23.pptx) (Feb. 25, 2022).*
Back to Citation

*3. COVID-19 Vaccines Work, Centers for Disease Control and Prevention, https://www.cdc.gov/ coronavirus/2019-ncov/vaccines/effectiveness/work.html (https://www.cdc.gov/coronavirus/2019- ncov/vaccines/effectiveness/work.html) (updated Dec. 23, 2021). See also Thompson MG, Natarajan K, Irving SA, et al. Effectiveness of a Third Dose of mRNA Vaccines Against COVID-19-Associated Emergency Department and Urgent Care Encounters and Hospitalizations Among Adults During Periods of Delta and Omicron Variant Predominance—VISION Network, 10 States, August 2021-January 2022. MMWR Morb Mortal Wkly Rep 2022;71:139-145 (Jan. 28, 2022). DOI: http://dx.doi.org/10.15585/mmwr.mm7104e3 (http://dx.doi.org/10.15585/mmwr.mm7104e3) (attributing decline of vaccine effectiveness to waning vaccine-induced immunity over time, possible increased immune evasion by SARS-CoV-2 variants, or a combination of these and other factors and finding that receiving a booster shot was highly effective at preventing COVID-19-associated emergency department and urgent care encounters and preventing COVID-19-associated hospitalizations).*
Back to Citation

*4. COVID Data Tracker, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data- tracker/#vaccinations_vacc-people-onedose-pop-5yr (https://covid.cdc.gov/covid-data- tracker/#vaccinations_vacc-people-onedose-pop-5yr) (last visited June 10, 2022).*
Back to Citation

5.  *COVID Data Tracker Weekly Review: The Time Is Now—Interpretive Summary for June 3, 2022, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/ covidview/index.html (https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html) (June 3, 2022).*
Back to Citation

6.  *COVID-19 Vaccine Boosters, Centers for Disease Control and Prevention, https://www.cdc.gov/ coronavirus/2019-ncov/vaccines/booster-shot.html#second-booster (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html#second-booster) (updated May 24, 2022).*
Back to Citation

7.  *National COVID-19 Preparedness Plan—March 2022, https://www.whitehouse.gov/wp-content/ uploads/2022/03/NAT-COVID-19-PREPAREDNESS-PLAN.pdf (https://www.whitehouse.gov/wp-content/uploads/2022/03/NAT-COVID-19-PREPAREDNESS-PLAN.pdf) (last visited Mar. 30, 2022). Antiviral pills will also be added to the stockpile for the first time. See also Information About COVID-19 EUAs for Medical Devices, U.S. Food and Drug Administration, https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs (https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#coviddrugs) (updated June 3, 2022); FDA News Release: Coronavirus (COVID-19) Update: FDA Authorizes First Oral Antiviral for Treatment of COVID-19, U.S. Food and Drug Administration, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19 (https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19) (Dec. 22, 2021).*
Back to Citation

8.  *Science Brief: Indicators for Monitoring COVID-19 Community Levels and Making Public Health Recommendations, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/indicators-monitoring-community-levels.html (https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/indicators-monitoring-community-levels.html) (updated Mar. 4, 2022); Nationwide COVID-19 Infection- and Vaccination-Induced Antibody Seroprevalence (Blood donations), Centers for Disease Control and Prevention, https://covid.cdc.gov/ covid-data-tracker/#nationwide-blood-donor-seroprevalence (https://covid.cdc.gov/covid-data-tracker/#nationwide-blood-donor-seroprevalence) (last updated Feb. 18, 2022).*
Back to Citation

9.  *This Order is not a legislative rule within the meaning of the Administrative Procedure Act ("APA") but rather a rescission of a previous Order undertaken as an emergency action under the existing authority of 42 U.S.C. 264(a) (https://www.govinfo.gov/link/uscode/42/264) and 42 CFR 71.20 (https://www.ecfr.gov/current/title-42/section-71.20), 71.31(b) (https://www.ecfr.gov/current/title-42/section-71.31#p-71.31(b)), which was taken without notice and comment. In the event that a court determines this rescission qualifies as a legislative rule under the APA, notice and comment and a delay in effective date are not required because the prior Order was established without notice and comment and there is good cause to lift that restriction immediately, given the current judgment that it is unnecessary to prevent the introduction of COVID-19 into the United States and to seek comment prior to the effective date of this notice would be impracticable and contrary to the public interest. 5 U.S.C. 553(b)(3)(B) (https://www.govinfo.gov/link/uscode/5/553). Further, while this Order is major under the Congressional Review Act "CRA", it is not necessary to delay the effective date for similar reasons of good cause. 5 U.S.C. 808(2) (https://www.govinfo.gov/link/uscode/5/808).*
Back to Citation

[FR Doc. 2022-13022 (/d/2022-13022) Filed 6-13-22; 4:15 pm]

BILLING CODE 4163-18-P

2/7/23, 9:13 AM                Federal Register :: Rescinding Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 …

PUBLISHED DOCUMENT

# EXHIBIT 09

**The ITTR re-imposed or remains in effect for China, Macau, etc., with additional designated airports.**

*(10 pages)*

Español | Other Languages

 Centers for Disease Control and Prevention



# Requirement for Proof of Negative COVID-19 Test or Documentation of Recovery from COVID-19 for Air Passengers Traveling to the United States from China, Hong Kong, or Macau

Updated Dec. 30, 2022

## What You Need to Know

- **If you plan to travel by air to the United States from China, Hong Kong, or Macau**, you will need to get a COVID-19 viral test no more than 2 days before your flight. You must show your negative result to the airline before you board your flight.
  - This requirement also applies if you have been in China, Hong Kong, or Macau in the past 10 days and you are traveling to the United States from one of the following airports: Incheon International Airport (ICN) in Seoul, Republic of Korea; Toronto Pearson International Airport (YYZ) in Canada; and Vancouver International Airport (YVR) in Canada (referred to as Designated Airports).
  - The requirement **does not apply** if you transited through an airport in China, Hong Kong, or Macau en route to the United States from another country, or if you spent less than 24 hours in China, Hong Kong, or Macau.

- If you recently recovered from COVID-19, you may instead travel with one of the following forms of documentation of recovery from COVID-19:
  - Your positive COVID-19 viral test result on a sample taken more than 10 days but fewer than 91 days before your flight, **or**
  - Your positive COVID-19 viral test result on a sample taken 10 or fewer days before your flight PLUS a letter from a licensed healthcare provider or a public health official stating that your COVID-19 symptoms started more than 10 days before your flight.

- These requirements apply to passengers 2 years of age and older regardless of citizenship or vaccination status.

On December 30, 2022, CDC issued an Order titled, "Requirements for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from Covid-19 for All Airline or Other Aircraft Passengers Traveling to the United States from the People's Republic Of China."

Starting **12:01am EST (5:01am GMT) on January 5, 2023**, all air passengers 2 years of age and older traveling to the United States from China, Hong Kong, or Macau will need to get a COVID-19 viral test no more than 2 days before their flight and show their negative result, or show proof documentation of having recovered from COVID-19 in the past 90 days, to the airline before boarding. This requirement also applies to passengers who have been in China, Hong Kong, or Macau in the

past 10 days and are traveling to the United States from one of the following airports: Incheon International Airport (ICN) in Seoul, South Korea; Toronto Pearson International Airport (YYZ) in Canada; and Vancouver International Airport (YVR) in Canada (referred to as *Designated Airports*).

These air passengers will also be required to confirm in the form of an attestation that the information they present is true.

For the full list of requirements and exceptions, please review the language in the Order.

Visit the following pages for additional recommendations and requirements before, during, and after international travel.

- Requirement for Proof of COVID-19 Vaccination For Air Passengers
- International Travel to and from the United States



## Travel Assessment
A tool to help you know the requirements to board a flight to the United States.

[Get Started]

## Aircraft Operators/ Airlines/ Crew

For additional information, resources, and FAQs please visit the following webpages:

- Aircraft Operators/Airlines/Crew FAQs Requirement for Proof of Negative COVID-19 Test or Documentation of Recovery from COVID-19

# Frequently Asked Questions

**What are you looking for?**

Enter a word or phrase to locate questions and answers that match.

## Overview

Does this requirement apply to U.S. citizens?                                    ⌄

Yes, this Order applies to U.S. citizens and lawful permanent residents (Green Card holders), unless they meet the criteria for an exception.

Does the Order apply to people who were only in an airport in China, Hong Kong, or Macau, or    ⌄
only in these areas for less than 24 hours?

No, the Order **does not apply** if you transited through an airport in China, Hong Kong, or Macau en route to the United States from another country, or if you spent less than 24 hours in China, Hong Kong, or Macau.

### How do I count the days to check if I have been in China, Hong Kong, or Macau in the past 10 days?                                                               ⌄

The date you left China, Hong Kong, or Macau is Day 0. The requirements no longer apply on Day 11, which is a full 10 days after you left China, Hong Kong, or Macau. For example, if you left China, Hong Kong, or Macau on January 1 (Day 0), the requirements no longer apply on January 12 (Day 11).

### Does this Order apply to land border crossings or persons arriving at seaports?                                                               ⌄

No, the requirements of this Order only apply to air travel to the U.S. from China, Hong Kong, Macau, or a *Designated Airport*.

### Does travel to the United States include travel to U.S. territories?                                                               ⌄

Yes, the requirement to present a negative COVID-19 viral test result or documentation recovery from COVID-19 also applies to air travel to US territories. U.S. territories include American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands.

## Test and Documentation Requirements

### What types of SARS-CoV-2 tests are acceptable under the Order?                                                               ⌄

You must be tested with a viral test to look for current infection – these include an antigen test or a nucleic acid amplification test (NAAT).

