**FILED**
CLERK, U.S. DISTRICT COURT

10/10/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___   DEPUTY

Cindy Russo
22485 Breakwater Way
Santa Clarita, CA  91350
Telephone: 908-797-8066
cjrz123@gmail.com

*Pro Se*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| URI MARCUS, YVONNE MARCUS, AVROHOM GORDON, DEVORAH GORDON & CINDY RUSSO, <br><br> Plaintiffs, <br><br> v. <br><br> CENTERS FOR DISEASE CONTROL & PREVENTION, DEPARTMENT OF HEALTH & HUMAN SERVICES, TRANSPORTATION SECURITY ADMINISTRATION, JULIE CARRIGAN, ALASKA AIRLINES, ALLEGIANT AIR, AMERICAN AIRLINES, DELTA AIR LINES, FRONTIER AIRLINES, HAWAIIAN AIRLINES, SOUTHWEST AIRLINES, UNITED AIRLINES, YET-TO-BE-NAMED EMPLOYEES OF THE 8 AIRLINES, STAT-MD, & MEDAIRE, <br><br> Defendants, | Case No.:  _2:22-cv-02383-SB-AS_ <br><br><br> **<u>FIRST AMENDED COMPLAINT</u>** <br><br> **<u>& DEMAND FOR JURY TRIAL</u>** |

## I.   <u>INTRODUCTION</u>

1.     Plaintiffs bring this lawsuit to vacate and permanently enjoin enforcement of the Federal Transportation Mask Mandate ("FTMM") and the International Traveler Testing Requirement ("ITTR") put into place by orders of the Centers for Disease Control & Prevention

("CDC") – under the purported authority of its parent agency, the Department of Health & Human Services ("HHS") (collectively "the Federal Defendants").

2.     The *ultra vires* FTMM consists of: 1) Executive Order 13998, 86 Fed. Reg. 7,205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) CDC Order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Health Directives 1542-21-01D, 1544-21-02D, and 1582/84-21-01D (March 19, 2022); and 5) TSA Emergency Amendment 1546-21-01D (March 19, 2022). (Exhibits 1-5 respectively)

3.     Only the CDC order is challenged in this Complaint since it appears the Courts of Appeals have jurisdiction over the TSA Health Directives and Emergency Amendment, and the president's executive order can be challenged by suing the agencies he directed to carry it out. The TSA is also listed herein with respect to their participation and aiding and abetting. Additionally, while the CDC gave the order, the TSA implemented it. Each one passes the blame to the other.

4.     The *ultra vires* ITTR is the CDC Order "Requirements for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country." 86 Fed. Reg. 69,256 (Dec. 7, 2021). (Exhibit 6)

5.     We also seek to end the unlawful discrimination against the disabled such as ourselves who can't safely wear a mask because of a medical condition by eight airlines we have flown on or have attempted to fly on during the COVID-19 pandemic: Alaska Airlines, Allegiant Airlines, American Airlines, Delta Airlines, Frontier Airlines, Hawaiian Airlines, Southwest Airlines, and United Airlines, (collectively "the Airline Defendants").

6.     Also charged are Numerous Yet-to-Be-Named Employees of the 8 Airlines (the "Individual Defendants"), and/or others involved, whose names will be learned during discovery.

7.     The final defendants are STAT-MD and MedAire (the "Medical Defendants"), two medical vendors who evaluate mask-exemption demands for most of the Airline Defendants.

8.      By mandating masks for all American travelers and requiring a negative COVID-19 test before any airline passenger may board a flight to the United States, the Federal Defendants have acted without statutory authorization or following the rulemaking process required by the Administrative Procedure Act ("APA"). These policies also raise serious constitutional concerns. Because of the FTMM, numerous state, local, and regional transportation agencies are told to enforce a federal mandate that is in direct conflict with the laws and policies of all 50 states that prohibit mask mandates or do not require face coverings.

9.      The Court should vacate worldwide[1] the FTMM and ITTR because they are improper, illegal, and unconstitutional exercises of executive authority. The mask mandate and testing requirement are procedurally defective because the Federal Defendants adopted them without following the APA's notice-and-comment requirements or considering the impact on millions of disabled travelers such as ourselves. They also ignored countless scientific and medical studies and articles showing that face masks are totally ineffective in reducing corona virus spread but are harmful to human health in at least 68 ways. Congress never intended for the Executive Branch to have the authority to promulgate these policies – and even if it did, the FTMM and ITTR are unconstitutional. CDC and HHS may not exercise their authority in a manner that is inconsistent with the administrative structure that Congress enacted.

10.     We have been restricted from flying by the Airline Defendants for more than 1½ years because of their enforcement of mask mandates that violate numerous provisions of federal and international laws, plus breach their contracts and violate tort law and the Constitution.

11.     The evidence is indisputable that the Airline Defendants since Summer 2020 have illegally discriminated against flyers with disabilities by refusing to grant mask exemptions and/or requiring such an onerous exemption process that makes it nearly impossible for those of us medically unable to cover our face to obtain a waiver.

---

[1] The FTMM purports to apply aboard flights to and from the United States, even when the aircraft is outside U.S. airspace. It likewise applies to ships calling on U.S. ports even when such vessels are in the open sea thousands of miles from American shores, far outside U.S. jurisdiction.

12.     Even when granted exemptions, the Airline Defendants create a new class of travelers relegated to travel only in seats located at the back of the aircraft, as if we are lepers with confirmed communicable diseases who must be segregated from all others. This despite the fact that they are further illegally mandating us to submit multiple negative COVID-19 tests, which confirm that mask-exempt passengers are virus-free.

13.     The Airline Defendants' conduct, contributed to by the Medical Defendants, results in the disabled who can't safely wear masks essentially being banned from using the nation's commercial aviation system. We have avoided flying as much as possible because we can't obstruct our oxygen intake.

14.     They play this game. The airline's say "sorry, the medical consultants said you're not able to fly." If you try to reach the medical consultants, they say, "you must talk to the airlines." Everyone passes the buck. No one takes responsibility.

15.     All defendants have illegally failed to give passengers – whether disabled or not – our legally guaranteed option under the Food, Drug, & Cosmetic Act ("FDCA") to refuse to use a medical device (face mask) not approved by HHS' Food & Drug Administration ("FDA") or allowed only under an Emergency Use Authorization ("EUA").

16.     In mandating masks for all passengers, the Airline Defendants have violated the Rehabilitation Act ("RA"), Air Carrier Access Act ("ACAA"), international law, California law, and their contracts with passengers – especially when it comes to illegally discriminating against travelers with disabilities who can't medically tolerate wearing a face covering with first a complete ban and then arduous exemption requirements that aren't supported by law.

17.     Making this matter worse is that the airlines' regulatory agency, the Department of Transportation ("DOT"), has given them guidance that actually supports their illegal behavior. (Exhibit 7) Therefore, we bring this suit to enforce the ACAA since the administrative agency has neglected its statutory duty to do so.

18.     Because the agency charged by Congress to enforce the rights of passengers with disabilities has failed to protect us and countless numbers of others similarly situated, our only recourse is a private suit in this Court to ensure the Airline Defendants cease and desist from

their unlawful conduct. The ACAA should also be enforced via the RA, conspiracy laws, and California's Unruh Civil Rights Act.

19.     The Airline Defendants have acted without statutory or regulatory authority to demand that every passenger obstruct their breathing by wearing an unauthorized or EUA medical device that covers their nose and mouth. The Airline Defendants have illegally required face coverings for 20 months or so not only on board their property (aircraft) but also in public areas of airports they do not own or control. They have all claimed that masking is a "federal law" when Congress has never enacted any such statute.

20.     The Court must stop the Airline Defendants from continuing to discriminate against flyers with disabilities and force them to follow the RA, ACAA, Unruh Act, and other laws because DOT has refused to do its job.

## II.     PARTIES

**Plaintiffs**

21.     Uri and Yvonne Marcus, husband and wife, are U.S. citizens who reside at Shmu'el Lupo 6/18, Jerusalem, Israel 9355006. They maintain both a residential address and a business address in the United States. Their mailing address in the United States is P.O. Box 126, Ojai, CA  92034. They are travelers subject to the FTMM, ITTR, and the airlines' mask policies. Sadly, Uri passed away recently.  His estate is represented here by his wife, as Administrator.

22.     In Israel, Mrs. Marcus in also known as "Adi Marcus" — her legal Hebrew name on her Israeli passport — to her physicians, friends, family and government authorities

23.     Plaintiffs Avrohom Gordon and Devorah Gordon, husband and wife, reside at 2251 State Route 222, New Richmond, OH 45157. They are travelers subject to the FTMM and the airlines' mask policies.

24.     Plaintiff Cindy Russo resides at 22485 Breakwater Way, Santa Clarita, CA 91350. She is a traveler subject to the FTMM and the airlines' mask policies.

**Defendants**

25.      Defendant Centers for Disease Control & Prevention is an agency of HHS. It is headquartered at 1600 Clifton Rd., Atlanta, GA 30329.

26.      Defendant Department of Health & Human Services is a department of the Executive Branch. It is headquartered at 200 Independence Ave., SW, Washington, DC 20201.

27.      Defendant Transportation Security Administration ("TSA") is an agency of the Department of Homeland Security ("DHS"). It is headquartered at 6955 Springfield Center Dr., Springfield, VA 20598.

28.      Defendant Julie Carrigan is the acting division director of TSA's National Transportation Vetting Center. She is sued in both her official and individual capacities. Her work address is 6955 Springfield Center Dr., Springfield, VA 20598.

29.      Defendant Alaska Airlines is an Alaska corporation doing business in California. Its headquarters is at 19300 International Blvd., Seatac, WA 98188. Its registered agent in California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833.

30.      Defendant Allegiant Airlines is a Nevada corporation doing business in California. Its headquarters is at 31201 N. Town Center Dr., Las Vegas, NV 89144. Its registered agent in California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833.

31.      Defendant American Airlines is a Delaware corporation doing business in California. Its headquarters is at 1 Skyview Dr., Fort Worth, TX 76155. Its registered agent in California is C.T. Corporation System, Suite 700, 330 N. Brand Blvd., Glendale, CA 91203.

32.      Defendant Delta Air Lines is a Delaware corporation doing business in California. Its headquarters is at 1030 Delta Blvd., Atlanta, GA 30354. Its registered agent in California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833-3505.

33.      Defendant Frontier Airlines is a Delaware corporation doing business in California. Its headquarters is at 4545 Airport Way, Denver, CO 80239. Its registered agent in

California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833.

34.     Defendant Hawaiian Airlines is a Delaware corporation doing business in California. Its headquarters is at Suite G350, 3375 Koapaka St., Honolulu, HI 96819. Its registered agent in California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833.

35.     Defendant Southwest Airlines is a Texas corporation doing business in California. Its headquarters is at 2702 Love Field Dr., Dallas, TX, 75235. Its registered agent in California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833.

36.     Defendant United Airlines is a Delaware corporation doing business in California. Its headquarters is at 233 S. Wacker Dr., Chicago, IL 60606. Its registered agent in California is C.T. Corporation System, Suite 700, 330 N. Brand Blvd, Glendale, CA 91203.

37.     Defendant Numerous Yet-to-Be-Named Employees of the Defendants consist of all officers, executives, and staff of the Defendants who participated in the conspiracy to interfere with our civil rights and/or neglected to prevent such interference. Their names will be learned during discovery. Until then, attorneys for the Defendants should adequately represent their interests.

38.     Defendant Center for Emergency Medicine of Western Pennsylvania, Inc., DBA STATMD ("Stat-MD") describes itself as providing "Airline Consultation Services" including in-flight emergency consultation as well as fitness-to-fly ground screening. STAT-MD is a nonprofit organization backed by the resources of the University of Pittsburgh Medical Center. Its headquarters is at 200 Lothrop St. #F1301, Pittsburgh, PA 15213, and it is incorporated in Pennsylvania.

39.     Defendant MedAire is a Nevada Corporation that describes itself as a medical advisory group delivering "integrated medical and security solutions for airlines that includes training, equipment, and professional services for crew and passengers beyond the cabin." Its headquarters is at Suite 450, 4722 North 24th St., Phoenix, AZ 85016. Its registered agent in

California is CSC-Lawyers Incorporating Service, Suite 150N, 2710 Gateway Oaks Dr., Sacramento, CA 95833-3505.

## III.   <u>JURISDICTION, VENUE & STANDING</u>

40.     This Court has original jurisdiction over our claims pursuant to 28 USC § 1331 since this case involves questions of federal law, including the U.S. Constitution, U.S. Code, Code of Federal Regulations, and international treaties ratified by the United States. This Court also has jurisdiction pursuant to 28 USC § 1343 because we seek damages for violations of our civil rights.

41.     Our state-law claims are so related to those under which this Court has original jurisdiction that they form part of the same case and controversy under Article III of the Constitution. Our state-law claims share common operative facts with our federal-law claims and the parties are identical. Resolving our federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties. Supplemental jurisdiction is therefore appropriate pursuant to 28 USC § 1367.

42.     This Court has jurisdiction over our claims for declaratory and injunctive relief, as well as to award monetary damages against the Airline Defendants, the Individual Defendants, and the Medical Defendants, under the Declaratory Judgment Act and this Court's inherent powers pursuant to 28 USC §§ 2201 & 2202 and 5 USC §§ 702 & 706.

43.     The Court also has diversity jurisdiction under 28 USC § 1332 since we are citizens of California and Ohio; the Airline Defendants do not have their principal place of business and are not incorporated in California; and the Medical Defendants likewise do not have their principal place of business and not incorporated in California. The amount of controversy is greater than $75,000.

44.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to this lawsuit occurred in California and in connection with flights to/from California. 28 USC § 1391.

45.     We have standing to sue the Federal Defendants because the FTMM and ITTR restricts our freedom of travel and unlawfully discriminate against us as disabled passengers, *inter alia*. A court order declaring unlawful and setting aside the FTMM and ITTR would redress our injuries because our freedom to travel without covering our faces and being subjected to virus testing would be restored.

46.     We have standing to sue the Airline Defendants, the Individual Defendants, and the Medical Defendants because they illegally discriminated against us on the basis of our medical conditions by denying us to ability to fly without wearing a mask as well as forcing us in violation of federal law and in breach of contract to wear unauthorized and/or EUA masks against our will to the detriment of our health. A court order declaring unlawful and enjoining the nongovernment defendants' illegal discrimination and contract breaches – plus an award of compensatory and punitive damages – would redress our injuries.

47.     This Court has Jurisdiction over Medical Defendants because each of the Defendants have contacts that are sufficient to establish specific personal Jurisdiction. As the court determined in a previous case against Medaire, Inc., "This contract, by *521 its very nature, contemplated that MedAire would deliberately reach out of Arizona and provide medical advice to Continental aircraft wherever they might be located. Obviously these aircraft would often be in Texas. Thus, MedAire had full knowledge that its medical advice would affect air travelers in Texas." McCaskey v. Continental Airlines, Inc., 133 F.Supp.2d 514, 520–21 (S.D.Tex.,2001).

48.     As the Supreme Court said, "Thus where the defendant "deliberately" has *476 engaged in significant activities within a State, Keeton v. Hustler Magazine, Inc., supra, 465 U.S., at 781, 104 S.Ct., at 1481, or has created "continuing obligations" between himself and residents of the forum, Travelers Health Assn. v. Virginia, 339 U.S., at 648, 70 S.Ct., at 929, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2184, 471 U.S. 462, 475–76 (U.S.Fla., 1985).

49.     We have standing to sue the Federal Defendants because the FTMM and ITTR restricted our freedom of travel and unlawfully discriminated against us as disabled passengers, inter alia. A California court order declaring unlawful and setting aside the FTMM and ITTR, would redress our injuries because the mandates of covering our faces and being subjected to virus testing would be declared to have been illegal.

50.     We have standing to sue the Airline Defendants, the Individual Defendants, and the Medical Defendants because they illegally discriminated against us on the basis of our medical conditions by denying us to ability to fly without wearing a mask as well as conditioning carriage upon compliance with their own masking rules, quite different from those of the CDC, in violation of numerous federal laws they swore to uphold, and in breach of contract to the detriment of Plaintiffs' health. An award of compensatory and punitive damages for the illegal discrimination and contract breaches of Airline and Medical Defendants would redress our injuries.

51.     Specific personal jurisdiction is proper in California for Defendant Julie Carrigan in her individual capacity, as per Ibrahim v. Department of Homeland Sec., 538 F.3d 1250 (C.A.9 (Cal.), 2008). In that case, the court found that although the federal official was a resident of Virginia and had no ties to California, his telephone conversation from the federal agency in Washington, D.C., ordering California police to detain an alien whose name appeared on the federal government's no-fly list and to prevent her from boarding plane while she was in United States on student visa, was sufficient for exercise of specific jurisdiction, in the alien's § 1983 suit asserting Bivens claims and California tort claims against the official in his individual capacity, since his telephone orders were purposefully directed at California as the purpose was to have consequences felt by the alien in the California airport. Jurisdiction was reasonably exercised due to California's strong interest in providing redress for its residents' tortious injuries, which would not infringe on Virginia's sovereignty. 42 U.S.C.A. § 1983. Ibrahim v. Department of Homeland Sec., 538 F.3d 1250 (C.A.9 (Cal.), 2008).

## IV.     <u>STATEMENT OF FACTS</u>

**The travel history of Plaintiffs Uri and Yvonne Marcus during the COVID-19 pandemic, their future travel plans, their disabling medical conditions that prevent them from masking, and the revocation of Mr. Marcus' Pre-Check eligibility.**

52.    **URIEL MARCUS' 2020 FLIGHTS (Exhibit 36)[2]:** Nov 20, 2020: United on Flight 955 from Tel Aviv, Israel, (TLV) to San Francisco (SFO) forced Mr. Marcus to mask against his will.

53.    Nov 23, 2020: Southwest on Flight 4379 from Oakland (OAK) to Los Angeles (LAX) forced Mr. Marcus to mask against his will.

54.    Nov 29, 2020: American on Flight 2645 from LAX to Las Vegas (LAS) forced Mr. Marcus to mask against his will.

55.    Dec 4, 2020: Southwest on Flight 4520 from LAS to Phoenix, Arizona, (PHX) forced Mr. Marcus to mask against his will.

56.    Dec 9, 2020: Southwest on Flight 4608 from PHX to LAX forced Mr. Marcus to mask against his will.

57.    Dec 9, 2020: United on Flight 1548 from LAX to SFO forced Mr. Marcus to mask against his will.

58.    Dec 9, 2020: United on Flight 954 from SFO to TLV forced Mr. Marcus to mask against his will.

59.    **YVONNE MARCUS' 2020-21 FLIGHTS (Exhibit 36):** Nov 20, 2020: United on Flight 955 from TLV to SFO forced Mrs. Marcus to mask against her will.

60.    Nov 23, 2020: Southwest on Flight 4379 from OAK to LAX forced Mrs. Marcus to mask against her will.

61.    Nov 29, 2020: American on Flight 2645 from LAX to LAS forced Mrs. Marcus to mask against her will

---

[2] Our apologies for the Exhibit numbers slightly out of order, as we were initially filing without the Marcus's, but had to include them afterwards

62.     Dec 4, 2020: Southwest on Flight 4520 from LAS to PHX forced Mrs. Marcus to mask against her will.

63.     Dec 9, 2020: Delta on Flight 3844 from PHX to LAX forced Mrs. Marcus to mask against her will.

64.     Jan 6, 2021: United on Flight 5926 from LAX to SFO forced Mrs. Marcus to mask against her will.

65.     Jan 6, 2021: United on Flight 954 from SFO to TLV forced Mrs. Marcus to mask against her will.

66.     July 30, 2021: United on Flight 955 from TLV to SFO forced Mrs. Marcus to mask against her will.

67.     July 30, 2021: Southwest on Flight 5733 from SFO to Burbank (BUR) forced Mrs. Marcus to mask against her will.

68.     Sept. 4, 2021: United on Flight 1548 from LAX to SFO forced Mrs. Marcus to mask against her will.

69.     Sept. 4, 2021: United on Flight 954 from SFO to TLV forced Mrs. Marcus to mask against her will.

70.     **MR. & MRS. MARCUS CAN'T TOLERATE WEARING FACE MASKS:** Due to their hyperactive airways and respiratory illnesses, it is harmful to cover their faces. When forced to muzzle themselves, they become panic-stricken, especially when threatening announcements are made over the cabin PA system, sometimes more than 15 times on a single one-hour flight, warning them of dire consequences should they remove the mask to take a full breath of air. There is an overall sense of uneasiness that further exacerbates breathing difficulties during each flight, particularly on the long-haul flights.

71.     Basal Cell Carcinoma is a type of locally invasive skin cancer and it can be caused by local irritation due to mask wearing. The chronic irritation is consistent with prolonged and persistent wearing of a facial mask. The pressure strip is persistently pinched to maintain proper sealing over and around the nose, persistent moisture of exhalation of moist air, and constant friction are a causative factor leading to the growth of this type of skin cancer.

72.     Mrs. Marcus had no problems with the skin of her nose and no lesions on the skin on her nose until she flew roundtrip from TLV to LAX via SFO in November 2020, returning in January 2021. In July 2021, she had to make another flight from TLV to SFO and on to LAX due to the death of her father.

73.     During all eight flights, four of which were about 14 hours long each, she complained of irritation and itching on the left side of her nose where the pressure of her required face mask rested. Because of flight rules requiring the mask at all times, she could not remove her mask to relieve the pressure on the sensitive area of her nose and subsequently developed a lesion within a week of her arrival.

74.     During her return trip from SFO to TLV on Sept. 4-5, 2021, again she was required to wear the mask for some 14 hours while still dealing with the open lesion on her nose, noting sensitivity, pain and itching on the left side of the nasal bridge.

75.     By October 2021, after lesion did not heal and the sensitivity, pain and itching had become a health concern, she consulted with Dr. Leon Gilead, a dermatologist and Mohs specialist, who diagnosed her condition as Basal Cell Carcinoma and recommended Mohs surgery. In his written opinion, he felt that the persistent irritation of prolonged mask wearing was a factor in causing the appearance of basal cell carcinoma in this location. Exhibit 37)

76.     On Dec. 26, 2021, Mrs. Marcus consulted with Dr. Leora Fisher-Peled, who confirmed the diagnosis of Basal Cell Carcinoma. (Exhibit 38)

77.     On Jan. 26, 2022, Mrs. Marcus sought the medical opinion of a third doctor, Dr. Ephraim ben-Zeev. Dr. ben-Zeev remarked that these types of skin cancers are certainly related to ongoing local irritation. Such a process of chronic irritation is consistent with prolonged wearing of a facial mask, where the pressure strip is persistently pinched to maintain proper sealing over and around the nose. Persistent moisture of exhalation of moist air and constant friction are a causative factor leading to the growth of this type of skin cancer. Exhibit 39

78.     Mrs. Marcus underwent surgery Feb 8, 2022, to remove the skin cancer that was the result of prolonged masking demanded by the defendants. Masking in Israel is not legally required anywhere, provided a person simply states that they are medically exempt.

79.     Mrs. Marcus is still recovering from surgery which resulted in a hole the size of a dime on the bridge of her nose. (Exhibit 40) She experiences pain and burning sensations daily without a break, and her wound will not fully recover for 4-6 months. It will also scar, causing facial disfigurement.

80.     In anticipation of upcoming travel, Mr. and Mrs. Marcus both obtained mask-exemption letters from their physicians on Sept. 19, 2021. (Exhibit 41).

81.     **ATTEMPTS TO BOOK 2022 FLIGHTS:** Mr. and Mrs. Marcus purchased roundtrip tickets from United Airlines on Jan. 27, 2022, for itinerary to fly TLV March 6-31. (Exhibit 42)

82.     United fraudulently misrepresented that "Refusing to wear a face mask in the airport or on board is a federal offense which may result in a fine of up to $35,000." *Id.* In reality, refusing to wear a mask comes with a TSA civil fine up to $500.

83.     United fraudulently misrepresented that "federal law" requires passengers to don masks. But Congress has never passed such a law. *Id.*

84.     United denied their mask exemptions despite the detailed doctors' notes we submitted. *Id.*

85.      Additional correspondence with United did not resolve the improper denials. *Id.*

86.     Mr. and Mrs. Marcus were forced to cancel their tickets due to United's discrimination. *Id.*

87.     Plaintiffs Uri Marcus and Yvonne Marcus purchased a one-way ticket from American Airlines on Feb 2, 2022, to fly JFK-LAX-JFK-TLV, for travel from March 7 to 31, 2022. (Exhibit 43).

88.     American fraudulently misrepresents that "federal law" requires the wearing of face coverings. But Congress has never enacted such a law. *Id.*

89.     American initially denied our mask exemptions multiple times. *Id.*

90.     American unlawfully informed us that it will only carry one mask-exempt passenger per flight. *Id. But see* 14 CFR § 382.17.

91.     After several follow-up correspondence, American finally granted the Marcuses provisional mask exemptions. But plaintiffs were discriminated against. They were assigned, against their will, to seats located in the last row of the planes. They would further have been forced to submit to Polymerase Chain Reaction ("PCR") COVID-19 testing and would be allowed to board only with a negative test result. id.

92.     American does not require nondisabled passengers to PCR test prior to boarding.

93.      Mr. and Mrs. Marcus were forced to cancel their tickets due to American's discrimination. *Id.*

94.     Mr. and Mrs. Marcus purchased roundtrip tickets from Delta Airlines Feb. 10, 2022, to fly TLV-New York (JFK)-LAX-JFK-TLV from March 17 to April 10, 2022. (Exhibit 44).

95.     Delta fraudulently misrepresents that "federal law" requires the wearing of face coverings. But Congress has never enacted such a law. *Id.*

96.     Mask exemptions were denied via Delta's illegal "Clearance to Fly," process which involved consulting with Defendant STAT-MD, which determined that mask exemptions could not be approved in advance even though due to plaintiffs' disabilities, they could not tolerate masking for 12-14 hour trans-Atlantic long-haul flights. Delta refused to make an exception to its rule. *Id.*

97.     Mr. and Mrs. Marcus were forced to cancel their tickets due to Delta's discrimination. *Id.*

98.     Mr. and Mrs. Marcus purchased a one-way ticket from Alaska Airlines on Feb. 25, 2022, to fly LAX-Boise (BOI) on June 6, 2022. (Exhibit 45).

99.      Alaska requires advance notice of at least three days to request a mask exemption. *Id. But see* 14 CFR § 382.25.

100.    Alaska requires COVID-19 testing for disabled passengers, but this rule does not apply to nondisabled passengers. id.

101.    Alaska requires a medical certificate. *Id. But see* 14 CFR § 382.23(a).

102.    Alaska fraudulently misrepresents that "federal law" requires the wearing of face coverings. But Congress has never enacted such a law. id.

103.    Mr. and Mrs. Marcus selected seats in Row 19. *Id.*

104.    Provisional mask exemptions were approved by Alaska but Mr. and Mrs. Marcus were discriminated against. They were assigned, against their will, to seats located in the last row (32) of the plane and would have been forced to submit to COVID-19 PCR testing, a rule that doesn't apply to nondisabled customers. *Id.*

105.    Mr. and Mrs. Marcus were forced to cancel their tickets due to Alaska's discrimination. *Id.*

106.    Mr. and Mrs. Marcus purchased two one-way tickets and one roundtrip ticket from Southwest Airlines on Feb. 25, 2022, for three separate itineraries: 1) BOI-Denver (DEN) on June 16, 2022; 2) Houston (HOU)-Phoenix (PHX) on June 24, 2022; and 3) LAX-LAS-LAX on June 28 to July 5. (Exhibit 46).

107.    Provisional mask exemptions were approved but plaintiffs were assigned, against their will, to seats located in the last row of all flights, despite Southwest's "open seating policy" for all passengers. Further, they would have been forced to submit to COVID-19 PCR testing and would be allowed to board only with a negative test result. However, no other passengers would have been required to PCR test prior to boarding. *Id.*

108.    Mr. and Mrs. Marcus booked roundtrip tickets from Hawaiian Airlines on Feb. 25, 2022, for flights LAX-Honolulu (HNL)-LAX on July 7-14. (Exhibit 47).

109.    Hawaiian fraudulently misrepresents that "federal law" requires the wearing of face coverings. But Congress has never enacted such a law. *Id.*

110.    Hawaiian informed us we would need to undergo a medical screening with Defendant MedAire's MedLink service. *Id.*

111.    Mask exemptions were denied via Hawaiian's illegal "Fit to Fly" process, which involved a full medical assessment with MedAire, who determined that mask exemptions could not be approved in advance even though due to Plaintiffs' disabilities, they could not tolerate

masking for 5-7 hour trans-Pacific long-haul flights. Hawaiian would make no exception to its rule. *Id*.

112.    A Hawaiian agent told Mr. Marcus on the phone that if he and his wife appeared for their flight to HNL and passed the Fit to Fly examination, they would be forced to sit in the rear of the aircraft regardless of what seats they chose during booking.

113.    Additional flights for business and family reasons are planned in the near future to multiple destinations, which the Marcuses are concerned will have to be canceled due to the FTMM and airlines' discriminatory mask policies.

114.    **REVOCATION OF MR. MARCUS' PRE-CHECK ELIGIBILITY:** Mr. Marcus applied for TSA Pre-Check status June 16, 2017, and paid the $85 fee. (Exhibit 48).

115.    Travelers approved for Pre-Check are allowed access to expedited security-screening lanes at airports nationwide.

116.    TSA approved Mr. Marcus' Pre-Check application June 21, 2017. id.

117.    His Pre-Check status was granted through June 16, 2022. *Id*.

118.    Mrs. Marcus signed up for Pre-Check at the same time Mr. Marcus did. Her application was also approved.

119.    Mr. Marcus, along with Larry James Bonin Jr., filed a Petition for Review with the U.S. Court of Appeals for the Fifth Circuit on Oct. 19, 2021, to challenge the legality of TSA's enforcement of the FTMM.

120.    That case was later transferred to the U.S. Court of Appeals for the District of Columbia Circuit, where it was finalized a few months ago. *Marcus v. TSA*, No. 21-1225.

121.    Defendant Julie Carrigan, TSA's acting division director for the National Transportation Vetting Center, wrote a letter dated Nov. 23, 2021 to Mr. Marcus informing him that his Pre-Check status was revoked: "As a result of recurrent checks and based on a comprehensive background check, TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to continue to be eligible for expedited airport security screening through the TSA Pre-Check Application Program. As a result, TSA has determined

that you are no longer eligible to participate in the TSA Pre-Check Application Program." (Exhibit 49).

122.    Ms. Carrigan electronically signed the letter Nov. 18 – one month after Mr. Marcus exercised his First Amendment right to petition the government for a redress of grievances by challenging TSA's FTMM enforcement in court. *Id*.

123.    Ms. Carrigan did not cite a reason why Mr. Marcus was flagged for revocation of his Pre-Check status, when he had not taken a flight in the United States or been present in the country since Dec 9, 2020. *Id*.

124.    However, TSA publishes a list of "Disqualifying Offenses & Other Factors"[3] that it supposed to cite when denying or revoking Pre-Check eligibility.

125.    TSA and Ms. Carrigan did not give Mr. Marcus an opportunity to respond to any allegations made against him, including a hearing.

126.    Mrs. Marcus is not suing TSA. Interestingly she has not received a letter from TSA revoking her Pre-Check eligibility.

127.    Mr. Marcus posed no threat to aviation security.

128.    Mr. Marcus was a Federal Aviation Administration Certified Commercial Pilot who also holds a CFII MEI (Flight Instructor Airplane Single & Multi Engine Instrument Airplane) Certificate, as well as a Private Pilot License holder in Israel.

129.    In February 2009, Mr. Marcus was awarded a certificate of completion for navigating the Washington, D.C., Special Flight Rules Area by FAA, for which oversight is by TSA. (Exhibit 50)  This document is given only to pilots who have demonstrated that they pose no security risk over D.C.'s protected airspace.

130.    In July 2010, Mr. Marcus was vetted by TSA at SNA (John Wayne Santa Ana Airport, California) and was given clearance and access to secured areas of the airport, where he rented aircraft from Sunrise Aviation Inc.

131.     In 2014, Mr. Marcus passed a General Aviation Security Course, for which TSA issued a Certificate of Completion.

_____

[3] https://www.tsa.gov/disqualifying-offenses-factors

132.    Mrs. Marcus, who again is not suing TSA, received an invitation from the agency Dec. 16, 2021, to renew her Pre-Check benefit.

133.    TSA approved Mrs. Marcus' Pre-Check renewal Dec. 18, 2021.

**Plaintiffs Uri and Yvonne Marcus' exhaustion of administrative remedies (Exhibit 51).**

134.    Mr. and Mrs. Marcus filed complaints of disability discrimination by Alaska Airlines with DOT.  id

135.    Mr. and Mrs. Marcus filed complaints of disability discrimination by American Airlines with DOT. id

136.    Mr. and Mrs. Marcus filed complaints of disability discrimination by Delta Air Lines with DOT.   id

137.    Mr. and Mrs. Marcus filed complaints of disability discrimination by Hawaiian Airlines with DOT.  id

138.    Mr. and Mrs. Marcus filed complaints of disability discrimination by Southwest Airlines with DOT.  id

139.    Mr. and Mrs. Marcus filed complaints of disability discrimination by United Airlines with DOT.  id

140.    DOT has failed to investigate or resolve any of their complaints against these six Airline Defendants.

141.    Mr. Marcus made an inquiry to TSA on March 10, 2022, via its webform to ask why his Pre-Check eligibility was revoked and what could be done to reinstate him since no reasons were given by Ms. Carrigan in the Nov. 23, 2021, letter.  id

142.    On March 14, 2022, TSA responded outlining the steps Mr. Marcus could take to have his Pre-Check reinstated. The letter states, "You received a letter that provides the reasons for the disqualification and directions to submit a correction of record."  id

143.    However, the Nov. 23, 2021, letter from Ms. Carrigan gave no reason for disqualification or directions to submit a correction of record. (Exhibit 49)

144.    Mr. Marcus requested clarification from TSA on March 14, 2022, via email. (Exhibit 51)

145.    Two days later, TSA sent an e-mail to Mr. Marcus inviting him to renew his Pre-Check eligibility that's about to expire in July. id id

146.    Later on March 16, 2022, after attempting to renew Mr. Marcus' eligibility online, as invited, the renewal was denied.  Id

147.    Mr. Marcus called the TSA renewal center on March 16, 2022, but after nearly an hour, no one was able to give him a reason why his renewal was not processed and approved.

148.    TSA e-mailed Mr. Marcus on March 17, 2022, indicating it would reply to his correspondence within 48 hours.  id

149.    Mr. Marcus messaged TSA again March 24, 2022, seeking a proper response to his difficulty renewing his TSA eligibility.  Id

150.    TSA has not responded to Mr. Marcus.

**The travel history of Plaintiffs Avrohom Gordon and Devorah Gordon during the COVID-19 pandemic, their future travel plans, and their disabling medical conditions that preclude masking. (See Exhibit 8)**

151.    Plaintiff Avrohom Gordon has not been able to travel because of the FTMM and his inability to wear a mask due to breathing issues that he had surgery for in the past. He has missed a few important events such as a friend's wedding, children's competition celebrations, work conferences, etc.

152.    Jan. 17, 2022: Mr. Gordon was booked on Allegiant Flight 4692 from Cincinnati (CVG) to LAX.

153.    Allegiant denied Mr. Gordon's mask exemption. *Id.*

154.    He was not able to travel because he has a medical disability that does not allow him to wear a mask, and masking would have been harmful to his health. Mr. Gordon was forced to cancel his trip.

155.    Jan. 18, 2022: Mr. Gordon was booked to fly Frontier Flight 2184 from Ontario
(ONT) to LAS then Frontier Flight 2022 from LAS to CVG..

156.    Frontier denied Mr. Gordon's mask exemption. *Id.*

157.    He was not able to travel because masking would have been harmful to his health.
Mr. Gordon was forced to cancel his trip.

158.    Plaintiff Devorah Gordon has a medical disability that does not allow her to wear
a mask.

159.    She has flown ten times during the pandemic and been harassed about masking,
causing even more anxiety to an already stressful medical situation.

160.    Feb. 10, 2021: American demanded from Mrs. Gordon to mask on Flight 2552
from Charlotte (CLT) to Newark (EWR)..

161.    Feb. 11, 2021: American demanded from Mrs. Gordon to mask against her will
on Airlines Flight 2554 from EWR to CLT.

162.    Aug. 23, 2021: American demanded from Mrs. Gordon to mask against her will
on a flight from CLT to Little Rock (LIT).

163.    Aug. 23, 2021: American demanded from Mrs. Gordon to mask against her will
on a flight from LIT to CLT.

164.    Sept. 19, 2021: American demanded from Mrs. Gordon to mask against her will
on Flight 5232 from CLT to CVG.

165.    Sept. 20, 2021: American demanded from Mrs. Gordon to mask against her will
on Flight 5352 from CVG to CLT.

166.    Oct. 5, 2021: American demanded from Mrs. Gordon to mask against her will on
Flight 1884 from CLT to CVG.

167.    Oct. 6, 2021: American demanded from Mrs. Gordon to mask against her will on
a flight from CVG to CLT.

168.    Jan. 17, 2022: Allegiant demanded from Mrs. Gordon to mask against her will on
Flight 4692 from CVG to LAX.

169.    Jan. 18, 2022: Frontier demanded from Mrs. Gordon to mask against her will on Flight 2184 from ONT to LAS and Flight 2022 from LAS to CVG.

170.    Mask-exemption demands were sent to Allegiant and Frontier because Mrs. Gordon is medically unable to safely wear a face covering. .

171.    All requests were denied by Allegiant and Frontier.

172.    Ms. Gordon felt physically, emotionally, psychologically, and spiritually ill for the duration of travel Jan. 17-18.

173.    At both the security checkpoint and boarding gate on Jan. 17, 2022, Mrs. Gordon said she has a disability that prevents her from wearing a mask safely. TSA and Allegiant asked her if she had a medical certificate from a doctor. She responded that according to law, they may not ask her for details of her disability or require her to prove her disability with a medical certificate.

174.    Frontier did not allow Mrs. Gordon to use her own mask and provided a disposable blue surgical-style mask to wear. On the wrapper it came in, it was written: "CIVIL PROTECTION, NOT MEDICAL."

175.    Aboard the Allegiant aircraft, multiple threatening announcements were made that according to the "law," passengers must mask or "be kicked off the plane and/or arrested, fined and/or put in jail."

176.    Mrs. Gordon went to the lavatory without a mask on. Upon exiting, an Allegiant flight attendant immediately reprimanded her very strongly, stating that "You must wear the mask the whole time."

177.    While eating, an Allegiant flight attendant approached Mrs. Gordon and said "You have been told too many times to put the mask on." She complied with the orders of the flight crew and fully donned the mask for the rest of the flight, even though she had not yet finished eating and she medically can't tolerate having her breathing blocked.

178.    The Allegiant flight attendant nevertheless asked for Mrs. Gordon to surrender her ID. When she hesitated, the Allegiant employee threatened to have the police meet her at the arrival gate, where she "would be fined $10,000."

179.   This is a fraudulent misrepresentation by Allegiant as the TSA civil fine for not wearing a mask is $500.

180.   When Mrs. Gordon did not comply with the request to present her identification, the Allegiant flight attendant told her she had a choice to surrender her ID or have the police meet her at the gate. Mrs. Gordon again chose not to surrender her ID because she had not violated any laws. The flight attendant replied in a nasty tone "fine, so the police will meet you at the gate."

181.   The captain of Allegiant Flight 4692 then announced on the aircraft's public-address system "There is one passenger that is not complying with the mask rules. We will give her one last chance and hope she will make the right choice, otherwise she will be met at the gate by the police." The flight attendant then came back and presented her with a written notice of the warning.

182.   Allegiant fraudulently misrepresented on the notice that "Your behavior is in violation of Title 14 of the Code of Federal Regulations." *Id.* However, the FTMM is not a federal regulation.

183.   The notice Allegiant gave to Mrs. Gordon fraudulently threatened her with "fines up to $25,000 and up to 20 years imprisonment, or both."

184.   When the Allegiant flight arrived at LAX, there were two police officers who met her at the gate.

185.    Mrs. Gordon agreed to speak with them. They asked her for her ID and warned that if she did not surrender it, the FBI could be called, she could go to jail, and could receive a big fine. (All of which are lies since the FTMM is not a criminal law enacted by Congress.)

186.   Mrs. Gordon eventually surrendered it, because they would not/could not give her clear information about the process when she asked, and she could not think straight with the mask on. The officers gave her ID to Allegiant and then returned it to her.

187.   It soon become clear that no laws had been violated, and the airport police could not do anything further. Mrs. Gordon removed her mask and proceeded to exit the terminal without any further incident.

188.   On return trip Jan. 18, 2022, from ONT, at the boarding gate, Frontier told her to don a mask. Mrs. Gordon informed Frontier's agent that she has a disability that does not permit her to wear a mask. Frontier informed her that this needs to be cleared in advance. Mrs. Gordon informed them that this constitutes discrimination. She demanded to speak with a supervisor.

189.   The Frontier supervisor was unable to cite any law that required her to wear a face mask. But the supervisor denied her boarding.

190.   Being coerced and under threat of being prevented from returning home, Mrs. Gordon harmed her health by donning a mask against her will. Then she was permitted to board the aircraft.

191.   On the second leg of the return flight home Jan. 18 from LAS to CVG, Mrs. Gordon was again instructed by Frontier to don a mask. Several announcements were made about the policy. But on this flight, masking was not enforced, and no one seemed to notice that she did not muzzle herself. This indicates that the rules issued by Frontier are enforced arbitrarily and capriciously.

**Some of the invasion of privacy and abuses suffered by Plaintiffs**

192.   Plaintiff Devorah Gordon was subjected to extreme invasion of her privacy and abuse. First, she was accosted by a flight attendant regarding the way in which she wore her mask.

193.   An Allegiant flight attendant strongly reprimanded her, stating that "You must wear the mask the whole time." While eating, a flight attendant approached Mrs. Gordon and said "You have been told too many times to put the mask on." This despite the CDC's own orders which permitted her to unmask during meals.

194.   The flight attendant then demanded that Mrs. Gordon surrender her ID, following up with a threat to have the police meet her at the arrival gate, where she "would be fined $10,000."

195.   The Captain of that flight then publicly shamed Mrs. Gordon, announcing on the aircraft's public-address system "There is one passenger that is not complying with the mask

rules. We will give her one last chance and hope she will make the right choice, otherwise she will be met at the gate by the police."

196.    Mrs. Gordon was then served with a written notice alleging violation of Title 14 of the Code of Federal Regulations, threatening her with "fines up to $25,000 and up to 20 years imprisonment, or both."

197.    Upon arrival at LAX, two armed police officers met her at the gate, and escorted her to within the terminal, just beyond the entrance to the jet way, in full public view of over a hundred deplaning passengers, and within earshot of dozens of other passengers coming from and going to that gate. Numerous airline personnel, passengers of all ages and airport workers were staring at the spectacle of Mrs. Gordon's debasing public treatment, all of which was precursory and in the wake of the Captain's public announcement to the entire crew and all passengers on Mrs. Gordon's flight, of her impending apprehension.

198.    A third large-framed and menacing officer then joined the party, standing to the side, to oversee the detainment and interrogation of Mrs. Gordon, adding to the encounter a sense of more fear, dread and threats, while embarrassing and humiliating her in the extreme, all conducted in front of the traveling public at a major high-density traffic US airport, taking place in a manner entirely devoid of privacy.

199.    Mrs. Gordon was warned that if she did not surrender her ID to the three police officers, the FBI could be called, she could go to jail, and she could receive a very large fine. Under compulsion and undue influence, she was not willing to risk missing her meeting in Los Angeles, Mrs. Gordon gave them her ID, who then passed it along to the airline personnel.

200.    After it become clear that Mrs. Gordon had not violated any laws, the airport police concluded that there nothing further they could. They released Mrs. Gordon and she proceeded to exit the terminal.

201.    This event purposely targeted Mrs. Gordon to set an example of what would happen to any other passenger who did not fully comply with every measure of Airline Defendants' orders that "exceeded guidance from the Centers for Disease Control and Prevention (CDC)." Mrs. Gordon felt tricked, taken advantage of, publicly shamed and humiliated.

202.    Mrs. Gordon's traumatizing and bizarre encounter with Airline personnel on her return trip, prior to boarding her flight was similar in many ways, in terms of unprofessionalism, pubic shaming, humiliation and embarrassment, all without any context of privacy with public view, while Airline Defendant's invaded her privacy and violated every federal law prohibiting the discrimination of disabled Americans in a public place.

203.    Plaintiff Cindy Russo public shaming and invasion of her privacy was comparable to that of Mrs. Gordon.

204.    After purchasing a ticket on UNITED, she made a request for a mask exemption, which the airline denied.

205.    Upon arrival at her Burbank departure airport, she proceeded to the check-in counter and UNITED's desk employee reported that her system was not allowing her to check her in to her flight to SFO.

206.    A phone call was made by the desk agent to another United employee who instructed the desk agent to repeatedly inform Mrs. Russo that check-in and boarding would be denied unless she agreed to wear the mask on all flights and while in the airports. These threats were issued in full public view and in earshot of other passengers waiting in line, and in front of other airport workers and airline personnel.

207.    Mrs. Russo was further informed that she would face delays, miss connections and be placed on no-fly lists, if she failed to comply with masking directives at all times.

208.    In light of her disability which prevented her from safely donning a mask, this invasion of her privacy and her pubic shaming was so unnerving, upsetting and fearful, that she had to take a seat away from the check-in desk, where was left with her legs uncontrollably shaking.

209.    Once aboard her flights, the flight steward reprimanded Mrs. Russo, who was sitting in front of the row, after the steward noticed that her mask was not being worn correctly. One again she was publicly shamed and/or confronted by UNITED employees.

210.    These events repeated themselves on fights from SFO to EWR, from EWR to Dallas (DFW), from DFW to BUR and from SFO to Orange County (SNA).

**Plaintiffs Avrohom and Devorah Gordon's exhaustion of administrative remedies.**

211.  Because Plaintiffs Avrohom Gordon and Devorah Gordon suffer from respiratory limitations, they are medically unable to fly masked, and cannot safely wear face coverings.

212.  Mr. and Mrs. Gordon timely filed charges for discrimination with DOT for violations of the Air Carrier Access Act. (Exhibit 9)

213.  DOT has failed to investigate or resolve any of their complaints.

214.  Additional flights for business and family reasons are planned in the near future to multiple destinations, which the Gordons are concerned will have to be canceled due to the FTMM and airlines' discriminatory mask policies.

**The travel history of Plaintiff Cindy Russo during the COVID-19 pandemic, her future travel plans, and her disabling medical conditions that make it intolerable to cover her face.**

215.  Plaintiff Cindy Russo has not been able to travel because of the FTMM and the airlines' discriminatory mask policies because she suffers from claustrophobia and Post-Traumatic Stress Disorder ("PTSD"). She medically cannot safely wear a face mask. She has missed important personal as well as work-related events as a result.

216.  When her mouth and nose are covered, it is both mentally and physically harmful to Ms. Russo. It reminds her of a traumatic situation wherein she was trapped and couldn't breathe. It is extremely harmful for her to cover her face because it produces massive anxiety.

217.  When Ms. Russo is forced by the defendants to cover her face, she feels anxious, trapped, and starts to profusely sweat. Her heart races and her head pounds.

218.  Her doctor has provided to her an exemption from wearing a mask. (Exhibit 10)

219.  Ms. Russo has flown eight times during the pandemic and been harassed about masking, causing even more anxiety to an already stressful medical situation. (Exhibit 11)

220.    Sept. 22, 2021: United forced Ms. Russo to mask against her will on Flight 5655 from Burbank (BUR) to SFO.

221.    Sept. 22, 2021: United forced Ms. Russo to mask against her will on Flight 1419 from SFO to EWR.

222.    Sept. 29, 2021: American forced Ms. Russo to mask against her will on Flight 802 from EWR to Dallas (DFW).

223.    Sept. 29, 2021: American forced Ms. Russo to mask against her will on Flight 2597 from DFW to BUR.

224.    Ms. Russo submitted a mask-exemption demand to United on Oct. 14, 2021, for an upcoming trip, noting United's numerous illegal policies.

225.    United denied Ms. Russo's mask-exemption demand.

226.    Oct 28, 2021: United forced Ms. Russo to mask against her will on United Flight 5655 from BUR to SFO.

227.    Oct. 28, 2021: United forced Ms. Russo to mask against her will on United Flight 2324 SFO to EWR.

228.    Nov. 1, 2021: United forced Ms. Russo to mask against her will on Flight 414 from EWR to SFO.

229.    Nov. 1, 2021: United forced Ms. Russo to mask against her will on Flight 1980 from SFO to Orange County (SNA).

**Plaintiff Cindy Russo's exhaustion of administrative remedies.**

230.    Mask-exemption demands were sent to United and American because Ms. Russo cannot tolerate masking due to her medical conditions.

231.    All requests were denied and she was forced to muzzle herself. Ms. Russo felt physically, emotionally, psychologically and spiritually ill for the entire duration of travel.

232.    Ms. Russo filed a complaint for discrimination against United with DOT for violations of the Air Carrier Access Act. (Exhibit 12)

233.    DOT has failed to investigate or resolve her complaint.

234.     Additional flights for business and family reasons are planned in the near future to multiple destinations, which Ms. Russo is concerned she may have to cancel due to the FTMM and airlines' discriminatory mask policies.

**Federal Transportation Mask Mandate**

235.     **PRESIDENTIAL ACTION:** The day after taking office (Jan. 21, 2021), President Joseph Biden issued "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); This executive order set in motion the FTMM issued by CDC and HHS as well as other federal agencies.

236.     President Biden's action marked an abrupt change of policy from the former administration. DOT "in October [2020] rejected a petition to require masks on airplanes, subways, and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department 'embraces the notion that there should be no more regulations than necessary.'" (Exhibit 13)

237.     "The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June [2020] hearing 'we do not plan to provide an enforcement specifically on that issue.'" *Id.*

238.     **DHS ACTION**: To carry out E.O. 13998, the Department of Homeland Security ("DHS") issued Determination 21-130 on Jan. 27, 2021: "Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using & Employed by the Transportation System."

239.     DHS directed its agency TSA to take actions to enforce CDC's FTMM order.

240.     **CDC ACTION**: Without providing public notice or soliciting comment, CDC – an agency within HHS – issued an order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" on Feb. 1, 2020, effective immediately. 86 Fed. Reg. 8,025 (Feb. 3, 2021).  This is the mask mandate we challenge in this Complaint.

241.     "This Order will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services

rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists."

242.    As authority for the FTMM, CDC invoked § 361 of the Public Health Service Act (42 USC § 264) and CDC regulations implementing that statute (42 CFR §§ 70.2, 71.31(b), & 71.32(b)).

243.    CDC's FTMM order applies to wholly intrastate transportation, including taking a rideshare, city bus, subway, or other mode of transit less than one mile – or even just sitting alone at a bus stop or train station reading a newspaper or talking on a cell phone without any intent to travel.

244.    "This Order exempts the following categories of persons: • A child under the age of 2 years; • A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act … This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability."

245.    "Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including **medical consultation by a third party**, **medical documentation by a licensed medical provider**, and/or other information as determined by the operator, as well as **require evidence that the person does not have COVID–19 such as a negative result from a SARS–CoV–2 viral test or documentation of recovery from COVID–19**. … Operators may further require that persons seeking exemption from the requirement to wear a mask **request an accommodation in advance**."   (emphasis added to show provisions that violate the ACAA).

246.    CDC's FTMM order makes no mention of the ACAA (49 USC § 41705) or the regulations promulgated thereunder (14 CFR Part 382).

247.    "This Order applies to persons on conveyances and at transportation hubs **directly operated by U.S. state**, local, territorial, or tribal **government authorities**, as well as the operators themselves. **U.S. state**, local, territorial, or tribal **government authorities directly operating conveyances and transportation hubs may be subject to additional federal**

**authorities or actions**, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities."   (emphasis added to illustrate 10th Amendment problems).

248.   CDC's FTMM order makes numerous false claims about the effectiveness of face coverings.

249.   The order fails to note that the scientific consensus for decades has been that face masks do not reduce the transmission of respiratory viruses and that covering one's face causes at least 68 harms to human health. See 228 scientific studies, medical articles, and videos at https://bit.ly/masksarebad.

250.   CDC's FTMM order contradicts numerous World Health Organization recommendations and standards, including that children under six should never wear masks.

251.   "Individuals traveling into or departing from the United States, traveling interstate, **or traveling entirely intrastate**, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transportation, must comply with the mask-wearing requirements set forth in this Order."   (emphasis added to illustrate 10th Amendment problem).

252.   Without citing any authority allowing it to delegate its supposed statutory and regulatory authority to an agency contained in a department outside of HHS, CDC's order includes a provision that "To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration…"

253.   **TSA ACTIONS**: Based on CDC's questionable delegation of its authority to an agency contained in a separate executive department, TSA issued three "Security Directives" (more accurately labeled "Health Directives") and one Emergency Amendment Feb. 1, 2021, to transportation operators requiring them to vigorously enforce the mask mandate. These four orders were effective until May 11, 2021, and have been renewed four times until April 18, 2022.

254.   Plaintiff Uri Marcus is part of a group of 13 disabled Americans challenging TSA's three Health Directives and one Emergency Amendment enforcing CDC's FTMM order.

There are six Petitions for Review currently before the U.S. Court of Appeals for the District of Columbia Circuit: *Wall v. TSA*, No. 21-1220; *Faris v. TSA*, No. 21-1221; *Marcus v. TSA*, No. 21-1225; *Eades v. TSA*, No. 21-1236; *Andreadakis v. TSA*, No. 21-1237; and *Abadi v. TSA*, No. 21-1258.

255.    These cases had been consolidated into *Wall v. TSA*.

### Congress has never enacted a mask mandate

256.    CDC and HHS' imposition of the FTMM goes against the express wishes of Congress. The Legislative Branch has explicitly failed to mandate masks in any setting, including the transportation sector. This shows clear, unambiguous congressional intent.

257.    The federal legislative response to corona virus has been enormous with dozens of bills related to the COVID-19 pandemic enacted into law.

258.    Not a single provision in any of the enacted bills grant CDC and HHS the authority to require face masks.

259.    Numerous bills have been introduced in Congress to require masks in the transportation sector. None have been passed out of committee in either chamber.

260.    On March 15, 2022, the Senate voted 57-40 to pass Senate Joint Resolution 37 disapproving of CDC's FTMM order. (Exhibit 14)

### CDC and HHS ignore better options than imposing the FTMM

261.    The Federal Defendants have not used more-effective options than the FTMM to reduce COVID-19 infections in the transportation sector.

262.    For example, in June 2007, CDC and HHS developed a public-health Do Not Board ("DNB") list, enabling domestic and international health officials to request that individuals with communicable diseases be restricted from boarding commercial aircraft arriving into, departing from, or traveling within the United States.

263.    CDC published a notice more than six years ago concerning the "Criteria for Requesting Federal Travel Restrictions for Public Health Purposes, Including for Viral Hemorrhagic Fevers." 18 Fed. Reg. 16,400 (March 27, 2015);

264.    There also exists a complimentary Public Health Border Lookout Record ("Lookout") system for individuals with communicable diseases that pose a public-health threat to travelers to restrict them from boarding commercial aircraft arriving into, departing from, or traveling within the United States. *Id.*

265.    Once an individual is placed on the DNB list, airlines are instructed not to issue a boarding pass to the individual for any commercial flight. Individuals included on the DNB list are assigned a Lookout record that assists in ensuring that an infected individual is detected if he or she attempts to enter or depart the United States through a port of entry. *Id*.

266.    "Disease is just a flight away. To protect America's health, CDC partners with the Department of Homeland Security to prevent the spread of serious contagious diseases during travel. CDC uses a Do Not Board list to prevent travelers from boarding commercial airplanes if they are known or suspected to have a contagious disease that poses a threat to the public's health. Sick travelers are also placed on a Lookout list so they will be detected if they attempt to enter the United States by land or sea. These tools can be used for anyone who poses a threat to the public's health."

267.    But there is no evidence in the administrative record, media reports, or anywhere else that the Federal Defendants are using the DNB list and Lookout system to stop people who have tested positive for COVID-19 from traveling during the time they are a danger to spread the virus to others (typically considered to be about 10 days).

**The Federal Defendants and Airline Defendants ignore that mask mandates endanger aviation safety.**

268.    Plaintiff Uri Marcus is an FAA certificated commercial multi-engine instrument airplane pilot and flight instructor. (Discussed above).

269.    A Pilots' health is strictly governed by regulations issued by the Federal Aviation Administration.

270.    Pilots are prohibited from operating an aircraft during any period of medical deficiency. However, they are required to comply with the FTMM, which causes known medical deficiencies. "[N]o person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person: … (1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation…" 14 CFR § 61.53(a).

271.    Wearing a mask before and during flight causes Mr. Marcus numerous medical deficiencies, whether he is acting as Pilot-in-Command or otherwise. "[A] person shall not act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person knows or has reason to know of any medical condition that would make the person unable to operate the aircraft in a safe manner." 14 CFR § 61.53(b).

272.    Wearing a mask before and during flight causes Mr. Marcus to feel that he is unable to operate the aircraft in a safe manner.

273.    Wearing a mask before the flight (for example, while in an airport terminal) makes Mr. Marcus feel like he is not fully prepared to perform as a pilot due to fatigue.

274.    "Extended wearing of [a] mask, which has become a part of routine life, has led to the emergence of 'mask fatigue.' Mask fatigue is defined as the lack of energy that accompanies, and/or follows prolonged wearing of a mask." (Exhibit 15)

275.    Forced masking "is considered as an impediment to professional work as well. This is because of the newly emerging condition, mask fatigue." *Id.*

276.    "We define mask fatigue as the lack of energy that accompanies, and/or is a consequence of extended use of a mask." *Id.*

277.    "There is published evidence which shows that extended wearing of mask impairs functioning…" *Id.*

278.    Aspects of mask fatigue include pressure/pain over ears, cheeks, and nose; skin
breakdown; aggravation of acne; itching; contact dermatitis; voice fatigue; laryngitis; sore throat;
respiratory compromise; Hypoxia; Hypercapnia; increased work of breathing; dizziness;
headache; irritability; physical exhaustion; decreased concentration/work efficiency; confusion
and disorientation; breathlessness; reduced fluid and food intake; chronic health effects on renal
and metabolic functions; aggravation of anxiety, depression, and feeling of impending doom;
claustrophobia; impaired social interaction/recognition; and maskophobia. *Id.*

279.    "The consequences of a negligent or wrongful certification, which would permit
an unqualified person to take the controls of an aircraft, can be serious for the public...,"
according to FAA's Guide for Aviation Medical Examiners.

280.    All active pilots must see an FAA certified doctor ("Aviation Medical Examiner"
or "AME") 1-2 times each year. Pilots are all obligated by law (49 USC § 46310, which imposes
criminal penalties) to disclose any disqualification condition pertaining to obtaining or
maintaining their medical certificate. If a pilot knows that masks are unhealthy for him and their
continued use can cause cumulative harm (as evidenced by years of unbiased scientific studies
prior to COVID-19 politicization), s/he is morally and legally obligated to abstain and/or report.

281.    However, the FTMM forces pilots not to disclose any disqualification condition
due to the ill effects of forced masking.

282.    The FTMM forces a pilot to obstruct his oxygen intake, causing diminished
mental and physical capacity during any flight, including recurrent training flights.

283.    Masking impairs a pilot's ability when conducting any flight as evidenced by the
fact that they are not, per FAA rules, required to wear a mask in the cockpit when flying.

284.    DOT, which includes FAA, notes that "the failure to wear a face covering is not
itself a federal violation," contradicting the FTMM.

285.    FAA recognizes the dangers of forced masking: "Air carriers should complete a
safety risk assessment and provide guidance to their crewmembers on procedures for the use of
masks as they may affect the donning of oxygen masks or conducting other safety functions on
the flight deck or in the cabin." FAA Safety Alert for Operators 20,009 (May 25, 2021);

**The Federal Defendants and Airline Defendants ignore that mask mandates have created chaos in the sky.**

286.   The defendants fail to take into account that in addition to the millions of Americans who can't safely obstruct their breathing because of a medical condition, tens of millions of Americans vehemently object to anyone ordering them to wear face masks. This is evidenced by some 5,981 incidents of "unruly" behavior aboard airplanes reported to the Federal Aviation Administration during 2021, 4,290 of which related to the FTMM. (Exhibit 16)

287.   So far this year, FAA has received 814 reports of unruly passengers, 535 of which related to the FTMM. id

288.   This conduct is understandable since the Food, Drug, & Cosmetic Act protects all Americans' right to refuse administration of an FDA unauthorized or EUA medical device such as a face covering, and masks make it difficult to breathe and function.

289.   The FTMM worsens transportation safety as some people violently stand up for their right to breathe freely, and many flight crews have sadly become increasingly hostile to any passenger who dares remove his/her mask for any reason.

290.   "'The number of physical and verbal assaults in our workplace has increased dramatically, many of which are related to mask compliance,' TWU Local 556, which represents Southwest's flight attendants, wrote in a letter."

291.   "Despite coming with hefty fines and the threat of criminal prosecution, the [FTMM] has spawned an epidemic of shouting matches – and worse – between defiant passengers and flight crews. … But if airlines are the last place in America to require masks, the skies are likely to become even less friendly for flight crews."

292.   "[T]he level of in-flight fracas has gotten exponentially worse in the past two years, with most cases involving disputes over masking."

293.   Airplanes, airports, and other transportation conveyances and terminals are now among the last places in America where anyone is forced to block their breathing.

294.    Chaos in the sky is likely to soon get worse. "Imagine the fury among anti-mask passengers if the federal government continues to enforce a mask requirement on airlines into the late spring and even the summer, when no one's making people mask up anywhere else. … Should the mask mandate continue into the summer and beyond, airlines could expect the bad behavior to increase, as customers grow accustomed to going maskless everywhere else."

295.    There are numerous videos posted to YouTube of in-flight conflicts between flight crews and passengers over the illegal mask mandates.

296.    "The current climate in the passenger cabin is highly stressed. We are experiencing a record high number of aggressive passenger incidents, many of which are fueled by … refusal to comply with onboard mask rules," the president of a major flight-attendant union said Dec. 24, 2021.

297.    All of the "unruly" behavior we've seen aboard airplanes when airlines try to enforce the FTMM is explained by science, none of which the defendants considered: "Wearing masks, thus, entails a feeling of deprivation of freedom and loss of autonomy and self-determination, which can lead to suppressed anger and subconscious constant distraction, especially as the wearing of masks is mostly dictated and ordered by others. These perceived interferences of integrity, self-determination and autonomy, coupled with discomfort, often contribute to substantial distraction and may ultimately be combined with the physiologically mask-related decline in psychomotoric abilities, reduced responsiveness, and an overall impaired cognitive performance."

298.    Being forced to cover the nose and mouth, a person's only two sources of oxygen – breathing is of course essential to maintaining life – "leads to misjudging situations as well as delayed, incorrect, and inappropriate behavior and a decline in the effectiveness of the mask wearer."

299.    "The use of masks for several hours often causes further detectable adverse effects such as headaches, local acne, mask-associated skin irritation, itching, sensations of heat and dampness, impairments, and discomfort predominantly affecting the head and face. However,

the head and face are significant for well-being due to their large representation in the sensitive cerebral cortex (homunculus)."

300.    "[P]assengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements…"

301.    "A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing. One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart."

302.    But passengers are allowed to drop their masks to eat and sip beverages, negating any possible positive impact of forced masking. "When you start opening it up to eating, the whole thing kind of weakens."

303.    "Flight attendants are dealing with mask compliance issues on every single flight they work right now."

304.    "The Federal Aviation Administration is warning air travelers about what it describes as a dramatic increase in unruly or dangerous behavior aboard passenger airplanes."

305.    "It is no secret that the threats flight attendants face each day have dramatically increased," states a letter from Julie Hedrick, president of the Association of Professional Flight Attendants. "Every day, we are subjected to verbal and sometimes physical altercations, mainly centered around mask compliance."

306.    "Airlines and federal officials have noted an uptick in passenger misbehavior. Flight attendant union leaders have attributed much of the uptick in passengers refusing to wear masks …"

307.    "President Joe Biden made a federal face mask rule on planes one of his first executive orders after he took office. But passenger misbehavior has continued throughout the year despite numerous fines against passengers proposed by the FAA."

308.    May 28, 2021: "Incidents of unruly behavior from airplane passengers has risen to an unprecedented level this year, union leader Sara Nelson told CNBC on Friday, the start of

the Memorial Day holiday weekend. 'This is an environment that we just haven't seen before, and we can't wait for it to be over,' the president of the Association of Flight Attendants-CWA said … She noted the role masks are playing in the surge…"

309.   Carrying out mask rules also worsens the already strained position of flight attendants, who are frontline enforcers even as they keep their usual safety responsibilities. "Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority."

310.   "One in five flight attendants so far this year has been involved in physical altercations with unruly passengers and 85% of cabin crew members have dealt with disruptive passengers this year…"

311.   "[M]any flight attendants reported … being subjected to yelling and swearing for federal mask mandate directions."

312.   The FTMM has "proven problematic. Physical confrontations on airplanes have dramatically increased this year, and of the 3,000+ that have been recorded by the Federal Aviation Administration so far in 2021, nearly three-quarters of them have been a direct result of arguments over wearing a face mask – whether between crew members and passengers, or passengers vs. passengers."

313.   "My fear, however, is that the mandate is going to someday cause a far bigger problem while in the air than just some unruly passenger being eventually duct-taped to a seat. One of these days, a confrontation is going to escalate far further than the crew member who had a finger bitten or the flight attendant who caught an errant punch square in the face and had two teeth knocked out. Ask yourself, is it worth it to have a mandate that ostensibly is for your safety but only leads further to unsafe conditions?"

314.   The defendants' reckless continual enforcement of the FTMM has led to "a surge in aggressive and violent behavior at airports and on flights…"

315. "Even if not intended to bring the plane down, you can imagine the kind of pandemonium on planes that we've seen in some of these videos that people have taken that can cause an incredibly dangerous accident," said U.S. Attorney General Merrick Garland."

316. These incidents would vanish if this Court vacates the FTMM and enjoins the Airline Defendants from mandating masks.

317. Major airlines having been calling for the abolition of the FTMM for the past 10 months.

318. Frontier CEO Barry Biffle said June 23, 2021, that face coverings are a prime contributor to a string of recent in-flight disruptions: "The reality is, a lot of people don't want to wear masks," Biffle said. "You don't have to wear a mask here [at the convention], you don't have to wear [masks] at Walmart, but yet you've got to do it on a plane." (Exhibit 17)

319. Spirit CEO Ted Christie also said June 23, 2021, that the U.S. government can help reduce the incidence of unruly air passenger behavior by doing away with the requirement that travelers wear face coverings: "That's got to be the next step – when facial [covering requirements] are relaxed on airplanes," Christie said. "That is going to take a lot of steam out of things." *Id.*

320. Southwest's then-CEO Gary Kelly and Airlines for America, the trade group representing most major U.S. carriers, lobbied for the FTMM to terminate Sept. 13, 2021. Exs. 402-404.

321. With mask mandates "in place, there has been a rise in onboard incidents that have harmed flight attendants, delayed or cancelled flights … When this atmosphere is combined with tensions around mask policy, we have seen a summer with more onboard skirmishes and more people injured than ever before," wrote Ben Baldanza, former CEO of Spirit Airlines.

322. "[T]he root cause of most of these incidents has been the mandated mask policy. It's not the policy itself, but the inconsistency of that policy with other parts of life. While many of us may be able to clearly understand why we must wear a mask on a plane but don't have to in restaurant, to others this makes no sense. Put that view in the stressful and emotional environment of an airline flight and the results we've seen this summer are not totally surprising."

323.    "[L]etting the [mask] mandate expire would lower the tensions onboard significantly and greatly reduce the number of potentially dangerous confrontations that flight attendants must face."

**The Airline Defendants ignore better options than imposing unlawful and discriminatory mask mandates.**

324.    The Airline Defendants have more effective tools to combat COVID-19 spread than requiring their passengers be muzzled (and refusing to grant medical exemptions). However, the defendants have not worked to implement these better procedures to reduce infections in the transportation sector.

325.    There's no evidence that the airlines have sought the government's cooperation in using existing federal procedures that actually target the sick.

326.    For example, the Airline Defendants have not worked with the Federal Defendants to use the public-health DNB and Lookout lists to prevent passengers who have recently tested positive for COVID-19 from flying.

327.    If the Airline Defendants truly care about preventing COVID-19 transmission on their planes, they would work with CDC, HHS, DHS, TSA, and other federal agencies to use the DNB and Lookout systems. Instead, they illegally treat every single passenger as having the corona virus and mandating they wear masks in defiance of the science that face coverings do nothing to prevent COVID-19 infections and deaths but harm human health. https://bit.ly/masksarebad.

328.    It appears Frontier is the only airline using a simple mitigation strategy that doesn't discriminate against anyone who isn't actually ill: "Frontier is the first U.S. airline to take passengers' temperatures with a touchless thermometer before boarding, and will block anyone with a temperature of 100.4 F or higher from flights."

329.    It's a mystery why the other Airline Defendants don't appear to be utilizing this simple measure to check for fevers (a key symptom of COVID-19) before check in or boarding.

**The Federal Defendants and Airline Defendants fail to take into account that airplane cabins pose little risk for corona virus spread.**

330.    There's nothing in the administrative record showing that CDC and HHS considered the ample evidence provided by the aviation industry and others that masks aren't necessary and do nothing to reduce COVID-19 spread.

331.    U.S. air carriers commissioned a lengthy report "Assessment of Risks of SARS-CoV-2 Transmission During Air Travel & Non-Pharmaceutical Interventions to Reduce Risk" by the Harvard T.H. Chan School of Public Health as part of the Aviation Public Health Initiative ("APHI").[4]

332.    This is yet another scientific/medical study the Federal Defendants ignored when promulgating the FTMM without any public notice or comment period.

333.    "Ventilation Systems on Aircraft: These sophisticated systems deliver high amounts of clean air to the cabin that rapidly disperses exhaled air, with displacement in the downward direction, reducing the risk of passenger-to-passenger spread of respiratory pathogens. Aircraft ventilation offers enhanced protection for diluting and removing airborne contagions in comparison to other indoor spaces with conventional mechanical ventilation and is substantially better than residential situations. This level of ventilation effectively counters the proximity travelers will be subject to during flights. The level of ventilation provided onboard aircraft would substantially reduce the opportunity for person-to-person transmission of infectious particles…" *Id.*

334.    "Particular emphasis is placed on the effectiveness of aircraft ventilation systems, which are able to filter 99.97% of SARS-CoV-2 particles out of air found on aircraft." *Id.*

335.    The study confirms what the airlines themselves have been promoting to customers: There is little-to-no risk of contracting COVID-19 aboard an aircraft. "After detailed analysis of these reports, ***it is the view of APHI that there have been a very low number of infections that could be attributed to exposure on aircraft during travel.***" *Id.* (emphasis added).

---

[4]  https://www.hsph.harvard.edu/wp-content/uploads/sites/2644/2022/09/Harvard-APHI-Phase-Two-Report.pdf

336.    CDC itself admitted *"the risk of getting a contagious disease on an airplane is low." Id.* (emphasis added).

337.    "A significant finding from the evaluation of these evacuation flight procedures [from China early in the pandemic] was that there was no COVID-19 infection among any of the air medical crews, despite the exposure to numerous positive cases." *Id.*

338.    "Given the volume of commercial flights daily, carrying millions of passengers and crew worldwide, *the number of documented incidents of infectious disease transmission occurring on board an aircraft remains infrequent.*" *Id.* (emphasis added).

339.    "Based on the investigations of outbreaks of other respiratory diseases on aircraft, it appears that transmission on aircraft is relatively infrequent." *Id.*

340.    "Air recirculation happens mostly when cruising, where about 40% to 50% of the cabin air is recirculated and filtered through a high-efficiency particulate air filter, also known as a HEPA filter. All the airlines interviewed have aircraft that are equipped with HEPA filters, and one of the airlines has increased the replacement frequency of their HEPA filters." *Id.*

341.    "The HEPA filters remove, at a minimum, 99.97% of the particulate matter from the return air. This high level of filtration ensures that the air supplied to the cabin is virtually free of particulate matter, including bacteria and viruses." *Id.*

342.    "Aircraft meeting current ventilation standards with 50% recirculation HEPA-filtered air will supply passengers with a clean air delivery rate of 19 cfm/person, which is essentially free of any virus particles." *Id.*

343.    "[T]he risk of SARS-CoV-2 transmission onboard aircraft will be below that found in other routine activities during the pandemic, such as grocery shopping or eating out." *Id.*

344.    "[T]he aircraft's environmental control systems effectively diluting and removing pathogens significantly reduce the risk of passengers and crewmembers from acquiring COVID-19 during the cruise segment of their journey." *Id.*

345.    American's and Southwest's CEOs testified to a Senate committee Dec. 15, 2021, that masks do not reduce the spread of COVID-19 and airplane cabins are already safe because of their excellent air filtration and recirculation. (Exhibit 18)

346.    Airlines for America, the airline industry's largest trade group representing nearly all major U.S. airlines, joined in a Feb. 25, 2021, letter to the White House again urging repeal of the FTMM. (Exhibit 19)

347.    "By March 18, repeal the Federal mask mandate for public transportation or provide a clear roadmap to remove the mask mandate within 90 days. ... Airplanes are already equipped with advanced air filtration systems, and airports have made large investments in air filtration, sanitation, and layouts. COVID-19 hospitalization rates have decreased significantly and ***the mask mandate should be lifted*** to reflect the improved public health environment." *Id*. (emphasis added).

348.    "[M]any of these same policies also came with the ***devastating*** ... consequences of severely limiting and discouraging travel. ... Since the start of the pandemic, the federal government's advisories, policies, and public messaging have focused on discouraging or actively restricting domestic and international travel. It is time for high-level officials within the Administration to publicly encourage travel to and within the U.S. Doing so would send a clear message to U.S. businesses, trading partners, and travelers alike that America is once again open for business." *Id*. (emphasis added).

349.    "[W]e encourage the Administration to immediately remove travel requirements that no longer fit with the current environment and to set clear timelines and metrics for when others will be lifted," including the mask mandate. *Id*.

350.    When President Biden, CDC, HHS, TSA, and others refused to let the FTMM expire March 18, Airlines for America fired off another letter to him March 23, 2022: "We are encouraged by the current data and the lifting of COVID-19 restrictions from coast to coast, which indicate it is past time to eliminate COVID-era transportation policies. ... much has changed since these measures were imposed and they no longer make sense in the current public health context. The persistent and steady decline of hospitalization and death rates are the most

compelling indicators that our country is well protected against severe disease from COVID-19." (Exhibit 20)

351.    "**Now is the time for the Administration to sunset federal transportation travel restrictions – including the international predeparture testing requirement and the federal mask mandate – that are no longer aligned with the realities of the current epidemiological environment**." *Id.* (emphasis original).

352.    The International Air Transport Association ("IATA") – which represents more than 290 international airlines including six of the largest U.S. passenger carriers – has called for an end to mask mandates aboard airplanes worldwide. Travel restrictions such as the FTMM "have had such a devastating impact on lives, economies, and the freedom to travel," said Willie Walsh, IATA's director general.

353.    "The past few weeks have seen a dramatic shift by many governments around the world to ease or remove COVID-19-related travel restrictions and requirements as the disease enters its endemic phase. It's vital that this process continue and even accelerate, to more quickly restore damaged global supply chains and enable people to resume their lives. ***One step to encourage a return to normality is to remove mask mandates for air travel. It makes no sense to continue to require masks on airplanes*** when they are no longer being required in shopping malls, theatres or offices. Aircraft are equipped with highly sophisticated hospital quality filtration systems and have much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed." (emphasis added).

354.    "[T]he international airline industry has been significantly harmed by COVID-19 and the myriad government responses to the virus. While we have begun to see signs of a recovery, the industry today has nearly 50% less passenger traffic than it did prior to COVID-19…" Mr. Walsh of IATA wrote the White House on March 8, 2022..

355.    "We urge the Biden Administration not to renew its mask mandate for transportation when it lapses on March 18, 2022. It makes no sense to continue to require masks on airplanes when they are no longer being required in shopping malls, theatres or offices. ***Aircraft are equipped with highly sophisticated hospital quality filtration systems and have***

*much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed.*" *Id.* (emphasis added).

356.    IATA notes on its website that "The risk of transmission in the modern cabin environment is low for a number of reasons: passengers face the same direction, seatbacks act as barriers, air flow is from the top to bottom, and the air is also very clean. Cabin air is refreshed 20-30 times an hour; About 10 times more than most office buildings."

357.    "Most modern jet aircraft are equipped with High-Efficiency Particulate Air (HEPA) filters. These filters have similar performance to those used in hospital operating theatres and industrial clean rooms." *Id.*

358.    The bacteria/virus removal efficiency rate of the HEPA filters onboard planes is 99.993%, including removal of SARS, which is similar to COVID-19. *Id.*

359.    The U.S. Department of Defense's Transportation Command conducted a study in October 2020 that found "aerosol particles were 'rapidly diluted by the high air exchange rates' of a typical aircraft cabin. Aerosol particles remained detectable for a period of less than six minutes on average. Both aircraft models (B777 and B767) tested removed particulate matter 15 times faster than a typical home ventilation system and 5-6 times faster 'than the recommended design specifications for modern hospital operating or patient isolation rooms.'" *Id.*

360.    "Airbus used computational fluid dynamics (CFD) research to create a highly accurate simulation of the air in an A320 cabin, to see how droplets resulting from a cough move within the cabin airflow. … The result was that potential exposure was *lower* when seated side by side on a plane than when staying six feet apart in an environment such as an office, classroom or grocery store." *Id.* (emphasis original).

361.    "Using CFD, Boeing researchers tracked how particles from coughing and breathing move around the airplane cabin. … The modeling determined the number of cough particles that entered the breathing space of the other passengers. Based on the airborne particle count, passengers sitting next to one another on an airplane is the same as standing more than seven feet (or two meters) apart in a typical building environment." *Id.*

362.   "Using CFD, cabin air flow and droplet dispersion models validated in full-scale cabin environment testing, Embraer analyzed the cabin environment considering a coughing passenger in several different seats and air flow conditions in our different aircraft to measure these variables and their effect. The research Embraer completed shows that risk of onboard transmission is extremely low, and the actual data on in-flight transmissions that may have occurred, supports these findings." *Id*.

363.   As major U.S. airlines just told the president March 23: "It makes no sense that people are still required to wear masks on airplanes, yet are allowed to congregate in crowded restaurants, schools and at sporting events without masks, despite none of these venues having the protective air filtration system that aircraft do."

**All defendants fail to take into account the voluminous scientific and medical research showing masks are totally ineffective in reducing COVID-19 transmission.**

364.   The CDC official responsible for the FTMM admitted masks are worthless and are just for show: "[W]e mask because it's the way we take care and express our concern for each other," said Marty Cetron, director of CDC's Division of Global Migration & Quarantine. (Exhibit 21)

365.   There's nothing in the administrative record showing that CDC and HHS considered the robust scientific and medical evidence documenting how masks are totally ineffective in reducing COVID-19 infections, hospitalizations, and deaths. *See* https://bit.ly/masksarebad for 228 scientific studies, medical articles, and videos detailing how masks do not reduce virus transmission but hurt human health. A sampling of these studies are quoted below.

366.   A study released May 25, 2021, by the University of Louisville found state mask mandates didn't help slow COVID-19 transmission.

367.   Mask manufacturers themselves admit their products are "not for medical use," "cannot eliminate the risk of contracting an infectious disease," "are not personal protective equipment," and "are not intended … to prevent any disease or illness."

368.    The federal government's experience confirms masks aren't effective, data that CDC and HHS failed to consider. TSA admits that, as of March 13, 2022, 22,297 of its employees[5] – all of whom must wear masks – have tested positive for COVID-19.

369.    CDC and HHS fail to answer a simple question: "If masks are effective, why have so many TSA workers contracted COVID-19?"

370.    During the surge of the Omicron corona virus variant during the winter holiday season of 2021-22, masks did not do anything to stop thousands and thousands of airline workers from getting infected, causing massive disruptions to the nation's air transportation system.

371.    Wearing a cloth mask does not shield the user from corona virus because too many infected droplets can slip through, according to a study by scientists at New Mexico State University.

372.    Masks can't be worn while transportation passengers are eating and drinking, thereby eliminating any effectiveness they might have in reducing virus transmission from infected travelers.

373.    One of the first real-world studies to conclude that face masks don't reduce COVID-19 infections was published in November 2020 by Danish scientists. The study divided thousands of Danish into groups of mask-wearers and non mask-wearers. "4,862 completed the study. Infection with SARS-CoV-2 occurred in 42 participants [wearing] masks (1.8%) and 53 control participants [who did not cover their faces] (2.1%). The between-group difference was 0.3 percentage point … *the difference observed was not statistically significant*…" (emphasis added).

---

[5] Since about half of those infected with COVID-19 don't have symptoms and might not realize they are infected, health authorities indicate that the real prevalence of the virus is typically at least double the number of cases confirmed by testing. TSA admits 22,297 of its workers have tested positive for corona virus (34% of its employees).  This means that some 44,594 TSA workers, an astounding two-thirds of its workforce of 65,000, have likely had corona virus. Yet they all have been forced to wear masks for more than 1½ years. So how exactly are masks effective in stopping COVID-19?

374.    "When it comes to masks, it appears there is still little good evidence they prevent the spread of airborne diseases. … overall, ***there is a troubling lack of robust evidence on face masks and Covid-19***." (emphasis added).

375.    "[N]ow that we have properly rigorous scientific research we can rely on, ***the evidence shows that wearing masks in the community does not significantly reduce the rates of infection***." *Id.* (emphasis added).

376.    "Upon our critical review of the available literature, we found only weak evidence for wearing a face mask as an efficient hygienic tool to prevent the spread of a viral infection," according to a study published in the European Journal of Medical Research.

377.    "In controlled laboratory situations, face masks appear to do a good job of reducing the spread of corona virus (at least in hamsters) and other respiratory viruses. However, evidence shows mask-wearing policies seem to have had much less impact on the community spread of COVID-19. Why this gap between the effectiveness in the lab and the effectiveness seen in the community? The real world is more complex than a controlled laboratory situation."

378.    "The most comprehensive between-country study of masks for COVID-19 infection is a comparison of policy changes, such as social distancing, travel restrictions, and mask wearing, across 41 countries. ***It found introducing a mask-wearing policy had little impact*** …" *Id.* (emphasis added).

379.    "CDC has admitted face masks do little to prevent the spread of COVID-19 amid mounting pressure to lift mask mandates across the U.S. In a new study, the CDC found face masks had a negligible impact on corona virus numbers that didn't exceed statistical margins of error."

380.    "***Where others say the science is settled, our analysis shows that is not the case***. We break down the most widely referenced studies on masking policies so you can see for yourself what the data really says. We should also point out that ***it is unscientific to claim that the science is settled***. Science is always a work-in-progress and we should never make the false claim that a scientific theory is settled as fact."  (emphasis added).

381.    "COVID-19 is as politically-charged as it is infectious. Early in the COVID-19 pandemic, the WHO, the CDC, and NIH's Dr. Anthony Fauci discouraged wearing masks as not useful for non-health care workers. Now they recommend wearing cloth face coverings in public settings where other social distancing measures are hard to do (e.g., grocery stores and pharmacies). *The recommendation was published without a single scientific paper or other information provided to support that cloth masks actually provide any respiratory protection*," according to the Association of American Physicians & Surgeons.  (emphasis added).

382.    "Conclusion: *Wearing masks (other than N95) will not be effective at preventing SARS-CoV-2 transmission*, whether worn as source control or as PPE." *Id.* (emphasis added).

383.    CDC constantly ignores its own research: "In a recent report in Emerging Infectious Diseases, … CDC suggests what experts have stated all along: There is no conclusive evidence that cloth masks protects users from corona virus, especially since most people do not use them correctly and do not keep them clean."

384.    "There is increasing evidence that cloth masks not only may be ineffective against stopping corona virus transmission, but that *they may actually increase the spread of the virus, as well as worsening other health conditions*." *Id*. (emphasis added).

385.    "A September report by the CDC found that more than 70% of COVID-positive patients contracted the virus in spite of faithful mask wearing while in public. Moreover, 14% of the patients who said they 'often' wore masks were also infected. Meanwhile, just 4% of the COVID-positive patients said they 'never' wore masks in the 14 days before the onset of their illness." *Id.*

386.    "A Covid-19 cross-country study by the University of East Anglia came to the conclusion that a mask requirement was of no benefit and could even *increase the risk of infection*."

387.    "A July 2020 study by Japanese researchers found that *cloth masks 'offer zero protection against corona virus'* due to their large pore size and generally poor fit." *Id.* (emphasis added).

388.    "Importantly, **the evidence just is and was not there to support mask use for asymptomatic people to stop viral spread during a pandemic**. While the evidence may seem conflicted, the evidence (including the peer-reviewed evidence) actually does not support its use and **leans heavily toward masks having no significant impact in stopping spread of the COVID virus**. In fact, it is not unreasonable at this time to conclude that surgical and cloth masks, used as they currently are, have absolutely no impact on controlling the transmission of Covid-19 virus, and **current evidence implies that face masks can be actually harmful**."   (emphasis added).

389.    CDC and HHS "have failed to look at the evidence or follow it, and **continue to operate in an arbitrary nonscientific, non-evidence informed manner**." *Id.* (emphasis added).

390.    CDC admitted in its "Emerging Infectious Diseases" May 2020 publication that "Although mechanistic studies support the potential effect of hand hygiene or face masks, evidence from 14 randomized controlled trials of these measures did not support a substantial effect on transmission of laboratory-confirmed influenza. … The effect of hand hygiene combined with face masks on laboratory-confirmed influenza was not statistically significant …"

391.    The University of Colorado School of Medicine published an article in the January/February 2021 edition of Annals of Family Medicine concluding: "Cloth masks lack evidence for adequate protection of health care clinicians against respiratory viral infections. The CDC notes that cloth masks are not considered [personal protective equipment] and that their capability to protect health care clinicians is not currently known. The CDC does not offer information regarding the degree of protection a cloth mask might provide compared to a medical mask."

392.    "Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a Cohort Study," published Feb. 2, 2021, in Lancet Infectious Diseases, "**observed no association of risk of transmission with reported mask usage by contacts**…"   (emphasis added).

393.    "At the very end of 2020, the WHO updated [its] guidelines, noting that any kind of mask was ineffective if the wearer comes into close contact with someone for 15 minutes or

more. … A mask alone, even when it is used correctly, is insufficient to provide adequate protection or source control."

394.    "The World Health Organization admits there is no scientific medical reason for any healthy person to wear a mask outside of a hospital. … If you do not have any respiratory symptoms, such as fever, cough, or runny nose, you do not need to wear a medical mask. When used alone, masks can give you a false feeling of protection and can even be a source of infection when not used correctly."

395.    The U.S. Department of Labor's Occupational Health & Safety Administration ("OSHA") states "Surgical masks are not considered respirators by OSHA … surgical masks do not seal tightly to the wearer's face, nor do they provide a reliable level of protection from inhaling smaller airborne particles."

396.    New studies and articles come out every week showing that masks don't reduce COVID-19 spread but harm human health.

**All defendants fail to consider that masks pose serious health risks to humans forced to wear them. By requiring masks, the Airline Defendants recklessly endanger the well-being of all passengers.**

397.    In addition to the science showing that masks have proven totally ineffective in reducing corona virus spread and deaths, there's nothing in the administrative record showing that CDC and HHS considered the serious health risks to human beings of forced masking nor the dangers of oxygen deprivation at high altitude such as in airplane cabins.

398.    Hundreds of scientific and medical studies illustrate the frightening number of negative health consequences of covering your face. https://bit.ly/masksarebad.

399.    "It is not clear however, what the scientific and clinical basis for wearing facemasks as protective strategy, given the fact that facemasks restrict breathing, causing hypoxemia and hypercapnia, and increase the risk for respiratory complications, self-contamination, and exacerbation of existing chronic conditions," according to a paper published by the National Institutes of Health ("NIH"), a part of HHS.

400.    The leading authority on this subject is a 42-page paper published April 20, 2021, by eight German doctors and scientists in the International Journal of Environmental Research & Public Health.

401.    They found: "Up until now, there has been no comprehensive investigation as to the adverse health effects masks can cause." The doctors reviewed 65 scientific papers on masks – and determined dozens of adverse health effects of covering your nose and mouth. *Id.*

402.    These German doctors and scientists coined a new disease: Mask-Induced Exhaustion Syndrome ("MIES"). *Id.*

403.    Symptoms of MIES include "an increase in breathing dead space volume, increase in breathing resistance, increase in blood carbon dioxide, decrease in blood oxygen saturation, increase in heart rate, increase in blood pressure, decrease in cardiopulmonary capacity, increase in respiratory rate, shortness of breath and difficulty breathing, headache, dizziness, feeling hot and clammy, decreased ability to concentrate, decreased ability to think, drowsiness, decrease in empathy perception, impaired skin barrier function with itching, acne, skin lesions and irritation, overall perceived fatigue and exhaustion." *Id.*

404.    Scientists have identified at least 68 dangers to human health from mask-wearing including adverse skin reactions such as acne, alveolitis (an inflammatory lung disorder), anxiety, asthma, bacterial pneumonia, blood-oxygen depletion, breathing difficulties, bronchiectasis (a condition in which the lungs' airways become damaged), carbon-dioxide retention, candidiasis (fungal infestation of the mucous membranes), cheilitis (inflammation of the lips), chronic bronchitis, chronic pneumonia, confusion, concentration problems, decrease in psychomotoric abilities, decreased thinking ability and disorientation, depression, dental impacts such as cavities, discouragement, disrupted nonverbal and verbal communication, disrupted social interaction, disruption of the basics of human communication (verbal and non-verbal), dizziness, drowsiness, dry mouth, elevated risk of COVID-19 through self-contamination, elevated transcutaneous carbon-dioxide values, exhaustion, facial deformities, facial itching, facial rashes, fatigue, fibrosis (excess tissue deposition), gingivitis (inflammation of the gums), halitosis (bad breath), headaches, hypercapnia hyperventilation, hypoxia, impaired clarity of

speech, impaired cognitive abilities, impaired field of vision, impaired learning, impetigo (a bacterial infection that produces red sores and can lead to kidney damage), increased blood pressure, increased feelings of insecurity, increased heart rate, increased risk of infection because masks are an ideal growth and breeding ground for various pathogens such as bacteria and fungi, increased stress, inhalation of toxic substances such as microplastics and chlorine compounds located in the masks, irritability, irritation of the respiratory tract, isolation, malaise, microbiological contamination (germ colonization), neuropathological and cardiovascular consequences, numbness, panic attacks, physiological changes and discomfort, reduced cardiopulmonary capacity, reduced happiness, reduced performance capability, skin irritation, social withdrawal, spontaneous pneumothorax, vascular damage, and voice disorders. https://bit.ly/ masksarebad.

405.    Numerous other medical and scientific studies warn us of the dangers of wearing face masks: "A recent study in the journal Cancer Discovery found that inhalation of harmful microbes can contribute to advanced stage lung cancer in adults. ***Long-term use of face masks may help breed these dangerous pathogens***. Microbiologists agree that frequent mask wearing creates a moist environment in which microbes are allowed to grow and proliferate before entering the lungs."  (emphasis added).

406.    "Since forced mask wearing began, dermatologists have coined the term 'maskne' to describe an onset of pimples near the mouth caused by masks clogging up pores with oil and bacteria. This can be caused by either disposable or cloth masks." *Id.*

407.    "Dentists have also been warning about a phenomenon known as 'mask mouth' in which patients are arriving back to the dental office with an increase in gingivitis and tooth decay as high as 50% in a period of just a few months since mask mandates began. ***This discovery sheds light on the growing evidence of harm caused by long-term mask wearing***." *Id.* (emphasis added).

408.    "In some situations, wearing a cloth face covering may exacerbate a physical or mental health condition, lead to a medical emergency, or introduce significant safety concerns, [CDC] explains."

409.    "Breathing is one of the most important physiological functions to sustain life and health. Human body requires a continuous and adequate oxygen (O2) supply to all organs and cells for normal function and survival. … Long-term practice of wearing facemasks has ***strong potential for devastating health consequences***."

410.    "Vulnerable populations such as people with mental health disorders … are at significant health risk for complications and harm … Wearing [a] facemask mechanically restricts breathing by increasing the resistance of air movement during both inhalation and exhalation process. … ***prolonged and continuous effect of wearing facemask is maladaptive and could be detrimental for health***." *Id.* (emphasis added).

411.    "***Cloth masks actually risk your health rather than protect it***. The moisture caught in these masks will become mildew-ridden in 30 minutes. Dry coughing, enhanced allergies, sore throat are all symptoms of a micro-mold in your mask."   (emphasis added).

412.    "Scores of dermatologists, dentists, immunologists, virologists, [and] pediatricians all over the world have been sounding the alarm for months over the continued use of face masks." *Id.*

413.    "Scientists have found evidence that some face masks which are on sale and being used by members of the general public are laced with toxic chemicals. Preliminary tests have revealed traces of a variety of compounds which are heavily restricted for both health and environmental reasons. This includes formaldehyde, a chemical known to cause watery eyes; a burning sensations in the eyes, nose, and throat; coughing; wheezing; and nausea. Experts are concerned that the presence of these chemicals in masks which are being worn for prolonged periods of time could cause unintended health issues."

414.    "Carbon dioxide (CO2) is a colorless, odorless, non-flammable gas that naturally occurs in the atmosphere. CO2 is produced by body metabolism and is a normal component of exhaled breath. … CO2 is denser than air and can collect in high concentrations in … confined spaces [such as within face masks] where it can displace oxygen creating a serious health hazard."

415.   "The primary health effects caused by CO2 are the result of its behavior as a simple asphyxiant. A simple asphyxiant is a gas which reduces or displaces the normal oxygen in breathing air. Symptoms of mild CO2 exposure may include headache and drowsiness. At higher levels, rapid breathing, confusion, increased cardiac output, elevated blood pressure and increased arrhythmias may occur." *Id*.

416.   Airplanes contain lower oxygen levels than most flight crew and passengers who live at sea level are used to. Most airplanes are pressurized to an elevation of 8,000 feet. As most people know, oxygen levels decrease with altitude. "For people with conditions – like heart or lung disease – that cause them to have special oxygen requirements, this is a big deal, and means they might need to fly with an oxygen concentrator, or not fly at all. But even for healthy people who are used to the abundant levels of oxygen present at sea level, it can have an effect."

**The FTMM violates the Food, Drug, & Cosmetic Act by forcing travelers to wear Food & Drug Administration unauthorized or Emergency Use Authorization medical devices without our consent. The Airline Defendants' mask mandates constitute practicing medicine without a license.**

417.   CDC itself admits a mask does "NOT provide the wearer with a reliable level of protection from inhaling smaller airborne particles and is not considered respiratory protection."

418.   Mask manufacturers concede their products are ineffective in preventing COVID-19 infection: "It is also important to ensure the product does not have any additional antimicrobial or antiviral claims made within its labeling."

419.   FDA, an agency within HHS, regulates most face masks under EUAs.

420.   HHS and FDA state: "On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks, [FDA] issued an [EUA] authorizing the use of face masks for use by members of the general public… A face mask is a device … that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. … Face masks are regulated by FDA when they meet the definition of a 'device' under section 201(h) of the Act. Generally, face masks fall within this

definition when they are intended for a medical purpose. … Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public … to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic."

421.   FDA states face masks must not be "labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction… No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask *may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic.*"  (emphasis added).

422.   The instruction manual for a 3M N95 respirator mask, which is FDA approved, makes clear its wearing still has risks: "Misuse may result in sickness or death. … [It] cannot eliminate the risk of contracting infection, illness, or disease… Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use."

423.   Despite the lack of data that masks are effective, FDA issued an umbrella EUA for 41 types of surgical masks, many of which are used by passengers to comply with the FTMM and the Airline Defendants' mask policies.

424.   Notably five types of masks have been withdrawn from the EUA after FDA found them to be defective. *Id.*

425.   FDA has also revoked the EUA for respirator masks made in China for being faulty.

426.   CDC's National Institute for Occupational Safety & Health ("NIOSH") found many masks made in China "authorized under the April 3, 2020, EUA did not meet the expected performance standards." *Id.*

427.   An astounding 167 respirator mask brands from China had their EUAs revoked by FDA. Another 54 were previously revoked. *Id.*

428.    So not only are quality masks worthless in CDC's goal of reducing transmission of COVID-19 (https://bit.ly/masksarebad), but the vast majority sold in the United States are actually defective, according to FDA.

429.    There's no indication these issues were considered as part of the Airline Defendants' conspiracy to interfere with the civil rights of the disabled.

430.    When a mask manufacturer applies for an EUA, it must agree it may not "misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: … antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency."  All defendants do not inform passengers of their legal right to refuse administration of the medical device.

431.    "[B]y the FDA's own admission, face masks such as those in common use by the public are not intended to protect the wearer or others from the COVID-19 virus, as they do not prevent or reduce infection."

**All 50 states do not require masking. The federal government may not impede on the states' sovereign police power to protect public health.**

432.    CDC's FTMM order overrides the mask policies of all 50 states that don't require masks.

433.    Ten states never adopted a statewide mask mandate. The other 40 states – seeing that mandatory masking had no effect on their COVID-19 cases, hospitalizations, and fatalities – have repealed their face-covering dictates.

434.    There are at least 14 states that prohibit mask mandates.

435.    President Biden acknowledged Dec. 27, 2021, during a meeting of state governors that "Look, there is no federal solution" to COVID-19. "This gets solved at a state level."

436.    However, the president has not repealed Executive Order 13998 that told CDC and HHS to mandate masks in the transportation sector. His administration continues extending TSA's enforcement of the FTMM without providing any explanation for doing so.

**Even if CDC voluntarily repeals its FTMM order, it could be reinstated at any time.**

437.    It's possible CDC could repeal the FTMM before the Court is able to render a judgment on this Complaint. However, that would in no way moot our case.

438.    CDC Director Rochelle Walensky, in announcing revised mask guidance Feb. 25, 2022, clearly stated the agency could change its masking recommendations again at any time.

439.    "None of us know what the future may hold for us and for this virus and we need to be prepared and we need to be ready for whatever comes next. We wanna give people a break from things like mask wearing when our levels are low and then have the ability to reach for them again, should things get worse in the future," Walensky told reporters during a Feb. 25, 2022, media briefing releasing new guidelines that 99.5% of Americans should not wear masks.

440.    Likewise Dr. Greta Massetti a senior epidemiologist at CDC, said the agency will always be updating its mask guidelines, indicating that the FTMM (if ever repealed) could be reinstated at any time.

441.    "Public-health prevention strategies can be dialed up when our communities are experiencing more severe disease and dialed down when things are more stable," Massetti told reporters during the Feb. 25 briefing.   .

**Many Americans with disabilities can't wear face masks.**

442.    CDC "states that a person who has trouble breathing or is unconscious, incapacitated, or otherwise unable to remove the face mask without assistance should not wear a face mask … Additionally, people with post-traumatic stress disorder, severe anxiety, claustrophobia, autism, or cerebral palsy may have difficulty wearing a face mask."

443.    "People who are deaf or hard of hearing – or those who care for or interact with a person who is hearing impaired – may be unable to wear cloth face coverings if they rely on lip-reading to communicate. Some people, such as people with intellectual and developmental disabilities, mental health conditions, or other sensory sensitivities, may have challenges wearing a cloth face covering."

444.    "Individuals with asthma, chronic obstructive pulmonary disease (COPD), or other respiratory disabilities may not be able to wear a face mask because of difficulty in or impaired breathing."

445.    "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety."

446.    A wide range of disabled people should not wear masks.

**The FTMM unlawfully discriminates against travelers with disabilities.**

447.    Because of the FTMM, many airlines have illegally banned passengers with disabilities who request face-mask exemptions, including children as young as two, in violation of the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR Part 382).

448.    Reports abound of unlawful discrimination against the disabled as a direct result of CDC's FTMM order.

449.    CDC itself states that passengers with numerous medical conditions should not be required to wear face coverings, but does nothing to enforce this due to the FTMM.

450.    "Masks or Cloth Face Covering: Recommendation: Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (***excluding*** children under age 2, or ***anyone who has a medical condition that causes trouble breathing***…," according to a July 2020 report issued by HHS and other federal agencies.  (emphasis added)

451.    "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks or cloth face coverings. … Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis." *Id.*

**The Airline Defendants conspired to put illegal mask polices in place starting in Spring 2020. The conspiracy soon involved interfering with the civil rights of the disabled such as plaintiffs with medical conditions who can't safely wear a face**

**coverings, totally banning us from using air transportation unless we agreed to endanger their health.**

452.    **ORIGINAL MASK POLICIES:** JetBlue was the first U.S. airline to require passengers to don face masks during flights, announcing the measure on April 27 for flights starting on May 4, 2020. "Exempt: Small children who are not able to maintain a face covering."

453.    Delta simultaneously announced it would also mandate face masks on flights effective May 4, 2020. "Only exceptions are for meal service and young children."

454.    United simultaneously announced it would also mandate face masks on flights effective May 4, 2020.

455.    Frontier simultaneously announced it would also mandate face masks on flights effective May 8, 2020.

456.    Hawaiian simultaneously announced it would also mandate face masks effective May 8.

457.    Hawaiian at first complied with the ACAA by noting "guests with a medical condition or disability preventing its use will be exempted from the policy."

458.    American simultaneously announced it would also mandate face masks on flights effective May 11, 2020. "Only exceptions are for young children and those with medical conditions that prevent them from wearing a face covering."

459.    Alaska simultaneously announced it would also mandate face masks on flights effective May 11, 2020.

460.    Southwest simultaneously announced it would also mandate face masks. "Southwest has required passengers to wear masks onboard since May 11, and said it will continue to bar passengers without a mask from boarding."

461.    **LEGAL ADVICE & EARLY EXCEPTIONS:** Lawyers advised the industry at the start of the COVID-19 pandemic that the ACAA prohibits airlines from discriminating against a passenger with a disability in the provision of air transportation.

462.    Airlines were provided legal advice that "A carrier may deny boarding, require a medical certificate, or impose conditions on a passenger *(such as wearing a mask)* only in cases

where a passenger **with a communicable disease** poses a 'direct threat' to the safety and health of others. In determining whether a passenger poses such a threat, the airline makes an **'individualized assessment'** by relying on current medical knowledge, the likelihood of potential harm to others, and whether reasonable procedures or modifications could mitigate the risk." (emphasis added).

463. The Airline Defendants conspired to impose mask mandates anyway, ignoring this legal guidance.

464. All major U.S. airlines except Allegiant conspired to mandate masks in early May 2020..

465. Recognizing that requiring masks violates the RA, ACAA, FDCA, other federal and international laws, and their contracts of carriage, the Airline Defendants at first told their flight attendants and pilots they shouldn't enforce their mask rules on board planes.

466. Passengers were still denied boarding if they didn't wear a mask at the gate, however. At this point, it appears the conspiracy to implement masks was undertaken with some understanding that the defendants could not interfere with the civil rights of the disabled. This would soon change, however.

467. It was reported in May 2020: "The major airlines have exceptions so that young children and those with medical issues don't have to wear masks."

468. There was compliance with the ACAA at first. The author of this article noted: "Presumably the airlines would be opening themselves up to a lawsuit if they forced someone to put on a mask when they claim they have a medical condition." .

469. **STRICT ENFORCEMENT EXCEPT FOR PILOTS:** By mid-June 2020, major airlines extended their conspiracy to ban flyers who refused to – or medically can't – wear masks from flying.

470. Plaintiffs need discovery to determine to what extent the Airline Defendants have conspired to share their "no-fly lists" among each other.

471.   Through the trade group they belong to, Airlines for America ("A4A"), Alaska, American, Delta, JetBlue, Southwest, and United announced they were conspiring to begin "vigorously enforcing face covering policies."

472.   Acknowledging that pilots and flight attendants are not licensed medical providers, the conspirators at this phase continued to permit some medical exemptions because "the crew isn't qualified to assess medical conditions, so there shouldn't be any follow-up questions" when someone self-declares a disability that makes it impossible for them to cover their nose and mouth.

473.   "U.S. airlines are very serious about requiring face coverings on their flights. Carriers are stepping up enforcement of face coverings and implementing substantial consequences for those who do not comply with the rules," said A4A President & CEO Nicholas Calio.[6]

474.   "Beginning June 16[, 2020] at American and June 18 at United, any passenger who does not wear a mask while traveling could be flagged for each airline's list of restricted flyers, possibly causing them to be barred from flying with the carrier again. … The policy updates by American and United coincided with a Monday announcement from the Airlines for America (A4A) trade group, which said many of its members were stepping up enforcement of their onboard mask policies.".

475.   While the Airline Defendants were stepping up their mask enforcement in early Summer 2020, they were exempting pilots from the muzzling rule because of the need for safety in the cockpit. American, for example, issued a memo to staff July 2, 2020, noting there is a "Flight Deck safety exception."

476.   In a lawsuit seeking *vacatur* of the FTMM, pilots from several of the Airline Defendants said they are exempt from masking in the cockpit, but not while in airport terminals. Complaint, *Carlin v. CDC*, No. 22-cv-800 (D.D.C.).

---

[6]                        https://abcnews.go.com/Politics/airlines-ban-passengers-refuse-wear-masks/story?id=71279833#:~:text=%22U.S.%20airlines%20are%20very%20serious,not%20comply%20with%20the%20rules.%22

477.    In a July 10, 2020, memo, American detailed its flight deck safety exception: "Pilots have certain exemptions on wearing masks in the flight deck for safety reasons. (i.e. A mask may interfere with their ability to see or don an oxygen mask.) … The pilots do not have to put on a face covering if they feel it could impact safety."

478.    These memos obtained from an American employee show how the airline industry was well aware that obstructing a person's breathing by mandating face coverings is dangerous.

479.    "When COVID-19 first became a threat, most airlines prohibited crews from wearing masks. … But even when mask usage started to become more common and ultimately permitted for flight attendants, it remained prohibited for cockpit crews by the FAA."

480.    "Additionally, the FAA issued a ruling that was adopted by most if not all airlines in the US, that allowed but did not require pilots to wear masks in the cockpit."

481.    "There are a number of issues that come with wearing a mask in the cockpit and those reasons are why most crew members don't wear one in flight. First, in an explosive decompression, getting your facial mask off and the oxygen mask on adds seconds to a procedure that is already time critical. Second is the issue of re-breathing $CO_2$ for hours on end while at altitude in a safety critical position. Third, for those who wear glasses, masks represent a challenge that frequently leads to those glasses becoming fogged. This can be a challenge even for those with perfect vision during daytime flights when you need to wear sunglasses. Even with the built-in shades, it can get very bright in the cockpit at altitude. Consequently, wearing a mask while operating the aircraft compromises safety. With what we know about how air flows on aircraft, the risks posed by wearing a mask greatly outweigh the risks that come from not wearing one inside the flight deck."

482.    The Airline Defendants ignored that numerous current and former flight attendants said all flight crew and passengers also should not wear masks for safety reasons because decreased oxygen levels reduce reaction time in an emergency. A cabin full of muzzled, oxygen-deprived flight attendants and passengers could result in a disaster if they are slow to respond to an in-flight emergency. Complaint, *Trocano v. CDC*, No. 22-cv-727 (D. Colo.).

483.     Masks also impair the critical ability for passengers and crew to communicate during an emergency. *Id*.

484.     The conspiracy now involved endangering the health and safety of the Airline Defendants' passengers.

485.     The crew on board every aircraft is there for one main reason: to guarantee the safety of the flight, including the crew and passengers on board the aircraft. To limit the oxygen intake of the crew and the passengers in an already low-oxygen environment like a plane is beyond dangerous as it impedes an optimum oxygen level in our bodies – not only for any pre-existing medical conditions any passenger or crew member might already have but also because it endangers the safety of the flight in case of emergency. *Id*.

486.     Not only would passengers and crew members lose precious time to wear an oxygen mask in case of a decompression because they would have to remove their own unauthorized or FDA EUA face covering first, but also the flight attendants would not be fit to handle an emergency because the already low oxygen level in their own bodies would incapacitate them from performing the emergency procedures that they have all been trained for. *Id*.

487.     **PROHIBITING THE DISABLED FROM FLYING:** The conspiracy would soon evolve to indisputably interfere with the civil rights of disabled passengers by totally banning us from using air transportation unless we agreed to harm our health by wearing a mask.

488.     The Individual Defendants should have known that forbidding disabled passengers from flying violates numerous federal and international laws, but they did nothing to stop the conspiracy.

489.     American and Southwest were the first carriers to institute a total ban on passengers with disabilities who can't wear a face mask.

490.     "Some carriers, such as American and Frontier, have created policies designed to make it exceedingly difficult or impossible for disabled people to fly without a mask. It is clear that testing requirements impose an undue burden on disabled travelers as there are few places in the country that guarantee a test result within 72 hours. In areas where rapid testing is possible,

it is often not covered by health insurance plans and can cost hundreds of dollars. The DOT's decision to grant airlines the authority to dictate which flights disabled people can take is ripe for abuse and further demonstrates that the Office of Aviation Consumer Protection has little to no interest in protecting the rights of disabled people."

491. The other airline conspirators soon followed in prohibiting the disabled from flying.

492. "Alaska Airlines announced a strengthening of [its] mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7[, 2020]. Alaska's announcement came the same day as New York-based JetBlue's, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th. Alaska, along with JetBlue, now joined American and Southwest, which announced similar zero-exceptions policies in recent weeks, as the airlines with the strictest face covering policies in the United States."[7]

493. Allegiant adopted a rule: "Only children under the age of 2 are exempt from wearing a face covering. Customers who are not able to wear a face covering will not be permitted to travel." *Id.*

494. Frontier said "We require both passengers and employees to wear a face-covering over nose and mouth throughout the Frontier travel experience including ticket counters, gate areas, baggage claim and onboard all flights. The only exception is for children under the age of 2." *Id.*

495. "Buried in a July 22 press release, United Airlines states that 'if a passenger believes that there are extraordinary circumstances that warrant an exception, they should contact United or speak to a representative at the airport.' Repeated requests for clarification were refused and, because the statement is not included on the airline's customer-facing website,

---

[7] https://thewindowflyer.com/posts/alaska-airlines-strengthens-mask-policy

Plaintiffs do not believe that United is willing to serve disabled passengers who cannot wear a mask.[8]

496.    "That's 8 of the 10 largest U.S. airlines which have told disabled people with autism, asthma, cerebral palsy, claustrophobia, COPD, PTSD, severe anxiety, and other conditions that they are not welcome onboard an aircraft. It is the largest ban on disabled air travel since the Air Carrier Access Act became law in 1986." *Id.*

497.    These policies were all implemented in late July and early August 2020, demonstrating both intra-corporate and inter-corporate conspiracies to interfere with civil rights by prohibiting all disabled Americans who can't obstruct our breathing from flying.

498.    The conspiracy continued into January 2021, when the defendants collectively lobbied for the Federal Transportation Mask Mandate. "[A]irlines and their unions requested [the FTMM] to help with passenger mask compliance…"

**Once the Federal Transportation Mask Mandate went into effect Feb. 1, 2021, the Department of Transportation finally forced the Airline Defendants to offer exemptions. But the conspiracy to prevent the disabled from flying continues as the exemption process each airline created is illegal and a farce, making it virtually impossible to get a waiver.**

499.    **ALASKA'S ILLEGAL POLICIES (Exhibit 52):** "Alaska Airlines announced a strengthening of [its] mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7[, 2020]. Alaska's announcement comes the same day as New York-based JetBlue's, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th. Alaska, along with JetBlue, now join American and Southwest, which announced similar zero-exceptions policies in recent weeks, as the airlines with the strictest face covering policies in the United States."

---

[8]    https://wheelchairtravel.org/only-3-airlines-will-allow-disabled-people-who-cannot-wear-a-face-mask-to-
fly/#:~:text=Buried%20in%20a%20July%202022,because%20the%20statement%20is%20not

500.    "Alaska Airlines said on Wednesday that it will no longer fly passengers who are unwilling or unable to wear a mask – even when there's a legitimate and documented medical reason – following similar moves by American Airlines and Southwest.".

501.    "If a guest is unwilling or unable to wear a mask for any reason while at the airport, they will not be permitted to travel," the airline said in a statement. "If a guest refuses to wear a mask after boarding their flight, they will be suspended from future travel."

502.    This policy follows a "yellow card" program that Alaska rolled out in June, in which flight attendants would issue a formal notice to passengers who refuse to wear masks. The airline said that going forward, any passenger who does not comply with the mask requirement after receiving a yellow card will be banned from flying with it immediately on landing, and will have any connecting or return flights cancelled.

503.    Alaska's current mask rules are: "If you have a disability and are unable to wear a mask, please call our dedicated accessible services line at 1-800-503-0101 … to request an exemption from the mask requirement."

504.    "Exemptions will require: • Documentation from a licensed health care provider as to your inability to wear a mask due to your disability; and • Proof of a negative test result from an FDA approved molecular NAAT or PCR Covid-19 test taken within 72 hours of your scheduled flight departure."

505.    "Documentation from your health care provider must be submitted to Alaska Airlines at least 72 hours before your flight. We recommend that you contact us at least one week before departure to start the exemption process."

506.    Alaska requires a passenger's doctor to disclose private medical information, against his/her will, to a third-party medical consultant "Open Doors NFP," which then recommends to Alaska to approve or deny a mask-exemption request, even though no licensed medical doctors actually work at Open Doors.

507.    Alaska required Plaintiffs Uri and Yvonne Marcus to provide a direct e-mail contact for their family physicians so that OpenDoors could contact them and verify their private medical information and conditions. This is an invasion of privacy.

508.    Open Doors does not have any doctors on staff, which puts it in the same category as Alaska, which said, "We are not doctors and cannot verify if you qualify for a mask exemption."

509.    Open Doors and Alaska are practicing medicine without a license.

510.    Alaska granted plaintiffs' mask exemptions but this was contingent on numerous additional steps that violate the law.

511.    Alaska fraudulently informs plaintiffs on its website that "federal law" requires all passengers to wear a mask while flying. But Congress never passed such a law, nor has DOT or any other agency promulgated such a regulation.

512.    **ALLEGIANT'S ILLEGAL POLICIES (Exhibit 53):** As of June 19, 2020, Allegiant was the only major U.S. airline not participating in the conspiracy to interfere with the civil rights of the disabled, and the only major carrier not to break the FDCA by requiring any passenger to don an FDA unauthorized or EUA medical device on their face.

513.    Allegiant did provide customers with FDA unauthorized or EUA medical devices, however, practicing medicine without a license: "[E]ach passenger gets a complimentary health and safety kit with a face mask, gloves, and two sanitizing wipes" and Allegiant "strongly encouraged passengers to wear" the devices.

514.    Allegiant was the lone holdout in the conspiracy at this time, noting the importance of not interfering with the civil rights of the disabled: "We've also heard from customers with asthma and other health conditions who say they can't wear masks. We want to ensure our policies accommodate them, as well."

515.    Defendant Allegiant quickly changed its tune, however, joining the conspiracy and implementing a mandatory mask policy July 2, 2020.

516.    Allegiant became the last major carrier to mandate muzzling. *Id.*

517.    Defendant Allegiant in June 2021 falsely represented that "federal law requires every person to wear a face covering that covers the nose and mouth at all times while traveling." There is no such law enacted by Congress. This is a deceptive and unfair trade practice.

518.     Allegiant misrepresents the FTMM by informing customers "Those with limited mobility who are unable to remove a face covering without assistance are exempt from the requirement."   But there are many other categories of exemptions under the FTMM. This is a deceptive and unfair trade practice.

519.     "To request face mask exemptions. please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved, a negative COVID test will be required within 3 days of each flight segment."   *But see* 14 CFR Part 382.

520.     Allegiant makes it difficult for customers with disabilities to (illegally) request in advance a mask exemption when booking their ticket. When a customer attempts to reserve a flight, a "Special Assistance" form comes up. But there is no box to check for mask exemption.

521.     **AMERICAN'S ILLEGAL POLICIES (Exhibit 54):** American makes little information about its mask-exemption process available on its website.

522.     "If you may be exempt because you have a disability that prevents you from safely wearing a mask as defined by the Americans with Disabilities Act (42 USC 12101 et. seq) you must contact us at least 72 hours before you plan to travel and travel with documentation confirming a negative COVID test or recovery."

523.     Additional unlawful American policies were described to Plaintiff Uri Marcus during a phone call Feb. 9, 2022.

524.     American fraudulently informed plaintiffs throughout the online ticket purchase pages that "federal law" requires each person to wear a mask while flying. However, Congress has never passed such a law, nor has DOT or any other agency promulgated such a regulation. The DOT itself on its own FAQ section on its website specifically states that wearing masks is NOT a federal law.

525.     American required Mr. and Mrs. Marcus to submit exemption requests in advance, which is illegal. 14 CFR § 382.25.

526.     Plaintiffs submitted the forms as a courtesy despite it being unlawful to demand advance notice. Plaintiffs included, as a courtesy, signed medical summaries from their family

physicians that they should not wear a mask. Plaintiffs wrote that American's mask policy is illegal in numerous ways including that airlines by federal law are NOT permitted to impose certain requirements or conditions on a person requesting an exemption from the mask mandate.

527.   After American finally did grant Mr. and Mrs. Marcus provisional mask exemptions, they went on to discriminate against them and assigned them, against their will, seats located in the last row of each flight.

528.   American and their employees at their Special Assistance Coordinators Department conspired to interfere with the civil rights of plaintiffs.

529.   **DELTA'S ILLEGAL POLICIES  (Exhibit 55):** Delta requires passengers to submit to a "Clearance to Fly" process prior to departure at the airport on the day of departure through STAT-MD, which means that a passenger who cannot don a mask for legitimate medical reasons because of his/her disability cannot know if he/she will actually be permitted board his or her flight after purchasing a ticket and arriving at the airport, ready to travel..

530.   Delta fraudulently informs plaintiffs throughout the online ticket purchasing process that "federal law" requires each person to wear a mask while flying. However, Congress has never passed such a law, nor has DOT or any other agency promulgated such a regulation.

531.   **FRONTIER'S ILLEGAL POLICIES (Exhibit 56):** Defendant Frontier also illegally requires advance notice and a medical certificate, among other discriminatory rules: "At least 10 days prior to departure: Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask…"  *But see* 14 CFR Part 382.

532.   This means a Frontier frequent flier would have to see his/her doctor before ***every trip*** on the airline. In other words, Frontier, like other airlines, refuses to grant passengers who have proven their disability a permanent mask exemption – meaning Frontier discriminates against disabled passengers on every single trip they take.

533.   "Failure to provide 10 days' notice will result in denial of the request." *Id. But see* 14 CFR Part 382.

534.    "Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight." *Id. But see* 14 CFR Part 382.

535.    Flyers with disabilities must endure this torment on each segment of their journey. "These testing requirements apply to return travel."

536.    Like Defendant Allegiant, Frontier makes it difficult for passengers to seek mask exemptions. While booking a flight a screen appears for a customer to select if he needs any "Special Services" – but there's no box to check for mask exemption.

537.    Frontier Airlines CEO Barry Biffle expressed his interest June 23, 2021, in removing himself and his airline from the conspiracy to interfere with the civil rights of the disabled. He said at an industry conference that face coverings are a prime contributor to a string of recent in-flight disruptions: "The reality is, a lot of people don't want to wear masks," Biffle said. "You don't have to wear a mask here [at the convention], you don't have to wear [masks] at Walmart, but yet you've got to do it on a plane." (as mentioned above)

538.    Despite his comments, Mr. Biffle has not taken any action to actually end his role in the conspiracy. Frontier has not stopped illegally depriving passengers of their right under the FDCA to refuse administration of an FDA unauthorized or EUA medical device, nor has he eliminated his company's numerous illegal mask-exemption rules that break the ACAA.

539.    **HAWAIIAN'S ILLEGAL POLICIES (Exhibit 57):** Despite acknowledging "the risk of viral transmission on board a commercial aircraft is extremely low," Hawaiian frequently states to customers that "Federal law requires that all guests two years and older wear a mask at the airport, while boarding, through the duration of the flight and while deplaning at their destination. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft and/or penalties under federal law."

540.    Congress has never passed such a law, nor has DOT or any other agency promulgated such a regulation.

541.    Hawaiian states "Guests who are unable to wear a face mask due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment. If you are unable to meet this requirement, we recommend that you reconsider your travel." *Id.*

542.    Hawaiian forces any passenger who passes its Fit to Fly medical consultation to sit in the rear of the aircraft regardless of what seats they chose during booking.

543.    Plaintiffs did not agree with Hawaiian's illegal policy that required them to complete a medical assessment from MedAire at the airport to be granted their mask exemptions as a condition to board the aircraft. (as mentioned above)

544.    Hawaiian even went so far as to demean and mock the medical disabilities of Plaintiffs Mr. and Mr. Marcus during the mask-exemption-request process by asking "Why in the world would you even want to ask for a mask exemption?"

545.    Plaintiffs Mr. and Mrs. Marcus submitted medical summaries that they cannot wear a mask, signed by their family physicians as a courtesy despite it being unlawful for Hawaiian to demand such documentation. *Id.*

546.    **SOUTHWEST'S ILLEGAL POLICIES (Exhibit 58):** "Customers with disabilities are not required to provide advance notice of the need for assistance…" Southwest correctly states on one of its web pages.

547.    However, Southwest then illegally makes passengers needing a mask exemption complete a "Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines" form and submit it at least seven days in advance. *Id.*

548.    Southwest's form requires passengers to acknowledge an illegal policy that "Southwest Airlines may change his travel dates and/or flights should one or more of his originally scheduled flights have a capacity of 75% or more, or another Passenger approved for a mask exemption booked on such flight." *Id.*

549.    "Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement. These requirements/conditions are described below." *Id.* Southwest fails to advise customers these requirements or conditions are prohibited by the RA and ACAA.

550.    Because DOT's guidance is illegal, there's no remedy for the disabled for the violation of our rights under the ACAA, therefore giving plaintiffs a private right of action to enforce the ACAA since DOT has failed its statutory duty to do so.

551.    "As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less crowded flight," according to Southwest. id

552.    "Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 75% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption. If the passenger's preferred flight ends up being more than 50% full on the day of travel, Southwest Airlines will work to re-accommodate Passengers who obtain a mask exemption. Please note that Passengers may be required to travel on a different date than their scheduled itinerary." *Id.*

553.    "At least seven (7) days prior to the Passenger's planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit [the form]…" *Id.*

554.    "A signed letter [is required] from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability." *Id.*

555.    "Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider…" *Id.*

556.    "No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result." *Id.* This sets different requirements for passengers without and with disabilities to fly; those who can mask

don't need a test, those who can't mask must get an expensive test for each segment of their journey.

557.    "Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure…" *Id.*

558.    No provision of federal law or regulations permit an airline to require that any person be tested for a disease as a condition of carriage, and such a provision is not contained in Southwest's contract of carriage.

559.    The most outrageous and discriminatory policy of Southwest is that "if the Passenger's originally scheduled date of travel is changed as a result of the flight having a capacity of 75% or more or another Passenger approved for a mask exemption, then you will be required to obtain a qualifying COVID negative viral test result within three (3) calendar days preceding the Passenger's new scheduled date of departure or return travel, as applicable and at your own expense." *Id.*

560.    So in other words, Southwest violates the law by refusing to carry a disabled person because the flight is pretty full and/or because there's another disabled person on board, and then it is going to violate the law AGAIN by mandating that Plaintiffs get ANOTHER negative COVID-19 test when nondisabled passengers are not subject to the testing requirement.

561.    "Southwest Airlines will introduce tough new face mask rules that will make it even more difficult for passengers with a legitimate medical exemption to fly with the airline…" id

562.    "Once a passenger has jumped through those hoops, Southwest Airlines will still refuse to board them if the flight is booked to 50% capacity or more. Even on a near-empty flight, an exempt passenger may still be refused boarding if there is more than one exempt passenger booked on the same flight." *Id.*

563.    Before the FTMM, "Southwest Airlines barred anyone over the age of two years old from flying with them if they claimed to have a medical condition that prevented them

wearing a face mask. Instead, Southwest told passengers to either delay travel indefinitely or find another airline to fly with." *Id.*

564.    Southwest finally changed its tune in Summer 2021, saying publicly it wants to withdraw from the conspiracy to interfere with the civil rights of disabled travelers.

565.    Southwest then-CEO Gary Kelly lobbied for the FTMM to terminate Sept. 13, 2021. As mentioned above and id.

566.    He testified to a Senate committee on Dec. 15, 2021, that masks are worthless in trying to reduce the spread of COVID-19 on planes.

567.    Yet Southwest still makes obtaining disability exemptions nearly impossible, and it has not actually withdrawn from the conspiracy.

568.    Mr. Kelly serves as A4A chairman. He said the aviation interest group wants the mandate ended due in part because "Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews."

569.    However, the FTMM was extended from Sept. 13 to Jan. 18, 2022, and again until March 18, 2022, and now again until April 18, 2022. None of the Airline Defendants have sued the federal government to block it even though they realize how discriminatory and dangerous it is.

570.    Southwest fraudulently informs plaintiffs on their website that "federal law" requires all to wear a mask while flying. But Congress never passed such a law, nor has DOT or any other agency promulgated such a regulation.

571.    **UNITED'S ILLEGAL POLICIES (Exhibit 59):** United requires a mask-exemption demand form must be submitted a minimum of seven days prior to scheduled departure.

572.    United requires proof of a negative COVID-19 PCR test result taken within 72 hours of scheduled departure.

573.    United may require a mask-exempt customer and anyone traveling with him/her to move to alternate seats in the cabin and/or change their itinerary to less-full flights.

574.   If granted, a United mask exemption request is applicable only to flights in a single reservation, and any exemption for future travel or travel in separate reservations will need to be applied anew.

575.   Mask-exemption applicants must agree: "I authorize the release of medical information pertaining to this mask exemption request and authorize my treating physician to speak with a United Airlines medical representative or any agent acting on its behalf." This is an invasion of privacy.

576.   "In order to assess and manage my request I understand that it may be necessary for United to disclose information relating to my health information to third parties such as medical professionals, airport staff, health agencies, United Express and Star Alliance carriers, and their employees, among others."   This is an invasion of privacy.

577.   A section of United's mask-exemption demand form "must be completed by a medical provider specifically treating the passenger's disability," making it a medical certificate.

578.   United fraudulently informs plaintiffs through its website that "federal law" requires each person to wear a mask while flying. However, Congress has never passed such a law, nor has DOT or any other agency promulgated such a regulation.

**The Airline Defendants accepted federal pandemic funding, subjecting them to the Rehabilitation Act, which prohibits recipients of federal financial assistance from discriminating against the disabled (Exhibit 60 & See below the cause of action for the Rehabilitation Act.**

579.   Most passenger airlines have historically not been subject to the RA, however that changed in 2020 when they accepted $25 billion in federal assistance from Congress in the Corona virus Aid, Relief, & Economic Security Act ("CARES Act"), signed into law March 27, 2020 (P.L. 116-136). The act provides assistance to consumers and businesses, including aid to air carriers, according to the Congressional Research Service ("CRS").

580.   "Treasury data show that, by October 5, 2020, more than $28 billion in payroll support had been approved for disbursement to 610 recipients, including 352 passenger airlines…"

581.   Another $29 billion in federal loans were made available to airlines.

582.   "In the midst of this crisis which threatens the jobs of tens of thousands of employees, distressed airlines have turned to the federal government for financial assistance."

583.   Section 504 of the RA applies to programs receiving federal funds.

584.   Legislative intent in passing the RA: "The time has come to firmly establish the right of these Americans to dignity and self-respect as equal and contributing members of society, and to end the virtual isolation of millions of children and adults from society."

585.   "The definition of disability applicable to Section 504 was amended by the ADA Amendments Act of 2008 to conform with the new definition of disability for the ADA. … *the definition of disability shall be construed in favor of broad coverage* to the maximum extent permitted by the terms of the act… The ADA Amendments Act specifically lists examples of major life activities including … *breathing*..." (emphasis added).

586.   The Supreme Court has determined that "Section 504 requires even-handed treatment and an opportunity for individuals with disabilities to participate and benefit from programs receiving federal funds."

587.   "The Spending Clause empowers Congress to tax and spend for the general welfare. Under this authority, which is subject to several limitations, Congress may offer federal funds to nonfederal entities and prescribe the terms and conditions under which the funds are accepted and used by recipients."

588.   By agreeing to accept $25 billion from the CARES Act and more money from subsequent appropriations, the Airline Defendants entered into a contract with the federal government to protect the rights of disabled travelers pursuant to the RA, the ACAA, and other federal and international laws.

589.   All Airlines Defendants have received federal funding during the COVID-19 pandemic.

590.   "Under the Spending Clause, Congress can place certain conditions upon granting federal funds. Under Title VI, the recipient agrees not to discriminate on the grounds of race by accepting the money. A similar analogy applies to § 504 with disability discrimination. When a recipient of federal funds discriminates, he is essentially breaking his agreement with Congress."

591.   "A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract."

**The Airline Defendants are unlawfully discriminating against millions of travelers with disabilities including the plaintiffs.**

592.   The Airline Defendants have a long track record during the pandemic of illegally banning passengers with disabilities who request face-mask exemptions, including children as young as two, in violation of the ACAA (49 USC § 41705) and its accompanying regulations (14 CFR Part 382). There are thousands of media reports of ACAA violations by the defendants.

593.   "The ability to access transportation is a precondition to the full enjoyment of many human rights by people with disabilities," according to the National Council on Disability ("NCD").[9]

594.   The Airline Defendants' mask policies violate guidelines from the International Air Transport Association, the major trade group for the worldwide aviation industry.

595.   The Airline Defendants' "lack of accommodation impedes the individual's participation in society. Inequality is not due to the impairment, but to the inability of society to eliminate barriers challenging persons with disabilities. This model puts the person at the center, not his/her impairment, recognizing the values and rights of persons with disabilities as part of society."[10]

596.   IATA adopted standards in August 2020 for serving the disabled during the COVID-19 pandemic. "Ensuring access to aviation facilities, services and information is fundamental to a disability inclusive COVID-19 response and recovery. If public health

_____

[9] https://ncd.gov/publications/2005/08022005-AccessTr2

[10]                                                    https://www.un.org/sites/un2.un.org/files/un_disability-inclusive_communication_guidelines.pdf

information, airport terminals, transport, communications, technologies and goods and services are not accessible, persons with disabilities may not be able to live and travel independently."

597.    IATA's standards state that the disabled should not "be subject to a more stringent medical screening or clearance than that required for other passengers. To be equitable, the standards applied should be the same."

598.    "Airlines should develop a specific and detailed company policy for the assistance and support to passengers with disabilities that is consistent across their network during the COVID-19 crisis. This policy should be robust, based on science…"

599.    The Airline Defendants' mask policies are NOT based on science. https://bit.ly/masksarebad.

600.    The Airline Defendants' policies are out of step with international standards set by IATA: "Airlines should provide reasonable accommodation to passengers … This will help to ensuring that all passengers exercise their human rights and their fundamental freedoms in an equitable manner."

601.    "Some passengers, such as those who cannot put on or remove a face mask themselves, small children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period."

602.    "[I]t is important to note how persons with disabilities are uniquely impacted by the pandemic in various aspects, including in the transport area. As countries relax their border control systems and airlines resume their services, accessibility and inclusion of persons with disabilities in aviation's COVID-19 response and recovery is a vital part of achieving the pledge to leave no one behind."

603.    In another document, IATA made clear that "denied boarding and passenger bans have raised criticism on airlines' policies that restrict people with disabilities from accessing air transportation as a violation of anti-discrimination and disability rights regulations."

604.    "Airlines should provide reasonable accommodation to passengers … This will help to ensure that all passengers exercise their human rights and their fundamental freedoms in an equitable manner."

605.     IATA advised airlines worldwide: "Some passengers, such as those who cannot put on or remove face masks themselves, very young children, and those who have certain types of medical conditions may not be able to tolerate the use of face coverings or masks for a lengthy period – or at all."

606.     "[A]ir travel is an essential component of many jobs in the global economy. For people with disabilities to be part of that economy, participate in the world community, and compete effectively for jobs requiring air travel, air carriers and federal oversight officials must ensure that their right to travel with appropriate accommodations is taken seriously and honored. Unfortunately, NCD has found that although things have improved since ACAA was passed in 1986, people with disabilities continue to encounter frequent, significant violations of the statute and regulations. When they complain, they encounter an enforcement effort that is both inconsistent and limited in scope."

**The Department of Transportation fails to enforce the Air Carrier Access Act and its own regulations.**

607.     The Office of Aviation Consumer Protection ("OACP"), a unit within the Office of the General Counsel of DOT, issued a Notice of Enforcement Policy ("NEP") Feb. 5, 2021, "Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft" (Exhibit 61) "to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Corona virus Disease 2019 (COVID-19)."

608.     "OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act ('ACAA') and the Department's implementing regulation in 14 CFR Part 382 ('Part 382') to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued." *Id.*

609.    The 45-day deadline was March 22, 2021. But there is no evidence DOT has taken any enforcement action against the Airline Defendants for violating the ACAA as these airlines continue to enforce their illegal discriminatory policies requiring, for example, that passengers with a disability that prevents them from wearing a mask must submit a request in advance in violation of 14 CFR § 382.25.

610.    "[T]he ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability." *Id.*

611.    "To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator. The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise." *Id. But see* 14 CFR Part 382.

612.    OACP's NEP did not advise airlines that the CDC's order allowing carriers to impose additional requirements is illegal (such as requesting a mask exemption in advance, submitting to a third-party medical consultation, submitting a medical certificate, and requiring a negative COVID-19 test). *Id. See* 14 CFR Part 382.

613.    In its Feb. 5 NEP, OACP admitted it had failed to enforce the ACAA and its regulations in 2020 when many airlines banned all passengers with disabilities who could not wear a face covering: "Some carriers have adopted policies that expressly allow 'no exceptions' to the mask requirement other than for children under the age of two. OACP has received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a 'no exceptions allowed' mask policy." *Id.*

614.   "CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties..." *Id.*

615.   OACP informed the airlines they had violated the law from Summer 2020 to January 2021 when they banned all travelers with disabilities: "It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for … individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others." *Id.*

616.   After DOT complaints are filed by passengers whom the Airline Defendants have discriminated on, investigations appear to average 12-14 months. Even if DOT were to resolve these complaints by finding that the Airline Defendants and their employees have broken the law by refusing the grant medical exemptions, there is no possibility for this process to provide an adequate remedy for disabled persons who need to fly within a week or two. Moreover, DOT is not fining airlines for breaking the law.

617.   "The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability. When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities …"

618.   But OACP illegally advised airlines that "In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that ***treat passengers presumptively as potential carriers of the SARS-CoV-2 virus*** and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew." *Id. But see* 14 CFR § 382.23(c)(1), which provides that an airline must have evidence that the passenger ***"has"*** a communicable disease, e.g. has tested positive for the corona virus. A "presumptive" determination that every single airline passenger is infected with COVID-19 is not only scientifically impossible, it goes against the plain language of 14 CFR § 382.23(c)(1).

619.    OACP wrongly informed airlines Feb. 5, 2021 that "both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask." *Id. But see* 14 CFR § 382.23(a).

620.    OACP wrongly informed airlines that "Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance." *But see* 14 CFR § 382.25.

621.    OACP wrongly informed airlines that they "may impose protective measures to reduce or prevent the risk to other passengers. For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test, taken at the passenger's own expense, during the days immediately prior to the scheduled flight." *Id.* As noted above, there is no provision of the ACAA or 14 CFR Part 382 that allows airlines to require a negative test to board a plane.

622.    "Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382."

623.    However, DOT has failed its duty to enforce the ACAA and its regulations, as evidenced by the Airline Defendants' continuance of policies that violate Part 382 fourteen months after the DOT issued its faulty NEP.

624.    Information provided to passengers by DOT contradicts OACP's Feb. 5, 2021 NEP as well as the Airline Defendants' mask policies. In a document "New Horizons: Information for the Air Traveler with a Disability," DOT informs flyers that ***"Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability …"*** (Exhibit 62) (emphasis added).

625.    "A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care. A disability is not sufficient grounds for a carrier to request a medical

certificate. ***Carriers shall not require passengers to present a medical certificate unless the person: … Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight.***" *Id.* (emphasis added).

626.    "If a person who seeks passage ***has an infection or disease*** that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … ***Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask).***" *Id.* (emphasis added).

627.    DOT publishes a 190-page handbook "What Airline Employees, Airline Contractors, & Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities: A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382."[11] Relevant excerpts of this handbook are attached at (Exhibit 63). (CFR citations appear to be different; presumably Part 382 has been reorganized and renumbered since this document was published.)

628.    "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation... ***Generally, you may not make inquiries about an individual's disability or the nature or severity of the disability.***" *Id.* (emphasis added).

629.    "***You must not refuse transportation to a passenger solely on the basis of a disability.***" *Id.* (emphasis added).

630.    "***You shall not require a passenger with a disability*** to travel with an attendant or ***to present a medical certificate***, except in very limited circumstances." *Id.* (emphasis added).

631.    "***You cannot require passengers with disabilities to provide advance notice of their intention to travel or of their disability*** except as provided below." *Id.* (emphasis added).

632.    "If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct

---

[11]        https://www.transportation.gov/individuals/aviation-consumer-protection/what-airline-employees-airline-contractors-and-air

threat to the health or safety of others, *you must make an individualized assessment* based on a reasonable judgment, relying on current medical knowledge or the best available objective evidence." No presumptive judgment that every single person has a communicable disease or infection is permitted. *Id.* (emphasis added).

633.    "If, in your estimation, a passenger *with a communicable disease or infection* poses a direct threat to the health or safety of other passengers, you may … (iii) impose on that passenger a special condition or restriction *(e.g., wearing a mask)*." *Id.* (emphasis added).

634.    "Except under the circumstances described below, *you must not require medical certification of a passenger with a disability as a condition for providing transportation.* You may require a medical certificate only if the passenger with a disability is an individual who is traveling on a stretcher or in an incubator (where such service is offered); needs medical oxygen during the flight (where such service is offered); or has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight." *Id.*

635.    "In addition, if you determine that a passenger *with a communicable disease or infection* poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger. *Id.* (emphasis added).

636.    "Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection." *Id.*

637.    "Discrimination is Prohibited: Management of carriers are required to ensure that the carrier … does not discriminate against qualified individuals with a disability by reason of such disability. *Id.*

638.    The yet-to-be-named Individual Defendants have failed their legal duties to ensure the disabled are not discriminated against.

639.    "Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted by the ACAA and part 382." *Id.*

640.    As a result of DOT's refusal to obey its statutory duty to enforce the ACAA, millions of Americans have been barred from flying.

641.    DOT has told the Airline Defendants they must accommodate passengers who are unable to tolerate wearing a face mask, however there is no evidence that DOT has actually initiated any civil enforcement proceedings against any air carrier for failure to grant mask exemptions.

642.    "Masks or Cloth Face Covering: Recommendation: Everyone should correctly wear a mask or cloth face covering over their nose and mouth at all times in the passenger air transportation system (excluding children under age 2, or ***anyone who has a medical condition that causes trouble breathing*** …," according to a July 2020 report issued by DOT, DHS, and HHS. It is titled Runway to Recovery[12] (emphasis added).

643.    "Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks … Accommodations for persons with disabilities or ailments who cannot wear cloth face coverings should be considered on a case-by-case basis." *Id.*

644.    DOT issued updated guidance in December 2020, stressing a key point: "Mask Use, ***specifically the need to accommodate those who cannot wear masks.***" id (emphasis added).

645.    But again, there is no evidence plaintiffs have located that DOT's OACP has fined any airline who banned customers with disabilities from flying, showing how DOT has failed its statutory duty to enforce the ACAA.

646.    "Masks Recommendation: Everyone should wear a mask per CDC guidance, over their nose and mouth, at all times in the passenger air transportation system (excluding children under age 2, ***or anyone who has a medical condition for which wearing a mask is contraindicated … Reasonable accommodations should be made for persons with disabilities or ailments who cannot wear masks." Id.*** (emphasis added).

647.    "Under the Air Carrier Access Act, ***U.S. and foreign air carriers have legal obligations to accommodate the needs of passengers with disabilities when the airlines develop***

---

[12]                        https://www.transportation.gov/sites/dot.gov/files/2022-02/Runway_to_Recovery_1.1_DEC2020_Final-508.pdf

***and implement policies requiring the use of masks*** to mitigate the public health risks associated with COVID-19." *Id.* (emphasis added).

648.   "The Air Carrier Access Act and its implementing regulations in 14 CFR Part 382 require airlines to ensure that their mask policies provide for reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear a face covering for medical reasons." *Id.*

649.   "On the matter of enforcing the law, the DOT has failed – unequivocally. The rights and dignity of travelers requiring special assistance and accommodation are violated frequently, while the department remains silent," wrote John Morris in Wheelchairtravel.org.[13]

650.   "How often does the DOT pursue action? Not often. In the past three years, only five penalties have been levied against airlines for violations of the ACAA. Typically, the DOT receives between 100-200 disability service complaints per month. … Five actions after thousands of complaints – that is not enforcement." *Id.*

651.   "Travelers with disabilities, myself included, have no way to ensure that air travel providers will honor the rights they have been guaranteed under the ACAA. Violations occur throughout the travel experience, from booking to baggage claim. Depending on the right that is violated, costs to the passenger may include disrupted travel, financial loss, pain and suffering, emotional distress, physical injury, an affront to personal dignity, or a combination of them all." *Id.*

652.   "It is disheartening to know that the DOT, the agency wholly responsible for enforcement of the law, has failed to protect your rights and mine so miserably." *Id.*

653.   "[A] civil right does not and cannot exist where an individual can take no definitive action to enforce it before the law or protect against its violation. The crux of the issue is this: The only venues within civil society where persons with disabilities cannot seek recourse before the law for discrimination on the basis of disability are on airplanes and in airports. A civil right is meant to be guaranteed." *Id.*

---

[13]   https://wheelchairtravel.org/expand-protections-civil-rights-for-disabled-travel-air-carrier-access-act/

654.   "I have submitted complaints to the DOT, and the agency has affirmed the legitimacy of 100% of my claims. No action has been taken. Those same airlines continue to violate those very same rights, repeatedly, and as if they are immune from the law. If my government will not stand up for me, and I cannot seek a redress for my own grievances before the court, what rights do I truly have?" *Id.*

655.   "By definition, civil rights are a class of protections that must be protected to have merit and value. If the air travel industry is permitted to ignore the ACAA without threat of challenge, the protections under the law cannot be classified as civil rights. To the travelers with disabilities who have been denied a voice, they are nothing but recommendations that are trampled on by the very airlines which they were meant to regulate." *Id.*

656.   "[T]he National Council on Disability (NCD) believes that DOT's approach is critically lacking in the key areas of compliance monitoring, complaint handling, and leadership by the Department of Transportation. … The key findings indicate that ACAA implementation and enforcement efforts over the past 12 years have been so lacking in several essential areas as to constitute non-enforcement." (as described above)

**International Traveler Testing Requirement.**

657.   Without providing public notice or soliciting comment, on Jan. 12, 2021, Defendant CDC announced an order (the ITTR) requiring all passengers flying to the United States from a foreign country to get tested no more than three days before their flight departs and to present the negative result (or documentation of having recovered from COVID-19) to the airline before boarding the plane.

658.   The day after taking office (Jan. 21, 2021), President Biden issued "Executive Order Promoting COVID-19 Safety in Domestic & International Travel."[14] E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); This Executive Order directed the ITTR be continued.

659.   The revised ITTR took effect Jan. 26, 2021. 86 Fed. Reg. 7,387 (Jan. 28, 2021).

---

[14]   https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-promoting-covid-19-safety-in-domestic-and-international-travel/

660.    The next version of the ITTR took effect Nov. 8, 2021. It made a minor change: modifying the requirement for unvaccinated flyers to get tested within one day of departure (keeping the mandate at three days for fully vaccinated passengers).

661.    Defendant CDC amended the ITTR order again, effective Dec. 6, 2021. This is the version presently in effect that plaintiffs are challenging ("Requirements for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country"). 86 Fed. Reg. 69,256;

662.    This latest version made another slight change: requiring all passengers, regardless of vaccination status, to submit a negative COVID-19 test taken within one day of departure.

663.    Before checking in for an international flight to the United States, CDC requires travelers to complete a "Passenger Disclosure & Attestation to the United States of America" form. All airlines must provide the disclosure to their passengers and collect the attestation prior to embarkation.

664.    Defendant CDC prohibits airlines from boarding any passenger who does not submit the form with an accompanying negative COVID-19 test taken within one day of departure.

665.    Congress has explicitly declined to require COVID-19 testing of international air travelers. There is no law authorizing the ITTR.


**CDC and HHS fail to consider that the ITTR doesn't apply to travelers entering the United States by land and sea, imposes significant financial and time burdens on travelers for no discernable benefit, and can leave American citizens stranded abroad indefinitely.**

666.    CDC and HHS have not explained why the ITTR applies only to air travel, not to those entering the United States by land or sea, including illegal aliens crossing the southern

border from Mexico to the United States, who are much more likely to be unvaccinated than U.S. citizens flying home from abroad.

667.    CDC and HHS have not presented any evidence that air travelers pose a greater risk to bringing COVID-19 into the country than land and sea passengers. Numerous COVID-19 outbreaks among illegal immigrants detained by the U.S. Border Patrol along the Mexican border as well as passengers and crew aboard cruise ships docking in the United States illustrate this point.

668.    For example, CDC has in the recent past told Americans not to cruise because of the high risk of COVID-19 transmission.[15]

669.    The ITTR imposes significant financial and time burdens on international travelers. Yet there is no discernable benefit as the purported reason for the latest version of the ITTR – to stop the Omicron corona virus variant from entering the United States – is moot because the variant is already widely circulating domestically, comprising about 99% of positive tests in the past month, according to CDC data.

670.    When an American citizen visits a foreign country, he/she has no guarantee that he/she will ever be able to return home due to the ITTR's stringent one-day testing requirement. This was  a major concern for Mr. and Mrs. Marcus in particular because they needed to travel to and from their home in Israel to the United States at least once a year for personal, family, and business reasons.

671.    The ITTR provides no exemptions in the case a country or region that normally does have rapid corona virus testing availability experiences a shortage of available COVID-19 tests.

672.    Unavailability of rapid testing is hardly speculative. It has occurred right here in the United States. "[T]he U.S. finds itself in the midst of yet another corona virus test shortage, with consumers facing limited sales at retailers and long lines at testing centers." (Exhibit 64)

---

[15] https://www.nytimes.com/2021/12/30/travel/cdc-cruises.html

673.   "The confusion has frustrated some public health professionals who say there simply aren't enough kits to permit people who are sick, those exposed to someone who has been infected with the virus, and people who want to travel and attend gatherings to get tested."[16]

674.   President Biden admitted finding rapid COVID-19 tests is a "real challenge" and "the need is great to do more in terms of the rapid tests and the availability of it."[17]

675.   CDC does not reimburse and is unable to help travelers get reimbursements for travel expenses as a result of canceled or delayed travel because of COVID-19 testing requirements for air passengers flying to the United States.

676.   For example, CDC does not reimburse travelers for the costs of new plane tickets, lodging, meals, and other expenses as a result of being stranded in a foreign country as a result of an inability to obtain a COVID-19 negative test result within one day of departure.

677.   CDC does not reimburse travelers for COVID-19 testing fees, which can cost as much as $200 depending on the location and type of test.

678.   If an airline passengers pays $200 for a corona virus test and the results do not come back within a day, not only does that person have to pay for another airline ticket, lodging, and meals, he/she must also pay $200 for another virus test – with no guarantee the results will come in time.

679.   If a flight is canceled or delayed until the next day, an airline passenger is forced to obtain another expensive COVID-19 test. The ITTR makes no exceptions for situations like this wholly outside passengers' control.


### V.   INJURIES & AFFECTS

680.   Plaintiffs' rights were stripped from them.

---

[16] https://www.cnn.com/2021/12/28/politics/joe-biden-covid-19-testing-failure/index.html
[17]         https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/12/27/remarks-by-president-biden-at-covid-19-response-teams-regular-call-with-the-national-governors-association/

681.    Plaintiffs were publicly shamed on multiple occasions, causing significant trauma.

682.    Initially, just the fear of facing the whole police-style "where is your mask?" teams roaming the airports and the planes, was the cause of severe anxiety for each of the Plaintiffs.  Plaintiffs were afraid to even try to get an exemption to fly.

683.    Finally, the Plaintiffs each attempted to get exemptions to fly and were hit with the discriminations as described. The anxiety of dealing with this was severe.

684.    The anxiety of going to the airport, and facing the fear of "how will I be treated?" was severe.

685.    The anxiety of being treated the way we were treated with all that discrimination, and public shaming was unbearable.

686.    That anxiety gets a bit less over time, but does not just go away.  The trauma is long lasting.

687.    Plaintiffs' financial situations were severely affected by their inability to travel.

688.    Plaintiffs were caused excessive anxiety and emotional damages.

689.    To this day, when Plaintiffs go on a plane or enter an airport, they get triggered, and go into a very intense place of anxiety. Often, they will choose not to travel, rather than experience those intense feelings.

690.    There are expected to be long-term repercussions from this almost two years of being restricted from traveling, and yelled at, publicly shamed, met by the police, and all the trauma that Plaintiffs' experienced, both physical damages, and emotional.


## VI.    CAUSES OF ACTION

**IRST CAUSE OF ACTION: VIOLATION OF THE ADMINISTRATIVE
PROCEDURE ACT: CDC's, & HHS's agency actions were not in accordance with
law and was in excess of their authority.**

691.    Plaintiffs incorporate the facts and allegations written above and allege:

692.    Pursuant to the Administrative Procedure Act (the "APA"), a court must "hold
unlawful and set aside agency action" that is "not in accordance with law" or "in excess of
statutory . . . authority, or limitations, or short of statutory right." See 5 U.S.C. § 706(2)(A), (C).

693.    The FTMM indicated its statutory and regulatory authority was derived from 42
U.S.C. § 264, 42 C.F.R. §§ 70.2 (the regulation implementing § 264), 71.31(b), and 71.32(b).

694.    The FTMM was in excess of that authority for three reasons:

695.    FIRST, none of the statutes or regulations it cites authorize the CDC to make or
enforce regulations that amount to a blanket preventative measure against people who may or
may not be carrying an infectious disease. Such a broad reading of the statute would be
"tantamount to creating a general federal police power." Skyworks, Ltd. v. CDC, 524 F. Supp.
3d 745, 758 (N.D. Ohio March 10, 2021).

696.    SECOND, the CDC's claim of authority under 42 U.S.C. § 264(a) does not take
into account the limiting language also found in that subsection. A statute must be read in context.
Hibbs v. Winn, 542 U.S. 88, 101 (2004). Section 264(a) grants the CDC the authority to "make
and enforce such regulations as in his judgment are necessary to prevent the introduction,
transmission, or spread of communicable diseases from foreign countries into the States or
possessions, or from one State or possession into any other State or possession."

697.    This grant of authority, however, is limited by the language found in the next
sentence: "For purposes of carrying out and enforcing such regulations, the [CDC] may provide
for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of
animals or articles found to be so infected or contaminated as to be sources of dangerous infection
to human beings, and other measures, as in his judgment may be necessary." 42 U.S.C. § 264(a).
The catchall provision "and other measures" is limited to "the kinds of measures" like the ones
listed in the statute. Ala. Ass'n of Realtors v. HHS, 141 S. Ct. 2485, 2488-89 (2021).

698.    A mask mandate for all people, including those whose infection status is
unknown, is unlike any of the measures listed in the statute. "Sanitation" here refers to the proper
disposal of human waste (urine and feces) as well as garbage. It applies to things, not human

beings. Masking is not a "sanitation" measure as the government argues. Nobody has ever said, for example, "I'm going to sanitize my face by covering it with a mask."

699.    THIRD, the CDC's interpretation of 42 U.S.C. § 264 ignores the structure of the statute. The Mask Mandate repeatedly cites § 264(a) as its authority. But § 264(a) only allows the CDC to impose specific restrictions on property interests. The FTMM was a restriction on travelers' liberty interests, which is an issue addressed by § 264(d). Section 264(d) applies only to "any individual reasonably believed to be infected with a communicable disease" and allows for apprehension and examination under only those circumstances.

700.    Read as a whole, as courts must do, it is clear that the "other measures" clause found in § 264(a) does not allow the CDC to restrict the liberty interest of all travelers by requiring them to wear a mask. On its face and as applied, the Mask Mandate violated Plaintiffs' right to be free from unlawful regulations, and Plaintiffs were irreparably harmed.

701.    Plaintiffs had no plain, speedy, and adequate remedy at law to prevent Federal Defendants from enforcing the FTMM. If not enjoined by this Court by means of declaratory relief, Federal Defendants will continue to enforce the next FTMM, even after May 11, 2023 when the next public emergency arises, in violation of Plaintiffs' rights. Accordingly, declaratory relief is appropriate. An actual and substantial controversy exists between Plaintiffs and Federal Defendants as to their legal rights and duties with respect to whether the FTMM exceeds the CDC's statutory authority. The case is presently justifiable because the FTMM applied to Plaintiffs on its face, and Plaintiffs did in fact face sanctions and will face sanctions in the future for our non-compliance. Declaratory relief is therefore appropriate to resolve this controversy.

702.    FOURTH, THE Mask Mandate not only exceeded Federal Defendants' statutory and regulatory authority, but in applying 42 U.S.C. § 264(a), it constitutes an unlawful delegation of legislative authority.

703.    Plaintiffs challenge as well the Executive Order on grounds that it constituted an improper exercise of legislative authority by the Executive Branch, and that it further improperly asserts a general police power that has traditionally been relegated to the States, in derogation of the Separation of Powers under the United States Constitution.

704.     The CDC Mask Mandate in part requires conveyance operators (and operators of transportation hubs) to use their best efforts to ensure that "any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel." 86 Fed. Reg. at 8026. Those best efforts include, inter alia, "instructing persons [AT ALL AIRPORTS] that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law." Id. (emphasis added).

705.     The latter directive constitutes an outright fabrication, as no such "Federal law" ever existed.

706.     The CDC had taken no action to publish any rule or other agency action of this sort for nearly an entire year since the COVID-19 pandemic was declared as a public health emergency, Defendants sought to justify bypassing the normal rule-making procedures required by the APA – thus claiming a sweeping police power over every person seeking to board a public conveyance or even enter a transportation hub - by calling it an emergency. And the proven adverse health effects from this cannot be casually dismissed.


**SECOND CAUSE OF ACTION: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: [FEDERAL DEFENDANTS]: Failure to observe the notice-and-comment procedure required by law before ordering the FTMM.**

707.     Plaintiffs incorporate the allegations of paragraphs above, and further allege:

708.     Even if the Mask Mandate fell within the CDC's statutory authority under 42 U.S.C. § 264(a), the APA required Defendants to provide notice of, and receive comment on, the Mask Mandate. See 5 U.S.C. § 533.

709.     Without specifically citing the "good cause" exception of 5 U.S.C. § 553(b)(B), Federal Defendants lean on a nearly three-year-old "emergency" of COVID-19 to claim that the Mask Mandate is not a "rule" within the meaning of the APA. 86 Fed. Reg. at 8030. As a result, Federal Defendants did not even invite comments, much less provide for a notice and comment interval.

710.    First, the Mask Mandate is clearly a "rule" within the meaning of the APA, because it prescribes law (the Mandate literally instructs carriers and transportation hub operators to inform passengers that failure to properly wear a mask constitutes a "violation of Federal law," 86 Fed. Reg. at 8026, even though no corresponding statute exists), and marks the consummation of an agency decision- making process that determines rights or obligations and/or constitutes action from which legal consequences will flow. See 5 U.S.C. § 551(4); Florida v. Becerra, 2021 Dist. LEXIS 114297 at *110.

711.    Second, the "good cause" exception of 5 U.S.C. § 553(b)(B), which Defendants have only tacitly invoked, is to be "narrowly construed and only reluctantly countenanced," and only "excuses the APA's notice-and- comment procedures in an 'emergency situation.'" Becerra, supra at *123.

712.    Good cause does not exist when the agency has sufficient time to provide notice and comment. HHS declared COVID-19 a public health emergency early in 2020, and yet did not promulgate the Mask Mandate until early 2021, practically a year later. If the COVID-19 pandemic presented a national emergency in early 2020, that emergency had long passed by early 2021. As noted by the Florida Court in Becerra, "[i]f the existence of a communicable disease alone permitted CDC to find 'good cause,' CDC would seldom, if ever, need to comply with the statutory requirement for 'good cause' to dispense with notice and comment." Becerra, supra at *126.

713.    Federal Defendants are in violation of the APA. This rule should be discarded and the Court should declare that ths is in violation.

**THIRD CAUSE OF ACTION: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: [FEDERAL    DEFENDANTS]: Arbitrary and capricious agency action in ordering the FTMM.**

714.    Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further allege:

715.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious," as Federal Defendants' actions were here. 5 U.S.C. § 706(2)(A).

716.    FIRST, Federal Defendants disregarded the fact that a protocol already exists under the Federal Aviation Act, and regulations promulgated thereunder by the Federal Aviation Administration (the "FAA"), which address an air carrier's ability to refuse boarding to a passenger based on a threat of communicable disease. See 49 U.S.C. § 44902(b); 14 C.F.R. §§ 382.21 and 6 382.19(c)(1)-(2).

717.    The regulatory regime promulgated by the FAA is comprehensive, and the FAA – which is responsible for interpreting and enforcing statutes governing flight operations – apparently did not deem it necessary to update or amend those regulations during the nearly one-year period from the onset of the COVID-19 pandemic to the date of the Mask Mandate.

718.    SECOND, an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Encino Motorcars, *LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Here, Federal Defendants failed to articulate why the Mask Mandate was needed, what specific State measures were inadequate, and why the exemptions under the Mask Mandate were not arbitrarily selected.

719.    As noted above, for example, Federal Defendants provide no epidemiological basis for drawing the line for exemptions for children at age 2 and under, whereas the WHO recommends against masking children age 5 and under, and recommends that children ages 6-11 wear masks only under limited circumstances.

720.    The Mask Mandate also failed to articulate whether any safety data respecting the effects of long-term mask use for persons of all ages was considered. The Mandate's only exemption for disabilities is for persons "who cannot wear a mask, or cannot safely wear a mask, because of the disability. …" 28 86 Fed. Reg. at 8027.

721.    The Mask Mandate also failed to articulate the long-term traumatic effects upon persons of all ages, who received mask exemptions, but were nevertheless, subjected to stressful negative social consequences precisely because they could not safely don masks.

722.     This failed to take into account persons such as Plaintiffs Gordon and Russo, who suffered from anxiety, headaches, and shortness of breath, along with other injuries, when we donned masks.

723.     Federal Defendants also failed to address the FDA's own uncertainty regarding the efficacy of masks for the general public, as well as concerns regarding the safety of wearing masks for extended periods of time.

724.     Federal Defendants also ignore the fact that the travel industry was, up until the time of the Mask Mandate, effectively self-regulating, and the Mask Mandate contained no finding to the contrary. The Mandate foreclosed carriers from adjusting to changing circumstances, or from offering alternative solutions.

725.     THIRD, the Mask Mandate failed to show that Federal Defendants considered less burdensome alternatives. For example, existing Federal Air Regulations provide guidance for airlines to determine whether they may deny boarding to a passenger based on a "direct threat" of infectious disease. See 14 20 C.F.R. §§ 382.21 and 382.19(c)(1)-(2).

726.     FOURTH, the administrative record shows that CDC and HHS ignored that mask mandates have created chaos in the sky, recklessly endangering aviation safety and security.

727.     FIFTH, The administrative record shows that CDC and HHS failed to take into account that airplane cabins pose little risk for corona virus to spread.

728.     SIXTH, eight experts in the field of industrial hygiene, with combined experience of nearly 150 years, wrote CDC and others Feb. 22, 2022, to express they are "highly concerned with the inaccurate and misleading guidance being promoted by the CDC on its website regarding efficacy of masking to prevent COVID-19 and now similar guidance regarding respirators and request for immediate correction to said guidance. The guidance is overly broad, inaccurate, and especially inappropriate for children and the general public." (Exhibit 22).

729.     Just three days later, CDC announced Feb. 25, 2022, it would exercise its "enforcement discretion" and no longer require kids on school conveyances to be muzzled. (Exhibit 23). CDC did not explain why school buses and vans are now exempt from the FTMM but not other modes of transportation.

730.   CDC did not publish the amended FTMM in the Federal Register.

731.   When arbitrary and capricious government health mandates are eliminated, see the letter sent to the President and the federal agencies, stating "countries that have removed these no-longer fit for purpose travel restrictions have already seen a significant upswing in forward bookings. International travel was artificially constrained by COVID-19 and government policies… we look forward to working with the Biden Administration to remove or modify all remaining COVID-19 travel restrictions…" according to the International Air Transport Association. (Exhibit 24).

**FOURTH CAUSE OF ACTION: [FEDERAL   DEFENDANTS]: VIOLATION OF THE UNITED STATES CONSTITUTION Article I, § I; Agency action (CDC and HHS) violates the   NON-DELEGATION DOCTRINE.**

732.   Plaintiffs incorporate the facts and allegations of the previous paragraphs, and further allege:

733.   Article I, Section I of the U.S. Constitutions states, "All legislative powers herein granted shall be vested in a Congress of the United States." Beyond exceeding the authority granted to the CDC under 42 U.S.C. § 264 and the relevant regulations, the FTMM also constitutes an unconstitutional delegation of legislative power to the CDC.

734.   To comply with the non-delegation doctrine, a statute must delineate: (1) a general policy; (2) the agency to apply it; and (3) the boundaries of the delegated authority. See Mistretta v. United States, 488 U.S. 361, 372-73 (1989). The boundaries of the delegated authority must meaningfully constrain the Executive Branch's discretion.

735.   If 42 U.S.C. § 264 could, in fact, be read to authorize the CDC to implement the Mask Mandate (which should not be the case), it does not provide adequate boundaries that meaningfully constrain the agency's authority. Accordingly, it violated the non-delegation doctrine. Plaintiffs allege that both on its face and as applied, the FTMM violated our constitutional rights.

736.    Plaintiffs were irreparably harmed until Judge Mizelle enjoined Federal Defendants from enforcing the FTMM on April 18, 2022. However, Plaintiffs still have no plain, speedy, and adequate remedy at law to prevent Federal Defendants from enforcing the next Mask Mandate, if not enjoined by this Court. Federal Defendants will continue to enforce the next Mask Mandate in violation of Plaintiffs' rights. Accordingly, declaratory relief is appropriate.

737.    An actual and substantial controversy exists between Plaintiffs and Federal Defendants as to our legal rights and duties with respect to whether the FTMM violated the United States Constitution. The case is presently justifiable because the FTMM applies to Plaintiffs on its face, and Plaintiffs will again face sanctions if we do not comply with the next mandate, even after May 11, 2023. Declaratory relief is therefore appropriate to resolve this controversy.

738.    The U.S. Government Accountability Office is a legislative branch government agency that provides auditing, evaluative, and investigative services for the United States Congress. It is the supreme audit institution of the federal government of the United States.

739.    The Government Accountability Office (GAO) is known as "the investigative arm of Congress" and "the congressional watchdog." GAO supports the Congress in meeting its constitutional responsibilities and helps improve the performance and accountability of the federal government for the benefit of the American people.

740.    GAO has the power to investigate and oversee the activities of the executive branch, the power to control the use of federal funds, and the power to make laws.

741.    Regarding the FTMM, the GAO said, "Accordingly, before it can take effect, the Mask Requirement is subject to the requirement that it be submitted to both Houses of Congress and the Comptroller General for review, which provides Congress a period of 60 days in which it may disapprove the rule using special procedures in accordance with the CRA."

742.    Because CDC and HHS did not submit the FTMM rule to Congress and the comptroller general, it never had any legal effect. Government Accountability Office Decision B-333,501 (Dec. 14, 2021);  (Exhibit 25).

743.     This is not a case where "federal courts do not have jurisdiction over statutory claims that arise under the CRA." Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 563 (9th Cir. 2019). The CRA is not involved. NO statutory claims arose under the CRA, because the CDC failed to follow procedures, without which the FTMM could not be enacted.

744.     On March 15, 2022, the Senate voted 57-40 to pass Senate Joint Resolution 37 disapproving of CDC's FTMM order. "[S]uch rule shall have no force or effect." (Exhibit 14).

745.     A court must "hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 USC § 706(2)(D).

746.     This Court has jurisdiction over our claims for declaratory relief.


**FIFTH CAUSE OF ACTION**: **[Federal Defendants] Unconstitutional Exercise of**
**Legislative Power; Violation of U.S. Const. Art. I, § 1 - The Public**
**Health Service Act is an unlawful delegation of legislative power as to**
**the Mask Mandate AND as to the Executive Order.**

747.     Plaintiffs incorporate the allegations of the previous paragraphs, and further allege:

748.     AS TO THE MASK MANDATE: Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." In other words, only Congress can make laws.

749.     If the Mask Mandate does not exceed Defendants' authority under 42 U.S.C. § 264 and its related regulations, then Section 264 constitutes an unlawful and unconstitutional delegation of legislative authority to the Executive Branch, which afforded the CDC the power to determine the rights of every person engaged in interstate travel, and to make a sweeping policy decision without any meaningful accountability to the electorate.

750.     AS TO THE EXECUTIVE ORDER: The Executive Order by the President is the basis of the executive branch's authority and its instructions to make these mandates. This Executive Order constituted an unconstitutional exercise of legislative power by the Executive

Branch, in that it is not authorized by any statute, and indeed does not even deign to cite any statutory basis.

751.    The Executive Order did not cite any national emergency, nor could it. No such emergency existed at the time that the Executive Order was entered. By then, the COVID-19 pandemic had affected travel in the United States for nearly a year.

752.    Congress could have enacted legislation requiring the wearing of masks on public conveyances during the year that preceded the Executive Order, but Congress did not do so.

753.    But the Senate did vote 57-40 on March 15, 2022, to pass Senate Joint Resolution 37 disapproving of CDC's FTMM order. "[S]uch rule shall have no force or effect." (Exhibit 14).

754.    No provision of Article II allows a President to enact nationwide edicts, merely because the Legislative Branch has failed to enact legislation that the President would prefer.

755.    The Executive Order is unprecedented in its breadth and impact. Never before has a President of the United States entered an executive order mandating that every citizen of the Republic be required to don a type of garment or device, whether when traveling or otherwise, for any reason whatsoever.

756.    The Executive Order contained no expiration date or sunset provision, and failed to provide any guidance as to when or under what conditions it may be deemed to have expired.

757.    The President and his federal agencies had no right to create such a legislation without getting it signed by Congress.


**SIXTH CAUSE OF ACTION: VIOLATION OF THE 10TH AMENDMENT: [FEDERAL DEFENDANTS]: VIOLATION OF THE TENTH AMENDMENT; CDC and HHS; the FTMM ran afoul of the Tenth Amendment, which gives states all powers not specifically given to the federal government, including the power to make laws relating to public health.**

758.     Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further
allege:

759.     The President's Executive Order that is the source and basis of their authority is
in violation of the U.S. Constitution. The Tenth Amendment to the United States Constitution
provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited
by it to the States, are reserved to the States respectively, or to the People." U.S. Const. Am. X.
The mask mandates are built on this and violate Plaintiffs' constitutional rights.

760.     The Executive Order impedes on the traditionally-recognized prerogative of the
States to protect the public health of their inhabitants under their general police power. The public
health power, including the power to quarantine, is still understood as a function of state police
power, with the federal role being limited to measures that are "distinctly limited in time, scope,
and subject matter." Florida v. Becerra, 2021 Dist. LEXIS 114297 at *43-44.

761.     The Executive Order contained no finding that the public health authority of the
States had somehow been inadequate, and contained no finding explaining why action by the
Federal government was suddenly warranted or necessary.

762.     On the contrary, all evidence points to the fact that President Biden created his
Executive Order in order to keep his campaign promise of forcing masks, without following the
legal process, and without even determining if it was necessary from a health perspective at all.

763.     As such, the Executive Order violated the Separation of Powers between the
States and the Federal Government because the federal government may not pre-empt the states'
authority when it comes to regulating public health within their own borders.

764.     The Mask Mandate violates the Tenth Amendment because the FTMM applied to
intrastate travel, including taking a rideshare car or transit bus just one mile, during which there
is no nexus to interstate commerce. Requiring individuals to wear a mask compels them to
engage in an activity that is not even commercial in nature. Intrastate travel "is an everyday right,
a right we depend on to carry out our daily life activities. It is, at its core, a right of function."
Johnson v. Cincinnati, 310 F.3rd 484, 498 (6th Cir. 2002).

765.    Neither the CDC nor the HHS may rely "on only a conclusory and dubious but self-serving generalization that non-federal measures are inherently insufficient to protect public health and safety." Florida v. Becerra, No. 8:21- cv-839 (M.D. Fla. June 18, 2021) (enjoining CDC's Conditional Sailing Order for cruiseships); aff'd No. 21-12243 (11th Cir. July 23, 2021).

766.    Twenty-two states have sued to strike down the Mask Mandate. See Van Duyne v. CDC, No. 4:22-cv-122 (N.D. Tex.); Florida v. Walensky, No. 8:22-cv-718 (M.D. Fla.). As 21 of them argued in filing a challenge to the Mask Mandate last year, the mask mandate "harms Plaintiffs' sovereign interests. "Many Plaintiffs have laws or policies prohibiting or discouraging mask requirements in contexts where the mask mandate applies. ... the mask mandate harms the Plaintiffs' quasi-sovereign interests in the health, safety, and welfare of their citizens. Forced masking ... causes a variety of negative health consequences, including psychological harms, reduced oxygenation, reduced sanitation, and delayed speech development." Complaint, Florida v. Walensky.

767.    There is no language in the U.S. Code indicating Congress' intent to invade the traditionally state-controlled realms of intrastate transportation and public health by forcing all passengers and workers to wear a mask. The Court requires "a clear indication" from Congress that it meant to "override[] the usual constitutional balance of federal and state powers" before interpreting a statute "in a way that intrudes on the police power of the States." Bond v. United States, 572 U.S. 844, 858, 860 (2014). The Mask Mandate "intrudes into an area traditionally and principally reserved to the states. ... The federal government is one of limited, enumerated powers. ... This principle is implicit in both the structure and text of the Constitution and was made express by the 10th Amendment. ... [States have the] power to prohibit vaccination from being compelled. Consistent with that authority, Arizona has enacted laws prohibiting State and local government entities from imposing vaccine mandates." Brnovich v. Biden, No. 21-cv- 1568 (D. Ariz. Jan. 27, 2022) (enjoining vaccine mandate for federal contractors).

768.    Congressional intent was clear throughout the pandemic: It has left decision-making about masks, lockdowns, business closures and restrictions, school shutdowns, limits on the size of public gatherings, and other mitigation measures up to the states. The only vote taken

by either chamber of Congress on masks was the Senate's 57-40 decision March 15, 2022, to terminate the Mask Mandate. (Exhibit 14).

769.    "'The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.' ... if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that [the federal government] is without power to regulate. ... To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." United States v. Lopez, 514 U.S. 549 (1995).

770.    If we use public transportation such as a train at Los Angeles Union Station or a bus at the Riverside Greyhound Bus Station or BART in San Francisco or an Airport Shuttle from SNA to ONT to visit a friend, that's a purely non-economic intrastate activity not subject to federal regulation pursuant to the 10th Amendment. The mask mandate, just like "…the [vaccination] Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power. A person's choice to remain unvaccinated and forgo regular testing is noneconomic inactivity. Cf. NFIB v. Sebelius, 567 U.S. 519, 522 (2012) (Roberts, C.J., concurring); see also id. at 652-53 (Scalia, J., dissenting). And to mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power. Zucht v. King, 260 U.S. 174, 176 (1922)." BST Holdings, LLC. v. Occupational Safety & Health Admin., No. 21-60845, 15 (5th Cir. Nov. 12, 2021).

771.    Furthermore, the Mask Mandate required states and their political subdivisions that operate transit systems, airports, train stations, etc. to enforce federal orders mandating masks – even when those federal orders directly conflict with the laws and policies of all 50 sovereign states.

772.    "The power of the Federal Government would be augmented immeasurably if it were able to impress into its service – and at no cost to itself – the police officers of the 50 States.

... [T]he Federal Government may not compel the States to implement, by legislation or executive

action, federal regulatory programs...” Printz v. United States, 521 U.S. 898, 919-920 (1997).

773.    CDC's Health Directives apply not only to travelers, but all employees working

in the transportation sector – most of whom never cross state lines and many of whom work for

state governments and their subdivisions. But the Constitution does not permit the CDC to

commandeer the states to enforce its policies. “The Federal Government ... may not compel the

States to enact or administer a federal regulatory program.” New York v. United States, 505 U.S.

144, 188 (1992).

774.    “It is an essential attribute of the States' retained sovereignty that they remain

independent and autonomous within their proper sphere of authority. ... even when the States are

not forced to absorb the costs of implementing a federal program, they are still put in the position

of taking the blame for its burdensome- ness. ... The Federal Government may neither issue

directives requiring the States to address particular problems, nor command the States' officers,

or those of their political subdivisions, to administer or enforce a federal regulatory program. It

matters not whether policymaking is involved, and no case-by-case weighing of the burdens or

benefits is necessary; such commands are fundamentally incompatible with our constitutional

system of dual sovereignty.” Printz v. United States, 521 U.S. 898, 919-920 (1997).

775.    “[I]f Congress intends to alter the “usual constitutional balance between the States

and the Federal Government,” it must make its intention to do so “unmistakably clear in the

language of the statute.” Will v. Michigan Dept. of State Police, 491 U.S. 58, 65 (1989). There

is no “unmistakably clear” language in any statute indicating Congress' intent for the CDC to

invade the traditionally state-operated arena of public health and intrastate transportation by

ordering travelers and employees to don masks.

776.    “Our reading of the statute's text accords with the principle that Congress does

not casually authorize administrative agencies to interpret a statute to push the limit of

congressional authority. That principle has yet greater force when the administrative

interpretation alters the federal-state framework by permitting federal encroachment upon a

traditional state power” such as public health and intrastate transportation. “Agencies cannot

discover in a broadly worded statute authority to supersede state ... law. Instead, Congress must
'enact exceedingly clear language if it wishes to significantly alter the balance between federal
and state power..." Tiger Lily v. HUD, 5 F.4th 666 (6th Cir. 2021).

777. The decision to impose a nationwide mask mandate on all forms of transportation
is one of vast economic and political significance. The Mask Mandate impacted about 2 million
airline passengers per day and an estimated 66 million Americans (about 20% of the population)
that use surface public transportation and/or work in the transport sector each day. It's hard to
think of any federal agency's directives that directly affect more people every single day than
the Mask Mandate.

778. Mask mandates have been the subject of "earnest and profound debate across the
country." Gonzales v. Oregon, 546 U.S. 243, 267 (2006). There were statewide mask mandates
put into place at some point during the pandemic by 40 states. However, in every state — even
in California — the mandate was repealed, ending those requirements.

779. "[T]he Tenth Amendment affirms the undeniable notion that under our
Constitution, the Federal Government is one of enumerated, hence limited, powers. ...
Accordingly, the Federal Government may act only where the Constitution authorizes it to do
so. ... The Constitution, in addition to delegating certain enumerated powers to Congress, places
whole areas outside the reach of Congress' regulatory authority." Printz v. United States, 521
U.S. 898, 937 (1997) (Thomas, J., concurring).

780. "Where the federal government seeks to preempt state law in an area that the
States have traditionally occupied, there is a strong presumption that the historic police powers
of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose
of Congress." Brnovich (cleaned up), citing Wyeth v. Levine, 555 U.S. 555, 565 (2009). "A
power not delegated [to the federal government] includes the state's police power, which 'is
defined as the authority to provide for the public health, safety, and morals' of the state's
population." Florida v. Nelson, No. 8:21-cv-2524 (M.D. Fla. Dec. 22, 2021) (enjoining vaccine
mandate for federal contractors), quoting Barnes v. Glen Theatre, 501 U.S. 560, 569 (1991).
"[T]he regulation of health and safety matters is primarily, and historically, a matter of local

concern. See Rice v. Santa Fe Elevator Corp., 331 U.S. at 230." See also Hillsborough County
v. Automated Medical Labs, 471 U.S. 707, 720 (1985).

781.    Even if masks were effective at reducing COVID-19 spread (but they are not and
never were), "People, for reasons of their own, often fail to do things that would be good for
them or good for society. Those failures – joined with the similar failures of others – can readily
have a substantial effect on interstate commerce. Under the Government's logic, that authorizes
Congress to use its commerce power to compel citizens to act as the Government would have
them act. That is not the country the Framers of our Constitution envisioned." NFIB v. Sebelius,
567 U.S. 519, 554 (2012).

782.    And here the Court reviews not an act of Congress, but orders of executive
agencies, which must be given even less weight when considering encroachment on powers the
Tenth Amendment reserves to the states and to the people. Not for a single day can a CDC issued
Mask Mandate pre-empt the laws of all 50 states that don't require face coverings. "[T]he
emergency regulation purports to pre-empt state laws to the contrary." NFIB v. Dept. of Labor,
No. 21A244 (U.S. Jan. 13, 2022).

783.    "This Court is not a public health authority. But it is charged with resolving
disputes about which authorities possess the power to make the laws that govern us under the
Constitution and the laws of the land. ... There is no question that state and local authorities
possess considerable power to regulate public health. They enjoy the 'general power of
governing,' including all sovereign powers envisioned by the Constitution and not specifically
vested in the federal government. ... The federal government's powers, however, are not general
but limited and divided. ... Historically, such matters have been regulated at the state level by
authorities who enjoy broader and more general governmental powers." Id. (Gorsuch, Thomas,
& Alito, JJ., concurring).


**SEVENTH CAUSE OF ACTION: [FEDERAL DEFENDANTS]:VIOLATION OF
THE ADMINISTRATIVE PROCEDURE ACT: The International Traveler Testing**

**Requirement exceeds the agencies' statutory authority under the Public Health Service Act.**

784.    Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further allege:

785.    Plaintiffs travel internationally, and are hindered by this illegal regulation/requirement.

786.    The ITTR exceeds CDC and HHS' authority under § 361 of the Public Health Service Act. 42 U.S.C. § 264. Section 361 does not include any authority to test an American citizen departing a foreign nation for the USA for a communicable disease.

787.    Section 361 does not authorize CDC and HHS to make a decision of such economic and political significance.

788.    The Court should hold unlawful and set aside the ITTR because CDC and HHS acted in excess of statutory authority. 5 U.S.C. § 706(2)(C).

789.    The ITTR did not expire; On June 12, 2022, rather CDC rescinded the international traveler testing order, but revoked it with a stern message that it could be re-imposed at any time the agency thinks it necessary. It did immediately reimpose it on travelers from certain countries and areas such as Hong Kong.[18]

790.    There is no question, that upon a resurgence of Covid hospitalizations, this will be reinstated. There is much talk in the news now of resurgence of Covid.  Many companies, colleges, and organizations have already reinstated some restrictions.

791.    In addition to the APA, since the government is required by statute to enforce the terms of international agreements that the United States has ratified related to the aviation sector, any such ITTR requirements that restrains liberty of movement of the disabled by not permitting them to fly without a medical clearance, remains a violation of the International Covenant on Civil & Political Rights as well as a violation of guidelines from the International Civil Aviation Organization ("ICAO"). We deserve to have our claims decided in District Court regardless of

---

[18] https://www.cdc.gov/media/releases/2022/p1228-COVID-china.html

whether the Testing Requirement is currently only partially in force. Thus, Plaintiffs' Causes of Action #'s 11-14 are not moot.

792.    As this Court determined, none of these claims are moot. CDC and HHS still want to maintain authority to mandate masks and virus testing in the transportation sector, and just like us they waited for a resolution of two appeals of conflicting decisions about the policies' legality that remain undecided before the 11th Circuit. While that particular Circuit Court eventually decided that it is moot for now, many other circuits disagreed.

793.    When the Hon. Judge Mizelle handed down her decision, the Justice Department announced it would appeal but not seek an emergency stay, meaning the mandate would not be enforced pending the 11th Circuit's review of the case from Florida.

794.    The Federal Defendants want to reinstitute it; this is why they appealed the worldwide vacatur by the Hon. Judge Mizelle in Health Freedom Defense Fund v. Biden, No. 8:21-cv-1693 (M.D. Fla. April 18, 2022). Their plan was, if the 11th Circuit reverses, the mandate would immediately go back into effect. Remember, it was never rescinded.

795.    What seems so obvious to the average citizen is that Federal agencies — i.e., the CDC, the HHS, the DOT, the DOJ, the TSA, the NIH and maybe some others — are working together towards these goals of mandating masks and travel entry restrictions/requirements. We should believe them when they file a brief and tell us in no uncertain terms that this issue is not moot, and that when given the go-ahead, they will reinstate the mandates, and enforce those mandates exactly as they have done in the past, deliberately discriminating against those who cannot safely don a face covering. We cannot imagine a scenario that would be less moot than this case.

796.    The Eleventh Circuit decision is not binding on this Court. The Supreme Court decided in two Covid restrictions cases that they are not moot.  The TSA themselves say that they plan to continue their mask mandate, and their case is not moot, and the DC Circuit agreed with them in Wall v. TSA.  The TSA's mask mandate was built on the CDC recommendations. It is all intertwined.

797.    The DC Circuit writes the following: "Because there is a more-than-speculative chance that the challenged conduct will recur, these cases are not moot." Wall v. Transportation Sec. Admin., No. 21-1220, 2023 WL 1830810, at *2 (D.C. Cir. Feb. 9, 2023).

798.    This district court absolutely can redress the injuries that reimplementation of the FTMM and/or ITTR would cause us, by issuing an injunction prohibiting its reinstatement at least with respect to American citizens.


**EIGHTH CAUSE OF ACTION: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: [FEDERAL DEFENDANTS]: failure to observe the notice-and-comment procedure required by law before ordering the International Traveler Testing Requirement.**

799.    Plaintiffs Uri and Yvonne Marcus, who are American and Israeli dual citizens, have been restricted from flying to the United States because of the ITTR.

800.    Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further allege:

801.    All Plaintiffs travel internationally, and are hindered by this illegal regulation/requirement.

802.    The ITTR is an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. It represents the consummation of CDC's decision-making process with respect to requiring testing for anyone flying into the United States. And it affects our legal rights and obligations because it prevents us from flying into the USA without obtaining an expensive, time-consuming, and unreliable COVID-19 test.

803.    The APA requires agencies to issue rules through a notice-and-comment process. 5 USC § 553.

804.    The ITTR is a rule within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 USC § 551(4).

805.    CDC issued the ITTR without engaging in the notice-and-comment process. 5 USC § 553.

806.    Good cause does not excuse CDC's failure to comply with the notice-and-comment process. 5 USC § 553(b)(3)(B).

807.    The Court should hold unlawful and set aside the ITTR because it violates the APA's notice-and-comment requirement. 5 USC § 706(2)(D).

808.    This Court can issue an injunction prohibiting this action, which will remedy the claim.

**NINTH CAUSE OF ACTION: [FEDERAL DEFENDANTS]: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT: Taking arbitrary and capricious agency action in ordering the International Traveler Testing Requirement.**

809.    Plaintiffs Uri and Yvonne Marcus, who are American and Israeli dual citizens, have been restricted from flying to the United States because of the ITTR.

810.    Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further allege:

811.    All Plaintiffs travel internationally, and are hindered by this illegal regulation/requirement.

812.    The administrative record shows that CDC and HHS failed to consider the burden of requiring all airline passengers to obtain a negative COVID-19 test within one day of departure.

813.    The administrative record shows that CDC and HHS failed to consider that travelers arriving into the United States by land or sea – including millions of illegal aliens crossing the border from Mexico – pose the same or higher risk of bringing corona virus into the country than travelers arriving by airplane.

814.    The administrative record produced by CDC and HHS fails to articulate any rationale for why airplane travelers should be tested for COVID-19 within a day of entering the United States but not those crossing by land or sea.

815.    The ITTR has not stopped new COVID-19 variants from entering the United States, as is its stated purpose.

816.    The Court should hold unlawful and set aside the ITTR because it is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A)

817.    This Court can issue an injunction prohibiting this action, which will remedy the claim.


**TENTH CAUSE OF ACTION**: [FEDERAL DEFENDANTS]: VIOLATION OF THE SEPARATION OF POWERS: The International Traveler Testing Requirement is an improper delegation of legislative power.

818.    Plaintiffs Uri and Yvonne Marcus, who are American and Israeli dual citizens, have been restricted from flying to the United States because of the ITTR.

819.    Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further allege:

820.    All Plaintiffs travel internationally, and are hindered by this illegal regulation/requirement.

821.    The U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1. Under the nondelegation doctrine, Congress cannot transfer legislative power to the Executive Branch. Acts of Congress must supply an intelligible principle to guide the Executive Branch's enforcement discretion.

822.    If the Court finds it does authorize the ITTR, § 361 of the Public Health Service Act (42 U.S.C. § 264) violates Article I's Vesting Clause and the separation of powers because Congress delegated legislative power to CDC and HHS with no intelligible principle to guide their discretion. That section authorizes CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases … from one State or possession into any other State or possession." 42 U.S.C. § 264(a). The statute further provides that CDC may take certain specific measures as well as "other measures, as in [its] judgment may be necessary." *Id.*

823.    If § 361 is so broad as to authorize the ITTR, then Congress provided no intelligible principle to guide CDC's discretion to take actions that "are" or "may be necessary" to "prevent the introduction, transmission, or spread of communicable diseases." *Id.* Vesting CDC with such broad authority and discretion without an intelligible principle violates the non-delegation doctrine.

824.    Notably Congress has declined numerous times during the 25-month-long COVID-19 pandemic to enact into law any traveler testing requirement.

825.    The Court should declare that § 361 of the Public Health Service Act is unconstitutional because it violates Article I and the separation of powers.

826.    The Court should hold unlawful and set aside the FTMM because it is "found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

827.    This Court can issue an injunction prohibiting this action, which will remedy the claim.

**ELEVENTH CAUSE OF ACTION: ALL DEFENDANTS:**

42 U.S. Code § 1983 - Civil action for deprivation of rights under the color of the law

828.    Plaintiffs incorporate the facts and allegations of the prior paragraphs, and further allege:

829.    The airline defendants and their employees, the medical defendants and their employees, and the federal agencies and their employees are in violation of 42 U.S. Code § 1983 - Civil action for deprivation of rights ("1983"), as they violated the various counts listed herein that are for discrimination against someone with a disability. Some directly and others through participation and aiding and abetting.

830.    The statute reads as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or

other proper proceeding for redress…"

831.     Typically, a 1983 violation is for law enforcement and police. There is an

exception, when a private person is acting under the color of law.

832.     " 'Private persons, jointly engaged with state officials in the prohibited action, are

acting "under color" of law for purposes of the statute. To act "under color" of law does not

require that the accused be an officer of the State. It is enough that he is a willful participant in

joint activity with the State or its agents,' " quoting United States v. Price, 383 U.S., at 794, 86

S.Ct., at 1157." Lugar v. Edmondson Oil Co., Inc., 102 S.Ct. 2744, 2756, 457 U.S. 922,

941(U.S.Va.,1982).

833.     The Government created laws unlawfully, and recruited the flight crew to enforce

them together. The police come and will remove a person who violates these fake laws. This is

certainly included as "under the color of the law."

834.     The flight crew believe that they have a higher authority, a quasi police power

while on the plane.

835.     Section 46504 of Title 49, United States Code (formerly section 1472(j) of Title

49 Appendix) sets forth the offense of interference with a flight crew member or flight attendant

within the special aircraft jurisdiction of the United States, which is defined in 49 U.S.C. §

46501(2). The statute applies to any "individual on an aircraft in the special aircraft jurisdiction

of the United States who, by assaulting or intimidating a flight crew member or flight attendant

of the aircraft, interferes with the performance of the duties of the member or attendant or lessens

the ability of the member or attendant to perform those duties." The statute provides for up to 20

years imprisonment, and further provides for imprisonment for any term of years or life if a

dangerous weapon is used. Interference with a flight crew member or attendant is a general intent

crime, and does not require a specific intent either to intimidate the flight crew member or

attendant or to interfere with the performance of his or her duties. United States v. Grossman, 131 F.3d 1449 (11th Cir. 1997).

836.    The flight attendants nowadays are constantly utilizing that power. They threaten people if they don't put that phone away, or they don't sit in their seat, they'll have them arrested and have the police waiting for them when the plane lands. They bark orders; "do not take pictures," "put up your mask," "move your seat to the upright position," and so on.

837.    Try and imagine what would happen if a person pulls out a cigarette on a flight, lights it, and begins to smoke it. That person would be physically removed from his seat to the rear of the plane, the cigarette taken away, and the police waiting for him when he lands.

838.    If Plaintiffs were to ignore the mask demands from the airlines, and would have said "I have a disability, I cannot wear a mask, I'm entitled to fly without one," and then goes on any of the above listed airline defendants' planes without a mask, all hell would break loose and the police would be there instantly. The people enforcing the law until the police get there and the ones calling the police, are the flight attendants and the pilots.

839.    Maybe years ago, these people were there to serve and make sure that passengers had a good flight. It has changed to a point where they often believe that their main job is to maintain order and make sure everyone is following the laws. They go up and down the aisles barking put away your phone, move your seatback into the upright position, no hand luggage on the floor, and lift your mask to cover your nose.

840.    These Plaintiffs experienced multiple situations during Covid-19, where the flight attendants barked commands, expecting Plaintiff to follow orders, or else.

841.    The violations of this count directly caused Plaintiffs' injuries. This Court can provide redress for Plaintiffs' injuries.


TWELFTH CAUSE OF ACTION: [ALL DEFENDANTS] CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS: 42 U.S. Code § 1985 - Conspiracy to interfere with civil rights.

842.    For this and all other causes of action, plaintiffs reallege and incorporate by reference the allegations and facts contained in the previous paragraphs and all exhibits attached hereto as though set forth fully herein.

843.    All the Defendants conspired to interfere with Plaintiff's civil rights, by conspiring to deprive him of his right to fly and by conspiring to deny him his rights in all the counts listed herein.

844.    42 U.S. Code § 1985 - Conspiracy to interfere with civil rights. " If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;…"

845.    "…if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

846.    The Supreme Court requires that there be class-based animus. Those words are not in the statute. The concept is that Congress wrote the law initially in regards to racial discrimination, which is a class-based animus. By the fact that Congress did not specify racial discrimination, we can deduce that they meant to include any discrimination. When there is a class-base animus, it is discrimination. When there's no class basis, it is a deprivation of rights, and will not fit into the category of discrimination.

847.    The Supreme court said that disability as a labeled category, all- inclusive, is not a class-based animus for these purposes. We do not experience a concept of discrimination against all people that are disabled.

848.    Mentally disabled people, a sub-category of disabled people, however, can be a class-based animus. It is a specific group and for whatever drives a person or group to discriminate against race, such as hatred, jealousy, ignorance, or any of a million reasons, this can fit the requirements. We can imagine people having animus towards mentally disabled

people. On several cases the Supreme Court considered them a class-based animus. See Olmstead v. L.C., 1999 · Supreme Court of the United States.

849. While all disabled people are too broad of a category to be considered class-based, people with specific disabilities, such as those with disabilities towards masks, should fit well as a class-based disability.

850. Again, the exact animus may be difficult to define or understand. That does not take away the fact that the animus is there.

851. Animus against black people may be based on a distorted belief that black people are not clean, or uneducated. Animus against Jews may be the distorted belief and generalization that Jews are sly and dishonest. Maybe they'll say, "Jews control the world." Anyone with eyes and a brain know that to be untrue, but we will consider that class-based animus, and that ignorance and irrational bias and animus will drive discrimination. That's what 1985 comes to irradicate.

852. There needs to be a class that this group shares a specific characteristic that others do not have.

853. There needs to be an opportunity for animus, bias, anger, and/or fear that is directed toward or about this class. Otherwise, the fact that it is a class, does not justify it to be included in a conspiracy to discriminate statute. That is the meaning and understanding behind the requirement of class-based animus.

854. People with disabilities who, because of their disabilities cannot wear a mask, is a new class, created unfortunately by Covid-19, which has received and been the brunt of animus that we have not seen before in our lifetimes.

855. It may sound like an overreaction. We can tell you with great confidence that it is not. We welcome anyone to spend the day with any of us in places where masks are required and see the reactions and feel the animus. It is there, it is very strong, and it is open and in your face. For some reason, the same ones who are so caring when it comes to other causes, are completely intolerant to our situation. "If you can't wear a mask, then stay home," they say.

856.   The class is a unique group of people with somewhat of an uncommon disorder and/or medical disability, some physical, some mental, and some emotional.

857.   Living within this class and suffering from constant blatant disability discrimination, we often try to understand the perspectives of the offenders. Many have now filed complaints, and lawsuits against so many of the major corporations. Large corporations such as Apple, Starbucks, Walmart, Target, Lyft, Caesars, Amtrak MGM Resorts, Greyhound, NYU Langone Health, and at least 40 airlines. Many of these, are companies that feel confident in their virtue, to lecture us on right and wrong, yet the various Plaintiffs allege that they have discriminated against them and most of these companies are standing strong in their belief that they're entitled to discriminate.

858.   How could that be? How could such virtuous people discriminate? As horrible as it sounds, that is the nature of discrimination. Those who grew up in the 60's and 70's remember. There was rampant discrimination against black people, Jews, Hispanics, and probably a dozen or so others. Many of those people were virtuous, possibly church-going or religious in any other denomination. It is hard to understand. Discrimination, bias, racism, sexism, and so on do not make sense.

859.   That is the whole point of it. If it made sense, it would not be racism or discrimination. It would be pragmatic intelligent responses to reality. If a group of people all were dishonest, it would be prudent to avoid doing business with the whole lot. We don't believe that it would be discrimination. Racism, discrimination, bias, and the like are specifically closed-minded, inherited, brainwashed, and/or xenophobically driven irrational views of classes of people, that are harmful and hurtful to those classes. They hardly ever make any sense. Small children are seldom racist, because they were not yet conditioned to believe these irrational thoughts.

860.   There is a class of individuals that are disabled with the exclusive and unique result that they cannot wear a mask. There is a very powerful animus that exists throughout our people, our government, and from the top to the bottom, that pervades in our society.

861.    Congress created these statutes to irradicate these irrational biases, and this case fits right into the intent of these laws. Some of the attorneys mentioned that this is a prewar civil rights law and it is no longer in effect.

862.    With all due respect, we are under the impression that if congress did not repeal this law, it remains in effect.

863.    In Bray v. Alexandria Women's Health Clinic, 1993 · Supreme Court of the United States, we see that this statute is still completely in effect where applicable.

864.    All the defendants together with the unnamed defendants conspired to interfere with my civil rights. It is a big project and it took a lot of actors together to make this discrimination happen.

865.    The essential elements of a § 1985 claim is: 1) a conspiracy; 2) to deprive plaintiffs of equal protection or equal privileges and immunities; 3) an act in furtherance of the conspiracy; and 4) an injury or deprivation resulting therefrom. We meet all four elements in bringing this claim against the Airline Defendants.

866.    We expect to prove through discovery that the Defendants conspired – with each other, other air carriers, agencies, and companies, and within their own companies – to ban disabled flyers because of a discriminatory motive.

867.    The conspiracy is not driven by public-health considerations, as proven above, and since masks are totally worthless in reducing the transmission of respiratory viruses such as COVID-19 and harm human health.

868.    Rather the Airline Defendants are motivated by a class-based, invidiously discriminatory animus resulting in an unfounded, ridiculous fear that healthy, uninfected disabled travelers who can't wear a face mask are somehow a grave danger.

869.    The Supreme Court gave an example of class animus that would apply to this statute, as opposed to the case at hand, which was regarding abortions, and the class animus was not identifiable. "Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing

yarmulkes is a tax on Jews." Bray v. Alexandria Women's Health Clinic, (1993) US Supreme Court.

870.    There is some strange animus that many people in America have today, during this Covid pandemic, towards people with disabilities who cannot wear a mask. <u>It is not a fear of the disease, as the same animus does not exist towards those that wear the mask primarily on their chin.</u>

871.    The airline defendants that discriminated against Plaintiff, the federal agencies, and others that encouraged, instigated, and/or aided and abetted, and the others were all conspiring with others to deprive this Plaintiff of his civil rights, in violation of this section.

872.    Congress identified disabled airline passengers as a class of people specifically in need of legal protection. Congressional intent was to protect airline passengers from discrimination, not to empower the carriers to fly above the law.

873.    The conspiracy is to deprive these individuals of their human rights.

874.    The conspiracy here involves the constitutional right to travel,  for which no other remedy exists except a lawsuit under 42 U.S.C. § 1985(3). "The right to pass freely from State to State has been explicitly recognized as among the rights and privileges of National citizenship." *Twining v. New Jersey*, 211 U.S. 78, 97 (1908). "That right, like other rights of national citizenship, is within the power of Congress to protect by appropriate legislation." *Id. at 105-106*.

875.    There is no doubt that conspiring to prevent all disabled passengers from flying who medically can't safely wear a mask, constitutes an invidious discrimination against a protected minority.

876.    It will unquestionably require discovery for Plaintiffs to reveal the exact depth of the conspiracy, in light of the extensive facts Plaintiffs laid out in his Complaint. However, the fact that there was a conspiracy between all this parties is frankly obvious. These parties had a clear understanding between all of them that they will together not allow passengers to fly without a mask, even though they are disabled and cannot wear a mask.

877.     Plaintiffs allege that Airline Defendants as an industry conspired with each other, with federal agencies and the Medical Defendants involved, and with the individual employees therein to discriminate against them due to their disabilities.

878.     Defendants may suggest that there is no clear evidence of them conspiring together, like a taped conversation where they are heard discussing between each other and agreeing to discriminate against the disabled as a group. But that's not required by the statute. Take for example, if you see five members of the Ku Klux Klan walking down a street with clubs in their hand, and they find and beat up a black person, do we need to hear them on tape conspiring to get together and beat the person in order to claim conspiracy?! Of course not! The same goes for the airline industry and the federal agencies that instigated the discrimination.

879.     They are almost all as an industry, including the federal agencies that govern them, colluding and conspiring to discriminate against Plaintiff and those similarly situated.

880.     *Thomas v. Roach*, 165 F. 3d 137 - Court of Appeals, 2nd Circuit 1999, said, "A conspiracy 'need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.' *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir.1995) (quoting *United States v. Rubin*, 844 F.2d 979, 984 (2d Cir.1988))."

881.     The Airline Defendants and the other defendants very clearly show "a tacit understanding to carry out the prohibited conduct," and upon proper discovery, Plaintiff shall provide further evidence.

882.     The class-based animus alleged is about an unprecedented, difficult to believe animus that is obvious from our Complaint and dozens of other complaints and news stories, toward people with a specific disability that did not allow them to don a mask. While it is not the responsibility of the Plaintiffs to determine the source or cause of this animus, it is possible that the political divide in the country between pro-maskers and the anti-maskers caused them to have animus towards the mask-disabled, as they did not refuse to differentiate between the ones that do not want to wear masks for political reasons and those of us with actual mask-related disabilities.

883.     We can certainly get to the bottom of the animus during discovery, but the fact that there is a specific animus to people like us with mask related disabilities is absolute, and so thick that it can be sliced with a knife. We felt it every time we entered a store with a mask policy. Medical centers, airlines, courts and others, they would give us a dirty look, even when they finally did let us in. The animus is most definitely there and we will prove that animus before and/or during trial.

884.     "In the *Cameron* case, we affirmed a judgment for plaintiffs in an action brought by a supporter of an incumbent sheriff's opponent who was arrested while distributing campaign leaflets and who charged that his arrest was a part of a conspiracy to deprive him and other supporters of the sheriff's opponent of the equal protection of the laws. In affirming, we held "that § 1985(3)'s protection reaches clearly defined classes, such as supporters of a political candidate. If a plaintiff can show that he was denied the protection of the law because of the class of which he was a member, he has an actionable claim under § 1985(3)." *(emphasis ours)* [*Cameron v. Brock*,] 473 F.2d at 610." [*Glasson v. City of Louisville*, 518 F.2d 899, 912 (6th Cir. 1975)].

885.   In *Lake v. Arnold*, 112 F. 3d 682 - Court of Appeals, 3rd Circuit 1997, where a specific group of disabled people were considered a class-based group for this purpose, it says as follows: "Discrimination based on handicap, including mental handicap, like that based on gender, often rests on immutable characteristics which have no relationship to ability. Where this is the case, we are convinced that the discrimination is invidious and that the reach of section 1985(3) is sufficiently elastic that the scope of its protection may be extended. In reaching this conclusion we are influenced by a number of factors which lie outside our own conjecture or analysis. We begin with the explicit statement of Congress itself. In enacting the Americans With Disabilities Act, Congress found that: [I]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society."

886.   In *Farber v. City of Paterson*, 440 F. 3d 131 - Court of Appeals, 3rd Circuit 2006 it says, "the phrase "class-based invidiously discriminatory animus" would confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section *(emphasis ours)*."

887.   As Plaintiffs in this case, we are a perfect match to this description. The animus of the Airline Defendants, federal agencies and their employees have denied Plaintiffs the equality of rights to travel in every respect and in every reasonable way, as other citizens can, due to our disabilities which prohibited us from wearing a mask.

888.   As written in *Lake v. Arnold*, 112 F. 3d 682 - Court of Appeals, 3rd Circuit 1997, the Court said, "Our own jurisprudence, informed by the reasoning of our sister court, convinces us that the mentally retarded, as a class, are entitled to the protection afforded by

section 1985(3)." If the mentally retarded are entitled to 1985(3) protection in their quest to function in life with their limitations attached, and to pursue happiness in life to the fullest of their opportunities and abilities, however diminished, it cannot be that Americans whose disabilities prevent them from safely masking, and prevents them from breathing — even if that limitation is merely perceived in their minds — that they would also not be afforded the same protection of law, in the same pursuit of happiness in life to fullest of their opportunities and abilities.

889.    In *Life Ins. Co. of North America v. Reichardt*, 591 F. 2d 499 - Court of Appeals, 9th Circuit 1979, the Court held that "Courts construing § 1985(3) have not limited its protection to racial or otherwise suspect classifications. [16] *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975) (political opponents are a sufficient class) *(emphasis ours)*; *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973) (supporters of a political candidate are a sufficient class) *(emphasis ours)*; *Azar*

890.    *v. Conley*, 456 F.2d 1382 (6th Cir. 1972) (a single family is a sufficient class) *(emphasis ours)*. See also *Harrison v. Brooks*, 446 F.2d 404 (1st Cir. 1971). Reichardt's allegation that an invidiously discriminatory animus was the motivating force behind the disparate policy terms offered to women is thus sufficient to survive a motion to dismiss for failure to state a claim."

891.    The actions and inactions of all these defendants directly caused the injuries to the Plaintiffs. This Court can redress Plaintiffs' injuries and claims.


**THIRTEENTH CAUSE OF ACTION**: ALL DEFENDANTS: 42 USC § 1986:
**NEGLECTING TO PREVENT INTERFERENCE WITH CIVIL RIGHTS**

892.    For this and all other causes of action, plaintiffs reallege and incorporate by reference the allegations and facts contained in the previous paragraphs and all exhibits attached hereto as though set forth fully herein.

893.    Defendants, and employees of all the Defendants, including the Numerous Unnamed defendants (whose names will be obtained during discovery) were aware of the conspiracy to interfere with the civil rights of the disabled by banning Plaintiff and similarly disabled from all flights, or requiring unlawful and discriminatory demands, but did nothing to stop it. These Individual Defendants possessed the power to stop the conspiracy, but have not taken any action to do so.

894.    "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action…" 42 USC § 1986.

895.    Section 1986 creates a remedy against persons whose acquiescence make conspiracies to interfere with civil rights possible.

896.    Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiffs for neglecting to prevent interference with their civil rights.

897.    Plaintiffs' injuries and damages were a direct result of the Defendants' actions and inactions.

898.    Therefore, the Airline and Defendants are liable to Plaintiffs for  violating 42 USC § 1986.

899.    Plaintiffs includes all the facts above and the details of the cause of action of 1985 (3) into this cause of action. As is well known, the 1986 statute follows and is subject to the 1985 (3) statute.

900.    Plaintiffs allege that each Defendant herein could have stood up for the Defendants, for human rights, and for the federal and state laws, and could have stopped this

conspiracy. A conspiracy can only exist when the various people and entities conspire. Each and every Defendant could have and should have spoken out against the deprivation of our human rights. They did not, and therefore they are in violation of 1986, by neglecting to interfere and stop the discrimination, at least within their own company, the companies that they were advising, and/or their own part of the discriminations.

901.    The statute reads as follows: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action…"

902.    Plaintiff alleges that all the Defendants had knowledge and participated in the discriminations described herein. They each had the ability to stop the parts of the discrimination that they participated in. If just one airline of this group said "no, we will not discriminate," that alone would allow Plaintiff an ability to fly to certain destinations. That would have stopped a few of the acts of discrimination. All of these Defendants had the ability to stop many of the described acts of discrimination, and they all neglected to stop the discriminations. On the contrary, they were actively participating and encouraging further discrimination.

903.    The actions and inactions of all these defendants directly caused the injuries to Plaintiff.

904.    For example, if Medaire and Stat-MD actually followed the laws and advised their clients, the airlines that they must not discriminate against people with mask disabilities and that this conspiracy must stop, they would have likely listened and the conspiracy would have ended.

905.    If the federal defendants would have actually followed the laws and notified the airlines that they must not discriminate against people with mask disabilities and that this conspiracy must stop, they would have likely listened and the conspiracy would have ended.

906.    If each airline defendant would have conveyed to each other that this is illegal, immoral, and wrong, then the conspiracy would have ended. The same goes for each and every defendant herein, and for those that may be added at a later date, upon uncovering their identities through discovery, and upon leave of this court.

907.    Every Defendant herein had the knowledge that these wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and had the power to prevent or aid in preventing the commission of the same, but neglected and/or refused to do so. They instead participated in the conspiracy and were directly involved in causing such wrongful acts to be committed.

908.    This Court has the power to provide redress through damages and injunctions.


**FOURTEENTH CAUSE OF ACTION: ALL DEFENDANTS: Violation of the Rehabilitation Act ("RA") against airline defendants, and medical Defendants, and with the other defendants aiding and abetting and facilitating the discrimination.**


909.    The Plaintiffs reallege and incorporate by reference herein all of the facts and allegations contained in paragraphs above and in the exhibits attached, and further alleges:

DHHS Section 504 regulation at 45 CFR Part 84.

910.    "Discriminatory actions prohibited. (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others…"

911.    Many, if not all of the Airline Defendants have received federal contracts and/or funding, and most accepted federal financial assistance during the COVID-19 pandemic, and before that, subjecting them to the Rehabilitation Act.

912.    The agreements signed by those arrangements to get the federal funding, including but not limited to the payroll assistance program, have specific clauses in them confirming that the airline must abide by the RA, the ACAA, and all other relevant laws. These agreement terms are readily available online.

913.    Here is a copy of the relevant clause:

> **Non-Discrimination**
>
> **36. The Recipient shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including:**
>
> a.   Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), including Treasury's implementing regulations at 31 CFR Part 22;
>
> b.   Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794);
>
> c.   The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101–6107), including Treasury's implementing regulations at 31 CFR Part 23 and the general age discrimination regulations at 45 CFR Part 90; and
>
> d.   The Air Carrier Access Act of 1986 (49 U.S.C. § 41705).
>
> 11

914.    Defendants who are employees of such companies are bound by the company's responsibilities with regards to RA. The same goes for the attorneys for the airlines.

915.    The Federal agencies and their employees are required to abide by the RA, as their funding is all federal funding.

916.    Recipients of federal funds are prohibited from discriminating against the disabled. But the Airline Defendants have banned from their aircraft and terminals, all passengers with disabilities that cause them not to be able to wear a mask.

917.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

918.    "[T]he terms 'program or activity' means all of the operations of … an entire corporation, partnership, or other private organization, or an entire sole proprietorship — (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole…" 29 USC § 794(b).

919.    "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 USC § 794a(2).

920.    The rights of the disabled to be free from discrimination in all facets of society were later articulated by Congress in the Americans with Disabilities Act. Although the ADA does not apply to airlines, its statutory purpose should be used in interpreting the RA and ACAA.

921.    "Congress finds that — (1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination; (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (3) discrimination against individuals with disabilities persists in such critical areas as…

transportation … (4) … individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion… (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; (7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and (8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 USC § 12101(a).

922.   "It is the purpose of this chapter — (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities…" 42 USC § 12101(b).

923.   Defendants discriminated against Plaintiffs in violation of the RA.

924.   Defendants' actions and/or inactions directly caused the damages described herein.

925.   This court can offer redress by granting an injunction requiring defendants to abide by the laws, and to allow Plaintiff to travel on the airplanes without any different treatment than other people, but without ever having to wear a mask.

926.   Plaintiff submits to this Court that although the mask mandate is currently not in effect, the federal government is actively pursuing its reinstatement, and it is very likely that it will be reinstated by many States, municipalities, and even private businesses, therefore nothing in this Complaint should be deemed as moot.

927.   The airlines that this count is referring to are only those companies that are based and incorporated here in the United States. The two attorneys, and the employees of

those U.S. airlines are also included in this count.  The foreign airlines and their employees are excluded, unless through discovery information is provided that shows otherwise. Above, in the description of the parties, it states which airlines are U.S. based and which are foreign based.

928.    Medaire & STAT-MD also receive federal funding, and are thus subject to the RA, and in violation thereof.  See Medaire SEC filing which is readily available online at https://www.sec.gov/Archives/edgar/data/1337301/000095015306000862/p72053e10vk.ht m. It lists income of $572,000 in a previous year, and Medaire indicates that the federal government is a major customer in their market and that Medaire has the largest market share in their industry. Discovery will provide more information and specifics.

929.    STAT-MD is a medical organization that receives significant funds from the federal government, as do almost all hospitals and medical facilities.

930.    While a number of Federal District Courts in similar cases have held that the funds the Airline Defendants received from the government under the CARES ACT — as compensation in response to the economic crises created by COVID-19 — did not constitute a subsidy or federal financial assistance within the meaning of the RA statute, the courts were misled by the airlines into believing this conclusion. The basis for such a position was the specific limited purpose set by the government to use disbursed CARES ACT funds, solely to meet Payroll obligations. In these cases and in many others, the courts have made an error, due to the dishonesty of the airlines. The airlines never submitted to the courts the actual FINAL "Payroll Support Program 3 Agreement and Extension [PSP3 — OMB: 1505-0263]" that set into motion the CARES ACT Loan and Payroll Support Programs for Air Carriers , the same that each and every Airline Defendant signed on January 15, 2021 according to the U.S. Department of the Treasury.

931.    Had any honorable Federal Judge received a copy of the PSP3 Agreement, he or she would have effortlessly seen that on page 11 of that Agreement, there exists a "Non-Discrimination" clause at paragraph 36. This same Agreement will auto-download as a PDF

or MS WORD document by clicking on the desired link. The relevant provision is written with this language:

932.    The stipulation is clear and unambiguous. "The Recipient [Airline] shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including: (b) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794)."

933.    The contracts signed reflect these terms and clarify and confirm that the recipient of the funds agrees to abide by the RA.

934.    The CARES ACT, by and through its signed PSP3 Agreements with the recipient Airline Defendants actually DID PROVIDE an exception to the Supreme Court's general rule that the Rehabilitation Act does not apply to the airlines. This is no longer speculative or conclusory. It is a factual allegation backed solidly by written physical evidence. The inclusion of this provision in the PSP3 Agreement was deliberate and calculated by the government with a view to reduce and discourage the predictable flood of discrimination incidents the Airlines were prone to carry out without a built-in fail-safe incentive to abide by Congressional intention.

935.    This Court can provide redress for Plaintiffs' claim by providing an injunction, prohibiting these violations going forward.

**FIFTEENTH CAUSE OF ACTION**: **[AIRLINE DEFENDANTS; MEDICAL DEFENDANTS]; ⇨ Pursuant to violations of 14 CFR §§ 382.19(c)(1), (c)(2), 382.21 and 49 USC § 41705(a) — there exists a PRIVATE RIGHT of action for aggrieved Plaintiffs against Airline and Medical Defendants who effectively banned passengers unable to safely don a facemask, and who were NOT known to have a communicable disease.  VIOLATION OF AIR CARRIER ACCESS ACT ("ACAA")**

936.    For this and all other causes of action, plaintiffs reallege and incorporate by reference the allegations and facts contained in the previous paragraphs and all exhibits attached hereto as though set forth fully herein.

937.    Plaintiffs turn now to that which is also well established by the courts: a PRIVATE RIGHT of action does in fact exist for aggrieved Plaintiffs in the instant case. Please bear with us as we explain.

938.    The United States Department of Justice informs us; "The Supreme Court has established "an implied private right of action" under Title VI [to which Airline and Medical Defendants are beholden] leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination."[1]

939.    "[O]ur prior decisions have found an implied right of action, e.g., Cannon v. University of Chicago, 441 U.S. 677, 703 (1979), and Congress has acknowledged this right in amendments to the statute, leaving it "beyond dispute that private individuals may sue to enforce." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).

940.    "Our conclusion is consistent with the "well settled" rule that "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v. Hood*, 327 U.S. 678, 684 (1946); see also Franklin v. Gwinnett County Public Schools, supra, at 66. When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient compensates the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure. See *Guardians*, 463 U.S., at 633 (Marshall, J., dissenting) ("When a court concludes that a recipient has breached its contract, it should enforce the broken promise by protecting the expectation that the recipient would not discriminate. . . . The obvious way to do this is to put private parties in as good a

---

[1] https://www.justice.gov/crt/fcs/T6Manual9

position as they would have been had the contract been performed"). *Barnes v. Gorman*, 536 U.S. 181, 189 (2002)."

941.    In 1996, the Ninth Circuit Court of Appeals very clearly determined that there was a private right of action implied by understanding the intent of Congress. "[W]e are persuaded by the reasoning of other circuits which have held that Section 1374(c) implies a private right of action for "otherwise qualified handicapped individuals." Adiutori v. Sky Harbor Intern. Airport, 1996 WL 673805, at *3 (C.A.9 (Ariz.),1996).

942.    "We, therefore, believe that under the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433 (1964).

943.    There is no binding precedent at this point from the Ninth Circuit, and/or there was no en banc decision to deny such a right.

944.    Even the Supreme Court's Sandoval casehas no precedent for ACAA laws. It is referring to a different set of laws.

945.    The Supreme Court has clearly explained that the private right of action under Title VI exists only under § 601, for cases of intentional discrimination.

946.    "[E]ntities receiving federal funds can be held liable under Title VI." Price v. Louisiana Dept. of Educ, 329 F. App'x 559, 561 (5th Cir. 2009).

947.    "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

948.    "(a) Three aspects of Title VI must be taken as given. First, private individuals may sue to enforce § 601. … Second, § 601 prohibits only intentional discrimination." Alexander v. Sandoval, 532 U.S. 275, (2001).

949.    This leaves Plaintiffs the mere task of alleging instances of intentional discrimination, which is a matter extreme simplicity, unfortunately, because the Defendants seem to agree that it was intentional.

950.    The task requires Plaintiffs to demonstrate: "(1) that it has suffered an irreparable injury;" *Ebay Inc. v. Mercexchange, L. L. C.*, 547 U.S. 388, (2006).

951.    For over 18 months, Plaintiffs suffered irreparable injury through physical harm and damage to our bodies, best summarized by "Frontiers" in their April 2023 report "Physio-metabolic and clinical consequences of wearing face masks." The report concluded that the "systematic review comprehensively revealed ample evidence for multiple adverse physio-metabolic and clinical outcomes of medical face masks … [which] can have long-term clinical consequences, especially for vulnerable groups e.g., children, pregnant, older adult, and the ill."[1]

952.    Plaintiffs also suffered irreparable harm through the loss of our ability to conduct business and generate income, the loss of our ability and constitutional right to live happy lives, being deprived of participating in rites of passage family events and visits, being deprived of the right to be free from discrimination leveled upon us on the basis of our medical disabilities and the loss of being treated with dignity and respect and be treated with human equality when it was not possible to safely don a face covering. Not one of these irreparable harms are remediable solely through monetary compensation.

953.    Private individuals may sue to enforce § 601 which prohibits intentional discrimination. In so doing, Plaintiffs must demonstrate "(2) that remedies available at law are inadequate to compensate for that injury;" Id.

954.    Our available remedies at law were, as we were told, to file administrative complaints with the DOT. The DOT rarely if at all acted. Rarely answered; never punished; rarely acknowledged; rarely functioned.

955.    To be fair, there were several cases against the DOT in Circuit Courts in related or similar cases, where petitioners asked the courts to enjoin the DOT to enforce ACAA's laws. However, the courts declined to compel the DOT to enforce them. ABADI v. DOT,

---

[1] "Frontiers" is the 3rd most-cited and 6th largest research publisher and open science platform, whose research journals are peer-reviewed by editorial boards of over 202,000 top researchers. See
  https://www.frontiersin.org/articles/10.3389/fpubh.2023.1125150/full.

Case # 22-1012 (a lawsuit in the DC Circuit Court of Appeals), and a similar case in the Second Circuit Case # 21- 2807.

956.    Both circuit courts held that there is no action required by the DOT to enforce the ACAA laws and therefore they claim to have no authority to review their action and/or inactions.   Petitioner has identified neither a legal requirement that the Department of Transportation ("DOT") resolved his complaints against airlines within a certain time period, nor a legal requirement that DOT take any other discrete action that it allegedly has failed to take." Abadi v. DOT, D.C. Circuit, Case # 22-1012, April 14, 2022.

957.    The entire DOT exhaustion of administrative remedies process, as turns out, may not have even been necessary "where it would be futile to resort to due process procedures or where it is improbable that adequate relief can be obtained by pursuing administrative remedies." Taylor v. Vermont Dept. of Educ., 313 F.3d 768, 789 (2nd Cir. 2002).

958.    Some Courts have concluded that "Plaintiffs lack a private right of action to pursue violations under the ACAA," and that "Congress did not intend to create a private cause of action under the ACAA." Thus, a court may hold that it is not at liberty to rewrite statutes or create rights of action where none exist.

959.    However, the US Department of Justice reaches the opposite conclusion. The Court previously has stated that it had "no doubt that Congress… understood Title VI as authorizing an implied private cause of action for victims of illegal discrimination." Cannon v. Univ. of Chicago, 441 U.S. 677, 703 (1979) (holding that an individual has a private right of action under Title IX).

960.    In Sandoval, 532 U.S. at 284-85, the Supreme Court explained that the private right of action under Title VI exists only under § 601, for cases of intentional discrimination.

961.    While it is true that the Court is not at liberty to rewrite statutes, it certainly can uphold rights of action where the Courts themselves have acknowledged they've already been created.

962.    The Sandoval Court stated, "The search for Congress's intent in this case begins and ends with Title VI's text and structure. The "rights-creating" language so critical to Cannon's § 601 analysis, 441 U.S., at 690, n. 13, is completely absent from § 602. Whereas § 601 decrees that "[n]o person . . . shall . . . be subjected to discrimination,"" § 602 limits federal agencies to "effectuat[ing]" rights created by § 601." Alexander v. Sandoval, 121 S.Ct. 1511, 1514, 532 U.S. 275, 276 (U.S.Ala.,2001)

963.    The Court stated, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Franklin, 503 U.S. at 70-71.

964.    "We recognized in Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), that § 2000d-7 "cannot be read except as a validation of Cannon's holding.' Id., at 72; see also id., at 78 (Scalia, J., concurring in judgment) (same). It is thus beyond dispute that private individuals may sue to enforce § 601." Alexander v. Sandoval, 532 U.S. 275, 280 (2001).

965.    Some courts seem to assume that Sandoval debunks and denies any and all implied rights of action. If it is not very clearly stated, then those courts assume that Sandoval says it cannot be implied by the court.

966.    That is not true and clearly evident from Sandoval itself. In Sandoval, while the Supreme Court decided that there was no private right of action for § 602, the Supreme Court was very firm about § 601 having a private right of action. To read from Sandoval that there is no such thing as an implied right of action at all, is completely wrong. Section 601 says "no person shall be subject to discrimination." Analysis from legal scholars light-years ahead of pro se Plaintiffs have rightly concluded there should be a right of action. Section 602 is about the regulating of those laws, and there is no indication that a private person, not a regulating agency, should have rights to pursue legal action. But that cannot be read into the laws and/or the intent of Congress when relating to § 601.

967.    When it comes to the ACAA, we find similar wording as that found in § 601. The entire ACAA is with regards to individuals with disabilities being entitled to be treated

like everyone else. There is no question, that similar to § 601, Congress wanted these laws to be enforced. The courts understood that, and therefore, when any court suggested that ACAA does NOT have a private right of action, they always followed that with a justification by describing the robust enforcement scheme set up by Congress to be handled exclusively by the DOT.

968.   Well, we have showed here how there is no robust enforcement scheme, as there is barely any enforcement at all. We have also shown how two Circuit Courts refused to review the DOT enforcement, presumably because there was no such mandate from Congress to enforce. If there was such a clear mandate from Congress, the Circuit Courts would be required to review the agency to determine if they were doing what Congress required of them.

969.   Once we determine that there is no alternative means of enforcement dictated by Congress, the ACAA disability laws become the same as § 601, where clearly Congress wanted no one to be discriminated against, and therefore absent an alternative avenue, the courts must consider the private right of action as implied by Congress. Just like in § 601, the court was confident in Sandoval that this is a given, that since Congress wanted to ensure that no one discriminates, people who were discriminated against must have a private right of action, especially when they have been deprived of any remedy whatsoever, through their alleged "robust and comprehensive enforcement scheme."

970.   Private individuals may sue to enforce § 601 which prohibits intentional discrimination, by demonstrating "(3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted;" Ebay Inc. v. Mercexchange, L. L. C., 547 U.S. 388, (2006).

971.   Factual Allegation: Plaintiffs were harmed by intentional discrimination. No remedy has been forthcoming. Defendants have admitted to noting. The balance of hardships and the threats they carry remain in place, and even after May 11, 2023, we expect them to be reinstituted at the mere whim of Federal Defendants and other agencies, when it fancies

them to do so, and Airline and Medical Defendants will be first off the blocks to illegally enforce those whims once again.

972.   Private individuals may sue to enforce § 601 which prohibits intentional discrimination, by demonstrating "(4) that the public interest would not be disserved by a permanent injunction." Id.

973.   Factual Allegation: Given the global testimony of Dr. Ashish Jha, the White House's top COVID-19 response coordinator, in an interview with the Philadelphia Inquirer streamed live on December 15, 2022, where he declared that "There is no study in the world that shows that masks work that well,"[1] it should by now be obvious that masking mandate was never purposed or tasked to reduce the spread of COVID on airplanes, but rather that they were issued for "CIVIL PROTECTION, NOT MEDICAL."

974.   Airline CEOs had already declared that "the airplane cabin is one of the safest indoor environments due to the combination of highly filtered air and constant air flow coupled with the downward direction of the air … high-quality masks are or those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so." (Exhibit 26).

975.   Thus, the public interest would not be disserved by a permanent injunction issued by this Court against the masking mandate as a matter of fact and as a matter of law, because money damages alone will not suffice. And with these things, we proceed.

976.   The ACAA, 49 USC § 41705, and its accompanying regulations, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who are known to have a communicable disease.

977.   The Airline Defendants' rules illegally assumed every single traveler was infected with COVID-19. This violated the regulation that "In determining whether an individual poses a direct threat, you must make an individualized assessment." 14 CFR § 382.19(c)(1).

---

[1] https://youtu.be/CMuvonB6Kvg. See also, https://tinyurl.com/4yasjkje.

978.   The Airline Defendants' mask policies don't did not provide for making an "individualized assessment" of whether someone was known to have COVID-19 or another communicable disease. Medical and Airline Defendants instead imposed a blanket policy, which assumed every passenger had a communicable disease and that every single traveler must wear a face covering, even though more than 99% of passengers every day were virus-free.

979.   Even if an airline determines "that the passenger does pose a direct threat, you must select the least restrictive response from the point of view of the passenger … For example, you must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2).

980.   Airlines are prohibited from requiring that a passenger wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR § 382.21.

981.   The Airline Defendants have since Summer 2020 and until the court in Florida stopped them from this illegal action, they illegally discriminated against disabled passengers with medical conditions who sought exemptions from the illegal blanket mask requirements, making it nearly impossible to obtain them. Even when obtained, numerous illegal provisions were attached as conditions.

982.   "In providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment." 49 USC § 41705(a).

983.   The Airline Defendants all have had policies of banning from future flights any passenger who had to remove his/her mask to breathe properly (Exhibit 27).

984.   All of these factors served as circumstantial evidence, probative of intent, wherein emerged a clear pattern of intentional discriminatory effect, over the course of over 18 long months.

985.    Departures from normal procedures were massive and extraordinary, which created a consistent pattern of actions of decision-makers that imposed much greater and intentional harm on minorities than on nonminorities.

986.    Plaintiffs have hereto sufficiently demonstrated "willful or repeated" and intentional violations of the relevant statutes. This triggers a private right of action under Title VI, to which Airline and Medical Defendants are obligated to defend.

987.    The actions and inactions of all these Defendants directly caused injuries to Plaintiffs.

**SIXTEENTH CAUSE OF ACTION: [AIRLINE DEFENDANTS; AIRLINE DEFENDANTS; & MEDICAL DEFENDANTS]; Pursuant to violations of the ACAA [14 CFR § 382.25] and the RA [29 USC § 794(a) — Requiring passengers who cannot safely don a facemask and seeking mask exemptions, to do so in advance.**

988.    For this and all other causes of action, plaintiffs reallege and incorporate by reference the allegations and facts contained in the previous paragraphs and all exhibits attached hereto as though set forth fully herein.

989.    "May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight? As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight." 14 CFR § 382.25.

990.    From the Dept of Justice Manual, "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

991.    Plaintiffs here factually allege that Airline Defendants and Medical Defendants violated 14 CFR § 382.25 and 29 USC § 794(a), by requiring disabled passengers who cannot safely don a facemask and who are seeking mask exemptions, to do so in advance.

992.    Plaintiffs exhausted administrative remedies, filing complaints with the DOT. The DOT's robust comprehensive enforcement scheme did not act or even investigate most of our complaints.

993.    When they did investigate, Airline Defendants were found to have violated laws, but the DOT declined to take any further action.

994.    When disputes over the DOT's final decision, action or inaction over disability-based discrimination claims arise, the passenger can file a petition for review in the U.S. Circuit Court of Appeals, pursuant to 49 U.S.C. § 46110.

995.    When Plaintiffs did that, the Circuit Courts claimed they had no authority to review the DOT's action and/or inactions.

996.    So we turned to the federal courts, where Airline Defendants asserted they are not subject to (1) the RA, (2) the ACAA or (3) UNRUH for easons of (1) 'payroll exclusion,' (2) 'no private right,' and (3) 'preemption' respectively. We have now argued and exposed these assertions as fabrications.

997.    Plaintiffs are every bit as much human beings with rights, as any public servant working for government. So, we ask this honorable Court, "What did we do wrong, that our claims should be dismissed?"

998.    Government agencies are not fulfilling their duties as demanded by Congress. Plaintiffs are right, because laws were written by the legislature to protect disabled Americans, and not to protect those who discriminate against us.

999.    Plaintiffs are happy with those laws. We are not happy with those who erase them, or claim they cannot be enforced. If Airline and Medical Defendants are not happy with our laws, or with the fact that they can and have been enforced by the courts, let them vote or lobby for someone else to change them.

1000.    In the meantime, we look to the brave actions of Judges who are willing to hold Airline and Medical Defendants accountable for their actions against the disabled.

1001.    One Judge — the Honorable Kathryn Kimball Mizelle from Florida — did just that. Dare we hope for another?

1002.   The actions and inactions of all these Defendants directly caused the injuries to Plaintiffs.

**SEVENTEENTH CAUSE OF ACTION: [AIRLINE DEFENDANTS; AND MEDICAL DEFENDANTS]; Pursuant to violations of the ACAA [14 CFR § 382.23(a); 14 CFR § 382.23(c)(1)] and the RA [29 USC § 794(a)] — Requiring a medical certificate from disabled passengers who cannot safely don a facemask. AND/OR ACAA [14 CFR § 382.23(d)] and the RA [29 USC § 794(a)] — Requiring passengers who could not safely don a mask, to undergo a medical screening in order to receive a mask exemption, without which they were banned from flying.**

1003.   For this and all other causes of action, plaintiffs reallege and incorporate by reference the allegations and facts contained in the previous paragraphs and all exhibits attached hereto as though set forth fully herein.

1004.   "Except as provided in this section, you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a).

1005.   "You may … require a medical certificate for a passenger if he or she HAS a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight." 14 CFR § 382.23(c)(1).

1006.   This requirement does not include SPECULATION that a person MIGHT have a communicable disease; evidence is required that the passenger actually HAS a communicable disease.

1007.   "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

1008.  "As a carrier, you may require that a passenger with a medical certificate undergo additional medical review by you if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition since the issuance of the medical certificate …" 14 CFR § 382.23(d).  There was certainly no justification for that in this scenario.

1009.  All Plaintiffs were restricted from flying because of the policies of these 4 airlines, who mandated that passengers who could not safely don a facemask to submit a medical certificate, also known as 'a doctor's letter or form, and/or a medical screening.'

1010.  Plaintiffs' have established that Airline Defendants have obligated themselves to the Civil Rights Act of 1964, the Rehabilitation Act of 1973 and the Air Carrier Access Act of 1986 by their own signatures on PSP CARES contract agreements that resulted in more than $13 Billion dollars being funneled into their bank accounts;

1011.  Plaintiffs' have established that there does in fact exist a PRIVATE RIGHT of action for ACAA violations for aggrieved Plaintiffs under all relevant statutes.

1012.  Thus, Plaintiffs here now factually allege that Airline Defendants and Medical Defendants violated 14 CFR § 382.23(a); 14 CFR § 382.23(c)(1) and 29 USC § 794(a) & 14 CFR § 382.23(d), requiring a medical certificate from disabled passengers who cannot safely don a facemask, and/or additional medical screening.

1013.  Plaintiffs exhausted administrative remedies, filing complaints with the DOT. The DOT's robust comprehensive enforcement scheme did not act or even investigate most of our complaints.

1014.  When they did investigate, Airline Defendants were found to have violated laws, but the DOT declined to take any action.

1015.  Defendants violated Plaintiffs' rights by requiring these medical certificates and/or a medical screening in violation of the ACAA and the RA, and the other relevant discrimination laws described herein. The actions and inactions of all these Defendants directly caused the injuries to Plaintiffs.

**EIGHTEENTH CAUSE OF ACTION**: VIOLATION OF THE **REHABILITATION ACT AND AIR CARRIER ACCESS ACT AGAINST AIRLINE DEFENDANTS AND MEDICAL DEFENDANTS:   Violation of ACAA 14 CFR Part 382; ACAA 382.25 A carrier may not require a passenger with a disability to provide advance notice that he or she is traveling on a flight.**

1016.  For this and all other causes of action, plaintiffs reallege and incorporate by reference the allegations and facts contained in the previous paragraphs and all exhibits attached hereto as though set forth fully herein.

1017.  ACAA 382.25 May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight?"

1018.  "As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight."

1019.  All the Airline Defendants violated this statute by discriminating against Plaintiffs due to their disability, by requiring him to reach out to them in advance, and by not allowing him to just purchase a ticket and board the plane, like anyone else without a disability.

1020.  All other defendants assisted, aided and abetted, and facilitated these violations.

1021.  Defendants' discriminations were the direct cause of Plaintiffs' injuries.

1022.  The discriminations were intentional and deliberate. The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.

1023.  NINETEENTH   CAUSE   OF   ACTION:   VIOLATION   OF   THE REHABILITATION ACT AND AIR CARRIER ACCESS ACT AGAINST AIRLINE DEFENDANTS and MEDICAL DEFENDANTS: Violation of ACAA 14 CFR Part 382: ACAA 382.33 Carriers cannot impose restrictions on passengers with a disability that they

*Case # 2:22-cv-02383-SB-AS*                    -147-                    COMPLAINT

do not impose on other passengers. The Plaintiffs reallege and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further allege:

1024.   ACAA 382.33 "May carriers impose other restrictions on passengers with a disability that they do not impose on other passengers?

1025.   "(a) As a carrier, you must not subject passengers with a disability to restrictions that do not apply to other passengers…"

1026.   All the Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by requiring him to do multiple things that were different than the requirements for the non-disabled.   One common requirement was the need for only Disabled people to show proof of a Covid test that was negative.   Non-disabled were not required.

1027.   All other defendants assisted, aided and abetted, and facilitated these violations.

1028.   Defendants' discriminations were the direct cause of Plaintiffs' injuries.

1029.   The discriminations were intentional and deliberate. The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.


**TWENTIETH CAUSE OF ACTION**: [AIRLINE DEFENDANTS; YET-TO-BE-NAMED INDIVIDUAL DEFENDANTS & MEDICAL DEFENDANTS]; **VIOLATION OF CAL. CIV. Code § 51 — THE UNRUH CIVIL RIGHTS ACT ("UNRUH").**

1030.   The Plaintiffs reallege and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further allege:

1031.   Defendants violated the California Laws against discrimination known as UNRUH. All the acts of discrimination that violate federal laws and are mentioned above, are also automatically violations of Unruh.

1032.   The Airline Defendants and their employees directly violated these laws.  The medical defendants aided and abetted, and even instigated and facilitated these violations.

1033.   UNRUH is not preempted by federal law, because as the Ninth Circuit clarifies, "[S]tate law is pre-empted ... if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " Cipollone, 505 U.S. at 516, 112 S.Ct. 2608 (quoting de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014)." National Federation of the Blind v. United Airlines Inc., 813 F.3d 718, 733 (C.A.9 (Cal.),2016).

1034.   UNRUH is a typical state disability group of laws specifically created to enhance and build on the federal disability laws, not to override or conflict with them.

1035.   When a passenger sends a complaint to the DOT for an ACAA violation, the automated response from the DOT includes the following: "The Department is limited to issuing cease and desist orders proscribing unlawful conduct by carriers in the future and assessing civil penalties payable to the government. The Department may only take such action through a settlement or after a formal hearing before an administrative law judge. Particularly egregious records of repeated violations may warrant the revocation of a carrier's economic authority to operate. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action." (Exhibit 28).

1036.   The DOT themselves confirm that state civil rights statutes were never intended to be preempted by federal statutes in aspects that the state is not conflicting with the federal. As mentioned above, Plaintiff's exhausted their administrative remedies, and now should be entitled to relief through State Civil Rights laws specifically created for this purpose.

1037.   See Segalman, where it says, "The Court first notes that, generally, "federal regulation of a subject—even thoroughgoing federal regulation—does not prevent states from adding remedies to the arsenal established by federal law." Radici v. Associated Ins.

Companies, 217 F.3d 737, 742 (9th Cir. 2000) (quoting NAACP v. American Family Mutual Ins. Co., 978 F.2d 287, 296 (7th Cir. 1992)).

1038.   Consistent with that general principle, the Ninth Circuit found in Gilstrap v. United Air Lines, "[t]he ACAA does not, however, preempt any state remedies that may be available when airlines violate those standards." 709 F.3d 995, 1010 (9th Cir. 2013)" Segalman v. Southwest Airlines Co., 2016 WL 146196, at *3 (E.D.Cal., 2016)

1039.   And further, it says, "Federal regulations "do[ ] not, however, preempt any state remedies that may be available when airlines violate those standards." Id.

1040.   See Foley, where the court states, "the mere existence of a detailed regulatory scheme does not by itself imply preemption of state remedies." Keams v. Tempe Technical Inst., Inc., 39 F.3d 222, 226 (9th Cir.1994) (citing English v. Gen. Elec. Co., 496 U.S. 72, 87, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)). In specific areas without pervasive regulations or other grounds for preemption, state law applies." Foley v. JetBlue Airways, Corp., 2011 WL 3359730, at *12 (N.D.Cal.,2011).

1041.   See the ninth circuit decision in Gilstrap v. United Air Lines, "The ACAA does not, however, preempt any state remedies that may be available when airlines violate those standards" Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1010 (C.A.9 (Cal.), 2013).

1042.   All the Airline Defendants operate flights into and out of airports located in California. As a result, they must obey California's UNRUH — CAL. CIV. CODE §§ 51, 52, 54 and 55 — laws protecting the disabled from discrimination. This Court must follow the Ninth Circuit, which has made clear many times that the Airline Deregulation Act does not pre-empt state antidiscrimination laws. "As used in a public utility sense, the term 'service' does not refer to alleged discrimination to passengers due to their disabilities." Newman v. American Airlines, 176 F.3d 1128, 1131 (9th Cir. 1999). See also Charas v. Trans World Airlines, 160 F.3d 1259 (9th Cir. 1998) (en banc); Taj Majal Travel v. Delta Air Lines, 164 F.3d 186, 194 (3rd Cir. 1998) (adopting the Ninth Circuit's approach).

1043.   See the Third Circuit's Decision in Elassaad v. Independence Air, Inc., "we are not persuaded that Congress intended the ACAA to preempt any state regulation of the

interaction between an air carrier and disabled passengers (or disabled persons in general…"
Elassaad v. Independence Air, Inc., 613 F.3d 119, 132 (C.A.3 (Pa.),2010).

1044.   UNRUH is specific to intentional discrimination. All the Defendants participated in this discrimination intentionally. They decided that although Plaintiffs have disabilities and the inability to wear a mask, they will require them to wear a mask or not allow them to fly. Some airlines required them to do things that other non-disabled passengers were not required to do. The Medical defendants, and the Federal Defendants participated fully and intentionally in these discriminations.

1045.   "[T]he court in Gilstrap found the ACAA preempted the state tort standard of care, but not the remaining tort law elements or remedies. See 709 F.3d at 1007 ("Gilstrap may still rely on California tort law to prove the other elements of her claims—breach, causation, damages, and remedies.")." Azocar v. Delta Air Lines, Inc., 562 F. Supp. 3d 788, 794 (C.D. Cal. 2021).

1046.   "[T]he court in Segalman … discussed the possibility, in dicta, that Gilstrap's "reasoning suggests that California law does provide remedies under [Unruh, CDPA], and common law of negligence in situations in which federal regulations provide the standard of care. See Segalman , 2016 WL 146196, at *3 (emphasis added)." Id.

1047.   "California law does provide remedies under the Unruh Act, Disabled Persons Act, and common law of negligence in situations in which federal regulations provide the standard of care or standard of discrimination." Segalman v. Southwest Airlines Co., No. 2:11-cv-01800-MCE-CKD, 7 (E.D. Cal. Jan. 11, 2016). Accordingly, the ACAA does not impliedly preempt Plaintiffs' Unruh Act claim.

1048.   All Plaintiffs have been discriminated against because of our disabilities on flights in and out of airports located in California.

1049.   "All persons within the jurisdiction of this state are free and equal, and no matter what their … disability, medical condition … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." CAL. CIV. CODE §51(b).

1050.  "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 … because the person is perceived to have one or more of those characteristics..." CAL. CIV. CODE § 51.5(a).

1051.  "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6." CAL. CIV. CODE § 52(a).

1052.  "Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section, and that conduct is of that nature and is intended to deny the full exercise of those rights, … any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint." CAL. CIV. CODE § 52(c).

1053.  "Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to facilities, … privileges of all common carriers, airplanes, … and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons." CAL. CIV. CODE . Civil Code § 51.1(a)(1).

1054.  "'Full and equal access,' for purposes of this section in its application to transportation, means access that meets the standards of Titles II and III of the Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards, it shall mean access that meets those higher standards." CAL. CIV. CODE 54.1(a)(3).

1055.  All counts against the Airline Defendants based on the Air Carrier Access Act may be enforced via California law since it adopts federal regulations as the standards the transportation sector must adhere to.

1056.  "Any person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 or otherwise interferes with the rights of an individual with a disability under Sections 54, 54.1 and 54.2 is liable for each offense for the actual damages and any amount as may be determined by a jury, or the court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($1,000), and attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights provided in Sections 54, 54.1, and 54.2." CAL. CIV. CODE § 54.3(a).

1057.  "The remedies in this section are nonexclusive and are in addition to any other remedy provided by law, including, but not limited to, any action for injunctive or other equitable relief available to the aggrieved party…" CAL. CIV. CODE § 54.3(b).

1058.  "Any person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code … may bring an action to enjoin the violation. The prevailing party in the action shall be entitled to recover reasonable attorney's fees." CAL. CIV. CODE § 55.

1059.  As described above, all Plaintiffs had interactions in California where they were discriminated against. Cindy Russo is a citizen of California and all her travels were to and from that state.

1060.  The Marcus's are Citizens of California and often need to travel to and from there to Israel, where they were residing at the time.

1061.  The Gordons both traveled to and from California as described above.  Much of the discrimination described happened in California.

1062.  The actions and inactions of all these Defendants directly caused the injuries to Plaintiffs.

**TWENTY-FIRST CAUSE OF ACTION: BREACH OF CONTRACT AGAINST THE AIRLINES DEFENDANTS: Alaska, Allegiant, American, Delta, Hawaiian, and Southwest threatened and carried out threats upon disabled Plaintiffs who could not safely don masks by denying us boarding, or subjecting us to worse consequences, when we never agreed to be subject to such consequences in the contract of carriage. Frontier and United's contract terms requiring face coverings are legally unenforceable.**

1063.   Eight airlines sold Plaintiffs tickets to fly on their airplanes.

1064.   All Airline Defendants threatened us, warned us and in many cases actually carried out those threats against disabled Americans/Plaintiffs when we failed to comply with masking directives. Plaintiffs were faced with unpleasant consequences, including but not limited to (1) being denied boarding; or when those threats and warnings were issued by airline personnel after boarding and during flight, we were told that (2) our names were being placed on no-fly lists; that (3) authorities were being notified and would be waiting for us at our destination arrival gates; that (4) we would be detained and interrogated; that (5) we would face delays; that (6) we would miss flight connections; that (7) we would be prevented us from returning home whether domestically, or abroad; and perhaps the greatest and most humiliating was that (8) in all cases all Plaintiffs were publicly shamed.

1065.   Such consequences to the ticket purchaser of any or all of these experiences which came about as a result of non-compliance with airline mask directives were never contractually codified in Defendant Airlines' contracts of carriage. Thus, this Cause of Action for Breach of Contract. The legal analysis follows:

1066.   The contracts of Carriage of FIVE of the EIGHT Defendant Airlines [ALASKA, AMERICAN, DELTA, HAWAIIAN and SOUTHWEST] never mention "COVID," "Masking Directives" or anything having to do with terms and conditions that would mitigate the transmission of a virus.

1067.   Airline Defendant ALLEGIANT AIR's contract of carriage (Exhibit 29) mentions inherent "Health Risks" associated with air travel and that passengers may contract a disease while aboard their aircraft.

1068.   TWO of the EIGHT Defendant Airlines [FRONTIER and UNITED] specified terms with regard to COVID, in the contracts of carriage.

1069.   First, FRONTIER's Contract of Carriage (Exhibit 30) states that they "may deny boarding to passengers who Frontier reasonably believes do not meet Frontier's COVID-19 screening measures [which] will include, but is not limited to … required wearing of facial coverings."

1070.   The screening measures that set criteria for who must don a mask are at the sole discretion of Frontier Airlines, and are "confined to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 220 (1995).

1071.   These measures, together with the measures taken by ALL Defendant Airlines CAN "be adjudicated without resort to outside sources of law." Smith v. Comair, Inc., 134 F.3d 254, 257 (4th Cir. 1998).

1072.   It is for these same measures that Plaintiffs seek "recovery solely for the airline's breach of its own, self-imposed undertakings." Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 220 (1995).

1073.   The Wolens exception DOES apply because the decision to implement FRONTIER's COVID-19 screening measures is obligated solely to Defendant FRONTIER's contractual terms of carriage, and to nothing else.

1074.   Thus, Wolens IS controlling, and this honorable Court can adjudicate Plaintiffs' contract claim precisely because it  "confine[s] itself to the terms of the parties' bargain," See Smith v. Comair, Inc., 134 F.3d 254, 258 (4th Cir. 1998).

1075.   Moreover, ALL Airlines Defendants admit in their contracts of carriage, this language — as seen in Defendant FRONTIER's contract, and similarly stated by all the rest — "In all cases, this Contract of Carriage will be subordinate to any applicable law."

1076.   This same contractual obligation, sourced solely in Airline Defendants' very own contracts of carriage, makes the contract subordinate to all applicable non-discrimination laws, precisely because the contractual clause IS sourced and enshrined in nothing external to the contract of carriage.

1077.   The second Defendant Airline that specified terms with regard to COVID in their contract of carriage, was UNITED (Exhibit 31).

1078.   Defendant United's contractual provision is enshrined under "Rule 21 — Refusal of Transport" and stipulates that for "[p]assengers who refuse to wear a mask or face covering while at the airport and/or onboard UA … [if UNITED] believe[s], in their sole discretion, that a failure to wear such a mask or facial covering may pose a risk to the health or safety of others; (I) UA has the right to refuse transport, on a permanent basis, any passenger who engages in any of the activities in this Rule. In addition, the activities enumerated in this Rule shall constitute a material breach of contract, for which UA shall be excused from performing its obligations under this contract.

1079.   So Defendant United Airlines, solely through their contract of carriage, "confined to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement" (Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 233 (1995)), stipulates that if they believe "in their sole discretion" that the refusal of a passenger to don a mask may pose a risk to the health or safety of others, this act would be deemed a material breach of contract, on the basis of which they may refuse to transport to that passenger — a claim that Plaintiffs dispute. Accordingly, this claim CAN "be adjudicated without resort to outside sources of law." Smith v. Comair, Inc., 134 F.3d 254, 257 (4th Cir. 1998), and because Plaintiffs seek "recovery solely for the airline's breach of its own, self-imposed undertakings." Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 220 (1995).

1080.   The Wolens exception DOES apply here because by that decision "in their sole discretion" under their own contractual terms and owing to nothing else, and not because of a decision to implement the FTMM — a federally-imposed obligation, which included provisions for passengers with disabilities who could not safely don a mask — Airline

Defendant UNITED seized for itself the right to refuse transport to Plaintiffs who could don a face covering — a claim that Plaintiffs dispute. UNITED has thus confined itself to the terms of the parties' bargain, for which Wolens IS controlling. See Smith v. Comair, Inc., 134 F.3d 254, 258 (4th Cir. 1998).

1081.   Moreover, under "Rule 3 — Application of Contract," Defendant Airline UNITED states with specificity, "This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies … In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on UA's operation, the latter shall prevail." Similar declarations are found in the contracts of carriage of each of the eight Airline Defendants, which it turn renders each Airline Defendant's contractually derived discretionary policies sourced and enshrined in nothing external to the contract of carriage, subordinate to ALL EXTERNAL non-discrimination laws promulgated by Congress.

1082.   Plaintiffs' dispute centers upon Defendant Airline's own reliance upon contracts of carriage, without resorting to any outside source of law that created our Breach of Contract Cause of Action when Defendants negated existing anti-discrimination laws, to which their own contract demands a subordinate posture. This provides Plaintiffs with the Wolson exemption precisely because Plaintiffs seek "recovery solely for the airline's breach of its own, self-imposed undertakings." Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 220 (1995).

1083.   Defendant Airlines claimed they had a legal contractual basis to threaten and act against the interests of Plaintiffs who could not safely don a face covering by means of (1) unpleasant consequences; (2) denying us boarding, preventing us from flying; (3) if discovered without a mask during flight, having our names placed on no-fly lists; (4) notifying authorities, such that they would be waiting for us at our destination arrival gates to detain and interrogate us; (6) causing us to experience travel delays; (7) missing flight connections; (8) being prevented from returning home whether domestically, or abroad; and (8) being

publicly shamed — when in fact, no legal contractual basis existed for any of these acts, as established by some of those very same contracts of carriage.

1084.   The breach of contract was solely with regards to the contract with the airline, "with no enlargement or enhancement based on state laws or policies external to the agreement." American Airlines, Inc. v. Wolens, 513 U.S. 219, 233 (1995), wherein Plaintiffs, inasmuch as Airline Defendants were concerned would "alleg[e] no violation of state-imposed obligations, but seek recovery solely for the airline's breach of its own, self-imposed undertakings." Id. at 220.

1085.   On the issue of safety, while it is true that ADA [i.e., the Airline Deregulation Act] allows air carriers to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety" (49 U.S.C.A. § 44902(a)(2)), the regulation is far more explicit.

1086.   That exact language of the statute allows an air carrier to refuse to transport a passenger who does not consent to a search of (1) his person when it is suspected that the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance; or of (2) his property in order to establish whether the property unlawfully contains a dangerous weapon, explosive, or other destructive substance, on the basis of which the carrier can decide if a passenger's withholding of his or her consent to be searched could be inimical to safety.

1087.   Plaintiffs in the instant case were never suspected of carrying or transporting a dangerous weapon, explosive, or other destructive substance. If unmasked, some airline workers may have believed — without definitive confirmation or proof — in possibly that Plaintiffs might be carrying a virus.

1088.   But according to a March 23, 2022 letter to President Biden from Airlines for America, the airline industry's largest trade group representing nearly all major U.S. airlines, and signed by SIX out of the eight Defendant Airline CEOs [ALASKA, AMERICAN, DELTA, HAWAIIAN, SOUTHWEST and UNITED], the signatories urged a repeal of the FTMM, citing that "Several studies … have concluded that an airplane cabin is one of the

safest indoor environments due to the combination of highly filtered air and constant air flow coupled with the downward direction of the air. Lifting the mask mandate in airports and onboard aircraft can be done safely as England has done. Importantly, the effectiveness and availability of high-quality masks for those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so."

1089.   In another letter to the White House dated one month earlier (February 25, 2022), the signatories wrote, "Travel businesses … implemented … safety that aligned with or exceeded guidance from the Centers for Disease Control and Prevention (CDC).

1090.   Airline CEOs never had a genuine concern for the safety of masked passengers in the presence of other passengers who could not safely don a mask. They were always more than confident that advanced air-filtration systems were more than sufficient to keep everyone safe from an airborne virus, regardless of who would or could wear a face-covering "if they chose to do so." This explains why most airlines never revised their contracts of carriage. Consequently, there existed no safety concerns that can be alleged as preempted by the ADA, under its own terms and provisions.

1091.   Airline Defendants thus cannot suddenly come before this Court and argue that a Wolens exception does not apply to Plaintiffs because the airlines are entitled to refuse to transport a passenger based on safety concerns in accordance with 49 U.S.C.A. § 44902(a)(2), precisely because "safety" from a virus does not apply within the meaning and context of the statute, and because according to Airline CEOs, "the combination of highly filtered air and constant air flow coupled with the downward direction of the air" would never reach or harm another passenger. Thus, there existed no concern for the "safety" of other passengers.

1092.   Nothing was written in any airline contract of carriage that sanctioned or justified a demand on the part of the airline to don a face-covering as a condition of carriage, else face unpleasant consequences; being placed on no-fly lists; notifying authorities; being detained and interrogated; causing travel delays; causing missed flight connections; preventing us from returning home, or being publicly shamed.

1093.   The screening measures and other retaliations against disabled Americans and Plaintiffs in this action constituted unmitigated breaches of contractual obligations, "without any enlargement or enhancement based on state laws or policies external to that contract" (Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 233 (1995)) that were executed at the Airline Defendants sole discretion, and yet at the same time, those very acts exceeded guidance from the Centers for Disease Control and Prevention (CDC).

1094.   Airline CEOs admitted that face coverings had nothing to do with passenger safety. And in any case, the order to follow federal guidelines, was exceeded, and thus NOT what the government had ordered, in that CDC guidelines included exemption for disability that Airline Defendants overturned, with the help of their hired guns, the Medical defendants.

1095.   They all relied in whole or in part upon their own contractual instruments containing self-imposed undertakings, from which Plaintiffs seek recovery.

1096.   On the matter of "service," Defendant Airlines refusal to transport a passenger who could not safely don a face covering was allegedly based on a perceived legal theory that an air carrier's "service" includes selective and discriminatory boarding privileges and procedures afforded only to the masked. According to this flawed theory, Plaintiffs' breach of contract claims would be preempted by the Airline Deregulation Act ("ADA") on the basis of its preemption clause, which states, "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C.A. § 41713(b)(1).

1097.   Once again, the SCOTUS DID recognize an exception to the ADA for contract claims, provided they "alleg[e] no violation of state-imposed obligations, but seek recovery solely for the airline's breach of its own, self-imposed undertakings." Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 220 (1995).

1098.   To qualify for this Wolens exception, Plaintiffs need not look any further than the contract of carriage itself, without relying upon the enactment or enforcement of a law,

regulation, or other provision related to "service" of an Airline Defendant, in order to establish that a breach of that contractual provision had in fact occurred.

1099.   No airline contract of carriage writes, defines or directs airline policy to prescribe the mandatory use of masks as a prerequisite to board a flight as part of a "service" provided by an air carrier.

1100.   No where in the definition of "service" in any contract of carriage does there exist language that suggests the provision of a "service" to protect passengers from the transmission of a virus, which may take place in the presence of unmasked passengers, by cajoling and even threatening them to don a mask.

1101.   The typical definition for "service" one finds is: "Scheduled Air Service means any current or future flight published on Southwest Airlines website, Southwest Airlines mobile apps, or in a computer reservation system used by Carrier."

1102.   In fact, Airline Defendant ALLEGIANT Airlines is honest enough to warn its customers via its contract of carriage that passengers contracting its carriage service comes with accepting certain health risks: "Carrier can offer no assurance that a passenger will not contract a viral or other disease while aboard an aircraft operated by Carrier or while using airport facilities utilized by Carrier. Accordingly, you hereby agree on behalf of yourself and anyone on whose behalf you make a purchase from Carrier, that neither Carrier nor any of its agents, directors, employees, officials or affiliated entities shall have any liability whatsoever in respect of disease, however contracted."

1103.   The Airline Defendants' contracts of carriage, on the other hand, DO contain provisions that are designed to mitigate occurrences of discrimination against the disabled. An airline's "service" here is defined by those contractual provisions that address discrimination, and is NOT defined by the provisions of 49 U.S.C.A. § 41713(b)(1). Thus, the Airline Deregulation Act does not preempt Plaintiffs breach of contract claims.

1104.   But even if the Deregulation Act were to preempt Plaintiffs' breach of contract claims related to boarding practices, wherein the airlines' refusal to grant exemptions from wearing of face-coverings would allegedly fall under the deregulated 'services' of an air

carrier, and thus forcing Defendants to rely on U.S.C.A. § 41713(b)(1) to justify discrimination, while depriving Plaintiffs of the Wolens exception, the 9th Circuit would not accept this as an ADA preemption because of their view of 'service' in this context. "To begin, under the ADA as we have interpreted it, the term service refers to the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail. Congress used service in § 41713(b)(1) in the public utility sense – i.e., the provision of air transportation to and from various markets at various times, and did not mean broadly to reach the various amenities provided by airlines, such as in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities. … Charas's analysis of the term service is equally applicable to discrimination claims, so that a claim concerning the service of accommodating disabled passengers (or failing to do so) does not automatically trigger the express preemption provision." Nat'l Fed. of the Blind v. United Airlines, 813 F.3d 718 (9th Cir. 2016) (cleaned up).

1105. The Wolens exception is thus preserved for Plaintiffs in the instant case. "Courts shall not interpret federal statutes as pre-empting state laws unless they "actually conflict" with the statute or federal standards promulgated thereunder." Id.

1106. State law does not interfere with the federal regulatory scheme; it provides a private right of action for those discriminated against by airlines. "[P]reemption of state laws that ensure equal access to public accommodations would do nothing to further the purposes of the ADA – namely the fostering of 'maximum reliance on competitive market forces.'" Alasady v. Northwest Airlines, No. 02-cv-3669, 2003 U.S. Dist. LEXIS 3841 (D. Minn. March 3, 2003).

1107. The court reasoned that "refraining from the violation of individuals' civil rights is not a theory of competition." Id.

1108. "The ACAA does not pre-empt remedies because the Federal Aviation Act ("FAA"), of which the ACAA is a part of, allows for other remedies, and al-lowing for other remedies does not conflict with the purpose of the FAA. Second, while remedies under the ACAA are not exclusive, the standards contained in the regulations implementing the ACAA

are the standards that will have to be used in any subsequent state law cause of action alleging

in-juries from violation of the ACAA regulations." Gilstrap v. United Airlines, 709 F.3d 995

(9th Cir. 2013).

1109.   While finding that the ACAA and its implementing regulations preempt state

standards of care that require airlines to do more than DOT regulations require to

accommodate passengers with disabilities, the Ninth Circuit also held that "The ACAA does

not, however, preempt any state remedies that may be available when airlines violate those

standards. For instance – but only insofar as state law allows it – tort plaintiffs may incorporate

the ACAA regulations as describing the duty element of negligence, and rely on state law for

'the other negligence elements (breach, causation, and damages), as well as the choice and

availability of remedies.' … Reading the ACAA in light of the FAA's savings clause and

liability insurance requirement, we cannot conclude that Congress intended to strip such

passengers of available state remedies for their injuries. As Justice Stevens observed when

construing another FAA-amending statute, '[s]urely Congress did not intend to give airlines

free rein to commit negligent acts subject only to the supervision of the Department of

Transportation, any more than it meant to allow airlines to breach contracts with impunity.'"

Id.

1110.   Mandating that passengers use experimental medical devices such as masks,

and that the disabled disclose their medical problems to avoid being placed on no-fly lists,

having authorities notified and waiting for us upon arrival at our destination city, where we

would be then be detained, face delays, endure missed connections; be prevented us from

returning home, and/or being publicly shamed, is not a "service" of an airline covered under

the Airline Deregulation Act.

1111.   Plaintiffs' breach of contract cause of action is therefore not preempted by the

Airline Deregulation Act ("ADA").

1112.   Airline Defendants' policies conditioning the carriage and transport of a

passenger on the wearing of a mask, when Plaintiffs never agreed to do so in the contract of

carriage, and especially for the disabled who are protected by the airlines' own enshrined anti-

discrimination policies, which placed them in subordination to federal anti-discrimination laws, and even more so when the CDC's own provision of exemptions that were available to Plaintiffs who could not safely don a mask AT ALL TIMES, are precisely what constitute this breach of contract cause this action.

1113.   "Passengers may take legal action in federal courts based on the contracts. [A] contract of carriage that conflicts with federal laws or regulations may not be enforceable by the airline." Congressional Research Service, in a report prepared for members and committees of Congress, #R43078, updated August 16, 2016.

1114.   The Airline Deregulation Act does not pre-empt breach-of-contract claims.

1115.   The actions and inactions of all Defendants directly caused the injuries to Plaintiffs.

1116.   Plaintiffs incorporate in this cause of action all of the related facts listed above and also incorporate all of the information presented in all other causes of action.

**TWENTY-SECOND CAUSE OF ACTION:**

**[AIRLINE DEFENDANTS]: RECKLESS MISCONDUCT AND DESPICABLE CONDUCT; Airline Defendants' mask policies gave rise to reckless misconduct and despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights. CA Civ Code § 3294.**

1117.   Plaintiffs incorporate all applicable facts and allegations listed above in Plaintiffs' Statement of Facts and elsewhere herein, regarding Defendant Airlines UNITED, ALLEGIANT, FRONTIER, and AMERICAN, into this Cause of Action, but in particular, the facts listed regarding Defendant Airlines Allegiant and Frontier and their reckless misconduct and despicable conduct carried out against Plaintiff Devorah Gordon, which caused her injury.

1118.   Each of these facts coincide with similar injuries of all Plaintiffs and are all interconnected.

1119.   Airline Defendants admitted to creating policies that "exceeded guidance from the Centers for Disease Control and Prevention (CDC)." (Exhibit 32). This action created chaos in the skies, recklessly endangering aviation safety and the well-being of all passengers, including Plaintiffs.

1120.   CA Civ Code § 3294 defines the degree of non-intentional misconduct that can legally give rise to an obligation to pay punitive damages as "despicable conduct carried on by the Defendant that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights — (a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

1121.   In accordance with CA Civ Code § 3294 (c)(2) "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights," and (c)(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

1122.   "A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he knows, or should know, it is highly probable that harm will result." Donnelly v. Southern Pac. Co. (1941) 18 Cal.2d 863, 869.

1123.   A cause of action for "conscious disregard of the rights or safety of others" exists, and it supports a punitive damages remedy. See, Peterson v. Superior Court (1982) 31 Cal.3d 147, 158-159, noting: "Nonintentional torts may also form the basis for punitive damages.... Such is the situation in this case, where an act performed without intent to harm has nevertheless resulted in injury and possible exposure to punitive damages because it was done with conscious disregard of the rights or safety of others." 1179. When Plaintiff Devorah Gordon boarded her FRONTIER flight, airline personnel did not allow her to use her own

mask, but instead provided a disposable blue surgical-style mask to wear. On the wrapper in which this mask came, was written: "CIVIL PROTECTION, NOT MEDICAL." (Exhibit 8 Page 23 of 34).

1124.  This demonstrates that Defendant Airline FRONTIER knew or should have known that donning masks was not about medical safety that would prevent or reduce the spread of COVID. Instead, all passengers, including those who could not safety don a mask, were subjected to undue influence to afford them, against their will, with what this Airline Defendant dubbed as "CIVIL PROTECTION" from chaos that would otherwise erupt in the skies while airline personnel carried out their misconduct and despicable acts.

1125.  In Ms. Gordon's experience, airline personnel threatened her with fines of $10,000 and then in writing, "$25,000 and up to 20 years imprisonment" (Exhibit 8 Page 24 of 34) for failure to don a mask. Threats were made that (1) she would be arrested and put in jail; (2) that the authorities, including the FBI would be called. (3) In fact, two police officers met her flight at LAX, and she was detained and interrogated; (4) she was publicly shamed and reprimanded by the Captain of one flight over the aircraft's public-address system before all passengers on that flight; (5) she was ultimately denied boarding on another flight. By these despicable acts and reckless misconduct, Plaintiff Gordon was injured.

1126.  Similar incidents were experienced by all other Plaintiffs in the instant case, all of which constitute despicable conduct carried on by the Defendant Airlines that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights.

1127.  Plaintiffs were afraid of civil unrest in the skies. We were afraid to fly. The skies were no longer safe or friendly for those who could not safely or medically don a mask. It is for this reason that CA Civ Code § 3294 was enacted, which is a protection legislated in California that is NOT preempted by the ADA because requiring disabled Americans to mask when we could not safely don a mask was not a "service" of an air carrier within the meaning of 49 U.S. Code § 41713(b)(1), nor could Airline Defendants' refusal to transport a maskless passenger be properly based on safety concerns legislated by 49 U.S. Code § 44902 or based on the implementation of federal executive orders.

1128.   Defendants' actions were the direct cause of Plaintiffs' injuries.


**TWENTY-THIRD CAUSE OF ACTION:  [FEDERAL DEFENDANTS; AIRLILNE DEFENDANTS]: PRACTICING MEDICINE WITHOUT A LICENSE; Prescribing the mandatory use of medical devices approved under an Emergency Use Authorization by the Food & Drug Administration.**

1129.   The Plaintiffs reallege and incorporate by reference herein all of the facts and allegations contained in paragraphs above, and further allege:

1130.   These Defendants were practicing medicine without a license. They were advising, encouraging, forcing, and dictating medical decisions and requirements without being properly licensed, And against the will of the Plaintiffs.

1131.   "(a) Notwithstanding Section 146, any person who practices or attempts to practice … any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats … or prescribes for any ailment … disease … or other physical … condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000)…. (b) Any person who conspires with or aids or abets another to commit any act described in subdivision (a) is guilty of a public offense, subject to the punishment described in that subdivision. (c) The remedy provided in this section shall not preclude any other remedy provided by law." CA Bus & Prof Code § 2052(a)(b)(c).

1132.   Only licensed physicians in each State may practice medicine. The role of government in medicine does not permit the government to practice medicine.

1133.   The 10th Amendment of the United States Constitution authorizes the states to establish laws and regulations protecting the health, safety and general welfare of their citizens. Thus, it is the responsibility of the individual states to regulate the practice of

medicine. Neither the CDC nor the HHS may practice medicine, as licenses to practice medicine are issued to physicians, not to government agencies. Similarly, no private corporation such as an airline may practice medicine.

1134.   The unlicensed practice of medicine should be adjudicated in this honorable Court, because all Plaintiffs were physically and conclusively harmed.

1135.   Airline Defendants at the time did not possess a valid, unrevoked, or unsuspended license or certificate to practice medicine, and consequently, Plaintiffs were harmed and injured by Airline Defendants' misconduct of practicing and/or attempting to practice medicine without a license. Airline Defendants cannot demand that Plaintiffs suffer harm and injury to mitigate the fear and anxiety of those paranoid about catching COVID. Airline employees are not competent and appropriately qualified physicians or other healthcare professionals able to evaluate who cannot medically tolerate covering their nose and mouth.

1136.   It's a matter of common sense that doctors, not airline companies, write prescriptions for medical devices. Plaintiffs' doctors told us NOT TO WEAR a mask and provided written letters exempting us. Airline Defendants have no power to overrule our doctors' judgments. Thus, Airlines are not immune from suits alleging the practicing and/or attempts to practice medicine without a license, and anyone that has been harmed or injured by entities and/or persons practicing medicine without a license, may sue for damages in a civil court of law.

1137.   PREEMPTION: State law claims regarding the Airline Defendant's decision to refuse to transport passengers based on "safety" concerns [49 U.S. Code § 44902(a)(2)] and/or the ADA preemption clause on "service" [49 U.S. Code § 41713(b)(1)] is entirely non-sequitur.

1138.   "To find field preemption here, we must infer that Congress intended to exclude all state law personal injury suits from the area of air travel, even though it didn't say so. The FAA betrays no such intention. It expressly preserves state remedies, declaring "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. §

40120(c). Moreover, it requires airlines to maintain liability insurance "sufficient to pay . . . for bodily injury to, or death of, an individual or for loss of, or damage to, property of others, resulting from the operation or maintenance of the aircraft." 49 U.S.C. § 41112. As the FAA doesn't create a federal cause of action for personal injury suits, see Bennett v. Southwest Airlines Co., 484 F.3d 907 (7th Cir. 2007), this clause can only contemplate tort suits brought under state law." Martin v. Midwest Express Holdings, 555 F.3d 806, 808 (9th Cir. 2009).

1139.   SAFETY: As factually presented in Cause of Action 22 [RECKLESS MISCONDUCT AND DESPICABLE CONDUCT], 49 U.S. Code § 44902(a)(2) addresses an airline's right to refuse transport of a passenger who does not consent to a search of his person or property, since either may "unlawfully conceal a dangerous weapon, explosive, or other destructive substance," inimical to the safety of other passengers.

1140.   Refusing the right to transport a passenger who cannot safely don a face-covering is not within the meaning of this statute. Consenting to search a passenger's body for a virus is not within the meaning of the statute, based on an unfounded assumption that such a virus would be inimical to the safety of a passenger if seated next to a disabled American who could not wear a mask.

1141.   Moreover, Airline CEOs sent two letters to the White House because they were convinced that "an airplane cabin is one of the safest indoor environments due to the combination of highly filtered air and constant air flow coupled with the downward direction of the air. Lifting the mask mandate in airports and onboard aircraft can be done safely … [T]he effectiveness and availability of high-quality masks for those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so."  Clearly, for airline CEOs, masking was entirely a voluntary undertaking, and at no time were other passengers ever risking their "safety" in the presence of disabled Americans in the same cabin who could not safely don a mask.

1142.   SERVICE: 49 U.S. Code § 41713(b)(1) addresses the ADA's [i.e., the Airline Deregulation Act's] preemption clause that no law, regulation, or other provision having the force and effect of law related to … "service" shall be enacted or enforced.

1143.   And yet, every one of the Airline Defendants' contracts of carriage contain provisions that are designed to mitigate occurrences of discrimination against the disabled. Frontier's contract of carriage, for example, spells it out under "Miscellaneous," where they state outright Subordination to law — In all cases, this Contract of Carriage will be subordinate to any applicable law." United mirrors the idea with, "the Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies … In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on … operation, the latter shall prevail." Similar language can be found in every contract of carriage.

1144.   Moreover, the 9th Circuit held that "…Congress used service in § 41713(b)(1) in the public utility sense – i.e., the provision of air transportation to and from various markets at various times, and did not mean broadly to reach the various amenities provided by airlines, such as in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities. … the term service is equally applicable to discrimination claims, so that a claim concerning the service of accommodating disabled passengers (or failing to do so) does not automatically trigger the express preemption provision." Nat'l Fed. of the Blind v. United Airlines, 813 F.3d 718 (9th Cir. 2016) (cleaned up).

1145.   Thus, when disabled Americans could not safely don a mask, withholding "service" from them was not grounds to claim the preemption clause of 49 U.S. Code § 41713(b)(1) within the meaning of the statute. Accordingly, the Airline Deregulation Act does not preempt Plaintiffs' practicing medicine without a license claim.

1146.   CONSENT AND EUA: It's a longstanding principle, codified in law, that it is not permissible to coerce anyone to receive an unlicensed medical product, and consent is required to submit to a medical procedure. Neither the CDC nor the HHS coerced anyone to don a face-covering, by assessing criminal penalties to individuals for failure to do so.

1147.   All relevant government agencies provided exemptions to any person who could not safely don a mask. In fact, Federal and state laws establish patients' rights to consent for medical procedures prior to those procedures being implemented upon the patient.

1148.   Plaintiffs' consent was not once obtained by Federal Defendants or Airline Defendants when it came to the donning of EUA masking.

1149.   The Airline Defendants provided FDA unauthorized EUA face masks without disclosing that: (1) the masks were only authorized for emergency use; (2) that there were "significant known and potential benefits and risks of such use and of the extent to which such benefits and risks are unknown"; and (3) flyers had the "option to accept or refuse administration of the product." 21 USC § 360bbb-3(e)(1)(A)(ii)(I)+(II)+(III).

1150.   One Airline Defendant, FRONTIER, provided passengers with a mask in a plastic package, upon which was written: "CIVIL PROTECTION, NOT MEDICAL." (Exhibit 8). This demonstrates that Defendant Airline FRONTIER knew or should have known that donning masks was not about medical safety that would prevent or reduce the spread of COVID.

1151.   "The right to be free from unwanted medical attention is a right to evaluate the potential benefit of treatment and its possible consequences according to one's own values and to make a personal decision whether to subject oneself to the intrusion." Cruzan ex rel. Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 309 (1990) (citing Vitek v. Jones, 445 U.S. 480, 494, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); Parham v. J.R., 442 U.S. 584, 600, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)); see also Cruzan, 497 U.S. at 309, 110 S.Ct. 2841 (Brennan, J., dissenting).

1152.   "The right of a competent adult patient to refuse medical treatment is a constitutionally guaranteed right which must not be abridged. As the court stated in Satz v. Perlmutter, supra,362 So.2d 160: "It is all very convenient to insist on … no resulting civil liability and no possible trespass on medical ethics.  However, it is quite another matter to do so at the patient's sole expense and against his competent will, …. Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and

invades his right to self-determination." (362 So.2d at p. 164.). Bartling v. Superior Court, 163 Cal.App.3d 186, 195-96 (Cal. Ct. App. 1984).

1153.   When Airline Defendants required passengers to don face coverings, Plaintiffs DO NOT ALLEGE that this act constituted a violation of the Food Drug and Cosmetics Act [hereinafter, "FDCA"]. There exists no private right of action under the FDCA.

1154.   The FDCA merely authorized the use of masks under EUA, and accordingly, Airlines were free to offer masks to their customers who desire whatever protections they believe masks would provide. As airline CEOs stated in their letter to the White House, "[T]he effectiveness and availability of high quality masks for those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so."

1155.   Plaintiffs allege in this Cause of Action that the violation of both Federal Defendants CDC and HHS, as well as that of Airline Defendants was practicing and/or attempting to practice medicine without a license to do so, combined with a failure to obtain CONSENT from the patient, which resulted in harm and/or injury to the Plaintiffs.

1156.   When an Airline Defendant threatened or carried out threats against Plaintiffs, because they were not able to safely don a mask, Plaintiffs were damaged and suffered harm, actionable by this claim, because they practiced medicine without a license.

1157.   To the extent that the CDC and HHS wrote, "Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19. … Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons

seeking exemption from the requirement to wear a mask request an accommodation in advance" (Exhibit 3) these statements are not supported in fact or in law. Such statements constitute false and fraudulent representations of truth not supported by law.

1158.   Moreover, Federal Defendants made false and fraudulent representations in failing to disclose that: "(1) the masks were only "authorized for emergency use;" (2) that there were "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown;" and (3) flyers had the "option to accept or refuse administration of the product." 21 USC § 360bbb-3(e)(1)(A)(ii)(I)+(II)+(III).

1159.   When Federal Defendants wrote, "Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask," (Exhibit 3), they were practicing medicine.

1160.   To the extent that the CDC and HHS wrote, "The exemption is not meant to cover people with disabilities for whom wearing a mask might only be difficult…"(Exhibit 34); and "A person with a condition that causes intermittent respiratory distress, such as asthma, likely does not qualify for this exemption because people with asthma, or other similar conditions, can generally wear a mask safely;" and "Persons who experience discomfort or anxiety while wearing a mask without imminent threat of harm would not qualify for this exemption" they were practicing medicine.

1161.   Practicing medicine includes, but is not limited to any system or mode of treating the sick or afflicted, or diagnosing, treating, or prescribing for any ailment, disease or other physical condition of any person. CA Bus & Prof Code § 2052(a)(b)(c).

1162.   The actions and inactions of Federal Defendants and Airline Defendants — directly caused the injuries to Plaintiffs.

**TWENTY-FOURTH CAUSE OF ACTION**: **[AIRLINE DEFENDANTS; MEDICAL DEFENDANTS]: INVASION OF PRIVACY AGAINST THE AIRLINE DEFENDANTS: Being required to disclose the nature or severity of Plaintiffs' disabilities to Airline Defendants and their hired guns the Medical**

**Defendants, as a condition of carriage. Being subject to public shaming if a
disabled American was unable to safely don a mask.**

1163.   The Plaintiffs reallege and incorporate by reference herein all of the facts and
allegations contained in paragraphs above, and further allege:

1164.   These Defendants forced Plaintiffs to disclose all of their private information,
in order to hopefully allow them to travel.  Plaintiffs were subject to public shaming, and other
discomforts. See Statement of Facts above.

1165.   As described in the two previous Causes of Action [BREACH OF
CONTRACT] and [PRACTICING MEDICINE WITHOUT A LICENSE], so also here.
There is no appropriate ADA preemption on the basis of 49 U.S. Code § 44902(a)(2), since
this is not a "safety" issue, as per the CDC's own admission.

1166.   In Federal District Court Judge Mizelle's Order that ended the Mask Mandate
on April 18, 2022, she explained that "The Mask Mandate is Arbitrary and Capricious
Because the CDC Failed to Adequately Explain its Reasoning." Health Freedom Defense
Fund, Inc. v. Biden (M.D. Fla. 2022).

1167.   "[T]he Mandate does not require universal masking. It exempts individuals
who are "eating, drinking, or taking medication" and a person who is "experiencing difficulty
breathing" or who is "feeling winded." 86 Fed . Reg. at 8027 & n.7. It also excludes
individuals who cannot wear a mask due to an ADA-recognized disability and all children
under two years old. See 86 Fed. Reg. at 8027-28 (providing other unexplained exceptions).
The Mandate makes no effort to explain why its purposes — prevention of transmission and
serious illness — allow for such exceptions. Nor why a two-year-old is less likely to transmit
COVID-19 than a sixty-two-year-old." Id. at 49.

1168.   In their Appellate brief, the CDC clarifies their purpose for the masking order:
"[T]he exceptions in the CDC's transportation mask order are tailored to minimize the risks
of transmission. For example, allowing people to remove their masks "for brief periods" when
eating or drinking and "temporarily" when unable to breathe, 86 Fed. Reg. at 8027 & n.7, is
consistent with the goal of reducing COVID-19 spread in transportation settings." (Appellate

Brief by the CDC, HEALTH FREEDOM DEFENSE FUND, INC. v. Joseph R. Biden et al,
In the 11th Circuit Court Case No. 22-11287 Doc. 8).

1169.   "[T]he CDC explained that wearing a mask is "one of the most effective
strategies available for reducing COVID-19 transmission." 86 Fed. Reg. at 8026." Id. at 6.

1170.   The CDC itself here admits that the masking order was never about "safety,"
and not certainly not within the meaning of the 49 U.S. Code § 44902(a)(2) statute. Had it
been about "safety," the entire transportation system would have been ordered to shut down,
because safety saves all, without discrimination.

1171.   No ADA statute authorizes an air carrier to refuse to transport a passenger the
carrier decides is, or might be, inimical to reducing COVID-19 transmission. This is because
reducing transmission can only guarantee safety from a virus to some.

1172.   Thus, the CDC knew or should have known that there was never a threat to
safety of passengers when a maskless passenger boarded, ate or drank, since CDC's stated
goal was never to guarantee a virus-free "safe-zone" to all passengers, but rather to reduce
transmission of a virus.

1173.   This fact is augmented by the letter from airlines CEOs to the White House,
which stated that "an airplane cabin is one of the safest indoor environments." (described
above).

1174.   Likewise, when disabled Americans could not safely don a mask, the grounds
to refuse them "service" was not is not within the meaning of the statute at 49 U.S. Code §
41713(b)(1), since an airline's "service" is defined by the contractual provisions enshrined
within its Contract of Carriage, which "is subject to applicable laws, regulations, rules, and
security directives imposed by governmental agencies … In the event of a conflict between
the Rules contained herein and such government laws, regulations, rules, security directives
and their corresponding effects on … operation, the latter shall prevail." (Exhibit 31).

1175.   Moreover, the 9th Circuit held that "…Congress used service in § 41713(b)(1)
in the public utility sense – i.e., the provision of air transportation to and from various markets
at various times, and did not mean broadly to reach the various amenities provided by airlines,

such as in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities. … the term service is equally applicable to discrimination claims, so that a claim concerning the service of accommodating disabled passengers (or failing to do so) does not automatically trigger the express preemption provision." Nat'l Fed. of the Blind v. United Airlines, 813 F.3d 718 (9th Cir. 2016) (cleaned up).

1176.  In DAY v. SKYWEST AIRLINES, the U.S. Court of Appeals for the Tenth Circuit agreed that "[C]laims arising out of an airline employee's failure to exercise due care are not "related to" a deregulated price, route, or service … We therefore hold that the district court erred in dismissing Day's negligence and contract claims as preempted by the ADA." Day v. SkyWest Airlines, 45 F.4th 1181, 1191 (10th Cir. 2022).

1177.  If a claim is not related to "safety" under 49 49 U.S. Code § 44902(a)(2) or isn't related to "service" under 49 U.S. Code § 41713(b)(1), then it is also not preempted by the Airline Deregulation Act.

1178.  SEC. 102 (a)(3) of 92 STAT. 1706 [the ADA — 1978] states that "In the exercise and performance of its powers and duties under this Act, things "deemed as being in the public interest and in accordance with the public convenience and necessity" include (3) The availability of a variety of adequate, economic, efficient, and low-price services by air carriers without unjust discriminations…"[1]. Accordingly, the Airline Deregulation Act does not preempt Plaintiffs' INVASION OF PRIVACY claims.

1179.  During COVID, Airline Defendants required disabled Plaintiffs seeking mask exemptions to provide sensitive, intimate details of our medical conditions to airline personnel as a condition of carriage, usually in writing and sometimes verbally in hearing range of other passengers and workers at busy airport check-in counters and boarding gates. And yet, Plaintiffs were under no legal obligation to disclose our private medical history to airline employees, who are not medical professionals.

---

[1] https://www.congress.gov/95/statute/STATUTE-92/STATUTE-92-Pg1705.pdf at 2

1180.   Airlines most often denied mask-exemption demands submitted by disabled passengers. In some cases, as with Defendant Airline UNITED, Plaintiffs were required to provide contact information for his/her doctor, together with a waiver signed by the Plaintiff authorizing the airline and its agents to speak with doctors privately, but not in the presence of Plaintiffs, as a precondition in the approval process for the airlines to accept mask exemptions issued by Plaintiff's physicians. These intrusions constitute invasion of privacy. (Exhibit 35).

1181.   On the few occasions that we were able to fly, we had to answer these personal questions to everyone that worked for the airline. The person at the check-in counter, the person at the gate, several of the flight attendants on each flight, and often even a pilot or two, would put us through the whole investigative and questioning process. They would often offer their own medical advice and/or determinations.

1182.   The Airline Defendants often required a signed waiver by the passenger authorizing them to share our medical information with all sorts of other parties, as a precondition to receiving an exemption to fly without a mask. Id.

1183.   The law protects people against many types of harms to one's personal space and private life. And yet, this question was always asked of Plaintiffs during the process of requesting an exemption from donning a mask: "Please describe the nature of your disability." But according to the DOT, 14 CFF Part 382 and the Federal Register, "[Y]ou may not make inquiries about an individual's disability or the nature or severity of the disability." 70 FR 41481.11[1]

1184.   There is a long and evolving history regarding the right to privacy in the United States. In the context of American jurisprudence, the Supreme Court first recognized the "right to privacy" in Griswold v. Connecticut (1965). In Griswold, the Supreme Court advocated for the "right to be let alone."

1185.   The Supreme Court, in particular, found a right to privacy that was derived from penumbras of other explicitly stated constitutional protections. The Court used the

---

[1] https://www.federalregister.gov/d/05-13947/p-160

personal protections expressly stated in the First, Third, Fourth, Fifth, and Ninth Amendments to find that there is an implied right to privacy in the Constitution. The Court found that when one takes the penumbras together, the Constitution creates a "zone of privacy."

1186.   In 1978, The Airline Deregulation Act [hereinafter, "the ADA"] prohibited states from regulating the price, route or service of an air carrier for the purposes of keeping national commercial air travel competitive.

1187.   The ADA did not come along 13 years after Griswold to overturn and preempt a Supreme Court decision on the basis that a "Service" from an airline legally includes the right to invade Plaintiffs' privacy in order to determine if we should be worthy enough to flight on their airplanes without a mask.

1188.   The ADA does not authorize Airline Defendants to refuse to transport us, except and unless we do not consent to a search of our persons and property to ascertain whether or not we are unlawfully carrying a dangerous weapon, explosive, or other destructive substance. Plaintiffs never refused to be subject to such a search.

1189.   The ADA does prohibit states from regulating the "service" of an air carrier, but only "for the purposes of keeping national commercial air travel competitive." It is not conceivable that after Airline Defendants "exceeded guidance from the Centers for Disease Control and Prevention (CDC)," (above)  by demanding that the disabled agree to waive their "right to be left alone" and disclose their medical problems and sensitive medical conditions in a futile effort to obtain a disability exemption in order to avoid a being refused transport, could be considered a "service" of an airline for the purposes of keeping national commercial air travel competitive under the Airline Deregulation Act.

1190.   It is inconceivable that an airline can engage in any activity it wishes, call it "service" and then expect that the government will be unable to regulate it, and that courts will instead sanction it by preempting any complaint under the protections afforded the airlines under 49 US Code § 41713(b)(1).

1191.   The ADA was never intended to function as a clearing house for authorizing any behavior the airlines decide is proper for them, which otherwise allows them to fly above

the law. The states are prohibited from regulating air carrier services, ONLY when those services are for the purposes of keeping national commercial air travel competitive.

1192.  "An actionable invasion of the right of privacy is the … wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Strutner v. Dispatch Printing Co., 2 Ohio App. 3d 377, 378 (Ohio Ct. App. 1982).

1193.  "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his/her private affairs or concerns, is subject to liability to the other for invasion of privacy." Jackson v. Playboy Enterprises, Inc., 574 F. Supp. 10 (S.D. Ohio 1983).

1194.  "Right Of Privacy Is Invaded (a) When there is unreasonable intrusion upon the seclusion of another … (c) Unreasonable publicity given to the other's private life, (d) Publicity which unreasonably places the other in a false light before the public." Klipa v. Bd. of Educ. of A.A. Co., 54 Md. App. 644, (Md. Ct. Spec. App. 1983).

1195.  "Liability for a claim of invasion of privacy by intrusion must be based upon an intentional interference with the plaintiff's interest in solitude or seclusion, either as to his person or as to his private affairs or concerns. Hoskins v. Howard, 132 Idaho 311, 971 P.2d 1135 (1999)" Uranga v. Federated Publications, Inc., 138 Idaho 550, 553 (Idaho 2003).

1196.  "An unreasonable intrusion occurs when one "intentionally intrudes. physically or otherwise upon the solitude or seclusion of another or his private affairs or concerns [in a manner which is]" highly offensive to a reasonable person." Tapia v. Sikorsky Aircraft Division, 1998 Ct. Sup. 6636, 6638 (Conn. Super. Ct. 1998).

1197.  Medical information is confidential and private under the California Constitution. Art. I § 1: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

1198.  California's Consumer Privacy Act of 2018 [1798.125] (a)(1)(A)(C)(D) contains a provision that consumers have a right of no retaliation following the exercise of

other rights granted to them by California and Federal laws. "(a)(1) A business shall not discriminate against a consumer because the consumer exercised any of the consumer's rights under this title, including, but not limited to, by: (A) Denying goods or services to the consumer. (C) Providing a different level or quality of goods or services to the consumer; and (D) Suggesting that the consumer will receive a different price or rate for goods or services or a different level or quality of goods or services."

1199.   Since the decisions, actions and inactions of Airline Defendants to refuse to transport disabled American passengers — unable to safely don masks — who are Plaintiffs in this case, directly caused the injuries to Plaintiffs owing to an invasion of their privacy in violation California's Constitution and on California's Consumer Privacy Act, and because these claims are NOT based on "safety" concerns as established above, these claims are not preempted by the ADA.


**TWENTY-FIFTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION AGAINST THE AIRLINE DEFENDANTS.**

1200.   All Plaintiffs are victims of fraudulent misrepresentations at the hands of Airline Defendants.

1201.   Plaintiffs reallege and incorporate by reference herein all of the facts and allegations contained in paragraphs herein, and further allege fraudulent misrepresentation, which is established by SIX factors:

1202.   **ONE: Representations were made by Defendant Airlines, namely:**

1203.   ALL AIRLINE DEFENDANTS with the help and coordination of the other Defendants, provided FDA unauthorized or EUA face masks without disclosing that: (1) the masks were only "authorized for emergency use;" (2) that there were "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown;" and (3) flyers had the "option to accept or refuse administration of the product." 21 USC § 360bbb-3(e)(1)(A)(ii)(I)+(II)+(III).

1204.   The Airline Defendants represented on their websites, in e-mails to passengers, signage at airports, on pages during an on-line ticket purchase, on board their property (aircraft) but also in public areas of airports they do not own, etc., that "federal law" required airline passengers wear face masks.

1205.   AIRINE DEFENDANT UNITED, during ticket purchase, threatened that "Refusing to wear a face mask in the airport or on board is a federal offense which may result in a fine of up to $35,000. Additionally, you'll be refused transport and could lose your travel privileges on United."

1206.   AIRLINE DEFENDANT AMERICAN, during ticket purchase, warned, "U.S. federal law requires that you wear a face covering at all times while indoors at the airport and on board your flight … If you refuse to wear one, you may be denied boarding and future travel on American. You may also face penalties under federal law."

1207.   AIRLINE DEFENDANT DELTA, blackmailed ticket purchasers during ticket purchase, saying "For everyone's safety, face masks are required. Federal law requires each person to wear a mask at all times while in the airport and when using public transit, during boarding and deplaning and for the duration of the flight. … failure to comply with the mask requirement could result in denial of boarding, removal from the aircraft during any point of your trip, being banned from future travel with Delta, personal fines and/or criminal penalties."

1208.   AIRLINE DEFENDANT ALASKA, during ticket purchase, announced that "Federal law requires guests to wear a mask."

1209.   AIRLINE DEFENDANT SOUTHWEST, during ticket purchase, repeatedly announced that, "Yes, Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law."

1210.   Additionally, SOUTHWEST represented that Federal Law required from passengers seeking a mask exemption to (1) provide advance notice of the need for assistance;

(2) agree with SOUTHWEST right to collect, use and share private medical information with

their third-party medical provider [STAT-MD]; (3) agree that SOUTHWEST may change the

ticket purchaser's travel dates and/or flights should one or more originally scheduled flights

that have a capacity of 75% or more, or another Passenger approved for a mask exemption

booked on such flight; (4) agree to submit a mask exemption for travel at least seven days

prior to the Passenger's planned date of travel; (5) agree to submit a signed letter from the

requesting Passenger's Medical Physician on the Physician's letterhead stating that the

Passenger with a disability has a recognized medical condition precluding the wearing or safe

wearing of a mask because of their disability; (6) agree to undergo a private medical screening

(over the phone) with a third-party medical provider (Southwest Airlines' vendor StatMD);

(7) agree that no later than 24 hours prior to the Passenger's scheduled departure(s), Passenger

must provide evidence of Passenger's qualifying COVID negative viral test result' (8) agree

that roundtrip travel will require an additional qualifying COVID negative viral test result

taken within three calendar days preceding the Passenger's scheduled date of return travel and

submitted no later than 24 hours prior to the Passenger's scheduled departure, unless the

Passenger's return flight is within three calendar days of the date of the initial negative

COVID-19 departure test; (9) agree that if the Passenger's originally scheduled date of travel

is changed as a result of the flight having a capacity of 75% or more or another Passenger

approved for a mask exemption, that passenger will be required to obtain a qualifying COVID

negative viral test result within three calendar days preceding the Passenger's new scheduled

date of departure or return travel, as applicable and at your own expense.

1211. AIRLINE DEFENDANT HAWAIIAN, during pre-ticket purchase

communications and on their Website declared, "Federal law requires that all guests two years

and older wear a mask at the airport, while boarding, through the duration of the flight and

while deplaning at their destination. Refusing to wear a mask is a violation of federal law and

may result in denial of boarding, removal from the aircraft and/or penalties under federal

law."

1212.   AIRLINE DEFENDANT ALLEGIANT represented that "federal law requires every person to wear a face covering that covers the nose and mouth at all times while traveling. … Yes, federal law requires every person to wear a face covering at all times in airports and on commercial aircraft."

1213.   Additionally, an ALLEGIANT flight attendant represented that if Plaintiff Devorah Gordon failed to surrender her ID to her, she would face the prospect of police meeting her at the arrival gate at LAX, where she "would be fined $10,000."

1214.   An ALLEGIANT flight attendant represented to Plaintiff Devorah Gordon her behavior in connection with violating federal law of wearing a mask was in violation of Title 14 of the Code of Federal Regulations."

1215.   An ALLEGIANT flight attendant represented to Plaintiff Devorah Gordon that she would be "fined up to $25,000 and receive up to 20 years imprisonment, or both," for violating federal law as it pertains to the mask mandate. Id.

1216.   AIRLINE DEFENDANT FRONTIER, during ticket purchase, threatened Plaintiffs, stating that "As required by federal law … all* passengers and employees must wear a face covering over nose and mouth throughout the Frontier travel experience including at ticket counters, gate areas, baggage claim and onboard all flights. … This level of protection is important for everyone's well-being. Not wearing an approved face covering is a violation of federal law and you may lose future travel privileges on Frontier."

1217.   Additionally, after Plaintiff Mrs. Gordon informed FRONTIER's agent of her disability that prevented her from safely donning a mask, FRONTIER represented to her that she needed to be cleared in advance. After Mrs. Gordon requested to speak with a supervisor, the supervisor denied her boarding.

1218.   **TWO: The representations were false.**

1219.   Federal laws are bills that have passed both houses of Congress, been signed by the President, passed over the president's veto, or allowed to become law without the President's signature.

1220.   Congress has never enacted a "federal law" or statute requiring all travelers to don a mask. any such statute. There is no statute in the U.S. Code requiring airline passengers to cover our faces. This is a false and fraudulent misrepresentation of law.

1221.   Moreover, the FTMM was not a criminal law enacted by Congress. Refusing to wear a mask was never subject to criminal prosecution.

1222.   The Executive Order on Promoting COVID-19 Safety in Domestic and International Travel, signed by President Biden on January 21, 2021 did not create a federal law.

1223.   The CDC's notice published in the Federal Register (86 Fed. Reg. 8025, 8030) on February 3, 2021 — the Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs  — did not promulgate a federal law.

1224.   No provision of federal law or regulations permitting an airline to require that any person be tested for a disease as a condition of carriage, was ever enacted by Congress.

1225.   Provisions were made in both the Presidential Executive Order on Promoting COVID-19 Safety in Domestic and International Travel, as well as in the CDC's REQUIREMENT FOR PERSONS TO WEAR MASKS WHILE ON CONVEYANCES AND AT TRANSPORTATION HUBS for Persons to unable to safely don masks, to claim exemptions.

1226.   The CDC's Notice in the Federal Register, published on February 3, 2021, with reference to who is exempt from the mask order reads "A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[1]

1227.   The CDC's own Web-published "mask-travel-guidance,"[2] with reference to "Disability Exemptions of the Order" reads…

1228.   "[C]ertain people with disabilities who, because of their disability, cannot wear a mask, or cannot safely wear a mask, are exempted from CDC's mask-wearing requirement. … The following persons with disabilities might be exempt from CDC's requirement to wear

---

[1]     https://www.federalregister.gov/d/2021-02340/p-568
[2]     https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

a mask based on factors specific to the person: A person with a disability who cannot wear a mask because it would cause the person to be unable to breathe or have respiratory distress if a mask were worn over the mouth and nose. … A person with a severe sensory disability or a severe mental health disability who would pose an imminent threat of harm to themselves … While this guidance uses the ADA's definition of disability, it does not address other ADA provisions that may be pertinent to issues involving the use of masks."

1229.   These provisions were ignored and instead, Airline Defendants "…exceeded guidance from the Centers for Disease Control and Prevention (CDC)."   In their own privatized world, to the detriment of disabled Plaintiffs like us, they targeted surpassed what they perceived as the CDC's statutory authority, and made-up their own polices and rules, all of which were false representations.

1230.   A disabled person cannot be required as a condition of travel, to complete and submit a signed letter from is Medical Physician, submit private medical information, agree to allow airlines to consult with their 3rd-party medical providers who are not our doctors, or force us to undergo private medical screenings. 49 USC § 41705(a).

1231.   An airline may not require us to sit in the last row of the aircraft, even though ALL OTHER PASSENGERS enjoy open unassigned seating. 14 CFR § 382.87(a).

1232.   An airline may not deny boarding, or removal a passenger from their aircraft, or threaten any other criminal penalties under federal law simply because he or she cannot safely don a mask. An airline may not require a medical certificate from disabled passengers who ask for a mask exemption. 14 CFR § 382.23(a).

1233.   An airline is not allowed to require passengers seeking mask exemptions to do so in advance. 14 CFR § 382.25.

1234.   Federal law prohibits an airline from limiting the number of mask-exempt passenger on a flight. 14 CFR § 382.17.

1235.   An airline cannot discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation. An airline may not impose illegal conditions of travel, such as requiring passengers to submit no later than

24 hrs prior to departure evidence of a COVID-19 negative viral test, when non-disabled customers aren't subject to this same requirement. No such requirement for testing was ever found in any airline's contract of carriage. 14 CFR § 382.11(a)(1). See also 49 USC § 41705.

1236.  An airline may not guess or assume that a passenger has a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight, without evidence of the same or without an individualized assessment. 14 CFR § 382.23(c)(1), 14 CFR § 382.19(c)(1).

1237.  Airlines by federal law are NOT permitted to impose any requirements or conditions on a person requesting an exemption from the mask requirement. 49 USC § 41705(a).

1238.  An airline is prohibited by federal regulations from forcing a disabled passenger to disclose his/her medical conditions. 14 CFR § 382.38.

1239.  Recipients of federal funds including airlines are prohibited from discriminating against the disabled. 29 USC § 794(a).

1240.  Airlines cannot mislead or deceive customers (1) with a practice that actually misleads or is likely to mislead consumers; (2) who are acting reasonably under the circumstances; (3) with respect to a material matter. 14 CFR § 399.79, 49 USC § 41712.

1241.  Airlines cannot deprive passengers of our statutory right to use the public airspace. 49 USC § 40103(a)(2).

1242.  Airlines cannot interfere with the civil rights of disabled passengers. 42 USC §§ 1985(3) and 1986.

1243.  An airline may not misrepresent "federal law," requiring all to wear a mask while flying, without consideration of the disability of a passenger who cannot comply because of his or her disability.

1244.  **<u>THREE (a)</u>: When made, Airline Defendant EXECUTIVES knew that their representations were false.**

1245. The DOT itself on its own FAQ section on its website specifically states that wearing masks is NOT a federal law.[1] Airline Defendant EXECUTIVES knew or should have known that their representations were false.

1246. With reference to FRONTIER, Airline Defendant EXECUTIVES knew or should have known that their representations were false: On their website, directly below their statement that "This level of protection [by means of requiring masking, owing to a federal law] is important for everyone's well-being."

1247. Exactly below this statement, it reads "STATE-OF-THE-ART AIR FILTRATION TECHNOLOGY: Did you know, the air in the cabin is passed through an air filtration system that mixes with fresh air drawn from outside? This occurs up to every 3 minutes circulating the cabin with new air and sending the old air directly outside. Our system uses HEPA filters capable of capturing respiratory virus particles at more than 99.9% efficiency."

1248. Moreover, on Wednesday, December 15, 2021, in Washington D.C. at 2:30 p.m. ET, the U.S. Senate Committee on Commerce, Science, and Transportation convened a three-hour long full committee hearing titled "Oversight of the U.S. Airline Industry."[2]

1249. Amongst the U.S. Senate Panel were Senator Maria Cantwell (D-WA) [Chair] and Senator Roger Wicker (R-MS) [Ranking Member].

1250. Amongst the witnesses in attendance were Mr. Doug Parker, CEO, American Airlines, and Mr. Scott Kirby, CEO, United Airlines.

1251. At about 53 minutes into that hearing, Senator Wicker asked the witnesses a question about air quality in cabins of the airlines' aircraft. A transcript of the witness' answers follows. The five-minute video clip of this portion of the hearing, downloaded from the U.S. Senate's website can be viewed here: https://www.youtube.com/watch?v=7olS4vBtgsk.

---

[1]   https://tinyurl.com/3uxhurpn
[2]   https://www.commerce.senate.gov/2021/12/commerce-committee-announces-airline-industry-hearing-on-december-15-2021

1252.   **Senator Wicker** *[01:07 - 01:32]*: Thank you very much. Let me ask you about air quality Mr. Laughter. In your testimony, you say, "We continue to electrostatically spray our aircraft interiors with high grade disinfectant and use HEPA air filters to remove 99.99% of airborne particles on board." Is this new or were those HEPA filters there all along?

1253.   **Mr. Laughter** *[01:33 - 01:42]*: Thank you Senator for that question. Those are HEPA filters that are part of an aircraft circulation system, and I would assume that are all modern airliners have those same systems.

1254.   **Senator Wicker** *[01:43 - 01:44]*: Ok, so they were there to start with?

1255.   **Mr. Laughter** *[01:45]*: That's correct.

1256.   **Senator Wicker** *[01:46- 01:48]*: And you have partnered with Mayo Clinic?

1257.   **Mr. Laughter** *[01:49]*: That is correct.

1258.   **Senator Wicker** *[01:50 - 02:15]*: Perhaps other airlines did something similar with the top experts in the world on Healthcare. What did they tell about the quality of air with respect to the virus as compared to say a theatre, a church, a concert hall, perhaps a hearing room? What did they tell you?

1259.   **Mr. Laughter** *[02:15 - 02:52]*: Senator you're right, we did partner with some science experts such as the Mayo Clinic and part of the discussion on the HEPA filters onboard the aircraft was to understand what that air turnover rate was and how the air quality on board the aircraft would compare to other facilities, and I can't speak to this room or any theatre but I think we all generally agree now that the cycle of the way air turns over in a pressurized air cabin and the filtration system is superior to many indoor spaces that you can be in.

1260.   **Senator Wicker** *[02:53 - 02:57]*: Ok. Who else from the airline industry would like to speak to that? Mr. Kirby? United?

1261.   **Mr. Kirby** *[02:58 - 03:27]*: Yeah, thanks for the question Senator. And at United we partnered with the Cleveland Clinic as our expert partner, but we also partnered with DARPA and the Department of Defense back in May of last year it was a great story about why were United Airlines airplanes flying circles over the Atlantic Ocean, and it was

because the department of defense was testing the airflow on airplanes. And the conclusion of that is that effectively anywhere that you're going to be indoors, the airplane is the safest place that you can be indoors. It's because of the air filtration.

1262.  **Senator Wicker** *[03:27 - 03:28]*: Safer than a theatre, safer than (inaudible)?

1263.  **Mr. Kirby** *[03:28 - 03:52]*: Far safer than a theatre. Safer actually than an intensive care unit because we have HEPA grade filters. But we filter the air twenty to thirty times an hour and a typical ICU is 2-3 times an hour. Aircraft are remarkably safe environments. The take away that I remember most is that being next to someone on an airplane — sitting next to them — is the equivalent of being fifteen feet away from them in a typical building.

1264.  **Senator Wicker** *[03:52 - 03:58]*: Now let me ask you this Mr. Kirby: Do you think your airline is better than Mr, Laughter's, Mr. Kelly's, Mr. Parker's airline?

1265.  **Mr. Kirby** *[03:58 - 04:01]*: Well of course I do and I think we've all done the same thing for safety.

1266.  **Senator Wicker** *[03:58 - 04:01]*: I withdraw the question

1267.  **Senator Wicker** *[04:02 - 04:17]*: Let me ask Mr. Kelly on the, on the air quality, and Mr. Parker, would both of you briefly comment on that and [on the question] "Will we ever, do you think be able to get on an airplane without masks?"

1268.  **Mr. Kelly** *[04:17 - 04:59]*: Well again, I would go on my colleague's comments on the quality of the air is. The statistics I recall is 99.97% of airborne pathogens are captured by the HEPA filtering system, and it's turned over every 2-3 minutes. We use UT Southwestern and Stanford School of Medicine. So we just add to this prestigious list. But yeah, I think the case is, is very strong that masks don't add much, if anything, in the air cabin environment. It is a very safe and very high quality compared to any other indoor setting.

1269.  **Senator Wicker** *[05:00]*: Mr. Parker?

1270.  **Mr. Parker** *[05:00 - 05:08]*: I concur. The aircraft is the safest place you can be. It's true of all of our aircraft. They all have these HEPA filters and the same airflow.

1271.   **Senator Wicker** *[05:09 - 05:10]*: Ok.

1272.   Clearly, without any doubt whatsoever, four of eight Airline Defendant CEO EXECUTIVES being sued in this action, knew that their representations of that "For everyone's safety, face masks are required. Federal law requires each person to wear a mask at all times…" were false.

1273.   Airline Defendant EXECUTIVES knew or should have known that their representations were false because the assertions that safety of passengers was at risk on their airplanes if passengers boarded without masks, were false. There NEVER was a safety issue, and they knew!

1274.   Airline Defendant EXECUTIVES knew or should have known that their representations were false because their contracts of carriage did not include a contractual obligation that wasn't subject to applicable laws, regulations, rules … imposed by governmental agencies.

1275.   Airline Defendant EXECUTIVES knew or should have known that their representations were false because the PSP CARES contract that they all signed to become recipients of over $13 Billion dollars in government aid, obligated them to comply with the disability provisions of the RA, amongst other important legislative Acts, regardless of the fact that the funds they received were used for Payroll.

1276.   Airline Defendant EXECUTIVES knew or should have known that their representations were false because of the two letters these CEOs signed and send to the White House, asking the President to lift the mask mandate, because safety of passengers was not an issue.

1277.   Airline Defendant EXECUTIVES knew or should have known that their representations were false after reading the President's Executive Order on Promoting COVID-19 Safety in Domestic and International Travel of January 21, 2021, which stated that the Executive Order must be "…consistent with applicable law," including anti-discrimination laws enacted by Congress decades before COVID.

1278.   The President's Order spelled it out! Exemptions were to be provided for disabled Americans who needed them and also needed to keep flying "to the extent that doing so is necessary or required by law."

1279.   **THREE (b): Airline Defendant EMPLOYEES made statements recklessly without knowledge of the truth.**

1280.   All Plaintiffs, and in particular, Plaintiff Devorah Gordon was targeted by Airline Defendant EMPLOYEES who made representative statements recklessly without knowledge of the truth. These statements were not mere words coming out of the mouths of Airline Employees. These false statements had severe negative consequences. We were (1) denied boarding; we were told that (2) we would be fined for up to $25,000, imprisoned for up to 20 years, or both; we were told that (3) our names were being placed on no-fly lists; that (4) authorities were being notified and would be waiting for us at our destination arrival gates; that (5) we would be detained and interrogated; that (6) we would face delays; that (7) we would miss flight connections; that (8) we would be prevented from returning home whether domestically, or abroad; and perhaps the greatest and most humiliating was that (9) in all cases all Plaintiffs were publicly shamed and in some cases by the Captain of the flight, over the aircraft's public address system, all made recklessly and without knowledge of the truth.

1281.   **FOUR: That the fraudulent misrepresentation was made with the intention that Plaintiffs rely on it.**

1282.   Airline Defendants wanted us — NO! They NEEDED US to rely on on their fraudulent misrepresentations. This is how they were able to get away with issuing empty threats for nearly two years. It is clear that they had an intent to deceive passengers regarding masks. Their own motivation was that if they failed to enforce what they believed was a federal law, they would loose their jobs. Thus, they were fully intent on and committed to getting us to rely on their fraudulent misrepresentations, or else we simply would not be permitted to fly. We had no choice but to rely on their representations.

1283.   **FIVE: That Plaintiffs did rely on the fraudulent misrepresentation.**

1284.   Plaintiffs in the instant case had travel necessities, whether stemming from family obligations or spanning from business obligations to personal obligations such as traveling to bury our dead. When the FTMM issued, we either could not travel, or if we had to travel, we were compelled, to our own detriment to mask-up, despite the exemptions we should have had, but were denied, lest we be stranded, and unable to return home. Our stories are not unique. Hundreds of thousands relied on the same fraudulent misrepresentations that we had to rely upon, or face dire consequences. Our reliance was motivated by only one thing: FEAR. Fear of what Airline Defendants would do to us, if we did not comply. We accepted their representations and relied on procedures and policies to own detriment.

1285.   **SIX**. **And we suffered. Plaintiffs suffered harm as a result of the fraudulent misrepresentations.**

1286.   Lying about the truth of the masks, assumed to have been foisted upon us for political purposes, created a complete fantasy mask wearing world that was almost insane.

1287.   We suffered trauma. We could not travel. We suffered emotional distress. We suffered, and still suffered PTSD. Our disabilities were not take seriously. They were not related to at all by those in an industry that should have known better. Our health diminished. We developed skin cancer. We were threatened. We were told by Airline employees that we were responsible for killing other human beings. We were yelled at in public by Defendant Airline Employees. We were denied boarding. We were told we would go to prison, and/or pay massive fines. We were told that we would be listed as terrorists on no-fly lists. We were subjected to detainments. We were escorted from an aircraft in full view of other passenger and in earshot by armed police. We were interrogated. We face delays; We were stressed out to the extent that traveling by air was akin to the stress one might feel when being taken before a firing squad. We missed flight connections. We were publicly humiliated and shamed over an aircraft's public address system by the Captain of the flight deck!

1288.   The damages to Plaintiffs by these lies were so severe, that it reached the point where life was nearly destroyed as described above. We will bring additional evidence in this regard, during the discovery process.

1289.   As described above our Cause of Action above [BREACH OF CONTRACT], since this is not a safety issue. "Safety" is not relevant to this Cause of Action because if enforced, it does not "relate to" Defendant Airlines' price, route or service. See 49 U.S.C. § 41713(b)(1). See also Pica v. Delta Air Lines, No. 19-55300, 4 (9th Cir. Jul. 16, 2020). Accordingly, the Airline Deregulation Act (ADA) does not preempt. It is simply not appropriate here.

1290.   Defendants' actions directly caused Plaintiffs' injuries.

**TWENTY-SIXTH CAUSE OF ACTION**: [FEDERAL DEFENDANTS; AIRLINE DEFENDANTS]: INFRINGEMENT ON THE CONSTITUTIONAL RIGHT TO TRAVEL: The Federal Transportation Mask Mandate (FTMM) and the International Traveler Testing Requirement (ITTR) interfered with Americans' right to travel domestically as well as internationally.

1291.   The Plaintiffs reallege and incorporate by reference herein all of the facts and allegations contained in paragraphs herein, and further allege:

1292.   Congress has declared that flying is a public right, not a privilege, especially for those with disabling medical conditions, such as is with Plaintiffs. "A citizen of the United States has a public right of transit through the navigable airspace. To further that right, the Secretary of Transportation shall consult with the Architectural and Transportation Barriers Compliance Board … before prescribing a regulation or issuing an order … that will have a significant impact on the accessibility of commercial airports or commercial air transportation for handicapped individuals." 49 U.S.C. § 40103.

1293.   While it is true that Plaintiffs do not possess a fundamental or constitutional right to travel by airplane, even though it is the most convenient mode of travel for us, traveling from Israel to LAX without boarding an aircraft would require us to (1) travel by boat from the south of Israel to Rome with stopovers in Cyprus and Greece — travel time: 8 days. (2) Then take a train from Naples to London — travel time: 2 days. (3) Then depart from Southampton in the UK, and disembark in New York — travel time: 14 nights. (4) And

then depart Philadelphia and travel via train to LAX — travel time: 4 days. Total travel time: 28 days. The total travel cost would exceed four times the cost of travel by air.

1294.   During COVID, the likelihood of being approved for such travel through Europe and at travel hubs throughout the United States — as disabled Americans with mask exemptions — would be nil. The FTMM applied to conveyances and at ALL transportation hubs nationwide [86 Fed. Reg. 8025 (Feb. 3,2021)].

1295.   When traveling in order to attend the funeral of a loved one, or in order to be with a loved one during a serious illness, possibly for the last time, or after an accident, traveling without boarding an aircraft is not logical or reasonable in light of the fact that UNITED offers daily direct flights from Tel Aviv to SFO that get the passenger to his or her destination within 14 hours, instead of 28 days, and at a fraction of the cost.

1296.   Owing to the age in which we all live and breathe, and given the alternative methods of travel available to the typical Jew wanting to visit Israel, Airline Defendants did in fact deny Plaintiffs their fundamental right to travel. We could not have reasonably traveled from Jerusalem to LAX by any other means other than by aircraft.

1297.   Mask exemptions were denied by Defendant Airlines, even though Plaintiffs possessed exemptions issued by their respective treating physicians. The CDC provided a path for exemptions, but Defendant Airlines exceeded guidance from the Centers for Disease Control and Prevention (CDC), and refused to accept our exemptions.

1298.   Plaintiffs could not travel safely with a mask owing to their disabilities. This fact has been established throughout this Complaint.

1299.   The FTMM was not merely a minor restriction or inconvenience upon our abilities to travel. For all intents and purposes, Plaintiffs were locked out from our own countries for which we hold Citizenship from birth. Accordingly, Plaintiffs can and MUST bring this claim for denial of our constitutional right to travel, especially when, to this day, no evidence or studies or science whatsoever exist that show that airplanes or other modes of transit contributed to the spread of COVID-19.

1300.   The FTMM required a traveler to do something to have the privilege of passing a checkpoint and continuing on his journey, and thus imposed directly on liberty interests of the United States Citizen.

1301.   Courts have ruled on the matter of discriminating against disabled Americans who cannot safely don a face-covering, by prohibiting or limiting their use the public airspace due to their disability, as alleged in this Cause of Action. "The federal guarantee of interstate travel … protects interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." *Zobel v. Williams*, 457 U.S. 55, 60, n. 6 (1982). Cited by *Bray v. Alexandria Clinic*, 506 U.S. 263, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993), citing U.S. Const. Art. IV, § 2. When Airline Defendants denied boarding their aircraft without a mask, it was tantamount to erecting an actual barrier to interstate movement.

1302.   For all Plaintiffs, the Mask Mandate amounted to significantly more than a minor restriction on travel. This entitles all Plaintiffs to bring this claim for the denial of our constitutional right.

1303.   The government doesn't control when citizens may travel, for what purpose, or using what mode. This right is reserved to the people by the Constitution. "The constitutional right to travel from one State to another, and necessarily to use … instrumentalities of interstate commerce in doing so [like airplanes], occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745 (1966), citing *United States v. Price*, (383 U.S. 787 (1966)).

1304.   Courts are — "…tasked with upholding the Constitution and redressing fundamental rights because – no matter how dire the crisis – constitutional protections remain commandments, not suggestions. … just because COVID-19 continues to linger, that is not an invitation to 'slacken … enforcement of constitutional liberties.'" *Air Force Officer v. Austin*, No. 5:22-cv-9, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022).

1305.   "Although there are viable alternatives to flying for domestic travel within the continental United States such as traveling by car or train, the Court disagrees with Defendants' contention that international air travel is a mere convenience in light of the realities of our modern world. Such an argument ignores the numerous reasons that an individual may have for wanting or needing to travel overseas quickly such as the birth of a child, the death of a loved one, a business opportunity, or a religious obligation. … The Court also disagrees with Defendants' assertion that all modes of transportation must be foreclosed before any infringement of an individual's due-process right to international travel is triggered. … The Court concludes international travel is not a mere convenience or luxury in this modern world. Indeed, for many international travel is a necessary aspect of liberties sacred to members of a free society." *Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014).

1306.   "To make one choose between flying to one's destination and exercising one's constitutional right appears to us, as to the Eighth Circuit, *United States v. Kroll*, 481 F.2d 884, 886 (8th Cir. 1973), in many situations a form of coercion, however subtle. … While it may be argued there are often other forms of transportation available, it would work a considerable hardship on many air travelers to be forced to utilize an alternate form of transportation, assuming one exists at all." *United States v. Albarado*, 495 F.2d 799 (2nd Cir. 1974).

1307.   "The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and the inability to fly to a significant extent defines the geographical area in which he may live his life. … An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment, and professional opportunities." *Mohamed v. Holder*, 2014 WL 243115 at *6 (E.D. Va. Jan. 22, 2014).

1308.   Airline Defendants had no statutory authority to coerce US Citizens to submit to medical experiments and devices or be bullied by airline personnel to do things that their doctors told them not to do, precisely because Airline Defendants are not Plaintiffs' doctors.

1309.   Plaintiffs do possess a fundamental right to travel by airplane, and Plaintiffs have been deprived of that right to travel to travel as they deem appropriate. No Judge, no Court, no government authority and certainly no private transportation company can wield any legal mandate that might otherwise restrict or limit in any capacity, Plaintiffs' fundamental and constitutional right in this regard.

1310.   <u>Defendants' actions directly caused Plaintiffs' injuries.</u>


**TWENTY-SEVENTH CAUSE OF ACTION: MEDICAL MALPRACTICE AGAINST DEFENDANTS STAT-MD AND MEDAIRE.**

1311.   Plaintiffs reallege and incorporate by reference herein all of the facts and allegations contained in paragraphs above, and further allege:

1312.   On Specific Jurisdiction, see § 44 above. The continuous and systematic in-state business activities of Medical Defendants is best demonstrated by their conduct within the forum state.

1313.   When Plaintiffs made mask exemption requests, Defendant Airlines contacted Medical Defendants. A consultation was provided on the basis of the passenger's point of origin, destination, time of departure, and how many other mask exemption requests were made for the same flight. Medical Defendants denied Plaintiffs' mask exemption requests for specific flights traveling to or from the State of California. This lawsuit arises from that conduct. Medical Defendants were thus "at home" in California, and not in any other jurisdiction.

1314.   Medical Defendants regularly committed tortious acts in California from which imminent injury did in fact result. Plaintiffs' imminent and/or unavoidable injuries came as a direct result of actions taken, advice given, and coordination provided by Medical Defendants. The acts and events, over which Plaintiffs brought this lawsuit, occurred in this district.

1315.   Plaintiffs may sue a corporate defendant in those states where the company systematically served that state's market for a specific company product or service — medical consultations in this case — that gives rise, in-state, to the lawsuit.

1316.   For Airline Defendants UNITED which contracted medical consultation services from STAT-MD — STAT-MD knew that Plaintiffs' exemption requests came from passengers in California, because our originating flights on those airlines departed from major California airports and/or our final destination airports were to major California airports. STAT-MD reviewed the itinerary, all details of the flight, and evaluated mask exemption requests on that basis. Thus, they were aware of directing activities within the State of California.

1317.   For Airline Defendants AMERICAN, ALLEGIANT and FRONTIER — all of which contracted medical consultation services from MedAire, Inc. — MedAire, Inc. knew that Plaintiffs' exemption requests came from passengers in California, because our originating flights on those airlines departed from major California airports and/or our final destination airports were to major California airports. MedAire Inc. reviewed the itinerary, all details of the flight, and evaluated mask exemption requests on that basis. Thus, they were aware of directing activities within the State of California.

1318.   Accordingly, Plaintiffs' allegations reflect Medical Defendants' purposeful direction toward California or purposeful availment of its laws required to **establish the first prong of the Ninth Circuit's test** of specific personal jurisdiction for this honorable Court.

1319.   Medical Defendants purposefully performed the act of denying mask exemptions for disabled Plaintiffs by which it availed itself of the privilege of conducting activities in the forum [i.e., the state of California], thereby invoking the benefits and protections of anti-discrimination and medical malpractice laws.

1320.   **On the 9th Circuit's 2nd prong**: Medical Defendants' actions of denying Plaintiffs' mask exemptions arise out of Medical Defendants' state of California related activities of provisioning medical consultations to Defendant Airlines to determine who, if

anyone, and when, if at all, would fly without a mask. The consultations took place at major airports in California.

1321.  Moreover, Medical Defendants' purposefully directed its activities to this forum by contracting with Defendant Airlines to handle all mask related disability requests for passengers flying to and from the forum state. The entire disability decision process at each California airport where these airlines fly, rests on the shoulders of Medical Defendants. Most of the injuries in this Complaint are alleged to have occurred in, on the way to, or on the way out from California.

1322.  Medical Defendants do other things other than help airlines ban people with mask-related disabilities. These Defendants have personnel in most states, especially California, in order to address all types of medical situations, and medical emergencies that constantly happen with their contracted airlines.  Medical Defendants have, to this day, significant contractually agreed business contacts in this state that Plaintiffs allege directly caused us our injuries.

1323.  When "Company A" contracts with "Company B" to assist "Company A" in directing certain of its activities at residents of this district, it is clear that both companies are availing themselves of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. Medical Defendants cannot defeat personal jurisdiction for this reason, as doing so it would not comport with fair play and substantial justice.

1324.  The Federal Circuit has summarized the Supreme Court's guidance regarding the due process requirement for establishing specific jurisdiction as follows: The plaintiff bears the burden of showing (1) that the defendant purposefully directed its activities at residents of the forum, and (2) that the plaintiff's claim arises out of or relates to those activities. *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, Case No. 2:13-CV-655, 8 (E.D. Tex. Sep. 2, 2014).

1325.  Plaintiffs have satisfied the first two prongs here.

1326.  "[I]f jurisdictional discovery has not taken place and an evidentiary hearing on jurisdiction has not been held, the plaintiff need only make a prima facie showing that the defendants are subject to personal jurisdiction in the forum." *Id.*

1327.  "In that setting, the Court must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts." *Id.*

1328.  MedAire Inc. was contacted by Defendant Airlines ALLEGIANT and FRONTIER in relation to Plaintiffs' mask exemption requests for flights arriving and departing from California airports, which were denied by MedAire, Inc.

1329.  There was no reasonable expectation that MedAire, Inc. was going to approve mask exemptions for any Plaintiff in this action, had we presented to the gate on the day of travel to undergo a telephone screening.

1330.  Plaintiffs were not given the opportunity to ask why. We were not given opportunity to appeal Medaire, Inc.'s decisions. If we could not comply with their medical malpractice and illegal policies, we were simply told, "If you are unable to meet this requirement, we recommend that you reconsider your travel."

1331.  In an interview with MedAire Inc.'s Global Medical Director of Aviation Health, Paulo M. Alves, MD on February 1, 2022, Dr. Alves stated, "The primary aim for the mask is to protect the people around you from you, but it is also giving you a layer of protection. Nothing is 100%, in medicine or in life, but I would not go into a place where people weren't wearing masks if I don't know them. Not because masks offer 100% protection, but because I want to minimize my odds of getting it."[1]

1332.  Medical Defendants had no interest in providing mask exemptions according to CDC policy guidelines, or in following settled law. Their only objective was to keep disabled Americans who could not safely don a mask, off of their clients' aircraft. The conspiratorial relationship with their clients was unmistakable. These are **factual allegations and non-conclusory**, backed by reliable evidence.

---

[1] https://thepointsguy.com/news/face-masks-will-stay-on-flights-experts-say/

1333.   "A conspiracy 'need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.' *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir.1995) (quoting United States v. Rubin, 844 F.2d 979, 984 (2d Cir.1988))."

1334.   "In order to set forth a viable claim in federal court, a plaintiff is required to satisfy both the Article III constitutional minimum of a "case or controversy" and any prudential considerations set by the courts. See *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 341 (D.N.J. 2003). To satisfy Article III standing, a plaintiff must demonstrate he/she has (1) suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, that the injury has to be fairly traceable to the defendant's challenged action; and (3) it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision. See **Lujan v. Defenders of Wildlife**, 504 U.S. 555, 560 (1992) (internal citations and quotations omitted)." *Disabled Patriots of America, Inc. v. City of Trenton*, Civil Action No.: 07-CV-3165(FLW), 4-5 (D.N.J. Sep. 24, 2008).

1335.   Medical malpractice occurred when MedAire Inc. through a negligent act or omission allegedly completed medical assessment of Plaintiffs, no less by telephone, while we were standing at the departure gate of an airport.

1336.   Medical Defendants' unverified "doctors" deviated from the standards of their profession by magically concluding that Plaintiffs' disabilities and medical exemptions issued by our family physicians were not real, did not exist, or could not be claimed as a means for us to obtain a waiver to travel aboard an airplane without masking, thereby causing injury to patient/Plaintiffs. That level of negligence arose from errors in diagnosis, lack of treatment, lack of aftercare, and lack of our health management from alleged and unverified "doctors" employed by Medical Defendants.

1337.   The process of formulating a diagnosis requires inter alia, a physical and mental examination in order to develop a list of possible causes of the diagnosed disorder. Medical Defendants undertook none of the above.

1338.   Medical Defendants had no verified legal or medical authority, had no verified medical expertise or specialty, reviewed Plaintiffs' mask-exemption requests submitted by their airline clients without ever physically examining Plaintiffs/passengers. In some cases,

1339.   With Defendant Airline UNITED, the mask exemption process required the applicant to grant permission to the airline and Medical Defendants to establish contact or exchange private medical information with the passenger's physician directly to clarify their medical condition. Medical Defendants did communicate with our physicians as part of the mask exemption request process.

1340.   Medical Defendants made decisions to injure Plaintiffs/passengers by making an arbitrary determination to deny mask exemptions without providing any rationale for their decisions.

1341.   These Medical Defendants played a central and essential roll together with their clients, Defendant Airlines. Accordingly, the ADA (Airline Deregulation Act) does NOT preempt medical malpractice because the claim is not related to "safety" or the price, route or service of the airlines, as presented in the previous Causes of Action. There is also no conflict between medical malpractice and any other federal law.

1342.   Plaintiffs at no time ever asked for, needed or wanted to be provided with medical treatment or medical screening from Medical Defendants contracted by Defendant Airlines to disenfranchise us from our disabilities and ignore the very thing that precluded us from masking, and subsequently prevented us from flying or subjected us to cancer, public shaming, being banned from flying, and other injuries presented in these causes of action. Those injuries were inescapable.

1343.   Medical Defendants had no legal authority to even review mask-exemption demands submitted to them by its airline clients. Plaintiffs never agreed through the contract of carriage to accept medical treatment from Medical Defendants.

1344.   Plaintiffs/patients never agreed to enter into a voluntary two-sided doctor/patient relationship with Medical Defendants. Rather, we were forced into an INVOLUNTARY RELATIONSHIP with Medical Defendants, and we were not provided

with any assurance of the qualifications of Medical Defendants personnel, to render a diagnosis that prevented us from receiving the mask waivers we sought. It is precisely for this reason that these medical consultations between the Medical Defendants and the Defendant Airlines constitute medical malpractice.

1345.   The Air Carrier Access Act [ACAA] does not allow Medical Defendants to provide medical consultations to airlines for disability accommodation requests, except in very limited circumstances by law. Those circumstances did not and never will include situations where mask waivers are being sought.

1346.   Airline Defendants had established illegal "Clearance to Fly," and "Fit to Fly" processes, referred to by various names, which involved consulting with Medical Defendants, all of whom openly and unabashedly determined that mask exemptions could not be approved in advance. This was compounded by their refusal to make any exception to their rule.

1347.   By and through the above **factual allegations**, we have articulated a viable legal basis for Plaintiffs' medical malpractice claims set forth herein.

1348.   The actions and inactions of ALL Defendants directly caused the injuries to Plaintiffs.


**TWENTY-EIGHTH CAUSE OF ACTION [DEFENDANT JULIE CARRIGAN IN HER INDIVIDUAL CAPACITY]; BIVENS ACTION FOR VIOLATING FIRST AMENDMENT RIGHTS.**

1349.   Defendant Carrigan signed the letter revoking Mr. Marcus' Pre-Check eligibility despite knowing the action was being taken in violation of his First Amendment rights to protest, speak out against illegal government mandates, associate with other FTMM opponents, and petition the government for a redress of grievances by filing a lawsuit against Defendant Carrigan's employer. Marcus v. TSA, No. 21-1225 (D.C. Cir.) (following transfer from the Fifth Circuit).

1350.   Under the Bivens doctrine, Defendant Carrigan is liable to Marcus for damages in her individual capacity for violating his constitutional rights.

1351.   Defendant Carrigan did cause irreparable harm to Plaintiff by participating in the discrimination machine that was threatening him to don a mask or face dire consequences when he could not safely do so. Her particular function was to punish those who could not comply, by striking down Pre-Check eligibility for the passenger who would dare go so far as to file a petition for review of TSA's masking order. She made an individual, personal decision to retaliate against Plaintiff, singling him out for filing a lawsuit against her employer, and then doing her part to ensure Plaintiff would regret rebelling against the TSA, because she had the power to do it. This is a factual allegation. It is non-conclusory. No remedy exists for the person whose right to redress a government grievance must be waived as a condition for obtaining Pre-Check privileges.

1352.   Moreover, although enhanced screening might not impose a constitutional violation, retaliating against a litigant for exercising his First Amendment right to petition, certainly does, just as this Court has held: A "violation of a constitutional right constitutes irreparable injury..." Gordon v. Holder, 721 F.3d 638 (D.C. Cir. 2013). The Supreme Court likewise frowns on government acts that violate constitutional rights. An American is "irreparably harmed by the loss of First Amendment rights 'for even minimal periods of time...'" Tandon v. Newsom, 141 S.Ct. 1294 (2021).

1353.   A federal government employee injured me. The employee was not acting within the scope of her duties. The employee was acting negligently or wrongfully, and the negligent or wrongful act caused me harm. Plaintiff Marcus' injuries were caused directly by the actions of Defendant Carrigan.

1354.   Accordingly, Plaintiff Marcus' allegations reflect Defendant Carrigan's purposeful direction toward California or purposeful availment of its laws required to establish the first prong of the Ninth Circuit's test of specific personal jurisdiction for this honorable Court.

1355.   Defendant Carrigan purposefully performed an act to revoke Plaintiff Marcus' Pre-Check eligibility IN CALIFORNIA in retaliation of him filing a lawsuit against her employer; an act which availed her of the privilege of conducting activities in the forum [i.e., the state of California], thereby invoking the benefits and protections its laws.

1356.   On the 9th Circuit's 2nd prong: Defendant Carrigan's actions of revoking Plaintiff Marcus' Pre-Check eligibility IN CALIFORNIA, in retaliation for filing a lawsuit against her employer, arose out of Mrs. Carrigan's State of California related activities of determining who was and was not eligible for the Pre-Check program IN CALIFORNIA. Her determinations directly affected the privileges Plaintiff applied for, received and took advantage of, at major airports throughout California, for four years prior to her act.

1357.   Moreover, Defendant Carrigan purposefully directed activities in this forum when she sent her letter to Plaintiff, to his California residential address. The responsibility of her decision to act in retaliation for the lawsuit filed against her employer, rests on Mrs. Carrigan's shoulders in her individual capacity. Plaintiff Marcus' injury in this Cause of Action occurred in the State of California.

1358.   Defendant Carrigan to this day, has significant contacts in this State, at every California Airport that Plaintiff alleges have directly caused his injury.

1359.   The Federal Circuit has summarized the Supreme Court's guidance regarding the due process requirement for establishing specific jurisdiction as follows: The plaintiff bears the burden of showing (1) that the defendant purposefully directed its activities at residents of the forum, and (2) that the plaintiff's claim arises out of or relates to those activities. Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc., Case No. 2:13-CV-655, 8 (E.D. Texas. Sep. 2, 2014).

1360.   Plaintiff has satisfied the first two prongs here. "[I]f jurisdictional discovery has not taken place and an evidentiary hearing on jurisdiction has not been held, the plaintiff need only make prima facie showing that the defendants are subject to personal jurisdiction in the forum." Id.

1361.   "In that setting, the Court must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts." Id.

1362.   Plaintiff incorporates in this cause of action all of the related facts listed above and also incorporate all of the information presented in all other causes of action that are relevant to this cause of action.

**TWENTY-NINTH CAUSE OF ACTION [AIRLINE DEFENDANTS]: pursuant to violations of the ACAA [14 CFR § 382.87(a); 14 CFR § 382.33(a)] and the RA [29 USC § 794(a)] — Discriminating against disabled passengers who could not safely don a facemask when after issuing a mask-exemption and after online seat selection during ticket purchase and/or after boarding the aircraft, and for the entire duration of the flight, Defendants changed the seat assignment to the back of the aircraft, usually in the last row of the aircraft, without the disabled passengers' consent, when other non-disabled passengers were permitted to retain their original seat-selections.**

1363.   "As a carrier, you must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability, except to comply with FAA or applicable foreign government safety requirements." 14 CFR § 382.87(a).

1364.   "[Y]ou must not subject passengers with a disability to restrictions that do not apply to other passengers…" 14 CFR § 382.33(a).

1365.   "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

1366.   Plaintiffs who could not safely don a facemask, but were approved for mask-exemptions, were restricted from flying after they learned that their seat selections during

ticket purchase and/or after boarding the aircraft, and for the entire duration of the flight, were changed and moved to the back of the aircraft, usually in the last row of the aircraft, without the ticketed passengers' consent, when other non-disabled passengers were permitted to retain their original seat-selections.

1367. Defendant Airlines had a policy that instructed gate agents and/or flight attendants to move disabled passengers who could not safely don a facemask, but were approved for mask-exemptions, after issuing a mask-exemption, to the back of the aircraft.

1368. Airline Defendants required mask-exempt passengers who purchased tickets in First of Business Class, to sit in the last row of Business Class or the first row of First Class, regardless of whether they selected other seats within that class. Moreover, they were forced to sit in a window seat even if they selected an aisle seat, while no other passengers were subjected to such blatant segregation, isolation or seat-reassignments.

1369. Plaintiffs' have established that Airline Defendants have obligated themselves to the Civil Rights Act of 1964, the Rehabilitation Act of 1973 and the Air Carrier Access Act of 1986 by their own signatures on PSP CARES contract agreements that resulted in more than $13 Billion dollars being funneled into their bank accounts, in our TWENTY-SECOND Cause of Action;

1370. Plaintiffs' have established that there does in fact exist a PRIVATE RIGHT of action for aggrieved Plaintiffs under all relevant statutes, in their TWENTY-THIRD Cause of Action;

1371. Plaintiffs' have established that CAL. CIV. Code § 51 — THE UNRUH CIVIL RIGHTS ACT — is not preempted by the ACAA, in our THIRTY-FIRST Cause of Action;

1372. Plaintiffs' have established that Airline Defendants have breached their own contracts of carriage, in our THIRTY-SECOND Cause of Action.

1373. Thus, Plaintiffs here now factually allege that Airline Defendants and Medical Defendants violated 14 CFR § 382.87(a); 14 CFR § 382.33(a)] and the RA [29 USC § 794(a) with discriminatory seating policies against disabled passengers who could not safely don a facemask when after issuing a mask-exemption and after online seat selection during ticket

purchase and/or after boarding the aircraft, and for the entire duration of the flight, Defendant Airlines changed the seat assignments to the back of the aircraft, usually in the last row of the aircraft, without the disabled passengers' consent, when other non-disabled passengers were permitted to retain their original seat-selections.

1374. For the Defendants and the courts to say to Plaintiffs, when such violations occur, "Complain to the DOT," even though the DOT did NOT and never will act, and then assert that "Airline and Medical Defendants are not subject to the RA, the ACAA or UNRUH" is tantamount to the U.S. Jurisprudence system of saying to Defendant Airlines…

1375. "Discriminate against disabled Americans at will. Disregard all anti-discrimination legislation. Plaintiffs can't do anything about it through the courts. The legislative branch never intended to invite the disabled to sue the Airlines over such violations. The Executive Branch doesn't care about the laws that were legislated long before they began their respective Administrations; and the Judicial Branch can easily render as null and void, all anti-discrimination legislation enacted since 1964, by relying on selective caselaw. The courts promise to look the other way, so take a free pass. We will turn a blind eye to your violations against disabled Americans. Anti-discrimination laws simply do not apply, because we have found a clever way to erase all of them and ignore Agencies that were charged with enforcing them. This was not the intent of Congress, nor was it the intent of our lawmakers.

1376. The actions and inactions of all these Defendants directly caused the injuries to Plaintiffs.

1377. Plaintiffs include in this cause of action all of the facts written above and also include all of the information presented in all other causes of action.

**THIRTIETH CAUSE OF ACTION [SPECIFIC AIRLINE DEFENDANTS SOUTHWEST AND UNITED; MEDICAL DEFENDANTS]: pursuant to violations of the ACAA [14 CFR § 382.17; 14 CFR § 382.11(a)(1); 49 USC § 41705; 14 CFR § 382.33(a)] and the RA [29 USC § 794(a)] — Banning disabled passengers who could not**

**safely don a facemask from flying or boarding an aircraft, even if a mask-exemption could have otherwise been issued, when and if a plane was more than a certain percentage full.**

1378.  "As a carrier, you may require that a passenger with a medical certificate undergo additional medical review by you if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition since the issuance of the medical certificate …" 14 CFR § 382.23(d).

1379.  "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17.

1380.  "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation…" 14 CFR § 382.11(a)(1). See also 49 USC § 41705.

1381.  "[Y]ou must not subject passengers with a disability to restrictions that do not apply to other passengers…" 14 CFR § 382.33(a).

1382.  "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

1383.  Plaintiffs have been restricted from flying by Airline Defendants Southwest and United, and were assisted in carrying out this restriction by Medical Defendants.

1384.  Southwest and United refused to board passengers who could not safely don a facemask, even if a mask-exemption had been issued, when and if a plane was more than a certain percentage full, banning disabled said passengers from flying.

1385.  Southwest even stated "Passengers may be required to travel on a different date than their scheduled itinerary."

1386.  Plaintiffs' have established that Airline Defendants have obligated themselves to the Civil Rights Act of 1964, the Rehabilitation Act of 1973 and the Air Carrier Access Act of 1986 by their own signatures on PSP CARES contract agreements that resulted in more

than $13 Billion dollars being funneled into their bank accounts, in our TWENTY-SECOND Cause of Action;

1387.   Plaintiffs' have established that there does in fact exist a PRIVATE RIGHT of action for aggrieved Plaintiffs under all relevant statutes, in their TWENTY-THIRD Cause of Action;

1388.   Plaintiffs' have established that CAL. CIV. Code § 51 — THE UNRUH CIVIL RIGHTS ACT — is not preempted by the ACAA, in our THIRTY-FIRST Cause of Action;

1389.   Plaintiffs' have established that Airline Defendants have breached their own contracts of carriage, in our THIRTY-SECOND Cause of Action.

1390.   Thus, Plaintiffs here now factually allege that Airline Defendants and Medical Defendants violated 14 CFR § 382.17; 14 CFR § 382.11(a)(1); 49 USC § 41705; 14 CFR § 382.33(a) and 29 USC § 794(a) when by their own discriminatory policies, they banned disabled passengers who could not safely don a facemask from flying or boarding an aircraft, even if a mask-exemption could have otherwise been issued, when and if a plane was more than a certain percentage full.

1391.   For the Defendants and the courts to say to Plaintiffs, when such violations occur, "You have no avenue for redress of your grievances except the DOT," even though the DOT did NOT and never will act, and then assert that "Airline and Medical Defendants are not subject to the RA, the ACAA or UNRUH" is tantamount to the U.S. Jurisprudence system of saying to Defendant Airlines and Medical Defendants…

1392. "Discriminate against disabled Americans at will. Disregard all anti-discrimination legislation. Plaintiffs can't do anything about it through the courts. The legislative branch never intended to invite the disabled to sue the Airlines over such violations. The Executive Branch doesn't care about the laws that were legislated long before they began their respective Administrations; and the Judicial Branch can easily render as null and void, all anti-discrimination legislation enacted since 1964, by relying on selective caselaw. The courts promise to look the other way, so take a free pass. We will turn a blind eye to your violations against disabled Americans. Anti-discrimination laws simply do not apply, because

we have found a clever way to erase all of them and ignore Agencies that were charged with enforcing them. This was not the intent of Congress, nor was it the intent of our lawmakers.

1393.   The actions and inactions of all these Defendants directly caused the injuries to Plaintiffs.

1394.   Plaintiffs include in this cause of action all of the facts written above and also include all of the information presented in all other causes of action.


## VII.  **PRAYER FOR RELIEF**


**WHEREFORE**, plaintiffs pray for relief as follows:

1.     Declare Defendants CDC and HHS' Feb. 1, 2021, Federal Transportation Mask Mandate order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" (86 Fed. Reg. 8,025 (Feb. 3, 2021)) contrary to statute and unconstitutional, vacate the order, and permanently enjoin its enforcement worldwide.

2.     Issue a permanent injunction that Defendants CDC and HHS shall not issue any other orders requiring any person wear a face mask unless such specific authority is enacted into law by Congress.

3.     Declare Defendants CDC and HHS' International Traveler Testing Requirement order effective Dec. 6, 2021, "Requirements for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country" (86 Fed. Reg. 69,256 (Dec. 7, 2021)) contrary to statute and unconstitutional, vacate the order, and permanently enjoin its enforcement worldwide.

4.    Issue a permanent injunction that Defendants CDC and HHS shall not issue any other orders requiring any person to present a negative COVID-19 or other virus test to board an airplane unless such authority is enacted into law by Congress.

5.    Declare that Defendants TSA and Julie Carrigan's actions rescinding Mr. Marcus' Pre-Check eligibility violates his First Amendment rights and 49 USC § 114(r).

6.    Declare that the Airline Defendants, the yet-to-be-named Individual Defendants, STAT-MD, and MedAire conspired to interfere with the civil rights of the disabled by refusing to transport the disabled solely because we can't safely wear face masks and rescinding Mr. Marcus' Pre-Check eligibility for protesting the FTMM.

7.    Declare that Defendant Julie Carrigan and the yet-to-be-named Individual Defendants neglected to prevent interference with the civil rights of the disabled by refusing to stop policies that decline to transport us solely because we can't safely wear face masks.

8.    Declare that the Airline Defendants' mask policies violate the Rehabilitation Act by discriminating against the disabled and issue a permanent injunction prohibiting them from engaging in such future conduct.

9.    Declare that DOT has failed its statutory obligation to enforce the Air Carrier Access Act, thereby creating a private right of action in this Court for the disabled to enforce the anti-discrimination law as Congress intended, and/or declare that the ACAA may be enforced via the Rehabilitation Act against any airline that receives federal financial assistance, and/or declare that the ACAA may be enforced via the California Unruh Civil Rights Act.

10.    Declare that the Airline Defendants' policies requiring passengers not known to have a communicable disease to wear a face covering violate the Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

11. Declare that the Airline Defendants' policies of refusing to provide mask exemptions to the disabled violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

12. Declare that the Airline Defendants' policies refusing transportation solely on the basis of a passenger's disability violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

13. Declare that the Airline Defendants' policies requiring passengers seeking mask exemptions to do so in advance violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

14. Declare that the Airline Defendants' policies requiring a medical certificate from disabled passengers who ask for a mask exemption violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

15. Declare that the Airline Defendants' policies requiring disabled passengers needing a mask exemption to undergo a medical screening with STAT-MD, MedAire, or any other medical vendor violates the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

16. Declare that the Airline Defendants' policies requiring disabled passengers who seek a mask exemption to submit a negative COVID-19 test for each flight when nondisabled customers aren't subject to this same requirement violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

17. Declare that all Airline Defendants that maintain policies of banning mask-exempt passengers from flying if a plane is more than a certain percentage full violate the

Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

18.   Declare that the Airline Defendants' policies of changing the seat assignment of a mask-exempt passenger without his/her consent violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

19.   Declare that the Airline Defendants' policies limiting the number of disabled passengers on a flight violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

20.   Declare that the Airline Defendants' policies conditioning the carriage and transport of a passenger on the wearing of a mask, when Plaintiffs never agreed to do so in the contract of carriage. This constitutes a breach of contract. Even if the contract would specifically state that carriage and transport of a passenger was conditioned upon the wearing of a mask, it would have been unenforceable because it violates federal law, regulations and ignores the CDC's own provision of an exemption that was available to Plaintiffs, who cannot safely don a mask.

21.   Declare that the Airline Defendants' mask policies constitute recklessness by creating chaos in the skies, imperiling aviation safety; and ignoring the massive evidence showing masks have proven totally ineffective at reducing COVID-19 spread but harm human health, hurting the wellbeing of all passengers.

22.   Declare that the Airline Defendants' mask policies constitute practicing medicine without a license, including violating federal law prohibiting the mandatory use of any medical device unauthorized or approved under an Emergency Use Authorization by the

Food & Drug Administration, and issue a permanent injunction prohibiting them from engaging in such future conduct.

23.    Declare that the Airline Defendants' mask policies constitute an invasion of privacy by forcing disabled passengers to disclose our medical conditions as a condition of transportation and issue a permanent injunction prohibiting them from engaging in such future conduct.

24.    Declare that the Airline Defendants' mask policies constitute deceptive and misleading trade practices and issue a permanent injunction prohibiting them from engaging in such future conduct.

25.    Declare that the Airline Defendants' mask policies constitute fraudulent misrepresentation and issue a permanent injunction prohibiting them from engaging in such future conduct.

26.    Declare that the Airline Defendants' mask policies infringe on the constitutional right to travel and issue a permanent injunction prohibiting them from engaging in such future conduct.

27.    Issue a permanent injunction prohibiting all Airline Defendants from creating and enforcing any future rules that require any passenger to cover his/her face unless the person is known to be infected with a communicable disease as alerted by the federal government's Do Not Board and Lookout systems or other public-health authorities.

28.    Declare that Defendants STAT-MD and MedAire's performance of medical consultations for airlines constitutes medical malpractice and issue a permanent injunction barring them from consulting with any airline or other transportation provider regarding any issue related to passenger use of face masks.

29.     For all causes of action in which monetary damages are available, award Plaintiff Uri Marcus compensatory and punitive damages against Defendant Julie Carrigan in the amount of at least $100,000 for rescinding his Pre-Check eligibility in violation of his First Amendment rights.

30.     For all causes of action in which monetary damages are available, award each plaintiff compensatory and punitive damages against all Airline Defendants in the amount of at least $100,000 per offense.

31.     For Mr. and Mrs. Marcus, there are two instances where Defendant Alaska discriminated against them. Their demand against Alaska is at least $200,000.

32.     For Mr. and Mrs. Gordon there are two instances where Defendant Allegiant discriminated against them. Their demand against Allegiant is at least $200,000.

33.     For Mr. and Mrs. Marcus, there are four instances where Defendant American discriminated against them. Their demand against American is at least $400,000.

34.     For Mr. and Mrs. Gordon there are 10 instances where Defendant American discriminated against them. Their demand against American is at least $1,000,000.

35.     For Ms. Russo there are two instances where Defendant American discriminated against her. Her demand against American is at least $200,000.

36.     For Mr. and Mrs. Marcus, there are seven instances where Defendant Delta discriminated against them. Their demand against Delta is at least $700,000.

37.     For Mr. and Mrs. Gordon there are four instances where Defendant Frontier discriminated against them. Their demand against Frontier is at least $400,000.

38.     For Mr. and Mrs. Marcus, there are four instances where Defendant Hawaiian discriminated against them. Their demand against Hawaiian is at least $400,000.

39.    For Mr. and Mrs. Marcus, there are 14 instances where Defendant Southwest discriminated against them. Their demand against Southwest is at least $1,400,000.

40.    For Mr. and Mrs. Marcus, there are 13 instances where Defendant United discriminated against them. Their demand against United is at least $1,300,000.

41.    For Ms. Russo there are six instances where Defendant United discriminated against her. Her demand against United is at least $600,000.

42.    For all causes of action in which monetary damages are available, award plaintiffs compensatory and punitive damages against each yet-to-be named Individual Defendant in the amount of at least $10,000 per offense.

43.    For all causes of action in which monetary damages are available, award plaintiffs compensatory and punitive damages against STAT-MD and MedAire in the amount of at least $125,000 each per plaintiff for a total of at least $625,000 each per plaintiff.

44.    Award all plaintiffs all costs and fees incurred during the prosecution of this lawsuit from all defendants pursuant to 28 USC § 2412, 29 USC § 794a, 42 USC § 1988, Calif. Civil Code §§ 52(a), 54.3(a), & 55, and/or any other applicable statute or authority.

45.    Award all plaintiffs attorney's fees (if they later hire an attorney to represent them in this lawsuit) incurred during the prosecution of this lawsuit from any defendant found to have acted outside its legal and/or constitutional authority pursuant to 28 USC § 2412, 29 USC § 794a, 42 USC § 1988, Calif. Civil Code §§ 52(a), 54.3(a), & 55, and/or any other applicable statute or authority; or, if they continue representing themselves, award them in lieu of attorney's fees reimbursement at the rate of at least $50 per hour for the time they have spent litigating this matter.

46.    Grant such other and further relief as the Court may deem just and proper under the circumstances.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

PLAINTIFFS HEREBY REQUESTS A JURY TRIAL ON ALL ISSUES RAISED IN THIS COMPLAINT.

## IX.   **CERTIFICATION**

Pursuant to Fed.R.Civ.P. 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) otherwise complies with the requirements of Rule 11.

Respectfully submitted this  10th Day of October, 2023,


_s/Yvonne Marcus_

(Signed by his wife, Yvonne Marcus as Administrator)
The Estate of Uri Marcus, plaintiff
P.O. Box 126
Ojai, CA 93024
Telephone: 909-833-0065
E-Mail: uri@ntcf.org


_s/Yvonne Marcus_

Yvonne Marcus, plaintiff
P.O. Box 126
Ojai, CA 93024
Telephone: 909-833-0065
E-Mail: adi@ntcf.org


_s/Avrohom Gordon_

Avrohom Gordon, plaintiff
2251 State Route 222
New Richmond, OH  45157
Telephone: 513-734-1770
gordon.avrohom@gmail.com


_s/Devorah Gordon_

Devorah Gordon, plaintiff
2251 State Route 222
New Richmond, OH  45157

Telephone: 513-734-1770
devorahlgordon@gmail.com


*s/ Cindy Russo*

Cindy Russo, lead plaintiff
22485 Breakwater Way
Santa Clarita, CA  91350
Telephone: 908-797-8066
cjrz123@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October  10, 2023, I filed this 1st Amended Complaint with the Court's CM/ECF electronic filing, which automatically served  the U.S. Department of Justice attorneys who are defending CDC and HHS, as well as attorneys for the Airline Defendants and STAT-MD.


*s/Cindy Russo*

Cindy Russo, lead plaintiff
22485 Breakwater Way
Santa Clarita, CA  91350
Telephone: 908-797-8066
cjrz123@gmail.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' Exhibit 1

whitehouse.gov

# Executive Order on Promoting COVID-19 Safety in Domestic and International Travel | The White House

11-14 minutes

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.  Policy.**  Science-based public health measures are critical to preventing the spread of coronavirus disease 2019 (COVID-19) by travelers within the United States and those who enter the country from abroad.  The Centers for Disease Control and Prevention (CDC), the Surgeon General, and the National Institutes of Health have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19.  Accordingly, to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely, it is the policy of my Administration to implement these public health measures consistent with CDC guidelines on public modes of transportation and at ports of entry to the United States.

**Sec. 2.  Immediate Action to Require Mask-Wearing on Certain Domestic Modes of Transportation.**

(a)  Mask Requirement.  The Secretary of Labor, the Secretary of Health and Human Services (HHS), the Secretary of Transportation (including through the Administrator of the Federal Aviation Administration (FAA)), the Secretary of Homeland Security (including through the Administrator of the Transportation Security Administration (TSA) and the Commandant of the United States Coast Guard), and the heads of any other executive departments and agencies (agencies) that have relevant regulatory authority (heads of agencies) shall immediately take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in compliance with CDC guidelines in or on:

(i)   airports;

(ii)   commercial aircraft;

(iii)  trains;

(iv)   public maritime vessels, including ferries;

(v)    intercity bus services; and

(vi)   all forms of public transportation as defined in section 5302 of title 49, United States Code.

(b)  Consultation.  In implementing this section, the heads of agencies shall consult, as appropriate, with interested parties, including State, local, Tribal, and territorial officials; industry and union representatives from the transportation sector; and consumer representatives.

(c)  Exceptions.  The heads of agencies may make categorical or case-by-case exceptions to policies developed under this section, consistent with applicable law, to the extent that doing so is necessary or required by law.  If the heads of agencies do make exceptions, they shall require alternative and appropriate safeguards, and shall document all exceptions in writing.

(d)  Preemption.  To the extent permitted by applicable law, the heads of agencies shall ensure that any action taken to implement this section does not preempt State, local, Tribal, and territorial laws or rules imposing public health measures that are more protective of public health than those required by the heads of agencies.

(e)  Coordination.  The Coordinator of the COVID-19 Response and Counselor to the President (COVID-19 Response Coordinator) shall coordinate the implementation of this section.  The heads of agencies shall update the COVID-19 Response Coordinator on their progress in implementing this section, including any categorical exceptions established under subsection (c) of this section, within 7 days of the date of this order and regularly thereafter.  The heads of agencies are encouraged to bring to the attention of the COVID-19 Response Coordinator any questions regarding the scope or implementation of this section.

**Sec. 3.  Action to Implement Additional Public Health Measures for Domestic Travel.**

(a)  Recommendations.  The Secretary of Transportation (including through the Administrator of the FAA) and the Secretary of Homeland Security (including

through the Administrator of the TSA and the Commandant of the Coast Guard), in consultation with the Director of CDC, shall promptly provide to the COVID-19 Response Coordinator recommendations concerning how their respective agencies may impose additional public health measures for domestic travel.

(b)  Consultation.  In implementing this section, the Secretary of Transportation and the Secretary of Homeland Security shall engage with interested parties, including State, local, Tribal, and territorial officials; industry and union representatives from the transportation sector; and consumer representatives.

**Sec. 4.  Support for State, Local, Tribal, and Territorial Authorities.**  The COVID-19 Response Coordinator, in coordination with the Secretary of Transportation and the heads of any other relevant agencies, shall promptly identify and inform agencies of options to incentivize, support, and encourage widespread mask-wearing and physical distancing on public modes of transportation, consistent with CDC guidelines and applicable law.

**Sec. 5.  International Travel.**

(a)  Policy.  It is the policy of my Administration that, to the extent feasible, travelers seeking to enter the United States from a foreign country shall be:

(i)   required to produce proof of a recent negative COVID-19 test prior to entry; and

(ii)  required to comply with other applicable CDC guidelines concerning international travel, including recommended periods of self-quarantine or self-isolation after entry into the United States.

(b)  Air Travel.

(i)    The Secretary of HHS, including through the Director of CDC, and in coordination with the Secretary of Transportation (including through the Administrator of the FAA) and the Secretary of Homeland Security (including through the Administrator of the TSA), shall, within 14 days of the date of this order, assess the CDC order of January 12, 2021, regarding the requirement of a negative COVID-19 test result for airline passengers traveling into the United States, in light of subsection (a) of this section.  Based on such assessment, the Secretary of HHS and the Secretary of Homeland Security shall take any further appropriate regulatory action, to the extent feasible and consistent with CDC guidelines and applicable law.  Such assessment and regulatory action shall include consideration of:

(A)  the timing and types of COVID-19 tests that should satisfy the negative test requirement, including consideration of additional testing immediately prior to departure;

(B)  the proof of test results that travelers should be required to provide;

(C)  the feasibility of implementing alternative and sufficiently protective public health measures, such as testing, self-quarantine, and self-isolation on arrival, for travelers entering the United States from countries where COVID-19 tests are inaccessible, particularly where such inaccessibility of tests would affect the ability of United States citizens and lawful permanent residents to return to the United States; and

(D)  measures to prevent fraud.

(ii)   The Secretary of HHS, in coordination with the Secretary of Transportation (including through the Administrator of the FAA) and the Secretary of Homeland Security (including through the Administrator of the TSA), shall promptly provide to the President, through the COVID-19 Response Coordinator, a plan for how the Secretary and other Federal Government actors could implement the policy stated in subsection (a) of this section with respect to CDC-recommended periods of self-quarantine or self-isolation after a flight to the United States from a foreign country, as he deems appropriate and consistent with applicable law.  The plan shall identify agencies' tools and mechanisms to assist travelers in complying with such policy.

(iii)  The Secretary of State, in consultation with the Secretary of HHS (including through the Director of CDC), the Secretary of Transportation (including through the Administrator of the FAA), and the Secretary of Homeland Security, shall seek to consult with foreign governments, the World Health Organization, the International Civil Aviation Organization, the International Air Transport Association, and any other relevant stakeholders to establish guidelines for public health measures associated with safe international travel, including on aircraft and at ports of entry. Any such guidelines should address quarantine, testing, COVID-19 vaccination, follow-up testing and symptom-monitoring, air filtration requirements, environmental decontamination standards, and contact tracing.

(c)  Land Travel.  The Secretary of State, in consultation with the Secretary of HHS, the Secretary of Transportation, the Secretary of Homeland Security, and the Director of CDC, shall immediately commence diplomatic outreach to the governments of Canada and Mexico regarding public health protocols for land ports of entry.  Based on this diplomatic engagement, within 14 days of the date of this order, the Secretary of HHS (including through the Director of CDC), the Secretary

of Transportation, and the Secretary of Homeland Security shall submit to the President a plan to implement appropriate public health measures at land ports of entry.  The plan should implement CDC guidelines, consistent with applicable law, and take into account the operational considerations relevant to the different populations who enter the United States by land.

(d)  Sea Travel.  The Secretary of Homeland Security, through the Commandant of the Coast Guard and in consultation with the Secretary of HHS and the Director of CDC, shall, within 14 days of the date of this order, submit to the President a plan to implement appropriate public health measures at sea ports.  The plan should implement CDC guidelines, consistent with applicable law, and take into account operational considerations.

(e)  International Certificates of Vaccination or Prophylaxis.  Consistent with applicable law, the Secretary of State, the Secretary of HHS, and the Secretary of Homeland Security (including through the Administrator of the TSA), in coordination with any relevant international organizations, shall assess the feasibility of linking COVID-19 vaccination to International Certificates of Vaccination or Prophylaxis (ICVP) and producing electronic versions of ICVPs.

(f)  Coordination.  The COVID-19 Response Coordinator, in consultation with the Assistant to the President for National Security Affairs and the Assistant to the President for Domestic Policy, shall coordinate the implementation of this section. The Secretary of State, the Secretary of HHS, the Secretary of Transportation, and the Secretary of Homeland Security shall update the COVID-19 Response Coordinator on their progress in implementing this section within 7 days of the date of this order and regularly thereafter.  The heads of all agencies are encouraged to bring to the attention of the COVID-19 Response Coordinator any questions regarding the scope or implementation of this section.

**Sec. 6.  General Provisions.**  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,
January 21, 2021.

# Plaintiffs' Exhibit 2

### Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System

As reflected in numerous determinations by the Executive Branch, including the President's March 13, 2020 determination that the outbreak of Coronavirus Disease 2019 (COVID-19) constitutes a "national emergency" under the National Emergencies Act and the nationwide public health emergency declared by the Secretary of Health and Human Services on January 31, 2020, the COVID-19 pandemic continues to pose a threat to our health and security. On January 15, 2021, the Centers for Disease Control and Prevention (CDC) updated their information to account for several new strains of COVID-19, including variant B.1.1.7 from the United Kingdom, variant B.1.351 from South Africa, and variant B.1.1.28.1 from Brazil.  As of January 20, 2021, the United States has experienced more than 24 million confirmed COVID-19 cases and more than 400,000 COVID-19 deaths. The CDC, the Surgeon General, and the National Institutes of Health have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19.  On January 21, 2021, the President issued the *Executive Order on Promoting COVID-19 Safety in Domestic and International Travel.*  The purpose of this Executive Order is to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely.  Further, on January 25, 2021 the President issued a *Proclamation on the Suspension of Entry as Immigrants and Non-Immigrants of Certain Additional Persons Who Pose a Risk of Transmitting Coronavirus Disease* whereby he reinstituted travel restriction for individuals traveling to the United States from the United Kingdom, Ireland, the Schengen Area, and instituted restrictions for South Africa.

In the light of these circumstances and direction from the President, and after consultation with public health officials, I, David P. Pekoske, Acting Secretary of Homeland Security, pursuant to the authority vested in me under section 101 of the Aviation and Transportation Security Act (ATSA), as codified at section 114(g) of title 49, United States Code (U.S.C.) do hereby determine that a national emergency exists and am directing the Transportation Security Administration to take actions consistent with the authorities in ATSA as codified at 49 U.S.C. sections 106(m) and 114(f), (g), (l), and (m) to implement the Executive Order to promote safety in and secure the transportation system.  This includes supporting the CDC in the enforcement of any orders or other requirements necessary to protect the transportation system, including

passengers and employees, from COVID-19 and to mitigate the spread of COVID-19 through the transportation system, to the extent appropriate and consistent with applicable law.  I specifically direct the Transportation Security Administration to use its authority to accept the services of, provide services to, or otherwise cooperate with other federal agencies, including through the implementation of countermeasures with appropriate departments, agencies, and instrumentalities of the United States in order to address a threat to transportation, recognizing that such threat may involve passenger and employee safety.


*David P. Pekoske* 1/27/2021

David P. Pekoske

Acting Secretary

Department of Homeland Security

EXHIBIT 3

**CENTERS FOR DISEASE CONTROL AND PREVENTION**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**ORDER UNDER SECTION 361**
**OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)**
**AND 42 CODE OF FEDERAL REGULATIONS 70.2, 71.31(b), 71.32(b)**

**REQUIREMENT FOR PERSONS TO WEAR MASKS**
**WHILE ON CONVEYANCES AND AT TRANSPORTATION HUBS**

SUMMARY:

Notice and Order; and subject to the limitations under "Applicability," pursuant to 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b):

(1) Persons[1] must wear[2] masks over the mouth and nose when traveling on conveyances into and within the United States. Persons must also wear masks at transportation hubs as defined in this Order.

(2) A conveyance operator transporting persons into and within the United States[3] must require all persons onboard to wear masks for the duration of travel.

(3) A conveyance operators operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for the duration of travel as a condition of controlled free pratique.[4]

(4) Conveyance operators must use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel. Best efforts include:

- boarding only those persons who wear masks;
- instructing persons that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law;
- monitoring persons onboard the conveyance for anyone who is not wearing a mask and seeking compliance from such persons;
- at the earliest opportunity, disembarking any person who refuses to comply; and
- providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement of this Order to wear a mask; best practices may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email;

---

[1] As used in this Order, "persons" includes travelers (*i.e.*, passengers and crew), conveyance operators, and any workers or service providers in the transportation hub.

[2] To "wear a mask" means to wear a mask over the nose and mouth.

[3] This includes international, interstate, or intrastate waterways, subject to the jurisdiction of the United States.

[4] As a condition of this controlled free pratique to commence or continue operations in the United States, conveyance operators must additionally require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons on the conveyance (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect. This precaution must be followed regardless of scheduled itinerary.

posted signage in multiple languages with illustrations; printing the requirement on
transit tickets; or other methods as appropriate.

(5) Operators of transportation hubs must use best efforts to ensure that any person entering or on
the premises of the transportation hub wears a mask. Best efforts include:

- allowing entry only to those persons who wear masks;
- instructing persons that Federal law requires wearing a mask in the transportation hub
  and failure to comply constitutes a violation of Federal law;
- monitoring persons on the premises of the transportation hub for anyone who is not wear-
  ing a mask and seeking compliance from such persons;
- at the earliest opportunity, removing any person who refuses to comply from the premises
  of the transportation hub; and
- providing persons with prominent and adequate notice to facilitate awareness and compli-
  ance with the requirement of this Order to wear a mask; best practices may include, if
  feasible, advance notifications on digital platforms, such as on apps, websites, or email;
  posted signage in multiple languages with illustrations; printing the requirement on
  transit tickets; or other methods as appropriate.

DEFINITIONS:

*Controlled free pratique* shall have the same definition as under 42 CFR 71.1, meaning "permis-
sion for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated
conditions."

*Conveyance* shall have the same definition as under 42 CFR 70.1, meaning "an aircraft, train,
road vehicle,[5] vessel . . . or other means of transport, including military." Included in the defini-
tion of "conveyance" is the term "carrier" which under 42 CFR 71.1 has the same definition as
conveyance under 42 CFR 70.1.

*Conveyance operator* means an individual operating a conveyance and an individual or organiza-
tion causing or authorizing the operation of a conveyance.

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[6]

*Interstate traffic* shall have the same definition as under 42 CFR 70.1, meaning

---

[5] This includes rideshares meaning arrangements where passengers travel in a privately owned road vehicle driven
by its owner in connection with a fee or service.
[6] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head,
including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face.  Masks do not
include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without
slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this Order.
CDC guidance for attributes of acceptable masks in the context of this Order is available at:
https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

"(1):

    (i) The movement of any conveyance or the transportation of persons or property, including any portion of such movement or transportation that is entirely within a state or possession–

    (ii) From a point of origin in any state or possession to a point of destination in any other state or possession; or

    (iii) Between a point of origin and a point of destination in the same state or possession but through any other state, possession, or contiguous foreign country.

(2) Interstate traffic does not include the following:

    (i) The movement of any conveyance which is solely for the purpose of unloading persons or property transported from a foreign country or loading persons or property for transportation to a foreign country.

    (ii) The movement of any conveyance which is solely for the purpose of effecting its repair, reconstruction, rehabilitation, or storage."

*Intrastate traffic* means the movement of any conveyance or the transportation or movement of persons occurring solely within the boundaries of a state or territory, or on tribal land.

*Possession* shall have the same definition as under 42 CFR 70.1 and 71.1, meaning a "U.S. territory."

*State* shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

*Territory* shall have the same definition as "U.S. territory" under 42 CFR 70.1 and 71.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the [Commonwealth of] Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

*Transportation hub* means any airport, bus terminal, marina, seaport or other port, subway station, terminal (including any fixed facility at which passengers are picked-up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States.

*Transportation hub operator* means an individual operating a transportation hub and an individual or organization causing or authorizing the operation of a transportation hub.

*U.S. port* shall have the same definition as under 42 CFR 71.1, meaning any "seaport, airport, or border crossing point under the control of the United States."

STATEMENT OF INTENT:

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Preservation of human life;
- Maintaining a safe and secure operating transportation system;
- Mitigating the further introduction, transmission, and spread of COVID-19 into the United States and from one state or territory into any other state or territory; and
- Supporting response efforts to COVID-19 at the Federal, state, local, territorial, and tribal levels.

APPLICABILITY:

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a Tribe that (1) requires a person to wear a mask on conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires conveyances to transport only persons wearing masks. Such requirements must provide the same level of public health protection as — or greater protection than —the requirements listed herein.

In addition, the requirement to wear a mask shall not apply under the following circumstances:

- While eating, drinking, or taking medication, for brief periods;
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication;
- If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;[7] or
- When necessary to temporarily remove the mask to verify one's identity such as during Transportation Security Administration screening or when asked to do so by the ticket or gate agent or any law enforcement official.

This Order exempts the following categories of persons:[8]

---

[7] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[8] Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

- A child under the age of 2 years;
- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]
- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

This Order exempts the following categories of conveyances, including persons on board such conveyances:

- Private conveyances operated solely for personal, non-commercial use;
- Commercial motor vehicles or trucks as these terms are defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle or truck;
- Conveyances operated or chartered by the U.S. military services provided that such conveyance operators observe Department of Defense precautions to prevent the transmission of COVID-19 that are equivalent to the precautions in this Order.

This Order applies to persons on conveyances and at transportation hubs directly operated by U.S. state, local, territorial, or tribal government authorities, as well as the operators themselves. U.S. state, local, territorial, or tribal government authorities directly operating conveyances and transportation hubs may be subject to additional federal authorities or actions, and are encouraged to implement additional measures enforcing the provisions of this Order regarding persons traveling onboard conveyances and at transportation hubs operated by these government entities.

To the extent permitted by law, and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel),[10] Federal agencies are required to implement additional measures enforcing the provisions of this Order.

BACKGROUND:

There is currently a pandemic of respiratory disease (coronavirus disease 2019 or "COVID-19") caused by a novel coronavirus (SARS-COV-2). As of January 27, 2021, there have been 99,638,507 confirmed cases of COVID-19 globally, resulting in more than 2,141,000 deaths. As of January 27, 2021, there have been over 25,000,000 cases identified in the United States and over 415,000 deaths due to the disease. New SARS-CoV-2 variants have emerged in recent weeks, including at least one with evidence of increased transmissibility.[11]

The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet) mainly through respiratory droplets

---

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. CDC will issue additional guidance regarding persons who cannot wear a mask under this exemption. https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html

[10] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/executive-order-promoting-covid-19-safety-in-domestic-and-international-travel/

[11] https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/scientific-brief-emerging-variants.html

produced when an infected person coughs, sneezes, or talks. These droplets can land in the mouths, eyes, or noses of people who are nearby and possibly be inhaled into the lungs. Infected people without symptoms (asymptomatic) and those in whom symptoms have not yet developed (pre-symptomatic) can also spread the virus. In general, the more closely an infected person interacts with others and the longer those interactions, the higher the risk of COVID-19 spread. COVID-19 may be transmitted by touching surfaces or objects that have the virus on them and then touching one's own or another person's eyes, nose, or mouth.

Masks help prevent people who have COVID-19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others.[12] Masks are primarily intended to reduce the emission of virus-laden droplets, i.e., they act as source control by blocking exhaled virus.[13] This is especially relevant for asymptomatic or pre-symptomatic infected wearers who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions.[14,15] Masks also provide personal protection to the wearer by reducing inhalation of these droplets, i.e., they reduce wearers' exposure through filtration.[16] The community benefit of wearing masks for SARS-CoV-2 control is due to the combination of these effects; individual prevention benefit increases with increasing numbers of people using masks consistently and correctly.

Appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.  Seven studies have confirmed the benefit of universal masking in community level analyses: in a unified hospital system,[17] a  German city,[18] a U.S. State,[19] a panel of 15 U.S. States and Washington, D.C.,[20,21] as

[12] https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html

[13] Leung NHL, Chu DKW, Shiu EYC, et al. Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nature Medicine.* 2020;26(5):676-680.https://dx.doi.org/10.1038/s41591-020-0843-2

[14] Moghadas SM, Fitzpatrick MC, Sah P, et al. The implications of silent transmission for the control of COVID-19 outbreaks. *Proc Natl Acad Sci U S A.* 2020;117(30):17513-17515.10.1073/pnas.2008373117. https://www.ncbi.nlm.nih.gov/pubmed/32632012

[15] Johansson MA, Quandelacy TM, Kada S, et al. SARS-CoV-2 Transmission From People Without COVID-19 Symptoms. Johansson MA, et al. JAMA Netw Open. 2021 Jan 4;4(1):e2035057. doi: 10.1001/jamanetworkopen.2020.35057.

[16] Ueki H, Furusawa Y, Iwatsuki-Horimoto K, et al. Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2. *mSphere.* 2020;5(5).10.1128/mSphere.00637-20. https://www.ncbi.nlm.nih.gov/pubmed/33087517

[17] Wang X, Ferro EG, Zhou G, Hashimoto D, Bhatt DL. Association Between Universal Masking in a Health Care System and SARS-CoV-2 Positivity Among Health Care Workers. *JAMA.* 2020.10.1001/jama.2020.12897. https://www.ncbi.nlm.nih.gov/pubmed/32663246

[18] Mitze T., Kosfeld R., Rode J., Wälde K. *Face Masks Considerably Reduce COVID-19 Cases in Germany: A Synthetic Control Method Approach.* IZA – Institute of Labor Economics (Germany);2020.ISSN: 2365-9793, DP No. 13319. http://ftp.iza.org/dp13319.pdf

[19] Gallaway MS, Rigler J, Robinson S, et al. Trends in COVID-19 Incidence After Implementation of Mitigation Measures – Arizona, January 22-August 7, 2020. *MMWR Morb Mortal Wkly Rep.* 2020;69(40):1460-1463.10.15585/mmwr.mm6940e3. https://www.ncbi.nlm.nih.gov/pubmed/33031366

[20] Lyu W, Wehby GL. Community Use Of Face Masks And COVID-19: Evidence From A Natural Experiment Of State Mandates In The US. *Health Aff (Millwood).* 2020;39(8):1419-1425.10.1377/hlthaff.2020.00818. https://www.ncbi.nlm.nih.gov/pubmed/32543923

[21] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.goldmansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

well as both Canada[22] and the United States[23] nationally. Each analysis demonstrated that, following directives from organizational and political leadership for universal masking, new infections fell significantly. Two of these studies[24,25] and an additional analysis of data from 200 countries that included localities within the United States[26] also demonstrated reductions in mortality. An economic analysis using U.S. data found that, given these effects, increasing universal masking by 15% could prevent the need for lockdowns and reduce associated losses of up to $1 trillion or about 5% of gross domestic product.[27]

Wearing a mask especially helps protect those at increased risk of severe illness from COVID-19[28] and workers who frequently come into close contact with other people (e.g., at transportation hubs). Masks are most likely to reduce the spread of COVID-19 when they are widely used by people in public settings. Using masks along with other preventive measures, including social distancing, frequent handwashing, and cleaning and disinfecting frequently touched surfaces, is one of the most effective strategies available for reducing COVID-19 transmission.

Traveling on multi-person conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and crowded airport terminals. Social distancing may be difficult if not impossible on flights.  People may not be able to distance themselves by the recommended 6 feet from individuals seated nearby or those standing in or passing through the aircraft's aisles. Travel by bus, train, vessel, and other conveyances used for international, interstate, or intrastate transportation pose similar challenges.

Intrastate transmission of the virus has led to—and continues to lead to—interstate and international spread of the virus, particularly on public conveyances and in travel hubs, where passengers who may themselves be traveling only within their state or territory commonly interact with others traveling between states or territories or internationally. Some states, territories, Tribes,

---

[22] Karaivanov A., Lu S.E., Shigeoka H., Chen C., Pamplona S. *Face Masks, Public Policies and Slowing the Spread of Covid-19: Evidence from Canada* National Bureau of Economic Research 2020.Working Paper 27891. http://www.nber.org/papers/w27891

[23] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[24] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.gold-mansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[25] Chernozhukov V, Kasahara H, Schrimpf P. Causal Impact of Masks, Policies, Behavior on Early Covid-19 Pandemic in the U.S. J Econom. 2021 Jan;220(1):23-62. doi: 10.1016/j.jeconom.2020.09.003. Epub 2020 Oct 17.

[26] Leffler CT, Ing EB, Lykins JD, Hogan MC, McKeown CA, Grzybowski A. Association of country-wide coronavirus mortality with demographics, testing, lockdowns, and public wearing of masks. Am J Trop Med Hyg. 2020 Dec;103(6):2400-2411. doi: 10.4269/ajtmh.20-1015. Epub 2020 Oct 26.

[27] Hatzius J, Struyven D, Rosenberg I. Face Masks and GDP. *Goldman Sachs Research* https://www.gold-mansachs.com/insights/pages/face-masks-and-gdp.html. Accessed January 20, 2021.

[28] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html

and local public health authorities have imposed mask-wearing requirements within their jurisdictional boundaries to protect public health.[29] Any state or territory without sufficient mask-wearing requirements for transportation systems within its jurisdiction has not taken adequate measures to prevent the spread of COVID-19 from such state or territory to any other state or territory. That determination is based on, *inter alia*, the rapid and continuing transmission of the virus across all states and territories and across most of the world. Furthermore, given how inter-connected most transportation systems are across the nation and the world, local transmission can grow even more quickly into interstate and international transmission when infected persons travel on non-personal conveyances without wearing a mask and with others who are not wearing masks.

Therefore, I have determined that the mask-wearing requirements in this Order are reasonably necessary to prevent the further introduction, transmission, or spread of COVID-19 into the United States and among the states and territories. Individuals traveling into or departing from the United States, traveling interstate, or traveling entirely intrastate, conveyance operators that transport such individuals, and transportation hub operators that facilitate such transportation, must comply with the mask-wearing requirements set forth in this Order.

America's transportation systems are essential. Not only are they essential for public health, they are also essential for America's economy and other bedrocks of American life. Those transportation systems carry life-saving medical supplies and medical providers into and across the nation to our hospitals, nursing homes, and physicians' offices. Trains, planes, ships, and automobiles bring food and other essentials to our communities and to our homes. Buses bring America's children and teachers to school. Buses, trains, and subways, bring America's workforce to their jobs.

Requiring masks on our transportation systems will protect Americans and provide confidence that we can once again travel safely even during this pandemic. Therefore, requiring masks will help us control this pandemic and aid in re-opening America's economy.

The United States and countries around the world are currently embarking on efforts to vaccinate their populations, starting with healthcare personnel and other essential workers at increased risk of exposure to SARS-CoV-2 and people at increased risk for severe illness from the virus. While vaccines are highly effective at preventing severe or symptomatic COVID-19, at this time there is limited information on how much the available COVID-19 vaccines may reduce transmission in the general population and how long protection lasts.[30] Therefore, this mask requirement, as well as CDC recommendations to prevent spread of COVID-19,[31] additionally apply to vaccinated persons. Similarly, CDC recommends that people who have

---

[29] Based on internet sources, 37 states plus D.C. and Puerto Rico mandate the wearing of masks in public. Among the jurisdictions that have imposed mask mandates, variations in requirements exist. For example, exemptions for children range in cutoff age from 2 to 12, but masks are generally required in indoor public spaces such as restaurants and stores, on public transit and ride-hailing services, and outdoors when unable to maintain 6 feet of distance from others. *See* https://www.aarp.org/health/healthy-living/info-2020/states-mask-mandates-coronavirus.html (accessed January 28, 2021).

[30] https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html

[31] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

recovered from COVID-19 continue to take precautions to protect themselves and others, in-
cluding wearing masks;[32] therefore, this mask requirement also applies to people who have
recovered from COVID-19.

ACTION:

Until further notice, under 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), and 71.32(b), unless
excluded or exempted as set forth in this Order, a person must wear a mask while boarding,
disembarking, and traveling on any conveyance into or within the United States. A person
must also wear a mask at any transportation hub that provides transportation within the United
States.

Conveyance operators traveling into or within the United States may transport only persons
wearing masks and must use best efforts to ensure that masks are worn when embarking, dis-
embarking, and throughout the duration of travel. Operators of transportation hubs must use
best efforts to ensure that any person entering or on the premises of the transportation hub
wears a mask.

As a condition of receiving controlled free pratique under 42 CFR 71.31(b) to enter a U.S. port,
disembark passengers, and begin operations at any U.S. port of entry, conveyances arriving into
the United States must require persons to wear masks while boarding, disembarking, and for the
duration of travel. Conveyance operators must also require all persons to wear masks while
boarding and for the duration of their travel on board conveyances departing from the United
States until the conveyance arrives at the foreign destination, if at any time any of the persons
onboard (passengers, crew, or conveyance operators) will return to the United States while this
Order remains in effect. These travel conditions are necessary to mitigate the harm of further in-
troduction of COVID-19 into the United States.

Requiring a properly worn mask is a reasonable and necessary measure to prevent the introduc-
tion, transmission and spread of COVID-19 into the United States and among the states and terri-
tories under 42 U.S.C. 264(a) and 42 CFR 71.32(b). Among other benefits, masks help prevent
dispersal of an infected person's respiratory droplets that carry the virus. That precaution helps
prevent droplets from landing in the eye, mouth, or nose or possibly being inhaled into the lungs
of an uninfected person, or from landing on a surface or object that an uninfected person may
then touch and then touch his or her own or another's eyes, nose, or mouth. Masks also provide
some protection to the wearer by helping reduce inhalation of respiratory droplets.

This Order shall not apply within any state, locality, territory, or area under the jurisdiction of a
Tribe, where the controlling governmental authority: (1) requires a person to wear a mask on
conveyances; (2) requires a person to wear a mask at transportation hubs; and (3) requires con-
veyances to transport only persons wearing masks. Those requirements must provide the same
level of public health protection as —or greater protection than—the requirements listed herein.

In accordance with 42 U.S.C. 264(e), state, local, territorial, and tribal authorities may impose
additional requirements that provide greater public health protection and are more restrictive than

---

[32] https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

the requirements in this Order. Consistent with other federal, state, or local legal requirements, this Order does not preclude operators of conveyances or transportation hubs from imposing additional requirements, or conditions for carriage, that provide greater public health protection and are more restrictive than the requirements in this Order (e.g., requiring a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or imposing requirements for social distancing or other recommended protective measures).

This Order is not a rule within the meaning of the Administrative Procedure Act ("APA") but rather is an emergency action taken under the existing authority of 42 U.S.C. 264(a) and 42 CFR 70.2, 71.31(b), 71.32(b). In the event that a court determines this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. Considering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Order. Similarly, the Office of Information and Regulatory Affairs has determined that if this Order were a rule, it would be a major rule under the Congressional Review Act, but there would not be a delay in its effective date as the agency has determined that there would be good cause to make the requirements herein effective immediately under the APA.

This order is also an economically significant regulatory action under Executive Order 12866 and has therefore been reviewed by the Office of Information and Regulatory Affairs of the Office of Management and Budget. The agency is proceeding without the complete analysis required by Executive Order 12866 under the emergency provisions of 6(a)(3)(D) of that Order.

If any provision of this Order, or the application of any provision to any carriers, conveyances, persons, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any carriers, conveyances, persons, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

To address the COVID-19 public health threat to transportation security, this Order shall be enforced by the Transportation Security Administration under appropriate statutory and regulatory authorities including the provisions of 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR part 1503, 1540.105, 1542.303, 1544.305 and 1546.105.

This Order shall be further enforced by other federal authorities and may be enforced by cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18 and 71.2.[33]

---

[33] While this Order may be enforced and CDC reserves the right to enforce through criminal penalties, CDC does not intend to rely primarily on these criminal penalties but instead strongly encourages and anticipates widespread voluntary compliance as well as support from other federal agencies in implementing additional civil measures enforcing the provisions of this Order, to the extent permitted by law and consistent with President Biden's Executive Order of January 21, 2021 (Promoting COVID-19 Safety in Domestic and International Travel).

<u>EFFECTIVE DATE</u>:

This Order shall enter into effect on February 1, 2021, at 11:59 p.m. and will remain in effect unless modified or rescinded based on specific public health or other considerations, or until the Secretary of Health and Human Services rescinds the determination under section 319 of the Public Health Service Act (42 U.S.C. 247d) that a public health emergency exists.

In testimony whereof, the Director of the Division of Global Migration and Quarantine at the Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set his hand at Atlanta, GA, this 29th day of January 2021.


Martin S. Cetron, M.D.
Director, Division of Global Migration and Quarantine
Centers for Disease Control and Prevention

Plaintiffs EXHIBIT  4

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598



**Transportation
Security
Administration**

## MEMORANDUM

To:  Covered Airport Operators

Date:  January 31, 2021

Subject:  Security Directive 1542-21-01

Attached to this memorandum is Security Directive (SD) 1542-21-01: Security Measures – Face Mask Requirements.  This SD is issued to implement the January 21, 2021, Executive Order on promoting measures to prevent the spread of coronavirus disease 2019 (COVID-19) by travelers within the United States and those who enter the country from abroad.  This SD also supports enforcement of the Centers for Disease Control and Prevention (CDC) Order mandating masks issued on January 29, 2021.

All queries concerning the attached SD must be directed to your assigned TSA Federal Security Director.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

Attachment:
Security Directive 1542-21-01



**Transportation
Security
Administration**

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598

## SECURITY DIRECTIVE

| | |
|---|---|
| NUMBER | SD 1542-21-01 |
| SUBJECT | Security Measures – Mask Requirements |
| EFFECTIVE DATE | 11:59 pm EST on February 1, 2021 |
| EXPIRATION DATE | May 11, 2021 |
| CANCELS AND SUPERSEDES | Not Applicable |
| APPLICABILITY | Airport operators regulated under 49 CFR 1542.103 and airlines that have exclusive area agreements under 49 CFR 1542.111 |
| AUTHORITY | 49 U.S.C. 114 and 44903; 49 CFR 1542.303 |
| LOCATION | Airports within the United States |

### PURPOSE AND GENERAL INFORMATION

Due to the ongoing COVID-19 pandemic and to reduce the spread of the virus, the President issued an Executive Order, *Promoting COVID-19 Safety in Domestic and International Travel*, on January 21, 2021, requiring masks to be worn in airports, on commercial aircraft, and in various modes of surface transportation. On January 27, 2021, the Acting Secretary of Homeland Security determined a national emergency existed requiring the Transportation Security Administration (TSA) to issue this Security Directive (SD) to implement the Executive Order and enforce the related Order[1] issued by the Centers for Disease Control and Prevention (CDC), pursuant to the authority of 49 U.S.C. sections 114 and 44903. Consistent with these mandates and TSA's authority, TSA is issuing this SD requiring masks to be worn to mitigate the spread of COVID-19 during air travel. TSA developed these requirements in consultation with the Federal Aviation Administration and CDC.

---

[1] *See* Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations (CFR) §§ 70.2, 71.31(B), 71.32(B); Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (January 29, 2021)

Security Directive                                                                    SD 1542-21-01

## DEFINITIONS

For the purposes of this SD, the following definitions apply:

*Conveyance* has the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle, vessel…or other means of transport, including military."

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[2]

## ACTIONS REQUIRED

Except at locations under the control of an aircraft operator, foreign air carrier, or a federal government agency or their contractors, the airport operator must apply the following measures:

A. The airport operator must make best efforts to provide individuals with prominent and adequate notice of the mask requirements to facilitate awareness and compliance.[3]  This notice must also inform individuals of the following:

   1. Federal law requires wearing a mask at all times in and on the airport and failure to comply may result in removal and denial of re-entry.

   2. Refusing to wear a mask in or on the airport is a violation of federal law; individuals may be subject to penalties under federal law.

B. The airport operator must require that individuals in or on the airport wear a mask, except as described in Sections D., E., and F.

   1. If individuals are not wearing masks, ask them to put a mask on.

   2. If individuals refuse to wear a mask in or on the airport, escort them from the airport.

C. The airport operator must ensure direct employees, authorized representatives, tenants, and vendors wear a mask at all times in or on the airport, except as described in Sections D., E., and F.

D. The requirement to wear a mask does not apply under the following circumstances:

   1. When necessary to temporarily remove the mask for identity verification purposes.

---

[2] A properly worn mask completely covers the nose and mouth of the wearer.  A mask should be secured to the head, including with ties or ear loops.  A mask should fit snugly but comfortably against the side of the face.  Masks do not include face shields.  Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures.  Medical masks and N-95 respirators fulfill the requirements of this SD.  CDC guidance for attributes of acceptable masks in the context of this SD is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

[3] Notice may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; or other methods as appropriate.

2.  While eating, drinking, or taking oral medications for brief periods.[4]  Prolonged periods
    of mask removal are not permitted for eating or drinking; the mask must be worn
    between bites and sips.

3.  While communicating with a person who is deaf or hard of hearing, when the ability to
    see the mouth is essential for communication.

4.  If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or
    otherwise unable to remove the mask without assistance.[5]

E.  The following conveyances are exempted from this SD:

1.  Persons in private conveyances operated solely for personal, non-commercial use.

2.  A driver, when operating a commercial motor vehicle as this term is defined in 49 CFR
    390.5, if the driver is the sole occupant of the vehicle.

F.  This SD exempts the following categories of persons from wearing masks:[6]

1.  Children under the age of 2.

2.  People with disabilities who cannot wear a mask, or cannot safely wear a mask, because of
    the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[7]

3.  People for whom wearing a mask would create a risk to workplace health, safety, or job
    duty as determined by the relevant workplace safety guidelines or federal regulations.

---

[4] The CDC has stated that brief periods of close contact without a mask should not exceed 15 minutes.  *See*
https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html
[5] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask
temporarily until able to resume normal breathing with the mask.  Persons who are vomiting should remove the mask
until vomiting ceases.  Persons with acute illness may remove the mask if it interferes with necessary medical care
such as supplemental oxygen administered via an oxygen mask.
[6] Airport operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the
requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed
medical provider, and/or other information as determined by the airport operator, as well as require evidence that the
person does not have COVID-19 such as a negative result from a SAR-CoV-2 viral test or documentation of recovery
from COVID-19. CDC definitions for SAR-CoV-2 viral test and documentation of recovery are available in
Frequently Asked Questions at:  https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-
travelers.html.  Airport operators may also impose additional protective measures that improve the ability of a person
eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less
crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded
section of the conveyance or airport. Airport operators may further require that persons seeking exemption from the
requirement to wear a mask request an accommodation in advance.
[7] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the
disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a mask
on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to remove
their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would impede
the function of assistive devises/technology.  It is not meant to cover persons for whom mask-wearing may only be
difficult.  CDC intends to issue further guidance regarding this exception.

G.  If an individual refuses to comply with mask requirements, follow incident reporting procedures in accordance with the Airport Security Program and provide the following information, if available:

1.  Date and airport code;

2.  Individual's full name and contact information;

3.  Name and contact information for any direct airport employees or authorized representatives involved in the incident; and

4.  The circumstances related to the refusal to comply.

## PREEMPTION

The requirements in this SD do not preempt any State, local, Tribal, or territorial rule, regulation, order, or standard necessary to eliminate or reduce a local safety hazard, which includes public health measures that are the same or more protective of public health than those required in this SD, if that provision is not incompatible with this SD.

## ACKNOWLEDGMENT OF RECEIPT

The airport operator must immediately provide written confirmation of receipt of this SD to the Federal Security Director (FSD).

## DISSEMINATION REQUIRED

The airport operator must immediately pass the information and measures set forth in this SD to any personnel having responsibilities in implementing the provisions of this directive. The airport operator may share this SD with anyone subject to the provisions of this directive to include but not limited to: federal, state, and local government personnel; direct airport employees or authorized representatives; vendors; tenants; exclusive area agreement holders; contractors; transport personnel; taxi drivers; law enforcement; etc.

## APPROVAL OF ALTERNATIVE MEASURES

The operator must immediately notify the FSD whenever any action required by this SD or a TSA-approved alternative measure cannot be carried out. In accordance with 49 CFR 1542.303(d), the airport operator may submit proposed alternative measures and the basis for submitting those measures in writing to the Assistant Administrator for Policy, Plans, and Engagement through the FSD.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598



**Transportation
Security
Administration**

<u>MEMORANDUM</u>

To:  Covered Aircraft Operators

Date:  January 31, 2021

Subject:  Security Directive 1544-21-02

Attached to this memorandum is Security Directive (SD) 1544-21-02: Security Measures – Face Mask Requirements.  This SD is issued to implement the January 21, 2021, Executive Order on promoting measures to prevent the spread of coronavirus disease 2019 (COVID-19) by travelers within the United States and those who enter the country from abroad.  This SD also supports enforcement of the Centers for Disease Control and Prevention (CDC) Order mandating masks issued on January 29, 2021.

All queries concerning the attached SD must be directed to your respective TSA Principal Security Inspector or International Industry Representative.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

Attachment:
Security Directive 1544-21-02



**Transportation
Security
Administration**

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598

## SECURITY DIRECTIVE

NUMBER — SD 1544-21-02

SUBJECT — Security Measures – Mask Requirements

EFFECTIVE DATE — 11:59 pm EST on February 1, 2021

EXPIRATION DATE — May 11, 2021

CANCELS AND SUPERSEDES — Not Applicable

APPLICABILITY — Aircraft operators regulated under 49 CFR 1544.101

AUTHORITY — 49 U.S.C. 114, 44902, and 44903; 49 CFR 1544.305

LOCATION(S) — All Locations

### PURPOSE AND GENERAL INFORMATION

Due to the ongoing COVID-19 pandemic and to reduce the spread of the virus, the President issued an Executive Order, *Promoting COVID-19 Safety in Domestic and International Travel*, on January 21, 2021, requiring masks to be worn in airports, on commercial aircraft, and in various modes of surface transportation. On January 27, 2021, the Acting Secretary of Homeland Security determined a national emergency existed requiring the Transportation Security Administration (TSA) to issue this Security Directive (SD) to implement the Executive Order and enforce the related Order[1] issued by the Centers for Disease Control and Prevention (CDC), pursuant to the authority of 49 U.S.C. sections 114, 44902, and 44903. Consistent with these mandates and TSA's authority, TSA is issuing this SD requiring masks to be worn to mitigate the spread of COVID-19 during air travel. The requirements in this SD must be applied to all persons onboard a commercial aircraft operated by a U.S. aircraft operator, including passengers and crewmembers. TSA developed these requirements in consultation with the Federal Aviation Administration and CDC.

---

[1] *See* Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations (CFR) §§ 70.2, 71.31(B), 71.32(B); Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (January 29, 2021)

DEFINITIONS

For the purposes of this SD, the following definitions apply:

*Conveyance* has the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle, vessel…or other means of transport, including military."

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[2]

ACTIONS REQUIRED

A. The aircraft operator must provide passengers with prominent and adequate notice of the mask requirements to facilitate awareness and compliance. [3] At a minimum, this notice must inform passengers, at or before check-in and as a pre-flight announcement, of the following:

  1. Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning.

  2. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

  3. If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.

B. The aircraft operator must not board any person who is not wearing a mask, except as described in Sections D., E., and F.

C. The aircraft operator must ensure that direct employees and authorized representatives wear a mask at all times while on an aircraft or in an airport location under the control of the aircraft operator, except as described in Sections D., E., and F.

D. The requirement to wear a mask does not apply under the following circumstances:

  1. When necessary to temporarily remove the mask for identity verification purposes.

---

[2] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this SD. CDC guidance for attributes of acceptable masks in the context of this SD is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

[3] Notice may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on boarding passes; or other methods as appropriate.

2.  While eating, drinking, or taking oral medications for brief periods.[4]  Prolonged periods of mask removal are not permitted for eating or drinking; the mask must be worn between bites and sips.

3.  While communicating with a person who is deaf or hard of hearing, when the ability to see the mouth is essential for communication.

4.  If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation.

5.  If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance, or otherwise unable to remove the mask without assistance.[5]

E.  The following conveyances are exempted from this SD:

1.  Persons in private conveyances operated solely for personal, non-commercial use.

2.  A driver, when operating a commercial motor vehicle as this term is defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle.

F.  This SD exempts the following categories of persons from wearing masks:[6]

1.  Children under the age of 2.

2.  People with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[7]

---

[4] The CDC has stated that brief periods of close contact without a face mask should not exceed 15 minutes. *See* https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html

[5] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[6] Aircraft operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the aircraft operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SAR-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SAR-CoV-2 viral test and documentation of recovery are available in Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Aircraft operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or airport. Aircraft operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

[7] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a mask on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to

3.  People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

G.  If a passenger refuses to comply with an instruction given by a crew member with respect to wearing a mask, the aircraft operator must:

1.  Make best efforts to disembark the person who refuses to comply as soon as practicable; and

2.  Follow incident reporting procedures in accordance with its TSA-approved standard security program and provide the following information, if available:

   a. Date and flight number;

   b. Passenger's full name and contact information;

   c. Passenger's seat number on the flight;

   d. Name and contact information for any crew members involved in the incident; and

   e. The circumstances related to the refusal to comply.

## PREEMPTION

The requirements in this SD do not preempt any State, local, Tribal, or territorial rule, regulation, order, or standard necessary to eliminate or reduce a local safety hazard, which includes public health measures that are the same or <u>more</u> protective of public health than those required in this SD, if that provision is not incompatible with this SD.

## ACKNOWLEDGMENT OF RECEIPT

The aircraft operator must immediately provide written confirmation of receipt of this SD to its Principal Security Inspector (PSI) or International Industry Representative (IIR), as appropriate.

## DISSEMINATION REQUIRED

The aircraft operator must immediately pass the information and measures set forth in this SD to any personnel having responsibilities in implementing the provisions of this directive. The aircraft operator may share this SD with anyone subject to the provisions of this directive to include but not limited to: federal, state, and local government personnel; authorized representatives; catering personnel; vendors; airline club staff; contractors; etc.

---

remove their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would impede the function of assistive devises/technology. It is not meant to cover persons for whom mask-wearing may only be difficult. CDC intends to issue further guidance regarding this exception.

Security Directive                                           SD 1544-21-02

APPROVAL OF ALTERNATIVE MEASURES

In accordance with 49 CFR 1544.305(d), the aircraft operator must immediately notify its PSI or
IIR, as appropriate, if unable to implement any of the measures in this SD, or in any TSA-
approved alternative measure.  The aircraft operator may submit proposed alternative measures
and the basis for submitting those measures to its PSI or IIR.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598



**Transportation
Security
Administration**

## MEMORANDUM

To:  Covered Owners/Operators

Date:  January 31, 2021

Subject:  Security Directive 1582/84-21-01

Attached to this memorandum is Security Directive (SD) 1582/84-21-01: Security Measures – Face Mask Requirements.  This SD is issued to implement the January 21, 2021, Executive Order on promoting measures to prevent the spread of coronavirus disease 2019 (COVID-19) by travelers within the United States and those who enter the country from abroad.  This SD also supports enforcement of the Centers for Disease Control and Prevention (CDC) Order mandating masks issued on January 29, 2021.

This SD applies to the passenger railroads, intercity bus services, and public transportation. Please refer to the SD for the specific applicability.

All queries concerning the attached SD should be submitted to TSA via email at TSA-Surface@tsa.dhs.gov

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

Attachment:
Security Directive 1582/84-21-01



**Transportation
Security
Administration**

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598

## SECURITY DIRECTIVE

| | |
|---|---|
| NUMBER | SD 1582/84-21-01 |
| SUBJECT | Security Measures – Mask Requirements |
| EFFECTIVE DATE | 11:59 pm EST on February 1, 2021 |
| EXPIRATION DATE | May 11, 2021 |
| CANCELS AND SUPERSEDES | Not Applicable |
| APPLICABILITY | Each owner/operator identified in 49 CFR 1582.1(a); each owner/operator identified in 49 CFR 1584.1 that provides fixed-route service as defined in 49 CFR 1500.3 |
| AUTHORITY | 49 U.S.C. 114 |
| LOCATION | United States |

## PURPOSE AND GENERAL INFORMATION

Due to the ongoing COVID-19 pandemic and to reduce the spread of the virus, the President issued an Executive Order, *Promoting COVID-19 Safety in Domestic and International Travel*, on January 21, 2021, requiring masks to be worn in airports, on commercial aircraft, and in various modes of surface transportation. On January 27, 2021, the Acting Secretary of Homeland Security determined a national emergency existed requiring the Transportation Security Administration (TSA) to issue this Security Directive (SD) to implement the Executive Order and enforce the related Order[1] issued by the Centers for Disease Control and Prevention (CDC), pursuant to the authority of 49 U.S.C. section 114. Consistent with these mandates and TSA's authority, TSA is issuing this SD requiring masks to be worn to mitigate the spread of COVID-19. The requirements in this SD must be applied to all persons in or on one of the conveyances or a transportation facility used by one of the modes identified above. TSA developed these requirements in consultation with the Department of Transportation (including the Federal Railroad Administration, the Federal Transit Administration, and the Federal Motor Carrier Safety Administration) and the CDC.

---

[1] *See* Order Under Section 361 of the Public Health Service Act (42 U.S.C. § 264) and 42 Code of Federal Regulations §§ 70.2, 71.31(B), 71.32(B); Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (January 29, 2021).

Security Directive                                                      SD 1582/84-21-01

DEFINITIONS

For the purpose of this SD, the following definitions apply:

*Conveyance* has the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle, vessel…or other means of transport, including military."

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[2]

*Transportation hub/facility* means any airport, bus terminal, marina, seaport or other port, subway stations, terminal (including any fixed facility at which passengers are picked-up or discharged), train station, U.S. port of entry, or any other location that provides transportation subject to the jurisdiction of the United States.

ACTIONS REQUIRED

A. Owner/Operators must notify passengers with prominent and adequate notice of the mask requirements to facilitate awareness and compliance.[3] At a minimum, this notice must inform passengers, at the time tickets are purchased or when otherwise booking transportation *and* at the time the conveyance departs its location after boarding passengers, of the following:

 1. Federal law requires wearing a mask while on the conveyance and failure to comply may result in denial of boarding or removal.

 2. Refusing to wear a mask is a violation of federal law; passengers may be subject to penalties under federal law.

B. Owner/Operators must require that individuals wear a mask, except as described in Sections D., E., or F., as follows:

 1. Any persons in a public transportation, passenger railroad, or bus conveyance covered by this SD.

 2. Any person in public areas of transportation hubs/facilities controlled by the owner/operator (such as for purposes of purchasing tickets, waiting areas, and platforms for boarding and disembarking) for the duration of travel, boarding, and disembarking.

---

[2] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this SD. CDC guidance for attributes of acceptable masks in the context of this SD is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

[3] Notice may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on tickets; or other methods as appropriate.

C. Owner/Operators must ensure that direct employees and contractor employees wear a mask at all times when in conveyances or in or around transportation facilities under their control, except as described in Sections D., E., or F.

D. The requirement to wear a mask does not apply under the following circumstances:

1. When necessary to temporarily remove the mask for identity verification purposes.

2. While eating, drinking, or taking oral medications for brief periods[4]. Prolonged periods of mask removal are not permitted for eating or drinking; the mask must be worn between bites and sips.

3. While communicating with a person who is deaf or hard of hearing, when the ability to see the mouth is essential for communication.

4. If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance.[5]

E. The following conveyances are exempted from wearing masks:

1. Persons in private conveyances operated solely for personal, non-commercial use.

2. A driver, when operating a commercial motor vehicle as this term is defined in 49 CFR 390.5, if the driver is the sole occupant of the vehicle.

F. This SD exempts the following categories of persons from wearing masks:[6]

1. Children under the age of 2.

---

[4] The CDC has stated that brief periods of close contact without a mask should not exceed 15 minutes. *See* https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html

[5] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

[6] Owner/Operators may impose requirements, or conditions of carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the owner/operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SAR-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SAR-CoV-2 viral test and documentation of recovery are available in Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Owners/Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub/facility Owners/Operators may further require that persons seeking exemption from the requirement to wear a mask request an accommodation in advance.

2. People with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[7]

3. People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

G. Owner/Operators must establish procedures to manage situations with persons who refuse to comply with the requirement to wear a mask. At a minimum, these procedures must ensure that if an individual refuses to comply with an instruction given by the owner/operator with respect to wearing a mask, the owner/operator must:

1. Deny boarding;

2. Make best efforts to disembark the individual as soon as practicable; or

3. Make best efforts to remove the individual from the transportation hub/facility.

H. If an individual's refusal to comply with the mask requirement constitutes a significant security concern, the owner/operator must report the incident to the Transportation Security Operations Center (TSOC) at 1-866-615-5150 or 1-703-563-3240 in accordance with 49 CFR 1570.203.

PREEMPTION

The requirements in this SD do not preempt any State, local, Tribal, or territorial rule, regulation, order, or standard necessary to eliminate or reduce a local safety hazard, which includes public health measures that are the same or more protective of public health than those required in this SD, if that provision is not incompatible with this SD.

PROCEDURES FOR SECURITY DIRECTIVES

A. The owner/operator must immediately provide written confirmation of receipt of this SD via email to TSA at TSA-Surface@tsa.dhs.gov.

B. The owner/operator must immediately disseminate the information and measures in this SD to corporate senior management, security management representatives, and any personnel having responsibilities in implementing the provisions in this directive. The owner/operator may widely share this SD with anyone subject to the provisions of this directive to include,

---

[7] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a mask on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to remove their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would impede the function of assistive devises/technology. It is not meant to cover persons for whom mask-wearing may only be difficult. CDC intends to issue further guidance regarding this exception.

but not limited to, federal, state, and local government personnel; direct owner/operator employees; tenants; contractors; transport personnel; taxi drivers; law enforcement; *etc.*

C. All individuals responsible for implementing this SD must be briefed by the owner/operator. If the owner/operator is unable to implement the measures in this SD, the owner/operator must submit proposed alternative measures and the basis for submitting the alternative measures to TSA for approval.

D. The owner/operator may comment on this SD by submitting data, views, or arguments in writing to TSA via email at TSA-Surface@tsa.dhs.gov . TSA may amend the SD based on comments received. Submission of a comment does not delay the effective date of the SD.

## APPROVAL OF ALTERNATIVE MEASURES

The owner/operator must immediately notify TSA via email at TSA-Surface@tsa.dhs.gov if unable to implement any of the measures in this SD. The owner/operator may submit proposed alternative measures and a justification for adopting those measures to the email addresses above.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

Plaintiffs - EXHIBIT 5

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598



**Transportation
Security
Administration**

### MEMORANDUM

To: Covered Foreign Air Carriers

Date: January 31, 2021

Subject: Emergency Amendment 1546-21-01

Attached to this memorandum is Emergency Amendment (EA) 1546-21-01: Security Measures –
Face Mask Requirements. This EA is issued to implement the January 21, 2021, Executive
Order on promoting measures to prevent the spread of coronavirus disease 2019 (COVID-19) by
travelers within the United States and those who enter the country from abroad. This EA also
supports enforcement of the Centers for Disease Control and Prevention (CDC) Order mandating
masks issued on January 29, 2021.

All queries concerning the attached EA must be directed to your assigned TSA International
Industry Representative.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

Attachment:
Emergency Amendment 1546-21-01



**Transportation
Security
Administration**

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598

## EMERGENCY AMENDMENT

| | |
|---|---|
| NUMBER | EA 1546-21-01 |
| SUBJECT | Security Measures – Mask Requirements |
| EFFECTIVE DATE | 11:59 pm EST on February 1, 2021 |
| EXPIRATION DATE | May 11, 2021 |
| CANCELS AND SUPERSEDES | Not Applicable |
| APPLICABILITY | Foreign air carriers regulated under 49 CFR 1546.101(a) and (b) |
| AUTHORITY | 49 U.S.C. 114, 44902, and 44903; 49 CFR 1546.105(d) |
| LOCATION(S) | All flights to, from, or within the United States |

### PURPOSE AND GENERAL INFORMATION

Due to the ongoing COVID-19 pandemic and to reduce the spread of the virus, the President issued an Executive Order, *Promoting COVID-19 Safety in Domestic and International Travel*, on January 21, 2021, requiring masks to be worn in airports, on commercial aircraft, and in various modes of surface transportation. On January 27, 2021, the Acting Secretary of Homeland Security determined a national emergency existed requiring the Transportation Security Administration (TSA) to issue this Emergency Amendment (EA) to implement the Executive Order and enforce the related Order[1] issued by the Centers for Disease Control and Prevention (CDC), pursuant to the authority of 49 U.S.C. sections 114, 44902, and 44903. Consistent with these mandates and the TSA's authority, TSA is issuing this EA requiring masks to be worn to mitigate the spread of COVID-19 during air travel. The requirements in this EA must be applied to all persons onboard a commercial aircraft operated by a foreign air carrier, including passengers and crewmembers. TSA developed these requirements in consultation with the Federal Aviation Administration and CDC.

---

[1] *See* Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations (CFR) §§ 70.2, 71.31(B), 71.32(B); Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (January 29, 2021)

Emergency Amendment                                                        EA 1546-21-01

---

DEFINITIONS

For the purposes of this EA, the following definitions apply:

*Conveyance* has the same definition as under 42 CFR 70.1, meaning "an aircraft, train, road vehicle, vessel…or other means of transport, including military."

*Mask* means a material covering the nose and mouth of the wearer, excluding face shields.[2]

ACTIONS REQUIRED

A. The foreign air carrier must provide passengers with prominent and adequate notice of the mask requirements to facilitate awareness and compliance. [3] At a minimum, this notice must inform passengers, at or before check-in and as a pre-flight announcement, of the following:

   1. Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning.

   2. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

   3. If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.

B. The foreign air carrier must not board any person who is not wearing a mask, except as described in Sections D., E., and F.

C. The foreign air carrier must ensure that direct employees and authorized representatives wear a mask at all times while on an aircraft or in a U.S.[4] airport location under the control of the foreign air carrier, except as described in Sections D., E., and F.

D. The requirement to wear a mask does not apply under the following circumstances:

   1. When necessary to temporarily remove the mask for identity verification purposes.

---

[2] A properly worn mask completely covers the nose and mouth of the wearer. A mask should be secured to the head, including with ties or ear loops. A mask should fit snugly but comfortably against the side of the face. Masks do not include face shields. Masks can be either manufactured or homemade and should be a solid piece of material without slits, exhalation valves, or punctures. Medical masks and N-95 respirators fulfill the requirements of this EA. CDC guidance for attributes of acceptable masks in the context of this EA is available at https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html.

[3] Notice may include, if feasible, advance notifications on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on boarding passes; or other methods as appropriate.

[4] Including U.S. territories: American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands.

Emergency Amendment                                                                    EA 1546-21-01

2.  While eating, drinking, or taking oral medications for brief periods.[5]  Prolonged periods
    of mask removal are not permitted for eating or drinking; the mask must be worn
    between bites and sips.

3.  While communicating with a person who is deaf or hard of hearing, when the ability to
    see the mouth is essential for communication.

4.  If wearing oxygen masks is needed because of loss of cabin pressure or other event
    affecting aircraft ventilation.

5.  If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or
    otherwise unable to remove the mask without assistance.[6]

E. The following conveyances are exempted from this EA:

1.  Persons in private conveyances operated solely for personal, non-commercial use.

2.  A driver, when operating a commercial motor vehicle as this term is defined in 49 CFR
    390.5, if the driver is the sole occupant of the vehicle.

F. This EA exempts the following categories of persons from wearing masks:[7]

1.  Children under the age of 2.

2.  People with disabilities who cannot wear a mask, or cannot safely wear a mask, because
    of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et
    seq.).[8]

---

[5] The CDC has stated that brief periods of close contact without a mask should not exceed 15 minutes. *See*
https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html
[6] Persons who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the
mask temporarily until able to resume normal breathing with the mask. Persons who are vomiting should remove
the mask until vomiting ceases. Persons with acute illness may remove the mask if it interferes with necessary
medical care such as supplemental oxygen administered via an oxygen mask.
[7] Foreign air carriers may impose requirements, or conditions of carriage, on persons requesting an exemption from
the requirement to wear a mask, including medical consultation by a third party, medical documentation by a
licensed medical provider, and/or other information as determined by the foreign air carrier, as well as require
evidence that the person does not have COVID-19 such as a negative result from a SAR-CoV-2 viral test or
documentation of recovery from COVID-19. CDC definitions for SAR-CoV-2 viral test and documentation of
recovery are available in Frequently Asked Questions at: https://www.cdc.gov/coronavirus/2019-
ncov/travelers/testing-international-air-travelers.html. Foreign air carriers may also impose additional protective
measures that improve the ability of a person eligible for exemption to maintain social distance (separation from
others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or
otherwise situating the individual in a less crowded section of the conveyance or airport. Foreign air carriers may
further require that persons seeking exemption from the requirement to wear a mask request an accommodation in
advance.
[8] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to
the disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a
mask on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to
remove their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would

3.  People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

G.  If a passenger refuses to comply with an instruction given by a crew member with respect to wearing a mask, the foreign air carrier must:

1.  Make best efforts to disembark the person who refuses to comply as soon as practicable; and

2.  Follow incident reporting procedures in accordance with its TSA-accepted security program or any applicable EAs and provide the following information, if available:

    a.  Date and flight number;

    b.  Passenger's full name and contact information;

    c.  Passenger's seat number on the flight;

    d.  Name and contact information for any crew members involved in the incident; and

    e.  The circumstances related to the refusal to comply.

PREEMPTION

The requirements in this EA do not preempt any host government, State, local, Tribal, or territorial rule, regulation, order, or standard necessary to eliminate or reduce a local safety hazard, which includes public health measures that are the same or more protective of public health than those required in this EA, if that provision is not incompatible with this EA.

ACKNOWLEDGMENT OF RECEIPT

The foreign air carrier must immediately provide written confirmation of receipt of this EA to its International Industry Representative (IIR), as appropriate.

DISSEMINATION REQUIRED

The foreign air carrier must immediately pass the information and measures set forth in this EA to any personnel having responsibilities in implementing the provisions of this directive.  The foreign air carrier may share this EA with anyone subject to the provisions of this directive to include but not limited to: host government, federal, state, and local government personnel; authorized representatives; catering personnel; vendors; airline club staff; contractors; etc.

---

impede the function of assistive devises/technology.  It is not meant to cover persons for whom mask-wearing may only be difficult.  CDC intends to issue further guidance regarding this exception.

Emergency Amendment                                                      EA 1546-21-01

APPROVAL OF ALTERNATIVE MEASURES

The foreign air carrier must immediately notify its IIR if unable to implement any of the measures in this EA, or in any TSA-approved alternative measure.  In accordance with 49 CFR 1546.105, the foreign air carrier may submit proposed alternative measures and the basis for submitting those measures to its IIR.

Darby LaJoye
Senior Official Performing the Duties of the TSA Administrator

*B. Federal Reserve Bank of Dallas* (Karen Smith, Director, Applications) 2200 North Pearl Street, Dallas, Texas 75201–2272:

1. *The Morris Family Trust and Frank E. Morris, individually and as trustee of the Trust, both of Gainesville, Texas;* to retain voting shares of Red River Bancorp, Inc., and thereby indirectly retain voting shares of First State Bank, both of Gainesville, Texas.

Board of Governors of the Federal Reserve System, December 2, 2021.

**Michele Taylor Fennell,**

*Deputy Associate Secretary of the Board.*

[FR Doc. 2021–26519 Filed 12–6–21; 8:45 am]

**BILLING CODE P**

---

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The public portions of the applications listed below, as well as other related filings required by the Board, if any, are available for immediate inspection at the Federal Reserve Bank(s) indicated below and at the offices of the Board of Governors. This information may also be obtained on an expedited basis, upon request, by contacting the appropriate Federal Reserve Bank and from the Board's Freedom of Information Office at *https://www.federalreserve.gov/foia/request.htm.* Interested persons may express their views in writing on the standards enumerated in the BHC Act (12 U.S.C. 1842(c)).

Comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors, Ann E. Misback, Secretary of the Board, 20th Street and Constitution Avenue NW, Washington DC 20551–0001, not later than December 31, 2021.

*A. Federal Reserve Bank of Philadelphia* (William Spaniel, Senior Vice President) 100 North 6th Street, Philadelphia, Pennsylvania 19105–1521. Comments can also be sent

electronically to *Comments.applications@phil.frb.org:*

1. *Workers United, Philadelphia, Pennsylvania; and Amalgamated Financial Corp., New York, New York;* to merge with Amalgamated Investments Company, and thereby indirectly acquire Amalgamated Bank of Chicago, both of Chicago, Illinois. This notice supplements FR Doc. 2021–26297.

Board of Governors of the Federal Reserve System, December 1, 2021.

**Michele Taylor Fennell,**

*Deputy Associate Secretary of the Board.*

[FR Doc. 2021–26422 Filed 12–6–21; 8:45 am]

**BILLING CODE P**

---

## FEDERAL RETIREMENT THRIFT INVESTMENT BOARD

### Notice of Board Meeting

**DATES:** December 17, 2021 at 10:00 a.m.

**ADDRESSES:** Telephonic. Dial-in (listen only) information: Number: 1–415–527–5035, Code: 2764 722 1247; or via web: *https://tspmeet.webex.com/tspmeet/onstage/g.php?MTID=e1220191d046633c698c24283fba3fb14.*

**FOR FURTHER INFORMATION CONTACT:** Kimberly Weaver, Director, Office of External Affairs, (202) 942–1640.

**SUPPLEMENTARY INFORMATION:**

#### Board Meeting Agenda

*Open Session*

1. Approval of the November 19, 2021 Board Meeting Minutes
2. Monthly Reports
   (a) Participant Activity Report
   (b) Investment Performance
   (c) Legislative Report
3. Quarterly Report
   (d) Vendor Risk Management Update
4. 2022/23 Internal Audit Plan Approval

*Closed Session*

Information covered under 5 U.S.C. 552b (c)(2) and (c)(9).

*Authority:* 5 U.S.C. 552b (e)(1).

Dated: December 1, 2021.

**Dharmesh Vashee,**

*General Counsel, Federal Retirement Thrift Investment Board.*

[FR Doc. 2021–26421 Filed 12–6–21; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

### Requirements for Negative Pre-Departure Covid–19 Test Result or Documentation of Recovery From Covid–19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice of amended Agency Order.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS), announces an Amended Order requiring a negative pre-departure COVID–19 test result or documentation of recovery from COVID–19 for all airline or other aircraft passengers arriving into the United States from any foreign country. This Amended Order was signed by the CDC Director on December 2, 2021, and supersedes the previous Order signed by the CDC Director on October 25, 2021.

**DATES:** This Amended Order will become effective at 12:01 a.m. on December 6, 2021.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Buigut, Division of Global Migration and Quarantine, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H16–4, Atlanta, GA 30329. Email: *dgmqpolicyoffice@cdc.gov.* Telephone: 1–800–232–4636.

**SUPPLEMENTARY INFORMATION:** This Amended Order updates COVID–19 testing requirements for air passengers 2 years or older boarding a flight to the United States.

This Amended Order prohibits the boarding of any passenger 2 years or older on any airline or aircraft destined to the United States from a foreign country unless the passenger presents paper or digital documentation of one of the following requirements:

(i) A negative pre-departure viral test result for SARS–CoV–2 conducted on a specimen collected no more than 1 calendar day before the flight's departure from a foreign country (*Qualifying Test*)
*Or*

(ii) Documentation of having recovered from COVID–19 in the past 90 days in the form of both of the following (*Documentation of Recovery*):
• A positive viral test result for SARS–CoV–2 conducted on a specimen

Plaintiffs - EXHIBIT 7

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

---

**NOTICE OF ENFORCEMENT POLICY:
ACCOMMODATION BY CARRIERS OF PERSONS WITH DISABILITIES
WHO ARE UNABLE TO WEAR OR SAFELY WEAR MASKS WHILE ON
COMMERCIAL AIRCRAFT**

---

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation (DOT or the Department), is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019 (COVID-19).  OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act (ACAA)[1] and the Department's implementing regulation in 14 CFR Part 382 (Part 382) to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

To carry out the Executive Order on Promoting COVID-19 Safety in Domestic and International Travel (Executive Order),[2] the Centers for Disease Control and Prevention (CDC) issued an order on January 29, 2021 (CDC Order)[3] that, among other things, requires U.S. and foreign air carriers to use their best efforts to ensure that persons on flights to, within, or from[4] the United States wear a mask for the duration of travel, including when boarding and disembarking aircraft. The CDC Order exempts certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask

---

[1] The ACAA, signed into law in 1986, prohibits discrimination by airlines against individuals with disabilities in commercial air transportation.  The Americans with Disabilities Act, signed into law after the ACAA in 1990, prohibits discrimination against individuals with disabilities in employment, state or local government, public accommodations, commercial facilities, telecommunications, and transportation other than by commercial airlines.

[2] Exec. Order No. 13998, 86 FR 7205 (Jan. 26, 2021).

[3] Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b): Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (CDC Order), *available at* https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf.

[4] CDC Order specifies that "[c]onveyance operators must also require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons onboard (passengers or conveyance operators) will return to the United States while this Order remains in effect." CDC Order at 9.

because of the disability.[5]  However, it allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability.  Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks.[6]  The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD.  At the same time, the ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability.  This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

<u>Background</u>

SARS-CoV-2, the virus that causes COVID-19, spreads most often when an infected person coughs, sneezes, or talks, and droplets from the infected individual's mouth or nose are spread through the air and come in contact with people nearby.[7]  Persons with COVID-19 infection may have symptoms of fever, cough, or shortness of breath,[8] or they may be asymptomatic[9] or pre-symptomatic[10] but still able to spread the virus.[11]  CDC has made clear that appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.[12]

---

[5] CDC Order at 4 and 5 (noting that this is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to disability).

[6] TSA Security Directive 1544-21-02: Security Measures – Face Mask Requirements (January 31, 2021).

[7] *See* Ctrs. for Disease Control & Prevention, *How COVID Spreads*, CDC.gov (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Ctrs. for Disease Control & Prevention, *Considerations for Wearing Masks*, CDC.gov (last updated Dec. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[8] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus*, CDC.gov (last updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[9] An asymptomatic case is an individual infected with SARS-CoV-2, who does not exhibit symptoms during the course of infection.   Ctrs. for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, CDC.gov (last updated Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[10] A pre-symptomatic case of COVID-19 is an individual infected with SARS-CoV-2, who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection.  *COVID-19 Pandemic Planning Scenarios*, *supra* note 8.

[11] *See How COVID Spreads* and *Considerations for Wearing Masks*, *supra* note 6.

[12] CDC Order at 6.

As of January 27, 2021, there have been over 99 million confirmed cases of COVID-19 globally and over 25 million confirmed cases of COVID-19 in the United States, with over 2 million deaths globally and over 400,000 deaths in the United States due to the disease.[13]  To slow the spread of COVID-19, on January 21, 2021, President Biden issued Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-wearing in domestic and international transportation.  The Executive Order further provides that the heads of agencies may make categorical or case-by-case exceptions to policies developed under the order, consistent with applicable law, to the extent that doing so is necessary or required by law.

Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.[14]  To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an accommodation to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator.  The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.[15]

In response to COVID-19, U.S. and foreign air carriers generally have implemented policies requiring passengers to wear masks onboard aircraft even before the issuance of the Executive Order and the CDC Order.  Some carriers have adopted policies that expressly allow "no exceptions" to the mask requirement other than for children under the age of two.[16] OACP has

---

[13] *Id.* at 5.

[14] 42 U.S.C. 12102(4).  OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation.   See also CDC Order at 4 and 5.

[15] CDC Order at 4. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

[16] It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others.  *See* Ctrs. for Disease Control & Prevention, *Information for Pediatric Healthcare Providers*, CDC.gov (last updated Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-

3

received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a "no exceptions allowed" mask policy.

The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth.[17] The CDC Order provides that a mask is not required in circumstances where an individual is "unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to wear the mask without assistance."[18] The Order notes that individuals may remove masks "who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask"."[19] Also, individuals with acute illness may remove the mask if it "interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask."[20] CDC will issue additional guidance regarding persons who cannot wear a mask on the basis of disability.[21] Individuals who have a physical or mental impairment that substantially limits one or more major life activities are individuals with a disability for purposes of the ACAA and Part 382.[22]

## Legal Authority

The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability.[23] When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities, provided that the modifications would not constitute an undue burden or fundamentally alter the airline's program.[24]

Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that

---

ncov/hcp/pediatric-hcp.html (stating that "[r]ecent evidence suggests that compared to adults, children likely have similar viral loads in their nasopharynx, similar secondary infections rates, and can spread the virus to others").

[17] Considerations for Wearing Masks, *supra* note 6.

[18] CDC Order at 4.

[19] CDC Order at 4 (footnote 7).

[20] CDC Order at 4 (footnote 7).

[21] CDC Order at 5 (footnote 9).

[22] 49 U.S.C. 41705(a); 14 CFR 382.3.

[23] 49 U.S.C. 41705(a); 14 CFR 382.11.

[24] 14 CFR 382.13.

the individual would pose a "direct threat" to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible.[25]  To support a determination that an individual poses such a direct threat, the airline must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," in order to ascertain "(i) [t]he nature, duration, and severity of the risk; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk."[26]  If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must, for example, "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation.[27]  Furthermore, the Department's regulations permit the airline to impose reasonable conditions, restrictions, or requirements on a passenger who has a "medical condition" that may cause the passenger to pose a risk to the health and safety of others.[28]

Enforcement Policy

The authority to pursue or not to pursue enforcement action against airlines with respect to air travel consumer protection and civil rights requirements, including compliance with the ACAA, lies with OACP.[29]

In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that treat passengers presumptively as potential carriers of the SARS-CoV-2 virus and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew.[30]  Notably, however, the CDC Order exempts from the mask mandate a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the

---

[25] 14 CFR 382.19(c)(1), (2).

[26] *Id.*

[27] 14 CFR 382.19(c)(2).

[28] 14 CFR 382.21(a)(3).  The rule recognizes that a passenger with a communicable disease or infection, such as infection with the SARS-CoV-2 virus or other "medical condition," may pose a direct threat to the health and safety of others onboard an aircraft, and the airline may be justified in refusing to transport the passenger or in requiring protective measures to mitigate the risk, consistent with the directives of public health authorities.  14 CFR 382.21(a)–(b).

[29] 49 U.S.C. 41705(c), 46301. The CDC Order requiring aircraft operators to mandate mask use will be enforced by the Transportation Security Administration under its statutory and regulatory authorities, including 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR 1542.303, 1544.305, and 1546.105.

[30] CDC Order at 5 ("The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."); *id.* at 7 ("Traveling on public conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces.").

5

disability.  The Department also requires reasonable accommodations for persons with disabilities who are unable to wear masks or are unable to wear them safely.[31]

Airlines have expressed concerns to OACP that a significant number of passengers may claim medical exemption from the mask requirements without an apparent credible basis.  The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.[32] Similarly, under the Department's disability regulation in 14 CFR Part 382, airlines may impose conditions, restrictions, or requirements on a passenger asserting that a medical condition prevents the passenger from wearing a face mask, because the passenger may pose a direct threat to the health or safety of others, as any passenger is a potential carrier of the SARS-CoV-2 virus.[33]  In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask.

Airlines have also represented to OACP that, given the number of passengers making such claims, it is not practicable for airlines to make the required individualized assessment of appropriate mitigation measures at the airport on the day of the flight.  Under the Department's disability regulation in Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask.[34]  However, Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance. Airlines may also require such passengers to check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel.

In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers.  For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test,[35] taken at the passenger's own expense, during the days immediately

---

[31] 14 CFR 382.13.

[32] *Id.*

[33] 14 CFR 382.21(a)(3).

[34] 14 CFR 382.19(c)(1).

[35] On January 12, 2021, CDC issued an order requiring any passenger flying into the United States from a foreign country to provide, before boarding the flight, proof of a negative pre-departure test result for SARS-CoV-2, the virus that causes COVID-19, or documentation of recovery from COVID-19 after a previous SARS-CoV-2 infection. This order became effective on January 26, 2021.  Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b): Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airlines or Other Aircraft Passengers Arriving into the United States from Any Foreign Country, *available at* https://www.cdc.gov/quarantine/pdf/global-airline-testing-order_2021-01-2_R3-signed-encrypted-p.pdf.

prior to the scheduled flight.[36]  Further, the airline may arrange for additional, appropriate mitigation measures, including arranging for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight.

To ensure travelers are aware of the face mask requirements, airlines should use their best efforts to make this information easily available.  The Department requires airlines provide information on request, to individuals with disabilities, about any service-related or other limitations on the airline's ability to accommodate passengers with a disability.[37]  Also, CDC and TSA require airlines to provide passengers with prominent and adequate notice to facilitate awareness and compliance with the requirement that masks must be worn, subject to certain limited exemptions, to mitigate the spread of COVID-19 during air travel.[38]  Airlines' obligation to provide information on the face mask requirements includes updating airlines' face mask policies on their websites to ensure accuracy and consistency with the ACAA, CDC Order and TSA SD.[39]

In recognition of the CDC Order, as well as airlines' efforts to minimize the potential for transmission of the virus onboard aircraft by implementing policies requiring passengers to wear masks onboard aircraft even before the issuance of the CDC Order, OACP  will exercise its prosecutorial discretion and provide airlines an opportunity to follow the steps described herein to become compliant before taking further action.[40]  Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382.  OACP will refrain from taking enforcement action against an airline for a period of up to 45 days from the date of this notice, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued.  This timeframe should provide airlines with adequate time to review and revise their mask procedures as needed to comply with the law.[41]

---

[36] A positive test result for SARS-CoV-2, the virus that causes COVID-19, is a valid reason for an airline to deny transport to any individual, including an individual with a disability.  CDC recommends isolation to separate people infected with SARS-CoV-2 from people who are not infected.  *See* Ctrs. for Disease Control & Prevention, *Isolate if You are Sick*, CDC.gov (last updated Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html.

[37] 14 CFR 382.41.

[38] CDC Order at 1; TSA SD at 2.

[39] *See* 14 CFR 399.79 (b)(2) (defining an airline's practice as "deceptive" to consumers within the meaning of section 41712 if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter).

[40] Every day, we are learning more about how COVID-19 spreads and affects people and communities.  OACP will continue to follow the data and information provided by public health authorities, such as CDC, on actions necessary to limit the spread or impact of SARS-CoV-2 and will make changes to this notice as necessary to be consistent with current medical knowledge and the best available objective evidence.

[41] This document is a temporary notice of enforcement discretion.  Regulated entities may rely on this notice as a safeguard from Departmental enforcement as described herein. To the extent that this notice includes guidance on how regulated entities may comply with existing regulations, it does not have the force and effect of law and is not meant to bind the regulated entities in any way.

Questions regarding this Notice may be addressed to the Office of Aviation Consumer Protection (C-70), 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

By:

Blane A. Workie
***Assistant General Counsel for***
***Office of Aviation Consumer Protection***

Dated:  February 5, 2021

*An electronic version of this document is available at http://www.dot.gov/airconsumer*

Plaintiffs' Exhibit 8

2:42 ⚠ 🌐 🔲 🔲 •   ▼◢ 🔋 69%

← 📥 🗑 ✉ ⋮



# Ready to Go?

Your flight is coming up!
Important details below!



### Your Flight Itinerary

**Avrohom Gordon**
Confirmation Code **BLN6PN**

Flight **692** - Jan. 17, 2022

**CVG**
6:30 AM

**LAX**
8:26 AM

Total time | Nonstop | 4 hrs 56 min

### Your Allegiant Checklist

Make sure you have everything
you need beforehand!

2:43    ⚠ 💬 🔲 📱 ·    🛜 ◢ 🔋 69%

←      📥 🗑 ✉ ⋮

## Confirmation #BLN6PN – Gordon ☆

▶ Inbox

**A**   **ACAA** Jan 15     ↩ ⋮
to me ⌄

Dear Mr. Gordon,

Our records indicate your upcoming flight is quickly approaching.  As a reminder, Allegiant requires all passengers to wear a compliant face mask during all phases of travel.  Additional information regarding our Face Mask policy may be reviewed on our website at www.allegiantair.com/going-distance-health-safety.  Our records also indicate a face mask exemption has not been granted.  If you are unable or unwilling to wear a compliant face mask, trave will be canceled with a full refund to the original form of payment.

Sincerely,



allegiant

**ACAA Disability Team**

P.O. Box 371477, Las Vegas, NV 89137

ACAA@allegiantair.com | www.allegiant.com



Exhibit 5:





The airline has guidelines and policies in place to help ensure that all passengers are handled in a consistent manner for most situations that are encountered.

Exceptions to policy can be made for the specific situations located under "Emergency Events" on the Travel Policies section of our website . You may submit your document by attaching to your reply. However, without new information we must respectfully bring an end to our correspondence for this topic.

We appreciate the feedback you have provided.

Thanks,

Ella Grace
Reservations Specialist
Frontier Airlines
********************************
*******************
P.S. We want your feedback! Please fill out our survey and you will be entered to win 2 FREE round-trip tickets on Frontier Airlines up to a value of $400. Click the link to take the survey:
https://www.surveymonkey.com/r/5LJKB2K
********************************
*******************

Customer By CSS Email (Avrohom Gordon) (01/07/2022 01:59 PM)

Topic: Frontier Airlines: Face Mask Exemption

---

Reference #: 220107-000083

---

Discussion Thread

**Response By Email (Ella Grace)** (01/08/2022 02:20 PM)

Hello Devorah,

Thank you for writing us back.

Respectfully, we cannot honor your request for face mask exemption without a documentation from a medical provider. Please be advise that we don't need any detail of your medical condition, we simply need a letter from a medical provider that you are unable to wear mask due to disability.

The airline has guidelines and policies in place to help ensure that all passengers are handled in a consistent manner for most situations that are encountered.

Exceptions to policy can be made for the specific situations located under "Emergency Events" on the Travel Policies section of our website . You may submit your document by attaching to your reply. However, without new information we must respectfully bring an end to our correspondence for this topic.

We appreciate the feedback you have provided.

Thanks,

Ella Grace
Reservations Specialist
Frontier Airlines
************************************************
P.S. We want your feedback! Please fill out our survey and you will be entered to win 2 FREE round-trip tickets on Frontier Airlines up to a value of $400. Click the link to take the survey:
https://www.surveymonkey.com/r/5LJKB2K
************************************************

**Customer By CSS Email (Avrohom Gordon)** (01/07/2022 01:59 PM)

To whom it may concern,

Thank you for your email. I decline to submit the documents you requested.
Please see my reasons, attached.

Thank you,

Avrohom





10:56   80%

# Your trip confirmation (EWR - CLT)  Inbox

**Newark to Charlotte – AA 25...**
Feb 11, 2021, 1:10 – 3:15 PM

Take-off
Feb 11, 2021, 1:10 PM

Landing
Feb 11, 2021, 3:15 PM

Flight duration
2 hr, 5 min

Passenger name          Seat
DEVORAH GORDON          -

Confirmation number
RDLJUL

View in Travel

**American Airlines** 2/8/2021
to me

American Airlines

Issued: February 8, 2021







11:02    80%

# Your e-ticket receipt SKT3QG: 19 Sep 2021 08:40  Inbox

**Charlotte to Cincinnati – AA ...**
Sep 19, 2021, 8:40 – 10:05 AM

Take-off
Sep 19, 2021, 8:40 AM

Landing
Sep 19, 2021, 10:05 AM

Flight duration
1 hr, 25 min

Passenger name                    Seat
MRS DEVORAH GORDON                 –

Confirmation number
SKT3QG

View in Travel

**Cincinnati to Charlotte – AA ...**
Sep 20, 2021, 5:07 – 6:45 AM

**B**   British Airways e-tic...   9/19/2021
to devorahleahgordon

BRITISH AIRWAYS







**Flight Details** (CVG - LAX)

Cincinnati - Los Angeles    Allegiant Air · G4692

| | | |
|---|---|---|
| 06:30, January 17, 2022 | **CVG** | Cincinnati/Northern Kentucky International Airport |
| 08:26, January 17, 2022 | **LAX** | Los Angeles International Airport T1 |

**Baggage Allowance**

[Checked Baggage] No free baggage allowance. Please contact the airline for detailed baggage regulations.
[Carry-on Baggage] 1 piece(s) per person. Each piece cannot exceed 40*38*18CM in size.

**Passenger**

| Name | Ticket Number |
|---|---|
| GORDON/DEVORAH LEAH | BL7VMH |

Click here to view date change and cancellation policies.

For more information, please check the attachments or view your booking in more detail on the Trip.com website or app.

**Important information**

· We'll use this PIN to verify your identity when you call us, and help protect your booking security. Please keep it safe.
· The airline booking reference can be used to check in, select seats, and purchase meals or baggage allowance.
· All departure/arrival times and dates are in local time.
· Tickets must be used in the sequence set out in the itinerary.
· Information about your booking, including ticket expiration dates and baggage restrictions, can be found on the booking details page.
· You must bring the valid travel ID you used at the time of booking when you check in for your flight or you will be unable to board the plane. Please ensure your ID has at least 6 months of validity starting from the last day of your itinerary.
· A transit visa may be required for transfers in a third country/region. We recommend confirming visa details with the embassy of the relevant country/region.
· If you have only booked a one-way ticket and are travelling on a short-term business/tourist visa, we recommend purchasing a return ticket as soon as possible. Failure to do so may result in denial of check-in, entry, or exit.

**Deals Unlocked with Your Flight**



Sheraton Los Angeles San Gabriel
★ ★ ★ ★ ★
4.5  403 Reviews
$124.00

Sheraton Gateway Los Angeles Hotel
★ ★ ★ ★
4.3  444 Reviews
$112.00

Sonesta Los Angeles Airport LAX
★ ★ ★ ★

The Line Hotel
★ ★ ★ ★



3:03

AllegiantAir.com - Itinerary #BLN6PN   Inbox

✈ Cincinnati to Los Angeles – G4 ...
Jan 17, 6:30 – 8:26 AM

Take-off
Mon, Jan 17, 6:30 AM

Landing
Mon, Jan 17, 8:26 AM

Flight duration
4 hr, 56 min

Passenger name                    Seat
AVROHOM GORDON                     –

Confirmation number
BLN6PN

Allegiant 7 days ago
to me ⌄

allegiant          Your booking has been canceled

Customer Name                  Book Date
DEVORAH GORDON                 01/07/2022

Your canceled confirmation number is:  BLN6PN

Flight Details   change/cancel

Departing Flight Information

Date          Flight #   Departure Airport      Departs
Mon, Jan 17,  692        Cincinnati Northern    06:30 AM
2022                     Kentucky

How To Allegiant

Boarding Passes
Starting 24 hours before
departure, check in online to
print your boarding pass(es)
or go paperless by viewing
your itinerary on the Allegiant
mobile app.







2:09  ● ▣ ▣      ❂ ⛁ ▤ ● ▼◢ 68% ▪

←                    ⬓    ⬚    ✉    ⋮

# Frontier Airlines: Face
# Mask Exemption [Incident:                ☆
# 220104-003238] ▶ Inbox

**Frontier Airlines** 3 days ago          ↰    ⋮
to me ⌄

 

You requested assistance from our on-line
support form. Below is a summary of your
request and our response.

Topic: Frontier Airlines: Face Mask Exemption

Reference #: 220104-003238

Discussion Thread
Response By Email (Ella Grace)
(01/07/2022 12:44 PM)
Hello Devorah,

Thank you for writing us back.

Respectfully, we cannot honor your request for face
mask exemption without a documentation from a
medical provider. Please be advise that we don't need
any detail of your medical condition, we simply need a
letter from a medical provider that you are unable to
wear mask due to disability.

The airline has guidelines and policies
in place to help ensure that all
passengers are handled in a



Thank you for writing us back.

Respectfully, we cannot honor your request for face mask exemption without a documentation from a medical provider. Please be advise that we don't need any detail of your medical condition, we simply need a letter from a medical provider that you are unable to wear mask due to disability.

The airline has guidelines and policies in place to help ensure that all passengers are handled in a consistent manner for most situations that are encountered.

Exceptions to policy can be made for the specific situations located under "Emergency Events" on the Travel Policies section of our website . You may submit your document by attaching to your reply. However, without new information we must respectfully bring an end to our correspondence for this topic.

We appreciate the feedback you have provided.

Thanks,

Ella Grace
Reservations Specialist
Frontier Airlines
*******************************
******************

Topic: Frontier Airlines: Face Mask Exemption

Reference #: 220107-000083

Discussion Thread

**Response By Email (Ella Grace)** (01/08/2022 02:20 PM)

Hello Devorah,

Thank you for writing us back.

Respectfully, we cannot honor your request for face mask exemption without a documentation from a medical provider. Please be advise that we don't need any detail of your medical condition, we simply need a letter from a medical provider that you are unable to wear mask due to disability.

The airline has guidelines and policies in place to help ensure that all passengers are handled in a consistent manner for most situations that are encountered.

Exceptions to policy can be made for the specific situations located under "Emergency Events" on the Travel Policies section of our website . You may submit your document by attaching to your reply. However, without new information we must respectfully bring an end to our correspondence for this topic.

We appreciate the feedback you have provided.

Thanks,

Ella Grace
Reservations Specialist
Frontier Airlines
**************************************************
P.S. We want your feedback! Please fill out our survey and you will be entered to win 2 FREE round-trip tickets on Frontier Airlines up to a value of $400. Click the link to take the survey:
https://www.surveymonkey.com/r/5LJKB2K
**************************************************

**Customer By CSS Email (Avrohom Gordon)** (01/07/2022 01:59 PM)

To whom it may concern,

Thank you for your email. I decline to submit the documents you requested.
Please see my reasons, attached.

Thank you,

Avrohom





# HEALTH AND SAFETY KIT

CIVIL PROTECTION, NOT MEDICAL
Item No: HEALTH AND SAFETY KIT (INCLUDES DISPOSABLE FACE MASK
AND WET WIPES)

Sizes:
170mm x 95 mm (Disposable Face Mask)

50mm x 135mm ( Disinfectant Wipes)

Standard: Mask  GB/T32610-2016

Standard : Wipes GB15979-2002

All items are single use ONLY. Re-use or extended use may lead to
infection or cross contamination. Masks contains an aluminum nose piece.
Wipes contain 0.1%benzalkonium chloride applied to each towelette.

Kit should be stored in a cool place   ( avoid excessive heat from 40
degrees C or 104 degrees F)

www.nationalallergy.com

RN# 83364

Plaintiffs' Exhibit 58



NOTICE

**Your behavior is in violation of Title 14 of the Code of Federal Regulations (CFR)**

You should immediately cease this behavior if you wish to avoid prosecution and your removal from this aircraft at the next point of arrival. Crewmembers have been trained to ensure your safety and security, and they have a responsibility to provide a safe and pleasant environment for all passengers onboard. We hope you understand that when a crewmember requests your compliance, it is with your best interest in mind.

This is a formal warning that FEDERAL LAW PROHIBITS the following:

· Threatening, intimidating or interfering with a crewmember. (CFR 121.580)

· Smoking on a non-smoking flight or in the lavatory, including electronic cigarettes. (CFR 121.317)

· Drinking any alcoholic beverages not served by a crewmember, appearing to be intoxicated or creating an alcohol or drug related disturbance. (CFR 121.575)

· Providing alcohol to any person who is a minor. (State and/or local laws apply)

· Failure to fasten seat belt or failure to occupy approved seat or berth when required. (CFR 121.317)

An incident report will be filed with the Federal Aviation Administration (FAA). If you do not refrain from these activities, you may be prosecuted to the fullest extent of the law. The Federal Aviation Act provides for civil monetary fines up to $25,000 and up to 20 years imprisonment, or both.

1734

01/31/20

1 of 1





















3:40

**Devorah Gordon** Jan 7
To whom it may concern, Thank you for your email. I decline to submit the documents you

**ACAA** Jan 7
to me

Passengers who are unwilling to comply to the Federal Face Mask Mandate or unwilling to comply to Allegiant's Face Mask Exemption procedure will be denied boarding. If you do not wish to comply, a full refund will be provided to the original form of payment.

**allegiant**

**ACAA Disability Team**

P.O. Box 371477, Las Vegas, NV 89137

ACAA@allegiantair.com | www.allegiant.com

Show quoted text

**Caution:** *Sender is from outside Allegiant Travel Company. Take caution before opening links/attachments or replying with sensitive data. If suspicious, forward to* phishing@allegiantair.com

← Reply      ← Reply all      → Forward

# Plaintiffs' Exhibit 9

**airconsumer@dot.gov**
Wed, Jan 12, 1:15 AM

to me

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel.  As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - Mr Avrohom Gordon devorahlgordon@gmail.com

CONTACT INFO:
2251 State Route 222 New Richmond,OH 45157

Home Phone: 5137341770
Daytime Phone: 5137341770

COMPLAINT INFO:
Airline Code: G4

Flight Date: 01/17/2022
Flight Itinerary: CVG to LAX flight number G4692

Description of Problem/Inquiry/Comment:
  I have a disability and cannot wear a mask.  I  asked the airline for an exemption but they  refused.  Here is their response:   Passengers who are unwilling to comply to the  Federal Face Mask Mandate or unwilling to comply  to Allegiant's Face Mask Exemption procedure will be denied boarding.  If you do not wish to  comply, a full refund will be provided to the  original form of payment.     2222  ACAA Disability Team  P.O. Box 371477, Las Vegas, NV 89137  ACAA@allegiantair.com | www.allegiant.com

This is System generated message, and a response to this email will not be delivered. 01/12/2022 01:08:33

irconsumer@dot.gov
Wed, Jan 12, 1:23 AM

to me

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel.  As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - Mrs Devorah Gordon devorahlgordon@gmail.com

CONTACT INFO:
2251 State Route 222 New Richmond,OH 45157

Home Phone: 5137341770
Daytime Phone: 537341770

COMPLAINT INFO:
Airline Code: F9

Flight Date: 01/18/2022
Flight Itinerary: ONT to CVG flight numbers F92184 and F92022

Description of Problem/Inquiry/Comment:
   I have a disability and cannot wear a mask.  I  asked the airline for an exemption but they  refused.  Here is their response:   Topic: Frontier Airlines: Face Mask Exemption _____ Reference #: 220107-000083 _____ Discussion Thread Response By Email (Ella Grace) (01/08/2022 02:20  PM) Hello Devorah,  Thank you for writing us back.  Respectfully, we cannot honor your request for  face mask exemption without a documentation from  a medical provider. Please be advise that we  don't need any detail of your medical condition,  we simply need a letter from a medical provider  that you are unable to wear mask due to  disability.  The airline has guidelines and policies in place  to help ensure that all passengers are handled in  a consistent manner for most situations that are  encountered.  Exceptions to policy can be made for the specific situations located under "Emergency Events" on  the Travel Policies section of our website . You  may submit your document by attaching to your  reply. However, without new information we must  respectfully bring an end to our correspondence  for this topic.  We appreciate the feedback you have provided.  Thanks,  Ella Grace Reservations Specialist Frontier Airlines

   This is System generated message, and a response to this email will not be delivered. 01/12/2022 01:16:18

Exhibits for paragraph 118 (Avrohom and Devorah file with DOT):

Airconsumer Acknowledgement

<u>airconsumer@dot.gov</u>
Wed, Jan 12, 1:12 AM

to Avrohom Gordon:

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel.  As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - Mrs Devorah Gordon devorahlgordon@gmail.com

CONTACT INFO:
2251 State Route 222

Home Phone: 5137341770
Daytime Phone: 5137341770

COMPLAINT INFO:
Airline Code: G4

Flight Date: 01/17/2022
Flight Itinerary: CVG to LAX flight number G4692

Description of Problem/Inquiry/Comment:
   I have a disability and cannot wear a mask.  I  asked the airline for an exemption but they  refused.  Here is their response:   Passengers who are unwilling to comply to the  Federal Face Mask Mandate or unwilling to comply  to Allegiant's Face Mask Exemption procedure will be denied boarding.  If you do not wish to  comply, a full refund will be provided to the  original form of payment.     2222  ACAA Disability Team  P.O. Box 371477, Las Vegas, NV 89137  ACAA@allegiantair.com | www.allegiant.com

This is System generated message, and a response to this email will not be delivered. 01/12/2022 01:05:21

# AT2022010129 - (AVROHOM GORDON, DEVORAH GORDON) MZ2300 - Allegiant Confirmation #BLN6PN

Inbox

**ACAA**

Feb 18, 2022, 2:34 PM

to DEVORAHLGORDON@GMAIL.COM, Alex

Dear Mr. Gordon,

On behalf of Allegiant, I am responding to the complaint you submitted to the Department of Transportation (DOT) regarding travel on January 17, 2022 Flight #692 from Cincinnati, Ohio (CVG) to Los Angeles, California (LAX). Allegiant strives to provide an excellent experience for all our customers and regrets that you had a less than positive experience.

The US Centers for Disease Control (the "CDC") has issued an Order which now legally requires masks to be worn by all persons traveling by air. (42 U.S.C. 264) Allegiant is more than willing to provide a face mask exemption to passengers who qualify. To begin the process, Allegiant requires a letter, on letterhead, from the passengers treating medical physician stating why a compliant face mask cannot be worn during flight. After the letter has been verified and approved, the passenger is required to submit a negative COVID test within 3 days of each flight's departure.

Our records indicate Ms. Devorah Gordon requested information for a face mask exemption on January 4, 2021 and an email with general information was immediately sent to DEVORAHLGORDON@GMAIL.COM. Our records indicated you and Devorah Gordon had two separate reservations for the same flight on the same day.

On January 7th, we received an email from Ms. Devorah's email address stating you had a "medical condition" and were unable to wear a face mask during flight. In addition, stating it was "illegal discrimination" to require a negative COVID test. However, Allegiant does not have a record of receiving the required physician's letter to begin the exemption process. A few days prior to departure, Allegiant's Disabilities Team reached out to you to inquire if you wish to begin the exemption process. Again, we received an email from Ms. Devorah requesting your reservation to be canceled.

Per your request, your reservation was canceled for a full refund. The refund, in the amount of $79.00, was credited to a card ending with x1198. According to ACAA Title 14 CFR Part 382 an air carrier must admit or deny a violation to the DOT after receiving a written disability complaint. In this instance, Allegiant will deny a violation when reporting to the DOT, as

Allegiant did not deny the request for a face mask exemption as the exemption process was not started.

Again, we regret any frustration and inconvenience experienced and we look forward to welcoming you aboard another Allegiant flight in the future.

Sincerely,

Jana

**Jana Leonard**
**Manager ~ ACAA/ DOT Compliance**
**& Small Claims**
**Corporate Complaint Resolution Official**
**(CCRO)**
P.O. Box 371477, Las Vegas, NV 89137
ACAA@allegiantair.com | www.allegiant.com

**Devorah Gordon <devorahlgordon@gmail.com>**

Mar 16,
2022, 12:44
AM (5 days
ago)

to ACAA

Dear Jana,

I was so flabbergasted by your blatant lies, excuses and illegal discrimination that it took me a bit of time to want to put together this short email.  I really have no wish to respond but would like to demonstrate to the court that I have exhausted all other means to resolve this dispute, prior to suing Allegiant in Federal Court.

Below are the main issues points in response to your email:

1. The US Centers for Disease Control (the "CDC") has issued an Order which now legally requires masks to be worn by all persons traveling by air.  (42 U.S.C. 264)

"Taking measures to prevent the entry and spread of communicable diseases" is not the same as "issuing an Order which now legally requires masks to be worn." The CDC can publish guidance regarding masking. They cannot "legally require" masks to be worn. That can only come from an act of Congress. We live in the United States where laws are made by Congress. CDC has no statutory authority to make laws that we are "legally required" to observe. This is common knowledge to anyone who took a basic civics class in high school or in College.

2. Allegiant does not have a record of receiving the required physician's letter to begin the exemption process.

According to law, there is no requirement for a physician's letter to be exempted.

1. An airline may not require a medical certificate from disabled passengers who ask for a mask exemption. "Except as provided in this section, you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a). "You may … require a medical certificate for a passenger if he or she HAS a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight." 14 CFR § 382.23(c)(1). This requirement does not include speculation that a person **might have a communicable** disease such as COVID-19; evidence is required that the passenger HAS a communicable disease, and PCR testing does not provide this evidence.

2. Refusing transportation to disabled passengers who are otherwise healthy and do not pose a direct threat to anyone is illegal. Airlines may not refuse to transport a disabled person who can't wear a face mask when there's no evidence that person is positive for COVID-19 or any other communicable disease. ALLEGIANT "must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2).

3. ALLEGIANT is prohibited by federal regulations from forcing a disabled passenger to disclose his/her medical conditions, as you did by stating that, "Allegiant does not have a record of receiving the required physician's letter to begin the exemption process," only to determine if passengers like me are entitled to a particular seating accommodation, pursuant to 14 CFR § 382.38. ALLEGIANT "may not make inquiries about an individual's disability or the nature or severity of the disability," according to the DOT. ALLEGIANT's mask policy constitutes invasion of privacy, which is illegal. ALLEGIANT is not my doctor and cannot practice medicine without a license.

4. Requiring a medical certificate also violates the Convention on International Civil Aviation. ALLEGIANT may not require passengers with disabilities needing a mask exemption to submit a medical clearance. The United States has ratified CICA, which makes it binding treaty law upon all persons and corporations in the United States. "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance." CICA Annex 9 § 8.39.

5. ALLEGIANT's mask policy doesn't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. According to the DOT, "If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)."

6. Federal regulation prohibits airlines from requiring that disabled passengers needing a mask exemption undergo a medical screening with an airline doctor or third-party vendor. ALLEGIANT may not require a medical certificate for a passenger unless he/she has a communicable disease. They may also not require a medical consultation (unless the carrier has evidence that a mask-exempt passenger is on CDC's "Do Not Board" list because he/she tested positive for COVID-19 or another communicable disease). "As a carrier, you may require that a passenger with a medical certificate undergo additional medical review by you if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition since the issuance of the medical certificate …" 14 CFR § 382.23(d).


3. According to ACAA Title 14 CFR Part 382 an air carrier must admit or deny a violation to the DOT after receiving a written disability complaint. In this instance, Allegiant will deny a violation when reporting to the DOT, as Allegiant did not deny the request for a face mask exemption as the exemption process was not started.

I did start the exemption process but would not continue with showing a Doctor's letter as that is not required by law *[see point 2 above]*. It is also illegal to require someone with a disability to ask for accommodation/exemption in advance of other passengers.

Your refund process is about the only thing that functions above board and follows the legal process. I'm so happy that you know how to return my money, when you have broken the law. What comes next is a lawsuit against ALLEGIANT in which we intend to name you, Jana Leonard, personally as well.

Sincerely,

Avrohom

**Devorah Gordon <devorahlgordon@gmail.com>**       Wed, Mar 16, 2:12 AM (5 days ago)

to Frontier

Dear Brittney,

I was so turned off by the excuses and illegal discrimination that it took me until now to want to put together this short email.  I really have no wish to respond but would like to would like to demonstrate to the court that I have exhausted all other means to resolve this dispute, prior to suing Frontier in Federal Court.
Below are the main issues in response to your email:

1. Carriers must, "not do any of the following things on the basis that a passenger has a communicable disease or infection, unless you determine that the passenger's condition poses a direct threat...

I am completely healthy and in no way even close to a direct threat to anyone.

   a. An airline may not require a medical certificate from disabled passengers who ask for a mask exemption. "Except as provided in this section, you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a). "You may … require a medical certificate for a passenger if he or she HAS a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight." 14 CFR § 382.23(c)(1). This requirement does not include speculation that a person **might have a communicable** disease such as COVID-19; evidence is required that the passenger HAS a communicable disease, and PCR testing does not provide this evidence.

   b. Refusing transportation to disabled passengers who are otherwise healthy and do not pose a direct threat to anyone is illegal. Airlines may not refuse to transport a disabled person who can't wear a face mask when there's no evidence that person is positive for COVID-19 or any other communicable disease. frontier "must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2).

   c. Taking measures to prevent the entry and spread of communicable diseases" is not the same as "issuing an Order which now legally requires masks to be worn." The CDC can publish guidance regarding masking. They cannot "legally require" masks to be worn. That can only come from an act of Congress. We live in the United States where laws are made by Congress. CDC has no statutory authority to make laws that we are "legally required" to observe. This is common knowledge to anyone who took a basic civics class in high school or in College.

2. Additionally, we do offer an exemption for customers with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act. You can view the requirements for this exemption HERE  . Our records indicate we requested your medical documentation

twice, however, you refused to provide this information. As this documentation was not provided, your exemption could not be approved.

   a. Frontier is prohibited by federal regulations from forcing a disabled passenger to disclose his/her medical conditions, as you did by stating that, " Frontier does not have a record of receiving the required physician's letter to begin the exemption process," only to determine if passengers like me are entitled to a particular seating accommodation, pursuant to 14 CFR § 382.38.  Frontier "may not make inquiries about an individual's disability or the nature or severity of the disability," according to the DOT.  Frontier's mask policy constitutes invasion of privacy, which is illegal.  Frontier is not my doctor and cannot practice medicine without a license.

b. Requiring a medical certificate also violates the Convention on International Civil Aviation.  Frontier may not require passengers with disabilities needing a mask exemption to submit a medical clearance. The United States has ratified CICA, which makes it binding treaty law upon all persons and corporations in the United States. "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance." CICA Annex 9 § 8.39.
According to law, there is no requirement for a physician's letter to be exempted from wearing the mask.  It is also illegal to require someone with a disability to ask for accommodation/exemption in advance of other passengers.

c.  Frontier 's mask policy doesn't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. According to the DOT, "If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask).

d. "Federal regulation prohibits airlines from requiring that disabled passengers needing a mask exemption undergo a medical screening with an airline doctor or third-party vendor.  Frontier may not require a medical certificate for a passenger unless he/she has a communicable disease. They may also not require a medical consultation (unless the carrier has evidence that a mask-exempt passenger is on CDC's "Do Not Board" list because he/she tested positive for COVID-19 or another communicable disease). "As a carrier, you may require that a passenger with a medical certificate undergo additional medical review by you if there is a legitimate medical reason for believing that there has been a significant adverse change in the passenger's condition since the issuance of the medical certificate …" 14 CFR § 382.23(d).


3. I am glad to see you were able to travel as planned, and hope these flights went well. This is manipulative talk. I was not able to travel as planned and the flight did not go well with me being denied boarding at the gate and then forced to mask so I could get home to my family.

Sincerely,
Devorah

On Thu, Feb 17, 2022 at 6:14 PM Frontier Airlines <frontierairlines@mailac.custhelp.com> wrote:



equested assistance from our on-line support form. Below is a
ary of your request and our response.

Frontier Airlines: DOT AT2022010130 - (DEVORAH GORDON)
00

ence #: 220217-000769

ssion Thread
onse By Email (Brittney) (02/17/2022 04:14 PM)
Devorah,

ve received your correspondence as submitted to the
tment of Transportation and appreciate the opportunity to
nd.

orry to hear about the mask exemption issues you experienced
ling your travel on January 18th from Ontario through Las
to Cincinnati.

rontier's responsibility to assist passengers with disabilities, in
dance with the US Department of Transportation (DOT)
tion 14 CFR Part 382.21 (1), which requires carriers must, "not
y of the following things on the basis that a passenger has a
unicable disease or infection, unless you determine that the
nger's condition poses a direct threat: In making this
sment, you may rely on directives issued by public health
ities (e.g., the U.S. Centers for Disease Control or Public Health
e; comparable agencies in other countries; the World Health
ization)."

er did not violate this regulation as the Centers for Disease
ol (CDC) Order and Transportation Security Administration
Security Directive state all passengers and employees must
a face covering over nose and mouth throughout the Frontier
experience including at ticket counters, gate areas, baggage
and onboard all flights. Additionally, we do offer an exemption

claim and onboard all flights. Additionally, we do offer an exemption for customers with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act. You can view the requirements for this exemption HERE . Our records indicate we requested your medical documentation twice, however, you refused to provide this information. As this documentation was not provided, your exemption could not be approved.

I sincerely apologize for any frustration this has caused, and for the disruption it caused to your travel plans. I am glad to see you were able to travel as planned, and hope these flights went well.

Please let me know if there's anything else I can assist you with. Thank you for sharing your feedback.

Kindly,

Brittney
Customer Relations Advocate
Frontier Airlines

ReplyForward

## Plaintiffs' Exhibit 10

| MEDICAL EXEMPTION FORM – FACE COVERING / MASKS CALIFORNIA | OFFICE USE ONLY |
|---|---|

### PATIENT INFORMATION

This form is to be completed after an assessment of the patient with regard to whether a mask impairs or restricts breathing or oxygenation as provided by federal and state health regulations such that a mask should not be worn or whether there is any other recognized medical condition that would prevent the patient from wearing a mask.

| Last Name | First Name | Gender |
|---|---|---|
| Russo | Cindy | F |

| Address | City | State | Zip Code |
|---|---|---|---|
| 22985 Breakwater Way | Santa Clarita | CA | 91350 |

*(Minors) Parent/Guardian Last Name* | *(Minors) Parent/Guardian First Name* | Phone Number (908) 797-8066

### TO BE COMPLETED AFTER EXAMINATION

Federal and state law provide for mandatory exemptions to wearing a mask, when applicable, under the Americans with Disabilities Act, state Human Rights Law, and other provisions of law, as well as when provided for under the applicable mask mandate or other applicable health regulations or guidance.

**Trouble breathing while wearing a face-covering?**

The Centers for Disease Control & Prevention (CDC) formal guidance regarding wearing a mask provides that "masks should NOT be worn by ... anyone who has trouble breathing." https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html

Yes: ✓   No:

**Medical condition or disability that prevents wearing a face covering?**

"The following individuals are exempt from wearing a face covering: Persons with a medical condition, mental health condition, or disability that prevents wearing a face covering." https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf

Yes: ✓   No:

| Signature | Date | SURVEY USE | Ic1NY |
|---|---|---|---|
| Lisa Wahlstedt MD | 2/16/2021 | | |

| APPROVED: | DISAPPROVED: | Comments: |
|---|---|---|
| LISA WAHLSTEDT MD CA A462P4 | | |

Date Reviewed: _/_/_   Evaluation Code:

DYBICR:

Plaintiffs' Exhibit 11

RUSSO/CYNTHIA
UA-***846

BURBANK TO SAN FRANCISCO

PRIORITY
BOARDING

UA5655

BUR-SFO B2

WED  SEPTEMBER 22 2021

GATE

GATE MAY CHANGE

BOARDING BEGINS:

10:05A

BOARDING ENDS: 10:15 AM
FLIGHT DEPARTS:10:30 AM
FLIGHT ARRIVES:11:56 AM

SEAT

5A

WINDOW
ECONOMY

OPERATED BY-SKYWEST DBA UNITED EXPRESS
CONFIRMATION: CXXP2D
TICKET: 016 7645954414

CXXP2D    5A
UA 5655   BA5D0F

BOARDING
GROUP

2

26



PRIORITY BOARDING

RUSSO/CYNTHIA
UA-***846

SAN FRANCISCO TO NEWARK

UA1419     GATE

SFO-EWR
WED SEPTEMBER 22 2021

BOARDING BEGINS:

1:35P

BOARDING ENDS:  2:10 PM
FLIGHT DEPARTS: 2:25 PM
FLIGHT ARRIVES:10:46 PM

SEAT

47D
AISLE
ECONOMY

CXXP2D    47D
UA 1419   BA5D0F

BOARDING
GROUP

2

124

CONFIRMATION: CXXP2D
TICKET: 016 7645954414





**Mask Exemption Request**
*Must be submitted a minimum of 7 days prior to scheduled departure     *1*

| *Initial* | ***This section must be completed by <u>passenger or designated assistant/guardian</u>*** |
|---|---|
|  | Passenger name *(print)*: <u>Cynthia Russo</u> |
|  | Reservation and itinerary information: <u>GZP7YS  BUR-SFO-EWR 10-28-21; Return 11-1-21</u> |
| <u>CR</u> | I understand that United, in its sole discretion and in accordance with CDC/DOT/TSA standards, will determine whether to approve my mask exemption request. |
| <u>*2</u> | I understand that United requires that I provide proof of a negative COVID-19 PCR test result taken within 72 hours of my scheduled departure. |
| <u>*3</u> | I understand that United may require me or my travelling party to move to alternate seats in the cabin and/or change our itinerary to less-full flights to allow for greater social distancing from other customers on board, if possible. United will advise regarding the alternatives, and changes to flights under these circumstances will be made at no additional cost. |
| <u>CR</u> | I understand that if United approves my mask exemption request, I need to print the approval letter and carry it on my person at all times while traveling and will need to show it to TSA at the security checkpoint prior to being screened. |
| <u>CR</u> | I understand that my mask exemption request is applicable only to flights in a single reservation, and any exemption for future travel or travel in separate reservations will need to be applied for anew. |
| <u>*4</u> | I authorize the release of medical information pertaining to this mask exemption request and authorize my treating physician to speak with a United Airlines medical representative or any agent acting on its behalf. |
| <u>*4</u> | I understand that if I choose to request a mask exemption, United will use the information on this form to handle my request. In order to assess and manage my request I understand that it may be necessary for United to disclose information relating to my health information to third parties such as medical professionals, airport staff, health agencies, United Express and Star Alliance carriers, and their employees, among others.<br><br>INDIVIDUALS LOCATED OUTSIDE OF THE UNITED STATES: If you are located outside of the United States and you choose to request a mask exemption, United will use the information on this form to handle your request. You understand that this form will be transferred to the United States, where data protection laws may not be equivalent to those in your home country. By signing below and affirmatively submitting this form, you give specific consent to United to process and transfer the information for these purposes. To exercise rights granted pursuant to |

| | applicable law, including withdrawal of consent, contact privacy@united.com. Withdrawal of consent does not affect the lawfulness of information processed until the withdrawal, and this information will continue to be maintained for compliance with legal obligations and for the establishment, exercise or defense of legal claims. |
| --- | --- |
| | Passenger or designated assistant/guardian name *(print)*: Cynthia Russo <br> Passenger or designated assistant/guardian signature: Cynthia Russo   *Digitally signed by Cynthia Russo DN: cn=Cynthia Russo, o, ou, email=cjrz123@gmail.com, c=US Date: 2021.10.14 12:02:12+04'00'* <br> Date: 10-14-21 <br> Phone contact: 908-797-8066          Email contact: cjrz123@gmail.com |

| *Initial* | **This section must be completed by a <u>medical provider</u> specifically treating the passenger's disability**    **\*4** |
| --- | --- |
| | Patient/passenger name *(print)*: Cynthia Russo |
| \*4 | I am a licensed medical provider currently treating the passenger's disability. |
| **\*5** <br><br><br><br> \*4 | **Pursuant to federal law, only individuals with a disability who cannot wear a mask or cannot safely wear a mask because of the disability, for example, individuals who do not know how to remove their masks, cannot remove them on their own, or cannot communicate promptly to ask someone else to remove their mask are eligible to request a mask exemption. Individuals for whom mask wearing may only be difficult are not eligible to request a mask exemption.** <br><br> I attest that the passenger cannot safely wear a mask in connection with the flight(s) for the itinerary above for the following reason(s): <br> I have claustrophobia, which gives me anxiety and makes my heart race, which causes respiratory distress. Therefore I can't tolerate wearing a face mask. My claustrophobia is related to my Post-Traumatic Stress Disorder I suffer as a result of being trapped in a tunnel in New Jersey. <br><br> Can the passenger wear a face shield? Yes ◯   No ◉ |
| | Medical provider's license information: \*4 <br><br> Date and type of the license: \*4 <br><br> License Number: \*4 <br><br> State or other jurisdiction in which license was issued: \*4 |
| | Your name *(print)*: \*4 <br> Your Specialty: \*4 <br> Signature and Date: Cynthia Russo   *Digitally signed by Cynthia Russo DN: cn=Cynthia Russo, o, ou, email=cjrz123@gmail.com, c=US Date: 2021.10.14 12:41:06+04'00'* <br> Business phone contact: \*4 |

| | Business email contact: *4 _____ |
|---|---|

*1 = Illegal; see attachment

*2 = Illegal; see attachment

*3 = Illegal; see attachment

*4 = Illegal; see attachment

*5 = Fraudulent misrepresentation; see attachment

| MEDICAL EXEMPTION FORM – FACE COVERING / MASKS CALIFORNIA | OFFICE USE ONLY |
|---|---|

## PATIENT INFORMATION

This form is to be completed after an assessment of the patient with regard to whether a mask impairs or restricts breathing or oxygenation as provided by federal and state health regulations such that a mask should not be worn or whether there is any other recognized medical condition that would prevent the patient from wearing a mask.

| Last Name Russo | First Name Cindy | Gender F |  |
|---|---|---|---|
| Address 22485 Breckwater Way | City Santa Clarita | State CA | Zip Code 91350 |
| (Minors) Parent/Guardian Last Name | (Minors) Parent/Guardian First Name | Phone Number (106) 797-8066 | |

## TO BE COMPLETED AFTER EXAMINATION

Federal and state law provide for mandatory exemptions to wearing a mask, when applicable, under the Americans with Disabilities Act, state Human Rights Law, and other provisions of law, as well as when provided for under the applicable mask mandate or other applicable health regulations or guidance.

| | Yes: | No: |
|---|---|---|
| **Trouble breathing while wearing a face-covering?**<br><br>The Centers for Disease Control & Prevention (CDC) formal guidance regarding wearing a mask provides that "masks should NOT be worn by ... anyone who has trouble breathing." https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html | ✓ | |
| **Medical condition or disability that prevents wearing a face covering?**<br><br>"The following individuals are exempt from wearing a face covering: Persons with a medical condition, mental health condition, or disability that prevents wearing a face covering." https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf | ✓ | |

| Signature *Lisa Wahlestedt MD* | Date 2/1/2021 | SURVEY USE | Ic1NY |
|---|---|---|---|
| APPROVED: LISA WAHLESTEDT MD CA A462P4 | DISAPPROVED: | Comments: | |
| | | Date Reviewed: __/__/__ | Evaluation Code |
| | | DYBICR: | |

Form: Ic-1NY

**Cindy Russo**
**Mask Exemption Request to United Airlines**
**Notes on United's Numerous Illegal Policies**
**Oct. 14, 2021**

1. An airline is not allowed to require passengers seeking mask exemptions to do so in advance. "May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight? As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight." 14 CFR § 382.25.

2. An airline may not require disabled passengers who seek a mask exemption to submit a negative COVID-19 test for each flight when nondisabled customers aren't subject to this same requirement. No provision of the Air Carrier Access Act or its accompanying regulations promulgated by DOT (nor any other law enacted by Congress) permits airlines to require passengers submit a negative test for any communicable disease. Mandating disabled flyers submit an expensive COVID-19 test before checking in but not requiring the same of nondisabled travelers is illegal discrimination. "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation…" 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705.

3. An airline may not change a disabled passenger's travel dates and/or flights. Federal law prohibits banning mask-exempt passengers from flying if a plane is more than a certain percentage full. "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17. "You must not discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation…" 14 CFR § 382.11(a)(1). *See also* 49 USC § 41705. You also may not change the seat assignment of a mask-exempt passenger without his/her consent. You may not instruct gate agents and/or flight attendants to move a mask-exempt passenger to a different seat than he/she selected. "As a carrier, you must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability, except to comply with FAA or applicable foreign government safety requirements." 14 CFR § 382.87(a).

4. An airline may not require a medical certificate from disabled passengers who ask for a mask exemption. "[Y]ou must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a). Requiring a medical certificate also violates international law. "[P]ersons with disabilities should be permitted to travel without the requirement for a medical clearance. Aircraft operators should only be permitted to require persons with disabilities to obtain a medical clearance in cases of a medical condition where it is not clear that they are fit to travel and could compromise their safety or well-being or that of other passengers." Convention on International Civil Aviation Annex 9 § 8.39.

5. Fraudulent Misrepresentation: You provide Food & Drug Administration unauthorized or Emergency Use Authorization face masks without disclosing that: 1) the masks (if authorized at all) are only designated for emergency use; 2) that there are "significant known and potential benefits and risks of such use" (or "the extent to which such benefits and risks are unknown"); or 3) flyers have the "option to accept or refuse administration of the product." 21 USC § 360bbb-3. You falsely represent that "federal law" requires airline passengers wear face masks. But Congress has never enacted such a

law. This is a fraudulent misrepresentation of the law. You also haven't told your passengers of the dozens of health risks of covering their sources of oxygen or that the scientific consensus is that masks are totally worthless in reducing COVID-19 spread. *See* bit.ly/masksarebad. Failing to disclose this information pursuant to the Food, Drug, & Cosmetic Act and your other legal obligations is a fraudulent misrepresentation.

6. Airlines by federal law are NOT permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement. "In providing air transportation, an air carrier … may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment." 49 USC § 41705(a).

7. An airline may not refuse transportation solely on the basis of a passenger's disability. "As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability, except as specifically permitted by this part." 14 CFR § 382.19(a).

8. Recipients of federal funds including airlines are prohibited from discriminating against the disabled. "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

9. Requiring Passengers Not Known to Have a Communicable Disease to Wear a Face Covering: Federal law bans airlines from requiring passengers who do not have a communicable disease to don a face mask. The ACAA, 49 USC § 41705, and its accompanying regulations, 14 CFR Part 382, spell out specific procedures for dealing with airline passengers who are known to have a communicable disease. Your mask policy violates these regulations by assuming that every passenger has a communicable disease such as COVID-19. Airlines are prohibited from requiring that a passenger wear a face covering or refuse him/her transportation unless they determine that the passenger "has" a communicable disease and poses a "direct threat" to other passengers and the flight crew. 14 CFR Part 382. Your rules illegally assume every single traveler is infected with COVID-19. This violates the regulation that "In determining whether an individual poses a direct threat, you must make an individualized assessment." 14 CFR § 382.19(c)(1). Your mask policy doesn't provide for making an "individualized assessment" of whether someone is known to have COVID-19 or another communicable disease. According to DOT, "If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may: … Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask)." This is the only scenario airlines are permitted to force any passenger to don a face covering.

10. "You must not take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected by this part or the Air Carrier Access Act." 14 CFR § 382.11(a)(4).

11. You are prohibited by federal regulations from forcing a disabled passenger to disclose his/her medical conditions. "May I ask an individual what his or her disability is? Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38. Generally, you may not

make inquiries about an individual's disability or the nature or severity of the disability," according to DOT. Your mask policy constitutes invasion of privacy, which is illegal.

12. Refusing Transportation to Disabled Passengers Who Are Healthy & Don't Pose a Direct Threat to Anyone: Airlines may not refuse to transport a disabled person who can't wear a face mask when there's no evidence that person is positive for COVID-19 or any other communicable disease."[Y]ou must not refuse transportation to the passenger if you can protect the health and safety of others by means short of a refusal." 14 CFR § 382.19(c)(2).

13. Breach of Contract: I did not agree to wear a face mask when I bought my ticket. Any mask provisions in your Contract of Carriage are invalid as they violate federal law and international treaties.

14. Reckless Endangerment – Forcing Passengers to Wear Masks in Violation of the Food, Drug, & Cosmetic Act that Are Experimental Medical Devices Proven to Harm Human Health: You are violating the Food, Drug, & Cosmetic Act by not giving passengers our legal option to refuse administration of an FDA unauthorized or emergency medical device (a face mask). 21 USC § 360bbb-3(e)(1)(A)(ii)(III). You may not provide illegal and/or EUA masks to your passengers without informing them use of the device is optional and they must give informed consent. This constitutes reckless endangerment.

15. Practicing Medicine without a License: You are prescribing all passengers to wear FDA unauthorized or EUA medical devices, but you do not have a license to practice medicine. Practicing medicine without a license is illegal in every state.

16. Deceptive & Misleading Trade Practices: You are deceiving your customers regarding mask rules, efficacy, and harms, and attempt to mislead us into believing face coverings are good for our health when the reality is they cause dozens of harms and create chaos in the sky due to oxygen deprivation. "Intent is not an element of either unfairness or deception," according to DOT. 85 Fed. Reg. 78,707 (Dec. 7, 2020). However, it's clear you have an intent to deceive passengers that face masks are effective in reducing COVID-19 spread, are authorized by FDA, etc. You clearly mislead customers that masks may be forced on passengers without their consent in violation of the Food, Drug, & Cosmetic Act. DOT defines an unfair trade practice by airlines as "demonstrating that the harm to consumers is (1) substantial; (2) not reasonably avoidable; and (3) not outweighed by offsetting benefits to consumers or competition." DOT defines a practice as ''deceptive'' by showing that: "(1) The practice actually misleads or is likely to mislead consumers; (2) who are acting reasonably under the circumstances; (3) with respect to a material matter." These requirements are codified at 14 CFR § 399.79. Airlines have a statutory duty not to deceive and mislead their customers. 49 USC § 41712.

17. Nuisance: You deprive disabled passengers who can't wear masks of our constitutional right to travel and our statutory right to use the public airspace. A public nuisance is when a person or corporation unreasonably interferes with a right that the general public shares in common.

18. Infringement on the Constitutional Right to Travel: You deprive disabled Americans and those who refuse to wear masks for health reasons of the ability to fly. In many cases, such as traveling from noncontinental states and territories to other states and territories, as well as going overseas, commercial airplanes are the only means of transportation. The Constitution protects against Americans' infringement on our freedom of movement by government actors and common carriers.

19. Violation of International Covenant on Civil & Political Rights: You require passengers to wear masks without giving our free consent, deprive us of our freedom to travel for not wanting to obstruct our breathing, curtail the liberty of movement, prevent us from entering or exiting our country of citizenship, and unlawfully interfere with our privacy. The United States has ratified the International Covenant on Civil & Political Rights, which makes it binding treaty law upon all persons and corporations in our country. "[N]o one shall be subjected without his free consent to medical or scientific experimentation." ICCPR Art. 7. "No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law." ICCPR Art. 9. "1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement ... 2. Everyone shall be free to leave any country, including his own. 3. The above-mentioned rights shall not be subject to any restrictions except those which are provided by law… 4. No one shall be arbitrarily deprived of the right to enter his own country." ICCPR Art. 12. "1. No one shall be subjected to arbitrary or unlawful interference with his privacy … 2. Everyone has the right to the protection of the law against such interference or attacks." ICCPR Art. 17.

## RE: [EXTERNAL] Request for Mask Exemption

1 message

---

**Mask Exception** <MaskException@united.com>                                Thu, Oct 14, 2021 at 3:02 PM
To: CJRZ <cjrz123@gmail.com>

Hello Ms. Russo,

Thank you for contacting United Airlines, Inc. ("United") regarding your request for an exemption from our face mask policy for your upcoming trip. After review of the request, we have declined your request for a face mask exception because the documentation you submitted was either incomplete. This decision was made in accordance with the Center for Disease Control Order, dated January 29, 2021, Transportation Security Administration Security Directive 1544-21-02, dated January 31, 2021, and the Air Carrier Access Act and its implementing regulations at 14 CFR 382.

United's form complies with CDC, TSA and DOT directives/guidance. A passenger that is not wearing a mask poses a direct threat to the health and safety of others, so we are able to require that the form be filled out. This allows us to determine if the direct threat can be reasonably mitigated by employing alternative measures to accommodate other passengers.


I understand that you may not want to fill out the form, there are 2 options

1 – If you want to travel, you will then need to wear a mask

2 – if you are not able to wear a mask and unable to travel, we can cancel and return the miles to your account – fee waived

We understand this decision may impact your travel plans.

Regards,

Wendy Marzullo
United Airlines

---

**From:** CJRZ <cjrz123@gmail.com>
**Sent:** Thursday, October 14, 2021 1:50 PM
**To:** Mask Exception <MaskException@united.com>
**Subject:** [EXTERNAL] Request for Mask Exemption


This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.


Hello,


Attached please find the completed form requesting a mask exemption for my upcoming trip.


Sincerely,

Cindy Russo

(908) 797-8066

---

🌐 **CDC Order Wearing of face masks while on conveyances and at transportation hubs 321.html**

**RE: [EXTERNAL] Flight GZP7YS**

1 message

---

**Mask Exception** <MaskException@united.com>                    Wed, Oct 27, 2021 at 1:06 PM
To: CJRZ <cjrz123@gmail.com>

Hello Ms. Russo,

I did add a note to your reservation that your mask exception was denied which would not interfere with you checking in for your flight.

Regards,

Wendy

---

**From:** CJRZ <cjrz123@gmail.com>
**Sent:** Wednesday, October 27, 2021 1:57 PM
**To:** Mask Exception <MaskException@united.com>
**Subject:** [EXTERNAL] Flight GZP7YS

This message was sent from outside of United Airlines. Please do not click links or open attachments unless you recognize the sender and know that the content is safe.

Hello,

I received a notice to check in for my upcoming flight on Oct 28th and when I tried to do that I received the following message.



Would you know if this has anything to do with my application for a mask exception?  I'd like to understand what this is about before arriving at the airport.  I have been corresponding with Wendy Marzullo.

Thank you,

Cindy Russo

(908) 797-8066

Plaintiffs' Exhibit 70

10:35 a.m.

Burbank (BUR)

*Flight UA5655 is operated by Skywest Airlines*

12:01 p.m.

San Francisco (SFO)

Fare class: United Economy (XN)

Duration: 1h 26m

Aircraft: Canadair Regional Jet

0h 59m CONNECTION

Depart

October 28, 2021

1:00 p.m.

San Francisco (SFO)

Arrival

October 28, 2021

9:29 p.m.

New York/Newark (EWR)

Flight info

Flight: UA 2324

Fare class: United Economy (XN)

Duration: 5h 29m

Aircraft: Boeing 757-200

| Depart | | Arrival | | Flight info |
|---|---|---|---|---|
| November 1, 2021 | ↑ | November 1, 2021 | | Flight: UA 414 |
| 12:00 p.m. | | 3:15 p.m. | | Fare class: United Economy (XN) |
| New York/Newark (EWR) | | San Francisco (SFO) | | Duration: 6h 15m |
| | | | | Aircraft: Boeing 777-300ER |

0h 50m CONNECTION

| Depart | | Arrival | | Flight info |
|---|---|---|---|---|
| November 1, 2021 | ↑ | November 1, 2021 | | **Flight: UA 1822** |
| 4:05 p.m. | | 5:21 p.m. | | Fare class: United Economy (XN) |
| San Francisco (SFO) | | Burbank (BUR) | | Duration: 1h 16m |
| | | | | **Aircraft: Airbus A319** |

Your safety is our top priority. Learn more about how we're providing a safer, cleaner travel experience at **united.com/cleanplus**

**Airconsumer Acknowledgement**    Plaintiffs' Exhibit 12

1 message

---

**airconsumer@dot.gov** <airconsumer@dot.gov>                                     Fri, Oct 15, 2021 at 12:39 AM
To: cjrz123@gmail.com

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel.  As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

   PERSONAL INFO:
   Passenger - Cindy Russo cjrz123@gmail.com

   CONTACT INFO:
   Santa Clarita,CA

   Home Phone:
   Daytime Phone: 908-797-8066

   COMPLAINT INFO:
   Airline Code: UA

   Flight Date: 10/28/2021
   Flight Itinerary: BUR-SFO-EWR

   Description of Problem/Inquiry/Comment:
   United Airlines violated the Air Carrier Access Act and numerous other laws by refusing to grant me a mask exemption for my Oct. 28, 2021, flights BUR-SFO-EWR and returning Nov. 1. United fraudulently informed me "federal law" requires each person to wear a mask while flying. However, Congress has never passed such a law, nor has DOT or any other agency promulgated a regulation. United cites no provision of the U.S. Code or the Code of Federal Regulations to support its false claim that "federal law" requires face coverings.  I can't wear a mask due to my medical conditions. United required me to submit an exemption request in advance, which is illegal. "As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight." 14 CFR § 382.25.  I submitted the form despite it being unlawful to request advance notice. I included a doctor's note that I shall not wear a mask. I wrote that United's mask policy is illegal in at least 19 ways including that airlines by federal law are NOT permitted to impose certain requirements or conditions on a person requesting an exemption from the mask mandate. 49 USC § 41705(a).  United may not require a medical certificate from disabled passengers who ask for a mask exemption. "[Y]ou must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation." 14 CFR § 382.23(a).  United may not require disabled passengers needing a mask exemption to undergo a medical screening since they may not ask for a medical certificate. 14 CFR § 382.23(d).  United may not change a disabled passenger's travel dates and/or flights. "As a carrier, you must not limit the number of passengers with a disability who travel on a flight." 14 CFR § 382.17. United also may not change the seat assignment of a mask-exempt passenger. "As a carrier, you must not exclude any passenger with a disability from any seat or require that a passenger with a disability sit in any particular seat, on the basis of disability...." 14 CFR § 382.87(a).  United may not require disabled passengers who seek a mask exemption to submit a negative COVID-19 test. No ACAA provision (nor any other law) permits airlines to require passengers submit a negative virus test. And mandating that only disabled flyers submit a COVID-19 test is illegal discrimination. 14 CFR § 382.11(a)(1) & 49 USC § 41705.  United denied my mask-exemption request, falsely claiming it is obeying the ACAA. United must be fined for violating the ACAA. DOT must also enjoin United from continuing to require numerous illegal steps to obtain a mask exemption.


   This is System generated message, and a response to this email will not be delivered. 10/15/2021 03:39:27

# Plaintiffs' Exhibit 13

washingtonpost.com

## Sneezed on, cussed at, ignored: Airline workers battle mask resistance with scant government backup

*Michael Laris*

13-17 minutes

Other passengers have verbally abused and taunted flight attendants trying to enforce airline mask requirements, treating the potentially lifesaving act as a pandemic game of cat-and-mouse. A loophole allowing the removal of masks while consuming food and beverages is a favorite dodge.

Asked to mask up, one passenger pulled out a large bag of popcorn and nibbled her way through it, kernel by kernel, stymieing the cabin crew for the length of the flight. Others blew off requests by chomping leisurely on apple slices, between occasional coughs, or lifting an empty plastic cup and declaring: "I am drinking!"

The displays of rule-bucking intransigence are described in more than 150 aviation safety reports filed with the federal government since the start of the pandemic and reviewed by The Washington Post. The reports provide an unguarded accounting of bad behavior by airline customers, something executives hit by a steep drop in travel and billions in pandemic-related losses are loath to share themselves.

Some reports raise safety concerns beyond the risk of coronavirus infection. A flight attendant reported being so busy seeking mask compliance that the employee couldn't safely reach a seat in time for landing.

One airline captain, distracted by mask concerns, descended to the wrong altitude. The repeated talk of problem passengers in Row 12 led the captain to mistakenly head toward 12,000 feet, not a higher altitude given by air traffic control to keep planes safely apart. The error was caught, and "there was no conflicting traffic," the captain wrote.

The Boeing 737 Max was grounded for 20 months following two crashes that killed 346 people. Now, after design changes, the aircraft is returning to service. (The Washington Post)

Some passengers are portrayed as oblivious, obstinate, foul-mouthed and, at times, dangerous. One called a flight attendant a "Nazi." Another "started to rant how the virus is a political hoax and that she doesn't wear a mask," a flight attendant reported.

With millions of passengers ignoring warnings from the Centers for Disease Control and Prevention to refrain from holiday travel, the reports offer an X-ray into the country's deeper failures against the coronavirus — and insights into the pitfalls and possibilities facing a new presidential administration.

While the White House under President Trump has, at times, been dismissive or hostile toward masks, President-elect Joe Biden is making a patriotic appeal to "mask up for 100 days," whatever people's politics. Biden has said he will sign an order on his first day requiring masks for "interstate travel on planes, trains and buses." How well those efforts will work remains to be seen.

Experts in psychology and decision-making say hostility toward wearing masks, even within the shared confines of a passenger jet, has been fueled by politicization — but also by skewed incentives and inconsistent messaging.

"The reinforcement principles are backward," said Paul Slovic, who studies the psychology of risk at the University of Oregon.

The usual signs of danger, and rewards for following potentially bothersome rules, are thrown off by a virus that is spread easily by people who don't know they have it, Slovic said.

"You get an immediate benefit for not following the guidelines because you get to do what you want to do," Slovic said. "And you don't get punished for doing the wrong thing" because it's not immediately clear who is being harmed.

The "squishiness of the requirement" to wear masks on planes also undermines the message that they are critical for public health, Slovic said. In contrast, he cites the rigid clarity of the ban on flying with a firearm. "It's not, 'You can carry it as long as you don't use it,' " Slovic said.

But passengers are allowed to drop their masks to snack and sip beverages. "When you start opening it up to eating, the whole thing kind of weakens," Slovic said.

Applying mask rules also worsens the already strained position of flight attendants, who are front-line enforcers even as they keep their usual safety responsibilities, experts said.

"Flight attendants are dealing with mask compliance issues on every single flight they work right now," said Taylor Garland, spokeswoman for the Association of Flight Attendants-CWA, noting that those efforts range from friendly reminders to facing passengers "actively challenging the flight attendants' authority."

The Department of Transportation in October rejected a petition to require masks on airplanes, subways and other forms of transportation, with Secretary Elaine Chao's general counsel saying the department "embraces the notion that there should be no more regulations than necessary."

The nation's aviation regulator has deferred to airlines on masks, with Federal Aviation Administration chief Stephen Dickson telling senators at a June hearing "we do not plan to provide an enforcement specifically on that issue."

Such matters are more appropriately left to federal health authorities, Dickson argued. "As Secretary Chao has said, we believe that our space is in aviation safety, and their space is in public health," Dickson said, referring to the CDC and other health officials.

Airline representatives say they take mask usage seriously and the overwhelming majority of customers comply. Some airlines have banned passengers for the length of the pandemic for refusing to mask up. Many have eliminated medical exemptions in their mask requirements.

"Of the hundreds of thousands of passengers who have flown with us, we have only needed to ban

about 370 customers for not complying," United Airlines spokeswoman Leslie Scott said. Delta said its mask-related no-fly list includes about 600 people, despite carrying about 1 million people each week.

Resistance by some passengers prompted Alaska Airlines to begin issuing yellow cards, akin to the warnings in soccer, to problem passengers.

The initial yellow card said employees would file a report that could result in a passenger being suspended. A later version was more aggressive, saying continued defiance would lead to a flight ban "immediately upon landing," even if the customer had a connecting flight.

Alaska Airlines has barred 237 passengers since August, and "in more than half of these incidents we also canceled onward or returning travel," spokeswoman Cailee Olson said.

American Airlines declined to release numbers of banned customers, as did Southwest, which said in a statement it appreciates "the ongoing spirit of cooperation among customers and employees as we collectively take care of each other while striving to prevent the spread of COVID-19."

Yet a small, uncooperative minority can wreak outsize havoc, safety reports show.

The anonymous reports are collected in a National Aeronautics and Space Administration database, part of a program meant to increase aviation safety by encouraging employees to provide candid descriptions of emerging problems without fear of reprisal. Names of people filing the reports, and their airlines, are removed by NASA before they are made available to regulators at the FAA and the public.

NASA analysts screen the reports to weed out irrelevant filings and may call back filers to clarify safety points. But its analysts do not try to verify people's identities or the accuracy of the reports.

The database shows some fliers treat airline mask requirements as a seemingly asinine rule to evade, akin to sneaking a late look at text messages after phones are supposed to be in airplane mode. Passengers berate flight attendants about their noncompliant cabin mates. Some reports read like cries for help.

"It all has to stop," pleaded one flight attendant.

"In the future I would like to feel safe while doing my job," said another.

● A woman refused to wear her mask as the plane rolled away from the terminal, saying it made her ill, and the pilot pulled over temporarily to try to avoid returning to the gate. She continued to resist but finally agreed.

"As soon as we took off, she took it off again and kept it off the entire flight," the flight attendant reported.

● A man started down the aisle, pausing about 18 inches from a flight attendant.

"He sneezed directly in my face, making no attempt to cover his mouth, pull up his mask or turn towards the row 1 window," the employee wrote. The flight attendant, who was wearing a face covering, judged the act unintentional and tried to blot away the remnants.

● A woman propped her foot up and painted her toenails with her mask below her chin, despite

several requests to wear it properly. After another passenger appealed for more to be done, the woman acquiesced, then loudly instructed the flight attendant to "go away!"

After landing, she cut in line to rush off the plane. "Although we understand the importance of wanting to retain customer loyalty, this kind of behavior should not be tolerated for the sake of one over an entire cabin of guests and employees," the flight attendant wrote.

● An immunocompromised passenger was furious at the lack of enforcement as another customer snacked incessantly on chocolate. The concerned passenger then removed his mask to complain to the flight attendant.

● A passenger claimed discrimination, arguing he was singled out for enforcement because of his tattoos. "He said 'I am complying, #%$^!' His nostrils were clearly visible," the flight attendant wrote.

● A pilot flouted the mask requirement with what appeared to be a passive-aggressive display, donning a flimsy, see-through veil described as useless for containing airborne particles.

● Flight attendants made an exception and allowed a distraught mother, whose daughter may have had a disability and screamed about the mask requirement, to remain on the plane. They tried cookies, which didn't help, then moved the family to seats three rows from other passengers, who were supportive.

● A customer, after earlier warnings, stuck his mask-free head in the aisle during the safety demonstration, "making a total mockery out of me," a flight attendant wrote. He repeated his taunt when the plane was fourth in line for takeoff. The captain turned around, and the man was taken off the plane.

The obstinacy cuts against basic health precautions. Experts in cabin air say masks are critical tools for safety. Cabin air is run through powerful filters, mixed with outside air and recirculated. But it takes several minutes for all air to be vented out of the cabin, giving the coronavirus and other viruses the opportunity to spread.

A Harvard study funded by the aviation industry said flying can be done with a relatively low risk of coronavirus infection if precautions are followed. It said masks are "perhaps the most essential layer" among measures to reduce transmission.

The study said removing masks to eat should be kept to an "absolute minimum," and straws should be used when feasible. "When one passenger briefly removes a mask to eat or drink, other passengers in close proximity should keep their masks on," researchers said.

Trump and some of his advisers, meanwhile, have stoked divisions over masks.

The president mocked Biden's frequent mask use, presided over White House events that flouted mask guidelines and relied on a former pandemic adviser who wrongly argued masks were ineffective. The White House also blocked a nationwide order, drafted by the CDC, that would have required masks on all forms of public transportation.

"Masks have been made a political issue from the start of the pandemic, and people don't believe they need to wear them," said Garland, whose union represents about 50,000 flight attendants.

"We do not have a president who tells people to wear a mask, and the federal government, not just in aviation but across the board, has declined to mandate it in any way, shape or form," she added, saying her members are eager to see a Biden administration set a different tone.

An FAA spokesman declined to answer questions about the risks involved with passengers refusing to wear masks.

After inquiries from The Post about enforcement, the agency distributed a news release touting its role in pursuing civil penalties in two assault cases but reiterated that "the failure to wear a face covering is not itself a federal violation."

The cases show how mask disputes can escalate.

On an Allegiant Air flight in August, a passenger hit a flight attendant, yelled obscenities at him and grabbed his phone as he described a mask-related dispute to the captain, according to the FAA. The agency said it is pursuing a $15,000 civil penalty for assault and interfering with a flight attendant.

Allegiant declined to say whether anyone was arrested or charged.

On a SkyWest Airlines flight to Chicago in August, a passenger took off a mask, "continually bothered" fellow customers and "at one point, grabbed a flight attendant's buttock as she walked by the passenger's row of seats," according to the FAA, which is seeking a $7,500 penalty.

Beyond addressing such extreme cases, some outside experts say federal and corporate leaders have fallen short.

"Both industry and government have failed the people on the front line who need to administer these rules," said Baruch Fischhoff, a psychologist and professor at Carnegie Mellon University who researches decision-making.

Politics often has driven responses to the pandemic, while critical public health communication on things like masks has not been tested to make sure it hits the right notes or is convincing, Fischhoff said. "Neither have fulfilled that responsibility for clear, consistent, tested communications," he said.

Fischhoff said that with 330 million people in the United States, it's not surprising the safety reports received by NASA reveal examples of poor behavior.

"Part of the reason they stand out is, I think, the vast majority of people are polite and civil to one another," Fischhoff said. Still, the reports probably represent a dramatic undercount because it takes time and initiative for busy employees to file them.

"If you see 100, there are probably 1,000 or 10,000. This is a widespread enough phenomenon that it needs to be taken seriously," he said. "You have to give credit to people who lodge just complaints and recognize they're just a fraction of the people who are observing things that threaten our health and our economy."

## Plaintiffs' Exhibit 14

IIA

117TH CONGRESS
2D SESSION

# S. J. RES. 37

Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by Centers for Disease Control and Prevention relating to "Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs".

———————

## IN THE SENATE OF THE UNITED STATES

FEBRUARY 10, 2022

Mr. PAUL (for himself, Mr. MARSHALL, Mr. BRAUN, Mr. CRAMER, Mrs. BLACKBURN, Mr. LANKFORD, Mr. HAWLEY, Mr. CRUZ, Mr. SCOTT of Florida, Mr. WICKER, Mr. COTTON, Mr. TUBERVILLE, Mrs. HYDE-SMITH, Mr. HOEVEN, Mr. LEE, and Ms. LUMMIS) introduced the following joint resolution; which was read twice and referred to the Committee on Health, Education, Labor, and Pensions

———————

# JOINT RESOLUTION

Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by Centers for Disease Control and Prevention relating to "Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs".

1    *Resolved by the Senate and House of Representatives*

2    *of the United States of America in Congress assembled,*

3    That Congress disapproves the rule submitted by the Cen-

4    ters for Disease Control and Prevention relating to "Re-

5    quirement for Persons To Wear Masks While on Convey-

2

1   ances and at Transportation Hubs'' (86 Fed. Reg. 8025

2   (February 3, 2021); determined through a letter of opin-

3   ion from the Government Accountability Office dated De-

4   cember 14, 2021, and printed in the Congressional Record

5   on December 15, 2021, on pages S9206–S9208, that the

6   order is a rule under the Congressional Review Act), and

7   such rule shall have no force or effect.

○

2483

Plaintiffs' Exhibit 15

PRIMARY CARE DIABETES

# Mask fatigue

Sanjay Kalra[1,2], Sandeep Chaudhary[3], Viny Kantroo[4], Jatin Ahuja [5]

## Abstract

Extended wearing of mask, which has become a part of routine life, has led to the emergence of 'mask fatigue'. **Mask fatigue is defined as the lack of energy that accompanies, and/or follows prolonged wearing of a mask.** This communication describes the various aspects of mask fatigue, and shares pragmatic tips on its reduction. This discussion is relevant to all health care professionals and to general public to some extent, in the present scenario.

**Keywords:** COVID 19, hypoxia, mask, N 95, fatigue, $CO_2$ retention

## Introduction

COVID-19 is here to stay.[1] With this new pandemic, we have had to modify our lifestyles, focusing on community and personal hygiene. One integral tenet of hygiene is the necessity of wearing masks. All adults and adolescents are now expected to wear masks in public places. As health care professionals, we are duty bound to encourage the public to follow these norms, and other aspects of COVID 19 prevention. It is also incumbent upon us to practice what we preach, and hence wear masks in work places and crowded areas. Health care professionals are more prone to this type of fatigue due to nature of extended hours of work, talking needed to assess and manage the patients and especially use of filtering face piece (FFP) respirators.

## The mask as a helper or a hazard?

A mask acts as a protection against the professional hazards of contracting airborne or droplet infection. Paradoxically, however, it is considered as an impediment to professional work as well.[2-4] This is because of the newly emerging condition, mask fatigue.

## Mask fatigue

The phrase 'mask fatigue' can be used in multiple contexts. Getting tired of using masks, and becoming tired due to the use of masks, both can be described as mask fatigue. We define mask fatigue as the lack of energy that

accompanies, and/or is a consequence of extended use of a mask. The mere lack of compliance or reluctance to wear a mask, or easy fatigability, does not qualify as a disorder. Mask fatigue may be considered as a disorder if it interferes with physical, mental, psychological, or social functioning in healthy adults. Table-1 describes the various etiopathophysiologic and clinical aspects of mask fatigue. There is published evidence which shows that extended wearing of mask impairs functioning of health care professionals.[2-5] Health care physicians relate anecdotes which highlight the difficulty associated with wearing masks, and with ensuring that patients and their carers wear masks as well. The situation is compounded by differing guidelines and varying information on the need to wear masks.[6]

## Mask fitness

Table-2[7] shares a few pragmatic tips to help minimize mask fatigue in health care workers. Simple rules if followed, can help minimize the fatigue. The most important tip to prevent this fatigue is to act early. The right choice of mask type depending upon area of work, fit, material, the correct way of donning it, and a graded approach to work while wearing it, help prevent mask fatigue. Primary prevention of mask fatigue also includes inculcating the right attitude to wear a mask, i.e., to consider these new norms as friend rather than as a foe.

**Table-1:** Aspects of mask fatigue.

**Biomedical**
- Mechanical
  - Pressure/pain over ears, cheeks, nose, skin breakdown, aggravation of acne, itching, contact dermatitis
- Laryngeal
  - V oice fatigue, Laryngitis, Sore throat
- Respiratory compromise
  - Hypoxia, Hypercapnia, increased work of breathing
  - Dizziness, Headache, irritability, physical exhaustion, decreased concentration/work efficiency, confusion, disorientation, breathlessness
- Nutritional/metabolic
  - Reduced fluid and food intake
  - chronic health effects on renal and   metabolic functions

**Psychosocial**
- Aggravation of anxiety, depression, feeling of impending doom
- Claustrophobia
- Impaired social interaction/recognition
- Financial impact
- Maskophobia

[1]Departments of Endocrinology, Bharti Hospital, Karnal, India; [2]All India Institute of Medical Science, Rishikesh, India; [3]Department of Endocrinology, NMC Hospital, Dubai, United Arab Emirates; [4]Department of Pulmonology, Critical Care and Sleep Medicine, Indraprastha Apollo Hospitals, New Delhi, India; [5]Department of Infectious Diseases, Dr Ahuja's ID Clinic, New Delhi, India.
**Correspondence:** Sanjay Kalra. e-mail: bridenkl@gmail.com

Plaintiffs' Exhibit 16



An official website of the United States government Here's how you know ⌄

⚠ The latest general information on the Coronavirus (COVID-19) is available on Coronavirus.gov. For FAA-specific COVID-19 resources, please visit faa.gov/coronavirus.

United States Department of Transportation

**Federal Aviation Administration**

# 2021 Unruly Passenger Data

The FAA investigates unruly-passenger incidents that airline crews report to the agency. The 2021 data below reflects all cases the FAA investigated that cited violations of one or more FAA regulations or federal laws.

## 2021 Year-End Totals



**5,981** Unruly Passenger Reports



**4,290** Mask-related Incidents Reported



**1,116** Investigations Initiated



**350** Enforcement Actions Initiated

In 2021, the FAA proposed $5 million in fines against unruly passengers.



*Unruly passenger rate is 6.9 incidents per 10k flights for the week of December 26, 2021.*

Page last modified: March 01, 2022 10:09:43 AM EST

An official website of the United States government Here's how you know ⌄

The latest general information on the Coronavirus (COVID-19) is available on Coronavirus.gov. For FAA-specific COVID-19 resources, please visit faa.gov/coronavirus.

United States Department of Transportation



**Federal Aviation Administration**

# Unruly Passengers

The FAA investigates unruly-passenger incidents that airline crews report to the agency. The data below reflects all cases the FAA investigated that cited violations of one or more FAA regulations or federal laws.

**Zero Tolerance for Unruly and Dangerous Behavior Toolkit** — digital products to help promote safe and responsible passenger behavior and bring awareness to the zero tolerance policy. Products include press releases, videos, and graphics.

**Year-to-date numbers current as of March 7, 2022.**


**814** reports of unruly passengers


**535** related to facemasks


**224** investigations initiated


**100** enforcement action cases initiated



6.2 incidents per 10k flights for week ending January 30, 2022.



Investigations initiated for calendar years 1995–2022

Hover for more details.

## 2021 Unruly Passenger Data

## General notes

- Interfering with the duties of a crewmember violates federal law.

- Federal Aviation Regulations 91.11, 121.580 and 135.120 state that "no person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated."

- The numbers in the table reflect all cases that FAA investigated that cited violations of one or more of the following regulations and/or federal laws: 14 CFR 91.11, 121.580, 135.120, 125.328, 49 U.S.C. 46318 & 46504. Historically, FAA has closed these cases with legal enforcement action (civil penalties), administrative action (warning notices), compliance action (counseling), or no action if there is insufficient evidence of a regulatory violation or violation of federal law. However, under our current *zero-tolerance policy* toward unruly passengers, we are not addressing cases with warning notices or counseling.

- The FAA's database contains only those incidents reported to FAA. Reporting is at the discretion of the crewmember.

- Security violations are excluded. Those cases are handled by the Transportation Security Administration (TSA).

- The repercussions for passengers who engage in unruly behavior can be substantial. They can be fined by the FAA or prosecuted on criminal charges.

- As part of the <u>FAA's Reauthorization Bill</u> (PDF) FAA can propose up to $37,000 per violation for unruly passenger cases. Previously, the maximum civil penalty per violation was $25,000. One incident can result in multiple violations.

Page last modified: March 08, 2022 9:12:46 AM EST

Plaintiffs' Exhibit 17

flightglobal.com

# Eliminating passenger mask mandate is 'next step': Spirit Airlines CEO

*Jon Hemmerdinger*

2-3 minutes

---

The US government can help reduce the incidence of unruly air passenger behavior by doing away with the requirement that travellers wear face coverings, says the chief executive of Spirit Airlines.

"That's got to be the next step – when facial [covering requirements] are relaxed on airplanes," CEO Ted Christie says during the Routes Americas conference on 23 June. "That is going to take a lot of steam out of things."



*Source: Max Kingsley-Jones/FlightGlobal*

Frontier Airlines CEO Barry Biffle agrees: face coverings are a prime contributor to a string of recent in-flight disruptions.

"The reality is, a lot of people don't want to wear masks," says Biffle, who also spoke at the event. "You don't have to wear a mask here, you don't have to wear [masks] at Walmart, but yet you've got to do it on a plane."

"People are agitated," he adds.

In January, the US Centers for Disease Control and Prevention mandated that air travellers must wear face masks to prevent the spread of Covid-19.

Meanwhile, the FAA has reported a surge in incidents involving allegations of unruly, even violent, passengers – events the FAA has said are often related to the face mask requirement.

"The masks make everyone uncomfortable, and it does drive a lot of friction," Christie says. "We are going to have to make a step here, where we are creating less abrasive" conditions.

The FAA responded to the trend by instituting a "zero tolerance" policy and dishing out hefty fines – some in the tens of thousands of dollars – to a number of passengers accused of airborne outbursts.

"We are focusing on the symptom, rather than the root cause," says Biffle, adding that such disturbances are uncommon but become high-profile thanks to social media. "The root cause is…. you've got to [war a mask] on a plane."

# Plaintiffs' Exhibit 18

## Two Major Airline CEOs Question the Need for Masks on Planes

By Chris Isidore, CNN Business
Updated 11:29 PM ET, Wed December 15, 2021

New York (CNN Business)The CEOs of two of the nation's major airlines say they don't think wearing masks on planes does much to help limit exposure to Covid.

The comments from American Airlines (AAL) CEO Doug Parker — the nation's largest carrier — and Southwest (LUV) CEO Gary Kelly came during a hearing about the financial support that airlines received from the federal government in 2020 and 2021. But the topic of masks arose via a question from Sen. Roger Wicker, the ranking Republican on the Senate committee holding the hearing.

"I think the case is very strong that masks don't add much, if anything, in the air cabin environment. It is very safe and very high quality compared to any other indoor setting," said Kelly.

Both Kelly and Parker, who each have announced plans to retire as CEOs in the coming months, mentioned that high-grade HEPA air filters on planes capture virtually all airborne contamination and air quality is helped by how frequently cabin air is exchanged with fresh air from outside the cabin.

"I concur. An aircraft is the safest place you can be," said Parker. "It's true of all of our aircraft — they all have the same HEPA filters and air flow."

After the hearing, American Airlines tried to walk back Parker's remarks. It issued a statement claiming that his concurrence with Kelly was on the point about the quality of the air in the aircraft cabin, not mask requirements.

Sara Nelson, the president of the Association of Flight Attendants, testified at the hearing that not all aircraft are equipped with the same quality of air filters. For example, some older planes do not have HEPA filters, she said.

The mask requirement is still a source of controversy. Much of the steep rise of in incidents involving unruly passengers over the last two years have revolved around passengers being ordered to wear masks.

"I think that is probably for the medical community to decide rather than me," Nelson added. "What I will add is that the studies that have been done [on masks]....were done with mannequins that were sitting straight forward with masks on, not removing them, not eating."

"It is important to recognize that the safe, controlled environment on planes...includes the HEPA filters that are not on all aircraft," she concluded.

Masks on planes are required by the federal government, following the guidance of the Centers for Disease Control. The DOT did not immediately respond to a request for comment on the testimony.
The remarks by Kelly and Parker were criticized by one committee member, Sen. Ed Markey, a Massachusetts Democrat.

"I'm shocked that some of the CEOs here today have suggested we no longer need masks mandates on planes," he said. "In the face of Omicron, children under five who still cannot be vaccinated....and that we still allow unvaccinated people on planes." He said it was "immoral" to take the position that people on planes could be forced to sit next to unvaccinated people who are not wearing masks.

Nelson, who Markey was questioning, agreed that while she hopes that one day masks will not be required, she does not support lifting the mask mandate at this time.

"I believe that the government has taken a very responsible approach to this," she said. "We believe it should continue to stay in place. It's a workplace safety issue. We do need a consistent message though. It troubles me too to hear different messages. I would hope we are going to stay on the same messages and follow the medical experts and do what's necessary to keep everybody safe."

Nelson said that the confidence in the safety of air travel is the reason people are willing to buy airline tickets in near pre-pandemic levels today. She said that the mask mandate is one of the factors leading to that confidence by airline passengers.

https://www.cnn.com/2021/12/15/business/airline-ceos-question-masks-on-plane-rule/index.html

dallasnews.com

# Southwest Airlines CEO says face masks 'don't add much' with airplane filtration systems

*By Kyle Arnold3:55 PM on Dec 15, 2021 CST*

4-5 minutes

---

Update: American Airlines CEO Doug Parker initially said "I concur" with comments from Gary Kelly in Wednesday's U.S. Senate Hearing, but American later clarified that Parker "concurred with the comments made by other witnesses about the high quality of aircraft cabin air, and did not intend to cast doubt on the necessity of face masks on planes."

Southwest Airlines CEO Gary Kelly told U.S. senators Wednesday that the air in airplane cabins is clean enough that face masks don't provide significant additional protection to passengers from COVID-19.

"I think the case is very strong that masks don't add much, if anything, in the air cabin," said Kelly, who runs Dallas-based Southwest. "The environment is very safe, very high quality compared to any other indoor setting."

"I concur," said Doug Parker, CEO of Fort Worth-based American Airlines. "The aircraft is the safest place you can be. That's true of all of our aircraft."

American later clarified that Parker's remarks were intended to agree with "the comments made by other witnesses about the high quality of aircraft cabin air, and did not intend to cast doubt on the necessity of face masks on planes," spokeswoman Stacy Day said.

The airline executives made the comments at a U.S. Senate committee hearing into how the airlines have used $54 billion in federal grants since March 2020 to help them financially survive the pandemic.





Kelly's face mask comments contradict efforts by the Biden administration to require them on airplanes, in airports and on other forms of interstate transportation, such as buses and trains. President Joe Biden made airplane face mask mandates among his first executive orders when he took office in January and has since renewed the face mask mandate through March 18, 2022.

Airlines have been requiring face masks on airplanes since the summer of 2020 and then subsequently partnered with the Department of Defense and research universities such as Harvard to show that HEPA filtration systems on airplanes make it difficult for coronavirus to spread among passengers.

Over the last year, the Federal Aviation Administration and the Department of Transportation have noted a sharp uptick in reports of unruly passengers, often violent outbursts that have resulted in assaults on crew members such as flight attendants and gate agents. There have been 5,664 reports so far this year, according to the FAA's data through Dec. 14, and 4,072 of those incidents have been tied to mask-related problems.

Kelly, who announced he is retiring in February, is also the chairman of Airlines 4 America, the main trade group for major airlines.

Parker, in a statement provided to the committee ahead of the hearing, said: "Airlines have required masks since early in the pandemic as an additive health and safety measure, and our industry strongly supported the introduction of the federal mask mandate."

Scott Kirby, CEO of Chicago-based United Airlines, said several studies show that airplane cabins are safe. Those studies are often industry-funded.

"The conclusion of that is that effectively anywhere that you're going to be indoors, the airplane is the safest place that you can be indoors," Kirby said. "It's because the air filters are safer than a theater, safer actually than an intensive care unit because we have HEPA-grade filters."

Kirby said airplane filters cycle air 20 to 30 times an hour, as opposed to twice or three times an hour in a hospital ICU. The studies from airlines also show that the way the air flows in cabins, from the ceiling to the floor, also reduces the risk of COVID-19 spread among passengers.

However, those studies were conducted on mannequins and may not be sufficient to cover the complexity of humans, said Sara Nelson, president of the Association of Flight Attendants-CWA. She also said that not all passengers have been vaccinated or have access to vaccines.

Nelson said she believes the mask mandate should stay in place for now.

"The filtration system is different from airline to airline or from aircraft to aircraft, so not all aircraft have the HEPA filtration," Nelson said. "What I will tell you is we look forward to the day that we no longer have the mask requirement. We are simply trying to get through this pandemic and have had to enforce this to keep everyone safe."

foxbusiness.com

## Southwest CEO: 'Masks don't add much, if anything' against COVID-19 on planes

*Breck Dumas*

4-5 minutes

12-15-21

Southwest Airlines CEO Gary Kelly told a U.S. Senate panel on Wednesday that "masks don't add much, if anything" in fighting the spread of COVID-19 on airplanes, calling into question the reasoning behind mask mandates on flights imposed both by airlines and the Biden administration.

Kelly made the comment during a hearing on airline oversight before the Senate Committee on Commerce, Science and Transportation, and other industry chiefs joined him in emphasizing that commercial aircraft filtration systems make them the safest indoor space there is.



Gary Kelly, chief executive officer of Southwest Airlines Co., speaks during a Senate Commerce, Science and Transportation Committee hearing in Washington, D.C., U.S., on Wednesday, Dec. 15, 2021. (Photographer: Chip Somodevilla/Getty Images/Bloomber (Photographer: Chip Somodevilla/Getty Images/Bloomberg via Getty Images / Getty Images)

### AIR TRAVELERS TO US SET TO FACE TOUGHER COVID-19 TESTING

Ranking member Sen. Roger Wicker, R-Miss., asked the CEOs about air quality on planes while posing the question, "Will we ever be able, do you think, to get on an airplane without masks?"

Speaking to discussions on air quality, Kelly said, "The statistics I recall is that 99.97% of airborne

pathogens are captured by the [high efficiency particulate air] filtering system, and it's turned over every two or three minutes."

"I think the case is very strong that masks don't add much, if anything, in the air cabin environment," Kelly said. "It's very safe, and very high quality compared to any other indoor setting."



Sen. Roger Wicker (R-Miss.) during hearing at the Senate Commerce, Science, and Transportation Committee on January 26, 2021, in Washington, DC. (Photo by Tom Williams-Pool/Getty Images) (Photo by Tom Williams-Pool/Getty Image / Getty Images)

**FATHER SAYS AUTISTIC SON BANNED BY AIRLINE, DENIED MEDICAL MASK EXEMPTION: 'MIND-BLOWING'**

Wicker then asked for a response from American Airlines CEO Doug Parker, who replied, "I concur. The aircraft is the safest place you can be – it's true of all of our aircraft. They all have these HEPA filters and the same airflow."

United Airlines CEO Scott Kirby told Wicker that, in fact, air quality on planes is "safer, actually, than an intensive care unit," adding that "being next to someone on an airplane – sitting next to them – is the equivalent of being 15 feet away from them in a typical building."

But most places in the U.S. no longer require masks indoors, save for certain Democrat-controlled jurisdictions and areas under federal oversight.

Airlines imposed mask requirements on their own in 2020 during the COVID-19 pandemic, and several welcomed President Biden's federal mandate for wearing masks on commercial flights after he took office. The federal rule was slated to expire in September, but the Transportation Security Administration extended it through Jan. 18.



President Joe Biden addresses the 76th Session of the U.N. General Assembly on September 21,
2021 at U.N. headquarters in New York City. . (Photo by Timothy A. Clary-Pool/Getty Images)
((Photo by Timothy A. Clary-Pool/Getty Images) / Getty Images)

**GET FOX BUSINESS ON THE GO BY CLICKING HERE**

The mask requirements have caused major headaches for airlines in the way of compliance, with
mask violations being the major cause of a sharp uptick in unruly behavior from passengers. In
response, the FAA has upped the fines on violations for fliers who disrupt air travel and urged
airlines to "take more action" on unruly passenger incidents.

Airlines have not pushed back publicly against the mandate.

When asked by FOX Business for further explanation on Kelly's comments, Southwest said in a
statement, "Southwest Airlines continues to abide by the federal mask mandate for customers and
employees both within the airport environment and onboard all Southwest aircraft."

Plaintiffs' Exhibit 19

   

**Mr. Jeffrey Zients**
Mr. Jeffrey Zients
Coronavirus Response Coordinator
The White House
Washington, DC  20500


February 25, 2022

Dear Mr. Zients:

We, the undersigned organizations representing the American travel and tourism business community, are grateful for the Biden Administration's continued leadership in the fight against COVID-19. With declining hospitalization rates, increased immunity, widely available vaccines and cutting-edge treatments on the horizon, America is reaching an inflection point where endemic-focused policies can replace pandemic-driven restrictions. As leading U.S. travel and business organizations, we respectfully urge the Administration to chart a clear course for replacing pandemic-era travel advisories, requirements and restrictions with endemic-focused policies of a "new normal" that enable travel to resume fully, freely and safely.

Throughout the pandemic, many of us have strongly supported federal policies to combat COVID-19 and keep travel moving, including a vaccine requirement to restart international travel and the federal mask mandate. Travel businesses also implemented a layered approach to public health and safety that aligned with or exceeded guidance from the Centers for Disease Control and Prevention (CDC).

Unfortunately, many of these same policies also came with the devastating—although, at the time, necessary—consequences of severely limiting and discouraging travel. In 2021, as many other sectors of the economy reached a full recovery:

- Business travel spending was approximately 50% below 2019 levels; and
- International travel spending was down a staggering 78% compared to 2019.

Given travel's slow economic recovery, and in light of the improved public health metrics in the U.S. and medical advancements to prevent the worst outcomes of COVID-19, we encourage the Administration to immediately remove travel requirements that no longer fit with the current environment and to set clear timelines and metrics for when others will be lifted.

For example, we strongly encourage the Biden Administration to immediately repeal the pre-departure testing requirement for vaccinated inbound international air travelers. This would accelerate the return of international travel to and from the U.S. without increasing the spread of COVID-19. For other travel protocols, such as the federal mask mandate for public transportation and the vaccination requirement for inbound international travel, it is time to set clear timetables and metrics for when these pandemic-focused travel requirements can be lifted.

Please find attached a list of federal travel advisories, requirements and restrictions that we believe should be reevaluated, updated or removed. Of course, reasonable and effective risk-based policies can be reinstated at any time if new variants of concern emerge or if the public health situation deteriorates. However, we believe it is time for the Administration to begin leading the country toward a new normal for travel and on a faster road to a full economic recovery.

Sincerely,

Airlines for America
American Hotel & Lodging Association
U.S. Chamber of Commerce
U.S. Travel Association

## RECOMMENDATIONS FOR A PATHWAY TO THE NEW NORMAL:

- **Remove the pre-departure testing requirement for all fully vaccinated inbound international arrivals.** Because of the pervasiveness of the omicron variant, increased immunity and higher vaccination in the U.S., the pre-departure testing requirement can be eliminated for fully vaccinated individuals without increasing the spread of COVID-19. Removing the pre-departure testing requirement will incentivize vaccination, increase demand for international travel to and from the U.S., and better align passenger aviation entry requirements with those at U.S. land border points of entry and other major travel-trade partners abroad (e.g., the United Kingdom and European Union).

- **By March 18, repeal the Federal mask mandate for public transportation or provide a clear roadmap to remove the mask mandate within 90 days.** The federal mask mandate for transportation networks is set to expire on March 18. The Administration should use this date as a decision point for either repealing this mandate or announcing a plan and timeline to repeal the federal mask mandate within the subsequent 90 days. Airplanes are already equipped with advanced air filtration systems, and airports have made large investments in air filtration, sanitation and layouts. COVID-19 hospitalization rates have decreased significantly and the mask mandate should be lifted to reflect the improved public health environment.

- **End "avoid travel" advisories and the use of travel bans.** The CDC should ensure that Americans are not dissuaded from traveling to any place with COVID-19 case rates that are equal to, or less than, the case rates prevailing in the U.S. As conditions continue to improve, the CDC should end all "avoid travel" advisories for vaccinated individuals. In the future, the Biden Administration should avoid the use of travel bans from specific countries, which are not recommended by the World Health Organization (WHO) and have proven to be an ineffective means of preventing the spread of COVID-19.

- **Work with other countries to normalize travel conditions and entry requirements.** As the pandemic abates and the Administration works to ease domestic and international travel requirements, it should encourage other nations to do the same and ensure that Americans are afforded the same travel privileges to other nations that their citizens have in the U.S. This should include an effort to align entry protocols with countries representing the top 20 inbound travel markets for the U.S., which include the United Kingdom and several nations in the European Union, as well as a coordinated effort within the State Department to resume routine visa processing in those aforementioned inbound travel markets. This will not only help avoid a confusing patchwork of different vaccination, testing and entry requirements across the globe, but it will also help the U.S. economy achieve the full recovery that it has been searching for since the pandemic's beginning.

- **By June 1, develop benchmarks and timelines for a pathway to the new normal that repeals pandemic-focused travel restrictions.** As COVID-19 and its variants become no more deadly than many other illnesses which are not closely monitored—or for which there are no travel implications—all remaining restrictions, including international vaccine and testing mandates, as well as any remaining mask mandates, should be removed. We strongly encourage the Administration to chart a path to the new normal and announce a plan to replace pandemic-focused travel restrictions with more permanent travel policies.

- **Send a clear message to the American public and the world that it is safe to travel again, particularly for vaccinated individuals.** Nations around the world are delivering public messages from high-level government officials and investing in travel promotion campaigns to encourage the resumption of domestic and international travel. Since the start of the pandemic, the federal government's advisories, policies and public messaging have focused on discouraging or actively restricting domestic and international travel. It is time for high-level officials within the Administration to publicly encourage travel to and within the U.S. Doing so would send a clear message to U.S. businesses, trading partners and travelers alike that America is once again open for business.

Plaintiffs' Exhibit 20



March 23, 2022

The Honorable Joseph R. Biden Jr.
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear Mr. President:

We appreciate your leadership throughout the COVID-19 crisis and now as the country recovers from the impacts of the pandemic. During the global health crisis, U.S. airlines have supported and cooperated with the federal government's measures to slow the spread of COVID-19. We are encouraged by the current data and the lifting of COVID-19 restrictions from coast to coast, which indicate it is past time to eliminate COVID-era transportation policies.

Our industry has leaned into science at every turn. At the outset, we voluntarily implemented policies and procedures -- mandating face coverings; requiring passenger health acknowledgements and contact tracing information; and enhancing cleaning protocols – to form a multi-layered approach to mitigate risk and prioritize the wellbeing of passengers and employees. We supported the Centers for Disease Control and Prevention (CDC) as they made some of these policies federal mandates and imposed additional measures, like predeparture testing and vaccination requirements for international travelers, in an to attempt to slow the introduction of variants into the United States.

However, much has changed since these measures were imposed and they no longer make sense in the current public health context. The persistent and steady decline of hospitalization and death rates are the most compelling indicators that our country is well protected against severe disease from COVID-19. Given that we have entered a different phase of dealing with this virus, we strongly support your view that "COVID-19 need no longer control our lives." **Now is the time for the Administration to sunset federal transportation travel restrictions – including the international predeparture testing requirement and the federal mask mandate – that are no longer aligned with the realities of the current epidemiological environment**.

## Predeparture Test Requirement

The predeparture test requirement, imposed to slow the introduction of variants into the U.S., has outlived its utility and stymies the return of international travel. The United Kingdom (UK), the European Union and Canada have recognized this reality and lifted travel restrictions. The U.S. inconsistency with these practices creates a competitive disadvantage for U.S. travel and tourism by placing an additional cost and burden on travel to the U.S. Further, many outbound travelers are not willing to risk being stranded overseas. In the Tenth Meeting of the Emergency Committee on January 19, 2022, the World Health Organization (WHO) noted that **"the failure**

March 23, 2022
Page 2

of travel restrictions introduced after the detection and reporting of Omicron variant to limit international spread of Omicron demonstrates the ineffectiveness of such measures over time."** The WHO recommended that countries consider a risk-based approach to the facilitation of international travel by lifting measures, like testing and/or quarantine requirements, for individual travelers who are fully vaccinated with COVID-19 vaccines listed by the WHO.[1] Finally, a recent study by Oxera and Edge Health that examined the effectiveness of travel restrictions in Europe concluded that such measures have failed to prevent the spread of COVID-19.[2]

## Mask Mandate

The science clearly supports lifting the mask mandate, as demonstrated by the recently released CDC framework indicating that 99 percent of the U.S. population no longer need to wear masks indoors. Several studies completed **before we had the added layer of widespread availability of vaccines**, including one from Harvard's T.H. Chan School of Public Health[3] and another from the U.S. Department of Defense[4], have concluded that an airplane cabin is one of the safest indoor environments due to the combination of highly filtered air and constant air flow coupled with the downward direction of the air. Lifting the mask mandate in airports and onboard aircraft can be done safely as England has done. Importantly, the effectiveness and availability of high-quality masks for those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so. It makes no sense that people are still required to wear masks on airplanes, yet are allowed to congregate in crowded restaurants, schools and at sporting events without masks, despite none of these venues having the protective air filtration system that aircraft do.

It is critical to recognize that the burden of enforcing both the mask and predeparture testing requirements has fallen on our employees for two years now. This is not a function they are trained to perform and subjects them to daily challenges by frustrated customers. This in turn takes a toll on their own well-being.

The high level of immunity in the U.S., availability of high-quality masks for those who wish to use them, hospital-grade cabin air, widespread vaccine availability and newly available therapeutics provide a strong foundation for the Administration to lift the mask mandate and predeparture testing requirements. We urge you to do so now.

We are requesting this action not only for the benefit the of the traveling public, but also for the thousands of airline employees charged with enforcing a patchwork of now-outdated regulations implemented in response to COVID-19.

Respectfully,

---

[1] https://www.who.int/news/item/19-01-2022-statement-on-the-tenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(covid-19)-pandemic
[2] https://www.iata.org/contentassets/31f976cb5de0427cbe4a85958857a472/oxera.pdf
[3] https://npli.sph.harvard.edu/resources-2/aviation-public-health-initiative-aphi/
[4] https://www.ustranscom.mil/cmd/panewsreader.cfm?ID=C0EC1D60-CB57-C6ED-90DEDA305CE7459D

March 23, 2022
Page 3

Ben Minicucci
CEO
Alaska Air Group

W. Douglas Parker
Chairman & CEO
American Airlines

John W. Dietrich
President & CEO
Atlas Air Worldwide

Ed Bastian
CEO
Delta Air Lines

Scot Struminger
EVP & CEO, Aviation
FedEx Express

Peter R. Ingram
President & CEO
Hawaiian Airlines

Robin Hayes
CEO
JetBlue Airways

Gary C. Kelly
Chairman
Southwest Airlines

Scott Kirby
CEO
United Airlines Holdings

Brendan Canavan
President
UPS Airlines

Nicholas E. Calio
President & CEO
Airlines for America

March 23, 2022
Page 4


cc:      The Honorable Pete Buttigieg, U.S. Secretary of Transportation
         The Honorable Alejandro Mayorkas, U.S. Secretary of Homeland Security
         The Honorable Gina Raimondo, U.S. Secretary of Commerce
         The Honorable Ron Klain, White House Chief of Staff
         The Honorable Steve Ricchetti, Counselor to the President
         The Honorable Jeffrey Zients, White House Coronavirus Response Coordinator
         The Honorable Brian Deese, Director of the National Economic Council

Plaintiffs' Exhibit 21

reuters.com

# CDC defends U.S. transit mask mandate as some call for scrapping

*David Shepardson*

4 minutes

---

Travelers board the air train ahead of the July 4th holiday, at the Newark Liberty International Airport, in Newark, New Jersey, U.S., July 2, 2021. REUTERS/Eduardo Munoz

WASHINGTON, July 16 (Reuters) - A senior U.S. health official who signed a sweeping order for masks to be worn on nearly all forms of public transport said they were a key tool in preventing COVID-19 transmission even as some lawmakers call for ending the rules.

Marty Cetron, director for the Centers for Disease Control and Prevention's (CDC) Division of Global Migration and Quarantine, told Reuters Thursday the agency's "current position" is the mandate should not be lifted.

"Masks are really powerful and we should make sure they're part of our arsenal," Cetron said in an interview. "We mask not just to protect ourselves - we mask because it's the way we take care and express our concern for each other."

The rules in place since January require masks to be worn by all travelers on airplanes, ships, trains, subways, buses, taxis, and ride-shares and at transport hubs like airports, bus or ferry terminals, train and subway stations and ports.

"The truth is that the unvaccinated portion that's out there is extremely vulnerable," Cetron said, especially in an indoor transportation hub "where the ventilation may not be optimized."

A group of Republican lawmakers this week introduced legislation to prohibit

mask mandates for public transport, arguing they no longer make sense with a growing number of Americans getting vaccinated. Republican Representative Andy Biggs said transit mask rules "are only being kept in place by those who relish controlling our day-to-day lives."

In mid-May, CDC said fully vaccinated people could avoid wearing masks indoors in most places - with some exceptions like transit.

The mask mandate has been a huge source of friction on U.S. airplanes. The Federal Aviation Administration said Tuesday that since Jan. 1 it has received 3,420 unruly passenger reports, including 2,559 for refusing to wear masks.

The Transportation Security Administration (TSA) said Sunday was the single-busiest day since February 2020, with nearly 2.2 million passengers.

"I get we're all just over this emotionally but I do think we will succeed together if we realize the virus is the enemy and it's not your fellow citizen or the person sitting next to you on a plane or a piece of cloth that you have to wear over your face," Cetron said.

The CDC transit mask order has no expiration date. In April, the TSA extended its mask requirement until Sept. 13.

"As long as the CDC order is in place, the expectation is the implementing modes ... would continue with their own directives," Cetron said.

"We won't wait until September to reevaluate," Cetron said, adding CDC is regularly reviewing the mandate. "If the pandemic were to suddenly disappear before then we have the ability to take down the order."

Under Donald Trump, a CDC push to mandate masks in transit was blocked.

Asked if he still believes there is a scientific or public health basis for U.S. travel restrictions that bar entry from some countries in the United States, Cetron said: "I'm not going to get into the details" but said U.S. government discussions are going on.

Reporting by David Shepardson Editing by Robert Birsel

Our Standards: The Thomson Reuters Trust Principles.

# Plaintiffs' Exhibit 22

February 22, 2022


Rochelle P. Walensky, MD, MPH
Director, Centers for Disease Control and Prevention
1600 Clifton Road, NE
Atlanta, GA 30333

Anthony S. Fauci, MD
Director, National Institute of Allergy and Infectious Diseases
National Institutes of Health
31 Center Dr # 7A03
Bethesda, MD 20892

Honorable Senator Ronald H. Johnson
328 Hart Senate Office Building
Washington DC 20510

Douglas L. Parker,
Assistant Secretary of Labor for Occupational Safety and Health
Occupational Safety & Health Administration
200 Constitution Ave NW
Washington, DC 20210

Mr. Jeffrey Zients
Coordinator and Counselor to the President
COVID-19 Pandemic Response
The White House
1600 Pennsylvania Ave. NW
Washington, DC  20500


Sent via US Mail Certified Return Receipt and e-mail

**Re:**   **Request for Immediate Corrections to the CDC Guidance on Masks and Respirators**


Dear Dr. Walensky, Dr. Fauci, Senator Johnson, Mr. Parker, and Mr. Zients:

We the undersigned, professional experts in the field of industrial hygiene, with combined experience of nearly 150 years, are highly concerned with the inaccurate and misleading guidance being promoted by the CDC on its website regarding efficacy of masking to prevent COVID-19 and now similar guidance regarding respirators and request for immediate correction to said guidance.  The guidance is overly broad, inaccurate, and especially inappropriate for children and the general public.

1

For reference, the field of industrial hygiene is defined as:

> *"That science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among of the citizens of the community" (https://www.aiha.org/about-ih/Pages/default.aspx).*

The AIHA defines an Industrial Hygienist (https://www.aiha.org/ih-careers/discover-industrial-hygiene) as:

> *"Scientists and engineers committed to protecting the health and safety of people in the workplace and the community."*

Thus, our profession is dedicated, in part, to providing controls to exposures and rely upon what is known as the hierarchy of controls.  The hierarchy of controls was first developed by the National Safety Council (NSC) in 1950.  This guides us as to the most effective to least effective exposure controls (see Figure 1):



**Figure 1: Hierarchy of Controls**

Note that masks do not fit into the hierarchy of controls simply because they are not even personal protective equipment.  This is recognized in the recent ASTM Face Covering (mask) Standard [ASTM F3502-21 – Standard Specification for Barrier Face Coverings (BFCs)] illustrated in Figure 2:

> 3.1.8 *respirator, n*—personal protective equipment (PPE) designed to protect the wearer from inhalation of hazardous contaminants.
> 3.1.8.1 *Discussion*—Barrier face coverings are not designed to meet the performance requirements of NIOSH-approved respirators. For the purpose of this specification, healthcare

**Figure 2: ASTM 2021 BFC Standard – Masks Not PPE (Respirators)**

The best industrial hygiene solution has for decades been engineering controls of dilution with fresh air, filtration, and/or destruction – all of which are readily available technologies.

Given this background, we the undersigned have been increasingly concerned about the mis-information provided by the CDC to the public; often reflected by inappropriately conclusive language that *omits technical limitations and documented negative effects associated with masks and face coverings*.  Examples of our concerns follow:

**Issue #1:     Recommending N-95 type masks is inappropriate for the general population and children:**

The CDC's January 14, 2021 and January 28, 2021 webpage language have instructed people to move away from masks and toward N95-type respirators (see for example https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html), including KN95 respirators (Figure 3):



**Respirators**

When choosing a respirator, look at how well it fits and read the manufacturer instructions. These instructions should include information on how to wear, store, and clean or properly dispose of the respirator. Respirators have markings printed on the product to indicate they are authentic, see appropriate N95 markings 🖼 and KN95 markings.

COVID-19                                                                                                                            4/8

in and out around the edges of the respirator. Gaps can be caused by choosing the wrong size or type of respirator or when a respirator is worn with facial hair. **For information about how to use your N95 correctly, see** How to Use Your N95 **Respirator.** The information on this page is about N95 respirators but also applies to international respirators, like KN95 respirators.

Most publicly available respirators are disposable and should be discarded when they are dirty, damaged, or difficult to breathe through.

More information on these two types of respirators is provided below.

**Figure 3: CDC January 14 & January 28, 2022 Guidance on Respirators – pgs. 4-5**

Under the topic of respirators, the CDC lists both N95 and KN95 respirators.

Moreover, as the CDC knows, persons or entities providing respirators in the workplace (unlike masks) must follow OSHA's Personal Protective Equipment Standard (OSHA 29 CFR 1910.132) to establish the nature of the hazard (Hazards Assessment) and the Respiratory Protection Standard (RPS) requirements (29 CFR 1910.134).   Non-employees must also follow the RPS under the manufacturers' instructions (as we shall show later).  These RPS requirements are substantial and include factors such as:

➢ Written RPS Plan

➢ Medical Clearance

➢ Initial Fit Test

➢ Annual Fit Test

➢ Training by a professional such as an IH on fit testing, cleaning, storage, and changeout.

As the CDC knows, or should know, movement from masks to respirators comes with significant requirements or as the manufacturers such as 3M state on their instructions, improper usage "may result in sickness or death".

In this context, we have recently been provided by the following request, and rejection by OSHA, to investigate improper usage of KN respirators by an employer (Figure 4):

**U.S. Department of Labor**

Occupational Safety and Health Administration
Toledo Area Office
420 Madison Ave, Suite 600
Toledo, OH 43604



February 9, 2022



RE: OSHA Complaint No. 1864651

Dear

The Occupational Safety and Health Administration (OSHA) has received your notice of alleged workplace hazard(s) against notified Gun Lake Casino. After careful review we have decided not to conduct an inspection because:

On the basis of the information provided to our office during our phone conversation the employer has provided and is requiring employees to wear KN95 masks which are not NIOSH certified respirators and would not be covered by OSHA's respiratory protection standard.

If you do not agree with this decision, you may contact me for a clarification of the matter at (419) 259-7542.

Section 11(c) of the OSH Act provides protection for employees against discrimination because of their involvement in protected safety and health related activity. If you believe you are being treated differently or action is being taken against you because of your safety or health activity, you may file a complaint with OSHA. You should file this complaint as soon as possible, since OSHA normally can accept only those complaints filed within 30 days of the alleged discriminatory action.

Thank you for your concern for a safe and healthful workplace.

Respectfully,

Todd Jensen
Area Director

**Figure 4: OSHA February 9, 2022 Response Letter to Gun Lake Casino Complaint**

OSHA rejected the employee complaint on a technicality that the employer was not following the OSHA RPS because the respirator was a KN95 rather than an N95. And, as shown in Figure 5, NIOSH does not approve KN95's:

 Centers for Disease Control and Prevention

Promoting productive workplaces through safety and health research 

# NIOSH–approved N95 Particulate Filtering Facepiece Respirators

This list is reviewed and updated weekly.

## Manufacturers Listed from A to Z – L

The N95 respirator is the most common of the seven types of particulate filtering facepiece respirators. This product filters at least 95% of airborne particles but is not resistant to oil-based particles.

This web page provides a table of NIOSH-approved N95 respirators listed by manufacturer from A-Z. You can find a specific manufacturer by clicking on the first letter of their name on the index below. Web links in the table go to the NIOSH Approval Holder's website. See the Notes section for information about private labels.

NIOSH entered a Memorandum of Understanding ☑ (MOU) in 2018 with the Food and Drug Administration (FDA). This MOU granted NIOSH the authority to approve surgical N95 filtering facepiece respirators. Prior to this MOU, both NIOSH and FDA approved and cleared surgical N95s. The **Model Number/Product Line in bold text followed by (FDA)** indicates these surgical N95 respirators in the table below. NIOSH also provides a table of the surgical N95 respirators approved prior to the MOU. Surgical N95 respirators approved under the MOU do not require FDA's 510(k) clearance. These NIOSH-approved surgical N95 respirators are only on the Certified Equipment List (CEL).

A respirator labeled as a KN95 respirator is expected to conform to China's GB2626 standard. NIOSH does not approve KN95 products or any other respiratory protective devices certified to international standards. For more information, view Factors to Consider When Planning to Purchase Respirators from Another Country.

**Figure 5: NIOSH Language Regarding Approval of KN95 Respirators**

So, in an obvious case of deception, the CDC recommends the usage of N95 and KN95 respirators (see Figure 3) yet must know they are not approved by NIOSH and that OSHA will not enforce the RPS.  The irony here is that NIOSH is part of the CDC (see Figure 5 letterhead), so the CDC clearly knows this.  Note that it is known that KN95 respirators from China are known to be less expensive than those made with the N95 designation and find widespread usage; this too was known, or should have been known, by the CDC.

Thus, the CDC pushes KN95 respirators as part of the move toward respirators, knowing they are not approved by their sub-agency NIOSH, which allows employers to make employees wear respirators without the protections of OSHA's Respiratory Protection Standard (RPS).  This is an unconscionable breach of the public health function and should be corrected immediately.

6

**Issue #2:** **CDC has issued harmful guidance for masking children that contradicts manufacturers' recommendations, world-wide standard practice and CDC's own guidance, and without appropriate risk-benefit analysis:**

The CDC's January 28, 2021 webpage language misleadingly implies respirators are acceptable for children yet knows that this is not the case simply based on manufacturer instructions, they link the reader to https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html – see Figure 6:

## Considerations for Children

### Masks

Anyone ages 2 years or older who is not vaccinated or not up to date on vaccines should wear masks in indoor public spaces. This recommendation also applies to people who are up to date on their vaccines when they are in an area of substantial or high transmission. CDC also currently recommends universal indoor masking for all teachers, staff, students, and visitors to K-12 schools, regardless of their vaccination status or the area's transmission rates. The benefits of mask-wearing are well-established.

### Respirators

Parents and caregivers may have questions about NIOSH-approved respirators (such as N95s) for children. Although respirators may be available in smaller sizes, they are typically designed to be used by adults in workplaces, and therefore have not been tested for broad use in children.

### Selecting Masks

- Masks and respirators should not be worn by children younger than 2 years.
- Choose a well-fitting and comfortable mask or respirator that your child can wear properly. A poorly fitting or uncomfortable mask or respirator might be worn incorrectly or removed often, and that would reduce its intended benefits.
    - Choose a size that fits over the child's nose and under the chin but does not impair vision.
- Follow the user instructions for the mask or respirator. These instructions may show how to make sure the product fits properly.
- Some types of masks and respirators may feel different if your child is used to wearing a regular cloth or disposable procedure masks.

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html                                6/8

**Figure 6: Misleading CDC Language Regarding Children
Wearing Masks and Respirators**

As illustrated in detail below, the CDC provided language in its January 28, 2022 guidance for children that is particularly misleading by obfuscating and omitting information readily known, or likely to have been known by the CDC.

"The benefits of mask-wearing are well-established:"

First, the benefits of children, or anyone for that matter, of wearing masks being well

7

established is simply false.  A Brownstone paper by Paul Elias Alexander published December 21, 2021 (https://brownstone.org/articles/more-than-150-comparative-studies-and-articles-on-mask-ineffectiveness-and-harms/) shows both the effectiveness of masks and their harms, citing 150 studies.  One of these author's testified in the Western District Court of Michigan on September 28, 2021, in a half-dozen interviews (e.g., Jeff Hayes Films:       https://rumble.com/vrfoox-covid-revealed-episode-8b-bonus-video-stephen-petty.html), in his own podcasts (https://rumble.com/c/PettyPodcasts) and in the Liberty Dispatch  in  Canada   (https://podcasts.apple.com/us/podcast/episode-99-masks-dont-work-an-interview-with-ppe/id1559570986?i=1000550149187).   During this testimony it was shown that the nearly 50 studies cited by the CDC purportedly showing masks are effective did not support statements made by the CDC and most suffered from a lack of a control group (group similar to the mask study group not wearing masks) or cofounding factors (multiple factors such as changes in HVAC systems, distancing, quarantining, and masks) wherein one cannot determine the specific contribution by masking.

But the most egregious part of this statement is that it only addresses supposed benefits, not liabilities.  Even the WHO - UNICEF (https://www.who.int/publications/i/item/WHO-2019-nCoV-IPC_Masks-Children-2020.1) understands that risk-rewards analysis should be done before recommending unproven, unscientifically-supported policies before masking them.  Remember – do no harm – is the overarching principle (Figures 7 & 8):

Advice to decision makers on the use of masks for children in the community

**Overarching guiding principles**

Given the limited evidence on the use of masks in children for COVID-19 or other respiratory diseases, including limited evidence about transmission of SARS-CoV-2 in children at specific ages, the formulation of policies by national authorities should be guided by the following overarching public health and social principles:

- Do no harm: the best interest, health and well-being of the child should be prioritized.
- The guidance should not negatively impact development and learning outcomes.
- The guidance should consider the feasibility of implementing recommendations in different social, cultural and geographic contexts, including settings with limited resources, humanitarian settings and among children with disabilities or specific health conditions.

**Figure 7: WHO UNICEF Recommendations for Children and Masks**

From Figure 7, the overarching guiding principle is to do no harm.

8

**Advice on the use of masks in children**

WHO and UNICEF advise decision makers to apply the following criteria for use of masks in children when developing national policies, in countries or areas where there is known or suspected community transmission[a] of SARS-CoV-2 and in settings where physical distancing cannot be achieved.

1. Based on the expert opinion gathered through online meetings and consultative processes, children aged up to five years should not wear masks for source control. This advice is motivated by a "do no harm" approach and considers:
   - childhood developmental milestones[b 41]
   - compliance challenges and
   - autonomy required to use a mask properly.

The experts (following the methods described above) recognized that the evidence supporting the choice of the age cut-off is limited (see above, section related to transmission of COVID-19 in children), and they reached this decision mainly by consensus. The rationale included consideration of the fact that by the age of five years, children usually achieve significant developmental milestones, including the manual dexterity and fine motor coordination movements needed to appropriately use a mask with minimal assistance.

In some countries, guidance and policies recommend a different and lower age cut-off for mask use[42-45]. It is recognized that children may reach developmental milestones at different ages and children five years of age and under may have the dexterity needed to manage a mask. Based on the do no harm approach, if the lower age cut-off of two or three years of age is to be used for recommending mask use for children, appropriate and consistent supervision, including direct line of sight supervision by a competent adult and compliance need to be ensured, especially if mask wearing is expected for an extended period of time. This is both to ensure correct use of the mask and to prevent any potential harm associated with mask wearing to the child.

Children with severe cognitive or respiratory impairments who have difficulties tolerating a mask should, under no circumstances, be required to wear masks.

Other IPC, public health and social measures should be prioritized to minimize the risk of SARS-CoV-2 transmission for children five years of age and under; specifically maintaining physical distance of at least 1 meter where feasible, educating children to perform frequent hand hygiene and limiting the size of school classes. It is also noted that there may be other specific considerations, such as the presence of vulnerable persons or other local medical and public health advice that should be considered when determining if children five years of age and under need to wear a mask.

2. For children between six and 11 years of age, a risk-based approach should be applied to the decision to use of a mask. This approach should take into consideration:
   - intensity of transmission in the area where the child is and updated data/available evidence on the risk of infection and transmission in this age group;
   - social and cultural environment such as beliefs, customs, behaviour or social norms that influence the community and population's social interactions, especially with and among children;
   - the child's capacity to comply with the appropriate use of masks and availability of appropriate adult supervision;
   - potential impact of mask wearing on learning and psychosocial development; and
   - additional specific considerations and adaptions for specific settings such as households with elderly relatives, schools, during sport activities or for children with disabilities or with underlying diseases.

3. Advice on mask use in children and adolescents 12 years or older should follow the WHO guidance for mask use in adults[1] and/or the national mask guidelines for adults.

   Even where national guidelines apply, additional specific considerations (see below) and adaptions for special settings such as schools, during sport, or for children with disabilities or with underlying diseases will need to be specified.

### Figure 8: WHO UNICEF Recommendations for Children and Masks by Age

Note that from Figure 8, WHO recommends against masking below age 6 and that children ages 6 to 11 may be masked upon completion of a risk assessment.  England has similar guidance.  But the CDC requires masks for children down to age 2 against WHO guidance and based on extensive reviews, has yet to perform any risk assessment on the net benefits of children wearing masks.

Specifically, it is well established that significant harms (i.e., reduced learning and development and physical, emotional, and social harms) have been reported in the literature (Figures 9-18):



**Figure 9: Curriculum Associates – Nov. 2021 – Title Page**



**Figure 10: Curriculum Associates – Reading Deficits in 2021 vs. Prior Years**



**Figure 11: Curriculum Associates – Math Deficits in 2021 vs. Prior Years**



**Figure 12: Brown University – Cognitive Deficits**



**Figure 13: Brown University Study – Learning Loss of 23% for Children Born Since Pandemic**



**Figure 14: Brown University Study – Non-Verbal and Verbal Development Losses**



**Figure 15: England Department of Education**



**Figure 16: England Department of Education – Loss of Communication and Physical Effects**



**Figure 17: Kisielinski et al. – Mask Meta Study – Reviewed 1,226 Studies**



**Figure 18: Kisielinski et al., – Areas of Quantitated Adverse Effects on Children and Adults**

14

Clearly, the CDC has not conducted a net risk assessment and should have, and must do so to avoid continuing harms to children.

Even more disturbing, in their innocent looking, new Guidance for Children (Learn the Signs, Act Early) the CDC has in part, extended the timeframes for children to achieve learning outcomes (https://www.cdc.gov/ncbddd/actearly/milestones/index.html). Regarding these changes – Figure 19, CDC refers the reader to an American Academy of Pediatrics (AAP) webpage (https://publications.aap.org/pediatrics/article-abstract/doi/10.1542/peds.2021-052138/184748/Evidence-Informed-Milestones-for-Developmental?redirectedFrom=fulltext):



## CDC's Developmental Milestones

CDC's milestones and parent tips have been updated and new checklist ages have been added (15 and 30 months). Due to COVID-19, updated photos and videos have been delayed but will be added back to this page in the future. For more information about the recent updates to CDC's developmental milestones, please view the *Pediatrics* journal article describing the updates.

**Figure 19: CDC Learn the Signs, Act Early New Webpage – Reference to AAP**

The headlines for the reference paper are reproduced as Figure 20:

Evidence-Informed Milestones for Developmental Surveillance Tools | Pediatrics | American Acade

SPECIAL ARTICLE | FEBRUARY 08 2022

## Evidence-Informed Milestones for Developmental Surveillance Tools

Jennifer M. Zubler, MD ✉; Lisa D. Wiggins, PhD; Michelle M. Macias, MD; Toni M. Whitaker, MD; Judith S. Shaw, EdD, MPH, RN; Jane K. Squires, PhD; Julie A. Pajek, PhD; Rebecca B. Wolf, MA; Karnesha S. Slaughter, MPH; Amber S. Broughton, MPH; Krysta L. Gerndt, MPH; Bethany J. Mlodoch; Paul H. Lipkin, MD

* Contributed equally as co-senior authors.

Address correspondence to Jennifer M. Zubler, MD, National Center on Birth Defects and Developmental Disabilities, Centers for Disease Control and Prevention, 4770 Buford Hwy NE, MS S106-4, Atlanta, GA 30341. E-mail: wyv4@cdc.gov

**Figure 20: CDC Referenced AAP Paper by Zubler (CDC) et al.**
**Dated February 8, 2022**

Zubler et al., write in part:

"*The Centers for Disease Control and Prevention's (CDC) Learn the Signs. Act Early. program, funded the American Academy of Pediatrics (AAP) to convene an expert working group to revise its developmental surveillance checklists.* The goals of the group were to identify evidence-informed milestones to include in CDC checklists, clarify when most children can be expected to reach a milestone (to discourage a wait-and-see approach), and support clinical judgment regarding screening between recommended ages. Subject matter experts identified by the AAP established 11 criteria for CDC milestone checklists, including using milestones most children (≥75%) would be expected to achieve by specific health supervision visit ages and those that are easily observed in natural settings.  A database of normative data for individual milestones, common screening and evaluation tools, and published clinical opinion was created to inform revisions.  ***Application of the criteria established by the AAP working group and adding milestones for the 15- and 30-month health supervision visits <u>resulted in a 26.4% reduction</u> and 40.9% replacement of previous CDC milestones. <u>One third of the retained milestones were transferred to different ages; 67.7% of those transferred were moved to older ages.</u>*** *Approximately 80% of the final milestones had normative data from ≥1 sources*. Social-emotional and cognitive milestones had the least normative data. These criteria and revised checklists can be used to support developmental surveillance, clinical judgment regarding additional developmental screening, and research in developmental surveillance processes. Gaps in developmental data were identified particularly for social-emotional and cognitive milestones.

Thus, at least 22.3% [67.7% of 33%] of the CDC child developmental milestones in place for ~18 years, were moved from a younger age to an older age in February 2022.

One must conclude the CDC, rather than acknowledging the harms being done to children's development by their COVID policies, including masking, is simply moving the goalposts for what constitutes normal child development rather than admitting and moving away from failed policies.

<u>Statements under "Respirators" and "Selecting Masks":</u>

➢ Parents and caregivers may have questions about NIOSH-approved respirators (such as N95s) for children.  *Although respirators may be available in smaller sizes, **<u>they are typically designed to be used by adults in workplaces</u>**, and therefore have not been tested for broad use in children*.

➢ ***<u>Masks and respirators should not be worn by children younger than 2 years.</u>***

➢ Choose a size that fits over the child's nose and under the chin but does not impair vision.  ***Follow the user instructions for the mask or respirator.*** *These instructions may show how to make sure the product fits properly.*

***This language may be the most misleading and egregious given that the links CDC provides to manufacturers' instruction state that their N95s are not for use with children – the CDC has to know this.***

The links to manufacturers' instructions from the January 28, 2022 mask and January 25, 2022 How to Use Your N95 Respirator are shown in Figures 21 and 22 respectively:

**Figure 21: CDC January 28, 2022 Link – Bottom of Page and CDC January 25, 2022 Link to Manufacturers' Guidance and Warnings**

The "How to Use Your N95 Respirator" is at the bottom of the CDC January 28, 2022 webpage.



**Figure 22: CDC January 15, 2022 Link to How to Use Your N-95 Respirator – Link to Manufacturers**

The link in turn takes one to the following page (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/free-n95-manufacturers.html) (Figure 23):





## COVID-19
## Free N95 Respirator Manufacturers

Distributed from the Strategic National Stockpile

Updated Jan. 25, 2022

### What You Need to Know

- The Strategic National Stockpile has distributed N95 respirators to pharmacy distribution centers throughout the country.
- You can find specific manufacturer's instructions for your N95 model below.

For information about how to use your N95 correctly, see How to Use Your N95 Respirator.

### 3M



MODEL
**3M Model 8210+**

NIOSH APPROVAL
**TC-84A-0007**

General and Occupational/Workplace 8210, 8110S, 8210Plus N95 Particulate Respirator User Instructions (3m.com) ■ ☑



MODEL
**3M Model 8110S**

NIOSH APPROVAL
**TC-84A-0007**

General and Occupational/Workplace 8210, 8110S, 8210Plus N95 Particulate Respirator User instructions (3m.com) ■ ☑

MODEL

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/free-n95-manufacturers.html                                                    1/

**Figure 23: CDC January 15, 2022 Link to How to Use Your N-95 Respirator –
Link to Manufacturers – pg. 1**

From this webpage, four manufacturers are listed representing 12 respirators:

➢   3M (6 models)

➢   Drager (1 model)

➢   Honeywell (2 models)

➢   Moldex (3 models).

For each model, the link can be clicked to get directly to the manufacturers' instructions for each respirator.  For 3M and Moldex, major suppliers, only one set of instructions is used for each of their individually listed respirators.  In other words, the same instructions were provided for each of the manufacturers' listed products.

Both 3M and Moldex explicitly state that their masks are not to be use by children (Figure 24).

Occupational/Workplace Use: 3M™ 8210, 8110S, 8210Plus N95 User Instructions

**Use Instructions**

1)   Failure to follow all instructions and limitations on the use of this respirator and/or failure to wear this respirator during all times of exposure can reduce respirator effectiveness and **may result in sickness or death.**

2)   In the U.S., before occupational use of this respirator, a written respiratory protection program must be implemented meeting all the requirements of OSHA 29 CFR 1910.134, such as training, fit testing, medical evaluation, and applicable OSHA substance specific standards. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. Follow all applicable local regulations.

3)   The particles which can be dangerous to your health include those so small that you cannot see them.

4)   Leave the contaminated area immediately and contact supervisor if dizziness, irritation, or other distress occurs.

5)   Store the respirator away from contaminated areas when not in use.

6)   Inspect respirator before each use to ensure that it is in good operating condition. Examine all the respirator parts for signs of damage including the two headbands, attachment points, nose foam, and noseclip. The respirator should be disposed of immediately upon observation of damaged or missing parts. Filtering facepieces are to be inspected prior to each use to assure there are no holes in the breathing zone other than the punctures around staples and no damage has occurred. Enlarged holes resulting from ripped or torn filter material around staple punctures are considered damage. Immediately replace respirator if damaged. Staple perforations do not affect NIOSH approval (For 8110S only).

7)   Conduct a user seal check before each use as specified in the Fitting Instructions section. **If you cannot achieve a proper seal, do not use the respirator.**

8)   Dispose of used product in accordance with applicable regulations.

**Use Limitations**

1)   This respirator does not supply oxygen. Do not use in atmospheres containing less than 19.5% oxygen.

2)   Do not use when concentrations of contaminants are immediately dangerous to life and health, are unknown or when concentrations exceed 10 times the permissible exposure limit (PEL) or according to specific OSHA standards or applicable government regulations, whichever is lower.

3)   Do not alter, wash, abuse or misuse this respirator.

4)   Do not use with beards or other facial hair or other conditions that prevent a good seal between the face and the sealing surface of the respirator.

5)   Respirators can help protect your lungs against certain airborne contaminants. They will not prevent entry through other routes such as the skin, which would require additional personal protective equipment (PPE).

6)   This respirator is designed for occupational/professional use by adults who are properly trained in its use and limitations. This respirator is not designed to be used by children.

7)   Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use.

**Figure 24: 3M Instructions for CDC Listed 3M N95 Respirators –
Not Designed to be Used by Children**

19

Note the following observations from Figure 24:

➢ ***This respirator is not designed to be used by children***!

➢ The respirator is only intended to be used for occupational or professional adults properly trained (e.g., under the RPS).

➢ Failure to follow instructions may result in sickness or death.

➢ A written respiratory protection plan, under the requirements of 29 CFR 1910.134 (RPS) must be in place prior to use of this respirator.

The Moldex instructions are essentially the same.

Moreover, 3M warns it is not protective against infectious diseases (Figure 25):

**Biological Particles**

This respirator can help reduce inhalation exposures to certain airborne biological particles (e.g. mold, *Bacillus anthracis*, *Mycobacterium tuberculosis*, etc.) but cannot eliminate the risk of contracting infection, illness or disease. OSHA and other government agencies have not established safe exposure limits for these contaminants.

5

**Figure 25: 3M Instructions for CDC Listed 3M N95 Respirators – Not Protective Against Infection, Illness, or Disease**

Note that anthrax and TB are much larger particles than virus particles like the COVID-19 virus.

In light of this discussion, the CDC should immediately correct their webpage stating explicitly that respirators, according to manufacturers' instructions, "Are not designed to be used by Children" and that anyone using a respirator must be doing so under a written respiratory protection plan that follows the OSHA RPS.

**Issue #3:    The CDC continues to ignore the fact that COVID-19 is primarily spread by aerosols (not droplets) making mask use mostly ineffective:**

The CDC continues to make the misleading argument that masks stop COVID droplets. This is misleading because while masks do stop some droplets (> 50 to 10 micron), the vast majority of COVID particles are smaller aerosols (≤ 5 microns) – see Figure 26:

> ## Types of Masks and Respirators
>
> Masks are made to contain droplets and particles you breathe, cough, or sneeze out. If they fit closely to the face, they can also provide you some protection from particles spread by others, including the virus that causes COVID-19.
>
> Respirators are made to protect you by filtering the air and fitting closely on the face to filter out particles, including the virus that causes COVID-19. They can also contain droplets and particles you breathe, cough, or sneeze out so you do not spread them to others.

**Figure 26: CDC – Misleading Guidance on Masks and Droplets**

We are not the only ones who have written you regarding this issue.  On February 15, 2001, the following scientists wrote a lengthy memo to you regarding your misleading language in this area and asked you to correct it:

➢ Rick Bright, PhD, Former Director of BARDA, Dept of Health and Human Services

➢ Lisa M. Brosseau, ScD, CIH, University of Minnesota CIDRAP

➢ Lynn R. Goldman, MD, MS, MPH, George Washington University

➢ Céline Gounder, MD, ScM, NYU Grossman School of Medicine & Bellevue Hospital Center

➢ Jose Jimenez, PhD, University of Colorado at Boulder

➢ Yoshihiro Kawaoka, DVM, PhD, University of Wisconsin-Madison and University of Tokyo

➢ Linsey Marr, PhD, Virginia Tech

➢ David Michaels, PhD, MPH, George Washington University

➢ Donald K. Milton, MD, DrPH, University of Maryland

➢ Michael Osterholm, PhD, MPH, University of Minnesota CIDRAP

➢ Kimberly Prather, PhD, University of California San Diego

➢ Robert T. Schooley, MD, University of California San Diego

➢ Peg Seminario, MS, AFL-CIO (retired)

They wrote in part:

> "To address and limit transmission via inhalation exposure and prevent COVID infections and deaths, we urge the Biden administration to take the following immediate actions:
>
> ● Update and strengthen CDC guidelines to fully address transmission via inhalation exposure to *small inhalable particles* from infectious sources at close, mid and longer range.  Updated guidelines should be informed by a risk assessment model that focuses on source and pathway (ventilation) controls first, followed by respiratory protection…

21

- *Issue an OSHA emergency standard on COVID-19 that recognizes the importance of aerosol inhalation, includes requirements to assess risks of exposure, and requires implementation of control measures following a hierarchy of controls…*

Edwards et al. (https://www.pnas.org/content/118/8/e2021830118) demonstrated that that the vast majority of COVID particles emitted during illness are aerosols not droplets (see Figure 27):



**Figure 27: Edwards et al., 2021 – Particle Size Emissions by Size and Time**

Edwards et al. concluded their paper with the following statements:

➢ Our finding that *the proportion of small respiratory droplets (i.e., aerosols) were the majority of particles exhaled in all subjects*.

➢ There may be an elevated risk of the airborne transmission of SARS CoV 2 by way of the very small droplets (aerosols) that transmit through conventional masks and *traverse distances far exceeding the conventional social distance of 2 m (~7').*

➢ Exhaled aerosol numbers appear to be not only an indicator of disease progression, *but a marker of disease risk in non-infected individuals.*

While the mask may contain droplets, they only do so for a period. As the masks are exposed to heat and moisture they suffer from degradation within a few hours.

We ask that the CDC immediately suspend misleading statements in all their public information that masks stop droplets when the vast majority of particles are smaller aerosols that stay suspended for days to weeks (vs. minutes for droplets), readily pass through gaps around the masks, and can reach deep into the lungs (see for example Fennelly, Kevin, P., 2020, Particle sizes of infectious aerosols: implications for infection control, Lancet Respir Med 2020; 8: 914–24).

**Issue #4:    CDC's position for masks used by the general public lacks proper scientific justification and creates potential harm based on a false sense of security:**

Statements that a mask can provide protection are false and mislead the public into a false sense of security.  Industrial Hygiene solutions seek a more than 90% relative risk reduction, and this publication continues to focus on the lowest form of non-protection that does not meet the least desirable mode of protection (PPE) in the Hierarchy of Controls with PPE.   The September 9, 2020 guidance from AIHA illustrated this concept of the need for a super reduction in relative risk, not a minor one (https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Reducing-the-Risk-of-COVID-19-using-Engineering-Controls-Guidance-Document.pdf - pg. 4).

Moreover, the CDC continues to provide guidance that gaps in masks can be eliminated; in the real world that never happens (Figure 28):

## Choosing a Mask or Respirator for Different Situations

Masks and respirators (i.e., specialized filtering masks such as "N95s") can provide different levels of protection depending on the type of mask and how they are used. Loosely woven cloth products provide the least protection, layered finely woven products offer more protection, well-fitting disposable surgical masks and KN95s offer even more protection, and well-fitting NIOSH-approved respirators (including N95s) offer the highest level of protection.

Whatever product you choose, it should provide a good fit (i.e., fitting closely on the face without any gaps along the edges or around the nose) and be comfortable enough when worn properly (covering your nose and mouth) so that you can keep it on when you need to. Learn how to improve how well your mask protects you by visiting CDC's Improve How Your Mask Protects You page.

A respirator has better filtration, and if worn properly the whole time it is in use, can provide a higher level of protection than a cloth or procedural mask. A mask or respirator will be less effective if it fits poorly or if you wear it improperly or take it off frequently. Individuals may consider the situation and other factors when choosing a mask or respirator that offers greater protection.

**Do NOT wear cloth masks with**

* Gaps around the sides of the face or nose
* Exhalation valves, vents, or other openings (see example)
* Single-layer fabric or those made of thin fabric that don't block light
* Wet or dirty material

**Figure 28: CDC Guidance Suggesting Gaps in Masks Can be Eliminated**

23

The CDC statement that masks should not be worn if gaps cannot be eliminated is meaningless because this cannot occur; only properly selected and fitted respirators can accomplish this.

Masks cannot ever obtain a perfect fit to the face and efficiencies of masks when worn in real world scenarios (day-long usage). When the mask has more than a 3% gap, it offers effectively zero protection (Figure 29):



**Figure 29: Loss of Mask Effectiveness in the Real World**

Thus, the core issue with masks, and even respirators, is the seal – small gap areas effectively render these devices ineffective.

The American Society for Testing and Materials (ASTM) Standard Specification for Barrier Face Coverings F3502-21 Note 2 states, "There are currently no established methods for measuring outward leakage from a barrier face covering, medical mask, or respirator. Nothing in this standard addressed or implied a quantitative assessment of outward leakage and no claims can be made about the degree to which a barrier face covering reduces emission of human-generated particles."

As well as, importantly, Note 5, "There are currently no specific accepted techniques that are available to measure outward leakage from a barrier face covering or other products. Thus, no claims may be made with respect to the degree of source control offered by the barrier face covering based on the leakage assessment."

Every breath increases atmospheric viral load, or the amount of viral matter held aloft in an enclosed space. In instances when it does not take very much of an airborne pathogen for vulnerable individuals to get sick, a contagious individual should not wear a mask or respirator that creates a concentrated plume of aerosols, thinking they are protecting others from their respiratory emissions.

Explosive force-generating events, such as coughs and sneezes, increase the pressure behind exhaled matter.  Masks can exacerbate the spread of airborne pathogens by creating focused plumes of fine particulates, in turn increasing emission trajectory, with the added concern of aerosolization of droplets through the mask membrane.

Finally, what is now most concerning, is that public entities are taking CDC guidance and making respirators available for free (Figure 30):



**Figure 30: "Free" Open Contaminated N95s Being Given Away
to the Public at Grocery Stores**

These entities, based on CDC guidance, likely and/or unknowingly, do not address the requirements of the Respiratory Protection Standard and causing additional harm to the public by such a lack of understanding.  Inevitably, this practice will result in harm and liability to their employees and customers for improper distribution and storage of respirators under the RPS.

**Conclusion:**

The CDC has built a series of recommendations for masking that are inconsistent with
the technical and medical literature.  The policy and procedural recommendations
exaggerate the benefits, while ignoring the limitations and harms, especially for children
and the general population.  In addition, the CDC has taken a policy position of "it might
work" and "it can't hurt" and use selective and weak observational data in the place of
actual controlled scientific study to justify inappropriate recommendations for masks and
face coverings.

Recently, the CDC has deployed a respiratory protection policy (i.e., masks to N95s) that
dismisses the key principles in any Safety and Health program regarding the use of
respirators – namely the Respiratory Protection Program.  There is no mention of potential
risks if the respirator is not properly used or fitted correctly.  Moreover, it is clear that
respirators are not intended for use with children.  In our profession, if PPE and respiratory
protection guidance was to ever be delivered without risk identification, fit testing, and
training, we would be liable for putting personnel in a high-risk scenario, which is what the
CDC is doing with their policy.

We would ask the CDC to accept these basic industrial hygiene facts that we have
presented, update their public guidance accordingly regarding the issue of droplets vs.
aerosols, stop confusing the public regarding the effectiveness of masks, and stop
implying respirators are acceptable for children, and to be given generally to the public.
In addition, it is clear the CDC knows, or should know, that gaps between the face and
mask are a major problem for real mask effectiveness and could never have met our
industry's requirement of 90% relative risk reduction.

The CDC is doing enormous damage to science and scientists by allowing politics to
dictate public health policy rather than actual science.  Increasingly, and for good reason
as we have illustrated, the public does not trust the CDC and its science; this must
change.

We recognize that it is easy to judge from afar and know that you and your team are under
tremendous stress during this period.  Our desire is to see the CDC and our country
succeed in these efforts.  As such, instead of just being critical, we want to offer our time
to your organization to find solutions together.  We would be willing to collaborate in the
creation of a competent plan that will be based on the Hierarchy of Controls and will be
tailored to various work and living environments.  We will also help develop data points
we can use to monitor and measure this program to enable proper adjustments as
needed.

We look forward to your responses to our concerns as we continue to work to protect the public.


Sincerely:


Stephen E. Petty, P.E., C.I.H., C.S.P.*
EES Group, Inc.
Pompano Beach, FL 33030
(spetty@eesgroup.us)


James R. Casciano, MS, CIH
Certified Industrial Hygienist
Lafayette, Colorado
(jamescasciano@gmail.com)


Tammy Clark
Occupational and Environmental Health
and Safety Professional
(tammy@standupmichigan.com)


Tyson Gabriel, IH, OEHS Pro
Premier Risk Management
4501 N 22nd St, Unit 190
Phoenix, AZ 85016
tydgabe@yahoo.com)


Dave Howard, Founder
Premier Risk Management
4501 N 22nd St, Unit 190
Phoenix, AZ 85016
(dhoward@premierrm.com)


Nathaniel Kelly, MPH, M.S. OSH, GSP
Health and Safety Manager
Hudsonville, MI
nathanielkelly1@yahoo.com


Megan K. Mansell
Risk Assessment, Compliance, and
Accommodations for Special Populations
Tallahassee, FL 32303
(MeganKristenMansell@gmail.com)


Kristen Meghan Kelly, M.S. OSH
Senior Industrial Hygienist
(kristenmeghan@gmail.com)


* Corresponding Author

Plaintiffs' Exhibit 23

cdc.gov

# COVID-19 and Your Health

19-24 minutes

---

### Summary of Recent Changes

Effective February 25, 2022, CDC does not require wearing of masks on buses or vans operated by public or private school systems, including early care and education/child care programs.



Traveling on public transportation increases a person's risk of getting and spreading COVID-19 by bringing people in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces. Air travel often requires spending time in security lines and busy airport terminals. Travel by bus, train, and other conveyances used for international, interstate, or intrastate transportation poses similar challenges. Staying 6 feet away from others is often difficult on public transportation conveyances. People may not be able to distance themselves by the recommended minimum of 6 feet from other people seated nearby or from those standing in or passing through the aisles on airplanes, trains, or buses.

Travel contributes to interstate and international spread of COVID-19. Wearing masks that completely cover the mouth and nose reduces the spread of COVID-19. People who never develop symptoms (asymptomatic) or are not yet showing symptoms (pre-symptomatic) might not know that they are infected but can still spread COVID-19 to others. Masks also offer protection to the wearer.

On January 29, 2021, CDC issued an Order that required face masks to be worn by all people while on public transportation (which included all passengers and all personnel operating conveyances) traveling into, within, or out of the United States and U.S. territories. The Order also required all people to wear masks while at transportation hubs (e.g., airports, bus or ferry terminals, train and subway stations, seaports, U.S. ports of entry, and other locations where people board public

transportation in the United States and U.S. territories), including both indoor and outdoor areas.

Effective February 25, 2022, CDC is exercising its enforcement discretion to not require that people wear masks on buses or vans operated by public or private school systems, including early care and education/child care programs. CDC is making this change to  align with updated guidance that no longer recommends universal indoor mask wearing in K-12 schools and early education settings in areas with a low or medium COVID-19 Community Level. School systems at their discretion may choose to require that people wear masks on buses or vans.

CDC previously announced that it would use enforcement discretion to not require people to wear a mask in outdoor areas of conveyances (if such outdoor areas exist on the conveyance) or while outdoors at transportation hubs. CDC will continue to evaluate the requirements of its Order and determine whether additional changes may be warranted.

While in indoor areas of conveyances or while indoors at transportation hubs, people are not required to wear a mask under the following circumstances:

- while eating, drinking, or taking medication for brief periods of time;

- while communicating for brief periods of time with a person who is hearing impaired when the ability to see the mouth is essential for communication;

- if, on an aircraft, wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation;

- if unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance;

- when necessary to temporarily lower or remove the mask to verify one's identity such as during Transportation Security Administration (TSA) screening or when asked to do so by the ticket or gate agent or any law enforcement official;

- when experiencing difficulty breathing or shortness of breath or feeling winded, until able to resume normal breathing with the mask; when vomiting until vomiting ceases; or if wearing a mask interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask.

The following categories of people continue to be exempt from the requirement to wear a mask:

- A child under the age of 2 years;

- A person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*);

- A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations.

People on board the following categories of conveyances continue to be exempt from the requirement to wear a mask:

- Private conveyances operated only for personal, non-commercial use;

- Commercial motor vehicles or trucks, if the driver is the only person in the vehicle or truck, or the vehicle or truck is operated by a team who all live in the same household and are the only persons in the vehicle;*

- Conveyances operated or chartered by the U.S. military as long as the operator of the conveyance follows all requirements of U.S. military services to prevent spread of COVID-19 that are equivalent to the requirements in CDC's Order.

*Non-passenger-carrying commercial vessels operated by a team of mariners who all live on the vessel and are the only people on the vessel are also permitted to use this exemption.

## Frequently Asked Questions

**General**

**What is a public transportation conveyance?**
A public transportation conveyance is any mode of transportation other than a private vehicle. Types of public transportation conveyances include airplanes, trains, subways, buses, taxis, ride-shares, maritime transportation, trolleys, and cable cars.

**Which public transportation conveyances does the order apply to, and in which areas?**
The Order applies to all public transportation conveyances traveling into the United States (i.e., arriving from a foreign country) or within the United States (including within states or territories or traveling between states or territories). The Order also applies to all conveyances leaving the United States until they arrive at a foreign destination.

If a conveyance has outdoor areas (such as on a ferry or an open-air trolley or bus), wearing a mask is not required while outdoors unless otherwise required by the operator, federal, state, tribal, territorial, or local government.

**How is CDC defining "outdoor" areas on conveyances and at transportation hubs?**
Subject to how other federal partners and state and local entities define "outdoors," CDC understands "outdoors" to refer to any open-air area. Examples of outdoor areas of conveyances are the uncovered top decks of buses and open deck areas of ferries or other vessels. Examples of outdoor areas of transportation hubs include surface parking lots and partially enclosed parking garages, passenger pick-up/drop-off areas, railway platforms, piers, open hangars, and airport runways.

**Are masks required on school buses?**
No, CDC does not require people to wear masks on buses or vans operated by public or private K-12 school systems or early care and education/child care (ECE) programs. At their discretion, school systems and ECE programs may choose to require that people wear masks on buses or vans.

**What kind of mask should I wear?**
People must wear masks that completely cover the mouth and nose. Masks should fit snugly against the sides of the face. See attributes of masks needed to fulfill the requirements of the Order. For more information about masks, see Types of Masks and Respirators.

**Can I wear a face shield instead of a mask?**
Face shields do not fulfill the requirements of the Order. Face shields may be worn in addition to a mask that fulfills the requirements of the Order, but face shields may **not** be worn **instead of** a mask. A face shield is effective at protecting the person wearing it from splashes to the face,

Plaintiffs' Exhibit 24

**Willie Walsh**
Director General

8 March 2022

Mr. Jeffrey Zients
White House Coronavirus Response Coordinator
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500
United States of America

Dear Mr. Zients,

I viewed with great interest President Biden's State of the Union address and his call for a reset on COVID-19 policies.  As Director General of the international Air Transport Association (IATA) and our more than 290 international airline members, including six of the largest US passenger airlines, I strongly support the President's conclusion that COVID-19 need no longer control our lives.

As you know, the international airline industry has been significantly harmed by COVID-19 and the myriad government responses to the virus.  While we have begun to see signs of a recovery, the industry today has nearly 50% less passenger traffic than it did prior to COVID-19, and we have suffered total losses in 2020-21 of $189.5 billion with a further $11.6 billion in losses expected this year.  We do not expect global passenger numbers to return to 2019 levels until 2024.  When healthy, the global airline industry supports $3.5 trillion in global GDP and contributes $779 billion to US GDP.

Throughout the pandemic, IATA and the airlines we represent have done their best to support governments as they attempted to control the spread of this dangerous disease.  Airlines across the world voluntarily implemented health and safety protocols to provide maximum protection to our customers and crew.  We have also worked with the US Government and other governments around the world to provide operational know-how and support on various proposed COVID-19 policies.  While we have not always agreed with governments' approach on these policies, we are confident that industry and government have both benefitted from this ongoing cooperation.

The past few weeks have seen a dramatic shift by many governments around the world, including most recently my native Ireland, to ease or remove COVID-19 travel restrictions and requirements as the disease enters its endemic phase.  I understand that under your leadership the Biden Administration is studying when and how to remove COVID-19 travel restrictions. To that end, I offer the following recommendations for your consideration:

./2

**International Air Transport Association,**

800 Place Victoria, P.O. Box 113
Montréal, QC, Canada H4Z 1M1

IATA Center, 33 Route de l'Aéroport, P.O. Box 416,
Geneva 15 Airport – 1215, Switzerland.

Tel: +41 (0) 22 770 2903
Email: iatadg@iata.org

**iata.org**

- 2 –

Mask mandate:  We urge the Biden Administration not to renew its mask mandate for transportation when it lapses on March 18, 2022.  It makes no sense to continue to require masks on airplanes when they are no longer being required in shopping malls, theatres or offices. Aircraft are equipped with highly sophisticated hospital quality filtration systems and have much higher air flow and air exchange rates than most other indoor environments where mask mandates already have been removed. Several Scandinavian countries have removed their mask mandates while other leading governments have made mask wearing either explicitly voluntary or are no longer enforcing a masking requirement.  If the Biden Administration believes that further study of this requirement is necessary before it is lifted, we urge you to extend the mandate for only an additional 30 days or until mask mandates are removed for any other form of transportation.

Pre-departure testing:  We strongly support the growing list of leading countries that have decided to remove their pre-departure testing requirement.  President Biden is rightfully proud of the high level of full vaccination achieved in the US and the various therapeutics now available to keep those who become infected out of hospitals.  Any minimal remaining public health benefits from testing are far outweighed by the detrimental impact this policy continues to have on people's travel freedom and livelihoods.

Passenger attestation:  Concurrent with removing pre-departure testing should be the removal of the requirement that passengers complete a long intrusive questionnaire on their testing and vaccination status.  The attestation results in large costs for airlines and potential threats to passengers' privacy while offering little to no health or law enforcement benefits.  We recommend that the attestation be eliminated in favor of language outlining civil and criminal penalties for presentation of false vaccination records to airline staff by non-US citizens.

While decisions as to whether or not to remove travel restrictions should be based solely on the health concerns that resulted in their being promulgated in the first place, it is important to note that countries that have removed these no-longer fit for purpose travel restrictions have already seen a significant upswing in forward bookings.  International travel was artificially constrained by COVID-19 and government policies. We expect a robust recovery when the United States and other leading countries join the European Commission, the United Kingdom and countries across the globe that have concluded that travel restrictions are no longer necessary from a public health perspective.

Over the longer term, we look forward to working with the Biden Administration to remove or modify all remaining COVID-19 travel restrictions, including the vaccination mandate for non-US citizens and the contact tracing program.

Thank you in advance for your consideration.

Yours sincerely,


**Willie Walsh**
Director General
International Air Transport Association

Plaintiffs' Exhibit 25

# GAO@100

**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

441 G St. N.W.
Washington, DC  20548

# Decision

| | |
|---|---|
| **Matter of:** | Centers for Disease Control and Prevention—Applicability of Congressional Review Act to Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs |
| **File:** | B-333501 |
| **Date:** | December 14, 2021 |

**DIGEST**

On February 3, 2021, the Centers for Disease Control and Prevention (CDC) published a document in the Federal Register entitled *Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025 (Mask Requirement).  Under the CDC's Mask Requirement all persons using public conveyances such as planes, trains, and buses must wear facial coverings while on the conveyance and at transportation hubs such as airports and bus stations. CDC did not submit a CRA report to Congress or the Comptroller General on the Mask Requirement.

The Congressional Review Act (CRA) requires that before a rule can take effect, an agency must submit the rule to both the House of Representatives and the Senate as well as the Comptroller General, and provides procedures for congressional review where Congress may disapprove of rules.  We conclude that the Mask Requirement meets the definition of a rule for purposes of CRA and, therefore, is subject to CRA's requirements for submission and congressional review.  With this decision, we are not taking a position on the policy of imposing a mask requirement or what steps the agency or Congress may take next; our decision only addresses CDC's compliance with CRA's procedures for congressional review.

**DECISION**

The Centers for Disease Control and Prevention (CDC), a component of the U.S. Department of Health and Human Services (HHS), issued a document entitled *Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025 (Mask Requirement) that was published in the Federal Register on February 3, 2021.  Senator Rand Paul, M.D., subsequently requested our legal decision as to whether the Mask Requirement is a rule for purposes of the Congressional Review Act (CRA).  Letter from Senator Rand Paul,

M.D., to Comptroller General (Aug. 9, 2021).  For the reasons explained below, we conclude that it is.

Our practice when rendering decisions is to contact the relevant agencies to obtain their legal views on the subject of the request.  GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* https://www.gao.gov/products/gao-06-1064sp.  Accordingly, we reached out to HHS to obtain the agency's legal views.  Letter from Managing Associate General Counsel, GAO, to Acting General Counsel, HHS (Aug. 12, 2021).  We received HHS's response on September 28, 2021.  Letter from Acting General Counsel, HHS, to Managing Associate General Counsel, GAO (Sept. 28, 2021) (Response Letter).

BACKGROUND

CDC Mask Requirement

On January 31, 2020, in response to confirmed cases of Novel Coronavirus Disease 2019 (COVID-19), the Secretary of HHS declared a public health emergency under the Public Health Service Act.[1]  The Secretary has renewed that declaration, most recently on October 15, 2021.[2]  Subsequently, the President declared that the COVID-19 outbreak constitutes a national emergency under the National Emergencies Act.  Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020).  The national emergency declaration was continued on February 24, 2021.  86 Fed. Reg. 11,599 (Feb. 26, 2021).

On January 29, 2021, CDC issued the Mask Requirement pursuant to its regulatory authorities under the Public Service Health Act with an effective date of February 1, 2021.[3]  Mask Requirement, at 8025-26.  It was published in the Federal Register on February 3, 2021.

---

[1] HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited Oct. 26, 2021).

[2] HHS, *Public Health Emergency Declarations*, *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx (last visited Nov. 2, 2021).

[3] Regulations implementing the Public Health Service Act empower CDC to take measures to prevent the introduction or spread of communicable diseases.  42 U.S.C. § 264; 42 C.F.R. §§ 70.2, 71.31, 71.32.  Actions CDC can take include inspection, fumigation, disinfection, sanitation, and pest extermination, among others.  42 C.F.R. §§ 70.2, 71.31, 71.32.

B-333501

The Mask Requirement states that masks help prevent the spread of COVID-19.
Mask Requirement at 8028.  The stated intent of the Mask Requirement is to
preserve human life; maintain a safe and secure operating transportation system;
mitigate further introduction, transmission, and spread of COVID–19 into and within
the United States; and support response efforts.  *Id.* at 8027 (statement of intent).

Under the Mask Requirement, a person must wear a mask while boarding,
disembarking, and traveling on any conveyance (such as an aircraft, train, road
vehicle, or vessel) into or within the United States.  *Id.* at 8026, 8029.  A person also
must wear a mask while at a transportation hub (such as an airport, bus terminal,
port, or subway station) that provides transportation within the United States.  *Id.*  It
also requires conveyance operators to only provide service to masked passengers
and to use best efforts to ensure passengers stay masked during the entire trip.  *Id*
at 8029.

The Mask Requirement provides several exemptions based on the characteristics of
a passenger or the travel scenario.  *Id.* at 8027-28.  For instance, passengers under
the age of two are exempt, as is travel by private conveyance for personal, non-
commercial use.  *Id.* at 8027, 8029.  Other federal agencies are required to take
additional steps to enforce the Mask Requirement.  *Id.* at 8028, 8030.  The Mask
Requirement will remain in effect until rescinded by CDC or the public health
emergency is ended by the Secretary of HHS.  *Id.* at 8026.

<u>Congressional Review Act</u>

CRA, enacted in 1996 to strengthen congressional oversight of agency rulemaking,
requires federal agencies to submit a report on each new rule to both Houses of
Congress and to the Comptroller General for review before a rule can take effect.
5 U.S.C. § 801(a)(1)(A).  The report must contain a copy of the rule, "a concise
general statement relating to the rule," and the rule's proposed effective date.  *Id.*
Each House of Congress is to provide the report on the rule to the chairman and
ranking member of each standing committee with jurisdiction.  5 U.S.C.
§ 801(a)(1)(C).  The CRA allows Congress to review and disapprove rules issued by
federal agencies for a period of 60 days using special procedures.  5 U.S.C. § 802.
If a resolution of disapproval is enacted, then the new rule has no force or effect.  *Id.*

CRA adopts the definition of rule under the Administrative Procedure Act (APA),
5 U.S.C. § 551(4), which states that a rule is "the whole or a part of an agency
statement of general or particular applicability and future effect designed to
implement, interpret, or prescribe law or policy or describing the organization,
procedure, or practice requirements of an agency."  5 U.S.C. § 804(3).  CRA
excludes three categories of rules from coverage: (1) rules of particular applicability;
(2) rules relating to agency management or personnel; and (3) rules of agency
organization, procedure, or practice that do not substantially affect the rights or
obligations of non-agency parties.  *Id.*

CDC did not submit a CRA report to Congress or the Comptroller General on the Mask Requirement.  In its response to us, CDC stated the Mask Requirement was not subject to the CRA because it was an emergency action under CDC's regulatory authorities and that any delays could result in serious harms.  Response Letter, at 1.

DISCUSSION

The issue here is whether the CDC Mask Requirement is a rule under CRA. Applying the statutory framework of CRA, we first address whether the Mask Requirement meets the definition of a rule under APA.  We conclude that it does. Second, we address whether any of the CRA exceptions apply.  We conclude they do not.  Therefore, we conclude the Mask Requirement is a rule for purposes of CRA.

CDC considers the Mask Requirement to be an order issued under its regulatory authorities implementing the Public Health Service Act.  *See* Response Letter, at 1-2 ("[t]he mask order is an emergency action taken under 42 C.F.R. §§ 70.2, 71.31(b), and 71.32(b) . . . implementing regulations of 42 U.S.C. § 264").  Although an agency's characterization should be considered in deciding whether its action is a rule under the APA definition (and whether, for example, it is subject to notice and comment rulemaking requirements), "[an] agency's own label . . . [is] not dispositive." *Chamber of Commerce of the U.S. v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980); B-329272, Oct. 19, 2017.

The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."  5 U.S.C. § 551(4).  By contrast, the APA defines an order to be "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."  5 U.S.C. § 551(6).  As we have noted in our prior decisions, these two definitions make rules and orders mutually exclusive categories.  *See* B-332233, Aug. 13, 2020, at 3.

Here the Mask Requirement meets the APA definition of a rule rather than an order. Regarding the first element of a rule, the Mask Requirement is an agency statement because it is an official document published in the Federal Register by CDC.  Mask Requirement at 8025-26.  It is of future effect, satisfying the second element, because the order states that it remains in place until rescinded or the public health emergency is terminated.  *Id.* at 8026.  Third, it implements and prescribes law or policy as it requires all travelers to wear a mask where previously they were not required to do so.  *Id.* at 8028-29.  Thus, the Mask Requirement falls within the APA's definition of rule.

Conversely, despite its label, the Mask Requirement is not an order for purposes of the APA because it is not the result of an adjudicatory process.  *See Coalition for*

*Common Sense in Gov't Procurement v. Sec'y for Veterans Affairs*, 464 F.3d 1306, 1316-17 (Fed. Cir. 2006).  As noted previously, an order is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form."  5 U.S.C. § 551(6).  Thus, an order results from an adjudicatory process.  *See Coalition for Common Sense in Gov't Procurement*, 463 F.3d at 1316-17.  Here, the Mask Requirement was not the result of an adjudicatory process but a prospective requirement setting process.  In its response to us, CDC described its process for drafting the Mask Requirement.  "[It] was drafted and cleared by the CDC program (Division of Global Migration and Quarantine), Center (National Center for Emerging and Zoonotic Infectious Diseases), and CDC's Office of the Director before it was provided to HHS for Departmental review.  Following HHS review and clearance, it was provided to OMB."  Response Letter at 2.  This is a process used to draft rules, not an adjudicatory proceeding.

In support of its position that the agency action here is an order not a rule, CDC asserted that its long-standing regulations permit it to act quickly to prevent the spread of communicable diseases and any delay in issuance of the Mask Requirement "could result in serious harm."  Response Letter, at 1.  CDC further stated that the order was an emergency action and requiring the order to go through notice and comment before taking effect "would exacerbate the substantial harm that the order was intended to mitigate."  *Id.*

While CRA does not provide an emergency exception from its procedural requirements to submit rules for congressional review, CRA and APA address an agency's need to take emergency action without delay.  Agencies can waive the required delay in effective date requirement when an agency for "good cause" finds (and incorporates the finding and a brief statement of reasons in the rule issued) that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C §§ 553(b), 808(2).  Therefore, an agency can provide for a rule to take effect immediately while still complying with the agency's statutory obligation to submit the rule to Congress for review.[4]

Having determined the Mask Requirement meets the definition of a rule, we must determine if any of the CRA exceptions apply.  We conclude they do not.  First, it is not a rule of particular applicability as it applies to all travelers using public conveyances and is not limited to specific parties.  Mask Requirement, at 8028-29.  Second, it does not deal with agency management or personnel but with travelers and conveyance operators.  *Id.* at 8026.  Finally, it is not a rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties as it imposes new requirements on people who are traveling to wear masks while in transit and at transportation hubs.  *Id.* at 8028-

---

[4] Over the course of the COVID-19 public health emergency, several agencies have submitted rules for congressional review while waiving the delay in effective date by invoking CRA's good cause exception.  *See, e.g.,* B-333486, Aug. 10, 2021; B-333381, Jul. 9, 2021; B-332918, Feb. 5, 2021.

29.  It also requires operators to only provide service to masked passengers.  *Id.* Thus, no exception applies.

CONCLUSION

The Mask Requirement is a rule for purposes of CRA because it meets the APA definition of a rule and no CRA exception applies. Accordingly, before it can take effect, the Mask Requirement is subject to the requirement that it be submitted to both Houses of Congress and the Comptroller General for review, which provides Congress a period of 60 days in which it may disapprove the rule using special procedures in accordance with the CRA.  While CDC asserted the need to act quickly as its justification for not submitting the Mask Requirement for congressional review, there is not an emergency exception under CRA.  An agency may, however, invoke the CRA's good cause exception and provide for a rule to take effect immediately while still complying with the agency's statutory obligation to submit the rule to Congress for review.  With this decision, we are not taking a position on the policy of imposing a mask requirement or what steps the agency or Congress may take next; our decision only addresses CDC's compliance with CRA's procedures for congressional review.

*Edda Emmanuelli Perez*

Edda Emmanuelli Perez
General Counsel

B-333501



Plaintiffs' Exhibit 26

March 23, 2022

The Honorable Joseph R. Biden Jr.
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear Mr. President:

We appreciate your leadership throughout the COVID-19 crisis and now as the country recovers from the impacts of the pandemic. During the global health crisis, U.S. airlines have supported and cooperated with the federal government's measures to slow the spread of COVID-19. We are encouraged by the current data and the lifting of COVID-19 restrictions from coast to coast, which indicate it is past time to eliminate COVID-era transportation policies.

Our industry has leaned into science at every turn. At the outset, we voluntarily implemented policies and procedures -- mandating face coverings; requiring passenger health acknowledgements and contact tracing information; and enhancing cleaning protocols – to form a multi-layered approach to mitigate risk and prioritize the wellbeing of passengers and employees. We supported the Centers for Disease Control and Prevention (CDC) as they made some of these policies federal mandates and imposed additional measures, like predeparture testing and vaccination requirements for international travelers, in an to attempt to slow the introduction of variants into the United States.

However, much has changed since these measures were imposed and they no longer make sense in the current public health context. The persistent and steady decline of hospitalization and death rates are the most compelling indicators that our country is well protected against severe disease from COVID-19. Given that we have entered a different phase of dealing with this virus, we strongly support your view that "COVID-19 need no longer control our lives." **Now is the time for the Administration to sunset federal transportation travel restrictions – including the international predeparture testing requirement and the federal mask mandate – that are no longer aligned with the realities of the current epidemiological environment**.

### Predeparture Test Requirement

The predeparture test requirement, imposed to slow the introduction of variants into the U.S., has outlived its utility and stymies the return of international travel. The United Kingdom (UK), the European Union and Canada have recognized this reality and lifted travel restrictions. The U.S. inconsistency with these practices creates a competitive disadvantage for U.S. travel and tourism by placing an additional cost and burden on travel to the U.S. Further, many outbound travelers are not willing to risk being stranded overseas. In the Tenth Meeting of the Emergency Committee on January 19, 2022, the World Health Organization (WHO) noted that **"the failure**

March 23, 2022
Page 2

of travel restrictions introduced after the detection and reporting of Omicron variant to limit international spread of Omicron demonstrates the ineffectiveness of such measures over time."** The WHO recommended that countries consider a risk-based approach to the facilitation of international travel by lifting measures, like testing and/or quarantine requirements, for individual travelers who are fully vaccinated with COVID-19 vaccines listed by the WHO.[1] Finally, a recent study by Oxera and Edge Health that examined the effectiveness of travel restrictions in Europe concluded that such measures have failed to prevent the spread of COVID-19.[2]

### Mask Mandate

The science clearly supports lifting the mask mandate, as demonstrated by the recently released CDC framework indicating that 99 percent of the U.S. population no longer need to wear masks indoors. Several studies completed **before we had the added layer of widespread availability of vaccines**, including one from Harvard's T.H. Chan School of Public Health[3] and another from the U.S. Department of Defense[4], have concluded that an airplane cabin is one of the safest indoor environments due to the combination of highly filtered air and constant air flow coupled with the downward direction of the air. Lifting the mask mandate in airports and onboard aircraft can be done safely as England has done. Importantly, the effectiveness and availability of high-quality masks for those who wish to wear them gives passengers the ability to further protect themselves if they choose to do so. It makes no sense that people are still required to wear masks on airplanes, yet are allowed to congregate in crowded restaurants, schools and at sporting events without masks, despite none of these venues having the protective air filtration system that aircraft do.

It is critical to recognize that the burden of enforcing both the mask and predeparture testing requirements has fallen on our employees for two years now. This is not a function they are trained to perform and subjects them to daily challenges by frustrated customers. This in turn takes a toll on their own well-being.

The high level of immunity in the U.S., availability of high-quality masks for those who wish to use them, hospital-grade cabin air, widespread vaccine availability and newly available therapeutics provide a strong foundation for the Administration to lift the mask mandate and predeparture testing requirements. We urge you to do so now.

We are requesting this action not only for the benefit the of the traveling public, but also for the thousands of airline employees charged with enforcing a patchwork of now-outdated regulations implemented in response to COVID-19.

Respectfully,

---

[1] https://www.who.int/news/item/19-01-2022-statement-on-the-tenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(covid-19)-pandemic
[2] https://www.iata.org/contentassets/31f976cb5de0427cbe4a85958857a472/oxera.pdf
[3] https://npli.sph.harvard.edu/resources-2/aviation-public-health-initiative-aphi/
[4] https://www.ustranscom.mil/cmd/panewsreader.cfm?ID=C0EC1D60-CB57-C6ED-90DEDA305CE7459D

March 23, 2022
Page 3

Ben Minicucci
CEO
Alaska Air Group

W. Douglas Parker
Chairman & CEO
American Airlines

John W. Dietrich
President & CEO
Atlas Air Worldwide

Ed Bastian
CEO
Delta Air Lines

Scot Struminger
EVP & CEO, Aviation
FedEx Express

Peter R. Ingram
President & CEO
Hawaiian Airlines

Robin Hayes
CEO
JetBlue Airways

Gary C. Kelly
Chairman
Southwest Airlines

Scott Kirby
CEO
United Airlines Holdings

Brendan Canavan
President
UPS Airlines

Nicholas E. Calio
President & CEO
Airlines for America

March 23, 2022
Page 4

cc: The Honorable Pete Buttigieg, U.S. Secretary of Transportation
   The Honorable Alejandro Mayorkas, U.S. Secretary of Homeland Security
   The Honorable Gina Raimondo, U.S. Secretary of Commerce
   The Honorable Ron Klain, White House Chief of Staff
   The Honorable Steve Ricchetti, Counselor to the President
   The Honorable Jeffrey Zients, White House Coronavirus Response Coordinator
   The Honorable Brian Deese, Director of the National Economic Council

Plaintiffs' Exhibit 27

travelpulse.com

## More Than 4,000 Passengers Banned From Airlines Over Mask Mandate

2-3 minutes    May 8, 2021

Since the onset of the COVID-19 pandemic last year, and the introduction of face mask-wearing mandates aboard flights, the number of naughty passengers has increased exponentially.

But this much?

ADVERTISING

The airlines and the Federal Aviation Administration have been cracking down on unruly behavior, to the point where more than 4,000 fliers have been banned in the last year according to CBS News.

In fact, some passengers are facing fines of up to $30,000 for their activities on some flights.

Trending Now



Here's a breakdown of the top 10 U.S. carriers and the number of passengers they've banned:

– Alaska: 538 since May 11, 2020

– Allegiant: 15 since July 2, 2020

– American: does not report

– Delta: more than 1,200 since May 4, 2020

– Frontier: 830 since May 8, 2020

– Hawaiian: 106 since May 8, 2020

– JetBlue: 140 since May 4, 2020

– Spirit: 604 since May 11, 2020

– Southwest: does not report

– United: 750 since May 4, 2020

That's 4,183 without two major airlines reporting.

And we haven't even talked about the FAA fines yet. The agency has its sights set on four passengers, including one that owes more than $30,000 in penalties.

CBS noted that this includes a February 7 JetBlue flight headed to New York that had to return to the Dominican Republic after a passenger refused to wear a face mask after being asked by flight attendants to wear one. The passenger threw an empty alcohol bottle and food, cursed at crew members, grabbed one flight attendant and hit another and drank alcohol that wasn't served to her.

At least one airline said it isn't as bad as it seems.

"With the federal mandate for air travel (including airports), and our face covering policy designed to ensure to the greatest degree that issues are addressed on the ground and potential violators do not board an aircraft, we find that the great majority comply," says a statement from Allegiant. "For the most part, those few who may need a reminder in flight also comply."

# Plaintiffs' Exhibit 28



**U.S. Department of Transportation**
Office of the Secretary
of Transportation

**GENERAL COUNSEL**

1200 New Jersey Ave., S.E.
Washington, DC 20590

March 25, 2022



Dear Mr ███:

This letter is in further reference to your disability complaint regarding Frontier Airlines. We were sorry to hear of the incident and appreciate the opportunity to advise you of the outcome of our investigation. Enclosed you will find an Investigation Summary Sheet that details the results of our investigation, which was based on the Air Carrier Access Act (ACAA), 49 U.S.C. Section 41705, and our implementing rule, 14 CFR Part 382.

In particular, the Investigation Summary Sheet identifies the applicable section of 14 CFR Part 382, provides a brief summary of that section and explains this office's view on whether the carrier has violated the ACAA and 14 CFR Part 382. If your complaint raises more than one disability issue, an additional Investigation Summary Sheet has been attached to address each issue.

If we believe the complained of incident involves a violation, the Investigation Summary Sheet indicates the action that we plan to take. We will either pursue formal enforcement action or by copy of this letter notify the airline specified in your complaint of our determination and warn it that any similar incidents could lead to formal enforcement action. Generally, we will pursue enforcement action on the basis of a number of complaints from which we may infer a pattern or practice of discrimination. However, where one or a few complaints describe particularly egregious conduct on the part of a carrier and those complaints are supported by adequate evidence, we will pursue enforcement action as our resources permit. If we decide to seek enforcement action against the airline, your complaint will be among those considered in the context of this action, which may lead to the issuance of a cease and desist order and to the assessment of civil penalties. In the event that this enforcement action leads to litigation, it is possible that we may need sworn statements or witnesses for a hearing. We will advise you if, in fact, we need your further help.

For your information, in an enforcement case, the U.S. Department of Transportation is limited to issuing cease and desist orders and assessing civil penalties not to exceed $34,174 per violation. Such action can only be accomplished through settlements or formal hearings before administrative law judges. We cannot order compensation for aggrieved parties. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based on private contract rights or on civil rights statutes that provide for a private right of action.

If we have insufficient evidence or it appears that the airline specified in your complaint has not violated the ACAA, we will not pursue enforcement action. Notwithstanding our decision not to pursue enforcement action, however, private legal action may be pursued in the courts based on private contract rights or on civil rights statutes that provide for a private right of action and, in such a proceeding, monetary damages may be sought.

Regardless of whether the airline has been determined to have violated the ACAA, we have entered your complaint in our computerized industry monitoring system, and the carrier's ACAA complaint totals in our monthly *Air Travel Consumer Report* reflect your complaint. Our monthly report is made available to the

aviation industry, the news media and the general public so that both consumers and air travel
companies can compare the overall complaint records of individual airlines, as well as the number of
disability complaints filed against particular carriers.  This system also serves as a basis for rulemaking,
legislation, and research.

Moreover, we also routinely monitor our complaint records to determine the extent to which carriers are
in compliance with the ACAA and to track trends or spot areas of concern which we feel may warrant
further action.  This ongoing process also enables us to ensure prompt corrective action whenever we
determine that an airline's policies or procedures are not in compliance with our ACAA regulations.  Your
complaint will be among those considered in the context of this overall process.

I hope this further information is useful.  Thank you again for taking the time to contact us.

Sincerely,

Livaughn Chapman, Jr.
Deputy Assistant General Counsel
  for Aviation Consumer Protection

/s/

By: Clereece Kroha
Senior Trial Attorney

Enclosures
cc: Frontier Airlines

# Plaintiffs' Exhibit 29

allegiantair.com

## Contract of Carriage | Allegiant Air

55-69 minutes

---



Effective on and after May 20, 2021

Passenger transportation by Allegiant Air, LLC. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on or in any Ticketless Travel Confirmation, specified on Carrier's Internet site with respect to electronic ticketing, or published in Carrier's schedules. By purchasing or accepting transportation, the passenger agrees to be bound thereby.

Review Allegiant's Terms and Conditions on ticketing, non-refundability, baggage and check-in.

Review Allegiant's Luggage Limitations of Liability

Review Allegiant's Notice - Overbooking of Flights

### 1. Definitions

Baggage means all luggage, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, typewriters, and similar articles, whether carried by the passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the passenger in the passenger cabin, will not be considered as baggage.

Baggage tag/Baggage Check means a document issued by Carrier solely for identification of checked baggage, a portion of which (Tag) is affixed by Carrier to a particular article of checked baggage for routing purposes and a portion of which (Check) is given to the passenger for the purpose of claiming the baggage.

Carriage means the transportation of passengers and/or baggage by air, gratuitously or for hire, and all services of Carrier incidental thereto.

Carrier means Allegiant Air, LLC.

Checked baggage means baggage of which Carrier takes sole custody and for which Carrier has attached a baggage tag(s) and/or issued a baggage check(s).

Individual with a disability means a person who:

1. has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities;

2. has a record of such an impairment; or

3. is regarded as having such impairment, as further defined in U.S. Department of Transportation regulations at 14 C.F.R. § 382.3.

Nonstop flight means a flight scheduled to operate between the origin and destination points without intermediate stops.

One–way means travel from one point to another on Carrier's scheduled air service assigned for travel between the two points.

Passenger means any person, except members of the crew, carried or to be carried in an aircraft with the consent of Carrier.

Qualified individual with a disability means an individual with a disability who:

1. with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares, or policies, takes those actions necessary to avail himself or herself of facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by Carrier;

2. with respect to obtaining air transportation on Carrier, offers, or makes a good faith attempt to offer, to purchase or otherwise to validly obtain air transportation; or

3. with respect to obtaining air transportation or other services or accommodations, as provided by U.S. Department of Transportation regulations on Nondiscrimination on the Basis of Disability in Air Travel, 14 C.F.R. Part 382:

1. purchases or possesses a valid Ticketless Travel Confirmation for air transportation on Carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the Confirmation has been purchased or obtained;

2. meets reasonable, nondiscriminatory requirements of this Contract of Carriage applicable to all passengers; and

3. whose carriage will not violate the requirements of the Federal Aviation Regulations or jeopardize the safe completion of the flight or the health or safety of other persons.

Roundtrip means travel from one point to another and return to the first point.

Scheduled air service means any flight scheduled in the current edition of the Official Airline Guide (OAG), Carrier's published schedule, Carrier's Internet site, or the computer reservation system used by Carrier.

Ticketless Travel Confirmation means the electronically–recorded information in Carrier's computer reservation system that provides for the carriage of the passenger occupying a single seat and his or her baggage.

Unchecked baggage is baggage other than checked baggage.

**2. Not Used**

**3. Application of Conditions**

The terms and conditions contained in this Contract of Carriage shall govern the application of all fares, rates, and charges published by Carrier and will apply only to Carrier's routes and services. No agent, servant, or representative of Carrier has authority to change or waive any provision of this Contract of Carriage unless authorized by a corporate officer of Carrier.

**4. International Travel**

In the event that any passenger purchasing transportation on Carrier may be determined to be in international transportation under the Montreal Convention, Carrier's liability in the event of a passenger's death or bodily injury is limited, in most cases, to proven damages not to exceed 128,821 Special Drawing Rights per passenger, with liability up to this limit not dependent upon negligence on the part of Allegiant.

**5. Electronic Surveillance of Passengers and Baggage**

Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent or knowledge.

**6. – 9. Not Used**

**10. Refusal to Transport**

Carrier will refuse to transport, or will remove from an aircraft at any point, any passenger in the following circumstances:

A. Safety and Government Request or Regulation – Whenever such action is necessary for reasons of aviation safety or to comply with any Federal Aviation Regulation or other applicable U.S. or foreign government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense, or whenever

such action is necessary or advisable by reason of weather or other conditions beyond Carrier's control (including, without limitation, acts of God, force majeure, strikes, civil commotions, embargoes, wars, hostilities, or disturbances, whether actual, threatened, or reported).

B. Search of Passenger or Property – Any passenger who refuses to permit the search of his or her person or property for explosives or a concealed, deadly, or dangerous weapon or article.

C. Proof of Identity – Any passenger who refuses on request to produce positive identification.
NOTE: Carrier shall have the right to require, but shall not be obligated to require, positive identification of persons purchasing ticketless travel and/or presenting a Ticketless Travel Confirmation for the purpose of boarding aircraft.

D. Special Medical Requirements – Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Carrier's aircraft: medical oxygen for use onboard the aircraft, incubators, respiratory assistance devices that must receive power from the aircraft's electrical power supply, or persons who must travel on a stretcher. The user must have a sufficient power supply during the flight to power the device, including a conservative estimate of any unanticipated delays. Spare lithium batteries for POCs are prohibited from being carried in checked baggage. Devices may not be charged using on-board power outlets.

E. Qualified Individuals with a Disability – Carrier will transport qualified individuals with a disability in accordance with the conditions and requirements of U.S. Department of Transportation regulations, 14 C.F.R. Part 382, unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 CFR § 382.27, Carrier requires 48 hour minimum advance notice and 1 hour advance check–in for a qualified individual with a disability who wishes to receive the following services available on the carrier's flights: (1) Provision by the carrier of hazardous material packaging for a battery for a wheelchair or other assistive device, (2) Accommodations for a group of ten or more qualified individuals with a disability, who make reservations and travel as a group, (3) Provision of an on–board wheelchair on aircraft that does not have an accessible lavatory. However, pursuant to 14 C.F.R. § 382.113, Carrier will not provide certain extensive in–flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, Carrier may require that a qualified individual with a disability be accompanied by an attendant as a condition of being provided air transportation in the following circumstances:

1. When the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from Carrier's Employees, including the safety briefing required by 14 C.F.R. §§ 121.571(a)(3) & (a)(4);

2. When the individual has a mobility impairment so severe that the individual is unable to assist in his or her own evacuation of the aircraft; or

3. When the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with Carrier's Employees adequate to permit transmission of the safety briefing required by 14 C.F.R. §§ 121.571(a)(3) & (a)(4)—and to enable the individual to assist in his or her own evacuation of the aircraft in the event of an emergency.
If Carrier determines that an individual meeting the criteria of Article 10.E. (1), (2), or (3) above must travel with an attendant, contrary to the individual's self–assessment that he or she is capable of traveling independently, Carrier will not charge the individual with the disability for the transportation of the attendant while accompanying such individual. Furthermore, if, because there is not a seat available on a flight for an attendant whom Carrier has determined to be necessary, an individual with a disability having a confirmed reservation is unable to travel on the flight, such individual will be eligible for denied boarding compensation under Article 105 below. For purposes of determining whether a seat is available for an attendant, the attendant shall be deemed to have checked in at the same time as the individual with the disability.

F. Comfort and Safety – Carrier may refuse to transport or remove from the aircraft at any point any passenger in the following categories as may be necessary for the comfort or safety of such passenger or other passengers:

1. Persons whose conduct are or have been known to be disorderly, abusive, offensive, threatening, intimidating, or violent;
NOTE: Carrier will not refuse to provide transportation to a qualified individual with a disability solely because the individual's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

2. Persons who are barefoot (other than infants);

3. Persons who are unable to occupy a seat with the seat belt fastened;

4. Persons who appear to be intoxicated or under the influence of drugs;

5. Persons who are known to have a contagious disease, if the Carrier determines the person's condition poses a direct threat as defined in 14 CFR § 382.3;

6. Persons who have an offensive odor, except where such condition is the result of a qualified disability;

7. Persons who have clothing/attire/accessories that are deemed patently offensive or obscene by other passengers and choose not to remove, change or cover the article(s).

8. Persons who wear or have on or about their persons concealed or unconcealed deadly or dangerous weapons; provided, however, that Carrier will carry passengers who meet the qualifications and conditions established in Federal Aviation Regulation, 14 C.F.R. § 108.11;

9. Manacled persons in the custody of law enforcement personnel; persons brought into the airport in manacles; persons who have resisted escorts; or escorted persons who express to Carrier's Employees an objection to being transported on the flight;

10. Persons who have misrepresented a condition which becomes evident upon arrival at the airport, and the condition renders the passenger unacceptable for carriage;

11. Infants fourteen (14) days of age or younger, unless approved for carriage in writing by an attending physician; or

12. Persons who are unwilling or unable to abide with Carrier's non–smoking rules.

Disposition of the fare of any passenger denied transportation or removed from Carrier's aircraft enroute under the provisions of Article 10 is governed by Article 90 of this Contract of Carriage.

**11. – 14. Not Used**

**15. Ticketless Travel Confirmation – General**

A. No person shall be entitled to transportation except upon presentation of a valid Ticketless Travel Confirmation or proof of identification acceptable to Carrier that transportation has been purchased through Carrier's electronic ticketing or Ticketless travel systems. Such electronic ticketing documentation shall entitle the person to transportation only between the points of origin and destination.

B. A Ticketless Travel Confirmation is valid for 365 calendar days from the date of issue, except as noted below:

1. Ticketless Travel Confirmations issued with fare restrictions, i.e., nonrefundable fares, are valid only on the flight and date shown on the Ticketless Travel Confirmation. If a Customer purchases transportation with fare restrictions but chooses not to travel on the flight and date for which the Ticketless Travel Confirmation is issued, the fare paid may, within 365 calendar days from the date of purchase, be applied toward the purchase of another Ticketless Travel Confirmation; however, the new Confirmation may be subject to a change fee and be more expensive or subject to different terms, conditions, or restrictions. No cash refund or credit card adjustments will be made for Ticketless Travel

Confirmations with fare restrictions.

C. Ticketless Travel Confirmations are not transferable unless specified thereon, but Carrier is not liable to the owner of a Confirmation for honoring or refunding such Confirmation when presented by another person.

**16. – 19. Not Used**

**20. Reservations**

A. A reservation on a given flight is valid when the availability and allocation of space is confirmed by a Reservations Sales Agent of Carrier or upon issuance of a Ticketless Travel Confirmation number, and the passenger's name is entered into Carrier's reservations system.

B. Airport check–in time limits: Carrier may cancel the reservation of any passenger who fails to check–in at least 45 minutes and arrive at the boarding gate at least 30 minutes before the scheduled departure time of the flight for which the reservation was made.

C. Carrier will refuse to carry any person when such refusal is necessary to comply with an applicable governmental regulation.

D. When a roundtrip or multi–segment reservation has been made and the passenger fails to claim his or her reservation for the first portion of the trip, Carrier reserves the right to cancel the return or continuing portions of the passenger's reservation for purposes of reservation inventory management.  Carrier does not prohibit or penalize what is commonly known as "back–to–back" or "hidden–city" ticketing.

**21. Groups Policies**

A. Groups of ten (10) or more will need to be booked on multiple reservations.

**22. – 24. Not Used**

**25. Ground Transportation**

Carrier does not assume responsibility for the ground transportation of any passenger or his or her baggage between any airport used by Carrier and any other location. Ground transportation is at the passenger's risk and expense. An exception to this article is if, for reasons outside Carrier's control, the Carrier is unable to land at the airport of the scheduled destination and is diverted to another airport as described in article 85.G.

**26. – 29. Not Used**

**30. Application of Fares – General**

A. Transportation is subject to the fares and charges in effect on the date on which such Ticketless Travel Confirmation was issued. If a Ticketless Travel Confirmation has been issued before an increase in the fare becomes effective, it shall be honored for transportation between the points, and at the class of service, for which it was purchased. The only exception for a post-purchase price increase would apply if the full amount of the itinerary has not yet been paid. This includes, but is not limited to, an increase in the price of seats, an increase in the price for the carriage of passenger baggage, an increase in an applicable fuel surcharge, or an increase in a government-imposed tax or fee. Fares may fluctuate and are subject to change without notice. No refunds or airline system credits will be provided after a reservation has been made through Customer Care. However, customer can make changes to reservations online at www.allegiantair.com.

B. Fares are published in Carrier's reservations system and may be obtained from an Allegiant Air Reservations Sales Agent by telephone at (702) 505-8888 on Carrier's Internet site at www.allegiantair.com, or through an authorized travel agent. Some travel agencies, however, may impose an additional charge for this service.

C. All published fares and charges are stated in U.S. currency.

D. No stopovers are permitted on published fares, except upon combination of local fares.

**31. – 34. Not Used**

**35. Carriage of Children**

A. Children Under Two (2) Years of Age – One child under two (2) years of age, not occupying a seat, will be carried without charge when accompanied by a fare–paying passenger fifteen (15) years of age or older. Carrier cannot guarantee that an unoccupied seat will be available for any child traveling without charge and without a confirmed reservation. Proof of age, such as a birth certificate, is required. Safety seats for children without a confirmed reservation may have to be transported as checked baggage if unoccupied seats are not available.

B. Children under two (2) years of age traveling on a confirmed reservation, with or without the use of a safety seat, will be charged the applicable fare.

C. Unaccompanied Minor Children
1. Carrier does not accept reservations for carriage of fare-paying Unaccompanied Minors or unescorted children under the age of fifteen (15) years.

2. Children fourteen (14) years and younger must be accompanied by an adult fifteen (15) years or older.

3. Special supervision for any travelers is not offered.

D. Responsibilities of Carrier – Carrier assumes no responsibilities for travelers fifteen (15) to seventeen (17) years old beyond those applicable to adult passengers.

E. In the case of a flight for which Carrier has issued a weather advisory, Carrier will refuse carriage to any passenger under the age of 18 if not traveling with a passenger age 18 or older.  Carrier will provide passengers refused carriage under this provision transportation on Carrier's next flight to passenger's destination that is not subject to a weather advisory and on which space is available, or a refund of the unused portion of passenger's fare in accordance with Article 90 below.  A "weather advisory" is issued by Carrier and notified to passengers when weather conditions may prevent the flight from landing at the planned destination because airport conditions or visibility fall below FAA or Carrier safety requirements, meaning Carrier may be unable to operate the flight or may have to land at an alternate airport.

**36. Not Used**

**37. – 41. Not Used**

**42. Internet Fares**

Special promotional fares may be available via the Internet on Carrier's website (Internet address: www.allegiantair.com). Seat availability, fares, and fare restrictions are published in the website presentation.

**43. Stopovers**

A. Carrier's local fares for a flight or flights between a passenger's point of origin and destination shall apply only to published nonstop flights, except as provided in Article 85.A. below.

B. A stopover shall occur when a passenger arriving at an intermediate or connection point on his or her itinerary fails to depart from such intermediate point on the published connecting flight to the passenger's next intermediate or destination. In the event of a single stopover, the passenger's fare shall be the sum of the appropriate local fares between the point of origin and stopover and the appropriate local fare between the point of stopover and destination. In the event of multiple stopovers, the passenger's fare shall be the sum of:

1. the appropriate local fare between the point of origin and first stopover; plus

2. the appropriate local fare(s) between each stopover point and the next subsequent stopover point, if any; plus

3. the appropriate local fare(s) between the point of last stopover and destination.

**44. Not Used**

**45. Acceptance of Baggage – General**

A. Inspection – All baggage tendered to Carrier for transportation is subject to inspection by Carrier.

B. Acceptance – Carrier will accept as baggage such personal property as is necessary or appropriate for the wear, use, comfort, or convenience of the passenger, as the personal property of the fare–paying passenger and not intended for sale to other persons, subject to the following conditions:

1. Carrier will refuse to accept baggage for transportation on any flight other than the flight on which the passenger is transported;

2. Carrier will refuse to accept any baggage for transportation if it or its contents cannot withstand ordinary handling, or if its weight, size, or character renders it unsuitable for transportation on the particular aircraft on which it is to be carried, unless the passenger releases Carrier from liability;

3. Each piece of baggage tendered to Carrier for carriage must have affixed thereto a current identification tag or label with the passenger's name, address, and telephone number (if available);

4. With the exception of wheelchairs, other mobility aids, and assistive devices used by an individual with a disability, Carrier will not accept as baggage any item having outside measurements (i.e., the sum of the greatest outside length plus the greatest outside height plus the greatest outside width) that exceed eighty (80) inches, or that weigh more than forty (40) pounds, except as provided in Article 65 below;

5. Carrier will refuse to accept baggage that, because of its nature, contents, or characteristics (such as sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to passengers or Carrier's Employees, damage to aircraft or other equipment, or damage to other baggage; and

6. Carrier will not accept baggage that cannot safely be carried in the baggage compartment of the aircraft.

**46. Carry–on Baggage**

A. Carrier will determine whether or not any baggage of a passenger, because of its weight, size, contents, or character, may be carried in the passenger cabin of the aircraft. Each item of carry–on baggage may have external dimensions no larger than nine inches by fourteen inches by twenty-two inches (9 in. x 14 in. x 22 in.). All carry–on baggage must be stowed underneath a seat or in an overhead compartment. Hard–sided items (i.e.,

those with inflexible surfaces) may be placed only on the floor of the overhead compartment (i.e., not on top of other items in the compartment) or underneath a seat. Carry–on baggage is the sole responsibility of the passenger. Claims for damaged, lost, forgotten, or stolen carry–on baggage will not be accepted by Carrier. Allegiant Air will charge a fee for a carry-on bag as well as for items intended to carry–on board the aircraft, but which exceed the specified dimensions, and/or require the services of gate checking at the aircraft door.

B. In accordance with FAA/TSA Security Directives, passengers are restricted to one (1) item of carry–on baggage that does not exceed external dimensions of nine inches by fourteen inches by twenty-two inches (9 in. x 14 in. x 22 in.) (e.g., roll–aboard bag, garment bag, tote bag) plus one smaller personal–type item (e.g., purse, briefcase, laptop computer, small backpack), not to exceed external dimensions of seven inches by fifteen inches by sixteen inches (7 in. x15 in. x16 in.), provided that such items are capable of being carried onboard the aircraft by one person without assistance and are capable of being stowed in an overhead compartment or completely underneath a seat. If requested, qualified individuals with a disability will be provided assistance by Carrier's Representatives in loading, stowing, and retrieving carry–on items, including authorized assistive devices. Carrier reserves the right to further restrict the size and number of carry–on items.

C. In addition to the carry-on baggage allowance provided herein, items such as reading material, food for en route consumption, a diaper bag, a small camera, and a coat, jacket, wrap, or similar outer garment, may be carried onboard the aircraft.

D. Mobility and other assistive devices authorized for carriage in the aircraft cabin upon which a qualified individual with a disability is dependent may be carried in addition to the two (2) item cabin baggage allowance.

E. Unless unoccupied seats are available on a flight, Carrier requires a reservation and purchase of transportation at the appropriate fare to ensure that a safety seat or infant seat may be used during flight. Only federally–approved and labeled safety seats or infant seats are permitted for use aboard Carrier's aircraft. Federal regulations prohibit the use of child booster seats and harness–type or vest–type restraining devices, except for the AmSafe Aviation CARES.

F. The following conditions apply to acceptance for carriage in the aircraft passenger cabin of bass violas, cellos, guitars, and other musical instruments, and electronic, computer, and audio/video equipment and parts thereof, whose size prevents such instruments or equipment from being handled as normal carry–on baggage:

1. the instrument or equipment must be contained in a case;

2. a reservation must be made for the instrument or equipment at the applicable fare;

3. the instrument or equipment must be secured in the first window seat aft of a floor–to–ceiling bulkhead. Such seats are limited in availability.

G. Carrier will refuse to transport items of carry–on baggage that may be harmful or dangerous to a passenger, the flight crew, or the aircraft.

**47. Live Animals – Pets**

*A. General Rules and Conditions*

The passenger assumes full responsibility for the conduct of his or her accompanying pet. In the event Allegiant incurs any loss, damage, delay, expense or legal liability of any kind in connection with the transport of such animal, ***the passenger accepts full responsibility for same and will reimburse Allegiant for the full amount of such loss, damage, delay, expense or legal liability incurred by Allegiant***.

Transportation of animals in the aircraft cabin must meet the following conditions:

- Allegiant will transport live animals only in the passenger cabin on flights within the contiguous 48 United States.

- All animals must be at least eight (8) weeks of age.

- Allegiant will not transport animals as checked baggage. Pets that can be carried on board include domestic dogs and cats only, and the pet must be transported in a hard-sided or soft-sided, leak-proof carrier that can fit under a seat.

- Pets must remain in the carrier at all times in the airport gate area and while aboard the aircraft. If a passenger does not comply, the animal may be denied boarding for future flights.

- All pet carriers may not exceed external dimensions of nine inches by sixteen inches by nineteen inches (9 in. X 16 in. x 19 in.).

- An Allegiant representative at the departure airport will determine if there is adequate room in the carrier for any pet. In the event of a disagreement, the Allegiant representative's decision will control.

- Animals cannot be ill or in distress.

- There is a non-refundable fifty dollar ($50.00) fee for each one-way flight for a pet carrier.

- Customers with animals in a carrier may not occupy a bulkhead row, an exit row, or the rows in front of or behind an exit row.

- Pets or pet carriers may NOT be placed in or strapped into a passenger seat and must be placed under the seat directly in front of the passenger bringing the pet. All animals are

required to be harmless, non-disruptive and odorless.

- Passengers with a pet carrier may bring one personal item, not to exceed exterior dimensions of 7 in. x 15 in. x 16 in. (17.8 cm x 38.1 cm x 40.6 cm), which may be stored in the overhead bin space free of charge.

- Passengers who choose to bring a carry-on bag along with a pet carrier, will be charged accordingly for the carry-on bag and must ensure that the carry-on bag does not exceed exterior dimensions of 9 in. x 14 in. x 22 in. (22.9 cm x 35.6 cm x 55.9 cm).

- Allegiant assumes no responsibility for the health or well-being of pets before, during or after a flight.

### 48. Service Animals

#### 48.1. General Rules and Conditions

The passenger assumes full responsibility for the conduct of his or her accompanying service animal(s). In the event Allegiant incurs any loss, damage, delay, expense or legal liability of any kind in connection with the transport of such animal, *the passenger accepts full responsibility for same and will reimburse Allegiant for the full amount of such loss, damage, delay, expense or legal liability incurred by Allegiant*.

#### 48.2 Service Animals

A service animal is a dog, regardless of breed or type, that is individually trained to do work or perform task for the benefit of a qualified individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. To assist Allegiant in verifying the training of the animal and determining whether the service animal poses a direct threat to the health or safety of others, Allegiant requires the following form to be fully completed and emailed or mailed to Allegiant at least 48 hours prior to scheduled departure. If travel is purchased within 48 hours of scheduled departure, the passenger must present the fully completed form to an Allegiant representative at least 30 minutes prior to departure.

U.S. Department of Transportation Service Animal Air Transportation Form

#### 48.4 Animal Transport and Miscellaneous

1. Allegiant only permits domestic dogs that are being used as service animal(s) by individuals with disabilities to accompany such individuals in the aircraft cabin at no charge.

2. Allegiant permits a service animal to accompany a qualified individual with a disability at either a bulkhead seat or a seat other than a bulkhead seat, as the individual prefers, unless the animal obstructs an aisle or other area that must remain unobstructed in order

to facilitate an emergency evacuation. All seating accommodation requests must be made at least 24 hours prior to scheduled departure. If a seat request is made within 24 hours of scheduled departure, Allegiant will make a reasonable effort to accommodate the request without displacing another passenger.

3. Passengers are limited to two (2) fully trained service animals if required to perform work or tasks directly related to the passenger's disability. All such animal(s) must remain under the control of the passenger at all times and be leashed, harnessed or tethered to the passenger at all times.

4. All animals are required to fit within the foot space of the disabled passenger and are prohibited from encroaching on the foot space of another passenger. If the animal encroaches on another passenger's foot space, the disabled passenger may be required to purchase a second seat to accommodate the animal. Animals are prohibited from occupying a seat and from sitting on or eating off of tray tables. Allegiant reserves the right to deny the transport of any animal that is improperly cleaned and/or has a foul odor, that appears to be ill or in physical distress, or that in the judgment of an Allegiant representative at the departure airport poses a direct threat to the health or safety of others.

5. Service animals in-training and Law Enforcement/Search and Rescue dogs may be considered for by Allegiant for transport on a case-by-case basis. Allegiant requires at least 72 hours prior notification and submission of any supporting documentation requested by Allegiant.

6. All animals are expected to be trained to behave in a public setting. Per the Code of Federal Regulations, Title 14, Part 382 (administered by the U.S. Department of Transportation), Allegiant reserves the right to deny transport to any animal displaying disruptive behavior, such as, but limited to:

1. Growling, snarling, biting, attempting to bite or acting in an aggressive manner

2. Running around or jumping on other passengers

3. Relieving itself in the airport terminal or in the aircraft cabin

4. Barking excessively (other than alerting passenger as trained)

If a passenger or a fully trained service animal does not meet the requirements of this Article 48, Allegiant reserves the right to deny boarding and/or transport of the animal.

**49. – 54. Not Used**

**55. Checking of Baggage**

A. Carrier will accept baggage for checking from a fare–paying passenger when tendered to

Carrier no earlier than two (2) hours in advance of flight departure time at Carrier' s airport ticket counter or curb–side check–in station, or at an earlier time on the day of commencement of travel as may be authorized by Carrier's Employees at the departure airport. Carrier will not check baggage tendered:

1. to a point beyond the destination indicated on the passenger's Ticketless Travel Confirmation;

2. to an intermediate stop or connection point;

3. for a flight to be operated on a later date.

**56. – 59. Not Used**

**60. Checked Baggage Allowance**

Upon presentation of a bag to be checked by a fare–paying passenger of a valid Ticketless Travel Confirmation, a checked baggage fee will apply.

Each piece of sporting equipment will be considered a checked bag with all applicable fees applied per person, per bag, per segment. All Baggage Fees are non-refundable except as provided in Article 65 below. Each bag must weigh 40 lbs or less and the outside measurements of each bag must not exceed eighty (80) inches. Applicable fees will be applied for those bags exceeding the weight and size limits. The total number of bags allowed may not exceed 5 per passenger.

- Firearms – Carrier will not accept assembled firearms and ammunition for transportation except as follows:

1. All passengers must declare their firearm at time of check-in.

2. Passengers must be 18 years of age to check a firearm.

3. Firearms and ammunition cannot be carried on board the aircraft but are accepted in checked baggage only.

4. Firearms must be unloaded and encased in a locked, hard-sided container acceptable to Allegiant for withstanding normal checked baggage handling without sustaining damage to the firearm. Only the individual checking the baggage should retain the key or combination.

1. Firearm parts, including magazines, clips, bolts and firing pins, are prohibited in carry-on baggage, but may be transported in checked baggage.

2. Replica firearms, including firearm replicas that are toys, may be transported in checked baggage only.

3. Rifle scopes are permitted in carry-on and checked baggage.

5. There is no limit to the number of firearms or corresponding accessories a passenger can carry in the locked hard-sided container.

1. Carrier will accept no more than a total gross weight of eleven (11) pounds of ammunition per passenger

2. Oversize / overweight restrictions still apply.

3. Ammunition must be in the manufacturer's original container or equivalent fiber, wood, or metal container specifically designed to carry ammunition, including removed handgun magazine. This carrier must provide sufficient cartridge separation.

- If a mobility aid or assistive device, upon which a passenger who is a qualified individual with a disability is dependent, cannot be carried in the passenger cabin due to space limitations, such aid or device will be checked and carried in addition to the 2 piece maximum without charge.

**61. – 64. Not Used**

**65. Excess Baggage Charges**

A. Application – Excess baggage charges specified in this Article will be applicable from the point at which the baggage is accepted to the point to which the baggage is checked.

B. Charges:

1. Baggage in excess of the five (5) bag maximum specified in Article 60 above will incur a charge of fifty dollars ($50.00) per piece per segment.

2. Baggage in excess of eighty (80) inches but not more than one hundred fifteen (115) inches (sum of outside length plus outside height plus outside width) will incur an oversize charge of seventy–five dollars ($75.00) per item in addition to the assessed Baggage Fee.

3. Baggage weighing between forty–one (41) and seventy (70) pounds will be accepted as checked baggage for an excess weight charge of fifty dollars ($50.00) per item in addition to the assessed Baggage Fee. Baggage weighing between seventy–one (71) and ninety-nine (99) pounds will be accepted as checked baggage for an excess weight charge of seventy–five dollars ($75.00) per item in addition to the assessed Baggage Fee.

C. No baggage more than 99 lbs. will be accepted.

**66. – 74. Not Used**

**75. Baggage – Limitation of Liability**

A. The liability, if any, of Carrier for loss of, damage to, or delay in the delivery of checked or unchecked baggage and/or its contents, with the exception of wheelchairs, mobility aids,

and assistive devices used by an individual with a disability, is limited to the proven amount of damage or loss, but in no event shall be greater than three-thousand, eight-hundred dollars ($3,800) Domestic or 1,288 Special Drawing Rights International per fare-paying passenger. Carrier will compensate the passenger for reasonable, actual and documented damages incurred as a result of the loss of, damage to, or delayed delivery of such baggage up to the limit of liability or declared valuation, whichever is higher, provided the passenger has exercised reasonable effort to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage.

B. Carrier will be liable for such personal property only for the period in which it is in the custody of Carrier. While every reasonable effort will be made to return items inadvertently left behind by passengers onboard an aircraft, Carrier assumes no custody or responsibility for property carried onboard an aircraft by a passenger.

C. Carrier's liability with respect to damage to wheelchairs, other mobility aids, and assistive devices upon which an individual with a disability is dependent shall be the documented cost of repair. If a wheelchair, mobility aid, or assistive device is lost or irreparably damaged, the criteria for calculating the compensation for a lost, damaged, or destroyed wheelchair or other assistive device shall be the original purchase price of the device without depreciation. Carrier will also compensate the passenger for other reasonable expenses incurred as a result of the loss of, damage to, or delayed delivery of the wheelchair, mobility aid, or assistive device.

D. Carrier assumes no responsibility and will not be liable for money, jewelry, cameras, photographic, video and electronic equipment (including computers), silverware, natural fur products, precious gems and metals, medication, negotiable papers, securities, business documents, samples, items intended for sale, paintings and other works of art, antiques, collectors' items, photographs, artifacts, antiques, heirlooms, manuscripts, furs, keys, spirits, irreplaceable books or publications, and similar valuables, except for claims arising from international flights covered by the Montreal Convention. Carrier discourages the foregoing items being placed in checked baggage.

**76. Fragile and Perishable Items as Baggage**

Carrier may, but is not obligated to, conditionally accept previously damaged, improperly packed, fragile, or perishable items for carriage as checked baggage subject to the passenger's assumption of risk for damage to or destruction of such items. Fragile or perishable items will not be accepted as checked baggage unless they are properly packed in an original factory–sealed carton or case designed for shipping such items and if the item does not pose a risk of damage to other checked baggage.

**77. – 79. Not Used**

**80. Claims**

A. In the case of loss of, damage to, or delay in delivery of baggage, no claim will be entertained by Carrier unless preliminary written notice of such claim is presented to Carrier at the airport, within four (4) hours after arrival of the flight on which the loss, damage, or delay is alleged to have occurred or within twenty-four (24) hours for missing contents. The preliminary notice may thereafter be amended in writing; however, such amended claim must be presented to Carrier no later than twenty–one (21) days after the occurrence of the event giving rise to the claim.

B. Failure to provide notice within the foregoing time limits will not bar a claim if the claimant establishes to the satisfaction of Carrier that he or she was unable, through no fault or omission of the claimant, to provide notice within the specified time limits.

C. To the maximum extent permitted by law, no legal action on any claim described above may be maintained against Carrier unless commenced within one (1) year of Carrier's written denial of a claim, in whole or in part.

**81. Class Action Waiver**

Any person who purchases air transportation and/or any ground accommodation or service from Carrier agrees, on behalf of such purchaser and anyone on whose behalf he or she makes such a purchase, that any lawsuit brought against Carrier, any of its affiliated entities, or any of its agents, directors, employees or officials related to this Contract of Carriage, any air transportation and/or ground accommodation or service purchased from Carrier, or any use of or dealings with Carrier's website shall be brought only in an individual capacity, and shall not be brought in or asserted as part of a class action proceeding. Purchaser warrants that all persons described in the foregoing sentence are bound thereby and by all other provisions of this Contract of Carriage.

**82. Smoking**

Smoking aboard Carrier's aircraft is prohibited by federal law.

**83. Health Risks**

An inherent risk of air travel is the possibility that one or more passengers on a flight may have a communicable disease, and that one or more other passengers may contract the disease. This could include Covid-19 or other serious disease. Despite the efforts of Carrier, public health authorities and others to minimize the spread of disease, Carrier can offer no assurance that a passenger will not contract a viral or other disease while aboard

an aircraft operated by Carrier or while using airport facilities utilized by Carrier. Accordingly, you hereby agree on behalf of yourself and anyone on whose behalf you make a purchase from Carrier, that neither Carrier nor any of its agents, directors, employees, officials or affiliated entities shall have any liability whatsoever in respect of disease, however contracted.

**84. Photos & Videos Onboard**

The use of small cameras or mobile devised for photography and video is permitted onboard provided you keep the purpose of your photography and video to capturing personal events. Photographing or recording other customers or airline personnel without their express consent is prohibited. Airline personnel reserve the right to prohibit photos and videos onboard the aircraft if it becomes a disturbance to them or other passengers.

**85. Failure to Operate as Scheduled**

A. This article covers:

1. Canceled Flights (both voluntarily changed by the carrier and for reasons beyond the carrier's control)

2. Late or Irregular Operations (both voluntarily changed by the carrier and for reasons beyond the carrier's control)

3. Schedule Changes

B. Cancel/Delay reasons beyond the carrier's control include, but are not limited to, acts of God, governmental actions, fire, weather, mechanical difficulties, Air Traffic Control, strikes or labor disputes, or inability to obtain fuel for the flight in question.

C. Carrier shall use its best efforts to notify all affected passengers promptly of planned schedule changes and service withdrawals.

D. If Carrier delays, cancels, or fails to operate any flight according to Carrier's published schedule, provided in the case of delay that the delay is significant, Carrier will, at the request of a passenger confirmed on an affected flight:

1. transport the passenger on another of Allegiant's flights on which space is available at no additional charge; or

2. refund the unused portion of the passenger's fare in accordance with Article 90 below; or

3. in the case of a schedule change made voluntarily by Carrier, and provided the schedule change is significant, refund the unused portion of the passenger's fare in accordance with Article 90 below.

E. Carrier shall not be liable for any consequential damages or incidental costs incurred by

the passengers such as, but not limited to, loss of wages/income/salaries/emotional distress that arise from the failure or delay in operating any flight.

F. Carrier will attempt to transport passengers and their baggage promptly and as scheduled. Flight schedules, however, are subject to change without notice, and the times shown in or on Carrier's published schedules and advertising are not guaranteed. At times, without prior notice to passengers, Carrier may need to substitute other aircraft, airlines or means of transportation and may change, add, or omit intermediate or connecting stops. Carrier cannot guarantee that passengers will make connections to other flights of its own or those of other airlines. In the event of flight schedule changes, Carrier will attempt to notify affected passengers as soon as possible at the airport or en route.

G. If a flight is unable to land at the destination airport and is diverted to another airport, the carriage by air shall, unless the aircraft continues to the original destination, be deemed to be completed when the aircraft arrives at the diversion airport. Carrier may, however, arrange or designate alternative transportation, whether by Carrier's own service or by other means of transportation specified by Carrier (which may include ground transportation) to transport passengers to the original destination without additional cost. Exceptions may include situations where alternative transportation is prevented by safety concerns. When alternative transportation to the original destination is provided by or at the direction of Carrier, any arrangements made by one or more passengers on their own will not be paid for or reimbursed by Carrier and are at the passengers' own risk.

**86. – 89. Not Used**

**90. Refunds**

A. Nonrefundable fares – Nonrefundable fares are not eligible for refunds, except as provided in Articles 85.A above and 90.B.through 90.D. below.

B. Flight terminations or involuntary cancellations – If a passenger's scheduled transportation is canceled, or terminated before the passenger has reached his or her final destination as a result of a flight cancellation or omission of a scheduled stop, Carrier will, at the passenger's option, transport the passenger on another of Carrier's flights on which space is available at no additional charge, or refund the fare for the unused transportation, or provide a credit voucher for such amount toward the purchase of future travel.

C. Denied boarding – If Carrier denies boarding or removes a passenger from an aircraft under conditions described in Article 10 (except Articles 10.B, 10.C, and 10.F) or Article 35.F above, Carrier will refund the fare paid for the unused portion thereof. If Carrier denies boarding or removes a passenger under any of the circumstances enumerated in Article 10.B, 10.C or 10.F, fares paid for any unused travel segment shall be forfeited and

non-refundable.

D. Eligible fare refunds and credits will be made by Carrier as follows:

1. when no portion of the transportation has been provided, the refund or credit will be issued in an amount equal to the fare paid (subject to Article 90.C above) less applicable change fees;

2. when a portion of the transportation has been provided, the refund or credit will be made in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided, (subject to Article 90.C above) less applicable change fees; or

3. if a customer cancels an entire air transportation itinerary within 24 hours after booking the itinerary and the scheduled time of departure of the initial flight in the itinerary was at least one week (168 hours) away at the time of booking, a full refund will be issued; provided, this does not apply when the air transportation was purchased as part of a package consisting of air and ground elements. Such cancellation may be accomplished online via the customer's "My Allegiant" account or by contacting the Allegiant Reservation Center by telephone.

E. Carrier shall make eligible refunds according to the original form of payment. Refunds for fares purchased with a debit or credit card shall be processed for crediting back to the same card account no later than seven (7) days from the date the refund request is received by Carrier. All credit refunds will be issued in the currency used at purchase (USD). Refunds for fares purchased with cash or by check will be issued by check no later than twenty (20) days after the refund request is received by Carrier; provided that, with regard to fares purchased by check, in cases where Carrier has reasonable cause to suspect fraud, Carrier may delay making an otherwise eligible refund until such time as the check by which the fare was purchased has cleared the financial institution on which it was drawn and Carrier has received payment from such institution. Refunds for fares purchased with instalment payments offered through a third party company, must be requested to Allegiant for the cancelation of the itinerary but the third party company will manage the settlement of the credit line and the final refund to the Customer.

**91. – 104. Not Used**

**105. Denied Boarding Compensation**

A. The following definitions, as prescribed in 14 C.F.R. § 250.1, pertain solely to the denied boarding compensation provisions of this Article:

- Airport means the airport at which the direct or connecting flight, on which the passenger holds confirmed reserved space, is planned to arrive or some other airport serving the

same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the passenger.

- Comparable air transportation means transportation provided to passengers at no extra cost by a direct air carrier holding a certificate of public convenience and necessity or commuter authority issued by the U.S. Department of Transportation, or by a foreign air carrier holding a foreign air carrier permit issued by the U.S. Department of Transportation authorizing the scheduled air transportation of persons.

- Confirmed reserved space means space on a specific date and on a specific flight of Carrier which has been requested by a passenger and which Carrier or its authorized agent has verified, by appropriate notation on the ticket or Ticketless Travel Confirmation, or in any other manner provided by this Contract of Carriage, as being reserved for the accommodation of the passenger.

- Stopover means a deliberate interruption of a journey by the passenger, scheduled to exceed four (4) hours, at a point between the place of departure and the place of final destination.

- The sum of the values of the passenger's remaining flight coupons means the sum of the applicable one–way fares, including any surcharges, airport or passenger facility charges, and air transportation taxes, less any applicable discounts.

B. Request for Volunteers – In the event of an unintentional overbooked flight, Carrier shall request volunteers for denied boarding. A volunteer is a person who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation, in any amount, in exchange for relinquishing his or her confirmed reserved space. Any other passenger denied boarding is considered to have been denied boarding involuntarily, even if that passenger accepts denied boarding compensation. If an insufficient number of volunteers come forward, Carrier may deny boarding to other passengers. However, Carrier will not deny boarding to any passenger involuntarily who was earlier asked to volunteer without having been informed about the possibility of being denied boarding involuntarily and the amount of compensation specified in Article 105.E. below.

C. Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversell – Subject to the exception in Article 105.D. below, Carrier will tender to a passenger the amount of compensation specified in Article 105.E. below, when:

1. the passenger holds a ticket for confirmed reserved space and presents himself or herself for carriage at the appropriate time and place, having complied fully with Carrier's requirements as to ticketing, reconfirmation, check-in, and acceptability for transportation in accordance with this Contract of Carriage; and

2. other than for reasons set forth in Article 10 above, or when resulting from substitution for

operational or safety reasons of an aircraft having a lesser seating capacity than the aircraft originally scheduled, Carrier is unable to accommodate the passenger on the flight for which the passenger holds confirmed reserved space, and such flight departs without the passenger.

D. Exception – The passenger will not be eligible for compensation if Carrier offers comparable air transportation, or other transportation used by the passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the passenger's next stopover or, if none, at the airport of the passenger's final destination not later than one (1) hour after the planned arrival time of the passenger's original flight or flights.

E. Amount of Compensation Payable to Passengers Involuntarily Denied Boarding Due to an Oversell:

1. Domestic Transportation Passengers traveling between points within the United States (including the territories and possessions) who are denied boarding involuntarily from an oversold flight are entitled to: (1) No compensation if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover not later than one hour after the planned arrival time of the passenger's original flight; (2) 200% of the fare to the passenger's destination or first stopover, with a maximum of $775, if the carrier offers alternate transportation that is planned to arrive at the passenger's destination or first stopover more than one hour but less than two hours after the planned arrival time of the passenger's original flight; and (3) 400% of the fare to the passenger's destination or first stopover, with a maximum of $1,550, if the carrier does not offer alternate transportation that is planned to arrive at the airport of the passenger's destination or first stopover less than two hours after the planned arrival time of the passenger's original flight.

| 0 to 1 hour arrival delay. | No compensation. |
| 1 to 2 hour arrival delay. | 200% of one-way fare (but no more than $775). |
| Over 2 hours arrival delay. | 400% of one-way fare (but no more than $1,550). |

2. Except as provided below, the airline must give each passenger who qualifies for involuntary denied boarding compensation a payment by cash or check for the amount specified above, on the day and at the place the involuntary denied boarding occurs. If the airline arranges alternate transportation for the passenger's convenience that departs before the payment can be made, the payment shall be sent to the passenger within 24 hours. The air carrier may offer free or discounted transportation in place of the cash payment. In that event, the carrier must disclose all material restrictions on the use of the free or discounted transportation before the passenger decides whether to accept the

transportation in lieu of a cash or check payment. The passenger may insist on the cash/check payment or refuse all compensation and bring private legal action.

3. Acceptance of the compensation may relieve Allegiant Air from any further liability to the passenger caused by its failure to honor the confirmed reservation. However, the passenger may decline the payment and seek to recover damages in a court of law or in some other manner.

**106. – 115. Not Used**

**116. Ticketless Travel Acceptability**

Carrier will accept only its own electronic Ticketless Travel Confirmation, and then only if all transportation written thereon uses the services of Carrier. Any tickets issued in conjunction with travel on another carrier will not be accepted.

**117. – 123. Not Used**

**124. Check Acceptance**

Allegiant accepts most major credit and debit cards. Allegiant does not accept cash, check, or money orders in-flight or at any airport location.

**125. - 126. Not Used**

**127. Right to Change Contract**

Carrier reserves the right, to the extent not prohibited by federal law, to change, delete, or add to any of the terms of this Contract of Carriage without prior notice. All changes must be in writing and approved by a corporate officer of Carrier.

Plaintiffs' Exhibit 30

# FRONTIER AIRLINES  Contract of Carriage

**Effective Date:**    04/13/2021

For a summary of changes, click here.

Case 2:22-cv-02383-SSS-AS   Document 190   Filed 10/10/23   Page 438 of 492   Page ID #:4207

# LIST OF EFFECTIVE PAGES

| REVISION NUMBER | **77** | REVISION DATE | 04/13/21 |
|---|---|---|---|

| Chapter/Page | Revision/Date |
|---|---|
| 00.00 Pg. 1 | Rev36 04/13/11 |
| 00.00 Pg. 2 | Rev36 04/13/11 |
| 00.00 Pg. 3 | Rev77 04/13/21 |
| Pg. 1 | Rev77 04/13/21 |
| Pg. 2 | Rev77 04/13/21 |
| Pg. 3 | Rev77 04/13/21 |
| Pg. 4 | Rev77 04/13/21 |
| Pg. 5 | Rev77 04/13/21 |
| Pg. 6 | Rev77 04/13/21 |
| Pg. 7 | Rev77 04/13/21 |
| Pg. 8 | Rev77 04/13/21 |
| Pg. 9 | Rev77 04/13/21 |
| Pg. 10 | Rev77 04/13/21 |
| Pg. 11 | Rev77 04/13/21 |
| Pg. 12 | Rev77 04/13/21 |
| Pg. 13 | Rev77 04/13/21 |
| Pg. 14 | Rev77 04/13/21 |
| Pg. 15 | Rev77 04/13/21 |
| Pg. 16 | Rev77 04/13/21 |
| Pg. 17 | Rev77 04/13/21 |
| Pg. 18 | Rev77 04/13/21 |
| Pg. 19 | Rev77 04/13/21 |
| Pg. 20 | Rev77 04/13/21 |
| Pg. 21 | Rev77 04/13/21 |
| Pg. 22 | Rev77 04/13/21 |
| Pg. 23 | Rev77 04/13/21 |
| Pg. 24 | Rev77 04/13/21 |

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                      Rev77 04/13/21

## Table Of Contents

| Section | Subject | Page |
|---------|---------|------|

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3. Refusal to Transport and Special Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
4. International Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
5. Child Passengers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
6. Service Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
7. Smoking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
8. Tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
9. Ticket Validity and Itinerary Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
10. Check-in Times . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
11. Fares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
12. Checked Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
13. Carry-On Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
14. Cabin-Seat Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
15. Conditions and Charges for Special Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
16. Limitations of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
17. Claim Limits and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
18. Failure to Operate on Schedule or Failure to Carry . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
19. Denied Boarding Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
20. Refunds; No-Show Cancellations and Service Charges . . . . . . . . . . . . . . . . . . . . . . . . . 21
21. Currency and Mode of Payment and Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
22. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

## 1.   Introduction

The following terms and conditions as well as such additional terms and conditions presented on Frontier Airlines' website, fare rules, published schedules or printed on or in any ticket or ticket-less travel authorization apply to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier"), as well as that transportation, regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used ("Contract of Carriage").

This document is available for public inspection at all Frontier locations. Copies may be obtained by visiting the Frontier's web site at www.FlyFrontier.com or by writing to: Frontier Airlines, Inc., Customer Relations, 4545 Airport Way, Denver, CO 80239.

## 2.   Definitions

A. **Codeshare** – A marketing and business arrangement in which two airlines "share" the same flight (which might include connecting legs). One airline places its designator code and flight number on a flight operated by the other airline, and markets and sells tickets for that shared flight as part of its published schedule.

B. **Code** – The U.S. Internal Revenue Code of 1986, as amended.

C. **DOT** – U.S. Department of Transportation.

D. **FAA** – U.S. Federal Aviation Administration.

E. **Fare Rules** – The rules and requirements associated with a ticket.

F. **IATA** – International Air Transport Association.

G. **No-Show Cancellation** – The automatic cancellation of a passenger's ticket upon such passenger failing to either (i) check-in for such passenger's flight, or (ii) board such passenger's flight, in either instance within the required times. The automatic cancellation will apply to all subsequent flights, including return flights, on the itinerary. Presentation of a ticket by someone other than the named passenger renders the ticket void and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 20. )

H. **Qualified Individual with a Disability** – An individual with a disability who: (i) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (ii) has a record of such an impairment; or, (iii) is regarded as having such an impairment, as further defined in 14 CFR 382.5.

I. **Standby Passenger** – A passenger boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.

J. **Stopover** – An intentional interruption in a passenger's trip in excess of 4 hours at a point between the place of departure and the final destination.

K. **STRETCH Seat** - A seat located in the front rows and exit rows of certain Frontier aircraft that have additional legroom. These seats are made available to passengers for a fee.

L. **Ticket** -The record of agreement, including electronic tickets, for passenger air transportation provided by the airline under certain terms and conditions to the passenger as described on the ticket, in the fare rules, and in this Contract of Carriage.

M. **TSA** – U.S. Transportation Security Administration.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

## 3.  Refusal to Transport and Special Conditions

A.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case Frontier will provide a refund of the amount paid for their ticket, which will be the limit of Frontier's liability.

  1)  Government Request -- To comply with a government requisition of space or request for emergency transportation (e.g., in connection with national defense or natural disaster (actual, threatened, or reported)).

  2)  No Seat for Safety Assistant - If a passenger requires a safety assistant (see section 3. B.6) and there is not a seat available on the applicable flight and, thus, both the passenger and the safety assistant are denied transportation. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

B.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case no refund will be due and Frontier will have no further liability.

  1)  Government Direction - To comply with a direction of a government official acting in their official capacity to remove or not provide transportation to a specific individual.

  2)  Identification -- The passenger refuses to produce a government-issued identification as required by Frontier's representatives or as required by law.

  3)  Passports/Visas -- The passenger intending to travel across any international border fails to possess and present all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over, or into which the passenger will fly, which will in all cases be the passenger's exclusive responsibility.

  4)  Failure to Check In or Appear - The passenger fails to check-in for their flight within the required times or appear for boarding of that flight within the required times. (The ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

  5)  Special Medical Requirements -- The passenger will be refused transport if the passenger requires medical equipment be used in flight or services (i) not provided by Frontier, (ii) that may not be used in flight, or (iii) does not have sufficient supplies therefor. The foregoing includes any medical equipment that would require use of power from the aircraft, medical equipment for which the passenger does not have sufficient batteries for the duration of the flight plus unexpected delays. Passengers must be able to sit in a single seat with the seat in the full and upright position, which precludes passengers that must lie flat or that must be transported on a stretcher. Frontier does not provide medical oxygen.

  *EXCEPTION:*  A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge provided that all batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits, and provided that if the device is to be used in flight: (i) the passenger must carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays, (ii) the device must be approved by the FAA with stickers indicating such, and (iii) prior to traveling, the passenger must complete the Portable Oxygen Concentrator Medical Authorization (form 30881) available on Frontier's website or obtain a medical statement from the passenger's physician addressing the points on the POC Medical Authorization form.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                   Rev77 04/13/21

NOTE:    *Passengers are referred to 14 CFR Part 121, SFAR No. 106 for regulations regarding and a list of Portable Oxygen Concentrators that are approved for use on aircraft.*

6) Qualified Individual with a Disability -- If transportation is refused because the passenger fails to comply with the following: Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 C.F.R. § 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 C.F.R. § 382.113, Frontier does not provide certain extensive in flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances: (i) when the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing, (ii) when the individual has a mobility impairment so severe that the individual is unable to assist in the passenger's own evacuation of the aircraft, (iii) when the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing, (iv) on the day of departure, if it is determined that an individual meeting the criteria of (i), (ii) or (iii) must travel with a safety assistant, contrary to the individual's self-assessment that the passenger is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

7) Prisoners - If transportation is refused because of a failure to comply with the following: Frontier accepts up to two "low risk" prisoners with hand restraints per flight. If the flight is 4 hours or less, at least one armed or unarmed law enforcement officer must accompany the prisoners. If the flight is more than 4 hours, at least two armed or unarmed law enforcement officers must accompany the prisoners. At no time may any prisoner be left unattended. No prisoners are accepted on codeshare itineraries.

8) Resistant Prisoners - Any prisoner who has resisted or is reasonably believed to be capable of resisting the prisoner's escort.

9) Proper Attire - Any passenger who is barefoot and over 3 years of age, unless required to be barefoot for medical reasons, or who is not otherwise fully clothed in clothing that is not lewd or obscene, threatening, intimidating, or would be objectionable to reasonable persons.

10) Malodorous Condition - Any passenger who has a severe or offensive body odor that is not due to a disability.

11) Intoxication - Any passenger who appears to be intoxicated or under the influence of drugs.

12) Communicable Disease or Infection - A passenger who has a communicable disease or infection (that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight) may be denied boarding by Frontier. If such a passenger presents a medical certificate dated within 10 days of the date of the flight for which it is being presented that includes specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not reasonable or feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight. Unacceptable measures include, but are not limited to: a required separation between the passenger and other persons, use of medical equipment not permitted to be used on the aircraft, or a requirement that any other passenger wear protective gear.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

a) 2019 Novel Coronavirus (COVID-19) – Frontier may screen passengers during the check-in and boarding process, and may deny boarding to passengers who Frontier reasonably believes do not meet Frontier's COVID-19 screening measures. Screening will include, but is not be limited to: completion of a health acknowledgment, required wearing of facial coverings, and submission to a temperature check. Notwithstanding Section 11 above, a passenger who presents a medical certificate dated within 10 days of the date of the flight for which it is being presented may be denied boarding if, on the planned date of travel, the passenger fails to meet Frontier's COVID-19 screening measures.

13) Refusal or Inability to Sit - Any passenger who is unwilling or unable to sit in an upright position during takeoff and landing with the seat belt fastened.

14) Failure to Follow Instructions - Any passenger who refuses to obey instructions from an employee or crewmember.

15) Use of Ticket Issued to Other Person - Any passenger who attempts to use a ticket not issued to that person. (This ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

16) Interference - Any passenger who interferes with any member of the flight crew in pursuit of their duties or attempts to do so.

17) Smoking - Any passenger who smokes or attempts to smoke on an aircraft.

18) Weapon - Any passenger who, except as permitted by law (see 49 C.F.R. § 1544.219), wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons.

19) Purchase in Violation of Contract of Carriage - Any passenger that purchases a ticket in violation of this Contract of Carriage or any fare rule. In addition, Frontier may (i) invalidate the tickets or any other that may have been purchased in the same manner, (ii) cancel any remaining portion of the passenger's itinerary, or (iii) confiscate any unused portions of the ticket.

20) General Refusal - Any person whom Frontier has informed is not permitted to purchase transportation from Frontier.

C. Refusal to Sell Transportation - Frontier may refuse to sell transportation to any person, including the following, and may inform such persons that they are not permitted to purchase transportation from Frontier:

1) Refusal to Comply - A person who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

2) Prior Conduct - A person who has disrupted airline operations, mistreated employees, or has not complied with Frontier's policies or otherwise violates this Contract of Carriage.

3) Misconduct - A person who has committed a fraudulent act against Frontier.

D. Customer of Size - If, in Frontier's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either or both armrests and occupying all or a portion of the adjacent seats, or encroaching into the aisle or adjacent seats, the passenger will be required to purchase a ticket for an additional seat (or more, if required to accommodate the passenger) at the price then applicable. If sufficient, contiguous seats are not available, the passenger will be given the option to switch to flights on which such seats are available (for which applicable fees will apply) or be given a refund.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                          Rev77 04/13/21

E. Allergies (Peanut, Pet, or Chemical) - Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Passengers are advised to consult a healthcare professional regarding the risks of onboard exposure to any allergen.

F. Pregnancy - Passengers who are pregnant are urged to consult with their doctor on whether it is safe to travel by air, including with due consideration to the possibility of turbulence, cabin pressurization, significantly increased risk of deep vein thrombosis associated with pregnancy, and lack of ready access to medical care. This is particularly important for women in their ninth month of pregnancy, who are urged to obtain an examination from their physician shortly before flying to confirm air travel will be safe. Women with a history of complications or premature delivery should not fly if pregnant. By traveling with Frontier, pregnant women acknowledge and accept these risks.Different policies for passengers who are pregnant may apply on any leg of a codeshare flight that is operated by the codeshare airline.

G. Electronic Surveillance of Passengers and Baggage - Passengers and their baggage are subject to inspection, including via electronic means, with or without the passenger's consent or knowledge.

H. Diversion While in Flight or Return to Gate- In the event that Frontier is required to divert an aircraft while in flight or return to gate because a passenger requires medical attention or due to the passenger's conduct, the passenger may be required to reimburse Frontier for the costs that Frontier incurs, including the cost to accommodate other passengers. The amount due will be as determined by Frontier.

## 4.  International Transportation

A. Compliance with Regulations - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying therewith (including as may be provided in this Contract of Carriage) or the consequences to any passenger resulting from the passenger's failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B. Compliance with Foreign Country Regulations regarding Importation of Goods - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

C. Customs Inspection - If required, a passenger must attend the inspection of the passenger's baggage, checked or unchecked, by customs or other government officials. Frontier accepts no responsibility to the passenger if they fail to observe this condition.

D. Government Regulation - No liability shall attach to Frontier if, based on what it understands to be applicable law, government regulation, demand, order, or requirement, it refuses to carry passenger. If, however, it is ultimately determined that Frontier was incorrect, the limit of its liability will be to refund the amount paid for the ticket on which transportation was refused.

E. International Operations - Frontier is required to make an attempt to obtain emergency contact information from a passenger traveling into or out of a foreign country. If a passenger refuses to provide emergency contact information, Frontier will document the attempt and may require the passenger to sign the document.

**International Transportation**                                          Pg. 6 of 24

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**  Rev77 04/13/21

F. Indemnification - A passenger shall indemnify Frontier for any loss, damage, or expense suffered or incurred by Frontier by reason of the passenger's failure to possess any required travel documents or other failure to comply with the provisions of this section, including the applicable fare if Frontier is required to transport the passenger home from a country. Frontier is not liable to the passenger for loss or expense due to the passenger's failure to comply with this provision.

G. Baggage Limitation - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements regarding baggage size and weight limitations of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

## 5. Child Passengers

A. Accompanied Children -- Children from 7 days through 14 years of age may travel with another passenger who is at least 15 years old.

B. Unaccompanied Children

  1) Frontier does not allow children under the age of 15 years old to travel unaccompanied; they must be accompanied by a passenger who is at least 15 years old. Passengers who are 15 years old or older may travel on Frontier without an adult companion. A birth certificate, official school ID, or other form of ID may be requested for age verification purposes if the child's age appears questionable.

  *NOTE:*    *Passengers under age 18 traveling without both parents may need additional documentation to travel across international borders, depending on the country's requirements.*

C. Infant and Child Fares (except as otherwise provided in a specific fare rule) are as follows:

  1) Infants under 2 years of age are accepted, without charge, when the infant does not occupy a separate seat and is accompanied by a fare-paying passenger at least 15 years old. A birth certificate may be requested for age verification purposes if the infant's age appears questionable.

  *NOTE:*    *Due to supplemental equipment considerations, the number of infants accepted per flight may be limited based on aircraft type.*

  2) One adult may accompany up to two infants under the age of 2.

    a) When an adult passenger is traveling with two infants under 2 years of age, a seat must be purchased for at least one infant. The fare is the same as an adult fare.

  3) Children 7 days - 14 years of age occupying a seat are charged the same fare as an adult passenger.

  *NOTE:*    *Passengers under age 2 traveling as lap children (not purchasing a seat) are subject to international taxes. These taxes must be paid prior to boarding the originating departure flight.*

D. Child Restraint Systems - Frontier accepts infant and child restraint systems (car seat or harness) approved for air travel that fit in the applicable aircraft seat with the arm rest down that meet the following requirements:

  1) Approved seats manufactured to U.S. standards between January 1, 1981, and February 25, 1985, must bear the label: "This child restraint system conforms to all applicable Federal motor vehicle safety standards."

  2) Seats manufactured to U.S. standards on or after February 26, 1985, must bear two labels: (i) "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and (ii) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT" in red lettering.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

CONTRACT OF CARRIAGE                                      Rev77 04/13/21

3) Seats not meeting the above criteria must bear a label or markings showing: (i) the seat was approved by a foreign government, (ii) the seat was manufactured under the standards of the United Nations, (iii) the seat or child restraint device furnished by the certificate holder was approved by the FAA through Type Certificate or Supplemental Type Certificate, or (iv) the seat or child restraint device was approved by the FAA in accordance with 14 C.F.R § 21.8(d), or FAA Technical Standard Order C-100b, or a later version.

NOTE 1:   *A child under the age of 2 must be held in the passenger's lap or be seated in an approved car seat for taxi, takeoff, and landing.*

NOTE 2:   *Frontier encourages all adults traveling with infants under 2 years of age to secure the infant in an approved car seat or harness in the infant's own purchased seat.*

4) Child Harness - The FAA-approved AMSafe Aviation C.A.R.E.S. child harness device may be used on-board the aircraft. It is designed for children weighing between 22 and 44 pounds (between 10 and 20 kilograms) and must bear the label "FAA Approved in accordance with 14 CFR 21.305(d) approved for aircraft use only."

5) Car Seats - A car seat may be used by a child between the ages of 7 days and 2 years if seat space is available after boarding, even if a seat has not been purchased for the child. A car seat may be used by any child when a separate seat has been purchased. To use a car seat onboard the aircraft:

a) It must bear manufacturer labels identifying approval for aircraft use, as described in subsection (1) and (2) above.

b) It must have a solid seat and solid back.

c) It must have restraint straps installed to hold the child in the car seat.

d) The child may not exceed the weight limitation of the car seat.

e) It may not be placed in the emergency exit rows, in the seats immediately in front of or behind the exit rows, or in any seat that has an airbag seatbelt installed.

f) Window seats are the preferred location for a car seat, so it does not impede a passenger's movement or egress into the aisle. Other seat assignments are permitted provided the car seat is not obstructing the egress of any passenger.

g) It must be secured by a seat belt at all times.

6) Booster Seats - Booster seats may be carried onboard aircraft but must be stowed in an overhead compartment or underneath the seat for takeoff and landing. Once the aircraft has reached cruising altitude, the passenger may use the seat during the flight. The booster seat must be stowed when the aircraft begins its descent.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev77 04/13/21

## 6.  Service Animals

A. General - The following categories of service animals are allowed in the cabin without charge:

1) Trained service dogs that assist passengers with disabilities. Passengers traveling with a service dog must complete and submit the Department of Transportation Service Animal Air Transportation Form, attesting to the dog's health, behavior, and training. For reservations booked more than 48 hours prior to travel, passengers must submit the completed form no later than 48 hours prior to travel. For reservations booked less than 48 hours prior to travel, passengers must submit the completed form in person to a Customer Service Agent upon arrival at the airport. Only dogs will be accepted as trained service animals. The animal must be at least 4 months old. The passenger is required to keep the animal under control at all times, with the animal on a leash or harness while in the boarding area and onboard the aircraft. Psychiatric support animals are recognized as trained service animals. Comfort animals, companionship animals, or any other non-task-trained animals are not recognized as service animals. Service animals in training will not be accepted.

2) Service Animals trained in explosive detection, contraband search, or search and rescue on active duty and traveling for that purpose will be accepted for travel. The passenger must present credible documentation the animal is traveling for that purpose.

B. Seating - The passenger may sit anywhere, except in an emergency exit row, provided the animal does not obstruct an aisle or egress of passengers in an emergency evacuation. The animal must fit under the seat or on the passenger's lap. If the passenger is seated in row 1, the animal will not be allowed on the passenger's lap. The animal may not occupy a seat. An animal that cannot or does not comply with the foregoing will not be accepted.

C. International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel with a service animal or emotional support animal. Different policies may apply on any leg of a codeshare flight that is operated by the codeshare airline.

D. Oxygen - No oxygen will be administered to a service animal in the event of an emergency.

## 7.  Smoking

A. Smoking is prohibited on all flights.

B. Federal law prohibits tampering with, disabling, or destroying any smoke detector installed in an aircraft lavatory.

C. The use of electronic smoking devices is prohibited at all times on all aircraft.

## 8.  Tickets

A. A passenger is entitled to transportation only upon presentation of a valid electronic ticket (e-ticket). The ticket entitles the passenger to transportation between the point of origin and the destination.

*NOTE:*  *Paper tickets are not issued on Frontier ticket stock. Only electronic tickets are issued for travel on Frontier. However, paper tickets from other airlines may be accepted for travel at Frontier's discretion.*

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

CONTRACT OF CARRIAGE                                                    Rev77 04/13/21

B. Tickets are honored only in the order in which they are issued.

C. The following practices are prohibited:

1) Back to Back Ticketing -- The purchase or use of portions of tickets from two or more tickets issued as round-trip fares or other scheme for circumventing minimum stay requirements.

2) Throwaway Ticketing -- The purchase or use of round-trip tickets for one-way travel.

3) Hidden City/Point Beyond Ticketing -- The purchase or use of a ticket from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D. A ticket which has not been properly issued or paid for, or which has been altered, mutilated, or improperly issued by an unauthorized party is not valid for travel or refund.

E. The purchaser of a ticket and the passenger intending to use it are responsible for ensuring that the ticket accurately states the name of the passenger.

F. A ticket may only be used by the person named on the ticket. Frontier is not liable to the purchaser of a ticket if the ticket is used by someone other than the person named on the ticket.

G. Presentation of a ticket by someone other than the named passenger renders the ticket void. The ticket is subject to confiscation, and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 20. )

H. An additional processing fee may apply to each ticket purchased or changed via Frontier's reservation center.

## 9.   Ticket Validity and Itinerary Changes

A. Period of Validity

1) Tickets issued by Frontier are valid for transportation only on the flights and dates shown on the ticket and have no value and are not valid for transportation thereafter. If a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee will be retained for 90 days from the date of cancellation of the ticket in the form of an electronic credit. The credit has no cash or refund value and may only be applied to a single subsequent ticket on a Frontier flight for the same passenger as the original ticket. In the case of a No-Show Cancellation, see section 20.

2) Except as required by law or as provided in this Contract of Carriage, Frontier shall have no obligation of any kind to reschedule any passengers who cancels a ticket before the scheduled flight departure time or to provide them with any refund or other credit for unused tickets.

3) Except as required by law or as provided in this Contract of Carriage, in the case of a No-Show Cancellation, Frontier shall have no obligation of any kind to reschedule any such passengers on any other flight, and the rules respecting No-Show Cancellations shall apply (see section 20. ).

B. Except for tickets purchased for travel within 7 days (168 hours) of purchase, all tickets may be canceled within twenty-four (24) hours of the purchase and a full refund will be given. After that time, except for tickets that are purchased as refundable, all tickets are non-refundable.

## 10. Check-in Times

A. Airport Check-In - It is the passenger's responsibility to arrive at the airport, taking into consideration travel time both to and within the applicable airport, including processing through the security check point with enough time to complete check-in and security screening processes.

---

**Ticket Validity and Itinerary Changes**                                    **Pg. 10 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                 Rev77 04/13/21

B. Passengers can check in beginning 2 hours before departure at Frontier's airport check-in counters or 24 hours before departure at www.FlyFrontier.com or on the Frontier mobile app, if the reservation is eligible for online or mobile app check-in.

C. Check-In Times

   1) For domestic flights (originating and to a destination within the United States), the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 45 minutes prior to scheduled departure whether or not checking bags.

   2) For international flights, the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 60 minutes prior to scheduled departure.

D. Time Limit for Checking Bags - Baggage to be checked must be presented at the airport within the minimum check-in time. Passengers who present baggage after the minimum check-in time may be refused transport. At some airports, the counter may close at the check-in cut-off time, in such cases, passenger and baggage check-in are not permitted after the check-in deadline. In the event that baggage is accepted after the minimum check-in time, the passenger will be liable for any costs and fees for the bag to be delivered in the event that it is not carried on the same flight.

E. Availability for Boarding - Tickets and seat assignments are subject to cancellation for passengers who fail to make themselves available for boarding at the departure gate at least 20 minutes prior to scheduled departure.

F. Failure to Check In or Appear - If a passenger fails to check in or board the flight within the required time, the ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20).

G. Misconnected Passengers - The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by Frontier will be accommodated on the next available flight operated by Frontier to the same destination. Frontier will not provide transportation on another airline or reimburse the cost of transportation purchased from another airline. The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operated by any other airline will be canceled and no refund or accommodation on another flight will be due unless available and purchased at the applicable price by the passenger.

## 11. Fares

A. Fares apply for transportation only between the airports for which they are published.

B. When a passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.

C. Fares are subject to change without notice until a ticket is issued.

## 12. Checked Baggage

A. Fees applicable to checked baggage:

   1) Baggage fees apply to each checked bag.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

2) Active U.S. military personnel, with Common Access Card (CAC), may check two bags at no charge for all types of tickets. Overweight and oversize charges for the first two free bags are also waived. This policy is for active U.S. military personnel only and does not extend to family members or traveling companions.

B. Baggage Allowance Exceptions - The following may be checked or carried on at no charge and do not count toward the passenger's baggage allowance.

1) Medical Assistive Devices - Canes, crutches, braces, wheelchairs, etc. for the use of the passenger. There is no limit to the number of mobility aids a passenger may check. Medical assistive devices must be packed separately, in protective packaging, for baggage fees to be waived.

2) Wheelchairs - In compliance with federal law, wheelchairs or other types of mobility devices for the passenger are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Certain Frontier aircraft can accommodate up to two wheelchairs up to 40 inches (101 cm) high, 50 inches (127 cm) long, 13 inches (33 cm) wide, and weighing no more than 70 pounds (31 kilograms) in the cabin of the aircraft on a first-come, first-served basis. Wheelchairs carried in the cabin of the aircraft will be brought to the front of the aircraft after all other passengers have deplaned.

3) Essential Infant or Child Items - Child restraint devices, car seats, strollers, diaper bags, and other essential baby items when the infant is traveling. These items must be packed separately, in protective packaging, for baggage fees to be waived.

C. Acceptable Baggage - Frontier will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

1) Checked baggage may not exceed 62 inches (157 cm) in linear dimension (height plus length plus width), nor more than 180 inches (457 cm) in any of those dimensions, or weigh more than 50 pounds (22.6 kilograms). Additional fees apply to items that exceed those size and weight limitations. Baggage weighing 100 or more pounds (45 kilograms) is not accepted.

NOTE 1:     *For baggage checked to or from Canada, no baggage weighing more than 70 pounds (31.75 kilograms) will be accepted.*

2) The TSA website maintains a list of items that passengers are not permitted to check in baggage. See www.tsa.gov for a complete list. Baggage containing any items on that list will not be accepted.

3) An item for transportation not suitably packaged to withstand ordinary handling and turbulence, or of a size, weight, or character that renders it unsuitable for transportation will not be accepted.

4) The passenger is responsible for ensuring that all items packed in checked baggage are properly packaged and padded to resist handling and turbulence. (Refer to section 17. )

5) All baggage is subject to inspection by Frontier. Frontier is not, however, obligated to perform an inspection. Frontier will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.

6) Frontier will not accept baggage or other personal property for storage.

7) Frontier will check baggage only when the passenger presents a valid ticket for transportation on the applicable flight.

8) The passenger's name, address, and telephone number must appear on the baggage.

9) Frontier has the right to refuse to transport baggage on any flight other than the one carrying the passenger.

10) Baggage will not be checked:

---

**Checked Baggage**                                                                 Pg. 12 of 24

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

a)  To a point that is not reflected on the passenger's ticket.

b)  Other than the passenger's destination on the applicable flight, but if the flight is a connecting flight, to the final destination, but if that connecting flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive then only to the destination of the first leg.

11) Live animals are not accepted as checked baggage.

12) Agricultural items, perishable items, or products that do not conform with customs or agricultural government law at the flight's destination will not be accepted.

13) Frontier will not accept for carriage any restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 C.F.R. §§ 171-177) and IATA Dangerous Goods Regulations. Examples of such goods are (i) liquor products over 140 proof, (ii) gasoline-powered tools, (iii) compressed gases, (iv) corrosives (such as acids and wet batteries), (v) explosives (such as dynamite and fireworks), (vi) flammables (such as matches and lighter fuels), (vii) poisons, and (viii) magnetic and radioactive materials. Electronic smoking devices (commonly referred to as e-cigarettes or personal vaporizers) pose a safety risk and are not permitted in checked baggage. These items are permitted in carry-on baggage. Spare lithium batteries are not allowed in checked baggage.

14) Perishable items must be packaged properly such that they cannot leak through their packaging. (Refer to section 17. )

D.  Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 13. Carry-On Baggage

A.  Passengers are permitted up to two carry-on items:

1)  One free personal item not larger than 8" x 14" x 18" (20 cm x 35 cm x 45 cm) that must fit within the personal item portion of the bag sizer.

2)  One carry-on item not larger than 10"H x 16"W x 24"L (25 cm x 40 cm x 114 cm) and weighing not more than 35 pounds (15 kilograms) that may be placed in the overhead compartment or under the seat. A fee for the carry-on item may apply based on the ticket type purchased. Active U.S. military personnel, with Common Access Card (CAC), may take a carry-on item free of charge for all types of tickets.

3)  Items that exceed these dimensions or are in excess of the allowance will be gate checked to which a fee will apply.

B.  The TSA website maintains a list of items that passengers are not permitted to carry onboard an aircraft. See www.tsa.gov for a complete list. Carry-on items containing any items on that list will not be accepted.

C.  The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment.

D.  Use of Portable Electronic Devices (PEDs)

1)  Small authorized PEDs are devices under 2 pounds and are of a size that can easily be placed in a seat pocket along with the other materials that are normally found in the seat pocket (Passenger Safety Information Card, Menu or airsickness bag). They include devices like tablets, readers, and mobile phones and may be used during all phases of flight when in airplane mode including taxi, takeoff, and landing. However, if using them during taxi, takeoff, and landing, you must secure these devices by holding them, putting them in your pocket or holster, or placing them in a seatback pocket.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

2) Large authorized PEDs are devices 2 pounds or more such as full-size laptops. They must be turned off and stowed during taxi, takeoff, and landing. You may stow them under the seat in front of you or in an overhead compartment. These devices may be used above 10,000 feet when authorized by a Flight Attendant announcement.

3) On all flights operating outside U.S. airspace, PEDs cannot be used during taxi, takeoff, and landing, but may be used in airplane mode above 10,000 feet when authorized by a Flight Attendant announcement.

E. Sound Emitting Devices - Portable electronic devices that emit sound (e.g., music or video players or games) may be used only with headphones and provided the sound, even via the headphones, cannot be heard by others.

F. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 14. Cabin-Seat Baggage

A. Cargo stowed inside the main cabin of the aircraft and occupying a passenger seat is referred to as "Cabin-Seat Baggage." Cabin-Seat Baggage may be transported on flights operated by Frontier subject to the following conditions:

1) The full fare for the ticket for the applicable seat is paid. There is no carry-on baggage allowance or baggage allowance for that ticket. If the Cabin-Seat Baggage must be accommodated into a STRETCH seat due to its size or at the passenger's request, the STRETCH seat fee applies.

2) The Cabin-Seat Baggage must be packaged or covered in a manner to avoid possible injury to passengers and crew.

3) The Cabin-Seat Baggage must be carried aboard the aircraft by the passenger.

4) The Cabin-Seat Baggage may not weigh more than 100 pounds (45 kilograms).

5) The Cabin-Seat Baggage cannot exceed size dimensions of 57" height x 17.84" width x 9.3" depth (144.78 cm x 45.31 cm x 23.62 cm).

6) The Cabin-Seat Baggage must fit in the seat without blocking aircraft signage or extending into the aisle and be secured with a seatbelt or other approved method.

7) Certain seats may not accommodate Cabin-Seat Baggage. Frontier will assign seats as appropriate.

8) Except as provided herein, Frontier is not responsible for damage to Cabin-Seat Baggage.

9) Cabin-Seat Baggage does not count toward the passenger's baggage allowance.

## 15. Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable fees.

*NOTE:* *Refer to the Sports Equipment and Special/Fragile Items chart hosted at* www.FlyFrontier.com *for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.*

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

A. Firearms -- Firearms are accepted as checked baggage on flights within the United States, but not international flights. Carriage of any firearm is subject to the following conditions:

1) In accordance with federal law, a passenger who presents baggage that contains a firearm must (i) ensure the firearm is unloaded, (ii) pack the firearm in a lockable, hard-sided container, (iii) declare the firearm unloaded at the time of check-in, and (iv) sign a "Firearms Unloaded" declaration.

2) If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, that container.

3) If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the container.

4) After screening, the passenger must lock the firearm container and retain the key or combination.

5) The passenger must make arrangements for and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

B. Ammunition - Ammunition for firearms (whether or not the firearm is also being carried) is accepted as checked baggage on flights within the United States, but not international flights, subject to the following conditions:

1) The ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood, or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

2) Each passenger is allowed up to 11 pounds (4.9 kilograms) of ammunition.

3) Loaded ammunition clips and magazines must also be securely boxed.

4) Ammunition may be packed with the firearm.

C. Live Animals -- Frontier accepts live animals only in the cabin of the aircraft, not as checked baggage. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

   EXCEPTION:  See separate rules with respect to service animals referred to in *6. Service Animals*.

1) Only the following animals are permitted:

   a) Domestic Flights -- Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds.

   b) International Flights -- Domesticated dogs and cats.

2) The passengers carrying the animal are responsible for making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

3) The passengers carrying the animal are responsible for paying any import/export fees, duties, or taxes that may apply as well as any fines for failing to comply with applicable law.

4) International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel.

5) The passengers carrying the animal are responsible for making advance reservations because no more than ten pet containers will be accepted per flight.

6) No passenger may carry more than one pet container.

7) The animal must remain in a pet container at all times and may not be fed while onboard the aircraft.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                              Rev77 04/13/21

8) The pet container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.

9) The animal may not disrupt other passengers and the passenger must be able to quiet the animal without removing it from the container.

10) The container counts toward the carry-on baggage allowance.

11) No oxygen will be administered to an animal in the event of an emergency.

D. Human Remains:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage subject to the following conditions:

a) The container must be made of a material such as wood or plastic that can be successfully screened by the TSA. If the container cannot be screened, it will not be allowed.

b) If the container is checked, it must be sufficiently packaged in a well-insulated and sturdy container.

c) If the container is carried onboard the flight, it counts toward the passenger's carry-on allowance and it must meet carry-on baggage dimensions.

2) Human remains in caskets are not accepted.

E. Dry Ice (frozen carbon dioxide) -- Dry ice may be carried under the following conditions:

1) A maximum of 5.5 pounds (2.5 kilograms) of dry ice per passenger is accepted in checked or carry-on baggage.

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

F. Bicycle - Bicycles may be carried under the following conditions:

1) The handlebars must be fixed sideways, and the pedals removed or wrapped in plastic foam or similar material and the entire bicycle is encased in a hard-sided case.

2) Bicycles may only be carried as checked baggage.

3) A fee applies for each bicycle checked as baggage.

4) Bicycles are excluded from baggage liability unless packaged in a hard-sided case.

G. Special Items - The following items may exceed carry-on baggage dimensions but may be taken as a carry-on item (and count toward the carry-on bag allowance) as long as they fit in the overhead bin: fishing rods, tennis rackets, wedding attire, poster tubes, and musical instruments. If any such items are comprised of more than one piece, they must be packaged together to be considered one item. The carry-on bag fee applies.

H. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 16. Limitations of Liability

A. Consequential Damages – Unless it is specifically stated otherwise in this Contract of Carriage, or as required by any applicable law, Frontier is not liable for any indirect, special, or consequential damages arising out of or resulting from transportation provided, delay in transportation, or any failure to provide transportation.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

B. International Transportation – With respect to international transportation, as defined in the following referenced conventions, as applicable, Frontier's liability will be limited as specified in, as and if applicable, (i) the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, October 12, 1929, as amended ("Warsaw Convention"), but subject to the Agreement entered into by Frontier pursuant to 14 C.F.R. Part 203 or (ii) the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999 ("Montreal Convention").

## 17. Claim Limits and Procedures

A. Limitations of Liability

1) Domestic Flights – With respect to domestic flights (i.e., those flights originating and ending within the United States) without any scheduled stops outside of the United States, or international flights to which neither the Warsaw Convention or the Montreal Convention apply, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of checked baggage shall be limited to $3,800 for all bags checked under a single ticketed passenger's name. Frontier will not be liable for:

   i) The following items included in checked baggage, with or without the knowledge of Frontier:

- alcohol
- antiques
- art, paintings
- art supplies
- artifacts
- bags made from lightweight material not designed for shipping
- blueprints
- books
- business documents
- CDs
- cell phones
- Cigars, cigarettes, electronic cigarettes, vape pens
- collectibles
- computer equipment (including hardware, software and all accessories)
- dentures
- drugs prohibited by federal or state law
- DVDs
- eyeglasses
- files
- food/perishables
- fragile articles or other similar valuable items and commercial effects
- hand and power tools
- heirlooms
- irreplaceable items
- jewelry
- keys
- machinery and its parts
- manuscripts
- medication
- money
- natural fur products
- negotiable papers/ instruments
- optics
- orthodontics
- orthotics
- photographic/video/ electronic equipment and accessories
- precious metals or stones
- publications
- samples
- securities
- silverware
- sound reproduction equipment
- sunglasses
- surgical supports
- toys

   ii) Articles strapped, taped, or tied to other pieces of baggage, which may become separated as a result of normal handling during transportation

   iii) Damage to the following items when not packed in a hard-sided case or other packing that is suitable for the item:

- Prosthetic devices
- Medical equipment

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev77 04/13/21

- Musical instruments
- Recreational or sporting equipment
- Baby items including car seats and strollers

iv) Damage to handles, straps, wheels, and zippers arising from normal wear and tear caused by ordinary handling of baggage

v) Damage arising from ordinary wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt

vi) Damage resulting from over-packing or misuse

vii) Damage arising from liquids on or in baggage; including weather (e.g., rain, snow)

2) International Flights/Montreal Convention – With respect to international flights to which the Montreal Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of baggage (whether checked or carry-on) shall be limited to 1,288 Special Drawing Rights per ticketed passenger. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount.

3) International Flights/Warsaw Convention – With respect to international flights to which the Warsaw Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay of (i) checked baggage shall be limited to 17 Special Drawing Rights per pound, or actual value, whichever is less, (ii) carry-on baggage shall be limited to 332 Special Drawing Rights or actual value, whichever is less. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount. Absent evidence to the contrary, bags will be presumed to weigh 20 pounds.

4) Frontier does not accept declarations of higher value or accept fees based on such declarations.

5) Subject to the above specified limits of liability, Frontier will compensate a passenger whose baggage has been lost, damaged or delayed for reasonable, documented direct damages up to the specified limit of liability, provided the passenger has made reasonable effort to minimize the amount of damage and provided documentation of the loss. The compensation due for lost or damaged property will be determined by the lesser of the documented original purchase price less applicable depreciation or the cost to make repairs.

6) Frontier's liability for wheelchairs, mobility aids, and assistive devices used by a passenger with a disability if lost or damaged by Frontier shall be up to the original purchase price of the device without regard to the above limitations of liability.

7) Passengers who incur incidental expenses as a result of delayed baggage delivery will be reimbursed per established DOT guidelines, subject to the above limitations of liability (as applicable). Any amounts paid to the passenger for incidental expenses will be deducted from the total loss amount prior to check issuance.

8) Frontier will not be liable for loss or damage to carry-on baggage unless such damage is caused by Frontier's or its agent's negligence, which does not include damage resulting from turbulence, shifting of items during flight, or ordinary handling, including placing the baggage in overhead compartments or under seats.

9) Frontier's employees and agents are not liable to passengers.

B. Time Limit to Make Claims and Procedures

---

**Claim Limits and Procedures**                                    **Pg. 18 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                                    Rev77 04/13/21

1) With respect to domestic flights and those international flights to which the Montreal Convention does not apply, any claim based on damage, delay, or loss of baggage must be reported to Frontier within 4 hours of the arrival of the flight on which the loss or damage is claimed to have occurred. Claims for pilferage may be made up to 24 hours after flight arrival. Any documentation required to support the claim must be submitted within 30 days from the date the requesting passenger receives the claim form packet from Frontier; Frontier will not be liable if the completed claims are not submitted, with documentation, within that time period.

2) With respect to international flights to which the Montreal Convention applies, in the case of baggage damage, the person entitled to delivery must submit in writing to Frontier as soon as possible after discovery of the damage, and at the latest in writing 7 days from receipt of checked baggage and in the case of delay or loss, complaints must be made at the latest within 21 days from the date on which the baggage has been placed at the passenger's disposal or should have been placed at the passenger's disposal in the case of loss. All claims must be made in writing and must be accompanied by supporting documentation. Any subsequent request for documentation from Frontier must be provided to Frontier within 21 days of the request.

## 18. Failure to Operate on Schedule or Failure to Carry

A. Liability Limited - Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage. Frontier may substitute alternate aircraft, change schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Frontier's sole discretion. Frontier's obligations for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule or type of equipment used on any flight, with or without notice to the passenger, are set forth below.

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket.

C. Delay, Misconnection, or Cancellation - In the event (i) a passenger's flight is canceled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.

D. For purposes of involuntary reroute, the following groups of cities are considered to be the same point. If Frontier is able to provide transportation to one of the specified alternative cities, Frontier has met its obligation for transport to the final destination.

- Chicago-O'Hare (ORD) / Milwaukee (MKE)
- Ft. Lauderdale (FLL) / West Palm Beach (PBI) / Miami (MIA)
- Los Angeles (LAX) / Orange County (SNA)
- Madison (MSN) / Milwaukee (MKE)

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

- New York La Guardia (LGA) /Trenton (TTN) /Philadelphia (PHL)
- Orange County (SNA) /San Diego (SAN)
- Orlando (MCO) /St. Augustine (UST)
- Orlando (MCO) /Tampa (TPA)
- Washington Dulles (IAD) /Washington National (DCA)

E.  Schedule Change Prior to Day of Travel -- When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:

1) Transport the passenger over its own route system to the destination; or

2) In the event Frontier determines that the schedule modification is significant, Frontier shall, if requested, provide passengers a refund of the cost of the unused portion of the ticket.

F.  Extended Onboard Ground Delays -- In accordance with FAA regulations, Frontier maintains and complies with a separate Contingency Plan for Lengthy Tarmac Delays. Frontier's Contingency Plan for Lengthy Tarmac Delays may be found on Frontier's website at https://az832049.vo.msecnd.net/media/1567/f9-contingency-plan-for-extended-tarmac-delays-2015.pdf. Frontier's Contingency Plan for Lengthy Tarmac Delays is subject to change without notice and is not part of this Contract of Carriage.

## 19. Denied Boarding Compensation

When a seat cannot be provided due to an inadequate number of seats for the number of passengers holding confirmed reservations (overbooking), the actions described in this section will be taken.

A.  Voluntary -- Passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel and for compensation in the form of an Electronic Travel Certificate for future transportation within 90 days on Frontier. The request and selection of volunteers will be in a manner determined solely by Frontier.

B.  Involuntary -- If insufficient passengers volunteer, passengers who cannot be accommodated on the flight will be denied boarding and Frontier will provide transportation on Frontier's flights to the same destination. After a passenger's boarding pass is collected or scanned and accepted by the gate agent, and the passenger has boarded, a passenger may be removed from a flight only for safety or security reasons or in accordance with Section 3 of this Contract of Carriage.

C.  Amount of Compensation -- Frontier will compensate a passenger for involuntary-denied boarding based on the new arrival time after the originally scheduled arrival time as follows:

| Domestic | International | Compensation |
|---|---|---|
| New arrival time within :59 | New arrival time within :59 | No Compensation |
| New arrival time within 1 - 1:59 | New arrival time within 1 - 3:59 | 200% (2x) of the one-way fare, not to exceed $775 |
| New arrival time 2 hours or more | New arrival time 4 hours or more | 400% (4x) of the one-way fare, not to exceed $1550 |

*NOTE 1:*     *Frontier will not provide compensation for denied boarding when an aircraft of lesser capacity is substituted due to operational or safety reasons.*

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                             Rev77 04/13/21

*NOTE 2:*     *No compensation will be due if boarding is denied for reasons other than overbooking (e.g., pursuant to applicable law or other provisions of this Contract of Carriage).*

D.  Onward Transportation for Passengers Denied Boarding

   1)  A passenger denied boarding, voluntarily or involuntarily, pursuant to this section, will be transported on Frontier's next available flight on which space is available and at no additional charge.

   2)  If a passenger who has been denied boarding, voluntarily or involuntarily, pursuant to this section, wishes to modify the travel date, if space is available, a ticket will be provided for travel within 72 hours at no additional charge.

E.  Electronic Travel Certificates - Frontier may offer passengers denied boarding involuntarily an Electronic Travel Voucher good for transportation on Frontier in lieu of cash compensation otherwise due under this section. Passengers may decline such offer in favor of the applicable cash compensation. The Electronic Travel Certificate has no refund value, will expire 90 days from date of issuance, is not transferable and may only be used to purchase tickets for the passenger to whom it is issued. Only one Electronic Travel Certificate may be used per ticket at the time of purchase. Electronic Travel Certificates may not be applied to ancillary fees and charges (e.g., seat fees, baggage fees) applied to group travel, or combined with other offers. If a ticket purchased with an Electronic Travel Certificate costs less than the amount of the certificate, no residual value remains. Changes to a ticket purchased with an Electronic Travel Certificate may result in a change fee and any additional fare difference based on the rules of the issued ticket.

F.  Time of Offer and Payment of Compensation

   1)  The offer of compensation for overbooking will be made by Frontier on the day and at the place where the failure to provide confirmed space occurred. If accepted, compensation will be given to the passenger. If the alternative transportation arranged for the passenger's convenience departs before the payment can be made, payment will be made by mail or other means within 24 hours after the denied boarding occurs.

   2)  Acceptance of any Denied Boarding Compensation constitutes full compensation for damages incurred by the passenger as a result of Frontier's failure to provide the passenger with a confirmed seat.

## 20. Refunds; No-Show Cancellations and Service Charges

A.  The provisions of this Section (20.A) shall apply with respect to refunds for tickets under this Contract of Carriage:

   1)  All refunds will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made.

   2)  The first portion of any amount refunded will be the full amount of taxes and fees imposed on the ticket purchase.

   3)  If applicable, cancellation fees or service charges will be assessed in a separate transaction and netted against the refunded amount.

   4)  No Use - If no portion of the ticket has been used, the refund amount will be equal to the fare, plus any ancillary purchases (checked or carry-on bag, seat assignments, etc.) and all charges, taxes, and fees paid for the ticket issued to the passenger.

   5)  Partial use - If a portion of the ticket has been used:

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                        Rev77 04/13/21

a) One-way ticket: If travel was terminated at an intermediate or stopover point, the refund amount will be equal to the amount of the fare and all ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid from the point of termination to the destination or to the point at which transportation is to resume and will be the lowest one-way fare for the class of service paid for minus any discount, plus all charges, taxes, and fees proportionately attributable, which shall be reasonably determined by Frontier.

b) Round-trip ticket purchased: the refund amount will be equal to the amount of the fare and ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid on the unused portion of the ticket, plus all charges, taxes, and fees proportionately attributable, which shall be reasonably determined by Frontier.

B. In addition to the provisions of Section 20.A, in situations other than No-Show Cancellations, the provisions of this Section (20.B) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) For refundable tickets that are canceled prior to flight departure, passengers should fill out an online request, available at www.FlyFrontier.com.

2) For tickets that are canceled up to 24 hours after the time of purchase (excluding tickets purchased within seven days before travel, which will be held as a credit, subject to a cancellation fee), passengers should cancel their tickets online at www.FlyFrontier.com.

3) <u>Payment</u> - A refund will be provided only to the original purchaser's form of payment. However, if, at the time of the application for refund, evidence is submitted that a company purchased the ticket on behalf of its employee or a travel agency has made a refund to its client, the refund will be made directly to the employee's company or the travel agency. The Table below illustrates other rules respecting payment:

| Payment Type | Refunded To |
|---|---|
| Universal Air Travel Plan | The subscriber against whose account the ticket was charged |
| Transportation Request issued by a government agency other than a U.S. government agency | The government agency that issued the transportation request |
| U.S. Government Transportation Request | The U.S. government agency that issued the U.S. Government Transportation Request with a check payable to the "Treasurer of the United States" |
| Credit Card | The account of the person to whom the credit card was issued |
| Travel Voucher | The original voucher will be reinstated if the cancellation is within 90 days of the voucher issue date |

4) <u>Identity</u> - Frontier does not assume responsibility to confirm that the person using or presenting a ticket for refund is the true owner of the ticket.

C. In situations involving a No-Show Cancellation, in addition to the provisions of Section 20.A, the provisions of this Section (20.C) shall apply with respect to refunds for tickets under this Contract of Carriage.

1) Automatic Refund; No Additional Submission Required – In the case of a No-Show Cancellation, the refund described in Section 20.A shall be automatically refunded to the purchaser.

2) Automatic Imposition of a No-Show Cancellation Service Charge.

---

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

a) Refund – The refund described in Section 20.A shall be given, but will be netted against the No-Show Cancellation Service Charge in a separate transaction.

b) Imposition of a No-Show Cancellation Service Charge – A No-Show Cancellation Service Charge will apply with respect to the ticket (or the segment for which the No-Show Cancellation applies) in the amount of the fare plus all ancillary purchases plus all charges, taxes and fees attributable to the fare and ancillary purchases.

c) The payment of the No-Show Cancellation Service Charge shall not entitle the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) to transportation.

D. To the extent required by applicable law, including Code § 6415(a) and the regulations promulgated thereunder, the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) hereby consents to Frontier recovering any allowance of a credit or refund of any overpayment of governmental fees or tax imposed, including pursuant to Code § 4261, including in each case which overpayment arises directly or indirectly as a result of a No-Show Cancellation as contemplated in this Contract of Carriage.

## 21. Currency and Mode of Payment and Fees

A. Fares, fees, charges, and taxes charged or collected by Frontier are due in United States dollars, except for bookings made through available Canadian online travel sites, which are due in Canadian dollars. Any purchases made in connection with such bookings would also be due in Canadian dollars.

B. All amounts due to Frontier must be paid with a credit card. Frontier does not accept cash for any transactions, including those on Frontier's aircraft.

C. Frontier does not accept personal checks, traveler's checks, certified (cashier's) checks, or money orders.

D. A service charge will apply to any improper chargeback on a credit card and may be charged to the same credit card via which the chargeback is made.

## 22. Miscellaneous

A. Subordination to Law - In all cases, this Contract of Carriage will be subordinate to any applicable law.

B. Metric References - Conversion of British units to metric units are approximate and for reference only. The British unit will apply.

C. Change Without Notice - Except as may be required by applicable laws, government regulations, orders, and requirements, Frontier reserves the right to amend this Contract of Carriage without notice, provided that no such change shall apply to carriage that has commenced.

D. No Waiver/Modification of Terms - No employee or agent of Frontier has the authority to waive, modify, or alter any provisions of the Contract of Carriage unless authorized by a corporate officer of Frontier. Accommodations provided beyond what is required by the Contract of Carriage do not alter the Contract of Carriage. Frontier's employees and agents, including third party travel agents and online travel sites, are only authorized to sell tickets for air transportation on Frontier subject to the Contract of Carriage.

E. Changes in Rules, Fares, and Charges - Unless otherwise provided within specific fare rules, transportation is subject to the rules, fares, and charges in effect on the date a ticket is issued, determined by the validation stamped or imprinted on the ticket, or valid electronic ticket.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

**FRONTIER**

**CONTRACT OF CARRIAGE**                                      Rev77 04/13/21

F.  Taxes and Charges - When the ticket is issued for the effective date, all government, airport, vendor, or other charges that apply to passenger travel into foreign countries are the responsibility of the passenger to whom the ticket was originally issued and are in addition to the published fare and charges.

G.  Fares/Charges - Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

H.  No Class Action - Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

I.  Time Limit for Action - No legal action may be brought by a passenger against Frontier unless commenced within 6 months from the date of the alleged incident.

J.  Choice of Law - This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law. All right to trial by jury in any action, proceeding or counterclaim arising out of or in connection with this Contract of Carriage is irrevocably waived.

K.  Codeshare Flights – Except for baggage policies (see section 12. , section 13. , and section 15. ), the policies, rules, and procedures of the operating airline will apply on any codeshare flight.

**Miscellaneous**                                              **Pg. 24 of 24**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

Case 2:22-cv-02383-SSS-AS   Document 190   Filed 10/10/23   Page 463 of 492   Page ID #:4232

# FRONTIER

**REVISION FILING
INSTRUCTIONS / HIGHLIGHTS**

## Contract of Carriage

REVISION NUMBER:     __77__

REVISION DATE:     <u>04/13/21</u>

«FirstName» «LastName»
«Dist_Loc»

Instructions for paper manuals:               For an online version of Contract of Carriage, <u>click here</u>.

1. Insert the attached revision as instructed below.
   o   Pages to be removed are listed in the left-hand column. A horizontal line in this column means no pages are to be removed.
   o   Pages to be inserted are listed in the middle column. A horizontal line in this column means no pages are to be inserted.
   o   A description of the revision is found in the right-hand column.
2. Fill in the Revision Date, Date Posted, and Posted By fields on the **Record of Revisions** page.
3. Direct questions regarding this revision to: **Tech Pubs at 720-374-4341.**

| REMOVE PAGES | INSERT PAGES | REVISION HIGHLIGHTS | Page 1 of 1 |
|---|---|---|---|
| 00.00 Pg. 3 | 00.00 Pg. 3 | <u>Changes made per PCR 21-210</u><br><br>**List of Effective Pages** – Updated | |
| Pgs. 1-24 | Pgs. 1-24 | **Updated:**<br>Table of Contents<br>3. Refusal to Transport and Special Conditions<br>17. Claim Limits and Procedures<br>19. Denied Boarding Compensation | |

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

Plaintiffs' Exhibit 31

Contract of Carriage Document

(revised November 8, 2021)

Transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express, are subject to the following terms and conditions, in addition to any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt. To the extent there is a conflict between this Contract of Carriage and any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, this Contract governs. By purchasing a ticket or accepting transportation, the passenger agrees to be bound by these controlling terms of this Contract of Carriage, and no covenants at law or in equity shall be implied or incorporated. Note, only the English version of United's Contract of Carriage governs the transportation of Passengers and Baggage provided by United Airlines, Inc. and Carriers doing business as United Express.

# Table of Contents

- Rule 1 Definitions
- Rule 2 Standard Format of Electronic Rules For Tariff Filing Purpose
- Rule 3 Application of Contract
- Rule 4 Reservations – Confirmation/Fare Quotes/Disclosures
- Rule 5 Cancellation of Reservations
- Rule 6 Tickets
- Rule 7 Ticket Validity Period
- Rule 8 Returned Check Charge
- Rule 9 Deleted
- Rule 10 Transatlantic Surcharges
- Rule 11 Pacific Surcharges
- Rule 12 Western Hemisphere Surcharges
- Rule 13 Acceptance of Children/Minors and Infants
- Rule 14 Special Services
- Rule 15 Medical Services
- Rule 16 Service Animals
- Rule 17 Ground Transfer Service
- Rule 18 Service Provided by United Express and Other Codeshare Partners
- Rule 19 Travel Documents
- Rule 20 Screening of Passengers and Baggage
- Rule 21 Refusal of Transport
- Rule 22 Smoking Policy
- Rule 23 Baggage
- Rule 24 Flight Delays/Cancellations/Aircraft Changes
- Rule 25 Denied Boarding Compensation
- Rule 26 Rerouting
- Rule 27 Refunds
- Rule 28 Additional Liability Limitations
- Rule 29 Customer Service Complaints
- Rule 30 Consent to use of Personal Data

# Rule 1 Definitions

As used in this Contract of Carriage, the following terms, whether or not capitalized, shall have the meanings ascribed below:

Add-On-Fare: See "Arbitrary"

Adult means a person who has reached his/her eighteenth birthday as of the date of commencement of travel.

Africa means the area composed of all the countries on the continent of Africa, other than Algeria, Morocco, Sudan, Tunisia, and Egypt, but including the following islands: Cape Verde, Comoros, Madagascar, Mauritius, Reunion, Sao Tome y Principe, and Seychelles.

Alternate Transportation means air transportation with a confirmed reservation at no additional charge (by any scheduled airline licensed by DOT), or other transportation accepted and used by the passenger in the case of denied boarding.

Animals means domesticated cats and dogs.

Applicable Adult Fare means the fare which would be applicable to an adult for the transportation excepting those special fares applicable to a passenger's status, e.g., military fares, adult standby, etc.

Airline Designator Code is the two letter identification code that reflects the Marketing Carrier, which may be different from the carrier operating the flight.

Arbitrary means an amount published for use only in combination with other fares for the construction of Through Fares. It is also referred to as "Proportional Fare", "Basing Fare", and "Add-On-Fare".

Area No. 1 (or "Area 1") means the area composed of all of the North and South American continents and the islands adjacent thereto, Greenland, Bermuda, the West Indies, the islands of the Caribbean Sea, and the Hawaiian Islands (including Midway and Palmyra).

Area No. 2 (or "Area 2") means the area composed of all of Europe (including that part of the Russian Federation in Europe) and the islands adjacent thereto, Iceland, the Azores, all of Africa and the islands adjacent thereto, Ascencion Island and that part of Asia lying west of and including Iran.

Area No. 3 (or "Area 3") means the area composed of all of Asia and the islands adjacent thereto except that portion included in Area No. 2, all of the East Indies, Australasia, the islands of the Pacific Ocean except those included in Area No. 1, and the Russian Federation (East of the Ural Mountains).

Asia means the area composed of Afghanistan, Bangladesh, Bhutan, Brunei, China, Hong Kong, India, Indonesia, the islands of the Pacific in Area No. 3 north of the equator, Japan, Kazakhstan, Kampuchea, Korea, Kyrgyzstan, Laos, Malaysia, Maldive Islands, Myanmar, Nepal, Outer Mongolia, Pakistan, Philippines, Russian Federation (East of the Ural Mountains), Singapore, Sri Lanka, Taiwan, Tajikistan, Timor, Thailand, Turkmenistan, Uzbekistan and Viet Nam.

Australasia means the area composed of Australia, New Caledonia, New Zealand, New Hebrides, Fiji, Samoa, Cook Islands, Papua, New Guinea, Tahiti and the islands adjacent thereto.

Baggage means such reasonable articles, effects and other personal property of a ticketed Passenger as are reasonably necessary or appropriate for the wear, use, comfort or convenience of the Passenger in connection with the Passenger's trip. Unless otherwise specified, it shall include both checked and unchecked baggage and property of the Passenger.

Baggage Check or Baggage Claim Tag mean those portions of the ticket that identify the carriage of a Passenger's checked baggage and that are issued by the carrier as a receipt for the Passenger's checked baggage.

Baggage Rules mean the conditions associated with the acceptance of baggage, including all applicable service charges, and services incidental to the transportation of baggage. See Rule 23 for more information.

Baggage Tag means a document issued by the carrier solely for identification of checked baggage, the portion of which is attached by the carrier to a particular article of checked baggage.

Banker's Buying Rate ("BBR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will purchase a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Banker's Selling Rate ("BSR") means the rate at which, for the purpose of the transfer of funds through banking channels (i.e., other than transactions in bank notes, travelers cheques and similar banking instruments), a bank will sell a given amount of foreign currency in exchange for one unit (or units) of the national currency of the country in which the exchange transaction takes place.

Basing Fare: See "Arbitrary"

Cabin Baggage means Carry-On-Baggage that due to its size and nature requires the purchase of a seat on board the aircraft to transport the piece of baggage.

Calendar Month means the period of time starting with the start of any day in a month, identified by number, and ending with the start of the same day of the following month. When the same day does not occur in the following month, this period ends on the last day of the month.

Calendar Week means a period of seven days starting at 12:01 a.m. Sunday and ending at midnight of the following Saturday, provided that when used in reference to service offered only once a week between points of travel, it shall mean a period of eight days commencing with 12:01 a.m. on the day the flight operates.

Caribbean Area means the area composed of Anguilla, Antigua, Aruba, Bahamas, Barbados, Barbuda, Bermuda, Bonaire, British Virgin Islands, Cayman Islands, Cuba, Curacao, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Leeward Islands, Martinique, Montserrat, Netherlands Antilles, Nevis, Saba, St. Barthelemy, St. Eustatius, St. Kitts, St. Lucia, St. Maarten, St. Vincent, Trinidad and Tobago, Turks and Caicos Islands, West Indies and Windward Islands.

Carriage means transportation of Passengers and their baggage by air or ground, either gratuitously or for payment.

Carrier means the carrier (air or ground) issuing the ticket and all carriers that carry or undertake to carry the Passenger and/or his baggage thereunder.

Carry-on-Baggage means baggage, other than Checked Baggage, carried on board an aircraft by a ticketed Passenger also known as unchecked baggage.

Central Africa means the area composed of Malawi, Zambia and Zimbabwe.

Central America means the area composed of Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua and Panama.

Checked Baggage means baggage that a ticketed Passenger has requested be carried by the carrier and for which the carrier has issued a Baggage Claim Tag to the Passenger.

Child means a person who has reached his/her second birthday but not his/her 12th birthday as of the date of commencement of travel.

Circle Trip means travel from a point and return thereto by a continuous, circuitous air route (including journeys comprising two (2) fare components but which do not meet the conditions of the round trip definition), provided, that where no reasonable direct scheduled air route is available between two points, a break in the circle may be traveled by any other means of transportation without prejudice to the circle trip.

Civic Aeronautics Board ("C.A.B.") means the United States Department of Transportation ("DOT").

Codeshare means an arrangement by which UA offers transportation service to a Passenger who is ticketed with the two letter airline designator code "UA" on a flight that is operated by a carrier other than UA.

Comparable air transportation means transportation provided by air carriers or foreign air carriers holding certificates of public convenience and necessity or foreign permits.

Confirmed reserved space means space on a specific date and on a specific flight and class of service that has been requested by a passenger, and that UA or its agent has verified by appropriate notation on the ticket as being reserved for the accommodation of the passenger.

Conjunction Ticket means two or more tickets concurrently issued to a Passenger and which together constitute a single contract of carriage.

Connection means a stop at an intermediate point on the route to be traveled where a change of planes is made and which does not fall within the definition of a stopover.

Consequential Damages means damages which are the result of an act but are not direct or immediate.

Contiguous United States or Continental United States mean the District of Columbia and all states of the United States other than Alaska or Hawaii.

Contract of Carriage means the terms and conditions contained in this document, as amended from time to time by the Carrier.

Country of Commencement of Transportation means the country from which travel on the first international sector takes place.

Country of Payment means the country where payment is made by the purchaser to the carrier or its agent. Payment by check, credit card or other banking instruments shall be deemed to have been made at the place where such instrument is accepted by the carrier or its agent.

Days means full calendar days, including Sunday and legal holidays, provided that for the purposes of notification, the balance of the day upon which notice is dispatched shall not be counted; and that for purposes of determining the duration of a validity period, the balance of the day upon which the ticket is issued or the flight commenced shall not be counted.

Department of Transportation ("DOT") means the United States Department of Transportation.

Destination means the ultimate point of the Passenger's journey as shown on the Ticket.

Domestic Carriage ("Domestic") means (except as otherwise specified) carriage in which, according to the Contract of Carriage, the place of departure, the place of destination or stopover, and the entire transportation is between points within the United States, or points within another sovereign state.

DOT Hazardous Materials Regulations are those regulations issued by the Materials Transportation Bureau of the Department of Transportation in Title 49 of the Code of Federal Regulations, Parts 171 through 180 (49 CFR 171-180).

Down Line Carrier means any carrier, other than the selecting carrier, who is identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

East Africa means the area composed of Burundi, Djibouti, Ethiopia, Kenya, Rwanda, Somalia, Tanzania and Uganda.

Europe means the area composed of Albania, Algeria, Andorra, Armenia, Austria, Azerbaijan, Azores, Belarus, Belgium, Bosnia and Herzegovina, Bulgaria, Canary Islands, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Lichtenstein, Lithuania, Luxembourg, Madeira, Malta, Monaco, Morocco, Netherlands, Norway, Poland, Portugal, Romania, Russian Federation (West of the Ural Mountains), San Marino, Slovakia, Slovenia, Spain, Sweden, Switzerland, Tunisia, Turkey in Europe and Asia, Ukraine, and the United Kingdom.

Fare Component means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

Flight Coupon means a portion of the Ticket that indicates travel points between which the coupon is good for carriage.

Force Majeure Event – any of the following situations: (a) Any condition beyond UA's control including, but not limited to, meteorological or geological conditions, acts of God, riots, terrorist activities, civil commotions, embargoes, wars, hostilities, disturbances, or unsettled international conditions, either actual, anticipated, threatened or reported, or any delay, demand, circumstances, or requirement due directly or indirectly to such condition; (b) Any strike, work stoppage, slowdown, lockout, or any other labor-related dispute involving or affecting UA's services; (c) Any governmental regulation, demand or requirement; (d) Any shortage of labor, fuel, or facilities of UA or others; (e) Damage to UA's Aircraft or equipment caused by another party; (f) Any emergency situation requiring immediate care or protection for a person or property; or (g) Any event not reasonably foreseen, anticipated or predicted by UA.

Foreign Air Transportation means transportation between a point in the United States and a point outside thereof.

Half Round Trip Fare means 50 percent of a specified or constructed round trip normal or special fare. In the absence of a specified or constructed round trip normal fare, the one way normal fare is considered to be a half round trip normal fare. If a specified or constructed one way special fare may be doubled to establish a round trip special fare, the one way special fare is considered to be a half round trip special fare.

Hawaii means Hilo, Honolulu, Kona, Lihue, and Maui.

IATA Rate of Exchange means the published rate of exchange issued by IATA from time to time.

Iberian Peninsula means the area composed of Gibraltar, Portugal (including Azores and Madeira) and Spain (including Balearic and Canary Islands).

Immediate Family Member means spouse, children, step-children, foster children, legally adopted wards, son/daughter-in-law, grandchildren, parents, step-parents, legal guardians, mother/father-in-law, grandparents, brother/sister, step-brother/sister, half-brother/sister, brother/sister-in-law, aunts/uncles and nieces/nephews.

Indian Ocean Islands means Comoros, Madagascar, Mauritius, Mayotte, Reunion and Seychelles.

Indian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Republic of Maldives and Sri Lanka.

Infant means a person who has not reached his/her second birthday as of the date of commencement of travel.

Interchange flight means a flight operated over the routes of two or more carriers without change of equipment.

Interline Transfer Point means any point at which the Passenger transfers from the services of one carrier to the services of another carrier.

Interline Transportation/Interline Agreement means carriage on the services of more than one carrier where carriers agree to accept each other's tickets and baggage.

Interline Itinerary means flights reflected on a single ticket involving more than one carrier.

International Carriage ("International") means any carriage other than Domestic Carriage, however, when the Warsaw and/or Montreal Conventions are applicable, the stated definitions of "International" therein shall prevail.

International Sector means a Sector of uninterrupted air travel for which the arrival and departure points are in two different countries.

NOTE: For purposes of applying fares under this Contract of Carriage:

1. Travel on a sector between the U.S.A. and Canada is not considered international, and

2. For fare construction purposes, when transoceanic travel is involved in a fare component, travel on the transoceanic sector shall be considered the international sector.

Interstate Transportation means transportation between a point in any state of the United States and the District of Columbia and a point in any other state of the United States or the District of Columbia.

Intraline Transportation or "On-line" transportation means carriage solely over the services of a single air carrier.

Journey means all travel included on a Ticket or group of Conjunction Tickets.

Legal Guardian means one who legally has the care and management of an infant/minor.

Local Currency Fares means fares and related charges expressed in the currency of the Country of Commencement of Transportation.

Major Life Activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Marketing Carrier means the carrier that sells flights under its Airline Designator Code, which code is identified on the first flight segment of the Passenger's ticket (i.e., Selected/Selecting Carrier for purposes of Interline Transportation to Canada only).

Maximum Outside Linear Dimensions means the sum of the greatest outside length plus the greatest outside width, plus the greatest outside height.

Medical Certificate means a letter or form from the Passenger's treating physician or hospital, where applicable, which must be signed and dated within one week of the first affected flight departure by the treating physician, or hospital in the country where the illness or treatment arose and which certifies the nature of the Passenger's illness and treatment.

Micronesia means the area composed of Guam, Johnston Island, Marshall Islands, Caroline Islands, Palau Island and Mariana Islands.

Mid-Atlantic Area means the area composed of Anguilla, Antigua, Bahamas, Barbuda, Barbados, Bermuda, Bolivia, Bonaire, Belize, Cayman Islands, Colombia, Costa Rica, Cuca, Curacao, Dominican Republic, Ecuador, El Salvador, French Guiana, Guadeloupe, Guyana, Haiti, Honduras, Jamaica, Martinique, Montserrat, Navis, Nicaragua, Panama, Peru, Puerto Rico, St. Kitts, St. Croix, St. Maarten, St. Thomas, Surinam, Trinidad, Tobago, and Venezuela.

Middle East means the area composed of Aden, Bahrain, Cyprus, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Muscat and Oman, Qatar, Saudi Arabia, Sudan, Syria, Trucial, United Arab Emirates and Yemen.

Military Agencies mean departments of the U.S.A. Army, Navy, and Air Force, the Marine Corps, the Coast Guard, the respective academies of the Army, Navy, Air Force, and Coast Guard, and the National Guard. The Reserve Officer Training Corps is not included.

Military Passenger means military personnel of the Military Agencies who are on active duty status or who have been discharged from active military service within seven days of the date of travel.

Minor means a person who has reached his/her second birthday but not his/her 18th birthday as of the date of commencement of travel.

Montreal Convention means the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999.

Netherlands Antilles means the islands of Bonaire, Curacao and St. Maarten.

Normal Fare means the full fare established for regular or usual service, the application of which is not dependent upon any limited period of ticket validity or other special circumstances. Unless otherwise herein specified, Normal Fares shall be considered to include the following, all year one-way, round trip, circle trip and open jaw trips, First Class, Business Class, Executive Class, Economy Class, Basic Economy, one-class Standard Service, Standard Services, Tourist/Coach Class service, Thrift Class service fares, and on-season and off-season fares.

North America means the area composed of Alaska, Canada, the Continental U.S.A. and Mexico.

North Central Pacific means all routes between points in Canada/U.S.A. and points in Area No. 3, except points in the Southwest Pacific, via the Pacific Ocean.

On-line means air transportation wholly on the same carrier.

On-line Tariff Data Base means the remotely accessible, on-line version, maintained by the filer, of (1) the electronically filed tariff data submitted to the "official DOT tariff database," and (2) the DOT approvals, disapprovals and other actions required by DOT.

On-line Transfer Point means any point at which the Passenger transfers from one service of a carrier to another service of the same carrier (bearing a different flight number).

Open-Jaw Trip means travel which is essentially of a round trip nature but the outward point of departure and inward point of arrival and/or outward point of arrival and inward point of departure are not the same.

Operating Carrier means the carrier that operates the actual flight.

Origin means the initial starting place of the journey.

Other Charges means charges such as taxes, fees, etc., not to be shown in the fare construction box of the ticket, excluding excess baggage charges.

Outward point means the stopover point on the passenger's itinerary that is the furthest from the passenger's point of origin.

Oversold Flight means a flight where there are more Passengers holding valid confirmed Tickets that check-in for the flight within the prescribed check-in time than there are available seats.

Participating Carrier includes both the selecting carrier and the down line carrier who has been identified as providing interline transportation to the passenger by virtue of the passenger's ticket.

Passenger means any person, except members of the crew, carried or holding a confirmed reservation to be carried in an aircraft with the consent of the carrier.

Passenger Coupon means that portion of the Ticket constituting the Passenger's written evidence of the Contract of Carriage.

Proportional Fare: See "Arbitrary" above.

Qualified Individual with a Disability means any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more Major Life Activities, has a record of such an impairment, or is regarded as having such an impairment. The phrases used in this definition are further defined in 14 CFR Part 382.3.

Related Charges means those charges to be shown in the fare construction box of the ticket and excess baggage charges.

Reroute means a change of routing, carriers, fares, class of service, flight or date from that originally provided on the ticket, but does not apply to open tickets.

Resident ("a Resident") means a person whose usual residence is in a certain country, provided that a more restricted definition may apply under local law.

Round-Trip means travel from one point to another and return by any air route for which the same normal all year through one way fare of the same class applies from the point of origin, provided that this definition shall not apply to travel for which the same all year through one way fare is established, between two points, in either direction around the world.

Routing means the cities and/or class of service and/or type of aircraft via which carriage is provided by the carrier(s) between two points.

Scandinavia means the area composed of Denmark, Norway and Sweden.

Search and Rescue Animals means a trained animal that assists law enforcement officers in the search of contraband and or other items, or which provides assistance with rescue efforts.

Sector or Segment is the portion of a journey covered by a single Flight Coupon.

Selected Carrier means the carrier whose baggage rules apply to the entire interline itinerary.

Selecting Carrier means the carrier whose designator code is identified on the first flight segment of the passenger's ticket at the beginning of an interline itinerary.

Service Animal means a dog, regardless of breed or type, that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability or a Search and Rescue Animal.

Service Animal Relief Attestation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(b) concerning the U.S. Department of Transportation Service Animal Air Relief Attestation Form.

Service Animal Transportation Form means a form made available by United that is consistent with the requirements of 14 CFR §382.75(a) concerning the U.S. Department of Transportation Service Animal Air Transportation Form.

Single Ticket means the record of agreement that permits travel from origin to destination, and may include interline, code-share, and intraline segments.

South America means the area composed of Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, French Guiana, Guyana, Paraguay, Peru, Surinam, Uruguay and Venezuela.

South Asian Subcontinent means the area composed of Afghanistan, Bangladesh, Bhutan, India, Nepal, Pakistan, Maldives and Sri Lanka.

South East Asia means the area composed of Brunei Darussalam, China, Guam, Hong Kong, Indonesia, Kampuchea, Kazakhstan, Kyrgyzstan, Laos, People's Democratic Republic of, Malaysia, Mongolia, Myanmar, Philippines, Singapore, Taiwan, Province of, Tajikistan, Thailand, Turkmenistan, Russian Federation (East of the Ural Mountains), Uzbekistan and Viet Nam.

South Pacific means the area composed of all routes between points in the U.S.A./Canada and points in the Southwest Pacific via the Pacific Ocean.

Southwest Africa means points within Africa composed of Botswana, Lesotho, Mozambique, Namibia, South Africa and Swaziland.

Southwest Pacific means that area composed of American Samoa, Australia, Cook Islands, Fiji, French Polynesia, Gilbert and Ellice Islands, Loyalty Islands, New Caledonia, New Hebrides, New Zealand, Papua, New Guinea, Samoa, Society Islands, Tonga, and intermediate islands.

Special Drawing Right ("SDR") means a special unit of currency, the value of which fluctuates and is recalculated each banking day. These values are known to most commercial banks and are reported in some newspapers and in the IMF Survey, published weekly by the International Monetary Fund, Washington, D.C. 20431.

Special Fare means a fare other than a normal fare.

Stopover means a deliberate interruption of travel by the Passenger, agreed to in advance by the carrier, at a point between the place of departure and the place of destination. For International flights a Stopover will also be deemed to occur at an intermediate point from which the Passenger is not scheduled to depart on the date of arrival, but if there is no connecting departure scheduled on the date of arrival, departure on the next day within 24 hours of arrival shall not constitute a Stopover. If a portion of the routing is traveled by surface transportation, one Stopover shall be deemed to have been taken for such portion. For Domestic flights, a Stopover will also occur when a Passenger arrives at a point and fails to depart from such point on:

1. The first flight on which space is available; or

2. The flight that will provide for the Passenger's earliest arrival at intermediate or junction transfer point(s) or destination point, via the carrier and class of service as shown on the Passenger's Ticket; provided, however, that in no event will a Stopover occur when the Passenger departs from the intermediate/junction point on a flight shown in the carrier's official general schedule as departing within four hours after arrival at such point.

Summary Page at the End of an Online Purchase (for Rule 23 I) only) means a page on the Carrier's website which summarizes the details of a ticket purchase transaction just after the passenger has agreed to purchase the ticket from the Carrier and has provided a form of payment.

Surface Sector means transportation by means other than air between two intermediate points in a Fare Component.

Through Fare means a fare applicable for travel between two consecutive fare construction points via an intermediate point(s).

Ticket means the record of agreement, including electronic tickets, e.g., "United Electronic Tickets" or "eTickets," for Passenger air transportation provided by UA under certain terms and conditions to the Passenger named on the Ticket and in accordance with applicable governing tariffs and regulations. An "eTicket" is the record of the ticket agreement maintained and processed within the carrier's electronic reservation system. A receipt is provided to the purchaser of the ticket that contains a reference for retrieving the record within the carrier's reservation system and summary of the ticket information. The carrier may mandate the issuance of an e-ticket, regardless of market, carrier, form of payment, and customer type.

Ticketed Point means points shown in the 'good for passage' section of the ticket plus any other point(s) used for fare construction and shown in the fare construction box of the ticket, provided that two flight numbers of two carriers such as for an interchange flight will not be permitted on one Flight Coupon.

Transatlantic Sector means that portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 2 and vice versa.

Transfer means a change from the flight on one carrier to the flight of another carrier, or a change from the flight of a carrier to another flight of the same carrier bearing the same flight number, or a change from the flight of a carrier to another flight that is a service bearing a different flight number of the same carrier, irrespective of whether or not a change of aircraft occurs.

Transfer Point means any point at which the Passenger Transfers.

Transit Point means any stop at an intermediate point on the route to be traveled (whether or not a change of aircraft is made) which does not fall within the definition of a Stopover.

Transoceanic means the portion of travel covering the area over an ocean and may refer to travel that is either transatlantic or transpacific.

Transpacific Sector means the portion of travel covered by a single Flight Coupon from the point of departure in Area No. 1 to the point of arrival in Area No. 3 and vice versa.

UA means United Airlines, Inc.

UA Ticket Stock means tickets printed, imprinted or issued electronically with the UA carrier code (016) as part of the ticket serial number.

Ultimate ticketed destination applies only to situations where a passenger's origin is a non-Canadian point and the itinerary includes at least one stop in Canada, as well as at least one stop outside of Canada. If the stop in Canada is the farthest checked point and the stop is more than 24 hours, the ultimate ticketed destination is Canada. (For Rule 23 I) only).

United means United Airlines, Inc.

United Express carriers are Carriers not wholly owned or operated by United Airlines, Inc. but operating with the UA designator code under the trade name "United Express."

Unaccompanied Minor means a Child/Minor 5 to 14 years of age when traveling alone or not accompanied on the same flight and in the same compartment by a companion Passenger at least 18 years of age or with a Legal Guardian or parent.

United Kingdom (or "U.K.") means the area composed of England, Scotland, Wales, Northern Ireland, Channel Islands and Isle of Man.

United States of America (or the "United States" or the "U.S.A.") means, unless otherwise specified, the area composed of the 48 contiguous states, the District of Columbia, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Midway, and Wake Islands.

United States Department of Defense means the U.S.A. Department of the Army, Navy, and Air Force, and the U.S.A. Marine Corps.

Validate means a confirmation that the Ticket has been officially issued by the carrier.

Warsaw Convention means the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929, or where applicable, that Convention, as amended, including without limitation, by the Protocol signed at The Hague September 28, 1955.

West Africa means the area composed of Angola, Benin, Burkina Faso, Cameroon, Cape Verde, Central African Republic, Chad, Congo (Brazzaville), Cote D'Ivoire, Equatorial Guinea, Gabon, The Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Mauritania, Niger, Nigeria, Sao Tome y Principe, Senegal, Sierra Leone, Togo and Congo (Kinshasa).

Western Hemisphere means the area composed of the Continental United States, Alaska, Hawaii, Puerto Rico, U.S. Virgin Islands, Canada, Greenland, Mexico, Central and South America, and the Caribbean Area.

Back to Top

# Rule 2 Standard Format of Electronic Rules For Tariff

# Filing Purpose

Rule number reserved for Airline Tariff Publishing Company ("ATPCO") filings.

Back to Top

# Rule 3 Application of Contract

A. These rules constitute the conditions of carriage upon which UA agrees to provide Domestic and International Carriage and are expressly agreed to by the Passenger. These Rules are also the tariffs filed by UA in accordance with certain government regulations.

B. This Contract of Carriage is subject to applicable laws, regulations, rules, and security directives imposed by governmental agencies, including but not limited to those imposed during or as a result of a national emergency, war, civil unrest or terrorist activities. In the event of a conflict between the Rules contained herein and such government laws, regulations, rules, security directives and their corresponding effects on UA's operation, the latter shall prevail.

C. The rules herein are applicable to transportation of Passengers and Baggage provided by UA. See Rule 18 regarding application of these rules to Codeshare services provided by UA on flights operated by a carrier other than UA.

D. Certain International Carriage is subject to the rules relating to liability established by, and to all other provisions of the Warsaw and/or Montreal Conventions. Any provisions of these rules that are inconsistent with any provision of the applicable Convention shall, to that extent, but only to that extent, be inapplicable to International Carriage.

E. Except as otherwise provided within specific fare rules, transportation is subject to the Contract of Carriage and charges in effect on the date on which the Ticket is issued. References to pages, rules, items and notes are coterminous and include revisions, supplements and reissues thereof.

F. Where the Ticket has been purchased and issued before the effective date of an increase in the applicable fare, the increase will not be collected, provided there is no change in Origin, Destination, Stopover point(s), flight(s) or dates shown on the original Ticket. These provisions apply whether an increase results from a change in fare level, a change in conditions governing the fare or a cancellation of the fare itself.

G. UA is responsible only for transportation of Passengers and Baggage provided by UA, which includes Codeshare services provided by UA on flights operated by a carrier other than UA. See Rule 18 regarding application of these rules to Codeshare services. When UA undertakes to issue a Ticket, check baggage, or make any other arrangements for transportation over the lines of any other carrier on an interline basis (whether or not such transportation is part of a through service), UA will act only as agent for the other carrier in these limited capacities, and will assume no responsibility for the acts or omissions of such other carrier, including but not limited to providing flight status information, delays and other acts or omissions that arise from their flight operations.

H. No employee or agent of UA has the authority to alter, modify, or waive any fare rules or any provision of the Contract of Carriage unless authorized by a corporate officer of UA. UA's appointed agents and representatives are only authorized to sell Tickets for air transportation pursuant to approved fares, rules, and regulations of UA. Failure or delay on the part of either party to exercise any right or power herein shall not operate as a waiver thereof.

I. Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, UA shall not be liable for any consequential, compensatory, indirect, incidental or punitive damages arising out of or in connection with the performance of its obligations under these rules.

J. UA's obligations hereunder extend only to the Ticketed Passenger. There are no third party beneficiaries to these rules.

K. Except where provided otherwise by law, UA's conditions of carriage, rules and tariffs are subject to change without notice, provided that no such change shall apply to Tickets issued prior to the effective date of such change.

L. The invalidity of any provision herein by local law shall not affect the validity of any other provision that shall remain in full force and effect.

M. If UA makes arrangements for Passengers with any third party to provide any services other than carriage by air, or if UA issues a ticket or voucher relating to transportation or services (other than carriage by air) provided by a third party such as hotel reservations or car rental, UA does not assume responsibility for the ground transportation of any Passenger or his or her baggage. The terms and conditions of the third party service provider will apply, as well as Rule 17 B) below.

N. Except as otherwise provided below, fare rule provisions, local or joint fares, including Arbitraries, contained in the On-line Tariff Database maintained by Airline Tariff Publishing Company on behalf of UA is considered to be part of International Passenger Rules and Fares Tariff No. IPR-2, C.A.B. No. 376, NTA(A) No. 210.I EXCEPTION: For Fares Published by Rule, see C.A.B. No. 737, NTA(A) No. 476.

O. By purchasing a ticket or accepting transportation under this Contract of Carriage, the Passenger agrees to be bound by the Federal Aviation Act (49 U.S.C. 40101, et seq.), including the Airline Deregulation Act (49 U.S.C. 41713).

P. By purchasing a ticket or accepting transportation under this Contract of Carriage, Passenger agrees that any lawsuit brought by Passenger against UA and Carriers doing business as United Express will be brought only in Passenger's individual capacity, and may not be brought in or asserted as part of a class action proceeding.

Q. You agree that you will notify United of any dispute arising out of or related to transportation covered by this Contract by submitting your concerns via the form at https://www.united.com/en/us/customercare, including a description of the nature of the dispute. Following delivery of such submission, you agree to allow United a period of sixty (60) days to provide a substantive response and to try to resolve the dispute prior to filing any lawsuit, arbitration, administrative or any other proceeding against United related to the dispute. Compliance with the notification procedures set forth herein shall be a condition precedent to your right to file any lawsuit, arbitration, administrative or any other proceeding against United. You agree that your failure to comply with the notification procedures set forth herein prior to filing a lawsuit, arbitration,

administrative or any other proceeding against United shall entitle United to recover reasonable attorneys' fees incurred in defending the lawsuit, arbitration, administrative or other proceeding.

Back to Top

# Rule 4 Reservations – Confirmation/Fare Quotes/Disclosures

A. A reservation for space on a given flight of UA is valid when the availability and allocation of such space is confirmed by UA or an authorized agent of UA and entered into the carrier's reservations system. At the time of reservation, UA requires the full name consisting of full first and last name for each passenger to be entered into the name field of the reservation, and other government mandated information, including but not limited to date of birth and gender.
   Only one name will be required for reservations for passengers whose passports reflect only one name. Reservations that do not contain the full name of each passenger, other required information, or fraudulent information will be automatically cancelled within 72 hours of reservation confirmation. UA requires ticketing at the time of reservation. UA will allow a 100% refund to the original form of payment if the request is made within 24 hours of ticketing and if the reservation is made one week or more prior to the scheduled flight departure and the ticket is purchased directly through UA.

B. Subject to payment or other satisfactory credit arrangements, a validated Ticket will be issued by UA or the authorized agent of UA indicating such confirmed reserved space provided the Passenger applies to UA or the authorized agent of UA for such Ticket within the Check-In Time Limits specified in Rules 5 D) and E). Such reservation of space is subject to cancellation by UA without notice if the Passenger does not comply with this Rule.
   EXCEPTION: Where other rules, including fare rules, provide for the issuance, validation, or purchase of a Ticket within specific time limits, these specific time limits will apply.

C. Once a Passenger obtains a Ticket indicating confirmed reserved space for a specific flight and date either from UA or its authorized agent, the reservation is confirmed even if there is no record thereof in UA's reservation system.
   EXCEPTION: Tickets shall not be valid if reservations are cancelled pursuant to Rule 5 or cancelled by the passenger or his/her representative.

D. Seat assignments, regardless of class of service, are not guaranteed and are subject to change without notice. UA reserves the right to reseat a Passenger for any reason, including from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which the applicable fee has been paid, and if a Passenger is improperly or erroneously upgraded to a different class of service. If a Passenger is removed from a United® Premium Plus seat, Economy Plus seat, or from Preferred Seating for which a fee has been paid, and the Passenger is not re-accommodated in a seat of equal or greater value, or if a Passenger is downgraded from a class of service and is not re-accommodated in a seat in an equal or greater class of service for which a fee has been paid-, the Passenger may be eligible for a refund in accordance with Rule 27. UA also prohibits Passengers from selling their seat assignments at any time and/or exchanging them at the time of boarding without first advising a member of the crew.

E. UA may limit the number of Passengers carried at any fare level and certain fares will not necessarily be available on all flights. The number of seats which UA shall make available on a given flight will be determined by UA.

Back to Top

# Rule 5 Cancellation of Reservations

A. UA has the right to cancel reservations (whether or not confirmed) of any Passenger whenever such action is necessary to comply with any governmental regulation, upon any governmental request for emergency transportation in connection with the national defense, or whenever such action is necessary or advisable by reason of weather or other conditions beyond UA's control, (including, but not limited to acts of God, force majeure events, strikes, civil commotions, embargoes, wars, hostilities, or other disturbances, whether actual, threatened, or reported).

B. UA has the right to cancel reservations (whether or not confirmed) due to the Passenger's failure to comply with the rules set forth herein, including but not limited to, the Passenger's failure to pay for the applicable Ticket under the conditions applicable to the fare for such travel.

C. Failure to Occupy Space - If a Passenger fails to occupy space which has been reserved for him/her on a flight of UA and UA fails to receive notice of the cancellation of the reservation before the departure, or if any carrier cancels the reservation of any Passenger, UA may cancel all reservations (whether or not confirmed) held by such Passenger on the flights of UA or any carrier for continuing or return space.

D. Check-In Time Limits - UA has the right to cancel reservations (whether or not confirmed), deny boarding and/or refuse the acceptance of checked baggage of any Passenger who fails to present himself/herself within the applicable check-in or loading gate time limits for Passengers and/or Baggage.
   1. Domestic flights, except those departing Guam:
      a. For Passengers who do not need to check baggage, Passenger must complete the purchase of the ticket(s), check-in and obtain a boarding pass at least 30 minutes prior to scheduled departure.
         EXCEPTIONS: At the following airports, Passengers must complete check-in at least 45 minutes prior to scheduled departure: Baltimore, MD; Aguadilla, Puerto Rico; and San Juan, Puerto Rico.
      b. For Passengers who do need to check baggage, Passenger must complete the purchase of the ticket(s), check-in, obtain a boarding pass,

I. Passengers Occupying Two Seats – Upon request, or if determined necessary by UA, and given availability, a Passenger will be permitted to the exclusive use of two seats subject to the payment of two applicable fares for the points between which the two seats will be used. A Ticket will be issued for each seat and the normal Checked Baggage Allowances will apply in connection with each such Ticket presented to UA. The carry-on allowance is limited to the allowance for one individual.

J. Prohibited Practices:

1. Fares apply for travel only between the points for which they are published. Tickets may not be purchased and used at fare(s) from an initial departure point on the Ticket which is before the Passenger's actual point of origin of travel, or to a more distant point(s) than the Passenger's actual destination being traveled even when the purchase and use of such Tickets would produce a lower fare. This practice is known as "Hidden Cities Ticketing" or "Point Beyond Ticketing" and is prohibited by UA.

2. The purchase and use of round-trip Tickets for the purpose of one-way travel only, known as "Throwaway Ticketing" is prohibited by UA.

3. The use of Flight Coupons from two or more different Tickets issued at round trip fares for the purpose of circumventing applicable tariff rules (such as advance purchase/minimum stay requirements) commonly referred to as "Back-to-Back Ticketing" is prohibited by UA.

4. The failure to comply with applicable stayover requirements, the failure to meet the purpose or status requirement associated with the Ticket's fare category, and the purchase or use of a Ticket that UA determines circumvents the applicable fare rules.

5. Any practice that United believes, in its sole discretion, is exploitative, abusive or that manipulates/bypasses/overrides United's fare and ticket rules.

K. UA's Remedies for Violation(s) of Rules - Where a Ticket is booked, held, purchased and/or used in violation of the law, these rules or any fare rule (including Hidden Cities Ticketing, Point Beyond Ticketing, Throwaway Ticketing, or Back-to-Back Ticketing), UA, without notice to the passenger, has the right in its sole discretion to take all actions permitted by law, including but not limited to, the following:

1. Invalidate the Ticket(s);

2. Cancel any remaining portion of the Passenger's itinerary;

3. Confiscate any unused Flight Coupons until the amount reflected in 5) below is collected;

4. Permanently ban or refuse to board the Passenger and to carry the Passenger's baggage, unless the difference between the fare paid and the fare for transportation used is collected prior to boarding;

5. Assess the Passenger for the actual value of the Ticket which shall be the difference between the lowest fare applicable to the Passenger's actual itinerary and the fare actually paid;

6. Delete miles in the Passenger's frequent flyer account (UA's MileagePlus Program), revoke the Passenger's Elite status, if any, in the MileagePlus Program, terminate the Passenger's participation in the MileagePlus Program, terminate any other air transportation agreement between UA and the Passenger, or take any other action permitted by the MileagePlus Program Rules in UA's "MileagePlus Rules;"

7. Charge a delivery fee and penalty, set at United's discretion, to send Checked Baggage to the Passenger; and

8. Take legal action with respect to the Passenger.

L. UA may mandate the issuance of an e-Ticket regardless of market, carrier, form of payment, or customer type (including mileage plus and participating carrier frequent flyer members). In addition to all applicable charges, UA will assess a 50.00 USD fee for issuance of a paper ticket.

M. UA will assess a 50.00 USD/50.00 CAD fee to assist with a voluntary change on tickets originally issued via any external ticketing source (travel agency, internet agency, other airline, etc.). The fee is non-refundable and applies in addition to all applicable charges.

N. Within the 50 U.S. states and Canada, UA will assess a 50.00 USD/50.00 CAD charge for tickets purchased at any airport location, a 25.00 USD/25.00 CAD charge for tickets purchased through Contact Centers, and a 30.00 USD/30.00 CAD charge for tickets purchased or changed through a City Ticket Office. Charges may vary outside the 50 U.S. states and Canada. These booking service charges are non-refundable and apply in addition to all applicable charges.

O. Unless prohibited by local law, UA may restrict acceptable forms of payment for its tickets, products, or services to debit or credit card.

Back to Top

# Rule 7 Ticket Validity Period

A. Nonrefundable Fares: Nonrefundable fares have no value after ticketed departure time. EXCEPTION: When the Passenger cancels the ticketed flight reservations prior to the ticketed departure time, the period of validity for that ticket applies.

B. Period of Validity - Except as otherwise provided in this Rule or required by the applicable local law of a foreign jurisdiction, any eligible Ticket issued by UA or its authorized agent on UA Ticket Stock must begin travel within one year from the date of issuance and will be valid for transportation for one year from the date on which transportation commences at the point of origin as designated on the original Ticket or, if no portion of the Ticket is used, one year from the date of issuance of the original Ticket. When an unused fare Ticket is completely exchanged, the original ticket validity applies. When fares are combined to create Round/Circle/Open-Jaw Trips, the most restrictive provisions will apply to the entire transportation.

C. Extension of Validity Period:

1. If the Passenger is prevented from using the Ticket, or a portion thereof during the period of validity specified in this Rule due to a UA flight cancellation or because UA is unable to provide space on the flight, UA will, without additional collection of fare, extend the ticket validity period of such Passenger's Ticket until the first flight of UA on which space is available in the class of service for which the fare has been paid.

2. If a Passenger is unable to commence or continue travel because of the death or serious illness of the Passenger, the Passenger's immediate family member(s), or the Passenger's traveling companion(s), UA may, in its sole discretion, waive or refund any applicable change fees

associated with changing the ticket(s). See Rule 27 or visit UA's website, united.com, for details regarding UA's Refund Policy.

D. Waiver of Minimum Stay Requirements - Special Fare - In the event of the death of a Passenger enroute, the minimum stay and group travel requirements with regard to any special fares will be waived for Passengers who are immediate family members of the deceased Passenger or were otherwise actually accompanying the deceased Passenger, on the following conditions:

   1. The ticket must be endorsed "earlier return on account of death of (name of Passenger)"; and

   2. A copy of the death certificate duly executed by the competent authorities under the applicable laws of the country in which death has occurred must be presented to UA at the time of reticketing. Passengers will be accommodated under this provision only in the class of service originally ticketed.
   NOTE: If the death certificate is not available at the time the Passenger requests reticketing under this provision, or if documentation satisfactory to UA has not been provided, the Passenger(s) requesting reticketing will be accommodated only upon payment of the fare applicable to transportation actually used and a request for a refund may later be filed with UA with the documents required. Upon receipt of the request for a refund and all supporting documents, UA will determine whether a refund to the Passenger is appropriate. If so, the maximum refund will be the difference between the total fare paid by the Passenger and the amount such Passenger would have paid if a waiver had been originally furnished under the provisions of this Rule.

E. Ticket Issue Date - The date when payment is made by credit card, or the ticket invoice date established when payment is made by other acceptable form of payment, will constitute the date a Ticket is "issued" in determining the validity period under this Rule.

Back to Top


# Rule 8 Returned Check Charge

UA will collect 25 USD/25 CAD for each returned check. This charge is non-refundable and is not subject to any discount.

Back to Top


# Rule 9 Deleted

Back to Top


# Rule 10 Transatlantic Surcharges

For details concerning transatlantic surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

Back to Top


# Rule 11 Pacific Surcharges

For details concerning transpacific surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

Back to Top


# Rule 12 Western Hemisphere Surcharges

For details concerning Western Hemisphere surcharges, see UA's International Fare service surcharges filed with ATPCO referencing this Rule.

Back to Top

# Rule 13 Acceptance of Children/Minors and Infants

A. Children/Minors/Infants Traveling Accompanied

   1. Children under the age of five (5) must be "accompanied" by an Adult Passenger or the child's Parent/Legal Guardian on the same flight and in the same compartment. UA reserves the right to require and charge the applicable service charge for Unaccompanied Minor service when a child age five (5) to fourteen (14) is traveling with a passenger who is not at least 18 years old or the child's Parent/Legal Guardian.

   2. United does not accept infants in incubation (except as permitted under Rule 15C) or infants under seven days old.

   3. Lap Children (infants under the age of two years):

     a. Additional infants under the age of two years must occupy a seat and be ticketed at the applicable adult fare.

     b. Infants under the age of two years for whom a seat at the applicable adult fare has not been purchased, may not occupy a seat. NOTE: Infants who are carried in an adult's lap do not require a Ticket for domestic travel. Infants traveling internationally and to and from Canada require a Ticket, which may be discounted off of the applicable fare. In many cases a Ticket is required for an infant to travel on international flights even if no fare is paid. In addition, some international destinations may carry service charges. A USD 0 value or fee only Ticket may be issued for an infant.

   4. Children who have reached their second birthday are required to purchase a seat and occupy a seat with a separate seat belt. Infants reaching their second birthday after outbound flights will be required to purchase a Ticket and occupy a seat for continuing/return flights only.

   5. Infant/child Seats: Children unable to sit upright with the seat belt fastened must be carried in an approved infant/child seat, if not being held by an Adult Passenger as a lap child. Infant/child seats:

     a. Must be FAA approved and be clearly marked with the original NHTSA label, must be approved by a foreign government with a label showing that the seat was manufactured under the standards of the United Nations, or must conform to the Canadian Motor Vehicle Safety Standard (CMVSS) 213 or 213.1 whereby a label of compliance must be affixed to the seat indicating compliance with the same.

     b. Must be used in unoccupied aircraft seats and cannot be held in an adult's lap.

     c. Cannot be used in an Exit Row.

     d. Must remain properly secured to an aircraft seat at all times unless stored as a carry-on.

   6. Proof of age may be required by UA for any child, minor, or infant traveling accompanied.

B. Children/Minors Traveling Unaccompanied

   1. UA requires Unaccompanied Minor service for children/minors age five (5) to fourteen (14) who are not accompanied by a passenger who is at least 18 years old or a Parent/Legal Guardian. The policies for UA's Unaccompanied Minor service apply only to flights operated by UA and Carriers doing business as United Express. UA does not offer unaccompanied minor service to or from other carriers.

   2. Unaccompanied children under five (5) years of age are not accepted on flights operated by UA and Carriers doing business as United Express.

   3. UA's Unaccompanied Minor service is mandatory for unaccompanied children age five (5) to fourteen (14) years old. For minors age fifteen (15) through seventeen (17) for whom UA's Unaccompanied Minor service is not purchased, UA will assume no financial or guardianship responsibilities beyond those applicable to an adult Passenger.

   4. Unaccompanied children/minors must be brought to the airport of departure by a parent, legal guardian, or responsible adult 30 minutes early (in addition to regular airport processing times shown for the airport). This parent, legal guardian, or responsible adult shall remain with the unaccompanied child(ren)/minor(s) until the unaccompanied child(ren)/minor(s) has boarded and the plane is airborne, and who shall confirm that the unaccompanied child(ren)/minor(s) will be met by another parent, legal guardian, or responsible adult upon deplaning at the final destination and shall furnish UA with that individual's name, address, and phone number(s).

   5. The parent, legal guardian, or responsible adult receiving the unaccompanied child(ren)/minor(s) upon deplaning at the final destination may be required to present a government-issued photo ID that matches the name and address provided by the parent or guardian who delivered the child to the departure airport, and may also be required to complete and sign documentation relating to such unaccompanied child(ren)/minor(s). UA reserves the right to refuse to release an unaccompanied minor to anyone other than the pre-designated individual.

   6. When two or more unaccompanied minors are traveling together, the most restrictive age requirement will apply.

   7. Proof of age may be required by UA.

C. Unaccompanied Minor Service Charge

   1. Service charges for Unaccompanied Minor service is subject to change at UA's discretion. The fare for Unaccompanied Minor service for children age five (5) to fourteen (14) years old includes the applicable adult fare in addition to a service charge of 150 USD/150 CAD assessed for each one-way journey from the child's boarding point to the child's final destination. One service charge assessed for each one-way journey applies to two or more children traveling together on the same reservation.

   2. For purposes of this Rule, Unaccompanied Minor service includes reasonable supervision for Unaccompanied Minors from boarding until deplaning at the final destination.

Back to Top

# Rule 14 Special Services

A. Definition of Non-Ambulatory under this Rule:

   1. Persons who are unable to move themselves or need the support of another person to walk or move, but who are otherwise capable of caring

for themselves without assistance throughout the flight are considered Non-Ambulatory.

    2. If a Passenger uses a wheelchair for convenience, the Passenger is not considered to be Non-Ambulatory.

    3. A child or infant is not considered to be Non-Ambulatory merely because of his/her age, except when requiring an Infant Transport System.

    4. If the Passenger can move himself/herself from his/her seat to the nearest emergency exit without the aid of another person, the Passenger is not considered to be Non-Ambulatory, regardless of the degree of impairment.

B. Qualifications for Acceptance of Non-Ambulatory Passengers - Non-Ambulatory Passengers are accepted when accompanied by an assistant able to assist the Non-Ambulatory Passenger to evacuate the aircraft in accordance with 14 CFR Part 382.29. See Rule 21.

C. Qualified Individual with a Disability - UA requires a Passenger, including a Qualified Individual with a Disability, to provide up to 48 hours' advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E) if such Passenger wishes to receive any of the following service accommodations:

    1. Transportation of an electric wheelchair on an aircraft with fewer than 60 seats.

    2. Provision by UA of hazardous materials packaging for a battery for a wheelchair or other assistive device.

    3. Accommodation for a group of ten or more Qualified Individuals with Disabilities who make reservations and travel as a group.

    4. Provision of an on-board wheelchair on an aircraft with more than 60 seats that does not have an accessible lavatory.

    5. Provision by UA of carrier-supplied in-flight medical oxygen (if applicable).

    6. Use of a ventilator, respirator, Continuous Positive Airway Pressure (CPAP) machine, or Passenger's own Personal Oxygen Concentrator (POC).

    Qualified Individuals with a Disability traveling with Service Animals must comply with the requirements of Rule 16.

D. When Travel Assistance is Required:

    1. If UA determines that an assistant is essential for safety, UA may require that a Passenger, including a Qualified Individual with a Disability, meeting any of the following criteria travel with an assistant as a condition of being provided air transportation:

      a. A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from UA personnel, including the safety briefing required by 14 CFR, Part 121.571(a)(3), (a)(4) and 135.117(b);

      b. A person with a mobility impairment so severe that the person is unable to physically assist in his or her evacuation of the aircraft; or

      c. A person who has both severe hearing and severe vision impairments if the person cannot establish some means of communication with UA personnel adequate to permit the transmission of the required safety briefing.
      NOTE: If UA determines that a person meeting the criteria in subparagraphs (a), (b) or (c) above must travel with an assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, UA will not charge for the transportation of the assistant.
      EXCEPTION: For Passengers traveling to/from Canada, UA will accept a disabled person's determination of his/her self-reliance.

    NOTE: Flight attendants and other crew members cannot assist with any medical services, assistance inside the lavatory, or in actual feeding.

    2. If, because there is not a seat available on a flight for an assistant whom UA has determined to be necessary, a Qualified Individual with a Disability with only one confirmed reservation is unable to travel on the flight, the Qualified Individual with a Disability shall be eligible for denied boarding compensation in accordance with Rule 25. For purposes of determining whether a seat is available for an assistant, the assistant shall be deemed to have checked in at the same time as the Qualified Individual with a Disability.

E. For Rules regarding wheelchairs, see Rules 23 and 28.

Back to Top

# Rule 15 Medical Services

A. Onboard Medical Oxygen Service - UA may provide on-board medical oxygen service when requested in advance and only in limited markets in the Micronesia area. Passengers requesting on-board medical oxygen service will be required to give UA a minimum 48 hours advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E). Contact UA to verify availability and additional conditions of service. UA is not liable for failure to provide this service in emergency or other circumstances beyond its control.

B. Passenger-Provided Portable Oxygen Concentrators - Portable oxygen concentrators (POCs) approved by the Federal Aviation Administration (FAA) may be carried and used on board flights operated by UA worldwide, at no charge, in accordance with specific FAA requirements. Passengers utilizing POCs are required to give UA a minimum 48 advance notice and check-in one hour before the check-in time for the general public for Domestic U.S. and International flights as set forth in Rule 5 D) and E) and must also meet the following conditions:

    1. Check united.com for a list of specific POCs currently approved by the FAA.

    2. Non-approved POC brands and models that do not contain compressed or liquid oxygen may be carried in the cabin if they meet United's carry-on size and weight requirements. Alternatively, they may be transported as checked baggage. UA may accept other brands and models for use on board in the future as they become approved by the FAA and UA.

    3. Passengers must satisfy specific requirements prior to boarding the aircraft. The Passenger must:

      a. provide advance notice in the reservation record that he/she is planning to use a POC on board the flight.

      b. have a signed written Doctor's statement that:

        i. states the user of the POC has the physical and cognitive ability to see, hear and understand the device's aural and visual cautions and

warnings and is able, without assistance, to take appropriate action in response to those cautions and warnings.

   ii. states whether or not oxygen use is medically necessary for all or a portion of the flight(s) listed on the Passenger's itinerary.

   iii. specifies the maximum oxygen flow rate in liters per minute corresponding to the pressure in the cabin of the aircraft under normal operating conditions.

   iv. may be reviewed at the airport prior to boarding and must be kept by the Passenger and provided upon request by UA personnel at any time during travel. Passenger's may use and print out the Medical Verification Statement available on UA's website, united.com.

  c. ensure that he/she has ample batteries to power the POC for the duration of his/her flight plus 3.0 additional hours to allow for unanticipated delays and any ground connection time where the POC is planned to be used.(NOTE: aircraft in -seat electrical power is not available for Passenger use with POCs).

  d. ensure that all extra batteries are properly protected from short circuiting by either:
   i. having recessed battery terminals or;

   ii. packing them so that the batteries do not contact metal objects including the terminals of other batteries.

4. Failure to meet the requirements will result in denied use of the POC during travel. Passengers planning on traveling with POCs are solely responsible for advising UA as soon as reservations are confirmed, regardless of whether the reservations were made through a travel agent, on the internet or directly with UA, in order to confirm specific requirements and to provide the airline with required information.

5. When travelling on or connecting to or from any flight other than a UA or a United Express flight, the Passenger is responsible for notifying and making independent arrangements directly with the other airline.

6. POCs are assistive devices for Passengers with disabilities. As such, they do not count toward carry-on or checked baggage limits, whether or not they are used on board. They must be able to fit underneath the seat or in an overhead storage compartment. A Passenger using a POC may not sit in an exit row or bulkhead seat. Additionally, a Passenger using a POC during takeoff and landing may not sit in an aisle seat.

7. UA is not liable for POC equipment failures, failure of the batteries that power the POC, or any other losses or damages alleged by the Passenger or any other person arising out of the use or possession of the POC, unless caused by the gross negligence or willful misconduct of UA.

C. Medical Transport Services - These services are limited and provided only in the Micronesia region. Passengers must provide 48 hours' advance notice for these services (UA will make reasonable efforts to accommodate Passengers who fail to meet the 48-hour reservation/notification requirement, but will not be obligated to do so). Subject to UA's approval based upon the availability of space, appropriate equipment, aircraft type, and pursuant to the following conditions:

1. Passengers on Stretchers
  a. Passenger must comply with UA's medical procedures;

  b. Passenger must pay for all seats required for stretcher transportation as determined by UA;

  c. Passenger must be accompanied by two assistants, provided at the Passenger's expense, one being a medical escort and the other a family member or guardian;

  d. The cost of ambulance service, hospitalization and other ground services shall be paid by the Passenger;

  e. The normal Baggage Allowance will apply to each fare paid; and

  f. The loading and unloading of the stretcher Passenger is the responsibility of the stretcher Passenger's assistants and must be arranged by the Passenger at his or her own expense.

2. All necessary medical documentation must be completed and provided to UA prior to flight.

Back to Top

# Rule 16 Service Animals

A. Service Animals: UA accepts for transportation, without charge, trained Service Animals for travel with a Qualified Individual with a Disability who requires the animal to assist them in the performance of necessary activities. The animal will be permitted to accompany the Passenger in the cabin, if it meets the conditions of acceptance noted below.

1. Conditions of Acceptance
  a. Other than for Search and Rescue Animals, the Passenger must submit to United a Service Animal Air Transportation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and accurately completed Service Animal Air Transportation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

  b. Evidence that an animal is a Service Animal include identification cards, other written documentation, the type of harness or markings on the harness, tags, or other credible assurances of the Qualified Individual with a Disability using the animal. UA, in its sole discretion, will determine if the evidence is sufficient.

  c. Service Animals must be properly harnessed or leashed and remain under the direct control of the Passenger. A Service Animal in addition to its owner-Passenger will be denied boarding, removed from the flight by UA, and in UA's sole discretion, permanently banned if the animal is too large or heavy to be accommodated in the cabin in the space immediately in front of the Passenger, cannot be contained or controlled by the Passenger, or otherwise exhibits behavior that poses a threat to the health or safety of other passengers or a significant

threat of disruption.

    d. On a flight segment scheduled to take 8 hours or more, the Passenger with a Service Animal other than a Search and Rescue Animal must submit to United a Service Animal Relief Attestation Form that has been completed on or after the date the Passenger purchased the Ticket and at least 48 hours prior to scheduled departure. If the Ticket has been purchased less than 48 hours prior to departure, the Service Animal Transportation Form must be submitted to United prior to departure. Such form must be submitted to United in accordance with United's policies. Failure to provide United a fully and accurately completed Service Animal Relief Attestation Form as required by this paragraph may result in the Passenger's being denied transportation on the scheduled flight.

2. UA accepts for transportation, without charge, a properly harnessed dog trained in explosive detection, drug search, and rescue, or other specific functions, when accompanied by its handler on official emergency business as authorized by an appropriate federal, state, or local government agency. Such official duty status must be documented in writing to the satisfaction of UA. The dog will be permitted to accompany its handler into the cabin, but not to occupy a seat.

3. Local regulations at the Passenger's final or intermediate destination(s) may apply and impose further requirements or restrictions, including but not limited to, carriage in the passenger cabin, limitations on the designation of Service Animals to dogs only, or the non-recognition of animals as trained and qualified Service Animals.

4. Trainers are permitted to bring one Service Animal onboard free of charge that is training to assist disabled passengers. This service animal must not occupy a seat, and a must meet all other conditions specified in this Rule. Trainers transporting service animals who are not in training must check these animals as cargo through the PetSafe® program.

B. Service Animals may not occupy a seat. Service Animals will be transported in the Passenger's lap or in the Passenger's foot space, unless this would be inconsistent with safety requirements set by the US Federal Aviation Administration, and may not encroach into another Passenger's foot space. If no other seat accommodation can be made and the animal is too big to fit safely in the cabin, the animal must be transported as cargo through the PetSafe® program, and as a result, may require the Passenger to re-book his or her flight.

C. Passengers with Service Animals will not be seated in emergency exit rows. They may not obstruct an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation.

D. The Passenger affirms that to the best of his or her knowledge, the Service Animal has not behaved aggressively or caused serious injury to another person or dog and does not pose a threat to the health and safety of others, and assumes full responsibility for the safety, well-being, and conduct of its animal, including the interaction of the animal with crew and other Passengers or Passenger property that may come in contact with the animal while on board the aircraft, and for compliance with all UA and governmental requirements, regulations, or restrictions, including entry permits and required health certificates of the country, state, or territory from and/or to which the animal is being transported. Any Passenger or his or her Service Animal who, by failing to comply with this Section, causes UA or its passengers any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense.

Back to Top

# Rule 17 Ground Transfer Service

A. UA may provide or procure ground transfer service between airports and city centers, between airports and any point in a Passenger's itinerary, or to places of lodging.

B. Except where ground transfer service is directly operated by UA, it is agreed that any such service is performed by independent operators. Such independent operators are not agents or servants of UA, and UA assumes no responsibility for the ground transfer of any passenger and/or his/her baggage. Anything done by an employee, agent or representative of UA in assisting the Passenger to make arrangements for such independent ground transfer service shall in no way make UA liable for the acts or omissions of such independent operator.

C. In cases where UA maintains and directly operates local transfer services for its Passengers, the terms, conditions, rules and regulations of UA, including but not limited to, those stated or to which reference is made in UA's Tickets, Baggage Checks and baggage valuation agreements shall be deemed applicable to such local ground transfer services. No portion of the air transportation fare shall be refundable in the event local ground services are not used by the Passenger.

Back to Top

# Rule 18 Service Provided by United Express and Other Codeshare Partners

A. UA has arrangements with certain other carriers to enable UA to provide Codeshare services to Passengers on flights operated by these carriers. Transportation provided by UA under a Codeshare arrangement with these carriers is designated by a flight number that includes UA's two-letter airline designator code, "UA". NOTE: For travel to or from the European Union and for reservations made in the European Union, UA will indicate the identity of the operating carrier at the time of reservation or as soon as administratively feasible.

B. For Codeshare services on flights operated by another carrier, UA is responsible for the entirety of the Codeshare journey for all obligations to Passengers established in these rules. The rules contained herein with respect to ticketing will apply to UA Codeshare services on flights operated by partner airlines. Notwithstanding the foregoing, the baggage liability provisions set forth in Rule 28 shall govern the liability of UA with respect

to any transportation subject to this Contract.

C. When another foreign or U.S. Codeshare partner operates a flight on which UA's designator code "UA" appears, the operating carrier's contingency plan for lengthy tarmac delays will apply to that flight.

Back to Top

# Rule 19 Travel Documents

A. Each Passenger desiring transportation across any international boundary is responsible for obtaining prior to travel and presenting upon request at any time all necessary travel documents, which shall be in good condition, and for complying with the laws of each country flown from, through or into which he/she desires transportation. Any Passenger who, by failing to comply with the laws of each country flown from, through or into which he/she desires transportation, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such documents or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to obtain and present such documents, which shall be in good condition, or to comply with such laws. Where legally permitted, UA reserves the right to hold, photocopy or otherwise reproduce a travel document presented by any Passenger. UA also reserves the right to deny boarding to any Passenger whose necessary travel documents are not in good condition according to UA's reasonable belief, or which otherwise do not comply with laws of the specific country the Passenger is departing from, transiting through, or traveling to.

B. Subject to applicable laws and regulations, the Passenger must pay the applicable fare whenever UA, on government order, is required to return a Passenger to his/her point of origin or elsewhere due to the Passenger's inadmissibility into/or deportation from a country. The fare will be the applicable fare in effect at the time of the rebooking for the return travel. Any difference between the applicable fare and the fare paid will be collected from the Passenger. UA will apply to the payment of such fares any funds paid by the Passenger for unused carriage or any funds of the Passenger in possession of or accessible/available to UA. The fare collected for carriage to the point of refusal of entry or deportation, as well as for return travel, will not be refunded by UA unless the law of such country requires that the fare be refunded.

C. This Rule and its limitations include, but are not limited to, Travel Documents related to travel by minors. Parents/guardians of minors are responsible for compliance with all requirements and procedures for minors travelling internationally, including, but not limited to documentary evidence, such as a notarized letter of relationship and permission for the minor's travel from the parent or legal guardian not present.

Back to Top

# Rule 20 Screening of Passengers and Baggage

Passengers and/or their baggage are subject to security screening, including but not limited to, security profiling, physical pat-downs and inspections, x-ray screening, manual bag searches, questioning of Passengers, and use of electronic or other detectors or screening or security devices, in the sole discretion of the government, airport or UA, and with or without the Passenger's presence, consent or knowledge. Neither UA nor its employees or agents is liable for any damage, loss, delay (including refusal to transport), confiscation of property, injury or other harm relating to or arising out of security screening conducted by an agent of the airport or any local, state, or federal agency or a Passenger's failure to submit to or comply with such security screening.

Back to Top

# Rule 21 Refusal of Transport

UA shall have the right to refuse transport on a permanent or temporary basis or shall have the right to remove from the aircraft at any point, any Passenger for the following reasons:

A. Breach of Contract of Carriage – Failure by Passenger to comply with the Rules of the Contract of Carriage.

B. Government Request, Regulations or Security Directives – Whenever such action is necessary to comply with any government regulation, Customs and Border Protection, government or airport security directive of any sort, or any governmental request for emergency transportation in connection with the national defense.

C. Force Majeure and Other Unforeseeable Conditions – Whenever such action is necessary or advisable by reason of weather or other conditions beyond UA's control including, but not limited to, acts of God, force majeure, strikes, civil commotions, embargoes, wars, hostilities, terrorist activities, or disturbances, whether actual, threatened, or reported.

D. Search of Passenger or Property – Whenever a Passenger refuses to submit to electronic surveillance or to permit search of his/her person or property.

E. Proof of Identity – Whenever a Passenger refuses on request to produce identification satisfactory to UA or who presents a Ticket to board and

whose identification does not match the name on the Ticket. UA shall have the right, but shall not be obligated, to require identification of persons purchasing tickets and/or presenting a ticket(s) for the purpose of boarding the aircraft.

F. **Failure to Pay** – Whenever a Passenger has not paid the appropriate fare for a Ticket, Baggage, or applicable service charges for services required for travel, has not paid an outstanding debt or Court judgment, or has not produced satisfactory proof to UA that the Passenger is an authorized non-revenue Passenger or has engaged in a prohibited practice as specified in Rule 6.

G. **Across International Boundaries** – Whenever a Passenger is travelling across any international boundary if:
1. The government required travel documents of such Passenger appear not to be in order according to UA's reasonable belief; or
2. Such Passenger's embarkation from, transit through, or entry into any country from, through, or to which such Passenger desires transportation would be unlawful or denied for any reason.

H. **Safety** – Whenever refusal or removal of a Passenger may be necessary for the safety of such Passenger or other Passengers or members of the crew including, but not limited to:
1. Passengers or Passengers' Service Animals whose conduct is unlawful; indecent; lewd, or sexual in nature; harassing; disruptive; disorderly; offensive; abusive; unsanitary; or violent;
2. Passengers who fail to comply with or interfere with the duties of the members of the flight crew, federal regulations, or security directives;
3. Passengers who assault any employee of UA, including the gate agents and flight crew, any employees of carriers doing business as United Express, any UA or United Express vendor employee, or any UA Passenger;
4. Passengers who, through and as a result of their conduct, cause a disturbance such that the captain or member of the cockpit crew must leave the cockpit in order to attend to the disturbance;
5. Passengers who are barefoot, not properly clothed, or whose clothing is lewd, obscene or offensive;
6. Passengers who appear to be intoxicated or under the influence of drugs (other than a qualified individual whose appearance or involuntary behavior may make them appear to be intoxicated or under the influence of drugs);
7. Passengers wearing or possessing on or about their person concealed or unconcealed deadly or dangerous weapons; provided, however, that UA will carry law enforcement personnel who meet the qualifications and conditions established in 49 C.F.R. §1544.219;
8. Passengers who are unwilling or unable to follow UA's policy on smoking or use of other smokeless materials;
9. Unless they comply with Rule 6 I), Passengers who are unable to sit in a single seat with the seat belt properly secured, and/or are unable to put the seat's armrests down when seated and remain seated with the armrest down for the entirety of the flight, and/or passengers who significantly encroach upon the adjoining passenger's seat;
10. Passengers who are manacled or in the custody of law enforcement personnel;
11. Passengers who have resisted or may reasonably be believed to be capable of resisting custodial supervision;
12. Pregnant Passengers in their ninth month, unless such Passenger provides a doctor's certificate dated no more than 72 hours prior to departure stating that the doctor has examined and found the Passenger to be physically fit for air travel to and from the destination requested on the date of the flight, and that the estimated date of delivery is after the date of the last flight;
13. Passengers who are incapable of completing a flight safely, without requiring extraordinary medical assistance during the flight, and Passengers who appear to have symptoms of or have a communicable disease (or there is reason to believe there was exposure to a communicable disease) or other condition that could pose a direct threat to the health or safety of themselves or others on the flight, or who refuse a medical screening for such disease or condition, whether suspected or actual. (NOTE: UA requires a medical certificate for Passengers who wish to travel under such circumstances. Visit UA's website, www.united.com, for more information regarding UA's requirements for medical certificates);
14. Passengers who fail to travel with the required safety assistant(s), advance notice and/or other safety requirements pursuant to Rules 14 and 15;
15. Passengers who do not qualify as acceptable Non-Ambulatory Passengers (see Rule 14);
16. Passengers who have or cause a malodorous condition (other than individuals qualifying as disabled);
17. Passengers whose physical or mental condition is such that, in United's sole opinion, they are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an escort. The escort must accompany the escorted passenger at all times;
18. Unaccompanied passengers who are both blind and deaf, unless such passenger is able to communicate with representatives of UA by either physical, mechanical, electronic, or other means. Such passenger must inform UA of the method of communication to be used;
19. Passengers who are unwilling to follow UA's policy that prohibits voice calls after the aircraft doors have closed, while taxiing in preparation for takeoff, or while airborne;
20. Passengers who refuse to wear a mask or face covering while at the airport and/or onboard UA and United Express flights if UA or United Express believe, in their sole discretion, that a failure to wear such a mask or facial covering may pose a risk to the health or safety of others; and
21. Passengers flying into the U.S. from a foreign country who: i) refuse to provide proof of full vaccination, ii) proof of a negative pre-departure test result for COVID-19, and iii) contact tracing information within 72 hours of their flight's departure, the sufficiency of which for each of the three items is subject to UA's approval.

I. Any Passenger who, by reason of engaging in the above activities in this Rule 21, causes UA any loss, damage or expense of any kind, consents and acknowledges that he or she shall reimburse UA for any such loss, damage or expense. UA has the right to refuse transport, on a permanent basis, any passenger who engages in any of the activities in this Rule. In addition, the activities enumerated in this Rule shall constitute a material breach of contract, for which UA shall be excused from performing its obligations under this contract.

J. UA is not liable for its refusal to transport any passenger or for its removal of any passenger in accordance with this Rule. A Passenger who is

removed or refused transportation in accordance with this Rule may be eligible for a refund upon request. See Rule 27 A). As an express precondition to issuance of any refund, UA shall not be responsible for damages of any kind whatsoever. The passenger's sole and exclusive remedy shall be Rule 27 A).

Back to Top

# Rule 22 Smoking Policy

Smoking (including use of electronic simulated smoking materials and smokeless cigarettes) is not permitted on any flights operated by UA. Use of betel nut (i.e., betel chewing) or any other type of chewing tobacco is also prohibited on all flights operated by United. Federal law also prohibits smoking in an airplane lavatory and tampering with, disabling, or destroying any smoke detector installed in any airplane lavatory. Federal law provides for a penalty of up to $2,000 for tampering with the smoke detector installed in this lavatory. Individuals are subject to FAA enforcement action and substantial monetary penalties for violation of this law and related regulations. By purchasing a ticket or accepting transportation, the Passenger agrees to comply with UA's policy on smoking and use of other smokeless materials, as well as applicable federal law, and UA reserves the right to seek reimbursement from any Passenger whose failure to do so causes UA any loss, damage or expense.

Back to Top

# Rule 23 Baggage

A. General Conditions of Acceptance - Passengers may check Baggage for carriage in the cargo compartment of the aircraft and/or may carry Baggage on board the aircraft subject to provisions in this Rule. UA will accept Baggage subject to the following conditions:

1. Passengers must present a valid Ticket for transportation over the lines of UA or over the lines of UA and one or more other carriers with which UA has an Interline Transportation agreement.

2. UA has the right to refuse to transport Baggage on any flight other than the one carrying the Passenger.

3. UA will refuse to accept property for transportation when the size, weight, character or type of packaging renders it unsuitable for transportation on the particular aircraft which is to transport it, or when the property cannot be accommodated without harming or annoying Passengers or which poses a risk to other baggage or cargo, or which is not suitable or adequately packed to withstand ordinary handling, unless the passenger executes a release form.

4. All Baggage or other property for which UA assumes custody and for which it issues a Baggage Claim Check shall be deemed acceptable for transportation by air.

5. Baggage will not be checked:
   a. To a point that is not on the Passenger's Routing;
   b. Beyond the Passenger's next point of Stopover or, if there is no Stopover, beyond the final Destination of the Ticket;
   c. Beyond a point to which all applicable charges have been paid;
   d. Beyond a point at which the Passenger is to Transfer to a connecting flight, if that flight is scheduled to depart from an airport different from the one at which the Passenger is scheduled to arrive; or
   e. To an intermediate point unless the intermediate point to which the Baggage is to be checked is a permissible Stopover point at the fare paid (except if the Passenger is making a connection to the first available UA flight departing from such intermediate point and the connection exceeds four hours, the Passenger may reclaim his/her Baggage at such intermediate connecting point).

6. UA has the right to refuse to accept Baggage from the Passenger if the Passenger fails to present the Baggage within the Check-in time limits specified in Rules 5 D) and E), or if the Passenger will be voluntarily separated from his or her Baggage (other than those Passengers whose flight is oversold and who volunteer to take a later flight). UA may require a signed release of liability as a condition of Baggage acceptance in these circumstances.

7. It is the Passenger's responsibility to attach proper identification to Baggage, and UA is not liable for a Passenger's failure to do so. It is also the Passenger's responsibility to claim the checked baggage at the baggage claim area, and UA assumes no obligation to verify the identity of the bearer at the destination airport.

8. Checked Baggage will generally be carried on the same aircraft as the Passenger unless such carriage is deemed impractical by UA, in which event the carrier will make arrangements to transport the Baggage on the next flight on which space is available. UA will charge fees to a Passenger for the delivery of Baggage when the Passenger fails to check-in within the applicable check-in time and it results in his/her Baggage traveling on a different flight.

9. All baggage is subject to inspection by UA and/or the TSA. However, there is no obligation that UA perform an inspection. UA will refuse to transport or will remove at any point baggage that the passenger refuses to submit for inspection.

10. UA will not accept baggage or other personal property for storage.

B. Baggage Allowance - When a Passenger presents a valid Ticket for transportation between points on UA, transportation of the Passenger's Baggage between such points will be subject to the terms and conditions of this Rule, as well as the Additional Liability Limitations found in Rule 28. For purposes of this Rule, "Baggage Allowance" is defined as the number of pieces of Baggage that will be carried subject to payment of applicable service charge(s), either as Checked Baggage or Carry-on Baggage, provided such Baggage meets the specified Maximum Outside

Linear Dimensions and maximum weight of each piece.

1. Checked Baggage Allowance - UA will accept up to two pieces of Checked Baggage weighing less than 51 pounds (23.1 kg) and a Maximum Outside Linear Dimension of 62 inches (158cm) (measured by adding the width + length + height) subject to payment of the applicable service charge(s). First and second Checked Baggage service charges, available on UA's Baggage Calculator, vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport). In addition, the following provisions apply for Checked Baggage:

   a. UA may, at its sole discretion, change, consider and make exceptions to its Baggage Allowance policy (e.g., to the number, size, weight, type, and/or applicable service charges) for certain MileagePlus members, First Class and Business customers, certain credit card holders, active military personnel, and/or other Passengers depending on the fare class purchased.

   b. Applicable Baggage service charges(s) paid are non-refundable. A Passenger who does not travel as a result of a cancellation, Schedule Change, or Irregular Operations will be eligible for a refund upon request. See Rule 27 C). United will also reimburse Passengers for any fee charged to transport bag(s) that are lost.

   c. UA may allow certain sporting equipment and other items to be checked in lieu of one piece of Baggage. See Rule 23 E) for more information.

   d. Boxes weighing less than 51 pounds (23.1 kg) and 42 linear inches (107 cm) may be accepted as Checked Baggage on flights operating as United Express to the Caribbean, Central America, and Mexico.

   e. For travel to, from or within Micronesia, Baggage is limited to two checked bags, 1 checked bag and 1 checked box or 1 checked bag and 1 checked cooler not to exceed Maximum Outside Linear Dimensions of 62 linear inches (158 cm) and weighing less than 51 pounds (23.1 kg).

   f. If bags exceed the maximum linear dimensions, weight, or allowance, excess baggage charges may also apply. Baggage weighing 100 pounds (45 kg) or more will not be accepted as checked baggage.

   g. The items listed below will not be included as part of the Checked Baggage Policy, and can be checked free of charge:
      i. Assistive devices (e.g. cane, one set of crutches, one set of braces, prosthetic devices, or a wheelchair). For additional information on wheelchairs, see G) 4) below.

      ii. For flights departing from Hawaii, one box of pre-packaged fruit up to a maximum weight of 30 pounds.

      iii. For each accompanied child, one child/infant's car restraint seat and one of the following items: a collapsible stroller, a compact folding stroller, or a folding wagon.

2. Carry-on Free Baggage Allowance - UA will accept one piece of Carry-on Baggage free of charge, which, for purposes of this Rule, is referred to as the "Carry-on Free Baggage Allowance", and one personal item such as a shoulder bag, backpack, briefcase, laptop bag or similar item, except, however, UA will not accept any Carry-on Baggage for passengers traveling on a Basic Economy fare and Basic Economy passengers whose baggage is checked at the gate will be charged the applicable checked bag service charge, plus a 25 USD/25 CAD gate handling service charge. Carry-on Baggage must not exceed the Maximum Outside Linear Dimensions of 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm), which includes its wheels and handles. Personal items must not exceed 9 inches (22 cm) x 10 inches (25 cm) x 17 inches (43 cm), which includes any wheels and handles. A personal item that exceeds these maximum linear dimensions but is not greater than 9 inches (22 cm) x 14 inches (35 cm) x 22 inches (56 cm) will be considered as Carry-on Baggage. Carry-on Baggage or personal items suspected of being oversized may require being placed into a sizing unit to determine acceptability. Carry-on Baggage that exceeds the Maximum Linear Dimensions allowed or that exceeds the Carry-on Free Baggage Allowance will be considered as Checked Baggage and is subject to Checked Baggage service charges. For flights departing Yap, Federated States of Micronesia (YAP), the maximum weight of carry-on baggage is 25 lbs/11.3 kg; any bag heavier than this amount will be considered as Checked Baggage and is subject to Checked Baggage service charges, such as Excess and Oversize/Overweight Baggage charges. Carry-on Baggage may be stored in carry-on compartments of the aircraft if so equipped, or it must be retained in the Passenger's custody and stored under a seat or in an overhead compartment approved for the carriage of such Baggage. See Rule 23 F) 5) below for UA's Carry-on policy regarding musical instruments. Carry-on Baggage is subject to the following additional conditions:

   a. Operations, space constraints, security directives and/or other safety considerations may require limitations to the allowable Carry-on Baggage on a specific flight.

   b. UA reserves the right in its sole and absolute discretion to determine the suitability and place of storage of any items to be carried in the cabin of the aircraft.

   c. UA reserves the right to check a Passenger's Carry-on Baggage for any reason, including if the Carry-on Baggage cannot be safely stowed, or the Carry-on Baggage is not compliant with the Maximum Outside Linear Dimensions specified in section 2) above.

   d. In addition to the Carry-on Free Baggage Allowance listed above, the following items do not count toward the one Carry-on plus one personal item:
      i. An overcoat or wrap.

      ii. An umbrella.

      iii. A reasonable amount of reading material.

      iv. A pet carrier (charges apply) (the carrier must be small enough to fit underneath the seat without blocking any person's path to the main aisle of the aircraft, and it must be stowed properly before the forward customer entry door to the aircraft is closed).

      v. A collapsible wheelchair.

      vi. A government approved child/infant restraint seat meeting Federal Motor Vehicle and FAA Approval Standards.

      vii. A camera.

      viii. A diaper bag.

      ix. A breast pump.

      x. A limited amount of Airport Duty Free items, merchandise purchased in the airport, or food. These items must be stowed in the same manner as Carry-on Baggage.

xi. Assistive devices (a cane, one set of crutches, prescription medications and any medical devices needed to administer the medications, a Portable Oxygen Concentrator (POC), etc.). These items must be stowed in the same manner as Carry-on Baggage.

xii. A compact folding stroller that complies with the Carry-on Baggage restrictions above.

3. Baggage Allowance for Children:

   a. Children paying for a seat will receive the appropriate baggage allowance for that seat in addition to one stroller or folding wagon and one car seat;

   b. Lap children will be granted a Baggage Allowance of one stroller or folding wagon and one car seat. Infants traveling internationally on 10% of an Adult fare are also allowed one stroller or folding wagon and one car seat in addition to their standard Baggage Allowance.

4. Passenger Reroutes - A Passenger rerouted in accordance with Rule 24 will be entitled to the maximum Baggage Allowance applicable for the trip originally purchased, regardless of whether the Passenger is transferred to a different class of service or whether the Passenger is entitled to a fare refund.

C. Excess and Oversize/Overweight Baggage Limits and Charges

1. Except as otherwise provided in the terms of this Contract of Carriage or by law, articles transported as Checked Baggage may not exceed the Maximum Outside Linear Dimensions of 115 linear inches (292 cm) or a maximum weight of 99.9 pounds (45.3 kg).

2. UA may, in its sole discretion, change, consider or make exceptions to its Excess or Oversize/Overweight Baggage policy (e.g., to the number, size, weight, type and/or applicable service charges).

3. Charges apply for Excess and Oversize/Overweight Baggage, in addition to applicable Baggage service charges(s) required to be paid pursuant to UA's general Baggage Allowance policy. These charges apply each way (i.e., based on a one-way trip) and are cumulative (i.e., Baggage that is excess and also oversized and/or overweight will be subject to both Excess Baggage *and* Oversize/Overweight Baggage charges).

4. Excess and Oversize/Overweight Baggage charges, available on UA's Baggage Calculator, may vary depending on the type of fare purchased, date of purchase, date of travel, active military status, the Passenger's itinerary (e.g., domestic or international), and/or when and where Baggage is checked and the applicable service charge is paid (e.g., checked and pre-paid at united.com or at the airport).

5. UA's acceptance of Excess and Oversize/Overweight Baggage shall be on a space-available basis only, and shall be subject to the load capacities of the aircraft in use. United may prohibit Checked Baggage exceeding either 70 lbs or more than 115 linear inches.

6. Excess and/or Oversize/Overweight Baggage charges will apply from the point at which Baggage is accepted for transportation to the point at which Baggage is checked or transported in the Passenger compartment. Baggage connecting to other airlines also may be subject to the connecting airline's Excess and/or Oversize/Overweight Baggage charges, in addition to UA's Excess and/or Oversize/ Overweight Baggage charges.

7. Excess Baggage Embargos – Excess and Oversize/Overweight Baggage may not be accepted on flights to/from certain destinations during certain specified dates (usually holiday periods). Contact United's Customer Contact Center for a list of cities and effective dates.

8. Additional Limits on Excess and Oversize/Overweight Baggage for Certain International Travel

   a. For travel between the U.S.A./Canada and points in Mexico (except during embargo periods) upon payment of the applicable Excess Baggage charges:

      i. Leon - one article of Baggage in excess of the Baggage Allowance will be accepted.

      ii. Guadalajara, Mexico City and Veracruz – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

      iii. Mexico on flights operating as United Express - one article of Baggage in excess of the Baggage Allowance will be accepted.

      iv. Mexico (all other cities and flights) – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

   b. For travel between the U.S.A./Canada and points in the Caribbean (except during embargo periods) upon payment of the applicable Excess Baggage charges:

      i. Dominican Republic, Tortola, British Virgin Islands - No Baggage in excess of the Baggage Allowance will be accepted.

      ii. Caribbean on flights operating as United Express - one article of Baggage in excess of the Baggage Allowance will be accepted.

      iii. Jamaica – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

      iv. Trinidad - one article of Baggage in excess of the Baggage Allowance will be accepted.

      v. Caribbean (all other flights) - up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

   c. For travel between the U.S.A./Canada and points in Central America/Panama (except during embargo periods) upon payment of the applicable Excess Baggage charges:

      i. Belize and/or Costa Rica – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

      ii. Honduras:

         a. Tegucigalpa - No Baggage in excess of the Baggage Allowance will be accepted.

         b. San Pedro Sula and Roatan – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

      iii. To El Salvador - No Baggage in excess of the Baggage Allowance will be accepted.

      iv. From El Salvador – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

      v. Central America/Panama on flights operating as United Express - one article of Baggage in excess of the Baggage Allowance will be accepted.

      vi. Applicable for travel between the U.S.A./Canada and Central America/Panama (all other flights) – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

   d. For travel between the U.S.A./Canada and South America (except during embargo periods) upon payment of the applicable Excess Baggage charges:

      i. Peru, Venezuela and Colombia - No Baggage in excess of the Baggage Allowance will be accepted.

ii. Brazil – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

iii. Ecuador – up to two articles of Baggage in excess of the Baggage Allowance will be accepted.

iv. South America (all other flights) – up to three articles of Baggage in excess of the Baggage Allowance will be accepted.

e. For travel between the U.S.A./Canada and the Philippines – up to three articles of Baggage in excess of the Baggage Allowance will be accepted for transportation upon payment of the applicable Excess Baggage charges. Additional articles may be carried as airfreight only and subject to applicable freight rates and availability.

9. Declaration of Higher Value for Checked Baggage

a. Passengers are not permitted to declare a higher value for Checked Baggage on UA or carriers doing business as United Express. When personal property, including Baggage, is tendered for transportation via two or more carriers other than UA with different maximum limits on declared value, the lowest limit for any such carrier shall apply to all carriers participating in such transportation.

D. Cabin Baggage Requiring a Seat - When a Passenger requests that an item be carried in the Passenger cabin of the aircraft as Cabin Baggage, and it is determined by UA in its sole and absolute discretion that the item is acceptable in the cabin but is so fragile and/or bulky as to require the use of a seat, the items will be accepted and considered Cabin Baggage. Examples include, but are not limited to, large or valuable musical instruments, media cameras, artifacts, garment bags, and similar items of a delicate nature or unusual size. In addition to the Carry-on Baggage conditions specified in Section B 2) a) and b) above, the following provisions also apply to Cabin Baggage Requiring a Seat:

1. Ticketed items are subject to thorough inspection.

2. Such items must be able to withstand the rigors of flight and should be packaged or covered, as necessary, to prevent contents from escaping and to avoid possible injury to other passengers. It is prohibited for either the instrument or the case to contain any object not otherwise permitted to be carried in an aircraft cabin because of the rules contained in this Contract, or any applicable law, regulation, rule, and/or security directive.

3. Ticketed items must be carried aboard the aircraft and strapped in a seat adjacent to the owner using the seatbelt securely (eliminating the possibility of shifting).

4. The weight of the item (including any case or covering) is not to impose any load on these seats or floor structure that exceeds the load limitations for these components, and cannot exceed 165 pounds, or the applicable weight restrictions for the aircraft.

5. No article secured to a seat may obstruct access to, or use of, any emergency or regular exit; block or protrude into any aisle or exit path; or obstruct any passenger's view of the overhead fasten seatbelt and no smoking signs or any required exit sign or video monitor/screens. NOTE: Due to the cabin configuration and FAA regulations, Cabin Baggage locations may vary.

6. No article may be secured in an emergency exit seat.

7. A seat for ticketed Cabin Baggage must be reserved in advance and the applicable charges must be paid.

8. UA will charge 100 percent of the applicable Adult fare for the portion of the trip on which the extra seat is used. The Cabin Baggage will not be included in determining Baggage Allowance or Excess Baggage Charges.

NOTE: Cabin-Seat baggage may not be accepted on some aircraft with weight/size restrictions.
NOTE: UA personnel, including flight attendants and other crew members, cannot assist with the movement or placement of Cabin Baggage Requiring a Seat.

E. Sports Equipment/Special Items – The sports items listed below, and which must weigh less than 51 pounds (23.1 kg) and a maximum outside linear dimension of 62 inches (158cm), will be accepted as Baggage by UA in accordance with the following provisions, accepted at applicable first and second checked bag service charges, and/or special item handling charges specified below. Charges are based on a one-way trip and are applicable from the point at which the item is accepted to the point to which the item is transported. Where an item is not included in the Baggage Allowance, and not specified as a special item listed below, it will be treated as excess baggage (first bag service charge, second bag service charge or excess bag service charge may apply, as well as applicable oversize and overweight service charges). Special item fees are based on a per item basis. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to the Sports Equipment/Special Items specified below when carried as Checked Baggage.
NOTE: Flights operating as United Express do not accept certain items listed below.

1. Archery Equipment - One item of archery equipment (a bow case containing bows, a quiver with arrows, or a maintenance kit of sufficient strength to protect items from damage) will be considered as one item of sporting equipment and allowed in place of one checked bag. United is not liable for damage to archery equipment that is not contained in a hard-sided case.

2. Baseball Equipment – One bag of baseball equipment will be considered as one item of sporting equipment and will be allowed in place of one checked bag. Baseball bats are not permitted in carry-on baggage.

3. Bicycles - United accepts non-motorized bicycles with single or double seats (including tandem) or up to two non-motorized bicycles packed in one case as checked baggage. If the bicycle(s) are packed in a container that is over 51 pounds (23.1 kg) and/or 62 linear inches (158 cm) service charges apply, it will be subject to standard oversize and overweight charges, and first and second bag fees may also apply. If the bicycle(s) are packed in a container that is less than 51 pounds (23.1 kg) and 62 (158 cm) total linear inches, there is no bicycle service charge, but, if applicable, the first or second bag service charge applies. Handlebars must be turned sideways and protruding pedals and accessories must be removed, or all loose items must be enclosed in plastic foam or similar protective material, or the bicycle must be enclosed in a sealed box. United is not liable for damage to bicycles that do not have the handlebars fixed sideways and pedals removed, handlebars and pedals encased in plastic foam or similar material, or bicycles not contained in a cardboard containers or hard-sided cases. If your itinerary includes a United Express flight, please contact United for information regarding aircraft cargo hold. Bicycles will not be accepted during excess baggage embargos.

4. Boogie/Skim/Speed Boards - One boogie/skim/speed board or one boogie/skim/speed board bag containing up to two boards will be considered as one item of sporting equipment and allowed in place of one checked bag.

5. Bowling Equipment - One set of bowling equipment consisting of a bowling bag (up to three in one bag), one to three bowling balls, and one pair of shoes will be considered as one item of sporting equipment and allowed in place of one checked bag. Bowling equipment weighing more than 51 pounds (23.1 kg) will be subject to overweight baggage charges.

6. Camping Equipment – Tents, backpacks or knapsacks, and sleeping bags will be accepted as checked baggage. Certain items made of cloth, plastic, vinyl or other easily torn material and those having aluminum frames, outside pockets, straps, buckles and other protruding parts will be accepted as fragile items. UA shall not be liable for fragile items. Lanterns, stoves and heating equipment which use liquid fuel, propane, butane or similar will not be accepted as checked or carry-on baggage in accordance with DOT hazardous materials regulations.

7. Fencing Equipment – One suitable container or packaging securely encasing fencing equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. EXCEPTION: Fencing containers that do not contain only fencing equipment will be subject to Overweight/Oversize Excess Baggage Charges.

8. Firearms/Shooting Equipment/Stun Guns – One item of shooting equipment per Passenger will be considered as one checked bag only when permitted by governmental regulations, and subject to the conditions below including UA's firearm policy. One item of shooting equipment is defined as: One hard-sided shooting equipment case containing up to five firearms, with or without scopes, and 11 pounds (five kgs.) of ammunition. Firearms carried in addition to this allowance will be assessed at the current excess baggage charge.

   a. International firearm regulations and laws vary by destination and transiting country. Contact appropriate consulates or embassies to obtain specific entry requirements applicable to destination(s). UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such regulations or laws.

   b. A Firearm will be accepted only from a customer who is 18 years of age or older.

   c. Curbside check-in of a firearm is not permitted.

   d. Advanced arrangements must be made.

   e. The firearm, including a hand gun, must be packed in a hard-sided container with a lock. The container must be locked at the time of acceptance by UA and the key or combination must remain in the customer's possession. The locked hard-sided container holding a handgun may be placed inside an unlocked soft-side piece of luggage. Containers may be purchased from UA. United is not liable for damage to a firearm or a hand gun that is not contained in a hard-sided case. EXCEPTION: For travel to/from the United Kingdom, handguns, pistols, rifles, and shotguns must be packed in a hard side rifle case.

   f. Baggage containing firearms will not be accepted knowingly for transportation by UA at any point unless a declaration, signed by the Passenger presenting such Baggage and dated on the day the Baggage is accepted for transportation, is attached to the inside of the case declaring that the firearm is not loaded.

   g. Properly packaged small arms ammunition up to a maximum of 11 pounds (five kgs.) may be checked as Baggage. The ammunition may be packed in the same container as the firearm or in a separate container. Ammunition must be packed in the manufacturer's original package or securely packed in fiber, wood or metal containers and the ammunition inside the container must be protected against shock and secured against movement. The Passenger shall make a written declaration confirming that the above provisions are met. Ammunition with explosive or incendiary projectiles will not be accepted.

   h. Except for military missions (e.g., CRAF), at no time will fully automatic weapons be acceptable as Checked or Carry-on Baggage.

   i. When a firearm that is used for sporting purposes is carried on the aircraft, the Passenger must have entry permits for the country/countries of transit and Destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such entry permits, or for the consequences to any Passenger resulting from his/her failure to obtain such entry permits.

      i. EXCEPTION : This provision may not apply to authorized persons who are performing a duty on board an aircraft, such as a law enforcement officer or diplomatic courier. Such Passenger may be permitted to retain custody of a firearm and ammunition upon identification at the time of check-in. The firearm will be transported in a section of the aircraft that is inaccessible to the customer.

   j. Stun Guns- Stun guns with their dry cell batteries removed are accepted in checked baggage only and solely for domestic travel, and when permitted by local, state, and/or governmental laws and regulations, which vary by destination. UA is not liable for any assistance or information provided by any employee or agent of UA to any Passenger relating to such regulations or compliance with such laws, or for the consequences to any Passenger resulting from his/her failure to comply with such laws or regulations. Tasers are prohibited as either carry-on or checked baggage.

   UA, at any time, without notice and for any reason, can suspend the carriage of firearms, shooting equipment, and stun guns.

9. Fishing Equipment - Two rods, one reel, one landing net, one pair of fishing boots and one fishing tackle box (all properly encased) will be considered as one item of sporting equipment and allowed in place of one checked bag. The total of all fishing equipment must weigh less than 51 pounds (23.1 kg), or overweight charges may apply. Fishing equipment containers must not exceed 115 linear inches or oversized charges may apply. For United Express flights, fishing equipment exceeding 80 linear inches will not be accepted as checked baggage.

10. Golfing Equipment – One standard-sized golf bag containing golf related equipment and personal items will be permitted and accepted as Checked Baggage, subject to the limits set forth in Rule 23(B)(1). Applicable overweight charges based on a customer's Baggage allowance will apply. All contents must be properly encased in a suitable container. The golf bag must be covered or enclosed in a heavy, rigid carrying case. UA assumes no liability for damages to items contained in a soft-sided case.

11. Gymnastic Equipment –One item of gymnastic equipment or one suitable container or packaging that securely contains gymnastic equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. EXCEPTION: Gymnastic cases weighing over 51 lbs (23.1 kg) that do not contain only gymnastic equipment will be subject to Overweight/Oversize Excess Baggage Charges.

12. Hang Gliding Equipment - Subject to the conditions and charges specified below, individual components of hang-gliding equipment can generally be packed in separate bags for each component. United will accept a maximum of two items per bag for a set of four component bags. Hang gliding equipment must not exceed 99.9 pounds (45.4 kg), and maximum length allowed varies by aircraft type.

   a. United will accept hang gliding equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

   b. Hang gliding equipment is not accepted as checked baggage on United Express flights, and is not accepted during excess baggage embargoes.

   c. Allow an extra 30 minutes at check-in.

13. Hockey/Lacrosse Sticks/Curling Brooms or Brushes – Up to two hockey, curling brooms/brushes, or lacrosse sticks taped together plus one hockey, curling or lacrosse bag will be considered as one item of sporting equipment and allowed in place of one checked bag. A duffel bag containing hockey, lacrosse, or curling equipment is treated as a normal checked bag. A duffel bag containing hockey equipment is subject to applicable overweight and oversize excess baggage charges. Hockey, curling brooms/brushes, or lacrosse sticks carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

14. Javelins – One hard sided container encasing javelins that are taped together will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked bag. Javelins carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

15. Kiteboards - Subject to the conditions and charges specified below, United will accept one kiteboard or one bag containing kite board equipment as checked baggage. The board must be well padded or the entire board must be encased in a suitable container to avoid scratching.
    a. United will accept kiteboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    b. Kiteboards greater than 115 linear inches (292 cm) will not be accepted as checked baggage. Kite boards greater than 80 linear inches (203 cm) will not be accepted as checked baggage on United Express flights. Kiteboards are not allowed during excess baggage embargos (except to Costa Rica).

    c. Allow an extra 30 minutes at check-in.

16. Oars - One pair of oars or one oar case containing up to two oars will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Oars carried in addition to the free baggage allowance will be assessed at current excess baggage charges.

17. Paintball Equipment - One bag containing equipment used in the paintball sport will be considered as one item of sporting equipment, if aircraft size and load conditions permit, and allowed in place of one checked item. Paintball guns are not permitted as carry-on baggage. A paintball gun may be checked in an unlocked soft or hard sided case. Paintball ammunition must be packed in the manufacturer's original package or securely packed in a container that will protect the paint balls from breakage. Compressed gas cylinders must be empty and have the regulator removed to allow for a visual inspection by a TSA Security Screener. Unopened paintball air canisters in original plastic packaging are sold empty and Passengers do not need to demonstrate that the canisters are empty.

18. Parachutes/Parasails - A sports parachute or parasail will be considered as one items of sporting equipment and allowed in place of one checked item. A parachute or parasail taken onboard the aircraft must meet carry-on size restrictions for placement underneath an aircraft seat. When checked as baggage, all excess, oversize and overweight charges will apply.

19. Poles vaults- Subject to the conditions and charges specified below, one pole vault properly encased in a suitable container will be accepted as Checked Baggage.
    a. Pole vault acceptance is restricted by aircraft type. Please contact United's Customer Contact Center for maximum length restrictions, which vary by aircraft type.

    b. United will accept pole vaults as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    c. Pole vaults are not accepted as checked baggage on United Express flights, and are not accepted during excess baggage embargos.

20. Pool cues –One pool cue case containing pool cues will be accepted as Checked Baggage.

21. Scuba/Diving Equipment – One suitable dive bag securely containing scuba/diving equipment will be considered as one item of sporting equipment and allowed in place of one checked bag. Dive bags measuring more than 51 pounds and/or that are over 62 linear inches will be charged as sporting equipment and special item charges apply. An empty dive tank or up to 3 rebreather tanks will not be included in determining the free baggage allowance and will be subject to a 150 USD/150 CAD service charge (each way) for flights within the U.S., Canada, Puerto Rico and the U.S. Virgin Islands. A 200 USD service charge (each way) applies for all other travel.
    NOTE: The empty dive/rebreather tank must have the regulator valve completely disconnected from the tank. The tank must not be sealed (i.e. the tank has an open end). The tank must have an opening to allow for a visual inspection by a TSA Security Screener. For rebreather equipment, soda lime that is 4% Sodium Hydroxide or less will be accepted in checked baggage. Soda lime that is 4.1% Sodium Hydroxide will not be accepted in checked baggage.

22. Skating Equipment – One pair of ice skates, roller skates, and rollerblades will be considered as one item of sporting equipment and allowed in place of one checked bag. For Domestic Carriage only, ice skates are permitted in carry-on baggage. Skating equipment carried in addition to the baggage allowance will be assessed at the current excess baggage charge. Skating equipment is subject to applicable overweight and oversize excess baggage charges.

23. Surfboards – Subject to the conditions and charges specified below, one surfboard or one surfboard bag containing up to four boards per customer with a maximum weight less than 51 pounds (23.1 kg) and maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any surfboard that is greater than 62 (158 cm) linear inches. The skeg/fin must be removed or well padded. The entire board must be encased in a suitable container to avoid scratching.
    a. United will accept surfboards as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    b. Surfboards or surfboard bags more than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, surfboards or surfboard bags more than 80 linear inches (203 cm) will not be accepted as checked baggage, and will not be accepted during baggage embargos (except for Costa Rica). If your itinerary includes United Express, please contact United for information regarding aircraft cargo hold limits.

    c. Allow an extra 30 minutes at check-in.

24. Tennis Equipment – One tennis racket case containing tennis rackets and balls will be considered as one item of sporting equipment and allowed in place of one checked bag. Tennis equipment must be properly protected or a limited liability form must be signed.

25. Water Skiing/Snow Skiing/Snowboard Equipment/Wakeboards

a. One item of ski equipment (one pair of water skis, one snowboard, one wakeboard, up to two pairs of snow skis and associated equipment in one snowboard bag , or one ski boot) with a weight less than 51 pounds (23.1 kg) is allowed in place of one checked bag. If more than one set of ski equipment is checked, each additional set of equipment (as outlined above) will be counted as one item, and the associated service charge(s) will apply. Acceptance is subject to aircraft size and load conditions.

b. Ski Bags and ski boot bags weighing more than 51 pounds (23.1 kg) that contain other items in addition to or in place of appropriate snow or water skiing equipment or ski boots will be subject to Overweight/Oversize Excess Baggage Charges.

26. Wave Ski - Subject to the conditions and charges specified below, one wave ski or one bag containing equipment used in wave skiing with a weight less than 51 pounds (23.1 kg) and maximum length of 115 linear inches (293 cm) will be accepted as Checked Baggage. Oversize fees will apply for any wave ski that is greater than 62 (158 cm) linear inches. The board must well-padded or the entire board must be encased in a suitable container to avoid scratching.

    a. United will accept wave skis as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    b. Wave skis greater than 115 linear inches (292 cm) will not be accepted as checked baggage. On United Express flights, wave skis greater than 80 linear inches (203 cm) will not be accepted as checked baggage. Wave skis will be transported subject to load capacities of the aircraft on any itinerary involving a United Express flight. Wave skis will not be accepted during excess baggage embargos.

27. Windsurfing Equipment- Subject to the conditions and charges specified below, windsurfing boards will be accepted as Checked Baggage. For purposes of this provision, one windsurfing board not exceeding 115 linear inches and not exceeding 99.9 pounds (45.3 kg) with one boom, one mast, one sail and necessary hardware will be considered as one item of windsurfing equipment.

    a. Windsurfing equipment must be padded and enclosed in suitable packing sufficient to protect from scratches or dents or other damage.

    b. United will accept windsurfing equipment as checked baggage up to the customer's maximum Checked Baggage Allowance. First, second, and any applicable oversize and overweight bag fees may apply.

    c. Windsurfing equipment cannot be accommodated on any itinerary involving a United Express flight, and is not accepted during excess baggage embargos. Additional size or acceptance limitations may apply dependent upon aircraft type and configuration.

    d. Allow an extra 30 minutes at check-in.

F. Fragile and Perishable Items –Fragile and perishable items include, but are not limited to, examples in Limitation of Liability, Rule 28 K). Upon request and subject to operational needs or space availability, a fragile or perishable item may be carried in a seat subject to the provisions and applicable charges in D) above. A fragile or perishable item may be accepted as Checked Baggage in accordance with this Rule only if it is packaged appropriately (g., in an original, factory-sealed carton, in a cardboard mailing tube, in a container/case designed for shipping such item or packed with protective internal material). Except for certain international Carriage subject to the terms of the Montreal Convention, UA is not liable for loss or damage of contents or delay in delivery which result from the unsuitability of such item(s) as Checked Baggage and/or the inadequacy of its packaging and not from the carrier's failure to exercise the ordinary standard of care. UA is not liable for damage to a customer's Carry-on Baggage or other in-cabin property that contains fragile or perishable items when such damage is caused by the fragile or perishable items. Customers are responsible for all damage caused by their property, whether such damage is to their own property or to someone else's property.

    1. Antlers – Subject to the conditions and charges specified below, one set of antlers retained as hunting trophies per ticketed Passenger will be accepted as Checked Baggage, if aircraft size and load conditions permit.

        a. Antlers will not be included in determining the Baggage Allowance and will be subject to a service charge of 150 USD/150 CAD per item. For international travel, a 200 USD/200 CAD per item service charge applies.

        b. Antlers must be as free of residue as possible.

        c. The skull must be wrapped and tips protected.

        d. Maximum Outside Linear Dimensions must not exceed 120 inches. However, on United Express Canadair regional jet flights the linear dimensions of the antlers cannot exceed 33 in. x 43 in. (83 cm x 109 cm) and overall linear dimensions must not exceed 98 in. (248 cm).

        e. The Passenger must make all arrangements and assume full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the county, state or territory to and from which the antlers are being transported.

    2. Automotive Towbars - Towbars will be accepted inside a checked bag. The towbar must be packaged to prevent damage to it and other bags. Towbars are subject to excess, overweight and oversize excess baggage charges. Baggage containing towbars in excess of 70 pounds (32 kilograms) or 115 linear inches (292 cm) will not be accepted as checked baggage.

    3. Dry Ice and Other Restricted and Prohibited Articles

        a. Any articles deemed a hazardous material pursuant to DOT Hazardous Materials Regulations (49 CFR 171-177), the IATA Dangerous Goods Regulations and revisions and reissues thereof (hereinafter the "Haz-Mat Regulations") will only be accepted subject to advance arrangements and compliance with the Haz-Mat Regulations. (NOTE: Any obligations of UA which may arise under this Rule or Rule 28 are not applicable when undeclared articles deemed hazardous material are discovered in checked baggage and confiscated and/or destroyed.)

        b. Limited quantities of dry ice, a maximum of 5.5 pounds (2.5 kilograms) per Passenger, will be accepted for carriage as checked or Carry-on Baggage provided the Baggage is properly designed to permit the release of carbon dioxide, and the container is labeled, "DRY ICE" or "CARBON DIOXIDE SOLID." The packaging must also show the net weight and identify the perishable item being preserved by the dry ice. Each container cannot have more than the maximum allowed per customer. Multiple Passengers cannot pool their portions together, even within the same traveling party.

        c. A 150 USD/150 CAD service charge applies to the transportation of dry ice as checked baggage on flights within or between the U.S. and Canada, and a 200 USD service charge applies to the transportation of dry ice as checked baggage on flights to all other destinations.

        d. UA may require acceptance of such articles at locations other than the passenger terminal.

        e. E-Cigarettes or Personal Vaporizers will not be accepted in Checked Baggage.

        f. Hoverboards, smart wheels, and any other self-balancing or self-propelled luggage, vehicles or devices are not accepted as checked or

carry-on baggage.

g. Lithium batteries, power banks, and spare batteries are not accepted as checked baggage. These types of batteries must be removed from any checked or carry-on baggage, including baggage checked at the gate. All batteries integrated as a part of the bag themselves (sometimes referred to as a smart bags) must also be removed if checked or brought on as carry-on baggage. Any items with non-removeable lithium batteries are not allowed on any United or United Express flights. Cell phones and computers installed with a lithium battery of less than 100 watt hours are permitted in carry-on and checked baggage.

h. The following items are prohibited as checked and carry-on baggage: Avalanche packs; fuel; mace and other self-defense sprays; fireworks, gunpowder, flares, flare guns and holiday poppers; gasoline-powered equipment; bleach, drain cleaners, epoxy, fuel, gel fuel, glue, insecticides, paint, torch lighters, spray starch, strike-anywhere matches and certain aerosols; ready-to-eat meals (MREs); and shock absorbers.

i. Any items prohibited by the TSA.

j. Illegal drugs, marijuana, and any cannabis infused products, such as Cannabidiol (CBD) oil are prohibited in checked or carry-on Baggage.
2) Except as otherwise provided in Rule

4. Liquor - Subject to the conditions below, alcoholic beverages in retail packaging may be checked as baggage.
   a. For alcoholic beverages less than 24 percent alcohol by volume (including most wines and beers) there are no restrictions on the amount that may be accepted in checked baggage or purchased after completing security screening at the checkpoint (Duty Free). If traveling internationally, alcoholic beverages may be subject to customs limits in the arrival country.

   b. For alcoholic beverages between 24 and 70 percent alcohol by volume there is a limit of 5 liters (1.3 gallons) per customer that may be accepted in checked baggage, or that may be purchased after completing security screening at the checkpoint (Duty Free). Packaging must be in receptacles smaller than 5 liters. Alcoholic beverages more than 70 percent alcohol by volume will not be accepted.

   c. All alcoholic beverages must be packed to prevent leakage and damage to other bags. UA shall not be liable for breakage or spillage of alcoholic beverages. Normal checked baggage allowance limits, excess charges and carry-on limits apply.

   d. Up to 3 oz. (100ml) of an alcoholic beverage may be taken through the security checkpoint provided it is less than 70 percent alcohol by volume, in a container that is 3 oz. or smaller, and is carried in a plastic zip-top bag.

   e. Alcohol transported on an airplane cannot be consumed on board

5. Musical Instruments - Musical instruments may be carried as Checked Baggage or as Cabin Baggage subject to the provisions in D) above. As part of a Passenger's one carry-on plus one personal item allowance and subject to UA's Carry-on Baggage conditions specified in Section B 2) a) and b) above, a small musical instrument such as a violin or a guitar can be carried in lieu of a carry-on bag if the instrument can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. If the musical instrument appears too large or irregularly shaped to fit under the seat or in the overhead compartment, or, if at the time the customer boards the aircraft, there is no space to stow it, it will not be accepted for in cabin stowage and will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. In the case of Basic Economy passengers, a small musical instrument may be carried on in addition to a personal item if it can be stowed safely in an overhead bin or under the Passenger's seat and there is space for its stowage at the time the Passenger boards. A larger musical instrument brought to the gate as a carry-on by a Basic Economy passenger and any instrument that cannot fit under the Passenger's seat or in open overhead bin space available at the time the Basic Economy passenger boards will be checked to the Passenger's final destination and subject to the applicable checked-baggage and gate-checked handling charges. All musical instruments, whether carry-on or checked, should be in a hard sided case, and stringed instruments should have the strings loosened to protect the neck from damage due to expansion and contraction which result from temperature variations. Checked instruments cannot exceed 165 pounds and 150 linear inches (or the applicable weight/size restriction for the aircraft) and will be included in determining the Baggage Allowance, and when in excess (over 2 checked items), overweight or oversize (115 linear inches is considered oversized, and over 51 pounds (23.1 kg) is considered overweight), will be subject to the Excess, Oversize, and Overweight Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to musical instruments or musical instrument cases.

6. Seafood - Seafood will be accepted and included in determining the Checked Baggage Allowance only if it is wrapped in a sealed protective material and packed in a leak-proof container. Seafood is subject to applicable excess, overweight and/or oversize charges. UA is not liable for seafood. Seafood will not be accepted if packed in wet ice or in a Styrofoam container.

7. UA will not accept wet ice or items containing wet ice as Checked or Carry-on Baggage.

8. UA will not accept perishable items packed in Styrofoam containers.

9. For travel to, from or within Micronesia, perishable items will only be accepted for transportation if within the Checked Baggage Allowance.

10. ZAM ZAM Water - Subject to the conditions below, one container or jerkin containing up to 10 liters (2.64 gallons) of ZAMZAM water will be accepted as checked baggage by UA at no extra charge in addition to the Baggage Allowance.
    a. Containers or jerkins containing ZAMZAM water must be properly packed in a plastic covering to prevent leakage and damage to other bags. UA is not liable for breakage or spillage of ZAMZAM water and/or containers.

    b. ZAMZAM containers or jerkins are not permitted as Carry-on or Cabin Baggage.

    c. Jerkins or ZAMZAM water containers in excess of one will be subject to excess baggage charges.

G. Other Checked Baggage Items - The items listed below will be accepted as Baggage by UA in accordance with the following specified provisions.
   1. Government approved child/infant seat - A government approved child/infant seat that conforms to all applicable Federal Motor Vehicle standards and approved in accordance with US FAR 121.311, including car seats approved for airline travel, will be accepted in addition to a Passenger's baggage allowance. When checked as baggage, all oversize and overweight charges will apply. First and second bag charges do not apply. A government approved child/infant seat for use in the Passenger compartment is permitted only when an additional seat is reserved for the infant, a Ticket is purchased, and the seat can be secured properly by a seat belt. The accompanying Adult Passenger is responsible for ensuring that the seat functions correctly, that the infant does not exceed the seat's limitations, that the infant is properly secured in the seat and that the seat is secured to the aircraft seat. UA is not liable for damage to child/infant seats when carried or brought onboard as anything other than Checked Baggage.

2. U.S. Military Baggage Allowance - Active U.S. military and their accompanying dependents on personal travel are allowed three (3) bags up to 70 pounds each with a maximum dimension of 62 linear inches without excess or overweight charges being assessed. Active U.S. military personnel on orders and active U.S. military personnel and their dependents (whether accompanying or non-accompanying) on orders for relocation are allowed five (5) bags up to 100 pounds each in United Economy, United Business, United Polaris business class, United First and United Polaris first class with a maximum dimension of 115 linear inches without excess, overweight or oversize charges being assessed. Non-accompanying dependents on travel not related to an order for relocation are not entitled to this additional baggage allowance.

3. Strollers and Folding Wagons – United accepts one collapsible stroller, one compact folding stroller or one folding wagon in addition to a Passenger's baggage allowance. One non-collapsible stroller may be carried as Checked Baggage in lieu of one piece of Baggage (62 inches Maximum Outside Linear Dimensions). This item will be included in determining the Baggage Allowance, and when in excess, overweight or oversize, such item will be subject to the Excess Baggage Charge. Except for certain International Carriage subject to the terms of the Montreal Convention, UA is not liable for damage to strollers or folding wagons when carried as Checked Baggage.

4. Wheelchairs - One wheelchair per Passenger will be accepted as Baggage by UA at no extra charge in addition to the Baggage Allowance. Excess and/or Oversize/Overweight baggage charges pursuant to Rule 23 C) may apply for checking in additional wheelchair(s) that are used for recreational purposes.

   a. In-cabin stowage of a wheelchair shall be in accordance with 14 CFR, Part 382, Subpart I.

   b. If no in-cabin storage space is available, the wheelchair will be carried in the cargo compartment of the aircraft.

   c. All types of wheelchairs will be accepted (collapsible, noncollapsible or powered wheelchairs with wet cell, dry cell or lithium batteries).

   d. For battery powered wheelchairs:
      i. Passenger must check in at least one hour before the check-in time for the general public for Domestic U.S. flights and for International flights as set forth in Rules 5 D) and 5 E).

      ii. The battery must be disconnected and/or wheelchairs with dry cell/lithium batteries must be secured to prevent accidental activation.

      iii. Wheelchairs containing lithium ion batteries will be accepted as checked baggage provided the battery is securely attached to the wheelchair, and has a means to prevent unintentional activation or short circuiting.

      iv. Lithium ion batteries for collapsible wheelchairs must be removed and carried in carry-on baggage only. A maximum of one spare battery not exceeding 300 WH or two spare batteries not exceeding 160 WH must be carried in carry-on baggage only.

H. Animals Other than Service Animals (For rules applicable to these animals, see Rule 16) - The transportation of live animals (other than Service Animals) in the cabin of the aircraft is subject to the provisions of this Rule. Carriage of animals not permitted in the cabin may be transported via PetSafe® through UA's Live Animal Service. UA will accept domesticated cats and dogs for transportation as in-cabin Baggage for domestic carriage and travel between U.S.A./Canada and Mexico, the Caribbean, Central and South America. (Exception: In-cabin pets will not be accepted for travel to/from Hawaii and Argentina.) Certain unusual animals/reptiles pose unavoidable safety and/or public health concerns and UA will not accept dogs of the Pit Bull breed, Snakes, other reptiles, ferrets, rodents and spiders as in-cabin baggage. Carriage of any other pets as in-cabin Baggage will be at UA's discretion.

1. General Conditions of Acceptance

   a. Advance arrangements must be made. Space must be reserved for animals in either the passenger or cargo compartment. Animals without reserved space will be accepted, if space is available, only after the animals for whom space has been reserved have been accommodated.

   b. The animal must be harmless, inoffensive, odorless and require no attention during transit.

   c. The animal must be confined in a cage or container subject to inspection and approval by UA before acceptance and must meet the department of agriculture requirements prior to acceptance.

   d. The container must be stored under the seat directly in front of the Passenger at all times, and the animal must remain in the container at all times. The passenger will not be permitted in a row immediately behind a bulkhead, or adjacent to an emergency exit. In the event the animal becomes offensive or causes a disturbance during transit, the animal may be removed, at the Captain's discretion, at the first stop and placed on an alternative carrier or carried as cargo by UA at the Passenger's expense.

   e. The Passenger must make all arrangements and assumes full responsibility for complying with any applicable laws, customs, and/or other governmental regulations, requirements, or restrictions of the country, state or territory to and from which the animal is being transported, including furnishing valid health and rabies vaccination certificate when required. UA will not be liable for loss or expense due to the passenger's failure to comply with this provision, and UA will not be responsible if any pet is refused passage into or through any country, state, or territory.

   f. UA will accept no more than one in-cabin pet container per Ticketed Passenger, except that two puppies/kittens (age: minimum 8 weeks/maximum 6 months) will be permitted in a single container.

   g. There may be only one cat or dog per container, and the animal must be able to stand up and turn around comfortably.

   h. UA will not transport an animal as in-cabin Baggage if the animal is in the custody of an Unaccompanied Minor age five (5) to fourteen (14) years old.

   i. The total number of Passengers carrying pet and the total number of in-cabin pets permitted on a single flight is limited by aircraft type and cabin.

   j. UA reserves the right to refuse carriage of animals in cabin or as cargo via PetSafe® at any time.
NOTE: Animals will not be accepted for carriage on some United Express flights.

2. Pet Containers

   a. Containers must be leak-proof and subject to inspection and approval by UA prior to acceptance. UA may refuse to accept any animal if, in its sole discretion, the animal is not properly confined in a container approved by UA.

   b. Containers must be made of metal, wood, polyethylene, fiberglass or composite material of similar strength.

   c. Containers must be ventilated on at least two sides and prevent any part of the animal from protruding outside of the container.

   d. Containers made totally of wire are not accepted.

e. Approved soft side carriers specifically designed as pet carriers are acceptable.

f. In-cabin animal containers must not exceed 17.5 inches in length by 12 inches in width by 7.5 inches in height for hard sided containers and 18 inches in length by 11 inches in width by 11 inches in height for soft sided containers.

g. Containers in such condition as to allow possible escape by an animal will not be accepted for transportation.

h. Passengers are responsible for ensuring that the containers meet all governmental requirements for the safe and humane transportation of the animal being transported, including, but not limited to being large enough to allow the animal to stand upright, turn around, and lie in a natural position.

i. Containers for transporting dogs and cats may be purchased from UA.

3. Carriage of Animals – (including their containers) is subject to the applicable service charge of a 125 USD/ 125 CAD each way (250 USD/250 CAD for round-trip travel).

4. Abandonment of Animals – An animal that is unclaimed by its owner or its owner's agent for a period of more than three (3) days after the scheduled carriage has occurred or was to occur, shall be deemed abandoned and UA will make reasonable efforts to return the animal to the owner or the owner's agent designated for that purpose. If the owner or the owner's agent cannot (or refuses to) be located after a period of three days, then the animal may be turned over to a local animal shelter or pound or otherwise handled as UA may deem proper without any liability to UA. Any costs associated with: (1) returning the animal deemed abandoned to the owner or the owner's agent or (2) caring, feeding, or transporting the abandoned animal, among other things, shall be borne solely by the owner or owner's agent.

5. Limitation of Exclusion from Liability
a. UA will not be liable for illness or injury to an animal or death of an animal.

b. UA will not be liable for loss or expense due to the Passenger's failure to comply with the provisions of this Rule, including, without limitation, if any animal is refused passage into or through any state or country.

I. Interline Baggage Acceptance
1. Applicability-Rule 23 I) solely applies to interline itineraries on a Single Ticket whose origin or ultimate ticketed destination is in Canada. For definitional understanding of the terms used in this Rule, see Rule 1 for clarification.

2. Baggage Rules Determination
a. Checked Baggage: When UA is the Selecting Carrier it will select and apply its own checked baggage rules found in Rule 23 throughout the Passenger's Interline Itinerary. When a Passenger makes a voluntary change to his or her itinerary, the checked baggage rules of the new Selected Carrier apply. The Selected Carrier's checked baggage service charges apply at any point where bags are checked, including stopovers. See Rule 23 B) 1) above for UA's Baggage Rules concerning special status, Rule 23 C) 7) regarding embargoes that may affect interline travel, and Rules 23 D), E), F), G) and H) regarding the transportation of special items.

b. Carry-On Baggage: Each Operating Carrier's carry-on baggage allowances and policies will apply to each flight segment in an Interline Itinerary, other than carry-on baggage charges, which are governed by the Selected Carrier's baggage rules. See Rule 23 B) above for UA's Carry-On Baggage allowances and policies.

c. Where UA is a Participating Carrier or is not the Selected Carrier on an Interline Itinerary but is an Interlining Carrier that is providing transportation to the passenger based on ticket issued, UA will apply the Selected Carrier's baggage rules throughout the Interline Itinerary.

3. Disclosure of Baggage Rules-For baggage rules provisions related to a passenger's first and second checked bag and the passenger's carry-on baggage (i.e., the passenger's "standard" baggage allowance), when UA sells and issues a ticket for an interline itinerary, it will disclose to the passenger on a summary page at the end of an online purchase and/or on the passenger's e-ticket receipt at the time of ticketing, the baggage information relevant to the passenger's itinerary and the applicable baggage rules of the Selected Carrier.

Back to Top

# Rule 24 Flight Delays/Cancellations/Aircraft Changes

A. General
1. U.S.A. Origin Flights - Where the UA flights originate in the U.S.A., the provisions of this Rule apply to a Passenger who has a Ticket and a confirmed reservation on a flight that incurs a Schedule Change, Force Majeure Event or Irregular Operations.

2. Non-U.S.A. Origin Flights - Where the UA flight originates outside the U.S.A., the following provisions apply to a Passenger who has a Ticket and a confirmed reservation on a flight:
a. If local or international laws regulate a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will not be applied.

b. If no local law otherwise regulates a Schedule Change, Force Majeure or Irregular Operations, then the procedures in Rule 24 will be applied.

3. Schedules are Subject To Change Without Notice - Times shown on tickets, timetables, published schedules or elsewhere, and aircraft type and similar details reflected on tickets or UA's schedule are not guaranteed and form no part of this contract. UA may substitute alternate carriers or aircraft, delay or cancel flights, and alter or omit stopping places or connections shown on the ticket at any time. UA will promptly provide Passengers the best available information regarding known delays, cancellations, misconnections and diversions, but UA is not liable for any misstatements or other errors or omissions in connection with providing such information. No employee, agent or representative of UA can bind UA legally by reason of any statements relating to flight status or other information. Except to the extent provided in this Rule, UA shall not be liable for failing to operate any flight according to schedule, or for any change in flight schedule, with or without notice to the passenger.