

# United States
# Department of Transportation

Home › Resources › For Individuals › Aviation Consumer Protection › File a consumer complaint › Complaint - Comment Form

# Air Travel Complaint – Comment Form Confirmation

## Your complaint has been submitted to the U.S. Department of Transportation.

**The U.S. Department of Transportation (Department or DOT) is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel. As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks for the Department to process your complaint. We apologize for the delay.**

The Department's Office of Aviation Consumer Protection is responsible for reviewing and responding to air travel service complaints against airlines and ticket agents. If your complaint or comment concerns airline safety, please contact the U.S. Department of Transportation's Federal Aviation Administration (FAA) at www.faa.gov/contact. If your complaint or comment concerns airline security, please contact the U.S. Department of Homeland Security's Transportation Security Administration (TSA) at TSA-ContactCenter@dhs.gov.

Consistent with our usual practice, we will forward your air travel service complaint to the airline or ticket agent that is the subject of your complaint, and ask that the entity reply to you. We will also review your complaint to determine whether the airline or ticket agent that is the subject of your complaint is complying with Federal aviation consumer protection and civil rights statutes and DOT regulations. We use complaints to track trends or spot areas of concern that may warrant further action in the future. Complaints may also serve as a basis for rulemaking, legislation, and research.

Further, the Office of Aviation Consumer Protection issues a monthly Air Travel Consumer Report (ATCR), which is designed to provide consumers with information on the quality of services provided by airlines. That report includes a section on complaints, which is based on the aggregate of air travel service complaints submitted to the Department. Your air travel service complaint will be included in the monthly ATCR, which is distributed to the industry and made available to the news media and the public so that both consumers and air travel companies can compare the complaint records of individual airlines and ticket agents.

If you are interested in obtaining copies of the ATCR or learning more about the rights of air travelers, we encourage you to visit our website at https://www.transportation.gov/airconsumer. The website contains clear, useful information about passenger rights, and highlights content on topics of greatest concern to consumers, including flight delays and cancellations, refunds, oversales, tarmac delays, and passengers' right to fly free of discrimination. It also has a collection of helpful tips and information to help you protect yourself while travelling.



**From:** airconsumer@dot.gov
**Subject:** Airconsumer Acknowledgement
**Date:** 6 March 2022 at 22:20
**To:** uri@ntcf.org

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgement.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel. As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - URI MARCUS uri@ntcf.org

CONTACT INFO:
PO BOX 126 OJAI,CA 93024

Home Phone:
Daytime Phone: 9098330065

COMPLAINT INFO:
Airline Code: WN

Flight Date: 06/16/2022
Flight Itinerary: BOI DEN, HOU PHX, LAX LAS, LAS LAX [2NVJ56, 2NPBTM, 2NJJSB]

Description of Problem/Inquiry/Comment:
   This complaint against SOUTHWEST Airlines  [hereinafter "SWA"] is also against DOT for "guiding" SWA to act on illegal orders in  connection with three SWA Itineraries:  2NVJ56, 2NPBTM and 2NJJSB. For example:  A  disabled person cannot be required to  notify  SWA "at least 7 days prior to the  planned  date of travel" in order to request  an ME." This is illegal. 14 CFR § 382.25.  A disabled  person cannot be required as a  condition of  travel, to "complete and submit a signed  letter from is Medical Physician." Against  our will we submitted private medical  info, and SWA took guidance from their 3rd- party  medical provider who is not our doctor,  forcing us to undergo private medical   screenings with their 3rd-party StatMD. This   is illegal. 49 USC § 41705(a). It is a gross   violation of the ADA and the ACAA.  SWA  granted our MEs but only by imposing  illegal  conditions of travel, namely...  We must  submit "no later than 24 hrs prior to departure evidence of a COVID-19 negative  viral test..." We are further required to   "bring a copy of our COVID-19 neg test to the   airport to ensure a smooth experience." An   airline may not require the disabled to  submit such tests when non-disabled customers  aren't subject to this same requirement. This   is illegal discrimination. 14 CFR § 382.11(a)  (1). See also 49 USC § 41705.  SWA informed  us that upon boarding, we would  be required  to sit in the last row of the aircraft, even  though ALL OTHER PASSENGERS  enjoy open  unassigned seating. SWA may NOT  deny the  same to an ME passenger, as if we  were  lepers with a disease not worthy of choosing  our own seats. 14 CFR § 382.87(a).  SWA  cannot threaten denial of boarding,  removal from the aircraft, and penalties  under  federal law" because we do not agree  with  their illegal rules. 14 CFR § 382.23(a).  SWA  falsely relies upon CDC's Order of  29  Jan  2021 and TSA's Directive of 31 Jan 2021.  The  CDC relaxed it's mask MANDATE for 70% of  the  USA on 25 Feb 2022. Yet they continue to   mandate masks in the most secure clear air   space on earth [INVALID] an airline cabin at  36,000  ft?! SWA fraudulently informed us on  their website  that "federal law" requires  all to wear  a mask while flying. But, Congress never passed  such a law, nor has DOT or

requires all to wear a mask while flying. But Congress never passed such a law, nor has DOT or any other agency promulgated such a regulation. The DOT itself on its own website states that wearing masks is NOT a federal law. See attachments. SWA cites no provision in the Code of FRs to support its false claims which DOT knows but SWA does not. A4A is a trade association representing SWA amongst others. SWA engages in mask enforcement, and yet A4A asked the White House to abolish the FTMM! SWA's words don't match their actions. See attached. SWA must be fined for violating ACAA, Codes of FRs and conspiring to interfere with our civil rights.

This is System generated message, and a response to this email will not be delivered.
03/06/2022 15:12:48

Plaintiffs' Exhibit 37

Home › Resources › For Individuals › Aviation Consumer Protection › File a consumer complaint

## Air Travel Service Complaint or Comment Form  (Not Related to Airline Safety or Security Issues)

Please use this form to file a complaint or comment about service you received or requested from an airline or ticket agent that does not relate to airline safety or security. This may include, but is not limited to, topics such as flight delays and cancellations, overbooking, disability, tarmac delays, baggage, discrimination, refunds, ticketing practices, family seating, frequent flyer programs, charter flights, privacy and air ambulance service.

The information that you provide in your complaint or comment form will be provided to the appropriate airline or ticket agent. More detailed information about DOT's complaint handling process, and other helpful information for air travelers is available here.

The required Privacy Act statement applicable to any information you provide is available here.

Items marked with a * are required.

| Personal Information: | | |
|---|---|---|
| I am | Passenger ▾ * | |
| Your Name: | | |
| Title: | Mrs ▾ | First Name: YVONNE * |
| Last Name: | MARCUS * | |

| Contact Information: | | |
|---|---|---|
| Address: | PO BOX 126 | |
| City: | OJAI | State: California ▾ |
| Zip Code: | 93024 | Home Phone: 9098330065 |

Either Email Address or Daytime Phone is required

Email Address: uri@ntcf.org *

Verify Email Address: uri@ntcf.org *

Daytime Phone: 9098330065 *

Would you like a copy of this submission sent to your email?
◉ Yes ○ No

| Complaint/Comment Information: |
|---|
| Airline/Company: |
| UNITED AIRLINES ▾ *  (If not listed or not applicable select "OTHER") |

**Flight Date (if applicable):** 03/06/2022 📅 (Date Format: mm/dd/yyyy)

**Flight Itinerary (if applicable):**

AEJERN UA 955 + UA 954 (Cities / Flight Number)

**Description of Problem/Inquiry/Comment**\*

United Airlines [hereinafter "UAL"] violated
the Air Carrier Access Act and numerous other
laws by refusing to grant my wife and I mask
exemptions for our upcoming 06 Mar 2022
flights TLV-SFO-TLV and returning 31 Mar 2022
[UAL Itinerary AEJERN].  UAL fraudulently
informed us through their  website

(Chars left: 3000)

### Attach a file (Optional):

**File Name:** (Please click the "Browse" button to select the file and click "Upload File" button.)

[Choose File] No file chosen     [Upload File]

Uploaded file/s

C:\fakepath\UA TLV SFO SFO TLV 06 MAR to 31 MAR 2022 UA.pdf   Remove file

### Incidents of Sexual Misconduct:

If your complaint relates to or includes allegations of sexual misconduct, a copy of your complaint will be sent to the FBI. Sexual misconduct is a broad term. It encompasses any behavior or attempted behavior of a sexual nature that is committed without consent or with someone incapable of consent, or by force, intimidation, coercion, or manipulation. Sexual misconduct also includes physical or verbal advances or harassment of a sexual nature, or public indecent exposure.

[Submit]  [Reset]  [Cancel]

Note - Please only hit Submit once as our system sometimes takes a few moments to process your complaint.

*A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2105-0568. Public reporting for this collection of information is estimated to be approximately 15 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are voluntary, and will be provided confidentiality to the extent allowed by the Freedom of Information Act (FOIA). Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Aviation Consumer Protection Division, Office of the Secretary, W96-473, 1200 New Jersey Avenue, SE, Washington, D.C. 20590.*

If you use the web complaint form above, we would welcome any comments that you may have about that process.

Please email any such comments to airconsumer2@dot.gov.

(That address does not accept complaints about air service, only comments about the web complaint form process.)



## United States
## Department of Transportation

Home › Resources › For Individuals › Aviation Consumer Protection › File a consumer complaint › Complaint - Comment Form

# Air Travel Complaint – Comment Form Confirmation

## Your complaint has been submitted to the U.S. Department of Transportation.

**The U.S. Department of Transportation (Department or DOT) is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel. As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks for the Department to process your complaint. We apologize for the delay.**

The Department's Office of Aviation Consumer Protection is responsible for reviewing and responding to air travel service complaints against airlines and ticket agents. If your complaint or comment concerns airline safety, please contact the U.S. Department of Transportation's Federal Aviation Administration (FAA) at www.faa.gov/contact. If your complaint or comment concerns airline security, please contact the U.S. Department of Homeland Security's Transportation Security Administration (TSA) at TSA-ContactCenter@dhs.gov.

Consistent with our usual practice, we will forward your air travel service complaint to the airline or ticket agent that is the subject of your complaint, and ask that the entity reply to you. We will also review your complaint to determine whether the airline or ticket agent that is the subject of your complaint is complying with Federal aviation consumer protection and civil rights statutes and DOT regulations. We use complaints to track trends or spot areas of concern that may warrant further action in the future. Complaints may also serve as a basis for rulemaking, legislation, and research.

Further, the Office of Aviation Consumer Protection issues a monthly Air Travel Consumer Report (ATCR), which is designed to provide consumers with information on the quality of services provided by airlines. That report includes a section on complaints, which is based on the aggregate of air travel service complaints submitted to the Department. Your air travel service complaint will be included in the monthly ATCR, which is distributed to the industry and made available to the news media and the public so that both consumers and air travel companies can compare the complaint records of individual airlines and ticket agents.

If you are interested in obtaining copies of the ATCR or learning more about the rights of air travelers, we encourage you to visit our website at https://www.transportation.gov/airconsumer. The website contains clear, useful information about passenger rights, and highlights content on topics of greatest concern to consumers, including flight delays and cancellations, refunds, oversales, tarmac delays, and passengers' right to fly free of discrimination. It also has a collection of helpful tips and information to help you protect yourself while travelling.



From: airconsumer@dot.gov
Subject: Airconsumer Acknowledgement
Date: 2 February 2022 at 11:40
To: uri@ntcf.org

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgment.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel. As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - Mrs YVONNE MARCUS uri@ntcf.org

CONTACT INFO:
PO BOX 126 OJAI,CA 93024

Home Phone: 9098330065
Daytime Phone: 9098330065

COMPLAINT INFO:
Airline Code: UA

Flight Date: 03/06/2022
Flight Itinerary: AEJERN UA 955 + UA 954

Description of Problem/Inquiry/Comment:
   United Airlines [hereinafter "UAL"] violated   the Air Carrier Access Act and numerous other   laws by refusing to grant my wife and I mask   exemptions for our upcoming 06 Mar 2022   flights TLV-SFO-TLV and returning 31 Mar 2022   [UAL Itinerary AEJERN].  UAL fraudulently  informed us through their  website   [https://www.united.com/ual/en/us/fly/travel/  what-to-expect.html#covid19-updates] that   "federal law" requires each person to wear a   mask while flying. However, Congress has   never passed such a law, nor has DOT or any   other agency promulgated such a regulation.   UAL cites no provision of the U.S. Code or  the Code of Federal Regulations to support   its false claim that "federal law" requires   face coverings.  We cannot wear masks due to  our medical conditions. UAL required us to  submit  exemption requests in advance, which  is  illegal. 14 CFR § 382.25.  We submitted  the forms as a courtesy despite  it being  unlawful to demand advance  notice.  We included, as a courtesy, signed medical   summaries from our family physicians that we   should not wear a mask. We wrote that UAL's   mask policy is illegal in at least 19 ways   including that airlines by federal law are   NOT permitted to impose certain requirements   or conditions on a person requesting an   exemption from the mask mandate. 49 USC §   41705(a).  UAL may not require a medical   certificate  from disabled passengers who ask  for a mask  exemption. 14 CFR § 382.23(a).   UAL may not require disabled passengers   needing a mask exemption to undergo a  medical   screening since they may not ask for a   medical certificate. 14 CFR § 382.23(d).  UAL   may not change a disabled passenger's  travel  dates and/or flights. 14 CFR § 382.17.  UAL  also may not change the seat assignment  of a  mask-exempt passenger. 14 CFR §  382.87(a).   UAL may not require disabled passengers who   seek a mask exemption to submit a negative  PCR test. No ACAA provision [nor any other  law] permits airlines to require passengers   submit a negative virus test. And mandating   that only disabled flyers submit a PCR test   constitutes illegal discrimination. 14 CFR §   382.11(a)(1) & 49 USC § 41705.  UAL denied  our mask-exemption requests  falsely relying  upon CDC's Order of  29 Jan 2021, TSA's  Security Directive of 31 Jan

requests, falsely relying upon SDG's Order of 25 Jan. 2021, TSA's Security Directive of 31 Jan. 2021 and the ACAA's implementation of 14 CFR 382. UAL and their employees at their Mask Exception <MaskException@united.com> Department must be fined for violating the ACAA and Federal regulations and conspiring to interfere with our civil rights. DOT must also enjoin UAL from continuing to require numerous illegal steps to obtain mask exemptions.


   This is System generated message, and a response to this email will not be delivered.
02/02/2022 04:33:54



Home › Resources › For Individuals › Aviation Consumer Protection › File a consumer complaint

# Air Travel Service Complaint or Comment Form  (Not Related to Airline Safety or Security Issues)

Please use this form to file a complaint or comment about service you received or requested from an airline or ticket agent that does not relate to airline <u>safety</u> or <u>security</u>. This may include, but is not limited to, topics such as flight delays and cancellations, overbooking, disability, tarmac delays, baggage, discrimination, refunds, ticketing practices, family seating, frequent flyer programs, charter flights, privacy and air ambulance service.

The information that you provide in your complaint or comment form will be provided to the appropriate airline or ticket agent. More detailed information about DOT's complaint handling process, and other helpful information for air travelers is available <u>here</u>.

The required Privacy Act statement applicable to any information you provide is available <u>here</u>.

Items marked with a * are required.

| Personal Information: | |
|---|---|
| **I am** | Passenger ∨ * |
| **Your Name:** | |
| **Title:** | Mr ∨   **First Name:** URI * |
| **Last Name:** | MARCUS * |

| Contact Information: | |
|---|---|
| **Address:** | PO BOX 126 |
| **City:** | OJAI     **State:** California ∨ |
| **Zip Code:** | 93024     **Home Phone:** 9098330065 |

Either Email Address or Daytime Phone is required

**Email Address:** uri@ntcf.org *    **Verify Email Address:** uri@ntcf.org *

**Daytime Phone:** 9098330065 *

Would you like a copy of this submission sent to your email?
◉ Yes  ○ No

| Complaint/Comment Information: | |
|---|---|
| **Airline/Company:** | UNITED AIRLINES ∨ *   (If not listed or not applicable select "OTHER") |

**Flight Date (if applicable):**    03/06/2022 📅 (Date Format: mm/dd/yyyy)

**Flight Itinerary (if applicable):**

AEJERN UA 955 + UA 954    (Cities / Flight Number)

**Description of Problem/Inquiry/Comment***

United Airlines [hereinafter "UAL"] violated the Air Carrier Access Act and numerous other laws by refusing to grant my wife and I mask exemptions for our upcoming 06 Mar 2022 flights TLV-SFO-TLV and returning 31 Mar 2022 [UAL Itinerary AEJERN].  UAL fraudulently informed us through their website

(Chars left: 3000)

### Attach a file (Optional):

**File Name:** (Please click the "Browse" button to select the file and click "Upload File" button.)

[Choose File] No file chosen        [Upload File]

Uploaded file/s

C:\fakepath\UA TLV SFO SFO TLV 06 MAR to 31 MAR 2022 UA.pdf   Remove file

### Incidents of Sexual Misconduct:

If your complaint relates to or includes allegations of sexual misconduct, a copy of your complaint will be sent to the FBI. Sexual misconduct is a broad term. It encompasses any behavior or attempted behavior of a sexual nature that is committed without consent or with someone incapable of consent, or by force, intimidation, coercion, or manipulation. Sexual misconduct also includes physical or verbal advances or harassment of a sexual nature, or public indecent exposure.

[Submit]  [Reset]  [Cancel]

Note - Please only hit Submit once as our system sometimes takes a few moments to process your complaint.

*A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2105-0568. Public reporting for this collection of information is estimated to be approximately 15 minutes per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are voluntary, and will be provided confidentiality to the extent allowed by the Freedom of Information Act (FOIA). Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Aviation Consumer Protection Division, Office of the Secretary, W96-473, 1200 New Jersey Avenue, SE, Washington, D.C. 20590.*

If you use the web complaint form above, we would welcome any comments that you may have about that process.

Please email any such comments to airconsumer2@dot.gov.

(That address does not accept complaints about air service, only comments about the web complaint form process.)



### United States
# Department of Transportation

Home › Resources › For Individuals › Aviation Consumer Protection › File a consumer complaint › Complaint - Comment Form

# Air Travel Complaint – Comment Form Confirmation

## Your complaint has been submitted to the U.S. Department of Transportation.

**The U.S. Department of Transportation (Department or DOT) is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel. As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks for the Department to process your complaint. We apologize for the delay.**

The Department's Office of Aviation Consumer Protection is responsible for reviewing and responding to air travel service complaints against airlines and ticket agents. If your complaint or comment concerns airline safety, please contact the U.S. Department of Transportation's Federal Aviation Administration (FAA) at www.faa.gov/contact. If your complaint or comment concerns airline security, please contact the U.S. Department of Homeland Security's Transportation Security Administration (TSA) at TSA-ContactCenter@dhs.gov.

Consistent with our usual practice, we will forward your air travel service complaint to the airline or ticket agent that is the subject of your complaint, and ask that the entity reply to you. We will also review your complaint to determine whether the airline or ticket agent that is the subject of your complaint is complying with Federal aviation consumer protection and civil rights statutes and DOT regulations. We use complaints to track trends or spot areas of concern that may warrant further action in the future. Complaints may also serve as a basis for rulemaking, legislation, and research.

Further, the Office of Aviation Consumer Protection issues a monthly Air Travel Consumer Report (ATCR), which is designed to provide consumers with information on the quality of services provided by airlines. That report includes a section on complaints, which is based on the aggregate of air travel service complaints submitted to the Department. Your air travel service complaint will be included in the monthly ATCR, which is distributed to the industry and made available to the news media and the public so that both consumers and air travel companies can compare the complaint records of individual airlines and ticket agents.

If you are interested in obtaining copies of the ATCR or learning more about the rights of air travelers, we encourage you to visit our website at https://www.transportation.gov/airconsumer. The website contains clear, useful information about passenger rights, and highlights content on topics of greatest concern to consumers, including flight delays and cancellations, refunds, oversales, tarmac delays, and passengers' right to fly free of discrimination. It also has a collection of helpful tips and information to help you protect yourself while travelling.



From: airconsumer@dot.gov
Subject: Airconsumer Acknowledgement
Date: 2 February 2022 at 11:44
To: uri@ntcf.org

Thank you for contacting us concerning your air travel service issue. The U.S. Department of Transportation (DOT) seeks to ensure that airline passengers are treated fairly. Complaints and comments from consumers are helpful for determining whether airlines or ticket agents are complying with Federal aviation consumer protection and civil rights statutes and DOT regulations, and to track trends or spot areas of concern that warrant further action. Your complaint or inquiry will be assigned to an analyst for review and you will receive a more detailed acknowledgement.

The Department is receiving a high volume of complaints given the unprecedented impact of the 2019 Novel Coronavirus (COVID-19) public health emergency on air travel. As a result, the time to process complaints is taking longer than normal. We are working hard to provide the best support we can, but it may take several weeks to process your complaint. We apologize for the delay.

Thank you again for taking the time to contact us.

Office of Aviation Consumer Protection
U.S. Department of Transportation

PERSONAL INFO:
Passenger - Mr URI MARCUS uri@ntcf.org

CONTACT INFO:
PO BOX 126 OJAI,CA 93024

Home Phone: 9098330065
Daytime Phone: 9098330065

COMPLAINT INFO:
Airline Code: UA

Flight Date: 03/06/2022
Flight Itinerary: AEJERN UA 955 + UA 954

Description of Problem/Inquiry/Comment:
United Airlines [hereinafter "UAL"] violated the Air Carrier Access Act and numerous other laws by refusing to grant my wife and I mask exemptions for our upcoming 06 Mar 2022 flights TLV-SFO-TLV and returning 31 Mar 2022 [UAL Itinerary AEJERN]. UAL fraudulently informed us through their website [https://www.united.com/ual/en/us/fly/travel/ what-to-expect.html#covid19-updates] that "federal law" requires each person to wear a mask while flying. However, Congress has never passed such a law, nor has DOT or any other agency promulgated such a regulation. UAL cites no provision of the U.S. Code or the Code of Federal Regulations to support its false claim that "federal law" requires face coverings. We cannot wear masks due to our medical conditions. UAL required us to submit exemption requests in advance, which is illegal. 14 CFR § 382.25. We submitted the forms as a courtesy despite it being unlawful to demand advance notice. We included, as a courtesy, signed medical summaries from our family physicians that we should not wear a mask. We wrote that UAL's mask policy is illegal in at least 19 ways including that airlines by federal law are NOT permitted to impose certain requirements or conditions on a person requesting an exemption from the mask mandate. 49 USC § 41705(a). UAL may not require a medical certificate from disabled passengers who ask for a mask exemption. 14 CFR § 382.23(a). UAL may not require disabled passengers needing a mask exemption to undergo a medical screening since they may not ask for a medical certificate. 14 CFR § 382.23(d). UAL may not change a disabled passenger's travel dates and/or flights. 14 CFR § 382.17. UAL also may not change the seat assignment of a mask-exempt passenger. 14 CFR § 382.87(a). UAL may not require disabled passengers who seek a mask exemption to submit a negative PCR test. No ACAA provision [nor any other law] permits airlines to require passengers submit a negative virus test. And mandating that only disabled flyers submit a PCR test constitutes illegal discrimination. 14 CFR § 382.11(a)(1) & 49 USC § 41705. UAL denied our mask-exemption requests falsely relying upon CDC's Order of 29 Jan 2021 TSA's Security Directive of 31 Jan

requests, falsely relying upon SDC's Order of 25 Jun 2021, TSA's Security Directive of 31 Jan 2021 and the ACAA's implementation of 14 CFR 382. UAL and their employees at their Mask Exception <MaskException@united.com> Department must be fined for violating the ACAA and Federal regulations and conspiring to interfere with our civil rights. DOT must also enjoin UAL from continuing to require numerous illegal steps to obtain mask exemptions.


  This is System generated message, and a response to this email will not be delivered.
02/02/2022 04:37:30



An official website of the United States government
Here's how you know ∨



# Plaintiffs' Exhibit 38

Home » Contact » precheck

# TSA PreCheck

Thank you for contacting the Transportation Security Administration. Your submission has been received. While many routine inquiries can be responded to in less than 48 hours, some responses that require additional information may take longer.

==Submission Values==

**Is this issue related to not receiving TSA PreCheck® on your boarding pass?** No

## TSA PreCheck® complaint
**Where did this happen?** Other
**Date:** 11-18-2021
**Approximate Time:** 2:55 PM
**Name of TSA employee (if known):** Acting Division Director Julie Carrigan
**Airline Name:** N/A
**Flight Number:** N/A
**Checkpoint/Area of Airport:** N/A
**Please provide a description of your inquiry/comment.** ▇▇▇▇▇▇▇▇▇▇

For 4 and a half years I was deemed an eligible, low risk traveler, authorized to enjoy expedited security screening at airports, together with my wife wherein both of us interviewed on the same day at SNA airport back in 2017, and both of us were approved on the same day for the TSA PreCheck program. We are both U.S. citizens and we both reside in Israel.

But suddenly, out of the blue on 02 Dec 2021, I received a letter from acting Division Director Julie Carrigan from the National Transportation Vetting Center, who wrote only that…

…during recurrent checks and based on a comprehensive background check, TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to continue to be eligible for expedited airport security screening through the TSA Pre Application Program. As a result, TSA has determined that you are no longer eligible to participate in the TSA Pre Application Program. This letter constitutes TSAs final decision.

I was never informed about or charged with about any illegal actions that might have triggered this revocation that one might assume arises from disqualifying criminal convictions, open criminal dispositions, and/or outstanding criminal warrants, none of which I have.

To the best of my knowledge, I have never been charged with nor have committed any violations of the federal security regulations, such as refusal to wear a mask in U.S. transportation systems, assault, threat, intimidation, or interference with flight crew, physical or sexual assault or threat of physical or sexual assault of any individual on an aircraft, interference with security operations, access control

violations, providing false or fraudulent document or made a bomb threat, or bringing a firearm, explosive, or other prohibited item to an airport or onboard an aircraft.

I have never been found to have committed a disqualifying offense that might have otherwise warranted having my TSA PreCheck enrollment disqualified or suspended, during any recurrent criminal history vetting process.

Upon researching the matter, I found that TSA often times bases its preliminary of determination of ineligibility on inaccurate, incomplete, or false information. At age 65 today, I have never even had a conviction or committed an offense that might have been otherwise downgraded to a misdemeanor or a lesser offense, or that was expunged or pardoned and therefore I should by all accounts remain be eligible for participation in PreCheck and should be sent my letter of renewal for PreCheck which would have normally expired on 16 JUN 2022. The letter my wife received ███████████ came on time in December 2021 and she was renewed on 18 Dec 2021, just as I should have been.

Shouldn't I have been properly notified of some disqualifying criminal offense if any existed that might have triggered the revocation? Or was it issued by mistake on the basis of some non existent disqualifying felony criminal conviction? As I said, no criminal charges were dismissed, because none ever existed.

I understand that the offenses that TSA considers for permanent disqualification from the PreCheck application program, involve a "transportation security incident," which includes being charged with any of a list of at least 63 illegal activities, none of which I have ever been a part of.

Not only was I was never involved in any of the above commissions of crime, but I was never involved with any conspiracy or any attempt to commit any of the crimes on your list.

I never received any Preliminary notice of determination of my ineligibility, which might have explained the basis for the ineligibility determination. And even if I had, shouldn't I have been given the right to appeal the TSA's determination?

Is there no process to rectify this mistake and have my PreCheck reinstated, so that I can renew it before June 16, 2022?

Please advise.

- Passenger Information
  **First Name:** URI
  **Last Name:** MARCUS
  **Email:** uri@ntcf.org
  **Phone:** 9098330065

Back to form

🖶 Print Friendly

| A - Z Index | Federal Relay |
| --- | --- |
| Civil Enforcement | FOIA |

Plaintiffs' Exhibit 39

From: **TSA Contact Center** tsa-contactcenter@tsa.dhs.gov
Subject: TSA Customer Service Response: SR: 05270868 - Webform submission from: TSA PreCheck
Date: 14 March 2022 at 17:57
To: uri@ntcf.org





Hello,

Thank you for contacting the Transportation Security Administration (TSA) Contact Center. The response to your inquiry is listed below. If you have additional questions, please respond to this email. Please include the Service Request Number of 05270868 in your inquiry. Thank You
TSA Contact Center

## Enrollment, Renewal, and Updates

### Denials or Requests for Appeals - TPAP

If you have been found ineligible for TSA PreCheck® via the TSA PreCheck® Application Program, you will receive a letter that provides the reasons for the disqualification and directions to submit a correction of record. To submit a correction of record, you must attach the last page of the letter as a cover sheet and provide documentation that addresses either the lawful presence (ex. a copy of the document indicating U.S. citizenship or lawful permanent residence) or criminal disqualifier (ex. court documentation or a corrected copy of a criminal history record). You must mail your documents to the following address:

Transportation Security Administration
TSA PreCheck® Application Program Processing Center
P.O. Box 8117
Fredericksburg, VA 22404-8117

Please be advised that if you are under want, warrant, complaint or indictment for a Disqualifying Criminal Offense, you will be disqualified until the want or warrant is released or the complaint or indictment is dismissed.

# Plaintiffs' Exhibit 40



**From:** **Uriel ben-Mordechai** uri@ntcf.org  🖉
**Subject:** Re: TSA Customer Service Response: SR: 05270868 - Webform submission from: TSA PreCheck
**Date:** 14 March 2022 at 18:29
**To:** tsa-contactcenter@tsa.dhs.gov
**Cc:** tsa-contactcenter@j-c5kmh4vyerb38cgipsp5fowfa0cp3bw3vltx4qg993bsxpcrd.t-4x9leau.na21.case.salesforce.com

Hi.

