# EXHIBIT 1

2024 WL 1346437
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

AARON ABADI Plaintiff,

v.

AMERICAN AIRLINES, INC., et al., Defendants.

23-cv-4033 (LJL)
|
Filed 03/29/2024

OPINION AND ORDER

LEWIS J. LIMAN United States District Judge

**\*1** This Opinion and Order resolves three motions pending before the Court: (1) the motion of Defendants American Airlines, Inc., Delta Airlines, Inc., JetBlue Airways Corp., Southwest Airlines Co., United Airlines, Inc., (the "Domestic Airlines"), and individual employees or agents of the Domestic Airlines Robert Land, Roy Goldberg, Debbie Castleton, and Nathalie Simon (the "Domestic Individuals") to dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim for relief under Rule 12(b)(6), Dkt. Nos. 121, 197; (2) the motion of Defendant Silver Airways, LLC ("Silver," and, together with the Domestic Airlines and Domestic Individuals, "Domestic Defendants"), to dismiss the Complaint for failure to comply with federal pleading standards under Federal Rule of Civil Procedure 8 and for failure to state a claim for relief pursuant to Rule 12(b)(6); (3) the motion of Defendants Concesionaria Vuela Compañia de Aviación, Royal Air Maroc, Aerovías de México S.A. de C.V., Transportes Aereos Portugueses, S.A., Spirit Airlines, Inc., Avianca S.A., Singapore Airlines, LATAM Airlines Group S.A., Iberia Líneas Aéreas de España, LOT Polish Airlines, S.A., British Airways P.L.C. (the "Foreign Airlines"), and individual employee Matthew Roberts (together with the Foreign Airlines, the "Foreign Defendants," and collectively, with the Domestic Defendants and Silver, the "Moving Defendants") [1] to dismiss the Complaint for, *inter alia*, failure to state a claim for relief, Dkt. No. 179. For the following reasons, the motions are granted.

BACKGROUND

The well-pleaded allegations of Plaintiff's Complaint, *see* Dkt. Nos. 3, 3-1, 3-2 ("Compl."), are assumed to be true for purposes of these motions. In light of Plaintiff's *pro se* status, the Court construes the Complaint liberally and broadly, and interprets it to state the strongest claims it suggests. *See, e.g., Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006).

I. The Relevant Parties

Plaintiff Aaron Abadi ("Plaintiff" or "Abadi"), proceeding *pro se*, is a resident and citizen of New York. Compl. ¶ 1. He has a sensory processing disorder that prevents him from wearing a mask. *Id.* ¶ 141. He "travels a whole lot," *id.* ¶ 807, both for his work and for pleasure, *id.* ¶¶ 174, 806–807. Plaintiff works in the "waste management and energy business" and is the owner and Chief Executive Officer ("CEO") of the National Environmental Group ("NEG"), and "needs to travel for his income." *Id.* ¶¶ 174, 813, 823. Plaintiff also "loves to travel for pleasure." *Id.* ¶ 174.

The Complaint names sixty-one defendants. The defendants include forty-six airlines ("Airline Defendants"), [2] several employees of airlines, two attorneys who have represented airlines, two medical advisory groups (MedAire, Inc., and the Center for Emergency Medicine of Western Pennsylvania, doing business as "STAT-MD"), and several "Government Defendants," including the National Institutes of Health ("NIH"), the Centers for Disease Control and Prevention ("CDC"), the United States Department of Health & Human Services ("HHS"), certain federal employees, and the President of the United States, [3] (collectively, "Defendants"). *Id.* ¶¶ 2–62. As noted, this Opinion addresses three motions to dismiss made by twenty-five of the Defendants.

**\*2** Domestic Defendants are five airlines and four individuals, all based in the United States. American Airlines, Inc. ("American"), Delta Airlines, Inc. ("Delta"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United") are airlines based in the United States that are alleged to fly through or have operations in Texas, where the Complaint was first filed. *Id.* ¶¶ 2, 15, 24, 38, 45. Roy Goldberg ("Goldberg") is an attorney who represents American. *Id.* ¶ 49. Nathalie Simon ("Simon") works in Delta's Customer Care Department. *Id.* ¶ 51. Robert Land ("Land") is the Senior

Vice President Government Affairs and Associate General Counsel of JetBlue. *Id.* ¶ 54. Debbie Castleton ("Castleton") works in customer support for JetBlue. *Id.* ¶ 55.

Foreign Defendants are eleven airlines and one individual. Concesionaria Vuela Compañia de Aviación, S.A.P.I. de C.V. ("Volaris"), Royal Air Maroc, Ltd. ("Maroc"), Aerovías de México S.A. de C.V. doing business as Aeromexico Airlines ("Aeromexico"), Transportes Aéreos Portugueses, S.A. ("TAP"), Avianca S.A. ("Avianca"), Singapore Airlines ("SIA"), LATAM Airlines Group S.A. ("Latam"), Iberia Líneas Aéreas de España, S.A. Operadora, Socieded Unipoersonal ("Iberia Air"), Lot Polish Airlines, S.A. ("LOT Air"), and British Airways P.L.C. ("British Air"), are foreign airlines that fly to and from the United States. *Id.* ¶¶ 4, 7, 12, 23, 28, 29, 34, 37, 43. Spirit Airlines, Inc. ("Spirit") is a U.S. based airline but joins the motion to dismiss of the above, ¶ 39, Matthew Roberts ("Roberts"), a British subject, is the airport manager for British Air at the Washington Dulles Airport and the Baltimore International Airport, *id.* ¶ 48.

## II. The Federal Government's Travel Policies in Response to COVID-19

"As the world well knows," the COVID-19 pandemic reached the United States in early 2020. *Goldberg v. Pace Univ.*, 88 F.4th 204, 208 (2d Cir. 2023). The virus caused "most of the planet to get sick, and caused the death [sic] of over 6 million people." Compl. ¶ 92.

On January 21, 2021, the day after his inauguration, President Biden issued Executive Order 13998, *Promoting COVID-19 Safety in Domestic and International Travel*, 86 Fed. Reg. 7205 (Jan. 21, 2021), in order to slow the spread of the COVID-19 virus. Compl. ¶ 95; *see* Dkt. No. 3-6, (the "Executive Order"). The Executive Order expressed the following policy of the United States:

> The Centers for Disease Control and Prevention (CDC), the Surgeon General, and the National Institutes of Health have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19. Accordingly, to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely, it is the policy of [the Biden] Administration to implement these public health measures consistent with CDC guidelines on public modes of transportation and at ports of entry to the United States.

Executive Order § 1.

The Executive Order directs the Secretaries of Labor, HHS, Transportation (including through the Administrator of the Federal Aviation Administration), Homeland Security (including through the Administrator of the Transportation Security Administration ("TSA")), and the heads of other executive departments and agencies to "immediately take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in compliance with CDC guidelines in or on," among other places, airports and commercial aircrafts. *Id.* § 2(a).

Pursuant to the Executive Order, the CDC issued rules regulating masking. On or about January 29, 2021, the CDC issued an order, Dkt. No. 3-7 (the "CDC Order" or "Mask Mandate") directing conveyance operators, including airlines, to use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel. Compl. ¶ 99. In pertinent part, the CDC Order states:

**\*3** (1) Persons must wear masks over the mouth and nose when traveling on conveyances into and within the United States. Persons must also wear masks at transportation hubs as defined in this Order.

(2) A conveyance operator transporting persons into and within the United States must require all persons onboard to wear masks for the duration of travel.

(3) A conveyance operators [sic] operating a conveyance arriving at or departing from a U.S. port of entry must require all persons on board to wear masks for the duration of travel as a condition of controlled free pratique. [4]

(4) Conveyance operators must use best efforts to ensure that any person on the conveyance wears a mask when boarding, disembarking, and for the duration of travel.

CDC Order at 1–2; *see also id.* at 9.

The CDC Order defines "conveyance as including, among other means of transport, aircrafts, and defines "conveyance operator" broadly to include any "individual or organization causing or authorizing the operation of a conveyance." *Id.* at 2. Best efforts include, among other measures:

- boarding only those persons who wear masks;

- instructing persons that Federal law requires wearing a mask on the conveyance and failure to comply constitutes a violation of Federal law;

- monitoring persons onboard the conveyance for anyone who is not wearing a mask and seeking compliance from such persons;

- at the earliest opportunity, disembarking any person who refuses to comply; and

- providing persons with prominent and adequate notice to facilitate awareness and compliance of the requirement of this Order to wear a mask; best practices may include, if feasible, advance notification on digital platforms, such as on apps, websites, or email; posted signage in multiple languages with illustrations; printing the requirement on transit tickets; or other methods as appropriate.

*Id.* at 1–2. With respect to foreign air carriers, the CDC Order provided:

> Conveyance operators must also require all persons to wear masks while boarding and for the duration of their travel on board conveyances departing from the United States until the conveyances arrives at the foreign destination, if at any time any of the persons onboard (passengers, crew, or conveyance operators) will return to the United States while this Order remains in effect.

*Id.* at 9.

The CDC Order exempted several categories of persons from its terms, including "a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act." *Id.* at 5; *see* Compl. ¶ 100. Footnote 8 of the CDC Order provided as follows:

> Operators of conveyances or transportation hubs may impose requirements, or conditions for carriage, on persons requesting an exemption from the requirement to wear a mask, including medical consultation by a third party, medical documentation by a licensed medical provider, and/or other information as determined by the operator, as well as require evidence that the person does not have COVID-19 such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19. CDC definitions for SARS-CoV-2 viral test and documentation of recovery are available in the Frequently Asked Questions as https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html. Operators may also impose additional protective measures that improve the ability of a person eligible for exemption to maintain social distance (separation from others by 6 feet), such as scheduling travel at less crowded times or on less crowded conveyances, or seating or otherwise situating the individual in a less crowded section of the conveyance or transportation hub. Operators may further require that persons seeking exemption from the requirements to wear a mask request an accommodation in advance.

**\*4**  CDC Order at 4 n.8.

---

Case 2:22-cv-02383-SSS-AS Document 229-1 Filed 04/12/24 Page 5 of 56 Page ID
#:5194
AARON ABADI Plaintiff, v. AMERICAN AIRLINES, INC., et al., Slip Copy (2024)

It also exempts children under the age of two years and those "for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations." *Id.* at 5. The CDC Order further directs that the mask requirement shall not apply under a number of circumstances, including while eating, drinking, or taking medication, for brief periods; when communicating with a person who is hearing impaired and the ability to see the mouth is essential for communication; and when necessary to temporarily remove the mask to verify one's identity. *Id.* at 4.

Included in the Order is a declaration of intent from the Director of the Division of Global Migration and Quarantine of the CDC, stating that he had determined that the Mask Mandate was "reasonably necessary to prevent the further introduction, transmission, or spread of COVID-19 into the United States and among the states and territories." *Id.* at 8. The CDC Order recites that as of January 27, 2021, there had been over ninety-nine million confirmed cases of COVID-19 globally, resulting in more than two million deaths; that the virus spreads very easily and sustainably between people who are in close contact with one another mainly through respiratory droplets; that air travel increases a person's risk of getting and spreading COVID-19; and that appropriately worn masks reduce the spread of COVID-19 especially from those persons who are pre-symptomatic or asymptomatic. *Id.* at 5–8.

These findings are disputed by Plaintiff, however, who alleges that "all of the studies [and] Dr. Fauci's own public statements ... confirm[ ] that masks are almost useless in the protection against Covid-19." Compl. ¶ 96; *see also id.* ¶¶ 109–112, 116, 118, 122.

On February 5, 2021, the Office of Aviation Consumer Protection ("OACP"), a subdivision of the Department of Transportation ("DOT"), issued a Notice of Enforcement Policy: Accommodation by Carriers of Persons with Disabilities Who Are Unable to Wear Masks While on Commercial Aircraft ("DOT Enforcement Notice"), which clarified the CDC Order, and reminded airlines of their obligations to accommodate passengers with disabilities. The DOT Enforcement Notice stated, *inter alia*, that,

> To ensure that only qualified persons under the exemption would be able to travel without a mask, the CDC Order

permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the operator. The CDC Order also permits operators to require protective measures, such as a negative result from a SARS-CoV-2 viral test or documentation of recovery from COVID-19 or seating or otherwise situating the individual in a less crowded section of the conveyance, e.g., aircraft.

**\*5** Dkt. No. 3-20 at 3. [5] Although the DOT Enforcement Notice expressly included airlines, is also reiterated that:

> The CDC Order permits airlines to impose requirements or conditions for carriage on a person requesting an exemption, including requiring a person seeking an exemption to request an accommodation in advance, submit to medical consultation by a third party, provide medical documentation by a licensed medical provider, and/or provide other information as determined by the airline.

*Id.* at 3–4. "In addition, airlines may impose protective measures to reduce or prevent the risk to other passengers. For example, airlines may require protective measures, such as a negative SARS-CoV-2 test, taken at the passenger's own expense, during the days immediately prior to the scheduled flight." *Id.* at 4.

Over one year later, on March 23, 2022, an organization named Airlines for America wrote a letter to President Biden, Dkt. No. 3-10 (the "Airlines Letter"), advocating that the President lift the Mask Mandate, Compl. ¶¶ 124–125, 128, 130. The Airlines Letter, signed by the executives of several airlines, including some airlines named as Defendants in this suit, noted that the aviation industry had voluntarily implemented mask mandates prior to the CDC Order and had supported the CDC's mandate and other travel restrictions. Airlines Letter at 1–3. It asserted, however, that "much ha[d] changed since these measures were imposed," and the Mask Mandate was no longer needed in light of "[t]he high level of immunity in the U.S., availability of high-quality masks for those who wish to use them, hospital-grade cabin air, widespread vaccine availability and newly available therapeutics." *Id.* at 1–2. [6]

On April 18, 2022, the United States District Court for the Middle District of Florida issued an opinion finding that the Mask Mandate exceeded the CDC's statutory authority and violated the procedures required for agency rulemaking under the Administrative Procedures Act, and accordingly vacated the Mask Mandate. *See Health Freedom Def. Fund, Inc. v. Biden*, 599 F Supp. 3d 1144 (M.D. Fla. 2022); Compl. ¶ 104.

**\*6** The Mask Mandate expired on May 11, 2023, the date that the HHS Secretary's declaration of a public health emergency expired. *See Expired Order: Wearing of face masks while on conveyances and at transportation hubs*, CDC.gov (May 12, 2023), https://www.cdc.gov/quarantine/masks/mask-travel-guidance.html. The Eleventh Circuit thus vacated as moot the Florida district court's decision. *See Health Freedom Def. Fund, Inc. v. President of the United States*, 71 F.4th 888 (11th Cir. 2023). [7]

### III. Restrictions on Plaintiff's Travel

Plaintiff is a New York resident with a sensory processing disorder that prevents him from wearing a mask. Compl. ¶¶ 1, 141. When he wears anything on his face, his "senses go into overload." *Id.* ¶ 141.

Plaintiff carries a letter from his primary care physician, *see* Dkt. No. 3-11 ("Doctor's Note"), attesting to the fact that he cannot wear a mask. Compl. ¶¶ 141, 810. The Doctor's Note recites, in full:

> Mr. Aaron Abadi is suffering from extreme sensitivity to touch, mostly in the area of his head. For this reason he is unable to wear face mask or face shield, and should not be required to do so. He has already recovered from COVID, and is not contagious.

Doctor's Note at 1. The letter does not contain the doctor's license number, a wet signature, or indicate when Plaintiff contracted and recovered from the virus, but is on hospital letterhead. *Id.* Further, Plaintiff's neurologist has stated, on a different form filed with the Florida Commission on Human Rights, that his disability is severe enough that it meets the basic and typically accepted definition of disability under federal and state law. Compl. ¶ 142; Dkt. No. 3-13.

For purposes of either work or pleasure, Compl. ¶ 174, Plaintiff wanted to fly from Amarillo, Texas to many other states and countries, but claims he was denied the ability to do so because of the Mask Mandate. *Id.* ¶ 69. Plaintiff alleges that more than fifty airlines "refused to allow [him] to fly normally." *Id.* ¶¶ 178, 797. The airlines service virtually every area of the globe, from North America to South America, Europe, Asia, and the Middle East.

Plaintiff states in his Complaint that he emailed all or almost all of the Moving Defendants to ask whether he could travel maskless while the Mask Mandate was in effect. But Plaintiff's allegations in his Complaint often omit the date that Plaintiff submitted his initial inquiry to each airline. And many of the communications between Plaintiff and Moving Defendants appended to the Complaint lack Plaintiff's initial email seeking exemption from the Mask Mandate, and even those documents that do include Plaintiff's first inquiry often omit the date that Plaintiff sent the communication. It appears, however, from the responses of many Moving Defendants that Plaintiff submitted most of these inquiries on September 1, 2, and 3 of 2021. From the appended documents that do include Plaintiff's initial inquiry, it appears that he used nearly identical language in his communication with each airline, stating that he had a disability, attaching his Doctor's Note, and asking whether he would be permitted to fly maskless.

**\*7** Plaintiff alleges that "[a]ll the airline corporation defendants, airline personnel defendants, and the attorney

defendants refused to allow Plaintiff to access flights at all, and/or unless he fulfilled unlawful requirements." *Id.* ¶ 166. Some airlines required medical forms to be filled out with a doctor's approval to file. *Id.* ¶ 170. Others required negative COVID-19 tests, even though passengers without disabilities faced no such requirement. *Id.* ¶ 171. Although Plaintiff booked several flights initially, he stopped doing so after he learned that the Mask Mandate would be applied to him. *Id.* ¶ 178. Very few airlines allowed Plaintiff to fly on their planes, leaving Plaintiff "mostly grounded for over two years." *Id.* ¶ 175.

Plaintiff alleges that the two medical consulting organizations determined on behalf of certain of the airlines who could fly and who could not fly. *Id.* ¶¶ 729–757. He names certain airline employees or representatives who responded to his requests for an exemption. *Id.* ¶¶ 758–783.

Although some airlines did allow Plaintiff to fly maskless, such as Air France, *id.* ¶ 818, Plaintiff claims that he lost business opportunities because other airlines denied him access to flights, missing out on projects in Bangalore, India, Sweden, South Sudan, the Dominican Republic, and Saudi Arabia, *id.* ¶ 816, 831. He claims that the guidance issued by the Government Defendants was "politically driven and untrue" and discriminatory. *Id.* ¶ 167. Plaintiff alleges it "would be the Plaintiff's dream come true, if the CDC took that ruling with the humility it deserves and packed up their mask mandates and hid them deep in a basement closet, never to be seen again. Unfortunately, that dream is nothing more than a fantasy." *Id.* ¶ 850.

Plaintiff recites his experience with each of the airlines that is a Moving Defendant. Many of the allegations are based on, and are limited to, what appears from the Complaint to be a form letter that Plaintiff sent the airlines on or about September 1, 2021, and the responses he received from the airlines.

### A. Defendants American and Goldberg

American is an airline based in the United States. *Id.* ¶ 2. American retains as counsel Roy Goldberg, an attorney of Stinson LLP. *Id.* ¶ 49. Plaintiff alleges that he was twice barred from boarding American flights: once on January 24, 2021, [8] and again November 8, 2021. *Id.* ¶¶ 180, 185. On the second occasion, American sent Plaintiff a letter stating that the documentation he submitted to obtain an exemption from the Mask Mandate did not meet American's qualifications and

thus his exemption request was denied. *Id.* ¶ 185; Dkt. No. 3-18 at 4.

Plaintiff again sought a medical exemption to the Mask Mandate from American in early 2022 for a flight to Phoenix, Arizona. Compl. ¶ 186; Dkt. No. 3-19. On February 20, 2022, American wrote Plaintiff stating that to receive a medical exemption, he was required to submit an official, dated letter from a licensed medical provider with the medical provider's license number, attesting that Plaintiff had a medically diagnosed physical or mental disability qualifying under the Americans with Disabilities Act which prevented him from safely wearing a mask for the duration of the flight and explaining why. Dkt. No. 3-19 at 5–6. Approval of any such request was conditioned upon proof, presented upon check-in at the airport, of a negative COVID-19 test taken within seventy-two hours of departure. *Id.* Upon receipt of Plaintiff's documentation, American approved the exemption but requested an updated doctor's letter—one dated within thirty days of the flight. Dkt. No. 3-19 at 1; Compl. ¶ 186. On March 1, 2022, Plaintiff emailed American and its counsel, Defendant Goldberg, accusing American of violating federal law by requiring the negative test and updated medical documentation. Dkt. No. 3-19 at 1. On March 4, 2022, Goldberg responded that American's requirements that Plaintiff present adequate medical documentation of his condition and a negative COVID-19 test were authorized by the DOT Enforcement Notice and consistent with CDC policy. Dkt. No. 3-20 at 3–4. In further communication, Plaintiff apparently again accused American and Goldberg of unlawful discrimination and threatened legal action. *See id.* at 1–2; Compl. ¶ 187. Plaintiff also sent Goldberg a copy of the Airlines Letter urging President Biden to end the Mask Mandate and noted that American's chairman had signed it. Dkt. No. 3-21.

**\*8** Plaintiff filed a complaint with the DOT after the first time he was denied access to an American flight in January 2021, complaining that American failed to make an exemption to its mask policy despite his disability. Compl. ¶ 181; Dkt. No. 3-16. After investigation, the DOT found that American had violated the Air Carriers Access Act of 1986 ("ACAA") because its then-applicable mask policy did not allow for medical exemptions and did not conduct an individualized assessment of whether Plaintiff could safely wear a mask due to his disability and, if he could, whether a reasonable accommodation could be made. Dkt. No. 3-16 at 3–4. However, the DOT also found that American had changed its policy effective February

2, 2021, to begin to allow medical exemptions, before the DOT Enforcement Notice reminded air carriers of their obligations to accommodate the needs of passengers with disabilities. *Id.* The investigation summary concluded that DOT would exercise its prosecutorial discretion and not take action for the ACAA violations that occurred before the DOT Enforcement Notice was issued. *Id.* Plaintiff has appealed the DOT determination. Compl. ¶ 183.

Plaintiff brings claims against both American and Goldberg. Plaintiff alleges that he "frequently flew with American and would have flown with American" had the airline exempted him from the Mask Mandate. *Id.* ¶ 704. Plaintiff alleges Goldberg "advised [American] to discriminate against him," *id.* ¶ 49; *see also id.* ¶ 698, and further that Goldberg "participated in the discrimination by assisting, advising, and instructing their clients" to engage in discrimination, *id.* ¶ 80; *see also id.* ¶ 699.

### B. Defendant Aeromexico
Aeromexico "is a foreign airline with flights to and from the United States." *Id.* ¶ 4. Plaintiff alleges that he provided Aeromexico a copy of his Doctor's Note attesting to his inability to wear a mask, but that the airline emailed him on or about September 1, 2021 refusing to issue an exemption. *Id.* ¶ 201. In April 2022, Plaintiff again sent Aeromexico a copy of his Doctor's Note and asked for confirmation that he would be able to fly without a mask. Dkt. No. 3-24 at 1–2. Aeromexico responded two weeks letter that, according to "local and international authorities," the use of a mask onboard Aeromexico flights was mandatory absent an exemption. *Id.* at 1. To obtain a medical exemption, passengers with health conditions were required "to provide a medical certificate proving their condition," including "the reason why a face mask cannot be worn during the flight, as well as the physician's signature, seal, and Professional ID Number." *Id.* The medical documentation had to "be delivered to [Aeromexico's] staff directly at the airport." *Id.* Plaintiff alleges, without explanation, that the medical documentation that Aeromexico required was "intended for people who medical conditions [sic] that might not be able to fly at all." Compl. ¶ 205.

Plaintiff does not allege that he ever purchased a ticket on Aeromexico or was ever denied travel on that airline. He nevertheless alleges that Aeromexico discriminated against him by requesting the medical documentation. *Id.* And he alleges that, given the frequency with which he flies, he "would need a Doctor on payroll" to handle the volume of medical documentation required by airlines. *Id.* ¶¶ 205–207.

### C. Defendant Avianca
Avianca "is a foreign airline with flights to and from the United States." *Id.* ¶ 7. Plaintiff emailed Avianca on September 1, 2021, explaining his disability with his Doctor's Note attached to inquire as to whether he could fly with the airline without a mask, and, when he did not receive a response, followed up on October 14, 2021. *Id.* ¶¶ 235–36; Dkt. No. 3-30. Avianca did not respond until October 3, 2022, Compl. ¶¶ 235–238; Dkt. No. 3-31,[9] at which point it stated that the Doctor's Note was insufficient to comply with its mask exemption policy as it did not include information about Plaintiff's itinerary to confirm that there was no local mask mandate regulation that did not exempt individuals with disabilities. Compl. ¶ 239; Dkt. No. 3-31. Plaintiff does not allege that he ever purchased a ticket on Avianca or was ever denied travel on that airline.

### D. Defendants British Air and Roberts
**\*9** British Air is an "airline based in the United Kingdom" with flights going "to and from the United States." Compl. ¶ 12. At all relevant times, British Air employed individual Matthew Roberts, "the Airport Manager for British Air at Washington Dulles Airport and at the Baltimore International Airport." *Id.* ¶ 48. Plaintiff wrote to British Air on December 13, 2020, asking whether he could fly on the airline without a mask. *Id.* ¶ 294. He attached the Doctor's Note and stated that he had tested positive for COVID-19 in October 2020 and was willing to provide a recent negative COVID-19 test. Dkt. No. 3-36. British Air responded the following day, stating that while it was mandatory for all passengers to wear a mask, it recognized that not everyone could do so, and that Plaintiff should be prepared to present his doctor's letter at all times, since he would be "challenged by [a]irport [p]ersonnel and [the] [c]abin [c]rew." *Id.*[10] Plaintiff purchased a ticket on British Air on or about January 17, 2021, to fly from New York to Bangalore, India. Compl. ¶ 297. Plaintiff ultimately appeared for flights out of New York on British Air on three separate occasions: January 22, 2021, February 3, 2021, and February 5, 2021, and was denied boarding each time. *Id.* ¶¶ 298–303. On January 22, 2021, Plaintiff, with his Doctor's Note and previous correspondence with British Air in hand, was initially informed by airline personnel that he could not fly without a mask. *Id.* ¶ 299. Eventually, airline staff told Plaintiff that he *would* be able to fly without a mask, but that

he nevertheless could not board the flight because his Indian visa was invalid. *Id.* Plaintiff returned home and confirmed with the Indian Consulate and Bureau of Immigration of India that his visa was valid. *Id.* ¶ 300. When he returned to the airport on February 3 to try to board another flight to India with his email correspondence with Indian immigration authorities in hand, he had an identical experience. *Id.* ¶¶ 301–302. Plaintiff had the same experience the third time he attempted to fly from New York to Bangalore on British Air on February 5. *Id.* ¶ 303.

On or about February 9, 2021, Plaintiff attempted to fly from Washington Dulles Airport, where he spoke with Defendant Roberts, the Washington Dulles Airport manager for British Air. *Id.* ¶ 305. After an hour of research, Roberts informed Plaintiff that his visa was valid, and told Plaintiff he would call him in the coming days to confirm. *Id.* ¶ 306. On February 11, 2021, Plaintiff called Roberts to follow up and was informed that, although his visa was valid, he would not be permitted to travel without a mask. *Id.* ¶ 307. Roberts reiterated this information via email, stating that British Air had determined that it was "unable to accept [Plaintiff] for travel according to TSA, [Customs and Border Protection,] and CDC regulations." Dkt. No. 3-37.

After having been denied flights in early 2021, Plaintiff sent another email to Defendant Roberts on December 14, 2021, asking whether he could fly on British Air without a mask, and was told that British Air's mask requirement had not changed. Compl. ¶¶ 310–11; Dkt. No. 3-38.