Phrases indicating a test is an antigen test could include, but are not not limited to:

- Rapid antigen test
- Viral antigen test
- Antigen Chromatographic Digital Immunoassay
- Antigen Chemiluminescence Immunoassay
- Antigen Lateral Flow Fluorescence

Examples of available NAATs for SARS-CoV-2 include but are not restricted to:

- Reverse transcription polymerase chain reaction (RT-PCR)
- Isothermal amplification including:
    - Nicking endonuclease amplification reaction (NEAR)
    - Transcription mediated amplification (TMA)
    - Loop-mediated isothermal amplification (LAMP)
    - Helicase-dependent amplification (HDA)
    - Clustered regularly interspaced short palindromic repeats (CRISPR)
    - Strand displacement amplification (SDA)

The test used must be authorized for detection of SARS-CoV-2 by the U.S. Food and Drug Administration or the relevant national authority in the country where the test is administered.

A viral test conducted for U.S. Department of Defense (DOD) personnel, including DOD contractors, dependents, and other U.S. government employees, and tested by a DOD laboratory located in a foreign country also meets the requirements of the Order.

---

### Can I get a rapid test? 

Rapid tests are acceptable if they are a viral test that meet the requirements under the Order.

---

### Does a self-test meet the conditions of the Order? 

**You** can use a self-test (sometimes referred to as home test) that meets the following criteria:

- The test must be a SARS-CoV-2 viral test (nucleic acid amplification test [NAAT] or antigen test) with Emergency Use Authorization (EUA) from the U.S. Food and Drug Administration (FDA) OR the relevant national authority where the test is administered.
- The testing procedure must include a telehealth service affiliated with the manufacturer of the test that provides real-time supervision remotely through an audio and video connection. Some FDA-authorized self-tests that include a telehealth service may require a prescription.
- The telehealth provider must confirm your identity, observe the sample collection and testing procedures, confirm the test result, and issue a report that meets the requirements of CDC's Order (see "What information must be included in the test result?" below).
- Airlines and other aircraft operators must be able to review and confirm your identity and the test result details. You must also be able to present the documentation of test results to U.S. officials at the port of entry and local/state health departments, if requested.

Some countries may restrict importation of tests that are not authorized or registered there. If you are considering bringing a U.S.-authorized test with you for use outside of the United States, contact authorities at your destination for information before you travel.

---

### What information must be included on the test result? 

A test result must be in the form of written documentation (paper or digital copy). The documentation must include:

1. Type of test (indicating it is a NAAT or antigen test)
2. Entity issuing the result (e.g., laboratory, healthcare entity, or telehealth service)
3. Sample collection date
   - A negative test result must show the sample was taken no more than 2 days before the flight.
   - A positive test result for documentation of recovery from COVID-19 must show the sample was taken within the 90 days before the flight.
4. Information that identifies the person (full name plus at least one other identifier such as date of birth or passport number)
5. Test result

Before boarding a flight to the U.S., you will need to show a paper or digital copy of your test result for review by the airline and may be requested to show to public health officials after you arrive in the U.S.

---

### Will CDC reimburse me for the cost of a COVID-19 test? 

CDC is not able to reimburse you for COVID-19 testing fees. You may wish to contact your insurance provider or the location that provided your test about payment options.

## What if I recently recovered from COVID-19? 

If you had a positive viral test result in the past 90 days, you can show one of the following forms of documentation of recovery from COVID-19:

- A positive viral test result from a sample collected more than 10 days and fewer than 91 days before your flight, OR
- A positive result dated 10 or fewer days before your flight PLUS a letter signed by a licensed healthcare provider stating that your symptoms started more than 10 days before your flight. The letter must:
  - list the date your symptoms started;
  - have information that identifies you personally (e.g., name and date of birth) that matches the personal identifiers on your passport or other travel documents; and
  - be signed and dated on official letterhead that contains the name, address, and phone number of the healthcare provider or public health official who signed the letter.

Also see "What information must be included on the test result?" above.

If you have recovered from COVID-19 but are not able to obtain documentation of recovery that fulfills the requirements, you will need to show a negative COVID-19 viral test result from a sample taken no more than 2 days before your flight departs.

Airlines must refuse to board anyone who does not present a negative test result for COVID-19 or documentation of recovery.

## How do I count the 10 days for documentation of recovery? When can I travel? 

The date your positive test was taken or the date your symptoms started is Day 0. You can travel on or after Day 11, which is 10 full days after Day 0. For example, if your test was taken or your symptoms started on January 1 (Day 0), you can travel on January 12 (Day 11).

## What if I have had a COVID-19 vaccine or have tested positive for antibodies? Do I still need a negative COVID-19 test or documentation of recovery from COVID-19?

Yes, the requirements of this Order apply regardless of vaccination or antibody status.

## Does my negative test result or documentation of recovery need to be in English?

Airlines and other aircraft operators must be able to confirm the test result and review other required information and should determine when translation is necessary for these purposes. If your documents are in a language other than English, you should check with your airline or aircraft operator before travel.

## Should I retain proof of a negative test or documentation of recovery? 

You are required to retain a paper or digital copy of your negative test result or documentation of recovery for the entirety of your itinerary to the United States as federal public health officials may request to see these documents when you arrive. State, territorial, tribal and/or local health departments in the United States may also request them under

their own public health authorities.

## Timing Requirements

### When do I need to get a test to travel to the US?

If you are 2 years of age or older and traveling to the U.S., you must get tested no more than 2 days before your flight to the departs from China, Hong Kong, Macau, or a *Designated Airport.*

### Why does the Order specify 2 days rather than 48 hours? What is considered 2 days?

The 2-day period is 2 calendar days before the flight's departure. The Order uses a 2-day time frame instead of 48 hours to provide more flexibility to the air passenger and aircraft operator. By using a 2-day window, test acceptability does not depend on the time of the flight or the time of day that the test sample was taken.

For example, if your flight is at 1pm on a Friday, you could board with a negative test that was taken any time on the prior Wednesday.

### Can a test taken before departure from the U.S. be used to return within the 2-day time frame? How will testing requirements be handled for short trips?

If a trip is shorter than 2 days, a viral test taken in the United States can be used to fulfill the requirements of the Order as long as the specimen was taken no more than 2 days before your return flight to the U.S. departs. If your return travel is delayed longer than 2 days after the test, you will need to be retested before your return flight.

If you are considering this option, you should additionally consider, as a contingency when making your travel plans, the availability of testing capacity at your destination and the time frame needed to obtain results.

### What if I am overseas and unable to find a testing site that has a turnaround time of 2 days and can't get tested before my flight?

When making plans for travel, you should consider the availability of testing capacity and the time frame needed to obtain results.

For more information on where to obtain a test overseas, you should review the relevant U.S. Embassy website  .

If you cannot find a place to get a test with a turnaround time of less than 2 days, you may consider using a self-test that includes a telehealth service affiliated with the manufacturer of the test that provides real-time supervision remotely through an audio and video connection. See Does a self-test meet the conditions of the Order?

You may also consider contacting the airline regarding options for changing your departure date to allow time for a test or see if the airline has identified options for testing.

# Connecting or Delayed Flights

## If I am traveling to the U.S. on connecting flights, do I show my result before the first flight or the last one?

If your itinerary starts in China, Hong Kong, or Macau, you will need to show your negative test result or documentation of recovery before boarding the flight that leaves China, Hong Kong or Macau.

- This applies even if you are connecting to the United States through a *Designated Airport*. You do not need to show your documents again at the *Designated Airport* as long as your flights were all booked on the same ticket.

If your travel to the U.S. starts at a *Designated Airport*, but you were in China, Hong Kong, or Macau in the past 10 days, you will need to show your negative test result or documentation of recovery before boarding the flight that leaves the *Designated Airport*.

## Does this requirement apply if I am connecting through the U.S. to another country?

Yes. The Order applies to passengers departing from China, Hong Kong, or Macau, or from a *Designated Airport* if they have been in China, Hong Kong, or Macau, in the past 10 days, if their destination is in the U.S. or if they are connecting through the U.S. to another country.

## What happens if my flight is delayed past the 2-day limit for testing?

If your flight is delayed past the 2-day limit of testing due to a situation outside of your control (e.g., delays because of severe weather or aircraft mechanical problem), and that delay is **24 hours** or less past the 2-day limit for testing, you do not need to be retested. If the delay is more than **24 hours** past the 2- day limit, then you will need to be retested.

## Can CDC help me get a refund for travel expenses if I have to cancel or delay travel because of testing requirements for air passengers flying to the U.S.?

CDC does not reimburse and is unable to help travelers get reimbursements for travel expenses because of canceled or delayed travel due to COVID-19 or testing requirements for air passengers flying to the US. While some companies may base their policies on CDC's travel recommendations or requirements, each company establishes its own refund policies.

In some cases, trip cancellation insurance may protect your financial investment in a trip if you need to change your itinerary in the event of an international outbreak. Visit CDC's Travelers' Health website if you would like to learn more about travel insurance, including trip cancellation insurance.

# Attestations

## What is an attestation?

An attestation is a statement, writing, entry, or other representation under 18 U.S.C. § 1001 that confirms that the information provided is true. Willingly providing false or misleading information may lead to fines and other criminal penalties.

### How do air passengers provide an attestation?                                             ⌄

As required by United States federal law, all airlines or other aircraft operators will provide and collect the passenger attestation on behalf of the U.S. Government prior to boarding.

### Do I have to print the attestation posted on the CDC website before coming the airport? How do   ⌄
### air passengers provide an attestation?