I don't understand how to proceed. You said that I *"will receive a letter that provides the **reasons** for the disqualification and **directions** to submit a **correction of record**."*

A copy of the letter is TSA's is attached. T**here are no reasons stated for my disqualification** other than that *"TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to continue to be eligible…"* and **no directions to submit a correction of record were given**. The letter simply stated that *"This letter constitutes TSA's final decision."*

How do I submit a **correction of record**, when I am NOT under **want, warrant, complaint or indictment for a Disqualifying Criminal Offense?**

Uri Marcus
KTN: ████████████



U.S. Department of Homeland Security
Springfield, Virginia 20598-6110

Transportation
Security
Administration

Mr. Uri Marcus
423 S Padre Juan Ave
Ojai, CA 93023
United States

Mr. Uri Marcus
P.O. Box 126
Ojai, CA 93024-0126
United States

NOV 2 3 2021

Re: Determination of Ineligibility, TSA Pre✓® Application Program, KTN ████████████

Dear Mr. Marcus:

On 18 Jun 2017, TSA found you eligible to participate in the TSA Pre✓® Application Program. As a participant previously found eligible for the TSA Pre✓® Application Program, you are subject to recurrent checks against various databases, including law enforcement, immigration, regulatory violation, and intelligence databases.

As a result of recurrent checks and based on a comprehensive background check, TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to continue to be eligible for expedited airport security screening through the TSA Pre✓® Application Program. As a result, TSA has determined that you are no longer eligible to participate in the TSA Pre✓® Application Program. This eligibility determination for the TSA Pre✓® Application Program is within the sole discretion of TSA.

Although you have been found ineligible to continue your participation in the TSA Pre✓® Application Program, you will continue to be screened at airport security checkpoints according to TSA standard screening protocols.

This letter constitutes TSA's final decision.

Sincerely,

JULIE A CARRIGAN    Digitally signed by JULIE
       A CARRIGAN
       Date: 2021.11.18
       14:55:17 -05'00'

Julie Carrigan
Acting Division Director
National Transportation Vetting Center

---

On 14 Mar 2022, at 17:57, TSA Contact Center <tsa-contactcenter@tsa.dhs.gov> wrote:



Hello,

Thank you for contacting the Transportation Security Administration (TSA) Contact Center. The response to your inquiry is listed below. If you have additional questions, please respond to this email. Please include the Service Request Number of 05270868 in your inquiry.
Thank You
TSA Contact Center

## Enrollment, Renewal, and Updates

### Denials or Requests for Appeals - TPAP

If you have been found ineligible for TSA PreCheck® via the TSA PreCheck® Application Program, you will receive a letter that provides the reasons for the disqualification and directions to submit a correction of record. To submit a correction of record, you must attach the last page of the letter as a cover sheet and provide documentation that addresses either the lawful presence (ex. a copy of the document indicating U.S. citizenship or lawful permanent residence) or criminal disqualifier (ex. court documentation or a corrected copy of a criminal history record). You must mail your documents to the following address:

## Plaintiffs' Exhibit 41

**From:** no-reply@universalenroll.identogo.com  📎
**Subject:** Don't lose your TSA PreCheck® benefits. Renew today!
**Date:** 16 March 2022 at 15:45
**To:** URI@ntcf.org  URI@NTCF.ORG



Hi URI,

As a friendly reminder, your TSA PreCheck membership is due to expire on **06/16/2022.** Renewing is quick and easy, and most members can renew **entirely online**. Renew today and keep your benefits for future travel!

**Renew today in 5 minutes or less**

**If you're still deciding, or just haven't gotten around to it yet, remember your TSA PreCheck membership includes benefits, like:**

- **Convenient:** your shoes, belt and light jacket stay on, and laptop and 3-1-1 liquids stay in your bags
- **Family-friendly:** kids 12 and under can tag along for free
- **Affordable:** many credit cards and loyalty programs cover the cost of the 5-year membership, for current pricing check here
- **Fast, easy to renew:** 98%+ of members can renew online in 3-5 minutes

**Renew today!**

**Questions about renewing your membership? Call 855-347-8371,** 8 a.m. - 10 p.m. Eastern, Monday - Friday, or check out our FAQs.

**We hope to see you soon!**

**The TSA PreCheck® Team**

**Renew Now**

If you'd like to opt out of non-mandatory email notifications, please click help.



# Plaintiffs' Exhibit 42

## Step 1 of 4 - Current TSA PreCheck® Information

**\* Required Fields**

Please enter your information below. Then click 'Next' to continue or 'Cancel' to exit.

Please provide your KTN and Date of Birth. If you are not sure of your KTN please use KTN Lookup or your flight booking site of choice to retrieve your KTN.

**Not Eligible to Renew at this Time - You currently have an enrollment in progress with TSA. Please call the UES Help Desk (855-347-8371) for further assistance**

There has been a change in your status. Please contact the UES Call Center for assistance.

Current TSA PreCheck® Information

\* KTN (Known Traveler Number)

███████████████

\* Date of Birth (MM/DD/YYYY)

███████████

\* Legal Last Name

MARCUS

Done

# PRIVACY ACT STATEMENT

**Authority:** 6 U.S.C. § 1140, 46 U.S.C. § 70105; 49 U.S.C. §§ 106, 114, 5103a, 40103(b)(3), 40113, 44903, 44935-44936, 44939, and 46105; the Implementing Recommendations of the 9/11 Commission Act of 2007, § 1520 (121 Stat. 444, Public Law 110-52, August 3, 2007); and Executive Order 9397, as amended.

**Purpose:** The Department of Homeland Security (DHS) will use your information to conduct a security threat assessment. Biometrics collected from applicants to the TSA PreCheck™ Application Program may also be used to conduct screening at airport checkpoints. Your fingerprints and associated information will be provided to the Federal Bureau of Investigation (FBI) for the purpose of comparing your fingerprints to other fingerprints in the FBI's Next Generation Identification (NGI) system or its successor systems including civil, criminal, and

# Plaintiffs' Exhibit 43

**From:** **TSA-ContactCenter** TSA-ContactCenter@tsa.dhs.gov
**Subject:** Automatic reply: TSA Customer Service Response: SR: 05270868 - Webform submission from: TSA PreCheck
**Date:** 17 March 2022 at 15:36
**To:** Uriel ben-Mordechai  uri@ntcf.org



Thank you for contacting the Transportation Security Administration.

Our goal is to respond in less than 48 hours, more complex questions may take longer.

We understand the Coronavirus is a concern for all travelers, for the latest information, please visit www.tsa.gov/coronavirus or www.cdc.gov.

To check if certain items may be packed in carry-on or checked bags, please use our search feature, What Can I Bring?

Check your driver's license or your state-issued ID and look for a star or the word "enhanced." Starting May 3, 2023, if your driver's license does not have one of these markings, you will not be able to use it to fly. For more information, visit tsa.gov/real-id.

# Plaintiffs' Exhibit 44



**From:** **Uriel ben-Mordechai** uri@ntcf.org 📎
**Subject:** Re: TSA Customer Service Response: SR: 05270868 - Webform submission from: TSA PreCheck
**Date:** 24 March 2022 at 8:36
**To:** tsa-contactcenter@j-c5kmh4vyerb38cgipsp5fowfa0cp3bw3vltx4qg993bsxpcrd.t-4x9leau.na21.case.salesforce.com

Shalom,

I still don't understand how TSA wants me to proceed. You wrote on March 23rd that I *"will receive a letter that provides the **reasons** for the disqualification and **directions** to submit a **correction of record**."*

A copy of the letter that TSA sent to me is attached. **There are no reasons stated for my ineligibility** other than that *"TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to continue to be eligible…"* and there were **no directions to submit a correction of record were given**. The letter simply stated that *"This letter constitutes TSA's final decision."*

How do I submit a **correction of record**, when I am NOT under **want, warrant, complaint or indictment for a Disqualifying Criminal Offense**?

On 16 Mar 2022, I received an email from **Universal Enroll**, which reminded me that my **KTN** expires on **06/16/2022**. It also invited me to renew. When I did, I received this error message:

> **Not Eligible to Renew at this Time - You currently have an enrollment in progress with TSA. Please call the UES Help Desk (855-347-8371) for further assistance**
>
> There has been a change in your status. Please contact the UES Call Center for assistance.

How do I resolve this? What caused my change of Status? What does it mean that **"You currently have an enrollment in progress with TSA"**?

I called the UES Help Desk and they did not have any answers.

If I am not eligible to renew, why not? What have I done wrong, and how do I correct it?


Uri Marcus
KTN: ▮▮▮▮▮▮▮▮



U.S. Department of Homeland Security
Springfield, Virginia 20598-6110

Transportation
Security
Administration

Mr. Uri Marcus                          Mr. Uri Marcus                    **NOV 2 3 2021**
423 S Padre Juan Ave                     P.O. Box 126
Ojai, CA 93023                           Ojai, CA 93024-0126
United States                            United States

Re: Determination of Ineligibility, TSA Pre✓® Application Program, KTN ▮▮▮▮▮▮▮▮

Dear Mr. Marcus:

On 18 Jun 2017, TSA found you eligible to participate in the TSA Pre✓® Application Program. As a participant previously found eligible for the TSA Pre✓® Application Program, you are subject to recurrent checks against various databases, including law enforcement, immigration, regulatory violation, and intelligence databases.

As a result of recurrent checks and based on a comprehensive background check, TSA was unable to determine that you pose a sufficiently low risk to transportation and national security to continue to be eligible for expedited airport security screening through the TSA Pre✓® Application Program. As a result, TSA has determined that you are no longer eligible to participate in the TSA Pre✓® Application Program. This eligibility determination for the TSA Pre✓® Application Program is within the sole discretion of TSA.

Although you have been found ineligible to continue your participation in the TSA Pre✓® Application Program, you will continue to be screened at airport security checkpoints according to TSA standard screening protocols.

This letter constitutes TSA's final decision.

Sincerely,

JULIE A CARRIGAN
Digitally signed by JULIE A CARRIGAN
Date: 2021.11.16
14:55:17 -05'00'

Julie Carrigan
Acting Division Director
National Transportation Vetting Center

---

On 23 Mar 2022, at 21:17, TSA Contact Center <tsa-contactcenter@tsa.dhs.gov> wrote:



Hello,

Thank you for contacting the Transportation Security Administration (TSA) Contact Center. The response to your inquiry is listed below. If you have additional questions, please respond to this email. Please include the Service Request Number of 05270868 in your inquiry.
Thank You
TSA Contact Center

Plaintiffs' Exhibit 52

<u>thewindowflyer.com</u>

# Alaska Airlines strengthens its mask policy — The Window Flyer

*The Window Flyer*

3 minutes                                          8-5-20



On Wednesday, Seattle-based Alaska Airlines announced a strengthening of their mask policy, requiring all passengers above the age of two to wear face coverings, with no medical exceptions allowed. The change goes into effect August 7th. Alaska's announcement comes the same day as New York-based <u>jetBlue</u>'s, who also announced it is eliminating medical exemptions for mask wearing, effective August 10th.

Alaska, along with jetBlue, now join <u>American and Southwest</u>, which announced similar zero-exceptions policies in recent weeks, as the airlines

with the strictest face covering policies in the United States. Meanwhile, another airline with a strict policy, Delta Air Lines, still allows medical exceptions, but now requires passengers who claim a medical exemption to consult with a medical professional via telehealth at the airport where a decision will be made if the passenger can fly maskless, be rebooked onto another flight, or denied boarding and given a refund.

It is important to note that while some people claim the moves are illegal and discriminatory, the US Department of Justice had already issued a statement at the end of June that "The ADA does not provide a blanket exemption to people with disabilities from complying with legitimate safety requirements necessary for safe operations." The key phrase in the statement pertains to "safe operations." In conjunction with the U.S. Department of Transportation's Air Carrier Access Act, which states that "airlines may not refuse transportation to people on the basis of disability. Airlines may exclude anyone from a flight if carrying the person would be inimical to the safety of the flight.", it appears to be well within an airline's right to require all passengers to wear masks, regardless of medical condition.

In addition to making masks mandatory for all passengers, Alaska has also extended its blocking of middle seats until October 31st, and its rebooking and cancellation fee waiver through September 8th.

yahoo.com

# No more medical exemptions: Alaska Airlines says anyone who can't or won't wear a mask won't be allowed to fly

*dslotnick@businessinsider.com (David Slotnick)*

4-5 minutes                                8 – 5 – 2 0



While other airlines demand documentation of medical conditions or connect fliers with doctors, Alaska has wiped away the complication with a blanket requirement.

Ted S. Warren/AP

- Alaska Airlines is the latest airline to announce it will no longer allow medical exemptions from its mask-wearing requirement.

- The carrier said that if a passenger was unwilling or unable to wear one, they would not be permitted to fly.

- Despite evidence that wearing masks can significantly limit the spread of the coronavirus, masks have become a flashpoint for conflicts aboard flights (as well as elsewhere).

- Visit Business Insider's homepage for more stories.

Alaska Airlines said on Wednesday that it will no longer fly passengers who are unwilling or unable to wear a mask — even when there's a legitimate and documented medical reason — following similar moves by American Airlines and Southwest.

US airlines have largely implemented on-board mask requirements since air travel demand began ticking back up this spring.

At first, those policies were criticized as toothless: Flight attendants were discouraged from confronting passengers who wouldn't wear masks, and airlines offered little clarity on the consequences for those customers. In June, airlines including Alaska, United, American, and Delta said they would ban passengers who refuse to comply with mask requirements.

The question of medical exemptions, however, has continued to vex airlines. Although airlines have said they would make exceptions for anyone with a medical reason for not wearing a mask, gate agents and flight attendants have been faced with passengers who claim exemptions without providing documentation. As mask use has become politicized in the US, exemption claims made in bad faith have become increasingly problematic.

In late-July, Delta Air Lines said that any passenger claiming a medical exemption would be required to consult with a medical professional at the airport, through a telehealth service. Passengers would either be cleared to fly maskless, rebooked on another flight, or refused service and given a refund. United said it would no longer accept medical exemption claims without documentation.

Alaska's new policy wipes away the complication by simply eliminating all exemptions.

"If a guest is unwilling or unable to wear a mask for any reason while at the airport, they will not be permitted to travel," the airline said in a statement. "If a

guest refuses to wear a mask after boarding their flight, they will be
suspended from future travel."

It was not immediately clear whether a refusal to accommodate medical
exemptions for legitimate medical reasons would violate any federal or state
disability protection laws. However, the Department of Justice said in June
that the Americans with Disabilities Act "does not provide a blanket exemption
to people with disabilities from complying with legitimate safety requirements
necessary for safe operations."

This policy follows a "yellow card" program that Alaska rolled out in June, in
which flight attendants would issue a formal notice to passengers who refuse
to wear masks. The airline said that going forward, any passenger who does
not comply with the mask requirement after receiving a yellow card will be
banned from flying with it immediately on landing, and will have any
connecting or return flights cancelled.

Alaska also said it will continue to block middle seats on flights through at
least October 31, a one-month extension.

Read the original article on Business Insider



# Accessible travel services

For the best travel experience when requesting these services:

- Make reservations as early as possible and request services while booking online, or call our dedicated accessible services line at 1-800-503-0101 (dial 711 for relay services).
- Arrive at the airport at least 2 hours prior to departure.
- Let us know about any special requirements - at check-in, in the boarding area, and on the aircraft.

**New:** Download our free mobile app called Fly for All, designed for those with cognitive and developmental disabilities, first-time flyers, and unaccompanied minors. It's available now on the App Store   and Google Play  .

---

**Federal law**   requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport. Visit our travel advisories to learn more about our mask requirement.

If you have a disability and are unable to wear a mask, please call our dedicated accessible services line at 1-800-503-0101 (dial 711 for relay services) to request an exemption from the mask requirement.

Exemptions will require:

- Documentation from a licensed health care provider as to your inability to wear a mask due to your disability; and
- Proof of a negative test result from an FDA approved molecular NAAT or PCR Covid-19 test taken within 72 hours of your scheduled flight departure

Documentation from your health care provider must be submitted to Alaska Airlines **at least 72 hours before your flight.** We recommend that you contact us at least one week before departure to start the exemption process.

---

Airport accessibility

Developmental and intellectual disabilities

Hearing

## Alaska Airlines -- Masks are Required to Fly

**Policy and guidelines**

Federal law requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport.

- Masks are required even if you are fully vaccinated.
- Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.
- The FAA has also implemented stricter legal enforcement and fines against guests who refuse to comply with crew instructions. In addition, we reserve the right to refuse transportation in the future to guests who refuse to comply with mask requirements.
- While guests are allowed to temporarily remove their masks when briefly drinking or eating or when taking medication, masks must otherwise be worn at all times, including between sips of beverages or bites of food.
- If wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.
- Information about medical accommodations may be found in our accessible services section.

**Acceptable masks**

The following are required to meet CDC requirements.

- A properly worn mask completely covers your nose and mouth.
- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).
- If gaiters are worn, they should have two layers of fabric or be folded to make two layers.
- Masks should be secured to the head with ties, ear loops, or elastic bands that go behind the head.
- A mask should fit snugly but comfortably against the side of the face.
- Masks should be a solid piece of material without slits, exhalation valves, or punctures.
- Additionally, the following are acceptable as long as your mask meets the requirements above.
- Masks can be either manufactured or homemade.
- Masks can be reusable or disposable.
- Masks can have inner filter pockets.
- Clear masks or cloth masks with a clear plastic panel may be used to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators are acceptable.

**Unacceptable masks**

The following DO NOT meet CDC requirements.

- Masks worn in a way that does not cover both the mouth and nose.
- Face coverings that do not cover a guest's nose and mouth
- Scarves, ski masks, balaclavas, or bandannas.
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose.
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through.
- Masks made from materials that are hard to breathe through (such as vinyl, plastic or leather).
- Masks containing slits, exhalation valves, or punctures.
- Masks that do not fit properly (large gaps, too loose or too tight).
- Face shields or goggles (face shields or goggles may be worn to supplement a mask that meets above required attributes).

https://www.alaskaair.com/content/advisories/travel-advisories
Visited May 24, 2021

Plaintiffs' Exhibit 53

onemileatatime.com

## Why Doesn't Allegiant Air Require Face Masks? | One Mile at a Time

5-6 minutes                6-19-20

_____

**Update**: _Allegiant Air will require customers to wear face masks as of July 2, 2020._

Wearing face coverings on planes has become a shockingly controversial topic. At this point, most US airlines require passengers to wear face masks, and some have even promised to step up enforcement.

What some people don't realize is that there's one major US airline that doesn't require face masks to be worn.

- Allegiant Air's face mask policy

- What's Allegiant Air's logic for not requiring masks?

- Is there an ulterior motive to Allegiant Air's policy?

- To the anti-mask crowd: vote with your wallet

- Bottom line

### Allegiant Air's face mask policy

Ultra-low-cost carrier Allegiant Air doesn't require passengers to wear face masks. To my knowledge, there's no other major US airline with such a policy.

Allegiant has a webpage titled "Going the Distance for Health and Safety," which describes all the initiatives the airline is taking. In some ways, Allegiant is more progressive than other airlines, as each passenger gets a complimentary health and safety kit with a face mask, gloves, and two sanitizing wipes.

At the same time, the airline doesn't require passengers to wear face masks. Heck, the above webpage doesn't even encourage passengers to wear masks.

Ironically the airline makes the following claim:

We work closely with the Centers for Disease Control and Prevention (CDC), Word Health Organization (WHO) and other authorities and experts. Based on their direction, we

ensure our actions not only follow current guidance, but exceed the recommended standards so you can fly with confidence.

The CDC does recommend that people should wear face masks in situations where social distancing isn't possible, so I'm not sure how exactly Allegiant is exceeding recommended standards.

## What's Allegiant Air's logic for not requiring masks?

I reached out to Allegiant Air to ask about the company's logic for not making face masks mandatory, and here's what I was told:

"We're constantly evaluating our policies to ensure they best meet our customers' needs. We strongly encourage passengers to wear face masks in all of our communications with them. We send reminder emails before their flights and make announcements at the gate and on board each flight. However, we find that most of our passengers have already adopted mask-wearing as a standard practice. We've also heard from customers with asthma and other health conditions who say they can't wear masks. We want to ensure our policies accommodate them, as well.

As an extra precaution, we provide each passenger with a free health and safety kit as they board their flights. The kits include a mask, gloves and sanitizing wipes. Passengers tend to already have their own wipes and masks but they appreciate the extra supplies we provide."

## Is there an ulterior motive to Allegiant Air's policy?

In some way, I respect the fact that Allegiant Air is doing a better job of managing expectations than other airlines. Other airlines "require" face masks, but face mask usage isn't as common or consistent as you'd hope, as I recently experienced firsthand.

Meanwhile, if you fly Allegiant, you should have no expectations that someone seated next to you is wearing a face mask, because there's no requirement to do so. Then you also won't be disappointed.

Is Allegiant Air's policy that straightforward, though, or does the airline have an ulterior motive? I've been in Nevada, Arizona, and Utah, the past couple of days, and have been in complete disbelief about how coronavirus is viewed here. I'll save that for another post, but simply put, a vast majority of people don't wear masks here.

When you look at the markets Allegiant Air serves, I can see how for some people this policy may actually be a selling point.

## To the anti-mask crowd: vote with your wallet

Flying Allegiant Air seems like the perfect solution for the anti-face mask crowd:

- You can support an airline that doesn't require face masks

- You can fly with like-minded people

That seems like a much better option than giving your money to a greedy company that's infringing on your personal liberties, no? 😊

While Allegiant obviously has a slightly different route network than other major airlines, odds are decent that they at least fly somewhat close to where you may need to go within the US, even if a bit of extra driving is needed.

## Bottom line

Allegiant is the only major US airline to not require passengers to wear face masks. The airline does offer face masks and gloves to passengers, but there's no requirement to wear them.

The airline notes that passengers are "encouraged" to wear masks, but because some passengers have health issues, the airline doesn't want to make it mandatory.

I have a hard time believing that this isn't a more deliberate move, though. With every other airline requiring masks, Allegiant is an outlier. I think the most likely explanation is that this is a reflection of some of the markets that Allegiant serves, and therefore the perception that many Allegiant passengers may have towards face masks.

**What do you make of Allegiant Air's decision to not require passengers to wear face masks?**

onemileatatime.com

# Allegiant Air Will (Finally) Require Face Coverings | One Mile at a Time

2-3 minutes            6-26-20

Better late than never, I suppose?

- Allegiant Air will require face coverings
- Why did it take Allegiant so long to add this rule?
- Bottom line

For quite a while now, Allegiant Air has been the only major US airline to not require passengers to wear masks. That will finally be changing. **As of July 2, 2020, Allegiant Air will require passengers to wear face masks at all times when traveling, including at the ticket counter and gate, during boarding, and while onboard the aircraft.**

https://twitter.com/braden_duran/status/1276528402464256006

## Why did it take Allegiant so long to add this rule?

Last week I wrote about how Allegiant Air was the only major US airline to not require face coverings during travel. Here's how the airline justified the policy:

"We're constantly evaluating our policies to ensure they best meet our customers' needs. We strongly encourage passengers to wear face masks in all of our communications with them. We send reminder emails before their flights and make announcements at the gate and on board each flight. However, we find that most of our passengers have already adopted mask-wearing as a standard practice. We've also heard from customers with asthma and other health conditions who say they can't wear masks. We want to ensure our policies accommodate them, as well.

As an extra precaution, we provide each passenger with a free health and safety kit as they board their flights. The kits include a mask, gloves and sanitizing wipes. Passengers tend to already have their own wipes and masks but they appreciate the extra supplies we provide."

On the one hand, I can appreciate the challenge some other airlines have when it comes

to enforcing face mask policies. I don't love the fact that airlines have created face mask policies they can't enforce, especially since many people rely on others to wear masks in order to feel comfortable on planes.

On the other hand, at least trying to require face masks to be used seems better than not requiring it.

## Bottom line

Allegiant Air will become the last major US airline to require passengers to wear face masks as of July 2, 2020. Welcome to the club, Allegiant!

Meet Ben Schlappig, OMAAT Founder

Expand All | Collapse All

# Face Covering Policy

## Am I required to wear a face covering?

Yes, federal law requires every person to wear a face covering that covers the nose and mouth at all times while traveling. Face coverings must be made of a solid material, fully cover the mouth and nose, fit snugly against the face, and be secured under the chin. Prohibited coverings include those with exhalation valves, holes (such as lace or mesh), neck gaiters, and bandanas. Face shields may be worn in addition to a face covering, but not as an alternative.

Learn more about the CDC's face covering recommendations here.

## Are Allegiant employees required to wear face coverings?

Yes, federal law requires every person to wear a face covering at all times. However, the law states face coverings can be briefly removed when communicating with a person who is deaf or hard of hearing or when the ability to see the mouth is essential for communication.

## Can I remove my face covering to eat, drink, or take oral medication?

Yes, you may briefly remove your face covering to eat, drink, or take oral medication, but prolonged removal is not permitted. Face coverings must be worn between bites and sips.

## Can I wear a bandana?

No, face coverings must be secured under the chin.

## Can I wear a face mask with a valve?

No, face coverings with exhalation valves are prohibited.

## Can I wear a face shield instead of a face mask?

No, face shields may be worn in addition to a face covering, but not as an alternative.

## Can I wear a neck gaiter?

No, neck gaiters are prohibited.

## Do children have to wear a face covering?

Children under the age of 2 are not required to wear a face covering.

## Do I have to wear a face covering at the airport?

Yes, federal law requires every person to wear a face covering at all times in airports and on commercial aircraft.

## Does Allegiant provide face coverings?

Yes, you can use your own face covering, but we also provide complimentary health and safety kits upon request that contain a single-use face mask and two sanitizing wipes. Please be advised that federal regulations require face masks to enter the airport.

## What if I choose not to wear a face covering?

Refusal to wear a face covering is a violation of federal law and can result in denial of boarding, removal from the aircraft and additional penalties.

## What should I do if I have a disability that prevents me from removing a face covering without assistance?

Those with limited mobility who are unable to remove a face covering without assistance are exempt from the requirement. To request face mask exemptions, please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved, a negative COVID test will be required within 3 days of each flight segment. Details for submission of negative tests will be provided upon exemption approval.

## What should I do if I have a medical condition that prevents me from wearing a face covering?

To request face mask exemptions, please email our Disabilities Team at ACAA@allegiantair.com at least 10 days prior to the departure of the first flight on your itinerary. Please note, if your exemption is approved, a negative COVID test will be required within 3 days of each flight segment. Details for submission of negative tests will be provided upon exemption approval.

**allegiant**

IWA to HOU   One way | Jun 20 | 1 Seated | Modify ▼          Log in          Trip Total: $110.00          CANCEL

Special Assistance

Allegiant is happy to assist passengers with disabilities. An Allegiant representative must be notified at the airport to receive disability accommodations. Please visit our FAQs ☑ page for more information.

☐ Wheelchair Assistance

☐ Traveling with personal wheelchair/scooter

☐ Traveling with Portable Oxygen Concentrator (POC)

☐ Service Animal (i.e. trained guide dog)

☐ Deaf/Hard of Hearing (Assistance is required)

☐ Blind/Low Vision (Assistance is required)

☐ Intellectual or Developmental Disability

Other Services Information

mask exemption

Please note that, for safety reasons, all passengers must be able to sit upright unassisted during taxi, take off and landing, or provide an FAA approved Orthotic Positioning device which enables upright positioning without attachment to the seat. For more information, visit our FAQs ☑ .

Plaintiffs' Exhibit 54

Home   **LOG IN**    English ▾   Search AA.com®   



PLAN TRAVEL   TRAVEL INFORMATION   ADVANTAGE®   

🏠 Home  ›  Travel updates

# Travel updates

ⓘ Testing requirements to enter the U.S. have changed

All travelers to the U.S. – 2 years and older – must show proof of a negative COVID-19 test taken 1 day before departure (or proof of recovery) regardless of citizenship or vaccination status.

*Read more about vaccine and testing requirements »*



## Health and testing requirements

The U.S. and countries around the world have a range of travel restrictions and testing requirements due to COVID-19. You may not be allowed to travel to certain destinations or may be required to self-quarantine when you arrive.

Travel requirements are updated often, so we recommend checking the latest entry requirements before your trip.

Travel and health restrictions by destination 🗗

## U.S. entry requirements

The U.S. government has changed requirements to enter the U.S. based on citizenship / residence and vaccination status. All travelers 2 and older entering the U.S. must provide their contact information within 72 hours of departure and a negative COVID-19 test. Travelers must also sign an attestation form confirming they meet U.S. entry requirements or will not be allowed to board the plane.

⌄ How U.S. travel requirements apply to you

⌄ Vaccine and testing requirements

⌄ Attestation forms

⌄ Contact tracing

# Face coverings

U.S. federal law requires that you wear a face covering at all times while indoors at the airport and on board your flight, regardless of vaccination status. If you refuse to wear one, you may be denied boarding and future travel on American. You may also face penalties under federal law.

These rules do not apply to children under 2, or if you have a disability that prevents you from wearing a face covering and meet the exemption requirements.

Visit the Centers for Disease Control and Prevention (CDC) website for more information about the mask requirement.

Requirement for face masks on planes and in airports ⧉

You should bring your own face covering to use while traveling. While limited quantities of face coverings may be available at the gate, they will not be available for every customer on every flight.