### E. Defendants Delta and Simon

Delta is "one of the major airlines of the United States." Compl. ¶ 15. At all relevant times, Nathalie Simon was employed by Delta in their Customer Care Department. *Id.* ¶ 51. Plaintiff contacted Delta several times to inquire whether he could travel without a mask and he was told that Delta determines eligibility for a medical exemption at the airport on the day of travel and does not provide advance clearance. Compl. ¶¶ 335–336.; Dkt. No. 3-41 at 7–8. Plaintiff wrote to Delta on January 24, 2021, stating that he had a sensory processing disorder and thus could not wear a mask, and asking whether he could fly without a mask. Dkt. No. 3-41 at 8–9. Plaintiff offered to send his Doctor's Note and provide a recent negative COVID-19 test. *Id.* The following day, Delta responded that it was aligned with the best practice guidelines from the CDC and that "[c]ustomers with medical conditions who are unable to wear a mask without compromising their personal safety w[ere] required to complete a Clearance-to-

Fly process prior to departure at the airport," a process that Delta assured Plaintiff was conducted quickly and privately. *Id.* at 6–7. It appears that Plaintiff received clearance to fly from Delta, as he emailed Delta in April 2021, noting that clearance process went "very smooth[ly]," and thanking them for an "absolutely amazing" flight from Paris to New York. *Id.* at 4–6.

Plaintiff later accused Delta of discrimination. On February 22, 2022, Plaintiff informed Delta that he had an upcoming flight on April 13, 2022, and, with his Doctor's Note attached, requested advance permission to fly maskless, stating that having to obtain a mask exemption at the airport on the day of his flight "creat[ed] a lot of anxiety" and constituted "a form of discrimination." *Id.* at 1–3. Delta responded that while it "would like to offer special consideration in [Plaintiff's] case, [it] must have the same process for all passengers with disabilities that prevent them from wearing masks," and the airline's "Fly Clear process can only be done at the airport on the day of departure." *Id.* at 1; Compl. ¶ 337. Plaintiff's next scheduled Delta flight was the Paris to New York leg of a trip from Bangalore to New York on March 31, 2022. Compl. ¶ 338. When Plaintiff arrived in Paris, however, having completed the Bangalore to Paris leg of his trip with Air France with "anxiety and fear" about the Delta clearance process, Delta refused to allow Plaintiff to travel without a mask. *Id.* ¶¶ 339–343. Ultimately, Plaintiff had to take an Air France flight to New York. *Id.* ¶ 351.

**\*10** Plaintiff complained about his experience to both Delta and the DOT shortly thereafter. *Id.* ¶¶ 354–355; Dkt. No. 3-42. On April 11, Defendant Simon, a Delta customer care representative, responded that Plaintiff had been declined a mask waiver because the third-party provider that oversaw the airline's Clearance to Fly program, Stat-MD,[11] had concluded that Plaintiff's condition—sensory processing disorder—was not a qualifying justification to obtain a mask waiver. Compl. ¶ 355; Dkt. No. 3-42 at 1–2. And on April 13, 2022, after being instructed by DOT to respond to Plaintiff's DOT complaint, Delta wrote Plaintiff again and acknowledged that Plaintiff must have been upset that he was not able to travel as planned "because STAT-MD would not approve a mask exemption for his medical condition," and apologized for any inconvenience. Dkt. No. 3-42 at 1.

Plaintiff alleges that Delta discriminated against him by denying his exemption request. Compl. ¶¶ 361, 724. Plaintiff also alleges that Simon, an employee of Delta in their

Customer Care Department, participated in the alleged discrimination on Delta's behalf. *Id.* ¶ 51; *see also id.* ¶ 725 (alleging that Simon was "complicit in [Delta's] violations of the law" and can be sued because "[i]f a person works for a company that violates the law, they must leave, and/or report them," and Simon's failure to do so "makes her equally responsible").

**F. Defendant Iberia Air**
Iberia Air "is a flagship airline based in Spain with flights to and from the United States." *Id.* ¶ 23. Plaintiff "notified" Iberia Air of his medical disability with a copy of the doctor's letter attesting to his inability to wear a mask. *Id.* ¶ 428. In its September 3, 2021 response, Iberia Air explained that to be exempt from the mask requirement, Plaintiff had to complete an attached medical form, have it signed by his doctor, and submit the form for approval at least three days before departure. *Id.* ¶ 431; Dkt. No. 3-53. Plaintiff alleges that the form "is for people that have medical issues that need a Doctor's [sic] approval to fly," and that his sensory processing disorder "is a sensory issue, not a medical issue that would affect [his] ability to fly." Compl. ¶ 432. Plaintiff alleges that Iberia Air uses the form to obstruct his flying. *Id.* ¶¶ 432, 436.

**G. Defendants JetBlue, Land, and Castleton**
JetBlue "is a mostly domestic airline that flies throughout the United States" and internationally. *Id.* ¶ 24. Robert Land is employed by JetBlue as their "Senior Vice President of Government Affairs and Associate General Counsel." *Id.* ¶ 54. Debbie Castleton is employed by JetBlue in their customer support department. *Id.* ¶ 55.

Plaintiff alleges that he had a flight booked with JetBlue for December 10, 2020. *Id.* ¶ 439. At the airport, he presented the JetBlue check-in staff with his Doctor's Note, but JetBlue did not permit him to board the plane without a mask. *Id.* ¶ 440. Plaintiff ultimately wore a mask during the flight, but alleges that it was "very painful." *Id.* ¶ 442. Plaintiff "never wore a mask on a flight after that experience." *Id.*

Plaintiff complained to the DOT. *See* Dkt. No. 3-16 at 5–8. On January 27, 2021, JetBlue, and specifically Defendant Land, responded to the complaint, stating that JetBlue "allow[ed] no exceptions to the face covering requirement" and "deny[ing] that [the airline's] actions were in violation of DOT regulations." Dkt. No. 3-55 at 1.

It appears, however, that JetBlue changed its policy and began accommodating individuals with disabilities almost immediately thereafter. On February 9, 2021, four days after the DOT Enforcement Notice was issued clarifying that airlines may exempt from the Mask Mandate those whose disabilities prevented them from wearing masks, a JetBlue customer support agent, Defendant Castleton, responded to Plaintiff's complaint to JetBlue's executive office. Dkt. No. 3-54 at 1–2. The email responding to Plaintiff's complaint stated, in pertinent part:

> **\*11** Customers with disabilities who cannot wear a mask, or cannot safely wear a mask because of a permanent disability as defined by the Americans with Disabilities Act may contact us via phone or chat to apply for an exemption from this requirement. Exemptions will be limited on board each flight and will require specific documentation submitted in advance as well as testing and a face shield worn at all times.

*Id.* at 1; Compl. ¶ 771. In addition to his claims against JetBlue, Plaintiff brings claims against Land and Castleton as the individuals who responded to Plaintiff's inquiries and complaints. Compl. ¶¶ 54–55. More specifically, Plaintiff alleges that Land "conspired with others at JetBlue, other airlines, and others to violate Plaintiff's civil rights, and did not intervene to prevent these discriminations [sic], even though he [had] the power to do [so]." *Id.* ¶ 764. As to Castleton, Plaintiff, referencing the language in Castleton's email stating that JetBlue required individuals exempt from the Mask Mandate to wear a face shield, asserts that Castleton made "very clear" that JetBlue would not accommodate Plaintiff and has "not reach[ed] out to the Plaintiff since then to correct" that information. *Id.* ¶¶ 770–772. Like his allegations as to Land, Plaintiff contends that Castleton "conspired with others at JetBlue and other airlines to violate Plaintiff's civil rights, and did not intervene to prevent these discriminations, even though she [had] the power to do [so]." *Id.* ¶ 774.

**H. Defendant Latam**

Latam "is an airline holding company headquartered in Santiago, Chile." *Id.* ¶ 28. As he did with numerous other airlines, Plaintiff notified Latam of his disability with the Doctor's Note and inquired as to whether he could travel maskless. *Id.* ¶ 476. Latam responded on September 3, 2021. *Id.* ¶ 477; Dkt. No. 3-59 at 1. It stated that to obtain a mask exemption, Plaintiff's "doctor must complete the attached form," at which point "the Latam doctors will study it and give you an answer." Compl. ¶ 479; Dkt. No. 3-59 at 1. Latam cautioned however, that because the mask mandate was "an ordinance of the health authorities," airport personnel would have the final say as to whether Plaintiff could fly maskless. Compl. ¶ 479; Dkt. No. 3-59 at 1.

Plaintiff filed a complaint with DOT on the basis of Latam's response, Compl. ¶ 492, alleging that Latam had discriminated against him on the basis of his disability and told him that he would not be permitted to fly, *see* Dkt. No. 3-60 at 2. Latam responded to Plaintiff's complaint by letter dated November 11, 2021. Compl. ¶ 492; Dkt. No. 3-60 at 1. The letter challenged Plaintiff's discrimination claims, and stated that "[u]pon a confirmed reservation, persons with a disability or medical condition who cannot wear a face mask or cannot wear it safely due to a disability or medical condition must send a medical certificate" to Latam's help center at least forty-eight hours before a scheduled flight, at which point Latam would inform the passenger whether he or she could travel without a mask. Dkt. No. 3-60 at 1.

### I. Defendant LOT Air

LOT Air "is a foreign airline based in Poland with flights to and from the United States." Compl. ¶ 29. Plaintiff inquired as to whether he would be permitted to fly maskless with LOT Air, and was informed on September 8, 2021, that to obtain an exemption from the mask mandate, Plaintiff had to submit medical documentation. Dkt. No. 3-61 at 9. Plaintiff responded approximately one month later, on October 12, 2021, with a copy of his Doctor's Note, and asked for confirmation that he would be permitted to fly without a mask. *Id.* at 3; Compl. ¶ 497. LOT Air responded to Plaintiff that same day, stating that "it was possible" for Plaintiff to fly without a mask, but that the final decision was left to gate personnel at the airport. Compl. ¶ 498; Dkt. No. 3-61 at 1. Plaintiff complains that he could not book a flight with LOT Air to fly to Poland, because if he succeeded in being permitted to fly maskless to Poland, he might be unable to leave the country if gate personnel in Poland would not let him board without a mask. Compl. ¶ 500.

### J. Defendant Maroc

**\*12** Maroc "is a foreign airline with flights to and from the United States." *Id.* ¶ 34. Plaintiff asked Maroc multiple times whether he would be permitted to fly without a mask beginning September 2, 2021. *Id.* ¶¶ 544–545. Although Maroc acknowledged receipt of Plaintiff's inquiries through automated emails, Maroc did not substantively respond to his inquiries. *Id.* ¶¶ 545–46; see Dkt. No. 3-66.

### K. Defendant Silver

Silver is a "regional airline" based in the United States. Compl. ¶ 36. Plaintiff emailed Silver on September 2, 2021, stating that he had "a sensory integration disorder" that rendered him unable to wear a mask, and asking whether he would be permitted to fly without a mask with a copy of his Doctor's Note attached. Dkt. No. 3-68 at 1. Silver responded with an email approximately one week later, on September 10, 2021. *Id.*; Compl. ¶ 564. It stated that a "[l]etter from CDC authorizing will be needed for domestic and international flights," and additionally, for international flights, both "CDC authorization and approval from the health department of that specific country," and, seemingly for all flights, a "[n]otice letter to TSA," to consider Plaintiff's request. Dkt. No. 3-68 at 1; *see* Compl. ¶¶ 565–566. Plaintiff complains that the CDC does not provide letters authorizing anyone to fly. Compl. ¶ 565. He alleges that since the demands are "practically impossible" to meet, Silver has prevented him from flying on the basis of his disability. *Id.* ¶¶ 567–568.

### L. Defendant SIA

SIA "is the flag carrier airline of Singapore." *Id.* ¶ 37. Plaintiff emailed SIA on September 3, 2021, informing them of his "sensory integration disorder" with his Doctor's Note attached and inquiring whether he could travel on the airline without a mask. *Id.* ¶ 574; Dkt. No. 3-69. SIA responded on September 6, asking for Plaintiff's booking information. Dkt. No. 3-69 at 2–3. Plaintiff responded that he had not yet booked a flight as he was awaiting an answer from the airline as to whether he could fly maskless. *Id.* at 1–2. On September 8, SIA responded that Plaintiff's Doctor's Note did not qualify him for an exemption. Id. at 1; Compl. ¶¶ 575–576.

### M. Defendant Southwest

Southwest is a U.S.-based airline "that flies throughout the United States, with several routes to international destinations." Compl. ¶ 38. Plaintiff wrote to Southwest

asking whether he would be permitted to fly without a mask. *Id.* ¶ 582. Southwest responded on May 24, 2021, describing requisite documentation needed to obtain a mask exemption: a form requesting an exemption, a signed letter from a physician at least seven days prior to travel, and a negative COVID-19 test within three days of the departure date. *Id.* ¶ 585; Dkt. No. 3-70 at 1, 3. Because Plaintiff had not completed the requisite form, his exemption request was denied. Dkt. No. 3-70 at 7.

Plaintiff filed a complaint with DOT against Southwest, alleging discrimination. Compl. ¶ 582; *see* Dkt. No. 3-70 at 7. Southwest responded, citing the CDC Order and denying any discrimination. Dkt. No. 3-70 at 6–7. Southwest invited Plaintiff to reapply for an exemption with the requisite materials. *Id.* Plaintiff then forwarded Southwest's response to an individual at DOT insisting that Southwest was discriminating against him on the basis of his disability and requesting that DOT "clarify the laws and correct these misinterpretations as soon as possible." *Id.* at 5.

 **\*13** Plaintiff alleges that "Southwest runs routes in many areas where [he] chooses to fly and needs to fly, and [he] would have flown with Southwest if not for these discriminations." Compl. ¶ 591.

### N. Defendant Spirit

Spirit is an airline based in the United States. *Id.* ¶ 39. [12] Plaintiff wrote to Spirit asking whether he would be permitted to fly without a mask. Id. ¶ 595. Spirit responded on September 3, 2021 with details regarding the airline's requirements to obtain an exemption to the mask mandate: that the passenger inform the airline that he would seek a mask exemption forty-eight hours before his flight, arrive at the airport three hours before their scheduled departure time to allow for possible screening by medical experts, present a negative COVID-19 test taken within twenty-four hours of the flight's departure time, and submit either Spirit's medical exemption form completed by a medical professional or a doctor's note on the doctor's official letterhead acknowledging the passenger's disability and listing the doctor's license number and phone number. *Id.* ¶¶ 596, 599–602; Dkt. No. 3-71 at 1–2.

### O. Defendant TAP

TAP is "the airline of Portugal" that services "flights to and from the United States." Compl. ¶ 43. Plaintiff reached out to TAP inquiring whether he would be permitted to travel without a mask multiple times starting on September 2, 2021. [13] Compl. ¶ 638; Dkt. No. 3-75. Plaintiff followed up on October 12 and November 11. Dkt. No. 3-75 at 2, 6–7. On November 11, TAP responded, requesting Plaintiff's booking reference, to which Plaintiff responded that he had not booked a flight with TAP as he was awaiting an answer as to whether he could fly maskless. *Id.* at 5. On November 12, TAP reiterated that it needed Plaintiff's booking information, but added that "to request to be excused for [sic] the use of a face mask for short periods of time," Plaintiff had to submit a Medical Information Form ("MEDIF") within seventy-two hours of departure and a negative COVID-19 test within forty-eight hours of departure. *Id.* at 4; Compl. ¶¶ 639–640. Plaintiff responded that same day, accusing TAP of disability discrimination in violation of the ACAA. Dkt. No. 3-75 at 4. TAP responded on January 11, 2022, stating that passengers with disabilities requesting a mask exemption were "required to fill out [the airline's] form," and clarifying that its testing requirement was not due to Plaintiff's disability but instead government policy for "[a]ll passengers travelling to/from Europe." *Id.* at 3.

Plaintiff alleges that because any exemption would be for "short periods of time," he would not be able to obtain a mask exemption for the duration of a flight to or from Portugal. Compl. ¶ 639. He also reiterates that MEDIFs are "used primarily for people that have medical issues that need a Doctor's approval to fly," and, as Plaintiff has sensory process disorder, which "is a sensory issue, not a medical issue that would affect [his] ability to fly," TAP's requirement was discriminatory. *Id.* ¶ 641.

### P. Defendant United

 **\*14** United is a U.S.-based airline that services flights both domestically and abroad. *Id.* ¶ 45. Plaintiff alleges that he was denied access to fly by the airline on or about December 18, 2020 due to his inability to wear a mask after providing United with a copy of his Doctor's Note. *Id.* ¶¶ 659–660. On December 17, United stated that it had determined, "based on a review of current medical knowledge and CDC guidance," that "the possibility of asymptomatic transmission of Covid-19" constituted "a direct threat to the health and safety of [its] passengers," a threat which could only be mitigated if each passengers wore a face mask. Dkt. No. 3-77 at 2. In response, Plaintiff informed United that he would file a complaint against it for disability discrimination. *Id.* United replied, reiterating its policy and denying that it had violated any federal disability laws. *Id.* at 1; Compl. ¶ 661.

Plaintiff then filed his complaint with DOT. When United received notice of the complaint, it emailed Plaintiff stating that it was adhering to the directives of the CDC and reiterating that it had not violated federal disability law. Dkt. No. 3-78.

Plaintiff alleges that he "frequently flew with United, and would have flown with United" had they exempted him from the mask requirement. Compl. ¶ 667. Plaintiff further alleges that until the Mask Mandate was lifted, "United continued to refuse Plaintiff access to fly," depriving him of business opportunities. *Id.* ¶ 662.

### Q. Defendant Volaris

Volaris "is a Mexican low-cost airline based in Santa Fe, Álvaro Obregón, Mexico City." *Id.* ¶ 47. Plaintiff notified Volaris of his inability to wear a mask with a copy of his Doctor's Note. *Id.* ¶ 678. In its initial response on October 1, 2021, Volaris informed Plaintiff that he would be required to wear a mask during the flight. *Id.* ¶¶ 679–680; Dkt. No. 3-80 at 1. However, and although Plaintiff does not mention this in his Complaint, his correspondence with Volaris appended to the Complaint reveals that Volaris changed its policy in the following month. On November 9, 2021, Volaris informed Plaintiff that he could request a mask exemption by submitting a signed doctor's letter attesting to Plaintiff's condition and the "[d]ates of incapacity" on official letterhead. Dkt. No. 3-80 at 3–4.

### IV. Plaintiff's Injuries

As noted above, Plaintiff flies frequently. Compl. ¶ 803; *see* Dkt. No. 3-83 (Plaintiff's flight itineraries for January through March of 2020). Plaintiff alleges that each of Defendants, individually and as a group, denied Plaintiff his right to travel on the basis of his disability.[14] Compl. ¶ 810. More specifically, Plaintiff alleges that he "was banned from traveling, and/or the process to get permission to travel was so complicated and/or expensive that it was not an option for Plaintiff." *Id.* ¶ 811.

Plaintiff asserts that he suffered several forms of injury from Defendants' alleged conduct. "Not allowing [Plaintiff's] business-related travel caused him severe financial damages" amounting to "billions of [d]ollars" of losses, due to both Plaintiff's inability to work due to his inability to travel, and lost lucrative prospective business opportunities. *Id.*

¶¶ 813–814, 825–827.[15] He also alleges that his business prospects required him to fly domestically to California, Florida, Texas, and Illinois, and internationally to England, Switzerland, Israel, India, Saudi Arabia, and the UAE, as well as many other destinations. *Id.* ¶ 838. As a result, Plaintiff alleges that he "ran out of money for basic life expenses." *Id.* ¶ 833. Plaintiff also alleges non-monetary harm from Defendants' alleged conduct: Plaintiff contends that "[n]ot allowing him his leisure travel is a violation of his rights and discrimination, [sic] and can cause serious anxiety, depression, and/or mental illness." *Id.* ¶ 808. Moreover, in his pursuit to fly maskless, Plaintiff was often "shamed publicly, and his personal information became public." *Id.* ¶ 812.

 **\*15**  Plaintiff asserts that this harm is continuing, *id.* ¶ 814, despite the fact that the Mask Mandate has terminated. In addition to injunctive and declaratory relief, he seeks actual, nominal, and punitive damages for the alleged discrimination he suffered. *See generally id.*

### PROCEDURAL HISTORY

Plaintiff filed this Complaint on May 1, 2023, in the United States District Court for the Northern District of Texas. Dkt. No. 3. By order of May 8, 2023, the District Court for the Northern District of Texas *sua sponte* transferred the case to this Court. Dkt. No. 10.

Plaintiff brings thirty-eight claims. Several counts concern only the Government Defendants or other non-moving Defendants, and thus are not addressed here. Counts One, Compl. ¶¶ 867–880, Two, *id.* ¶¶ 881–887, and Three, *id.* ¶¶ 888–896 allege various violations of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* against the CDC and HHS; Counts Four, *id.* ¶¶ 897–903, and Five, *id.* ¶¶ 904–910, allege unconstitutional delegation of legislative power in violation of Article I of the United States Constitution against the CDC and HHS and against the President of the United States in connection with the Executive Order; and Count Six, *id.* ¶¶ 911–917, alleges violation of the separation of powers doctrine and the Tenth Amendment in connection with the President's Executive Order. Count Thirty-Eight alleges violations of the non-delegation doctrine against the Government Defendants. *Id.* ¶¶ 1349–1363. One count, Count Thirty-Five, *id.* ¶¶ 1310–1318, asserts medical malpractice by what Plaintiff calls the "medical defendants"—the private companies that some airlines contracted with to administer their mask exemption policies.

This Opinion is addressed to the remaining claims—asserted under both federal and state law—insofar as they are brought against the Moving Defendants. [16] Count Seven, *id.* ¶¶ 918–931, alleges violations of 42 U.S.C. § 1983; Count Eight, *id.* ¶¶ 932–998, alleges violations of 42 U.S.C. § 1985; and Count Nine, *id.* ¶¶ 986–1002, alleges violations of 42 U.S.C. § 1986. Counts Ten through Eighteen allege violations of various provisions of the ACAA, *see id.* ¶¶ 1003–1124, and Count Nineteen, *id.* ¶¶ 1125–1150, alleges violations of the Rehabilitation Act, 29 U.S.C. §§ 720 *et seq.* Counts Twenty through Twenty-Six allege violations of various state and city anti-discrimination laws. *Id.* ¶¶ 1151–1227. Counts Twenty-Seven through Twenty-Nine, *id.* ¶¶ 1228–1248, and Counts Thirty-Three, and Thirty-Six, *id.* ¶¶ 1285–1295, and Thirty-Six, *id.* ¶¶ 1319–1328, allege various torts each arising from the laws of four different states: New York, New Jersey, California, and Texas. [17] Counts Thirty through Thirty-Two allege contract or quasi-contract claims arising from the laws of those same four states. *Id.* ¶¶ 1249–1284. Count Thirty-Four alleges violation of Plaintiff's right to privacy under the United States Constitution, the constitutions of various states, and state law. *Id.* ¶¶ 1296–1309. Finally, Count Thirty-Seven alleges infringement of Plaintiff's constitutional right to travel. *Id.* ¶¶ 1329–1348.

**\*16** In late 2023, Moving Defendants filed their motions to dismiss. The Domestic Defendants filed their motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), along with a memorandum of law in support on October 30. Dkt. Nos. 121–22. [18] Plaintiff filed his opposition to the motion to dismiss on November 16. Dkt. No. 172. The Domestic Defendants filed a reply brief in further support of their motion on November 28. Dkt. No. 199.

Silver moved to dismiss the Complaint for failure to comport with Rule 8 and for failure to state a claim under Rule 12(b)(6) on November 1, 2023, along with a memorandum of law in support of its motion. Dkt. Nos. 130, 132. But in its briefing, Silver did not make any arguments regarding Plaintiff's failure to state claims, contending only that the Complaint failed to comport with Rule 8's requirements as to form. Dkt. No. 132. Instead, it sought to join the Domestic Airlines' and Domestic Individuals' 12(b)(6) arguments. Dkt. No. 220. The Court accordingly treats Silver as having joined the Domestic Defendants' motion to dismiss. Plaintiff filed his opposition to Silver's motion on November 16. Dkt. No. 170. Silver filed a reply in support of dismissal on November 27. Dkt. No. 189.

The Foreign Defendants moved to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) and, as to Defendant Roberts, lack of personal jurisdiction under Rule 12(b)(2) on November 20. Dkt. Nos. 179-180. Plaintiff opposed the motion on November 22. Dkt No. 194. The Foreign Defendants filed a reply memorandum on December 12. Dkt. No. 228.

## LEGAL STANDARD

Moving Defendants challenge every cause of action Plaintiff levels against them principally on grounds that the Complaint fails to state a claim for relief under Rule 12(b)(6). One Defendant argues that the Complaint fails to comport with the form requirements of Rule 8. [19] In addition, Domestic Defendants challenge Plaintiff's standing. [20]

**\*17** In considering a motion to dismiss pursuant to Rule 12(b)(6), a "court must accept the material facts as alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (quoting *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836 (1994)). However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

When adjudicating a motion to dismiss under Rule 12(b)(6), the court considers not only the well-pleaded allegations of the complaint but documents incorporated by reference and "matters of which judicial notice may be taken." *Chambers*

*v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order).

The Court ordinarily construes *pro se* pleadings broadly and liberally, interpreting them so as to raise the strongest arguments they suggest. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000). And this obligation rings "especially true when dealing with *pro se* complaints alleging civil rights violations." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146 (2d Cir. 2002); *see also Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001) (same). However, while the Court construes *pro se* pleadings liberally, *pro se* plaintiffs are not relieved of the requirement that they plead facts that raise a right to relief above a speculative level. *See Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007) ("[*P*]*ro se* status does not relieve a plaintiff of the pleading standards otherwise prescribed by the Federal Rules of Civil Procedure."). And, in this case, Plaintiff is entitled to somewhat lesser solicitude because of his extensive experience with and schooling in the law as it applied to motions to dismiss and mask mandates and other public health measures taken to slow the spread of COVID-19. *See Sledge v. Kooi*, 564 F.3d 105, 109-110 (2d Cir. 2009) (discussing circumstances where frequent *pro se* litigant may be charged with knowledge of particular legal requirements); *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010).[21]

## DISCUSSION

**\*18**  Plaintiff brings a series of claims under both federal and state law. Moving Defendants contend that the Plaintiff fails to state a claim for each. Dkt. Nos. 122, 180, 197. Moving Defendants also contend that the state law claims are preempted by several federal laws. The Court addresses each of Plaintiff's claims *in seriatim*, breaking briefly between the federal and state law claims to discuss general preemption principles.

## I. 42 U.S.C. § 1983 Claim

Count Seven of the Complaint[22] alleges that the Airline Defendants and their employees, among others,[23] violated 42 U.S.C. § 1983 by discriminating against him on the basis of his disability. Compl. ¶¶ 918–931. Section 1983

"provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). It was enacted "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Plaintiff claims that the Airline Defendants acted under color of law, Compl. ¶¶ 922–924, because they were recruited by the Government to enforce the Mask Mandate, *id.* ¶ 924, and because flight crews utilized "quasi police power," protected by federal statutory law, while on the plane, *id.* ¶¶ 925–926. Moving Defendants contend that Plaintiff's claim fails as a matter of law because he has not demonstrated state action sufficient to trigger 1983, *see* Dkt. Nos. 180, 198.

Section 1983 provides that an action may be maintained against a "person" who has deprived another of rights independently secured by the "Constitution and laws." 42 U.S.C. § 1983. To successfully plead a § 1983 claim, a plaintiff must allege two elements. First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* It is well established that airlines and their staff "are private, not state, actors." *Blythe v. Southwest Airlines Co.*, 383 F. App'x 766 (10th Cir. 2010); *see Sanchez-Naek v. Tap Port., Inc.*, 260 F. Supp. 3d 185, 192 n.1 (D. Conn. 2017); *see also Berlin v. JetBlue Airways Corp.*, 436 F. Supp. 3d 550, 563–64 (E.D.N.Y. 2020); *Mapp-Leslie v. Norwegian Airlines*, 2020 WL 264919, at \*2 (E.D.N.Y. Jan. 17, 2020). Accordingly, Plaintiff must show that the defendants were nonetheless acting "under color of state law," and thus are subject to liability under § 1983. Importantly, "a private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.' " *Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012) (quoting *Cranly v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)). "Rather, 'there must be such a close nexus between the state and the challenged action' that the state is 'responsible for the specific conduct of which the plaintiff complains.' " *Id.* (quoting *Cranley*, 318 F.3d at 111). As the Second Circuit has explained, *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (per curiam), the actions of nominally private entities are

attributable to the state when those actions meet one of three tests:

**\*19** (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (alterations in original) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). The Court "begin[s] the fair attribution inquiry by identifying 'the specific conduct of which the plaintiff complains, rather than the general characteristics of the entity.' " *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (quoting *Fabrikant*, 691 F.3d at 207). Importantly, "even extensive regulation by the government does not transform the actions of the regulated entity into those of the government." *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 (1987). Here, Plaintiff alleges that the airlines discriminated against him by not permitting him to fly maskless upon presentation of his Doctor's Note, in violation of his constitutional rights and federal law. Thus, the ultimate issue that the Court addresses is whether the decisions of Moving Defendants to require him to wear a mask or otherwise comply with their policies is fairly attributable to the state so as to subject Moving Defendants to the strictures of the Constitution.