As required by United States federal law, all airlines or other aircraft operators will provide and collect the passenger attestation on behalf of the U.S. Government prior to boarding. Please check with the airline or aircraft operator for your flight to learn how the airline or aircraft operator will collect your attestation.

### Should I retain a copy of my attestation?                                                  ⌄

The attestation should be submitted to and retained by the airline or aircraft operator. If you are an air passenger, you are required to retain a paper or digital copy of your negative test result or documentation of recovery but are not required to retain a copy of your attestation.

## Exceptions

### Can I get an exception to the testing requirement?                                         ⌄

Exceptions may be granted on an extremely limited basis when emergency travel (like an emergency medical evacuation) must occur to preserve someone's life, health against a serious danger, or physical safety and testing cannot be completed before travel.

### How do I apply for a humanitarian exception to the requirement to show a pre-departure negative ⌄
### COVID-19 test or documentation of recovery?

CDC may grant a humanitarian exception in very limited circumstances only when an individual must travel to the United States to preserve health (e.g., emergency medical evacuations) or safety (e.g., violence) and is unable to access or complete the testing requirement before travel.

Individuals who fit the exception criteria described in CDC's Order may contact the nearest U.S. embassy or consulate. The embassy will then transmit this information to the CDC for consideration.

Please review the procedures for applying for a humanitarian exception as listed on the webpage of the embassy or consulate where you will apply. This link will lead you to the relevant embassy or consulate: https://www.usembassy.gov  .

To facilitate the review of a humanitarian exception request, individuals should submit the following information to the embassy or consulate for transmission to the CDC. *All information needs to be completed in full and in English for the request to be sent to CDC.*

- Name (family name/surname, given name)
- Age

- U.S. Citizen, U.S. National, Lawful Permanent Resident?
  - If no:
    - Nationality
    - Indicate Visa Type or if passenger has Electronic System for Travel Authorization (ESTA)
- Cell phone number (including country code) of passenger or head of household if family unit
- Email address of passenger or head of household if family unit
- US destination address
  - Is US destination home address?
- Flight itinerary, including any connecting flights
  - Airline
  - Flight #
  - Departure airport and date of departure
  - Arrival airport and date of arrival
- Any COVID-19 vaccines received to date, if applicable (list product name and date for each dose)
- Purpose of travel to the US and a brief explanation of why urgent travel is needed
- Justification for humanitarian exception for **testing requirement** (e.g., no testing available where passenger is located)
- Documentation to support justification (e.g., medical records, orders for emergency evacuation)
- Information regarding any other solutions that were sought prior to application (e.g., flight changes, assistance in obtaining testing, etc.)

---

### What if I have tested positive for COVID-19 and need medical evacuation to the United States before I have documentation of recovery?                                                    ⌄

Private flights or general aviation aircraft may transport a person who has tested positive for COVID-19 and does not meet criteria for documentation of recovery if they obtain authorization from CDC and use infection control measures to prevent onboard transmission consistent with relevant CDC guidance.

---

### Are crew members excepted from the requirements of this Order?                                                    ⌄

Crew on passenger or cargo flights are excepted from the requirements of the Order under certain circumstances. For more information, see FAQs for airlines.

---

### Are U.S. federal law enforcement personnel excepted from the requirements of this Order?                                                    ⌄

U.S. federal law enforcement officers on official travel are excepted from the requirements of the Order if:

1. Officers are carrying out a law enforcement function (e.g., for security purposes) on the aircraft; AND
2. The urgent need to travel does not allow time for testing.

CDC expects that U.S. federal law enforcement agencies will determine whether their employees' travel meets the requirements of the exception. CDC recommends that employees travel with a copy of their travel orders and a signed letter (paper or electronic) from their agency stating that the employee's travel meets the requirements of the exception.

---

### Are U.S. military personnel excepted from the requirements of the Order?                                                    ⌄

U.S. military personnel, civilian employees, dependents, contractors, and other U.S. government employees are excepted from the requirements of the CDC Order if they are traveling on official military travel orders and observing applicable U.S. Department of Defense force health protection guidance to prevent the transmission of COVID-19. This exception applies to persons on official military orders on U.S. military flights (including whole aircraft contract charter operators) and non-U.S. military flights (e.g., commercial flights).

In addition, U.S. military personnel are excepted from the requirements of Order if they are traveling under official U.S. government travel orders, i.e., issued by other government agencies.

CDC expects that U.S. military services will determine what is considered "official military or U.S. government travel orders" that meet the requirements of this exception.

CDC recommends that U.S. military personnel, civilian employees, dependents, contractors, and other U.S. government employees traveling under official military travel orders on non-military aircraft, such as commercial flights, carry their applicable travel orders with them to present to air carrier/operator personnel or public health authorities. Airlines only need to verify U.S. military personnel, civilian employees, dependents, contractors, and other U.S. government employees are traveling on official military travel orders.

U.S. military personnel, civilian employees, U.S. military personnel dependents, contractors, and other U.S. government employees not traveling on official military travel orders or U.S. government travel orders remain subject to CDC's testing Order requirements.

---

Are diplomats and special visa holders excepted from the requirements of the Order?                    ⌄

No, diplomats and special visa holders are not excepted from the requirements of this Order.

---

Last Updated Dec. 30, 2022

# EXHIBIT 10

**COVID-19 cases have increased in China.**

*(2 pages)*

 CDC Centers for Disease Control and Prevention



## COVID-19 in China, Hong Kong, and Macau

Warning - Level 3, Avoid Nonessential Travel

**Alert - Level 2, Practice Enhanced Precautions**

Watch - Level 1, Practice Usual Precautions

Beginning January 5, at 12:01AM ET, there are new requirements for air passengers 2 years of age and older traveling to the United States from China, Hong Kong, or Macau, and those traveling from Seoul, Toronto, and Vancouver who have been in China, Hong Kong, or Macau in the past 10 days. These passengers, regardless of citizenship or vaccination status, are required to show a negative COVID-19 test result taken no more than 2 days before their flight departs. Those who had COVID-19 in the 90 days before their travel to the United States can instead show documentation of recovery from COVID-19.

## Key points

- Reconsider travel to China, Hong Kong, and Macau due to the rapid increase in COVID-19 cases and limited health care resources.
- If you do travel, take the steps below to protect yourself and others from COVID-19.

## If You Travel

- Get up to date with your COVID-19 vaccines before you travel. Even if you are up to date with your COVID-19 vaccines, you may still be at risk for getting and spreading COVID-19.
- Consider getting tested before travel to China, Hong Kong, and Macau.
- Prepare a travel health kit with items you may need, especially those items that may be difficult to find at your destination, such as fever reducing medicines.
- Consider getting travel insurance and travel health insurance in case you need health care or your trip is interrupted.
- Wear a mask when indoors in public, and follow CDC's recommendations for wearing masks in travel and public transportation settings.
- Follow all entry and exit requirements and recommendations ⧉ at your destination.
- Get tested with a viral test 3-5 days after you get back to the United States. Some U.S. airports offer a free take-home COVID-19 test when you participate in a program tracking new variants.

### Current Situation

In December 2022, China ended its Zero-COVID policy. Since then, COVID-19 cases have increased rapidly resulting in the highest number of cases per day in China since the start of the pandemic. There are also indications that severe cases and hospitalizations are increasing. There are reports that the healthcare system is overwhelmed and access to health care and medicine is limited. As cases increase, chances of new variants of concern emerging increase as well.

## More Information

- General Information about International Travel to and from the United States
- COVID-19

- U.S. Department of State China Travel Advisory ⧉

---

Page last reviewed: December 28, 2022

Content source: National Center for Emerging and Zoonotic Infectious
Diseases (NCEZID)

Division of Global Migration and Quarantine (DGMQ)

# EXHIBIT 11

*Andreadakis v. CDC et al.,*
**Memorandum Opinion by
U.S. District Court Judge
David Novak, July 11, 2022.**
*(32 pages)*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

KLEANTHIS ANDREADAKIS,
    Plaintiff,

v.                              Civil No. 3:22cv52 (DJN)

CENTER FOR DISEASE
CONTROL & PREVENTION *et al.*,
    Defendants.

## **MEMORANDUM OPINION**

Plaintiff Kleanthis Andreadakis filed the instant Complaint (ECF No. 1) challenging the implementation and enforcement of two government-issued COVID-19 safety measures regulating the airline industry. This matter comes before the Court on two motions to dismiss filed by multiple defendants. Defendants American Airlines, Inc., JetBlue Airways Corp., Southwest Airlines Co. and United Airlines, Inc. (collectively, the "Airline Defendants") have filed a Motion to Dismiss the Complaint (ECF No. 78), moving pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all twenty-four counts against them for failure to state a claim. Similarly, Defendant STAT-MD has filed a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(6) (ECF No. 80), moving to dismiss the two counts against it for lack of personal jurisdiction and failure to state a claim. For the reasons stated herein, the Court will GRANT the Motions and dismiss all claims against the Airline Defendants and STAT-MD. Additionally, for the reasons stated herein, the Court will DISMISS AS MOOT all claims against Defendants Centers for Disease Control and Prevention ("CDC") and the Department of Health and Human Services ("HHS") (collectively, the "Federal Defendants").

# I.     BACKGROUND

## A.     The Challenged Orders

Plaintiff challenges two government orders relating to the safety of air travel.  On January

13, 2021, the CDC issued an order, which it then amended in December 2021 (the "Testing

Order"), generally requiring international air travelers to provide proof of a negative COVID-19

test before departure to the United States.  *Requirement for Negative Pre-Departure COVID-19*

*Test Result or Documentation of Recovery from COVID-19 for All Airline or Other Aircraft*

*Passengers Arriving into the United States from Any Foreign Country*, 86 Fed. Reg. 69,256,

69,258 (Dec. 7, 2021.)  Effective June 12, 2022, the CDC rescinded the Testing Order, citing the

improvement of other tools used to fight COVID-19.  87 Fed. Reg. 36129 (June 15, 2022).