⌄ Acceptable face coverings

⌄ During your flight

⌄ Exemption for customers with disabilities*

If you may be exempt because you have a disability that prevents you from safely wearing a mask as defined by the Americans with Disabilities Act (42 USC 12101 et. seq) you must contact us at least 72 hours before you plan to travel and travel with documentation confirming a negative COVID test or recovery.

Please note, making false claims of a disability or a health condition to obtain an exemption from wearing a face covering may result in denial of travel on American for the duration of the U.S. federal mask requirement.

Call Special Assistance: 800-237-7976

*This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. It is not meant to cover persons for whom mask-wearing may only be difficult.

# Travel flexibility

We're making travel easier by giving you even more flexibility and the freedom to make your own choices when you fly with us.

Here's what you can expect:

- No more change fees for all domestic, short-haul international and select long-haul international flying on Premium Cabin, Premium Economy and Main Cabin fares. Basic Economy fares bought on or after April 1, 2021 are non-refundable and non-changeable.
- Fly standby for free on earlier domestic flights, including Puerto Rico and the U.S. Virgin Islands, to the same destination on the same day.
- If you buy Basic Economy fares you may now buy extras like upgrades, seats, priority boarding and same-day flight changes.

Plaintiffs' Exhibit 55

wcjb.com

# Confusion over Delta face mask policy causes trouble for one local mom

4-5 minutes

GAINESVILLE, Fla. (WCJB) - Traveling alone with a toddler is already a stressful experience, but the airline face mask policies can cause some big headaches for parents - especially when airline employees are not consistently interpreting the policy the same way.

"I was trying but at the end of the day she is three," said an emotional Krystyn Linville.

Krystyn and her daughter, Finley, were traveling to see her mother in North Carolina. Krystyn, knowing the Delta face mask policy, was prepared for the flight. The mother packed three different masks, a tablet and plenty of snacks for her three-year-old daughter.

After some initial fussiness and a mask selfie, Finley was slowly adjusting - thats when things took a turn.

"Flight attendant was going through her walk through, and I guess Finley's mask had fallen down, and it was down her chin area," Krystyn told TV20. "She said to me, 'I need you to put her mask on or I am going to call the gate attendant and have you guys removed from the plane – that was the very first sentence she ever said to me."

Krystyn says the flight attendants continued to harass her and her daughter about the mask throughout the flight, even though Finley only removed her mask when she was snacking - which is allowed.

Snacks that the flight attendants, Krystyn says, did not even want to provide to her - despite other passengers receiving them.

Their constant presence stressed an already frazzled Finley and made the situation worse for the toddler and the mother.

In Atlanta, Krystyn tried to ask someone at Delta customer service about the face mask policy.

"Here is the policy," she told the Delta representative. "I pulled out my phone and went onto Delta's website, and I showed him the policy, and he said, 'that's not what the policy said."

The rep then appeared at the gate at her connecting flight to warn the next flight crew that

her daughter "was a problem."

Krystyn flew on Endeavor Air, which is a Delta partner and abides by Delta policies.

She argued that the part of the face mask policy that exempts 'young children who cannot maintain a face covering' fit her situation. The policy even exempts unaccompanied minors from wearing a face mask - those kids ranging from 5 to 17-years- old.

In a statement to TV20, Delta writes: "Wearing a mask or face covering is one of the most important ways customers and employees stay safe while flying. We apologize for any confusion or miscommunication that may have occurred on this trip, and we are in touch with our Delta Connection partner that operated the flight to look in to the situation."

"There is no federal mandate, so everything is airline to airline," said Travelers United President and co-founder Charles Leocha. "But not only is it airline to airline, it's flight attendant to flight attendant."

Leocha, who works for a travel advocacy group that lobbies in Washington, has seen a spike in cases of families getting kicked off of flights.

"It's foolishness," said Leocha, who says flight crews should be more reasonable when dealing with younger children.

Although Krystyn says the Delta rep spoke to the second flight crew, the flight attendant on the flight, realizing the situation, offered Finley a bottle of water - which would allow the three-year-old girl to take a break from wearing a mask if she wanted to.

"Just frustrating to not wanting to have this trip taken away from my mom and to not let grown people treat my child the way they were treating her," said Krystyn.

Krystyn and her daughter are set to return home to Gainesville on Friday, and she is anxious about her upcoming trip.

"It is already going to be stressed flying with a toddler. They already present their own challenges, but then to not know if the staff is going to treat us appropriately or treat my daughter appropriately and just be educated or aware of their policy."

*Copyright 2020 WCJB. All rights reserved.*

naturalnews.com

# Delta Air Lines bans over 100 people from flying with them for refusing to comply with company's mask mandate

*Arsenio Toledo*

5-7 minutes

8 - 8 - 2 0



(Natural News) Delta Air Lines CEO Ed Bastian said that his company's no-fly list has greatly expanded after they started banning passengers from flying with Delta if they refuse to comply with the company's COVID-19 mask mandate.

"We've had well over 100 people that have refused to keep their mask on during the flight," Bastian said in an interview. The CEO further said that while a vast majority of Delta's flyers have complied with the company's mask mandate, the few who did not have been blamed for causing flight disruptions.

A company spokesperson confirmed that these people have lost their ability to book future flights with Delta.

Bastian said during his interview that passengers are not allowed to board a plane if they

aren't wearing masks. However, employees have reported that once people are on the plane many try to take off their masks. Flight attendants have regularly tried to get the passengers to keep their masks on for the duration of the flight, warning that if they continue with their behavior they will not be allowed to fly with the company.

One infamous incident occurred on July 23. A Delta flight going to Atlanta, Georgia, went back to Detroit, Michigan after two passengers refused to keep their face coverings on. The flight later departed for its original destination. Social media has been flooded with viral videos of people asserting their individual rights. (Related: Harvard doctor wants US to enforce national mask mandate; Surgeon General says order may lead to REBELLION.)

Mask fight on a plane. The goal of all global corporate media is to create then grow this kind of division amongst people so that the most evil people in the world can consolidate wealth & power. They are satan's mouthpiece pic.twitter.com/MbQRUigPQ9

— George (@jitotweets) August 2, 2020

Bastian has urged people who are considering flying without a mask to consider traveling with other airlines that have fewer restrictions, to figure out other means of traveling or to simply not travel at all.

Listen to this episode of the *Health Ranger Report*, a podcast by Mike Adams, the Health Ranger, as he talks about how people can use the logic employed by the lunatic liberal mob in order to claim that they are wearing a face mask despite their objections over being forced to wear one.

## Delta Air Lines more focused on profits than on upholding individual rights

In a letter Bastian sent to Delta employees on Thursday, August 6, the CEO talked about how the company needs to not only keep customers happy, but to also ensure that public health protocols are met. He emphasized that this was going to be Delta's business strategy for the foreseeable future.

"We want to ensure that those who travel now are choosing Delta," the letter read. This strategy will allow the company to bring in additional revenue, which will help keep them afloat and also "build additional loyalty and affinity for our brand, which will power our growth when demand begins to come back."

Delta and other major American airline companies are focused on making sure that they make enough money, as the COVID-19 pandemic has tanked much of their revenue due to the slowdown in worldwide travel.

From April to June, the company reported that it had 93 percent fewer passengers than it did during the same three months last year. In July, the company's second quarter report showed that Delta had a net loss of $5.7 billion, the largest since the 2008 financial crisis.

Delta and several other airlines announced early in June that they would be forcing their passengers to wear face masks whenever they fly on their planes. Other airline companies that have announced similar mask mandates include United Airlines and American Airlines.

Delta's own mandatory mask policy came into effect on May 1 and it required all of the company's passengers to wear a mask for the duration of the flight. The company has distinguished itself as having some of the strictest rules regarding masks among airline companies, such as preventing middle seats from being sold in order to maintain some level of social distancing between passengers.

Delta's policy also requires people who want to be exempted from wearing a mask due to health concerns to go through a process known as the "Clearance to Fly screening process" before being allowed to board a Delta plane.

This screening takes place over the phone and is conducted in partnership with the *University of Pittsburgh Medical Center* (UPMC). A physician has the final say over whether or not a person looking to fly can board the Delta plane without a mask. It can take up to an hour to complete.

If the physician finds that they are not allowed to fly without a mask, the customer can ask to be rebooked for a later flight or get a refund. If they insist on boarding the plane or if they make false medical claims, Delta can temporarily blacklist customers from booking flights with their company. The worst offenders, the company warns, can be permanently banned from flying with Delta.

Delta has not stated when their mask mandate will end.

Learn about all the other companies that are using the Wuhan coronavirus pandemic to impose their will upon their potential customers with tyrannical policies such as mask mandates by reading the articles at Pandemic.news.

**Sources include:**

DailyMail.co.uk

Edition.CNN.com

BusinessInsider.com

FoxBusiness.com

news.delta.com

# Delta expands safety commitment by requiring all customers to wear face coverings across travel

5-6 minutes          4 - 3 0 - 2 0

In keeping with best practice guidelines from the CDC, starting May 4 Delta will require all customers to wear a face mask or appropriate face covering when traveling.



Delta employees and customers will experience an extra layer of protection starting May 4, as we require all customers to wear a face mask or appropriate face covering when traveling with us.

In keeping with best practice guidelines from the Centers for Disease Control, this move comes on the heels of our announcement earlier this week requiring employees worldwide to wear face masks if they are unable to maintain six feet of distance with customers or each other. This requirement for our

people helps set the example for our customers to follow as well.

This action is one more way we are working to protect our people and customers, as well as doing our part in the broader community to help slow and stop the spread of the virus. Other measures include:

- New temporary requirements for employees to wear masks or face coverings when within six feet of others while at work, starting this week

- Employee temperature checks

- Enhanced cleaning measures implemented in airports and on aircraft

- Expanding electrostatic spraying procedures, which disinfect employee work and break areas, to more locations

"Nothing is more important than the health and safety of our people and our customers," said Bill Lentsch, Chief Customer Experience Officer. "While we remain committed to our new standard of clean and to providing more space for our customers when they travel, we take seriously the CDC guidelines for adding this extra layer of protection. We believe this change will give customers and employees some additional comfort when traveling with us."

Please visit the CDC website for guidance on:

- Recommendations for masks, including how to make one at home

- Use of Cloth Face Covering to Help Slow the Spread of COVID-19

Face coverings will be required starting in the check-in lobby and across Delta touchpoints including Delta Sky Clubs, boarding gate areas, jet bridges and on board the aircraft for the duration of the flight – except during meal service. Their use is also strongly encouraged in high-traffic areas including security lines and restrooms. People unable to keep a face covering in place, including children, are exempt.

This temporary requirement will be communicated to customers using the same channels we have shared changes to service and experiences throughout this pandemic. Delta.com, Pre-flight emails and Fly Delta app push notifications will serve as reminders before heading to the airport, while

signage, displays and, of course, our incredible Delta people will support this effort via announcements once traveling. And while we continue to encourage customers to bring their own face covering when traveling with us, supplies will be available for customers who need them.

**Delivering on Delta's New Standard of Clean**

Delta will continue evaluating our practices and new opportunities to support personal safety. Requiring customers and employees to wear face coverings throughout their journey is one of many steps Delta has taken to protect their health and safety, while providing an essential service to the communities we continue to serve. These efforts and our new standard of clean include:

- Expanding electrostatic sanitizing spraying – to all aircraft and adopting extensive pre-flight cleaning practices that disinfect high-touch areas – on top of existing cleaning measures and the use of state-of-the-art air circulation systems with HEPA filters that extract more than more than 99.999% of even the tiniest viruses on many Delta aircraft

- Taking steps to give customers and employees more space for safer travel on the ground and in the air by blocking middle seats, reducing the number of customers on each flight and pausing automatic Medallion Complimentary Upgrades

- Adjusting the boarding process to encourage more space for safer travel by boarding all flights from back-to-front — reducing the instances of customers needing to pass by one another to reach their seats

- Streamlining onboard food and beverage service on all flights and encouraging customers to pack their own food and beverages to decrease touch points

- Providing supplies directly to customers when available, including hand sanitizers, amenity kits and other protective equipment to minimize the spread of COVID-19 and other viruses

- Connecting with health experts, partners and healthcare industry leaders on best practices

  *A comprehensive list of onboard changes can be found on delta.com.*

onemileatatime.com

# Delta Air Lines Adds Face Mask Requirement | One Mile at a Time

3 minutes                    4-30-20

___

And now all airlines seem to be following one another. We've just seen announcements from JetBlue, Frontier, and American, regarding passengers having to wear face masks. Now Delta is joining the club as well.

- Delta Air Lines will require face masks

- Delta will have masks for those who need them

- Bottom line

## Delta Air Lines will require face masks

As of May 4, 2020, Delta Air Lines will require all employees and customers to wear a face masks or appropriate face covering.

Face coverings will be required throughout the journey, including at check-in, in Delta SkyClubs, at boarding gates, in jet bridges, and onboard flights.

There are a couple of exceptions:

- People unable to keep a face covering in place, including children, are exempt

- Face coverings don't have to worn during meal services

Delta also notes that face masks are "strongly encouraged" in high-traffic areas at the airport that aren't Delta-specific, like security lines and restrooms.

This is a temporary requirement, and they'll be communicating this with customers through the same channels they have shared all other changes.

As Delta's Chief Customer Experience Officer describes this decision:

"Nothing is more important than the health and safety of our people and our customers. While we remain committed to our new standard of clean and to providing more space for our customers when they travel, we take seriously the CDC guidelines for adding this extra layer of protection. We believe this change will give customers and employees some

additional comfort when traveling with us."



### Delta will have masks for those who need them

While Delta encourages customers to bring their own face coverings when traveling, the airline will have supplies available to those who need them. Presumably they would be available starting at check-in, since a face covering is required throughout the Delta journey.

### Bottom line

It seems like we're quickly getting to the point where most (and probably eventually all) US airlines will require passengers to wear face masks. I firmly believe that this is the right move for now, given the lack of social distancing that's possible on aircraft.

Hopefully this requirement doesn't last as long as the ban on liquids… 

Meet Ben Schlappig, OMAAT Founder

paddleyourownkanoo.com

# Delta Becomes First U.S. Airline to Require Customers Who Claim a Medical Exemption for Not a Wearing Face Mask to Get Pre-Clearance

*by Mateusz Maszczynski 17th July 2020*

3-4 minutes

Delta Air Lines has become the first major U.S. carrier to require passengers who claim a medical exemption for not wearing a face mask on one of its planes to first obtain clearance from a physician. Despite mandatory face mask rules, passengers have been able to claim a medical reason for not wearing one without providing any proof.

"Customers with health conditions or disabilities that explicitly prevent the wearing of a face covering or mask are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport," an updated FAQ's section on Delta's website informs passengers.

The process for passengers who need pre-clearance, Delta warns, could take up to an hour and will involve a virtual consultation with a healthcare professional.

The Atlanta-based airline does not provide a list of possible exemptions, suggesting passengers will be considered on a case-by-case basis. Details will be passed to gate staff and flight attendants to ensure they know which passengers won't be wearing a mask.

The new rules won't take effect until Monday, July 20th and the service will be available 24 hours a day.

"Medical research tells us that wearing a mask is one of the most effective ways to reduce the COVID-19 infection rate," a spokesperson for the airline explained.

"That's why Delta remains committed to requiring customers and employees to wear a mask or face covering as a consistent layer of protection across all Delta touchpoints. We encourage customers who are prevented from wearing a mask due to a health condition to reconsider travel."

"If they decide to travel, they will be welcome to fly upon completing a virtual consultation

prior to departure at the airport to ensure everyone's safety, because nothing is more important."

Several weeks ago, Delta joined other U.S. including American and United in threatening to ban passengers who simply refuse to wear a face mask. Flight attendants don't have the power to enforce face mask rules if someone doesn't wear a mask onboard a flight but they file a report after the flight and passengers face being added to a 'no fly' list.

Several international airlines, including Dutch flag-carrier KLM, have required passengers who have a medical reason for not wearing a face covering to seek pre-clearance since mandatory face mask policies were introduced.

Federal authorities have declined to mandate the wearing of face masks onboard flights despite calls from lawmakers and flight attendant leaders.

**Sign Up for the Cabin Crew Brief**

Get the latest cabin crew recruitment news delivered to your inbox once a week...

Mateusz Maszczynski

Mateusz Maszczynski is a serving international flight attendant with experience at a major Middle East and European airline. Mateusz is passionate about the aviation industry and helping aspiring flight attendants achieve their dreams. Cabin crew recruitment can be tough, ultra-competitive and just a little bit confusing - Mateusz has been there and done that. He's got the low down on what really works.

travelsort.com

# Delta: For Face Mask Exemption Must Have Pre-Flight Medical Evaluation

4-5 minutes                7-19-20



.

**Delta Airlines, as with Most Other Airlines Flying During Covid-19, Requires that Passengers Wear Face Masks While Aboard**, as well as during check-in, boarding, and in Delta Sky Clubs. Delta's face mask requirement is expected to remain through at least December 31, 2020, and could well be extended.

There are exceptions for children and for passengers with health conditions or disabilities that prevent wearing a mask, and passengers are also able to remove a mask to consume food and drink.

In the absence of a U.S. federal mandate (or even a DoT mandate) however, some adult passengers without a disability or medical reason that prevents wearing a mask have not

complied with Delta's (or other airlines') face mask requirements, potentially putting other passengers needlessly at risk of being infected with coronavirus. There's only so much flight crew can do vis-a-vis the more intransigent passengers, since crew are supposed to de-escalate situations with any non-compliant passengers.

Delta is now taking a stronger approach that may prevent non-compliant (but otherwise healthy) individuals from boarding in the first place: urging passengers that are unable to wear a mask not to fly ("strongly encouraged to reconsider travel"), or otherwise face a mandatory "Clearance to Fly" pre-flight evaluation conducted virtually by STAT-MD prior to the flight.

STAT-MD is Delta's in-flight emergency medical partner, staffed by physicians that are also knowledgeable about FAA regulations and the Air Carrier Access Act, which prohibits discrimination on the basis of disability when it comes to air travel.

Since the ACA prohibits airlines from requiring advance notice that a person with a disability is traveling, the new "Clearance to Fly" procedure will be conducted at the airport; Delta's coronavirus FAQ says to arrive early as the process can take over 1 hour.

While Delta can make a note on the passenger's profile of a medical exemption, after successfully undergoing the "Clearance to Fly" pre-flight evaluation, the airline can require it for future flights, such that those requiring a medical exemption may need to continue to arrive earlier for their Delta flights.

United and American Airlines have threatened to ban passengers who refuse to wear face masks but don't have a medical exemption. That can be difficult to enforce once such passengers are already on the plane. Delta's approach makes more sense, since it requires all passengers who want to claim a medical exemption to declare this prior to boarding, and be interviewed by a licensed physician. For those with true medical exemption needs, that won't pose an issue, other than arriving an hour earlier, but it may well deter those who don't have a legitimate medical reason for not wearing a face mask, since Delta plans to ban passengers who make false claims, bolding mine:

"**Any false claims** of a disability or health condition **to obtain an exemption from wearing a mask** or face covering may result in the **suspension of travel privileges on any Delta flight** for the duration of the mask/face covering requirement."

**If you've flown on a Delta flight recently, how compliant were other passengers about wearing face masks?**

**Recommended Posts**

United, AA, Delta, JetBlue Require Face Masks for Passengers

Review: Delta One A330 Paris to NYC

delta.com

# Face Masks | Delta Air Lines

5-6 minutes



**For everyone's safety, face masks are required.**

Delta customers, employees and partners are required to wear a face mask or appropriate cloth face covering over their nose and mouth throughout their travel.

Federal law requires each person to wear a mask at all times while in the airport and when using public transit, during boarding and deplaning, and for the duration of the flight. Refusal to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties





## When Masks Are Required

Masks or face coverings are required from curb to claim throughout the airport, including these Delta touchpoints:

- Lobby Check-in

- Delta Sky Clubs

- Boarding Gate Areas

- Jet Bridges

- On board the aircraft for the duration of the flight

Masks must be worn at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking – masks must be worn between bites and sips.

If oxygen masks are needed due to loss of cabin pressure or other events affecting aircraft ventilation, personal face masks should be removed to accommodate oxygen masks.

## Types of Masks

To comply with federal law and for the protection of our customers and employees, Delta has specified the types of masks allowed onboard in compliance with CDC guidance. Masks or face coverings should be secured to the head with ties or ear loops and should fit snugly but comfortably against the side of the face to ensure proper fit.

### Permitted Masks:

- Disposable surgical or medical masks

- Cloth masks with tightly woven fabric (2 or 3 ply masks are recommended)

- Valve-free respirator masks (N95 or KN95)

- Fabric masks with a clear plastic window

- Gaiters with two layers (single layer gaiters should be doubled over)

- Plastic face shields or goggles may be worn in addition to a mask but are not approved mask replacements

**Masks Not Permitted:**

- Any mask with an exhaust valve

- Masks with slits, punctures or holes

- Bandanas, scarves, ski masks, and balaclavas

- Novel and battery-operated masks that do not meet the specifications of the permitted masks listed above

## Mask Exemptions

Children under the age of two are exempt from the mask requirement.

Customers with a disability who cannot wear a mask for reasons related to their individual disability are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you are a customer with a disability who requires this exemption, please arrive early to complete the process during check-in to avoid missing your flight. This process can take over one hour and requests are now evaluated pursuant to the CDC and TSA's federal mask requirement for air transportation (adopted in February 2021). Mask exemptions only apply for travel onboard flights operated by Delta Air Lines and Delta Connection and do not exempt customers from any requirements that may be imposed by governments, including local, state or foreign countries, (at the origin or destination) or from requirements on other airlines. An exemption request is required for each unique itinerary, and each request is conducted on a case-by-case basis pursuant to law. Please consult your departure, connection and arrival locations for local mask mandate requirements.

Any false claims of a disability to obtain an exemption from wearing a mask or face coverings may result in the suspension of travel privileges on any Delta flight for the duration of the mask/face covering requirement and may be reported to appropriate government authorities.

Learn about Delta Partner carrier face mask policies.

## Related Links

delta.com

# Face Masks | Delta Air Lines

5-6 minutes



**For everyone's safety, face masks are required.**

Delta customers, employees and partners are required to wear a face mask or appropriate cloth face covering over their nose and mouth throughout their travel.

Federal law requires each person to wear a mask at all times while in the airport and when using public transit, during boarding and deplaning, and for the duration of the flight. Those who have received a COVID-19 vaccination are still required to wear a mask. Refusal to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties.





## When Masks Are Required

Masks or face coverings are required from curb to claim throughout the airport, including these Delta touchpoints:

- Lobby Check-in

- Delta Sky Clubs

- Boarding Gate Areas

- Jet Bridges

- On board the aircraft for the duration of the flight

Masks must be worn at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking – masks must be worn between bites and sips.

If oxygen masks are needed due to loss of cabin pressure or other events affecting aircraft ventilation, personal face masks should be removed to accommodate oxygen masks.

## Types of Masks

To comply with federal law and for the protection of our customers and employees, Delta has specified the types of masks allowed onboard in compliance with CDC guidance. Masks or face coverings should be secured to the head with ties or ear loops and should fit snugly but comfortably against the side of the face to ensure proper fit.

**Permitted Masks:**

- Disposable surgical or medical masks

- Cloth masks with tightly woven fabric (2 or 3 ply masks are recommended)

- Valve-free respirator masks (N95 or KN95)

- Fabric masks with a clear plastic window

- Gaiters with two layers (single layer gaiters should be doubled over)

- Plastic face shields or goggles may be worn in addition to a mask but are not approved mask replacements

**Masks Not Permitted:**

- Any mask with an exhaust valve

- Masks with slits, punctures or holes

- Bandanas, scarves, ski masks, and balaclavas

- Novel and battery-operated masks that do not meet the specifications of the permitted masks listed above

## Mask Exemptions

Children under the age of two are exempt from the mask requirement.

Customers with a disability who cannot wear a mask for reasons related to

their individual disability are strongly encouraged to reconsider travel or should be prepared to complete a 'Clearance-to-Fly' process prior to departure at the airport. If you are a customer with a disability who requires this exemption, please arrive early to complete the process during check-in to avoid missing your flight. This process can take over one hour and requests are now evaluated pursuant to the CDC and TSA's federal mask requirement for air transportation (adopted in February 2021). Mask exemptions only apply for travel onboard flights operated by Delta Air Lines and Delta Connection and do not exempt customers from any requirements that may be imposed by governments, including local, state or foreign countries, (at the origin or destination) or from requirements on other airlines. An exemption request is required for each unique itinerary, and each request is conducted on a case-by-case basis pursuant to law. Please consult your departure, connection and arrival locations for local mask mandate requirements.

Any false claims of a disability to obtain an exemption from wearing a mask or face coverings may result in the suspension of travel privileges on any Delta flight for the duration of the mask/face covering requirement and may be reported to appropriate government authorities.

Learn about Delta Partner carrier face mask policies.

## Related Links

Plaintiffs' Exhibit 56

TRAVEL ALERT

Sign up for **our latest deals!**

We are committed to you and your well-being. Learn more.



# COMMITTED TO YOU

Frontier remains committed to ensuring that the sky is for everyone. This means going the extra mile in all that we do for you.


### HEALTH & SAFETY
Learn More


### TRAVEL TIPS
Learn More


### HELPFUL VIDEOS
Learn More


### CHANGE FEES
Learn More

Find the Spanish Committed To You page here

## FROM CHECK-IN TO ARRIVAL AT YOUR DESTINATION, WE ARE COMMITTED TO YOUR HEALTH AND SAFETY

The next time you fly with us, you'll notice that we've made several changes. We've been working around the clock to improve our customer experience and to safeguard your well-being. Whether you are planning a trip back home to give mom a hug or dreaming of planting your feet in the sand, rest assured that the extra measures we are taking are designed to provide a safe and pleasant travel experience from the time you check-in until you arrive at your destination.

*We'd like to share how Frontier is 'Committed to You' and what that means for you and your family when you're ready to travel again.*



Frontier Airlines Magic

## STEPS WE'RE TAKING TO SUPPORT YOUR WELL-BEING & COMFORT



### ENHANCED CLEANING ON & OFF THE PLANE

Our **Ticket Counters, Gate Areas, and Aircraft** are getting extra attention. We've increased cleaning intervals with EPA approved anti-virus cleaning solutions. Here's a more specific look at what we're doing onboard:

- **Before Every Flight** the aircraft is cleaned with a focus on passenger seating, cabin walls, overhead bins, galleys and lavatories.
- **Aircraft with Extended Time Between Flights** are cleaned to include a wipe down of all customer and crew touchpoints - lavatories, seats, armrests, tray tables, walls, overhead panels and bins, window shades and galleys - with a disinfectant EPA rated to be effective against viruses, including SARS-CoV-2, the virus that causes COVID-19.
- **Every night** while our planes are positioned overnight, our Aircraft Appearance Team spends 4 to 6 hours thoroughly cleaning the aircraft's interior from top to bottom using industry-recommended disinfectant.
- **Monthly** enhanced deep cleaning of the entire aircraft

utilizing an anti-microbial agent that reaches virtually every surface and forms a protective shield that continues to be effective against viruses for 30 days.



## FACE COVERINGS

As required by federal law, the Centers for Disease Control (CDC) Order and Transportation Security Administration (TSA) Security Directive, all* passengers and employees must wear a face covering over nose and mouth throughout the Frontier travel experience including at ticket counters, gate areas, baggage claim and onboard all flights. Face coverings are not required for children under the age of 2. Face coverings must fit snugly over your nose and mouth and be secured under the chin. Open-chin triangle bandanas, face coverings containing vents, valves or mesh material, and face shields are not acceptable as face-coverings. This level of protection is important for everyone's well-being. Not wearing an approved face covering is a violation of federal law and you may lose future travel privileges on Frontier.

Check out our blog post on 'How to Make a No Sew Face Mask' - link here.



## STATE-OF-THE-ART AIR FILTRATION TECHNOLOGY

Did you know, the air in the cabin is passed through an air filtration system that mixes with fresh air drawn from outside? This occurs up to every 3 minutes circulating the cabin with new air and sending the old air directly outside.

Our system uses HEPA filters capable of capturing respiratory virus particles at more than 99.9% efficiency. These are the same filters used in hospitals and doctors' offices.



## TEMPERATURE SCREENING

To help ensure the well-being of everyone onboard, a non-invasive temperature screening taken on the forehead using a touchless thermometer will be taken at the gate for all passengers and crew.

Anyone with a temperature of 100.4 degrees Fahrenheit or higher will not be able to board the plane. If time allows, we will give customers the opportunity to rest before receiving a second check. If the second temperature screening is 100.4 degrees or higher, our team will help the customer to rebook travel on a later date when they are feeling better.



## QUICK & EASY HEALTH ACKNOWLEDGEMENT

When you check-in for your flight on our website or mobile app, you will be asked to accept the following health acknowledgment:

- You will have your temperature screened by a touch-less thermometer prior to boarding. Anyone with a temperature of 100.4 degrees or higher will not be allowed to fly.
- You will **wear a face covering over your nose and mouth throughout your journey,** including ticket counters, gate areas, and onboard our aircraft.
- In the last 14 days, neither you, nor anyone in your household or that you have come in close contact with, has tested positive for, exhibited symptoms of, or been advised to quarantine for COVID-19.
- You will wash your hands/sanitize before boarding the flight.



## MAINTAINING SOCIAL DISTANCE

We're making space for you at our check-in counters and gate areas. Signage and floor markers have been placed throughout the gate and ticket areas encouraging customers to maintain social distancing.