The Complaint fails to satisfy any of the three tests. To satisfy the compulsion test, "plaintiff must allege 'actual coercion' by a state actor that impacts upon the private actor's decision-making." *O'Brien v. Carrier Coach, Inc.*, 2006 WL 692409, at \*3 (W.D.N.Y. Mar. 6, 2006) (collecting cases) (rejecting a Section 1983 claim even though the plaintiff alleged that the defendant's business "depend[s] upon a certain amount of governmental aid," and is "conducted according to policies which 'are greatly influenced and/or shaped by state and/ or federal statutes and regulations.' " (citations omitted)). "A private entity ... is not a state actor where its conduct is not compelled by the state but is merely permitted by ...

law." *Dawkins v. Biondi Educ. Ctr.*, 164 F. Supp. 3d 518, 526 (S.D.N.Y. 2016). "[T]he state must be involved ... with the activity that caused the injury. Putting the point another way, the state action, not the private action must be the subject of the complaint." *Powe v. Miles*, 407 F.2d 73, 81 (1968). The state must have "exercised coercive power or ... provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Hernandez v. City of New York*, 2022 WL 316938, at \*5 (S.D.N.Y. Feb. 2, 2022) (quoting *Doe v. Rosenberg*, 996 F. Supp. 343, 348-49 (S.D.N.Y. 1998)). Even if a private entity is funded by the state and subject to extensive state regulation, its decision does not become state action. *See, e.g.*, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974); *McGugan*, 752 F.3d at 229–31. This rule has been applied to airlines specifically. *See Anderson v. USAir, Inc.*, 812 F.2d 49, 56 (D.C. Cir. 1987) ("USAir is not transformed into a government actor by regulation.").

**\*20** Plaintiff does not allege compulsion here. Plaintiff does not allege that the state had any involvement in the decision of any of the Moving Defendants to apply their mask policies to him or provided any encouragement to the Moving Defendants to do so. From the Complaint and appended documents, each airline's unique mask exemption policy was a function of its individual interpretation of the CDC Order and the DOT Enforcement Order and generalized decision-making. Each of the Moving Defendants acted autonomously with respect to his requests, setting forth their own requirements and policies for exemptions to the Mask Mandate. *Cf. McGugan*, 752 F.3d at 239; *Doe v. Harrison*, 254 F. Supp. 2d 338, 342 (S.D.N.Y. 2003).[24]

Plaintiff also does not allege the type of "pervasive entanglement" necessary to satisfy the joint action or close nexus test.[25] To "assure that constitutional standards are invoked only when it can be said that the [s]tate is responsible for specific conduct of which the plaintiff complains," *see, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), "[i]t is not enough ... for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff, ... [r]ather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*' giving rise to the action," *Sybalski*, 546 F.3d at 257–58 (emphasis in original) (quoting *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977)). "A private actor can only be a willful participant in joint activity with the [s]tate or its agents if the two share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014)

(internal quotation marks omitted). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [state]." *Forbes*, 2008 WL 3539936, at \*5 (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). The existence of governmental regulations, standing alone, does not create the requisite entwinement. *See, e.g.*, *Blum*, 457 U.S. at 1004. Similarly, the fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action. *Rendell-Baker*, 457 U.S. at 840–42; *see S.F. Arts & Athletics*, 483 U.S. at 544 ("The Government may subsidize private entities without assuming constitutional responsibility for their actions."); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009); *Fabrikant v. French*, 691 F.3d at 207 ("[A] private entity does not become a state actor ... merely on the basis of the private entity's creation, funding, licensing, or regulation by the government."). Nor is a private entity's "undertak[ing] to perform a service for the government" sufficient. *Anderson v. USAir*, 818 F.2d 49, 56 (D.C. Cir. 1987).

 **\*21** Here, not only is there no allegation that the Airline Defendants contracted with the government, Plaintiff alleges no facts that could support a finding of largely overlapping identity between the state and the defendant entities that Plaintiff contends acted under color of law. Plaintiff's allegations that flight crews exercise a "quasi police power," Compl. ¶ 925, fail because courts have consistently held that "[t]he provision of information to or summoning of police officers, even if that information ... results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of § 1983," *Young v. Suffolk County*, 705 F.2d 183, 196 (E.D.N.Y. 2010) (Bianco, J.); *see also Ginsberg*, 189 F.3d at 272; *Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 325–26 (7th Cir. 1978), *cert. denied*, 444 U.S. 841 (1979).

Finally, Plaintiff does not satisfy the public function test. To satisfy the public function test, "the government must have traditionally *and* exclusively performed the function." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019); *see Jacobson v. Kings Cnty. Democratic Cnty. Comm.*, 788 F. App'x 770 (2d Cir. 2019) (summary order); *Steele-Warrick v. Microgenics Corp.*, 2023 WL 3959100, at \*5 (E.D.N.Y. June 12, 2023). "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action.' " *S.F. Arts & Athletics*, 483 U.S. at 545 (quoting *Rendell-Baker*, 457 U.S. at 842). "[A]

private entity may be considered a state court [only] when it exercises a function 'traditionally exclusively reserved to the State.' " *Manhattan Cmty. Access Corp.*, 587 U.S. at 804 (quoting *Jackson*, 419 U.S. at 352). "It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way." *Id.* at 810. The Plaintiff does not allege, nor could he, that the operation of airlines in the United States has been traditionally and exclusively reserved to the government. [26]

Plaintiff alleges that "flight crew[s] believe that they have ... a quasi police power while on the plane," and that, if violations of airline policy occur on a flight, "[t]he people enforcing the law until the police [arrive] and the ones calling the police[ ] are the flight attendants and the pilots. Compl. ¶¶ 925, 928. However, "the mere fact that a private actor [requested and] received police assistance is not sufficient to transform that private actor's conduct into state action for § 1983 purposes." *See, e.g.*, *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (citing *Ginsberg*, 189 F.3d at 272); *see also Anderson*, 818 F.2d at 190 (airline not transformed into government actor by intervention of Federal Aviation Administration police to remove party from plane). Insofar as Plaintiff alleges that flight crews themselves act as police, *see* Compl. ¶¶ 925–929, "courts have consistently held that the mere fact that an individual's job involves the investigation of crime does not transform him into a government actor," *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1457 (10th Cir. 1995) (quoting *United States v. Garlock*, 19 F.3d 441, 443–44 (8th Cir. 1994)); *see also Ginsberg*, 189 F.3d at 272. "This is true even when the government requires that certain security measures be taken." *Gallagher*, 49 F.3d at 1457. Plaintiff also implies that the flight crews had discriminatory motive, Compl. ¶ 924, but "one's motivation is irrelevant to the determination of whether one is a state actor," *Young v. Suffolk County*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010) (citing *Kash v. Honey*, 38 F. App'x 73, 75–76 (2d Cir. 2002) (summary order)).

 **\*22** In conclusion, the Court finds that Plaintiff has failed to plausibly allege that Moving Defendants are state actors, and thus his 1983 claim fails as a matter of law. *See, e.g.*, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982) ("Action by a private party pursuant to [1983], without something more, was not sufficient to justify a characterization of that party as a 'state actor.' "). The Court thus need not consider whether Plaintiff adequately pled a deprivation of rights, the second element necessary to plead a 1983 claim.

## II. 42 U.S.C. § 1985 Claim

In Count Eight, Plaintiff alleges that all Defendants engaged in a conspiracy with one another to interfere with his civil rights by depriving him of his right to fly in violation of 42 U.S.C. § 1985. Compl. ¶¶ 932–985. In particular, Plaintiff alleges he was discriminated against based on his membership in the class of "those with disabilities towards masks," *id.* ¶ 940; *see also id.* ¶ 945, analogizing to "[m]entally disabled people, a sub-category of disabled people," *id.* ¶ 939, a group he alleges constitutes a protected class. He claims that he "expect[s] to prove through discovery that the Airline Defendants conspired—with each other, other air carriers, and within their own companies—to ban disabled flyers because of a discriminatory motive." *Id.* ¶ 961. He also claims that the conspiracy involved "the constitutional right to travel." *Id.* ¶ 969. He alleges that the parties all "had a clear understanding between all of them that they will together not allow passengers to fly without a mask, even though they are disabled and cannot wear a mask." *Id.* ¶ 971.

Section 1985(3) provides, in pertinent part, as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws [those persons shall be liable for damages to a person who is] injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States.

42 U.S.C. § 1985(3). To make out a claim under Section 1985(3), the plaintiff must adequately allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States."

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam). In adopting the predecessor to Section 1985(3), Congress's "central concern" was to "combat[] the violent and other efforts of the [Ku Klux] Klan and its allies to resist and to frustrate the intended affects of the Thirteenth, Fourteenth, and Fifteenth Amendments." *United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 837 (1983). The statutory "language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Thus, the conspiracy must "be motivated by 'some racial or ... [other] discriminatory animus.' " *Mian*, 7 F.3d at 1087–88 (quoting *Scott*, 463 U.S. at 829); *see also Mira v. Kingston*, 715 F. App'x 28, 30 (2d Cir. 2017) (summary order), *cert. denied*, 139 S. Ct. 126 (2018); *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (Section 1985(3) requires evidence "that the actions of the individual [defendants] were motivated by racial animus or ill-will"); *Thomas v. DeCastro*, 2019 WL 1428365, at *7 (S.D.N.Y. Mar. 29, 2019) ("Under Section 1985, [a p]laintiff must make 'a showing of class-based invidiously discriminatory animus' on the part of the conspiring parties, as well as provide 'some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end.' " (citations omitted)); *Gong v. Sarnoff*, 2023 WL 4561800, at *10 (S.D.N.Y. July 17, 2023). In order to allege a claim under Section 1985(3), plaintiff must allege the existence of a qualifying class and that the alleged co-conspirators were animated by a "class-based, invidiously discriminatory animus," *i.e.*, that the co-conspirators committed to their course of conduct "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272 (1993) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). The plaintiff must also allege "that the conspiracy 'aimed at inferring with rights' that are 'protected against private, as well as official, encroachment,' " *id.* (quoting *Scott*, 463 U.S. at 833), *i.e.*, the right must be "consciously targeted and not just incidentally affected," *Spencer v. Casavilla*, 44 F.3d 74, 78 (2d Cir. 1994); *see also id.* at 79 (impairment of the right must be the conscious objective of the conspiracy).

**\*23** At the outset, Domestic Defendants argue that Plaintiff cannot plead a claim under Section 1985(3) because "disability discrimination claims by disabled airline

Case 2:22-cv-02383-SSS-AS  Document 229-1  Filed 04/12/24  Page 19 of 56  Page ID
#:5208
AARON ABADI, Plaintiff, v. AMERICAN AIRLINES, INC., et al., Slip Copy (2024)

passengers are exclusively governed" by a separate federal statute, the ACAA. Dkt. No. 122 at 8. In *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366 (1979), the Supreme Court held that Section 1985(3) could not be used to enforce rights created solely by Title VII of the Civil Rights Act of 1964. *Id.* at 378. The Court observed that recognition of a plaintiff's ability to enforce through Section 1985(3) a right created by Title VII would permit a plaintiff to circumvent the "detailed administrative and judicial process designed to prove an opportunity for nonjudicial and nonadversary resolution of claims." *Id.* at 372–73; *see id.* at 375–76 ("If a violation of Title VII could be asserted through § 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of the law."). In *Sherlock v. Montefiore Medical Center*, 84 F.3d 522 (2d Cir. 1996), the Second Circuit extended *Novotny* to claims brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq. Id.* at 527. The court stated that the existence of a "similar mechanism for enforcement and conciliation of claims under the ADEA [as under Title VII] persuades us that a violation of the ADEA likewise cannot be the basis for a claim under § 1985(3)." *Id.*; *see also Sauter v. Nevada*, 142 F.3d 445 (9th Cir. 1998) (deeming Section 1985(3) unavailable to enforce statutory rights under ADA and ADEA "when the statute in question has its own remedial structure").

Defendants' argument is not persuasive.[27] The Court did not base its decision in *Novotny* solely on the fact that an alternative administrative remedy was available for the complainant. It based its decision on the fact that the right asserted to be enforced through Section 1985(3) did not exist independently of Title VII. 442 U.S. at 378; *see also id.* at 376 ("The right [the plaintiff] claims under § 704(a) did not even arguably exist before the passage of Title VII."). Thus, the case did not involve any claim of "implied repeal." *Id.* at 377. In effect, the right created by Title VII was part-and-parcel of the remedial regime Congress created to enforce it. A plaintiff could not assert that congressionally created right without following the congressionally created process for enforcing it.

In this case, however, Plaintiff does not rest his Section 1985(3) claim solely on a congressionally-created right to be free from discrimination in airline travel. He asserts a constitutionally-protected right to be able to travel interstate, a right that the Supreme Court has stated is "secured against interference from any source whatever, whether governmental or private." *United States v. Guest*, 383 U.S.

745, 759 n.17 (1966); *see Saenz v. Roe*, 526 U.S. 489, 498 (1999) (the right to interstate travel "is so important that it is 'assertable against private interference as well as governmental action ... a virtually unconditional personal right, guaranteed by the Constitution to us all' " (quoting *Shapiro v. Thompson*, 394 U.S. 618, 643 (1969) (Stewart, J., concurring))).[28] His claim is thus analogous to those where courts have held that a plaintiff can bring independently a claim under Section 1985(3) for a right protected by the Constitution. *See, e.g., Stevenson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2022 WL 179768, at *15 (W.D.N.Y. Jan. 20, 2022) (citing cases). It may be that Congress created an administrative process for Plaintiff to enforce his rights under the ACAA. There is no indication that, in passing the ACAA, Congress intended to foreclose a plaintiff from asserting an independent claim for conspiracy to violate his right to interstate travel because of his membership in a protected class. *Cf. Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*, 651 F. Supp. 3d 695, 706–07 (S.D.N.Y. 2023) (holding that a plaintiff may pursue remedies under RFRA and Title VII simultaneously).[29]

**\*24** Plaintiff's claim under Section 1985(3) fails for a different reason—because he is unable to plead the elements of a claim under that statute. Specifically, Plaintiff cannot satisfy the existence of a conspiracy, the first element of 1985(3) claim, or that Defendants engaged in the conspiracy for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws.

There is some division of authority regarding whether Section 1985(3) protects against discrimination based on disability. A number of courts outside the Second Circuit have held that disabled persons do not constitute a "class" within the meaning of Section 1985(3). *See Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000) (holding that Section 1985(3) "does not cover claims based on disability-based discrimination or animus"); *D'Amato*, 760 F.2d at 1486 (holding that the disabled are not a class under Section 1985(3) because "[t]he handicapped as a class differ radically from the racially-based animus motivating the Ku Klux Klan and white supremacists against which Congress directed Section 1985(3)"); *Wilhelm v. Cont'l Title Co.*, 720 F.2d 1173, 1177 (10th Cir. 1983) ("[A] class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now § 1985(3)."); *see also Serris v. Chastaine*, 2022 WL 715115, at *3 (E.D. Cal. Mar. 10, 2022), *report and recommendation adopted*, 2022 WL 801427 (E.D. Cal. Mar.

16, 2022) ("Disabled individuals do not constitute a 'class' within the meaning of section 1985(3)."); *Andreadakis v. Ctr. for Disease Control & Prevention*, 2022 WL 2674194, at *9 (E.D. Va. July 11, 2022).

On the other hand, the Third Circuit has held that individuals with mental disabilities are a qualifying class under Section 1985(3), *see Farber v. City of Paterson*, 440 F.3d 131, 137 (3d Cir. 2006); *Lake v. Arnold*, 112 F.3d 682, 686 (3d Cir. 1997), and the Eighth Circuit has stated that "§ 1985(3)'s protection extends to the handicapped as a class as well as to females," *Larson by Larson v. Miller*, 55 F.3d 1343, 1352 (8th Cir.), *reh'g granted, judgment vacated sub nom. Larson v. Miller*, 67 F.3d 148 (8th Cir. 1995), and *on reh'g*, 76 F.3d 1446 (8th Cir. 1996).

The Second Circuit stated in 1982 that the claim that the "mentally retarded"[30] were a class protected by section 1985(3) was "colorable." *See People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 42 (2d Cir. 1982), *vacated on other grounds sub nom. People of State of N.Y. by Abrams v. 11 Cornwell Co.*, 718 F.2d 22 (2d Cir. 1983). The decision has never been overruled or questioned by the Second Circuit. A number of district courts in this Circuit subsequently held that disabled individuals are a class falling within the protection of Section 1985(3). *See Lalonde v. City of Ogdensburg*, 2023 WL 2537626, at *16 (N.D.N.Y. Mar. 16, 2023); *Doe v. Yorkville Plaza Assocs.*, 1994 WL 509903, at *9 (S.D.N.Y. Sept. 19, 1994); *Trautz v. Weisman*, 819 F. Supp. 282, 290 (S.D.N.Y. 1993); *cf. B.D.S. v. Southold Union Free Sch. Dist.*, 2009 WL 1875942, at *20 n.8 (E.D.N.Y. June 24, 2009) (stating in dicta that "the Second Circuit has recognized mental disability as a class protected by Section 1985, and, thus, it logically follows that persons with other types of disabilities, i.e., learning and developmental disabilities, would also be part of a class protected by Section 1985") (internal citations omitted). However, other circuits have disagreed. *See, e.g., Fitzpatrick v. Town of Falmouth*, 321 F. Supp. 2d 119, 124 (D. Me. 2004) (stating that there is a disagreement among the Circuits whether Section 1985 covers disability discrimination and holding that it does).

**\*25** The Second Circuit has resisted an interpretation of Section 1985(3) that would limit it to "protecting only [African-Americans] and other analogously oppressed minorities [as] untenable in light of the history of the Act." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Keating v. Carey*, 706 F.2d 377, 387 (2d Cir. 1983)). At the same time, it has held that a class must possess "inherited or

immutable characteristics" for it to be "sufficient to satisfy the class-based animus requirement." *Id.*

The Court need not decide in this case whether the disabled are a qualifying class under Section 1985(3). *See, e.g., Griffin*, 403 U.S. at 103 n.9; *Andreadakis*, 2022 WL 2674194, at *8. The Complaint contains no well-pleaded allegations to support the conclusion of conspiracy, or an agreement to violate a federal right, or invidious discrimination.

"A conspiracy is an agreement between two or more individuals where one acts in further of the objection of the conspiracy and each member has knowledge of the nature and scope of the agreement." *Morpurgo v. Incorporated Village of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (summary order). "In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.' " *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003), *cert. denied*, 54 U.S. 1110 (2004) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)); *see Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement—with one another."). A plaintiff must allege "specific facts relating to the purported conspiracies." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 308 (S.D.N.Y. 2013). "It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' " *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993)); *see San Filippo v. U.S. Tr. Co. of N.Y., Inc.*, 737 F.2d 246, 256 (2d Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985) ("[C]onclusory allegations of conspiracy are insufficient to survive ... a 12(b)(6) motion for dismissal."); *see also Taranto v. Putnam County*, 2023 WL 6318280, at *12 (S.D.N.Y. Sept. 28, 2023) (dismissing complaint for failure to sufficiently plead conspiracy); *Gropper v. Fine Arts Hous., Inc.*, 12 F. Supp. 3d 664, 671–72 (S.D.N.Y. 2014) (same); *Brooks v. County of Nassau*, 54 F. Supp. 3d 254, 259 (E.D.N.Y. 2014) (same); *Roffman v. City of New York*, 2002 WL 31760245, at *5–6 (S.D.N.Y. Dec. 10, 2002) (same); *Arroyo-Horne v. City of New York*, 2019 WL 3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020) (summary order) (dismissing 1985 conspiracy claim where the complaint did "not provide any allegations or include any facts from which

Case 2:22-cv-02383-SSS-AS   Document 229-1   Filed 04/12/24   Page 21 of 56   Page ID
#:5210
AARON ABADI Plaintiff, v. AMERICAN AIRLINES, INC., et al., Slip Copy (2024)

the Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of the laws or equal privileges and immunities under the laws"); *Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003), *aff'd sub nom.*, *Friends of Gong v. Pac. Culture*, 109 F. App'x 442 (2d Cir. 2004) (summary order) (finding that the plaintiff failed to adequately plead a 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy among the various defendants" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

**\*26**  Plaintiff alleges that "the Airline Defendants conspired—with each other, other carriers, and within their own companies—to ban disabled flyers because of a discriminatory motive." Compl. ¶ 961. He further alleges that "[t]he airline defendants that discriminated against Plaintiff, the federal agencies and lawyers, that encouraged, instigated, and/or aided and abetted and the others were all conspiring with others to deprive this Plaintiff of his civil rights, in violation of his section." *Id.* ¶ 966. But as these assertions lack any factual foundation, they are merely conclusory allegations "masquerading as factual conclusions." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (quoting *Smith v. Loc. 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)); *see also O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1184 (N.D. Cal. 2022), *aff'd sub nom., O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (finding that "generalized statements about [a private entity and the government] working together ... do not support an inference of an illegal conspiracy"). "Although Plaintiff makes some allegations of relationships between the alleged co-conspirators, [he] has done so by way of freewheeling and speculative allegations which fail to raise a reasonable inference of a conspiracy." *Morpurgo*, 697 F. Supp. 2d at 340. There are forty-six Airline Defendants, domestic and foreign, covering virtually every flight route in the world. It is implausible that each of them conspired with the other. There are "no specific factual allegations respecting a meeting of the minds, specific communications between the [alleged conspirators], or even concerted activities or coordinated efforts between them." *Johnson v. City of New York*, 669 F. Supp. 2d 444, 451 (S.D.N.Y. 2009).

Construing the complaint liberally, as the Court must do for a *pro se* litigant, the most that Plaintiff is able to plead is that all, or virtually all, of the Airline Defendants applied their Mask Mandate policies to him at approximately the same time. But the Supreme Court has instructed that parallel

conduct alone, "without some further factual enhancement," is insufficient to establish a meeting of the minds or to state a claim for conspiracy. *Twombly*, 550 U.S. at 556; *Seklecki*, 635 F. Supp. 3d at 23; *Adreadakis*, 2022 WL 2674194, at \*9. "[L]awful parallel conduct fails to bespeak unlawful agreement." *Twombly*, 550 U.S. at 556. And here, it would have been "natural" and "rational" for each of the airlines, acting alone, to adopt the policies each of them adopted. *Id.* at 566. The President of the United States had issued an Executive Order advising that masking while traveling could mitigate the spread of COVID-19, Dkt. No. 3-6 § 1, and the CDC had adopted the Mask Mandate, applicable to each of the airlines—foreign and domestic—requiring them to use their "best efforts to ensure" that any person on their flights wear a mask when boarding, disembarking, and for the duration of travel. Compl. ¶ 99; CDC Order at 9. Although the Mask Mandate exempted individuals with disabilities, CDC Order at 5, it also permitted airlines to take other measures to ensure passenger safety, including requiring the person requesting an exemption to obtain a negative COVID-19 test, to obtain medical documentation by a licensed medical provider, and to request an accommodation in advance, CDC Order at 4 n.8. In those circumstances, it would be surprising if any individual airline did not impose the requirements that the Airline Defendants imposed on any person requesting an exemption. There also is nothing suspicious, or supportive of conspiracy, in that many of the Airline Defendants responded to Plaintiff approximately around the same date. From the Complaint and the documents appended thereto, it appears that Plaintiff sent requests for mask exemptions to most of the Airline Defendants on or around September 1, 2021. The timing of the responses he received were a function of the timing of his requests, and not a function of any pre-existing agreement among the Defendants, or a reflection of the time each airline formulated its specific policy. Indeed, the Complaint's allegations strongly suggest independent action. Although certain of the airlines followed the same policies, many did not. *Compare* Delta Mask Exemption Policy, Compl. ¶¶ 335–337 (requiring same-day clearance determined at the airport); *with* Spirit Mask Exemption Policy, *id.* ¶¶ 595–602 (requiring forty-eight-hour notice before flight of intent to request mask exemption before arriving at airport for screening). The Complaint therefore does not allege a conspiracy. [31]

**\*27**  Next, even if Plaintiff sufficiently pleaded the existence of a conspiracy, he has failed to allege that the conspiracy was "motivated by some ... invidious discriminatory motive." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 146

(2d Cir. 1999)). Plaintiff states that "[t]here is no doubt that conspiring to prevent all disabled passengers from flying who medically can't safely wear a mask, constitutes an invidious discrimination against a protected minority." Compl. ¶ 970. "Discriminatory purpose ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray*, 506 U.S. at 271–72. But Plaintiff offers no "proof that the defendants' impetus" in creating and enforcing mask exemption policies was motivated by animus against the disabled. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995). To the contrary, the natural inference from the facts that Plaintiff alleges are that each airline adopted its policies as a reasoned response to government regulations during a deadly global pandemic. The airlines were not motivated by animus to those who for medical reasons could not wear a mask. They adopted the policies for medical reasons, notwithstanding that the policies might have some incidental effect on those who, for medical reasons, might have challenges in wearing a mask.

Finally, Plaintiff fails to allege that the conspiracy violated a federal right. Plaintiff alleges that Defendants' actions deprived Plaintiff of his constitutional right to interstate travel. "Because 'Section 1985(3) provides no substantive rights itself,' a deprivation of a constitutional right is a required object of a conspiracy under 1985(3)." *Ochoa v. Bratton*, 2017 WL 5900552, at *9 (S.D.N.Y. Nov. 28, 2017) (quoting *Novotny*, 442 U.S. at 372). To implicate the right to interstate travel, a § 1985(3) conspiracy must have as its "predominant purpose ... to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right." *Bray*, 506 U.S. at 275 (quoting *Guest*, 383 U.S. at 760). In this case, the right to travel was affected only incidentally. "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right." *Id.* Rather, "[t]he right must be aimed at; its impairment must be a conscious objective of the enterprise." *Id.* (internal alterations, citations, and quotation marks omitted). Here, although Plaintiff claims that the goal of the conspiracy was to prevent individuals with disabilities from flying, Plaintiff alleges no facts to support that conclusion, even on the most generous reading of the Complaint. The policies were enacted in the midst of a global pandemic where masks—whether or not Plaintiff believes in their efficacy—were thought to reduce the spread of the virus. The fact that the pandemic was the predominant purpose behind Defendants' masking policies is reflected

by the date they were put in place—during the pandemic and in the aftermath of the President's Executive Order. And, as health conditions improved years later, as Plaintiff repeatedly reminds the Court, the executives of several airlines signed onto a letter stating that the Mask Mandate was no longer needed. The facts that Plaintiff alleges thus undercut the inference he would have the Court draw. The policies were not adopted because they would impede travel but notwithstanding that they would impact travel.

### III. 42 U.S.C. § 1986 Claim

Plaintiff next alleges that Moving Defendants, among others, violated 42 U.S.C. § 1986 because they "were aware of the conspiracy to interfere with the civil rights of the disabled by banning Plaintiff and similarly disabled from flights, or requiring unlawful and discriminatory demands, but did nothing to stop it." Compl. ¶ 988. Plaintiff alleges "[i]f each airline defendant would have conveyed to each other that this is illegal, immoral, and wrong, then the conspiracy would have ended." *Id.* ¶ 1001.

Section 1986 of Title 42 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action.

**\*28** 42 U.S.C. § 1986. In short, it "provides a cause of action against anyone who having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects

to do so." *Mian,* 7 F.3d at 1088 (internal quotation marks omitted).

Moving Defendants argue that Plaintiff's Section 1986 claim should be dismissed because: (1) he fails to allege a viable claim under Section 1985; and (2) the claim is time-barred because it was filed more than one year after the challenged conduct. Dkt. No. 122 at 12–13; Dkt. No. 199 at 3–4.