On February 3, 2021, the CDC issued the Mask Order.  CDC, *Order Under Section 361*

*of the Public Health Service Act, Requirement for Persons to Wear Masks While on Conveyances*

*and at Transportation Hubs*, 86 Fed. Reg. 8025, 8026 (Feb. 3, 2021).  The Mask Order required

persons to "wear masks over the mouth and nose when traveling on any conveyance . . . into or

within the United States" and "at transportation hubs." *Id.* at 8026.  The Mask Order exempted

"child[ren] under the age of 2" and anyone "with a disability who cannot wear a mask, or cannot

safely wear a mask," among others.  *Id.* at 8027.  It further exempted "[p]rivate conveyances

operated solely for personal, non-commercial use." *Id.* at 8028.  It did not apply "[w]hile eating,

drinking, or taking medication, for brief periods." *Id.* at 8027.  The CDC last extended the Mask

Order to remain in place until May 3, 2022, but thereafter stopped enforcing the Mask Order

effective April 18, 2022 due to the court order discussed below.[1]  Likewise, the Transportation

Security Administration has ceased enforcing its mask-related security directives.

On April 18, 2022, United States District Judge Kathryn K. Mizelle of the Middle

District of Florida issued an order (the "Vacatur Order") declaring the Mask Order unlawful,

vacating it and remanding it to the CDC.  *Health Freedom Defense Fund, Inc. v. Biden, et al.*,

No. 8:21cv1693 (M.D. Fla.), ECF No. 53.  The Government has appealed that ruling.

No. 8:21cv1693 (M.D. Fla.), ECF No. 55.  The briefing in the appeal has not yet completed, and

the Eleventh Circuit has not yet scheduled oral argument.  *Health Freedom Defense Fund, Inc. v.*

*Biden, et al.*, No. 22-11287 (11th Cir.).

## B.    Plaintiff's Lawsuit

Plaintiff belongs to a group known as Americans Against Mask Mandates ("AAMM"),

which Lucas Wall chairs.  AAMM works collectively on lawsuits filed by its members to

challenge the Mask Order.  On January 28, 2022, Plaintiff, proceeding *pro se*, filed the instant

Complaint against the CDC, HHS, American Airlines, JetBlue Airways, Southwest Airlines,

United Airlines and STAT-MD.  (Compl. (ECF No. 1).)  Plaintiff seeks to "permanently enjoin

enforcement of the Federal Transportation Mask Mandate and International Traveler Testing

Requirement put into place by orders of the [CDC] — under the purported authority of its parent

agency, [DHS]."  (Compl. at 1-2.)  Plaintiff also seeks to "end the unlawful discrimination

against the disabled such as [himself] who can't safely wear a mask" by the four Airline

Defendants.  (Compl. at 2.)  He also sues STAT-MD as the "medical vendor that evaluates mask-

exemption demands for airlines including Southwest."  (Compl. at 2.)  Plaintiff brings forty-four

---

[1]      Federal Transit Administration, *Federal Mask Requirement for Transit*,
https://www.transit.dot.gov/TransitMaskUp (last visited July 5, 2022).

counts in his Complaint. These include twelve violations of the Administrative Procedures Act ("APA") related to the creation and implementation of the challenged orders; six constitutional violations based on the restriction of the freedom to travel and the delegation of legislative power; thirteen violations of the Rehabilitation Act and Air Carrier Access Act for various COVID-related flight restrictions placed on air travelers; two counts of civil rights violations; and, various state law claims. Plaintiff brings the tenth case filed by AAMM members in federal courts.

### C.    Procedural History

On January 28, 2022, Plaintiff filed his Complaint. (ECF No. 1.) On February 4, 2022, he filed a Motion for Preliminary Injunction (ECF No. 21) against the Federal Defendants, and, on February 7, 2022, he filed a Motion for Preliminary Injunction (ECF No. 10) against United Airlines. He filed a motion for expedited briefing on both, which the Court denied. (ECF Nos. 11, 22, 27.) In requesting preliminary injunctions, Plaintiff asked the Court to enter an order enjoining Defendants from enforcing the FTMM. Defendants opposed the request for a preliminary injunction. (ECF Nos. 49-50.)

On February 7, 2022, the Airline Defendants filed a Motion to Transfer Litigation to the Middle District of Florida. (ECF No. 12.) Similarly, on February 17, 2022, the Federal Defendants filed a Motion to Transfer to the Middle District of Florida. (ECF No. 44.) In both transfer motions, Defendants argued that Plaintiff's lawsuit constitutes a substantially similar and in many respects identical lawsuit to Wall's litigation pending before Judge Byron in the Middle District of Florida. They argued that Plaintiff filed this action due to AAMM's dissatisfaction with the litigation pending before Judge Byron in Florida. Plaintiff opposed the transfer motions. (ECF No. 53.)

On April 6, 2022, the Airline Defendants filed their Motion to Dismiss. In support, they largely argue that the Air Carrier Access Act of 1986 ("ACAA"), 49 U.S.C. § 41705, and the Airline Deregulation Act ("Deregulation Act"), 49 U.S.C. § 41713(b), preempts Plaintiff's claims and provides the sole remedy for an airline passenger bringing disability discrimination and state law claims against the airlines. (Airline Defs.' Mem. of Law in Supp. of Mot. to Dismiss Compl. ("Airline Defs.' Mem.") (ECF No. 79) at 8, 17-22.) Similarly, the Airline Defendants argue that Plaintiff lacks a private right of action to allege violations of the ACAA. (Airline Defs.' Mem. at 10.) Further, the Airline Defendants aver that Plaintiff's claims under the Rehabilitation Act fail, because they are not subject to that Act. (Airline Defs.' Mem. at 13-15.) Additionally, the Airline Defendants argue that Plaintiff's claim for civil conspiracy under 42 U.S.C. § 1985(3) fails, because that section does not apply to disability discrimination complaints. (Airline Defs.' Mem. at 6-7.) Finally, the Airline Defendants argue that the Court lacks personal jurisdiction over them, because Plaintiff has not alleged that he purchased a ticket to fly from any of the Airline Defendants in Virginia. The Airline Defendants included a *Roseboro* notice with their Motion, advising Plaintiff that he needed to respond within twenty-one days or risk dismissal of his complaint. (ECF No. 78-2.)

On April 8, 2022, Defendant STAT-MD filed its Motion to Dismiss. It primarily argues that the Court lacks personal jurisdiction over Plaintiff's claims against it. (Br. in Supp. of Mot. to Dismiss. ("STAT-MD Mem.") (ECF No. 81) at 5.) Additionally, it argues Plaintiff's claims for medical malpractice fail, because Plaintiff has not alleged the provision of health care or a physician-patient relationship. (STAT-MD Mem. at 6.) Additionally, that claim fails, because Plaintiff did not obtain a certificate of merit before filing suit, as required by Virginia's Medical Malpractice Act. (STAT-MD Mem. at 9.) Finally, STAT-MD argues that the civil

conspiracy claims fail to properly allege the existence of a conspiracy, warranting dismissal. (STAT-MD Mem. at 10.)   STAT-MD also included a *Roseboro* notice with its Motion, warning Plaintiff that a failure to respond to the motion within twenty-one days could result in the dismissal of his action. (STAT-MD Mem. at 1.)

On April 18, 2022, Plaintiff filed a Motion to Stay Briefing on Defendants' Motions to Dismiss (ECF No. 82), asking the Court to stay his deadline to respond to the motions to dismiss until after resolution of the transfer motions and preliminary injunction motions. On April 22, 2022, the Court denied his stay motion as moot, because it had resolved the transfer motions and preliminary injunction motion. (ECF No. 88.) Plaintiff, however, still failed to respond to the motions to dismiss. Accordingly, on June 14, 2022, the Court ordered Plaintiff to respond to the Motions by June 17, or it would consider the Motions unopposed. (ECF No. 93.) Plaintiff did not respond to the Motions or otherwise ask for an extension by June 17. Instead, on June 21, 2022, he filed a request for an extension of twenty-one (21) days to respond to the Motions, claiming that he had not responded because the Court had not ruled on his Motion to Stay. (ECF No. 94.) The Court denied his request for an extension, because it had ruled on the Motion to Stay, and had previously warned the parties that briefing on any motions would follow the standard briefing schedule provided for in the Local Rules. (ECF No. 98.) Plaintiff has still not filed an opposition to the Motions to Dismiss, and the Court considers the Defendants' bases for dismissal uncontroverted. *See Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004) (noting that when a plaintiff does not respond in opposition to a motion to dismiss, a district court is "entitled, as authorized [by the Local Rules], to rule on the [defendants'] motion and dismiss [the plaintiff's] suit on the uncontroverted bases asserted therein").

On April 22, 2022, the Court denied the preliminary injunction motion and the transfer motions. (ECF No. 88.) Additionally, the Court ordered the parties to brief the impact of the Vacatur Order on Plaintiff's claims, and whether it rendered any of them moot. Plaintiff responded that it did not moot any of his claims, and that he would continue to press forward with all of his claims. (ECF No. 89.)