At the gate, our boarding process has changed to load passengers from the back of the aircraft to the front. This helps to minimize "passing" contact with other passengers during the boarding process.

We're currently installing plexiglass partitions at our ticket counters for the added safety of both employees and passengers.

# OUR EVERYDAY DISINFECTION PROCEDURE AT A GLANCE

Let us take you through our everyday disinfection procedure. Aircraft disinfection is performed in accordance with the Airbus Aircraft Maintenance Manual (AMM).



1. Aircraft doors are opened.
2. Touchpoints and surfaces are sprayed and cleaned with a disinfectant cleaner.

3. All trash and waste is removed from the aircraft.

4. Anti-bacterial hand soap is added to the restrooms.

*The daily cleaning process takes several hours to complete. We have taken a variety of proactive measures with respect to COVID-19 including increased heavy cleaning of aircraft and increased supplies of cleaning and disinfection products on board.*



Committed to You - Fresh Air

# FRESH AIR

The air onboard our planes is cleaner than many of the public places you visit daily. From outside the plane, clean air flows into the cabin via a sophisticated filtration system – using a hospital-grade HEPA filter - while old air is pushed back outside. Within every 3 minutes, you're breathing fresh outside-air.

# TOUCHLESS THERMOMETER SCREENINGS

Jake Filene, SVP Customers, talks about Frontier's new temperature screenings for both passengers and crew.





## HEPA FILTERS

Learn more about our HEPA (High-Efficiency Particulate Arrestors) aircraft filtration systems which filter 99.99% of dust particles and airborne contaminants such as viruses and bacteria.

## FACE COVERINGS REQUIRED FOR CUSTOMERS

At Frontier, your health and safety are our top priority. **Frontier customers are required to wear a face-covering over their nose and mouth throughout their journey**. This includes all ticket counters, gate areas, and onboard our aircraft.

Frontier flight crews are also required to wear face-coverings while working.



Based on CDC guidance, a suitable face covering should be an item of cloth that should fit snugly against the side of the face and that should be secured with ties or ear loops. It should also include multiple layers of fabric and allow for unrestricted breathing. The CDC recommends surgical masks and N-95 respirators be reserved for healthcare workers and other medical first responders. The policy will not apply to very young children who are unable to maintain a face covering.



**CABIN FOGGING**



**CUSTOMER WELLBEING**



**DISINFECTION**



**HEALTHY TRAVEL TIPS**

## STEPS WE ENCOURAGE WHEN TRAVELING

✓ **1 - Upon entering the airport, put your face-covering over your nose and mouth.**

✓ **2 - Bring your own gloves, hand sanitizer, and cleaning wipes.**

✓ **3 - Limit your touchpoints – for instance, download your mobile boarding pass prior to arrival.**
**It also saves time! And, bring your own snacks to avoid additional contact.**

✓ **4 - While in the terminal, maintain social distancing whenever possible.**



**Barry Biffle**
CEO, Frontier Airlines

**C. Jeffrey Knittel**
CEO, Airbus Americas, Inc

# A Special Message From Frontier and Airbus CEOs

open
___

## *FEDERAL & EXPERT GUIDELINES THAT WE

# FOLLOW

Frontier Airlines continues to closely monitor developments with respect to COVID-19.

- Mask Exemptions for Customers with Disabilities
  Customers with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) can apply for a face mask exemption. To learn about pre-travel exemption requirements, click here. This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability. It is not meant to cover persons for whom mask-wearing may only be difficult.
- As a U.S.-based commercial airline, we coordinate closely with multiple federal and other agencies to ensure we are continuously operating under established best practices for aircraft cleanliness and sanitation. Among those, we follow the recommendations set forth by the **CDC for 'Preventing Spread of Disease on Commercial Aircraft'** as well as adhere to our own stringent internal guidelines.
- All of our aircraft are regularly cleaned using disinfectant deemed by the U.S. Environmental Protection Agency (EPA) as effective against COVID-19.
- If you need travel advice, we recommend visiting the U.S. Centers for Disease Control's (CDC) website at cdc.gov/travel.

From our family to yours, we look forward to welcoming you onboard again soon!

We are committed to you and your well-being. Learn more.

Travel / Travel Info / **Special Services**



# SPECIAL SERVICES

Need a little extra help? We are happy to assist you. Here is some information on our services and policies.

If you seek additional assistance with booking a flight, flight information, or have a special services request, please call us at 801-401-9004 or fill out our Contact Us Form.

# PICK A TOPIC FOR MORE INFORMATION

## Mask Exemptions for Customers with Disabilities

open

If you are a person with a disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) and that disability prevents you from safely wearing a mask, and you are requesting an exemption to the CDC order requiring masks to be worn during air travel, the following requirements must be met:

- At least 10 days prior to departure:
    - Submit documentation from a licensed medical provider on professional letterhead stating the customer is a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act. Form Here
        - State license number (or, if applicable, other medical license information) from the medical provider must be included on the letter.
        - Frontier will contact your licensed medical provider to validate the document.
        - Any customer who presents falsified medical documentation will be subject to suspension of their privileges for future travel on Frontier.
        - Failure to provide 10 days' notice will result in denial of the request.
- At the airport on each day of travel:
    - The customer must check in at the Frontier ticket counter a minimum of 2 hours prior to departure.
        - Present evidence that the customer requesting a mask exemption does not have COVID-19 by providing a negative result from a SARS-CoV-2 viral test; the specimen for the test must have been collected no more than 3 days before the applicable flight. This evidence must be shown to the Frontier representative at the airport before boarding each flight.
- These testing requirements apply to return travel.



# Face Mask Exemption

This form should only be used by customers requesting an exemption to the Centers for Disease Control (CDC) Order and Transportation Security Administration (TSA) Security Directive requiring masks to be worn during air travel and who meet the following requirements:

- Customers with a disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.) whose disability prevents them from safely wearing a mask.
- The request is being submitted at least 10 days before departure.
- The request includes:
    - Documentation from a licensed medical provider on professional letterhead stating the customer requesting the exemption is a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of that disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)
    - The documentation includes the medical professional's state license number (or, if applicable, medical license information)

A representative from Frontier Airlines will contact the licensed medical provider to validate the document.

Any customer who presents falsified medical documentation will be subject to suspension of their privileges for future travel on Frontier Airlines.

Enter the information for the customer that is requesting the mask exemption.

**Email Address** *

**Frontier Confirmation Code** *

**Passenger First Name** *

**Passenger Middle Name**

**Passenger Last Name** *

Please note that the Passenger Name entered must match the Reservation.

### Origin Departure Date

**MM**     **DD**     **YYYY** *

5  ⌄   24  ⌄   2021

Please note: failure to provide 10 days' notice will result in denial of the request.

---

### Attach Documentation (PDF preferred and size should be less than 10 MB) *

Browse...   No file selected.

---

Continue...

Earn **507 mi.** on this trip! Learn More

Add Additional Services & Information

| Special Services [-] | Cabin Pet [+] | Redress Number [+] | Known Traveler Number/TSA Pre✓/® [+] |

We make sure to take care of passengers who need special assistance.

Select Special Service(s)

Wheelchair Services

☐ Can walk some short distances/need help to/from gate

☐ Can walk short distance/cannot use stairs/need help to/from gate

☐ Aisle chair needed, transfer assist to/from aircraft seat

☐ I have my own wheelchair

Special Assistance

☐ Blind or Vision Impairment

☐ Deaf or Hearing Impairment

☐ Cognitive or Developmental Disability

☐ Request Trained Service Animal

For more information about special services at Frontier, please visit our special services page.

Please Note: For safety reasons, passengers must be able to sit upright (unassisted) during taxi, take off and landing to travel on Frontier Airlines.

Plaintiffs' Exhibit 57

hawaiianairlines.com

## Keeping You Safe | Hawaiian Airlines

8-10 minutes

---

Our primary concern is always the health and safety of our guests and employees. In line with recommendations by leading public health authorities, we have reinforced and enhanced cleaning procedures across our business, including regularly reviewing our safety measures to align with new research as it becomes available. Recent studies from respected researchers such as the Harvard T.H. Chan School of Public Health and the Department of Defense have validated that the risk of viral transmission on board a commercial aircraft is extremely low.

At the Airport | On Board Our Aircraft | Changes to In-Flight Services

At the Airport
On Board Our Aircraft
Changes to In-Flight Services

## At the airport





- Hawaiian Airlines airport employees wear face masks when interacting with guests.

- Federal law requires that all guests two years and older wear a mask at the airport, while boarding, through the duration of the flight and while deplaning at their destination. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft and/or penalties under federal law.

- Masks worn during travel must meet **CDC's requirements**, including:

- The mask must completely cover the nose and mouth and should fit snugly against the side of the face, secured to the head with ties or ear loops. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.

- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).

- Masks should be a solid piece of material without vents, mesh, slits, exhalation valves, punctures, or other obviously transparent cloth coverings.

- Scarves, ski masks, balaclavas and bandannas are not acceptable forms of face masks.

- Guests must wear their masks at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking; masks must be worn between bites and sips.

- Face shields or goggles cannot be used in lieu of a face mask, but may be used in addition to an appropriate mask.

- Personal air purifiers can be brought on board, but cannot be used or charged on board and must be stowed away properly.

- Guests who are unable to wear a face mask due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment. If you are unable to meet this requirement, we recommend that you reconsider your travel. Please note that any face covering exemptions apply only to travel on Hawaiian Airlines.

- We disinfect our common areas, such as our counters and kiosks, multiple times each day.



- Hand sanitizers are readily available for travelers at airports statewide and on the mainland.

- TSA is allowing passengers to bring liquid hand sanitizer up to 12 ounces in carry-on bags until further notice.

- We have temporarily closed the Kauai and Hawaii Island Premier Club locations. **The Plumeria Lounge** and **Premier Club** location at Honolulu's Daniel K. Inouye International Airport have

reopened, as well as the Premier Club location at Kahului Airport in Maui.

## On board our aircraft





- We have detailed protocols, guided by the CDC and industry research, for cleaning and disinfecting our aircraft.

- Our transpacific aircraft are thoroughly cleaned after every flight with hospital-grade, EPA- approved disinfectants that are effective against COVID-19.

- Our neighbor island aircraft are cleaned and disinfected daily.

- We pay special attention to areas that our guests frequently touch, such as seats, seatbacks, headrests, IFE monitors, tray tables, overhead bins, walls, windows and shades, as well as galleys and lavatories, among other areas within the aircraft.



- Hawaiian Airlines airport employees wear face masks when interacting with guests.

- Federal law requires that all guests two years and older wear a mask at the airport, while boarding, through the duration of the flight and while deplaning at their destination. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft and/or

penalties under federal law.

- Masks worn during travel must meet **CDC's requirements**, including:
- The mask must completely cover the nose and mouth and should fit snugly against the side of the face, secured to the head with ties or ear loops. If gaiters are worn, they should have two layers of fabric or be folded to make two layers.

- Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source).

- Masks should be a solid piece of material without vents, mesh, slits, exhalation valves, punctures, or other obviously transparent cloth coverings.

- Scarves, ski masks, balaclavas and bandannas are not acceptable forms of face masks.

- Guests must wear their masks at all times except while eating, drinking, or taking oral medications for brief periods. Prolonged periods of mask removal are not permitted for eating or drinking; masks must be worn between bites and sips.

- Face shields or goggles cannot be used in lieu of a face mask, but may be used in addition to an appropriate mask.

- Personal air purifiers can be brought on board, but cannot be used or charged on board and must be stowed away properly.

- Guests who are unable to wear a face mask due to a medical condition or disability will be required to complete an assessment with a medical professional via phone at the airport. We recommend arriving at the airport early with ample time to complete the assessment, as the process may take more than one hour, and your flight will not be held. Please notify one of our Guest Services Agents as soon as you are ready to complete the medical assessment. If you are unable to meet this requirement, we recommend that you reconsider your travel. Please note that any face covering exemptions apply only to travel on Hawaiian Airlines.

- On transpacific flights, our cabin air is cleaned through high-efficiency particulate air (HEPA) filters that create a dry and essentially sterile environment, inhospitable to the growth of viruses.

- On flights between the Islands, the air in our Boeing 717 cabins is not recirculated but instead continuously replaced with fresh, outside air controlled for temperature.

## Changes to in-flight service



Plaintiffs' Exhibit 58



Español 

FLIGHT | HOTEL | CAR | VACATIONS    SPECIAL OFFERS    RAPID REWARDS® 

# Customers with Disabilities

Notice of Disability

Assistance in the Airport

Security Screening

Wheelchairs & Other Devices

Allergies

Cognitive Disabilities

Deaf or Hard of Hearing

Blind Or Low Vision

Medication

Trained Service Animals

Medical Oxygen

Portable Oxygen Concentrators

Non-Passenger Escort

Mask Exemptions

Your Rights

## Advance notice of disability

Customers with disabilities are not required to provide advance notice of the need for assistance; however, doing so helps us better prepare for the number of Customers who will need our help.

We give Customers the opportunity to proactively notify Southwest Airlines of any specific disability-related needs during and after booking.

When booking a new reservation, Customers may use the "Special Assistance" link on the Passenger & Payment Info page to indicate that he/she requires assistance. When booking online, Customers may notice that there is a link (identified with an italicized "i") that directs the user to the details of our policies for assisting Passengers with disabilities. After the Customer has selected his/her option(s), the Customer should scroll down and complete the booking process.

If a reservation has already been created, simply click on the "FLIGHT | HOTEL | CAR | VACATIONS" link located on the top of our home page. Then, select "Manage Reservations" from the "Flight" column, input the required information, and select "Search." From that page, click on the "Special Assistance" link under the Passenger name. Once a Customer has added his/her option(s), the Customer should click "Update Information" and the information will be saved to the Customer's reservation.

Customers may also advise us of any disability-related travel needs at the time of booking by telephone or, if a reservation has already been made, by calling 1-800-I-FLY-SWA (1-800-435-9792) prior to travel.

We recommend that Customers arrive at the airport no later than the recommended airport arrival time. If traveling with a power wheelchair, in the event that we need to prepare the wheelchair for stowage, we may ask that Customers relinquish his/her power wheelchair up to an hour in advance of departure. In this case, the Customer will be transferred to an airport wheelchair until boarding begins.

If traveling in a group of 10 or more Customers who use wheelchairs, please advise us at least 24 hours in advance by calling 1-800-I-FLY-SWA (1-800-435-9792) so that we can ensure adequate staffing and room in the cargo compartment of the aircraft for the wheelchairs.

**Join the Discussion**

Share knowledge and learn from travelers just like you.
Community ↗

**Need Help?**

We're a click away.
Contact Us

### How May We Help You? Search Customer Service

Enter Keyword(s)     [ Search ]

**Need help?**

Contact Us

**Subscribe**

Wanna receive

**Connect with us** ↗



## Passenger Application for Exemption to Federal Mask Requirement on Southwest Airlines

Please complete the information below and submit to Southwest Airlines for review of a mask exception application.  You are submitting the information below and as outlined in this Application for Exemption in order for Southwest to evaluate and process your request for an exemption from the federal mask mandate while flying with Southwest Airlines. Southwest Airlines may share this information with a third-party medical provider, the CDC and other government authorities, and our agents, vendors, and service providers for purposes of managing and fulfilling your travel reservations and assisting Southwest Airlines with the evaluation and processing of your application for an exemption.

Please check the box below that applies:

- I am completing this form for myself.
- I am completing this form for the minor named herein.  I am either the parent or guardian of the minor child and have the authority to and, by completing this form, hereby attest to the information provided below.

Passenger First Name:  _____

Passenger Middle Initial: _____

Passenger Last Name: _____

Contact Email address: _____

Contact Phone number: _____

Reason for Mask Exception Request:

_____

_____

_____

Is flight already booked?  Yes_____  No_____

If flight is already booked, please include the following information:

Date(s) of Travel: _____

City Pair: _____

Confirmation Number (if flight already booked): _____

Does Passenger possess a WN Employee ID? _____

If Passenger possesses a WN Employee ID, please include the following information:

WN Employee ID of Traveling Passenger: _____

By submitting this request and signing below, I [name of passenger or authorized representative] [on behalf of _____] have read and understand the disclosures and requirements included above pertaining to my application to receive an exemption from the federal requirement to wear a mask while flying on Southwest Airlines, including, without limitation, Southwest's collection, use, and sharing of information and that Southwest Airlines may change my travel dates and/or flights should one or more of my originally scheduled flights have a capacity of 75% or more, or another Passenger approved for a mask exemption booked on such flight.

_____
Passenger Signature or Signature of Passenger Parent or Guardian

_____
Printed Name of Passenger or Parent or Guardian

Date: _____

**Southwest Airlines – Masks FAQ**

**Should I wear a mask in the airport and on the plane? What forms of masks are acceptable?**

Yes, Federal law requires each person to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law. On the aircraft, if wearing oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation, masks should be removed to accommodate oxygen masks.

Masks are also required in the airport.
If you forget your mask at home, a mask will be available for you.

Acceptable forms of masks
In accordance with the Federal law, a properly worn mask completely covers the nose and mouth, is secured to the head with ties, ear loops, or elastic bands that go behind the head, and fits snugly against the side of the face. Cloth masks should be made with two or more layers of a breathable fabric that is tightly woven (i.e., fabrics that do not let light pass through when held up to a light source). Neck gaiters (also called multi-bands) may be worn as mask so long as they have two layers of fabric or may be folded to make two layers and cover the nose and mouth and are secured under the chin.

In addition, if your mask meets the requirements noted above, the following are acceptable:

- Clear masks or cloth masks with a clear plastic panel to facilitate communication with people who are hearing impaired or others who need to see a speaker's mouth to understand speech.
- Medical masks and N-95 respirators.
- The following are some examples of coverings that will not be accepted:
- Masks not made of a solid piece of material, including those made of mesh or lace fabrics or with slits, exhalation valves or punctures
- Face shields (face shields may be worn in addition to a mask that meets the above required attributes)
- Bandanas, scarves, ski masks, or balaclavas
- Shirt or sweater collars (e.g., turtleneck collars) pulled up over the mouth and nose
- Masks made from loosely woven fabric or that are knitted, i.e., fabrics that let light pass through
- Masks that do not fit properly (large gaps, too loose or too tight)

Exemptions to face coverings
Young children under the age of 2.

Beginning March 14, 2021, Southwest Airlines will consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability. Several conditions apply that must be completed/adhered to prior to travel and receiving a mask exemption. For more details on this policy and for access to the submission form, please visit here.

<u>When the Federal law requires Customers to wear a mask</u>

Customers will be required to wear a mask over their nose and mouth at all times during their Southwest travel experience—while checking in, boarding, while in flight, deplaning, retrieving baggage; and any other time they may engage with a Southwest Employee or another Customer. Customers are required to wear a mask in order to board the plane.

The following are times when a Customer may need to briefly remove their mask:

- When necessary for identity verification purposes such as during Transportation Security Administration screening or when asked to do so by our Employees or any law enforcement official
- While eating, drinking, or taking oral medications. Prolonged periods of mask removal are not permitted for eating or drinking; the mask must be worn between bites and sips.
- While communicating with a person who is hearing impaired when the ability to see the mouth is essential for communication
- If, on an aircraft, wearing of oxygen masks is needed because of loss of cabin pressure or other event affecting aircraft ventilation
- If unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to remove the mask without assistance

**If I have received the COVID-19 vaccine, am I required to adhere to the federal mask mandate and/or other travel requirements?**

Yes, per federal mask mandate, the requirement to wear a mask applies to all passengers ages 2 and over, including vaccinated persons. Please continue to adhere to all current travel requirements, including United States Government requirements for flights arriving in the United States and other federal, state, international, and local COVID-19 travel restrictions that apply to your specific itinerary. For more information regarding travel requirements for specific destinations, please click here.

https://www.southwest.com/airline-cleanliness-social-distance/#mask-faq
Visited May 24, 2021

**Exemption to Federal Mask Requirement on Southwest Airlines**

Federal law requires each person, 2 years of age and older, to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

Southwest Airlines will consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability.

Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement.  These requirements/conditions are described below.

Important Notice:  Flight must be less than 75% full
As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less-crowded flight. Therefore, Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 75% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption. If the passenger's preferred flight ends up being more than 50 percent full on the day of travel, Southwest Airlines will work to reaccommodate Passengers who obtain a mask exemption. Please note that Passengers may be required to travel on a different date than their scheduled itinerary. That may also require the Passenger to provide documentation of new (updated) test results at the Passenger's expense in line with Southwest Airlines' requirements to receive a mask exemption.

Please comply with the following pre-travel steps:
- At least seven (7) days prior to the Passenger's  planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit the following via Southwest.com>Contact Us>Send a Message.>Email Us: Comment/Question>Disability>Future Travel Assistance:
- A fully completed copy of this form executed by the Passenger making the request, or if the Passenger requesting a mask exemption is a minor child, the parent or guardian of such minor child; and
- A signed letter from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability.

Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider (Southwest Airlines' vendor StatMD).

If Southwest preliminarily approves a mask exemption after reviewing the Passenger's PDF document and the Medical Physician's letter and after receiving the third party medical provider's affirmation for travel, if required, Southwest will contact you at the phone number or email address provided below to discuss any need to change your travel dates and/or flights and remind you of the need to obtain a qualifying COVID negative viral test.

No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result. A qualifying COVID negative viral test result is defined as:

A physical or electronic documentation of a qualifying COVID negative viral test taken within three (3) calendar days preceding the Passenger's scheduled date of travel. A viral test means a viral detection test for current infection, which is a nucleic acid amplification test with observation approved or authorized by the relevant national authority for the detection of SARS-CoV-2.

Note:  Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure, unless the Passenger's return flight is within three (3) calendar days of the date of the initial negative COVID-19 departure test.  Also, if the Passenger's originally scheduled date of travel is changed as a result of the flight having a capacity of 75% or more or another Passenger approved for a mask exemption, then you will be required to obtain a qualifying COVID negative viral test result within three (3) calendar days preceding the Passenger's new scheduled date of departure or return travel, as applicable and at your own expense.

https://www.southwest.com/html/customer-service/unique-travel-needs/customers-with-disabilities-pol.html
Visited May 24, 2021



FLIGHT | HOTEL | CAR | VACATIONS     SPECIAL OFFERS

# Customers with Disabilities

Notice of Disability

Assistance in the Airport

Security Screening

Wheelchairs & Other Devices

Allergies

Cognitive Disabilities

Deaf or Hard of Hearing

Blind Or Low Vision

Medication

Trained Service Animals

Medical Oxygen

Portable Oxygen Concentrators

Non-Passenger Escort

**Mask Exemptions**

Your Rights

### Exemption to Federal Mask Requirement on Southwest Airlines

Federal law requires each person, 2 years of age and older, to wear a mask at all times throughout the flight, including during boarding and deplaning. Refusing to wear a mask is a violation of federal law and may result in denial of boarding, removal from the aircraft, and/or penalties under federal law.

**Southwest Airlines will consider applications for exemptions from this mask requirement from Passengers with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability.**

Per guidance from the U.S. Department of Transportation, airlines are permitted to impose certain requirements or conditions on a person requesting an exemption from the mask requirement.

**Please comply with the following pre-travel steps:**

At least seven (7) days prior to the Passenger's planned date of travel, a Passenger requesting a mask exemption for travel on Southwest Airlines must complete and submit the following via **Southwest.com>Contact Us>Send a Message.>Email Us: Comment/Question>Disability>Future Travel Assistance:**

1. A fully completed copy of this form executed by the Passenger making the request, or if the Passenger requesting a mask exemption is a minor child, the parent or guardian of such minor child; and

2. A signed letter from the requesting Passenger's Medical Physician on the Physician's letterhead stating that the Passenger with a disability has a recognized medical condition precluding the wearing or safe wearing of a mask because of their disability.

Once Southwest Airlines receives a mask exemption application in line with the above criteria, at Southwest's request to Passenger, Passenger may undergo a private medical screening (over the phone) with a third-party medical provider (Southwest Airlines' vendor StatMD).

If Southwest preliminarily approves a mask exemption after reviewing the Passenger's PDF document and the Medical Physician's letter and after receiving the third party medical provider's affirmation for travel, if required, Southwest will contact you at the phone number or email address provided below to discuss any need to change your travel dates and/or flights and remind you of the need to obtain a qualifying COVID negative viral test.

No later than 24 hours prior to the Passenger's scheduled departure(s), Passenger must provide evidence of Passenger's qualifying COVID negative viral test result. A qualifying COVID negative viral test result is defined as:

A physical or electronic documentation of a qualifying COVID negative viral test taken within three (3) calendar days preceding the Passenger's scheduled date of travel. A viral test means a viral detection test for current infection, which is a nucleic acid amplification test with observation approved or authorized by the relevant national authority for the detection of SARS-CoV-2.

**Note:** Roundtrip travel will require an additional qualifying COVID negative viral test result taken within three (3) calendar days preceding the Passenger's scheduled date of return travel and submitted no later than 24 hours prior to the Passenger's scheduled departure, unless the Passenger's return flight is within three (3) calendar days of the date of the initial negative COVID-19 departure test.

## Join the Discussion

Share knowledge and learn from travelers just like you.

paddleyourownkanoo.com

# Southwest Introduces Tough New Face Mask Exemption Rule That Still Complies With CDC Rules

*by Mateusz Maszczynski 11th March 2021*

4-5 minutes

---

Southwest Airlines will introduce tough new face mask rules that will make it even more difficult for passengers with a legitimate medical exemption to fly with the airline while still complying with a Centers for Disease Control and Prevention (CDC) federal mask mandate.

Along with requiring a pre-travel questionnaire at least seven days before departure and written proof of their medical exemption from a physician, passengers will also need to obtain a negative pre-departure COVID-19 test certificate within 72-hours of departure and undergo a private medical screening with a third-party medical provider.

Once a passenger has jumped through those hoops, Southwest Airlines will still refuse to board them if the flight is booked to 50 per cent capacity or more. Even on a near-empty flight, an exempt passenger may still be refused boarding if there is more than one exempt passenger booked on the same flight.

One of President Biden's first acts on entering the White House was to introduce a federal face mask mandate for passengers and employees on public transport including airplanes. The order came into effect on February 1 but the mandate actually eased the strict face mask rules that some airlines had introduced.

Like American Airlines and United, Dallas-based Southwest airlines barred anyone over the age of two years old from flying with them if they claimed to have a medical condition that prevented them wearing a face mask. Instead, Southwest told passengers to either delay travel indefinitely or find another airline to fly with.

The federal mask mandate, however, included a specific exemption for passengers with medical issues that made it impossible for them to wear a mask. Airlines like United and Southwest have been forced to comply, although they can add conditions.

"As a mitigation measure, DOT allows airlines to schedule the passenger (not wearing a mask) on a less-crowded flight. Therefore, Southwest requires that a Passenger obtaining a mask exemption travel on a flight with less than 50% capacity at the time of the flight's departure, and with no other Passengers on board approved for a mask exemption," the airline explains on its website.

Southwest says it will accommodate passengers on a different flight at no extra cost but this might be on a later date. If that were to happen, passengers would be responsible for covering the cost of a new COVID-19 test themselves.

According to TSA data, passenger numbers are slowly ticking up with travel demand currently sitting around 45 to 50 per cent of what it was at this time in 2019. However, many airlines have slashed schedules and consolidated flights, meaning that passenger numbers often exceed 50 per cent

capacity.

The CDC still recommends that people avoid all but the most essential of air travel – including those who are fully vaccinated against COVID-19. The agency also says passengers should continue to wear a face mask on airplanes, in airports and anywhere else in a crowded public environment.

**Sign Up for the Cabin Crew Brief**

Get the latest cabin crew recruitment news delivered to your inbox once a week...

Mateusz Maszczynski

Mateusz Maszczynski is a serving international flight attendant with experience at a major Middle East and European airline. Mateusz is passionate about the aviation industry and helping aspiring flight attendants achieve their dreams. Cabin crew recruitment can be tough, ultra-competitive and just a little bit confusing - Mateusz has been there and done that. He's got the low down on what really works.

≡

# A4A Won't Push for a Federal Transportation Mask Mandate Extension

 John Michael Jayme    |    July 25, 2021



03:54                    15 KEY TRAVEL ADVISO

The federal transportation mask mandate is about to end on September 13. According to this mandate, people will have to wear masks in public transportation including airports and planes. Since CDC eased on masking rules, airports and airplanes have been the few remaining places where you are required to wear a mask.

It's also the number one reason why there's an increased report of unruly passengers on planes. The majority of these unruly passengers refused to wear masks.

Southwest Airlines CEO Gary Kelly, who is also the chairman of Airlines for America (A4A), said that the trade group and Southwest are not recommending an extension of the federal transportation mask mandate.

## Federal Transportation Mask Mandate Extension As Delta Variant Spreads?

President Biden announced the federal transportation mask mandate in January. The goal is to protect the passengers' and flight crews' health and improve mask compliance. This means that travelers will have to wear masks on trains, buses, planes, airports, and other transportation hubs. It was originally only up to May. But with the COVID situation in the US, it was extended until September 13.

Kelly said that airlines support the mask guidelines set by the US Centers for Disease Control and Prevention. According to the latest guidance, only unvaccinated individuals should be wearing a mask. He added though that "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate".

03:54                                    **15 KEY TRAVEL ADVISO**

Kelly isn't sure if the Transportation Security Administration will extend or lift the mandate. According to Kelly, "That's a political question, to a degree".