Section 1986 provides "a remedy against individuals who share responsibility for conspiratorial wrongs under § 1985 by failing to make reasonable use of their power to prevent the perpetration of such wrongs." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 222 n.28 (1970) (Brennan, J., concurring). "A § 1986 claim must be predicated upon a valid § 1985 claim." *Mian,* 7 F.3d at 1088; *see Thomas,* 165 F.3d at 147 (dismissing 1986 claim where 1985 claim failed because 1986 claims are "predicated upon a valid § 1983 claim"); *Brown v. City of Oneonta, N.Y., Police Dep't,* 106 F.3d 1125, 1133 (2d Cir. 1997), *abrogated on other grounds by Gonzaga Univ.,* 536 U.S. 273 (same); *Schlosser v. Droughn,* 2021 WL 4263374, at *7 (D. Conn. Sept. 20, 2021). Because Plaintiff has failed to allege a valid Section 1985 claim, Plaintiff also has failed to allege a claim under Section 1986.

Independent of the failure as a matter of law, Plaintiff's Section 1986 claim also fails because it is time-barred. An action under Section 1986 must be "commenced within one year after the cause of action has accrued." 42 U.S.C. § 1986; *see Paige v. Police Dep't of City of Schenectady,* 264 F.3d 197, 199 n.2 (2d Cir. 2001); *Farmer v. County of Westchester,* 2022 WL 3902729, at *4 (S.D.N.Y. Aug. 30, 2022), *appeal dismissed,* 2023 WL 2563753 (2d Cir. Mar. 16, 2023). "Under federal law, the claim accrues when the plaintiff knows or has reason to know of the harm or injury that is the basis of his action." *Farmer,* 2022 WL 3902729, at *4; *see Rozz v. Town of Hempstead,* 2023 WL 2731691, at *4 (E.D.N.Y. Mar. 31, 2023); *Rich v. New York,* 2022 WL 992885, at *9 (S.D.N.Y. Mar. 31, 2022); *Young v. Lord & Taylor, LLC,* 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). Plaintiff's claims against the Airline Defendants all accrued no later than April 18, 2022, the date that the United States District Court for the Middle District of Florida vacated the Mask Mandate. *See Health Freedom Def. Fund, Inc.,* 599 F. Supp. 3d 1144; Compl. ¶ 104. But, the Complaint was filed more than one year later, on May 1, 2023. *See generally* Compl. Plaintiff's Section 1986 claims are therefore untimely.

## A. Constitutional Claims as to Defendant Lawyers

Domestic Defendants correctly argue that the claims against Land and Goldberg under Sections 1985(3) and 1986 should be dismissed for the additional and independent reason that those statutes may not be used to sue an airline attorney for his or her work in providing legal services to an airline client. Dkt. No. 122 at 14–15; Dkt. No. 199 at 4–5.

Construing Plaintiff's allegations broadly "to raise the strongest arguments that they suggest," *Cruz,* 202 F.3d at 597 (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996)), the Complaint could be read to allege 1985(2) claims against Land and Goldberg. *Cf. Levy v. City of New York,* 726 F. Supp. 1446, 1453 (S.D.N.Y. 1989). The first clause of that statute makes it unlawful for "two or more persons ... to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein." 42 U.S.C. § 1985(2).

**\*29** "The gist of the wrong at which § 1985(2) is directed is ... intimidation or retaliation against witnesses in federal-court proceedings." *Haddle v. Garrison,* 525 U.S. 121, 125 (1998). Congress did not "impose a requirement of class-based animus on persons seeking to prove a violation of their rights under the first clause of § 1985(2)." *Kush v. Rutledge,* 460 U.S. 719, 726 (1983). The Second Circuit appears never to have addressed the question whether the first clause of Section 1985(2) applies to "a conspiracy to deter a party from filing a suit in federal court." *Keating,* 706 F.2d at 386 n.13.[32] However, the weight of authority holds that only witnesses and parties to a *pending* matter in federal court can bring suit under Section 1985(2). *See Bell v. N.Y. State Dep't of Corr. & Cmty. Supervision,* 2019 WL 1305809, at *11 (N.D.N.Y. Mar. 22, 2019); *Ruggiero v. City of Cortland,* 2018 WL 5983505, at *9 n.6 (N.D.N.Y. Nov. 14, 2018); *Empire Merchs., LLC v. Reliable Churchill LLP,* 2017 WL 7512900, at *10–12 (E.D.N.Y. Jan. 30, 2017) (collecting cases). While the Complaint on its face does not make reference to the language used by Goldberg in responding to Plaintiff's grievances, correspondence between Plaintiff and Goldberg appended to the Complaint indicates that after Goldberg, outside counsel for American, Compl. ¶ 49, refuted Plaintiff's accusation that his client had violated the law, he stated that Plaintiff did "not have the right to threaten and pursue baseless claims," and "advised that there will be a significant financial cost for doing so," based on a fee-shifting provision and Federal Rule of Civil Procedure 11, Dkt. No. 3-20 at 1. Plaintiff alleges that Land, an executive and associate general counsel of JetBlue, conspired with

JetBlue "to violate Plaintiff's civil rights, and did not intervene to prevent these discriminations, even though he did have the power to do that." Compl. ¶ 764.

The most that Plaintiff's allegations support is that each of Goldberg and Land conspired with the corporation by which they were employed and on behalf of which they acted as agent. As Plaintiff has been made aware by the Third Circuit in a decision rejecting his 1985 claims against a private company's mask policy, *see Abadi v. Target Corp.*, 2023 WL 4045373, at *1 (3d Cir. June 16, 2023) (per curiam), *cert. denied*, 144 S. Ct. 235 (2023), under the intracorporate conspiracy doctrine, "the officers, employees, and agents of the same corporate entity acting within their scope of employment," including outside counsel, "along with the corporate entity itself, are considered a single entity and are legally incapable of conspiring with each other," *Savarese v. City of New York*, 547 F. Supp. 3d 305, 343–44 (S.D.N.Y. 2021) (quoting *Biswas v. City of New York*, 973 F. Supp. 2d 504, 534 (S.D.N.Y. 2013)); *see also Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008), *abrogation on other grounds recognized by Murphy v. Hughson*, 82 F.4th 177 (2d Cir. 2023). That doctrine applies to cases under Section 1985. *See, e.g.*, *Herrmann v. Moore*, 576 F.2d 453 (2d Cir. 1978); *see also Chance v. Cook*, 50 F.4th 48, 52 (11th Cir. 2022); *Heffernan v. Hunter*, 189 F.3d 405, 413–14 (3d Cir. 1999); *Frierson-Harris v. Hough*, 2006 WL 298658, at *5 (S.D.N.Y. Feb. 7, 2006), *aff'd*, 328 F. App'x 753 (2d Cir. 2009) (summary order). There is an exception to the intracorporate conspiracy doctrine where individuals within a single entity could be found liable if they were pursuing personal interests wholly separate and apart from the entity. *See, e.g.*, *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71–72 (2d Cir.), *cert. denied*, 425 U.S. 974 (1976). But that exception does not apply here. By communicating their respective employer's policies to Plaintiff, Goldberg, as American's counsel, and Land, as a JetBlue executive and general counsel, were acting within the scope of their responsibilities in their correspondence with Plaintiff, rather than pursuing any independent goal of discrimination, and thus Plaintiff's claims fail. *See, e.g.*, *Farese v. Scherer*, 342 F.3d 1223, 1231 (11th Cir. 2003); *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723 (S.D.N.Y. 1997).

## IV. Air Carrier Access Act

**\*30**  In Counts Ten through Eighteen, Plaintiff recites causes of action under the ACAA and its implementing regulations. The ACAA prohibits both domestic and foreign air carriers from discriminating against individuals with disabilities. 49 U.S.C. § 41705(a)(1). Count Ten alleges that all Defendants violated the general nondiscrimination requirements of the ACAA, as clarified by 14 C.F.R. § 382.11, by discriminating against him due to his disability in their provision of air transportation. Compl. ¶¶ 1003–1057. In Count Eleven, *id.* ¶¶ 1058–1065, Plaintiff alleges that the Airline Defendants violated the regulation under the ACAA that requires air carriers to have and update their policies to ensure nondiscrimination, 14 C.F.R. § 382.13, by not modifying their mask policies "to properly accommodate Plaintiff and his disability," Compl. ¶ 1062. Count Twelve, Compl. ¶¶ 1066–1073, alleges that Airline Defendants violated the ACAA, and specifically 14 C.F.R. § 382.15, "by not making sure that their contractors were aware of the requirements to properly accommodate Plaintiff and his disability," Compl. ¶ 1070. Count Thirteen, Compl. ¶¶ 1074–1082, alleges that "many of the Airline Defendants," and specifically JetBlue, violated the ACAA and 14 C.F.R. § 382.17 by limiting the number of persons who were disabled on each flight, Compl. ¶ 1078. Count Fourteen, *id.* ¶¶ 1083–1092, alleges that the Airline Defendants violated the ACAA and 14 C.F.R. § 382.19 by refusing to provide transportation on the basis of his disability, Compl. ¶ 1087, and "[a]ll other defendants assisted, aided and abetted, and facilitated those violations," *id.* ¶ 1090. Count Fifteen, *id.* ¶¶ 1093–1100, alleges that the Airline Defendants violated the ACAA and 14 C.F.R. § 382.21 by limiting access to transportation on the grounds of his disability or on the grounds that he may have a communicable disease, and the other defendants assisted or facilitated these violations, Compl. ¶¶ 1097–1098. Count Sixteen, *id.* ¶¶ 1101–1108, alleges that certain of the Airline Defendants violated the ACAA and 14 C.F.R. § 382.23 by requiring him to produce a medical certificate, and some of the other defendants "assisted, aided and abetted, and facilitated" the discrimination, Compl. ¶ 1105–1106. Count Seventeen, *id.* ¶¶ 1109–1116, alleges that the Airline Defendants violated the ACAA and 14 C.F.R. § 382.25 by requiring him, as a disabled person, to provide advance notice that he was traveling on a flight, and that the remaining defendants assisted or facilitated those violations, Compl. ¶¶ 1113–1114. Count Eighteen, *id.* ¶¶ 1117–1124, alleges that the Airline Defendants violated the ACAA and 14 C.F.R. 382.33 by imposing restrictions on him as a disabled person that were not imposed on other passengers and that all other defendants assisted or facilitated those violations, Compl. ¶¶ 1121–1122.

Both Domestic and Foreign Defendants respond that each of these claims fail because the ACAA does not, expressly or impliedly, confer a private right of action permitting

enforcement by aggrieved individuals. Dkt. No. 122 at 16–17; Dkt. No. 180 at 17–18.

The ACAA was passed by Congress in direct response to the Supreme Court's decision in *U.S. Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597, 605 (1986)*, which held that commercial airlines were not subject to the nondiscrimination provisions of the Rehabilitation Act by virtue of their receipt of federal financial assistance. *See* S. Rep. No. 99-400 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2398, 2329. Subsection 41705(a) of the ACAA provides that an air carrier "[m]ay not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities; (2) the individual has a record of such an impairment; (3) the individual is regarded as having such an impairment." 49 U.S.C. § 41705(a). A separate violation occurs "for each individual act of discrimination prohibited by subsection (a)." *Id.* § 41705(b). An aggrieved passenger may file a written complaint alleging a violation of federal statutes regulating air travel, *see id.* §§ 40101–46507, including the ACAA, *id.* § 46101(a)(1). Under subsection 41705(c) of the ACAA, the Secretary of Transportation is required to investigate each complaint of discrimination made to it under the ACAA, publish disability-related complaint data in a manner comparable to other consumer complaint data, and regularly review all complaints received by air carriers alleging disability discrimination, and report annually to Congress on the results of such review. *Id.* § 41705(c) (1), (2), (3). The ACAA also provides a limited right of access to the federal courts by permitting an individual with a "substantial interest" in an administrative decision of the DOT to file a petition for review in a federal appellate court, but provides that, in that proceeding, DOT's factual findings, "if supported by substantial evidence, are conclusive." *Id.* § 46110(a), (c).

In the first fifteen years after the ACAA's enactment, courts held that the law implied a private right of action for injured passengers to seek damages against the commercial airlines that discriminated against them. *See, e.g., Shinault v. Am. Airlines, Inc., 936 F.2d 796 (5th Cir. 1991)*, *abrogation recognized by Stokes v. Sw. Airlines, 887 F.3d 199 (5th Cir. 2018)*; *Tallarico v. Trans World Airlines, Inc., 881 F.2d 566, 568–69 (8th Cir. 1989)*. But following the Supreme Court's 2001 decision in *Alexander v. Sandoval, 532 U.S. 275 (2001)*, which held that a private right of action could be found in a statute only when "the text and structure" of the law

required it, *id.* at 288, courts shifted course. As the Second Circuit explained in *Lopez v. Jet Blue Airways, 662 F.3d 593 (2d Cir. 2011)*, *Sandoval* required that "a review of the text and structure of a statute yield a clear manifestation of congressional intent to create a private cause of action." *Id.* at 596. After undertaking the analysis required by *Sandoval*, the Second Circuit held that that the ACAA did not create an implied private right of action for passengers injured by the discriminatory acts of a commercial airline. *Id.* at 597–98; *see also Boswell v. Skywest Airlines, Inc., 361 F.3d 1263, 1269–71 (10th Cir. 2004)* (same); *Love v. Delta Airlines, Inc., 310 F.3d 1347, 1354-60 (11th Cir. 2002)* (same); *Ruta v. Delta Airlines, Inc., 322 F. Supp. 2d 391 (S.D.N.Y. 2004)* (same). The Second Circuit determined that "although the ACAA is intended to protect the passengers of air carriers against discrimination on the basis of disability, the text and structure of the statute show that Congress chose to accomplish this goal through means other than private enforcement actions in the district court." *Lopez, 662 F.3d at 598*. The court concluded that "[t]he statute does not expressly provide a right to sue the air carrier, and that right should not be implied because the statute provides an administrative enforcement scheme designed to vindicate fully the rights of disabled passengers." *Id.*

**\*31** Plaintiff acknowledges that the Second Circuit has held that there is no private right of action under the ACAA. Compl. ¶¶ 1012, 1016–1017, 1023, 1035. But he argues that the Court should not follow *Lopez* and should imply a private cause of action because "DOT is not enforcing the ACAA, but rather ignoring everything," and in fact is itself "participating directly in the violations of the laws." *Id.* ¶ 1027; *see also id.* ¶ 1044 ("Considering these facts, being that there is no real DOT enforcement, and certainly not robust nor comprehensive nor elaborate, but Congress certainly wanted them to be enforced. That means that the Courts all need to acknowledge and correct their mistakes. The Courts need to allow for a private right of action, as is certainly the will of Congress when it wrote these laws."). Plaintiff asserts "in this case where the Department of Transportation ('DOT') completely refuses to act, and on the contrary, they encourage the airlines to violate the laws, ... there must therefore be an implied private right of action." *Id.* ¶ 1009; *see also* Dkt. No. 172 at 12 ("The Circuit Court cannot say that they cannot require the DOT to enforce the law and simultaneously say that there is a robust enforcement scheme."). However, the Second Circuit has held that the ACAA's administrative enforcement scheme is "designed to vindicate fully the rights of disabled passengers" and contains "no implied private right of action." *Lopez, 662 F.3d at 597, 600*. Contrary to

Plaintiff's contentions, Dkt. No. 172 at 11–12, Dkt. No. 194 at 28–29, this Court is bound by Second Circuit precedent "unless and until it is overruled ... by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit," *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 653 (S.D.N.Y. 2021) (quoting *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd*, 854 F.3d 197 (2d Cir. 2017)); *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) (per curiam) ("A decision of a panel of [the Second Circuit] is binding unless and until it is overruled by the [Circuit sitting] *en banc* or by the Supreme Court."); *see also In re Arab Bank, PLC Alien Tort Stat. Litig.*, 808 F.3d 144, 154 (2d Cir. 2015), *aff'd sub nom.*, *Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018); *Cartica Mgmt., LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477, 486 (S.D.N.Y. 2014) ("[D]istrict courts and other inferior courts are bound by decisions of the Court of Appeals in the appropriate circuit unless overruled by an intervening Supreme Court decision or other change in law." (quoting *United States v. Moreno*, 2000 WL 1843232, at *5 (S.D.N.Y. Dec. 14, 2000) (Sotomayor, J.))).

Plaintiff's discontent with the DOT's enforcement decisions following his complaints to the agency does not mean that this Court must or can create an alternative remedy for him any more than it did for the plaintiff in *Lopez*, who also did not prevail at the administrative stage. *See* 662 F.3d at 595; *see also Marcus v. Ctrs. for Disease Control & Prevention*, 2023 WL 3044614, at *9 (C.D. Cal. Feb. 21, 2023) (declining the plaintiffs' request to imply a private right of action from a federal statute on the grounds that "the Court is not at liberty to rewrite statutes or create rights of action where none exist"). Plaintiff asserts that he pursued administrative claims against airlines under the ACAA and that he "won against many airlines at the DOT disability complaint division." Dkt. No. 172 at 7; *see also* Compl. ¶¶ 182 (DOT found American violated the law); 1028 (discussing DOT complaints against JetBlue and American Airlines). To the extent Plaintiff had a complaint with DOT's administration of the ACAA, his remedy lay with a petition to review to the United States Court of Appeals pursuant to 49 U.S.C. § 46110(a), and not with an independent action under the ACAA in this Court. Plaintiff in fact recognized this, explaining that he sought review of DOT's enforcement decisions in two circuit courts. Compl. ¶¶ 1029, 1033. Plaintiff's petition to the United States Court of Appeals for the District of Columbia Circuit was dismissed for lack of jurisdiction on the grounds that Plaintiff had not identified any legally required act that DOT was required to take as required by the Administrative Procedure Act. *In re*

*Abadi*, 2022 WL 2541249, at *1 (D.C. Cir. Apr. 14, 2022) (per curiam), *cert. denied sub nom. Abadi v. Dep't of Transp.*, 143 S. Ct. 220 (2022). The Second Circuit also denied relief to Plaintiff. *Abadi v. Dep't of Transp.*, 2021 WL 7500325, at *1 (2d Cir. Dec. 29, 2021), *cert. denied*, 142 S. Ct. 1694 (2022). [33] "Like the administrative-enforcement scheme, this limited right of [judicial] review of an administrative decision suggests that Congress did not intend to otherwise allow access to federal courts under the statute." *Lopez*, 662 F.2d at 597–98. Accordingly, all of Plaintiff's claims arising out of the ACAA fail as a matter of law.

## V. Rehabilitation Act

**\*32** In Count Nineteen, Plaintiff alleges that the Airline Defendants based in the United States violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, by discriminating against him on the basis of his disability, and that some of the other Defendants, including the U.S. airlines' employees and counsel, facilitated this discrimination. Compl. ¶¶ 1125–1150.

As a threshold matter, because "the Rehabilitation Act does not provide for individual liability," *Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022), Plaintiff's Rehabilitation Act claims against any individuals fail as a matter of law. Plaintiff's claims against the Airline Defendants require further analysis.

The Rehabilitation Act of 1973 prohibits discrimination against handicapped or disabled persons in any program or activity receiving Federal financial assistance. Section 504 of the Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(2) of this Title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). "To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege: [1] that he or she is a person with disabilities under the Rehabilitation

Act, [2] who has been denied benefits of or excluded from participating in a federally funded program or [activity], [3] solely because of his or her disability." *Bryant v. N.Y. State Educ. Dep't,* 692 F.3d 202, 216 (2d Cir. 2012), *cert. denied,* 569 U.S. 958 (2013); *see Hogan v. Mahabir,* 2023 WL 3628554, at *4 (E.D.N.Y. May 24, 2023). There is no dispute that Plaintiff has a disability as defined by the Rehabilitation Act. Moving Defendants do, however, dispute whether the second and third elements are satisfied.

### A. Denial of Benefits or Exclusion from Participation in a Federally Funded Program or Activity

Plaintiff alleges that he has sufficiently alleged discrimination in a program or activity receiving federal financial assistance because the U.S.-based Airline Defendants "banned ... all passengers with disabilities that cause them not to be able to wear a mask" while receiving "federal contracts and/or funding," and accepting "federal financial assistance during the COVID-19 pandemic," and thus were subject to the Rehabilitation Act. Compl. ¶¶ 1129, 1133. Plaintiff's claim is premised specifically on the funding disbursed through the Payroll Support Program ("PSP") authorized under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020). Compl. ¶ 1147. The U.S.-based airlines do not contest that Plaintiff is disabled within the meaning of the Act, but dispute whether, by denying him access to their flights, they excluded him from a "program or activity receiving Federal financial assistance" within the meaning of the Rehabilitation Act, and even if they did, whether Plaintiff was excluded on the basis of his disability. *See* Dkt. No. 122 at 17–21; Dkt. No. 180 at 18–22.

The question thus is whether carriage on the airlines became a "program or activity" receiving federal financial assistance by virtue of the PSP funding. The phrase "program or activity" is defined by the Rehabilitation Act to mean, *inter alia,* all of the operations of an entire corporation "(i) if assistance is extended to such corporation ... as a whole; or (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 29 U.S.C. § 794(b)(3)(A).

 *33  Plaintiff has not alleged that the COVID-19-related assistance funded the corporation as a whole within the meaning of Section 504, nor could he. The airline recipients were not "engaged in the business of providing education, health care, housing, social services, or parks and recreation." The funding also was not appropriated to each airline "as a

whole." Rather, it was designated for the particular purpose of "the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient, including the payment of lost wages, Salaries, and Benefits to Returning Employees." OMB 1505-0263 at 5. As other courts have explained, "the phrase 'as a whole' means that federal assistance is extended to the organization otherwise than for some specific purpose —put differently, that the recipient of federal funds received those funds as general assistance." *Collins v. Giving Back Fund,* 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6, 2019) (citing S. Rep. No. 100-64, at 17 (1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 19). The legislative history of Section 504 reveals that money distributed to an entity " 'as a whole' refers to situations where the corporation receives general assistance that is not designated for a particular purpose." S. Rep. No. 100-64 (1987). For example, federal financial assistance to a company "for the purpose of preventing the company from going bankrupt" constitutes "assistance to a corporation 'as a whole,' " whereas aid "which is limited in purpose," such as funding for job training, "is not considered aid to the corporation as a whole, even if it is used at several facilities and the corporation has the discretion to determine which of its facilities participate in the program." *Id.* Similarly, aid to support "one among a number of activities" of an entity would "not be assistance ... as a whole." *Id.* Here, the program limited the purposes for which recipients could use payments. The CARES Act was "aimed at helping businesses make payroll and pay operating expenses in order to keep people employed through the economic downturn." *Lucius v. Fort Taco, LLC,* 2022 WL 335491, at *2 (S.D. Fla. Jan. 5, 2022) (quoting *In re Gateway Radiology Consultants, P.A.,* 983 F.3d 1239, 1247 (11th Cir. 2020)). The PSP agreements were a means through which the CARES Act met that end.

Plaintiff recognizes that many courts have held that the funds that the Airline Defendants received did not constitute a subsidy or federal financial assistance sufficient to bring them generally within the coverage of the Rehabilitation Act. Compl. ¶ 1147. He argues, however, that those decisions are mistaken because each U.S.-based Airline Defendant, in connection with the receipt of CARES Act funds, signed the "Payroll Support Program 3 Agreement and Extension" with the government, agreeing that they would comply with Section 504 of the Rehabilitation Act. *Id.* ¶¶ 1130, 1147–1150.

The PSP agreements that the U.S.-based Airline Defendants signed do not give rise to a claim by Plaintiff under Section 504. The agreements do not suggest that funding is being extended to each of the U.S.-based Airline Defendants as

whole entities. Rather, the agreements extend funding for a limited purpose and, at most, obligate the airlines to comply with Section 504 in connection with that limited purpose or program or activity. They do not and cannot expand the scope of Section 504. *See, e.g., Ladzinski v. Sperling S.S. & Trading Corp.*, 300 F. Supp. 947, 954 (S.D.N.Y. 1969) (parties cannot by agreement expand the scope of law passed by Congress). The PSP agreements are made in connection with the provision of financial assistance for the payment of employees. To the extent that the federal government extended funding in connection with a program or activity, it may follow then that the airlines are obliged to comply with Section 504 with respect to that program or activity. It does not follow that the airlines are required to comply with Section 504 in connection with all of their activities.[34] *Cf. Ruiz v. City of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (allegations of employment discrimination under the Rehabilitation Act are treated differently from other allegations of discrimination).

The Complaint may also be read to suggest that the Court should recognize a right that Plaintiff has under the PSP contracts directly, in breach of contract. But that theory also does not help Plaintiff. Plaintiff is not a party to the PSP contracts and therefore has no right to enforce them, even if it could be said that the U.S.-based Airline Defendants breached them. *See, e.g., England v. United Airlines, Inc.*, 627 F. Supp. 3d 963, 968 (N.D. Ill. 2022); *see Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984) ("[A]bsent a contractual relationship there can be no contractual remedy."). Plaintiff does not allege that he is a third-party beneficiary to the contract, nor could he. *See, e.g., Thomas v. UBS AG*, 706 F.3d 846, 852 (7th Cir. 2013) ("[A] government contract that involves no negotiable terms but merely brings the other party to the contract under a statute (or, we can assume, a regulation) does not confer third-party beneficiary status on anyone."); *see also Caires v. JP Morgan Chase Bank, N.A.*, 880 F. Supp. 2d 288, 302 (D. Conn. 2012) ([C]ourts have rejected the contention that a member of the public can be considered a third party beneficiary of a government contract on the sole basis that [the] contract was intended to benefit the public absent clear intent indicating the public's right to enforce the contract as a third party beneficiary."). At the very least, Plaintiff is an *incidental*, rather than an *intended* third-party beneficiary. *Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*, 941 F. Supp. 2d 406, 418 (S.D.N.Y. 2013). But under federal common law, which governs a court's interpretation of federal government contracts, *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014), "a third party must be an intended, rather than incidental, beneficiary in order to enforce a contract," *Kinek v. Gulf & W., Inc.*, 720 F. Supp. 275, 280 (S.D.N.Y. 1989), *aff'd sub nom., Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503 (2d Cir. 1994).[35] In general, "the contract terms [must] 'clearly evidence an intent to permit enforcement by the third party in question.' " *Hillside Metro*, 747 F.3d at 49 (quoting *Premium Mortg. Corp. v. Equifax*, 583 F.3d 103, 108 (2d Cir. 2009)); *see also McNeill v. N.Y.C. Hous. Auth.*, 719 F. Supp. 233, 248–49 (S.D.N.Y. 1989) (Walker, J.) ("Under ... federal common law ..., a third party may have enforceable rights under a contract if the contract was made for her direct benefit."). Moreover, to the extent that Circuit precedent directs the Court to follow the Restatement's rule as to whether a third-party beneficiary may sue to enforce a contract, *see Hillside Metro*, 747 F.3d at 49, "[t]he Restatement sets forth a heightened standard for evaluating intended third party beneficiary status where a government agency is a party to the contract," *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 767 (W.D.N.Y. 2017); *see also Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999). "In the case of government contracts, 'individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.' " *Fero*, 236 F. Supp. 3d at 767 (quoting Restatement (Second) of Contracts § 313 cmt. a (1981)).

**\*34** The PSP agreements do not clearly manifest an intent to benefit or permit enforcement by any private party, nor does Plaintiff so allege. *See, e.g., Abu Dhabi Com. Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 185 (S.D.N.Y. 2009) (dismissing claim by alleged third-party beneficiary where the plaintiffs "failed to allege contract language or other facts sufficient to give rise to a plausible inference that any of these contracts clearly evidence an intent to permit enforcement by [the] plaintiffs" (internal quotation marks omitted)); *see also England*, 627 F. Supp. 3d at 971–72.

### B. Exclusion on the Basis of Disability

Finally, even if Plaintiff did sufficiently allege that the U.S.-based Airline Defendants received funds that sufficed to subject them to the Rehabilitation Act, he has not satisfied the third element necessary to state a claim: exclusion *on the basis of* his disability. "The third element is satisfied if a plaintiff plausibly pleads that defendants failed to 'mak[e] reasonable accommodations to the known physical or mental limitations of an ... individual with a disability.' " *Doe v.*

*U.S. Sec'y of Transp.*, 2018 WL 6411277, at *7 (S.D.N.Y. Dec. 4, 2018) (alterations in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). Each airline, as permitted by federal law, instituted their own mask exemption policies for individuals who could not safely wear a mask due to their disabilities. That Plaintiff himself believes these exemption policies to be unreasonable does not make them so. The airlines' decisions to deny Plaintiff air transport was "not based upon [Plaintiff's] classification" as an individual with a disability, "but rather upon the type of modification that he requested." *Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995) (per curiam). Merely failing to accept Plaintiff's three-line Doctor's Note as a basis for establishing Plaintiff's disability does not constitute discrimination, because, "[a]lthough a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) (citing *Fink v. N.Y.C. Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995)). Accordingly, Plaintiff's claims under the Rehabilitation Act fail.