## II.   STANDARD OF REVIEW

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citation omitted). If a federal court reviews "only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint," then a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive a motion to dismiss under Rule 12(b)(2). *Id.* at 268 (citations omitted). "[T]he court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction," *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989), though the Court need not consider only Plaintiff's proof of personal jurisdiction to decide which inferences it will make, *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993). "[W]here the defendant has provided evidence which denies facts essential for jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant has presented evidence." *Indus. Carbon Corp. v. Equity Auto & Equip. Leasing Corp.*, 737 F. Supp. 925, 926 (W.D. Va. 1990) (citation omitted).

PLAINTIFFS' SUPPLEMENTAL BRIEF
ON MOOTNESS [DKT. #170]

Similarly, a motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

# III.    ANALYSIS

The Court will first address Defendant STAT-MD's Motion to Dismiss, finding that it lacks personal jurisdiction over STAT-MD for Plaintiff's claims.  Next, the Court will address the Airline Defendants' Motion to Dismiss, finding that none of Plaintiff's claims against them can survive the Airline Defendants' challenge.  Finally, although the Federal Defendants have not moved for dismissal, the Court will address why the claims against the Federal Defendants are moot.

## A.    The Court Lacks Personal Jurisdiction Over Plaintiff's Claims Against STAT-MD.

Defendant STAT-MD argues that the Court lacks personal jurisdiction over it for Plaintiff's claims.  (STAT-MD Mem. at 4-6.)  The Court agrees.

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdictional challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every state following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).  Determinations of personal jurisdiction require a two-step inquiry.  First, a court must find that the long-arm statute of the forum state authorizes the exercise of jurisdiction over a nonresident defendant. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  Then, the court must find that the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the Fourteenth Amendment. *Id.*

Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of the Fourteenth Amendment Due Process Clause, "the two-prong test collapses into a single inquiry when Virginia is the forum state." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012).  The Due Process Clause of the Fourteenth Amendment requires that a defendant "have certain minimum contacts with [the

forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Within those parameters, a court may find that it has either general or specific personal jurisdiction over a defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). General personal jurisdiction exists over defendants with "continuous and systematic contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). When the "continuous corporate operation within a state [is] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities," a court can assert general jurisdiction over a corporate defendant. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993) (quoting *Int'l Shoe Co.* 326 U.S. at 318)). Otherwise, a court may exercise specific personal jurisdiction only if a defendant's minimum contacts with the forum state form the basis for the claims in question. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004).

The Court cannot exercise general jurisdiction over STAT-MD. Corporate defendants fall under the general jurisdiction of courts in their place of incorporation and principal place of business. *Ford Motor Company v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1024 (2021). Here, Plaintiff alleges that "STAT-MD is a non-profit organization backed by the resources of the university of Pittsburgh Medical Center. Its headquarters is at 200 Lothrop St. #F1301, Pittsburgh, PA 15213." (Compl. at 6.) Thus, STAT-MD is not subject to general jurisdiction in Virginia, requiring Plaintiff to establish the Court's specific jurisdiction to survive STAT-MD's personal jurisdiction challenge.

With respect to specific personal jurisdiction, the Fourth Circuit has established a three-part test, requiring trial courts to consider: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (internal quotations and citations omitted). Alternatively, because personal jurisdiction constitutes an individual right, a party may waive that right and submit to the personal jurisdiction of a court by appearance or by providing express or implied consent in "[a] variety of legal arrangements." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982).

Under the first prong of the test for specific jurisdiction, the Fourth Circuit has enumerated several nonexclusive factors to consider whether a defendant has purposefully availed itself of the forum state, including:

- whether the defendant maintains offices or agents in the forum state,
- whether the defendant owns property in the forum state,
- whether the defendant reached into the forum state to solicit or initiate business,
- whether the defendant deliberately engaged in significant or long-term business activities in the forum state,
- whether the parties contractually agreed that the law of the forum state would govern disputes,
- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship,
- the nature, quality and extent of the parties' communications about the business being transacted, [and]
- whether the performance of contractual duties was to occur within the forum.

*Consulting Eng'rs Corp.*, 561 F.3d at 278 (cleaned up). "If, and only if . . . the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the Court] move on to a consideration of prongs two and three." *Id.*

"The second prong of the test for specific jurisdiction . . . requires that the defendant's contacts with the forum state form the basis of the suit." *Id.* at 278-79 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A.*, 466 U.S. at 414). Finally, the third prong "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Id.* at 279. Specifically, a court may evaluate "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Id.* (citing *Burger King Corp.*, 471 U.S. at 477). With this standard in mind, the Court now turns to whether it can exercise personal jurisdiction over STAT-MD.

Plaintiff's scant allegations against STAT-MD do not satisfy the first prong of the test. Plaintiff alleges that STAT-MD reviews and denies mask-exemption demands for its airline clients "without ever speaking to the passenger or his/her doctor." (Compl. ¶¶ 671, 884.) Plaintiff makes no further allegations against STAT-MD. Plaintiff does not allege that any of this occurs in Virginia, nor that STAT-MD even knows whether the exemption request comes from a passenger in Virginia. Indeed, Plaintiff's allegations of wrongdoing stem from the claim that STAT-MD only interacted with the airlines (located outside of Virginia), rather than Plaintiff or his doctors, perhaps located in Virginia. Accordingly, Plaintiff has not alleged that STAT-MD purposefully availed itself of the privilege of conducting business in Virginia. The dearth of allegations connecting STAT-MD's activities to Virginia also render Plaintiff unable to satisfy the second or third prong of the test for personal jurisdiction. Thus, the Court lacks

personal jurisdiction over STAT-MD, and the Court will dismiss the claims that Plaintiff brings

against it.[2]

**B.     The Court Will Dismiss the Claims Against the Airline Defendants.**

The Court now turns to the Airline Defendants' Motion to Dismiss. The Court will first

address whether the civil conspiracy claims can survive before turning to Plaintiff's claims under

the ACAA and the Rehabilitation Act. Finally, the Court will turn to Plaintiff's claims under

various state laws and international laws. For the reasons stated below, all of the claims against

the Airline Defendants fail.

**i.     Plaintiff's Civil Conspiracy Claims Fail.**

In Counts 19 and 20, Plaintiff alleges that the Airline Defendants and STAT-MD

conspired to deprive disabled Americans of their civil rights by banning "anyone medically

unable to wear a face mask from using the nation's air-transportation system." (Compl. ¶¶ 669-

81.) Plaintiff brings this claim under 42 U.S.C. § 1985(3). The Airline Defendants move to

dismiss these claims, first asserting that § 1985(3) does not apply to disability discrimination.

(Airline Defs.' Mem. at 6-7.) Rather, they claim that § 1985 claims apply only to race-related

discrimination conspiracies. (Airline Defs. Mem. at 6-7.)

42 U.S.C. § 1985 states in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving,
> either directly or indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; . . . [and] in any case of
> conspiracy set forth in this section, if one or more persons engaged therein do, or cause to

---

[2]     Because the personal jurisdiction question presents a threshold inquiry that the Court
must first resolve, the Court need not address the arguments raised by STAT-MD in support of
its Rule 12(b)(6) motion. However, the Court finds that these arguments have merit. The Court
notes that it would also dismiss Plaintiff's claims against STAT-MD for failure to state a claim
for the reasons that it dismisses them against the Airline Defendants and for the reasons set forth
in STAT-MD's Memorandum, especially in light of Plaintiff's failure to rebut the arguments.

be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3); *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 156 (4th Cir. 1985).

The statute dates to 1871, when Congress passed the Ku Klux Klan Act to combat racial violence that the Klan and others waged against African Americans in the Reconstruction-Era South. *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1487 (7th Cir. 1985). Section 2 of the Ku Klux Klan Act became § 1985. *Id.* As a threshold matter, "[i]n order to recover under Section 1985(3), a plaintiff must establish that 'some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' action' exists." *D'Amato*, 760 F.2d at 1485 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). The Fourth Circuit has not yet addressed whether § 1985(3) applies to claims for disability discrimination.

The Supreme Court in *Griffin v. Breckenridge* explained that a plaintiff must demonstrate some class-based discriminatory animus motivating the conspirators' actions. 403 U.S. at 102. In *Griffin*, white citizens assaulted Black petitioners who travelled on a highway, and the petitioners alleged that the defendants conspired to do so with racial motivations. *Id.* at 88. The Court held that § 1985(3) extends to private conspiracies, but some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions must exist. *Id.* at 102. The Court concluded that petitioners did state a cause of action, because it fully alleged that the defendants conspired to commit the assault for racially charged reasons. *Id.* at 103.

In *United Brotherhood of Carpenters v. Scott*, the Supreme Court held that § 1985(3) could not reach conspiracies motivated by bias towards others on account of their economic views, status or activities, and thus it could not reach an alleged conspiracy against nonunion

PLAINTIFFS' SUPPLEMENTAL BRIEF ON MOOTNESS [DKT. #170]

workers. 463 U.S. 825, 837-38 (1983). In that case, a construction company and two employees sued union members for allegedly conspiring to deprive the plaintiffs of equal protection by attacking a construction site, assaulting workers and destroying property. *Id.* at 825. The Court reaffirmed that there must be some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions. *Id.* at 835. The Court further reasoned that the predominant purpose of the statute was to combat animus against Blacks and their supporters in the Reconstruction-era South. *Id.* at 836. The Court withheld judgment on whether § 1985(3) reached any farther than that central concern. *Id.* at 837.