The recent surge of COVID cases in the US is something that can affect the decision of TSA. Delta variant is now the dominant strain in the US. CDC currently has no comment regarding the status of the mask mandate. Caitlin Shockey in an email said that "We can't comment on pending regulatory discussions as to the future of the order".

American Airlines CEO Doug Parker said that "What they decide, we'll enforce".

---



**John Michael Jayme**

*John Michael Jayme is a Travel Analyst for The Jet Set. He writes about news and events affecting the travel industry.*

---

READ MORE

03:54

**15 KEY TRAVEL ADVISO**

usatoday.com

# Will the mask mandate for flights be extended? Southwest Airlines CEO says airlines not pushing for it

3-4 minutes

`July 22, 2021; updated July 27`

Airplanes and airports are among the few remaining places where face masks are required, but they might not be after Sept. 13if the rule isn't extended.

Southwest Airlines CEO Gary Kelly, chairman of industry lobbying group Airlines for America (A4A), said Thursday that Southwest and the trade group are not recommending another extension of the federal transportation mask mandate.

The mandate, which airlines and their unions requested to help with passenger mask compliance and to protect the health of flight crews, was put in place by President Joe Biden in January. The mandate, which applies to trains, planes and airports, buses and transportation hubs, was initially due to expire in May but was extended through Sept. 13, with the blessing of airlines.

Reports abound of passengers refusing to wear masks and becoming aggressive with flight crews.

Kelly, answering reporter questions during Southwest's quarterly earnings conference call, said airlines support following Centers for Disease Control and Prevention guidance on masks, which says vaccinated individuals don't need one but unvaccinated individuals should wear one.

**New rules**: CDC lifts indoor mask requirement for fully vaccinated people

Unless that advice changes, he said, "we wouldn't advocate from Southwest's perspective, or the A4A for that matter, extending the mandate."

Kelly said he doesn't know whether the mandate, enforced by the

Transportation Security Administration, will be extended or lifted.

"That's a political question, to a degree," he said.

Kelly said the government is studying the matter, given the spreading delta variant, which has caused a spike in COVID-19 cases, but he is not aware of "any efforts underway" to extend the mask mandate.

**COVID-19 and travel:** The delta variant is spreading. Should travelers be concerned?

The CDC has had no comment on the status of the mandate beyond Sept. 13.

"We can't comment on pending regulatory discussions as to the future of the order," spokesperson Caitlin Shockey said via email.

Kelly is the first U.S. airline executive to publicly express what is in effect support for letting the mandate expire, though United Airlines CEO Scott Kirby said he expected it to be lifted in September.

"What they decide, we'll enforce," American Airlines CEO Doug Parker said earlier Thursday on the airline's quarterly earnings conference call. "It's not for us to opine."

Last week, Delta CEO Ed Bastian told Wall Street analysts and investors he didn't know the fate of the mandate.

He said there are as many "pros to taking the mask requirement off as there are to keeping it on at the present time."

"I think it's important that medical experts make those decisions, not airline professionals, as we've learned through the pandemic," he said on the airline's earnings call. "They're the ones that have all the insight and the information and keeping people safe. I appreciate people not wanting to wear the mask. I don't like wearing the mask when I'm on board either, but it's something that we need to do to keep each other safe."

Los Angeles County, the most populated county in the USA, will once again require people to wear masks indoors – regardless of vaccination status – after a surge in COVID-19 cases.

# Plaintiffs' Exhibit 59

**Mask Exemption Request**

*Must be submitted a minimum of 7 days prior to scheduled departure*

| *Initial* | ***This section must be completed by <u>passenger or designated assistant/guardian</u>*** |
|---|---|
| | Passenger name *(print)*:_____ |
| | Reservation and itinerary information:_____ |
| _____ | I understand that United, in its sole discretion and in accordance with CDC/DOT/TSA standards, will determine whether to approve my mask exemption request. |
| _____ | I understand that United requires that I provide proof of a negative COVID-19 PCR test result taken within 72 hours of my scheduled departure. |
| _____ | I understand that United may require me or my travelling party to move to alternate seats in the cabin and/or change our itinerary to less-full flights to allow for greater social distancing from other customers on board, if possible. United will advise regarding the alternatives, and changes to flights under these circumstances will be made at no additional cost. |
| _____ | I understand that if United approves my mask exemption request, I need to print the approval letter and carry it on my person at all times while traveling and will need to show it to TSA at the security checkpoint prior to being screened. |
| _____ | I understand that my mask exemption request is applicable only to flights in a single reservation, and any exemption for future travel or travel in separate reservations will need to be applied for anew. |
| _____ | I authorize the release of medical information pertaining to this mask exemption request and authorize my treating physician to speak with a United Airlines medical representative or any agent acting on its behalf. |
| _____ | I understand that if I choose to request a mask exemption, United will use the information on this form to handle my request. In order to assess and manage my request I understand that it may be necessary for United to disclose information relating to my health information to third parties such as medical professionals, airport staff, health agencies, United Express and Star Alliance carriers, and their employees, among others.<br><br>INDIVIDUALS LOCATED OUTSIDE OF THE UNITED STATES: If you are located outside of the United States and you choose to request a mask exemption, United will use the information on this form to handle your request. You understand that this form will be transferred to the United States, where data protection laws may not be equivalent to those in your home country. By signing below and affirmatively submitting this form, you give specific consent to United to process and transfer the information for these purposes. To exercise rights granted pursuant to |

| | applicable law, including withdrawal of consent, contact privacy@united.com. Withdrawal of consent does not affect the lawfulness of information processed until the withdrawal, and this information will continue to be maintained for compliance with legal obligations and for the establishment, exercise or defense of legal claims. |
|---|---|
| | Passenger or designated assistant/guardian name *(print)*: _____<br>Passenger or designated assistant/guardian signature:_____<br>Date:_____<br>Phone contact:_____Email contact:_____ |

| *Initial* | **This section must be completed by a <u>medical provider</u> specifically treating the passenger's disability** |
|---|---|
| | Patient/passenger name *(print)*:_____ |
| _____ | I am a licensed medical provider currently treating the passenger's disability. |
| _____ | **Pursuant to federal law, only individuals with a disability who cannot wear a mask or cannot safely wear a mask because of the disability, for example, individuals who do not know how to remove their masks, cannot remove them on their own, or cannot communicate promptly to ask someone else to remove their mask are eligible to request a mask exemption. Individuals for whom mask wearing may only be difficult are not eligible to request a mask exemption.**<br><br>I attest that the passenger cannot safely wear a mask in connection with the flight(s) for the itinerary above for the following reason(s):<br>_____<br>_____<br>_____<br>_____<br><br>Can the passenger wear a face shield? Yes ___◯___  No ___◯___ |
| | Medical provider's license information:<br><br>Date and type of the license:_____<br><br>License Number:_____<br><br>State or other jurisdiction in which license was issued: _____ |
| | Your name *(print)*: _____<br>Your Specialty:_____<br>Signature and Date:_____<br>Business phone contact:_____ |

| | Business email contact:_____ |

Plaintiffs' Exhibit 60





# CARES Act Payroll Support to Air Carriers and Contractors

## Updated October 22, 2020

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act; P.L. 116-136), signed into law on March 27, 2020, provided assistance to consumers and businesses, including aid to air carriers and eligible contractors. Emergency funds also were provided to eligible airports. Assistance to air carriers in Division A, Title IV of the CARES Act included loans and loan guarantees, funds to support the pay and benefits of air carrier workers, and a suspension of aviation excise taxes on air transport of people, cargo, and aviation fuel through calendar year 2020. This Insight focuses on the payroll support program (PSP).

Section 4112 of the CARES Act provided $32 billion in payroll support to aviation workers. From this amount, the Secretary of the Treasury was authorized to provide up to

- $25 billion for passenger air carriers (any air carrier that, during the period from April 1, 2019, to September 30, 2020, derived more than 50% of its air transportation revenue from the transportation of passengers);
- $4 billion for cargo air carriers (any air carrier that, during the period from April 1, 2019, to September 30, 2020, derived more than 50% of its air transportation revenue from the transportation of property or mail, or both); and
- $3 billion for contractors who provide ground services directly to air carriers, such as catering services or on-airport functions.

The law specified that the amount received by each air carrier or contractor was to be based on its payroll expenses for the six-month period from April through September 2019, and that the payroll support funds must be used exclusively for continuing the payment of employee wages, salaries, and benefits. The law also required that air carriers or contractors receiving payroll support must refrain from conducting involuntary layoffs or furloughs or reducing pay rates and benefits from the day the payroll support agreement was executed until September 30, 2020.

According to the CARES Act, air carriers and contractors receiving payroll support also must comply with other program terms and conditions, including continuation of certain air service deemed necessary by the Secretary of Transportation, refraining from stock buybacks or dividend payments through September 30, 2021, and limiting the compensation of highly paid employees until March 24, 2022.

**Congressional Research Service**
https://crsreports.congress.gov
IN11482

Administered by the U.S. Treasury, PSP has generated considerable interest from airlines and contractors. Treasury data show that, by October 5, 2020, more than $28 billion in payroll support had been approved for disbursement to 610 recipients, including 352 passenger airlines (some operating unscheduled service), 38 cargo carriers, and 220 contractors.

Although Treasury set April 27, 2020, as the deadline for PSP applications, it agreed to accept and consider applications beyond the deadline, subject to the availability of funds. Program data indicate that Treasury accepted and approved applications in the months after the original deadline, as shown in **Table 1**.

### Table 1. CARES Act Payroll Support Program (PSP)
(As of October 5, 2020)

|  | Passenger Airlines | Cargo Airlines | Contractors | Total |
| --- | --- | --- | --- | --- |
| 1st Agreement Date | 04/20/2020 | 05/08/2020 | 05/15/2020 | N/A |
| Number of Recipients | 352 | 38 | 220 | 610 |
| PSP Amount | $24,960,745,211 | $826,478,739 | $2,411,868,310 | $28,199,092,260 |

**Source:** CRS analysis of U.S. Treasury CARES Act Payroll Support Program data (as viewed on October 21, 2020).

Treasury data indicate that the first group of agreements was reached with a number of passenger airlines on April 20, 2020, and about 72% of the passenger airlines payroll agreements occurred in April and May. The first batch of agreements with cargo airlines was reached on May 8, 2020, followed by contractors in mid-May (**Table 1**). Contractors' payroll support agreements were disbursed relatively evenly in May, June, and July. The timing of PSP agreements suggests that passenger airlines were the first group affected by the abrupt drop in air travel as a result of the COVID pandemic, followed by aviation contractors downstream. Air cargo carriers have been less affected.

The data also indicate that, as of October 5, 2020, over 99% of the $25 billion appropriated for payroll support to passenger airlines was committed, compared with approximately 80% of the $3 billion for contractors and over 20% of the $4 billion for cargo carriers. This also appears to agree with reports that cargo carriers have been faring better than passenger airlines.

As one of the PSP requirements prohibits involuntary furloughs or pay-rate reductions through September 2020, many airlines have asked employees to voluntarily take a leave of absence and/or begun to offer voluntary separation packages. Airlines also have warned employees about possible furloughs in October. Airlines and union groups have been advocating for continued federal aid.

However, the payroll support benefit did not expire on September 30, 2020. There is no deadline for a recipient to expend payroll support funds, as long as they are used exclusively for the continuation of employee wages, salaries, and benefits, as stated in a Treasury document. Since many payroll support agreements were approved and executed in May, June, July, or later, many employers are likely to have had funds available for payroll support beyond September 30, 2020. Meanwhile, airlines have been accessing additional capital in private markets and from Treasury's loan and loan guarantees program.

PSP has helped airlines and contractors to temporarily avert mass layoffs and furloughs due to the unprecedented drop in business. The number of passengers on U.S. airlines in April 2020 was 96% lower than in the same month in 2019. The number of U.S. airline passengers in mid-October 2020 remains about 65% lower than the 2019 level, and air travel is not expected to fully recover to pre-pandemic level for years. Congress could consider augmenting, extending, or reallocating undistributed PSP funds to passenger carriers that need more assistance. However, without immediate and significant improvement in passenger traffic, airlines may not have sufficient business to sustain current employment levels even

with short-term payroll assistance from the government. It is likely the airlines will need to restructure for
survival and long-term growth.

## Author Information

Rachel Y. Tang
Analyst in Transportation and Industry

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff
to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of
Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of
information that has been provided by CRS to Members of Congress in connection with CRS's institutional role.
CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United
States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However,
as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the
permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

iclg.com

# International Comparative Legal Guides

*Global Legal Group*

65-83 minutes



## USA: Aviation Laws and Regulations 2021

**ICLG - Aviation Laws and Regulations** - USA covers common issues in aviation laws and regulations - including aircraft trading, finance and leasing, litigation and dispute resolution – in 27 jurisdictions

Published: 02/02/2021

### Hot off the press

**Chapter Content Free Access**

1. 1. **General**
2. 2. **Aircraft Trading, Finance and Leasing**
3. 3. **Litigation and Dispute Resolution**
4. 4. **Commercial and Regulatory**
5. 5. **In Future**

#### 1. Genera**l**

**1.1     Please list and briefly describe the principal legislation and regulatory bodies which apply to and/or regulate aviation in your jurisdiction.**

Aviation is principally regulated by the following:

on March 27, 2020, the bipartisan Coronavirus Aid Relief and Economic Security ("CARES") Act was signed into law which included $58 billion in aid to airlines ($29 billion in payroll grants for workers and $29 billion in loans for the airlines).

**4.7     Are state subsidies available in respect of particular routes?  What criteria apply to obtaining these subsidies?**

The Essential Air Service ("EAS") Program permits the US government to subsidise air carriers to serve small, rural communities to maintain a minimal level of scheduled air service to those communities.  Generally, the DOT will subsidise between two round trips per day with a 30- to 50-seat aircraft between an EAS community and a major hub airport.  In selecting a carrier, the DOT considers: (1) service reliability; (2) contractual and marketing arrangements with a larger carrier at the hub; (3) interline arrangements with a larger carrier at the hub; and (4) community views (49 USC §§ 41731–41732).

The Alternative Essential Air Service Program designates funds directly to the municipality or airport authority instead of to the carrier, and allows them to forego their EAS for a certain amount of time and allocate the grant money in ways that may better suit their individual needs, but that would not otherwise meet EAS guidelines.

The Small Community Air Service Development Program ("SCASDP") is a grant program to provide financial assistance to small communities that address air service and airfare issues (49 USC § 41743).  SCASDP's eligibility criteria are broader than EAS and provide a grant applicant the opportunity to self-identify its air service deficiencies and propose an appropriate solution.  To be eligible, the airport serving the community cannot be larger than a small hub airport and the community must demonstrate that it has insufficient air carrier service, or unreasonably high airfares.  The DOT may provide assistance to an air carrier to subsidise service to and from an underserved airport for a period of up to three years, or it may provide assistance to an underserved airport.  SCASDP can involve, for example, revenue guarantees, financial assistance for marketing programs, start-up costs and studies.  There is no limit on the amounts of the grants, which vary depending upon the features and merits of proposals.  To date, grant sizes have ranged from $20,000 to nearly $1.6 million.

**4.8     What are the main regulatory instruments governing the acquisition, retention and use of passenger data, and what rights do passengers have in respect of their data which is held by airlines and airports?**

For purposes of security screening, the Intelligence Reform and Terrorism Prevention Act of 2004 (49 USC § 114) and the TSA's Secure Flight Program (49 CFR Parts 1540 and 1560) require airlines that operate flights to and from the US to collect passenger name records ("PNR data"), which includes the passenger's full name, date of birth, and gender. Records of passengers who are not potential or confirmed matches on the No Fly List are

**4.14     To what extent does general consumer protection legislation apply to the
relationship between the airport operator and the passenger?**

Airports must be accessible to passengers with disabilities through compliance with the
applicable sections of the Americans with Disabilities Act of 1990 (49 USC §§
12101–12213), Section 405 of the Rehabilitation Act of 1973 (29 USC § 794), and the Air
Carrier Access Act of 1986 (40 USC § 41705, 14 CFR Part 382).  Airlines are also
required to provide: assistance to passengers with disabilities, such as wheelchair or other
guided assistance to board, deplane, or connect to another flight; seating accommodation
assistance that meets passengers' disability-related needs; and assistance with the
loading and stowing of assistive devices.

In addition, when airport owners and operators accept federal grants, such as through the
AIP, the Federal Aid to Airports Program, or the Airport Development Air Program, they
agree to operate their facilities in a safe and efficient manner and to comply with certain
conditions and assurances.  These assurances include that the airport will be available for
public use on fair and reasonable terms without unjust discrimination.

**4.15     What global distribution suppliers (GDSs) operate in your jurisdiction?**

The GDSs that operate in the US include Amadeus, Sabre, and Travelport (parent
company of GDS systems Galileo, Apollo, and Worldspan).

**4.16     Are there any ownership requirements pertaining to GDSs operating in your
jurisdiction?**

No.  However, the DOT can monitor the actions of GDSs under its unfair and deceptive
practice statute, 49 USC § 41712.

**4.17     Is vertical integration permitted between air operators and airports (and, if
so, under what conditions)?**

There are patterns of vertical integration in the US, especially with multiple major
operators contracting with smaller operators at regional airports.  Generally, however,
operators enter into lease agreements with airports and there is federal oversight because
of competition concerns given that airports are natural monopolies.  "Local" competition in
the New York area (with JFK, Newark, and LaGuardia airports being in competition with
each other and JFK's multiple terminals being operated individually by multiple different
carriers and non-carriers) may be viewed as an exception.

**4.18     Are there any nationality requirements for entities applying for an Air
Operator's Certificate in your jurisdiction or operators of aircraft generally into and
out of your jurisdiction?**

Yes.  Under the FAA's enabling statute, a US air carrier must be deemed a US citizen by

remains to be seen with many of the defendant airlines moving to dismiss the actions. However, a significant decision was recently issued in *Ward v. American Airlines, Inc.* wherein the US District Court of Northern Texas rejected America Airline's argument that the breach-of-contract claims were preempted by the ADA.

On a different note, there has been a call for the overhaul of the FAA's aircraft certification process that will affect aircraft manufacturers going forward.  In October 2018 and March 2019, Boeing's 737 Max jets were involved in two deadly crashes prompting lawmakers to push to enact legislation that would impose stricter requirements on the Federal Aviation Administration's aircraft certification process.  In October 2018, Lion Air Flight 610 crashed in the Kava Sea, resulting in 189 deaths, and was followed by the crash of Ethiopian Airlines Flight 302 in March 2019, resulting in 157 deaths.  Since the March 2019 crash, the fleet has been grounded.  On November 17, 2020, the House passed the bipartisan Aircraft Certification Reform and Accountability Act, which includes nearly 30 provisions aimed at strengthening the aircraft certification process, ensuring transparency and accountability, incorporating improvements in the analysis of human factors, and imposing stricter requirements for disclosing "safety-critical information" to the FAA.  The bill will also require the FAA to revise and improve its process for issuing amended type certificates to older airplanes and implement an added layer of oversight for the FAA's Organization Designation Authorization ("ODA") program, which currently delegates certain tasks of the aircraft certification process to the plane manufacturers themselves. The bill would require the FAA to approve any employees who are selected by manufacturers to perform delegated tasks under the program and assign FAA engineers or inspectors to be advisors to the employees participating in the ODA program.

### Acknowledgment

The authors thank Jean Cunningham, an associate in Fox's Aviation Practice Group in New York, for her assistance with the preparation of this USA chapter.  Ms. Cunningham helps clients resolve a broad range of aviation, product liability and commercial matters.



# Section 504 of the Rehabilitation Act of 1973: Prohibiting Discrimination Against Individuals with Disabilities in Programs or Activities Receiving Federal Assistance

**Cynthia Brougher, Coordinator**
Legislative Attorney

September 29, 2010

**Congressional Research Service**

7-....

www.crs.gov

RL34041

# Summary

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against an otherwise qualified individual with a disability solely by reason of disability in any program or activity receiving federal financial assistance or under any program or activity conducted by an executive agency or the U.S. Postal Service. Section 504 was the first federal civil rights law generally prohibiting discrimination against individuals with disabilities. This report examines Section 504, recent amendments to the definition of disability, Section 504's regulations, and Supreme Court interpretations. Section 504's differences with the ADA, and its relationship to the Individuals with Disabilities Education Act (IDEA), are also discussed.

# Contents

Introduction..................................................................................................................................... 1

Overview of Section 504 ................................................................................................................. 2

   Historical Background................................................................................................................ 2

   Statutory and Regulatory Provisions ........................................................................................ 2

      Section 504 Statutory Provisions ........................................................................................ 2

      Definition of Disability ....................................................................................................... 3

      Regulations........................................................................................................................... 4

Selected Supreme Court Decisions................................................................................................. 4

Section 504 and the ADA ............................................................................................................... 7

Section 504 and Education ............................................................................................................. 8

# Contacts

Author Contact Information............................................................................................................ 9

Acknowledgments .......................................................................................................................... 9

# Introduction

Section 504 of the Rehabilitation Act of 1973[1] prohibits discrimination against an otherwise qualified individual with a disability solely by reason of disability in any program or activity receiving federal financial assistance or under any program or activity conducted by an executive agency or the U.S. Postal Service. Section 504 was the first federal civil rights law generally prohibiting discrimination against individuals with disabilities.[2] The concepts of Section 504 and its implementing regulations were used in crafting the Americans with Disabilities Act (ADA)[3] in 1990. The ADA and Section 504 are, therefore, very similar and have some overlapping coverage but also have several important distinctions. For example, Section 504 is limited to programs receiving federal funds or the executive agencies and the Postal Service while the ADA broadly covers the private sector regardless of whether federal funds are involved and does not cover the executive agencies or the Postal Service. The ADA Amendments Act of 2008, P.L. 110-325, amended the definition of disability in the ADA and the definition of disability applicable to Section 504.[4]

This report examines Section 504, the recent amendments to the definition of disability, Section 504's regulations, and Supreme Court interpretations. Section 504's differences with the ADA, and its relationship to the Individuals with Disabilities Education Act (IDEA), are also discussed.[5]

---

[1] 29 U.S.C. §794. Title V of the Rehabilitation Act contains other sections relating to disability discrimination law. Section 501, 29 U.S.C. §791, requires federal agencies to establish affirmative action program plans for the hiring, placement, and advancement of individuals with disabilities. Section 502, 29 U.S.C. §792, establishes the Architectural and Transportation Barriers Compliance Board (the Access Board), which in part provides technical guidance regarding architectural, transportation, and communication barriers. See http://www.access-board.gov/. Section 503, 29 U.S.C. §793, provides for affirmative action in employment of individuals with disabilities in certain federal contracts. The Rehabilitation also contains provisions authorizing the federal government to make grants to states and territories to provide vocational rehabilitation (VR) services to persons with disabilities who are interested in seeking and retaining employment. For a discussion of VR services see CRS Report RL34017, *Vocational Rehabilitation Grants to States and Territories: Overview and Analysis of the Allotment Formula*, by Scott Szymendera and (name redacted). This report focuses on section 504; a discussion of these provisions is beyond its scope.

[2] The National Council on Disability, the independent federal agency tasked with making recommendations to the President and Congress to enhance the quality of life for all Americans with disabilities and their families, stated: "Section 504 of the 1973 Rehabilitation Act is acknowledged as the first national civil rights law to view the exclusion and segregation of people with disabilities as discrimination and to declare that the Federal Government would take a central role in reversing and eliminating this discrimination." National Council on Disability, "Rehabilitating Section 504" (February 12, 2003), at http://www.ncd.gov/newsroom/publications/2003/section504.htm.

[3] 42 U.S.C. §12101 *et seq.* For a detailed discussion of the ADA see CRS Report 98-921, *The Americans with Disabilities Act (ADA): Statutory Language and Recent Issues*, by (name redacted).

[4] For a more detailed discussion of the ADA Amendments Act see CRS Report RL34691, *The ADA Amendments Act: P.L. 110-325*, by (name redacted).

[5] 20 U.S.C. §1400 et seq. For a discussion of IDEA, see CRS Report RS22590, *The Individuals with Disabilities Education Act (IDEA): Overview and Selected Issues*, by (name redacted) and (name redacted).

# Overview of Section 504

## Historical Background

Although Section 504 was the first federal statute that provided broad civil rights protections for individuals with disabilities, there was very little discussion of its meaning or importance during its enactment in 1973. The most detailed discussion was during congressional debate when Senator Humphrey observed,

> I am deeply gratified at the inclusion of these provisions which carry through the intent of original bills which I introduced, jointly with the Senator from Illinois (Mr. Percy), earlier this year, S. 3044 and S. 3458, to amend, respectively, Titles VI and VII of the Civil Rights Act of 1964, to guarantee the right of persons with a mental or physical handicap to participate in programs receiving Federal assistance, and to make discrimination in employment because of these handicaps, and in the absence of a bona fide occupational qualification, an unlawful employment practice. The time has come to firmly establish the right of these Americans to dignity and self-respect as equal and contributing members of society, and to end the virtual isolation of millions of children and adults from society.[6]

The implementation of Section 504 was not performed expeditiously. The then Department of Health, Education, and Welfare (HEW)[7] published regulations in 1978 only after a federal court held that HEW was required to promulgate regulations[8] and after demonstrations at HEW offices.[9] The year 1978 also saw major amendments to Section 504.[10] These amendments expanded Section 504 nondiscrimination requirements to programs or activities conducted by executive agencies, and added a new section 505[11] which applied the remedies, procedures and rights of Title VI of the Civil Rights Act of 1964[12] to Section 504 actions.

## Statutory and Regulatory Provisions

### Section 504 Statutory Provisions

Section 504 has been amended numerous times since its original enactment in 1973. The core requirement of the section is found in subsection (a). This subsection was amended by P.L. 95-602 which added the provisions regarding the regulations. Section 504(a) currently states the following:

---

[6] 118 CONG. REC. 32310 (September 26, 1972) (Remarks of Sen. Humphrey).

[7] HEW was divided into the current Department of Health and Human Services (HHS) and the current Department of Education (ED).

[8] *Cherry v. Mathews,* 419 F.Supp. 922 (D.D.C. 1976).

[9] National Council on Disability, "Rehabilitating Section 504" (February 12, 2003), at http://www.ncd.gov/newsroom/publications/2003/section504.htm.

[10] P.L. 95-602.

[11] 29 U.S.C. §794a.

[12] 42 U.S.C. §2000d *et seq.*

(a) No otherwise qualified individual with a disability in the United States, as defined in section 705(20), shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of Congress, and such regulations may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.[13]

Subsection (b) of Section 504 defines the term "program or activity." This subsection was added by P.L. 100-259 in 1988 in response to the Supreme Court's narrow interpretation of the phrase "program or activity" in Title IX of the Education Amendments of 1972.[14] The amendment clarified that discrimination is prohibited throughout the entire institution if any part of the institution receives federal financial assistance.[15]

Subsection (c) of Section 504 was also added by P.L. 100-259 in 1988. It contains an exception for small providers so they are not required to make significant structural alterations to their existing facilities to render them accessible if alternative means of providing the services are available. This subsection was added to clarify that P.L. 100-259 does not add new requirements for architectural modification.[16]

Subsection (d) of Section 504 requires that the standards used to determine whether there has been a violation of Section 504 regarding employment discrimination complaints are the same as those in the Americans with Disabilities Act. This subsection was added by P.L. 102-569 in 1992. P.L. 102-569 also substituted the term "disability" for the term "handicap."

## Definition of Disability

The definition of disability applicable to Section 504[17] was amended by the ADA Amendments Act of 2008 to conform with the new definition of disability for the ADA.[18] The Senate Statement of Managers noted the importance of maintaining uniform definitions in the two statutes so covered entities "will generally operate under one consistent standard, and the civil rights of individuals with disabilities will be protected in all settings."[19]

The ADA definition defines the term disability with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such

---

[13] 29 U.S.C. §794(a).

[14] *Grove City College v. Bell*, 465 U.S. 555 (1984). See also *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624 (1984).

[15] For a discussion of the purpose of the amendment see S.Rept. 100-64, 100th Cong., 2d Sess. (June 5, 1987), reprinted in 1988 U.S. CODE CONG. & AD. NEWS 3 (1988).

[16] *Id.*

[17] 29 U.S.C. §705.

[18] P.L. 110-325, §7. For a more detailed discussion of the ADA Amendments Act see CRS Report RL34691, *The ADA Amendments Act: P.L. 110-325*, by (name redacted).

[19] 153 CONG. REC. S. 8347 (Sept. 11, 2008)(Statement of Managers to Accompany S. 3406, the Americans with Disabilities Act Amendments Act of 2008).

individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."[20] Although this is essentially the same statutory language as was in the original ADA, P.L. 110-325 contains new rules of construction regarding the definition of disability, which provide that

> the definition of disability shall be construed in favor of broad coverage to the maximum extent permitted by the terms of the act;

> the term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act;

> an impairment that substantially limits one major life activity need not limit other major life activities to be considered a disability;

> an impairment that is episodic or in remission is a disability if it would have substantially limited a major life activity when active; and

> the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, except that the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered.[21]

The ADA Amendments Act specifically lists examples of major life activities including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. The act also states that a major life activity includes the operation of a major bodily function.