## VI. State and City Claims [36]

**\*35** Each of Plaintiff's remaining claims, with four exceptions, [37] implicate state and city law as to some or all of the Moving Defendants. Accordingly, the Court undertakes to address them here. Moving Defendants contend that Plaintiff's state and city causes of action, which assert, *inter alia*, claims for disability discrimination, breach of contract, and various torts, are preempted by federal law, and, on the merits, fail to state a claim as a matter of law. Moving Defendants rely on several statutes in support of an argument that Plaintiff's state law claims are preempted—the Airline Deregulation Act, the Air Carrier Access Act, and the Federal Aviation Act.

The Court agrees that Plaintiff's claims are either preempted by the Airline Deregulation Act ("ADA") or the ACAA, or fail to state a claim for relief, or both. It therefore need not reach whether those claims are also preempted by the Federal Aviation Act. *See, e.g., Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 225 (2d Cir. 2008) (per curiam). The Court first discusses the preemptive effect of the ADA and the ACAA. It then addresses each of Plaintiff's claims on the merits.

### A. Preemption under the ADA and the ACAA

"In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *See N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005), *cert. denied*, 550 U.S. 913 (2007)). The ADA contains an express preemption provision, while the ACAA does not.

#### 1. The ADA

Passed in 1978, the ADA, 49 U.S.C. § 1301 *et seq.*, was part of President Carter's initiative "to withdraw economic regulation of interstate airline rates, routes and services." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 422 (1992) (Stevens, J., dissenting). [38] Congress enacted the ADA " 'to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services.' " *Id.* (quoting H.R. Rep. No. 95-1779, at 53 (1978) (Conf. Rep.), U.S.C.C.A.N. 1978, 3737).

"To ensure that the States would not undo federal deregulation with regulation of their own," *id.* at 378 (majority opinion), Section 105(a) of the ADA contains what the Supreme Court has characterized as an express preemption provision. Section 105(a) expressly preempts state regulations relating to the prices, routes and services of air carriers. It provides:

> **\*36** [A] state, political subdivision of a State, or political authority of at least 2 states may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service* of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1) (emphasis added). The Supreme Court has held that the term "related to" in the Deregulation

Act is to be read broadly. *Morales*, 504 U.S. at 383–84; *see Air Transp. Ass'n*, 520 F.3d at 222 ("[T]he Supreme Court has repeatedly emphasized the breadth of the ADA's preemption provision."). *Morales* held that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' " or that "have the forbidden significant effect" upon the same "are preempted." 504 U.S. at 384, 388; *see also United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 335 (1st Cir. 2003). A state claim is not preempted only if it would affect an airline's "price, route, or service" in "too tenuous, remote, or peripheral a manner to have preemptive effect." *Morales*, 504 U.S. at 390. Accordingly, "generally applicable tax, environmental, and blue sky laws" might not be preempted even if it can be said that such laws "relate" to the "price, route, or service," if they are too distant from the ADA's deregulatory purposes. *Abdu-Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 83 (2d Cir. 1997). By contrast, state consumer protection laws addressing unfair methods of competition and unfair or deceptive acts and practices and tort claims (including fraud claims) of general applicability, for example, are preempted because, if applied to an air carrier, they would have the force and effect of setting a standard for or otherwise regulating prices, routes, or services. *Morales*, 504 U.S. at 385–87; *see, e.g.*, *Wolens*, 513 U.S. at 226. Likewise, "requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays does relate to the service of an air carrier and therefore falls within the express terms of the ADA's preemption provision." *Air Transp. Ass'n*, 520 F.3d at 223.

The ADA's preemption provision does not "appl[y] only to legislation enacted by a state legislature and regulations issued by a state administrative agency." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 281 (2014). It also applies to common-law rules that impose "binding standards of conduct that operate irrespective of any private agreement." *Id.* at 281–82 (quoting *Wolens*, 513 U.S. at 229 n.5). Indeed, "the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute or regulation." *Id.* at 283. It is irrelevant that the state law may be perfectly congruent with federal law. *Morales*, 504 U.S. at 386. "The pre-emption provision ... displaces all state laws that fall within its sphere, even including state laws that are consistent with [the] substantive requirements [of federal law]." *Id.* at 387 (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829 (1988)).

"To determine whether a claim has a connection with, or reference to an airline's prices, routes, or services, [the Court]

must look at the facts underlying the specific claim." *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998). Courts in this Circuit and elsewhere have applied the three-part test articulated by then-Judge Sotomayor in *Rombom v. United Air Lines, Inc.*, 867 F. Supp. 214 (S.D.N.Y. 1994), which considers: (1) "whether the activity at issue in the claim is an airline service"; (2) "if the activity in question implicates a service, ... whether the claim affects the airline service directly or tenuously, remotely, or peripherally"; and (3) "whether the underlying tortious conduct was reasonably necessary to the provision of the service," or was "outrageous conduct that goes beyond the scope of normal aircraft operations." *Id.* at 221–22; *see, e.g.*, *Doe v. Delta Airlines, Inc.*, 129 F. Supp. 3d 23, 35 (S.D.N.Y. 2015), *aff'd*, 672 F. App'x 48 (2d Cir. 2016) (summary order); *Lozada v. Delta Airlines, Inc.*, 2014 WL 2738529, at *3 (S.D.N.Y. June 17, 2014); *Reed v. Delta Airlines, Inc.*, 2011 WL 1085338, at *4 (S.D.N.Y. March 23, 2011); *Ruta*, 322 F. Supp. 2d at 400; *Farash v. Continental Airlines, Inc.*, 574 F. Supp. 2d 356, 363–64 (S.D.N.Y. 2008) (Sullivan, J.); *Donkor v. Brit. Airways, Corp.*, 62 F. Supp. 2d 963, 972 (E.D.N.Y. 1999); *id.* at 972 n. 5 (collecting cases); *Galbut v. Am. Airlines, Inc.*, 27 F. Supp. 2d 146, 152 (E.D.N.Y. 1997); *Peterson v. Cont'l Airlines, Inc.*, 970 F. Supp. 246, 250 (S.D.N.Y. 1997).

**\*37** Under this test, courts have held that claims involving personal injury, *Doe v. Delta Airlines*, 129 F. Supp. 3d at 35, physical injury, *Trinidad v. Am. Airlines, Inc.*, 932 F. Supp. 521, 526 (S.D.N.Y. 1996), or where a plaintiff is arrested, *Rombom*, 867 F. Supp. at 224, may not be preempted, *see Lozada v*, 2014 WL 2738529, at *4. For example, "where the gist of the false arrest and false imprisonment claim is that the airline caused the passenger to be arrested by authorities without a proper factual basis, courts have held that the claims are not related to services and, therefore, are not preempted." *Lewis v. Cont'l Airlines, Inc.*, 40 F. Supp. 2d 406, 413 (S.D. Tex. 1999) (citing *Diaz-Aguasviva v. Iberia Lineas Aereas de Espana*, 902 F. Supp. 314, 316 (D.P.R. 1995), *vacated in part on other grounds*, 937 F. Supp. 141 (1996)); *Curley v. Am. Airlines, Inc.*, 846 F. Supp. 280, 281–82 (S.D.N.Y. 1994); *Bayne v. Adventure Tours USA, Inc.*, 841 F. Supp. 206, 207 (N.D. Tex. 1994). The Second Circuit has stated in a summary order that the ADA "preempts claims that challenge airline policies and could potentially create inconsistent standards between states, while leaving room for personal injury actions that allege an airline was negligent in carrying out its policy." *Fawemimo v. Am. Airlines, Inc.*, 751 F. App'x 16, 19 (2d Cir. 2018) (summary order). Claims of discrimination also may not be preempted, for intentional discrimination is outside the

normal scope of an airline's operations. *See, e.g., Doricent v. Am. Airlines, Inc.,* 1993 WL 437670, at *5 (D. Mass. Oct. 19, 1993).

Alternatively, and more generally, other courts outside of this Circuit have also looked to (1) the objectives of the ADA, which provide "a guide to the scope of the state law that Congress understood would survive," and (2) "the nature of the effect of the state law on" airline prices, routes, and services. *See Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.,* 519 U.S. 316, 325 (1997); *Day v. SkyWest Airlines,* 45 F.4th 1181, 1187 (10th Cir. 2022).

## 2. The ACAA

The ACAA was enacted with the express purpose of "provid[ing] that prohibitions of discrimination against handicapped individuals shall apply to air carriers." Air Carrier Access Act of 1986, Pub. L. No. 99-435, § 2, 100 Stat. 1080. In its current form, the ACAA states that an air carrier "may not discriminate against" any individual who has a "physical or mental impairment that substantially limits one or more major life activities." 49 U.S.C. § 41705(a). DOT has issued regulations specifying how airlines must comply with the ACAA. *See* 14 C.F.R. pt. 382. As the Ninth Circuit has explained:

> The regulations impose four general duties on air carriers: "not [to] discriminate against any qualified individual with a disability, by reason of such disability, in the provision of air transportation"; "not [to] require a qualified individual with a disability to accept special services ... that the individual does not request"; "not [to] exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons," with certain limited exceptions; and "not [to] take any adverse action against an individual (e.g., refusing to provide transportation) because the individual asserts, on his or her own behalf or through or on behalf of others, rights protected" by the regulations or the ACAA.

*Gilstrap v. United Air Lines, Inc.,* 709 F.3d 995, 1000 (9th Cir. 2013) (quoting 14 C.F.R. § 382.11(a)). The ACAA requires air carriers to train "all personnel who deal with the traveling public" on "awareness and appropriate responses to passengers with a disability." 14 C.F.R. § 382.91(d).

The ACAA contains several enforcement mechanisms. The Act (1) requires airlines to maintain an internal dispute resolution program for collecting, responding to, and reporting passenger complaints of discrimination on the basis of disability, 14 C.F.R. § 382.151; (2) directs the Secretary of Transportation to collect and publish data on disability-related complaints and to report annually to Congress on all complains received, 49 U.S.C. § 41705(c)(2)–(3); and (3) as noted *supra,* permits any person may file a complaint with the Secretary of Transportation about an alleged regulatory violation, including discrimination, 49 U.S.C. § 46101(a)(1). If, upon investigation, DOT finds a violation, DOT is empowered to impose fines on air carriers of up to $25,000 per violation, 49 U.S.C. § 46301(a), and may revoke an air carrier's certificate, 49 U.S.C. § 41110(a)(2)(B). DOT may also initiate an action in federal court or ask the Department of Justice to commence an enforcement action. 49 U.S.C. § 46106. The complainant, or any person "disclosing a substantial interest in an order issued by the Secretary of Transportation," may petition for judicial review of the decision by a United States Court of Appeals, as Plaintiff here did before both the Second Circuit and the D.C. Circuit. *See In re Abadi,* 2022 WL 2541249, at *1 (denying Plaintiff's appeal of DOT's order); *Abadi v. Dep't of Transp.,* 2021 WL 7500325, at *1 (same).

### B. State and City Discrimination Law Claims

**\*38** Counts Twenty through Twenty-Six of Plaintiff's Complaint allege violations of various state and city laws against discrimination by Defendants. Count Twenty alleges that Defendants violated the California Unruh Civil Rights Act by discriminating against Plaintiff with respect to any flights he would take from California and by failing to accommodate his disability. Compl. ¶¶ 1151–1173. Counts Twenty-One and Twenty-Two allege violations of New Jersey state law. Count Twenty-One alleges that the Airline Defendants violated the New Jersey Civil Rights Law against Discrimination ("NJLAD"), N.J. Stat. Ann. 10:5-5, 10:5-12, by denying him access to fly from Newark Airport. *Id.* ¶¶ 1152–1180. Count Twenty-Two alleges that the Airline Defendants violated NJLAD, N.J. Stat. Ann. 10:5-12, by sending him notices that he would not be permitted to travel on their airlines or by making unlawful demands in connection with flights from all airport locations, including Newark Airport. *Id.* ¶¶ 1181–1189. Counts Twenty-Three through Twenty-Five allege violations of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. Count Twenty-Three alleges that the airline defendant denied him equal access to all facilities and to fly from JFK

and LaGuardia Airports in Queens, New York. *Id.* ¶¶ 1190–1198. Count Twenty-Four alleges that the airline defendants violated the New York City Human Rights Law by sending him email notices, on the basis of his disability, that he could not fly from JFK Airport and LaGuardia Airport. *Id.* ¶¶ 1199–1207. Count Twenty-Five alleges that the airline defendants violated the NYCHRL by failing to engage in a cooperative dialogue with him about an accommodation for his disability within a reasonable time frame. *Id.* ¶¶ 1208–1214. Finally, Count Twenty-Six alleges a violation of the Texas Civil Rights Laws. *Id.* ¶¶ 1215–1227. Plaintiff alleges that he was discriminated against in connection with any flights he would take from Texas. *Id.* ¶ 1221.

Each of Plaintiff's state and municipal-law discrimination claims is preempted by both the ADA and the ACAA. Plaintiff claims that Defendants violated each of these laws by denying him access to fly based on his disability. *See* Compl. ¶ 1157 (Unruh Act); ¶ 1178 (NJLAD); ¶¶ 1220–1225 (Texas law); or by, in addition to denying him access to fly, sending him email notices that he would not be permitted to fly or declining to engage in a cooperative dialogue in response to his request to fly without a mask, *id.* ¶¶ 1190–1214 (NYCHRL). In one form or another, each of the Unruh Act, NJLAD, NYCHRL, and the Texas Civil Rights Law is addressed to discrimination with respect to access to airline flights. The Unruh Act, Cal. Civ. Code § 51, guarantees all persons within the jurisdiction of California, the right to full and equal accommodations, advantages and services, no matter their disability. *See id.* The NJLAD makes it unlawful for an owner, agent or employee of any place of public accommodation [39] to deny any person accommodations on the basis of disability or to discriminate on the basis of disability. N.J. Stat. Ann. § 10:5-12(f)(1). The NYCHRL is similar to the NJLAD and, in pertinent part, make it unlawful to fail to accommodate a disability or to discriminate on the basis of disability and also prohibits public accommodations from refusing to engage in cooperative dialogue within a reasonable time upon accommodation request. N.Y.C. Admin. Code § 8-107-28. The Texas Civil Rights law states in pertinent part that no airline "operating within the state may refuse to accept as a passenger a person with a disability because of the person's disability." Tex. Hum. Res. Code Ann. § 121.003(b).

Plaintiff's claims under each of these laws is preempted by the ADA. Plaintiff claims that the Moving Defendants should have permitted him to fly mask-free because his disability prevented him from flying with a mask. Plaintiff's claim implicates a "service" within the meaning of the ADA. Indeed, there could be few more items more central to the services that airlines provide than "access to flights." *Wolens,* 513 U.S. at 226; *Ginsberg,* 572 U.S. at 284 (stating that "services" as it is used in the ADA includes "access to flights"); *Lozada,* 2014 WL 2738529, at *4 ("There are few acts more fundamental to the service of air travel than the decision by an airplane crew whether or not to transport a passenger."). That is the service that an airline provides. Indeed, "the term ... encompasses matters such as *boarding procedures*, baggage handling, and food and drink—matters incidental to and distinct from the actual transportation of passengers," *Air Transp. Ass'n,* 520 F.3d at 223 (emphasis added) (collecting cases), "in addition to the transportation itself," [40] *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc). Plaintiff would have each of California, New Jersey, Texas, and New York City both require the Moving Defendants to make accommodations for Plaintiff on their flights and dictate the content of that accommodation. Finally, the alleged conduct was not so "outrageous to go beyond the scope of normal aircraft operations," but rather fell "within a spectrum of reasonable conduct." *Rombom,* 867 F. Supp. at 225. The Complaint does not contain any well-pleaded allegations of invidious discrimination, that the Moving Defendants applied their mask mandates to Plaintiff "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" him as a person with a disability. *Feeney,* 442 U.S. at 279. Plaintiff merely claims that the Moving Defendants, faced with a Presidential statement regarding the importance of mask wearing to public health and a federal mandate requiring the wearing of masks, with limited exceptions, applied their mask mandates to him just as they would to any passenger and, in those instances when he did not qualify for an exemption, denied the exemption. "[T]he allegations in no way rise to the level of 'outrageous conduct' that would allow [Plaintiff] to escape preemption." *Andreakakis,* 2022 WL 2674194, at *11–12 (holding an "airlines' refusal to grant [the plaintiff] an exemption to the [m]ask [m]andate when selling him a ticket ... fall[s] under the services provided by an airline" and was thus preempted by the ADA); *see, e.g., Montgomery v. Delta Air Lines, Inc.*, 2023 WL 2400743, at *5 (5th Cir. Mar. 8, 2023) (per curiam) ("[Airline's] decision not to provide transportation to [the plaintiffs] is enough for us to hold that the [ADA] preempted their claims."); *Stadulis v. JetBlue Airways Corp.*, 2023 WL 8437280, at *5 (D.N.J. Dec. 5, 2023) (holding that because the plaintiff's claim pertains to the airline defendants' policies that "implicate, among other things, boarding procedures and 'destinations of the point-to-

AARON ABADI, Plaintiff, v. AMERICAN AIRLINES, INC., et al., Slip Copy (2024)

point transportation of passengers,' " his claim "falls squarely within the definition of 'services' under the ADA's broad preemption provision"); *Gill v. JetBlue Airways Corp.*, 836 F. Supp. 2d 33, 41 (D. Mass. 2011) ("The accommodation of disabilities during boarding, provided by airline personnel, is a bargained-for or anticipated 'service' to the passenger."); *Hodges*, 44 F.3d at 336; *Onoh v. Nw. Airlines, Inc.*, 613 F.3d 596, 599 (5th Cir. 2010).

**\*39** Plaintiff cannot save his claim by alleging, as he does, that one or the other of the state laws was "specifically created to enhance and built on federal disability laws, not to override or conflict with them," Compl. ¶ 1163 (Unruh Act), or does not conflict with federal law, *id.* ¶ 1166 (Unruh Act). That argument was explicitly rejected in *Morales*. The Supreme Court there held that the ADA preempts both state laws that are consistent with federal law and those inconsistent with federal law, so long as the state law that is invoked had a connection with or reference to airline "rates, routes, or services." *Morales*, 504 U.S. at 386–87.

It also makes no difference that Plaintiff claims that it was the communications and not the denial of service that violates state or municipal statutory law and that the Airlines Defendants "all sent email notices and/or communications to Plaintiff conveying that he will not be permitted to travel on their airlines at all and/or without meeting unlawful demands." Compl. ¶ 1183. If the ADA preempts state or municipal regulation with respect to an airline's decision to deny a person access to a flight, the ADA must, by extension, preempt state or municipal regulation concerning communications between the airline and the customer informing the customer that he has been denied access to a flight. *See, e.g.*, *In re Jetblue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d 299, 316 (E.D.N.Y. 2005) ("As this claim concerns the lawfulness of representations made by [the airline] in the course of communicating with potential passengers, the relevant activity for purposes of preemption analysis is the provision of reservations and the sale of tickets to travel with [that airline], ... [and] communication of company policy concerning [boarding policies] is reasonably necessary to the facilitation of reservations and ticket sales."); *cf. Morales*, 504 U.S. at 388 ("Advertising 'serves to inform the public of the ... prices of products and services, and thus performs an indispensable role in the allocation of resources.' " (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977))).

Plaintiff's state law discrimination claims also are preempted by the ACAA, with the exception that Domestic Defendants

do not assert that the ACAA preempts New Jersey discrimination law. *See* Dkt. No. 122 at 23–26; Dkt. No. 180 at 22–25. Generally, Moving Defendants contend that the ACAA impliedly preempts Plaintiff's state claims by so thoroughly occupying the field that one may conclude that Congress's intent in enacting it was to bar states from legislating in the same field. *See, e.g.*, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Although the ACAA does not contain an express preemption provision, preemption may be inferred where federal regulation in a particular field is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.*; *see also Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (explaining that where "explicit pre-emption language does not appear," reviewing "courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent").

As noted, the ACAA provides that "an air carrier ... may not discriminate against an otherwise qualified individual" on the ground that "the individual has a physical or mental impairment that substantially limits one or more major life activities." 49 U.S.C. § 41705(a)(1). While the mere existence of a detailed regulatory scheme does not by itself imply preemption of state remedies, *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990), the volume and complexity of federal regulation is one factor that demonstrates congressional intent to displace state law in that area, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000). And as several courts have recognized, *see, e.g.*, *Boswell*, 361 F.3d at 1270–71; *Love*, 310 F.3d at 1359; *Johnson v. Nw. Airlines, Inc.*, 2010 WL 5564629 (N.D. Cal. May 5, 2010), Congress has established a comprehensive enforcement mechanism for violations of the act," *see* 49 U.S.C. § 46110. Congress provided that individuals (such as Plaintiff here) may file a complaint with the Secretary of Transportation and, once the Secretary has heard the complaint, appeal the Secretary's order to the United States Court of Appeals. *Id.* The question is whether this constitutes field preemption of state disability laws.

**\*40** The Court finds that it does. *See, e.g.*, *Gill*, 836 F. Supp. 2d at 44 ("It is clear that the ACAA and its implementing regulations do, in fact, preempt certain state laws directed at disability discrimination in the provision of air-travel services."). "It is clear that the ACAA is aimed at ensuring respect and equal treatment for disabled airline passengers." *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 132 (3d Cir. 2010). "The ACAA comprehensively

addresses not only discrimination in the form of access to services and information, but also with respect to assisting disabled passengers in boarding, deplaning, and connecting to subsequent flights.' " *Marcus*, 2023 WL 3044614, at \*9 (quoting *Lagomarsino v. Delta Airlines, Inc.*, 2020 WL 1955314, at \*3 (C.D. Cal. Feb. 7, 2020)). DOT itself has described the ACAA's regulatory scheme as a "detailed, comprehensive, national regulation" that "substantially, if not completely, occupies the field of nondiscrimination on the basis of handicap in air travel." *Nondiscrimination on the Basis of Handicap in Air Travel, Supplementary Information: Legal and Other General Issues, 55 Fed. Reg. 8008, 8014 (Mar. 6, 1990)*. DOT has thus concluded that "there is a strong likelihood that state action on matters covered by [ACAA rules] will be regarded as preempted." *Id.* Here, there was an express regulation governing masking while traveling and permitting airlines to formulate with their own policies regarding mask exemptions.

And most courts that have considered the question have found field preemption of state disability laws by the ACAA. *See, e.g., Gill*, 836 F. Supp. 2d at 44. For example, "[t]he Ninth Circuit has held that the ACAA and its regulations occupy the field of nondiscriminatory treatment of airline passengers, and therefore impliedly preempt state statutory claims." *Azocar v. Delta Air Lines, Inc.*, 562 F. Supp. 3d 788, 792 (C.D. Cal. 2021) (citing *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 731–33 (9th Cir. 2016)). Numerous district courts have also found that the ACAA preempts state disability laws. *See, e.g., Azocar*, 562 F. Supp. 3d at 794; *Marcus*, 2023 WL 3044614, at \*9; *Lagomarsino*, 2020 WL 1955314, at \*; *Summers v. Delta Airlines, Inc.*, 805 F. Supp. 2d 874, 876 (N.D. Cal. 2011); *Foley v. JetBlue Airways, Corp.*, 2011 WL 3359730, at \*13 (N.D. Cal. Aug. 3, 2011).

Finally, because the FAA was amended by the ACAA, and the ACAA contains the relevant provisions regarding disability law, the Court does not assess preemption under the FAA. Nor does the Court assess the merits of Plaintiff's state and local discrimination law claims. Preemption by either the ADA or the ACAA provides sufficient basis for dismissal of Plaintiff's state-law disability claims.

### C. State Tort Claims

In Counts Twenty-Seven through Twenty-Nine, Plaintiff brings assorted state law tort claims against the Airline Defendants. Count 27 alleges intentional and unintentional torts under the laws of "Texas, New York, New Jersey,

California and/or other states." Compl. ¶¶ 1228–1234. Count 28 alleges negligence claims under the laws of "Texas, New York, New Jersey, California, and many other states." *Id.* ¶¶ 1235–1241. Count 29 alleges a claim for intentional infliction of emotional distress under the laws of "Texas, New Jersey, New York, and California as well as many other states." *Id.* ¶¶ 1242–1248.

Moving Defendants argue that the broad claim for "intentional and unintentional torts" and the negligence claim are preempted by the ADA and that Plaintiff fails to allege the essential elements of the "intentional tort" claim. Dkt. No. 122 at 27–29. Defendants argue that Plaintiff has failed to state the elements of the tort of intentional infliction of emotional distress and that his intentional infliction claim also is time-barred by the one-year statute of limitations in New York. *Id.* at 29–30; Dkt. No. 199 at 10–11. The Court addresses each in turn. [41]

### 1. Negligence

**\*41** In Count Twenty-Eight of the Complaint, Plaintiff alleges that Defendants are liable in tort for negligence because they "had a duty to treat Plaintiff with decency, to help him circumvent a policy that would cause him the inability to travel and/or the suffering due to his disability." Compl. ¶ 1237. Defendants argue that Plaintiff's negligence claim is preempted by the ADA and the ACAA. *See, e.g.*, Dkt. No. 122 at 28–29.

Plaintiff's negligence claim can be framed in two ways. The Complaint may be understood as alleging that Defendants were negligent by failing to accommodate Plaintiff's disability to his liking, or that the Defendants were negligent in allegedly discriminating against Plaintiff or allowing him to be discriminated against on the basis of his disability. On the former reading, Plaintiff's negligence claim is preempted by the ADA; on the latter, the claim is preempted by the ACAA. First, to the extent that Plaintiff's negligence claim is based on the airlines' failure to accommodate his disability to his liking, the claim is preempted by the ADA. Obligations imposed by the tort law of negligence are "state-imposed." *Ginsberg*, 572 U.S. at 286. They impose "binding standards of conduct" that are determined by "state policy," *id.* at 286– 87, and do not merely seek to enforce the parties' "own, self-imposed undertakings," *Wolens*, 513 U.S. at 228. For example, "[c]ourts resolve legal duty questions by resort to common concepts of morality, logic and consideration of

the social consequences of imposing the duty." *Tenuto v. Lederle Laby's., Div. of Am. Cyanamid Co.*, 687 N.E.2d 1300 (N.Y. 1997). Moreover, Plaintiff's claim clearly "relates to" the provision of an airline's primary "service[ ]"—access to flights—just as his discrimination claims do. *See Wolens*, 513 U.S. at 236 (Stevens, J., dissenting) ("Presumably, if an airline were negligent in a way that somehow affected its rates, routes, or services, and the victim of the airline's negligence were to sue in state court, the majority would not hold *all* common-law negligence rules to be preempted by the ADA."). For the same reasons that Plaintiff's state and municipal law discrimination claims are preempted so too are his claims of negligence for failure to make an accommodation. If a state may not by statute dictate to an airline the food, water or electricity it provides to its passengers, *Air Transp. Ass'n*, 520 F.3d at 223, it may also not by common law dictate to an airline what safety measures it requires those passengers to take. Furthermore, Plaintiff does not allege that any airline did anything other than ask him to follow their mask-exemption policies like all other individuals with disabilities who could not wear masks. This plainly does not constitute outrageous or unreasonable conduct.

Reading Plaintiff's Complaint as alleging negligence for permitting him to be subjected to discrimination on the basis of his disability, his claim is preempted by the ACAA. A state-law claim is preempted if the ACAA regulates the condition or circumstance alleged to have caused plaintiff's injury. *See, e.g., Summers*, 805 F. Supp. 2d at 882; *Baugh v. Delta Air Lines, Inc.*, 2015 WL 761932, at *7 (N.D. Ga. Feb. 23, 2015). Here, the ACAA regulates with specificity an airline's obligations to ensure that individuals with disabilities are treated properly, including training customer-facing employees on appropriate response. *See, e.g.*, 14 C.F.R. §§ 382 (prohibiting airlines from refusing to provide transportation to a passenger with a disability on the basis of his or her disability), 382.3 (defining terms such as "individual with a disability" and "qualified individual with a disability"). To the extent that Plaintiff's claim is one of discrimination masquerading as negligence, it fails as preempted by the ACAA's sweeping provisions regarding treatment of individuals with disabilities.