In *Harrison v. KVAT Food Mgmt., Inc.*, the Fourth Circuit expressed reluctance to extend the protections of § 1985(3) beyond those classes expressly provided by the Supreme Court. 766 F.2d 155, 161 (4th Cir. 1985). In *Harrison*, a discharged employee alleged that his former employers had conspired to prevent him from running for office as a Republican, but the court ultimately ruled that the protection of § 1985(3) did not extend to claims citing discriminatory animus against a class formed around purely political views. *Id.* at 161. The court reasoned that, based on the Supreme Court's decision in *Scott*, the 1871 Civil Rights Act and § 1985(3) originally intended to protect African Americans and the struggle for civil rights in the post-Civil War South. *See Harrison*, 766 F.2d at 160, 161 ("We are concerned here with a statute enacted to fulfill a particular purpose and designed to meet particular conditions."). *Harrison* further stressed the importance of the decision in *Scott* to withhold judgment on whether § 1985(3) extended further than that central original purpose. *Id.* at 162.

In *Buschi v. Kirven*, the Fourth Circuit held, in relevant part, that employees who called themselves "whistleblowers" could not qualify as a class entitled to protection under § 1985(3), because they did not possess characteristics comparable to race, national origin or sex, nor were

they in "unprotected circumstances." 775 F.2d 1240, 1258 (4th Cir. 1985). The court reasoned

that, to meet the requirement of class-based discriminatory animus, the class must possess the

"'discrete, insular and immutable characteristics comparable to those characterizing classes such

as race, national origin, and sex.'" *Id.* at 1257 (quoting *Bellamy v. Mason's Stores, Inc.*, 368 F.

Supp. 1025, 1028 (E.D. Va. 1973)).

However, these decisions occurred before the passage of the Americans with Disabilities

Act ("ADA") in 1990. In enacting the ADA, Congress found that:

> Individuals with disabilities are a discrete and insular minority who have been
> faced with restrictions and limitations, subjected to a history of purposeful
> unequal treatment, and relegated to a position of political powerlessness in our
> society, based on characteristics that are beyond the control of such individuals
> and resulting from stereotypic assumptions not truly indicative of the individual
> ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7). Thus, Congress elevated the status of disabled individuals in passing

the ADA. Thus, although the Fourth Circuit has not applied a § 1985(3) claim to disabled

individuals, and construes protected classes narrowly, it has not foreclosed that application since

the passage of the ADA. Other courts have determined that the passage of the ADA renders

individuals with a disability protected under § 1985(3). *See, e.g., Lake v. Arnold*, 112 F.3d 686,

687-88 (3d Cir. 1997) (pointing to the ADA as evidence that § 1985(3) protects those with a

mental disability). Ultimately, the Court need not definitively determine whether § 1985(3)

applies to individuals with disabilities. Assuming, arguendo, that § 1985(3) applies to

individuals with a disability, Plaintiff's claim still fails for the reasons stated below.

### ii. Plaintiff Fails to State a Claim Under 1985(3).

The Airline Defendants further argue that Plaintiff fails to state a claim under § 1985(3).
The Court agrees.

> To prevail on a claim under § 1985(3), a plaintiff must prove:
>
> (1) a conspiracy of two or more persons;
> (2) who are motivated by a specific class-based, invidiously discriminatory animus to
> (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all,
> (4) and which results in injury to the plaintiff as
> (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Additionally, "the law is well settled that to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Id.*

Claims under § 1985(3) rarely prevail. *Davis v. Hudgins*, 896 F. Supp. 561, 571 (E.D. Va. 1995) ("Because of the high threshold that a Plaintiff must meet to establish a prima facie case under section 1985, courts often grant motions of dismissal.") (*citing Simmons*, 47 F.3d at 1377 ("This Court, under that standard, has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion.")). Plaintiffs must allege the purported conspiracy with more than mere conclusions. *Simmons*, 47 F.3d at 1377 ("Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts.").

Here, Plaintiff has not alleged a conspiracy with the required concrete facts. Instead, he merely makes conclusory allegations regarding a conspiracy. Specifically, he alleges that the "Airline Defendants conspired to deprive disabled Americans, a protected class, of our civil rights by adopting policies in Summer 2020 that banned any person medically unable to wear a face mask from using the nation's air-transportation system." (Compl. ¶ 671.) He does not provide any details on how they conspired. Further, he alleges that he "expect[s] to prove through discovery that the Airline Defendants conspired — with each other, with other air

carriers, within their own companies, and with STAT-MD — to ban disabled flyers because of a discriminatory motive." (Compl. ¶ 680.) In doing so, he merely parrots the requirements of a prima facie claim under § 1985(3). He further alleges that the Airline Defendants "are motivated by a class-based, invidiously discriminatory animus resulting in an unfounded, ridiculous fear that healthy, uninfected disabled travelers who can't wear a face mask are somehow a grave danger." (Compl. ¶ 681.) Again, he offers no concrete facts to support these allegations. These allegations simply will not suffice to state a claim under § 1985(3). Accordingly, the Court will dismiss Counts 19 and 20.

### iii. Plaintiff Lacks a Private Right of Action Under the ACAA.

In Counts Twenty-Two through Thirty-Three, Plaintiff brings claims under the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, alleging that the Airline Defendants discriminated against him on the basis of his disability. (Compl. ¶¶ 699-768.) The Airline Defendants move to dismiss these claims on the basis that no private cause of action exists under the ACAA. (Airline Defs.' Mem. at 10-11.) The Court agrees.

The ACAA provides that an air carrier:

[m]ay not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities; (2) the individual has a record of such an impairment; (3) the individual is regarded as having such an impairment.

49 U.S.C. § 41705(a).

However, the ACAA does not expressly bestow the right to sue to enforce this right. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). When Congress does not create an explicit private right of action, courts may interpret the structure and language of the statute to determine if Congress nevertheless intended to imply a right of action. *Id.*

Although the Fourth Circuit has not directly addressed this question, other circuits have determined that the ACAA does not create a private right of action. *See Love v. Delta Air Lines*, 310 F.3d 1347, 1354 (11th Cir. 2022) ("Moreover, taken together, the text of the ACAA . . . and the surrounding statutory and regulatory structure create an elaborate and comprehensive enforcement scheme that belies any congressional intent to create a private remedy."); *Lopez v. JetBlue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) (concluding that "the text and structure of the ACAA manifests no congressional intent to create a private right of action in a federal district court"); *Boswell v. Skywest Airlines, Inc.*, 61 F.3d 1263, 1270 (10th Cir. 2004) ("Congress' creation of a specific means of enforcing the statute indicates that it did not intend to allow an additional remedy — a private right of action — that it did not expressly mention at all."); *Segalman v. Southwest Airlines Co.*, 895 F.3d 1219, 1229 (9th Cir. 2018) ("In sum, the ACAA's legislative history is insufficient to overcome the strong suggestion that the statute's remedial scheme forecloses an implied private cause of action.").

The Court finds the reasoning of these circuit courts persuasive. The ACAA does not provide a private right of action for Plaintiff to sue the Airline Defendants in this Court. Accordingly, the Court will dismiss his claims under the ACAA.

### iv. Plaintiff's Claims Under the Rehabilitation Act Fail.

Plaintiff also brings claims under the Rehabilitation Act in Counts Twenty-One, Twenty-Two and Twenty-Four through Thirty-Three. The Airline Defendants move to dismiss these claims, arguing that the Rehabilitation Act does not apply to them. (Airline Defs.' Mem. at 13.)

The Rehabilitation Act prohibits discrimination against disabled individuals with respect to any program or activity that receives federal financial assistance. 29 U.S.C. § 794(a). Courts have defined the term "federal financial assistance" with respect to the Rehabilitation Act "to

mean the federal government's provision of a subsidy to an entity." *Shotz v. American Airlines, Inc.*, 420 F.3d 1332, 1335 (11th Cir. 2005). The Supreme Court has held that the Rehabilitation Act generally does not apply to commercial airlines, because airlines did not receive federal financial assistance within the meaning of the statute. *U.S. Dep't of Trans. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 599 (1986). However, courts must still determine whether a particular defendant is subject to the statute. "Generally, to determine the applicability of the Rehabilitation Act, a court must determine whether the government intended to give the defendant a subsidy, as opposed to compensation." *Tavares v. United Airlines*, 2015 WL 5026197, at *7 (E.D. Va. Aug. 24, 2015).

Plaintiff alleges that the Rehabilitation Act applies to Defendant Airlines, because they "have accepted financial assistance during the COVID-19 pandemic, subjecting them to the Rehabilitation Act." (Compl. ¶ 689.) Defendants contend that they only received government funds pursuant to the Payroll Support Program established under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"). (Airline Defs.' Mem. at 13.) They could use this money "exclusively for the continuation of Wages, Salaries, and Benefits" to airline employees. (Airline Defs.' Mem. at 13.) Because the government restricted the way in which they could use the funds, rather than giving them discretion, the funds do not constitute federal financial assistance within the meaning of the Rehabilitation Act. (Airline Defs.' Mem. at 13.)

In *Schotz*, the Eleventh Circuit found that the Rehabilitation Act did not apply to airlines even though the government had provided them funds via the Stabilization Act in response to the September 11 attacks. 420 F.3d at 1337. The Eleventh Circuit determined that the Stabilization Act responded to the economic crises that the airline industry faced as a result of the terrorist attacks, thus compensating airlines for their losses rather than generally subsidizing them. *Id.* at

1336.  The court found that Congress could not have intended to undermine the ACAA and the accompanying regulatory scheme when it responded to the economic crises.  *Id.* at 1337.

The Court finds that this reasoning applies here.  Plaintiff has not demonstrated that Congress intended the CARES Act to undermine the ACAA.  Nor has he rebutted the argument that the CARES Act responded to the economic crises created by COVID-19, compensating the airlines for their losses rather than providing a general subsidy.  Thus, on the record before it, the Court does not find that the CARES Act provided an exception to the Supreme Court's general rule that the Rehabilitation Act does not apply to the airlines.  Accordingly, the Court will dismiss Plaintiff's claims under the Rehabilitation Act.