## Regulations

The first Section 504 regulations were promulgated by the then department of Health, Education, and Welfare (HEW) in January of 1978. Soon after this, the 1978 amendments to Section 504 were passed which applied Section 504 nondiscrimination requirements to programs or activities conducted by executive agencies, and added language requiring the promulgation of regulations. Each executive agency and the Postal Service now has its own Section 504 regulations which are tailored to the particular recipients of that agency's programs. In addition, each executive agency and the Postal Service have regulations which delineate the coverage of Section 504 with regard to that agency's own programs. In 1980, President Carter issued Executive Order 12250 which provided that the Department of Justice shall coordinate the implementation and enforcement of certain nondiscrimination provisions, including those of Section 504.[22]

# Selected Supreme Court Decisions

The Supreme Court has examined Section 504 in numerous contexts and, since the enactment of the ADA in 1990, has often referenced Section 504 in its analysis of ADA cases. The first Section

---

[20] P.L. 110-325, §4(a), amending 42 U.S.C. §12102.

[21] Low vision devices are not included in the ordinary eyeglasses and contact lens exception.

[22] Executive Order 12250 (November 2, 1980), reprinted at http://www.usdoj.gov/crt/cor/byagency/eo12250.htm.

504 case to reach the Supreme Court was *Southeastern Community College v. Davis*.[23] In *Southeastern*, the plaintiff was a student with a serious hearing disability and who sought to be trained as a registered nurse. The college argued that she was not "otherwise qualified" as she could not understand speech except through lip reading and that this limitation made it unsafe for her to participate in the normal clinical program. The Supreme Court agreed with the college, noting that it was unlikely that she "could benefit from any affirmative action that the regulations reasonably could be interpreted as requiring."[24] The Court concluded that

> there was no violation of §504 when Southeastern concluded that respondent did not qualify for admission to its program. Nothing in the language or history of §504 reflects an intention to limit the freedom of an educational institution to require reasonable physical qualifications for admission to a clinical training program. Nor has there been any showing in this case that any action short of a substantial change in Southeastern's program would render unreasonable the qualifications it imposed.[25]

Similarly, in *Alexander v. Choate*[26] the Supreme Court found no violation of Section 504 where Medicaid recipients with disabilities claimed that a proposed 14-day limitation on in-patient coverage had a discriminatory effect on individuals with disabilities. The Court found that the limitation was neutral on its face as it would provide Medicaid users with or without disabilities with "identical and effective hospital services."[27] Section 504 did not require the state to alter its definition of the Medicaid benefit because individuals with disabilities have greater medical needs. Citing *Southeastern*, the Court observed that Section 504 requires even-handed treatment and an opportunity for individuals with disabilities to participate and benefit from programs receiving federal funds. "The Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed."[28]

*Consolidated Rail Corporation v. Darrone*[29] raised the issue of whether an employment discrimination action under Section 504 was limited to situations where the primary objective of the federal financial assistance was to provide employment. The Supreme Court held that such actions were not limited since the primary goal of the Rehabilitation Act is to increase employment of individuals with disabilities. The fact that Congress chose to ban such employment discrimination only by the federal government and recipients of federal funds did not require that Section 504 be further limited.

In *Bowen v. American Hospital Association*[30] the Supreme Court addressed the issue of whether Section 504 regulations requiring the provision of health care to infants with disabilities were authorized by Section 504. This case began when the parents of a child with Down Syndrome requested that life-saving surgery not be performed.[31] In response to the death of the child, HHS

---

[23] 442 U.S. 397 (1979).

[24] *Id.* at 409.

[25] *Id.* at 414.

[26] 469 U.S. 297 (1985).

[27] *Id.* at 302.

[28] *Id.* at 304.

[29] 465 U.S. 624 (1984).

[30] 476 U.S. 610 (1986).

[31] This situation is generally referred to as the "Baby Doe" case.

promulgated a regulation under Section 504 stating that Section 504 required that nourishment and medically beneficial treatment should not be withheld from infants with disabilities.[32] Striking down these regulations, the Court noted that the legislative history of the Rehabilitation Act did not support the argument that federal officials can intervene in treatment decisions traditionally left by state law to the parents and attending physicians.[33]

*School Board of Nassau County v. Arline*[34] examined the issue of when an individual with a disability is "otherwise qualified" for a job if the individual has a contagious disease. Gene Arline taught elementary school until her employment was terminated after she suffered a third relapse of tuberculosis within two years. The Supreme Court held that an individual with a contagious disease may be a person with a disability under Section 504 but that a person who poses a significant risk of communicating an infectious disease to others that cannot be alleviated by reasonable accommodation will not be otherwise qualified for a job. This should be determined by findings of fact based on reasonable medical judgments about the nature of the risk, the duration of the risk, the severity of the risk, and the probabilities the disease will be transmitted and will cause harm.[35]

In *Traynor v. Turnage*[36] the Supreme Court examined the application of Section 504 to an executive agency, more specifically to the Veterans' Administration (VA). The veterans who brought the suit had been denied an extension of the time limit for the use of educational benefits due to disability on the ground that their alleged disability was due to alcoholism unrelated to a psychiatric condition. VA regulations prohibited the granting of a time extension because alcoholism unrelated to a psychiatric condition was considered willful misconduct.[37] 38 U.S.C. §211(a) bars judicial review of the Veterans' Administrators' decision "on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans." The first question the Court addressed, then, was whether 38 U.S.C. §211(a) foreclosed the Court from considering whether the VA regulation violated Section 504. Holding that such suits were not precluded, the Supreme Court noted that

> Section 211(a) insulates from review decision of law and fact 'under any law administered by the Veterans' Administration,' that is, decisions made in interpreting or applying a particular provision of that statute to a particular set of facts... But the cases now before us involve the issue whether the law sought to be administered is valid in light of a subsequent statute whose enforcement is not the exclusive domain of the Veterans' Administration.[38]

The Court then examined the second issue in *Traynor*: whether the regulation was inconsistent with the requirements of Section 504. Finding that the regulation did not violate Section 504, the Court observed, "There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons."[39] The Court also noted that "Congress is entitled to establish priorities for the allocation

---

[32] 45 C.F.R. §84.55(b) (1985).

[33] 476 U.S. 610, 645 (1986).

[34] 480 U.S. 273 (1987).

[35] *Id.* at 288.

[36] 485 U.S. 535 (1988).

[37] 28 C.F.R. §3.301(c)(2).

[38] 485 U.S. 535, 543-544 (1988).

[39] *Id.* at 549.

of the limited resources available for veterans' benefits, ... and thereby to conclude that veterans who bear some responsibility for their disabilities have no stronger claim to an extended eligibility period than do able-bodied veterans."

The Supreme Court in *Barnes v. Gorman*[40] held in a unanimous decision that punitive damages may not be awarded under Section 202[41] of the ADA and Section 504 of the Rehabilitation Act. Jeffrey Gorman uses a wheelchair and lacks voluntary control over his lower torso which necessitates the use of a catheter attached to a urine bag. He was arrested in 1992 after fighting with a bouncer at a nightclub and during his transport to the police station suffered significant injuries due to the manner in which he was transported. He sued the Kansas City police and was awarded over $1 million in compensatory damages and $1.2 million in punitive damages. The eighth circuit court of appeals upheld the award of punitive damages but the Supreme Court reversed. Although the Court was unanimous in the result, there were two concurring opinions, and the concurring opinion by Justice Stevens, joined by Justices Ginsburg and Breyer, disagreed with the reasoning used in Justice Scalia's opinion for the Court.

Justice Scalia observed that the remedies for violations of both Section 202 of the ADA and Section 504 of the Rehabilitation Act are "coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964."[42] Neither Section 504 nor Title II of the ADA specifically mention punitive damages, rather they reference the remedies of Title VI of the Civil Rights Act. Title VI is based on the congressional power under the Spending Clause[43] to place conditions on grants. Justice Scalia noted that Spending Clause legislation is "much in the nature of a contract" and, in order to be a legitimate use of this power, the recipient must voluntarily and knowingly accept the terms of the "contract." "If Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."[44] This contract law analogy was also found to be applicable to determining the scope of the damages remedies and, since punitive damages are generally not found to be available for a breach of contract, Justice Scalia found that they were not available under Title VI, Section 504, or the ADA.

# Section 504 and the ADA

The Americans with Disabilities Act was modeled on the statutory language, regulations, and case law of Section 504. The ADA and Section 504 are, therefore, very similar and have some overlapping coverage but also have several important distinctions. Most significantly, Section 504 is limited to programs receiving federal funds or the executive agencies and the Postal Service while the ADA broadly covers the private sector regardless of whether federal funds are involved and does not cover the executive agencies or the Postal Service.

There are several other distinctions between the ADA and Section 504. For example, the ADA contains specific exemptions for religious entities.[45] There are no corresponding provisions in

---

[40] 536 U.S. 181 (2002).

[41] 42 U.S.C. §12132. Section 203, 42 U.S.C. §12133, contains the enforcement provisions.

[42] 42 U.S.C. §2000d *et seq.*

[43] U.S. Const., Art. I §8, cl.1.

[44] *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

[45] 42 U.S.C. §§12113(c), 12187.

Section 504. Therefore, if a faith-based organization receives federal funds, it is prohibited from discriminating against an individual with a disability.[46]

Title I of the ADA prohibits employment discrimination which is also prohibited with regard to the entities covered by Section 504. However, the enforcement procedures for the two statutes are somewhat different. Enforcement of Title I of the ADA parallels that of Title VII of the Civil Rights Act of 1964 and includes the requirement that persons alleging discrimination file a charge with the EEOC.[47] However, under Section 504 an employment discrimination complaint may be filed with the Office of Civil Rights for the agency that provided the federal financial assistance or the Department of Justice. Administrative procedures do not have to be exhausted prior to filing suit in federal court.[48]

# Section 504 and Education

Several federal statutes, notably the Individuals with Disabilities Education Act (IDEA),[49] Section 504, and the ADA, address the rights of individuals with disabilities to education.[50] Although there is overlap, particularly with Section 504 and the ADA, each statute plays a significant part in the education of individuals with disabilities. Generally, although there are some differences regarding K-12 schools, the Department of Education (ED) has interpreted the Section 504 compliance standards for schools to be the same as the basic requirements of IDEA.[51]

As discussed previously, the Rehabilitation Act is amended by the ADA Amendments Act to reference the definition of disability in the ADA. Section 504's coverage of education was a subject of discussion during the passage of the ADA Amendments Act, and the Senate Statement of Managers observed:

> We expect that the Secretary of Education will promulgate new regulations related to the definition of disability to be consistent with those issued by the Attorney General under this Act. We believe that other current regulations issued by the Department of Education Office of Civil Rights under Section 504 of the Rehabilitation Act are currently harmonious with Congressional intent under both the ADA and the Rehabilitation Act.[52]

The implications of the changes in the definition of disability under Section 504 and the ADA for the coverage of children in K-12 schools is not entirely clear. Perry Zirkel, a Lehigh University education and law professor, argues that the ADAAA would result in more students in K-12 education being given Section 504 plans, especially students with diabetes, asthma, food

---

[46] For a more detailed discussion of Section 504 requirements for faith-based organizations see http://www.dol.gov/odep/pubs/fact/faith.htm.

[47] 42 U.S.C. §12117(a), 42 U.S.C. §2000e-5.

[48] 29 U.S.C. §794a, 42 U.S.C. §2000d *et seq.*

[49] 20 U.S.C. §1400 et seq.

[50] For a more detailed discussion and comparison of the educational coverage of these statutes see CRS Report R40123, *Education of Individuals with Disabilities: The Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act (ADA),* by (name redacted) and (name redacted).

[51] These requirements include the provision of a free appropriate public education in the least restrictive setting.  See 34 C.F.R. Part 104, Appx. A, Subpart D.

[52] *Id.*

allergies, dyslexia, and attention deficit disorder (ADD).[53] Another commentator noted that the addition of "reading" in the list of major life activities may be problematic since "there is no easy way to distinguish children who are unable to read because they have a disability from those who have simply received poor instruction."[54]

## Author Contact Information

Cynthia Brougher, Coordinator
Legislative Attorney
/redacted/@crs.loc.gov, 7-....

## Acknowledgments

Previous authors of this report include (name redacted) and (name redacted).

---

[53] "ADA Amendments Become Law, New Definitions Expand Protection," SECTION 504 COMPLIANCE HANDBOOK (Nov. 2008).

[54] "List of 'Major Life Activities' in ADA Bill Raises Questions About Reading," 24 THE SPECIAL EDUCATOR 3 (October 10, 2008).



# State and Federal Authority to Mandate COVID-19 Vaccination

April 2, 2021

**Congressional Research Service**

https://crsreports.congress.gov

R46745

**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R46745

April 2, 2021

Wen W. Shen
Legislative Attorney

# State and Federal Authority to Mandate COVID-19 Vaccination

The Coronavirus Disease 2019 (COVID-19) vaccines recently authorized by the U.S. Food and Drug Administration (FDA) are a critical tool to address the pandemic. After determining that these vaccines meet the applicable statutory standards and the Agency's specific safety and efficacy standards, FDA issued Emergency Use Authorizations (EUAs) under Section 564 of the Federal Food, Drug, and Cosmetic Act (FD&C Act). In particular, data supporting the EUA requests show that the vaccines are effective at preventing symptomatic COVID-19 in vaccinated individuals. Given this data, many public health experts believe that promoting COVID-19 vaccination—along with continued engagement in community mitigation activities that prevent transmission, such as mask wearing and social distancing—should be a key component of the United States' pandemic response.

One available legal tool for increasing vaccination rates is for governments to require vaccination. Under the United States' federalist system, states and the federal government share regulatory authority over public health matters, with states traditionally exercising the bulk of the authority in this area pursuant to their general police power. This power authorizes states, within constitutional limits, to enact laws "to provide for the public health, safety, and morals" of the states' inhabitants. In contrast to this general power, the federal government's powers are confined to those enumerated in the Constitution.

This report provides an overview of state and federal authority to mandate vaccination. The first part of the report provides background on state and local authority to mandate vaccination under states' general police power. It discusses the Supreme Court's long-standing recognition of state and local authority to mandate vaccination as an exercise of their police power, as well as modern courts' analyses of more recent challenges to state vaccination mandates based on the First Amendment's Free Exercise Clause. The first part of the report closes with a look at how the COVID-19 vaccines' EUA status may affect a court's analysis of a potential mandate.

The second part of the report provides an overview of federal authority to mandate vaccination. It discusses one possible source of existing federal authority, Section 361 of the Public Health Service Act (PHSA), and reviews the extent of Congress's constitutional authority under the Constitution's Spending and Commerce Clauses to potentially mandate vaccination.

fines.[63] CDC has incorporated the higher fines into applicable regulations, which subject violating individuals to a fine up to $100,000 if the violation does not result in death, or a fine of up to $250,000 if the violation results in a death.[64] Violations by organizations are subject to a fine of up to $200,000 per event if the violation does not result in a death, or $500,000 per event if the violation results in a death.[65] Given the significant potential penalties, any mandate issued under the provision—assuming that it falls within the Agency's delegated authority—may be more appropriately structured as requirements on entities in interstate commerce, such as a requirement on entities to verify vaccination status.[66]

## Congress's Authority to Mandate Vaccination

Although states have traditionally exercised the bulk of authority over public health matters, including vaccination, Congress shares certain concurrent authority in this area emanating from its enumerated powers in the Constitution.[67] This authority derives from, among other sources, the Constitution's Spending and Commerce Clauses.[68]

The Spending Clause empowers Congress to tax and spend for the general welfare.[69] Under this authority, which is subject to several limitations, Congress may offer federal funds to nonfederal entities and prescribe the terms and conditions under which the funds are accepted and used by recipients.[70] Over the past century, Congress has frequently invoked this authority in the public health context, including for purposes of controlling specified diseases, establishing neighborhood or community health centers, and creating federal health insurance programs, including Medicare and Medicaid.[71]

Applying its authority in the context of a vaccination mandate, Congress could encourage states to enact a vaccination mandate meeting certain federal requirements by imposing it as a condition of receiving certain federal funds.[72] This use of the Spending Clause authority, assuming it falls within the broad parameters of being for the "general welfare," would be permissible so long as (1) Congress provides clear notice of the vaccination mandate that states must enact; (2) the mandate is related to the purpose of the federal funds; (3) this conditional grant of funds is not

---

[63] *See* 18 U.S.C. §§ 3559, 3571(b)(5), 3571(c)(5).

[64] *See* 42 C.F.R. § 70.18(a).

[65] *See id.* § 70.18(b).

[66] For instance, CDC's public transit mask mandate was issued under Section 361 and includes an obligation on conveyance operators to require passengers to wear masks while also contemplating "widespread voluntary compliance" and enforcement support from other federal agencies with access to civil enforcement schemes. *See* 86 Fed. Reg. 8025, 8026, 8030 n.33 (Feb. 3, 2021). *See also* Abramson, *supra* note 17, at 24–27 (noting that some state vaccination mandates for health care workers are structured as a requirement on hospitals and health care facilities to ensure that their employees are vaccinated against specified vaccine-preventable diseases).

[67] McCuskey, *supra* note 6, at 113–20.

[68] *See id.* at 116–19.

[69] U.S. Const. art. I, § 8, cl. 1.

[70] *See* Nolan & Lewis, *supra* note 8, at 29–31 (discussing South Dakota v. Dole, 483 U.S. 203, 207–08 (1987)).

[71] *See* James G. Hodge, Jr., *The Role of New Federalism and Public Health Law*, 12 J.L. & Health 309, 335–37 (1998); McCuskey, *supra* note 6, at 118–19.

[72] *See Dole*, 483 U.S. at 211–12 (holding that 23 U.S.C. § 158, which conditioned the provision of certain federal highway funds upon a state's enactment of a minimum drinking age of twenty-one, was a valid exercise of Congress's spending clause authority).

---

Plaintiffs' Exhibit 61

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

---

**NOTICE OF ENFORCEMENT POLICY:
ACCOMMODATION BY CARRIERS OF PERSONS WITH DISABILITIES
WHO ARE UNABLE TO WEAR OR SAFELY WEAR MASKS WHILE ON
COMMERCIAL AIRCRAFT**

---

The Office of Aviation Consumer Protection (OACP), a unit within the Office of the General Counsel of the U.S. Department of Transportation (DOT or the Department), is issuing this Notice of Enforcement Policy to remind U.S. and foreign air carriers of their legal obligation to accommodate the needs of passengers with disabilities when developing procedures to implement the Federal mandate on the use of masks to mitigate the public health risks associated with the Coronavirus Disease 2019 (COVID-19).  OACP will exercise its prosecutorial discretion and provide airlines 45 days from the date of this notice to be in compliance with their obligation under the Air Carrier Access Act (ACAA)[1] and the Department's implementing regulation in 14 CFR Part 382 (Part 382) to provide reasonable accommodations to persons with disabilities who are unable to wear or safely wear masks, so long as the airlines demonstrate that they began the process of compliance as soon as this notice was issued.

To carry out the Executive Order on Promoting COVID-19 Safety in Domestic and International Travel (Executive Order),[2] the Centers for Disease Control and Prevention (CDC) issued an order on January 29, 2021 (CDC Order)[3] that, among other things, requires U.S. and foreign air carriers to use their best efforts to ensure that persons on flights to, within, or from[4] the United States wear a mask for the duration of travel, including when boarding and disembarking aircraft. The CDC Order exempts certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask

---

[1] The ACAA, signed into law in 1986, prohibits discrimination by airlines against individuals with disabilities in commercial air transportation.  The Americans with Disabilities Act, signed into law after the ACAA in 1990, prohibits discrimination against individuals with disabilities in employment, state or local government, public accommodations, commercial facilities, telecommunications, and transportation other than by commercial airlines.

[2] Exec. Order No. 13998, 86 FR 7205 (Jan. 26, 2021).

[3] Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b), 71.32(b): Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs (CDC Order), *available at* https://www.cdc.gov/quarantine/pdf/Mask-Order-CDC_GMTF_01-29-21-p.pdf.

[4] CDC Order specifies that "[c]onveyance operators must also require all persons to wear masks on board conveyances departing from the United States and for the duration of their travel until the conveyance arrives at the foreign destination if at any time any of the persons onboard (passengers or conveyance operators) will return to the United States while this Order remains in effect." CDC Order at 9.

because of the disability.[5]  However, it allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability.  Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks.[6]  The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD.  At the same time, the ACAA and Part 382, which are enforced by OACP, require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability. This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

<u>Background</u>

SARS-CoV-2, the virus that causes COVID-19, spreads most often when an infected person coughs, sneezes, or talks, and droplets from the infected individual's mouth or nose are spread through the air and come in contact with people nearby.[7]  Persons with COVID-19 infection may have symptoms of fever, cough, or shortness of breath,[8] or they may be asymptomatic[9] or pre-symptomatic[10] but still able to spread the virus.[11]  CDC has made clear that appropriately worn masks reduce the spread of COVID-19—particularly given the evidence of pre-symptomatic and asymptomatic transmission of COVID-19.[12]

---

[5] CDC Order at 4 and 5 (noting that this is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to disability).

[6] TSA Security Directive 1544-21-02: Security Measures – Face Mask Requirements (January 31, 2021).

[7] *See* Ctrs. for Disease Control & Prevention, *How COVID Spreads*, CDC.gov (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Ctrs. for Disease Control & Prevention, *Considerations for Wearing Masks*, CDC.gov (last updated Dec. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.

[8] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus*, CDC.gov (last updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[9] An asymptomatic case is an individual infected with SARS-CoV-2, who does not exhibit symptoms during the course of infection.   Ctrs. for Disease Control & Prevention, *COVID-19 Pandemic Planning Scenarios*, CDC.gov (last updated Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[10] A pre-symptomatic case of COVID-19 is an individual infected with SARS-CoV-2, who has not exhibited symptoms at the time of testing, but who later exhibits symptoms during the course of the infection.  *COVID-19 Pandemic Planning Scenarios*, *supra* note 8.

[11] *See How COVID Spreads* and *Considerations for Wearing Masks*, *supra* note 6.

[12] CDC Order at 6.

As of January 27, 2021, there have been over 99 million confirmed cases of COVID-19 globally and over 25 million confirmed cases of COVID-19 in the United States, with over 2 million deaths globally and over 400,000 deaths in the United States due to the disease.[13]  To slow the spread of COVID-19, on January 21, 2021, President Biden issued Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-wearing in domestic and international transportation.  The Executive Order further provides that the heads of agencies may make categorical or case-by-case exceptions to policies developed under the order, consistent with applicable law, to the extent that doing so is necessary or required by law.

Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.[14]  To ensure that only qualified persons under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an accommodation to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator.  The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.[15]

In response to COVID-19, U.S. and foreign air carriers generally have implemented policies requiring passengers to wear masks onboard aircraft even before the issuance of the Executive Order and the CDC Order.  Some carriers have adopted policies that expressly allow "no exceptions" to the mask requirement other than for children under the age of two.[16] OACP has

---

[13] *Id.* at 5.

[14] 42 U.S.C. 12102(4).  OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation.   See also CDC Order at 4 and 5.

[15] CDC Order at 4. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions at https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

[16] It would be a violation of the ACAA to have an exemption for children under 2 on the basis that children that age cannot wear or safely wear a mask and not to have an exemption for the limited number of individuals with disabilities who similarly cannot wear or safely wear a mask when there is no evidence that these individuals with disabilities would pose a greater health risk to others.  *See* Ctrs. for Disease Control & Prevention, *Information for Pediatric Healthcare Providers*, CDC.gov (last updated Dec. 30, 2020), https://www.cdc.gov/coronavirus/2019-

received complaints from persons who assert they have a disability that precludes their wearing a mask, and who contend that they were denied transport by an airline under a "no exceptions allowed" mask policy.

The CDC and other medical authorities recognize that individuals with certain medical conditions may have trouble breathing or other difficulties such as being unable to remove the mask without assistance if required to wear a mask that fits closely over the nose and mouth.[17] The CDC Order provides that a mask is not required in circumstances where an individual is "unconscious (for reasons other than sleeping), incapacitated, unable to be awakened, or otherwise unable to wear the mask without assistance."[18] The Order notes that individuals may remove masks "who are experiencing difficulty breathing or shortness of breath or are feeling winded may remove the mask temporarily until able to resume normal breathing with the mask"."[19] Also, individuals with acute illness may remove the mask if it "interferes with necessary medical care such as supplemental oxygen administered via an oxygen mask."[20] CDC will issue additional guidance regarding persons who cannot wear a mask on the basis of disability.[21] Individuals who have a physical or mental impairment that substantially limits one or more major life activities are individuals with a disability for purposes of the ACAA and Part 382.[22]

<u>Legal Authority</u>

The ACAA prohibits U.S. and foreign air carriers from denying air transportation to or otherwise discriminating in the provision of air transportation against a person with a disability by reason of the disability.[23] When a policy or practice adopted by a carrier has the effect of denying service to or otherwise discriminating against passengers because of their disabilities, the Department's disability regulations in Part 382 require the airline to modify the policy or practice as necessary to provide nondiscriminatory service to the passengers with disabilities, provided that the modifications would not constitute an undue burden or fundamentally alter the airline's program.[24]

Part 382 allows an airline to refuse to provide air transportation to an individual whom the airline determines presents a disability-related safety risk, provided that the airline can demonstrate that

---

ncov/hcp/pediatric-hcp.html (stating that "[r]ecent evidence suggests that compared to adults, children likely have similar viral loads in their nasopharynx, similar secondary infections rates, and can spread the virus to others").

[17] Considerations for Wearing Masks, *supra* note 6.

[18] CDC Order at 4.

[19] CDC Order at 4 (footnote 7).

[20] CDC Order at 4 (footnote 7).

[21] CDC Order at 5 (footnote 9).

[22] 49 U.S.C. 41705(a); 14 CFR 382.3.

[23] 49 U.S.C. 41705(a); 14 CFR 382.11.

[24] 14 CFR 382.13.

the individual would pose a "direct threat" to the health or safety of others onboard the aircraft, and that a less restrictive option is not feasible.[25]  To support a determination that an individual poses such a direct threat, the airline must make "an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence," in order to ascertain "(i) [t]he nature, duration, and severity of the risk; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk."[26]  If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must, for example, "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation.[27]  Furthermore, the Department's regulations permit the airline to impose reasonable conditions, restrictions, or requirements on a passenger who has a "medical condition" that may cause the passenger to pose a risk to the health and safety of others.[28]

<u>Enforcement Policy</u>

The authority to pursue or not to pursue enforcement action against airlines with respect to air travel consumer protection and civil rights requirements, including compliance with the ACAA, lies with OACP.[29]

In accordance with the CDC Order, as conveyance operators, airlines are required to implement face mask policies that treat passengers presumptively as potential carriers of the SARS-CoV-2 virus and, therefore, as presenting a potential threat to the health and safety of other passengers and the crew.[30]  Notably, however, the CDC Order exempts from the mask mandate a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the

---

[25] 14 CFR 382.19(c)(1), (2).

[26] *Id.*

[27] 14 CFR 382.19(c)(2).

[28] 14 CFR 382.21(a)(3).  The rule recognizes that a passenger with a communicable disease or infection, such as infection with the SARS-CoV-2 virus or other "medical condition," may pose a direct threat to the health and safety of others onboard an aircraft, and the airline may be justified in refusing to transport the passenger or in requiring protective measures to mitigate the risk, consistent with the directives of public health authorities.  14 CFR 382.21(a)–(b).

[29] 49 U.S.C. 41705(c), 46301. The CDC Order requiring aircraft operators to mandate mask use will be enforced by the Transportation Security Administration under its statutory and regulatory authorities, including 49 U.S.C. 106, 114, 44902, 44903, and 46301; and 49 CFR 1542.303, 1544.305, and 1546.105.

[30] CDC Order at 5 ("The virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."); *id.* at 7 ("Traveling on public conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces.").

disability.  The Department also requires reasonable accommodations for persons with disabilities who are unable to wear masks or are unable to wear them safely.[31]

Airlines have expressed concerns to OACP that a significant number of passengers may claim medical exemption from the mask requirements without an apparent credible basis.  The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.[32] Similarly, under the Department's disability regulation in 14 CFR Part 382, airlines may impose conditions, restrictions, or requirements on a passenger asserting that a medical condition prevents the passenger from wearing a face mask, because the passenger may pose a direct threat to the health or safety of others, as any passenger is a potential carrier of the SARS-CoV-2 virus.[33]  In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have a recognized medical condition precluding the wearing or safe wearing of a mask.

Airlines have also represented to OACP that, given the number of passengers making such claims, it is not practicable for airlines to make the required individualized assessment of appropriate mitigation measures at the airport on the day of the flight.  Under the Department's disability regulation in Part 382, airlines must conduct an individualized assessment of the potential ways to mitigate the risk to others of allowing passengers with disabilities to fly without a mask.[34]  However, Part 382, like the CDC Order, permits airlines to require passengers with disabilities who are unable to wear masks to request an accommodation in advance. Airlines may also require such passengers to check in early and to agree to undergo the required individualized assessment a reasonable period in advance of the scheduled flight, provided that the process is completed on the day of travel.

In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers.  For example, airlines may require protective measures, such as a negative result from a SARS-CoV-2 test,[35] taken at the passenger's own expense, during the days immediately

---

[31] 14 CFR 382.13.

[32] *Id.*

[33] 14 CFR 382.21(a)(3).

[34] 14 CFR 382.19(c)(1).