**\*42** Plaintiff's negligence claims also fail on the merits. New York, New Jersey, California, and Texas all employ similar tests for negligence: "[t]o establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3)

injury proximately resulting therefrom." *See, e.g., Solomon v. City of New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985); *Townsend v. Pierre*, 110 A.3d 52 (N.J. 2015) (New Jersey); *Artiglio v. Corning Inc.*, 957 P.2d 1313, 1318 (Cal. 1998) (California); *Lee Lewis Const., Inc v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001) (Texas). Although the states differ as to whether common carriers, such as airlines, are subject to heightened duties of care, with New Jersey, California, and Texas following the common law rule imposing a heightened duty of care, *Maison v. N.J. Transit Corp.*, 245 A.3d 536, 542 (N.J. 2021) (New Jersey); *Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 421 (Cal. Ct. App. 2022); *VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 359 (Tex. 2020) (Texas), and New York subjecting common carriers only "to the same duty of care as any other potential tortfeasor," *Bethel v. N.Y.C. Transit Auth.*, 703 N.E.2d 1214, 1218 (N.Y. 1998), Plaintiff's claim fails under each state's law because he does not plead facts supporting a duty of care in the first place, *see, e.g., Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001) ("The threshold question in any negligence action is ... [whether the] defendant owe[s] a legally recognized duty of care to [the] plaintiff."); *Graff v. Beard*, 858 S.W.3d 918, 919 (Tex. 1993) ("It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability."). Moving Defendants are not alleged to have had any cognizable relationship with Plaintiff. *See, e.g., FMC Corp. v. Fleet Bank*, 641 N.Y.S.2d 25, 26 (1st Dep't 1996) ("transient and noncontractual relationship" insufficient to establish a duty). Here, where Plaintiff does not allege that he flew, or even bought tickets to fly with, most of the Moving Defendants, he cannot plead some sort of special relationship or some other set of circumstances between himself and Moving Defendants that would give rise to an affirmative duty. He simply did not "submit [himself] ... to the carrier's charge." *Orr v. Pac. Sw. Airlines*, 208 Cal. App. 3d 1467, 1472 (Cal. Ct. App. 1989). Without some sort of privity between the airlines and the Plaintiff, there can be no duty. *Cf. Strauss v. Belle Realty Co.*, 482 N.E.2d 34, 36 (N.Y. 1985) (utilities do not owe duty of care to noncustomers); *Purdy v. Pub. Adm'r of Westchester Cnty.*, 526 N.E.2d 4 (N.Y. 1988) (physician bore no duty to the general public to warn the resident of the dangers of driving given her medical condition); *Uber Techs.*, 79 Cal. App. 5th at 422–23 (finding no duty where common carrier had control over neither the plaintiff's safety nor the physical hazards of common carrier transportation). As to the airlines that from which Plaintiff did not buy tickets, the relationship between Plaintiff and those airlines was that of a vendor and potential buyer, which is insufficient to establish a duty in negligence. And as to the Moving

Defendants with whom Plaintiff did buy a ticket to fly, a contract is generally insufficient to create a legal duty unless the contract itself imposes a duty to protect. *See, e.g., Palka v. Servicemaster Mgmt. Servs. Corp.*, 634 N.E.2d 189, 194 (N.Y. 1994); *McHenry v. Asylum Ent. Del., LLC*, 46 Cal. App. 5th 469, 485–86 (Cal. Ct. App. 2020) (a special relationship arises by contract only if the contract itself imposes a duty to protect); *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). Plaintiff alleges no such duty arising from the contracts he had with the few Moving Defendants with whom he had purchased tickets to fly. And even if Plaintiff's contracts with some Moving Defendants could alone establish sufficient privity to give rise to a duty, the duty was not so broad as to protect Plaintiff from the injuries he alleges here. *See, e.g., Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 408 (S.D.N.Y. 2015), *aff'd sub nom., Abdel-Karim v. EgyptAir Holding Co.*, 649 F. App'x 5 (2d Cir. 2016) (summary order) ("[A]n airline['s] duty of reasonable care ... requires the common carrier to exercise care 'which a reasonably prudent carrier of passengers would exercise under the same circumstances, in keeping with the dangers and risks known to the carrier or which it should reasonably have anticipated.' " (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998))). Plaintiff's complaint boils down to the fact that the airlines did not relieve Plaintiff of the mask-exemption requirements required of all other passengers who could not safely wear masks aboard flights. Airlines have no such duty, nor do the employees of any airline have any "duty to provide [a] plaintiff ... with a customer service system that would provide him with his relief of choice." *Farash*, 574 F. Supp. 2d at 367–68. And airlines do not have any duty to relieve Plaintiff of the mask-exemption requirements required of all other passengers simply because he had already contracted COVID-19 and thus presented less of a risk. *Cf. Gross v. Am. Airlines, Inc.*, 755 F. Supp. 89, 91 (S.D.N.Y. 1991).

### 2. Intentional Infliction of Emotional Distress

Count 29 of the Complaint alleges claims for intentional infliction of emotional distress under New York, New Jersey, California, and Texas law. Compl. ¶¶ 1242–1248. There are two separate defects with respect to Count Twenty-Nine. First, it is preempted. Second, even if not preempted, it fails to state a claim for relief.

Plaintiff's claims of intentional infliction of emotional distress in violation of "Texas, New Jersey, New York, and California

as well as many other states," are all based on Defendants' alleged "duty ... to help him circumvent a policy that would cause him the inability to travel and/or the suffering due to his disability." *Id.* ¶ 1244. Each of Texas, New Jersey, New York, and California employ similar definitions of intentional infliction of emotional distress. *See, e.g., Howell v. N.Y. Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993) ("One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." (quoting Restatement (Second) of Torts § 46)); *Buckley v. Trenton Sav. Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988) ("[T]he plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe," with the conduct being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" (quoting Restatement (Second) of Torts § 46 cmt. d (1977))); *Cochran v. Cochran*, 65 Cal. App. 4th 488 (Cal. Ct. App. 1998) (California); *Twyman v. Twyman*, 855 S.W.2d 619 (Tex. 1993) (Texas).

**\*43** Plaintiff's claim is preempted. The nub of his claim is that the conduct of the Defendants in denying him the ability to board a flight and to fly mask-free inflicted emotional distress on him. So understood, however, the claim represents simply a repackaging in different garb of his discrimination claim and it suffers the same fate. *See Smith*, 134 F.3d at 259 (holding that claim that passenger suffered intentional infliction of emotional distress when not permitted to board was preempted by ADA); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1434 (7th Cir. 1996) (same); *Chukwu v. Bd. of Dirs. Brit. Airways*, 889 F. Supp. 12, 14 (D. Mass. 1995), *aff'd sub nom., Azubuko v. Bd. of Dirs., Brit. Airways*, 101 F.3d 106 (1st Cir. 1996).

Second, and independent of the fact that the claims are preempted, Plaintiff fails to state a claim for relief. The law of all four states all appears to have come from the Restatement (Second) of Torts and require essentially the same conduct.

Under New York law, "a plaintiff claiming intentional infliction of emotional distress must plead four elements: '(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.' " *Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44, 47 (2d Cir. 2016) (summary order) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)). Under New Jersey

law, "the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley*, 544 A.2d at 863. California law, quite similar to New York law, requires a plaintiff claiming IIED to allege "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior Court*, 820 P.2d 181, 202 (Cal. 1991); *see also Hughes v. Pair*, 209 P.3d 963 (Cal. 2009). The "[c]onduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Christensen*, 820 P.2d at 202. Similarly, Texas requires a showing (1) that a defendant acted intentionally or recklessly; (2) that his conduct was extreme and outrageous; (3) his actions caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). Texas law allows recovery for IIED only "in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)); *see also id.* (damages for emotional distress recoverable "only if the factual basis for the claim is distinct from the factual basis for the discrimination claim").

Even read liberally, the Complaint does not plausibly allege a claim for IIED under any of these laws.[42] To begin with, Plaintiff fails to establish extreme and outrageous conduct by Defendants. *See, e.g., Kaye v. Trump*, 873 N.Y.S.2d 5 (1st Dep't 2009) (finding that the defendant's rude remarks, commencement of two baseless lawsuits, and attempts to frighten plaintiff by seeking to instigate her arrest, were not sufficiently outrageous); *Obendorfer v. Gitano Grp., Inc.*, 838 F. Supp. 950, 952, 955 (D.N.J. 1993) (derogatory gender-based comments made to the plaintiff, along with allegations that plaintiff's fiancé was a "cheat" and a "liar" insufficient to make out claim for IIED); *Schneider v. TRW, Inc.*, 938 F.2d 986, 92–93 (9th Cir. 1991) (applying California law and concluding that evidence that plaintiff's supervisor screamed and made threatening gestures at plaintiff while criticizing her job performance insufficient to state claim for IIED); *Vaughn v. Drennon*, 372 S.W.3d 726, 732 (Tex. App. 2012) (lack of showing of "a high degree of mental pain that is more than mere worry, vexation, embarrassment, or anger" dooms IIED claim).

**\*44**  The Airline Defendants, consistent with federal law, set policies to ensure the health and safety of passengers, and also set mask exemption policies that would have permitted Plaintiff to fly had he complied with their terms. Defendants' refusal to accept Plaintiff's three-line Doctor's Note as sufficient corroboration of disability to satisfy the policies they were legally entitled to set is neither extreme nor outrageous. Neither is requiring, for example, a negative COVID-19 test or a doctor's note with the doctor's license number included. Plaintiff offers nothing more "than conclusory allegations that [the defendants] acted with the intent to cause, or in reckless disregard of a substantial probability of causing, severe emotional distress." *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 106 (S.D.N.Y. 2020).

Plaintiff also has failed to sufficiently allege intent to cause severe emotional distress on the part of any Moving Defendants. *See Friedman*, 647 F. App'x at 47; *Buckley*, 544 A.2d at 863 ("For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress."); *Christensen*, 820 P.2d at 202; *see also Hughes*, 209 P.3d at 976 (act must be taken "with the intention of causing, or reckless disregard of the probability of causing, emotional distress"); *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999) ("[A] claim for intentional infliction of emotional distress will not lie if emotional distress is not the intended or primary consequence of the defendant's conduct." (citing *Standard Fruit & Vegetable Co.*, 985 S.W.2d at 68)). From Plaintiff's allegations, each of the Moving Defendants, seeking to comply with the Mask Mandate, simply applied their mask-exemption policies as permitted by the CDC Order, on the belief that those policies would mitigate the risk of COVID-19 spread to passengers. Plaintiff alleges that such a view was misguided and ill-informed. But he does not allege that it was adopted with the intent to cause harm to him or in reckless disregard that it would cause him severe emotional distress.

Finally, Plaintiff does not sufficiently allege that the actions of the airlines caused him severe emotional distress. Severe emotional distress is defined as emotional distress of such substantial quality or enduring quality that no reasonable person in civilized society should be expected to endure it. *See, e.g., Talmor v. Talmor*, 712 N.Y.S.2d 833, 837 (N.Y. Sup. Ct. 2000) (New York); *Buckley*, 544 A.2d at 863 (New Jersey); *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 821 (Cal. 1993) (California); *GTE Sw., Inc.*, 998 S.W.2d at 618 (Texas). Most of the harm Plaintiff alleges is

financial. *See* Compl. ¶¶ 813–814, 833, 838. When it comes to emotional injury, the most he alleges is that discrimination "can cause serious anxiety, depression, and/or mental illness," *id.* ¶ 808, that, he "was having anxiety and fear" about whether an airline would turn him away from his return flight from a foreign country for not wearing a mask, *id.* ¶ 339, and that he was "shamed publicly, and his personal information became public," *id.* ¶ 812. Plaintiff has not alleged that he sought counseling or medical treatment. *See, e.g., MVS Int'l Corp. v. Int'l Advert. Sols., LLC,* 545 S.W.3d 180, 205 (Tex. App. 2017). Plaintiff's allegations do not provide sufficient factual basis for severe emotional distress under the laws of any of the four states. *See, e.g., Shannon v. MTA Metro-North R.R.,* 704 N.Y.S.2d 208, 209 (1st Dep't 2000) (finding that the plaintiff's "detailed allegations that defendants intentionally and maliciously engaged in a pattern of harassment, intimidation, humiliation and abuse, causing him unjustified demotions, suspensions, lost pay and psychological and emotional harm over a period of years, were sufficient to support the cause of action for intentional infliction of emotional distress"); *Buckley,* 544 A.2d at 366 (claims of emotional distress based on anxiety, shame and embarrassment are insufficient); *DeAngelis v. Hill,* 847 A.2d 1261, 1272 (N.J. 2004); *Lingar v. Live-In Companions, Inc.,* 692 A.2d 61 (N.J. Super. Ct. App. Div. 1997) (where the plaintiffs claimed they were "emotionally traumatized" by the defendant's fraud, although the plaintiff was " 'acutely upset' by reason of the incident, [her] emotional distress was not 'sufficiently substantial to result in physical illness or serious psychological *sequelae*' " (quoting *Eyrich v. Dam,* 473 A.2d 539 (N.J. Super. Ct. App. Div. 1997))); *Hughes,* 209 P.3d at 976 ("Liability for intentional infliction of emotional distress 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " (quoting *Restatement (Second) of Torts,* § 46 cmt. d)); *MVS Int'l Corp.,* 545 S.W.3d at 205 ("Generally, a plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger."); *Union Pac. R.R. Co. v. Loa,* 153 S.W.3d 162, 171–72 (Tex. App. 2004) (general references to anxiety, stress, withdrawal, and depression insufficient to meet severe emotional stress threshold). [43]

### D. Contract Claims

**\*45** Plaintiff alleges in Count Thirty that four Moving Defendants—American, British Air, Delta and JetBlue—have breached their contracts with him, in violation of the laws of New York, New Jersey, California, and Texas, by forcing him to wear a mask in order to travel.

Compl. ¶¶ 1249–1270. [44] Count Thirty-One alleges that all Defendants, including all Moving Defendants, have violated the doctrine of promissory estoppel. *Id.* ¶¶ 1271–1277. In Count Thirty-Two, Plaintiff alleges that "the attorneys wrongfully interfered in Plaintiff's contracts with the airlines, both as described in the Breach of Contract cause of action and in the Estoppel cause of action." *Id.* ¶ 1280. [45]

#### 1. Breach of Contract

Plaintiff alleges that "[t]he airlines that Plaintiff purchased tickets on, breached their contract by forcing him to wear a mask, attempting to force him to wear a mask, by not allowing him to fly if he [did] not wear a mask, and/or by not accommodating his special needs." *Id.* ¶ 1251. The elements required to sustain a breach of contract claim are substantially identical in all four states. Plaintiff must show (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the agreement by the defendant; and (4) damages. *Moreno-Godoy v. Kartagener,* 7 F.4th 78, 85 (2d Cir. 2021) (New York); *Globe Motor Co. v. Igdalev,* 139 A.3d 57, 64 (N.J. 2016) (New Jersey); *Oasis W. Realty, LLC v. Goldman,* 250 P.3d 1115, 1121 (Cal. 2011) (California); *USAA Tex. Lloyds Co. v. Menchaca,* 545 S.W.3d 479, 501 n.21 (Tex. 2018) (Texas).

As an initial matter, Plaintiff's breach of contract claims are not preempted by the ADA. [46] In *Wolens,* the Supreme Court held that the ADA does not "shelter airlines from suits ... seeking recovery solely for [an] airline's alleged breach of its own, self-imposed undertakings," but only from suits alleging "violation of state-imposed obligations." 513 U.S. at 228; *see also Gen. Refining Corp. v. Fed. Exp. Corp.,* 993 F. Supp. 2d 254, 259 (E.D.N.Y. 2014). The ADA thus does not forbid a court from "affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated ... with no enlargement or enhancement based on state laws or policies external to the agreement." *Wolens,* 513 U.S. at 232–33.

Plaintiff's breach of contract claims fail for another, independent reason. Construing his Complaint liberally, Plaintiff alleges that he purchased tickets only with American, British Air, Delta, and JetBlue. Compl. ¶¶ 180, 185 (American), 297 (British Air), 338 (Delta), 439 (JetBlue). He thus does not have a breach of contract claim against any of the other Moving Defendants. *See, e.g., Kasada, Inc. v.*

*Access Cap., Inc.*, 2004 WL 2903776, at *15 (S.D.N.Y. Dec. 14, 2004). And, even as to American, British Air, Delta, and JetBlue, he does not allege a contract term that those airlines violated.

"A sufficient pleading for breach of contract must 'at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.' " *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624 (S.D.N.Y. 2013) (quoting *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)). A plaintiff must " 'plead the provisions of the contract upon which the claim is based'—in other words, 'a complaint in a breach of contract action must set forth the terms of the agreement upon which liability is predicated.' " *Anders v. Verizon Commc'ns*, 2018 WL 2727883, at *8–9 (S.D.N.Y. June 5, 2018) (quoting *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993)); *see Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *6 (S.D.N.Y. Apr. 23, 2021), *on reconsideration*, 2021 WL 2075481 (S.D.N.Y. May 24, 2021). Plaintiff alleges that "[t]he airlines that Plaintiff purchased tickets on, breached their contract by forcing him to wear a mask, attempting to force him to wear a mask, by not allowing him to fly if he does not wear a mask, and/or by not accommodating his special needs." Compl. ¶ 1251. But he does not allege any contract terms he had with any airline that required the airline to permit him to fly without wearing a mask. Plaintiff's Complaint therefore fails to state a claim for breach of contract.

### 2. Tortious Interference

**\*46** Plaintiff's claims for tortious interference with contract (Count Thirty-Two) and promissory estoppel (Count Thirty-One) fail for similar reasons. Plaintiff alleges that "Defendants ... and the attorneys wrongfully interfered in Plaintiff's contracts with the airlines both as described in the Breach of Contract cause of action, and in the Estoppel cause of action." Compl. ¶ 1280.

Plaintiff's tortious interference claims under all four state laws are preempted under the ADA. Although claims for breach of contract seek merely to hold airlines to their self-imposed undertakings and therefore are not preempted, claims for tortious interference seek to hold a third-party to standards of care imposed by the state and therefore are preempted. The nub of Plaintiff's complaint is that the airlines and those associated with them interfered with Plaintiff's ability

to contract and fly with the airlines by the statements they made about their masking and health policies. But the ADA was enacted specifically to avoid a patchwork of *de facto* regulation of airlines' statements regarding their policies—which directly affect their services—like the ones Plaintiff attacks here. *See, e.g., Ginsberg*, 572 U.S. at 285–86; *Mitchell v. U.S. Airways*, 858 F. Supp. 2d 137, 155–57 (D. Mass. 2012). Accordingly, courts across the country have found tortious interference claims preempted under the ADA. *See, e.g., Brown v. United Airlines, Inc.*, 720 F.3d 60, 71 (1st Cir. 2013), *cert. denied*, 572 U.S. 1046 (2014); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Sup. 2d 239, 253–54 (S.D.N.Y. 2004); *Continental Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 572 (E.D. Va. 2000); *Wine & Spirits Wholesalers of Mass., Inc. v. Net Contents, Inc.*, 10 F. Supp. 2d 84, 87 (D. Mass. 1998); *Virgin Atl. Airways, Ltd. v. Brit. Airways, PLC*, 872 F. Supp. 52, 66–67 (S.D.N.Y. 1994); *Cont'l Airlines, Inc. v. Am. Airlines, Inc.*, 824 F. Supp. 689, 693–95, 713 (S.D. Tex. 1993) (dismissing as preempted plaintiffs' state-law claims for unfair competition and tortious interference with business relations and noting that "if state-law claims such as those advanced by [plaintiffs] were not preempted, airlines would have to be wary lest their activities relating to setting rates, determining routes, and providing services run afoul of any number of state laws, even though their activities fully complied with both the ADA and federal antitrust laws").

Plaintiff's tortious interference claim also fails on the merits. Under the law of all four states that Plaintiff invokes, a plaintiff must plead the existence of a valid contract between the plaintiff and a third party and the intentional procurement of a breach of that contract or interference with performance of the contract, among other elements, to establish a claim for tortious interference. *See, e.g., Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1375–76 (N.Y. 1996) (New York); *Fid. Eatontown, LLC v. Excellency Enter., LLC*, 2017 WL 2691417, at *6 (D.N.J. June 22, 2017) (New Jersey); *Reeves v. Hanlon*, 95 P.3d 513, 517 (Cal. 2004) (California); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (Texas).

Other than the few exceptions mentioned above, Plaintiff does not allege that he had any contract with any of the airlines. And, without exception, he does not allege facts to support that any airline breached a contract or that the lawyers he names in the Complaint interfered in any way with those contracts. He thus does not have a claim for tortious interference with contract. [47]

### 3. Promissory Estoppel

**\*47** Finally, Plaintiff fails to state a claim for promissory estoppel under the laws of any of the four states. Plaintiff alleges that all the "listed" Defendants are liable to him in promissory estoppel because they alleged "in their advertisements, on their websites, in their brochures and statements ... that they are decent people, that they will treat those with disabilities and/or special needs with care," Compl. ¶ 1273, but that they "violated that promise horribly, and mistreated this Plaintiff, causing injuries and damages," *id.* ¶ 1274.

Moving Defendants argue that Plaintiff fails to state a claim for relief because (1) the claim is preempted; and (2) Plaintiff fails to state the elements of a claim for promissory estoppel. Dkt. No. 122 at 36–37; Dkt. No. 180 at 22–26; Dkt. No. 199 at 12–13.

In all four states under which the Court evaluates Plaintiff's claim, promissory estoppel exists only in the absence of a binding contract. *See, e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987); *Goldfarb v. Solimine*, 245 A.3d 570, 577–78 (N.J. 2021); *Kajima/Ray Wilson v. L.A. Metro. Transp. Auth.*, 1 P.3d 63 (Cal. 2000); *Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App. 2007); *see also Annabi v. N.Y. Univ.*, 2023 WL 6393422, at \*11 (S.D.N.Y. Sept. 29, 2023) ("Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." (quoting *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2009))). Plaintiff thus can only assert a promissory estoppel claim against those airlines with whom he did not have an express contract, and Plaintiff's promissory estoppel claim fails as to the airlines with whom he alleges he had a contract because under the laws of all four states, a party may not recover under a promissory estoppel theory if an enforceable contract covers the same subject matter. *See, e.g.*, *Goldberg*, 88 F.4th at 214; *Segal v. Lynch*, 48 A.3d 328, 342 (N.J. 2012); *Drennan v. Star Paving Co.*, 333 P.2d 757 (Cal. 1958); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212 (Tex. 2002). [48]

As to the airlines with which Plaintiff did not have an express contract, the Court finds that Plaintiff's promissory estoppel claim is not preempted. A claim for promissory estoppel, which, here, differs from the breach of contract claim only insofar as it permits collection on reliance interests based on a clear and unambiguous promise rather than an agreement, *see Drummond v. Akselrad*, 2023 WL 3173780, at \*6–8 (S.D.N.Y. May 1, 2023), "furnishes a ground for enforcing a promise made by a private party, rather than for implementing a state's regulatory policies," and thus is "not preempted," *ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 884 (7th Cir. 2011).

**\*48** To state a claim under the equitable doctrine of promissory estoppel under the laws of all four states, a plaintiff must plead a clear and unambiguous or definite promise and detrimental or substantial reliance, as well as injury resulting from the reliance. *See, e.g.*, *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000) (New York); *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 944 A.2d 1 (N.J. 2008) (New Jersey); *Advanced Choices, Inc. v. State Dep't of Health Servs.*, 182 Cal. App. 4th 1661, 1672 (Cal. Ct. App. 2010) (California); *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983) (Texas). "[P]romissory estoppel [turns] upon the clarity and definitiveness of its promise and change in the plaintiff's position as a result of that promise." *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 2023 WL 4211035, at \*12 (S.D.N.Y. June 27, 2023). "A promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel." *Kilgore v. Ocwen Loan Serv., LLC*, 89 F. Supp. 3d 526, 534 (E.D.N.Y. 2015) (quoting *Bd. of Trs. ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, 2012 WL 3930112, at \*6 (S.D.N.Y. Sept. 10, 2012)); *Joseph Martin, Jr., Delicatessen v. Schumacher*, 417 N.E.2d 541 (N.Y. 1981); *see also Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.*, 704 A.2d 1321, 1325 (N.J. Super. Ct. App. Div. 1998); *Garcia v. World Savings, FSB*, 183 Cal. App. 4th 1031, 1045 (Cal. Ct. App. 2010); *2001 Trinity Fund, LLC v. Carrizo Oil & Gas, Inc.*, 393 S.W.3d 442, 458 (Tex. App. 2012).

On the merits, Plaintiff's promissory estoppel claim fails as to the airlines with which he had no contract because he does not allege a clear, unambiguous, or definite promise, much less one that he would be able to fly maskless upon presentation of his Doctor's Note, or detrimental reliance. He identifies statements that certain airlines would offer to make the trip "a comfortable and enjoyable experience" for customers with disabilities, Dkt. No. 194 at 36, stated that the "well-being" of customers with special needs was their "priority," *id.*, that they provided "care and assistance to our passengers with disabilities," *id.* at 37, and were "committed to making flights as easy as possible for our customers traveling with disabilities," *id.* at 38. These statements fall far short of a

Case 2:22-cv-02383-SSS-AS   Document 229-1   Filed 04/12/24   Page 41 of 56   Page ID
#:5230
AARON ABADI Plaintiff, V. AMERICAN AIRLINES, INC., et al., Slip Copy (2024)

promise, let alone a clear one, that the airlines would permit a passenger to travel without a mask or would violate the Mask Mandate. *See, e.g.*, *Dombrowski v. Somers*, 362 N.E.2d 257, 258 (N.Y. 1977) (promise to "take care of" plaintiff too vague to spell out a meaningful promise); *see also Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 570 (Tex. App. 1989) (promise to improve quality of patient care too vague to support promissory estoppel claim). Nor does Plaintiff allege he acted upon the basis of such vague promises. [49]

### E. Injurious Falsehoods Claim

In Count Thirty-Three, Plaintiff alleges that all of the defendants "maliciously made false statements recklessly and without regard to their consequences." Compl. ¶ 1287. The offending statements that Plaintiff identifies include statements that "[m]asks will protect you from Covid 19," "[p]eople with disabilities who cannot wear a mask pose a direct threat to the passengers and crew," "Covid 19 is an extremely dangerous disease," and "[d]isability laws do not require you to accommodate a disabled person who cannot wear a mask." *Id.* ¶¶ 1288–1293. Moving Defendants argue that Plaintiff's claim is preempted by the ADA and fails to state the elements of a claim for injurious falsehood. Dkt. No. 122 at 37; Dkt. No. 180 at 22–27; Dkt. No. 199 at 13.

**\*49** With minor variations, New York, New Jersey, and California appear to have adopted the definition of injurious falsehood from the Restatement. In New York, the tort of injurious falsehood "consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Kasada*, 2004 WL 2903776, at \*15 (quoting *Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C.*, 523 N.Y.S.2d 875, 877 (2d Dep't 1988)) (internal citation marks omitted). Under New Jersey law, an "injurious falsehood" is "any false statement that causes pecuniary loss." *Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C.*, 160 A.3d 44, 75 (N.J. Super. Ct. App. Div. 2017) (citing Restatement (Second) of Torts § 623A). "[I]t is enough that the false statement 'disparage[s] the plaintiff's title to his property, or its quality or the character or conduct of plaintiff's business.' " *Id.* (quoting Restatement (Second) of Torts § 151 cmt. a); *see also Sys. Ops., Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1138 n.6 (3d Cir. 1977). Under California law, "[o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for

publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." *Hartford Cas. Ins. Co. v. Swift Dist., Inc.*, 326 P.3d 253, 260 (Cal. 2014) (quoting Restatement (Second) of Torts § 623(a)).