### v.    Plaintiff's Claim Under the Virginia Human Rights Act Fails.

In Count Thirty-Four, Plaintiff brings a claim under the Virginia Human Rights Act ("VHRA") against the Airline Defendants for the alleged disability discrimination.  (Compl. ¶¶ 775-88.)  The Airline Defendants move to dismiss this count, arguing that several federal laws preempt it.  (Airline Defs.' Mem. at 16-18.)

The Airline Deregulation Act provides that:

> [A] state, political subdivision of a State, or political authority of at least 2 states may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

In *Morales v. Trans World Airlines*, the Supreme Court broadly interpreted the scope of the pre-emption provision.  504 U.S. 374 (1992).  The Court held that the "relat[ed] to" phrase "express[es] a broad pre-emptive purpose," such that the statute preempts claims that have a "connection with, or reference to" an airline's prices, routes or services.  *Id.* at 378, 383.  The statute preempts even general statutes when particularly applied to airlines.  *Id.* at 386.  Thus, it

preempted the application of general state consumer protection statutes to airline fare advertising. *Id.*

Here, Plaintiff seeks to apply a general statute — the VHRA — to the airlines. Specifically, he seeks to enforce his claims under the ACAA by way of the VHRA. (Compl. ¶ 778.) Essentially, he alleges that the airlines discriminated against him by refusing to let him board the plane without a mask, despite his disability preventing him from safely wearing a mask. However, the Fourth Circuit has determined that the Deregulation Act preempts claims related to boarding practices. *See Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) ("Smith's tort claims are based in part upon Comair's refusal of permission to board. Undoubtedly, boarding procedures are a service rendered by an airline. Therefore, to the extent Smith's claims are based upon Comair's boarding practices, they clearly relate to an airline service and are preempted under the [Deregulation Act].") (cleaned up). Moreover, to the extent that Plaintiff could argue that his claim stems from the airlines' refusal to grant him an exemption to the Mask Mandate when selling him a ticket, this likewise would fall under the services provided by an airline. Accordingly, Plaintiff's claim under the VHRA — Count Thirty-Four — is preempted, and the Court will dismiss it.

### vi.    Plaintiff's Breach of Contract Claim Fails.

In Count 35, Plaintiff brings a breach of contract claim against the Airline Defendants, alleging that the Airline Defendants breached the contract of carriage when forcing Plaintiff to wear a mask when the parties did not agree to it in the contract. (Compl. ¶¶ 789-804.) Additionally, Plaintiff claims that United's contract terms requiring face coverings lack legal enforceability. (Compl. ¶ 796.) Defendant argues that the Court must dismiss this Count,

arguing that the Deregulation Act preempts the breach of contract claim.  (Airline Defs.' Mem. at 18-19.)

The Supreme Court has recognized a narrow exception to the Deregulation Act's preemption for some breach of contract claims.  In *American Airlines, Inc. v. Wolens*, the Court carved out an exception for certain contract claims against airlines for actions that seek to enforce the parties' "own, self-imposed undertakings," such as agreements with respect to a frequent flyer program.  513 U.S. 219, 228 (1995).  However, the Court limited this exception to breach of contract actions confined to the terms of the contract, "with no enlargement or enhancement based on state laws or policies external to the agreement."  *Id.* at 233.  "Thus, when a contract claim cannot be adjudicated without resort to outside sources of law, the claim is still preempted by the [Deregulation Act]."  *Smith*, 134 F.3d at 257.  The Fourth Circuit has held that preemption applies when a contract claim "can only be adjudicated by reference to law and policies external to the parties' bargain," or "directly implicates the airline's discretion and/or duty under federal law."  *Id.* at 258.

Here, Plaintiff's breach of contract claim arises out of the Airline Defendants requiring him to wear a mask on the flight or obtain a medical exemption.  Put differently, Plaintiff sues the Airlines for enforcing the Mask Mandate — federal law.  Thus, Plaintiff's breach of contract claim "directly implicates the airlines' discretion and/or duty under federal law," *id.*, and, therefore, the Deregulation Act preempts it.  The Court will dismiss Count Thirty-Five.

### vii.    Plaintiff's Other State Law Claims Fail.

In Counts Thirty-Six through Forty, Plaintiff alleges various other state law claims, including reckless endangerment, practicing medicine without a license, invasion of privacy, deceptive and misleading trade practices and fraudulent misrepresentation.  (Compl. ¶¶ 805-51.)

The Airline Defendants move to dismiss these claims as preempted by the Deregulation Act or as failing to state a claim. (Airline Defs.' Mem. at 19-22.)[3]

As discussed above, the Deregulation Act preempts state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713. The Fourth Circuit has recognized that "[s]uits stemming from outrageous conduct on the part of an airline toward a passenger will not be preempted under the [Deregulation Act] if the conduct too tenuously relates or is unnecessary to an airline's services." *Smith*, 134 F.3d at 259. The court gave the example that an airline holding a passenger without a safety or security justification would not give rise to preemption of that passenger's false imprisonment claim.

Here, all of Plaintiff's allegations arise from his claims that the Airline Defendants improperly required him to adhere to the Mask Mandate or submit proof of a required medical exemption. However, all of these relate to the Airlines' services. Additionally, the allegations in no way rise to the level of "outrageous conduct" that would allow them to escape preemption. Instead, the allegations show the Airline Defendants complying with law as set forth in the Mask Mandate. Accordingly, the Court will dismiss Counts Thirty-Six through Forty as preempted.

### viii. Plaintiff's Claim for Infringement of Right to Travel Fails.

In Count Forty-One, Plaintiff alleges that the Airline Defendants infringed on his constitutional right to travel. (Compl. ¶ 852-68.) The Airline Defendants move to dismiss this count, arguing that Plaintiff does not enjoy a constitutional right to travel by airplane. (Airline Defs.' Mem. at 22.) The Court agrees.

---

[3] Defendants correctly point out that no civil cause of action exists for reckless endangerment (Count Thirty-Six). Even if such a cause of action did exist, it would be preempted for the reasons stated herein. Likewise, even if Plaintiff had alleged facts in Count Thirty-Seven to show that the Airline Defendants practiced medicine without a license (he has not), then such a claim would be preempted.

Individuals enjoy a constitutional right to travel. *Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("[T]he constitutional right to travel from one State to another is firmly embedded in our jurisprudence."). However, courts have recognized that individuals do not enjoy a constitutional right to travel by the method of their choice. *See, e.g.*, *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("[T]ravelers do not have a constitutional right to the most convenient form of travel[, and] minor restrictions on travel simply do not amount to the denial of a fundamental right."); *Gilmore v. Gonzalez*, 435 F.3d 1125, 1137 (9th Cir. 2006) (noting that the plaintiff "does not possess the fundamental right to travel by airplane even though it is the most convenient mode of travel for him"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification.").

The Airline Defendants have not denied Plaintiff his fundamental right to travel. He may still travel by means other than aircraft. Further, he may travel by aircraft without a mask by obtaining an exemption. Or, he may travel by airplane with a mask. Thus, the Mask Mandate amounts to nothing more than a minor restriction on his travel, such that he cannot bring a claim for the denial of a constitutional right. Accordingly, the Court will dismiss Count Forty-One.

### ix. Plaintiff's International Covenants Claims Fail.

In Counts Forty-Two and Forty-Three, Plaintiff brings claims for violations of international law. (Compl. ¶¶ 869-82.) Specifically, Plaintiffs claims that the Airline Defendants have violated the International Covenant on Civil & Political Rights ("ICCPR") in Count Forty-Two and the Convention on Civil Aviation in Count Forty-Three. The Airline Defendants move to dismiss these claims, arguing that Plaintiff lacks a cause of action to enforce these covenants. (Airline Defs.' Mem. at 23.) The Court agrees.

Generally, treaties do not carry the force of law that affords an individual a private right of action to enforce its terms. *Medellin v. Texas*, 552 U.S. 491, 505 (2008) ("In sum, while treaties may comprise international commitments, they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms."). More specifically, the Supreme Court has recognized that the ICCPR binds the United States as a matter of common law, but "the United States ratified the [ICCPR] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004).

Plaintiff has not identified any reason why these two treaties confer a private cause of action that would allow him to prosecute these claims. Accordingly, the Court will dismiss Counts Forty-Two and Forty-Three. In sum, the Court will grant the Airline Defendants' Motion to Dismiss and will dismiss counts Nineteen through Forty-Three. [4]

## C.  Plaintiff's Claims Against the Federal Defendants Are Moot.

Plaintiff brings Counts One through Eighteen against the CDC and HHS, asking the Court to set aside the Mask Mandate and Testing Order and enjoin those agencies from enforcing the mandates. However, the Court lacks subject matter jurisdiction over those claims, because the orders do not remain in effect. Thus, Plaintiff cannot claim a continuing injury that the Court can redress, rendering his claims moot.

---

[4]  The Airline Defendants argue that the Court lacks personal jurisdiction over Plaintiff's claims against them, because he has not alleged that he bought a ticket to use their services. (Airline Defs.' Mem. at 24.) However, Plaintiff has alleged that he attempted to fly or was denied the ability to fly on each of the airlines. (Compl. ¶¶ 8, 10, 18, 23-24.) At this stage, construing these allegations in Plaintiff's favor, the Court finds these allegations sufficient to confer personal jurisdiction.