[35] On January 12, 2021, CDC issued an order requiring any passenger flying into the United States from a foreign country to provide, before boarding the flight, proof of a negative pre-departure test result for SARS-CoV-2, the virus that causes COVID-19, or documentation of recovery from COVID-19 after a previous SARS-CoV-2 infection. This order became effective on January 26, 2021.  Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 Code of Federal Regulations 70.2, 71.31(b): Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airlines or Other Aircraft Passengers Arriving into the United States from Any Foreign Country, *available at* https://www.cdc.gov/quarantine/pdf/global-airline-testing-order_2021-01-2_R3-signed-encrypted-p.pdf.

prior to the scheduled flight.[36]  Further, the airline may arrange for additional, appropriate mitigation measures, including arranging for the passenger to sit in a less crowded section of the plane, to take a flight at times when airports are less crowded, and/or scheduling the passenger on a less crowded flight.

To ensure travelers are aware of the face mask requirements, airlines should use their best efforts to make this information easily available.  The Department requires airlines provide information on request, to individuals with disabilities, about any service-related or other limitations on the airline's ability to accommodate passengers with a disability.[37]  Also, CDC and TSA require airlines to provide passengers with prominent and adequate notice to facilitate awareness and compliance with the requirement that masks must be worn, subject to certain limited exemptions, to mitigate the spread of COVID-19 during air travel.[38]  Airlines' obligation to provide information on the face mask requirements includes updating airlines' face mask policies on their websites to ensure accuracy and consistency with the ACAA, CDC Order and TSA SD.[39]

In recognition of the CDC Order, as well as airlines' efforts to minimize the potential for transmission of the virus onboard aircraft by implementing policies requiring passengers to wear masks onboard aircraft even before the issuance of the CDC Order, OACP  will exercise its prosecutorial discretion and provide airlines an opportunity to follow the steps described herein to become compliant before taking further action.[40]  Airlines are expected to review their face mask policies immediately and to revise them as necessary to comply with the ACAA and Department's disability regulation in Part 382.  OACP will refrain from taking enforcement action against an airline for a period of up to 45 days from the date of this notice, so long as the airline demonstrates that it began the process of compliance as soon as this notice was issued. This timeframe should provide airlines with adequate time to review and revise their mask procedures as needed to comply with the law.[41]

---

[36] A positive test result for SARS-CoV-2, the virus that causes COVID-19, is a valid reason for an airline to deny transport to any individual, including an individual with a disability.  CDC recommends isolation to separate people infected with SARS-CoV-2 from people who are not infected.  *See* Ctrs. for Disease Control & Prevention, *Isolate if You are Sick*, CDC.gov (last updated Jan. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html.

[37] 14 CFR 382.41.

[38] CDC Order at 1; TSA SD at 2.

[39] *See* 14 CFR 399.79 (b)(2) (defining an airline's practice as "deceptive" to consumers within the meaning of section 41712 if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter).

[40] Every day, we are learning more about how COVID-19 spreads and affects people and communities.  OACP will continue to follow the data and information provided by public health authorities, such as CDC, on actions necessary to limit the spread or impact of SARS-CoV-2 and will make changes to this notice as necessary to be consistent with current medical knowledge and the best available objective evidence.

[41] This document is a temporary notice of enforcement discretion.  Regulated entities may rely on this notice as a safeguard from Departmental enforcement as described herein. To the extent that this notice includes guidance on how regulated entities may comply with existing regulations, it does not have the force and effect of law and is not meant to bind the regulated entities in any way.

Questions regarding this Notice may be addressed to the Office of Aviation Consumer Protection
(C-70), 1200 New Jersey Avenue, S.E., Washington, D.C. 20590.

By:

Blane A. Workie
*Assistant General Counsel for*
*Office of Aviation Consumer Protection*

Dated:  February 5, 2021

*An electronic version of this document is available at http://www.dot.gov/airconsumer*

Plaintiffs' Exhibit 62

# *New Horizons*

 Information for the
Air Traveler with
a Disability





U.S. Department of Transportation

Rev. Feb. 2004

# *INTRODUCTION*

For years, access to the nation's air travel system for persons with disabilities was an area of substantial dissatisfaction, with both passengers and the airline industry recognizing the need for major improvement. In 1986 Congress passed the Air Carrier Access Act, requiring the Department of Transportation (DOT) to develop new regulations which ensure that persons with disabilities will be treated without discrimination in a way consistent with the safe carriage of all passengers. These regulations were published in March 1990 and have been amended several times since then.

The DOT regulations, referred to here as the Air Carrier Access rules, represent a major stride forward in improving air travel for persons with disabilities. The rules clearly explain the responsibilities of the traveler, the carriers, the airport operators, and contractors, who collectively make up the system which moves over one million passengers per day.

The Air Carrier Access Act was amended effective April 5, 2000, to cover foreign air carriers. The rules that implement the ACAA will be amended to reflect that change.

The Air Carrier Access rules are designed to minimize the special problems that travelers with disabilities face as they negotiate their way through the nation's complex air travel system from origin to destination. This is achieved:

- By recognizing that the physical barriers encountered by passengers with disabilities can frequently be overcome by employing simple changes in layout and technology.

- By adopting the principle that many difficulties confronting passengers with hearing or vision impairments will be relieved if they are provided access to the same information that is available to all other passengers.

- Through training of all air travel personnel who come in day-to-day contact with persons with disabilities, to understand their needs and how they can be accommodated quickly, safely, and with dignity.

This guide is designed to offer travelers with disabilities a brief but authoritative source of information about the Air Carrier Access rules: the accommodations, facilities, and services that are now required to be available. It also describes features required by other regulations designed to make air travel more accessible.

The guide is structured in much the same sequence as a passenger would plan for a trip: the circumstances he or she must consider prior to traveling, what will be encountered at the airport, and what to expect in the transitions from airport to airplane, on the plane, and then airplane to airport.

# ✈ *Planning Your Trip*

## The New Traveling Environment

THE AIR CARRIER ACCESS RULES SWEEP aside many restrictions that formerly discriminated against passengers with disabilities:

- A carrier may not refuse transportation to a passenger solely on the basis of a disability.

- Air carriers may not limit the number of individuals with disabilities on a particular flight.

- All trip information that is made available to other passengers also must be made available to passengers with disabilities.

- Carriers must provide passage to an individual who has a disability that may affect his or her appearance or involuntary behavior, even if this disability may offend, annoy, or be an inconvenience to crew-members or other passengers.

There are a few exceptions:

- The carrier may refuse transportation if the individual with a disability would endanger the health or safety of other passengers, or transporting the person would be a violation of FAA safety rules.

- The carrier may refuse transportation if there are no lifts, boarding chairs or other devices available which can be adapted to enplane the passenger. Airline personnel are not required to carry a mobility-impaired person on or off the aircraft by hand, i.e. to directly pick up the passenger's body in the arms of one or more airline staffers and carry the individual up or down stairs. Lifts or similar devices are currently required for nearly all flights on aircraft with 19 or more seats at airports with 10,000 or more annual enplanements.

- There are special rules about persons with certain disabilities or communicable diseases. These rules are covered in the chapter entitled "At the Airport."

- The carrier may refuse transportation if it is unable to seat the passenger without violating the FAA Exit Row Seating rules. See the chapter "On the Plane."

There are new procedures for resolving disputes:

- All carriers are now required to have a Complaints Resolution Official (CRO) immediately available (even if by phone) to resolve disagreements which may arise between the carrier and passengers with disabilities.

- Travelers who disagree with a carrier's actions toward them can pursue the issue with the carrier's CRO on the spot.

- A carrier that refuses transportation to any person based on a disability must provide a written statement to that person within 10 calendar days, stating the basis for the refusal. The statement must include, where applicable, the basis for the carrier's opinion that transporting the person could be harmful to the safety of the flight.

- If the passenger is still not satisfied, he or she may pursue DOT enforcement action.

## Getting Advance Information About the Aircraft

Travelers with disabilities must be provided information upon request concerning facilities and services available to them. When feasible this information will pertain to the specific aircraft scheduled for a specific flight. Such information includes:

- Any limitations concerning the ability of the aircraft to accommodate an individual with a disability (the carrier shall provide this information to any passenger who states that he or she uses a wheelchair for boarding,

1

even if the passenger does not explicitly request the information);

- The location of seats (if any) with movable aisle armrests and any seats which the carrier does not make available to an individual with a disability (e.g., exit rows);

- Any limitations on the availability of storage facilities in the cabin or in the cargo bay for mobility aids or other equipment commonly used by an individual with a disability;

- Whether the aircraft has an accessible lavatory.

Normally, advance information about the aircraft will be requested by phone. Any carrier that provides telephone service for the purpose of making reservations or offering general information must provide comparable services for hearing-impaired individuals, utilizing telecommunications devices for the deaf (TDDs), or text telephones (TTs). The TTs shall be available during the same hours that the general public has access to regular phone service. The response time to answer calls on the TT line shall also be equivalent to the response time available to the general public. Charges for the call, if any, shall be the same as charges made to the general public.

## When Advance Notice Can Be Required

Airlines may not require passengers with disabilities to provide advance notice of their intent to travel or of their disability except as provided below. Nonetheless, letting the airline know in advance how they can help you will generally result in a smoother trip.

Carriers may require up to 48 hours advance notice and one hour advance check-in from a person with a disability who wishes to receive any of the following services:

- Transportation for an electric wheelchair on an aircraft with fewer than 60 seats;

- Provision by the carrier of hazardous materials packaging for the battery of a wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group;

- Provision of an on-board wheelchair on an aircraft that does not have an accessible lavatory for persons who can use an inaccessible lavatory but need an on-board chair to do so.

An airline that uses a "block seating" approach to provide special seating for passengers with disabilities is free to require 24 hours advance notice for such accommodations. See the "Seating" section later in this booklet.

Carriers are not required to provide the following services or equipment, but should they choose to provide them, they may require 48 hours advance notice and a one hour advance check-in:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical supply;

- Accommodations for a passenger who must travel on a stretcher.

Carriers may impose reasonable, non-discriminatory charges for these optional services.

Where a service is required by the rule, the airline must ensure that it is provided if appropriate notice has been given and the service requested is available on that particular flight. If a passenger does not meet advance notice or check-in requirements, carriers must make a reasonable effort to accommodate the requested service, providing this does not delay the flight.

If a passenger with a disability provides the required notice but is required to fly on another carrier (for example, if the flight is cancelled), the original carrier must, to the maximum extent feasible, provide assistance to the second carrier in furnishing the accommodation requested by the individual.

It must be recognized that even when a passenger has requested information in advance on the accessibility features of the scheduled aircraft,

carriers sometimes have to substitute a different aircraft at the last minute for safety, mechanical or other reasons.  The substitute aircraft may not be as fully accessible—a condition that may prevail until the retirement of the last of the aircraft that were in service before the implementation of the Air Carrier Access rules.

## When Attendants Can Be Required

Carriers may require the following individuals to be accompanied by an attendant:

- A person traveling on a stretcher or in an incubator (for flights where such service is offered);

- A person who, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from carrier personnel;

- A person with a mobility impairment so severe that the individual is unable to assist in his or her own evacuation from the aircraft;

- A person who has both severe hearing and severe vision impairments which prevent him or her from receiving and acting on necessary instructions from carrier personnel when evacuating the aircraft during an emergency.

The carrier and the passenger may disagree about the applicability of one of these criteria.  In such cases, the airline can require the passenger to travel with an attendant, contrary to the passenger's assurances that he or she can travel alone. However, the carrier cannot charge for the transportation of the attendant.

The airline can choose an attendant in a number of ways.  It could designate an off-duty employee who happened to be traveling on the same flight to act as the attendant.  The carrier or the passenger with a disability could seek a volunteer from among other passengers on the flight to act as the attendant.  The carrier could provide a free ticket to an attendant of the passenger's choice for that flight segment.  In the end, however, a carrier is not required to find or furnish an attendant.

The attendant would not be required to provide personal service to the passenger with a disability other than to provide assistance in the event of an emergency evacuation.  This is in contrast to the case of the passenger that usually travels accompanied by a personal attendant, who would provide the passenger whatever service he or she requests.

If there is not a seat available on the flight for an attendant, and as a result a person with a disability holding a confirmed reservation is denied travel on the flight, the passenger with a disability is eligible for denied boarding compensation.

For purposes of determining whether a seat is available for an attendant, the attendant shall be deemed to have checked in at the same time as the person with the disability.

3

# ✈ *At The Airport*

## Airport Accessibility

UNTIL A FEW YEARS AGO, ONLY THOSE AIRPORT facilities designed, constructed, or renovated by or for a recipient of federal funds had to comply with federal accessibility standards. Even at federally-assisted airports, not all facilities and activities were required to be accessible. Examples are privately-owned ground transportation and concessions selling goods or services to the public.  As a result of the Air Carrier Access rules, and the Americans with Disabilities Act of 1990 (ADA) and implementing regulations, these privately-owned facilities must also be made accessible.

In general, airports under construction or being refurbished must comply with the ADA Accessibility Guidelines (ADAAG) and other regulations governing accessibility in accordance with a timetable established in the ADA.  The ADAAGs can be found at http://www.access-board.gov/adaag/html/adaag.htm.  Note in particular section 10.4, "Airports."  Thus, while there are still many changes to be made, the accessibility of most airports is improving.  With few exceptions, the following services should be available in all air carrier terminals within the next few years:

- Accessible parking near the terminal;

- Signs indicating accessible parking and the easiest access from those spaces to the terminal;

- Accessible medical aid facilities and travelers aid stations;

- Accessible restrooms;

- Accessible drinking fountains;

- Accessible ticketing systems at primary fare collection areas;

- Amplified telephones and text telephones (TTs) for use by persons with hearing and speech impairments (there must be at least one TT in each terminal in a clearly marked accessible location);

- Accessible baggage check-in and retrieval areas;

- Jet bridges and mobile lounges that are accessible (at airports that have such facilities);

- Level entry boarding ramps, lifts or other means of assisting an individual with a disability on and off an aircraft;

- Information systems using visual words, letters or symbols with lighting and color coding, and systems for providing information orally;

- Signs indicating the location of specific facilities and services.

## Moving Through the Airport

To make travel easier for an individual with a disability, major airports will be required to make the following services accessible under new rules being put into effect in the next several years:

- Shuttle vehicles, owned or operated by airports, transporting people between parking lots and terminal buildings;

- People movers and moving walkways within and between terminals and gates.

All carrier facilities must currently include one accessible route from an airport entrance to ticket counters, boarding locations and baggage handling areas.  These routes must minimize any extra distance that wheelchair users must travel compared to other passengers to reach these facilities.  Outbound and inbound baggage facilities must provide efficient baggage handling for individuals with a disability, and these facilities must be designed and operated so as to be accessible.  There must be appropriate signs to indicate the location of accessible services.

Carriers cannot restrict the movements of persons with disabilities in terminals or require them to remain in a holding area or other location while awaiting transportation and other assistance.

Curbside baggage check-in (available only for domestic flights) may be helpful to passengers with a disability.

## Passenger Information

Carriers must ensure that individuals with disabilities, including those with vision and hearing impairments, have timely access to the same information provided to other passengers,including (but not limited to) information on:

- ticketing;

- scheduled departure times and gates;

- change of gate assignments;

- status of flight delays;

- schedule changes;

- flight check-in;

- checking and claiming of luggage.

This information must be made available upon request.  A crew member is not required to interrupt his or her immediate safety duties to supply such information.

A copy of the Air Carrier Access rules must be made available by carriers for inspection upon request at each airport.

As previously noted, any carrier that provides telephone service for the purpose of making reservations or offering general information shall also provide TT service.  This service for people with speech and hearing impairments must be available during the same hours that the general public has access to regular phone service, with equivalent response times and charges.

## Security Screening

An individual with a disability must undergo the same security screening as any other member of the traveling public.

If an individual with a disability is able to pass through the security system without activating it, the person shall not be subject to special screening procedures.  Security personnel are free to examine an assistive device that they believe is capable of concealing a weapon or other prohibited item.  If an individual with a disability is not able to pass through the system without activating it, the person will be subject to further screening in the same manner as any other passenger activating the system.

Security screening personnel at some airports may employ a hand-held device that will allow them to complete the screening without having to physically search the individual.  If this method is still unable to clear the individual and a physical search becomes necessary, then at the passenger's request, the search must be done in private.

If the passenger requests a private screening in a timely manner, the carrier must provide it in time for the passenger to board the aircraft.  Such private screenings will not be required, however, to a greater extent or for any different reason than for other passengers.  However, they may take more time.

## Medical Certificates

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical care.

A disability is not sufficient grounds for a carrier to request a medical certificate.  Carriers shall not require passengers to present a medical certificate unless the person:

- Is on a stretcher or in an incubator (where such service is offered);

- Needs medical oxygen during flight (where such service is offered);

- Has a medical condition which causes the carrier to have reasonable doubt that the individual can complete the flight safely, without requiring extraordinary medical assistance during the flight; or

- Has a communicable disease or infection that has been determined by federal public health authorities to be generally transmittable during flight.

If the medical certificate is necessitated by a communicable disease (see next section), it must say that the disease or infection will not be communicable to other persons during the normal course of flight, or it shall state any conditions or precautions that would have to be observed to prevent transmission of the disease or infection to others.

Carriers cannot mandate separate treatment for an individual with a disability except for reasons of safety or to prevent the spread of a communicable disease or infection.

## Communicable Diseases

As part of their responsibility to their passengers, air carriers try to prevent the spread of infection or a communicable disease on board an aircraft. If a person who seeks passage has an infection or disease that would be transmittable during the normal course of a flight, and that has been deemed so by a federal public health authority knowledgeable about the disease or infection, then the carrier may:

- Refuse to provide transportation to the person;

- Require the person to provide a medical certificate stating that the disease at its current stage would not be transmittable during the normal course of flight, or describing measures which would prevent transmission during flight;

- Impose on the person a condition or requirement not imposed on other passengers (e.g., wearing a mask).

If the individual has a contagious disease but presents a medical certificate describing conditions or precautions that would prevent the transmission of the disease during the flight, the carrier shall provide transportation unless it is not feasible to act upon the conditions set forth in the certificate to prevent transmission of the disease.

Plaintiffs' Exhibit 63

# What Airline Employees, Airline Contractors, and Air Travelers with Disabilities Need to Know About Access to Air Travel for Persons with Disabilities

### *A Guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR Part 382 (Part 382)*

# Chapter 1:  Understanding How to Use this Manual

**A.  Introduction**
**B.  Background**
**C.  Keyword Definitions**

## A.  Introduction

_Purpose of the Manual_

This manual is a guide to the Air Carrier Access Act (ACAA) and its implementing regulations, 14 CFR part 382 (part 382).  It is designed to serve as a brief but authoritative source of information about the services, facilities, and accommodations required by the ACAA and the provisions of part 382.  The manual does not expand air carriers' legal obligations or establish new requirements under the law.   It contains suggested practices and procedures for carriers to use on a voluntary basis to implement Part 382.

The primary purpose of the manual is to help you, employees/contractors of air carriers and employees/contractors of indirect air carriers that provide services or facilities to passengers with disabilities, to assist those passengers in accordance with the law.  Knowing your legal responsibilities will help ensure consistent compliance with the law and protect the civil rights of air travelers with disabilities when providing services, facilities, and accommodations to them.

Throughout the manual, rather than talking about air carriers' or indirect air carriers' employees/contractors such as yourself in the third person, the word "you" is used.  In most instances, the word "you" refers to personnel who deal directly with the traveling

public.  Moreover, the obligations and responsibilities under the law as set forth in the manual must be read within the context of each specific employee's duties on the job.

A second purpose of this manual is to offer air travelers with disabilities information about their rights under the ACAA and the provisions of part 382.  Accordingly, in addition to the other useful information in this manual, Appendix I contains a list of "Tips for Air Travelers with Disabilities" to help ensure a smooth and comfortable trip.  In addition, Appendix III provides a list of "Frequently Asked Questions" and answers and Appendix IV contains a list of "Recent DOT Enforcement Orders Related to the ACAA." These DOT enforcement orders are useful because they provide examples in which DOT has interpreted some of the provisions of the ACAA and part 382 under particular circumstances.

**B.  Background**

*U.S. Air Carriers*

In 1986, Congress passed the ACAA, which prohibits discrimination by U.S. air carriers against qualified individuals with disabilities.  49 U.S.C. 41705.  In 1990, the Department of Transportation (DOT) issued part 382, the regulations defining the rights of passengers with disabilities and the obligations of U.S. air carriers under the ACAA.  Since then, these regulations have been amended a number of times.  DOT has also issued guidance to air carriers on the ACAA and part 382 in a variety of ways:  preambles to regulatory amendments, industry letters, correspondence with individual carriers or complainants, enforcement actions, website postings, and informal conversations with the public and air carriers.

*Foreign Air Carriers*

On April 5, 2000, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"; Pub. L. 106-181) amended the ACAA to cover foreign air carriers. Although a final rule modifying part 382 to cover foreign air carriers has not yet been issued, in May 2000 DOT's Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Enforcement Office) issued a notice informing the public of its intent to use the provisions of part 382 as guidance in investigating any complaints of non-compliance with the ACAA by foreign carriers. In addition, in July 2003 DOT amended part 382 by adding a new section, 382.70, that requires both U.S. carriers and foreign carriers to record and report to DOT on written disability-related complaints that they receive. At the present time, section 382.70 is the only provision of part 382 that specifically states that it applies to foreign carriers. Finally, a notice of proposed rulemaking (NPRM) proposing to extend the other provisions of part 382 to foreign carriers was published on November 4, 2004. Therefore, while the majority of this manual does not expressly apply to foreign carriers, they should look to this document and part 382 in satisfying their general nondiscrimination obligations under AIR-21 and DOT's May 2000 guidance.

*Development of Technical Assistance Manual*

In 2000, Congress required DOT to create a technical assistance manual to provide guidance to individuals and entities with rights or responsibilities under the ACAA. This manual responds to that mandate. In creating this manual, DOT held meetings with representatives from the disability community, air carriers, and organizations that contract with air carriers to provide disability-related services. Those who attended the

meetings made suggestions for this manual.  All of these suggestions have been

thoroughly considered by DOT and incorporated where appropriate.


_ACCESS_

A step-by-step process for resolving issues involving passengers with disabilities appears

later in this manual.  Whether the issue is a matter of law, customer service, or both, the

ACCESS checklist will be useful in identifying the needs of passengers with disabilities

and determining what accommodations the air carriers are required to provide as a matter

of law.  *See* Chapter 6, section B.


**How to use this Manual**

This manual is structured in the same sequence as the steps a passenger would encounter

on a trip, *i.e.*, requirements concerning

- planning a flight,

- the airport experience,

- enplaning, deplaning, and making connections,

- services during a flight, and

- responding to disability-related complaints.

This manual contains the following tools to assist you in quickly and easily finding the

answer to your questions:

- A Table of Contents at the beginning of the manual;

- An Alphabetical Index at the back of the manual; and

- A part 382 Index listing the citations to part 382 at the back of the manual.

Also, the following appendices appear at the end of the manual:

- Appendix I:  "Tips for Air Travelers with Disabilities" as they relate to the most commonly-used accommodations, facilities, and services that carriers are required to make available to such passengers;

- Appendix II:  a list of concerns applicable mainly to air carrier management, as opposed to frontline customer service personnel;

- Appendix III:  a list of "Frequently Asked Questions" and answers;

- Appendix IV:  a list of "Recent DOT Enforcement Orders Related to the ACAA";

- Appendix V:  the full text of part 382; and

- Appendix VI:  the DOT document "Guidance Concerning Service Animals in Air Transportation."

### *Themes of this Manual*

#### *Legal Requirements and Customer Service*

This manual highlights the difference between actions you must take according to the law as stated in part 382 and actions that you may choose to take in an effort to provide superior customer service to passengers with disabilities.  Legal requirements are generally designated by the words, "must" or "shall" in the manual.  Words such as "should" or "may" indicate accommodations that part 382 does not require but that DOT recommends and that you may decide to provide as a matter of good customer service.

#### *Safety*

**Indirect Air Carrier:**

A company not directly involved in the operation of an aircraft that sells air transportation services to the general public, such as tour and charter operators.  [Sec. 382.5]

**Individual with a Disability:**

Any individual who:

- has a physical or mental impairment that, on a permanent or temporary basis,

- substantially limits one or more major life activities,

- has a record of such an impairment, or

- is regarded as having such an impairment. [Sec. 382.5]

**Qualified Individual with a Disability:**

An individual with a disability who:

- accompanies or meets a traveler using airport facilities;

- seeks information about schedules, fares, or policies;

- attempts to use facilities or services offered to the general public by an air carrier;

- has a ticket, or makes a good faith attempt to buy a valid ticket for a flight;

- arrives with a valid ticket for the flight; and

- meets reasonable, nondiscriminatory requirements applicable to all passengers.

  [Sec. 382.5]

# Chapter 2:  Learning the Basics about the Law

# Protecting Air Travelers with Disabilities

- **What does the Air Carrier Access Act (ACAA) say?**  The ACAA prohibits U.S. and foreign air carriers from discriminating against an air traveler with a disability on the basis of such disability (49 U.S.C. 41705).

- **What is 14 CFR Part 382 (part 382)?**  Part 382 is a detailed set of rules that define air carriers' responsibilities under the ACAA and ensures that individuals with disabilities will be treated without discrimination consistent with the safe carriage of all passengers.

- **Who has to follow part 382?**  The following organizations and individuals must comply with part 382: (1) air carriers and their employees (*e.g.*, ticket and gate agents, flight attendants, baggage handlers, pilots, etc.); (2) authorized agents of an air carrier (*e.g.*, travel agents); (3) organizations and their employees that have business arrangements with air carriers to provide disability-related services (*e.g.*, wheelchair service, baggage handling, etc.); and (4)  indirect air carriers and their employees (*e.g.*, tour operators) that provide facilities, services, or other accommodations to passengers with disabilities.

- **Who is protected by part 382?**  Part 382 protects three categories of individuals with disabilities: (1) individuals who have a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (2) individuals who

have a record of such impairment; and (3) individuals who are regarded as having such an impairment, whether they have the impairment or not.

- **What is a physical or mental impairment?**

  **Physical impairments** include (1) physiological disorders or conditions; (2) cosmetic disfigurements; or (3) anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

  Examples of physical impairments include orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, HIV disease, drug addition, and alcoholism.

  **Mental impairments** include mental or psychological disorders, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

  Physical characteristics such as the color of one's eyes, hair, or skin, baldness, and left-handedness do not constitute physical impairments.  Similarly, neither age nor obesity alone constitutes a physical impairment.  Disadvantages due to cultural or economic factors are not covered by part 382.  Moreover, the definition of "physical or mental impairment" does not include personality traits such as poor judgment or a quick temper, where these are not symptoms of a mental or psychological disorder.

- **What is a substantial limitation on major life activities?** To qualify as a "disability" under part 382 a condition or disease must substantially limit a major life activity. Major life activities include, but are not limited to, activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

- **When does an impairment "substantially limit" a major life activity?** There is no absolute standard for determining when an impairment is a substantial limitation. Some impairments obviously limit the ability of an individual to engage in a major life activity.

  *Example 1*:  *A person who is deaf is substantially limited in the major life activity of hearing.*

  *Example 2*:  *A person with traumatic brain injury may be substantially limited in the major life activities of:  (a) caring for himself or herself; and (b) working, because of memory deficiency, confusion, contextual difficulties, and the inability to reason appropriately.*

  *Example 3*:  *An individual who is paraplegic may be substantially limited in the major life activity of walking.*

- **Are temporary mental or physical impairments covered by part 382?** Yes.

  *Example*:  *While on a skiing trip, Jane breaks her leg and is placed in a cast that keeps her from bending her leg and walking without the use of crutches. Jane will eventually recover the full use of her leg, but in the meantime she is substantially limited in the major life*

*__Example 2__: Karen, an individual born with a prominent facial disfigurement, has been refused transportation on the grounds that her presence has upset several passengers who have complained to gate agents about her appearance.  Karen's physical disfigurement becomes substantially limiting only as a result of the attitudes of others and she is protected by the provisions of part 382.  Refusing to provide transportation to Karen would violate section 382.31 because you must not refuse to provide transportation to a qualified individual with a disability, such as Karen, solely because her appearance may offend or annoy other passengers.  As in the example above, and regardless whether the decision to refuse transportation was correct, you must provide Karen with a written explanation of the specific basis for the refusal within 10 calendar days of the incident.*

- **How do I determine whether a person is an individual with a disability?**

  Provide an opportunity for the passenger to self-identify by asking how you can best assist him or her.

- **How do I assist a passenger with a disability?**  Ask the passenger how you can best assist him or her.  A passenger with a disability has the most information about his or her abilities, limitations, level of familiarity with the airport and airline, and needs in connection with traveling by air.

- **May I ask an individual what his or her disability is?** Only to determine if a passenger is entitled to a particular seating accommodation pursuant to section 382.38.  Generally, you may not make inquiries about an individual's disability or the nature or

severity of the disability.  However, you may ask questions about an individual's ability to

perform specific air travel-related functions, such as enplaning, deplaning, walking through

the airport, etc.

**Example 1**:  *You may not ask a person, "What is your disability?"  You may not ask, "Do*

*you have diabetes?"*

**Example 2**:  *You may ask, "Can you walk from the gate area to your aircraft seat?"  You*

*may ask, "Are you able to transfer from the aisle chair over a fixed aisle seat armrest?" You*

*may ask, "Can you walk from this gate to your connecting gate?"  You may ask (by writing a*

*note if necessary), "Do you need me to notify you if I make any announcements over the*

*public address speaker?"*

**Example 3**:  *Susan asks for a bulkhead seat because the condition of her leg necessitates her*

*need for greater legroom. You may ask, "Are you unable to bend your leg or is your leg*

*fused or immobilized?"  [Sec. 382.38]*

- **What are some of the requirements of part 382 that you should be aware**

   **of?**  Following are some of the principal requirements of part 382.  It is important to note

   that the requirements of part 382 listed below are not meant to be exhaustive.  Rather, it is a

   list of requirements governing situations that you are likely to encounter on a regular basis.