Texas has adopted a slightly different understanding. *See, e.g.*, *Hurlburt v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). Under Texas law, "the tort of 'injurious falsehood' is known by the name of 'business disparagement.' " *Van Duzer v. U.S. Bank Nat'l Ass'n*, 995 F. Supp. 2d 673, 694 (S.D. Tex. 2014). "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

In each of the four states, the claim fails for numerous reasons. Plaintiff fails to identify specific false statements made by specific defendants. *See Kasada*, 2004 WL 2903776, at \*15. He does not identify any statements that impugn the "condition, value or quality of [his] product or property." *LoanStreet, Inc. v. Troia*, 2022 WL 3544170, at \*8 (S.D.N.Y. Aug. 17, 2022) (quoting *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989)). He does not plead special damages. *Id.* at \*8 (New York); *Patel v. Soriano*, 848 A.2d 803, 835 (N.J. Super. Ct. App. Div. 2004) (New Jersey); *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1035 (Cal. Ct. App. 2002) (California); *Hurlbut*, 749 S.W.2d at 767 (Texas). He also does not identify any statements that any Moving Defendant made about him specifically to any third party.

### F. Invasion of Privacy Claim

Plaintiff alleges in Count Thirty-Four "[a]ll the Defendants either directly or with their guidance and help caused Plaintiff to be forced to disclose his medical condition and describe in detail his disabilities in order to possibly get an opportunity to fly with them" in violation of the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution and the constitutions "of the various states where these violations happened, including the Constitution of California." Compl. ¶¶ 1296–1309. Plaintiff's federal constitutional claim regarding the right to privacy is not preempted, but his privacy claims arising under state law are, and thus fail on that basis. And both the federal and the state

law claims independently fail because they do not state a claim upon which relief may be granted.

Plaintiff's federal privacy claims fail as a matter of law because Plaintiff cannot establish that any of the Moving Defendants violated the First, Third, Fourth, Fifth, Ninth or Fourteenth Amendments to the United States Constitution because those amendments apply only to state actors. *See, e.g.*, *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 613–14 (1989). As discussed above in connection with Plaintiff's Section 1983 claim *supra*, none of the Moving Defendants are state actors.

**\*50** To the extent that Plaintiff seeks to invoke state constitutional, statutory or common law, Plaintiff's claims are preempted by the ADA. At bottom, Plaintiff seeks through the tort of invasion of privacy to prevent a private commercial airline from requesting medical information before granting an exemption to a passenger from otherwise generally applicable rules designed to ensure the safety of each of its passengers on flights operated by the airlines. In that sense, the claim directly relates to the airline's services and is thus preempted by the ADA. Plaintiff's claims would affect airline service directly by preventing the Moving Defendants from making the inquiries necessary for the services they provide and pursuant to their duty to protect other passengers. Nor were Defendants' requests for medical information outrageous or beyond the scope of normal aircraft operations. *See Pica v. Delta Air Lines, Inc.*, 812 F. App'x 591, 593 (9th Cir. 2020) (holding that claim against airline for failure to protect personal information in violation of California Civil Code § 1798.82 was preempted by the ADA); *In re Am. Airlines, Inc., Priv. Litig.*, 370 F. Supp. 2d 552, 563 (N.D. Tex. 2005). "Airline agents often ask questions of passengers who present themselves for check-in and make ticketing and seating decisions as part of the boarding process, and these activities are 'services' within the meaning of the ADA." *Elnajjar v. Nw. Airlines, Inc.*, 2005 WL 1949545, at \*5 (S.D. Tex. Aug. 15, 2005) (holding invasion of privacy claim to be preempted); *see also Andreakadis*, 2022 WL 2674194 at \*12 (holding that invasion of privacy claim based on airline's requirement that plaintiff submit proof of a required medical exemption was preempted by the ADA and did not constitute "outrageous conduct"); *Marcus*, 2023 WL 3044614, at \*11 (finding that invasion of privacy claim based on airlines' requests "for medical information to determine whether passengers were eligible for an exemption" to the Mask Mandate was "a state law claim regarding Airline

Defendants' concerns of safety and their implementation" of the Mask Mandate and thus "preempted by the ADA").

Plaintiff's state constitutional privacy claims also fail to state a claim. Plaintiff has not stated a claim under the constitutions of New York, New Jersey, or Texas, if for no other reason the privacy provisions of those constitutions bind only state actors. *See SHAD All. v. Smith Haven Mall*, 488 N.E. 1211, 1217 (N.Y. 1985) (New York); *In re J.A.*, 186 A.3d 266 (N.J. 2018) (New Jersey); *City of Sherman v. Henry*, 928 S.W.2d 464, 468 (Tex. 1996) (Texas); *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 530 (Tex. 2008) (Texas); *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 91, 93 (Tex. 1997) (Texas). [50] Because Plaintiff does not allege any facts that could support a finding that Moving Defendants performed as state actors, Plaintiff's claim fails under the laws of New York, New Jersey, and Texas.

California, on the other hand, extends its privacy protections to the actions of private entities in addition to the government. "The California Constitution guarantees to individuals the right of 'privacy,' " but this right "is not absolute." *Grafilo v. Wolfsohn*, 33 Cal. App. 5th 1024, 1034 (Cal. Ct. App. 2019) (quoting Cal. Const. art. I, § 1). Plaintiff has not alleged facts that could give rise to a violation of this provision. In *Hill v. National Collegiate Athletic Ass'n*, 865 P.2d 633 (Cal. 1994), the California Supreme Court set forth a framework for analyzing constitutional invasion of privacy claims. An actionable claim requires three essential elements: (1) the claimant must have a legally protected privacy interest; (2) the claimant's expectation of privacy must be objectively reasonable; and (3) the invasion of privacy complained of must be serious in both its nature and scope. *Id.* at 654–55. "If the claimant establishes all three required elements, the strength of that privacy interest is balanced against countervailing interests," *County of Los Angeles v. L.A. Cnty. Emp. Relations Comm'n*, 301 P.2d 1102, 1115 (Cal. 2013); *Grafilo*, 33 Cal. App. 5th at 1034 (requires "balancing the privacy interest at stake and the seriousness of the threatened invasion with the strength of legitimate and important countervailing interests"). Plaintiff has a legally recognized privacy interest "in precluding the dissemination or misuse of sensitive and confidential information." *Hill*, 865 P.2d at 654. But his claim fails to satisfy the second element—the reasonable expectation of privacy, a factor "not independent of the circumstances." *Id.* at 655. "[O]pportunities to consent voluntarily to activities impacting privacy interests obviously affects the expectations of the participant." *Id.* Thus, in the instances in which Plaintiff voluntarily disclosed his

medical condition to airlines without being prompted for the information, Plaintiff did not have a reasonable expectation of privacy. *See, e.g., Pioneer Elecs. (USA), Inc. v. Superior Court*, 150 P.3d 198, 205 (Cal. 2007) ("[I]t seems unlikely that [individuals], having already voluntarily disclosed their identifying information ... in the hopes of obtaining some sort of relief[ ] would have a reasonable expectation that such information would be kept private."). And to the extent that Plaintiff was prompted for any medical information by Defendants, he had "advance notice" of any medical disclosure request, which the California Supreme Court has recognized "may serve to 'limit an intrusion upon personal dignity and security.' " *Hill*, 865 P.2d at 655 (quoting *Ingersoll v. Palmer*, 743 P.2d 1299 (Cal. 1987)). And the requests for medical information were often little more than what Plaintiff voluntarily disclosed in his Doctor's Note. *See, e.g.*, Dkt. No. 3-19 (American's mask-exemption policy requiring only a signed letter from a licensed medical provider on official letterhead attesting to the passenger's disability and describing why it renders the passenger unable to wear a mask). Moreover, "customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy." *Hill*, 865 P.2d at 655. Plaintiff was aware of the Mask Mandate, and was aware that airlines were permitted by federal regulation to formulate policies for mask exemptions for individuals with disabilities, thus Plaintiff was well aware that he would likely be required to provide proof of his disability that satisfied the airlines' policies. *Cf. Whalen v. Roe*, 429 U.S. 589, 602 (1977) (reporting of drug prescriptions to government was supported by established law and "not meaningfully distinguishable from a host of other unpleasant intrusions of privacy that are associated with many facets of health care"); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 114 (3d Cir. 1987) (no invasion of privacy in requirement that applicants for special police unit disclose medical information in part because of applicant awareness that such disclosure "has historically been required by those in similar positions"). Accordingly, Plaintiff's privacy claim under the California Constitution fails as a matter of law.

**\*51** To the extent that Plaintiff attempts to invoke state statutes or common law, those claims also fail. Although the Plaintiff does not identify the specific state laws he alleges to have been violated, the Complaint is most naturally read to refer to the definition of invasion of privacy as an intrusion upon seclusion set forth in Section 652 of the Restatement (Second) of Torts which has been adopted by California, New Jersey, and Texas. *See, e.g., Miller v. Nat'l Broad. Co.*,

187 Cal. App. 3d 1463, 1482, (Cal. Ct. App. 1986); *Bisbee v. John C. Conover Agency, Inc.*, 452 A.2d 689, 691 (N.J. Super. Ct. App. Div. 1982) (New Jersey); *Doe v. Mobile Video Tapes, Inc.*, 43 S.W.3d 40, 48 (Tex. App. 2001) (Texas); *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 253 (Tex. App. 1993), *writ denied* (Mar. 23, 1994); *Gill v. Snow*, 644 S.W.2d 222, 224 (Tex. App. 1982), *abrogated by Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex. 1994). The Restatement provides that:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652. As the Restatement explains, this form of invasion of privacy "consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." *Id.* § 652B cmt. a.[51] The thrust of this aspect of the tort is, in other words, that a person's private, personal affairs should not be pried into. *See, e.g.*, William L. Prosser, Law of Torts § 117 (4th ed. 1971). The converse of this principle is, however, of course, that there is no wrong where the defendant did not actually delve into plaintiff's concerns, or where plaintiff's activities are already public or known.[52] *Bisbee*, 452 A.2d at 691.

Plaintiff's claims thus fail. Plaintiff does not allege that any of the defendants improperly delved into his privacy. Each of the airlines sued here had policies that required all passengers to wear masks pursuant to the CDC Order. As noted here, Plaintiff sought an exemption from those policies and, in connection with that request for an exemption, proffered a letter from a doctor. In many instances, from the allegations of the Complaint, Plaintiff sent the airlines his Doctor's Note even before he was asked for any medical documentation. Courts in each state have found that the plaintiff had no reasonable expectation of privacy where the plaintiff voluntarily disclosed the information at issue. *See, e.g., Bisbee*, 452 A.2d at 691 (New Jersey); *Fazio v.*

*Temporary Excellence, Inc.*, 2012 WL 300634 (N.J. Super. Ct. App. Div. Feb. 2, 2012) (New Jersey); *Sanchez-Scott v. Alza Pharms.*, 86 Cal. App. 4th 365, 376–77 (Cal. Ct. App. 2001) (California); *Roberts v. CareFlite*, 2012 WL 4662962, at *5 (Tex. App. Oct. 4, 2012) (Texas) (public comments that could be viewed by third parties do not give rise to intrusion upon seclusion claim). To the extent that Defendants affirmatively requested Plaintiff's medical information, Plaintiff's claim still fails as such a request would not be highly offensive to any reasonable person, because Plaintiff was aware of the mask mandate and airlines' prerogative to set mask-exemption policies for the disabled and because those policies —designed to ensure that individuals who could mask would mask—were reasonable in light of the global pandemic and federal regulations applicable at the time. *See, e.g.*, *Zarnow v. Clinics of N. Tex.*, 2007 WL 2460360, at *10–11 (Tex. App. Aug. 31, 2007) (where plaintiff knew of reasonable company policy, no cognizable invasion of privacy claim).

### G. Fraudulent Misrepresentation Claim

**\*52** Count Thirty-Six [53] alleges fraudulent misrepresentation by the Airline Defendants, "with the help and coordination of the other Defendants." Compl. ¶¶ 1319–1328. Plaintiff alleges that the Airline Defendants lied "about the truth of the masks," *id.* ¶ 1326, and have misleadingly omitted "the dozens of health risks of covering our sources of oxygen and that the scientific consensus is that masks are totally worthless in reducing COVID-19 spread," *id.* ¶ 1323.

Whether understood as a fraud claim or a fraudulent concealment claim, the claim is both preempted and fails on the merits.

### 1. Fraud

Fraud, of course, requires at least (1) false statement of a material or important fact; (2) made with scienter or intent; (3) reliance; and (4) injury. *See, e.g.*, *Small v. Lorillard Tobacco Co., Inc.*, 720 N.E.2d 892, 898 (N.Y. 1999) (New York); *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521 (N.J. 1981) (New Jersey); *Perlas v. GMAC Mortg., LLC*, 187 Cal. App. 4th 429, 434 (Cal. Ct. App. 2010) (California); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (Texas). [54]

This claim is squarely preempted by the ADA, as the Supreme Court's *Wolens* decision makes clear. *Marcus,*

2023 WL 3044614, at *11; *see Seklecki*, 635 F. Supp. 3d at 24 (fraudulent representation claim is preempted); *Andreakadis*, 2022 WL 2674194 at *12 (same). The *Wolens* Court considered the ADA's preemptive effect on a law concerning "unfair or deceptive acts or practices, including but not limited to the use of employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact." 513 U.S. at 227. The Court proceeded to conclude that the law at issue was prescriptive, "serv[ing] as a means to guide and police the marketing practices of the airlines ... not simply give effect to bargains offered by the airlines and accepted by airline customers," and thus was preempted by the ADA. *Id.* at 228. The Court thus has little difficulty concluding that the ADA likewise preempts Plaintiff's fraud claims here. [55]

Plaintiff's fraud claim also fails to state a claim for relief. Plaintiff does identify which Defendant made which statement. He also does not allege any facts to support that any of the Defendants made any of the challenged statements knowing it was false or with reckless disregard as to its truth. Indeed, Plaintiff's Complaint is most naturally read to allege that each of the Moving Defendants had a basis for the challenged statements: the findings and orders issued by the federal government. Plaintiff also never alleges that he relied upon the Defendants' alleged misrepresentations. In fact, the correspondence with many Airline Defendants appended to his Complaint reveals that he did not rely on the airlines' representations that mask-wearing would protect him from the virus, that COVID-19 was dangerous, or that the airlines were not required by law to accommodate individuals with disabilities who could not wear masks. *See, e.g.*, Dkt. No. 3-18. [56]

### 2. Fraudulent Concealment

**\*53** To the extent that Plaintiff intends to plead fraudulent concealment, that claim is also preempted and also fails to state a claim under the laws of any of the four relevant states. As noted above, Plaintiff's claim is, by simple extension from *Wolens*, preempted by the ADA.

In New York, New Jersey, and California, to state a claim for fraudulent concealment, a plaintiff must plead all the elements of fraud and additional elements. *See, e.g.*, *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (1st Dep't 2003) (New York); *Rosenblit v. Zimmerman*, 766 A.2d 749, 757 (N.J. 2001) (New Jersey); *Boschma v. Home Loan*

*Ctr., Inc.*, 198 Cal. Ap. 4th 230, 248 (Cal. Ct. App. 2011) (California). Therefore, by virtue of failing to state a claim for fraud, Plaintiff also fails to state a claim for fraudulent concealment. Plaintiff here also fails to establish the requisite additional element required by New York, New Jersey, and California law: that the defendant owed to the plaintiff a duty to disclose. *See, e.g., Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011) (New York); *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 725 A.2d 1133, 1139 (N.J. Super. Ct. App. Div. 1998) (New Jersey); *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1186 (Cal. Ct. App. 2014).[57]

In Texas, fraudulent concealment does not exist as an independent tort, but rather is an affirmative defense to statutes of limitations. *See, e.g., BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011); *see also Shah v. Moss*, 67 S.W.3d 836, 845–46 (Tex. 2001); *Advent Tr. Co. v. Hyder*, 12 S.W.3d 534, 542 (Tex. App. 1999). In order to prevail on a claim of fraudulent concealment, a plaintiff must plead (1) an underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception. *See, e.g., Earle v. Ratliff*, 998 S.W.2d 882, 888 (Tex. 1999); *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983). Because Plaintiff's other tort claims fail, he fails to state a claim for fraudulent concealment.

### H. Constitutional Right to Travel Claim

**\*54** Finally, in Count 37, Plaintiff alleges that the airline defendants infringed on his "constitutional right to travel" by depriving him of the ability to fly and by "banning disabled travelers who can't wear face masks and should be exempt from such policies." Compl. ¶¶ 1329–1348.[58] The claim is meritless.

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Guest*, 383 U.S. at 768; *see also Saenz*, 526 U.S. at 498 ("[T]he 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence" (quoting *Guest*, 383 U.S. at 757)); *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 901 (1986). The right "embraces at least three different components": (1) "the right of a citizen of one State to enter and to leave another State"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right

to be treated like other citizens of that State." *Saenz*, 526 U.S. at 500; *see Town of Southold v. Town of East Hampton*, 477 F.3d 38, 53 (2d Cir. 2007). "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses 'any classification which serves to penalize the exercise of that right.' " *Soto-Lopez*, 476 U.S. at 903 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 340 (1972)); *Town of Southold*, 477 F.2d at 53; *Owner Operator Indep. Drivers Ass'n, Inc. v. Pa. Tpk. Comm'n*, 934 F.3d 283, 295 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 959 (2020).

The right to freedom of travel, however, is primarily a right against the State and against governmental action. "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro*, 394 U.S. at 629; *see United States v. Davis*, 482 F.2d 893, 913 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955 (9th Cir. 2007) (discussing right to travel "without unreasonable governmental restriction").[59] And, while the Supreme Court has held that the right protects against private interference "in at least some contexts," *Bray*, 506 U.S. at 274, those contexts are limited and do not apply here where, as discussed *supra*, the predominant purpose of the challenged policies was not to impede or prevent travel. The United States Constitution simply does not confer a free-floating right on all citizens to compel a private airline, who is not a state actor, to transport him within a State or from one State to another. Plaintiff's right to travel claim thus fails for the identical reasons that his Section 1983 and Section 1985(3) claims, discussed earlier in this Opinion, fail. He does not allege that any of the Moving Defendants is a state actor or the existence of a private conspiracy intended to deprive him of the right to travel.

**\*55** Plaintiff's claim would fail even if the Moving Defendants were state actors. The mask mandates of each of the Moving Defendants do not actually deter travel from one State to another or within a State. The mask mandate of each airline did not prevent Plaintiff from traveling on another airline. Even the mask policies of all the airlines did not prevent Plaintiff from other modes of transport. The mask mandates simply required Plaintiff either to wear a mask or otherwise to comply with the policies of the airlines. *See Andreadakis*, 2022 WL 2674194, at \*13 (plaintiff's constitutional right to travel was not denied because he could

"still travel by means other than aircraft" and "may travel by aircraft without a mask by obtaining an exemption"); *Wall v. Ctrs. for Disease Control & Prevention*, 543 F. Supp. 3d 1290, 1292 (M.D. Fla. 2021) ("[F]lying may be Plaintiff's preferred mode of transportation, but it is by no means the *only* reasonable mode of transportation available to him."). "[T]ravelers do not have a constitutional right to the most convenient form of travel[, and] minor restrictions on travel simply do not amount to the denial of a fundamental right." *Town of Southold*, 477 F.3d at 54 (quoting *Town of Southold v. Town of E. Hampton*, 406 F. Supp. 2d 227, 242 (E.D.N.Y. 2005)); *see also Urbina v. City of New York*, 672 F. App'x 52, 55 (2d Cir. 2016) (summary order) (same); *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 258 (2d Cir. 2013) (same). "A law does not 'actually deter' travel merely because it makes it somewhat less attractive for a person to travel interstate." *Pollack v. Duff*, 793 F.3d 34, 46 (D.C. Cir. 2015); *see Frey v. Pekoske*, 2021 WL 1565380, at *12 n.7 (S.D.N.Y. Apr. 21, 2021) (claim that airline security screenings burden the right to travel borders on frivolous because if plaintiff did not want to subject themselves to screenings, they could have traveled from Florida to New York by car or train). Plaintiff makes no plausible allegation that the Moving Defendants—commercial airlines that profit from the business of transporting passengers—adopted their policies to deter travel. The "purpose" of the mask mandates "was not to impede travel but to protect the welfare" of all of the passengers on Moving Defendants' flights. *See Town of Southold*, 477 F.2d at 54; *see also Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 141 (2d Cir. 2010). Finally, the policies do not use classifications that "penalize" the exercise of the right to travel. *Town of Southold*, 477 F.2d at 54. They apply in an "evenhanded" way to all persons regardless of geography or length of stay in a particular location. *Id.*

## CONCLUSION [60]

For the foregoing reasons, the motions to dismiss are GRANTED. The Clerk of Court is respectfully directed to close Dkt. Nos. 121, 179, and 197.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 1346437

---

## Footnotes

1      Although Plaintiff alleges that Spirit Airlines is incorporated in Delaware and headquartered in Florida, Compl. ¶ 39, because Spirit joins the motion to dismiss of several foreign airlines, the Court includes Spirit when it refers the motion to dismiss by the Foreign Defendants for ease of reference.

2      On February 29, 2024, Plaintiff moved to drop his claims against one airline, FAST Colombia S.A.S. doing business as Viva Air Colombia, due to the airline's bankruptcy proceedings. Dkt. No. 335. The Court granted Plaintiff's request and dismissed Plaintiff's claims against that airline. Dkt. No. 336.

3      The Court dismissed Plaintiff's claims against President Biden as barred by absolute immunity. *See* Dkt. No. 17.

4      "Pratique" refers to the official permission granted by authorities to allow a ship to have dealings with a port, given after a showing of a clean bill of health, or, otherwise, a period of quarantine. *See, e.g., Pan Cargo Shipping Corp. v. United States*, 234 F. Supp. 623, 629 (S.D.N.Y. 1964), *aff'd*, 373 F.2d 525 (2d Cir. 1967); *see also Am. S.S. Owners Mut. Prot. & Indem. Ass'n Inc. v. Lafarge N. Am., Inc.*, 2008 WL 449353, at *4 n.2 (S.D.N.Y. Sept. 29, 2008).

5      Although Plaintiff does not append the DOT Enforcement Notice to his Complaint because Plaintiff's allegations are based on the purported unlawfulness of the Airline Defendants' mask-exemption policies, and many of the communications between Plaintiff and the Airline Defendants appended to the Complaint expressly reference the DOT Enforcement Notice as giving them the power to fashion mask-exemption

Case 2:22-cv-02383-SSS-AS   Document 229-1   Filed 04/12/24   Page 47 of 56   Page ID
#:5236
AARON ABADI, Plaintiff, v. AMERICAN AIRLINES, INC., et al.,..., Slip Copy (2024)

policies, the Court deems that the DOT Enforcement Notice is incorporated into the Complaint by reference and thus properly considered on a motion to dismiss. *See, e.g.,* *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016),

6   Plaintiff frequently uses the Airlines Letter as proof that "[t]here was no safety concern for the airline[s]," *see, e.g.,* Compl. ¶ 1260, but this muddles the timeline of events giving rise to this litigation. When the government promulgated the Mask Mandate, in January 2021, airlines followed it. It was not until more than one year later —March 2022—that the executives of some airlines advocated for termination of the Mask Mandate, when vaccines were widely available and infection rates were down. In any case, nowhere in the Airlines Letter does it state that the virus posed no safety concern—rather, the rationale the signatories provided was that the risk of transmission was substantially lower than it had been earlier in the pandemic.

7   On a motion to dismiss, the Court may consider "matters of which judicial notice may be taken, such as legislative facts, and adjudicative facts, such as publicly filed decisions of this and other courts." *J.L. v. E. Suffolk Boces*, 113 F. Supp. 3d 634, 645 (E.D.N.Y. 2015) (internal citations and quotation marks omitted); *see also* *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

8   The DOT Investigation Summary Sheet associated with the incident and attached to the Complaint states the travel date as January 27, 2021. Dkt. No. 3-16. The difference is immaterial to this motion.

9   Although Plaintiff's Complaint alleges that Avianca "ignor[ed] [his] emails ... for about a month" by failing to respond until "on or about October 3, *2021*," Compl. ¶ 238 (emphasis added), Avianca's letter response appended to the Complaint reflects that it was sent on October 3, 2022, Dkt. No. 3-31. It is well established that "[w]hile the Court must accept the facts as alleged in the complaint, 'when any allegations contradict the evidence contained in the documents ..., the documents control.' " *Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) (quoting *Rozsa v. May David Grp., Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002), *aff'd sub nom., Rozsa v. SG Cowen Sec. Corp.*, 165 F. App'x 892 (2d Cir. 2006) (summary order)); *see Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 402 (S.D.N.Y. 2020); *see also* *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 314 (S.D.N.Y. 2008) (explaining that a court is under no obligation "to reconcile [a *pro se*] plaintiff's own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint").

10   In his Complaint, Plaintiff states that British Air emailed him and approved his request to fly without a mask, and that the email indicated that he did not need clearance. Compl. ¶¶ 295–296. The correspondence that Plaintiff appended to the Complaint as an exhibit reflects otherwise, and, as noted, *supra* note 9, controls.

11   Plaintiff's claims against Stat-MD's agent, the Center for Emergency Medicine of Western Pennsylvania, Inc., Compl. ¶ 53, are not addressed in this Opinion.

12   Although Plaintiff has included in his Complaint claims against Spirit's outside counsel, Miguel Morel, Compl. ¶ 50, Morel did not join the Foreign Defendants' motion to dismiss with Spirit and has filed his own motion to dismiss, Dkt. No. 261, which the Court does not address in this Opinion.

13   Plaintiff's Complaint alleges that he initially wrote to TAP on September 3, 2021, but Plaintiff's email correspondence with TAP appended to the Complaint and incorporated by reference therein reflect that Plaintiff emailed TAP on September 2, 2021. Dkt. No. 3-75 at 1. As noted *supra* note 9, the official documentation controls.

14   And, "for the little traveling that he did do," Plaintiff "was forced to ... [spend] thousands of dollars more," a total loss amounting in over $10,000. Compl. ¶ 809.

15     Plaintiff appends to his Complaint an unsigned, unsworn affidavit by the Chief Operating Officer ("COO") of his company, Dkt. No. 3-85, which Plaintiff says "attests to the losses that NEG projects sustained due to [his] inability to travel," Compl. ¶ 823. Even if the Court were to consider this affidavit, *see, e.g.*, *Meimaris v. Royce*, 2018 WL 9960113, at *2 (S.D.N.Y. Nov. 5, 2018) (stating that "[t]he Court cannot rely on the contents of an unsigned and unsworn affidavit" and collecting cases to that effect), the COO's affidavit does not state that Plaintiff lost out on billions of dollars due to Defendants' conduct. The COO merely avers that while the Mask Mandate was in effect, Plaintiff entered into a contract with a member of the royal family of the United Arab Emirates ("UAE") to provide gas-fired turbine generators, but the other party reneged on the deal and Plaintiff was unable to save it because he could not fly to the UAE to speak with the individual in person. Dkt. No. 3-85 ¶¶ 5, 8–9. The COO states that Middle Eastern royalty is generally distrustful of video conferencing technology, and thus Plaintiff had to travel to the UAE in person, *id.* ¶ 10; if he had, the COO "is very confident" that "the outcome would be very different" and the deal could have been completed as agreed, *id.* ¶¶ 9, 11. Plaintiff sued for breach of contract in federal court in Connecticut and received a judgment in the amount of $140 million. *Id.* ¶ 14. The COO also avers that the owners of other companies that Plaintiff had contracted with also reneged on their contractual obligations when they did not "see [Plaintiff] in Saudi Arabia in person," and Plaintiff seeks to sue those individuals for breach of contract as well. *Id.* ¶¶ 15, 17.

16     In many instances, Plaintiff does not specify which Defendants he asserts various claims against. The Court construes the Complaint broadly to allege discrimination by all Defendants unless otherwise pled, but in this Opinion only addresses the validity of each claim as to the Moving Defendants.

17     It is clear that the conduct of each of the Moving Defendants does not fall within the reach of all four states whose law Plaintiff invokes. Nor is it clear which state law would address the conduct of which of the Moving Defendants. In this Opinion, for purposes of simplicity, and because Plaintiff's claims against each Moving Defendant fail under the law of all four states, the Court assumes without deciding that the law of each of the four states applies to each Moving Defendant. However, the Court has not concluded that the conduct of any of the Moving Defendants can be reached by the law of any particular state.

18     In their opening motion to dismiss, Domestic Defendants did not address Plaintiff's Section 1983 claims. They instead filed another motion to dismiss and accompanying memorandum of law specifically seeking dismissal of the 1983 claims on November 28, 2023. Dkt. No. 197. Plaintiff filed his response on December 24, 2023. Dkt. No. 240.