The Court has an independent duty to satisfy itself of its own subject matter jurisdiction even where the defendant does not directly challenge it. *Andrus v. Charlestone Stone Products Co., Inc.*, 436 U.S. 604, 608 n.6 (1978); *see United States v. Urutyan*, 564 F.3d 679, 684 (4th Cir. 2009) ("Nevertheless, we are obliged to satisfy ourselves of subject-matter jurisdiction, even where the parties concede it."). Indeed, "questions of subject matter jurisdiction must be decided first, because they concern the court's very power to hear the case." *Owens-Illinois v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999). Following the vacatur of the Mask Order, the Court ordered Plaintiff to brief the effect of the Vacatur Order on his claims, including which ones he intended to continue to litigate, and which ones had become moot. (ECF No. 87 at 14-15.) Plaintiff responded that he intended to press forward with all of his claims and that the Vacatur Order had not mooted any of them. (ECF No. 89.) The Court disagrees.

Article III of the Constitution limits the Court's jurisdiction to cases and controversies. U.S. Const. art. III, § 2, cl. 1; *Eden, LLC v. Justice*, 36 F.4th 166, 169 (4th Cir. 2022). The mootness doctrine finds its root in the case-or-controversy limitation on federal judicial power, preventing a federal court from issuing advisory opinions on legal questions without a live controversy before it. *Eden*, 36 F.4th at 169. Thus, a "pending lawsuit is rendered moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021). Courts "may only decide cases that matter in the real world" at the time that they decide them. *Eden*, 36 F.4th at 170. Decisions have no "practical effect in the real world" when a plaintiff has already received the relief sought in the lawsuit. *Id.* To that end, if "one of the elements essential to standing, like injury-in-fact, no longer obtains," then "a case is moot." *American Federation of Government Employees v. Office of Special Counsel*, 1 F.4th 180, 187 (4th Cir.

2021).  In the context of challenging a government order no longer in effect, deciding the legality

of the order would amount to issuing "an opinion advising what the law would be upon a

hypothetical state of facts, in which the challenged orders had never been rescinded — which

[courts] of course lack jurisdiction to provide." *Id*. (cleaned up).

Here, Plaintiff asks the Court to set aside two orders that the government no longer

enforces and that no longer have any legal effect.  TSA's Security Directives and Emergency

Amendments, the enforcement mechanism of the Mask Order, expired on May 3, 2022.  It has

not been renewed.  Additionally, on April 18, 2022, a federal district court vacated the Mask

Order. *Health Freedom Defense Fund,* 2022 WL 1134138.  Accordingly, effective April 18,

2022, the CDC considers the Mask Mandate "no longer in effect" and, as a result, "CDC will not

enforce the Order."[5]

Likewise, effective June 12, 2022, the CDC rescinded the Testing Order.  87 Fed. Reg.

36129 (June 15, 2022).  In rescinding the Testing Order, the CDC cited the "widespread uptake

of effective COVID-19 vaccines," immunity bestowed by infection and vaccines and the

availability of effective therapeutics.  87 Fed. Reg. at 36130.  The CDC determined that these

tools available to travelers could replace the testing requirement. *Id.*  Indeed, the CDC noted that

the public did not have these tools available to it in January 2021 when it concluded that the

Testing Order constituted a reasonable and necessary measure to help mitigate the spread of

COVID-19. *Id*. at 362130-31.

Therefore, because neither order remains in effect, Plaintiff's claims to set aside the

Orders do not present a live controversy.  Plaintiff claims that the Orders injure him by forcing

him to wear a mask while flying or risk a ban from using public airspace. (ECF No. 21 at 26.)

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html

Without continued enforcement of the complained-of Orders, neither of these harms can materialize.  Thus, Plaintiff can no longer claim an injury-in-fact.  Likewise, his claim to standing lacks redressability, as the Court cannot redress Plaintiff's claimed injury.  Neither Order remains subject to enforcement, so the Court enjoining their enforcement and setting them aside would provide no additional relief to Plaintiff.  As such, his claims against the Federal Defendants are moot.  Absent an exception to the mootness doctrine, discussed below, the Court must dismiss his claims.

In arguing that the government will reinstate the Orders (ECF No. 89), Plaintiff appears to invoke the "voluntary cessation" exception to the mootness doctrine.  "Pursuant to the voluntary cessation exception, a civil action does not become moot when a defendant voluntarily ceases its allegedly improper behavior, if there is a reasonable chance that the behavior will resume."  *Lighthouse Fellowship Church*, 20 F.4th at 162.  The exception seeks to eliminate the litigation tactic of "evad[ing] judicial review by temporarily altering questionable behavior."  *Eden, LLC*, 36 F.4th at 170.  As in the case here, "in circumstances where a challenged governmental regulation or legislation has expired, the inapplicability of the voluntary cessation exception has been established in several significant situations where mootness has been found."  *Lighthouse Fellowship Church*, 20 F.4th at 163 (first citing *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (Mem.); then citing *Kremens v. Bartley*, 431 U.S. 119 (1977); and then citing *Burke v. Barnes*, 479 U.S. 361 (1987).).

Here, the Court finds that the voluntary cessation exception does not apply.  First, the Court questions whether the exception could even apply to the Mask Order, as Defendants did not *voluntarily* rescind the order.  Rather, a federal district court vacated the order and then the government allowed it to expire.  However, even if the exception could apply in this situation,

the Court does not find it reasonable to expect that enforcement will recur. The return of enforcement of the Mask Order would require the Eleventh Circuit to vacate the district court's opinion in *Health Freedom Defense Fund*. Then, the TSA would need to renew the enforcement order, which expired on May 3, 2022. Especially in light of the changed circumstances that the CDC cited when lifting the Testing Order, the Court finds this too speculative to invoke the voluntary cessation doctrine.

Additionally, the cessation of enforcement can in no way be attributed to an effort by the government to moot this litigation. The lack of an evasive litigation tactic resembles the defendant's actions in *American Federation of Government Employees v. Office of Special Counsel*, 1 F.4th 180 (4th Cir. 2021), where the plaintiffs challenged an advisory opinion of the Office of Special Counsel ("OSC") that related to the 2020 election. After the district court ruled, but before the Fourth Circuit ruled, the OSC withdrew its opinion, because the 2020 election was over. *Id.* at 284. The Fourth Circuit rejected the application of the "voluntary cessation" doctrine, because "there [was] no whiff of any of the opportunism, on the part of the defendant, that typically supports invocations of mootness exceptions where voluntary cessation of the challenged conduct is at issue." *Id.* at 188. The OSC had not withdrawn its opinion "with the aim of avoiding judgment in court" and, therefore, the court dismissed the appeal as moot. *Id.* at 188. Likewise, here, Defendants did not rescind or stop enforcing the Orders with the aim of avoiding judgment in this Court, and the Court sees no traces of opportunism in their decisions.

Finding Plaintiff's claims moot comports with how other courts have treated challenges to expired COVID-19 restrictions. For example, in *Lighthouse Fellowship Church*, the Fourth Circuit held that the plaintiff's challenges to Virginia's COVID-19 related restrictions were

moot, because the restrictions had ended between the time the district court had ruled and when the Fourth Circuit issued its ruling. 20 F.4th at 161, 166 (4th Cir. 2021.) In finding it unreasonable that Governor Northam would reinstate the expired restrictions, the court relied in large part that "the current circumstances [were] materially different from those present at the outset of the pandemic." *Id.* at 164. The court cited greater knowledge of COVID-19 and how "vaccines and other measures to combat the virus have led to a significant change in the relevant circumstances." *Id.* Thus, the court found it "entirely speculative to assert that Governor Northam" would reinstate the restrictions. *Id.* Thus, the "voluntary cessation" exception to mootness did not apply, and the court dismissed the claims as moot.

Likewise, in *Eden, LLC*, the Fourth Circuit held that plaintiff's challenges to West Virginia's terminated COVID-19 safety measures became moot on appeal. 36 F.4th at 172. The court cited cases from numerous other circuits also finding challenges to terminated COVID-19 related restrictions moot. *Id.* at 171. Yet again, the court cited the change in circumstances, including "vaccines and other measures to combat the virus," to find the "likelihood of recurrence still more remote." *Id.* Accordingly, the court dismissed the plaintiff's claims as moot. *Id.*

Here, the Court finds the reasoning in these recent Fourth Circuit cases compelling. Circumstances have changed, as cited by the CDC in rescinding the Testing Order, including the availability of vaccines and other safety measures employed to combat the virus. Thus, the Court finds it unreasonable to expect that enforcement of these terminated Orders will recur. Therefore, the Court will dismiss Plaintiff's claims against the Federal Defendants as moot.

Case 2:22-cv-02383-SSS-AS   Document 173-1   Filed 02/14/23   Page 128 of 128   Page ID
#:3659
Case 3:22-cv-00052-DJN   Document 99   Filed 07/11/22   Page 32 of 32 PageID# 2522

## IV.    CONCLUSION

For the reasons stated above, the Court will DISMISS WITHOUT PREJUDICE Counts

One through Eighteen for lack of subject matter jurisdiction, because the Court finds these

claims moot.  Additionally, the Court will GRANT the Airline Defendants' Motion to Dismiss

(ECF No. 78), and DISMISS WITH PREJUDICE Plaintiff's claims against the Airlines in

Counts Nineteen through Forty-Three for failure to state a claim upon which relief can be

granted.  Finally, the Court will also GRANT Defendant STAT-MD's Motion to Dismiss (ECF

No. 80) and DISMISS WITHOUT PREJUDICE Counts Nineteen and Forty-Four for lack of

personal jurisdiction.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically, notify all counsel

of record and send a copy to Plaintiff at his address of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: July 11, 2022

32