- You must not discriminate against qualified individuals with a disability.  [Sec. 382.7(a)(1)]  You must not *require* a passenger with a disability to accept special services (including, but not limited to, pre-boarding) not requested by the passenger.  [Sec. 382.7(a)(2)]  Instead, you may *ask* a passenger with a disability if he or she would like a particular service, facility, or other accommodation.  In addition, you must not exclude a qualified individual with a disability from or deny the individual the benefit of any air transportation or related services that are available to other passengers.  [Sec. 382.7(a)(3)]  For example, if you choose to provide ground transportation and overnight accommodations to passengers because of a flight cancellation, you must ensure that the ground transportation to the hotel, and the hotel itself, are accessible to a passenger with a disability.

- You must not refuse transportation to a passenger solely on the basis of a disability.  [Sec. 382.31(a)]

- You must provide transportation to an individual with a disability who has an impairment that affects his or her appearance or results in involuntary behavior except under limited circumstances specified below.  You must provide transportation to such individuals with disabilities even if the disability may offend, annoy, or inconvenience crewmembers or other passengers.  [Sec. 382.31(b)]  However, if the person's disability results in involuntary behavior that would or might be inimical to the safety of the flight, then the person may properly be refused transportation.  [Sec. 382.31(d)]

- You shall not limit the number of individuals with disabilities on a particular flight.  [Sec. 382.31(c)]

- If transportation of a passenger with a disability would endanger the safety of the aircraft or the health or safety of its passengers or violate an FAA safety regulation, you may refuse transportation to the individual with a disability.  [Sec. 382.31(d)]

- You shall not require a passenger with a disability to travel with an attendant or to present a medical certificate, *except* in very limited circumstances.  [Secs. 382.35(a) and 382.53(a)]

- You shall not exclude a passenger with a disability from any seat in an exit or other row solely on the basis of his or her disability except to comply with FAA safety rules.  FAA safety rules establish criteria that must be met in order for a passenger to occupy a seat in the emergency exit rows.  [14 CFR 121.585]  If a passenger with a disability meets these FAA criteria, he or she must be allowed to sit in an emergency exit row.  As with any other passenger, you must look at the individual passenger with a disability and reasonably assess whether he or she meets FAA criteria for exit-row seating.  [Sec. 382.37(a)]

- You must provide timely enplaning, deplaning, and connecting assistance to passengers with disabilities requesting such assistance.  As part of this duty, you must provide equipment (*e.g.*, wheelchairs, electric carts, and aisle chairs) and personnel (*e.g.*, individuals to propel wheelchairs and aisle chairs and individuals to assist passengers with disabilities in carrying and stowing their baggage).  [Secs. 382.39(a)(1) and 382.39(b)(5)]

- You must allow a passenger with a disability to stow his or her cane or other assistive device inside the cabin of the aircraft close to his or her seat if it fits, consistent with FAA safety rules on carry-on items.  [Sec. 382.41(c)]

# Chapter 3:  Assisting Air Travelers with Disabilities

# Planning a Trip

A.  **Advance Notice**
B.  **Information about the Aircraft**
C.  **Mobility Aids and Assistive Devices**
D.  **Service Animals**
E.  **Accommodations for Air Travelers  who are Deaf, Hard of Hearing, or Deaf-Blind**
F.  **Communicable Diseases**
G.  **Medical Certificates:  When are They Allowed?**
H.  **Your Obligation to Provide Services and Equipment**
I.  **Attendants**

## A.    Advance Notice

You cannot require passengers with disabilities to provide advance notice of their
intention to travel or of their disability except as provided below.  [Sec. 382.33(a)]

*Advance Notice Only for Particular Services and Equipment*

You may require up to 48 hours' advance notice and one hour's advance check-in from a
passenger with a disability who wishes to receive the following services:

- Transportation for a battery-powered wheelchair on an aircraft with fewer than 60
  seats;

- Provision by the carrier of hazardous materials packaging for the battery of a
  wheelchair or other assistive device;

- Accommodations for 10 or more passengers with disabilities who travel as a group;
  and

- Provision of an on-board wheelchair on an aircraft that does not have an accessible lavatory for passengers with disabilities who can use an inaccessible lavatory but need an on-board chair to do so.  [Secs. 382.33(b)(5)-(8)]

**<u>Example</u>**:  *While making his reservation, a passenger with a disability gave the reservation agent 48 hours' advance notice that he would need an aisle chair to access the lavatory on his upcoming flight.  The flight is on an aircraft with more than 60 seats and it does not have an accessible lavatory.  During the call, the passenger is made aware of the fact that the lavatory is inaccessible, but explains that he can use an inaccessible lavatory as long as he has access to a carrier-provided aisle chair.  Because the passenger has complied with the advance notice requirement here, normally this information would have been entered into the passenger's reservation record (otherwise known as the passenger name record (PNR)) by the carrier and the request for an aisle chair would have been handled through that notification process.  You are a new gate agent for your carrier and when this passenger approaches you at the gate more than an hour before the scheduled departure time of the flight and asks about the aisle chair, you are not sure how to reply.  What should you do?*

*To begin, as a matter of good customer service, you should tell the passenger that you are not sure but you will find out for him.  You should ask a colleague and, if necessary, contact a CRO.  When you ask your colleague, you are told that all aircraft with more than 60 seats in your carrier's fleet maintain an in-cabin aisle chair.  Once you receive this information you should assure the passenger that an aisle chair is available so he can use the inaccessible lavatory on the aircraft.*

28

*Advance Notice for Optional Services and Equipment*

Although carriers are not required to provide the following services or equipment, if they choose to provide them, you may require 48 hours' advance notice and one hour's advance check-in for:

- Medical oxygen for use on board the aircraft;

- Carriage of an incubator;

- Hook-up for a respirator to the aircraft's electrical power supply; and

- Accommodation for a passenger who must travel on a stretcher.  [Secs. 382.33(b)(1)-(4)]

If appropriate advance notice has been given and the requested service is available on that particular flight, you must ensure that the service or equipment is provided.


*Make a Reasonable Effort to Accommodate, Even Without Advance Notice*

In addition, even if a passenger with a disability does *not* meet the advance notice or check-in requirement, you must make a reasonable effort to furnish the requested service or equipment, provided that making such accommodation would not delay the flight. [Secs. 382.33(c) and (e)]


**Example 1**:  *Mr. Thomas uses a battery-powered wheelchair.  He travels frequently between Washington, DC, and New York for business.  One day, he finds out that he has an important business meeting in New York and must travel up to New York that afternoon.  He has no time to provide advance notice regarding the transportation of his battery-powered wheelchair and arrives at the gate 45 minutes before his flight is*

*scheduled to depart.  The aircraft for the flight has fewer than 60 passenger seats.  What
should you do?*

*Carriers may require 48 hours' advance notice and one-hour advance check-in for
transportation of a battery-powered wheelchair on a flight scheduled to be made on an
aircraft with fewer than 60 seats.  Carriers may require the same advance notice for
provision of hazardous materials packaging for a battery.  However, airline personnel
are required to make reasonable efforts to accommodate a passenger who fails to
provide the requisite notice to the extent it would not delay the flight.  Therefore, you
must make a reasonable effort to accommodate Mr. Thomas as long as it would not delay
the flight.*

*Mr. Thomas is a frequent traveler on this particular route and he knows that usually it is
feasible to load, store, secure, and unload his battery-powered wheelchair and spillable
battery in an upright position [Sec. 382.41(g)(2)] or detach, "box", and store the
spillable battery [Sec. 382.41(g)(3)] within about 20-25 minutes.  If this is the case, you
must accommodate Mr. Thomas, his battery-powered wheelchair, and the spillable
battery even though Mr. Thomas did not provide advance notice, since doing so would
not delay the flight.*

**_Example 2_**: *Ms. Webster must travel with medical oxygen and shows up at the airport
without providing advance notice of her need for medical oxygen.  As a policy, your
carrier does not provide medical oxygen on any flights.  What should you do?*

*To begin, you should confirm that your carrier does not provide the optional service of medical oxygen for use on board a flight.  If no medical oxygen service is available on your carrier, you should explain this to Ms. Webster and tell her that the carrier cannot accommodate her.*

*As a matter of customer service, you may direct Ms. Webster to another carrier that does provide medical oxygen service in that market.  The passenger should be aware, however, that the provision of medical oxygen involves coordination with the passenger's physician to determine the flow rate and the amount of oxygen needed and arranging for the delivery of the oxygen by the carrier to the point of origin of the passenger's trip. Therefore, normally, it is not possible to accommodate a passenger who needs medical oxygen on a flight unless the advance notice is provided because the accommodation cannot be made without delaying the flight.*

### *If Aircraft is Substituted, Make an Effort to Accommodate*

Even if a passenger with a disability provides advance notice, sometimes weather or mechanical problems require cancellation of the flight altogether or the substitution of another aircraft.  Under these circumstances, you must, to the maximum extent feasible, assist in providing the accommodation originally requested by the passenger with a disability.  [Sec. 382.33(f)]

## B.    Information about the Aircraft

You should be familiar with and be able to provide information about aircraft accessibility for passengers with a disability when they request this information.  [Secs.

*Requests for Seat Assignments by a Passenger Accompanied by a Service Animal*

For a disabled passenger traveling with a service animal, you must provide, as the

passenger with a disability requests, either a bulkhead seat or a seat other than a bulkhead

seat.  [Sec. 382.38(a)(3)]

If carriers provide special information concerning the transportation of animals outside

the continental United States to any passengers, you must provide such information to all

passengers with a disability traveling with a service animal on the flights.  [Sec.

382.55(a)(3)]

## E.   Accommodations for Air Travelers who are Deaf, Hard of Hearing, or Deaf-Blind

If your carrier makes available a telephone reservation and information service to the

public, you must make available a text telephone (TTY) to permit individuals who are

deaf or hard of hearing to make reservations and obtain information.  The TTY must be

available during the same hours as the telephone service for the general public and the

same wait time and surcharges must apply to the TTY as the telephone service for the

general public.  [Secs. 382.47(a) and (b)]

## F.   Communicable Diseases

*Passengers with a Communicable Disease Are Permitted on Flight*

Except as described below, you must not (i) refuse transportation to; (ii) require provision

of a medical certificate from; or (iii) impose any condition, restriction, or requirement not

imposed on other passengers on, a passenger with a communicable disease or infection. [Sec. 382.51(a)]

*If Direct Threat to Health or Safety of Others, Limitations May be Imposed*

Only if a passenger with a communicable disease or infection poses a *direct threat* to the health or safety of others, can you take any of the actions listed above.  [Sec. 382.51(b)(1)]  A *direct threat* means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

If you are faced with particular circumstances where you are required to make a determination as to whether a passenger with a communicable disease or infection poses a direct threat to the health or safety of others, you must make an individualized assessment based on a reasonable judgment, ***relying on current medical knowledge or the best available objective evidence.***  If the presentation of a medical certificate would alleviate concerns over the passenger's condition, or reasonable modification of policies, practices, or procedures would lessen the risk to other passengers, then you should consider this in making such an individualized assessment.  You should also confer with appropriate medical personnel and a CRO when making this assessment.

*If the Passenger Poses a Direct Threat to the Health and Safety of Others*

If, in your estimation, a passenger with a communicable disease or infection poses a direct threat to the health or safety of other passengers, you may (i) refuse to provide transportation to that person; (ii) require that person to provide a medical certificate

stating that the disease at its current stage would not be transmittable during the normal course of a flight or, if applicable, describing measures that would prevent transmission during the flight [Sec. 382.53(c)]; or (iii) impose on that passenger a special condition or restriction (*e.g*., wearing a mask).  You must **choose the least restrictive** of the three options set forth above that would accomplish the objective.  [Sec. 382.51(b)(4)]

At all times, as a matter of good customer service, you should treat the passenger with courtesy and respect.

## G.     Medical Certificates:  When are they Allowed?

A medical certificate is a written statement from the passenger's physician saying that the passenger is capable of completing the flight safely without requiring extraordinary medical assistance during the flight.  Except under the circumstances described below, you must not require medical certification of a passenger with a disability as a condition for providing transportation.

You may require a medical certificate only if the passenger with a disability is an individual who

- is traveling on a stretcher or in an incubator (where such service is offered);

- needs medical oxygen during the flight (where such service is offered); or

- has a medical condition that causes the carrier to have reasonable doubt that the passenger can complete the flight safely without requiring extraordinary medical assistance during the flight.  [Sec. 382.53 (a) and (b)]

39

*Medical Certificate and a Passenger with a Communicable Disease or Infection*

In addition, if you determine that a passenger with a communicable disease or infection poses a direct threat to the health or safety risk of others, you may require a medical certificate from the passenger.  [Sec. 382.53(c)(1)]  The medical certificate must be dated within 10 days of the flight date.  [Sec. 382.53(c)(2)]

In the event that you determine the need for a medical certificate, you should indicate to the passenger with a disability the reason for the request.  You should base your request on the reasons set forth under the law and outlined above.

At all times, you should treat the passenger from whom you are requesting a medical certificate with courtesy and respect.

**_Example_**:  *A passenger arrives at the gate with her six year old daughter.  The girl's face and arms are covered with red lesions, resembling chicken pox.  What should you do?*

*Generally, you must not refuse travel to, require a medical certificate from, or impose special conditions on a passenger with a communicable disease or infection.  However, if a passenger appears to have a communicable disease or infection that poses a direct threat to the health or safety of other passengers, you may be required to make a determination about the best course of action based on the seriousness of the health risk and the ease of disease transmittal.  For a communicable disease or infection to pose a direct threat, the condition must both be readily transmitted under conditions of flight and have serious health consequences (e.g., SARS).  Medical conditions that are easily*

*transmitted in aircraft cabins but have limited health consequences (e.g., a common cold) as well as conditions that are difficult to transmit in aircraft cabins but have serious health consequences (e.g., AIDS) do not pose a direct threat to the health or safety of passengers.*

*The first thing you should do is interview the passenger and her mother to obtain basic information about the girl's condition. This exchange should be done discreetly and in a courteous and respectful manner. If you still have a question about the nature of the child's condition that will impact decisions about transportation, you should contact a CRO and explain the situation.*

*Here, the mother tells you and the CRO that the child has chicken pox but is no longer contagious. The CRO would likely consult with appropriate medical personnel to verify whether the child could be contagious based on the mother's statement.*

*If there is a reasonable basis for believing that the passenger poses a direct threat to the health or safety of others, you must choose the least restrictive alternative among the following options: (i) refusing transportation to the individual; (ii) requiring a medical certificate; or (iii) imposing a special condition or limitation on the individual. If the medical support people indicate that there is a chance that the child is no longer contagious but only if a certain number of days have passed since the outbreak of the lesions, you could request a medical certificate before you permit the child to travel.*

*Having discussed the situation with the passenger and her mother and consulted the CRO and the medical support personnel, the request for a medical certificate appears to be reasonable under the circumstances and the least restrictive of the three options.*

*Keep in mind that section 382.53(c)(2) specifies that the medical certificate be from the child's physician and state that the child's chicken pox would not be communicable to other passengers on the flight. The medical certificate must also include any conditions or precautions that would have to be observed to prevent the transmission of the chicken pox to other passengers and be dated within ten days of the date of the flight. If the medical certificate is incomplete or if the passenger is attempting to travel before the date specified in the medical certificate or without implementing the conditions outlined to prevent transmission, the child would not be permitted to fly.*

## H.    Your Obligation to Provide Services and Equipment

When assistance getting on or off a plane, making flight connections, or receiving transportation between gates is requested by a passenger with a disability, or offered by carrier personnel and accepted by the passenger, you must provide it.  [Sec. 382.39(a)] More specifically, you must provide, as needed, the following:

- services personnel
- ground wheelchairs
- boarding wheelchairs
- ramps or mechanical lifts.  [Sec. 382.39(a)(1)]

Aircraft with more than 60 passenger seats having an accessible lavatory must be equipped with an operable on-board wheelchair.  [Sec. 382.21(a)(4)]  On-board

It may not be apparent whether a person is an individual with a disability. You should provide an opportunity for a passenger to self-identify as an individual with a disability by asking if the person needs assistance and, if so, how best you can assist with those needs. Keep in mind that you cannot require an individual with a disability to accept special services, including pre-boarding.

***Some Examples of Physical Impairments [Sec. 382.5(a)(1)]:***

- Orthopedic impairment;

- Deafness (profound hearing loss);

- Hard of hearing (mild to profound hearing loss);

- Vision impairment and blindness;

- Speech disorder;

- Cerebral palsy;

- Epilepsy;

- Muscular dystrophy;

- Multiple sclerosis;

- Cancer;

- Heart disease; and

- Diabetes.

***Some Examples of Mental or Psychological Impairments [Sec. 382.5(a)(2)]:***

- Mental retardation;

- Depression;

- Anxiety disorders;

- Specific learning disabilities; and

- Brain injury.

Below is a list of general tips to consider when interacting with people with disabilities followed by tips relating to interacting with individuals with one or more of the five basic types of disabilities. These tips are aimed at ensuring that services, facilities, and other accommodations are provided to passengers with disabilities in a respectful and helpful manner.

Some of the tips relate to specific legal requirements, but most of them set forth suggestions for interacting in a way that would constitute good customer service and demonstrate a sensitivity to the issues concerning passengers with disabilities. The following tips should be read and employed with the above qualification in mind.

# APPENDIX II

# Airline Management-Related Issues

# Airline Management-Related Issues

Appendix II highlights provisions of the ACAA and the accompanying regulations outlining specific responsibilities of management of carriers, *i.e.*, requirements to be implemented by management employees as opposed to personnel who deal with the traveling public, including passengers with a disability.  In places, these are overlapping responsibilities and cross-references will be made to specific sections of this manual.

**Discrimination is Prohibited**

Management of carriers are required to ensure that the carrier (either directly or indirectly through its contractual, licensing, or other arrangements for provision of air transportation) does not discriminate against qualified individuals with a disability by reason of such disability.  [Sec. 382.7(a)(1)]  In addition, management of carriers should be aware that they are responsible for compliance with the ACAA and part 382 not only by their *own* employees, but also by employees of any company or entity performing functions on behalf of the carrier.

More specifically, carriers cannot require a passenger with a disability to accept special services, *e.g.*, pre-boarding, not requested by the passenger.  [Sec. 382.7(a)(2)]  Carriers cannot exclude a qualified individual with a disability from or deny that individual the benefit of air transportation or related services that are available to other individuals, even if there are separate or different services available for passengers with a disability, except as provided by the ACAA and part 382.  [Sec. 382.7(a)(3)]  Carriers cannot take actions adverse to passengers with a disability if they assert their rights under the ACAA and part 382.  [Sec. 382.7(a)(4)]

Carriers cannot limit the number of passengers with a disability on a given flight.  [Sec. 382.31(c)]   Carriers must modify policies, practices, and facilities as necessary to ensure nondiscrimination consistent with the standards of Section 504 of the Rehabilitation Act, as amended.  Carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their program.  [Sec. 382.7(c)]

### *Refusal of Transportation*

Carriers cannot refuse transportation to a qualified individual with a disability solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience others.  [Sec. 382.31(b)]  Carriers must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability unless it is expressly permitted by the ACAA and part 382.  [Sec. 382.31(a)]

### *Safety Considerations*

The ACAA does not require air carriers to disregard applicable FAA safety regulations.  [Sec. 382.3(d)]

Carriers may refuse to provide transportation to *any* passenger on the basis of safety and if carriage would violate FAA regulations.  However, when carriers exercise this authority, they must not discriminate against a passenger with a disability on the basis of disability.  [Sec. 382.31(d)]

**Written Explanation for Refusal of Transportation**

When a carrier refuses to provide transportation to a passenger on a basis relating to disability, the carrier must specify in writing to the passenger the basis for the determination within 10 days of the refusal of transportation.  [Sec. 382.31(e)]  In the situation where refusal of transportation is based on safety concerns, the written notice must include the carrier's reasonable and specific basis for its opinion that transporting the passenger would be inimical to the safety of the flight.

**No Charge for Accommodating Passengers with a Disability**

Carriers cannot impose charges for providing facilities, equipment, or services that are required by the ACAA and its accompanying regulations for passengers with a disability.  [Sec. 382.57]

**Indirect Air Carriers**

If an indirect air carrier provides facilities or services for passengers that are covered for other carriers by sections 382.21 through 382.55, the indirect air carrier must do so in a manner consistent with those regulations.  [Sec. 382.7(b)]

**Contractors and Travel Agents**

Carriers must receive assurances from their contractors who provide services, including travel agents (except non-U.S. citizens providing services outside the U.S.), that they will not discriminate on the basis of disability when providing such services and include a clause with that assurance in their contracts.  [Sec. 382.9(a)]  Similarly, their contracts must contain a

# APPENDIX III

# Frequently Asked Questions

# Frequently Asked Questions

**QUESTION**:  What's the difference between the Air Carrier Access Act (ACAA) and the Americans with Disabilities Act (ADA)?

**ANSWER**:  The ACAA, signed into law by then-President Reagan in 1986, prohibits discrimination by *airlines* against individuals with disabilities in commercial air transportation. The ADA, signed into law after the ACAA in 1990 by then-President Bush, prohibits discrimination against individuals with disabilities in employment, public accommodations, commercial facilities, telecommunications, and *transportation other than by commercial airlines* (*e.g.*, subway and bus systems).  [Sec. 382.1]

**QUESTION**:  Do the ACAA and its implementing regulations (14 CFR part 382 or part 382) apply to both U.S. and foreign carriers?

**ANSWER**:  When initially passed in 1986, the ACAA and part 382 (subsequently issued in March 1990) applied only to U.S. carriers.  However, on April 5, 2000, Congress extended the applicability of the ACAA to cover foreign carriers.  At approximately the same time, DOT issued a notice to foreign carriers advising them that the Department intended to use the provisions of part 382, which by its terms does not impose requirements on foreign air carriers, as guidance in investigating any complaints it receives alleging noncompliance with the ACAA by foreign carriers.  The only provision of part 382 that currently applies to foreign air carriers is Section 382.70(b), which expressly requires foreign carriers to record, categorize, and report written disability-related complaints associated with any flight segment originating or

**Glossary**

***Direct Threat to the Health or Safety of Others***
A significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.

***Fundamental Alteration***
A modification that substantially alters the basic nature or purpose of a program, service, product or activity.

***Individual with a Disability***
"Any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment."  (Section 382.5).

***Qualified Individual with a Disability***
Any individual with a disability who:
(1) "takes those actions necessary to avail himself or herself of facilities or services offered by an air carrier to the general public with respect to accompanying or meeting a traveler, use of ground transportation, using terminal facilities, or obtaining information about schedules, fares or policies";
(2) "offers, or makes a good faith attempt to offer, to purchase or otherwise validly to obtain . . . a ticket" "for air transportation on an air carrier"; or
(3) "purchases or possesses a valid ticket for air transportation on an air carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the ticket has been purchased or obtained; and meets reasonable, nondiscriminatory contract of carriage requirements applicable to all passengers."  (Section 382.5).

***Service Animal***
Any animal that is individually trained or able to provide assistance to a qualified person with a disability; or any animal shown by documentation to be necessary for the emotional well being of a passenger.

**Sources**
*See:* 14 CFR 382.5**,** 14 CFR 382.37(a) and (c), 14 CFR 382.38 (a)(3), (b), (d) & (h)-(j), 14 CFR 382.55(a)(1)-(3), 14 CFR 382.57, "Guidance Concerning Service Animals in Air Transportation," (61 FR 56420-56422, (November 1, 1996)), "Commonly Asked Questions About Service Animals in Places of Business" (Department of Justice, July, 1996), and "ADA Business Brief: Service Animals" (Department of Justice, April 2002).
Questions regarding this notice may be addressed to the Office of Aviation Enforcement and Proceedings, C-70, 400 7th Street, SW, Washington, D.C. 20590.  A copy of this notice will be published in the Federal Register.
An electronic version of this document is available on the World Wide Web at http://airconsumer.ost.dot.gov
Issued in Washington, DC on May 2, 2003.

Samuel Podberesky,

Assistant General Counsel for Aviation Enforcement and Proceedings

Plaintiffs' Exhibit 64

usatoday.com

# Hours in line or a $110 test: How the COVID test shortage is 'frustrating' Puerto Rico visitors

6-8 minutes

---

Puerto Rico resident Sarah Molinari was looking forward to spending time in New York this week to catch up with family and celebrate the holidays. What she didn't see coming were the hours spent scrolling through COVID-19 testing center websites to make sure she could fly home Tuesday.

While traveling to the U.S. territory used to be a breeze for Molinari and other vaccinated travelers, that changes Monday when Puerto Rico starts requiring all travelers to test negative for COVID before arriving.

The new rule comes as the U.S. finds itself in the midst of yet another coronavirus test shortage, with consumers facing limited sales at retailers and long lines at testing centers.

"I was getting really frustrated, thinking about how do I plan and make sure I get this test in time?" Molinari said. "I have no problem with the policy itself. It's more of the inadequacy of testing on a national scale right now that's making these policies really complicated."

Testing requirements are nothing new in the age of COVID-19, but travelers are finding it more difficult – and more expensive – to visit certain domestic destinations amid the latest testing shortage.

## New COVID testing requirements to enter Puerto Rico begin Dec. 27

Gov. Pedro Pierluisi announced the rule change Monday, one week before the new rules were set to go into effect.

Starting Dec. 27, all passengers arriving on domestic flights must show a negative coronavirus test taken no more than 48 hours before arrival, regardless of vaccination status. (Currently, only unvaccinated domestic travelers are required to show proof of a negative test.)





Discover Puerto Rico, the territory's destination marketing organization, told USA TODAY that PCR and rapid tests are accepted, but at-home tests cannot be used.

"The government of Puerto Rico, along with Discover Puerto Rico, are committed to protecting and prioritizing the health and safety of all on the Island; residents and visitors alike," reads a statement from Discover Puerto Rico. "The changes to local guidelines made by Governor Pierluisi and the Health Department this week reflect the recent and rapidly changing landscape of COVID-19, which required immediate action."

Officials "highly suggest"  travelers test before departure, but passengers who arrive without a negative coronavirus test will have 48 hours to take a test upon arrival. Tests are available at the Luis Muñoz Marín International Airport, and Discover Puerto Rico noted that travelers can also schedule a test at a local pharmacy. Those who don't get tested in time face a $300 fine.

Travelers who test on the island do not need to quarantine while they wait for results, according to Discover Puerto Rico, but unvaccinated travelers will need to quarantine seven days after arrival, even with a negative test.

**NERVOUS ABOUT TRAVEL (AGAIN?)**What to know about airline, hotel and cruise cancellation policies as omicron surges

## Difficulties getting tested

While post-arrival testing is an option, Molinari said the Caribbean island has its own testing supply issues. Discover Puerto Rico's website says travelers can get a test on site at the Luis Muñoz Marín International Airport after arrival, but travelers should be prepared to pay $110 for the service.

"I can't do that," said Molinari, who was surprised to learn the test's price tag.

But finding a test stateside is also a challenge.

"Friends that were going to the public testing sites around New York were telling me about hours-long waits," she said. "Some of them show up at one site, wait for hours and then they would run out of tests. So my thought was ... I really just might not get a test when I need it."

Eventually, after about four hours trying to track down a test her insurance would cover, Molinari found a clinic that could offer her an antigen test at no cost.

"I have access to the technology and the information, and I have the time to navigate this process, whereas for many others, that's not the situation that they're in," Molinari said. "So if this was hard for me, my question is, how is someone else supposed to do this?"

Other travelers have taken to social media with their concerns over finding a test in time.

**IS IT SAFE TO TRAVEL RIGHT NOW?** What health experts are doing for the holidays this year

## Hawaii, US Virgin Islands: Other testing requirements for domestic flights

White House press secretary Jen Psaki reiterated Thursday that the federal government does not plan to require testing for domestic air travel at this time.

"We still require masks on airplanes, of course. We've also increased the fee on, if people do not wear masks on airplanes," she said. "Rules, as you know, for international travel are different ... to help keep COVID cases out of this country and delay any new possible variant from coming into the country."

All U.S. flights – domestic and international – require masks through at least March 18. International flights into the U.S. also require a negative pre-departure viral coronavirus test taken no more than one day before travel.



Even so, some domestic destinations have taken it into their own hands to add more stringent entry requirements.

► **Hawaii:** Unvaccinated U.S. travelers flying into Hawaii can take a test to avoid a 10-day quarantine. The state accepts Nucleic Acid Amplification Tests (NAATs) from a trusted travel partner taken no more than 72 hours before departure.

► **U.S. Virgin Islands:** Domestic travelers 5 and older flying into the U.S. Virgin Islands must submit a negative antigen or NAAT test within five days of travel, including those who have been fully vaccinated outside the Virgin Islands.

►**Northern Mariana Islands:**As of Monday, all fully vaccinated travelers must be tested for the coronavirus upon arrival. Travelers must quarantine while they wait for their results. Unvaccinated travelers must quarantine at a designated government facility for seven days and will be tested after the quarantine period ends. If their test is positive, they will be isolated another 10 days at the facility.

► **American Samoa:** The U.S. territory currently limits entry to essential purposes.

*Follow USA TODAY reporter Bailey Schulz on Twitter: @bailey_schulz.*