19     Silver argues that the Complaint should be dismissed for failure to follow the requirement of Federal Rule of Civil Procedure 8(a)(2) that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, *see* Fed.R.Civ.P. 12(f), or to dismiss the complaint. Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *Harnage v. Lightner*, 916 F.3d 138, 141 (2d Cir. 2019); *Collins v. Pearson Educ., Inc.*, 2024 WL 895316, at *5 (S.D.N.Y. Mar. 1, 2024). If the court dismisses a complaint under Rule 8, "it should generally give the plaintiff leave to amend." *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995). The length of Plaintiff's complaint is, in part, a function of the number of defendants he has sued. 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1217 (4th ed.) ("[I]n the context of a multiparty, multiclaim complaint each claim should be stated as succinctly and plainly as possible even though the entire pleading may prove to be long and complicated by virtue of the number of parties and claims."). The complaint here is not so confused, ambiguous, vague or unintelligible to require dismissal.

20     Domestic Defendants halfheartedly argue that Plaintiff lacks standing to bring their claims against him, *see* Dkt. No. 122 at 41–43, and that the claims are moot, *id.* at 43–46. Foreign Defendants do not share this

Case 2:22-cv-02383-SSS-AS   Document 229-1   Filed 04/12/24   Page 49 of 56   Page ID
#:5238
AARON ABADI, Plaintiff, v. AMERICAN AIRLINES, INC., et al.,..., Slip Copy (2024)

view. *See* Dkt. No. 180. To establish standing, a plaintiff must allege (1) an injury in fact that is actual or imminent, not conjectural or hypothetical; (2) that is fairly traceable to the conduct of the defendant; and (3) that is likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice" to establish standing. *Id.* Plaintiff here has alleged sufficient facts against at least some of the Moving Defendants to establish standing by claiming (1) that he was denied access to their flights, *see, e.g.*, Compl. ¶¶ 180–85, 343, 493, 660; (2) that he suffered injuries that were actual and fairly traceable to the conduct of the airlines, *e.g.*, *id.* ¶ 442 (alleging pain and suffering from flight on JetBlue); *id.* ¶ 662 (alleging that he needed to fly on United for his business but was denied access); and (3) that he suffered injury in the form of increased travel spending for alternate travel and lost business opportunities, *id.* ¶¶ 809, 814, that can be remediated by an award of money damages. Moreover, the allegations against each of the Moving Defendants are nearly identical. Accordingly, at this stage, the Court is seized with jurisdiction and need not make an individualized review as to whether, with respect to each of the Moving Defendants, Plaintiff has made sufficient allegations of standing. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (only one petitioner needs to have standing for court to have Article III jurisdiction); *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *Kachalsky v. County of Westchester*, 701 F.3d 81, 84 n.2 (2d Cir. 2012), *cert. denied*, 569 U.S. 918 (2013), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (holding that where "at least one plaintiff has standing, jurisdiction is secure and we can adjudicate the case whether the additional plaintiff has standing or not" and declining to address issue of whether an additional defendant was a proper party to the case). Because Plaintiff has asserted a claim for damages, including nominal damages, his claims against the Moving Defendants are not moot. *See, e.g.*, *Van Wie v. Pataki*, 267 F.3d 109, 115 n.4 (2d Cir. 2001) (noting that a claim for damages, even nominal in nature, prevents a case from becoming moot even if the allegedly unlawful conduct has ceased); *see also Marin v. Town of Southeast*, 136 F. Supp. 3d 548, 562–63 (S.D.N.Y. 2015).

21      Plaintiff has brought numerous actions challenging mask mandates and other COVID-19-related restrictions under federal and state disability law. These claims have almost uniformly been rejected. *See, e.g.*, *Abadi v. New York*, 2022 WL 347632 (S.D.N.Y. Feb. 4, 2022), *aff'd sub nom., Abadi v. City of New York*, 2023 WL 3295949 (2d Cir. May 8, 2023) (summary order), *cert. denied*, 144 S. Ct. 260 (2023) (denying Plaintiff injunctive relief enjoining enforcement of some of New York City's COVID-19-related restrictions, including the requirement that individuals be vaccinated against the virus to enter indoor dining, entertainment, recreation, and fitness venues, and the requirement that employees of the City and City contractors be vaccinated or take weekly COVID-19 tests); *Abadi v. Target Corp.*, 2023 WL 4045373, at *1 (3d Cir. June 16, 2023) (per curiam), *cert. denied*, 144 S. Ct. 235 (2023) (rejecting Plaintiff's federal claims of discrimination on the basis of disability against Target and unnamed Target employees on the basis of the store's mask policy for lack of subject matter jurisdiction and failure to state a claim); *Abadi v. Target Corp.*, 2023 WL 6796558 (E.D. Pa. Oct. 13, 2023) (dismissing Plaintiff's state law claim against Target for lack of jurisdiction and failure to state a claim); *Abadi v. Walmart, Inc.*, 2022 WL 9822322 (D. Me. Oct. 17, 2022), *report and recommendation adopted*, 2022 WL 16552955 (D. Me. Oct. 31, 2022), *aff'd*, *see* CM-ECF 22-cv-00228-GZS, Dkt. No. 17 (D. Me. Sept. 29, 2023) (dismissing Plaintiff's claims of disability discrimination due to masking requirement under the Americans with Disabilities Act, Rehabilitation Act, Supremacy Clause, 42 U.S.C. §§ 1983, 1985, 1986, and state law for failure to state a claim); *Abadi v. Quick Check Corp.*, 2023 WL 3983879 (D.N.J. June 13, 2023) (denying Plaintiff's motion for leave to amend his complaint alleging disability discrimination claims under the Americans with Disabilities Act and the Rehabilitation Act complaint to (1) name as defendants seven individuals employed by the convenience store, which the district court denied; and (2) to bring a state law discrimination claim against the convenience store, which the court granted); *see also* CM-ECF 3:21-cv-20272-MAS-RLS, Dkt. No. 44 (D.N.J. Jan. 4, 2024), *appealed to Third Circuit*, CM-ECF 3:21-cv-20272-

MAS-RLS, Dkt. No. 46 (D.N.J. Jan. 26, 2024) (denying Plaintiff's motion for reconsideration of the court's decision on his motion to amend).

Plaintiff also brought challenges to DOT decisions regarding his allegations of disability discrimination against various airlines in two different circuit courts, but was rejected in both, with the Supreme Court again declining to grant certiorari in both actions. *See In re Abadi*, 2022 WL 2541249, at *1 (D.C. Cir. Apr. 14, 2022) (per curiam), *cert. denied sub nom. Abadi v. Dep't of Transp.*, 143 S. Ct. 220 (2022) (denying Plaintiff's appeal of DOT's order); *Abadi v. Dep't of Transp.*, 2021 WL 7500325, at *1 (2d Cir. Dec. 29, 2021), *cert. denied*, 142 S. Ct. 1694 (2022) (same).

22    As noted, Counts One through Six allege claims against the Federal Defendants, and thus are not addressed in this Opinion.

23    In many instances, Plaintiff does not specify which Defendants he asserts various claims against. The Court construes the Complaint broadly to allege discrimination by all Defendants unless otherwise pled, but in this Opinion only addresses the merits as to the Moving Defendants.

24    Indeed, Plaintiff alleges that the DOT on occasion found that the Moving Defendants had violated federal law in their application of the Mask Mandate to him. *See, e.g.*, Compl. ¶¶ 155, 182, 215. Those allegations undermine, rather than support, any claim of state compulsion.

25    Over sixty years ago, in *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), the Supreme Court fashioned a "symbiotic relationship" test—a concept "closely related to the [entwinement] concept," *Forbes v. City of New York*, 2008 WL 3539936, at *7 (Aug. 12, 2008), but slightly broader—to determine whether a private entity acted under color of law. In *Burton*, the Supreme Court considered whether the state "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." 365 U.S. at 725. "Thus, in contrast to the nexus inquiry, this avenue of approach ousts the challenged conduct from center stage and concentrates instead on the nature of the overall relationship between the State and the private entity." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 21 (1st Cir. 1999). Under the symbiotic relationship test, courts considered the extent to which the private entity was independent in the conduct of its day-to-day affairs and whether the state knowingly shared in the profits accrued from complained of conduct of the private entities. To the extent this test remains good law, and even applicable here, *see, e.g.*, *Island Online, Inc. v. Network Sols., Inc.*, 119 F. Supp. 2d 289, 306–07 (E.D.N.Y. 2000) (noting that the symbiotic relationship test is "limited to cases involving leases of public property" and "cases where the State benefits financially from a private entity's discriminatory conduct"), the allegations fail that test as well. The airlines are independent in conducting their day-to-day affairs, and Plaintiff does not plead otherwise. Nor did the state knowingly share in any profits accrued from the allegedly discriminatory conduct—a key element to finding a symbiotic relationship. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 843 (1982); *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079 (2d Cir. 1990). Plaintiff does not allege that the government, or, for that matter, the Moving Defendants, financially profited at all from the discrimination. *See, e.g.*, *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 494 (1st Cir. 1996) (finding no symbiotic relationship where the plaintiff failed "to link the alleged [legal violation] to some financial gain to the government"). In fact, Plaintiff himself indicates that the airlines lost money by allegedly discriminating against individuals with disabilities and not permitting them to fly. For example, Plaintiff did not book flights with several airlines, including SIA, *see* Dkt. No. 3-69 at 1–2, and TAP Air, *see* Dkt. No. 3-75 at 2, 5–7, because he was awaiting a determination as to whether he could fly maskless.

26    Plaintiff alleges that he "experience multiple situations during Covid-19, where the flight attendants barked commands, expecting Plaintiff to follow orders, or else." Compl. ¶ 930. That conclusory allegation does not

support a claim that the airlines acted with the power of the state and, in doing so, deprived Plaintiff of his constitutional rights.

27    The Court recognizes that the United States District Court for the District of Massachusetts reached a contrary conclusion. *See Seklecki v. Ctr. for Disease Control & Prevention*, 635 F. Supp. 3d 15, 22 (D. Mass. 2022).

28    This is not to say that Plaintiff has asserted a well-founded claim for infringement of his right to travel. As discussed below, *see infra*, the right to interstate travel is not "virtually unqualified," rather it is subject to "reasonable government regulation." *Aptheker v. Sec'y of State*, 378 U.S. 500, 508 (1964).

29    The Seventh Circuit's decision in *D'Amato v. Wis. Gas Co.*, 760 F.2d 1474 (7th Cir. 1985), is not to the contrary. There, the Seventh Circuit affirmed the dismissal of Plaintiff's claim that the defendants had violated Section 1985(3) by terminating his employment on the basis of his disability. In part, the court reasoned that allowing the plaintiff to pursue his claim for employment discrimination "through the mechanism of Section 1985(3) would impermissibly intrude on the statutory scheme of both [the Rehabilitation Act] and 1985(3)." *Id.* at 1487. But, as the court observed, "the right to employment that [the plaintiff] claims did not exist prior to the enactment of Section 503." *Id.* Thus, as with Title VII, the right did not exist independent of the remedial regime Congress created to enforce it.

30    The Court notes that the medical community no longer uses the term "mentally retarded." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499 (Aug. 1, 2013). By quoting the Second Circuit, the Court does not mean to endorse the continued use of this language.

31    The only allegation of concerted action made by Plaintiff is that in March 2022, certain of the airlines agreed amongst themselves, through an organization named Airlines for America, to urge the federal government to drop the Mask Mandate. *See generally* Airlines Letter. But that some of the airlines agreed amongst themselves that the Mask Mandate should be relaxed—which would serve their economic interests—hardly suggests that all of the airlines agreed to discriminate against persons with disabilities a year earlier.

32    After *Keating*, the Second Circuit held that "[t]he essential allegations of a § 1985(2) claim of *witness* intimidation are (1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation, or threat from attending court or testifying freely in any *pending* matter, which (3) results in injury to the plaintiff." *Chahal v. Paine Webber Inc.*, 725 F.2d 20, 23 (2d Cir. 1984) (emphasis added).

33    Contrary to Plaintiff's contention, the circuit courts did not hold that they could not "require the DOT to enforce the ACAA laws," Compl. ¶ 1036, they stated that the ACAA does not require DOT to enforce the law in the way that Plaintiff has decided is proper. *See, e.g., In re Abadi*, 2022 WL 2541249, at *1 ("A claim under the Administrative Procedure Act for [an agency's] failure to act 'can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004))).

34    Plaintiff relies heavily on these contracts to make his Rehabilitation Act claims, and quotes selectively from the contracts, *see* Compl. ¶ 1149, but does not append the complete, executed contracts to his Complaint. However, the Court finds that these public documents are incorporated by reference into the Complaint because the Complaint makes "a clear, definite and substantial reference to the documents." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003); *see also Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436 (S.D.N.Y. 2022).

35    Federal common law directs courts, in interpreting federal government contracts, to look to "general principles of contract law," *Dobson v. Hartford Fin. Servs. Grp., Inc.*, 389 F.3d 386, 399 (2d Cir. 2004), and, with respect to whether a third-party beneficiary may sue to enforce a contract, "look[ ] to the same considerations as does

the Restatement of Contracts," *Grand Manor Health Related Facility*, 941 F. Supp. 2d at 418 (quoting *Rivera v. Bank of Am. Home Loans*, 2011 WL 1533474, at *4 (E.D.N.Y. Apr. 21, 2011)).

36    Neither Plaintiff nor the Moving Defendants argue that the Court should decline supplemental jurisdiction over Plaintiff's state claims and the Court declines to do so. All of Plaintiff's claims arise out of "a common nucleus of operative fact." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)); *see Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000) (noting that supplemental jurisdiction does not exist "when the federal and state claims rest[ ] on essentially unrelated facts"). Plaintiff's remaining claims do not raise novel or complex issues, nor do they predominate over his federal claims. The only basis for declining jurisdiction is that the Court is dismissing Plaintiff's federal claims. But, in that instance, the Second Circuit instructs that "a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated [by the Supreme Court]: economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004). Here, the Court and the parties have invested substantial time on the state law claims. In addition, the claims raise issues of preemption and "federal courts are particularly appropriate bodies for the application of preemption principles." *United Mine Workers v. Gibbs*, 338 U.S. 692, 729 (1950). It would disserve judicial economy for the Court not to address them.

37    Plaintiff also asserts two federal causes of action against Moving Defendants and others: (1) violation of his constitutional right to privacy, *see* Count Thirty-Four, Compl. ¶¶ 1296–1309; and (2) violation of his constitutional right to travel, *see* Count Thirty-Seven, Compl. ¶¶ 1329–1348, each of which the Court addresses in turn. Plaintiff also asserts two claims against Defendants whose motions to dismiss the Court does not undertake to address in this Opinion: a state-law medical malpractice claim, *see* Count Thirty-Five, Compl. ¶¶ 1310–1318, and violation of the non-delegation doctrine through the President's Executive Order, *see* Count Thirty-Eight, Compl. ¶¶ 1349–1363, neither of which are addressed in this Opinion.

38    As the Supreme Court has noted, prior to deregulation, the Civil Aeronautics Board "set rates, routes, and services through a cumbersome administrative process of applications and approvals." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232 (1995).

39    Although Plaintiff does not allege that the airplanes are places of public accommodation, he provides the definition of "public accommodation" under New Jersey law—"[a] place of public accommodation shall include ... any public conveyance operated on land or water or in the air," Compl. ¶ 1176 (quoting N.J. Stat. Ann. § 10:5-5), and the Court thus construes this allegation to state that the Airline Defendants constitute public accommodations under New Jersey law.

40    Even courts that have taken a narrower view of the meaning of "services" under the ADA have squarely held that it refers to "the provision of air transportation to and from various markets at various times." *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1266 (9th Cir. 1998) (en banc).

41    Plaintiff's Count Twenty-Seven alleges "[i]ntentional and/or unintentional Tort[s] in Texas, New York, New Jersey, California and/or other states." Compl. ¶ 1228. The only wrong he alleges in support of that claim, however, is that the airlines "caused torts" against him "by not allowing him to travel and by mistreating him as described above." *Id.* ¶ 1230. The allegation appears to be a catch-all, intended to capture those torts suggested by his allegations but not specifically pled by him. So understood, Count Twenty-Seven does nothing more than what the Court would do on its own initiative with a *pro se* litigant—construe the Complaint to raise the strongest claims that it supports. To the extent that Plaintiff contends that state common law compels the airlines to provide services to him notwithstanding their mask policies, his claims are preempted

for the reasons discussed herein. Because, even construing Plaintiff's claims broadly, none of them state a claim for relief, Count Twenty-Seven is dismissed as well.

42   Plaintiff's intentional infliction of emotional distress claims are also time-barred under New York's one-year statute of limitations for such claims. *See* N.Y. C.P.L.R. § 215 Commentary. Courts in the Second Circuit differ as to when such claims accrue—either at the time of the activity causing the distress or at the time of the last "actionable act." *Berlin*, 436 F. Supp. 3d at 566 n.11 (collecting cases). On the view most favorable to the Plaintiff, the latest an actionable act could have occurred is April 16, 2022, the date that the Florida district court vacated the CDC Mask Mandate. *See, e.g.*, *Marcus*, 2020 WL 3044614, at *2 ("The CDC stopped enforcing the [Mask Mandate] on April 18, 2022."). As noted above, Plaintiff did not file his action until over a year later, in May 2023.

43   Although Plaintiff does not expressly assert negligent infliction of emotional distress ("NIED"), to the extent he intended to do so, that claim fails both as preempted and as a matter of law. In New York, a claim for negligent infliction of emotional distress "must generally be premised upon a breach of a duty owed directly to the plaintiff which either unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or her own safety." *E.B. v. Liberation Publ'ns, Inc.*, 777 N.Y.S.2d 133, 135 (2d Dep't 2004). Plaintiff never alleges that any of the Defendants conduct implicated his physical safety, thus any NIED claim would fail under New York law. In New Jersey, NIED "can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." *Decker v. Princeton Packet*, 561 A.2d 1122 (N.J. 1989). Because Plaintiff fails to allege the requisite duty and the requisite severe emotional distress, an NIED claim would fail under New Jersey law. *Innes v. Marzano-Lesnevich*, 87 A.3d 775 (N.J. Super. Ct. App. Div. 2014), *aff'd*, 136 A.3d 108 (N.J. 2016); *Schillaci v. First Fid. Bank*, 709 A.2d 1375, 1380 (N.J. Super. Ct. App. Div. 1998). Under California law, the "negligent causing of emotional distress is not an independent tort," rather, the tort of negligence and its traditional elements apply. *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 770 P.2d 278, 281 (Cal. 1989). As noted above, Plaintiff fails to state a negligence claim under California law. Finally, Texas does not recognize a cause of action for negligent infliction of emotional distress, *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993), absent a cognizable legal duty, *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 543–44 (Tex. 2018). Because, as discussed *infra*, Plaintiff cannot allege a legally cognizable duty as to Moving Defendants, any NIED claim would fail under Texas law as well.

44   This claim is also asserted against El Al. Compl. ¶ 1253.

45   Count Thirty-Two, for tortious interference, also is asserted against HHS, CDC, and NIH. Compl. ¶ 1280.

46   The Domestic Defendants do not argue that the ACAA preempts breach of contract claims.

47   To the extent that no actual contract is alleged, all four relevant states recognize a claim for tortious interference with prospective economic relations, *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir.), *cert. denied*, 568 U.S. 1068 (2012) (New York); *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989) (per curiam) (New Jersey); *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (California); *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (Texas). But Plaintiff cannot state a claim for this tort either because he does not allege facts that any defendant acted "solely out of malice" or through dishonest, unfair, or improper means, *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004), that any conduct was wrongful by some measure beyond the fact of the interference itself, *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170–71 (N.J. 2001); *see Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 574 (Cal. 2020), or was "independently tortious" so that it "would violate some other recognized tort duty," *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001).

48    In addition to tortious interference with contract and tortious interference with prospective business relations, California recognizes negligent interference with prospective economic advantage as well. But that tort too—which "imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition," *Settimo Assocs. v. Environ Sys., Inc.*, 14 Cal. App. 4th 842, 845 (Cal. Ct. App. 1993)—fails on Plaintiff's allegations. "When negligent, yet disruptive, acts allegedly interfere with an economic relationship, the acts are deemed tortious only where there was an existing duty of care owed by the defendant to the plaintiff." *Golden Eagle Land Inv., L.P. v. Rancho Santa Fe Ass'n*, 19 Cal. App. 5th 399, 430 (Cal. Ct. App. 2018). "[A]mong the criteria for establishing a duty of care is the blameworthiness of the defendant's conduct." *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1187 (Cal. Ct. App. 1998) (internal quotation marks omitted). Plaintiff has not alleged that any of the Moving Defendants owed him an existing duty of care, nor can any of the facts he pleads support such an allegation. *See, e.g.*, *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 349 (Cal. Ct. App. 1997).

49    Indeed, it appears that with respect to virtually all, if not all, of the airlines Plaintiff was informed early and unambiguously that he would have to comply with their mask policies in order to fly on their planes.

50    "While the Texas Constitution contains no express guarantee of a right of privacy, it contains several provisions similar to those in the United States Constitution that have been recognized as implicitly creating 'zones of privacy.' " *Tex. State Emps. Union v. Tex. Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987).

51    New York does not recognize a common law right of privacy. *See Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publ'g.*, 727 N.E.2d 549 (N.Y. 2000); *Porco v. Lifetime Ent. Servs., LLC*, 150 N.Y.S.3d 380, 383 (3d Dep't 2021); *Ratermann v. Pierre Fabre USA, Inc.*, 651 F. Supp. 3d 657, 668 (S.D.N.Y. 2023). The statutory right of privacy which pertains to the use of a name, portrait or picture for advertising or trade purposes, *see* N.Y. Civil Rights Law §§ 50, 51, would not apply here, because Plaintiff does not allege that Defendants used his likeness for either advertising or trade purposes, *see, e.g.*, *Beverley v. Choices Women's Med. Ctr., Inc.*, 587 N.E.2d 275, 278 (N.Y. 1991) ("A name, portrait or picture is used 'for advertising purposes' if it appears in a publication which, taken in its entirety, was distributed for use in, or as part of, an advertisement or solicitation for patronage of a particular product or service."); *Kane v. Orange Cnty. Publ'ns.*, 649 N.Y.S.2d 23, 25 (2d Dep't 1996) (explaining that a name, portrait or picture is used for "trade purposes" if it "involves use which would draw trade to the firm").

52    At least some Texas courts have limited the tort to physical invasion of property or eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying. *See, e.g.*, *Clayton v. Wisener*, 190 S.W.3d 685, 696 (Tex. App. 2005). On this understanding of intrusion upon seclusion, Plaintiff fails to allege the facts necessary to state a claim.

53    As mentioned *supra* note 37, Count Thirty-Five alleged medical malpractice only against STAT-MD and MedAire, Compl. ¶¶ 1310–1318, and thus the Court does not address it here.

54    In at least New York and California, fraud claims must be pleaded with particularity. *See, e.g.*, *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009); *Robinson Helicopter Co., Inc v. Dana Corp.*, 102 P.3d 268, 276 (Cal. 2004). Plaintiff's claim would fail in those two states on that basis as well.

55    Texas courts have found that, where a plaintiff's "misrepresentation and fraud claims ... [we]re premised on [the airline's ticketing] and boarding procedures," they were directly related to airline "services," and thus preempted by the ADA. *See, e.g.*, *Delta Air Lines v. Black*, 116 S.W.3d 745, 756 (Tex. 2003). In that case, the tort claims were based on an airline's denial of a first-class seat to a passenger on an overbooked flight,

Case 2:22-cv-02383-SSS-AS   Document 229-1   Filed 04/12/24   Page 55 of 56   Page ID
#:5244
AARON ABADI, Plaintiff, v. AMERICAN AIRLINES, INC., et al.,..., Slip Copy (2024)

a far more attenuated link to ticketing and boarding than Plaintiff's claim here. *Id.*; *see also Henson v. Sw. Airlines Co.*, 180 S.W.3d 841, 845–46 (Tex. App. 2005).

56    To the extent Plaintiff intends to plead a negligent misrepresentation claim, that too fails. To state a claim for that tort under New York law, a plaintiff must show: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000); *see Sykes v. RFD Third Ave. 1 Assocs., LLC*, 938 N.E.2d 325 (N.Y. 2010). The elements under New Jersey, California, and Texas law are similar. *See, e.g.*, *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000) (New Jersey); *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (California); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1992) (Texas). Plaintiff fails to state a claim under any of the state law tests for negligent misrepresentation because he fails to allege that Moving Defendants owed him a duty to give correct information, *see, e.g.*, *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 84 (N.Y. 2011) (finding dismissal of claim warranted where plaintiff failed to allege facts showing a special relationship, defined as a relationship in which "persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified" (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996))); *see also Petrillo v. Bachenberg*, 655 A.2d 1354, 1357 (N.J. 1995); *Biakanja v. Irving*, 320 P.2d 16, 18 (Cal. 1958), or that Plaintiff relied on such representations to his detriment, *see, e.g.*, *Meyercord v. Curry*, 832 N.Y.S.2d 29, 30–31 (1st Dep't 2007); *Kaufman*, 754 A.2d at 1195; *Bily v. Arthur Young & Co.*, 834 P.2d 370, 408–10 (Cal. 1992); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018).

57    Although Plaintiff does not expressly bring a claim arising out of the civil conspiracy laws of any state, he does generally plead "[i]ntentional and/or unintentional [t]ort in Texas, New York, New Jersey, California and/or other states." Compl. ¶ 1228. The Court, in keeping with its obligation to construe the Complaint liberally, thus reads civil conspiracy into Plaintiff's Complaint. But such a claim fails, because each of New York, New Jersey, California, and Texas does not recognize civil conspiracy as an independent tort, and thus a cause of action alleging conspiracy to commit a tort stands or falls with a sufficiently-stated underlying tort. *See, e.g.*, *Mamoon v. Dot Net Inc.*, 25 N.Y.S.3d 85, 88 (1st Dep't 2016) (New York); *Bd. of Educ. of City of Asbury Park v. Hoek*, 183 A.2d 633, 646 (N.J. 1962) (New Jersey); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 480 (Cal. 1994) (California); *Agar Corp., Inc. v. Electro Circs. Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (Texas). Because Plaintiff fails to state a claim for any other tort, he also does not state a claim for civil conspiracy.

58    Count 38, alleging violation of the non-delegation doctrine, is pleaded only against the federal defendants. Compl. ¶¶ 1349–1363.

59    "Unlike the right of interstate travel, which is 'virtually unqualified,' the freedom to travel internationally is far from absolute, and has been described as "no more than an aspect of liberty protected by the Due Process Clause.' " *Karpova v. Snow*, 402 F. Supp. 2d 459, 472 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 262 (2d Cir. 2007) (quoting *Haig v. Agee*, 453 U.S. 280, 306 (1981)). That right is only violated as a substantive matter when the government has engaged in "conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority," *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999), which is not alleged here. Moreover, Plaintiff "does not possess a fundamental right to travel *by airplane*" specifically. *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023) (quoting *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006)).

60    Defendant Roberts, the British Air Airport Manager at Washington Dulles Airport and the Baltimore International Airport, also challenge this Court's personal jurisdiction. Dkt. No. 180. Ordinarily, the Court would have addressed those Defendants' personal jurisdiction arguments before reaching the merits. *See, e.g., Sinochem Int'l Co. Ltd. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). However, "[i]n cases involving 'multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action,' " the Second Circuit "ha[s] proceeded directly to the merits of a motion to dismiss." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013) (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir.), *cert. denied*, 568 U.S. 958 (2012)). Here, the other Moving Defendants do not challenge personal jurisdiction and the Court therefore considers such defense to be waived or forfeited as to them. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011) (holding that "a district court should not raise personal jurisdiction *sua sponte* when a defendant has appeared and consented, voluntarily or not, to the jurisdiction of the court" (quoting *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010))). Since the Court has concluded that Plaintiff fails to state a claim against each Moving Defendant—including Roberts—the Court "decline[s] to address the personal jurisdiction claim[ ]" that he makes. *Naranjo*, 667 F.3d at 246 n.17; *see also LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 574 n.8 (S.D.N.Y.), *aff'd*, 922 F.3d136 (2d Cir. 2019); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.